# **Exhibit 40**

**Document Produced in Native Format**

CONFIDENTIAL

THREE_ARROWS_00322564

# **Exhibit 41**

**Document Produced in Native Format**

CONFIDENTIAL

THREE_ARROWS_00322565

# Exhibit 42



Neutral Citation Number: [2013] EWHC 347 (Ch)

Case No: HC10C03729

**IN THE HIGH COURT OF JUSTICE**
**CHANCERY DIVISION**

Royal Courts of Justice
Strand, London, WC2A 2LL

Date: 25/02/2013

Before :

**THE HONOURABLE MR JUSTICE HILDYARD**

- - - - - - - - - - - - - - - - - - - -

Between :

| | |
|---|---|
| **MRS ADELLE CHALLINOR and 20 OTHERS** | **Claimant** |
| and - | |
| **JULIET BELLIS & CO** | **Defendant and Part 20 Claimant** |
| - and - | |
| **MR GEOFFREY EGAN** | **Second Defendant and Part 20 Defendant** |

- - - - - - - - - - - - - - - - - - - -

**Andrew Sutcliffe QC, Adam Kramer** (instructed by **Hewlett Swanson LLP**) for the **Claimant**
**Ian Croxford QC, Clare Stanley** (instructed by **Clyde & Co LLP**) for the **First Defendant**
**Francis Bacon** (instructed by **Messrs Reynolds Porter Chamberlain**) for the **Second Defendant**

Hearing dates: 9-10, 11, 14-18, 21-25, 28-30 May 2012, 13 -15. 18 June 2012
- - - - - - - - - - - - - - - - - - - -

# Approved Judgment

I direct that pursuant to CPR PD 39A para 6.1 no official shorthand note shall be taken of this Judgment and that copies of this version as handed down may be treated as authentic.

.............................

THE HON. MR JUSTICE HILDYARD

| TABLE OF CONTENTS |
|---|

**Table of Contents**

The parties: the Main Claim and the Part 20 Claim ................................................................ 6

    The Claimants ............................................................................................................ 6

    The Defendant Firm .................................................................................................... 6

    Gist of Main Claim ..................................................................................................... 6

    Gist of Part 20 Claim .................................................................................................. 7

    Gist of claim against Mr Egan in Main Claim ............................................................. 7

    Questions in issue ....................................................................................................... 8

Summary of the nature and basis of the Claims ..................................................................... 9

    (1)     Claimants‟ primary case in the Main Claim ..................................................... 9

    (2)     Claimants‟ secondary case in the Main Claim ................................................... 9

    (3)     Alternative remedies for the Claimants in the Main Claim .............................. 10

    (4)     Claimants‟ contingent claim against Mr Egan in the Main Claim .................... 10

    (5)     The Defendant Firm‟s Part 20 claim against Mr Egan ..................................... 11

The Albermarle investors and previous Albermarle schemes ............................................... 11

    Characteristics of previous Albermarle schemes ...................................................... 11

    Relevance of previous Albermarle schemes in informing Claimants‟ approach ............... 14

Changes in Albermarle pattern  after acquisition of Egan Lawson by Erinaceous ................ 17

    Egan Lawson becomes ECS and part of the Erinaceous Group ................................. 17

    Erinaceous Group‟s developing financial difficulties ............................................... 17

    Mrs Bellis takes over the role of solicitor ................................................................. 19

    Mrs Bellis‟s perception of her role .......................................................................... 19

Mrs Bellis and her other family interests ............................................................................ 19

Albermarle Fairoaks scheme and the facts in more detail ................................................... 21

    The underlying investment: Fairoaks airport land ..................................................... 21

    Purchase and funding of the Fairoaks land ............................................................... 22

    SDLT changes and Erinaceous difficulties bring further complication ...................... 22

Chronological sequence of background events ..................................................................... 23

    Development of the structure .................................................................................... 23

    Mr Egan‟s agreed funding terms .............................................................................. 25

    Arrangements for ownership and control of SPV ...................................................... 26

    Mr Cummings becomes beneficial owner of AFL ..................................................... 27

The Engagement Letter ................................................................................................28

The "initial teaser" .....................................................................................................29

Proposal for a loan note ...............................................................................................29

Revised Teaser and the Teaser email ...........................................................................30

Draft Loan Notes are provided and sent out..................................................................31

PwC advise right of conversion not feasible ...................................................................32

Payments start into the client account ..........................................................................33

Payments out of client account to RBS ........................................................................34

Delay and uncertainty continues ..................................................................................35

RBS Equity Bridge repayments ...................................................................................39

Investors become aware of their treatment as unsecured subordinated lenders ................40

Mrs Bellis" contemporaneous Memorandum in December 2007 .....................................41

Events in 2008: the investors call for the return of their monies......................................43

Denouement ...............................................................................................................43

Issues ...............................................................................................................................44

Scope and nature of the evidence: gaps in disclosure ....................................................47

Scope and nature of evidence ......................................................................................48

Are the "offering documents" part of the admissible factual matrix? ..............................51

Witnesses ........................................................................................................................52

Observations as to the witnesses .................................................................................54

(1)      Nature of the "investment" solicited ................................................................56

(a)      The evidence given on the Claimants" subjective point of view as to the nature of the investment
56

(b)      Mr Egan"s point of view as to the nature of the investment ................................60

(c)      Mrs Bellis" point of view as to the nature of the investment ................................63

(2)(a)   Was Mrs Bellis aware of the terms of the "offering documents" and did she know they had been sent
to the investors?.............................................................................................................67

(3)      What did the parties understand to be the role of the Defendant Firm? ...............73

(a)      Investors" understanding as to the role of Mrs Bellis ..........................................73

(b)      Mr Egan"s understanding as to the role of Mrs Bellis ..........................................73

(4)      Requirement for investors to make payments into client account ........................76

(a) The investors" understanding of reasons for use of client account ..............................76

(iii) Mr Egan"s perception as to reason for use of client account ....................................77

(iii)    Mrs Bellis" perception as to reasons for use of client account ..............................................79

(5)    What did parties perceive to be required to authorize payments out of client account? Were such requirements satisfied?..............................................................................................................82

(a) Claimants" understanding ...........................................................................................82

(b)    Mr Egan"s understanding as to what authority was required for payments out ....................84

(c)    Mrs Bellis" understanding on the issue of authority........................................................86

(6)    Were there any other factors operating on Mrs Bellis in making payments out of client account? 88

(7)    The alleged conversation between Mrs Bellis and Mr Wallis ................................................89

(8)    What went wrong: the aftermath ....................................................................................95

THE MAIN CLAIM: ESCROW/QUISTCLOSE TRUST ....................................................................97

Issue 1: was a contractual relationship established between the Claimants and the Defendant Firm? ...97

Was there any express escrow agreement made between the Claimants and the Defendant Firm? ...98

Was there any implied escrow agreement between them? ..................................................................98

Contracting parties and the engagement to be demonstrated ..........................................................98

Was there an intention to create legal relations between the Claimants and the Defendant Firm? ....99

Can terms of sufficient certainty to establish a valid contract be implied or inferred? ...................104

Answer no different if "offering documents" taken into account...................................................105

Did the Claimants have different subjective intentions? ................................................................107

Should a form of Quistclose trust be implied?........................................................................................107

Nature of a Quistclose trust ........................................................................................................107

Application in this case ...............................................................................................................111

Breach of trust in making payments to RBS ................................................................................117

If necessary to show breach of fiduciary duty or that Mrs Bellis"s conscience affected ................118

CLAIMANTS" ALTERNATIVE CASE: the Defendant Firm had no authority to receive funds raised 120

Engagement Letter as alleged source of authority.......................................................................125

Had Mr Cummings authority to bind AFL to the Engagement Letter? ...........................................125

When did he become beneficial owner of the shares in AFL? .......................................................125

Can a sole beneficial owner of shares informally bind a company? ...............................................129

Consequences if no authority to borrow and/or receive monies....................................................130

Alternative contention: ratification ............................................................................................132

The need to establish "conscious awareness"..............................................................................135

FURTHER ALTERNATIVE CLAIM IN RESTITUTION..............................................................136

REMEDIES/LOSSES ............................................................................................................. 139

CLAIMANTS" CLAIM AGAINST MR EGAN ................................................................... 143

(1)      Were representations made by Mr Egan to the Claimants as to the terms on which monies paid into the client account would be held? ............................................................................................................. 144

(2)      Were the circumstances such as to give rise to a duty of care on the part of Mr Egan? .......... 149

PART 20 CLAIM ................................................................................................................. 153

    Dishonestly procuring breach of trust ............................................................................. 155

    Breach of warranty of authority/collateral contract ......................................................... 159

    Allegation that Mr Egan owed fiduciary duties of which he was in breach ..................... 159

    Procuring wrongdoing by ECS ......................................................................................... 162

    Conclusion as to Part 20 Claim ........................................................................................ 163

SUMMARY OF CONCLUSIONS ....................................................................................... 163

POSTSCRIPT ....................................................................................................................... 164

SCHEDULE A……………………………………………………………………………....167

**The Hon. Mr Justice Hildyard** :

***The parties: the Main Claim and the Part 20 Claim***

*The Claimants*

1.      The 21 Claimants ("the Claimants") in the main Part 7 claim ("the Main Claim") comprise a group of investors who paid monies into the First Defendant"s client account in respect of a property investment opportunity ("the Albermarle Fairoaks scheme") relating to development land ("the airport land") at and around an airport property in Surrey by the name of "Fairoaks".

2.      The airport land had been acquired by a special purpose vehicle ("SPV") which came to be called Albermarle Fairoaks Limited ("AFL").   AFL was incorporated in Guernsey, originally under the name Shelco Twenty-Two Limited.  AFL has been in administration since 2010.

*The Defendant Firm*

3.      The First Defendant to the Main Claim is a firm of Solicitors ("the Defendant Firm"). Its principals at the material time were Mrs Juliet Bellis ("Mrs Bellis") and Mr Patrick Solomon. (The latter had no involvement in any of the matters in dispute and has played no part in any of these proceedings.)

4.      The Defendant Firm acted as solicitors in the Albermarle Fairoaks scheme, and its client account was used to receive money raised from investors in that scheme.

*Gist of Main Claim*

5.      The focus of the Main Claim is as to the purposes for which, and the terms on which, the Claimants made payments into that client account ("the Defendant Firm"s client account" or "the client account" as appropriate in the context) with a view to participation in the Albermarle Fairoaks scheme. The total sums invested amounted to some £2,280,000.

6.      The Claimants contend that the monies so remitted were at all material times held subject to escrow conditions, and further or alternatively, on a form of *Quistclose* or resulting trust for them or otherwise to their order. They claim that the payment of those monies out of the Defendant Firm"s client account constituted a breach of contract and/or trust for which the Defendant Firm is liable.

7.      The Defendant Firm contends that the monies were paid by way of immediate loan to AFL and not subject to any escrow conditions or any form of *Quistclose* or resulting trust.  The Defendant Firm denies that the payments it made out of its client account were wrongful in any way and rejects the claims made against it.

*The Second Defendant and Part 20 Defendant*

8.      The Second Defendant to the Main Claim and the defendant in the Part 20 Claim by the Defendant Firm is Mr Geoffrey Egan ("Mr Egan").

9.      It was through Mr Egan that the opportunity to invest in the Albermarle Fairoaks scheme was introduced to the Claimants in the Main Claim.

10.     Mr Egan is a chartered surveyor and a fellow of the Royal Institute of Chartered Surveyors. He was throughout the course of the Albermarle Fairoaks scheme at all material times employed by a company now called Erinaceous Commercial Services Limited ("ECS").  ECS had previously been called Egan Lawson Ltd ("Egan Lawson"), taking its name from its two founder shareholders and directors, namely, Mr Egan and his long-standing colleague, Mr Dougie Lawson ("Mr Lawson").

11.     The Albermarle Fairoaks scheme was the latest in a series of investment opportunities promoted by Mr Egan and Mr Lawson under the name or banner "Albermarle". These had certain characteristics in common, as I later describe.

12.     In about August 2006, after it had brought forward and operated some 10 such Albermarle investment schemes, Egan Lawson was purchased by a public company listed on the London Stock Exchange called Erinaceous Group Plc ("Erinaceous"). Egan Lawson was re-named ECS (although Egan Lawson did not formally change its name until 2 March 2007).

13.     Erinaceous was at the time something of a stock-market favourite.  It called itself a „one-stop shop" for property services, and had grown quickly by acquisitions so that the group comprised almost 100 subsidiary companies. Inevitably its bank borrowings were substantial.

14.     After its acquisition by Erinaceous, ECS continued to carry on business using the name Egan Lawson and the Albermarle brand.  Thus the Albermarle Fairoaks scheme was promoted through ECS, using the name Egan Lawson, under the Albermarle brand.

15.     Messrs Egan and Lawson, though now employed by ECS/Erinaceous, continued to be the individuals concerned in identifying investment propositions and presenting them to potential investors. They had developed a following of investors, akin to an investors" club. They were usually able to rely on a loyal inner core to invest in most of the schemes, and in later schemes, to provide initial capital to attract other investors.

*Gist of Part 20 Claim*

16.     In its Part 20 Claim, the Defendant Firm claims against Mr Egan a contribution by way of full indemnity from Mr Egan pursuant to the Civil Liability (Contribution) Act 1978 ("the Part 20 Contribution Claim") if it is found liable to compensate the Claimants.

*Gist of claim against Mr Egan in Main Claim*

17.     As mentioned above, Mr Egan is also joined as the Second Defendant in the Main Claim, albeit the claim against him is in a separate document put before the Court shortly after the first day of trial (15 May 2012).

18.    Until the first day of trial, Mr Egan had appeared to be fully supportive of the Claimants" position in the Main Claim. In particular, he had supported the Claimants" contentions that their payments into the Defendant Firm"s client account were made subject to agreed escrow conditions.

19.    However, just as the trial commenced, Mr Egan changed his stance to say that the payments made by the Claimants were not subject to such conditions.

20.    Faced with this turn of events, the Claimants applied for, and I granted them, permission to bring a claim against him on the basis that the Claimants had relied on his representations that their money would be held on escrow conditions and only for the purposes above described.

21.    Again, like the Part 20 Claim, the claim against Mr Egan is contingent: if, contrary to their primary case, the payments were not advanced on escrow terms and/or were advanced as loans without any entitlement to equity participation, then those representations were false, and the Claimants seek damages for negligent misrepresentation accordingly.

*Questions in issue*

22.    The questions ultimately in issue in this complex and hard fought case are:

(1)    whether monies paid into the Defendant Firm"s client account by the Claimants were held subject to contractual escrow conditions binding upon the Defendant Firm and stipulating that such monies should not be released pending further instruction from the relevant Claimant or a specifically defined event;

(2)    whether, alternatively, such monies were held on a *Quistclose*-type or other form of resulting trust or otherwise to the order of the Claimants;

(3)    whether in applying those monies the Defendant Firm was in breach of the terms or trusts under which it held those monies;

(4)    whether, if not recoverable for breach of contract or trust, the Claimants are entitled to some form of restitutionary remedy in respect of the monies they paid into the Defendant Firm"s client account;

(5)    whether, if the monies were not held subject to binding escrow conditions or on trust or to the order of the Claimants, that was due to breach by Mr Egan of any duty he owed personally to the Claimants; and

(6)    whether, if the Defendant Firm"s application of the monies was a breach of contract or trust or other obligation, and it is thus liable to the Claimants, the Defendant Firm is entitled to contribution from Mr Egan in respect of that liability.

23.    In addition, there are issues of causation if loss (or a right to equitable compensation) is established.

*Summary of the nature and basis of the Claims*

*(1)    Claimants" primary case in the Main Claim*

24.    It is the Claimants" primary case in the Main Claim that the funds were paid out of the Defendant Firm"s client account otherwise than in accordance with the agreed conditions and purposes for and conditions on which they were paid in.

25.    That contention is based on the following grounds:

    (1)    the monies were remitted and held subject to express or implied escrow conditions that were never satisfied;

    (2)    the monies were remitted and could only be applied for the purposes of equity investment in AFL, and on a form of *Quistclose* or resulting trust for the Claimants in the meantime;

    (3)    in treating the monies remitted to its client account as monies immediately lent to AFL rather than monies subscribed for equity participation either in AFL or a holding company or fund, and in applying them to reduce a bridging loan made by the Royal Bank of Scotland plc ("RBS") to AFL ("the RBS Equity Bridge") to enable it to acquire the airport land before any equity participation was definitely agreed and available and before AFL was under the Claimants" control, the Defendant Firm acted in breach of the escrow conditions and inconsistently with the purposes for which those monies had been paid in.

26.    A variant of this primary case is that monies paid into a solicitors" client account are necessarily held on trust, and if it was not the objective intention of the parties that the monies paid into the Defendant Firm"s client account should immediately belong to AFL, then they must have been, or should be treated as having been, held on trust or to the order of the Claimants as payers, and could not be paid out without their unequivocal instructions or the Defendant Firm could be completely certain that pre-stipulated conditions for payment to AFL had been met or satisfied.

*(2)    Claimants" secondary case in the Main Claim*

27.    Alternatively, the Claimants" secondary case in the Main Claim is that AFL never properly resolved to borrow, and the Defendant Firm had no authority to receive, such monies and was in breach of trust in paying them to RBS towards the reduction of the RBS Equity Bridge. The Claimants seek to recover the money they have lost in consequence.

28.    The Claimants" secondary case is based on the following grounds:

    (1)    AFL"s board of directors never properly resolved to borrow monies from the Claimants;

    (2)    the Defendant Firm was never validly authorised by or on behalf of AFL to receive or acquire beneficial ownership of the monies remitted to its client account by the investors (including the Claimants), so that

(3)     a resulting trust in favour of the Claimants must automatically arise.

(4)     Further, even if the Claimants agreed to lend money to AFL (which they deny), it was an implied condition precedent of that agreement that properly executed loan notes recording the agreed terms be issued by AFL, which condition was never satisfied.

*(3)     Alternative remedies for the Claimants in the Main Claim*

29.     In the alternative to claims for an account and repayment, the Claimants claim in restitution for unjust enrichment.  The Claimants contend in this context that:

(1)     they paid monies into the Defendant Firm"s client account under a mistake, believing that the monies they remitted to that account would be held in escrow and remain beneficially owned by them unless and until conditions of the escrow were satisfied, which they never were ("the Mistake Claim"); and

(2)     even if the Claimants agreed to lend money to AFL (which they deny), the agreement failed and was void because AFL never authorised the borrowing, so that there was a total failure of consideration ("the Failure of Consideration Claim").

30.     The Claimants seek relief against the Defendant Firm as follows:

(1)     damages or equitable compensation equal to the sums severally remitted, together with the costs of an administration application against AFL;

(2)     further or alternatively, an account and reconciliation in the form required by Rule 32 of the Solicitors Accounts Rules ("the SAR") and replacement of money improperly withdrawn for the Defendant Firm"s client account (pursuant to rule 7 of the SAR); alternatively

(3)     restitution equal to the amounts remitted to the Defendant Firm"s client account by the Claimants;

(4)     interest and costs.

*(4)     Claimants" contingent claim against Mr Egan in the Main Claim*

31.     As indicated above, the Claimants" claim against Mr Egan is contingent upon them failing in their primary claims against the Defendant Firm.  It is based on allegations of negligence against Mr Egan personally, even though it is his position that he did what he did as an employee and director of ECS.

32.     The basis of the claim is as follows:

(1)     The Claimants relied on Mr Egan personally, as in previous Albermarle schemes, and as he must have known they would: he was their point of contact, and their understanding of the Albermarle Fairoaks scheme was solely derived from the way it was presented to them by him;

(2)   Mr Egan solicited their investments on the basis that the Claimants would obtain a mix of loan and equity participation which was the hallmark of all previous Albermarle Schemes he had introduced to them, and that in the meantime their monies would be held safe on escrow terms and conditions in the Defendant Firm"s client account;

(3)   Mr Egan owed them a duty of care of which he was in breach in misrepresenting to them that their money was advanced on binding escrow terms and/or in failing to explain that their money would be on loan and used to repay indebtedness of AFL before the investment vehicle (be it AFL or a holding entity) was in their control and/or their entitlement to equity participation was unconditional;

(4)   The Claimants would not have transmitted funds to the Defendant Firm"s client account if the misrepresentations had not been made and they had known the true position; so that

(5)   Mr Egan is liable for damages in respect of their losses.

*(5)    The Defendant Firm"s Part 20 claim against Mr Egan*

33.    The Defendant Firm"s contingent claim for a contribution from Mr Egan by way of full indemnity if it is found liable to the Claimants is based on the following grounds:

(1)   It was Mr Egan who required the Defendant Firm (by Mrs Bellis) to make payments out of its client account in breach of escrow conditions;

(2)   in doing so, he dishonestly procured or assisted the Defendant Firm to commit breaches of trust; further or alternatively,

(3)   he was in breach of fiduciary duty and/or a duty of care he owed the Claimants by reason of his relationship of trust and confidence with the Claimants (and each of them);

(4)   he should be liable to make fair and reasonable contribution to any damages or equitable compensation for which the Defendant Firm is found liable.

34.    Mr Egan denies every pleaded basis of the contribution claim and seeks its dismissal in its entirety.

### The Albermarle investors and previous Albermarle schemes

*Characteristics of previous Albermarle schemes*

35.    The Claimants had all invested previously in one or more property investment opportunities offered to them under the brand name "Albermarle" ("Albermarle investment schemes") through Egan Lawson and latterly ECS.

36.    The Albermarle investment schemes which Egan Lawson organised and promoted were in each case undertaken through or comprised an unregulated collective investment scheme. A number of examples were documented in the bundles and several were more particularly considered during the course of the trial.

37.   Albermarle investment schemes followed a pattern, although there were variations from scheme to scheme.

38.   They usually involved the use of a special purpose vehicle ("SPV"), either a company or, more often, a Limited Liability Partnership ("LLP"). Their hallmark was that investors would invest principally by way of debt (unsecured interest free loans), with a very small amount of their investment being referable to an "equity" interest in the SPV. The typical ratio of loan to equity would be 9,999: 1; but the equity element would in aggregate secure for the Investors control of the SPV.

39.   Sometimes when offered for investment the SPV would be used to acquire commercial property with an income stream. Sometimes (as indeed in the case of the Albermarle Fairoaks scheme) the SPV already existed and held property, and investors would „buy in" with a view to expansion and further property being acquired. It was commonplace for property to be bought with the benefit of bank borrowing and other loans (including those unsecured loans from investors).

40.   The general objective of each Albermarle investment scheme seems to have been to develop or otherwise increase the value of land identified as ripe for development, service the bank finance in the meantime with the income stream, and then sell the developed / improved land and distribute the profits.

41.   It also seems to have been commonplace in Albermarle investment schemes for the investors" loans to be repaid in tranches as funds became available to the SPV as value was realised from the underlying investments, and before any final realisation.

42.   The Albermarle investment schemes were intended to be tax efficient for the investors. That was the rationale of the matched loan/equity mix which was their hallmark.

43.   Investors" loans would be repaid over time without interest and without any charge to tax: that was the rationale of the loan element, which avoided distributions having to be by way of dividend attracting a charge to tax.

44.   Eventually the profit from the deal (when the SPV was wound up or it was otherwise realised) would be treated as a capital gain, taxed at a lower rate than income tax (and often with the benefit of taper relief): that was the rationale (or part of it) of the equity element, which also ensured that the investors would together control the SPV to which the loans were made.

45.   It was a fundamental feature of the Albermarle investment schemes that the investors would have or be entitled to control of the SPV used through their ownership of its equity:   in none of the Albermarle investment schemes prior to the Albermarle Fairoaks scheme was it ever contemplated that the investors would simply be lenders without control of the SPV and equity participation. Their security was in that control.

46.   Thus, in every Albermarle investment scheme, the basis on which the investors subscribed was an unqualified right to equity participation in the investment vehicle: the loan element was the machinery for repayment, the equity provided the means of control and of obtaining a profit share. Typically, the investor would join the LLP as a

member, so they were investing into a corporate body in which they had equity and which the investors would together control.

47.     The two (loan and equity) were as horse and carriage: put another way, they were intended to be stapled together or at least matched and coupled. All the Claimants who gave evidence were agreed on this: and they were also adamant that they considered that the monies they subscribed remained theirs unless and until their right became unqualified, though all accepted that the documentation to evidence and certify their right might not be issued formally until some time later.

48.     The Albermarle banner came to attract a loyal following. In addition to Mr Egan and Mr Lawson, and various of their colleagues at Egan Lawson who would also usually invest themselves, an inner circle of repeat investors developed (whom Mr Croxford QC, leading counsel representing the Defendant Firm, labelled "the inner core").

49.     They included Mr Wallis (the 8th Claimant), European Securities (the 16th Claimant), and Black Isle (the 14th Claimant).  European Securities is a company controlled by Mr Ian Watson.  Black Isle is a company which at the material time was controlled by Mr Alan Thomson; Mr Egan owns 25% of it.

50.     At least in the context of the later Albermarle investment schemes, and especially Albermarle Shoreham, that inner core of investors were offered the opportunity to come in to schemes at an early stage prior to a wider offering.  They thereby secured first place in the queue of those wishing to participate. This could be an advantage if the scheme was over-subscribed (as was the case, for example, in Albermarle Shoreham); and in some cases they seem to have enjoyed slightly more advantageous terms.

51.     The basis upon which the inner core investors were invited to and did in fact invest in later schemes, and in particular Albermarle Shoreham, appears sometimes to have been quite informal. For example, in Albermarle 8 LLP (which involved an investment in property in Stafford) as in Albermarle Shoreham, inner core investors subscribed before any Information Memorandum or Application Form but instead following a letter or email from Mr Egan.

52.     It was also a common theme of the Albermarle investment schemes prior to Albermarle Shoreham and Albermarle Fairoaks that the investors would rely on the solicitors advising the SPV both to safeguard their interests as future equity participants and also to ensure that their subscription moneys would not be released unless and until their participation and control of the SPV was safely arranged or in place (sometimes via Messrs Egan and/or Lawson as their agents or nominees).  They acted, in effect, as solicitors to the offer.

53.     The expectation of the Claimants, as expressed by the third Claimant, Mr Andrew Kevin Cole ("Mr Cole") was that the Defendant Firm would act for the investors as well as the investment vehicle (which they would ultimately own) and (as he put it) "be looking after our interests." Indeed, Mr Cole told me that Mr Egan expressly confirmed this to him.

54.     I pause briefly to note that this is how the solicitor, namely Ms Helen Streeton ("Ms Streeton"), who had invariably, or almost invariably, been retained in all Albermarle

investment schemes prior to Albermarle Shoreham, appears to have conceived and undertaken her role. Ms Streeton worked sequentially for Forsters, Fox Williams and Boodle Hatfield: and it was those firms who were variously instructed in relation to the various Albermarle investment schemes before Erinaceous acquired Egan Lawson, according to where she was working from time to time.

55.     As I later elaborate, it seems to me that their habitual reliance on Ms Streeton, as well as their trust in Mr Egan, later informed the Claimants" expectations of Mrs Bellis and the Defendant Firm in the Albermarle Fairoaks transaction.

56.     Put shortly, for present purposes, the overall gist of the evidence given on behalf of the Claimants in this regard was that their expectation was that monies paid into the designated solicitors" client account would not be used or released without their informed consent sought in advance before actual payment. Mr Wallis"s evidence under cross-examination captures the gist, and seemed to me to represent the position of them all:

> "Q.  In which of your previous investments had this process ever taken place that somebody came back to you and said, "Mr Wallis, sir, we have your money, may we now have instructions to use it?
>
> A.  Helen Streeton did that very frequently, my Lord.  In fact, I had say on virtually every investment I made.  We had conversations once the money had actually been deposited with her.  She was very particular about the fact that it was my money and until she was happy that I was happy to depart with that money then nothing was to happen to it."

*Relevance of previous Albermarle schemes in informing Claimants" approach*

57.     The Claimants" case is that they especially relied on three previous Albermarle investment schemes promoted after the date of the acquisition by Erinaceous of Egan Lawson in informing their understanding of Albermarle schemes in general and their approach to the Albermarle Fairoaks scheme in particular.

58.     These were (a) the Albermarle Shoreham Investment (in which apparently all save the 2nd, 6th, 7th, 17th, 18th and 19th Claimants invested); (b) the Albermarle Croydon Investment (in which apparently all save for the 2nd, 3rd, 4th, 5th, 11th, 12th, 13th and 16th Claimants invested); and (c) the Albermarle Brighton Investment (in which apparently the 3rd, 8th and 14th Claimants invested).

59.     The underlying investment in each case is not relevant: what is relevant is the investment model that each such investment exemplified, the *modus operandi* of Mr Egan in each, and the level of trust that the Claimants developed in both.

60.     The Claimants contend that they each exemplify and demonstrate a common investment model (defined in the Amended Particulars of Claim as "the Investment Model") which was the template for, or at least informed, the Albermarle Fairoaks scheme.

61.     That contention provides the basis for the Claimants" claim that certain of the terms of the Investment Model should be treated as implicit also in the Albermarle Fairoaks scheme.

62.     The Investment Model is described by the Claimants in paragraph 7 of the Re-Re-Amended Particulars of Claim ("the RRAPC") as follows:

> *"The Investment Model involved the purchase of a target property using senior debt from a third party lender combined with medium or long term equity investment from investors. These investments were made on terms that in consideration for each "unit" of investment an investor would receive a combination of (i) equities, such as shares in a limited company, membership of a limited liability partnership ("LLP") or units in unit trusts, and (ii) loan notes. The precise structure of the investment scheme (including the character of the special purpose vehicle used in each case, whether a company, LLP or unit trust) would vary depending on the nature of the investment and the most tax efficient solution but in each case the Investment Model dictated that the investor"s money would be dealt with on the following basis:*
>
> 7.1     *The investor"s money would be paid into a designated bank account (usually a solicitor"s account) and held in that account to the investor"s order until such time as sufficient monies had been raised and the special purpose vehicle was in a position to issue loan notes and equity in the manner described below.*
>
> 7.2     *A large proportion of the sum invested (usually 99.99%) would be treated as a loan repayable by the special purpose vehicle in accordance with the terms of loan notes issued by that vehicle to each investor.*
>
> 7.3     *If sufficient monies were not raised, with the result that the special purpose vehicle was not in the position to issue loan notes and equity to the relevant investor, the investor"sfunds would be repaid to him (with interest , if appropriate) from the designated bank account."*

63.     As regards these features in the context of Shoreham, Croydon and Brighton:

(1)     In the Albermarle Shoreham and Croydon schemes, the application forms provided for investors" subscription moneys to be paid into a solicitor"s client account (the Defendant Firm in the case of Shoreham, Boodle Hatfield at Coutts in the case of Croydon) on escrow terms attached, the escrow terms being identical save as regards the identity of the escrow agent and its client account details. The terms included the following:

> *"The Escrow Sums will continue to belong to the payer unless and until released to [the Albermarle SPV] on issue of Offer Shares as provided for in the Offer [for shares and loan notes in the SPV]. The Escrow Sums will not be returned to the payer or transferred to the payer unless and until the Offer lapses without Offer Shares having been issued as provided for in the Offer. [The Escrow agents] will be*

> *entitled to retain any interest accruing on the Escrow Sums.   The costs of transmitting Escrow Sums pursuant to these terms will be deducted from the sums concerned."*

(2)   The Albemarle Croydon scheme, which involved the sale and leaseback of Erinaceous"s headquarters building called "Phoenix House" in Croydon. The Defendant Firm acted for Erinaceous and Boodle Hatfield acted for the SPV. In the special circumstances of that scheme, Ms Streeton expressly confirmed to ECS and Mr Egan (in a letter dated 17 September 2007) that, though there had been a drafting error suggesting another condition, the only operative escrow condition was the issue of equity in the form of Units in accordance with the offer; and it appears that the release of funds out of the escrow account may have preceded the formal issue and certification of Units.   But no such release was effected until control of the SPV was beyond doubt; and it is also interesting to note that it appears that Investors may have been (and, for example, Mr Glatman certainly was) asked for specific approval for release of funds given the error above described.

(3)   However, in respect of Albermarle Shoreham, inner core investors (namely, in that scheme, Stuart Wallis, Black Isle and European Securities) were invited by Mr Egan to, and did, transfer a first tranche of funds to the Defendant Firm"s client account before any application form was available for use (and before the provision of any Information Memorandum as required for an investment of this sort).

(4)   It is unclear in the context of Albemarle Shoreham (since the documentary evidence was sparse) what process Mr Egan used to obtain these funds; but some £2 million was raised from the early (inner core) investors.   The monies solicited by Mr Egan were received and in due course applied to complete this first stage of the Shoreham Airport purchase.   (The total consideration for the two leases purchased was £3.8 million; this was left outstanding as a loan by Erinaceous to Albermarle Shoreham ("the Erinaceous Loan"), and Albermarle Shoreham assumed responsibility for repaying a loan which Erinaceous had made to a fund introduced to Erinaceous by Mr Nicholas Cummings (Mrs Bellis brother: "Mr Cummings") called Berkshire UK Industrial Property Limited Partnership ("BUKIP") in June 2006 and the loan ("the Brightside Loan") which the founder of BUKIP (Brightside) had made to BUKIP to enable it to purchase two of the underlying properties.)

(5)   The monies advanced by inner core investors at stage 1 were largely used to repay the Brightside Loan on 28 December 2006, and the balance went to Erinaceous on 29 December 2006. No investment memorandum, nor any application form, had by then been issued.

(6)   In the context of Albermarle Shoreham, the funds initially subscribed were not transferred on the terms of an express escrow; Mrs Bellis in a letter to Mr Lawson dated 21 December 2006 ("the Shoreham engagement letter") records Mr Egan as having characterised them as to be treated as unsecured loans, even though the early round inner core investors were later asked to

fill in application forms contained in the investment memorandum ("IM") once it had been produced.

(7)     Furthermore, in the case of the Albermarle Brighton scheme, which never proceeded beyond the stage of an initial invitation by Mr Egan (by e-mail dated 4 July 2007) to an inner circle of repeat investors to provide "some initial seed capital to push the project forward", no escrow account nor escrow terms were provided for: "seed" or inner core investors were simply asked to transfer monies to an account at Coutts in the name of Albermarle Brighton International Arena LLP, in effect on trust.

(8)     In the event, both Albermarle Shoreham and Albermarle Croydon proceeded and the escrow arrangements undoubtedly put in place for second tranche investors fell away. Albermarle Brighton did not proceed and the subscribed moneys were all returned to the payers.

64.     It may be apparent from all this that the preceding Albermarle schemes share similar characteristics, but with some variations: the pattern is similar but not exactly replicated. Nevertheless the Claimants rely on these preceding Albermarle schemes to establish the incorporation by usage or implication of escrow terms; and the Defendant Firm relies on them in support of its contention that it was not at all unusual for (at least) inner core investors to invest seed capital on an informal basis, well before the issue of any of the documentation ordinarily required.

### *Changes in Albermarle pattern  after acquisition of Egan Lawson by Erinaceous*

*Egan Lawson becomes ECS and part of the Erinaceous Group*

65.     The acquisition of ECS by Erinaceous brought changes of considerable significance. I should mention the following.

66.     The first is the most obvious: Messrs Egan and Lawson lost their independence and became subject to the ultimate direction and control of Erinaceous and in particular of Mr Neil Bellis ("Mr Bellis") and Lucy Cummings ("Ms Cummings").

67.     Mr Bellis and Ms Cummings were, until 7 November 2007, its Chief Executive and Chief Financial Officer respectively; they were founding members of Erinaceous and between them still owned some 17% of its shares.

68.     I formed the impression that whereas prior to the acquisition of Egan Lawson, the SPVs used for the Albermarle investment schemes were in effect treated as vehicles owned by or for the investors from their inception, afterwards, they came to be treated as subsidiaries owned and controlled (even though indirectly) by Erinaceous.

69.     A second change, as it seems to me, is that not only did Egan Lawson become, as its subsidiary, subject to the control of Erinaceous, but it was also, to some extent at least, tied to its fortunes, and became something of a cash-cow or resource for its growing need for money as its fortunes deteriorated.

*Erinaceous Group''s developing financial difficulties*

70.   Over the course of 2007 Erinaceous slid into considerable financial difficulty: its need for cash, especially in order to seek to retain its bankers" patience, became pressing. This undoubtedly (to my mind) translated into increasing pressure on Mr Egan to get as much money from "his" loyal investors, as quickly as possible.

71.   As to the development over 2007 of Erinaceous" financial difficulties, although there was some dispute before me in this respect, the following facts appear to me clear from the documentary evidence:

(1)   The group"s share price on AIM fell sharply over the course of April through September 2007, and especially sharply after the collapse of takeover talks in August.

(2)   By e-mail to Mrs Bellis and Ms Cummings (cc Mr Cummings) dated 17 September 2007 Mr Egan reported that "some of the investors are giving us a hard time as they read the press…"

(3)   By 20 September 2007 Deloitte & Touche (auditors to Erinaceous and the group) had discovered that Erinaceous had been in breach of its banking covenants on interest cover and cashflow as a result of poor trading in the first half of the year and had insisted on putting a "going concern" qualification on the interim accounts stating their belief that there was "a material uncertainty which may cast significant doubt on the group"s ability to continue as a going concern."

(4)   On 24 September 2007, Mr Egan, in response to an e-mail from Ms Cummings (circulated to Mr Cummings) seeking to downplay the significance of the breaches of banking covenants and urging speedier fundraising as a *"top Group priority in order to steady the banks again"*, reported that:

*"Whilst we have raised a little, investors are refusing to put in money off the back of an unsecured loan note, particularly when they are constantly reading adverse press comment.  The fact that the property is overvalued, that the rents have been cooked up and the interest rate from Erinaceous is penal, do not help either.  Some of the big investors we have been talking to have withdrawn…owing to concerns for the group."*

(5)   By 28 September 2007 the Times, the Daily Telegraph, and the Financial Times all carried stories about the real risk of its collapse.

(6)   By October 2007 it was reported on FT.com that *"Erinaceous Group, the troubled property services company, slumped a further 29% to 24p as take-over talks were called off"*.

(7)   On 6 November 2007 Mr Bellis and Ms Cummings were placed on garden leave.

(8)   After unsuccessful efforts to rescue the group made by Mr Nigel Turnbull and a new board,  Erinaceous went into administration on 14 April 2008.

        (9)      However, it is to be noted that it was not until 9 February 2010 that AFL followed it.

72.      There are clear signs that as the financial position of Erinaceous deteriorated over the Summer of 2007, and its difficulties with its bankers grew, Mr Bellis and Ms Cummings came to regard the Albermarle Funds, and especially those still open for subscription, as providing a source of substantial and (as they hoped) quickly available profit and funds.  In the context of Fairoaks especially, they placed considerable pressure on Mr Egan, both to maximise the return to Erinaceous and to speed up the collection of funds from his Albermarle investor following.

*Mrs Bellis takes over the role of solicitor*

73.      The third change of significance I have already briefly mentioned. Whereas in all, or almost all, the Albermarle investment schemes prior to the acquisition of Egan Lawson by Erinaceous the solicitor used for the transaction was Ms Streeton (at whichever firm she happened to be at the time), after that acquisition Mrs Bellis took over the role Ms Streeton had played.

74.      The Albermarle inner core and indeed other repeat investors had come to trust Ms Streeton to protect their interests; and Ms Streeton does appear to have done so (and in various instances herself to have invested).

75.      Mrs Bellis had not the same experience or undivided loyalty. She was and is primarily a property lawyer; she had not the in-depth familiarity with the Albermarle investment schemes (and though admitting to a grasp of the overall structure, denied knowledge of their detail); and she was subject ultimately, as were Messrs Egan and Lawson, to control by Erinaceous.

76.      As I explain in the next paragraphs, Mrs Bellis also had strong ties to Erinaceous and its group companies, and she and her firm were heavily dependent on Erinaceous; that dependence further discouraged any objective consideration on her part of the transactions in 2007, as well as any inclination to look after the interests of investors separately to those of Erinaceous.

*Mrs Bellis"s perception of her role*

77.      The fourth change was a consequence of the first three.  As it seems to me, a combined effect of Egan Lawson/ECS becoming a subsidiary of Erinaceous, Mrs Bellis"s ties and interests, and her different outlook in comparison with Ms Streeton, was that whereas before the acquisition of ECS by Erinaceous, the solicitors (in the person of Ms Streeton) to the relevant SPV in effect seemed to regard themselves as charged with the protection of the investors (as the prospective owners of the SPV), afterwards the solicitors (in the person of Mrs Bellis) were beholden to Erinaceous and viewed the SPV as part of the Erinaceous Group.  Mrs Bellis seldom, if ever, focused on the matter from the point of view of the investors.

**Mrs Bellis and her other family interests**

78.      As may already be apparent, Mrs Bellis had a number of family contacts in the Erinaceous group: Mr Bellis being her husband, Ms Cummings her sister, and Mr Mr

Cummings (who worked for Erinaceous as a consultant, was nominally the beneficial owner of all the shares in AFL, and came to play a significant role in the Albermarle Fairoaks transaction) being her brother. Mrs Bellis was also company secretary to Erinaceous and its numerous subsidiaries.

79.    Mrs Bellis established the Defendant Firm in the same year as Erinaceous was incorporated. The Defendant Firm was retained and acted at all material times thereafter as solicitors of the Erinaceous companies, including (after its acquisition) ECS.

80.    The Defendant Firm had its offices in the same building as Erinaceous in Croydon: it had a service occupancy of almost the whole of one floor of a seven-floor building and it shared a reception area (and entrance) with Erinaceous.

81.    In a typical year, some 70% of the Defendant Firm's fee income came from Erinaceous and its subsidiaries. Mrs Bellis told me that the Defendant Firm earned some £0.8 million from Erinaceous in 2006, and something just under £1 million in 2007.

82.    These fees were fixed by the Erinaceous remuneration committee annually. Sometimes a proportion was attributed to a particular transaction (in the case of Fairoaks, for example, some £200,000 was attributed): but the fee arrangements were far from standard, and certainly not fixed at arm's length.

83.    In addition, Mrs Bellis received fees for acting as company secretary for Erinaceous and its subsidiaries (of about £40,000 per year).

84.    Mr Egan told me he regarded her as, in effect, Erinaceous' in-house lawyer. The heads of terms for the Albermarle Brighton investment described Erinaceous' lawyers as the "in house legal team". The fee arrangements I have described support the depiction.

85.    It is not easy to accept (although she does maintain) that Mrs Bellis was independent. It is the Claimants' case that Mrs Bellis and thus her firm were in a position of obvious conflict, and that this led to her either preferring the interests of Erinaceous or disregarding her duties to AFL and the interests of the investors who would in due course own it.

86.    Mrs Bellis' position, and the potential conflicts of interest inherent in it, was further complicated by her own personal interests. Thus, for example, she, with her husband and her sister, also owned and controlled a company called Longmint Aviation Limited ("Longmint"). Longmint came to own a strategic part of the land at Fairoaks airport (where the petrol tanks were).

87.    Further, these family connections and interests meant that Mrs Bellis's financial position and the future of her firm was very closely tied to Erinaceous and its group. Although Mrs Bellis emphasised that she was not aware until September of Erinaceous's financial difficulties, I cannot accept this: the extent of her family interests and her family connections  make it too improbable.  I find, on a balance of probabilities, that she became aware of these difficulties from her husband and sister, if not from her work, as they developed.

### Albermarle Fairoaks scheme and the facts in more detail

88.   Before turning to the detail of the facts, it may assist an understanding of a story which is at once convoluted and yet in large part undisputed for me to outline certain distinguishing or critical features of the Albermarle Fairoaks scheme: especially since it differed from the previous schemes in a number of respects, and the underlying investment was both considerably larger and more complex.

### The underlying investment: Fairoaks airport land

89.   The underlying investment comprised land with commercial development potential at Fairoaks Airport in Surrey. AFL acquired this land (which was only part of the airport complex) in July 2007 from Erinaceous as part of a large and complex scheme involving (a) the acquisition of the entire airport and the airport operating company by Erinaceous and other companies on 26 July 2007 and (b) that onward sale by Erinaceous to AFL.

90.   Amongst other things, the overall transaction involved restructuring the ownership of various land/assets via Luxembourg, Liberian and Maltese companies. There were also fiscal, listing and regulatory implications to consider, as well as bank lending arrangements.

91.   It was complicated further by the fact that the airport complex and operations came into multiple ownership, including Mrs Bellis and her family‟s involvement through Longmint which I have already mentioned.  Longmint acquired the Mann Aviation group companies (an aircraft engineering and maintenance business based at the airport) and invested in a small, strategically important, part of the airport land.

92.   Mrs Bellis‟ relaxed attitude to conflicts of interest is illustrated by her lack of concern in acting for Longmint in the Fairoaks transaction, as well as for Erinaceous and AFL. Longmint also leased the „hectare‟ of development land in the middle of the Fairoaks Airport from AFL for £60,000 per annum *for 100 years* because, as Mrs Bellis put it, Longmint wanted a "*piece of the action*". (These were the rents that Mr Egan described as "cooked up" in his email of 24 September 2007 referred to in paragraph 71(4) above.)

93.   Mrs Bellis was company secretary of Longmint as well as Erinaceous throughout this time and she signed the leases with AFL on behalf of Longmint. She accepts that she drafted the lease of the hectare of land for both sides, as well as acting for Longmint in registering the leases. In other words, she acted for both sides insofar as there was legal work to be done.

94.   Mrs Bellis saw nothing untoward in all this. It was pressed on me after circulating an earlier draft of this judgment that she had no reason to do so, on the footing that each of the companies concerned was well aware of her various roles.  In the case of Erinaceous and Longmint, I am sure that is so; but I do not accept that AFL and the Investors were aware, still less gave their informed consent.  In any case, the point is not really whether or not Mrs Bellis‟s multiple roles conflicted; it is the fact that she had them and the extent of her and her immediate family‟s interests.  I have concluded that Mrs Bellis felt able to act in these multiple capacities as well as the SPV (AFL) and representing apparently conflicting interests because she considered Erinaceous

and its subsidiaries and associated companies in effect to be one entity, and to a large extent, at least until November 2007 when her husband and her sister were removed, a family affair.

*Purchase and funding of the Fairoaks land*

95.    AFL was a shelf-company and had no resources of its own. The purchase price to AFL of the land and other interests at Fairoaks of some £31 million was funded by 3 loans from RBS, and an unsecured loan of £15 million from Erinaceous.

96.    Part of RBS" funding, the RBS Equity Bridge, was a short term bridging loan of £7 million, half of which was to be repaid on 26 October 2007 (i.e. after just 3 months), with another £3.5 million required to be repaid by 26 January 2008.

97.    The scheme required about half the borrowings to be repaid in the early course I have described out of money to be raised from the Albermarle circle of investors and (in light of its unusual size) additional investors also.

98.    Thus the amount of funding required to be raised from investors was some £22 million. This was a far bigger funding task than Egan Lawson (and in particular, Mr Egan, who was the individual principally involved) had undertaken in previous Albermarle investment schemes.

99.    Further, and unlike most of the previous Albermarle schemes, by the time that the Albermarle investors were invited to participate, the underlying property transaction had actually already completed. Funds lent had already been drawn down and deployed. The Albermarle vehicle in question (AFL) was thus already committed to repaying the substantial bank borrowings within 3 months. AFL and Erinaceous were in effect irrevocably committed.

100.    Consequently, as regards investors, it was not a case where if an aggregate investment target could not be achieved by a closing date, the underlying deal would not proceed. However, if outside funds were not raised by investors, Erinaceous would be left with the burden of its guarantee of the RBS Equity Bridge, and probably an economic responsibility for the other borrowings also.  Longmint would also be likely to be prejudiced too. All that would have, or potentially have, serious adverse financial consequences for Mrs Bellis"s family.

101.    However, and as I shall return to below, the evidence of the Claimants was that although they were aware that RBS had lent monies, at no time were they informed or given any inkling of the instalment payment dates of these loans, and had no reason to believe that the monies raised from them in September were required to pay off an instalment imminently due.  Mr Egan accepted this; and Mrs Bellis could not gainsay it.

*SDLT changes and Erinaceous difficulties bring further complication*

102.    The complications inherent in the Fairoaks deal (given its magnitude and the multiple interests to be accommodated) were exacerbated by a further considerable complication caused by changes in UK tax provisions. These changes threatened the

model or pattern that had hitherto been adopted in all (or virtually all) of the preceding Albermarle schemes.

103.    By 2007 the preferred vehicle for use in Albermarle schemes was an LLP. The advantage of the LLP was that it paid stamp duty land tax ("SDLT") upon purchase of the land, but the investors would not pay stamp duty on joining the LLP.

104.    However, on 13 April 2007 ECS through Messrs Egan and Lawson were advised by Boodle Hatfield that the content of the Finance Bill (which became the Finance Act 2007), might render the use of LLPs potentially tax inefficient, at least where completion of the underlying property acquisition pre-dated the investor''s membership of the LLP (as was of course the case).

105.    It was proposed that that in those circumstances, the acquisition of „equity'' in the LLP by an investor would also be subject to a charge to SDLT, referable to the underlying property value.  Obviously that would be highly tax inefficient: SDLT would be payable by the LLP upon acquisition of the land, and then payable again by the investors upon their acquisition of equity. Some other SPV or structure, in the event one with a cross-border element, had to be devised. This was by no means straightforward; and it was bound to take time.

106.    I return to elaborate on some of these complexities and their consequences later. For the present suffice it to say that from July 2007 a measure of lack of co-ordination, not to say chaos, is apparent: and so too is the increasing dominance of the interests and requirements of Erinaceous, regardless of the effect on the Albermarle investors.

### *Chronological sequence of background events*

107.    I turn to the chronology of the background events. Notwithstanding the fact of some 10 full days of cross-examination most of the facts are uncontroversial.  I leave until later facts substantially in dispute.

### *Development of the structure*

108.    I can take up the largely undisputed chronological sequence of events from 3 July 2007, when, after a period of uncertainty following the advice from Boodle Hatfield as to the SDLT complications to which I have already referred, Mrs Bellis emailed Mr Egan telling him that she had received informal advice from Nabarro as to a possible alternative structure, namely a Jersey or Guernsey "*offshore fund*".

109.    The essential features of the alternative structure envisaged for the Albermarle Fairoaks scheme were as follows:

    i)      A Channel Islands exempt company would be established in time for completion to take title to the development land and borrow money for that purpose.

    ii)     The shareholder of the company would be the person who would ordinarily have been chosen as the founder member of an LLP, had an Albermarle   LLP been used as the SPV: that is to say, Mr Egan and/or Mr Lawson or Egan Lawson colleagues.

iii)   A Channel Islands unit trust would be established, which would then acquire the shares in the company from the founder shareholders (for which there would be no SDLT charge).

iv)   The company would then be liquidated and the property could be distributed up to the unit trust without an SDLT charge.

v)   Investors could invest in units in the unit trust.

110.   This alternative structure was untested and complicated: it would inevitably take time to develop and establish. Mrs Bellis suggested, that in the meantime, a Guernsey or Jersey company could be set up in order to purchase the land, financed as envisaged by the current plan for the LLP purchase (i.e. RBS Equity Bridge) and:

> "You would start fund raising immediately upon the basis that investors would be making a straightforward loan to the Jersey or Guernsey company which would be converted into an investment into the fund when it was up and running."

111.   In parallel, Mr Egan had also been making enquiries and had apparently spoken to Richards Butler and also to Mr Ric Berman ("Mr Berman", sometimes referred to as "Ric"), the Chief Executive of the specialist registered corporate finance and regulatory adviser regularly used by Mr Egan in the context of Albemarle schemes.

112.   Mr Egan replied to Mrs Bellis as to her suggestion on 3 July 2007:

> "That is virtually what Ric has been suggesting and he is registered in Guernsey, he also takes the view that in time one could list it on the AIM/Irish Stock Exchange etc. Then grow it into a fund, adding further properties.
>
> I have also had a chat with Richards Butler who are doing our hotel deal, and whilst they seem to agree with Boodle Hatfield they say if we just exchange contracts or hold up the formation of the LLP until the money is in, which we can do with some of our current deals (the hotel and Finsbury Sq) we can still do the normal LLP route.
>
> So I suggest we go down both routes, the LLP's on shore for the leisure deals and the Guernsey route for Fairoaks to grow into a fund by adding Shoreham etc."

Thus Mr Egan envisaged creating some sort of umbrella/super-fund which could be listed, and which could acquire not only AFL but Albemarle Shoreham too.

113.   Both Mrs Bellis and Mr Egan recognised that the "super-fund" route would take yet further time to set up. This was highlighted in Nabarro's email and in Mrs Bellis' email of 3 July 2007, and reinforced by Mr Berman during their discussion on 6 July 2007. Mr Berman said it would take about 2 months to set the fund up. He advised that a Guernsey fund was the most "sensible", and suggested:

> "Closed ended fund – 12 year life. Put a couple of projects in it. Then list it on Irish Stock Exchange. Share issuance

> *programme – premium management programme which allows
> [it] to issue new share [without] a prospectus – [could] have
> an "infrastructure fund" – substantial costs but sensible, e.g. to
> put Shoreham in."*

114.    However, Mr Berman also explained that this type of arrangement would be a
"regulated investment", and so would require FSA regulated individuals to be
involved in soliciting investment in the UK, or only solicit investment from regulated
entities or professional investors. As was later realised by Mr Egan, submitting to
such regulation was likely to add complexity to the establishment and operation of
such scheme. Hitherto, the Albermarle schemes had been unregulated collective
investment schemes.

*Instruction of Guernsey lawyers and Guernsey shelf company*

115.    On 3 and 4 July 2007, Mrs Bellis approached Guernsey lawyers, Ozannes, in
connection with the incorporation of an exempt company and unit trust. Ms Helen
Wyatt ("Ms Wyatt") of Ozannes advised by email that a unit trust would take some
time to establish, and the raising of money by the issue of units in a unit trust would
require Control of Borrowing Order consent ("COBO consent") from the Guernsey
Financial Services Commission.

116.    As for an exempt company, Ms Wyatt said this could either be newly incorporated
(this would take about 3 working days provided all the information needed was
provided), or Ozannes could provide a shelf-company *"which could be used provided
that the directors, shareholders, registered office and company name of that company
will need to be changed and appropriate filings made with HM Greffe (the Companies
registry)."*   Ms. Wyatt attached an application form, which she requested be
completed *"regardless as to whether or not the shelf company is to be used in order
that we have relevant background detail…"*

117.    The controlling hand of Erinaceous is clear from the intervention of Ms Cummings
and Erinaceous. Ms Cummings took over dealing with Ozannes and emailed Ms
Wyatt on 9 July 2007.  She explained (as it turned out, optimistically) that the
property transaction would likely be completing in the next week, and was therefore
interested in a two stage process – establish the company first, and later *"the fund to
sit above company and raise the equity to repay the non bank loans, and can when
ready dissolve the company and transfer the assets and liabilities to the fund."*

*Mr Egan's agreed funding terms*

118.    By this time, Mr Egan had already agreed terms with RBS for funding, and on 6 July
2007 Mr Gareth Beaton at RBS sent through to Mr Egan "Credit Approved Terms"
for "Albermarle Fairoaks LLP".

119.    The facilities offered were a Senior Loan of £24 million or 60% of market value
(whichever was lower), and an Equity Bridge Facility of £7 million repayable within
6 months of initial drawdown, with an interest rate of 1.5% over LIBOR "plus
MLA's".  The source of repayment was described as being:

> *"from equity raised from new investors, 50% to be repaid within 3 months"*

120. Mrs Bellis and Mr Egan dealt with RBS in a telephone conference on 9 July 2007. The SDLT issue was raised with RBS, and RBS"s solicitor (Mr Grieve at Burness LLP) agreed that the changes to the SDLT partnership provisions meant that *"following any property acquisition new members/partners will now be subject to SDLT. This corresponds with the advice given to Geoff that he should not use an English LLP"*.

*Arrangements for ownership and control of SPV*

121. By 11 July 2007, it seemed as if the underlying transaction would actually complete the following week: so there was some real urgency to get the investment vehicle established.

122. On 11 July 2007 Ms Cummings sent through to Ozannes the completed application form, which recorded Mr Egan and Mr Lawson as being the nominated shareholders. They were the people who at that stage were regarded as being likely to be the founding members of an LLP had one been used. This was in conformity with previous Albermarle investment schemes: those two held the shares in substance for the investors, who would replace them and own the entity once subscription was complete and the scheme could safely proceed.

123. Ms Wyatt provided a list of administrators who could provide corporate administration services. Ultimately Ms Cummings selected Legis Trust & Corporate Administration Limited ("Legis").

124. The following day (12 July 2007) Ms Wyatt emailed Ms Cummings, pressing for a decision on the administrators, explaining that until they were in place Ozannes could not lodge an application for incorporation of a new company; there needed to be administrators because they supplied the registered office. She also suggested that the administrators should provide corporate *"nominee shareholders/directors"* to get the company incorporated, with Messrs Egan and Lawson being the beneficial owners.

125. Legis agreed to provide a registered office facility, secretarial and administration services on the afternoon of 12 July 2007 (the precise chronology is relevant as I explain later). That evening Ms Wyatt emailed saying that Ozannes had not been able to submit company incorporation papers because they *"remain incomplete until the administrator has been appointed and a registered office determined."*

126. On the morning of Friday, 13 July 2007, it was decided not to incorporate a new company but to use a shelf-company. Ms Wyatt emailed:

> *"it has now been decided in the interests of time to use Shelco Twenty Two Limited and to change the beneficial ownership (and later the name) rather than to incorporate a new company.*
>
> *We are awaiting confirmation of whom the beneficial owner will be – it is intended to use First/Second Ovalap as nominee*

> *shareholders for the time being and to use Legis as registered office.*
>
> *Please could you let us know what info you are missing regarding the change of beneficial ownership form as I would like to get this in today so that we can use the company in a transaction on Wednesday."*

*Mr Cummings becomes beneficial owner of AFL*

127.    Also on 13 July 2007, after tax advice from PwC to Erinaceous that the beneficial owner ought not to be an employee of Erinaceous or of any of its subsidiaries, it was decided by Erinaceous to use Mr Mr Cummings as beneficial owner of the shares in AFL.

128.    Mr Cummings was not an employee of Erinaceous (the relationship was as a consultant): but he was part of the family and no doubt perceived by Mr Bellis and Ms Cummings as biddable (as he proved to be). Whereas Mr Egan and Mr Lawson had regarded their beneficial ownership of the SPV in previous schemes as held for the benefit of the investors, it appears from later matters that Mr Cummings regarded himself, in effect, as a placeman for Erinaceous: by whom he was indeed placed in that position. When the interests of Erinaceous and the investors diverged, he chose to prefer the interests of Erinaceous and his family, as I explain more fully later.

129.    Ms Cummings emailed details for Mr Cummings to Ms Wyatt. Ms Cummings then asked Mrs Bellis by email to provide a lawyer"s reference for Mr Cummings to be sent to Legis (no doubt for their ‚Know Your Client" checks). The application for consent to change the beneficial owner was then submitted to the Guernsey authorities. Ms Wyatt explained that "*we cannot use the company for this transaction until consent to the change of beneficial ownership is received but as the application and consent request have been submitted today we do not foresee any difficulty in transacting on Wednesday 18th July.*"

130.    Consent in principle for the change in beneficial ownership was provided by the States of Guernsey Policy Council on the same day; but this was expressly subject to the proviso that there be no objection by Guernsey"s Law officers.  On 17 July 2007 HM Procureur confirmed that he raised no objection to that change.

131.    There is a dispute (which I address later in the context of the Claimants alternative basis of claim) as to precisely when, in such circumstances, Mr Cummings became beneficial owner.  It seems to have been assumed by Mrs Bellis and Mr Cummings at the time that the consent for a change operated from 13 July 2007; and on 13 July 2007 Mrs Bellis prepared and Mr Cummings (purportedly as beneficial owner of AFL) signed a letter of engagement  ("the Engagement Letter").

132.    The importance of the dispute is that it affects a question whether that Engagement Letter was ever validly approved by or on behalf of AFL, and the Defendant Firm places substantial reliance on the Engagement Letter as the source of its authority to do what it subsequently did.

*The Engagement Letter*

133.    The Engagement Letter in relevant part read as follow:

> "*Shelco Twenty Two Limited has been incorporated in Guernsey to take the legal title to the Development Land.  As you know, the usual vehicle which has been previously used for projects of this type is a limited liability partnership but, in view of the recent stamp duty land tax changes, Geoff has been advised that this is no longer appropriate.  I understand that Geoff is taking his own advice as to the structure which will be adopted for the fund raising but that, until that structure is in place, investors will be making loans to Shelco Twenty Two Limited in order, first of all, to repay the equity bridge of £7m and secondly to repay the loan which will be made by Erinaceous Group plc of the balance needed to complete (likely to be £15m)…*
>
> *This firm does not have the expertise to advise on the structure which should be adopted in the future as a vehicle for investors.  As indicated above, Geoff is taking his own advice on this (initially from Ric Berman) and I understand that Lucy is also assisting in liaising with Ozannes in Guernsey.  Following my discussion with Geoff and Michael, however, I can confirm that I am agreeable to receiving the monies from investors on the basis that these monies are remitted either by way of loan to Shelco Twenty Two Limited or as an investment in whatever structure is put in place for the project and that these monies will be immediately utilised to repay monies owed to the Royal Bank of Scotland…*"

134.    Although completion of the contract for the purchase of the development land had at that time been anticipated to take place on 18 July, it was delayed until 26 July 2007. The Defendant Firm acted as the solicitor for AFL on the transaction, and Legis, which provided the corporate directors of AFL, knew of the Defendant Firm"s role acting for AFL: it made no complaint and at the least acquiesced in it.  The transactional documents were finalised (including RBS"s requirement for Guernsey legal opinions as to whether AFL could enter into the transaction and if so by whom). The formalities required by RBS were observed.

135.    In completing the purchase of the development land on 26 July 2007, AFL contributed none of the purchase price from any capital of its own. As apparent from the Completion Statement, the purchase price all came from money borrowed from RBS (as to £31 million) and Erinaceous (as to £15 million).

136.    Subsequently there was VAT to be paid on the purchase, and RBS funded a VAT Bridging Loan of £7.72 million, which was provided on 24 August 2007.

137.    On 26 July 2007 Ms Cummings emailed Mr Egan and Mr Lawson explaining that the Fairoaks Transaction would probably be completing that day.  She said:

> *"...so we need to sort out early round fund raising. As you know there is not only the equity bridge from RBS but the loan from E [Erinaceous] – so this is a big task. We need the early round loans as quickly as possible – the fund structure will take a few weeks to set up so we can offer an early subscribers discount pending issue of the units in the trust."*

138.    Mr Egan replied the same day, saying

> *"I agree I have the initial teaser ready".*

*The "initial teaser"*

139.    This "*initial teaser*" simply described the nature of the Fairoaks property and its potential: it did not set out the terms of investor participation.

140.    Once ready it was then sent in draft to Ms Cummings and Mr Cummings on 1 August 2007. On 3 August 2007, Ms Cummings made some amendments in tracked changes and sent it back to Mr Egan – "*please feel free to ignore or accept as you wish. I think we are heading for a good result on this – I hope your investors feel the same!*"

141.    On 30 July 2007 Mr Cummings signed an administration agreement with Legis. This provided principally for:

(1)    Legis to provide (for a fee) corporate nominees to hold the Shares and to exercise all voting powers in accordance with "Proper Communications" (that is to say, instructions given by Mr Cummings as the person prescribed for that purpose);

(2)    Legis to provide, at its sole discretion, up to two corporate or individual directors to be appointed by the legal shareholders to act as directors of AFL in accordance with the Articles of Association.

*Proposal for a loan note*

142.    On 6 August 2007 Mr Egan emailed Ms Cummings, asking her (emphasis supplied):

> *"Can you comment on my earlier note re security and bonus for early investors please, as I would like to include it, perhaps we give them a loan note for the Guernsey company pending the Investment Memorandum being completed, plus maybe interest at 1% above base (same as bank)."*

143.    Ms Cummings (again the controlling hand of Erinaceous is evident) agreed with this proposal:

> *"Loan note from Guernsey co (now renamed Albermarle Fairoaks Ltd) would be fine – happy with the interest until the structure is in place as this should be neutral to your returns model."*

*Revised Teaser and the Teaser email*

144.   On 8 August 2007 at 13.41 Mr Egan sent out a revised Teaser ("the Teaser") under cover of an email to his investors ("the Teaser email") to which he attached three excel spreadsheets.  The Teaser email was then sent to Ms Cummings.

145.   The Teaser email solicited investment.  It read as follows:

> "***ALBEMARLE FAIROAKS***
>
> *We have just completed the purchase of Fairoaks Airport and the income producing element 160,000 sq ft on 16 acres plus 20 acres of development land has been transferred into Albermarle Fairoaks and we are now aiming to raise the equity, it has been banked by RBS."*
>
> *I attach a brief summary of the transaction and figures from which you can see that the IRR projections are 15-32% depending on how much pre-let development we undertake over the next 5 years.   The property has been acquired in a Guernsey Limited Company and we intend to create Guernsey Close Ended Fund above it controlled by the investors.   This will enable:*
>
> *(1)   SIPP investors to invest in Fairoaks*
>
> *(2)   Fairoaks to be merged in due course with Albermarle Shoreham*
>
> *(3)   Ultimately a listing in the Guernsey or maybe Irish Stock Exchange which will give liquidity to the investments and Inheritance Tax and Capital Gains Tax advantages*
>
> *Prior to formal fund raising in September, I am keen to offer the opportunity to invest straight away to some of our regular Investors as Shoreham was oversubscribed.*
>
> *If it is possible to transfer money in the next week, I can immediately issue loan notes and ensure that a paid return of 1% above base rate can commence immediately.  If you let me know how much to earmark for you, I will send you the bank details."*

146.   Pausing there: the Teaser e-mail does not appear on its face to have been sent or circulated to Mrs Bellis: she denies having seen it and rejects the Claimants" contention that she did. Although the Engagement Letter had identified it as a document she did need to see, she told me that she never asked to see it either (which she accepted "may have been" remiss of her).  All this is surprising and I return to it: in the meantime, I note that even if she did not see the August version she plainly had seen the earlier (June) draft containing a description of the proposed investment, but no invitation such as in the Teaser email.

*Draft Loan Notes are provided and sent out*

147.   Mrs Bellis" first recorded involvement in the "fund-raising" part of the story was on 8 August 2007 when she spoke to Mr Egan and he asked her to draft a form of loan note for Mr Egan to show to the investors.  Her attendance note records:

> *"(3)   What can we give them now?  A Loan Note.  Me to draft a Loan Note."*

148.   The plan for a loan note, which at that time was envisaged to provide for a contractual right of conversion into some form of equity, is reflected in an email Mr Egan sent to Ms Cummings, Mr Lawson, Mr Pearson and Mrs Bellis (half an hour before he sent out the Teaser email):

> *"We are out to key investors to get some initial money now, giving them a loan note for the Guernsey Company which Juliet has promised to draft, at 1% above base.*
>
> *Juliet is also sending me copies of all the docs, leases etc, so I can get Ric started on the Investment Memo…"*

149.   On 13 August 2007 Mr Egan emailed Mrs Bellis chasing her for the draft loan note:

> *"Any chance of a loan note, so I can collect some funds."*

150.   On 14 August 2007 Mrs Bellis emailed Mr Egan asking for further information as to the terms of the loan notes:

> *"1. I imagine that it will attract interest but at what rate?*
>
> *2. I am proposing that the note will be cancelled in return for an appropriate unit in the new unit trust which is being set up but there should be a long stop date in the note for repayment if the unit trust does not get formed.  Any ideas?*
>
> *3. The note will have to spell out that the lender"s loan is subrogated to the Royal Bank of Scotland"s senior debt.  I assume that this is not a problem?*
>
> *4. Are there any other conditions which you think ought to go in the loan note to ensure that it ties in with what investors have been told?"*

151.   Mr Egan replied immediately saying:

> *"Thanks that"s fine, the note should be 1% over base, the rest of your comments are ok."*

152.   He then (within minutes) sent another email answering Mrs Bellis" question of the long stop date for repayment if the unit trust does not get formed:

> *"Sorry long stop date say 1 year"*

*PwC advise right of conversion not feasible*

153.    Then, on 15 August 2007, Mrs Bellis emailed Mr Egan advising that she had received advice that the loan notes could not be convertible into equity in the unit trust:

> "*Draft Loan note.  On discussing this further with Price Waterhouse Cooper (who are advising on the best vehicle for the fund) they had strongly urged that there is no element of conversion in the note.  I have therefore just done a very simple note with conditions attached.  The only outstanding item of information I need from you is when you envisage paying the interest to the noteholders.  I have currently inserted quarterly in arrears.*"

154.    She added, that although other documents (in particular, the property management agreements "modelled on Shoreham") would "have to go over to Guernsey to be signed":

> "*...I will obtain authorisation from the Guernsey directors for you and Dougie [Lawson] to sign the loan notes as otherwise issuing them is going to be very cumbersome*"

155.    This change in what had previously been proposed (the change from a convertible loan note to a simple debt) was made unilaterally by Mrs Bellis, apparently on the basis of oral advice from PwC in discussions with Erinaceous" director Michael Pearson of which no written record was produced or (so far as I am aware) exists.

156.    Its significance is obvious: yet it is not even the subject of formal record, let alone proper assessment. This confirms the picture I have formed of Mrs Bellis" indifference to the interests of the investors, and her abdication not only of any real responsibility for the overall legal coherence of the transaction as a whole (which she sought to disclaim under the terms of the Engagement Letter) but also of her most basic duties in relation to the use of her firm"s client account, and as adviser to the vehicle for the investment intended to be made by the Claimants (the SPV, AFL).

157.    It is, however, important to bear in mind that the change was "behind the curtain": it was not explained to investors.  The change gave rise to, or (given the SDLT problem) exacerbated, a real difficulty (which Mrs Bellis never addressed) as to how loan and equity were to be matched and coupled: but there is no reason to think that it resulted in any alteration in the investors" own perception of the nature of the investment they intended to make.

158.    To return to the chronology, Mrs Bellis had omitted to attach the draft loan note to her email of 15 August 2007, and Mr Egan chased for this on 20 August 2007:

> "*2) The draft loan note was not attached, could I have it asap as I want to collect some money.*"

159.    Mrs Bellis then emailed the draft loan note to Mr Egan at 10.38am on 20 August 2007. The draft Loan Note was an unsecured Loan Note "*repayable on the later of one year from the date issue* [sic] *or when the Senior Debt shall have been paid in*

Challinor + 20 others & Juliet Bellis & Co, & Egan

*full*" but with a power reserved to AFL to pay off early, in whole or in part. The Loan Notes, having a coupon of 1% over Bank of England Base Rate were to rank *pari passu inter se* and be subordinated to the rights of RBS in respect of the Senior Debt.

160.   Pausing again, Mrs Bellis must have envisaged that Mr Egan would in due course be using the drafts "to collect some money" (since that was what he had expressly stated); but she must have understood that the drafts had not been approved by the directors of AFL (since she had not yet made any arrangements for that, nor for the delegation of authority by them).

161.   Further, Mrs Bellis appears to have made no effort to enquire what the investors had and were being told. She still did not ask to see the Teaser email, though necessarily by this time the only logical assumption she could have made was that there had opened up a material difference between what the investors had been told in the Teaser email (as to an equity investment) and what was now on offer (a loan note). Again I return to this later.

162.   After expressions of interest were received from investors, on or about  20 to 22 August 2007 Mr Egan sent (or had sent on his behalf) a further email ("the Loan Note Email") to those who had responded positively. He thanked the investors for their interest and asked them to forward the money to the Defendant Firm, attaching the client account details and the loan note about which Mr Egan said:

> "I have also attached the loan note (with interest) which we will be issuing pending completion of the Unit Trust."
>
> *The remainder of the terms of the transaction will be fairly similar to Shoreham LLP...*"

163.   In the meantime, it is Mr Wallis" evidence that he clearly recalls calling Mrs Bellis sometime between 15 and 17 August 2007 because he "*wanted to speak with [her] before transferring my funds to her client account*" to inform her that he was proposing to transfer a quarter of a million pounds to her firm and wished the money to be held "*pending my further instructions*". Mrs Bellis denies that there was any such conversation; and the dispute is perhaps the most fundamental of the factual issues: I return to it in paragraphs 449 to 475 below.

*Payments start into the client account*

164.   Monies subscribed by investors started being transferred into the Defendant Firm"s client account from around 21 August 2007.  The dates, amounts and payers are set out in the Schedule attached**.**

165.   Mrs Bellis" evidence was that she spoke to Mr Egan on the telephone on 24 August 2007, during which Mr Egan instructed her that the sums which had been received from the 15th Claimant (Tenon) should be transferred to RBS.  Mrs Bellis noted in manuscript on a print out of the email:

> "GE confirms → RBS"

166.   Mr Egan, however, said that he does not recall any such conversation.  In his first witness statement he stated that he was on his boat which was docked at Poole Harbour – on a *"team away day meeting"* and it was *"very unlikely that I would have taken a telephone call on my mobile on that date from Juliet Bellis…"*  However, Mr Egan later served a second witness statement in which he now says that the "away day" was not in fact on 24 August 2007, but 31 August 2007 (which was the day that he sent the email to Mrs Bellis described below). I return to address the dispute as to this conversation later.

167.   Earlier in the afternoon of 31 August 2007, Mrs Bellis had sent Mr Egan a schedule summarising the payments which had been received into the client account for AFL, and the total was then £1.35million.  Mr Egan's response was:

> *"the Fairoaks money needs to go to RBS. asap".*

168.   On 3 September 2007, Mr Grieve (as already mentioned, a partner at Burness, RBS's Scottish solicitors) emailed Mrs Bellis in relation to the VAT Bridging Loan and the timing of the transfer/restructuring into the unit trust (of which more below).  He also asked about the fund-raising:

> *3.   I understand that our clients met or spoke last week and that the equity raising is progressing well and that approx £2 million has been forwarded to you.  My understanding is that this is to be remitted to the bank…. in reduction of the equity bridge.  Can you confirm that you have similar instructions."*

169.   Since the principal contact with RBS was Mr Egan, it seems likely that it was he who had spoken with someone at RBS the previous week.  In any event, Mrs Bellis' evidence was that she spoke to Mr Egan following her receipt of this email and he asked her to send the money to RBS *"as soon as it comes in"*.  This is recorded in her manuscript note written on the email. I return to this also later.

*Payments out of client account to RBS*

170.   On 4 September 2007 Mrs Bellis responded to Mr Grieve's email:

> *"I currently hold £1,450,000 and am remitting this to the Bank today.  There is a further £250k on its way to me – there was some confusion about the payee on the cheque - and further funds are expected.  This is in reduction of the equity bridge."*

171.   As she had foreshadowed in her email to Mr Grieve, two payments were then made from the client account to RBS which were applied to reduce the RBS Equity Bridge: £1,450,000 was paid on 4 September 2007, and £350,000 on 7 September 2007.

172.   The RBS Bridging Payments were thus paid out of sums which had, by that date, been paid into the client account by the 2nd, 3rd, 6th to 8th, 10th to 16th and 18th and 19th Claimants.  They were in fact paid early (the first instalment not in fact being due until 26 October 2007).

173.   At the time that these payments were made, the form of the loan notes had not yet
        been finalised, still less authorised and agreed by AFL; COBO consent (the need or
        likely need for which in the context of the transaction Mrs Bellis must have been
        aware of from her correspondence with Helen Wyatt at Ozannes in July 2007), was
        still not in place; and Mrs Bellis had not undertaken the required Know Your Customer
        ("KYC") checks. Mrs Bellis was well aware of all this.

174.   Furthermore, Mrs Bellis and Mr Egan knew that at the end of August / early
        September 2007 a unit trust would not be established in time for any of the Claimants
        to subscribe to it and it had not been determined how and in what form the Claimants
        would obtain the equity participation in and control of  AFL, the achievement of
        which accordingly remained uncertain.

175.   They both appear to have had some expectation that Loan Notes could be issued
        promptly after Mr Egan raised loans from investors (including the Claimants): but the
        structure remained uncertain. None of the Claimants was advised by either Mrs Bellis
        or Mr Egan (or, indeed, anyone else) about these uncertainties.

*Delay and uncertainty continues*

176.   The delays and uncertainties continued. Throughout August, September and October
        2007 both Mrs Bellis and Mr Egan knew that no unit trust or any vehicle for equity
        participation had been formed.

177.   In tandem with the fund-raising, Mr Egan had apparently set Mr Berman the task of
        drafting an IM for equity participation through the unit trust.

178.   On the evening of 26 July 2007 it appears that Ms Wyatt had emailed Ms Cummings,
        Mr Berman and Mr Egan about the formalities for establishing a fund structure.  She
        explained:

              *"Our correspondence with the Guernsey Financial Services
              Commission to date in connection with the take on and
              activities of Shelco Twenty Two Limited has been made on the
              basis that the ultimate structure to be put in place would not
              constitute a fund as only one property would be held.  I note
              however that this is not the case and that the fund will own a
              number of properties (possibly through subsidiaries) and a full
              fund application will be required. We will need to inform the
              Commission accordingly and submit the fund application to
              them"*

179.   Nothing then appears to have happened until the end of August when there was a
        flurry of activity from Mr Egan who seems at that time to have been trying to finalise
        an IM.

180.   In an email on 28 August 2007 Mr Egan asked Mrs Bellis for updated versions of a
        Participation Agreement, Draft Loan Note and Property Management Agreement,
        explaining that *"we are waiting to finalise the Investment Memorandum, which we
        must do asap as the rules change in October."*

181.   In that email, copied to Ms Cummings, he asked *"how is the Unit Trust formation going?"*  Ms Cummings responded saying *"The unit trust formation is awaiting the investment memorandum"*.  At that time the unit trust under consideration was still the "super - fund" which would cover both Shoreham and Fairoaks.

182.   It appears that Mr Egan had a meeting with Mr Berman on or around 4 September 2007 in connection with the drafting of an investment memorandum.

183.   Then on 7 September 2007 Mr Berman sent through to Mr Egan and Ms Cummings an investment memorandum for "Albermarle Infrastructure Plus Limited" (the "Albermarle Infrastructure IM"), a proposed Guernsey registered closed-ended investment company which was to be established into which both Albermarle Fairoaks and Albermarle Shoreham would be merged.

184.   This Albermarle Infrastructure IM was, of course, consistent with the type of super-fund that Mr Egan had mentioned in his 3 July 2007 email, and which Mr Berman had explained to Mrs Bellis when they spoke on 6 July 2007 (see above). By mid-September 2007 however Mr Egan appears to have realised that having a regulated entity would be administratively burdensome.   On 17 September 2007 Mr Egan emailed Mrs Bellis and Ms Cummings saying that:

> *" The meeting with compliance and Ric seems to have thrown up more complications than solutions, and he says it would take some time to start from scratch with the fund and FSA etc. I wonder if there is a quicker route which we can do right now, either by just giving the investors shares in Albermarle Fairoaks Ltd or another and then looking at putting a fund over Fairoaks and  Shoreham much later."*

Ms Cummings (not Mrs Bellis) responded on 18 September 2007 saying:

> *"I am talking to Guernsey fund managers about the structure and what we need  to do – your idea might be the most pragmatic but I think under Guernsey GSFC regulation we will need a GPUT on top of  the Guernsey company.  If Ric [Berman] is not prepared to appoint you an AR I may have to use an external fund manager which would cut in to our margin, but they would then have to   appoint us as an AR."*

185.   On 17 September 2007 Mr Egan emailed Mrs Bellis:

> *" Some of the Investors are giving us a hard time as they read the press.  However I am sure I can make some headway with some of them if I can explain a) That theirloan notes are ahead of Erinaceous but behind RBS, where do I evidence that, and b) How do I get these loan notes signed and by whom. "*

186.   Mrs Bellis responded on 18 September 2007 attaching a revised draft loan note making it clear that the note-holder would rank ahead of Erinaceous. She said she would send this, together with the Participation Agreement and Property Management

Agreement to the corporate directors to approve, and to authorise Messrs Egan / Lawson to sign the loan notes.

187.    Mrs Bellis did this.  She emailed AFL"s corporate directors on 20 September 2007 attaching the draft Loan Note referring to the fund raising having:

> *"started by way of loans to the company and lenders would like*
> *some documentation evidencing their loan".*

188.    Mr Dickinson ("Mr Dickinson") (acting for AFL"s corporate directors in Guernsey) did not reply until 24 September 2007 (having been out of the office until then).  His response was simply to say *"Did you forward this to any of my colleagues to deal with in my absence or is it still pending?"* He did not state any objection to the notion of a loan note.  He emailed again the following day having made some minor changes to the draft. He explained that KYC documentation was required, and he said that *"In the meantime, we are making the application to the Guernsey authorities for the Control of Borrowing Consent for the £25 million."*   It is not clear from Mr Dickinson"s email how he got the figure of £25 million: it was not referred to in Mrs Bellis" email.  The COBO consent was then obtained in those terms on 27 September 2007.

189.    On 15 October 2007, by which time Ms Wyatt had been instructed to deal with the regulatory formalities in connection with the formation of the unit trust, Mrs Bellis emailed Ms Wyatt to explain a possible change in the structure (the interposition of an LLP), saying:

> *"Some investors prefer to invest through the LLP route rather*
> *than simply make loans to the company (which give an income*
> *but not share of the equity growth)."*

190.    By late September 2007 there were still a number of Guernsey regulatory "hoops" which needed to be jumped through, including in particular KYC documentation and COBO consent.  Thereafter, Mrs Bellis was in regular email contact with Mr Egan: both were well aware that no loan notes had been issued to investors, and that they could not be issued unless and until these hurdles were overcome.

191.    On 27 September 2007, Mrs Bellis emailed Mr Egan explaining that "*the loan notes*" would be issued by AFL but:

> *"there are some regulatory issues which are having to be*
> *resolved.  In particular, the Guernsey administrators will need*
> *KYC evidence so this will be needed for those who have*
> *already participated as a matter of urgency.  Could you let me*
> *have the relevant pieces of paper for onward transmission (ie*
> *copy passport and utility bill).  The Guernsey administrators*
> *are also of the view that the issue of the notes might need to*
> *come from them."*

192.    Having by email sent on 27 September 2007 chased Mrs Bellis, stating that he wanted *"to get to £3.5m quickly to get the brownie points back from RBS for paying them back early",* on 1 and 2 October 2007 Mr Egan sent some information about the

investors to Mrs Bellis and Ms Cummings for the specific purpose of enabling the loan notes to be issued.

193.    On 4 October 2007, Mr Egan emailed Ms Cummings and circulated Mrs Bellis saying that he was "*determined to beat*" the deadline for repayment of half the RBS Equity Bridge of 26 October 2007 and that he had "*the balance of the first £3.5m waiting to go in*" from further investors; but that they would "*not do it until they get their loan notes.*"

194.    In his 4 October 2007 email Mr Egan also explained that he had been promised £3 million from another investor, but that "*they want to go straight into the Unit Trust, do you know when that will be ready*".

195.    On 4 October 2007, Mrs Bellis replied about the unit trust:

> "*I am working on the docs. for the unit trust and will be getting them back over to Guernsey tomorrow. Lucy tells me that Guernsey can turn this round pretty quickly and it would be better to get the money directly into the unit trust given the regulatory problems I am continuing to hit with the loan notes.*"

196.    On about 9 October 2007 Mrs Bellis was informed by Erinaceous" Head of Tax, Mr Roy Flood, that the Chancellor of the Exchequer, in his Pre-Budget Statement, had announced that he was unravelling the changes made to the SDLT regime for LLPs in 2007.  Mrs Bellis notified Mr Egan of this change and advised that, subject to getting information from Mr Egan as to "the category of investor who is being targeted", an LLP might be able to be used after all, not as part of the proposed unit trust, but either as shareholder of AFL or to take a conveyance of the Development Land from AFL. She said that there was limited time to get this resolved and asked for his views.

197.    There is an email exchange between Mrs Bellis and Mr Egan on 17 October 2007, starting with Mr Egan forwarding various KYC documents in respect of the fifteenth Claimant:

(1)    Mrs Bellis emailed Mr Egan asking him whether Saskia (Mr Egan"s assistant) was "OK to chase up investors as we need some cash coming in next  week to clear the £3.5m equity bridge – due 26th Oct."

(2)    Mr Egan"s response was "We will do it together, but so far they are refusing until the loan notes are available.  Plus we have about £3.5m promised but they will only go straight into the Unit trust."

(3)    Mrs Bellis said: "If you can organise the KYC documents plus the loan note application (when Guernsey have signed it off) to come to me I will package it all off to go over to Guernsey so that the loan notes are issued as soon as the cash comes into my client account.  That would seem the quickest way of achieving the desired result?? I will be speaking again to Guernsey tomorrow afternoon and hope to have a further progress report then."

198.    On 23 October 2007, Mrs Bellis sent to Mr Egan‟s assistant (for Mr Egan‟s attention) a draft application form for loan notes, explaining that she would let him know as soon as it had been approved by Ozannes.  She said that she had "*asked Ozannes to let me have a draft of an application for the unit trust.*"

199.    The Senior Loan facility of £24 million had a "payment holiday" until 15 October 2007.  On that date a sum of £380,000 odd was payable to RBS as interest on the Senior Loan.  The interest on the Senior Loan was to be repaid out of the rental payments received from tenants.  These rental payments were to be collected by Egan Lawson under a Property Management Agreement (which had not in fact been executed).

200.    On 12 October 2007, Michelle de Carteret, a senior administrator at Legis, emailed Mrs Bellis asking how much cash the Defendant Firm would be able to send to RBS in relation to the "loan facility" which "*is due to mature on Monday 15 October. Interest due on this will be £379,942.62*".

201.    Mrs Bellis‟ evidence is that she had a telephone discussion with Mr Egan between 10 and 15 October 2007, during which Mr Egan told her that she should make the payment out of the monies in the client account and that Egan Lawson would then make an equivalent payment from the rent when it was collected to RBS to reduce the Bridging Loan.

*RBS Equity Bridge repayments*

202.    By 26 October 2007 only £1.8 million of the first tranche of the RBS Equity Bridge (£3.5 million) due to be repaid by then had been paid.  Mr Egan‟s fund-raising activities were also not going as well as had been hoped; at this time Erinaceous was getting some bad press, and Mr Egan was of course now connected with Erinaceous.

203.    An extension of the repayment date for the first tranche was required.  That was a responsibility which fell to Mr Egan. He therefore arranged to meet with RBS, and a 1 month extension was then agreed.

204.    The Defendant Firm contends (and I accept) that Mr Egan must by then have known (for how else would he have been able to negotiate the extension) what sums had been paid by the Defendant Firm to RBS and by when; and that he must also have known that these sums had been paid before any loan notes or units had been issued; but that even so, Mr Egan still made no protest, nor did he make any suggestion that Mrs Bellis had in any way acted wrongly in paying the money out.

205.    However, on 13 November 2007, Mr Lawson wrote an email to Mr Egan recognising that funds raised to date had been paid out and cautioning against raising further money if all that could be offered was a loan note.

206.    On 22 November 2007, Mr Egan himself wrote to his investors, including the Claimants "*to acknowledge*" their respective sums advanced "*as payment for your share in Albermarle Fairoaks Limited*" and saying that:

"*For the time being this is being treated as a loan to the Guernsey Limited company, which ranks ahead of any loan made by Erinaceous but after the loan for the property from RBS.*"

*Investors become aware of their treatment as unsecured subordinated lenders*

207.    This was, so far as I am aware, the first written record of any communication to investors of their status as subordinated and unsecured lenders whose monies had already been paid out of the client account to which they had sent their monies.

208.    It was put to Mr Wallis in cross-examination that his muted response to this demonstrated that the revelation that the money he had sent had already been deployed before any documents were in place did not come as a surprise: and that, on the contrary, it was what he had expected: otherwise surely, it was suggested, he would have been both astonished and angry with Mr Egan.  Mr Wallis did not accept this.  He rejected any suggestion that all he expected was a loan note, and that the money he had invested could be applied even before its finalisation. He said his anger was directed not at Mr Egan but at Mrs Bellis, to whose firm he had entrusted his money. He explained that in fact by then he had already spoken to Mr Egan who had acknowledged that "*we had a significant problem in relation to this investment…[and] …was expressing really serious doubt as to whether we were actually going to get value..[and] were probably going to need to take legal action as a result.*"

209.    However, Mr Wallis (and, subject to the next paragraph, I infer from the lack of any evidence to the contrary, the other investors) concluded that it was best left to Mr Egan to try to obtain the equity participation that they had expected; and none complained directly to Mrs Bellis herself about any breach of their understandings (which Mr Wallis said he now greatly regretted).

210.    Mr Glatman (on behalf of his family interests) did contact Mrs Bellis by telephone on 3 December 2007, of which he made a contemporaneous note. There is a dispute between him and Mrs Bellis (who also made a rather shorter note) as to the scope of their conversation to which I must return.  Suffice it for the present to note that Mr Glatman records that he:

> "*questioned her around 5pm about the investor position in this scheme. Asked her why investors had loan notes when no reference to these in the fundraising documentation…I indicated to her that loan notes never suggested in the funding documentation and certainly no suggestion of any additional debt above base debt from bank.  Questioned if the time had not come to return money – she pointed me at Geoff Egan…*"

211.    On the same day, Mr Glatman  emailed Mr Egan as follows:

> "*Geoff*"
>
> *As you might appreciate, I am in a slightly difficult position in view of my other discussion, but I am writing to you in the light of the recent letters which I have had from you addressed to the*

> *Mark Glatman Accumulation and Maintenance Trust and also my SIPP, as each party has invested £50,000 in Albermarle Fairoaks.*
>
> *At the time of subscription in August 2007, it was clear that we were investing in an Albermarle syndicate with £24M of bank debt and the balance of the purchase price provided by investors.*
>
> *There was no question of investing for loan stock, nor was there any suggestion that there would be any other debt within the investment other than the bank finance of £24M.*
>
> *I would have thought that urgent consideration should be given to untangling what does appear to be a wrongful use of investor funds and to compensate and reimburse the investors accordingly.*
>
> *At this stage I have to record that I am reserving my rights on behalf of both investors and would welcome some clarification of the investor position and the intentions of Erinaceous in this respect."*

The reference to "other discussion" was not explored before me.

*Mrs Bellis'' contemporaneous Memorandum in December 2007*

212. Attached to an email sent to Mr Dickinson on 17 December 2007 Mrs Bellis provided a memorandum ("the December Memorandum") setting out her perception of the history, together with a list of investors.

213. In the December Memorandum she described her retainer as being limited to acting on behalf of the Guernsey company in acquiring the property; as I discuss at greater length later, she said that *"Geoff together with Ms Cummings of Erinaceous Group plc gave instructions to Ozannes to implement the agreed structure."* She added that the requisite documentation for loan notes and units and unit trust were, as far as she could see, ready.

214. By email to Mr Dickinson dated 19 December 2007 Mr Egan stated that he considered *"Her note is accurate."* He went on:

> *"I suppose my only question is whether or not I had the authority or whether she should have accepted an instruction from me on the payment of funds to RBS.*
>
> *All the investors want their money back, but I guess I may be able to talk them into leaving it in or putting more in if they could immediately take control of Albermarle Fairoaks Limited, and then forget the Unit Trust etc. Whose decision is that??"*

215. Mr Dickinson immediately responded (by email of the same date):

> *"You did not have any authority to instruct on this and Juliet Bellis should not have accepted an instruction from you in connection with this company.*
>
> *Please do not, under any circumstances, attempt to solicit further funds on behalf of the company and do not attempt to convince these people that they should leave money with the company.*
>
> *...*
>
> *Voluntary disposal of the Company would presently be the decision of Mr Cummings as he is the beneficial owner. However, the Directors here are considering various alternatives, including an outright sale of the Company"sassets to clear all outstanding liabilities."*

216. Somewhat remarkably in the circumstances, and in light of the inadequacy of a loan note (without more) to record the combined equity/loan investment that both he and the Claimants say was ultimately envisaged, Mr Egan continued his efforts to persuade Mrs Bellis and Legis to do what was necessary to enable final Loan Notes to be issued.

217. In an email to Mrs Bellis, copied to Mr Dickinson and dated 11 January 2008, he said that this would *"be a big relief to our people"*. It may be, however, that he expected the unit trust would follow imminently: Mrs Bellis had emailed him on 6 December 2007 to say that the "unit trust and applications for units" were in final form.

218. Also on 11 January 2008, Mr Dickinson wrote to Mr Egan and Mrs Bellis, with reference to Mr Egan"s earlier email which included a request to him for loan notes to be issued once KYC requirements had been satisfied, as follows:

> *"I don"t remember saying we would issue loan notes, the format for the loan notes has not even been agreed yet.*
>
> *We discussed issuing a single share for every £1,000 received (£1 for share and £999 creditor) and that, if the loan note format was eventually agreed we would convert the creditor to loan note [sic]. I also suggested that the company would issue an acknowledgement of receipt of the funds confirming the company"s intention to issue the loan notes once the scheme had been approved by our local regulator (GFSC).*
>
> *However, we will not do the share issues or the acknowledgements until the KYC has been checked and I am not inclined to allow any of my people to do any further work (including the KYC check) on this company until my request for payment of outstanding fees has been met and there is an agreement for prompt payment of future fees incurred by Legis and Ozannes…".*

*Events in 2008: the investors call for the return of their monies*

219.    During 2008 Mr Egan continued to press for Loan Notes to be issued. However, the investors" concerns grew; and, for example, on 7 February 2008 Mr Wallis wrote to Mrs Bellis requesting immediate return of his monies with interest and suggesting that she would wish to notify her professional indemnity insurers. This was followed by a letter to the Defendant Firm from Boddle Hatfield dated 6 March 2008 to the same intent.

220.    On 26 June 2008, Mr Egan emailed Mr Dickinson at Legis asking for Loan Notes to be issued:

> *"Stephen, this is the list of investors who forwarded their funds to Juliet Bellis.  They either need their money returned or loan notes issuing as soon as possible…"*
>
> *Obviously you are aware that we have asked Boodle Hatfield to pursue Juliet Bellis, but what else can we do as the clients are very anxious.  Could I have your thoughts please.  I guess they would be happy with loan notes, provide (sic) they rank ahead of Erinaceous, which was always agreed to be the case."*

221.    Mr Dickinson"s response (the same day) was to counsel against the issue of Loan Notes:

> *"If the company issues loan notes, the investors will have received consideration for the payments which Juliet Bellis & Co has processed and she/her firm is off the hook."*

222.    Mr Egan then asked:

> *"can you issue shares and/or loan notes to those investors?"*

223.    Mr Dickinson, responded saying he "supposed" the directors would look at issuing shares/loan notes, but the "*investors would have to confirm that"s what they wanted and that they had taken appropriate independent legal advice before making the request.  Wouldn"t bemy course of action in their shoes… (sic)"*.

*Denouement*

224.    The Claimants did not thereafter press further for Loan Notes to be issued. Instead, and apparently having decided against pressing for Loan Notes, the seventh and ninth Claimants applied for an administration order in respect of AFL in the English Court alleging themselves to be creditors of AFL.  They obtained an interim order from Mr Justice Vos on 29 January 2010.

225.    It subsequently emerged that the application was not in the prescribed form. But, whatever its merits, the effect of the application was to prompt RBS, as holders of a qualifying floating charge over AFL"s assets, to appoint their own administrators, indicating that they could not "take the risk" of the administration application being successful with an alternative investor being appointed. They appointed their own

administrator the day before the return date for the hearing of the relevant Claimants'' application.

226.   As I elaborate later, it is the Defendant Firm''s case that it was this that finally prevented AFL from issuing any Loan Notes, let alone equity, and removed any realistic prospect of AFL redeveloping the land and/or rescheduling its debt with RBS, and ultimately repaying the Claimants the monies they had loaned.

227.   The Defendant Firm relies on this, and what it depicts as an earlier refusal of Mr Dickinson to assist in the transfer of beneficial ownership in the shares from Mr Cummings to enable the investors to attain the equity participation which had been their goal, as being causative of loss.  It denies accordingly that any loss was caused by acts of the Defendant Firm.

228.   In point of fact, Mr Cummings and Ms Cummings refused to part with beneficial ownership unless and until they had obtained indemnities, and only then if and after a deal for the sale of assets to Augusta Westland had been completed.

229.   But that is for later; for the present that completes this recital of the events leading up to the Claimants'' recourse to proceedings against the Defendant Firm.

## Issues

230.   Having thus outlined the basic chronological sequence of events I turn to adumbrate the fundamental issues which I must address and decide.

231.   Without determining at this stage their legal significance or consequences, the principal factual issues to which, to my mind, the evidence given must be related and assessed were as follows:

   (1)   What were the perceptions and expectations of the parties as to the nature of the "investment" which the investors were being invited to make? What in that context did the Claimants understand to be the purpose and effect of the draft Loan Notes they were sent?

   (2)   Was Mrs Bellis aware of the terms of the "offering documents" and did she know they had been sent to the investors? What did Mrs Bellis consider to be the purpose and effect of the draft Loan Notes?

   (3)   What did the parties perceive to be the role of the Defendant Firm?

   (4)   What were the perceptions and expectations of the parties as to the purpose and consequences of the (undisputed) requirement that the monies representing their investments should be paid into the Defendant Firm''s client account, rather than to AFL or ECS?

   (5)   What did the parties perceive to be required in order to authorise the Defendant Firm to make payments out of its client account of the monies received into it from the investors?

   (6)   On what basis did Mrs Bellis consider that such requirements had been satisfied? Why did she make the payments that she did?

(7)   Did Mr Wallis have any conversation with Mrs Bellis in or about August 2007 and if so what do each recall was said?  More particularly, did Mrs Bellis agree with Mr Wallis to hold the money he had paid to his order?

(8)   If the expectation of the parties was that they would ultimately acquire some form of equity participation in and control of the investment vehicle or a unitised fund by which it was owned, as well as being lenders to AFL, why was that expectation not fulfilled?

(9)   Did AFL by its proper organ determine to borrow money from the Claimants and validly authorise Mr Egan/ECS to solicit and the Defendant Firm to receive into its client account for its own immediate benefit or to its order monies raised from the Claimants? Alternatively did it after the fact ratify or adopt their acts?

(10)  For whom was Mr Egan acting in his communications with the Claimants in soliciting funds in the context of the Albermarle Fairoaks scheme? Did Mr Egan invite the Claimants to rely on himself personally in making payment in respect of the Albermarle Fairoaks scheme?

(11)  What happened to the monies paid by the Claimants into the Defendant Firm"s client account and (a) for what purpose (b) on whose instructions (c) on what basis (d) in what circumstances and (e) when were they released? More particularly as to (b), on whose authority were such instructions given?

(12)  Was Mrs Bellis in a position where her duty and her interests were in conflict or where she had conflicting duties, and did these impact on her conduct?

232.   As is apparent from my recitation of the chronological sequence of events, much of the evidence is not disputed.  The basic factual matrix is clear and can, I think, be summarised as follows in paragraphs 233 to 244 below.

233.   With the exception of the 2nd, 6th, 7th and 17th to 19th Claimants ,all the Claimants had invested in at least one previous Albermarle Investment scheme; and each of the 1st, 2nd, 3rd to 5th, and 8th to 16th Claimants had invested in Albermarle Shoreham (also in 2007 and only a few months earlier than Albermarle Fairoaks).

234.   The IM in the Albermarle Shoreham scheme, and the application form appended to it, expressly provided that Mrs Bellis and her firm should act as escrow agent for the Albermarle Shoreham scheme, and that investors should make payment into her client account. The Defendant Firm had accepted that appointment by making available its client account for that purpose.

235.   There was an escrow agent appointed or other escrow arrangement established in each previous Albermarle investment scheme in which the Claimants had invested. However, the terms of the escrow provisions varied, and in some cases payment was not made into the escrow agent"s account, but into a designated account for the SPV.

236.  The purpose of these escrow arrangements was for the protection of the investors and to ensure that the investors" monies would not be used if the investment envisaged could not proceed.

237.  The Albermarle Shoreham scheme was the first Albermarle investment scheme in which the Defendant Firm acted as solicitor to the SPV and as escrow agent: and so it was the only Albermarle scheme prior to Albermarle Fairoaks in which the Defendant Firm had so acted.

238.  However, Mrs Bellis *"had a pretty good overall knowledge of the Albermarle structure"* (as she acknowledged under cross-examination). She was aware in general terms that Albermarle investment schemes invariably offered a loan/equity mix: and that this would usually be in the case of each investor of a loan to an LLP and a capital contribution to that LLP, issued together and comprising and evidenced by a "Unit" in the LLP.

239.  Mrs Bellis knew that in the context of the Albermarle Shoreham scheme the inner core investors had subscribed a "first tranche" of money before any IM had been prepared or any loan note and equity share produced or provided. But she also knew that all the investors expected to receive equity: the loan would be linked or "matched" (as Mr Wallis described it).

240.  In the specific context of the Albermarle Fairoaks scheme, Mrs Bellis was aware that the monies were to be held in her firm"s client account pending some future event or instruction. It was never suggested that she was to make immediate payment out of the monies; the dispute was rather as to what event or instruction was to authorise such payment and to whom.  Further, in my view, even the Engagement Letter (which Mrs Bellis had prepared) expressly envisaged *"whatever structure is put in place for the project"* being in place, and any regulatory requirements in Guernsey satisfied before utilisation of the monies subscribed.

241.  Mrs Bellis was also aware (not least from its name and presentation) that the transaction was being marketed as an Albermarle investment scheme, connoting features characteristic of such schemes and likely to be subscribed by the usual club of investors (or some of them at least).

242.  She was aware that, as in the context of the Albermarle Shoreham scheme, investors in the Albermarle Fairoaks scheme would expect, in due course, equity participation as well as evidence of a loan, though she may not have envisaged that these would be contemporaneous.

243.  More negatively, it follows from her own denial of having seen any communications with investors and her own depiction of Mr Egan as the conduit with them that she must have been aware, when receiving monies into her firm"s client account, that she could not be sure what they had or would be told or the terms upon which the payments were made.

244.  She also knew, when monies were received into her firm"s client account, that the Loan Notes were in draft and not final form; that they had not been formally authorised or approved by the legal directors of AFL; that she had no evidence that any investor had agreed their terms; that the requisite KYC checks had not been

made; and that COBO consents were required but remained outstanding (as they did until 27 September 2007).

245.   I turn to address other more disputed aspects of the factual matrix. But I should give my overview of (1) the scope and nature of the evidence, (2) the witnesses who appeared before me and (3) the evidence they gave.

*Scope and nature of the evidence: gaps in disclosure*

246.   As to (1), the events in question took place some 5 years ago; and the documentary record is incomplete. This is partly because some of it is in the hands of persons who are not parties, and partly because it would appear that there never was a documentary record made of certain key events.

247.   Erinaceous" administrators chose not to waive privilege; and no application fr third party disclosure was made.  Mrs Bellis" company secretary files, which she apparently returned upon her retirement as company secretary to Erinaceous in November 2007 and which might have provided an insight into the objectives of and any instructions given by Erinaceous or its subsidiaries, were not made available.

248.   Nor is there available any record of advice given to Erinaceous by Price Waterhouse Coopers as to the problems of convertibility (see paragraph 153 above) which appear to have led to the investors being invited to lend money without any right to equity participation (contrary to the Albermarle model).

249.   Further, Erinaceous" records might have contained notes or minutes revealing what Ms Cummings and/or Mr Bellis, were told, or knew and believed, as to the arrangements for payments into the Defendant Firm"s client account, or as to the pressures put on the Defendant Firm; and they might have assisted also in determining conclusively detailed points in issue of some real materiality, and especially whether Mrs Bellis ever saw the Teaser email (see below).

250.   There were material gaps in the Claimants" surviving documents also. Perhaps most importantly, the only contemporaneous document Mr Wallis was able to disclose was his wife"s diary: his evidence was that his practice was routinely to destroy documents after a year, and he continued blithely with this practice after he must have appreciated that litigation was in prospect.  Whether retention would have helped or hindered him is a matter of speculation: but, for example, drafts of his letter after the event (see above) would plainly have been useful, at least potentially.

251.   Other gaps included any documentary evidence of the proofs of debt apparently lodged in AFL"s administration, which the Defendant Firm argues demonstrate that the Claimants considered themselves and sought to prove as creditors of, not investors in, AFL.

252.   On both sides the process of disclosure was not beyond criticism.  Thus, certain documents that were available to the Defendant Firm were not disclosed until late in the day, on the eve of trial.

253.   The two I have especially in mind are (i) an invoice (for £200,000) by the Defendant Firm to Erinaceous for work in connection with Albermarle Fairoaks and (ii) the

transcript of a 3-hour interview of Mrs Bellis by the Administrators of AFL on 9 June 2011 in which she was asked a number of questions about Albermarle Fairoaks and gave answers that did provide material for her cross-examination before me. I acknowledge that Counsel had advised that the transcript need not be disclosed as part of standard disclosure, and that its disclosure was not resisted when it was specifically requested shortly before trial, I consider that both those documents should have been disclosed: and I note that the invoice, as well as being obviously relevant, had been asked for by the Administrators of AFL during that interview, and Mrs Bellis had promised to provide it.

254. On the other hand, Mr Croxford, in his written closing, described the Claimants" disclosure as "lamentable". He instanced especially the failure to disclose until during the trial board resolutions of the 15th and 17th Claimants resolving to subscribe for loans invited by the Teaser-email. He described these in his oral closing (of which he provided a very helpful „Speaking Note" for which I am very grateful) as the most important of all the documents. Plainly that documentation should have been disclosed earlier.

255. But, although regrettable, it does not seem to me that either these gaps or these criticisms go to the root of the case: and to some extent at any rate they are matters under the bridge.

256. For the avoidance of doubt, I do not have any reason to think that any of the lapses, gaps or failures to disclose are such as to cast doubt, or materially affect my views, on the credibility of any of the parties. Although the destruction of potentially disclosable material in the case of Mr Wallis is of itself a matter for concern, and may also suggest that the Claimants may not have been sufficiently advised as to their obligations, it does not materially affect my assessment of his evidence in relation to the dispute as to whether he did or did not have the discussion with Mrs Bellis on which he relies.

*Scope and nature of evidence*

257. In the peculiar circumstances of this case, as it seems to me, there is more than the usual difficulty in determining which of the extensive evidence led and documents provided is admissible for the purposes of interpreting the scope, effect and meaning of the arrangements between the parties.

258. The problem is exacerbated by the curious nature of the engagements between the various parties and, especially, the almost complete dearth of communications between, in particular, the Claimants and the Defendant Firm. The documentation is voluminous; but very little of it "crossed the line" between the relevant persons between whom contractual relations are alleged to have been established. This has resulted in a plethora of legal issues and factual curiosities that have made the case considerably more complex than the simple statement of the dispute at the commencement of this judgment might otherwise suggest.

259. Except possibly in the case of the engagement of the Defendant Firm by AFL on the terms of the Engagement Letter (see paragraph 133 above), these engagements were either not expressed in writing at all or were partly written and partly oral, part express and partly to be inferred from conduct or obvious intent.

260.   There is no written definition of the role of the Defendant Firm in relation to the Claimants (if any) whether as regards the use of the Defendant Firm"s client account or at all; nor of the role of Mr Egan and ECS. Each one"s expectations of the other is a matter of inference.

261.   The only alleged direct discussion between the Claimants and the Defendant Firm in the context of this transaction prior to the receipt of the monies paid into the Defendant Firm"s client account is that which Mr Wallis claims to have taken place between him and Mrs Bellis: but Mrs Bellis denies it completely.

262.   As to communications between the Claimants and Mrs Bellis" only admitted client, AFL, the only "offering documents" (as Mr Croxford labelled them) were the emails sent by Mr Egan to the Claimants attaching in one case the Teaser and in the other case, a draft Loan Note: and Mrs Bellis denies having seen either at any relevant time.

263.   The ordinary position is clear. It was common ground that the parties" subjective intentions are not usually relevant or admissible in determining the meaning of their contractual engagements, or whether the effect of the arrangements they made was such as to create a trust (see *Quistclose* [14] and [17] and[71]). As Counsel for the Defendant Firm put it in their closing submissions, words and acts are ordinarily to be interpreted objectively, and (in particular) words are taken as they would reasonably be understood by the person to whom they were spoken or written, not as they were subjectively understood by the person who spoke or wrote them.

264.   It was also common ground that for background facts to be relevant to the question of interpretation, they must have been shared by "*the parties*", i.e. "*both parties*". The logic of this rule is clear: a reasonable person could only think that the parties intended each other to understand the words they used in the light of something that they thought both of them knew.  As Brennan J has observed in the High Court of Australia *Codelfa Construction Prop Ktd v State Rail Authority of New South Wales* (1982) 149 CLR 337: "*an extrinsic fact known only to one of the contracting parties can shed no light upon the meaning with which that word or phrase was used by the others*".

265.   This means that any communications between the Claimants and each other (and no-one else), or between the Defendant Firm and Ms Cummings or others but not the Claimants, are (subject to the next following paragraphs) irrelevant to the task of interpretation: they were not readily available (as to which see below) to both parties, and so could not be assumed by the reasonable man to have informed what obligations the parties should objectively be thought to have undertaken.

266.   However, in this case, there are (as it seems to me) at least three reasons (in addition to the obvious practical point that the evidence has been led and cross-examined on all sides) why I consider it appropriate and necessary to consider the evidence given of the parties" respective perceptions, and to broaden the scope of my review as regards other disputed evidence.

267.   First, not only are there issues of interpretation (that is, the meaning of whatever was contractually agreed); there are also issues as to what (if anything) was agreed, and even as to whether the parties intended to create contractual relations between them at all.  I accept the Claimants" submissions in closing that evidence of subjective

understandings (including by subsequent conduct) as to what were the terms of the contract is admissible where the contract is not written or not wholly expressed in writing, but instead arises in whole or part from conduct and oral conversations and the implications therefrom.

268.    Lord Hoffmann explained this in *Carmichael and Another v National Power PLC* [1999] AC 2042: as there will have to be direct evidence of the conduct and communications, often evidence of "*a clear understanding of what was agreed*" (including by conduct showing "*what the parties thought they had agreed*") is evidence of what conduct and communications took place i.e. what "*terms, in an objective sense, were agreed*", albeit that "*of course the tribunal may reject such evidence [of subjective understandings] and conclude that the party misunderstood the effect of what was being said and done*".

269.    Secondly, Counsel for the Defendant Firm advanced an argument that a claimant who had a positive (subjective) intention to enter into a different contract to that alleged in its pleaded case should not be permitted to obtain relief upon an objectively ascertained fiction he knows to be false. In other words, a person may not rely upon a construct of objectively ascertained facts if his actual subjective intention at the material time was the opposite. Counsel instanced especially in this context the position of the 15th and 17th Claimants, each of which by its agent signed the draft Loan Notes provided under cover of the Loan Note email.

270.    In support of this argument, Counsel for the Defendant Firm cited in particular the decision of Hirst J in *Lark v Outhwaite* [1991] 2 Ll Rep 132 at 141, where having noted the approach of Buckley J in his judgment in *Beesley v Hallwood Estates* [1960] 1 WLR 549, in which the subjective intention of a plaintiff was accepted as being a relevant consideration, Hirst J said:

> "*I have no doubt that the prime test is the objective one, but it does not seem to me that the Court can be obliged completely to disregard any evidence of subjective intention (as is shown by the Beesley case) and that in a case like the present it would indeed be completely unrealistic to do so.*"

He then considered the matter objectively and concluded that there was no intention to create legal relations. Having done so he went on:

> "*If in addition, Mr Lee's evidence [the claims manager of the Plaintiff's broker] is taken into account the matter is put completely beyond doubt. ............. I am quite satisfied that the only possible construction of Mr Lee's evidence is that he had no intention whatsoever of varying the contract, and therefore no intention of entering into any legal relationship.*"

271.    Both *Beesley* and *Lark v Outhwaite* concerned, not a question of contractual interpretation, but the prior question as to whether the parties shared an intention to create binding contractual obligations at all.  In the latter context, it is readily understandable that evidence of a subjective intention to the contrary may be admissible (and see also *HLB Kidsons v Lloyd's Underwriters* [2008] EWCA Civ

1206 at paragraph 64, and *Attrill and others v Dresdner Kleinwort Ltd* [2012] EWHC 1189 (QB)).

272.   In my view, these authorities are probably only applicable in the context of an issue as to intention to create legal relations, and not to issues of interpretation. But I may be wrong about that; and in any event, in this case there is an issue as to the former. This signals to me that a review of subjective perceptions and intentions is appropriate on this basis also, so that I can determine the issue raised by the Defendant Firm on both points.

273.   Thirdly, I consider it of some relevance in the context of determining the dispute as to whether or not there was a conversation between Mr Wallis and Mrs Bellis such as he alleges to consider whether what Mr Wallis says was discussed and agreed is consistent with his other evidence and with the evidence given by other witnesses of their expectations and perceptions.

274.   For all these reasons I consider it appropriate and necessary to review in some detail the evidence, both written and oral, that was put before me, despite the ultimately objective nature of the enquiry primarily to be undertaken.

275.   Before turning to describe that evidence, and indicate my views as to the witnesses, it is also necessary to address the dispute between the Claimants and the Defendant Firm as to whether or not the Teaser email and Loan Note email are to be included in the admissible factual matrix.

*Are the "offering documents" part of the admissible factual matrix?*

276.   The issue arises in the context of the oft-cited passage of Lord Hoffmann"s speech in *ICS v West Bromwich BS* [1998] 1 WLR 896 (HL), where he explained that the factual matrix includes all *"the background knowledge which would reasonably have been available to the parties in the situation in which they were at the time of the contract…"*

277.   However, the test of reasonable availability is not always easy to apply, and requires restraint in its application. As Macfarlan JA said in *The Movie Network Channel Pty Ltd v Optus Vision Pty Ltd* [2010] NSWCA 111, *"in the age of the internet, the range of materials that is "reasonably available" is virtually limitless"*; stricter parameters than ease of access are essential.

278.   The point arises in acute form in this case in relation to the "offering documents". As indicated above, there is no positive evidence that Mrs Bellis saw the email teaser or knew that Mr Egan had sent it to the Claimants; and she firmly denied both. The Defendant Firm submits that it follows that "these documents cannot be considered in determining whether there was an implied contract". The Claimants contend that this is not so: both documents were plainly "reasonably available", in that a reasonable observer would have expected Mrs Bellis as well as the Claimants to have had the documents, not least because under the terms of her engagement by AFL she had expressed the need to see "a copy of any documentation which goes out to investors".

279.   In my view, the following parameters are discernible:

(1)    At least where there is no direct evidence as to what the parties knew and did not know, and as a corollary of the objective approach to the interpretation of contracts, the question is what knowledge a reasonable observer would have expected and believed both contracting parties to have had, and each to have assumed the other to have had, at the time of their contract: see *per* Vos J in *Spencer v Secretary of State for Defence* [2012] EWHC 120 (Ch) at paragraphs 65 to 74;

(2)    that includes specialist or unusual knowledge which only parties entering into a contractual engagement of the sort in question might reasonably be assumed to have; and it also includes knowledge which it is to be inferred, from the nature of the actions they have in fact undertaken, that they had or must have had;

(3)    however, it does not include information that a reasonable observer would think that the parties merely might have known: that would open the gate too far to subjective or idiosyncratic speculation;

(4)    the fact that material is readily available or notorious may support an inference as to what the parties actually knew;

(5)    but (subject to (6) below) where it is demonstrated that one or more of the parties did not in fact have knowledge of the matter in question such knowledge is not to be imputed; nor is the test what reasonable diligence would or might have revealed: in either case, that would be inappropriately to introduce impermissible concepts of constructive notice or a duty (actionable or otherwise) to make inquiries or investigations: and see *per* Mann J in *Toth v Emirates and Another* [2012] EWHC 517 (Ch) at paragraph 44, agreeing with the analysis in the decision of MacFarlan J in the Supreme Court of New South Wales in *The Movie Network Channel* case [2010] NSWCA 111 (at paragraph 97);

(6)    the exception is that a reasonable person cannot be assumed to be in ignorance of clear and well known legal principles affecting or incidental to the contractual engagement in question: see *per* Vos J in *Spencer v Secretary of State* at paragraph 72.

280.    In my judgment, adopting those as the relevant parameters, if Mrs Bellis'' evidence that she did not in fact see either of the offering documents is accepted, they should be excluded from the factual matrix.  The fact that an objective observer would have expected her to see both is a factor in determining whether she did or not; but it cannot trump a conclusion that in fact she did not, if that is what is found. I return to determine that issue of fact later.

## Witnesses

281.    In addition to the documentary materials the following individuals gave evidence by witness statement(s) at trial.

282.    For the Claimants:

(1)     The First Claimant on the record, Mrs Adelle Challinor ("Mrs Challinor");

(2)     Mr Richard Berman ("Mr Berman" sometimes referred to in emails as "Ric");

(3)     The ninth Claimant, Mr Garry Watts MBE ("Mr Watts");

(4)     Mr Mark Lewis Glatman ("Mr Glatman", on behalf of the eighteenth and nineteenth Claimants);

(5)     The eighth Claimant, Mr Stuart Wallis ("Mr Wallis");

(6)     The third Claimant, Mr Andrew Kevin Cole ("Mr Cole");

(7)     Mr Ashok Mahtani ("Mr Mahtani"); and

(8)     Ms Helen Wyatt ("Ms Wyatt")

All the above save Ms Wyatt were cross-examined. Ms Wyatt"s evidence was unchallenged.

In addition, a Witness Statement made by Mr Dickinson of Legis in other proceedings (between AFL and the First Defendant, number HC08C03768) was introduced by hearsay notice.

283.   For the Defendant Firm and Part 20 Claimant the witnesses were:

(1)     Mrs Bellis; and

(2)     Mr Cummings, Mrs Bellis" brother.

Both were cross-examined. Mrs Bellis spent nearly four days in the witness box.

284.   For the Second Defendant and Part 20 Defendant the witnesses were:

(1)     Mr Geoff Egan; and

(2)     Mr Douglas Lawson.

They were both cross-examined.

Ms Saskia Hunter MRICS, Mr Egan"s secretary at ECS, also provided a witness statement but in the event was not called (so her statement is not in evidence).

285.   Of the 21 Claimants, therefore, the following individual claimants did not give evidence:

(1)     the second Claimant, Ms Sheila Cocker;

(2)     the fourth Claimant, Mr Charles Evans;

(3)     the fifth Claimant, Mr John Kerrison and his wife Mrs Gaynor Kerrison (Claimant 5A);

(4)   the sixth Claimant, Mr Robert Meadows;

(5)   the seventh Claimant, Mr George Melio; and

(6)   the tenth Claimant, Mr Robert Wilson-Wright.

(7)   The fifteenth and seventeenth corporate Claimants, Tenon (IOM) Corporate Services Limited and Maple Investments Limited (which is owned by Mr Mahtani and his family), each of which filled in the draft Loan Notes;

(8)   The fourteenth and sixteenth corporate Claimants, Black Isle Property Company Limited (of which Mr Egan is a director and 25% shareholder) and European Securities Limited.

286.   I shall address later the consequences of these absences, especially in the context of the allegations of misrepresentation, where individual reliance on the representation would have to be established.

287.   I should also note that neither Mr Bellis (Mrs Bellis'' husband and CEO of Erinaceous) nor Ms Cummings (Mrs Bellis'' sister and CFO of Erinaceous), or Mr Pearson, or any of the persons responsible for the management of Erinaceous and its group, were called to give any evidence in these proceedings. Given the close involvement of, in particular, Ms Cummings, this is surprising: she and possibly the others might well have been relevantly examined on a number of potentially relevant issues. These include when the financial problems that beset Erinaceous were first uncovered, what Mrs Bellis knew of them, what Ms Cummings believed about what the investors expected and would get, and who in reality was controlling and directing the transaction from time to time.

288.   That surprise may be mitigated by the fact that I understand that in two prior sets of proceedings (included in the trial bundles) relating to Longmint''s interest in the Fairoaks airport, Ms Cummings had (respectively) been found not to have been truthful about her role and knowingly to have arranged for false accounting. Although it is right to record that Mrs Bellis was adamant that the findings made by Gloster J and Sales J respectively were wrong, and I should make clear that the findings as such have not materially coloured my view, they may explain a certain reluctance to participate in further proceedings.

*Observations as to the witnesses*

289.   A curiosity of this case (as I have already noted) is the lack of communication between the Claimants and Mrs Bellis and the Defendant Firm.  A consequence is that the only direct clash of evidence that I must resolve relates to the dispute between Mr Wallis and Mrs Bellis as to whether or not they had a conversation in which she agreed that she held his monies in her firm''s client account to "await his instructions" or to his order.

290.   I will return to that dispute under a separate heading.   In the meantime, my impressions of Mr Wallis can be summarised as follows: he struck me as a proud man, accustomed to financial success in a busy life, and indignant about a turn of events that, with the benefit of hindsight, smacked of carelessness on all sides,

including his own. He was occasionally truculent and often defensive. He ascribed inconsistencies of detail to his busy life. I sensed a desire in him to show that he had been wiser than events on their face might suggest.

291. As to the others of the Claimants" witnesses, I accept Counsel for the Claimants" description of them as intelligent and honest professionals who were doing their best to recollect events and truthfully assist me. However, the events in question are some time past; and the process of preparation for litigation does tend to persuade even the most painstaking and careful that what seems consistent with their case now is truly what they recall was their understanding then, whereas memory may be imperfect, and conduct less consistent.

292. In my approach to their evidence, as to the oral evidence on behalf of the Defendants, I bear very much in mind the observations of Lord Goff in *Grace Shipping Inc and another v C.F. Sharp & Co (Malaya) Pte Ltd* [1987] 1 Ll LR 207 (at 215) in the Privy Council (a case which concerned whether the parties had reached a concluded agreement some 5 years before the trial):

> *"In such a case, memories may very well be unreliable; and it is of crucial importance for the Judge to have regard to the contemporary documents and to their overall probabilities."*

293. That is particularly so where, as here, it is apparent that the witnesses have only really sought to reconstruct events for the purposes of producing their evidence at a late stage in the process, and sometimes before having the opportunity to review the documents themselves. The evidence of the Claimants" witnesses inevitably lacked detail.

294. Mrs Bellis" evidence was rather different. It struck me that she had gone over and over the matter in her mind and no doubt with her advisers over a long period of time. She had also been involved in previous litigation, including that involving her brother and sister.

295. Mrs Bellis is plainly intelligent and organised: and over the course of a very long cross-examination she seldom seemed at a loss. She expressed herself in carefully modulated and moderate terms throughout. She was almost unsettlingly articulate and controlled. She spoke in short, crisp, sentences, almost as if from a script, as the transcript of her evidence confirms. She appeared to me to appreciate the aphorism that a person is never as believable as when admitting error in hindsight: but she carefully confined her admissions.

296. Mr Croxford (for the Defendant Firm) evoked St Paul"s first letter to the Corinthians in describing Mr Egan"s evidence. St Paul said that he had *"become all things to all men, that he might by all means save some."* Mr Egan was by no means a model of consistency; and Mr Croxford"s further depiction of his *"gyrations…calculated variously to save the case of some party at one time and yet destroy that same case at another"* had forensic force.

297. But though unreliable, and rash, I do not think Mr Egan was dishonest. He is not a lawyer, and he is not a details man. He wanted to get the job done and assumed that the legal mechanics would fall into place, as they always had in other Albermarle

schemes that had proceeded. He was prepared to "follow orders": hence he did not warn the investors of the frailties in the Albermarle Fairoaks scheme caused by Erinaceous seeking to get too much profit and cash out of it. He was disingenuous in affecting surprise that the monies paid into the client account had been paid out. However, I am in no real doubt that he always expected that investors would indeed get the combined loan and equity participation and control of AFL that they expected. In that regard, he assumed that Mr Cummings was a placeman for Erinaceous and that Erinaceous would in turn ensure equity participation and control for investors.

298.   Using the adumbration of factual issues in paragraph 231 above as an index, I think I can summarise the evidence as follows.

*(1)*   *Nature of the "investment" solicited*

*(a)*   *The evidence given on the Claimants" subjective point of view as to the nature of the investment*

299.   First, as to the terms on which they were invited to invest (I am using that word to comprehend both a loan and an equity stake of whatever nature), the Claimants (or rather, those of the Claimants who gave evidence) were substantially as one: they were being invited to participate as equity investors who would have control of the SPV in accordance with the pattern characteristic of Albermarle investment schemes, with a matched or coupled or "stapled" loan element as the means of (in effect) tax efficient distribution.

300.   Their perception was that although no completed package of documentation including an investment memorandum was provided (as, for example, Mrs Challinor recalled had been provided when she invested in the Albermarle Croydon scheme), the Teaser e-mail branded the Fairoaks opportunity very clearly as an Albermarle investment which followed the basic pattern of (a) payment to an escrow account or agent for (b) onward subscription for a mixed loan/equity investment in a property venture on the basis that (c) subscription moneys would be applied only for that purpose and returned if the investment did not proceed.

301.   Further, all were at one that the form of the equity was not specific, but that this was unimportant to them. It might be in shares in the SPV itself or in units in a unit trust or unitised holding entity above it; the form did not matter to any of them as long as it gave equity participation and control in the SPV whatever might be its legal form.

302.   Their perception, which I consider to be readily understandable, and which I would expect to have been the perception of all the Claimants, is captured and exemplified in this extract from the cross-examination by Mr Croxford of Mrs Challinor:

> "Q.  Well, that is a matter for my Lord. I am not here to argue about your opinions, Mrs Challinor, so I am not going to follow any of that with you. But the form of documents was radically different, was it not?
>
> A.  No. The -- what was missing from Fairoaks was an application form and an investment memorandum and a final form of loan note. But the major part of this Teaser badged this very clearly as an Albermarle nvestment and we were given information about internal rates of return. We're told that they're aiming to raise equity and we're told that if we want to subscribe early we can because the likelihood is that this may also be oversubscribed and -- but on the back of early investment our monies would receive a deposit rate of 1 percent over base but the information that

was lacking meant that at no point did we think our money was therefore to be freely used, at that point.

Q.  I understand that, and I am still not going to follow your opinion, but the party that Geoff was contacting you in respect of, the Albermarle investments, was Albermarle Fairoaks. Yes?

A.  Yes.

Q.  At that stage you did not know whether that was a limited liability company or a limited liability partnership.

A.  That's correct.

Q.  And from your point of view, it didn't matter which one it was. No?

A.  No, I don't think it did.

Q.  Whichever form of vehicle it was, ultimately you decided that you wanted to invest in that company or partnership?

A.  I think it's true to say it wasn't of interest to me what form it took, but, yes, we were wanting to invest in Albermarle    Fairoaks."

303.    As to the promise in the e-mail Teaser of a return of 1% above base rate from the date of payment into the Defendant Firm"s client account, none of the witnesses regarded this as introducing any substantive change, let alone materially altering the "pattern".

304.    Thus, as Mrs Challinor put it in her witness statement, "*Although the payment of interest pending the achievement of the fund-raising target was a new feature, it made sense and did not alter the fundamental nature of what we were doing*". Earning base rate plus 1% made commercial sense as an incentive to commit money early, which it was obvious would be of benefit to Mr Egan who would want to have firm commitments both for peace of mind ("*so he could see how much money he"sraised*") and to "*build a book*" to encourage further investment (as Mr Glatman put it). "*[T]he thinking, presumably, was that it wouldn't be fair to people coming in right at the end to receive the same treatment as those who had put their money in early*" (as Mrs Challinor said in cross-examination). It was "*giving us a little bit of priority*" (as Mr Glatman said).

305.    From their point of view, the Claimants did not know (or need to know) whether this was the rate on the Defendant Firm"s account or whether, as some assumed, Erinaceous would be paying the interest (or reimbursing the Defendant Firm after doing so), or whether there would be an adjustment factor in the amount of units and loan notes issued to capitalise the interest earned. (The investors knew of course that the main investment loans (matched to equity) never earned any interest.)

306.    All of the witnesses were adamant that it did not occur to them that the offer of 1% above base rate related to anything other than a return on subscribed monies whilst held in escrow as a premium for early commitment.

307.    Thus, they were all fortified in the assumption that (as Mr Cole put it in cross-examination) "*the one per cent above base was definitely to do with getting your money in early*" by the "*commercial nonsense*" (as again Mr Cole put it) of advancing money unsecured on a speculative venture at such a rate.

308.  As Mr Glatman explained: "*there's no chance I would have invested in a 1 per cent over base unsecured loan where the money was disappearing to the bank and I possibly was going to end up with nothing. I would have to be a complete lunatic to do that.*"

309.  Mr Watts concurred: "*I am as adamant that I can be that I would have had no interest whatsoever in advancing money on the loan*" and it would be "*pure folly*". So did Mr Cole: "*Why would I take an equity risk for one per cent over base rate return? It's just unheard of*", it is "*commercial nonsense*". Mrs Challinor said the suggestion would be "*simply pie in the sky*". Mr Mahtani said in evidence that he got more than this risk-free from the bank.

310.  Mr Wallis was adamant: "*it would not have been of the slightest interest to me.*" It was "*entirely speculative, very, very dangerous, potentially where you could lose all your money and where it was ranking behind a very significant amount of senior debt. I just would never have done it.*" This was particularly the case for Mr Wallis because he had been looking into Erinaceous for a merchant bank and not liked what he saw, which was why he was concerned to ensure that his money was held on escrow and that Mrs Bellis understood that.

311.  Turning to the other "offering document", the Loan Note email, and consistently with and no doubt predestined by their views as expressed above, the Claimants who gave evidence were again at one in dismissing the draft as no more than a temporary expedient. They regarded it as a bit of paper intended to record the fact of early investment and the promise of interest, but restricted to the limited period before the anticipated equity/loan note was available (or the return of their monies if the investment did not proceed).

312.  Mr Croxford, on behalf of the Defendant Firm, sought to divide the Claimant witnesses as having taken one of two courses in relation to the email Loan Note, both impermissible. His division was into (a) one group (namely, Mrs Challinor) asserting that the words used clearly did not and could not mean what they say, and (b) the other group (namely, Mr Cole, Mr Watts, Mr Glatman, and Mr Wallis) making assumptions or drawing inferences about what the documents said without really reading them.

313.  Mrs Challinor "*would have glanced at it*" but not paid it much attention because "*we weren't talking about a loan*". She says that "*[A]s there was no application form with the Fairoaks documentation… we used this as a way of recording who we were*" as Mrs Bellis would need "*something to say who we were*". Mr Glatman would not have paid much attention because Mr Egan was just saying, by this document, that "*while the money"s sitting in the solicitor"s account you"l get interest at whatever it was, 1% over base*". Mr Cole would have "*flicked through*" it but it "*would have been of no interest to me whatsoever.*" Mr Wallis would have "*skipped through it*" but "*would not in any way have registered that this was being issued in isolation… from actually having shares or unit trusts or something similar*". It was like a "*receipt*".

314.  Similarly, Mr Glatman "*understood the loan note to just be a convenient way of recording the amount of our investment and the coupon, and definitely not to mean that my early deposit of funds had become a loan*" and also suggested that if Mr Egan

had actually sought to issue the loan note, that would have been very different and have triggered an alarm bell and he would have got his money back.

315.    Mr Cole observed that if there had been an attempt to issue a *zero coupon* loan note without unit attached that would have worried him, but the loan note with interest was clearly just an interim document. He just thought it was a way of confirming the interest payable, and to give paperwork to people who wanted something recording that their money had gone in.

316.    It is of some interest to note that in her evidence to AFL"s administrators on 9th June 2011, Mrs Bellis herself seemed to echo this depiction of the loan notes as "some bits of paper".

317.    My firm impression from them all is that they regarded the draft Loan Note they were sent as no more than a record of the fact that their money had been received, that interest would be paid on it pending application if the transaction proceeded, and that in due course they would receive a document, or two stapled documents, that would evidence both elements of their investment. It is true that the terms of the draft recorded a different transaction; but I see no reason to disbelieve any of them when they say they simply did not contemplate being bound by such terms.

318.    I would accept that this evidence suggests an indifference to the paperwork, and carelessness that in retrospect must be a source of regret and some embarrassment to all of them. But indifference or carelessness is one thing; cognisant acceptance is another. I accept that none of the Claimants who gave evidence intended their investment to be regulated by those terms; and further, I do not think that any of them took either the provision of draft loan notes or their terms to signify that their monies would be available to AFL before the entitlement to equity participation was secure. I accept that this simply did not occur to any of them: an unsecured loan on those terms was beyond their contemplation.

319.    It is true that Mrs Challinor went further than the others in that she signed the draft, as did her husband, and even had these signatures witnessed. I accept also Counsel for the Defendant Firm"s submission that Mrs Challinor did not have a credible explanation as to why she went to the trouble of signing the draft and having it witnessed. The indications are that she and her husband were prepared to sign whatever Mr Egan put in front of them as necessary in the context of an Albermarle investment scheme they had in principle decided to invest in. But the document was headed a draft; it was not intended to be any more than that by the offeror; and as such its signature does not in my judgment bind either of the Challinors. I accept Mrs Challinor"s evidence that she only glanced at the draft and had no perception that it would substantially alter what she understood to be the fundamental character of her intended investment. It is evidence of careless reliance on conformity with the Albemarle investment scheme pattern; but not of contractual acceptance.

320.    Similarly as to the filling in of draft Loan Notes by both Tenon and the minute noting formal approval at a board meeting of Maple of its investment of £150,000 *"in return for the issuance of a 1% above base unsecured redeemable loan note by AFL":* both signify a remarkable carelessness and reliance on everything being as expected without any further examination, but neither constitute binding arrangements. In the absence of evidence from Tenon and Maple, I have considered whether the fact of

that approval must be taken to connote their acceptance of those terms; but I have concluded that it is so unlikely that either would have agreed to lend money on such terms without equity participation that the true explanation is that those Claimants, like all the Claimants who gave evidence, must have regarded the drafts as being in effect no more than a temporary receipt which did not affect the fundamental nature of their intended investment in a loan and equity mix in accordance with the Albemarle pattern.

321.    In summary, and for the avoidance of doubt, in my judgment, none of the Claimants became bound by their terms as a matter of law: the documents being in draft only and still remaining to be completed, approved and authorised. Further, I do not consider that those terms are a reliable guide to what they expected: the expectations of those who gave evidence were as described above, and the draft Loan Notes were regarded at most as a temporary expedient to record a passing entitlement. I do not consider there to be any sufficient basis for attributing to any of the Claimants any other expectation.

*(b)     Mr Egan's point of view as to the nature of the investment*

322.    As I understood it, Mr Egan's evidence under cross-examination was also substantially to the effect that the Loan Note was indeed just a piece of paper in the nature of a receipt for moneys received but which would not be released unless and until it was clear that the Fairoaks investment would safely close. By this Mr Egan meant in summary that investors would have the certainty both of equity participation in some agreed form and control of the SPV (whether directly or indirectly).

323.    Under cross-examination, Mr Egan described the Loan Note as *"interim evidence of their investment"*, but not as recording a loan such as to make the monies available to AFL.

324.    The following exchange illustrates his stance in answer to Mr Sutcliffe:

> "Q. Now, can I suggest to you that when you got this document from Mrs Bellis -- and we know you got I think the same day from her -- you didn't give the document much thought beyond it being a lawyer's piece of paper to give a record that investors had transferred money to the solicitor's account and were getting interest?
>
> A. That's right.  I am afraid I tended to leave the detailed documentation to the experts.
>
> Q. You certainly didn't consider the detail of it, minimum period of a year and the subordination provision, which in fact meant that it would lock the investors into a loan until the full £31 million had been repaid to RBS in five years' time?
>
> A. Well, what was discussed this morning was that it was a year.  As far as we were concerned, the year --I would have looked at the year or I was aware of the year because there was an email between Mrs Bellis and myself -- the year was a long stop date.  It wasn't a year's loan.  It was a year's long stop date on the basis that this would have taken weeks or at most more than a few weeks to actually complete the investment       memorandum, which would have its own units, which would have its own additional loan notes which would replace these loan notes.  So the year, as far as I was concerned, was a long stop. What was the other point you raised?
>
> Q. That it would effectively because of what's called the subordination –

A.  Well, it would always be subordinated to RBS.  Everything is subordinated to RBS.  They have the first legal charge on the property.

Q.  The 31 million, as we know, £24 million worth of it didn't have to be repaid for five years did it, over five years?

A.  That's correct, but you could have repaid it at any time if you had sold the property, et cetera.

Q.  Of course.

A.  That comes as no surprise to me that it was subordinated to RBS: it has to be.

Q.  Yes.  But this document, which you forwarded on, you didn't think changed the money, the status of the money, from being safe in the solicitor's hands?

A.  Not at all.

Q.  Mr Glatman, rather colourfully, says that he would have had to be a complete lunatic to put his money at risk in this way for base plus 1 per cent; that's Day 5, page 52?

A.  (The witness nodded)

Q.  Did you hear him give that evidence?

A.  I read it.

Q.  Would you agree?

A.  Yes.

Q.  Whether you would have put it so colourfully, you would still agree with him?

A.  Well, absolutely.  If I compare this money with the --this money at 1 per cent above that is being described as unsecured, which it isn't, if you compare that with the loan note that Erinaceous had for the balance of the funds that were to be paid on Shoreham, which was unsecured and everyone acknowledges it was unsecured, the rate there was 10 per cent above base.  Now, if you had offered -- if these investors were investors, not lenders anyway, but you would have had to have offered, you know, 10 per cent above base to entice them into doing anything like that.

Q.  Mr Cole -- Day 6, page 103 -- said: "Why I would take an equity risk for 1 per cent over base rate return?  It's just unheard of."

A.  Yes.

Q.  It's no good to say, is it, that these people were eventually going to get equity because the point the investors make is that they would not have risked their money on loan?

A.  No, it's not eventually.  To take the terminology that Mr Glatman was using, it's stapled.

Q.  You are not trying to tell the court that the investors were in the habit of making short-term loans to Albermarle syndicates?

A.  Well, they have never done it before."

325.   As Mr Croxford emphasised strongly, both in submission and in his cross-examination of Mr Egan, this line is not easy to reconcile with either Mr Egan's emails to Mrs Bellis in August, September and October 2007 (which I have quoted

above) chasing for loan notes to assist fund raising with a view to repayment to RBS of the equity bridge loan, or Mr Egan's verified Defence.

326.   The latter (at paragraph 12) reads in most relevant part as follows:

> *"…Mr Egan told the Investors on 20 August 2007 that they would receive a loan note "pending completion of the unit trust". The reasonable inference from this representation was that, prior to the issue of units or equity in the unit trust, or whatever "vehicle" ended up owning the asset, the Investors funds were to be available to be used for the sole purpose or benefit of AFL. Mr Egan admits that he did not specifically inform each of the Investors that their funds may be used to pay down the RBS Equity Bridge. For the avoidance of doubt, it was Mr Egan's belief that, following receipt of the Investors funds, AFL was in a position imminently to issue units or shares to the Investors such that they would have complete control of AFL and hence the underlying asset. By this stage Mr Egan believed that the transaction was effectively 95% completed…"*

327.   Such was the difficulty I initially felt in reconciling Mr Egan's evidence under cross-examination by Mr Sutcliffe and his Defence and his cross-examination by Mr Croxford that I enquired of Mr Egan's Counsel in the course of his closing submissions whether he wished to amend; but after taking careful instructions Mr Bacon confirmed that he did not. Inevitably, Mr Sutcliffe on behalf of the Claimants exhorted me to rely on Mr Egan's answers to him as being the most reliable of what, on one view, are rather different depictions of Mr Egan's understanding as to the nature of what was being offered to the investors.

328.   On reflection, I think the answer to the inconsistency, and the reality of Mr Egan's understanding, lies in the same paragraph of his Defence. Mr Egan struck me as somewhat swashbuckling in his attitude to detail. He looked to what he assumed would ultimately be the realities, rather than what he regarded as legal formalities. From his point of view, the Albermarle investment scheme pattern was clear; it needed tweaking, but not substantively altering, to take into account the SDLT considerations, the consequent adoption of a "foreign" SPV and fund structure, and the advice of PwC; appropriate documentation would follow in due course: all would turn out well in the end.

329.   My assessment is that he believed and trusted in (a) there being no substantial impediment or delay likely to the issue of units or shares or equity so that (b) there would only be a very small period, if any, during which the investors were lenders only (and even then their entitlement to equity would follow imminently) and in consequence (c) in lay terms (and Mr Egan consistently emphasised that he is not a lawyer nor a man for detail) he convinced himself then (and with some prevarication, now) that in substance the investors were never exposed to the position of being unsecured and unsubordinated lenders at a commercially "unheard of" or "nonsensical" interest rate (as may have eventuated).

330. I suspect also that he expected Mrs Bellis to advise him if he was pushing ahead too precipitately as matter of law. There being no amber, still less a red, light he proceeded as quickly as possible to achieve his primary commercial objective of satisfying RBS and his ultimate employers, Erinaceous: that indeed is in substance what he told AFL"s administrators when interviewed by them, and indeed in substance confirmed to me.

(c)     Mrs Bellis" point of view as to the nature of the investment

331. Mrs Bellis did not contest that investors ultimately expected an equity stake or participation in some form. Where her perception really differed from that of the witnesses for the Claimants was as to the relationship between the loans they were to make and that equity participation, and how the one would lead to the other.

332. As she accepted, and as I find, she did regard the investors, both in Albermarle Shoreham and in Albermarle Fairoaks, as ultimately being entitled to such equity participation after making unsecured loans; but she was unclear, and indeed seemed careless, as to how this was to be achieved: she seems just to have assumed that it would be achieved.

333. In the context of Albermarle Shoreham she told me this:

> "...I have to say that at this stage I did not know the detailed structure of the Albermarle funds, in other words I did not know the split between loans and equity – my understanding was that Mr Egan would deal with whatever formalities were necessary, as he had his own documentation which he had used in the past...I did not know precisely how it would happen, but certainly accept that although these people were sending money by way of an unsecured loan in that interim period, it was always the intention that in due course they would have equity in the LLP."

334. I have also had particular regard to a letter dated 21 December 2006 from Mrs Bellis to Mr Lawson and Tom White which comprised the Defendant Firm"s engagement letter in that transaction ("the Shoreham engagement letter") and described the first tranche payments as "unsecured loans" to the LLP investment vehicle; and to Mrs Bellis" oral evidence that she did not herself know until later whether first tranche investors would receive equity or merely a loan instrument.

335. It was urged on me that these matters coloured Mrs Bellis"s approach and support her contention that loan and equity participation were decoupled in both transactions; and that although all investors expected equity, they were nonetheless content that their monies be deployed even before they had the certainty of it.

336. I would accept that these matters support the Defendant Firm"s argument that the Claimants" contention that Albermarle Shoreham was a template that should have informed Mrs Bellis"s perception of the nature of the Albermarle pattern or model is two-edged. At first blush, indeed, Albermarle Shoreham seems to support Mrs Bellis"s stance before me that at least in the context of Albermarle Fairoaks she

regarded the loan and the equity participation as separate. But further consideration presents a more complex picture.

337.    First, there was no evidence that any of the investors ever saw the Shoreham engagement letter or ever understood or agreed that the money they invested would be by way of unsecured loan which could and would be used to repay indebtedness before the structure and terms of equity participation had been agreed and full subscription achieved. Mr Wallis"s depiction of shock when he was much later shown the Shoreham engagement letter carried the ring of truth. Investors were (by e-mail to them all dated 20 March 2007) kept informed in this regard, and it appears that no monies were released prior to the full indeed over-subscription, and a renewed commitment to send out both loan notes and share certificates in respect of the coupled or matched lao/equity investment. Secondly, unlike the case in the Albermarle Fairoaks transaction, by the time of the payments the investment vehicle (an LLP) had in fact already been established. Thirdly, that investment vehicle was already controlled by Messrs Egan and Lawson for and on behalf of the prospective investors. Fourthly, so far as investors were concerned, all that remained to be done was the paperwork necessary to record their investment, which was presented as no more than a ministerial process.

338.    In short, therefore, the pattern apparent from the Albermarle Shoreham scheme was that even if the paperwork was "flimsy" and notwithstanding raising cash in two tranches, investors monies would not be deployed unless and until (a) a viable structure and defined terms had been established for their ultimate equity investment (b) in a suitable investment vehicle (c) the control of which on their behalf was unconditionally secure, and (d) full subscription to ensure the transaction could be completed had been achieved.

339.    I do not feel able to determine one way or the other whether that was Mrs Bellis"s subjective perception; but equally I do not think that the Albermarle Shoreham transaction offers any real support for any contention that the investors had demonstrated they were prepared to lend without matched equity participation and control.  Furthermore, under cross-examination Mrs Bellis did not contend that it did: her contention was that Albemarle Fairoaks was simply different.

340.    As to that, and her perception in the context of Albermarle Fairoaks itself, the following extracts from her cross-examination seems to me to encapsulate her evidence in this regard:

> "Q.  Moreover as we have seen from your notes on the Brighton draft LLP document, you knew that the investors always want equity and loan notes in Albermarles, didn't you?
>
> A.  I knew that in terms of the Albermarle LP structure, which was what Shoreham was, and which was what -- excuse me, and what was envisaged for Brighton, that loan notes and equity would be issued together.  What was absolutely clear to me in this transaction was that investors would not have equity in Albermarle Fairoaks Limited.  It was a different structure, it was a different approach.  They would have made loans to Albermarle Fairoaks Limited and in due course the unit trust or infrastructure fund would be set up above the company and the investors would have equity participation in it.
>
> Q.  In other words -- please confirm -- there was never an intention, on your part or indeed anybody else's, that the investors would be stuck with just a loan?

A. Yes, that's correct. That was the understanding throughout: that this was an interim measure, particularly during the early fund-raising; that the loans would be made to Albermarle Fairoaks Limited; that the investors would, in acknowledgement of those loans, be issued with the loan note; and that once the unit trust or the infrastructure fund was set up, then they would receive units in those, in whatever fund was set up, and the later round of investors would go straight into the unit trust or the infrastructure fund.

Q. So you knew the terms of the loan note were what the noteholders -- you knew that the terms of the loan note were not what the noteholders would agree to?

A. My understanding was that these moneys were coming into Albermarle Fairoaks Limited as a straightforward loan. The loan notes in my mind were, therefore, there effectively to confirm receipt of those loans. I was fully aware that there would be, at a later date, a unit trust or infrastructure fund set up and these loan notes or these moneys would be effectively credited to the unit trust. As I said yesterday, my original idea was to draft these loan notes so that they had an element of convertibility and Mr Sutcliffe pressed me as to why that was changed. I can only say that I had had advice from PriceWaterhouse Cooper, and I regret that I cannot find a note of that, but my clear recollection is that I was advised that for fiscal reasons there should not be an element of conversion in the notes.

Q. Mrs Bellis, you knew at the time that these terms were not even what you say you thought the investors were agreeing to?

A. This loan note was there to show that they had made a loan to Albermarle Fairoaks Limited."

341. PwC"s advice against any element of convertibility (of which no written record was provided in the evidence before the court) was (see paragraph 153 above) given some time on or before 15 August 2007. Mrs Bellis was apparently unable to tell me who instructed and paid PwC. But the fact is that any element of convertibility was thereafter abandoned; and no thought appears to have been given to a replacement mechanism to secure the agreed objective of equity participation.

342. The transaction and fundraising from investors carried on thereafter "undefined" (to quote the written submissions of Counsel for the Defendant Firm) without any analysis as to how investors were to be ensured entitlement to equity participation; the fund structure became a subject for the future, whilst such focus as there was fell on the loan note, and the need to pay down the equity bridge before 26 October 2007.

343. When asked about the extraordinary lack of documentation and lack of definition as to how equity participation was to be secured Mrs Bellis offered this in reply to questions from Mr Sutcliffe:

*"I have to say, with the benefit of hindsight, I was perhaps a little surprised at the informality, but Mr Egan assured me that he had dealt with Albermarle funds in the past on exactly this basis. In other words, money would be received and the paperwork would be dealt with at a later date."*

344. This is consistent with the view I have formed more generally as to her attitude and her assumption, which was that this was simply how things were done in Albermarle schemes, and that despite the delays and uncertainties the investors" expectations would be met in the end, as indeed they had been in the Albermarle Shoreham scheme.

345.    In my view, however, it is plain and obvious, and would have been plain and obvious to Mrs Bellis had she focused on the nature of what was on offer, that, without the equity participation and control of the SPV that was the hallmark or characteristic of the Albermarle pattern, no sensible investor would have agreed to invest. It simply makes no commercial sense at all to be locked into a five-year unsecured, subordinated loan that could not be repaid before RBS was repaid in full, and with an interest rate of 1% over base rate.

346.    Furthermore, unless coupled or matched, the Albermarle model of a loan/equity mix would have been unachievable: the usual 9,999:1 loan to equity ratio was rendered impossible; and the whole point of the tax efficient structure by which principal was returned early and profit then made on equity was shot through and invalidated by the deferment of any repayment for 5 years.

347.    I do not consider that any reasonably competent solicitor would not have appreciated all this, once properly focused on the structure.  Mrs Bellis struck me as intelligent and painstaking in her work for Erinaceous. I do not think it reasonable to suppose that she was insensible to the commercial nonsense thus inherent in the arrangements from the investors" point of view if equity participation was not secured.  In my judgment, the reasonable and rational explanation is that she must have thought or persuaded herself that this would not come to pass.

348.    I do not think her indifference to the risks from the point of view of investors connotes that she was unaware of them. I ascribe it to the abdication of responsibility to which I have previously referred, her assumption that all would be well in the end, and the impetus of her single-minded objective of assisting to get in the money to pay down the equity bridge which would safeguard the transaction and reduce Erinaceous" exposure under its guarantee of the RBS Equity Bridge and its other loans in respect of the Fairoaks venture.

349.    I have puzzled over the following extract of her evidence under cross-examination by Mr Sutcliffe:

> "Q.  You had no reason to believe at that point, did you, Mrs Bellis, that Mr Egan's investors would want to make unsecured loans at a time when the fund was not even up and running and there was no certainty that it would?
>
> A.  I am afraid that I do not quite follow your question. Perhaps you could rephrase it.
>
> Q.  I do not think I need to rephrase it.
>
> A.  Okay, fine.
>
> Q.  I will ask it again.
>
> A.  Fine.
>
> Q.  You had no reason to believe at that time, on 3 July, that Mr Egan's investors would want to make unsecured loans at a time when the fund that you have talked about was not even created and there was no certainty that it would be created.
>
> A.  I am afraid that such a thought did not cross my mind at the time."

I am not entirely confident that Mrs Bellis understood quite what she was being asked, even at the second attempt. But what I think her answer really reveals and conveys is this: as above stated, if it did not cross her mind to worry about the commerciality or sense of the matter from Mr Egan's investors' stand-point if the loan proceeded but they did not also in due course obtain an equity stake in some agreed form, that was because she assumed that this would never happen. The Albermarle Shoreham scheme had encouraged her to assume that what she later described as "flimsy paperwork" was the norm, but that all would be well in the end; and the growing imperative to get the money in discouraged any doubting reflection.

*(2)(a)  Was Mrs Bellis aware of the terms of the "offering documents" and did she know they had been sent to the investors?*

350.  As I have mentioned previously it is a curiosity of the case that Mrs Bellis contends she saw neither, notwithstanding that she drafted the Loan Note and that the Engagement Letter stipulated that she would *"need to see a copy of any documentation which goes to the investors".*

351.  The email Teaser of 8 August 2007 is headed "Albermarle Fairoaks". It is signed by Mr Egan as *"Director, Albermarle Investment Syndicates"*. It makes no reference at all to the Defendant Firm or to Mrs Bellis, and it was not sent or (so far as the documentary evidence goes) circulated to either (though it was to Ms Cummings and Nigel Davis and Michael Pearson of Erinaceous).

352.  There is no documentary or any other direct evidence to suggest that Mrs Bellis saw it.  She denied consistently that she had done so. She accepted that the terms of retainer might have caused her to ask to see it; but she did not ask: *"No I did not, I'm afraid.  It may have been remiss of me, but I did not."*

353.  The Claimants urged me to disbelieve this. Counsel submitted that it simply could not be believed. But I see no basis or reason for concluding, contrary to Mrs Bellis' consistent and direct evidence and in the absence of any other, that she did at the time see the Teaser e-mail: and I decline to do so.

354.  Further, her "remiss" failure to seek out what the investors had been told seems to me to be consistent with my earlier conclusion that she was oblivious to that side of the transactional equation.

355.  Her evidence as to the loan note is more difficult to accept, although again under cross-examination Mrs Bellis never departed from her position that she was not aware that Mr Egan had sent a draft Loan Note out to investors, did not see the covering e-mail (dated 20 August 2007) by which he did so, and did not, at that time, expect Mr Egan to send out the draft loan note (which was her draft) to investors.

356.  The Claimants, in their written closing submissions, depicted this as being *"plainly a lie that Mrs Bellis has fixed on as helping her to explain why a draft note was sent out."* (Counsel for the Defendant Firm sought to persuade me that this was not properly put to Mrs Bellis; but I am satisfied that Mrs Bellis knew that this was suggested against her and had a fair opportunity to respond.)

357.  The evidence in this regard reveals the following:

(1)   On 13 August 2007 Mr Egan had emailed Mrs Bellis: "Any chance of a loan note, so I can collect some funds. Thankyou."

(2)   On 14 August 2007 Mrs Bellis advised Mr Egan by email that she was working on *"the Fairoaks documentation"* comprising (*inter alia*) a draft loan note, but asked for more information as follows:

> *"I imagine that it will attract interest but at what rate?*
>
> *I am proposing that the note will be cancelled in return for an appropriate unit in the new unit trust which is being set up but there should be a long stop date in the note for repayment if the unit trust does not get formed. Any ideas?*
>
> *The note will have to spell out that the lender"s loan is subrogated [she explained in court that she meant subordinated] to the Royal Bank of Scotland"s senior debt. I assume this is not a problem?*
>
> *Are there any other conditions which you think ought to go in the loan note to ensure that it ties in with what investors have been told?"*

(3)   On 15 August 2007, as mentioned previously, she advised Mr Egan by email of PwC"s advice against any element of conversion and also queried when interest should be payable (she had for present inserted quarterly in arrears): that same email purportedly had a draft loan note attached;

(4)   By email to Mrs Bellis (circulated to Ms Cummings and Mr Cummings) on 20 August 2007 Mr Egan advised *"The draft loan note was not attached, could I have it asap as I want to collect some money?"*

(5)   Mrs Bellis replied to all 4 minutes later (at 10:38) attaching a loan note;

(6)   On the same day, 20 August 2007 at 13:14 Mr Egan emailed Mr Wallis (cc Saskia Hunter) attaching the draft Mrs Bellis had prepared: other investors (especially Mr Cole and Mr Glatman and Mr Mahtani, and the next day Mr Melio) were sent the same soon after that;

(7)   The covering e-mail (summarised and quoted in part in paragraph 162 above) provided the Defendant Firm"s bank account details on its second page, in the body of what appears to be an email originally sent by Mrs Bellis. Its invitation to recipient investors was in these terms:

> *"Could you now forward the money to Juliet Bellis – I have attached the relevant Bank Details.*
>
> *I have also attached the Loan Note (with interest) which we will be issuing pending completion of the Unit Trust.*
>
> *The remainder of the terms of the transaction will be fairly similar to Shoreham LLP."*

(8) The draft loan note attached was quite obviously (a) only a draft, (b) unfinished, (c) undated, (d) not executed and (e) had at least one clause (clause 9.2) which was still not in settled form. (Though it is fair to acknowledge that the Trust Assistant at Tenon appears to have thought otherwise.)

(9) On 21 August 2007 in the early afternoon Mr Egan‟s secretary, Saskia Hunter, sent Mrs Bellis an email, attaching *"a schedule of confirmed investors who will be sending money direct to the Juliet Bellis & Co client account for Fairoaks Airport."*

(10) Early on 22 August 2012 Mr Egan sent an email to Mrs Bellis, Ms Cummings and Mr Pearson (which was also circulated to Mr Cummings) stating:

> *"The money will now be trickling in, would it be possible to register the dates for each receipt please, so that we can pay the investors interest."*

(11) That previous day Mrs Bellis received from Lloyds TSB CHAPS receipts of payment (for example, from Mr Cole, timed at 15:14 on 21 August 2007.

(12) On 24 August 2007 Mr Egan received an email from Chrissy Dobson, a Trust Assistant at Tenon (IOM) Ltd.  This confirmed that the trustees had approved investment of £150,000 in the Fairoaks scheme, attached *"competed unsecured redeemable loan notes 2007"* and at the end it stated: *"look forward to receiving our signed copy and the necessary documentation in due course"*: I return to this in paragraph 753 below but pause for the present to recall that in Mrs Bellis‟ handwriting (as she confirmed) in the right hand margin is a note stating *"GE confirms > RBS"*. No other draft Loan Notes appear to have been returned by investors.

358. Mrs Bellis knew that the loan note *"was still in draft form. It would have obviously had to go to Guernsey to get a Board resolution before it was issued"*. She knew it would not be issued in that form because it may be (and was) amended in Guernsey. She knew also that no such note had been approved by Guernsey and that no Board resolution had ever been obtained. But she said she expected it to be issued *"in these terms or similar."*

359. As noted earlier, she described it in her interview by AFL‟s administrators as just a "bit of paper" that Mr Egan wanted (not that Mrs Bellis was requiring) to keep the investors happy. She told them this:

> *"But the loan notes were – the way in which it worked was that the money came in and Geoff was then saying, you know, the investors want some bits of paper.  That‟s, put it crudely, the way it worked. And that‟s the way Geoff has always worked.*
>
> *Q. Right. And that didn‟t give you cause for concern?*
>
> *A. No."*

360.    I draw the following conclusions as to what Mrs Bellis knew about the dissemination on or about 20 August 2007 of the draft loan note that she had prepared:

(1)    she knew that Mr Egan wanted draft loan notes to provide to potential investors as a record of their investment and as confirmation that they would be paid interest;

(2)    she envisaged that the terms might be altered before they were finally issued but was not concerned if they were sent out in the meantime;

(3)    I infer from the e-mail from her providing her firm"s client account details that she probably was aware that investors would, when sent the draft, be asked to make payment to that account;

(4)    It may be that Mrs Bellis" denial is in the strictest sense accurate: she may not have seen the actual email sent; but if she did not actually see the email sent to investors covering the draft loan notes she was well aware that an email substantively along those lines would be likely to be sent;

(5)    She did not stand back to assess the commerciality or likely acceptability of the terms from the point of view of investors.

*(2)(b)   What did Mrs Bellis perceive to be the purpose and effect of the draft Loan Notes?*

361.    The last point is reflected, as I see it, in the terms of the draft Loan Notes which Mrs Bellis prepared (described by Counsel for the Defendant Firm as *"unequivocal"*).

362.    Mrs Bellis admits that these terms did not reflect what the investors expected to get. Her evidence under cross-examination reveals her approach, and I quote it at length since it seems to me to cover comprehensively both her own attitude and what she expected would be the attitude of the recipient investors:

> "MR SUTCLIFFE:  At the time, Mrs Bellis, did you consider  what the investors would have made of this document which, had it been executed, would have signed them up to an unsubordinated unsecured loan at base rate plus 1 per cent for five years?
>
> A.  You are asking me to put myself in the position of one of the Albermarle investors in 2007 having seen this document?  Is that the question you are asking?
>
> Q.  No, I am asking you whether, at the time, you gave any thought to how the investors would have reacted to this document?  Did you possibly think that -- they were the people who were going to receive this document.  Did you think for one moment that they would have agreed to part with their money on the basis that it was an unsubordinated unsecured loan at base rate plus 1 per cent for five years?
>
> A.  Yes, because my understanding was that Mr Egan would have communicated with them that this was an interim measure and that in due course -- I think everybody, we are all in agreement on this -- in due course they would receive equity in the fund or trust that was set up; and that it was always agreed and intended that Albermarle Fairoaks Limited would then be subsumed within that trust.  So that, therefore, at that stage, there would have been a reorganisation and their loans would have been converted into, I imagine, a small amount of equity in the unit trust, with the remainder being outstanding, as was the case in Shoreham, as well. If you are asking me would I personally have invested at the time, I would not, but I would not have invested in Shoreham between Christmas and New Year.  I would not have invested in the way in which, it seems to me, from this case and from disclosure, in

which many of these people sent their money in on the basis of very flimsy paperwork. That's my personal opinion.

MR JUSTICE HILDYARD: Mrs Bellis, can I ask you a question. I am so sorry, Mr Sutcliffe.

A. Yes. No, do.

MR JUSTICE HILDYARD: Your expectation was that their expectation was a convertible loan note?

A. My expectation was originally that there should be some conversion rights, and I was told for fiscal reasons that would be a bad idea.

MR JUSTICE HILDYARD: You were told by PwC?

A. PwC, yes.

MR JUSTICE HILDYARD: Now, that may be the advice for fiscal reasons.

A. Yes.

MR JUSTICE HILDYARD: But that does not alter, does it, your expectation of what their expectation would be?

A. That is correct.

MR JUSTICE HILDYARD: So you proceeded on the footing that they would not be getting what they expected?

A. I proceeded on the basis that they would be getting a loan note because it was a straightforward loan to Albermarle Fairoaks Limited, but that there would certainly be a restructuring of Albermarle Fairoaks Limited, and it was always anticipated that Albermarle Fairoaks Limited would be collapsed into the unit trust and the fund as soon as that was set up.

MR JUSTICE HILDYARD: So their expectation would be met in the end?

A. Exactly, my Lord.

MR SUTCLIFFE: Do you accept, Mrs Bellis -- I think you do from your answer just now -- that this document at page 163 did not record the contract which you understood was intended by the investors?

 A. It reflected my understanding of what we were doing at this particular stage in the transaction.

Q. That's not the answer to my question. I asked you about this document.

 A. Yes.

Q. The terms of this document did not reflect or record the contract which you believed at that time was intended by Mr Egan's investors?

A. The contract which I believed the investors intended at this stage was to make a loan to Albermarle Fairoaks Limited. It was, I fully accept, agreed by everybody that at some point in the future there would be a change to the structure which would then enable the investors to have equity in the fund or trust which was set up above Albermarle Fairoaks Limited. So in my mind it would have been a two-stage process. But at this stage I was absolutely clear that the money that was coming in was a loan to Albermarle Fairoaks Limited.

Q. There is nothing in this document which gave the investors any right to insist on what you call the second stage?

A. Yes. No, there is not. You are quite correct. I believe that was the thrust of his Lordship's question just now.

Q. It's pretty clear, Mrs Bellis, that Mr Egan had not grappled with these issues, had he?

A. I don't know what Mr Egan had grappled with or not, I am afraid.

Q. You must have done so, Mrs Bellis, mustn't you, as a solicitor?

A. I had grappled with these issues insofar as trying to draw up a document which reflected what my understanding of the position was at that stage.

Q. Given that you knew this document did not record the actual terms of the loan between the parties, I suggest that you did not think this was ever going to be issued as a binding loan note, did you?

A. It was sent to Mr Egan in draft form. I did not, at the time, think that Mr Egan was going to send this out to investors.

Q. Indeed, it was never intended to be issued in these terms, was it?

A. It would have been issued in these terms or in terms similar, I believe, because this was my understanding of what the position was, as I say, at this time.

Q. That is why you did not immediately contact AFL (i.e. Legis) in Guernsey to get a Board resolution; that's right, isn't it?

A. At this stage, it was still in draft form. It would have obviously had to go to Guernsey to get a Board resolution before it was issued.

Q. If you can be handed bundle A1 and go to your Defence, behind tab 3.

A. Tab 3.

Q. Page 47.

A. Yes.

Q. I direct your attention to (e) on that page. Page 47, do you see that, (e)?

A. Yes.

Q. "Mrs Bellis did not address her mind to the issue of the COBO or Know Your Customer requirements. The Guernsey regulatory issues were matters which had been dealt with by Ms Cummings with the assistance of Ozannes." That can't be right, can it, Mrs Bellis?

A. Yes, it is unfortunately correct.

Q. It's no good saying that Ms Cummings dealt with it. You were party to the emails on about 13 July dealing with the question of COBO consent, weren't you?

A. Yes, I had seen those emails.

Q. You had emails with Mr Dickinson on 23 July that we looked at yesterday in which you said that the Erinaceous loan was already covered by COBO?

A. Yes, after asking Ms Cummings. I think I said I had checked with Lucy and the COBO consent covers it.

> Q.  So what is your evidence?  Is it that you did think about COBO consent for this fund-raising exercise but you expected your sister to deal with it?  Or that it just never entered your mind at all?
>
> A.  What happened was during -- with the fund-raising exercise, I inquired or I asked Lucy again, "Is the COBO consent fine?"  She said "yes".  I fully accept that I should have gone back and checked the detailed terms of the COBO consent, but I am afraid I did not, and that is an error on my part."

*(3)    What did the parties understand to be the role of the Defendant Firm?*

*(a)    Investors" understanding as to the role of Mrs Bellis*

363.    Rightly or wrongly in law, it seems to me likely that the investors" understanding was that Mrs Bellis was acting for them, particularly in relation to the monies they were instructed to pay into her firm"s client account. That is how, as it seems to me, Ms Streeton had appeared to them to regard her role in previous transactions, and I sensed from all those Claimants who gave evidence that this was what they thought the requirement to pay into that solicitors" client account connoted or reflected in the circumstances.

364.    Once again, I think this perception is best expressed in the words of one of the witnesses. Mr Cole, in explaining to me (at my request) a paragraph in his witness statement, told me this:

> "MR JUSTICE HILDYARD:  -- you say in the last paragraph of paragraph 15 that it was your understanding that:
>
> "The defendant would be acting for the investors in accepting my funds, which what I had also understood when remitting them for Shoreham."
>
> A.  Yes.
>
> MR JUSTICE HILDYARD:  Can you explain that to me, please? Why did you think the defendant could be acting for the investors?
>
> A.  Really because on all the transactions which I've been involved in with Geoff previously, we would use a common set of solicitors, which was normally Helen Streeton at Fox Williams, and when I was involved with Legal and General we always had a common firm of solicitors involved who acted for top company and the investors.  So that was consistent all the way through and, indeed, for Shoreham when you look at the investment memorandum which raised the conversation which I had with Geoff, indeed Juliet Bellis and Co were the solicitors for the offer or memorandum, as I understood it.  It's for the top company and the investors which go together.  So it was indeed my understanding that by transferring my monies to Juliet Bellis' client account that, likewise, the intention was that Juliet Bellis would be acting for the investors and, indeed, when I spoke to Geoff about this we had that conversation because he described how the Erinaceous Group worked and the family and that she was an independent solicitor as well as being company secretary to Erinaceous but that she would be looking after our interests.
>
> MR JUSTICE HILDYARD:  So that her firm was in effect solicitors to the offer?
>
> A.  Yes, exactly."

*(b)    Mr Egan"s understanding as to the role of Mrs Bellis*

365.    Mr Egan thought of Mrs Bellis as, in substance, Erinaceous" in-house lawyer; and so it did indeed appear.

366. Geographically (she shared the same office building and the same entrance to it), financially (she invoiced Erinaceous direct, and her remuneration was, in effect, determined as such by a committee of Erinaceous), self-interestedly (her husband, sister and brother were in substantial control and had a large shareholding), and in terms of the expertise she could offer as in reality its property department (with little other commercial expertise).

367. Further, and as appears from the chronological sequence of events set out earlier in this judgment, Mrs Bellis frequently deferred to Ms Cummings, or left her to reply to enquiries from Mr Egan: the email exchanges of 28 August referred to in paragraph 180 above provide an example. Ms Cummings was not a director or shareholder or otherwise connected to AFL or ECS: but consistently with Mr Egan"s understanding, her interventions reflected the reality that Erinaceous ultimately controlled the transaction, and Mrs Bellis answered to her.

*(c)    Mrs Bellis" understanding as to her firm"s role*

368. It was obvious, to my mind, that Mrs Bellis herself had carefully considered, and honed, her best line of defence, and she never strayed from it: that her firm had no role except to advise Mr Egan and Mr Lawson as representing AFL in the transaction, that she never assumed or owed any duty to the investors, for whom (it is her case) she acted only in a ministerial capacity.

369. She had expressly stated in an email dated 22 November 2007 in reply to an email dated 9 November 2012 from Ms Wyatt of Ozannes, that she, though acting for AFL, *"regarded Geoff [Egan] and Dougie [Lawson] as "the client" for the purposes of this transaction and they have approved the documentation…."*

370. However, they were employed by ECS, and were *de facto* subject to direction by (in particular) Ms Cummings, as Mrs Bellis knew. Mrs Bellis accepted that her firm was to be paid by Erinaceous (under the arrangements previously explained): she never intended to invoice AFL and never did so. She also accepted that until 13 July 2007 her firm acted for Erinaceous (in respect of the actual property transactions); but she was adamant that after 13 July 2007 her firm was not acting for Erinaceous. Her position was that the firm acting was one called ASB Law, and that she sought to protect the interests of AFL at all times. ASB law"s engagement letter (dated 21 June 2007) was addressed to Mrs Bellis at Erinaceous and was counter-signed in acceptance of its terms by Mrs Bellis (as Company Secretary) and her sister Ms Cummings (as Director).

371. Mrs Bellis"s real expertise was in property transactions. The reality is that she had little relevant experience or expertise, and could offer next to nothing in terms of advice, beyond that; and apart from relaying advice from Nabarro Nathanson as to the structure to take account of SDLT changes, she never did so.

372. Once the property transactions were completed, she was content to do unquestioningly whatever was suggested to her by Mr Egan or required by Ms Cummings, unless it was patently beyond the scope of her firm"s licence (she could not handle regulatory work).

373. In the Engagement Letter, Mrs Bellis recorded her understanding that *"most of the initial investors are likely to be those who have already invested in Shoreham."* She also made clear that her firm was not authorised by the Financial Services Authority to carry out investment business, so that it would be Mr Egan"s responsibility to ensure that any investment memorandum sent out to investors was compliant with any regulatory requirements. However, she stated nevertheless that she would *"need to see a copy of any documentation which goes out to investors"*, recording that all she had seen was an early draft "Teaser" (comprising not the email Teaser but an early draft of its attachment).

374. Mrs Bellis virtually ignored the investors, even to the point of undertaking none (or almost none) of the "know your customer" checks required, as indeed she admitted, saying (in answer to Mr Sutcliffe"s questions):

> "Perhaps erroneously again, with the benefit of hindsight, I was content to accept his [Mr Egan"s] assurance that these people were not drug dealers or terrorists."

375. "These people", as she described them, were not, in her perception, her clients; and owing them, as she saw it, no legal obligation, she had no regard for them. This doubly exposed the investors who had in previous Albermarle transactions come to regard Ms Streeton as protecting their interests, as Mr Egan confirmed. In answer to Mr Sutcliffe he told me:

> "Q. On the subject of Mrs Streeton, Mr Wallis told the court that the investors had built up a good relationship with Helen Streeton over the years?
>
> A. Yes.
>
> Q. That she provided a very good service?
>
> A. Yes.
>
> Q. That he regarded her as independent from you and completely safe with his money?
>
> A. Yes.
>
> Q. That she would frequently contact the investors before releasing their money to explain the position to them and check that they agreed; were you aware of that?
>
> A. She wouldn't telephone all of them, but I think that she would communicate with some of the key investors, yes.
>
> Q. Mr Wallis said she was pedantic and would come back to him even if there was the minutest change to her understanding?
>
> A. Extremely.
>
> Q. Do you know how such conversations between Mrs Streeton and investors took place?
>
> A. No, I don't because I don't know the detail of any of them."

376. The truth, as I see it, is that Mrs Bellis was parachuted in by Erinaceous to replace Ms Streeton (who did have relevant expertise and on whom Mr Egan and his investor following had always safely relied), first in the Albermarle Shoreham scheme and then in the Albermarle Fairoaks scheme. This was because of her connections and her

property transaction expertise (which was relevant to the initial, property acquisition, phase); and because she was, as Mr Egan depicted her, in effect Erinacous"s in-house lawyer.

377. The investors expected her to be as Ms Streeton had been and to regard her role in acting for the investment vehicle as in substance acting for them as its future owners. They and (I think) Mr Egan assumed they could rely on her, as they had on Ms Streeton, to counsel caution where appropriate, and to keep the investors informed in advance of any dealings with their moneys. But this was not how Mrs Bellis perceived her role; and her loyalty was to Erinaceous and her family interests. That mismatch of expectation and experience proved disastrous.

377A. This mismatch proved disastrous. To my mind it explains, or at the least helps to explain, what I have earlier described as Mrs Bellis"s abdication of her responsibilities. These, in my judgment, plainly and obviously extended to (a) establishing precisely the intended relationship between each investor and the SPV, and what documentation and information had been given to investors in that regard (as indeed Mrs Bellis had stipulated in the Engagement Letter that she needed to see but never followed up); (b) satisfying herself, if her firm could not advise, that appropriate advice from Ozannes and Legis was in place that the intended relationship could and would be established as a matter of legal mechanics, and that any regulatory requirements had been complied with (as again she had stipulated in the Engagement Letter, but again never followed up); (c) ensuring that the terms of that relationship had, at the least, finally been agreed and approved by Ozannes before AFL or the investors were irrevocably committed and any monies invested were released from her firm"s client account; (d) completing any KYC requirements. She did none of this; urged on by Mr Egan and the crumbling position of her family"s company, Mrs Bellis trusted that, as in Shoreham, everything would be all right in the end. It was not.

### (4)   Requirement for investors to make payments into client account

#### (a) The investors" understanding of reasons for use of client account

378. All of the Claimants who gave evidence were (as it seemed to me) at one in drawing comfort from the fact that payment was to be made into a solicitor"s client account, both because that resonated with them as being consistent with the Albermarle "pattern", and because it appeared to them to connote or confirm that if the scheme could not proceed their money would be safe and returned to them.

379. As to their understanding of the purposes of paying into a client account they were uniform, not to say formulaic, in their conviction that it was to ensure that the monies were kept safely under the control of someone in whom they could trust unless and until the scheme could proceed to completion, so that if it did not proceed (as in the case of Albermarle Brighton) the monies would be paid back in full.

380. None understood that their money could be used in the meantime, except to demonstrate their intention to invest if the scheme did proceed. They further appeared all to trust Mr Egan and (in the case of Fairoaks, as in the case of Shoreham) Mrs Bellis to determine the point at which the scheme was sure to proceed.

THE HONOURABLE MR JUSTICE HILDYARD                     Challinor + 20 others & Juliet Bellis & Co, & Egan
Approved Judgment

381.    Mrs Challinor's evidence in answer to Mr Croxford is representative:

> "Q. You knew that the property had already been purchased by that company?
>
> A. Yes.
>
> Q. How on Earth was that company putting your money to work if it was simply going to sit on deposit?
>
> A. It wasn't going to be able to put our money to work until we were in a position whereby we could be offered ownership in that company and, at this point, when the monies were in, we weren't being -- we were being told that this was an Albermarle investment and therefore the expectation was that at the point at which our monies were to be put to work -- in your words -- we would have some form of documentation, be it an investment memorandum, an application form, a subscription form, a membership agreement, something similar which would then say categorically what would happen at the point our monies were used.
>
> Q. And do you say that was something you had in mind at the end of August when you read this email and the attached papers?
>
> A. That's exactly what I understood this to mean, that we would be -- we were putting our money in early but that the outcome would be that we would have an investment in Albermarle Fairoaks.
>
> Q. And that must have seemed quite uncertain to you, therefore, as to what was proposed?
>
> A. I don't think it was uncertain. We hadn't dealt with a Guernsey limited company before. I'm not au fait with what the particular rules were but it was quite clear it was going to be a little bit more complicated but, again, our monies were being asked to be placed in a solicitor's client account and therefore our thoughts were, well, they'll stay there and if it can't all work out, we will get the money back.
>
> Q. Can't all work out by when?
>
> A. There were never -- there was no timing to referred to on this but there was an aim to raise equity so we knew there was an amount of money that they were looking to raise in respect of Fairoaks and we knew that there was an idea to create a fund above, which in fact the idea subsequently we know was dropped, but we knew there were further machinations to go through before this could be completed in the way other investments had been completed.
>
> Q. Surely you were curious about what these machinations might be and how long they might take?
>
> A. Well, I don't suppose that we imagined that we were talking years but we were aware that we were being asked for repeat information in terms of the KYC requirements of the funds, so I suppose we did think it would take a little longer."

382.    I also find as a fact that although investors knew (for example, from the Teaser email) that RBS had assisted in financing the transaction, none of them was aware of the tight repayment schedule, nor (more particularly) of the terms of the RBS Equity Bridge and the commitment to pay back in instalments beginning in October 2007.

*(iii) Mr Egan's perception as to reason for use of client account*

383.    It will be recalled that Mr Egan, who had a minority interest in one of the Claimants, Black Isle, had, until the eve of trial, supported the Claimants' case based on contractual escrow, but then changed his stance.

384.    Once again, I think the essence of his revised case as to why monies were to be paid
        into the Defendant Firm''s client account can best be seen in an extract from his oral
        evidence:

> "Q. See, what I understand you to be saying to the AFL administrator and what I
> believe your evidence to this court is, is that when money is taken into a solicitor's
> account before an investment memorandum is issued, it is to be held safe by that
> solicitor awaiting the IM and it is not provided as a loan; it is as simple as that, isn't
> it?
>
> A. It's certainly not a loan.  It is to be held safe until they are a hundred per cent that
> the remainder of the transaction can be closed.
>
> Q.  That is the whole reason, I suggest, why it goes to a solicitor's account, not the
> bank account of the LLP or the company?
>
> A.  Correct.
>
> Q.  And ordinarily, if you give money to a company for immediate use, you pay it
> straight to the company.  Do you agree?
>
> A.  Yes.
>
> Q.  Everyone could understand that?
>
> A.  Correct."

385.    Thus, as I understood him, Mr Egan, considered it would not be "safe" to release the
        money for AFL''s use unless and until there was the certainty that the transaction
        could and would close in accordance with the investors'' expectations.

386.    So far as he was concerned (as I understood him), closure (and thus "safety") would
        entail (a) sufficient equity fundraising and investors to enable the scheme to proceed
        (though no fixed amount seems to have been specified); (b) ownership and control of
        the investment vehicle which controlled the property asset on behalf of and for the
        benefit of investors so that the value in that vehicle would be available to them; and
        (c) agreement on the terms and form of the equity shares and loan notes to be issued
        to investors such that *"the solicitors"* were *"100% certain that the documents could
        catch up"*.

387.    He considered this all to be in conformity with the invariable pattern in this regard of
        all Albermarle schemes. Until then, the investors'' money would be held in the client
        account, to be applied when safe, or else returned to them (as in the Albermarle
        Brighton scheme when it did not proceed with interest).

388.    As to the overall prospect of the transaction closing, he seemed to have little doubt;
        and he was comforted in this by the fact that Erinaceous had guaranteed the RBS
        Equity Bridge. As to the documentation, he was sanguine: it had followed in
        Albermarle Shoreham and it would follow again. As indicated previously, I also
        gained the impression that he expected Mrs Bellis to warn if in any doubt whether the
        investors'' expectation of equity participation and control of AFL by them or on their
        behalf could be met.

389.    Where ultimately he disagreed with the Claimants was as to whether, in the specific
        context of the Albermarle Fairoaks transaction, there was ever any actual contractual
        agreement on escrow terms (especially as regards "first tranche" investors who

advanced monies prior to the issue of any Investment Memorandum, the document in which escrow terms would typically be expressed).

390. On the issue as to whether those investors ever agreed or intended to make unconditional loans such that the monies paid into the client account would immediately belong to AFL, he remained at one with the Claimants.

391. However, his case as to what would suffice to constitute sufficient certainty prior to the issue of definitive documentation remained unclear and variable throughout.

(iii)    Mrs Bellis" perception as to reasons for use of client account

392. Mrs Bellis" position is clear from the following quotation from the transcript of her cross-examination by Mr Sutcliffe:

> "Q.What I do not understand Mrs Bellis is if, as you say, these monies were to be treated as immediate loans going to RBS, why should the funds come to you? Wouldn't it have made more sense for them to go straight to the AFL RBS bank account?
>
> A.  Mr Egan was keen for the monies to come through my client account so that he could log the money coming through, as I think was the case with the early round of fundraising in Shoreham.  He was keen to ensure that those people who came in early got some sort of enhanced return for their investment and, secondly, he thought that it would probably be sensible for me to keep a record of who came in when.
>
> Q.  It would be perfectly clear from an RBS bank statement, what monies were being paid into that AFL account, wouldn't it?
>
> A.  Yes.  I can only reiterate that Mr Egan specifically did request to come into my client account so that the date of receipt could be easily ascertained and logged and I believe there is somewhere an email that says something like that.
>
> Q.  I suggest to you that you only leave money in a solicitor's client account if it is to be held or decisions are to be taken as to how it is to be used?
>
> A.  The decision taken and the reason why it came to my client account in my mind was so that it could be used to reduce the equity bridge.  That was the sole purpose of the early round of fundraising."

393. Mrs Bellis plainly recognised at trial the importance to her case that it should be accepted that she had no uncertainty as to the reason and basis on which the investors were remitting monies to her firm"s client account; and she never admitted to any doubt that the monies received into her firm"s client account were intended for application in reduction of the RBS Equity Bridge, and belonged to AFL from the moment of their receipt.

394. She conceded under cross-examination that if she had been at all uncertain as to the basis on which monies were being paid into her firm"s client account she would have been bound to check with the payers.  This was the exchange between Mr Sutcliffe and Mrs Bellis in this regard:

> "Q.  Mrs Bellis, you knew that the investors were paying substantial sums of money into your account?"
>
> A.  Yes.
>
> Q.  Your client account?

> A.  Yes.
>
> Q.  And not AFL's RBS account?
>
> A.  Yes.
>
> Q.  Because it was a solicitor's client account where their     money would be safe as it had been on previous Albermarles, didn't you?
>
> A.  I knew they were paying money into my client account. My understanding and genuine belief was, and still is, that that money was to be utilised for the benefit of AFL and principally to repay the loan to the RBS equity bridge.
>
> Q.  Think carefully about this question, if you would.  Do you accept that, if you were uncertain as to the basis on which moneys were being paid into your client account, your duty as a solicitor with third party's money in a client account required you to contact the payers of the money to check the basis on which the money was received or, alternatively, to hold on to that money?
>
> A.  If I had been uncertain, then you are correct.  But I was not uncertain.
>
> Q.  Mrs Bellis, you didn't care, I suggest to you, because you assumed it would work out and you simply didn't bother to consider your duty to the investors, did you?
>
> A.  That's not correct."

395.    She repeated this assertion of certainty on almost every day of her cross-examination over the course of 4 days.  The same point was injected into her evidence relating to the dispute as to whether she had any conversation with Mr Wallis, which I come to later.  In a more general context the following extract (from her cross-examination by Mr Sutcliffe) is illustrative:

> "There was no question, in my mind, that there was any escrow or holding to order. The monies belonged to AFL as soon as they arrived in my client account.  That was my understanding."

396.    In this she was supported by the terms of the Engagement Letter (the authenticity of which the Claimants did not accept until the eve of trial), and in particular her reference in it to being agreeable to receive the monies from investors *"upon the basis that… these monies will be immediately utilised to repay monies owed to Royal Bank of Scotland."*

397.    She rejected any parallel with Albermarle Shoreham in this context, as well as the specific suggestion put to her that the required investment memorandum for Albermarle Fairoaks, had one been produced, would have had escrow terms as in the Shoreham memorandum earlier that same year.  Her case is clear from the following extract from the transcript of her cross-examination by Mr Sutcliffe:

> "Q. You would have assumed that when an investment memorandum was produced, it would have had escrow terms like the Shoreham memorandum earlier that year?
>
> A.  It would have had terms attached to it but it would not have had escrow terms in terms similar to Shoreham because it was always clear to all parties that this early round of fundraising would be used to repay the equity bridge to Royal Bank of Scotland.  Therefore it would not have contained the various conditions which we saw in the Shoreham documentation.
>
> Q.  As the solicitor receiving investors' money into your client account, it was your responsibility to ensure you understood the basis on which this money was being received, wasn't it?

A. Yes.

Q. It was your responsibility to ensure that others were putting together an investment memorandum and getting regulatory consents together on the correct basis?

A. That, as my later endeavours make clear, was the responsibility of others because as I have said in the letter, I did not have the expertise to advise on the structure and I was reliant upon others to liaise with the Guernsey regulatory people.

Q. What I do not understand Mrs Bellis is if, as you say, these monies were to be treated as immediate loans going to RBS, why should the funds come to you? Wouldn't it have made more sense for them to go straight to the AFL RBS bank account?

A. Mr Egan was keen for the monies to come through my client account so that he could log the money coming through, as I think was the case with the early round of fundraising in Shoreham. He was keen to ensure that those people who came in early got some sort of enhanced return for their investment and, secondly, he thought that it would probably be sensible for me to keep a record of who came in when.

Q. It would be perfectly clear from an RBS bank statement, what monies were being paid into that AFL account, wouldn't it?

A. Yes. I can only reiterate that Mr Egan specifically did request to come into my client account so that the date of receipt could be easily ascertained and logged and I believe there is somewhere an email that says something like that.

Q. I suggest to you that you only leave money in a solicitor's client account if it is to be held or decisions are to be taken as to how it is to be used?

A. The decision taken and the reason why it came to my client account in my mind was so that it could be used to reduce the equity bridge. That was the sole purpose of the early round of fundraising."

398.    She was also asked whether it occurred to her, and if so whether it concerned her, that on that basis she would in effect be agreeing to operate her firm"s client account as an AFL bank account in England, with herself as signatory (which would not only be an unusual and inappropriate use of a solicitor"s client account, but could also risk bringing AFL onshore for tax (and SDLT) purposes). Her answer was that it simply did not occur to her.

399.    This lack of focus on risks is consistent with my general appreciation of her conduct in the matter as previously described. For the reasons I have identified earlier, she took it as read that investors were prepared, in return for the promise of a loan/equity package in line with the Albermarle pattern, to make available monies to be used in due course to pay down the RBS Equity Bridge on the basis of what she described as *"flimsy paperwork"* and which she herself would not have regarded as a sufficient basis for an investment.

400.    However, I consider that Mrs Bellis must, as an intelligent and experienced solicitor, have appreciated that she could not properly treat as belonging immediately to AFL monies paid in to her client account on terms which to her knowledge were not only not yet documented but which had not yet even been determined, let alone agreed, either by the investors or AFL itself.

401.    Further, as it seems to me, a fundamental premise of Mrs Bellis" contention that the investors were aware and intended the money they remitted to her firm"s client

account would immediately belong to AFL is her alleged supposition that the monies would be used to pay down that indebtedness. But Mrs Bellis had no reason to think that the investors were aware of the instalment payments due in respect of AFL"s borrowing (whether under the RBS Equity Bridge or otherwise).

402.   She must have known, and I find that she did know, that to treat such monies as belonging to AFL, and to pay them to RBS on its behalf on that basis, was to act in anticipation of a position, which she knew still to be uncertain, being subsequently regularised, confirmed and documented, with the inevitable inherent risk that it would not be so.

403.   That the risk had not eventuated in the context of the Albermarle Shoreham scheme may explain, at least in part, why she took it. She may also have been comforted by her assumption that, in practical terms even if not legal formality, Mr Egan could be taken to speak for "his" band of investors (as indeed she asserted in her witness evidence she believed he had). But that, in my judgment, does not alter the fact that what she was doing was taking a risk with other people"s money; and that blind faith could not excuse or justify such an abdication of responsibility and breach of basic principles, as well as of the SAR.

404.   In short, I do not accept that Mrs Bellis can ever in truth have had the certainty that she so frequently asserted in evidence that investors had committed the monies they remitted to her firm"s client account for immediate use in reduction of the RBS Equity Bridge. Assumption that all will be well, and indifference to the risk that it might not be, is one thing: certainty is quite another. Indeed, in my judgment, she knew enough to know that she could not be certain.

*(5)   What did parties perceive to be required to authorize payments out of client account? Were such requirements satisfied?*

*(a) Claimants" understanding*

405.   There is no evidence that any of the Claimants were aware that the monies he or she had remitted to the Defendant Firm"s client account had been paid out until much later, in about November/December 2007. When they did find out that their money had been paid out of the Defendant Firm"s client account the evidence of the Claimants who appeared before me was of "shock" and "distress" and being "horrified". That invites the question as to what they perceived to be the requisite authority for payments out from the client account of the monies they had remitted to it.

406.   I have already discussed their perceptions (which I infer as a matter of probability was the perception of all the Claimants) as to the purposes of requiring payment into a client account, and their expectation that those monies would be kept "safe" until it was clear that the Albermarle Fairoaks scheme could proceed without impediment to its completion, with their equity participation agreed and needing only formal documentation.

407.   Inherent in that is that the Claimants were content for the monies to be released once it was "safe" without further instruction from them. Counsel for the Claimants accepted this in the course of closing argument, except in the case of Mr Wallis

(whose evidence was to the effect that he expected Mrs Bellis to confirm with him before making any payment out).

408.    The difficulties in giving sufficient legal definition to the concept of the monies being required to be held until it was "safe" to release them were vividly illustrated in the repeated amendments to the Particulars of Claim: formulation after formulation did not quite seem to capture the concept.

409.    In their final formulation, paragraph 18 of the Claimants" pleading was amended to read as follows:

> "18.    The investors  —[Erinaceous] and the Firm expressly and/or impliedly agreed (in the circumstances particularised below) ("the Agreement") that the investors" monies would be paid into the Firm"s client account on the following basis:
>
> 18.1    The investors" monies would be held in escrow in the Firm"s client account, remaining beneficially owned by the investors;
>
> 18.2    The monies would earn interest at 1% above base rate.
>
> 18.3    *The Firm could only release such funds to a Fairoaks vehicle, and only if the following conditions ("the Agreed Condition") were satisfied:*
>
>> a.    *There existed a Fairoaks vehicle which owned (directly or through a wholly owned subsidiary) the Fairoaks property ("the Fairoaks Investment Vehicle"); and*
>>
>> b.    *Claimants had (or would acquire at the point of release of the funds) legally enforceable rights against the Fairoaks Investment Vehicle to (i) equity (in whatever form) in that Vehicle, which would be 100% owned by investors, and (ii) zero coupon loan notes from that Vehicle or a wholly owned subsidiary, (i) and (ii) being in the tax efficient proportion of equity to loan notes of 1:9,999 or similar.*
>
> 18.4    *If it became clear to the Firm that the conditions in 18.3(a) and (b) could not be satisfied within a reasonable time, the Firm would be obliged to return the money to Claimants with accrued interest at the above rate.*
>
> *Alternatively, the Agreement was that the investors" monies would be held in the Firm's client account, remaining beneficially owned by the investors, to their order."*

410.    I shall return to consider whether the terms as pleaded are sufficiently certain for the purposes of establishing a valid contract; for the present it is sufficient to record them as the Claimants" final shot at defining in words their understanding as to the terms on which the monies were held in the client account.

411.    For completeness, however, I should here record that in permitting the Claimants to amend paragraph 18 of their RRAPC to rely on this further (and in the event, final) iteration of their case in this regard (as I did in my Ruling on 18 June 2012) I expressly made clear that I was not adjudicating as to the merits of the amendment, nor indicating satisfaction with their clarity or consistency. A point in the case being whether the terms alleged are sufficiently clear to satisfy the requirement of certainty, I considered that I would unfairly and unnecessarily foreclose the matter if, during the sound and fury of the hearing, I were to refuse to permit the Claimants to put forward what they considered to be their best case.

*(b)      Mr Egan's understanding as to what authority was required for payments out*

412.    Consistently with his perception of the purposes of requiring payment into the Defendant Firm"s client account, the upshot of Mr Egan"s evidence, as I see it, is that he did not consider that any further instruction or confirmation was needed to authorise Mrs Bellis to make payment out of that client account to RBS in payment of instalments due in respect of the RBS Equity Bridge once "safe" to do so (see paragraph 384 above).

413.    He emphasised that he *"relied on the solicitors concerned to be satisfied in that way."* His position, as confirmed to Counsel for the Claimants in cross-examination, was that the monies in the client account *"should only have been released, they should have been held safe, until the solicitor could be absolutely certain that units, whatever they are called , shares and loan notes, could be issued."*

414.    Mr Egan contended that he did not consider himself to have any authority to direct or instruct Mrs Bellis and her firm to make payments out of their client account. He did regard it as his function to push the transaction along, and to do his utmost to see to it that the interest and instalment payments due in respect of the RBS Equity Bridge were paid, early if possible. But it was for Mrs Bellis to advise and restrain him if that was not possible or not "safe".

415.    There is no doubt that Mr Egan did press Mrs Bellis to make payments out of the firm"s client account to pay down the RBS Equity Bridge, and became increasingly pressing as the instalment due date of 26 October 2007 approached.

416.    It is also the case that, in comments on Mrs Bellis" December Memorandum he stated:

> *"Her note is accurate.  I suppose my only question is whether
> or not I had the authority or whether she should have accepted
> an instruction from me on the payment of funds to RBS."*

417.    However, Mr Egan denies ever giving any formal instruction to Mrs Bellis to effect payment. He stated in his first Witness Statement that he *"was not in a position to give a formal instruction to Juliet Bellis"* and that he *"certainly did not intend that*

*Juliet Bellis do anything consequent upon that email which would put her in breach of her obligations to her clients"* (amongst whom he included the investors).

418.    He added that he was not an employee, director or officer of AFL; he was only an employee of ECS; he was not an agent for the investors either; Mrs Bellis knew all this and so

> *"it must have been clear to Juliet Bellis from the facts that I had no authority to provide any formal instruction to her to remit the investors" monies to RBS."*

419.    Mr Egan urged that the only written record of an alleged instruction was his email to Mrs Bellis of 31 August 2007 in which he said (in reply to an email from Mrs Bellis informing him of payments from investors into the client account totalling £1,350,000) *"Thanks, the Fairoaks money needs to go to RBS asap"*, and an earlier handwritten note of hers on an email dated 24 August 2007 from Tenon (notifying her that £150,000 had been sent to that client account) which reads *"GE confirms -> RBS"*.

420.    In short, Mr Egan accepts that he pressed; just as he pleads that he was under great and increasing pressure from Erinaceous (and in particular, the CFO, Mr Pearson); but not that he had authority or intended to instruct.

421.    His appreciation that he might have asserted an authority that he did not have are manifest both from his reaction to the December Memorandum (see paragraph 416 above) and from his efforts to present himself as surprised that Mrs Bellis had paid out to RBS monies paid into her firm"s client account by the Claimants. Thus, he expressed himself in December 2007 to Mr Glatman as having been "shocked" when the documentation did not follow like clockwork after the monies had been paid out to RBS; but as he explained under cross-examination:

> *"Shock that monies had been paid away and then not supported by the documentation. I mean, I cannot say it was shock – I cannot say it was shock that the monies had been paid away because I knew the monies had been paid away. I cannot deny that I knew they had been paid away. It was a shock that they had been paid away and then not followed up with documentation…*
>
> *They should not have been paid away."*

422.    Mr Egan"s evidence is not satisfactory, and his role gives ground for real concern. It is obvious, and I find, that he did encourage Mrs Bellis to remit to RBS the monies "his" investors paid into her firm"s client account as soon as possible, knowing that the paperwork was not in order, and even the basic structure had not yet been agreed. His attitude, as it seems to me, was that what the investors did not know they would not mind, provided it all turned out well in the end and they made money, as had indeed been his experience in the Albermarle Shoreham scheme.

423.    His initial and sustained attempts to deny that he knew that the monies had been paid out were disingenuous: he knew full well they had been as indeed he later admitted

(see paragraph 421 above).  I would accept Mrs Bellis" depiction of him, insofar as his explanation of his conduct in this particular matter is concerned, as *"not a credible or reliable source of information."* His versions of events did more than once change to suit his cause.

424.   On the question whether he gave instructions to Mrs Bellis, I consider that the documentary evidence is the surest guide so far as the true facts are concerned; and the rest is a matter of interpretation. I accept Mr Egan"s contention that he was not in a position, and had no authority (express or implied), to give instructions to Mrs Bellis as to the use and payment out of monies remitted to her firm"s client account; that Mrs Bellis, if she thought about the matter at all, could not have thought he did; and his emails to her, although plainly pressing for payment, were not intended by him, nor reasonably taken by her, to be instructions on which she could safely and properly act without more.

*(c)   Mrs Bellis" understanding on the issue of authority*

425.   As noted previously, the Engagement Letter, which Mrs Bellis drafted and was not countersigned by any director of AFL or by its legal owners, but by Mr Cummings *"as beneficial owner of the shares…"*,  purported to establish the scope of her retainer by AFL *"to act on its behalf in the Fairoaks Airport transaction"*.

426.   The Engagement Letter also included the following statement:

> *"I can supply a standard form of loan note if that would assist but I must emphasise that any such document will need to be approved by Ozannes in Guernsey as the legal requirements in Guernsey may be different.  If any other type of documentation is required (for example a unit in a fund) then this will have to come from Ozannes as it is outside the scope of my firm"s expertise."*

427.   Mrs Bellis" case was that she was entitled to make payments out to reduce or repay the RBS Equity Bridge as and when directed to do so by Mr Egan, whom she said she regarded as acting on behalf of AFL and the investors.

428.   She told me that she regarded Mr Egan as *"the prime mover in the transaction in the sense that he was sent draft leases, he was sent the draft loan agreement with RBS and he was integrally involved in all aspects of the fundraising in the sense that he obtained the credit approved terms [sic]….Mr Egan has always…was, to my mind, central to the Albermarle funds…."*

429.   She was adamant in this regard. I gained the firm impression that Mrs Bellis understood all too well, by the time of trial, that her best line was to assert repeatedly that she had always relied on Mr Egan and never had any doubt as to his authority to speak for and on behalf of all persons interested at all material times.  Indeed, I sensed she had become convinced of this in her own mind.

430.   However, in my view, she cannot have had any such certainty at the time. On the contrary, I have no doubt that Mrs Bellis was conscious at the time of the legal deficiencies, both as regards Mr Egan"s authority and as regards the legal paperwork:

she struck me as legalistic and precise.  She accepted under cross-examination that she knew that Mr Egan had no *"formal delegated authority from the Guernsey directors"*.  As already noted previously, she knew that loan notes had not been finalised or authorised, and that she could have no certainty as to the terms on which the investors had agreed to remit funds into her firm''s client account. Even if she assumed that, if these matters were regularised in accordance with her somewhat sketchy expectations, Mr Egan''s authority would be confirmed, she cannot have thought that it was safely in place.

431.   In my view, the truth as noted before, is that, at the time, Mrs Bellis acted on the assumption that a position that she knew to be uncertain in law would in due course be regularised.  She went along with Mr Egan''s approach of "transaction first, legal niceties later."  She knew that the approach had worked in the Albermarle Shoreham transaction; she presumably persuaded herself that it would work again; and payment in reduction of the RBS Equity Bridge (which Erinaceous had guaranteed) was in line with the commercial interests of Erinaceous and the group. She comforted herself that as a commercial matter, Mr Egan could be regarded as "Mr Albermarle" and a conduit to "his investors." But in doing so, she must have known that she was allowing commercial exigencies and assumptions to displace legal uncertainties.

432.   Put another way, I do not believe that she ever believed that as matter of law Mr Egan (to quote her third Witness Statement of 17 April 2012) "had authority" to make decisions on behalf of the fund as well as on behalf of "his investors"; she proceeded on an assumption that seemed commercially reasonable and advantageous at the time, but she never had reason to be satisfied, and never was satisfied, as to its legal cohesion and integrity.

433.   This also, in my judgment, explains the inconsistencies in Mrs Bellis'' evidence on the issue at trial, and what appeared to me to be her obvious discomfort when pressed to explain what she believed to be the source of Mr Egan''s authority.

434.   This was particularly evident to me in the context of her effective cross-examination by Mr Bacon (on Mr Egan''s behalf) with regard to her changing (and to my mind, obviously unreliable) evidence as to the payment of £379,942 to RBS from her firm''s client account on 15 October 2007.

435.   In this regard, when questioned by the Erinaceous Administrators (in June 2011) she had stated that the transfer was expressly directed by Legis.  But when questioned by Mr Bacon she said she had been *"clearly mistaken"* and had given *"a slightly misleading answer to the question from Dundas & Wilson".* Her revised version was that, once again, it was Mr Egan who had given the instruction, though there was not the slightest suggestion of that in her earlier interview.

436.   As to what she had told Legis, in her December Memorandum, she introduced a further variation: that it was Mr Egan and Ms Cummings *"of Erinaceous Group plc"* who had given instructions to implement the structure and for the remittance of monies received from investors to RBS to reduce the equity bridge.

437.   All this is to my mind redolent of reconstruction in the context of an appreciation that her assumption that she could pay out to RBS once advised to do so by Mr Egan had

been misplaced and a consequent need to build up a different justification for having proceeded as she had done.

438.    This is, to my mind, further confirmed by her conduct in relation to the balance of some £100,057 remaining in her firm"s client account after paying the £379,942 to RBS, which she sat on until August 2009, ignoring instructions to her from Legis. By then, of course, Legis had made clear to her that they considered she had had no authority to pay out the monies remitted to her client account by investors, and she cannot have had any good reason not to return the monies or interplead.

439.    In that context, it was put to her by Mr Sutcliffe that she retained the monies to assist Erinaceous, a suggestion which she rejected; but I accept that then, as throughout, her assumption that the requisite documentation would be put in place in the end was buttressed by the imperative of paying down the RBS Equity Bridge which Erinaceous had guaranteed.

*(6)     Were there any other factors operating on Mrs Bellis in making payments out of client account?*

440.    The Claimants contend that in acting as she did, with such disregard for the lack, not only of any settled documentation but any definition as to how the expectations of the investors were to be met, Mrs Bellis was also influenced by the personal interests of herself and her family, causing her to ignore (or at least discount) risks to the Albermarle Fairoaks scheme investors in pursuit of such interests.

441.    I feel I should also record my conclusion that Mrs Bellis did demonstrate, to my mind, a capacity for self-delusion where it suited her and her family interests, be it about conflicts of interest, or the reliance on Mr Egan"s instructions she asserted, or the propriety of simply disbursing monies without any certainty as to the terms on which they were paid or the authority on which they were received and to be disbursed, or (later) the use for her own and family"s advantage of Mr Cumming"s alleged beneficial ownership of the shares in AFL.

442.    Lacking from her evidence, to my mind, was any sense of responsibility to those (the investors) who she must have known relied on her (whether in such a way as to found legal liability or not) and any ability to distinguish clearly between her own and her family"s interests and the interests of those involved in the Albermarle Fairoaks scheme.

443.    I consider that Mrs Bellis looked at the transaction as another Erinaceous venture, in which in effect, even if not in theory, she acted for the Erinaceous Group. That was what she was accustomed and paid to do. Her family controlled Erinaceous and the Erinaceous Group: in default of any evidence to the contrary from Ms Cummings and Mr Bellis, I have no reason or evidence to doubt that the company and the group, including ECS, were (in the words of Mr Egan) *"run almost like a family company with one family in absolute control…"*

444.    I note in point of detail, but to my mind revealing detail, that in her December Memorandum on the matter to Mr Dickinson dated 17th December 2007 (see paragraph 213 above), and before the dangers of such an admission were as obvious as they became, she volunteered that it was Ms Cummings as well as Mr Egan whose

instructions she followed in remitting monies to RBS. She later sought to re-write this: for example, in her 4th and main trial witness statement, she tried to explain away the reference and stated categorically that *"at no time did Lucy give me instructions to remit funds to RBS; all instructions came from Mr Egan."* I prefer her contemporaneous, less careful, account.

445.   I do consider, and so find, that as Erinaceous" financial problems deepened in September 2007 and onwards (see paragraph 71 above), the imperative of getting money in to reduce Group indebtedness supplanted any other considerations. If Mrs Bellis at least by then had any uncertainty, as I consider she must have had, it was certainly not in the interests of Erinaceous, Longmint, or her family interests to raise them: the commercial imperative was to get in the investors" money, keep the deal afloat, and keep the bank at bay.

446.   Thus, whereas Mr Egan might, in earlier Albermarle investment schemes, have expected Ms Streeton to restrain him if commercial preferences overstepped legal bounds and to *"save him from being a hot-headed estate agent"*, in the context of the Albermarle Fairoaks scheme, he told me he consistently felt under huge and growing pressure to raise funds:*"I was continually pushed, pushed, pushed to raise money."*

447.   I take into account that it is in Mr Egan"s interest to try to explain his own actions, which are the subject of valid criticism (and not least his failure to explain to investors that the monies he raised were immediately being used).  I also take into account that he had good reason to get money in whereby to discharge instalments due to RBS: the relationship with RBS was important, and he wanted "brownie points" to enhance the prospect of loans to meet later funding needs. But his depiction of the pressure on him from Erinaceous to get money in from investors had, to me, a clear ring of truth.

448.   In summary, I consider that the personal interests of Mrs Bellis and her family, and the increasing domination of the interests and needs of Erinaceous, do assist in explaining what might otherwise seem to be Mrs Bellis" inexplicable indifference to the interests and expectations of the investors, and her passive acceptance of frailties, uncertainties and deficiencies in the legal structure from their point of view.

*(7)    The alleged conversation between Mrs Bellis and Mr Wallis*

449.   So far, I have been concerned to set out the factual background leaving aside the particular position of Mr Wallis and the dispute surrounding it. There is a clear conflict of evidence between Mr Wallis and Mrs Bellis as to whether or not they had a conversation during the course of which she assured him she would not utilise any funds paid by him into the Defendant firm"s client account pending his further instructions.  Mr Wallis is adamant they had this conversation; Mrs Bellis is equally adamant that they did not.  I turn to that now.

450.   Mr Wallis says that he clearly recalls calling Mrs Bellis on 15/16/17 August 2007 because he "*wanted to speak with [her] before transferring my funds to her client account*".

451.   He says he obtained her number from Mr Egan after asking Mr Egan why they were not using Ms Streeton of Boodle Hatfield, and recalls calling her from his St Paul"s office, introducing himself to Mrs Bellis, and telling her he was proposing to transfer

a quarter of a million pounds to her firm and wished the money to be held "*pending my further instructions. She gave me the assurance that I sought. She specifically confirmed to me that she would seek my authority before utilisation of the funds… The conversation was brief and to the point*". He then gave Mrs Bellis his number so that she could contact him to take instructions.

452.   He told me that he distinctly remembers the conversation, which was a short one. He thought it very likely he used the words "escrow, awaiting my further instructions"; "*This was the whole reason for my call and "escrow" was an expression I used when talking to Helen Streeton and other solicitors over many years*".

453.   He explained the reason why Mrs Bellis" name signalled alarm bells (as it had not on Albermarle Shoreham) and caused him to want express comfort from her: he had been investigating Erinaceous for a merchant bank and knew that they had serious problems. He told me that there had been speculation and gossip in the City as early as July 2007 that Erinaceous was in breach of its bank covenants.

454.   The immediate persuasiveness of his account was not assisted by the fact that the date he suggested in his first witness statement as being the date of the alleged conversation he says he had with Mrs Bellis "*before transferring…funds to her client account*" in fact was after the date on which he did in fact transfer funds; nor by the fact that he stated the conversation was immediately preceded by one with Mr Egan, and the revised date for the conversation was a date when Mr Egan was away on holiday.  Then he changed this and suggested that on reflection he was as certain as he could be that the date of the conversation was 16 or 17 August 2007.

455.   However, Mr Egan did confirm Mr Wallis" evidence that Mr Wallis called Mr Egan in August 2007 and asked for Mrs Bellis" number so that he could call her and check her out for himself or similar (that was Mr Egan"s recollection, although he could not remember whether the latter point was on Shoreham or Fairoaks). He confirmed that Ms Streeton used to telephone key investors before releasing money (hence Mr Wallis wanting the same treatment here).

456.   Mr Egan also confirmed that Mr Wallis had told him in late 2007/early 2008 about the Wallis/Bellis call, and that this was why Mr Wallis was so angry with Mrs Bellis (who had not in fact called Mr Wallis for instructions). They agree that he was not told immediately after the call in August, but Mr Egan confirmed that "*I was told subsequently*" and certainly well before February 2008.

457.   Mrs Bellis denies the conversation. Her initial case was that she did not recall the conversation but if it took place she thought it was not on the terms Mr Wallis alleges. However, by the time of her oral evidence her stance had hardened and she was adamant that no conversation had taken place. She described why she was sure this was so in answering questions from Mr Sutcliffe,  rationalising as follows:

> "MRS BELLIS: I am very sure in my own mind that this conversation did not take place, I do not recall it, but I fully accept that memories are not always 100 per cent accurate. However, I believe that if this conversation had taken place I would have recalled it because, although I am not 100 per cent certain of what Mr Wallis is saying that he told me, the substance of it seems to me that he was asking me effectively to give him an undertaking to hold the money to his order.  He's used variously the term "escrow", I think in his third witness statement he says that on reflection he may have used the word "escrow". But leaving aside whatever technical

terms he may have used, the substance I think of what he is saying -- and I am sure your Lordship will correct me if I am wrong -- is that he was asking me for an undertaking that I would not release his money without his express authority. Now, it is drummed into solicitors from a very early age that all undertakings must be considered carefully and recorded on the file. There is no note on the file. If I had given an undertaking, there would have been a note on the file.

MR JUSTICE HILDYARD: I think what he said, in case it helps you, is that it was his standard to say, and he said to you, that the money was to be held to await his further instructions.

A. Thank you, my Lordship. I am grateful for that. If he had said that to me, I would have interpreted that as an undertaking to him, if I had said, "Yes, I confirm that", I would have been undertaking to him that I would not release those funds without his instructions and that would have been recorded on my file. I appreciate that, although I do try to take file notes of conversations, invariably some do not get noted up. That is, I am afraid, the reality of it. Every solicitor I think would like to believe that they note everything but, in reality, things do get missed.

But if there had been a conversation with someone who said, "I am sending you a substantial sum of money and you are not to pay it out unless you get specific instructions from me", that would have been noted because I would have treated that in my mind as an undertaking. The third point is this. If that conversation had taken place, it would have run counter to everything which had been discussed beforehand, which is fully reflected in the contemporaneous documents, that I had understood and still do understand: that the money which was going to come into my client account would be used to repay the RBS loan (in other words, it would be my client's money, Albermarle Fairoaks Limited's money). If this conversation had taken place, I would have immediately contacted Mr Egan, Michael Pearson, Ms Cummings, whoever was available, Mr Egan I would guess, to say, "Look, I have had this conversation. What is going on? I have obviously had to confirm to Mr Wallis that I will not release his moneys, but this directly runs counter to what I have understood throughout this transaction."

So I have thought about this very, very carefully. I have tried to rack my memory, and I am now certain that this conversation did not take place because, as I said earlier, although I cannot recall it, I have thought about all the other supporting factors in case my memory was defective.

MR SUTCLIFFE: If you could pass bundle A1 back to Mr Tozzi and go to your witness statement, which is in front of you.

….

What I want to be clear from you, Mrs Bellis, is this: is your evidence that Mr Wallis is lying to the court and that you and he had no telephone conversation at all in August 2007?

A. I had no --

Q. No, wait until I have finished my question. Or are you saying that the conversation might have happened but you are not sure whether the conversation was as Mr Wallis says?

A. There was no conversation with Mr Wallis."

458.    With an even more precise, numbered, breakdown of the process whereby she came to be sure that the conversation simply never happened she repeated this "speech" (as Mr Sutcliffe depicted it) a few minutes later.

459.    This repetition of her thought processes long after the event in question did not, to my mind, add an impression of veracity. Mrs Bellis was not a spontaneous witness: I formed the impression that she had gone over and over in her mind what, in respect of

key issues, she should say: the result was impressive in terms of its clarity, but considerably less so in terms of its immediate credibility. Her precision seemed rehearsed: her evidence struck me as truthful in its detail, but incomplete.

460.   The dispute is thus acute: there is no middle ground, and *ex post facto* rationalisation by each has hardened their respective positions. The passage of time, and the natural tendency for witnesses to convince themselves ever more strongly of their version of events in the meantime, makes the dispute difficult to resolve on the basis of their own evidence.  The firmer guide is the documentation. Of particular importance is a letter dated 7 February 2008 which, after the unsettling events of November 2007, the confirmation of deep financial problems in the Erinaceous group, and the forced departure from Erinaceous of both Ms Cummings and Mr Bellis, Mr Wallis sent to Mrs Bellis.

461.   That letter, which Mr Wallis drafted with the help of Mr Egan and (they both think) Ms Streeton, is  stamped as having been received on 8 February 2008, and is headed Albermarle Fairoaks Ltd.  It read as follows:

> *"I am writing to you directly as I am becoming increasingly concerned about my position as an investor in the above company. My views are shared by other investors, who fully support my action on their behalf.  We have all been regular supporters of the Albermarle Syndicates for approximately 5 years and have been pleased with their performance thus far.*
>
> *I submitted £250,000 to you on or around 4th September 2007 [sic] based on the profile for the transaction prepared by Erinaceous Commercial Services. This indicated that you as the lawyer concerned would hold funds in your dedicated client account until the entire fund was closed, KYC checks had been concluded on all investors, and the fund"scorporate documents issued to those investors.*
>
> *However, I am led to believe that the fund raise for the project is unlikely to be completed which means that funds should immediately be returned to investors plus the interest earned to date.*
>
> *Having enquired about the matter further, I have been informed that you have remitted funds totalling some £2m without the appropriate closing of the fund or authority from Legis to the Royal Bank of Scotland.  I am informed by my lawyers that this is in breach of your fiduciary duties and breaks Law Society rules.*
>
> *I now require this situation to be sorted out to my complete satisfaction, with all monies deposited with you for myself and other investors returned immediately with interest.  Failure to do this within the next seven days will force me to take this matter up formally with my own lawyer and to alert the Law*

      

> *Society to what I am informed is a serious breach of your duties.*
>
> *Presumably you will wish to notify your professional indemnity insurers regarding the issue.*
>
> *I look forward to hearing from you by return"*

462.  The most striking thing about the letter in the present context, of course, is that there is no mention in it, or even a hint, of the disputed conversation. Nor was it mentioned in either of two following letters in the nature of letters before action respectively dated 6 March 2008 and 20 March 2008 from Boodle Hatfield to the Defendant Firm (drafted by Ms Streeton, on behalf of Mr Wallis).

463.  Indeed, there is no reference to the conversation in any contemporaneous or near-contemporaneous documentation at all.

464.  Inevitably, this was the focus of extended cross-examination of Mr Wallis and Mr Egan by Mr Croxford. I am bound to say that what Mr Wallis offered as an explanation for there being no mention of the conversation in any of the letters in February and March 2008 was not, in my view, compelling.

465.  He said that he had discussed the conversation in question with Mr Egan when they were drafting the first, and with an unnamed assistant at Boodle Hatfield (*"not Helen Streeton"*) but had felt (and he acknowledged that it *"may have been a wrong decision"*) that it was not appropriate to mention the conversation in question

> *"purely because it would have been a contentious issue, potentially, and what we wanted to do was to focus on what we wanted to do, which was to get our money back or get the issue completed satisfactorily. If we had an issue in there, and there clearly was an issue about, first of all, whether I had had the conversation with her and if I had the conversation with her, which I had, exactly what was said, that would have been the focus of the letter, as distinct from actually trying to sort of establish what we thought our rights were."*

466.  In his first witness statement (made on 7 November 2011) Mr Wallis had attributed more specifically to Boodle Hatfield the decision to make no reference to the conversation in question: *"For reasons of conciseness, I think, they chose not to include reference to it in these letters."*

467.  Neither a desire for conciseness nor a desire to avoid a source of contention seems to me to be a compelling explanation of the omission; and (unless possibly it was a desire not to differentiate his position from that of other investors, which was not suggested by Mr Wallis nor (accordingly) put to any witness) none suggests itself.

468.  Furthermore, the third letter (dated 20 March 2008) refers to an escrow, stating as follows:

> *"Our client Mr Wallis sent to you on 4 September 2007 a sum of £250,000 to be held in escrow. It appears to us that you breached these escrow arrangements and your implied solicitors undertaking by sending these monies without his consent…"*

Mr Wallis, under cross-examination, suggested that he may not have seen this letter until it had already gone out and had no input into it. Even if that is so, if Mr Wallis had (as is his evidence, as already related) previously discussed the disputed conversation with someone at Boodle Hatfield, and seems very odd that an implied undertaking should have been put forward, rather than the express one which Mr Wallis says (in substance) Mrs Bellis gave him.

469. Neither Ms Streeton nor anyone else from Boodle Hatfield provided a witness statement. Of course, that may be because of anxieties about waiver of privilege; but whatever the reason, the fact is that on this important point there was no corroboration of an important aspect of the matter from individuals able to give it.

470. The first occasion on which the alleged conversation was mentioned was at an acrimonious meeting on 28 October 2009 attended by Messrs Egan, Wallis, Bellis and Cummings, Mrs Bellis and others. Each side accused the other of lying about the terms on which the monies were held in the Defendant Firm"s client account and as to who had authorised the payments out to RBS. It does not appear to be suggested that the terms of the conversation were explained. There is a dispute as to whether Mr Wallis said at that meeting that he had a tape recording of the conversation which *"confirmed his version of events"*: Mr Wallis strongly denies this: I do not think I need to resolve that one way or the other.

471. By early 2010 Mr Wallis, along with other claimants, had instructed Mr Dunnill, then at the firm of Heatons. Heatons sent a letter on their behalf pursuant to the relevant pre-action protocol on 18 May 2010. Once again no mention was made of the terms of the alleged conversation. The first mention made in any document was in the Particulars of Claim in November 2010.

472. I have concluded on the available evidence and the balance of probabilities that the conversation which Mr Wallis has convinced himself took place did not actually do so, or at least not in the terms he has suggested. The inconsistencies of his account, the lack of any independent corroboration of it, and (most especially) the absence of any reference to it in the contemporaneous documentation or until so long after the event, have ultimately persuaded me to this conclusion.

473. I should make clear, however, that I do not think Mr Wallis was being knowingly untruthful. I think he has genuinely convinced himself that a conversation had taken place: my sense is that he simply cannot now believe that he would have left himself so exposed and wishful thinking as to what he should have done became an assumption that he had done it.

474. This is not at all unusual: and it does not signify dishonesty. I do not accept the suggestion in the Defendant Firm"s written closing that the explanation is that Mr Wallis hoped to extract money out of the Defendant Firm"s indemnity insurers and *"was prepared to say just about anything to pursue that."* I do not think that my

finding more generally undermines the credibility of Mr Wallis, nor the other Claimant witnesses; nor does it prove that there was no escrow arrangement, still less that none can be implied.

475.  Equally, my conclusion means that I reject the invitation to me in the Claimants" written closing that Mrs Bellis was, by her denial, seeking to bolster her defence and that this casts doubt on her credibility generally.  The dispute as to the conversation is an important issue: but to my mind, for those reasons, a discrete and self-contained one.

*(8)     What went wrong: the aftermath*

476.  I discuss later, under separate headings below, the facts specifically relevant to (a) the Claimants" alternative or secondary claim based on the contention that the Defendant Firm never had authority to receive monies into its client account as immediate loans to AFL because no organ of AFL ever authorised such lending and (b) the claims of (i) the Claimants and (ii) the Defendant Firm against Mr Egan.  But I turn lastly, in dealing with facts relevant to all the claims, to the denouement and what went wrong. This is principally relevant to issues of causation; but it also sheds a revealing light on the attitude of Mrs Bellis.

477.  A combination of factors came together to undermine the commercial viability of the Albermarle Fairoaks scheme, including the following:

(1)     the funds borrowed were of a far higher order than in previous Albermarle schemes,

(2)     the complexities caused by SDLT changes necessitated a Guernsey structure and alterations to the basic Albermarle model of investment in an onshore LLP, which caused conceptual problems and much delay;

(3)     delays undermined confidence;

(4)     the repayment schedule agreed by Mr Egan, even after he renegotiated an extension, was simply too accelerated properly to be achieved in light of the above;

(5)     fundraising coincided with a sudden and eventually disastrous decline in the fortunes of Erinaceous, making it all the more problematic.

478.  Even so, the investors might still have opted to pursue investment rather than demand repayment but for three factors:

(1)     One was their appreciation, guided strongly by Mr Dickinson, that the risks were too great, given the magnitude of indebtedness;

(2)     A second was the decision in the end of RBS to opt for administration (which commenced on 9 February 2010);

(3)     But in the meantime a third was the extraordinary conduct of Mr Cummings, with the assistance of both Ms Cummings and Mrs Bellis, in effectively hijacking AFL by using or purporting to use his beneficial

ownership of the shares to wrest control of AFL from Mr Dickinson and take it up for himself and his two sisters.

479.    Focusing on point (3) in paragraph 478 above, AFL (by its corporate directors) in January 2008 instructed Boodle Hatfield to act for it and to instigate proceedings against the Defendant Firm (as indeed was done, by Claim no. HC08C03768) to recover the firm''s files in relation to the Albermarle Fairoaks transaction. Access to those files had, not a little surprisingly, given Mrs Bellis'' insistence that she acted only for AFL, been denied.

480.    Just as surprisingly, the reaction of Mr Cummings and Ms Cummings, acting together with Mrs Bellis, was not to accept directions from the Court, but to take steps to remove the Guernsey-appointed directors and themselves take control to put a stop to the proceedings.

481.    This was accomplished by dint of Mr Cummings, apparently on the basis of being beneficial owner of the shares, procuring the transfer of the shares into his own name and replacing the Guernsey directors by himself and Ms Cummings. His excuse for doing this was his alleged concern (to quote from Mrs Bellis'' instructions to Counsel which were in evidence) *"that proceedings had been issued by the Claimant without his knowledge and that he was being denied any information as to the affairs of the Claimant."*

482.    Mrs Bellis acted for Mr Cummings in doing this and for AFL thereafter in bringing an end to the proceedings against her. Not for the first time she saw no conflict in her positions. The proceedings were terminated; and for good measure her firm was then paid substantial fees due to her out of the monies that she had retained on the excuse that she was unclear to whom they belonged.

483.    I rehearse the episode for two principal reasons. One is that it goes a long way to explaining, in my view, why the investors could not realistically be expected to do anything other than to enforce their legal rights in circumstances where the investment vehicle had been used against them. The second is that it illustrates the indifference to the interest of others (including the investors) who might reasonably have expected at least objective consideration, which Mr Cummings, Ms Cummings and Mrs Bellis, brother and the two sisters, were capable of when in single-minded pursuit of their own interests.

484.    After this long recitation of the chronology and further analysis and findings on the facts, I turn to the legal issues which must ultimately determine the case. I propose to do so under 4 main headings or chapters: (1) the main claim, based on contractual escrow or a *Quistclose* or other resulting trust; (2) the Claimants'' alternative claim based on the Defendant Firm having had no authority to receive monies on behalf of AFL; (3) the Claimants'' contingent claims against Mr Egan; and (4) the Defendant Firm''s Part 20 claim against Mr Egan.

## THE MAIN CLAIM: ESCROW/QUISTCLOSE TRUST

*Issue 1: was a contractual relationship established between the Claimants and the Defendant Firm?*

485.    I start with the Claimants" primary case that escrow arrangements were agreed between themselves and the Defendant Firm.

486.    An escrow arrangement must depend upon an enforceable contract or undertaking. As I noted in my judgment at an earlier stage in these proceedings (in the context of an application by the Defendant Firm for their summary disposition), [2011] EWHC 3249 (Ch), the doctrine of escrow is strictly applicable only to deeds. It is (to quote Lord Denning MR in *Alan Estates Ltd v W.G. Stores Ltd* [1982] Ch 511, 520) a *"relic of medieval times"*) rooted in the rule that a deed only has effect as such upon being delivered. A deed delivered as an escrow becomes a deed only when the escrow condition is fulfilled, though if and when the condition is fulfilled title passes as at the date of the escrow.

487.    The notion has, however, been translated into other contexts; and (as is indeed reflected in documentation relating to other Albermarle transactions) escrow accounts, escrow agency and escrow arrangements are commonplace and accepted in commercial transactions, denoting that notwithstanding transfer of a fund or property by X to Y property in the fund does not pass from X to Y until satisfaction of the agreed escrow event or condition.

488.    The essence of such an arrangement is a contractual agreement or undertaking not to treat the funds transferred by X as the property of Y unless and until the escrow event or condition is satisfied. The effect is that X cannot undo or recall the transfer pending fulfilment of the escrow event; but Y cannot use the funds as his own until such fulfilment.

489.    An escrow arrangement is similar to two other arrangements for the retention of an interest in property notwithstanding its transfer or delivery: a retention of title (or *Romalpa*) clause, and a *Quistclose* purpose trust. But whereas escrow arrangements and retention of title provisions are creatures of contract, a *Quistclose* trust may exist despite the absence of any contract at all between the parties.

490.    A classic *Quistclose* trust (which derives its nomenclature from the case of *Quistclose Investments Ltd v Rolls Razor Ltd* [1970] AC 567) arises where one person makes a loan to a borrower for a specific purpose where the borrower is not free to apply the money for any other purpose. The duty of the recipient not to use funds transferred to it for any purpose other than the purpose for which it was transferred, and to return any funds not so used, which is the hallmark of a *Quistclose* trust, is fiduciary not contractual: see *per* Lord Millett in *Twinsectra Ltd v Yardley and others* [2002] 2 AC 164 at 186*F*. That is so even if the arrangements giving rise to the trust are contractual in origin.

491.    Here, the Claimants" primary pleaded case depends on establishing a contract; and it is to the issue whether the admissible factual matrix supports the making of a valid contract of escrow capable of legal enforcement to which I turn first.

*Was there any express escrow agreement made between the Claimants and the Defendant Firm?*

492.  In paragraph 18 of the RRAPC (which, in its final iteration, I set out in paragraph 409 above) the Claimants allege the agreement on which they rely to have been expressly or impliedly agreed.

493.  However, the particulars which are given under the heading "Particulars of Agreement Formation" are directed to establishing an implied contract; and none of the witnesses (apart from Mr Wallis) suggested any express agreement.

494.  The Claimants accept that (leaving aside for the present the position of Mr Wallis) there was no written contract, nor indeed were there any material communications written or oral, between any of the (other) Claimants and Mrs Bellis.

495.  Nor do the Claimants allege that Mr Egan (or anyone else) acted on behalf of the Defendant Firm so as to bring about such a contract with them through his agency.

496.  In such circumstances I did not understand the Claimants ultimately to pursue any claim based on express contract, save in the case of Mr Wallis. In any event I consider that such a claim would be hopeless on the basis of the evidence before me.

*Was there any implied escrow agreement between them?*

497.  Accordingly, except as regards Mr Wallis, the Claimants" case must be based on there being an implied contract, to be inferred from the way that the parties conducted themselves in relation to each other.

498.  The question therefore is whether any contractual relationship between the several Claimants and the Defendant Firm may be inferred from the admissible circumstances, and if so, whether its terms are sufficiently clear and certain to be given contractual effect.

*Contracting parties and the engagement to be demonstrated*

499.  As to the parties to the alleged contract, in the RRAPC, the Claimants pleaded that the implied contract was entered between the Claimants, the Defendant Firm and also Erinaceous.

500.  In the course of trial, and in closing, the focus of the Claimants" case in this regard was on the alleged agreement between them and the Defendant Firm: no real basis for establishing a contract to which Erinaceous were party was advanced, although they continued to rely on exchanges between Mr Egan, Mr Lawson, Ms Ms Cummings and Mr Pearson as denoting knowledge, belief and agreement that the monies paid by or on behalf of the Claimants were not being made as loans to AFL, but subject to the escrow arrangements pleaded.

501.  It is, of course, important to distinguish between (a) any contract of loan between the Claimants and AFL and (b) any contract of escrow or retention of title between the Claimants and the Defendant Firm. However, and equally obviously perhaps, the one may impact on the other.

502.    Put shortly, if the monies were remitted to the Defendant Firm"s client account with the intention on the part of the payers (the Claimants) of making an immediate loan to AFL then that is inconsistent with any contract of escrow.

503.    If, on the other hand, the shared intention was that the funds had to be retained in that account pending some further event (whether automatic or at their say-so), and in the meantime remain the Claimants" monies and/or monies held to their order, then the inference of an engagement on the part of the account holder, the Defendant Firm, is plainly necessary. The engagement may not be contractual in nature; it may be based in equity/trust, and imply fiduciary obligations (as in the case of a *Quistclose* trust): but it is not inconsistent with, and may give rise to, the inference of a contract.

504.    Further, the question as to whether the requirement for payment into the Defendant Firm"s client account, and its acceptance that its account would be used for that purpose, unequivocally implies a contractual relationship with the payers melds into the question as to the reasons for the monies being so remitted.

505.    In light of the interplay between the two, the Claimants perceived the real issue not to be one as to contractual formation (as to which they submitted there was no real difficulty), but one as to the terms of the engagement agreed.

506.    That was not how the Defendant Firm perceived the matter, as Mr Croxford made quite clear in his own closing submissions. He repeatedly stressed (describing them as "Cheshire & Fifoot points"), that to establish an implied contract of escrow the Claimants must demonstrate satisfaction of the ordinary requirements of any contract, including an intention to create legal relations, offer, acceptance and consideration.

507.    In a sense, I think both parties are both right and wrong. The Claimants, as it seems to me, have too easily dismissed the point; the Defendant Firm has become trapped in its own classification. The fact is that the issues of formation and interpretation are not hermetically sealed; but they do each need to be addressed and satisfied.

508.    In addressing these points, and in light of the dispute as to whether the relevant "offering documents" were common to the parties, and for comprehensiveness in case of subsequent challenge, I shall deal with the issue of formation (and then interpretation) in two stages. In line with my factual conclusions, at the first stage I shall assume that Mrs Bellis was indeed not aware in fact of either "offering document"; on that basis the principal conduct in relation to the Defendant Firm relied on by the Claimants in this case is the sending of money by them, to the Defendant Firm"s client account (held at Lloyd"s TSB) rather than to AFL or an account of AFL or of Erinaceous.

*Was there an intention to create legal relations between the Claimants and the Defendant Firm?*

509.    The burden of proof on the issue of intention to create binding contractual obligations where there is no express contract, and the question is whether a contract should be implied, rests on the proponent: see *Modahl v British Athletics Federation* [2001] EWCA Civ 1447, [2002] 1 WLR 1192 at [100], where Mance LJ said:

> "Where there is an express agreement on essentials of sufficient certainty to be enforceable, an intention to create legal relations may commonly be assumed. It is otherwise when the case is that a contract should be implied from the parties'' conduct. It is then for the party asserting a contract to show any necessity for implying it."

510. Ordinarily, a process of offer by one and acceptance by the other will be evident and will provide a firm basis for the relevant shared intention to make a contractually binding agreement.

511. As Counsel for the Defendant Firm submitted, where conduct other than express offer and acceptance is relied on, the starting point is to consider what the relevant conduct is and factual material from which it is alleged that a contract may be inferred.

512. To be relevant the conduct must "cross the line" between the parties: it must be conduct of one in relation to the other which cannot be explained in any other way than that the objective intention of both was to create legal relations. However, as it seems to me, express communication between the parties may not be necessary: it is the appreciation of each of the conduct of the other in the context in which such conduct takes place, and the necessary referability of such conduct to the assumption of contractually binding obligations, that is of the essence.

513. Obviously the conduct relied on must precede the date from which it is alleged the contract was established. Accordingly, the factual nexus must (except as described later) be confined to the period prior to 21 August 2007, the date on which money was first received.  The first such receipt was on 21 August 2007 (from Mr Cole) in the sum of £400,000. Further amounts were received between 22 August and 24 August: £50,000 from Mr Glatman''s A&M Trusts, £250,000 from Black Isle Property and a further £50,000 from Mr Glatman''s SIPP on 22 August; £250,000 from HWC Fiduciare on 23 August; and £150,000 from Tenon on 24 August.  Other receipts and their dates are set out in a schedule marked „A".

514. The Claimants considered any issue as to intention to create legal relations to be clearly and unequivocally answered by the fact that the Defendant Firm made available its client account in the context of the Albermarle Fairoaks scheme for the purpose of receiving subscription payments: by making available that account for receipt into it of monies subscribed by the Claimants, the Defendant Firm must necessarily have undertaken contractual obligations to them in respect of such receipt.

515. Further, and as pleaded in „Particulars of Agreement Formation" under paragraph 18.4 of the RRAPC, it is the Claimants'' case that Mrs Bellis was well aware from previous Albermarle Investment Schemes, and in particular from the Albermarle Shoreham scheme in which the First Defendant had itself acted as escrow agent, that the Investment Model provided for investors'' moneys to be held in escrow, and usually by a solicitor escrow agent: the template, in other words, called for the Defendant Firm to undertake contractual obligations to the Claimants.

516. The Claimants also relied in this context on the SAR, which govern every solicitor''s practice. The rules applicable at the relevant date were the SAR 1998. In summary:

(1) All money that does not belong to the solicitor (solicitor‟s money is called „office money‟ in the SAR) must be held in a separate client bank account (Rules 13 to 15). Money may only be withdrawn from the client account when properly required for payment on behalf of the person on whose behalf the money is being held or on their instructions (Rule 22(1)(a) and (e)) or for other limited reasons which do not apply here.

(2) Where a solicitor is trustee (called a „controlled trust‟), money must be held for the beneficiary (Rules 8, 13 and 22). Where a solicitor is stakeholder, money must be held for the depositor (Rules 13(i), 22 and 26 to 27). Where money is accepted on terms that it is "to the sender‟s order", money must be held and then returned on demand (Rule 13 note (v)).

(3) A solicitor has a duty to replace money improperly withdrawn from a client account (Rule 7).

(4) Accounting records must be kept showing all dealings with client money (which includes all third party money), and reconciliations performed every five weeks, and the solicitor must retain for two years all authorities for the withdrawal of money (Rule 32). A full accountants‟ report must be produced within six months of the end of each (at least annual) accounting period (Rule 35).

(5) Under the accounting guidelines (Appendix 3) a solicitor should "*ensure there is supporting evidence showing clearly the reason for the payment, and the date of it*" for each payment from the client account (paragraph 4.2).

517. The essence of the Claimants‟ argument in this regard, as I understand it, is that the SAR, whether or not directly enforceable by persons whose monies have been paid into a client account, underpin the relationship between a solicitor and such persons; and signify acceptance by the solicitor of enforceable obligations not to apply such moneys unless and until entirely clear that such application would be consistent with the purposes for and the conditions under which the payment made into the relevant client account was made.

518. Against this, and rejecting any suggestion of any intention to create any contractual relationship between the Claimants and his clients, Counsel for the Defendant Firm submitted that the only conduct common to the parties was equivocal, and did not necessarily connote any engagement or contractual relationship between the Claimants and the Defendant Firm at all, just as payment into a bank account in the name of AFL would not connote any contractual relationship between the bank and the payers.

519. Counsel for the Defendant Firm submitted that the test is one of necessary inference: that the court must be persuaded by the payer that the payment into the client account is consistent only with the payer having intended to make a contract; "in other words, that this conduct cannot be explained in any other way".

520. They submit that in all the circumstances the Claimants have failed to discharge the burden upon them to demonstrate an intention to establish a contractual relationship

between themselves and the Defendant Firm; they say that the intention to make loans left no room for any such contractual relationship and that the Claimants fall at the first fence. Or in other words: the contract of loan between the Claimants and AFL precludes any such contractual relationship as the Claimants now seek to imply between themselves and the Defendant Firm.

521.    Counsel for the Defendant Firm prayed in aid that it is obvious that there may be a variety of circumstances in which payment into a solicitors" client account is made, without giving rise or being referable to any contractual engagement. They caution that it would be *"surprising and impracticable if every time a solicitor received money into a client account the solicitor was thereby at risk of having concluded an implied contract with the payer merely because of the payment."*

522.    As to this, as appears from my earlier description of her evidence, Mrs Bellis was quite clear: payment into her firm"s client account was for convenience of collection and recording only; the payers were making loans to AFL; from the moment the monies arrived she admitted to no doubt that they were intended to and did belong to AFL as monies loaned to it to enable it to pay down the equity bridge; she acted throughout for AFL and nobody else; and her firm"s receipt of the monies was purely ministerial; the making available of her firm"s client account did not connote there to be any contractual engagement between her firm and the Claimants, and none is necessarily to be inferred from their conduct or hers.

523.    Further, the Defendant Firm rejected the Claimants" contention that the making available of the Defendant Firm"s client account must be seen and construed in the context of previous Albermarle investment schemes where the client account of the solicitor to the investment vehicle was utilised as the collecting point for monies to be held in escrow.

524.    Counsel for the Defendant Firm contended that the Defendant Firm"s involvement as solicitor to the SPV in the Albermarle Shoreham scheme was a wholly inadequate basis for a submission than an otherwise equivocal act of paying into a client account was rendered demonstrative of an intention to establish a contractual relationship between payers and the Defendant Firm.

525.    They further contended that this in effect amounted to a plea that there was a "course of dealing" such that the terms of one transaction, the Albermarle Shoreham transaction, should be transposed or read into the Albermarle Fairoaks scheme in order both to establish contractual intention and to provide or supplement the terms of the contract said to have resulted. It was submitted on the Defendant Firm"s behalf that this was misconceived: first, the history of one previous transaction could not amount to a course of dealing; secondly, and in any event a "course of dealing" in a previous context might be invoked to supplement the terms of a subsequent contract but could not be invoked to establish the preliminary question as to whether a contract was ever intended at all.

526.    As I have indicated, the mismatch in the approach of the parties, as so often in this case, has added to the difficulty of satisfactorily addressing the issues in a neatly sequential way, and then in deciding between the competing, but not necessarily corresponding, arguments.

527.    I have in the end concluded on this aspect of the argument as follows:

(1)    I reject the Defendant Firm‟s contention that an immediate loan was intended. It seems to me clear from the factual background that the objective intention was that the monies paid into the Defendant Firm‟s client account were not immediately to belong to AFL, and they were to be parked pending finalisation of the Loan Note terms, KYC checks, COBO consents, and formal authorisation on behalf of AFL. Indeed, although the Defendant Firm contended that its belief was that Mr Egan was *"raising money by way of straightforward loan to AFL"* I did not understand it to c ontend that the monies subscribed could be released to AFL before then;

(2)    I accept the Claimants‟ contention that, objectively, the provision by the Defendant Firm of that account, and the instructed use of it by the Claimants for the purposes of the transaction was in the circumstances plainly and unequivocally referable to a shared intention that the monies paid in should be retained separately from the monies of AFL, and that payment out to or at the direction of AFL should await some further event or instruction, pending which the monies would be held safe for the payers;

(3)    I consider that the resulting consequence is that Mrs Bellis must objectively be taken to have accepted that she had assumed obligations to the payers such as to require her to keep the monies they had invested in her firm‟s client account unless and until the terms on which the monies paid in were clarified and the regulatory requirements fulfilled.

(4)    The circumstances (and the inferences to which in my judgment they give rise) which I regard as especially relevant are as follows:

a)    the objective probability, there being no sensible indication to the contrary, that the purpose of requiring an investor to make payment into the client account of the solicitor‟s firm acting for the investment vehicle is to keep such monies separate and apart from the investment vehicle and under the control of the solicitor pending some further defined event;

b)    the inference to be drawn that the solicitor does engage with the payer not to make payment out of that account in the meantime;

c)    the fact that all monies in a solicitor‟s client account are held subject to the SAR and the inference to be drawn in that and the other circumstances (in my judgment) that a solicitor‟s firm accepts binding obligations to any person paying monies into its client account not to apply such moneys unless and until entirely clear that such application would be consistent with the purposes for which, and/or the conditions under which, the payment made into the relevant client account was made (and see also paragraphs 560 to 568 below);

d)    Mrs Bellis‟ knowledge of and involvement in the  Albermarle Shoreham scheme, and especially the use of her firm‟s client account in that context;

e) Mrs Bellis" knowledge of and involvement in drafting loan notes for use in the Albermarle Fairoaks scheme which she knew were not in final form when receiving monies into her firm"s client account, so that she cannot have known at that point what were the final agreed terms on which investors were parting with their money (whether or not she knew about "the offering documents");

f) the further inference that, as an experienced solicitor, Mrs Bellis must have known that the terms on which the monies paid in to her firm"s client account remained unclear and would need to be clarified before she could accept any instructions from or on behalf of AFL with regard to the application of those monies;

g) the fact (as noted previously) that so many regulatory requirements remained to be completed, and the terms of the investment remained so uncertain;

h) last but not least, the fact that the investors were not told and did not know, and Mrs Bellis can have had no reason to think that they did know, about either the date of instalment payments due under the RBS Equity Bridge and its terms or (consequently) that their monies were needed immediately to pay instalments.

528.   In the result, therefore, I do not accept the Defendant Firm"s case that (a) all it was doing was providing an account into which investors in the Albermarle Fairoaks scheme, such as the Claimants, would pay their money for immediate use, or to the immediate order, without more, of AFL and that (b) there is nothing to signify, nor was there any objective intention to establish, any relationship such as to give rise to enforceable obligations of any kind between the Claimants and the Defendant Firm. It is, however, a different matter whether those obligations were intended to create legal relations or be capable of creating and constituting a contract.

*Can terms of sufficient certainty to establish a valid contract be implied or inferred?*

529.   As to that, I do not think that the evidence supports any more legally definite or more intricate obligation than that set out above; and more specifically, I do not consider that the evidence supports the Claimants" primary case that escrow terms (in any of the various iterations) were implicitly agreed such as to establish a contract. Nor do I think that as pleaded they would have had the requisite degree of certainty required to constitute an enforceable contract setting out defined escrow conditions or terms.

530.   Further reflection has confirmed me in my view that, save possibly in the case of the last iteration pleaded (see below), the terms suggested are at once too intricate and yet too vague to be safely implied or inferred and given contractual effect. The variety of alternative formulations offered further support that conclusion: it is difficult enough to establish an implied contract of sufficient certainty even when the terms avowed are settled.

530A.   For the avoidance of doubt, I confirm that (at the request of Counsel for the Claimants further to receipt of an earlier draft of this judgment) I have specifically considered whether the last and simplest iteration of the Claimants" alternative case, quoted in

paragraph 409 in the last sentence (beginning "Alternatively…") has the requisite certainty to found a contract. I accept that this final iteration is neither itself intricate nor vague; and I do not doubt that such a term (simply to hold to the payer"s order) might in other circumstances found a contract. However, in this case, and perhaps ironically in view of my criticism of the earlier iterations, I do not think that the objective intention of the parties would be captured by that simple formulation. In my view, the parties" objective intention was that the monies should be kept in the client account pending either an instruction or an event: but the event ("safety") was not sufficiently defined to satisfy the requirements of certainty in the context of a contract. It may be that another way of looking at this, as urged by the Defendant Firm, is that the circumstances are not such that an intention to establish a contract can be inferred: but, as the result is the same, it is not necessary for me to determine which is the most accurate formulation; and, as indicated previously, it seems to me that the dividing line between the question of certainty of term and intention to create contractual relations is often an indefinite one.

531.   I do not think the gaps can be made good by importing the terms of the Albermarle Shoreham escrow arrangements. Although escrow arrangements of some sort were part of what Mr Egan called the Albermarle "pattern", there were variations in their form. I do not accept that the form in Albermarle Shoreham establishes a template to govern future Albermarle investment schemes nor an established course of dealing such as to justify its implication.

532.   Moreover, the Albermarle Shoreham "pattern" does not necessarily assist the Claimants as much as they appeared to me to suggest. I have had well in mind the point made on behalf of both Mr Egan and the Defendant Firm that in the Albermarle Shoreham scheme (on which the Claimants place so much reliance as a template) there were two stages, and at the first stage the first tranche investors (including Mr Wallis) do appear to have made payments to the investment vehicle, the proceeds of which (some £2 million) were applied to reduce that investment vehicle"s indebtedness to (amongst others) Erinaceous before any documentation had been finalised. There were no escrow arrangements at that first stage (though there were at the second stage, as set out in the Information Memorandum eventually issued).

*Answer no different if "offering documents" taken into account*

533.   As indicated previously, I have so far been considering the question whether the escrow conditions pleaded were impliedly agreed without reference to the "offering documents".

534.   However, if such knowledge were to be assumed, and the factual nexus extended accordingly, my conclusions would be substantially as stated above. I would, however, feel fortified in my conclusion that the investors/Claimants did not intend the monies they were required to pay into the Defendant Firm"s client account to be immediately available to AFL, and that the draft Loan Notes promised in the email Teaser and sent later should be regarded as intended to be a purely temporary record of receipt and promise of payment of interest pending full subscription and finalisation closing of the transaction.

535.   Objectively construed, in my view the email Teaser (which was circulated to potential investors Mr Egan and which Mrs Bellis says she did not see):

(1)     sets the Albermarle Fairoaks transaction fairly and squarely in the context of, and as following the same basic pattern (loan/equity mix) as, Albermarle Shoreham and previous Albermarle Fairoaks schemes;

(2)     draws recipient regular investors" attention to the fact that the investment property has already been acquired in a Guernsey Limited Company to be owned by a Guernsey Close Ended Fund controlled by (equity) investors, with facilities from RBS;

(3)     makes clear that what is on offer is "equity";

(4)     solicits offers on the basis of a projected 15-32% Internal Rate of Return ("IRR");

(5)     draws attention to the fact of oversubscription in the Albermarle Shoreham scheme;

(6)     so as to enable them to avoid the risk of reduced participation in consequence of oversubscription, offers regular investors the opportunity "straight away" to "earmark" and guarantee their equity participation at their nominated amount in return for pre-commitment of funds by payment into a nominated bank account (in the event, the Defendant Firm"s client account) for onward investment, with such funds to generate in the meantime (pending investment) a paid return of 1% above base rate;

(7)     promises evidence of that pre-commitment in the form of loan notes to be issued immediately;

(8)     mentions that the scheme *"has been banked by RBS"* but does not draw attention to any particular borrowing, still less any imminent repayment obligation.

536.    As to the sending of the draft Loan Notes (which I would include in the factual matrix, whether or not Mrs Bellis in fact knew that the drafts had been sent):

(1)     the document was incomplete and obviously a draft;

(2)     it would require revision and completion before execution (I consider Mr and Mrs Challinor"s signature as signifying not acceptance of the terms but record of receipt, see paragraph 319);

(3)     its terms should if read have aroused concern and invited enquiry, but I accept the evidence of all the Claimants who gave evidence that none of them focused on its terms at the time, and either did not read it and assumed that there was no substantial departure from the Albemarle pattern (as in the case of Mr Wallis) or proceeded on the careless but honest assumption that it was a purely temporary expedient: I take one or other as indicative of the likely reaction of all the Claimants, and find accordingly.

537.    In summary, whether or not the "offering documents" are taken into account, the evidence is, in my judgment:

(1) sufficient to negate any objective intention to make an immediate unsecured, subordinated loan at a miserly interest rate, and to establish an objective intention that Mrs Bellis and the Defendant Firm should treat the monies remitted as continuing to belong to the payers, and as requiring to be kept safe for them accordingly unless and until it was clear that they had agreed clear and certain terms for, or directed, its release; but

(2) insufficient, and lacking requisite certainty and detail as to the terms on which the money would be available to (or for the use of) AFL, to establish a contract of escrow whether on the terms pleaded or at all.

538. Given the latter conclusion I do not think it necessary to deal at length with Counsel for the Defendant Firm's further „*Cheshire and Fifoot*" point that the ordinary requirements of offer, acceptance and consideration are not fulfilled: and in particular as to the latter that the Engagement letter between the Defendant Firm and (purportedly at least) AFL already committed the firm to receive monies into client account, and that consideration was past.

*Did the Claimants have different subjective intentions?*

539. My conclusion also means that Counsel for the Defendant Firm's final argument against there being found to be any contractual intention, based on a premise of a subjective intention to the contrary, is otiose. I deal with it only in case the matter proceeds further, and differently.

540. That final argument was to the effect that the subjective intention of a party, though not ordinarily relevant or admissible, may be admissible to displace the outward objective appearance of intention to create legal relations and agreement. In other words, whereas evidence of subjective intention would not ordinarily be permissible in deciding issues of contractual interpretation, it may in certain circumstances be admissible in deciding issues of intention to create legal relations and formation.

541. As will be apparent already, I would reject the argument. I do not consider that any of the Claimants subjectively intended to make an immediate loan to AFL, whether on the terms of the draft Loan Notes or otherwise. For the avoidance of doubt that is my view even in the case of the Claimants who purportedly filled in Loan Notes and approved them: I find as a fact that none of the Claimants subjectively intended to make an unsecured subordinated loan without stapled equity and cooperative control of the investment vehicle.

**Should a form of Quistclose trust be implied?**

542. Although I have found against the Claimants' case based on a contract, express or implied, I have nevertheless concluded that the Claimants did not intend the monies they paid into the Defendant Firm's client account thereupon to belong to AFL, and trusted Mrs Bellis to keep their money safe until their objectives were reliably fulfilled and secured. The next question, therefore, is whether those circumstances are such as to give rise to a *Quistclose* or some similar form of trust.

*Nature of a Quistclose trust*

543.    The true or doctrinal nature of a *Quistclose* trust has long been debated; but Lord Millett"s characterisation of it as a sub-species of a resulting trust probably holds sway. In *Twinsectra Ltd v Yardley and others* [2002] 2 AC 164, Lord Millett explained its juridical nature as follows:

> "68.  Money advanced by way of loan normally becomes the property of the borrower.  He is free to apply the money as he chooses, and save to the extent to which he may have taken security for repayment the lender takes the risk of the borrower"s insolvency.  But it is well established that a loan to a borrower for a specific purpose where the borrower is not free to apply the money for any other purpose gives rise to fiduciary obligations on the part of the borrower which a court of equity will enforce…

> 69.  Such arrangements are commonly described as creating "a *Quistclose* trust", after the well-known decision of the House in *Quistclose Investments Ltd v Rolls Razor Ltd* [1970] AC 567 in which Lord Wilberforce confirmed the validity of such arrangements and explained their legal consequences.  When the money is advanced, the lender acquires a right, enforceable in equity, to see that it is applied for the stated purpose, or more accurately to prevent its application for any other purpose.  This prevents the borrower from obtaining any beneficial interest in the money, at least while the designated purpose is still capable of being carried out.  Once the purpose has been carried out, the lender has his normal remedy in debt…This depends on the intention of the parties collected from the terms of the arrangement and the circumstances of the case.

> …

> 71.  A settler [payor] must, of course, possess the necessary intention to create a trust, but his subjective intentions are irrelevant.  If he enters into arrangements which have the effect of creating a trust, it is not necessary that he should appreciate they do so; it is sufficient that he intends to enter into them.

> …

> 73. A *Quistclose* trust does not necessarily arise because money is paid for a particular purpose. A lender will often inquire into the purpose for which a loan is sought in order to decide whether he would be justified in making it.  He may be said to lend the money for the purpose in question, but that is not enough to create a trust; once lent the money is at the free disposal of the borrower…

> 74. The question in every case is whether the parties intended the money to be at the free disposal of the recipient: *In re Goldcorp Exchange Ltd* [1996] 1 AC 74, 100 per Lord Mustill.

His freedom to dispose of the money is necessarily excluded by an arrangement that the money shall be used *exclusively* for the stated purpose, for as Lord Wilberforce observed in the *Quistclose* case…:

> „A necessary consequence for this, by a process simply of interpretation, must be that if, for any reason, [the purpose could not be carried out,] the money was to be returned to [the lender]: the word „only" or „exclusively" can have no other meaning or effect."

…

76. Equity"s intervention is…[justified because it]…is unconscionable for a man to obtain money on terms as to its application and then disregard the terms on which he received it. The duty is not contractual but fiduciary. It may exist despite the absence of any contract at all between the parties…; and it binds third parties as well, as in the *Quistclose* case itself. The duty is fiduciary in character because a person who makes money available on terms that it is to be used for a particular purpose only and not for any other purpose thereby places his trust and confidence in the recipient to ensure that it is properly applied. This is a classic situation in which a fiduciary relationship arises, and since it arises in respect of a specific fund it gives rise to a trust.

…

100. …the *Quistclose* trust is an entirely orthodox example of the kind of default trust known as a resulting trust. The lender pays the money to the borrower by way of loan, but he does not part with the entire beneficial interest in the money, and in so far as he does not it is held on resulting trust for the lender from the outset...When the purpose fails, the money is returnable to the lender, not under some new trust in his favour which only comes into being on the failure of the purpose, but because the resulting trust in his favour is no longer subject to any power on the part of the borrower to make use of the money …

101. …A trust must have certainty of objects. But the only trust is the resulting trust for the lender. The borrower is authorised (or directed) to apply the money for a stated purpose, but this is a mere power and does not constitute a purpose trust. Provided the power is stated with sufficient clarity for the court to determine whether it is capable of being carried out or whether the money has been misapplied, it is sufficiently certain to be enforced. If it is uncertain, however, then the borrower has no authority to make use of the money at all and must return it to the lender under the resulting trust. Uncertainty works in favour of the lender, not the borrower…"

544.   Norris J, in a summary of the above principles which the Court of Appeal approved on appeal (see the recent decision of the Court of Appeal *Raymond Bieber & Others v Teathers Limited* [2012] EWCA Civ 1466, which was delivered on 14 November 2012, and to which the parties" respective Counsel helpfully drew my attention whilst this judgment was in the course of preparation), added this:

> "it is implicit in the doctrine so described…that the specified purpose is fulfilled by and at the time of the application of the money. The payer, the recipient and the ultimate beneficiary of the payment (that is, the person who benefits from the application by the recipient of the money for the particular purpose) needs to know that property has passed."

545.   Building on that, a subsidiary ground for Norris J"s decision in declining to accept that the complex arrangements made in that case gave rise to a *Quistclose* trust was that the criteria for the exercise of the power were (see paragraph 42 of his judgment at [2012] EWHC 190 (Ch))

> "imprecise and highly subjective matters quite different from the usually encountered directions to use the money to acquire property, or to obtain a good marketable title or a first charge, or to pay a dividend or to pay the balance outstanding on a loan agreement for a car or to pay a publicity agent."

However, Norris J"s main ground for his decision was the incompatibility of the alleged trust with express contractual terms binding on the parties.

546.   On appeal, the Court of Appeal upheld Norris J"s decision on the main ground; but as I read it Patten LJ"s judgment (with whom Sullivan and Arden LJJ agreed) did not confirm the subsidiary ground. In his judgment, Patten LJ also emphasised the following in the context of the arrangements said in that case to give rise to a *Quistclose* trust (the numbering has been added by me):

> (1)   *"In deciding whether particular arrangements involve the creation of a trust and with it the retention by the paying party of beneficial control of the monies, proper account needs to be taken of the structure of the arrangements and the contractual mechanisms involved."*

> (2)   *"It is necessary to be satisfied not merely that the money when paid was not at the free disposal of the payee but that, objectively examined, the contractual or other arrangements properly construed were intended to provide for the preservation of the payor"s rights and the control of the use of the money through the medium of a trust."*

> (3)   *"Critically this involves the court being satisfied that the intention of the parties was that the monies transferred by the investors should not become the absolute property of [the ultimate payee]…but should continue to belong to the investors unless and until the conditions attached to their release were complied with."*

547.    Thus, in *Twinsectra*, monies paid by Twinsectra (T) to a solicitors'' client account subject to an undertaking by the solicitor (S) to retain the monies "until such time as they are applied in the acquisition of [identified] property on behalf of our client" (X) were held on resulting trust for T, subject only to a power to pay the vendor (V) out of the property. When the solicitors (S) paid the monies to another firm of solicitors (L) also acting for their client (X) following assurances by L on behalf of X that the money would be used in the acquisition of the property paid out to X and he used the money for a different purpose (not the purchase of the identified property) that was held to be a breach of trust by S. (T claimed that L had dishonestly assisted that breach of trust, but in the circumstances the claim ultimately failed.)

*Application in this case*

548.    Translated into the present case, the investors are in the position of Twinsectra (T), AFL is in the position of the client borrower, and the Defendant Firm may be in the position of the Solicitors (S).  Just as in *Twinsectra*, the commitment (if any) is given by the borrowers'' solicitors. The question is whether such a commitment was given (or implicit) and if so whether it constituted a trust obligation, or whether in reality the Defendant Firm simply had a ministerial function to act as receiving agent for its client (AFL), as Counsel for the Defendant Firm contend.

549.    Of course, in the present case there is nothing as clear and explicit as the undertaking in the *Twinsectra* case. Indeed, reflecting their arguments on the contractual issues, Counsel for the Defendant Firm submitted that not only was it not a party to, but it was not even aware of, any document or communication which on any reasonable reading could be taken to convey an intention on the part of the investors that the monies they remitted should remain their monies to be applied only for purposes defined with sufficient precision to give rise to a trust.  Further, and in the same circumstances they contended that Mrs Bellis had certainly not accepted any obligation to the investors of a fiduciary nature.

550.    Put shortly, Counsel for the Defendant Firm maintained throughout that there was no "mutual intention" or any sufficient certainty of exclusive purpose from which a *Quistclose* trust might arise. They concluded in the context of this issue with the submission that the claim that there was a *Quistclose* resulting trust between each of them and the Defendant Firm was:

> "impossible to understand.   There was no relationship of lender and borrower between the Claimants and the Defendant Firm.  The monies were not advanced by the Claimants by way of loan to the Defendant Firm, with a power to use those monies for particular purposes. Such relationship as existed between any Claimant and the Defendant Firm was that the Defendant Firm was recognised as being the agent of AFL undertaking a ministerial function for its client."

551.    I am not persuaded by this.  As it seems to me, the lack of writing does not necessarily mean that the circumstances are not such as to give rise to a *Quistclose* trust, though of course the burden of demonstrating that such a trust may be inferred in such circumstances is inevitably heavier. Nor does the fact that in this case, the trustee is not the borrower make the argument "impossible to understand". The *Quistclose* trust

analysis or doctrine is plainly capable of extending to the three-party situation in this case, as it did in *Twinsectra*. More generally, I consider that Counsel for the Defendant Firm adopted too restrictive a view as to what might be regarded as a form of *Quistclose* trust.

*Trusts analogous to classic Quistclose trusts*

552.    I accept that in a classic *Quistclose* case it is the combination of (a) the exclusiveness of the purpose, (b) the sufficient definition of the exclusive purpose to enable its satisfaction to be clearly determined, (c) the communication of that purpose to the immediate recipient of the monies and (d) the direction (express or implied) for return of the monies to the payer if the exclusive purpose is no longer capable of being satisfied that negates any intention on the part of the payer to part with the entire beneficial interest in the monies in the meantime. As Lord Millett explained, it is that retention of beneficial interest unless and until the purpose can be fulfilled that gives rise to the resulting trust in favour of the payer.

553.    Stipulation of an exclusive purpose for the loan may be the classic, but in my judgment is not the only, circumstance of which the immediate recipient is cognisant and which negates an intention on the part of the payer, to pass away beneficial ownership so as to give rise to such a resulting trust.

554.    The crucial question, as it seems to me, is as to the terms on which (objectively determined) the Defendant Firm received investors'' monies into its client account, and whether such terms should negate any intention that such monies should belong immediately to AFL, such that the account holder is bound to hold such monies for the payer pending receipt or satisfaction of a clear direction or pre-stipulated event providing for or triggering transfer of ownership to AFL.

555.    As was discussed in argument, nomenclature, or over-rigid characterisation, has bedevilled this case. At an earlier stage, debate over the appropriateness of the term „escrow'' in any context other than deeds clouded the real issue; and at trial, rigid analysis of the characteristics of a classic *Quistclose* trust, as if that was the only form of resulting trust, obscured the real question I have identified.

556.    As Lord Millett emphasised in *Twinsectra* (at page 192*F-H*):

> "I do not think that subtle distinctions should be made between "true" *Quistclose* trusts and trusts which are merely analogous to them.  It depends on how widely or narrowly you choose to define the *Quistclose* trust.  There is clearly a wide range of situations in which the parties enter into a commercial arrangement which permits one party to have a limited use of the other''s money for a stated purpose, is not free to apply it for any other purpose, and must return it if for any reason the purpose cannot be carried out."

557.    In my judgment, once excessively strict characterisation is abandoned and the essential question is understood, some of the difficulties that seemed to arise in consequence of the lack of documentation, and the paucity and uncertainty as to the communications between the parties, fall away (or at least are materially attenuated).

558.    The focus then becomes not so much on whether there was a sufficient definition and shared understanding of the purpose for which loans were made, but more on

(1)    what in all the admissible circumstances can have been the objective intention of the parties in making and accepting payments into the Defendant Firm"s client account before the terms of any loan had been finally agreed, if not to hold the money pending agreement or some future instruction or event;

(2)    what can have been the objective intention of the parties if the terms of the loans were never finally agreed or the future instruction or event was never given or did not occur; and

(3)    whether (objectively) there ever was, or arose, any sufficient basis for Mrs Bellis to treat the monies without enquiry of the payers as belonging to AFL.

559.    *Twinsectra* assists in this regard also in confirming the characterisation of monies held in a solicitor"s client account. In his speech Lord Hoffmann said this (at paragraph 12):

> "Money in a solicitor"s client account is held on trust. The only question is the terms of that trust."

560.    As to that question, and in answer to Counsel for the Defendant Firm"s more general argument that it cannot be right that every payment by a person who is not a client into a solicitor firm"s client account connotes retention of a beneficial interest in the monies paid by the payer, the Claimants relied further on the factual background specific to this case. In particular, their Counsel emphasised the following matters (each of which I accept and find accordingly):

(1)    the lack of any sensible explanation in all the circumstances for the requirement for payment into a client account other than (a) to prevent its being available to the ultimate intended recipient pending some further event or instructions and (b) to provide that in the meantime it is to be held under the control of a solicitor for the benefit of the payer;

(2)    the marketed and obvious characterisation of the transaction as an Albermarle investment scheme with the basic characteristics common to such schemes, in none of which had the investors ever made unsecured loans without an immediate right to a matched equity investment element;

(3)    the Claimants" familiarity with those basic characteristics, and their expectations accordingly that what they would obtain by subscribing money was a combination of a loan and „equity" participation (albeit that the documents to evidence that right might follow after the application of the monies invested);

(4)    the arrangements in Albermarle Shoreham, which took place only a few months before, and in which the Defendant Firm was both adviser and escrow agent, and where monies were required to be remitted to the same

client account with the Defendant Firm acting as escrow agent on terms set out in a document attached to the Information Memorandum for that transaction and expressly agreed between the investor and the Albermarle Shoreham vehicle, Albermarle (Shoreham) LLP, as a term of the application form required to be subscribed;

(5)     the inherent unlikelihood that the Claimants would ever have agreed to lend monies without any security, on terms that were not finalised, without control of the SPV (AFL) and so without any identified right to, or ability to require to be made available to them, some form of „equity investment" in AFL or in a fund above it;

(6)     the fact that at the time of the transfer of the Claimants" monies, Mrs Bellis knew that no formal and final documentation had been provided to them, still less agreed by them;

(7)     the fact that in this case (unlike what might be thought the more standard case) the monies to be remitted to the client account came from a number of persons;

(8)     all giving rise to the inference that, at the very least pending the agreement of formal documentation and the completion of any steps necessary to ensure there was no impediment to its issue and signature, the monies transferred should be held to the order of the payers;

(9)     the fact that, as a solicitor, and in light of her previous experience in respect of the Albermarle Shoreham transaction, Mrs Bellis could be expected to know, and did know, all the above and that (a) it was necessary for AFL"s directors formally to approve borrowing in accordance with specified and formal documentation before accepting money from investors (and the concomitant repayment obligation to them) and (b) it was not permissible for her to accept and apply monies received from investors unless and until „know your customer" and Consent to Borrowing ("COBO") and any other regulatory requirements in Guernsey had been completed.

561.    As to (1) in paragraph 558 above, even if, as I have earlier concluded, these factors are not sufficient to establish a contract in terms certain enough to be enforceable at law, I consider that they do connote (a) that the monies paid by the Claimants into the Defendant Firm"s client account  were not thereupon immediately to belong to or be subject to the directions of AFL; and (b) that until the final agreement on the terms of any loan and the finalisation of KYC and regulatory consents the monies were to be retained in that client account at least (c) pending agreement, some future instruction by or on behalf of the Claimants, or the happening of a pre-stipulated event (the achievement of "safety").

562.    As to (2) in paragraph 558 above, it also seems to me that it is to be inferred from the same circumstances that if, for whatever reason, the scheme failed, or no definitive agreement (whether or not documented) could be reached as to the terms of the loan, then the monies should be remitted back to the payers, and not to AFL.

563.    As to (3) in paragraph 558 above, and whether there ever was, or arose, any sufficient basis for Mrs Bellis to treat the monies as becoming the property of AFL if (as I have found) they belonged to the payers when remitted to and received in her firm"s client account, the answer is to my mind clear from Mrs Bellis" own evidence.

564.    It is Mrs Bellis" own case that she never knew even that draft loan notes had been sent out to investors; and in any event she accepted that she understood that the drafts were incomplete and would require amendment too. It must follow that she knew that no terms had been agreed for the loans, whether or not the terms included machinery to ensure equity participation.

565.    Furthermore, I have already found that she can never have had any real certainty, either as to what the investors were being told (since on her case she never saw the Teaser email and never made any enquiry in that regard, or at all of any of the Claimants) or as to how the expectations she knew them to have of a matched equity entitlement were to be met.

566.    Having become a trustee for the Claimants upon receipt into her firm"s client account she and her firm could not in equity foreclose the beneficiaries" interests and become trustee in respect of the same monies for another person without the most unequivocal instructions from her beneficiaries or else complete certainty that they had directed payment to AFL on conditions that had unequivocally been met.  As it seems to me, her case in answer to the contractual claim, and her evidence generally, makes it impossible for her to comply with these requirements.

567.    In that context, any uncertainty as to what directions were given or are to be implied as to the release of or transfer of beneficial interests in the monies does not undermine the trust; it undermines the ability of the trustee to do anything other than seek direct instructions from the beneficiaries or remit the monies back to them: see *Twinsectra* at paragraph 101.

568.    See also *per* Chadwick J (as he then was) in *Bristol and West BS v May, May & Merrimans* [1996] 2 All ER 801 at 819:

> "In *Target Holdings Ltd v Redferns (a firm)* [1995] 3 All ER 785 at 795, [1995] 3 WLR 352 at 362 Lord Browne-Wilkinson made it clear that he accepted that moneys held by solicitors on client account are trust moneys. Absent any express trust imposed by the client at the time that the moneys are paid to the solicitor, it seems to me that the trust which attaches to clients' moneys (in cases within this second category) is an implied trust imposed in order to give effect to the Accounts Rules made under s 32 of the 1974 Act [*i.e. the Solicitors' Accounts Rules 1986, then 1991, then 1998*]. The solicitor's obligations under that trust are the obligations imposed by the rules. It follows that a payment made out of clients' moneys to or to the order of a third party which is not authorised by, or 'properly required' on behalf of, the client is a payment made in breach of trust."

568A   In this context, Counsel for the First Defendant have urged on me (in relation also to paragraph 527(4)(c) above especially in their comments on an earlier draft of this

judgment which was circulated to them) that the trust to which Chadwick J above refers is a trust for the benefit of the solicitor"s client, and not the payer, and the duties are accordingly owed to the client, and not the payer. I would add this in deference to their concerns. Of course, in the *May, May and Merrimans* case the various firms of solicitors whose client accounts were being utilised to hold the proceeds of loans made by the plaintiff building society were in each case acting on each side of the lending transaction. However, and as set out in paragraph 516 above, the SAR expressly require all money that does not belong to the solicitor to be held in a separate client account, and not all monies held in a solicitor"s client account are held for a client of that firm. The question is not who the firm"s client is, but on whose behalf or to whose order or instruction the money is being held. It is for the solicitor to establish that with certainty; and his or her duty is not to withdraw that money from the client account unless and until clearly authorised to do so by the person on whose behalf or to whose order or instruction the money is held. That accords with a basic principle of the law of trust and trustees, that a trustee must ensure that he or she knows who the beneficiaries are and the terms of the trust in question.

569.    Counsel for the Defendant Firm argued that the objective inference of arrangements such as in equity to be characterised as in the nature of a trust is not enough: only actual knowledge and acceptance that Mrs Bellis was to hold the monies remitted to her firm"s client account not for AFL, but for the Claimants, could be said to engage her conscience sufficiently to fix her with fiduciary obligations. They argued strenuously that it would be *"utterly perverse"* to conclude that she had undertaken any implied engagement to *"people whom she had never met, not entered into any discussions with or given any solicitor"s undertaking to"* and that any suggestion that Mrs Bellis actually knew that the monies were to be held for the Claimants and not her client AFL was *"not only inherently improbable but simply not reconcilable with the contemporaneous documents."*

570.    They supported this with the following points:

(1)    Mrs Bellis had given very clear advice to Mr Egan in early July that the SDLT change and the delay in the setting up of a unit trust meant that he should solicit "straightforward loans" to AFL.

(2)    She did not see the Teaser or the Loan Note Email, but even if she had these would not have led her to question that Mr Egan would or might be implicitly representing to his investors (people whom she had never met and whom she believed Mr Egan wanted to protect) that the deal would be anything other than a straightforward loan.

(3)    She had drafted only a Loan Note, and she had not been asked to draft any form of agreement which gave the Claimants a right to equity, and indeed had been advised by PwC that the Loan Notes could not be convertible.

(4)    Of course she (and Mr Egan, and the Claimants) all had an expectation that the Claimants would in due course be given equity in the unit trust, but it is (so it was submitted) ludicrous to suggest that she knew or appreciated that they had only sent their money on terms that it was to be held for some indeterminate time until that eventuality occurred.  Her email to Mr Egan

on 15 August 2007 expressly deals with the possibility that such eventuality would not occur.

(5)     There is no evidence that she knew and appreciated that the corporate directors (people she regarded as functionaries) had not authorised the raising of loan finance (if that was the case) or that if asked they would not have authorised it.

(6)     There is no evidence that when she made the transfers to the RBS on 4 and 7 September 2007 she knew or appreciated that she was to hold monies on behalf of the Claimants who had by then invested.

(7)     Short of a proven allegation of dishonesty it is inconceivable that a solicitor of 30 years standing, with an unblemished professional record, would have transferred money to RBS had she believed the Claimants had any interest in such funds.

(8)     The person whom Mrs Bellis reasonably expected was acting for Claimants and might have been expected to warn her was Mr Egan. Far from putting her on notice that she should hold monies on trust/escrow for Claimants or hold it "safe" (an expression not found in any contemporaneous communication from Mr Egan) he positively tells (or at least encourages) her to send it to RBS reinforcing her belief that this is authorised and appropriate.

571.    These points have immediate forensic force; and I have considered and reflected on them with care; but I am ultimately not persuaded that they alter the legal analysis in the particular circumstances of this case.

*Breach of trust in making payments to RBS*

572.    The reason lies, to my mind, in the distinguishing feature of this case which is the fact that there is no doubt that upon receipt into the client account the monies paid in by the Claimants were immediately impressed with a trust, not because (at that point at any rate) Mrs Bellis" conscience was affected but because of the nature of a client account and the circumstances of the payment as adumbrated above (and see especially paragraphs 527 and 537).

573.    Once in that trust, with Mrs Bellis (or her firm) as trustee, Mrs Bellis was bound to establish with certainty who was the beneficiary, and once she had established that to act only in accordance with directions from that beneficiary of which she could be entirely certain.

574.    She was certain of neither. I have already held that, despite her oft-rehearsed protestations to the contrary, she simply could not have had, and I have further held (insofar as necessary) that she did not have, any such certainty.

575.    Not only is it a primary duty of a trustee to establish immediately the terms of the trust and the identity of its beneficiaries: but also (and as already set out) the SRA requires that, and requires certainty of instruction. It does not matter, to my mind,

whether that is characterised as a factor affecting the trustee"s conscience; whatever the terminology, the duty and the obligation are inherent and unavoidable.

576.   As I see it, there is no need in this case to enter into the debate whether, as Lord Browne-Wilkinson suggested in *Westdeutsche*, no trust can be imposed by law unless and until the trustee"s conscience is affected (see especially at pages 705D-E and 709D) or whether, as Lord Millett would have it (and a number of other cases support him, see *Underhill and Hayton, „Law of Trusts and Trustees", 18ᵗʰ ed.* at 22.7) a resulting trust arises where the circumstances in which the property was provided disclose that the disponor did not intend to, or did not effectively, part with his beneficial interest (a "default resulting trust" being the machinery of equity to ensure that his continuing beneficial interest is recognised and enforceable).

577.   There is, in my view, probably no need either to enter the further debate whether, under a resulting trust of that kind, the trustee owes fiduciary duties beyond the duty to restore the trust property on demand if still in possession of it (see again *Underhill & Hayton ibid.*)

578.   In this case, in my judgment, the trust and that limited fiduciary obligations are inherent in the fact that Mrs Bellis made available her firm"s client account and, in the events as they unfolded after doing so but before receipt of the Claimants" monies, could not have been and was not certain whose directions she could follow.   In thereafter proceeding regardless, she inevitably breached her duties as trustee. That, in my judgment, is sufficient to establish liability.

*If necessary to show breach of fiduciary duty or that Mrs Bellis"s conscience affected*

579.   However, if it is necessary to show that a fiduciary relationship with more extensive fiduciary obligations and their breach, and/or that Mrs Bellis"s conscience (as that is understood in equity) was affected, the fact of both is supported, to my mind, by the following facts (as in each case I have found them):

   (1)   Mrs Bellis, as a qualified and ordinarily competent solicitor must have known that (a) monies required to be paid into her firm"s client account for the purposes of the Albermarle Fairoaks transaction were held on trust and subject to the SAR; (b) it was her duty to establish the terms of that trust and the identity of the person(s) entitled under it; (c) she could not be certain either as to the terms on which the payment was made or the identity of the person(s) immediately entitled, since neither was yet the subject of any definitive or complete agreement; (d) pending at the very least the finalisation of such terms, complete certainty as to the person(s) entitled and what event, mandate or instructions would constitute an authority to make payments out to a third party, she was bound to retain such monies safely in that client account;

   (2)   Mrs Bellis knew from her experience of acting for the SPV in the Albermarle Shoreham scheme and her role in the Albermarle Croydon scheme that this is indeed what the investors were likely to expect;

   (3)   Mrs Bellis knew also that AFL had not approved either the borrowing or the final terms of loan notes, and that the terms of any investment were not only

          incomplete but also subject to conditions of KYC and COBO which had not been fulfilled;

(4)    Mrs Bellis accepted that she would not herself have contemplated proceeding to commit money to AFL on the basis of the documentation available;

(5)    Mrs Bellis was in a position of conflict of interest in acting for Erinaceous, AFL and Longmint, such as to require particular care before preferring Erinaceous and Longmint interests;

(6)    I have concluded that although Mrs Bellis assumed all would work out in the end, she knew also that the legal requirements had not yet been satisfied.

580.    Further, as regards the monies paid away later, in 2009:

(1)    The Defendant Firm knew that on 11 December 2007 Mr Dickinson told Mrs Bellis by email that he did not know that funds "*from potential unit loan note holders*" had gone to RBS and asked for confirmation and stated "*Please can I ask you not to make any further payments… unless you have our express permission to do so*" (underlined in the email). (This was after Mr Glatman"s call on 3 December 2007 questioning the payments out.)

(2)    Then on 13 December 2007, Mr Dickinson emailed RBS under the heading "*VERY URGENT*", copying Mrs Bellis, to say that the monies sent to RBS "*simply do not belong*" to AFL and asked for their return to the Defendant Firm"s dient account.

(3)    This is as plain an indication as can be that the human embodiment of one of AFL"s two corporate directors thought that the money sent to RBS did not belong to AFL and therefore can only have belonged to the Claimants, as Mrs Bellis accepts.

(4)    From that point onwards the Defendant Firm was on clear notice of a lack of authority by AFL and proprietary claim by the Claimants.

(5)    Mrs Bellis" explanation in interview was that "*I quite frankly felt at that stage I was not quite certain who I could safely take instructions from. So I hung on to the money*". Mrs Bellis" explanation in oral evidence was that she thought Mr Dickinson was confused or wrong, she "*did not really understand where he was coming from*" and:

(6)    "there was clearly, in my mind, at this stage, some considerable difficulty in determining who had the real authority to give instructions for Albemarle Fairoaks Limited… at that stage I therefore felt it sensible to hang onto the money. I had had a direction instruction from Legis not to pay monies out, therefore if Mr Egan had subsequently said to me to pay money out, I would not have done so."

(7)    In spring 2008 there was then intimation of a claim that the money was held on escrow. Plainly from then on, in my judgment (and I so find):

      a)    Mrs Bellis knew that the AFL directors thought the money was the Claimants" and paid out without authority.

      b)    Mrs Bellis knew that the Claimants thought there had been an escrow and it had been breached.

      c)    Mrs Bellis knew that the Claimants had a possible trust or other proprietary claim (whether against the Defendant Firm, AFL or RBS).

      d)    Mrs Bellis knew that she should have contacted all the Claimants, especially those whose money was still in the account. Yet she deliberately chose not to do so, in order to protect herself and Erinaceous.

581.    I record that Counsel for the Defendant Firm objected to these points on the grounds that they amounted to an allegation of dishonesty which had not been pleaded nor properly put to Mrs Bellis. There would be force in this if the Claimants were advancing a plea of dishonesty as such or by necessary implication: however, these points are not relied on for that purpose, but only to support the contention that Mrs Bellis was in a fiduciary position and/or her conscience was affected, which the Defendant Firm submits is a vital ingredient of the case against it as it has always understood it. As such, it seems to me these factors may legitimately be taken into account; and in my judgment they support the conclusions I have expressed.

582.    Accordingly, not on the basis of contractual escrow, nor on the basis of a classic *Quistclose* trust, but rather on the basis of an analogous form of resulting trust of which Mrs Bellis was in breach, I have concluded that the Claimants succeed in their primary case.

## CLAIMANTS' ALTERNATIVE CASE: *the Defendant Firm had no authority to receive funds raised*

583.    I address next the Claimants" alternative case that, even if there was no escrow nor any form of *Quistclose* trust arrangement by reference to the basis on which the claimants" monies made payments into the Defendant Firm"s client account, the Defendant Firm held the monies on trust and must account for them, or alternatively is liable to pay restitutionary compensation, on the basis that AFL never validly authorised the borrowings, nor the receipt into the Defendant Firm"s client account of monies for AFL"s own use which it would be liable to repay with interest.

584.    Although the legal analysis of their consequences is of some complexity, the facts relevant to the Claimants" alternative case are relatively clear and straightforward.

*Relevant facts as to AFL"s management, constitution and ownership*

585.    It is first necessary for me to paint in some details as to AFL and its management and ownership.

586.    AFL was incorporated in Guernsey. As is usual in English law also, the authority to manage its business is, under its Articles of Association, vested in its board of

directors. More particularly, the powers of the company to borrow money are expressly allocated to its board.

587.    The relevant Articles are in the following terms:

(1)    Article 95 provides:

*"The Board may exercise all the powers of the Company to borrow money and to mortgage hypothecate pledge or charge all or part of its undertaking property and uncalled capital and to issue debentures and other securities whether outright or as collateral security for any liability or obligation of the Company or of any third party"*

(2)    Article 96 provides:

*"The business of the Company shall be managed by the Board who may exercise all such powers of the Company as are not required to be exercised by the Company in general meeting subject nevertheless to these Articles and to such regulations as may be prescribed by the Company in general meeting but no regulation so made shall invalidate any prior act of the Board. The general powers given by this Article shall not be limited or restricted by any special authority or power given to the Board by any other Article."*

(3)    Article 99 provides:

*"The Board may at any time by power of attorney under the hand of such person or persons duly authorised in that behalf appoint any person or any fluctuating body of persons whether nominated directly or indirectly by the Board to be the attorney of the Company for such purposes and with such powers and discretions and for such periods and subject to such conditions as the Board may think fit…"*

588.    Also potentially relevant are the following Articles:

(1)    Article 9, which provides (in relevant part):

*"Except as ordered by a court of competent jurisdiction or as required by law the Company shall not be affected or bound by or compelled in any way to recognise (even when having notice) any equitable…interest in any share…or any other rights in respect of any share except an absolute right to the entirety in the registered holder…"*

(2)    Article 60, which provides:

*"The quorum for a general meeting shall be two Members present in person or by proxy"* (*"Member"* being defined in Article 1 as including *"registered holder of a share and vice versa and any person entitled on death disability or insolvency of a member."*)

589.    At all material times until 9 June 2009 (when Mr Cummings purported to appoint himself and Ms Cummings as directors of AFL in their place) the directors of AFL

were corporate entities, namely Ovaco Limited ("Ovaco") and Lapco Limited ("Lapco"): both being Guernsey companies whose directors (including Mr Stephen Dickinson) were appointed by Legis.

590. The registered shareholders of AFL were at all material times until June 2009 companies (First Ovalap Limited and Second Ovalap Limited) who were the nominees of Legis and who subscribed AFL"s Memorandum of Association.

591. In June 2009, Mr Cummings (apparently on the advice of Guernsey lawyers) purported to requisition and hold (on 9 June 2009) an Extraordinary General meeting at which it was resolved (amongst other things) that the shares of First Ovalap Limited and Second Ovalap Limited should be transferred to Ms Cummings and Mr Cummings respectively.

592. Until 9 June 2009, none of Mr Bellis, Mrs Bellis, Mr Cummings, Ms Cummings, Mr Egan or Mr Lawson was ever a director of AFL, nor of Ovaco, Lapco, or Legis; and at no time was Erinaceous, Mr Bellis, Mrs Bellis, Mr Cummings, Ms Cummings, Mr Egan or Mr Lawson a registered shareholder of AFL.

593. There is no evidence, nor any assertion, of (a) any decision by the Board of AFL to borrow money, nor of (b) the grant of any authority to Mr Egan or Mrs Bellis or anyone else to borrow or receive money on its behalf. When Ms Cummings, by email (copied to Mrs Bellis) dated 18 July 2007, sought the agreement of the AFL directors to operate the AFL bank account, Mr Dickinson made clear that only the AFL directors (through their usual Legis signatories) could deal with such matters.

594. The unchallenged evidence of Ms Wyatt of Ozannes, Guernsey legal advisers to Legis and its appointees and directors, and the (hearsay) evidence of Mr Dickinson, was that the directors of AFL did not even know of the receipt of moneys into the Defendant Firm"s client account or any supposed loans. Mrs Bellis confirmed in cross-examination that she did not dispute this.

595. The reaction of Legis and Ozannes, when the transfers out to RBS of the monies sent to the Defendant Firm"s client account became known to them, was, as set out in an email from Mr Dickinson to Mr Egan dated 19 December 2007:

> *"You did not have any authority to instruct on this and Juliet Bellis should not have accepted an instruction from you in connection with this company."*

596. It will be recalled that Mrs Bellis did not dispute that Mr Egan was not "formally" authorised on behalf of AFL: *"he did not have any actual authority, any formal delegated authority by AFL, that"s correct."* I infer that she did know that at the time too. She also knew that the authority of AFL"s Board was required to issue AFL loan notes. She simply proceeded on the basis that Mr Egan was "Mr Albermarle", organising this Albermarle fund as he had organised the Albermarle Shoreham scheme: *"he had arranged for the finance, he had organised the valuation, and he was now carrying out the early round of equity funding."*

*Dispute of fact as to the authority of Mr Egan*

597.     The fact that so much was left to be done by Mr Egan, and indeed had been done by him before ever Legis was involved or AFL adopted as the SPV, is the foundation (together with the Engagement Letter) for the Defendant Firm"s answer to the Claimants" alternative case.

598.     The case made on behalf of the Defendant Firm is that notwithstanding that the express authority of AFL"s directors was not in place, nevertheless Mr Egan and ECS and the Defendant Firm did have actual authority, under express or implied contracts of agency with AFL, to solicit (in Mr Egan"s case) loans on behalf of AFL and (in the Defendant Firm"s case) to receive the loan monies into its client account and disburse them on Mr Egan"s direction.

*Defendant Firm"s case that Mr Egan/ECS and the Defendant Firm had actual authority*

599.     The building blocks of the Defendant Firm"s case that the authority of Mr Egan/ECS to raise and of the Defendant Firm to receive money on behalf of AFL was inherent in the true nature of his relationship with AFL and Legis can, I think, be summarised as follows:

(1)     AFL was SPV acquired to be a creature of Mr Egan and Mr Lawson: it was they who were initially put forward to be beneficial owners of its shares and it was always intended to be subject to their control;

(2)     However, after PwC"s advice that for fiscal reasons it was unwise for an employee of Erinaceous or any of its subsidiaries to be a beneficial owner of the SPV"s (AFL"s) shares, Mr Cummings was selected (he being a consultant with close ties to Erinaceous, but not an employee or director) to be a "placeholder" of the shares;

(3)     In light of its status as a Guernsey corporation, and to present the vehicle as being controlled offshore, Legis were instructed to provide their administration and corporate management services for a fee (the essence of their trust and corporate business being to provide such services for numerous clients);

(4)     Legis was not paid to make commercial decisions but was paid to provide offshore corporate services itself and via its Ovalap creatures;

(5)     As part of those services Legis provided corporate directors; but the reality is (as in other offshore structures) that such directors were not in reality decision-makers: they were ciphers, their business in reality being to arrange and perform the formalities of corporate administration but not to become engaged in actual management or themselves make substantive decisions;

(6)     Provided that what the corporate directors were asked to do was *intra vires* AFL and not apparently inappropriate for AFL to do (which is where the exercise of a tiny residual discretion lay) then the directors, were expected

by the shareholders, and were contractually obliged to do as they were asked by or on behalf of the beneficial owners;

(7) In the present case, the corporate directors had been in place for only a few days when the Albermarle Fairoaks transaction completed; everything had been negotiated and finalised before they were even appointed. They did not negotiate with the vendors; they did not negotiate the borrowing with RBS;

(8) It was an integral part of the pre-existing package that Legis was to implement that (a) Mr Egan would carry on with fundraising, (b) the Defendant Firm would be solicitors for AFL, (c) the Defendant Firm would receive the monies solicited by Mr Egan into its client account and (d) the Defendant Firm would immediately pay those monies to RBS towards the reduction of the RBS Equity Bridge;

(9) Neither AFL"s corporate directors nor its legal shareholders had any real substantive, still less any independent, role in terms of decision-making: their role was to put in place what was required to ensure a proper record;

(10) In short, the role of Legis and its appointee corporate directors and shareholders was, and was always intended to be, substantively ministerial and administrative, and they were to act at the behest and on the instructions of Mr Egan and/or the beneficial owner: the fund raising, and Mr Egan"s authority on AFL"s behalf to solicit funds, make arrangements for its receipt and direct its application were inherent aspects of the purpose for which AFL was acquired and were taken as read.

600. The Claimants do not substantially dispute that it was always expected that Mr Egan would be the individual responsible both for soliciting funds and, after taking advice, determining the best structure whereby to translate the Albermarle investment scheme for use in the context of Albermarle Fairoaks; nor that it was intended that the funds raised would be used to repay first (though investors were not made aware of the instalment repayment dates) the RBS Equity Bridge of £7 million and then the loan made by Erinaceous.

601. However, further or in the alternative to their case that it was never envisaged by them, or indeed by Legis or its appointees, that funds raised would be applied before a structure was in place that would afford them, upon payment, the right in return for the mixed loan and equity participation that was the hallmark of the Albermarle investment model, the Claimants contend that whilst fundraising and the application of funds at the direction of Mr Egan might have been expected, the borrowing and receipt of funds was never validly authorised by AFL"s directors in the manner required by AFL"s Articles of Association.

602. In this regard, they contend that it is not good enough to resort to characterisation of AFL as merely *"a creature"* of Messrs Egan and Lawson, and to the Legis corporate directors as ciphers and little more than *"titular directors",* simply there to provide *"the formal structure and no more. The idea that they were "decision makers" is…far-fetched".*

603.  They submit, further, that even if that was so, only the board of directors can validly bind the company; and the fact, even if proved, that they would take dictation does not attenuate the requirement for formal process.

604.  I accept the Claimants'' submissions. In my judgment, the attempt on the part of the Defendant Firm to conjure actual or implied authority from the depiction of AFL as a creature, and its directors as ciphers, is misconceived, and their resort to cases such as *Re Hydrodan* [1994] BCC 161 and *Thames Valley Housing v Elegant (Guernsey) Ltd & Ors* [2011] EWHC 1288 (Ch) is misplaced.

605.  Those cases, in my view, concern a very different question: the liability of persons who actually directed the affairs of a company, but were not in name or legal nicety *de jure* directors of it.  But that is not, in my view, the question in this case.  I do not consider that there is anything in those cases that bears on the question here which is whether what was done can be treated as valid and binding on AFL notwithstanding that it was never approved by any person or body which had lawful power to bind it.

606.  I have concluded that neither the pre-packaged nature of the arrangements (which is in any event a broad but inaccurate depiction), nor the fact that AFL''s *de jure* directors were providing an offshore corporate service business and would no doubt have been amenable to instruction, alters the fact that a company may only be legally bound by its proper organs as stipulated by its constitution, except possibly where all its corporators (being more than one) are agreed and there is some outward expression and record of their informed agreement thereby to bind the company.

*Engagement Letter as alleged source of authority*

607.  As to the Engagement Letter, which was purportedly signed on behalf of AFL (under its then name, Shelco Twenty Two Limited) by Mr Cummings as the beneficial owner of its shares, the Defendant Firm''s case is that thereby it agreed and was authorised (a) to receive monies from investors upon the basis of those monies being remitted either by way of loan to AFL or as an investment in whatever the structure put in place for the project (as to the form of which it was agreed Mr Egan would be taking his own advice, initially from Mr Berman) and (b) immediately to utilise the monies so remitted to repay monies owed by AFL to RBS.

*Had Mr Cummings authority to bind AFL to the Engagement Letter?*

608.  The dispute between the parties in this context is not the terms of the Engagement Letter (as to which see paragraph 133 above) but as to whether Mr Cummings, when he signed it, had authority to bind AFL to its terms as its beneficial owner.

*When did he become beneficial owner of the shares in AFL?*

609.  It is common ground or at least not disputed that

    (1)  Mr Cummings, by whom it was signed purportedly for AFL, was not (and never became) a director or a shareholder of AFL: if he had authority it was only as beneficial owner of AFL;

(2)   Although he became a „placeholder" as a temporary measure until the investors took control of AFL (as Mrs Bellis and Mr Cummings both agreed in cross-examination), he did not discuss at any length, if at all, the terms of the Engagement Letter, the purpose of which really was to ensure the Defendant Firm"s valid appointment;

(3)   He was asked to sign the Engagement Letter by Mr Pearson of Erinaceous, and not by Mr Egan or the investors (who were and remained oblivious of both the Engagement Letter and its terms);

(4)   At the time of his signature, there were no directors in place, and the requisite declaration of trust by the legal owners was not made by them (being Legis" nominee shareholders) until 19 July 2007 (some 6 days after the date of the Engagement Letter);

(5)   That declaration was made, and could only be made, following final approval for a change in beneficial ownership being granted by the Guernsey HM Procureur on 17 July 2007;

(6)   As Mrs Bellis confirmed under cross-examination the *de jure* Directors never saw the Engagement Letter: Mrs Bellis said that *"to be quite honest, [I] forgot about it…";* and

(7)   Although Ms Cummings (at Erinaceous) and Ms Wyatt (at Ozannes) were the persons primarily engaged in securing the change in beneficial ownership, it is clear that Mrs Bellis was well aware when Mr Cummings signed the Engagement Letter that the change of beneficial ownership had not yet finally been approved by the Guernsey authorities;

(8)   Helen Wyatt expressly notified Mrs Bellis by email on 13 July 2007 (in the afternoon) that "We cannot use the company for this transaction until consent to the change of beneficial ownership is received but as the application and consent request have been submitted today we do not foresee any difficulty in transacting on Wednesday 18 July."

(9)   In the event, the Guernsey authorities dealt with the matter expeditiously: provisional consent (subject to there being no objection by the Law Officers) was given late on 13 July 2007. However, there then appears to have been some further deliberation by the authorities into concerns whether Erinaceous had been mixed up in some fraud and Helen Wyatt was asked by the Guernsey authorities not to pass on the provisional consent until expressly advised. HM Procureur in Guernsey eventually provided a certificate of no objection on 17 July 2007.

610.   What is disputed is whether even before the declaration of trust, Mr Cummings had already become beneficial owner. The Defendant Firm contends that the critical sequence was as follows:

(1)   On 13 July 2007 Mr Harwood (a Partner at Ozannes) completed/signed a "Notification of Change of Beneficial Ownership" ("the Notification") in respect of the shares in Shelco Twenty Two Limited.

(2)    Mr Harwood made a declaration that the particulars in that Notification were *"true and correct to the best of my knowledge and belief."* The "particulars" included at paragraph (j) a cross-reference to the schedule overleaf containing *"details of the registered and beneficial owners"*. The Schedule describes Mr Cummings as *"Beneficial Owner."*

(3)    Ms Wyatt"s evidence is that the Notification was, as its name suggests, a form which "notifies the authorities that nominee subscribers supplied by Ozannes would hold the two shares in the company, and Mr Cummings would be the beneficial owner".

(4)    Legis was told that Mr Cummings was to be the new beneficial owner on the morning of 13 July 2007 and a couple of hours later Ms Cummings sent through to Carol Rowe of Legis a Client Personal Details form signed by Mr Cummings.

(5)    Later that day Ms. Wyatt copied Ms Rowe in on the email to Ms Cummings which confirmed that Ozannes had submitted the Notification to the Guernsey authorities.

(6)    The Defendant Firm contends that it is therefore plain that on 13 July 2007 Ozannes had instructed their nominee shareholders that henceforth they were to hold the shares as nominees for Mr Cummings.

(7)    They make the further point that Legis had sent out their terms of business to Ms Cummings on 12 July 2007, and Mr Cummings had, in signing the Client Personal Details Form, accepted Legis" terms of business, under which he was liable for their fees.

(8)    Thereafter, on 19 July 2007 two declarations of trust were executed by the nominee shareholders in which they *"acknowledge and declare"* that they each held one share on trust absolutely for Mr Cummings.

(9)    It is the Defendant Firm"s case that as a matter of their true construction, these instruments confirmed the pre-existing nomineeship/bare trust which had been in place since 13 July 2007.

611.    There was no evidence of Guernsey law before me as to why the consent of the Guernsey authorities was needed, nor more particularly as to the role of "HM Procureur" in this exercise. Counsel for the Defendant Firm submitted that there is no equivalent under English law to which the Court can or should take cognisance.

612.    As it seems to me, the question that arises in default of any evidence as to any special rule of Guernsey law is simply as to (a) the construction of the relevant declarations of trust and (b) the effect of the stipulation as to the necessity for the advance consent of the relevant Guernsey authorities, adopting ordinary principles of construction on the usual assumption that Guernsey law is the same as English law in that regard.

613.    As to (a) and the construction of the declarations of trust, these read in operative and relevant part as follows:

"DECLARATION OF TRUST

WE, [FIRST][SECOND] OVERLAP LIMITED of etc.,

HEREBY ACKNOWLEDGE AND DECLARE that we hold
One fully paid share of £1.00 each in the company called

SHELCO TWENTY TWO LIMITED

(hereinafter called "the Share") registered in our name as
nominee of and Trustee for

Mr Nicholas Richard Cummings of etc.,

(hereinafter called "the Owner"), that we are not under any
duty to monitor, enhance or preserve the value of the said share
and WE UNDERTAKE AND AGREE to retain the share
certificate in safe custody and not to transfer deal with or
dispose of the Share save as the Owner may from time to time
direct, subject only to us receiving satisfactory due diligence in
respect of any subsequent transferee or beneficial owner.

FURTHERMORE WE irrevocably assign to the Owner the
right to receive any dividends which may be declared on the
Share together with all profits or other monies which may be
paid or payable to us from time to time upon the Share or in
respect thereof, AND WE FURTHER AGREE AND
UNDERTAKE to exercise our voting power as Holder of the
Share in such manner and for such purposes as the Owner may
from time to time direct or determine.

DATED etc."

614.  I do not see anything in that wording sufficient to justify the conclusion that in equity
beneficial entitlement had already passed to Mr Cummings. In so far as reliance is
placed on the word "acknowledge" as connoting that, I think it is misplaced: it is too
slender a reed to take that weight. In my judgment, the words support what I would
take to be the ordinary presumption that such an instrument is intended to take effect
from and after its date.

615.  As to (b) and the effect of the need for the consent of the Guernsey authorities, I agree
with Counsel for the Defendant Firm that the absence of any Guernsey law advice
makes it difficult, perhaps impossible, to assess whether the need for consent is in
legal effect a condition precedent to the effectiveness of any declaration of trust.  But
my decision on point (a) makes it unnecessary and inappropriate to take this further.

616.  In short, I consider that until the declarations took effect beneficial ownership and
legal interest remained undivided, and thus Mr Cummings did not become beneficial
owner until 19 July 2007 and cannot have had standing to bind AFL when he
purported to sign the Engagement Letter as such.

617.    The interesting question that would otherwise have arisen as to the ability of a single beneficial owner of shares in a company to bind that company in that capacity does not, therefore, strictly arise. I shall address the question in this context only briefly, for comprehensiveness.

*Can a sole beneficial owner of shares informally bind a company?*

618.    The essence of the Defendant Firm"s case that such a beneficial owner of shares could bind the company is that Mr Cummings" beneficial ownership "*was tantamount to legal ownership – the nominee shareholders held on bare trust for him, and were contractually obliged to follow his instructions.*"

619.    Counsel relied in this context on the approval by Lord Hoffmann in *Meridian Global Funds Management Asia Ltd v Securities Commission* [1995] 2 AC 500 (PC) of the statement in *Multinational Gas and Petrochemical Co v Multinational Gas and Petrochemical Services Ltd* [1983] Ch 258 that

> "*the unanimous decision of all the shareholders in a solvent company about anything which the company under its memorandum has power to do shall be the decision of the company.*"

620.    In fact, that proposition is derived from the much older statement to like effect in the seminal company law case of *Salomon v Salomon & Co Ltd* [1897] AC 22. The "unanimous consent rule" is also often associated with *Re Duomatic Limited* [1969] 2 Ch 365 and referred to as "the *Duomatic* principle".

621.    However, in my view, the proposition is to be applied with circumspection, and not so as to allow decisions to be made and binding upon a company without the knowledge of its directors or members and at the whim of persons of whom in theory at least the company has no notice (such as beneficial interests in shares).

622.    In particular, in my judgment, although there may be circumstances where the consent of all beneficial holders of shares may be treated as binding (see *Shahar v Tsetsekkos* [2004] EWHC 2659 (Ch) at [67]) if objectively manifested (see *Schofield v Schofield* [2011] EWCA Civ 154, [2011] 2 BCLC 319), the Court should be slow to treat as binding on a company decisions made or acts done by the beneficial holders of shares in a company where (as here)

> (1)    the decision is one within the general powers of management entrusted to the directors;
>
> (2)    the directors are not aware of the decision;
>
> (3)    there is nothing to suggest that the interests of the company have not been addressed;
>
> (4)    the beneficial ownership of the shares is vested in a single person, whose decision-making process is not manifest (and see *per* Oliver J (as he then was) in *Re New Cedos Engineering Co Ltd* [1994] 1 BCLC 797 at 814, doubting that a company could be

> "bound by the lonely soliloquies of the person who happened to be the sole survivor of the registered shareholders".

(5) The doubt is all the greater in the case of a single beneficial owner, who has no legal relationship with the corporate body at all.

623. Accordingly, in this case, I would not have been disposed to treat as binding on AFL the signature of Mr Cummings on the Engagement Letter, even had I accepted that he was by then the beneficial owner of all its shares (which I have not).

*Consequences if no authority to borrow and/or receive monies*

624. Before addressing the alternative defence of subsequent ratification, I turn to consider what (subject to that alternative defence) the consequences are if, as I have concluded, AFL had not properly and validly authorised the borrowings or the receipt of monies from the Claimants into the Defendant Firm"s client account when the payments into that account were made.

625. The Claimants accept that if the monies had been advanced by them directly to AFL, the fact (if established) that the borrowings were not authorised would not have prevented legal and equitable title passing to AFL, thus confining the Claimants to a claim in restitution (for total failure of consideration). Assuming no escrow or any form of *Quistclose* trust, the payments would be characterised as out-and-out payments, with nothing to qualify the intention to pass ownership: see *Westdeutsche*, and also *Re Goldcorp Exchange Limited (in receivership)* [1995] 1 AC 74.

626. However, as in the context of their case on a form of *Quistclose* trust, the Claimants contend that what makes the difference, and compels a different conclusion, in this case is the interposition of the Defendant Firm and the unauthorised receipt of the moneys, not into an account of AFL"s, but into the client account of the Defendant Firm, which is necessarily a trust account, with legal ownership and beneficial ownership being divided.

627. Put another way, and quoting the Claimants" Closing Submissions, the problem for the Defendant Firm is that if it did not have authority to receive money for AFL, the beneficial title did not vest in AFL, but cannot have been intended to vest in the Defendant Firm, and therefore must have remained in the Claimants (as the only remaining candidates, given that *"the equitable, or beneficial interest, cannot remain in the air…"* (*per* Lord Wilberforce in *Vandervell v IRC* [1967] 2 AC 291 (HL) at 1412)) .

628. The trust asserted arises, not by reference to the intention of the payer, but in a sense the lack of intention: it being clear both that equitable title was not meant to pass to the transferee, and that it cannot go where it was meant to go, it remains with the transferor.

629. Mr Croxford roundly rejected this analysis. He characterised the notion of an automatic bare resulting trust arising upon the failure of a transaction as *"legally illiterate"*. He said it was conspicuously unsupported by any authority. He submitted

that the question was always as to the intention of the transferor, whether express or implied, to retain title. He analysed *Westdeutsche*, *In re Goldcorp* and the two cases of *Vandervell v IRC* [1967] 2 AC 291 and *In re Vandervell's Trusts (No. 2)* [1974] 1 Ch 269 as demonstrating that the intention, actual, inferred or presumed in every case was the touchstone.

630.    Notwithstanding Mr Croxford's forceful advocacy, and mindful of the spectre of illiteracy, I have concluded that the Claimants' analysis is, in the peculiar circumstances of this case, correct, and that the analysis is supported by authority.

631.    In *Vandervell v IRC*, the transferor/would-be settlor procured the transfer of shares to which he was beneficially entitled to the Royal College of Surgeons ("the RCS"), on condition that the RCS then granted an option over them to his trustees. He did so, not because he wanted to recover the shares himself but rather in order that, after he had used the shares as a vehicle to make a gift to the RCS, his trustees would then get them back and hold them for his children. He had no intention or wish to retain for himself any equitable ownership in the shares: on the contrary, retaining any equitable interests in the shares had extremely adverse tax consequences. Unfortunately for him, the beneficial interests he was creating in the option were not stated with sufficient precision, and the trusts failed. It was held that the equitable interest in the shares was held on resulting trust for him, though that was the last thing he intended; and he was charged to tax accordingly.

632.    In his speech in the House of Lords, Lord Upjohn explained how the resulting trust arose in this way (at 313E to 314B):

> "If A intends to give away all his beneficial interest in a piece of property and thinks he has done so but, by some mistake or accident or failure to comply with the requirements of the law, he has failed to do so, either wholly or partially, there will, by operation of law, be a resulting trust to him of the beneficial interest of which he had failed effectually to dispose. If the beneficial interest was in A and he fails to give it away effectively to another or others or on charitable trusts it must remain in him. Early references to Equity, like Nature, abhorring a vacuum, are delightful but unnecessary. Let me give an example close to this case.
>
> A the beneficial owner informs his trustees that he wants forthwith to get rid of his interest in the property and instructs [them] to hold the property forthwith upon such trusts as he will hereafter direct; that beneficial interest, notwithstanding the expressed intention and belief of A that he has thereby parted with his whole beneficial interest in the property, will inevitably remain in him for he has not given the property away effectively to or for the benefit of others. As Plowman J said ([1966] Ch 261, 266): "As I see it, a man does not cease to own property simply by saying 'I don't want it.' If he tries to give it away the question must always be, has he succeeded in doing so or not?"

633.  Now, of course, the present case is not a case of gift; nor is it one where there is a pre-existing equitable interest in specific property. However, as it seems to me, the like principles apply, since the payment was not intended for the recipient and the recipient had no authority to receive it for anyone else. The money, like the wrongly addressed letter, must be returned to sender, address (as it were) unknown.

634.  I should stress that this is an unusual case.  As the Claimants accepted, as indicated above, failure of consideration would not lead to the transferor retaining its equitable interest; it is doubtful whether mistake would either; and property may pass even in a transaction induced by fraud.  It is the combination of the receipt into a trust account of borrowed monies where the borrower had not authorised the borrowing or such receipt, that, in my judgment, makes the case exceptional.

*Alternative contention: ratification*

635.  The third factual foundation of the Defendant Firm"s case that Mr Egan and the Defendant Firm must be taken to have been duly authorised (respectively) to fund raise and receive funds on behalf of AFL depends on events later (some considerably later) in the chronological sequence: the Defendant Firm relies on those subsequent events as amounting to effective express or implied ratification of authority.

636.  There are, as I see it, three strands to the Defendant Firm"s case in this regard; and it may help to separate these out.

637.  One strand is the contention that Mr Dickinson, in effect, adopted the raising and receipt of funds, albeit after the event. A second strand is that AFL was procured to ratify both, after Mr Cummings, Ms Cummings and Mrs Bellis obtained control of it and removed Legis and its appointees.  A third strand is that the Claimants (or at least some of them), having elected to pursue remedies as creditors by seeking an administration order in respect of AFL on that basis, must now be treated to have accepted that the loans are to be treated as valid, their alleged status as creditors being inconsistent with any claim under a trust.

638.  The essentials of the first strand of the Defendant Firm"s case (based on Mr Dickinson"s adoption of the borrowing and receipt and payment out of funds remitted to the client account) can be summarised as follows:

(1)  Mr Dickinson was aware from an email to him from Mrs Bellis dated 20 September 2007 that fund raising by way of loans to AFL had started: Mrs Bellis" email to him of that date (which was circulated also to Ms Cummings) so informed him, notified him that *"lenders would like some documentation evidencing their loans"* and attached (among other documents) an *"instrument so that the company permits directors of [ECS] (who are administering the fund raising) to sign each loan note so that they can be issued quickly without having to go over to you....It would be helpful if you could let me have some relevant board minutes plus executed documents as soon as you have been able to consider the paperwork attached."*

(2)  He raised no objection, and on 25 September 2007, Mr Dickinson wrote to the Guernsey Financial Service Commission inviting them to consider

granting *"permission under the Control of Borrowing Ordinances ["COBO"] for consent to raise up to £25,000,000 by way of unsecured loan notes…";*

(3) Even when on 11 December 2007, and having been informed by Mr Egan that *"you have transferred funds you have received from potential unit/loan holders to the Company"'s loan account at the bank",* Mr Dickinson by email to Mrs Bellis required her not to make any payments to any of AFL's accounts and asked for details in respect of all amounts already sent, he did not suggest that the raising of funds had not been authorised.

639.  In my judgment, this argument also is misconceived. Again, the question is whether thereby AFL is bound in law: and again the answer is in its constitutional arrangements.  Even if Mr Dickinson did go along with the fundraising, that would not bind AFL.  As it is, and as the Claimants pointed out, there is no evidence that Mr Dickinson ever appreciated or proceeded on the basis of the loans being on agreed terms such that AFL became entitled to the monies as its own. In my judgment, the first strand of the Defendant Firm's case on ratification fails.

640.  The second strand of the Defendant Firm's case on ratification is woven from later events and, in particular, the actions of Mr Cummings and Ms Cummings after they took control of AFL in June 2009.

641.  No specific act of ratification is relied upon; it is submitted that ratification should be implied from

(1) the fact that, after her appointment as a director of AFL Ms Cummings made and signed a witness statement, purportedly on behalf of and with the authority of AFL, dated 5 October 2009, and in opposition to an application by some of the Claimants for an administration order in respect of AFL in which she recounted in detail the *"fund-raising process undertaken by Mr Egan, the advances made by the Claimants and the payments made out of the client account to the RBS"*; and

(2) the signature by Ms Cummings, as a director of AFL, of the Statement for Affairs for its administration, in which she referred to the Claimants as *"creditors of AFL" and/or "investors" or "AFL's investors"*;

(3) the Claimants' own evidence that they submitted proofs in the administration as creditors, which the Administrators accepted as such; and

(4) Mrs Bellis' own evidence that she was authorised to pay money by Ms Cummings and Mr Cummings acting as directors of AFL (including payment to her own firm of fees out of monies held in client account).

642.  The Claimants contend that none of these facts and matters evidences ratification. They make the following points (which in substance I quote from their Closing Submissions):

(1) AFL (through its dire**ctors)** had already (in 2008) sought to persuade RBS to pay the money back to the Claimants.

(2)   The alleged ratifier was a director in June 2009, but it is the Board which has the power to borrow and authorise receipt of money, and therefore to ratify the same: there was no board resolution (as would be expected) or delegation of authority and therefore Ms Cummings" actions alone would have been insufficient to ratify.

(3)   In any case, the relevant paragraphs of Ms Cummings" witness statement, provided in opposition to the administration application and said to amount to the ratification, do not provide any clear adoption of the loans or payments on behalf of AFL. Those paragraphs refer several times to Mr Egan raising funds on the basis of loan notes being   issued. They also refer to the fact of Mr Egan confirming that the money should be paid out. However, this does not necessarily mean (and, on his own evidence, did not mean to Mr Egan) that funds were to be on loan or that AFL adopted the payments. The loan note document is not the same as there being a loan and Ms Cummings does not refer to the loan or adopt an obligation to the investors on behalf of AFL.

(4)   A clear ratification would be required; this was never done. The Defendant Firm seems to accept this: its plea in the Part 18 Response 49 is not that these paragraphs in Ms Cummings" statement were themselves ratification but that they are "*evidence that the directors had, by that stage, ratified the making of the three payments*".

(5)   Notably, the Defendant Firm did not call any direct evidence from Ms Cummings to support the allegation, and no notice or explanation was given to enable the administration proceedings witness statement to be relied upon as a hearsay statement.

(6)   In any event, the alleged ratification comes too late. If the resulting trust arose in favour of the Claimants with the Defendant Firm as trustee, as the Claimants contend, and was then breached, a ratification of the void „loan" over two years later cannot somehow erase the trust and breach of trust. Ratification can bind a company to a contract it was not bound to, but not erase other legal consequences.

(7)   As Bowstead and Reynolds observes, as approved in a slightly earlier form by the Court of Appeal in *The Borvigilant* [2003] EWCA Civ 935 *per* Clarke LJ at paragraphs 59 to 90:

> "*Ratification is not effective where to permit it would unfairly prejudice a third party, and in particular—*
>
> *(6)   ratification may not be recognised if it will affect proprietary rights in either real or personal property…which have arisen in favour of the third party or others claiming through him since the act of the unauthorised agent;*
>
> *(7)   the ratification of a contract can only be relied on by the principal if effected within a time after the*

> *act ratified was done which is reasonable in all*
> *the circumstances."*

(8) Here, the prejudice to the Claimants is clear: the Claimants have an equitable property right which (on the Defendant Firm"s case) would be lost, the Claimants have other legal claims which (on the Defendant Firm"s case) would become barred; so the supposed ratification came too late.

643. I accept the Claimants" submissions: even taking into account Ms Cummings" witness statement in other proceedings as if it were admissible, none of the factors relied on by the Defendant Firm constitute clear ratification.

644. In any event, if (as I consider to be the case) the borrowings and receipt of the Claimants" monies were not initially authorised, I do not consider that *ex post facto* ratification after the Claimants had sought to recover the monies could in law or equity remove from the Claimants and vest in AFL the entitlement to payment out of the Defendant Firm"s client account.

645. In that connection, my conclusion earlier that the Claimants never intended to make an immediate loan to AFL without a matched entitlement to equity participation means that the Defendant Firm"s contention that if the Claimants intended a loan it is neither unfair nor inequitable to hold the Claimants to the loan which they intended to make by a process of subsequent ratification falls away.

646. The third strand relied on, in effect that the Claimants (or some of them) ratified or adopted the characterisation of their payments into the Defendant Firm"s client account and their own status as loan creditors by seeking an administration order over AFL in that capacity, likewise fails: in my judgment, the act of some of the Claimants in seeking to protect their interests in that way would not be sufficient to deprive them of the right to repayment under a resulting trust or (subject to what follows) compensation for its breach.

*The need to establish "conscious awareness"*

647. The Defendant Firm correctly draw a distinction, in the context of this alternative way in which the Claimants put their case (as in the context of their primary case), between a case where a fund said to be held on resulting trust still exists (where the determination that the trust does exist is sufficient to establish in turn the trustee"s obligation to return the fund) and a case where (as here) the trustee has disposed of the fund.

648. However, for the reasons previously stated, I consider that Mrs Bellis and the Defendant Firm were under fiduciary obligations and/or had the requisite "conscious awareness" that they could not be certain as to the basis on which the funds were held; and that is sufficient to make good for the Claimants their claim that the payments out of the client account were breaches of trust for which the Defendant Firm should be held liable.

649. Put shortly, the Defendant Firm plainly became a trustee of the funds remitted to its client account: and no duty of a trustee is plainer than that of establishing, before

dealing with the monies or property subject to the trust, the terms of the trust and the identity of its beneficiaries (both present and prospective).

650.    I would also rely in this context on the facts and matters referred to in paragraphs 579 and 580 above.

651.    Accordingly, in my judgment, the Claimants" alternative case is also well-founded.

## FURTHER ALTERNATIVE CLAIM IN RESTITUTION

652.    At least by the standards of this rather expansive judgment, I shall deal more briefly with the Claimants" alternative case in restitution for unjust enrichment, which on the view I have taken of the case it is not necessary for them to establish.

653.    As adumbrated in paragraph 29 above, that alternative case is put on two bases: (1) the Mistake Claim; and (2) the Failure of Consideration Claim. On the views I have taken in respect of the Claimants" primary claims, neither in the event arises.

654.    As to (1) and the Mistake Claim, although I have rejected the Claimants" contractual claim (that there was established a binding contract of escrow), I have upheld their claims that the monies they remitted to the Defendant Firm"s client account remained theirs beneficially under a form of *Quistclose* or resulting trust. In such circumstances, there seems to me to be neither room nor justification for a restitutionary claim: there was no unjust enrichment of either of the Defendants.

655.    As to (2) and the Failure of Consideration Claim, again my conclusion, that the monies which the Claimants remitted to the Defendant Firm"s client account remained theirs in equity under a form of resulting trust, makes unnecessary and unavailable any alternative basis of claim such as this.

656.    The question whether a claim for restitution on grounds of the unjust enrichment of the Defendant Firm thus arises only if I am wrong in my principal conclusions.

657.    Furthermore, the Claimants accept that they would have no claim in restitution (whether on grounds of mistake or total failure of consideration) if there was a binding loan made by them to AFL: their claim is premised on there being *"no loan and no authority to receive money for AFL."*

658.    The Claimants contend that on the premise above described the Defendant Firm was unjustly enriched, and a restitutionary claim based on either ground lies, if and to the extent that the monies paid into its client account were not held by it on trust either for the Claimants or for AFL: in such circumstances, its receipt was not ministerial.

659.    The Claimants deny the availability of any defence on ground of change of position, since in paying the monies in its client account to RBS the Defendant Firm *"had all the warning lights flashing but ignored them and paid the money away."*

660.    The Defendant Firm rejects any such claim.  On its behalf it is contended that (a) there was no "mistake" only (at most) a "misprediction"; (b) the receipt of monies was subsequently ratified on AFL"s behalf; (c) the Claimants cannot rely on total failure of consideration in light of their claims as creditors to seek an administration of AFL; and (d) the defence of change of position is available to it since it applied the

monies it received on what in good faith it considered to be the instructions, and in the interests, of its client AFL.

661.   As to (a), the authority relied on for the Defendant Firm is *Dextra Bank & Trust Co Ltd v Bank of Jamaica* [2002] 1 All ER (Comm) 193 (PC). In that case, the Privy Council rejected a claim based on restitution based on a mistake as to the nature of a transaction on the following basis:

> "28. Their Lordships turn to Dextra's claim to recover its money as having been paid to the BOJ under a mistake of fact. To succeed in an action to recover money on that ground, the plaintiff has to identify a payment by him to the defendant, a specific fact as to which the plaintiff was mistaken in making the payment, and a causal relationship between that mistake of fact and the payment of the money: see Barclays Bank Ltd. v W J Simms, Son and Cooke (Southern) Ltd. [1980] 1 QB 677, 694. In the opinion of their Lordships, there are difficulties with regard to the second and third of these elements in the present case.
>
> 29. Their Lordships turn then to the second element, viz. that Dextra must have paid the money to the BOJ under a mistake of fact. It is the contention of Dextra that the money was paid under a mistake, in that Dextra had intended to make a loan. The difficulty with this proposition is that this does not appear to have been a mistake as to a specific fact, like for example a mistake as to the identity of the defendant, but rather a misprediction as to the nature of the transaction which would come into existence when the Dextra cheque was delivered to the BOJ, which is a very different matter: see Birks, Introduction to the Law of Restitution, pp. 147–8. In that passage, Professor Birks explains the rationale of this distinction in terms relevant to the present case, as follows:
>
>> „The reason is that restitution for mistake rests on the fact that the plaintiff's judgment was vitiated in the matter of the transfer of wealth to the defendant. A mistake as to the future, a misprediction, does not show that the plaintiff's judgment was vitiated, only that as things turned out it was incorrectly exercised. A prediction is an exercise of judgment. To act on the basis of a prediction is to accept the risk of disappointment. If you then complain of having been mistaken you are merely asking to be relieved of a risk knowingly run …
>>
>> The safe course for one who does not want to bear the risk of disappointment which is inherent in predictions is to communicate with the recipient of the benefit in advance of finally committing it to him. He can then qualify his intent to give by imposing conditions, or sometimes by making a trust …‟

> Here, unfortunately, Dextra failed to communicate directly with the BOJ to make sure that the BOJ understood that the money was being offered as a loan. Instead, it left the communication of this vital matter to its agent, Phillips. Dextra's misplaced reliance on Phillips led it to assume that a loan would result; and this prediction proved to be mistaken. But a misprediction does not, in their Lordships' opinion, provide the basis for a claim to recover money as having been paid under a mistake of fact."

662.    I am not myself persuaded that the true characterisation in this case of the causative reason for the payment by the Claimants into the Defendant Firm"s client account is a misprediction as to the true effect of that payment, rather than a mistake (the distinction drawn by Professor Birks, and to some extent reflected in *Dextra*, being between a mistake as to the present and a mistake as to the future (which was labelled a misprediction). In *Dextra*, the claimant (Dextra) drew a cheque on its bankers in favour of the defendant (Bank of Jamaica).  It did so on the assumption that a secured loan agreement would be concluded between them: but none ever was. As is apparent from the passage of its advice quoted above, the Privy Council held that the payment was not paid under a mistake of fact as to the present but on the basis of a misprediction as to the future (that a loan agreement would be entered into). In the present case, it is a nice point, as it seems to me, whether the operative mistake was as to the present effect of paying into the Defendant Firm"s client account or as to the future consummation of the transaction they all intended. As it seems to me both were operative; and that in such circumstances a claim for restitution on grounds of mistake should be available (subject of course, to the various defences, if available). But even if that is incorrect, and no claim lies for mistake, that does not address the alternative way the Claimants put their case (total failure of consideration).

663.    I have already addressed and rejected both (b) and (c) in paragraph 660 above:   see paragraphs 635 to 645 above as to the suggestion of ratification (which I there reject) and paragraphs 646 (as to the effect of asserting status as creditors in seeking an administration order in respect of AFL, which I have held not to preclude a claim). I would conclude, if the matter required decision (which, as explained, on the view of the matter I have taken, it does not), that the reasoning of the House of Lords in *Westdeutsche* in overruling *Sinclair v Brougham* [1914] AC 398 applies so that the alternative claim based on failure of consideration, and advanced on the premise that the borrowing was unauthorised by AFL, should succeed, subject to any other equitable defences, and in particular, any change of position on which the Defendant Firm may rely.

664.    In that regard, and as to (d) in paragraph 660 above, I consider that my conclusion that Mrs Bellis made the payments without any sufficient certainty either as to the basis on payments had been made by the Claimants into her firm"s client account or as to her firm"s authority to receive such payments precludes realistic reliance on the defence asserted of *bona fide* change of position.

665.    To borrow the language of Moore-Bick J (as he then was) in *Niru Battery Manufacturing Co v Milestone Trading Ltd* [2002] EWHC 1425 (Comm), affirmed [2003] EWCA Civ 1446, absence of good faith "is capable of embracing a failure to

act in a commercially acceptable way…"; and see also Knox J"s formulation of "commercially unacceptable conduct in the particular context involved" in *Cowan de Groot Properties Ltd v Eagle Trust Plc* [1992] 4 All ErR700, 761 (quoted by Moore-Bick J in *Niru* at paragraph 128).

666.   Accordingly, I would have been disposed to find in favour of the alternative claim in restitution: but in light of my primary conclusions I consider that I need make no final determination.

### Section 61 Trustee Act 1925 and any equitable defences

667.   The Defendant Firm"s last *cri de coeur* is that if, contrary to all its submissions, the court finds that it is otherwise liable (as I do), it should not be required to make compensation and should be excused on grounds that Mrs Bellis acted honestly and reasonably for the benefit of her firm"s client, AFL, and should be relieved from liability under section 61 of the Trustee Act 1925.

668.   I do not consider, on the basis of my findings, that any resort to section 61 of the Trustee Act 1925 is available.

669.   It is well established that the section is to be narrowly construed and restrictively applied (see *Re Alsopp* [1914] I Ch 1 in the context of a predecessor section) and that all three circumstances specified in the section must co-exist and persuade the court in the exercise of its discretion that relief is appropriate.

670.   The three statutorily specified circumstances are that the trustee must have acted (1) honestly and (2) reasonably such that he ought fairly (that is to say, in fairness to himself and other persons who may be detrimentally affected) to be excused. I do not consider that Mrs Bellis acted reasonably; and in my judgment, her conduct fell short of the high standards expected of her position: put another way, and again echoing the words of Moore-Bick J in *Neru* (see above), she failed to act in a commercially acceptable way.

671.   I would not, in any event, consider it appropriate in all the circumstances to exercise my discretion in her firm"s favour and thereby deprive the Claimants of proper recourse and remedy for the payment out of the monies they had entrusted to her.

672.   Other equitable defences were floated, without any real elaboration: acquiescence, laches, and the general equitable maxim that he who comes to equity must come with clean hands, and equity follows the law.  I shall be as short in answer as was their presentation: in the circumstances I do not accept that any resort to these defences avails the Defendant Firm.

### REMEDIES/LOSSES

673.   The trust funds no longer being available, the Claimants seek equitable compensation for breach of trust.

674.   They sought, in the alternative, damages for breach of contract; but since I have not accepted their case in contract, that does not arise.

675.   The measure they submit to be appropriate is the money that the Defendant Firm
       would have been obliged to return to the Claimants if the funds had not been paid
       away, together with costs incurred to date, including costs of some £94,715 in
       pursuing the administration application.

676.   To this the Defendant Firm has erected a variety of arguments in support of its
       contention that the payments out did not cause the Claimants any recoverable loss.
       These include the following:

       (1)   If Mrs Bellis had sought "formal" authority from the Claimants, her first
             port of call would have been to ask Mr Egan.  He would probably have
             obtained that formal authority: the Claimants would probably have done
             exactly as he asked them to because they trusted him, and because they
             were clearly each inclined to embark upon an investment which
             (objectively at least) involved a loan and in which the prospect of an
             "equity" investment being available in the medium term was contemplated
             by all involved;

       (2)   If Mrs Bellis had realised that formalities might be gone through and had
             sought formal authority from Guernsey, for example, by the Engagement
             Letter being sent to Legis back in July or subsequently following up to
             ensure that Legis approved of such terms, the corporate directors would in
             all probability have given it.  Mr Cummings could have instructed the
             nominee shareholders to ensure it was agreed, and if the directors refused,
             they would have been replaced.  Some arrangement would have been
             concluded so as to enable the Defendant Firm and Mr Egan to fulfil the
             roles which they were always expected and understood to occupy.

       (3)   If formal authority had been obtained exactly the same course of events
             would have followed.

       (4)   If the Claimants had been given loan notes and/or shares that in itself would
             not have avoided loss – indeed the loss was precipitated by the Claimants"
             decision to bring the Administration Application.

       (5)   The effective cause of the Claimants not getting "value" was:

             (a)   their own decision not to take loan notes and shares, alternatively

             (b)   the fault of Legis (Mr Dickinson) who refused to do anything until he
                   got paid.

       (6)   Mr Egan was the party who in fact caused the breach of trust by leading
             Mrs Bellis to believe that the Claimants were content for their money to be
             paid to RBS.

677.   I am not ultimately persuaded by any of these arguments.

678.   As to (1), I have accepted the witness evidence on behalf of the Claimants that they
       would never have lent money without the unqualified and clear right to a combined
       loan and equity participation. I do not accept that any of them would have made 5-

year term, unsecured, subordinated loans at an interest rate of 1% over base rate without the practical certainty that the transaction would achieve the level of support to proceed as planned and that they would at all material times have control of the investment vehicle through equity participation in it.

679.   I have also accepted the Claimants" basic argument that the explicit requirement of all investors to pay into the Defendant Firm"s client account, rather than to AFL (which Mrs Bellis accepted she knew from at least 18 July 2007 had its own bank account at RBS with Guernsey administrators as the only authorised signatories), is realistically only explicable on the basis that such monies were to be segregated from AFL (by not being held in its account) and would not immediately belong to AFL but be held as client monies pending some further event or instruction. The fact that Mrs Bellis, who did her own book-keeping, chose to credit such monies to a client ledger with the rubric "Albemarle Fairoaks Limited – Fairoaks Airport" does not, in my judgment, indicate anything more than that the monies had been sent in relation to that transaction, and in any case cannot upset the objective intention, as I have found it to have been, that the monies should not immediately be available or belong to AFL itself.

680.   I should add that I accept the Defendant Firm"s contention that all the witnesses for the Claimants agreed that they anticipated and accepted that the monies they subscribed could be used before they had received formal documentation: Counsel for the Defendant Firm labelled this the „decoupling" of the issue of the documents from the use of investors" money. However, what is really important in this context is not what the investors" expectations were as regards formal documentation but what they regarded as the substantive nature of the investment that such documentation was to record.

681.   As to that, none of them accepted or expected that their money could be used unless and until the investment vehicle was established, the transaction was sure to proceed and there was no substantive impediment to the issue of formal documentation to evidence a matched loan and equity investment, so that all that remained to be done was simply a formal or ministerial act of delivery of such documentation "in due course".

682.   I do not think there is any basis or justification for re-writing history in the manner contemplated in (2) and (3) above. The fact is that authority was not obtained, and it is not useful to speculate whether it would have been. The Defendant Firm must, in my view, succeed or fail on the basis of what in fact it did, rather than on the basis of what it might have done.

683.   Further, even if the Engagement Letter (the document on which the Defendant Firm places most reliance as establishing its authorisation to receive moneys from investors) had been formally approved by Legis and AFL, I do not accept that this would have authorised or justified the receipt of funds into the Defendant Firm"s bank account on behalf of (and treated as belonging to) AFL unless and until the Defendant Firm could be certain (which I have held it cannot have been) of the basis on which such monies had been paid, and  the terms on which payment was made was certain and had been formally authorised and offered by AFL, and accepted by the payers. Even the Engagement Letter expressly envisages that a *"structure is to be put in place*

*for the project"* so that it is clear whether investor monies are remitted by way of loan or as an investment.

684. Moreover, as events unfolded in September 2007, and concerns about the financial position and prospects of Erinaceous grew, any assumption on the part of Mrs Bellis that she could safely receive and pay out monies without knowing the terms on which they had been paid became even more unjustifiable. I appreciate that most of the monies had by then been paid out to RBS; but at least £230,000 came in after 28 September 2007 which Mrs Bellis cannot reasonably have thought she was entitled to receive for payment to AFL in the knowledge that no settled structure was in place and without establishing the true nature of the payment into her firm"s client account.

685. I note in that regard that in an e-mail dated 11 October 2007 which he circulated to Mrs Bellis and was in effect in reply to her email to him of 10 October 2007 (in which she made clear no structure was yet in place for the investment vehicle), Mr Pearson of Erinaceous identified the need for agreement of a structure for the investors as *"a key issue to resolve ASAP as without solving this the barrier to receipt of property fund loans remains".* In this he expressed what must have been obvious to Mrs Bellis all along.

686. More generally, I do not consider that the speculation (on which the Defendant Firm"s submissions in this context are based) as to what might have been in different circumstances than in fact obtained is helpful or permissible. But if speculation were appropriate, in my judgment, the likelihood is that if the formalities had properly been observed, the barrier expressly acknowledged by Mr Pearson would have prevented money being paid into the Defendant Firm"s client account being treated as belonging to AFL for so long as the structure and terms of payment in remained uncertain.

687. In other words, if Mrs Bellis and her firm had complied with their obligations they would not have obtained authority to treat as belonging to AFL and pay out to RBS the monies paid into the client account by the Claimants.

688. I do not accept, therefore, the Defendant Firm"s submission that *"If formal authority had been obtained exactly the same course of events would have followed."*

689. As to (4) in paragraph 676 above and the application made by some of the Claimants for an administration order (which eventually caused RBS itself to exercise its powers to appoint an administrator) it was, as it seems to me, open to each of the Claimants, at any stage until subscription of equity, to decline to proceed further and demand repayment of their monies and take any steps (including applying for administration) to protect those monies or secure repayment. I do not accept that the application for an administration order was what caused the loss. What caused the loss was the payment of their monies to RBS without authority and in breach of trust.

690. Further, it seems to me that the application made is entirely understandable given the risks and uncertainties made clear by the unilateral conduct of Ms Cummings and Mr Cummings in using the latter"s position as a placeman to wrest control of AFL away from Legis to themselves, and using that control to insulate themselves from documentary disclosure and to pay the Defendant Firm its charges.

691.   As to (5) in paragraph 676 above, I accept, of course, that the measure of equitable compensation for breach of trust has to be assessed as at the date of judgment and not at an earlier date, and that in some cases the facts known at trial may lead to the conclusion that no loss has in fact been suffered (see *per* Lord Browne-Wilkinson in *Target Holdings Ltd. v Redferns* [1996] 1 AC 421 at 437H and 437E). But I do not see that later events have reduced, still less eradicated, the loss in this case. In my judgment, the Claimants were justified in concluding that, in the circumstances I have described, the prospect of obtaining "value" was uncertain and probably illusory; and that the Claimants were entitled to elect to seek to recover in full the sums that were supposed to have been held on trust for them.

692.   As to (6) in paragraph 676 above, I address later (especially in the context of the Defendant Firm"s Part 20 claim against him) whether Mr Egan was the party who in fact caused the breach of trust; for the present suffice it to say that I do not consider his role to be such as to reduce the liability of the Defendant Firm to the Claimants.

## CLAIMANTS' CLAIM AGAINST MR EGAN

693.   It was made clear in their Closing Submissions that the Claimants" claim against Mr Egan is an alternative claim advanced only if and in case the Claimants" primary claim that the monies paid by the Claimants were held on escrow conditions or subject to a form of *Quistclose* trust fails. However, the Claimants did state that *"it may still succeed if Cs succeed against D on the alternative basis that a resulting trust arose automatically as a result of D"s lack of authority from AFL."*

694.   In the event, I have found against the Claimants on their claim based on escrow, but for them on both (a) their claim based on some form of *Quistclose* trust and (b) their claim based on a resulting trust as a result of lack of authority.  I shall address the claim against Mr Egan in case I am wrong in my conclusions as to (a) and given that the alternative claim is pursued in the case of (b).

695.   The Claimants" claim against Mr Egan, brought when Mr Egan changed his position (on the first day of trial) as to whether or not escrow terms had been intended and agreed, is based on negligent misrepresentation.

696.   The claim is that Mr Egan impliedly represented that (a) the monies paid into the Defendant Firm"s client account by the Claimants would be held on conditions of escrow, and that in any event this was his (Mr Egan"s) belief; (b) he understood the Defendant Firm to have accepted the escrow conditions, and did not expect those monies would be or believe that they might be released by the Defendant Firm until the escrow conditions were satisfied; (c) he understood and believed that Erinaceous, ECS, and AFL (as promoters, arrangers and prospective borrowers respectively) all understood and accepted that those monies were not intended to belong to AFL until the escrow conditions were satisfied.

697.   Neither side has been consistent: the Claimants have repeatedly reformulated their position as to what the escrow conditions were. Mr Egan has performed the *volte-face* already described, it being his position at trial that he did not believe that monies paid into the Defendant Firm"s client account would there be held subject to an escrow on receipt, but rather could be used for the benefit of AFL (subject to the proper lawful authority of AFL being obtained).

698.   It is clear that the Claimants trusted Mr Egan, and expected to obtain the matched equity and loan mixed participation which was the hallmark or characteristic of an Albermarle investment scheme, and were not (at least until the end of 2007) troubled by the lack of documentation to evidence their investments.

699.   It is also clear that Mr Egan considered them to be investors who would be equity participants in whatever was fixed upon as the most efficient vehicle. He never conceived that they might be treated as confined to being merely unsecured, subordinated lenders; his expectation was that the investors would in due course be provided with some form of equity broadly in accordance with the Albermarle model, and that all would be well in the end, as it had been in previous Albermarle schemes.

700.   But trust and shared expectations are not the same thing as, and may have developed quite apart from, representations.  It is much less clear whether what the Claimants did and expected was influenced by representations made to them by Mr Egan; whether Mr Egan assumed responsibility for and invited reliance upon those representations; and also whether they relied on Mr Egan in an individual capacity or simply as the person within ECS whom they had become accustomed to dealing with routinely.

701.   I turn to discuss (1) first, whether any representations were in fact made by Mr Egan, (2) secondly, whether the circumstances were such as to give rise to a duty of care on his part (3) if so, what was the scope of that duty.

### *(1)   Were representations made by Mr Egan to the Claimants as to the terms on which monies paid into the client account would be held?*

702.   The Claimants largely (indeed, as I read their pleading, exclusively) base their case on inferences from the Teaser and Teaser email, a subsequent follow-up e-mail of 20 August 2007, and implied representations. As noted above to be typical for this case, there was otherwise next to no express communication between the relevant individuals, namely the various investors, Mrs Bellis and Mr Egan.

703.   Insofar as advanced at all, any contention that the Claimants relied on any express representations made by Mr Egan was only (and at best) half-heartedly pursued. In that context:

(1)   Ms Challinor"s belief that her money was *"held in escrow by solicitors and was therefore safe"* was based on her understanding that the solicitors would, in respect of that element of the transaction, be acting for her.  She at one time seemed to suggest that this belief might have been encouraged or confirmed by a conversation with Mr Egan; but under cross-examination she accepted she could not be sure of the terms of such a conversation some 5 years previously, simply remembering its gist as being him saying something along the lines of *"well Fairoaks is another good one. It"s like Shoreham. Are you in?"*

(2)   Mr Glatman referred in his witness statement to a conversation with Mr Egan about the proposed Albermarle Fairoaks scheme, stating that he thinks that Mr Egan indicated that monies subscribed early would be *"held, pending completion of the fundraise"* and that nothing Mr Egan said

disabused him of his understanding that *"as with previous transactions, the monies transferred to the solicitors" client account would be held in escrow, and that once sufficient monies had been raised, the deal would then be done and monies released in return for the issue of shares and loan notes, which would follow in due course".* But under cross-examination he presented all this as *"an inference"* from his discussions with Mr Egan rather than something Mr Egan had in fact said.

(3)     Mr Watts" recollection was hazy and he could not remember any specific conversation with Mr Egan.

(4)     Mr Cole referred in his witness statement to discussions with Mr Egan during July/August 2007 both on the telephone and in person, from which he says that he understood from Mr Egan that *"if either the [equity bridge] of £7m could not be repaid in full or for some other structural reason the investment could not be made, then as with the Brighton investment...the investors funds would be returned."*

Under cross-examination Mr Cole embellished on this, stating that his understanding from his conversations with Mr Egan was that the money was *"going into a solicitors client account until the Jersey close-ended fund was set up, at which time the unit trust would be completed and issued and the money would be transferred from the solicitors client account into the vehicle at the top."*

Mr Cole had not said this either in his witness statement or in the Further Information supplied on his behalf, which he signed. He later admitted that he may have inferred this and that though he had tried his best to reconstruct events he had no clear recollection of what precisely was said and when.

I do not doubt Mr Cole"s honesty: but I do think the embellishment was a reconstruction without factual foundation beyond the fact that Mr Cole had come to believe its accuracy, before being challenged.

(5)     Mr Wallis stated in his witness statement that when informed by Mr Egan that his investment should be paid into the Defendant Firm"s client account he queried why Ms Streeton of Boodle Hatfield was not being used, and upon Mr Egan telling him that *"this was a requirement of the deal as Mrs Bellis was Erinaceous" solicitor"* expressed his wish to *"confirm that my money would be held by Mrs Bellis in escrow waiting my further instructions"* whereupon Mr Egan gave him Mrs Bellis"s telephone number.

Under cross-examination Mr Wallis, though insistent on his conversation with Mrs Bellis, did not elaborate on his conversations with Mr Egan, and accepted the difficulties of trying to remember what was said in conversations several years ago. I do not consider that the evidence supports any suggestion of any express representation as to the escrow arrangements by Mr Egan to Mr Wallis: I find that none was made.

    (6)    Mr Mahtani did not suggest that Mr Egan made any oral representation to him.

    (7)    None of the other Claimants gave evidence.

    (8)    Mr Berman is not a Claimant: but when giving evidence on their behalf he did not suggest that Mr Egan made any express representation to him in this regard.

704.    None of the above, in my judgment, comprises or connotes an express representation on the part of Mr Egan that investors'' monies would be held subject to escrow conditions.

705.    No explicit representation is to be found in the Teaser, its covering e-mail or the 20 August 2007 e-mail with draft Loan Note to potential investors who had expressed an interest after receipt of the Teaser either. In reality, the Claimants'' case on those documents is not so much on what is expressly stated in them but on the inferences they contend should be drawn from the description of the Albermarle Fairoaks scheme as another Albermarle scheme similar to Albermarle Shoreham.

706.    In particular, the Claimants rely on the absence of any warning that their monies might be deployed before they had any legal entitlement to equity participation and control of the investment vehicle.  In other words, the Claimants rely not so much on any explicit representation but on inferences and implication from the manner in which, against the background of previous Albermarle investment schemes, the opportunity to invest in the Albermarle Fairoaks scheme was presented.

707.    In *CRSM v Barclays Bank plc* [2011] EWHC 484 Hamblen J addressed the law on misrepresentation in some detail. As to implied representations he explained (at paragraph 220):

> "220. In relation to implied representations the "court has to consider what a reasonable person would have inferred was being implicitly represented by the representor's words and conduct in their context": per Toulson J in *IFE v Goldman Sachs* [2007] 1 Lloyd's Rep 264 at para. 50. That involves considering whether a reasonable representee in the position and with the known characteristics of the actual representee would reasonably have understood that an implied representation was being made and being made substantially in the terms or to the effect alleged."

708.    In this case, the representations relied upon are (it is pleaded on behalf of the Claimants) to be implied from:

    (1)    the Albermarle Investment Model, the inclusion of (admittedly varying) escrow arrangements, and *"the invariable rule that… at the same time as the investors'' monies were released from the escrow the investors would gain 100% ownership and control of the investment vehicle"*;

(2)    the presentation of the Albermarle Fairoaks investment as similar to previous Albermarle investment schemes, especially Albermarle Shoreham, and the branding of the investment as an Albermarle scheme in the Teaser and elsewhere;

(3)    the references in the Teaser and elsewhere to „investors" and „invest" and never to „lenders" or „lend";

(4)    the invitation to such investors to pay into what was obviously the client account of a solicitors" firm which those investors who had invested in Albermarle Shoreham would recognise to have been the appointed escrow agent for that transaction;

(5)    the fact that Mr Egan never told any of the investors that their money would be treated as a loan and used before the structure had been established and was in their control;

(6)    the fact that it was reasonable that Mr Egan knew (as in fact he did know) from their past consistent history of investments that the investors would never be interested in risking their money in an unsecured subordinated term loan, or a loan which was only convertible if a unit trust was set up, or any investment in which the investors did not have control of the investment vehicle;

(7)    The investors" subjective understanding that the moneys would be held on escrow conditions in the client account, and the fact that none was told of the equity bridge or of any instalment payments being due on loans from the RBS (or any other lender);

(8)    Mr Egan"s own case (until the first day of trial on 10 May 2012) that the monies were to be held on escrow;

(9)    The fact that the draft interim loan notes reasonably appeared to be *"just pieces of paper to record the amount of investment and the rate of return…and not something intended to characterise the monies received as a loan rather than an equity investment";*

(10)    The understanding that a reasonable reader would form of the Teaser and the email to which it was attached: that investors were investing to obtain an equity stake and their money would be applied for that purpose and not disbursed until then.

709.    On behalf of Mr Egan it is submitted that none of this, separately or compositely, amounts to a representation such as might have caused a representee in the circumstances and with the characteristics of the Claimants reasonably to believe that monies they paid into the Defendant Firm"s client account would be held subject to contractually binding escrow conditions.

710.    In particular, it is submitted on his behalf that no representation can reasonably be implied that some standard escrow arrangement common to all Albermarle investment schemes would apply to the Albermarle Fairoaks scheme.

711.   Mr Egan relied especially on the following:

> (1)   he only ever suggested, at most, (in an email to potential investors who had expressed an interest after receipt of the Teaser) that Albermarle Fairoaks was *"fairly similar"* to Albermarle Shoreham (as in many ways it was): he never suggested the two were identical;

> (2)   the Claimants themselves accepted that the Albermarle Fairoaks scheme was unusual in important respects;

> (3)   there was no settled "Investment Model" common to all Albermarle schemes and no representation that there was can be spelt out: a number of the prior Albermarle investment schemes did not involve escrow terms at all;

> (4)   in his e-mail of 20 August 2007 to potential investors, he invited them to forward *"the money to Juliet"* and also attached what he described as *the loan note (with interest) which we will be issuing pending completion of the Unit Trust"*, from which Mr Egan maintains it was reasonably to be inferred that *"prior to the issue of units or equity in the unit trust, or whatever "vehicle" ended up owning the asset, the investors funds were to be available to be used for the sole purpose or benefit of AFL"*; and

> (5)   the repeated amendments to the Claimants" formulation of what they must demonstrate were standard conditions impliedly represented to govern the escrow arrangements is fatal to the Claimants" contentions.

712.   It is further submitted on behalf of Mr Egan that if by words or conduct he caused the Claimants to believe that monies paid into the Defendant Firm"s client account were to be held on escrow terms, what induced that belief was not a representation of fact, but of intention, expectation or belief which gives rise to no actionable misrepresentation.

713.   As to the implied representations alleged, I accept, not without hesitation, the submissions made on behalf of Mr Egan that neither by his conduct, nor by anything he wrote or said to the Claimants or other investors, did Mr Egan make an implied representation of fact such as would have caused a reasonable representee in the position and with the known characteristics of the Claimants (or any of them) to believe that the monies they paid into the Defendant Firm"s client account would be held subject to defined and contractually binding escrow conditions.

714.   My hesitation in this context has been increased by the consideration that there is a narrow dividing line between (a) a representation that there would be binding escrow terms applicable and (b) a representation that monies paid into the Defendant Firm"s client account would be held "safe".  The differences are not only more real to a lawyer than to an investor; but even viewed with a legal lens they are not always easy to distinguish. The confusion in terminology throughout the case is testament to that. But the differences are important in this context: for though I do not accept any representation was made as to (a), I do accept that a representation was made as to (b).

715.    As in the context of the Main Claim, I accept that the investors, and a reasonable representee in their position and with their characteristics, were and would reasonably have been encouraged and confirmed by what was said and done in their expectation and belief that their monies would be held in the Defendant Firm"s client account and would not be released unless and until "safe"  in terms of there being no impediment to them receiving what they regarded themselves as having bargained for (and see above for an elaboration of what "safe" meant).

716.    As it seems to me, the reality of the matter is that everything that was said and done by Mr Egan in this regard tended to encourage and confirm the belief in the investors that they could trust him as they had in the past, and that, as in the past, their money would be held for them unless and until it was clear that in due course they would receive in return for their monies the mixture of loan and equity that was the hallmark or characteristic of the Albermarle schemes (or as Mr Egan himself described it in his first witness statement *"integral to the Albermarle syndicates"*).

717.    However, on the basis of the conclusions that I have reached earlier (in the context of the Claimants" main claim) the representations made by Mr Egan were, as it happens, true.  The Claimants" claim against Mr Egan does not therefore arise.

718.    I turn to the question whether Mr Egan owed a duty of care in case, once again, I am wrong in the conclusions I have reached.

### *(2)    Were the circumstances such as to give rise to a duty of care on the part of Mr Egan?*

719.    The Claimants suggested that the *"real battleground between the parties turns on the duty of care."*  That is because Mr Egan denies that he personally owed any such duty, and contends that any such duty would only be owed by ECS, his employer and the company of which he was a director.

720.    As a corollary of the fact that a limited company is a separate person in law having the benefit for its participants of limited liability (subject to certain exceptions), the starting point is that an individual who makes negligent misstatements whilst contracting on behalf of a company of which he is an employee or director does not thereby, and without more, assume personal responsibility for the truth or accuracy of the statements made, which is a necessary ingredient for liability.

721.    However, the fact of acting as a director or agent of a limited company is not an absolute exemption from a claim in negligent misstatement; a director or other agent of the company may on the facts be treated as having assumed personal responsibility for the negligent misstatement (or the negligent provision of services), if it was reasonable for the third party who claims to have relied on that director or agent to have concluded that such director or agent to have accepted personal responsibility.

722.    Neither the test nor the result is reached by applying any doctrine of company law whether under common law or statute; both are reached by relying on the requirement for an assumption of responsibility as a necessary ingredient of liability under the tort of negligence in the relevant context. It is not the position of the defendant within the company, nor the rules which govern his relationship with the company, which is important; the question is whether the defendant has taken on a personal commitment in addition to the obligations of the company.

723.    It also follows from the analysis, and the necessity to apply the laws of tortious liability rather than rules or provisions of company law that a director or other agent would not escape liability where assumption of responsibility is not a necessary ingredient for tortious liability, for example, in deceit (see *Standard Chartered Bank v Pakistan National Shipping Corp (No. 2)* [2003] 1 AC 959 (HL)).

724.    The point typically arises in acute form when the company is not available to be sued (for example, because it is insolvent), so that the alternative analysis of vicarious liability would be to no avail.  That is indeed the position in this case.

725.    Especially given Mr Egan's late and sudden change of case, the Claimants concluded it to be both impractical and in all probability futile to seek to join ECS: that would have required its restoration to the register, ECS having been dissolved following its liquidation, and the pursuit of any relevant insurer if it had a run-off policy, most Professional Indemnity and D&O cover being on a „claims made" basis. (These points may well explain, as the Claimants suggested, why the Defendant Firm had not sued ECS and why Mr Egan has never sought to join ECS for contribution.)

726.    The question raised is a composite one: whether the circumstances are such as to justify a finding of personal assumption of responsibility by Mr Egan notwithstanding that he was acting as an employee or director of the company (ECS). The Claimants expressly disavowed any claim in deceit.

727.    Three authorities require particular consideration. The leading one is *Williams v Natural Life Health Foods* [1998] 1 WLR 830, being a decision of the House of Lords.  Lord Steyn, who gave the only reasoned speech, emphasised in allowing the appeal that (contrary to the view of the majority in the Court of Appeal) it is not enough to show that a company acted principally through a particular individual and that such individual had been trumpeted as having particular personal experience and special expertise, and a prominent role in the transaction in question. Nor is it sufficient (see 835C)

> "that there should have been a special relationship with the principal [the company].  There must have been an assumption of responsibility such as to create a special relationship with the director or employee himself."

728.    Further:

> "the touchstone of liability is not the state of mind of the defendant. An objective test means that the primary focus must be on things said or done by the defendant or on his behalf in dealings with the plaintiff. Obviously, the impact of what a defendant says or does must be judged in the light of the relevant contextual scene. Subject to this qualification the primary focus must be on exchanges (in which term I include statements and conduct) which cross the line between the defendant and the plaintiff."

729.    As to assumption of responsibility, Lord Steyn then went on:

> "…it is important to make clear that a director of a contracting
> company may only be held liable where it is established by
> evidence that he assumed personal liability and that there was
> the necessary reliance."

730.    The facts pleaded by the Claimants as denoting the assumption of responsibility by
Mr Egan of a personal duty of care are that:

(1)    it was Mr Egan who broked the Fairoaks investment scheme to the
investors;

(2)    he did so using a badge („Albermarle‴) that made no reference and carried
no resonance with either Erinaceous or ECS: it was the badge and his
involvement that was important, the identity of the corporate vehicle being
neither obvious nor important;

(3)    he knew much more about the investment and Erinaceous and the
Defendant Firm‴s role and understanding of it than the investors (and was
fully aware that he did);

(4)    he knew that the investors trusted him as a result of a long relationship: they
were in effect members of an investment club and were his contacts, not
those of Erinaceous or ECS;

(5)    he knew that the investors would rely on his presentation in deciding
whether to transfer funds to the Defendant Firm.

731.    Mr Egan denies any personal assumption of responsibility. It is submitted on his
behalf that an objective assessment of the facts (that being the assessment required,
see *Henderson v Merrett Syndiates Limited* [1994] 2 AC 145, 181B-C) makes it
obvious he did not: he acted throughout as an employee and director only. Further, it
is submitted that reliance on the individual by each claimant must be demonstrated,
and that this has not been demonstrated in any case, but least of all in the case of
those Claimants who have not given any evidence. Thirdly, it is submitted that it is all the
more difficult to show the requisite "crossing of the line" (see above) where
substantively the reliance asserted is on implied and not express representations.

732.    I consider that, at least outside the context of the giving of and reliance on advice in
the nature of professional advice, or advice over the imprimatur of an individual
asserting professional or other special expertise (as for example in the case of *Merrett
v Babb* [2001] QB 1174, in which Mr Babb was found personally liable in respect of a
mortgage valuation report which he signed personally, writing his own name and
professional qualifications at the end of it), the court will (and in my view, should) be
slow to find that a director or employee of a company has assumed personal
responsibility when discharging functions on its behalf.

733.    The Claimants recognised this; but they depicted the present case as a striking
example of one where the special circumstances amply justified a finding of personal
assumption of responsibility. The strong personal ties between Mr Egan and "his"
investors pre-dating the involvement of ECS and Erinaceous, and Mr Egan‴s
description of himself in the Teaser as being a director of "Albermarle Investment

Syndicates", a trading name or brand but not a legal entity, and his frequent use of that description from Spring 2007 (after expressly agreeing with Ms Cummings that he could do so) are circumstances materially out of the ordinary.

734.    Further, I think there is some force in Mr Sutcliffe"s submission that a distinction should be drawn between cases (such as *Williams v Natural Life*) where the negotiations in the course of which the misstatement are the prelude to a contract with the company and cases (as here, and as in *Merrett v Babb*) where there is no contractual relationship with either the company or the director or agent.

735.    These points and the curiosities described above have given me pause for thought. However, I have eventually concluded that, although out of the ordinary, the circumstances are not, overall, such as to justify a finding of personal assumption of responsibility on the part of Mr Egan.

736.    I am comforted in that overall assessment by the fact that none of the Claimants who gave evidence understood Mr Egan to be acting in his own right: all understood him to be employed by and acting for Egan Lawson/ECS or possibly Erinaceous; and none of them suggested that he or she had relied on him having assumed some special commitment beyond or separate from that which he owed in acting for his company.

737.    The nearest any of them got to an assertion of personal assumption of responsibility was the following exchange between Mr Bacon (for Mr Egan) and Mr Watts:

> "Q. You were aware that Egan Lawson had been taken over in 2006 by Erinaceous Group?"
>
> A. Yes, I was.
>
> Q. That he had then become an employee -- whether he was a director or whatever, he was an employee of the Erinaceous Group?
>
> A. Without specifically having focused on the point, yes, that would have been a self-evident conclusion to have drawn, yes.
>
> Q. And that he wasn't dealing with you, therefore, in a personal capacity.
>
> A. Well, that may be true in a strictly legal sense. However, it was -- and he would absolutely I am sure support this, that he was dealing with me personally based on his personal contacts with me, and would not have been seeking to mislead me because of the fact that he could hide behind a corporate veil. So I think it's   --
>
> Q. I can assure you he is not seeking to do that. But his position is that he is and was at all material times to your knowledge an employee of Erinaceous Group?
>
> A. Clearly it is difficult for me to deny that because it is self-evident, I just hadn't thought about it at the time.
>
> Q. Thank you. I didn't mean to interrupt. When you had received investment notices in the past --
>
> A. Um-hum.
>
> Q. -- you were aware that they were provided to you on behalf of Egan Lawson, and then in turn by ECS, Erinaceous Commercial Services, and that he wasn't supplying them to you in his own personal capacity?
>
> A. Exactly so. To a certain extent, nothing had changed."

738.  That seems to me to reflect the reality: the Claimants'' connection was with Mr Egan and they followed him to whatever company he was working for: but they understood him to be working for a company and to be dealing with them as part of the ordinary course of his work for the company: it matters not whether it was Egan Lawson, ECS or Erinaceous.

739.  I have reached my conclusion without regard to the terms of the Investment Memoranda issued in previous Albermarle investment schemes which specifically stated that investors should carry out their own investigations and that the directors of Egan Lawson Limited did not assume any responsibility for the accuracy of representations in the relevant Investment Memorandum. I would, if necessary, have concluded that these earlier Information Memoranda do not provide a template for Albermarle Fairoaks or foreclose the assumption by Mr Egan of personal responsibility in a case where no such Information Memorandum was provided.

740.  I would also accept the submission on behalf of the Claimants that the exclusion in the Investment Memoranda I have seen would not (restrictively construed as they must be) have covered the case of a misrepresentation as to the existence or not of escrow arrangements.

741.  My conclusion absolves me, as I see it, from the necessity of determining the issue which would otherwise arise as whether reliance had been established, especially in the case of Claimants who gave no evidence of it.  Reliance must of course be established in addition to proof of assumption of personal responsibility.  As Lord Steyn said in *Williams v Natural Life* (at 836E-F):

> "If reliance is not proved, it is not established that the assumption of personal responsibility had causative effect."

As I say: I do not think that, in the event, my decision is required; suffice it to say that I should have thought individual reliance would be required to be demonstrated, and it would not suffice to rely on an inference of the likelihood of reliance without express confirmation by the individual claimant of the fact of it. (For the avoidance of doubt, such reliance does not, of course, have to be demonstrated in the context of the Claimants'' main claim: and see *per* Patten LJ in *Bieber & Others v Teathers [supra]* at paragraph 11.)

742.  My same conclusion also means that I do not think it necessary or appropriate to address Mr Egan''s further defence based on disclaimers of responsibility in the draft IM and in the Information Memoranda in previous Albermarle investment schemes.

## PART 20 CLAIM

743.  I turn lastly to the Defendant Firm''s claim under CPR Part 20 against Mr Egan for contribution. I focus on the various heads of claim; the parties have agreed that the question of apportionment of any liability should be held over to a further hearing after consideration of this judgment.

744.  It is common ground that under section 1(5) of the Civil Liability (Contribution) Act 1978 ("the 1978 Act") the judgment in the Main Action will be conclusive as regards

the Part 20 Claim as to any issue determined by that judgment in favour of the person from whom the contribution is sought (here, of course, Mr Egan).

745.    The 1978 Act provided (by section 1(1)) a statutory right of contribution to a person liable in respect of damage suffered by another person to recover from any other person *"liable in respect of the same damage (whether jointly with him or otherwise)"*.

746.    It is clear from the Court of Appeal"s decision in *Charter plc v City Index Ltd* [2007] EWCA Civ 1382, [2008] Ch 313 that liability can be said to be for the "same damage" whether or not that liability arises in tort or contract or in restitution: in that case, it was held that even though a claim for knowing receipt might generally be described as restitutionary, that did not preclude it being treated as an action concerned with recovering compensation for the purposes of the 1978 Act (and that liability to compensate should be equated with liability in respect of damage in the same context).

747.    The Defendant Firm pleads the following bases of contribution against Mr Egan:

(1)    If there was a contractual escrow agreement concluded between the Claimants and the Defendant Firm, Mr Egan is liable for procuring its breach by telling Mrs Bellis to make the payments she did out of her firm"s client account to RBS: but I have held that no such contract was established, so this basis is redundant;

(2)    If the Defendant Firm held the monies paid into its client account by the Claimants on trust for them, then Mr Egan knew of such trust and that payments out constituted a breach of its terms, and so dishonestly assisted or procured such breach: I have held that such monies were held on resulting trust, of which the Defendant Firm was in breach: so this basis does require assessment;

(3)    It having been held in the Main Caim that Mr Egan did not have authority to act on behalf of AFL, and that monies were received into and paid out of the Defendant Firm"s client account on the basis that he warranted he did have such authority, he was in breach of his warranty of authority, alternatively of a collateral contract between him and the Claimants that their monies would be held subject to escrow conditions;

(4)    Mr Egan stood in a relationship of trust and confidence with each of the Claimants such as to give rise to fiduciary duties on his part, of which he was in breach in not disclosing the true nature of what was proposed;

(5)    If Mr Egan committed wrongful acts whilst acting in his capacity as a director of ECS, he should be held liable for directing or procuring ECS to commit the same.

748.    I address bases (2) to (5) below.

*Dishonestly procuring breach of trust*

749.    The Defendant Firm"s claim for contribution under this head (dishonestly assisting or procuring breaches of the resulting trust I have held arose) is based upon the plea that Mr Egan (a) gave instructions on which Mrs Bellis relied in making payments out of her firm"s client account of £1,450,000 on 4 September 2007 and £350,000 on 7 September 2007 (b) knowing that such payments would constitute breaches of the terms on which such monies had been paid into that client account, or, alternatively, having deliberately abstained from enquiring as to whether such payments would involve breaches and reckless as to the same.

750.    Mr Egan denies that the payments were made in accordance with instructions received from him, and denies that he gave or had any authority to give such instructions to the Defendant Firm.  He rejects any suggestion that he was dishonest, noting also that the Claimants did not suggest any such thing and distanced themselves from any such suggestion.

751.    Mr Bacon, on behalf of Mr Egan, also made the point that the allegation of dishonesty was not put to him. Mr Croxford excused this on the footing that *"it was an impossible task to confront him with dishonesty"* given that the issue only arises on the hypothesis denied by the Defendant Firm (of there being escrow arrangements or a resulting or *Quistclose*-type trust). Mr Bacon did see the force of this; and in any event, I consider that Mr Egan knew that it was being said that he was implicated if indeed a contract or trust was established. I consider it is not unfair to allow the allegation to be considered. It is, however, well established that dishonesty must be clearly demonstrated: and any rational explanation which is consistent with honesty will be likely to be sufficient to displace it.

752.    As to the issue whether Mr Egan gave Mrs Bellis payment instructions, the Defendant Firm relied on (a) an alleged telephone conversation between them *"on or around 24 August"* during the course of which it is suggested by Mrs Bellis he instructed her to transfer to RBS sums received into her firm"s client account from Tenon; (b) an email from Mr Egan to Mrs Bellis dated 31 August 2007 in which he stated that *"the Fairoaks money needs to go to RBS asap asap"*; and (c) a (further) telephone conversation between then on or around 3 September 207 during which, so Mrs Bellis says, Mr Egan confirmed that money should be transferred to RBS *"as soon as it comes in"*.

753.    As to (a), Mrs Bellis referred to the alleged conversation in her witness statement and relied on a manuscript note in her writing on the face of an email from Tenon dated 24 August 2007 which reads *"GE confirms -> RBS"*. But under cross-examination by Mr Bacon she admitted that she "*had no clear recollection of this telephone conversation*" and suspected that it probably had taken place later.  Mr Egan was not asked about the conversation.  I do not think the evidence is such as to infer from it an instruction given by Mr Egan to Mrs Bellis. See paragraph 136.

754.    As to (b), Mr Bacon on behalf of Mr Egan described this e-mail of 31 August 2007 as *"no more than Mr Egan chivvying her along"* which did not amount to an instruction or direction. I broadly accept this: I do not consider that this e-mail is realistically characterised as an instruction or direction either.

755. The reality, as I find, is that the e-mail did no more than confirm Mrs Bellis'' predisposition, despite having no certainty as to the terms on which the monies had been remitted or the directions that she could follow (see, for example, paragraph 578 above) that she should pay out to RBS as soon as possible: a predisposition consistent with (and to my mind explicable at least in part by reference to) what I find she must have been well aware were the obvious interests of Erinaceous. But for that, she would not and could not realistically have taken the email to constitute an instruction or direction mandating her to effect a transfer.

756. Counsel for the Defendant Firm submitted, further, that even if Mr Egan did not instruct Mrs Bellis, he did request her to make the transfers and that the Defendant Firm should be entitled to an indemnity or contribution from him on the principle established by the House of Lords in *Sheffield Corporation v Barclay* [1905] AC 392; they referred also to *Yeung Kai Yung v Hong Kong and Shanghai Banking Corp.* [1981] AC 787.

757. The principle relied on was stated in the following terms by the Earl of Halsbury LC (at page 397):

> "In *Dugdale v Lovering* (1875) LR 10 CP 196 Mr Cave, arguing for the plaintiff , put the position thus: „It is a general principle of law when an act is done by one person at the request of another which act is not manifestly tortious to the knowledge of the person doing it, and such act turns out to be injurious to the rights of a third party, the person doing it is entitled to an indemnity from the person who requested that it should be done." This though only the argument of counsel was adopted and acted upon by the court, and I believe it accurately expresses the law."

758. It is, however, important to bear in mind the basis of the principle. This is that the circumstances in which the request is made are such as to give rise to the inference of a promise by the person making the request to indemnify the requested person if actioning the request causes actionable injury or damage to a third party: see *Yeung Kai Yung* at 798G.  Such an inference will most easily be made when the requested party is undertaking a statutory duty or a common law duty of a ministerial character: see *Sheffield Corp v Barclay* at 399 and *Welch v Bank of England* [1955] 1 Ch 508 at 509 and 548-549 (cited in *Yeung Kai Yung*). It is also likely to be inferred as a matter of policy where the request is fraudulent but the requested party has no knowledge of the fraud: *ibid.*

759. Neither circumstance applies in the present case: and in my judgment the circumstances in this case do not support the inference. Moreover, and in any event, where the request is from a person purportedly but not properly on behalf of another, I doubt the principle has any application: the recourse of the requested party is for breach of warranty of authority.

760. Again, as to (c) in paragraph 752 above, the evidence of the alleged conversation is a manuscript note by Mrs Bellis on the margin of an e-mail, this time from Mr Iain Grieve of Burness & Co (the firm acting for RBS) to Mrs Bellis dated 3 September 2007. Item 3 of that e-mail read as follows:

"I understand that our clients met or spoke last week and that the equity raising is progressing well and that approx £2 million has been forwarded to you. My understanding is that this is to be remitted to the bank…in reduction of the equity bridge. Can you confirm that you have similar instructions."

As previously noted, the manuscript annotation reads: *"GE – yes- get it over -> RBS as soon as it comes."*

761.   Mr Egan at first disputed having had the conversation at all, saying that he *"would not have said that…why would I have said that?"* He later appeared to accept he might have said something along those lines but would not have intended any transfer until it was *"safe"*.

762.   I did not find Mr Egan convincing in this regard: I accept that he did confirm that the monies were to be transferred as soon as they arrived: and that this accorded with his strong desire and objective to ensure that the RBS Equity Bridge instalment payment was met. But I accept that Mr Egan, not being a solicitor, would not have expected Mrs Bellis to make a transfer unless entirely satisfied on reasonable grounds that it was proper to do so. Again, in my view, the reality is that Mrs Bellis acted in line with her assumptions as above described.

763.   In any event, I think it plain, and have previously found, that Mrs Bellis knew that the arrangements with the investors were still uncertain or incomplete, and that AFL had not authorised the borrowings. The references in the email from Mr Grieve of Burness & Co of 3 September to equity raising must have further added to the uncertainty. I do not accept that Mrs Bellis transferred monies because she felt she could rely on Mr Egan having authority; she was guided by unquestioning assumption, indifference to the risk for investors inherent in that assumption, and the growing imperative of ensuring RBS was paid.

764.   I would add, in that regard, that Mrs Bellis" insistence that Ms Cummings never once instructed her to make the payments and that she never regarded herself as acting for Erinaceous, or in accordance with the overall direction of Ms Cummings (her sister, with whom she lived), or with an eye to its interests, struck me as both inherently unlikely and in my subjective assessment not believable. I reject that evidence accordingly.

765.   It will be recalled that in her memorandum to Mr Dickinson dated 14 December 2007 she referred to having received *"instructions from Geoff Egan and Ms Cummings to reduce the equity bridge"; and also that she told the Administrators of AFL in her interview at Dundas & Wilson on 9 June 2011 that it was Legis which gave her the relevant instructions. The best she could do as to the latter was to accept in cross-examination that she had given *"a slightly misleading answer".* All this reinforces my sense that Mrs Bellis" later story that she relied only on Mr Egan is contrived.

766.   Lastly under this sub-heading, I do not accept the suggestion that Mr Egan was dishonest in the sense necessary to establish liability for dishonest assistance. The test for dishonesty in such a context has been much debated at the highest level and there have been a number of decisions since that have considered the application of the tests that have emerged.

767.   There is a helpful review of these authorities in *Brown v InnovatorOne plc* [2011] EWHC 119 (Comm), paragraphs 1046 to 1054.   Hamblen J summarised the "combined test" that has been prescribed and adopted as having two elements as follows:

> "(1)  The subjective element – The Court must consider the defendant"s subjective state of mind and what the defendant actually knew and understood; and
>
> (2)  The objective element – The Court must consider whether or not, with that state of mind, knowledge and understanding, the relevant conduct is dishonest, applying an objective standard of dishonesty."

768.   As stated by Morgan J in *Aerostar Maintenance International Ltd v Wilson* [2010] EWHC 2032 at paragraphs [183 to 184], for the most part (and as to (1)), dishonesty is to be equated with conscious impropriety; and as to (2), what is meant by saying that the standard is objective is that a person is not free to set up his own standards of honesty; thus

> "If by ordinary objective standards, the defendant"s mental state would be judged to be dishonest, it is irrelevant that the defendant has adopted a different standard or can see nothing wrong in his behaviour."

769.   In my judgment, Mr Egan was not acting with conscious impropriety in encouraging Mrs Bellis to pay out to RBS monies received from investors into her firm"s client account.

770.   Mr Egan placed especial reliance in this connection on an email dated 4 September 2007 from Mrs Bellis to him attaching (amongst other things) a *"Loan Note as approved and ready to go."* He contends that this demonstrates that it was reasonable for him to conclude, as he states he did conclude, that the loan transaction was in order and had been authorised by Legis before any payments were made.

771.   I was not entirely convinced by this: it struck me as elevated in its importance and embellished with hindsight.   But I accept the more general point that Mr Egan believed that all would be well in the end, albeit without either a full (or any real) understanding of the legal mechanics whereby the desired result could be achieved, or any sustained effort to ascertain when that end would be; but this was not conscious impropriety. He had a clean heart; even if his head was sometimes filled with somewhat rash assumptions.

772.   I do not consider that this rashness crossed the line over to recklessness of a nature sufficient to establish dishonesty. I do not think the evidence suggests indifference to a suspected truth: gross want of caution is not proof of dishonesty: and see *The Kriti Palm* [2006] EWCA Civ 1601 at [256] to [259] (also quoted by Hamblen J in *Brown v InnovatorOne* at [1055]). Further, although I accept that "assistance" has a wide meaning and that (as Counsel for the Defendant Firm submitted, referring to *Baden v Societe Generale* [1993] 1 WLR 509 at 574-575 and Underhill and Hayton "*Law of Trusts and Trustees*"(18th ed.) at 98.53) there is not a requirement that what was done

had the consequence that a loss was suffered I am not persuaded that Mr Egan"s conduct, though regrettable, did substantially "assist" or facilitate the commission of the breach of trust.

*Breach of warranty of authority/collateral contract*

773.   The Defendant Firm pleads that the Teaser and/or the Loan Note emails contained an express or implied warranty by Mr Egan (alternatively Egan Lawson) that he (alternatively Egan Lawson) was a duly authorised agent of AFL for the purposes of raising investment funding, and that (on the basis that in fact neither was authorised, as I have found) he was in breach of that warranty of authority.

774.   The Defendant Firm also pleads that if the investors paid "on some form of escrow", the Teaser and/or the Loan Note emails contained an express or implied representation by Mr Egan to the investors that the following collateral terms would have binding contractual effect:

(a)   their investments would be held by the Defendant Firm;

(b)   their investments would not be loans to AFL;

(c)   alternatively, if the investments were loans, they would be on terms that their investments would be held on trust by the Defendant Firm until Interim Loan Notes were issued to investors.

The Defendant Firm pleads that if that collateral contract was so concluded, Mr Egan was in breach of it, because the Investments were released before the conditions agreed were satisfied.

775.   Mr Egan denies that the Teaser and/or the Loan Note emails contained any express or implied warranty or any such representations (express or implied); he denies both the collateral contract pleaded and that he was in breach of it. He avers that in any event the investment monies were released by Mrs Bellis and not by him and that, furthermore, everything he did was as an employee of, and in discharge of duties entrusted to him by, ECS and there is no basis for holding him personally liable in such circumstances.

776.   As I have set out above, not one of the Claimants contended that Mr Egan warranted that he was personally a duly authorised agent of AFL for the purposes of raising investment funding; and not one contended that he or she had read the Teaser and/or the Loan Note emails as giving rise to the inference that he was. Looking at the matter objectively, I do not consider that either of the documents, or the circumstances, supports the Defendant Firm"s case in this regard: and I reject both formulations of that case (that is to say, whether couched in terms of breach of warranty of authority or breach of collateral contract) accordingly.

*Allegation that Mr Egan owed fiduciary duties of which he was in breach*

777.   The Claimants do not assert that Mr Egan was their fiduciary. However, the Defendant Firm pleads that in the circumstances he stood in a relationship of trust and confidence with each (or some) of the investors, and owed them fiduciary duties (a) to

act loyally and faithfully in their best interests; (b) of full and frank disclosure; and (c) not to allow his personal interests or the interests of third parties to conflict with his duties to the investors. In their written closing submissions, Counsel for the Defendant Firm characterised Mr Egan as *"the paradigm fiduciary".*

778.    The Defendant Firm"s case in this regard is that in consequence of such duties he was obliged but failed (a) to disclose to the investors that Mr Egan proposed to, as he did, give instructions to the Defendant Firm to disburse the investors" monies paid into its client account to repay instalments due in respect of the RBS Equity Bridge and/or interest payments prior to satisfaction of any escrow conditions; (b) to seek their informed consent to that, and (c) not to give such instructions unless and until he had obtained their informed consent; (d) to disclose to the investors any of the following: (i) the terms and instalment repayment dates of the RBS Equity Bridge; (ii) that AFL was indebted to RBS in the sum of £31 million; (iii) that their investments would be subordinated to such indebtedness to RBS; (iv) that their investments were "highly risky" because unless the fund-raising target was reached and the RBS Equity Bridge repaid in time, AFL might never be able to repay the investments.

779.    Mr Egan denies that he personally stood in a relationship of trust and confidence to the investors and thus denies both any fiduciary duties and any breach by him of any of them. Once again, Mr Egan makes the point that at all times he acted in his capacity as an employee, alternatively a director of ECS and had no autonomous role personally. He accepts that he "co-authored" the Teaser but denies that this gave rise to any fiduciary obligations.

780.    As accepted by both parties, whether someone is a fiduciary, and if so, what duties that person owes in that capacity, are questions of fact. The types of relationship that may be so characterised are not closed; the definition is open-textured.  Thus, in *Bristol & West Building Society v Matthew* [1998] Ch 1, Millett LJ provided the following definition (at page 18A-B):

> "A fiduciary is someone who has undertaken to act for or on behalf of another in a particular matter in circumstances which give rise to a relationship of trust and confidence. The distinguishing obligation of a fiduciary is the obligation of loyalty.  The principal is entitled to the single-minded loyalty of his fiduciary. This core liability has several facets. A fiduciary must act in good faith; he must not make a profit out of his trust; he must not place himself in a position where his duty and his interest may conflict; he may not act for his own benefit or the benefit of a third person without the informed consent of his principal. This is not intended to be an exhaustive list, but it is sufficient to indicate the nature of fiduciary obligations. They are the defining characteristics of the fiduciary. As Dr Finn pointed out in his classic work *Fiduciary Obligations* (1977), p.2, he is not subject to fiduciary obligations because he is a fiduciary; it is because he is subject to them that he is a fiduciary."

781.    That the investors trusted Mr Egan in general terms is not in doubt or dispute. The investors looked to him to select and recommend investments; and they had come to

trust his judgement. I have little doubt that they associated the Albermarle brand with him, and took comfort from his continuing involvement. I have little doubt that their experience in previous Albermarle schemes had encouraged them to be less exacting in their expectations of proper record and full explanation than would otherwise have been the case.

782.    I also consider that Mr Egan was plainly and obviously remiss in failing to explain the funding arrangements: in particular, it is extraordinary that he did not ensure that the investors were aware of the terms of the RBS Equity Bridge and, in particular, the instalments that were due. His personal optimism was misplaced and rash; he let "his" investors down when that optimism was proved to be ill-founded. His disregard for proper process and paperwork seems inexcusable once its effect is revealed.

783.    I have also been concerned by indications that Mr Egan was aware of frailties in the structure and economics of the Albermarle Fairoaks scheme that he did not reveal to investors but of which he complained to Ms Cummings and Erinaceous when they sought to blame him for delays in fundraising.

784.    I have particularly in mind the email sent by Mr Egan to (I assume) Ms Cummings some time after 24 September 2007 (the heading appears to have been deleted, but it appears to have been in reply to an email from Ms Cummings of that date in which she referred to breaches by Erinaceous of its banking covenants and adverse press reaction) from which I have already quoted in paragraph 71(4) above.  That email began:

> *"I feel it is unreasonable for you to lay the group"s problems at Dougie"s and my door particularly as we have no say in how the group is run*
>
> *1)    Albermarle Croydon was overpriced as Neil kept pushing it and it thus proved difficult to raise equity ...*
>
> *2)    Fairoaks. We are unable to do a proper fund raise until the Unit Trust is in place ..."*

785.    That email illustrates not only the pressures Mr Egan was under (from Ms Cummings and Erinaceous) and Mr Egan"s doubts and discomfort, but also the disparity in the information available to Mr Egan compared to that available to the investors, who were not told about the overvaluation, or the cooking up of the rents or of the penal interest rate payable to Erinaceous. The disparity put the investors at a disadvantage and meant that they were in point of fact reliant upon him and others for fair description of what was truly involved.

786.    Nevertheless, I do not consider that he personally undertook obligations such as to characterise him as a fiduciary.  It was not him or even his employer ECS to whom the investors entrusted their monies/investments. He did not act, and they did not understand him to be acting, personally for them or on their behalf. He acted for ECS, and accepted the direction of Ms Cummings and Erinaceous, both in identifying the investment opportunity to be made available to investors and in inviting expressions of interest in and participation in it through (as he envisaged) the usual mix of equity

and loan. Mr Egan was not personally a party to any transaction with any of the investors: and there was not in law entrusted to him, nor did he have their authority to exercise, any power or discretion which might affect their interests. Lastly, the relationship between him and "his" investors was commercial in character and did not, as I see it, oblige him to act exclusively in their interests.

787. In short, though critical of the way Mr Egan conducted himself, I do not accept this basis for the Defendant Firm"s claim to contribution either.

*Procuring wrongdoing by ECS*

788. Faced with the difficulty of establishing personal assumption of responsibility or fiduciary obligations on the part of Mr Egan, the Defendant Firm pleads, in the last of its alternative bases for contribution, that Mr Egan directed or procured Egan Lawson/ECS to commit any acts established to have been wrongful.

789. The Defendant Firm did not elaborate upon this line of argument beyond citing and commending to my attention in oral submissions two authorities, namely *Standard Chartered Bank v Pakistan National Shipping Corpn and others (Nos 2 and 4)* [2002] UKHL 43, [2003] 1 AC959 and *MCA Records Inc & Anor v Charly Records Ltd & Ors* [2002] BCC 650.

790. In my judgment, the following principles may be derived from those authorities:

(1) Just as in the context of criminal liability, no-one can escape the clutches of the criminal law by the simple device of showing that he had carried out his frauds in his capacity as a director of a company and in circumstances where his acts were to be attributed to the company, so in the context of tortious liability, a person"s status as a director cannot invest him with immunity if the ingredients of the relevant tort are made out against him: see the *Standard Chartered* case at paragraphs [39] and [40]).

(2) "Thus, there is no reason why a director of a company should be in any different position to a third party and therefore it is possible that a director can be capable of becoming a joint tortfeasor by procuring and inducing the company, for which he works to carry out a tortious act": see *MCA Records* at p667E-F, quoting Aldous LJ in *Williams v Natural Life Health Foods* [1998] 1 WLR 830 at paragraph [21].

(3) "However there are good reasons to conclude that the carrying out of duties of a director would never be sufficient to make a director liable": *ibid* at 667F, although Chadwick LJ suggested it was unwise ever to say never in this field (see *MCA Records* at paragraph 49).

(4) Thus, "a director will not be treated as liable with the company as a joint tortfeasor if he does no more than carry out his constitutional role in the governance of the company – that is to say, by voting at board meeting": that is "what policy requires if a proper recognition is to be given to the identity of the company as a separate legal person": see *per* Chadwick LJ in *MCA Records* at paragraph 49.

(5)  However, "there is no reason why a person who happens to be a director or controlling shareholder of a company should not be liable with the company as a joint tortfeasor if he is not exercising control through the constitutional organs of the company and the circumstances are such that he would be so liable if he were not a director or controlling shareholder": again see *per* Chadwick LJ in *MCA Records* at page 668G.

791.  In the present case, in my judgment, Mr Egan cannot be said to have stepped outside his remit as a director/employee or acted otherwise than in the discharge of his obligations as he perceived them as such.  Accordingly, I do not consider there to be any basis for holding Mr Egan liable to make contribution as a joint tortfeasor with ECS.

*Conclusion as to Part 20 Claim*

792.  It follows that, in my judgment, the Defendant Firm"s Part 20 claim for indemnity or contribution fails and should be dismissed accordingly.


**SUMMARY OF CONCLUSIONS**

793.  My conclusions may be summarised by reference to the questions adumbrated in paragraph 22 above as follows.

794.  As to (1), the Claimants" argument that the monies paid into the Defendant Firm"s client account by the Claimants were held subject to contractual escrow terms binding on the Defendant Firm fails: the difficulties that the Claimants had in defining the terms and conditions of the contract reflect the fact that no sufficiently certain agreement can be discerned or inferred.

795.  As to (2), I do not consider that the facts are such as to give rise to a classical *Quistclose* trust, with the payment and receipt of money being expressly stipulated or acknowledged to be for a defined and exclusive purpose. However, in my judgment, the combined effect of the fact that (a) the Claimants" monies were required to be and were paid into a trust account, and (b) were not (I have found) objectively or subjectively intended to belong upon receipt to AFL, was that the Defendant Firm held such monies on trust for the Claimants and subject to the SAR.

796.  As to (3), having thus become a trustee for the Claimants upon receipt into her firm"s client account of the monies they had paid, Mrs Bellis and her firm could not, in all the circumstances, in equity foreclose the beneficiaries" interests and become trustee in respect of the same monies for another person without the most unequivocal instructions from her beneficiaries or complete certainty that they had directed payment to AFL on conditions that had unequivocally been met. Such instructions were never received; and no such certainty was ever achieved.

797.  The Claimants" alternative case that a resulting trust arose upon receipt of the Claimants" monies into the Defendant Firm"s client account because such receipt on behalf of AFL was not authorised succeeds also.

798.   On the basis of the conclusions above, there is no need or basis for the Claimants'' further alternative claim in restitution: I would have been disposed to accept that case, but I make no final determination in that regard.

799.   The Claimants'' case against Mr Egan is, on that basis, otiose; but in any event, I do not consider that the circumstances are such as to justify imposing liability upon him personally: in my judgment, Mr Egan did not owe any personal duty to the Claimants, nor did he make any actionable misrepresentations to them.

800.   I do not consider there to be any basis for the Defendant Firm''s claim for contribution against Mr Egan personally: in my judgment, he did not assume personal responsibility or fiduciary duties to the Claimants; he did not give any warranty of his authority to bind AFL and/or the investors; he did not procure wrongdoing by ECS; nor did he dishonestly assist the Defendant Firm in its breaches of trust.

801.   Accordingly, and in summary:

  (1)   the Claimants succeed on their Main Claim, and would do so on their Alternative Claim; they are entitled to relief accordingly;

  (2)   their claims against Mr Egan are unnecessary;

  (3)   the Defendant Firm''s Part 20 claim against Mr Egan fails.

802.   I would invite Counsel to prepare a draft Minute of Order and to fix a date for a further hearing after formal judgment to deal with that and other consequential matters.  In the meantime, I am most grateful to them, and those instructing them, for their patience and their considerable assistance.


## POSTSCRIPT

803.   A postscript such as this is unusual: but I have found this an unusual case. Its purpose is to explain that after circulating an earlier version of this Judgment in draft and invited Counsel to identify any patent errors or omissions, or any matters that they considered lacked sufficient and required further explanation, I received a number of helpful suggestions. They were advanced succinctly but politely:  I am grateful to Counsel for them: I have sought to take all of these into account and indeed to address many, though not all, of these suggestions in this final version.

804.   I would add a few miscellaneous observations, which I have found difficult to assimilate into the main body of this judgment and may be more helpfully addressed by way of this postscript.

805.   First, Counsel for the Defendant Firm have queried my findings as to the intention of the parties, given (as is indeed the case) that many of the Claimants did not give evidence.  I would offer the following clarification:

  (1)   Ultimately, the question whether a trust (or contract) is to be implied depends upon the objective intentions of the parties as derived from all the admissible  circumstances:  I  have  explained  why  in  the  particular

circumstances I have also addressed the subjective intentions of the parties (the principal reason being that the Defendant Firm sought to rely on subjective intention as disqualifying reliance on objective intention).

(2)   I have also sought to explain why, in the case of particularly identified claimants who might have been supposed to have had a contrary intention, I have concluded that nevertheless a resulting trust, by way of implication and/or by operation of law, arises.

(3)   I have not considered there to be any basis for concluding that other claimants (those who did not give evidence but who were not specifically identified as being persons to whom a contrary subjective intention should be attributed) had any subjective intention such as to disqualify them from relying on the objective intentions of the parties as I have found them to be.

(4)   Except in the context of misrepresentation claims there was no need to establish any form of reliance (and see *per* Patten LJ in *Bieber v Teathers* at paragraph 11).

(5)   Whilst I remained surprised that no evidence at all (even of a formal nature) was offered by some of the Claimants, I do not think this, in the circumstances as I have found them, deprives them of a claim.

806.   Secondly, Counsel for the Defendant Firm politely queried my references to Mrs Bellis/the Defendant Firm having "abdicated" responsibility, and have sought clarification of the basis on which Mrs Bellis/the Defendant Firm had any responsibility or owed any obligations to the Claimants, her only client (as they presented the matter) being AFL. As to this:

(1)   I have sought to explain the basis on which, in my judgment, the monies paid by the Claimants into the Defendant Firm"s client account were there held on trust for them.

(2)   The responsibilities of a trustee to establish the terms of the trust and the identity of the beneficiaries are trite and basic, seem to me to be reinforced by the SAR and if anything heightened in the case of a solicitor who has chosen to make available his or her firm"s client account; and they are not discharged by an expectation that all will be well in the end.

(3)   It may be (as Lord Millett has suggested writing extra-judicially) that while the money remained in the Defendant Firm"s client account and there held on trust for the payers (as I have concluded) the payers are to be treated, for that purpose, as the Defendant Firm"s clients: see *Trust & Trustees,* vol. 17, No. 1, February 2011.

(4)   It was suggested at the hearing, I think in response to a question from me, but without elaboration, that in advising a SPV which is to hold the investment assets, and any fund which may be the ultimate investment medium, and thus acting as (in effect) solicitor to the offer, a solicitor may owe a duty of care to the investors whose vehicle that SPV is to be. In circumstances such as these, and especially if the solicitor is aware, or at

least on notice, that (a) no other legal adviser is advising them as a body and (b) in preceding analogous transaction they have come to rely on the solicitor acting for the SPV to have regard to their interests, that does seem to me at least arguable. However, I am aware that these may be deep waters: and in default of detailed argument, I simply leave the argument open, and I base my judgment on the factors referred to earlier, and not that argument.

807.   Lastly, Counsel for the Claimants have sought clarification whether or not the costs expended in seeking an administration order in respect of AFL (of some £94,715.18) are recoverable: they contend that they should be, on the basis that they were incurred as a result of a breach of trust. However, in their written closing submissions, Counsel for the Defendant Firm contended that the application was made on a basis (that the applicants were creditors of AFL) which was inconsistent with the basis of the Claimants" claims in these proceedings, and that such costs were unreasonable and should be irrecoverable. I do not think this was expressly addressed before me at the oral hearing: and I shall hear further argument in that regard after delivering this judgment.

## SCHEDULE A

| Claimant No | Claimant Name | Investment amount | Date of investment |
|---|---|---|---|
| First and 1(a) | Mrs Adelle Challinor and Mr Paul Challinor | £100,000.00 | 28/09/2007 |
| Second | Ms Sheila Cocker | £100,000.00 | 31/08/2007 |
| Third | Mr Andrew Kevin Cole | £100,000.00 | 21/08/2007 |
| Fourth | Mr Charles Evans | £30,000.00 | 31/10/2007 |
| Fifth and (5a) | Mr John Kerrison and Mrs Gaynor Kerrison | £100,000.00 | 25/09/2007 |
| Sixth | Mr Robert Meadows | £100,000.00 | 29/08/2007 |
| Seventh | Mr George Melio | £100,000.00 | 03/09/2007 |
| Eighth | Mr Stuart Wallis | £250,000.00 | 04/09/2007 |
| Ninth | Mr Garry Watts | £100,000.00 | 03/10/2007 |
| Tenth | Mr Robert Wilson-Wright | £100,000.00 | 04/09/2007 |
| Eleventh | Mrs Amanda Garner & Mr Andrew Cole A/C LM Cole | £100,000.00 | 21/08/2007 |
| Twelfth | Mrs Amanda Garner & Mr Andrew Cole A/C JA Cole | £100,000.00 | 21/08/2007 |
| Thirteenth | Mrs Amanda Garner & Mr Andrew Cole A/C CAJ Cole | £100,000.00 | 21/08/2007 |
| Fourteenth | Black Isle Property Company Limited | £250,000.00 | 22/08/2007 |
| Fifteenth | Tenon (IOM) Corporate Services Limited (as Trustee for Bright Cook & Co. LTD 2006 Employee Trust Re. Mr Cook and Family Sub Fund | £150,000.00 | 24/08/2007 |
| Sixteenth | European Securities LTD | £250,000.00 | 23/08/2007 |
| Seventeenth | Maple Investments LTD | £150,000.00 | 17/09/2007 |
| Eighteenth | Mr Mark Glatman, Mr Keir McGuiness, Mr David Taylor and Miss Stephanie Miles (as trustees for The Mark Glatman Accumulation and Maintenance Trust) | £50,000.00 | 22/08/2007 |
| Nineteenth | BWSIPP Trustees LTD (as trustees for BWSIPP Mark Glatman - 0761) | £50,000.00 | 22/08/2007 |

# Exhibit 43

## *1396 Arbuthnott v Fagan
## Deeny v Gooda Walker Ltd (in liquidation)

Positive/Neutral Judicial Consideration

**Court**
Court of Appeal (Civil Division)

**Judgment Date**
30 July 1993

**Report Citation**
[1995] C.L.C. 1396

Court of Appeal (Civil Division)

Sir Thomas Bingham MR , Steyn and Hoffmann L JJ

Judgment delivered 30 July 1993

*Lloyd's insurance market—Underwriting conducted on behalf of names by underwriting agents through syndicates—Names and underwriting agents parties to Lloyd's standard agency agreements—Construction of 'pay now, sue later' clause—Whether names precluded from bringing action for breach of contract or negligence in conduct of underwriting against managing and members' agents before paying cash calls in respect of underwriting.*

This was an appeal against a decision of Saville J on the construction of clauses in Lloyd's standard agency agreements. The issue was whether the names were precluded by the 'pay now, sue later' clauses from bringing actions for negligent underwriting against the members' and managing agents before paying the sums demanded.

As a result of severe losses the plaintiff Lloyd's names brought actions against their members' agents and managing agents for breach of contract and breach of duty in the conduct of underwriting for certain syndicates. The contracts in question were Lloyd's standard agency agreements. The form of agreement was changed with effect from 1990, but in respect of the clauses in issue there was no material difference. A preliminary issue as to the construction of the 'pay now, sue later' clauses was determined by the Commercial Court in favour of the names. Saville J held that the clauses precluded the names from making any legal challenge to the agents' assessment of the names' liabilities, expenses and outgoings of the underwriting business until they had paid the cash requirements made upon them, but their claims arising from negligent underwriting were not or need not be related to cash calls made against them. The underwriting agents appealed.

*Held* , dismissing the appeal:

1.  The purpose of the 'pay now, sue later' clause was to ensure that the settlement of claims was not deferred by litigation between the names and the members' and managing agents. The subclause in issue was designed to preclude a name from challenging the cash demand in the courts before it had been paid. It was not intended to prevent a name from bringing proceedings for breach of contract or negligence in respect of the underwriting for the relevant year of account.

Per curiam (Sir Thomas Bingham MR) Courts will never construe words in a vacuum. They will wish to be informed of the context, the background, the factual matrix or the mischief. But an initial judgment of what an instrument was intended to

achieve should not be permitted to override the clear language of the instrument since what an author says is usually the surest guide to what he means. Construction is a composite exercise, neither uncompromisingly literal nor unswervingly purposive: the instrument must speak for itself, but it must do so in situ and not be transported to the laboratory for microscopic analysis.

**The following cases were referred to in the judgments:**

*Attorney-General v Prince Ernest Augustus of Hanover [1957] AC 436* .
*Boobyer v Holman & Co Ltd [1993] 1 Ll Rep 96* .
*Reardon Smith Line Ltd v Yngvar Hansen-Tangen [1976] 1 WLR 989* .

**Representation**

Bernard Eder QC and David Foxton (instructed by Elborne Mitchell ) for the appellant Fagan.
Bernard Eder QC and Simon Bryan (instructed by Elborne Mitchell ) for the appellant Gooda Walker Ltd. *1397*
Anthony Boswood QC and Stephen Moriarty (instructed by Richards Butler ) for the respondent Arbuthnott.
Jonathan Mance QC and David Lord (instructed by Wilde Sapte ) for the respondent Deeny.

**JUDGMENT**

Bingham MR:

This appeal, against a decision of Saville J given on 13 May 1993, raises an issue of construction. All the plaintiffs are Lloyd's names. The relevant defendants are these names' members' agents and also (in the Gooda Walker action) their managing agents. The issue of construction arises from the agreements between the names and these agents.

In the Feltrim action the names sued their members' agents claiming damages for breach of contract in the conduct of underwriting for four syndicates. The claim related to three underwriting years 987–89 inclusive). During that period the names and the members' agents were parties to a standard agency agreement in the form mandatorily prescribed by Lloyd's Agency Agreements Byelaw No. 1 of 1985. For purposes of this appeal the crucial provision of that agreement is cl. 9. After 1989 that form of agreement was superseded.

In the Gooda Walker action the names sued their members' agents for damages for breach of contract and tort in the conduct of underwriting for four (different) syndicates during the years 1988 and 1989. The same form of agreement as in the Feltrim action governed relations between the names and their members' agents during that period and the construction of cl. 9 is accordingly in issue in this action also. But a further claim has been made by these names relating to the 1990 underwriting year. It has been made against the names' members' agents and also their managing agents. Against the former it was made under the standard members' agents' agreement prescribed by Lloyd's Agency Agreements Byelaw No. 8 of 1988 and against the latter under the standard managing agents' agreement prescribed by the same byelaw. These forms of agreement came into force for the year 1990 onwards. In this action an issue also therefore arises on the construction of cl. 7.1 of the 1990 form of standard managing agents' agreement.

Although these factual distinctions exist between the Feltrim and Gooda Walker actions, and although cl. 7.1 of the later agreement does not exactly reproduce the language of cl. 9 of the earlier agreement, it is only very faintly suggested that the two clauses are, for any purpose relevant to this appeal, to be differently construed and I do not think there is any ground for doing so. It is therefore convenient to confine attention to one of the clauses and I turn to cl. 9 as the clause under which most of the pleaded claims have been made.

© 2025 Thomson Reuters.

Clause 9 is headed 'Undertaking by the name to pay all liabilities and outgoings' and its first three subclauses read as follows:

'(a)  The name shall keep the agent at all times in funds available for the payment of the liabilities, expenses and outgoings of the underwriting business. All such funds and any other moneys for the time being held on the name's behalf may in the absolute discretion of the agent be paid or applied in or towards the discharge of such liabilities, expenses and outgoings provided that in the case of expenses and outgoings incidental to the conduct of the underwriting business they are proper and reasonable in incidence and amount. The agent shall have an unfettered discretion in determining the funds from time to time required from the name for the purpose of making any such payments as aforesaid, and the agent shall be the sole judge both as to the existence and as to the amount (or the estimated amount) of any such liability, expense or outgoing. The agent shall be under no liability to make any such payments otherwise than out of assets for the time being held for  *1398 the account of the name; but should the agent nevertheless do so, the name shall reimburse the agent in respect thereof.

(b)  The name shall pay any funds required by the agent under subcl. (a) of this clause free from and clear of any set-off, counterclaim or other deduction on any account whatsoever and promptly within such period for payment as the agent may in its discretion specify in its' requirement; and in respect of such payment time shall be of the essence. The name hereby agrees that no such setoff, counterclaim or deduction shall be a defence to any proceedings instituted by the agent to enforce a requirement, and the name waives stay of execution and consents to the immediate enforcement of any judgment obtained in such proceedings.

(c)  It shall be a condition precedent to the issue of proceedings or the making of any reference to arbitration by the name in respect of any matter arising out of or in any way connected with either the making of such requirement by the agent or the subject matter thereof, or the preparation or audit of the accounts referred to in cl. 6, that the name shall have duly complied with any such requirement made or purported to be made by the agent, and no cause of action in respect of any such matter shall arise or accrue in favour of the name until such requirement shall have in all respects been duly complied with. At no time shall the name seek injunctive or any other relief for the purpose (or which has the result) of preventing the agent from making or enforcing any such requirement or of preventing the agent or any sub-agent from applying any money or assets for the time being held by them respectively on behalf of the name in or towards the discharge of the liabilities, expenses and outgoings of the underwriting business.'

'The underwriting business' referred to in subcl. (a) is denned in cl. 2(a) of the agreement to mean:

'underwriting at Lloyd's for the account of the name such classes and descriptions of insurance business, other than those prohibited by the council, as may be transacted by the syndicate.'

'The syndicate', by virtue of cl. 1(a), means the syndicate or syndicates of which the name is a member.

Subclauses (a) and (b) are not directly in issue in this appeal, but they provide the essential prelude to subcl. (c), which is. Subclause (a) contains two important stipulations: that the name must keep the agent in funds to enable the agent to meet the

liabilities, expenses and outgoings of the underwriting business as denned; and that it is for the agent alone (subject no doubt to a duty of honesty: *Boobyer v Holman & Co Ltd [1993] 1 Ll Rep 96* ) to decide what sum is heeded for those purposes. Subclause (b) obliges the name promptly to pay any sum required by the agent in full and without deduction of any kind. Should the agent issue proceedings to enforce any requirement, the name agrees to forego any right to plead any set-off, counterclaim or deduction or to claim a stay of execution or to resist the enforcement of any judgment.


So one comes to subcl. (c). The agents draw attention to the names' claims in the actions and suggest that the loss and damage claimed relate directly to and are founded upon the cash requirements made upon the names for purposes of the underwriting business. They accordingly submit:

(1)  that a name who has not met a requirement made for a particular syndicate for a particular year of account has no cause of action and cannot bring proceedings for breach of contract or negligence in respect of that syndicate and that year of account; and

(2)  that in any event a name has no cause of action and is precluded from bringing proceedings in respect of claims for breach of contract or duty when the damages  *\*1399*  which he seeks to claim relate to a requirement made upon him for underwriting liabilities or expenses which he has not met. It appears that before the judge the agents put their case more broadly, but I have quoted the submission as put in the skeleton argument provided to this court.


The names contend that subcl. (c) has an altogether more limited purpose: to preclude the name from making any legal challenge to the making of a requirement or to its substance (i.e. the agent's assessment of the liabilities, expenses and outgoings of the underwriting business) until he has paid the sum called for. But while accepting that such a challenge is precluded the names deny that their claims arising from negligent underwriting are, or need be, related to cash calls made against them.


Saville J preferred the names' construction, basing himself both on the language of the subclause and on its wider commercial purpose.


As always on an issue of this kind, the parties have, very properly, analysed the precise language of cl. 9(c) in great detail in order to identify every possible pointer to the true construction of the subclause. I do not in any way disparage this exercise, but nor do I think it necessary to rehearse the detailed arguments advanced. For in my view the construction of the subclause is plain and is that for which the names contend.


Access to funds with which to settle valid claims by policyholders is the life-blood of any insurance business. Under the Lloyd's regime the members' or managing agent has a wide discretion to determine the sum necessary to fund the conduct of the underwriting business, including the payment of claims, which he may demand from the name and the name must pay at once. The settlement of claims is not to be deferred while names and members or managing agents squabble among themselves. So the name agrees, if sued, to forgo all defences and all procedural devices which may defeat or delay enforcement of the claim for the sum demanded. So far, as already stated, the draftsman's intention is clear and uncontroversial. But the draftsman was plainly alive, as any experienced, lawyer would be, to another risk: that the name might himself initiate legal proceedings to challenge the demand, whether on procedural or substantial grounds, or attack the audit on which it was based, or might have recourse to the courts to seek to prevent such demand being made in the first place. These possible escape routes also the draftsman was, as I infer, plainly determined to block. Clause 9(c) was his way of doing so.


Mr Eder, for the members and managing agents, argued that the names' construction failed to give effect to the full terms of the subclause, part of which would on that basis be superfluous. He may have been right, but I do not find the point persuasive even if correct. In drafting a clause of this kind a draftsman's primary concern is not to avoid repetition (he may even think it

desirable to make explicit what would anyway be implicit) but at all costs to avoid leaving loopholes which an unscrupulous party might exploit, even if this does lead to repetition.

Much more persuasive, to my mind, is the care taken by the draftsman to define the rights of suit which the name is precluded from making until he has paid. These are 'in respect of any matter' arising out of or in any way connected with either the making of such requirement by the agent or the subject matter thereof, and 'the preparation or audit of the accounts', and 'in respect of any such matter' and 'preventing the making or enforcing any such requirement'. In other words, the name is precluded from exercising litigious rights relating to the agent's requirement (whether as to procedure or substance) and its accounting basis. Had the intention been to restrict the rights of the names in the sweeping manner contended for by the agents much broader and less specific language would have been appropriate and would, I feel sure, have been used.

As it is, the scheme of the clause seems to me to be clear and sensible. The duty of the name to pay sums required by the agent without prevarication or deduction or delay is stated clearly and unequivocally. That reflects the overriding need, acknowledged on all *1400 sides, to ensure that funds are available for the prompt settlement of the claims of those who have insured or reinsured at Lloyd's. But that need does not require that names should forego all rights to complain of negligent underwriting while there are still calls outstanding and unpaid. There is no necessary connection between foregoing rights to challenge requirements until payment has been made and foregoing rights to complain of negligent underwriting not involving a challenge (on grounds of procedure or substance) to the requirement, and far from seeking to link them the text of the subclause is on my reading of it clear in its intention to treat them separately by directing its prohibition to the former situation and not the latter. I am fortified in my preference for the names' construction by the recognition that the agents would, as I think, deprive the names of valuable rights without doing so clearly or for any obvious reason, would in certain situations work severe hardship to the names without corresponding benefit to the market and would give rise to offensive anomalies.

I would accordingly echo the observation of the judge:

> 'In my judgment, bearing in mind the purpose of the "pay now, sue later" provisions and the words the parties have chosen to use, neither of the constructions suggested by Mr Eder is correct.'

I agree, on the somewhat different formulation advanced to this court, both as to cl. 9(c) and cl. 7.1(e). I would accordingly dismiss this appeal and affirm the judge's answers to the questions put to him.

Courts will never construe words in a vacuum. To a greater or lesser extent, depending on the subject matter, they will wish to be informed of what may variously be described as the context, the background, the factual matrix or the mischief. To seek to construe any instrument in ignorance or disregard of the circumstances which gave rise to it or the situation in which it is expected to take effect is in my view pedantic, sterile and productive of error. But that is not to say that an initial judgment of what an instrument was or should reasonably have been intended to achieve should be permitted to override the clear language of the instrument, since what an author says is usually the surest guide to what he means. To my mind construction is a composite exercise, neither uncompromisingly literal nor unswervingly purposive: the instrument must speak for itself, but it must do so in situ and not be transported to the laboratory for microscopic analysis.

Steyn LJ:

I have had the advantage of reading the judgments of Bingham MR and Hoffmann LJ and I agree with their reasons for concluding that the appeals before us ought to be dismissed. In view, however, of the great importance of the matter for the Lloyd's insurance market, and for those who are involved in it, I will briefly explain why I entertain no doubt that the construction of the 'pay now, sue later' provision put forward by the agents in the Feltrim and Gooda Walker actions is demonstrably wrong.

A study of the two sets of points of claim show, and the agents concede, that both actions are based on the premise that the agents acted within their authority and validly committed the names to insurance liabilities. And the fact that the carrying on of the underwriting business resulted in expenses and outgoings is common ground. The validity of the cash calls made under cl. 9 is not challenged directly or indirectly by the names. The case pleaded in the points of claim are confined to assertions that in breach of contract or in breach of the common law duty of care the agents negligently committed the names to imprudent insurance liabilities, or, alternatively negligently failed to protect the names by appropriate reinsurances when it would have been prudent to do so. In his careful and incisive speech Mr Eder QC emphasised that the fact of cash calls, and the payments made by names pursuant to the cash calls, must necessarily be part of the evidential material which will be placed before the court in aid of the quantification of  *1401  the names losses. That may be right. But the very deployment of such evidence by the names will presuppose the acceptance by the names of validity of the cash calls.

Against this characterisation of the proceedings, I turn first to the question whether cl. 9 of the standard agency agreement which is scheduled to the Agency Agreements Byelaw No. 1 of 1985, 11 March 1985, is apt to preclude such proceedings until the names have paid the relevant cash calls. The critical provision is cl. 9(c). It adopts a twofold technique: it stipulates for a condition precedent to certain proceedings, and provides that no cause of action 'in respect of any such matter shall arise', until the relevant cash call has been paid. It creates a contractual prohibition against the taking of certain proceedings by the name against the agent. The question is: what proceedings? As Bingham MR has pointed out the answer to that question is to be found in the meaning of the following words in cl. 9(c):

> 'in respect of any matter arising out of or in any way connected with either the making of such requirement by the agent or the subject matter thereof, or the preparation or audit of the accounts referred in cl. 6…'

The question is whether these words properly construed cover the proceedings as I have described them.

There are two rival interpretations before the court. The interpretation advanced on behalf of the plaintiff names, which was accepted by Seville J; treats cl. 9(c) as creating a prohibition against proceedings challenging the validity of a cash call until the cash call has been paid. The interpretation put forward on behalf of the agents treats cl. 9 (c) as prohibiting all proceedings relating a name's membership of a particular syndicate for a particular year of account until the name has paid all cash calls in respect of that syndicate for that year of account.

Mr Eder emphasised the width of the words 'in respect of any matter arising out of or in any way connected with'. I was unimpressed with this semantic analysis. These words are merely descriptive of the connection between the proceedings and 'the making of such requirement by the agent or the subject matter thereof', the latter being the words upon which Mr Eder relies. The 'making of such requirement' plainly refers to the issue and despatch of a cash call. It cannot assist the agents' argument. That leaves the words 'the subject matter thereof'. What does 'the subject matter of the requirement' mean? On one view it might mean the actual details of the cash call. The judge concluded that it means the agents' assessment of liabilities, expenses and outgoings which led to the cash call. As a matter of first impression and common sense that is how I would also interpret cl. 9(c) read in the context of cl. 9 as a whole. And the detailed textual analysis undertaken by Mr Eder does

not suggest to me that the agents' extensive interpretation is to be preferred. I am, however, confident that even if cl. 9(c) is capable as a matter of language of accommodating the agents' interpretation it must nevertheless be rejected. In my view the context excludes it as a feasible interpretation.

I regard the purpose of cl. 9(c) as a matter of prime importance. It was common ground at first instance, and again before us, that the only purpose of the provision is to protect policyholders. The objective is that valid claims of policyholders should be paid promptly. It is conceded on behalf of the agents that it was not even a subsidiary purpose of cl. 9(c) to confer a protection on agents for breaches committed by them in and about the underwriting of insurance business.

I readily accept Mr Eder's submission that the starting point of the process of interpretation must be the language of the contract. But Mr Eder went further and said that, if the meaning of the words is clear, as he submitted it is, the purpose of the contractual provisions cannot be allowed to influence the court's interpretation. That involves approaching the process of interpretation in the fashion of a black-letter man. The argument assumes that interpretation is a purely linguistic or semantic process until *1402* an ambiguity is revealed. That is wrong. Dictionaries never solve concrete problems of construction. The meaning of words cannot be ascertained divorced from their context. And part of the contextual scene is the purpose of the provision. In the field of statutory interpretation the speeches of the *House of Lords in Attorney-General v Prince Ernest Augustus of Hanover [1957] AC 436* showed that the purpose of a statute, or part of a statute, is something to be taken into account in ascertaining the ordinary meaning of words in the statute: see Viscount Simonds' speech, at p. 461, and Lord Somervill of Harrow's speech, at p. 473. It is true that such a purpose may also be called in aid at a later stage in the process of interpretation if the language of the statute is ambiguous but it is important to bear in mind that the purpose of the statute is a permissible aid at all stages in the process of interpretation. In this respect a similar approach is applicable to the interpretation of a contractual text. That is why in *Rear don Smith Line Ltd v Yngvar Hansen-Tangen [1976] 1 WLR 989* Lord Wilberforce, speaking for the majority of their Lordships, made plain that in construing a commercial contract it is always right that the court should take into account the purpose of a contract and that presupposes an appreciation of the contextual scene of the contract.

*Corbin on Contracts*, 1960, vol. 3, s. 545, explains the role that the ascertainment of the purpose of a contract should play in the process of interpretation:

> 'In order to determine purposes we are obliged to interpret their words in the document of agreement and their relevant words and acts extrinsic to that document. It may seem foolish, therefore, to say that the words of a contract should be interpreted in the light of the purposes that the parties meant to achieve, when we can turn on that light only by process of interpretation. Nevertheless, it is believed that such an admonition serves a useful purpose. As the evidence comes in and as interpretation is in process, the court may soon form a tentative conviction as to the principal purpose or purposes of the parties. As long as that conviction holds (and the court must be ready at all times to be moved by new evidence), further interpretation of the words of contract should be such as to attain that purpose, if reasonably possible.'

In the same section of this seminal work the author added that if the court is convinced that it knows the purpose of the contract, however vaguely expressed and poorly analysed, it should be loath to adopt any interpretation of the language that would produce a different result. In my judgment these observations accurately state the approach to be adopted. And in the present case the purpose of cl. 9(c) is not in doubt.

Given the acknowledged purpose of cl. 9(c) I take the view that it only created a prohibition on legal proceedings calling in question a cash call until that cash call was paid. That is a meaningful interpretation since in the absence of a provision

such as cl. 9(c) a name could challenge a cash call on the ground that it was not made in good faith or upon reasonable grounds. See *Boobyer v Holman & Co [1993] 1 Ll Rep 96* , at p. 97. And the names' interpretation ensures that the underlying purpose of cl. 9(c) is fully achieved After all cl. 9(c) effectively precludes a challenge to a cash call until it is paid. Cash calls directed to names to pay for liabilities, expenses and outgoings of the underwriting business will therefore be readily collectible by summary judgment.

The implications of the agents' argument that cl. 9(c) precludes the names from suing the agents for negligence so long as a cash call in respect of the syndicate and year of account remains outstanding generates immediate scepticism. This is an invitation to adopt an interpretation which is at variance with the purpose of cl. 9(c). This interpretation achieves something that is commercially unnecessary and different from the acknowledged purpose of cl. 9(c). It amounts to saying that cl. 9(c) has the coincidental or collateral effect that the agent is protected against actions in negligence while a cash call remains unpaid. Furthermore, as Mr Boswood QC said, the agent's *\*1403* interpretation leads to the extraordinary result that if the agent ruins a name by negligent underwriting, so that the name cannot pay the cash call, the contract breaker or tortfeasor goes scot-free. And that result is inimical to the interests of policyholders and the Lloyd's market since the claim against the agent may be an asset available to meet the policyholders' claims. That is so uncommercial and unreasonable a result that words of the greatest precision would be required to achieve it. Clause 9(c) plainly comes nowhere near this.

I would therefore dismiss the appeal in the Feltrim action and in the Gooda Walker action so far as it involves the interpretation of cl. 9(c).

In the Gooda Walker action a similar issue arises in respect of the 1990 underwriting year under cl. 7.1(e) of the standard managing agent's agreement, which is in a form scheduled to the Agency Agreements Byelaw No. 8 of 1988, 7 December 1988. While there are differences between the wording of cl. 9(c), which I have considered, and cl. 7.1(e), the differences are plainly immaterial. For the reasons already given I would also dismiss the appeal in the Gooda Walker action in respect of the 1990 underwriting year.

Hoffmann LJ:

It does not seem to me sensible, or indeed possible, to try to construe cl. 9(c) without regard to the purpose of the clause a whole. This is particularly true When one is trying to construe so vague an expression as 'connected with'. Connections may exist in an infinite variety of forms and degrees. Only the context can indicate which of these connections is meant. The need to examine the context is not obviated by the use of intensifiers like 'in any way'. I accept Mr Eder's submission that such words indicate an intention that the concept of connection should be broadly construed. But they cannot be read literally, or else they will include connections such as Fluellen found between Harry Monmouth and Alexander of Macedon:

> 'There is a river in Macedon, and there is also moreover a river at Monmouth … and there is salmons in both.'

It is therefore still necessary to limit the connections to those which are relevant for the purpose in hand.

© 2025 Thomson Reuters.

The purpose of cl. 9 is clear and uncontroversial. It is designed to insulate the liability of the name to provide whatever funds are necessary for the underwriting business from the state of accounts between himself and the agent. Such insulation is necessary for the purposes of enabling the Lloyd's market to meet its liabilities. Otherwise the flow of funds needed to pay policyholders' claims may be clogged by disputes within Lloyd's between names and their agents, to the detriment of the market as a whole.

Clause 9 achieves this result by making a cash call an autonomous source of liability, insulated from the underlying relationship of principal and agent in much the same way as a documentary credit is insulated from the underlying commercial transaction. Clause 9(a) requires the name to pay whatever sum the agent in his discretion decides is needed to discharge the liabilities of the underwriting business. Clause 9(b) prevents the name from raising a set-off or counterclaim by way of defence. Clause 9(c) makes compliance with a cash call a condition precedent to the issue of proceedings 'in respect of any matter arising out of or in any way connected with the making of such requirement by the agent or the subject-matter thereof'. The 'making of such requirement' means the act of making the call. Its 'subject-matter' is the contents of the demand: the amount which the name is asked to pay and any further information which it contains. What kind of connection do the words 'in any way connected with' connote? This is where assistance must be found in the purpose of the clause as a whole. In my view the relevant connection is one which makes the proceedings a challenge to the validity or enforceability of the call. This construction enables the three subclauses to constitute a coherent and rational structure: subcl. (a) empowers the agent to create the autonomous obligations; subcl. (b) prevents *1404* the name from using matters arising between him and agent as a defence and subcl. (c) prevents him from actively impugning the validity or enforceability of the obligations.

On this view, the proceedings brought by the names do not fall within (c). They are not calculated to challenge, invalidate or block the enforcement of the cash calls. The names acknowledge their liability in respect of those which remain unpaid. In some cases at least, the reason for non-payment is that they have no more money. But they wish to pursue claims for negligence by the agents in the conduct of the underwriting business. In my judgment these claims are not for the purpose of cl. 9 'connected with' the cash calls. The whole purpose of the clause in making the cash call an autonomous obligation is to ensure that there is no such connection.

It seems to me legitimate to test the plausibility of a given construction by examining what the consequences would be. The construction for which the agents contend means that if they are going to be negligent, they should rather ruin their names entirely than leave them with enough resources to pay their calls. In the latter case they will be exposed to an action for negligence whereas in the former case they will be immune. Mr Eder said that his startling consequence had to be accepted in the interests of maintaining discipline at Lloyd's and inducing the names to pay their calls. But his argument cannot apply to those who have no money. And in cases of contumacious refusal to pay, it is hard to see why denial of the right to sue for negligence will be more effective than the undisputed right of Lloyd's to obtain judgment for the unpaid calls.

I think that the construction adopted by the judge gives full effect to the policy of insulating the call liability from the other rights and duties of name and agent inter se. I accept that it may also mean, if one analyses the various phrases in detail, that parts of the clause overlap with the effect of other parts and are redundant. In a document like this, however, little weight should be given to an argument based on redundancy. It is a common consequence of a determination to make sure that one has obliterated the conceptual target. The draftsman wanted to leave no loophole for counter-attack by the recipient or intended recipient of a call. It is no justification for construing the language so as to apply to a situation which, on a fair reading of the general purpose of the clause was not within the target area.

I would therefore dismiss the appeal.

*(Appeal dismissed)* *1405*

# **Exhibit 44**

of the recourse action for want of prosecution should be dismissed, subject to a term that the appellants do within 14 days serve a statement of claim in the terms of their draft statement of claim referred to earlier.

The respondents must pay the appellants' costs in the Court of Appeal and before their Lordships' Board. However, since the point on which the appellants have now succeeded was not taken before Mr. Registrar Barnett or Mr. Justice Mayo, the orders as to costs made by them should stand.

---

# COURT OF APPEAL

Jan. 12, 13 and 14, 1987

---

## EURICO S.p.A.
v.
## PHILIPP BROTHERS

## (THE "EPAPHUS")

Before Sir John Donaldson, M.R.
Lord Justice Stephen Brown and
Lord Justice Croom-Johnson

**Charter-party (Voyage) — Demurrage — Delay caused because vessel unable to enter nominated port and because cargo had to be fumigated — Whether vessel ready to discharge — Whether sellers entitled to claim demurrage.**

On Mar. 11, 1981, Ore Chartering Ltd. chartered the vessel *Epaphus* from her owners, to proceed to one port West Coast India and there load a full and complete cargo of between 9000 and 9200 tonnes of bagged rice and carry it to one port in charterers' option out of Bandar Abbas, Dubai, one port East Coast Africa. The charter provided inter alia by cl. 6 that:

Time for discharging (to count) from 8 a.m. on next working day after ship is reported and in every respect ready and in free pratique, and written notice tendered whether in berth or not.

Pursuant to the charter 9200 tonnes of bagged rice were shipped at Kandla and bills of lading were issued dated between Mar. 31 and Apr. 7, 1981, providing for carriage to Mombasa. These bills came into the possession of the sellers who were an associate company of the charterers.

The original sale of the cargo fell through and on May 6, 1981, the buyers agreed to buy and the sellers agreed to sell 9200 tonnes of Indian white rice to be shipped at Kandla for—

. . . one main Italian port to be declared on vessel passing through Suez . . . per vessel . . . *Epaphus*.

The sale contract further provided that—

. . . Time to count and demurrage/despatch as per Charter Party . . .

Discharge by the terms of the sale contract was to be the responsibility of the buyers and they were to pay demurrage to the sellers if the laytime was exceeded.

By agreement between the buyers and sellers and with the concurrence of the shipowners the destination in the bills of lading was changed to "North Italian port" and the vessel set course for Suez.

On May 15 the vessel passed Suez and the buyers declared their intention to discharge the vessel

"Trieste/Ravenna range" and on May 19 they declared Ravenna as the discharge port.

The vessel was unable to enter Ravenna since her draft exceeded the allowable maximum and it was arranged that the vessel should go to Ancona.

She arrived there and berthed at 13 40 hours on May 22 having presented a notice of readiness at 07 37 hours that day. About 688,150 tonnes of cargo was discharged. The vessel returned to Ravenna where she arrived on May 27, 1981, awaiting a berth. A further notice of readiness was presented on May 28, 1981, at 09 40 hours and the vessel finally berthed on May 30, 1981.

It was then found on opening the hatches that the cargo was slightly infested with live insects and the cargo had to be fumigated.

The vessel commenced discharge on Friday June 12 at 08 00 hours and completed discharge on Thursday, July 16 at 10 00 hours.

The time allowed for discharging was only five days, 21 hours and 26 minutes and the sellers claimed demurrage for over 39 days amounting to $181,808.61. The buyers argued that only $81, 857.63 was due and they paid this amount on Apr. 14, 1982.

The sellers claimed the balance and the dispute was referred to arbitration. The Council of Appeal of the London Rice Brokers Association and the arbitrators found in favour of the sellers and the buyers appealed.

————*Held*, by Q.B. (Com. Ct.) (STAUGHTON, J.), that (1) if the vessel had not been named in the sale contract the sellers would have been bound to tender bills of lading of a ship which could enter any main Italian port and which was contractually bound to do so on the buyers' nomination; the fact that the vessel was named ought not to make any difference since the sellers would be likely to know the characteristics of the vessel and what powers they had to determine its destination under the contract of carriage at the time when the sale contract was made; the word "main" was designed to limit the buyers' choice and the sellers' obligation and the sellers undertook that the vessel was capable of entering all main Italian ports;

(2) time did not start to count when the vessel first arrived at the anchorage near Ravenna; she was not then ready to discharge and there was no reason why the buyers should rely on that;

(3) on May 28 the vessel was fit and ready to discharge her cargo; the problem was the presence of insects in the cargo and since there was no finding that the insects were the fault of the vessel, the vessel was ready to discharge and time started to count at 8 00 a.m. on May 29 following the notice of readiness given in Ravenna on May 28; the submission that the risk of deterioration in the condition of the rice was by the sale contract, if not by the charter, placed on the buyers would be rejected;

(4) time having started immediately ceased to count until after June 11, 1981, when a disinfestation certificate was received;

(5) the buyers' claim that the stoppage of work by shore workers because rats were found in the cargo was an interruption of laytime, lacked the necessary finding in the award to support their contention and they had not applied for an order for further reasons or for remission on any other substantive ground.

The award would be varied in accordance with the judgment.

On appeal by the sellers and cross-appeal by the buyers:

————*Held*, by C. A. (Sir JOHN DONALDSON, M.R., STEPHEN BROWN and CROOM-JOHNSON L.JJ.), that (1) the infestation affected only the readiness of the cargo to be discharged not the readiness of the vessel to discharge that cargo and the learned Judge was plainly right in holding that any infestation of the cargo did not affect the readiness of the vessel as a vessel to do her part in the discharge of the cargo; the buyers' contention that the vessel was not ready to discharge and could not give an effective notice of readiness before June 11 would be rejected (*see* p. 220, cols.1 and 2);

(2) while the cost of the fumigation might be for the buyers' account, the running of time was interrupted in circumstances in which cl. 5 of the charter applied unless the vessel was already on demurrage (*see* p. 220, col.2; p. 221, col.2; p. 222, col.2);

(3) the learned Judge took an unduly strict view in holding that the buyers failed on the issue of rats due to the absence of a finding of fact as to the stoppage; the learned Judge's order ought to be varied to take account of time lost due to rats, whether real or imaginary and whether alive or dead provided always that the vessel was not already on demurrage (*see* p. 221, cols.1 and 2; p. 222, col.2);

(4) (CROOM-JOHNSON, L.J., *dissenting*) the parties to any contract were free to agree upon any terms which they considered appropriate including a term requiring one of the parties to do the impossible; if this contract had provided in terms that the cargo would be delivered "at one Italian port *however small*" or "at *any* one Italian port", it would be impossible to construe this as a contract only to deliver at ports of sufficient size or draught limitation to permit the entry of the named vessel; the parties had expressly chosen to limit the buyers' choice in a particular way i.e. to *main* Italian ports; this could not mean *some* main ports and the plain implication was that the parties were satisfied that the vessel could enter any main Italian port; it was impossible to construe "main Italian port" as "all main Italian ports except Ravenna" or to imply a term that the buyers could not choose Ravenna or any main port with a draught limitation of less than the vessel's draught on arrival; the learned Judge was right in holding that by the terms of the contract the parties undertook that the ship was capable of entering all main Italian ports; the appeal would be dismissed (*see* p. 218, col.2; p. 219, cols.1 and 2; p. 220, col.1; p. 221, cols.1 and 2);

————*Aktieselskabet Olivebank v. Dansk Svovl-*

*syre Fabrik*, [1919] 2 K.B. 162 and *Reardon Smith Line Ltd. v. Ministry of Agriculture Fisheries and Food*, [1961] 1 Lloyd's Rep. 385, considered.

The following cases were referred to in the judgments:

Aktieselskabet Olivebank v. Dansk Svovlsyre Fabrik, [1919] 2 K.B. 162;

*Moorcock*, The (1889) 14 P.D. 64;

Reardon Smith Line Ltd. v. Ministry of Agriculture Fisheries and Food (The "Vancouver Strikes" case), (C.A) [1961] 1 Lloyd's Rep. 385; [1962] 1 Q.B. 42.

This was an appeal by the sellers, Philipp Brothers and a cross-appeal by the buyers, Eurico S.p.A., from the decision of Mr. Justice Staughton ([1986] 2 Lloyd's Rep. 387) in which he held that the sellers' claim for demurrage failed, that the disinfestation of the cargo did not affect the readiness of the vessel and that there would be no deduction for rats on the ground that the buyers lacked the necessary finding of fact and had not sought remission.

Mr. Nicholas Merriman (instructed by Messrs. Middleton Potts) for the buyers; Mr. David Grace, Q.C. (instructed by Messrs. Ingledew Brown Bennison & Garrett) for the sellers.

The further facts are stated in the judgment of Sir John Donaldson, M.R.,

Judgment was reserved.

Friday May 15, 1987

## JUDGMENT

**Sir JOHN DONALDSON, M.R.:** Vessels seeking to enter the port of Ravenna in Italy must not draw more that 28 ft. In May, 1981, *Epaphus* carrying a cargo of 9200 tonnes of rice sought to do so, but alas she drew 28 ft. 7 in. on an even keel and the harbour authorities refused permission to enter. This fact, the consequent need to divert to, and lighten the vessel at, Ancona, the presence of an admixture of insects in the rice, which was detected when the vessel sought to discharge the balance of the cargo at Ravenna, and the presence of rats alleged to be perceived by the shore workers on the same occasion, all combined to produce a claim by the sellers of the rice against the buyers for demurrage which was duly referred

to arbitration under the rules of the London Rice Brokers' Association.

The arbitrators appointed by the parties disagreed and the umpire awarded the sellers U.S. $99,950.98, together with interest and costs. On appeal the Council of the Association affirmed the umpire's award. On a further appeal to the High Court under the Arbitration Act, 1979, Mr. Justice Staughton found in favour of the buyers and made a special order as to costs. The sellers now appeal, with the leave and certificate of the learned Judge, seeking to restore the award of the Council. The learned Judge's judgment is reported at [1986] 2 Lloyd's Rep. 387 and I can therefore deal with the matter more briefly than would otherwise be the case.

*The lawfulness of the order to discharge at Ravenna*

This is the main point in the appeal, the answer to which indirectly determines when time began to count for purposes of calculating demurrage.

The buyers bought the rice cargo afloat on the terms of the London Rice Brokers' Association Rice Contract, c. & f., shipping weight, which had been completed to provide that the cargo would be delivered to the buyers overside at—

. . . one main Italian port to be declared on vessel passing Suez.

In fact the declaration was made late, but nothing turns on that. When given, it was for Ravenna, which is a large port through which the buyers, and no doubt others, habitually imported rice cargoes.

I have no doubt that the buyers, the sellers and the shipowners all either knew or could without much difficulty have ascertained that (a) the draught limitation on Ravenna was 28 ft., (b) the vessel would on arrival at Ravenna draw more than 28 ft, albeit not much more, (c) there was no way in which this draught could be reduced without lightening the vessel and (d) this could not be effected without putting in to Ancona. In ordering the vessel to Ravenna the buyers were thus giving an order with which the sellers could never have complied.

Mr. David Grace, Q.C., for the sellers, submits that in these circumstances Ravenna was not a permissible nomination because, even if Ravenna could in the abstract be regarded as a "main Italian port", it was not a port at all for this particular vessel carrying this particular cargo and the contract contemplated no other

vessel or cargo. Alternatively he submitted that it was an implied term of the contract that, in exercising their option to nominate the discharging port, the buyers would not order the vessel to discharge at a port which was impossible of access. In support of this proposition, Mr. Grace referred to Scrutton on Charterparties, 19th ed., art. 68, where under the heading "To proceed to a Port as ordered", it is stated that—

> . . . if . . . the charterer will only name a port which is impossible of access, he commits a breach of contract, and the shipowner . . . can claim freight under a *quantum meruit*, and also damages for any detention of the ship . . . due to the charterer's refusal to nominate a proper port . . .

the authority for which is said to be *Aktieselskabet Olivebank v. Dansk Svovlsyre Fabrik*, [1919] 2 K.B. 162 and to *Reardon Smith Line Ltd. v. Ministry of Agriculture, Fisheries and Food* (the *Vancouver Strikes* case) [1961] 1 Lloyd's Rep 385; [1962] 1 Q.B. 42, where, at p. 419 and 110, Lord Justice Willmer said:

> At the same time it seems to me that some limitation on the charterers' freedom of choice must be implied, even in cases where the ports from which the choice can be made are specifically named in the charter-party. It was indeed conceded by counsel for the charterers, both before the Judge and in this court, that an impossible port must not be nominated. Lord Justice Bowen said, in *Tharsis Sulphur & Copper Co. v. Morel Bros. & Co . . .*

> It will not do . . . to choose a dock the entrance of which is blocked — that would be practically no exercise at all of the option.

> In *A/S Olivebank v. Dansk Svovlsyre Fabrik . . .* where a ship was chartered during the First World War to carry nitrates for discharge at a safe port in the United Kingdom or at one of several named ports in Denmark, the nomination of Aalborg at a time when, to the knowledge of the charterers, it was impossible to import nitrates into Denmark owing to a prohibition by the British Government was held, both by Mr. Justice Bailhache and the Court of Appeal, to be a mere nugatory nomination, entitling the shipowners to recover not only their freight but also damages.

> Subject, however, to an implied obligation not to nominate an utterly impossible port as in the above instances, the principle is well established that where a charterparty provides a choice of named places for loading or discharge, the charterer is free to exercise his option as he chooses, and in doing so is in no way bound to consult the convenience of the shipowners. It was so held in *Bulman & Dickinson v. Fenwick & Co.* [1894] 1 Q.B. 179, following the dictum of Lord Justice Bowen in *Tharsis Sulphur & Copper Co. v. Morel Bros. & Co.* In *Bulman v. Fenwick* it was said by Baron Pollock whose judgment was affirmed by the Court of Appeal:

> . . . It is not a question between the plaintiffs and the defendants as to what is reasonable or unreasonable, it is a question of contract between the parties.

The material part of the judgment of Lord Esher M.R. in the Court of Appeal is quoted in extenso by Mr. Justice McNair in his judgment, and I need not repeat it. It is interesting to observe that the editors of Scrutton on Charterparties, 16th ed., at p. 142 (note (h)) make the comment:

> . . . In *Bulman v. Fenwick . . .* the Court of Appeal appears to hold that the only limitation to the charterer's power to select a berth is that he must not choose one that is so blocked that the obstacle cannot be removed in a time consistent with the commercial adventure.

The decision in *Bulman v. Fenwick*, it may be remarked, was specifically approved by Lord Dunedin in *Matheos (Owners) v. Louis Dreyfus & Co.*, (1925) 21 Ll.L. Rep. 233 at p. 234.

Mr. Nicholas Merriman replied that there was no analogy between a contract for the sale of goods and a charter-party and that even under a charter-party the shipper can exercise a discharging port option without regard to the interests or convenience of the shipowner, unless the port was "utterly impossible", which connoted that it had ceased to operate as a port, and not simply that it could not be used by a particular vessel.

So far as I am aware, there is no authority which is directly decisive of this problem. It is therefore necessary to go back to first principles. My starting point is that parties to any contract are free to agree upon any terms which they consider appropriate, including a term requiring one of the parties to do the impossible, although it would be highly unusual for parties knowingly so to agree. If they do so agree and if, as is inevitable, he fails to perform, he will be liable in damages. That said, any Court will hesitate for a long time before holding that, as a matter of construction, the parties have contracted for the impossible, par-

ticularly in a commercial contract. Parties to such contracts can be expected to contemplate performance, not breach.

The tools available to a Court in this exercise of reluctance to accept that the parties have contracted to do the impossible are those of construction of the express terms used by the parties and of implying a term which qualifies, but does not contradict, the express terms. In many, and perhaps most, cases it may be debatable whether the Court is giving the words a "commercial construction" or whether it is implying a qualifying term and I cannot think that it matters. What does matter is that in its struggle to make common sense prevail, the Court cannot say that the parties agreed upon something, however sensible, when their chosen words show clearly that they agreed the exact opposite.

Let me give examples. Suppose a contract between the late Mr. Henry Ford for the sale of one of his famous Model T cars. Legend has it that he was in the habit of giving his customers a free choice as to the colour of the paintwork, provided always that they chose black. A contract to supply a car in the colour of the customer's choice, provided that he chose black, would create no problem. Black would be his only option. But a contract which in express terms gave the customer a free choice of colour simpliciter would have created serious problems for Mr. Ford. Even though the contractual matrix known to the parties was that Mr. Ford would not or could not produce cars in any colour other than black, it would have been quite impossible to construe the contract other than as giving the customer a range of options as to colour or to imply a term that he must choose black.

Coming nearer home, if this contract had provided in terms that the cargo would be delivered "at one Italian port *however small*" or "at *any* one Italian port", it would be impossible to construe this as a contract only to deliver at ports of sufficient size or draft limitation to permit the entry of the named vessel. The parties would, in effect, have listed all Italian ports and expressly agreed that the buyers could nominate any one of them. Nor could any term to this effect be implied, since it would flatly contradict the express terms of the contract that the buyers' choice embraced *any* Italian port. On the other hand, if the contract had provided simply that the cargo would be delivered to "at one Italian port" there would have been scope for considering whether the parties thereby intended in effect to list all Italian ports, how-

ever small, or only those Italian ports which were of a size or draft limitation suited to the vessel and a decision that the parties intended to refer only to the latter would have involved no contradiction of the express terms — only their construction. Still less would there have been any difficulty if the parties had adopted the almost universal practice of limiting the buyers' (or charterers') choice to a "safe" port, for a port which the vessel cannot enter is not such a port.

However, in the instant case the parties have expressly chosen to limit the buyers' choice in a particular way, namely to *main* Italian ports. This cannot mean *some* main ports and the plain implication is that the parties were satisfied, albeit wrongly and even negligently, that the vessel could enter any main Italian port. Given the small margin of error in relation to Ravenna, and there is no suggestion that there would have been a problem in relation to any other main Italian port, this is not so improbable as it would have been if the vessel has been a V.L.C.C. In these circumstances it seems to me to be quite impossible in principle to construe "main Italian port" as "all main Italian ports except Ravenna" or to imply a term that, notwithstanding the express terms of the option, the buyers could not choose Ravenna or any main port with a draft limitation of less than the vessel's draft on arrival or to hold, as did the Council of the Rice Brokers' Association, that—

> . . . it was the buyers' responsibility to ensure that the vessel's draft did not exceed that of the Port so nominated by them, and that therefore the consequences of their not complying with this duty were for their account.

This conclusion has, however, to be reconciled with the dictum of Lord Justice Willmer in the *Vancouver Strikes* case and with the decision of this Court in the *Olivebank* case (sup.) which does not appear to have been brought to the attention of the learned Judge. In the *Olivebank* the charterer had the express option of nominating a discharging port in the United Kingdom, in which case it had to be a safe port, or one of four named Danish ports, including Aalborg. When the time came to exercise the option, the charterers nominated Aalborg well knowing that entry into this port was illegal under British wartime legislation. This Court held that this was a bad nomination, implying a term that the charterers would nominate a port which would give the shipowners an opportunity of earning their freight, that freight being

earned only on arrival at the nominated destination.

The explanation of this apparent inconsistency is, I think, simple. Any implication that orders could never be given to go to Vancouver (in the *Vancouver Strikes* case) or to Aalborg (in the *Olivebank*) would have contradicted the express terms of the contract. But it would be quite otherwise if the term to be implied was that the vessel could be ordered to Vancouver/Aalborg, unless that port should have become impossible subsequently to the making of the contract. Such an implied term does not contradict the express terms of the contract, but merely modifies them by making them subject to an implied exception which may or may not take effect in the event. This distinction is not mentioned in any of these cases, but the reason is, I think, that in each case the "impossibility" in fact arose after the date of the contract. If this is right, they represent no departure from principle and are not material to the instant appeal. It would have been quite different if, subsequently to the making of this contract, a sudden storm had silted the harbour at Ravenna and reduced the maximum permissible draft, but this is not suggested.

Accordingly I would affirm the learned Judge on the main point. The remaining issues arise in part by way of appeal and in part by way of cross-appeal.

*Infestation*

The infestation of the cargo escaped the attention of the port authorities at Ancona, assuming that it then existed, which must be considered probable, but it caused a hold-up in discharge when the vessel eventually entered Ravenna after lightening. The award finds that the vessel gave notice of readiness at 09 40 hours on May 28, 1981, and that the infestation was detected when the hatches were opened after she had berthed on Saturday, May 30. On Monday, June 1, application was made for the fumigation of the cargo and a disinfestation certificate was received on Thursday, June 11. Thereupon discharge began.

On these facts Mr. Merriman argued here and below that the vessel was not ready to discharge, and could not therefore give an effective notice of readiness, before June 11. The learned Judge rejected this contention, holding that any infestation of the cargo did not affect the readiness of the vessel, as a vessel, to do her part in the discharge of the cargo, this having always been the test applied. This is plainly

right. The infestation affected only the readiness of the cargo to be discharged, not the readiness of the vessel to discharge that cargo which is quite different. The appeal on this point therefore fails.

This is not, however, the end of the infestation factor, because under the sale contract demurrage fell to be calculated in accordance with the terms of the vessel's charter and under cl. 5 of that charter time lost by reason of the intervention of the sanitary or other constituted authorities was not to count. The learned Judge held accordingly that time did not count while the vessel was waiting for the cargo to be fumigated and while fumigation was in progress. Mr. Grace submitted here, as below, that as the condition of the cargo was at the risk of the buyers, cl. 5 had no application. Like the learned Judge, I consider that while the cost of fumigation might well be for buyers' account, the running of time was indeed interrupted in circumstances in which cl. 5 applied unless the vessel was already on demurrage. Happily we do not have to determine whether the vessel was at that time on demurrage, as the parties have accepted that this can and will be done by them in the light of our decision.

Mr. Grace had a further point. He submitted that in any event not all the time between June 1 and 11 was excepted, because, as he said, some of this time was wasted in arguments as to who paid for what. Suffice it to say that this point was not argued before the learned Judge or, I think, before the arbitrators and the Council and is certainly not open in this Court.

*Rats*

This is a small point raised by the buyers and worth only some U.S. $5000. What is said is that discharging was suspended from 12 00 hours on June 16 until 14 00 hours on June 17 because the shore gangs saw, or claimed that they saw, rats in the cargo. This would stop time running on the grounds that time was lost owing to a cause beyond the control of the charterers, unless the vessel was already on demurrage (cl. 5 of the charter). The buyers' solicitor says that the fact of the loss of time is never in dispute. All that had to be decided and, in effect, all that was submitted to arbitration, at all events as a live issue, was whether the vessel was on demurrage at the relevant time. The sellers' solicitor, however, contends that the fact of the stoppage, or at least its cause, was in issue in the arbitration. The award by the Council makes no mention of this issue, but annexes a so-called statement of facts or time sheet prepared by the buyers which shows this stoppage

and attributes it to rats, while also recording that the master denied that there were any rats. This particular excitement seems to have come to an end when the cargo was visited by a vet, although whether this was in the interests of the master, the crew, the shore gang, the cargo or the rats themselves, is not revealed.

The learned Judge thought that the buyers' solicitor was probably right, but he refused to make any deduction for rats on the grounds that the buyers lacked the necessary finding of fact and had not sought to remit the award to the arbitrators for such a finding.

For my part I agree with the strictures of the learned Judge concerning the annexation to awards of unexplained pieces of paper which are in truth only evidence in the arbitration. The Council should have explained why they were annexing the time sheet and whether they found it to be accurate. Nevertheless, since his conclusion that the only real issue was whether the vessel was already on demurrage before the rat stoppage, I think that he took an unduly strict view in holding that the buyers failed on this point due to the absence of a finding of fact as to the stoppage. In my judgment the learned Judge's order should be varied to take account of time lost due to rats, whether real or imaginary and whether alive or dead, provided always that the vessel was not already on demurrage. That issue can be resolved by agreement between the parties.

Subject to rats, I would dismiss both appeal and cross-appeal.

**Lord Justice STEPHEN BROWN:** The principle issue in this appeal concerns the nomination of the port. The sellers contend that the buyers' option to nominate a "main Italian Port" should be subject to the further implied limitation that the port should be one which the vessel was able to enter. The buyers argue that the contract should be strictly construed and that there is no basis for implying any additional limitation upon their option.

I agree with Sir John Donaldson, M.R., that in the absence of authority it is necessary to approach the matter on the basis of first principles. The terms of the contract are clear and specific. The sellers specified a "main Italian Port". The Judge was right in my view to hold that Ravenna was within that category. The evidence clearly supported such a finding. He was also correct in my judgment to hold that the word "main" was intended to limited the buyers' choice. I do not consider that there is any basis for implying any further limitation. It is to be observed that as a matter of fact it was

not glaringly obvious that the vessel would be unable to enter the port. Only a matter of inches was involved. The sellers could have stipulated for a further limitation of the buyers' choice, but they did not do so. I agree with the Judge that by the terms of the contract they undertook that the ship was capable of entering all main Italian ports.

I do not consider that the analogy with charter-parties is apt or persuasive. In any event, the facts of the *Olivebank* case were very different from those in this case. There the "impossibility" was a supervening event. I agree with the views expressed by Sir John Donaldson, M.R. in his judgment.

On the main issue therefore I agree with the decision of the learned Judge.

I also agree with the judgment of Sir John Donaldson, M.R. on the subsidiary issues of infestation and "rats". I therefore agree with the order which he proposes.

**Lord Justice CROOM-JOHNSON:** It is with diffidence that I have come to a different conclusion.

The contract which requires interpretation is a contract of sale of the cargo of rice on board *Epaphus* then at sea off the coast of Africa, under a charter-party dated the Mar. 11, 1981. The contract was subject to terms contained in the charter-party. The destination was originally—

> One port in Charter's option out of Bandar Abbas, Dubai, one port East Coast Africa.

By the contract of sale this was changed to—

> . . . one main Italian port to be declared on vessel passing Suez direct . . .

Other terms of the sale contract provided:

> 5 Sellers to deliver the Rice overside and Buyers to take the Rice . . . in accordance with conditions of Charter Party . . . from ship's side, paying all expenses therefrom . . . [ — and there was a typed clause: — ] *Discharge* 125 metric tons per workable hatch per weather working day shex uu. Time to count and demurrage/despatch as per Charter Party. Copy of Charter Party to be sent to buyers as soon as possible.

Although the charter-party was never supplied to the buyers, both parties contracted on the basis that it applied.

The main Italian port which was declared was Ravenna which, as it turned out, could not receive a ship of the draught of the *Epaphus*. Ravenna was at all time an "impossible" port, although not by much. The dispute is which

party should take responsibility for the demurrage.

The buyers submit that they were entitled to nominate Ravenna, which is a "main Italian port", and if the result was that the ship could not get in, the loss is that of the sellers. The sellers contend that there should be implied in the contract an obligation not to nominate an impossible port, and rely on the dictum of Lord Justice Willmer in *Reardon Smith Line v. Ministry of Agriculture, Fishers and Food*, [1961] 1 Lloyd's Rep. 385 at p. 419; [1962] 1 Q.B. 42 at p. 110, which has been set out in full in the judgment of Sir John Donaldson, M.R.

In addition, reference has been made to *A/K Olivebank v. Dansk Svovlsyre Fabrik*, [1919] 2 K.B. 162, which has also been summarized by Sir John Donaldson, M.R. In the *Olivebank* case the same argument was advanced in the Court of Appeal by the charterers as has been advanced by the buyers in the present case. It was submitted that the charterers had an option to nominate any of the four named Danish ports (all of which were "impossible" in the circumstances), and there was no room to imply into the contract a term which altered the express wording of the charter-party. The Court of Appeal did not imply a term which contradicted or changed the wording of the charter-party. The case was decided on the basis that if the nominated port was impossible there should be implied into the contract a term that the nomination should be a good nomination such as would allow the shipowners an opportunity of earning their freight. The Court referred to the nomination having been made by the charterers with the knowledge that the cargo of nitrate could not be delivered to a Danish port because the total quantity allowed by the British government to be shipped to Denmark had already been reached, but the decision does not appear to have depended on knowledge. It was decided that the nomination was a bad nomination, and therefore the shipowners could recover their freight on a quantum meruit.

Lord Justice Bankes put his decision on the alternative basis of the principle of *The Moorcock*, (1889) 14 P.D. 64.

In the present case, there was no evidence or finding that Ravenna was the only main Italian port which could not receive *Epaphus*, but even if there had been others it would not in my view make any difference. The facts of this case are, it was said, highly unusual because a sale afloat in a named ship is rare. It produces no inconsistency in the sale contract if one implies in it a term that the nomination to a main Italian port should not be a nomination to an "impossible" port. Indeed, it gives commercial sense to the contract. But for the nomination there would have been no difficulty in performing the contract.

I am unable to distinguish the *Olivebank* case. In that case the list of ports was not altered. It was decided on the validity of the nomination. Accordingly on the main point as to who should pay the demurrage, the buyers or the sellers, I would allow the appeal.

I would in any event agree with the judgment of Sir John Donaldson, M.R. on the other issues concerning infestation and rats.

[*Order: Appeal dismissed with costs. Cross-appeal allowed with costs. Application for leave to appeal to the House of Lords refused.*]

# Exhibit 45

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 11 |
| FTX TRADING LTD., *et al.*,[1] | Case No. 22-11068 (KBO) |
| Debtors. | (Jointly Administered) |

## <u>REBUTTAL DECLARATION OF THE RT. HON. LORD NEUBERGER OF ABBOTSBURY</u>

---

[1]      The last four digits of FTX Trading Ltd.'s and Alameda Research LLC's tax identification number are 3288 and 4063, respectively. Due to the large number of debtor entities in these Chapter 11 Cases, a complete list of the Debtors and the last four digits of their federal tax identification numbers is not provided herein. A complete list of such information may be obtained on the website of the Debtors' claims and noticing agent at https://cases.ra.kroll.com/FTX.

**Table of Contents**

I.    INTRODUCTION ................................................................................................................ 1

II.   PRINCIPLES OF CONTRACTUAL INTERPRETATION ................................................. 2

III.  CLAUSE 8.2.6 AND THE EXISTENCE OF A TRUST ...................................................... 6

IV.   QUASI-BAILMENT ............................................................................................................ 18

V.    SINGLE ASSET THEORY ................................................................................................. 24

VI.   THE REMAINING QUESTIONS ....................................................................................... 29

I, Lord Neuberger of Abbotsbury, hereby make this rebuttal declaration ("**Rebuttal**") under penalty of perjury pursuant to § 1746 and state as follows:

## INTRODUCTION

1. I have had the opportunity to consider the Declaration of the Right Honourable Dame Elizabeth Gloster ("**Dame Elizabeth's Declaration**") in support of the Amended Proof of Claim filed by the Joint Liquidators of Three Arrows Capital Ltd (in liquidation) ("**3AC**"). Dame Elizabeth's Declaration covers a wider range of questions than I was asked to address in my First and Second Declarations. But, as she recognises at [16] of her Declaration, the "*precise nature of 3AC's interest in digital assets notionally associated with 3AC's 'Account' or Accounts ... on the Exchange is central to the questions that [she has] been asked to address*". I agree.

2. My focus in this Rebuttal, therefore, is on the precise nature of any interest it might be alleged that 3AC has in the Digital Assets notionally associated with the 3AC Accounts on the FTX Exchange. There are two main bases upon which Dame Elizabeth suggests that 3AC might assert an interest over the Digital Assets:

   a. First, Dame Elizabeth suggests on the basis of section 8.2.6 of the Dotcom Terms that FTX is a trustee for 3AC, holding the legal title to Digital Assets on 3AC's behalf while 3AC retains equitable title to those assets. This is on the basis that references to "title" and "ownership" in section 8.2.6 refer only to equitable title to Digital Assets;

   b. Secondly, and in the alternative, Dame Elizabeth states that section 8.2.6 has the effect of creating a quasi-bailment arrangement, such that 3AC had the necessary degree of control to obtain legal title over any Digital Assets acquired on the FTX Exchange.

On the first basis, 3AC would have an equitable interest in the Digital Assets, whereas on the latter basis, 3AC would have a legal interest in the Digital Assets.

3.  I respectfully disagree with Dame Elizabeth in relation to both those alleged bases. However, there is much we agree about, and I shall try and concentrate on areas of disagreement.

4.  This Rebuttal deals with the following topics:

    a.  The English Law principles of contractual interpretation;

    b.  The question of whether section 8.2.6 created a trust (with FTX as legal owner and 3AC as beneficial owner) over the Digital Assets.

    c.  The question of quasi-bailment, and in particular whether there is the requisite control over Digital Assets purchased by 3AC;

    d.  What Dame Elizabeth describes as "*Question 3*", namely whether 3AC's rights and obligations *vis-à-vis* FTX may properly be reflected as "*a single net figure*"; and

    e.  The remaining questions canvassed in Dame Elizabeth's Declaration.

## PRINCIPLES OF CONTRACTUAL INTERPRETATION

5.  The difference between my summary of the relevant principles and those set out by Dame Elizabeth is one of emphasis and degree, but in the present context it seems to me that it may be significant.

6.  First, I do not consider that her summary of the law sufficiently reflects the weight that is placed on the ordinary meaning of the words which the parties elected to use. In <u>Arnold v Britton</u> [2015] AC 1619, the Supreme Court underscored the centrality of the wording the parties chose to use in the following strong terms at [17]-[20] (emphasis added):

"17 *First, the reliance placed in some cases on commercial common sense and surrounding circumstances … **should not be invoked to undervalue the importance of the language of the provision which is to be construed**. The exercise of interpreting a provision involves identifying what the parties meant through the eyes of a reasonable reader, and, **save perhaps in a very unusual case, that meaning is most obviously to be gleaned from the language of the provision**. [...]*

*18 Secondly, when it comes to considering the centrally relevant words to be interpreted, I accept that the less clear they are, or, to put it another way, the worse their drafting, the more ready the court can properly be to depart from their natural meaning. … **However, that does not justify the court embarking on an exercise of searching for, let alone constructing, drafting infelicities in order to facilitate a departure from the***

*natural meaning. If there is a specific error in the drafting, it may often have no relevance to the issue of interpretation which the court has to resolve.*

*19 The third point … Commercial common sense is only relevant to the extent of how matters would or could have been perceived by the parties, or by reasonable people in the position of the parties, as at the date that the contract was made. […]*

*20 Fourthly, **while commercial common sense is a very important factor to take into account when interpreting a contract, a court should be very slow to reject the natural meaning of a provision as correct simply because it appears to be a very imprudent term for one of the parties to have agreed**, even ignoring the benefit of wisdom of hindsight. **The purpose of interpretation is to identify what the parties have agreed, not what the court thinks that they should have agreed.** … [I]t is not the function of a court when interpreting an agreement to relieve a party from the consequences of his imprudence or poor advice. Accordingly, **when interpreting a contract a judge should avoid re-writing it in an attempt to assist an unwise party or to penalise an astute party**.*"

7.  Secondly, Dame Elizabeth makes the point (at paragraph [43(e)]) that the extent to which textualism and contextualism "*will assist the court in its task will vary according to the circumstances of the particular agreement or agreements*". This is a word-for-word extract from [13] of <u>Wood v Capita Insurance Services Ltd</u> [2017] AC 1173, and the words should be seen in their context. The paragraph is in these terms (emphasis added):

"*Textualism and contextualism are not conflicting paradigms in a battle for exclusive occupation of the field of contractual interpretation. Rather, the lawyer and the judge, when interpreting any contract, can use them as tools to ascertain the objective meaning of the language which the parties have chosen to express their agreement. The extent to which each tool will assist the court in its task will vary according to the circumstances of the particular agreement or agreements. **Some agreements may be successfully interpreted principally by textual analysis, for example because of their sophistication and complexity and because they have been negotiated and prepared with the assistance of skilled professionals. The correct interpretation of other contracts may be achieved by a greater emphasis on the factual matrix, for example because of their informality, brevity or the absence of skilled professional assistance.** But negotiators of complex formal contracts may often not achieve a logical and coherent text because of, for example, the conflicting aims of the parties, failures of communication, differing drafting practices, or deadlines which require the parties to compromise in order to reach agreement. There may often therefore be provisions in a detailed professionally drawn contract which lack clarity and the lawyer or judge in interpreting such provisions may be particularly helped by considering the factual matrix and the purpose of similar provisions in contracts of the same type. The iterative process, of which Lord Mance JSC spoke in Sigma Finance Corpn [2010] 1 All ER 571 , para 12, assists the lawyer or judge to ascertain the objective meaning of disputed provisions.*"

8.  Thirdly, where the contract in question is one which is in a "standard form", i.e. one which various counterparties seeking to use particular services sign up to (rather than individually negotiating terms), the weight to be placed on factual matrix and background knowledge

is very constrained. As Lord Collins (with whom Lords Mance and Hope agreed) observed at [36]-[37] of Re Sigma Finance [2010] 1 All ER 571 (emphasis added):

> "36 *Sigma financed its investments over a 13-year period by debt securities issued or guaranteed by it. It entered into liquidity facilities intended to hedge against market liquidity risks. It entered into financial instruments intended to hedge against currency and interest rate risk. Others provided liquidity facilities, or entered into financial hedging instruments. The security trust deed* **secures a variety of creditors, who hold different instruments, issued at different times, and in different circumstances**.
> 37 **Consequently this is not the type of case where the background or matrix of fact is or ought to be relevant, except in the most generalised way.** *I do not consider, therefore, that there is much assistance to be derived from the principles of interpretation re-stated by Lord Hoffmann in the familiar passage in Investors Compensation Scheme Ltd v West Bromwich Building Society [1998] 1 W.L.R. 896, 912–913.* **Where a security document secures a number of creditors who have advanced funds over a long period it would be quite wrong to take account of circumstances which are not known to all of them. In this type of case it is the wording of the instrument which is paramount** …"

The Dotcom Terms are, as I understand it, the terms which govern the relationship between FTX and, to quote from Sigma, "*a variety of creditors, who hold different instruments, issued at different times, and in different circumstances*".

9. Fourthly, I believe that Dame Elizabeth (at [46]) makes too much of the 'rule against surplusage'. While I agree that the court does lean against surplusage, it is generally regarded as little more than a makeweight point, especially in the case of a standard form. In this connection:

   a. In Total Transport Corporation v Arcadia Petroleum Ltd [1998] CLC 90, Staughton LJ (with whom Auld LJ and Sir John Balcombe agreed) observed at 97 that "*It is well-established law that the presumption against surplusage is of little value in the interpretation of commercial contracts*".

   b. I made similar observations (with which Lords Mance, Sumption, Carnwath and Toulson agreed) in the Privy Council decision of Antigua Power Company Limited v Attorney-General of Antigua and Barbuda [2013] UKPC 23 at [38], that "*on issues of interpretation, arguments based on surplusage are rarely of much force*".

   c. In Re Lehman Brothers International (Europe) (No. 4) [2018] AC 465, I observed in the Supreme Court at [67] that "*… the fact that an expression in a sentence, especially in a very full document, does not, on analysis, have much, if any, effect*

*if it is given its natural meaning is not, at least on its own, a very attractive or a very convincing reason for giving it an unnatural meaning*" and "*if one has to choose between giving a phrase little meaning or an unnatural meaning, then, in the absence of a good reason to the contrary, the former option appears to me to be preferable*".

d.  Even in a situation where the rule against surplusage is given *some* weight, an argument based on surplusage "*cannot justify the attribution of a meaning [to a clause] that the contract, interpreted as a whole, cannot bear*": *Lewison* at [7.35], approved by the Court of Appeal at [39] of <u>Merthyr (South Wales) Limited v Merthyr Tydfil County Borough Council</u> [2019] EWCA Civ 526.

e.  In this case, bearing in mind that the Dotcom Terms are a standard form, surplusage is an especially suspect guide, as "*the presumption against surplusage is unlikely to be useful in interpreting a standard form of contract (see <u>Beaufort Developments (NI) Ltd v Gilbert Ash (NI) Ltd</u> [1999] 1 AC 266)*", as was said in <u>Secretary of State for Defence v Turner Estate Solutions Ltd</u> [2015] EWHC 1150 (TCC) at [62]; *Lewison* at [7.32].

10. Fifthly, the presumption that a contract does not require performance of the impossible, considered by Dame Elizabeth at [45], is not a particularly strong presumption. In the relatively recent decision of <u>Cuckow v AXA Insurance UK plc</u> [2023] EWHC 701 (KB) at [119], Ritchie J set out his understanding of the principle in <u>The Epaphus</u> in the following terms (emphasis added):

> "*I take from this case that the Courts will **try** to avoid construing a contract as requiring one party to perform the impossible, **but where the words are clear the construction will match the words**.*"

11. Sixthly, Dame Elizabeth suggests at [47] that the contracting parties may be taken to know the general law, and can be assumed to know "*clear and well-known legal principles affecting or incidental to the contractual engagement in question*". I agree, but, as was said in <u>Triple Point Technology Inc v PTT Public Co Ltd</u> [2021] AC 1148 at [35], that assumed knowledge relates to "*the general law*", and does not extend to specialist areas of law, such

as the intricacies of the law of trusts or the laws of bailment, let alone to the law relating to an entirely new class of assets.

12. Seventhly, and in addition to the principles set out by Dame Elizabeth, clear words are necessary in order to create property rights. In particular, a trust will only be found to exist if there is a sufficiently certain intention to create a trust. The test was put this way in the English Court of Appeal: "*Although an intention to create a trust does not require the use of the word trust or similar language, there must be, as Scarman LJ said …[2], 'a clear declaration of trust and that means there must be clear evidence from what is said or done of an intention to create a trust…'*".[3]

## CLAUSE 8.2.6 AND THE EXISTENCE OF A TRUST

13. Dame Elizabeth's conclusion is that the effect of section 8.2.6 is to vest legal title over 3AC's Digital Assets in FTX (or assumes that legal title is vested in FTX) and that equitable ownership is vested in 3AC. She bases this conclusion on a number of factors, which she discusses in paragraphs [50]-[76] and [87]-[90] of her Declaration.

14. In my view, this conclusion is incorrect for a combination of powerful reasons, which I would summarise as follows:

   a. It is contrary to the plain words of section 8.2.6(A) which makes it clear not merely that ownership rests with 3AC, but also that it does not rest with FTX: "*Title to your Digital Assets shall at all times remain with you and shall not transfer to FTX Trading*". As Dame Elizabeth fairly says in [55], section 8.2.6 "*would probably most naturally be read as a reference to legal and equitable title*". I regard that as an understatement: an unqualified reference to "title" naturally means legal title.

   b. The point is reinforced by section 8.2.6(B), which provides that "*None of the Digital Assets in your Account are the property of … FTX Trading*"; on Dame Elizabeth's view, 3AC's Digital Assets are the legal property of FTX Trading: her

---

[2]    Paul v Constance [1977] 1 WLR 527 at 531.

[3]    Wilkinson v North [2018] 4 WLR 41, per David Richards LJ at [48].

reading involves giving a very unnatural meaning to this very simple and apparently unambiguous provision as well.

c.   On Dame Elizabeth's reading, nothing is said about the legal title to 3AC's Digital Assets, which is rather strange. It seems very unlikely that the parties would have taken the trouble to spell out (in unclear terms) their equitable ownership, and fail to refer to their legal ownership. The better reading is that nothing need be said about the equitable title unless and until it is divorced from the legal title (as it does not in practice exist until then).

d.   Given that it must be clear that a trust was intended before the court will conclude that there is indeed a trust, these points are particularly telling.

e.   It is not right to give a provision in a contract an unnatural meaning if it conflicts with the plain intentions of the parties – especially when that intention is expressed in the contract. The notion that legal title is vested in FTX while equitable title is vested in 3AC, such that the Digital Assets are held by FTX on trust for 3AC, is flatly contrary to the plain intention of the parties as revealed in a number of provisions of the Dotcom Terms which make it clear that any intention to create a trustee-beneficiary relationship is firmly rejected – see especially sections 2.1.3, 2.2.2,  and 38.6, and also sections 2.10, 8.2.6, and 9.2.

f.   In a case on which Dame Elizabeth relies, namely in [54] of LBIE (see below at [19]), Briggs J said that "*the presence or absence of an obligation on B (the recipient) to keep the property separate from its own property is a powerful indicator of the presence or absence of a relationship of trustee and beneficiary between B and A*"). No such obligation appears to exist in the Dotcom Terms.

g.   Dame Elizabeth relies on certain factors, namely the so-called rule against surplusage ([56(a)], the factual matrix ([56(b)]), the presumption against impossibility ([56(c)]), and commercial sense ([56(d)]). None of these factors justify giving a meaning to a provision which it does not bear and which is inconsistent with express provisions. Further none of these factors is particularly strong, especially in the context of a standard form agreement relating to technical,

novel arrangements whose workings will not be widely known, and where the law can fairly be described as being abstruse.

h.   Although not necessary for my conclusion, it seems to me that the whole foundation for Dame Elizabeth justifying a departure from the natural meaning of section 8.2.6 is questionable in that the clause does have some meaning if it applies to legal and equitable title, albeit I accept that it is a limited meaning: see in particular paragraphs [21.a.iii] and [26] below.

i.   Quite apart from all the above eight points, I find it hard to see how it can be said that there is the requisite certainty of subject matter for a trust to arise. Insofar as reference can be had to the relevant factual matrix (which is the approach Dame Elizabeth has adopted), the reality of the FTX Exchange, as I understand it, is that it would be an extraordinarily difficult, if not impossible, task for any customer to have identified the actual Digital Assets that Dame Elizabeth argues they had a proprietary interest over. An English court would not ignore such practicalities.

15. What follows in this section of my Rebuttal is a development of the points summarised in the preceding paragraph.

16. Given Dame Elizabeth's reliance on the provision, I start by quoting section 8.2.6:

"*All Digital Assets are held in your Account on the following basis:*
(A) *Title to your Digital Assets shall at all times remain with you and shall not transfer to FTX Trading. As the owner of Digital Assets in your account, you shall bear all risk of loss of such Digital Assets. FTX Trading shall have no liability for fluctuations in the fiat currency value of Digital Assets held in your Account.*

(B) *None of the Digital Assets in your Account are the property of, or shall or may be loaned to, FTX Trading; FTX Trading does not represent or treat Digital Assets in User's Accounts as belonging to FTX Trading.*

(C) *You control the Digital Assets held in your Account. At any time, subject to outages, downtime, and other applicable policies (including the Terms), you may withdraw your Digital Assets by sending them to a different blockchain address controlled by you or a third party.*"

17. A very strained interpretation of paragraphs (A) and (B) is necessary on the approach taken by Dame Elizabeth. I appreciate that analogies can be dangerous, but to use a simple example, if I were offering to sell "*Title*" to my house such that the purchaser became

"*owner*" of the house and the house became the "*property*" of the purchaser, the purchaser would be unlikely to be satisfied if I then transferred an equitable title.

18. As discussed in the authorities cited at [6]-[12] above, displacing the natural and ordinary meaning of a clause in a contract is not an easy exercise – and that is especially so when the words concerned appear clear, where the contract was professionally drafted, where the contract is a standard form, and where the alternative reading is flatly contrary to the parties' expressed intentions.

19. I do not agree that Dame Elizabeth's view is supported, as she suggests at paragraph 43(d), by what Briggs J said in <u>LBIE v RAB Market Cycles (Master) Fund Limited</u> [2009] EWHC 2545 (Ch) at [53]. First, so far as general principle is concerned, he said that "*the labels used may not be decisive …, but the language used may be a compelling guide*", which is the normal approach to contractual interpretation. Secondly, he held that the parties in that case had "*used the clearest language to display their intention that securities held by the Prime Broker for the time being continue to belong beneficially to the Counterparty, subject of course to the charge in favour of the Prime Broker*", and it cannot possibly be said that the parties have used "*the clearest language*" to achieve the result which Dame Elizabeth favours. Thirdly, as the passage just quoted shows, Briggs J was not considering only the phrases "*belong to the Counterparty*" and "*do not belong to the Prime Broker*" (which Dame Elizabeth refers to). He was also considering the way in which the relevant provision also described the Prime Broker as the "*custodian*" who held "*custody*" of the securities in question – which are phrases Briggs J specifically identified as being important, but which Dame Elizabeth does not refer to in her treatment of this case. It was on the basis of those phrases (i.e. "*custodian*" and "*custody*") as well that Briggs J concluded that the securities were held by the Prime Broker on trust for the Counterparty.

20. Dame Elizabeth raises four arguments at [56] for rejecting the natural and ordinary meaning, and adopting her preferred meaning, of section 8.2.6:

   a. The rule against surplusage, that "*where multiple interpretations are available, one of which gives content to a term and others which do not, the Court will, if possible,*

*adopt the interpretation that gives the term content, rather than rejecting the provision altogether*": at [56(a)].

b.  The factual matrix, that "*3AC's act of depositing digital assets with FTX for use on the Exchange involved a transfer of control from 3AC to FTX*", and further that "*3AC's digital assets would ultimately be pooled with the digital assets of other customers and held in unsegregated hot wallets such that a withdrawal of digital assets by 3AC would not necessarily (or even likely) lead to the same digital assets being returned*": at [56(b)].

c.  The presumption against impossibility, that it would be "*impossible*" for 3AC to "*h[o]ld the legal title to the digital assets associated with 3AC's customer Account*", and that "*unless and until 3AC took steps to withdraw [assets credited to 3AC's Account], there would never actually be an act of transfer to 3AC, and thus there would be no means by which legal title could transfer to 3AC*": at [56(c)].

d.  The meaning put forward "*makes commercial sense, not least because [the] splitting of legal and equitable interests is achievable as a matter of law*": at [56(d)].

21. I respectfully disagree with the weight which Dame Elizabeth gives to those four arguments:

a.  The Rule Against Surplusage:

i.  The rule against surplusage carries little weight in the interpretation of commercial contracts. This is *a fortiori* the case where (1) giving effect to a clause which would otherwise be surplusage would offend against the natural meaning of the clause, and (2) one is interpreting a standard form of contract (see[8] and [9] above).

ii.  In any event, even if it wishes to avoid surplusage, the Court will not adopt an interpretation which gives the clause an effect which would be inconsistent with, or would "*pu[t] a red line*" through, another clause, let alone other clauses, in the contract: <u>Costain Ltd v Tarmac Holdings Ltd</u>

[2017] 1 Lloyd's Rep 331 at [43]. As discussed in more detail at [22] below, Dame Elizabeth's reading of section 8.2.6 is inconsistent with a number of other contractual provisions.

iii. In any event, section 8.2.6 is, in my view, not mere surplusage if, as it naturally means, it provides that legal title to 3AC's Digital Assets rests with 3AC, at least at the point that they are deposited, and it then leaves it to the courts to work out the consequences of the dealings with those assets thereafter.

b. Factual Matrix:

i. Dame Elizabeth says at [36] that she has been instructed to "*assume the following facts*" in relation to factual matrix, and I cannot, of course, express a view on the correctness of those assumed facts. All I would say is that if the assumptions are misplaced to any significant extent, that obviously may undermine her analysis and conclusion, even if (contrary to my view) it would otherwise be correct.

ii. In any event, however, and as set out above at [8], the factual matrix is not relevant in a case concerning a contract like the Dotcom Terms "*except in the most generalised way*".

iii. Insofar as the factual matrix is relevant, Dame Elizabeth's own characterisation of the factual matrix, entailing that customer's assets "*were not permanently stored in the segregated wallets*" and were "*transferred to pooled 'hot wallets' owned and controlled by FTX*", would itself be inconsistent with a trustee-beneficiary relationship – see paragraph [14.f] above.

c. Impossibility:

i. The argument that it is "*impossible*" for 3AC to hold the legal title to the digital assets associated with the 3AC Accounts is difficult to reconcile with 3AC's case on quasi-bailment as developed by Dame Elizabeth (see e.g. at

-11-

[84] of her Declaration where she suggests that a digital asset acquired by 3AC "*would be treated, as between FTX and 3AC, as 3AC's asset*").

ii.   In so far as the argument raises questions of fact, they are not for me to address.

iii.   In any event, impossibility would not warrant a construction which is contrary to the natural and ordinary meaning: see [10] above. It is not as if this is a type of impossibility which would mean that the contract as a whole could not work: it would, even taken at its very highest, merely mean that there was a piece of contractual machinery (out of many in the contract) which may not be able to operate as intended.

d.   Commercial Sense

i.   At [56(d)], Dame Elizabeth says that interpreting section 8.2.6 as applying solely to equitable ownership and title gives the clause "*a meaning that makes commercial sense, not least because th[e] splitting of legal and equitable interests is achievable as a matter of law*".  With respect, all that is saying is that her interpretation is conceptually possible, which I suggest takes matters no further.

ii.   I find it hard to see how the interpretation put forward in Dame Elizabeth's Declaration "*is a meaning that is consistent with the factual matrix ... and [is] a meaning that makes commercial sense*" (at [56(d)]), particularly in the light of the other provisions of the Dotcom Terms.

22. I now turn to the other provisions of the Dotcom Terms, I have addressed sections 2.1.3, 2.2.2, 2.10, 8.2.6, 9.2, and 38.6 at [45] of my First Declaration. Dame Elizabeth has sought to address these provisions at [63]-[69] of her Declaration. I disagree with Dame Elizabeth's treatment of these provisions:

Section 2.1.3

a.   Section 2.1.3 states in terms that "*FTX Trading is not your broker, intermediary, agent, or advisor and has **no fiduciary relationship or obligation to you in***

connection with <u>*any trades or other decisions or activities*</u> *effected by you using the Services*" (emphasis added).

b.  Dame Elizabeth suggests that "*Clause 2 as a whole is not concerned with the general relationship between the parties but is concerned with trading and risk*", and that section 2.1.3 accordingly disclaims a fiduciary relationship to protect FTX "*against liability for trading and transactional decisions made by 3AC using the Exchange*".

c.  I cannot agree. Section 2.1.3 refers specifically to "*trades **or** other decisions **or** activities*" (emphasis added), and not, as Dame Elizabeth states, "*trading **and** transactional decisions*" (emphasis added). Such unqualified references to "decisions" and "activities" plainly extend beyond mere trading, and to the holding of assets.

d.  The term "*Services*" in section 2.1.3 is also specifically defined in the Dotcom Terms as referring to the User's use of "*(A) the Exchange and any Specified Service that may be offered to you by a Service Provider (collectively, the "Platform"), as a User to buy, sell, exchange, **hold**, stake, lend borrow, send, receive or otherwise transact in **or list** Digital Assets; (B) the FTX Application Programming Interface; and (C) **any other services offered through the FTX website or any Mobile Application**"* (emphasis added). The emphasised terms make clear that section 2.1.3 applies not only to "*trading and transactional decisions*", but even to purely passive acts like "*hold[ing]*" Digital Assets.

e.  The expansive approach to disclaiming a fiduciary relationship is further apparent from the use in section 2.1.3 of the phrase "*in connection with*", which connotes a wide connecting link: <u>Celestial Aviation Services Limited v Unicredit Bank GmbH</u> [2024] 2 All ER (Comm) 966 at [55]. Thus, even if Dame Elizabeth is correct that section 2.1.3 only concerns a customer's "*trading and transactional decisions*", I do not see how that assists her position given that I understand that there is a direct factual connection between holding assets and such decisions.

-13-

Section 2.2.2

f.  Section 2.2.2 provides that "... *We provide no warranty as to the suitability of the Digital Assets traded under the Terms and* **assume no fiduciary duty to you in connection with such use of the Services**" (emphasis added).

g.  Dame Elizabeth asserts at [69(b)] that section 2.2.2 extends only to excluding liability "*presumably as an advisor, of any fiduciary duty*", and that it is "*separate from the question of the relationship between FTX and the customer when it comes to custody or ownership of customer assets*", which is dealt with in section 8.

h.  Again, I disagree. Section 2.2.2 specifically refers to "*Services*" (as defined), which, as explained in sub-paragraph [d]. above, clearly extends to the holding of Digital Assets. I agree that section 2.2.2 refers in particular to a fiduciary duty "*in connection with such use [i.e. the trading of Digital Assets under the Terms] of the Services*", but, as mentioned in [d]. above, the phrase "*in connection with*" is a broad term which captures purely *factual* connection. Thus, insofar as holding the Digital Assets is *factually* connected to trading, that would be "*in connection with*" use for trading, and the exclusion of fiduciary duty in section 2.2.2 would apply.

Section 2.10

i.  Section 2.10 provides that "*Neither Digital Assets nor any fiat currency or E-Money held in your Account is eligible for any public or private deposit insurance protection*". As mentioned at [45.3] of my First Declaration, this provision suggests that the parties contemplated the risk of loss on insolvency, such that public or private deposit insurance might otherwise apply to prevent or mitigate the loss. However, if FTX did in fact hold the Digital Assets on trust for 3AC, there would be no risk of loss on insolvency; the Digital Assets would be ring-fenced and excluded from FTX's general pool of assets. While (like section 9.2) this is not as strong a point as sections 2.1.3, 2.2.10 and 38.6, this line of argument is not addressed by Dame Elizabeth at all.

Section 9.2

j.  Section 9.2 provides that if FTX is "*holding*" property and is unable to contact the customer, then "*your Account may be transferred to FTX Trading, or an Affiliate*

*of FTX Trading, as Trustee of the Unclaimed or Abandoned Property. FTX Trading or the Affiliate of FTX Trading (as applicable), as Trustee, will hold the Unclaimed or Abandoned Property on your behalf*". This clause shows that the parties knew how to create a trustee-beneficiary relationship in clear terms, and contrasts with the wording used in section 8.2.6. I accept that that is less telling than my reliance on sections 2.2.2, 2.10, and 37.6, but it is of obvious, if limited, relevance.

k.   Dame Elizabeth is rather dismissive of section 9.2 for reasons (in [65]) which appear to me to be inconsistent with the importance she attaches to surplusage and impossibility – e.g. her reliance on drafting inconsistencies to explain away section 9.2 while not referring to such matters when relying on surplusage.

<u>Section 38.6</u>

l.   Section 38.6 provides that "*Nothing in the Terms or in any matter or any arrangement contemplated by it is intended to constitute a partnership, association, joint venture, **fiduciary relationship** or other cooperative entity between the parties for any purpose whatsoever ... Each party confirms it is **acting on its own behalf and not for the benefit of any other person**"* (emphasis added).

m.   Dame Elizabeth's response to this provision (at [66]) is essentially twofold: that it is "*essentially a boilerplate provision*", and that it "*cannot possibly be read as precluding a bare trust relationship in relation to the holding or ownership of Digital Assets across the board, not least because it would then be wholly inconsistent with clause 9.2*".

n.   I know of no rule of interpretation which entitles one to ignore the effect of a term because it can be described as a "*boilerplate*" provision. Indeed, it rather flies in the face of Dame Elizabeth's rejection of surplusage. On one view, if a clause can be described as "*boilerplate*", it could be argued rather to reinforce its importance,

because its effect is well-known.[4] But to my mind, this clause should be interpreted in the same way as any other clause.

o.  As for the inconsistency between section 38.6 and section 9.2, the fact that there is one specific and clear provision which is inconsistent with an equally clear and general provision is common in commercial contracts, and gives rise to the well-known rule that one gives effect to the particular, but otherwise one gives effect to the general, and not that the general somehow becomes invalid. In this case, the inconsistency (which I agree exists as a question of strict logic) is easily explicable in that section 38.6 is dealing with the normal conduct of the relationship between the parties, whereas section 9.2 is dealing with a very specific and unusual event.

23. The fact that Dame Elizabeth's construction of section 8.2.6 cannot be reconciled with several other provisions of the Dotcom Terms weighs heavily against the construction which she puts forward, and which I would anyway reject as a matter of language.

24. Even if my reasoning so far is rejected, I would still be of the view that, on the facts as I understand them (namely the sweeping of all Digital Assets into multiple sweep addresses), no trust under section 8.2.6 could exist because there is no certainty of subject matter. In this regard, Dame Elizabeth asserts (at [60(d)]) that the nature of the beneficiary's interest in the fund is that of a "*beneficial co-ownership share*" rather than its interest in any particular part of the fund, saying that this follows from Briggs J's decision in <u>Pearson, Lomas v Lehman Brothers Finance SA</u> [2010] EWHC 2914 at [227]. Briggs J in that case accepted that a trust of part of a fungible mass without the appropriation of any specific part for the beneficiary would not fail for uncertainty of subject matter, "*provided that the*

---

[4]    I note for completeness the observations of Lord Leggatt at [30] of <u>GEM Management v Firefox Ltd</u> [2022] UKPC 17 at [30], where he stated that it would "*be back to front to allow boilerplate clauses of the kind placed at the forefront of GEM's argument to dictate the meaning of core provisions of the contract*". Nothing of the sort is happening on the present facts. Unlike in <u>GEM</u>, the so-called "boilerplate" terms are entirely consistent with the other provisions I have referred to – and cohere with the natural meaning of the words. It cannot be said that boilerplate is "*dictat[ing] the meaning of core provisions*", in circumstances where all of those indications point the same way.

*mass itself is sufficiently identified and provided also that the beneficiary's proportionate share of it is not itself uncertain*".

25. While I hesitate to step into the facts, I consider that the requirements which Briggs J outlined in <u>Pearson</u> are not satisfied. While Dame Elizabeth's Declaration suggests at [89] the neat example of 3AC having 100 Bitcoin which FTX held in an unsegregated pool of 1,000 Bitcoin, the reality of FTX's sweep addresses, particularly during periods of intensive trading, is very different. While that analysis could be applicable at the moment that the 100 Bitcoin are swept into the pool or "hot wallet", as I have been instructed of the factual position, the analysis becomes problematic immediately thereafter, because thousands of deposits and withdrawals took place every hour in the sweep addresses – before even considering spot, margin, and proprietary trading on the FTX Exchange. Further, because I have been instructed that the FTX Exchange continuously collected trading fees in the form of Digital Assets like Bitcoin, not only were a customer's assets commingled with other customers' assets, they were commingled with the assets of the FTX Exchange. In those circumstances, it must be an "*essentially futile and close to impossible and possibly impossible exercise*" to identify 3AC's proportionate share of the Bitcoin from time to time in FTX's sweep addresses, to quote Trower J in <u>Piroozzadeh v Persons Unknown</u> [2023] EWHC 1024 (Ch) at [8].

26. Dame Elizabeth describes the "*logical terminus*" of my reasoning as being, she says, to "*give clause 8.2.6 no meaning at all*". As I say in paragraph [21.a.iii] above, the clause confirms the intention that legal title is vested in the customer at least at the point the asset is deposited, and militates *against* the existence of a trust in the parties' commercial relationship. This accords with the natural meaning of section 8.2.6, and it is coherent with the other provisions of the Dotcom Terms. But, even if this construction gives section 8.2.6 no independent effect, the argument against that interpretation really boils down, in substance, to an argument against surplusage. The legal weight to be placed on such an argument has been canvassed in paragraph [9] above. But, in any event, contractual construction involves determining the meaning of what the parties have *in fact* said, not what they meant to say, let alone what they would have been well-advised to say. Although not directly in point, the English Law of trusts is replete with examples where the

declaration of a trust has failed, notwithstanding the parties' intentions. There is no reason why this is not one such situation.

27. I would summarise my conclusion on this aspect as being:

    a. The ordinary meaning of the words used in section 8.2.6 is, as Dame Elizabeth effectively admits, against her proposed interpretation, which is at odds with the ordinary meaning of the words the parties specifically chose to adopt.

    b. As stated at paragraph [25] above, I hesitate to step into the facts, but as I understand it, the factual matrix which Dame Elizabeth relies on is (i) one that she has been instructed to assume; (ii) one for which the question of admissibility remains for 3AC to establish; (iii) not all one way; and (iv) could not in any event properly justify overturning the natural and ordinary meaning of the words used to contrive the construction which Dame Elizabeth supports.

    c. What Dame Elizabeth's construction ultimately seems to turn on is little more than the rule against surplusage. But the legal authorities on that rule make it clear that it is a weak or very weak argument.

    d. It is vital to focus on what the parties actually agreed in their contract, rather than what they might wish they had agreed, or would or should have been advised to agree, and also bearing in mind the other provisions in the contract which they agreed.

    e. Particularly given that clear words are required to give rise to a trust, it is wrong in principle to hold that a trust has been created by giving a clear provision in an agreement an unnatural meaning which is inconsistent with other provisions of the agreement.

## QUASI-BAILMENT

*Introduction*

28. I turn next to the secondary aspect of Dame Elizabeth's analysis, namely a potential extension of the English Law on bailment to digital assets. This would create what has been termed a "*quasi-bailment*". As set out in my First Declaration, the concept of possession is

at the core of bailment. It is both long-established and axiomatic that something which is not tangible, like a chose in action, cannot be the subject of a bailment – at least as the law presently stands. That is why, in order for a quasi-bailment to exist over something intangible (like digital assets), an extension of the law would be necessary.

29. At the risk of speculation, I would imagine that this need for an extension of the law as it presently stands may, at least in part, explain why Dame Elizabeth focuses her analysis on a trust arising.

30. While such an extension has not taken place in any decision of the English (and Commonwealth) Courts, Dame Elizabeth and I are agreed that it is at least conceptually possible that English Law will develop to extend the principle of bailment to quasi-bailments. However, as I imagine any Judge looking to make new law would accept, the precise content of the extension is a point on which views may legitimately differ. That is in many senses unsurprising. Quasi-bailment is a novel area of law, and academic views on the subject diverge. In my view, the precise contours which will shape such a novel development will have to be determined by the traditional, incremental process of the common law in the English courts. Dame Elizabeth and I are, however, agreed as to at least *some* of the elements which are likely to be necessary for a quasi-bailment to arise, namely that:[5]

   a. For a quasi-bailment to arise, it is necessary (but not necessarily sufficient) that the parties must have intended to create a legal relationship whereby the bailee would obtain control of the digital assets but the bailor would have superior title; and that the bailor did in fact have superior title.

   b. If digital assets are added to a pool, it might be possible for all the customers depositing into that pool to become legal tenants in common. However, for this to occur, it would be necessary to find an intention that the proprietary interest

---

[5]     See in particular paragraphs [60.1]-[60.5] of my First Declaration, and paragraph [83] of Dame Elizabeth's Declaration.

retained by the customer was only a proportionate interest in the bulk to which he has contributed.

c.  In other words, it must be possible objectively to determine a shared intention between the customer and exchange for the customer to have title to a percentage of all digital assets in a pool, as opposed to the customer having title to a specified number of tokens.

31. I believe that there is, in substance, one point in dispute between Dame Elizabeth and me in relation to quasi-bailment. This point relates primarily to our predictions on how the law of quasi-bailment is likely to develop. Obviously the likelihood of predictions materialising is a matter for the Court, but I respond in brief given that Dame Elizabeth has engaged with it:

a.  At [60.4] of my First Declaration, I stated that if a customer acquires a digital asset on the exchange but never obtains the necessary degree of control, then the customer would not obtain legal title to the digital asset required, and would simply be an unsecured creditor in relation to the asset in question. I went on at [60.5] to consider the degree of control which was likely to be required for the purposes of quasi-bailment, namely that "*a digital asset acquired on the exchange [must be] identified and segregated for the customer*".

b.  Dame Elizabeth states (at [85]) that "*the 'control' provided for under clause 8.2.6 should be construed as a right to request FTX to act in respect of the assets and, specifically, to require FTX to transfer the 3AC Digital Assets to 3AC (or to its order)*", and that this control should suffice for the customer to obtain legal title to the digital asset ("*In my view, if English law were to develop the concept of a quasi-bailment and the purpose of that development were to accommodate digital asset exchange structures, then an English Court would likely accept that the superior control-based interest of a customer was sufficient to justify the existence of a quasi-bailment as between the customer and the exchange …*").

32. With respect, I am unable to agree with Dame Elizabeth. My disagreement is twofold: First, and even assuming that the law of bailment is extended to provide for quasi-bailment, I do

not think it is possible to predict, with any confidence that, as Dame Elizabeth expresses it, "*an English Court would likely accept that the superior control-based interest of a customer was sufficient to justify the existence of a quasi-bailment*" ("**the prediction**"). Second, and on the assumption that the prediction turns out to be correct, I do not see how section 8.2.6 is reflective of what Dame Elizabeth describes as the requisite "*inten[tion] [for] a bailment over the proportionate share*" of the digital assets held by FTX. I elaborate on both these points below.

*Whether the prediction as to the development of English Law will materialise*

33. As a starting point, it is important to be clear precisely what Dame Elizabeth's Declaration asserts about the potential development of English Law. Dame Elizabeth suggests at [85] of her Declaration that "*if English law were to develop the concept of a quasi-bailment **and the purpose of that development were to accommodate digital asset exchange structures**, **then** an English Court would likely accept that the superior control-based interest of a customer was sufficient to justify the existence of a quasi-bailment as between the customer and the exchange*" (emphasis added). Thus, her prediction is conditional on English Law developing the concept of a quasi-bailment and – critically – the purpose of that development being to accommodate digital asset exchange structures. I do not understand, nor do I believe it to be likely, that the purpose behind extending the law to create quasi-bailment would solely be in order to accommodate digital asset exchange structures.[6] Rather, the purpose of such a development, if it occurred, would be considerably wider in scope, and to go towards rationalising the potential legal relationships persons may have with digital assets more generally. It seems to me very unlikely that the purpose behind the development of the law of quasi-bailment would be the narrow objective of accommodating digital asset exchange structures.

34. Even setting that questionable conditionality aside, it is important to be clear about what Dame Elizabeth is suggesting. What [85] of her Declaration predicts – in its terms – is that "*the superior control-based interest of a customer [will be] sufficient to justify the existence*

---

[6]    See e.g. Law Commission Final Report at [7.107] on the utility of this development for conflicts of law purposes.

*of a quasi-bailment*", without more. I do not think that there is a sound basis for suggesting that the law will develop in this manner. The academics differ: see e.g. Sheehan, who argues (at pp95-96) that there should be no relativity of legal title in digital assets.[7] Indeed, the Law Commission has specifically noted that the types and degree of control which matter for particular purposes will need to be worked through by the Common Law. The Law Commission has also specifically proposed that a body of experts consider such issues further.[8] While not every proposal by the Law Commission is ultimately acted upon by legislators and Judges there is obvious merit in this particular suggestion.

35. In my view, there are also powerful practical reasons for eschewing Dame Elizabeth's suggestion of control as the sole basis for determining whether a quasi-bailment exists. (This is similar to the point made in part at paragraph [25] above). Put simply, Dame Elizabeth points to a straightforward situation where the only question is – as between two parties – which party has superior title. But the reality of how FTX's sweep addresses were used is, as I have been told, far more complex. I am instructed that the assets of hundreds of thousands of users were commingled on the FTX Exchange, and that over 1,000 transactions took place per hour in June 2022. These transactions included, *inter alia*, margin trades, sales, deposits, withdrawals, conventional futures contracts, fees paid to the FTX Exchange, and liquidations. There is thus real practical difficulty in even identifying a customer's proportionate share over a mixed fungible mass – difficulty akin to that which led Trower J in Piroozzadeh v Persons Unknown [2023] EWHC 1024 (Ch) at [8] to conclude that attempting to trace such assets in the pool was "*an essentially futile and close to impossible and possibly impossible exercise*". In circumstances where even identifying a customer's proportionate share may prove an insurmountable practical hurdle, I have serious doubts as to whether a Court would consider it appropriate to determine (a) whether the parties in fact intended a bailment over the proportionate share; and (b) the right(s) of

---

[7]    Duncan Sheehan, *Digital assets, blockchains and relativity of title* [2024] JBL 78. As mentioned in my original Report, Sheehan appears to be in the minority of commentators on this point – but his view is plainly defensible, and it is worth mentioning that the specific question as to what form the law of quasi-bailment might take is not one which has attracted a large volume of academic commentary.

[8]    Law Commission Final Report, Footnote 19; see also [6.46] and [5.61].

control the parties envisaged over the proportionate share. In those circumstances, I would be surprised if a Court was prepared to adopt a test of control for whether a quasi-bailment arose without more; an English Court would no doubt be concerned with identifying and delimiting the extent of the alleged quasi-bailment.

36. Even apart from the potential practical difficulties, it seems to me that there are at least two conceptual points which militate against Dame Elizabeth's prediction as to how the law of quasi-bailment might develop:

    a. First, insofar as the value of the unsegregated sweep addresses containing 3AC's Digital Assets may at any time have decreased to zero, there are real conceptual difficulties in identifying any "proportionate share" 3AC might be said to retain, even assuming that the pool later increased in value again.

    b. Second, doing away with the need for identification or segregation of a digital asset and determining the existence of a quasi-bailment purely on whether a party has some abstract notion of "control" would seem to give rise to real floodgate concerns. Under Dame Elizabeth's approach, there would be a real risk that durable proprietary interests could be too readily created over assets, the identification of which is wholly uncertain, and in circumstances where the assets over which the proprietary interests are said to arise have not been in any way delimited from the unsegregated pool.

37. Bearing these points in mind, I do not share Dame Elizabeth's confidence that the expansion of English Law to provide for quasi-bailments will necessarily take the form she suggests. In this regard, I should not be taken as saying that Dame Elizabeth's prediction will certainly not materialise, merely that an English Court looking to make new law would look very carefully at these (and of course, other) considerations before deciding what course to adopt, and that that course may very well not be that which–Dame Elizabeth suggests.

*If the prediction is correct, whether Dame Elizabeth's test for a quasi-bailment would be satisfied*

38. I now turn to consider whether, assuming the test Dame Elizabeth puts forward for a quasi-bailment to arise does become the law, a quasi-bailment would arise in this case. In

answering this question, it is useful to bear in mind what Dame Elizabeth has stated at [83] of her Declaration, namely that in circumstances where bailments can arise over commingled assets where the goods are mixed by consent, "*the question is whether the parties so intended a bailment over the proportionate share*". Dame Elizabeth suggests (at [84]) that "*clause 8.2.6 of the Terms soundly demonstrates that it was the intention of the parties that any asset acquired on the Exchange by a customer and 'held in [the customer's] Account' would be treated, as between FTX and 3AC, as 3AC's asset*".

39. I disagree with Dame Elizabeth's reading of section 8.2.6 of the Dotcom Terms in [84] of her Declaration. Section 8.2.6 does not, to my mind, demonstrate that the parties "*intended a bailment over the proportionate share*" of the commingled Digital Assets in FTX's sweep addresses. Not only do the Dotcom Terms nowhere state that a quasi-bailment is intended, the Dotcom Terms do not refer to a customer's interest in Digital Assets being in the form of "a proportionate share". Section 8.2.6(C) specifically refers to the customer "*control[ling] the Digital Assets held in [its] Account*", and provides that the customer "*may withdraw [its] Digital Assets by sending them to a different blockchain address*". The reference to the specific Digital Assets held by the customer in its Account, coupled with the reference to "***your** Digital Assets*" (emphasis added) and sending "*them*" to a different blockchain address, sits uneasily with the suggestion that the parties intended a bailment "*over the proportionate share*" of the commingled assets. But, as Dame Elizabeth acknowledges at [83], such an intention would be necessary for a quasi-bailment to arise. If the parties had intended to give 3AC rights over a "*proportionate share*" of the commingled assets, they could have straightforwardly said so. Instead, they chose to refer to "*the Digital Assets held in **your** Account*", "***your** Digital Assets*", and "*sending **them** to a different blockchain address*" (emphasis added). Thus, even assuming that Dame Elizabeth were correct as to the likely requirements for quasi-bailment to arise, I do not think that those requirements are met.

**SINGLE ASSET THEORY**

40. I turn now to what Dame Elizabeth has described as "*Question 3*" in her Declaration, namely whether the provisions of the Dotcom Terms "*support a contention that the extent of 3AC's rights (if any) over the 3AC Assets is limited to a single net figure arrived at by*

*deducting from the value of the 3AC Assets the amount of any liabilities owed by 3AC to FTX*". This is addressed at paragraphs [98]-[109] of her Declaration.

41. Before addressing the support Dame Elizabeth finds in the Dotcom Terms to answering Question 3 in the affirmative, it is necessary to address the assumptions inherent in the phrasing of Question 3.

   a.  One assumption implicit in Question 3 is that English Law is the governing law for the Question.

   b.  Another assumption is that liabilities were "owed by 3AC to FTX" at any time. This point seems noteworthy because I understand that FTX has not filed a claim against 3AC in the Joint Liquidators' liquidation proceedings.

   c.  To the extent liabilities ever did arise, Question 3 does not identify where they arose from: whether under the margin program described in section 16, some other section of the Dotcom Terms, or some other independent source.

   d.  Further, there is the factual issue of whether FTX effected a set-off in respect of the 3AC accounts.

   e.  There is also the legal issue of whether FTX's bankruptcy under BVI Law resulted in an automatic set-off.

   f.  In the face of these issues I, like Dame Elizabeth, centre my discussion of Question 3 on the interpretation of the Dotcom Terms.

42. Dame Elizabeth's treatment of Question 3 centres on the parties' contractual terms. She relies in particular on (a) sections 8.2.6(C), 7.4, 8.2.9, and 8.2.10; (b) section 10; (c) section 16.2; and (d) section 38.7.2.

43. Sections 8.2.6(C), 7.4, 8.2.9, and 8.2.10 are relied upon by Dame Elizabeth as examples which show "*that the customer can deal with its assets*", and which "*rely on the assumption that the customer was entitled to deal with its assets without regard to the net balance on its account*" (at [102]).

a. In my view, any analysis of the applicability of "single asset theory" to a contractual relationship should begin with the primary means through which, under the relevant contractual terms, a customer may incur a negative balance — in the case of the Dotcom Terms, the margin program discussed in section 16 and schedule 3.

b. Section 16.2 permits a customer to incur a negative balance in a given asset, but only if the customer agrees "*to maintain a sufficient amount of Assets at all times to meet our margin requirements*". Further, "*[i]f the value of the Assets in [the customer's] Account falls below the margin maintenance requirement*", then FTX may liquidate the customer's positions and assets. As a result, in order to incur a negative balance, a customer consents to the so-called "single asset theory" by way of the Dotcom Terms which in this context refer to the value of all of the customer's "Assets" in their "Account", i.e. the customer's net account balance.

c. Thus, "*the assumption that the customer was entitled to deal with its assets without regard to the net balance on its account*" (as Dame Elizabeth says at [102], based on sections 8.2.6(C), 7.4, 8.2.9, and 8.2.10) may very well be the case where a customer has not got a negative balance. But section 16.2 makes clear that, if a customer develops a negative balance, then they may cease to be entitled to deal with their assets without regard to the net balance of their account.

d. Despite section 16.2 providing the contractual starting point to analyse "single asset theory" for customers trading on margin, Dame Elizabeth gives it short shrift, saying that it  "*only work[s] if the customers' Assets were treated as being held separately from their liabilities*". But this ignores, as noted at [43.b] above, the fact that section 16.2 refers to the "*value of the Assets in your Account*" as a whole, not as separate assets and liabilities.

44. I turn next to section 10, which bears setting out in full:

"*10 DEBIT ACCOUNT BALANCE*
*10.1 If at any time your Account has a debit balance, you agree to pay us: (i) the applicable fees set out in the Fee Schedule; (ii) the total debit balance; and (iii) such other amounts specified in the Terms.*

*10.2 If you fail to pay such amounts, we may suspend your ability to use the Services or close your Account. We also reserve the right to debit your Account accordingly and/or to*

*withhold amounts from fiat currency and Digital Assets that you may transfer to your Account.*

*10.3 If, after a demand is made by FTX Trading, you have not made payment of the outstanding debit balance by the time stated in the demand, then:*

> *10.3.1 you authorise us to sell any Digital Assets or redeem any fiat currency or E-Money in your Account to recover the outstanding debit balance;*
> *10.3.2 you agree to indemnify us and each other Indemnified Party against all Losses that we suffer or incur as a result of your not paying the outstanding debit balance; and*
> *10.3.3 you will be liable for all costs which we incur in relation to instructing a collection agency, law firm or other third party to assist with and advise on the collection of such outstanding debit balance (where applicable)."*

45.  Dame Elizabeth suggests at [104] of her Declaration that the "*only coherent interpretation of the words 'debit balance' in that clause are to a negative USD (i.e. trading) balance*", because "*if debit balance meant overall debit balance (i.e. the single asset theory), there would be no use in liquidating the Assets as described in clause 10.3.1 because that could not effect any reduction of the debit balance; it would just change one asset type into another*". I disagree with Dame Elizabeth's construction of the phrase "*debit balance*" for the following reasons:

   a.  As a preliminary matter, section 10 sits outside of the provisions applicable to customers trading on margin (i.e., section 16 and schedule 3 of the Dotcom Terms, dealt with (as relevant) above). Section 10 does not cross refer to section 16; it does not include terms used in section 16 like "margin requirements," "borrow[ing]," or "defaulting on a loan"; and it is phrased in terms of debit owed to "us" (the FTX Exchange) rather than, in section 16, "debts to other Users."

   b.  In any event, section 10.3.1 in terms provides that if a customer has not made payment of the outstanding debit balance by the time stated in a demand made by FTX Trading, the customer authorises FTX to "*sell any Digital Assets or redeem any fiat currency or E-money in [the customer's] Account **to recover the outstanding debit balance**". This is different from how Dame Elizabeth characterises section 10.3.1 at [104] of her Declaration, where she suggests that the phrase "*debit balance*" must refer to a negative USD balance because there would otherwise "*be no use in liquidating the Assets as described in clause 10.3.1 because that could not effect any **reduction of the debit balance**". As appears to me clear

from the wording of section 10.3.1, FTX's objective in selling the customer's Assets is not necessarily to *reduce* the debit balance – but rather to *recover* the outstanding debit balance. If that is right, no question of section 10.3.1 needing to achieve the reduction of the debit balance would arise.

c.    Further and in any event, liquidating a customer's Digital Asset *would* help FTX recover (at least part of) the outstanding debit balance. FTX could – as envisaged under section 10 – use the proceeds of the liquidation to offset the debit balance.

d.    I note also Dame Elizabeth's suggestion that liquidating the Assets "*would just change one asset type into another*" (at [104]). The subtext of this suggestion is that there would be no reason to change one asset type into another. But that premise is unfounded. If, for example, the value of the Assets was declining, it might make commercial sense for FTX to sell the Assets to prevent further loss on the Account in question.

e.    I thus do not agree with Dame Elizabeth's characterisation of a "*debit balance*" as referring to a negative USD balance. Rather, the phrase should be given its natural and ordinary meaning, and refer to the customer's (negative) net position.

46.    Finally, Dame Elizabeth points to section 38.7.2, which contains a unilateral right of set-off in favour of FTX. She has been instructed that FTX did not purport to exercise this right (at [106]). Whether or not FTX did so is a question of fact for this Court, and I will not address that point. I note that if this assumption does not hold, then section 38.7.2 provides a further, independent basis to support "single asset theory" outside of the structure set out in sections 16.2 and 10. I also note in passing that I do not agree with Dame Elizabeth's reasoning in suggesting that "*[t]he fact that the right of set-off was unilateral suggests that this is an outcome that FTX would have wished to avoid because it wished to reserve to itself the ability to choose which amounts were subject to the set off*" (at [106]). FTX could well have wished to reserve to itself the ability to choose which amounts were subject to its right of set-off, while at the same time remaining agnostic about whether it "*wished to avoid*" the outcome of setting off.

47. In summary on this point, the provisions I have canvassed point towards there being a netting off of assets and liabilities. But even if I am wrong on that, it may ultimately not matter, at least insofar as (a) the Court finds, as a question of fact, that FTX did exercise its right of set off; and (b) the Court finds, as a matter of BVI Law, that an automatic set-off arose upon FTX's insolvency.

## THE REMAINING QUESTIONS

48. I turn finally to the four remaining questions Dame Elizabeth addresses. These are:

    a.  Question 4: If FTX had carried out or permitted action(s) that resulted in the sale, transfer, or liquidation of some or all of the 3AC Assets between 12 June and 14 June 2022, would the Terms have authorised such action(s)? If not, what claim(s) under English law would 3AC have against FTX (if any) in relation to the wrongful loss of its interest in those assets as a result?

    b.  Question 5: To the extent that FTX's conduct deprived 3AC of, or removed, 3AC's ownership rights (if any) to, the 3AC Assets (both in respect of digital assets and fiat currency), would such conduct by FTX give rise, as against FTX, to a breach of contract claim, a claim in restitution, a claim in conversion, a breach of trust claim, and/or a breach of fiduciary duty claim?

    c.  Question 6: (a) Assuming your answer to Question 5 is "yes", under English law and the Terms, what remedies would be available to 3AC for such a breach? (b) Additionally, assume that the 3AC Joint Liquidators have no claim against FTX for receiving an unfair preference under the (BVI) Insolvency Act 2003 and the only reason that they do not have that claim is because FTX's breach of the Terms caused 3AC not to have an equitable proprietary interest in the 3AC Assets. Can the loss of an unfair preference claim form part of the damages recoverable by 3AC from FTX for its breach of the Terms?

    d.  Question 7: What is the nature of 3AC's interest in the Futures Contracts?

49. As I mentioned at the beginning of this Rebuttal, Dame Elizabeth acknowledged at [16] of her Declaration, the "*precise nature of 3AC's interest in digital assets notionally associated with 3AC's 'Account' or Accounts … on the Exchange is central to the questions that [she*

*has] been asked to address*". I agree. Thus, dismissal of Dame Elizabeth's primary case would, in many senses, be determinative of these remaining questions – or at least large parts of them.[9] I therefore do not propose to go through the remaining questions in granular detail. Instead, I will make brief comments on three relatively standalone issues, namely:

    a.   The proper construction of section 16 and FTX's rights to sell assets in 3AC's Accounts – which relate to Question 4 in particular;

    b.   The proper construction of section 30 and the limitation of FTX's liability – which relate to Question 6 in particular; and

    c.   The suggestion (at [123]) that 3AC might be entitled to damages of the type awarded in <u>Attorney-General v Blake</u> [2001] 1 AC 268.

50. Turning first to Dame Elizabeth's analysis of section 16 of the Dotcom Terms, this is set out at [114] of her Declaration. The relevant part of section 16.2 provides that:

*"If the value of the Assets in your Account falls below the margin maintenance requirement or we determine, in our sole discretion, that your Account appears to be in danger of defaulting on a loan, we may seize and/or liquidate any or all of your positions and Assets on any balance in your Account **in order to reduce your leverage or settle your debt to other Users**, in which case, you may sustain a total loss of all Assets in your Account."* (Emphasis added)

51. Dame Elizabeth suggests at [114] that by virtue of the text highlighted in bold font, section 16 "*did not give FTX a right to liquidate assets for the purposes of settling debts that it considered 3AC may have owed to FTX*". The unspoken assumption in Dame Elizabeth's position is that FTX could only act to "*reduce [3AC's] leverage*" in relation to other Users, and not 3AC's leverage position *vis-à-vis* FTX itself.

---

[9]    See for example Question 7. Dame Elizabeth states at [150] that the Futures Contracts were "*[3AC's] choses in action and its personal property*", and that "*3AC had a proprietary interest in the chose(s) in action arising from the Futures Contracts*". That turns entirely on 3AC having a proprietary interest arising out of Dame Elizabeth's analysis on trusts (since even on Dame Elizabeth's analysis of quasi-bailment, quasi-bailment applies to digital assets and not choses in action).

52. As a preliminary point, Dame Elizabeth appears to assume that the purpose of "*reduc[ing] your leverage*" must be read subject to the qualifier which applies to the second purpose, of "*settl[ing] your debt to other Users*". However, in my view:

   a. In particular, her reading of section 16.2 is not its natural and ordinary meaning. Rather, what section 16.2 appears to refer to is to FTX seizing and / or liquidating a customer's positions and Assets in order to reduce the customer's leverage *generally*, or to settle the customer's debt to other Users. There is no reason for reading "*to other Users*" as a qualifier to the first purpose when no such words were used. I note in this regard that section 16.2 goes on to refer again to settling the customer's debts "*to other Users*", but never uses the phrase "*to other Users*" in conjunction with the reduction of leverage.

   b. The ordinary elements of contractual construction accordingly militate against Dame Elizabeth's view of section 16. This is compounded by my analysis of section 10 above (see [45] above) – and weighs against her characterisation of the circumstances in which FTX was entitled to liquidate any assets 3AC might have had.

53. I turn next to Dame Elizabeth's treatment of the exclusion clause in section 30 of the Dotcom Terms, which is addressed at [140] *et seq* of her Declaration. The key provision is section 30.2, which provides (capitalisation original):

   "*SUBJECT TO SECTION 30.1, NEITHER FTX TRADING NOR ANY OF THE OTHER INDEMNIFIED PARTIES SHALL BE LIABLE TO YOU IN CONTRACT, TORT (INCLUDING NEGLIGENCE),* **EQUITY***, STATUTE* **OR ANY OTHER CAUSE ARISING OUT OF OR IN CONNECTION WITH YOUR USE OR INABILITY TO USE THE SERVICES …*" (Emphasis added)

54. Section 30.1 in turn provides that:

   "*NOTHING IN THE TERMS SHALL LIMIT OR EXCLUDE A PARTY'S LIABILITY:*
   *30.1.1 FOR DEATH OR PERSONAL INJURY CAUSED BY ITS NEGLIGENCE;*

   *30.1.2 FOR FRAUD OR FRAUDULENT MISREPRESENTATION; OR*

   *30.1.3 TO THE EXTENT SUCH LIABILITY CANNOT BE EXCLUDED BY APPLICABLE LAWS.*"

55. Dame Elizabeth states (at [144]) that "*the exclusion provisions in clause 30 do not apply at all to any claim against FTX as trustee*". She further states, at [145], that "*clause 30.2*

*cannot be construed as purporting to exclude a claim for fraud, bad faith or misappropriation against FTX as trustee*", and that "*use of the word 'EQUITY' [does not suggest] that FTX's obligations as trustee in relation to the preservation of 3AC's equitable ownership of the 3AC Assets are being excluded*".

56. In my view, section 30.1 is clear, and speaks for itself. Only certain specific exceptions from the limitation of liability are provided for, and these are enumerated in sections 30.1.1 to 30.1.3. While it is well-established that will not exclude loss or damage resulting from *actual fraud*, the notion that exclusion clauses in English Law are to be strictly construed is of considerably less force than it used to be. Thus, in <u>South East Water Ltd v Elster Water Metering Ltd</u> [2025] EWCA Civ 287 at [29], Coulson LJ said that although "*[i]t used to be the case that the courts adopted a strict (not to say strained) approach to contractual interpretation if the clause in question was an exclusion clause or one limiting liability*", "*the court has moved away from that approach, particularly in relation to clauses which limit rather than exclude liability*".

57. Coulson LJ went on to explain that "*[t]he modern approach is now summarised by Lord Leggatt in* <u>Triple Point Technology Inc v PTT Public Co Limited</u> [2021] AC 1148", from which he then quoted:

> "107.The approach of the courts to the interpretation of exclusion clauses (including clauses limiting liability) in commercial contracts has changed markedly in the last 50 years. ....
>
> 108.The modern view is accordingly to recognise that commercial parties are free to make their own bargains and allocate risks as they think fit, and that the task of the court is to interpret the words used fairly applying the ordinary methods of contractual interpretation. It also remains necessary, however, to recognise that a vital part of the setting in which parties contract is a framework of rights and obligations established by the common law (and often now codified in statute). These comprise duties imposed by the law of tort and also norms of commerce which have come to be recognised as ordinary incidents of particular types of contract or relationship and which often take the form of terms implied in the contract by law. Although its strength will vary according to the circumstances of the case, the court in construing the contract starts from the assumption that in the absence of clear words the parties did not intend the contract to derogate from these normal rights and obligations.*"

58. More specifically, I disagree with Dame Elizabeth's reading of section 30.2. In particular:

-32-

a.  There is no basis for suggesting that section 8 of the Dotcom Terms should somehow be "*carved out*" from the general exclusions of liability the parties agreed. I cannot identify any terms – whether express or implied – in support of this suggestion, and I disagree with it.

b.  In relation to section 30.2, it seems to me that Dame Elizabeth is effectively reading-out the word "*EQUITY*" from the provision. It is trite that trusts are creatures of equity, and that a claim arising out of breach of a trust is equitable in nature. It is not clear what meaning, if any, is to be given to the word "*EQUITY*" if FTX's (alleged) obligations as trustee are carved out of the exclusion clause.

c.  Further and in any event, section 30.2 refers not only to "*EQUITY*", but also to "*ANY OTHER CAUSE ARISING OUT OF OR IN CONNECTION WITH YOUR USE OF OR INABILITY TO USE THE SERVICES*". The natural and ordinary meaning of these words is clear – as is the wide ambit given to "*in connection with*" (as to which see [22.e] above).

d.  Dame Elizabeth's reference to the "*irreducible core*" of a trust does not assist her analysis. The irreducible core of a trust determines the duties owed by the trustee to the beneficiaries; it does not mean that the parties cannot, by the terms of the trust, exclude liability for certain losses from the trustee's shoulders. Indeed, in <u>Armitage v Nurse</u> [1998] Ch 241, the case which Dame Elizabeth cites in relation to the irreducible core of duties (at [145(b)]), the English Court of Appeal accepted that an exclusion clause *would* apply – so long as there was no dishonesty (in the sense of actual fraud). At 251, Millett LJ (with whom Hutchison and Hirst LJJ agreed) said that:

> "*In my judgment clause 15 exempts the trustee from liability for loss or damage to the trust property no matter how idolent, imprudent, lacking in diligence, negligent or wilful he may have been, so long as he has not acted dishonestly.*"

e.  I find it difficult to see how Dame Elizabeth's suggestion that the "*irreducible core*" of duties takes her analysis very far. I accept that liability for fraud and / or dishonesty on the part of the trustee cannot be excluded, and that exclusion clauses must generally be interpreted strictly, but English Law does not go further. Given

the clear wording of section 30.2, I do not see how Dame Elizabeth's position on exclusion of liability is tenable.

59. I turn finally to Dame Elizabeth's invocation of Attorney-General v Blake as a potential basis for liability on the part of FTX. In my view, Dame Elizabeth has not provided the Court with a full or complete picture as to how exceptionally Attorney-General v Blake is regarded in English jurisprudence. In particular:

   a. The facts of the case concerned a former member of the British Secret Intelligence Service. However, in 1951, he became a Soviet spy. He was discovered in 1961 and was imprisoned. He escaped in 1966, and then fled to the Soviet Union. He wrote a book about his experiences as a double agent titled "*No Other Choice*", and received a lucrative publishing contract for its release. The British Crown brought an action for all the profits Mr Blake made on his book, including for profits he had not yet received, and was successful (by a majority) before the House of Lords.

   b. In very simple terms, the facts of Attorney-General v Blake were exceptional. Each Law Lord in the majority referred to the striking policy reasons applicable to that case. Indeed, Lord Nicholls began his judgment with the words "*My Lords, George Blake is a notorious, self-confessed traitor*" (at 275). That should suffice to give this Court an indication of how Attorney-General v Blake is regarded.

   c. Authorities after Attorney-General v Blake have been clear as to its exceptional facts. Attorney-General v Blake has been described by the Supreme Court in One Step (Support) Ltd v Morris-Garner [2019] AC 649 as one concerning "*the notorious traitor George Blake*" (at [64]). It has also been described as "*anomalous*" and "*an exceptional case*" in the recent Supreme Court decision of Recovery Partners GP Ltd v Rukhadze [2025] 2 WLR 529 (at [148] and [278] respectively).

   d. It seems to me self-evident that the present facts fall far short of those involving Cold War-era subterfuge and treachery. I do not think I need to say more on Dame Elizabeth's suggestion that damages pursuant to Attorney-General v Blake might be warranted.

A list of the documents I have considered in drafting this Rebuttal is set out in Annex 1 to this Declaration.  Otherwise, I incorporate all other annexes and disclosures included in my *Second Declaration of Lord Neuberger of Abbotsbury*, as supplemented on October 21, 2025.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct to the best of my knowledge and belief.

Executed in London, United Kingdom on 3rd November, 2025

The Rt. Hon. Lord Neuberger of Abbotsbury

# Exhibit 46

# COURT OF APPEAL

## May 17, 1995

---

## INTERNATIONAL FINA SERVICES A.G.
### v.
## KATRINA SHIPPING LTD.
## AND TONEN TANKER KABUSHIKI KAISHA

## (THE "FINA SAMCO")

Before Lord Justice NEILL,
Lord Justice ROCH and
Lord Justice AULD

**Charter-party (Time) — Duty to maintain clause — Indemnity — Off-hire — Eleven stoppages of discharge due to boiler trouble — Vessel ordered off berth due to deteriorating weather conditions — Seawater found to have entered boiler through crack in condenser — Whether owners failed to comply with duty to maintain obligation — Whether vessel off-hire — Whether charterers entitled to be indemnified for loss of time.**

By a time charter dated June 27, 1989 the owners let their vessel *Fina Samco* to the head charterers Katrina for a period of 18 months 30 days more or less in charterers' option with a further option for another 18 months 30 days more or less which the charterers exercised. The charter was in the Shelltime 4 form and provided inter alia:

    3. *Duty to maintain*

    (i) Throughout the charter service, Owners shall, whenever the passage of time, wear and tear or any event . . . requires steps to be taken to maintain or restore the conditions stipulated in Clauses 1 and 2(a), exercise due diligence so to maintain or restore the vessel.

    (ii) If at any time whilst the vessel is on hire under this charter the vessel fails to comply with the requirements of Clauses 1, 2(a) or 10 then hire shall be reduced to the extent necessary to indemnify Charterers for such failure . . .

    21. *Off-hire*

    (a) On each and every occasion that there is loss of time (whether by way of interruption in the vessel's service . . . or in any other manner) (i) due to . . . breakdown (whether partial or total) of . . . boilers . . . and such loss continues for more than three consecutive hours (if resulting from interruption in the vessel's service) . . . then . . . the vessel shall be off-hire from the commencement of such loss of time until she is again ready and in an efficient state to resume her service . . .

Katrina sub-chartered the vessel to Tonen by a time charter dated May 23, 1990 on identical terms save for the rate of hire.

The vessel was ordered to carry three grades of crude oil from the Gulf to two Japanese discharge ports, Tomakomai and Nagoya.

At 16 12 on Oct. 21, 1990 the vessel arrived at Tomakomai and discharge commenced at 01 12 on Oct. 22. At 01 24 on Oct. 22 discharge was suspended due to boiler trouble. Discharge recommenced at 01 48 but, again due to the same trouble, was stopped at 02 00. Between 01 12 and 08 48 there were no less than 11 stoppages of discharge ranging in length from six minutes to 36 minutes and by 08 30 amounted in aggregate to three hours two minutes. After 08 48 stoppages continued while attempts were made to diagnose the boiler trouble.

At 11 15 on Oct. 22 the berthing master ordered the vessel to leave the berth due to deteriorating weather and sea conditions and the vessel was unable to return to her berth until Nov. 8.

On Nov. 1 it was found that seawater had entered the boilers through a crack in the condenser. The crack was rapidly plugged and boiler tests were completed by 11 30 on Nov. 1. It was found that the boiler defect had not existed at the delivery of the vessel.

The vessel did not get back to her berth until 13 00 on Nov. 8 and discharging resumed at 14 45. With one subsequent withdrawal due to sea conditions discharge was completed at 07 30 on Nov. 14, 1990.

The charterers claimed that the vessel was off-hire from Oct. 22 because there had been a loss of time due to interruption of the service or partial loss of service by the boiler breakdown, such loss lasting more than three hours. In the alternative they relied on the indemnity provided by cl. 3(ii) of the charter contending that there was a loss of time caused by the failure of the vessel to comply with the requirements of cl. 1.

The material issues between the owners and Katrina were the same as the issues between Katrina and Tonen.

The dispute was referred to arbitration and the arbitrator held that the vessel was not off-hire under the terms of the off-hire clause but that Katrina and Tonen were entitled by cl. 3(ii) to an indemnity in respect of time lost and expenses caused by the boiler deficiencies. The arbitrator held that Katrina were entitled to a reduction of hire to the extent of U.S.$432,480.50 and Tonen to the extent of U.S.$613,190.

The owners appealed against that part of the award which held that the charterers could recover an indemnity under cl. 3(ii) and Katrina appealed against that part of the award which held that the vessel was not off-hire.

————*Held*, by Q.B. (Com. Ct.) (COLMAN, J.), that (1) the purpose and effects of cl. 3(ii) was to provide charterers with a remedy for losses due to breach of cll. 1, 2(a) and 10; by providing for an indemnity by way of reduction of hire it reflected the unqualified or absolute nature of the owners' obligations under these clauses;

(2) the clause provided a remedy by way of indemnity for losses sustained while the vessel was on hire caused by breach of a group of obligations under the charter which were of an unqualified nature; it was not

concerned with the actual or potential loss of the cll. 1 or 2(a) characteristics after delivery where there was no deficiency at the time of delivery; if there was loss of time due to non-compliance with the cll. 1, 2(a) or 10 obligations there would be cl. 3(ii) indemnity and the vessel might also go off-hire under the off-hire clause but there was nothing in cl. 3(ii) which provided in addition to those remedies for breach of cl. 3(i) an indemnity by way of reduction of hire; and the owners' appeal succeeded;

(3) under cl. 21(a) the charterers had to point either to a continuous interruption of service lasting more than three hours or an aggregate loss of time of three hours resulting from partial loss of service; they could not establish a continuous interruption exceeding three hours at any time before 08 48; there were 10 separate interruptions of service caused by the boiler tripping and each stoppage represented a separate interruption;

(4) there was no finding of fact on the basis of which it could be said that there was a partial loss of service; all that the findings amounted to were 10 separate interruptions of service and there was nothing to justify cumulating any time before 08 48 on Oct. 22; it was impermissible to identify as a partial loss of service separate interruptions of service which had been due to the same effect and the arbitrator had correctly concluded that the vessel was not off-hire from 01 24 on Oct. 22, 1990;

(5) the service required of the vessel after 11 15 was to await the improvement of the sea conditions off the berth and that service was not interrupted by the boiler defects or anything else; the loss of time due to interruption of service extended from 08 48 to 11 15 and since this was less than three hours, the off-hire clause was not applicable; the arbitrator was right to conclude that the vessel was never off-hire at any stage and the charterers' appeal would be dismissed;

(6) the award would be set aside to the extent that it awarded the charterers an indemnity in respect of loss time and expenses of U.S.$540,736.84 and the award in favour of the sub-charterers would also be set aside.

The head charterers (Katrina) appealed the issue for decision being:

Whether clause 3(ii) of the charterparty in the Shelltime 4 form can be paraphrased:

"If at any time whilst the vessel is on hire deficiencies in clause 1 or 2(a) characteristics existing at the time of the delivery continue or there occur deficiencies of space contrary to clause 10, then hire shall be reduced . . . "

and should be so construed.

————*Held*, by C.A. (NEILL, ROCH and AULD, L.JJ.), that cl. 3(ii) had to be construed in the context of the other provisions of the charter; in particular it had to be construed in the context and in conjunction with cl. 3(i); cl. 3(iii) contained provisions as to what was to happen if the owners were in breach of the obligations under cl. 3(i); those provisions in effect gave the owners a period of 30 days after notification of a breach to comply with the due diligence requirement before the vessel went off-hire; and although a breach of cl. 3(i) could give rise to a claim for damages and the remedy under cl. 3(iii) was not the only remedy availa-

ble it was impossible to fit an absolute obligation under cl. 2 of the kind suggested by the charterers (i.e. that the owners were under an absolute obligation to keep the vessel up to the same standard when it was delivered) alongside the due diligence obligations in cl. 3(ii); the question posed would be answered in the affirmative (*see* p. 351, col. 2; p. 352, col. 1).

———————

The following cases were referred to in the judgment of Lord Justice Neill:

Antaios Compania Naviera S.A. v. Salen Rederierna A.B., (H.L.) [1984] 2 Lloyd's Rep. 235; [1985] A.C. 191;

Arbuthnott v. Fagan, (C.A.) July 30, 1993 unreported;

Miramar Maritime Corporation v. Holborn Oil Trading Ltd., (H.L.) [1984] 2 Lloyd's Rep. 129; [1984] A.C. 676;

Wickman Machine Tools Sales Ltd. v. Schuler A.G., (H.L.) [1973] 2 Lloyd's Rep. 53; [1974] A.C. 235.

———————

This was an appeal by the head charterers Katrina Shipping Ltd. and the sub-charterers Tonen Tanker Kabushiki Kaisha from the decision of Mr. Justice Colman ([1994] 1 Lloyd's Rep. 153) allowing the appeal of the owners International Fina Services A.G. against the arbitration award made by Mr. Christopher Moss as sole arbitrator in which he held inter alia that Katrina and Tonen were entitled to be indemnified by the owners for breach of the owners' duty to maintain the vessel.

Mr. Bernard Eder, Q.C. and Mr. Joe Smouha (instructed by Messrs. Stephenson Harwood) for the plaintiff owners; Mr. Jeremy Cooke, Q.C. and Mr. Stephen Hofmeyr (instructed by Messrs. Clifford Chance) for Tonen; Mr. Andrew Wales (instructed by Messrs. Ince & Co.) for Katrina.

The further facts are stated in the judgment of Lord Justice Neill.

Judgment was reserved.

Thursday June 22, 1995

———————

## JUDGMENT

**Lord Justice NEILL:** By a time charter dated June 22, 1989 International Fina Services A.G. as

the disponent owners let the VLCC *Fina Samco* to Katrina Shipping Ltd. (Katrina) for a period of 18 months, 30 days more or less in charterers' option with charterers having a further option for another 18 months, 30 days more or less. Katrina exercised this further option. The charter-party was on an amended Shelltime 4 form.

By a sub-charter-party dated May 23, 1990 Katrina sub-chartered the vessel to Tonen Tanker K.K. (Tonen) on terms which were in substance identical to those in the head charter save for the rate of hire.

Under a voyage charter-party between Tonen and Idemitsu Kosan Co. Ltd. (Idemitsu) the vessel was ordered to carry three grades of crude oil from the Arabian Gulf to two Japanese discharge ports.

The vessel arrived at the sea berth at Tomakomai at 16 12 on Oct. 21, 1990. Discharge commenced at 01 12 on Oct. 22. At 01 24 on Oct. 22 discharge was suspended due to boiler trouble. At 01 48 discharge started again but during the next few hours there were no less than 10 further stoppages. Discharge finally stopped at 08 48. At 11 15 the berthing master ordered the vessel to leave the berth which was in an exposed position. It was subsequently found as a result of a boiler water analysis that seawater had entered the boilers through a crack in the condenser. The vessel was not able to return to the berth until 13 00 on Nov. 8; discharge resumed at 14 45 on the same day. The discharge at Tomakomai was completed by 07 30 on Nov. 14, 1990.

Following these events Katrina and Tonen withheld hire under the head charter and sub-charter respectively, claiming that they were entitled to do so because the vessel had been off-hire due to interruption of the service or partial loss of service by the boiler breakdown, or alternatively because they were entitled to rely on an indemnity in cl. 3(ii) of their respective charter-parties.

There then followed arbitration proceedings between the owners and Katrina, and between Katrina and Tonen. The proceedings were heard together by Mr. Christopher Moss sitting as the arbitrator. By his award dated June 10, 1993 he rejected the claims that the vessel had been off-hire at the relevant time but upheld the claims for an indemnity under cl. 3(ii) of the respective charter-parties and concluded that there had been a loss to Katrina and Tonen respectively of 18 days 19 hours and 37 minutes as a result of the boiler problems (Reasons, par. 80). The basis of the arbitrator's decision that the vessel had not been off-hire was because the charterers had been unable to prove that there had been a continuous interruption of service lasting more than three hours or an aggregate loss of time of three hours resulting from partial loss of

service, as required by cl. 21(a) of the charter-parties.

The parties appealed to the High Court pursuant to s. 1 of the Arbitration Act, 1979. By his judgment dated Oct. 5, 1993 Mr. Justice Colman held that the arbitrator had been right to conclude that the vessel never went off-hire at any stage, but further decided that neither Katrina nor Tonen was entitled to an indemnity under cl. 3(ii) of their charter-parties. Accordingly he set aside the arbitrator's award insofar as the arbitrator had made awards in favour of Katrina and Tonen for a reduction in hire and for additional expenses ([1994] 1 Lloyd's Rep. 153).

Mr. Justice Colman refused Katrina and Tonen leave to appeal to the Court of Appeal pursuant to s. 1(7)(a) of the 1979 Act but certified, in accordance with s. 1(7)(b) of the Act, that the following question of law was one of general public importance:

Whether clause 3(ii) of the charterparty in the Shelltime 4 form can be paraphrased:

If at any time whilst the vessel is on hire deficiencies in clause 1 or 2(a) characteristics existing at the time of the delivery continue or there occur deficiencies of space contrary to clause 10, then hire shall be reduced . . .

and should be so construed.

Leave to appeal was given by Lord Justice Staughton on Jan. 13, 1994. The decision of the Judge is now reported in [1994] 1 Lloyd's Rep. 153. It will be seen that the appeal is limited to the operation of the indemnity under cl. 3(ii). We are not concerned with the contention below that the vessel was off-hire within the meaning of cl. 21.

*The relevant clause in the charter-parties*

The following terms in Shelltime 4 are material. It will be convenient to group the clauses under the side headings in the charter-party, but it is important to remember that by cl. 42 it was provided:

The side headings have been included in this charter for convenience of reference and shall in no way affect the construction hereof.

*Description and condition of vessel*

1. At the date of delivery of the vessel under this charter

(a) she shall be classed: A. B. S.

(b) she shall be in every way fit to carry crude petroleum and/or its products;

(c) she shall be tight, staunch, strong, in good order and condition, and in every way fit for the service, with her machinery, boilers, hull and other equipment (including but not limited

to hull stress calculator and radar) in a good and efficient state;

(d) her tanks, valves and pipelines shall be oil-tight;

(e) she shall be in every way fitted for burning

at sea — [type of fuel stated]

in port — [type of fuel stated];

(f) she shall comply with the regulations in force so as to enable her to pass through the Suez and Panama Canals by day and night without delay;

(g) she shall have on board all certificates, documents and equipment required from time to time by any applicable law to enable her to perform the charter service without delay;

(h) she shall comply with the description in Form B appended hereto, provided however that if there is any conflict between the provisions of Form B and any other provision, including this Clause 1 of this charter, such other provision shall govern.

*Shipboard Personnel and their Duties*

2. (a) At the date of delivery of the vessel under this charter

(i) she shall have a full and efficient complement of master, officers and crew for a vessel of her tonnage, who shall in any event be not less than the number required by the laws of the flag state and who shall be trained to operate the vessel and her equipment competently and safely;

(ii) all shipboard personnel shall hold valid certificates of competence in accordance with the requirements of the law of the flag state;

(iii) all shipboard personnel shall be trained in accordance with the relevant provisions of the International Convention on Standards of Training, Certification and Watchkeeping for Seafarers, 1978;

(iv) there shall be on board sufficient personnel with a good working knowledge of the English language to enable cargo operations at loading and discharging places to be carried out efficiently and safely and to enable communications between the vessel and those loading the vessel or accepting discharge therefrom to be carried out quickly and efficiently.

(b) Owners guarantee that throughout the charter service the master shall with the vessel's officers and crew, unless otherwise ordered by Charterers:

(i) prosecute all voyages with the utmost despatch;

(ii) render all customary assistance; and

(iii) load and discharge cargo as rapidly as possible when required by Charterers or their agents to do so, by night or day, but always in accordance with the laws of the place of loading or discharging (as the case may be) and in each case in accordance with any applicable laws of the flag state.

*Duty to Maintain*

3. (i) Throughout the charter service Owners shall, whenever the passage of time, wear and tear or any event (whether or not coming within Clause 27 hereof) requires steps to be taken to maintain or restore the conditions stipulated in Clauses 1 and 2(a), exercise due diligence so to maintain or restore the vessel.

(ii) If at any time whilst the vessel is on hire under this charter the vessel fails to comply with the requirements of Clauses 1, 2(a) or 10 then hire shall be reduced to the extent necessary to indemnify Charterers for such failure. If and to the extent that such failure affects the time taken by the vessel to perform any services under this charter, hire shall be reduced by an amount equal to the value, calculated at the rate of hire, of the time so lost.

Any reduction of hire under this sub-Clause (ii) shall be without prejudice to any other remedy available to Charterers, but where such reduction of hire is in respect of time lost, such time shall be excluded from any calculation under Clause 24.

(iii) If owners are in breach of their obligations under Clause 3(i) Charterers may so notify Owners in writing: and if, after the expiry of 30 days following the receipt of any such notice, Owners have failed to demonstrate to Charterers' reasonable satisfaction the exercise of due diligence as required in Clause 3(i), the vessel shall be off-hire, and no further hire payments shall be due, until Owners have so demonstrated that they are exercising such due diligence . . .

*Payment of Hire*

9. Subject to Clause 3(iii) payment of hire shall be made in immediately available funds to:

[details of payment by telegraphic transfer to an identified account were given]

per calendar month in advance, less:

(i) any hire paid which Charterers reasonably estimate to relate to off-hire periods, and

(ii) any amounts disbursed on Owners' behalf, any advances and commission thereon, and charges which are for Owners' account pursuant to any provision thereof, and

(iii) any amounts due or reasonably estimated to become due to Charterers under Clause 3(ii) or 24 hereof . . .

*Space Available to Charterers*

10. The whole reach, burthen and decks of the vessel and any passenger accommodation (including Owners' suite) shall be at Charterers' disposal, reserving only proper and sufficient space for the vessel's master, officers, crew, tackle, apparel, furniture, provisions and stores, provided that the weight of stores on board shall not, unless specially agreed, exceed 300 tonnes at any time during the charter period . . .

*Off-Hire*

21. (a) On each and every occasion that there is loss of time (whether by way of interruption in the vessel's service or, from reduction in the vessel's performance, or in any other manner)

(i) due to deficiency of personnel or stores; repairs; gas-freeing for repairs; time in and waiting to enter dry dock for repairs; breakdown (whether partial or total) of machinery, boilers or other parts of the vessel or her equipment (including without limitation tank coatings); overhaul, maintenance or survey; collision, stranding, accident or damage to the vessel; or any other similar cause preventing the efficient working of the vessel; and such loss continues for more than three consecutive hours (if resulting from interruption in the vessel's service) or cumulates to more than three hours (if resulting from partial loss of service); or . . .

then without prejudice to Charterers' rights under Clause 3 or to any other rights of Charterers hereunder or otherwise the vessel shall be off-hire from the commencement of such loss of time until she is again ready and in an efficient state to resume her service from a position not less favourable to Charterers than that at which such loss of time commenced; provided, however, that any service given or distance made good by the vessel whilst off-hire shall be taken into account in assessing the amount to be deducted from hire.

(b) If the vessel fails to proceed at any guaranteed speed pursuant to Clause 24, and such failure arises wholly or partly from any of the causes set out in Clause 21(a) above, then the period for which the vessel shall be off-hire

under this Clause 21 shall be the difference between

(i) the time the vessel would have required to perform the relevant service at such guaranteed speed, and

(ii) the time actually taken to perform such service (including any loss of time arising from interruption in the performance of such service).

For the avoidance of doubt, all time included under (ii) above shall be excluded from any computation under Clause 24.

In addition I should refer to, but I need not set out, cl. 24 which, with the side heading "Detailed Description and Performance", contained a guarantee by the owners that the speed and consumption of the vessel should be as stated, and also contained provisions for deduction from or additions to the hire if the vessel failed to meet or exceeded the speed or consumption so specified.

*The decision of the arbitrator*

In reaching his decision that the vessel was at no time off-hire by reason of the boiler breakdown the arbitrator held that —

. . . the three hour requirement necessary to trigger clause 21 must be taken to have been intended specifically to exclude short interruptions . . .

such as those which occurred before 08 48 on Oct. 22, 1990. In addition the arbitrator accepted the owners' argument that the earliest that the vessel could have gone off-hire would have been 11 48, that is, three hours after 08 48 when discharge stopped, but that this period of three hours could not be relied upon because at 11 15 the vessel was ordered to leave the berth because of impending bad weather.

There are two other important matters to note before coming to cl. 3(ii) and par. 68 of the arbitrator's Reasons. First, it was conceded by the respective charterers that at the date of delivery of the vessel the vessel was "tight, staunch etc." and that the boilers were "in a good and efficient state": see cl. 1(c). Secondly, the arbitrator found that the owners were not in breach of their obligations under cl. 3(i) to exercise due diligence to repair the boilers once a defect had become apparent (Reasons, pars. 60–64).

It follows therefore: (a) That at all material times the vessel was on-hire; and (b) That there was no breach of any of the owners' obligations under cll. 1(c) or 3(i).

One turns therefore to cl. 3(ii) of the charterparty.

# LLOYD'S LAW REPORTS

It will be seen at once that cl. 3(ii) gives rise to difficulty when read in conjunction with cll. 1 and 2. The opening words of cl. 3(ii):

If at any time whilst the vessel is on hire under this charter the vessel fails to comply . . .

appear to be apt to cover a failure *occurring* whilst the vessel is on hire. Moreover, such a construction can be used without difficulty in relation to cl. 10. But the words "fails to comply" are followed by the words "with the requirements of clauses 1, 2(a) or 10 . . . ". Both clauses 1 and 2(a) open with the words "at the date of delivery of the vessel under this charter . . . ".

The crucial question to be determined therefore is the proper construction in the context of the words "the requirements" of cll. 1 and 2(a).

The arbitrator answered this question in par. 68 of his Reasons as follows:

It seemed to me that the introductory words to clause 3(ii) — "If at any time whilst the vessel is on hire under this charter" — could only be construed as providing an indemnity in respect of the requirements regarding the condition of the vessel in clauses 1, 2(a) and 10 throughout the period of the charter service. . . . The side note to clause 3 is entitled "Duty to Maintain" and I consider that the purpose of clause 3(ii) is to provide the charterer who cannot bring himself within the off-hire clause with an indemnity in respect of hire which he has paid for a consideration which has failed. Ex hypothesi clause 3(ii) only applies when the vessel is on hire, so it seemed to me that it could not be said that it cut across the off-hire clause.

## The decision of the Judge

The owners appealed from the arbitrator's decision in accordance with s. 1 of the 1979 Act. The Judge upheld the arbitrator's conclusion that the vessel was at no time off-hire, but he reached a different conclusion as to the proper construction of cl. 3(ii). I should refer to parts of his judgment in [1994] 1 Lloyd's Rep. 153 at p. 159:

In my judgment the purpose and effect of cl. 3(ii) is to provide charterers with a remedy for losses due to *breach* of cll. 1, 2(a) and 10. It does this by providing for an indemnity by way of reduction of hire calculated in the manner described. By so doing it reflects the unqualified or absolute nature of owner's obligations under those clauses. The opening words of the clause are needed to express the need for the continuing incidence after delivery of the vessel's deficiency in the cll. 1 and 2(a) characteristics which existed at delivery and the incidence at any time after delivery while on hire of deficiencies of space contrary to cl. 10.

The Judge then suggested a paraphrase of cl. 3(ii), which has been reproduced in the certified question now before us.

The Judge then continued:

It is perfectly true that, as Mr. Cooke has pointed out, if the vessel was deficient in any of the cll. 1 and 2(a) characteristics at delivery the time at which it failed to comply with cll. 1 and 2(a) must already have passed once it came on hire. Accordingly it could be said that this suggested that cl. 3(ii) was not triggered by a *breach* of cll. 1 or 2(a) but rather by mere subsequent deficiency in the cll. 1 or 2(a) characteristics. I accept that cl. 3(ii) is not worded with perfect accuracy so as to achieve the meaning which, in my judgment, the sense of the clause and its relationship with the other clauses give it. Nonetheless, the draftsman has, I consider, sufficiently clearly expressed the sense that (i) when the clause refers to the vessel having failed to comply with requirements of those three clauses it refers to breaches of those clauses and (ii) when the clause identifies the relevant time when the non-compliance took place, although as regards cl. 10 it was concerned with the time when the breach itself took place and continued, as regards cll. 1 and 2(a) it was concerned with the continuing incidents whilst on hire of those deficiencies of the vessel or its personnel which had already amounted to a breach of those clauses at delivery.

The clause thus provides a remedy by way of indemnity for losses sustained while the vessel is on hire caused by breach of a group of obligations under the charter which are of an unqualified nature. So construed it is not concerned with the actual or potential loss of the cll. 1 or 2(ii) characteristics after delivery where there was no deficiency at the time of delivery. That eventuality falls within cl. 3(i) and gives rise to a quite separate due diligence obligation to which cl. 3(iii) is an ancillary sanction. If there is loss of time due to non-compliance with the cll. 1, 2(a) or 10 obligations there will be a cl. 3(ii) indemnity and the vessel may also go off-hire under the off-hire clause. If there is loss of time due to non-compliance with a cl. 3(i) obligation, the vessel may go off-hire under cl. 3(iii) or under the off-hire clause. In my judgment, however, there is nothing in cl. 3(ii) which provides, in addition to those remedies for breach of cl. 3(i), an indemnity by way of reduction of hire.

The Judge then set out the particular reasons which had led him to this conclusion:

(i) The use in cl. 3(ii) of the word "requirements" as distinct from "conditions" in cl. 3(i) — a strong indicator that cl. 3(ii) is concerned

with non-compliance with obligations, as distinct from non-existence of physical or crew characteristics

(ii) The extreme improbability that, having created a qualified due diligence obligation in cl. 3(i), the parties would have agreed to an indemnity for losses attributable to deficiencies the occurrence of which was not in itself a breach by owners, but merely placed them under that qualified remedial obligation.

(iii) The absence of any qualified remedial obligation in respect of breaches of cll. 1, 2(a) or 10.

### The proper approach to the construction of the clause

It is necessary to remember that this is a commercial document and that one must therefore strive to attribute to it a meaning which accords with business commonsense. Moreover, this approach conforms with the following guidance which can be collected from recent authority:

(1) The fact that a particular construction leads to a very unreasonable result must be a relevant consideration. The more unreasonable the result the more unlikely it is that the parties can have intended it, and if they do intend it the more necessary is it that they shall make their intention abundantly clear [*Wickman Tools v. Schuler A.G.*, [1973] 2 Lloyd's Rep. 53 at p. 57, col. 2; [1974] A.C. 235 at p. 251E per Lord Reid].

(2) There must be ascribed to the words a meaning that would make good commercial sense if the [bill of lading] were issued in *any* of these situations, and not some meaning that imposed upon a transferee to whom the bill of lading for goods afloat was negotiated, a financial liability of unknown extent that no businessman in his senses would be willing to incur [*Miramar Maritime Corporation v. Holborn Oil Trading Ltd.*, [1984] 2 Lloyd's Rep. 129 at p. 131, col. 1; [1984] A.C. 676 at p. 682 per Lord Diplock].

(3) If detailed semantic and syntactical analysis of words in a commercial contract is going to lead to a conclusion that flouts business commonsense, it must be made to yield to business commonsense [*Antaios Compania Naviera S.A. v. Salen Rederierna A.B.*, [1984] 2 Lloyd's Rep. 235 at p. 238, col. 2; [1985] A.C. 191 at p. 201 per Lord Diplock].

(4) Courts will never construe words in a vacuum. To a greater or lesser extent, depending on the subject matter, they will wish to be informed of what may variously be described as the context, the background, the factual matrix or

the mischief. To seek to construe any instrument in ignorance or disregard of the circumstances which gave rise to it or the situation in which it is expected to take effect in my view pedantic, sterile and productive of error. But that is not to say that an initial judgment of what an instrument was or should reasonably have been intended to achieve should be permitted to override the clear language of the instrument, since what an author says is usually the surest guide to what he means. To my mind construction is a composite exercise, neither uncompromisingly literal nor unswervingly purposive: the instrument must speak for itself, but it must do so *in situ* and not be transported to the laboratory for microscopic analysis [*Arbuthnott v. Fagan*, (July 30, 1993) (unreported) per Sir Thomas Bingham M.R.].

(5) Dictionaries never solve concrete problems of construction. The meaning of words cannot be ascertained divorced from their context. And part of the contextual scene is the purpose of the provision [*Arbuthnott v. Fagan* (supra) per Lord Justice Steyn].

With this guidance in mind I turn to consider the construction of cl. 3(ii) in the context of these two charter-parties.

### The meaning of cl. 3(ii)

The arguments as to the construction of clause 3(ii) which were advanced on behalf of the charterers and which found favour with the arbitrator can be summarized as follows:

(a) Proper weight has to be given to the opening words of cl. 3(ii) — "if at any time whilst the vessel is on hire under this charter . . . " The subsequent words " . . . the vessel fails . . . " must be read in conjunction with the opening words of the clause.

(b) The word "fails" is in the present tense. Accordingly the failure contemplated is a failure at any time whilst the vessel is on hire. If a failure at the point of delivery had been contemplated words such as "has failed to comply" would have been used.

(c) The failure contemplated is a failure to comply with the "requirements" of cll. 1, 2(a) or 10. In the context the word "requirements" does not mean legal obligations. The word is apt to refer to characteristics. The owners' construction not only ignores the opening words but also demands a strained construction of the words "fails to comply with the requirements". Thus the owners contend that "the requirements of clauses 1 and 2(a)" are limited to the requirements at the date of delivery and that a failure to comply must be construed accordingly. But if the requirements are so limited then ex hypothesi there cannot be a *failure* while the vessel is on hire. Nor can there be, on the

owners' own argument, a "continuing failure". The *failure*, if any, occurred at the date of delivery.

(d) It is common ground that a failure to comply with the provisions in cl. 10 as to the space to be made available to the charterers could occur at any time "whilst the vessel is on hire". It is therefore logical to construe "fails to comply" with cll. 1 or 2(a) as applying to occurrences during the on-hire period.

(f) The owners' argument involves the proposition that the words "fails to comply with the requirements" means that there has been a breach of the charter and thus a breach at the date of delivery. But the word "breach" is not used in cl. 3(ii) and the wording of cl. 3(ii) is to be contrasted with the words "in breach of their obligations under clause 3(i)" in cl. 3(iii). The charterparty would have used the word "breach" if that had been intended.

(g) If the owners' argument is correct cl. 3(ii) serves little if any purpose in relation to a failure to comply with cll. 1 or 2(a). Breaches of those clauses would in any event give rise to claims for damages. The right to an indemnity would add little to the charterers' other rights. Nor would much be added by the right under cl. 9 to make deductions from the payment of hire.

(h) The argument that the charterers' construction of the clause flouts business commonsense cannot be sustained. Shelltime 2, which was the Shelltime form current between 1958 and 1963, contained the following provision in cl. 24:

> Should the vessel during the charter period fail to comply in any respect with the said description, hire shall be reduced to the extent necessary to indemnify charterers for such failure, the charter remaining otherwise unaffected.

It is right to note, however, that the "description" referred to in this sentence was that set out in a document attached to the charter-party and was in terms which the Court has not seen.

These are very formidable arguments. In particular the argument summarized at (c) above exposes the problems created by the owners' construction of the words " . . . fails to comply with the requirements . . . ". If the word "requirements" means and is limited to "requirements at the date of delivery" it is difficult to see how a failure to comply with these requirements can occur after that date has passed.

The owners sought to counter the charterers' arguments in a number of ways. They drew attention to the fact that whereas in cl. 3(i) reference was made to "the conditions stipulated in clauses 1 and 2(a)", in cl. 3(ii) the reference was to "the requirements of clauses 1 and 2(a)". The word "requirements" imported a legal obligation. The legal obligation was to be found in cll. 1 and 2(a) and was in terms linked to "the date of delivery of the vessel". It was true that the word "breached" was not used in cl. 3(ii), but this was readily explained by the fact that cl. 1 was concerned with the description of the *vessel* and cl. 2(a) was concerned with the numbers and standards of the shipboard personnel.

In addition the owners raised a number of detailed points as to the effect which the charterers' construction of cl. 3(ii) might have on the off-hire provisions in cl. 21.

As I said earlier, the crucial question to be determined is the proper construction in the context of the words "the requirements" in cl. 3(ii).

I have set out at some length the cogent arguments advanced on behalf of the charterers in support of their construction. In the end, however, I have felt obliged to reject these arguments not by means of any linguistic analysis but because I have found it impossible to fit cl. 3(ii) (on the charterers' construction) into the rest of the charter-parties and in particular into the rest of cl. 3 in a way which makes any commercial or business sense. Nor is the charterers' construction so clear that one is forced to adopt it.

In reaching my conclusion I have found it necessary to consider the scope of the indemnity which would result if the charterers' construction were correct. For this purpose I have ignored the provisions of cl. 10. On the charterers' construction cl. 3(ii) would be triggered if at any time while the vessel was on-hire: (a) the vessel ceased to accord with the provisions as to her description and condition with which she had had to comply under cl. 1 at the time of delivery; or (b) the shipboard personnel ceased to accord with the provisions as to their numbers and standards with which they had had to comply at the time of the delivery of the vessel.

Once cl. 3(ii) had been triggered the charterers would then become entitled to deduct from hire such amount as would be necessary to indemnify them against any loss suffered by reason of the triggering event. This indemnity would include an amount equal to the value of the time lost by reason of the triggering event.

To put the matter shortly, the charterers would be entitled to an indemnity whenever the vessel fell below the standard laid down for its condition on delivery. The owners would therefore have to keep the vessel up to the same standard as when it was first delivered and this would be an absolute obligation.

Clearly it would be possible for parties to a charter-party to impose absolute obligations to subsist throughout the period of hire. It may be that cl. 24 in Shelltime 2 had this or some similar effect.

But cl. 3(ii) has to be construed in the context of the other provisions of the charter-party. In particular it has to be construed in the context of and in conjunction with cl. 3(i). I should repeat cl. 3(i):

> Throughout the charter service owners shall, whenever the passage of time, wear and tear or any event (whether or not coming within clause 27 hereof) requires steps to be taken to maintain or restore the conditions stipulated in clauses 1 and 2(a), exercise due diligence so as to maintain or restore the vessel.

Clause 3(iii) contains provisions as to what is to happen if the owners are in breach of the obligations under cl. 3(i). These provisions in effect give the owners a period of 30 days after notification of a breach to comply with the due diligence requirement before the vessel goes off-hire. It is true that a breach of cl. 3(i) could give rise to a claim for damages and that the remedy under cl. 3(iii) is not the only remedy available, but I find it impossible to fit an absolute obligation under cl. 3(ii) of the kind suggested by the charterers alongside the due diligence obligations in cl. 3(i).

The Judge described cl. 3(ii) as not being worded "with perfect accuracy". I would use stronger language. But, though Mr. Cook presented the arguments on behalf of the charterers with the greatest skill I am unable to construe cl. 3(ii) in the way he suggested. Such a construction does not make sense in the context of cl. 3 as a whole.

I return to the question of law for which the Judge granted a certificate in accordance with s. 1(7)(b) of the 1979 Act.

I confess that I have found it easier to decide that the charterers' construction cannot be correct than to reach a final conclusion as to the suggested paraphrase. In the end, however, I have not found a more satisfactory formula and accordingly I would answer the question posed in the affirmative.

**Lord Justice ROCH:** I agree.

**Lord Justice AULD:** I also agree.

---

## COURT OF APPEAL

June 20 and 21, 1995

---

ASTILLEROS ESPAÑOLES S.A.
AND BANCO EXTERIOR DE ESPAÑA
S.A.
v.
BANK OF AMERICA NATIONAL TRUST
AND SAVINGS ASSOCIATION

Before Lord Justice EVANS,
Lord Justice OTTON and
Lord Justice PILL

Banking — Letter of guarantee — Construction — Shipbuilding contract — Default in payment of instalments — Defendants made payments — Whether payments discharged defendants' liability under guarantee.

The plaintiffs were the well known Spanish shipyard and their bankers were the beneficiaries of a letter of guarantee dated Oct. 31, 1983 issued by the defendants. The letter of guarantee provided inter alia:

> 5. . . . (b) With effect from the maturity date of Promissory Note No. 1 (namely 30th April 1986) or such earlier date on which any of the . . . sixteen (16) Promissory Notes may be prepaid in accordance with the terms thereof, the said maximum liability of the [defendants] shall be reduced proportionately as and when payment of each amount of principal and/or interest in respect of the said Promissory Notes shall have been duly made to [the plaintiffs] . . .

The letter of guarantee was issued pursuant to a shipbuilding contract between the yard and Sea Rapid Maritime Corporation under which the yard built a vessel *Wayfarer* and delivered the vessel to Sea Rapid on deferred credit terms. The purchase price was payable in 16 semi-annual instalments between Oct. 31, 1986 and Oct. 31, 1993 and interest was to be paid semi-annually starting on Apr. 31, 1984. The first four payments were payments of interest only, the 5th to 20th payments each consisted of an instalment of principal and a payment of 6 months interest on the reducing amount of principal outstanding.

Each of the promissory notes included a default provision and in the event of the failure to pay the principal or interest on the note on the due date and in the event that the default should continue for a period of 14 days the principal on the note and accrued interest thereon might at the option of the yard be declared to be and become immediately due and payable.

Sea Rapid only made the first three payments. Thereafter payments numbers 4 to 15 and a 16th payment were made by the defendants within 14 days of the due date.

A dispute arose on the construction of the letter of guarantee.

The defendants contended that on the true construction of cl. 5(b) their maximum liability under the letter of guarantee was reduced by the amount of each of the

# Exhibit 47

Case No: A3/2006/2654

<u>Neutral Citation Number: [2007] EWCA Civ 11</u>
<u>IN THE SUPREME COURT OF JUDICATURE</u>
<u>COURT OF APPEAL (CIVIL DIVISION)</u>
<u>ON APPEAL FROM THE CHANCERY DIVISION</u>
<u>MANN J</u>
<u>[2006] EWHC 3215 (Ch)</u>

<u>Royal Courts of Justice</u>
<u>Strand, London, WC2A 2LL</u>

<u>Monday  22nd January 2007</u>

Before :

**<u>THE MASTER OF THE ROLLS</u>**
**<u>LADY JUSTICE ARDEN</u>**
and
**<u>LORD JUSTICE DYSON</u>**

- - - - - - - - - - - - - - - - - - - -

Between :

| | |
|---|---|
| **(1) CITIBANK NA** | **First Respondent** |
| | **Second Respondent** |
| **(2) MBIA ASSURANCE SA** | |
| - and - | |
| **QVT FINANCIAL LP** | **Appellant** |

(Transcript of the Handed Down Judgment of
WordWave International Ltd
A Merrill Communications Company
190 Fleet Street, London EC4A 2AG
Tel No: 020 7421 4040  Fax No:  020 7831 8838
Official Shorthand Writers to the Court)

**Mr Andrew Popplewell QC and Mr Jasbir Dhillon (instructed by Reynolds Porter
Chamberlain LLP) for the Appellant
(1) Mr Richard Adkins QC (instructed by Denton Wilde Sapte LLP) for the First Respondent
(2)  Mr Mark Barnes QC and Mr Andrew Lenon QC (instructed by Cadwalader
Wickersham & Taft LLP) for the Second Respondent**

- - - - - - - - - - - - - - - - - - - -

# <u>Judgment</u>
# <u>As Approved by the Court</u>

**Crown Copyright ©**

**Lady Justice Arden :**

*Introduction*

1.  This appeal concerns the rights of parties to a securitisation of debt owed by the Eurotunnel group, the operator of the Channel Tunnel.  The debt in question is known as "Eurotunnel tier 3 junior debt".  Securitisation is a method of finance which has only been developed comparatively recently.  It now accounts for a very considerable volume of the finance raised in the market.  It is said to have had considerable effect on banking systems, and to be of economic importance. As it did in this case, securitisation often takes the form of the dedication of a particular source of cash due to be received from a third party to particular securities issued by a special purpose vehicle, or "SPV", which will often be incorporated in a low tax jurisdiction and which will acquire the cash stream with the proceeds of notes or other securities issued by it.  This cash stream is then used to service the payment of income and capital on those securities and, as here, those securities are often issued on the basis that recourse is limited to the assets which are the source of the cash.

2.  Securitisation may be achieved in many different ways but in this case it is achieved by a declaration of trust of those assets.  The holders of securities are insulated from the effect of insolvency of the company or person producing the source of cash but they can, as this case shows, still be affected in some way by the insolvency or reconstruction of that party.  The securitisation process enables a person who has the right to receive the cash flow stream to diversify the risk attached thereto and to raise money for other purposes of its own.

3.  The securities which an SPV issues may (as here) be issued in tranches, often carrying different credit risk and maturity dates.  This variety can attract a range of investors with different requirements.  There is said to be a cash flow "waterfall" to investors in the order in which they take that credit risk.  The securities can be wholly or partially "enhanced" by the grant of security, including third party security.  In this case, some of the notes issued by the SPV are secured by a guarantee issued by one of the respondents, MBI Assurance SA ("MBIA").  However, those held by the appellant, QVT Financial LP ("QVT"), one of the noteholders, are not so enhanced and QVT is thus at the bottom of the cash "waterfall".  The other respondent to the appeal is the trustee of the security for the notes, Citibank NA ("Citi").

4.  This may be the first case in which the courts have had to consider the rights of the parties to a securitisation.  The appeal has had to be heard and this judgment prepared as a matter of urgency because the dispute turns on whether an option can or should be exercised, and the period for exercise of that option expires fifteen days from 15 January 2007.

*Background to this appeal*

5.   By its claim form dated 20 November 2006, Citi applied for directions from the court in its capacity as trustee of a trust constituted by a trust deed dated 20 February 2001

("the trust deed") between Citi, MBIA and Fixed-Link Finance BV ("FLF") and a deed of charge dated the same date ("the deed of charge"). The subject-matter of the trust is predominantly Eurotunnel tier 3 junior debt owned by FLF. The nominal amount of the debt is denominated in sterling and euros, and FLF holds £506m and €918m of such debt. This has been used to secure seven tranches of notes, referred to below as "the notes", having aggregate nominal amounts of £432,050,000 and €745m. It is not clear whether the Eurotunnel tier 3 junior debt owned by FLF has been formally assigned to the trustee and notice given to the Eurotunnel group, and these proceedings have been conducted on the basis that FLF is the legal holder of this debt.

6.    In August 2006, the Eurotunnel group, having encountered financial difficulties, started proceedings in the French courts for approval by the court of a restructuring plan, called the Safeguard Plan ("SP"). Immediately prior to the hearing of this appeal on 15 January 2007, the Commercial Court of Paris approved the SP pursuant to provisions of the French Commercial Code. So far as relevant, that plan provides for the assignment of the Eurotunnel tier 3 junior debt by FLF to a Eurotunnel company in consideration of the issue of certain notes redeemable as shares in Eurotunnel ("the NRS") plus cash. The plan provides that the holder of Eurotunnel tier 3 debt may elect to receive cash instead of NRS and an amount of cash. I refer to that option as the "tier 3 cash option". This option does not give noteholders the par value of their notes but only some 61.9% of the par value of their notes.

7.    By a letter dated 22 November 2006, MBIA, in its capacity as "note controlling party" as defined in the trust deed, directed the trustee to exercise the tier 3 cash option at the earliest available opportunity. QVT intimated to Citi that it would be contrary to the Citi's position as trustee to exercise or consent to the exercise of the tier 3 cash option. In those circumstances, Citi sought directions from the court. This appeal raises questions of interpretation. It is not concerned with the question of the propriety of the exercise by the trustee or MBIA of any power or with the question whether MBIA would be acting in breach of any implied term of the trust deed or deed of charge.

8.    The matter came before Mann J and the judge gave judgment on 13 December 2006, and by his order declared that on the true construction of the trust deed and deed of charge Citi was obliged to comply with the instruction in the letter dated the 22 November 2006 and in particular that Citi had power to exercise the tier 3 cash option or to instruct FLF to exercise it, that MBIA had power pursuant to the trust deed and deed of charge to direct or instruct Citi to exercise that option and that the exercise of that option did not require the consent of Citi under the negative pledges contained in the deed of charge and conditions attached to the notes.

9.    The judge's judgment contains a clear and useful summary of the underlying facts on this matter, and it is common ground that paragraphs 1 to 24 of his judgment, which I need not repeat, accurately set out the background to this case. I need now only set out those parts of the document which were critical to the argument on this appeal.

*The critical provisions of the trust deed and deed of charge*

10.   Clause 4 of the deed of charge sets out the security which FLF gave over the Eurotunnel tier 3 junior debt in favour of Citi.  It is sufficient to set out the following extract:

> " 4.1 As continuing security for the payment and discharge of the Secured Obligations but always subject to clause 9, the Issuer with full title guarantee, in favour of the Trustee for the Trustee itself and on trust for the Issuer Secured Creditors, hereby assigns by way of security all of its right, title, interest and benefit present and future under or in respect of:
>
> 4.1.1 The Participation Documents… (including… any shares, bonds or other debt obligations of securities issued in exchange, conversion or substitution therefore…) all proceeds thereof…
>
> including… all rights to vote and exercise any other decision -- making rights pursuant to the Participation Documents… "

11.   For this purpose, "Participation Documents" include an agreement called the Credit Agreement "and any document or agreement amending, replacing or supplementing" the Credit Agreement.  The Credit Agreement is the document under which Eurotunnel tier 3 junior debt is repayable.

12.   Clause 8 of the deed of charge is headed " Perfection of  the trustee's security" and it in material part provides:

> "8. PERFECTION OF THE TRUSTEE'S SECURITY
>
> 8.1   The Issuer will from time to time at the request of the Trustee (at the direction of MBIA, if it is the Note Controlling Party) execute and deliver all such supplements and amendments hereto and all such legal assignments, transfers, mortgages, legal or other charges or securities or do all such other acts or things or execute any other documents as may in the opinion of the Trustee or MBIA be necessary or advisable to:
>
> 8.1.1   effectively provide security or to perfect any security provided to the Trustee, on behalf of itself and on behalf of the Issuer Secured Creditors, over the Issuer's estate or interest in any property or assets of whatsoever nature or tenure and wheresoever situate for the payment or discharge of the Secured Obligations;
>
> 8.1.2  take all such actions as are necessary to perfect or

protect the validity of any security made or to be made by or pursuant to this Deed;

8.1.3 enforce any rights under any of the Transaction Documents or Participation Documents to which the Issuer is a party or under which the Issuer has any rights …"

13.    The negative pledge clause (clause 19.4) in the deed of charge provides so far as material as follows:

"The Issuer… will not at any time… without the prior written consent of the trustee and MBIA (for so long as it is the Note Controlling Party):

….

19.4.2 sell, convey, transfer, lease or lend otherwise dispose of (or attempt to sell, convey, transfer or lease, lend otherwise dispose of), whether by means of one or a number of transactions related or not and whether at one time or over a period of time, the whole or any part of the Issuer's undertaking, property or assets, or enter into any agreement (otherwise than an agreement conditional upon the consent or agreement of the Trustee) for any such sale, conveyance, transfer, lease, loan or other disposal."

14.    The negative pledge clause in the conditions attached to the notes is in similar, but not identical, form.  It provides that

"So long as any of the Notes … remain outstanding, the Issuer shall not, without the prior written consent of the Trustee and MBIA …(for so long as it is the Note Controlling Party)…

4.1.1 create or permit to subsist any security interest whatsoever over any of its assets or sell, lend, part with or otherwise dispose of all or any part of its assets, including any uncalled capital or its undertaking present or future."

15.    The "Note Controlling Party" is defined to mean MBIA, unless it is in default or has ceased to be liable on its guarantee of the notes.

16.    Clause 12.2 of the trust deed provides for FLF's rights under the "Financing Agreements", which include the Credit Agreement, to be exercisable by the trustee but the trustee is bound to exercise those rights in accordance with part 1 of schedule 4 to the trust deed:

"12.2     Proceedings relating to the Financing Agreements

Subject to Clause 14.1.7, all the Issuer's rights in respect of the Financing Agreements (including, without limitation, its rights to vote as a Lender (as defined in the Financing Agreements)) which have been assigned to the Trustee pursuant to the Deed of Charge shall, unless and until the Secured Obligations have been discharged in full, be exercised by the Trustee in accordance with Part 1, Schedule 4."

17.     Part I of schedule 4 provides so far as material:

"*Provisions for Meetings of Noteholders and Provisions relating to the Financing Agreements*

*Part 1*

*Provisions for votes in relation to the Financing Agreements*

*If MBIA is the Note Controlling Party*

So long as MBIA is the Note Controlling Party, all the Issuer's rights in respect of the Financing Agreements (including, without limitation, its right to vote as a Lender (as defined in the Financing Agreements)) which have been assigned to the Trustee pursuant to the Deed of Charge shall be exercised by the Trustee acting solely and in all circumstances, in accordance with the prior written instructions of MBIA (subject as aforesaid)."

18.     The trust deed and deed of charge both contain provisions enabling the trustee to waive or consent to actions by FLF.  In the case of the trust deed the relevant provision is clause 8, which provides in material part as follows:

" The Trustee shall, only if directed by MBIA (while MBIA is the Note Controlling Party) and otherwise may…authorise or waive, on such terms and conditions (if any) as shall seem expedient to it or MBIA (whilst the Note Controlling Party), any proposed breach or breach of any of the covenants or provisions contained in these presents, the Notes or any of the other Transaction Documents…; any such authorisation, waiver … shall be binding on the Noteholders… provided that (i) the Trustee shall not exercise any powers conferred upon it by this clause 8.1… so as to authorise or waive any such proposed breach or breach relating to any of the matters the subject of the Basic Terms Modifications…"

19.    The Transaction Documents include the deed of charge.

20.    There is a lengthy definition of "Basic Terms Modification" in part 2 of schedule 4 to the trust deed.  The definition includes any proposal:

> "any proposal
>
> (a) to change any date fixed for payment of principal or interest in respect of the Notes, to reduce the amount of principal or interest payable on any date in respect of the Notes or to alter the method of calculating the amount of any payment in respect of the Notes on redemption or maturity or the date of such payment…
>
> (b) to effect the exchange, conversion or substitution of the Notes for, or the conversion of the Notes into, shares, bonds or other obligations or securities of the Issuer, MBIA or any other person or body corporate formed or to be formed…"

21.    The relevant provision in the deed of charge is clause 31.2 which provides in material part as follows:

> "Any waiver and any consent by the Trustee and MBIA under this Deed must be in writing and may be given subject to any conditions thought fit by the Trustee (acting on the instructions of MBIA for as long as it is the Note Controlling Party)."

*The material provisions of the SP (Safeguard Plan)*

22.    The Commercial Court of Paris gave its approval to the SP on 15 January 2007 subject to an addendum which is not material to this appeal.  The provisions of the SP which are material are as follows:

> "2.2.3.2  Tier 3 Debt
>
> 2.2.3.2.1   The following provisions relate to the Tier 3 Debt:
>
> (a) the holders of the Tier 3 Debt shall assign the debt corresponding to the Tier 3 Debt to GET SA or to a subsidiary designated by GET SA, in exchange of [sic] the consideration described in paragraph 2.2.3.2.1(b);
>
> (b) each of the assignors of the Tier 3 Debt shall be

offered a pro rata share:

(i) of 75.69% of the nominal amount of the NRS (being an aggregate amount of £965 million divided into a nominal amount of £430,523,751 (being 631,298,502 euros) and of 783,729,248 euros (being £534,476,249)) (*the Tier 3 Consideration*) allocated as follows:….

(ii) a cash payment in the amount of £66,920,790 (being 98,129,300 euros) and of 121,823,199 euros (being £83,079,210).
……
(c) the terms of the Tier 3 Debt will be amended so that it is payable upon first demand by the creditor;
……

2.2.3.2.2 During a period of 15 calendar days from the date of the court decision approving the Safeguard Plan, each holder of the Tier 3 Debt other than the Tier 3 Cash Option Arrangers (as defined in Annex 4 – paragraph 1 to this Proposal) will have an option to receive cash rather than all or part of the NRS constituting the Tier 3 Consideration referred to in (i) of paragraph 2.2.3.2.1(b) above (*the Tier 3 Cash Option*). Once exercised, this election shall be irrevocable. For the avoidance of doubt, if a holder of Tier 3 Debt does not notify its election to receive cash consideration within the 15 calendar day period referred to above, it will be deemed to have elected to receive NRS.

Certain holders of the Tier 3 Debt have indicated to Eurotunnel their intention to exercise the Tier 3 Cash Option for an overall principal amount of Tier 3 Debt of approximately 570 million pounds sterling (being approximately 835.8 million euros) if this Proposal is approved.
….

2.2.8    The approval of this Proposal by the creditors of the Companies and the decision of the Commercial Court of Paris to approve the Safeguard Plan will prevent any creditor of any of the Companies from relying on any terms in any contracts binding the Companies permitting it to require the early repayment of any debt payable, each creditor of the Eurotunnel group being obliged to abide by the provisions of the Safeguard Plan relating to the treatment of the Debt.
….

In addition, the provisions of the Safeguard Plan will apply to and will be enforceable against all creditors of the Eurotunnel group including those who have not

complied with the formalities to declare their debt within the relevant time limits..."

*The judge's judgment*

23.    The judge dealt first with the power of the trustee to exercise the tier 3 cash option. He held that the security rights under clause 4 extended to the Participation Documents and that the rights conferred by the SP were rights conferred by a document amending replacing or supplementing those documents (specifically the credit agreement) within the definition of Participation Documents to which I have referred.   He further held that the right to exercise the option was a "voting or other decision-making right within clause 4".   Alternatively, in his judgment, the trustee could require FLF to exercise the tier 3 cash option under clause 8.1.3 of the deed of charge. This empowered the trustee to require FLF to do all such other acts or things as in the opinion of the trustee or MBIA may be necessary or advisable "to  enforce any rights under any of the… Participation Documents..".

24.    The judge held that the fact that the tier 3 cash option was charged to the trustee meant that the trustee could require its exercise at any time:

> "40. Since it is clear that the security rights give such extensive rights to Citibank, and that those rights cover the right to exercise the Tier 3 Option if it can exercise those rights itself, then in my view it follows that Citibank has the right to direct FLF to exercise it if necessary.  That must at the very least be implicit in the security provisions.   There is no commercial reason to distinguish between cases in which Citibank can technically vote or elect itself from those where, for technical reasons, it cannot do so but FLF could. Through that route, therefore, Citibank has the power to direct FLF as to how they should be exercised.  The right to exercise the Tier 3 Option would fall within that."

25.    The judge then dealt with the question whether MBIA had power to give directions to the trustee to exercise the tier 3 cash option.  This depended on clause 12 .2 of the trust deed, read with part I of schedule 4.

26.    The judge next rejected the argument that no such power arose prior to enforcement of the security:-

> "43. Mr Popplewell's main point on this related to timing and the purpose of the exercise.  He sought to say that exercising the option was an act of disposal which was not the sort of thing that a mortgagee was entitled to do under a mortgage before the time for enforcement has arisen.  His case depends on an analysis of mortgages and the nature of a mortgagee's rights; I have outlined his arguments above.  I find that this argument fails.

Assuming for present purposes that the exercise of the option could be characterised as a disposal, it does not follow that the mortgagee cannot exercise it.   Just what a mortgagee is entitled to do before a default will depend on the terms of the mortgage, not on the label that one chooses to apply to the act.   There are few hard and fast rules.   Mr Popplewell submitted that it is trite law that a mortgagee has no power to dispose of mortgaged property while the mortgagor is performing its obligation.   That does not seem to me to be right - there are many cases in which there is technically a power to dispose of mortgaged property from the outset because the statutory power is made exercisable from the date of the mortgage.   But in any event that does not help in the present case.   The real question is whether, on the true construction of the deed of charge, Citibank can exercise this right.   An exercise by a mortgagee of his rights at any time might be regarded as "enforcing" his mortgage, but the real question is whether the act can be done at that time in question.   Acts to preserve the security can be done without the further "enforcement" of the obligation to repay.   There is no express bar in the deed of charge itself which would prevent the exercise of the Tier 3 Option, and no reason for implying one either. There are all sorts of good reasons why it might be desirable to do it pre-enforcement (in the sense of enforcing payment of the bonds), not the least of which is the fact that it only lasts 15 days.   Whether or not it can be done depends on the terms of the mortgage, not on some entrenched principle of the law of mortgages. This mortgage, in my view, entitles Citibank to give directions as to FLF to execute the option, for the reasons given above.   Since there is no express or implied limitation confining such a direction to circumstances of enforcement (in the sense of enforcing the primary payment obligations) or even default, the right can be exercised by Citibank if and when the Tier 3 Option comes into existence.

44.   Mr Popplewell also submitted that to exercise the option would destroy the commercial nature of the bond. It turned it from a securitisation of Channel Tunnel investments into a cash investment.   The words of the document are plain.   I have seen nothing in the documentation which requires Citibank and FLF in all circumstances to maintain something which amounts to an investment in the Eurotunnel financing.   On the other hand there is wording which, in my view, plainly covers the right to exercise, or direct the exercise of, the option. This argument therefore also fails."

27.   The next question was whether or not MBIA's power extended to directing Citi to exercise the tier 3 cash option.  The judge held that the right to exercise the option was a right "in respect of" the credit agreement.

28.   The judge next dealt with a submission that this interpretation resulted in an impossible diminution of the "irreducible core" of the trustee's obligations, an expression used by Millett LJ in *Armitage v Nurse* [1998] Ch 248.  The judge held:

> "48. It is not clear to me whether Mr Popplewell utilises the "irreducible core" principle as a principle of construction (so as to cut down what the words might otherwise mean) or as a principle of validity.  Millett LJ was probably using it in the latter way, though it is no doubt capable of operating in the former.  But however it is sought to be deployed, the principle does not assist in the present case.  There is no doubt that while MBIA is the Note Controlling Party it is given a very large degree of control over the subject matter of the trust.  It can give directions as to the taking or non-taking of enforcement action; it can direct the substitution of another debtor on the Notes; it can direct certain modifications of the Notes; and it can do a lot of other things, some of which one would expect that a trustee might decide to do, and others which would be more in the realm of matters for the beneficiaries to decide.   However, even taken together, they do not contravene Millett LJ's principle.  The trust regime as a regime remains intact.  The trust property is still held on identifiable trusts; Citibank still has functions as trustee; if MBIA does not give directions when entitled to, or when MBIA ceases to be the Note Controlling Party, Citibank will have even more functions.   What has happened is that various powers have been surrendered to MBIA for the time being, but that was done as a matter of commerce.  The position would look less unusual if the directions were to come from the G Noteholders (who are likely to have similar interests to MBIA), but would still be in substance the same.   The Noteholders all take their commercial interests on terms that, and knowing that, MBIA wields the power that it wields.  Whether or not this is good business, it is certainly not inimical to a trust structure.  It is what the Noteholders have agreed should be the case.  Clause 10.4 of the trust deed and Condition 15 of the Notes make the position clear. I do not think that there is anything in this point of Mr Popplewell."

29.   Lastly the judge dealt with the question whether or not the exercise of the option would result in a breach of the negative pledge clauses.  He held as follows:

> "52. I do not consider that it would be such a disposal.  The option does not come into existence until the

Safeguard Plan comes into effect.  At that point the Eurotunnel debt formerly vested in FLF goes.   The plan is equivocal as to whether it is assigned to GET SA or whether it is extinguished by a deemed repayment, but that probably does not matter.  In its place is a new bundle of rights – rights to cash and to the hybrid notes, with a cash option for the latter.  If that state of affairs had arisen consensually there would almost certainly have been a disposal at that point (but no-one has suggested that there was one).   What is left is the consideration.  The Option gives the right to take the consideration in an alternative form.  At the point of election the property rights in respect of the Plan rights are a bundle of rights to take certain property.   They should in my view be viewed as a bundle.  There is no proposal that FLF should dispose of those rights in the sense of parting with them in favour of another.  The proposal is that FLF should exercise one of the rights in a certain way so as to receive its consideration in form B (cash) when otherwise it would have received it in form A (notes).   While the right to notes disappears on the election to receive cash, there is not, in my view, a disposal for the purposes of clause 19.4.  The notes will never have been received, so it cannot be they that have been disposed of.  It seems to me to be artificial or unduly formalistic to regard that as a disposal of the right to the notes.  It is more realistic to regard what has happened as an exercise of rights, and no more.  No property passes from FLF; nothing is destroyed; there is no transferor or transferee.  All those are possible badges of a disposal.  None occurs.   There is therefore no disposal for the purposes of clause 19.4.

53. If it be thought that that is a strange conclusion because it might leave FLF with an uncontrolled right to make an election in which Citibank could be interested, I would add (although the point was not argued before me) that that is not the inevitable consequence of my decision.   I have identified above Citibank's formal interest in the exercise of the option and its rights in respect of it.  Its proprietary rights in the benefits of the Safeguard Plan carry with them the right to vote or direct the voting, and it must follow that it could restrain FLF from making an election that it did not wish to have made.  That would be a necessary adjunct to its own rights as mortgagee (by assignment) of the benefits of the plan.   This produces a commercially sensible regime in relation to the exercise of such rights in a case like this."

*The issues on this appeal*

*Issue 1: Does the trustee have power to cause the exercise by FLF of the tier 3 cash option?*

30.    QVT's case under this issue is that the trustee has no power to exercise the tier 3 cash option and that therefore it cannot be instructed to do so by MBIA. Mr Andrew Popplewell QC on its behalf submits that the trustee can only exercise its powers under the deed of charge for the preservation of the secured property and that the exercise of the cash option would not be a preservation of the secured property. The basic law on the right to preserve mortgaged property is summarised in these terms in Fisher and Lightwood's *Law of Mortgage* (11th ed) (2002):

> " Right to preserve the mortgaged property
>
> 16.4 In order to preserve the sufficiency of his security, the mortgagee is entitled, from the time of the mortgage, to have the mortgaged property preserved from deterioration or diminution in value, either at the hands of the mortgagor, or of any other person whose interest is inferior to that of the mortgagee. That applies whether he is in or out of possession. When in possession, the mortgagor may also, in some circumstances, be liable as tenant of the mortgagee. However, the mortgagee is under no duty to preserve his security unless and until he takes possession of it. "

31.    MBIA does not rely on this principle in any way. It does not, for example, seek to say that it is entitled to cause FLF to exercise the tier 3 cash option simply because it otherwise would expire and cease to exist, or because the value of the security is insufficient.

32.    Mr Popplewell prefaces his submissions on this issue by submitting that the underlying Eurotunnel debt which is security for the notes is fundamental to the commercial purpose of the notes. He submits that it is not just the value of the security which matters but the nature of that security. He submits that that is central to the structure because it is the performance of the underlying debt, the Eurotunnel tier 3 junior debt, and its predicted performance which will determine the value of the notes and the price at which they will be bought and sold on the market. Indeed, unusually, under the terms of issue of the notes Eurotunnel will benefit if the credit rating from the debt improves so that when they come to be repaid they are either repaid in full or refinanced at a higher value than they were priced for the purposes of the issue of the notes. QVT submits that it follows that it is not open to MBIA or Citi to decide that the notes or Eurotunnel debt are overvalued and that the security would be better invested in other investments.

33.    Mr Popplewell submits that unless and until the security becomes enforceable the powers of the trustee are limited to the powers which the law always affords to the mortgagee to step in if it is necessary to do so because there is a threat of impairment to the security and it is necessary to protect the security by way of preservation. For the purposes of this submission, Mr Popplewell relies on clause 11 of the deed of charge which enables FLF to make payments out of accounts charged as part of the security.

He further relies on clause 16 of the deed of charge which provides for the trustee to exercise the power of sale and other powers conferred by section 101 of the Law of Property Act 1925 in the event the security becomes enforceable. Mr Popplewell contrasts the effect of the exercise of the option. He submits that the exercise of the tier 3 cash option would result in the extinction of the right to NRS. He submits that the effect of the approval by the Commercial Court of Paris of the SP is that (although the SP is unclear as to the exact date when the NRS are issued) holders of Eurotunnel tier 3 junior debt become immediately entitled to rights to the NRS. He further submits that it is common ground that one way or another the NRS are part of the security charged by clause 4 of the deed of charge. He does not accept that the judge was right in saying that the rights under the SP fall within the definition of Participation Documents, because he submits that the order of the Commercial Court of Paris is not a "document" for the purpose of that definition.

34.    Mr Popplewell submits that the exercise of the tier 3 cash option would amount to destruction and not preservation. Only if the security was being impaired could the trustee step in and exercise the option. He submits that this ties in with his commercial argument that, so far as investors of the notes are concerned, the security is a Eurotunnel debt instrument and the trustee cannot simply decide to sell that instrument because it considers that there is a more attractive investment. Mr Popplewell submits that the trustee's obligation is to retain the security in specie as a Eurotunnel instrument and that accordingly, only in the rare situation where the value of that is threatened, can the trustee exchange that instrument for other security. It would follow from Mr Popplewell's submission that if from the outset an asset had been charged with an option to sell it at a particular price to a particular person, the mortgagee could not exercise that option unless his security was threatened.

35.    Alternatively, Mr Popplewell submits that the trustee cannot rely on the powers of the mortgagee to take steps to preserve the security unless it is able to establish and justify that the right to the NRS was an inadequate and inferior security. Mr Popplewell submits that this follows from the limited powers of the mortgagee to intervene in relation to the security prior to the security becoming enforceable. Mr Popplewell submits that the proposition for which he contends is deducible from the fact that the trust deed confers limited powers on the trustee prior to the security becoming enforceable.

36.    Mr Popplewell submits that the judge was wrong to rely in the alternative on clause 8 of the deed of charge. He submits that this is limited to taking steps for the perfection of security. He relies on the cross heading to that effect. To give it wider effect would cut across the limitation on the trustee's powers prior to enforcement of the security. It would also on his submission be contrary to the right of redemption and the commercial purpose of the deed of charge. Mr Popplewell submits that the whole of clause 8 has to be read in the context of preservation of the security. For example, if the charge is an equitable charge, the trustee may need to ask FLF to perform certain acts even though as a matter of substance the right to those acts is vested in the trustee. The purpose of clause 8 is to assist the trustee to do that which it is otherwise entitled to do but which it requires FLF's assistance in doing. Were it otherwise, then on his submission the width of clause 8.1.3 would render most of the rest of the document otiose.

37.     Mr Mark Barnes QC, for MBIA, effectively meets these arguments by submitting that it is all a matter of contract.  He submits that under the terms of the trust deed and deed of charge the right to exercise the tier 3 cash option is part of the security for the notes and that the trustee can require its exercise on behalf of the noteholders at any time, whether the mortgage is legal or equitable.  He submits that as the charge was fixed FLF could not deal with the option without the consent of the trustee in any event.  He relies on the decision of this Court in *Nelson v Hannam* [1943] 1 Ch 59, to which I refer below.

38.     In the alternative Mr Barnes seeks to uphold the decision of the judge on issue 1 on the basis of clause 8 of the deed of charge.  He submits that the SP is a "document" which replaces the credit agreement for the purpose of the definition of "participation document".

39.     Mr Barnes further submits that Mr Popplewell's argument that the commercial purpose of the securitisation was that the retention of the security in the form of a Eurotunnel debt is beside the point because there has had to be a restructuring of the Eurotunnel group.  Furthermore, MBIA does not contend that the trustee has wide powers to vary the security, but only that it has power to deal with the situation with which it has been faced.  In any event, cash was closer to the form of investment which the noteholders had originally made than debt convertible into equities (such as the NRS).

40.     In my judgment, the judge was right in his conclusion on this issue.  The tier 3 cash option was security substituted by the SP for the Eurotunnel tier 3 junior debt.  It is a question of the true interpretation of the trust deed and deed of charge whether in the period prior to enforcement the trustee is to have any right to intervene in the exercise by FLF of its rights in respect of the Eurotunnel tier 3 junior debt.  While in the normal way the holder of security would not be expected to take steps in relation to the charged property before the security becomes enforceable, unless it could show that the sufficiency of the security was threatened, there is nothing in my judgment which prevents the parties from agreeing that the holder should have rights to intervene before the security becomes enforceable.  Moreover, in my judgment, *Nelson v Hannam* is authority for this proposition, and it is to that case that I now turn.

41.     In *Nelson v Hannam*, the mortgagor of a building lease assigned the lease by way of security to the mortgagee, together with an option conferred on the mortgagor by the lessors of the property to purchase the reversion on completion of the buildings.  The mortgagee exercised this option, shortly after a summons for foreclosure had been taken out against the mortgagor, and a dispute then arose between the parties as to whether the mortgagor could require the mortgagee to convey to him the freehold reversion on redemption of the mortgaged property and on payment of the purchase price of the freehold reversion.  This court held that the mortgagor was so entitled, but it is not the point with which this court is concerned on this appeal.  The court also held in the course of its judgment that the option was part of the security and that the mortgagee could exercise the option during the currency of the mortgage because that is what the agreement between the parties had provided.  Thus, at page 61, Lord Greene MR held:

> "The option was part of the security and it was clearly
> contemplated by the parties that the mortgagee might
> exercise the option during the currency of the mortgage

and so improve the security…"

42.   Again at page 62 he held that he was "unmoved" by the argument that the exercise of the option could cause serious hardship to the mortgagor if the option price was a large sum.  Lord Greene MR held:

> "Any such result is one which necessarily flows from a mortgage of such a peculiar piece of property as an option, and, if a mortgagor mortgages an option to a mortgagee and the option is only exercisable on payment of a sum of money, the mortgagor enters into the transaction on the footing that, if the mortgagee chooses to do so, he is entitled to improve or perfect his security by making that expenditure, and he knows from the beginning that, if the mortgagee does so, he, the mortgagor, will only be entitled to redeem if he reimburses the mortgagee what he has spent."

43.   Again at page 64, Lord Greene MR held:

> "The answer clearly is that, if a mortgagor gives to a mortgagee a security of that character, he must abide by the consequences.  It may be unfortunate for him to find that the mortgagee has exercised the option at what may turn out to be an extravagant price and that he can only get back his mortgaged property, on payment of the price in addition to the mortgage money, but that is a necessary result of the security which he has chosen to give."

44.   The other member of the court was Du Parcq LJ who agreed with Lord Greene and gave a judgment of his own on a further point in the case.

45.   Mr Popplewell submits that this case is distinguishable because the mortgagee had commenced proceedings for foreclosure before he exercised the option.  Moreover the option was an option to acquire property rather than an option to convert the mortgaged property into cash. He also submits that it is possible that what had happened was that the mortgagee chose to exercise the option because the security was inadequate, and therefore in peril, but there is nothing in the report which indicates that this was the basis on which the mortgagee was held to be entitled to have exercised the option. If there was any peril, it was that the valuable option to acquire the freehold reversion would expire without its being exercised.  In my judgment, the fact that the mortgagee had commenced foreclosure proceedings does not affect the fundamental proposition that the parties could by contract agree to a situation in which the mortgagee had the right to exercise the option before the security became enforceable.  That that was the proposition accepted by the court is apparent from the passages I have cited above from the judgment of Lord Greene MR. If further authority were needed, I note that Astbury J. seems also to have been of the view that parties to a charge could by contract confer rights on the chargee to exercise rights conferred by the mortgaged property before

enforcement of the mortgage: see *Wise v Landsell* [1921] 1 Ch 420,430, a case dealing with the voting rights attached to shares which had been charged by the registered holder.

46.    In *Nelson v Hannam*, this court was able to come to the conclusion that the parties had vested the right to exercise the option in the mortgagee.  It would appear that the legal title to the option had been assigned to the mortgagee, and it may be that the court felt able to come to its conclusion as to the true interpretation of the parties' arrangements from this fact. It was a striking conclusion to reach as potentially the liability thrown on to the mortgagor could have been very considerable and could have rendered it impossible for him to redeem the mortgaged property. The same type of liability could arise if there was a mortgage of shares and the company issuing the shares decided to make a substantial rights issue, but in practice it is likely that that eventuality would be covered by the terms of the mortgage documentation. Moreover, it appears that there is little precedent in the reported cases for a mortgagee to be entitled to step in to exercise rights assigned to it prior to the security becoming enforceable except in the case where there is a risk that security will prove to be insufficient, and the right to preserve the mortgaged property arises.  It may be that the reason for this is the potential unfairness to the mortgagor.  Whether the mortgagee can step in must depend on the interpretation of the security documentation. It may well be that in another case the court would be reluctant to come to the same conclusion.

47.    In the present case, it would appear that there is only an equitable assignment of the Eurotunnel tier 3 debt to the trustee.  However, this makes no difference to the principle.  The court must look to find the intentions of the parties from the provisions in the agreement as a whole.  In my judgment, clause 8.1.3 of the deed of charge read with clause 4 contains a clear indication for this purpose.  In my judgment, clause 8.1 goes beyond the preservation of security, and that is apparent from the fact that clause 8.1.1 refers to steps to be taken to perfect the security, whereas the rest of clause 8.1 goes on to deal with further matters.  Those include the power to require FLF to enforce the rights conferred by the Participation Documents.  I accept (although Mr Popplewell did not make this point) that clause 8.1.3 appears to enable the trustee to require FLF to act without any reimbursement of any cost that may be involved, but that objection would apply to other forms of action as well as to the exercise of an option requiring the payment of cash.  I express no view about the contractual rights of parties in that situation.  The power to require FLF to enforce any rights conferred by the Participation Documents must in my judgment include the right to require the exercise of the tier 3 option which is a necessary step to the enforcement of the rights which that option confers.  Because of the risk of unfairness to the mortgagor, I would not agree with the judge's conclusion in paragraph 40 of his judgment that Citi was entitled to require the exercise of the tier 3 cash option prior to enforcement and in the absence of insufficiency simply because it was part of the charged property.  But I would reach the same conclusion as the judge reading clauses 4 and 8 of the Deed of Charge together.

48.    For the purpose of reaching this conclusion on clause 8.1 of the deed of charge, it is necessary to consider whether the SP constituted a "document", replacing (in whole or part) the credit agreement.  Mr Popplewell submits that this word refers only to a private law agreement.  However, the word "document" would naturally include a court order and it should have been within the reasonable contemplation of the parties that their rights might be altered by some form of composition sanctioned by the court under

its statutory powers. There is a separate argument as to whether an alteration of rights which is brought about by such an order derives its force and legitimacy, not from any form of agreement or unilateral documents such as a deed poll executed by the issuer of the securities, but from the authority of the court acting under statutory powers. Mr Barnes submits that this court cannot reach any conclusion as to the effect of the order of the Commercial Court of Paris approving the SP because that is a matter of French law. There is no evidence of French law. He points out that not even the provisions of the Commercial Code, under which the SP was approved, are in evidence. I proceed on the basis that this court can in the usual way decide the matter by applying the presumption that French law is the same as English law. However, in my judgment, even if this issue as to the effect of the French court's order were decided in QVT's favour, it does not prevent the order from being a "document" within the meaning of the definition of Participation Documents.

49.     Thus the position as I see it can be summarised in this way. Clause 8.1 of the deed imposes on FLF the duty to "do all such other acts or things or execute any other document as may in the opinion of Citi or MBIA be necessary or desirable to…8.1.3 enforce any rights under the Participation Documents, which include the SP because the SP is a "document replacing or supplementing" the credit agreement. In these circumstances, Citi has power to cause the exercise by FLF of the tier 3 cash option.

50.     In my judgment, it can make no difference that the effect of the exercise of the option was to turn property into cash. There is an acquisition of property (cash) even in this situation. The exercise of the option is not inconsistent with FLF's right of redemption because when the option proceeds are received, they will be held by way of security, just as tier 3 cash option the NRS would have been held. To say that the option ceases to exist is to look at part only of the operation. The true position is that the tier 3 cash option and the rights to the NRS are translated into a sum of money.

51.     Mr Popplewell argues that the effect of the exercise of the tier 3 cash option will be to convert what was thought to be an investment in Eurotunnel junior debt into an investment of some other kind. He submits that this is contrary to what the party is expected when they invested in FLF notes. In other words he relies on the commercial background to the acquisition of notes. As this Court recently said in *The Square Mile Partnership Ltd v Fitzmaurice McCall Ltd* [2006] EWCA Civ 1690 at [5]:

> "In the case of a commercial contract, the factual matrix includes the commercial context in which the contract was made. Moreover, as Lord Steyn said in *Mannai Investment Co Ltd v Eagle Star Life Assurance Co Ltd* [1997] AC 749 at 771: "in determining the meaning of the language of a commercial contract, and unilateral contractual notices, the law therefore generally favours a commercially sensible approach. The reason for this is that a commercial construction is more likely to give effect to the intention of the parties." The language must of course be capable of bearing that meaning."

52.     In this case, the language is not capable of giving effect to the commercial expectations

as described by Mr Popplewell and in any event, as Mr Barnes submits, the circumstances have changed from those envisaged at the time of the original subscription of the notes.

53.    I therefore reject QVT's arguments on issue 1.  Accordingly, issue 2 arises and I must now turn to that.

*Issue 2: if the trustee has the power to cause the exercise of the tier 3 cash option, is it obliged to exercise that power at the direction of MBIA or must it exercise its own independent judgment in the performance of its duties as a trustee?*

54.    There is a preliminary point to make here.  If QVT is not right on the first issue, and MBIA can give a direction to the trustee to exercise the option, clause 10.4 of the trust deed applies and that provides that when acting on an instruction of MBIA as the note controlling party the trustee is not required to have regard to the interests of the noteholders.  In other cases, the trustee is required to have regard solely to the interests of the noteholders and not the interests of any other class of creditor (clause 14.1.6. of the trust deed).

55.    On this issue, Mr Popplewell puts his case in three ways.  First (route A), he submits that if it is said by MBIA that the tier 3 cash option is to be exercised for the purpose of preserving the security, it must be shown that the tier 3 cash option is superior to the NRS.  It is not so said and so I need not deal further with the route A.  Secondly (route B), Mr Popplewell submits that the exercise of the option by FLF requires the consent of Citi under clause 19.4 of the deed of charge or condition 4 of the notes and MBIA has no right to direct the giving of their consent.  Thirdly (route C), Mr Popplewell submits that Citi's right to exercise the option is not within the rights which MBIA can direct Citi to exercise.  In particular he submits it is not within clause 12 .2 of the trust deed, on which MBIA relies.

56.    As to route B, Mr Popplewell submits that there are two issues: (1) whether the exercise of the option requires consent and (2) whether MBIA has power to direct Citi to give consent.  The judge did not deal with the second point.  On the first point Mr Popplewell submits that the negative pledge should be construed as widely as possible in order to give effect to its purpose.  Its purpose is to support the assignment to the trustee of the security.  On his submission, it would, as a commercial matter, be odd if the negative pledge clause did not stop FLF from exercising the option on its own.  He submits that it does not involve any distortion of the language to treat the exercise the option as within the concept of "disposing" or parting with the assets, namely the right to the NRS.  He further submits that the effect of exercising the option is to confer the benefit of the NRS down the chain of the noteholders to more junior holders of debt and bondholders.  He submits that, as a commercial matter, is what will happen and that that should be within the concept of disposal in the negative pledge clause.  He submits that the judge's reasoning is artificial.  It is not necessary to have a disponor and disponee. What is happening in fact is that the existing right to the NRS is foregone and extinguished.  As a matter of the ordinary use of language, that involves the disposal of the rights.  Mr Popplewell does not accept that non-exercise of the tier 3 cash option would involve the disposal although it would lead to the expiration of the option right.

Mr Popplewell submits that authorities taken from other contexts, such as freezing injunctions or section 127 of the Insolvency Act 1986, relied on by MBIA, provided no assistance.

57. Mr Popplewell also submits that it would be odd if MBIA could direct the trustee to give its consent to a disposal of FLF's assets, particularly if MBIA was using the power of direction for the purpose of promoting its own extraneous interests rather than those of the noteholders. He submits that the power of direction must equally be exercisable in these circumstances as in any other. He submits that it has also to be recalled that FLF is merely a special purpose vehicle, and that it is unlikely to have a controlling mind independent of that of MBIA and the Eurotunnel Group.

58. It is in this context that Mr Popplewell invokes the proposition that if MBIA can direct the trustee to exercise the power of consent in clause 19.4, this would be inconsistent with the irreducible core of the trust, which is that a trustee must act in good faith and to the benefit of beneficiaries in relation to the trust property and be accountable as such. Mr Popplewell relies on a passage from the judgment of Millett LJ in *Armitage v Nurse* [1998] Ch 248 at 253H:

> "I accept the submission made on behalf of Paula that there is an irreducible core of obligations owed by the trustees to the beneficiaries and enforceable by them which is fundamental to the concept of a trust. If the beneficiaries have no rights enforceable against the trustees there are no trusts. But I do not accept the further submission that these core obligations include the duties of skill and care, prudence and diligence. The duty of the trustees to perform the trusts honestly and in good faith for the benefit of the beneficiaries is the minimum necessary to give substance to the trusts, but in my opinion it is sufficient."

59. Mr Popplewell points out that, although the trustee is liable in negligence under the trust deed, its liability is subject to the all important provision in clause 10.4 which precludes it from taking account of the interest of noteholders when it acts on the instructions of MBIA as the note controlling party. If MBIA can give a direction to the trustee to give its consent under the negative pledge clauses, then on Mr Popplewell's submission, the trustee in reality ceases to be a trustee of the security. He becomes a nominee, unaccountable to the noteholders, and knowing no duty to act even in good faith. MBIA could even give a direction to the trustee to give its consent to the disposal by FLF of all its assets for £1. Against that background, MBIA's powers to give directions should be narrowly construed.

60. Mr Popplewell submits that the reference to the consent of both the trustee and MBIA is an indication that both were required to consent separately and independently. If the consent of the trustee was simply the direction of MBIA, clause 19.4 could have been more simply worded to refer only to the consent of MBIA so long as it was the note controlling party. Mr Popplewell submits that there are other provisions in the trust deed providing for double consent. He further submits that clause 31.2 of the deed of

charge is not inconsistent with this requirement since on its true interpretation it provides for the consent of both the trustee and MBIA, with the additional requirement that MBIA can impose conditions where the trustee consents.

61.     Mr Popplewell further submits that clause 8 of the trust deed also provides for the trustee to exercise its discretion independently. In fact Mr Popplewell submits that under this clause the trustee cannot give its consent at all because (a) the effect of the SP will be to reduce the amount of principal and interest payable in respect of the notes and (b) the exercise the option will on QVT's case results in a lower realisation from the notes then if the NRS had been retained.  Mr Popplewell submits that the question whether MBIA has power to direct the trustee to give its consent depends on whether the trustee has power to consent at all.  In his submission it would not have that power if QVT were right at the end of the day that the exercise the option resulted in a diminution in value.  He submits that, since QVT has raised an issue about whether the exercise by the trustee of the option would result in undervalue, it was not possible from the court to make the declaration that the judge made.

62.     Mr Popplewell submits, in my judgment correctly, that the power to give consent to a disposal under the negative pledge is not within clause 12.2 of the trust deed.  That clause is concerned with the rights of FLF, whereas the negative pledges create new self-standing rights in the trustee to give its consent.

63.     Mr Popplewell refers to MBIA's argument that MBIA can direct the trustee to give its consent to FLF under the negative pledges by virtue of clause 12.3 of the trust deed. This sets out the circumstances in which the trustee can be compelled to take any "action or proceedings".  It is not necessary for me to express a view on this point, but provisionally it seems to be unlikely that in the context of this clause the word "action" means "act", as opposed to the making of an application to the court.

64.     As to route C, Mr Popplewell submits that there is nothing in the trust deed which enables MBIA to direct the trustee to cause the tier 3 cash option to be exercised.  He submits that clause 12.2 should be given a narrow construction and should be confined to rights exercised for the purpose of preserving the security in the period prior to enforcement.

65.     Mr Barnes submits that the negative pledges are not engaged.  He relies on the fact that there is neither a disponor nor a disponee.  In any event, on his submission it is highly artificial to say that the negative pledges are engaged where two forms of consideration offered.  It is not wholly clear under the SP whether the holder of Eurotunnel tier 3 junior debt obtains, in substitution for his debt, rights to NRS and cash with an alternative in the form of the tier 3 cash option or whether he obtains the right to take either NRS and cash or the tier 3 cash option.

66.     Mr Barnes's essential answer to Mr Popplewell's submissions is that it was again a question of contract and that clause 12.2 is clear.  The trustee had to exercise its rights over FLF's rights in accordance with the directions of MBIA.  There was no basis on which clause 12.2 could be read down so as to apply only where the trustee was

directing the issuer to exercise a right with a view to the preservation of the security.  In the alternative, he relied on clause 12.3.

67.    Mr Richard Adkins QC, for the trustee, maintains a neutral position.  He pointed out that on one interpretation of clause 31.2 the trustee had no discretion in the giving of a consent or waiver, though he accepted that in other provisions of the deed of charge and trust deed, the trustee had an independent discretion.

68.    In my judgment, the trustee is bound to give a direction to FLF if so required by MBIA on two bases.  The first is if MBIA forms the opinion that it is necessary or advisable that FLF should exercise the option for the purposes of clause 8.1.3 (see the express terms of clause 8.1).  Secondly, clause 12.2 of the trust deed must be interpreted according to its tenor.  There is nothing on the face of it to limit it, where security has not become enforceable, to a case where the trustee is seeking to invoke FLF's right to exercise the tier 3 cash option in order to preserve the sufficiency of the security.  In my judgment, having regard to the rights conferred by clause 8.1 of the deed of charge, no such limitation can be implied.

69.    Moreover, in my judgment, the negative pledge clauses do not on their true interpretation apply where the action taken by FLF is being taken at the direction of the trustee and (so long as it is the note controlling party) MBIA.  The negative pledge clauses make no sense if the consent of those parties has already been given because the purpose of the clauses is to prevent transactions without the consent.

70.    I would like to add a little more on this last point.  The judge held in paragraph 52 of his judgment:

> "While the right to notes disappears on the election to receive cash, there is not, in my view, a disposal for the purposes of clause 19.4.  The notes will never have been received, so it cannot be they that have been disposed of.  It seems to me to be artificial or unduly formalistic to regard that as a disposal of the right to the notes.  It is more realistic to regard what has happened as an exercise of rights, and no more.  No property passes from FLF; nothing is destroyed; there is no transferor or transferee.  All those are possible badges of a disposal.  None occurs.  There is therefore no disposal for the purposes of clause 19.4."

71.    In my judgment, the critical question is the meaning of the word "dispose" in the context of these negative pledge clauses.  As Lord Steyn said in *R (Daly) v Home Secretary* [2001] 2 AC 532 at 548: "In the law, context is everything".  In my judgment it is clear from the negative pledges that destruction of an asset is not required.  Both negative pledge clauses refer to loans.  Clause 19.4 also refers to leases.  Condition 4 attached to the notes referred to a parting with property.  Thus both negative pledges envisage a temporary disposal of property and do not require the destruction of property.  This point is important because the judge's interpretation narrowed the

protection conferred by the negative pledge clauses, which are of considerable practical importance to the parties. In the interpretation of documents the court must always be careful to construe words in their context. It is for that reason that I do not accept that the decisions under section 127 of the Insolvency Act 1986 necessarily afford the court with much assistance. The proposition may be illustrated by reference to the example given in a famous legal debate about a notice in a public park saying "No vehicles are permitted in the park" (see HLA Hart (1958) 71 Harv. Law Review 593 at 607, Fuller, ibid, 630 at 662 to 664). In the context of such a notice, it is unlikely that the prohibition would extend to such vehicles as prams or children's tricycles. A similar point can be derived from one of the authorities relied on by Mr Barnes, namely *Law Society v Shanks* [1988] 1 FLR 504 where this court held that the prohibition in a freezing injunction on a disposition of assets by a person holding assets for a person subject to such an order does not prevent the person from disposing of the assets to that person. Likewise the word "dispose" in the negative pledges must be construed in the context of those clauses and so construed in my judgment exclude disposals at the direction of the trustee and MBIA. It is also clear from the context of the negative pledge clauses that the transactions which fall within those clauses are defined by reference to their legal form and not by reference to their economic substance and accordingly I would reject Mr Popplewell's argument that there would be a breach of the negative pledge clauses because the effect of the exercise of the Eurotunnel tier 3 cash option on QVT's case is to shift value from noteholders further down the chain to bondholders and others.

72.    On the basis of these conclusions, in my judgment it is unnecessary to decide the question whether, even if the exercise of the tier 3 cash option was not directed by the trustee and MBIA, there is under the SP a disposal of any asset for the purpose of the negative pledge clauses. I propose nonetheless to set out my judgment on this issue. The issue is not whether the assignment of the Eurotunnel tier 3 junior debt under the SP or the mere exercise of the tier 3 cash option amounts to a disposal of any asset, but whether the exercise of the option involves a release of the NRS or an exchange of NRS for cash within the negative pledge clauses. This issue would appear to involve at least one question of French law (the interpretation of the SP) as well as an issue of English law (the interpretation of the negative pledge clauses). The former question would also require the interpretation of a document of which we have only a part and that is in translation from the authoritative version in French. The difficulty about the issue is, as I explain below, that it depends on a proper appreciation of the entire reorganisation of the Eurotunnel tier 3 debt involved in the SP, and we have not had full submissions on that matter. Nor do we have all the documents. We are not told for instance whether there is any form of the notice of exercise of the tier 3 cash option which Eurotunnel tier 3 debt holders wishing to exercise the tier 3 cash option must use. Such a document (if it exists) might well throw light on the question whether there is a disposal, as Mr Popplewell submits, of the rights to the NRS.

73.    Putting aside those possible difficulties, I would accept that on the way that the SP is drafted it is arguable that, by exercising the tier 3 cash option, FLF gives up its rights under the SP to receive NRS and that this is an exchange caught by the negative pledge clauses. These transactions would as a commercial matter need to be simultaneous to facilitate trading in the notes (or the NRS) and to ensure that the position of the Eurotunnel tier 3 debt holders was not at any stage at risk, and so it is unlikely that those promoting the SP intended there to be any gap between the two events. It is not

suggested by Mr Popplewell that the assignment of Eurotunnel tier 3 debt was a disposal within the meaning of the negative pledge clauses, perhaps because this was not voluntary but was required by the mandatory terms of the scheme (see generally *Re Garner's Motors* [1937] I Ch 594). In contrast there is no such obligation to exercise the tier 3 cash option.

74.  Those are some of the arguments in favour of QVT's approach. On the other hand, there are indications in the SP which militate against an analytical approach of this kind, for example the sentence beginning "For the avoidance of doubt," in para. 2.2.3.2.2 of the SP. The SP must of course be read as a whole.

75.  More compelling in my judgment is an analysis of the arrangements surrounding the tier 3 cash option. Quite clearly the Eurotunnel group does not have the cash resources necessary to meet the entitlements of the debt holders exercising the tier 3 cash option. So it has had to enter into arrangements for the underwriting of the tier 3 cash option. That means that it had to arrange for the allocation to underwriters of the NRS to which electing debt holders are entitled. It is important to note that this is an underwriting and not a placing.

76.  Although we do not have all the documents, it appears from annex 4 to the SP that what has been agreed is that those tier 3 debt holders who do not exercise the tier 3 cash option can elect to take up some of the entitlement of NRS which those electing to take the tier 3 cash option do not take. This will provide at least some of the cash necessary to meet the claims of the Eurotunnel debt holders electing to exercise the tier 3 cash option. If there is still some NRS left, it will be taken up by the tier 3 cash option arrangers pursuant to the underwriting undertaking set out in annex 4. We are not told who the cash arrangers are save that it would appear that they are the bondholders and others referred to at the end of paragraph 71 of this judgment, to whom, on Mr Popplewell's argument, value is shifted as a result of the tier 3 cash option arrangements.

77.  The issue then is whether what happens is that NRS is allocated to all Eurotunnel tier 3 junior debt holders, on the basis that those who accept the tier 3 cash option renounce their allocation in favour of those who underwrite the cash option, or whether what happens is that the NRS which is not taken up by those electing debt holders is allocated directly to the underwriters in accordance with all the arrangements described in annex 4. In annex 4, the rights of the underwriters are described as by way of "subscription", not renunciation or transfer. In addition it would appear under the timetable that the NRS are not created and issued until some 120 days after the approval of the SP (see page 24). In those circumstances, I interpret the SP as meaning that NRS is not allocated to Eurotunnel tier 3 junior debt holders if they elect to exercise the tier 3 cash option. The most that they can be said to get is rights to NRS. Indeed it is the rights to the NRS which, on Mr Popplewell's submission, form the subject of a disposal contrary to the negative pledge clauses.

78.  It is on those rights which I next focus. In my judgment, those rights are not absolute rights to an allocation of NRS because they are always subject to the possibility that the Eurotunnel tier 3 junior debt holder will not accept, or be deemed to accept, its

allocation of NRS because it has exercised the tier 3 cash option.

79. In those circumstances, the correct analysis in my judgment is that the right which a Eurotunnel tier 3 debt holder obtains to NRS is always subject to inherent defeasance if it exercises the tier 3 cash option. On that basis it cannot be said that there is any disposal of the NRS.

80. Accordingly, if it had been necessary to decide the question of disposal for the purposes of the negative pledge clauses, in my judgment on the true interpretation of the SP there is no act constituted by the exercise of the tier 3 cash option which could be said to be a disposal for the purposes of the negative pledge clauses, even if there had been no direction from MBIA and the trustee. In substance, (and for simplicity ignoring the cash which is allocated with the NRS) under the terms of the SP and the Eurotunnel tier 3 junior debt holder was given the right to take either cash or NRS. When he exercises the right to take cash he does not give up his right to obtain NRS. He never obtained the right to NRS in that situation.

81. In the light of the conclusions reached above, it is also, in my judgment, unnecessary to ask whether MBIA can direct the trustee to give its consent under the negative pledge clauses. However, any such instruction would in my judgment in any event be within clause 8 of the trust deed. In my judgment, the argument that the option is capable of reducing the amount of the notes for the purpose of the Basic Terms Requirements is unsound, because it is clear that in that context the reduction referred to is a reduction in nominal amount. The SP does not affect the terms of the Eurotunnel tier 3 junior debt which is simply assigned to a Eurotunnel company under the SP. The NRS are not securities of FLF, which is the issuer of the notes, and accordingly para. (b) of the definition of Basic Terms Requirement (set out above) does not apply. On that basis, it seems to me that MBIA was able to give a direction to the trustee to give consent under the negative pledges by virtue of clause 8 of the trust deed, and the question of whether a waiver could be directed under clause 31.2 of the deed of charge would not then arise. Accordingly, even if contrary to the conclusions reached above, the exercise of the tier 3 cash option was a "disposal" of property within the meaning of the negative pledge clauses, MBIA could direct the trustee to give its consent under clause 8.1 of the trust deed.

82. Mr Popplewell submits that the effect of the structure which enables a direction to be given to the trustee by MBIA is to reduce the trustee's obligations below the irreducible minimum identified by Millet LJ in *Armitage v Nurse*. In my judgment this is not correct. The trustee continues at all times to have an obligation of good faith, and in addition, as Mr Adkins submits, there are other clauses in the trust deed where the trustee has a real discretion to exercise, for example in clause 8 of the trust deed which also confers a discretion on the trustee to give authorisations or waivers. In my judgment, while it is correct that it would be a surprising interpretation of the documentation, against which the court should lean, if the powers of the trustee were so reduced that it ceases to be a trustee at all, that point has not been reached in the present case and therefore there is no risk of recharacterising the office of trustee as something else.

83.     For the reasons given above, I would reject QVT's arguments on the second issue.

*Disposition*

84.     For the reasons given above, I would dismiss this appeal

**Lord Justice Dyson:**

85.     I agree that this appeal should be dismissed, but in view of the complexity of the issues raised, I would like to add a few words of my own.

*Issue 1: does Citibank ("Citi") have the power to instruct FLF to exercise the Tier 3 cash option under the Safeguard Plan?*

86.     The starting point is that it is common ground that the rights to the hybrid notes and to exercise the cash option were within the scope of clause 4 of the deed of charge and formed part of the security that, by operation of the Safeguard Plan, was substituted for the Eurotunnel Tier 3 junior dept.

87.     Mr Popplewell QC advances a number of arguments in support of the proposition that Citi cannot instruct FLF to exercise the cash option. They have been set out in some detail by Arden LJ. The premise on which the arguments are based is that the entitlement to exercise the cash option is analogous to the entitlement to sell the Tier 3 Debt that existed prior to the Safeguard Plan.

88.     In my judgment, this is not an apt analogy. As Mr Barnes QC pointed out, there is a fundamental difference between the sale of property and the exercise of rights that are part of the property secured. The relevance of the decision of this court in *Nelson v Hannam* [1943] 1Ch 59 is that it shows that, once an option becomes an essential part of a mortgage transaction, the mortgagee may exercise the option during the currency of the mortgage in accordance with its terms, and is entitled thereby to "improve or perfect his security": per Lord Greene MR p 62. I agree with Arden LJ's reasons at para 43 for rejecting Mr Popplewell's attempts to distinguish this decision. There is no hint in the judgment of Lord Greene that his reasoning was based on or influenced by the possibility that the mortgagee exercised the option to purchase the freehold reversion in order to preserve his security. In the passage at p 62 cited by Arden LJ at para 40 above, Lord Greene was describing the legal effect of a mortgage of an option. Hence his reference to the result "which *necessarily* flows from a mortgage of such a peculiar piece of property as an option" and "[the mortgagor] knows from *the beginning* that…" (my emphasis in both cases).

89.     For my part, I would be inclined to hold that, subject to the questions of consent arising under the second issue, Citi could require FLF to exercise the cash option in the absence of the Event of Default even if there was no need to do so in order to preserve the security, and could do so simply because the option is part of the charged property.

Mr Popplewell does not point to any provisions in the deed of charge which prohibit the exercise of the option in such circumstances. The entitlement to exercise the cash option is not analogous to the entitlement that existed prior to the Safeguard Plan to sell the Tier 3 debt. As Mr Barnes points out, this is not a case of a sale by the chargee, but a compulsory reconstruction, under which FLF's rights in relation to the Tier 3 debt have been replaced with consideration comprising a right to cash and hybrid notes, the notes being subject to the cash option.

90.     But it is not necessary to decide the first issue on the basis that the option can be exercised simply on the ground that it forms part of the security. I agree with Arden LJ (para 47) that clause 8.1 of the deed of charge gives the chargee the right to exercise the cash option. Mr Popplewell submits that, on its true construction, clause 8.1 is limited to requiring FLF to take steps for the purpose of perfecting the existing security rights granted by clauses 3 to 5 of the deed of charge, and that it does not confer any additional free-standing right to exercise the Tier 3 cash option prior to an Event of Default. But clause 8.1.3 gives Citi the power to require FLF to do what is necessary or advisable to enforce rights under any of the Participation Documents. These documents include the Credit Agreement and "any document of agreement amending, replacing or supplementing it". I agree with the judge that the Safeguard Plan, which extinguished the Credit Agreement and replaced it with something else, falls within these words of extension. I see no warrant for construing the word "document" in the definition of "Participation Documents" as being limited to a private law agreement. I agree with what Arden LJ says about this at para 48 above.

91.     The effect of Mr Popplewell's argument is that the cash option cannot be exercised at all, and the choice between cash and shares offered by the Safeguard Plan must go by default. That would be a most surprising result to which I would arrive only if compelled to do so. Far from being compelled to such a conclusion, I would hold that the deed of charge, properly construed, gives Citi the right to require FLF to exercise the cash option.

*Issue 2: is Citi obliged, at the direction of MBIA, to instruct FLF to exercise the cash option or must it exercise its own independent judgment in deciding whether to give such an instruction?*

92.     Mr Popplewell submits that (i) the exercise by FLF of the cash option is a "disposal" or a "parting with" FLF's accrued rights within the meaning of the negative pledge in clause 19.4 of the deed of charge and/or condition 4 of the FLF notes, (ii) this can only be done with the written consent of both Citi and MBIA and (iii) this requires in addition to MBIA's consent the independent consent of Citi to the exercise.

93.     The first question is whether the exercise of the cash option involves a disposal of or parting with FLF's property. Mr Popplewell submits that it does, since the exercise of the option involves the disposal or parting with FLF's existing rights to NRS under the Safeguard Plan. I incline to the view that the judge was right to reject this submission for the reasons that he gave at para 52 of his judgment. It is true that the form of the Plan is that the holders of the Tier 3 debt "shall be offered" a share of the NRS with an option to receive cash, the default position being that, unless the cash option is exercised within 15 calendar days, the holder will be deemed to have elected to receive

NRS. In substance, however, para 2.2.3.2.2 of the Safeguard Plan gives the holders of the debt the right to choose between two forms of alternative consideration, NRS and cash. I do not consider that clause 19.4 is intended to prevent the debt holder from choosing between two forms of security. In my view, it is artificial and formalistic to say that, in exercising the cash option, FLF would be disposing of its right to receive NRS. I recognise that the proper interpretation of the Safeguard Plan is a matter of French Law as to which we have been give no information. The true construction of the deed of charge and the FLF notes, however, is a matter of English law. Had it been necessary to do so, I would have held that the exercise of the cash option would not be a disposal within the meaning of clause 19.4 of the deed of charge or a parting with property within the meaning of condition 4 of the FLF notes.

94.     But even if the exercise of the cash option were a disposal of or parting with FLF's right to receive NRS, clause 19.4 does not require that, in addition to MBIA's consent, Citi should give its own consent based on an application of its independent judgment. For the reasons that I shall summarise briefly, MBIA can direct Citi to require FLF to exercise the cash option and Citi is obliged to comply with such a direction. I agree with the judge (para 50) that, once it is decided that MBIA has the right to give such a direction to Citi, it makes no sense to say that clause 19.4 should be construed so as to require Citi then to consider the point itself.

95.     I agree with Arden LJ that MBIA can direct Citi to require FLF to exercise the cash option pursuant to (i) clause 12.2 and Schedule 4 Part 1 of the trust deed and/or (ii) clause 8.1 of the deed of charge. As regards (i), the right to exercise the cash option is a right "in respect of" the Credit Agreement, which is one of the Financing Agreements. I agree with the judge that the words "in respect of" are wider than "under" and I do not accept Mr Popplewell's submission that they should be construed narrowly. They are wide enough to apply to a right in respect of the consideration payable upon a forced substitution of the Credit Agreement. Schedule 4 Part 1 includes among the FLF rights which are to be exercised by Citi in accordance with MBIA's instructions its right to vote as a lender. It is difficult to see why it should have been intended that MBIA should be able to instruct Citi how to vote (eg on a reconstruction), but not on the choice of consideration following a scheme such as the Safeguard Plan.

96.     As regards (ii), for the reasons already given, clause 8.1 of the deed of charge gives the chargee the right to exercise the cash option. The obligation undertaken by FLF under clause 8.1 is to carry out the activities there described "at the request of the Trustee (at the direction of MBIA, if it is the Note Controlling Party)". It follows that, if the exercise of the cash option is one of those activities, Citi is obliged to exercise the option if directed to do so by MBIA.

97.     For my part, I would also accept Mr Barnes' alternative submission that, if MBIA did not have the right to direct the exercise of the option pursuant to clause 12.2 and Schedule 4 Part 1 of the trust deed, MBIA would be entitled to direct Citi to exercise the option pursuant to clause 12.3 of the trust deed. Clause 12.3 provides that "The Trustee shall not be bound [to act]…unless directed to do so by MBIA". Specifically, it is bound "…to take…any other action…pursuant to or in connection with…the Transaction Documents" (which include the deed of charge). This clearly means that, if directed by MBIA, it is so bound.

98.    There is a yet further route to the same conclusion on the second issue.  If the exercise of the cash option in the absence of Citi's consent would be a disposal in breach of clause 19.4 of the trust deed or a parting with property in breach of condition 4 of the FLF notes, Citi would be obliged by clause 8.1 of the trust deed to waive the breach (or proposed breach) if directed to do so by MBIA.  The breach (or proposed breach) would be of one of "the covenants or provisions contained in…the Notes or any of the other Transaction Documents".  In my judgment, the proviso to clause 8.1 would not apply.

99.    For these brief reasons, which I do not believe to be in substance different from those of Arden LJ, I would dismiss the appeal.

**The Master of the Rolls:**

100.    I agree with both judgments.

# Exhibit 48

A

[COURT OF APPEAL]

*HUNTER v. MOSS

1993  Dec. 20, 21                              Dillon, Mann and Hirst L.JJ.

B

*Trusts—Declaration of trust—Oral—Defendant holding 95 per cent. of company's shares—Defendant declaring himself trustee of 5 per cent. of company's issued share capital for plaintiff absolutely— Shares not ascertained or identified—Whether sufficient certainty of subject matter to constitute valid trust*

The defendant was the. registered holder of 950 shares in a company with an issued share capital of 1,000 shares. Following trial of an action the deputy judge held that the defendant had made a valid oral declaration of trust constituting himself trustee for the plaintiff of 5 per cent. of the company's issued share capital, and that the trust applied to 50 of the defendant's 950 shares. The defendant applied by motion, within 28 days, for the judgment to be recalled and set aside, inter alia on the ground, which had not been argued at trial, that the purported trust had failed for want of certainty of the subject matter. The deputy judge dismissed the motion.

C

On the defendant's appeal:—

D

*Held,* dismissing the appeal, that in the case of a declaration of trust of personalty the requirement of certainty of subject matter did not necessarily entail segregation of the property which was to form the subject matter of the trust; that the declaration of trust by the defendant was sufficiently certain as to subject matter, since the shares held by the defendant were of such a nature as to be indistinguishable from each other and were all therefore capable of satisfying the trust without identifying any particular 50 shares; and that, accordingly, the trust was not void for uncertainty of subject matter (post, pp. 457B–C, 458A–C, 459E–F).

E

*In re London Wine Co. (Shippers) Ltd.* [1986] P.C.C. 121 distinguished.

Decision of Mr. Colin Rimer Q.C., sitting as deputy High Court judge in the Chancery Division [1993] 1 W.L.R. 934 affirmed.

F

The following cases are referred to in the judgment of Dillon L.J.:

*Cheadle, In re* [1900] 2 Ch. 620, ·C.A.
*Clifford, In re* [1912] 1 Ch. 29
*Diplock, In re* [1948] Ch. 465; [1948] 2 All E.R. 318, C.A.
*Earl of Lucan, In re* (1890) 45 Ch. D 470
*Knight v. Knight* (1840) 3 Beav. 148
*London Wine Co. (Shippers) Ltd., In re* [1986] P.C.C. 121
*Mac-Jordan Construction Ltd. v. Brookmount Erostin Ltd.* (1991) 56 B.L.R. 1, C.A.
*Milroy v. Lord* (1862) 4 De G.F. & J. 264
*Rose, In re* [1952] Ch. 499; [1952] 1 All E.R. 1217, C.A.

G

H

The following additional cases were cited in argument:

*Arthur Sanders, In re* (1981) 17 B.L.R. 131
*Bizzey v. Flight* (1876) 3 Ch. D. 269
*Bond Worth Ltd., In re* [1980] Ch. 228; [1979] 3 W.L.R. 629; [1979] 3 All E.R. 919
*Cozens, In re* [1913] 2 Ch. 478
*Hallett's Estate, In re* (1880) 13 Ch. D. 696

A    *Oldfield, In re* (1904) 1 Ch. 549
*Rayack Construction Ltd. v. Lampeter Meat Co. Ltd.* (1979) 12 B.L.R. 30
*Sinclair v. Brougham* [1914] A.C. 398, H.L.(E.)
*Taylor v. Plumer* (1815) 3 M. & S. 562
*Wait, In re* [1927] 1 Ch. 606
*Williams, In re* (1897) 2 Ch. 12

B    APPEAL from Mr. Colin Rimer Q.C. sitting as a deputy High Court
judge in the Chancery Division.

By a judgment dated 16 October 1992 Mr. Colin Rimer Q.C., sitting
as a deputy High Court judge in the Chancery Division, found that the
defendant, Robert Joseph Moss, had declared himself to be a trustee for
the plaintiff, David Morris Hunter, as to a 5 per cent. holding in the
issued share capital of Moss Electrical Co. Ltd. to which the plaintiff had
C    thereupon become absolutely beneficially entitled. The company's issued
share capital consisted of 1,000 shares of which the defendant was the
registered holder of 950 and it was held that the trust applied to 50 of
the defendant's 950 shares. Judgment was given for the plaintiff for
£112,723.70.

By a notice of motion dated 11 November 1992 the defendant applied
D    to the same deputy judge (but by different counsel) to have the judgment
in the action recalled and set aside on the grounds, inter alia, that (1) the
deputy judge had been wrong in law in holding that a voluntary express
trust had been properly constituted by the oral statement of the defendant
made in September 1986; and (2) the judge ought to have held that an
unappropriated proportion amounting to 50 unidentified and similar
shares out of 950 issued shares in Moss Electrical Co. Ltd. which were
E    held and owned by the defendant did not sufficiently identify the specific
property to be held by the defendant as the property of the plaintiff and
that the express trust claimed by the plaintiff thereby failed to be
properly constituted by reason of uncertainty of the property. On
20 November 1992 the deputy judge dismissed the motion.

By a notice of appeal dated 26 November 1992, and subsequently
F    amended, the defendant appealed on the grounds that (1) the judge was
wrong in law in holding that a voluntary express trust was properly
constituted by the oral statement of the defendant; (2) the judge was
wrong in law in finding that the fact that the defendant did not realise
the legal and tax consequences of the making by him of the trust did not
alter the position; and (3) in any event, the damages were too large.

The facts are stated in the judgment of Dillon L.J.

G

*Michael Hartman* for the defendant.
*Edward Davidson* for the plaintiff.

DILLON L.J. This is an appeal by the defendant in this action,
Mr. Robert Joseph Moss, against the order made by Mr. Colin Rimer
H    Q.C. sitting as deputy High Court judge in the Chancery Division. The
judge, in fact, delivered two judgments after the trial of the action. The
first was judgment delivered on Friday, 16 October 1992 by way of
reserved judgment after a trial which had taken place between 2 and
7 October. In that judgment the judge, as he said at the beginning of the
second judgment, found as a fact that in the course of a conversation
between the plaintiff, Mr. David Morris Hunter, and the defendant in
early September 1986 the defendant declared himself to be a trustee for

Dillon L.J.                    **Hunter v. Moss (C.A.)**                [1994]

the plaintiff of five per cent. of the issued share capital of a company      A
called Moss Electrical Co. Ltd. which has been referred to in the
judgments and the other documents as "M.E.L." Having reached that
conclusion, by his order made on that date the judge declared that the
defendant had held 50 shares out of the total of 1,000 issued shares in
M.E.L. on an express oral trust for the plaintiff and that such shares
were converted into the equivalent proportion of the consideration
received by the defendant on the sale of the entire share capital of      B
M.E.L. to a company called Bennett & Fountain Group Plc. ("Bennett
& Fountain").

The judge further ordered that the plaintiff was entitled to five per
cent. of the consideration which the defendant had received from Bennett
& Fountain amounting in total to a judgment sum of £112,723·70
including interest. So there was to be judgment for that sum with costs.      C

The first issue that arises on this appeal is that the conclusion that the
defendant had declared himself a trustee for the plaintiff of 50 shares in
M.E.L., being 5 per cent. of the share capital of that company, is
challenged. Apart from that, however, after the judge had pronounced
his order on 16 October 1992, and before his order was drawn up, he
was invited by Mr. Hartman of counsel, for the defendant, to withdraw
his order and reach a different conclusion on a point of law which had      D
not been argued in the trial prior to 16 October 1992. The position is
that Mr. Clark of counsel had appeared for the defendant at the trial.
Mr. Hartman, who appears on this appeal, only came on the scene after
the trial and he made the application on which the judge gave a further
judgment on 20 November 1992 rejecting the application.

The point taken by Mr. Hartman in that, as it were, second bite at      E
the cherry was that as there was no identification of the 50 shares in
M.E.L. out of the total of 1,000 issued shares in M.E.L. there was no
sufficient certainty as to what the trust property was to be and, therefore,
any attempt by the defendant to declare a trust was ineffective in law for
want of sufficient certainty as to the trust property. That is the second
point that is taken on this appeal.

Thirdly, a further point is taken as to the calculation of the      F
compensation resulting in the sum of £112,723·70 which the judge
awarded by his order. It is said that that resulted from a wrong turn
taken by everyone—and, in particular, by Mr. Clark, the counsel then
acting for the defendant—at the end of the hearing before the judge
reserved to give his judgment of 16 October.

I should come first to the history of the matter which I take,      G
gratefully, from the chronology provided by Mr. Hartman. M.E.L. seems
to have been incorporated in 1962. Its business was that of a wholesaler
in industrial electrical equipment, trading from an address in East
London. It had one class of shares only—1,000 ordinary shares—and
by 1983 490 of these were held by the defendant. 410 were held by his
father, Mr. Max Moss, and 100 by his mother. In late 1983, the plaintiff
attended for interview. In January 1984 he commenced employment with      H
M.E.L. On 12 July 1985 he was appointed finance director for M.E.L.

At that time the managing director of M.E.L. was a Mr. Ravinder
Sood. In the course of 1984 50 ordinary shares in M.E.L. were sold to
Mr. Sood to give him a shareholding of 5 per cent. in M.E.L. In fact, it
seems that those shares came from the shareholding of Mr. Max Moss,
the defendant's father. What was done was that, as the value of the
shares at that stage was not as high as it subsequently, for a time at any

The Weekly Law Reports 25 March 1994

Case 22-11068-KBO    Doc 34430-7    Filed 01/16/26    Page 275 of 380
455
1 W.L.R.                    Hunter v. Moss (C.A.)                    Dillon L.J.

A    rate, became, there was a bonus provided for Mr. Sood which enabled
him to purchase the 50 shares. In September 1985 Mr. Max Moss died
and the balance of his shares in M.E.L. were transferred to the
defendant.

In June 1986 the defendant stated an intention to give the plaintiff 50
ordinary shares in M.E.L. The obvious object of that was to put the
plaintiff in the same position as Mr. Sood. But it seems that the value of
B    the shares was thought to have risen somewhat and also there was a fear
of what the fiscal consequences might be, particularly, perhaps, as at that
time there were proposals by Bennett & Fountain to buy the share
capital of M.E.L. One of the problems was whether there would be a
capital gains tax liability on the defendant; another may have been
whether there might be an income tax liability on the plaintiff. At any
C    rate, the defendant stated his intention to give the plaintiff 50 shares,
and attempts were made to work out a scheme by which those shares
would be transferred to the plaintiff without attracting any tax
consequences. That scheme, however, proved abortive and in a discussion
with the defendant in early September 1986, as the judge held, a trust
was declared.

Following that, on 30 September 1986 the agreement proposed for
D    the sale of the share capital to Bennett & Fountain was signed and
completed fairly soon thereafter. I will go into the details of the transfer
later.

In 1988 and in 1989 there were dividends paid on the Bennett &
Fountain shares and there was also a rights issue. In 1989 the defendant
paid the plaintiff the net dividends on what was thought to be the
E    appropriate proportion attributable to the plaintiff's 5 per cent. in M.E.L.
of the Bennett & Fountain shares which had been issued to the
defendant. Unfortunately, thereafter the parties fell out and the writ in
this action was issued on 17 July 1990.

So far as the first point is concerned, whether there was a firm
declaration of trust, the judge has set out his findings of fact very
carefully in his October 1992 judgment (unreported). There were various
F    assertions in evidence by the plaintiff which were denied by the
defendant. The judge had preferred the evidence of the plaintiff to that
of the defendant. Mr. Hartman does not seek to go behind the judge's
preference for the plaintiff's evidence, but he says that, even on the
judge's findings of fact in favour of the plaintiff, the requisite degree of
certainty of intention to declare an immediate trust cannot be inferred.
G    The judge sets out part of his summary of the plaintiff's evidence, at p. 15
of the transcript:

"The plaintiff's evidence is that, by about early September 1986, the
. . . scheme"—that was a scheme being considered with another
company for getting around the fiscal problem—"was abandoned.
Instead, the parties reverted to the original arrangement which had
H    been proposed at the meeting of 22 June 1986"—the parties included
Bennett & Fountain—"under which Bennett & Fountain would pay
£3m in cash and shares for M.E.L. So far as his 5 per cent. in
M.E.L. is concerned, the plaintiff says that, at about this time the
defendant told him that, despite all efforts, a solution could not be
found to what was regarded as being a problem with regard to it and
it was getting in the way of the proposed sale. The plaintiff says
that, during that conversation, the defendant asked him if he would

mind if he, the defendant, held on to the plaintiff's shares for him    A
until a solution was found and that, in the meantime, he would
ensure that the plaintiff received all the dividends that he was
entitled to. The plaintiff is unsure whether the defendant said in
terms that he would, in the meantime, hold the shares 'in trust' for
him, but he says that that is the sense of what the defendant said to
him. In summary he said that the defendant made clear to him that,
pending the finding of a solution to the perceived difficulties, he    B
would hold 5 per cent. of M.E.L.'s issued shares for the plaintiff
and would account to him for all dividends due in respect of such
holding."

That is the crucial finding. It is also picked up at various other places in
the judgment. The judge said, at p. 36 of the transcript:
                                                                        C
"I have found that, shortly afterwards (in about early September
1986), the defendant had a conversation with the plaintiff in which
he said words whose substantive sense was that he would henceforth
hold five per cent. of the M.E.L. shares either for, or in trust for,
the plaintiff, and that he would pay him the dividends due in respect
of such holding."
                                                                        D
The judge said, at p. 37:

"I find that, as from that conversation in early September 1986, the
defendant held 5 per cent. of M.E.L.'s issued shares, i.e., 50 shares,
on trust for the plaintiff. Even if he did not in terms use the words
'in trust,' the sense of what he then said was that he would
thenceforth hold the shares on such a trust."                          E

There is a similar passage in that judgment, at p. 34, which I need not
read. I find it impossible, in the context in which this matter comes
before us, to go behind the judge's summary, at p. 15:

"pending the finding of a solution to the perceived difficulties, he
would hold five per cent. of M.E.L.'s issued shares for the plaintiff
and would account to him for all dividends due in respect of such     F
holding."

I do not think we can prefer the view that the substance of the judge's
finding, or the evidence, was, at p. 15:

"the defendant asked [the plaintiff] if he would mind if he, the
defendant, held on to the plaintiff's shares for him until a solution  G
was found and that, in the meantime, he would ensure that the
plaintiff received all the dividends that he was entitled to."

The judge was, no doubt, working from his own notebook and
recollection of the witnesses' evidence, but the transcripts of the evidence
of the plaintiff have not been put before us.
I do not see that it is open to us to reject the judge's finding    H
repeatedly stated in the course of his judgment. One understands clearly
what is meant by "pending the finding of a solution to the perceived
difficulties." The whole purpose can only have been, however, that the
declaration of trust that the judge found was intended to be an immediate
declaration of trust to have effect so as to enable the sale to Bennett &
Fountain to go through in the hope that some other solution would come
to light, but it had to have an immediate effect. He could not have been

A    intending at that juncture to mean that he would simply shelve the idea of transferring shares and giving the plaintiff any rights in respect of what had been referred to as "the plaintiff's 5 per cent. in M.E.L." until a solution at some later date was hopefully found which would enable the defendant's favourable wishes to the plaintiff to be given effect to without adverse tax consequences for either of them. Therefore, I do not think it is open to Mr. Hartman to dispute the judge's conclusion of fact which is

B    the crucial conclusion which he seeks to challenge in this part of his notice of appeal. The finding must stand.

    I pass then to the second point of uncertainty. It is well established that for the creation of a trust there must be the three certainties referred to by Lord Langdale in *Knight v. Knight* (1840) 3 Beav. 148. One of those is, of course, that there must be certainty of subject matter. All

C    these shares were identical in one class: 5 per cent. was 50 shares and the defendant held personally more than 50 shares. It is well known that a trust of personalty can be created orally. We were referred to the well known passage in the judgment of Turner L.J. in *Milroy v. Lord* (1862) 4 De G.F. & J. 264, 274–275, where he said:

> "I take the law of this court to be well settled, that, in order to
> D    render a voluntary settlement valid and effectual, the settlor must
> have done everything which, according to the nature of the property
> comprised in the settlement, was necessary to be done in order to
> transfer the property and render the settlement binding upon him.
> He may of course do this by actually transferring the property to the
> persons for whom he intends to provide, and the provision will then
> be effectual, and it will be equally effectual if he transfers the
> E    property to a trustee for the purposes of the settlement, or declares
> that he himself holds it in trust for those purposes; and if the
> property be personal, the trust may, as I apprehend, be declared
> either in writing or by parol; but, in order to render the settlement
> binding, one or other of these modes must, as I understand the law
> of this court, be resorted to, for there is no equity in this court to
> F    perfect an imperfect gift. The cases I think go further to this extent,
> that if the settlement is intended to be effectuated by one of the
> modes to which I have referred, the court will not give effect to it
> by applying another of those modes. If it is intended to take effect
> by transfer, the court will not hold the intended transfer to operate
> as a declaration of trust, for then every imperfect instrument would
> be made effectual by being converted into a perfect trust."

G    In the present case there was no question of an imperfect transfer. What is relied on is an oral declaration of trust. Again, it would not be good enough for a settlor to say, "I declare that I hold 50 of my shares on trust for B," without indicating the company he had in mind of the various companies in which he held shares. There would be no sufficient certainty as to the subject matter of the trust. But here the discussion is

H    solely about the shares of one class in the one company.

    It is plain that a bequest by the defendant to the plaintiff of 50 of his ordinary shares in M.E.L. would be a valid bequest on the defendant's death which his executors or administrators would be bound to carry into effect. Mr. Hartman sought to dispute that and to say that if, for instance, a shareholder had 200 ordinary shares in I.C.I. and wanted to give them to A, B, C and D equally he could do it by giving 200 shares to A, B, C and D as tenants in common, but he could not validly do it

by giving 50 shares to A, 50 shares to B, 50 shares to C and 50 shares to    A
D, because he has not indicated which of the identical shares A is to
have and which B is to have. I do not accept that. That such a
testamentary bequest is valid, appears sufficiently from *In re Clifford*
[1912] 1 Ch. 29 and *In re Cheadle* [1900] 2 Ch. 620. It seems to me,
again, that if a person holds, say, 200 ordinary shares in I.C.I. and he
executes a transfer of 50 ordinary shares in I.C.I. either to an individual
donee or to trustees, and hands over the certificate for his 200 shares and    B
the transfer to the transferees or to brokers to give effect to the transfer,
there is a valid gift to the individual or trustees/transferees of the 50
shares without any further identification of their numbers. It would be a
completed gift without waiting for registration of the transfer: see *In re
Rose* [1952] Ch. 499. In the ordinary way a new certificate would be
issued for the 50 shares to the transferee and the transferor would receive    C
a balance certificate in respect of the rest of his holding. I see no
uncertainty at all in those circumstances.

Mr. Hartman, however, relied on two authorities in particular. One
is a decision of Oliver J. in *In re London Wine Co. (Shippers) Ltd.* [1986]
P.C.C. 121 which was decided in 1975. That was a case in which the
business of the company was that of dealers in wine and over a period it
had acquired stocks of wine which were deposited in various warehouses    D
in England. Quantities were then sold to customers by the company, but
in many instances the wine remained at the warehouse. There was no
appropriation—on the ground, as it were—from bulk, of any wine, to
answer particular contracts. But the customer received from the company
a certificate of title for wine for which he had paid which decribed him
as the sole and beneficial owner of such-and-such wine of such-and-such    E
a vintage. The customer was charged for storage and insurance, but
specific cases were not segregated or identified.

Subsequently, at a stage when large stocks of wine were held in
various warehouses to the order of the company and its customers, a
receiver was appointed by a debenture holder. The question that arose
was whether the customers who had received these certificates of title
had a good title to the quantity of wine referred to in the certificate as    F
against the receiver appointed under a floating charge. The judge held
that it could not be said that the legal title to the wine had passed to
individual customers and the description of the wine did not adequately
link it with any given consignment or warehouse. And, furthermore, it
appeared that there was a lack of comparison at the time the certificates
were issued in that, in some cases, the certificates were issued before the    G
wine which had been ordered by the company had actually been received
by the company. It seems to me that that case is a long way from the
present. It is concerned with the appropriation of chattels and when the
property in chattels passes. We are concerned with a declaration of trust,
accepting that the legal title remained in the defendant and was not
intended, at the time the trust was declared, to pass immediately to the
plaintiff. The defendant was to retain the shares as trustee for the    H
plaintiff.

Mr. Hartman also referred to *Mac-Jordan Construction Ltd. v.
Brookmount Erostin Ltd.* (1991) 56 B.L.R. 1, a decision of this court.
The position there was that Mac-Jordan were sub-contractors for
Brookmount as main contractors. There was retention money kept back
by Brookmount which, on the documents, was to be held on a trust for
the sub-contractors, but it had not been set aside as a separate fund

A  when a receiver was appointed by the main contractor, Brookmount's, bank. It was, consequently, held that Mac-Jordan were not entitled to payment in full of the retention moneys in priority to the receiver and the secured creditor. It was common ground in that case that, prior to the appointment of the receivers, there were no identifiable assets of Brookmount impressed with the trust applicable to the retention fund. At best, there was merely a general bank account.

B  In reliance on that case Mr. Hartman submitted that no fiduciary relationship can attach to an unappropriated portion of a mixed fund. The only remedy is that of a floating charge. He referred to a passage in the judgment of Lord Greene M.R. in *In re Diplock* [1948] Ch. 465, 519–520 where he said:

C  "The narrowness of the limits within which the common law operated may be linked with the limited nature of the remedies available to it . . . In particular, the device of a declaration of charge was unknown to the common law and it was the availability of that device which enabled equity to give effect to its wider conception of equitable rights."

D  So Mr. Hartman submitted that the most that the plaintiff could claim is to have an equitable charge on a blended fund. He mentioned the decision of Chitty J. in *In re Earl of Lucan* (1890) 45 Ch.D. 470 which points out that, where there was merely an equitable charge which did not grant perfect and complete rights to the chargee and it was given by way of gift to a volunteer, there could be no specific performance in favour of the volunteer who would have no priority over the creditors of the grantor. As I see it, however, we are not concerned in this case with

E  a mere equitable charge over a mixed fund. Just as a person can give, by will, a specified number of his shares of a certain class in a certain company, so equally, in my judgment, he can declare himself trustee of 50 of his ordinary shares in M.E.L. or whatever the company may be and that is effective to give a beneficial proprietary interest to the beneficiary under the trust. No question of a blended fund thereafter

F  arises and we are not in the field of equitable charge.

Therefore, I agree with the deputy judge on the conclusion of the uncertainty point which he dealt with in his November 1992 judgment [1993] 1 W.L.R. 934.

There then rests the slightly tangled question of what the relief to be granted should be. As I have said in dealing with the history, Mr. Sood,

G  the managing director, was granted 50 shares in M.E.L. and, when the share capital of M.E.L. was sold to Bennett & Fountain, Mr. Sood received 187,500 Bennett & Fountain shares in exchange for his 50 M.E.L. shares. The claim for the plaintiff in his pleaded case at all stages until the end of the trial was that he, like Mr. Sood, should be entitled to 187,500 Bennett & Fountain shares or, rather, to their equivalent at the agreed price under the sale of Bennett & Fountain. The defendant in

H  respect of his shares in M.E.L.—which, by then, were all the shares except Mr. Sood's because he held, as trustee, the plaintiff's shares and it seems that he had received his mother's shares—received for his whole holding 13,500,000 shares in Bennett & Fountain plus £150,000 in cash.

We have the position, therefore, that Mr. Sood received, and the plaintiff was claiming, 187,500 shares. However, the defendant's receipt included a cash sum. The question, therefore, arose whether the plaintiff should receive the proportion of shares that Mr. Sood received or a

proportion of the cash sum and a proportion of the shares which the    A
defendant had received. By the time of the trial I think the defendant
had disposed of all his shares, but nothing turns on that. The judge said
in his October 1992 judgment:

"It was not disputed by Mr. Clarke"—then the counsel for the
defendant—"that, if I were so to find, the plaintiff's beneficial
interest in the 50 M.E.L. shares became translated, upon the    B
completion of the M.E.L. acquisition by Bennett & Fountain on
28 October 1986 into, at any rate for the most part, a corresponding
proportion of the Bennett & Fountain shares which the defendant
received in exchange for his M.E.L. shares. The plaintiff's pleaded
case is that he became entitled to 750,000 10p Bennett & Fountain
shares, now represented by 187,500 20p shares. As I have said, that
is the holding which Mr. Sood acquired in exchange for his 50    C
M.E.L. shares. However, Mr. Clarke submits that, in this respect,
the plaintiff's pleaded case is inaccurate. He says that the correct
position is that the plaintiff is more properly to be regarded as
having become entitled in equity to 5 per cent. of the total
consideration paid by Bennett & Fountain for the M.E.L. shares,
i.e., 5 per cent. of the cash sum of £150,000 paid to the defendant,    D
or £7,500; and 177,631·57 20p Bennett & Fountain shares—that
number of shares being the post-consolidation equivalent of the
number of Bennett & Fountain shares which the defendant received
for each 50 M.E.L. shares. Mr. Davidson agreed that that was
probably the more correct way of identifying the plaintiff's
entitlement, and agreed Mr. Clarke's figures. For my part, having
considered the matter further whilst preparing this judgment, it    E
appears to me that, strictly, the cash element of the plaintiff's
entitlement is £7,894·73 rather than £7,500, that sum being the cash
amount received by the defendant in respect of each 50·of his 950
M.E.L. shares. I will give Mr. Clarke the opportunity of pointing
out any error in that reasoning but, subject to that, I proceed on the
basis that the plaintiff's equitable interest in 5 per cent. of M.E.L.'s    F
issued shares became translated upon its acquisition by Bennett &
Fountain and after adjustments to take account of Bennett &
Fountain's subsequent share consolidation, into (1) £7,894·73 in
cash, and (2) 177,631·57 20p Bennett & Fountain shares."

The judge then proceeded to hold that the appropriate remedy by
way of monetary compensation in place of his beneficial interest in    G
177,631·57 shares was 39p per share. That is the mid-market price on
30 November 1989.
    Then he, again, returns to the point that no cash sum has been
claimed in the pleadings and the case was exclusively put forward on the
basis of 187,500 shares. It was, however, not suggested by Mr. Clarke
that any deficiency in the pleading put the plaintiff out of court on the    H
point. And, indeed, the judge understood Mr. Clarke to accept that if he
were, in principle, to find in favour of the plaintiff then it would be right
also to award him the cash sum. The judge then held that it would be
right to do so. It is relief which the plaintiff is entitled to as a consequence
of having established his beneficial interest in 5 per cent. of M.E.L.'s
shares. He goes on then to deal with interest and there are calculations
of interest.

A Then there is discussion after judgment in which it appears that the judge had miscalculated the number of days for which interest would be running on the basis, which was common to the parties, on which the award should be made. Accordingly, that was adjusted to produce the figure of £112,723·70. Mr. Clarke specifically said, subject to that interest adjustment, that he agreed with the judge's calculation on the case sum which he had checked, that it did seem to be right. He is, therefore,

B clearly accepting the basis on which the judge was following Mr. Clarke's suggestion, proceeding with the agreement of Mr. Davidson, picking up any mathematical errors on anyone's part en route.

 Mr. Hartman says that the true calculation is the calculation which was pleaded of 187,500 shares and he adds in relation to that that when net dividends were paid in 1989 they were paid on the equivalent of

C 187,500 shares. What actually happened at that time was that the defendant said to the plaintiff, "I owe you some dividends. You must calculate them." They were calculated by the plaintiff on the footing that his notional shareholding in Bennett & Fountain was the same as Mr. Sood's. This would actually produce in total, for mathematical reasons which it is unnecessary to go into, a smaller sum than the £112,000 the judge awarded. It comes down, as set out in the revised

D notice of appeal, from the £112,723·70 to £104,707·55. As I see it, however, Mr. Clarke put forward the methodology that the plaintiff was entitled to his percentage of the consideration which the defendant received on the sale to Bennett & Fountain, that is to say, to the proportion attributable to 50 shares of cash and shares received by the defendant for his holding. That seems to me to have been, in principle,

E correct unless there was some other arrangement made whereby the plaintiff had agreed that he would have, on the transfer, shares only as Mr. Sood was, apparently, willing to have. But, although the claim was put forward on a basis of shares only, and the dividends were accounted for, without considering the problem, on that basis, I do not see any evidence of any supplementary agreement which would have prevented the ordinary tracing rule applying, that he would be entitled to the due

F portion of the consideration received by the defendant.

 Mr. Davidson accepted, though it had not been pleaded, Mr. Clarke's proposal and when the mathematics had been ironed out that was something in which the judge's order was really representing the consent of the parties to the proper way of giving effect to the judge's finding that a trust for 50 ordinary shares in M.E.L. had been validly created by

G the defendant in favour of the plaintiff. The consent swept out of the way any other possible arguments that there might have been. It has been suggested that, therefore, any interference with the judge's finding as to the amount to be awarded would require the consent of the judge below, or of this court, under the recently inserted R.S.C., Ord. 59, r. 1B and Mr. Hartman asks us, so far as is necessary, to grant such consent. If I were with him on the substantive conclusion I would,

H indeed, be prepared to grant leave. But it seems to me that there was, indeed, consent between the parties to this way of doing it which was also, as I see it, a correct way.

 Therefore, I would not interfere with the financial award by the judge except for correcting yet one more minor point which has come to light, and that is that Mr. Davidson has discovered—and the point is put forward at the end of his skeleton argument—that the net dividend payments which the plaintiff received in 1989 were calculated on an

assumed beneficial holding of 187,500 Bennett & Fountain shares    A
whereas, on the judge's conclusion, he was only the beneficial owner of
177,631·57 such shares. Consequently, there was, when the net dividends
were paid by the defendant, an overpayment of £498·95 for which the
plaintiff should give credit. That is best done by adjusting the figure
which the judge awarded of £112,723·70 by deducting £498·95. Subject
to that very minor adjustment, I would dismiss this appeal.
                                                                      B

MANN L.J.    I agree.

HIRST L.J.    I also agree.

> Appeal dismissed with costs.
> Legal aid taxation of plaintiff's costs.    C
> Leave to appeal refused.

*Solicitors: Nabarro Nathanson; Hewitson Becke & Shaw, Cambridge.*

                                                    G. F.
                                                                      D

——————

E

\*MOTOR AND GENERAL
INSURANCE CO. LTD.    .    .    .    .    .    . APPELLANTS
                        AND
PAVY    .    .    .    .    .    .    .    .    . RESPONDENT    F

[APPEAL FROM THE COURT OF APPEAL OF TRINIDAD AND TOBAGO]

1993    July 21; Dec. 15            Lord Griffiths, Lord Goff of Chieveley,
                                    Lord Lowry, Lord Slynn of Hadley
                                    and Lord Woolf
                                                                      G

> *Trinidad and Tobago—Road traffic—Third party insurance—Insurers'*
> *liability to pay insured's judgment debt—Third party issuing writ*
> *for damages against insured in respect of damage to vehicle after*
> *collision—Insured failing to forward writ to insurers in breach of*
> *condition in policy—Third party obtaining judgment and claiming*
> *payment from insurers—Whether insured's breach of condition*
> *giving insurers defence to claim for damage to property—Motor*
> *Vehicles Insurance (Third Party Risks) Act (Laws of Trinidad*    H
> *and Tobago, 1983 ed., c. 48:51), ss. 4(1)(b)(5), 8, 10(1)*

> Section 4(1)(*b*) of the Motor Vehicles (Third Party Risks)
> Act[1] required the drivers of motor vehicles in Trinidad and

[1] Motor Vehicles Insurance (Third-Party Risks) Act, s. 4(1)(*b*)(5): see post, p. 465A–C.
S. 8: see post, p. 465D–E.
S. 10(1): see post, p.465F–G.

# Exhibit 49

Neutral Citation Number: [2010] EWHC 2914 (Ch)

Case No: 7942 of 2008

**IN THE HIGH COURT OF JUSTICE**
**CHANCERY DIVISION**
**COMPANIES COURT**

**IN THE MATTER OF LEHMAN BROTHERS INTERNATIONAL (EUROPE) (IN ADMINISTRATION)**
**AND IN THE MATTER OF THE INSOLVENCY ACT 1986**

Royal Courts of Justice
Strand, London, WC2A 2LL

Date: 19/11/2010

Before :

**MR JUSTICE BRIGGS**
- - - - - - - - - - - - - - - - - - - -
**Between:**

**(1)  STEVEN ANTHONY PEARSON**
**(2)  ANTHONY VICTOR LOMAS**
**(3)  MICHAEL JOHN ANDREW JERVIS**
**(4)  DAN YORAM SCHWARZMANN**
**(5)  DEREK ANTHONY HOWELL**
**(The Joint Administrators of Lehman Brothers International (Europe)**
**(In Administration))**

**Applicants**

**- and -**

**(1)  LEHMAN BROTHERS FINANCE SA**
**(2)  LEHMAN BROTHERS COMMERCIAL CORPORATION ASIA**
**LIMITED**
**(3)  LEHMAN BROTHERS ASIA HOLDINGS LIMITED**
**(4)  LEHMAN BROTHERS INC.**
**(5)  LEHMAN BROTHERS SPECIAL FINANCING INC.**

**Respondents**

- - - - - - - - - - - - - - - - - - - -
- - - - - - - - - - - - - - - - - - - -
Hearing dates: 11th – 29th October 2010

# Approved Judgment

I direct that pursuant to CPR PD 39A para 6.1 no official shorthand note shall be taken of this
Judgment and that copies of this version as handed down may be treated as authentic.
............................

MR JUSTICE BRIGGS

**Mr Iain Milligan QC, Mr Guy Morpuss QC, Mr Daniel Bayfield & Mr Socrates**
**Papadopoulos** (instructed by **Linklaters LLP**) for the Joint Administrators

**Mr Gabriel Moss QC & Mr William Willson** (instructed by **Herbert Smith LLP**)
for Lehman Brothers Finance SA

**Mr Robin Dicker QC & Mr Tom Smith** (instructed by **Mayer Brown International LLP**)

for Lehman Brothers Commercial Corporation Asia Limited and Lehman Brothers Asia Holdings Limited

**Mr Michael Brindle QC & Mr Nik Yeo** (instructed by **Norton Rose LLP**) for Lehman Brothers Inc

**Mr Philip Jones QC & Mr Giles Richardson** (instructed by **Weil, Gotshal & Manges LLP**) for Lehman Brothers Special Financing Inc

**Mr Justice Briggs:**

## <u>INTRODUCTION</u>

1.      This application by the Administrators of Lehman Brothers International (Europe) ("LBIE") seeks the court's directions as to the principles governing the beneficial ownership, as between LBIE and a number of its affiliates within the Lehman group, of securities which LBIE had, prior to the onset of its administration, acquired from third parties ("the street") for the account of those affiliates and which, vis-à-vis the rest of the world, still remain vested in LBIE.

2.      The securities comprise a broad range, including both fixed income and equities. The overwhelming majority of them are in dematerialised form, in relation to which LBIE's ownership, as against the rest of the world, consists of a chose in action represented by a credit in LBIE's account (a "depot") with a clearing house, depository or custodian (collectively "depositories"). A small minority consist of shares with physical documentary title, either registered or bearer, in respect of which legal title was generally vested in a nominee, which may also be regarded as a depository for present purposes.

3.       LBIE acquired the relevant securities pursuant to a global settlements practice which had been instituted generally within the Lehman Brothers group ("the Group") in the early 1990s. By then, the Group conducted a truly worldwide securities business, operating in numerous different and widely separated time zones including, most importantly for present purposes, Europe, the USA and the Far East. Put shortly, the essence of the global settlements practice was that the Group identified a single group company (a "hub company") in each main time zone into which all securities acquired in that time zone were settled on acquisition, and from which all such securities were transferred on re-sale to the street. LBIE was the designated hub company for securities bought and sold in Europe, regardless of whether it or one of its affiliates around the world was to enjoy the economic risks and rewards of ownership, including rises and falls in value, and the intermediate income, whether by way of coupon or dividend.

4.      The global settlements practice applied not merely to securities bought and sold as part of a trading strategy designed to yield profits in its own right, but also to securities bought and sold by way of the hedging of the risks arising from the derivatives businesses of particular affiliates.

5.      It was also (or became) Group policy not merely to hold securities between acquisition and re-sale, but to use them for the raising of finance for the Group by lending them to the street in the meantime. Again, the Group designated the same hub companies for the carrying on of this activity as it did to the acquisition and sale of the underlying securities, regardless of the identity of the affiliate for which the securities had been acquired and were held. Thus, all lending of securities to the street in Europe for the raising of finance was carried out by LBIE, and LBIE did not account to specific affiliates for the substantial economic benefits obtained by the use of securities acquired for the affiliate's account in connection with that activity. By contrast, LBIE did account to affiliates for all intermediate income received from securities held for their account between acquisition and re-sale.

6.   The concentration of the acquisition, sale and lending of securities within one Lehman hub company within each main geographical area of the Group's activities was perceived to be very beneficial to the Group in terms of efficiency and economy, but it was also perceived to create, at least potentially, three problems for the hub company. The first ("the capital charge problem") was that to the extent that the hub company paid the acquisition price for securities on settlement with the street, against an unsecured debt for the same acquisition price owed to it by the affiliate for which it had been purchased, the hub company faced a regulatory capital charge which, at least in the case of LBIE and Lehman Brothers Inc ("LBI"), the New York hub company, amounted to 100% of the amount of the unsecured debt.

7.   The second problem ("the segregation problem") was that the hub company might, unless a regulatory exception applied, be required to segregate securities acquired for the account of third parties (including affiliates) rather than, as was the Group's practice, for the hub company to hold all securities acquired both for itself and its affiliates in un-segregated house accounts.

8.   The third problem ("the financing problem") was that the use of securities for the raising of finance by lending to the street required the hub company to be able to transfer absolute and unencumbered title to its street counterparty, whether under re-purchase transactions ("repos") or stock loans, and it was perceived that if the effect of the acquisition of securities by a hub company for an affiliate was to confer beneficial title to the securities upon the affiliate, then the hub company might be in difficulty giving good title to the street as necessitated by financing transactions.

9.   I have described these as potential problems because it is far from clear, in the early 1990s at least, that they, or any of them, rendered LBIE's centralised activities in the acquisition and sale of securities for its affiliates, or by lending to the street, impracticable, still less unlawful in regulatory terms. Nonetheless they were perceived to be of sufficient gravity, either immediately or in the near future, to give rise to the setting up of a small project group of persons within LBIE known as the Regulation and Administration of Safe Custody and Global Settlement working party, or "Rascals" for short, tasked with devising a solution to them. That catchy acronym became the label used for the identification of the processes adopted to address those three perceived problems and, in due course, as the name for this litigation.

10.  The Rascals project was initiated in 1993. Following negotiations between LBIE and the affiliates for which it dealt in securities, the Rascals processes recommended by the working party began to be applied from about 1996. Rascals processes continued to be applied between LBIE and various of its affiliates until, and indeed after, LBIE went into administration on the morning of 15th September 2008. Although those processes shared certain common features, they were by no means uniform, as between LBIE and different affiliates, or in relation to different types of securities.

11.  Nonetheless, and at the risk of oversimplification, the Rascals processes shared the following common features:

     i)   They were applied to large classes of securities acquired by LBIE, acting as hub company, for the account of affiliates.

ii)     In each case the affiliate purported to confer upon LBIE its proprietary interest (if any) in the underlying security in exchange for monetary consideration in the form of a purchase price or the deposit of monetary collateral, leaving the affiliate with a contractual right against LBIE to recover its proprietary interest in equivalent securities, again for monetary consideration, at a future date.

iii)    The commercial intent (albeit not contractual obligation) of the processes was usually that they should apply for the whole or substantially the whole of the period between the acquisition of the security from the street by LBIE and its eventual re-sale to the street.

iv)     The intended effect of the processes (whether or not successful) was to replace an unsecured obligation by the affiliate to refund LBIE the purchase price for the acquisition of the security from the street with a secured obligation of the affiliate to pay for its re-acquisition from LBIE of an equivalent security under the Rascals processes, whether by paying the repurchase price under the off-leg of a repo or paying back the collateral lodged during the currency of a stock loan (repos and stock loans being the two types transaction alternatively used by all the Rascals processes).

12.   It will be unnecessary for me to describe every form of Rascals processing used within the Group between the mid-1990s and its collapse in 2008.  Nonetheless a brief description of the two principal methods of Rascals processing extant immediately prior to the collapse will serve by way of introduction to make intelligible the issues which have arisen thereafter.  The first, Automatic Rascals, was applied mainly to fixed income securities.  As its name implies, it was not merely automatic by 2008, but fully computerised, so that the series of daily repeated transactions between LBIE and the relevant affiliates were entered into and settled entirely electronically, without the need for any human intervention on either side.

13.   On the day of the settlement of LBIE's acquisition of the security from the street, LBIE and the affiliate entered into a repo contract, providing for the immediate sale of the security by the affiliate to LBIE for a fixed price in fact equivalent to its value that day ("the on-leg"), followed by a sale back of an equivalent security by LBIE to the affiliate on the following day at the same price plus an interest charge or fee ("the off-leg"), with LBIE having the right of use of the security in the meantime.

14.   On the following day LBIE and the affiliate would enter into a replacement repo, in all respects identical to the first, save that the price would be fixed by reference to the marked to market value of the security on that day.  This process would then be repeated on every subsequent day of the period during which the security (or its equivalent) was held, until and including the day before the settlement of the eventual sale of the security back to the street.  Thus, the settlement of that sale would coincide with the off-leg of the last in the series of computer-generated repo transactions between LBIE and the affiliate.

15.   Pursuant to master agreements between LBIE and each of its relevant affiliates, the repo transactions under Automatic Rascals were on industry standard terms, pursuant to which title to the underlying security was not to pass either under the on-leg or the off-leg of the repo until payment.  I note in passing that this feature of Automatic Rascals was common ground before me, save that it was challenged by Lehman

Brothers Finance SA. ("LBF") in relation to the off-leg.   As will appear, I have rejected that challenge, for reasons which will follow.

16.      It was not the intention of the designers of Automatic Rascals that the purchases and re-purchases constituted by the on and off-legs should be cash settled.   Rather, payment and repayment was intended to be achieved, in form by what I shall loosely call book entries, but in substance by a series of successive offsets.   Thus, the affiliate's debt to LBIE for the acquisition price of the security from the street was largely offset by LBIE's debt to the affiliate on the on-leg of the first repo.   The affiliate's debt to LBIE under the off-leg of the first repo was in turn largely offset by LBIE's debt to the affiliate on the on-leg of the second repo.   These offsets continued until the settlement of the sale of the security to the street, whereupon the affiliate's debt on the off-leg of the last repo was largely offset by LBIE's obligation to account to the affiliate for the proceeds of the sale of the security back to the street.

17.      I have throughout that summary used the phrase "largely offset" to reflect the fact that the cross debts were not necessarily, or even usually, identical. Differences would arise from the constantly changing value of the underlying security, and the fixing of the repo prices by reference to its marked to market value from time to time.   Thus for example, a rise in the value of the security between the trade date and the settlement date of the acquisition from the street would mean that LBIE's debt on the first on-leg would exceed the affiliate's debt in relation to the purchase price, and vice versa. Similar changes were caused by marked to market movements during the series of daily repos, and by any disparity between the sale price of the security on the trade date, and its marked to market value on the settlement date, back to the street.   Other differences would arise from fees and interest charges arising under the repos being added to the amounts payable.

18.      I have in the same phrase used "offset" rather than set-off to record the fact that, in the parties' accounting records, the nearly equal but opposite credits and debits between LBIE and each affiliate were not immediately cancelled by journals and replaced by a net balance. I shall describe in due course how the opposing entries were in due course dealt with. The question whether the offsetting entry (such as LBIE's debt to an affiliate for the on-leg of the first repo) can properly be said to have paid *pro tanto* the original debt (such as the affiliate's debt to LBIE for the acquisition price of the security from the street) has been the subject of keen debate, to which I shall return.

19.      Manual Rascals, as its name implies, was triggered only by human intervention, and was a process (or the label for a process) mainly applied to equities.   An equity purchase by LBIE for an affiliate from the street selected for Manual Rascals processing would be made the subject of a stock loan by the affiliate back to LBIE. By contrast with the daily repos, the stock loans (also on standard industry terms) were open-ended.   They provided for transfer by the affiliate of its title to the security back to LBIE in exchange for monetary collateral, with a right in the affiliate to reacquire title to an equivalent security upon payment of the collateral back to LBIE, with small adjustments for a stock loan fee and/or an interest charge in relation to the collateral and provision for margining adjustments to the collateral during the life of the stock loan, to reflect changes in the marked to market value of the security. Manual Rascals therefore required no daily repetition of transactions between acquisition and resale of the security from and to the street.   Furthermore, the evidence does not enable it to be said with confidence that Manual Rascals was

invariably or even usually applied to a security on the day of the settlement of its acquisition from the street.

20.     As with Automatic Rascals, it was not envisaged by the designers of the process that cash collateral would actually be delivered by LBIE on the making of the stock loan, or physically redelivered by the affiliate upon its termination.  Rather, payment was, again, to be recorded in book entries, but achieved by offset.  LBIE's obligation to lodge collateral was intended to be achieved by an offset against the affiliate's debt for the price of the acquisition from the street.  Similarly, the affiliate's obligation to repay collateral at the end of the stock loan was to be offset against LBIE's obligation to account for the proceeds of the sale of the security to the street.  Again, these offsets were not precise, due to movements in the value of the underlying security by reference to which the collateral was calculated, between the original trade date for the acquisition and the settlement of the sale, in each case with the street.

21.     I have throughout this summary described the subject matter of the Rascals repos and stock loans as if it were the very securities that LBIE purchased from the street.  In fact it was in each case the beneficial interest (if any) of the affiliate in the securities, of which LBIE remained the owner as against the street throughout the process. LBIE remained the account holder recognised by the depositary from start to finish, and the Rascals process was therefore entirely internal, within the Group, and invisible to the rest of the world, although its perceived consequences were reflected in the Group companies' regulatory reporting, and in their published accounts.

22.     This litigation is, as I have said, concerned only with securities still within LBIE's depots which were, when it went into administration, the subject of one or other of the Rascals processes which I have summarised.  In relation to Automatic Rascals, the computers which generated the stream of daily repos did not cease to do so by virtue of the Administration Order, nor is it suggested that the Order itself deprived the subsequent automated electronic workings of that computer programme of contractual efficacy.  The automatic process continued until 23rd September 2008, when a manual intervention by an employee of LBIE (which I shall describe in detail in due course) prevented any new repos being made thereafter, with the consequence as a matter of form that all existing repos ended with their off-legs scheduled for that day.

23.     As for Manual Rascals, the stock loans by which that process was applied simply remained open when LBIE went into administration, there being no provision in them, or in the parties' computer systems, for automatic off-legs.

24.     It is by no means the case that all Rascalled securities which LBIE had acquired for affiliates but not re-sold for the affiliates to the street prior to LBIE going into administration remain in LBIE's depots now.  Large numbers of them had been lent to the street by LBIE, and its insolvency meant that LBIE was unable to reacquire equivalent securities from its street lending counterparties due to its inability to pay the repurchase prices under repos or return the collateral under stock loans.  Those which remain in LBIE's depots, and which are the subject matter of this application, therefore constitute a small and unrepresentative subset of those which were subject to Rascals processing when the Group collapsed.

**THE ISSUES**

25.     The trial of this application for directions has taken the form of a straight adversarial fight between LBIE by the Administrators on the one hand and five of its affiliates on the other.    By contrast with some earlier applications for directions, the Administrators have not at any stage in this application assumed a neutral role.    On the contrary, they claim that LBIE is beneficially entitled to all the Rascalled securities remaining in its depots, to the exclusion of any of its affiliates.

26.     For their part, the respondent affiliates each claim beneficial title to all those securities remaining in LBIE's depots acquired by LBIE for their separate accounts, to a large extent on overlapping legal arguments, but based upon the detailed separate facts about LBIE's relationship with each of them.

27.     The first main area of dispute concerns the beneficial ownership of securities acquired by LBIE for the affiliates' account before the Rascals processes were applied to them. The first plank in the Administrators' case is that the global settlements practice by which LBIE acquired from the street securities for the account of affiliates was neither capable as a matter of law, nor intended, to confer beneficial title upon affiliates in relation to any of the securities acquired, entirely regardless of the Rascals processes.    It being common ground that a beneficial interest in an affiliate necessitates a trustee beneficiary relationship between LBIE and the affiliate, the Administrators say that the supposed trust necessarily fails in every case due to uncertainty of subject matter or uncertainty of terms. They say that the objective common intention of both LBIE and its affiliates was that the affiliates should obtain the economic risks and benefits of an owner of the underlying securities not by the transfer of ownership (in the sense of a proprietary interest) but by the creation of purely contractual rights and liabilities between LBIE and the affiliates having the same economic effect, as it were, synthetically.

28.     This is roundly challenged by the affiliates, each of which claims (albeit by reference to slightly different facts) that LBIE acquired or settled the acquisition of securities for each of them as broker or settlement agent on terms which ordinarily imply the holding of the underlying securities on trust for the affiliate principal, and that there are no facts which suggest any different outcome.  On the contrary, they each say that the essential predicate of the Rascals process was that, but for it, the beneficial interest in the underlying securities was intended and assumed, as between LBIE and the affiliate, to lie with the affiliate.

29.     Save for that last point, all the parties to this application have invited me to address this first issue by a close legal and factual analysis of the global settlement practice upon the counter-factual assumption that, for this purpose, the Rascals process can temporarily be ignored.  They appear to have done so mainly for their own tactical reasons.  There were numerous securities acquired by LBIE for affiliates (and held in its depots when the Group collapsed) to which Rascals processes were not applied, but they are, by definition, not the subject matter of this application.  As will appear, I have considerable reservations as to the utility of addressing the effect of the Group's global settlement practice upon the beneficial ownership of Rascalled securities on the counter-factual hypothesis that Rascals processes were not intended to be, and were not, applied to them.

30.     The second main area of dispute concerns the effect upon beneficial entitlement to Rascalled securities on the assumption, contrary to the Administrators' primary case, that but for Rascals processing, the beneficial interest in the securities would have vested in the affiliates. The Administrators' case is that the Rascals process did what it said on the tin, that is, transfer any beneficial interest of the affiliates in the Rascalled securities to LBIE, that this is where the beneficial interests lay when the Group collapsed, and that the aftermath, including the switching off of the Automatic Rascals process, brought about no subsequent re-transfer of beneficial interests back to the affiliates.

31.     The bones of the Administrators' case in this respect are that:

   i)      LBIE paid by offset for the transfer of title from the affiliates by each repo on-leg and stock loan, and that the beneficial interests resided in LBIE continuously thereafter.

   ii)     On 15th September 2008 those beneficial interests were therefore with LBIE.

   iii)    That none of the affiliates (all of which were also insolvent) paid LBIE for the repurchase of securities under the final repo off-legs under Automatic Rascals which occurred on 23rd September 2008, with the consequence that title remained with LBIE.

   iv)    Alternatively that the manual intervention into the computerised Automatic Rascals process was invalid because it was not authorised by the Administrators.

   v)     That all Manual Rascals stock loans have remained open since the onset of LBIE's administration.

   vi)    That in any event no affiliate has been able to repay the collateral provided by LBIE under the stock loans, with the consequence that, pursuant to their terms, title has not passed back to the affiliates.

32.     The affiliates' case in relation to the Rascals part of the dispute may be broadly summarised as follows, although the factual basis for each affiliate's case is divergent.

   i)      That LBIE never paid for any of the repo on-legs or lodged collateral for any of the stock loans, there being no available off-set in the form of a debt due from the affiliate for the acquisition price from the street, as a result of the Group's inter-company finance arrangements, with the consequence that beneficial title never passed to LBIE under the Rascals processes, Automatic or Manual.

   ii)     That even if title did pass, it reverted under Automatic Rascals to the relevant affiliates on the final off-leg on 23rd September 2008 or, in the case of certain affiliates, slightly earlier.

   iii)    That in relation to Manual Rascals, there arose a resulting trust in favour of the relevant affiliate once the alleged purpose of Manual Rascals (namely to

enable LBIE to use the underlying securities to raise trade finance in the street) became incapable of fulfilment by virtue of LBIE's going into administration.

33. In addition to those general arguments, the second and third respondents (being members of the Group's Far Eastern enterprise) have additional arguments, peculiar to them, as to why the Rascals processes failed to achieve their intended purpose, arising from complicated inter-company novation and netting arrangements applicable to the Group's Far Eastern operations.

34. It is no small irony that the primary cases of all the protagonists involve treating the Rascals processes as, in effect, a complete waste of time and effort. On the Administrators' primary case the Rascals processes were entirely unnecessary, because beneficial title in the underlying securities never passed to the affiliates in the first place. On the primary cases of all the respondents the Rascals processes simply failed to achieve their intended purpose, because for a variety of reasons the assumptions upon which they were based were incompatible with the pattern of financial dealings between the parties, established either by agreement or by invariable practice reflected in book entries.

35. It is, at least at first sight, counter-intuitive to think that one of the largest and most sophisticated investment banking institutions in the world, staffed by some of the foremost experts in the business and advised by the most eminent law firms, should have spent more than a decade solemnly entering into countless thousands of mutual transactions which were either completely unnecessary, completely ineffective or both. The suspension of disbelief called for by the parties' primary cases has not been easy.

36. The question whether the Rascals processes were necessary has called both for a close analysis of the operation of the Group's global settlement practice, and also a study of the legal question whether the recognition in English law in Hunter v. Moss [1994] 1 WLR 452 that there can be a trust of part of an un-segregated mass of fungibles is sufficiently flexible to be capable of being applied to the constantly fluctuating mass of security interests appearing in LBIE's un-segregated house depot accounts with its depositories.

37. The question whether, if the Rascals processes were necessary to confer upon LBIE beneficial title to the underlying securities, they were effective for that purpose has called for a minute examination both of the contractual structures put in place between LBIE and each of the respondents (together with other affiliates) and the accounting records employed by the Group for the purpose of recording their financial dealings, including but not limited to those constituted by the Rascals transactions.

## THE FACTS

38. By contrast with most other applications by the Administrators to date, the present case has not proceeded upon the basis of assumed facts. Rather, the parties have helpfully agreed some of the relevant facts, albeit only for the purposes of this application. Others have been the subject of dispute, to the extent that there has been a limited amount of cross-examination. Nonetheless the parties have sensibly deferred to a later stage in the administration all detailed questions as to whether, and if so precisely how, the Rascals processes were applied to specific securities. The

purpose of this application has been to obtain directions as to the legal consequences, in terms of the beneficial ownership of securities, of their having been processed in accordance with certain recognisable patterns, both in terms of security transactions and the parties' accounting for their financial consequences.

39.    Since there has been no precise correspondence between the manner in which LBIE dealt with each of the five respondent affiliates which have claimed beneficial interests in the relevant securities, either in terms of contract or accounting records, it has been necessary to consider the relationship between LBIE and each affiliate separately, both in terms of the deployment and testing of evidence, and in this judgment.

40.    The documentary evidence has fallen into three main classes:

   i)    A small number of memoranda and communications generated in connection with the carrying out of the Rascals project in the early to mid-1990s;

   ii)    The written agreements made from time to time between LBIE and the relevant affiliates (including but not limited to the respondents) relevant to the Rascals processes and the parties' funding arrangements;

   iii)    The parties' accounting records.  These were for the most part computerised, and presented in court in the form of helpfully selective screenshots with appended (and usually un-contentious) interpretative notes.

41.    The oral evidence has consisted of two main strands.  First, some of those employees within the Group involved in the planning, implementation and subsequent operation of the Rascals processes have given evidence.  Since the processes were originally planned and put in place more than ten years ago the first hand recollection of most of them has been understandably limited.

42.    The second main strand has consisted of the essentially interpretative evidence both of members of the teams of professionals now engaged in the insolvency processes affecting each of the parties and in addition some former Group employees experienced in operating or studying the Group's accounting records and therefore qualified to assist the court in their interpretation.  There has finally been evidence about the circumstances in which the Automatic Rascals processes were, in effect, switched off on 23rd September 2008, directed to the question whether the switching off was authorised by the Administrators.

43.    As might be expected of mainly professional persons with no particular axe to grind, all the witnesses did their considerable best to assist the court both with their recollection and their interpretation of technical accounting records.  Both individually and collectively they provided very considerable assistance to the court, not least because of the readiness of most of them, when challenged, to acknowledge instances where, mainly due to continuing research, conclusions or assumptions in their earlier written evidence called for qualification or amendment.

44.    This has not been to any significant extent a case in which the outcome of issues of fact has turned upon the relative skill, competence, demeanour or integrity of different witnesses.  Nonetheless I should briefly mention the evidence of Mrs Lisa Greenway

who, in no less than eight successive witness statements, undertook on behalf of the Administrators the main burden of providing a detailed explanation of the Rascals processes and the interpretation of the Group's accounting records. She augmented that evidence in chief and was cross-examined at some length by counsel for each of the respondents.

45.     Mrs Greenway joined the Lehman Group in 1992 and worked continuously for it until its collapse, in a wide variety of different roles of increasing seniority in London, mainly but not exclusively for LBIE. Following LBIE's entry into administration she was appointed by the Administrators as an Executive Director in LBIE's Administration Intercompany Team. Her presentation of the Rascals processes and her interpretation of the Group's accounting records was mainly the product of the work carried out by herself and her team during LBIE's administration. Her work for the Group prior to the collapse had not brought her into close contact with the Rascals processes, or with the Group's financial recording of Rascals and its effect. Nonetheless her long familiarity with the Group's accounting systems over many years well qualified her to present and interpret them to the court, her experience in what cross-examining counsel described as "the university of life" more than making up for her lack of any specific accountancy qualifications beyond A level maths and economics.

46.     Generally, Mrs Greenway's presentation and interpretation of the Rascals processes and the Group's accounting records was reliable, subject only to certain occasions when she and her team drew conclusions from their research which, after cross-examination, turned out not to be supported by the underlying documents, or any other evidence, or which were undermined by subsequent more detailed research carried out by others. Those specific instances did not undermine the generality of her evidence as a careful, unbiased, honest and intelligent presentation of an extremely complex subject, fully deserving of the court's gratitude.

**THE PARTIES**

47.     The following brief description of the parties, and of the Group of which they formed part, relates to the period immediately prior to the Group's collapse in September 2008. It is not suggested that any differences from that description at any earlier date are relevant to the issues which I have to decide although, of course, the securities with which this application is concerned were acquired from the street during a period of some years prior to the collapse.

48.     The Lehman Group was in 2008 one of the four biggest investment banks in the United States, the core of its business being global investment banking, including the provision of financial services to corporations, governments and municipalities, institutional clients and high net worth individuals. It organised its business activities in three segments, namely capital markets, investment banking and investment management. Those segments included equity and fixed income sales, trading and research, capital markets and advisory financing, asset management, principal investing and private equity.

49.     The Group sought to present itself to the world, and to organise itself internally, as a single integrated business enterprise, rather than as a collection of separate legal entities all pursuing their own affairs in isolation from each other. Nor were its

separate legal entities confined to trading only in their countries of incorporation. Many of them, including all but one of the parties to this application, carried on business activities on a global rather than merely national or regional basis.

50.    Nonetheless, the tendency of financial services regulation to operate on national lines, the differences in national fiscal systems and the requirements of those dealing with the Group as clients, customers or trading counterparties meant that, for numerous purposes, the identity of Group companies as separate legal entities with principal places of business in particular jurisdictions was of unavoidable importance, both as a matter of internal organisation and external dealings.

51.    The ultimate parent company within the Group was Lehman Brothers Holdings Inc. ("LBHI"), a Delaware corporation with its headquarters in New York.  For present purposes, its importance is that it provided a treasury function, including day to day cash-flow management, throughout the Group either directly or (due to regional netting arrangements) indirectly.  The contractual regime for the provision of that treasury function, and its (not always consistent) application over time forms an important plank in the respondents' case that the Rascals processes were ineffective.

52.    One consequence of the Group's endeavours, within limits, to conduct an integrated business was that its staff were not invariably, or even usually, employed exclusively to conduct the business affairs of individual affiliates.  Thus for example, the manager of a trading desk in a particular geographical location would be likely to deal in securities or particular types for a number of different Lehman entities, commonly in pursuit of a Group business strategy rather than on a strictly entity by entity basis.  Thus while a particular entity might appear from its financial statements to conduct business on an enormous scale, it might have a very small number of the Group's staff devoted solely to its affairs, relying on the non-exclusive services of a very large number of others for the conduct of its trading activities.  This is, as I shall describe, particularly true of one of the respondents, LBF.

**LBIE**

53.    LBIE was the Group's principal trading company in Europe.  It provided a wide range of financial services to clients including trading and broking, equity and fixed income securities and dealing in financial derivatives.  It traded in securities for its own account, for the account of Lehman affiliates, including the respondents, and for its own clients.  It maintained depot accounts with the main European securities depositories including, in particular, Euroclear.  LBIE maintained both house accounts and segregated accounts with its securities depositories. Pursuant to the global settlement practice which I have described, LBIE settled all securities trades for its affiliates into house accounts rather than segregated accounts.

54.    LBIE went into administration on 15th September 2008.  LBIE's case has been presented, through the Administrators, by Mr Iain Milligan QC, Mr Guy Morpuss QC, Mr Daniel Bayfield and Mr Socrates Papadopoulos.

**Lehman Brothers Finance SA ("LBF")**

55.    LBF is a Swiss company with a core business consisting of the entry into OTC equity derivatives transactions, either directly with the street or via other Group companies

on a back to back basis.  By 2008 LBF carried on approximately 50% of the Group's total business of that type.  Despite the enormous size of its business, LBF's board consisted only of three non-executive directors, and it enjoyed the exclusive services of only about a dozen staff.  Its day to day business activities were transacted on its behalf by Group staff employed by other entities, working mainly outside Switzerland, and in particular at LBIE's premises in London, on a non-exclusive basis.

56.  LBF's business model was constructed in such a way as to maximise its efficiency and profitability from a regulatory and fiscal perspective.  It was not subject to regulation by the Swiss Financial Market Supervisory Authority ("FINMA"), nor did it hold a banking licence.  Its customers included other Lehman affiliates and professional market participants from the street worldwide.  Its non-regulated status meant that it did not incur regulatory capital charges when entering into OTC derivatives transactions and it also enjoyed a valuable commercial stock exemption from Swiss stamp tax in relation to its dealings in securities for hedging purposes.

57.  LBF's hedging activities required it to establish both long and short positions in securities.  Subject to certain minor exceptions, it did not hold securities or security positions through depot accounts of its own with depositories.  Rather it used the depots established by LBIE (for European securities), LBI (for USA securities) and other affiliates elsewhere.  It also used employees of (or located at the premises of) the Group hub companies for the implementation of its trading strategies, including its hedging activities.

58.  On 22nd December 2008 LBF was placed into a Swiss bankruptcy process on the application of FINMA, PricewaterhouseCoopers AG being appointed as its bankruptcy liquidator. It has appeared on this application by Mr Gabriel Moss QC and Mr William Willson.

## Lehman Brothers Commercial Corporation Asia Limited ("LBCCA") and Lehman Brothers Asia Holdings Limited ("LBAH")

59.  LBCCA and LBAH are two of the Lehman Group entities based in the Far East.  LBCCA's business was proprietary trading and investment, and LBAH was the primary provider of inter-company funding for Lehman Group entities in the Asia Pacific region, standing for that purpose between the Far Eastern trading entities and the Group treasury function provided by LBHI.  Both companies were based and incorporated in Hong Kong.  European securities acquired for the account of LBCCA were routinely settled by LBIE and held in its house depot accounts.  For reasons which I shall explain in detail later, LBAH came to be used as LBIE's counterparty for the Automatic Rascals processing of such securities.

60.  LBCCA and LBAH were both placed into provisional liquidation by the High Court of Hong Kong Special Administrative Region on 19th September 2008 and the same three partners in KPMG China were appointed as provisional liquidators of each of them.  They have both appeared by the same team of solicitors and counsel in these proceedings led by Mr Robin Dicker QC and Mr Tom Smith.  If otherwise successful in claiming beneficial ownership of relevant securities as against LBIE, they do not require any issue as to title as between them to be resolved on this application.

**Lehman Brothers Inc. ("LBI")**

61.    LBI was a registered broker dealer in the USA trading in a variety of financial instruments including equity and fixed income securities. It was the Group's hub company for the USA and the rest of North and South America, and therefore performed a similar function within that geographical area in terms of the settlement and holding of securities that LBIE performed for the Group within Europe. For present purposes LBI is joined as a respondent not because of its activities as a hub company but because LBIE settled and held European securities for its account.

62.    There is an issue whether transactions which may properly be described as Rascals processes were applied to any of the relevant securities, as between LBIE and LBI. Nonetheless it is clear that a very small number of surviving relevant securities (that is, still held in LBIE depots) were the subject of open stock loans by LBI to LBIE when the Group collapsed. It is common ground that, as between LBIE and LBI, this application is about those securities, whether or not the stock loans were strictly part of the Rascals process.

63.    On 19th September 2008 the United States District Court for the Southern District of New York appointed James Giddens as the trustee for the liquidation of LBI under the United States Securities Investor Protection Act of 1970. Mr Giddens was, pursuant to that order, authorised to litigate claims for the recovery of property on LBI's behalf. LBI appeared on this application by Mr Michael Brindle QC and Mr Nik Yeo.

**Lehman Brothers Special Financing Inc. ("LBSF")**

64.    LBSF was the principal Lehman Group company engaged in fixed income OTC derivatives business, typically interest rates swaps, credit default swaps and other derivative products based on fixed income securities such as government and corporate bonds. It was an unregulated entity and, as a result, unable to trade at all on markets which limited trading to regulated entities, and in relation to European securities used LBIE to enter into such trades for its account. Even where it could trade in its own name in securities, LBSF used LBIE for the settlement of securities trades into LBIE's house depot accounts in accordance with the global settlements practice. The securities to which LBSF claims title were acquired mainly in the pursuit of LBSF's hedging strategies.

65.    In numerous respects, LBSF's position in relation to the issues on this application matched that of LBF. Nonetheless, because LBF's hedging was mainly in equities whereas LBSF's was mainly in fixed income securities, the two companies' main economic interests in the litigation concern Manual and Automatic Rascals respectively.

66.    LBSF made a voluntary filing for bankruptcy under Chapter 11 in the United States Bankruptcy Court for the Southern District of New York on 3rd October 2008. It appeared on this application by Mr Philip Jones QC and Mr Giles Richardson.

**THE GROUP BOOK-KEEPING SYSTEMS**

67.    Throughout the period relevant to Rascals, Lehman Brothers operated a Group-wide, largely automated book-keeping system to which, prior to the collapse, each of its

affiliates had access.  Three aspects of it need brief description.  The first is the International Trading System ("ITS"), which was the Group's main trade settlement system for securities settled in Europe and Asia.  It recorded both trades (i.e. contracts for the acquisition or sale of securities), and settlements (i.e. completion of those contracts by the transfer of the relevant securities and payment of the price).

68.    ITS recorded both transactions with the street and inter-company transactions within the Group.  In addition to creating trade tickets recording the essential terms of an acquisition or sale, ITS would also automatically generate appropriate accounting book entries in the books of those Group companies affected by the trade, some of which I will have to describe later in detail.

69.    ITS was used as the main book-keeping platform for Automatic Rascals, and was, subject to manual override, capable of identifying securities which LBIE had contracted to acquire for the account of an affiliate as eligible or ineligible for Automatic Rascals treatment.  Eligible securities were then subjected to daily repos by the ITS system without any human intervention, in terms both of the creation of trade tickets and of all appropriate accounting book entries.  Following the collapse, ITS has continued to be available for inspection by the Administrators and, albeit not always to the same extent, by the office-holders of the respondents.

70.    ITS was, in relation to book entries, in effect a sub-ledger of the Group's general ledger known as DBS, from which from time to time each Group company prepared its own financial statements, eventually reflected in its audited accounts.

71.    Finally, brief mention must be made of a further IT system used by the Group's financing businesses outside the USA, called Global 1.  It was the principal means of recording the stock loan activity in respect of non US issued securities between members of the Lehman group, as well as stock loans entered into by members of the Lehman group with external counterparties in the street. Since the collapse it has been only sporadically available to parties other than the Administrators.

## LBIE'S USE OF SECURITIES HELD FOR ITS AFFILIATES' ACCOUNT

72.    The Administrators' case that the affiliates never acquired any beneficial interest in securities held by LBIE for their account is mainly based upon the way in which, with the affiliates' consent, LBIE then dealt with those securities. In short, LBIE settled them into house rather than segregated accounts with its depositories, and the Administrators say that LBIE thereafter used them in all respects as part of its own business assets. I shall address this general assertion and its consequences in due course. At this stage, two aspects of the way in which LBIE used such securities deserve special mention. They are the use of securities held for affiliates to settle short positions, and the use of securities for lending to the street.

## Short Positions

73.    Securities were typically acquired by LBIE for the account of affiliates' trading books for hedging purposes or otherwise pursuant to the affiliates' trading strategies.  The hedging and other strategies of those businesses would also, from time to time, require the affiliates to establish short positions.

74. In order to establish a short position for the trading book of an affiliate LBIE would sell (for the account of that affiliate's trading book) to a street counterparty securities which were not in the inventory of that trading book. It was of course necessary for LBIE to ensure that securities were available to it in order to settle the trade. LBIE could acquire the securities by borrowing stock from the street. Alternatively it could use securities that it held in its house depots either for its own account, or for the trading books of other affiliates. I infer, but this was not specifically spelt out in evidence, that LBIE could also establish short positions of its own, and meet its settlement obligations in the same way.

75. The establishment of short positions could therefore lead to LBIE having a nil position in a particular stock line in its house depot account, even though it had acquired securities of that type for an affiliate, which had yet to be re-sold to the street. To take a very simple example, a nil position might arise if LBIE acquired a hundred shares in (say) ICI for affiliate A, and then used those shares to settle a one hundred share ICI short position created for affiliate B. LBIE's books would show matching long and short positions with each affiliate, but its house depot account with the depository for ICI shares would, (assuming no other relevant transactions in that stock) be zero.

76. In real life LBIE's dealings with any particular stock in its house depot accounts were generally much more complicated than that, and nil positions may have been quite rare in practice. Nonetheless the point of the example is that, to the extent that house accounts were used to settle short positions, this inevitably generated deficiencies in LBIE's holdings of relevant stock at any given time below the simple gross aggregate of the securities held both for itself and for all relevant affiliates for the books of which it had acquired or settled that stock.

## Lending To The Street

77. For the purposes of this explanation, I shall refer to securities the subject matter of this lending activity as "stock" in order to distinguish it from security in the sense of property held as security for the repayment of a debt. I have already referred to what was or became Group policy for the hub companies to make stock earn its keep while held between acquisition and resale (whether for the hub company itself or for affiliates) by using it for the purpose of obtaining finance.

78. Just as with Rascals processes, the two main vehicles for this purpose were repos and stock loans. The essential features of a repo are that it consists of a single combined sale and repurchase contract, for the sale of specified securities settling on day one, and for the re-purchase on a fixed later date ("day two") of equivalent securities at substantially the same price, adjusted by a repo fee and/or interest charge. The sale on day one and the re-purchase on day two are generally known as the on-leg and the off-leg of the repo respectively. I shall refer to the seller under the on-leg as A and the other party to the repo as B. Although Rascals repos are invariably for one day's duration, this is not an invariable feature of a repo generally.

79. The following are standard features of repos:

    i)    On neither leg is the person obliged to make payment given credit. A may refuse to transfer the stock on settlement of the on-leg without simultaneous

payment by B. Similarly B may refuse to transfer equivalent stock on settlement of the off-leg without simultaneous payment by A.

 ii) The on-leg requires A to transfer unencumbered title to the stock to B, and B has the same obligation on the off-leg.

 iii) B's obligation is only to transfer equivalent stock. B is under no obligation to hold the stock received under the on-leg on trust for A, nor even under the obligation of a mortgagee in relation to it. B can use the stock for any purpose in connection with its business, including the settlement of a short sale to a third party.

 iv) A repo leaves the market risk in the stock with A throughout. This is because the off-leg repurchase price is the same as the on-leg price, subject only to adjustment by an interest charge and/or fee. A also obtains any intermediate income on the stock between day one and day two. Although A retains no beneficial interest in the stock during that period, it may nonetheless continue to record that amount of the stock as an asset on its balance sheet, because it retains the economic risks and benefits of ownership through the performance of purely personal obligations by B.

 v) For those reasons a repo is capable of being regarded in economic (but not legal) terms as a form of secured lending by B to A in the amount of the purchase price, for the period between days one and two, the security for B being constituted by receiving the stock on the on-leg while being under no obligation to transfer equivalent stock to A otherwise than against the receipt of the re-purchase price under the off-leg.

80. A stock loan has substantially the same effect as a repo, albeit by means which are at least terminologically slightly different. A transfers absolute and unencumbered title in stock to B against (i) an undertaking to transfer back equivalent stock in the future at either a fixed date or a floating date triggered by notice, and (ii) the immediate receipt of monetary collateral, which A is obliged to transfer back to B on the future date against the simultaneous receipt of equivalent stock. Where, in particular, the stock loan's off-leg is floating rather than fixed, margining provision is generally made for adjustment, upwards or downwards, in the collateral to reflect increases or falls in the value of the stock.

81. The stock loan shares all the same essential features of a repo. In particular, B is under no trust obligation in relation to the stock received under the on-leg, its obligation being a merely personal one to transfer equivalent stock to A against simultaneous return of the collateral.

82. Both under a repo and a stock loan, A is, for the whole of the period between the on-leg and the off-leg, at B's credit risk so far as concerns obtaining back stock equivalent to that transferred under the on-leg. If B has neither the necessary stock nor the means to pay for its acquisition in time for the settlement of the off-leg, A may have to whistle for the stock. Nonetheless A has the security of B's money, transferred under the on-leg. By the same token, B is equally at A's credit risk so far as concerns return of its money, since A is under no obligation to keep the money (whether purchase price under a repo or collateral under a stock loan) in a segregated

trust account. On the contrary, the commercial purpose of repos and stock loans is that A should have free use of the money, and B free use of the stock, in each case for deployment in, and the benefit of, their respective businesses. Nonetheless B has the security of having received A's stock, and cannot be compelled to transfer equivalent stock to A without simultaneous repayment.

83.    As with shorts, the Group policy whereby LBIE as a hub company put securities held in its house depot accounts to work for the raising of finance by lending to the street in the form of repos and stock loans meant that, on any particular day, the amount of securities within any particular stock line held in its depot accounts could, and indeed usually would, fall well short of the aggregate amounts recorded in inter-company accounts as held by LBIE for affiliates and for itself. In fact, it became settled policy, in particular after about 1997, to keep the amount of securities lying idle in LBIE's house depot accounts as low as possible. On each trading day the account would be reviewed to identify all securities suitable for lending to the street, and such securities would be transferred from a house account to a designated stock lending sub-account, in respect of which unencumbered title would be transferred to street counterparties under repos and stock loans, in exchange for cash which, far from being credited to any account held on a fiduciary basis for affiliates, LBIE simply deployed in and about its own business, any spare cash being passed up to LBHI pursuant to group treasury arrangements.

84.    An inevitable consequence of this practice was that LBIE's ability at any particular time to transfer securities held for affiliates at the affiliate's direction (whether upon re-sale to the street or for any other purpose) was critically dependent upon LBIE's own solvency, to the full extent that, at any moment in time, securities held in LBIE's house accounts had been lent to the street or used to make good short positions. As will appear, when LBIE went into administration a very substantial proportion of the securities originally settled into LBIE's house accounts on behalf of its affiliates were out on loan to the street and were, therefore, lost to the affiliates because of LBIE's inability to pay the re-purchase price under repo off-legs or to return the collateral received under stock loans. It is possible that LBIE's use of securities held for affiliates with long positions for settling its own or other affiliates' short positions contributed to this very large shortfall.

85.    Another consequence of the global settlement practice is that it is at least potentially misleading to speak of LBIE acquiring, holding and then reselling stock for the account of affiliates, if that phraseology conjures up a picture of particular shares or bonds being bought, held and then resold. LBIE's own interest in a particular stock vis-à-vis its depository was not in specific securities, but rather a co-ownership right to a stated (but unappropriated) number within the whole of the depository's holding. More importantly, between the acquisition and resale of securities for a particular affiliate, LBIE's house depot account in that particular stock was likely to have a constantly fluctuating balance, depleted and refreshed on a daily basis by street lending, street borrowing, sales and purchases for LBIE itself and for other affiliates. Even ignoring the nature of LBIE's rights against its depository, it would be the merest fluke if the 100 ICI ordinary shares acquired for an affiliate on a Monday were the same as the 100 ICI ordinary shares sold for its account on the following Friday. I shall nonetheless continue to speak of LBIE's acquisition, holding and resale of securities for its affiliates, because that is the jargon of the trade, or at least of the

hearing of this application. It must however be understood subject to this health warning.

86.     I have described LBIE's practice of settling short positions and of lending to the street as a general aspect of LBIE's use of securities held in its house depot accounts, without reference to any particular period or point in time and, after 1995, without reference to the question whether, in relation to affiliates' securities, it was limited to those which had been Rascalled.  Mr Dicker sought to dissuade me from any over-readiness to assume that these practices were widespread before the Rascals processes were introduced, or that they were applied thereafter indiscriminately to Rascalled and non-Rascalled securities.  Since the very limited evidence about those aspects of the Group's global settlements practice before 1996 consists mainly of documents generated during the Rascals project, I shall for convenience defer my findings about those matters to the next section of this judgment.

## THE RASCALS PROJECT 1993-1996

87.     I have already described the perceived problems arising from the adoption of the global settlement practice which led to the constitution of the Rascals project team. Its leader and the principal architect of the Rascals processes was a Mr Oliver Backhouse, who was at the time head of the Lehman European Regulatory Capital Group based in London, but who has since died.  His supervisor between 1993 and 1995 was Thomas Bolland, then the Lehman European Financial Controller, and thereafter Chief Financial Officer for Europe from 1995 until 2001.  Mr Bolland gave evidence and was cross-examined.  The Rascals project and its implementation was only one of an increasing number of matters for which Mr Bolland was responsible at the time.   Although he identified useful contemporaneous documents, his own unaided recollection of the development and implementation of Rascals was inevitably less than precise.

88.     The impression given by Mr Bolland, to some extent backed up by the contemporaneous documents, was that the Rascals project, although initiated within LBIE, was perceived to address problems arising from the global settlement practice of a type likely to affect not merely LBIE but also other hub companies settling securities trades for affiliates.  The evidence of Mr William Burke, employed from 1991 onwards in LBI's regulatory reporting department in the USA was, by contrast, to the effect that Rascals was very much LBIE's solution to its own problems and that, for example, LBI dealt with problems arising from the global settlement practice in a different way.  Mr Burke was an occasional addressee of memoranda emanating from the Rascals project, which Mr Bolland said was discussed extensively with LBIE's affiliates.

89.     It is unnecessary for me to resolve this difference of emphasis, since I am concerned only with the effect of Rascals upon LBIE's activities as hub company when settling trades in securities for affiliates.  The relevance of the contemporaneous material is twofold.  First, it demonstrates, at least from LBIE's perspective, the problems which the Rascals processes were designed to address and at least LBIE's purposive intention in constructing and then operating the Rascals processes.  Secondly, those documents demonstrate that LBIE's thinking in this regard was sufficiently ventilated within the Group for it to be improbable that any affiliate which subsequently participated with LBIE in Rascals processing could have been unaware of LBIE's

purposive intention, or of the problems which the Rascals processes were designed to address. Thus, the purpose or intent behind the Rascals processes may properly be described as having been mutual, even if they were processes aimed at dealing with LBIE's particular problems as a hub company.

90. The following matters, relevant to the issues which I have to decide, sufficiently appear from those contemporaneous documents. First, they display a clear underlying assumption that one effect of LBIE's settling the acquisition of a security from the street for the account of one of its affiliates was to confer upon the affiliate beneficial title to the security, even though LBIE invariably settled it into one of its un-segregated house depot accounts. In cross-examination Mr Bolland confirmed that this was indeed his understanding at the time, although he recalled an opinion of some of his then colleagues that title would not pass to an affiliate in relation to a security cash-settled by LBIE with the street until the affiliate paid the purchase price to LBIE.

91. Secondly, the evidence makes it clear that a primary purpose of the Rascals processes (whether by way of daily repos or stock loans) was indeed that the affiliate should thereby confer absolute title to the underlying security upon LBIE, to the exclusion of any continuing beneficial interest of the affiliate. Without doing so, the perception was that none of the problems thrown up by the global settlement practice would be satisfactorily addressed. Without full title to the underlying securities, LBIE would have no effective security as against its affiliate to remedy the capital charge problem. For as long as the affiliate remained the beneficial owner of the security, the segregation problem would not be addressed. Equally, the financing problem was perceived to require LBIE actually to have absolute title to the security in order to be able to lend it to the street, not least since the standard terms of repos and stock loans required the transfer of absolute title to the street counterparty, against cash plus a merely personal obligation to transfer back equivalent securities.

92. In fact, as is hinted at by the contemporaneous documents, none of those problems were necessarily immediate in 1993, when the Rascals project was established, or insoluble otherwise than by a transfer of absolute title. The capital charge problem was, prior to the coming into force of the EU Capital Adequacy Directive at the beginning of 1996, capable of being addressed by reference to an exception in favour of unsecured loans between affiliates. A requirement to segregate securities held for the account of third parties was subject to an exception for regulated affiliates until after 2005. The financing problem had not proved insoluble from the adoption of the global settlement practice in 1993, even though LBIE had regularly lent to the street securities acquired for the account of affiliates prior to the introduction of the Rascals processes. This worked in practice, since stock borrowers in the street customarily took title to securities from LBIE under repos and stock loans for value and without notice of the affiliates' beneficial interests.

93. Mr Bolland was pressed in cross-examination by Mr Moss with the suggestion that, in any event, the off-leg of the daily repos which eventually became the principal mechanism under Automatic Rascals necessarily involved a transfer of beneficial title back to the affiliate at the beginning of every day, where it rested until the coming into effect of the next on-leg later on the same day. Mr Bolland's response was that it had been his understanding that the purpose and effect of the daily repos was to confer continuous rather than intermittent beneficial title on LBIE, and in this he was corroborated by a memo of Mr Backhouse created in 1997 to the effect that "I have

always taken the view that the RASCALS repo lasts 23 hrs 59 mins & 59.999 secs and that if a dividend arises that happens in the 0.001 sec the stock is back in 'custody'." Whether the process of daily repos had that effect as a matter of law is something to which I shall return but, to the extent that the answer depends upon the parties' mutual intention, I accept Mr Bolland's evidence that the objective behind Rascals was to bring about a continuous beneficial interest of LBIE in the underlying security, to the exclusion of the affiliate, for as long as the security was the subject matter of a Rascals process, whether by a stream of daily repos or by an open-ended stock loan.

94. Thirdly, it is evident that, as a matter of purpose and intent, the Rascals processes were conceived of as effecting a transfer of beneficial title from the affiliate to LBIE despite payment for the first repo (or collateral for the stock loan) not being effected by cash settlement as between LBIE and the affiliate. Payment was to be effected by book entries, coupled with offset against the affiliate's unsecured debt to LBIE for the original acquisition price of the security from the street. That this was to be the method of payment is spelled out in the contemporaneous documents. It is not, as some of the respondents suggested, simply an after-the-event interpretation of the Rascals structure dreamed up by the Administrators and their legal team.

95. Finally, the contemporaneous material provides no guidance as to subjective intent in relation to beneficial ownership in the event that the Rascals process should be terminated, not by the eventual resale of the security to the street, but by events triggered by the insolvency of one or both of the parties to the Rascals transactions. This is hardly surprising, since the Rascals processes were devised in order to meet regulatory and other problems associated with the active carrying on of LBIE's business, rather than in the context of an apprehension that the Group might collapse. Nonetheless it is inherent in the capital charge problem, and in the solution that LBIE should become in effect a secured creditor of the affiliate, that a purpose of the Rascals process was to confer security upon LBIE in the form of beneficial title to the underlying stock in the event of the affiliate's insolvency.

96. The contemporaneous documents also shed light on the question raised by Mr Dicker as to the extent to which LBIE's use of affiliates' securities held in its house depot accounts for settling short positions and for lending to the street was widespread before 1996. In a paper headed "Rascals Project" in March 1995, Mr Brian Nicholson, a member of the Rascals Project team wrote this, under the heading "Title":

> "As well as not segregating the stock belonging to other group companies, the stock is often used to secure financing, e.g. a trader in LBI takes a position in a Bund, the trade clearing through LBIE's Euroclear account. Since Bunds are a European product, they would normally be funded by the London repo desk. The repo desk will repo the bond out and pass the benefit back to the LBI traders book. The repo is booked out of LBIE, not LBI (the repo trader sees only the bonds sitting at Euroclear, he has no indication of ownership). Clearly, LBIE has no title to the bonds and should not do the repo."

97.     In an email dated 21st April 1995, in relation to the same issue, Mr Backhouse said this:

> "The problem is that the settling company ends up with a big debt from the trading company and with the trading company's securities in its depot which it then uses (e.g. for its own funding needs via repo) as if they belong to it."

98.     Those two extracts, taken together, suggest that the raising of finance by lending securities to the street was a general feature of LBIE's dealings with securities held in its un-segregated depot accounts, including securities held for affiliates, before the implementation of Rascals. In his examination in chief Mr Bolland confirmed that this was the practice before Rascals was implemented, and that it was well known to LBIE's affiliates, being part of the way in which the Group operated, rather than a practice peculiar to LBIE. He recalled that this practice was discussed with representatives of LBIE's affiliates during the Rascals Project in which he participated.

99.     The two extracts quoted above do not (at least at first sight) speak with one voice as to the question whether LBIE used the funding obtained by lending securities on its house depot accounts to the street specifically for funding the acquisition of securities for the affiliates whose securities were used in that way, or simply for the purposes of its own business, including the raising of funding for the acquisition of securities generally. The first extract suggests the former whereas the second suggests the latter. Evidence from Mrs Greenway (in her sixth witness statement and in cross-examination) suggested that the reference in the first extract to the benefit being passed "back to the LBI Traders Book" did not mean that LBIE accounted for the benefit of any street funding to the affiliate whose securities had been lent to the street, but rather that LBIE's traders were expected as far as possible to fund the cost of the acquisition of securities generally from the proceeds of street lending. As already described, LBIE rather than the affiliates bore the cash-flow burden of the acquisition of securities settled into a LBIE depot. Prior to the implementation of Rascals, LBIE merely had an unsecured receivable from the affiliate for which the securities were acquired.

100.    In my judgment the reference to passing the benefit back to the LBI Traders Book in the first quoted extract does not displace the clear impression given by the evidence as a whole that, both before and after the implementation of Rascals, the financing benefit obtained by LBIE from lending securities in its un-segregated depot accounts to the street was applied generally by LBIE to fund its activities, including but not limited to funding the settlement of its affiliates' acquisitions, and that at no time did LBIE account on a specific basis to the affiliate whose securities were lent to the street, or recognise any obligation to do so.

101.    The quoted passage from Mr Nicholson's note is relevant also to the question whether, after the introduction of Rascals, LBIE confined its street lending of affiliates' securities to those which had been Rascalled. The passage "the repo trader sees only the bonds sitting at Euroclear; he has no indication of ownership" suggests that, at least in 1995, it would have been impossible for any of LBIE's repo traders (i.e. those conducting the street lending) to have known whether any particular

security was held either for LBIE, or for the book of any particular affiliate. Evidence relating to the period after 1995 suggests otherwise.

102.  It is clear from the evidence that, by the time of the Group's collapse, a very large part of the affiliates' securities which had been Rascalled were out on loan to the street. That is the primary reason why LBIE's depots contain only a minority of the securities by then acquired for affiliates' books and not resold outright to the street. Nonetheless, since the present application has only been concerned with Rascalled securities, the evidence does not permit any findings as to the extent to which non-Rascalled securities were, after 1995, habitually (rather than merely accidentally) lent by LBIE to the street.

103.  I consider that the evidence shows with reasonable clarity that the basis upon which Rascals was implemented was that it would be extended, automatically or manually, to all those securities at all likely to be suitable for lending to the street so that, whether or not a repo trader could actually check on his own computer screen whether a security which he wished to lend to the street had been Rascalled, he could proceed on the working assumption that, if it was held for the book of an affiliate rather than for LBIE itself, it had been.

## IMPLEMENTATION OF RASCALS

104.  Implementation of Rascals manifested itself in two distinct forms.  The first consisted of a series of written master agreements entered into between LBIE and each of its relevant affiliates, designed to provide a structure (uniform for each affiliate, but not always across the Group) for the subsequent entry into repo and stock lending contracts.  The second consisted of the making of the repos and stock loans thereafter, now evidenced by the Group's electronic books and records, and reflected in each relevant entity's accounts and financial statements.

## THE INTER-COMPANY AGREEMENTS

105.  The analysis of the implementation of the Rascals processes is greatly complicated by the need to address the terms and subsequent implementation of the master agreements in the context of other agreements made between LBIE and the relevant affiliates, including financing agreements, custody agreements, brokerage agreements and agency agreements.  Most of them appeared to have been in, or modelled on, forms in standard use within the Group from time to time.

106.  None of these agreements were negotiated at arm's length between their various parties, all of which were wholly owned subsidiaries of sub-subsidiaries of LBHI.  Far from being the product of any bargaining process, they appear to have been put in place mainly as a convenient means of recording in contractual form the basis upon which, from time to time, inter-company transactions and arrangements were being conducted, and for purposes having more to do with being able to demonstrate fact-patterns about inter-company dealings relevant to regulators, auditors and fiscal authorities, rather than to serve as binding and rigidly enforceable contracts between the entities concerned.

107.  I do not mean by that description that these agreements are to be regarded as shams. Nonetheless the absence of arm's length bargaining, and of any conflict of

commercial interests calling for their rigorous scrutiny or enforcement, coupled with serious and sometimes insoluble divergences between the terms of the agreements and the inter-company dealings revealed by the Group's book-keeping, means that this patchwork of agreements between LBIE and the relevant affiliates forms a by no means wholly reliable guide as to the basis upon which the Rascals transactions were conducted and, in particular, paid for.

108.    Furthermore, the absence of arm's length bargaining, coupled with the use, for convenience, of internal standard forms within the Group means that it is often difficult to ascertain precisely in relation to any particular agreement to what business between its parties it was intended to apply, or to which it was, thereafter, actually applied.  Some of the agreements are, to a modern eye, in extraordinarily short and generalised form.  While that has mercifully eased the task of their assimilation, it has led to real difficulties of interpretation, either separately, or as part of the wider patchwork of agreements in force between the relevant parties from time to time.

109.    A further general complicating factor is that whereas the agreements apparently regulating the dealings between LBIE and the affiliates appear to have been made on a wide range of dates between 1996 and 2003, the accounting records evidencing specific Rascals transactions (and in particular the Automatic Rascals process) which have been focused on for the purposes of analysis mainly concern the period after 2005, during which the overwhelming majority of the relevant surviving securities were acquired from the street.  The evidence did not show whether those responsible during that period for processing the relevant transactions were concerned to comply with, or were even cognizant of, the terms of the relevant agreements, all of which were by then several years old, leaving open a real possibility that even if the agreements constituted an accurate reflection of the basis of inter-company dealings to which they related at the time when they were made, inter-company practices thereafter diverged from that pattern without anyone taking the trouble to amend the framework of agreements accordingly.

110.    The result of these general features of the parties' mutual dealings is that, as Mr Milligan put it in opening, the court is being invited on this application "to make the best sense of what is in some respects a mess".

111.    There is, unfortunately, no escape from a separate review of the apparent contractual relationship between LBIE and each of the respondent affiliates, save only that for this and most other purposes, LBCCA and LBAH can be taken together.

112.    Save where I state otherwise, the agreements were all governed by English law.  Even where they were not, in respect of all but one of them, the parties have invited me to assume that the application of a foreign law interpretation would produce the same result as under English law.  The exception is an agreement between LBIE and LBI, governed by New York law, about the interpretation of which substantial expert evidence has been deployed but, happily, cross-examination avoided.

**LBF**

113.    Reliance was placed by LBIE and/or LBF on the following types of agreement between them: an Inter-Company Repurchase Agreement ("ICRA"), a Master Custody Agreement ("MCA"), an Inter-Company Funding Agreement ("ICFA") an

Agency Agreement and a Brokerage Agreement, together with a supplement. I shall describe the relevant provisions of each, in turn.

114. The ICRA, dated 15th March 1996 and made between LBIE and LBF was clearly the result of the Rascals project, and was specifically concerned with regulating the routine making of repos and stock loans between its parties. It includes the following recitals:

> "WHEREAS each Party may settle securities transactions at the request of the other Party and, as a consequence of these transactions, may hold securities on behalf of the other Party;
>
> WHEREAS all parties wish to ensure that security and monetary balances arising between them from such settlement are properly secured;
>
> WHEREAS the parties are or may become subject to capital adequacy and other regulations under the various jurisdictions in which they operate;
>
> WHEREAS the parties wish to ensure both that there can be no doubt about adherence to regulations relating to the custody of assets and that there is no doubt about their treatment for regulatory capital purposes of the inter-company balances arising from these settlements;
>
> WHEREAS the parties consider that the most appropriate way in which to resolve this is to enter into repurchase, sell/buy-back or stock loan transactions in respect of securities held by one party but owned by another."

115. Clause 1 made general provision for the parties to enter into repos and stock loans between each other. In the case of repos, the current version of the industry standard PSA/ISMA in force from time to time was to apply. In relation to stock loans the current version of the industry standard Overseas Securities Loan Agreement ("OSLA") was to apply.

116. Clause 1 then continued:

> "Where a Party is holding securities (the "Holding Party") on behalf of the other Party (the "Owning Party"), the Holding Party may, in its discretion and by notice to the Owning Party buy or borrow the Securities, in which case the Owning Party shall pass full legal and beneficial ownership in the securities to the Holding Party against receipt by the Owning Party of purchase monies (in the case of repurchase or sell/buy-back transactions) or collateral (in the case of stock loan transactions). Both Holding Party and Owning Party agree that the Owning Party shall be obligated to repurchase or accept return of the Equivalent Securities, at a price to be agreed by the Holding Party and the Owning Party…."

117.    Clause 1 concluded with notice provisions whereby either side could call back or put back the equivalent securities at any time, and conferred on the Holding Party the right to sell the securities upon default by the Owning Party in repurchasing or accepting return.

118.    Clause 2(a) enabled transactions to be entered into orally or in writing at the initiation of either party, and then provided for evidence of transactions in the form of Confirmations, a process which research post-collapse suggests was routinely ignored, reliance being placed instead on deal and trade tickets together with book entries, all in the ITS system.  Clause 2 concluded as follows:

> "In the event of a default in relation to more than one transaction a net aggregate sum of the amounts owed by one party to the other under this agreement shall become due and payable."

119.    Clause 3 made provision for daily marking to market of both securities and collateral, with consequential margin obligations.  Since, under Automatic Rascals, the daily repos were each transacted at the marked to market price of the underlying security on that day, margining was unnecessary.  Margining was necessary in relation to Manual Rascals.

120.    Clause 4 provided that, wherever a security generated intermediate income (by coupon or dividend or otherwise) while the subject of a repo or stock loan, that income would be paid or credited by the Holding Party to the Owning Party.

121.    Clause 5, headed Netting, provided as follows:

> "All parties hereto agree on an ongoing basis that all obligations of the Owning Party to Holding Party and vice versa shall be calculated on a net aggregate basis.  It is agreed that all securities and cash owed by Holding Party to Owning Party shall be set off against the obligations of Owning Party to Holding Party.  For the purposes of calculating the net aggregate exposure pursuant to this section the value of any securities purchased, lent or provided as collateral shall be the value determined by the Lehman Brothers ITS system.  The claims of the Owning Party to the Securities is to be set off against the claim of the Holding Party to the payment of money for the Securities."

122.    Clause 8 provided for the agreement to remain in force until terminated by seven days written notice from either side.

123.    The incorporation by reference in clause 1 of the ICRA of the industry standard repo and stock loan forms of agreement (namely the PSA/ISMA and OSLA) meant that, in relation to the detailed terms of any particular repo or stock loan, the master agreement was automatically updated in line with changes in the industry standard. Nothing turns on those standard terms.

124.    LBIE and LBF made an Agency Agreement on 29th November 1996.  It was replaced by a Brokerage Agreement dated 27th March 1998, which was in turn amended by a Supplement dated 23rd October 2000.  The importance of these agreements is not their operative terms, which simply regulated the remuneration payable by LBF to LBIE for services therein specified, but rather in their recitals.  Recitals (c) and (d) to the Agency Agreement were as follows:

> "(c)    The Company, as agent for LBF, negotiates the terms of individually tailored derivative product transactions entered into by LBF and in connection therewith markets and sells such derivative products, as well as executes for LBF transactions intended to hedge related balance sheet exposures.
>
> (d)    The Parties intend to organise their financial relationship relating to the Company's agency activities for LBF's derivatives business."

Recitals (c) and (d) to the Brokerage Agreement which (by clause 7) superseded the Agency Agreement were as follows:

> "(c)    The Company is responsible for designing, marketing and selling derivative products as agent for LBF, as well as for hedging related balance sheet exposures.
>
> (d)    The Parties intend to organise their financial relationship and in particular the compensation of the Company's activities such as described above."

125.    Clause 1 of the Brokerage Agreement (which was governed by Swiss law) provided for brokerage commission at a stated rate to be payable "for each transaction entered into by the Company (*i.e. LBIE*) as agent for LBF".  The Supplement merely altered the rate of remuneration, so as to bring it into conformity with the OECD Transfer Pricing Guidelines for Multi-Nationals and Tax Administrations.

126.    Mr Moss placed reliance on the Agency and Brokerage agreements as determinative of the relationship between LBIE and LBF in connection with LBIE's settlement of securities for LBF's account.  Mr Antony Rush, a Managing Director and head of the LBIE Administration Tax Team, gave evidence that these agreements (in particular the Brokerage Agreement and its Supplement) were an unreliable guide to the legal nature (as broker, agent or otherwise) of LBIE's securities settlement service for LBF's account, being concerned merely to ensure conformity in terms of inter-company remuneration with the transfer pricing guidelines in force from time to time. He nonetheless confirmed that brokerage was routinely paid by LBF to LBIE in relation to LBIE's purchases of securities from the street for LBF's account, at least until 2001, in answer to a question from the court during cross-examination.  He declined Mr Moss's invitation to treat his evidence in chief, that those agreements "were not intended to define the nature of the legal relationship between LBIE and LBF or the capacity in which LBIE was acting described therein" as meaning that those agreements were shams.

127.    In my judgment the fact that brokerage under these agreements was in fact paid by LBF to LBIE in connection with LBIE's settlement of securities for LBF's account demonstrates that both parties assumed when those agreements were made that LBIE provided those services to LBF as an agent or broker.

128.    Considerable reliance was placed by Mr Moss on the terms of a Master Custody Agreement made between LBIE and LBF on 22nd August 2003.  It is in standard Lehman Group form, and evidently designed, at least primarily, for use between a Lehman company and an external client, for the purpose of regulating the terms upon which the Lehman company was to hold securities, precious metals or other forms of property as custodian for the client in custody accounts.

129.    The MCA described LBIE as the Custodian and LBF as the Client.  Its terms are, *prima facie*, wholly incompatible with the global settlement practice, pursuant to which, far from keeping LBF's securities in a separate custody account, subject only to pooling with the securities of other clients, as required by the MCA, the settled practice was for all securities held for the account of an affiliate to be aggregated with LBIE's own securities in a house depot account, and used for financing purposes by LBIE for its own account.

130.    It seemed to me, initially, that the reconciliation of this incompatibility might lie in the fact that, without depots of its own, LBF might need from time to time to arrange for LBIE to hold LBF's own clients' securities on a custodial basis.  Mr Moss submitted, in opening, that this could not be so, since LBF had no external clients.  It emerged in evidence however that external counterparties in derivatives transactions with LBF would commonly lodge non-monetary collateral or margin with LBF in the form of securities which, lacking its own depots, LBF did indeed then arrange for LBIE to hold.  The evidence was ambivalent as to whether in those circumstances LBIE invariably ensured that such securities were held in custody accounts, but it seems to me probable that it was in connection with the holding of such securities, deposited by LBF's counterparties as collateral or margin, that it was considered appropriate for LBIE to enter into an MCA with LBF.  The MCA had in my judgment nothing whatsoever to do with securities acquired by LBIE for LBF's account in connection with LBF's hedging strategies.

131.    I must finally describe the Inter-Company Funding Agreement ("ICFA") made between LBF, LBIE and LBHI on 5th June 2000.  Its recitals were as follows:

> "WHEREAS LBF is a Swiss Limited company trading in equity and other derivatives and investing in securities to hedge exposures arising from derivative transactions.
>
> WHEREAS LBIE is a member of the Securities and Futures Authority and is authorized to carry on investment business in the United Kingdom under the Financial Services Act 1986.
>
> WHEREAS LBIE acts as settlement agent for LBF in certain of the derivatives and securities transactions noted above.
>
> WHEREAS LBHI can provide treasury services to any Lehman Brothers group company."

132.   Under the heading Funding and Settlement, clause 1 was as follows:

> "1.      Funding and Settlement
>
> LBIE agrees to settle such securities transactions as LBF requests it to: and LBHI agrees to provide funding to LBF to permit LBF to provide funds to LBIE to effect settlement transactions on behalf of LBF.  LBIE will hold funds provided by LBF on deposit for LBF as requested by LBF from time to time.
>
> For the avoidance of doubt, any loans under this agreement are provided directly from LBHI to LBF and at no time will LBIE be regarded as lending to LBF."

The agreement was by clause 6 to remain in full force until terminated by any party giving written notice to the others.  No such notice of termination appears ever to have been given.  Nor does it appear thereafter to have been amended in writing as prescribed by clause 7.

133.   The ICFA formed the bedrock of LBF's case as to the ineffectiveness of the Rascals processes for the purposes of transferring beneficial ownership in the underlying securities.  As will appear, similar cases were advanced both by LBSF and, in a more complicated form, by LBCCA/LBAH.  I will defer addressing the issues as to the interpretation and implementation of the IFCA to a later stage in this judgment.  Regardless of the effect of clause 1, its recitals plainly identify LBIE as settlement agent for LBF in at least some of LBF's security investments for hedging purposes.  To that extent it is supportive of Mr Moss's submissions based upon the Agency and Brokerage agreements.

## LBCCA/LBAH

134.   The relationship of these respondents with LBIE gives rise to the most complicated contractual analysis.  It will be recalled that LBCCA was a Hong Kong securities trader which used LBIE for the settlement of European securities.  LBAH was, so far as is relevant for present purposes, a funding company, interposed in the funding arrangements between LBHI and Group entities in the Asia/Pacific region including LBCCA.

135.   The Rascals project was intended to be implemented in relation to securities acquired by LBIE for the account of LBCCA by the combined effect of two agreements, both made on 28th November 1997, entitled respectively the Multi-Party Repurchase Agreement ("MPRA") and the Inter-Company Novation and Netting Agreement ("the NNA").  On its face, the NNA appears to have had a substantially wider purpose and effect than merely the implementation of Rascals, and it is convenient to describe it first.

136.   The NNA was made between LBAH, LBIE and seven other Lehman entities in the Far East, one of which was LBCCA.  Its recitals are as follows:

> "WHEREAS:

(1)     each of the Parties is an Affiliate of Lehman Brothers Holdings Inc; and

(2)     the Parties wish to enter into this Agreement in order to achieve the netting of all payment and delivery obligations under certain inter-group company payables, receivables and deliverables so as to reduce inter-company exposures; and

(3)     the Parties have agreed that rights and obligations under certain inter-company cash payables, receivables and deliverables will be transferred to and assumed by LBAH and netting arrangements are to be put in place on the terms set out below;"

137.    Clause 1 contained a number of definitions including the following:

"Balance Ledger" means the ledger of certain balances and debts owing between two Parties and prepared and maintained by LBAH for the purposes, inter alia, of this Agreement;

"Inter-Company Balance" means (subject always to clause 4 (Cessation)) a balance, debt or deliverable owed between two Parties and as, or to be, recorded or shown in the Balance Ledger from time to time, but not including, (i) Excluded Balances; (ii) Novated Balances; and (iii) Unnovated Balances (unless otherwise agreed between the Parties to the relevant balance and LBAH);

"Excluded Balance" means a balance debt or deliverable as recorded or shown from time to time in the Balance Ledger of a type as set out in, and between those parties referred to, in Schedule 1 hereto;

"Novated Balance" bears the meaning set out in Clause 6;

"Unnovated Balance" means (subject always to Clause 4 (Cessation)) a balance or deliverable owed between LBAH and a Party and as recorded or shown in the Balance Ledger from time to time, but not including (i) excluded balances; and (ii) novated balances, unless otherwise agreed between LBAH and such Party.

"Balances" means Inter-Company Balances, Novated Balances and Unnovated Balances;"

138.    Clause 3 made provision for additional parties to be added to the agreement.  With effect from 5th June 2000 LBHI (or, literally, its London branch) was added as a party. Clause 4 made provision for cessation of the arrangements contemplated by the NNA in relation to particular balances, by the issue of a Cessation Notice by LBAH, but the evidence does not suggest that any Cessation Notices have ever been served.

139.    For present purposes the important provisions of the NNA are to be found in clauses 6 and 7, headed respectively Novation and Netting.  Clause 6 is worth quoting in full:

> "6.1    Novation Time
>
> An Inter-Company Balance shall be deemed to be novated in accordance with Clause 6.2 as of the time immediately after that Inter-Company Balance becomes due and payable, notwithstanding that it may not be shown or recorded in the Balance Ledger at that time.
>
> 6.2    Novation
>
>> (a)    Upon the occurrence of an Inter-Company Balance arising between the Parties hereto the relevant Inter-Company Balances shall be novated, whereby the outstanding rights and obligations under such Inter-Company Balances shall be cancelled and terminated and there shall be deemed to arise two separate debts:
>>
>>> (i)    one of them subsisting between (x) the creditor Party ("the Creditor Party"); and (y) LBAH in lieu of the debtor Party ("the Debtor Party");
>>>
>>> and
>>>
>>> (ii)    the other of them subsisting between (x) the Debtor Party; and (y) LBAH in lieu of the Creditor Party;
>>
>> Each of these two separate debts (each a "Novated Balance") being on the same terms mutatis mutandis as the relevant Inter-Company Balance.
>>
>> The obligations and rights of the Parties to the Novated Balances shall entirely supersede and replace the obligations and rights of the parties to the relevant Inter-Company Balance."

140.    Clause 7.1, headed Settlement Netting provides as follows:

> "7.1    If, with respect to two Parties on any Business Day more than one payment is payable or more than one security is deliverable under two or more Balances owed between such Parties then the amounts of such payments or deliverables shall be aggregated and only the difference between the aggregate amounts shall be payable or deliverable, by the Party owing the larger sum or amount deliverable to the other Party, and, if the aggregate amounts are equal, no payment of the relevant amounts or delivery of the relevant securities shall be made."

141.    Clause 7.2 makes similar provision under the heading Novation Netting, in relation to Novated Balances (as explained in clause 6.2), as is made in relation to Balances prior to novation in clause 7.1.

142.    Clause 7.3(a) brings the operation of settlement and novation netting to an end upon the happening of an Early Termination Date (which is triggered, *inter alia*, by an insolvency event affecting a party), and it is replaced by close-out netting under clause 7.4.  Clause 7.3(b) provides that settlement and novation netting should apply notwithstanding that LBAH and/or any Party may fail to record the new obligations referred to in those clauses in its books or records.

143.    Clause 8 obliges all parties to any Inter-Company Balance to enter into Novated Balances in accordance with the terms of the agreement.  By clause 15, the agreement is governed by Hong Kong law.

144.    The provisions as to novation and netting in the NNA are reasonably comprehensible in the context of Balances consisting of inter-company debts.  Thus for example a debt owed by LBCCA to LBIE in connection with LBIE's cash settlement of a security acquired for LBCCA's account would, from the moment it became due and payable (see clause 6.2) be replaced by equivalent debts owed by LBCCA to LBAH and by LBAH to LBIE, subject to any settlement netting applicable to that debt prior to novation because of any debt due at the same time by LBIE to LBCCA.  Equally, the novated balance due from LBAH to LBIE would itself be subject to novation netting by reference to any other novated balances owed either way, as between LBIE and LBAH.

145.    By contract, the effect of the NNA in relation to balances consisting of what are described (without any further definition) as "deliverables" is extraordinarily opaque.  It is tolerably clear from the phrase "more than one security is deliverable" in clause 7.1 that a deliverable is some form of obligation in relation to a security and probably, since otherwise it would simply be a debt, a non-monetary obligation.  For present purposes, the critical question is whether and if so how the provisions of the NNA as to deliverables apply to the relationship of trustee and beneficiary (rather than debtor and creditor) which the respondents allege arose between LBIE and an affiliate by reason of LBIE's settlement of the acquisition of a security for the affiliate's account.  Critically, is the effect of the NNA to substitute LBAH as LBIE's beneficiary under that trust and if so, what is the relationship then created by clause 6.2 between LBAH and LBCCA in connection with the same security?

146.    No surviving document or evidence suggests that anyone within the Group gave this conundrum any rational thought.  Nonetheless it is clear from the terms of the MPRA, made on the same date as the NNA, that the assumption of the draftsman at least was that LBAH did become LBIE's beneficiary.  This is because the MPRA, which was the primary vehicle for the application of Rascals processes to securities acquired by LBIE for LBCCA's account, was made not between LBIE and LBCCA, but between LBIE and LBAH.  Save for the slight difference in its title, it is otherwise, and for all practical purposes, in the same terms as the ICRA between LBIE and LBF, which I have already described.

147. Another baffling aspect of the NNA concerns the effect of the addition of LBHI as a party in June 2000. Literally, it would appear to have the effect that any inter-company debts or deliverables arising even between LBIE and LBHI would be subject to novation, so as to interpose LBAH, regardless whether the debt or deliverable had anything to do with the affairs of the Group in the Far East. Plainly the inclusion of LBHI was intended to have some more limited purpose, but the nature of that purpose, or of the relevant limitations, is almost unfathomable.

148. A Master Custody Agreement ("MCA") was also entered into between LBCCA and LBIE on 17th November 2000. For the reasons which I have already given in relation to the agreement in similar form between LBIE and LBF, I consider that it has no relevance or application to Rascalled securities. Its reasonably obvious purpose was to regulate LBIE's custody of European securities deposited with LBCCA by its clients, for which LBCCA had no suitable depot of its own.

**LBI**

149. The relevant contractual structure as between LBIE and LBI consisted of four agreements, the first of which in time was an Undisclosed Clearing Custody and Brokerage Services Agreement ("UCCBSA") dated 15th November 1996, which replaced an earlier agreement of the same type dated 13th July 1994. Both agreements contained the following provisions:

> "Relationship of LBIE and LBI. It is understood and agreed that LBIE is acting as a clearing broker for LBI, and not for any customer of LBI or for any other person, in respect of transactions performed hereunder…" (Clause 3.2)

> "Except as otherwise provided in this Agreement, LBIE shall be responsible for the safekeeping as custodian for LBI of all money and securities received by it pursuant to this Agreement." (Clause 8.1)

> "In the event that LBIE effects a short sale in a given security, and it is holding in custody for any customer of LBI a long position in the same security, LBIE shall ensure that such long position shall remain segregated for the benefit of such customer and shall not be offset against LBIE's short position" (Clause 8.5 (1994 version) Clause 8.8 (1996 version))

150. Apart from the specific provision about long positions of LBI's customers, neither agreement contained any general requirement for LBIE to segregate LBI's securities and money while held in safekeeping as custodian.

151. There is a sharp dispute as to the interpretation of the UCCBSA, backed up by competing expert evidence as to the applicable principles of New York law, to which I shall have briefly to return. For present purposes it is sufficient for me to note that the agreement made in 1996 (at about the time of the conclusion of the Rascals project) contained the following three provisions which were absent from the July 1994 agreement:

"8.4    LBIE may use its own funds to settle any non custody customer and proprietary transaction on behalf of LBI.  To the extent that LBIE does so then LBIE shall be deemed to have stepped in as principal at point of settlement and, until such time as LBI shall pay LBIE, LBIE shall have the unfettered right to use the securities it has paid for as it sees fit.  LBIE shall maintain a separate account of these transactions ('the related loan account').

8.5    The securities held by LBIE relating to transactions arising under paragraph 8.4 above shall be marked to market at close of business each day and the difference between their total value and the balance on the related loan account shall be settled on demand and the balance on the related loan account adjusted to the extent such settlement occurs.

8.6    In the event of a default by LBI then LBIE shall have the right to realise all securities it holds relating to the transactions arising under paragraph 8.4 and to apply the proceeds to reduce or extinguish the balance on the related loan account. In such event only the net remaining balance on the related loan account shall be accountable between the parties."

152.    LBIE and LBI made a Global Master Repurchase Agreement on 1st November 1996, replacing an earlier agreement of the same type dated 14th February 1996.  Since it does not appear that any surviving security held in LBIE's depots for LBI was the subject of a repo, I need say no more about it.

153.    LBIE and LBI also made an Overseas Securities Lender Agreement ("OSLA") on 27th February 1997.  There is no issue as to its interpretation or effect.  It regulated stock lending between the two companies on terms which (*inter alia*) made the obtaining of beneficial title to equivalent securities by the stock lender at the end of a stock loan conditional on repayment of the collateral.

154.    It is likely that there existed a Master Custody Agreement between LBIE and LBI since, although it cannot be found, there are references to it in schedules dated respectively 20th June 2000 and 9th January 2002 from which its existence, probably on standard Group MCA terms, can readily be inferred.  Again, I consider it to have no more relevance to the issues arising from Rascals than any of the MCAs to which I have already referred.

**LBSF**

155.    There existed a suite of agreements between LBIE and LBSF broadly similar to those which I have already described as between LBIE and LBF.  They included a Multi Party Repurchase Agreement ("MPRA") dated 15th November 1996 to which LBIE and LBSF were two of the five parties.  Its terms differed in no significant respect from the ICRA between LBIE and LBF.  There was also an MCA, although (as with LBI) a copy has not survived.  I infer that it was on the same terms as those which I have already described, and equally irrelevant for the same reasons as concern LBF.

156.    LBSF, LBIE and LBHI made an inter-company funding agreement ("ICFA") on 2nd February 2001.  Again, it is in identical terms to that made between LBIE and LBF.  Nonetheless, Mr Jones QC for LBSF placed reliance for the purposes of interpreting the ICFA between LBIE and LBSF upon two earlier funding agreements, the first of which was a Non-Discretionary Agency Agreement made between LBSF, LBIE and Lehman Brothers Holdings plc ("LBH plc") in January 1994.  While broadly in the same terms as the 2001 ICFA it contained the following additional material.  First, there was an additional final recital in the following terms:

> "WHEREAS plc wishes LBIE to act as its agent in making advances to LBSF in regard to those same securities transactions."

In clause 1 the second sentence reads as follows:

> "Notwithstanding that the accounting records of the parties to this agreement may show PLC lending to LBIE which then lends to LBSF IT IS HEREBY AGREED that any loans under this agreement are provided directly from plc to LBSF and that at no time will LBIE be regarded as lending to LBSF."

157.    The second predecessor to the 2001 ICFA was dated 5th June 2000 and also entitled a Non-Discretionary Agency Agreement.  By contrast with the 2001 ICFA it contained the same additional recital as I have quoted from the 1994 agreement, but its clause 1 was in the same terms as the 2001 agreement.

158.    Finally, LBIE and LBSF entered into a pair of successive Discretionary Agency Agreements dated respectively 27th March 1995 and 16th August 2002.  It took from 1995 until October 2000 before LBSF got round to signing the earlier agreement. It is sufficient to quote briefly from the second of those agreements. It included the following recitals:

> "WHEREAS LBSF enters into transactions in interest rate swaps, currency swaps, interest rate caps, equity swaps, equity options, equity securities and other related transactions intended to hedge interest rate, equity and currency risk and providing capital markets advice and services (the "Transactions").
>
> WHEREAS LSBF wishes LBIE to use its best efforts to find customers willing to enter into with, and effect Transactions through LBSF as agreed from time to time. "

Clause 1 headed Services was as follows:

> "Subject to the terms and conditions of this Agreement, LBIE agrees to act as an introducing agent to LBSF for the purposes of the Transactions.  All documentation relating to the Transactions will be arranged by LBIE as introducing agent for and on behalf of LBSF, subject to LBSF's confirmation."

By clause 6 the agreement was stated to remain in full force and effect until terminated by seven days written notice. There is no evidence that it was terminated before the collapse. Conversely there is no evidence that any payments were ever made under it to LBIE. Payments were made to LBIE under the earlier agreement until about 2001, after which they were made by LBSF to LBEL pursuant to a similar form of agreement between those parties.

## IMPLEMENTATION – THE BOOK ENTRIES

159. This is, potentially at least, an enormous subject, and the interpretation of the book entries lies at or close to the heart of a number of the issues which I have to decide. Nonetheless, at least by the end of the hearing, the scope of factual dispute about the entries themselves, as opposed to their interpretation, had become very limited, albeit that serious limitations on the extent of the respondents' access to the Group's electronic book-keeping systems after the collapse means that there are areas of incomplete research where it is necessary to draw inferences based on probabilities, and some areas where the available material precludes any safe conclusions at all.

160. The account which follows is therefore very much a brief summary of an enormous mass of primary material. In describing what the book entries show I have avoided as far as possible the use of the words debit and credit because of the differences in the ways in which those words are used, both as between lawyers and accountants, and by different accounting conventions. Generally, where I describe the book entries as showing payables and receivables between Group entities, it may be assumed that the books of both the creditor and the debtor show substantially the same position. This is because, for present purposes, most of the relevant entries in the books and records of the relevant entities within the Group are derived, directly or indirectly, from the ITS system in common use by all of them, and their consequences passed automatically to the individual entities' separate books via DBS.

161. Although many of the book entries generated by the Rascals processes take a common form as between LBIE and each of the respondent affiliates, there are nonetheless important differences which make it impossible to provide a general description applicable to all of them. I shall therefore begin with describing the book entries reflecting the implementation of Rascals as between LBIE and LBF. Thereafter I shall focus in relation to the other respondents upon the departures from the LBIE/LBF model thus described.

## LBF

## Acquisition From The Street

## The Trade Date

162. Whenever LBIE acquired a security from the street for the account of LBF, two trade tickets were generated by ITS on the trade date (that is, in legal parlance, the date of the contract). The first was a trade ticket recording the essential terms of LBIE's contract with the street counterparty (invariably described in the ticket as the "client"). The second ticket recorded a back to back sale of the same amount of the same security by LBIE to LBF with the same settlement date and the same price.

Each ticket would then lead to the automatic generation by ITS of consequential entries in LBIE's and LBF's books.

163. First, LBIE's stock inventory account would, as a result of the first ticket, momentarily show a long position by reference to that type of security and, until the settlement date, a debt due to the street counterparty for the purchase. The second ticket would generate a long position in LBF's stock inventory account with a corresponding unsecured debt due (but not yet payable) to LBIE in its pending transactions inter-company account, for the same amount.

**The Settlement Date**

164. Completion of the purchase of the securities by LBIE from the street almost invariably required LBIE to pay cash to the street counterparty, and this was recorded in LBIE's books, which from then on showed LBIE as the holder of the relevant rights to the security as against its depository. By contrast, the LBIE and LBF accounting records showed LBF as owing LBIE an unsecured debt for the acquisition price as both due and payable, reflected in the transfer of that debt from the pending transactions inter-company account to the unsecured inter-company account. LBF continued to be recorded in its stock inventory as having a long position in respect of that type of security, as it had been since the trade date. LBIE's stock records showed that its long position in that security as against its depository was allocated to its inter-company account with LBF.

**Rascals Processing**

165. As might be expected from the nature of LBF's equity-based derivatives business, most of LBIE's security acquisitions for its account related to equities, with the consequence that most of the Rascals transactions between LBIE and LBF were of the manual type. It is nonetheless convenient to deal with the processing of Automatic Rascals transactions first.

**Automatic Rascals**

166. The ITS system was programmed automatically to recognise securities eligible for Automatic Rascals processing. It is unnecessary to describe the eligibility criteria (save to note that it excluded, among others, securities issued by a Lehman Group company and securities which were so illiquid as to be generally unsuitable for stock lending to the street). The computer programme identified securities of a particular type as eligible or ineligible by what the evidence describes as a "tag" which could be manually switched between those two classes.

167. A security tagged as eligible for Automatic Rascals was thus identified automatically by the ITS system which, on the settlement date for the acquisition of the security from the street, generated both a deal ticket setting out the essential terms of the one day repo, and separate trade tickets for each of the on and off legs of that repo. The deal ticket and both trade tickets were generated on the settlement date, i.e. day one of the first repo.

168. Both tickets caused automatic accounting entries to be made in ITS. The on-leg was reflected in an unsecured debt owed to the affiliate by LBIE, in the amount of the

marked to market value of the security that day. This was booked to the same unsecured inter-company account as showed LBF's debt to LBIE for the acquisition price from the street. The off-leg generated a secured debt owed by the affiliate to LBIE (payable the following day) as the repurchase price, into which was built the one day interest charge payable by the affiliate.

169.    Thus, at midnight on the settlement date (the end of day one of the first repo) the combined effect of the acquisition of the security from the street for LBF's account and the making of the first repo may, in terms of accounting entries, be summarised as follows.  First, LBF continued to record the security acquired as a long position in its inventory account.  Secondly, the unsecured inter-company account between LBIE and LBF would show largely off-setting debts each way, owed to LBIE for the acquisition price and to LBF for the repo on-leg price.  If the security was marked to market at its original trade price, the debts would precisely off-set.  If not, there would be an amount owing unsecured, to LBIE if the security had declined in value, and to LBF if it had increased in value.  Finally, the secured inter-company account between LBIE and LBF would show a debt to LBIE in respect of the off-leg repurchase price, payable on day two.

170.    On the day after the settlement date for the acquisition from the street (day two of the first repo) accounting entries were made to reflect the settlement of the off-leg of the first repo, the settlement of the on-leg of the second repo, together with the secured liability of LBF to pay LBIE for the settlement (on the following day) of the off-leg of the second repo.  Any change in the marked to market value of the security would be reflected in the prices payable and repayable under the second repo and, again, the off-leg purchase price would have added to it a one day interest or financing charge payable by LBF.

171.    Thus, LBF's obligation to pay for the settlement of the off-leg of the first repo was transferred from secured to unsecured inter-company account, where it would be largely offset by LBIE's obligation to pay for the on-leg of the second repo, differences in marked to market values being reflected in a corresponding change in the unsecured inter-company balance between LBIE and LBF.  LBF's secured liability to pay for the off-leg of the second repo would be recorded in the secured inter-company account.  Viewed as at midnight at the end of the second day, LBF's secured liability to LBIE (in respect of the off-leg of the second repo) would therefore have changed from the amount shown as a secured liability at the end of day one, in line with any change in the marked to market value of the security.

172.    Accounting entries reflecting daily repos of the type which I have described continued to be made throughout the period between the acquisition of the security from the street and its ultimate re-sale to the street.  It is unnecessary to describe them in any detail. Their overall effect was to show LBIE as the secured creditor of LBF, albeit in constantly changing amounts, in respect of the continuous succession of off legs.

173.    On the trade date for the re-sale to the street, a short position would be recorded in LBF's inventory account, off-setting the original long position recorded on the trade for the acquisition.  Daily repos would continue between the trade date and the settlement date for the re-sale to the street.  No new repo would be entered into between LBIE and LBF on the settlement date.  Thus, on that day, LBF's secured liability to pay for the last off-leg would be transferred to unsecured inter-company

account and largely off-set by LBIE's obligation to account for the proceeds of sale received from the street counterparty, subject to movements in the marked to market value of the security between trade date and settlement date.

174.    Mrs Greenway's evidence (as the principal interpreter of the accounting entries) was that each off-leg appeared to settle prior to the succeeding on-leg, and that the final off-leg settled prior to LBIE's settlement of the re-sale to the street, so that there were, at least in theory, moments on every day when LBF's secured liability to pay the off-leg purchase price was recorded as replaced by an unsecured liability in the same amount, before being largely off-set by LBIE's unsecured obligation to pay for the next on-leg, or, on the final day, to account for the proceeds of the re-sale to the street.

175.    Furthermore, some of the evidence about the ITS accounting entries, in particular an example given by Mr Stacey of a particular Automatic Rascals process which occurred at the time of the collapse (Friday 12th September – Monday 15th September 2008) suggests that some hours may have elapsed between the making of the accounting entries for the settlement of the off-leg and the making of the entries recording the settlement of the following on-leg. Much debate has been focused on whether these apparent intra-day time lags are of any greater legal significance than is, these days, usually attributed to a *scintilla temporis* or, in modern parlance, a nanosecond.

## **Manual Rascals**

176.    The open-ended nature of the stock loans used for the purposes of Manual Rascals makes it much easier to describe their accounting treatment. Technically, the full description would be more complicated because the entries involve both the Global 1 and ITS systems, but their interpretation is uncontentious.

177.    The accounting entries reflecting the acquisition by LBIE from the street of a security which is then Manually Rascalled are the same as those for a security subjected to Automatic Rascals. Thus, on the settlement date of that acquisition, LBF is shown as owing the acquisition price to LBIE on unsecured inter-company account.

178.    The first point of difference between Automatic and Manual Rascals is however that the evidence does not permit any conclusion safely to be drawn as to whether Manual Rascals was generally, or even usually, applied on the settlement date of the acquisition of the security, or upon some later date. After increasingly inconclusive debate, the parties eventually accepted that, if that timing issue mattered in terms of beneficial ownership now, I should express my conclusions on the alternative assumptions that Manual Rascals was, or was not, applied on the settlement date for the acquisition.

179.    The result of that is that at the end of the day of the settlement with the street, in relation to a security which had yet to be Manually Rascalled, the book entries will show merely an unsecured debt due and payable by LBF to LBIE for the whole of the acquisition price.

180.    The stock loan invariably used for Manual Rascals processing involved first, the creation of a trade ticket which, by contrast with the repo deal tickets and on-leg trade

tickets, makes no reference to the consideration for the stock loan.  Nor is there generated on day one of the stock loan any trade ticket for the off-leg.

181.    The financial accounting entries arising from the stock loans were dealt with on an aggregate basis for the relevant day, rather than on an individual basis, as with repos. Nonetheless, their effect, in relation to an individual stock loan, is to treat the monetary collateral invariably to be provided by LBF as an offset against LBF's debt to LBIE for the acquisition price, on the unsecured inter-company account, and to treat LBF's future liability to repay collateral to LBIE as, in effect, a secured loan of the same amount by LBIE to LBF, in substantially the same way as the entries recording a repo.

182.    The open-ended stock loans between LBIE and its affiliates (including LBF) included provision for margining the collateral, that is increasing or reducing it in accordance with rises or falls in the value of the underlying security.  The amounts required to be paid by way of margin adjustment each way were reflected in the unsecured inter-company account between LBIE and LBF, and the consequential increase or decrease in the monetary collateral reflected in adjustments of the amount by which, in the secured inter-company account, LBIE was shown to be a secured creditor of LBF.

183.    Finally, on the settlement date for the re-sale of the security to the street, the off-leg of the stock loan is reflected in a trade ticket, together with accounting entries which show off-setting entries in unsecured inter-company accounts between, on the one hand, LBF's liability to repay the collateral to LBIE, and LBIE's liability to account for the proceeds of the sale to the street.  In that respect, the entries broadly correspond with the off-leg of the final repo in a series of Automatic Rascals transactions.  Some stock loans were closed earlier than upon the resale of the security to the street, for example when an underlying loan of that security to the street ended, or if an intended loan to the street did not proceed.  It is unnecessary to describe the accounting entries made in that event.

## Month End Netting, Novation And Pay Down

184.    LBF had no bank account of its own, and was therefore unable directly to settle unsecured inter-company balances with LBIE by cash payment.  Unsecured balances were, instead, dealt with as follows.  At the end of each month, temporary journal entries were made reflecting a netting, as between LBIE and LBF, of all unsecured inter-company balances, and the novation of the resulting net balance to LBHI.  By that I mean that LBHI was interposed between LBF and LBIE, so that any net debt on the unsecured inter-company account owed by LBF to LBIE was replaced by a debt from LBF to LBHI, and a debt from LBHI to LBIE.  If the net balance was owed the other way, LBIE would owe LBHI, and LBHI would owe LBF.  Similar arrangements existed as between LBIE and certain other affiliates, including LBSF, LBCCA and LBAH, but not LBI.

185.    Pay down of the net inter-company balance thus created, for example between LBIE and LBHI, was subject to the obtaining of various Group internal approvals, and did not occur every month.  For months where there was no pay down, the temporary month end journal entries to which I have referred were then reversed at the beginning of the next month.  For months where there was pay down, the journal entries became permanent.

186.  What matters for present purposes is that the secured balances owed by LBF to LBIE at the end of the month in respect of Rascalled securities, whether there was a pending stream of one day repos or an open stock loan, were not included within the month end netting, novation and pay down processes between LBIE, LBF and LBHI. That much is common ground. The consequences, in terms of an understanding of how the Rascals processes worked (if they did) and were paid for (if they were) has nonetheless been a matter for protracted argument.

**LBSF**

187.  It is convenient to take the reflection in the accounting entries of the implementation of Rascals between LBIE and LBSF out of turn, mainly because, subject to one significant exception, the accounting treatment was in all respects the same as between LBIE and LBF. The only significant difference relates to the manner in which LBIE's purchases of securities from the street for LBSF were recorded in terms of trade tickets.

188.  I have already described above how, as between LBIE and LBF, two trade tickets were generated on the trade date of any securities acquisition from the street for LBF's book. In the case of LBSF, and for reasons which remain largely a matter of conjecture, such acquisitions from the street were recorded sometimes by two trade tickets and sometimes by a single trade ticket. Furthermore, acquisitions from other affiliates were on occasion recorded by three trade tickets, but they can be ignored for present purposes.

189.  Cases where acquisitions led to the generation of two trade tickets were dealt with in all relevant respects in the same way as between LBIE and LBF. Single trade tickets consisted of the electronic record of a direct trade (i.e. contract) between LBSF and the street counterparty. The only reference in the ticket to LBIE was the identification of a LBIE account number for settlement of the trade. All the other accounting entries generated both by the trade and its settlement were the same as between LBIE and LBF, save only that, in relation to single ticket trades, no entry was made in LBIE's stock inventory.

190.  The natural inference from the use of a single ticket is that LBSF rather than LBIE was in fact the contracting Lehman party with the street counterparty. By the end of the hearing that had become, more or less, common ground. In any event, I find that to be the probable explanation. What remains entirely unclear is why, on any particular occasion, LBSF rather than LBIE contracted with the street. It may have been merely a consequence of the rules of the particular exchange or clearing house on or across which the relevant securities had to be traded or settled. For present purposes the reason does not matter and, to the extent that the use of one or two tickets to record a relevant trade has any consequence upon beneficial ownership now, I am invited to deal with them alternatively. As will appear, I have concluded that it makes no difference.

191.  Another consequence of LBSF's fixed income derivatives business is that most of the Rascals processing applied to security dealings by LBIE for its book were Automatic rather than Manual, the opposite being the case for LBF. In the end, nothing turns on that difference either.

**LBCCA/LBAH**

**Acquisition From The Street**

192.   Subject to one difference, the recording in the Group's records of LBIE's acquisition of securities from the street for the book of LBCCA was in all respects the same as for LBF and LBSF.  The only difference, of no import for present purposes, is that (so far as research has revealed to date) they were all single ticket transactions, the implication being that LBCCA itself contracted with the street counterparty in every case.

**Rascals Processing**

193.   It is at this stage that the recording of transactions relating to securities acquired by LBIE for LBCCA's book diverges from the pattern so far described, and in a manner which has given rise to serious complexity and difficulty, as a matter of interpretation, albeit only one dispute as to primary fact.  There is also a baffling difference between the manner in which Automatic and Manual Rascalling of such acquisitions was dealt with, for which it is impossible to find any rational explanation.

**Automatic Rascals**

194.   It will be recalled that there existed, from November 1997, a NNA between LBIE, LBCCA, LBAH and a number of other Far Eastern Group companies, to which LBHI was added as a party with effect from June 2000, and which was expressed to apply both to debts and to deliverables.  It is obvious that those in London and Hong Kong responsible for the implementation of Automatic Rascals in relation to securities acquired for LBCCA's trading book thought that in some way the effect of the NNA was to transfer title to the underlying securities from LBCCA to LBAH, along with the inter-company unsecured debts incurred by LBCCA in connection with LBIE's acquisition of those securities.  Thus, the whole of the Automatic Rascalling applied to those securities was conducted, so far as the Group records show, entirely between LBIE and LBAH, to the complete exclusion of LBCCA.  Nonetheless, the LBCCA inventory records continue to show it rather than LBAH as having a long position in the underlying securities, and both LBCCA's and LBIE's records continue to show LBCCA as owing an unsecured debt to LBIE for the whole of the purchase price, at least from each settlement date until the end of the month in which it occurred.  This is, if for no other reason, because the entries which in the case of LBF record LBIE's on-leg obligations as offsetting the affiliate's original acquisition debt simply never arrive in the inter-company unsecured account between LBIE and LBCCA, being recorded instead in the unsecured inter-company account between LBIE and LBAH.

195.   Nothing in any of the Group's records, (leaving aside the NNA itself) shows how, if at all, LBAH was clothed with sufficient title to the underlying securities to be able to repo them up to LBIE.  Furthermore, as between LBIE and LBAH, LBIE's obligation to pay the on-leg purchase price arrives in the inter-company account between those two companies with nothing already owed the other way available for offset.  LBIE is nonetheless shown as LBAH's secured creditor in respect of the repurchase price for the off-leg.

196.    The matter becomes even more opaque (in terms of interpretation) at the end of the month.  At this point, all unsecured inter-company balances between LBIE, LBAH, LBCCA (and certain other Hong Kong entities) are novated and netted so as to give rise to a substitute single inter-company balance, not between LBAH and LBIE (as might have been supposed pursuant to the NNA) but between LBHI and LBIE.

197.    Furthermore, the effect for LBCCA of that month end process was to substitute LBHI for LBIE as LBCCA's unsecured creditor for a sum equivalent to the whole of the acquisition price for the underlying securities rather than, as between LBIE and LBF, merely for the unsecured element left behind after extracting the secured amount financed by the Rascals process.

198.    For LBIE the effect of the month end process on the unsecured inter-company account was no different from what it would have been if Automatic Rascals had been processed directly with LBCCA, or if the LBCCA acquisition price debts had been novated up to LBAH immediately, rather than straight to LBHI at the month end. This is because the offset which would then have occurred every day between the acquisition debt and the first repo on-leg purchase price debt occurred in bulk when they both arrived at LBHI at the month end, when LBAH's unsecured receivables from LBIE and LBCCA's unsecured payables to LBIE are both novated up to LBHI and netted. As Mr Milligan put it, it all comes out in the wash at the month end so far as concerns the unsecured balances, at least from LBIE's perspective.

199.    Looked at from LBCCA's viewpoint, the month end position actually recorded is not the same as would have resulted from direct participation in Automatic Rascals, or if an immediate novation of the acquisition debts had taken place with LBAH.  LBCCA was never recorded as a secured debtor of LBIE in relation to Automatic Rascals, but LBAH was.  More significantly LBCCA continued to owe LBHI the whole of the acquisition price from the street after the month end, rather than the net amounts (if any) remaining after offset between the acquisition debt and the on-leg purchase debt. Similarly LBAH remained a creditor of LBHI for the on-leg purchase debt.  The underlying securities remained reflected in long positions on LBCCA's inventory account throughout.

200.    The Administrators' case was, by the end of the hearing, that this imbalance between LBCCA and LBAH was in fact sorted out at the year end, by the belated recognition of a novation to LBAH of LBCCA's aggregate acquisition debt, thus enabling the missing offset with the on-leg purchase debt to take place after the event. There was conflicting evidence about this, between on the one hand Mrs Greenway and Mr Gibb for LBIE, and Mr Alldis for LBCCA/LBAH on the other.  Due to the production of LBCCA's 2007 accounts just before the end of the hearing, this evidence continued to arrive (with my permission) thereafter, and Mr Alldis's departure on holiday then led to a situation where a further adjournment of several weeks would have been required in order for the issue to have been subjected to full research, reply evidence and, if necessary, cross examination.  The issue whether there was such a year end adjustment, and if so as to its precise effect, was highly technical, and heavily dependent upon after-the-event interpretation of inadequate materials. I therefore directed that there should be no further procedure in relation to this issue, and that I would give judgment on the alternative bases that there had been or had not been such a year end adjustment, to the extent that it mattered.

**MANUAL RASCALS**

201.   The thinking which identified LBAH rather than LBCCA as LBIE's proper counterpart for Automatic Rascals was not applied to Manual Rascals, where the stock loans were entered into directly between LBCCA and LBIE.  Again, no rational explanation for this difference of treatment has emerged, or even been proffered.  The accounting treatment of Manual Rascals transactions between LBIE and LBCCA was also complicated, by comparison with that which I have described as between LBIE and LBF.  The complications relate to the manner in which LBIE's obligation to pay collateral to LBCCA in relation to the on-leg of the stock loan is recorded.

202.   The first entry in relation to any particular stock loan consists of the recording of LBIE's collateral liability in a cash memo account, as part of the daily aggregate arising from similar transactions, not only between LBIE and LBCCA, but also between LBIE and other Hong Kong affiliates.  By "similar transactions" I mean equity financing transactions relating to securities of the same type.  The net aggregate balance is then posted to LBIE's account with LBHI and LBHI's account with LBAH.

203.   No entry is made in LBCCA's books recording a receivable from LBIE in respect of the collateral.  Nonetheless is appears that an equivalent receivable  is recorded as owing to LBCCA from another Lehman Hong Kong company Lehman Brothers Asia Capital Company ("LBACC").   Mrs Greenway's evidence (unchallenged on this point) was that, by reference to complicated inter-company entries between a number of Lehman Brothers Hong Kong companies under what she described as the Global Cash and Collateral Management System ("GCCM"), it was nonetheless possible to link the LBIE obligation to pay the collateral with the receivable recorded as owing to LBCCA by LBACC, so that, taking those complicated records as a whole, it was appropriate to describe LBIE's obligation in relation to the collateral as shown as owing indirectly to LBCCA, as it were, round the houses. Nonetheless, at no time does LBIE's collateral obligation appear in the same inter-company account as LBCCA's obligation to pay the acquisition price, so that it is not obvious how they can have offset each other, at least prior to month-end novation and netting through LBHI.

204.   The ITS system does nonetheless record a secured obligation of LBCCA to repay the collateral to LBIE on the off leg, in the same way as in relation to the other affiliates. This persists for as long as the stock loan remains open, and is reflected in both LBIE's and LBCCA's accounts.

**LBI**

205.   By contrast with the complicated and confusing picture which I have described in relation to the Hong Kong affiliates, the accounting relationship between LBIE and LBI was straightforward.   LBIE and LBI entered into no Automatic Rascals transactions at all, and there is good reason to doubt whether the stock loans by which, from time to time, LBI purported to lend its beneficial interest in particular stock to LBIE really form part of any Rascals process at all.  Nonetheless, for present purposes, it is common ground that I should give directions as to the present beneficial ownership of securities which (a) were settled by LBIE into one of its

depots for LBI's account; (b) were then made the subject of a stock loan by LBI to LBIE; and (c) remain held in a LBIE depot.

206. The accounting treatment of LBIE's acquisition of such securities from the street was no different from that applied to acquisitions for the other affiliates, which I have already described.  As between LBIE and LBI, they gave rise to single trade tickets, rather than to pairs, the implication being that LBIE merely settled trades which had been entered into directly by LBI with the street counterparty.  The starting point from an accounting perspective therefore is that the settlement of such trades created an unsecured liability of LBI to LBIE to pay the acquisition price, recorded on inter-company account.

207. By contrast with the other affiliates, there existed between LBIE and LBI a system for regular pay down of unsecured inter-company liabilities which was operated on a frequency that varied between daily and about two or three times a week.  Thus, unless a security settled by LBIE for LBI's account was subjected to a same-day stock loan, LBI's liability to refund LBIE for the acquisition price paid to the street would simply be discharged in full by the next regular pay down.

208. By contrast, if a stock loan intervened, either on the same day or in any event prior to the next pay down, then any net balance between LBI's liability for the purchase price and LBIE's liability for the collateral would be dealt with at the next pay down.

209. Similarly, unsecured inter-company liabilities between LBIE and LBI arising from margin adjustments to the collateral under stock loans (as already described in relation to LBIE and LBF) would be swept into the regular pay down process in the same way.

210. For reasons which remain unexplained, the accounting records ceased to show any entries in respect of liabilities to pay collateral in respect of some of the stock loans, as between LBIE and LBI, after the end of May 2008.

## THE GROUP'S COLLAPSE AND ITS AFTERMATH

211. LBIE went into administration shortly before 8 a.m. on 15th September 2008.  All the respondent affiliates went into forms of insolvency process within the same week or shortly thereafter.  LBHI's insolvency process started just before that of LBIE.  On the same day the Administrators caused an instruction to be given to all LBIE's staff, to the effect that no trades or other transactions were to be entered into without the Administrators' consent.  I shall refer to it (adopting the parties' own abbreviation) as the "blanket instruction".

212. On 16th September, under cover of an email timed just after 5 p.m., LBF notified LBIE of the termination of all inter-company agreements or arrangements between them, to the extent that they authorised LBIE to act on behalf of or as an agent for LBF, without specific approval, adding that no further transactions in cash or securities were allowed.

213. The winding up petition in relation to LBAH was presented on 19th September 2008, thereby giving rise to an event of default under clause 10 of the GMRA between LBIE and LBAH.

214. The Automatic Rascals process operated, as I have described, without the need of any human intervention at all.  It therefore continued, as between LBIE and the relevant respondents (i.e. LBF, LBSF and LBAH) during the whole of the week beginning 15th September 2008, continuing to generate routine book entries of the types which I have described.

215. On 23rd September, shortly after midday (London time), and without any prior discussion with the Administrators, an employee of LBIE manually switched all the tags which governed the eligibility of securities of a particular type for Automatic Rascals processing from eligible to ineligible, with the result that the ITS system recorded all pending repos as having their off-legs settled on that date, and recorded no further repos thereafter. The effect of stopping the Automatic Rascals process in that way was that the ITS system recorded unsecured liabilities of each of the relevant affiliates arising from their obligations to pay the off-leg repurchase price in relation to each repo, with no corresponding offset constituted by a LBIE obligation to pay the on-leg purchase price of any further repo, and no continuing secured liability, the off leg having apparently settled.  One interpretation of those entries, which of course the respondents adopt, is that LBIE thereby handed back to the affiliates beneficial title to all securities subject to Automatic Rascals, leaving itself only with unsecured debts owed by its, by then, hopelessly insolvent affiliates.

216. Consistent with one of the objectives of the Rascals process, a very large proportion of the underlying securities were out on loan by LBIE to the street at the time of the collapse.  In respect of a large proportion of those, LBIE has been unable to pay the off-leg repurchase price, or repay the collateral, necessary to get back equivalent securities from its street counterparties.  The result is a large shortfall between the securities now held by LBIE in its house depots and the amount to which the affiliates lay beneficial claim. Nonetheless the value of those which remain is extremely large. They are mixed with securities which were never Rascalled and with securities held for LBIE's own trading book.  They are subject to various other competing claims, and to the resolution of issues such as lien and the consequences of shortfall which are not for determination on this application.

## **GLOBAL CLOSE**

217. The various office holders in charge of the insolvency processes of the majority of the Group's trading companies, including LBIE and the respondents, have attempted to identify their financial position at the collapse, including reconciling inter-company balances within the Group, following the collapse, by a process known as Global Close.  They chose close of business on 12th September 2008 as the accounting reference date, and used the going concern principles and policies habitually used by the Group for its regular reconciliation exercises hitherto.

218. The relevance of Global Close to the issues arising in this application is limited.  The choice of 12th September 2008, just before the collapse, means that the effects of the switching off or other termination of the Automatic Rascals process were not captured by that exercise.  Nonetheless because of the tendency of ITS entries to be reflected upwards via DBS into the separate companies' own books, the net unsecured balances caused by the Rascals processes while up and running are generally reflected in the Global Close reconciliation.

219.   The secured balances are also captured, on the assumption that at the accounting reference point the Automatic Rascals repos were all at the stage of an on-leg: i.e. that they were not at that moment in time (if any) between the settlement of an off-leg and the settlement of the on leg for the next repo.  Similarly, all relevant stock loans under Manual Rascals were also open, thereby capturing all secured liabilities of the affiliates to repay collateral.


# ANALYSIS

## A.   DID LBIE'S ACQUISITION OF SECURITIES FOR THE ACCOUNT OF AN AFFILIATE GIVE RISE TO ANY BENEFICIAL INTEREST FOR THE AFFILIATE?

220.   This is the question which all the parties (for their separate tactical reasons) have invited me to address, as arising logically prior to the application of Rascals processing to any such securities. This application is about (and only about) Rascalled securities. My complaint during the hearing that, in relation to Rascalled securities, this seemed to me rather an unreal question, fell on deaf ears.  It is no doubt an important question in relation to securities held by LBIE for an affiliate's book at the time of the collapse which were not Rascalled. But those securities are not the subject of this application.  It is a rational historical question in relation to securities acquired by LBIE for an affiliate's book under the global settlements practice which prevailed before Rascals was implemented (i.e. before 1996), but it is not suggested that any of the securities acquired that long ago were still in a LBIE depot at the time of the collapse.

221.   In relation to Rascalled securities, it is an inescapable aspect of the relationship between LBIE and each affiliate that, upon or after acquisition, they were to be or might be Rascalled, either because they were eligible securities for Automatic Rascals, or securities sufficiently worth being lent to the street to be Manually Rascalled.  The fact that Rascals processes were to be or could be applied to eligible securities is an essential part of the terms upon which LBIE acquired them for the books of the affiliates, and cannot therefore be ignored when considering whether LBIE acquired them as trustee rather than as absolute owner.

222.   A conclusion that the Rascals processes applied to the securities were and remain effective to confer absolute title on LBIE would deprive this prior question of any relevance.  Nonetheless it matters because of the affiliates' case that, for different reasons, the Rascals processes were ineffective for that purpose, either because LBIE never paid for the on-leg, or because LBIE transferred title back to the affiliate on the final off-leg (Automatic Rascals) or because LBIE holds them on resulting trust (Manual Rascals) or, finally, because in relation to LBCCA the Automatic Rascals processing was transacted with the wrong affiliate.

223.   I have concluded that the most useful way in which (at the parties' insistence) I should address this first question is in two stages.  First I shall address it in relation to the period before 1996, that is after the institution of the global settlements practice, but before LBIE and any affiliate had decided to apply Rascals processing to securities acquired for that affiliate's book.  Secondly I shall address the question by

reference to the period after the introduction of Rascals, on the footing that LBIE and each of its affiliates (with the possible exception of LBCCA) intended that relevant securities acquired by LBIE for that affiliate's book were to be Rascalled Automatically, or were liable to be Manually Rascalled at LBIE's discretion.

224.   At each stage the question whether the acquisition gave rise to a proprietary interest for the affiliate, and therefore a trustee beneficiary relationship between LBIE and the affiliate, is governed by the same legal principles, to which I now turn.

## THE LAW

225.   I set out below what I conceive to be the principles to be applied, where A acquires title to property for the account of B, to the question whether B thereby obtains a proprietary interest in that property.   I do so initially merely by stating those principles.   Later, I shall to the extent necessary look in more detail at some of them.

## The Principles

i)   The recognition of a proprietary interest of B in property where A has the legal or superior title necessarily assumes the existence of a trust as between A and B.

ii)   There can be no such proprietary interest if the necessary trust would fail for uncertainty.

iii)   A trust of part of a fungible mass without the appropriation of any specific part of it for the beneficiary does not fail for uncertainty of subject matter, provided that the mass itself is sufficiently identified and provided also that the beneficiary's proportionate share of it is not itself uncertain.

iv)   A trust does not fail for want of certainty merely because its subject matter is at present uncertain, if the terms of the trust are sufficient to identify its subject matter in the future.

v)   Subject to the issue of certainty, the question whether B has a proprietary interest in the property acquired by A for B's account depends upon their mutual intention, to be ascertained by an objective assessment of the terms of the agreement or relationship between A and B with reference to that property.

vi)   The words used by the parties such as "trust", "custody", "belonging", "ownership", "title", may be persuasive, but they are not conclusive in favour of the recognition of B's proprietary interest in the property, if the terms of the agreement or relationship, viewed objectively, compel a different conclusion.

vii)   The identification of a relationship in which A is B's agent or broker is not conclusive of a conclusion that A is, in relation to the property, B's trustee, although it may be a pointer towards that conclusion.

viii)   A relationship which absolves A from one or more of the basic duties of trusteeship towards B is not thereby rendered incapable of being a trustee beneficiary relationship, but may be a pointer towards a conclusion that it is not.

ix)    Special care is needed in a business or commercial context.  Thus:

(a)    The law should not confine the recognition and operation of a trust to circumstances which resemble a traditional family trust, where the fulfilment of the parties' commercial objective calls for the recognition of a proprietary interest in B.

(b)    The law should not unthinkingly impose a trust where purely personal rights between A and B sufficiently achieve their commercial objective.

x)    There is, at least at the margin, an element of policy.  For example, what appears to be A's property should not lightly be made unavailable for distribution to its unsecured creditors in its insolvency, by the recognition of a proprietary interest in favour of B.  Conversely, the clients of intermediaries which acquire property for them should be appropriately protected from the intermediary's insolvency.

## Commentary

226.    Principles (i) and (ii) were not the subject of any dispute or elaboration by counsel, and may be taken as read.  It is common ground that a trust may exist not merely between legal owner and ultimate beneficial owner, but at each stage of a chain between them, so that, for example, A may hold on trust for X, X on trust for Y and Y on trust for B. The only true trust of the property itself (i.e. of the legal rights) is that of A for X. At each lower stage in the chain, the intermediate trustee holds on trust only his interest in the property held on trust for him. That is how the holding of intermediated securities works under English law, wherever a proprietary interest is to be conferred on the ultimate investor.   In practice, especially in relation to dematerialised securities, there may be several links in that chain.

## Certainty

227.    Principle (iii) is derived from Hunter v. Moss [1994] 1 WLR 452.  It formed a central plank in the respondents' submissions.  Mr Moss described it as the basis upon which securities are intermediated in the modern world, and therefore a principle to which the law should lend the broadest possible support.  For his part Mr Milligan did not challenge the basic principle, or its operation in relation to a segregated securities account.  He focused his attention on the requirement for a sufficiently certain mass of fungibles which, he submitted, could not be satisfied by an un-segregated house depot account which LBIE was free to use for lending to the street, and for meeting short positions, rather than being obliged to keep it whole.  Further, he submitted that the probability that on any given day the supposed trust fund (constituted by LBIE's un-segregated house depot account for a particular description of security) would fall well short of the aggregate of the affiliates' supposed beneficial interests raised such difficulties of apportionment between them as to render the supposed trust uncertain as to its terms, as well as to its subject matter.

228.    Hunter v. Moss was a very simple case on its facts.  The defendant was registered as the holder of 950 shares in a company with an issued share capital of 1,000 shares. He orally declared himself a trustee for the plaintiff of 5% of the company's issued share capital, which the trial judge interpreted as meaning 50 of his 950 shares.  Both

the judge and the Court of Appeal rejected the submission that such a trust must fail for want of appropriation of any specific shares out of the defendant's holding to satisfy the plaintiff's beneficial interest in 50 of them.

229.    The Court of Appeal specifically distinguished Re London Wine Co (Shippers) Limited [1986] PCC 121, in which Oliver J had found that the issue to customers by a wine dealer of certificates of title describing them as beneficial owners of specific quantities of wine of specified types and vintages failed to create a proprietary interest under a trust because the dealer had never appropriated specific quantities of matching wine to each of its customers from stocks held in bulk in its warehouses. The reason for the distinction appears more clearly from the judgment of the trial judge (Colin Rimer QC as he then was) at [1993] 1 WLR 934, at 940 and 946, namely that the complete fungibility of the block of shares made it irrelevant which 50 of the 950 should be identified for the purpose of giving effect to the trust.

230.    The Court of Appeal also distinguished Mac-Jordan Construction Limited v. Brookmount Erostin Limited [1992] BCLC 350, in which a developer's failure to carve from its general assets a retention fund for its builder pursuant to an obligation in the building contract, before becoming insolvent, was held to preclude the identification of the necessary subject matter of an enforceable trust of the retention monies. Again, the precise basis for the distinction is not spelt out in Hunter v. Moss, but it is reasonably clear that the Court of Appeal thought that the defendant's holding of 950 shares in a particular company was a sufficiently specific fund, separate from the defendant's general assets, to resolve any issue as to certainty of subject matter, any further appropriation to the plaintiff's specific interest being unnecessary.

231.    Hunter v. Moss has not been without its academic and judicial critics, but its conclusion that there is no objection on the grounds of uncertainty to a trust of part of a shareholding of the trustee has been generally followed, in this country in Re Harvard Securities [1997] 2 BCLC 369, in Hong Kong in Re CA Pacific Finance Limited [2000] 1 BCLC 494, and in Australia in White v. Shortall [2006] NSW SC 1379.

232.    The difficulty with applying the Court of Appeal's judgment in Hunter v. Moss to any case not on almost identical facts lies in the absence of any clearly expressed rationale as to how such a trust works in practice. There has not been unanimity among those courts which have followed Hunter v. Moss, nor among the many academics who have commented upon it, as to the correct approach. The analysis which I have found the most persuasive is that such a trust works by creating a beneficial co-ownership share in the identified fund, rather than in the conceptually much more difficult notion of seeking to identify a particular part of that fund which the beneficiary owns outright. A principal academic advocate for the co-ownership approach is Professor Roy Goode: see for example "Are Intangible Assets Fungible?" [2003] LMCLQ 379. Among the judicial commentators I have found the analysis of Campbell J in White v. Shortall (supra) at paragraph 212 to be the most persuasive. My own preference for the co-ownership analysis may be observed in LBIE v. RAB Market Cycles [2009] EWHC 2545 (Ch), at paragraph 56. I propose to adopt it for the purposes of the analysis which follows.

233.    Neither Hunter v. Moss nor any of the decisions of the common law courts which have followed it address the subject matter certainty issues raised in the present case

as a result of LBIE's liberty to deal with securities acquired and held for the time being for the account of affiliates, by lending them to the street or by using them to settle short positions of other affiliates or of LBIE itself.  All that the cases do is to demonstrate, by contrast with Mac-Jordan Construction v. Brookmount (in relation to money) or Re Goldcorp Exchange Limited [1995] 1 AC 74 (in relation to gold bullion) how the identification of a fund of which the beneficiary is to be a co-owner may sufficiently satisfy the requirement of subject matter certainty.  Thus it is no objection that the fund is beneficially shared with the trustee, as in Hunter v. Moss itself and in White v. Shortall.  Nor is it an objection that a segregated fund (i.e. one in which the trustee does not share) is a constantly changing fund beneficially co-owned by a constantly changing class of the clients of the trustee: as in CA Pacific Finance Limited.

234.    At the heart of Mr Milligan's submissions based upon subject matter uncertainty lay the undoubted fact that, at any moment in time, the supposed trust fund consisting of LBIE's house depot account in respect of a specific type of security (such as ordinary shares in ICI) might consist either of shares originally acquired, equivalent shares subsequently acquired by the exercise of rights under a repo or stock loan with the street, or simply shares subsequently acquired by LBIE to make good a shortfall caused by using shares to settle its own or other affiliates' short positions.  Furthermore, the fund could (for reasons already explained) consist at a particular moment in time of no securities at all, where all had been used to settle short positions, or all had been lent to the street, so that the only identifiable trust property consisted of LBIE's personal rights to obtain equivalent securities in the future, for example by calling in stock loans or enforcing the off-legs of repos, as against street counterparties.

235.    To meet this obvious and serious point of distinction with the Hunter v. Moss line of authority Mr Moss and counsel for the other respondents relied upon  Principle (iv) above, namely that a trust does not fail for want of certainty merely because its subject matter is to consist of after-acquired property.  For that principle Mr Moss relied simply on Tailby v. Official Receiver (1888) 13 App Cas 523.  That was a case about an equitable assignment by way of security of all the present and future book debts of the assignor, without limit as to time or type.  It shows that a trust is not vitiated by subject matter uncertainty merely because the trustee has, at the date of the creation of the trust, yet to acquire property answering the relevant description.  Since it applied to all the assignor's future book debts however obtained, no question of subject matter uncertainty arose.

236.    It is convenient at this point to break off my discussion of the legal principles applicable to this first main issue generally, and address the Administrators' uncertainty case directly, first in relation to subject matter and then in relation to terms.  In both respects I shall first address the position as it was before 1996, when Rascals processing began to be implemented.

237.    The starting point is that it is misleading to think of LBIE's house depot accounts as if they were simply one big omnibus account into which all its holdings of securities of any type were deposited, like some single bank account used for all its payments and receipts of cash.  However they were recorded, the reality is that LBIE held a great multiplicity of positions on house depot accounts, one position for each type of security, by which I mean not one for equities and one for fixed income, but one for

ICI ordinary shares, one for BP ordinary shares, separate positions for any different class of shares of the same issuer, and further separate positions for different classes of fixed income securities, again, separately for each issuer. The question of certainty must be addressed by looking, conceptually at least, at each position individually, even if they were all recorded in one account. LBIE's depot account position for ICI ordinary shares is a convenient (if now purely historical) example. It would consist at any given moment in time of a chose in action against LBIE's depository in relation to a specified number of ordinary shares, and would consist of a beneficial co-ownership interest in the depository's total holding of shares of that type.

238.    At any moment in time, the amount of shares so held by LBIE would be attributable to acquisitions from the street both for its own account and for the accounts of one or more affiliates, less shares sold to the street for those same accounts, but also, reduced by shares lent to the street and shares used to settle short positions, as already described. For all shares lent to the street LBIE would have contractual rights to obtain equivalent securities, subject to paying for them. For shares used to settle affiliates' short positions, LBIE would have similar rights against the relevant affiliates. As and when, at any later date, LBIE received back shares pursuant to its repos and stock loans with the street, the shortfall in the depot account would be made good *pro tanto* by equivalent shares attributable to the exercise of those rights.

239.    Although the picture created by that analysis is very much more complicated than the simple facts of <u>Hunter v. Moss</u>, I consider that it gives rises to no fatal uncertainty of subject matter. The subject matter of the fund is, from start to finish, LBIE's holding of ICI ordinary shares or, more precisely, LBIE's beneficial co ownership interest in its depositary's holding of ICI ordinary shares, as shown in LBIE's relevant depot account with its depository. The subject matter of the fund may also include all LBIE's rights to recover equivalent securities from street lending counterparties, and its rights as against affiliates to make good short positions. The subject matter of each affiliate's beneficial interest is its co-ownership share in the fund thus constituted, which will (in principle, whether or not in practice) be readily ascertainable from Group records, showing the amount of those securities acquired for LBIE and for each affiliate, less the amounts disposed of, expressed as a proportion of the whole.

240.    The question whether the fund consists simply of LBIE's proprietary rights in relation to the securities, or includes LBIE's personal rights to recover equivalent securities from street lending counterparties or from short affiliates is a question of intention, as between LBIE and its affiliates, rather than subject matter certainty. If the former, I see no uncertainty or other objection in a conclusion that the subject matter of the fund extends to equivalent securities once acquired by LBIE's exercise of those rights. If the latter, there is in my judgment no valid objection that the rights are purely personal and contractual, and not such as would be enforced by an order for specific performance: see again <u>Tailby v. Official Receiver</u> (*supra*).

241.    As to the latter point, no-one doubts the beneficial interest of clients in a solicitor's client account. Yet the subject matter of that fund consists entirely of the solicitor's purely personal rights as a customer of the client account bank or banks.

242.    I turn to address Mr Milligan's case based on uncertainty as to terms. By this he meant that, because of the typical shortfall in the fund constituted by LBIE's depot account, caused by lending to the street and the meeting of short positions, it was

impossible to say in relation to the depleted balance how it should be shared between LBIE and the affiliates for whose accounts the securities had been acquired. Should the matter be resolved, Mr Milligan asked rhetorically, by a first in first out approach or by a *pari passu* approach? It was no answer, he submitted, that the court would, in the case of a shortfall in an undoubted trust fund, resolve that issue by reference to settled equitable principles. To avoid a fatal uncertainty as to the subject matter of each affiliate's beneficial interest, the answer had to be found in the terms upon which the supposed trust was constituted.

243. I accept the premise for that submission, but not Mr Milligan's conclusion. Subject matter certainty requires not only that the identity of the shared fund is certain, but also that the proportionate amount of each alleged beneficiary's share is also certain. Thus, an uncertainty as to the terms upon which LBIE and its affiliates were to bear any shortfall would be destructive of the necessary certainty of each affiliate's beneficial share in the securities remaining in LBIE's depot account. In truth, uncertainty as to terms in this context means, or inevitably leads to, uncertainty as to beneficial subject matter.

244. But I see no reason why, on the assumption that LBIE and its affiliates had a common intention which authorised LBIE to operate its house depot accounts in a matter which included lending to the street and the making good of short positions, the consequential day to day shortfalls thereby created in the depot accounts should not be shared on a *pari passu* basis. Bearing in mind that the evidence shows that LBIE's operation of its house depot accounts in that way was an aspect of the Group settlements practice rather than something done idiosyncratically by LBIE behind the backs of one or more of its affiliates, there is no basis in fact for concluding that the manner in which LBIE operated those accounts before the implementation of Rascals was other than consensual. If all those interested in the fund consented to the arising of the shortfall inherent in the way it was managed, then I can see no reason why they should not be taken to have agreed to bear the consequences of the shortfall equally.

245. The law does not lightly allow contracting parties' purposes and intentions to be defeated by supposed uncertainty, and there is in my judgment no reason why the law should do so any more readily than normal merely because the issue is as to the validity of an intended trust. On the contrary, the law commonly recognises the creation of a trust as a necessary consequence of an intention that parties should share property beneficially, in circumstances where the parties themselves have given no thought at all to the terms of the consequential trust, if indeed they even recognised its existence. In all such cases the law fills the consequential gaps by implication, and by importation of generally applicable principles.

246. The beneficial ownership of matrimonial and other shared homes is a case in point. The courts have for many years wrestled with the difficulties which arise in quantifying the beneficial interests of cohabitees, in circumstances where a clear mutual intention that they should share the property necessitates the existence of a trust, in particular in cases where only one of them is the legal owner. Nonetheless, at no time during this protracted and difficult debate has the fact that the parties themselves frequently give no thought to the amount of their proportionate shares in the property led the courts to conclude that the intended trust fails for uncertainty.

247.   By parity of reasoning, and on the assumption that LBIE and its affiliates intended that the affiliates should enjoy proprietary interests in securities acquired by LBIE for their account, the fact that the mode of LBIE's operation of its house depot accounts to which they all consented may throw up difficulties of analysis as to their proportionate shares in the securities which remain after the collapse is not a basis for concluding that the trust which the law necessarily recognises so as to give effect to their intended proprietary interests should fail for want of certainty, whether as to terms, or as to the amount of those beneficial interests.

248.   I have thus far been considering the question of certainty in relation to the pre-Rascals period, and concluded that, if a trust was intended as the necessary consequence of the conferral upon affiliates of proprietary interests in securities acquired by LBIE for their account, such a trust would not fail for uncertainty.  I can envisage no reason why a different conclusion should follow from that analysis, conducted after the implementation of Rascals.  On the contrary, it seems to me that an argument of uncertainty would be weaker than in relation to the pre-Rascals period.  The Rascalling of the relevant securities (if not defective in the various ways alleged by the respondents) would for the duration of the underlying repos and stock loans confer absolute title to the underlying securities upon LBIE, and therefore, for the same period, take them out of the supposed trust fund.  The result would be that any lending of those Rascalled securities to the street would have no effect upon the constitution of the fund, thereby depriving Mr Milligan's submissions as to the uncertainties created by the consequential shortfall in the fund of most of their effect.  If the Rascals processes were ineffective to confer absolute title upon LBIE, then the certainty issues would broadly match those which I have already addressed in relation to the pre-Rascals period.  I can therefore return to the remaining legal principles listed above, all of which assist in answering the question whether a proprietary interest, and therefore a trust, was intended.

## Intention

249.   Principles (v) and (vi), which focus on the essential objectivity of the process of the ascertainment of the parties' mutual intention, were not in dispute between counsel, and therefore call for no justification.  They serve as a warning against giving excessive weight to the labels used by the parties to describe their relationship, or even to the labels chosen to describe their supposed interests in the relevant property. Banking is fertile ground for the misuse of language in that context, as the habitual employment of phrases like "money in a bank account" or references to banks "looking after customers' money" demonstrates.

## Agency

250.   Principle (vii), namely that an agency relationship is not conclusive of, but only a pointer towards the existence of a trust relationship, was not directly challenged, but was the subject of extensive submissions.  Enormous effort was devoted by the respondents towards demonstrating that LBIE acted as the affiliates' agent or broker in the making and settlement of securities transactions for their account, and valiant effort was deployed by Mr Milligan in challenging that assertion.  It is therefore appropriate that I address the relevant agency principle in a little more detail.  For this purpose, I shall refer to the agent or broker as A and the principal as B, in conformity with the analysis thus far.

251.    The starting point is that the question whether A is B's agent does not fall to be answered in the negative merely because B contracts as principal with the third party: see Teheran-Europe Co. Ltd v. ST Belton (Tractors) Ltd [1968] 2 QB 53, at 59-60 per Donaldson J.  In that case the judge was concerned with the question whether the terms upon which B contracted with the third party created any privity between A and the third party.  Nonetheless Donaldson J's lucid description of the three ways in which an agent can conclude a contract on behalf of his principal puts the point beyond doubt.  In the present case LBIE contracted with the street counterparty as principal in many, but by no means all, of the relevant securities trades.  But that is perfectly consistent with LBIE having been the affiliate's agent for all purposes connected with the terms and consequences of the transaction, as between them.

252.    A conclusion that, as between them, A acts as B's agent in the acquisition of property from C by no means leads to the inevitable result that B thereby obtains a proprietary interest in the property, such that it is held by A as his trustee.  Nelson v. Rye [1996] 1 WLR 1378 is a classic example of a case in which that assumption was wrongly made, as is illustrated by the devastating critique of that judgment by Millett LJ in Paragon Finance v. DB Thakerar & Co [1999] 1 All ER 400, at 415-6.  Nelson was a solo musician, managed by Rye, who collected Nelson's fees and royalties as his agent, with an undoubted duty to account.  Nonetheless the terms of the agency relationship permitted Rye to mix Nelson's fees and royalties with his own money, to use them for his own cash-flow, to deduct his own commission and to account for the balance to Nelson only at the year end.  Those features of the relationship were inconsistent with the existence of any trust of the receipts, and therefore with any proprietary interest of Nelson in them, for as long as they remained with Rye.

253.    The true principles are in my judgment admirably summarised in Bowstead & Reynolds on Agency (19th ed) in paragraph 6-041, from which I have drawn the following extracts (although the whole passage deserves reading in full):

> "The analogy with trust might be taken to suggest first, that when an agent holds title to money or other property for his principal, he always does so (in situations where the principal does not himself own it) as trustee.  This would often be impractical and has never been the rule.  It is perfectly possible for property so held, especially money, to be the agent's own, and mixed with his own assets subject only to a duty to transfer or account for it to his principal.  Equally however he may certainly hold as trustee.
>
> Sometimes the answer turns on the contract between principal and agent.  It is clear in this context and in general that the existence of a contractual relationship of debtor and creditor between the parties does not prevent the existence of a simultaneous trust relationship, or a fiduciary relationship of a less onerous nature, involving nevertheless that certain money or property is held on trust.
>
> Thus it may be provided expressly between principal and agent that money received is so held.  At other times the intention to create a trust may be inferred; the matter turns on the objective

> interpretation, according to general principles, of the intentions of the parties.
>
> …the present trend seems to be to approach the matter more functionally and to ask whether the trust relationship is appropriate to the commercial relationship in which the parties find themselves; whether it was appropriate that money or property should be, and whether it was, held separately, or whether it was contemplated that the agent should use the money, property or proceeds of the property as part of his normal cash flow in such a way that the relationship of debtor and creditor is more appropriate.
>
> A relevant consideration also is whether money or property was received in pursuance of a single transaction for which the agent was appointed, or as part of a group of transactions in respect of which a general account was to be rendered later or periodically.
>
> Although the issue does not arise in many of the cases, a central question, really one of policy, and perhaps too often overlooked (because not in issue) is whether the rights of the principal are sufficiently strong, and differentiatable from other claims, for him to be given priority in respect of them in the agent's bankruptcy….
>
> Sometimes the position is secured by statute or regulation providing that particular types of functionary (e.g. estate agents and solicitors) hold clients' money on trust, pay into client accounts and keep trust accounts."

## Basic Duties of Trusteeship

254.   Principle (viii), that a trustee may be excused performance of basic trust duties without rendering impossible the existence of a trust, was also the subject of extended debate.  Mr Milligan submitted that if A is permitted by B both to mix property acquired for B's account with his own property and to use it for the purpose of his own business, those incidents in the A/B relationship were necessarily, and fundamentally, incompatible with any relationship of trustee and beneficiary in relation to the property.  He brought some powerful dicta to bear in support of that submission.

255.   In Paragon v. Thakerar (*supra*) at p.416 in the passage to which I have already referred, Millett LJ said this:

> "It is fundamental to the existence of a trust that the trustee is bound to keep the trust property separate from his own and apply it exclusively for the benefit of his beneficiary.  Any right on the part of the defendant to mix the money which he received with his own and use it for his own cash-flow would be inconsistent with the existence of a trust. "

256.    In <u>Ayerst v. C & K (Construction) Limited</u> [1976] AC 167, at 180 Lord Diplock said this, in relation to the use of the expression "trust" and "trust property" in reference to the assets of a company in liquidation:

> "All that was intended to be conveyed by the use of the expression "trust property" and "trust" in these and subsequent cases (of which the most recent is *Pritchard v. M.H. Builders (Wilmslow) Limited* [1969] 1 WLR 409) was that the effect of the statute was to give to the property of a company in liquidation that essential characteristic which distinguished trust property from other property, viz., that it could not be used or disposed of by the legal owner for his own benefit, but must be used or disposed of for the benefit of other persons."

257.    These, and other broad and general statements about the core characteristics of a trust need to be addressed with some caution.  In <u>Brown v. Inland Revenue Commissioners</u> [1965] AC 244 a question arose as to the income tax treatment of interest received by a solicitor upon deposited client account money and used for his own benefit.  The solicitor also lent client monies to other clients on interest bearing loans, and kept for himself the difference between the interest charged and the interest paid on clients' deposits.  The House of Lords held that, in both respects, the solicitor's receipt of interest was an unauthorised secret profit, and a breach of trust.  But Lord Reid added this, at page 258:

> "The appellant (*the solicitor*) supports this contention on the grounds of custom and implied agreement.  On the facts found in the case he cannot succeed on custom if only because the practice is by no means universal and I shall not consider what the position would be if there were a custom in the legal sense. As regards implied agreement I do not doubt that clients could agree, if they so chose, to their solicitor making profit out of their money by using it in certain ways in certain circumstances.  The fact that a solicitor is in a fiduciary position does not prevent him from making agreements with clients who are sui juris and are fully aware of the facts.  And there might be circumstances from which an agreement could be implied."

258.    In my judgment there is no immutable principle that an arrangement between A and B (where A acquires property for B's account) which includes a consensual disapplication of some fiduciary obligation generally regarded as a basic feature of a trust, thereby prevents the existence of a trustee beneficiary relationship arising between the parties, or the recognition of A's proprietary interest in the property.  The Lehman Brothers litigation provides two recent examples.  In <u>LBIE v. RAB Market Cycles</u> (*supra*) at paragraphs 60 to 63, I concluded that the prime broker's Right of Use under clause 11 of the standard form  International Prime Brokerage Agreement (Charge Version) used by LBIE with its customers was, although a powerful contra-indication to the recognition of a trustee beneficiary relationship between LBIE and its customers under that agreement,  not however inevitably fatal to it, if (as was the case) other aspects of the relationship pointed more powerfully in favour of a trust.

259.  In <u>LBIE (sub nom CRC Credit Fund Limited v. GLG Investments plc sub-fund)</u> [2010] EWCA Civ 917, the Court of Appeal affirmed my decision that regulatory permission given to an investment firm to deposit clients' money in a house account before segregating it under the regime regulated by CASS 7 did not automatically mean that the statutory trust imposed by that regime was incapable of applying to client money until it had been segregated.

260.  In my judgment the true principle which emerges from these cases is that, while there are no hard and fast rules whereby the consensual disapplication of some basic trustee duty precludes the recognition of a trustee beneficiary relationship between the parties, nonetheless the greater the extent to which those duties are disapplied, the harder it will be for the court to conclude, taking all relevant matters into account, that the parties objectively intended to create such a relationship between them.

**<u>The Business Or Commercial Context</u>**

261.  Authority for principle (ix)(a), that the law should not, in a commercial context, be hidebound by traditional rules about trusts derived from their origin in family settlements, is to be found in <u>Target Holdings v. Redferns</u> [1996] AC 421, per Lord Browne-Wilkinson at p. 435-6.  Principle (ix)(b) that the law should not unthinkingly impose a trust where purely personal rights between A and B sufficiently achieve their commercial objective is in my view no more than an aspect of the need to interpret commercial agreements and arrangements purposively.

**<u>Policy</u>**

262.  The cited extract from Bowstead & Reynolds acknowledges the role to be played by policy considerations in the recognition or the denial of a trustee beneficiary relationship between agents and their principals.  Mr Moss forcefully illustrated how deeply the concept of the trustee beneficiary relationship is embedded in modern thinking about intermediated securities, both by reference to the Financial Markets Law Committee's July 2004 Report on "Property Interests in Investment Securities" and to the Unidroit Convention on Substantive Rules for Intermediated Securities (signed in October 2009) which, although yet to be ratified by the United Kingdom, nonetheless commands the broad support (so Mr Moss informed me) of the Law Commission.

263.  Nonetheless, both those documents (in section 8 of the FMLC Report and Articles 24 and 25 of the Unidroit Convention) assume that an effective system for the conferral and protection of proprietary interests in intermediated securities upon the clients of the intermediaries presupposes rules which require the intermediaries to maintain at all times a pool of securities sufficient to satisfy their clients' entitlement.  Mr Moss (who was himself a contributor to the FMLC Report) did not persuade me that the basis upon which LBIE was free to use securities acquired for the account of affiliates for lending to the street, and for making good short positions, came near to satisfying that type of pool maintenance obligation.

264.  As for the need to avoid the unthinking extension of proprietary claims in circumstances which infringe the *pari passu* principle in insolvency, sufficient authority is to be found in the observations of Lord Neuberger in <u>Re B A Peters (In Administration)</u> [2008] EWCA Civ 1604, at paragraph 21, as follows:

"In my view, the court should not be too ready to extend the circumstances in which proprietary or other equitable claims can be made in insolvent situations, bearing in mind the consequences to unsecured creditors. To raise those in the commercial world, it must sometimes seem almost a matter of happenstance as to whether or not a particular creditor, with no formal security, has a proprietary or equitable claim. However the fact is that every time such a claim is held to exist in the case of an insolvent debtor, the consequence is that one commercial creditor gets paid in full to the detriment of all the other commercial creditors, who also have no formal security, but are found to have no proprietary claim."

## Application To The Facts

## The Pre Rascals Period

265. Having already disposed of the objection based on uncertainty, I now set out my conclusions on the question whether LBIE's acquisition of securities for the account of its affiliates gave rise to proprietary interests in the affiliates' favour. I shall first address the question in relation to the pre-Rascals period, i.e. on the basis that it was not part of the common intention of the parties that a security acquired by LBIE for an affiliate's book should thereupon or thereafter be Rascalled. The first question is whether, as the respondents all contend, LBIE was acting as the affiliates' agent or broker or whether, as the Administrators maintain, LBIE was acting as a principal in its own right. As already noted, this issue is clouded by the fact that the agreements between LBIE and the various respondent affiliates deployed in evidence almost all post-date this period. Nonetheless, I consider it legitimate to have regard to the recitals found in those agreements entered into by way of implementation of the Rascals project, to the extent that they describe an existing relationship, upon which the particular terms of those agreements were then to be superimposed. This is, in particular, because the recommendations of the Rascals working party which led to the making of those agreements were necessarily based upon a review of a pre-Rascals relationship between the parties in connection with the acquisition of securities by a hub company for its affiliates' accounts.

266. In my judgment the evidence clearly establishes that LBIE was indeed acting as the affiliates' agent or broker, rather than purely as a principal in its own right. My reasons follow.

267. The agreements which point that way may be summarised as follows. First, as between LBIE and LBF, there is the ICRA made in March 1996, the Agency Agreement made in November 1996 and the Brokerage Agreement made in March 1998. As between LBIE and LBAH there is the MPRA made in November 1997. As between LBIE and LBSF there is the MPRA made in November 1996, and the original Non-Discretionary Agency Agreement made in January 1994. Between LBIE and LBI there is the UCCBSA made in July 1994, the predecessor of the 1996 version described earlier in this judgment.

268. More fundamentally, the feature common to the relationship between LBIE and all of the respondent affiliates for the books of which it acquired securities was that LBIE

acquired and settled or (as the case may be) merely settled those securities into its house depot accounts upon the basis, and with the intent, that the economic risks and benefits inherent in the ownership of those securities would be for the account of the affiliates rather than for LBIE, both as to market risk and intermediate income.

269.    For the purpose of understanding the relationship between LBIE and its affiliates, it is in my judgment nothing to the point that in relation to some, although not all, of the relevant acquisitions LBIE contracted with the street counterparties as principal, for the reasons which I have already given in relation to the Teheran-Europe decision of Donaldson J.

270.    On any view, and in relation to all the relevant acquisitions, it is not seriously challenged by the Administrators that LBIE was liable to account to the relevant affiliate both for the proceeds of the ultimate sale of the security to the street and for any intermediate income received from the moment of acquisition onwards. Those are quintessentially characteristic of the obligations of an agent or broker for the affiliates.

271.    Against that, it is equally common ground that LBIE did not, and was not expected to, comply with the other characteristic obligation of a broker, namely to "get into his possession, and retain, an equivalent number of shares" to those delivered to him under the acquisition contract: see Solloway v. McLaughlin [1938] AC 247 at 256. All that LBIE did in practice was to manage its house depot accounts in such a way as to ensure (for as long as it remained solvent) that it could settle trades by way of disposal of shares held for its affiliates' books, whether by retaining shares, borrowing them from the street or having recourse to securities held for its own book or for other affiliates. Nonetheless I consider that this consensual departure from the ordinary obligations of a broker comes nowhere near displacing a conclusion that, for all purposes in connection with LBIE's acquisition and holding of securities for its affiliates' books, LBIE's role was that of an agent or broker. It makes no difference for present purposes which of those two technically different but overlapping labels is to be applied.

272.    I also accept, as the next stage in the respondents' submissions, that proof that LBIE acted as an agent or broker for its affiliates is a *prima facie* indication that the affiliates were to have proprietary interests in the securities thus acquired. That much seems to me to be implicit in the judgment of the Privy Council in Solloway (*supra*) at pages 257-8. But it is no more than a starting point.

273.    It is to be noted  from the *travaux preparatoires* of the Rascals committee, and from the recollection of Mr Bolland in evidence, that the general view within the Group (at least in London where the Rascals working party appears to have been based) was indeed that a hub company's acquisition of securities from the street for the books of affiliates did give rise to proprietary interests in the affiliates' favour, although some appeared to have thought that no such proprietary interest arose until the affiliate had refunded LBIE for the acquisition price. Nonetheless the subjective assumptions of Group employees about the legal consequences of the parties' arrangements are not the same as the objective ascertainment of intention to be derived from the terms of those arrangements, viewed as a whole. For example, many if not most ordinary clearing bank customers probably think they own the money in their bank deposit accounts, whereas the standard terms of a clearing bank's contract with its customer

creates only personal rather than proprietary rights in relation to such accounts. Such depositors are merely unsecured creditors, not beneficiaries under a trust.

274. In my judgment the basis upon which LBIE acquired and dealt with securities for its affiliates' accounts prior to the implementation of Rascals, as reflected in the global settlement practice which I have described, was not such as to give the affiliates proprietary interests in the underlying securities. My reasons follow.

275. First and foremost, while those arrangements included an obligation upon LBIE to account in relation to its holding of the underlying securities, both for any proceeds of sale and for any intermediate income, they imposed upon LBIE none of the characteristic obligations of a trustee in relation to those securities. On the contrary, they clearly disapplied such obligations. Thus LBIE was free to mix the securities with its own, to dispose of them by way of street lending on terms which permitted LBIE to enjoy the consequential funding benefits of the cash received in lieu, without accounting to the affiliates, and to use the securities of one affiliate to make good short positions both for other affiliates and for LBIE itself. In short, LBIE was free to use securities held in its house depot accounts generally for the purposes of its cash flow and more generally for its business, albeit that its business included agency and brokerage activities for its affiliates. LBIE was under no obligation to maintain sufficient securities in its house depot accounts to match the aggregate of its affiliates' book entitlements. On the contrary, it simply managed its house depot accounts so as to be able to settle disposals of securities held for its affiliates' books, as and when instructed to do so. In all those respects, LBIE's permitted conduct in relation to its house depot accounts much more closely resembles that of a banker in relation to customers' deposits than a trustee in relation to its beneficiaries' property.

276. Secondly, the conferral upon the affiliates of a proprietary interest in the underlying securities was not necessary for the achievement of the commercial objectives of the parties. The affiliates' objective was to enjoy the economic fruits of ownership, namely the rises and falls in the value of the security, and its intermediate income, either as an investment in its own right, or as a hedge against the risks of derivatives transactions which formed the main business, for example, of LBF and LBSF. Those fruits could be fully enjoyed as the result of LBIE's personal obligation to account, both for the proceeds of the on-sale of the securities to the street, and for the intermediate income, at least for as long as LBIE remained solvent, and therefore able to discharge its personal obligations.

277. The affiliates had no need to obtain any form of title to the underlying securities. They were settled into LBIE's name and re-sold in LBIE's name. For all purposes connected with the street, LBIE's title was a sufficient means of enabling the affiliates to realise their economic interests in the capital and income value of the securities.

278. Nor did the affiliates, as associated companies in the same group, have cause to rely upon a proprietary interest as a protection against the risk of LBIE's insolvency, as they might have had if choosing a wholly independent broker or settlement agent for their dealings in securities. Furthermore, LBIE's liberty to use the underlying securities in connection with its own business, and in particular by lending them to the street, meant that the arrangements gave the affiliates no real protection against LBIE's insolvency in any event.

279.  A useful demonstration of the fact that the affiliates' commercial purposes in connection with the securities did not require the conferral upon them of a proprietary interest is to be found in the fact that the Rascals processes, later superimposed upon the global settlement practice, had as their main object the conferral of absolute title on LBIE, to the exclusion of the affiliates, for the whole of the period during which LBIE held the underlying securities for the affiliates' account.  No-one appears to have considered that the superimposition of Rascals processes in any way detracted from the achievement of the commercial purposes for which the affiliates used LBIE as their broker or settlement agent.

280.  In reaching my conclusion that, prior to the implementation of Rascals, the operation of the global settlement practice between LBIE and its affiliates did not confer upon the affiliates a proprietary interest in the underlying securities, I have not ignored the factors relied upon by the respondents for the contrary argument.  I will briefly address the main factors relied in turn.

281.  First, I have already acknowledged that LBIE's status as the affiliates' agent or broker is a pointer in the opposite direction, but only a starting point.  Secondly, the respondents placed much emphasis on the routine inclusion of the underlying securities in the affiliates' stock inventories.  At first sight this is indeed another pointer towards a conclusion that the beneficial interest in the underlying securities lay with the affiliates rather than with LBIE.

282.  On closer analysis however, this factor carries no real weight as evidence of any common assumption or intention about beneficial title.  I have already described how the underlying securities came to be included in the affiliates' stock inventories upon the trade date rather than the settlement date, and how they remained in those stock inventories during the whole of the period when the underlying securities were the subject of Rascals processes, whether by repo or stock loan.  Similarly, they were removed from the affiliates' stock inventories upon the trade date of a re-sale of the underlying security, rather than upon the settlement date.  Thus, the underlying securities appeared in the affiliates' stock inventories before they (or for that matter LBIE itself) could have acquired any proprietary interest in them, since the earliest date for the passing of title from the street is the settlement date rather than the trade date.  Equally, they remained in the stock inventories at a time when it was commonly assumed that the Rascals processes conferred absolute title on LBIE.  Finally, they were removed from the stock inventories before the affiliates (on their case) lost their proprietary interest, which only occurred on the settlement of the re-sale to the street.

283.  Mr Bolland's written evidence was that the significance of the entry of a security in an affiliate's stock inventory was a recognition that, during the period when it was so recorded, the affiliate was entitled to the economic risks and returns of the securities position, rather than necessarily to a proprietary interest in the underlying security. This was confirmed by Mr Dominic Gibb, the Lehman Brothers European Financial Controller at the time of the collapse, and he said that this approach to the accounting treatment of securities positions was consistent with his understanding of UK GAAP. Mr Gibb was cross-examined on this evidence by Mr Brindle, by reference to paragraph 14 of FRS26, which provides that:

>  "An entity shall recognise a financial asset or a financial liability on its balance sheet when, and only when, the entity

becomes a party to the contractual provisions of the instrument."

Mr Gibb was prepared to acknowledge in cross-examination that the phrase "party to the contractual provisions of the instrument" was generally equivalent to ownership of it, but not always.

284. Mr Brindle directed my attention to provisions of FRS26 which specifically explained why, during the currency of a repo or stock loan, the on-leg seller or stock lender continues to record the underlying security on its balance sheet, the explanation being that it continues to retain substantially all the risks and rewards of ownership.

285. In my judgment, taking this evidence as a whole, while an affiliate's inclusion of the underlying security in its stock inventory (and therefore as an asset in its balance sheet) is certainly consistent with beneficial ownership, it is equally consistent with personal rights securing to it the economic fruits, risks and rewards of ownership, in the absence of any conferral of a proprietary interest.

286. A more specific case was advanced on behalf of LBF, based upon its inclusion of the underlying securities in a stock register required to be maintained by Swiss stamp tax legislation. LBF was a Swiss securities dealer for stamp tax purposes, and stamp tax was chargeable on any transfer of ownership in taxable securities for consideration in circumstances where a Swiss securities dealer acted as a counterparty or intermediary in respect of such a transfer, and no exemption arises. In fact, LBF enjoyed the hugely valuable benefit of a stamp tax exemption in respect of securities required for hedging purposes, but it was nonetheless under a continuing obligation to record and report such acquisitions for stamp tax purposes.

287. LBF routinely recorded and reported its purported acquisition of the underlying securities acquired by LBIE for its book under the global settlement practice. As with the affiliates' stock inventories, LBF did not record a disposal of the underlying securities when title to them was purportedly transferred to LBIE under the Rascals processes. No-one suggested that LBF's leaving the underlying securities on its stock register while Rascalled arose from some perception at the time that the Rascals processes were ineffective for the purposes of passing absolute title to LBIE.

288. There was some rather inconclusive evidence (not all of which was subjected to cross-examination) about whether there was a tendency in Switzerland to over-report stock acquisitions subject to the stamp duty exemption. For present purposes, I am prepared to assume that Mr Eric Fiechter, a Swiss lawyer and non-executive director of LBF, believed that, for Swiss law and stamp tax purposes, the acquisition by LBIE of securities for LBF's books was to be treated as an acquisition by LBF. The question for decision however is whether in English law LBIE's acquisition conferred a proprietary interest on LBF. On that question it seems to me that Mr Fiechter's perception of the Swiss legal and fiscal consequences of the arrangements is of limited persuasive force.

289. Attempts were made by various of the respondents to rely upon the terms of the Master Custody Agreements in force from time to time between LBIE and the affiliates. In my judgment, for the reasons already given in relation to each respondent between which and LBIE there existed a MCA, those agreements are

simply inapplicable to LBIE's holding of securities for the affiliates' books in un-segregated house depot accounts. LBIE's making of those agreements with LBF and LBSF is, as I have already explained, probably attributable to the fact that, from time to time, derivatives counterparties in transactions with those affiliates occasionally lodged securities rather than cash by way of collateral, and those affiliates then used LBIE's segregated accounts for keeping those securities in custody. As for LBCCA, it had clients whose securities were deposited with LBIE.

290.    For LBI, Mr Brindle placed reliance upon the language of both the 1994 and 1996 versions of the UCCBSA which, in various places, described LBIE as holding securities for LBI "as custodian". As a matter of language this affords some support to LBI's case for a proprietary interest, but it is by no means sufficient to displace the considerations which, as much for LBI as for the other affiliates, militate the other way. While the UCCBSA is to be construed in accordance with New York law principles of interpretation, the small differences in those principles, by comparison with English law, afford no basis for attributing some more powerful consequence to the use of the word "custody" in what is, by common consent, otherwise an entirely English law analysis of the nature of the relationship between LBIE and LBI, and the consequences of that relationship in terms of the creation of a trustee beneficiary relationship between LBIE and LBI. Furthermore the UCCBSA did not in general terms require segregation of securities or money held by LBIE in custody for LBI, save in relation to long positions held indirectly for LBI's customers.

291.    LBSF advanced no particular arguments of its own on this issue, the underlying facts about its relationship with LBIE being for these purposes substantially the same as between LBIE and LBF.

292.    Mr Dicker's submissions for LBCCA in relation to the pre-Rascals period focused, as I have already described, upon the thinness of the evidence about the operation of the global settlements practice, by comparison with the much more detailed evidence in relation to the later period. It was a submission equally available to all the affiliates, rather than one based on special facts applicable to the LBIE/LBCCA relationship viewed separately. While there is force in Mr Dicker's submission that LBIE's policy to lend to the street as much of the securities in its house depot accounts as possible was intensified during rather than before the implementation of Rascals, I have not been persuaded (for the reasons already given) that LBIE's liberty to use such securities for street lending during the pre-Rascals period was subject to any significant restrictions, as between itself and either LBCCA or any other of the respondent affiliates.

293.    I am conscious that I have in relation to the pre-Rascals period reached a conclusion on the question of proprietary interest which is the opposite to that which I reached in relation to the similar question arising from the terms and operation of the IPBA(Charge) in the RAB Market Cycles case, notwithstanding that the IPBA permitted LBIE a right of use (which I described as a right to swap) in relation to the underlying securities. That right of use was the main contra-indication to the existence of a beneficial interest of LBIE's clients in the underlying securities, but there were powerful factors pointing towards a trustee beneficiary relationship in that case, which are absent from the present analysis. In particular, the language of the IPBA included not merely references to custody, but also to the securities as "belonging to the Counterparty" and that they "do not belong to the Prime Broker".

The IPBA required the client's securities to be segregated, and permitted mixing with LBIE's property only in exceptional circumstances. Furthermore, the right of use was hedged about by obligations to replace securities thus used with equivalent securities, hence my description of it as a right to swap, whereas in the present case, LBIE's consensual use of securities held in its house depot account appears to have been subject to no significant restrictions of any kind.

294.   I am therefore satisfied that there is no inconsistency between my conclusion in the present case that, prior to the application of Rascals, no trustee beneficiary relationship existed between LBIE and the affiliates, and my contrary conclusion in relation to the IPBA (Charge).   At the end of the day, a line has to be drawn somewhere.   I am satisfied that it lies between those two different structures.

## The Period After The Implementation Of Rascals

295.   LBIE's use of securities held for the account of its affiliates did not become any more trustee-like after the introduction of Rascals, at least in relation to Rascalled securities.   On the contrary, as already explained, the policy by which such securities were to be put to use by lending to the street for the improvement of LBIE's cash-flow intensified after Rascals was introduced.   Furthermore, the Rascals processes were specifically designed and intended to justify that use, both in terms of avoiding any regulatory requirement to segregate, and in terms of ensuring (albeit in my judgment unnecessarily) that LBIE had good title to lend securities to the street.

296.   Nonetheless, the interposition of the Rascals processes between the acquisition of securities for the account of affiliates and their use in street lending necessarily acquires a complete re-analysis of the factors for and against the recognition of a trustee beneficiary relationship during the (largely theoretical) period between acquisition and Rascalling.

297.   At the heart of any repo or stock loan is a mutual assumption that, prior to its taking effect, the on-leg seller or stock lender (as the case may be) has some form of proprietary interest in the underlying security.   In short, it must have property to sell or to lend, if the repo or stock loan is not to be meaningless.   This must be all the more the case in relation to repos or stock loans which (as they invariably did as between LBIE and its affiliates) in terms preserve for the seller/lender the economic fruits, risks and benefits of the underlying security throughout the period of the repo or stock loan.   If those economic fruits, risks and benefits are not transferred, and no property interest is transferred either, the repo or stock loan is denuded of any operative effect.

298.   For the purpose of the objective ascertainment of the parties' mutual intention, it must be supposed that they considered that the repos and stock loans were effective, even if, as alleged, they may in fact have been defective for one or more technical reasons. I exclude from that analysis the Automatic Rascalling of securities acquired for the book of LBCCA, where its case is not merely that the repos were technically ineffective, but that they were made by LBIE with the wrong affiliate, leaving LBCCA entirely unaffected by them.   I will return later to the issue whether LBCCA's case in that regard is made out.

299.    It is in my judgment entirely artificial, and therefore misleading, to appraise the parties' mutual intention as at the moment of acquisition of a security for the affiliate's book without regard to the fact that, in accordance with well established procedures, the underlying security was either immediately thereafter to be Automatically Rascalled, or eligible for Manual Rascalling because of its suitability for street lending.  In relation to securities eligible for Automatic Rascals, the entirely automated procedures in place by 2006 left no room for uncertainty, as at the moment of acquisition, whether such securities would be Rascalled.  Their subjection to an immediate repo on the settlement date was an entirely automated process calling for no human intervention of any kind.

300.    The position in relation to Manual Rascals is less straightforward, both because the process was discretionary, depending upon the decision of a member of LBIE's trading team, and because the stock loan did not always immediately follow the settlement of the acquisition from the street.  Nonetheless, the understanding upon which Manual Rascals was based was, as I have already described, designed to ensure that before any specific security was lent to the street by LBIE, it would be made the subject of a stock loan from the relevant affiliate, if it had not already been Automatically Rascalled.

301.    Two important consequences flow from that analysis.  The first is that, as all the respondents submitted, the mutual understanding and intention of the parties in relation to any security eligible for Automatic or Manual Rascals must have been that, to enable the Rascals process to take effect, the basis upon which its acquisition from the street had been settled by LBIE was such as to confer some form of proprietary interest on the affiliate.  The second consequence is that the use, subsequent to Rascalling, of the underlying security by LBIE for the furtherance of its own business (whether by street lending, settling short positions or otherwise) is no longer a significant factor in the objective ascertainment of the parties' intention as to beneficial ownership on acquisition.  On the contrary, as Mr Dicker cogently submitted, LBIE's subsequent conduct in relation to the underlying Rascalled securities is entirely attributable to the mutual intention that the repos and stock loans between LBIE and the affiliate (rather than the acquisition itself) should confer upon LBIE absolute title, free from any competing proprietary interest in the affiliate.

302.    Mr Milligan's response to these two submissions was his often repeated refrain that, in reality, the Rascals processes were just a form of belt and braces, designed merely to resolve some doubt about whether LBIE acquired, and thereafter retained, absolute title on acquisition.  Mr Milligan sought to buttress that submission by reference to the recitals to the standard form ICRA and MPRA, which do indeed make some reference to the avoidance of doubt.

303.    I have not been persuaded by this submission.  The evidence shows that the prevailing assumption within the Group was that LBIE's acquisition of securities for the account of an affiliate conferred a proprietary right on the affiliate, the only uncertainty being whether that right was (in accordance with normal practice between parties at arm's length) postponed until the receipt of payment.  Secondly, none of the agreements between LBIE and the affiliates pursuant to which Rascals was implemented, still less the industry standard form repos and stock loans utilised for that purpose, disclose any uncertainty as to the existence of a proprietary interest in the affiliate.  On the contrary, the presumed existence of such an interest is the essential basis for all those

transactions. Thirdly, the reference in the recitals to the standard form ICRA and MPRA is to the avoidance of doubt about whether LBIE and its affiliates were adhering to capital adequacy and other regulatory requirements, rather than to a doubt as to whether, apart from Rascals, the affiliates had proprietary interests in the underlying securities.

304. Even if there may have been differing views about that question within the Group prior to 1996, the implementation of the Rascals processes by the use of repos and stock loans simply demonstrates in my judgment that those who assumed that the affiliates did acquire proprietary interests upon settlement of acquisitions from the street prevailed, and that it is their intention and understanding, rather than any different understanding of those who thought otherwise, that must be taken as governing the parties' mutual intention during the period after 1996, when Rascals was being implemented.

305. It is nothing to the point that I have concluded that prior to the implementation of Rascals, the prevailing understanding within the Group was, as a matter of English law, wrong, so that for any purpose connected with a need to ensure that LBIE had absolute title to the underlying securities, the Rascals processes were unnecessary. The parties' decision to implement those processes has the two consequences which I have just described, and for which the respondents have contended.

306. It follows in my judgment that the introduction of the Rascals processes as an important element in the terms governing LBIE's acquisition of eligible securities for its affiliates' accounts not only compels a re-evaluation of the question whether the affiliates thereby obtained a proprietary interest on acquisition, but also a conclusion, contrary to that which I have reached in relation to the pre-Rascals period, that they indeed did acquire such an interest. By eligible securities I mean, of course, securities eligible either for Automatic or Manual Rascals. It is an entirely different question, as to which I express no view one way or the other, whether the acquisition of securities which were ineligible for Rascals processing (whether because they were issued by a Lehman group company, inappropriate for lending to the street, or for any other reason) gave rise to any similar proprietary interest. Not only were such securities not Rascalled, but they were, ex hypothesi, unlikely to be subjected to street lending or other uses essentially inconsistent with the existence of a trust in relation to them. In any event, such securities are not the subject matter of this application and there has been no satisfactory evidence about how securities of that type were dealt with by LBIE after acquisition.

307. I have considered whether the mutual intention (which was a pre-requisite of the Rascalling of eligible securities) that the affiliates should first acquire some proprietary interest in them ought to be regarded as a conditional intention, the condition being the effectiveness of the relevant Rascals repo or stock loan as a means of the transfer of title back to LBIE. In my judgment I should not so conclude. Nothing in the way in which LBIE and the affiliates dealt with the Rascals processing of eligible securities after 1996 suggests any doubt in the corporate minds of the parties as to the effectiveness of the repos and stock loans for the purpose of clothing LBIE with absolute title. The challenges to the effectiveness of the Rascals transactions with which I have to deal emerged entirely after the collapse, when the structures came to be subjected to the critical analysis of the various affiliates' office-holders and their legal advisers.

308.    To that general conclusion there are two potential exceptions.  The first is LBCCA, in relation to Automatic Rascals to which, on the face of the documents at least, it was not a party.  Mr Dicker had no cogent answer to the proposition that LBCCA could hardly, at one and the same time, rely upon the intended Rascalling of eligible securities as a critical factor in the beneficial interest analysis, while repudiating any involvement in that process.

309.    The second more complicated exception relates to LBI.  It will be recalled that the capital adequacy problem arising from LBIE's acquisition of securities for the account of affiliates had no real application as between LBIE and LBI, because of the process of regular pay-downs of inter-company indebtedness which followed within a day or two of any relevant acquisition.  LBIE was simply not for any significant period an unsecured creditor of LBI in relation to the aggregate cost of such acquisitions.  It may be for that reason that Automatic Rascals was never applied as between LBIE and LBI.

310.    There was nonetheless some stock lending between LBIE and LBI, but it is by no means clear that this took place as part of any conscious application of Rascals processing, rather than merely on a sporadic basis, as and when LBIE wished to lend to the street a security acquired for LBI's book.  As between LBIE and LBI this case is in fact concerned only with some thirteen securities still held in a LBIE depot which were the subject of stock loans at the time of the collapse.  All other issues between LBIE and LBI in relation to securities acquired for its book remain to be resolved on some future occasion.

311.    The second complication arises from the terms of clauses 8.4 and following of the UCCBSA (quoted above) which appeared for the first time in its November 1996 version.  These provided, in relation to securities not paid for on acquisition, (i) that LBIE should "be deemed to have stepped in as principal at point of settlement", (ii) that until paid for, LBIE should have the unfettered right to use the securities as it saw fit, subject to maintaining a separate account of those transactions, and (iii) that upon default LBIE should have the right to realise all securities held pursuant to clause 8.4 and to apply the proceeds of sale to exclude any balance on that separate account.

312.    Considerable time and effort both by counsel and by LBI's expert were devoted to the question whether, in relation to securities not paid for by LBI, clause 8.4 and following deprived LBI of any proprietary interest which it might otherwise have had in those securities.  That dispute included a debate about whether LBI's expert's opinion about what a New York court would conclude that clauses 8.4 and following actually meant was even admissible in this court, a debate which, had it been necessary to do so, I would have resolved against LBI.

313.    But in my judgment it is neither necessary nor appropriate for me to address the issues arising from the interpretation of clauses 8.4 and following of the UCCBSA (1996 version) on this application.  It is unnecessary because, so far as I have been able to ascertain, there is no basis for concluding that, by the time of the collapse, the acquisition of those securities which had by then been subjected to stock loans had not been paid for by LBI to LBIE under the regular pay-down process which I have described.  The only difficult issue in relation to the thirteen relevant securities is whether LBIE had ever paid the collateral in respect of ten of the thirteen, and if not, whether LBIE could rely on a passing of absolute title from LBI to it under the

relevant stock loans. For present purposes, the necessary common assumption that, immediately prior to those stock loans, LBI had a proprietary interest thereby to confer upon LBIE is sufficient to justify an affirmative answer to the question whether LBI had such a proprietary interest, even if for reasons which have not been explained, LBIE never thereafter paid the collateral.

314.    Whatever the precise meaning of Clause 8.4 and following of the UCCBSA, Mr Brindle submitted that they showed that, if and when LBI did pay for LBIE's acquisition of securities for its book, LBI was intended to have a proprietary interest in them, regardless whether they were Rascalled, or even eligible for Rascalling. I recognise the force of that, but if LBIE continued to use and manage all such securities in the same way as it had before the introduction of Rascals (i.e. whether or not Rascalled), I would not regard the terms of the 1996 UCCBSA as sufficient to override the considerations which have led me to conclude that no proprietary interest was intended or in fact created. The difficulty in relation to LBI is that, since this Application has not been about non-Rascalled securities, the evidence does not show whether in fact LBIE did continue to use LBI's securities in the same non-trustee-like manner after 1995. That evidential lacuna makes it inappropriate that I should resolve that question now.

**Conclusion**

315.    I can therefore conclude the difficult analysis of the first main issue between the parties as follows. Prior to the implementation of Rascals, the terms upon which LBIE acquired securities and thereafter held them in its un-segregated house depot accounts for the books of affiliates did not give rise to a proprietary interest in favour of the affiliate, but only to personal rights. Secondly, following the implementation of the Rascals processes, the acquisition of securities eligible to be Rascalled, and which were then purportedly Rascalled, including therefore all the securities the subject matter of this application, did give rise to a beneficial interest in the affiliates immediately prior to being Rascalled, regardless of the effectiveness or otherwise of the Rascals transactions in conferring absolute title on LBIE. To that second conclusion there is the exception in relation to LBCCA, to which I shall return. Furthermore it applies to LBI only in relation to the subject matter of the 13 stock loans open as at the date of the collapse.

**B.    DOES THE RASCALS PROCESSING OF THE RELEVANT SECURITIES MEAN THAT LBIE NOW HOLDS ABSOLUTE (INCLUDING BENEFICIAL) TITLE TO THE RASCALLED SECURITIES REMAINING IN ITS DEPOTS?**

316.    The number and variety of competing arguments which arise in this part of the case, together with the factual differences affecting LBIE's relationship with each of the respondents, make the presentation of my analysis and conclusions on this question a complicated task in itself. For the most part I have no alternative but to consider the case in relation to each respondent separately (albeit treating LBCCA and LBAH as a single group) and to address Automatic Rascals separately from Manual Rascals. It is for the most part also necessary to consider the effect of on-legs separately from the effect of off-legs, both in relation to repos and stock loans. In addition to questions of interpretation, the parties' submissions also raise issues of performance, waiver and estoppel by convention, as well as an alleged resulting trust of the type first identified in Barclays Bank Limited v. Quistclose Investments Limited [1970] AC 567.

317. It is convenient however to begin by mentioning certain points of common ground, and by resolving one point which was common ground save for one dissentient party.

318. First, it was common ground that, subject to any issue as to compliance with a condition precedent, the on-leg of each repo and stock loan was effective to transfer any proprietary interest of the relevant affiliate to LBIE. By relevant affiliate I mean the affiliate which was party to the relevant repo or stock loan. Secondly, it became common ground during the hearing that, as a matter of contract, the passing of title under the on-leg of each repo and stock loan was conditional upon payment by LBIE of the on-leg purchase price or collateral (as the case may be). Thirdly, it was almost common ground that, as a matter of contract, the passing of title from LBIE back to the affiliate under each off-leg was also subject to the same condition as to payment. The only dissenter from that last proposition was LBF, the point being conceded by the other respondents.

319. In my judgment the concession was rightly made. I need only deal with LBF's challenge, by reference to the contractual provisions between it and LBIE. Clause 1 of the ICRA made in March 1996 provided that the re-sale and return to LBF of equivalent securities was to be:

> "Against the payment of their purchase price or return of collateral in money by Seller to Buyer."

Clause 3(c) of the standard form GMRA in force at the time of the collapse made similar provision in relation to repos, and clause 6(c) provided that:

> "Transfer of Equivalent Securities by Buyer and payment of the Repurchase Price payable by Seller against the transfer of such Equivalent Securities shall be made simultaneously."

Finally, the standard form OSLA dated 27th February 1997 (which regulated stock loans), made similar provision in clause 7(B), to the effect that repayment of the collateral was to be simultaneous with the transfer of equivalent securities to the lender. In my judgment it is clear, as between LBIE and LBF, that as a matter of contract LBIE's obligation to re-transfer title to equivalent securities, both under repos and stock loans, was conditional upon the simultaneous payment of the repurchase price or repayment of the collateral (as the case may be) by LBF. When it is borne in mind that LBIE's and LBF's books uniformly recorded LBIE as a secured creditor of LBF in relation to the repurchase prices payable and the collateral repayable under the off-legs of repos and stock loans, a conclusion that LBIE was contractually obliged to return to LBF its proprietary interest in the underlying securities otherwise than in exchange for payment would in my judgment be commercially absurd.

**LBF**

**Automatic Rascals**

**The on-leg**

320.  It will be recalled that the Administrators' case is that LBIE paid for the on-leg of the first repo under the Automatic Rascals process by way of offset of its payment obligation against LBF's obligation to refund LBIE for its cash payment of the acquisition price of the security from the street.

321.  LBF advanced the following counter-submissions, all in support of the general argument that LBIE never paid the on-leg purchase price.  First, Mr Moss submitted that the accounting records were inconsistent with any automatic set-off.  Secondly, he submitted that, on the true construction of the Inter-company Funding Agreement of June 2000 ("the ICFA") LBHI rather than LBF was LBIE's debtor in relation to the purchase price from the street.  Mr Jones for LBSF submitted that, even if those two arguments were wrong, nonetheless in every case in which the purchase price for the on-leg of the first repo exceeded the purchase price payable to the street, then nonetheless LBIE did not pay even by offset in full, so that the condition for the passing of title on the on-leg was not satisfied.  If that submission were good for LBSF, it would equally be good for LBF.

322.  By way of riposte, Mr Milligan submitted that if for any of those reasons the contractual condition for the passing of title on the on-leg of the first repo was not satisfied, nonetheless LBF was estopped by convention from denying that title had passed, both on the first and every subsequent on-leg.

323.  In support of his submissions both as to interpretation and estoppel, Mr Milligan submitted that I should approach those issues upon the basis of the recognition of an overriding common intention between the parties that Automatic Rascals was to bring about a vesting of absolute title to the underlying securities in LBIE for the whole of the period between the acquisition of the securities from the street and their subsequent re-sale to the street, a submission which acquired the abbreviated name of "cradle to grave".  Mr Moss submitted that I should consider each successive repo as a separate transaction, with no relevance attached to its place in a series.  It is convenient to address this difference of approach at the outset, since it coloured much of the detail of the parties' rival submissions.

324.  I accept the broad thrust of Mr Milligan's cradle to grave analysis, for the following reasons.  While it is of course necessary to look separately at each repo, for example for the purpose of understanding how it was performed and paid for (if it was), and for the purpose of understanding the structure of the stream of daily repos as a whole, nonetheless a purposive approach to the interpretation of the repos as the mode of achieving the objectives of the Automatic Rascals process leads inescapably to a conclusion that the parties' purpose was indeed to bring about a continuous vesting of absolute title to the underlying securities in LBIE, rather than a vesting of title in LBIE between (say) 7 p.m. on each working evening and (say) 2 p.m. on the afternoon of the next working day, with a vesting of beneficial title in the affiliate between 2 p.m. and 7 p.m., as Mr Moss argued.

325.  That conclusion follows inevitably from an analysis of the problems for which Rascals (including Automatic Rascals) was to be a solution.  None of the three problems would be solved merely by arrangements which left LBIE as the absolute owner of the underlying securities for part, rather than the whole, of each day.  Thus, Article 4 of the Capital Adequacy Directive (Council Directive 93/6/EEC) clearly required the prescribed level of adequacy to be maintained at all times, and it is clear from correspondence between the Security and Futures Authority and the Group in relation to the Capital Adequacy Directive in December 1995 that this was well understood within the Group.  Similarly, the avoidance of a requirement to segregate, and the assurance of good title to lend the underlying securities to the street both required that LBIE be continuously, rather than intermittently, the absolute owner of the underlying securities.  In particular, LBIE did not confine the street lending of securities subjected to Automatic Rascals rigidly to one day repos.

326.  Finally, the reason for the use of a stream of successive one day repos in the Automatic Rascals process had nothing to do with creating intermittent title in LBIE.  Its purpose was to provide a mechanism whereby the amount of the secured loan from time to time was constantly adjusted so as to be equivalent with the marked to market value of the stock held by LBIE as security.  In that respect the constant repetition of daily repos under Automatic Rascals had the same margining effect as the provisions for adjustment of collateral in the open-ended stock loans used under Manual Rascals.

327.  Mr Moss's best point was that the evidence did show (albeit by reference to specific examples rather than a comprehensive survey) that there could be a gap of some hours between the processing of the off-leg of one repo and the on-leg of the next repo on any particular day, and the consequential accounting entries did, if read literally, appear to substitute the secured debt owed to LBIE for an unsecured debt on settlement of the off-leg, followed by a new secured debt of the adjusted marked to market amount on the settlement, later in the day, of the next on-leg.  There was on the face of it a period each day when, according to the parties' records, no repo on-leg was in place.

328.  The cradle to grave submission is however concerned not with continuity of contracts but with continuity of absolute title.  I have decided, contrary to Mr Moss's submission, that the passing of title back to an affiliate pursuant to the off-leg of a repo was conditional upon simultaneous payment of the repurchase price.  The intention behind the Automatic Rascals structure was, as I have already described, that the off-leg repurchase price would be largely offset against the next on-leg purchase price payable by LBIE.  Thus in the example of an off-leg booked as settled at 2 p.m. and a following on-leg booked as settled at 7 p.m. on the same day, title under the off-leg would pass back to the affiliate only upon settlement of the on-leg, whereupon it would pass immediately back to LBIE.  In abstract theory there might, as Mr Backhouse graphically described it, be a split second while title lay with the affiliate on its way round the circle which started and finished with LBIE, but the interpretation of commercial documents is no more to be affected by such split seconds as the analysis of a mortgage transaction is to be based upon the supposed *scintilla temporis* between the purchaser's acquisition of the legal estate, and his charge to the lender: see <u>Abbey National v. Cann</u> [1991] 1 AC 56, at 93, per Lord Oliver.

329.   Returning to the respondents' main submissions in support of the supposed ineffectiveness of the repo on-legs, there is in my judgment nothing of substance in the distinction between offset and set-off for the purposes of deciding whether LBIE paid for the first on-leg after settlement of an acquisition from the street. It is true that in the unsecured inter-company account between LBIE and LBF the offsetting entries of LBF's debt to LBIE (for the street acquisition price) and LBIE's debt to LBF (for the first on-leg) are merely recorded as successive entries, with no immediate journal extinguishing them as against each other. But that comes nowhere near displacing a conclusion that the parties intended that the offsetting of those two obligations should have the effect, *pro tanto*, of paying both debts. Where in a single account two parties record successive mutual credits and debits there is in reality only a net debt owing, one way or the other between them, at any particular moment in time: see Wood on English and International Set-Off at paragraph 3-3. This normal conclusion may of course be displaced by a contrary intention where for some reason the parties wished to preserve the opposing debts, but in the present case the evidence as to intention is all one way. Witness after witness agreed with Mr Moss in cross-examination that payment under the repo structure of Automatic Rascals was to be by book entry rather than by cash. A book entry which merely records an unpaid debt pays nothing. But book entries which record offsetting debts and credits sufficiently evidence payment if, but only if, there is an offsetting credit available for that purpose.

330.   I am no more impressed by Mr Jones' submission that, in cases where the repo on-leg price was greater than the acquisition price from the street, the condition for the passing of title was not satisfied in full, and therefore, not at all. The parties must be taken to have understood when setting up the Automatic Rascals process that increases in the value of the underlying security between the trade date of its acquisition from the street and the date of the first repo would lead to small deficiencies in payment of the on-leg purchase price, which would then fall to be settled as unsecured liabilities at the next monthly netting and novation process, as between LBIE, LBF and LBHI. It is inconceivable that the parties can have intended the efficacy of a repo on-leg in passing absolute title from the affiliate to LBIE to depend upon whether the on-leg purchase price was slightly greater, equal to or slightly less than the acquisition price from the street. The answer that an available but slightly smaller offset was sufficient to discharge the simultaneous payment condition for passing of title on the on-leg may be arrived at either, as a matter of interpretation, by a vigorous application of the principle *verba ita sunt intelligenda ut res magis valeat quam pereat* or on the basis that any consequential non-compliance with the strict terms as to passing of title was simply waived by the affiliate.

331.   The main plank in Mr Moss's case that title did not pass to LBIE on the first on-leg, enthusiastically supported by both Mr Dicker and Mr Jones, was that LBIE had no available offsetting receivable due from LBF, because of the terms of the ICFA. By clause 1 LBHI agreed to provide funding to LBF and to permit LBF to provide funds to LBIE to effect settlement transactions on behalf of LBF. LBIE was to hold funds provided by LBF on deposit for LBF and requested by LBF from time to time. Clause 1 concluded that, for the avoidance of doubt "any loans under this agreement are provided directly from LBHI to LBF and at no time will LBIE be regarded as lending to LBF".

332.  LBF's case was that whenever an acquisition by LBIE from the street for LBF's book settled (as it always did) without LBF paying cash, the acquisition was for the purposes of clause 1 of the ICFA to be treated as funded by LBHI rather than by unsecured lending by LBIE to LBF.  Mr Moss submitted that the final sentence of clause 1 (quoted above) was a deeming provision that ought to prevail over any apparent accounting entries to the contrary, and Mr Jones bolstered that argument by reference back to an earlier version of the ICFA between LBIE and LBSF (but with LBH plc rather than LBHI) which contained express words requiring a disregard of accounting entries to the contrary.  I was treated by Mr Jones and Mr Milligan to an erudite analysis of the authorities relating to the question whether words in an earlier agreement omitted from a later agreement are or are not to be implied. If it had been necessary to do so I would have concluded that it was not safe to assume that such an implication was intended by way of carry-over into the later ICFA between LBIE and LBSF, not least because of the change in parties and the introduction of Rascals between the dates of the two agreements.  Nonetheless I consider that Mr Moss is correct in his submission that the final sentence of clause 1 of the ICFA between LBIE and LBF is a deeming provision which, to the extent that it applies for present purposes, would override accounting entries to the contrary.

333.  I have not however been persuaded that clause 1 of the ICFA has any application to the acquisition from the street of securities which were then subjected to Automatic Rascals.  In my judgment, such an acquisition did not require funding from LBF at all, still less from LBHI in substitution for LBF.  The acquisition was in substance self-funded by LBIE, since it used LBF's unsecured obligation to pay for the acquisition price from the street as an offset against its obligation to pay the purchase price under the first repo on-leg.  The secured debt from LBF to LBIE which arose under the first repo did not represent funding for the acquisition of the security from the street, but LBF's off-leg purchase price obligation.

334.  All that LBF can be said to have funded in relation to an acquisition from the street was the amount (if any) by which the acquisition price exceeded the first repo on-leg price.  This was indeed retained initially as an unsecured debt to LBIE on inter-company account and, in due course, novated to LBHI at the month end so that it became thereafter funded by LBHI rather than LBF.  To that very limited extent clause 1 of the ICFA may have had some application to the acquisition from the street of Automatically Rascalled securities, as indeed the accounting entries show, albeit only at the month end. But by definition that amount, even if deemed immediately to be owing to LBIE by LBHI rather than LBF forms no part of the offset used by LBIE as the means of its payment for the on-leg.

335.  Nor is there anything in the notion that LBF funded the acquisition from the street during such brief period on the settlement date as may have elapsed between settlement of the acquisition from the street, and the taking effect of the first repo on-leg.  For the purposes of answering the question "did LBF or LBHI have to fund the acquisition?" that is no more than another *scintilla temporis*.

336.  It well may be that clause 1 of the ICFA had a more substantial operation in relation to acquisitions of securities by LBIE for LBF's book which were not then Rascalled at all.  But such acquisitions fall outside the scope of this application and I say no more about them.

337. Mr Moss and counsel for the other respondents concerned with Automatic Rascals sought to bolster their submissions about the ICFA by pointing to the undoubted fact that, as the Group's central banker and treasury, LBHI provided cash on a daily basis to LBIE, to the extent necessary for its immediate needs. Furthermore the inter-company position between LBIE and LBHI was as a matter of policy maintained on a basis designed to ensure that LBHI was always LBIE's creditor, rather than the other way round. For that purpose a prudential minimum of US$1 billion of net debt owed by LBIE to LBHI was sought to be maintained. Furthermore, at least during the period immediately prior to the collapse, surplus cash in LBIE's house accounts at the end of a business day was routinely swept up and transferred to LBHI, with a fresh cash float being transferred back to LBIE at the beginning of the following day.

338. In my judgment this aspect of the Group's treasury and cash management system says nothing about the applicability of clause 1 of the ICFA to the acquisition from the street of Automatically Rascalled securities. The Group's accounting records uniformly show that at no time did LBHI treat as part of its inter-company position with LBIE any part of the acquisition price of securities from the street for LBF's book other than such occasional unsecured balances as arose from transactions where the acquisition price from the street exceeded the on-leg price of the first repo. The volume of business between LBIE and LBF, *a fortiori* if aggregated with the volume of similar business between LBIE and LBSF, and between LBIE and LBAH/LBCCA, was frequently so great that, if the full acquisition prices had been included, the amounts of unsecured indebtedness of LBHI to LBIE would substantially have overtopped the US$1 billion minimum LBIE debt, so as to render LBHI from time to time a net debtor to LBIE. It cannot have been the intention of any of the parties to the ICFA that clause 1 should by a deeming provision have that destructive effect upon a major policy objective in relation to inter-company balances between LBHI and LBIE.

339. For those reasons the challenge to the effectiveness of the first repo on-legs based upon the ICFA fails. In my judgment the uniform effect of the first repos in relation to the Automatic Rascalling of securities acquired by LBIE for LBF's book was, as plainly intended, to transfer to LBIE any proprietary interest of LBF in the underlying securities.

## The First Off-Leg And Subsequent Repos

340. The above analysis of the effect of the first repo on-leg shows that, at the beginning of the business day following the settlement of the acquisition from the street, LBIE was indeed a secured creditor of LBF in respect of the off-leg repurchase price falling due later that day, because LBIE had acquired absolute title to the underlying security under the first repo by paying the on-leg purchase price by offset. The result is, as I have also described, that since LBF never paid an off-leg repurchase price in cash but only by way of offset against LBIE's next on-leg purchase price obligation, title passed back to LBF, if at all, only for a nanosecond on its way round a circle which started and finished with LBIE, when the next repo on-leg settled.

341. The same analysis holds good for every subsequent daily repo. The "cradle to grave" objective of conferring absolute title to the underlying security to LBIE on a continuous basis between the acquisition from the street and its subsequent resale to the street was thereby achieved.

342. It is therefore strictly unnecessary for me to address Mr Milligan's alternative submissions based upon estoppel by convention.  Mindful however that this case will probably be appealed, and of the risk that a higher court may take a different view of the complicated issues of interpretation and analysis thus far, I shall briefly address the estoppel submission, on the hypothetical basis that I had concluded that the repo on-legs were ineffective to transfer LBSF's proprietary interest in the underlying securities to LBIE, as a matter of contract.

343. An estoppel by convention may arise where parties to a transaction act on an assumed state of facts or law, the assumption being either shared by them both or made by one and acquiesced in by the other.  The effect of an estoppel by convention is to preclude a party from denying the assumed facts or law if it would be unjust to go back on the assumption.  See Republic of India v. India Steamship Co Ltd (No 2) [1998] AC 878 at 913 E-G.

344. The circumstances in which a shared but mistaken assumption as to the meaning or effect of a prior agreement between the parties will give rise to an estoppel by convention are not straightforward: see Keen v. Holland [1984] 1 WLR 251, Hamed El Chiaty and Co v. The Thomas Cook Limited [1992] 2 Lloyd's Rep 399, CP Holdings Limited v. Dougdale (unrep) 22nd May 1998, Wilson v. Truelove [2003] EWHC 750 (Ch), PW & Co v. Milton Gate Investments Limited [2004] Ch 142 and Colchester v. Smith [1991] Ch 448.  I attempted a summary of the relevant principles to be derived from Keen v. Holland and the cases commenting upon it in HMRC v. Benchdollar Limited & ors [2009] EWHC 1310 Ch, at paragraphs 41 to 52, albeit in a non-contractual context.  To the extent relevant, I have applied my summary of the relevant law in paragraph 52 of that judgment to the analysis of the various alleged estoppels by convention which have arisen in the present case.  For convenience I set it out below:

> "(i)      It is not enough that the common assumption upon which the estoppel is based is merely understood by the parties in the same way.  It must be expressly shared between them.
>
> (ii)      The expression of the common assumption by the party alleged to be estopped must be such that he may properly be said to have assumed some element of responsibility for it, in the sense of conveying to the other party an understanding that he expected the other party to rely upon it.
>
> (iii)      The person alleging the estoppel must in fact have relied upon the common assumption, to a sufficient extent, rather than merely upon his own independent view of the matter.
>
> (iv)      That reliance must have occurred in connection with some subsequent mutual dealing between the parties.
>
> (v)      Some detriment must thereby have been suffered by the person alleging the estoppel, or benefit thereby have been conferred upon the person alleged to be estopped, sufficient to

make it unjust or unconscionable for the latter to assert the true legal (or factual) position."

345. The convention alleged by the Administrators has been variously put in written and oral submissions and in position papers, either that LBIE paid for the repo on-legs or that, in any event, the repo on-legs were effective to confer absolute title to the underlying securities on LBIE. Since the only challenge to the effectiveness of the repos for that purpose is the alleged absence of payment by LBIE for the on-legs, the two conventions amount in substance to the same thing.

346. By the time that any of the securities the subject matter of this application were acquired from the street, LBIE and LBF had for many years been engaging in a Rascals process of daily repos in relation to eligible securities of the same type. The mutual book entries resulting from those repos uniformly describe their effect as making LBIE a secured creditor of LBF in respect of the off-leg purchase prices under every repo. To LBF's knowledge (and with its acquiescence) LBIE had constructed the Automatic Rascals process in relation to those securities as a way of legitimising, from a capital adequacy, regulatory and street lending perspective, the basis upon which it carried out its acquisition, holding, and exploitation of such securities for LBF's book, and on the express basis that this necessitated the conferral upon LBIE of absolute title to the underlying securities, to the exclusion of any proprietary interest of LBF. LBIE's status as LBF's secured creditor appeared both in LBIE's and LBF's accounts, and constituted the basis upon which LBIE considered itself able properly to satisfy compliance with the capital adequacy regime introduced pursuant to the Directive. Both LBIE and LBF benefited from the conduct of the Automatic Rascals process on that basis and, in so far as it was intended thereby to confer the requisite capital adequacy upon LBIE, so did LBIE's unsecured creditors stand to benefit in the event of its insolvency. The conduct of the Automatic Rascals process on an assumption that the on-legs thereby conferred absolute title on LBIE was part of a course of dealing which both preceded and followed the acquisition of the securities which are the subject matter of this application.

347. In those circumstances I consider that the legal requirements for the establishment of an estoppel by convention are satisfied. Having for many years obtained the benefit of LBIE's acquisition from the street for securities for its book, without paying cash up front but on the assumption that LBIE became by the Rascals process a secured creditor, I consider that it would now be unconscionable for LBF to resile from that convention as to the effect of the on-legs of the Automatic Rascals repos. The requirement that the conventional understanding was sufficiently shared between LBIE and LBF, and that LBIE assumed an element of responsibility for it seem to me fully satisfied by their adoption of a mutual system of book-keeping which recorded LBIE as a secured creditor, and by LBF's acquiescence in circumstances where, but for the effective transfer of beneficial title, LBIE would have been unable to satisfy itself that it could continue to act as LBF's agent or broker in the acquisition of securities from the street, consistent with its capital adequacy and regulatory obligations.

348. Before leaving this aspect of the case I must briefly mention an alternative fall-back submission by Mr Moss as to the basis upon which the Rascals on-legs might properly be regarded as having been effective to confer upon LBIE absolute title to the underlying securities in circumstances where, contrary to my finding, it were

concluded that LBIE had not paid for the purchase price under the on-legs. Mr Moss's submission (devised as will appear, for the purpose of giving LBF a leg-up in the next stage of the analysis) was that LBF could be said to have waived the requirement for simultaneous payment as a condition for the transfer of title. On a like for like basis, Mr Moss submitted that a similar waiver should be identified in relation to the passing of title back to LBF on every off-leg. Thus the daily repos should be analysed, he said, as a series of transactions under which title passed to and fro between LBIE and LBF, but without payment ever being made one way or the other on either leg of the transaction.

349.   Mr Moss's ingenious purpose for deploying that analysis was to ground a submission that, without payment of the repurchase price under the final off-legs which occurred when the Automatic Rascals was switched off a week after the collapse, LBF could recover its proprietary interest in the underlying securities without payment to LBIE.

350.   I have not been persuaded that the mutual and comprehensive waiver of all payment obligations under the repo transactions is a viable analysis, for two related reasons. The first is that I cannot envisage how the parties could properly have recorded LBIE as a secured creditor for the off-leg purchase price in circumstances where, by conduct, they had established a course of dealing which included a commitment by LBIE to return LBF's interest in the underlying securities on the off-leg without ever demanding simultaneous payment. To treat the repos as conferring security upon LBIE in those circumstances would be a mere sham.

351.   Secondly, that analysis would have the consequence that for part of every day during a series of automatic repos, that is the period between settlement of the off-leg and settlement of the on-leg of the next repo, beneficial title would lie in LBF rather than LBIE, so that LBIE would for that period be in breach of its capital adequacy obligations, any regulatory requirements for segregation and would (or at least as the parties feared) lack title for the lending of the underlying securities to the street. Mr Moss, with some support from Mr Dicker, submitted this mattered not if the time for measuring compliance with LBIE's capital adequacy and regulatory obligations was, on each day, at a moment when there was an on-leg in place. For the reasons which I have already given, I am wholly unpersuaded by that submission.

### The Final Off-Leg

352.   The primary case advanced on behalf of LBF (and the other respondents engaged in Automatic Rascals with LBIE) was that since LBIE never acquired absolute title under the on-legs, the consequences, if any, of the final off-legs which occurred upon the switching off of the Automatic Rascals process do not matter. I have rejected that case.

353.   Nonetheless LBF advanced a number of alternative submissions as to why, even if at the moment of collapse LBIE enjoyed absolute title to Automatically Rascalled securities, it nonetheless transferred a beneficial interest back to LBF when the process was switched off. LBF's case may be summarised as being first, that this is what the final automatic book entries showed, namely that LBIE in fact transferred back beneficial title without insisting on payment by LBF. Alternatively LBF alleges that because of its letter to LBIE terminating its authority to transact on its behalf, sent on 16th September 2008, the Automatic Rascals process ended with the off-leg which

immediately followed LBIE's receipt of that letter, all subsequent repos being unauthorised. LBF advances the same case as to the consequences of the settlement of that off-leg as it does in relation to the final off-leg recorded as taking place on 23rd September.

354. For their part the Administrators submit that beneficial title did not pass back to LBF on the final off-leg for any one or more of the following reasons:

    i)      It was never paid for the repurchase of the securities by LBF.

    ii)     Equivalent securities were not appropriated by LBIE to any trust in favour of LBF.

    iii)    The repurchase contract constituted by the off-leg was not specifically enforceable.

    iv)    A proprietary remedy is excluded by the GMRA.

Those submissions would all apply equally to the off-leg on 23rd September and to the off-leg following receipt of LBF's termination letter on 16th September. Finally, the Administrators submit that, to the extent that LBF's case depends upon the off-leg recorded as occurring on the 23rd September, this was the result of an unauthorised action taken by an employee of LBIE, contrary to paragraph 64 of Schedule B1 to the Insolvency Act 1986.

355. It is convenient to begin the analysis of this final stage, as between LBIE and LBF, by a summary of the relevant facts. On 15th September 2008, when the Group collapsed, there existed on-legs in relation to all securities with which this application is now concerned, as between LBIE and LBF, for which, as I have found, LBIE had paid by offset, and pursuant to which LBIE therefore had absolute title to the underlying securities.

356. As at that date, LBIE was a secured creditor of LBF in (at least) the aggregate amount of all the off-leg repurchase prices of those repos, together with the aggregate amount of the off-leg repurchase prices of repos relating to all other Automatically Rascalled securities, most of which are no longer in LBIE's depots. As was well known to both parties and (in due course) to their office-holders, there was no prospect that LBF would be able to pay those debts, and LBIE's only effective security for payment consisted in a refusal to re-transfer to LBF any proprietary interest in equivalent securities, and a consequential right to realise such corresponding underlying securities as it held in its depots, for the benefit of its unsecured creditors.

357. Both on 16th and 23rd September, the parties' mutual computerised book-keeping system was still up and running, and recorded apparent settlements of all repo off-legs due to take place on those two dates. On both occasions the accounting system showed LBF's secured debt to LBIE as replaced by an unsecured debt. On 16th September this was immediately replaced by a secured debt for the off-leg of the new repo apparently contracted on that day. On 23rd September no reinstatement of LBIE as LBF's secured creditor occurred, so far as appears from the automatic book entries.

358. The electronic processes which led to that result on 23rd September resulted from a decision by an employee of LBIE, for which no specific authority had been obtained from the Administrators, to set all the eligibility tags for Automatic Rascals in relation to the relevant securities from eligible to ineligible. But for that switching, Automatic Rascals would have continued in relation to the underlying securities between LBIE and LBF, potentially *ad infinitum* but in reality either until the relevant computers broke down, or until the process was switched off in some other manner.

359. The electronic recording of the settlement of the final off-legs on 23rd September occurred not because of the conscious decision of an individual to waive any condition of payment by LBF, but simply because the computer programme had been set up from the outset on an assumption that, immediately after any off-leg, there would either be a new on-leg or the settlement of a sale of the underlying security to the street. It is possible to see, with the benefit of hindsight, why such accounting entries would ordinarily follow from the switching of all eligibility tags to ineligible, but I consider it most unlikely that the individual who took the decision to switch the tags either appreciated that this would be what would then occur, still less that the final automatic book entries would be used as the basis for a case that LBF rather than LBIE now has beneficial title to the surviving underlying securities. All that the evidence shows is that the decision to switch the tags was taken in the belief that this was consistent with the blanket instructions given by the Administrators on 15th September, because it prevented LBIE from entering into any new Automatic Rascals transactions with LBF.

360. In my judgment neither on 16th nor 23rd September did the repo off-legs recorded in the parties' mutual electronic records have the effect of bringing about a transfer back to LBF of any proprietary interest in the underlying securities, save only in the sense of a momentary transfer on 16th September if, but only if, the on-leg of the next repo which is recorded as having then followed was authorised by LBF.

361. At the outset, I consider it strictly unnecessary to decide, one way or the other, whether the final authorised repo had its off-leg on 16th or 23rd September. My reasons for concluding that in neither case did LBF thereby reacquire a proprietary interest (other than momentarily on 16th) are based upon an analysis of whichever of the two was the last authorised transaction between the parties. Should it matter to a higher court, I would have concluded that LBF's instruction to LBIE on 16th September was insufficient to terminate the process of daily repos, because (by contrast with transactions with the street) the computerised process by which the Rascals repos were transacted did not require LBIE to act as LBF's agent. Each transacted with the other as principal.

362. Whichever it was, it is clear that LBF did not pay LBIE the repurchase price. In my judgment LBIE did not waive compliance with that repayment obligation as a condition for the passing back to LBF of a proprietary interest in the underlying securities. On my analysis of the way in which the daily repo process operated, LBIE had on every previous occasion been paid the repurchase price by offset against its payment obligation on the next repo, and title had momentarily gone round in a circle from LBIE to LBF and then back to LBIE on settlement of that further on-leg.

363. The mere fact that a computer programme was set up on a particular assumption (namely that any off-leg would be followed by an on-leg or by a re-sale of the

underlying security to the street) does not have the consequence that, when the computer mindlessly performed the same steps in the wholly different circumstances prevailing at the moment of the settlement of the last off-leg, its mechanical recording of the book entries which I have described means that LBIE either waived its right to payment, or transferred any   proprietary interest to LBF.  On my analysis, on no previous occasion had title actually passed even momentarily back to LBF until payment by offset, and on the assumption that the off-legs and on-legs on any particular day were in terms of book entries separated in time, that momentary passing of title back to LBF did not occur merely because of the book entries made by the accounting computer at the moment of apparent settlement of the off-leg.

364.   Even if my primary analysis were held by a higher court to be wrong, such that there was some kind of habitual waiver of payment on the off-leg, I consider it entirely wrong to infer that any such waiver also occurred on the final off-leg, in the wholly different circumstances (by comparison with all those that gone before) that:

   i)     there was never to be another on-leg;

   ii)    the securities were not being sold to the street; and

   iii)   LBF's insolvency meant that it was never going to pay the repurchase price in any other way.

365.   It follows that I accept, as conclusive for all present purposes, the Administrators' first submission.  Had it been necessary to consider the others, I would not have accepted them.  While I acknowledge that the obligation of the off-leg seller under a repo is ordinarily a merely personal obligation which, because it relates only to equivalent securities, involves no trust of securities pending appropriation, the relevant fact-pattern for present purposes is that on 16th and/or 23rd September LBIE either held equivalent securities in a depot account, or held rights under repos or stock loans with the street to acquire equivalent securities which have since become identifiable by the reacquisition of such securities and their lodgement in a depot. When it is borne in mind that, from start to finish, LBF's proprietary interest consists not of an exclusive interest in any particular securities, but of a co-ownership interest in a fund, it seems to me that the reacquisition of a fund of equivalent securities constitutes a sufficient appropriation for present purposes to clothe a proprietary interest of that kind with sufficient substance to enable it to be regarded as the subject matter of a trust.

366.   In my judgment Tailby v. Official Receiver is sufficient authority for there being no need for the repo off-leg to be specifically enforceable, and for a sufficient appropriation to take place in the future, by LBIE's subsequent acquisition of equivalent securities.

367.   It will be apparent that I have not found it necessary to determine whether the Administrators' case that the switching off of Automatic Rascals was unauthorised is well-founded.  Nonetheless I will briefly address it, against the risk that it should become material on appeal.  Conceptually, it is tempting to regard a switching-off process designed to prevent new transactions occurring as both consistent with the Administrators' blanket instruction and as falling short of the exercise of a management power within the meaning of paragraphs 64(2)(a) of Schedule B1.  But

that is I think to ignore the way in which the switching-off process actually operated if, contrary to my conclusion, it had the effect of releasing rather than enforcing LBIE's security for payment of LBF's debt, by actually transferring back to LBF a proprietary interest in the underlying equivalent securities. The Automatic Rascals process could have been switched off in a manner which did not have that effect, for example by making sure that the book entries did not record a settlement of the final off-legs. That might have required assistance from persons with considerable IT skill and experience, but it would not have been impossible. If the Administrators had even known of the Automatic Rascals processes during their first week in office, I consider that they could have exercised their management powers in a way which did not even appear to release LBIE's security for payment of LBF's debts. Since the switching off of Automatic Rascals was carried out in a way which interfered with the ability of the Administrators to take that course, I consider that, had it otherwise been effective to transfer a proprietary interest in the underlying securities back to LBF, it infringed paragraph 64.

368. At a very late stage in the hearing, the point was taken that paragraph 64 of Schedule B1 does not spell out the consequences of an infringement of it, as between the company in administration and any third party. But in my judgment a third party who or which deals with a company in administration or with an officer of that company in circumstances which involve the company or its officer committing a breach of paragraph 64, without any step being taken by the administrators to confer actual or ostensible authority for the purposes of the relevant exercise of the management power, cannot complain of the administrators' recourse to paragraph 64 on the basis that the management power was exercised without their authority. Were it necessary to do so, I would conclude that a third party would be unable to avoid the consequences, even if it was equity's darling i.e. a *bona fide* purchaser for value without notice of the infringement. In the present case, since LBF neither could nor did pay the repurchase price, it was nothing more than a volunteer, in relation to the proprietary interest which it alleges it received as a result of the switching off of Automatic Rascals.

## Conclusion

369. For the reasons thus far given, I have therefore concluded that, in relation to securities which were, at the moment of LBIE's collapse, the subject matter of Automatic Rascals, LBF has no proprietary interest in such securities.

## Manual Rascals

370. The analysis of the Manual Rascals transactions between LBIE and LBF largely follows the above analysis of the Automatic Rascals process, but is simpler because of the absence of any repeated one day repos, and the concession by LBF that Manual Rascals transactions have all remained open since the collapse.

## The On-Legs

371. Mr Moss advanced substantially the same "no payment by LBIE" submission in relation to the stock loans under Manual Rascals as he did in relation to the repos under Automatic Rascals. For the most part, those submissions also fail, for the reasons which I have already given. In relation to stock loans instituted on the same

day as the settlement of the acquisition from the street, there is in my judgment no relevant distinction between Automatic and Manual Rascals in relation to the first (and, for a stock loan, only) on-leg.

372.    In relation however to stock loans instituted on a later date, there is at first sight less force in my conclusion that the acquisition from the street required no funding from LBF or therefore from LBHI within the meaning of clause 1 of the ICFA. Pending the putting into place of a stock loan, it may be said that, for a brief period, the acquisition from the street was funded by an unsecured debt due from LBF to LBIE, rather than by LBIE's payment obligation under the on-leg. The period between the settlement of the acquisition from the street and the on-leg under the stock loan is not so obviously a mere *scintilla temporis*, without legal or commercial consequences.

373.    Nonetheless, by parity of reasoning with the purposive analysis which I have applied to the funding issue in relation to Automatic Rascals, it cannot objectively have been the parties' intention that the deeming provisions of clause 1 of the ICFA should be applied to the question whether or not LBF was a debtor for the acquisition price from the street, so as to provide the offset against LBIE's payment obligation in relation to the on-leg. To treat the effectiveness of the Manual Rascals process as depending in each case upon whether the stock loan was entered into on the day of the settlement with the street, or on some later date, seems to me commercially incomprehensible. It would in any event have no impact at all on the outcome of the alternative case based upon estoppel by convention. Furthermore the alternative analysis by way of habitual waiver of payment obligations is no more persuasive, not least because LBIE is recorded as a secured creditor of LBF in relation to stock loans in exactly the same way as it is in relation to repos. Perhaps more importantly, the waiver analysis in relation to stock loans takes LBF nowhere because it is not suggested that the relevant stock loans have ever closed.

374.    There might have been some substance in treating delayed stock loans as falling within a separate category from other Rascals processing (so far as concerns the applicability of the case based on the ICFA) if there was evidence that they had been recorded in the parties' mutual records any differently from other Rascals transactions. On the contrary, LBIE is shown as LBF's secured creditor just as much in relation to delayed stock loans as it is in relation to automatic repos and immediate stock loans, at least in the sense that there was no submission or evidence to the contrary.

**After the Collapse**

375.    Mr Moss very fairly acknowledged on behalf of LBF that if his submissions as to the absence of any passing of title on the on-leg under the stock loans did not prevail, then absolute title to the underlying securities rested with LBIE at the time of the collapse. Nonetheless he and the other respondents advanced a claim for a beneficial interest under a resulting trust, of the Barclays Bank Limited v. Quistclose variety. The argument ran as follows. The main purpose of Manual Rascals was to facilitate LBIE's lending of the underlying securities to the street, in the course of its business. Once LBIE ceased business, that purpose became impossible of fulfilment. Accordingly, but by way of resulting trust, LBIE should be regarded as holding the underlying securities upon trust to give effect to the same proprietary interest in LBF as had preceded the putting in place of the stock loans pursuant to Manual Rascals.

376.    As authority for that argument Mr Moss took me to the thorough analysis of the <u>Barclays v Quistclose</u> resulting trust in Lord Millett's dissenting speech in <u>Twinsectra Limited v. Yardley</u> [2002] 2 AC 164, at paragraphs 68-100. The gist of Lord Millett's analysis (and in this respect he was the only one of their Lordships to express any view on the subject, rather than a dissenter) was that if A transfers money or other property to B to be used only for a specific purpose, then B obtains no beneficial interest in the property, but holds it as a fiduciary, first to use it if possible for that purpose, and if not, on resulting trust for A. Such an arrangement "prevents the borrower from obtaining any beneficial interest in the money, at least while the designated purpose is still capable of being carried out" (paragraph 69). The question in every case "is whether the parties intended the money to be at the free disposal of the recipient" (paragraph 74). "The duties are fiduciary in character because a person who makes money available on terms that it is to be used for a particular purpose only and not for any other purpose thereby places his trust and confidence in the recipient to ensure that it is properly applied. This is a classic situation in which a fiduciary relationship arises, and since it arises in respect of a specific fund it gives rise to a trust." (paragraph 76).

377.    Lord Millett concluded as follows, at paragraph 100:

> "As Sherlock Holmes reminded Dr Watson, when you have eliminated the impossible, whatever remains, however improbable, must be the truth. I would reject all the alternative analyses, which I find unconvincing for the reasons I have endeavoured to explain, and hold the *Quistclose* trust to be an entirely orthodox example of the kind of default trust known as a resulting trust. The lender pays the money to the borrower by way of loan, but he does not part with the entire beneficial interest in the money, and in so far as he does not it is held on a resulting trust for the lender from the outset. Contrary to the opinion of the Court of Appeal, it is the borrower who has a very limited use of the money, being obliged to apply it for the stated purpose or return it. He has no beneficial interest in the money, which remains throughout in the lender subject only to the borrower's power or duty to apply the money in accordance with the lender's instructions. When the purpose fails, the money is returnable to the lender, not under some new trust in his favour which only comes into being on the failure of the purpose, but because the resulting trust in his favour is no longer subject to any power on the part of the borrower to make use of the money. Whether the borrower is obliged to apply the money for the stated purpose or merely at liberty to do so, and whether the lender can countermand the borrower's mandate while it is still capable of being carried out, must depend on the circumstances of the particular case."

378.    Accepting as I do for present purposes the whole of that analysis, I consider that the assertion of a resulting trust in the present case is manifestly unsustainable, for the following reasons. First and foremost the fundamental purpose and effect of the stock loans was precisely to confer absolute title upon LBIE in relation to the underlying

security, to the exclusion of any continuing proprietary interest in LBF. Secondly, LBIE paid for the transfer of LBF's beneficial interest by lodging collateral of equivalent value. As Mr Moss eventually reluctantly acknowledged, he could not suggest that LBF could enjoy a beneficial interest under a resulting trust affecting the underlying securities without repaying that collateral in full. Thirdly, the effect of the stock loan was not to confer a limited permission (still less obligation) on LBIE to use the underlying securities for a specified purpose, but rather to give LBIE an unfettered right of use, coupled only with a personal obligation to transfer equivalent securities on closure of the stock loan, in exchange for repayment of the collateral. Fourthly, an important purpose of the stock loan (central to its effect for capital adequacy purposes) was in commercial terms to render LBIE a secured creditor of LBF in relation to the return of the collateral. To describe the purpose of the transaction as having become impossible of fulfilment by reason of LBIE's insolvency is completely to ignore the fact that, because of LBF's insolvency, the status of the transaction as conferring security has, for the first time, become of the utmost value to LBIE, and to its unsecured creditors.

379. In short, I find it difficult to conceive of any transaction (other than an outright sale) less amenable to a <u>Barclays v. Quistclose</u> analysis than the stock loans with which this case is concerned.

## Conclusion

380. For the above reasons, I have concluded that LBF is no more entitled to a beneficial interest in securities the subject of stock loans under Manual Rascals than in relation to the repos under Automatic Rascals.

## LBSF

381. I have reached precisely the same conclusions in relation to LBSF's claims as to the ineffectiveness of the Rascals processes as I have in relation to LBF. In certain small respects, Mr Jones for LBSF relied upon aspects of the transactional relationship between his client and LBIE which differed from the pattern in relation to LBF. In particular, LBSF was to a significant extent a single ticket rather than a two ticket participator in acquisition from the street. Mr Jones sought to pray in aid an antecedent to the ICFA between LBSF, LBIE and LBHI, to which Mr Moss for LBF did not have recourse.

382. Nonetheless, for reasons already given, those small differences in the pattern of dealings between LBIE and LBSF give rise to no relevant differences in the process of analysis of LBSF's challenges to the validity of the Rascals processes in conferring absolute title on LBIE. I have taken on board distinct submissions made by Mr Jones for LBSF when addressing the matter as between LBIE and LBF, because it seemed to me that his submissions, if well-founded, would for the most part avail LBF as well. As will be apparent, I have not been persuaded by those submissions. It follows that my conclusions in relation to LBSF, both in relation to Automatic and Manual Rascals, match those which I have described in relation to the claims of LBF.

**LBAH/LBCCA**

383.  No such similar equivalence applies to the analysis required of the extraordinarily complicated position as between LBIE and the two Hong Kong affiliates. The central difficulty lies in finding an interpretation of the Novation and Netting Agreement ("NNA") which makes sense of the very different way in which Automatic and Manual Rascals processes were applied to securities acquired and held by LBIE for the book of LBCCA. Whereas LBAH acted as LBIE's repo counterparty under Automatic Rascals, LBCCA acted as the stock lender under Manual Rascals. Whilst it is therefore necessary to analyse Automatic and Manual Rascals separately, an attempt to understand the meaning and operation of the NNA which is based upon an exclusive focus upon one or other of those processes may fairly attract the criticism that it involves the wearing of blinkers. I shall therefore begin by addressing the interpretation of the NNA by reference to the whole of LBIE's activity of the acquisition and Rascalling of securities for the Hong Kong affiliates, before addressing the effectiveness of each of the Automatic and Manual Rascals processes separately.

384.  While the court is of course entirely neutral as between the parties in relation to a dispute about the meaning of an agreement, where (as here) the competition is between a party which asserts that the agreement is effective to achieve its obvious purpose, and a party which asserts that it is not, then the court is in my judgment obliged to search for an interpretation which achieves rather than destroys that purpose (i.e. *ut res magis valeat quam pereat*), albeit not to re-write the parties' bargain. The court's duty is in that respect no different from that which it faces when confronted by rival interpretations of a commercial agreement, one of which makes commercial sense, and the other of which produces a commercial nonsense.

385.  Mr Dicker's primary submission, for LBCCA and LBAH, was that whatever the meaning and effect of the NNA in relation to inter-company debts between its parties, it had no effect at all in relation to proprietary interests in securities. The result was that a proprietary interest in securities acquired for LBCCA's book could not be transferred to LBIE by anyone other than LBCCA. Since LBCCA was not a party to the relevant Rascals agreement (the MPRA between LBIE and LBAH of November 1997), nor (according to the electronic book entries), the on-leg seller under any of the repos entered into under the Automatic Rascals process, that process must therefore have been wholly ineffective to transfer any proprietary interest of LBCCA in the underlying securities. The implication behind Mr Dicker's submissions was that the decision that the Automatic Rascals process should be put in place between LBIE and LBAH rather than between LBIE and LBCCA was simply a dreadful mistake, from the consequences of which LBIE is now unable to escape.

386.  Conversely, although this was not part of his primary case, Mr Dicker pointed out that if the NNA was in some way effective to confer upon LBAH the necessary title with which to effect Automatic Rascals transactions with LBIE, then it is difficult to see how it could be construed so as to leave LBCCA with the requisite title for the purposes of Manual Rascals transactions with LBIE. His point was that there was no uniform interpretation of the NNA which extended its effect to proprietary interests in securities in a way which made sense of the parties' subsequent dealings.

387.    Mr Dicker submitted, and I agree, that the starting point is to understand what the word "deliverable" means as part of the definition of "Inter-Company Balance" in clause 1 of the NNA, and as part of the phrase "or more than one security is deliverable under two or more balances" in clause 7.1, under the heading Settlement Netting.  In the latter context he took me to paragraph 1-006 of Wood on Set-off and Netting, Derivatives, Clearing Systems (2nd edition) which, he submitted, suggested that the settlement netting of deliverables normally relates to personal obligations to deliver securities due for performance on the same day.  In relation to novation netting he took me to paragraph 12.09 of Benjamin on Finance Law which, he submitted, suggests that novation netting is generally concerned with fungible personal obligations, rather than with proprietary interests.  Next, he handed up some worked examples of the insoluble problems which would occur if the NNA was sought to be applied by way of settlement or novation netting in connection with proprietary interests owned by Hong Kong companies in relation to securities held by LBIE, and proprietary interests of LBIE in relation to securities held by a Hong Kong hub company.  Finally, Mr Dicker submitted that, even though they were made on the same day, it was wrong to treat the NNA and the MPRA as two agreements forming part of a larger overall transaction, so that the interpretation of one could be assisted by reference to the other.  The NNA was, he said, entered into for reasons separate and distinct from the furtherance of the Rascals project.

388.    If Mr Dicker had been correct in his submission that recourse cannot properly be had to the MPRA for the purpose of interpreting the NNA, I would have agreed with him that, looked at purely on its own, it would be difficult to think that the references to deliverables in the NNA extended beyond their normal usage, i.e. to personal delivery obligations due for performance on the same day.  That may fairly be ascribed as the ordinary meaning of the word deliverable in the context of settlement netting and novation netting.  But in my judgment it is not merely permissible but essential to interpret the NNA as part of a package which included the MPRA.  This is not merely because they were made by overlapping (although not identical) parties on the same day, but because there is also a large subject matter overlap between the two agreements, and it is plain from the surviving communications between the parties about their drafting, that the NNA was formulated with the Rascals processes very much in mind.

389.    Although the House of Lords has in Chartbrook Limited v. Persimmon Homes Limited [2009] UKHL 38 very recently upheld the rule excluding the parties' negotiations as admissible guides to the interpretation of their agreement, extrinsic evidence has always been admissible for the purpose of ascertaining, as a surrounding fact, the commercial or business object of the transaction: see Prenn v. Simmonds [1971] 1 WLR 1381 at 1384 per Lord Wilberforce.  It would in my judgment be extraordinary if recourse could not be had to the prior discussions of parties representing associated Group companies for the purpose of understanding whether the NNA had Rascals transactions between its parties as part of its intended subject matter, or whether (which is really the same thing) the NNA and the MPRA of even date were agreements dealing simultaneously with an overlapping subject matter, and therefore each to be construed by reference to the other.

390.    The NNA was of course made between a larger number of parties than the MPRA.  The evidence did not show whether or not similar MPRAs were made between LBIE

and other Hong Kong companies (parties to the NNA) for which LBIE acquired and held securities eligible for Rascalling. That is because no other Hong Kong companies have made claims in relation to any of the securities the subject matter of this application, so that the detail of LBIE's relationship with them has simply not been investigated.

391. Once the NNA and the MPRA are placed on a table side by side, it becomes immediately apparent (at this stage without looking at the parties' subsequent conduct) that their mutual understanding was that the novation provisions of the NNA had the consequence that LBAH rather than LBCCA should be the on-leg seller or stock lender under Rascals transactions, since LBCCA made no similar simultaneous MPRA with LBIE, and since the MPRA between LBAH and LBIE was, on its face, designed to operate as a master Rascals agreement both in relation to repos and stock loans.

392. As at November 1997 there did in fact exist as between LBIE and LBCCA both an OSLA (i.e. a master agreement in relation to stock lending) and a GMRA (in relation to repos), having been made between those parties in March and August 1995 respectively. This is not therefore a case in which there existed no contractual basis for repos and stock loans between LBCCA and LBIE. The significance of the MPRA made between LBIE and LBAH on the same day as the NNA is that because LBAH was purely a financing company with no securities trading activities of its own, the only rational explanation for its entering into an MPRA with LBIE in November 1997 is that it was assumed that it would acquire title to securities eligible for Rascals, by virtue of the NNA, by a process therein described as novation, from some other Hong Kong trading company which did use LBIE for the acquisition and holding of securities. The question is whether any such intention can be seen to be implemented within the NNA by any legitimate process of interpretation, rather than by rewriting it.

393. In my judgment, it both can and should. The answer emerges by way of analogy with the novation of a debt. Clause 6 of the NNA is about novation pure and simple, rather than either novation netting or settlement netting. It is in that respect separate from those conventional contexts as described in the two text books to which Mr Dicker drew my attention. Clause 6.2 applies to all Inter-Company Balances (as defined) and spells out in relation to debts that a debt originally owed, for example, by LBIE to LBCCA should be replaced by two debts, by LBIE to LBAH, and by LBAH to LBCCA. This is described as something which occurs in relation to all "outstanding rights and obligations under such Inter-Company Balances".

394. Clause 6 does not expressly refer anywhere to deliverables, but its application to deliverables is the result of the inclusion of deliverables in the definition of Inter-Company Balance to which I have already referred. Furthermore, it is clear from clause 7.1 that a deliverable is a right and/or obligation in relation to a security.

395. The existence of a trustee beneficiary relationship between LBIE and LBCCA in relation to a security held for LBCCA's account in a LBIE depot creates fiduciary obligations and proprietary rights which, in my judgment, it was intended should be subjected to a process akin to novation. It was not intended that LBCCA should simply transfer its proprietary interest in the underlying security to LBAH for nothing in return. That would be wholly contrary to the purposes of clause 6, in which the

rights of the creditor (here LBCCA) against one debtor (LBIE) are replaced by identical rights against another debtor (LBAH), while LBAH acquires similar rights as against LBIE.

396.   In my judgment that concept may readily be applied to fiduciary obligations and proprietary interests under a trustee beneficiary relationship by the interposition of LBAH in the chain of beneficial title between LBIE and LBCCA.  LBAH thus becomes LBIE's beneficiary, but it holds those rights upon trust for LBCCA as the ultimate beneficial owner.

397.   There is nothing unusual or surprising in the creation of a structure of trusts and sub-trusts between the legal owner and ultimate beneficial owner in relation to intermediated securities.  As Mr Moss submitted it is the very basis upon which the modern system for the intermediation of securities works.  Thus, ignoring Rascals and the NNA for the moment, where LBIE settled into its depot account a security acquired for the book of an affiliate, with the intent that the affiliate should have a proprietary interest in it, there necessarily existed a structure of trust and sub-trust, pursuant to which LBIE has a proprietary interest as against its depository (which holds the legal rights) and the affiliate has a proprietary interest as against LBIE.  Under that structure the depository recognises LBIE as its beneficiary and in turn LBIE recognises the affiliate as its beneficiary.

398.   That analysis of the operation of clause 6 of the NNA in relation to proprietary interests in securities held under a trust will not entirely satisfy a purposive interpretation of the NNA and the MPRA read together unless its effect is also to confer on LBAH as intermediate trustee a right to confer absolute title to the underlying security on LBIE so as, in effect, to overreach LBCCA's ultimate beneficial interest.  Again, I see no reason why such a power to overreach should not be treated as included.  Wherever a trustee sells trust property with the authority of the beneficiary (i.e. pursuant to a power in the relevant trust instrument) that sale necessarily overreaches the beneficiary's proprietary interest in the subject matter of the sale, so that his interest then attaches to the *quid pro quo*, i.e. to the proceeds of sale.  I see no reason why the interposition of LBAH as an intermediate trustee between LBIE and LBCCA should not confer upon LBAH the same power, in relation to the Rascalling by LBAH of the underlying securities, either by repo or stock loan, under the MPRA.

399.   Finally, there remains the apparent inconsistency arising from the fact that whereas LBAH entered into the repos under Automatic Rascals, LBCCA entered into the stock loans under Manual Rascals.  This is not strictly a matter of interpretation, but rather of reconciling an available interpretation with the subsequent conduct of the parties.  In my judgment there is no necessary inconsistency.  An interpretation of clause 6 of the NNA which leaves LBCCA as the ultimate beneficial owner of the underlying security, but with LBAH rather than LBIE as its immediate trustee, nonetheless seems to me to leave LBCCA free to deal with its ultimate beneficial interest, provided only that it has not in the meantime been overreached by a sale, repo or stock loan in relation to that same security by LBAH.  It must be borne in mind in this context that the whole of the Rascals processes involved the affiliates as repo sellers or lenders, not of the underlying securities themselves, but only of such beneficial interest in those securities as they may have enjoyed.

400. I shall now address the effectiveness or otherwise of the Automatic and Manual Rascals transactions entered into respectively by LBAH and LBCCA upon the basis of the interpretation of clause 6 of the NNA at which I have arrived. Because I acknowledge that my interpretation involves at least an extension of the ordinary meaning of the words used, I shall also address the remaining issues on the alternative basis that Mr Dicker's more restricted interpretation of the NNA is the correct one.

## Automatic Rascals

## The On-Legs

401. Besides adopting the submissions of Mr Moss as to the ineffectiveness of the on-leg for the purposes of transferring any proprietary interest to LBIE, Mr Dicker advanced the following main submissions specific to LBCCA/LBAH. First, he said that LBCCA/LBAH simply had no proprietary interest to transfer, because the NNA was on its true interpretation not concerned with proprietary interest in securities. I have rejected that submission, but will return to its consequences if correct. Secondly he submitted that in any case LBAH did not owe LBIE a debt for the acquisition price from the street, to which LBIE could have recourse by way of offset as a means of payment of the on-leg purchase price. In this respect Mr Dicker was assisted by the inter-company records which, as I have described, continued to show LBCCA as LBIE's unsecured debtor for the acquisition price from the street, from the settlement date in relation to any particular security until the following month end. Thereafter LBCCA was shown as owing the acquisition price to LBHI, although this may have been replaced by a novation to LBAH at the year end.

402. I do not accept that submission either. The debt for the acquisition price from the street owed by LBCCA to LBIE was, on any view, an Inter-Company Balance, and therefore liable to be novated pursuant to clause 6 of the NNA. Clause 6.1 provides that:

> "Inter-Company Balance shall be deemed to be novated in accordance with clause 6.2 as of the time immediately after that Inter-Company Balance becomes due and payable, notwithstanding that it may not be shown or recorded in the Balance Ledger at that time."

The "Balance Ledger" is defined as meaning "the ledger of certain balances and debts owing between two Parties and prepared and maintained by LBAH for the purposes, *inter alia*, of this agreement".

403. I was not shown any document or screenshot corresponding to that definition of "Balance Ledger" but it is clear that clause 6.1 was designed to provide for a deemed immediate novation, regardless whether the parties' mutual accounting systems were operated in such a way as to record it as occurring then, or thereafter. If effect is given to that deeming provision, it follows that LBCCA's initial debt to LBIE for the purchase price of any security from the street was immediately novated so as to be deemed a debt owing to LBIE by LBAH, and therefore available by way of offset against LBIE's debt to LBAH for the on-leg purchase price under the first repo.

404.    I have already concluded that from LBIE's perspective the month end novation and netting process between LBIE, LBHI, LBCCA and LBAH had the same effect thereafter as if there had been an immediate novation of the acquisition debt between LBIE, LBAH and LBCCA at the time of the first repo. As Mr Milligan put it, at the month end it all came out in the wash.  That left only an imbalance as between LBCCA and LBAH, in relation to their separate unsecured accounts with LBHI.  For reasons already explained, I have been unable to resolve, without disproportionate further delay and expense, whether this was also resolved at the year end. Whether it was or not, I do not consider that any such enduring imbalance as between LBCCA and LBAH is of any consequence in relation to the question whether the repos between LBAH and LBIE were effective to confer on LBIE absolute title to the underlying securities.   LBIE was entitled to engage in repos with LBAH on the footing that there had been a deemed novation of LBCCA's acquisition debt to LBAH, whether or not LBAH, LBCCA and LBHI followed through the consequences of the novation in their mutual accounting.

405.    I turn to deal with the consequences in terms of the effectiveness of the repo on-legs in the event that Mr Dicker's interpretation of the limited scope of clause 6 of the NNA should prevail in a higher court.  Mr Milligan advanced an alternative case based on estoppel by convention, but he never resiled from his primary submission that LBCCA never acquired a proprietary interest in the securities in the first place.  I shall deal with that question first.

406.    I have already concluded that, prior to the implementation of Rascals, the consensual basis upon which LBIE acquired, settled and held securities for the accounts of its affiliates was not such as to confer a proprietary interest on the affiliates.  By contrast, I have concluded that, once LBIE and any particular affiliate restructured their relationship so that eligible securities would be the subject of Rascals processing, this necessarily involved the initial conferral of some proprietary interest in eligible securities upon the affiliate.

407.    Mr Dicker's primary case, based upon an interpretation of the NNA which rendered it inapplicable to proprietary interests in securities, was of course that LBCCA had no part at all in the supposed Automatic Rascalling of its eligible securities, the whole process taking place, by virtue of a ghastly mistake, between LBIE and LBAH.  If that be right, then I consider that the basis of my conclusion that, following the implementation of Rascals, a proprietary interest in securities eligible for Automatic Rascals was conferred upon affiliates is simply inapplicable to LBCCA.  Mr Dicker had no cogent answer to this conundrum when I raised it with him as a possible outcome during his closing submissions.

408.    On any view, LBIE continued to deal with securities acquired for LBCCA's book, after the implementation of Rascals, with the same liberty to use them for the purposes of its own business as it had done prior to 1996.  Since the parties used and had access to a Group-wide mutual system of book-keeping, it is in my judgment unreal to suppose that LBIE's use of those securities was unknown to LBCCA, or that, unless and until LBCCA participated in the Rascals processes it thought that, for the first time in 1996, LBIE would cease using securities held for its book as it had done since 1993.

409.    The question whether there arose an estoppel by convention between LBIE and LBCCA is by no means straightforward.  At the heart of the Administrators' similar case against LBF and LBSF was the fact that, from start to finish, those two affiliates constantly recorded LBIE as a secured creditor in respect of the off-leg repurchase prices.  So did LBAH, but of course LBCCA did not.  Nonetheless, LBCCA had full access to the ITS accounts system, which for almost ten years from 1997 constantly recorded the Automatic Rascalling by LBAH of what (on this analysis) were LBCCA's securities, without a word of protest.  Furthermore LBCCA was no less privy to the purposes for which the Rascals processes had been instituted than any other affiliate, being one of the Hong Kong sub-group of companies all of which were represented in discussion about the Rascals process by the same individuals.

410.    Issues as to whether a person alleged to be subject to an estoppel by convention has sufficiently "crossed the line" as to make itself responsible for the conventional understanding in question normally arise between persons dealing with each other at arm's length.  In the exceptional circumstances constituted by the fact that all the potential parties to the convention estoppel here relied upon are co-subsidiaries or sub-subsidiaries of the same holding company, doing business for the benefit of common shareholders, using a common accounting and book-keeping system, and sharing the services of individuals employed on a non-exclusive basis, it seems to be that the necessary sharing or acquiescence is capable of being established by those features rather than, as would be necessary in an ordinary case, by some specific "crossing of the line" between persons dealing at arm's length.  Accordingly, although with rather less confidence than in relation to LBF and LBSF, I have concluded that if it had been necessary for the Administrators to rely upon a convention estoppel for the purpose of preventing LBCCA now from denying that the Automatic Rascals on-legs were effective in relation to any proprietary interest of its own in the underlying securities (whether because of want of title or non-payment by LBIE), the Administrators' case in that regard ought to succeed.

411.    I have considered whether the possibility that LBCCA and LBAH failed ever to record in their books a novation to LBAH of LBCCA's acquisition debt means that the recognition of a convention estoppel would now work an injustice to either of them, or to any other person. It will be recalled that I have been unable to decide, without disproportionate delay, whether this was or was not done at the year end. Mr Dicker submitted that it would not be just for LBCCA to lose any proprietary interest in the underlying securities while at the same time owing LBHI the full acquisition debt from the street.

412.    I am not persuaded that there would be any relevant injustice. The fact that LBCCA, LBAH and LBHI may, as between themselves, have failed to reflect in their mutual accounting the consequences of the Automatic Rascalling of LBCCA's securities which was obviously intended strikes me as an internal matter between them. It had no consequences as between them as a group and LBIE since, as I have described, it all came out in the wash at each month end. LBHI has declined despite invitation to participate in this application.    LBCCA and LBAH have not asked the court to adjudicate on any issues as to beneficial ownership which might have arisen between them, the inference being that any such question can be resolved between them, without the assistance at least of the English court. As I see it, the imbalance which would remain if the year end adjustments were not made is an imbalance essentially

between LBCCA and LBAH, in their respective inter-company accounts with LBHI. It is not one with which this court need be concerned.

413.   Mr Dicker's last line of defence was that even if an estoppel might be established, it would not rescue LBIE from the requirement for writing imposed by s. 53(1)(c) of the Law of Property Act 1925. He relied by analogy upon the *obiter dicta* of Lord Scott in <u>Cobbe v Yeoman's Row Management Ltd</u> [2008] 1WLR 1752, at paragraph 29, to the effect that estoppel could not be relied upon as an answer to s. 2 of the Law of Property (Miscellaneous Provisions) Act 1989. If the NNA did not confer LBCCA's interest in the underlying securities upon LBAH, then there was, said Mr Dicker, no writing capable of validating any disposition of that interest, whether upon LBAH of LBIE.

414.   Mr Milligan sought to meet that ingenious point by reference to <u>Vandervell v. IRC</u> [1967] 2 AC 291.  But that case only establishes that s.53 has no application to a disposition by the trustee which, at the beneficiary's direction, carries with it the beneficial interest as well; see per Lord Donovan at pp. 317-8.  In my judgment the real answer is that the estoppel merely prevents LBCCA from denying that LBAH was, by the NNA, constituted an intermediate trustee for LBCCA of its interest in the underlying securities. That was not itself a disposition of LBCCA's equitable interest. The transfer of LBCCA's equitable interest to LBIE was itself achieved by LBAH's participation in the Automatic Rascals process with LBIE which was itself fully documented, albeit electronically, by ITS.  Accordingly the s.53 point fails.  For completeness I should say that I have reached no conclusion as to whether Lord Scott's dictum in <u>Cobbe v. Yeoman's Row</u> is applicable to s. 53.  If it is, it may be that a number of the cases which have recognised convention estoppel might need to be reconsidered.

**<u>The Off-Legs</u>**

415.   Mr Dicker did not advance any submissions in relation to the consequences of the switching off of the Automatic Rascals process following the collapse, different from those advanced by Mr Moss and Mr Jones on behalf of LBF and LBSF.  Nonetheless, the Administrators sought to introduce a specific alternative case against LBAH arising from the provisional winding up order made against that company on 19th September 2008, and what by common consent was therefore a consequential event of default under clause 10 of the applicable GMRA.  I found it unnecessary to determine those issues, which include complicated questions of timing, as between the moment of the winding up order in Hong Kong and the question whether (contrary to my view) there was an on-leg or off-leg in relation to any particular repo during part of a business day.  The issues are all questions of law arising upon facts which are either not in dispute, or which I have determined, and can therefore be addressed without a re-trial by a higher court if necessary.

**<u>Conclusion</u>**

416.   For the above reasons, I have concluded that in relation to securities remaining in LBIE's depots for the book of LBCCA (or LBAH) which were, actually or apparently, the subject of Automatic Rascals processing between LBIE and LBAH, neither LBCCA nor LBAH retains any proprietary interest in them.

**MANUAL RASCALS**

417.    Under this heading, the salient facts are that:

   i)    LBCCA rather than LBAH was the lender under each relevant stock loan.

   ii)    The parties' mutual records consistently showed LBIE as LBCCA's secured creditor in relation to its right to repayment of collateral.

   iii)    LBIE's obligation to pay collateral on the on-leg of each stock loan does not specifically appear as an entry on the unsecured inter-company account between LBIE and LBCCA.  Nonetheless it is possible to identify a connection between that obligation of LBIE and a receivable shown on LBCCA's inter-company account with another Hong Kong affiliate, namely LBACC, in each case arising as a result of the funding arrangements in existence between the Hong Kong companies.

   iv)    As with LBF and LBSF, all the stock loans remained open after the collapse, and it is not suggested that LBCCA has, or could, repay any of the collateral for which LBIE continues to be shown in their mutual records as a secured creditor.

418.    On the interpretation of the NNA which I consider to be correct, there is nonetheless no title impediment which would have prevented LBCCA from making a stock loan to LBIE of its ultimate beneficial interest in the underlying securities.  That is not because clause 6 of the NNA operated only in relation to securities eligible for Automatic Rascals, but because clause 6 did not prevent LBCCA from remaining the ultimate beneficial owner of them, with power to deal with its beneficial interest, subject only to any prior disposal of it by LBAH, by an authorised transaction as LBCCA's immediate trustee.

419.    There is nonetheless a real problem with LBIE's case that LBCCA owed it a debt for the acquisition price from the street, against which LBIE could offset its obligation to pay collateral on the on-leg.  If, as I have concluded, the effect of clause 6 of the NNA was to cause an immediate novation of that debt, so as to replace LBCCA with LBAH as LBIE's debtor, then there was on the face of it no immediately available offset to which LBIE could have recourse against LBCCA, by way of payment.  Of course, the parties' mutual book-keeping did not show LBCCA's debt to LBIE as being novated to LBAH, at least before the year end, but in that respect clause 6.1 of the NNA contains a deeming provision which, at least as a matter of contract, overrides the absence of contemporaneous book-keeping entries.

420.    The reality however is that LBCCA did get the benefit of LBIE's payment of collateral, not directly, but by the "around the houses" process which led in every case to LBCCA being credited with an equivalent amount in its inter-company account with another Hong Kong affiliate, LBACC.  Mr Dicker very fairly acknowledged that if these accounting entries were capable of amounting to a process of payment, then LBCCA could not assert that it had not been paid the collateral in respect of the stock loan on-legs.

421.   On any view, it seems to me that the constant recognition in LBCCA's and LBIE's mutual records that LBIE was a secured creditor of LBCCA in relation to the return of the collateral makes the alternative case for the establishment of a convention estoppel (sufficient to prevent LBCCA from denying the effectiveness of the stock loans as a means of transfer of LBCCA's beneficial interest to LBIE) just as strong as it is in relation to LBF and LBSF.

422.   As for the consequences of the collapse in relation to Manually Rascalled securities, as between LBIE and LBCCA, Mr Dicker did not advance any alternative submissions to those put forward by Mr Moss and Mr Jones on behalf of LBF and LBSF.   For the reasons already given, I consider that those submissions do not prevail.

## Conclusion

423.   It follows that for the above reasons, neither LBCCA nor LBAH retain any proprietary interest in securities which remain in LBIE's depots, to the extent that those securities were subjected to Manual Rascals processing.

## LBI

424.   The issue as to the effectiveness of Rascals processing as between LBI and LBIE for the purpose of passing title to LBIE seems to me, by comparison with the issues relating to the other respondents, very straightforward indeed.   The salient facts may be summarised as follows:

   i)      There were no Automatic Rascals transactions between LBIE and LBI.

   ii)     LBIE holds securities in its depots in respect of which, at the time of the collapse, there have been identified thirteen open stock loans by LBI to LBIE. Of those, three of them are accompanied by evidence of payment by LBIE to LBI of the collateral.   As to the remaining ten, there is, as at today, no such evidence.

   iii)    The ordinary process of pay-down on a daily or similar basis between LBIE and LBI means that, in respect of the acquisition of the underlying security from the street, LBI has paid LBIE in full and that, where (in relation only to three of the stock loans) there are book-keeping entries recording LBIE's liability in relation to collateral, that has also been paid.

425.   Those facts mean first that none of the issues about non-payment for the on-leg of the stock loan caused by inter-company funding agreements between LBIE and the other respondents affect the issue as between LBIE and LBI.   The only question arising in relation to the on-leg is a purely factual one, namely whether there is any evidence at all sufficient to show the recording and consequential pay-down of LBIE's obligation to pay collateral.

426.   Mr Milligan did not suggest, in relation to securities for which there was a stock loan but no evidence of payment of collateral, that title nevertheless passed to LBIE by way of waiver of the payment obligation, or by estoppel.   He accepted, rightly in my

view, that the Administrators' case in relation to the 13 stock loans depended upon proof of payment.

427. Mr Milligan submitted that I should answer the on-leg question in purely formulaic terms, leaving on one side the evidential question whether by further research the Administrators can show that payment of the collateral was booked. For LBI Mr Brindle submitted in closing that the Administrators have had quite enough time to research this question in relation to the small number of relevant securities, that the Administrators have failed to demonstrate any evidence sufficient to support a conclusion that the collateral was paid, and that there should now be an end of the matter in relation to those ten stock loans.

428. While I have considerable sympathy for Mr Brindle's submission, it has from start to finish been common ground that I should not on this application delve into disputed factual questions arising in relation to individual securities or transactions. While it may be that there is no basis other than Micawberism for Mr Milligan's suggestion that, even now, something might turn up to prove payment of the collateral, I consider that I should simply decide at this stage that, in relation to stock loans for which LBIE cannot prove payment of collateral, the beneficial interest in the underlying securities rests with LBI.

429. As for the remaining three stock loans, in which there is evidence of the booking (and therefore payment at the next pay-down) of collateral, Mr Brindle did not offer any submissions other than those already advanced in relation to Manual Rascals by the other respondents, as to why LBIE should not now be regarded as having absolute title to the underlying securities, it being common ground that LBI has neither repaid, nor is in a position to be able to repay, the collateral. Accordingly I conclude that in relation to those three stock loans, LBI has no proprietary interest in the underlying securities to the extent that they remain in a LBIE depot.

430. I fear that Mr Brindle and Mr Milligan may feel slightly short-changed in the sense that I have declined to adjudicate upon the issues of interpretation (pursuant to New York law) and application (in the English law context) of clauses 8.4 and following of the UCCBSA, or upon the issue whether, after 1995, LBI acquired a proprietary interest in non-Rascalled securities. The clause 8.4 issues are matters which, as it seems to me, do not arise on the facts relating to the only relevant Manually Rascalled transactions, since LBI appears to have paid LBIE the acquisition price from the street in full. Non-Rascalled securities are on any view outside the scope of this application, and the evidence about how LBIE used them is not available. It may well be that those issues will arise in relation to such securities transactions. If they do they can be determined as and when necessary.

*****