# Exhibit 50

**If this Transcript is to be reported or published, there is a requirement to ensure that no reporting restriction will be breached. This is particularly important in relation to any case involving a sexual offence, where the victim is guaranteed lifetime anonymity (Sexual Offences (Amendment) Act 1992), or where an order has been made in relation to a young person.**

**This Transcript is Crown Copyright. It may not be reproduced in whole or in part other than in accordance with relevant licence or with the express consent of the Authority. All rights are reserved.**

IN THE HIGH COURT OF JUSTICE                    No. BL-2022-001878
BUSINESS AND PROPERTY COURTS OF ENGLAND
AND WALES
BUSINESS LIST (ChD)
**[2023] EWHC 1024 (Ch)**

Rolls Building
Fetter Lane
London  EC4A 1NL

Thursday, 2 March 2023

Before:

MR JUSTICE TROWER

B E T W E E N :

JAHANGIR PIROOZZADEH                                    Claimant

- and -

(1) PERSONS UNKNOWN CATEGORY A
(2) PERSONS UNKNOWN CATEGORY B
(3) OA CAPITAL HOLDINGS LIMITED
(4) JOANNE INDUSTRY INC
(5) TD BANK NA
(6) KREISSPARKASSE KOELN
(7) BROCKHAUS & KOLLEGEN
RECHTSANWALTGESELLSCHAFT MBH
(8) BINANCE HOLDINGS LIMITED
(9) AUX CAYES FINTECH CO LTD                            Defendants

_____

**J U D G M E N T**

**A P P E A R A N C E S**

<u>MR D ARMSTRONG KC</u> and <u>MISS R MULDOON</u> (instructed by Giambrone & Partners LLP) appeared on behalf of the Claimant.

<u>MR D QUEST KC</u> (instructed by Herbert Smith Freehills LLP) appeared on behalf of the Eighth Defendant.

<u>MS L DE BRUYN</u> (instructed by Cooley (UK) LLP) appeared on behalf of the Ninth Defendant.

_____

MR JUSTICE TROWER:

1    On 18 October 2022, Sir Anthony Mann made an order without notice against the first three defendants restraining them from dealing with the claimant's cryptocurrency in the form of 870,818 USD Tether ("USDT") transferred into the eighth and ninth defendant exchanges from what were described as "five last hop wallets". He also made an order requiring the eighth defendant to preserve the claimant's 479,904 Tether or its traceable proceeds received from three of the five last hop wallets and requiring the ninth defendant to preserve the claimant's 399,914 Tether or its traceable proceeds received from the other two of the identified last hop wallets. Orders were also made for service of the claim form, the order and other documents in the case on the first, second, third, eighth and ninth defendants out of the jurisdiction and by alternative means and for disclosure by the eighth and ninth defendants in exercise of the *Bankers Trust* jurisdiction.

2    On 18 November 2022, which was the return date given by Sir Anthony Mann, Michael Green J continued the injunction over a relisted return date hearing to be fixed by the court with a time estimate of one day. The order recorded that he did so because the eighth defendant had indicated to the claimant that it was proposing to contest the application and the claimant had notified the eighth defendant and the court that he intended to call live evidence from his expert intelligence and tracing firm MITMARK. This is the hearing ordered by Michael Green J.

3    The background can be shortly stated as it appears from the claimant's evidence. During the course of the second half of 2021 (between 29 June and 28 September) the claimant, a resident of Canada, was induced by a complete stranger with whom he had had unsolicited WhatsApp contact to transfer CAD$1,990,051 to two accounts. The first was an account held at the fifth defendant, a US bank, in the name of the fourth defendant also a US entity. The second was an account held at the seventh defendant, a German bank, in the name of the sixth defendant which is a German partnership. The claimant's evidence is that he made transfers to enable foreign exchange trading on an account he was induced to open purportedly with the third defendant, an English company incorporated earlier the same year with a single resident of China as its director and no trading documentation filed. The claimant was then induced to increase his trading capital with the third defendant by transferring eight tranches of Tether to four separate cryptocurrency wallets utilised by the third defendant. These transfers were made over an eighteen-day period in the first half of November 2021 and the total amount transferred was some 870,818 Tether.

4    By early December 2021, the claimant had realised that he was a victim of a scam because his attempts to withdraw funds from his trading account with the third defendant which itself was a sham were unsuccessful. There is strong evidence that he has, indeed, been the subject of a fraud and that is not an issue in the present application.

5    It took the claimant some time to instruct solicitors and experts to identify what had occurred. Solicitors instructed first attempted to discover what had happened during the first part of 2022 and the investigation agents were eventually instructed on 28 June 2022. Around about the same time, and the precise dates do not matter, letters before action to the fraudsters and the banks in relation to the Canadian dollars transactions were sent.

6    The reports the investigation agents produced asserted that it was possible to trace the Tether which had originally been transferred by the claimant to the third defendant's cryptocurrency wallets onwards to the five wallets held with the eighth and the ninth defendants referred to in the order made by Sir Anthony Mann. So far as the eighth defendant is concerned, the evidence is that these were deposit wallets or addresses used by

the eighth defendant's own account holders identified only by number. The actual identity of the users of those five wallets was not publicly available information on the blockchain. The disclosure orders made by Sir Anthony Mann have revealed the identity of the users in whose names these five accounts were then held. It is not said that they are parties to the fraud and they have not been joined to the proceedings. Since the original credits were made to the three accounts held by the other users at the eighth defendant, the Tether balances on those accounts have been reduced to zero or almost zero. All of those transactions emptying the accounts occurred some time before the injunction was granted save for a very small balance on one of them attributable to another transaction.

7    The position is the same so far as the ninth defendant is concerned although it has not formally joined in this application. It has pleaded in its defence and asserted in a skeleton for the purposes of this hearing that the same has happened to the two user accounts held by it. I also understand, although this was not developed in argument before me, that this is claimed to be the position in evidence adduced by the ninth defendant for the purposes of a reverse summary judgment application issued by it some ten days ago but which is not before the court on this hearing.

8    It is convenient to describe at this stage what happens to crypto assets held at a deposit address with the eighth defendant as explained in its evidence. The uncontradicted evidence adduced by the eighth defendant is that the user does not retain any property in the Tether deposited with the exchange. As it is put in Mr Quest's skeleton argument, the user's account is credited with the amount of the deposit and they are then permitted to draw against any credit balance as in a conventional banking arrangement. The Tether, like other crypto assets, are then swept into a central unsegregated pool address known as a "hot wallet" where they are treated as part of the eighth defendant's general assets. They are not specifically segregated to be held for the sole benefit of the user from whose account they have been transferred. This is what happened in the present case. All of the Tether deposited in the three user addresses held at the eighth defendant were swept into one of two hot wallets. Since that exercise was carried out, there have been hundreds of transactions an hour passing through each of the hot wallets which operate as a central pool. It is evident that, in those circumstances, any attempt to trace the Tether swept into the pool from the three user accounts at the eighth defendant would have been as at the time of the order made by Sir Anthony Mann over nine months later an essentially futile and close to impossible and possibly impossible exercise.

9    In their application of 30 January 2023 the eighth defendant seeks an order discharging the interim proprietary injunction made against it by Sir Anthony Mann on 21 October on the grounds that it should never have been made without notice and that the claimant's legal representatives failed in their duty of fair presentation. In support of this application which was for good and sufficient reasons heard before any application to extend the injunction or continue the injunction, the eighth defendant makes four headline points. The first is that the claimant did not properly explain the defences likely to be available to the eighth defendant in respect of its alleged liability as a constructive trustee. The second is that the claimant did not explain why there was a sufficient risk of a breach of trust by the eighth defendant to justify an injunction. The third is that the claimant did not explain why damages would not be an adequate remedy and the fourth is that the claimant did not explain how it was that the eighth defendant would in practice be able to comply with the order.

10   Before explaining my conclusions on the four headline points, I should deal with the initial complaint that the application should never have been made without notice. It is said by the eighth defendant that what occurred demonstrated a serious breach by the claimant and his

legal representatives of the principle expressed by Hoffmann J in *Re First Express Ltd* [1992] BCLC 824 at p.828E where Hoffmann J said:

> "It is a basic principle of justice that an order should not be made against a party without giving him an opportunity to be heard. The only exception is when two conditions are satisfied. First, that giving him such an opportunity appears likely to cause injustice to the applicant, by reason either of the delay involved or the action which it appears likely that the respondent or others would take before the order can be made."

11    Thirty years on from Hoffmann J's well-established statement of principle, urgency is unlikely of itself to be sufficient in the absence of a well-founded fear that action to the detriment of the applicant might be taken by the respondent should notice be given. Ease of communication is now such that some sort of notice is nearly always possible.

12    The eighth defendant submitted that no possible grounds on which injustice could have been caused to the claimant have been shown. It is said that secrecy was not necessary as against it as it was not alleged to be guilty of wrongdoing. It is also submitted that, even as against the first to fourth defendants, the position was dubious as action had already been threatened by solicitors' correspondence some time earlier, as I have already mentioned.

13    The justification for a without notice application was given in para.8.2 of the witness statement produced in support of the original application. However, this evidence did not distinguish between the various defendants. I agree that this is a significant failing in circumstances in which there is no evidence that the eighth defendant would itself take any steps or permit any steps to be taken were it to be forewarned of the application and nothing to that effect was said at the hearing.

14    The position now taken by the claimant is that the eighth defendant was not told because there might have been an inadvertent tipping off. The way the point is put in para.6.17 of his skeleton argument is as follows:

> "6.17    Sir Anthony Mann was satisfied that the Order was properly obtained on an urgent without notice basis. In addition to the reasons addressed in submissions, the Claimant maintains that this was properly done as:
>
> 6.17.1    Had the Eighth Defendant of been put on notice of the urgent hearing, this could have resulted in the inadvertent tipping off of the First, Second, Third and/or Fourth Defendants. This risk is greater in cases of this kind owing to the ease of movement of cryptoassets at '...the click of a mouse', as termed by Mr Justice Bryan in *AA*.
>
> 6.17.2    Further, or in the alternative, the Eighth Defendant is an unregulated entity."

15    I am not persuaded that this was a good answer to the point made against the claimant for a number of reasons. The first is that tipping off was not an issue that was raised before Sir Anthony. The second and perhaps more substantive point is that there is no specific evidence that might have caused the court to conclude that tipping off was a material risk, although I will come back to the point that the eighth defendant was not a regulated entity (and the opacity of its corporate structures) shortly. I also agree with Mr Quest's submission

that there was an obvious solution to any perceived problem which was to proceed against the fraudsters and serve any order on the eighth defendant as a non-respondent. If specific relief was later needed, it could have been sought later in response to any reaction from the eighth defendant.

16    Turning to the fact that it is also now said that the eighth defendant is not a regulated entity and that this was a material factor for consideration by the court when considering whether it was inappropriate for notice to be given, my attention was drawn to paras.5.2 to 5.10 of the claimant's evidence in support of the original application. These paragraphs describe the claimant's case as to the status of Binance. It was said that taking all of those considerations together, it reasonable for the claimant to treat the eighth defendant in a manner that was different from a bank or a law firm, they being amongst the other respondents to the application. It was said by the claimant that Sir Anthony Mann was aware of concerns that the claimant reasonably had about the status and structure of the eighth defendant and that the following matters, in particular, were made clear by the claimant's evidence.

17    I do not need to read the entirety of para.5, but the two factor to which the claimant drew particular attention were the opaque structure of the group of which the eighth defendant forms part. This structure was described by HHJ Pelling QC in the case of *Fetch.AI Limited v Persons Unknown*. The second factor was the fact that the eighth defendant is outside the scope of regulatory oversight. It was said by Mr Armstrong on behalf of the claimant that, notwithstanding the fact that Sir Anthony Mann's attention had been drawn to the matters set out in para.5 of the witness statement, it remained his view in the light of the circumstances at the time the application was made that a without notice was appropriate.

18    I have reached the conclusion that, taken purely in isolation, this factor alone would not have justified the discharge of the injunction once granted, although in saying that it should not be read as the court's determination that it was right for substantive relief to be sought against the eighth defendant without notice in this case. In my view, Mr Quest's 'obvious solution' (as described above would have been a much more appropriate way forward.

19    However, this failure to give notice to the eighth defendant cannot be considered in isolation. It was said to be more serious because the claimant failed in his duty to make a fair presentation of the case at the without notice hearing. The duty to do so when applying without notice is trite law in this area and is well recognised by numerous authorities. In *Siporex Trade SA v Comdel Commodities Ltd* [1986] 2 Lloyd's Rep 428, Bingham J summarised the position as follows. He said that an applicant must show the utmost good faith and disclose his case fully and fairly. He must identify the crucial points for and against the application and not rely on general statements and the mere exhibiting of numerous documents. He must investigate the nature of the cause of action asserted and the facts relied on before applying for relief and he must identify any likely defences.

20    In the *Pugachev* case [2014] EWHC 4336 (Ch) at 171, Mann J said in a passage with which I agree:

> "The obligation to anticipate defences in pursuit of the obligation to make full and frank disclosure is very important. An Applicant for without notice relief has actively to consider what points of defence might be taken by the defendant and put them before the court. That is a fundamental requirement, and safeguard."

21    I also agree with the submission made by Mr Quest that it is not sufficient for the applicant in these circumstances to rely on the judge. One helpful illustration of the reason for this is

given by Popplewell J in the case of *Fundo Soberano De Angola v Jose Filomeno Dos Santos* [2018] EWHC 2199 (Comm) at paras.51 to 53 where he said the following, a statement of general principle which will chime with any judge faced with granting injunctive relief on without notice applications:

> "The task of the judge on a without notice application in complex cases such as the present is not an easy one. He or she is often under time constraints which render it impossible to read all the documentary evidence on which the application is based, or to absorb all the nuances of what is read in advance, without the signposting which is contained in the main affidavit and skeleton argument. It is essential to the efficient administration of justice that the judge can rely on having been given a full and fair summary of the available evidence and competing considerations which are relevant to the decision."

22    Against that background of the principles, I turn to the four headline points that are made by the eighth defendant in support of its case that there was a failure by the claimant to make a fair presentation.

23    As to the constructive trust point, the judge expressed some concern about the position. I have had the benefit of a note, albeit not a verbatim transcript, of the hearing. He asked counsel during the course of the hearing why it was that the exchange defendants were constructive trustees if they were simply exchanges. He did so against the background of a statement in para.5.1(3) of counsel's skeleton for the hearing that there was an arguable claim based on the following cause of action against all defendants, "Equitable property claims against all the defendants as constructive trustees based on the proposition that when property is obtained as a result of wrongdoing, equity imposes a constructive trust on the recipient by operation of law."

24    Counsel's response to the judge's question was that the exchanges are constructive trustees, "Because they are in control of those cryptocurrency assets," and she then went on to say that it had been held in *D'Aloia* that exchanges are constructive trustees. There was then a later exchange which went along the following lines.

> "Judge: Let us refer back to the issue of constructive trustee. If a client pays money into a bank account, that bank is not then a constructive trustee.
>
> Counsel: Respectfully, I disagree. Purely by receiving the assets in question is enough.
>
> Judge: You are not fixed with constructive trustee unless you know of and are fully aware of a fraud.
>
> Counsel: No, I do not agree. The initial wrongdoing is enough.
>
> Judge: The exchanges only become constructive trustees once they have been told about your case against them. Have you written to the exchanges yet to put them on notice?
>
> Counsel: No, my Lord."

25    The problem with the way in which this was put was that the claimant did not make any reference during the course of those exchanges to what really mattered as a defence. If the

recipient of the stolen Tether was a *bona fide* purchaser, it is almost certainly the case that the proprietary rights of the beneficiary will not survive. It is sufficient for these purposes to refer to what Lord Sumption said in *Akers v Samba Financial Group* [2017] AC 424 at para.83:

> "There are a number of reasons why the proprietary interest of the beneficiary may not be effective or enforceable. Obvious examples include cases where the property or its traceable proceeds have been transferred to a bona fide purchaser for value without notice; and cases where the property has been consumed or destroyed, or has ceased to be traceable."

26      In the present case, once the Tether had been swept from the user accounts into the pool, the users were then granted credit in the amount of the value swept which would then constitute the eighth defendant a purchaser and no longer susceptible to any remedy at the suit of the claimant so long as it acted *bona fide*. Whilst Sir Anthony Mann was told that the cryptocurrency is transferred into a pool held by the exchange, and that "after the credit they are offering credit of those assets", the possible legal consequences were not mentioned to him. In my judgment, that should have been done if the reasoning of Popplewell J in *Dos Santos* was being properly observed and complied with. The same may be said arising out of what Mann J himself had said in *Pugachev*.

27      I also agree with the eighth defendant's submission that the lack of a fair presentation was made more acute because, although the pooling was mentioned, its true significance was rather distorted by the fact that the evidence from the claimant's legal representatives was to the effect that the applicant's Tether was currently "in the Exchange Defendants' control." In my judgment this was obviously incorrect in the light of what occurred when the Tether was pooled. In particular, it should have been apparent that the consequence of pooling was that the users' right to receive substitute assets from the exchange was at the very least likely to constitute the exchange a purchaser for value of anything that was transferred into the account in the first place.

28      I also think that the position is made more rather than less acute by what occurred in *D'Aloia*, a case in which very similar allegations were made against the eighth defendant. In that case, I had given an *ex tempore* judgment on a without notice application made by the same legal representatives acting for another claimant in his claim against, amongst others, the eighth defendant. I made no mention in my judgment of a *bona fide* purchaser defence to a claim in constructive trust against the exchange, and there is no support in that judgment for the proposition that I had held without more that "exchanges are constructive trustees" which is what the note of the hearing before Sir Anthony Mann records as part of the submissions made on behalf of the claimant.

29      I should also add that there is no indication from my judgment in *D'Aloia* that the evidence in that case showed that the cryptocurrency had been pooled. But, more significantly, by the time the without notice application was made in the current proceedings, it had become known from the defence being run by the eighth defendant in *D'Aloia* that its *modus operandi* involved pooling and that where that had occurred it was likely to assert a *bona fide* purchaser defence. Not only was this not mentioned to Sir Anthony Mann, but the claimant sought to persuade him that mere receipt was sufficient, in part on the basis that the assets concerned (the Tether originally transferred) were still identifiable as within the control of the eighth defendant as at the date of application, a point that was confirmed on the evidence.

30    As to this last point, I do not agree with the submission made by the claimant that it would have been improper for his legal representatives to pre-empt defences in these proceedings in reliance on those raised in unconnected proceedings. The point which is established in all of the cases such as *Siporex*, *Pugachev* and *Dos Santos*, is that the duty is on the legal representatives as well as the claimant to identify and anticipate likely defences. If as a result of their involvement in other litigation the legal representatives are aware both of the way in which the eighth defendant asserted that its pooling operations functioned and the nature of the legal consequences which were said by it to flow from that, there can in my judgment be no basis for them to say that it did not occur to them that such defences were not likely to be run.

31    As to damages being an adequate remedy, I agree with Mr Quest that this should have been presented in a more comprehensive manner. I accept that what was said about the inadequacy of damages in relation to the first, second and third defendants would have justified an injunction, but there was no explanation or evidence as to why the eighth defendant should be tarred with the same brush. Indeed, I think it is fair to say that the claimant's skeleton did not address the adequacy of damages against the eighth defendant at all.

32    Of course, this is something which it might be said that the judge could have asked himself but, in my judgment, this is a classic instance of the situation referred to by Popplewell J and does not of itself give a sufficient excuse to release the claimant from its own duty to explain the position to him. I should add, as I will deal with shortly, I remain unclear why it is said that damages are not an adequate remedy and, indeed, I think it is fair to say that Mr Armstrong for the purposes of the submissions today did not for various reasons advance that as an argument with any force.

33    The final breach is said to be a failure to explain how it was as a practical matter that the eighth defendant was able to freeze the traceable proceeds of the relevant Tether in light of the pooling structure of which the claimant's expert and legal representatives were aware. The judge was given no explanation as to how the eighth defendant was able to freeze the Tether as a matter of practical reality or, indeed, to identify it for the purposes of justifying the injunctive relief sought. This too seems to me to be a very important non-disclosure (and failure to explain), thrown into quite sharp relief by the fact that the judge had indicated at the outset of the hearing that he was concerned that the application was, in any event, an exercise in futility because of the lapse of time.

34    Mr Armstrong submitted that it could be seen that the judge had the difficulty of tracing in mind because of the way in which he expressed the opening words of the order which refer to an injunction preserving both the Tether itself and its traceable proceeds. It does not seem to me that it is possible to draw the conclusion that Mr Armstrong invites me to draw from the way in which the order was drafted. The point which matters is the difficulty in tracing that which is said to represent the Tether, not the fact that some form of tracing might in some circumstances have been possible or in some circumstances it might have been appropriate for an injunction to be granted to ensure the preservation of the traceable proceeds. Even now, it remains unclear how it is said that the eighth defendant is able to identify the traceable proceeds of the claimant's Tether. Indeed Mr Armstrong accepted that he was not able to assist on the point either, although he made strong submissions to the effect that, at this stage of the proceedings, it could not be expected that the claimants would be able to have an answer.

35    In my judgment, taken together, the consequences of what occurred are that I agree that the matter was not objectively speaking fairly presented to the judge. This means that the order

made by Sir Anthony Mann as extended without further argument by Michael Green J should in the normal course be discharged. The court does, however, retain a discretion to continue or regrant the order even where there has been such a failure. But before it does so, there are a number of factors it must take into account which include the importance of the non-disclosure to the issues before the judge, the need to encourage compliance, the extent of any culpability and the injustice to the claimant which may occur if an order is discharged. Those principles were set out in para.7(xii) of the judgment of Carr J in *Tugushev v Orlov* [2019] EWHC 2031 (Comm), a judgment which in the remainder of para.7 provided a helpful distillation of the relevant authorities on the issue of fair presentation.

36      I have formed the view that, having regard to these considerations, there is no basis on which it would be right to remake the order in the present case. As to the importance of the non-disclosure, I agree with what Mann J said in the *Pugachev* case about the obligation to anticipate defences. The eighth defendant's submission that the *quid pro quo* for proceeding in the absence of a respondent is that the court must be told what arguments might have been raised if the respondent were present is one with which I agree. The judge seems to have been persuaded that it was arguable that purely receiving the assets in question is enough to give rise to a constructive trust but that was only a proper presentation if combined with a full explanation of the likely defences. I also agree that the presentation made more generally, particularly in relation to the without notice aspect of the application and the question of whether damages were an adequate remedy, did not make sufficient distinction between the position of the first defendant and the fourth defendant on the one hand and the exchanges on the other. It is very easy for a court on an application of this sort to allow all of the defendants to be lumped into the same box. That makes it particularly important for a claimant to make sure that the court is fully apprised of the clear distinction between the separate positions of the various defendants. It was an important and significant deficiency that this was not done.

37      I also agree that the need to ensure proper compliance with the duty is acute in the context of a case such as the present one. As the eighth defendant explains in its submissions, exchanges can often find themselves joined as respondents for the purposes of the grant of *Bankers Trust* relief and/or injunctive relief. It is particularly important that the nature of the claims against them and whether there is a substantive claim or merely a claim seeking *Norwich Pharmacal* or *Bankers Trust* relief is properly differentiated. In my judgment, this is a case in which the claimant and his legal representatives may have lost sight of the importance of that distinction.

38      As to culpability, while I am inclined to think that this was a case of the legal representatives adopting an overenthusiastic approach to the merits of their client's case as against the exchanges, there is some level of culpability. The reality is that a deliberate decision was made not to disclose a possible defence. I think that this can be seen from paras.6.19 to 6.21 of the claimant's current skeleton where they made the following submission which showed both that they knew of the defence and decided that they did not need to disclose it:

> "Further, and in any event, we note that the witness statement of Mr Bushell dated 15 November 2022 relied upon by the Eighth Defendant makes reference to proceedings in *D'Aloia* entirely unrelated to the present proceedings. We take the view that it would not have been appropriate for us to refer to those unconnected proceedings for various reasons, including:
>
> 6.19.1    for reasons of privilege; and

> 6.19.2   as it would have been improper for the Claimant to pre-empt
> the Eighth Defendant's defences in these proceedings in reliance on
> those raised in unconnected proceedings."

Then in 6.21 it was said:

> "We do not accept that a claimant must bring to a court's attention the
> defences any given defendant is likely to raise, as claimed by Mr
> Bushell, in order to comply with its duty of full and frank disclosure.
> This instead requires an admission on the part of a claimant that a
> defendant may be innocently caught up such that undertakings are
> given. This is precisely what was done."

39    In my judgment, these statements demonstrate a misapprehension of the nature of the duty
to make full disclosure to the judge on a without notice application. The duty extends not
just to a fair presentation of the underlying facts (to the extent they are known or might
properly be anticipated), but also the way in which those facts might reasonably be expected
to support a defence. All of this needs to be properly explained in order to ensure that the
presentation is fair. This remains an important consideration even though it is not suggested
by Mr Quest (and nor do I find) that what seems to me to have been a deliberate decision
was motivated by anything other than a misapprehension as to the nature and extent of the
duty. It is not suggested that there was any dishonesty or anything of the like involved.

40    As I have already emphasised, the duty of fair presentation is very important. Careful
attention is required to ensure that every avenue is fully explored before relief of this sort is
sought, more particularly where the delay from the time of the fraud and, indeed, from the
time at which the investigation had started, meant that the excuse of having insufficient time
to give mature consideration to the way in which the case should be put (or might be
defended) would not, even if material, be available to the claimant or his legal
representatives.

41    I also agree, and this is the fourth factor, that there is no risk of any significant injustice to
the claimant if the injunction is now discharged. There is still no explanation as to why
damages would not be an adequate remedy to him should a claim against the eighth
defendant succeed at trial. This last point is also one of the principal three reasons why I
would not in any event have continued the injunction against the eighth defendant even if I
had been satisfied that the application was fairly presented to Sir Anthony Mann in the first
place. I should say that the second of those principal three reasons is that in the exercise of
my discretion I consider that the injunction can serve no useful purpose because it is wholly
impracticable for the eighth defendant to preserve the deposited Tether in circumstances
where there has been no explanation as to how as a practical matter it might be possible for
the claimant to trace into his Tether or their traceable proceeds in the hand of the eighth
defendant as at the time it was first on notice of the claim. The evidence is overwhelming
that they had long since been mixed and dissipated in the pooled addresses.

42    The third principal reason relates to whether or not there is a serious issue to be tried. It is
said by the eighth defendant that there can be no serious issue that the eight defendant
acquired title to the deposited Tether when it was received at the deposit addresses. I have
given careful consideration to the question as to whether or not it is necessary for me to
determine that issue here and now. I have reached the conclusion that it is not, and I decline
to do so, although, in saying that, the claimant can garner no support for thinking that his
claim against the eighth defendant has any real substance. I think it is perfectly possible that
an application to strike out or dismiss by way of reverse summary judgment may succeed.

But, in the light of the conclusion that I have reached on the application to discharge the injunction for failure to make a fair presentation and not regrant it, and also in light of the fact that there is extant an application by the ninth defendant for reverse summary judgment, I have decided that it would not be right for me to express at this hearing any concluded views on the question of serious issue to be tried.

43      So far as the result is concerned, the consequence of my conclusion is that the injunction as against the eighth defendant will be discharged. Because of the grounds on which I have discharged it, it will be discharged as from the date on which it was granted.

_____

## __CERTIFICATE__

Opus 2 International Limited hereby certifies that the above is an accurate and complete record of the Judgment or part thereof.

*Transcribed by **Opus 2 International Limited***
*Official Court Reporters and Audio Transcribers*
***5 New Street Square, London, EC4A 3BF***
***Tel: 020 7831 5627    Fax: 020 7831 7737***
***civil@opus2.digital***

This transcript has been approved by the Judge

# Exhibit 51

TORKINGTON *v.* MAGEE.

1902
*June* 19, 25.

*Chose in Action—Assignment—Contract to sell Reversionary Interest—Assign-
ment by Purchaser of Benefit of Contract—Right of Assignee to sue Vendor
for Breach — " Legal Chose in Action " — Judicature Act,* 1873 (36 *&* 37
*Vict. c.* 66), *s.* 25, *sub-s.* 6.

The defendant contracted to sell his reversionary interest in property to
R., who by deed assigned his interest under the contract to the plaintiff,
and notice in writing of the assignment was duly given to the defendant.
The defendant after the assignment to the plaintiff refused to perform his
contract :—

*Held,* that the assignment was an assignment of a "legal chose in
action" within s. 25, sub-s. 6, of the Judicature Act, 1873, and that the
plaintiff was entitled to sue the defendant for damages for the breach of
contract.

APPEAL from the Mayor's Court.

The following statement of the facts proved at the trial,
and the decision of the Common Serjeant, is taken from the
judgment of Channell J.

This was an appeal from the Mayor's Court in an action
brought by the plaintiff, claiming to sue as assignee by virtue
of the Judicature Act, 1873 (36 & 37 Vict. c. 66), for damages
for an alleged breach of a contract by the defendant to sell to
one Rayner a reversionary interest. The contract should have
been completed on May 8, 1901. It was not completed on
that date, but it is agreed that time was not of the essence of
the contract, and the parties continued to negotiate on the
footing that the contract was still in force. On June 10,
whilst matters were still in this condition, Rayner by deed
assigned his interest in the contract to the plaintiff, and notice
in writing of the assignment was given to his vendor, the
defendant. Negotiations proceeded for a time, but afterwards
the plaintiff alleged that the defendant had broken the contract,
and brought this action for damages. At the trial the Common
Serjeant held that the plaintiff was not entitled to sue under
the Judicature Act, because the contract was not a "legal
chose in action" within the meaning of the section relied on

1902
—————
Torkington
v.
Magee.

(s. 25); but he found that there had been a breach by the defendant, and that the damages, if the plaintiff was entitled to recover, would be 100*l.*

The plaintiff appealed from that decision.

*Stewart-Smith, K.C.* (*Sydney Clarke* with him), for the plaintiff. The assignment by Rayner of his interest in the contract to the plaintiff was an assignment of a " debt or other legal chose in action " within s. 25, sub-s. 6, of the Judicature Act, 1873, and the plaintiff is, therefore, entitled to sue the defendant for damages for breach of the contract. The term " legal chose in action " includes all rights the assignment of which a Court of Law or Equity would before the Act have considered lawful. The Colonial judges took that view in *King* v. *Victoria Insurance Co.* (1), and Lord Hobhouse in delivering the judgment of the Privy Council did not dissent from it : see also *Manchester Brewery Co.* v. *Coombs.* (2) A Court of Equity would before the Judicature Act have recognised the right of either party to specific performance of this contract to buy a reversion ; the purchaser had an equitable interest in the contract, which he could assign, and his assignee would have been entitled in a Court of Equity to all the rights and remedies of his assignor against the vendor. Things which have been held to be " things in action " are enumerated in the argument in *Colonial Bank* v. *Whinney.* (3) They include policies of life insurance and shares in companies ; and, if those are " legal choses in action," it is difficult to see why a right to the benefit of a contract to sell a reversion is not. Whether or not this was a " legal chose in action " before the Judicature Act, it is covered by the terms of the statute. [He also referred to *Price* v. *Seaman.* (4)]

*M. M. Macnaghten,* for the defendant. It may be admitted that a right to recover damages for breach of a contract is a chose in action, but the expression " debt or other legal chose

(1) [1896] A. C. 250.                    (3) (1886) 11 App. Cas. 426, at
(2) [1901] 2 Ch. 608 ; Farwell J.    pp. 429, 430.
at p. 619.                                      (4) (1825) 4 B. & C. 525.

**2 K. B.**          KING'S BENCH DIVISION.          429

in action" in s. 25, sub-s. 6, of the Judicature Act, 1873, does
not cover it.  Sub-s. 6 does not cover all things which are
things in action—e.g., it does not cover shares in a company,
because they can only be transferred under the Companies
Acts.  The words "debt or other legal chose in action,"
mean "debt or other liquidated money claim arising under a
contract"; they do not include a right to claim unliquidated
damages: *May* v. *Lane* (1), judgment of Lord Esher M.R. (2)
and of Rigby L.J. (3)  The dicta of the Colonial judges in
*King* v. *Victoria Insurance Co.* (4) went too far, and the
dictum, too, of Farwell J. in *Manchester Brewery Co.* v.
*Coombs* (5) was not necessary for the decision of the case, and
was given without the point having been argued before him.
Further, this was not a right which could have been assigned
before the Judicature Acts.  The defendant could not have
sued the plaintiff in respect of it, nor could Rayner in the
defendant's name.  A bare right to sue was not assignable,
nor would the Court of Equity ever enforce it: *Prosser* v.
*Edmonds.* (6)

*Stewart-Smith, K.C.*, in reply.  In *May* v. *Lane* (1) there was
a mere promise to lend money; it could not be enforced by a
decree for specific performance, nor could an action be brought
on it.  The dictum of Lord Esher M.R. was unnecessary
for the decision of the case.  [He also referred to *Hall* v.
*Laver.* (7)]

*Cur. adv. vult.*

June 25.  The judgment of the Court (Lord Alverstone C.J.,
Darling and Channell JJ.) was read by

CHANNELL J., who, after stating the facts as previously set
forth, proceeded :—We have, therefore, to consider the meaning
of the expression "other legal chose in action" in sub-s. 6 of
s. 25 of the Judicature Act, 1873.  In order to arrive at this
meaning, I think it necessary to consider what is the object of

1902

TORRINGTON
*v.*
MAGEE.

---

(1) (1894) 64 L. J. (Q.B.) 236.          (5) [1901] 2 Ch. 608.
(2) 64 L. J. (Q.B.) at p. 237.          (6) (1835) 1 Y. & C. 481; Lord
(3) 64 L. J. (Q.B.) at p. 238.     Abinger C.B. at p. 497; 41 R. R. 352.
(4) [1896] A. C. 250.          (7) (1838) 3 Y. & C. 191.

1902

TORKINGTON
v.
MAGEE.

Channell J.

the Act, and of the particular section of the Act in which the words are to be found. The Act provided for the amalgamation of the then existing superior Courts of Law and Equity with a view to the administration in the new Court of one system of law in place of the two systems previously known as Law and Equity, and the general scope of the Act was to enable a suitor to obtain by one proceeding in one Court the same ultimate result as he would previously have obtained either by having selected the right Court, as to which there frequently was a difficulty, or after having been to two Courts in succession, which in some cases he had to do under the old system. The 25th section provided what was to be the rule in future in cases where previously the two systems differed. This is seen not only by looking at the particular matters provided for by the first ten sub-sections, but by the words of sub-s. 11: "Generally in all matters not hereinbefore particularly mentioned in which there is a conflict or variance between the rules of equity and the rules of the common law with reference to the same matter, the rules of equity shall prevail." This seems to me to shew that sub-s. 6 is one of the matters particularly mentioned in which the rules of equity and common law had conflicted or varied in reference to the same matter, and this gives the clue to the meaning of any doubtful expression. "Chose in action" is a known legal expression used to describe all personal rights of property which can only be claimed or enforced by action, and not by taking physical possession. It is an expression large enough to include rights which it can hardly have been intended should be assignable by virtue of the sub-section in question, as, for instance, shares, which can only be transferred as provided by the Companies Acts. It is probably necessary, therefore, to put some limit upon the generality of the words; but I think that the necessary limitation is shewn by the considerations to which I have already referred, and also by the words of sub-s. 6 itself. I think the words "debt or other legal chose in action" mean "debt or right which the common law looks on as not assignable by reason of its being a chose in action, but which a Court of Equity deals with

as being assignable." That is the point of difference or
variance between the rules of equity and common law which
it is intended to deal with by this sub-section. Further, by
the words of the sub-section itself the assignment is to be
effectual in law, subject to all the equities which would have
been entitled to priority over the rights of the assignee if this
Act had not been passed. This seems to mean that the cases
dealt with are cases where the assignee had some right before
the Act—that is to say, where the right of the assignee had
previously been recognised by a Court of Equity. That the
assignment is still to be subject to equities again seems to
indicate that the rule of the Court of Equity is substantially
being adopted; but it is to be remembered that in cases within
these first ten sub-sections there is not necessarily a simple
adoption of the rules of equity as in cases under sub-s. 11.
New rules are, at least in several cases, laid down for the new
Court which, whilst based mainly on the rules of equity, yet
nevertheless are not a simple repetition of equity rules. For
instance, the provisions of these sub-sections as to interpleader
and as to the Trustee Act appear to be new, and I think also
the provisions that both the assignment and the notice of it
must be in writing were with respect to matters not held
necessary in equity. Now, the question we have to consider
in the present case is whether an executory contract of pur-
chase under which each party has rights and responsibilities,
but of which there had been no breach at the date of the
assignment, so that at that date no action could be brought
upon the contract, but which, if occasion should ever arise to
enforce it, must of necessity be enforced by action, is assignable
by this sub-section as a " legal chose in action." That it is a
legal chose in action, and was so at the date of the assignment,
cannot be denied; but the question is whether it is so within
the meaning of the words as used in the sub-section. I think
it is, because it is a case in which the assignee would, at any
rate after giving notice of the assignment, have had rights if
the Act had not been passed. The Court of Equity would
undoubtedly have recognised his right, and would have treated
the assignor as being trustee for his assignee, and they would

1902

TORKINGTON
v.
MAGEE.

Channell J.

have given to the assignee all the rights and remedies as against his assignor which they gave to a cestui que trust against his trustee, and would have given to him as against the other party to the contract all the rights and remedies which they gave to a cestui que trust against a third person dealing with his trustee in reference to the subject of the trust after notice of the trust. I believe it to be clear that in such a case as the present, if the assignor Rayner refused to sue the defendant for damages for the benefit of the present plaintiff, the assignee, the plaintiff could have taken proceedings in a Court of Equity, and have got a decree that he should be at liberty, on giving a proper indemnity, to use the assignor's name for the purpose of suing the present defendant. Thus by going to two Courts the plaintiff would have got his damages from the defendant, assuming, of course, that there had been a breach of contract by the defendant. It is true that the present plaintiff could not in the Court of Equity get damages from the defendant ; but that is because the Court did not, except in cases under Lord Cairns' Act, entertain a claim for damages at all, whether by the party to the contract or his assignee, and not because of the plaintiff being assignee. It is suggested that there is a difficulty in holding that such a contract as the present can be assigned by virtue of this sub-section, because the contract cannot be transferred in its entirety—that is to say, only the benefit of it, and not the liability under it, can be transferred. But this is just what the sub-section deals with. It says that the assignment shall be sufficient to transfer the legal right to such debt or chose in action, and any difficulty as to the liability of the assignor is met by the clause as to the assignment being subject to equities. The assignee only takes subject to any claim under the contract which would have been good against his assignor. Further, of course he can only recover damages if he can shew a breach by the defendant, and the question whether there had, or had not, been a breach might in many cases depend upon dealings between the original contracting parties. In my opinion, upon the facts of the present case, assuming the breach which has been found by the Common Serjeant, the plaintiff might, before the Judicature

Act, by going first to the Court of Equity and then going, in
the name of the assignor, to the Court of Common Law, have
got his damages ; and I think, under these circumstances, the
sub-section applies, and the plaintiff may now go to the High
Court of Justice (or to the Mayor's Court, which has the same
combined legal and equitable jurisdiction) direct for his damages.
I find nothing in the cases on the subject contrary to this view.
It was the view of the Colonial judges who decided the case
which came before the Privy Council in *King* v. *Victoria
Insurance Co.* (1)  The Privy Council did not dissent from
their view.   They simply decided the case on a different
ground, and "preferred to express no opinion what limitation
(*if any*) should be placed on the literal meaning of the term
'legal chose in action.'"  That question, they say, is not free
from difficulty ; but it may be that they rather felt the difficulty
of putting any limitation at all upon the literal meaning than
a difficulty in limiting it to at least the same extent as the
Colonial judges had done.  Farwell J. clearly expressed the
same view in *Manchester Brewery Co.* v. *Coombs* (2) ; but it
seems that he, without much examination of the report,
thought that it had been so held by the Privy Council.  *May*
v. *Lane* (3) appears to contain a dictum of Lord Esher that
a claim for damages could not be assigned under this sub-
section.   This was not necessary to the decision, and it is
not quite clear from the report until the facts are carefully
examined what it was that Lord Esher thought to be the
objection to such an assignment.  Rigby L.J., however,
adds : "A legal chose in action is something which is not in
possession, but which must be sued for in order to recover
possession of it.  It does not include a right of action" (by
that I think he means a *mere* right of action) " such as, for
instance, a right to recover damages for breach of contract, or
a legal right to recover damages arising out of an assault;
for if the argument on behalf of the plaintiff be correct, such
a right would be assignable, and this section of the Judica-
ture Act would materially affect the law of champerty and

1902

TORKINGTON
*v.*
MAGEE.

——
Channell J.

(1) [1896] A. C. 250.          (2) [1901] 2 Ch. 608, at p. 619.
                (3) 64 L. J. (Q.B.) 236.

1902

TORKINGTON
*v.*
MAGEE.
___
Channell J.

maintenance." When the facts of that case are looked at, it will be seen to be quite clear that the contract, by breach of which the alleged damages had accrued, had never been assigned at all. The document was in the form: " We authorize you to pay 50*l.* out of the moneys due or to become due to us on the buildings we are erecting." If there had been any debt, this might have been a good assignment of 50*l.* out of it, although *Brice* v. *Bannister* (1), which so holds, has been somewhat doubted in *Durham Brothers* v. *Robertson* (2) and *Jones* v. *Humphreys.* (3) There was, however, no debt, but at most a claim for damages (probably nominal only) for not advancing money pursuant to contract. It could not possibly be said that this document was an assignment of the contract; at most it was an assignment of damages in respect of a particular breach. I think Rigby L.J. did not mean that an assignee of a contract could never sue for damages for breach of it, but merely that when a breach of contract had occurred in respect of which the original party to the contract could sue for damages, he could not assign those damages so as to enable the assignee to sue. I have no doubt that the practice of the Court of Equity prior to the Judicature Act was to refuse to give effect to an assignment of a mere right to litigate. Those Courts were bound by the law as to champerty and maintenance as well as the Courts of Common Law. It is not, however, necessary for us to deal exhaustively with the question of what contracts a Court of Equity would have held to be assignable. Here the contract is one to purchase a reversion. It is a class of contract in which the Court of Equity recognised the right of each party, vendor as well as purchaser, to specific performance, and where the purchaser was entitled to specific performance he was recognised as having an equitable interest in the property. In that state of things he could assign the contract and his equitable interest thereunder without any objection arising from the law as to champerty. The fact that something subsequently happened which prevented his getting specific performance, or the fact that he elected to claim damages,

(1) (1878) 3 Q. B. D. 569.    (2) [1898] 1 Q. B. 765; Chitty L.J. at p. 774.
(3) [1902] 1 K. B. 10.

**2 K. B.**          KING'S BENCH DIVISION.          435

would not take away the right which had vested in him, on notice of the assignment, to all the legal and other remedies for the chose in action. The decision of Chitty J. in *Western Wagon and Property Co.* v. *West* (1) is, I think, in accordance with this view. I may mention, not as an authority, but in explanation of the view I take, that I myself in *Marchant* v. *Morton, Down & Co.* (2) have held that this sub-section is merely machinery; that it enables an action to be brought by the assignee in his own name in cases where previously he would have sued in the assignor's name, but only where he could so sue. I think that in the present case, where there was a contract of sale which gave the purchaser an equitable interest in the property contracted to be sold, the assignment and notice gave the assignee a legal right to sue, not only for specific performance if he had a case for it, but also for damages if he either was driven or elected to take that remedy. I think, therefore, that the appeal should be allowed, and judgment be entered for the plaintiff for 100*l*. The Chief Justice and Mr. Justice Darling concur in this judgment.

1902

TORKINGTON
*v.*
MAGEE.

Channell J.

*Appeal allowed.*

Solicitor for plaintiff: *J. W. Browne.*
Solicitor for defendant: *G. J. Fowler.*

(1) [1892] 1 Ch. 271.          (2) [1901] 2 K. B. 829, at p. 832.

W. A.

# Exhibit 52

Page 1

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

-------------------------------------X

IN RE:  FTX TRADING LTD, et al.

                    Debtors.

                         Chapter 11

                    Case No.  22-11068 (JTD)

-------------------------------------


                ** VIDEOTAPED DEPOSITION**

            STEPHEN NICHOLAS ATHERTON K.C.

             Wednesday, November 12, 2025




Reported by:

Angela M. Shaw-Crockett, CCR, CRR, RMR, CSR

Job 1435607



Page 30

1  understand there's an issue of Antigua law.
2      Q.  Not opining on English law in your
3  rebuttal declaration; is that correct?
4      A.  I don't believe so.  I think the
5  references, again, are for the same purpose of
6  trying to clarify, explain, or illustrate principles
7  of Virgin Islands law, BVI law.
8      Q.  So then, in neither of your reports, are
9  you opining on whether; under documents governed by
10  Antigua or English law, FTX was contractually
11  authorized to take certain actions; were you?
12      MR. BELLER:  Objection.
13      A.  No.  I think insofar as dealing with the
14  actions of FTX, I've been provided with certain
15  instructions as to what I'm given to understand,
16  certain matters, and I've been asked to make certain
17  assumptions.
18  BY MR. PROULX:
19      Q.  Likewise, you didn't provide any opinion
20  with respect to what rights or obligations
21  Three Arrows may have had under contracts governed
22  by English or Antigua law; is that correct?
23      MR. BELLER:  Objection.
24      A.  Not specifically.

Page 31

1  BY MR. PROULX:
2      Q.  Have you reviewed any deposition
3  transcripts in this matter?
4      A.  No.
5      Q.  Do you know who was deposed in this matter
6  other than, of course, yourself?
7      A.  I believe Lord Neuberger was deposed
8  yesterday.  I've read in other documents that
9  Mr. Bankman-Fried may have been deposed.  Obviously,
10  other witnesses have been deposed in these
11  proceedings.
12      Q.  And in those other documents, are you
13  referring to Mr. Levy's declaration in which he
14  cites Mr. Bankman-Fried's deposition transcript?
15      A.  Yes.  And that may -- there may be a
16  reference, I think, in the Proof of Claim to a
17  deposition -- I may be wrong, but there may be other
18  declarations where there's been reference to
19  depositions of other witnesses.
20      Q.  Are you -- you reviewed Mr. Levy's report,
21  correct?
22      A.  Yes, I did.
23      Q.  So you're aware, then, that he also cites
24  deposition testimony given by Steven Coverick,

Page 32

1  sitting in the shoes of FTX itself; are you not?
2      A.  I'm sure he did.  And he may have referred
3  to others.  I just can't remember specifically what
4  they may have been.
5      Q.  Did you ask to review those deposition
6  transcripts?
7      A.  No, I didn't.
8      Q.  Why not?
9      A.  Because I'm really concerned with
10  outlining and providing an opinion on the law of the
11  BVI, and I'm not required, as I understand it, to
12  provide opinions or provide a recitation of the
13  facts other than those that I'm provided on
14  instructions or by reference to the assumptions I've
15  been asked to make.
16      Q.  Did counsel inform you whether any of the
17  factual assumptions you were provided were rendered
18  inaccurate by any deposition testimony in this
19  matter?
20      A.  No.
21      Q.  No, they didn't inform you, or no, they
22  said it was not rendered inaccurate?
23      A.  I don't want to appear rude, but perhaps
24  you can clarify the question so I can answer it as

Page 33

1  clearly as I can.
2      Q.  I fully recognize that involved a double
3  negative, so I'm more than happy to do that.
4      I'm asking if counsel informed you that
5  any of the factual assumptions they provided to you
6  are no longer accurate?
7      A.  No.  They did not inform me of that being
8  the case, if it is the case.
9      Q.  Does your rebuttal report contain all of
10  the opinions you are giving in this matter with
11  respect to Mr. Levy's report?
12      A.  Yes.  I believe so.
13      Q.  So you don't offer any disagreements with
14  Mr. Levy's report or analysis beyond what is
15  reflected in your rebuttal report; is that correct?
16      A.  Yes.  But I do make the point in either or
17  both of the declarations that if I haven't dealt
18  with the matter, it shouldn't be interpreted as
19  being in agreement or, necessarily, a disagreement
20  with what Mr. Levy has said.  It's just not dealt
21  with because I didn't consider it to be material.
22      Q.  Well, this is a forum for you to then
23  explain any other disagreements you have with
24  Mr. Levy outside of the four corners of your

MAGNA ▶
LEGAL SERVICES

1   between Dame Elizabeth Gloster and Lord Neuberger.
2         And it may also have an effect on the
3   analysis for -- could you just give me a moment so I
4   can get the right?
5         MR. PROULX:  For the record, Mr. Atherton,
6   are you looking at your original declaration
7   now?
8     A.  I am.  I'm just looking for -- yes, I'm
9   looking at page 7 of the original declaration.  It
10  may have an implication on the BVI proprietary
11  restitution claim, which -- what you indicated to me
12  that Lord Neuberger is said to have said, it may
13  have an impact on the analysis of the elements of
14  that particular cause of action.
15  BY MR. PROULX:
16    Q.  Any impact on the preference claim
17  asserted by the Joint Liquidators?
18        MR. BELLER:  Objection.
19    A.  Trying to evaluate it now, I think not.
20  But insofar as I can, I reserve the right to
21  consider it because I've only just been informed of
22  what you've just informed me.  But as presently
23  advised, I don't think it would materially change
24  the view as regards the necessary elements or the

1   merits of the BVI preference claim.
2   BY MR. PROULX:
3     Q.  We'll come to this more over the course of
4   the day, but you view it as a necessary element of
5   the preference claim that Three Arrows have a
6   proprietary interest in the assets underlying the
7   relevant transactions; do you not?
8         MR. BELLER:  Objection.
9     A.  Could you repeat that, please?
10  BY MR. PROULX:
11    Q.  With respect to the Joint Liquidators'
12  preference claim, you view as a necessary element
13  the relevant transactions involve assets in which
14  Three Arrows had a proprietary interest; do you not?
15        MR. BELLER:  Objection.
16    A.  My understanding from the point in time
17  when I read, prepared my original declaration and my
18  rebuttal declaration, relying upon Lord Neuberger's
19  declarations of what the situation was, there was no
20  interest of any proprietary nature that 3AC could be
21  said to have in any of the digital assets.
22  BY MR. PROULX:
23    Q.  Would legal title be a sufficient
24  proprietary interest to maintain a preference claim?

1     A.  Again, trying to analyze it now, I don't
2   think so because the legal title would be,
3   essentially, I think, just the existence of a chosen
4   action, which would provide a legal basis for, much
5   as I understand the position to be without there
6   being any potential compromise of Lord Neuberger's
7   original position, that 3AC had the ability to call
8   for the withdrawal of some or all of the account
9   balance or could ask for the withdrawal, which
10  happened on occasion, of digital assets from
11  accounts associated with it.
12    Q.  Is it your testimony, then, Mr. Atherton,
13  that the only conceivable proprietary interest that
14  can sustain a preference claim is a beneficial or
15  equitable ownership interest in the assets
16  transferred?
17    A.  As presently advised, yes, I think that
18  would remain the position.
19    Q.  What do you mean "as presently advised"?
20    A.  Well, because you've asked me a question
21  where the premise for the view I've expressed is
22  difference of the premise on the basis of which I
23  have expressed it.  I've only just received notice
24  of it.

1         I'm happy to consider it in more detail.
2   But, as I say, "as presently advised," which is a
3   phrase I've used before in answer to one of your
4   questions, I don't think -- let me take an example.
5         The BVI restitution claim as, I think
6   Mr. Levy and I agree, is concerned with the ability
7   to vindicate legal title to an asset.  And the legal
8   title is essentially the ability to ask for delivery
9   of an asset.  That in and of itself doesn't intimate
10  or give substance to the existence of any other form
11  of interest, beneficial interest.  It merely
12  represents or reflects a right to ask for delivery
13  of a digital asset or a component or a part of the
14  account balance.
15        That's how I'm considering at the moment.
16  So as I say, I think the important thing would be
17  that principally one's concerned with assets in
18  which the company would have a proprietary -- by
19  that, I mean, beneficial proprietary interest.
20    Q.  Okay.  Just to make sure I understand your
21  testimony correctly, and putting out to the side
22  anything involving the facts of this particular
23  case, under BVI preference law, the only way to
24  sustain a preference claim is to -- is for the

1      MR. BELLER: Objection.
2      A.   I think that on a recollection from my
3  original declaration, I think there may have been an
4  issue about how the relevant transactions are
5  articulated in the Proof of Claim as to whether or
6  not they were conducted by FTX or by 3AC.
7      But I also understand that it's the
8  position of the FTX Recovery Trust that other than
9  for the liquidation -- again, I don't want to be
10  condescending, but I assume you understand what I
11  mean by that as I've defined it in the first
12  declaration.
13  BY MR. PROULX:
14      Q.   Finish your answer, and then we can talk
15  about terminology.
16      A.   Thank you.  Sorry.
17      So other than for the liquidation, which
18  was conducted by FTX, then I think the position of
19  the FTX Recovery Trust is that any other relevant
20  transactions were conducted by or instigated by FTX.
21      Q.   Okay.  So by "liquidation," are we -- are
22  you referring to the approximate $82 million of
23  digital assets that FTX liquidated on approximately
24  June 14, 2022?

1      A.   That's correct.
2      Q.   And when you say that, "I think the
3  position of the FTX Recovery Trust is that any other
4  relevant transactions were conducted by or
5  instigated by FTX," assuming that position, do you
6  agree that Three Arrows entered into those
7  transactions?
8      MR. BELLER: Objection.
9      A.   I think you may have misspoken in the
10  course of asking the question.  So would you mind
11  asking it again so I can be sure whether or not you
12  did misspeak, or that I misunderstood the question.
13  BY MR. PROULX:
14      Q.   Based on the assumptions you've been
15  provided --
16      A.   Yes.
17      Q.   -- did Three Arrows enter into the
18  relevant transactions other than the 82 million
19  liquidation?
20      A.   That I understand is the position of the
21  FTX Trust, yes.
22      Q.   Is that your position?
23      A.   I don't have the -- I have not
24  investigated the facts so that would be an

1  assumption that I've been asked to make.  The
2  initial observation was that that's not necessarily
3  how one reads the articulation of the narrative in
4  the Proof of Claims as far as I recall.
5      Q.   Are you repudiating certain assumptions
6  you were given?
7      A.   No, I don't think so.  I'm just trying to
8  clarify what -- I think at one point I say in the
9  declaration that it appeared that the nature of the
10  narrative is put forward by the Joint Liquidators in
11  the Proof of Claim -- and I'm happy for you to
12  correct me -- was that the transactions were
13  conducted other than by FTX.  But I think that
14  FTX Recovery Trust's position, and the assumption
15  I'm prepared to make, is that other than the
16  liquidation, the transactions were initiated or
17  instigated by 3AC.  When I suggested that you
18  misspoke, I think you said "FTX" in your question
19  not 3AC so.  I may have been wrong.
20      Q.   I may well have.  So let me just make sure
21  we're all clear.
22      A.   I'm not trying to be combative at all.
23      Q.   What you're saying, based on the
24  assumption that you've just described, did

1  Three Arrows enter into the relevant transactions
2  within the meaning of -- other than the 82 million
3  liquidation, within the meaning of the BVI
4  Insolvency Act?
5      A.   Yes.  I'm prepared to make that assumption
6  for the purposes of the proceedings.
7      Q.   Thank you.
8      (Reporter clarification request.)
9  BY MR. PROULX:
10      Q.   So now turn to your rebuttal report,
11  please, sir.
12      A.   (Witness complies.)
13      Yes.
14      Q.   And I'll direct you to paragraph 53.
15      You say that --
16      A.   Sorry.  I'm not quite there.
17      Q.   Please let me know when you're there.
18      A.   Yes.  Thank you.
19      Q.   You're, in this paragraph, responding to
20  certain opinions given by Mr. Levy with respect to
21  the composite transaction consisting of
22  Three Arrows' entry into the FTX Terms of Service as
23  you describe that term.
24      Do you see that paragraph?



Page 74

1    A.  I'll just read it if you don't mind.
2    Q.  Yep.
3    A.  Thank you.
4        Yes, I've read that.  Thank you.
5    Q.  Thank you, sir.
6        Was Three Arrows' entry into the FTX Terms
7  of Service a type of transaction?
8        MR. BELLER:  Objection.
9    A.  The entry into or the conclusion of the
10  Terms of Service agreement between FTX and 3AC could
11  constitute a transaction.
12  BY MR. PROULX:
13   Q.  And you write that:
14       "The FTX Terms of Service, dated
15  13 May 2022, were no more than a renewal of the user
16  agreement that specified the Terms of Service for
17  the Exchange on an after" that date.
18       Do you see that?
19   A.  That's what's written there.
20   Q.  Is that -- what is that statement based
21  on?
22   A.  I'm not sure I understand what the purpose
23  of your questions are, if I'm honest.
24   Q.  Okay.

Page 75

1        You have a sentence you've written in
2  paragraph 53, the 1st sentence, just read it into
3  the record.
4    A.  The first sentence?
5    Q.  Yes.  What's the basis of that sentence,
6  Mr. Atherton?
7    A.  There was a prior agreement -- there was
8  an agreement as to Terms of Service, which predates
9  it, the Terms of Service at the 13 of May, 2022, and
10  that -- a new Terms of Service was entered into
11  dated the 13th of May 2022, which I understand were
12  the terms that governed the relationship between FTX
13  and 3AC, from 13th of May 2022 onwards.
14   Q.  You say you understood.  I'm asking, how
15  do you understand that?  Did you conduct any factual
16  review of the Terms of Service to confirm that?
17   A.  I've seen a document, which may or may not
18  be dated, but which I've given to understand were
19  the Terms of Service from the outset, I think, of
20  the relationship between 3AC and FTX.  And that the
21  later terms, the Terms of Service dated
22  13th May, 2022, were the Terms of Service extant as
23  of the relevant dates, those dates being the course
24  of June 2022.

Page 76

1    Q.   These are all more assumptions you've been
2  provided?
3    A.   I'm not sure it was an assumption, it may
4  be.  All I'm saying is there was a terms of service
5  which predated this.  And the Terms of Service
6  referred to here were dated 13th of May 2022.  And
7  Mr. Levy -- although Mr. Levy is, as I understand
8  him, saying that because that agreement was entered
9  into within the vulnerability period, then it may be
10  taken -- it may be taken as forming part of an
11  argument as regards to whether or not there was a
12  preference of FTX by 3AC, by reference to the rights
13  and obligations agreed to under the terms of the FTX
14  Terms of Service dated 13th May 2022.
15       That's my understanding of what Mr. Levy
16  is seeking to say -- says in his declaration.
17   Q.   That's a long-winded explanation for the
18  simple question of whether this is an assumption or
19  not, whether there was a renewal.
20       MR. BELLER:  Objection.  And I would ask
21   that you treat the witness with respect.  And I
22   don't think there's a question there.
23  BY MR. PROULX:
24   Q.   Mr. Atherton, you began your previous

Page 77

1  answer by saying "I'm not sure if it was an
2  assumption, it may be."  Do you have any
3  clarification on whether it was, in fact?
4    A.   Well, simply because I understand, I've
5  seen a document which predates this, which purports
6  to be relevant Terms of Service.  The actual
7  relevant documents, I understand to be the FTX Terms
8  of Service dated the 13th of May, 2022.  And that's
9  the document which Mr. Levy is referring to.  And
10  his analysis of saying there may be a broader
11  concept or concept for a relevant transaction, being
12  the entry into this agreement, and its relevance is
13  that it was an agreement between FTX and 3AC.  This
14  is my rehearsal of my understanding of his analysis.
15       But that is a relevant transaction, so an
16  insolvency transaction, because it took place within
17  the vulnerability period, was entered into during
18  the vulnerability period, and the other necessary
19  elements for the ability to prosecute a claim to
20  impeach preference are otherwise present.
21       MR. PROULX:  Okay.  For the record, I
22   don't know whether it was an assumption you
23   were provided or not.  That's not a question
24   for you.  I'm putting that on the record.

MAGNA
LEGAL SERVICES

BY MR. PROULX:
1
2     Q.   Do you have an understanding of whether
3  FTX under the prior user agreement was -- would have
4  been authorized to conduct the June 14, liquidation
5  that it did?
6        MR. BELLER:  Objection.
7     A.   You can take me to the terms, but I think
8  the terms were different.  They weren't exact.
9  BY MR. PROULX:
10    Q.   Okay.
11    A.   I used the phrase "renewal" because this
12  basis, or the basis of 3AC's ability to continue to
13  participate in the Exchange or on the Exchange was
14  to be on the basis contained in that document dated
15  13th May, 2022.
16    Q.   What is your understanding of the material
17  differences, if any, between the prior user
18  agreement and the May 13, 2022, Terms of Service?
19    A.   Off the top of my head I can't remember
20  the specifics, but I do appreciate that there were
21  difference.
22    Q.   Thank you, sir.
23        You write next in this paragraph, a couple
24  of lines down, that "The FTX Exchange was 'necessary

1  for 3AC to carry on its business.'"
2        Do you see that about halfway down?
3     A.   You want me to read into the record what I
4  say here?
5     Q.   No.
6     A.   Only because what you said wasn't actually
7  specific or accurate.
8        MR. BELLER:  Can you provide a paragraph
9     number for where you're referring?
10 BY MR. PROULX:
11    Q.   53.  I'm happy to just read it again into
12  the record.  I didn't know there was going to be a
13  misstatement of the document, but for avoidance of
14  doubt I'm happy to do so, the same paragraph we've
15  been looking at.
16        "If 3AC had not entered into this
17  agreement, it would not have been allowed to
18  continue to participate in or continue to have
19  access to the market which the Exchange provided and
20  which was necessary for 3AC to carry on its
21  business."
22        Do you see that, Mr. Atherton?
23        Haven't moved an inch.
24    A.   I'm not -- I'm just having trouble reading

1  the passage.  Let me just read the paragraph again
2  to myself.  Sorry.
3        (Witness reviews document.)
4        I'm sorry.  I was looking at the wrong
5  sentence.
6  BY MR. PROULX:
7     Q.   Not a problem.
8     A.   Thank you for the clarification.
9     Q.   Do you see that?
10    A.   Yes.
11    Q.   Always happy to clarify.  I don't mean to
12  point you to something not intending to review.
13    A.   I'm sorry.  I understand.  Thank you.
14    Q.   What's that statement based on?  That use
15  of the FTX Exchange was necessary for 3AC to carry
16  on its business"?
17    A.   Well, I'm making that statement in the
18  context of these proceedings and 3AC's participation
19  on the Exchange as a proprietary trader in digital
20  assets.
21    Q.   Is that an assumption provided by counsel
22  or is that based on some independent review of some
23  factual documents?
24    A.   It's neither.  It's an understanding that

1  3AC was a trader in digital assets.  It had
2  participated previously, prior to this date, on
3  the Exchange as part of its business.  And in order
4  to continue to participate on the Exchange, it
5  entered into the Terms of Service dated the 13th of
6  May 2022.
7     Q.   So then you must have a view on whether
8  3AC participated in any other cryptocurrency
9  exchanges in this time period, right?
10       MR. BELLER:  Objection.
11    A.   I'm sure it did.  Mainly -- the
12  observation is mainly in the context of these
13  proceedings.  I understand, but only from implicit
14  references in other documents, that 3AC may have
15  traded on the exchanges.  I don't know what they
16  were, but all I'm alluding to here is the specifics
17  of this case.  That in order to trade on this
18  Exchange in the pursuit of its business, it entered
19  into this agreement.
20 BY MR. PROULX:
21    Q.   You don't know how much business
22  Three Arrows conducted on those other exchanges
23  relative to the FTX Exchange; do you?
24    A.   No, I don't.

1      Q.   You write that -- the same exact
2  paragraph:
3           "The entry into the FTX Terms of Service
4  in May 2022, represented a transaction through which
5  Three Arrows received commensurate consideration."
6      Do you see that portion of the paragraph?
7      A.   The sentence continues on.
8      Q.   It does.
9      A.   Yes.  I've read it.
10     Q.   Thank you, sir.
11          What -- well, let me first ask, why is any
12  commensurate consideration, that Three Arrows
13  received, relevant in any respect to the preference
14  claim here?
15     A.   It may not be specifically relevant to the
16  preference claim, but insofar as it may be relevant
17  on the undervalued transaction claim.  All I'm
18  seeking to point out is that in return for entering
19  into the transaction -- beg your pardon.  In return
20  for -- yes, in return for 3AC entering into the term
21  of service, it was granted access to participation
22  on the Exchange.
23     Q.   You write in the next sentence:
24          "In addition, it may reasonably be

1  inferred that the Terms of Service were entered into
2  by 3AC in May 2022 in the ordinary course of its
3  business."
4      Do you see that?
5      A.   Yes.
6      Q.   Are you, in fact, opining that
7  Three Arrows entered into the Terms of Service in
8  the ordinary course of its business?
9           MR. BELLER:  Objection.
10     A.   Well, what the sentence says is:
11          "In addition, it may reasonably be
12  inferred that the Terms of Service were entered into
13  by 3AC in May 2022, in the ordinary course of its
14  business, and cannot, therefore, constitute an
15  unfair preference."
16          I'm making the observation, that in the
17  context of these proceedings, 3AC is a trader in
18  digital assets, and in the pursuit of that business,
19  entered into this agreement in order to participate
20  on the Exchange, which formed part of its business,
21  and it may reasonably be inferred as part of the
22  ordinary course of its business.
23          I'm sorry, I'm trying to unpack it because
24  you're suggesting that -- well, I don't know what

1  you're suggesting, but I'm just trying to explain --
2      BY MR. PROULX:
3      Q.   Is it your view, Mr. Atherton, that it
4  would --
5           MR. BELLER:  Counsel, I would ask you to
6  let the witness finish his answer.
7      A.   I'm sorry.  I think I had finished.  So I
8  was -- I paused again, so fair for you to ask the
9  question.
10     BY MR. PROULX:
11     Q.   It is never my intention to cut you off.
12     A.   I understand that.  Don't worry.
13     Q.   Feel free to let me know if any of your
14  answers are not finished and I'm happy to let you
15  finish them.  Just a bit of cross talk, it happens.
16     A.   I beg your pardon.
17     Q.   Is it your opinion that the entry into the
18  Terms of Service would likely be inferred to be in
19  the ordinary course of business?
20          MR. BELLER:  Objection.
21     A.   It's a standard phrase.  It may reasonably
22  be inferred.
23     BY MR. PROULX:
24     Q.   Can a composite transaction -- or sorry,

1  strike that.
2           Can a composite insolvency transaction
3  contain components that are in the ordinary course
4  and other components that are not?
5      A.   Well, I'd have to understand what the
6  specifics are you're seeking to refer to or be
7  provided with a much more comprehensive context in
8  which any answer I could give would have any degree
9  of utility.
10     Q.   Are you aware of any authority that would
11  provide a composite transaction -- the components of
12  a composite transaction are either all in the
13  ordinary course or all not in the ordinary course?
14          MR. BELLER:  Objection.
15     A.   Again, in what context?
16     BY MR. PROULX:
17     Q.   In any context.  Are you aware of any case
18  that has said that in any context?
19     A.   Off the top of my head, no.
20     Q.   You conclude this paragraph by -- final
21  sentence -- by stating:
22          "Essentially, the same arguments can be
23  deployed in relation to 3AC's entry into the
24  March 2022 Line of Credit Agreement."

MAGNA
LEGAL SERVICES

1     Do you see that sentence?

2    A.  Yes, I do.  Thank you.

3    Q.  Do you characterize the March 2022 Line of

4 Credit Agreement as a renewal of something?

5    A.  I think that there was a previous

6 agreement which provided for a lesser amount of

7 credit.

8    Q.  That previous agreement, did it provide

9 for a line of credit as well?

10    A.  I can't remember the specifics, I'm

11 afraid, sorry.

12    Q.  Did it provide an agreement with respect

13 to margin trading on the FTX Exchange?

14    A.  I can't remember the specific terms.  I

15 mean, I'm happy to look at it -- the documents, if

16 you want to take it to me.  But the off the top of

17 my head, I can't remember.

18    Q.  You're not opining here then that there

19 was a renewal of a prior document embodied in the

20 March 2022 Line of Credit Agreement, are you?

21    A.  I'm simply stating that there was a line

22 of credit agreement entered into in March of 2022.

23 And my understanding is that it was there to -- in

24 order to provide for an additional line of credit,

1 or rather a line of credit in a greater amount than

2 that which is otherwise being provided under the

3 previous agreement.

4    Q.  Was the March 2022 Line of Credit

5 Agreement necessary for 3AC to carry on its business

6 with the FTX Exchange?

7    MR. BELLER:  Objection.

8    A.  Whether it is necessary would be a matter

9 for the management of 3AC.  But it may be reasonably

10 inferred, as it seems to me, that if 3AC perceived

11 it was necessary to open that line of credit, it was

12 appropriate in the context of the prosecution of its

13 ordinary course of business.

14    That's all I'm really seeking to say.

15 BY MR. PROULX:

16    Q.  When you say, "it may be reasonably

17 inferred," is this a standard of art in BVI

18 procedure?  Please feel free to take your time?

19    A.  I'm sorry.  It's being on a plane, I

20 think, and you always acquire a cough.

21    Q.  If you ever need a break, just let us

22 know.

23    A.  Yes.

24    "Reasonably inferred" is not a term of

1 art, but it's -- I don't know in terms of in the

2 United States, but it's a phrase often used by

3 lawyers in England to say that something may be

4 inferred and it's a reasonable inference in the

5 circumstances of the case.  That's all that seems to

6 say.

7    Q.  No more than that?

8    A.  No.

9    Q.  Do you offer any opinion or have you been

10 provided any assumptions, with respect to whether

11 FTX provided advance notice to Three Arrows of its

12 intended liquidation on June 14, 2022?

13    A.  I think that may be referred to in either

14 the earlier paragraph or the later paragraph of the

15 rebuttal declaration.  But I can't specifically

16 recall.  That's -- I'm sorry, but I'm happy to add

17 to that.

18    I understand that Mr. Levy makes a point

19 about there being notice and acquiescence on the

20 part of 3AC or given to 3AC, and acquiescence on its

21 part in relation to the liquidation.

22    Q.  And that's not an analysis for Mr. Levy

23 that you take issue with in your rebuttal report?

24    A.  I think it might be because I don't know.

1 That's an assumption he's been asked to make.  I

2 can't remember the paragraph when later in the

3 rebuttal documents, rebuttal declaration, where I

4 set out again the assumptions I've been asked to

5 make.  But...

6    Q.  Is a company -- debtor company's

7 acquiescence in a -- advance notice of an

8 acquiescence in a given insolvency transaction,

9 relevant potentially to whether or not it entered

10 into that transaction?

11    A.  Not in my view, no.

12    Q.  Where in your rebuttal report do you

13 espouse that?

14    A.  I don't know.  But you've asked me a

15 question and the answer is that does not constitute,

16 in my view, the entry into a transaction.  And

17 again, I'm happy to add to that because I thought

18 about what Mr. Levy said.

19    In the preference context in England under

20 the Insolvency Act, the -- there's a what might be

21 colloquially referred to as "mental element," which

22 is that the company needs to suffer something to be

23 done.  Now, acquiescence might be suffering

24 something to be done, but that's not an element of

MAGNA ▶
LEGAL SERVICES

Page 94

1  liquidation on June 14, does that imply that
2  Three Arrows authorized them to?
3          MR. BELLER: Objection.
4      A.  I think that's the assumption that
5  Mr. Levy is operating under, which is why he wants
6  to suggest that there was a composite transaction,
7  which incorporates the terms and effect of the 13th
8  of May 2022 Terms of Service.  That's what I
9  understand the relevance of this issue to be.  And
10 was -- I understand the premise of your original
11 questions by reference to my response to Mr. Levy in
12 the paragraph that you took me to, which I think was
13 paragraph 53.
14 BY MR. PROULX:
15     Q.  I'm not sure I understand the previous
16 answer.  Are you suggesting that FTX was not
17 authorized to conduct the liquidation on June 14?
18         MR. BELLER: Objection.
19     A.  That doesn't reflect the answer, I don't
20 think, that I gave.
21         I think the position is that FTX was
22 authorized under the terms as between it and 3AC to
23 conduct the liquidation.
24

Page 95

1  BY MR. PROULX:
2      Q.  Do you dispute, Mr. Atherton, that the
3  relevant transactions have occurred within the
4  vulnerability period as that term is defined in the
5  BVI Insolvency Act?
6      A.  Could you specify which transactions?
7      Q.  Sure.
8          Beginning with -- well, let me ask a
9  different question.
10         Do you dispute that the vulnerability
11 period within the meaning of the BVI Insolvency Act
12 began six months -- approximately six months prior
13 to the appointment of the Joint Liquidators of 3AC?
14     A.  No, I don't, and I acknowledge that that
15 is in fact the position in my first declaration.
16     Q.  Okay.
17         If a given transaction within that
18 six-month period constitutes an insolvency
19 transaction, would it have been conducted within the
20 vulnerability period?
21     A.  I'll answer it this way.  A transaction
22 which took place on the 12th, 13th, 14th of June,
23 regardless of whether it was an insolvency
24 transaction or not, it would be a transaction which

Page 96

1  fell within the vulnerability period.  I have not --
2  in fact, I've stated that that's the position in my
3  first declaration.
4      Q.  Does Three Arrows' entry into the
5  March 2022 Line of Credit Agreement constitute a
6  transaction that occurred within the vulnerability
7  period?
8      A.  Yes, it does.  That's the point that
9  Mr. Levy makes, and I made that observation earlier
10 this morning.
11     Q.  In either of your reports, do you offer an
12 opinion on whether 3AC was insolvent within the
13 meaning of BVI law at the time of the June 12 or
14 June 14 transactions?
15     A.  I don't offer an opinion on that.  I
16 merely point out that insolvency is a requirement
17 and is a necessary element at the time of the
18 transaction, whether it's a preference or -- an
19 unfair preference or undervalue transaction.  Either
20 the company must be insolvent at the time or it must
21 be coming solvent as a consequence of the relevant
22 transaction, whether it's sought to be impeached as
23 a preference or it's sought to be impeached as an
24 undervalue transaction.  And I set out what the

Page 97

1  necessary test is because as you appreciate it, a
2  cash-flow test, and I simply say that I'm a --
3  proposed to assume for purposes of my declarations,
4  that it's insolvent.  The company, 3AC, was
5  insolvent within the meaning of the Insolvency Act
6  in the BVI.
7      Q.  Do you take issue with the way in which
8  Mr. Levy in his report articulated that standard
9  you've just described?
10     A.  No, I don't.  The only issue I take with
11 Mr. Levy is, as I recall he says that he's not aware
12 of a case in the BVI which discusses the cash-flow
13 insolvency test.  And that's where I refer in my
14 footnote to referring in error to a particular case
15 and then I seek to correct that by reference to a --
16 forgive me, I can't remember the name of the case,
17 different case, which appears to me to discuss the
18 cash-flow insolvency test by reference to the
19 English authorities which Mr. Levy refers to and
20 appears to endorse.  That analysis -- that's my -- I
21 don't have a problem with his general description of
22 what's required.
23     Q.  So let's move back to the other, what I
24 understood your testimony to be, was the other



Page 102

1  there exists such an asset or where there exists an
2  interest in an asset, which can be distributed,
3  that's really what I'm concerned and trying to
4  convey.
5      Q.  Where an insolvent company is a bailor of
6  the relevant assets or those, quote, assets of a
7  company, as you use the term in your last answer?
8      A.  Well, when it's a bailor, it's not in
9  possession.  When it's a bailor, it's not in
10  possession of those assets, and it will have a
11  superior legal title to the bailee, who will be in
12  possession of the asset.  And the right is for the
13  bailor to seek the return of the asset which is the
14  subject of the bailment.
15      Q.  So to my last question then, are those
16  assets of company, in that scenario, available for
17  distribution to its creditors?
18      A.  Yes.  Unless there is some sort of lien
19  available to the bailee.  If a company went into
20  liquidation, the liquidators would be entitled to
21  ask for asset to be returned, to get in that asset.
22      Q.  So then, is it your view that if
23  Three Arrows lost a beneficial ownership interest
24  and the relevant digital assets by way of FTX's

Page 103

1  commingling or otherwise, then there's nothing
2  available to creditors of its estate with respect to
3  those digital assets?
4      A.  Put it slightly differently, insofar as
5  those assets aren't available for distribution in
6  the liquidation, then they're not available for
7  distribution in the liquidation.
8      Q.  What determines whether or not they're
9  available for distribution in the liquidation?
10      A.  Whether or not they are an asset of the
11  company.
12      Q.  On the assumptions you've been given, are
13  they an asset of the company?
14      A.  Well, they're digital assets.
15      Q.  Yes.
16      A.  No.
17      Q.  So nothing was available to Three Arrows'
18  creditors in respect of the digital assets and its
19  liquidation, based on the instructions you've been
20  provided?
21      A.  Correct.  Other than the account balance.
22      Q.  So if there's nothing available to
23  Three Arrows' creditors in its liquidation, there
24  was nothing available to Three Arrows itself in

Page 104

1  respect to the digital assets; is that right?
2      A.  On the basis of the assumptions I've been
3  asked to make, and on the basis of my understanding
4  of the position as I've been given to understand it,
5  the situation of relationship as between 3AC and FTX
6  is one of debtor and creditor.  So that 3AC had the
7  contractual ability to ask for the delivery to it of
8  its account balance, or it could ask for the
9  delivery to it a withdrawal from the Exchange of
10  digital assets, up to the value of the account
11  balance.  And that's what it was, it's contractual
12  rights.
13      Q.  Is that contractual right an asset of 3AC?
14      A.  The chose in action would be an asset of
15  3AC, correct.
16      Q.  Is that asset, that chose in action,
17  available for distribution to its creditors?
18      A.  Well, the value of that chose in action
19  would be.  The value of that chose in action, if I'm
20  a liquidator to try to get in that action, is to ask
21  for the delivery of the assets which the contract
22  provides that I'm entitled to ask for.
23      Q.  You agree as much, do you not, in
24  paragraph 51 of your rebuttal report, that the

Page 105

1  chose in action is an asset of 3AC in respect of the
2  contractual entitlements you just referenced?
3      A.  Do you mind if I just read that, please?
4      Q.  Of course.  I'm specifically going to ask
5  you about the first sentence only at this point.
6      A.  That's helpful.  Thank you.
7          Yes, thank you.
8      Q.  Did I accurately state your position?
9      A.  I think you did, yes.
10      Q.  Okay.  Thank you, sir.
11          Let me then drill down with you a little
12  bit on a few points.
13      A.  Yes, of course.
14      Q.  You refer in that sentence to "a claim to
15  enforce a contractual right to request delivery."
16          Do you see that?
17      A.  Yes.
18      Q.  Are you drawing a distinction between a
19  claim to enforce a contractual right, versus the
20  contractual right itself as being an asset of the
21  company?
22      A.  Yes.  Because what I'm trying to convey is
23  you have contractual rights.  And insofar as that
24  contractual right is not complied with, you would



Page 106

1  have a chose in action to enforce that contractual
2  right. That's what I'm essentially seeking to
3  illustrate. So just in a contract, in any contract,
4  if there's nonperformance on the other side of the
5  contract, then the relevant party would be able to
6  bring a claim for breach of contract. And as I
7  point out in this paragraph, that's part of or one
8  of the claims, which the Joint Liquidators seek to
9  advance in the Proof of Claim.
10     Q. Is the -- is chose in action you've just
11 described an asset of a company as the term "asset"
12 is defined in the BVI Insolvency Act?
13     A. Well, I think that's what I tried to
14 explain I think in this paragraph, which is, a cause
15 of action for breach of contract -- just in very
16 general terms, a cause of action for breach of
17 contract would, in principle, constitute an asset of
18 a company if it's a company's contract. To that
19 extent, insofar as that asset has value, that value
20 could be realized for the benefit of the creditors
21 of the company.
22     Q. And it could be -- can it be realized only
23 as a breach of contract where the underlying
24 contractual entitlement is delivery up of the

Page 107

1  assets?
2      A. It would only sound in damages because --
3  on the assumption that I've been asked to make, and
4  an ordinary understanding of the contract rights in
5  this case.
6          In the absence of any proprietary right in
7  favor of 3AC, to say that is my issue, I want it
8  back. That's not this case. Like the assumption
9  I've been asked to make and my understanding of the
10 situation is, taking it as the example, the breach
11 of contract claim, is that 3AC would have a
12 contractual right to ask for the delivery of an
13 asset. If that asset existed and wasn't delivered,
14 then the punitive claim for breach of contract would
15 be for damages for the value of that asset. Not for
16 the asset itself.
17     Q. So my question, Mr. Atherton, was simply,
18 when you use the term "may well constitute an asset
19 of 3AC," are you using the term "asset" as defined
20 in the BVI Insolvency Act? Happy to make a
21 representation about -- let me stop there.
22     A. I'm simply saying that the ability to make
23 a claim for breach of contract would be an asset of
24 the company, which the liquidators could seek to try

Page 108

1  and get in or enforce in an attempt to realize
2  value, and then make a distribution to the
3  creditors.
4      Q. I'll represent to you that Section 21 of
5  the BVI Insolvency Act defines an asset to include:
6          "Money, goods, things in action, land, and
7  every description of property wherever situated, and
8  obligations and every description of interest,
9  whether present or future or vested or contingent,
10 arising out of, or incidental to, property."
11         Happy to pull it up if you need to dispute
12 that's the definition of --
13     A. No. I'm happy to take that from you.
14 That's my understanding. And I think as I say, my
15 description of the position would, in terms of the
16 chose in action before, within that definition it
17 gave you, specifically refers to chose in action.
18     Q. Thank you, sir.
19         Can a chose in action be legally owned?
20     A. Yes. The chose in action, the cause of
21 action for a breach of contract, is an asset
22 which -- of the company. I'm not sure it's
23 necessary to try and deconstruct it into ownership.
24 It's just an asset of the company.

Page 109

1      Q. And property of the company?
2      A. It's an asset, yes, insofar as any
3  distinction. I don't think it matters.
4      Q. Is -- are only chose in actions found in
5  breach of contracts assets of the company, or is any
6  chose in action the company has an asset of the
7  company?
8      A. I'm not sure I'm -- if you're trying to
9  make a distinction, I'm not sure what the relevant
10 distinction is that you're trying to make. Sorry.
11     Q. If a company has a chose in action for
12 conversion of an asset, is that an asset of the
13 company?
14     A. That chose in action would be, or that
15 cause of action would be, an asset.
16     Q. And legally owned by the company?
17     A. It's just an asset of the company.
18     Q. Property of the company?
19     A. Yes.
20     Q. And you acknowledged that, right, in
21 footnote 69 of your rebuttal declaration. This is
22 in paragraph 47.
23     A. Footnote 69.
24     Q. Yes. On paragraph 47, please.



Page 110

1    A.   Do you mind if I read the paragraph as
2  well, please?
3        I'm sorry.  I'm not sure that's dealing
4  with the same issue or type of issue.
5    Q.   I'm referring to the second sentence of
6  footnote 69, where you say:
7        "As was noted in Re Emanuel, what the
8  creditor received from the insolvent company was the
9  actual benefit of a valuable chose in action that
10 was owned by/was an asset of the insolvent company."
11   A.   Yes.  By reference to the assertiveness of
12 that case.  I'm not disputing that a chose in action
13 that a company has is an asset of the company.
14   Q.   A chose in action can be transferred from
15 the company --
16   A.   I beg your pardon, that's my fault.
17   Q.   A chose in action could be transferred
18 from a company to another, yes?
19   A.   Yes.  By assignment, for example.
20   Q.   A chose in action can be subject to a
21 trust, yes?
22   A.   In the dim and distant past, I think there
23 may be an issue about that in a matter of equity.
24 But for present purposes, I'm happy to assume that's

Page 111

1  correct.  But I may want to go back to that because
2  there may be some old equitable authority which
3  qualifies that, but I'm happy to proceed on that
4  basis for the moment.
5    Q.   Assume for a moment that 3AC had no
6  liabilities whatsoever on the FTX Exchange and
7  simply a positive digital asset balance, as you use
8  that term in your reports.
9        Are you with me so far?
10       MR. BELLER: Objection.
11   A.   I'm -- you're asking me to make an
12 assumption about liabilities on the Exchange of 3AC,
13 and I'm not sure how that accords or does not accord
14 with the assumptions that I've been asked to make or
15 the premises upon which I've provided my opinion.
16 And also, I don't know to who, you're suggesting,
17 those liabilities of 3AC, if they existed, were
18 owed.
19 BY MR. PROULX:
20   Q.   I'm asking you to make a new assumption
21 that I acknowledge is not consistent with the
22 assumptions you've been given for purposes of your
23 testimony today.  The new assumption is that Three
24 Arrows had only a positive digital asset balance, as

Page 112

1  you used that term, on the Exchange, and no negative
2  U.S. dollar balance or other negative balances.  I'm
3  not asking you to accept that, but do you understand
4  that assumption?
5    A.   Yes and no.  As I understand the position
6  as a matter of actuality, it had a positive asset
7  and it had a positive account balance, but had a
8  negative U.S. dollar balance.  So if all you're
9  saying is that the factual situation you're asking
10 me to assume is that there were no negative balance,
11 it was just a positive asset account balance, then I
12 understand that.  But...
13   Q.   Thank you, sir.
14       What would have happened to Three Arrows'
15 contractual entitlements to that solely positive
16 digital asset balance, in the event of its
17 liquidation, assuming no liquidations or sales of
18 those assets?
19       MR. BELLER: Objection.
20   A.   Given the assumption you've asked me to
21 make, then the liquidators acting on behalf of 3AC,
22 would have been contractually entitled to ask for
23 the delivery of, in what you say is the value of the
24 account balance.

Page 113

1  BY MR. PROULX:
2    Q.   And that ability to ask for delivery of
3  terms, the value being the account balance, that is
4  an asset of Three Arrows' estate, yes?
5    A.   The contractual claim, the
6  chose in action, is an asset of the estate.
7    Q.   So if the value of that asset is the
8  account balance, how are 3AC's creditors any
9  differently positioned economically if Three Arrows'
10 assets consist of a beneficial proprietary interest
11 in the assets, versus a contractual entitlement to
12 their value?
13       MR. BELLER: Objection.
14   A.   I'm sorry.  I think you'll have to repeat
15 that question.
16 BY MR. PROULX:
17   Q.   Sure.
18   A.   Thank you.
19   Q.   Accepting for present purposes your
20 explanation of value in the prior answer, how
21 economically are Three Arrows' creditors differently
22 situated depending on whether 3AC's asset was only a
23 contractual entitlement to the digital assets versus
24 a beneficial proprietary interest in the digital



1    Q.   Flip please to paragraph 8.2.6, on
2  page 10, in the lower right-hand corner.
3    A.   (Witness complies.)
4    Q.   Specifically, I'll direct you to 8.2.6(C)?
5    A.   (Witness complies.)
6    Q.   My question is, does 8.2.6(C), entitle
7  Three Arrows only to request delivery of its account
8  balance or to request delivery of the digital assets
9  themselves associated with their accounts?
10       MR. BELLER:  Objection.
11    A.   As I understand the situation, these
12  clauses and these contracts are subject to detailed
13  consideration by -- on behalf of the
14  FTX Recovery Trust, Lord Neuberger, and on behalf of
15  3AC by Dame Elizabeth Gloster.  They are, if you'd
16  like, the experts who have been called to testify as
17  to the true meaning and effect of these documents.
18  BY MR. PROULX:
19    Q.   You're not opining then that the
20  contractual entitlements that 3AC had was not to
21  demand delivery up of all of the assets in its
22  account, are you?
23       MR. BELLER:  Objection.
24    A.   Again, on the basis of what I've been

1  asked to assume, it was a contractual ability for
2  3AC to ask for the transfer to it of its account
3  balance.  Or it could ask for the withdrawal as we
4  previously discussed this morning or earlier today.
5  It was capable of withdrawing digital assets from
6  the Exchange.
7  BY MR. PROULX:
8    Q.   Is this 8.2.6(C) the provision you have in
9  mind for the latter of the two contractual
10  entitlements?
11    A.   You may withdraw your digital assets by
12  sending them to a different block chain address
13  controlled by you or a third party, correct.
14    Q.   Let's stop for lunch.  We've been going
15  for another hour.
16    A.   I'm not quite sure I finished with the
17  answer.
18    Q.   I didn't know.
19    A.   I paused.  But my point being that, I've
20  also been asked to assume that 3AC or any other
21  participant wasn't able to withdraw digital assets
22  to the extent that the value sought to be withdrawn
23  in terms of those digital assets was greater than
24  the account balance in any given case in relation to

1  any given participant.
2    Q.   That's an assumption you were provided by
3  counsel?
4    A.   Yes.  That's my understanding and what I
5  was given to understand.
6    Q.   Not reflected by anything or the words on
7  the page here?
8       MR. BELLER:  Objection.
9    A.   For example, the debate between
10  Lord Neuberger and Dame Elizabeth Gloster is such
11  that there is a dispute as to what these terms in
12  fact mean.  So if you say to me, that's not what the
13  clause says, it may or may not be what the clause
14  says.  It may or may not be what the clause means.
15  That's been dealt with, you know, that's not my
16  specific remix.  I'm giving you the -- my
17  understanding of what I begin to understand the
18  assumption as to how what was intended -- how the
19  relationship was designed to operate.
20  BY MR. PROULX:
21    Q.   So you're not opining independently on the
22  scope of the contractual entitlement that -- the
23  full scope of the contractual entitlement that 3AC
24  had, pursuant to this document or any others?

1    A.   I think that's fair to say to the extent
2  I've already explained what my understanding is
3  under the assumptions I've already made, as to the
4  nature of the relationship between FTX and 3AC,
5  which as regards to the assets on the Exchange, as
6  regards to the account balance, it was a contractual
7  right for 3AC to ask for the payment, equivalence of
8  the value of the account balance, to be made to it.
9       That, in and of itself, did not give it a
10  proprietary right to any of the digital assets that
11  were associated with its accounts on the Exchange or
12  with the account balance itself.  I'm sorry I've
13  delayed your lunch.
14    Q.   Are you done?
15    A.   I'm finish now.
16    Q.   Okay now to stop for lunch?
17    A.   Yes.
18       MR. PROULX:  Counsel, you're okay to stop
19  for lunch?
20       MR. BELLER:  Yes.
21       MR. PROULX:  Off the record.
22       THE VIDEOGRAPHER:  We're off the record.
23  The time is 12:57 p.m.
24       (At 12:57 p.m. a luncheon recess was

1          MR. BELLER:  Objection.
2      A.   Insofar as from -- insofar as the purchase
3  price has not been paid, yes, it would be entitled
4  to seek to recover the purchase price.
5  BY MR. PROULX:
6      Q.   Is that an asset of the company?
7      A.   Is what an asset of the company?
8      Q.   The right to obtain payment of the
9  purchase price?
10     A.   The chose in action would be an asset of
11  the company, correct.
12     Q.   Even though the company lost any
13  proprietary interest in the goods upon their
14  delivery to the customer?
15     A.   You're assuming that -- in the scenario
16  that you're positing that title is passed under the
17  terms of sale.
18     Q.   That's a fair comment.  I'm happy to
19  stipulate that title is passed in that scenario.
20     A.   In which case, the remedy would be an
21  attempt to recover the purchase price or the sales
22  price, if you're viewing it from the perspective of
23  the vendor.
24     Q.   You referred to something called the "pari

1  passu principle" in your report.
2          Are you familiar with that term?
3      A.   Yes, I am.
4      Q.   What is that principle, in your view?
5      A.   I think, as I've touched upon this
6  certainly earlier today, the pari passu principle is
7  a principle that governs the distribution of assets
8  in an insolvent liquidation or insolvent winding-up,
9  whereby the concept or policy is that the assets of
10  the company are to be distributed to unsecured
11  creditors on a proportional or a ratable basis.
12     Q.   When you say "assets of the company,"
13  you're not referring only to assets in which the
14  company had a proprietary interest; you're referring
15  to any assets of the company, yes?
16     A.   The process would be the liquidators
17  getting the assets of the company.  They generally
18  would monetize them, and then would distribute those
19  funds, pari passu, ratably, amongst the creditors of
20  the company.  It may be payments that are made in
21  priority, such as to secured creditors or
22  preferential creditors.  But that's what the
23  pari passu principle is intended to cover.
24     Q.   So that's a "yes," Mr. Atherton?

1          MR. BELLER:  Objection.
2      A.   I've just answered the question.  If you
3  want me to answer the question again, ask me for a
4  specific answer.  I thought I answered the question.
5  I'm sorry.
6  BY MR. PROULX:
7      Q.   Does the loss of a chose in action that a
8  company has result in a diminution in its assets
9  available for distribution to creditors?
10         MR. BELLER:  Objection.
11     A.   Would the loss of a chose in action --
12  assuming that the chose in action is a
13  chose in action of the company, then if the
14  chose in action is lost, then it would represent, in
15  theory or in principle, a diminution in the assets
16  of that company, assuming, again, the company has
17  not received anything in return for the
18  chose in action.
19  BY MR. PROULX:
20     Q.   In your view in this case, did
21  Three Arrows lose a chose in action that you have
22  ascribed to it at any point in time?
23         MR. BELLER:  Objection.
24     A.   Not on my understanding.  I think we've

1  covered this earlier today.  The right of the 3AC to
2  seek payment of the account balance from FTX, in
3  principle, remains extant.
4  BY MR. PROULX:
5      Q.   If 3AC had filed for liquidation
6  immediately before the relevant transaction here in
7  the June '12 through '14 period, wouldn't FTX have
8  been left to file a claim in its liquidation for the
9  negative balances on its account?
10         MR. BELLER:  Objection.
11     A.   I think that's an assumption you're asking
12  me to make.
13  BY MR. PROULX:
14     Q.   It is.
15     A.   The answer, as I understand it, is no
16  because of the way the customer accounts operated so
17  that the -- it's the account balance which is the
18  asset, and it's not divided between a digital asset
19  balance and a negative U.S. dollar balance.
20     Q.   Well, when a company -- insolvent company
21  files for bankruptcy in the BVI, isn't there a stay
22  imposed with respect to its assets?
23     A.   Upon liquidation, there is a statutory
24  stay which prevents, for example, legal proceedings

Page 138

1   is dealings with the company's assets.
2        The logical conclusion being that if that
3   wasn't the case, it wouldn't be necessary to have
4   that alternative scenario in terms of a transaction
5   which causes the company to become insolvent.
6   BY MR. PROULX:
7        Q.   Taking the converse of that, Mr. Atherton,
8   a transaction can be an insolvency transaction if it
9   doesn't cause the company to become insolvent,
10  right?
11       A.   Yes, because it's already insolvent.
12       Q.   A transaction can be an insolvency
13  transaction if it involves assets not owned by the
14  debtor, correct?
15       A.   Could you say that again, please?
16       Q.   A transaction can be an insolvency
17  transaction and not cause the company to become
18  insolvent because it already is?
19       A.   Yes.
20       Q.   It can also not involve assets owned by
21  the debtor, correct?
22       A.   But I think in those circumstances, one
23  has to look at whether or not the transaction that
24  doesn't involve the assets of the company has some

Page 139

1   deleterious affect on the assets of the company.
2   Because if a transaction involves assets which would
3   not otherwise be available to the liquidation state
4   for distribution to creditors, then one is left with
5   asking the question on what basis would be -- would
6   there be a remedy under the Insolvency Act to
7   restore to the company something that was never the
8   company's?
9        Q.   You've been consistently referring to the
10  assets of the company, not engaging with my
11  questions regarding whether they need to be
12  proprietary interests of the company.
13       Is it your position or not that an unfair
14  preference claim in an insolvency transaction
15  requires a transaction in assets in which a company
16  has a proprietary interest; yes or no, Mr. Atherton?
17       MR. BELLER:   Objection.  And this is now
18  the second time on the record that I have had
19  to ask you, Counsel, to treat the witness with
20  respect.  There is no need for the tone and the
21  aggression with which you are asking your
22  questions.
23       MR. PROULX:  I will let the record speak
24  for itself and the evasive answers we've been

Page 140

1   receiving from this witness, the nonanswers
2   we've been receiving from this witness, and the
3   recasting of questions by this witness.
4        I will ask my questions.  You impose
5   whatever objections you'd like, and we'll
6   proceed.
7   BY MR. PROULX:
8        Q.   Mr. Atherton, does an insolvency
9   transaction require a proprietary interest in the
10  assets involved in that transaction?
11       A.   The transaction requires the transaction
12  to involve the assets of the company.  Those assets
13  may be reflective of the company having a
14  proprietary interest in them or, as we discussed
15  earlier, it may be that a $50 credit balance in a
16  bank that is not the property stricto sensu of the
17  company is, nevertheless, an asset of the company in
18  the terms of its chose in action.  And, ordinarily,
19  the bank will deliver up the $50.
20       Q.   Thank you, Mr. Atherton --
21       A.   But --
22       Q.   I didn't know you weren't done.
23       A.   But the asset is the chose in action which
24  the company owns.

Page 141

1        Q.   Thank you for that clarification.  Let's
2   talk about the Invest Bank case.
3        Are you familiar with that case?
4        A.   Yes, I am.  I think I refer to it in my
5   first declaration.
6        Q.   Which judicial body offered that opinion?
7        A.   The United Kingdom Supreme Court,
8   ultimately.  It was the subject of decisions at
9   lower levels.
10       (Exhibit 115 was received and marked for
11  identification, as of this date.)
12  BY MR. PROULX:
13       Q.   Mr. Atherton, you've been handed what's
14  been marked as Exhibit 115.  Is this the Invest Bank
15  case from the English Supreme Court with which
16  you're familiar?
17       A.   It's the judgment in that case, correct.
18       Q.   How, generally speaking, is the UK Supreme
19  Court's opinions respected or not respected by BVI
20  courts?
21       A.   As a matter of technicality, they would be
22  classified as being persuasive or authoritative
23  only, rather than binding on policy.  But I think
24  it's fair to say that they're heavily persuasive,



Page 142

1  and provided they have a direct precedential value
2  in terms of the issue that's decided, they would
3  generally be adopted or followed, certainly
4  considered.
5      Q.  Invest Bank was interpreting certain
6  provisions of the UK Insolvency Act; is that right?
7      A.  It was interpreting Section 423 of the
8  Insolvency Act, 1986.
9      Q.  It was also interpreting Section 238 of
10 the Insolvency Act, correct?
11     A.  I don't think that's quite right, in that
12 there are similarities in terms of elements of
13 Section 238 and 423; whereas I think you'll find
14 from paragraph 1 of the judgment, the principal --
15 the first issue which the court was considering was
16 the interpretation of Section 423 of the
17 Insolvency Act.
18     Q.  By my count, discussion of 238 comes up 23
19 times in this decision.  And as you say, they do
20 compare and contrast, to the extent of a comparison,
21 238 to 423; don't they?
22     A.  Perhaps I might answer that question by
23 reference to paragraph 1 of the judgment:
24         "This appeal raises a single but important

Page 143

1  point on the construction of Section 423 of the
2  Insolvency Act 1986."
3         That's the principal issue that the court
4  was considering.  As I indicated and as you
5  correctly pointed out, there are similarities
6  between Section 423 and Section 238.
7      Q.  And the essential reasoning of the court
8  in interpreting Section 423 makes its way through
9  interpretation of 238; does it not?
10     A.  Well, only in the sense that the court was
11 interpreting, amongst -- in the context of
12 interpretation of 423, the word "transaction," which
13 is defined in the Act.  And that links together the
14 two sections, because the word "transaction" is also
15 used in Section 238.
16         And one of the things that one of the
17 Masters of the Court was anxious to point out is
18 that it would be -- this is my word, "ill-advised"
19 or, perhaps even "wrong" -- for that word to be
20 used -- that same word to have two different
21 meanings in two different parts of the Act.
22         So in interpreting Section 423 and giving
23 meaning and interpreting the definition of
24 "transaction" for Section 423, it would plainly have

Page 144

1  a consequence for the use of that word in the
2  context of Section 238.
3      Q.  Thank you for that robust answer,
4  Mr. Atherton.
5      A.  Not trying to be robust.  I'm just trying
6  to be as accurate as possible.  So I'm sorry.
7      Q.  I appreciate the accuracy.
8         The definition of "transaction" within the
9  meaning of the UK Insolvency Act, do you have a
10 characterization of whether it's broad or narrow?
11     A.  I think -- can you show me in the judgment
12 where this --
13     Q.  Sure.
14     A.  -- definition is reproduced, please?
15         THE VIDEOGRAPHER:  Mr. Atherton, can you
16 move over here?
17         (A discussion was held off the record.)
18         MR. PROULX:  Let's go off the record.
19         THE VIDEOGRAPHER:  We're going off the
20 record.  The time is 2:17 p.m.
21         (Recess.)
22         THE VIDEOGRAPHER:  We are back on the
23 record.  The time is 2:20 p.m.
24

Page 145

1  BY MR. PROULX:
2      Q.  Paragraph 30 of the Invest Bank decision,
3  Mr. Atherton, provides a definition for
4  "transaction" that's defined in Section 436 of the
5  UK Insolvency Act.
6      A.  Thank you.  Do you mind if I just read it?
7      Q.  Do you see that definition, is my
8  question?  Take your time.
9      A.  I'm so sorry.  Thank you.
10         (Witness reviews document.)
11         Yes.  I just wanted to be sure I
12 understood the precise terms.
13         Yes, it is, as the court states, a broad
14 definition, and it's said to be inclusive, so
15 not delimiting.  And as a matter of practice,
16 the word is -- and the phrase is given, in the
17 jurisprudence, a broad interpretation.
18     Q.  Does Section 436 in the definitions
19 therein apply only to certain provisions of the
20 UK Insolvency Act or to those terms wherever they
21 appear subject to any other more specific
22 definition?
23     A.  I think the latter, which is why I think
24 the court was anxious to state that that word could

**MAGNA**
LEGAL SERVICES

1  not have different meanings where it otherwise
2  appeared.
3      Q.  And that word, in fact, appears in one or
4  more of the preference provisions in the UK
5  Insolvency Act; does it not?
6      A.  You'd have to remind me.  I'm sorry.
7      Q.  I'm happy to make a representation it
8  does.  I can refer you to a specific one quickly.
9      Section 243 of the UK Insolvency Act
10 titled "Unfair Preferences":
11     "Subject to Section 2 below, subsection 4
12 below applies to a transaction entered into by the
13 company, whether before or after 1st of April 1986,
14 which has the effect of creating a preference in
15 favor of a creditor to the prejudice of the general
16 body of creditors," and continues.
17     Do you accept the representation, or would
18 you like me to show you that provision?
19     A.  I don't accept the representation because
20 Section 243 is the preference provision as it
21 applies to Scotland, I think, 239 -- Section 239 is
22 the preference provision that would apply in
23 England.  As you may or may not appreciate, there is
24 a difference.

1      Scottish law is not identical to English
2  law, but you have a UK provision, and therefore,
3  within it, there would be particular references to
4  wording which is specific or provisions which is
5  specific to Scotland.
6      Q.  I appreciate that clarification.  Just as
7  a matter of English law jurisprudence, to the extent
8  you're able to opine on it, does an English law
9  preference, Wales of England preference, require a
10 transaction of some kind?
11     A.  That's why I asked you to take me to the
12 relevant section, because I need to understand, were
13 that word, if that word does -- is included in the
14 principal section, which I think is Section 239 --
15 if it does appear, where does it appear and in what
16 context?
17     Q.  I can show you, mindful of time, that the
18 word does not appear -- the word "transaction" does
19 not appear.  My question was, of course, different.
20     My question was, whatever the statute may
21 say, the words, does there need to be transaction of
22 some kind to sustain an English law preference
23 claim?
24     MR. BELLER:  I'm going to object.  I don't

1  know -- he can answer it to the extent he has a
2  view, but Mr. Atherton is not being put forward
3  as an expert directly in English preference
4  law.  So to the extent it has, within the scope
5  of his analysis under his BVI expertise, and
6  otherwise and to the extent he has a view, I'm
7  happy for him to answer.
8      But I'm just noting that this line of
9  questions seems to be meandering around
10 provisions of English law and Scottish law that
11 seem a little bit far afoul of we're talking
12 about.
13     MR. PROULX:  Counsel, your monologue just
14 now itself runs afoul of the rules.  The
15 witness is here to testify as to what he is
16 here to testify to and is, himself, testifying
17 as to the scope of his representation, not you
18 coaching him on that point.
19     Let the record reflect what opposing
20 counsel has said.
21 BY MR. PROULX:
22     Q.  Do you need me to repeat the question,
23 Mr. Atherton?
24     A.  No.

1      Q.  Do you need me to put in front of you
2  Section 239 of the UK Insolvency Act?
3      A.  If you have that, I'd appreciate it.
4      Q.  We do, yes.
5      A.  Thanks.
6      (Exhibit 116 was received and marked for
7  identification, as of this date.)
8  BY MR. PROULX:
9      Q.  Before we get there, Mr. Atherton, in
10 light of counsel's comment right now, are you not
11 interpreting the Invest Bank decision, given that
12 this is a matter of a UK judicial body?
13     MR. BELLER:  I'm going to object to the
14 characterization of what I said, which is
15 completely mischaracterized by the purported
16 question.
17 BY MR. PROULX:
18     Q.  You can answer the question, Mr. Atherton.
19     A.  I am qualified to opine on the law of
20 England, and that allows me to -- qualifies me to
21 offer an opinion on the interpretation of the
22 judgments in the Invest Bank case, and it also
23 allows me to consider the terms and interpretation
24 of provisions under the Insolvency Act, 1986 as it

MAGNA
LEGAL SERVICES

1 applies in England.
2     Q.   On page 18 of that document that we've
3 just provided you -- this is marked as Exhibit 116,
4 and is an excerpt of the UK Insolvency Act, 1986.
5     A.   Thank you.
6     Q.   It's Section 239, as you requested.
7     A.   Thank you very much.
8         Do you mind if I quickly refamiliarize
9 myself?
10    Q.   Yes.
11    A.   (Witness reviews document.)
12        As you fairly indicated, the word
13 "transaction" does not appear in Section 239.
14    Q.   My question was very simple.
15        Does there need to be a transaction under
16 239 to sustain a preference claim under the law of
17 England of Wales?
18    A.   I do beg your pardon.  I hadn't quite
19 finished, but I'm happy to answer the question in
20 this way, because we touched upon it earlier today:
21        If one looks at Section 239, subsection 4
22 on page 18 of the extract that you handed me, for
23 the purposes of this section and Section 241, a
24 company gives a preference to a person if -- (a) is

1 irrelevant.
2         "(B) if the company does anything or
3 suffers anything to be done which, in either case,
4 has the effect of putting that person into a
5 position which, in the event of the company going
6 into insolvent liquidation, will be better than the
7 position he would have been in, if that thing had
8 not been done."
9         As we discussed earlier, when you took me
10 to part of Mr. Levy's declaration and you asked me
11 about whether or not acquiescence could be involved
12 in the transaction and I said no, and I said to you
13 that acquiescence might, in an English context, be
14 constituted by the company doing anything or
15 suffering anything to be done.
16        So "transaction" here, the word does not
17 appear.  The opposite parts of the section are
18 indicating something other than necessarily a
19 transaction, namely, the company doing something,
20 "does anything or suffers anything to be done."  So
21 that may include a transaction, or it may be
22 something distinctive from a transaction.
23        What certainly doesn't apply is the
24 definition of "transaction" as it appears in

1 Section 426 because the word doesn't appear in the
2 operative part of the section.
3         That's all I was trying to explain.
4 Apologies if it's taking rather longer than you
5 anticipated.
6     Q.   Do the -- as set out in Invest Bank, do
7 the concerns that animated a undervalue transaction
8 claim that it was adjudicating there overlap with or
9 are similar to the concerns that animate a
10 preference claim under the UK Insolvency Act?
11    A.   Again, I'm sorry, but I don't really
12 understand the question.
13    Q.   Is the only reason you're opining that --
14 let's talk about the Scotland provisions.  I think
15 that may be at 420 -- 243.
16        Do you need us to provide you that section
17 as well?
18    A.   No.  I'm certainly not being touted as,
19 nor am I, an expert on the law of Scotland.
20    Q.   Do you have any reason to believe that
21 "transaction," as used within the meaning of 436,
22 would have any different meaning as it relates to a
23 Scotland preference claim than it does a UK
24 undervalue claim under 423?

1         MR. BELLER:  Objection.
2     A.   I'm trying to be as fair as possible.  I'm
3 not an expert in Scottish law.  I've indicated to
4 you that, as I understand the decision in the
5 Invest Bank case, the definition of "transaction" is
6 sought to be, or applied a definition of that word
7 throughout the Act.  But I should also say that --
8 could I just -- for example, if you have the
9 judgment in front of you.
10        MR. PROULX:  Uh-huh.
11    A.   I'm just on page 329.  So if you look at
12 the top of the right-hand page, it says "Invest Bank
13 PSC v. El-Husseini," and then it says "SC," in
14 brackets, "E."
15        Similar to the situation that used to
16 apply under the House of Lords, that's the Supreme
17 Court, the UK Supreme Court.  But "E" is England.
18 So it's not sitting as, like, espousing adjudgments
19 in the context of Scottish law; otherwise, it would
20 say "SC," brackets, "S."
21 BY MR. PROULX:
22    Q.   Mr. Atherton, taking a step back, what is
23 your opinion as to the relevance or lack of
24 relevance of Invest Bank at all to the preference

**MAGNA**
**LEGAL SERVICES**

Page 154

1  claim asserted under BVI law by the Joint
2  Liquidators?
3      A.  In principle, it has more relevance to an
4  undervalue transaction as a matter of BVI law.
5      Q.  That wasn't my question, of course.
6      A.  Well, I can try and give you as fulsome an
7  answer as possible.
8      Q.  I want you to answer my question directly,
9  Mr. Atherton.
10         MR. BELLER:  Counsel, let the witness
11     finish his answer.  And for the third time,
12     please treat the witness with the respect that
13     he deserves, in a professional manner.
14         MR. PROULX:  For the record, Counsel,
15     before the break, as we discussed, we want to
16     be mindful of time here and move forward at a
17     rapid clip so that the witness can get out of
18     here at a reasonable hour today.
19         I'm trying to do that.  I'm trying to
20     receive answers that are responsive to my
21     questions so we can facilitate that.  The
22     witness not currently doing that.
23         MR. BELLER:  I encourage you to ask better
24     questions if you're not getting the answers

Page 155

1      that you want, instead of berating the witness
2      and interrupting him repeatedly.
3  BY MR. PROULX:
4      Q.  Mr. Atherton, of course, I welcome you to
5  finish whatever answer you were providing.
6      A.  I'm not trying to irritate you.  I am
7  mindful, though, of my obligation, which is to
8  assist the court.  And I'm endeavoring to do that.
9         On one level it has no relevance at all
10  because the word "transaction" doesn't appear in the
11  preference section in Section 239.  Going back to
12  paragraph 1 of the judgment, I read to you the first
13  part which said specifically what the single but
14  important point was, and then about half a dozen
15  lines down on paragraph 1:
16         "The general issue as initially presented
17  by the appellants was whether Section 423 applied
18  only where the transaction involved the transfer of
19  an asset beneficially owed by the debtor.  As will
20  appear, this issue was refined an narrowed by the
21  appellants in the course of submissions.  The more
22  specific, but nonetheless important, issue has
23  remained unchanged: whether Section 423 can apply to
24  a transaction whereby a debtor agrees to procure a

Page 156

1  company which he owns to transfer a valuable asset
2  for no consideration or at an undervalue, thereby
3  reducing or eliminating the value of his shares in
4  the company to the prejudice of his creditors."
5         That was the context in which the first
6  issue was being decided, and that was the issue that
7  was ultimately decided.  The point being -- and as
8  is further referred to in, I think, paragraph 35 and
9  paragraph 60 of the report, which is that one is
10  looking towards the diminution in the value of the
11  assets of the debtor, even though the transaction
12  may have directly involved only assets of, in this
13  case, an affiliated or related third party.
14         MR. PROULX:  Move to strike your answer as
15     nonresponsive.
16  BY MR. PROULX:
17      Q.  Mr. Atherton, do you have a view on
18  whether the conception of transaction under 432 --
19  strike that -- 423 and 436 of the UK Insolvency Act
20  would also apply to the BVI law, statutory provision
21  for undervalue claim at 426?
22      A.  No, not directly.  As I've said in my
23  second declaration, no doubt it could be put -- this
24  case could be put to a BVI court in an attempt to

Page 157

1  argue that it had relevance and persuade the court
2  that it should take it into account.  But, of
3  course, there is no definition of "transaction" in
4  the BVI legislation, and the phrase that is defined
5  is "insolvency transaction."
6      Q.  Does "insolvency transaction" appear in
7  both the BVI preference provision and the BVI
8  undervalue transaction provision?
9      A.  It's a common phrase which is applicable
10  in both a preference context and in an undervalue
11  transaction context, yes.
12      Q.  Are you opining as a matter of BVI law
13  that the meaning of "insolvency transaction" means
14  one thing in the preference context and another in
15  the undervalue claim context?
16      A.  No.  I'm not saying that at all.
17      Q.  You said earlier that, no doubt, it could
18  be put to this -- "no doubt it could be put -- this
19  case could be put to a BVI court," referring to the
20  Invest Bank case, in an attempt to argue that the
21  definition of "transaction" there also applies to
22  426 in the BVI Insolvency Act.
23         If it was, do you have a view on whether
24  or not a BVI court would likely accept that

MAGNA
LEGAL SERVICES

Page 158

1  application of that --
2     A.  I --
3     Q.  Sure, please.
4     A.  I think there's an issue in that, because
5  as I've sought to explain in both declarations, this
6  case is concerned with a specific provision and a
7  specific definition.  In a different jurisdiction
8  involving a different statute which is not
9  applicable in the BVI.
10     So, for example, the definition of
11  "transaction" because the word "transaction" does
12  not appear in the preference provision doesn't have
13  any relevance to the preference provision in
14  England.  The issue, therefore, may be if the
15  reasoning here doesn't apply to preferences in
16  England, that might create a problem or an issue as
17  to why it should apply in the -- understanding the
18  definition and the interpretation, an insolvency
19  transaction, which, under the BVI statute, is
20  applicable to a preference.
21     So there are -- and also, as I've sought
22  to explain in my declaration, the origin, the
23  statutory lineage of Section 423 is very different
24  to the statutory lineages of, in particular,

Page 159

1  anti-preference provisions in English law or under
2  laws which are similar to English law.
3     MR. PROULX:  Move to strike to your answer
4  as nonresponsive.
5  BY MR. PROULX:
6     Q.  Again, my question was about the proposed
7  application of the definition of "transaction" in
8  the UK Insolvency Act context and the BVI Insolvency
9  Context, namely Section 426.
10     Do you have a view on whether --
11     A.  Section 245.
12     Q.  It's Section 246, Mr. Atherton,
13  "undervalue transaction."
14     A.  You asked me about a preference.
15     Q.  I did not.
16     A.  I answered the question you asked me as to
17  why it's not a linear progression from the
18  interpretation of the defined word in the English
19  statute, "transaction," to the application of that
20  interpretation to the phrase "insolvency
21  transaction" in the context of that phrase in the
22  preference provisions in the BVI, which is
23  Section 245 of the Act.
24     MR. PROULX:  Move to strike your answer as

Page 160

1  nonresponsive.  I'll be bringing this to the
2  court, Mr. Atherton.
3     A.  I'm sorry?
4     MR. BELLER:  Counsel, I don't know what
5  you're saying, you will be bringing to the
6  court.  The witness is clearly endeavoring to
7  answer your questions to the best of his
8  ability.  To the extent you feel his answers
9  are not getting there, you can ask follow-up
10  questions.
11     I don't know what you think you're going
12  to get from the court, but the witness is doing
13  his best.
14     MR. PROULX:  We're protecting the record.
15  The objection speaks for itself.
16     MR. BELLER:  And my response to your
17  purported suggestion that there is something to
18  bring to the court is also on the record.
19     Q.  The core purpose of both the English law
20  preference provisions and undervalue transaction
21  provisions is to avoid prejudice to creditors; is it
22  not?
23     A.  In broad terms, yes.
24     (Reporter clarification request.)

Page 161

1  BY MR. PROULX:
2     Q.  And Invest Bank in broad terms held that
3  that policy would be frustrated even if the assets
4  transferred were not beneficially owned by the
5  debtor company, yes?
6     A.  It goes into further explanation because
7  the effect of the transaction would have been to
8  diminish the actual assets of the debtor in that
9  case.  As was accepted by the court and as was
10  ultimately accepted by the claimants in the case.
11     Q.  Preferences in undervalue transactions
12  within the meaning of UK insolvency acts, can
13  involve different types of transactions.  That
14  doesn't mean that the assets transferred to support
15  each type of claim need to be different in kind
16  themselves, right?
17     MR. BELLER:  Objection.
18     A.  Transactions in an undervalue, under
19  Section 238 of the Insolvency Act in 1986 in
20  England, and preferences under Section 249, may be
21  of various types and may relate to various types of
22  assets of the company.
23  BY MR. PROULX:
24     Q.  The same assets too?

MAGNA
LEGAL SERVICES

Page 170

1    A.   Correct.
2    Q.   Didn't Invest Bank caution against reading
3  words into corresponding provisions just as you've
4  done so here?
5    A.   I didn't read any words into that
6  provision.  I merely said that that indicates that
7  one may be concerned with, in the terms of the
8  relief that may be granted, assets which have been
9  removed from the company, or assets which have been
10  diminished in value.
11       I'm quite happy to accept that 2(a) may go
12  beyond that, but 2(a), 2(b), 1(b) are indicative of
13  dealings with or rectifying dealings with a
14  company's assets.
15    Q.   And you're aware, are you not, that
16  Invest Bank was also interpreting section 425 of
17  corresponding remedial provision of the
18  UK Insolvency Act?
19    A.   But it's not the corresponding provision,
20  remedial provision of the insolvency act in the BVI.
21  Unless you're wasting time, I'm prepared to show you
22  why.
23    Q.   Let's not let you waste time then.
24    A.   Good.

Page 171

1    Q.   Do you concede that Section 249 is of
2  broad scope?
3    A.   It's in relatively broad scope, yes.
4  249(1) is concerned with the remedy that can be
5  provided and subsection 2 says "without prejudice to
6  the generality of 249," and then gives rise to the
7  first two specific types of relief that can be
8  granted.
9    Q.   The court has wide discretion in this
10  area, right, under 249?
11    A.   Yes, it is.  And it's sufficiently wide to
12  cause the court not to grant relief, even in
13  circumstances where the necessary elements of a
14  claim for an undervalued transaction or a claim for
15  an unfair preference have been established.
16    Q.   You're aware, are you not, that
17  Invest Bank cautioned against reading words into the
18  provisions at issue in that decision?
19    A.   Yes.
20       MR. BELLER:  Asked and answered.
21    A.   Yes.
22  BY MR. PROULX:
23    Q.   And it said:
24       "The straightforward and natural

Page 172

1  interpretation of the provisions at issue there
2  should be given effect."
3    A.   The judgment said what it said.  It was
4  interpreting Section 423 of the Insolvency Act of
5  1986 as applied in England.
6    Q.   You don't think you're reading words into
7  Section 245 and 249 with your addendums as to how
8  you construe a transaction or insolvency
9  transaction?
10    A.   No, I'm not.  Because as part of the
11  interpretation process -- and this is not in any way
12  heterodox -- one looks at the mischief, which the
13  relevant provision of the consideration is to act
14  towards, which is directed, and as I indicated in
15  both of my declarations.  That mischief, in relation
16  to Section 245, is the avoiding contravention of the
17  pari passu principle.  The mischief in Section 423
18  is slightly different.
19    Q.   Only slightly?
20    A.   Well, it's different in the sense that
21  it's directed at fraud and directed at creditors
22  seeking to put assets beyond -- I'm sorry -- debtors
23  putting assets beyond the creditors and situations
24  which might otherwise impair the ability or

Page 173

1  prejudice the ability -- prejudice the interest of
2  those who may have a claim against a debtor or their
3  assets.
4    Q.   You also refer to the Australian decision
5  of Re Emanuel in your rebuttal report.  This is
6  specifically at paragraph 47.
7       Do you recall that decision?
8    A.   Just give me a moment.
9       This is in response -- this reference is
10  in response to it being referred to by Mr. Levy in
11  his declaration.
12    Q.   That's a yes, you're familiar with that
13  case?
14    A.   That's a yes.  I thought you were going to
15  ask me a question.
16    Q.   You write that in paragraph 47, in my
17  opinion -- this is the second to last sentence:
18       "In my opinion, assuming all of the
19  necessary elements are present, there can be no
20  argument that such a transaction or arrangement can
21  potentially constitute an unfair preference."
22       Do you see that?
23    A.   I'm going to have to read the paragraph.
24    Q.   Okay.



Page 182

1  that relief be granted in certain circumstances
2  where a third-party receives a benefit from the
3  preferential transaction?
4      A.  I think that's provided for in
5  Section 249, yes.
6      Q.  Yes.  Specifically, 249(2)(d).
7      A.  Should I take?
8      Q.  You're welcome to.
9      A.  Thank you.  Just as it's the...
10     Q.  Try to quickly find the page number.  It's
11  143.
12     A.  And you're looking at -- you want me to
13  look at 249 2?
14     Q.  2(d).
15     A.  Yes.  Thank you.
16     Q.  Are you on page 143, sir?
17     A.  Yes.
18     Q.  When might an order be proper under
19  Section 249(2)(d)?
20     A.  Well, in circumstances where there as been
21  an impeachable insolvency transaction and a benefit
22  has been received by a party from the company.
23     Q.  What does "a benefit" mean there?
24     A.  Obviously, it depends upon the

Page 183

1  circumstances of the case.
2      Q.  It has flexible application?
3      A.  Well, it depends upon what the nature of
4  the benefit is in any given case.  And that -- the
5  nature of that benefit will be a matter which the
6  court will consider in determining whether or not
7  it's appropriate for that person to pay a sum of
8  money to the company in respect of the benefit
9  allegedly received.  So it's very fact specific and
10  very contextual.
11     Q.  Are you familiar with the court of appeal
12  decision, In re: Sonatacus Limited?
13     A.  Yes, I am.
14     Q.  What is your understanding of that case.
15     A.  Off the top of my head, I can't remember.
16     Q.  I can represent to you did not discuss it
17  in your rebuttal report.
18     A.  Do I not refer to it?  I know it's
19  referred to by Mr. Levy.  I can't recall whether I
20  refer to it in my declaration.
21     Q.  I'm happy to represent to you that you do
22  not.
23     A.  Very well.
24     Q.  Do you recall anything about the case?

Page 184

1      A.  Not off the top of my head, no.
2      Q.  Do you recall any dispute with Mr. Levy's
3  characterization of that case?
4      A.  Not that I recall, no.
5      Q.  In paragraph 33(d), still where we were
6  just looking, in both Roman numerals 1, 2, and 3,
7  you refer to a scenario referred to above.  I'm
8  paraphrasing.  What scenario do you have in mind in
9  that statement?
10     A.  I think the scenario I'm referring to is
11  that which is rehearsed in subparagraph C at the top
12  of the page.
13     Q.  And can you paraphrase the scenario in C
14  as you understand it?
15     A.  Payments of one of the company's creditors
16  by a third-party, at a point in time when the
17  company is insolvent, even if that payment is made
18  at the instigation of the relevant company.  And
19  then I go on to say, that in that scenario, it
20  wouldn't be constituted -- it wouldn't be
21  characterized as an unfair preference of that
22  relevant creditor and I explain why.
23     Q.  You're not opining that that scenario
24  manifested on the facts of this case based on your

Page 185

1  assumptions, are you?
2      A.  No, I don't think so.  What -- I'm
3  responding to a case 386 which is advanced by
4  Mr. Levy in his declaration.  So in my understanding
5  of a case theory which he is seeking to advance in
6  that document.
7      Q.  The scenarios in which Section 249 operate
8  aren't circumscribed in any way?
9      A.  Well, they're circumscribed by the terms
10  of Section 249.
11     Q.  Fair.  But the specific fact pattern is
12  not laid out that would give rise to an order under
13  249?
14     A.  No, no, of course.
15     Q.  In your view, if an order under 249 were
16  made as against FTX in this case, on account of a
17  benefit received from the preferential transactions,
18  are you opining that that would result in a windfall
19  to the Three Arrows estate?
20         MR. BELLER:  Objection.
21     A.  I'm not saying anything of the sort.  I
22  don't understand the premise for your question or
23  the assumptions or circumstances which would be
24  applicable to the question or the assumption which

MAGNA
LEGAL SERVICES

Page 186

1   you're asking me to make.
2   BY MR. PROULX:
3       Q.   In 33(d), Roman numeral 3...
4       A.   You mind if I read it?  Sorry.
5       Q.   Yes.
6       A.   Thank you.
7            Yes.
8       Q.   Let's actually move on.  I'm going to
9   withdraw any question there.
10      A.   That's fine.  Thank you.
11      Q.   The email -- at paragraph 42, sir, of your
12  rebuttal report, the very last sentence you write:
13           "By contrast, the assets in dispute in the
14  present case were never available to 3AC's creditors
15  and were not owned by an affiliated party."
16           What do you mean by "the assets in dispute
17  in the present case were never available to 3AC's
18  creditors"?
19      A.   I'm referring to digital assets.
20      Q.   And that's predicated under the assumption
21  you've been provided regarding ownership; is that
22  right?
23      A.   And lack of any proprietary interest, yes.
24      Q.   But nevertheless, assets, in respect of

Page 187

1   the digital assets, would be available to 3AC's
2   creditors in the form of 3AC's chose in action to
3   the asset entitlements, correct?
4            MR. BELLER:  Objection.
5       A.   No.  That's not correct.
6   BY MR. PROULX:
7       Q.   Why not?
8       A.   Sorry.  Why not?
9       Q.   Why not?
10      A.   For the reasons I sought to previously
11  explain.  There was a contractual right to ask for
12  assets but not a proprietary right in those assets.
13  So insofar as those assets aren't delivered, that
14  would result in a monetary claim, an unsecured
15  claim, a claim as -- vis-a-vis FTX consequence upon
16  the debtor-creditor relationship that they have.
17      Q.   So that chose in action is not available
18  to -- for distribution upon the liquidation of 3AC
19  unless 3AC first made a demand for those assets; is
20  that your testimony?
21           MR. BELLER:  Objection.
22      A.   No, that's not my testimony.
23  BY MR. PROULX:
24      Q.   Why isn't that your testimony?

Page 188

1            MR. BELLER:  Objection.
2       A.   Because, as I've sought to explain, a
3   chose in action is an asset of the company.  The
4   liquidators could seek to enforce that by action
5   four breach of contract.  It would have a value in
6   theory.  That value, for example, would actually be
7   the account balance.  And that's what the Proof of
8   Claim, the amount of the Proof of Claim, would be
9   directed to.
10  BY MR. PROULX:
11      Q.   In paragraph 34 of your rebuttal report,
12  as well as in paragraph 35, you criticize the
13  Joint Liquidators for bringing a preference claim on
14  the basis that it would "require the court to treat
15  3AC differently and more favorably."
16           Looking at paragraph 35 specifically.
17           Do you see that?
18           MR. BELLER:  Objection to the
19  characterization.
20      A.   I'm sorry.  Could I just read the
21  paragraph, please?
22           No, I'm not criticizing the
23  Joint Liquidators of 3AC at all.
24

Page 189

1   BY MR. PROULX:
2       Q.   Do you in fact believe that the sustaining
3   of the Joint Liquidator's preference claim would be
4   to treat 3AC differently and more favorably?
5       A.   Insofar as the liquidators are seeking to
6   recover something or certain claims in relation to a
7   situation which is out with how other creditors are
8   being treated by the FTX Recovery Trust, and how
9   other creditors have accepted that they should be
10  treated, then 3AC are seeking to be treated
11  differently.  That's the substance of the claim.
12  And as I've said in the final sentence of the
13  paragraph, whether or not 3AC should be or can be
14  treated differently is matter for the Court.
15      Q.   Do you have any understanding of whether
16  any of the other former FTX customers were
17  themselves Debtors in insolvency proceedings?
18      A.   Could you say that again?
19      Q.   Of course.
20           Do you have any understanding of whether
21  other former FTX customers are themselves Debtors in
22  insolvency proceedings?
23      A.   Are they subject to insolvency
24  proceedings?

MAGNA
LEGAL SERVICES

1    A.  No.  I don't think it's a term of art.  It
2  was a way of describing -- that I sought to use to
3  describe the account balance.
4    Q.  You also assumed that the overall account
5  balance subsumes the negative positions, including
6  the negative U.S. dollar balance that 3AC had in the
7  relative period?
8        MR. BELLER:  Objection.
9    A.  I'm not sure I can agree with your
10  characterization of "subsuming."  It's -- the way
11  I'm given to understand the Exchange operated was
12  that ultimately, the account balance is what
13  matters.
14  BY MR. PROULX:
15    Q.  "Given to understand", just to clarify for
16  the record, means "based on an assumption you've
17  been provided"?
18    A.  Yes.
19    Q.  Paragraph 57(c) of your rebuttal report,
20  sir, you say -- in looking at the second full
21  sentence, and I'm truncating to streamline:
22        "A negative account balance, overall,
23  could still include positive positions in assets."
24        If you see that portion of the...

1    A.  On page 27 or 28?
2    Q.  On the last line of 27, please.
3    A.  Yes.
4    Q.  So in your view, a negative account
5  balance can include positive positions within it,
6  but a positive account balance can include negative
7  positions within it?
8        MR. BELLER:  I'm sorry.  At least the
9        transcript here does not accurately reflect
10        what is written.  So I want to make sure that
11        there isn't a misunderstanding between counsel
12        and the witness.  This says "I do not agree
13        insofar as a negative account balance, overall,
14        could still include."  So I just want to make
15        sure the record is clear.
16        MR. PROULX:  Yeah, Counsel, I don't think
17        that's proper objection, but in the interest of
18        compromise here I'll ask.
19  BY MR. PROULX:
20    Q.  Do you agree, in fact, that a negative
21  account balance can include positive positions in
22  assets?
23    A.  Well, my understanding of the position is
24  that the account balance in relation to 3AC, insofar

1  as it's taking accounts of assets and accounts which
2  are associated to 3AC, have a positive digital asset
3  balance and a negative U.S. dollar balance.  But it
4  was positive -- the account balance was positive
5  because the monetary value of digital assets was
6  greater than the monetary value of the U.S. dollar
7  negative balance.
8    Q.  Understanding that, let me ask a very
9  simple question if I can.
10        Can a negative account balance overall
11  include positive positions?
12        MR. BELLER:  Objection.
13    A.  I think the answer to that is, yes.  For
14  example, you could have a positive digital asset
15  balance and a negative U.S. dollar balance where the
16  negative U.S. dollar balance was greater than the
17  monetary value of the digital assets as recorded in
18  the relevant electronic ledgers.  It's just the
19  obverse of what the position was as that be -- as
20  that appear in June 2022.
21  BY MR. PROULX:
22    Q.  So the converse is true as well?  The
23  obverse is true as well?
24    A.  I think I've just said that.

1    Q.  So if all that the parties had is between
2  them was, the facts as you've been provided them, a
3  positive account balance in favor of 3AC, does that
4  mean that 3AC had no liabilities to FTX at the
5  relevant time period?
6        MR. BELLER:  Objection.
7    A.  The ultimate position is that the account
8  balance was positive.  There's essentially a netting
9  off of what may adopt in your characterization.
10  Netting off of a negative balance and a positive
11  balance, resulting in, in this case, relevant time a
12  positive asset account balance.
13  BY MR. PROULX:
14    Q.  So FTX then could take no action against
15  3AC if it was a creditor and only a credit -- strike
16  that.
17        A debtor and only a debtor of 3AC,
18  correct?
19        MR. BELLER:  Objection.
20    A.  If FTX is a debtor to 3AC, then it
21  wouldn't have any right to enforce or -- as against
22  3AC.
23  BY MR. PROULX:
24    Q.  So that means it couldn't enforce under

**MAGNA**
LEGAL SERVICES

Page 202

1  the Terms of Service, correct, for a monetary
2  payment?
3          MR. BELLER: Objection.
4      A. Well, I don't know. It depends on the
5  circumstances and on what particular term of the
6  term of service one's seeking to invoke in that
7  situation. So I'm unable to say.
8  BY MR. PROULX:
9      Q. It might have been a creditor with respect
10 to certain liabilities under the Terms of Service?
11         MR. BELLER: Objection.
12     A. I don't know. It may depend upon an
13 absolute understanding of how the Exchange operated
14 in terms of what precisely was incorporated within
15 the negative U.S. dollar balance. But I'm not able
16 to say.
17 BY MR. PROULX:
18     Q. Earlier today you were talking about the
19 facts as you'd been provided it that FTX, in fact,
20 liquidated a portion of Three Arrows' assets
21 associated with their accounts; is that right?
22     A. I did refer to that and that's what I
23 understood happened.
24     Q. Have you made any assumptions as to

Page 203

1  whether at that point in time, Three Arrows' overall
2  account balance was positive?
3      A. I think my understanding is that the
4  account balance was positive at that point in time.
5      Q. How could --
6      A. I don't know. But I think that is the
7  position.
8      Q. How then could FTX have liquidated assets
9  in the first place if it wasn't a creditor with
10 respect to Three Arrows?
11         MR. BELLER: Objection.
12     A. I think it depends upon the terms of the
13 Terms of Service that were sought to be relied upon
14 and invoked. But I -- insofar as I understand the
15 position, I explained and answered- your question
16 this morning. I can't take it any further than
17 that, I don't think.
18 BY MR. PROULX:
19     Q. So you're not then opining that FTX was
20 only a debtor and not also a creditor because it in
21 fact, invokes contractual rights?
22         MR. BELLER: Objection, misstates
23 testimony.
24     A. I'm not giving any opinion on the facts.

Page 204

1  I'm not -- as you know, I'm not a witness of fact.
2  I'm simply providing my opinion as to relevant legal
3  principles of BVI law.
4  BY MR. PROULX:
5      Q. And therefore, your opinion with respect
6  to the facts you've been provided, including that
7  FTX in fact invoked contractual purported rights
8  under these agreements, means that FTX was a
9  creditor with respect to those rights, correct?
10         MR. BELLER: Objection.
11     A. I don't think -- or my understanding and
12 the assumptions I've been asked to make, that that's
13 necessarily an appropriate characterization of the
14 factual position.
15 BY MR. PROULX:
16     Q. Are there any assumptions that you've been
17 provided that suggest otherwise?
18         MR. BELLER: Objection.
19     A. Well, again, I don't know. But I don't
20 think it matters in the sense that it would
21 ultimately be a matter of the court to determine on
22 what basis the liquidations were executed or
23 liquidation.
24

Page 205

1  BY MR. PROULX:
2      Q. Do you have an understanding of whether
3  the liquidations affected a monetary payment of the
4  relevant digital assets for credits in the form of
5  U.S. dollars?
6      A. My understanding of the way the accounts
7  operated was if U.S. digital assets are sold, then
8  the digital asset balance will be reduced and there
9  will be a commensurate increase in the U.S. dollar
10 balance or a commensurate reduction in the negative
11 U.S. dollar balance.
12     Q. And that's what happened when your -- on
13 your assumption Three Arrows initiated the tens of
14 thousands of asset sales on June 13 and 14?
15     A. Sorry. Just so I'm clear, the transaction
16 that occurred on the 13th and 14th of June, I
17 understand, were sales of digital assets and that
18 the proceeds of those sales would have been
19 reflected in the account balance by reference to an
20 appropriation to the U.S. dollar balance.
21     Q. Can -- and also same question with respect
22 to the June 14 liquidation that you've been
23 instructed was conducted by FTX?
24     A. I'm assuming that that would be although

MAGNA
LEGAL SERVICES

Page 206

1  for the identity of the party instigating it, then
2  the situation would attain in the same way.
3      Q.  Can a debtor validly demand monetary
4  payments from its creditor?
5          MR. BELLER:  Objection.
6      A.  I don't think I can answer that question
7  because it's conclusory.  But it's conclusory upon
8  assumptions, factual, counterfactual, situations or
9  scenarios, which I don't have.
10 BY MR. PROULX:
11     Q.  You're not able as a blanket matter to say
12 that could never transpire properly?
13     A.  I don't think I can give you an answer to
14 that other than the one I've just given to you, I'm
15 afraid.
16     Q.  In paragraph 56 -- hopefully you're on
17 that same page?
18     A.  I am.  Thank you.
19     Q.  Thank you, sir.  I'm just going to read
20 into the record the first sentence:
21         "I am given to understand that, and as
22 reflected in my original declaration, a positive
23 account balance meant that the account holder had a
24 right to demand -- strike that -- a right to expect

Page 207

1  payment from FTX," and it continues.
2          Do you see that portion?
3      A.  Yes, I do.  Thank you.
4      Q.  What do you mean "a right to expect
5  payment from FTX"?
6      A.  Well, on the basis there was an account
7  outside an insolvent scenario that there was an
8  account balance and it posited, the account holder
9  would be entitled to ask for the payments of the
10 value of that account balance, and accordingly,
11 would be expected or would expect to be paid it.
12     Q.  Why do you say "would expect payment from
13 FTX," in particular?
14     A.  Well, FTX is the operator of the Exchange.
15 It would expect payments of the account balance.
16     Q.  Why not expect payment from other
17 customers of the Exchange?
18     A.  Because I'm talking about the account
19 balance.  My understanding is the account balance
20 is -- well, the account balance.  That's the asset
21 which the participant is entitled to.  I don't
22 mention here anything about any of the participants.
23     Q.  And if a portion of that account balance
24 were based on an asset provided by another party?

Page 208

1          MR. BELLER:  Objection.
2  BY MR. PROULX:
3      Q.  Does that change your answer?
4          MR. BELLER:  Objection.
5      A.  Well, I don't understand the premise,
6  because my understanding is the account balance is
7  the asset of, in this case, 3AC.  So I'm not sure
8  why that account balance would include assets that
9  belong to or were owned by, on your assumption,
10 other participants.  I just -- I'm not able to make
11 any such differentiation or provide any explanation
12 as to why that may or may not be the case.
13 BY MR. PROULX:
14     Q.  Do you understand that FTX had a margin
15 trading program?
16     A.  I understand that it did, yes.
17     Q.  Do you have a view on whether other FTX
18 customers lent assets to one another pursuant to
19 that program?
20         MR. BELLER:  Objection.
21     A.  I don't have any details of the manner in
22 which the margin program in fact operated.  I can't
23 remember whether or not I referred to or recite an
24 assumption in the beginning of my first declaration

Page 209

1  which relates to that.  If it's there I'm sure you'd
2  be able to find it.  I don't have a detailed
3  knowledge at all of the operation to margin program.
4  BY MR. PROULX:
5      Q.  If all a customer has on the FTX Exchange
6  is a net account balance, positive for some,
7  negative for the others, how do they have any assets
8  to lend to one another in the first place?
9          MR. BELLER:  Objection.
10     A.  I'm not sufficiently -- I don't have a
11 sufficient understanding of how the Exchange
12 operated between participants to answer that
13 question.
14 BY MR. PROULX:
15     Q.  You understand, though, and I believe
16 you've been instructed that certain customers,
17 including Three Arrows, had a negative U.S. dollar
18 balance associated with their accounts on the
19 Exchange, yes?
20     A.  We've been proceeding on that basis for
21 the day, yes.
22     Q.  What's the source of that negative account
23 balance?  How was it accrued for these customers?
24         MR. BELLER:  Objection.

Page 214

1    A.  I'm assuming that to be the case, because
2  that seems to be the premise for, at least in part,
3  upon which 3AC is advancing a Proof of Claim in the
4  liquidation.
5  BY MR. PROULX:
6    Q.  Can you -- in paragraph 57 of your report,
7  turn to that, please, sir.
8    A.  Of the rebuttal?
9    Q.  Your rebuttal report.
10   A.  Fifty-seven?
11   Q.  Correct.
12   A.  Thank you.
13   Q.  You briefly respond to a few points made
14 by Mr. Levy with respect to topics in his report.
15 And some of them relate to the FTX Terms of Service
16 and the March 2022 Line of Credit Agreement.  Are
17 you aware that those are governed by English law and
18 Antigua law respectively?
19   A.  Yes, I am.
20   Q.  Are you interpreting those under those
21 bodies of law in this paragraph?
22   A.  No.  I'm simply responding to Mr. Levy's
23 interpretation of those documents.
24   Q.  Based on BVI law?

Page 215

1    A.  Based on my understanding of those
2  documents.  I'm not seeking to interpret them, I'm
3  merely seeking to respond to what Mr. Levy says in
4  relation to those documents.
5    Q.  And that's based on your understanding of
6  the documents as you've been instructed to construe
7  them by counsel?
8    A.  No.  I'm probably just adopting the same
9  approach as Mr. Levy has in terms of looking at the
10 documents and on the same basis as he's asserted
11 what they mean, responding to his assertion as to
12 what they mean.
13   Q.  Well, in paragraph 57(b) for example, you
14 write that, in the beginning of second clause:
15      "My understanding is that a customer's
16 ability to withdraw assets from the Exchange was
17 limited by reference to the state of the account
18 balance."
19      Do you see that?
20   A.  Yes.
21   Q.  I think we talked about this earlier, you
22 couldn't point me to any terms that restrict a
23 customers ability to withdraw assets from
24 the Exchange by reference to the state of the

Page 216

1  account balance; is that correct?
2    A.  I don't remember the specific response,
3  but I think -- and if I didn't, maybe I should have.
4  This goes to the question of the basis for treating
5  the account balance as the unitary asset.  And
6  you're quite right to point out that that is based
7  upon my understanding, which is at least partly
8  based upon an understanding that I'd been provided,
9  or been given to understand by the attorneys.  It's
10 also by reference to my understanding of
11 Lord Neuberger's interpretation in the first
12 declaration and his second declaration.
13   Q.  Thank you for that clarification.  Let's
14 look at 57(d) for a moment.  I'll just read this
15 into the record:
16      "Mr. Levy asserts that the FTX Terms of
17 Service prevent the FTX Recovery Trust from
18 asserting that 3AC could owe obligations to other
19 parties, but I'm aware of no basis for that
20 assertion."
21      Did I read that correctly?
22   A.  Yes, you did.
23   Q.  What analysis, if any, have you done to
24 assess that assertion?

Page 217

1    A.  By reference to the FTX Terms of Service,
2  I'm not sure I precisely understand the premise for
3  the view adopted by Mr. Levy.  And reading the FTX
4  Terms of Service, I'm not aware of a basis for that
5  assertion.
6    Q.  Just taking this one, for example, who
7  were the parties to the FTX Terms of Service?
8    A.  Well, in this specific instance, I think
9  FTX and 3AC.
10   Q.  Any other parties to the Terms of Service
11 in this specific instance?
12   A.  I don't know.
13   Q.  You haven't checked?
14   A.  I can't recall.
15   Q.  Did you look at one point for whether that
16 was the case or not?
17   A.  Well, I've looked at the FTX Terms of
18 Service.  I cannot recall whether or not there are
19 other parties to that document, or to that
20 agreement.
21   Q.  You write in the next paragraph,
22 subparagraph 57(e) -- I'll just read this quickly:
23      "Mr. Levy argues that the March 2022 Line
24 of Credit Agreement renders FTX a creditor as to the

MAGNA
LEGAL SERVICES

Page 218

1  120 million line of credit, but I understand that
2  this was already part of the negative USD balance
3  that formed part of the account balance," and it
4  continues.
5      A.  Yes.
6      Q.  Do you see that?
7      A.  Yes.
8      Q.  Was that understanding based on an
9  assumption provided by counsel?
10     A.  Yes, it is.
11     Q.  Not independent review of the facts in
12 this case?
13     A.  No.
14     Q.  Do you offer an opinion on whether the
15 portion of Three Arrows' negative USD balance
16 attributable to the line of credit was or was not
17 due to FTX?
18     A.  No.  I don't give any opinion in that
19 regard.
20     Q.  Are you offering the opinion that if
21 Three Arrows had an overall account balance
22 inclusive of the impact of a line of credit within
23 the overall account balance, that FTX could take no
24 action to seek repayment of a line of credit?

Page 219

1      A.  That comes back to my understanding that
2  in the context of the account balance, FTX would be
3  a debtor to 3AC or another market participant in the
4  same situation.
5      Q.  And that situation could not seek
6  repayment of a monetary obligation pursuant to the
7  line of credit?
8      MR. BELLER:  Objection.
9      A.  That's the understanding that I've been
10 provided with.
11 BY MR. PROULX:
12     Q.  Okay.
13     A.  There's a netting resulting in the account
14 balance.  If netting is even the right nomenclature.
15     Q.  Let's take a break now.  It's not going to
16 be long one.  Off the record, please.
17     THE VIDEOGRAPHER:  We're going off the
18 record.  The time is 4:20 p.m.
19     (Recess.)
20     THE VIDEOGRAPHER:  We are back on the
21 record.  The time is 4:26 p.m.
22 BY MR. PROULX:
23     Q.  Mr. Atherton, you have been talking on
24 occasion about something called "the March 2022 Line

Page 220

1  of Credit Agreement," as you used that term.
2      Do you know what document I'm referring
3  to?
4      A.  There is a document.  Yes, I know what
5  you're referring to.
6      Q.  I'm happy to present it to you.
7      A.  Yes, if you wouldn't mind, if you're going
8  to ask me questions about it.
9      (Exhibit 20 was PREVIOUSLY received and marked for
10 identification, as of this date.)
11 BY MR. PROULX:
12     Q.  You probably have been handed two copies,
13 do you want to pass one to your counsel?
14     A.  Sorry.
15     Q.  That was my fault not yours.
16     My question is simple on this document.
17 If you flip to page 2, there's a second section of
18 this document called the "FTX institutional customer
19 margin and line of credit agreement."
20     Do you see that?
21     A.  I do.
22     Q.  And under the second paragraph of that
23 section it defines something called "indebtedness."
24     Do you see that term?

Page 221

1      A.  I do see the term.  Let me just take a
2  moment.
3      Yes, I see that.
4      Q.  Are you offering any opinion or have you
5  been provided any instructions regarding the meaning
6  of that term?
7      A.  No.
8      Q.  Do you have any understanding of the --
9  strike that.
10     Put this document to the side, please,
11 sir.
12     A.  (Witness complies.)
13     Thank you.
14     Q.  Putting aside the facts of this
15 litigation, did you take any issue with the way in
16 which Mr. Levy described when a creditor is put in a
17 better position as a result of a preferential
18 transaction?
19     A.  I can't remember in what terms he
20 precisely put that.
21     Q.  If you can look to Mr. Levy's report in
22 paragraph 100, for example.
23     A.  100?
24     Q.  100.

MAGNA
LEGAL SERVICES

Page 226

1  to there?
2      A.  The rights that I refer to in my first
3  declaration where I think I refer to them as
4  being -- what I'm trying to do is apply the law to
5  the scenario.  The sale of digital assets and the
6  receipt of U.S. dollars happened automatically, for
7  want of a better phrase, to give the account
8  balance.  And I'm simply trying to explain what
9  mechanically may be said to have happened.  And that
10  that netting, again, if that's the right phrase or
11  word, wrote to create the account balance or
12  generate the account balance, is akin to a
13  contractual right of setoff or a right of
14  combination that a bank -- like a bank might have.
15      Q.  So that netting as you describe it, that's
16  not actually a setoff being conducted pursuant to
17  contractual rights?
18      A.  Well, it may be.  But it's working on the
19  assumption that there's no unitary asset here.  And
20  so I'm trying to explain in the context of the
21  assertions or allegations that are made in relation
22  to the reference transactions.  Trying to convey an
23  understanding of mechanically what may have happened
24  or what -- yes, what may have happened.

Page 227

1      Q.  What may have happened.  That's
2  speculating what may have happened.  We don't know
3  for sure?
4      A.  We know for sure there was an account
5  balance generated.  I'm simply trying to explain in
6  the context of the preference allegation, how it
7  might be said that it could have been a preference.
8  And in that context saying, how there wasn't a
9  preference.
10      Q.  You referred to your original declaration,
11  I believe, as where this view stemmed from.  I took
12  a look back and couldn't for the life of me find the
13  contractual rights that you allude to in this
14  paragraph 62(a) and welcome you to point me to where
15  they are.
16      A.  Yes.  I think that is a fair comment.  And
17  the relevant provisions would be or could be the
18  provisions in clause 38.7 or Section 38.7 of the FTX
19  Terms of Service, which is at page 26 of the
20  document you handed to me earlier, Exhibit 15.
21      Q.  And that's a document for the record, you
22  have up in front of you right now?
23      A.  Yes, it is.
24      Q.  And you said 38?

Page 228

1      A.  I'm sorry, 38.7.
2      Q.  And that's on page?
3      A.  26.
4      Q.  And you refer to these as provisions that
5  could be -- could have given rise to a setoff.  Did
6  they -- have you been instructed whether they in
7  fact did?
8      A.  No.  I have not been instructed as to
9  whether or not they in fact did.
10      Q.  Have you conducted any independent factual
11  review as to whether these rights were in fact
12  exercised?
13      A.  No.
14      Q.  Okay.  So it's speculation that these may
15  have been setoff rights that were in fact applied?
16      MR. BELLER:  Objection.
17      A.  It's speculation in the sense as to what
18  I'm trying to do is rationalize the allegations that
19  there has been a preference and to try and
20  understand what is said to be the preference.
21  Because as I say in the first declaration, it's not
22  necessarily entirely clear what precisely the
23  relevant arrangement transactional circumstance is,
24  which is said to give rise to the preference.

Page 229

1      So I've sought to, myself, understand
2  that.  And then in that context try to provide a
3  legal overlay in terms of how those facts or how the
4  unfair reference provisions may respond to the
5  relevant circumstances as best as I can understand
6  the assertions made in the Proof of Claim.
7  BY MR. PROULX:
8      Q.  And that legal overlay in this case is
9  under English law?
10      A.  Yes, because that's the governing law
11  here.  But in the sense that that may be the
12  provision that, if one had to rely on it, is the
13  term that was in play.  But as I say, the position
14  is that there was an account balance that was the
15  asset.  And that's the consequence of digital assets
16  being sold and U.S. dollars being received.
17      Q.  Do you know what, if anything,
18  Lord Neuberger says about this provision 38.7?
19      A.  I've seen what he says certainly in his
20  third declaration.
21      Q.  Do you know what, if anything,
22  Dame Elizabeth Gloster says about this
23  paragraph 38.7?
24      A.  I've read what she says as well.

1    Q.  Do either opine that this provision was in
2  fact implemented?
3    A.  Well, no.  I think, to be fair to them,
4  they wouldn't know anymore than I would.  But
5  both -- my understanding what Lord Neuberger says is
6  that the existence of this provision and its
7  exercise, if it was exercised, is an end result.
8  Effectively, the same as and supports the notion
9  that the account balance was a unitary asset.  And
10  as I read Dame Elizabeth Gloster's declaration, I
11  think she says that the existence of this provision
12  is inconsistent with the notion of there being
13  unitary assets by reason of the account balance.
14    Q.  To her point, if there was only a unitary
15  single account balance in the first instance, why
16  would there be a need for any setoff at all?
17      MR. BELLER:  Objection.
18    A.  I don't know.  There may be circumstances
19  in which, in an appropriate context -- if it's not
20  already reflected in the operation of the account
21  giving rise to the account balance, then it may --
22  there may be circumstances in which it would operate
23  outside that.
24

1  BY MR. PROULX:
2    Q.  What amounts, if any, were payable by
3  Three Arrows to FTX under this clause 38.7?
4      MR. BELLER:  Objection.
5    A.  Well, the clause isn't creating
6  liabilities or requiring payments from 3AC to FTX.
7  In circumstances where there may be -- there may be
8  cross-claims then it may be that that's when this
9  section -- this clause comes into affect.
10  BY MR. PROULX:
11    Q.  May come into effect or likely would have
12  come into effect?
13      MR. BELLER:  Objection.
14    A.  38.7.2, "FTX may set off."
15  BY MR. PROULX:
16    Q.  Do you understand this provision to give
17  Three Arrows a right of setoff as well, a
18  cross-claim, I think as you referred to it?
19      MR. BELLER:  Objection.
20    A.  I think on my reading of the language in
21  38.7.1, it would seek to preclude a setoff as
22  regards amounts owed by 3AC to FTX.
23  BY MR. PROULX:
24    Q.  Do you understand that Three Arrows is

1  alleged to have engaged in over 52,000 transactions
2  in the relevant time period?
3    A.  Relevant time period being what?
4    Q.  June 13 to 14th time period?
5    A.  I don't know that of my own understanding.
6  I think I've read it.  It's been referenced that
7  they were the number of trades that where entered
8  into.
9    Q.  And did FTX conduct a setoff or invoke
10  this provision after each one of those transactions?
11    A.  I have --
12      MR. BELLER:  Objection.
13    A.  -- absolutely no idea.
14      (A discussion was held off the record.)
15  BY MR. PROULX:
16    Q.  I believe your answer was, "I have
17  absolutely no idea."
18      Is that your answer, Mr. Atherton?
19    A.  Yes.
20      Timed after the objection was raised by my
21  friend.
22      (A discussion was held off the record.)
23  BY MR. PROULX:
24    Q.  What actions, if any, did FTX need to take

1  to invoke the setoff provision?
2      MR. BELLER:  Objection.
3    A.  Seek to invoke the setoff provision if
4  it's -- if it was required.
5  BY MR. PROULX:
6    Q.  Okay.
7    A.  As I said earlier, the account balance is
8  the consequence of sales and proceeds being
9  received.  That creates simply a netting between
10  those elements, at which either are reflective of
11  this clause or are separate to this clause or in any
12  event could result or be the net result of the
13  invocation of this clause.
14    Q.  What other contractual rights of setoff or
15  combination, if any, do you speculate may have been
16  relevant in this matter?
17      MR. BELLER:  Objection.
18    A.  I don't speculate as regards any other
19  contractual provisions.
20  BY MR. PROULX:
21    Q.  What other contractual right to setoff or
22  combination have you been --
23      THE WITNESS:  Excuse me.  I'm very sorry.
24      MR. PROULX:  Let us know if you need a

Page 234

1    break.
2        THE WITNESS:  I didn't want to interrupt
3    your question.  Forgive me.
4        MR. PROULX:  No problem.  You good?
5        THE WITNESS:  Yes.
6    BY MR. PROULX:
7    Q.   What other contractual rights of setoff or
8    combination have you been instructed FTX, in fact,
9    exercised in this case?
10   A.   I don't think I've been told that they
11   exercised any or instructed to exercise any, other
12   than that is how I've been given to understand the
13   accounts operated to result in an account balance.
14   Q.   Is there a difference between a right of
15   setoff versus a right of combination in your view?
16   A.   A right of combination is something which
17   is applicable to -- maybe to banks where they can
18   combine two separate accounts with the same bank
19   with the same customer, to give a net result if
20   there's one account is in credit and one account is
21   in debit.
22   Q.   Do you understand the FTX Recovery Trust
23   to have invoked this section 38.7 at any point in
24   this litigation?

Page 235

1    A.   I have no idea.  Sorry.
2    Q.   Mr. Atherton, given your English law
3    overlay of section 38.7, what is your English law
4    overlay of section 8.2.6?  This is on page 10 of the
5    Terms of Service.
6        MR. BELLER:  Objection.
7    A.   8.2.6?
8    BY MR. PROULX:
9    Q.   Yes.
10   A.   I've not been asked to look specifically
11   at this agreement.  And I have certainly not been
12   asked to look at this clause.  The reason I provided
13   an overlay in relation to the setoff clause is
14   because it seemed to have some specific relevance to
15   what may or may not have been occurring within the
16   accounts and in relation to the derivation of the
17   account balance.
18   Q.   And were you asked specifically to look at
19   paragraph 38.7 of the term of service?
20   A.   No.
21   Q.   Do you agree with Mr. Levy that
22   contractual rights of setoff that are unexercised by
23   a creditor cannot be used to set off a preference
24   claim in BVI insolvency proceedings?

Page 236

1    A.   Sorry.  I didn't understand that question.
2    Q.   Do you agree with Mr. Levy that
3    contractual rights of setoff that are not exercised
4    by the creditor prior to a company's liquidation,
5    can then be applied or exercised in the company's
6    liquidation?
7    A.   If that's what he says, I think that is
8    roughly what he does say, I think the answer is no,
9    they can't be, because at that point in time -- I'm
10   sorry, but just to complete.  At that point in time,
11   the space is occupied by insolvency setoff.
12   Q.   And by insolvency setoff, you mean the
13   Section 150.  You refer to this as automatic, right?
14   A.   Automatic self-executing and as of the
15   date of the liquidation.  Albeit the actual
16   reconciliation in terms of understanding how the net
17   balance one way or the other is created.  Obviously,
18   it takes effect post liquidation.  The liquidators
19   have to try and work out how any cross-claims are to
20   be reconciled.
21   Q.   Just running through the timing point you
22   just tried to clarify and make sure I understand it.
23   A.   I'm sorry.  So the insolvency setoff
24   operates and takes effect as of the date of the

Page 237

1    liquidation.  So it's self-executing and automatic.
2    But of course, the reconciliation, if required, of
3    the claim of the creditor and any counterclaim by
4    the company, will have to be reconciled subsequently
5    by the liquidators just as a matter of reality.
6    Q.   So the automatic insolvency setoff looks
7    to the claim and counterclaim as they exist at some
8    point in time after the commencement of the
9    litigation?
10   A.   As at the date of the liquidation.
11   Q.   As at.
12   A.   It's just the arithmetic or the accounting
13   exercise to understand what the net balance is in
14   that circumstance will have to take place,
15   necessarily, afterwards.
16   Q.   So your view then is that the relevant
17   measurement of the claim and counterclaim then, in
18   the context of automatic insolvency setoff, is not
19   made at the point in time of the preferential
20   transactions themselves?
21       MR. BELLER:  Objection.
22   A.   I don't understand that.  I'm simply --
23   I'm not -- my earlier answer to your question was
24   not in the context of a preferential claim or

MAGNA ▶
LEGAL SERVICES

Page 238

1    preferential circumstance.  I was merely trying to
2    explain what happens when you have a creditor who
3    asserts a claim against the company.  And the
4    company would appear to have a claim against that
5    creditor on the basis of a mutual dealing.
6    BY MR. PROULX:
7        Q.   In the context now specifically of a
8    preference claim under Section 245, the claims that
9    the creditor may assert against the insolvent
10   company.  At what point in time is the quantum of
11   that claim determined by?
12       A.   I'm sorry.  I don't understand
13   conceptually the question.
14       Q.   Sure.
15           I'm just trying to understand when -- I'm
16   asking you some timing questions.
17       A.   I understand that.  But I don't understand
18   what transactions you're saying are occurring at any
19   particular point in time.
20       Q.   Okay.
21           Let's go a little more step by step in
22   this case so to make sure we're all moving together.
23           Will you agree that if a company
24   beneficially owns the assets at issue in an

Page 239

1    insolvency transaction under Section 245, that the
2    insolvency setoff under 150 cannot apply to those
3    assets?
4            MR. BELLER:  Objection.
5        A.   Again, I'm not understanding the question.
6    BY MR. PROULX:
7        Q.   Sure.  Let me point you to paragraph 148
8    of Mr. Levy's report.
9        A.   Yes, of course.
10       Q.   Specifically, actually, 149, to move
11   things along here.  Let me know if you disagree with
12   anything in paragraph 149.
13       A.   As I understand what Mr. Levy is saying
14   here, he's saying that if the claim of 3AC against
15   FTX was a proprietary claim, namely, laying claim to
16   a specific piece of property, then any claim which
17   FTX may have against 3AC in that context, there
18   can't be a setoff.
19       Q.   And do you agree with that statement?
20       A.   This is Mr. Levy's point about mutuality.
21   As a matter of law, a proprietary claim cannot be
22   setoff as -- as against a monetary claim in the
23   insolvency section under Section 150.  I think
24   that's what Mr. Levy says, and I think on that basis

Page 240

1    I agree with that.
2        Q.   And I think you referred in your prior
3    answer to situation where there's claim laying to a
4    specific piece of property.  When there's a claim
5    laying to property in a trust where the claimant
6    pulls that property as tenants in common, in that
7    case, is your answer the same or different?
8        A.   I think, to be honest, you're conflating a
9    number of issues.  And essentially position is, if
10   I'm laying claim to a piece of property, I'm saying
11   that that property falls outside the liquidation and
12   it's my property.
13           So it may be a specific piece of property,
14   and I understand that the case theory which is being
15   advanced is that, if not a specific piece of
16   property, there is said to be a specific sharer of a
17   specific fund.  There's an issue about that.  I'm
18   not involved in that issue.  Lord Neuberger gives an
19   opinion in relation to that, and I think
20   Dame Elizabeth Gloster gives an opinion in relation
21   to that.
22       Q.   I'm certainly not asking you to opine
23   whether or not a trust was created.  I'm essentially
24   saying in the event that a trust was in fact, if

Page 241

1    that is a sufficient proprietary claim to the assets
2    in that case?
3            MR. BELLER:  Objection.
4        A.   I think I've answered it.  But what's
5    being asserted is a beneficiary entitlement to an
6    asset, rather that simply asserting the existence of
7    debt between 3AC and FTX.
8    BY MR. PROULX:
9        Q.   If FTX is not a creditor in respect of the
10   company's liabilities can it invoke Section 150?
11           MR. BELLER:  Objection.
12       A.   It's not -- first of all, it's not
13   something that FTX would invoke.  It's something
14   that, in the context of the liquidation of 3AC,
15   would happen automatically.
16   BY MR. PROULX:
17       Q.   So let me --
18       A.   I'm self-executing.  So it assumes that
19   there's a claim by FTX against 3AC and a monetary
20   claim by 3AC against FTX.
21       Q.   And on the assumptions you were provided
22   are those the facts at hand?
23       A.   No.
24       Q.   So on the facts and at hand, 150 does

MAGNA
LEGAL SERVICES

Page 242

1  not -- as you've been instructed them, 150 would not
2  apply?
3         MR. BELLER: Objection.
4     A.  On the facts as I've been given to
5  understand them and in the circumstances of the
6  cases outlined in both my declarations, Section 150,
7  Insolvency Setoff, it does not apply and is not
8  relevant, saying to the extent, as I've sought to
9  explain in my first declaration, that it may be
10  taking into account when one is looking at the
11  hypothetical or notional liquidation.
12  BY MR. PROULX:
13     Q.  62(b) of your rebuttal declaration,
14  please.
15     A.  Yes, of course.
16     Q.  You say:
17         "In such circumstances, the concept of
18  insolvency setoff taking automatic effect as of the
19  date of the actual liquidation of 3AC is of no
20  relevance since insolvency setoff only becomes
21  operative from the relevant time, i.e., upon the
22  appointment of the Joint Liquidators, and has, and
23  had, no part to play until that moment in time."
24         Did I read that correctly?

Page 243

1     A.  Yes, you did.
2     Q.  What do you mean it has "no relevance" in
3  those circumstances?
4     A.  Well, because it only comes into play at
5  the point in time of the appointment of the
6  Joint Liquidators of 3AC.
7     Q.  What circumstances are you referring to in
8  62(b) where you say in such circumstances continuing
9  the automatic setoff is of no relevance?
10     A.  Because as at the point in time of the
11  liquidation, there aren't any claims or cross-claims
12  on the basis of the assumptions that one can
13  separate out claims and cross-claims as between 3AC
14  and FTX.  I'm responding to the attempt to say that
15  there are liabilities and there are assets.  And
16  we're not dealing with unitary asset in the form of
17  account balance.
18     Q.  So if the unitary asset theory, as I
19  believe you referred to it, is correct, then the
20  insolvency setoff doesn't apply in that case either?
21     A.  Correct.
22     Q.  But the insolvency setoff assumes
23  liabilities and assets between the creditor and
24  debtor?

Page 244

1     A.  No.  There's no assumption.  It merely
2  takes effect automatically insofar as there are
3  such -- there is such a situation.
4     Q.  So in the event here where it did take
5  effect, if it wouldn't have taken effect, would
6  there have been distinct assets and liabilities as
7  between Three Arrows and FTX?
8         MR. BELLER: Objection.
9     A.  I'm sorry.  I don't understand the premise
10  on which that question is put.
11  BY MR. PROULX:
12     Q.  The insolvency setoff takes effect, does
13  it not, only if each party has claims against the
14  other?
15     A.  Whether it be mutual credits and debits,
16  and those mutual credits and debits remain
17  outstanding as at the date of the liquidation.
18     Q.  Mr. Levy talks about the concept of
19  mutuality at paragraph 146 of his report.
20     A.  Yes.
21     Q.  Could you turn to that please?
22     A.  Yes.
23     Q.  Do you disagree with the articulation of
24  the standard for mutuality under Section 150 by

Page 245

1  Mr. Levy?
2     A.  No.  I think I've already accepted that
3  answer to earlier questions where I alluded to what
4  Mr. Levy said in this paragraph.
5     Q.  And do you dispute that claims are mutual
6  with one another under the meaning of Section 150
7  only if they both are money claims?
8     A.  Yes.  And or can be reduced or have been
9  reduced or can be reduced to a monetary value and
10  that they operate between the same parties.  So in
11  this context, a creditor and a debtor.
12     Q.  What can not be reduced to a monetary
13  value that stems from a legal cause in action, in
14  your view?
15     A.  Well, specifically, if I considered that
16  there is a specific piece of property which is in
17  the possession of the company in liquidation, but
18  which is making it personal, my property, that's a
19  proprietary claim.  Yes, in theory it could be
20  reduced to a value of the property.  But that's not
21  the nature of the claim.  The claim is to a specific
22  item of property in that scenario.
23         So that claim that -- the attempt to
24  vindicate my rights in that property, the part the



Page 262

1     Q.   In this paragraph, including its subparts,
2  you're responding to analysis from Mr. Levy
3  regarding whether FTX may be held liable as a
4  beneficiary of the relevant transactions as opposed
5  to a creditor; is that right?
6     A.   Well, I think paragraph 67, the previous
7  paragraph, is rehearsing Mr. Levy's -- as part of
8  Mr. Levy's declaration which is dealing with the
9  issue of, if FTX would have absorbed the losses that
10 would otherwise have been borne by other exchange
11 customers as a result of the nonpayment of 3AC's
12 negative U.S. dollar balance; and it continues.  So
13 it's a response to the absorption of loss point.
14    Q.   And at high level, what is your response
15 to the absorption of loss point?
16    A.   The assumption is -- or the
17 understanding as expressed by Mr. Levy, is not
18 commensurate with the understanding that I've been
19 provided with or the assumption I've been asked to
20 make.  As set out in earlier, the rebuttal
21 declaration, that FTX was not under any legal
22 obligation to absorb losses of the type that
23 Mr. Levy is referring to.
24    Q.   If FTX had been obligated to absorb those

Page 263

1  losses, do you offer an opinion as to whether or not
2  it could be liable under Section 249 as a
3  beneficiary of the preferential transactions?
4     A.   Not in the context of the vacuum of that
5  question.  It would have to be put in a set of
6  circumstances with a hypothetical or counterfactual
7  so that I could understand precisely what is said.
8     Q.   It's not a hypothetical or counterfactual.
9  Mr. Levy offers an affirmative analysis,
10 Mr. Atherton.
11    A.   No.  But on the basis of his
12 understanding.  My understanding is that that's not
13 the factual position.  So I need to understand what
14 losses are being referred to, what the nature of the
15 obligation was.  So essentially, circumstances which
16 give rise to that obligation, the nature of the
17 obligation and whether or not the circumstances are
18 such that there has been a preference from which it
19 can be said, or can't be said, that FTX has
20 benefited.
21    Q.   So when you adopt the assumption that FTX
22 was not legally obligated to cover these losses, you
23 don't even know what losses these might refer to?
24    A.   Well, I'm responding the losses referred

Page 264

1  to by Mr. Levy.
2     Q.   I actually don't know who spoke over.  I
3  wanted to give you the floor.
4     A.   That's kind.
5        All I'm seeking to say here is that,
6  FTX -- or my understanding or the assumption I was
7  being asked to make, was not legally obliged to
8  absorb any losses.  And therefore, insofar as there
9  may be alleged to have been a preference of the
10 third-party in that regard, the relevant
11 circumstances don't attain to FTX receiving a
12 benefit because it just didn't happen.
13    Q.   Where does Section 249 provide that
14 beneficiary may only be held liable if it had a
15 legal obligation to do something?
16    A.   It doesn't.  But what I'm saying is that
17 FTX, as I understand it, did not absorb losses and
18 was not legally obliged to absorb losses.  So the
19 circumstance posited by Mr. Levy or my understanding
20 or the assumptions I've been asked to make, doesn't
21 arise.
22    Q.   And you're unable to just take the
23 opposite assumption and proceed from there in this
24 discussion?

Page 265

1     A.   Well, not unless there's a proper context.
2     Q.   Please finish.
3     A.   I would need to understand what it is
4  precisely that's being said in terms of
5  understanding whether or not there is grounds for
6  relief.
7     Q.   You know the context when you're negating
8  something, but you refuse to engage with the context
9  when you're --
10    A.   Well, because --
11       MR. BELLER:  Objection.
12       THE WITNESS:  I'm sorry.
13       MR. BELLER:  Objection, argumentative.
14    A.   I'm simply responding to the position as
15 postulated by Mr. Levy.  If you want to postulate a
16 further assumption or a further scenario, I'm happy
17 to respond to it, provided I understand the full
18 context of what it is being said and how it is being
19 asserted.  That is a circumstance where relief may
20 appropriately be granted.  That's all I'm asking
21 for.
22 BY MR. PROULX:
23    Q.   And I'm trying to do that as simply -- let
24 me finish Mr. Atherton.

MAGNA▶
LEGAL SERVICES

Page 266

1  A.  I'm sorry.  I'm quite happy for you to
2  continue.
3  Q.  I'm trying to do that as simply and
4  quickly as possible within your own framework, the
5  context that you're allowed to discuss.
6  If you turn to paragraph 7(e) of your
7  rebuttal report.
8  A.  Backwards.
9  Q.  Simply remove the word "not" from your
10  assumption there.
11  Are you able to proceed from that or not?
12  A.  When I get there.
13  Very well.  "If FTX was obligated to
14  absorb amounts of negative balance that were
15  incurred by one customer through borrowing from
16  other customers, via the Spot Margin Program."
17  Q.  Are you able to answer questions with the
18  assumption you've just stated or not?
19  A.  Well, I understand the assumption.  I can
20  make it in opposite terms.
21  Q.  Thank you.
22  A.  But I still don't understand because I
23  don't understand the context in which the existence
24  of that obligation is being put to me and its

Page 267

1  significance.
2  Q.  So then, in negating it, you also don't
3  know the significance of what you're negating or its
4  context?
5  MR. BELLER:  Objection, argumentative.
6  A.  No.  Because what Mr. -- that passage that
7  I quote -- and I've read Mr. Levy's declaration.
8  What Mr. Levy is saying is that in circumstances
9  where FTX is obligated to observe losses, has there
10  been a situation of benefit?
11  And he postulates it on the basis that
12  there has been a reference of third parties, and
13  therefore, by absorbing the losses, somehow FTX has
14  received a benefit.  I don't agree with the premise
15  upon which that assertion is made.
16  BY MR. PROULX:
17  Q.  Are you aware of any case law from any
18  jurisdiction that requires a legal or practical
19  obligation to do something before the subject is --
20  can obtain a benefit from doing that thing?
21  A.  No.  I'm not aware off the top of my head
22  of any specific authority.  I am aware of
23  circumstances where it may be said that relief can
24  be granted against a party who's received a benefit

Page 268

1  as a consequence of the preference given to a
2  different party.
3  That, I understand.  And I'm not arguing
4  with the ability of a court to grant relief in those
5  broad circumstances.  But you're asking me to be
6  specific about a set of circumstances where a set of
7  circumstances are not specific.
8  Q.  How can we be more specific, Mr. Atherton,
9  than citing specific deposition testimony, specific
10  factual record evidence that supports Mr. Levy's
11  analysis?
12  How would you like us to be more specific
13  for you?
14  MR. BELLER:  Objection.
15  A.  Just to give me a fulsome set of
16  circumstances.
17  If what you're driving at is can a third
18  party receive a benefit from a proven preferential
19  circumstance in relation to another creditor, and in
20  those circumstances is it possible for a court to
21  grant relief against the party that received the
22  benefit, I mean, I've accepted that's a position.
23  But that's in very broad legal terms, without
24  specific applications and specific facts.

Page 269

1  I've not doubted that as a matter of
2  content, but I'm not applying it to a scenario.  And
3  you're asking me to apply it to a scenario, but the
4  scenario is imperfectly formed, if I can put it that
5  way.
6  BY MR. PROULX:
7  Q.  You chose not to review the actual factual
8  circumstances that Mr. Levy cited and relied on in
9  his own declaration?
10  A.  I referred to and relied upon his
11  recitation of the relevant parts of his declaration.
12  Q.  Can breaking legal promises create legal
13  liabilities?
14  MR. BELLER:  Objection.
15  A.  I don't understand it.  I don't understand
16  the concept of "legal promises."  Breaching a
17  contract can have circumstance -- can have
18  consequences obviously.
19  BY MR. PROULX:
20  Q.  Can avoiding those consequences be a
21  benefit?
22  MR. BELLER:  Objection.
23  A.  In a vacuum, yes, possibly.  But, again,
24  if you're asking me to apply the preference



Page 270

1  provisions and the relief provisions attendant to
2  the preference claim provisions, I can't answer that
3  question in that imperfectly formed scenario.
4  BY MR. PROULX:
5      Q.  Is it your typical practice not to review
6  source materials relied on in an expert report that
7  you're responding to?
8          MR. BELLER:  Objection.
9      A.  No.  I was given a variety of source
10  materials which I reviewed and considered.
11  BY MR. PROULX:
12      Q.  That's not your typical practice, or that
13  is your typical practice?
14          MR. BELLER:  Objection.
15      A.  My typical practice is to review the
16  materials I'm provided with.
17  BY MR. PROULX:
18      Q.  You didn't independently review any
19  testimony on this subject from FTX's former CEO; is
20  that correct?
21      A.  Is that Mr. Bankman-Fried?
22      Q.  That is.
23      A.  I think I said earlier, at the outset of
24  today, that I haven't.

Page 271

1      Q.  You didn't review any testimony on the
2  subject from FTX's former director of engineering;
3  did you?
4      A.  No.
5      Q.  You didn't review any testimony on this
6  subject from FTX's former head of institutional
7  sales; did you?
8      A.  No.
9      Q.  Didn't review any documents relating to
10  FTX's liquidation engine; did you?
11      A.  No.
12      Q.  Do you know what that means?
13      A.  No.
14      Q.  You didn't review any documents relating
15  to FTX's Backstop Liquidity Provider Program; did
16  you?
17      A.  No, I didn't.
18      Q.  Do you know what that program is exactly?
19      A.  No, I don't.
20      Q.  You didn't review any documents relating
21  to FTX's backstop fund or insurance fund; did you?
22      A.  No.
23      Q.  Do you know how that fund operated?
24      A.  No, I don't.

Page 272

1      Q.  Do you know how much money was in it?
2      A.  I have no idea.
3      Q.  Do you know how much money was in it
4  relative to the liabilities on Three Arrows'
5  negative account balance?
6      A.  If I don't know --
7          MR. BELLER:  Objection?
8      A.  -- how much money was in it, I can't give
9  a relative observation.
10  BY MR. PROULX:
11      Q.  Do you have an opinion or have you been
12  instructed on who, if anyone, FTX customers who had
13  assets under the margin program would have recourse
14  to in the event they were not repaid their margin
15  loans?
16      A.  No.
17      Q.  You don't have a view on whether recourse
18  could or could not be had to FTX in that scenario?
19      A.  I simply don't know.
20      Q.  Do you understand that whether or not
21  recourse could be had to FTX as a matter of BVI law?
22      A.  I don't understand why there might be a
23  potential for resource as a matter of BVI law.
24      Q.  Paragraph 68(d).

Page 273

1      A.  Of the rebuttal?
2      Q.  Of your rebuttal report.
3          Feel free to read it for context.  Just to
4  speed things up, I'm going to point you to the final
5  sentence in your statement, or observation, that:
6          "The important point to note is that the
7  principal beneficiary would be 3AC by reason of
8  reduction in number and value of the claims against
9  its estate."
10          Let me know when --
11      A.  May I read it?
12      Q.  Of course.
13      A.  (Witness reviews document.)
14          Yes, I've read it.  Thank you.
15      Q.  Are you opining that it's not possible for
16  FTX to benefit from the occurrences described in
17  this paragraph and for 3AC to benefit at the same
18  time?
19      A.  No.  I'm not saying that.  I'm simply
20  saying that the obvious tangible benefit on that
21  scenario is that 3AC has avoided having to pay
22  certain liabilities.
23      Q.  But for the asset sales at issue in this
24  case, wouldn't 3AC's accounts on the Exchange have

1  been left with a significant negative U.S. dollar
2  balance?
3         MR. BELLER: Objection.
4      A.  Not necessarily, no.
5  BY MR. PROULX:
6      Q.  In what circumstances may it not have?
7         MR. BELLER: Objection.
8      A.  You'll have to give me the first question
9  again, please.
10        MR. PROULX: Sure.  I'll add a clarifying
11 remark.
12     A.  Please do.
13 BY MR. PROULX:
14     Q.  But for the asset sales at issue in this
15 case, wouldn't Three Arrows' accounts on the
16 Exchange have been left with a large negative USD
17 balance -- and I'll add, at the time it entered
18 insolvency proceedings?
19        MR. BELLER: Objection.
20     A.  Yes.  Because, as we've previously
21 discussed, if there are no digital asset sales,
22 there can't be any accretion to the U.S. dollar
23 balance.  The effect of which, given the state of
24 the balance at the relevant time, was negative.

1         So unless there were incoming U.S. dollar
2  payments, the U.S. dollar negative balance, as it
3  stood, would have remained the same.
4  BY MR. PROULX:
5      Q.  What opinion, if any, do you offer on
6  whether the avoidance of significant reputational
7  damages can constitute a benefit within the meaning
8  of Section 249?
9      A.  I seek to explain that in the paragraph
10 that you took me to and in the attendant footnote at
11 number 102.
12     Q.  And I'm asking, in your own words, what is
13 your opinion on this subject?
14     A.  My own words are contained in
15 footnote 102.
16     Q.  So in the footnote 102, you acknowledge,
17 do you not, that reputational benefit can, in
18 principle, be a benefit within the meaning of 249?
19     A.  No, I don't.
20     Q.  Is it in all cases of reputational --
21     A.  I --
22     Q.  Let me finish my question.
23     A.  I do apologize.  I'm sorry.
24     Q.  In all cases, the gaining of a

1  reputational benefit by a third party is precluded
2  as a source of -- or precluded as a potential
3  benefit within the meaning of 249; is that your
4  testimony?
5      A.  No.  I didn't use the word "preclusion."
6         And, as ought to be apparent from this
7  section of my declaration, particularly the
8  footnote, if FTX is taking action voluntarily, and
9  if that has the effect of a benefit as regard to
10 reputation, the first question is, why is that a
11 benefit given by the company?
12        It wouldn't be.  So why would that be
13 pursuable or a basis for remedy in the context of a
14 preference?
15        And, secondly, is it possible to, even
16 assuming that's not right, which it must be, when
17 one's looking at the restitutional nature of the
18 remedies that are contained within Section 249, how
19 does one restore something to the company which
20 wasn't the company's and relates to a benefit which
21 is purely the consequence of an act by a third party
22 which bestows a benefit on itself?
23        And thirdly, regardless of what Mr. Levy
24 says, there is no authority that indicates or

1  asserts that reputational -- or the avoidance of
2  damage to one's reputation or enhancement of one's
3  reputation in this context is a benefit which is
4  susceptible of being reflected in relief being
5  granted by the court.
6      Q.  Is there any authority that says opposite
7  of that?
8      A.  Well, there was the potential opportunity
9  for that to be set in the Byers and Chen case, but
10 it wasn't.  As far as I'm aware, there's no
11 authority that says that that is a position, that it
12 can be the position, and that a court is granting
13 relief in that regard.
14     Q.  You've taken the position that the
15 potential benefit to FTX here would not have been
16 from the Three Arrows.
17        Are you opining that Three Arrows did not
18 conduct the bulk of the asset sales that decreased
19 its negative U.S. dollar liabilities to FTX?
20        MR. BELLER: Objection.
21     A.  The premise of the question is that
22 Three -- that FTX voluntarily absorbed losses, and
23 extending that, the reason it did that voluntarily
24 was to avoid reputational loss.

MAGNA
LEGAL SERVICES

1    So I'm not sure, on that scenario, what
2  role, if any, 3AC is actually or purporting to play.
3  BY MR. PROULX:
4    Q.  When you say "voluntarily absorbed
5  losses," those losses were hypothetical that were
6  avoided, no?
7    MR. BELLER:  Objection.
8    A.  I don't know.  All I'm doing here is
9  responding to an assertion by Mr. Levy that, on his
10  understanding and the assumptions he's been asked to
11  make -- is that losses were absorbed.
12    I don't know any legal basis for that;
13  therefore, if that did occur on that hypothetical,
14  then it would have been on a voluntary basis.  So
15  I'm still not aware of what role it said 3AC would
16  be playing in the relevant context.
17  BY MR. PROULX:
18    Q.  Okay.  Do you offer an opinion of whether
19  the avoidance of liabilities at FTX might have
20  occurred to other customers for failing to prevent
21  3AC's defaults on the Exchange can constitute a
22  benefit within the meaning of 249?
23    MR. BELLER:  Objection.
24    A.  Could you ask the question again so I can

1  try and process it?
2    MR. PROULX:  I'll just repeat -- sure.
3  I'll repeat.
4  BY MR. PROULX:
5    Q.  Do you offer an opinion on whether the
6  avoidance of liabilities that FTX might have
7  incurred to other customers on the Exchange for
8  failing to prevent 3AC's defaults can constitute a
9  benefit within the meaning of 249?
10    A.  Well, it depends upon whether the benefit
11  is set to be the consequence of a preference
12  transaction.
13    Like I said, without intending to being
14  rude, the scenario is incomplete because I'd need to
15  understand what it said was the preferential
16  transaction.  Because the preference would have to
17  be of that third party and then how the preferential
18  treatment of that creditor then resulted or causes a
19  benefit to be obtained by FTX.
20    Q.  On the facts of this case, as you
21  understand them and have been instructed, are there
22  any third parties to whom Three Arrow owed anything?
23    MR. BELLER:  Objection.
24    A.  I don't think so.  There may be reference

1  to 3AC owing liabilities to -- in the context of
2  margin transactions, but they don't really feature
3  the analysis that I've been asked to conduct as
4  regard to BVI law.
5  BY MR. PROULX:
6    Q.  Any opinions on whether FTX being able to
7  commence its bankruptcy proceedings later than it
8  would otherwise have had to due to repayment of
9  3AC's massive liabilities on the platform constitute
10  a benefit within the meaning of 249?
11    MR. BELLER:  Objection.
12    A.  I don't understand the premise for that.
13  I have no knowledge of that.  I haven't been asked
14  to give an opinion in context of the preference
15  claims in the circumstances you've just outlined.
16  BY MR. PROULX:
17    Q.  Accepting your assumption that
18  Three Arrows conducted the vast majority of the
19  asset sales at issue in this case, did that help
20  anyone other than Three Arrows?
21    MR. BELLER:  Objection.
22    A.  My understanding of the circumstances
23  under the assumptions I've been asked to make, then
24  those sales benefited 3AC.  I'm not sure how they

1  would have benefited anybody else.
2  BY MR. PROULX:
3    Q.  Do you offer an opinion on whether or not
4  they benefited anyone else?
5    A.  No, I don't.
6    Q.  Do you have an opinion or have you been
7  instructed on why FTX cared about liquidation of
8  3AC's accounts?
9    MR. BELLER:  Objection.
10    A.  I think I, perhaps in the rebuttal
11  declaration, refer to those transactions being
12  positive in the sense that they resulted in -- the
13  sale resulted in an accretion to the U.S. dollar
14  account.  But, of course, the effect of them in the
15  circumstance I understand were prevailing at the
16  time, they resulted in the sale or the disposal of
17  assets which were volatile, and, indeed,
18  deteriorating in value, with a result that upon
19  sale, U.S. dollars would have been realized which,
20  comparatively speaking, is more stable than digital
21  assets, which is a generality, I suppose, but also
22  in the circumstances in which those transactions
23  were taking place.
24

BY MR. PROULX:
Q. And those proceeds of resulting U.S. dollars decreased Three Arrows' liability on the Exchange?
MR. BELLER: Objection.
A. I'm sorry --
BY MR. PROULX:
Q. Those -- disposal of assets which were volatile and deteriorated in value resulted in decrease in Three Arrows' liabilities on the Exchange?
MR. BELLER: Objection.
A. I don't think that's what I said, but --
BY MR. PROULX:
Q. I'm asking you.
A. I don't know.
Q. Okay. Do you offer an opinion on whether --
MR. PROULX: I think the answer was "I don't know" to the last question, Angie.
BY MR. PROULX:
Q. Do you offer an opinion on whether Section 250 of the BVI Insolvency Act plays any role in the availability of remedial relief under



Section 249?
A. Do you mind if I look at Section 250?
Q. Yes. Just -- it is, speeding things up, page 143?
A. (Witness reviews document.)
It limits -- in the circumstances in which they would apply, it limits the ability or the nature of the remedies the court can impose.
Q. And do you offer any opinion on whether it would be applied properly in this case on the facts and assumptions you've been provided?
MR. BELLER: Objection.
A. I think I do in response to what Mr. Levy says may or may not be appropriate by reference to Section 250. I'd have to look at my declaration in rebuttal, but I do give an opinion on whether or not the circumstances of this case may give rise to limitations of the nature set out in Section 250.
BY MR. PROULX:
Q. I'm not trying to hide the ball. You're welcome to look at your declaration to try to understand your views on 250. It looks like it's on footnote 105.
A. Paragraph 105 of my rebuttal?



Q. I believe footnote 105.
A. Oh, I beg your pardon.
Q. It looks like it's paragraph 69.
A. (Witness reviews document.)
That's my -- that's the response and opinion that I've advanced in relation to the possible applicability of Section 250.
Q. I didn't understand the response as you wrote it here.
Could you please explain it to me?
A. You didn't understand it?
Q. I did not.
A. Can I refresh my memory of what it said?
Q. You can review the document. I'm just asking for your understanding of how 250 applies, if at all.
A. (Witness reviews document.)
Well, as Section 250 provides, there's a rebuttable presumption of good faith in relation to a party in this scenario, which would be occupied -- the position would be occupied by FTX. So evidentially, that presumption would have to be rebutted in order for the good faith exemption or exception not to apply.



Q. Is there a rebuttable presumption that the transaction at issue was for value as well?
A. It's dealt with, but I don't believe so. I think it's subsection 3 of Section 250. It's only relating to good faith.
Q. And in Section 52(b), to establish a defense under 250 is the good faith and for value requirements -- are they separate? Are they conductive or disjunctive?
A. It's an articulation of a defense of a person who entered into a transaction in good faith and for value. So it's conjunctive.
Q. So as far as I could tell, you justified the satisfaction of the for-value component of that in conjunction with the rebuttable presumption.
Do you have views outside of that rebuttable presumption whether FTX provided value?
A. Well, I think what you just said is not a fair articulation of what I deal with. I'm not suggesting the presumption relates to value at all, only to good faith, which would be obvious, because one can assess value from the nature of the transaction but one can't necessarily assess good faith. And that's why there's a presumption which



MAGNA LEGAL SERVICES

Page 286

1  needs to be rebutted.
2        I don't think I'm being unfair.  If I'm
3  wrong on that, then please direct me to where I say
4  something that's not consistent with what I've
5  explained.
6        Q.   What is your opinion, if any, as to
7  whether FTX received a benefit from the transaction
8  for value?
9        MR. BELLER: Objection.
10       A.   Again, what transaction?  What benefit?
11  And what may or may not be the putative value that's
12  being given?
13  BY MR. PROULX:
14       Q.   Transactions we're talking about are the
15  June 13th or 14th?
16       A.   So the sales --
17       Q.   Let me finish.
18       A.   I'm so sorry.
19       Q.   Asset sales.
20            Now do you think you need to clarify
21  anything?
22       A.   Trying as best I can, as before, to apply
23  what I understand to be the objection, which is the
24  application of the proceeds to the negative U.S.

Page 287

1  dollar balance.  The value that would be given is
2  the reduction in that negative U.S. dollar balance.
3  And good faith would be presumed unless rebutted.
4        I think somewhere I'm more precise in
5  dealing with what the value may be, but at the
6  moment I'm not able to identify the particular part
7  of the declaration which deals with the value
8  question.  So forgive me.
9        Q.   If FTX is not a creditor of Three Arrows,
10  as I believe you assumed, could it have received any
11  benefit for value for the -- from the asset sales at
12  issue?
13       MR. BELLER: Objection.
14       A.   I don't see how for the moment, unless
15  we're discussing absorption of losses, for example.
16  BY MR. PROULX:
17       Q.   Do you know what, if anything, any
18  witnesses testified in this case regarding FTX's
19  awareness of Three Arrows' financial troubles at the
20  time of the asset sales?
21       A.   No.
22       Q.   Good faith presumption does not apply,
23  right, when the beneficiary had notice that the
24  transaction was an unfair preference; is that

Page 288

1  correct?
2        A.   That is what is included in, I think,
3  Section 250 yes -- I'm sorry subsection 4.
4        Q.   Whether the beneficiary knew or ought to
5  have known that the company was insolvent is
6  relevant to that inquiry, right?
7        A.   You mind bearing with me while I look at
8  this?
9            (Witness reviews document.)
10           Yes.  Subsection 4 says that the exemption
11  or the preclusion doesn't apply:
12           "To a person who, at the time of the
13  transaction, had notice of (ii) the relative
14  proceedings as defined in subsection 5."
15           And then it sets out a series of
16  insolvency proceedings.
17           (Reporter clarification request.)
18       A.   I think that's what I said, yes.
19           So the question is whether or not FTX
20  should be precluded from taking advantage, as far as
21  relevant, of the exemption to relief, have notice of
22  the proceedings, as set out in A, B, C, of
23  subparagraph 5.
24       Q.   You don't dispute that FTX was a party to

Page 289

1  the relevant transactions, right?
2        MR. BELLER: Objection.
3        A.   My understanding is that it wasn't a party to
4  the transactions, being the sales instigated by 3AC, but
5  it was a party to the transactions which we've
6  reserved to as the liquidation.
7  BY MR. PROULX:
8        Q.   Is it your view that FTX had no role in
9  the effectuation, crediting, or debiting of the
10  sales initiated by 3Ms?
11       MR. BELLER: Objection.
12       A.   That may be one of the issues because I've
13  sought to analyze it in terms of the effecting of a
14  setoff or netting by FTX, but that all happened as
15  part of the operation of the Exchange, is what I'm
16  given to understand.
17           So on that analysis FTX wouldn't actually
18  have had to have done anything in relation to the
19  receipt of the U.S. dollars into 3AC's account,
20  because that just happened automatically.
21           That's my understanding.
22  BY MR. PROULX:
23       Q.   Do you agree that if FTX was a party to
24  insolvency transaction, then Section 252(b) and

MAGNA
LEGAL SERVICES

Page 290

1    consideration of good faith and for value don't
2    apply in the first place?
3            MR. BELLER: Objection.
4        A.  No, I don't.  I don't agree with that.
5    That's not what -- I think that may be what Mr. Levy
6    says, but that's not my understanding of what he
7    said in subsection 2(b) of Section 250.
8    BY MR. PROULX:
9        Q.  What is the clause in the middle of
10   that -- there's a carve-out.  It says:
11           "Except where that person was a party to
12   the transaction."
13           What work does that do?
14       A.  My understanding of that is essentially a
15   reproduction of the corresponding provision in the
16   1986 Insolvency Act in England, where it's referring
17   to transaction and undervalue.
18           And so what (b) is saying is it doesn't
19   apply where it requires a person who received a
20   benefit from the transaction in good faith of a
21   value to pay a sum to the officeholder except where
22   that person was a party to the transaction.
23           I'm asserting that as that's really a
24   reference to an undervalue transaction because it

Page 291

1    then goes on to say "or in respect of an unfair
2    preference."
3            So the second part is a specific
4    delineation between the first part, which refers to
5    transaction, and unfair preference.  And in that
6    circumstance, the good faith provision doesn't apply
7    because the preference -- has to be the preference
8    was given to the person when he or she was a
9    creditor of the company.
10       Q.  Is that an understanding based on any case
11   law, legal treatises or other legal authority?
12       A.  No.  If I'm perfectly candid, I don't know
13   whether that particular provision has been subject
14   of analysis in the BVI.  As I say, on a -- reading
15   the -- just looking at the words, there is a
16   separation between a person being a party to the
17   transaction and then a specific reference to when
18   the exemption doesn't apply in the specific context
19   of an unfair preference.
20       Q.  Even though in the BVI Insolvency Act, the
21   word "transaction" does appear in the relevant
22   preference claim language in 245?
23       A.  It doesn't, though; does it?  It refers to
24   insolvency transactions.

Page 292

1        Q.  Turn to 245, please, sir.
2        A.  I'm sorry.
3        Q.  It's on page 140.
4        A.  Yes, yes.  I see, yes.
5        Q.  Do you want to amend your last response?
6        A.  No, I don't.  Because, again, the
7    transaction is -- what that says is the transaction
8    is an unfair preference when it's an insolvency
9    transaction.  So it's a qualification to what the
10   transaction -- the reference "transaction" there is.
11   And then he's entered into a vulnerability period
12   and then has the effect of placing the creditor in a
13   better position.
14       Q.  Doesn't 246 do the exact same thing, sir?
15           "Transaction" appears in the lead-in;
16   "insolvency transaction" appears in the body.
17       A.  Well, it says "enters into an undervalue
18   transaction."
19           What I'm saying is if we look at the
20   wording of Section 250(b), on the plain reading of
21   that provision, it refers to a party to the
22   transaction, and then it makes a specific reference
23   to "or in respect of an unfair preference."
24           So it's drawing a distinction they can't

Page 293

1    be the same.  So all I'm suggesting is what that
2    must mean is the transaction there is being a party
3    to an undervalue transaction, and then there's a
4    separate provision made in respect of where the
5    transaction is an unfair preference.
6        Q.  Turn back to the Terms of Service document
7    at 8.2.6 provision that we're focused on today.
8    This is Exhibit 15.  Has a Bates stamp in the bottom
9    middle.
10       A.  Yes.  It's 8.2...
11       Q.  Page 10, please, 8.2.6.
12       A.  Yes.
13       Q.  Your view is that a failure by FTX to
14   comply with that provision, 8.2.6(c) could lead to
15   money damages at the end of the day; is that right?
16       A.  No.  I'm not giving any effect to that
17   opinion at all.
18       Q.  So it can only -- it is not reducible to a
19   sum of money damages, a breach of that provision?
20           MR. BELLER: Objection.
21       A.  I haven't said that either.  I haven't
22   given an opinion as to true meaning and effect of
23   8.2.6.
24

Page 294

BY MR. PROULX:
1
2    Q.  If a company was claiming against FTX
3  under 8.2.6 in the context of FTX's insolvency
4  proceedings, doesn't it stand to recover less
5  damages for a breach in contract -- breach of
6  contract chose in action than a remedy for specific
7  performance?
8        MR. BELLER:  Objection.
9    A.  I'm not sure I understand the question.  I
10 can explain what I think it means.
11       I'm sorry.  If you want to put it again,
12 that's fine.
13       MR. PROULX:  I'll put it again.
14 BY MR. PROULX:
15   Q.  Isn't the company claiming against FTX
16 under 8.2.6(c) and FTX's own proceedings, insolvency
17 proceedings, worse off getting money damages than
18 specific performance because it is subject to the
19 pari passu principle itself?
20       MR. BELLER:  Objection.
21   A.  I don't think that the elements of that
22 question actually follow as a matter of logic.  As I
23 say, I've not ventured any opinion as to how or if
24 it was possible for 3AC to seek to enforce

Page 295

1  section -- or clause 8.2.6 or in what circumstances
2  it may be able to obtain a remedy or assert there
3  has been a breach of that clause.
4  BY MR. PROULX:
5    Q.  So if you don't know the circumstances in
6  which there may or may not have been a breach or
7  what the remedy would be, you then, are not opining
8  on whether or not contractual entitlement under this
9  claim would be commensurable with a money damages
10 claim that FTX might have against Three Arrows?
11       MR. BELLER:  Objection.
12   A.  Again, I'm not sure I understand the
13 question in the context of this clause.  All I can
14 say is that the premise of the claims as they are
15 put in the Proof of Claim is that the assets are the
16 property of 3AC, and, therefore, they are seeking to
17 assert a proprietary right against FTX in respect of
18 those assets.
19       As I've previously stated today and in my
20 declarations, my understanding, and the assumptions
21 you have asked to be given, is that there is no
22 proprietary right available or proprietary claim
23 available to FTX, either to specific assets or a
24 tracing claim, where it said other assets represent

Page 296

1  the assets to which the principal proprietary claim
2  would otherwise have related.
3  BY MR. PROULX:
4    Q.  Aside from Three Arrows' chose in action
5  or its contractual entitlements pursuant to this
6  provision?
7    A.  We've been through this before.  That is
8  property.  The chose in action is an asset of the
9  company, but it doesn't correspond to a proprietary
10 claim to the asset in respect of which 3AC may have
11 a contractual right to ask for.
12   Q.  Thank you.
13       MR. PROULX:  Let's go off the record for
14 just a moment.  This is not a break.
15       THE VIDEOGRAPHER:  We are going off the
16 record.  The time is 6:32 p.m.
17       (Recess.)
18       THE VIDEOGRAPHER:  We are back on the
19 record.  The time is 6:34 p.m.
20       MR. PROULX:  Just for the record, Counsel
21 informed us a few hours ago, Mr. Atherton,
22 about your flight obligations tonight.  And we,
23 off record, we're giving counsel some options
24 to accommodate them.

Page 297

1        Do you understand that?
2        THE WITNESS:  Yes, I do.
3        MR. PROULX:  Thank you, sir.
4  BY MR. PROULX:
5    Q.  Do you agree that the
6  ordinary-course-of-business defense is a defense
7  that the Defendant has the burden of proving up?
8    A.  Yes.
9    Q.  Did you agree or disagree in any way with
10 Mr. Levy's articulation of the standard that governs
11 the ordinary-course-of-business defense?
12   A.  Could you -- I think I do, but I'd just
13 like to be directed to where he articulates what he
14 says about the availability of the defense, please.
15   Q.  Paragraph 170, Mr. Levy's report.
16   A.  (Witness reviews document.)
17       Yes.  I've read that.
18   Q.  Do you dispute the way in which he
19 articulated the standard that is applicable to the
20 ordinary-course-of defense?
21   A.  I think I would in very general terms,
22 which is that insofar as subparagraphs A, B, C, and
23 D of paragraph 170 seek to delimit the circumstances
24 or the facts or factors which the court would be

MAGNA ▶
LEGAL SERVICES

Page 298

1  considering a weigh in the context of considering
2  such a defense, the important point is that, as he
3  says about the Countrywide case in paragraph 117:
4       "The board declines to adopt any
5  particular formulation of the test or make any
6  comprehensive statements of the criteria for
7  determining when a transaction is to be held to have
8  taken place in the ordinary course of business."
9       Emphasize the following points, but there
10 will be other issues and other points which need to
11 be taken into account.  Specifically, I don't accept
12 that if response -- the responses to abnormal
13 financial difficulties would be dispositive of the
14 lack that had not been in ordinary course of
15 business.
16      All I'd be saying is that the court would
17 look at all the circumstances, including matters
18 such as this, and simply try to objectively
19 determine whether or not the transactions that were
20 sought to be characterized as being in the ordinary
21 course of business, they would characterize them as
22 being such.
23      Q.  Thank you, sir.
24          When you say they would include matters

Page 299

1  such as this, you're including the focus on whether
2  the conduct is ordinary operational activities of
3  businesses as going concerns or responses to
4  abnormal financial difficulties?
5       You're saying that's a relevant
6  circumstance to consider?
7       A.  I think the court would consider that.  I
8  don't believe that the abnormal financial
9  difficulties in any way disposits it.  It may color
10 the circumstances, but, for example --
11      Q.  Finish your answer, but mindful of the
12 time --
13      A.  No, no.  I understand, but I want to
14 assist as much as possible.
15      Q.  You've answered the question.  If you
16 have --
17          MR. BELLER:  The witness has not finished
18 his answer.
19      A.  All I'm indicating, for example, is that a
20 company is there to make profits, but if the
21 circumstances dictate it's necessary to avoid
22 losses, I don't necessarily see why that wouldn't --
23 those transactions which are sought to do that would
24 necessarily not be in the ordinary course of

Page 300

1  business, the whole gamut of the circumstances.
2  BY MR. PROULX:
3       Q.  Do you agree that within that gamut, as
4  Countrywide stated, the focus needs to be on whether
5  the relevant activities are responsive to abnormal
6  financial difficulties?
7       A.  I think if you look at that phraseology
8  and then look at what the court has said previously,
9  there is an inherent tension to what is said.  I
10 don't think there's any particular focus, other than
11 for the actual circumstances of the case across the
12 board, to try and analyze whether or not the defense
13 can be properly asserted and properly made out if
14 it's made out.
15      Q.  Why don't you identity the relevant
16 circumstance in the ordinary course inquiry in your
17 initial expert report?
18          MR. BELLER:  Objection?
19      A.  I don't understand the question.
20 BY MR. PROULX:
21      Q.  I don't believe in your initial expert
22 report you ever acknowledge that Countrywide's
23 directive regarding the focus being on ordinary
24 operational activities.

Page 301

1       A.  No, I didn't, but I made the point it also
2  refers to, as does another case, there may be
3  exceptional circumstances, and because they're
4  exceptional and because the trades or transactions
5  may be exceptional for that company, that in itself
6  doesn't constitute those transactions not being in
7  the ordinary course of business.
8       Q.  Do you have an opinion here on whether
9  taking into account the expert opinions given by
10 Three Arrows with respect to ordinary course,
11 Three Arrows -- strike that -- FTX would satisfy its
12 burden of meeting the ordinary-course defense before
13 a BVI court?
14      A.  I'm not able to say because they are
15 the -- I'm quite prepared to respect their views,
16 but there's no -- as I understand it, there's no
17 responsive evidence to that evidence.
18          I'm quite prepared to accept that the
19 factors that are referred to in those declarations
20 would be factors which would be considered in
21 determining whether the defense was available.
22      Q.  When you refer to respecting their views,
23 I appreciate their company.
24          You haven't actually read their views yet;

Page 302

1    is that correct?
2        A.   No, I have.  I thought I made that clear
3    this morning.
4        Q.   I apologize.  I misheard your testimony.
5        A.   No, no.  I have read them, and some of it
6    is very technical.  But I have no issue with the
7    factors they refer to or the circumstances they
8    refer to, the analysis they refer to would be
9    considered by the court.  But at the same time, as I
10   understand, no responsive evidence has ever been
11   filed or lodged in response to those.
12       Q.   When you say "responsive evidence," do you
13   mean responsive evidence by FTX?
14       A.   Yes.  FTX Recovery Trust, yes.
15       Q.   I think what I meant to ask earlier, and
16   you rightly corrected me, was that you hadn't
17   reviewed those reports prior to submitting and
18   preparing your rebuttal report; is that correct?
19       A.   I think I was struggling, and I have not
20   checked, but I can't recall whether I had them
21   before or subsequently.  But I have read them.
22       Q.   Okay.
23       A.   So I know what the content is.
24       Q.   Let's talk about the undervalue

Page 303

1    transaction claim for a moment.
2        I believe you have some separate
3    assumptions made with respect to this claim in
4    paragraph 83 of your rebuttal report.
5        Please turn to page 38.
6        Let me know when you see those
7    assumptions.
8        A.   Paragraph 83?
9        Q.   Correct.  I'm going to direct your
10   attention to paragraph 83(e) for starters.  It says:
11       "The challenged transactions occurred at
12   fair market price."
13       Do you see that?
14       A.   Yes.
15       Q.   This was an assumption you were provided,
16   right?
17       A.   Yes.
18       Q.   If the challenged transactions had not
19   occurred at fair market price, how, if at all, would
20   that change your views with respect to the elements
21   of the undervalue transaction claim?
22       A.   Again, I just need to understand or have
23   specifics in order to answer that question on a
24   definitive basis from my ability to give an opinion.

Page 304

1    That's all I can say.
2        Q.   Were you provided any specifics when you
3    adopted that assumption?
4        A.   No.  I don't know of a situation why, if
5    3AC are selling digital assets, why they would be
6    selling them for anything other than fair market
7    price.
8        Q.   You acknowledge that, do you not, that
9    FTX, in fact, sold a substantial amount of digital
10   assets in the relative time period?
11       A.   On the 14th, I think, it conducted the
12   liquidation.
13       Q.   Are you aware of what the evidence shows
14   in this case with respect to whether or not FTX sold
15   those assets at fair market value or not?
16       A.   I don't know if that's true or not.
17       Q.   If that record evidence establishes that
18   FTX sold that portion of the assets at issue at less
19   than fair market value price, are you able to
20   proceed from there and see how that might affect
21   your opinion or not?
22       A.   No.  Because I would need to understand,
23   for example, whether or not the alleged undervalue
24   is significant or not.

Page 305

1        Q.   If the alleged undervalue were
2    significant, are you able to explain how that
3    changes your opinion, if at all?
4        A.   Well, if a transaction is entered into by
5    a company whereby it alienates an asset for
6    significantly less than its value to a third party,
7    that would constitute, in theory, in principle, and
8    undervalue transaction.
9        I can't be any more specific than that.
10       Q.   You reference in both, I believe, your
11   initial and rebuttal reports, a statutory defense
12   under 246.2 in respect of the undervalue
13   transaction.
14       Let me know if you're familiar with that
15   provision.
16       A.   I'm turning there now.  Thank you.
17       Q.   Is that -- do you accept that that
18   statutory defense is a defense on which the invoking
19   party bears the burden?
20       A.   Yes.
21       MR. PROULX:  Let's take our final break
22   here, as we've already discussed with counsel
23   off the record, and we'll be back shortly,
24   within 10 minutes.

MAGNA
LEGAL SERVICES

Page 314

1   NAME OF CASE:  In Re:  FTX Trading Limited, et al.
2   DATE OF DEPOSITION:  November 12, 2025
3   NAME OF WITNESS:  Stephen Nicholas Atherton K.C.
4   Reason Codes:
5      1.  To clarify the record.
       2.  To conform to the facts.
6      3.  To correct transcription errors.
7   Page _____ Line _____ Reason _____
    From _____ to _____
8
9   Page _____ Line _____ Reason _____
    From _____ to _____
10
11  Page _____ Line _____ Reason _____
    From _____ to _____
12
13  Page _____ Line _____ Reason _____
    From _____ to _____
14
15  Page _____ Line _____ Reason _____
    From _____ to _____
16
17  Page _____ Line _____ Reason _____
    From _____ to _____
18
19  Page _____ Line _____ Reason _____
    From _____ to _____
20
21  Page _____ Line _____ Reason _____
    From _____ to _____
22
23  _____
    STEPHEN NICHOLAS ATHERTON K.C.
24



# Exhibit 53

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| In re: | Chapter 11 |
| FTX TRADING LTD., *et al.*, | Case No. 22-11068 (KBO) |
| Debtors. | (Jointly Administered) |

## DECLARATION OF STEPHEN HOUSEMAN KC

I, Stephen Houseman KC, state as follows:

## A.    Introduction

1.    I am a barrister and one of His Majesty's Counsel in independent practice in England & Wales. I was Called to The Bar in November 1995 and took silk (Queen's Counsel) in March 2013, becoming King's Counsel upon the accession of King Charles III upon the death of The Late Queen Elizabeth II in September 2022.

2.    I have been requested by Sullivan & Cromwell LLP to provide this Declaration containing my opinion on aspects of Antiguan law (as defined below) in light of and in response to the First Supplemental Declaration of Paul Anthony Webster, KC in Support of the Amended Proof of Claim Filed by the Joint Liquidators of Three Arrows Capital Ltd. (In Liquidation), dated 31 October 2025 ("**Webster Declaration**"). The Webster Declaration has been filed on behalf of the joint liquidators of Three Arrows Capital Ltd. ("**3AC**") ("**Joint Liquidators**") in Case No. 22-11068 (KBO) in the United States Bankruptcy Court, District of Delaware, against FTX Trading Ltd., et al. It deals with aspects governed by Antiguan law.

3.    My total remuneration for this engagement is £30,000, representing my standard professional rate for the provision of expert opinions on Antiguan law. A more junior member of my chambers has, under my direction, provided assistance in the preparation

1

of this report and will receive remuneration of £22,500 in total. While my fees are to be paid by the FTX Recovery Trust, my compensation is in no way dependent upon my conclusions, the evidence I may give, or the result of these proceedings.

4.     A list of factual materials provided to me by Sullivan & Cromwell LLP that I have considered in preparing this Declaration is attached as **Exhibit A**. A list of the legal materials I have considered is attached as **Exhibit B**.

5.     Capitalised words and phrases, unless appears otherwise, have the defined meanings set out in the Webster Declaration. For the avoidance of doubt, this does not constitute and is not intended to constitute an acceptance on my part of any particular proposition or propositions set out in the Webster Declaration.

6.     I give this opinion on identified aspects of Antiguan law in connection with FTX Recovery Trust's objection filed on 20 June 2025 ("**Objection**") to the Amended Proof of Claim filed by the Joint Liquidators dated 27 March 2025 ("**Proof of Claim**" or "**PoC**"). In the Proof of Claim, the Joint Liquidators assert various claims based on theories that they are entitled to recover approximately $1.53 billion from FTX Trading, Ltd. ("**FTX**").

7.     In particular, I have been asked to address whether, as a matter of Antiguan law (and assuming for present purposes that FTX did _not_ own the assets at issue), the March 2022 Line of Credit Agreement ("**March 2022 LOC**"[1]): (i) created a security interest in favour of FTX under Antiguan law as to the assets (including any relevant rights or

---

[1] The Joint Liquidators have argued that the March 2022 LOC in fact constitutes two separate agreements, which Mr Webster separately defines as the "LOC" and the "Margin Agreement." (Webster Declaration, §20.) The March 2022 Line of Credit Agreement includes two separately named sections, but I am instructed that it is a single document with a common DocuSign ID number issued, which 3AC signed. I am instructed to proceed, for the purposes of preparing the present Declaration, on the basis that the March 2022 Line of Credit Agreement is one, singular agreement. However, given that Mr Webster has analysed the March 2022 LOC as falling into two parts, I refer herein to these two parts as "**March 2022 LOC – Line of Credit**" and "**March 2022 LOC – Margin Agreement**".

interests) credited to 3AC's customer accounts on the FTX.com Exchange at the end of the day on 12 June 2022, and (ii) if so, what form of security it created over such assets.

8.   In addressing these questions of Antiguan law, I consider and respond to the conclusions set out in the Webster Declaration, as summarised at Section II thereof. However, I do not engage with the argument set out at (e.g.) paragraph 13a. of the Webster Declaration, namely that, if FTX owned the relevant assets (as FTX claims), then it follows that the March 2022 LOC did not create any security. This is because I am instructed to offer my analysis strictly on the basis of a contrary assumption that the relevant assets are not the property of FTX Recovery Trust.

9.   For the avoidance of doubt, the analysis and conclusions set out below are strictly without prejudice to (and do not opine on) what I understand on instructions to be FTX's position that FTX Recovery Trust owns the assets held by the Exchange and credited to 3AC's customer accounts, and that 3AC did not have any property interest in those assets as at the end of the day on 12 June 2022. I understand that the Court will receive separate evidence and analysis on this point, which is outside the scope of this Declaration.

10.  By way of summary based on the primary assumption outlined above:

(i)    The March 2022 LOC created a security interest in favour of FTX under Antiguan law as to the assets credited to 3AC's customer accounts on the FTX.com Exchange at the end of the day on 12 June 2022.

(ii)   Specifically, the March 2022 LOC created: (i) possessory security (a pledge and/or lien) over the relevant assets in FTX's favour, which was duly perfected as a consequence of FTX having acquired exclusive control over the relevant assets; and (ii) non-possessory security (a fixed charge, alternatively a floating charge) over those assets. I explain at paragraphs 74 and 93 below what I

understand to be the relevant assets falling within the definition of 'Secured Assets' for these purposes. For the avoidance of doubt, I have only considered and opined on the perfection of the possessory security, as this is a matter of Antiguan law. I have not considered and express no view as to whether the charge so created was duly perfected since this is a matter of BVI law, which I understand will be addressed by Stephen Atherton, KC.

(iii)   Finally, should the Court find that 3AC has incurred any liability to FTX in connection with the Margin Lending Program (as defined below), whatever that liability might be and on whatever basis (as to which I am not qualified to opine), then this liability would qualify as 'Indebtedness' for the purposes of the March 2022 LOC.

11.   The following paragraphs are structured as follows (the present Introduction being **Section A**):

(i)     **Section B:** Professional experience;

(ii)    **Section C:** Summary of Webster Declaration;

(iii)   **Section D:** Factual background;

(iv)   **Section E:** Analysis of Antiguan law;

(v)    **Section F:** Legal effect of the March 2022 LOC.

**B.      Professional Experience**

12.   I have been a member of Essex Court Chambers in London for my entire professional life, commencing on 1 January 1997. My practice involves a broad range of international commercial and modern chancery disputes as summarised in my current curriculum vitae attached as **Exhibit C**. I have a separate profile for other specialist injunctive and arbitral challenge work which I do not exhibit.

13.    I am or have been admitted or registered as advocate in a number of jurisdictions around the world, including: the British Virgin Islands, Cayman Islands, St. Lucia, Antigua & Barbuda, Singapore International Commercial Court (SICC), Dubai International Financial Centre (DIFC), Gibraltar and the Isle of Man.  For simplicity I refer to Antigua & Barbuda as 'Antigua' and hence refer to 'Antiguan law' as shorthand.

14.    I was admitted as an Attorney-at-Law in the Eastern Caribbean Supreme Court ("**ECSC**") in Antigua in 2018. The admission was licensed in order that I could act as lead advocate representing the claimant (minority shareholder) in an action against a company in the High Court in the case of 1Globe Capital LLC v. Sinovac Biotech Ltd. (ANUHVC 2018/0120). That action was brought pursuant to s.122 of the International Business Corporations Act (Cap.122) Revised Laws of Antigua & Barbuda 1992 ("**IBCA**"). I represented the claimant at trial and on appeal. My instructing solicitors were replaced after we obtained special leave to appeal to the Privy Council and so new leading counsel was instructed: see [2025] UKPC 3.

15.    In addition to my practice as a barrister, I was appointed as a Deputy Judge of the High Court in November 2019 by the Lord Chief Justice of England & Wales. My appointment covers both the Chancery Division, where I have sat in the Business List, Insolvency & Companies Court, Property Trusts & Probate List; and (what is now) the King's Bench Division, where I am authorised by the Lord Chancellor and Lord Chief Justice to sit in the Commercial Court. I sit regularly in this capacity as well as taking appointments in international arbitration.

16.    One of the cases I heard and decided sitting as a Deputy High Court Judge is Wang v. Darby [2021] EWHC 3054 (Comm); [2022] Bus LR 121. That case was the first contested hearing in the jurisdiction as to whether a trust exists in respect of

5

cryptocurrency. I am aware that the reported decision has been cited and followed in different jurisdictions, including Isle of Man and Hong Kong.

17. Whilst sitting in the Insolvency & Companies Court of the Chancery Division in London, I made orders for final exit relief in one of the largest and highest profile investment bank special administrations yet undertaken in that jurisdiction: see In The Matter of SVS Securities Plc (In Special Administration) [2023] EWHC 585 (Ch). There were approximately 18,600 (mostly retail) clients of SVS at the time it was placed into special administration in August 2019.

18. During almost 30 years in private practice and almost six years sitting as a Deputy High Court Judge in London, I have considered numerous matters involving security in banking and finance contexts. Former and current clients include: HSBC, Barclays, Morgan Stanley, JP Morgan, CitiBank, UniCredit, ING, Tether and BlackRock, plus many more major institutions or commercial counterparties. I believe this combination of experience qualifies me to give this opinion on Antiguan law.

19. During the past four years, I have not provided testimony as an expert in any case, whether at trial or by deposition.

**C.    Webster Declaration: Summary**

20. Mr Webster concludes as follows:

(i)    First, that the March 2022 LOC – Line of Credit (i.e. the first part of the March 2022 LOC, which Mr Webster takes as a separate, standalone contract and defines as the "LOC") does not purport to, and did not, provide a security (paragraphs 12, 37-39);

(ii)    Second, that the March 2022 LOC – Margin Agreement (i.e. the second part of the March 2022 LOC, which Mr Webster takes as a separate, standalone contract

6

and defines as the "Margin Agreement") could "*in theory*" have created a security, but did not for two reasons:

    a.  First, because FTX owned the assets at issue (i.e. if FTX succeeds on its primary case); and

    b.  Secondly, because any such security did not attach to any Secured Assets.

(paragraphs 13, 47-55);

(iii)    Third, even if the March 2022 LOC – Margin Agreement created a security, it created only a lien or a pledge (not a charge or a mortgage), and FTX did not and cannot perfect the security so created (paragraphs 14, 56-87); and

(iv)    Fourth, even if such security was duly perfected, FTX did not have a valid, perfected security in respect of such lending, because: (i) the Loan Documents did not sufficiently identify FTX as the lender for the Margin Lending Program; and (ii) to the extent Third-Party Lenders made loans to 3AC through the Margin Lending Program, they lacked the privity of contract needed to establish a valid, perfected security (paragraphs 15, 90-100).

21.    I agree with Mr Webster that the March 2022 LOC – Line of Credit (i.e. the first part of the March 2022 LOC), *per se*, does not create any security. I also agree that, if and to the extent that any Third-Party Lenders made loans to 3AC through the Margin Lending Program, they lacked the privity of contract needed to establish a valid, perfected security over the Secured Assets under the March 2022 LOC. As explained above, I do not engage with the Joint Liquidators' arguments premised on FTX owning the relevant Secured Assets. Subject to these points, and for the reasons explained below, I disagree with Mr Webster's conclusions (as summarised above).

**D.      Factual background**

22.      I do not have personal knowledge of the facts in this case beyond the documents I have reviewed (as listed in **Exhibit A**). I have been instructed to assume the facts set out in the paragraphs below. I set these out in some detail, under a number of headed subsections, since these factual details are relevant to the legal analysis set out in **Sections E & F** below.

(a)      The 3AC Accounts and 3AC's trading on the Exchange

23.      As of April 2022, 3AC was reported to have over $3 billion of assets under its management. While it was functional, 3AC maintained certain customer accounts ("**3AC Accounts**") on the FTX.com exchange ("**Exchange**").

24.      3AC opened the 3AC Accounts in February 2020, and regularly made deposits and withdrawals throughout its time as an Exchange customer. In addition to the regular deposits and withdrawals, 3AC was also a high-volume trader on the Exchange.

(b)      Customer Account Balances

25.      Customer accounts were associated with balances for particular assets to which the customer had a contractual entitlement, which reflected credits for assets they deposited on to the Exchange, bought on the Exchange via a trade with another customer, or received on the Exchange via a transfer from another customer. Like every other customer account, the 3AC Accounts had a balance of all assets held by the Exchange that were credited to the 3AC Accounts ("**Account Balance**").

26.      The Account Balance represented 3AC's total entitlement with respect to the 3AC Accounts based on the value of all assets associated with a customer's account, including cryptocurrency tokens (such as BTC and ETH) and fiat. Although customers could view sub-balances for each asset type, these were simply components of the overall Account Balance, which functioned as a single, integrated total. The Proof of

Claim incorrectly assumes that the digital asset balance ("**Digital Asset Balance**") can be isolated from the USD balance ("**USD Balance**"), when in fact both together make up the Account Balance, and affect each other inversely: for instance, when a customer sold BTC for USD, the Digital Asset Balance decreased and the USD Balance increased by the same amount, leaving the Account Balance unchanged (setting aside any relevant trading fees).

(c)     Margin Trading

27.     The Exchange offered a margin lending program ("**Margin Lending Program**"), which allowed participating customers to increase their exposure to digital asset prices by borrowing assets from other Exchange customers. The Margin Lending Program was a voluntary and competitive peer-to-peer market, which customers opted into by enabling a feature on their customer account. Once the feature was enabled, a customer would automatically access the Margin Lending Program in connection with execution of a trade that, absent leverage accessed through the Margin Lending Program, the customer would not have been permitted to execute.

28.     3AC participated in the Margin Lending Program, like many other customers. In mid-May 2022, 3AC took long positions in BTC and ETH via spot margin trading. Through this activity, 3AC accumulated a larger positive Digital Asset Balance, because it acquired an entitlement based on the value of BTC and ETH; and a larger negative USD Balance, because it paid using funds borrowed through the Margin Program.

(d)     Perpetual Futures Trading

29.     Customers could also open perpetual futures positions on the Exchange. These were essentially contractual bets on the future price of a digital asset that did not require the customer to actually buy or sell the digital asset. 3AC also had a large number of perpetual futures positions.

30.    The perpetual futures contract itself was not an asset that had value—it could not be sold or otherwise transferred for consideration. It was a derivative instrument to create exposure to the price movement of the underlying asset—the opportunity to receive a USD credit or debit depending on whether prices went up or down every 30-second interval.

(e)    Margin Requirements

31.    Customers were required to maintain minimum levels of assets credited to their customer accounts in order to maintain leveraged positions accumulated through spot margin trading or perpetual futures trading. First, customers were required to maintain a minimum value of assets, based on a weighted formula, to open a new position on margin. Second, customers were also required to maintain a minimum leverage ratio, based on a different formula that accounted for the type of asset, throughout the life of the specific position acquired through the use of leverage ("**Maintenance Margin Requirement**").

32.    The margin requirements applicable to the 3AC Accounts were set out in the terms of service governing those accounts. When creating a customer account, each customer agreed to terms of service that governed their use of the Exchange. There are three relevant versions of the terms of service. The "FTX Terms of Service" dated May 13, 2022 ("**TOS**") were in force during the June 2022 period relevant to the Proof of Claim, and until FTX filed for bankruptcy in November 2022.

33.    Based on the terms in the TOS, failure to comply with the Maintenance Margin Requirement gave FTX the right to liquidate assets associated with the customer account to bring it into compliance. Depending on the facts and circumstances, including the customer's trading history, FTX could fully liquidate or close a customer account.

<u>(f)     Line of Credit</u>

34.     Certain customers entered into contracts with FTX that provided them a line of credit. A line of credit had two primary consequences as relevant here. First, the line of credit contributed (in the amount of the line of credit) to the assets credited to the customer account for purposes of assessing compliance with the Maintenance Margin Requirement. In other words, the customer could use the line of credit to take on more leveraged positions. Second, the line of credit provided a source of leverage without requiring the customer to borrow from the Margin Program. In other words, the customer could purchase assets via spot margin trading, and build a positive Digital Asset Balance and negative USD Balance, by first utilizing the line of credit, and only once it was exhausted would the customer then utilize the Margin Program.

35.     3AC was the beneficiary of a Line of Credit, which increased over time through new agreements and stood at $120 million in June 2022 ("**Line of Credit**"). Under the March 2022 LOC, 3AC was required to maintain an Account Balance of 200% of the amount of its Line of Credit that was utilized. In other words, 3AC was subjected to an additional obligation to maintain $240 million in Account Balance at all times.

<u>(g)     FTX's Control over the Assets Credited to the 3AC Accounts</u>

36.     I am instructed to assume the following facts concerning FTX's control with regards to assets deposited by customers on to the Exchange, including those assets credited to the 3AC Accounts:

(i)     FTX held the keys to the addresses in which all digital assets at issue were stored. Possession of private keys for an address amounts to "control" over the digital assets stored in that address in the cryptocurrency context.

(ii)    No customer (including 3AC) could access assets stored in the addresses controlled by FTX, which included all of the digital assets at issue in this dispute.

(iii)    Although 3AC could make withdrawal requests to FTX, withdrawals came from addresses holding commingled digital assets that were deposited by many customers (and by FTX). Customers could not withdraw a specific digital asset (e.g., a BTC they deposited), as opposed to some quantity of the digital asset. Nonetheless, I am instructed to assume for present purposes that 3AC retained proprietary interests in the digital assets thus held in the FTX pooled account and that 3AC held these interests in the 3AC Accounts, and I do not opine on the merits of that assumption.

(iv)    There were restrictions on 3AC's ability to withdraw assets from the Exchange. 3AC could only withdraw if its accounts were in good standing, and in fact FTX turned off withdrawals for 3AC because it breached applicable requirements.

(v)    FTX had the contractual right, under clause 4c. of the March 2022 LOC – Margin Agreement, to liquidate any and all assets associated with the 3AC Accounts should 3AC breach applicable requirements, and in fact did liquidate certain assets. I do not purport to assess whether FTX had additional rights related to liquidations under other contracts, including the TOS.

(h)    Activity in the 3AC Accounts on 13 & 14 June 2022

37.    The Joint Liquidators contend that 3AC is entitled to the full Digital Asset Balance (instead of the Account Balance) of the 3AC Accounts as of the end of the day (measured in UTC) on 12 June 2022, less some adjustment they purport to make premised on withdrawals and market prices. I am instructed that the 3AC Accounts had a total Account Balance of approximately $284 million at the end of 12 June 2022

(measured in UTC). This reflected a positive Digital Asset Balance of approximately $1.017 billion and a negative USD Balance of approximately $733 million. By the end of 14 June 2022 (measured in UTC), the 3AC Accounts had an Account Balance of approximately $2 million.

38.     The Account Balance declined on 13 and 14 June 2022 because the prices of digital assets declined, and because 3AC withdrew assets from the 3AC Accounts. 3AC also sold digital assets for USD via trades on the Exchange on 13 and 14 June 2022. These trades did not reduce the Account Balance because they involved a credit for USD in the same amount as the debit for the digital asset that was sold.

39.     Under the March 2022 LOC, 3AC was required to maintain an Account Balance of $240 million. The 3AC Accounts were in breach of those requirements on June 13, 2022. FTX contacted 3AC multiple times to inform 3AC that it was out of compliance with its agreements, and to warn 3AC that FTX would have to liquidate assets associated with the 3AC Accounts unless 3AC corrected the issue. 3AC ignored FTX's efforts to resolve the issue, and instead of depositing assets, it actually withdrew another $18 million in ETH on 14 June 2022.

40.     FTX turned off withdrawals from the 3AC Accounts at 4:08 p.m. (UTC). Finally, starting at 10:21 p.m. (UTC) on 14 June 2022, FTX initiated a series of liquidating transactions in which digital assets (ETH, FTT, GBTC, and ETHE) were sold for approximately $82 million.

**E.      Analysis of Antiguan Law**

41.     At the risk of repetition, my analysis proceeds on the basis of the assumption that FTX did not own the assets credited to the 3AC Accounts; and it is, of course, without prejudice to FTX's position that these assets were its property.

42.     The analysis below is set out in sub-sections which, in broad terms and for ease of comparison between the two documents, track the structure of the Webster Declaration.

(a)     Sources of law in Antigua & Barbuda

43.     Pursuant to section 2 of the Common Law (Declaration of Application) Act 1705, Cap.92 ("**1705 Act**"), English common law applies (i.e. "*is in force*") in Antigua "*so far as it stands unaltered by any written Laws of these Islands, or some of them*". Accordingly, the common law of England & Wales, and by analogy that of Commonwealth jurisdictions, has full force in Antigua save in so far as altered by local legislation. In the modern context, after the judicature legislation of the late nineteenth century, common law includes principles of equity. I refer to 'common law' in this modern fused sense.

44.     The phrase "*stands unaltered by any written Laws*", as found in section 2 of the 1705 Act, means what it says. The concept of altering the common law arises where a local statute either (i) expressly abrogates or supplants the common law; (ii) provides for a legal consequence that is sufficiently different from the effect of common law; or (iii) subsumes the common law at a certain date and makes clear that there is no scope for reflecting its subsequent evolution into the statutory definition or codification. Short of this being done on the face of a statute, it must be taken to leave the relevant principles of common law intact. There is no scope for implied *general* prohibition or preclusion arising from an instance of *specific* positive prescription. To construe s.2 otherwise would be a charter for legal uncertainty, contrary to the expressed purpose of the 1705 Act.

45.     This approach was applied or assumed by the JCPC, as the apex appellate court for Antigua, in Re Stanford International Bank [2019] UKPC 45. The bank had been run as part of a massive Ponzi scheme. Its liquidators sought to recover funds from those

depositors who had been paid out before the bank ceased trading, i.e. on the basis that such payments constituted fraudulent preferences according to insolvency principles. It was common ground that the IBCA does not contain any provision for the avoidance of fraudulent or wrongful preferences; there was no explanation available for why this was the case. The JCPC stated that "*the common law about fraudulent preference is applicable in the insolvent winding up of an [Antiguan company], in default of any statutory provision <u>which replaces it</u>…*" (see [21], my emphasis added). This is a clear indication of highest authority to the effect that the common law remains in full force in Antigua absent a statute that replaces it.

46.     I am further reinforced in that view by the following:

(i)     In <u>Niyazov v. Maples & Calder</u> [2019] BVI 561 at [31]-[32], the ECCA (BVI) recognised that "*by virtue of [the 1705 Act], the [British] Virgin Islands adopted the English common law, subject to any modifications thereof, enacted either locally or by extension of English enactments.*"

(ii)    In a series of judgments in other legal contexts, the JCPC has applied English equitable doctrines to Antiguan cases, including (a) the equitable doctrine (developed in English law) of proprietary estoppel (<u>Gordon v. Havener</u> [2021] UKPC 26 at [15]); (b) the developing equitable doctrine in English law of an implied constructive trust of property as between unmarried partners, which was applied to divorced spouses in the absence of any specific Antiguan statute providing for property adjustment orders in such situations (<u>Abbott v. Abbott</u> [2007] UKPC 53); and (c) equitable principles by which a vendor or mortgagor can contradict a receipt clause in a deed (<u>Creque v. Penn</u> [2007] UKPC 44).

47.     Accordingly, subject to the detail of the analysis in the foregoing paragraphs, I agree with the analysis and conclusions set out in Section B of the Webster Declaration.

(b)     Rules of contractual interpretation

48.     The common law provides the rules of contractual interpretation in Antigua.

49.     The Eastern Caribbean Court of Appeal has adopted and followed the guidance developed by the English Supreme Court in recent years, such as (notably) the English Supreme Court decision in Rainy Sky v. Kookmin [2011] 1 WLR 2900.

50.     For example, in the Eastern Caribbean Court of Appeal decision in Kenneth Krys & others v. New World Value Fund Ltd. & others BVIHCMAP2013/0017, at [24], Pereira JA followed the English Supreme Court decision in Rainy Sky v. Kookmin [2011] 1 WLR 2900 and held as follows:

"In the case of Rainy Sky SA v Kookmin Bank [fn. 11 - 11 [2011] 1 WLR 2900.] English Supreme Court held that the ultimate aim of interpreting a provision in a contract, especially a commercial contract, is to determine what the parties meant by the language used, which involves ascertaining what a reasonable person would have understood the parties to have meant. A reasonable person here is one who has all the background knowledge which would reasonably have been available to the parties in the situation in which they were at the time of the contract. The relevant background knowledge includes absolutely anything which would have affected the way in which the language of the document would have been understood by a reasonable man, excluding earlier drafts of the agreement and evidence of the content of pre-contractual negotiations and the parties' subjective intentions."

51.     At paragraph [26] of Kenneth Krys (supra), Pereira JA went on to make the following observations:

> *"Rainy Sky was a case where there was an ambiguity. Here, the parties are agreed that there is no ambiguity in the language used. Rather, the opposing parties contend that their interpretation of the clauses in the contract – each leading to a different result – is the only correct one. Where the parties have used unambiguous language, the court must apply it. A court can only consider the commercial purpose where the language used is ambiguous. Further, a court is only justified in departing from the plain meaning of words if it leads to an absurdity – that is, where the court is satisfied that a mistake has been made and is satisfied as to what has to be done to correct it."*

52. The guidance to contractual interpretation laid down in the English line of cases (including <u>Rainy Sky</u> (supra)) has been followed in many other decisions of the Eastern Caribbean Court of Appeal, including <u>Dickon Mitchell v. Rita Joseph-Olivetti</u> GDAHCVAP 2014/0026; <u>GTAWA v. St. Georges University Ltd.</u> GDAHCVAP 2014/008; and <u>Yang Hsueh Chi Serena & others v. Equity Trustee Ltd.</u> BVIHCMAP 2013/0012.

<u>(c)    Contractual interpretation: security documentation (fixed/ floating classification)</u>

53. The only forms of consensual security known to English and Antiguan law are (i) the mortgage, which is a security transfer of ownership; (ii) the pledge, which creates a limited legal interest by the delivery of possession; (iii) the contractual lien, which differs from the pledge only in that the creditor's possession was acquired otherwise than for the purpose of security; and (iv) the charge. See <u>In re Cosslett (Contractors) Ltd.</u> [1998] Ch 495, at 508F-G per Millett LJ (with whom Evans Sir Ralph Gibson LJJ agreed); also <u>Goode & Gullifer on Legal Problems of Credit and Security</u> (7th ed.), §1-05.

54.     Security is of two kinds: fixed and floating. Under a fixed charge the asset is appropriated to satisfaction of the debt immediately or upon the debtor acquiring an interest in it. Under a floating charge appropriation is deferred; the chargee's rights attach in the first instance not to specific assets but to a shifting fund of assets, the debtor being left free to manage the fund in the ordinary course of business (it being only when the debtor's management powers are brought to an end that the charge crystallises and fastens on the specific assets then comprised in the fund or subsequently acquired by the debtor). See Goode & Gullifer (supra), §1-10, 4-07, 4-30 to 4-53.

55.     The well-established canon of principles governing the interpretation of contracts are relevant also in the context of classifying the type of security granted as a matter of Antiguan law. In the Privy Council decision in Agnew v. Commissioners of Inland Revenue [2001] UKPC 28 (New Zealand), at [32], Lord Millett described the Court's task in characterising a charge as either floating or fixed in the following way:

"The question is not merely one of construction. In deciding whether a charge is a fixed charge or a floating charge, the court is engaged in a two-stage process. At the first stage it must construe the instrument of charge and seek to gather the intentions of the parties from the language they have used. But the object at this stage of the process is not to discover whether the parties intended to create a fixed or a floating charge. It is to ascertain the nature of the rights and obligations which the parties intended to grant each other in respect of the charged assets. Once these have been ascertained, the court can then embark on the second stage of the process, which is one of categorisation. This is a matter of law. It does not depend on the intention of the parties. If their intention, properly gathered from the language of the instrument, is to grant the company rights in respect of the charged assets which are inconsistent with the nature

*of a fixed charge, then the charge cannot be a fixed charge however they may have chosen to describe it.*

*... in construing a debenture to see whether it creates a fixed or a floating charge, the only intention which is relevant is the intention that the company should be free to deal with the charged assets and withdraw them from the security without the consent of the holder of the charge; or, to put the question another way, whether the charged assets were intended to be under the control of the company or of the charge holder."*

56.     This approach to the interpretation of debentures and security documentation, involving the two-stage process of analysis as described by Lord Millett ("**First Stage**" and "**Second Stage**"), remains applicable at common law (in both England and, in my opinion, Antigua). See the decision of Edwin Johnson J in the English High Court in Re Avanti Communications Ltd. (in administration) [2023] BCC 873, at [25] to [26].

First Stage: Contractual interpretation

57.     The labels used by the parties to denote their rights and obligations are relevant at the First Stage as a guide to what security they objectively intended to create, such as the labels fixed and floating. See Arthur D Little Ltd. (In Administration) v. Ableco Finance LLC [2002] EWHC 701 (Ch); [2002] 3 W.L.R. 1387, at [31].

58.     The court is again fundamentally concerned, at the First Stage, with the nature of the rights and obligations the parties intended to create. See Ashborder BV v. Green Gas Power Ltd. [2004] EWHC 1517 (Ch), at [181].

Second Stage: Legal analysis

59.     Further useful guidance on the differences between fixed and floating charges, which in my opinion also represents the law of Antigua, can be found in the speeches of the members of the House of Lords in Re Spectrum [2005] 2 A.C., at [112]:

*"If, as I think, the hallmark of a floating charge and a characteristic inconsistent with a fixed charge is that the chargor is left free to use the assets subject to the charge and by doing so to withdraw them from the security, how should the charge over book debts granted by the bank's debenture be categorised? The following features of the debenture and the arrangements regarding the bank account into which the collected debts had to be paid need to be taken into account: (1) the extent of the restrictions imposed by the debenture (para 81 above); (2) the rights retained by Spectrum to deal with its debtors and collect the money owed by them (para 81 above); (3) Spectrum's right to draw on its account with the bank into which the collected debts had to be paid, provided it kept within the overdraft limit (para 82 above); (4) the description "fixed charge" attributed to the charge by the parties themselves."*

60.     The nature of the assets in question may also be taken into account. A distinction often drawn in the authorities is between a chargor's circulating capital and its non-circulating capital, the reason being that "*compliance with the terms of a fixed charge on the company's circulating capital would paralyse its business*"; see Agnew at [7]. As Lord Millett further explained in Agnew, at [30], assets forming a company's circulating capital "*are the natural subjects of a floating charge*". In Arthur D Little (supra), Roger Kaye QC (sitting as a Deputy High Court Judge) noted that the charged shares in that case were not part of the chargor's circulating capital. The chargor did not need to sell them, deal with them, or substitute them as part of its ordinary business as a management consultant, nor to improve or assist its cash flow as part of that business. In holding that the shares were subject to fixed charge security, the judge noted as follows, at [41]:

*"None of these impeded the company's ability to trade as a management consultant without recourse to the shares. It is a striking feature of all the relevant cases to which*

*I was referred that a charge over what was regarded as the company's circulating capital was inconsistent with a fixed charge."*

61.     In <u>Ashborder</u> (supra), at [183], the relevance of the nature of the assets in question was said to be limited, where there is an express power for the chargor to dispose of the assets in question. Where there is not, Etherton J (as he then was) recognised that the nature of the assets may well be significant. As Etherton J explained, at [183]:

*"183. Further, there is a danger in the present case in laying too great an emphasis on the nature of the assets in question, namely the Licences and the OGL Shares. The fact that assets are not part of a company's circulating capital or stock in trade, which it needs to sell as part of its ordinary business, can understandably have an important influence in the categorisation of a charge as a fixed charge, rather than a floating charge, in an appropriate case. In the present case, however, unlike, for example, Arthur D Little and Re Yorkshire Woolcombers Association, the parties have agreed an express provision permitting each of the Octagon Group Companies to dispose of assets in the ordinary course of its business. In accordance with Lord Millett's two stage process, what must be ascertained at the first stage, as a matter of standard interpretation of written documents, is whether, on the language used, the express power to dispose of assets in the ordinary course of business was limited to particular assets or applied to all assets of the company. Whilst, of course, the nature of the assets in question forms part of the factual background against which the standard process of documentary interpretation takes place, the ordinary and natural meaning of the words used is the primary touchstone. By contrast, in the absence of an express provision permitting disposals in the ordinary course of business, the nature of the charged assets assumes a much greater significance in the process of establishing whether the intention was to create a fixed charge or a floating charge over the assets in question."*

62.     Regard may also be had to the nature of the business of the chargor when construing the rights and obligations created under the contractual documentation; see <u>Arthur D Little</u> (supra), at [40(2)]:

> *"(2) I again remind myself that the company was not trading in shares and no one has suggested it did. The essential nature of its business cannot, in my judgment, be ignored. The shares in CCL were not part of the company's circulating capital and it did not need to sell them, to deal with them, or to substitute them as part of its ordinary business as a management consultant, nor to improve or assist its cash flow as part of that business. The shares were not part of a fluctuating body of assets which changed from time to time in the ordinary course of the company's business."*

63.     Post-contractual conduct is generally irrelevant and inadmissible. However, in this context, it has been noted that if a stipulation in the charging documents is not adhered to in practice, the agreement may be held to be a sham and characterised as a floating charge. See <u>Goode & Gullifer</u> (supra), §4-22.

64.     As regards the Second Stage, the authorities make clear that the critical question is whether the rights and obligations in respect of the relevant assets are consistent, as a matter of law, with fixed charge security or floating charge security. The labels used by the parties are not relevant. The correct characterisation of the relevant instrument of charge is a question of law, having regard to the rights and obligations ascertained at the First Stage.

65.     In <u>Re Yorkshire Woolcombers Association Ltd.</u> [1903] 2 Ch. 284, Romer LJ provided the following description of a floating charge, at p.295:

> *"I certainly do not intend to attempt to give an exact definition of the term 'floating charge', nor am I prepared to say that there will not be a floating charge within the*

*meaning of the Act, which does not contain all the three characteristics that I am about to mention, but I certainly think that if a charge has the three characteristics that I am about to mention it is a floating charge. (1) If it is a charge on a class of assets of a company present and future; (2) if that class is one which, in the ordinary course of the business of the company, would be changing from time to time; and (3) if you find that by the charge it is contemplated that, until some future step is taken by or on behalf of those interested in the charge, the company may carry on its business in the ordinary way as far as concerns the particular class of assets I am dealing with."*

66.     In relation to the third characteristic identified by Romer LJ one can see that a critical question, if not the critical question, at the Second Stage is the question of control: who has control of the relevant class of assets, as between chargor and chargee? Returning to the judgment of the Privy Council in <u>Agnew</u>, Lord Millett, after quoting Romer LJ's description of a floating charge in <u>Woolcombers</u>, gave the following further explanation of the third characteristic identified by Romer LJ, at [13]:

*"This [Romer LJ's description] was offered as a description and not a definition. The first two characteristics are typical of a floating charge but they are not distinctive of it, since they are not necessarily inconsistent with a fixed charge. It is the third characteristic which is the hallmark of a floating charge and serves to distinguish it from a fixed charge. Since the existence of a fixed charge would make it impossible for the company to carry on business in the ordinary way without the consent of the charge holder, it follows that its ability to do so without such consent is inconsistent with the fixed nature of the charge."*

67.     In <u>Woolcombers</u>, at [23], Lord Millett added the following, on the question of control:

"*If the chargor is free to deal with the charged assets and so withdraw them from the ambit of the charge without the consent of the chargee, then the charge is a floating charge. But the test can equally well be expressed from the chargee's point of view. If the charged assets are not under its control so that it can prevent their dissipation without its consent, then the charge cannot be a fixed charge.*"

68.   The question of control, and its relationship with the nature of the relevant class of assets subject to the relevant charge was explained by Stanley Burton QC (as he then was) in <u>Re Cimex Tissues Ltd.</u> [1994] B.C.C. 626, in the following terms at p.635:

"*If the crucial difference between a fixed charge and a floating charge is in the nature of the interest of the chargee prior to any event of crystallisation, it would follow that a licence for the chargor to deal to some extent with the charged assets is not necessarily inconsistent with a fixed charge. If, however, the licence to deal given to the chargor is extensive, the charge will be floating, since in these circumstances there is in effect no attachment of the charge to any specific asset: see Goode, Legal Problems of Credit and Security, at p. 56. The extent to which the licence to deal is compatible with a fixed charge must depend on all the circumstances of the case, and in particular on the nature of the charged property. Where the charged property is stock, or book debts - i.e. where the assets are naturally fluctuating - the court will readily conclude that a liberty for the chargor to deal with the charged assets is inconsistent with a fixed charge. Where, as in the present case, the assets are specific and do not necessarily fluctuate, some liberty to release the charged assets may not be inconsistent with a fixed charge. Conversely, however, on this basis a floating charge over present goods, not extending to future goods, is not a conceptual impossibility.*"

(d)     Attachment and perfection of security

69.    The High Court in England recently ruled for the first time at a trial (rather than at an interlocutory state) that a digital asset, in that case USDT, constitutes property: D'Aloia v. Persons Unknown [2025] 1WLR 821. This proposition is consistent with my own prior decision in Wang v. Darby as noted above. It is also correct as a matter of Antiguan law, in my opinion. It follows that a digital asset is capable, in principle, of being made subject to security as collateral for a debtor's indebtedness. I understand that this accords with the opinion expressed in the Webster Declaration at §70.

70.    Attachment denotes the creation of the security interest as between debtor and creditor. The effect of attachment is that the security interest fastens on the asset so as to give the creditor rights in rem against the debtor itself, though not necessarily against third parties. Attachment of a security interest is thus to be distinguished from perfection of a security interest, the latter usually involving a further step (possession, registration, notice, or attornment) which constitutes notice of the security interest to third parties and must be taken if they are to be bound. See Goode & Gullifer (supra), §2-02.

71.    In order for a security interest to attach otherwise than by operation of law the following conditions must co-exist:

*"(1) there must be an agreement for security conforming to any statutory formalities;*

*(2) the asset to be given in security must be identifiable;*

*(3) the debtor must have an interest in the asset or a power to give it in security;*

*(4) there must be some current obligation of the debtor to the holder of the security (or (maybe) to another person which the asset is designed to secure;*

*(5) any contractual conditions for attachment must have been fulfilled; and*

*(6) in the case of a pledge, actual or constructive possession must be given to the creditor."*

(Goode & Gullifer (supra), §2-03)

72.    A pledge requires delivery of possession; an agreement for a pledge which is not accompanied or followed by delivery of possession is a mere contract conferring no real right on the intended pledgee. See Dublin City Distillery Ltd. v. Doherty [1914] A.C. 823, per Lord Atkinson at p.843. Similar considerations apply to a contractual lien, which differs from a pledge only that it arises from the creditor's possession of goods which were delivered to it for some purpose other than security. Goode & Gullifer (supra), §2-10. Indeed, in the context of a pledge or a contractual lien, possession constitutes both attachment and perfection of the security to the collateral.

73.    I note that perfection of a charge is achieved differently. I do not express any opinion in relation to the perfection of any charge created under the terms of the March 2022 LOC. I understand that Mr Atherton, KC will address this topic pursuant to an analysis under the law of the BVI.

74.    In the present case the Secured Assets (as defined in the March 2022 LOC), held in the 3AC Accounts, consisted of both (i) 3AC's interests in the digital assets credited to the 3AC Accounts (albeit the digital assets themselves were swept on a regular basis into the FTX pooled addresses), and (ii) 3AC's rights to withdraw assets from the Exchange, which came from amongst assets stored in the FTX pooled addresses. I accept that the mere rights referred to in (ii) above are not capable of 'possession' for the purposes of a pledge or lien, albeit that they are capable of being subject to security by way of charge. Insofar as (i) is concerned, i.e. 3AC's interests in the digital assets themselves,

these are also not capable of physical possession for the purposes of attachment or perfection of any pledge or contractual lien created under the March 2022 LOC. Accordingly, applying a traditional approach, such assets cannot form the subject matter of a lien or a pledge. However, like Mr Webster and for substantially the same reasons as he gives, I am of the view that these digital assets are nonetheless capable of being subject to security by way of pledge or lien.

75.    The Webster Declaration at §76 concludes that, given the nature of the relevant Secured Assets in the present case, "*FTX would have to establish control of the Secured Assets to prove that it had perfected its security over them*". I concur with this proposition on substantially the same basis as Mr Webster has put it. In particular:

(i)    Mr Webster makes reference to certain BVI decisions addressing an analogous question, namely the <u>location</u> of cryptocurrency, holding that this is determined by the location of the person who controls the relevant crypto wallet by having the private key (<u>Smith & Kardachi v. Torque Group Hotels Ltd. & others</u> BVIHCCOM 2021/0003 (Wallbank J); <u>AQF v. XIO & others</u> BVIHCCOM 2023/0239 (Mangatal J). I agree that these authorities are instructive by analogy, so far as they go.

(ii)    Mr Webster also makes reference in this connection to paragraph 5.10 of the Law Commission Report on Digital Assets that was presented to Parliament in the UK in June 2023 (the "**LC Report**"), where a proposed test was promulgated as to who 'controls' a digital asset as follows: *"[B]roadly speaking, the person in control of a [digital] object at a particular moment in time is the person who is able sufficiently to: (1) exclude others from the [digital] object; (2) put the [digital] object to the uses of which it is capable; and (3) identify themselves as the person with the abilities specified in (1) to (2)*

27

*above."* Mr Webster also makes reference to the Principles of Digital Assets and Private Law, published by the International Institute for the Unification of Private law (UNIDROIT), at §§6.1 and 6.2 (which promulgates a similar test to that propounded in the LC Report).

(iii)    Mr Webster also refers to the English Court of Appeal decision in <u>Your Response Ltd. v. Datateam Business Media Ltd.</u> [2014] EWCA Civ 281, where it was held that the Claimant did not have the benefit of a lien over a database, mainly because he did not have exclusive control of the database having given the Defendant free access and the password to the database. Moore-Bick LJ confirmed the requirement of "*exclusive control*" for a security, stating as follows at paragraph [31]:

> *"Although the contract in the present case contained no express provision for the publisher [defendant] to have access to the data, neither did it contain any provision, express or implied, excluding him from it and the fact that the data manager [claimant] did in fact make access to it freely available by the provision of a password is in my view inconsistent with the conclusion that he was in fact exercising the kind of exclusive control that would equate to the continuing possession required for the exercise of a lien. In view of the other conclusions to which I have come it is not necessary to reach a final decision on this point, but if necessary I would hold that in this case the data manager did not exercise the degree of control necessary to entitle it to exercise a lien."*

76.    On this basis, I agree with the conclusions at §§82-83 of the Webster Declaration that, insofar as the March 2022 LOC created a lien or a pledge over the Secured Assets (i.e. insofar as the pledge and lien are concerned, the interests in the digital assets credited to the 3AC Accounts), attachment of this security to the Secured Assets and perfection

of that security results from FTX acquiring exclusive control over those Secured Assets, which includes the right to prevent others from having access to or receiving benefits from them; and that such control must exist when the security is being created but that, if control was lost by FTX for whatever reason following the creation of the security, that pledge or lien will nonetheless be effective as against 3AC provided that FTX's control had been regained by the time the security came to be enforced.

**F.      Legal Effect of the March 2022 LOC**

(a)      Terms of the March 2022 LOC

77.     Again, the March 2022 Line of Credit Agreement includes two separately named sections. However, I am instructed that it is a single document with a common DocuSign ID number issued, which 3AC signed. I am instructed to proceed, for present purposes, on the basis that the March 2022 Line of Credit Agreement is one, singular agreement. Only because Mr Webster addresses two parts of the March 2022 LOC, I will refer herein to each specifically – both subject to an Antiguan governing law clause – as "**March 2022 LOC – Line of Credit**" and "**March 2022 LOC – Margin Agreement**".

78.     As noted above, under clause 5 of the March 2022 LOC – Line of Credit, 3AC was required to maintain an Account Balance of $240 million. This flowed from the fact that the Line of Credit under the March 2022 LOC stood in the sum of $120 million (Recital of the document), whereas under clause 5 it was provided as follows:

*"Throughout the lifetime of the Line of Credit, at least 200% of the Line of Credit ("Collateral") must be maintained in the Borrower's FTX account, as opened with the email address kyle@threearrowscap.com. Should the Collateral fall below 200% of the Line of Credit at any time, it must immediately, and by no later than twenty four hours*

*of such fall, be reinstated to 200% of the Line of Credit. Borrower agrees that following any failure by it to return Collateral to 200% of the Line of Credit within one day of it falling below such amount, Lender may apply special interest in respect of outstanding amounts under the Line of Credit at that time at an indicative rate of 10% per day."*

79.     Clause 6 of the March 2022 LOC – Line of Credit lists a number of different Events of Default (including, at paragraphs (b) and (c) respectively, 3AC's failure to pay any portion of the Line of Credit when due, and 3AC's insolvency). Clause 7 then provides that, if any Event of Default occurs, "*all obligations outstanding from the Borrower to the Lender shall immediately become due and payable without demand, protest or other notice of any kind, all of which are hereby expressly waived. In the event of such Event of Default, the Lender may proceed to enforce the payment of all obligations of Borrower to Lender and to exercise any and all of the rights and remedies afforded to Lender by law of under the terms of this Line of Credit Agreement or otherwise.*"

80.     I agree with Mr Webster that the March 2022 LOC – Line of Credit (i.e. the first part of the March 2022 LOC) does not in itself purport to, and did not, provide any security in favour of FTX (Webster Declaration §§12, 37-39).

81.     The preamble to the March 2022 LOC – Margin Agreement records that it is an agreement between FTX and 'Customer', without expressly specifying the identity of or otherwise defining the capitalised term 'Customer'.

82.     The following recital goes on to record as follows: "*WHEREAS, Customer is a customer of the FTX.com cryptocurrency exchange and FTX desires to afford Customer with access to margin trading and potentially discretionary line of credit facilities (together, the "Indebtedness") as set forth herein*". The document is signed, in the signature block at the bottom, by Mr Davies on behalf of 3AC. Against this backdrop it is clear in my

opinion, on a proper interpretation of the March 2022 LOC as a whole, that 3AC is the 'Customer' for the purpose of the March 2022 LOC – Margin Agreement.

83.    The 'Indebtedness', as defined in the recital to the March 2022 LOC – Margin Agreement, refers to the Customer's "*access to margin trading and potentially discretionary line of credit facilities*". In my opinion, to the extent it is assumed that 3AC incurred any liabilities to FTX notwithstanding a positive Account Balance as I have assumed for purposes of this analysis (an assumption on which I do not opine), it is clear that the defined term 'Indebtedness' would refer to any liabilities 3AC might incur under the 2022 March LOC – Line of Credit, as well as to any liabilities 3AC might incur as a consequence of any margin trading activity it might engage in on the Exchange.

84.    Clause 2 of the March 2022 LOC – Margin Agreement ('Payment upon Demand') provides as follows: "*Customer shall at all times be liable for the payment upon demand of the principal (if applicable) plus any debit balance or other obligations owing under this Agreement. At any time, FTX may "call" the Indebtedness upon notice to Customer.*"

85.    Clause 3 of the March 2022 LOC – Margin Agreement ('Lien') provides as follows:

*"All assets in all of the FTX accounts of the Customer (the "Secured Assets") are collateral for the Indebtedness. The Customer hereby pledges and grants a continuing lien on and security interest in, the Secured Assets as continuing security for the full and punctual payment, performance and discharge of the Indebtedness, until the satisfaction of all liabilities and performance of all obligations of Customer to FTX under this Agreement. FTX shall have all the remedies of a chargee under the laws of Antigua and Customer shall not grant any other person a lien against the Secured*

*Assets in or in any right, title or interest in or to the Secured Assets without the prior written consent of FTX."*

86.    Clause 4 of the March 2022 LOC – Margin Agreement ('Maintenance of Collateral') sets out a number of provisions in relation to 3AC's obligation to maintain collateral. In particular:

(i)    Clause 4a. ('Amount Required'): "*Customer will at all times maintain such cash, cryptocurrency, or other property in the accounts of the Customer for collateral and/or margin purposes as FTX shall require from time to time via a margin call or other request. Collateral requirements may be established and changed by FTX in its sole discretion and judgement without notice to Customer.*"

(ii)    Clause 4b. ('Collateral Calls'): "*In regard to collateral or margin calls, whether for maintenance or otherwise, in lieu of immediate liquidations, FTX, may permit Customer a period of time to satisfy a call. This time period shall not in any way waive or diminish FTX's right in its sole discretion, to shorten the time period in which Customer may satisfy the call, including one already outstanding, or to demand that a call be satisfied immediately. Nor does such practice waive or diminish the right of FTX to sell out positions to satisfy the call, which can be as high as the full indebtedness owed by Customer.*"

(iii)    Clause 4c. ('Liquidation'): "*Customer acknowledges that the Secured Assets may be liquidated without notice to satisfy minimum maintenance, collateral requirements or margin calls. Customer acknowledges that it is not entitled to choose which assets in its account(s) are liquidated or sold by FTX to meet minimum maintenance, collateral requirements or margin calls. To satisfy minimum maintenance, collateral requirements or margin calls, and without*

*further notice, Customer authorizes FTX to sell any assets, top up assets in its discretion, cancel any open order; close any outstanding order; and otherwise take any action deemed necessary to obtain liquidity to comply with collateral requirements with respect to the Indebtedness. Liquidation is conducted in the orderbooks on FTX or using voluntary liquidity providers. FTX does not itself generally take on the user's positions. Customer shall be liable to FTX for any deficiency remaining in any such accounts in the event of the liquidation thereof, in whole or in part, by FTX or by the undersigned; and, the undersigned shall make payments of such obligations and indebtedness upon demand."*

87.    Clause 6 of the March 2022 LOC – Margin Agreement deals with margin transactions. Sub-paragraph (b) of Clause 6 reiterates that if 3AC's account balance *"drops far enough below initial margin, FTX may liquidate [the Customer's] positions in accordance with Section 4(c)"*.

88.    Clause 7 of the March 2022 LOC – Margin Agreement sets out FTX's power to offer lines of credit and confirms that amounts owed under the lines of credit are Indebtedness under the Margin Agreement.

89.    Clause 9 of the March 2022 LOC – Margin Agreement lists the Events of Default and Clause 10 of the March 2022 LOC – Margin Agreement lists FTX's remedies in the event of default. Relevantly, clause 10 ('Lender's Remedies') provides as follows:

*"Upon the occurrence and during the continuation of any Event of Default where Customer is the Defaulting Party, FTX may, at its option: (i) declare any amounts hereunder immediately due and payable with effect upon notice to Customer; (ii) terminate this Agreement upon notice to Customer; and (iii) exercise all other rights and remedies available to FTX hereunder, under applicable law, or in equity, against*

*Customer and/or its Affiliates. On demand, Customer shall pay any balance owing with respect to the Indebtedness, including fees and any costs of collection…"*

(b)      Analysis of March 2022 LOC – Margin Agreement

90.     In my view, to the extent the assumptions I am applying for purposes of this Declaration are determined to be applicable, clause 3 of the March 2022 LOC – Margin Agreement created a security over the "*assets in all of the FTX accounts* [of 3AC]", defining these as the "*Secured Assets*".

91.     Mr Webster offers two separate bases for opining that the March 2022 LOC did not create any valid security.

92.     The first basis proceeds on the footing that FTX's primary case is correct (i.e. that FTX owned the relevant Secured Assets) – my analysis herein, as noted above, proceeds entirely on the basis that one assumes FTX is not the owner of the relevant assets.

93.     The second basis proceeds on the footing that there were no assets held ***in*** the 3AC Accounts referred to in the definition of 'Secured Assets' in clause 3. I am instructed that, in fact, there were substantial Secured Assets (as defined) credited to the 3AC Accounts. Specifically, I am instructed to assume that, whilst digital assets credited to the 3AC Accounts were subject to regular sweeps into pooled addresses controlled by FTX (and, again, I am instructed to assume for present purposes that these digital assets remained at all times 3AC's property notwithstanding FTX's position that they were FTX's property), nonetheless 3AC retained ownership of the digital assets credited to the 3AC Accounts and that the 3AC Accounts also included rights to withdraw assets from the Exchange that were held in pooled addresses controlled by FTX in respect of those digital assets recorded as being credited to 3AC. Accordingly, I proceed on the basis that (i) insofar as the lien and pledge were concerned, the Secured Assets were or

included those digital assets credited to the 3AC Accounts (with FTX's sweeping of these digital assets into the FTX pooled account constituting an integral part of the perfection of that security over those digital assets, but 3AC nonetheless retaining ownership of those digital assets); and (ii) insofar as the charge was concerned, the Secured Assets credited to the 3AC Accounts also included, i.e. in addition to 3AC's proprietary interests in the digital assets credited to the 3AC Accounts, 3AC's rights to withdraw assets from the Exchange that are derived from the FTX pooled addresses (as described above).

94.    The better view, in my opinion, is that security was indeed granted, in respect of 3AC's 'Indebtedness' (as defined), over the 'Secured Assets' (as defined), in favour of FTX pursuant to clause 3 of the March 2022 LOC – Margin Agreement. I consider that the security thereby created was in the nature of a pledge and/or lien (i.e. possessory security), and/or fixed and/or floating charge (i.e. non-possessory security). I take these forms of security in turn below.

Pledge/lien

95.    The better view is that, on the proper interpretation of clause 3 of the March 2022 LOC – Margin Agreement, a pledge or lien was granted in favour of FTX over the Secured Assets and that this grant of security was duly perfected.

96.    Indeed, the language in the second sentence of clause 3 is plain and unambiguous in this regard: "*The Customer hereby pledges and grants a continuing lien on and security interest in, the Secured Assets as continuing security for the full and punctual payment, performance and discharge of the Indebtedness, until the satisfaction of all liabilities and performance of all obligations of Customer to FTX under this Agreement*". As noted by Pereira JA in the ECCA in Kenneth Krys (supra), where the parties have used

plain language the Court must apply it, with recourse of the commercial purpose of the drafting only being relevant in the case of ambiguity, and with recourse to departing from the plain meaning of words only being permissible where the plain meaning "*leads to an absurdity*".

97.    It would appear that Mr Webster shares this view, i.e. that the plain meaning of the language used in clause 3 drives one to the conclusion that the parties objectively intended for security by way of pledge and lien to be granted over the Secured Assets in FTX's favour, albeit that he takes the view that such security was not duly perfected.

98.    Unlike Mr Webster I am of the view that, having regard to the test for perfecting possessory security by way of lien or pledge in the case of digital assets (i.e. the 'exclusive control' test – Section E(d) above), it is clear that the grant of security by way of lien or pledge was duly perfected.

99.    As noted above, I am instructed that I can and should assume the following facts concerning FTX's control with regards to assets deposited by customers on to the Exchange, including those assets credited to the 3AC Accounts (the Secured Assets for the purposes of clause 3 of the March 2022 LOC – Margin Agreement):

(i)     FTX held the keys to the addresses in which all digital assets at issue were stored. Possession of private keys for an address amounts, as a matter of fact, to "control" over the digital assets stored in that address in the cryptocurrency context. Indeed, as noted above, two BVI first-instance decisions have held that the distinct but analogous matter of the location of cryptocurrency is determined by the location of the person who controls the relevant crypto wallet by having the private key (Smith and Kardachi v. Torque Group Hotels Ltd. & others BVIHCCOM 2021/0003 (Wallbank J); AQF v. XIO & others BVIHCCOM 2023/0239 (Mangatal J)).

(ii)     No customer (including 3AC) could access assets stored in the addresses controlled by FTX, which included all of the assets at issue in this dispute. Whilst 3AC retained its rights to withdraw digital assets that were sourced from those assets held in FTX's pooled addresses (i.e. the Secured Assets for the purposes of clause 3 of the March 2022 LOC – Margin Agreement), it had no direct recourse against any particular identifiable digital assets held in those pooled addresses.

(iii)    Although 3AC could make withdrawal requests to FTX, withdrawals came from addresses holding commingled digital assets of many customers (and FTX's own assets), i.e. the FTX pooled account. They could not withdraw a specific digital asset (e.g., a BTC they deposited) as opposed to some quantity of the digital asset.

(iv)    There were restrictions on 3AC's ability to withdraw anything from the Exchange. Specifically, 3AC could only withdraw if its accounts were in good standing, and in fact FTX turned off withdrawals for 3AC because it breached applicable requirements.

(v)     FTX had the contractual right, under clause 4c. of the March 2022 LOC – Margin Agreement, to liquidate any and all assets associated with the 3AC Accounts should 3AC breach applicable requirements, and in fact it did liquidate certain assets.

100.    In light of the foregoing facts and matters, and applying the 'exclusive control' test for the perfection of possessory security by way of pledge or lien over digital assets, I am of the view that the pledge and/or lien granted under clause 3 of the March 2022 LOC – Margin Agreement was duly perfected as a consequence of FTX acquiring 'exclusive

control' (in the relevant sense) over the Secured Assets (i.e. insofar as the pledge or lien was concerned, the digital assets credited to the 3AC Accounts).

<u>Fixed or floating charge</u>

101.  I agree with Mr Webster that clause 3 of the March 2022 LOC – Margin Agreement did not create a mortgage over the Secured Assets (Webster Declaration §68). However, unlike Mr Webster, I consider that the effect of this provision was to grant a fixed charge, alternatively a floating charge, over the Secured Assets (*contra* Webster Declaration §67).

102.  As to the First Stage of the analysis (using the taxonomy of Lord Millett in <u>Agnew</u> as described above), I consider that the rights and obligations arising from clause 3 of the March 2022 LOC – Margin Agreement, on its proper construction, are in the nature of a charge over the Secured Assets. In particular:

(i)    Clause 3 opens by providing that the Secured Assets are "*collateral for the Indebtedness*", without specifying that the security over this collateral would be limited to possessory security.

(ii)   The second sentence of clause 3 provides as follows (emphasis added): "*The Customer hereby pledges and grants a continuing lien on <u>and security interest in</u>, the Secured Assets as continuing security for the full and punctual payment, performance and discharge of the Indebtedness, until the satisfaction of all liabilities and performance of all obligations of Customer to FTX under this Agreement*." Again, this language does not limit the security so granted to possessory security by way of pledge or lien, but is drafted in more general terms. Moreover, if the words "*and security interest in*" are to have any meaning additional to security by way of pledge or lien (the only two possessory forms of consensual security), then they must refer to one of the two <u>non-</u>possessory

forms of consensual security. The more obvious of the two, noting the absence of any of the distinctive incidents of a mortgage (e.g. transfer of title), being a charge rather than a mortgage.

(iii)     The final sentence of clause 3 provides as follows: "*FTX shall have all the remedies of a chargee under the laws of Antigua and Customer shall not grant any other person a lien against the Secured Assets in or in any right, title or interest in or to the Secured Assets without the prior written consent of FTX.*" In my view the reference to the '*remedies of a chargee*' serves to specify the form of <u>non-</u>possessory security referred to in the previous sentence, when it was stipulated that 3AC "*hereby pledges and grants a continuing lien on <u>and security interest in</u>, the Secured Assets*" (emphasis added). I do not agree with Mr Webster's view that "*[this] additional stipulation would not be necessary if the remainder of clause 3 were intended to create a charge*" (Webster Declaration §67).

103.    As to the Second Stage of the analysis (again using the taxonomy of Lord Millett in <u>Agnew</u> as described above), I consider that the charge granted under clause 3 is in the nature of a fixed charge over the Secured Assets, alternatively a floating charge.

104.    On the facts as I have been instructed to assume them (see paragraph 93 above), it is clear that 3AC (the chargor) was not left free to use the digital assets subject to the charge and by doing so to withdraw them from the security, nor was it left free to exercise the rights to withdraw assets from the Exchange that were held in the FTX pooled addresses (which, as noted at paragraph 93 above, also constituted Secured Assets for the purposes of the charge under clause 3). In fact, FTX had legal and practical control over the Secured Assets at all times and exercised that control from

time to time. See paragraph 99 above. This militates in favour of holding that the effect

of clause 3 was to grant fixed charge security over the Secured Assets in FTX's favour.

105.    Alternatively, if not a fixed charge, then I consider that the effect of clause 3 was to

grant a floating charge over the Secured Assets in FTX's favour. However, it is difficult

to see how the Court would arrive at that conclusion in circumstances where: (i) 3AC's

control over the Secured Assets was minimal, whereas FTX's control over them was

effectively exclusive, given that 3AC's rights to withdraw assets from the Exchange

that were held in the FTX's pooled addresses were fettered in the various ways set out

at paragraph 99 above; and (ii) the Secured Assets were not in any appreciable sense a

part, or at least not a core part, of 3AC's "*circulating capital*". Again, whilst 3AC was

a high-volume trader on the Exchange, it was reported to have over $3 billion of assets

under its management as of April 2022[2] – of which only a small proportion would have

been tied up, at any given time, in the form of Secured Assets caught by clause 3 of the

March 2022 LOC – Margin Agreement (i.e. 3AC's proprietary interests in their digital

assets and their rights to participate in FTX's pooled account of digital assets).

106.    Again, I note that perfection of a charge is achieved differently from perfection of

possessory security. I do not express any opinion in relation to these topics. I understand

that Mr Atherton, KC will address this topic pursuant to an analysis under the law of

the BVI.

(c)    Liabilities under the Margin Lending Program

107.    As stated above, my analysis in this Declaration assumes that the Court has determined

that 3AC owed liabilities to FTX, notwithstanding my understanding that 3AC had a

---

[2] Declaration of Russell Crumpler in Support of Verified Petition Under Chapter 15 for Recognition of a Foreign Main Proceeding and Related Relief, at ¶ 15, In re Three Arrows Capital Ltd., Case o. 22-10920 (MG) (Bankr. S.D.N.Y. July 1, 2022), D.I. 3, §8.

positive Account Balance; I do not opine on whether that is the case. Subject to that clarification, I understand that, in light of the structure of the Margin Lending Program, there are three potential categories of creditor to whom 3AC might owe liabilities for purposes of this analysis which could (in principle) constitute 'Indebtedness' for the purposes of the March 2022 LOC – Margin Agreement. First, Third-Party Lenders (i.e. other Customers participating in the Margin Lending Program). Second, other entities in the broader FTX Group. Third, FTX itself (i.e. 3AC's counterparty to the March 2022 LOC).

108.   As regards the first two categories (i.e. Lenders under the Margin Lending Program other than FTX itself, and therefore not parties or privies to the March 2022 LOC), I agree with Mr Webster's analysis – based on the English and Eastern Caribbean cases he has cited in support of that analysis (Webster Declaration §§97-98) – that these Lenders cannot, as a matter of Antiguan law, enforce the provisions of the March 2022 LOC because they were not parties to it.

109.   As regards FTX itself, if the Court should find that any liability has been incurred by 3AC to FTX under or in respect of the Margin Lending Program, whatever that liability might be and on whatever basis (as to which I am not qualified to opine), then I consider that this liability would qualify as 'Indebtedness' for the purposes of the March 2022 LOC. Indeed, the recital defining 'Indebtedness' refers to both liabilities in respect of margin trading and liabilities in respect of credit facilities, defining these liabilities "*together*" as 'Indebtedness'. This strongly suggests that any liabilities 3AC might have incurred to FTX itself directly under or in respect of the Margin Lending Program would constitute part of the Indebtedness secured by way of the security provided by clause 3. However, as noted above, I am not qualified to opine on what liabilities might have been incurred by 3AC to FTX under or in respect of the Margin Lending Program,

nor as to the basis on which any such liability might have been incurred, and so I express

no opinion in this regard.

I declare under penalty of perjury of the laws of the United States of America that the

foregoing is true and correct to the best of my knowledge, information, and belief.

_/s/   S. T. Houseman_
Stephen Houseman KC
Essex Court Chambers
24-28 Lincoln's Inn Fields
London WC2A 3EG
England, United Kingdom

# Exhibit 54

| From: | Ningxin Zhang[/O=EXCHANGELABS/OU=EXCHANGE ADMINISTRATIVE GROUP (FYDIBOHF23SPDLT)/CN=RECIPIENTS/CN=894994B66B3041CABAD8486A4 2EC8E32-NXZHANG] |
|---|---|
| Sent: | Mon 7/6/2020 4:50:47 PM (UTC+08:00) |
| To: | Calvin Tan[CALVIN@ascentfunds.sg] |
| Cc: | Three Arrows FA[threearrowscapFA@ascentglobalop.com]; TAC Operations[operations@threearrowscap.com] |
| Subject: | RE: Three Arrows- USDC premium payment for OTC option |

Hi Calvin,

They are paid from FTX exchange



3AC-FTX-00558862



**From:** Calvin Tan <CALVIN@ascentfunds.sg>
**Sent:** Monday, 6 July, 2020 3:16 PM
**To:** Ningxin Zhang <nxzhang@threearrowscap.com>
**Cc:** Three Arrows FA <threearrowscapFA@ascentglobalop.com>; TAC Operations <operations@threearrowscap.com>
**Subject:** Three Arrows- USDC premium payment for OTC option

Dear Ningxin,

We seek your assistance let us know which account the premium was paid from for the below two option

**Option 1**



## 1. The terms of the Transaction to which this Confirmation relates are as follows:

**General:**
Trade Date: 8-May-2020
Commencement Date: 8-May-2020
Buyer: Three Arrows Capital Ltd
Seller: ⌐ **Redacted – PII** ⌐
Currency Option Style: European
Underlying: 500 ETH

Currency Option Type:  Call
Currency: USD
Strike Price: 270
Valuation Date: 15-May-2020
Business Days: Singapore
Calculation Agent: Three Arrows Capital Ltd

**Premium:**
Premium: 575 USDC
Premium Payment Date: 8-May-2020

**Exercise:**
Expiration Date: 15-May-2020
Expiration Time: 4 p. m. local time in Singapore

**Settlement:**
Settlement: Physical
Settlement Currency: ETH
Settlement Date: 15-May-2020

**Option 2**

3AC-FTX-00558864



## 1. The terms of the Transaction to which this Confirmation relates are as follows:

**General:**
Trade Date: 14-May-2020
Commencement Date: 14-May-2020
Buyer: Three Arrows Capital Ltd
Seller: **Redacted – PII**
Currency Option Style: European
Underlying: 500 ETH

Currency Option Type: Call
Currency: USD
Strike Price: 230
Valuation Date: 22-May-2020
Business Days: Singapore
Calculation Agent: Three Arrows Capital Ltd

**Premium:**
Premium: 725 USDC
Premium Payment Date: 14-May-2020

**Exercise:**
Expiration Date: 22-May-2020
Expiration Time: 4 p. m. local time in Singapore

**Settlement:**
Settlement: Physical
Settlement Currency: ETH
Settlement Date: 22-May-2020

Thank you and Best regards,

Calvin Tan
Director of Operations
ASCENT Fund Services (Singapore) Pte. Ltd
D: +65 6832 5082

**M:** +65 9238 9806

This e-mail may contain information that is confidential or protected from disclosure. If you are not an intended recipient of this e-mail, please delete and do not duplicate or redistribute it. Unless specifically indicated, this e-mail is not an offer nor a solicitation to buy or sell any securities, investment products or other financial product or service, an official confirmation of any transaction, nor an official statement of Three Arrows Capital Pte. Ltd. Please note that we reserve the right to review content of emails and instant messages passing through our IT systems. Calls may be recorded for quality and monitoring purposes. Please refer to our website at www.threearrowscap.com for any further Terms and Conditions

3AC-FTX-00558866

# Exhibit 55

| Manage articles | Moderate content | Arrange content | Customize design | User permissions | Settings |

©Zendesk

Add

Help Center

Back

# Non-USD Collateral

May 23, 2022, 7:09:09 PM

**By default, collateral is posted in USD and PNL is paid out in USD.**

Balances of the following coins also count towards collateral.

| Coin | Weight (total) | Weight (initial) | IMF factor |
|------|----------------|------------------|------------|
| 1INCH | 0.9 | 0.85 | 0.0005 |
| AAPL | 0.9 | 0.85 | 0.005 |
| AAVE | 0.9 | 0.85 | 0.0025 |
| ABNB | 0.9 | 0.85 | 0.005 |
| ACB | 0.9 | 0.85 | 0.0025 |
| ALPHA | 0.9 | 0.85 | 0.00025 |
| AMC | 0.9 | 0.85 | 0.0025 |
| AMD | 0.9 | 0.85 | 0.005 |
| AMZN | 0.9 | 0.85 | 0.03 |
| APHA | 0.9 | 0.85 | 0.001 |
| ARKK | 0.9 | 0.85 | 0.005 |
| ATOM | 0.9 | 0.85 | 0.0005 |
| AUD | 0.99 | 0.98 | 0.00001 |
| AVAX | 0.9 | 0.85 | 0.002 |
| BABA | 0.9 | 0.85 | 0.01 |
| BAND | 0.85 | 0.8 | 0.001 |
| BB | 0.9 | 0.85 | 0.0025 |
| BCH | 0.95 | 0.9 | 0.0008 |
| BILI | 0.9 | 0.85 | 0.005 |
| BITW | 0.9 | 0.85 | 0.005 |
| BNB | 0.95 | 0.9 | 0.0005 |
| BNT | 0.9 | 0.85 | 0.0025 |
| BNTX | 0.9 | 0.85 | 0.005 |
| BRL | 0.99 | 0.98 | 0.00001 |
| BRZ | 0.99 | 0.98 | 0.00001 |

FTX_3AC_000044909

| | | | |
|------|-------|------|---------|
| BTC | 0.975 | 0.95 | 0.002 |
| BTMX | 0.7 | 0.65 | 0.0008 |
| BUSD | 1 | 1 | 0 |
| BVOL | 0.85 | 0.8 | 0.005 |
| BYND | 0.9 | 0.85 | 0.0075 |
| CAD | 0.99 | 0.98 | 0.00001 |
| CEL | 0.85 | 0.8 | 0.001 |
| CGC | 0.9 | 0.85 | 0.0025 |
| CHF | 0.99 | 0.98 | 0.00001 |
| COIN | 0.85 | 0.8 | 0.01 |
| COMP | 0.9 | 0.85 | 0.002 |
| CRON | 0.9 | 0.85 | 0.001 |
| CUSDT | 0.9 | 0.85 | 0.00001 |
| DAI | 0.9 | 0.85 | 0.00005 |
| DOGE | 0.95 | 0.9 | 0.00002 |
| DOT | 0.9 | 0.85 | 0.0005 |
| ETH | 0.95 | 0.9 | 0.0004 |
| ETHE | 0.9 | 0.85 | 0.0025 |
| EUR | 0.99 | 0.98 | 0.00001 |
| FB | 0.9 | 0.85 | 0.01 |
| FIDA | 0.85 | 0.8 | 0.001 |
| FTM | 0.85 | 0.8 | 0.0005 |
| FTT | 0.95 | 0.95 | 0.0005 |
| GBP | 0.99 | 0.98 | 0.00001 |
| GBTC | 0.9 | 0.85 | 0.0025 |
| GDX | 0.9 | 0.85 | 0.0025 |
| GDXJ | 0.9 | 0.85 | 0.005 |
| GLD | 0.9 | 0.85 | 0.005 |
| GLXY | 0.9 | 0.85 | 0.005 |
| GME | 0.9 | 0.85 | 0.005 |
| GOOGL | 0.9 | 0.85 | 0.025 |
| GRT | 0.9 | 0.85 | 0.00025 |
| HKD | 0.99 | 0.98 | 0.00001 |
| HOLY | 0.9 | 0.85 | 0.0005 |
| HOOD | 0.85 | 0.8 | 0.005 |
| HT | 0.9 | 0.85 | 0.0003 |
| HUSD | 1 | 1 | 0 |
| IBVOL | 0.85 | 0.8 | 0.015 |

FTX_3AC_000044910

| | | | |
|---|---|---|---|
| KNC | 0.95 | 0.9 | 0.001 |
| LEO | 0.85 | 0.8 | 0.001 |
| LINK | 0.95 | 0.9 | 0.0004 |
| LRC | 0.85 | 0.8 | 0.0005 |
| LTC | 0.95 | 0.9 | 0.0004 |
| LUNA | 0.9 | 0.85 | 0.0001 |
| MATIC | 0.85 | 0.8 | 0.00004 |
| MKR | 0.9 | 0.85 | 0.007 |
| MOB | 0.6 | 0.55 | 0.005 |
| MRNA | 0.9 | 0.85 | 0.005 |
| MSTR | 0.9 | 0.85 | 0.008 |
| NFLX | 0.9 | 0.85 | 0.01 |
| NIO | 0.9 | 0.85 | 0.004 |
| NOK | 0.9 | 0.85 | 0.001 |
| NVDA | 0.9 | 0.85 | 0.01 |
| OKB | 0.9 | 0.85 | 0.0003 |
| OMG | 0.85 | 0.8 | 0.001 |
| USDP | 1 | 1 | 0 |
| PAXG | 0.95 | 0.9 | 0.002 |
| PENN | 0.9 | 0.85 | 0.005 |
| PFE | 0.9 | 0.85 | 0.004 |
| PYPL | 0.9 | 0.85 | 0.008 |
| RAY | 0.85 | 0.8 | 0.0005 |
| REN | 0.9 | 0.85 | 0.00025 |
| RSR | 0.85 | 0.8 | 0.0001 |
| RUNE | 0.85 | 0.8 | 0.001 |
| SECO | 0.9 | 0.85 | 0.0005 |
| SLV | 0.9 | 0.85 | 0.0025 |
| SNX | 0.85 | 0.8 | 0.001 |
| SOL | 0.9 | 0.85 | 0.0004 |
| STSOL | 0.9 | 0.85 | 0.0004 |
| MSOL | 0.9 | 0.85 | 0.0004 |
| SPY | 0.9 | 0.85 | 0.01 |
| SQ | 0.9 | 0.85 | 0.008 |
| SRM | 0.9 | 0.85 | 0.0005 |
| SUSHI | 0.95 | 0.9 | 0.001 |
| SXP | 0.9 | 0.85 | 0.0005 |
| TLRY | 0.9 | 0.85 | 0.001 |

FTX_3AC_000044911

| | | | |
|---|---|---|---|
| TOMO | 0.85 | 0.8 | 0.0005 |
| TRX | 0.9 | 0.85 | 0.00001 |
| TRY | 0.99 | 0.98 | 0.00001 |
| TRYB | 0.9 | 0.85 | 0.00001 |
| TSLA | 0.9 | 0.85 | 0.01 |
| TSM | 0.9 | 0.85 | 0.015 |
| TUSD | 1 | 1 | 0 |
| TWTR | 0.9 | 0.85 | 0.004 |
| UBER | 0.9 | 0.85 | 0.004 |
| UNI | 0.95 | 0.9 | 0.001 |
| USD | 1 | 1 | 0 |
| USDC | 1 | 1 | 0 |
| USDT | 0.975 | 0.95 | 0.00001 |
| USO | 0.9 | 0.85 | 0.0025 |
| UST | 0.85 | 0.8 | 0.0005 |
| WBTC | 0.975 | 0.95 | 0.005 |
| WUSDC | 1 | 1 | 0 |
| WUSDT | 0.975 | 0.95 | 0.00001 |
| XAUT | 0.95 | 0.9 | 0.002 |
| XRP | 0.95 | 0.9 | 0.00002 |
| YFI | 0.9 | 0.85 | 0.015 |
| ZAR | 0.99 | 0.98 | 0.00001 |
| ZM | 0.9 | 0.85 | 0.01 |
| ZRX | 0.85 | 0.8 | 0.001 |

For positive balances, collateral = size * price * min(weight, 1.1 / (1 + imf factor * sqrt(size))). For negative balances, collateral = size * price.

You can choose whether to use FTT as collateral on the settings page. By default your account will use FTT as collateral. Note that Weight (total) is used t determine collateral for the purpose of liquidations, and Weight (initial) is for the purpose of opening new positions.

In the event that your USD balance falls too far below zero (see below for details), some of your balances in the above coins may be automatically trade into into USD by sending market orders into the corresponding FTX spot markets.

Any positive PnL will be paid out in USD regardless of which type of collateral you use.

**For accounts with spot-margin trading disabled, FTX will trade your non-USD collateral into USD if your USD balance is negative and any of the following hold:**

- You are close to liquidation: your account's margin fraction is less than (20bps + maintenance margin fraction requirement)
- Your negative USD balance is large: over $30,000 in magnitude
- Your negative USD balance is large when compared to overall collateral: its magnitude is over 4 times larger than your net account collateral

FTX will first turn (non-USD fiat), then (BTC and USDT), then (ETH, BNB, PAXG, XAUT,  KNC), and (BCH, LTC, TRYB, LINK, TRX), and then FTT (if you have it enabled) into USD. If both BTC and USDT are eligible choices, FTX will choose the larger balance: if you have $1000 of USDT and $100 of BTC, your USD1 will be traded into USD first. FTT collateral is always used last.

FTX_3AC_000044912

If you'd like to convert your USD PnL into BTC you can do so using our spot market.

Note that collateral conversions will potentially top you up so that you have slightly more than zero USD left by converting 10% more than is necessary in case of price movements.

**Charging interest instead of collateral converting**

Instead of having your collateral converted into USD, you can enable spot margin trading on your account in order to automatically borrow the negative USD balance via the spot margin market and pay the prevailing USD borrow rate.

As an example, assume you opened a long futures position and only had BTC as collateral. If your position goes against you, you would have a negative USD balance. At that point, instead of converting your BTC collateral, FTX will use it to borrow USD from the spot margin market for the amount you're negative. You will be charged the prevailing USD borrow rate for any negative USD balance.

Keep in mind that negative balances will require margin in the same way that futures positions do, and the default threshold for collateral conversions will be the same as for futures liquidations (i.e. being below maintenance margin).

To enable spot margin trading, go to the Margin section on your profile page and click "Enable spot margin trading".

---

Restore

☑ Show changes

 Rae

UnpublishedMay 25, 2023, 12:35:21 AMRae



Body updatedNov 8, 2022, 9:58:18 AMFTX Crypto Derivatives Exchange



PublishedNov 7, 2022, 3:42:53 AMFTX Crypto Derivatives Exchange



Body updatedNov 7, 2022, 3:42:50 AMFTX Crypto Derivatives Exchange

FTX_3AC_000044913



Body updatedNov 7, 2022, 3:14:30 AMFTX Crypto Derivatives Exchange



PublishedNov 6, 2022, 3:56:15 AMFTX Crypto Derivatives Exchange



Body updatedNov 6, 2022, 3:56:12 AMFTX Crypto Derivatives Exchange



PublishedNov 6, 2022, 3:48:51 AMFTX Crypto Derivatives Exchange



Body updatedNov 6, 2022, 3:48:48 AMFTX Crypto Derivatives Exchange



PublishedNov 6, 2022, 3:30:21 AMFTX Crypto Derivatives Exchange



Body updatedNov 6, 2022, 3:17:23 AMFTX Crypto Derivatives Exchange



Body updatedNov 6, 2022, 3:15:12 AMFTX Crypto Derivatives Exchange



FTX_3AC_000044914

PublishedOct 21, 2022, 4:30:15 AMFTX Crypto Derivatives Exchange



Body updatedOct 21, 2022, 4:30:13 AMFTX Crypto Derivatives Exchange



PublishedOct 21, 2022, 4:20:45 AMFTX Crypto Derivatives Exchange



Body updatedOct 21, 2022, 4:20:41 AMFTX Crypto Derivatives Exchange



Body updatedOct 21, 2022, 4:19:30 AMFTX Crypto Derivatives Exchange



PublishedOct 19, 2022, 2:03:21 AMFTX Crypto Derivatives Exchange



Body updatedOct 19, 2022, 2:03:18 AMFTX Crypto Derivatives Exchange



Body updatedOct 19, 2022, 1:58:24 AMFTX Crypto Derivatives Exchange



PublishedSep 28, 2022, 1:39:01 AMFTX Crypto Derivatives Exchange

FTX_3AC_000044915



Body updatedSep 28, 2022, 1:31:12 AMFTX Crypto Derivatives Exchange



PublishedSep 25, 2022, 10:53:22 AMFTX Crypto Derivatives Exchange



Body updatedSep 25, 2022, 10:52:40 AMFTX Crypto Derivatives Exchange



PublishedSep 9, 2022, 4:31:37 AMFTX Crypto Derivatives Exchange



Body updatedSep 9, 2022, 4:31:11 AMFTX Crypto Derivatives Exchange



PublishedAug 17, 2022, 2:15:14 AMFTX Crypto Derivatives Exchange



Body updatedAug 17, 2022, 2:15:12 AMFTX Crypto Derivatives Exchange



PublishedAug 15, 2022, 2:55:18 PMFTX Crypto Derivatives Exchange



FTX_3AC_000044916

PublishedAug 14, 2022, 10:48:49 PMFTX Crypto Derivatives Exchange



Body updatedAug 14, 2022, 10:46:48 PMFTX Crypto Derivatives Exchange



Body updatedAug 14, 2022, 10:46:05 PMFTX Crypto Derivatives Exchange



Body updatedAug 14, 2022, 10:45:43 PMFTX Crypto Derivatives Exchange



Title updatedAug 14, 2022, 8:51:40 PMFTX Crypto Derivatives Exchange



Body updatedAug 14, 2022, 8:51:00 PMFTX Crypto Derivatives Exchange



Body updatedAug 14, 2022, 8:45:25 PMFTX Crypto Derivatives Exchange



Body updatedAug 14, 2022, 8:45:14 PMFTX Crypto Derivatives Exchange



Body updatedAug 14, 2022, 8:43:10 PMFTX Crypto Derivatives Exchange

FTX_3AC_000044917



PublishedAug 1, 2022, 3:13:08 PMFTX Crypto Derivatives Exchange



Body updatedAug 1, 2022, 3:13:06 PMFTX Crypto Derivatives Exchange



PublishedJul 31, 2022, 11:34:00 PMFTX Crypto Derivatives Exchange



Body updatedJul 31, 2022, 11:33:57 PMFTX Crypto Derivatives Exchange



PublishedJul 22, 2022, 3:22:13 AMFTX Crypto Derivatives Exchange



Body updatedJul 22, 2022, 3:22:07 AMFTX Crypto Derivatives Exchange



Body updatedJul 22, 2022, 3:20:01 AMFTX Crypto Derivatives Exchange



PublishedJul 19, 2022, 12:13:48 PMFTX Crypto Derivatives Exchange



FTX_3AC_000044918

Body updatedJul 19, 2022, 12:13:47 PMFTX Crypto Derivatives Exchange



PublishedJul 19, 2022, 12:13:06 PMFTX Crypto Derivatives Exchange



Body updatedJul 19, 2022, 12:13:04 PMFTX Crypto Derivatives Exchange



PublishedJul 19, 2022, 12:12:53 PMFTX Crypto Derivatives Exchange



Body updatedJul 19, 2022, 12:12:51 PMFTX Crypto Derivatives Exchange



PublishedJul 16, 2022, 4:50:52 AMFTX Crypto Derivatives Exchange



Body updatedJul 16, 2022, 4:50:50 AMFTX Crypto Derivatives Exchange



PublishedJul 16, 2022, 2:15:51 AMFTX Crypto Derivatives Exchange



Body updatedJul 16, 2022, 2:15:47 AMFTX Crypto Derivatives Exchange

FTX_3AC_000044919



Body updatedJul 16, 2022, 2:11:03 AMFTX Crypto Derivatives Exchange



PublishedJul 11, 2022, 12:48:14 AMFTX Crypto Derivatives Exchange



Body updatedJul 11, 2022, 12:48:12 AMFTX Crypto Derivatives Exchange



PublishedJun 16, 2022, 3:26:34 AMFTX Crypto Derivatives Exchange



Body updatedJun 16, 2022, 3:26:32 AMFTX Crypto Derivatives Exchange



PublishedMay 23, 2022, 7:09:09 PMFTX Crypto Derivatives Exchange



Body updatedMay 23, 2022, 7:09:08 PMFTX Crypto Derivatives Exchange



PublishedMay 23, 2022, 7:08:37 PMFTX Crypto Derivatives Exchange



FTX_3AC_000044920

Body updatedMay 23, 2022, 7:08:33 PMFTX Crypto Derivatives Exchange



PublishedMay 13, 2022, 11:02:08 AMFTX Crypto Derivatives Exchange



Body updatedMay 13, 2022, 11:02:05 AMFTX Crypto Derivatives Exchange



PublishedMay 10, 2022, 7:49:05 PMFTX Crypto Derivatives Exchange



Body updatedMay 10, 2022, 7:49:04 PMFTX Crypto Derivatives Exchange



PublishedMay 10, 2022, 7:46:14 PMFTX Crypto Derivatives Exchange



Body updatedMay 10, 2022, 7:46:13 PMFTX Crypto Derivatives Exchange



PublishedMar 23, 2022, 8:05:49 AMFTX Crypto Derivatives Exchange



Body updatedMar 23, 2022, 4:22:21 AMFTX Crypto Derivatives Exchange

FTX_3AC_000044921



Body updatedMar 23, 2022, 4:17:54 AMFTX Crypto Derivatives Exchange



PublishedMar 18, 2022, 1:30:45 PMFTX Crypto Derivatives Exchange



Body updatedMar 18, 2022, 1:30:41 PMFTX Crypto Derivatives Exchange



PublishedMar 17, 2022, 5:07:15 PMFTX Crypto Derivatives Exchange



Body updatedMar 17, 2022, 5:07:14 PMFTX Crypto Derivatives Exchange



PublishedMar 17, 2022, 5:07:06 PMFTX Crypto Derivatives Exchange



Body updatedMar 17, 2022, 5:07:04 PMFTX Crypto Derivatives Exchange



PublishedFeb 20, 2022, 2:25:22 PMFTX Crypto Derivatives Exchange

Showing 80 out of 289 revisions    Show more

CYBER**ARK**ʹ  Secure Web Sessions

**Mapping web page**
**This web page is being mapped so that you can begin creating rules. This might take a few moments.**

Cancel



## Mapping web page
**This web page is being mapped so that you can begin creating rules. This might take a few moments.**
Cancel



## Mapping web page
**This web page is being mapped so that you can begin creating rules. This might take a few moments.**
Cancel



## Mapping web page
**This web page is being mapped so that you can begin creating rules. This might take a few moments.**
Cancel

FTX_3AC_000044923



**Mapping web page**
This web page is being mapped so that you can begin creating rules. This might take a few moments.
Cancel



**Mapping web page**
This web page is being mapped so that you can begin creating rules. This might take a few moments.
Cancel



**Mapping web page**
This web page is being mapped so that you can begin creating rules. This might take a few moments.
Cancel

FTX_3AC_000044924

 **CYBERARK** ⋮ Secure Web Sessions

## Mapping web page
**This web page is being mapped so that you can begin creating rules. This might take a few moments.**

Cancel

FTX_3AC_000044925

# **Exhibit 56**

| Manage articles | Moderate content | Arrange content | Customize design | User permissions | Settings |

©Zendesk

Add

Help Center

Back

American English

# Margin/Collateral

Jan 4, 2022, 2:04:36 AM

*As the terms of service make clear, manipulative behavior is not tolerated on FTX.  Any attempts to do so may result in account termination at FTX's sole discretion.*

All margin is posted in 'USD' in your wallet.  USD can be funded by depositing either USDC, TUSD, USDP, BUSD, or HUSD.

By default all positions use the same collateral pool, and all USD, non-USD fiat, BTC, USDT, ETH, and many other tokens in your wallet count as collateral. Each subaccount has one central collateral wallet and uses cross margining for the account.  Each subaccount has separate margin and collateral from other subaccounts.

If you want to use isolated margin create a subaccount for that position and move in collateral.  This means that the fund you can lose on a trade are limited to those in the subaccount that does the trade (and will never include funds not on FTX).

Please note that hedged positions on the same underlying index will not reduce the collateral requirements for both positions, although in practice the P will cancel out as the market moves. For example, if you have a short position on BTC-Perpetuals, the collateral requirements for adding a long BTC-0327 position will be the same as an account without the short position.

## Initial Margin

An account can only increase its position as long as its Margin Fraction is above its Initial Margin Fraction. For small positions, this means that the Margin Fraction must be at least 5%, meaning that accounts can only initialize positions to a maximum of 20x leverage.  As your position size increases, so does your Initial Margin Fraction.

In addition, you can select a maximum leverage (per subaccount) on your account page.  You may not put on a position that would put your leverage higher than that. (In other words--your maximum initial leverage is min(1/initial margin fraction, account leverage).

For instance, if you deposit $1,000 of collateral into your account, then the maximum position size you can put on is:

3x Leverage: $3,000

5x Leverage: $5,000

10x Leverage: $10,000

20x Leverage: $20,000

If your Initial Margin Fraction is 12%, then that means that your maximum leverage is 1/12% = 8.333x, so if you deposit $1,000 of collateral you could put on a position of size $8,333.

## Maintenance Margin

If your Margin Fraction falls below your Maintenance Margin Fraction, your account will begin to get liquidated.  For instance, if your maintenance margin fraction is 6%, then you will begin to get liquidated once you are 16.66x leveraged.

If you drop below maintenance margin, the FTX risk engine will send liquidation orders in the market to close down your position.

If you drop below auto-close margin fraction, then your position will begin to be closed at the zero price against the backstop liquidity providers.

See here for more details about the liquidation engine.

Confidential

## Non-USD Collateral

See Non-USD Collateral for more details.

In the event that your USD balance falls too far below zero (see below for details), some of your balances in the above coins may be automatically trade into to USD by sending market orders into the corresponding FTX spot markets.

You can choose whether to use FTT as collateral on the settings page. By default your account will use FTT as collateral. Note that Weight (total) is used t determine collateral for the purpose of liquidations, and Weight (initial) is for the purpose of opening new positions.

Any positive PnL will be paid out in USD regardless of which type of collateral you use.

**FTX will trade your non-USD collateral into USD if your USD balance is negative and any of the following hold:**

- You are close to liquidation: your account's margin fraction is less than (20bps + maintenance margin fraction requirement)
- Your negative USD balance is large: over $30,000 in magnitude
- Your negative USD balance is large when compared to overall collateral: its magnitude is over 4 times larger than your net account collateral

---

Restore

☑ Show changes



PublishedOct 19, 2022, 5:05:45 AMFTX Crypto Derivatives Exchange



Body updatedOct 19, 2022, 5:05:42 AMFTX Crypto Derivatives Exchange



PublishedOct 9, 2022, 5:43:50 PMFTX Crypto Derivatives Exchange



Body updatedOct 9, 2022, 5:43:46 PMFTX Crypto Derivatives Exchange



PublishedAug 19, 2022, 3:25:15 AMFTX Crypto Derivatives Exchange



Body updatedAug 19, 2022, 3:25:12 AMFTX Crypto Derivatives Exchange



PublishedAug 18, 2022, 3:55:18 AMFTX Crypto Derivatives Exchange



Body updatedAug 18, 2022, 3:55:15 AMFTX Crypto Derivatives Exchange



PublishedAug 17, 2022, 9:44:30 PMFTX Crypto Derivatives Exchange



Body updatedAug 17, 2022, 9:44:21 PMFTX Crypto Derivatives Exchange



Body updatedAug 17, 2022, 9:38:17 PMFTX Crypto Derivatives Exchange



FTX_3AC_000044681

PublishedAug 17, 2022, 2:11:56 AMFTX Crypto Derivatives Exchange



Body updatedAug 17, 2022, 2:11:54 AMFTX Crypto Derivatives Exchange



PublishedAug 16, 2022, 8:13:03 PMFTX Crypto Derivatives Exchange



Body updatedAug 16, 2022, 8:13:01 PMFTX Crypto Derivatives Exchange



PublishedAug 15, 2022, 10:01:03 PMFTX Crypto Derivatives Exchange



Body updatedAug 15, 2022, 10:00:52 PMFTX Crypto Derivatives Exchange



PublishedAug 15, 2022, 4:55:35 PMFTX Crypto Derivatives Exchange



PublishedAug 14, 2022, 10:48:43 PMFTX Crypto Derivatives Exchange



Body updatedAug 14, 2022, 10:27:02 PMFTX Crypto Derivatives Exchange

FTX_3AC_000044682



Body updatedAug 14, 2022, 10:26:56 PMFTX Crypto Derivatives Exchange



Body updatedAug 14, 2022, 10:26:48 PMFTX Crypto Derivatives Exchange



Body updatedAug 14, 2022, 10:25:17 PMFTX Crypto Derivatives Exchange



Body updatedAug 14, 2022, 10:24:55 PMFTX Crypto Derivatives Exchange



Body updatedAug 14, 2022, 10:24:11 PMFTX Crypto Derivatives Exchange



Body updatedAug 14, 2022, 10:23:49 PMFTX Crypto Derivatives Exchange



Body updatedAug 14, 2022, 10:23:31 PMFTX Crypto Derivatives Exchange



Body updatedAug 14, 2022, 10:22:24 PMFTX Crypto Derivatives Exchange



FTX_3AC_000044683

Body updatedAug 14, 2022, 10:22:02 PMFTX Crypto Derivatives Exchange



Body updatedAug 14, 2022, 10:21:49 PMFTX Crypto Derivatives Exchange



Body updatedAug 14, 2022, 10:21:09 PMFTX Crypto Derivatives Exchange



Body updatedAug 14, 2022, 10:20:11 PMFTX Crypto Derivatives Exchange



Body updatedAug 14, 2022, 10:19:38 PMFTX Crypto Derivatives Exchange



Body updatedAug 14, 2022, 10:18:28 PMFTX Crypto Derivatives Exchange



Body updatedAug 14, 2022, 10:17:31 PMFTX Crypto Derivatives Exchange



Body updatedAug 14, 2022, 10:16:59 PMFTX Crypto Derivatives Exchange



Body updatedAug 14, 2022, 10:13:39 PMFTX Crypto Derivatives Exchange

Confidential



Body updatedAug 14, 2022, 10:08:24 PMFTX Crypto Derivatives Exchange



Body updatedAug 14, 2022, 10:08:07 PMFTX Crypto Derivatives Exchange



Body updatedAug 14, 2022, 10:07:56 PMFTX Crypto Derivatives Exchange



Body updatedAug 14, 2022, 10:07:15 PMFTX Crypto Derivatives Exchange



Body updatedAug 14, 2022, 10:04:37 PMFTX Crypto Derivatives Exchange



Body updatedAug 14, 2022, 10:04:02 PMFTX Crypto Derivatives Exchange



Body updatedAug 14, 2022, 10:00:59 PMFTX Crypto Derivatives Exchange



Body updatedAug 14, 2022, 10:00:43 PMFTX Crypto Derivatives Exchange



FTX_3AC_000044685

Body updatedAug 14, 2022, 9:59:28 PMFTX Crypto Derivatives Exchange



Body updatedAug 14, 2022, 9:58:14 PMFTX Crypto Derivatives Exchange



Body updatedAug 14, 2022, 9:58:05 PMFTX Crypto Derivatives Exchange



Body updatedAug 14, 2022, 9:57:07 PMFTX Crypto Derivatives Exchange



Body updatedAug 14, 2022, 9:56:50 PMFTX Crypto Derivatives Exchange



Body updatedAug 14, 2022, 9:55:50 PMFTX Crypto Derivatives Exchange



Body updatedAug 14, 2022, 9:54:51 PMFTX Crypto Derivatives Exchange



Body updatedAug 14, 2022, 9:54:18 PMFTX Crypto Derivatives Exchange



Body updatedAug 14, 2022, 9:54:02 PMFTX Crypto Derivatives Exchange

FTX_3AC_000044686



Body updatedAug 14, 2022, 9:53:49 PMFTX Crypto Derivatives Exchange



Body updatedAug 14, 2022, 9:51:18 PMFTX Crypto Derivatives Exchange



Body updatedAug 14, 2022, 9:51:02 PMFTX Crypto Derivatives Exchange



Body updatedAug 14, 2022, 9:50:57 PMFTX Crypto Derivatives Exchange



Body updatedAug 14, 2022, 9:48:15 PMFTX Crypto Derivatives Exchange



Body updatedAug 14, 2022, 9:48:08 PMFTX Crypto Derivatives Exchange



Body updatedAug 14, 2022, 9:43:31 PMFTX Crypto Derivatives Exchange



Body updatedAug 14, 2022, 9:43:04 PMFTX Crypto Derivatives Exchange



FTX_3AC_000044687

Body updatedAug 14, 2022, 9:35:41 PMFTX Crypto Derivatives Exchange



Body updatedAug 14, 2022, 9:35:30 PMFTX Crypto Derivatives Exchange



Body updatedAug 14, 2022, 9:35:19 PMFTX Crypto Derivatives Exchange



Body updatedAug 14, 2022, 9:31:28 PMFTX Crypto Derivatives Exchange



Body updatedAug 14, 2022, 9:25:23 PMFTX Crypto Derivatives Exchange



Body updatedAug 14, 2022, 9:24:49 PMFTX Crypto Derivatives Exchange



Body updatedAug 14, 2022, 9:23:03 PMFTX Crypto Derivatives Exchange



Body updatedAug 14, 2022, 9:22:38 PMFTX Crypto Derivatives Exchange



Body updatedAug 14, 2022, 9:22:09 PMFTX Crypto Derivatives Exchange

FTX_3AC_000044688



Body updatedAug 14, 2022, 9:21:17 PMFTX Crypto Derivatives Exchange



Body updatedAug 14, 2022, 9:19:12 PMFTX Crypto Derivatives Exchange



Body updatedAug 14, 2022, 9:18:57 PMFTX Crypto Derivatives Exchange



Body updatedAug 14, 2022, 9:15:21 PMFTX Crypto Derivatives Exchange



Body updatedAug 14, 2022, 9:14:56 PMFTX Crypto Derivatives Exchange



Title updatedAug 14, 2022, 9:14:22 PMFTX Crypto Derivatives Exchange



Body updatedAug 14, 2022, 9:14:22 PMFTX Crypto Derivatives Exchange



Body updatedAug 14, 2022, 8:44:28 PMFTX Crypto Derivatives Exchange



FTX_3AC_000044689

PublishedAug 14, 2022, 4:34:31 PMFTX Crypto Derivatives Exchange



Body updatedAug 14, 2022, 4:29:31 PMFTX Crypto Derivatives Exchange



Body updatedAug 14, 2022, 4:28:02 PMFTX Crypto Derivatives Exchange



Body updatedAug 14, 2022, 4:27:13 PMFTX Crypto Derivatives Exchange



Body updatedAug 14, 2022, 4:25:42 PMFTX Crypto Derivatives Exchange



Body updatedAug 14, 2022, 4:11:10 PMFTX Crypto Derivatives Exchange



Body updatedAug 14, 2022, 4:10:57 PMFTX Crypto Derivatives Exchange



Body updatedAug 14, 2022, 4:10:37 PMFTX Crypto Derivatives Exchange



Body updatedAug 14, 2022, 4:07:36 PMFTX Crypto Derivatives Exchange

FTX_3AC_000044690



Body updatedAug 14, 2022, 4:04:00 PMFTX Crypto Derivatives Exchange



Body updatedAug 13, 2022, 9:48:03 PMFTX Crypto Derivatives Exchange



Body updatedAug 13, 2022, 9:27:18 PMFTX Crypto Derivatives Exchange



Body updatedAug 13, 2022, 9:27:11 PMFTX Crypto Derivatives Exchange



Body updatedAug 13, 2022, 9:26:55 PMFTX Crypto Derivatives Exchange



Body updatedAug 13, 2022, 9:26:34 PMFTX Crypto Derivatives Exchange



Body updatedAug 13, 2022, 9:26:20 PMFTX Crypto Derivatives Exchange



Body updatedAug 13, 2022, 9:17:32 PMFTX Crypto Derivatives Exchange



FTX_3AC_000044691

Body updatedAug 13, 2022, 9:17:22 PMFTX Crypto Derivatives Exchange



Body updatedAug 13, 2022, 9:16:38 PMFTX Crypto Derivatives Exchange



Body updatedAug 13, 2022, 9:16:05 PMFTX Crypto Derivatives Exchange



Body updatedAug 13, 2022, 9:15:56 PMFTX Crypto Derivatives Exchange



Body updatedAug 13, 2022, 9:14:09 PMFTX Crypto Derivatives Exchange



Body updatedAug 13, 2022, 9:09:25 PMFTX Crypto Derivatives Exchange



Body updatedAug 13, 2022, 9:09:08 PMFTX Crypto Derivatives Exchange



Body updatedAug 13, 2022, 9:08:54 PMFTX Crypto Derivatives Exchange



Body updatedAug 13, 2022, 9:08:18 PMFTX Crypto Derivatives Exchange

FTX_3AC_000044692



Body updatedAug 13, 2022, 9:08:04 PMFTX Crypto Derivatives Exchange



Body updatedAug 13, 2022, 9:07:53 PMFTX Crypto Derivatives Exchange



Body updatedAug 13, 2022, 9:05:37 PMFTX Crypto Derivatives Exchange



Body updatedAug 13, 2022, 9:02:33 PMFTX Crypto Derivatives Exchange



Body updatedAug 13, 2022, 9:01:48 PMFTX Crypto Derivatives Exchange



Body updatedAug 13, 2022, 8:58:54 PMFTX Crypto Derivatives Exchange



Body updatedAug 13, 2022, 8:58:20 PMFTX Crypto Derivatives Exchange



Body updatedAug 13, 2022, 8:58:05 PMFTX Crypto Derivatives Exchange



FTX_3AC_000044693

Body updatedAug 13, 2022, 8:56:56 PMFTX Crypto Derivatives Exchange



Body updatedAug 13, 2022, 8:56:46 PMFTX Crypto Derivatives Exchange



Body updatedAug 13, 2022, 8:45:27 PMFTX Crypto Derivatives Exchange



Body updatedAug 13, 2022, 8:44:22 PMFTX Crypto Derivatives Exchange



Body updatedAug 13, 2022, 8:43:58 PMFTX Crypto Derivatives Exchange



Body updatedAug 13, 2022, 8:43:29 PMFTX Crypto Derivatives Exchange



Body updatedAug 13, 2022, 8:43:05 PMFTX Crypto Derivatives Exchange



Body updatedAug 13, 2022, 8:42:44 PMFTX Crypto Derivatives Exchange



Body updatedAug 13, 2022, 8:41:42 PMFTX Crypto Derivatives Exchange

FTX_3AC_000044694



Body updatedAug 13, 2022, 8:41:19 PMFTX Crypto Derivatives Exchange



Body updatedAug 13, 2022, 6:33:22 PMFTX Crypto Derivatives Exchange



PublishedAug 1, 2022, 3:12:09 PMFTX Crypto Derivatives Exchange



Body updatedAug 1, 2022, 3:12:07 PMFTX Crypto Derivatives Exchange



PublishedJan 4, 2022, 2:04:36 AMFTX Crypto Derivatives Exchange



PublishedDec 3, 2021, 10:19:52 AMFTX Crypto Derivatives Exchange



Body updatedDec 3, 2021, 10:19:50 AMFTX Crypto Derivatives Exchange



PublishedNov 30, 2021, 2:23:21 PMFTX Crypto Derivatives Exchange



FTX_3AC_000044695

Body updatedNov 30, 2021, 2:23:18 PMFTX Crypto Derivatives Exchange



PublishedNov 30, 2021, 3:35:28 AMFTX Crypto Derivatives Exchange



Body updatedNov 30, 2021, 3:35:26 AMFTX Crypto Derivatives Exchange



PublishedNov 28, 2021, 10:56:25 AMFTX Crypto Derivatives Exchange



Body updatedNov 28, 2021, 10:56:25 AMFTX Crypto Derivatives Exchange



PublishedNov 26, 2021, 4:42:40 PMFTX Crypto Derivatives Exchange



Body updatedNov 26, 2021, 4:42:39 PMFTX Crypto Derivatives Exchange



PublishedNov 26, 2021, 3:41:44 PMFTX Crypto Derivatives Exchange



Body updatedNov 26, 2021, 3:41:43 PMFTX Crypto Derivatives Exchange

FTX_3AC_000044696



PublishedOct 26, 2021, 4:41:12 AMFTX Crypto Derivatives Exchange



Body updatedOct 26, 2021, 4:41:10 AMFTX Crypto Derivatives Exchange



PublishedSep 10, 2021, 3:19:55 PMFTX Crypto Derivatives Exchange



Body updatedSep 10, 2021, 3:19:53 PMFTX Crypto Derivatives Exchange



PublishedSep 1, 2021, 2:47:40 PMFTX Crypto Derivatives Exchange



Body updatedSep 1, 2021, 2:47:39 PMFTX Crypto Derivatives Exchange



PublishedAug 26, 2021, 8:25:11 PMFTX Crypto Derivatives Exchange



Body updatedAug 26, 2021, 8:25:09 PMFTX Crypto Derivatives Exchange



FTX_3AC_000044697

PublishedAug 17, 2021, 10:25:45 AMFTX Crypto Derivatives Exchange



Body updatedAug 17, 2021, 10:25:44 AMFTX Crypto Derivatives Exchange



PublishedJul 30, 2021, 4:17:19 PMFTX Crypto Derivatives Exchange



Body updatedJul 30, 2021, 4:17:16 PMFTX Crypto Derivatives Exchange



PublishedJun 18, 2021, 3:00:31 AMFTX Crypto Derivatives Exchange



Body updatedJun 18, 2021, 3:00:28 AMFTX Crypto Derivatives Exchange



PublishedMay 29, 2021, 6:11:58 AMFTX Crypto Derivatives Exchange



Body updatedMay 29, 2021, 6:11:56 AMFTX Crypto Derivatives Exchange



PublishedDec 19, 2020, 12:31:08 PMFTX Crypto Derivatives Exchange

FTX_3AC_000044698



Body updatedDec 19, 2020, 12:31:06 PMFTX Crypto Derivatives Exchange



PublishedDec 8, 2020, 3:45:29 AMFTX Crypto Derivatives Exchange



Body updatedDec 8, 2020, 3:45:28 AMFTX Crypto Derivatives Exchange



PublishedDec 1, 2020, 3:45:28 PMFTX Crypto Derivatives Exchange



Body updatedDec 1, 2020, 3:40:08 PMFTX Crypto Derivatives Exchange



PublishedOct 28, 2020, 6:44:37 PMFTX Crypto Derivatives Exchange



Body updatedOct 28, 2020, 6:44:35 PMFTX Crypto Derivatives Exchange



PublishedOct 14, 2020, 6:41:25 PMFTX Crypto Derivatives Exchange



FTX_3AC_000044699

Body updatedOct 14, 2020, 6:41:24 PMFTX Crypto Derivatives Exchange



PublishedJun 8, 2020, 10:21:24 AMFTX Crypto Derivatives Exchange



Body updatedJun 8, 2020, 10:21:23 AMFTX Crypto Derivatives Exchange



PublishedJun 8, 2020, 10:19:10 AMFTX Crypto Derivatives Exchange



Body updatedJun 8, 2020, 10:19:09 AMFTX Crypto Derivatives Exchange

Permanently deleted user

PublishedMay 8, 2020, 4:08:46 PMPermanently deleted user

Permanently deleted user

Body updatedMay 8, 2020, 4:08:45 PMPermanently deleted user



PublishedMay 6, 2020, 11:00:30 PMFTX Crypto Derivatives Exchange



PublishedApr 7, 2020, 4:28:26 AMFTX Crypto Derivatives Exchange



Body updatedApr 7, 2020, 4:28:25 AMFTX Crypto Derivatives Exchange

FTX_3AC_000044700



PublishedApr 7, 2020, 1:11:39 AMFTX Crypto Derivatives Exchange



Body updatedApr 7, 2020, 1:11:39 AMFTX Crypto Derivatives Exchange



PublishedMar 31, 2020, 7:08:06 AMFTX Crypto Derivatives Exchange



Body updatedMar 31, 2020, 7:08:06 AMFTX Crypto Derivatives Exchange



PublishedMar 27, 2020, 6:32:55 AMFTX Crypto Derivatives Exchange



Body updatedMar 27, 2020, 6:32:54 AMFTX Crypto Derivatives Exchange



PublishedMar 9, 2020, 8:52:32 PMFTX Crypto Derivatives Exchange



Body updatedMar 9, 2020, 8:52:30 PMFTX Crypto Derivatives Exchange

FTX_3AC_000044701



PublishedMar 6, 2020, 5:46:13 AMFTX Crypto Derivatives Exchange



Body updatedMar 6, 2020, 5:46:11 AMFTX Crypto Derivatives Exchange



PublishedFeb 24, 2020, 1:14:53 AMFTX Crypto Derivatives Exchange



Body updatedFeb 24, 2020, 1:14:52 AMFTX Crypto Derivatives Exchange



PublishedFeb 15, 2020, 1:34:03 AMFTX Crypto Derivatives Exchange



Body updatedFeb 15, 2020, 1:34:01 AMFTX Crypto Derivatives Exchange



PublishedDec 13, 2019, 2:39:40 AMFTX Crypto Derivatives Exchange



Body updatedDec 13, 2019, 2:39:39 AMFTX Crypto Derivatives Exchange



FTX_3AC_000044702

PublishedNov 24, 2019, 7:10:22 PMFTX Crypto Derivatives Exchange



Body updatedNov 24, 2019, 7:10:20 PMFTX Crypto Derivatives Exchange



PublishedNov 24, 2019, 6:52:19 PMFTX Crypto Derivatives Exchange



Body updatedNov 24, 2019, 6:52:18 PMFTX Crypto Derivatives Exchange



PublishedNov 24, 2019, 6:45:47 PMFTX Crypto Derivatives Exchange



Body updatedNov 24, 2019, 6:45:45 PMFTX Crypto Derivatives Exchange



PublishedNov 8, 2019, 1:57:14 PMFTX Crypto Derivatives Exchange



Body updatedNov 8, 2019, 1:57:13 PMFTX Crypto Derivatives Exchange



PublishedNov 8, 2019, 1:56:36 PMFTX Crypto Derivatives Exchange

Confidential

FTX_3AC_000044703



Body updatedNov 8, 2019, 1:56:34 PMFTX Crypto Derivatives Exchange



PublishedOct 3, 2019, 7:58:14 AMFTX Crypto Derivatives Exchange



Title updatedOct 3, 2019, 7:58:14 AMFTX Crypto Derivatives Exchange



PublishedOct 3, 2019, 7:56:01 AMFTX Crypto Derivatives Exchange



Title updatedOct 3, 2019, 7:56:00 AMFTX Crypto Derivatives Exchange



Body updatedOct 3, 2019, 7:56:00 AMFTX Crypto Derivatives Exchange



PublishedSep 20, 2019, 8:25:39 AMFTX Crypto Derivatives Exchange



Body updatedSep 20, 2019, 8:25:37 AMFTX Crypto Derivatives Exchange



FTX_3AC_000044704

PublishedAug 29, 2019, 6:47:47 AMFTX Crypto Derivatives Exchange



Body updatedAug 29, 2019, 6:46:48 AMFTX Crypto Derivatives Exchange



PublishedAug 13, 2019, 10:23:20 AMFTX Crypto Derivatives Exchange



Ready for publishingAug 13, 2019, 10:12:24 AMFTX Crypto Derivatives Exchange



PublishedAug 1, 2019, 9:54:45 AMFTX Crypto Derivatives Exchange



Body updatedAug 1, 2019, 9:54:43 AMFTX Crypto Derivatives Exchange



PublishedJul 28, 2019, 9:58:49 PMFTX Crypto Derivatives Exchange



Body updatedJul 28, 2019, 9:58:47 PMFTX Crypto Derivatives Exchange



PublishedJul 28, 2019, 10:02:37 AMFTX Crypto Derivatives Exchange

Confidential



Body updatedJul 28, 2019, 10:02:30 AMFTX Crypto Derivatives Exchange



PublishedJul 28, 2019, 10:01:45 AMFTX Crypto Derivatives Exchange



Body updatedJul 28, 2019, 10:01:43 AMFTX Crypto Derivatives Exchange



PublishedJul 4, 2019, 11:58:09 AMFTX Crypto Derivatives Exchange



Body updatedJul 4, 2019, 11:58:09 AMFTX Crypto Derivatives Exchange



PublishedJul 4, 2019, 11:57:20 AMFTX Crypto Derivatives Exchange



Body updatedJul 4, 2019, 11:57:20 AMFTX Crypto Derivatives Exchange



PublishedJun 18, 2019, 3:04:27 PMFTX Crypto Derivatives Exchange



FTX_3AC_000044706

Body updatedJun 18, 2019, 3:04:26 PMFTX Crypto Derivatives Exchange



PublishedJun 5, 2019, 6:30:19 PMFTX Crypto Derivatives Exchange



Body updatedJun 5, 2019, 6:30:17 PMFTX Crypto Derivatives Exchange



PublishedMay 4, 2019, 6:30:24 AMFTX Crypto Derivatives Exchange



Body updatedMay 4, 2019, 2:59:11 AMFTX Crypto Derivatives Exchange



PublishedMay 3, 2019, 8:37:15 PMFTX Crypto Derivatives Exchange



Body updatedMay 3, 2019, 8:37:13 PMFTX Crypto Derivatives Exchange



PublishedMay 3, 2019, 8:25:06 PMFTX Crypto Derivatives Exchange



CreatedMay 3, 2019, 8:25:06 PMFTX Crypto Derivatives Exchange

Confidential



## Mapping web page
This web page is being mapped so that you can begin creating rules. This might take a few moments.

Cancel



## Mapping web page
This web page is being mapped so that you can begin creating rules. This might take a few moments.

Cancel

FTX_3AC_000044708

# Exhibit 57

# HUNT (LIQUIDATOR OF OVENDEN COLBERT PRINTERS LTD) v HOSKING

## Court of Appeal (Civil Division)

## Elias, Kitchin and McCombe LJJ: 15 November 2013

### [2013] EWCA Civ 1408; [2015] B.C.C. 615

**H1** *Winding up—Transactions at an undervalue—Creditor company agreed fee to its accountant to assist liquidator of debtor company—Large sums paid to accountant under agreement—Accountant paid sums into client account—Creditor went into administration and then winding up—Liquidator of debtor company appointed administrator/liquidator of creditor company—Accountant paid sums from client account to the administrator/liquidator—New liquidator appointed to creditor company in liquidation before dissolution—New liquidator claimed payments by accountant to former administrator/liquidator were transactions at an undervalue—Whether payments were transactions entered into by the company—Claim struck out—Appeal—Insolvency Act 1986 ss.238, 241, 436.*

**H2** This was an appeal by the liquidator of a company against an order of Peter Smith J ([2013] EWHC 311 (Ch)) striking out a claim brought by the liquidator pursuant to ss.238 and 241 of the Insolvency Act 1986 against an insolvency practitioner alleging that indirect payments to the latter constituted transactions at an undervalue.

**H3** The first respondent, "H", was a licensed insolvency practitioner who in 2002 was appointed joint liquidator of two connected companies, "the CSM companies", which companies owed the company, "Ovenden", in excess of £1.3 million so that Ovenden was prospectively entitled to a substantial dividend from their liquidation. In December 2003 Ovenden entered into a fee agreement with its then accountant, "T", to reward T for work he had carried out for Ovenden in formulating its claim in the liquidation of the CSM companies and providing information to H as liquidator to assist him in bringing claims against the former directors and accountants of the CSM companies. The agreement authorised T to receive any distributions from the liquidation of the CSM companies, to hold those distributions in an account to the order of Ovenden, and to transfer to his own account agreed fees. Ovenden wrote to H in his capacity as liquidator of the CSM companies authorising him to pay the dividends due to Ovenden into a client account maintained by T's firm. The agreement was varied in January 2005 in light of additional work for T's firm so that if the distributions from the CSM companies in favour of Ovenden exceeded £916,967, then T's firm were entitled to retain fees of the difference between the sum received and £750,000 which was the maximum amount Ovenden would be entitled to. Between November 2004 and May 2005 distributions were made from the CSM companies in favour of Ovenden exceeded £1.275 million. Sums were paid by T into his firm's a client account. On the basis of the 2005 variation T's his entitlement rose to over £526,502. Between 10 December 2004 and 6 October 2005 T made a series of payments totalling £224,951 out of the client account to H or persons on his behalf. H later maintained that T was his personal friend and that T was simply repaying personal loans which H had made to him. In 2006 Ovenden went

into administration with H and one of his partners appointed as joint administrators and Ovenden subsequently went into creditors' voluntary liquidation with H as one of the liquidators. The liquidation was completed but before dissolution of Ovenden a creditor and former director applied for deferral of the dissolution and a new liquidator was appointed. The new liquidator contended that T had no entitlement to any fees and provided no consideration at all for the 2003 agreement or the 2005 variation, that both agreements were entered into as a result of fraudulent misrepresentations by T to the directors of Ovenden as to the further work and that the authorising signature on behalf of Ovenden to the 2005 variation was a forgery. He contended that H must always have known that T had no proper entitlement to the moneys T paid over to H. The new liquidator brought a claim on behalf of Ovenden pursuant to ss.238 and 241 of the Insolvency Act 1986 that the payments made by T to H constituted transactions at an undervalue whereby the payments were either transactions between Ovenden and H or were transactions between Ovenden and T, and the court had power to make an order against H as a third party who received benefits from those transactions. H applied for summary judgment or an order striking out the claim.

**H4** The judge struck out the claim as having no chance of success: the payments were not "transactions" entered into by Ovenden, but were either payments that T was authorised to make, which could not be attacked unless the agreements were themselves challenged and they had not been, or they were not, in which case the payments constituted a breach of trust and so could not be attributed in any way to Ovenden. The new liquidator appealed and contended that T had misappropriated the funds he held on trust for Ovenden as he had no right to take the moneys and to make the payments to H and also that if T had been entitled to make the payments, they had been made for no or inadequate consideration.

**H5 Held,** dismissing the appeal:

**H6** 1. (Per Kitchin LJ) The requirement that the company has itself entered into a transaction at an undervalue was an essential part of any claim under s.238 of the Insolvency Act 1986 and comprised two inter-related elements: first, that there was a transaction, and secondly that the transaction was something which the company had itself entered into.

**H7** 2. The term "transaction" was widely defined in s.436 of the 1986 Act as including a gift or arrangement; as such it was broad enough to encompass a payment made by a company or by an agent of the company acting within the scope of his authority. However there was the need for the second and vital element that the transaction must be something that the company had "entered into". This connoted the taking of some step or act of participation by the company. Thus the composite requirement required the company to make the gift or make the arrangement or in some other way be party to or involved in the transaction in issue so that it could properly be said to have entered into it within the statutory period. The unilateral misappropriation by a director of the assets of company did not constitute a dealing between the company and the company. (*Re Brabon* [2000] B.C.C. 1171, *Manson v Smith (liquidator of Thomas Christy Ltd)* [1997] 2 B.C.L.C. 161, applied.)

**H8** 3. The improper withdrawal by T of the funds he held on trust, if that was what it was, did not constitute a dealing between him and Ovenden. Nor could it be said that T was acting as agent for Ovenden in making the impugned payments. T was a trustee of the funds but a trustee was not an agent for his beneficiary. He contracted in his own name with a right of indemnity against the beneficiary for the liabilities he has incurred. (*Ingram v Inland Revenue Commissioners* [2000] 1 A.C. 293 applied.)

**H9** 4. The liquidator's second contention, that T was in some way authorised or entitled to make the impugned payments, but that they were made for no or inadequate consideration, also faced an insuperable difficulty that when T took the funds from the client account and paid them over to H it

[2015] B.C.C. 615    617

required no further act or step by Ovenden beyond the 2003 agreement and the 2005 variation, neither of which was said to constitute or form part of a relevant transaction. The payments themselves were not a gift by Ovenden to T, nor did Ovenden enter into a further transaction of any other kind with him. It followed that T's actions in withdrawing the funds from the client account and paying them over to H were not transactions entered into by Ovenden. For these reasons the claim against H under ss.238 and 241 must fail and the judge was right to strike it out, so that the appeal should be dismissed.

**H10 Cases referred to:**

*Brabon, Re* [2000] B.C.C. 1171

*Ingram v Inland Revenue Commissioners* [2000] 1 A.C. 293

*Manson v Smith (liquidator of Thomas Christy Ltd)* [1997] 2 B.C.L.C. 161

*Smith (Administrator of Cosslett (Contractors) Ltd v Bridgend County Borough Council* [2001] UKHL 58; [2002] 1 A.C. 336; [2001] B.C.C. 740

*Stone & Rolls Ltd (in liq.) v Moore Stephens (a Firm)* [2009] UKHL 39; [2009] 1 A.C. 1391

**H11** *Simon Davenport QC* and *Peter Shaw* (instructed by Stevensdrake, Crawley) for the appellant liquidator.

*Antony Zacaroli QC* and *Stephen Robins* (instructed by CMS Cameron McKenna LLP) for the respondents.

**JUDGMENT**

**KITCHIN L.J.:**

**Introduction**

**1.** This is an appeal by Mr Stephen Hunt, the liquidator of Ovenden Colbert Printers Ltd ("Ovenden"), against the order of Peter Smith J made on 22 February 2013 whereby he struck out a claim brought by Mr Hunt against Mr Andrew Hosking.

**2.** The claim was brought pursuant to ss.238 and 241 of the Insolvency Act 1986 ("the 1986 Act"). Mr Hunt alleges that Mr Hosking has received or benefited from payments made by Ovenden which constitute transactions at an undervalue, and that these transactions were entered into by Ovenden within a period of two years ending with the commencement of its insolvency.

**3.** The judge held that the claim had no prospect of success. On this appeal, Mr Hunt contends that the judge fell into error, that his order should be set aside and that directions should be given for the further conduct of the claim. He argues that there are substantial issues of fact concerning the circumstances in which the payments were made which cannot be resolved on a summary judgment or "strike-out" application, and that it is therefore not possible to say that the claim is bound to fail.

**4.** For his part, Mr Hosking accepts that he has received certain payments and recognises that, for the purposes of this application, this court must proceed, as did the judge, on the basis that the various factual allegations made by Mr Hunt will be established at trial. However, he maintains that the claim as formulated must nevertheless fail because the particular payments which he has received were not the result of any transaction which was entered into by Ovenden in the relevant period. Accordingly, the requirements of s.238 cannot be fulfilled and no claim may be made against him under s.241. The judge was therefore right to strike the claim out.

618     Hunt (Liquidator of Ovenden Colbert Printers Ltd) v Hosking

## Background

**5.** The background relevant to this appeal may be summarised as follows. Mr Hosking is a licensed insolvency practitioner and was for some time a partner in Grant Thornton UK LLP. In 2002 Mr Hosking was appointed joint liquidator of two connected companies, CSM Group Ltd and CSM Sheet Fed Ltd ("the CSM companies"). The CSM companies owed Ovenden in excess of £1.3 million and accordingly Ovenden was prospectively entitled to a substantial dividend from their liquidation.

**6.** On 17 December 2003 Ovenden entered into a fee agreement ("the 2003 agreement") with its then accountant, Mr Alan Temple, a sole practitioner trading as Scott Temple Wilshire & Co ("STW"). Mr Hosking maintains that the purpose of this agreement was to reward Mr Temple for the work he had carried out for Ovenden in formulating its claim in the liquidation of the CSM companies and providing information to himself as liquidator of those companies to assist him in bringing claims against their former directors and accountants.

**7.** The 2003 agreement authorised Mr Temple to receive any distributions from the liquidation of the CSM companies, to hold those distributions in an account to the order of Ovenden, and to transfer to his own account agreed fees. In that regard the agreement provided:

> "We authorise you to transfer from the proceeds to your office account, the agreed fees in the sum of 25% of any distribution in excess of £250,000.
> The balance of the funds are to be held to our account and released only as instructed in writing by ourselves, such instructions shall include copies of any board minutes pertaining thereto."

**8.** On the same day, 17 December 2003, Ovenden wrote to Mr Hosking in his capacity as liquidator of the CSM companies authorising him to pay the dividends due to Ovenden into a client account maintained by STW.

**9.** On 28 January 2005 the 2003 agreement was purportedly varied in the following terms:

> "Due to the additional work performed by Scott Temple Wilshire & Co since the original agreement above, this agreement is amended, such that if the distributions from C/S/M Group in favour of Ovenden Colbert Printers Ltd exceeds the sum of £916,967, then Scott Temple Wilshire & Co are entitled to retain fees of the difference between the sum received and £750,000, which is the maximum amount Ovenden Colbert Printers Ltd will be entitled to."

This variation ("the 2005 variation") was ostensibly signed by a Mrs N A Waugh on behalf of Ovenden.

**10.** Over the period November 2004 to May 2005 distributions were made from the CSM companies in favour of Ovenden amounting to in excess of £1.275 million. These sums were paid by Mr Temple into a client account at Barclays Bank Plc designated "Scott Temple Wilshire & Co Client Account".

**11.** On the basis of the 2003 agreement, Mr Temple became entitled to a payment of £256,502.34. On the basis of the 2005 variation, however, his entitlement rose to £526,502.34.

**12.** Between 10 December 2004 and 6 October 2005 Mr Temple made a series of payments out of the client account amounting to a total of £570,292 (a sum which exceeded his entitlement under either agreement, although nothing has been made of that in these proceedings). Of these, payments totalling £224,951.11 were made to Mr Hosking or to persons on his behalf. It is these payments to or for the benefit of Mr Hosking which are attacked in these proceedings. Mr Hosking maintains that Mr Temple was his personal friend and that Mr Temple was simply repaying personal loans which Mr Hosking had made to him.

**13.** On 6 April 2006 Ovenden filed notice of intention to appoint an administrator. Mr Hosking and one of his partners, Mr Anthony Flynn, were appointed as joint administrators. The company

subsequently went into creditors' voluntary liquidation, with Mr Hosking as one of the liquidators. On 9 January 2009 a final meeting of creditors was held, following which the company would ordinarily have been dissolved. However, upon an application made to the court by a creditor and a former director, the dissolution of the company was deferred and Mr Hunt was appointed liquidator.

**14.** In his capacity as liquidator of Ovenden, Mr Hunt now advances a series of very serious allegations against Mr Temple and Mr Hosking. So far as Mr Temple is concerned, Mr Hunt contends that he had no entitlement to any fees and provided no consideration at all for the 2003 agreement or the 2005 variation. Moreover, he continues, both of these agreements were entered into as a result of fraudulent misrepresentations made by Mr Temple to the directors of Ovenden as to the further work he was being asked or required to undertake. He also asserts that the signature of Mrs Waugh on the 2005 variation was a forgery. As for Mr Hosking, Mr Hunt contends that he must always have known that Mr Temple had no proper entitlement to the moneys he was paying over to him.

**Mr Hunt's claims**

**15.** As I have mentioned, Mr Hunt's claims against Mr Hosking are founded on ss.238 and 241 of the 1986 Act.

**16.** Section 238 confers on a liquidator a right to apply to the court to have certain transactions entered into by a company at an undervalue set aside. It reads:

> **"238  Transactions at an undervalue (England and Wales)**
> (1) This section applies in the case of a company where–
>> (a)  the company enters administration, or
>> (b)  the company goes into liquidation;
> and "the office-holder means the administrator or the liquidator, as the case may be.
> (2) Where the company has at a relevant time (defined in section 240) entered into a transaction with any person at an undervalue, the office-holder may apply to the court for an order under this section.
> (3) Subject as follows, the court shall, on such an application, make such order as it thinks fit for restoring the position to what it would have been if the company had not entered into that transaction.
> (4) For the purposes of this section and section 241, a company enters into a transaction with a person at an undervalue if–
>> (a)  the company makes a gift to that person or otherwise enters into a transaction with that person on terms that provide for the company to receive no consideration, or
>> (b)  the company enters into a transaction with that person for a consideration the value of which, in money or money's worth, is significantly less than the value, in money or money's worth, of the consideration provided by the company.
> (5) The court shall not make an order under this section in respect of a transaction at an undervalue if it is satisfied–
>> (a)  that the company which entered into the transaction did so in good faith and for the purpose of carrying on its business, and
>> (b)  that at the time it did so there were reasonable grounds for believing that the transaction would benefit the company."

**17.** "Transaction" is defined in s.436 in these terms:

"'Transaction' includes gift, agreement or arrangement, and references to entering into a transaction shall be construed accordingly."

**18.** The transaction must have been entered into at a relevant time, which is defined in s.240:

**"240  Relevant time under ss 238, 239**

(1) Subject to the next subsection, the time at which a company enters into a transaction at an undervalue or gives a preference is a relevant time if the transaction is entered into, or the preference given–

    (a)  in the case of a transaction at an undervalue or of a preference which is given to a person who is connected with the company (otherwise than by reason only of being its employee), at a time in the period of 2 years ending with the onset of insolvency (which expression is defined below).""

**19.** Section 241(2) permits orders to be made against third parties who have received a benefit from a transaction falling within s.238. It reads:

**"241  Orders under ss 238, 239**

(2) An order under section 238 or 239 may affect the property of, or impose any obligation on, any person whether or not he is the person with whom the company in question entered into the transaction or (as the case may be) the person to whom the preference was given; but such an order–

    (a)  shall not prejudice any interest in property which was acquired from a person other than the company and was acquired in good faith and for value, or prejudice any interest deriving from such an interest, and

    (b)  shall not require a person who received a benefit from the transaction or preference in good faith and for value to pay a sum to the office-holder, except where that person was a party to the transaction or the payment is to be in respect of a preference given to that person at a time when was a creditor of the company."

**20.** Mr Hunt maintains that the payments made by Mr Temple to or for the benefit of Mr Hosking were transactions at an undervalue. Originally the case was advanced in two ways, described as "route 1" and "route 2". Route 1 was that the payments were transactions between Ovenden and Mr Hosking. Route 2 was that the payments were transactions between Ovenden and Mr Temple, and that the court has power to make an order against Mr Hosking as a third party who has received benefits from those transactions.

**21.** There are two other important matters I must mention at this stage concerning the nature of the case which Mr Hunt advances. First, the claim is founded entirely on ss.238 and 241 of the 1986 Act. Mr Hunt was invited by the judge to consider whether he wished to amend to plead a different or additional case, such as a claim against Mr Temple for breach of trust and a claim against Mr Hosking for dishonest assistance in breach of trust, but, after a short adjournment, he chose not to do so.

**22.** Second, Mr Hunt identifies the relevant transactions within the meaning of s.238(2) as being the payments rather than the 2003 agreement or the 2005 variation. The 2003 agreement was, of course, entered into more than two years before the onset of insolvency. However, the 2005 variation falls within that two-year window. Nevertheless, it has been made clear by Mr Hunt, and it was confirmed to this court during the course of the appeal hearing, that it forms no part of his case that this was or formed part of a transaction impugned under s.238 and no application has been made to set it aside.

[2015] B.C.C. 615                                                                 621

**The decision of the judge**

**23.** The judge found both route 1 and route 2 unarguable. In summary, he found that, however the case might be put, the payments attacked by Mr Hunt were not transactions which Ovenden had entered into. Moreover, they were either payments that Mr Temple was authorised to make or they were not; in the former case, they could not be attacked unless the agreements were themselves challenged, and they had not been; in the latter case, the payments constituted a breach of trust and so could not be attributed in any way to Ovenden.

**The appeal**

**24.** On this appeal, Mr Hunt only pursues route 2. Mr Simon Davenport QC who has appeared on behalf of Mr Hunt, as he did below, has developed the route 2 argument in the following way.

**25.** First, the payments made by Mr Temple out of the client account were transactions within the meaning of s.238 between Ovenden and Mr Temple. These payments included the payments made directly to Mr Temple or to his office account and also, importantly for present purposes, the payments made to Mr Hosking. The payments made to Mr Hosking constituted a sub-set of the totality of the payments and, although they were made directly from the client account to Mr Hosking, they involved, as a first step, the intervention of Mr Temple who treated the moneys paid over as his own.

**26.** Second, Mr Temple had no contractual entitlement to any of the moneys taken from the client account for the reasons I have summarised above and, as a result, the transactions were entered into at an undervalue. The evidential support for these allegations is set out in Mr Hunt's second witness statement to which we were taken in the course of the hearing. There Mr Hunt explains that the investigations he has carried out suggest that all of the work which Mr Temple claims to have undertaken for Ovenden had already been undertaken and paid for prior to December 2003 so there was no consideration for the 2003 agreement; at that time Mr Temple had no reason to believe that any further work would be required; such additional work that Mr Temple in fact undertook thereafter was very minor and paid for separately; there is good reason to believe that Ms Waugh's signature on the 2005 variation is a forgery; there was in any event no consideration for the 2005 variation; and Mr Temple positively misled Ovenden at all times about the work he had done and was required to do. In summary, Mr Hunt continues, Mr Temple misapplied Ovenden's money and deceived its directors.

**27.** Third, the court may make an order against Mr Hosking under s.241(2) of the 1986 Act in so far as he has received a benefit from the transactions because he was not acting in good faith. In support of this contention Mr Hunt relies upon a number of matters, including the following: the payments were made to Mr Hosking out of STW's client account and very shortly after STW had received the dividend payments from the CSM companies; Mr Hosking, as liquidator of the CSM companies, knew that substantial dividends were being paid to STW's client account; the personal loans made by Mr Hosking to Mr Temple were not due for repayment until 2007 and they carried no interest; Mr Hosking was in any event substantially overpaid; and Mr Hosking has sought to justify the payments made to Mr Temple on the basis that Mr Temple had conducted substantial work for the benefit of Ovenden when he must have known at all times that Mr Temple had not carried out any such work.

**28.** Mr Davenport further submits that all of the factual matters to which I have referred are complex and that there is every reason to suppose that further investigations will add to or alter the available evidence. In these circumstances the case is wholly unsuitable for summary determination.

**29.** Mr Hosking accepts that, this being an appeal on a point of law from a strike-out order, we must assume that it can be established at trial that Mr Temple acted in breach of his fiduciary duty as a trustee of the funds held in the client account. That is plainly right. But it seems to me that we must also consider the possibility that Mr Temple was acting within the scope of his authority and consider the merit of the claim on that basis too. Similarly, we must assume that Mr Hosking was not acting in good faith when he received the benefits relied upon and so cannot rely upon the defence afforded by s.241(2)(a) and (b).

**30.** Nevertheless, Mr Antony Zacaroli QC, who has appeared in this appeal on behalf of Mr Hosking, submits, and I agree, that a claim against him under s.241 can only succeed if a claim under s.238 is first established. He also submits that this is something Mr Hunt cannot do because an essential ingredient of any claim under s.238 is that there has been a transaction into which a company has itself entered. In this case, however, none of the payments made by Mr Temple from his client account constituted a transaction entered into by Ovenden and thus the requirements of s.238 are incapable of being satisfied.

**31.** The requirement that the company has itself entered into a transaction is an essential part of any claim under s.238 and comprises two interrelated elements: first, that there is a transaction; and second, that the transaction is something which the company has itself entered into.

**32.** As I have explained, the term "transaction" is widely defined in s.436 as including a gift or arrangement. If it were necessary for the purposes of this decision, I would therefore be disposed to find it is broad enough to encompass a payment made by a company or by an agent of the company acting within the scope of his authority. But to focus unduly on the term "transaction" risks obscuring the need for the second and vital element, namely the requirement that the transaction be something that the company has "entered into". This expression connotes the taking of some step or act of participation by the company. Thus the composite requirement requires the company to make the gift or make the arrangement or in some other way be party to or involved in the transaction in issue so that it can properly be said to have entered into it, and of course it must have done so within the period prescribed by s.240.

**33.** These notions are reflected in the decision of Jonathan Parker J in *Re Brabon* [2000] B.C.C. 1171. In that case the trustee of a bankrupt alleged that transfers of land by a mortgagee were transactions at an undervalue within the scope of s.339 of the 1986 Act. A claim against the purchaser failed because the transfers were not transactions entered into by the bankrupt. Jonathan Parker J said at p.1190:

> "In the end, however, one comes back to the plain words of the subsection. In my judgment the words 'entered into by the [bankrupt]' do not extend to a transfer by way of sale not by the bankrupt but by the bankrupt's mortgagee."

**34.** So also, the unilateral misappropriation by a director of the assets of company does not constitute a dealing between him and the company. This issue arose in *Manson v Smith (liquidator of Thomas Christy Ltd)* [1997] 2 B.C.L.C. 161 in the context of r.4.90 of the Insolvency Rules 1986 (SI 1986/1925) and an attempt by a director of an insolvent company to set off a sum he had been ordered to pay in misfeasance proceedings against the balance due to him on his loan account. In rejecting his application for permission to appeal, Millett LJ said this at p.164 (a passage subsequently cited with approval by *Lord Hoffmann in Smith (Administrator of Cosslett (Contractors) Ltd v Bridgend County Borough Council* [2001] UKHL 58; [2002] 1 A.C. 336; [2001] B.C.C. 740 at [35]):

"First, r 4.90 and its predecessors require there to be mutual debts or mutual dealings. When Mr Manson improperly withdrew money from the company this did not constitute a dealing between him and the company. A misappropriation of assets is not a dealing. Mr Manson will object to the analogy, but I hope he will forgive me for it is only an analogy: the thief who steals my watch does not deal with me. Similarly, the man who steals money from a company does not obtain the money by a dealing within r 4.90. Accordingly, his liability to repay money he has misappropriated cannot be set off against any debt owing to him by the company."

**35.** Similarly, in *Stone & Rolls Ltd (in liq.) v Moore Stephens (a Firm)* [2009] UKHL 39; [2009] 1 A.C. 1391, Lord Phillips said at [46] that an English court would not attribute to a company the act of its managing director in dishonestly transferring the company's funds into his own account.

**36.** I come then to apply these principles in the context of the present case and in doing so I must consider the two ways the case can be put. The first and primary argument advanced by Mr Davenport on Mr Hunt's behalf is that Mr Temple has misappropriated the funds he held on trust for Ovenden because he had no right to take the moneys and make the payments to Mr Hosking. But here Mr Hunt faces precisely the difficulty encountered by Mr Manson in *Manson v Smith* (above). The improper withdrawal by Mr Temple of the funds he held on trust, if that is what it was, did not constitute a dealing between him and Ovenden.

**37.** Nor can it be said that Mr Temple was acting as agent for Ovenden in making the impugned payments. Mr Davenport disclaimed any such contention and he was right to do so. Mr Temple was a trustee of the funds but, as Lord Hoffmann explained in *Ingram v Inland Revenue Commissioners* [2000] 1 A.C. 293 at p.305, a trustee in English law is not an agent for his beneficiary. He contracts in his own name with a right of indemnity against the beneficiary for the liabilities he has incurred.

**38.** That brings me to the second way the case can be put, namely that Mr Temple was in some way authorised or entitled to make the impugned payments, albeit that they were made for no or inadequate consideration. However, in my judgment this argument also faces an insuperable difficulty. When Mr Temple took the funds from the client account and paid them over to Mr Hosking it required no further act or step by Ovenden beyond the 2003 agreement and the 2005 variation, and, as I have said, neither of these is said to constitute or form part of a relevant transaction. The payments themselves were not a gift by Ovenden to Mr Temple, nor did it enter into a further transaction of any other kind with him. It follows that the actions of Mr Temple in withdrawing the funds from the client account and paying them over to Mr Hosking were not transactions entered into by Ovenden, just as the transfers of land were not entered into by the bankrupt in *Re Brabon*.

**39.** Mr Zacaroli also submits that, on this second hypothesis, the claim must fail for a further reason. He says that if Mr Temple was entitled to be paid the fees he claimed then there could be no undervalue because whenever a company makes a payment in discharge of an actual obligation, the value of the consideration given (the payment) necessarily equals the value of the consideration received (the discharge of the obligation to make that payment). I recognise the force of this submission, however I am not persuaded that it necessarily addresses all the ways in which Mr Hunt challenges the 2003 agreement and the 2005 variation, notwithstanding that he is not seeking to set aside either agreement and neither is said to constitute or form part of a relevant transaction. In the circumstances and since it is not necessary for me to express a final conclusion upon it, I prefer not to do so.

**40.** For the reasons I have given I believe the claim against Mr Hosking under ss.238 and 241 must fail and the judge was right to strike it out. I would therefore dismiss the appeal.

**McCOMBE LJ:**

**41.** I agree.

**ELIAS LJ:**

**42.** I also agree. Mr Davenport submitted that the purposes of s.238, namely to protect creditors of an insolvent company, would be better served if the withdrawal of money by Mr Temple was treated as a relevant transaction at that time when the money was actually lost to the company. That may be so, but like my Lord, Kitchin LJ, I can see no legitimate way in which s.238 can be construed to achieve that result. The section catches transactions entered into by the company. As I understand it, Mr Davenport QC was asserting that there was a continuing authority for Mr Temple to withdraw the money at least until that authority was revoked or exercised. I agree; but that is precisely why it was not necessary for the company to enter into any further distinct transaction at the point when Mr Temple withdrew the funds. Any relevant transaction would have to be the underlying agreement by which the authority was conferred, in this case either the 2003 agreement or the 2005 variation, but neither of these was relied upon.

*(Appeal dismissed)*

# Exhibit 58

**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| In re: | Chapter 11 |
| FTX TRADING LTD., *et al.*, | Case No. 22-11068 (KBO) |
| Debtors. | (Jointly Administered) |

**DECLARATION OF STEPHEN NICHOLAS ATHERTON K.C. IN REBUTTAL**

# Contents

I.   INTRODUCTION ................................................................................................................. 3

II.  SUMMARY OF CONCLUSIONS .................................................................................... 5

   A.   Preliminary Observations ........................................................................................... 5

   B.   Conclusions Regarding Specific BVI Claims Asserted by the Joint Liquidators............................ 6

III. BVI PREFERENCE CLAIMS ........................................................................................... 8

   A.   Positions in the Levy Declaration Not Articulated in the POC ......................................... 9

   B.   A "*Transaction*" for Purposes of a Preference Claim Must Involve a Depletion in the Assets in Which 3AC Had a Proprietary Interest ................................................................................ 11

      i.    The Pari Passu Principle ......................................................................................... 13

      ii.   Case Authorities ..................................................................................................... 18

      iii.  Contractual "Entitlements" as Assets of 3AC ............................................................ 24

      iv.   The Right of FTX to Liquidate ................................................................................ 25

   C.   FTX Was Not Put into a Better Position as a Creditor ................................................... 26

      i.    FTX Was Not a Creditor of 3AC on the Facts as I Understand Them ............................ 26

      ii.   FTX Was Not Put into a Better Position as a Creditor ................................................. 28

   D.   The Transactions Did Not Result in an "Avoidance of Losses" for FTX ........................... 31

   E.   FTX Has an Ordinary Course of Business Defence ....................................................... 34

IV.  NON-PREFERENCE BVI CLAIMS ............................................................................... 35

   A.   BVI Undervalue Transaction Claim ........................................................................... 35

      i.    Existence of an Undervalue Transaction ................................................................... 35

      ii.   Undervalue Transactions – statutory defence ............................................................ 37

   B.   BVI Turnover Claim ................................................................................................ 38

   C.   BVI Proprietary Restitutionary Claim ....................................................................... 39

   D.   BVI Unjust Enrichment Claim .................................................................................. 41

   E.   BVI Conversion Claim ............................................................................................. 42

V.   ALTERNATIVE SCENARIO IF FTX IS ASSUMED TO HAVE A SECURITY INTEREST ......... 43

## I.    INTRODUCTION

1.    I am the same Stephen Atherton K.C. who provided a declaration in support of the claim objection of the FTX Recovery Trust's Objection to the Amended Proof of Claim Filed by the Joint Liquidators of Three Arrows Capital Ltd., which was executed by me on 20 June 2025 (the "***Original Declaration***").[1]

2.    I have been asked by Sullivan & Cromwell LLP, on behalf of the FTX Recovery Trust, to give my further opinion as to certain relevant aspects of the laws of the BVI as regards the BVI Claims asserted by the Joint Liquidators against the FTX Recovery Trust as articulated in the POC. More specifically, I have been asked to consider and comment upon the views expressed by Robert Stuart Levy K.C. on the laws of the BVI as contained in the declaration executed by him on 21 October 2025 (the "***Levy Declaration***"), which I understand was provided by the Joint Liquidators in support of their effort to assert the BVI Claims. I set out my analysis in this rebuttal declaration (the "***Rebuttal Declaration***").

3.    As previously stated in my Original Declaration, I am being remunerated at the rate of £1,500 *per* hour, which is my standard rate for providing expert opinions on BVI law. My compensation is in no way contingent upon my findings, the testimony I may give, or the outcome of these proceedings. I understand that my duty is to give my honest, objective and independent opinion to the Court, and I have done so.

4.    A list of the legal materials I have reviewed for the purposes of this Rebuttal Declaration is attached as Exhibit A, to the extent that they were not already included in Exhibit A to my Original Declaration. I have also been provided with, and have considered, certain other relevant documents that have been provided to me by the FTX Recovery Trust. These documents are listed below, excluding any documents already included in Exhibit B to my Original Declaration.

5.    Since providing my Original Declaration, I have reviewed and considered, among the other items listed in the Exhibits hereto: (i) the Second Declaration of The Rt. Hon. Lord Neuberger of Abbotsbury, executed on 19 June 2025 (together with the annexes thereto); (ii) the Declaration of Steven P. Coverick, signed by him on 20 June 2025 (together with the exhibits thereto); and

---

[1] In this Supplemental Declaration, I have adopted the same definitions and abbreviations as employed in my Original Declaration.

(iii) the Objection of the FTX Recovery Trust to the Amended Proof of Claim of the Joint Liquidators of 3AC, filed on and dated 20 June 2025.

6.   For the record, I can confirm that nothing in the content of the documents referred to in paragraph 5 above or any other materials I have been provided with has caused me to amend or alter the opinions expressed in, or the content of, my Original Declaration.

7.   In preparing this Rebuttal Declaration, I have been asked to assume the following facts in addition, to those set out at paragraph 13 of my Original Declaration:

   a.   The FTX Recovery Trust (and the FTX Debtors before it) assessed the quantum of creditor claims by former FTX customers in the FTX bankruptcy proceedings on the basis of the entire position of the customer account(s), that is the Account Balance, and did not ignore negative balances in particular assets for determining the size of customer claims;

   b.   The market prices of Bitcoin ("***BTC***") and Ethereum ("***ETH***") declined from the end of the day on 12 June 2022 (UTC) to the end of the day on 27 June 2022 (UTC);

   c.   The transactions occurring in the 3AC Accounts on 13 June 2022 and 14 June 2022 were initiated by 3AC and not FTX, with the exception of the subset of trades comprising the Liquidation on 14 June 2022;

   d.   For each challenged transaction involving the sale of a Digital Asset for USD, the 3AC Accounts received a debit to the Digital Asset Balance (and, more specifically, the balance for the particular Digital Asset) and a credit to the USD Balance that had an equivalent notional value in USD (putting aside trading fees);

   e.   FTX was not legally obligated to absorb amounts of negative balances that were incurred by one customer through borrowing from other customers via the Spot Margin Program; and

   f.   A separate analysis conducted by Stephen Houseman, K.C. concludes that, in the event that a Court were to find that the assets sought by the Joint Liquidators were the property of 3AC and not of FTX, then the March 2022 Line of Credit Agreement created: (i) a possessory security interest (i.e., a pledge or lien) over the relevant assets in FTX's favour, which was duly perfected as a consequence of FTX having acquired exclusive control over the relevant

4

assets; and (ii) a non-possessory security interest (by way of a fixed charge, alternatively a floating charge security interest) over those assets. I do not purport to have conducted an analysis of this contract (which is governed by Antiguan law), and for purposes of this Rebuttal Declaration (except as expressly specified) I maintain the assumptions as to proprietary interests used in my Original Declaration, namely:

      i.        By reference to the Declarations of Lord Neuberger, I have been asked to assume that 3AC did not have any form of proprietary interest in the Assets associated within the Account Balance as of the end of 12 June 2022 (or subsequently);[2] and

      ii.      As a consequence (by reference to the Declaration of Lord Neuberger), it is impossible for 3AC to identify, follow or trace any specific Digital Asset or any other Asset associated with the Account Balance as of 12 June 2022 (or subsequently) or any Asset currently held by the FTX Recovery Trust or anything which might be said to represent any relevant Asset.[3]

## II.    SUMMARY OF CONCLUSIONS

### A.    Preliminary Observations

8.    The substance of the views I expressed in my Original Declaration have not altered upon reading and considering the content of the Levy Declaration.[4]

9.    Based on the assumptions I was instructed to make in my Original Declaration,[5] the views contained in the Levy Declaration are, to a significant extent, predicated upon what appear to me to be incorrect assumptions and counterfactual propositions and scenarios that it would seem that Mr Levy has been asked to adopt.[6] In my opinion, this serves to divorce the views expressed by

---

[2] See paragraph 13(q) of my Original Declaration.
[3] See paragraph 13(r) of my Original Declaration.
[4] I have not dealt with each and every criticism of my Original Declaration made by Mr Levy, nor have I dealt with every issue raised by Mr Levy with which I may disagree. To the extent that I have not directly engaged with matters raised or opinions expressed by Mr Levy, this should not be taken as an acceptance by me that those matters or opinions are correct, or that I agree with them.
[5] See paragraph 13 of my Original Declaration.
[6] For example: (i) 3AC has or has retained a proprietary interest in the relevant assets (see paragraph 27 of the Levy Declaration); (ii) FTX over-stated the negative USD Balance in the 3AC Accounts (see paragraph 210 of the Levy Declaration); (iii) on the sale of the relevant assets 3AC was not given full credit for the market value of those sales (see paragraph 210 of the Levy

5

Mr Levy as to the law of the BVI from the actual facts and circumstances of the case as I understand that they existed at the time, and the actual nature of the relationship as between each of FTX, other users of the Exchange, and 3AC.

10.    In a similar vein, I note that Mr Levy has not addressed the issue raised by me in my Original Declaration that relates to the lack of clarity and the lack of particularity from which the articulation of the BVI Claims in the POC suffers.  As observed in my Original Declaration, this would be an important issue for such claims if they were to be presented to a BVI Court.[7]  This issue also has resonance as regards the Levy Declaration in that there are a number of occasions where his views as to the laws of the BVI are expressed in the context of a characterisation or description of certain of the claims which are different to the BVI Claims as articulated in the POC, or which are not reflected in the POC.

11.    For the purposes of considering the legal context of the BVI Claims, there does not appear to me to be any material difference between the rehearsal of the sources of the laws of the BVI and the structure and operation of the Courts and legal system of the BVI as contained in my Original Declaration[8] and the corresponding paragraphs of the Levy Declaration.[9]

   B.   Conclusions Regarding Specific BVI Claims Asserted by the Joint Liquidators

12.    **BVI Preference Claims**:[10] My opinion as to the status and merits of the BVI Preferences Claims is unchanged. The Joint Liquidators BVI Preference Claims will fail: (i) there has not been any relevant "*insolvency transaction*", including because the alleged transactions sought to be impeached did not involve or diminish assets in which 3AC had a proprietary interest; (ii) FTX was not a creditor of 3AC at any relevant time; (iii) FTX was not put in a better position as a creditor as the result of any allegedly relevant transaction to the detriment of other creditors of 3AC (even assuming FTX was a creditor of 3AC); and (iv) in any event, the FTX Recovery Trust

---

Declaration); and (iv) FTX was obligated to discharge the liabilities owed by 3AC to other participants on the Exchange (see paragraph 158 of the Levy Declaration). Similarly, as pointed out below, in certain respects, Mr Levy appears to have adopted formulations of the headline claims contained in the POC that are different to the formulation of those claims as rehearsed in the POC.

[7] See paragraph 19 of my Original Declaration.
[8] See paragraphs 14-17 of my Original Declaration.
[9] See paragraphs 35-40 of the Levy Declaration.
[10] See paragraph 34(a) of the Levy Declaration and paragraph 12(a) of my Original Declaration.

6

could assert a statutory ordinary course of business defence depending on the evidentiary record before the Court.

13. **BVI Undervalue Transaction Claim**:[11] Any such claim will fail: (i) the factual premises upon which there is said to have been a transaction at an undervalue do not exist, including because the alleged transactions sought to be impeached did not involve or diminish assets in which 3AC had a proprietary interest; (ii) because, as I understand it, there can be no argument that 3AC received no consideration, or significantly less consideration than 3AC provided in relation to the transactions subject to challenge; and (iii) even assuming that the Joint Liquidators were able to establish that there had been undervalue transactions, the FTX Recovery Trust has a statutory defence.

14. **BVI Turnover Claim**:[12] My opinion as to the status and merits of the BVI Turnover Claim, remains the same: the Joint Liquidators could not successfully assert a turnover claim under s.274A(1) of the Insolvency Act. The BVI Turnover Claim, regardless of whether the appropriate procedural vehicle to advance such a claim is s.274A(1) of the Insolvency Act as stated in the POC, is wholly dependent upon 3AC having a proprietary right to or interest in the assets said to be subject to the claim. As stated in my Original Declaration and in reliance on the Declarations of Lord Neuberger, I understand that no such interest can or could be established and therefore the BVI Turnover Claim cannot or could not succeed.

15. **BVI Proprietary Restitutionary Claim**:[13] My opinion as to the status and merits of the BVI Proprietary Restitutionary Claim remains the same: the Joint Liquidators will not be able to successfully assert that 3AC is entitled to a proprietary restitutionary claim against the FTX Recovery Trust or in respect of any assets in the possession of or formerly in the possession of FTX or the FTX Recovery Trust. This claim is dependent upon 3AC having the proprietary right to or interest in the assets subject to the claim – in particular a subsisting legal title to the assets said to be subject to such a claim.[14] As stated in my Original Declaration, and for the reasons there

---

[11] See paragraph 34(b) of the Levy Declaration and paragraph 12(b) of my Original Declaration.
[12] See paragraph 34(c) of the Levy Declaration and paragraph 12(c) of my Original Declaration.
[13] See paragraph 34(d) of the Levy Declaration and paragraph 12(d) of my Original Declaration.
[14] Which contention, as noted below, is inconsistent with the principal assertion of the Joint Liquidators that 3AC possesses a beneficial interest in the relevant assets.

stated, 3AC has no relevant right or interest and therefore the BVI Proprietary Restitutionary Claim cannot succeed.

16.   **BVI Unjust Enrichment Claim:**[15] My opinion as to the status and merits of the BVI Unjust Enrichment Claim remains the same. The necessary elements to be able to pursue this cause of action are absent. FTX was not enriched at the expense of 3AC, and even if it can be said that FTX was enriched at the expense of 3AC, any such enrichment was not unjust. Additionally, the general rule is that no unjust enrichment claim will be available where, as here, there subsists a relevant contract as between the relevant parties the terms of which determines the rights and obligations of the parties to that contract – the relevant contract not having been terminated.  In any event, FTX may be found to have a defence of change of position. Therefore, as stated in my Original Declaration, and for the reasons there stated, the BVI Unjust Enrichment Claim cannot succeed.

17.   **BVI Conversion Claim:**[16] As stated in my Original Declaration, and as Mr Levy appears to accept, such a claim in relation to intangible property of the type alleged to be subject to this claim is not (at present) known to the common law of the BVI. Therefore, as stated in my Original Declaration, and for the reasons there stated, the BVI Conversion Claim cannot succeed.

## III.   BVI PREFERENCE CLAIMS

18.   There does not appear to be any substantive disagreement between Mr Levy and me as to the necessary elements to enable the prosecution of a claim under s.245 of the Insolvency Act to challenge a transaction on the basis that a particular transaction constitutes an unfair preference of a creditor of an insolvent company.[17] However, Mr Levy and I disagree as to the application of those necessary elements for the reasons set out below.

---

[15] See paragraph 34(e) of the Levy Declaration and paragraph 12(e) of my Original Declaration
[16] See paragraph 34(f) of the Levy Declaration and paragraph 12(f) of my Original Declaration.
[17] We agree that one of the necessary elements that 3AC must establish is that 3AC must have been insolvent at the time of the alleged preference transactions, or that it became insolvent as a consequence of the alleged preference transactions. I assumed in my Original Declaration that 3AC was insolvent on and after 12 June 2022, and I have maintained this assumption for the purposes of this Rebuttal Declaration (see paragraphs 36-37 of my Original Declaration). I note briefly that the Levy Declaration does not acknowledge that I made this assumption. As I expect that the Court appreciates, the burden is on the Joint Liquidators to ultimately establish the insolvent position of 3AC at the relevant time. Mr Levy provides a brief exegesis on what is meant by "cash-flow" insolvency as a matter of the law of England, whilst noting that he is not aware of a BVI Court having considered the "cash-flow" test for insolvency in detail. Although I do not raise any issue as regards the solvency or insolvency of 3AC at the relevant time, for the purposes of the BVI Preference Claims and the BVI Undervalue Claim, I am content to accept the summary provided by Mr Levy as being accurate. That said, upon reviewing my Original Declaration, I noticed that I had

8

A.   Positions in the Levy Declaration Not Articulated in the POC

19.   This may be repetitious, but in my opinion, it is important to have in mind the substance of the BVI Preference Claims as advanced by the Joint Liquidators in the POC. As noted in my Original Declaration, there is a lack of clarity in the POC as to what the Joint Liquidators allege to be the relevant "*transactions*" said to constitute the alleged unfair preferences.[18] The POC defines the "*June 13 Takings*" and "*June 14 Takings*" as, "*a series of liquidations, seizures, or other transfers*" that are alleged to have taken place on those dates.[19] It would appear that the allegation is that the "*June Takings*" are the relevant "*transactions*" giving rise to the BVI Preference Claims.[20]

20.   The nature of the BVI Preferences Claims as described in the Levy Declaration relates to two alleged, "*series of transactions said to constitute an unfair preference*", namely:[21] (i) "*a substantial number of sales and trades of digital assets associated with 3AC's accounts on the Exchange between 13 and 14 June 2022, which the FTX Recovery Trust asserts were initiated by 3AC*"; and (ii) "*the liquidations of digital assets associated with 3AC's accounts on 14 June 2022, which FTX concedes it conducted*". This formulation of the BVI Preference Claims is, in my view, different from the formulation of the BVI Preference Claims as rehearsed in the POC. As expressed in the POC, the BVI Preference Claims are said to have consisted of an unspecified, "*series of liquidations, seizures, or other transfers*" of assets said to be owned by 3AC. Given these differences, the analysis contained in the Levy Declaration appears to go beyond the nature of the claims as asserted in the POC and the premises for those claims also appear to be different, but I understand such issues to be ones for the Court to consider and determine.

---

referred in error to the decision of Mr Justice Adderley in Donna Union Foundation v Koshigi Limited BVIHC (Com) 231 of 2018 (see paragraph 35 and footnote 37 of my Original Declaration). Although the Donna Union case does refer to judicial precedents from the Courts in England (in particular BNY Corporate Trustee Services Ltd v Eurosail-UK 2007-3 BL plc [2013] UKSC 28), this decision only deals with the "balance sheet" test for insolvency and not the "cash-flow" test for insolvency. I had intended to refer to the decisions of Mr Justice Wallbank in: PT Ventures SGPS SA v Vitadel Limited [2021] ECSC J0930-3; and PT Ventures SGPS SA v Vitadel Limited [2024] ECSC J0417-4. The decisions in the PT Ventures cases refer to both the Eurosail case and the decision in Re Cheyne Finance plc (No.2) [2008] Bus LR 1562 and (certainly in relation to the latter PT Venture judgment) contain a detailed analysis of the cash-flow test for insolvency and the analysis as rehearsed in the judgments in Eurosail and Re Cheyne Finance as a matter of the law of the BVI.

[18] See paragraphs 25-26 of the Original Declaration.
[19] See paragraph 40 of the POC.
[20] See paragraphs 51-54 of the POC.
[21] See paragraph 79 of the Levy Declaration.

9

21.   Additionally, whereas for the purpose of his analysis Mr Levy has adopted a position that the pursuit of the BVI Preference Claims by the Joint Liquidators does not require there to have been a transaction involving the assets of 3AC (a view with which I disagree as explained in my Original Declaration and further considered below), this is at odds with the nature and bases of the claims actually pursued in the POC:

   a.   The section of the POC outlining the giving of an unfair preference to FTX by 3AC is entitled, "*The Dissipation of the 3AC Debtor's Assets*";[22]

   b.   Furthermore, paragraph 40 of the POC defines the "*June 13 Takings*", the "*June 14 Takings,*" and the "*June Takings*" by reference to these being dealings with, "*the 3AC Debtor's digital and other asset holdings*";[23]

   c.   To this end, the POC includes a chart that purportedly shows that, at the end of the day on 12 June 2022, "*the 3AC Debtor's assets and alleged negative USD balance on the FTX platform*".[24]  This inclusion is with a view to evidencing the size of the supposed quantum of the BVI Preference Claims which are defined by reference to them being, "*Lost Assets*";[25] and

   d.   Further, as alleged in the first paragraph of the POC, "[o]*n June 12, 2022, the 3AC Debtor had assets on the FTX platform worth approximately $1.59 billion*" and alleged that, "*those assets were transferred to, or otherwise liquidated by or for the benefit of FTX*".[26]

22.   On this basis, it is readily apparent to me that, on any fair reading of the BVI Preference Claims as asserted in the POC, the Joint Liquidators have advanced those claims on the grounds that the unfair preference "*transactions*" involved the disposition of assets in which 3AC had a proprietary right or interest. As a result, to the extent Mr Levy seeks to articulate a theory of recovery based upon transactions that involve assets that are the property of a party other than 3AC (e.g., FTX), it may be said that this is a new and different iteration of the BVI Preference Claims and not one

---

[22] See page 15 of the POC at Section V.
[23] See paragraph 40 of the POC.
[24] See paragraph 42 of the POC. As noted in my Original Declaration, I have been instructed to assume that these figures do not accurately reflect the relevant balances held in the 3AC Accounts at the relevant times, although I have not assessed or sought to verify these actual amounts myself.
[25] See paragraph 43 of the POC.
[26] See paragraph 1 of the POC.

10

identified or contained in the POC. I understand, however, that the scope of what has been asserted in the POC to be a matter for the Court to consider.

B.  A "*Transaction*" for Purposes of a Preference Claim Must Involve a Depletion in the Assets in Which 3AC Had a Proprietary Interest[27]

23.  As a substantive matter of the law of the BVI, I disagree with Mr Levy's position that establishing the existence of an "*insolvency transaction*", a necessary element for an unfair preference claim under the Insolvency Act, "*does not require a proprietary interest in the assets transferred*".[28] In my opinion (as expressed in my Original Declaration[29] and as further expressed below), the Joint Liquidators cannot assert an unfair preference claim arising from "*transactions*" that did not involve a diminution in the value of the assets of 3AC, which assets would otherwise have been available for distribution to 3AC's creditors in the liquidation of 3AC's insolvent estate.

24.  As an initial comment, it appears that Mr Levy seeks to analyse the view I have expressed as being the result of applying a "*narrow*" construction to the words "*transaction*" and "*insolvency transaction*" as they appear in the Insolvency Act. The view I have expressed, and which I maintain, is predicated on what I consider to be an established understanding of the purpose and effect of provisions such as those contained in s.245 of the Insolvency Act[30] and an appropriate interpretation of the relevant statutory wording in its  statutory context. In this sense I cannot agree with Mr Levy's framing of my analysis.

25.  For this reason, it is important to appreciate the nature and extent of the views I expressed in my Original Declaration:

a.  The ability of a liquidator to challenge certain types of transactions that have occurred pre-liquidation exists in order to ensure that a creditor of an insolvent company does not obtain a benefit from a transaction that has served to deplete the assets of the insolvent company, such that there are fewer assets available for distribution to the other creditors of the company;[31]

---

[27] I drew attention to the nature and extent of the debate on this issue in my Original Declaration at footnote 33.
[28] See the heading at Section 3 on page 16 of the Levy Declaration.
[29] See paragraph 27 of my Original Declaration.
[30] In other words, the "*mischief*" at which such provisions are directed and are intended to avoid or prevent.
[31] See paragraph 27 of my Original Declaration.

11

b.   There was no detriment in the present case to the other creditors of 3AC because there had been no depletion in the assets of 3AC which might otherwise have been available to distribute to its creditors in the course of its liquidation;[32]

c.   Insofar as it was argued, or is now sought to be argued, by the Joint Liquidators that it was not necessary for the transactions sought to be challenged to involve assets that belonged to 3AC for the purposes of whether or not a transaction is an "*insolvency transaction*", such an argument could not succeed as a matter of the law of the BVI;[33]

d.   The policy behind the promulgation of provisions such as s.245 of the Insolvency Act is to permit the reversal of the economic consequences for a company and its creditors of certain types of transaction that are proximately antecedent to a company's insolvent liquidation;[34]

e.   It is generally accepted that transactions entered into by a company before the commencement of winding up and which have the effect of reducing the value of the assets that would otherwise be available to the creditors of a company should be susceptible to challenge, as they serve to adversely affect the statutory regime (as it exists under the law of the BVI) for equal or proportional distribution of a company's assets to its unsecured creditors in the course of a liquidation; and

f.   Given that the assets that are the subject of the alleged "*insolvency transactions*" were not in fact assets of 3AC at the relevant time, the policy that underlies the ability of a liquidator to set aside certain types of antecedent transactions was not engaged, this served to further inform my opinion that the relevant transactions did not involve unfair preference transactions which inured to the benefit of FTX at the expense of the other unsecured creditors of 3AC.

26.   Thus, as I sought to explain in my Original Declaration, and contrary to the principal analysis as contained in the Levy Declaration, the premise underlying the ability of liquidators to challenge transactions as unfair preferences under the Insolvency Act confirms that a "*transaction*" is relevant as a potential unfair preference only insofar as it involves or directly diminishes assets in

---

[32] See paragraph 27 of my Original Declaration.
[33] See paragraph 28 of my Original Declaration.
[34] See paragraph 51 of my Original Declaration.

12

which the insolvent debtor has some form of proprietary interest. As already stated, the ability of a liquidator to challenge certain types of transactions that have occurred pre-liquidation as unfair preferences is intended to ensure that a creditor of an insolvent company does not obtain a benefit from a transaction that has served to deplete the assets of the insolvent company, such that there is less value available for distribution to the other unsecured creditors of that insolvent company.[35]

27. Mr Levy's contrary opinion is advanced on the following three bases: (i) his articulation of the nature and extent of the *pari passu* principle; (ii) judicial precedents from England and Australia; and (iii) a new argument that dealings that relate to contractual "*entitlements*" enjoyed by 3AC would suffice to establish an unfair preference transaction even though the unfair preference transactions involved assets that were not assets in which 3AC had a proprietary interest. None of these bases has caused me to change the views I have previously expressed as regards the lack of substance in the BVI Preference Claims.

   *i.   The Pari Passu Principle*

28. Although Mr Levy purports to invoke the *pari passu* principle in support of his analysis, in my view a proper understanding and articulation of this principle serves to confirm my analysis of the position in relation to the BVI Preference Claims. For such claims to have any chance of success, in my opinion, the relevant transactions must involve a depletion in the assets of 3AC which would otherwise be available for distribution to its general body of unsecured creditors in liquidation.

29. The quintessence of the *pari passu* rule is the need to ensure that the assets of a company in liquidation (subject to any prior ranking claims) are divided rateably among the unsecured creditors of that company in accordance with the statutory distribution regime.[36] The *pari passu* principle is a rule that is concerned with securing the orderly distribution of a company's assets, thereby ensuring that no unsecured creditor of the company is placed in a better position *vis-vis*,

---

[35] See paragraph 27 of my Original Declaration.

[36] As to which see s.207 of the Insolvency Act (as regards creditor claims against companies) and s.344 (as regards bankrupt individuals). The principle is also reflected in Part XIX of the Insolvency Act (albeit this part of the Insolvency Act is not (as yet) in force), which is concerned with orders that the BVI Courts may make to assist insolvency related proceedings pending before a foreign Court.  See in particular ss.467 and 468 of the Insolvency Act and <u>UBS AG New York v Fairfield Sentry Ltd (in Liquidation)</u> [2019] BCLC 1 (cited at footnote 17 of the Levy Declaration and referencing the ability of the Courts in relation to statutory provisions such as those under discussion in this case to make orders which have the effect of annulling certain types of transaction and permitting the grant of restitution and thereby promoting the prevention of preferential dispositions of a company's property and the distribution of a company's property in accordance with the statutory insolvency regime).

13

or at the expense of, the other unsecured creditors of that company. The principle has been referred to as, the "*fundamental principle of equality*" to achieve justice as between creditors[37] and the, "*most fundamental principle of insolvency law*".[38]

30.   The *pari passu* principle is well-recognised as being the foundation for statutory provisions of the type contained in s.245 of the Insolvency Act.[39] These statutory provisions allow liquidators to impeach transactions entered into prior to the liquidation of a company as being unfair preferences. The fundamental "mischief" at which such statutory provisions are directed is to preserve the assets of an insolvent company in which the unsecured creditors of that company, as a whole, may benefit.[40]

31.   Contrary to what is said in paragraph 67 of the Levy Declaration, the *pari passu* principle is not necessarily contravened in the event that a transaction occurs the result of which is that a creditor of a company, "*is put in a better position than other creditors of equal rank*". Mr Levy's description of the relevant principle might be said to be not entirely accurate or, at least, incomplete. A transaction that does not involve or does not directly affect the assets of the insolvent debtor does not implicate this principle. As stated in my Original Declaration, the provisions of s.245 of the Insolvency Act are directed towards transactions entered into by the relevant company and that involve the assets of that company.[41] Such transactions benefit a particular unsecured creditor of the relevant company at the expense of the other unsecured creditors of that company by disturbing or contravening the equitable or rateable distribution of the assets of that company as between its unsecured creditors (as is provided for by the statutory regime contained in the Insolvency Act).[42]

---

[37] See: <u>Re Lehman Brothers (International) Europe (in Administration) (no.4)</u> [2018] AC 465 at paragraphs [12], [20], [172], and [198]; <u>Rubin v Eurofinance SA</u> [2103] 1 AC 236, in particular at paragraphs [94]-[98]; <u>Belmont Park Investments Pty Ltd v BNY Corporate Trustee Services Ltd</u> [2012] 1 AC 383; and see <u>Cleaver v Delta American Reinsurance Co</u> [2001] 2 AC 328.

[38] "<u>Goode on Principles of Corporate Insolvency Law</u>" (5th Ed, 2018), at paragraph 8-02 and generally Chapter 8 (*ibid*). See also "<u>The Law of Insolvency</u>" (Fletcher, 5th Ed, 2017) at paragraph 26-020, where provisions such as ss.245 and 246 of the Insolvency Act are described as having the purpose of ensuring that from the commencement of a company's liquidation the property of the company is preserved intact for the benefit of the general body of its unsecured creditors.

[39] See for example <u>Byers v Chen</u>, *supra*, at paragraph [128] and to the same effect <u>Re Weavering Macro Fixed Income Fund Limited (in Liquidation)</u> 2016 2 CILR 514 – a decision of the Court of Appeal of the Cayman Islands and see in the Privy Council at [2019] UKPC 36.

[40] As I stated in paragraph 27 of my Original Declaration.

[41] See paragraph 27 of my Original Declaration.

[42] See "<u>Goode</u>", *op cit* at paragraph 13-85 and generally Chapter 13 (*ibid*); and "<u>The Law of Insolvency</u>", *op cit*, at paragraph 26-039 (*ibid*).

14

32. By way of example, if one assumes that the assets involved in the so-called "*June Takings*" are assets in which 3AC had no proprietary interest (as I understand to be the case according to the assumptions I have been asked to make), then the "*June Takings*" did not have the effect of diminishing the number or value of assets that would otherwise have been available to 3AC's creditors in liquidation. If the relevant transactions had never occurred, the relevant assets, not being assets in which 3AC had a proprietary interest (as *per* Lord Neuberger's Declarations) would not have formed part of 3AC's liquidation estate and would not therefore have formed part of any fund or asset pool from which distributions to unsecured creditors of 3AC could have been made by the Joint Liquidators.

33. That this is the actual position is, in my opinion, further supported by at least the following matters:

a. In my opinion, the wording of s.245(1) of the Insolvency Act plainly implicates that for a transaction to constitute an unfair preference the unfair preference must be given by the relevant company.[43] It follows, in my opinion, that an unfair preference cannot in any genuine or substantive sense be said to have been given by the company in question unless the relevant transaction improves the position of one of the unsecured creditors of that company at the expense of the general body of unsecured creditors by reducing the benefit that the general body of creditors would otherwise have received upon the distribution in the course of the company's liquidation of that part of the company's property that was the subject of the relevant transaction;[44]

b. An "*insolvency transaction*" is not limited to a transaction that is entered into by the company at the time that it is insolvent, but also includes a transaction that may be said to have caused the company to become insolvent. This, in my opinion, clearly anchors the purpose of the anti-preference provisions contained in s.245 of the Insolvency Act to the avoidance of the actual assets of an insolvent company being depleted in such a way as then leads to the subversion of the *pari passu* principle of distribution of a company assets in a liquidation for the benefit of its general body of unsecured creditors;

---

[43] "*Subject to subsection (2), a transaction entered into by a company is an unfair preference given by the company to a creditor if the transaction…*".
[44] See "Goode", *op cit* at paragraph 13-85.

15

c.    It further follows, in my opinion, that a payment of one of a company's creditors by a third-party (at a point in time when the company is insolvent) even if that payment is made at the instigation of the relevant company[45] cannot be characterised as an unfair preference[46] of the relevant creditor. That is because the value of the assets available for distribution to the company's other creditors has not been depleted. In fact, in such a scenario, the position would be that the company itself has benefitted in that an alleged liability to which it was subject has been reduced or discharged. Moreover, in the context of an insolvent liquidation of that company its creditors will also have benefitted since the burden on the assets available for rateable distribution as between the unsecured creditors has been reduced by the amount of the alleged liability discharged or reduced as a consequence of the payment made by the third-party. In other words, the assets available for distribution will remain unaffected but will be distributable between fewer creditors or distributable by reference to creditor claims that have been reduced in terms of their aggregate value;

d.    A consideration of the type of remedies which the Court may grant to reverse the effect of an unfair preference transaction[47] is also indicative of the mischief at which s.245 of the Insolvency Act is directed:[48]

    i.    Section 245(1)(a) and (b) of the Insolvency Act permit the Court to set aside the relevant transaction or restore the position to what it would have been if the company had not entered into the relevant transaction. In a scenario of the type referred to above, the granting of such relief would serve only to worsen the position for the company and its other unsecured creditors by reverting to the situation as it existed prior to the repayment of the relevant debt to the relevant creditor by the third-party;

---

[45] Which may or may not be considered to be sufficient to satisfy the requirement that the transaction the subject of challenge is a transaction entered into by the company: see s.245(1) of the Insolvency Act.

[46] Provided that there is no recourse to the company in favour of the third-party or other burden placed on the relevant company's assets as a consequence of the payment made by the third-party.

[47] See s.249(1) and (2) of the Insolvency Act.

[48] Whilst recognising that s.249(2) of the Insolvency Act does not operate and is not intended to delimit the scope of the type of orders the Court can make by reference to the objective of the relief it may grant as expressed in s.249(1)(a) and (b). Reference to the statutory remedies available as an aid to interpretation of the provisions to which those remedies relate is a legitimate course to adopt: Invest Bank PSC v El-Husseiny [2025] 2 WLR 320 at paragraph [59].

16

ii.     In a scenario of the type referred to above relief in the nature of that referred to in s.249(2)(a) or (b) of the Insolvency Act would in theory be available – but to what end?:

a.      Payment to the company by the (former) creditor of the company of the monies it had received from the third-party would represent a windfall to the insolvent estate as there would be an accretion to the assets of the company resulting in a swelling of the assets of the insolvent estate to a level greater than had existed at the time of the relevant transaction;

b.      The granting of such relief could not properly be characterised as being restorative, or restitutionary.[49] To the contrary, the granting of such relief might more appropriately be characterised as penal or punitive from the perspective of the (former) creditor in receipt of the payment from the third-party and indeed from the perspective of the third-party that made the payment – neither of whom can be said to have been involved in any wrongdoing;[50]

iii.    Furthermore, in a scenario of the type referred to above relief in the nature of that referred to in s.249(2)(d) of the Insolvency Act is plainly and obviously inapt given that it requires payment by a person to the liquidator of benefits received by them from the company, which in a scenario of the type referred to above is not what will have occurred.

34.   Finally, I should point out that, I understand the position to be that the manner in which FTX and the FTX Recovery Trusts have treated 3AC's Account Balance and its component parts is identical to the way that the Account Balances of all other customers on the Exchange have been

---

[49] Which is what such relief as provided for by s.249 is plainly intended to be i.e., to restore value to the company for the benefit of its creditors, which would otherwise have been lost by reason of the unfair preference transaction.

[50] True it is, that the Court could prevent any windfall effect and/or ameliorate any actual or perceived penal consequence of granting such relief by making an order in relation to the (former) creditor that it be entitled to submit a claim in the company's liquidation (see s.249(2)(g) of the Insolvency Act) and/or by making an order that the company be required to make a payment to the third-party in the same amount as the amount ordered to be paid to it by the (former) creditor once received (pursuant to s.249(2)(h) of the Insolvency Act). But the granting of such relief in the context under discussion merely serves to reinforce the proposition that the objective of s.245 of the Insolvency Act and nature of the attendant relief that a Court may grant and the mischief to which these provisions are directed are as stated in my Original Declaration and as repeated herein.

17

dealt with and have had their claims dealt with in these bankruptcy proceedings, and reflects the rights of those parties that participated on the Exchange as they find effect in the context of these bankruptcy proceedings and U.S. federal bankruptcy law.

35. On that basis, the approach sought to be advanced by 3AC in its POC as to how its Account Balance and its component parts should be treated would require the Court to treat 3AC differently (and more favourably) than other former FTX customers who are creditors of the FTX estate. I accept, however, that whether or not this unique treatment of 3AC is appropriate in the context of these bankruptcy proceedings is a matter for the Court to determine.

### ii.    Case Authorities

36. I have reviewed what I consider to be the relevant authorities referenced in the Levy Declaration, and none of those authorities cause me to alter the views expressed by me in my Original Declaration. Nor, in my view, do those authorities provide a basis for a claim that there has been an unfair preference of FTX in the absence of the allegedly relevant transactions serving to reduce the pool of assets that would otherwise have been available to pay a dividend to 3AC's creditors in the course of its liquidation.

### a.    _Invest Bank PSC v El-Husseiny_

37. I do not see how the opinion I have expressed can be legitimately said to be "_inconsistent with highly persuasive authority_", the authority referred to being the decision of the UK Supreme Court in Invest Bank PSC v El-Husseiny.[51]

38. First, the Invest Bank decision can have only limited (if any) persuasive precedential value in the BVI as regards the proper interpretation of the meaning and effect of ss.245 and 246 of the Insolvency Act. This is due to important contextual differences between the relevant statutory regimes in England and in the BVI. As was made clear at the outset of the judgment in the Invest Bank case, the appeal before the UK Supreme Court was concerned with a single but important point as to the proper construction of s.423 of the Insolvency Act 1986 in England and Wales.[52]

---

[51] _Supra_.  See in particular paragraphs 69-72 of my Original Declaration.  The decision in the Invest Bank case has recently been the subject of specific consideration and application in the context of a more recent case in the High Court of England and Wales concerning a claim made under s.423 of the Insolvency Act namely: Credit Suisse Virtuoso SICAV-SIF v SoftBank Group Corp [2025] EWHC 2631 (Ch).
[52] See the Invest Bank case at paragraph[1].

18

As stated in my Original Declaration the Invest Bank judgment is concerned with: (i) an entirely different statutory provision; (ii) that is contained in and forms part of an entirely different statute; (iii) which was enacted in and applies in an entirely different jurisdiction; and (iv) concerns a statutory claim that has a very different statutory lineage than s.245 of the Insolvency and is rooted in the laws directed at preventing what historically were referred to as "*fraudulent conveyances*".

39.   No doubt, the judgment in the Invest Bank could be put to and considered by the BVI Courts for purposes of the statutory interpretation of the Insolvency Act in the BVI. However, in my opinion, given these key structural, contextual and policy differences, the Courts in the BVI would ultimately have little regard to the decision in determining the proper interpretation to be applied to ss.245 and 246 of the Insolvency Act in the BVI (and in particular s.245 of the Insolvency Act, which is concerned with transactions said to be unfair preferences – the Invest Bank case was not concerned with any issues that related to the regime for setting aside transactions said to constitute voidable preferences as it applied in England).[53]

40.   Secondly, even if one applied the Invest Bank decision notwithstanding these important differences, the reasoning set forth in that decision confirms that, as set forth in my Original Declaration and herein, a transaction must have the effect of depleting the assets that would otherwise be available to the unsecured creditors of a company in the liquidation of that company. Importantly, in the Invest Bank case, the issue of statutory construction considered by the UK Supreme Court (as noted in paragraph 38 above) was to be determined in the context of whether s.423 of the Insolvency Act 1986 can apply to a transaction whereby a debtor agreed to procure a company which the debtor owned to transfer a valuable asset for no consideration or at an undervalue, thereby reducing or eliminating the value of the debtor's shares in that company to the prejudice of his creditors, or whether such a transaction falls outside s. 423 of the Insolvency Act 1986 because the debtor does not personally own the asset that was transferred by the company (albeit that the company was owned by the debtor).[54] The effect of the transaction was thereby to reduce or eliminate the value of the shares owned by the debtor in the company that had disposed of its assets to the prejudice of the debtor's own creditors. The UK Supreme Court

---

[53] At paragraph [74] of the judgment in the Invest Bank case it was recognised that under the Insolvency Act 1986 although they share some common features, the regimes for transactions at an undervalue and for unfair preferences are clearly separate and are aimed at different types of transaction. The same is true for the regimes for unfair preferences and undervalue transactions under the Insolvency Act in the BVI.

[54] *Ibid*, at paragraph [1].

19

ultimately concluded that a transfer by a solvent company owned by a debtor of a valuable asset owned by the solvent company for no or inadequate consideration necessarily resulted in a diminution in the value of the debtor's assets (i.e., the debtor's shares in the company) and/or assets against which enforcement action against the debtor could ultimately be taken. Consistent with the issue which the UK Supreme Court had to determine,[55] the Court also drew attention to the fact that it had been (correctly) accepted by the claimant in that case that it was a necessary element of its claim that the value of the debtor's assets i.e., his shares in the company, had been in fact diminished as a result of the transfer of the company's own asset because the company was owned by the debtor.[56]

41.  I do not see meaningful parallels between the situation that was under consideration in the <u>Invest Bank</u> case and the case theory sought to be advanced by the Joint Liquidators. As noted above, because the transaction in issue in the <u>Invest Bank</u> involved an asset in which an entity owned and controlled by the insolvent debtor had a proprietary interest, the transaction would have diminished the assets available to the insolvent debtor's creditors because the transaction in issue served to reduce the value of the debtor's own assets even though the relevant transaction did not directly involve an asset owned by the debtor. The <u>Invest Bank</u> decision was not concerned with and therefore did not address a situation in which the relevant transaction involved an asset that was the property of an unaffiliated entity, the disposal of which could not and did not diminish the value of an asset that would otherwise have formed part of a debtor's insolvent estate. To that extent, there is no substantive dichotomy between the decision in the <u>Invest Bank</u> case and the opinion expressed by me in my Original Declaration and herein and the reasons for that opinion.

42.  As to the example referred to at paragraph 61 of the Levy Declaration, this offers nothing beyond the fact pattern that arose in the <u>Invest Bank</u> case: a transaction whereby an insolvent company caused or procured its subsidiary company to transfer assets in which that subsidiary had a proprietary interest to a creditor of the insolvent parent company, in diminution or discharge of a debt owed by the parent company to that creditor. As was recognised in the <u>Invest Bank</u> case, such a transaction would have the effect of reducing the value of the assets of the parent company, which assets would otherwise have been available for distribution amongst the general body of

---

[55] See paragraph 39 above.
[56] <u>Invest Bank</u>, *supra*, at paragraph [35].

the unsecured creditors of the insolvent parent company in the form of the value of the debtor company's shares in its subsidiary.[57] By contrast, the assets in dispute in the present case were never available to 3AC's creditors and were not owned by an affiliated party.[58]

### b.    Australian Decisions

43.    Nor do the other authorities from Australia invoked by Mr Levy cause any change to my analysis as contained in my Original Declaration. At paragraph 67 of the Levy Declaration, reference is made to the Australian decision in G & M Aldridge Pty Ltd v Walsh.[59] This case is cited in support of the argument that in any circumstances in which a creditor has been put in a better position than other creditors by reason of a transaction, that is a circumvention of the *pari passu* principle and (other things being equal) constitutes a preference regardless of whether the transaction involves an asset belonging to the relevant insolvent company.

44.    I have dealt above with an explanation of the *pari passu* principle, why the description of that principle by Mr Levy is not accurate or may be regarded as incomplete and why for there to be an unfair preference of a creditor the transaction sought to be impeached must be one that benefited the creditor at the expense of other creditors and involve a depletion of the assets of the company in question.[60]

45.    Specifically, as regards the decision in the case G & M Aldridge, in my opinion this decision is not authority for the principle for which it is cited by Mr Levy and therefore does not affect the views I expressed in my Original Declaration.[61] I make the following observations:

---

[57] At paragraph [60] of the judgment in the Invest Bank case the following was said: that the argument advanced to the effect that a transfer of property owned by a debtor was required for the purposes of s.423 of the Insolvency Act 1986 was "*diluted*" by an acceptance on the part of the claimants that, "*...the release of debt owed to the debtor or the surrender of an interest in property, whether gratuitously or at an undervalue, fell with section 423(1), even though it involved no transfer of property. In the light of the terms of section 423(1) and (3), this concession was in our view unavoidable. The appellants' case must instead be that it is an essential element of any transaction falling within section 423 that it directly involves property owned by the debtor, and not as here property owned by a company which is in turn owned by the debtor*". However, the examples referred to do not in fact take the analysis any further. The transactions referred to are not transfers of property owned by the debtor, but they are plainly transactions that involve assets that are owned by and/or in which the debtor has an interest.

[58] Furthermore, in such a situation, depending on the circumstances (e.g., the size and nature of the insolvent company's shareholding in the subsidiary) the liquidators of the parent company might well be able to take control of the subsidiary and (through legal action for example) recover the assets of the subsidiary for distribution to its creditors and/or its shareholder, namely the insolvent parent company.

[59] [2002] BPIR 482, and which is discussed at paragraph 13-85 of "Goode" *op cit* (see footnote 33 of my Original Declaration.

[60] See paragraphs 28-35 above and paragraph 27 of my Original Declaration.

[61] Which were, in any event, expressed in the context of the Australian jurisprudence.

21

a.  The case is concerned with the interpretation s.122 of the Bankruptcy Act (Australia) and s.451 of the Companies Code (for the State of Victoria). As will be seen upon a comparison between s.122 of the Bankruptcy Act (Australia) and s.451 of the Companies Code (for the State of Victoria) and s.245 of the Insolvency Act, these statutory provisions are in very different terms to the relevant parts the BVI statutory provisions dealing with unfair preferences;[62]

b.  Before the Court of Appeal of the Supreme Court of Victoria there were two issues for determination in the G & M Aldridge case: (i) whether the payments made by the company that held monies on behalf of the insolvent company and from which the relevant payments were (for the purposes of the relevant statutory anti-preference provisions)[63] made by the insolvent company; and (ii) whether the relevant payments had the effect of preferring the recipients who were unsecured creditors of the insolvent company over the other unsecured creditors of the insolvent company.

c.  The Court of Appeal decided that the relevant payments were made for and on behalf of the insolvent company from monies held by a third-party for and on behalf of the insolvent company and that the relevant payments amounted to payments made by the insolvent company on behalf of the insolvent company. This determination was not the subject of any appeal to the High Court of Australia;[64]

d.  Therefore, the issue for determination before the High Court was whether the relevant payments had preferred the recipients of the payments (in their capacity as unsecured creditors of the insolvent company) over other unsecured creditors of the insolvent company;[65]

e.  It was accepted that the monies held on behalf of the insolvent company were subject to a valid fixed charge (an apparently valid floating charge having crystallised).[66] However, as

---

[62] It should also be noted that the provisions under discussion in the G & M Aldridge decision are no longer the relevant statutory anti-preference provisions applicable under Australian law.

[63] Namely, as noted above, s.122 of the Bankruptcy Act Corporations Act (Australia) and s.451 of the Companies Code (for the State of Victoria).

[64] See G & M Aldridge at paragraphs [11]-[15].

[65] Ibid.

[66] However, on a proper analysis of the position there must be significant doubt as to whether there was (as a matter of fact and law) a valid fixed charge security interest in the G&M Aldridge decision. See Re Spectrum Plus Ltd (in Liquidation) [2005] 2

22

determined by the Court, those of the company's unsecured creditors had received the relevant payments because of the decision by the bank not to enforce its security with the result that the insolvent company was able to and free to make the payments it did to certain of its unsecured creditors but not to others; and

f.   In reality therefore, the payments were made from assets that were in effect assets of the insolvent company, or at least constituted payments made from assets which, on the facts of the case, were and would otherwise have been available for distribution to all of the unsecured creditors *pari passu* in the insolvent liquidation of the relevant company.

46.   It should also be noted that (save as mentioned in the following paragraph) the decision in G & M Aldridge does not appear to have been cited or followed as authority for the proposition for which it is referred to and relied upon by Mr Levy. Indeed, it appears to be the position under Australian law that for the relevant insolvency transaction to constitute an unfair preference, the relevant transaction must involve a depletion in the assets of the insolvent company before there can be a recovery by a liquidator on the grounds that there has been an unfair preference.[67] That is, of course, my view of the relevant law as it applies in the BVI.

47.   At footnote 30 of the Levy Declaration reference is made to the decision of the Federal Court of Australia in Re Emanuel (No 14) Pty Ltd.[68] However, in my opinion, this decision similarly is not supportive of the views expressed by Mr Levy. As was found on the facts of that case (in simple terms), when an insolvent company (A) owes money to one of its creditors (C), and A directs a

---

AC 680, a decision of the House of Lords in England; and see: S Atherton and R Mokal, "Charges over chattels: issues in the fixed/floating jurisprudence" (2005) 26 "Company Lawyer" 10 (referred to with approval in Re Spectrum Plus Ltd (in Liquidation).

[67] See (for example): Cant v Mad Brothers Earthmoving Pty Ltd (in liq) [2020] VSCA 198; Re Western Port Holdings Pty Ltd (receivers and managers appointed) (in liq) [2021] NSWSC 232; BounceLED Pty Ltd v Clear Skies Corp Pty Ltd (in liq) [2023] NSWSC 121; Re Pacific Plumbing Group Pty Limited (in liquidation) [2024] NSWSC 525; and Re Corio Bay Dairy Group Pty Ltd (in liq) [2025] VSC 466. And as noted above and in my Original Declaration, see the discussion at paragraph 13-85 of "Goode" *op cit* (see footnote 33 of my Original Declaration). In Robt Jones Holdings Ltd v McCullagh [2019] NZSC 86, the Supreme Court of New Zealand discussed the relevant Australian authorities (pre-2019) including the decision in G & M Aldridge, *supra*. However, the Supreme Court ultimately concluded that there was no consensus in the Australian decisions (as at the date of the judgment in the Robt Jones) case as to whether a diminution in the company's assets was necessary before a transaction can be set aside as an unfair preference. The decision in the Robt Jones case was considered in Cant v Mad Brothers Earthmoving Pty Ltd (in liq) but not followed. The Court of Appeal for the Supreme Court of Victoria concluded that the decision of the Supreme Court of New Zealand was concerned with a statutory regime that was relevantly different to that applicable in Australia. Moreover, it seems clear that the decision in the Robt Jones case was premised upon a policy change New Zealand in relation to this area of insolvency law which was sought to be given effect to by the promulgation in New Zealand of s.292 of the Companies Act 1993.

[68] (1997) 15 ACLC 1099.

23

third-party (B) which owes money to A, to pay C the money that would otherwise be received by A from B (and C accepts the payment from B in discharge of A's indebtedness), then this can constitute a transaction whereby the insolvent company made a payment using its assets (i.e., monies that would otherwise have been received by A from B) and that such a transaction can constitute an unfair preference of C by A (the insolvent company). As such the money paid to C by B was recoverable by the liquidator of A.[69] In my opinion, assuming all the necessary elements are present, there can be no argument that such a transaction or arrangement can potentially constitute an unfair preference and be set aside. That said, such a fact pattern bears no similarity to the facts in the present case (as I have been given to understand them) and as such is of no relevance to this case.[70]

   *iii.    Contractual "Entitlements" as Assets of 3AC*

48.   Finally, at paragraphs 72-74 of the Levy Declaration, Mr Levy appears to raise a new argument i.e., not one that is reflected in the POC (at least as a claim under s.245 of the Insolvency Act). The new argument (so it seems) is intended to provide a platform to advance his thesis that for a transaction to constitute an unfair preference it need not involve a depletion in the assets owned by the insolvent company in question.

49.   As I understand what is said by Mr Levy, he argues that even though 3AC did not own any Digital Assets, the relevant purported transactions served to reduce the value of 3AC's contractual entitlement to request delivery of Digital Assets from FTX to the benefit of FTX as a creditor of 3AC, and that therefore FTX was in receipt of an unfair preference. This new argument does not, in my view, assist the Joint Liquidators.

50.   First, and assuming the existence of such a contractual entitlement for present purposes, Mr Levy's analysis does appear to assume or contend that the entitlement referred to is, or confers,

---

[69] See: "McPherson & Keay's Law of Company Liquidation" (5th Ed, 2021), at paragraph 11-064. As was noted in Re Emanuel, *supra*, what the creditor received from the insolvent company was the actual benefit of a valuable chose in action that was owned by / was an asset of the insolvent company.

[70] At footnote 33 of the Levy Declaration reference is made to the judgment in Re Hood [2021] 2 WLR 313. That case is not an authority for the proposition advanced by Mr Levy. In any event, the case was concerned with a situation in which a third-party, at the request of the debtor, had made a payment to one of the debtor's creditors to discharge a debt that formed the basis for the presentation of a bankruptcy petition against the debtor and where the debtor had agreed to reimburse / repay the third-party in respect of the amount the third-party had paid to the petitioning creditor. The judge in that case merely passed comment that in such circumstances there might be a case for saying that the payment made to the petitioning creditor constituted an unfair preference under the Insolvency Act 1986.

some form of proprietary right in Digital Assets on the Exchange in favour of 3AC. As previously stated, and by reference to the Declarations of Lord Neuberger, 3AC does not have any proprietary interest in any Digital Assets. Mr Levy offers no basis for his assertion that the contractual entitlement referred to or relied upon constitutes or grants a proprietary right to Digital Assets in favour of 3AC.

51. Secondly, I do accept (again assuming the existence of such a contractual entitlement for present purposes) that a claim to enforce a contractual right to request the delivery of Digital Assets (not embodying any proprietary right or claim) may well constitute an asset of 3AC. However, that cause of action or potential asset would seem to be encapsulated in the breach of contract claim for damages as articulated in paragraphs 55-57 of the POC (I do not offer any opinion on the merits of such a claim). The value of such a potential asset (on the assumption referred to above) would remain intact and available for the benefit of the creditors of 3AC (should such a claim prove successful). Any transactions involving Digital Assets are only potentially relevant in the present context (insofar as they are relevant at all) to an assessment of the possible quantum of a claim for damages for any breach of contract on the part of FTX by reason of its refusal or inability to deliver Digital Assets to 3AC upon a request for such delivery by 3AC. As such, it has no relevance to the analysis of whether or not there is a prosecutable claim for an unfair preference under s.245 of the Insolvency Act. Moreover, as stated above, the type of claim for an unfair preference as formulated by Mr Levy in paragraphs 72-74 is not to be found in the POC.

*iv.    The Right of FTX to Liquidate*

52. With respect to the Liquidation (a small fraction of the alleged transactions at issue), at paragraphs 84-87 of the Levy Declaration it is argued that although the Liquidation pursued by FTX was an act of FTX and not of 3AC and comprised transactions to which 3AC was not a party and in which 3AC was not involved, there nevertheless may be scope for the Liquidation to be understood as being part of an extended or composite transaction to which 3AC was a party or in which it was involved. Mr Levy argues that because the Liquidation was undertaken pursuant to the terms contained in the FTX Terms of Service dated 13 May 2022 and the March 2022 Line of Credit Agreement, which agreements were entered into within the Vulnerability Period it follows (so it

is said) that the Liquidation was part of a transaction that constituted an insolvency transaction that was entered into by 3AC.[71]

53.   I do not agree with this analysis. First, the FTX Terms of Service dated 13 May 2022 were no more than a renewal of the user agreement that specified the terms of service for the Exchange on and after 13 May 2022. In other words, if 3AC had not entered into this agreement, it would not have been allowed to continue to participate in or continue to have access to the market which the Exchange provided and which was necessary for 3AC to carry on its business. In my opinion, the entry into the FTX terms of service in May 2022 represented a transaction through which 3AC received commensurate consideration i.e., the ability from that date to continue to have access to and participate in and trade on the Exchange. In addition, it may reasonably be inferred that the Terms of Service were entered into by 3AC in May 2022 in the ordinary course of its business and cannot therefore constitute an unfair preference.[72] Essentially the same arguments can be deployed in relation to 3AC's entry into the March 2022 Line of Credit Agreement.[73]

   C.   FTX Was Not Put into a Better Position as a Creditor

        i.   *FTX Was Not a Creditor of 3AC on the Facts as I Understand Them*

54.   I further disagree with Mr Levy's conclusion that FTX was a creditor of 3AC because,[74] as set forth in my Original Declaration, the 3AC Accounts with the Exchange had a positive Account Balance as at the end of the day on 12 June 2022 (as I have been instructed to assume).[75] As such, FTX was a debtor of 3AC, not a creditor. If FTX was not a creditor of 3AC, then there can be no BVI Preference Claim.

55.   Mr Levy contends that, "*a creditor is a person to whom the debtor owes a payment of money, even if that payment obligation is future, contingent or unliquidated*".[76] I do not understand there to be any dispute that, as a matter of fact, the 3AC Accounts did not have a negative Account Balance as at the end of the day on 12 June 2022, or at any relevant point in time. As I understand it, if one considers the relationship between 3AC and FTX at the Joint Liquidators' chosen point

---

[71] As required by s.245(1) of the Insolvency Act and which is a necessary element of any claim that a transaction constituted an unfair preference.
[72] See s.242(2) of the Insolvency Act.
[73] *Ibid*.
[74] See paragraphs 105-135 of the Levy Declaration.
[75] See paragraph 42 of my Original Declaration.
[76] See paragraph 108 of the Levy Declaration.

of time (the end of the day on 12 June 2022), then FTX would have been a debtor of 3AC in the amount of the Account Balance (subject to potential deductions in respect of fees or applicable transaction costs).

56. I am given to understand that, and as reflected in my Original Declaration, a positive Account Balance meant that the account holder had a right to expect payment from FTX and that therefore the account holder in such a situation would be a creditor of FTX, and FTX would be in the position of a debtor in relation to the relevant account holder.[77] As with the other account holders and participants on the Exchange, this is the position that obtained in relation to 3AC as an account holder and as a participant on the Exchange.

57. I note the recitation by Mr Levy of certain of the contractual provisions contained in the agreements entered into between FTX and 3AC.[78] However, in my opinion, none of the provisions Mr Levy has identified alters the nature of the relationship between FTX and 3AC in terms of being a debtor or creditor as at the end of the day on 12 June 2022. For example:

    a.   Mr Levy highlights the existence of the Spot Margin Program, but the existence of this program did not affect whether 3AC could have demanded payment from FTX on the basis of a positive Account Balance;[79]

    b.   Mr Levy notes that a provision of the FTX Terms of Service allowed 3AC (or other customers) to withdraw Digital Assets, but my understanding is that a customer's ability to withdraw assets from the Exchange was limited by reference to the state of the Account Balance;[80]

    c.   Mr Levy argues that a provision of the FTX Terms of Service (clause 10.3.1) authorising the sale of Digital Assets if there was a "*debit balance*" must refer to a negative USD Balance, and not the Account Balance (overall), because otherwise it would be "*entirely meaningless*" because it would be "*impossible to recover the outstanding 'debit balance' from the assets in the Account*".[81] I do not agree insofar as a negative Account Balance (overall) could still

---

[77] See paragraph 43 of my Original Declaration.
[78] See paragraphs 114-134 of the Levy Declaration.
[79] See paragraph 113 of the Levy Declaration.
[80] See paragraph 118 of the Levy Declaration.
[81] See paragraph 120 of the Levy Declaration.

include positive positions in assets for which there would potentially be a reason to liquidate (e.g., to exit a risky, deteriorating position for a more stable one). This argument also speaks to only one consequence of what was a package of rights that FTX benefited from in the event that 3AC had an overall negative Account Balance (e.g., the right to be indemnified or to claim costs incurred from 3AC). I do not see how this provision suggests that something other than the Account Balance determined whether 3AC or FTX was entitled to demand payment form the other;

d.  Mr Levy asserts that the FTX Terms of Service  prevent the FTX Recovery Trust from asserting that 3AC could owe obligations to other parties,[82] but I am aware of no basis for that assertion;

e.  Mr Levy argues that the March 2022 Line of Credit Agreement renders FTX a creditor as to the $120 million Line of Credit, but I understand that this amount was already part of the negative USD Balance that formed part of the Account Balance, such that this amount does not alter which party could demand payment from the other in relation to the 3AC Accounts;[83] and

f.  Mr Levy acknowledges that FTX had a contractual right of set-off via the FTX Terms of Service, which I address below, but suffice to say this provision confirms that creditor status should be assessed by reference to the overall state of the Account Balance.[84]

58.  Given that the Account Balance was positive before the alleged relevant "*transactions*" took place, FTX was 3AC's debtor. As such, my opinion remains that FTX was not a creditor of 3AC under BVI law based upon the facts as I understand them.

ii.  *FTX Was Not Put into a Better Position as a Creditor[85]*

59.  Even if one assumed that FTX was in fact a creditor of 3AC, my view remains that it cannot be said that FTX was put into a better position as such as the result of the transactions alleged to be unfair preferences by the Joint Liquidators.

---

[82] See paragraphs 122-125 of the Levy Declaration.
[83] See paragraph 129 of the Levy Declaration.
[84] See paragraphs 126-127 of the Levy Declaration.
[85] See paragraphs 45-53 of my Original Declaration.

60.   Mr Levy raises what would happen in a "*hypothetical liquidation*" of 3AC as at the end of the day on 12 June 2022 (i.e., had the challenged transactions not taken place on 13 June 2022 and 14 June 2022).[86] The transactions subject to challenge involved 3AC incurring debits to its Digital Asset Balance and credits in an equivalent amount to its (negative) USD Balance.

61.   However, as I sought to explain in my Original Declaration, in the event of a notional liquidation as at the dates of the transactions sought to be challenged, the net effect of a (notional) automatic and self-executing insolvency set-off[87] taking effect as at the date of the notional liquidation would have been the same as that which resulted from the transactions that are the subject of challenge by the Joint Liquidators. That is why I expressed the view that as at the date of such notional liquidation (and assuming FTX to have been a creditor of 3AC as at that date) FTX was not placed in a better position as a result of the transactions sought to be impeached, because the same position would have obtained as a result of and in the context of a notional liquidation as at the same dates. It remains my view that, on an analysis and in the context of a notional liquidation, it can be seen that FTX did not receive a benefit which may be avoided on the basis that it was an unfair preference. The impact of a (notional) automatic statutory set-off under the Insolvency Act that would have to be applied as part of the analysis of what would occur in a notional liquidation would serve to establish that FTX did not received an unfair preference to the detriment of the other unsecured creditors of 3AC; the net effect of the relevant transactions being no more extensive than the net effect of the application of a notional insolvency set-off.[88]

62.   As I sought to explain in my Original Declaration, the application of the proceeds of realisation of the Digital Assets in diminution of the negative USD Balance cannot have been an unfair preference of FTX. This is because:

   a.   The contractual rights of set-off or combination took effect prior to the commencement of the liquidation of 3AC;[89]

   b.   In such circumstances, the concept of insolvency set-off taking automatic effect as at the date of the actual liquidation of 3AC is of no relevance since insolvency set-off only becomes

---

[86] See paragraphs 137-138 of the Levy Declaration.
[87] See s.150 of the Insolvency Act.
[88] See paragraph 48 of my Original Declaration.
[89] I.e., the time at which the Joint Liquidators were appointed, see: s.160 of the Insolvency Act.

operative from the "*relevant time*" i.e., upon the appointment of the Joint Liquidators and has (and had) no part to play until that moment in time;[90] and

c. Therefore, the taking effect of the rights of set-off / right of combination that operated in relation to 3AC's accounts with FTX was valid, and their effects and consequences are binding on the Joint Liquidators.[91]

63. Given that, in my opinion, the rights of set-off / combination that were effected in relation to 3AC's account with FTX were no more extensive or were co-extensive with the terms and effect of mandatory, automatic and self-executing insolvency set-off,[92] FTX was not and cannot be said to have been placed in a better position than it otherwise would have enjoyed in the event of 3AC's (notional) insolvent liquidation at the date of the exercise of those rights set-off / combination. Therefore, FTX cannot be said to have been preferred.[93]

64. Mr Levy expresses the view in relation to insolvency set-off that, insofar as insolvency set-off under the law of the BVI may be relevant as between FTX and 3AC, such set-off could not operate as a necessary element is lacking in the present case for insolvency set-off to apply namely the need for mutuality.[94] The concept of mutuality is as described at paragraph 146 of the Levy Declaration.[95] Mr Levy's premise for the argument that the necessary mutuality is lacking appears to be by treating the negative USD Balance as a "*monetary claim*", but the positive Digital Asset Balance as a "*proprietary entitlement*".

65. In my opinion, the necessary facets of insolvency set-off under s.150 of the Insolvency Act, insofar as relevant, are present. The premise for Mr Levy's argument does not exist if, as I have been instructed to assume and as informed by Lord Neuberger's analysis, 3AC did not have a proprietary right in the assets held by the Exchange, including those reflected in the Digital Asset

---

[90] *Ibid* and s.149 of the Insolvency Act. In any event, as noted in my original Declaration and below, the exercise by FTX of its contractual rights of set-off went no further than the automatic set-off which would have come into operation upon the appointment of the Joint Liquidators and which would have resulted in the netting off of the positive Digital Asset Balance and the negative USD Balance to the same extent.

[91] See: "Goode on Principles of Corporate Insolvency Law" (5th Ed, 2018), at paragraph 9-13; and "Goode and Gullifer on Legal Problems of Credit and Security" (7th Ed, 2022), at paragraph 7-99.

[92] As provided for by s.150 of the Insolvency Act.

[93] See paragraphs 45-53 of my Original Declaration. And see "Goode", *op cit*, at paragraph 13-74 and the attendant foot note 206.

[94] See paragraphs 146-148 of the Levy Declaration.

[95] See also "Goode", *op cit*, at paragraph 9-02.

30

Balance. In other words, although 3AC might have been able to seek payment from FTX (under the relevant contracts between FTX and 3AC) of an amount equal to the value of the assets reflected in its Digital Asset Balance, 3AC could not validly have asserted a proprietary claim to any specific Digital Assets. The Digital Asset Balance and the USD Balance each represent money claims or claims that legitimately have been reduced to money and therefore mutuality exists as between those claims.

66.   It may assist if I were to add that I have been asked to assume that the prices of BTC and ETH (which I understand to be among the assets credited to the 3AC Accounts as at the end of the day on 12 June 2022) continued to decline from 12 June 2022 through 27 June 2022, the date of the application for the appointment of the Joint Liquidators. If that is correct, in the absence of what are said to be the relevant transactions 3AC would ultimately have incurred significant losses resulting in a reduced Digital Asset Balance and resulting in a reduced Account Balance. Such a state of affairs was avoided by virtue of the relevant transactions. Such circumstances, in my view, provide an obvious and plausible reason as to why the relevant transactions were entered into by 3AC and how they can be seen to have inured to its benefit rather than to the benefit of FTX.

   D.   The Transactions Did Not Result in an "Avoidance of Losses" for FTX

67.   Paragraphs 156-160 of the Levy Declaration assert that FTX benefitted from the dealings that occurred on 13 and 14 June 2022 on the basis that FTX is said to have been obligated to make good losses suffered by other participants on the Exchange as a consequence of and to the extent that 3AC was unable to discharge its alleged liabilities to those other participants.[96] At paragraph 158 of the Levy Declaration it is stated that: "*If FTX (or affiliated entities) would have absorbed the losses that would otherwise have been borne by other Exchange customers as a result of the non-payment of 3AC's negative USD balance, as I understand FTX's CEO testified, then FTX benefitted from the transactions, to the extent of the losses it avoided incurring.*"[97] On this basis, as I understand it, it is alleged that other market participants, as creditors of 3AC, were the recipients of unfair preferences[98] and insofar as FTX received a benefit from the granting of those

---

[96] See paragraph 52 of the POC.
[97] See paragraph 158 of the Levy Declaration.
[98] Under s.245 of the Insolvency Act.

unfair preferences FTX (even though not a creditor of 3AC) could be made subject to an order by the BVI Court to account to the Joint Liquidators for the benefit it allegedly received.[99]

68.   I do not agree with this analysis:

a.   The factual and legal premise upon which Mr Levy's analysis is based is, I am given to understand, not correct in that FTX was not legally obligated to make good losses suffered by participants on the Exchange as a result of 3AC being unable to discharge its alleged liabilities to other participants on the Exchange. In this regard, I note that the analysis is premised on the assumption that "*If*" FTX had absorbed the losses of other customers of the exchange. In any event, no benefit, in that sense, can therefore have been received by FTX;

b.   Furthermore, in this regard Mr Levy points to no facts suggesting that FTX was legally obligated to make good losses suffered by other participants on the Exchange as a result of 3AC being unable to discharge any alleged liabilities to them. I understand this to be disputed by the parties;

c.   As part of his case theory, Mr Levy also relies on an assertion that there would be a stay imposed by BVI law in the event of a hypothetical liquidation,[100] but such a (hypothetical) stay only applies in relation to any action or steps to enforce rights over assets of the relevant company.[101] Any such stay would not therefore affect assets or property that were not assets or was not property of 3AC;

d.   It is asserted by Mr Levy (but does not form part of any claim as contained in the POC) that insofar as FTX voluntarily (without being under any obligation) decided to discharge 3AC's liabilities to other participants on the Exchange in order to maintain its reputation or avoid reputational damage, it received a benefit for which it may be made to account to the insolvent estate of 3AC. In my opinion, if such a scenario had transpired and assuming that any payments made by FTX were accepted by the other participants on the Exchange (without more) as discharging or reducing 3AC's liabilities to them, the important point to

---

[99] Pursuant to s.249 of the Insolvency Act.
[100] See paragraph 158 of the Levy Declaration.
[101] And I assume that Mr Levy is referring to the stay that would come into effect (albeit hypothetically) is that provided for by s.175(1)(c) of the Insolvency Act.

note is that the principal beneficiary would be 3AC by reason of the reduction in the number and value of the claims against its estate;[102]

e.  As determined by the Courts in England, a Court would only exercise its discretion in granting relief against a third party under the equivalent of s.249 of the Insolvency Act if such an order were required as part of the process of restoring the position of the company to what it would otherwise have been and the relevant third-party was in possession of assets applied in making the unfair preference or, had otherwise personally benefited in monetary terms from the unfair preference in some direct and tangible way.[103]

f.  Furthermore, and as recently illustrated, the Court has a wide discretion in this area and may, in appropriate cases and in the exercise of its discretion refuse to grant relief where to do so might be considered to be unjust and inequitable and not consistent with or not reflective of the power of the Court to grant restorative relief.[104]

69.  Even assuming that the Joint Liquidators were successful in establishing that FTX, as a third-party, had received a benefit from alleged transactions such as those referred to above involving other participants on the Exchange, it would not automatically follow that there was a proper basis upon which a BVI Court might grant relief as against FTX given that FTX would have given value for any alleged benefit allegedly received. This is not least because FTX would arguably be entitled to rely upon the rebuttable presumption that any alleged benefit that it may have received would have been received by it in good faith.  Only if that presumption was rebutted (by the Joint Liquidators) on the facts, would the Court be able to exercise its discretion to grant relief under s.249 of the Insolvency Act.[105] The presumption will be rebutted if (insofar as material to the present case) the Joint Liquidators can show that at the time of the relevant transaction FTX had

---

[102] As for the argument relating to whether FTX may have benefited from such payments by being able to maintain its reputation or by avoiding a loss of reputation, there is no authority for the proposition that such a benefit may form the basis for relief whereby a contribution ought to be made by the party who is said to have received such a benefit to the insolvent estate. Even assuming that the receipt of such a benefit is one to which s.249 of the Insolvency Act might respond, in my opinion, the granting of relief by a BVI Court against a person that receives such a benefit must be unlikely. In particular, by reference to s.249(2)(d) of the Insolvency Act, to which specific reference is made in foot note 71 of the Levy Declaration, I ask rhetorically - how might it be said that such a benefit could have been received "*from the company*". I should add that I was the trial counsel for the liquidators in the case of Byers v Chen referred in the Levy Declaration.  For completeness, I would also refer to the recent decision of the BVI Court of Appeal in Byers v Chen [2025] ECSC J0620-3 (20 June 2025).
[103] See: Re Oxford Pharmaceuticals Ltd [2009] 2 BCLC 485 and cited with approval by the BVI Court of Appeal in Byers v Chen BVIHCVAP 2015/2011 (12 June 2018).
[104] See: Credit Suisse Virtuoso SICAV-SIF v SoftBank Group Corp, *supra*.
[105] See s.250 of the Insolvency Act.

33

notice that the transaction was an unfair preference (or a transaction at an undervalue as the case may be). On the information available to me and based upon the allegations contained in the POC, there is nothing to suggest that FTX had notice that 3AC had entered into transactions that constituted unfair preferences (or an undervalue transaction as appropriate).

E. FTX Has an Ordinary Course of Business Defence

70.   Mr Levy and I disagree as to the approach a BVI Court would take in considering any defence raised by the FTX Recovery Trust that the transactions which the Joint Liquidators seek to impeach were entered into by 3AC in the ordinary course of 3AC's business. Mr Levy takes issue with my analysis on the grounds that 3AC's financial position as at the end of the day on 12 June 2022 meant that the, "*relevant transactions were a response to abnormal financial difficulties.*"[106] In my opinion, the law of the BVI does not wholly foreclose the ability of a party to rely on such a defence or that such a defence might not succeed in circumstances where transactions are being entered into at a time when a company faces abnormal financial difficulties. Where the transactions under challenge involve attempts by a company in financial difficulties to prevent or mitigate trading losses or insolvency, with a view to the survival of the company and its business, this might very well be viewed as a paradigm example of the type of circumstances in which such a defence can properly be deployed and would have a role to play.

71.   As made clear in my Original Declaration, and as noted in the opinion of the Privy Council in the Countrywide Banking case,[107] whether or not a transaction is considered to be in the ordinary course of a company's business requires examination of the actual transaction in its factual setting with the relevant circumstances having to be assessed in each individual case. The fact that a transaction may be regarded as exceptional or unprecedented in the circumstances does not preclude that transaction having been entered into in the ordinary course of that company's business.[108]

72.   For example, where a company trades in particular assets as part of its usual business, then in circumstances where those assets are rapidly declining in value, an attempt to jettison positions in those assets in order to minimise losses could well be considered to be transactions undertaken

---

[106] See paragraph 175 of the Levy Declaration.
[107] [1998] AC 338.
[108] See Koza Ltd v Akcil [2020] 1 All ER (Comm) 301.

34

in the ordinary course of that company's business even though the market conditions faced by the company are exceptional or unprecedented. Exceptional or unprecedented market conditions (without more) cannot, in my opinion, eliminate the applicability of the defence and its potential to be relied upon successfully.

73.    In adopting the position that he does, Mr Levy relies on the argument that the ordinary course of business defence is unavailable because the alleged transactions on 13 June 2022 and 14 June 2022 involved larger volumes and trade sizes, and occurred more quickly than previous transactions involving 3AC on the Exchange.[109] I have not reviewed or assessed what are said to be the relevant facts. I can observe, however, that while size and timing of transactions may be relevant considerations, so would the size and sophistication of 3AC and what might be considered within the industry to be reasonable and appropriate responses on the part of a company confronted with market conditions such as those faced by 3AC and a trading portfolio of the type of assets possessed by 3AC.

## IV.    NON-PREFERENCE BVI CLAIMS

74.    My conclusions remain the same as to the other, non-preference BVI Claims asserted in the POC and addressed in the Levy Declaration, namely that the Joint Liquidators could not make out any of these claims.

### A.    BVI Undervalue Transaction Claim

75.    I see no basis for changing my conclusion that the Joint Liquidators have not articulated a viable BVI Undervalue Transaction Claim.

#### i.    Existence of an Undervalue Transaction

76.    As in the case of unfair preferences, it is important to identify the mischief towards which statutory provisions such as those contained in s.246 of the Insolvency Act are directed.

77.    Whereas, the statutory ability of a liquidator to challenge transactions that constitute unfair preferences is aimed at preventing the circumvention of the *pari passu* principle, statutory provisions such as s.246 of the Insolvency Act are directed at impeaching transactions entered into prior to the liquidation and which have the effect of removing an asset of the company that

---

[109] See paragraphs 176-177 of the Levy Declaration.

would otherwise have been available for distribution to creditors, or transactions that serve to diminish the net asset value of a company. Provisions such as s.246 of the Insolvency Act may be considered to be conceptually more closely linked with avoiding contravention of the anti-deprivation rule.[110]

78.    As such, this further indicates that the ability of a liquidators to set aside an undervalue transaction is concerned with whether assets in which a company has an interest have been removed or depleted and with the recovery of such assets or the restoration of the value of those assets to the company for the benefit of its creditors. It may further be observed that ordinarily a transaction that constitutes an unfair preference cannot also constitute an undervalue transaction. This may be illustrated by a simple example: where an insolvent company has used its money to pay a creditor in discharge of the debt owed to that creditor (in circumstances that, other things being equal, constitutes that payment as an unfair preference), that transaction cannot also be an undervalue transaction. This is because the company's debt has been discharged and the company has accordingly received full value for the payment made by it to its creditor. Undervalue transactions are concerned with circumstances in which an asset of a company has been the subject of a transaction where the company has received value that in money terms is significantly less than the value of the asset the subject of the transaction.

79.    I agree with Mr Levy that the BVI Undervalue Claim could only succeed if a transaction is identified for which 3AC received "*no consideration*" or "*consideration which is significantly less in value than the consideration provided by 3AC.*"[111] Having reviewed the Levy Declaration, I still do not see any basis for the Joint Liquidators' assertion that such a transaction occurred here:

   a.    Mr Levy articulates the transactions alleged to occur at an undervalue as involving "*52,000 alleged trades on 13 and 14 June 2022, in which digital assets associated with 3AC's accounts on the FTX Exchange were sold and the proceeds of such sales applied to reduce in absolute value terms 3AC's negative USD balance.*"[112] If 3AC received credits of an

---

[110] See "Goode", *op cit* at paragraph 13-03; and see: Belmont Park Investments Pty Ltd v BNY Corporate Trustee Services Ltd, *supra*.
[111] See paragraph 184 of the Levy Declaration. See also the recent judgment in Credit Suisse Virtuoso SICAV SIF v Softbank Group Corp., *supra*.
[112] See paragraph 181 of the Levy Declaration.

36

equivalent value to the debits provided in such transactions, I do not see how they may be argued to have resulted in no or significantly less consideration being received by 3AC than was given by 3AC. This is particularly true for transactions that occurred at a fair market price; and

b.   To the extent that the basis for the undervalue transaction claim is that the proceeds of the sale of assets alleged to be owned by 3AC were applied to the repayment of fictitious or overstated alleged liabilities said to be owed by 3AC to FTX, I do not opine on the veracity of that factual premise (though it is inconsistent with what I have been asked to assume). However, as reflected in my Original Declaration,[113] insofar as the alleged undervalue transaction(s) involved or resulted in the *pro tanto* reduction in an alleged liability owed by 3AC to FTX, or owed by 3AC to one or more other users of the Exchange then (in my opinion) there cannot have been a transaction at an undervalue since 3AC would have received full value (by reason of the *pro tanto* diminution – or by reason of the discharge – of that alleged liability) as a consequence of the transaction.

80.   Furthermore, just as in relation to the BVI Preference Claims, my opinion remains that the Joint Liquidators cannot assert a BVI Undervalue Transaction Claim without identifying a transaction that involved or diminished the assets in which 3AC had a proprietary interest. I make reference to my discussion in the context of the BVI Preference Claims at Section III.B of this Rebuttal Declaration, and highlight the differences in the undervalue context below.

*ii.    Undervalue Transactions – statutory defence*

81.   As stated in my Original Declaration, on the information available to me and based upon the allegations contained in the POC, there is nothing to suggest that 3AC did anything other than deal with FTX in the belief (on reasonable grounds) that it would benefit from those dealings.

82.   To be clear, in making this statement I was not suggesting that the burden of proving the defence is not with FTX, nor was I suggesting that such a statement is sufficient to establish the statutory defence. Furthermore, in my opinion and on any fair reading of what I said, I cannot be taken to have intended anything of that sort.

---

[113] See paragraph 61 of my Original Declaration, and consequential upon the vagueness of the allegations contained in the POC.

37

83. I would, however, add the following facts as I understand (and have been asked to assume) them to what I said in my Original Declaration:

   a. 3AC initiated the vast majority of the challenged transactions (save those comprising the Liquidation);

   b. 3AC exited positions that were deteriorating in an attempt to establish more favourable positions in a more stable asset (i.e., USD);

   c. Had the relevant transactions not occurred, then the Account Balance for the 3AC Accounts would have deteriorated and been lower at the time of the initiation of 3AC's insolvency proceedings than it actually was in reality;

   d. Each of the challenged transactions involved the exchange of credits and debits of equivalent amounts / value;

   e. The challenged transactions occurred at a fair market price;

   f. There is nothing to support any of the suppositions made by Mr Levy, as I understand the nature of the allegations contained in the POC, that 3AC knew that any alleged liabilities were fictitious or were overstated (or that any alleged liabilities were in fact fictitious or overstated); and

   g. The circumvention of the objectives of the law of insolvency as referred to in paragraphs 189 of the Levy Declaration is not consistent with or indeed may be said to expose the flaw in any suggestion that s.246 of the Insolvency Act is not concerned with depriving its creditors of the benefit of assets owned by 3AC or in which it had an interest.

   B. BVI Turnover Claim

84. As stated in my Original Declaration, the fundamental point is that the basis for any claim of this nature is that the Joint Liquidators must establish that 3AC has a proprietary right to or interest in the relevant assets which they are seeking to recover. As stated in my Original Declaration, and for the reasons there stated, this they cannot do. [114]

---

[114] See paragraphs 80-81 of my Original Declaration, and paragraph 2025 of the Levy Declaration.

85.    I do not take Mr Levy to disagree with this analysis insofar as he suggests that to succeed in a turnover claim to recover the relevant assets from FTX it would have to be resolved in favour of the Joint Liquidators that 3AC had a proprietary interest in the relevant assets, that those assets were still identifiable (in their original form or in some other form), remain in the possession of FTX, and are capable of being restored to 3AC.[115] However, as stated in my Original Declaration and for the reasons there stated, I understand that the Joint Liquidators will not be able to establish any of the foregoing.[116]

86.    Mr Levy does appear to recognise that in England, recourse to the equivalent provision in the Insolvency Act 1986 is not appropriate for determining complex issues as to entitlements to property.[117] We agree on this much. Moreover, and as I sought to make clear in my Original Declaration, the present case is such a complex case.

C.    BVI Proprietary Restitutionary Claim

87.    It would seem, although it is not entirely clear, that the Joint Liquidators have abandoned this claim and are relying on an assertion that the relevant Digital Assets were held on trust by FTX for the benefit of 3AC (and are therefore relying upon an alleged beneficial interest in the relevant assets persisting in favour of 3AC, rather than relying upon a cause of action that is inconsistent with a persisting beneficial interest in favour of 3AC) to enforce a subsisting legal title in the relevant assets.[118]

88.    Nothing in the Levy Declaration[119] has caused me to alter my conclusion, as expressed in my Original Declaration, or the reasons for that conclusion:[120]

a.    As I stated in my Original Declaration, my understanding is that: (i) the Joint Liquidators cannot establish that 3AC had any proprietary interest in the relevant assets as credited to 3AC's Account Balance as of the end of 12 June 2022 (or anytime thereafter); and (ii) there

---

[115] See paragraph 198 of the Levy Declaration.
[116] See paragraphs 80-81 of my Original Declaration.
[117] See paragraph 196 of the Levy Declaration.
[118] See paragraph 205 of the Levy Declaration.
[119] See paragraphs 200-210 of the Levy Declaration.
[120] See paragraphs 84-92 of my Original Declaration.

is no ability to follow or trace any of the relevant assets that do form or did form part of the 3AC Account Balance as of 12 June 2022 (or anytime thereafter);[121]

b.  I further understand the relevant assets were deposited on the Exchange and into 3AC's accounts by 3AC on the terms that were freely entered into as between 3AC and FTX. It cannot legitimately be alleged that the deposit of the relevant assets by 3AC on the terms agreed by 3AC and FTX and the standard operation of the Exchange in relation to the relevant assets that were deposited with the Exchange and that occurred in accordance with those terms was in any way unconscionable or unjustified.[122]

89.  I would add:

a.  The asserted premise for the BVI Proprietary Restitutionary Claim would appear to be the overstatement of alleged liabilities owed by 3AC and a consequent overpayment to FTX. As noted above, the FTX Recovery Trust takes the position that the amount of the negative USD Balance as at the end of 12 June 2022 was not overstated (and, indeed, that it was not a separate liability but rather one component part of the Account Balance); and

b.  As regards the matter raised in paragraph 207 of the Levy Declaration, I have sought to deal with this above. As stated above, the Joint Liquidators may seek to assert a claim for breach of contract, the quantification of the damages in respect of which may be based upon the value of the assets which FTX is alleged in breach of contract to have failed to deliver. But any such claim is not a claim based upon a continuing proprietary interest of whatever nature in the assets said to be relevant to such a claim.

90.  Mr Levy notes that he is, "*not aware of any decision of the BVI courts which considers such a proprietary restitutionary claim*"[123] Nor am I. Put simply, in my opinion, the Joint Liquidators have not articulated a viable proprietary restitutionary claim and any such claim would fail before the BVI Courts.[124]

---

[121] See paragraphs 13(q)-13(r) of my Original Declaration.
[122] See paragraph 206 of the Levy Declaration.
[123] See paragraph 204 of the Levy Declaration.
[124] See paragraph 88 of my Original Declaration.

D. _BVI Unjust Enrichment Claim_

91.    There is nothing contained in the Levy Declaration[125] which causes me to change the view I expressed in my Original Declaration that there is no basis for a claim against the FTX Recovery Trust founded upon the principle of unjust enrichment.

92.    Further, it seems that this claim is also based upon an alleged overstatement of alleged liabilities owed by 3AC to FTX and an alleged consequent over-payment of what are said to be relevant liabilities owed by 3AC to FTX and/or an alleged failure by FTX to give full credit for the value of the relevant assets in respect of any payment of alleged liabilities owed by 3AC. I understand that these alleged factual premises are not accepted by the FTX Recovery Trust. As already noted above, the FTX Recovery Trust takes the position that the amount of the negative USD Balance as at the end of 12 June 2022 was not overstated (and that the USD Balance was not a separate liability from the Account Balance, which was positive), and that the transactions that occurred on 13 June and 14 June 2022 were conducted at full market value.

93.    In any event, as stated in my Original Declaration, the general rule is that a remedy in unjust enrichment is not available where there exists a relevant contract as between the relevant parties which determines the rights and obligations of the parties to that contract and that contract has not been terminated.[126] Save in respect of the disputed factual premises addressed in the paragraph above (all of which the Joint Liquidators would have the burden of proving), Mr Levy has not otherwise explained why the circumstances of the present case are such as to cause the general rule to not be applicable.

94.    Finally, I maintain my position that a defence of change of position may be available to FTX on the basis that it has not retained the relevant assets the receipt of which it is said caused its alleged enrichment. I went no further than that, nor could I since the availability of such a defence is heavily dependent upon the facts - in particular the manner in which and the reasons for which there may be said to have been a change in the position of the party said to have been enriched unjustly.[127]

---

[125] See paragraphs 211-218 of the Levy Declaration.
[126] See paragraph 96 of my Original Declaration.
[127] See paragraph 97 of my Original Declaration.

41

E.  BVI Conversion Claim

95.   As the common law of the BVI (and England and Wales) presently stands, the BVI Conversion
Claim (as rehearsed in the POC) is not available to the Joint Liquidators since the assets alleged
to be the subject of this claim constitute intangible property and the tort of conversion does not
permit claims or remedies in relation to such assets. As I read the relevant parts of the Levy
Declaration, he acknowledges that this represents the current state of the law in the BVI.[128] He
further states that he is, "*not aware of any decision of the BVI courts which considers the
application of the tort of conversion to digital assets (or to intangible property more
generally)*."[129] Neither am I.

96.   In my Original Declaration, I further observed (among other things) that no viable BVI
Conversion Claim appeared to have been advanced in the POC because FTX took possession of
the relevant assets upon a voluntary and consensual delivery and because 3AC had no proprietary
interest in the relevant assets.[130] Mr Levy raises two potential theories for what he refers to as a
"*tort-based claim analogous to conversion*".[131] Mr Levy further states that the relevant remedy
would be damages calculated on the basis that, "*redelivery of* [the relevant assets are] *themselves
no longer appears to be possible*".[132] However, it may be more apt to characterise the claims he
then describes as being additional or alternative claims for alleged breaches of contract.[133] In any
event, the claims rehearsed take matters no further given that they are premised on 3AC having
proprietary rights to the relevant assets, or are based upon the assertion that there was an
overstatement of the alleged liabilities owed by 3AC to FTX and an alleged consequent
overpayment to FTX, or an alleged failure by FTX to give full credit for the value of the relevant
assets in respect of any alleged payment of alleged liabilities owed by 3AC to FTX.[134]

---

[128] See paragraph 220 of the Levy Declaration.
[129] See paragraph 222 of the Levy Declaration.
[130] See paragraph 100 of my Original Declaration.
[131] See paragraph 223 of the Levy Declaration.
[132] See paragraph 224 of the Levy Declaration.
[133] See paragraph 223 of the Levy Declaration.  At paragraph 223.b. of the Levy Declaration, the claim is described in the
following terms: "*the Liquidation could in my view be said to amount to a conversion of 3AC's digital assets (or contractual
entitlements to such assets)*". That part of the description of the alleged claim that appears in parenthesis is nothing more than a
re-articulation of the new claim proffered the Levy Declaration on which I have already stated my views above.
[134] See paragraphs 223-225 of the Levy Declaration.

97.  What is more, Mr Levy appears to be doubtful of the efficacy of the cause of action he attempts to articulate, which in my opinion, is telling.

98.  The BVI Conversion Claim (as contained in the POC) is not justiciable under the laws of the BVI. In addition, for my part and in my opinion, the causes of action sought to be advanced in the Levy Declaration and said to be founded upon the tort of conversion have no prospect of success.

## V.    ALTERNATIVE SCENARIO IF FTX IS ASSUMED TO HAVE A SECURITY INTEREST

99.  I understand that the FTX Recovery Trust and the Joint Liquidators dispute whether, in the assumed scenario in which a Court determines that 3AC had a proprietary interest in the relevant assets (and not FTX, as I am instructed to assume), FTX would have had a security interest that precludes the BVI Preference Claim and the other BVI claims.

100.  I understand that the issue of which party has a proprietary interest in the relevant assets is a question that will be addressed by Lord Neuberger, and indeed that he has already addressed this issue, including in submitting evidence considered by this Court.

101.  I also understand that the issue of whether the March 2022 Line of Credit Agreement, which is governed by the laws of Antigua and Barbuda ("*Antigua*") created a security interest in favour of FTX, in the event that the proprietary interest question is assumed to be resolved in 3AC's favour, will be addressed in a rebuttal declaration by Stephen Houseman, KC (the "*Houseman Declaration*"). I am further instructed that the Houseman Declaration has been prepared strictly as an alternative case and without prejudice to the FTX Recovery Trust's positions in this matter.

102.  The Houseman Declaration concludes that in the event that a Court were to find that the Assets were the property of 3AC and not of FTX, that the March 2022 Line of Credit Agreement created: (i) a possessory security interest (i.e., a pledge or lien) over the relevant assets in FTX's favour, which was duly perfected as a consequence of FTX having acquired exclusive control over the relevant assets; and (ii) a non-possessory security interest (by way of a fixed charge security interest, alternatively a floating charge security interest) over those assets.

103.  Whilst I express no view as to Antiguan law, in the event that the Court found that a non-possessory security interest, being a fixed charge or alternatively a floating charge, was created over the assets that are the subject of the BVI Claims, then there is a question as to what (if any)

43

steps would be required to perfect that security under BVI law (which is the relevant law as 3AC is a company incorporated in the BVI).

104. Having considered Section 161, 163 and 166 of the BVI Business Companies Act 2004 (as revised), the effect of these provisions for current purposes is that, provided the charge is valid and binding in accordance with the laws of Antigua, it would be deemed a valid security interest under BVI law.

105. Whilst there is a security registration system in the BVI, registration in the BVI is voluntary and is not required to perfect a security interest or to render it enforceable. As a result, no further steps would be required to perfect the security under the law of the BVI, and whether registration of such security interest has occurred merely goes to the question of priority as between security interests created by the company in question and not the validity or enforceability of any relevant security interest.

44

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge and belief.

Executed in Liverpool on 3 November 2025

_____

Stephen Atherton K.C.

# Exhibit 59

1562

**In re Cheyne Finance plc (No 2) (Ch D)**                    [2008] Bus LR

Chancery Division                                            A

## *In re* Cheyne Finance plc (No 2)

### [2007] EWHC 2402 (Ch)

2007   Oct 17                                            Briggs J

B

*Insolvency — Winding up — Company's debts — Inability to pay debts "as they fall due" — Whether permissible for receivers to have regard to debts falling due in future in determining whether company cash-flow insolvent — Insolvency Act 1986 (c 45), s 123(1)(e)*

Receivers were appointed in respect of C plc by the security trustee pursuant to a security trust deed.  "Insolvency event" was defined in the deed as a determination by any receiver that C plc was, or was about to become, "unable to pay its debts as they [fell] due" to certain senior creditors, as contemplated by section 123(1)(e) of the Insolvency Act 1986[1].  The applicable solvency test therefore was the commercial or cash-flow test, the balance sheet test having apparently been deliberately omitted.  The receivers applied to the court for its assistance as to whether, on assumed facts, C plc was or was about to become unable to pay its debts within the meaning of the insolvency event definition; that depended on whether, and the extent to which, they were permitted to have regard to senior debts falling due in the future.

On the receivers' application—

*Held,* that the effect of the words "as they [fell] due" was to create in the solvency test in section 123(1)(e) of the Insolvency Act 1986 a flexible and fact-sensitive requirement to consider future liabilities; that, therefore, the definition of insolvency event in the security trust deed did permit the receivers to have regard to C plc's ability to pay senior debts falling due in the future; that they could properly make an insolvency event determination when they had come to the conclusion that C plc was more likely than not unable to pay its debts, in other words, if they were satisfied on the balance of probabilities; and that, based on the assumed facts before the court, it was difficult to envisage how the receivers could not make a determination that C plc was already insolvent ( post, paras 24, 56, 67, 70, 74, 77).

*Bank of Australia v Hall* (1907) 4 CLR 1514 considered.

The following cases are referred to in the judgment:

*Bank of Australasia v Hall* (1907) 4 CLR 1514
*Byblos Bank SAL v Al-Khudhairy* [1987] BCLC 232
*Cheyne Finance plc, In re* [2007] EWHC 2116 (Ch); [2008] 1 BCLC 732
*Cuthbertson and Richards Sawmills Pty Ltd v Thomas* (1998) 28 ACSR 310
*European Life Assurance Society, In re* (1869) LR 9 Eq 122
*Hymix Concrete Property Ltd v Garrity* (1977) 13 ALR 321
*Lewis v Doran* (2005) 219 ALR 555
*Sandell v Porter* (1966) 115 CLR 666
*Southern Cross Interiors Pty Ltd v Deputy Comr of Taxation* (2001) 39 ACSR 305
*Taylor v Australia and New Zealand Banking Group Ltd* (1988) 6 ACLC 808

No additional cases were cited in argument or referred to in the skeleton arguments.

C

D

E

F

G

H

[1] Insolvency Act 1986, s 123(1): "A company is deemed unable to pay its debts . . . (e) if it is proved to the satisfaction of the court that the company is unable to pay its debts as they fall due."

1563

[2008] Bus LR                    In re *Cheyne Finance plc* (No 2) (Ch D)
                                                                Briggs J

*A*    **APPLICATION** for directions

The receivers of the business and assets of Cheyne Finance plc, who were appointed on 4 September 2007 pursuant to a security trust deed dated 3 August 2005 made between the company and Bank of New York, applied for directions on the question whether, on certain assumed facts, the company was unable or about to become unable to pay its debts as they fell due. The court heard submissions from four interested parties A, B, C

*B*    and D, creditors of the company, on the basis that their anonymity was to be preserved.

The application was heard in private and the judgment is reported by permission of the judge.

The facts are stated in the judgment.

*C*    *Richard Sheldon QC* and *Barry Isaacs* for the receivers.
*William Trower QC* and *Richard Fisher* for interested party A.
*Simon Mortimore QC* and *Hilary Stonefrost* for interested party B.
*Martin Pascoe QC* and *David Allison* for interested party C.
*Stuart Isaacs QC* and *Daniel Bayfield* for interested party D.

**BRIGGS J**

*D*    **1** This is a second urgent application for directions by receivers of the business and assets of Cheyne Finance plc ("Cheyne"), appointed on 4 September 2007 pursuant to a security trust deed ("the trust deed") dated 3 August 2005 between Cheyne and the Bank of New York.

**2** I heard and determined an earlier application in mid-September: *In re Cheyne Finance plc* [2008] 1 BCLC 732. The opening paragraphs of

*E*    my judgment on that application are a sufficient general introduction to this application.

**3** That application raised an issue as to how the receivers should apply moneys coming into their hands during the period between their appointment and the happening, if one should happen, of an insolvency event, as defined. That issue turned on a question of construction of the trust

*F*    deed. The only factual assumption then required was that at that time an insolvency event had not occurred.

**4** My decision on that application, which has not been appealed, was that pending the happening of an insolvency event the receivers should apply moneys coming into their hands, first, in prompt payment of the debts of senior creditors and any prior debts as and when they fell due; secondly, in making provision for payment of the same classes of debt not yet due and,

*G*    if that left any surplus—which then seemed unlikely, at least in the short term—in the manner provided for in the payment priority established in clause 12.1(c) and following of the trust deed.

**5** I shall refer in this judgment to debts of senior creditors and those ranking in priority to them collectively as "senior debts". I use that phrase rather than "senior obligations", which is a defined term with a slightly narrower meaning in the common terms agreement.

*H*    **6** I preferred the "pay as you go" construction over a rival "pari passu" construction pursuant to which full provisioning for payment of all senior debts was to take precedence over payment on time and in full of such debts as and when they fell due. I was not asked by the receivers on that occasion to construe the definition of "insolvency event" in the common

1564
*In re* Cheyne Finance plc (No 2) (Ch D)                                    [2008] Bus LR
Briggs J

terms agreement, principally because, as at that time, the receivers had not    A
formed the view that Cheyne was insolvent on any arguable construction of
that definition, or even that Cheyne was balance sheet insolvent, a concept
apparently deliberately omitted from the common terms agreement and
trust deed by confining the incorporation of the Insolvency Act 1986
definition so as to exclude section 123(2).

7   It appeared to be more or less assumed, both by the receivers and the
proponents of the rival arguments on that occasion, that for as long as the    B
receivers had the wherewithal to pay senior debts actually due and those
falling due in the very near future then they could not make an insolvency
event determination even though they regarded a default in payment of
senior debts as inevitable in the middle or longer term future: see para 7
of my earlier judgment.

8   My determination of the issue of construction then raised did not    C
depend upon that assumption about the meaning of insolvency event, and
I then regarded it as one which might need to be tested if the receivers'
expectations as to Cheyne's longer term ability to pay its senior debts
changed.

9   Intensive work which has since been carried out by and at the
receivers' direction into Cheyne's likely future cash flow has caused a change
in the receivers' expectations and has precipitated an urgent need for the    D
meaning of the insolvency event definition to be determined.

10   The happening of an insolvency event depends upon a determination
by the receivers that Cheyne is, or is about to become, unable to pay its
senior debts.  The receivers do not suggest that the courts should usurp their
function by making that determination itself, a process which might involve
factual issues being determined by an adversarial process.  Rather they invite    E
the court to decide whether, on certain assumed facts, Cheyne is or is about
to become unable to pay its debts within the meaning of the insolvency event
definition.  They recognise that the fact-finding part of the task entrusted to
them is to remain their responsibility and the invitation to the court to decide
the insolvency question on assumed facts is in substance designed as a
convenient vehicle for resolving all relevant issues of construction of the
insolvency event definition.    F

*The assumed facts*

11   These are stated fully but concisely in the second witness statement
of Neville Barry Kahn, one of the three receivers.  Since they are, by
definition, not in dispute before me I need only summarise their
consequences. They are derived from work done by the receivers in defining    G
the dates upon which the senior debts will all fall due and the amounts
falling due on each relevant date, and from work done and opinions
formulated by the receivers' chosen valuers on the amounts of cash capable
of being made available for payment on those dates on various hypotheses as
to the manner in which the receivers carry out the necessary asset realisation
programme.

12   By way of introduction, first, it is plain that Cheyne could not pay its    H
senior debts in full as they fall due merely by letting its own investments run
to maturity and collecting the resulting cash.  The investments must be sold
in an uncertain market before maturity so that any estimation of Cheyne's
incoming cash flow is critically dependent upon assumptions about the

*A*     future market for Cheyne's assets, and in particular about the effect on that market, in which Cheyne is a substantial player, of any particular sales campaign.

    **13**    Secondly, in advising as to Cheyne's likely incoming cash flow in the future, its advisers have, I suspect prudently and inevitably, taken and projected forward present market values and avoided subjective guesswork as to where the market may move hereafter.

*B*    **14**    Thirdly, the valuers have subjected to intense scrutiny the effect upon realisations of Cheyne's marketing programme driven, as it is, by the need to meet predictable and extremely large payment obligations in the near and medium term future. Their opinion is that sales at the volume and rate required to pay senior debts as and when they fall due will probably incur forced sale discounts in ranges lying between zero and 7%, depending upon

*C*     the class of asset involved.

    **15**    The results of this exercise may be stated as follows. (a) If the receivers were able to avoid incurring any discounts from open market value by reason of the size and timing of their sales programme, they would, by selling at present market values, just be able to pay all senior debts on time and in full. The prospect of avoiding incurring such discounts is regarded by the receivers, on advice, as unlikely. (b) If forced sale discounts are

*D*     encountered at the midpoint of each of the ranges advised by the valuers as being the most likely, then Cheyne will default in paying its senior debts as they fall due in February 2009, with a consequential shortfall as against debts falling due then or thereafter. (c) If higher but still realistically possible discounts are incurred, default with a consequentially larger shortfall could occur as early as November 2008. (d) The receivers have considered

*E*     whether there is any method of realisation of Cheyne's investment portfolio which holds out the prospect of realising better value than forced sales at the rate necessary to pay all senior debts in full and on time. Following tentative negotiations their present view is that best value would be obtained by a sale of the whole portfolio to an investment bank in return for an underwritten note. This would, they think, hold out a better and indeed realistic prospect of paying all senior debts in full but not on time, i e not in accordance with

*F*     the maturity dates of those debts. This is because the cash-flow profile required, when aggregated with Cheyne's existing cash assets to match the maturity dates of the senior debts, would not be obtainable on an underwritten note received on a negotiated sale of the investment portfolio.

    **16**    Mr Kahn summarises the position in his second witness statement as follows:

*G*
> "As described above, the receivers are currently in a position to continue with the 'pay as you go' approach to approximately 31 October 2007. The receivers also have a substantial investment portfolio of assets in their hands. However, the best current assessment is that the high level of asset sales required to continue with the 'pay as you go' approach would involve Cheyne Finance selling assets for discounted prices which

*H*
> would in turn deplete its balance sheet and render it unable to pay some of its late-maturing senior obligations."

    **17**    A recent further sale means that Cheyne can now pay due debts from liquid funds until 14 November, but it is agreed before me that I should assume, and the receivers do not suggest otherwise, that the circumstances of

that recent sale have no effect on the best current assessment which I have    A
described, namely that default and a consequential shortfall will occur in
relation to senior debts.

*The questions raised by this application*

    18    Having formed the view that the sales programme necessary to pay
senior debts as they fall due is not the method likely to realise best value for
Cheyne's senior creditors, the receivers therefore ask for the following    B
questions to be determined by the court:
    1. Whether, on the assumption that the facts stated in Mr Kahn's second
witness statement are true, Cheyne Finance plc is unable or about to become
unable to pay its debts as they fall due to senior creditors within the meaning
of insolvency event.
    2. If the answer to question 1 is "No", (a)(i) are the receivers obliged to    C
sell assets of Cheyne Finance plc to ensure that so far as is possible it pays its
debts to senior creditors as they fall due? (ii) If the answer to (i) is "Yes", are
the receivers nevertheless permitted to cause Cheyne Finance plc to enter
into a sale, the consequence of which is that the debt of any senior creditor
which would be paid in full as it falls due absent the sale is not paid in full as
it falls due? Would such a sale render Cheyne Finance unable, or about to    D
become unable, to pay its debts as they fall due to senior creditors within the
meaning of insolvency event? (b) Are the receivers permitted to cause
Cheyne Finance plc to enter into a sale, the consequence of which is that it
continues to pay senior obligations in full as they fall due, but which renders
it certain or most likely that not all senior obligations will be paid in full as
they fell due? Would such a sale render Cheyne Finance unable or about to
become unable to pay its debts as they fall due to senior creditors within the    E
meaning of insolvency event?
    19    That formulation of the questions is the subject of an agreed
amendment made at the outset of the hearing, and differs in that respect
from the form as it appears in the application notice.
    20    I have heard submissions from four interested parties, and I will call
them parties A, B, C and D. All have appeared, as on the last occasion, on
the basis that their anonymity is to be preserved. But this time all the parties    F
also seek that the hearing be conducted, and judgment given (at least at this
stage) in private, so as to avoid confidential information—for example,
about the receivers' expectations and advice as to the value of its portfolio—
falling into the public domain. Maintaining anonymity of the parties will
therefore, unlike on the last occasion, not have the compensating advantage
that the hearing and judgment be conducted and given in public. I have    G
therefore sought and obtained on a confidential basis from the receivers the
identity of all parties, which is not to be placed on the court file or otherwise
made public.
    21    Party A, as before, represents all senior creditors with short maturity
dates for whom continuation of the pay as you go regime is preferable to an
early declaration of an insolvency event. Party B, again as before, represents
all senior creditors whose interests would be served by an early declaration    H
of an insolvency event. Party C is a member of the class represented by
party B. Party D are a group of holders of subordinated debt, i e not senior
creditors. The debt in question consists of mezzanine capital notes ranking
below the senior obligations in the payment priority established by clause 12

A   of the trust deed.  On the assumed fact that continuing with pay as you go is less likely than the determination of an immediate insolvency event to yield anything for them, they also support party B on the issues before me.

    22   Question 1 is the most important question and has occupied most of the court's time.  Strictly, question 2 falls away if question 1 is answered in the affirmative, but I have been requested by all parties, other than party D, to decide question 2 in any event, regardless of the outcome of question 1.

B   To an extent, the analysis of the issues underlying question 2 sheds light on the answer to question 1, to which I now turn.

    23   The definition of insolvency event in the common terms agreement is as follows.

C       "'Insolvency event' means a determination by the manager or any receiver that the issuer [Cheyne] is, or is about to become, unable to pay its debts as they fall due to senior creditors and any other persons whose claims against the issuer are required to be paid in priority thereto, as contemplated by section 123(1) of the United Kingdom Insolvency Act 1986 (such subsection being applied for this purpose only as if the issuer's only liabilities were those to senior creditors and any other persons whose claims against the issuer are required under the security trust deed to be

D       paid in priority thereto)."

    24   The argument on question 1 has revealed two related issues as to the construction of the insolvency event definition in the common terms agreement, namely: (1) to what extent, if at all, is it permissible for the receivers to have regard to senior debts falling due in the future when addressing Cheyne's commercial solvency ("the future debts question");

E   and, (2) with what degree of confidence must the receivers have formed the view that Cheyne is or is about to become unable to pay its relevant debts as they fall due before they can properly make an insolvency event determination ("the standard of proof question").  Most of the debate has centred on the first of those two questions.

*The future debts question*

F      25   For party A, Mr Trower and Mr Fisher submitted that on the question whether Cheyne is unable to pay its debts as they fall due only those senior debts which are presently due are to be considered.  On the question whether Cheyne is about to become so unable, then that admits in addition only those senior debts which are about to become—ie on the point of becoming—due, and excludes all senior debts with medium or longer term

G   maturities.

    26   Parties B, C and D all submit that, both in principle and because all Cheyne's senior debts have fixed maturity dates and amounts and because Cheyne is in run-off rather than a going concern, all senior debts can and must be considered whenever falling due.

    27   In its essentials, party A's submission was simple, and may be summarised as follows.

H    1. Leaving aside section 123(1)(a), (b), (c) and (d) of the Insolvency Act 1986, none of which apply on the assumed facts, the deliberate omission of subsection (2) shows that the parties agreed that the receivers had to apply the English test of commercial or cash-flow insolvency to be found in section 123(1)(e).

2. When compared with section 123(2), the language of section 123(1)(e)   **A**
omits, and therefore requires to be ignored, all contingent and prospective
liabilities.

3. The draftsmen of the insolvency legislation were perfectly capable of
requiring reference to the future where it was intended: see, apart from
section 123(2), sections 8 and 89 of the Insolvency Act 1986, sections 152
and 173(3)(b) of the Companies Act 1985 and section 643(1)(b)(ii) and
section 714(3)(b)(ii) of the Companies Act 2006.   **B**

4. Any doubt as to the admissibility of future events, including the falling
due of future debts, is resolved in the trust deed by the phrase "is about to
become".

5. There is nothing uncommercial in the parties to the trust deed adopting
a clear and simple test of insolvency which excludes the need to make
difficult judgments about the value of Cheyne's assets in the future, even if,   **C**
as Mr Trower accepted, it introduces an element of priority in favour of
short maturity as against long maturity senior debts, which is not found spelt
out in terms in the payment priority in clause 12.

28    Attractively though these submissions were presented, I have come
to the conclusion that they lead to the wrong result and must be rejected.
My reasons follow.   **D**

29    Section 123(1)(e) dates only from the Insolvency Act 1985. There is
very little authority on its present form, and its previous form was rather
different. Putting on one side the improbability that the draftsman of, still
less the parties to, the common terms agreement or the trust deed knew its
history, that history may be summarised as follows.

30    Section 80 of the Companies Act 1862 provided to the extent
relevant as follows: "A company under this Act shall be deemed to be unable   **E**
to pay its debts . . . (4) Whenever it is proved to the satisfaction of the court
that the company is unable to pay its debts."

31    In *In re European Life Assurance Society* (1869) LR 9 Eq 122, it was
held that "debts" in section 80 meant only those actually due. Furthermore,
prospective creditors had no locus to petition.

32    Section 28 of the Companies Act 1907 both permitted prospective
creditors to petition and required the court to have regard to contingent and   **F**
prospective liabilities when applying the 1862 Act. That new provision was
consolidated in the Companies (Consolidation) Act 1908 in section 130 in
the following form:

> "A company shall be deemed to be unable to pay its debts . . . (iv) if it is
> proved to the satisfaction of the court that the company is unable to pay
> its debts, and, in determining whether a company is unable to pay its
> debts, the court shall take into account the contingent and prospective   **G**
> liabilities of the company."

33    No substantive change occurred in 1929 in section 169(4) of that
Act; or in 1948 in section 223(d) of that Act; nor indeed in the 1985
Companies Act in section 518(1)(e), despite slight changes in the language.

34    During the long period from 1907 to 1985 English courts addressed   **H**
the questions posed by, for example, section 223(d) of the 1948 Act, without
any rigid distinction between commercial and cash-flow insolvency on the
one hand and balance sheet insolvency on the other. The submission that
commercial insolvency could not be established by reference to future debts

A    could not have succeeded.  This is reflected, for example, in the decision of
the Court of Appeal in *Byblos Bank SAL v Al-Khudhairy* [1987] BCLC 232,
in which inability to pay debts within section 223 of the Companies Act
1948 was incorporated into a debenture as a trigger for the appointment of
receivers.  Nicholls LJ said, at p 247:

B        "Construing this section first without reference to authority, it seems
to me plain that, in a case where none of the deeming paras (a), (b) or
(c) is applicable, what is contemplated is evidence of (and, if necessary,
an investigation into) the present capacity of a company to pay all its
debts.  If a debt presently payable is not paid because of lack of means,
that will normally suffice to prove that the company is unable to pay its
debts.  That will be so even if, on an assessment of all the assets and
C    liabilities of the company, there is a surplus of assets over liabilities.
That is trite law.  It is equally trite to observe that the fact that a
company can meet all its presently payable debts is not necessarily the
end of the matter, because para (d) requires account to be taken of
contingent and prospective liabilities.  Take the simple, if extreme, case
of a company whose liabilities consist of an obligation to repay a loan of
£100,000 one year hence, and whose only assets are worth £10,000.  It is
D    obvious that, taking into account its future liabilities, such a company
does not have the present capacity to pay its debts and as such it 'is'
unable to pay its debts.  Even if all its assets were realised it would still be
unable to pay its debts, viz, in this example, to meet its liabilities when
they became due."

35    Mr Trower described this as a case about balance sheet insolvency.
E    I disagree.  Nicholls LJ is speaking about the ability of the company to meet
its liabilities when they became due.  What is striking, and for present
purposes persuasive, is his explanation that the phrase "is unable to pay" is a
reference to the company's present capacity, not to the date upon which
relevant debts will fall due.

36    In the Insolvency Act 1985, repeated in section 123 of the 1986 Act,
F    commercial and balance sheet insolvency are for the first time split apart.  In
place of the mandatory requirement to take account of contingent and
prospective liabilities there has been added in section 123(1)(e) the phrase
"as they fall due" after "debts".  The mandatory requirement to consider
contingent and prospective liabilities now only appears in section 123(2).
There is no English authority on the question whether, as Mr Trower
submitted, those changes prevent reference to prospective, i e future, debts
G    under section 123(1)(e).

37    To the limited extent that academic writers have addressed this
point, they are divided.  In their *Annotated Guide to the Insolvency
Legislation 2006/2007*, 9th ed (2006), p 149 Messrs Sealy and Milman say:

        "Paragraph (e) (as Companies Act 1985 section 518(1)(e)) formerly
read: 'if it is proved to the satisfaction of the court that the company is
H    unable to pay its debts (and, in determining that question, the court shall
take into account the company's contingent and prospective liabilities).'
This formula was unhelpful in that it ran together two issues: (1) the
question of whether current debts could be met as they fell due,
i e 'commercial' solvency; and (2) the question whether the company

would ultimately prove solvent if its future as well as present liabilities   *A*
were brought into the reckoning.  The confusion was resolved by the
amendment made by [the Insolvency Act] 1985: contingent and
prospective liabilities are no longer to be taken into account for the
purposes of paragraph (e), while insolvency calculated on a balance-sheet
basis becomes a separate test under section 123(2)."

38   The English version of Professor Keay's *McPherson's Law of*   *B*
*Company Liquidation*, 1st ed (2001), reaches the same conclusion.

39   Professor Goode in his *Principles of Corporate Insolvency Law*,
3rd ed (2005), treats the developed Australian jurisprudence on this
question as applicable to cash-flow insolvency under section 123(1)(e), and
as permitting what he describes as "an element of futurity", at least by
reference to the near future.  In fact, the Australian jurisprudence is not   *C*
necessarily limited to considering debts falling due in the near future,
although typical fact situations may often impose that restriction in
practice.

40   The third edition (2002) of Professor Fletcher's *Law of Insolvency*
assumes that contingent and prospective liabilities logically have no part to
play in the cash-flow evaluation of the company's affairs.  For reasons which
appear from the Australian jurisprudence, I doubt that supposed logic.   *D*

41   There is a wealth of Australian authority on the question of whether
a cash-flow or commercial insolvency test permits references to debts which
will fall due in the future, i e in English terminology "prospective debts",
rather than "prospective or contingent liabilities".  The reason why this
question has, unlike in England, been analysed in such detail in Australia is
probably that neither the Australian courts nor legislature have developed a   *E*
balance sheet test of the type found in section 123(2).

42   Prior to 1992 the statutory test for insolvency in force in Australia
was one based on inability to pay debts as they become due: see, for
example, sections 107 to 109 of the Queensland Insolvency Act 1874.

43   In *Bank of Australasia v Hall* (1907) 4 CLR 1514, 1527 Griffith CJ
said:   *F*

"It was argued that only debts then actually payable and the amounts of
which were then actually ascertained should be taken into consideration.
One answer to this argument is that the matter for determination is
the ability of the debtor, which is a state or condition that cannot be
determined without having regard to all the facts.  Another answer is that
the debts referred to are not his debts 'then' payable, but his debts 'as they   *G*
become due'—a phrase which looks to the future."

He said, at p 1528:

"The words 'as they become due' require, as already pointed out, that
some consideration shall be given to the immediate future; and, if it
appears that the debtor will not be able to pay a debt which will certainly
become due in, say, a month (such as the wages payable by Robertson for   *H*
the month of July) by reason of an obligation already existing, and which
may before that day exhaust all his available resources, how can it be said
that he is able to pay his debts 'as they become due' out of his own
moneys?"

A    The only dissenting judge, Higgins J, agreed on the meaning of the phrase "as they become due". He said, at p 1554:

> "The critical words are 'as they become due'; so that, on the one hand, a debtor in making a payment or giving a security to a creditor, has to take into account, not only his debts immediately payable, but his debts which will become payable . . ."

B
**44**    In *Sandell v Porter* (1966) 115 CLR 666, 670, construing section 95 of the Bankruptcy Acts 1924 to 1960, Barwick CJ said:

> "The conclusion of insolvency ought to be clear from a consideration of the debtor's financial position in its entirety and generally speaking ought not to be drawn simply from evidence of a temporary lack of liquidity. It is the debtor's inability, utilising such cash resources as he has or can command through the use of his assets, to meet his debts as they fall due which indicates insolvency."

C

**45**    In *Hymix Concrete Property Ltd v Garrity* (1977) 13 ALR 321, 328 Jacobs J (with whom Barwick CJ and Gibbs J agreed) said that an inability to pay debts as they become due was to be recognised in an endemic shortage of working capital rather than in a temporary lack of liquidity. Such an analysis requires some review of the future.

D

**46**    In *Taylor v Australia and New Zealand Banking Group Ltd* (1988) 6 ACLC 808, 811 McGarvie J said that the question of whether a company was able to pay its debts as they fell due was a question of fact to be decided as a matter of commercial reality in the light of all the circumstances. In that case the company had sold its main business asset and paid off its overdraft with part of the proceeds. In deciding whether it was then insolvent for the purposes of a preference claim against the bank the judge conducted a detailed review of the company's present and future debts before concluding that its finite assets were insufficient to enable it to pay them as they fell due.

E

**47**    From 1992 onwards the question of whether a company was solvent was to be decided pursuant to a formula now to be found in section 95A of the Corporations Act 2001 (Cth), which is as follows. Under the heading "Solvency and insolvency":

F

> "(1) A person is solvent if, and only if, the person is able to pay all the person's debts, as and when they become due and payable.
> "(2) A person who is not solvent is insolvent."

G    The familiar phrase "as and when they become due" has been supplemented by the words "and payable".

**48**    In *Cuthbertson and Richards Sawmills Pty Ltd v Thomas* (1998) 28 ACSR 310, 319 Einfeld J said: "Certain predicted events about which there is little uncertainty, such as the planned sale of a major asset or the falling due of a substantial loan, may influence whether the company is able to pay its debts as they become due and payable." He said, at p 320:

H    "In essence the issue of a company's solvency should be viewed as it would by someone operating in a practical business environment."

**49**    In *Southern Cross Interiors Pty Ltd v Deputy Commissioner of Taxation* (2001) 39 ACSR 305 Palmer J held that the addition of the words "and payable" added nothing to the old formula based on "due". In his

judgment, both in English and in Australian company legislation the word   A
"due" had always meant "due and payable".

50    Finally, in *Lewis v Doran* (2005) 219 ALR 555, para 103, there is a
helpful explanation of the question how far into the future the inquiry as to
present insolvency may go.  In short, it is a fact sensitive question depending
upon the nature of the company's business and, if known, of its future
liabilities.
                                                                            B
51    It is clear from that brief review of the Australian decisions that in
an environment shorn of any balance sheet test for insolvency, cash-flow or
commercial insolvency is not to be ascertained by a slavish focus only on
debts due as at the relevant date.  Such a blinkered review will, in some cases,
fail to see that a momentary inability to pay is only the result of a temporary
lack of liquidity soon to be remedied, and in other cases fail to see that due to
an endemic shortage of working capital a company is on any commercial         C
view insolvent, even though it may continue to pay its debts for the next few
days, weeks or even months before an inevitable failure.

52    Furthermore, the common sense requirement not to ignore the
relevant future was found to be implicit in the Australian cases in the simple
phrase "as they become due".

53    Returning to the English legislation, it is, in my view, critical to
note that when separating out balance sheet insolvency from commercial       D
insolvency in 1985 the legislature did not merely remove the requirement
to include contingent and prospective liabilities in framing section 123(1)(e)
out of its predecessor, but added what in Australia have always been
regarded as the key words of futurity, namely the phrase "as they fall due".
In that context "fall due" is, in my judgment, synonymous with "become
due".
                                                                            E
54    Mr Trower submitted that the existence of the balance sheet test in
section 123(2) makes an Australian type of approach to the commercial
insolvency test unnecessary, because a company will always be balance sheet
insolvent in circumstances where a review of future debts shows that it is
commercially insolvent.  I disagree.  First, I can see no good reason why the
developed understanding in Australia of the nature of the exercise required
by the phrase "unable to pay debts as they become (or fall) due" should not   F
be recognised when the same phrase is, for the first time, deliberately
inserted into the English insolvency test.  The Australian approach makes
commercial sense, whereas the blinkered approach of ignoring the future
does not.

55    Secondly, a company may not always be balance sheet insolvent
where an Australian style test for commercial insolvency is satisfied, as in   G
this example: the company has £1,000 ready cash and a very valuable but
very illiquid asset worth £250,000 which cannot be sold for two years.
It has present debts of £500, but a future debt of £100,000 due in six
months.  On any commercial view the company clearly cannot pay its debts
as they fall due, but it is, or would be, balance sheet solvent.

56    In my judgment, the effect of the alterations to the insolvency test   H
made in 1985 and now found in section 123 of the 1986 Act was to replace
in the commercial solvency test now in section 123(1)(e), one futurity
requirement, namely to include contingent and prospective liabilities, with
another more flexible and fact sensitive requirement encapsulated in the new
phrase "as they fall due".

A   57   In the case of a company which is still trading, and where there is therefore a high degree of uncertainty as to the profile of its future cash flow, an appreciation that section 123(1)(e) permits a review of the future will often make little difference. In many, if not most, cases the alternative balance sheet test will afford a petitioner for winding up a convenient alternative means of proof of a deemed insolvency.

B   58   The irony of the present case is that the insolvency event test, when applied by the receivers appointed under the trust deed, will be in relation to a company in run-off, closed to future business, when its future cash-flow profile is abnormally clear and when no balance sheet alternative test is available.

59   This leads me to my second main reason for rejecting party A's case on the future debts issue. In my judgment, the presumed common intention C   to be derived from the parties' choice to define inability to pay debts by reference to section 123(1) rather than section 123(2) is simply that they wished Cheyne's solvency to be adjudicated on a commercial rather than balance sheet basis, and nothing more than that. The definition incorporates the whole of section 123(1), not just section 123(1)(e). The common feature of the lettered sub-subsections of section 123(1) is that they are indicia of commercial rather than balance sheet insolvency. Companies which fail to D   pay their judgment debts or, without good reason, to respond to statutory demands, are usually unable to pay their debts as they fall due regardless of the state of their balance sheets.

60   Even if my view as to the meaning and effect of section 123(1)(e) were wrong and a higher court concluded that it was to be interpreted as imposing the blinkers for which Mr Trower contends, it would, in my E   judgment, be perverse to conclude that the parties to the common terms agreement and trust deed intended that consequence, because of its potentially bizarre and uncommercial effects in the context of the affairs of Cheyne. In my last judgment I questioned whether, if the receivers had sold all Cheyne's assets for cash, and knew for sure that it would default in the distant rather than near future, it could not be determined to be insolvent until that distant event of default was about to occur. The receivers would F   be obliged to go on paying early maturing senior debts in full, knowing that a failure to pay anything in respect of later maturing debts of identical seniority was a racing certainty. I cannot envisage any reason why the parties to the common terms agreement and trust deed should have intended thereby to confer an absolute priority on the holders of early maturing senior debt. The manner in which that priority would impact on senior creditors G   would depend, not upon anything to be found in the payment priority, but upon the unpredictable outcome of a run-off which, at the time both of the framing of the contractual documents and the making of any investment in Cheyne pursuant to them, must have been regarded by the participants as an unpleasant but hopefully remote future risk.

61   Mr Trower accepted that his construction had that consequence but submitted that it was commercially understandable because later maturing H   paper carried a slightly higher coupon and because investors with later maturity dates are always exposed to greater risks due to the longer time line in which those risks may occur.

62   In my judgment, the extra coupon on the longer notes does not begin to explain a deliberate choice of Mr Trower's construction in preference to

that advocated by parties B to D.  Furthermore, incurring a risk of future    A
adverse events, such as is inherent in the pay as you go regime during a
run-off while insolvency is merely a risk rather than a probability, is different
in kind from a contractual choice absolutely to prefer earlier senior debt
where insolvency is not merely a risk but a dead certainty.

63   Party A's construction also produces a conflict between the
insolvency event definition and the receivers' obligation under clause 10.2(a)    B
of the trust deed, whereas the alternative construction does not.  Clause
10.2(a) is as follows:

  "It shall be a term of any appointment of a receiver under
  subclause 10.1 that such receiver shall, unless and until an insolvency
  event notice is delivered by the security trustee in accordance with
  clause 9: (a) manage the security assets and the business of the chargor
  with the objective of arranging for timely payment in full of the chargor's    C
  obligations to the senior creditors and any creditors ranking in priority to
  the senior creditors in the payment priority and . . . in each case as and
  when they fall due for payment in accordance with clause 12 below . . ."

64   In my judgment, the management objective thereby identified is to
ensure, if possible, the timely payment in full of all senior debts as and when
they fall due.  It would be extraordinary if, during a run-off period when the    D
receivers knew that a medium or long term default was inevitable but could
not determine an insolvency event until just before default occurred, they
were to be saddled with an impossible objective, impossible because they
knew that good management could not enable all senior debts to be paid
in full.

65   Mr Trower submitted that it was implicit in clause 10.2(a) that if a    E
choice had to be made between payments of all debts in full or payment of
early maturing debts on time, the receivers had to choose a management
method best calculated to secure the latter, even if it caused a greater failure
to achieve the former.  Again, I disagree because of the commercially
bizarre results which this would produce.  I put to Mr Trower the example
where Cheyne had liabilities of £1bn falling due in one month and £6bn
falling due in six months.  To raise the £1bn would require a fire sale for    F
£3bn of a portfolio which, if sold in an orderly manner over six months,
could raise £6bn.  Plainly, no commercially rational framers of the trust
deed would impose upon the receivers an obligation to effect that fire
sale.  Yet Mr Trower submitted on that precise example that this is what
clause 10.2(a) required.

66   On the alternative construction there is substantial harmony    G
between the definition of insolvency event and clause 10.2(a).  For as long as,
paying due regard to future debts, it appears that Cheyne can pay all its
senior debts in full as they fall due, the obligation in clause 10.2(a) is
attainable.  Once it appears that Cheyne can no longer expect to pay all its
senior debts in full as and when they fall due, the objective in 10.2(a) ceases
to be attainable, but the receivers can at exactly the same time determine that
there has been an insolvency event.  All debts are then accelerated and the    H
10.2(a) obligation ceases to apply.

67   Party A's best point, in my judgment, was the effect of the phrase
"or is about to become" in the insolvency event definition.  As a matter of
language, the phrase does, on the face of it, point to a review only of the

A    immediate future, and may suggest that the draftsman thought, so that the
parties should be presumed to have intended, that "is unable" otherwise
required the receivers to wear the blinkers for which Mr Trower contended,
and then lifted the blinkers slightly so as to permit a very restricted look
ahead at debts which will fall due imminently.

68    If the test whether Cheyne is unable to pay its debts when they fall
due permits a review of all Cheyne's future senior debt then it is hard to
B    envisage how, if Cheyne is about to fail that test, it is not already insolvent.
Mr Mortimore for party B suggested that "is about to become" was designed
to deal with a situation where the receivers proposed a transaction which,
once consummated, would cause Cheyne to fail the test, rather like a
preference which renders a company insolvent under section 240(2)(b) of
the Insolvency Act 1986.

C    69    I cannot see how the discharge of the clause 10.2(a) duty while
Cheyne is not insolvent could lead to a situation where the proposed
transaction makes it insolvent on party B's approach to the future debts
issue.  As will appear, on party A's approach the answer to that question
may be different.  It may be that, in truth, the phrase "or is about to become"
is a piece of thoughtless drafting which adds little or nothing to "is".  Though
mindful that contracts should, if possible, be construed to avoid such a
D    conclusion, the other factors which lead me to resolve the future debts
question against party A's construction easily outweigh this apparent
contra-indication.

70    I therefore conclude that the definition of insolvency event does
permit the receivers to have regard to Cheyne's ability to pay senior debts
falling due in the future.

E
*The standard of proof question*

71    I turn, therefore, to the standard of proof question.  Here the rival
contentions range between party C's Australian type submission that the
receivers should determine an insolvency event unless satisfied on the
balance of probabilities that Cheyne will be able to pay all senior debts when
they fall due, to party A's submission that the receivers should not determine
F    an insolvency event unless satisfied that there is no reasonable prospect that
Cheyne will be able to pay its debts when they fall due.  In the middle lay
parties B and D's submission that the burden was on the receivers to satisfy
themselves of Cheyne's insolvency on the balance of probabilities.

72    Party A's approach would prevent an insolvency event where, as on
the presently assumed facts, the prospect that Cheyne will pay its senior
G    debts in full when they fall due is less than likely but more than fanciful.  By
contrast, all the other parties advocated the balance of probabilities which,
regardless of the burden of proof which separated party C's submission from
that of parties B and D, would require a determination of insolvency on the
assumed facts.

73    In using the language of litigation, (standard and burden of proof,
balance of probabilities, reasonable and fanciful prospects), both counsel
H    and I have borne in mind throughout that the trust deed calls for experienced
professionals working in the commercial world to make the determination,
not the court at the end of a trial or a summary judgment application
under CPR Pt 24.  The language is, however, useful because it compresses
well-understood concepts into short phrases.

74   I have come to the conclusion that the level of confidence with ___A___ which, before determining an insolvency event, the receivers must consider that Cheyne is or is about to become unable to pay its senior debts as they fall due is better reflected in a balance of probabilities than in a view that the contrary prospect is so unlikely as to have become fanciful. They must be satisfied, (a state of mind which calls for careful and thorough inquiry), that inability to pay is more likely than not. My reasons follow.

___B___

75   Parties B to D are entitled to take some comfort from the fact that the incorporation of section 123(1) as the relevant test of itself uses a definition which is framed to be used in court and resolved on a balance of probabilities, even though the test is, in fact, to be applied outside court and not by a judge. By contrast with a state of mind requisite for a finding of wrongful trading—that is, knowledge that there was no reasonable prospect that the company would avoid going into insolvent liquidation—which is ___C___ used as a test for directors' personal liability, the insolvency event test is imposed upon the receivers in the trust deed to determine the time at which run-off by fiduciaries with pay as you go is replaced by a pari passu distribution by the same fiduciaries in accordance with the payment priority. If that change is postponed for as long as there is more than a fanciful prospect of payment in full, its consequences may work grave prejudice ___D___ to senior creditors with later maturing debts out of all proportion to the prejudice to early maturing creditors of becoming subject to pari passu distribution of assets realised to produce best value rather than early cash. The fact that the market for Cheyne's investment portfolio may go up as well as down may well make it hard to say that the prospect of payment in full is only fanciful, even though unlikely.

76   Being satisfied on the balance of probabilities is, in my judgment, ___E___ typical of the standards on which commercial fiduciaries are accustomed to act when making important business decisions in the best interests of their beneficiaries. I can see no good reason in the present case to impose any higher hurdle.

77   The assumed facts are, as I have said, summarised by the passage in the second witness statement of Mr Kahn, at para 93, where he states that ___F___ on the receivers' best current assessment Cheyne is now unable to pay all its senior debts as they fall due. Accordingly, I answer question 1 in the affirmative.

*Question 2*

78   It follows that question 2 does not strictly arise on the assumed facts, ___G___ since the receivers will presumably make a determination of insolvency if those facts do not change for the better. I am asked none the less to address question 2 in any event in case, on appeal, a different answer is given to question 1 than that which I have given. I shall do so briefly, reflecting the brevity of the submissions made on these further questions.

79   I do so, first, on the assumption that I am correct in my construction of insolvency event, but assuming that, perhaps because the assumed facts ___H___ change or are found to differ from the true facts, the receivers none the less do not make an insolvency event determination. A future default in paying senior debts is therefore assumed to be improbable, but there may still be a real risk of it.

A    80    Question 2(a)(i). In advance of an insolvency event clause 10.2(a) of
the trust deed requires the receivers to manage the assets so as to maximise
the prospect (which, although probable, may be still subject to real risk), of a
timely payment in full of all senior debts. If a proposed asset sale maximises
that prospect, then the receivers should sell. If not, they should not. The
question as framed omits the words "all", "timely" and "in full", which
should be added to any affirmative answer.

B
81    Question 2(a)(ii). On my construction of insolvency event, the
answer must be no. Such a sale would convert Cheyne from a company
probably able to pay all senior debts in full on time, and therefore solvent,
into one that could not. No sensible interpretation of clause 10.2(a) could
permit such a sale, not least because it would cause an insolvency event
where it was otherwise improbable.

C    82    Question 2(b). On my construction of insolvency event the answer
must again be no, because if there has been no insolvency event absent the
sale Cheyne will probably be able to pay all its senior debts in full, and
clause 10.2(a) requires the receivers to maximise that prospect, whereas the
sale would prevent it.

83    I turn now to question 2 on the alternative construction of
insolvency event to that which I have preferred. On that construction it is,
D    on the assumed facts, probable, but not necessarily certain, that Cheyne will
fail to pay all senior debts in full as they fall due, but the receivers are unable
to declare an insolvency event, so remain bound by clause 10.2(a) of the trust
deed.

84    One of the reasons why I have rejected that construction of
insolvency event is that, in my judgment, it gives rise to extraordinary
E    difficulties in understanding how the clause 10.2(a) duty is to be performed,
it being unlikely that the stated objective can be achieved in full. The same
problems are magnified if future default is not merely probable, but certain.

85    Question 2(a)(i). Again, in my judgment, the answer must be yes,
but with the addition of the words "all", "on time" and "in full". Where a
proposed sale increases the prospects of achieving that objective from, for
example, just better than fanciful to, for example, just less than even, then
F    they should sell. If not, they should not sell.

86    Question 2(a)(ii). This question raises the problem that a proposed
transaction may affect the prospects of achieving different parts of the
clause 10.2(a) objective in different ways. For example, a proposed sale may
substantially increase the prospects of payment of all senior debts in full, but
at the price of making it certain that some will be paid late. The portfolio
G    sale referred to in the assumed facts is just such a transaction.

87    Unsurprisingly, on my construction of insolvency event, clause
10.2(a) provides no answer to this conundrum. On the alternative
construction of insolvency event no other provision of the trust deed does
either. In my judgment, the receivers would have to make that choice by
applying their own judgment as to which course would best serve the
interests of the senior creditors as a whole. I reject party A's submission that
H    clause 10.2(a) impliedly prefers prompt payment of early maturing debts
over all other parts of the stated objective.

88    The consequence of such a decision may be to accelerate the date
when, on the alternative construction of insolvency event, an actual or
imminent default in payment of a senior debt on time triggers an insolvency

1578
**In re Cheyne Finance plc (No 2) (Ch D)**                    [2008] Bus LR
Briggs J

A

event.  If so, so be it.  If the beneficial transaction made such a default
imminent, then it would trigger an immediate insolvency event even prior
to the sale.  But to treat that consequence as meaning that therefore the
receivers should not sell would be to allow the tail to wag the dog.  It would
almost, by definition, be a transaction which the receivers would wish to
pursue after an insolvency event, so the fact that a decision to sell would
trigger an insolvency event would not, in my judgment, matter.

B

89    Question 2(b).  This question presumably contemplates some kind of
distressed sale which, although it fails to achieve best value, generates the
early cash necessary to postpone an immediate or early insolvency event
constituted by an actual or imminent default.   On the alternative
construction it would not trigger an insolvency event.  Again, unsurprisingly,
in my view, clause 10.2(a) provides no clear answer to this conundrum.
I would answer it, like question 2(a)(ii), by reference to the receivers'
judgment as to the best interests of the senior creditors as a whole.  From the
evidence it seems most unlikely that the receivers would think that such a
transaction was in the best interests of senior creditors as a whole, unless
perhaps the increased probability of a later default was marginal, whereas
the proposed transaction secured major advantage in terms of earlier
payment.

C

90    In my judgment, the receivers would not be obliged slavishly to effect
any sale which would postpone an early or imminent default regardless of
the gravity of later defaults thereby caused by failing to obtain best value.

D

*Order and directions accordingly.*

*Solicitors: Lovells; Hunton & Williams; Milbank, Tweed, Hadley &
McCloy LLP; Ashurst LLP; Kaye Scholer LLP; Jones Day; Herbert
Smith LLP; Sidley Austin LLP.*

E

Reported by CELIA FOX, Barrister

————

F

G

H