# **Exhibit 60**

A

# Re Sonatacus Ltd
# CI Ltd v Joint Liquidators of Sonatacus Ltd

[2007] EWCA Civ 31
Court of Appeal (Civil Division).
Smith and Hooper L.JJ. and Sir Martin Nourse.
Judgment delivered January 25, 2007.

B

> *Winding up—Transactions at an undervalue—Preferences—Payment by company—Company insolvent at time or insolvent as a result of the payment—Payment without obligation to discharge indebtedness of company's controller—Whether payment a transaction at an undervalue—Whether payment a preference—Whether preference payment could act as consideration to prevent payment being a transaction at an undervalue—Appeal—Insolvency Act 1986, ss.238, 239, 241.*

C

This was an appeal against a decision of the judge ([2006] B.C.C. 927), dismissing an appeal against a decision of a district judge on an application by the liquidators of a company in creditors' voluntary winding up that a payment by the company did not constitute a preference within s.239 of the Insolvency Act 1986 but that it constituted a transaction at an undervalue and s.238 so that the respondent was ordered to repay the sum plus interest to the liquidators.

D

The company, "Sonatacus", had a sole director, "S", who was a friend of "A", who was the effective controller of the appellant, "CIL". CIL agreed to lend £65,000 to S but had insufficient funds to advance the sum directly and so procured an associated company, "Proweb", to advance the funds on its behalf. At S's request the sum of £65,0000 was paid direct to Sonatacus by Proweb, although the obligation to repay remained pursuant to the agreement on S personally. Three weeks before the term of the loan expired a sum of £50,000 was paid into CIL's bank account by bank transfer by Sonatacus at the direction of S. It was accepted that Sonatacus was insolvent at the time or became insolvent as a result of the transfer. Sonatacus ceased trading a few weeks later and went into creditors' voluntary winding up a few weeks after that. The liquidators of Sonatacus later issued an application against CIL pursuant to s.239 of the Insolvency Act 1986 claiming that the payment of £50,000 by Sonatacus to CIL constituted a preference and was void or voidable accordingly. A claimed that the loan of £65,000 had been made to S personally and that CIL was therefore a creditor of his and not of Sonatacus. That provoked the liquidators to make an alternative application that the payment of £50,000 by Sonatacus to CIL was a transaction at an undervalue pursuant to s.238 of the 1986 Act and was void or voidable accordingly. The liquidators argued that CIL provided no consideration to Sonatacus for receiving the payment of £50,000. A contended that the latter allegation was fallacious.

E

F

G

The district judge dismissed the first application but acceded to the second application and made a declaration that the payment of £50,000 by Sonatacus to CIL constituted a transaction at an undervalue. CIL appealed but the judge dismissed the appeal and affirmed the district judge's decision on the transaction at an undervalue, though for different reasons. That made it unnecessary for him to consider the preference claim under a respondents' notice by the liquidators. CIL appealed to the Court of Appeal and submitted further that Sonatacus had given consideration of £50,000 and received the consideration of the pro tanto discharge or release of a debt due to Proweb. The value of the consideration given by Sonatacus was identical to the value of the consideration received by Sonatacus at the time the payment was made. The liquidators put in a late respondents' notice seeking, in the alternative, a declaration in relation to the preference claim.

H

A    *Held*, dismissing the appeal:

**1. On the payment of the £65,000 by CIL to Sonatacus S became a debtor to CIL for that amount and Sonatacus became a debtor to S for that amount. On the payment of the £50,000 by Sonatacus to CIL the debts of Sonatacus to S and of S to CIL were, to that extent, respectively discharged. In so far as the payment of the £50,000 discharged the debt of Sonatacus to S, Sonatacus gave a preference to S within s.239 and it not having**

B    **been suggested on behalf of the liquidators that the payment was for some reason void, it must be treated as being voidable by them. Those propositions were the basis of the judge's decision on the question of a transaction at an undervalue, that the only consideration on which CIL could rely to defeat the suggestion of undervalue was the preferential payment to S, but that as a matter of law a preferential payment that was inevitably susceptible to challenge could not amount to consideration for the making of that very payment. (Phillips v Brewin Dolphin Bell Lawrie Ltd [2001] B.C.C. 864**

C    **applied.)**

**2. Once it was established that it was not CIL that was the creditor of Sonatacus the liquidators must rely on s.241(1) which could require any person to pay, in respect of benefits received by him from the company, such sums to the liquidator as the court directed. This was subject to s.241(2) which provided that an order under s.239 could affect the property of or impose an obligation on any person, whether or not the person to**

D    **whom the preference was given, but the order should not require a person who received a benefit from the preference in good faith and full value to pay a sum to the liquidator. There could be no doubt that CIL was a person which received a benefit from the preference given by the company to S. So, quite apart from the question of value, if CIL was to retain the £50,000, it must be shown that it received that sum "in good faith" and it was obvious, both from the language and structure of s.241(1) and (2) and as a matter of common sense, that the onus of showing good faith rested on CIL.**

E    **3. As controller of CIL, A failed to establish that CIL acted in good faith. With his previous knowledge that the £65,000 had been paid into Sonatacus's bank account and that S's companies had been in some financial difficulty, A must have known that it was likely that the £50,000 had been repaid by Sonatacus and, moreover, at a time when it was insolvent, or he must at the least have shut his eyes to that possibility.**

F    **4. An appropriate order for payment should be to substitute for the declaration made by the district judge a declaration that the payment of £50,000 made by Sonatacus to CIL constituted a preference given by Sonatacus to CIL within ss.239–241 of the 1986 Act.**

The following case was referred to in the judgment of Sir Martin Nourse:

*Phillips (Liquidator of A J Bekhor & Co) v Brewin Dolphin Bell Lawrie Ltd* [2001] UKHL 2; [2001] B.C.C. 864; [2001] 1 W.L.R. 143.

G    Mark Cooper (instructed by Jolliffe & Co, Chester) for the appellant.

Jeremy Cousins Q.C. and Justin Kitson (instructed by Andrew Jay & Co, Gainsborough) for the respondent.

JUDGMENT

H

**Sir Martin Nourse:**

1. This appeal raises questions under Pt VI of the Insolvency Act 1986 (Miscellaneous provisions applying to companies which are insolvent or in liquidation), ss.238 (Transactions at an undervalue) and 239 (Preferences).

A

2. The material facts can be taken from the judgment in the court below of His Honour Judge Hodge Q.C., sitting as a judge of the Chancery Division in Manchester (*Barber v CI Ltd* [2006] B.C.C. 927). They can be stated mainly in his own words, though it is now unnecessary to state them as fully as he did.

3. Sonatacus Ltd ("the company") was incorporated on November 19, 1997, under the Companies Act 1985 as a company limited by shares. It began trading shortly thereafter, its principal activity being the sale and distribution of mobile telephones and accessories. The sole director of the company was Paul Santo Susca.

B

4. Mr Susca was a friend, though not a close one, of Rahail Aslam, who was a director and the effective controller of the appellant, CI Ltd ("CIL"). By a deed described as a loan agreement dated September 18, 2000, and expressed to be made between Mr Susca (both as borrower and surety) and CIL (as lender), it was provided that, in consideration of the sum of £65,000 lent to Mr Susca by CIL, Mr Susca covenanted with CIL to repay the said sum to it on written demand, together with interest, Mr Susca and CIL agreeing that "the loan to be the subject of a fixed term arrangement the full amount together with all costs interest and charges to be paid by 18 February 2001." At that time, CIL had insufficient funds to advance the sum of £65,000 to Mr Susca directly. It therefore procured an associated company, Proweb Ltd, to advance the funds on its behalf. The judge said that he need say no more about the involvement of Proweb Ltd, since it was merely a source of funds to enable CIL to advance moneys to Mr Susca.

C

D

5. At Mr Susca's request the sum of £65,000 was paid direct to the company by Proweb. However, as the judge observed, the obligation to repay that sum remained, pursuant to the written loan agreement, an obligation of Mr Susca personally. He said that there was no evidence as to what happened to the £65,000 after it had been received by the company, but that the moneys had been advanced to the company in a commercial transaction which, in cross-examination, Mr Henry (see below) had agreed had led to an obligation upon the company to repay them to Mr Susca.

E

6. On January 29, 2001 (some three weeks before the fixed-term expired), a sum of £50,000 was paid into CIL's bank account by way of a CHAPS transfer made by the company at the direction of Mr Susca. It was accepted before Judge Hodge that the company was insolvent at that time, or that it became insolvent as a result of that transfer. It is unnecessary to deal with the fate of the remaining £15,000.

F

7. On March 2, 2001, the company ceased trading, and a formal resolution was passed placing it into creditors' voluntary liquidation on March 29, 2001. On the same day, joint liquidators of the company were appointed and Mr Susca swore an estimated statement of affairs indicating that the company had assets estimated to realise £20,140, preferential creditors totalling £7,474 and non-preferential creditors totalling £54,318.77.

G

8. On March 11, 2005, after a delay of nearly four years, for reasons, which, as the judge observed, had not been explained in evidence, the joint liquidators issued an application against CIL in the Manchester County Court ("the first application") pursuant to ss.239 and 240 of the 1986 Act claiming a declaration that the payment of £50,000 made by the company to CIL on January 29, 2001, constituted a preference and was void or voidable accordingly. The application was supported by a witness statement of Neil Henry, one of the joint liquidators, dated March 9, 2005, in which it was alleged that, on or about September 20, 2000, the company had received a loan from CIL in the sum of £65,000 thus making CIL a creditor of the company. Mr Henry went on to allege that, in receiving the repayment of £50,000 on January 29, 2001, CIL had been treated preferentially as compared to other non-secured creditors of the company. Evidence in answer to the first application was put in by Mr Aslam in the form of an

H

A  undated witness statement, which it is agreed was made before July 25, 2005. It will be necessary to refer to Mr Aslam's statement in greater detail in due course. At present it is only necessary to say that his evidence was to the effect that the loan of £65,000 had been made to Mr Susca personally, and that CIL was therefore a creditor of his and not of the company.

9. As the judge said, Mr Aslam's witness statement provoked the issue of a further (in substance an alternative) application by the joint liquidators in the county court on July 25,
B  2005 ("the second application"), claiming a declaration that the payment of £50,000 made by the company to CIL on January 29, 2001, constituted a transaction at an undervalue pursuant to the provisions of ss.238 and 240 of the 1986 Act and was void or voidable accordingly. The second application was supported by a witness statement of Timothy James Foreman, an assistant solicitor in the employment of the solicitors acting for the joint liquidators, in which he claimed that CIL provided no consideration to the company for receiving the payment of £50,000. In answer to the second application, Mr Aslam put in a further witness statement
C  dated November 13, 2005, in which he contended that the allegation that the company had received no consideration for the payment of the £50,000 was fallacious.

10. On November 29, 2005, the proceedings having been transferred to the Chancery Division, both applications came before District Judge Needham, who dismissed the first and acceded to the second by making a declaration that the payment of £50,000 made by the company to CIL on or about January 29, 2001, constituted a transaction at an undervalue
D  pursuant to the provisions of ss.238 and 240 of the 1986 Act. Since that declaration was made on a ground that the joint liquidators have not relied on, it is unnecessary to examine the district judge's reasoning. He made an order for payment by CIL to the joint liquidators of £50,000 plus interest of £15,300.

11. CIL appealed to the judge against the declaration and order made by the district judge. The appeal came before Judge Hodge on June 8, 2006. At the outset of the hearing, he gave the
E  joint liquidators permission to put in a late respondents' notice relying on the preference claim that had been dismissed by the district judge. However, he refused an application by the joint liquidators to adduce fresh evidence at that stage. After hearing argument on the substantive appeal, the judge dismissed it, affirming the district judge's decision on the transaction at an undervalue, though for different reasons. That made it unnecessary for him to consider the preference claim under the respondents' notice, and he did not do so.

F  12. On July 25, 2006, Jonathan Parker L.J. gave CIL permission to bring a second appeal to this court. Again, the joint liquidators have put in a late respondents' notice (for which we have given permission) seeking, in the alternative, a declaration in relation to the preference claim.

13. So far as material, s.238 of the 1986 Act provides:

"(1) This section applies in the case of a company where–

(a)  the company enters administration, or
G
(b)  the company goes into liquidation;

and 'the office-holder' means the administrator or the liquidator, as the case may be.

(2) Where the company has at a relevant time (defined in section 240) entered into a transaction with any person at an undervalue, the office-holder may apply to the court for an order under this section.
H
(3) Subject as follows, the court shall, on such an application, make such order as it thinks fit for restoring the position to what it would have been if the company had not entered into that transaction.

(4) For the purposes of this section and section 241, a company enters into a transaction with a person at an undervalue if–

(a)  the company makes a gift to that person or otherwise enters into a transaction with that person on terms that provide for the company to receive no consideration, or

(b)  the company enters into a transaction with that person for a consideration the value of which, in money or money's worth, is significantly less than the value, in money or money's worth, of the consideration provided by the company.

…"

14.  So far as material, s.239 of the 1986 Act provides:

"(1) This section applies as does section 238.

(2) Where the company has at a relevant time (defined in the next section) given a preference to any person, the office-holder may apply to the court for an order under this section.

(3) Subject as follows, the court shall, on such an application, make such order as it thinks fit for restoring the position to what it would have been if the company had not given that preference.

(4) For the purposes of this section and section 241, a company gives a preference to a person if–

(a)  that person is one of the company's creditors or a surety or guarantor for any of the company's debts or other liabilities, and

(b)  the company does anything or suffers anything to be done which (in either case) has the effect of putting that person into a position which, in the event of the company going into insolvent liquidation, will be better than the position he would have been in if that thing had not been done.

…"

15.  Section 240 of the 1986 Act makes provision for the "relevant time" under ss.238 and 239. Since it is agreed that the provisions of s.240 are satisfied in the present case, it is unnecessary to rehearse them.

16.  So far as material, s.241 of the 1986 Act headed "Orders under ss. 238, 239" provides:

"(1) Without prejudice to the generality of sections 238(3) and 239(3), an order under either of those sections with respect to a transaction or preference entered into or given by a company may (subject to the next subsection)–

(a)  …

(d)  require any person to pay, in respect of benefits received by him from the company, such sums to the office-holder as the court may direct, …

(2) An order under section 238 or 239 may affect the property of, or impose any obligation on, any person whether or not he is the person with whom the company in question entered into the transaction or (as the case may be) the person to whom the preference was given; but such an order–

(a)  shall not prejudice any interest in property which was acquired from a person other than the company and was acquired in good faith and for value, or prejudice any interest deriving from such an interest, and

(b)  shall not require a person who received a benefit from the transaction or preference in good faith and for value to pay a sum to the office-holder, except where that person was a party to the transaction or the payment is to be in respect of a preference given to that person at a time when he was a creditor of the company.

…"

A    17.  In order to understand how these provisions apply to the present case, it is necessary to make a close analysis of the relationships between the parties and the effect of the payments that were made. About the following propositions there can be no doubt:

(1)    On the payment of the £65,000 by CIL to the company Mr Susca became a debtor to CIL for that amount and the company became a debtor to Mr Susca for that amount.

B    (2)    On the payment of the £50,000 by the company to CIL the debts of the company to Mr Susca and of Mr Susca to CIL were, to that extent, respectively discharged.

(3)    In so far as the payment of the £50,000 discharged the debt of the company to Mr Susca, the company gave a preference to Mr Susca within s.239. It not having been suggested on behalf of the joint liquidators that the payment was for some reason void, it must be treated as being voidable by them.

18.  These propositions were the basis of Judge Hodge's decision on the question of a transaction at an undervalue. Having stated (at [29]) that the only consideration on which CIL could rely to defeat the suggestion of undervalue was the preferential payment to Mr Susca, he accepted the submission of Mr Cousins Q.C., for the joint liquidators, relying on the speech of Lord Scott of Foscote in *Phillips v Brewin Dolphin Bell Lawrie Ltd* [2001] UKHL 2; [2001] B.C.C. 864 at p.872; [2001] 1 W.L.R. 143 at p.153, that, as a matter of law, a preferential payment which is inevitably susceptible to challenge cannot amount to consideration for the making of that very payment. The judge stated his conclusion as follows:

D    "33. . . . I am satisfied on the evidence that, as between Sonatacus and Mr Susca, this was a payment which fell within . . . s.239 . . . In those circumstances it does seem to me that that payment cannot properly be treated as constituting valuable consideration for the purpose of taking the payment made by Sonatacus to CI Ltd outside the scope of s.238 . . .

E    34. In my judgment, the principle underlying what Lord Scott said is equally applicable here. The consideration was always precarious in nature. It does seem to me that it would fly in the face of the legislative purpose underlying ss.238 and 239 for a court to uphold a payment made in these circumstances."

19.  On the basis of the arguments presented to the judge his reliance on the principle underlying what Lord Scott said in the *Brewin Dolphin* case and his decision to affirm the district judge's decision on the transaction at an undervalue on that ground appear to have been correct. However, a five-page case report published in Tolley's *Insolvency Law & Practice* (LexisNexis Butterworths) (on October 1, 2006, (2006) 22 IL & P 183), was highly critical of the judge's decision, concluding as follows:

"For the reasons given above, it is submitted that the court in the present case committed a logical fallacy in holding that a payment susceptible to challenge as a preference can also therefore be challenged as a transaction at an undervalue. Moreover, the court misunderstood the distinct functions performed by ss 238 and 239, thus undermining the statutory defence of bona fide purchase in s 241(2)."

20.  In a supplementary skeleton argument dated December 14, 2006, Mr Cooper, who has appeared for CIL here and in both courts below, invited us to read the case note in support of CIL's arguments on the appeal. Apart from a quotation of the conclusion, no guidance was given as to the nature and extent of the support which was said to be derived from the case note. In opening CIL's appeal on December 19, Mr Cooper made it clear that he did not adopt the whole of the reasoning of the authors of the case note, but it remained unclear to us what he did or did not adopt. Accordingly, we directed him to put in a further supplementary skeleton argument in order to clarify CIL's case.

21.  The oral argument was concluded on December 19, when judgment was reserved. On December 20 Mr Cooper put in his further supplementary skeleton argument, from which the following summary of his submissions may be taken:

"The correct analysis in the present circumstances is, it is submitted, as follows. Sonatacus gave consideration of £50,000 and received the consideration of the *pro tanto* discharge or release of a debt due to Mr Susca. There is no further analysis necessary to show that there was no transaction at undervalue as at the date the payment was made. The value of the consideration given by Sonatacus was identical to the value of the consideration received by Sonatacus at the time the payment was made. There was an equal exchange of values by Sonatacus receiving the same value as it gave."

22. The position in regard to the transaction at an undervalue is not at all satisfactory. The reasoning of the authors of the case note as adopted by Mr Cooper, though it may possibly be specious, cannot simply be rejected. Nor could their reasoning be accepted without Mr Cousins having been accorded a proper opportunity for giving it a considered response. Had it not been for the views hereafter expressed on the preference claim, it would have been necessary for the matter to be adjourned for further written submissions and perhaps for further oral argument.

23. Although the preference claim has largely gone unnoticed, it is worth remembering that it was that claim that was first made by the joint liquidators. That is hardly surprising. The payment of £50,000 having been made by an insolvent company, it would be natural to assume that it was the actual payee which had been given the preference. However, once it is established that it was not CIL that was the creditor of the company, the joint liquidators must rely on s.241(1)(d), subject to the defence provided by s.241(2), which, so far as it applies to the present case, provides:

"An order under section . . . 239 may affect the property of, or impose any obligation on, any person whether or not he is . . . the person to whom the preference was given; but such an order–

(a)   shall not prejudice any interest in property which was acquired from a person other than the company and was acquired in good faith and for value, or prejudice any interest deriving from such an interest, and

(b)   shall not require a person who received a benefit from the transaction or preference in good faith and for value to pay a sum to the office-holder, [exception inapplicable] . . ."

24. There can be no doubt that CIL was a person which received a benefit from the preference given by the company to Mr Susca. So, quite apart from the question of value, if CIL is to retain the £50,000, it must be shown that it received that sum "in good faith". Moreover, it is to my mind obvious, both from the language and structure of s.241(1) and (2) and as a matter of common sense, that the onus of showing good faith rests on CIL.

25. The district judge dismissed the first application on the simple ground that CIL was not a creditor of the company. He did not have to decide any question of good faith. Nor did Judge Hodge, who, having held that there had been a transaction at an undervalue, expressly stated (at [37]) that he did not need to enter into questions of good faith. Nevertheless, CIL's good faith was potentially an issue in each of the courts below, and it is clear from Mr Aslam's first witness statement, which was prepared under professional advice, that the point was well in mind.

26. The material passages in Mr Aslam's first witness statement are the following:

"2. . . . I have had a personal relationship with [Mr Susca] since 1995 though this ceased to be the case in or around mid 2001 . . .

3. At some time prior to 18 September 2000 Mr Susca approached me to ask for a loan. He wanted to borrow £65,000 to fund an expansion of his business interests. In and around September 2000 Mr Susca's companies were in some financial difficulty. He had consistently told me this was due to cash flow problems and the fact that this was so is demonstrated by the often erratic and late payment of rent to [CIL by an associated company of the company which was a tenant of CIL.] . . . Though Mr Susca did not ask

A    me I would not have lent money direct to the company even if he had made such an enquiry. I was only prepared for [CIL] to lend the money to Mr Susca personally . . .

6. Mr Susca had asked me to pay the loan money into the company's bank account. He said that this would be more convenient for him . . .

7. Mr Susca repaid the money to [CIL] in part on 29 January 2001. £50,000 was received in [CIL's] bank account by CHAPS on that date. I did not know until my
B    accountant examined my bank statement in about March of 2001 that the money had been transferred out of the company's bank account. . . . I had no control over how Mr Susca chose to repay [CIL], and it did not seem unusual to me that Mr Susca had chosen to repay some of the loan in this way when he had initially asked me to pay loan money due to him into the company's bank account. Any arrangement that there might have been between Mr Susca and the company was a matter for him . . .

C    11. [CIL] never became a creditor of the company. [CIL] was Mr Susca's creditor and he has repaid the loan made to him to [CIL's] satisfaction. When it came for Mr Susca to repay the money as agreed, I was not concerned about the source of the money but I accepted it as payment from Mr Susca and I had no reason to question it.

12. That the company became involved, as a third party receiving and making payments for Mr Susca, was Mr Susca's choice . . ."

D    27. The good faith issue having been decided in neither court below, it would have been a possible course for us to remit it to the district judge to be decided by him. However, Mr Cousins submitted that this court was in just as good a position to make the decision on the basis of Mr Aslam's first witness statement, which is the only evidence bearing on the point. Mr Cooper accepted that the onus was on CIL to show good faith. On that footing, I am of the opinion that we can and should decide the issue of good faith ourselves.

E    28. In my judgment, Mr Aslam's first witness statement falls short of establishing that CIL received the £50,000 in good faith. The evidence is that, in and around September 2000, Mr Aslam knew that Mr Susca's companies were in some financial difficulty; that he would not have lent money direct to the company even if Mr Susca had asked him to do so; and that Mr Susca asked him to pay the £65,000 into the company's bank account because that would be more convenient for Mr Susca. That was the position on September 18, 2000, when the loan agreement was entered into.
F

29. On January 29, 2001, barely four and a half months later, £50,000 was received in CIL's bank account by a CHAPS payment made on that date. Mr Aslam says that he did not know until his accountant examined CIL's bank statement in about March 2001 that the money had been transferred out of the company's bank account. But he does not say that he did not know that the £50,000 had been repaid on January 29. The clear implication is that he did. With his previous knowledge that the £65,000 had been paid into the company's bank account and that
G    Mr Susca's companies had been in some financial difficulty, he must have known that it was likely that the £50,000 had been repaid by the company and, moreover, at a time when it was insolvent, or he must at the least have shut his eyes to that possibility. On either footing Mr Aslam has failed to establish that CIL acted in good faith.

30. For these reasons I would substitute for the declaration made by the district judge a declaration that the payment of £50,000 made by the company to CIL on or about January 29,
H    2001, constituted a preference given by the company to CIL within ss.239–241 of the 1986 Act. I would affirm the district judge's order for payment or make such other order for payment as may be appropriate. I would dismiss the appeal accordingly.

31. Had the appeal been allowed, it would have been necessary for us to rule on an application by the joint liquidators for an order that there be a re-trial before Judge Hodge, on the ground that there was new and compelling evidence that CIL had forged the loan agreement

A

dated September 18, 2000, had given untruthful evidence and had committed a fraud on the court. It was that evidence that was the subject of the application made by the joint liquidators at the outset of the hearing before Judge Hodge (see [11] above), which he, correctly as it seems to me, dismissed at that stage. In the event it is unnecessary for us to consider that application and we have not done so.

**Hooper L.J.:**

B

32.  I have read both judgments in draft and agree with them.

**Smith L.J.:**

33.  I agree with the judgment of Sir Martin Nourse and add only a few words of my own to explain further why I was unwilling simply to uphold the judge's decision that the payment of £50,000 by the company to CIL must be set aside as a payment at undervalue.

C

34.  Much of the argument during the hearing related to the question of whether the authors of the article in Tolley's *Insolvency Law & Practice* were correct in their criticism of the judge's decision. Although Mr Cooper did not fully embrace the argument advanced in the article, I found it at least theoretically persuasive. I think that the judge might have been wrong to hold that the payment of £50,000 by the company to CIL was a transaction at undervalue because the consideration given by CIL (namely a partial discharge of Mr Susca's debt) was precarious in that it was liable to be set aside as a preferential payment. The argument advanced in the article was that the very fact that the consideration (discharge) was voidable meant that the payment itself was also voidable and therefore recoverable. The reduction in value to the company of the discharge (due to its precariousness) was precisely counterbalanced by the reduction in value of the payment made by the company (due its recoverability). Therefore the transaction was financially neutral. I see the theoretical logic of that argument. However, it seems to me that, in practice, the reduction in value of the discharge due to the chance that it would be set aside is not necessarily precisely counterbalanced by the chances of recovery of the money payment. The chances might be different. Although as a matter of law, the money would be recoverable if the preferential transaction were set aside, in practice it might not be; it might have disappeared. If CIL were of doubtful solvency, the transaction might not be financially neutral.

D

E

35.  Accordingly, it seems to me that the basis of the judge's finding was, if not actually wrong, somewhat uncertain. I do not imply any criticism of the judge. The argument discussed in Tolley's *Insolvency Law & Practice* was not raised before him. Indeed, it is possible that the judge was right. However, in my judgment, what happened in this case was obviously a preferential transaction and I agree with Sir Martin Nourse that it should be dealt with as such. If that is done the burden of showing that it received the £50,000 in good faith rests upon CIL. I also agree, for the reasons given by Sir Martin Nourse, that CIL failed to discharge that burden. I agree with the proposed disposal that he makes in [30] of the judgment.

F

G

(*Appeal dismissed*)

H

© **2007 Sweet and Maxwell Ltd**
bcp2007 bcp   292 Mp   194—bcp23075

# **Exhibit 61**

Supreme Court                                                               *A*

# Invest Bank PSC *v* El-Husseiny and others

## [2025] UKSC 4

2024  May 7, 8;                                    Lord Hodge DPSC, Lord Hamblen,
2025  Feb 19                        Lord Stephens, Lady Rose, Lord Richards JJSC      *B*

*Debt — Enforcement — Transaction at undervalue — Debtor causing company
wholly owned and controlled by him to transfer assets for purpose of putting
them beyond creditor's reach — Whether debtor entering into transaction if
assets not beneficially owned by him — Insolvency Act 1986 (c 45), s 423*

The claimant brought claims against the defendants, seeking inter alia to enforce      *C*
a judgment debt against the first defendant and to obtain relief under section 423 of
the Insolvency Act 1986[1] against the other defendants on the basis that the first
defendant had entered into transactions at an undervalue with those defendants for
the purpose of putting assets beyond the reach of the claimant or of otherwise
prejudicing the claimant's interests. Some of the alleged transactions involved assets
which, prior to being transferred, had been held not by the first defendant but by a
company that was wholly owned and controlled by him. Determining various      *D*
interim applications, the judge held, inter alia, that a debtor could enter into a
"transaction" within the meaning of section 423 even if the assets in question were
not legally or beneficially owned by the debtor. The Court of Appeal dismissed the
third and fourth defendants' appeal against that conclusion. The third and fourth
defendants appealed, contending that section 423 was not capable of applying where
a debtor agreed to procure a company which he owned to transfer an asset which he
did not personally own, even if that transfer would result in the value of the debtor's      *E*
shares in the company being reduced or eliminated to the prejudice of his creditors.
On the appeal—

*Held*, dismissing the appeal, that on a true construction a "transaction" within
section 423(1) of the Insolvency Act 1986 was not confined to a dealing with an asset
owned by the debtor but, rather, extended to the type of transaction whereby the
debtor entered into an arrangement under which a company owned by him or her
transferred a valuable asset for no consideration or at an undervalue; that, in      *F*
particular, such a straightforward reading of section 423(1) of the 1986 Act was not
inconsistent with (i) textual indicators within the wording of sections 423 to 425 of
the Act, (ii) a consideration of the purpose that the fraudulent transfer regime in
sections 423 to 425 was designed to achieve or (iii) the way in which that regime was
intended to interrelate with sections 238 and 339, which dealt with transactions at an
undervalue in the context of corporate and personal insolvency; that, rather, the
wording of sections 423 to 425 strongly supported the straightforward reading of
section 423(1), in that (a) the word "gift" in section 423(1)(a), which could only refer      *G*
to the gifting of property that the debtor owned, did not correspondingly limit the
transactions "otherwise" entered into to which that paragraph applied, (b) the fact
that the word "consideration" in section 423(1) had a narrower meaning than when
used in contract law generally did not create any problems for the straightforward
reading, (c) the bona fide purchaser defence in section 425(2) did not indicate that
the drafter of that provision had assumed that in order for section 423 to apply someone
must have received property that was owned by the debtor, (d) the inclusion of an      *H*
"arrangement" in the definition of "transaction" in section 436(1) made for a broad

---

[1] Insolvency Act 1986, s 423: see post, para 26.
S 425(2): see post, para 48.
S 436(1): see post, para 30.

© 2025 The Incorporated Council of Law Reporting for England and Wales

321
[2025] 2 WLR                                   Invest Bank PSC v El-Husseiny (SC(E))

A  definition of "transaction" and (e) any other reading would require important words
to be read into section 423(1) which were simply not there; that, further, restricting
section 423(1) to transfers of property owned by the debtor would undermine the
purpose of sections 423 to 425 of providing redress where transactions at an
undervalue were entered into with the mental element identified in section 423(3);
that, moreover, there was no good reason for giving different meanings to
"transactions" at an undervalue in sections 238, 339 and 423, notwithstanding that
B  sections 238 and 339 did not depend on establishing the mental element required by
section 423(3), it being impossible to think of circumstances in which a transaction
was held to be within section 423(1) when it would not also appropriately fall within
sections 238 or 339; and that, accordingly, the first defendant had, by arranging
with each of the other defendants that he would procure one of the companies
owned by him to transfer an asset to that defendant for no consideration, entered
into a "transaction" with that defendant within section 423(1)(a) by making an
C  "arrangement" with them on terms that provided for the first defendant to receive no
consideration (post, paras 33–37, 43, 47, 52–56, 59–60, 63–64, 72, 75–76).
    *Clarkson v Clarkson* [1994] BCC 921, CA distinguished.
    Decision of the Court of Appeal sub nom *Invest Bank PSC v El-Husseini* [2023]
EWCA Civ 555; [2024] KB 49; [2023] 3 WLR 645 affirmed.

The following cases are referred to in the judgment of Lady Rose and Lord
D  Richards JJSC:

*Agricultural Mortgage Corpn plc v Woodward* [1995] 1 BCLC 1; [1994] BCC 688,
    CA
*BTI 2014 LLC v Sequana SA* [2019] EWCA Civ 112; [2019] Bus LR 2178; [2019]
    2 All ER 784; [2019] 2 All ER (Comm) 13; [2019] 1 BCLC 347, CA
*Bacon (MC) Ltd, In re* [1990] BCLC 324; [1990] BCC 78
*Clarkson v Clarkson* [1994] BCC 921, CA
E  *Commercial Bank of Dubai PSC v Al Sari* [2023] EWHC 1797 (Comm)
*Delaney v Chen* [2010] EWCA Civ 1455; [2011] BPIR 39, CA
*4 Eng Ltd v Harper* [2009] EWHC 2633 (Ch); [2010] 1 BCLC 176; [2010] BCC 746
*JSC BTA Bank v Ablyazov* [2018] EWCA Civ 1176; [2018] BCC 96, CA
*JSC VTB Bank v Skurikhin (No 3)* [2015] EWHC 2131 (Comm)
*Inland Revenue Comrs v Hashmi* [2002] EWCA Civ 981; [2002] 2 BCLC 489; [2002]
    BCC 943, CA
F  *MacDonald v Carnbroe Estates Ltd* [2019] UKSC 57; 2020 SC (UKSC) 23; [2020]
    1 BCLC 419; SC(Sc)
*Mathieson, In re* [1927] 1 Ch 283, CA
*National Bank of Kuwait v Menzies* [1994] 2 BCLC 306; [1994] BCC 119, CA
*R (O) v Secretary of State for the Home Department* [2022] UKSC 3; [2023] AC 255;
    [2022] 2 WLR 343; [2022] 4 All ER 95, SC(E)
*Spellman v Spellman* [1961] 1 WLR 921; [1961] 2 All ER 498, CA

G  The following additional cases were cited in argument:

*Akers v Samba Financial Group* [2017] UKSC 6; [2017] AC 424; [2017] 2 WLR 713;
    [2017] 2 All ER 799; [2017] 2 All ER (Comm) 97, SC(E)
*Akhmedova v Akhmedov* [2021] EWHC 545 (Fam); [2021] 4 WLR 88
*Brookmann Home Ltd, In re* [2021] EWHC 2610 (Ch); [2022] BCC 122
*Cadogan v Kennett* (1776) 2 Cowp 432
H  *Feakins v Department for Environment, Food and Rural Affairs* [2005] EWCA Civ
    1513; [2007] BCC 54, CA
*Foskett v McKeown* [2001] 1 AC 102; [2000] 2 WLR 1299; [2000] 3 All ER 97,
    HL(E)
*Gwinnutt v George* [2019] EWCA Civ 656; [2019] Ch 471; [2019] 3 WLR 229, CA
*Lemos v Lemos* [2016] EWCA Civ 1181; [2017] BPIR 716, CA

© 2025 The Incorporated Council of Law Reporting for England and Wales

*MDA Investment Management Ltd, In re* [2003] EWHC 227 (Ch); [2004] EWHC 42    A
    (Ch); [2005] BCC 783
*National Westminster Bank plc v Jones* [2001] EWCA Civ 1541; [2002] 1 BCLC 55,
    CA
*Ovenden Colbert Printers Ltd, In re* [2013] EWCA Civ 1408; [2014] 1 BCLC 291;
    [2015] BCC 615, CA
*Paramount Airways Ltd, In re* [1993] Ch 223; [1992] 3 WLR 690; [1992] 3 All ER 1,
    CA                                                                          B
*Prest v Petrodel Resources Ltd* [2013] UKSC 34; [2013] 2 AC 415; [2013] 3 WLR 1;
    [2013] 4 All ER 673, SC(E)
*Tasarruf Mevduati Sigorta Fonu v Merrill Lynch Bank and Trust Co (Cayman) Ltd*
    [2011] UKPC 17; [2012] 1 WLR 1721; [2011] 4 All ER 704, PC

**APPEAL** from the Court of Appeal
    By a Part 7 claim form issued on 9 July 2021 the claimant bank, Invest    C
Bank PSC, brought primary debt claims against the first defendant, Ahmad
Mohammad El-Husseini, a Lebanese businessman against whom the
claimant said it had judgment debts from proceedings brought by it in Abu
Dhabi, amounting to the equivalent of £20m; and various other secondary
claims against the second to eighth defendants, who were respectively,
Mohammed Ahmad El-Husseiny, Alexander Ahmad El-Husseiny, Ziad
Ahmad El-Husseiny, Ramzy Ahmad El-Husseiny, Joan Eva Henry, Virtue    D
Trustees (Switzerland) AG and Global Green Development Ltd.    The
secondary claims sought relief relating to assets ("the claim assets") against
which, directly or indirectly, the claimant wished to assert an entitlement
to enforce the first defendant's liability to it.    The claimant sought:
(1) declarations that the first defendant held the beneficial interest in the
claim assets, legal title to which was now held variously by the other    E
defendants; and (2) relief under section 423 of the Insolvency Act 1986 as
regards the claim assets, on the basis that the steps allegedly taken by the
first defendant in 2017 relating to each of the claim assets involved a
transaction at an undervalue entered into by him for the purpose of putting
assets beyond the reach of or otherwise prejudicing the interests of his
creditors.
    Following a hearing of various interim applications, by a decision dated    F
13 May 2022 and by orders dated 13 May 2022, 11 July 2022 and
9 September 2022 Andrew Baker J [2022] EWHC 894 (Comm); [2022]
BPIR 1503 held, inter alia, that a "transaction" could be entered into within
the meaning of section 423 of the 1986 Act if the assets were not beneficially
owned by the debtor.
    By an appellant's notice filed on 29 September 2022 and pursuant to    G
permission granted on 27 October 2022 by the Court of Appeal (Males LJ)
the third and fourth defendants appealed.  On 19 May 2023 the Court of
Appeal (Singh, Males and Popplewell LJJ) [2023] EWCA Civ 555; [2024]
KB 49 dismissed the appeal.
    With permission of the Supreme Court (Lord Briggs, Lord Burrows
and Lady Rose JJSC) the third and fourth defendants appealed.  The issue in
the appeal was agreed to be: can section 423 of the 1986 Act be engaged    H
where the subject matter of the transaction does not include the transfer of
assets which are beneficially owned by the debtor?
    The facts are stated in the judgment of Lady Rose and Lord
Richards JJSC, post, paras 2–8.

© 2025 The Incorporated Council of Law Reporting for England and Wales

A    *Daniel Warents*, *Niamh Davis* and *Graham Virgo KC (Hon)* (instructed
by *Longmores Solicitors LLP, Hertford*) for the third and fourth defendants.
     *Paul McGrath KC* and *Marc Delehanty* (instructed by *PCB Byrne LLP*)
for the claimant.

     The court took time for consideration.

B    19 February 2025.    **LADY ROSE** and **LORD RICHARDS JJSC**
(with whom **LORD HODGE DPSC**, **LORD HAMBLEN** and **LORD
STEPHENS JJSC** agreed) handed down the following judgment.

     1    This appeal raises a single but important point on the construction of
section 423 of the Insolvency Act 1986 ("IA 1986").  In very broad terms,
C    section 423 provides remedies to creditors in circumstances where a debtor
takes steps to defeat or prejudice their claims by entering into a transaction,
which is very broadly defined, on terms that provide for the debtor to receive
no consideration or consideration worth less than the consideration which
the debtor provides.  The general issue as initially presented by the appellants
was whether section 423 applies only where the transaction involves the
transfer of an asset beneficially owned by the debtor.  As will appear, this issue
D    was refined and narrowed by the appellants in the course of submissions.  The
more specific, but nonetheless important, issue has remained unchanged:
whether section 423 can apply to a transaction whereby a debtor agrees to
procure a company which he owns to transfer a valuable asset for no
consideration or at an undervalue, thereby reducing or eliminating the value
of his shares in the company to the prejudice of his creditors, or whether such
E    a transaction falls outside section 423 because the debtor does not personally
own the asset.
     2    This issue arose in proceedings commenced in the High Court in July
2021 to enforce judgments previously obtained in Abu Dhabi by the first
respondent, Invest Bank PSC ("the Bank"), against Mr Ahmad El-Husseini
("Mr El-Husseini") for AED 96m, which is equivalent to about £20m.  The
judgment debt arose under guarantees given by Mr El-Husseini in respect of
F    credit facilities granted by the Bank to two companies connected with him.
     3    The Bank identified valuable assets in this jurisdiction against which
it wished to enforce those judgments.  These included houses in central
London or companies owning such houses, which, it said, ought to be made
available for this purpose.  It alleged that Mr El-Husseini had arranged for
these assets to be transferred to other people in order to put them beyond the
G    reach of the Bank and its judgment debt or to reduce the value of the
companies which owned them.  It sought relief under section 423.
     4    As described in more detail below, the issue on this appeal was
decided against the appellants at first instance and by the Court of Appeal
on preliminary applications as to jurisdiction and other matters.  The
proceedings subsequently came to trial before Calver J in the Commercial
Court in July 2024.  Following a four-week hearing, Calver J gave judgment
H    on 21 November 2024 [2024] EWHC 2976 (Comm), dismissing all the
Bank's claims, on the grounds that the Bank had failed to establish that at
least one of Mr El-Husseini's purposes in making any of the transfers was to
put assets beyond the reach of the Bank.  The judge therefore dismissed the
action on a ground that does not arise on this appeal.  Whether because of a

possible appeal or otherwise, the parties have not requested this court to   A
refrain from giving judgment on this appeal and, in any event, the general
importance of the issue on the appeal is such that judgment should be given.

5    Several transfers of assets were included in the claim, some of London
properties and some of shares, some transferred to one or more of
Mr El-Husseini's sons and some transferred to companies or trusts. In order
to identify and consider the legal point that arises for decision in this appeal,
it is useful therefore to focus on one particular transfer as a good example.   B
This is the transaction involving a property at 9 Hyde Park Garden Mews
("9 Hyde Park"). For the purposes of the appeal, the court has assumed the
following facts:

(a).  Before 9 Hyde Park was transferred, it was legally and beneficially
owned by a Jersey company, Marquee Holdings Ltd ("Marquee"). It was
worth about £4.5m.   C

(b).  At the time of the transfer, Mr El-Husseini was the beneficial owner
of all the shares in Marquee.

(c).  Mr El-Husseini arranged with one of his sons, the second appellant
Ziad Ahmad El-Husseiny ("Ziad"), that he would cause Marquee to
transfer the legal and beneficial ownership of 9 Hyde Park to Ziad for no
consideration.

(d).  In June 2017, Mr El-Husseini caused Marquee to transfer the legal   D
and beneficial title to 9 Hyde Park to Ziad.

(e).  Ziad did not pay any money or provide any other consideration
either to Marquee or to Mr El-Husseini in return for the house.

6    The Bank did not allege that Ziad, in agreeing to receive or in
receiving 9 Hyde Park, had any dishonest intent or shared his father's alleged
purpose. The Bank did not contend that the transaction was a sham.   E

7    The effect of this transaction, on the assumed facts, was that Marquee
transferred a valuable asset to Ziad and received nothing in return, with the
result that Mr El-Husseini's shareholding in Marquee was correspondingly
reduced in value. Likewise, Mr El-Husseini received nothing in return for
procuring the transfer of 9 Hyde Park to compensate for the reduction in the
value of his shares in Marquee. Thus, the Bank's ability to enforce its
judgment was adversely affected to the extent of some £4.5m. However, the   F
appellants say that the transfer of 9 Hyde Park could not fall within
section 423 because the debtor, Mr El-Husseini, did not transfer any
property that he himself owned, while the Bank argues that there is no such
requirement in section 423(1) and that the transaction could be caught by
the regime.

8    The other parties to the action were alleged to have been involved   G
with other properties in respect of which the Bank was also seeking orders
but we do not need to refer to them further.

*The proceedings*

9    The Bank issued these proceedings on 9 July 2021. The day before, at a
without notice hearing, the Bank obtained permission to serve its claim on all
the individual defendants out of the jurisdiction and also obtained a domestic   H
freezing order against Mr El-Husseini. The Bank sought in summary (a) to
enforce the Abu Dhabi judgments in England against Mr El-Husseini or
alternatively for a judgment against him on the debts allegedly due to it under
the personal guarantees given by him; (b) declarations that certain assets

© 2025 The Incorporated Council of Law Reporting for England and Wales

A   were held on trust for Mr El-Husseini by his sons; and (c) relief under
section 423.

    10   The Bank obtained a default judgment on the first part of the claim
and for our purposes there is no doubt that Mr El-Husseini is liable to pay
the judgment debt to the Bank.

    11   Mr El-Husseini, Ziad, and Alexander El-Husseiny (another of
Mr El-Husseini's sons) applied to set aside service of the Bank's claim so far
B   as it made claims under section 423 (save as regards one property) on the
ground that those claims did not raise a serious issue to be tried. The
jurisdiction challenge and a number of other applications were heard in
February 2022 by Andrew Baker J. In a judgment handed down on 13 May
2022 [2022] EWHC 894 (Comm); [2022] BPIR 1503, he determined two
points of law relating to the interpretation of section 423 (the text of which
C   we have set out at para 26 below).

    12   First, Andrew Baker J held that the fact that the relevant assets were
not legally or beneficially owned by the judgment debtor but instead by a
company owned or controlled by him did not in law prevent the transfer
from falling within the scope of section 423. This point has been referred to
as the "Beneficial Interest Point". He dealt with the Beneficial Interest Point
at paras 43–46 of his judgment. He noted first that there was no wording in
D   section 423, or in the definition of "transaction" in section 436 of the IA
1986, which limited section 423 to a transaction whereby a beneficial
interest of the debtor was transferred. He concluded at para 46:

        "On that statutory language, in my view it is impossible to say that it is
        a pre-requisite of a transaction entered into by the debtor, for it to fall
        within section 423, that it concern an asset beneficially owned by the
E     debtor, and cannot extend to an arrangement made with a view to a
        transferee acquiring at an undervalue an asset owned by a company
        owned by the debtor, with a view to putting that asset beyond the
        (indirect) reach of the creditor in any attempt they might make to enforce
        their rights against the debtor."

    13   Secondly, the judge held that a debtor does not "enter into a
F   transaction" for the purposes of section 423 when all his actions are carried
out in his capacity as a director or other organ of the company which owns
and transfers the relevant assets. We refer to this as "the Capacity Point"
since it turns on the capacity in which the debtor effects the transfer—is it in
his personal capacity so that he, personally, "enters into" the transaction for
the purposes of section 423 or is it only in his capacity as an organ of the
G   company so that it is only the company which "enters into" the transaction?
He held at para 47(1) that if and to the extent that the Bank relied on steps
taken by Mr El-Husseini which, on analysis, amounted to steps taken by a
company controlled by him, those steps cannot themselves amount to or
involve the entry into *by him* of any transaction for the purpose of
section 423. On that basis and on the basis that, as the appellants claimed,
9 Hyde Park was beneficially owned by Marquee, the judge held that on the
H   Bank's pleaded case the transfer of 9 Hyde Park fell outside section 423:
para 71.

    14   After the judge made the order giving effect to his ruling ("the May
2022 Order"), the Bank applied for permission to re-amend its Particulars of
Claim. The amendments were aimed at identifying steps that were alleged to

have been taken by Mr El-Husseini in his personal capacity (rather than, say, *A*
as a director of Marquee) such as arranging with Marquee and his sons for
the transfers of the assets to take place.  The Bank thereby attempted to
supplement its pleaded case in a way which avoided the import of the
Judge's ruling on the Capacity Point by identifying, so far as it could on the
information then available to it, conduct which Mr El-Husseini carried out
in his personal capacity rather than just as a director of the relevant *B*
company.  Permission was granted to make those amendments on 11 July
2022.

15    Alexander and Ziad appealed against the judge's ruling on the
Beneficial Interest Point and the Bank appealed against his ruling on the
Capacity Point.

16    The Court of Appeal (Singh, Males and Popplewell LJJ) dismissed
the appellants' appeal on the Beneficial Interest Point and allowed the Bank's *C*
appeal on the Capacity Point: [2023] EWCA Civ 555; [2024] KB 49.

17    On the Capacity Point, Singh LJ concluded at para 54 that the Bank's
appeal should be allowed on a narrow point of law which he explained as
follows:

   "It amounts simply to saying that the Judge was wrong to prevent the
   Bank from pursuing its claim as pleaded on this issue.  It amounts to no *D*
   more than saying that such acts of a debtor are capable in law, without
   more, of falling within the terms of section 423 of the 1986 Act.  Whether
   they do so, and whether there are other facts (as the Judge himself
   recognised there may be) which are more than simply the fact that the
   company acts through its director, would have to be established at a trial
   on the whole of the evidence." *E*

18    As regards the Beneficial Interest Point, the appellants' appeal was
summarised as raising the question whether a "transaction" can be entered
into within the meaning of section 423 if the assets transferred are not
beneficially owned by the debtor.  If, as the appellants submitted, section 423
applied only where a beneficially owned asset of the debtor was transferred,
then the judge had been wrong to declare that the court had jurisdiction over
the claims to, amongst other things, 9 Hyde Park and had also been wrong to *F*
grant the Bank permission to amend the detail of its claims in respect of that
property.

19    Singh LJ gave several reasons for concluding that the appellants'
construction of section 423 was wrong: paras 60–67.  First, it required
reading words into section 423 that were not there.  Secondly, the word
"transaction" was defined broadly in section 436(1) and there was no reason *G*
to give a restrictive meaning to the broad terms used: "agreement or
arrangement".  Thirdly, the interpretation of section 423(1) was informed by
the purpose of the section which was clear from subsection (3): the court
should not interpret subsection (1) "in a way which would easily defeat the
purpose of section 423 when read as a whole".  Fourthly, there was no good
policy reason to restrict the meaning.  Finally, at paras 65–73, Singh LJ *H*
addressed a point made by the appellants comparing section 423 with
the wording used in section 238 (relating to insolvent companies) and
section 339 (relating to bankrupt individuals), and their submission that
the decision of the Court of Appeal in *Clarkson v Clarkson* [1994] BCC 921 on
section 339 was binding authority that in the context of these sections a

© 2025 The Incorporated Council of Law Reporting for England and Wales

327

A  "transaction" must involve a transfer of assets which are beneficially owned
by the debtor.  Singh LJ stressed that although section 423 was included in the
Insolvency Act, it was not limited to situations of insolvency and had a
different historical origin from those provisions concerned only with
insolvency.  He said at para 67:

B      "The important point for present purposes is that, although
    section 423 finds itself in the same Act as those provisions which are
    concerned with bankruptcy or corporate insolvency, its scope is wider.
    There is no need for there to be any insolvency.  The unfortunate reality of
    life is that even very wealthy debtors are sometimes unwilling, rather than
    unable, to pay their debts.  They may well make strenuous efforts to use
    various instruments, including a limited company, for the purpose of
    putting their assets beyond the reach of a person who is making, or may
C    make, a claim against them; or otherwise prejudicing the interests of such
    a person."

    20    The appellants sought permission to appeal to this court only on the
Beneficial Interest Point and not on the Capacity Point.  Permission was
granted on 18 October 2023.

D  *The legislation*

    21    Attempts by debtors to defeat their creditors and make themselves
judgment-proof are not new.  In Roman law, the actio pauliana was designed
to counter these attempts (see *The Institutes of Justinian*, book 4, title 6,
para 6, *The Digest of Justinian*, book 42, title 8), and it remains in differing
forms an important feature of many European legal systems: see, for
E  example, article 1341-2 of the French Civil Code, and the Anfechtungsgesetz
in Germany.
    22    According to the appellants' research, legislation in England goes
back to the time of King Edward III (50 Edward III, c 6).  The present
legislation can be traced to the Fraudulent Conveyances Act 1571 (13 Eliz,
c 5), which was replaced by section 172 of the Law of Property Act 1925.
F      23    The topic was one of those considered by the review of insolvency
legislation by the committee chaired by Sir Kenneth Cork which led to the
publication of *Report of the Review Committee on Insolvency Law and
Practice* (Cmnd 8558) (1982) ("the Cork Report").  Chapter 28 of the Cork
Report identified two categories of remedies.  First, there are remedies which
form part of the general law and may be invoked whether or not the debtor
has become insolvent.  The second are remedies which form part of the law
G  of insolvency and may be invoked only after the debtor has first been
declared insolvent: see para 1201 of the Cork Report.  The Cork Report, at
para 1202, described the principle behind the first category, then in the form
of section 172 of the Law of Property Act 1925, as being that "persons must
be just before they are generous and that debts must be paid before gifts
can be made."  The Cork Report made recommendations to improve the
protection for creditors provided by this remedy.
H      24    Those recommendations were adopted but section 423 of the IA
1986 was not enacted in exactly the terms suggested in the Cork Report, a
point we note later in this judgment.  The IA 1986 represented a substantial
reform and re-drafting of insolvency legislation, dealing for the first time in
one statute with both individuals and companies in the law of England and

© 2025 The Incorporated Council of Law Reporting for England and Wales

Wales. The reforming provisions had for the most part been included in the    *A*
Insolvency Act 1985 but, save for a few sections, those provisions were not
brought into force until they could be consolidated into the IA 1986. For
this reason, we shall not refer again to the 1985 Act but will proceed on the
basis that the relevant provisions of the IA 1986 were new and implemented
the intended reforms.

25    Part XVI, headed Provisions Against Debt Avoidance, comprises    *B*
sections 423 to 425 and applies in England and Wales only. Section 423 sets
out the elements of the claim which must be established by a claimant, while
section 424 identifies those who may bring claims under section 423 and
section 425 provides, on a non-exhaustive basis, for the remedies available
to the court. Articles 367–369 of The Insolvency (Northern Ireland) Order
1989 (1989/2405 (NI 19)) are in virtually identical terms. There is no
statutory equivalent applicable in Scotland, but an alienation of property by    *C*
an insolvent debtor for inadequate consideration may be challenged without
proof of any purpose to prejudice creditors, under statute (section 242 of the
IA 1986 in the case of companies or section 98 of the Bankruptcy (Scotland)
Act 2016 in the case of individuals) or, without time limits, at common law:
see *MacDonald v Carnbroe Estates Ltd* [2020] 1 BCLC 419 at paras 19–28
per Lord Hodge JSC.

26    Section 423 is in the following terms:    *D*

"(1) This section relates to transactions entered into at an undervalue;
and a person enters into such a transaction with another person if— (a) he
makes a gift to the other person or he otherwise enters into a transaction
with the other on terms that provide for him to receive no consideration;
(b) he enters into a transaction with the other in consideration of marriage
or the formation of a civil partnership; or (c) he enters into a transaction    *E*
with the other for a consideration the value of which, in money or
money's worth, is significantly less than the value, in money or money's
worth, of the consideration provided by himself.

"(2) Where a person has entered into such a transaction, the court may,
if satisfied under the next subsection, make such order as it thinks fit for—
(a) restoring the position to what it would have been if the transaction    *F*
had not been entered into, and (b) protecting the interests of persons who
are victims of the transaction.

"(3) In the case of a person entering into such a transaction, an order
shall only be made if the court is satisfied that it was entered into by him
for the purpose— (a) of putting assets beyond the reach of a person who
is making, or may at some time make, a claim against him, or (b) of    *G*
otherwise prejudicing the interests of such a person in relation to the
claim which he is making or may make.

"(4) In this section 'the court' means the High Court or— (a) if the
person entering into the transaction is an individual, any other court
which would have jurisdiction in relation to a bankruptcy petition relating
to him; (b) if that person is a body capable of being wound up under
Part IV or V of this Act, any other court having jurisdiction to wind it up.    *H*

"(5) In relation to a transaction at an undervalue, references here and
below to a victim of the transaction are to a person who is, or is capable of
being, prejudiced by it; and in the following two sections the person
entering into the transaction is referred to as 'the debtor'."

© 2025 The Incorporated Council of Law Reporting for England and Wales

A    27    Section 423 contains in subsection (1) the acts to which the section applies and in subsection (3) the debtor's requisite subjective intention. They are respectively the actus reus and the mens rea which a claimant must establish.

28    The issue in this appeal arises under section 423(1), but section 423(3) has a crucial role in establishing the purpose of the section and is therefore an important element in considering the proper scope of

B    section 423(1). It may be noted, but it is not directly relevant, that there has been discussion in decisions of the Court of Appeal as to what constitutes the debtor's "purpose" within the meaning of section 423(3): see *Inland Revenue Comrs v Hashmi* [2002] 2 BCLC 489 and *JSC BTA Bank v Ablyazov* [2019] BCC 96. Issues can arise in cases of mixed purposes. In *Ablyazov*, the Court of Appeal approved the test applied by the judge in that

C    case, namely whether the debtor had "positively intended" to put funds beyond the reach of his creditors. However expressed, it is unquestionably the debtor's subjective purpose that must be established.

29    As regards those who have standing to make claims under section 423, section 424 provides that, in the case of a debtor, whether individual or corporate, that is subject to a formal insolvency process, an

D    application may be made by the officeholder or (with the leave of the court) by a "victim of the transaction", and in any other case by a victim of the transaction. Special provision is made where the debtor is subject to a voluntary arrangement. In every case, an application is treated as made on behalf of every victim of the transaction: section 424(2). A "victim of the transaction" is defined by section 423(5) as "a person who is, or is capable of being, prejudiced by it".

E    30    Importantly, section 436(1) defines "transaction" for the purposes of the IA 1986, except in so far as the context otherwise requires, as including "a gift, agreement or arrangement, and references to entering into a transaction shall be construed accordingly". In particular, the inclusion of an arrangement makes for a broad definition of "transaction". It is not suggested that there is anything in the context of section 423 which would

F    mean that this definition does not apply.

31    There are other provisions of the IA 1986 concerned with transactions at an undervalue, applicable only in the context of a formal insolvency process: section 238, applicable in the administration or liquidation of companies, and section 339, applicable in the bankruptcy of an individual. The definition of "transaction" in section 436(1) applies equally

G    to those sections, which as regards the transactions to which they apply are drafted in very similar terms to section 423. The significant difference is that the remedy under section 423 is triggered by the mental element required by section 423(3), while the remedies under the other sections are triggered by objective criteria, in particular that the transactions were entered into within specified periods before the commencement of the relevant insolvency process. We shall refer in more detail to these sections when addressing

H    submissions based on the drafting similarities, the application of the definition in section 436(1) and decisions on sections 238 and 339.

32    There was no difference between the parties as to the principles of statutory construction. We must look at the wording of the provision in dispute in the context in which it appears in the section and in the Act as a

© 2025 The Incorporated Council of Law Reporting for England and Wales

whole, bearing in mind the purpose for which it was enacted: see *R (O) v Secretary of State for the Home Department* [2023] AC 255, paras 29–31.

*A straightforward reading of section 423*

33    A straightforward reading of section 423(1), together with the definition of "transaction" in section 436(1), would suggest that the transaction involving 9 Hyde Park fell within the terms of section 423(1), and that there was no requirement for Mr El-Husseini himself to dispose of property belonging to him.

34    On the assumed facts, Mr El-Husseini arranged with Ziad that he would procure Marquee to transfer 9 Hyde Park to Ziad who would not pay a price or provide other consideration for the transfer. Applying section 423(1)(a), Mr El-Husseini made an arrangement ("entered into a transaction") with Ziad on terms that provided for Mr El-Husseini to receive no consideration. If Ziad had agreed to provide some, but inadequate, consideration, section 423(1)(c) would equally have applied. In that case, Mr El-Husseini would have entered into an arrangement with Ziad for a consideration the value of which was significantly less than the value of the consideration provided by himself: the consideration provided by Mr El-Husseini was his agreement to procure the transfer to Ziad of 9 Hyde Park by Marquee, and the consideration provided by Ziad was the inadequate sum to be paid by Ziad either to Marquee or to Mr El-Husseini.

35    A transfer by a debtor owned company of a valuable asset for no or inadequate consideration necessarily results in a diminution in the value of the debtor's shares in the company. The Bank accepted that it was a necessary element in their claim that the value of Mr El-Husseini's assets, in this case his shares in Marquee, had been diminished as a result of the transfer. Depending on the circumstances, the transfer may either reduce the value of the shares or destroy their value completely. Either way, it prejudices the creditor's ability to enforce the judgment. It also removes an asset of the company that might otherwise have become available for enforcement of the judgment debt against the debtor: see for example the orders made in *JSC VTB Bank v Skurikhin (No 3)* [2015] EWHC 2131 (Comm) and *Commercial Bank of Dubai PSC v Al Sari* [2023] EWHC 1797 (Comm).

36    An arrangement by a debtor to procure such a transfer is an obvious way in which a debtor may seek to defeat his creditors. This had been the case long before the enactment of the IA 1986. The mental element required by section 423(3) can without difficulty be satisfied as regards such an arrangement. Whether or not it strictly speaking puts assets beyond the reach of creditors within the meaning of section 423(3)(a), it certainly prejudices the interests of creditors within the meaning of section 423(3)(b).

37    In circumstances where the mental element set out in section 423(3) is satisfied, where the transaction is well within the mischief at which section 423 is aimed, as that mischief appears from section 423(3), where the arrangement meets the terms of section 423(1), and where the section contains no express requirement for a disposal of any property belonging to the debtor (as the appellants accept), the application of well-established principles of statutory construction would seem to lead to the same analysis as Andrew Baker J and the Court of Appeal on this issue.

38    The appellants do not accept this approach and submit, on various grounds, that it is implicitly and necessarily a requirement of section 423

© 2025 The Incorporated Council of Law Reporting for England and Wales

A   that the transaction involves the transfer of property belonging to the debtor.

39    The appellants' submissions may be grouped under three headings:

a. Textual indicators within the wording of sections 423 to 425.

b. A consideration of the purpose that the regime was designed to achieve and what it was not designed to achieve.

B   c. How the fraudulent transfer regime in sections 423 to 425 was intended to interrelate with sections 238 and 339 dealing with transactions at an undervalue in corporate and personal insolvency.

40    We consider each of these in turn.

*Indications in the wording of sections 423 to 425*

*(i) Transactions which are "otherwise" like gifts*

C   41    Mr Warents, who appeared for the appellants, pointed out that section 423(1)(a) itself contains two limbs. It refers to the person making a gift—the first limb—and then to the person "otherwise" entering into a transaction for no consideration—the second limb.

42    It was common ground that the word "gift" in the first limb bears its ordinary meaning: see *BTI 2014 LLC v Sequana SA* [2019] Bus LR 2178

D   ("*Sequana*") at para 41. Mr Warents relied on *Spellman v Spellman* [1961] 1 WLR 921 as establishing that a donor can only make a gift of property that he owns. In that case the car which the wife claimed that the husband had gifted to her before their separation was in fact owned by the hire purchase company from which the husband had obtained a loan to pay for the car. Mr Warents argued that the use of the word "otherwise" introducing the

E   second limb of section 423(1)(a) shows that the transfer must, like a gift, involve the transfer of a proprietary interest by the debtor. Here there has been no gift of Mr El-Husseini's shares because he still owned them after the transaction had been completed. He could not make a gift of 9 Hyde Park because he did not own it, Marquee owned it.

43    We do not accept that the word "gift" is so limiting of the transactions to which the second limb of section 423(1)(a) applies. There is nothing in the

F   wording of the provision that suggests that the word "gift" governs the rest of the definition. The Court of Appeal so decided in *Sequana*, holding that the payment of a dividend by a company to its shareholders was not a gift but was a transaction for no consideration: para 50. Further, there is no support in academic commentary for such a limitation. Mr McGrath KC, appearing on behalf of the Bank, referred to the relevant passage in Parry, *Transaction Avoidance in Insolvencies*, 3rd ed (2018), para 4.15. The authors state that

G   while a gift, by definition, involves the transfer of an asset, transactions which provide for the debtor to receive no consideration do not necessarily entail the transfer of an asset. They include, for example, the promise of a forbearance for which no consideration is received or the voluntary waiver of a debt. See similarly *Goode on Principles of Corporate Insolvency Law*, 5th ed (2018), para 13-24.

H

*(ii) The requirement that the consideration must be paid to the debtor*

44    Mr Warents drew to our attention that section 423(1) specifies that the transaction entered into by the debtor may fall within the provision if it does not "provide *for him*" to receive any consideration (paragraph (a)) or if

© 2025 The Incorporated Council of Law Reporting for England and Wales

the consideration "provided *by himself*" is significantly more than the consideration provided by the other person (paragraph (c)).

45   This, he submitted, showed that the term "consideration" in this section does not bear the same meaning as consideration more generally in contract law.  In general contract law, consideration moving from one party to someone other than the counterparty to the contract can be good consideration.  If a debtor's son owes a debt of £1,000 to a bank and the debtor agrees to pay the bank that £1,000 in return for the bank releasing the son from his debt, that would be a transaction at full value under ordinary contract law principles.  However, that would rightly fall within section 423(1)(a) because there is no consideration moving *to the debtor*; his assets are depleted by £1,000 to the detriment of his creditors.

46   That result, Mr Warents argued, creates a conundrum for the Bank.  Suppose that the facts relating to 9 Hyde Park were the same except that Ziad had paid Marquee the full value of the house.  There would be no diminution in the value of Mr El-Husseini's shares because the assets of Marquee are not reduced.  But it would still be a transaction under which *Mr El-Husseini himself* receives no consideration and so appears, on the Bank's construction of the provision, to be caught when clearly it should not be caught.  Under the appellants' construction of the provision, it would not be caught because there is no property of the debtor being transferred.

47   While Mr Warents is correct that "consideration" in section 423(1) has a narrower scope than in contract law generally, we do not accept that it creates the suggested conundrum.  Going back to the assumed facts as regards the transfer of 9 Hyde Park, Mr El-Husseini arranged with Ziad that he would procure his company, Marquee, to transfer the property to Ziad for no consideration.  Given that a "transaction" includes an arrangement and so "consideration" in section 423(1) may include unenforceable promises, that undertaking by Mr El-Husseini was consideration of very considerable value provided by him.  If Ziad had agreed with his father to pay the full value of 9 Hyde Park to Marquee, that undertaking would have been consideration of equivalent value provided to Mr El-Husseini, the performance of which would have ensured no diminution in the value of Mr El-Husseini's shareholding in Marquee.

*(iii) The bona fide purchaser defence*

48   There is a limited defence in section 425(2) for a bona fide purchaser, in the following terms:

"An order under section 423 may affect the property of, or impose any obligation on, any person whether or not he is the person with whom the debtor entered into the transaction; but such an order— (a) shall not prejudice any interest in property which was acquired from a person other than the debtor and was acquired in good faith, for value and without notice of the relevant circumstances, or prejudice any interest deriving from such an interest, and (b) shall not require a person who received a benefit from the transaction in good faith, for value and without notice of the relevant circumstances to pay any sum unless he was a party to the transaction."

49   The protection is limited under section 425(2)(a) to any interest in property which was acquired "from a person other than the debtor" and

© 2025 The Incorporated Council of Law Reporting for England and Wales

[2025] 2 WLR                                   Invest Bank PSC v El-Husseiny (SC(E))
                                               Lady Rose and Lord Richards JJSC

A   under section 425(2)(b) to a person who was not "a party to the transaction"
with the debtor.

50   Mr Warents' submission on this was that the drafter of that
provision assumed that in order to be caught by section 423, there would
be someone who acquired property from the debtor and who was too
proximate to the debtor to be able to rely on the defence and hence the
defence was only made available to someone who was at least one remove
B   from the debtor.

51   The provision, Mr Warents said, only makes sense if the most
proximate person is a person who receives property owned by the debtor.
That person cannot rely on the defence even if they were entirely innocent.
However, he said, applying that to the facts of 9 Hyde Park, there is no one
who receives property from Mr El-Husseini because he does not pass any of
C   his assets to anyone.  In theory therefore, Ziad could, if he had paid full value
for 9 Hyde Park, rely on the bona fide purchaser defence even though he is
the most proximate person to the original transfer of the house by Marquee.
There could be no policy reason for allowing a bona fide person in the
position of Ziad (that is to say the first person to receive the property directly
as a result of the transaction) to rely on the defence because he receives the
property from Marquee and not from Mr El-Husseini, but not allowing Ziad
D   to be able to rely on the defence if he had received the property directly from
Mr El-Husseini.  That illogicality must mean that the drafter expected that
the first person to receive the assets as a result of the transaction received
those assets from the debtor.  The assumption made by section 425(2)(a) is
therefore that the transaction involves the transfer of an asset by the debtor.

52   We do not agree that the wording of section 425(2) indicates that the
E   drafter was making the assumption on which Mr Warents relied.  If that was
the drafter's assumption, section 423(1) would have been drafted to include
it expressly.  It is true that it may put a third-party recipient in a more
favourable position than someone who receives property directly from the
debtor and that, in a case such as the present, there is no person who is so
proximate to the debtor that he is ruled out from reliance on the defence.  As
regards the present case, given that Ziad did not pay anything for the house,
F   he is not in any position to mount a defence under section 425(2) even
though it is not alleged that he shared his father's fraudulent purpose.

53   Overall, we consider that the wording of sections 423 to 425
strongly supports the submissions of the Bank, and the conclusion of the
courts below, that section 423(1) contains no requirement that a transaction
must involve a disposal of property belonging to the debtor, although no
G   doubt it will in many cases.  Necessarily, as Mr McGrath accepted, there
must be a depletion or diminution in value of the assets available for
enforcement of claims against the debtor (whether by creditors individually
or collectively through a formal insolvency process).  But that may occur
through a transaction that does not involve the disposal of the debtor's own
property, such as in the case of 9 Hyde Park.

54   The appellants' case involves a significant limitation on the
H   operation of the provision which, if it were intended, one would expect to
see clearly spelled out in the wording of the section.  Their construction
requires important words to be read into the section because those words are
simply not there.  One would also expect to see it heavily trailed in
admissible Parliamentary materials or academic commentary leading up to

© 2025 The Incorporated Council of Law Reporting for England and Wales

and in the wake of section 423 being enacted.  Neither party took us to any
such material.                                                                    A

55    In places the wording of the provision appears deliberately to have
avoided reference to the assets of the debtor.  In section 423(3)(a) the
fraudulent purpose is described as "putting assets beyond the reach of"
the creditor and not "putting *his* assets beyond the reach of" the creditor.
The non-exhaustive description of the kinds of order the court can make in           B
section 425(1)(a) and (b) refer to requiring "*any* property" transferred as
part of the transaction or vested in any person rather than referring to the
*debtor's* property being transferred or vested.  It may be noted that while the
recommendations in the Cork Report at para 1215 envisaged that the new
provision would expressly deal with dispositions of property, they did not
specify that this would be restricted to property of the debtor.  In the event,
section 423 was drafted in wider terms and contains no express reference to          C
dispositions of property.

56    Finally, on the language of section 423, Mr Warents submitted that
the exclusion of transactions relating to property not owned by the debtor
from the scope of section 423 was in keeping with the presumption against
confiscation.  In *In re Mathieson* [1927] 1 Ch 283, a case concerning
section 42 of the Bankruptcy Act 1914 (4 & 5 Geo 5, c 59) which was
replaced by section 339 of the IA 1986, Atkin LJ said at p 296: "I am entitled       D
to expect clear words to be used, if it is intended to divert to the benefit of
the debtor's creditors property which bona fide before the bankruptcy had
passed beneficially to other persons."  We do not accept Mr Warents'
submission.  First, section 423 expressly contemplates that the transferee of
property may be ordered to restore it.  As discussed above, there is a defence
available to a bona fide purchaser for value without notice of the debtor's          E
purpose, but only if the asset in question was acquired from a person other
than the debtor: see section 425(2).  The section therefore expressly provides
that any other transferee, including *any* transferee from the debtor and any
volunteer, may be required to re-transfer property.  The powers of the court
as to the appropriate remedy in section 423(2) are drafted in very wide terms
and, where the transferee has provided some value for the transfer, the court
may require reimbursement or compensation to be paid to the transferee as a          F
term of any order for restoration of the property: see *4 Eng Ltd v Harper*
[2010] 1 BCLC 176, paras 11–16 per Sales J, and as regards the statutory
provisions applicable in Scotland, *MacDonald v Carnbroe Estates Ltd*
[2020] 1 BCLC 419, paras 63–65 per Lord Hodge JSC.  Second, the Bank's
reading of the section as not being restricted to dealings with the debtor's
own property is, for the reasons given in this judgment, no more than a              G
natural reading of section 423(1) in context.  It does not involve an expansive
reading, whereas the appellants' case involves reading exclusionary words
into the section.

*The purpose of section 423*

57    The appellants accepted that in construing sections 423 to 425, the
purpose for which they were enacted is clearly relevant and important.              H
Mr Warents also accepted that the purpose is made apparent by
subsection (3).  That describes the purpose which the debtor must have when
he enters into the transaction, and it makes clear that the purpose of the
sections is to provide redress where transactions at an undervalue are entered

© 2025 The Incorporated Council of Law Reporting for England and Wales

A into with the mental element identified in subsection (3). Mr Warents warned the court, however, against elevating the importance of that purpose such that it overrides the other requirements of section 423. He gave examples of actions by a debtor which would satisfy the mental element of section 423(3) but would not come within section 423(1). In *Delaney v Chen* [2011] BPIR 39, two debtors sold the freehold of their home on terms that there was an immediate grant back to them of a 21-year non-assignable lease. Their

B purpose was found to have been, at least in part, to make enforcement of a judgment debt more difficult, but a claim under section 423 failed because the debtors had received full value in the form of the cash price paid by the purchaser together with the surrender value of the lease. Mr Warents gave the example of a debtor who owned a valuable wine collection. He might drink his most valuable wine to avoid its seizure by creditors or an

C officeholder, but it would not fall within section 423(1), even if this involved some "transaction" between the debtor and a third party such as a friend helping him to choose the bottles and carry them up from the cellar. The same could be said of the destruction of a valuable chattel. As Mr Warents put it, section 423 is not a kind of statutory conspiracy claim which requires only some sort of combination between the debtor and another person.

D 58 Mr Warents also warned against over-reliance on the discretion of the court under sections 423(2) and 425 when deciding whether to grant a remedy and then in fashioning any remedy as a cure-all to resolve the problems that would arise from too broad a construction of the term "transaction at an undervalue". The need for the debtor to have entered into such a transaction is an additional and logically prior requirement included by the legislature before one gets to the question of what the appropriate

E remedy might be. That requirement must be given its full weight.
59 We accept that section 423(1) must be satisfied in accordance with its own terms and that their proper construction cannot be dictated by the terms of section 423(3), or by the breadth of the remedies available to the court. Parliament has specified two elements, not one, each of which must be satisfied for a successful claim under the section. Nonetheless, section 423(1) does not stand to be construed in a linguistic vacuum,

F uninfluenced by its purpose as set out in section 423(3). A proper regard to that purpose may cut both ways. Mr McGrath accepted in the course of argument that a transaction which had no effect on the availability or value of assets otherwise available to meet the claims of creditors would not fall within section 423(1), even if it might strictly fall within its terms. Equally, however, where a transaction not only has the purpose of prejudicing

G creditors but has that effect, there is no reason why it should not fall within section 423(1), if a reasonable reading of the subsection permits it. Still less is there any reason to read into section 423(1) an implied restriction which would undermine the purpose of the section, as expressed in section 423(3), as the appellants seek to do in this case.
60 The implied restriction was originally framed by the appellants, in their Grounds of Appeal and written case, as one which required a *transfer*

H of an asset beneficially *owned* by the debtor. This was diluted in a number of different respects during oral submissions, including in particular by an acceptance that the release of debt owed to the debtor or the surrender of an interest in property, whether gratuitously or at an undervalue, fell with section 423(1), even though it involved no transfer of property. In the light

© 2025 The Incorporated Council of Law Reporting for England and Wales

of the terms of section 423(1) and (3), this concession was in our view    A
unavoidable. The appellants' case must instead be that it is an essential
element of any transaction falling within section 423 that it directly involves
property owned by the debtor, and not as here property owned by a
company which is in turn owned by the debtor. This again is a restriction
which is not expressly included in section 423. In our judgment, it is a
restriction which is not justified by the terms of section 423(1), and which
would undermine the purpose of section 423, for reasons already stated.    B

*The interrelationship between sections 423, 238 and 339 of the IA 1986*

    61    Sections 238 and 339 of the IA 1986 were enacted to provide
remedies in the case of transactions at an undervalue where the debtor has
subsequently entered administration or liquidation (section 238) or been
declared bankrupt (section 339). Section 339 replaced section 42 of the    C
Bankruptcy Act 1914 but in substantially different terms. They do not
depend on establishing the mental element required by section 423(3),
although there is a defence available to claims under section 238 where the
court is satisfied that the company entered into the transaction in good faith
and for the purpose of carrying out its business and that there were
reasonable grounds for believing that the transaction would benefit the
company (section 238(5)). Instead, the condition for their application is    D
that the transaction was entered into within a specified period before the
commencement of the relevant insolvency process: two years in the case of
the administration or liquidation of a company (section 240) and five years
in the case of bankruptcy (section 341), provided in each case the company
or individual was insolvent at the time of the transaction or became so as a
result of the transaction.                                                  E
    62    These conditions clearly distinguish section 423 and sections 238
and 339, but all three sections apply to transactions which are defined in
substantially the same terms.
    63    There is force in Mr Warents' submission that where, in three
sections in the same statute dealing with transactions at an undervalue, the
same language is used to identify the features of those transactions, the court
should proceed on the basis that a common meaning was intended for them,    F
unless there are clear reasons to the contrary. This is all the more so when,
whatever their historical origins, the sections were newly drafted provisions
in the statute introducing for the first time the concept of "a transaction at an
undervalue". In *National Bank of Kuwait v Menzies* [1994] 2 BCLC 306,
Balcombe LJ said at p 319 that the definition of a transaction at an
undervalue in section 423(1) "is in all relevant respects the same as the    G
definition in section 238(4)" and on that basis he applied to section 423(1)
Millett J's analysis of section 238(4) in *In re MC Bacon Ltd* [1990] BCLC
324, as did Sir Christopher Slade in *Agricultural Mortgage Corpn plc v
Woodward* [1994] BCC 688, 695 and Lord Neuberger of Abbotsbury MR in
*Delaney v Chen* [2011] BPIR 39, para 15.
    64    Mr Warents argued that it was therefore not appropriate to rely on    H
the purpose of one section (section 423, as expressed in subsection (3)) to
construe a provision which was common to the three sections. There would
be merit in this argument if this would result in distortions in the meaning of
the common provisions as they appeared in the other sections. But we are
unable to see that this is the case. The common purpose is to set aside or

© 2025 The Incorporated Council of Law Reporting for England and Wales

337

A   provide other redress in cases where there have been transactions at an
    undervalue which have prejudiced creditors. We find it impossible to think
    of circumstances in which a transaction was held to be within section 423(1)
    when it would not also appropriately fall within section 238 or 339. In any
    event, we see no reason as a matter of policy or purpose why a transfer by a
    company owned by an insolvent company or individual should not fall
    within those sections.
B
        65   Mr Warents further argued that in *Clarkson v Clarkson* [1994]
    BCC 921 the Court of Appeal interpreted section 339 in a way which is
    inconsistent with the Bank's case as regards section 423(1).

        66   In that case each of the three director/shareholders of a property
    development company took out an insurance policy on his own life which
    was issued jointly to the three of them as trustees. At that time the company
C   was successful. The trustees held the policy taken out by Mr Clarkson, one
    of the director/shareholders, and any proceeds on trust for such one or more
    of a class which comprised his wife and other close family members and the
    other two director/shareholders, Mr Dawber and Mr Smith. In default of
    appointment within two years after the death of Mr Clarkson, the trustees
    would hold the fund for Mr Dawber and Mr Smith in equal shares. Two
    years later, in the midst of the property crash of 1990/91, the company went
D   into receivership and demands were made under guarantees given by the
    director/shareholders. In 1992, the three trustees appointed the policy, then
    constituting the trust property, to Mrs Clarkson, whose husband was by
    then terminally ill. In 1993, Mr Dawber and Mr Smith were both declared
    bankrupt.

        67   Their trustees in bankruptcy argued that the appointment to
E   Mrs Clarkson was a transaction at an undervalue, on the grounds that she
    gave no consideration for it and, if that appointment had not been made, the
    policy could have been appointed to Mr Dawber and Mr Smith or the power
    of appointment would have vested in the trustees in bankruptcy.

        68   The appeal by the trustees in bankruptcy was dismissed. The power
    of appointment was a power given to the three directors in their capacity as
    trustees and they were bound to exercise the power in accordance with their
F   fiduciary duties. The power would not have vested in their respective
    trustees in bankruptcy because, even if categorised as "property" for this
    purpose, the power was "property held by the bankrupt on trust for
    any other person" and thus excluded from the bankrupt's estate by
    section 283(3)(a) of the IA 1986.

        69   The facts and issues in *Clarkson* are far removed from those in the
G   present case. Mr Warents relied on it because as part of his reasoning,
    Hoffmann LJ (with whom Stuart-Smith and Saville LJJ agreed), said at p 930
    that section 339:

        "was intended to enable the trustee to recover for the benefit of the
        creditors any property which he [ie the debtor] had given away for
        nothing or at an undervalue during the relevant period as defined in
H       section 341. What property did these bankrupts have at the relevant
        time?"

    Having analysed the property held by the bankrupts, Hoffmann LJ said:
    "The question is: are any of these interests property which they have given
    away?", and subsequently noted counsel's submission that "the test for

whether the bankrupts had given away their property was whether it would,    A
on their bankruptcy, have vested in their trustees. That seems to me a
reasonable approach."

70   Mr Warents relied on this part of Hoffmann LJ's judgment to support
the appellants' case that a transaction at an undervalue in section 339, and
therefore in section 423, must involve some property belonging to the debtor.

71   We reject the suggestion that Hoffmann LJ was laying down a test    B
which must be satisfied in all cases brought under section 339, or sections 238
or 423. There was no question in *Clarkson* of any relevant "property" being
owned by anyone other than the bankrupts. He was focused on the particular
and rather unusual facts of that case and was applying the relevant legal
analysis to those facts. It cannot sensibly be suggested that, if confronted
with the very different facts of this case, he would have applied the same
analysis as if it were a necessary, albeit implied, element of section 423(1).    C
Mr Warents' submission provides a good example of trying to rely on a
judgment as setting out a general and immutable principle without regard to
the facts of the case.

72   In our judgment, *Clarkson v Clarkson* is clearly distinguishable on
its facts. It is, in our view, wrong to distinguish it on the grounds that it is a
decision under section 339, which does not therefore illuminate section 423    D
with its wider ambit and different historical origins. As we have earlier said,
we can see no good reason for giving different meanings to transactions at an
undervalue in sections 238, 339 and 423.

73   Finally, Mr Warents argued that there was a "common rationale" for
the transaction at an undervalue test in the three sections, namely, to
distinguish between such transactions on the one hand and preferences given
by a debtor to particular creditors ahead of an insolvency process on the    E
other. In keeping with the Cork Report's recommendation, preferences may
only be challenged within a formal insolvency process, for which provision is
made in sections 239 and 340 of the IA 1986. The conditions for relief are
different from those under sections 238, 339 and 423, as regards the effect
of the preference (to put the creditor in a better position than in a formal
insolvency process), the mental element involved (the debtor must be
influenced by a desire to put the creditor in that better position) and the    F
shorter period before the commencement of the insolvency period in which
the preference must be given. Mr Warents submitted that, since the mental
element in section 423(3) could be satisfied in the case of a preference, it was
essential that the transaction at an undervalue test should provide an effective
mechanism for excluding preferences from the ambit of sections 238, 339
and 423.    G

74   We are uncertain why, even if this analysis were correct, it would
assist the appellants' case that a transaction at an undervalue must involve
an asset belonging to the debtor. Although sharing some common features, the
regimes for transactions at an undervalue and for preferences are clearly
separate and are aimed at different types of transaction. The purpose of
sections 238, 339 and 423 is to set aside or grant other relief in respect of
transactions at an undervalue and they are drafted to achieve that purpose.    H
A straightforward preference—the payment of a debt, for example—will not
be a transaction at an undervalue, but there may be circumstances in which
the same transaction falls, to some extent, within section 238 or 339 as a
transaction at an undervalue, and, to a different extent, within section 239

© 2025 The Incorporated Council of Law Reporting for England and Wales

*A*  or 340 as a preference.  For example, a debtor might transfer a property worth £100 to X for no consideration other than the discharge of the debtor's liability of £60 to X.  If the transfer took place within the periods applicable under both relevant sections, the transfer could be found to be a preference as to £60 and a transaction at an undervalue as to £40.  Indeed, sections 240(1) and 341(1) expressly contemplate that a transaction may be both a preference and a transaction at an undervalue.

*B*

*Conclusion*

75   We are not persuaded by any of the submissions made by the appellants that the straightforward reading of section 423(1) adopted by the courts below is wrong.  On the contrary, we consider that both the language of section 423(1) and the purpose of the section point clearly to the
*C*  conclusion that a "transaction" within section 423(1) is not confined to a dealing with an asset owned by the debtor but extends to the type of transaction in this case, whereby the debtor enters into an arrangement under which a company owned by him or her transfers a valuable asset for no consideration or at an undervalue.  In our view, the proper approach to the construction of section 423(1) is as set out earlier in this judgment at
*D*  paras 33–37.

76   The appeal is for these reasons dismissed.

*Appeal dismissed.*

Ms B L Scully, Barrister

*E*

———————

*F*

*G*

*H*

© 2025 The Incorporated Council of Law Reporting for England and Wales

# Exhibit 62

# HIGH COURT OF AUSTRALIA

## GLEESON CJ,
## GAUDRON, GUMMOW, HAYNE AND CALLINAN JJ

---

G & M ALDRIDGE PTY LTD                                        APPELLANT

AND

JOHN MARTIN WALSH                                           RESPONDENT
(as Liquidator of Thompson Land Limited
(Receiver and Manager Appointed) (In
Liquidation))

*G & M Aldridge Pty Ltd v Walsh*
[2001] HCA 27
*24 May 2001*
M104/2000

ORDER

*Appeal dismissed with costs.*

On appeal from the Supreme Court of Victoria

Representation:

M L Sifris for the appellant (instructed by Rockman & Rockman)

I J Hardingham QC with A P Rodbard-Bean for the respondent (instructed by
Abbott Stillman & Wilson)

> Notice: This copy of the Court's Reasons for Judgment is subject to
> formal revision prior to publication in the Commonwealth Law Reports.

# HIGH COURT OF AUSTRALIA

## GLEESON CJ,
## GAUDRON, GUMMOW, HAYNE AND CALLINAN JJ

---

ELECRAFT (AUST) PTY LTD                                   APPELLANT

AND

JOHN MARTIN WALSH                                        RESPONDENT
(as Liquidator of Thompson Land Limited
(Receiver and Manager Appointed) (In
Liquidation))

*Elecraft (Aust) Pty Ltd v Walsh*
*24 May 2001*
M105/2000

### ORDER

*Appeal dismissed with costs.*

On appeal from the Supreme Court of Victoria

**Representation**:

M L Sifris for the appellant (instructed by Rockman & Rockman)

I J Hardingham QC with A P Rodbard-Bean for the respondent (instructed by
Abbott Stillman & Wilson)

Notice:  This copy of the Court's Reasons for Judgment is subject to
formal revision prior to publication in the Commonwealth Law Reports.

# HIGH COURT OF AUSTRALIA

## GLEESON CJ,
## GAUDRON, GUMMOW, HAYNE AND CALLINAN JJ

---

K & V PLUMBERS PTY LTD                    APPELLANT

AND

JOHN MARTIN WALSH                    RESPONDENT
(as Liquidator of Thompson Land Limited
(Receiver and Manager Appointed) (In
Liquidation))

*K & V Plumbers Pty Ltd v Walsh*
*24 May 2001*
M106/2000

## ORDER

*Appeal dismissed with costs.*

On appeal from the Supreme Court of Victoria

Representation:

M L Sifris for the appellant (instructed by Rockman & Rockman)

I J Hardingham QC with A P Rodbard-Bean for the respondent (instructed by
Abbott Stillman & Wilson)

Notice:  This copy of the Court's Reasons for Judgment is subject to
formal revision prior to publication in the Commonwealth Law Reports.

# HIGH COURT OF AUSTRALIA

## GLEESON CJ,
## GAUDRON, GUMMOW, HAYNE AND CALLINAN JJ

---

BARDEN-STEELDECK INDUSTRIES                              APPELLANT
PTY LTD

AND

JOHN MARTIN WALSH                                       RESPONDENT
(as Liquidator of Thompson Land Limited
(Receiver and Manager Appointed) (In
Liquidation))

*Barden-Steeldeck Industries Pty Ltd v Walsh*
*24 May 2001*
M107/2000

## ORDER

*Appeal dismissed with costs.*

On appeal from the Supreme Court of Victoria

## Representation:

M L Sifris for the appellant (instructed by Rockman & Rockman)

I J Hardingham QC with A P Rodbard-Bean for the respondent (instructed by
Abbott Stillman & Wilson)

> Notice:  This copy of the Court's Reasons for Judgment is subject to
> formal revision prior to publication in the Commonwealth Law Reports.

CATCHWORDS

*G & M Aldridge Pty Ltd v Walsh*
*Elecraft (Aust) Pty Ltd v Walsh*
*K & V Plumbers Pty Ltd v Walsh*
*Barden-Steeldeck Industries Pty Ltd v Walsh*


Companies – Winding up in insolvency – Preference – Payments made by project manager to unsecured creditors – Payments from property subject to fixed and floating charge – Payments made after crystallisation of floating charge – Chargee took no action in relation to payments – Whether payments had effect of giving creditors a preference, priority or advantage over general body of unsecured creditors.

Words and phrases – "preference, priority or advantage".

*Bankruptcy Act* 1966 (Cth), s 122(1), (2).
*Companies Code* (Vic), s 451.

1    GLEESON CJ, GAUDRON, GUMMOW, HAYNE AND CALLINAN JJ.    Four
appeals were heard together.  Each raises an identical issue, arising out of the
same transaction, concerning the preference provisions of the *Companies Code*
(Vic) ("the Code") and the *Bankruptcy Act* 1966 (Cth) ("the Act").    The
respondent to each appeal, the liquidator of Thompson Land Limited (Receiver
and Manager Appointed) (In Liquidation) ("TLL"), commenced actions in the
County Court of Victoria against each appellant for the recovery of amounts said
to represent payments or transfers of property which were void as against the
respondent by virtue of s 451 of the Code.  The actions were heard by Judge
Ostrowski.  They were successful.  Appeals to the Court of Appeal of the
Supreme Court of Victoria were dismissed[1].

2    The issues have narrowed as the litigation has proceeded.  Some of the
points argued before Judge Ostrowski were not pursued in the Court of Appeal;
and the present appeal does not cover all of the issues decided by the Court of
Appeal.  The central point argued in this Court concerns the significance of a
floating charge that had crystallised before the impugned transaction.  In order to
explain the argument it is necessary to outline the facts and make brief reference
to some of the other issues that arose at earlier stages.

3    TLL was wound up by order of the Supreme Court of Victoria on
6 September 1990.  The respondent was appointed liquidator.  The application
for winding up had been filed on 15 May 1990.

4    At all material times, Australia and New Zealand Banking Group Ltd
("the Bank") was a secured creditor of TLL, the security being a mortgage
debenture which gave the Bank a fixed charge over certain assets and a floating
charge over all other assets of TLL.  The debenture provided for automatic
crystallisation of the floating charge in certain circumstances which, it is agreed,
arose on 9 March 1990.  It also empowered the Bank to appoint a receiver and
manager to take possession of the secured property.  The Bank did not make such
an appointment until 27 April 1990.

5    TLL was a public company.  Its shares were listed on the Stock Exchange.
In early 1990 it had recently completed the development of a new shopping
centre at Dandenong known as the Capital Centre.  The Centre was occupied, and
its shops were operating.  However, trade creditors of TLL, including the
appellants, were having difficulty obtaining payment of debts owing to them.

---

1    *G & M Aldridge Pty Ltd v Walsh* [1999] 3 VR 601.

*Gleeson   CJ*
*Gaudron   J*
*Gummow   J*
*Hayne     J*
*Callinan  J*

2.

6          The appellants were four members of a larger group of 12 contractors who had worked on the construction of the Centre and to whom final payments were owed by TLL. They were not the only unsecured creditors of TLL. But they made common cause, and, in early March 1990, consulted the same solicitor, Mr Rockman. He, in turn, dealt with TLL's solicitors.

7          A company named Construction Engineering Pty Ltd had been appointed by TLL as the project manager for the Centre. That company, as agent for TLL, had engaged the contractors who worked on the Centre, and had attended to their payment on behalf of TLL. It appeared that, at the time Mr Rockman was consulted, Construction Engineering Pty Ltd was holding in its bank account an amount of approximately $400,000 on behalf of TLL, which represented over-payments made by TLL as advances to pay contractors. On 15 March 1990, Mr Rockman's clients entered into an agreement with TLL to the following effect. The amount of $400,000 was to be divided between the 12 contractors in proportion to the debts owing to them. TLL directed Construction Engineering Pty Ltd immediately to make the appropriate payment to each of the 12 contractors as a first instalment, or "deposit", on account of the debt. The balance of the debt was to be paid on 20 April 1990 and, as security, each contractor was assigned certain units held by TLL in the M & T Property Fund. The part payments were made by Construction Engineering Pty Ltd at the direction of TLL. The balance was never paid, and each creditor, on 20 April 1990, sold the units it was given as security for a small amount. The proceeds of sale left substantial amounts owing to each creditor. The respondent's action was to recover the part payments and the proceeds of sale of the units.

8          The Bank's charge had crystallised before the making of the part payments and the giving of the security over the units. There has been no suggestion that the assets of TLL were sufficient to pay out the Bank or that there was any surplus for unsecured creditors. At the time of the crystallisation of the charge, the assets of TLL included the sum of $400,000 held on its behalf by Construction Engineering Pty Ltd and the units in the M & T Property Fund. However, the Bank did not take, and never has taken, any steps to enforce whatever rights it had, or may later have had, in respect of those assets. Judge Ostrowski, after referring to the fact that the event which caused the charge to crystallise was a notice to pay delivered to TLL by the Bank on 9 March 1990, and that the Bank did nothing to follow up the notice until it appointed a receiver and manager on 27 April 1990, said:

          "[The Bank] permitted the bank account of TLL to be operated both up and down for quite some time [after 9 March]. It negotiated with TLL concerning a refinancing of its borrowings. Indeed, it offered a $5m

3.

refinancing which could not come to fruition because TLL could not [fulfil] the conditions attached to it. It released the units in the M & T Property Fund to serve as security for the balance payable to [the appellants] on 20 April 1990."

9        Those findings were made in response to an argument that there had been waiver, estoppel, or acquiescence which defeated any rights that the Bank might otherwise have had. The learned judge found it unnecessary to decide those questions, or to make any further findings about the action or inaction of the Bank. When regard is had to the passage just quoted, it may not be difficult to understand why the Bank has never subsequently taken any action in relation to the $400,000 or the proceeds of sale of the units. However that may be, there are no findings concerning the conduct of the Bank additional to those set out above.

10       The financial position of TLL during March, and the early part of April 1990, was the subject of considerable uncertainty at the time. That uncertainty was reflected in the issues litigated before Judge Ostrowski. On 1 March 1990, the Supreme Court of Victoria granted an injunction restraining a creditor, Landkon Pty Ltd, from filing an application for an order to wind up TLL. On 19 February 1990, the directors of TLL had signed a formal declaration of solvency, which was treated as evidence of solvency in the injunction proceedings. There was no evidence, and Judge Ostrowski made no findings, as to the reasons for the delay between the crystallisation of the Bank's charge and the appointment of a receiver and manager, or as to the extent of the Bank's knowledge of the agreement between TLL and Mr Rockman's clients, including the appellants.

11       Section 122 of the Act provided, so far as presently relevant:

"122(1)   A conveyance or transfer of property, a charge on property, or a payment made, or an obligation incurred, by a person who is unable to pay his debts as they become due from his own money (in this section referred to as 'the debtor'), in favour of a creditor, having the effect of giving that creditor a preference, priority or advantage over other creditors, being a conveyance, transfer, charge, payment or obligation executed, made or incurred:

(a)   within 6 months before the presentation of a petition on which, or by virtue of the presentation of which, the debtor becomes a bankrupt …

*Gleeson   CJ*
*Gaudron   J*
*Gummow   J*
*Hayne     J*
*Callinan  J*

4.

…

is void as against the trustee in the bankruptcy.

…

(2)   Nothing in this section affects:

(a)   the rights of a purchaser, payee or encumbrancer in good faith and for valuable consideration and in the ordinary course of business."

12      Section 451 of the Code provided, so far as relevant, that a transfer of property, a charge on property, or a payment made, by a company that, if it had been a natural person, would, in the event of his becoming a bankrupt, be void as against the trustee in bankruptcy, is, in the event of the company being wound up, void as against the liquidator.  The payments made to the appellants by Construction Engineering Pty Ltd at the direction of TLL, and the transfers of the units by way of security were, it is agreed, made within the period which, by virtue of s 451 of the Code, corresponds to the period referred to in s 122(1)(a) of the Act.

13      The issues argued in the County Court were whether TLL was, on 15 March 1990, unable to pay its debts as they became due from its own money; whether the payments made by Construction Engineering Pty Ltd to the appellants and the other clients of Mr Rockman were, for the purposes of ss 122 and 451, made by TLL; whether those payments and the transfers of the units had the effect of giving the appellants a preference, priority or advantage over other creditors; and whether the appellants could claim the benefit of s 122(2)(a).

14      Judge Ostrowski resolved the first, second, and third issues in favour of the respondent.  As to the fourth issue, he found that the appellants acted in good faith, but that the payments and transfers of property were not in the ordinary course of business.

15      Only the second and third issues were argued in the Court of Appeal.  The argument on the second issue turned upon the capacity in which Construction Engineering Pty Ltd held the sum of approximately $400,000.  The Court of Appeal decided that, in the circumstances, the payments made by Construction Engineering Pty Ltd, as agent for and at the direction of TLL, of moneys it was holding on behalf of TLL, amounted to payments by TLL.  Since that matter has not been pursued in this Court, it is unnecessary to go into the reasoning of the Court of Appeal on the question.

5.

16         It is the third issue that was pursued in this Court.  The appellants argued that they received no preference, priority or advantage over other creditors of TLL.  The reason for that was said to lie in the existence, as at 15 March 1990, of the charge to the Bank, the prior crystallisation of the charge, so that it had become a fixed charge over the amount of approximately $400,000 and the units in the M & T Property Fund, and the agreed fact that the assets the subject of the charge were insufficient to pay TLL's debt to the Bank.  It follows, according to the argument, that if TLL had been put into liquidation immediately before the transaction of 15 March 1990, there would have been no surplus available for unsecured creditors, and, in particular, the moneys held by Construction Engineering Pty Ltd on behalf of TLL, and the units, would all have gone to the Bank.  In those circumstances, it was contended, the inaction of the Bank was irrelevant.  The charge having crystallised, the moneys held by Construction Engineering Pty Ltd on behalf of TLL, and the units, were not assets available to the unsecured creditors in a winding up of TLL, and the appellants therefore received no preference, priority or advantage over other creditors.

17         To characterise the conduct of the Bank as mere inaction may involve over-simplification.  As was noted earlier, the respondent argued in the County Court that the Bank, by its conduct, waived its rights, or, by reason of estoppel or acquiescence, would have been precluded from enforcing them; and the Bank has never attempted to enforce a claim either against the appellants or the respondent in relation  to the subject matter of the present proceedings.  Neither Judge Ostrowski nor the Court of Appeal found it necessary to deal with the respondent's arguments, with the result that there are no findings of fact sufficient to enable us to deal with the question, which has not been pursued in this Court.  And there is no occasion to decide whether, consistently with the reasoning in *N A Kratzmann Pty Ltd (In Liq) v Tucker [No 2]*[2], the effect of the orders made in favour of the respondent, if upheld, would defeat any claim which the Bank might now make.  The Bank is not a party to this litigation.

18         The appellants rely upon the following passage in the judgment of Brennan CJ in *Sheahan v Carrier Air Conditioning Pty Ltd*[3]:

---

2     (1968) 123 CLR 295 at 301-302.

3     (1997) 189 CLR 407 at 424-425.

Gleeson   CJ
Gaudron   J
Gummow   J
Hayne    J
Callinan   J

6.

"If a fund in the hands of a debtor or a debtor's agent is charged
with the payment of a secured debt that would exhaust the fund, so that no
part of the fund is available for distribution among the general creditors,
and a payment to a general creditor is made out of the fund with the
consent of the chargee, that creditor gains no preference at the expense of
other general creditors.  The effect of such a payment is not to prefer the
payee among the general creditors but to prefer the payee to the secured
creditor who would otherwise have been entitled to the money paid.  And,
as the secured creditor has consented to the payment, no recoupment of
the money paid is possible."

19        To like effect is a passage in the judgment of Finkelstein J in *Wily v St
George Partnership Banking Ltd*[4].

20        The facts in *Wily* differed from those here.  The payments held not to be
preferential were made not to unsecured creditors but to the bank which held a
floating charge but was not fully secured.  Two payments were made in
realisation of that security, to which the claims of the unsecured creditors were
subject.  But the third payment was made at an earlier stage to reduce existing
indebtedness.  At the time of this third and critical payment, the charge had not
fixed upon the property applied in making the payment.  In the Court of Appeal
in the present case, Phillips JA expressed reservations concerning the conclusion
that the property applied in the third payment was not "available" for the
unsecured creditors.  It is unnecessary for us to decide whether we agree with
those reservations respecting the third payment.  This is because, in any event,
we would not accept *Wily* as authority for a general proposition that payments
out of assets not "available" to unsecured creditors can never be preferential.

21        The case of *Sheahan* concerned a secured creditor which appointed a
receiver and manager to an insolvent company attempting to trade out of its
difficulties.   The receiver opened an account pursuant to s 421(1) of the
Corporations Law, into which he paid the proceeds of realised assets which were
subject to the security.  From that account he made payments to creditors in order
to encourage them to continue to supply goods and services.  Three members of
the Court held that the payments were not relevantly made by the company.
Brennan CJ held that they were made by the company, but were not preferences.
It was in the course of giving his reasons for that conclusion that he made the
observation quoted above.  And it was in that context that Brennan CJ referred to

4    (1999) 84 FCR 423 at 435.

7.

the payment being made with the consent of the secured creditor who would otherwise have been entitled to receive the proceeds of the realisation of assets the subject of the security.

22    The premise for the conclusion reached by Brennan CJ in *Sheahan*, that the payment in issue was made by the company, should not be accepted.  Further, even if, as is the case in the present matters, a payment is made by the company, the question is not whether the payment was "at the expense of other general creditors"[5].  The question is whether the payment gave the recipient a preference, priority or advantage.

23    It is not the case that the existence of an equitable interest in a third party, whether by way of ownership or security, in property which is transferred, or money which is paid, to an unsecured creditor necessarily denies the possibility the unsecured creditor is thereby preferred as against other unsecured creditors. That is demonstrated by so much of the decision in *Richardson v The Commercial Banking Co of Sydney Ltd*[6], as concerned a cheque for £390 which a client, Mrs Turner, handed to her insolvent solicitor, Price.  The cheque represented the balance of purchase money for a property bought by Mrs Turner. Price banked it to the credit of an account which was overdrawn and in excess of security held by the bank.  It was held that the bank obtained a preference.

24    Dixon, Williams and Fullagar JJ pointed out that if, in an identifiable form, the money representing the cheque had come into the hands of the official receiver, Mrs Turner would have had a tracing remedy and the money would never have been available to Price's creditors.  Their Honours added that Price could be taken to have converted the cheque so that, had Mrs Turner wished, she was entitled to prove in the bankruptcy with the general creditors.

25    Dixon, Williams and Fullagar JJ, referring to s 95 of the *Bankruptcy Act* 1924 (Cth), which, so far as is relevant, corresponds to s 122 of the Act, then said[7]:

---

5    (1997) 189 CLR 407 at 424.

6    (1952) 85 CLR 110.

7    (1952) 85 CLR 110 at 136-137.

*Gleeson  CJ*
*Gaudron  J*
*Gummow  J*
*Hayne  J*
*Callinan  J*

8.

"On the whole it appears to us that the payment of a cheque representing trust funds into the office account, were it otherwise to operate to give a preference to the bank, would be within s 95. It is within s 95 because, although the same moneys could never but for the misappropriation have been available to the bankrupt's creditors, there would be a preference, priority or advantage effected in favour of the bank as a creditor, in making a payment to it, when other creditors must prove and other creditors suffer the disadvantage of being exposed to the competition upon the assets of the proof of the defrauded owner of the funds. If the payment to the bank is undone at the suit of that owner, that would be another matter. If it is undone at the suit of the Official Receiver, then the owner may or may not be able to follow the moneys into his hands. That is a question involving matters of law and of fact and we are not now called upon to decide it in either branch."

26        The juridical nature of a floating charge has been examined in numerous cases and by commentators. It was referred to by Brennan CJ in *Sheahan*[8], and was discussed by Gleeson CJ in *Fire Nymph v The Heating Centre (in liq)*[9]. A provision for automatic crystallisation of a floating charge, which, as in the present case, may occur some time before the secured creditor intervenes in the debtor's affairs by appointing a receiver and manager, may give rise to competing equities. It may be one thing to say, where a charge has become fixed and the subject assets have been realised, that the proceeds of realisation are, in the circumstances, unavailable to the general body of creditors in a bankruptcy or winding up. It is another thing to say that the crystallisation of a floating charge, regardless of what the chargee does or fails to do thereafter, necessarily means that assets the subject of the charge may never be dealt with in such a manner that may benefit some or all of the unsecured creditors, or that may give some of them a preference, priority or advantage over others.

27        As in the present case, a floating charge is commonly given over the whole of the undertaking and assets of a company. One of the primary objectives of a floating charge is to enable a debtor company to carry on its business as a going concern and dispose of its assets in the ordinary course of business notwithstanding the existence of the charge. In the situation of uncertainty that existed in relation to TLL between 9 March and 27 April 1990, when the

8    (1997) 189 CLR 407 at 422-423.

9    (1992) 7 ACSR 365 at 371-373.

9.

company continued to trade, and was negotiating with the Bank as to future arrangements, an assertion that none of its assets were "available" to unsecured creditors begs the question. There is at least a possibility that some or all of those assets might find their way to some or all of those creditors; as in fact occurred. There was also a possibility that this might happen, with or without the knowledge of the Bank, in circumstances where the Bank either could do nothing, or might choose to do nothing, to undo that result.

28          If the assets which had been disbursed to some of the unsecured creditors were promptly recovered by the Bank, those unsecured creditors would have no preference, priority or advantage over others. If, as here, the unsecured creditors retain the payments, they are preferred to others. It is no answer to the conclusion that there is a preference in such a case to say that the Bank might have acted differently. Nor is it an answer to say that there might be, or even will be, no assets that will be available for distribution between remaining unsecured creditors. It is no answer because, first, they are preferred in the obvious sense that their debts are wholly or partly met by the debtor[10]. Secondly, they are preferred over other unsecured creditors who "suffer the disadvantage of being exposed to the competition upon the assets of the proof"[11] of the Bank in an amount greater than would be the case had the assets been applied to the Bank's debt rather than being depleted by the payment to the preferred unsecured creditors. Unlike the circumstances considered in *Sheahan* it cannot be said that the payments were made by the secured creditor rather than the company.

29          In *Ferrier and Knight v Civil Aviation Authority*[12], a Full Court of the Federal Court of Australia[13] examined the policy considerations underlying the preference provisions of bankruptcy laws in a number of common law jurisdictions. The case concerned complexities of running accounts that are not presently relevant. The Full Court, observing that, as in the United States, and unlike the position in England, Australian preference provisions operate objectively, rather than by reference to the subjective purpose of the debtor,

---

10    *Richardson v The Commercial Banking Co of Sydney Ltd* (1952) 85 CLR 110 at 136.

11    (1952) 85 CLR 110 at 137.

12    (1994) 55 FCR 28.

13    Beaumont, Gummow and Lindgren JJ.

*Gleeson   CJ*
*Gaudron   J*
*Gummow   J*
*Hayne     J*
*Callinan  J*

10.

quoted a passage from a 1977 House Committee Report[14] which had, in turn, been cited by the Supreme Court of the United States in *Union Bank v Wolas* in 1991[15]:

> "The purpose of the preference section [of *The Bankruptcy Reform Act of 1978*] is two-fold.  First, by permitting the trustee to avoid prebankruptcy transfers that occur within a short period before bankruptcy, creditors are discouraged from racing to the courthouse to dismember the debtor during his slide into bankruptcy. The protection thus afforded the debtor often enables him to work his way out of a difficult financial situation through cooperation with all of his creditors.   Second, and more important, the preference provisions facilitate the prime bankruptcy policy of equality of distribution among creditors of the debtor.   Any creditor that received a greater payment than others of his class is required to disgorge so that all may share equally.   The operation of the preference section to deter 'the race of diligence' of creditors to dismember the debtor before bankruptcy furthers the second goal of the preference section − that of equality of distribution."

30          The same policy is at work in the Australian legislation.   A primary objective is that of securing equality of distribution amongst creditors of the same class.   The pursuit of that objective has the consequential effect of deterring the "race to the courthouse" and that, in turn, enhances the prospect of enabling debtors to trade out of their difficulties without undue and discriminatory risk to creditors.

31          In the present case, the appellants were members of a larger class of unsecured creditors.   That class also included, but was not limited to, the other contractors who consulted Mr Rockman.   As between the 12 contractors (including the appellants) and the other unsecured creditors, the 12 contractors obtained a preference, priority or advantage in that the amount of approximately $400,000, and the units in the M & T Property Fund, became available to them and not to unsecured creditors generally.   And, as in *Richardson*, to the extent to which there was a shortfall to the Bank, the other creditors had to suffer the competition of the Bank in a distribution of any other assets.   The fact that there may not have been any other assets does not alter the principle.

---

14   House Committee Report No 95-595 (1977) at 177-178.

15   502 US 151 at 161 (1991).

11.

32        We are not concerned with what the position would have been if the assets presently in dispute had been seized by the Bank or a receiver had been appointed.  As between the members of the class consisting of the unsecured creditors of TLL, in the events that happened, because of the decision of the Bank (perhaps for good commercial purposes) not to enforce its charge for a time, even though it had crystallised, assets were paid or transferred by TLL to some but not to others.  To say that, if the Bank had acted differently, those assets would have been applied solely for the benefit of the Bank, is not to deny that some members of the class of unsecured creditors obtained a preference, priority or advantage over others.

33        The appeals should be dismissed with costs.

# **Exhibit 63**

# FEDERAL COURT OF AUSTRALIA

**CORPORATIONS LAW** - Unfair Preferences - whether arrangement, under which pursuant to a contract between A and B, B agrees to and does pay A's debt to C, constitutes a transaction voidable as an unfair preference of C - meaning of 'transaction' - whether transaction can include composite of dealings to not all of which A is a party - extinguishment of a debt.

Corporations Law, s9; s588FA

*Nilant* v *Plexipack Packaging Services Pty Ltd* (1996) 14 ACLC 1559
*Ramsay* v *National Australia Bank Limited* [1989] VR 59
*Richardson* v *Commercial Banking Co of Sydney Ltd* (1952) 85 CLR 110

Beatson, *The Use and Abuse of Unjust Enrichment*, (Clarendon Press, Oxford, 1991)
Goff and Jones, *The Law of Restitution*, (4th Ed, Sweet and Maxwell, London 1993)
Mason and Carter, *Restitution Law in Australia*, (Butterworths, Sydney 1995)

**IN THE MATTER OF EMANUEL (NO 14) PTY LTD (IN LIQUIDATION); PETER IVAN MACKS and EMANUEL (NO 14) PTY LTD (IN LIQUIDATION) v BLACKLAW & SHADFORTH PTY LTD**
**No SG13 of 1997**

**O'LOUGHLIN, BRANSON, FINN JJ**
**ADELAIDE**
**23 July 1997**

IN THE FEDERAL COURT OF AUSTRALIA    )
                                     )
SOUTH AUSTRALIA DISTRICT REGISTRY    )    No. SG 13 of 1997
                                     )
GENERAL DIVISION                     )


                                  IN THE MATTER OF EMANUEL
                          (NO. 14) PTY LTD (IN LIQUIDATION)
                                (ACN 008 080 206)

                                  PETER IVAN MACKS and EMANUEL
                          (NO 14) PTY LTD (IN LIQUIDATION)
                          (ACN 008 080 206)
                          Appellants

                          BLACKLAW & SHADFORTH PTY LIMITED
                          (ACN 010 474 736)
                          Respondent


COURT:    O'LOUGHLIN, BRANSON, FINN JJ
PLACE:    ADELAIDE
DATE :    23 July 1997


                        MINUTES OF ORDERS

THE COURT ORDERS THAT:

The appeal be allowed with costs.

- 2 -

Note:        Settlement and entry of orders is dealt with in Order
             36 of the Federal Court Rules.

IN THE FEDERAL COURT OF AUSTRALIA   )
                                     )
SOUTH AUSTRALIA DISTRICT REGISTRY    )     No. SG 13 of 1997
                                     )
GENERAL DIVISION                     )

                              IN THE MATTER OF EMANUEL
                         (NO. 14) PTY LTD (IN LIQUIDATION)
                              (ACN 008 080 206)

                              PETER IVAN MACKS and EMANUEL
                         (NO 14) PTY LTD (IN LIQUIDATION)
                         (ACN 008 080 206)
                         Appellants

                         BLACKLAW & SHADFORTH PTY LIMITED
                         (ACN 010 474 736)
                         Respondent


COURT:    O'LOUGHLIN, BRANSON, FINN JJ
PLACE:    ADELAIDE
DATE :    23 July 1997

                         REASONS FOR JUDGMENT


      The issue in this appeal falls within a narrow compass. It
is this. 'A' contracts with 'B' that in settlement of all claims
between them B will (inter alia) make payments both to A and, at
A's direction, to 'C'.  C is A's creditor and the payment to C,
if made and accepted, will result in a partial discharge of A's
debt to C.  If that payment is made to and accepted by C, can it
properly be said that A and C are parties to a "transaction" deemed
an unfair preference by s588FA of the Corporations Law?

- 2 -

**The Parties and the Appeal**


The appeal is brought both by the liquidator of Emanuel (No 14) Pty Ltd (In Liquidation) ("Emanuel") and by the company itself against a judgment of a judge of this Court dismissing their application for an order that the respondent, Blacklaw & Shadforth Pty Ltd ("Blacklaw"), pay to them the sum of $322,313.54.  It was alleged that the payment to Blacklaw of that sum, being an unfair preference, was recoverable by Emanuel's liquidator from Blacklaw under s588FF.


**The Statutory Provisions and Their Provenance**


Section 588FA(1) provides:


"**588FA(1)** A transaction is an unfair preference given by a company to a creditor of the company if, and only if:

(a)  the company and the creditor are parties to the transaction (even if someone else is also a party); and

(b)  the transaction results in the creditor receiving from the company, in respect of an unsecured debt that the company owes to the creditor, more than the creditor would receive from the company in respect of the debt if the transaction were set aside and the creditor were to prove for the debt in a winding up of the company;

even if the transaction is entered into, is given effect to, or is required to be given effect to, because of an order of an Australian court or a direction by an agency."


For its part s9 of the Corporations Law defines "transaction"

- 3 -

in the following way:

> "'**transaction**', in Part 5.7B, in relation to a body corporate
> or Part 5.7 body, means a transaction to which the body is
> a party, for example (but without limitation):
>> (a)   a conveyance, transfer or other disposition by the
>> body of property of the body;  and
>> (b)   a charge created by the body on property of the
>> body;  and
>
> (c)   a guarantee given by the body;  and
> (d)   a payment made by the body;  and
> (e)   an obligation incurred by the body;  and
> (f)   a release or waiver by the body;  and
> (g)   a loan to the body;
> and includes such a transaction that has been completed or
> given effect to, or that has terminated;"

Section 588FA is contained in Part 5.7B.


That Part was enacted in 1992 in the *Corporate Law Reform
Act* 1992 (Cth) so bringing to an end the prior legislative practice
of importing into the Corporations Law and its predecessors those
provisions of the *Bankruptcy Act* 1966 (Cth) that enabled a trustee
in bankruptcy, hence a liquidator, to attack certain preferential
and other transactions entered into before liquidation that
reduced the pool of property available for distribution to
creditors:  see *Bankruptcy Act* 1966, ss120-122 as at 1992.  As
the Explanatory Memorandum to the 1992 Act indicates (para 20),
the legislation implemented the recommendations of the Australian
Law Reform Commission, *Report No 45:  General Insolvency Inquiry*
(1988) (the "Harmer Report").

- 4 -

That Report in its recommendations in relation to the avoidance of antecedent transactions did not seek to deviate from the "broad policy" evident in the *Bankruptcy Act* provisions it sought to replace: Harmer Report, para 630. It doubtless is the case that decisions on those provisions will often provide useful guidance in the interpretation of aspects of Part 5.7B. Care, though, will need to be taken to ensure that proper account is taken of the significant textual differences between the old and the new regimes. For the purposes of this appeal it is important to note one of these.

The then *Bankruptcy Act* 1966, s122 - there was a major amendment to it in 1996 - particularised the types of transaction (eg "a conveyance or transfer of property") which, if satisfying other specified conditions, would constitute a preference and for that reason would be void as against the trustee. In consequence, if a transaction was to be impugned, it had to be shown to be of one of the types specified.

In contrast to this, s588FA refers only, and generically, to a "transaction" possessing certain characteristics. The s9 definition, while exemplifying "transactions", makes no attempt to define the word itself. We emphasise this for this reason. A benefit might well be conferred on a creditor in a dealing that would not have been caught by any one of the types of transaction

- 5 -

specified in s122.  The dealing might, nonetheless, constitute a "transaction" for the purposes of s588FA.


**The Factual Setting**


On 26 October 1993, ELFIC Ltd ("ELFIC") - a company in what will be referred to as the EFG group - offered Emanuel finance (subject to security) for the construction of a road (the "Haul Road") on Bribie Island in Queensland.  That offer, which was accepted, envisaged that the work would be done by sub-contractors who would seek progress payments from Emanuel and that Emanuel, on authorising payment in a given instance, would forward claims to ELFIC for its approval and direct payment to the sub-contractors.


Emanuel contracted Blacklaw to construct the road on 19 August 1994.  Blacklaw commenced work and, though a "stop order" was imposed by a local government authority in late September 1994, Blacklaw later issued (12 October 1994) a progress claim for that work.  We would note in passing that the stop order was not lifted until mid-1995.  The consultant engineers who were to certify the claim, after discounting retention moneys, a deposit, and a $14,700 claim which was disallowed, authorised payment to Blacklaw of $322,313.54.  By the terms of its contract with Blacklaw, that sum then became payable by Emanuel.

- 6 -

On 30 November 1994, Blacklaw lodged a second progress claim. This was for $79,509.20 and comprised in the main the retention money and deposit deducted from the first progress claim.  Two days later Blacklaw served a statutory demand on Emanuel.

On 21 December 1994 a director of Emanuel informed Mr Shadforth, a director of Blacklaw, that Emanuel's solicitors were writing to the solicitors of a company in the EFG group calling upon it to advance funds for the purpose of meeting the progress payment.  A letter of that date to Clayton Utz solicitors, was put in evidence.  It indicated that Emanuel did not have the financial capacity to pay Blacklaw the $322,000 odd it owed it. It acknowledged that ELFIC was not obliged to make advances under the terms of its 26 October 1993 contract because of the stop order.  Emanuel nonetheless sought reassurance that funds would be advanced to pay Blacklaw's account if the "conditions precedent to [the] loan facility" were fulfilled.

At much the same time Mr Shadforth had communications with EFG which Blacklaw asserted - but the trial judge rejected - resulted in an agreement with EFG that it would pay Blacklaw directly for the sums outstanding under the latter's contract with Emanuel.

There had previously been significant secured loan

- 7 -

transactions between the Emanuel group and the EFG group.  After default on loans and then litigation between them the two groups compromised their claims upon the terms of a Deed of Forbearance and Release ("the Deed") of 17 March 1995.

Under the Deed the Emanuel group covenanted (inter alia) to transfer properties to nominees of the EFG group.  Amongst those properties were properties of Emanuel.  For its part, the EFG group covenanted:

> "6.1 to pay:
>
>> (a)  to the Emanuel Group the sum of $650,000 on the Settlement Date by cheque drawn in favour of Messrs Johnson Winter & Slattery whose receipt for and on behalf of the Emanuel Group shall be a sufficient discharge to EFG group for such payment;  and
>>
>> (b)  to Messrs Johnson Winter & Slattery the sum of $50,000 on the Settlement Date on account of that firm's legal costs of and incidental to acting for the Emanuel Group;
>>
>> ...
>
> 6.7 to pay, at the direction of the Emanuel Group, to Blacklaw & Shadforth Pty Ltd ACN 010 474 736 the sum of $322,313.54 for work performed for the Emanuel Group in relation to the construction of the Haul Road on Bribie Island."

Two days before the Deed, Clayton Utz for the EFG group wrote to Messrs Johnson Winter & Slattery for Emanuel enclosing an "Authority to Disburse" for signature.  As the letter indicated:

> "This authority relates to the payment of the amount of

- 8 -

$322,313.54 to Blacklaw & Shadforth Pty Ltd for work performed in relation to the construction of the Haul Road;"

On 17 March 1995 Emanuel executed the following document:


**"AUTHORITY TO DISBURSE MONIES**

TO:      **ELFIC LIMITED ACN 007 606 206**
         Level 20
         Waterfront Place
         1 Eagle Street
         BRISBANE   QLD   4000

AND TO:  **CLAYTON UTZ**
         Solicitors
         Santos House
         215 Adelaide Street
         BRISBANE  QLD   4000

We, the undersigned hereby request, authorise and direct you to pay for and on our behalf the amount of $322,313.54 to **BLACKLAW & SHADFORTH PTY LTD ACN 010 474 736** for work performed by Blacklaw & Shadforth Pty Ltd in relation to the construction of the Haul Road on Bribie Island.

In consideration of payment by you of the said sums we agree not to make any claim against you relating to the disbursement of the said sums and to indemnify you against any claim, demand or action arising from or in relation to the above disbursement."


Whatever else its legal effect, it would seem the document was treated by Clayton Utz as the direction to EFG group envisaged by para 6.7 of the Deed.


We note in passing that on the same date Clayton Utz received in its trust account the sum of $4,722,313.54 from Fosters Brewing Group Ltd ("Fosters") on behalf of the EFG group.

- 9 -

By letter dated 21 March 1995, Clayton Utz wrote to Blacklaw as follows (omitting formal parts):

> **"Emanuel Group**
> **Construction of Haul Road on Bribie Island**
>
> We refer to our telephone conversation of this morning and enclose in accordance with the instruction of the Emanuel Group of companies a cheque in the sum of $322,313.54 in full and final settlement of all claims which your company may have against the Emanuel Group of companies.
>
> Please acknowledge receipt of the cheque on the duplicate of this letter attached."

Blacklaw banked the cheque and on 23 March wrote to Clayton Utz accepting the $322,313.54 but only as part payment of the amounts owed under the Haul Road contract.

On the same day Emanuel entered into voluntary administration under Part 5.3A of the Corporations Law. Six days later Blacklaw lodged a claim with the administrator of Emanuel for $72,266.91 being the balance of the amount due under the Haul Road contract. Emanuel was placed in liquidation on 24 January 1996.

On 7 February 1996 the liquidator of Emanuel wrote to Blacklaw demanding repayment of the $322,313.54 on the ground that it was "a voidable unfair preference".

- 10 -

**The Applicants' Claim**

The question before the trial judge that is now raised in this appeal, was whether there in the circumstances a "transaction" to which both Emanuel and Blacklaw were parties as required by s588FA(1)(a). Emanuel contended at the trial that the "transaction" was one of the following:

> "(1) a contract between Emanuel and Blacklaw for the payment of the sum of $322,313.54, evidenced by and limited to the Clayton Utz letter of 21 March 1995 in the context of Emanuel's authority dated 17 March 1995 and the acceptance and banking of the Clayton Utz cheque, or

> (2) the payment by Emanuel to Blacklaw of the sum of $322,313.54, either on the basis that that payment was procured by and so was made by Emanuel pursuant to the original contract between Emanuel and Blacklaw of 19 August 1994 under which Emanuel was indebted to Blacklaw in that amount or on the basis that it was a discrete payment by Emanuel from its funds, being funds made available to it pursuant to the DOFR, or

> (3) the payment to Blacklaw by Clayton Utz pursuant to the DOFR, being a payment procured by Emanuel as part of the Emanuel Group reflected in clause 6.7 of the DOFR, and under which Emanuel procured that payment (and other promises) from EFG in consideration of the Emanuel Group granting to EFG a release in respect of claims the Emanuel Group had or might have had against EFG and agreeing to other action including the transfer of properties over which EFG had been granted security."

(The acronym "DOFR" referred to the Deed of Forbearance and

- 11 -

Release which is elsewhere referred to in these reasons as "the Deed".)

His Honour rejected all three contentions.  Put shortly, his reasons for so doing were as follows.

(i)  The alleged Emanuel-Blacklaw contract.  His Honour was unprepared to find that there was such an agreement:  (a) because Clayton Utz was, on the evidence, acting for the EFG group in the matter;  and (b) because the relevant arrangement under which the payment was made was the Deed and Blacklaw was not a party to it. His Honour expressly rejected the contention that the 21 March letter evidenced an agency relationship between Clayton Utz and Emanuel in relation to the making of the payment.

(ii)  The alleged payment procured by Emanuel.  This characterisation of the relevant "transaction" was rejected by his Honour on the alternate bases (a) that the payment was not made by Emanuel but by EFG;  or (b) if it be said that the Deed was the "transaction", that Blacklaw was not a party to it.  In reaching this conclusion his Honour accepted the correctness of, and followed, the decision of R D Nicholson J in *Nilant* v *Plexipack Packaging Services Pty Ltd* (1996) 14 ACLC 1559.  It will be necessary to refer to that decision below.

(iii)  The alleged payment procured under the Deed para 6.7.

- 12 -

This again was rejected for reasons similar to those in (ii) above: (a) insofar as the "transaction" related to the Deed, Blacklaw was not a party to, or in any way involved in it;  (b) insofar as the payment itself was concerned, it was not made by Emanuel. Importantly his Honour was unprepared to aggregate these two "steps", Emanuel being a party to one, Blacklaw to the other, for the purpose of finding "as a matter of fact" that together they constituted the transaction.

**The Appeal**

The appellant has advanced as its principal contention in this appeal that the transaction was:

> (i)   the payment of $332,313.54 to Blacklaw in respect of the Emanuel debt on 21 March 1995 under cover of the letter from Clayton Utz to Blacklaw of that date;  or (ii) the arrangement pursuant to which Blacklaw was paid $322,313.54 in respect of the Emanuel debt on 21 March 1995 under cover of the letter from Clayton Utz of that date.

Acknowledging that, for s588FA(1)(a) purposes, both Emanuel and Blacklaw must be shown to be parties to the "transaction", the appellant has submitted that in effecting the payment Clayton Utz was acting as agent for Emanuel (whether or not the firm was

- 13 -

acting as well for EFG in the matter).

The respondent for its part has submitted that no basis exists for disturbing any of his Honour's findings - including that Clayton Utz was not acting as Emanuel's agent - and that his Honour's construction and application of the word "transaction" were unexceptionable and were supported by *Nilant's* case.

## *Nilant's* case

Because of its significance both in his Honour's reasons and to the respondent's submissions, it is appropriate at the outset to refer to *Nilant's* case - the more so because we consider that it has led the trial judge into error.

The circumstances of that case were these.  A company (A) sold its business to a third party (B) on terms (inter alia) that part of the purchase price was to be paid to a creditor of the company (C).  That payment was made at a time when A was insolvent.  A's liquidator sought a declaration that the payment was an unfair preference.  This was refused.

It was held that the contract of sale of itself was not relevantly a "transaction" within s588FA(1)(a) for the reason that C was not a party to that contract.  This characterisation of the contract was correct in our view.

- 14 -

It equally was held, more questionably in our view, that for the purposes of the definition of "transaction" in s9 of the Corporations Law, the payment to C was not "a payment made by [A]". In reaching that conclusion, R D Nicholson J followed the decision of the Full Court of the Supreme Court of Victoria in *Ramsay* v *National Australia Bank Limited* [1989] VR 59.

In that case, in construing the words "a payment made ... by" in s451(1) of the *Companies (Victoria) Code*, the Full Court (at 63) rejected the proposition that:

> "... a payment out of his own moneys by B to C, pursuant to a contractual obligation to discharge A's debt to C, an obligation imposed upon B by a contract between A and B, can be said to be a payment made by A to C.  The words of s.451 must be given their ordinary, natural meaning."

We have, with respect, some difficulty with this conclusion. Before a payment made by B to C can be effective to discharge A's debt to C, ordinarily it must be made with A's authorisation or ratification: see Mason and Carter, *Restitution Law in Australia*, para 846, (Butterworths, Sydney, 1995);  Goff and Jones, *The Law of Restitution*, 17, (4th ed, Sweet and Maxwell, London, 1993); and see generally on payment of another's debt, Beatson, *The Use and Abuse of Unjust Enrichment*, Ch 7, (Clarendon Press, Oxford, 1991).  Where a payment is so made it can properly be said that it is A's act that makes B's payment efficacious at law to

- 15 -

discharge the debt to C. This, of itself, does not provide reason for saying that the payment itself is made by A. Nonetheless where that payment constitutes part of the consideration B furnished and A required in the A-B contract and where (inter alia) that consideration is in the final settlement of the obligations inter se of A and B, then we see no compelling reason for not concluding that A has made the payment to C albeit by using B as its instrument for the purpose. It is, though, unnecessary to consider either this matter or *Ramsay's* case further for reasons we give below.

Returning to *Nilant's* case, finally R D Nicholson J considered the question whether the "transaction" was properly to be seen as involving the contract of sale, the payment and the extinguishment of the debt so that, by being a party to the contract, the company (A) was "a party to the other elements of the transaction". His Honour rejected this on this basis. The acts of payment and extinguishment could not individually qualify as a "transaction" within s9, and so should not be joined to the contract which was a s9 transaction. In declining to allow such joining, his Honour said (at 1, 565):

> "In my view that course is not open because the subparagraphs of the definition of "transaction" in s9 are each specifically qualified by use of the words "by the body". Each type of transaction exemplified in those subparagraphs must be one in which "the body" is the active party. The words "but without limitation" do not have the effect of qualifying as a "transaction" actions by others as transactions to which the body is a party. If it was intended by the draftsperson that the definition should have the wider

- 16 -

compass, I do not consider that intention has been accomplished."

We cannot agree with his Honour's reasoning for two reasons, one specific, one general. The specific reason is this. Insofar as it is suggested that A was not party to the extinguishment of C's debt brought about by B's payment, we note again that A's authorisation of B's payment is necessary to discharge the debt, save in exceptional cases of no present relevance: see generally Beatson, above, ch 7; Goff and Jones, above, 17 and esp fn 2. In this way A is a party to the extinguishment even if it be said A is not a party to the payment itself.

The general reason is that we do not see the language of s9 (which exemplifies but does not define "transaction") as precluding a finding of a transaction to which the debtor A is a party merely because that transaction itself is made up of a composite of dealings in not all of which A participates.

It is not necessary for the purpose of this appeal to determine in any exhaustive fashion when a composite of dealings can together be said to constitute a s9 transaction notwithstanding that not all of its component parts considered in isolation could rightly be said individually to be transactions.

- 17 -

While s9 does not define "transaction", it does through the process of exemplification typify the forms of conduct or dealing engaged in by a company that will be characterised as a transaction for its purposes - "a conveyance ... of property", "an obligation incurred", "a release or waiver", etc.  Common to the examples is the characteristic that the conduct or dealing engaged in by the debtor company has the consequence of effecting a change in the rights, liabilities or property of the company itself.

We confine our observations for present purposes simply to a course of dealing initiated by a debtor for the purpose of, and having the effect of, extinguishing a debt.  It is not apparent to us why it should not be said that, where a debtor so acts and extinguishes a debt, the relevant "transaction" is the totality of the dealings through which the debtor procures the intended outcome, irrespective of whether one or more of the dealings in the sequence in question does not involve or require the participation of the debtor but does require that of a third party. The transaction, in other words, is the totality of the dealings initiated by the debtor so as to achieve the intended purpose of extinguishing the debt.

Such a conclusion is consonant with standard dictionary meanings given "transaction". It finds some support in decisions on the *Bankruptcy Act* provisions dealing with voidable

- 18 -

transactions and, most notably, *Richardson* v *Commercial Banking Co of Sydney Ltd* (1952) 85 CLR 110 which recognised that a discrete dealing (eg the payment of money) may itself merely be part of an "entire" or "whole transaction":  ibid, 129.  And, given the characteristics we have identified as being integral to the forms of "transaction" envisaged by s9, it is consistent with the burden of the statutory "definition" itself.

We conclude, then, that a course of dealing initiated by a debtor that is intended to, and does, extinguish a creditor's debt can in its totality be a transaction for the purposes of Part 5.7B of the Corporations Law notwithstanding that the achievement of that end can only be realised through the participation of a third party in a particular dealing (or dealings) within the overall transaction, being a particular dealing (or dealings) to which the debtor is not or may not be a party.

To this extent we consider the reasoning in *Nilant's* case to be incorrect and, correspondingly, so is the reasoning of the trial judge to the extent that he followed *Nilant's* case.

The conclusion that such a composite of dealings can be a s9 "transaction" does not of itself lead to the result that an unfair preference was given in this case.  The particular transaction must fall, nonetheless, within para (a) of s588FA(1)

- 19 -

and must have the consequence identified in para (b).  To these
matters we now turn.


**Section 588FA(1)(a)**


    We have already noted that, while the appellant has described
the relevant "transaction" as the payment of (or else the
agreement to pay) Blacklaw in respect of the Emanuel debt, it has
sought to make both Emanuel and Blacklaw parties to this
transaction by contending that when Clayton Utz made the payment
it was acting as Emanuel's agent.


    The trial judge rejected the agency argument on the facts
and we see no reason to disagree with this finding.  Clayton Utz
may well have sought to protect its own position by obtaining the
authority to make the disbursement from Emanuel.  But when it made
that disbursement it was performing a ministerial function for
EFG (its client) in furtherance of EFG's contractual obligation
to Emanuel under the Deed.


    Consistent with what we have said concerning *Nilant's* case,
though, it is unnecessary for the appellant to rely upon agency
to establish a transaction falling within s588FA(1)(a). On the
facts as found by the trial judge, Emanuel sought to and did
procure the partial extinguishment of Blacklaw's debt through

- 20 -

action it took, both in entering into, and under, the Deed.  Its

entry into the Deed;  its direction under para 6.7 for a payment

to be made to Blacklaw;  and the payment so made with Emanuel's

authorisation (with the result it produced when Blacklaw accepted

the payment as partial satisfaction of the debt) constituted the

relevant transaction.  Clearly both Emanuel and Blacklaw were

parties to that transaction even though neither was a party to

all of its component elements.

    It is the case that this transaction was not identified in

this precise way by the appellant in its appeal.  This

characterisation of it was, though, raised by the Court at the

hearing. It involves no more than a consideration of the composite

of the two "transactions" alleged by the appellant - a composite

which his Honour was unprepared to accept because of *Nilant's*

case.  In these circumstances we do not consider that any

unfairness to the respondent has resulted from its being raised

on the appeal in the form it has.

    Finally we should indicate that in written supplementary

submissions the respondent has contended that the Deed on its

proper construction created a trust for the payment of creditors

of a type similar to that considered in *Barclays Bank Ltd* v

*Quistclose Investments Ltd* [1970] AC 567:  on the so-called

"Quistclose" trust see *Re Australian Elizabethan Theatre Trust;*

- 21 -

*Lord* v *Commonwealth Bank of Australia* (1991) 30 FCR 491 esp at 499ff.

While it is the case that a trust fund was created and that the moneys in that fund were to be used to pay some particular creditors of Emanuel, that trust was created by Fosters transferring funds to the EFG group's solicitors, Clayton Utz, for the purpose of their being put in funds to effect the contractually stipulated payments.  There was no requirement in the Deed that such a trust be created.  There is no evidence in the Deed from which it properly could be inferred that the parties to the Deed intended to create such a trust as the respondent alleges.  And it has not been suggested that Fosters unilaterally created a trust for the benefit (inter alia) of Emanuel:  cf *Re Kayford Ltd* [1975] 1 All ER 604.

Even if, contrary to our conclusion, trusts of the *Quistclose* or *Kayford* forms were created there would, in the circumstances, be a very real question as to in whom the beneficial interest in the funds in Clayton Utz's hands resided until the payment was made to Emanuel.  But answering that question would not have any actual bearing on whether the transaction between the parties was as we have identified it to be.  All that a trust finding would do would be to change the machinery employed by the parties in extinguishing Emanuel's debt to Blacklaw.

- 22 -

**Section 588FA(1)(b)**

The question here is whether the transaction resulted in Blacklaw *"receiving from the company"* more than it would have if the transaction were set aside and Blacklaw was to prove in the winding up of Emanuel.  It is clear that what Blacklaw received *from the transaction* was the partial satisfaction of its debt at the rate of 100 cents in the dollar and that this was more than it would receive in satisfaction of its debt as a creditor in the winding up.  But did it receive what it did *from the company* as the sub-section requires?

There is no doubt that, if the money received by Blacklaw had been required under the Deed (i) to be paid first to Emanuel and then paid on to Blacklaw as Emanuel's money, or (ii) to be held by EFG on trust for Emanuel pending the latter's direction to pay Blacklaw, then the financial benefit accruing to Blacklaw would, relevantly, have been received from the company.

Does it make an operative difference that, rather than adopting such expedients, the Deed provided for direct payment to Blacklaw?  In our view it does not and it would be surprising if it did.

- 23 -

What Blacklaw received from the company was the actual benefit of a valuable chose in action (ie para 6.7 of the Deed) owned by Emanuel. Whether or not Blacklaw was a trust-beneficiary or a contract-beneficiary of that chose: as to which see *Trident General Insurance Co Limited* v *McNiece Bros Pty Ltd* (1988) 165 CLR 107 - and it is unnecessary for present purposes to determine the rights, if any, that Blacklaw had against EFG - what Emanuel provided to Blacklaw, and what Blacklaw received from Emanuel was the actual enjoyment of the benefit secured to *Emanuel* by its contractual provision with EFG. That actual benefit took the form of a monetary payment which partially discharged Emanuel's debt.

If it be thought that the chose was without value to Emanuel so that it could not in consequence be said that Emanuel was giving a benefit of value to Blacklaw, it is the case that if EFG failed to make the payment as directed, Emanuel could have recovered from it the sum agreed to be paid to Blacklaw: *Ashdown* v *Ingamells* (1880) 5 ExD 280. This merely illustrates why a direct payment such as occurred vin this case should not be treated differently from either the trust or the payment on contingencies to which we earlier referred.

Accordingly we conclude that, the provisions of s588FA(1) having been satisfied, an unfair preference was given by Emanuel to Blacklaw. In these circumstances and for the reasons set out

- 24 -

above, the appeal is allowed with costs.

                    I certify that this and the preceding 23 pages are
                    a true copy of the Reasons for Judgment of the
                    Court.



                    Associate     :
                    Dated         :  23 July 1997



Counsel for the appellant     :  Mr M.F. Blue
Solicitors for the appellant  :  Fisher Jeffries

Counsel for the respondent    :  Mr N. Samios
Solicitors for the respondent :  Andersons Solicitors

Date of hearing               :  8 May 1997

Date of judgment              :  23 July 1997

# **Exhibit 64**

Chapter 11

## ASSETS AVAILABLE FOR DIVISION AND DISTRIBUTION

The task of collecting or getting in the assets of the company is one which is **11-001** likely to absorb a large part of the time and attention of the liquidator in the course of the winding up. In order to perform it adequately, it is necessary that the liquidator should be conversant with the law on various matters. In particular, the liquidator will need to know, first, what assets are legally available for division among creditors and for distribution among members of the company; secondly, what means are able to be used for obtaining information as to the whereabouts of those assets; and, thirdly, what forms of procedure are available for recovering them. This chapter is concerned with the first and third issues; Ch.15 considers the second issue. This chapter considers the assets which may be able to be recovered and what actions can be initiated by a liquidator to recover assets to which he or she is entitled. Much of this chapter is concerned with discussing the law applicable to the adjustment of transactions entered into prior to winding up commencing. Where a pre-liquidation transaction is adjusted in favour of the company then the assets available for distribution will be augmented, and in some cases, significantly. Some actions which a company in liquidation has and which are related to the misconduct of officers of the company prior to winding up are not considered here, even though the end result of the prosecution of the actions could well swell the assets of the company. It is felt that it is better to leave consideration of such actions, including actions for fraudulent trading (under s.213 of the Insolvency Act 1986), until Ch.16 which deals with misconduct in general, and particularly focusing on company officers, although it is felt that it is preferable to deal with actions against directors for breach of duty and for wrongful trading in this chapter as no proof of wrongdoing in the fraudulent sense is required to succeed against directors in respect of these actions. There may be other actions that a liquidator may bring against directors and others where the company had a right against such persons. An example is where directors have made unlawful distributions of company assets. Such action could conceivably amount to breaches of directors' duties and fall within the duties discussed in this chapter, but they may also constitute breaches of specific legislative provisions or there might be remedies provided at common law.[1] This chapter provides some discussion in relation to this.

While this is a very long chapter (and really that could not be avoided given the importance of matters covered and the many questions that are not resolved), it is not intended to deal exhaustively with all of the many issues that are involved in this area because of the constraints of space which operate necessarily with a general text like this.

---

[1] For instance, see *Bairstow v Queens Moat Houses Plc* [2000] 1 B.C.L.C. 549 (Nelson J); [2002] B.C.C. 91; [2001] 2 B.C.L.C. 531 CA.

ASSETS AVAILABLE FOR DIVISION AND DISTRIBUTION

## I. GENERAL

**11-002**    It is important to observe that the meaning and content of the expression "available assets" varies according to whether the company in question is or is not insolvent. In either case the assets available for division among creditors and for distribution among members will of course include all property that belongs[2] to the company at the commencement of winding up.[3] But although the fact that a company is insolvent necessarily means that there can be no distribution to the members in winding up, the range of assets available for satisfying the liabilities of the company is far more extensive in the case of a company which is insolvent than of one which is not. This, as we shall see, is the consequence of certain special statutory provisions that apply only where there is an insolvency. It is convenient to deal first with the general position as regards all companies. Before doing so it should be noted that the chapter addresses actions by liquidators that might lead to the swelling of the funds of the insolvent estate. These funds will be distributed according to the statutory scheme. Creditors themselves may have the right to bring proceedings against directors or other parties who have caused loss to them as a consequence of their conduct against the company. For instance, if directors engaged in asset-stripping their company so that there were no funds available to pay a creditor's judgment against the company.[4] In such a situation both the company and the creditor would suffer harm. Before the decision of the Supreme Court in *Sevilleja v Marex Financial Ltd*[5] creditors would not have been able to bring proceedings as their loss would be regarded as only reflective of the loss of the company. In the asset-stripping example just given, the liquidator is likely to have a good action against the directors and may proceed against them. However, there might be reasons why the liquidator declines to do so. If a liquidator did take action the courts would not allow double recovery, that is, both the liquidator and a creditor would not be awarded damages for the same conduct of the wrongdoer.[6]

### A.    All companies

**11-003**    The assets of any company, whether it is solvent or insolvent, comprise all property which belongs to it at the commencement of winding up,[7] which will in most cases be either the day on which the petition for a winding-up order was presented (in compulsory liquidations) or the day on which the members voted that the company wind up (in voluntary liquidations), all subsequent dispositions being void unless sanctioned by the court under s.127 of the Insolvency Act 1986 (the Act).[8]

While "assets" is not defined in the Act, "property" is, in s.436, and broadly so.[9] This latter term is defined as including

"money, goods, things in action, land and every description of property wherever situ-

---

[2]    Not property which merely appears to belong to the company: *Re Carl Hirth Ex p. The Trustee* [1899] 1 Q.B. 612 at 624.

[3]    As to dispositions of property after winding up has commenced, see above at paras 7-009–7-044.

[4]    *Sevilleja v Marex Financial Ltd* [2020] UKSC 31; [2020] B.C.C. 783.

[5]    *Sevilleja v Marex Financial Ltd* [2020] B.C.C. 783.

[6]    *Sevilleja v Marex Financial Ltd* [2020] B.C.C. 783.

[7]    *Re United Ports Insurance Co* (1877) 36 L.T. 457.

[8]    All references in chapters to sections are references to sections in the Insolvency Act 1986 unless the contrary is indicated.

[9]    *Akers v Samba Financial Group* [2017] UKSC 6; [2017] 1 B.C.L.C. 151.

ated and also obligations and every description of interest, whether present or future or whether vested or contingent, arising out of, or incidental to, property".

Property therefore embraces all the real and personal property of the company, including choses in action such as goodwill,[10] unpaid calls on shares,[11] and rights of action for compensation or damages.[12] Prior to the inclusion of a definition of property in companies legislation, non-assignable contractual rights,[13] property held on trust,[14] and property which has been validly mortgaged or charged[15] or which was subject to some other form of enforceable encumbrance were held not to be included, and the definition of property does not appear to change the effect of those decisions.

Assets held by the company in trust, although not available for the purposes of winding up, are nevertheless subject to the control of the liquidator acting through the company in the place of the directors. Moreover, the creditors of a trustee company whose debts were incurred in the administration of the trust are entitled to be subrogated to the trustee company's claim to an indemnity out of the assets of the trust. The assets that are available in this way to the creditors by subrogation are not assets available for distribution among the general creditors of the company.    **11-004**

In the absence of any statutory provision regulating the administration of trusts of which the company is the trustee, the liquidator is expected to act in a responsible way in the administration of the trust in the name of the company. This duty does not necessarily require the liquidator in all cases to apply to the court for the appointment of a new trustee. Indeed, it is this involvement in the administration of the trust and the winding up of the trustee company which forms the basis of the liquidator's claim to be subrogated to the trustee company's right of indemnity from the trust assets in respect of remuneration, costs and expenses. Only where the liquidator's costs and expenses are necessarily incurred in performing the company's duties as trustee will it be possible for the liquidator's costs and expenses to be recouped from the trust assets.

## B.   Insolvent companies

In addition to assets of the foregoing description, there are various other forms of property to which a liquidator can resort for the purpose of satisfying the liabilities of a company that is insolvent. The power to do so stems from ss.238–241 and 244–246 (ss.242 and 243 apply to Scotland only). These provisions provide for the adjustment of transactions entered into both before liquidation and administration. We are only concerned with liquidation here so no further reference will be made to administration in this context, save in some contexts where administration precedes liquidation. Special mention needs to be made of another    **11-005**

---

[10]   *Re Leas Hotel Co* [1902] 1 Ch. 332.
[11]   *Webb v Whiffin* (1871-72) L.R. 5 H.L. 711 at 724; *King v Tait* (1936) 57 C.L.R. 715 at 741.
[12]   For example, a claim for misfeasance: *Re Park Gate Waggon Works Co* (1881) 17 Ch. D. 234; or a claim for wrongful trading; compare *Re Cyona Distributors Ltd* [1966] 2 W.L.R. 761; reversed [1967] Ch. 889.
[13]   *Nokes v Doncaster Amalgamated Collieries* [1940] A.C. 1014 (contract of personal service).
[14]   *Re Kootenany Valley Fruit Lands Co* (1912) 3 D.L.R. 423; *Canadian Guarantee Trust Co v Young* [1933] 3 D.L.R. 558; *Re Australian Home Finance Ltd* [1956] V.L.R. 1; *Quistclose Investments Ltd v Rolls Razor Ltd* [1970] A.C. 567; *Re Kayford Ltd* [1975] 1 W.L.R. 279.
[15]   *Re Barleycorn Enterprises Ltd* [1970] Ch. 465.

provision, s.423, which must be discussed in the same context as the sections mentioned earlier, even though it is not found in the same part of the Act as the other provisions. It is a provision which applies to individuals as well as companies; it can be invoked by creditors in addition to office-holders like liquidators, and it is broader than the other provisions as it is not necessary for a debtor/respondent to be in liquidation or any other insolvency regime before it can be invoked.

The most important of the above provisions provide, inter alia, for the adjustment of pre-liquidation transactions, and similar provisions in other jurisdictions are often variously referred to as "the avoidance provisions", "provisions for transactional avoidance", or "avoiding powers" (the last one used chiefly in the US). The reason for the use of avoidance in the description of the type of proceedings (and most discussion of pre-liquidation transactions is in the context of avoidance) which we are discussing is that originally the only provision made in relation to such transactions by statute was for avoidance. If one wanted to obtain a repayment of money paid or property given by the company pre-liquidation the claimant had to seek a declaration for avoidance of the transaction and then seek recovery, most commonly, for money had and received.[16] This was a common law restitutionary claim.[17] Here, because we will consider provisions which do not provide either at all or exclusively for avoidance, it is appropriate to refer to the provisions simply as "the adjustment provisions". As we shall see, the provisions on which a liquidator may rely enable the court to make a number of different kinds of orders which will adjust pre-liquidation transactions that can be challenged.

## II.   The Adjustment Provisions

**11-006**    At the outset it should be noted that the law in this area, and the issues which have emanated from the decided cases, is voluminous and accordingly in a general text on liquidation only so much space can be devoted to this topic. For greater detail, especially concerning some of the issues and problems that exist in this area the reader should refer to specialist works.[18]

---

[16] *Penson v Moon* (1866) 15 L.T. 444; *Marks v Feldman* (1870) L.R. 5 Q.B. 275; *Banque Belge pour L'Estrange v Hambrouck* [1921] 1 K.B. 321 at 323; *Rousou's Trustee v Rousou* [1955] 1 W.L.R. 545; *Coates v Charles Porter & Sons Pty Ltd* (1990) 8 A.C.L.C. 1264; *Star v O'Brien* (1997) 15 A.C.L.C. 144.

[17] In relation to preferences, see Keay, "The Recovery of Voidable Preferences: Aspects of Recovery" [2000] Cfi L.R. 1.

[18] For example, see Keay, "In Pursuit of the Rationale Behind the Avoidance of Pre-Liquidation Transactions" (1996) 18 *Sydney Law Review* 56; Fletcher, "Voidable Transactions in Bankruptcy: British Perspectives" in J. Ziegel (ed.), *Current Developments in International and Comparative Corporate Insolvency Law* (Oxford: Clarendon Press, 1994), pp.297–310; Prentice, "The Effect of Insolvency on Pre-Liquidation Transactions" in B. Pettet (ed.), *Company Law in Change: Current Legal Problems* (London: Stevens, 1987); Keay "The Avoidance of Pre-Liquidation Transactions: An Anglo-Australian Comparison" [1998] *Journal of Business Law* 515; Keay, "Preferences in Liquidation Law: A Time for a Change" [1998] 2 Cfi L.R. 198; Parry et al, *Transaction Avoidance in Insolvencies*, 3rd edn (Oxford: Oxford University Press, 2018); Keay, "Transactional Avoidance: Critical Aspects of English and Australian Law" (2000) 8(1) *International Insolvency Review* 1; J. Armour and H. Bennett (eds), *Vulnerable Transactions in Corporate Insolvency* (Oxford: Hart Publishing, 2003); Milman and Parry, "Challenging Transactional Integrity on Insolvency: An Evaluation of the New Law" (1997) 48 N.I.L.Q. 24; Keay, "The Recovery of Voidable Preferences: Aspects of Recovery" [2000] Cfi L.R. 1; McCormack, "Swelling Corporate Assets: Changing What is on the Menu" (2006) 6 *Journal of Corporate Law Studies* 39.

THE ADJUSTMENT PROVISIONS

## A.   Introduction

It is trite law that, in general, a person or a company is not penalised for dispos-   **11-007**
ing of assets that would otherwise have been available to creditors,[19] unless it can
be said that the disposition had the purpose of defrauding creditors.[20] For example,
if a company was to prefer creditor X over creditor Y by paying X and refraining
from paying Y, the common law would not interfere, because in contract the debtor
is obliged to pay creditor X, who is entitled to the payment.[21] Likewise, the com-
mon law would not give a remedy where property was sold by a company to
another party pursuant to terms which were not commercially justifiable. If it did,
it would be interfering with the rights of persons and entities either to enjoy freedom
of contract or their ability to dispose of property in the way that was seen fit by the
owner.

A leading text identifies three reasons why unsecured creditors should not be
permitted to challenge transactions before the advent of liquidation or some other
formal insolvency proceeding[22]:

> "First, so long as the company is conducting its business in a lawful manner there is no
> justification for allowing interference by unsecured creditors in its affairs. They have no
> interest in the company's assets and therefore no right to complain of the way in which
> the company chooses to dispose of the assets. Secondly, the creditor of a company not in
> winding up or administration has a more direct method of obtaining payment, namely by
> instituting proceedings, taking judgment and enforcing it by one or more of the available
> forms of execution, which include seizure and sale of the company's property and attach-
> ment of debts due to it. It is only if these measures fail, or are considered pointless because
> of insufficiency of the company assets, that recourse to avoidance proceedings becomes
> necessary. Thirdly, different creditors may have different views as to avoidance
> proceedings. No single creditor or group of creditors can demand protection for himself
> or itself alone."

Secured creditors are in a different position and may need to attack an action that
places their security at risk. Such creditors of companies will have a provision in
the deed of charge, mortgage or other instrument creating the security interest,
which entitles them to appoint either an administrative receiver (in relation to
charges created before 15 September 2003)[23] or an administrator.

As the common law does not prohibit debtors from dissipating their assets, it has   **11-008**
been left to the legislature to construct some limitations on the types of transac-
tions which can be entered into if debtors are, at a later date, subject to liquidation.

Parliament has taken the view, and it is a long established one, that transactions
by which an insolvent disposed of property within a certain time zone prior to the
commencement of winding up, in circumstances that are unfair to the creditors,

---

[19]  Report of the Insolvency Law Review Committee, *Insolvency Law and Practice* (HMSO, 1982),
     Cmnd.858 (commonly referred to as the "Cork Report"), para.1207.
[20]  See s.423 and discussed below at paras 11-112–11-130.
[21]  Segilson, "The Code and the Bankruptcy Act: Three Views on Preferences and After-Acquired
     Property" (1967) 42 N.Y.U.L.R. 278, 292.
[22]  Van Zwieten, *Goode on Principles of Corporate Insolvency Law*, 5th edn (London: Sweet &
     Maxwell, 2019), pp.619–620.
[23]  The date on which the provisions of the Enterprise Act 2002 affecting corporate insolvency became
     operational.

ASSETS AVAILABLE FOR DIVISION AND DISTRIBUTION

should be subject to adjustment. The policy is consistent with that which exists in most advanced systems of law.[24]

The consequence of the policy is that transactions which effected the disposition of assets or other property and which were entered into quite legally and, in many cases, quite properly before the commencement of winding up, may be reviewed and adjusted. Therefore, the policy has fostered the implementation of retrospective law, in that when the transaction which has subsequently been adjusted was made, it was not in breach of the law and, except where the transaction involved parties associated with the insolvent, parties involved in the transaction may have no idea that winding up would eventuate.

**11-009**     If transactions are subject to adjustment the assets disposed of by the debtor company may be recovered and made available to meet the claims of the creditors. What transactions are involved, and the conditions which precipitate their adjustment, vary according to the particular ground which gives rise to adjustment, but the common policy is, no matter what the transaction, that creditors in general are protected

> "against a diminution of the insolvent's assets which confers an unfair or improper advantage on the other party [to the transaction] [the recipient of assets or money]".[25]

The concern is that the debtor has given an advantage to someone at some point before the opening of the liquidation proceedings. Therefore, the provisions seek to address two possible situations. First, they prohibit the unjust enrichment of a creditor who received property from the insolvent, to the detriment of all other creditors.[26] Professor Goode has asserted that what is regarded as objectionable is not that a creditor might obtain an advantage over other creditors. Rather, it is, certainly as far as English law is concerned, the action of the debtor in deliberately, or in some cases unwittingly, being party to a reduction of its assets so as to advantage one party at the expense of the general body of creditors.[27] Thus, legislation provides for the adjustment of transactions which not only favour creditors of the insolvent but also transactions which favour other parties, such as the recipient of property at an undervalue.[28] The recipient may not be a creditor of the insolvent but in receiving a special benefit he or she is gaining at the expense of the general body of creditors. Such a transaction affects the statutory regime designated for the distribution of an insolvent's estate. Secondly, the provisions seek to address the situation where an insolvent company may transfer some of its assets, prior to entry into insolvency proceedings, at below value market, or purchase assets at above market value, in order to benefit some third party, often an associate or connected party of the company. The adjustment provisions endeavour, inter alia, to ensure that the total amount of the insolvent estate is not depleted.

It has been traditionally asserted that if such transactions could not be adjusted in some way it would be open to a debtor, before liquidation, to dissipate assets in favour of whomsoever the debtor pleased and this is unlikely to benefit those who

---

[24]    Cork Report, para.1200. For a discussion of aspects of avoidance rules in EU Member States, see McCormack, Keay and Brown, *European Insolvency Law: Reform and Harmonization* (Cheltenham: Edward Elgar, 2017), Ch.4.

[25]    R.M. Goode, *Principles of Corporate Insolvency Law*, 2nd edn (London: Sweet & Maxwell, 1997), pp.521–522.

[26]    Goode, *Principles of Corporate Insolvency Law* (2011), p.522.

[27]    Goode, *Principles of Corporate Insolvency Law* (2011), p.526.

[28]    See s.238 of the Insolvency Act 1986.

are entitled to benefits and it is also not likely be in accord with the principle of fair and equal distribution (pari passu principle).[29] If dissipation transpired there would be a reduction of the property that would be available to the liquidator to distribute to those creditors who had not been favoured by the debtor.

As Collier stated:

**11-010**

"… if the creditors and debtors could deal with impunity with the debtor's assets up to the date of bankruptcy, only tag ends and remnants of unencumbered assets would too often remain."[30]

In 1982 the Insolvency Law Review Committee, *Insolvency Law and Practice*[31] ("Cork Report") put it this way:

"… the bankruptcy code, on the other hand, is directed towards achieving a pari passu distribution of the bankrupt's estate among his creditors. The justification for setting aside a disposition of the bankrupt's assets made shortly before his bankruptcy is that, by depleting his estate, it unfairly prejudices his creditors; and even where the disposition is in satisfaction of a debt lawfully owing by the bankrupt, by altering the distribution of his estate it made a pari passu distribution among all the creditors impossible."[32]

The generally-accepted view has been that the consequence of the policy of pari passu distribution is that transactions which effect the disposition of assets or other property before the commencement of winding up should be reviewed and adjusted if they affect the principle of equal distribution.

It would be remiss of me at this point to point out that notwithstanding the fact that the pari passu principle is said to be at the heart of insolvency law and fundamental to it,[33] it has been eroded significantly and remains only as a theoretical doctrine.[34] Equal treatment rarely occurs because the principle does not affect the rights of certain people. These rights are discussed in detail in Ch.13. The focus of the courts on pari passu has been severely criticised by some commentators,[35] on the basis, inter alia, that it is not a principle, and the criticism is considered in Ch.13. Nevertheless, the courts still emphasise the pari passu doctrine and they seek to implement it.[36]

**11-011**

On considering a claim that a transaction falls foul of the adjustment provisions, a court may decide that a transaction should be avoided, and if this is the case

---

[29] For a discussion of this principle as a rationale for the existence of the adjustment provisions and other rationales, see Keay, "In Pursuit of the Rationale for the Avoidance Provisions in Insolvency Law" (1996) 18 *Sydney Law Review* 55, 65–68. For a discussion of the pari passu principle, see Finch and Worthington, "The Pari Passu Principle and Ranking Restitutionary Rights" in F. Rose (ed.), *Restitution and Insolvency* (London: LLP, 2000), pp.1–7; Finch, "Is Pari Passu Passe?" [2000] Insolv. L. 194.

[30] W. Collier, *Collier on Bankruptcy*, 14th edn (Matthew Bender, 1956), Vol.3, p.742.

[31] Cork Report (HMSO, 1982), Cmnd.8558.

[32] Cork Report, para.1209.

[33] The cases are voluminous. For a recent decision, see *Re Airbase (UK) Ltd* [2008] EWHC 124 (Ch) at [29].

[34] Cork Report, para.233.

[35] For example, see the incisive discussion by Professor Riz Mokal in "Priority as Pathology: The Pari Passu Principle Myth" (2001) 60 C.L.J. 581 and his challenging monograph, *Corporate Insolvency Law—Theory and Application* (Oxford: Oxford University Press, 2005), Ch.4.

[36] For example, see the decisions of: *Re HIH Casualty and General Insurance Ltd* [2005] EWHC 2125 (Ch); *The Joint Administrators of LB Holdings Intermediate 2 Ltd v the Joint Administrators of Lehman Brothers International (Europe)* [2017] UKSC 38 at [97].

ASSETS AVAILABLE FOR DIVISION AND DISTRIBUTION

then the assets disposed of by the debtor may be recovered and made available to meet the claims of the creditors.

## B.   The origins of the adjustment provisions

**11-012**   It is not intended to deal with the evolution of the various provisions allowing for adjustment in any detail. Nevertheless, it is appropriate to provide a brief outline of the origins of the provisions and the major judicial and legislative events that have helped to produce the provisions which we now have.

Prior to the introduction of the Act, provisions that dealt with pre-liquidation transactions provided for their avoidance.[37] Clearly, the Romans made provision for the avoidance of some transactions entered into by debtors,[38] with the most well-known action being the *actio pauliana*.[39] The provisions that they had appear to be limited to cases where creditors were defrauded by the debtor's dispositions.[40] It was not until the Middle Ages that any form of avoidance was provided for in England. While the first statute dealing with avoidance in insolvency is often regarded as the Statute of Elizabeth (13 Eliz.1 c.5) in 1571,[41] it has been argued[42] that the earliest was a statute passed in 1376[43] which was aimed at limiting the apparently prevalent practice of persons secretly transferring their tenements and chattels into the names of others and then living on the proceeds, with the result that creditors were unable to execute on the transferor's assets for debts owed.[44] The legislation permitted creditors to execute against the assets as if the gift had not been made.[45]

In medieval times, if debtors could not pay their debts, there was an unregulated scramble by creditors for their assets, the rule being "first come, first served"[46]; there was no provision for a sharing of the property. This state of affairs was rectified to some degree by the first recognised bankruptcy statute of 1542.[47] It provided for the distribution of the proceeds of sale of property among the creditors ratably. This approach was affirmed by the bankruptcy statute of 1570.[48] In the same year the Statute of Elizabeth[49] provided for the setting aside of fraudulent conveyances. It was stated in broad terms that all

"… feigned, covinous and fraudulent feoffments, gifts, grants, alienations, conveyances,

---

[37]   For example, s.230 of the Companies Act 1948 which incorporated the bankruptcy provisions providing for avoidance.

[38]   See J.B. Moyle, *The Institutes of Justinian*, 5th edn (Oxford: Clarendon Press, 1913), p.175; Radin, "Fraudulent Conveyances and Roman Law" (1931) 18 *Virginia Law Review* 109.

[39]   The other actions were: *interdictum fraudatorium; in factum; in integrum restitution* (H. Roby, *Private Roman Law* (CUP, 1902), p.273).

[40]   See Moyle, *The Institutes of Justinian* (1913), p,175; Radin, "Fraudulent Conveyances and Roman Law" (1931) 18 *Virginia Law Review* 109.

[41]   For example, see H.W. May, *The Law of Fraudulent and Voluntary Conveyances*, 3rd edn (London: Steven & Haynes, 1908), pp.2–9.

[42]   The Hon. Justice B.H. McPherson, "Avoiding Transactions in Insolvency" in J. Lessing and J. Corkery (ed.) *Corporate Insolvency Law* (Gold Coast: The Taxation and Corporate Research Centre, Bond University, 1995), p.186.

[43]   50 Edw. 3, c.6.

[44]   The Hon. Justice B.H. McPherson, "Avoiding Transactions in Insolvency" in Lessing and Corkery (ed.) *Corporate Insolvency Law* (1995), p.186.

[45]   The Hon. Justice B.H. McPherson, "Avoiding Transactions in Insolvency" in Lessing and Corkery (ed.) *Corporate Insolvency Law* (1995), fn.38.

[46]   Cork Report, para.31.

[47]   34 & 35 Hen. 8, c.4.

[48]   13 Eliz.1 c.7.

[49]   13 Eliz.1 c.5.

bonds … devised and contrived of malice, fraud, covin, collusion or guile, to the end, purpose and intent, to delay, hinder or defraud creditors and others of their just and law-ful actions, suits, debts … should henceforth be utterly void, frustrate and of no effect".[50]

The statute, in order to protect creditors, declared all dispositions and convey-ances of property, made with the intention of defrauding creditors to be null and void.[51] This legislation introduced the right given to creditors to avoid fraudulent conveyances, transactions which can be seen as the forerunners of transactions which can be attacked under s.423 of the Insolvency Act 1986, and it marked the beginnings of the law of fraudulent preferences, or simply "preferences" as they are now known.[52]

**11-013**

It was not until the companies legislation of 1856 that a statute included provi-sions regulating the pre-liquidation dealings of companies,[53] and subsequent statutes regulating companies, rather than including their own provisions, specifically incorporated provisions of the bankruptcy legislation relating to, inter alia, fraudulent preferences.[54] This process continued until the advent of the Act which now provides separately for the adjustment of pre-liquidation transactions and pre-bankruptcy transactions, although there is a great deal of similarity between the provisions and some of the cases to which reference is made in the chapter are bankruptcy cases.

## C.    The rationale for the provisions

The rationale behind the existence of provisions allowing for the adjustment of transactions that were quite permissible when made, deserves a brief consideration.[55] It is somewhat unfortunate, particularly in relation to legislative development, that while the adjustment provisions have been regularly considered by courts, there has been little attempt to ascertain and articulate the rationale for the provisions, and where there has been it has been brief.

**11-014**

Historically, the adjustment (or avoidance) provisions contained in the insolvency legislation of the UK (and in other common law countries such as Australia, New Zealand, Canada and the US)[56] can, it is submitted, be divided loosely into two groups of provisions. First, there are provisions, such as s.239[57] that regulate the giv-ing of preferences by a corporate debtor, and aim at adjusting rights among the creditors inter se.[58] The second group, including provisions such as s.238[59] and

---

[50]   13 Eliz.1 c.5.

[51]   May, *The Law of Fraudulent and Voluntary Conveyances* (1908), p.1.

[52]   The Hon. Mr Justice B.H. McPherson, "Avoiding Transactions in Insolvency" in *Corporate Insolvency Law* Lessing and Corkery (ed.) *Corporate Insolvency Law* (1995), p.187.

[53]   Joint Stock Companies Act (19 & 20 Vict., c.47) s.76.

[54]   R.M. Goode, *The Principles of Corporate Insolvency Law*, 1st edn (London: Sweet & Maxwell, 1990), p.3.

[55]   For a detailed discussion, see Keay, "In Pursuit of the Rationale for the Avoidance Provisions in Insolvency Law" (1996) 18 *Sydney Law Review* 55.

[56]   Many EU Member States take a similar approach. See McCormack, Keay and Brown, *European Insolvency Law* (2017), Ch.4.

[57]   See other examples in other countries, such as Corporations Act 2001 (Aust.) s.588FA and Bankruptcy Reform Act 1978 (U.S.) s.547, which cover the same material.

[58]   Jackson, "Avoiding Powers in Bankruptcy" (1984) 36 *Stanford Law Review* 725, 726; T. Jackson, *The Logic and Limits of Bankruptcy Law* (Cambridge, Massachusetts: Harvard University Press, 1986), pp.68–69.

[59]   See Corporations Act 2001 (Aust.) ss.588FB, 238; Bankruptcy Reform Act 1978 (US) s.548.

s.423, is designed to adjust the rights of creditors as against the debtor.[60] This latter group has its origins in fraudulent conveyance law which can be traced back to the Statute of Elizabeth,[61] and are aimed at preventing the depletion of the estate of a debtor to non-creditors and with loss for the creditors.

Fraudulent conveyances[62] involve debtors making transfers and incurring obligations with the intent to delay, hinder or defraud creditors.[63] The essence of a fraudulent conveyance is that an insolvent parts with property or money and receives nothing or little in return[64]; this action will prejudice all of the creditors of the insolvent,[65] whereas with preferences one or more creditors are benefited vis-à-vis the other creditors. The classic instance of a fraudulent conveyance is the transfer of property or money by a debtor to an associate or a relative (for little or no consideration), thereby placing it out of the reach of creditors.[66] Fraudulent conveyances involves debtor misbehaviour in that the debtor is acting improperly in disposing of assets for less than, or no, value (often to associates). Preferences are designed to adjust the benefits received by creditors, i.e. a creditor who receives more from a transaction within a certain time zone before liquidation than would be received if the creditor had to prove in the winding up. Preferred creditors may be directed to pay to the insolvent an amount equal to the benefit received. Preferences involve creditor misbehaviour in that it is creditors who are trying to steal an advantage over and above their fellow creditors. More will be said about provisions in the mould of fraudulent conveyances and the preference provision later in this chapter.

**11-015**     There is little doubt that the adjustment provisions have been included in the Act to foster a general purpose of liquidation law, i.e. to provide an orderly process for dealing with the affairs of insolvents,[67] and, one might add, to ensure distribution of company property pursuant to the statutory scheme.[68] This latter view is demonstrated in the Australian decision of *Burns v Stapleton*,[69] where it was stated

---

[60]   See Oditah, "Assets and the Treatment of Claims in Insolvency" (1992) 108 L.Q.R. 459, 465.

[61]   13 Eliz.1 c.5.

[62]   The fraudulent conveyance was recognised in Roman law (Kennedy, "Involuntary Fraudulent Transfers" (1987) 9 *Cardozo Law Review* 531, 535).

[63]   *Lloyd's Bank Ltd v Marcan* [1973] 1 W.L.R. 1387 at 1392; *Re World Expo Park Pty Ltd* (1984) 12 A.C.S.R. 759 at 768; D. Baird, *The Elements of Bankruptcy* (Westbury, Foundation Press, 1992), p.134. See s.6 of the Statute of Elizabeth; Baird and Jackson "Fraudulent Conveyance Law and its Proper Domain" (1985) 38 *Vanderbilt Law Review* 829.

[64]   Baird, *The Elements of Bankruptcy* (Westbury: Foundation Press, 1992), p.136.

[65]   See Langstaff, "The Cheat's Charter" (1975) 91 L.Q.R. 86, 87.

[66]   Cullina, "Recharacterising Insider Preferences as Fraudulent Conveyances: A Different View of Levitt v Ingersoll Rand" (1991) 77 *Virginia Law Review* 113, 159.

[67]   This is consistent with the approach adopted in the United States. See *Report of the Commission on the Bankruptcy Laws of the United States*, H.R. Doc. No.137 Pt 1, 93rd Congress, 1st Sess. (1973), p.19, p.71 cited by Ponoroff, "Evil Intentions and on Irresolute Endorsement for Scientific Rationalism: Bankruptcy Preferences One More Time" [1993] *Wisconsin Law Review* 1439, 1474; Orelap, "Avoidance of Preferential Transfers Under the Bankruptcy Reform Act of 1978" (1979) 65 *Iowa Law Review* 209, 210–211; Warren, "Bankruptcy Policy in an Imperfect World" (1993) 92 *Michigan Law Review* 336, 351; Nimmer, "Security Interests in Bankruptcy: An Overview of section 547 of the Code" (1980) 17 *Houston Law Review* 289, 291.

[68]   For example, see Mokal, "Priority as Pathology: The Pari Passu Principle Myth" (2001) 60 CLJ 581. Also, see *Skandinaviska Enskilda Banken AB v Conway* [2019] UKPC 36; [2019] B.P.I.R. 1562 at [102].

[69]   *Burns v Stapleton* (1959) 102 C.L.R. 97.

that a transfer would be a preference if it were to dislocate the statutory order of priorities amongst creditors.[70]

The provisions seek to assist the bringing of orderliness to the disorder that often marks an insolvent's relationship with creditors, in that they endeavour to resolve the creditor-debtor conflict[71] by enabling the insolvent (through the agency of the liquidator) to work out the situation through co-operation with all creditors.[72] In this working out, a liquidator will be required to balance the need for an orderly and fair resolution of the estate with the private interests of creditors. It is submitted that the adjustment provisions are an important factor in insolvency law's policy of providing for a collective process,[73] i.e. transactions entered into by the insolvent within certain periods before liquidation are set aside so that the property or money involved can be collected and distributed to the creditors as a group (subject to priorities provided by law).

Three primary rationales have been given for the existence of a preference provision in insolvency legislation, namely the promotion of the pari passu principle, the prevention of the dismemberment of the debtor and deterring people from taking preferences. The first has been subject to significant questioning by some commentators,[74] as indicated earlier.

As has already been noted, it has been traditionally asserted that one of the fundamental principles of the law of insolvency is that the assets of an insolvent are to be distributed fairly and ratably among creditors. It would be impossible to achieve equality if the law was to disregard what occurred prior to the filing of bankruptcy or winding up proceedings. **11-016**

The Cork Report put it this way:

"… the bankruptcy code, on the other hand, is directed towards achieving a pari passu distribution of the bankrupt's estate among his creditors. The justification for setting aside a disposition of the bankrupt's assets made shortly before his bankruptcy is that, by depleting his estate, it unfairly prejudices his creditors; and even where the disposition is in satisfaction of a debt lawfully owing by the bankrupt, by altering the distribution of his estate it made a pari passu distribution among all the creditors impossible."[75]

The adjustment provisions that allow for the challenging of preferences are, traditionally, viewed as justified on the basis of ensuring equal distribution, because preferences distort what creditors receive vis–à-vis one another. It is submitted that it would be more correct to say that the preference provision can be justified, as indicated earlier, on the basis of ensuring that there will not be a dislocation of the statutory order of priorities amongst creditors.[76] Such a justification does not compromise the provision or its use by liquidators in attaching preferential transfers.

When a debtor gives a preference, one creditor receives more than others. If the **11-017**

---

[70] *Burns v Stapleton* (1959) 102 C.L.R. 97 at 104.

[71] Neider, "Voidable Preferences: An Analysis of the Proposed Revisions of Section 60b" [1974] *Wisconsin Law Review* 481, 491.

[72] Broome, "Payments on Long-Term Debt as Voidable Preferences: The Impact of the 1984 Bankruptcy Amendments" (1987) *Duke Law Journal* 78, 115.

[73] Professor Michael Bridge in "Collectivity, Management of Estates and Pari Passu" in Armour and Bennett (eds), *Vulnerable Transactions in Corporate Insolvency* (2003), p.4 states that the collective process is a necessary precondition for the application of the pari passu principle.

[74] Most notably by Professor Riz Mokal in "Priority as Pathology: The Pari Passu Principle Myth" (2001) 60 CLJ 581.

[75] Cork Report, para.1209.

[76] See *Burns v Stapleton* (1959) 102 C.L.R. 97 at 104.

law did not take into account, and allow for the setting aside of, pre-liquidation transactions so that the creditors and the debtor could deal with the debtor's assets without restriction there would only remain "tag ends and remnants of unencumbered assets"[77] for the liquidator to distribute to the general body of creditors.

Perhaps rather than saying the provisions are designed to promote the pari passu principle, it should be couched wider than that and said to be to prevent the circumvention of the statutory scheme of distribution,[78] which includes a pari passu distribution.

Arguably the first rationale mentioned above is the main, and possibly the only, rationale, but two other rationales have been mooted. The first of these and the second rationale overall involves concern over the dismemberment of the debtor, that is, a reduction of funds and assets might seriously reduce the chances of the insolvent being able to continue to carry on business effectively or at all, and, this is the critical issue, it reduces the possibility of the insolvent being able to be restructured. The thinking behind this is that the value of the assets of the debtor are likely to be greater when employed in a business that is a going concern than when disposed of separately, particularly in a liquidation. The rationale is related to the possible scramble for payment that could occur if creditors become aware that a debtor is insolvent. The law has been concerned that if a scramble is not prevented, creditors who participated and succeeded in a scramble would improve their position at the expense of other creditors,[79] so that there would be little remaining for distribution in a subsequent liquidation,[80] which may well be caused, ultimately, by the rush of creditors demanding payment. Hence, the adjustment provisions are viewed as a means of stopping creditors from engaging in the scramble, and securing, what are in some cases, undue benefits.[81] Whether this rationale is actually fulfilled by the legislation that we have in England and Wales is highly debatable. It is submitted that it can be argued that the preference law that we have does in fact exacerbate the scramble, for good reason, namely the enforcement of the law disallowing preferences is generally impotent when it comes to reclaiming payments made to parties that are not connected with the company. More of this issue later.

If there were no adjustment provisions, so the argument goes, the creditors would have every incentive to grab what they could, and as quickly as they could. If this occurred the costs incurred by creditors would escalate, as they would need to be more diligent in their monitoring of their debtors' financial affairs, and it could precipitate the premature termination of the businesses of some debtors because of the pressure placed on them[82]; one cannot expect creditors to refrain from exerting

---

77  Seligson, "Preferences under the Bankruptcy Act" (1961) 15 *Vanderbilt Law Review* 115.

78  *Skandinaviska Enskilda Banken AB v Conway* [2019] B.P.I.R. 1562 at [102].

79  Friedman, "Lender Exposure Under Sections 547 and 550: Are Outsiders Really Insiders?" (1990) 44 *Southwestern Law Journal* 985, 989; Ponoroff, "Evil Intentions and on Irresolute Endorsement for Scientific Rationalism: Bankruptcy Preferences One More Time" [1993] *Wisconsin Law Review* 1439, 1451.

80  Friedman, "Lender Exposure Under Sections 547 and 550: Are Outsiders Really Insiders?" (1990) 44 *Southwestern Law Journal* 985, 994.

81  *G & M Aldridge Pty Ltd v Walsh* [2002] B.P.I.R. 482; [2001] HCA 27; (2001) 203 C.L.R. 662.

82  Jackson, "Bankruptcy, Non-Bankruptcy Entitlements, and the Creditors' Bargain" (1982) 91 *Yale Law Journal* 857, 862; Barney, "Bankruptcy Preferences and Insider Guarantees" (1991) 57 *Louisiana Law Review* 1047; Nutovic, "The Bankruptcy Preference Laws: Interpreting Code Section 547(c)(2), 550 (a)(1), and 546 (a)(1)" (1985) 41 *The Business Lawyer* 175.

pressure, in a hope that the debtor will survive, when all the creditors around them are endeavouring to salvage what they can.[83]

The adjustment provisions that are derived from provisions permitting the impugning of fraudulent conveyances require a different justification as they are included, principally, to arrest debtor misbehaviour, and not creditor misbehaviour (the aim of preferences).[84] While both preferences and fraudulent conveyances deplete the estate of the debtor, thereby prejudicing creditors, provisions attacking the former are concerned with re-ordering the distribution of what are, prima facie, legitimate payments, and provisions dealing with transactions like fraudulent conveyances are concerned with recovering payments that are totally unwarranted. With respect to fraudulent conveyances, the law is concerned with something which strikes at the heart of commercial morality; not only do such transfers hurt the creditors, persons are given benefits which they do not deserve. This is generally unacceptable behaviour and it is contrary to the principles of insolvency law.

**11-018**

The prevention of commercial impropriety, as a justification for adjustment provisions of the anti-fraudulent conveyance type, can be supported by the fact that one of the purposes of the law of insolvency is to provide for the investigation of the conduct of the debtor, and this, in corporate insolvency, requires an examination of the conduct of the company's controllers.[85] This purpose exists to meet the demands of commercial morality.[86] The public interest demands that those responsible for conducting the affairs of companies, behave in accordance with proper commercial behaviour.[87] In implementing this public interest, and permitting certain transactions to be attacked, the legislature is also protecting creditors. It is ensuring that undeserving third parties do not benefit at the expense of creditors in general. If a company sold equipment worth £100,000 to a director for £40,000, a liquidator would seek to attack the transaction as an undervalued transaction. It is improper that the director receives a windfall and the creditors' share of the company's assets is reduced.

A third rationale that is sometimes espoused is that the provisions in general are designed to deter parties from seeking to benefit from transactions with insolvents. The reasoning is that people will not engage in such transactions as there will be on liquidation an action brought to recover the benefits of the transaction. Nevertheless, whether such a policy exists is questionable as most parties are likely to take the benefit of transactions for a number of reasons. First, the company might not fall into liquidation. Secondly, even if it does, the liquidator might take the decision not to commence avoidance proceedings for any one of a number of reasons. Thirdly, the beneficiary of the transaction might be able to fend off a liquidator's claim or come to some compromise with the liquidator. So, there seems little in the

---

83 Ponoroff, "Evil Intentions and on Irresolute Endorsement for Scientific Rationalism: Bankruptcy Preferences One More Time" [1993] *Wisconsin Law Review* 1439, 1447–1448.

84 Jackson, *The Logic and Limits of Bankruptcy Law* (1986), p.146; Prentice, "The Effect of Insolvency on Pre-Liquidation Transactions" in Pettet (ed.), *Company Law in Change: Current Legal Problems* (1987), p.77; Jackson, "Avoiding Powers in Bankruptcy" (1984) 36 *Stanford Law Review* 725, 777 and 786; Friedman, "Lender Exposure Under Sections 547 and 550: Are Outsiders Really Insiders?" (1990) 44 *Southwestern Law Journal* 985, 1007.

85 Cork Report, paras 198, 238 and 239. Also, see Prentice, "The Effect of Insolvency on Pre-Liquidation Transactions" in *Company Law in Change: Current Legal Problems* (1987), p.71.

86 Cork Report, para.235.

87 Prentice, "The Effect of Insolvency on Pre-Liquidation Transactions" in *Company Law in Change: Current Legal Problems* (1987), p.71.

way of deterrence as far as a recipient of a benefit from the company is concerned, and thus, in effect, there is very little support for this rationale.

## D.   The framework

**11-019**      The provisions which deal with the adjustment of pre-liquidation transactions are contained, primarily in Pt VI of the Act, and apply not only to companies in liquidation, but also to companies which are in administration (under Pt II of the Act). We will focus solely on liquidation, but much of what is said here is relevant to the situation where an administrator is challenging pre-administration transactions. As indicated earlier, there are provisions in Pt XVI of the Act (headed "Provisions Against Debt Avoidance") that are also relevant. These do not apply just to debtors in liquidation or administration. They apply to all debtors whether companies or individuals and whether or not the debtor enters some kind of formal administration. The provisions covered in this part of the book only relate to transactions that occurred after the date of the commencement of the Act, namely 29 December 1986. If a transaction occurred before this date then the liquidator must have reference to the previous law.[88] As there will be few, if any, transactions falling into this category they are not discussed here. It is worth noting that the present provisions were introduced because of substantial criticism of the previous provisions by, inter alia, the Cork Report.[89]

The adjustment provisions are, as indicated earlier, those contained in ss.238–241 and 244–246 and also 423. In brief, ss.238 and 239 provide that transactions which are transactions at an undervalue and preferences respectively may be adjusted, and this may even entail the avoidance of the transaction. Sections 240 and 241 are provisions which relate to ss.238 and 239 and explain the scope of those latter sections. Section 244 provides that a transaction which involves the provision of credit to the company could be subject to a court order if it was extortionate, and even set aside. Section 245 is a provision which indicates that certain floating charges are invalid. Finally, s.246 states that a lien or other right to retain possession of any of the company's papers is unenforceable to the extent that its enforcement would deny possession to the liquidator, but does not apply to a lien on documents which gives a title to property.

It should be noted that ss.238, 239 and 423 do not apply to transactions which are protected through the operation of s.165 of the Companies Act 1989. That provision states that market contracts to which a recognised investment exchange or recognised clearing house is a party or which is entered into under default rules applying to the market and any disposition made under such a contract is not able to be challenged under ss.238, 239 and 423.

It also must be noted here that UK by the Financial Markets and Insolvency (Settlement Finality) Regulations 1999 (SI 1999/2979) implemented the Settlement

---

[88]   For example, s.230 of the Companies Act 1948 (re-enacted in s.615 of the Companies Act 1985) coupled with ss.42–44 of the Bankruptcy Act 1914. The Bankruptcy Act avoidance provisions were incorporated by reference in the Companies Act until the advent of the Insolvency Act 1986. All of these provisions have now been repealed.

[89]   See Ch.28 of the Report. Also, see Professor Farrar's criticism of the preference provision: "The Bankruptcy of the Law of Fraudulent Preference" [1983] J.B.L. 390.

THE ADJUSTMENT PROVISIONS

Finality Directive 98/26[90] and reg.17(1) of the 1999 Regulations disapplies the avoidance rules in ss.238, 239 and 423 in respect of a transaction to which the 1999 Regulations apply.

Before considering the substantive provisions of the Act that provide for adjustment, it is necessary to deal with an important part of the framework of the legislative set-up, namely some key terms which pervade the more critical provisions and which affect the scope of those provisions. These terms are "relevant time", "unable to pay debts" and "connected person", and will be referred to regularly when we consider the substantive adjustment provisions.

**11-020**

### 1.   The relevant time

Not all pre-liquidation transactions can be challenged by a liquidator. As we will see shortly, a transaction must fall into certain categories, such as a transaction at an undervalue. Also, for a liquidator to be able to seek an order adjusting a pre-liquidation transaction on the basis that it is a transaction at an undervalue (s.238) or a preference (s.239) (the most commonly invoked provisions) or the avoidance of a floating charge (s.245) the transaction must have been entered into within "the relevant time", which is a time zone specified in the legislation. The actual time zone applicable will depend on several circumstances, including what type of transaction is alleged to have been made, but what is uniform with all transactions is that the time zone is calculated in relation to a specific date: the onset of insolvency.[91] Section 240(3) explains that this phrase means, where a company entered winding up immediately following the discharge of an administration order, the date of the presentation of the petition on which the administration order was made. If the company's liquidation occurred in any other circumstances, then the date of the commencement of the winding up is the onset of insolvency. As discussed in Ch.7, the commencement of winding up is not really the beginning of the liquidation; it is a deemed commencement of winding up. In voluntary winding up the deemed date of commencement is at the time of the passing of the resolution for voluntary winding up.[92] In compulsory liquidation winding up is deemed to have commenced at the time of the presentation of the petition.[93] In addition, the consequence of s.129(1) is that if a voluntary liquidation was commenced prior to the presentation of a petition on which a winding-up order is subsequently made then the commencement of winding up is deemed to be the date of the resolution to wind up. If a petition is presented and then there is a substitution order made leading to an amended petition, the date of the commencement of the winding up is deemed to be the date of the presentation of the petition by the first petitioner.[94]

**11-021**

After establishing the date of the onset of insolvency, the liquidator must then work backwards to see what transactions, if any, fall within the periods set out in the Act. For a transaction to be able to be challenged on the basis that it is a preference then it must have been given in the six months before the onset of insolvency.[95] This period is extended to two years when the person who was the recipient of the

---

[90] Directive 98/26 on settlement finality in payment and securities settlement systems [1998] OJ L166/45.

[91] 1986 Act s.240(3).

[92] 1986 Act s.86.

[93] 1986 Act s.129(2).

[94] *Re Western Welsh International System Buildings Ltd* (1985) 1 B.C.C. 99,296.

[95] 1986 Act s.240(1)(b).

ASSETS AVAILABLE FOR DIVISION AND DISTRIBUTION

preference is connected with the company (except merely through employment). Who can be regarded as connected with the company is considered shortly. Transactions which are categorised as transactions at an undervalue may be adjusted where they were entered into by the company within two years of the onset of insolvency. In relation to a liquidation a floating charge will only be avoided where it was created within either the 12 months prior to the onset of insolvency,[96] or, where the charge was created in favour of a connected person, the two-year period before the onset of insolvency.[97]

## *2.  Unable to pay debts*

**11-022**    The relevant time for determining whether a transaction is in fact able to be subject to adjustment is not only dependent on the amount of time before the onset of insolvency. There is another factor to take into account when it comes to some of the adjustment provisions. Liquidators, when taking action under ss.238 (transaction at undervalue), 239 (preference) or 245 (creation of a floating charge) in relation to a transaction, may have to establish, besides the fact that the transaction occurred within the designated time zone, that either the company was unable to pay its debts at the time of the transaction or became unable to pay its debts as a result of the transaction.[98] The provisions that include this requirement state that the concept of "unable to pay its debts" is to be construed according to the way that phrase is meant in s.123. Unable to pay debts, which is a more expansive way of saying "insolvent", is defined in s.123(1)–(2) of the Act. The subsections enumerate six instances where a company will be deemed to be unable to pay its debts. Two of these do not apply in England and Wales and will not be considered here.[99] The four instances discussed earlier, in Ch.3, were:

- the company failed to comply for three weeks with a written demand served on it left at its registered office where the demand was given by a creditor owed a debt in excess of £750 and the demand required the payment of the amount due[100];
- execution or other process issued on a judgment or order of any court in favour of a creditor of the company was returned wholly or partly unsatisfied[101];
- it is proved to the satisfaction of the court that the company is unable to pay its debts as they fall due[102]; and
- it is proved to the satisfaction of the court that the value of the company's assets is less than the amount of its liabilities after taking into account the company's contingent and prospective liabilities.[103]

So, besides establishing deemed insolvency by serving a demand on the company

---

[96]  1986 Act s.245(3)(b).
[97]  1986 Act s.245(3)(a).
[98]  See 1986 Act ss.240(2) for transactions at an undervalue and preferences and 245(4) for creation of floating charges.
[99]  The two instances are: in Scotland the inducie of a charge for payment on an extract decree, or an extract registered bond, or an extract registered protest, have expired without payment being made (s.123(1)(c)); in Northern Ireland a certificate of unenforceability has been granted in respect of a judgment given against the company (s.123(1)(d)).
[100]  1986 Act s.123(1)(a).
[101]  1986 Act s.123(1)(b).
[102]  1986 Act s.123(1)(e).
[103]  1986 Act s.123(2).

or executing judgment against the company, the company can be shown to be unable to pay its debts as they fall due (cash flow insolvency) or the value of assets are less than the amount of liabilities (balance sheet insolvency). These two tests were explained and assessed in Ch.3.[104]

It is important to note that while the courts are very wary of using hindsight in making their decisions, it might be used in determining the issue of whether the company in liquidation could pay its debts at the time of the entry into the impugned transaction.[105]

It will be recalled that a transaction might be able to be impugned under some of the adjustment provisions, not only if the company was unable to pay its debts when entering into the transaction but also if, as a result of the transaction, the company became unable to pay its debts. So, where the company would have been solvent but for that transaction, the requirement will be satisfied. If the circumstances were such that the company would have become insolvent in any event, whether or not it entered into the impugned transaction, the transaction will not fall foul of the adjustment provisions, unless it is found to be part of a series of transactions which, taken as a whole, contributed to the failure of the company.

The meaning of insolvency was discussed in detail in Ch.3.[106]

### 3.  Connected person

While the issue of being unable to pay debts may mean that the number of transactions that a liquidator can attack is reduced, there is another concept in the Act which has the potential to increase the number of transactions which can be impugned. If the party to a transaction in which the company in liquidation is involved falls within the definition of "connected person", then a liquidator is able to challenge transactions that are able to be classified as preferences, if they were entered into up to two years before the onset of insolvency.[107] This is to be contrasted with the period of six months[108] specified for preferential transactions where the party to the transaction is not a connected person. Likewise, in relation

**11-023**

---

[104] See above at paras 3-019–3-039.
[105] *Green v Tai* [2015] B.P.I.R. 24 at [82]; *Watchorn v Jupiter Industries Ltd* [2014] EWHC 3003 (Ch) at [46], [47].
[106] See above at paras 3-025–3-039.
[107] 1986 Act s.240(1)(a). Where a winding-up order was made as a result of a petition presented under s.124 during the period of 27 April 2020 to 30 September 2021 on the basis that the company was unable to pay its debts, s.240(1)(a) has effect as if the reference to the period of two years ending with the onset of insolvency were to the period which begins with whichever is the later of the day two years before the day on which the petition was presented, and the day two years and six months before the day on which the winding-up order was made, and it ends with the day on which the winding-up order was made (para.15(2) of Sch.10 to the Corporate Insolvency and Governance Act 2020) (as amended by the Corporate Insolvency and Governance Act 2020 (Coronavirus) (Extension of the Relevant Period) Regulations 2020 (SI 2020/1031) reg.2, the Corporate Insolvency and Governance Act 2020 (Coronavirus) (Extension of the Relevant Period) (No.2) Regulations 2020 (SI 2020/1483) reg.2, the Corporate Insolvency and Governance Act 2020 (Coronavirus) (Extension of the Relevant Period) Regulations 2021 (SI 2021/375) reg.3(4) and the Corporate Insolvency and Governance Act 2020 (Coronavirus) (Extension of the Relevant Period) (No.2) Regulations (SI 2021/718) reg.2).
[108] 1986 Act s.240(1)(b). Where a winding-up order was made as a result of a petition presented under s.124 during the period of 27 April 2020 to 30 September 2021 on the basis that the company was unable to pay its debts, s.240(1)(b) has effect as if the reference to the period of six months ending with the onset of insolvency were to the period which begins with whichever is the later of the day six months before the day on which the petition was presented, and the day 12 months before the

ASSETS AVAILABLE FOR DIVISION AND DISTRIBUTION

to the avoidance of floating charges in s.245, a floating charge will only be avoided where it was created in the 12 months before the onset of insolvency,[109] whereas if a floating charge was created in favour of a connected person then the time is expanded to two years.[110] The designation of a person as a connected person might be helpful in a claim under s.238 in that if a benefit was given to a connected person the liquidator is not required to establish that the company was insolvent when the transaction impugned was entered into.

"Connected person" is defined in a somewhat complex way in the Act. The term is defined initially in s.249 as a director or shadow director[111] or an associate. But then one must travel to other sections to get a complete view of the term. First, "director" is defined in s.250 of the Companies Act 2006 as "any person occupying the position of director, by whatever name called". Secondly, "shadow director" is defined in s.251(1) of the Companies Act 2006 as "a person in accordance with whose directions and instructions the directors of the company are ac-

---

day on which the winding-up order was made, and ends with the day on which the winding-up order was made (para.15(3) of Sch.10 to the Corporate Insolvency and Governance Act 2020) (as amended by the Corporate Insolvency and Governance Act 2020 (Coronavirus) (Extension of the Relevant Period) Regulations 2020 (SI 2020/1031) reg.2, the Corporate Insolvency and Governance Act 2020 (Coronavirus) (Extension of the Relevant Period) (No.2) Regulations 2020 (SI 2020/1483) reg.2, the Corporate Insolvency and Governance Act 2020 (Coronavirus) (Extension of the Relevant Period) Regulations 2021 (SI 2021/375) reg.3(4) and the Corporate Insolvency and Governance Act 2020 (Coronavirus) (Extension of the Relevant Period) (No.2) Regulations (SI 2021/718) reg.2).

[109] 1986 Act s.245(3)(b). Where a winding-up order was made as a result of a petition presented under s.124 during the period of 27 April 2020 to 30 September 2021 on the basis that the company was unable to pay its debts, s.245(3)(b) has effect as if the reference to the period of 12 months ending with the onset of insolvency were to the period which begins with whichever is the later of the day 12 months before the day on which the petition was presented, and the day 18 months before the day on which the winding-up order was made, and ends with the day on which the winding-up order was made (para.18(3) of Sch.10 to the Corporate Insolvency and Governance Act 2020 (as amended by the Corporate Insolvency and Governance Act 2020 (Coronavirus) (Extension of the Relevant Period) Regulations 2020 (SI 2020/1031) reg.2, the Corporate Insolvency and Governance Act 2020 (Coronavirus) (Extension of the Relevant Period) (No.2) Regulations 2020 (SI 2020/1483) reg.2, the Corporate Insolvency and Governance Act 2020 (Coronavirus) (Extension of the Relevant Period) Regulations 2021 (SI 2021/375) reg.3(4) and the Corporate Insolvency and Governance Act 2020 (Coronavirus) (Extension of the Relevant Period) (No.2) Regulations (SI 2021/718) reg.2).

[110] 1986 Act s.245(3)(a). Where a winding-up order was made as a result of a petition presented under s.124 during the period of 27 April 2020 to 30 September 2021 on the basis that the company was unable to pay its debts, s.245(3)(a) has effect as if the reference to the period of two years ending with the onset of insolvency were to the period which begins with whichever is the later of the day two years before the day on which the petition was presented, and the day two years and six months before the day on which the winding-up order was made, and ends with the day on which the winding-up order was made (para.18(2) of Sch.10 to the Corporate Insolvency and Governance Act 2020 (as amended by the Corporate Insolvency and Governance Act 2020 (Coronavirus) (Extension of the Relevant Period) Regulations 2020 (SI 2020/1031) reg.2, the Corporate Insolvency and Governance Act 2020 (Coronavirus) (Extension of the Relevant Period) (No.2) Regulations 2020 (SI 2020/1483) reg.2, the Corporate Insolvency and Governance Act 2020 (Coronavirus) (Extension of the Relevant Period) Regulations 2021 (SI 2021/375) reg.3(4) and the Corporate Insolvency and Governance Act 2020 (Coronavirus) (Extension of the Relevant Period) (No.2) Regulations (SI 2021/718) reg.2).

[111] If a bank can be classified as the shadow director of a company it would be possible that a bank could be seen as a connected person and would, of course, be open to the possibility of having to give up payments made to it by the company where the payments are preferences. See *Re A Company No.005009 of 1987* (1988) 4 B.C.C. 424. This same issue has worried banks and others in the United States for a number of years. See Pitts, "Insider Guarantees and the Law of Preferences" (1981) 55 *American Bankruptcy Law Journal* 343, 353; Barney, "Bankruptcy Preferences and Insider Guarantees" (1991) 51 *Louisiana Law Review* 1047, 1049.

customed to act",[112] but excludes persons who are giving advice to the company in a professional capacity. It seems that it is possible in certain circumstances that a company's bank could be regarded as a shadow director and therefore be caught by the connected person category. Thirdly, the expression "associate" is defined, far more fully than the other elements of s.249, in s.435. Section 435 was intended to be very wide in scope.[113] "Associate" includes a broad range of persons and relationships. Besides identifying as associates, spouses and relatives, and association in partnership,[114] the section seeks to define when a company is deemed to be an associate of another company. Further, s.435 explains how persons can be associates because of their control of companies.[115] "Control of a company" is obviously an important phrase in the context of s 435.[116] Section 435(10) deals with what is meant by control of a company for the purposes of the section.

The relationship between trustee and beneficiaries under some types of trust may lead to those persons deemed to be associates of the company if the company or its associates are able to benefit under the trust.[117] The provision also, in somewhat of an elaborate manner, defines "relative".[118]

In *Re SMU Investments Ltd*[119] Insolvency and Companies Court (ICC) Judge Prentis said that the test for establishing someone is a connected party is not a high one, but the onus is on the person alleging a connectedness to show grounds of substance, even if they are inferential.[120]

The foregoing provisions are designed, collectively, to stop persons and companies associated with the company that is in liquidation, or directors of that company, from benefiting from preferences and floating charges which occurred outside of the normal time zone of six or 12 months respectively. The Cork Report put it this way:

"If the law of insolvency is to reflect the social and economic conditions of modern society, and is to be accepted as fair and just by the general public, then it cannot treat husband and wife, or persons living together as man and wife, or other closely connected persons, as if they were unrelated parties accustomed to deal with each other at arms' length. Nor can it treat companies which are members of the same group, or other closely associated companies, as if they were wholly unrelated. Special relationships call for special provisions to be made."[121]

Connected persons are singled out as they are likely to be aware of the financial affairs of the company and may be able to exert influence to gain some advantage.[122] The Australian Law Reform Commission in its *General Insolvency Inquiry* ("Harmer Report") observed that "experience has shown that related person credi-  **11-024**

---

[112] For a discussion of the ingredients of the definition, see *Re Hydrodam (Corby) Ltd* [1994] B.C.L.C. 180; [1994] B.C.C. 161 per Millett J.

[113] *Re CGL Realisations Ltd (formerly Comet Group Ltd) (in liq)* [2020] EWHC 1707 (Ch); [2021] B.P.I.R. 215.

[114] 1986 Act s.435(3).

[115] 1986 Act s.435(6). Section 435(10) defines when control exists.

[116] See Pollard and Heath, "Some tricky issues on 'control' in section 435(1) of the Insolvency Act 1986" (2018) 31 *Insolvency Intelligence* 33.

[117] 1986 Act s.435(5). See the discussion of this provision in *Re Thirty-Eight Building Ltd* [1999] 1 B.C.L.C. 416; [1999] B.C.C. 260.

[118] 1986 Act s.435(8).

[119] *Re SMU Investments Ltd* [2020] EWHC 875 (Ch).

[120] *Re SMU Investments Ltd* [2020] EWHC 875 (Ch) at [38].

[121] Cork Report, para.1033.

[122] Pitts, "Insider Guarantees and the Law of Preferences" (1981) 55 *American Bankruptcy Law Journal*

ASSETS AVAILABLE FOR DIVISION AND DISTRIBUTION

tors are more likely to be favoured by the insolvent when financial difficulties emerge".[123]

The advent of the term, "connected person", appears to be evidence of a recognition that those related persons, such as directors and persons associated with directors, may have had the foresight to see the liquidation of the company as a distinct possibility well in advance. Where such foresight exists it may be tempting for directors and others to take action to manipulate the affairs of the company in order to safeguard their own interests or the interests of associated entities; they may seek to recover loans and other debts owed to them before the final demise of the company,[124] as well as disposing of assets beyond the reach of creditors and to their own advantage.[125]

The date at which one determines whether a person is connected is the date on which the agreement that led to the transaction that is sought to be impugned is entered into and not the date when any assets are transferred pursuant to the agreement.[126]

## E.    Transactions at an undervalue[127]

### 1.    Introduction

**11-025**    While other provisions included in the adjustment sections of the Act were based directly on previous provisions in either the companies or the bankruptcy legislation, s.238 was a new provision clearly providing that undervalued transactions could be adjusted.[128] Now, after saying that, it must be acknowledged that the section is, in a sense, a successor to s.42 of the Bankruptcy Act 1914 (avoidance of voluntary settlements benefiting the debtor's family or associates), which provided for the avoidance of voluntary settlements. The Cork Report said that s.42 should be repealed and replaced by a provision drafted in modern language[129] and the Committee, after some deliberation, agreed to adopt as a recommendation a proposal that the new statutory provision should apply also to corporate debtors.[130] Besides saying that s.238 is a successor to s.42 of the Bankruptcy Act, it is undoubtedly true to say that the provision has its roots in the law which first provided for the avoidance of fraudulent conveyances, in 1571. This is because the provision is designed

---

343, 353; Barney, "Bankruptcy Preferences and Insider Guarantees" (1991) 51 *Louisiana Law Review* 1047, 1049.

[123]  Report No.45 (Canberra, 1988), para.636 available at: *http://www.austlii.edu.au/au/other/alrc/ publications/reports/45* [Accessed 6 June 2013].

[124]  Keay, "An Exposition and Assessment of the Unfair Preference" (1994) 19 *Melbourne University Law Review* 545, 564–565.

[125]  For example, see *Re Clasper Group Services Ltd* [1989] B.C.L.C. 143, a case decided under the old law of preferences.

[126]  *Re Flexi Containers Ltd*; sub nom. *Breese v Hiley* [2018] EWHC 12 (Ch).

[127]  For further detail, see Parry, *Transaction Avoidance in Insolvencies*, 3rd edn (Oxford: Oxford University Press, 2018); Armour and Bennett (eds), *Vulnerable Transactions in Corporate Insolvency* (2003), Ch.3.

[128]  The equivalent provision for individual insolvency is s.339 and cases dealing with that provision are discussed in this part of the chapter. There are many similarities between ss.238 and 339, but also there are differences and they should be noted.

[129]  Cork Report, para.1231.

[130]  Cork Report, para.1237. For a discussion of similar action taken in Australia with respect to its equivalent provisions, see Keay, *Avoidance Provisions in Insolvency Law* (Sydney: Law Book Co, 1997), pp.208–209.

to prevent debtor misbehaviour, namely preventing insolvent companies disposing of assets, particularly to associates, at an undervalued amount just before winding up, thereby reducing the pool of property which would be available to the liquidator to distribute to creditors. A provision like s.238 is designed to discourage those in control of companies from transferring assets or opportunities to associates so that they benefit and the insolvent estate is depleted leading ultimately to the creditors losing out. As will be plain when we consider s.423 and the avoidance of transactions designed to defraud creditors, there is a distinct overlap between ss.238 and 423 in that they are both aimed at stopping dissipation of assets at an undervalue and both are descendants of the anti-fraudulent conveyance legislation. Frequently an application for a transaction to be adjusted is based on both ss.238 and 423. Likewise there is the possibility of overlap between s.238 and the provision dealing with preferences, i.e. s.239. The overlaps mean that cases decided under s.423 might be of relevance to a matter that comes within s.238.

While in the seminal case on preferences under the Act, *Re MC Bacon Ltd*,[131] Millett J (as he then was) protested at counsel citing cases which dealt with previous preference provisions,[132] in dealing with a transaction at an undervalue case, the Court of Appeal in *Hill v Haines*,[133] did not, interestingly, take the same view as far as such transactions were concerned,[134] and did refer to cases decided under s.42 of the Bankruptcy Act 1914. It is respectfully submitted that while it is necessary to take into account the differences in legislation, cases under old regimes should be able to be considered.

This provision is most likely to be invoked with transactions at an undervalue, where the company has either purchased an asset at an inflated price or sold one of its assets for a significantly smaller sum than market value would dictate.[135] Until the past 15 years or so, there was a surprising paucity (relatively speaking) of reported cases dealing with s.238, which might well have been because of the lack of use of the section.

At the outset it should be noted that notwithstanding there is no reference in s.238 of it having extraterritorial scope, the court in *Re Paramount Airways Ltd (No.2)*[136] held that the provision could have effect outside of the country. However, a court, in a case involving a foreign element, had to be satisfied, before making an order, that the respondent was sufficiently connected with England for it to be just and proper to make the order.[137] Sir Donald Nicholls V-C said that a court would look at all of the circumstances as far as connection was concerned and the sort of connections that would be regarded as sufficient were:     **11-026**

"the residence and place of business of the defendant, his connection with the insolvent, the nature and purpose of the transaction being impugned, the nature and locality of the property involved, the circumstances in which the defendant became involved in the transaction or received a benefit from it or acquired the property in question, whether the defendant acted in good faith, and whether under any relevant foreign law the defendant

---

[131] *Re MC Bacon Ltd* [1990] B.C.L.C. 324.
[132] *Re MC Bacon Ltd* [1990] B.C.L.C. 324 at 335.
[133] *Hill v Haines* [2007] EWCA Civ 1284; [2007] B.P.I.R. 1280.
[134] *Hill v Haines* [2007] EWCA Civ 1284; [2007] B.P.I.R. 1280 at [18].
[135] See *Walker v WA Personnel Ltd* [2002] B.P.I.R. 621.
[136] *Re Paramount Airways Ltd (No.2)* [1993] Ch. 223; [1992] B.C.C. 416. This case involved an administration but nothing turns on that fact.
[137] *Re Paramount Airways Ltd (No.2)* [1992] B.C.C. 416 at 425.

acquired an unimpeachable title free from any claims even if the insolvent had been adjudged bankrupt or wound up locally."[138]

In *Jyske Bank (Gibraltar) Ltd v Spjeldnaes (No.2)*,[139] Evans-Lombe J held, in relation to a claim under s.423 of the Act, that *Re Paramount Airways* did not establish that the court could never grant an order under s.423 (and one would assume, under s.238) in the absence of the type of connections with England and Wales which the court set out. The judge granted relief pursuant to s.423, on the basis that he had heard the main action and was well aware of the facts, and that for him to make the order would be both quicker and less costly than having fresh proceedings in Ireland, with which the action had links, and the issue had been dealt with as part of the wider claims in the action.[140] In *Avonwick Holdings Ltd v Azitio Holdings Ltd*[141] Cockerill J adopted a similar view, saying that the court must consider the factors mentioned specifically in *Re Paramount Airways* but that others could be taken into account in undertaking a balancing exercise.[142] Her Ladyship came to the conclusions that there were connections other than those mentioned in *Re Paramount Airways* that enabled her to decide the issue. In *Suppipat v Narongdej*[143] Butcher J accepted this approach and refused a strike out application made on the basis that a s.423 claim which was made against foreign defendants who had no connection with England and Wales could not be brought.

## 2. *Conditions for adjustment*

**11-027**     Before a court will consider making any order adjusting a pre-liquidation transaction on the basis that it was a transaction at an undervalue under s.238, a liquidator[144] (only a liquidator may bring proceedings when a debtor is in liquidation) must establish the following:

- the company is in liquidation[145];
- the company entered into a transaction at an undervalue in the two years preceding the onset of insolvency[146]; and
- at the time when the transaction was entered into the company was unable to pay its debts or the company was unable to pay its debts as a result of entering into the transaction.[147]

Importantly, liquidators are not required to demonstrate that there was any intention to defraud or injure the company or its creditors, or that the company was aware of its insolvency at the time of the transaction. Nor is there an obligation on the liquidator to prove that the insolvent company intended to sell at an undervalue or

---

[138] *Re Paramount Airways Ltd (No.2)* [1992] B.C.C. 416 at 425.
[139] *Jyske Bank (Gibraltar) Ltd v Spjeldnaes (No.2)* [2000] B.C.C. 16; [1999] 2 B.C.L.C. 101.
[140] *Jyske Bank (Gibraltar) Ltd v Spjeldnaes (No.2)* [2000] B.C.C. 16 at 34.
[141] *Avonwick Holdings Ltd v Azitio Holdings Ltd* [2018] EWHC 2458 (Comm).
[142] *Avonwick Holdings Ltd v Azitio Holdings Ltd* [2018] EWHC 2458 (Comm) at [53].
[143] *Suppipat v Narongdej* [2020] EWHC 3191 (Comm); [2020] Costs L.R. 1649.
[144] 1986 Act s.238 is also available to an administrator acting pursuant to an administration order under Pt II of the Act (see s.238(1)) but the following discussion naturally centres on a liquidator.
[145] 1986 Act s.238(1).
[146] 1986 Act ss.238(2), 240(3). See *Clarkson v Clarkson* [1994] B.C.C. 921 for a case where a claim failed because the transaction did not occur within the relevant time period.
[147] 1986 Act s.240(2).

pay over the market value for an asset, but if that can be established then it may have an effect on the remedy that is ordered.[148]

The requirement to establish insolvency on the part of the company at the time of the transaction can be criticised. It is submitted that there should not be such a requirement for the operation of a section that is designed to curtail the misbehaviour of debtors.[149] The insolvency of the debtor should not be the central issue, but the fact that a company is dissipating its assets that may lead ultimately to insolvency and, in any event, may prejudice creditors. As Keith Bennetts observed in relation to dispositions covered by the Australian equivalent (now s.588FB of the Corporations Act 2001)[150]:

"Here, we are concerned with dispositions of property by the company, being conduct which may adversely affect the asset position of the company in any subsequent winding up. The state of its solvency at the time of the transaction is, in view of the policy justification for avoidance, irrelevant."[151]

It might be said that as s.423 covers fraudulent transactions and there is no need **11-028** to prove insolvency for a successful action pursuant to that section, there is no reason why s.238 should not include an insolvency requirement; liquidators could use s.423 where there is difficulty in establishing insolvency on the part of the company. But the fact is that s.423 actions are not easy to sustain because, as we will see shortly, there is a need to establish that the debtor had the purpose of putting his or her assets beyond the reach of claimants.[152]

There is some good news for liquidators, however, in that the onus of proving insolvency is removed in circumstances where the respondent is a connected person. In such a situation there is a rebuttable presumption that the company was insolvent at the time of the transaction.[153] And, after all is said and done, it is transactions in favour of connected persons that are usually the most blatant examples of debtor misbehaviour.

It has been established, in order to overcome any doubt that the wording of s.238 which provides that it applies to a transaction entered into by the company means that the section does not extend to transactions entered into by someone other than the company, such as the company's mortgagee.[154]

### 3. The meaning of transaction at an undervalue

Section 238(4) sets out what a transaction at an undervalue is, and it occurs **11-029** where:

"(a) the company makes a gift to that person [the person subject to the proceedings] or otherwise enters a transaction with that person on terms that provide for the company to receive no consideration, or (b) the company enters into a transaction with that person for

---

[148] *Stanley and Wood v TMK Finance Ltd* [2010] EWHC 3349 (Ch); [2011] B.P.I.R. 876 at [7].
[149] This is in contrast with provisions designed to set aside preferences, which are aimed at preventing creditors benefiting more than other creditors.
[150] Although the commentator was referring to predecessor legislation, the Corporations Law.
[151] "Avoidance Powers Under the Corporations Law: Reviewing the Nexus Between Commercial and Insolvent Transactions" (1994) 6 *Australian Insolvency Bulletin* 36.
[152] See 1986 Act s.423(3).
[153] 1986 Act s.240(2).
[154] See *Re Brabon* [2000] B.C.C. 1171. This case dealt with a bankruptcy and considered s.339 but that provision is in essence the same as s.238.

ASSETS AVAILABLE FOR DIVISION AND DISTRIBUTION

a consideration the value of which, in money or money's worth, is significantly less than the value, in money or money's worth, of the consideration provided by the company."

"Transaction" is defined in s.436 as including "a gift, agreement or arrangement" and it is indicated that the references to "entering into a transaction" in the Act are to be construed accordingly. The "entering into" part of the requirement must not be overlooked. It means that not only must there by a transaction, the company must have also taken some step or act of participation in some arrangement.[155] It has been suggested that the way that a transaction is characterised can have a critical part to play in determining whether there was an undervalue.[156] "Transaction" is not always easy to identify,[157] but it is defined broadly and embraces a potentially wide range of possibilities,[158] and the courts have said that they should not strain to limit the width of the definition.[159] It is unnecessary to establish that there was a contract.[160] However, the liquidator must establish that there is a transaction to which the debtor company is a party and that there is mutuality between the debtor and the respondent; that is, there was some form of dealing between the company and the respondent,[161] and this must involve an engagement between the parties.[162] But it might be formal or informal; it might be in writing or made orally. A single stage in a series of connected dealings can be seen as a transaction and so can a number of connected arrangements between the debtor and several other parties.[163] "Transaction" would appear to cover:

- gifts[164];
- agreements to perform tasks for no consideration;
- purchases of property which has a market value less than the price paid;
- leases of assets over their rental value;
- dispositions of property for prices less than their market value;
- the supply of an asset on lease below its rental value;
- agreeing to pay for services a sum which exceeds their value;

---

[155] *Re Ovenden Colbert Printers Ltd (in liq)*; sub nom. *Hunt v Hosking* [2013] EWCA Civ 1408; [2015] B.C.C. 615; [2014] B.P.I.R. 285.

[156] Armour, "Transactions at an Undervalue" in Armour and Bennett (eds), *Vulnerable Transactions in Corporate Insolvency* (2003), p.55.

[157] *Re Taylor Sinclair (Capital) Ltd* [2001] 2 B.C.L.C. 176 at 184.

[158] For example, see *Re Taylor Sinclair (Capital) Ltd* [2001] 2 B.C.L.C. 176 at 184; *Re HHO Licensing Ltd* [2007] EWHC 2953 (Ch); [2007] B.P.I.R. 1363; [2008] 1 B.C.L.C. 223 at 31.

[159] *Phillips v Brewin Dolphin Bell Lawrie Ltd* [1999] B.C.C. 557 CA at 565. On appeal, the House of Lords appeared to agree with this approach: [2001] UKHL 2; [2001] 1 W.L.R. 143; [2001] B.C.C. 864.

[160] *Re HHO Licensing Ltd* [2007] EWHC 2953 (Ch) at 31.

[161] *Re Taylor Sinclair (Capital) Ltd* [2001] 2 B.C.L.C. 176 at 185; *Re Ovenden Colbert Printers Ltd (in liq)*; sub nom. *Hunt v Hosking* [2013] EWCA Civ 1408; [2015] B.C.C. 615; [2014] B.P.I.R. 285. Thus, the unilateral misappropriation of assets of the company by a director could not constitute a transaction at an undervalue as there would be no dealing between the director and the company. Naturally, there are other grounds on which a director could be pursued by a liquidator, such as breach of duty.

[162] *Re Hampton's Capital Ltd* [2015] EWHC 1905 (Ch); [2016] 1 B.C.L.C. 374. The mere transmission of money to effect a payment without any form of dealing between the company and the payee could not be a transaction at an undervalue unless the payment could be regarded as a gift.

[163] *Phillips v Brewin Dolphin Bell Lawrie Ltd* [2001] UKHL 2; [2001] 1 W.L.R. 143; [2001] B.C.C. 864.

[164] For an example of this, see *Re Barton Manufacturing Co Ltd* [1998] B.C.C. 827; [1999] 1 B.C.L.C. 740. For there to be a gift, the company would have had to intend to confer a gratuitous benefit on the transferee: *Clarkson v Clarkson* [1994] B.C.C. 921 at 926.

- agreeing to provide services for a sum less than their value;
- providing a guarantee for no benefit or a benefit less than the value of the benefit conferred by the guarantee; and
- providing security for a previously unsecured loan.[165]

The giving of security by a company to a creditor constitutes a transaction, but, the generally held view since *Re MC Bacon Ltd*[166] has been that it is not one that falls within s.238, as all that the company loses is the ability to apply the proceeds of the realisation of the security otherwise than in satisfaction of the secured debt,[167] and that is not something capable of valuation in monetary terms and is not customarily disposed of for value.[168] Millett J in *Re MC Bacon Ltd*[169] said:

"By charging its assets the company appropriates them to meet the liabilities due to the secured creditor and adversely affects the rights of other creditors … All it loses is the ability to apply the proceeds otherwise than in satisfaction of the secured debt. That is not something capable of valuation in monetary terms and is not customarily disposed of for value."[170]

But, in light of the comments of Arden LJ (with whom the other judges agreed on all points save the issue of the limitation period that applies) in the Court of Appeal in *Hill v Spread Trustee Co Ltd*,[171] it does not follow that a transaction involving the granting of security can never amount to a transaction for no consideration as such a grant is no different from any other transaction in that respect.[172]

In his decision in *Re MC Bacon Ltd*,[173] Millett J broke s.238 down into parts as far as a transaction is concerned. His Lordship said that the transaction must be:  **11-030**

"(i) entered into by the company; (ii) for a consideration; (iii) the value of which is measured in money or money's worth; (iv) is significantly less than the value; (v) also measured in money or money's worth; (vi) of the consideration provided by the company."[174]

It serves no significant purpose to detail all of the kinds of dealings that have said to constitute transactions within s.238 but it is worth mentioning that the unilateral misappropriation by a director of his or her company's property has been held not

---

[165] The transactions are based on Goode, *Principles of Corporate Insolvency Law* (1997), pp.356–357 and para.668 of the Australian Law Reform Commission's *General Insolvency Inquiry* ("Harmer Report"), Report No.45, 1988, Canberra.

[166] *Re MC Bacon Ltd* [1990] B.C.L.C. 324. See Armour, "Transactions at an Undervalue" in Armour and Bennett (eds), *Vulnerable Transactions in Corporate Insolvency* (2003), pp.44–45.

[167] *Re Mistral Finance Ltd (in liq)* [2001] B.C.C. 27.

[168] *Re MC Bacon Ltd* [1990] B.C.L.C. 324 at 340.

[169] *Re MC Bacon Ltd* [1990] B.C.L.C. 324.

[170] *Re MC Bacon Ltd* [1990] B.C.L.C. 324 at 340.

[171] *Hill v Spread Trustee Co Ltd* [2006] EWCA Civ 542; [2007] 1 W.L.R. 2404; [2006] B.P.I.R. 789. While the case was dealing with an allegation that a transaction was in breach of s.423, s.423(1) is in very similar terms to s.238(4).

[172] *Hill v Spread Trustee Co Ltd* [2006] EWCA Civ 542; [2007] 1 W.L.R. 2404; [2006] B.P.I.R. 789 at [93]. Arden LJ was quick to add that in her judgment the view that she was positing was also the view of Millett J who was careful to point out that the security in the case before him was not given without consideration because it was given in exchange for forbearance by the creditor.

[173] *Re MC Bacon Ltd* [1990] B.C.L.C. 324.

[174] *Re MC Bacon Ltd* [1990] B.C.L.C. 324 at 340. This breakdown was approved of by the House of Lords in *Phillips v Brewin Dolphin Bell Lawrie Ltd* [2001] UKHL 2; [2001] 1 W.L.R. 143; [2001] B.C.C. 864.

to constitute a transaction between the director and the company.[175] In *Re Kiss Cards Ltd*,[176] the court said that the mere fact that a payment is made into a joint account does not mean, necessarily, that there was a transaction within s.238 between the one making the payment and all those who are account holders of the account. It may be the case that if there is no explanation for the payment it might be regarded as a gift to the account holders and therefore a transaction at an undervalue.

Indications are that it is sometimes difficult to isolate the transaction that can be challenged.[177] In *Phillips v Brewin Dolphin Bell Lawrie Ltd*,[178] the Court of Appeal was called on to hear an appeal from Evans-Lombe J[179] in relation to an alleged transaction at an undervalue. The liquidator had argued that two agreements could be seen as constituting a transaction for the purposes of s.238. The liquidator failed in this argument before the Court of Appeal. Morritt LJ (with whom the other members of the court agreed) said that the

"transaction must be identified by reference to the person … with whom the company entered into it. Only the elements of the transaction between the company and that person may be taken into account. Thus, without more, a contract between the company, A and B cannot be part of a transaction entered into by the company, A, with C. I introduce the caveat 'without more' to guard against cases where the transactions are artificially divided".[180]

**11-031**    The House of Lords subsequently heard an appeal from the Court of Appeal decision, and dismissed it, but importantly their Lordships did say that linked, but distinct, commercial contracts can make up a single transaction for the purposes of s.238.[181] But, as indicated by the quote taken from Morrit LJ's judgment above, the courts are likely to be reluctant to view a number of contracts involving different parties as constituting a single transaction.[182]

From the judgment of Millett J in *Re MC Bacon Ltd*,[183] approved of by Jonathan Parker J (as he then was) in *Re Brabon*,[184] it is plain that a liquidator must establish a significant undervalue by proving the respective values of the consideration given by the parties to the transaction, and this must be done in money terms.[185] So, in the classic kind of case where the company sells an asset for £10,000 to X and the liquidator maintains that the asset was worth £20,000, while he or she does not appear to have to prove the exact monetary value of the asset, the liquidator must establish that the value received for the asset was significantly less than the actual value of the asset.

**11-032**    Besides actually establishing a transaction, an undervalue element must be proved, and that can be difficult in some cases. The undervalue element leads to an

---

[175] *Re Ovenden Colbert Printers Ltd (in liq)*; sub nom. *Hunt v Hosking* [2014] EWCA Civ 1408; [2014] B.P.I.R. 285.

[176] *Re Kiss Cards Ltd* [2016] EWHC 2176 (Ch); [2016] B.P.I.R. 1449 at [8].

[177] See the discussion in Mokal and Ho, "Consideration, Characterisation and Evaluation: Transactions at an Undervalue after Phillips v Brewin Dolphin" (2001) 1 J.C.L.S. 359.

[178] *Phillips v Brewin Dolphin Bell Lawrie Ltd* [1999] B.C.C. 557.

[179] See *Phillips v Brewin Dolphin Bell Lawrie Ltd* [1998] 1 B.C.L.C. 700.

[180] *Phillips v Brewin Dolphin Bell Lawrie Ltd* [1999] B.C.C. 557 at 565.

[181] *Phillips v Brewin Dolphin Bell Lawrie Ltd* [2001] UKHL 2; [2001] 1 W.L.R. 143; [2001] B.C.C. 864.

[182] Armour, "Transactions at an Undervalue" in Armour and Bennett (eds), *Vulnerable Transactions in Corporate Insolvency* (2003), pp.63–64.

[183] *Re MC Bacon Ltd* [1990] B.C.L.C. 324.

[184] *Re Brabon* [2000] B.P.I.R. 537 at 562.

[185] Also, see *National Bank of Kuwait v Menzies* [1994] 2 B.C.L.C. 306; [1994] B.C.C. 119.

examination of the consideration provided in the transaction. So, the issue of consideration is very much central to the transaction under scrutiny. The actual consideration given to the company by the other party to the transaction will usually be examined carefully. The House of Lords in *Phillips v Brewin Dolphin Bell Lawrie Ltd*[186] said that if the value of the consideration for which a company enters into a transaction is speculative then the party who relies on the consideration is required to establish the value.[187]

The use of the word "consideration" in s.238(4) might well lead to confusion. The word is used regularly in the contract law field and in that sense has a rather specialised meaning. It is debatable whether the word is being used in its contractual sense.[188] In any event, the interpretation of "consideration" is likely to have no bearing on the end result. For example, X provides £1 in exchange for a car owned by Y Ltd that is in fact worth £10,000. Although X had given good consideration in a contractual sense, the transaction would be attacked by Y's liquidator. The liquidator would argue that the transaction falls within s.238(4)(b) in that the company received consideration which is significantly less than the value of the consideration provided by the company.

The compromise or release of, or forebearance to press, a valid claim, or even a doubtful or invalid claim, as long as it is not known to be invalid but is advanced in good faith, can provide good consideration in the context of s.238.[189] But any transfer that is expressed to be simply for natural love and affection will constitute a transfer at an undervalue unless there is some other explanation of it.[190] **11-033**

It is essential that an application for a claim under s.238 pleads or defines the transaction on which the applicant relies for the purpose of the provision and an applicant adequately addresses in the evidence that is adduced the value that is alleged to flow between the company in liquidation and the counter-party.[191]

While gifts and bilateral transactions are those transactions that are normally impugned, it has been held by the Court of Appeal in *BTI 2014 LLC v Sequana SA*[192] that there is no policy reason that confines "transaction" to these kinds of transactions as far as s.423(1) is concerned and it can cover a unilateral act, and the same reasoning may apply to s.238.

## 4. *Valuation*

Whether a transaction is a transaction at an undervalue pursuant to s.238(4)(b) will often depend significantly on the question of value. In determining value, the **11-034**

---

[186] *Phillips v Brewin Dolphin Bell Lawrie Ltd* [2001] UKHL 2; [2001] 1 W.L.R. 143; [2001] B.C.C. 864 at [27].

[187] In this case, the House of Lords held that the party had not done so.

[188] Professor Goode assumes that it is (*Principles of Corporate Insolvency Law* (1997), p.360) while other commentators (E. Bailey, H. Groves, C. Smith, *Corporate Insolvency Law and Practice* (London: Butterworths, 1992), p.364) take the view that it is not. The latter see the word as meaning benefit in financial terms.

[189] *Hill v Haines* [2007] EWCA Civ 1284; [2007] B.P.I.R. 1280 at [79].

[190] *Simms v Oakes* [2002] EWCA Civ 8; [2002] B.P.I.R. 1244 at [5].

[191] *Re Guardian Care Homes (West) Ltd (in liq); Hellard v Graiseley Investments Ltd* [2018] EWHC 2664 (Ch) at [64].

[192] *BTI 2014 LLC v Sequana SA* [2019] EWCA Civ 112; [2019] B.C.C. 631. This decision is the subject of an appeal to the Supreme Court but not in relation to the Court of Appeal's judgment on the s.423 part of the application.

court is to look at the value received from the point of view of the debtor.[193] The undervalue element leads to the need for an examination of the consideration provided in relation to the transaction. Thus, the issue of consideration is very much central to the transaction under scrutiny. The actual consideration given to the debtor company by the other party to the transaction will usually be examined carefully and it should be noted that the House of Lords, in *Phillips v Brewin Dolphin Bell Lawrie Ltd*,[194] considered that if the value of the consideration for which a company enters into a transaction is speculative, then the party who relies on the consideration is required to establish the value.

In the typical case litigated under this section, the main issue is likely to be whether the company received significantly less consideration than it gave, that is where the company was transferring an asset the incoming value was significantly less than the value of the asset transferred.[195] Resolving this issue will usually entail a valuation in money terms of the consideration provided both by the company and the other party to the transaction. It has been held that the liquidator must establish the respective values in money or money terms of the consideration given and received by the company and, also, demonstrate that what it received was significantly less than what it provided.[196] But, as we have seen in the last part of the chapter, a court is not obliged necessarily to calculate the exact value of the amounts being transferred by the company and being received by the company.[197] A liquidator cannot, it would seem, point to other non-financial benefits received by the other party to the transaction in order to establish the fact that the transaction falls within s.238.

In determining value, the court in *Stanley and Wood v TMK Finance Ltd*[198] said that a judge could take into account a subsequent sale of the property as the basis for establishing the value of the property at the relevant time; however this depended on the fact that there had been no significant change in market conditions and the circumstances surrounding the sale could be regarded as proving a reliable base for inferring market value at the relevant time, namely the sale from the company to the respondent.

**11-035**    The same valuation principles should be employed for valuing both the consideration received by the company and the consideration disposed of by the company.[199]

In dealing with a claim under s.423 in relation to an alleged transaction defrauding creditors, Neuberger J (as he then was) in *National Westminster Bank Plc v Jones*[200] said that when determining whether consideration received by the defendants to a s.423 claim was significantly less than the consideration passed to the

---

[193] *Re MC Bacon Ltd* [1991] Ch. 127; and affirmed in *Delaney v Chen* [2010] EWCA Civ 1455; [2011] B.P.I.R. 39 at [15].

[194] *Phillips v Brewin Dolphin Bell Lawrie Ltd* [2001] UKHL 2; [2001] 1 W.L.R. 143; [2001] B.C.C. 864 at [27].

[195] *Re Thoars (Deceased)*; sub nom. *Reid v Ramlort Ltd* [2004] EWCA Civ 800; [2005] 1 B.C.L.C. 331; [2004] B.P.I.R. 985.

[196] See *Re MC Bacon Ltd* [1990] B.C.L.C. 324 at 340–341; and approved of in *Phillips v Brewin Dolphin Bell Lawrie Ltd* [1999] B.C.C. 557 CA at 566.

[197] *Re Thoars (Deceased)*; sub nom. *Reid v Ramlort Ltd* [2004] EWCA Civ 800; [2005] 1 B.C.L.C. 331; [2004] B.P.I.R. 985. This is a general approach that is adopted in this area. See *Re HHO Licensing Ltd*; sub nom. *Clements v Henry Hadaway Organisation Ltd* [2007] EWHC 2953 (Ch); [2007] B.P.I.R. 1363; [2008] 1 B.C.L.C. 223.

[198] *Stanley and Wood v TMK Finance Ltd* [2010] EWHC 3349 (Ch); [2011] B.P.I.R. 876.

[199] *Re Thoars* [2002] EWHC 2416 (Ch); [2003] 1 B.C.L.C. 499; [2003] B.P.I.R. 489.

[200] *National Westminster Bank Plc v Jones* [2000] B.P.I.R. 1092.

debtor(s), the court has to form the view as to the price which the property representing the consideration given by the defendants and that given by the debtor(s) would fetch in the open market, thus providing a "correct valuation".[201] The court will have to compare the value of property as against what consideration was given for it, and then consider "in percentage terms, how much less the consideration is than the value".[202] The courts are concerned with actual value and not book value.[203]

It is impossible to say what will constitute "significantly less". The expression has not been interpreted by the courts and probably will never be precisely defined.[204] Clearly one cannot say how much less than market value constitutes "significantly less" in any given case. It is submitted that the use of such an expression creates opportunity for extensive debate on the issue of value and it would have been preferable not to have included any quantitative term in s.238.

As mentioned above, in *Phillips v Brewin Dolphin Bell Lawrie Ltd*[205] Lord Scott **11-036** said that an asset's value is not less than the amount that a reasonably well-informed purchaser is ready to pay.[206]

It is likely that the problem facing liquidators will be the valuing of assets that are the subject of the transaction to be challenged. As Professor Goode says in relation to valuing:

"[It] is not an exact science but to a considerable extent a matter of judgment as the amount a willing buyer would pay in the market when dealing with a willing seller."[207]

Some property is easy to value accurately, while other items are not. The ease or difficulty of valuation depends not only on the nature of the property but the circumstances in which the transaction occurs.[208] Particularly, the liquidator may have difficulty establishing the market value of assets disposed of or purchased by the company. This task is made more difficult if the transaction was entered into some years before the proceedings are heard by a court.

Young J (as he then was) of the New South Wales Supreme Court, in *McDonald* **11-037** *v Hanselmann*,[209] provided some illuminating thoughts on the issue of value. His Honour said:

"Value is not a matter which is to be decided in a vacuum. Value usually is associated with a person. The pure concept of value is, of course, what a reasonable objective person would pay for the property rather than lose it, but very often property will have a special value to a person because of factors unique to that person. For instance, a particular copy of a book may have a special value because of the inscription once showed it belonged to the intending purchaser's grandfather. If that special fact is known to the vendor and to other persons, it may be a matter to take into account when working out what the

---

[201] *National Westminster Bank Plc v Jones* [2000] B.P.I.R. 1092 at 1115.
[202] *National Westminster Bank Plc v Jones* [2000] B.P.I.R. 1092 at 1115.
[203] *Pena v Coyne* [2004] EWHC 2684 (Ch); [2004] 2 B.C.L.C. 703 (a s.423 case).
[204] I. Snaith in *The Law of Corporate Insolvency* (London: Waterlow Publishers, 1990), p.648 argues that a de minimus rule must apply.
[205] *Phillips v Brewin Dolphin Bell Lawrie Ltd* [2001] UKHL 2; [2001] 1 W.L.R. 143; [2001] B.C.C. 864.
[206] *Phillips v Brewin Dolphin Bell Lawrie Ltd* [2001] UKHL 2; [2001] 1 W.L.R. 143 at [30].
[207] *Principles of Corporate Insolvency Law*, 3rd edn, p.88.
[208] I. Snaith, *The Law of Corporate Insolvency* (1990), p.648.
[209] *McDonald v Hanselmann* (1998) 28 A.C.S.R. 49.

hypothetical objective purchaser would pay rather than lose it, but very often the special feature will not be known to the vendor or to the general market."[210]

Young J went on to say that the judgment of Millett J in *Re MC Bacon Ltd*[211] lends some support for the proposition that the financial stringencies of the company at the time when the transaction occurs can be considered when evaluating the transaction.

In assessing whether there is an inequality of benefit, as s.238(4)(b) requires, one must be cognisant of all aspects of the transaction. This is illustrated in *Agricultural Mortgage Corp v Woodward*,[212] which involved a claim under s.423 by a creditor of a debtor and not a liquidator. In this case a farmer (Mr W) borrowed £700,000 from A which took security over the farm. Mr W fell into arrears and before a deadline for the satisfaction of the arrears, Mr W granted his wife (Mrs W) a tenancy of the property. The farm, absent any tenancy, was worth £1 million, but with a tenancy the farm was worth less than £500,000. It was agreed that the rent reserved under the tenancy represented a full market rent. At first instance, HH Judge Weeks QC (sitting as a High Court judge) found that the transaction involving Mr W and Mrs W constituted a transaction that was entered into by the former for the purpose of prejudicing A's interests and within s.423. This finding was not challenged on appeal. However, his Honour did not find that the transaction was entered into at an undervalue. A appealed to the Court of Appeal on this point, and the Court of Appeal reversed the decision of Judge Weeks. The Court took into account the fact that the result of the transaction was that the husband experienced a diminution of the value of his land and the wife was advantaged in that she was granted security of tenure in the family home. Also, the family business was saved from its creditors and Mrs W was given the chance to negotiate a large surrender value for her interest.[213] Mrs W was, in effect, placed in "a ransom position".[214]

**11-038**    Lord Scott in *Phillips v Brewin Dolphin Bell Lawrie Ltd*[215] said that the price paid for an asset can be presumed to be market value, and, therefore, not transferred at an undervalue within the section, if it was sold after arm's length negotiations and after proper marketing, and both parties acted "knowledgeably, prudently and without compulsion".[216] We will return to the issue of arm's length transactions shortly.

The consideration should be valued as at the date of the transfer. In appropriate circumstances the occurrence or non-occurrence of events subsequent to the transfer that is impugned and before the assessment of the consideration, may be considered in assessing the value of consideration in money or money's worth,[217] an approach that the House of Lords in *Phillips v Brewin Dolphin Bell Lawrie Ltd*[218] appeared to endorse. An example of this might be where a property, when sold, was expected

---

[210] *McDonald v Hanselmann* (1998) 28 A.C.S.R. 49 at 54.

[211] *Re MC Bacon Ltd* [1990] B.C.L.C. 324 at 340–341.

[212] *Agricultural Mortgage Corp v Woodward* [1994] B.C.C. 688. For another case in a similar context, but dealing solely with s.423, see *National Westminster Bank Plc v Jones* [2000] B.P.I.R. 1092; *Times*, 22 June 2000 per Neuberger J.

[213] *Agricultural Mortgage Corp v Woodward* [1994] B.C.C. 688 at 696.

[214] *Agricultural Mortgage Corp v Woodward* [1994] B.C.C. 688 at 696.

[215] *Phillips v Brewin Dolphin Bell Lawrie Ltd* [2001] UKHL 2; [2001] 1 W.L.R. 143; [2001] B.C.C. 864.

[216] *Phillips v Brewin Dolphin Bell Lawrie Ltd* [2001] UKHL 2; [2001] 1 W.L.R. 143 at 30.

[217] *Re Thoars* [2002] EWHC 2416 (Ch); [2003] 1 B.C.L.C. 499; [2003] B.P.I.R. 489 at [8], [17].

[218] *Phillips v Brewin Dolphin Bell Lawrie Ltd* [2001] UKHL 2; [2001] 1 W.L.R. 143; [2001] B.C.C. 864.

to receive planning permission that would boost its value and those in the market for a property with such permission might be willing to pay more for it, and the property did in fact attract the necessary permission post sale. As far as valuation goes it has been said that the question in every case would be whether there was a "significant" disparity in the consideration moving from and to the debtor.[219]

Both items of consideration must be considered, when valuing, from the company's point of view.[220] It has been held in the Court of Appeal in *Ramlort Ltd v Reid*[221] that while it is preferable if precise values of the consideration involved in the transaction can be established, it is not absolutely necessary for exact monetary values to be assigned to the outgoing and incoming consideration that constitute the impugned transaction.[222] The critical issue is: was what the company received significantly less than what it gave?[223] Jonathan Parker LJ said in *Ramlort Ltd v Reid* that he could:

"see no reason why the court, if it considers it appropriate to do so, should not address the issue of undervalue by taking from a range of possible values those which are most favourable to the party seeking to uphold the transaction".[224]

So, in the case where the company buys an asset for £140,000 from X and the liquidator maintains that the asset was only worth £100,000, while he or she does not appear to have to prove the exact monetary value of the asset, the liquidator must establish that the actual value of the asset was significantly less than the amount paid for it by the company. Whether a sum is significantly less is for the court to decide given the evidence, particularly of the value of the relevant property.

While the consideration should be valued as at the date of the transfer, in ap- **11-039** propriate circumstances the occurrence or non-occurrence of events subsequent to the transfer that is impugned, and where the valuation at the time of the transaction would have taken account of factors that were at that time uncertain but were known or anticipated, may be considered in assessing the value of consideration in money or money's worth.[225] This was an approach that the House of Lords in *Phillips v Brewin Dolphin Bell Lawrie Ltd* appeared to endorse. While courts have said that hindsight should not be employed in determining value it has been suggested that the House of Lords in this case was not applying a hindsight approach to valuation, or else the value of consideration would be at the time of the trial and not at the time of the transaction; rather, their Lordships were considering a transaction that was so speculative that later events could be employed to assess its valuation at the time of the transaction. This view has been accepted and applied by David Richards J (as he then was) in *Stanley and Wood v TMK Finance Ltd*.[226] In *Phillips v Brewin Dolphin Bell Lawrie Ltd*, the factors taken into account by their Lordships were known by the parties at the time of the transaction. According to the

---

[219] *Re Thoars (Deceased)*; sub nom. *Reid v Ramlort Ltd* [2004] EWCA Civ 800; [2005] 1 B.C.L.C. 331; [2004] B.P.I.R. 985 at 102–105.

[220] *Re MC Bacon Ltd* [1990] B.C.L.C. 324 at 340.

[221] *Ramlort Ltd v Reid* [2004] EWCA Civ 800; [2004] B.P.I.R. 985.

[222] *Ramlort Ltd v Reid* [2004] B.P.I.R. 985 at [103].

[223] *Ramlort Ltd v Reid* [2004] B.P.I.R. 985 at [104]. For applications of the principle, see *Stanley and Wood v TMK Finance Ltd* [2010] EWHC 3349 (Ch); [2011] B.P.I.R. 876; and the bankruptcy case of *Ailyan v Smith* [2010] EWHC 24 (Ch); [2010] B.P.I.R. 289 at [48], [49].

[224] *Ramlort Ltd v Reid* [2004] B.P.I.R. 985 at [104].

[225] *Reid v Ramlort Ltd* [2002] EWHC 2416 (Ch); [2003] 1 B.C.L.C. 499; [2003] B.P.I.R. 489 at [8], [17].

[226] *Stanley and Wood v TMK Finance Ltd* [2010] EWHC 3349 (Ch); [2011] B.P.I.R. 876.

ASSETS AVAILABLE FOR DIVISION AND DISTRIBUTION

Vice-Chancellor at first instance in *Reid v Ramlort Ltd*),[227] when referring to *Phillips v Brewin Dolphin Bell Lawrie Ltd*:

> "I take that ratio to be that (1) the value of the consideration in money or money's worth is to be assessed as at the date of the transaction, (2) if at that date value is dependent on the occurrence or non-occurrence of some event and that event occurs before the assessment of value has been completed then the valuer may have regard to it, but (3) the valuer is entitled, indeed bound, to take account of all other matters relevant to the determination of value as at the date of the transaction."

In *Stanley and Wood v TMK Finance Ltd*,[228] David Richards J indicated that the court can specifically take into account a subsequent sale of the property that was the subject of the transaction as the basis for establishing the value of the property at the relevant time; however, this depended on the fact that there had been no significant change in market conditions and the circumstances surrounding the sale could be regarded as proving a reliable base for inferring market value at the relevant time, namely the sale from the company to the respondent.[229] According to David Richards J this was "not an application of a hindsight principle, which in an insolvency context usually means taking account of later events to value a contingency as at an earlier date … It is simply using the later sale to establish by inference the market value at the earlier date".[230] If full hindsight were employed then the values of the property transferred would be ascertained at a date after the transaction was entered into and not at the date of the transaction. In *Watchorn v Jupiter Industries Ltd*,[231] HH Judge Purle QC (sitting as a High Court judge) appeared to employ hindsight in relation to a s.238 claim, but in fact he was using hindsight only in order to determine the value of company assets in order to ascertain whether the company was insolvent at the time of the transaction, and not to decide whether there had been an undervalue in relation to the transfer that was sought to be impugned by the liquidator.[232]

Professor Rebecca Parry and Sharif Shivji maintain that it would seem that a court can only take into account events subsequent to the transaction where they resolve ambiguities that would prevent a valuer from coming to a firm view of the value of consideration at the time of the transaction.[233]

**11-040**   Value is not to be determined in the light of the debtor's subjective views. Rather, value is an objective concept and any value passed to the debtor must be determined by reference to what the debtor receives rather than, for example, to what the counterparty gives up.[234]

While market value is often critical, it must be said that market value is not always indicative of the true value of a piece of property to the insolvent company. Market value might be difficult to ascertain because of information asymmetry at the time of the transaction. Of course, the value of property acquired by a debtor company might decrease after acquisition, so the time to value any property

---

[227] At first instance, *Reid v Ramlort Ltd* [2002] EWHC 2416 (Ch); [2003] 1 B.C.L.C. 499; [2003] B.P.I.R. 489 at [17].

[228] *Stanley and Wood v TMK Finance Ltd* [2010] EWHC 3349 (Ch); [2011] B.P.I.R. 876.

[229] *Stanley and Wood v TMK Finance Ltd* [2010] EWHC 3349 (Ch); [2011] B.P.I.R. 876 at [17]–[18].

[230] *Stanley and Wood v TMK Finance Ltd* [2010] EWHC 3349 (Ch) at [16].

[231] *Watchorn v Jupiter Industries Ltd* [2014] EWHC 3003 (Ch).

[232] *Watchorn v Jupiter Industries Ltd* [2014] EWHC 3003 (Ch) at [46]–[47].

[233] R. Parry et al, *Transaction Avoidance in Insolvencies*, 2nd edn (Oxford: OUP, 2011), p.107.

[234] *Lyle v Bedborough* [2021] EWHC 220 (Ch); [2021] 2 P. & C.R. DG1 at [70].

transferred is at the time of the impugned transaction. As mentioned earlier, a transaction is made at arm's length then the English courts might be less likely to look behind it.[235] In *Phillips v Brewin Dolphin Bell Lawrie Ltd*, Lord Scott stated:

> "The value of an asset that is being offered for sale is, prima facie, not less than the amount which a reasonably well-informed purchaser is prepared, in arm's length negotiations, to pay for it."[236]

However, just because a transaction is entered into at arm's length does not necessarily mean that that transaction is not at an undervalue. In *Phillips v Brewin Dolphin Bell Lawrie Ltd*, Lord Scott observed that the price paid for an asset can be presumed to be market value and, therefore, not transferred at an undervalue within the section if it was sold after arm's length negotiations and after proper marketing, and both parties acted "knowledgeably, prudently and without compulsion",[237] and this suggests that a party might be able to lead evidence to rebut that presumption. In *Ailyan v Smith*,[238] HH Judge Cooke (sitting as a High Court judge) said that:

> "the court has to assess as best it can on the evidence what [the asset's] value in money or money's worth would be to a rational and reasonably well-informed purchaser, having knowledge of the actual characteristics of what it is he is buying".[239]

Clearly one cannot say how much less than open market value constitutes "significantly less" in any given case. Each case must be considered on its facts. In determining value the court is to look at the value received from the point of view of the debtor.[240] In some situations a piece of property might have a special value to a party and a transaction which fails to reflect that value may be susceptible to challenge.[241] The terms of an arrangement might also affect value and so an arrangement without certain terms might involve fair consideration being given, but the fact that the terms are included in the arrangement might lead a court to determine that there is a significant undervalue.[242] Also of importance in ascertaining value is the totality of an arrangement and not simply the market value in isolation from other pertinent factors.[243]

The same principles should be employed in the valuation of both the consideration received by the company and the consideration given by the company.[244] In the typical case a substantial issue is likely to be whether the company received significantly less consideration than it gave; that is, where the debtor company was paying for an asset, was the value of that asset significantly less than the value of

---

[235] *Re Brabon* [2000] B.C.C. 1171.
[236] *Phillips v Brewin Dolphin Bell Lawrie Ltd* [2001] UKHL 2; [2001] 1 W.L.R. 143; [2001] B.C.C. 864 at [30]. For a more recent exposition of the position, see *Hargreaves v Salt* [2010] EWHC 3549 (Fam); [2011] B.P.I.R. 656.
[237] *Phillips v Brewin Dolphin Bell Lawrie Ltd* [2001] UKHL 2; [2001] 1 W.L.R. 143; [2001] B.C.C. 864 at [30].
[238] *Ailyan v Smith* [2010] EWHC 24 (Ch).
[239] *Ailyan v Smith* [2010] EWHC 24 (Ch) at [69].
[240] *Re MC Bacon Ltd* [1990] B.C.L.C. 324; *Delaney v Chen* [2010] EWCA Civ 1455 at [15].
[241] J. Armour, "Transactions at an undervalue" in J. Armour and H. Bennett (eds), *Vulnerable Transactions in Corporate Insolvency* (Oxford, Hart Publishing, 2003), p.73.
[242] See *Barclays Bank Plc v Eustice* [1995] 1 W.L.R. 1238.
[243] *Agricultural Mortgage Corp Plc v Woodward* [1994] B.C.C. 688 at 696.
[244] *Reid v Ramlort Ltd* [2002] EWHC 2416 (Ch), at first instance.

the payment made?[245] So far as valuation is concerned, it has been said that the question in every case is whether there was a "significant" disparity in the consideration moving from and to the debtor.[246] Resolving this issue will, as explained earlier, usually entail a valuation in money terms of the consideration provided both by the company and the other party to the transaction. It has been held that the liquidator must establish the respective values in money or money terms of the consideration given and received by the company and, also, demonstrate that what it received was significantly less than what it provided.[247] But, as mentioned above, a court is not obliged necessarily to calculate the exact value of the amounts being transferred and being received by the company.[248]

It has been accepted that a preferential payment which is susceptible to challenge cannot amount to consideration for the purposes of the undervalue provision.[249]

## 5. *Defences*

**11-041**    In defence to an application pursuant to s.238, a defendant could argue that the company entered into the transaction in good faith, for the purpose of carrying on its business and when entering the transaction there were reasonable grounds for believing that the transaction would benefit the company.[250] It may be argued, under this defence, that a company that had horrendous cash flow problems would benefit from the sale of an asset, whatever the price.[251] Other situations where the defence may be invoked could be where the defendant was in a very strong negotiating position,[252] or where the transaction was related to the company's decision to close down its business operations.[253]

The defence consists of two limbs, namely the need to act in good faith in the course of carrying on the company's business[254] and the holding of a belief on reasonable grounds that the transaction would benefit the company.[255] With the first limb, it is the company that must act in good faith, and as a result there is no examination of the mind or actions of the party with whom the company made the transaction. This is manifested in *Re Barton Manufacturing Co Ltd*.[256] In that case, before Harman J, there were three payments which were attacked as transactions at an undervalue. Only one is relevant here. That payment was the one made by the company to S, the wife of one of the directors of the company. S, on her evidence,

---

[245] *Reid v Ramlort Ltd* [2004] EWCA Civ 800.

[246] *Re Thoars (Deceased)*; sub nom. *Reid v Ramlort Ltd* [2004] EWCA Civ 800 at [102]–[105].

[247] See *Re MC Bacon Ltd* at 340–341; approved in *Phillips v Brewin Dolphin Bell Lawrie Ltd* [1999] B.C.C. 557 CA at 566.

[248] Also, see *Re HHO Licensing Ltd* [2007] EWHC 2953 (Ch); [2007] B.P.I.R. 1363; [2008] 1 B.C.L.C. 223.

[249] *Re Peppard* [2009] B.P.I.R. 331 at [28]. This case involved a consideration of the equivalent provision for individual insolvency, namely s.339.

[250] 1986 Act s.238(5).

[251] Professor Ian Fletcher ("Voidable Transactions in Bankruptcy: British Perspectives" in Ziegel (ed.), *Current Developments in International and Comparative Corporate Insolvency Law* (1994), p.305) submits that in such circumstances, persons acquiring assets at "bargain" prices should be assured of retaining the benefits of their bargains.

[252] *Goode on Principles of Corporate Insolvency Law* (2019), p.648.

[253] *Goode on Principles of Corporate Insolvency Law* (2019), p.649.

[254] 1986 Act s.238(5)(a).

[255] 1986 Act s.238(5)(b).

[256] *Re Barton Manufacturing Co Ltd* [1998] B.C.C. 827.

paid the money received from the company to the company's parent to reduce the parent's overdraft and thereby freeing up funds for the company ("the subsidiary") to make payments. It was held that as S was repaid by the parent company, the payment to S by the company in liquidation was nothing more than a gift. The critical thing is that Harman J accepted S's evidence that she knew nothing of the affairs of her husband (a director of the subsidiary) and was acting in good faith, yet that was not relevant as it was the company that had to have acted in good faith.[257]

So, s.238(5)(a) does not deal with the state of mind or circumstances of the person receiving a benefit from the company, but requires the emphasis to be on the attitude of the company, and this is probably consistent with the traditional approach adopted in relation to fraudulent preferences, namely the intention of the debtor is critical and the intention of the creditor is immaterial.[258] It may be onerous, in some cases, for a respondent to prove that the company acted with propriety. The question of whether the company entered into the transaction in good faith involves considering a subjective state of mind. This can be a problem because it is sometimes difficult to know whose subjective state of mind is relevant where a company is involved. As it is an abstraction, a company has no mind of its own—it acts through human agents.[259] Deciding whose mind is relevant will not be too demanding where either the company is a "one-man company" as the knowledge of the company is that of the alter ego of the company,[260] or a small group constitutes the company—the group's knowledge will be the knowledge of the company.[261]

A much used approach is to ascertain who is the directing mind and will of the company and ascertain what was their knowledge.[262] The company has, under this approach, attributed to it the mind and will of the natural person(s) who manages and controls its actions.[263] According to Viscount Haldane in *Lennard's Carrying Co Ltd v Asiatic Petroleum Co Ltd*,[264] the directing mind and will might be a person who is under the direction of the shareholders in general meeting, the board or someone who has, pursuant to the articles, an authority co-ordinate with the board.[265] Hoffmann LJ (as he then was) said in *El Ajou v Dollar Land Holdings Plc*[266] that

**11-042**

---

257 For a case where the court said that the first limb was fulfilled, see *Lord v Sinai Securities Ltd* [2004] EWHC 1764 (Ch); [2004] B.C.C. 986; [2005] 1 B.C.L.C. 295.

258 L. Sealy and D. Milman, *Annotated Guide to the Insolvency Legislation*, 4th edn (Bicester: CCH Editions Ltd, 1994), p.297.

259 For example, see *Lennard's Carrying Co Ltd v Asiatic Petroleum Co Ltd* [1915] A.C. 705 at 713; *HL Bolton (Engineering) Co Ltd v T J Graham & Sons Ltd* [1957] 1 Q.B. 159 at 172–173; *Tesco Supermarkets Ltd v Nattrass* [1972] A.C. 153 at 170; *El Ajou v Dollar Land Holdings Plc* [1994] B.C.C. 143 at 150.

260 *Bernard Elsey Pty Ltd v Commissioner of Taxation* (1969) 121 C.L.R. 119 at 121.

261 *FCT v Whitfords Beach Pty Ltd* (1982) 150 C.L.R. 355 at 370.

262 *Lennard's Carrying Co Ltd v Asiatic Petroleum Co Ltd* [1915] A.C. 705 at 713; *HL Bolton (Engineering) Co Ltd v T J Graham & Sons Ltd* [1957] 1 Q.B. 159 at 172–173; *Tesco Supermarkets Ltd v Nattrass* [1972] A.C. 153 at 170; *Entwells Pty Ltd v National and General Insurance Co Ltd* (1991) 5 A.C.S.R. 424 at 429; *El Ajou v Dollar Land Holdings Plc* [1994] B.C.C. 143 at 150, 158; *Meridian Global Funds Management Asia Ltd v Securities Commission* [1995] 2 A.C. 500 PC (NZ).

263 *El Ajou v Dollar Land Holdings Plc* [1994] B.C.C. 143 at 150.

264 *Lennard's Carrying Co Ltd v Asiatic Petroleum Co Ltd* [1915] A.C. 705.

265 *Lennard's Carrying Co Ltd v Asiatic Petroleum Co Ltd* [1915] A.C. 705 at 713.

266 *El Ajou v Dollar Land Holdings Plc* [1994] B.C.C. 143.

"a person held out by the company as having plenary authority or in whose exercise of such authority the company acquiesces, may be treated as its directing mind".[267]

Later, in *Meridian Global Funds Management Asia Ltd v Securities Commission*,[268] Lord Hoffmann, echoing part of what Viscount Haldane had said much earlier and referred to above, stated that whose mind was attributed to the company was to be found in the company's constitution, and regard must be had to any statutory provision involved and the context and policy of that provision. He stated further that the principles of agency had to be taken into account. These comments were approved of by the House of Lords in *Stone & Rolls Ltd v Moore Stephen*[269] and by the Supreme Court in *Bilta (UK) Ltd v Nazir*.[270] Lord Mance JSC said in the latter case, after approving of the approach adopted by Lord Hoffmann, that one must ask: "whose act or knowledge or state of mind is *for the purpose* of the relevant rule to count as the act, knowledge of state of mind of the company?"[271] Whether a person will be regarded as an agent of the company will depend on whether he or she has been given authority by the company. Frequently, the board of directors, which is usually given wide management powers by the company's articles of association, will delegate power to act for it to certain directors, collectively or as individuals to represent the company in broad or particular circumstances, and it may authorise persons other than the directors to act for the company in some situations.[272] Clearly, the more difficult cases arise where decisions are made by managers and other employees of the company.[273] Lord Mance said in *Bilta (UK) Ltd v Nazir*[274] that "a company may as a result of such rules have imputed to it the conduct of an ordinary employee".[275] In this situation it is necessary for a court to determine whether a person had a high enough level of power to say that his or her motives can be said to represent those of the company.[276] So, a court must determine the extent of the authority of directors, managers or employees and whether it is sufficient to enable them to represent the company.

In the preference case, *Re Agriplant Services Ltd*,[277] Jonathan Parker J seemed happy to equate the state of mind of the director who essentially ran the company with the state of mind of the company.[278] Yet, the issue is complicated when Lloyd J says in *Wills v Corfe Joinery Ltd (in liq)*[279] that the directors and the company's state of mind must be considered.[280] Is the state of mind of the directors different from the company? If so, whose state of mind is relevant for the purposes of s.238? Probably if there is a board decision the courts will have no hesitation in saying that that represents the state of mind of the company. But what if, as will most frequently occur, there is no board decision and there are two or more directors involved in controlling the affairs of the company and there is no agreement between them that

---

[267] *El Ajou v Dollar Land Holdings Plc* [1994] B.C.C. 143 at 159.
[268] *Meridian Global Funds Management Asia Ltd v Securities Commission* [1995] 2 A.C. 500
[269] *Stone & Rolls Ltd v Moore Stephen* [2009] UKHL 39.
[270] *Bilta (UK) Ltd v Nazir* [2015] UKSC 23.
[271] *Bilta (UK) Ltd v Nazir* [2015] UKSC 23 at [41].
[272] *Tesco Supermarkets Ltd v Natrass* [1972] A.C. 153 at 171.
[273] R. Parry et al, *Transaction Avoidance in Insolvencies* (2011), p.195.
[274] *Bilta (UK) Ltd v Nazir* [2015] UKSC 23.
[275] *Bilta (UK) Ltd v Nazir* [2015] UKSC 23 at [40].
[276] *Tesco Supermarkets Ltd v Natrass* [1972] A.C. 153 at 171.
[277] *Re Agriplant Services Ltd* [1997] B.C.C. 842.
[278] *Re Agriplant Services Ltd* [1997] B.C.C. 842 at 851.
[279] *Wills v Corfe Joinery Ltd (in liq)* [1997] B.C.C. 511.
[280] *Wills v Corfe Joinery Ltd (in liq)* [1997] B.C.C. 511 at 516.

the company should enter the impugned transaction. Will the courts only be concerned with the state of mind of the director(s) who organises the transaction?[281] In *Re Exchange Travel (Holdings) Ltd*,[282] Rattee J refused to place any strength on the fact that the finance director who made the payment that was being attacked as a preference had no desire to improve the position of the creditor to whom the payment was made, and therefore, there could be no preference under s.239.[283] The learned judge accepted that the controllers of the company with whom the creditor was connected were behind the payment.[284]

In general terms, "good faith" connotes honesty and propriety.[285] In the insolvency field it has assumed a fundamental meaning wherever it is employed. Essentially, it means that there is no intention on the part of the person who is required to act in good faith to circumvent the purposes of the laws of insolvency.[286] When it comes to interpreting "good faith" in relation to adjustment provisions, the expression has been interpreted in line with the meaning given to it generally in insolvency law. It has been held to mean that the person who is to act in good faith must not intend to benefit at the expense of other creditors or collude with the debtor in prejudicing creditors. The issue of whether a company acted in good faith may be somewhat academic as it is unlikely that good faith will be an issue in most cases involving transactions at an undervalue.[287] Liquidators will usually be more concerned with denying that it could have been reasonably believed that the transaction would benefit the company.

With the second limb, the requirement for the use of this defence is not that the transaction did in fact benefit the company, but that the company had reasonable grounds for believing that it would.[288] The grounds are to be assessed at the time of the transaction and so there is no room for the court to consider the transaction in hindsight. The test is objective so the belief of a company is of no assistance to it if it was not reasonably held. If no consideration was given to the company the respondent has a much harder task in fulfilling this limb of the defence. The two limbs mean that a company could enter a transaction in good faith, but because of negligence, in that it is possible to say that there could be no reasonable grounds for believing that the transaction could benefit the company, the transaction could be impugned.

**11-043**

---

[281] This was the case in *Re Agriplant Services Ltd* [1997] B.C.C. 842. But this was not a difficult case as the director who instigated the transaction on behalf of the company was clearly the directing mind of the company.

[282] *Re Exchange Travel (Holdings) Ltd* [1996] B.C.C. 933.

[283] *Re Exchange Travel (Holdings) Ltd* [1996] B.C.C. 933 at 948.

[284] *Re Exchange Travel (Holdings) Ltd* [1996] B.C.C. 933 at 948.

[285] *Olifent v Australian Wine Industries Pty Ltd* (1996) 14 A.C.L.C. 510 at 515. For a discussion of the expression in the general law, see J. O'Connor, *Good Faith in English Law* (Aldershot: Dartmouth Publishing Company, 1990); Farnsworth, "Good Faith Performance and Commercial Reasonableness Under the Uniform Commercial Code" (1963) 30 *University of Chicago Law Review* 666; Summers, "Good Faith in General Contract Law and the Sales Provisions of the Uniform Commercial Code" (1954) 54 *Virginia Law Review* 195; Anderson, "Good Faith in the Enforcement of Contracts" (1988) 73 *Iowa Law Review* 299. In a bankruptcy context, see Ponoroff, "The Limits of Good Faith Analyses: Unravelling and Redefining Bad Faith in Involuntary Bankruptcy Proceedings" (1992) 71 *Nebraska Law Review* 209.

[286] For example, see Orelup, "Avoidance of Preferential Transfers Under the Bankruptcy Reform Act of 1978" (1979) 65 *Iowa Law Review* 209, 239.

[287] See *Pegulan Floor Coverings Pty Ltd v Carter* (1997) 15 A.C.L.C. 1293 at 1299.

[288] For a case where the respondent failed on this limb, see *Lord v Sinai Securities Ltd* [2004] EWHC 1764 (Ch); [2004] B.C.C. 986; [2005] 1 B.C.L.C. 295.

It is submitted that where a company cannot be said to fulfil the criteria established in s.238(5), it is unfair that the person who entered into the contract with the company has no defence when acting quite properly. He or she may have realised that a bargain was being secured, but there could be multifarious proper reasons why the assets are being disposed of at significantly less than market value. For instance, a person may receive property of a company, for less than market value, where the transaction was entered into in good faith for the purpose of the company's business, and yet the transaction could be set aside because of the negligence of company officers in assessing what benefit could be gained from the transaction by the company.[289]

The defence is rarely successful, but was in *Levy McCallum Ltd v Allen*.[290] In that case Treacy J found that a guarantee given by a company that ended up in liquidation was given in good faith for the purpose of carrying on the business of the company and with reasonable grounds for believing that it would benefit the company. The company had guaranteed the debt of another company (in the same corporate group) that owed it money.

**11-044**    There has been no authority on whether or not it is possible for a respondent to plead the change of position defence in relation to a s.238 claim. This is a restitutionary defence.[291] Any action taken by a respondent that is to qualify as changing position would have to establish that it was done in good faith, but if the liquidator can establish undervalue, then that might enable a court to infer lack of good faith. Interestingly, in the context of s.423 (transactions defrauding creditors), a provision which overlaps with s.238 in some respects, mainly because both are involved with transactions that diminish the asset pool available to creditors and as a result of a transaction at an undervalue, a judge has taken into account the issue of change of position. In a case involving a claim under s.423 of the Act, *4Eng Ltd v Harper*,[292] Sales J (as he then was) said that where persons receive property in good faith and have changed their position as a result, then it would not be appropriate to require the transferee to return the property.[293] This was a controversial decision and it has been criticised by a number of commentators.[294] Nevertheless, in *BTI 2014 LLC v Sequana SA*,[295] Rose J referred to this part of the judgment in *4Eng Ltd v Harper* with implicit approval, although she considered that change of position did not amount to a complete defence but was, rather, relevant to the question of the appropriate relief to be granted.[296]

---

[289] Snaith, *The Law of Corporate Insolvency* (1990), p.650. Despite this concern, experience suggests that there have not been cases where parties to transactions have been prejudiced because of the negligence or improper actions of companies.

[290] *Levy McCallum Ltd v Allen* [2007] NICh 3; [2007] NIJB 366 and noted in Capper (2008) 21 Insolv. Int. 59.

[291] In the context of avoidance provisions, see Degeling, "Restitution for Vulnerable Transactions" in Armour and Bennett (eds), *Vulnerable Transactions in Corporate Insolvency* (2003), pp.417–425.

[292] *4Eng Ltd v Harper* [2009] EWHC 2633 (Ch); [2010] B.P.I.R. 1; [2010] 1 B.C.L.C. 176.

[293] *4Eng Ltd v Harper* [2009] EWHC 2633 (Ch); [2010] B.P.I.R. 1; [2010] 1 B.C.L.C. 176 at [14].

[294] For example, see Morgan, "4 Eng Ltd v Harper—an unjustified change?" (2010) 3(1) *Corporate Rescue and Insolvency* 5; Goode, *Principles of Corporate Insolvency Law*, 4th edn (2011), pp.633–634).

[295] *BTI 2014 LLC v Sequana SA* [2016] EWHC 1686 (Ch).

[296] *BTI 2014 LLC v Sequana SA* [2016] EWHC 1686 (Ch) at [522]–[525]. This approach was applied by ICC Judge Jones in *Re Fowlds (A Bankrupt)* [2020] EWHC 1200 (Ch); [2020] B.P.I.R. 1111 when addressing the issue of a preference. On appeal from the decision of Judge Jones, Trower J (*Bucknall v Wilson* [2021] EWHC 2149 (Ch) at [94]) denied change of position could be relied on as a defence

One other useful point to note[297] is that the court has been willing to apply restitutionary principles in relation to claims for relief when determining that a transaction was void under s.127 because there was no statutory provision for relief,[298] but relief is provided for transactions caught by s.238. We will come to this issue shortly.[299]

### 6. Orders

**(a)  The setting**  If a liquidator has proved that a transaction at an undervalue within s.238 had been entered into, then the court is probably first going to make a declaration to that effect.[300] Then it will consider what other orders are appropriate. Section 238(3) provides, somewhat implicitly, that if a liquidator is able to establish the conditions required under the section and a transaction at an undervalue was given, and no defence can be made out under s.238(5), the court is to make orders that restore the position to what it would have been if the company had not entered the impugned transaction. This provision encapsulates the aim of the adjustment legislation, i.e. to ensure that there is restitution by restoring the status quo, and it has been said that a court can order restitution of assets even where the nature and substance of the assets had changed significantly since the transfer that is under attack.[301] But s.238(3) is not the only relevant provision. Because s.241(1) provides that

> "without prejudice to the generality of sections 238(3) and 239(3) [the latter deals with preferences], an order under either of those sections with respect to a transaction or a preference entered into or given by a company may …".

**11-045**

and the provision goes on to set out a number of orders which the court may make to achieve the goal articulated in s.238(3).

It has been said that in determining what order to make, the court is not to start with a presumption that favours monetary compensation as against a setting aside of the relevant transaction or vice versa, for the courts must fashion the most appropriate remedy, as far as practicable, in order to restore the position pre-transaction.[302] So, courts will be slow to allow a transferee of property that is later subject to a successful claim pursuant to s.238 to retain the property and pay the difference between the purchase price and a fair value, where the transferee had notice that the transaction might be challenged by a liquidator.[303] When a court exercises its discretion in relation to what is the most appropriate remedy, the events subsequent to the impugned transaction being put into effect will be considered.[304]

The court is not to be prevented from making an order restoring the pre-

---

to claims brought under the bankruptcy equivalents of ss.238 and 239. The latter judgment was delivered just before going to press and so it could not be analysed in this chapter.

[297] A point made in *Insolvency Lawyers' Association Bulletin* No.360 (17 October 2011).

[298] *Rose v AIB Group (UK) Plc* [2003] EWHC 1737 (Ch); [2003] 1 W.L.R. 2791.

[299] See para.11-047 below.

[300] For example, see *Re Bangla Television Ltd (in liq)* [2006] EWHC 2292 (Ch); [2007] 1 B.C.L.C. 609 at [28].

[301] *Walker v WA Personnel Ltd* [2002] B.P.I.R. 621 at 634.

[302] *Re Thoars (Deceased)*; sub nom. *Reid v Ramlort Ltd* [2004] EWCA Civ 800; [2005] 1 B.C.L.C. 331; [2004] B.P.I.R. 985 at [125]. This was a bankruptcy case dealing with s.339 of the Act. Also, see *Singla v Brown* [2007] EWHC 405; [2007] B.P.I.R. 424.

[303] *Walker v WA Personnel Ltd* [2002] B.P.I.R. 621 at 634–635.

[304] *Walker v WA Personnel Ltd* [2002] B.P.I.R. 621 at 634–635.

ASSETS AVAILABLE FOR DIVISION AND DISTRIBUTION

transaction position because the respondent to the action cannot be restored to the position he or she was in immediately prior to the transaction being entered into. The court's primary, and possibly only, concern was, under s.238(3), the restoration of the company's position.[305] The position of the respondent was to be taken into account by the court as a general matter of discretion, but it was not incumbent on the court to ensure that the respondent was restored to his or her exact pre-transaction position, as often that would be impossible.[306] Notwithstanding that view, there is later authority[307] that suggests that if the respondent has changed his or her position then an order in favour of the applicant may not be made. This is considered in detail below.

**11-046**     The orders in s.241 are, in effect, examples of what a court can do, but clearly a court is not limited by the kinds of orders enumerated in s.241. Section 241(1) provides a judge with an unfettered discretion as to the order which he or she might make if an applicant has succeeded in establishing that there was a transaction at an undervalue or a preference. The discretion is unfettered but must be exercised judicially within the context of the statutory provision and its purpose.[308] The orders set out in s.241 indicate the wide range that court orders may take.[309] However, for the most part, courts are likely to make orders which follow one or more of those in s.241(1). It is difficult to know how creative courts can be with the orders which they are able to make as there are, relatively speaking, few cases which have dealt with transactions at an undervalue under the Act, and it only comes after a significant amount of case law development that the parameters, if any, are set. But whatever order(s) is made by a court it must seek to restore the position as it existed prior to the making of the transaction, and to effect this objective the orders set out in s.241(1) are not to be seen as restrictive, so while the examples set out may omit orders which might be thought to be appropriate in some cases, a court is not prevented from making such an order. This is extremely necessary as humans can be most inventive in the kinds of transactions that they engineer, and courts must not be hamstrung as to the orders that they can make.

In any event a court, if a liquidator was successful, would have to make a declaration that the impugned transaction was a transaction at an undervalue. But it is something of a debatable question as to whether a court would have any other order that would effect a restoration of the company's position. Has a court the right to decline to make any other order? The problem is that s.238(3) provides that the court *shall* make such order as it thinks fit for restoring the position existing before the impugned transaction. The use of the word "shall" is strange if the courts were to have the right to decline to make an order; the wording of the provision appears to indicate that courts have no option but to make a restoration order. Nevertheless, in *Re Paramount Airways Ltd*,[310] Nicholls VC said that despite the use of "shall" the phrase "such order as it thinks fit" confers an overall discretion on the court and that

---

[305] *Lord v Sinai Securities Ltd* [2004] EWHC 1764 (Ch); [2004] B.C.C. 986; [2005] 1 B.C.L.C. 295 at 15.

[306] *Lord v Sinai Securities Ltd* [2004] EWHC 1764 (Ch); [2004] B.C.C. 986; [2005] 1 B.C.L.C. 295 at 12-16.

[307] *Claridge's Trustee in Bankruptcy v Claridge* [2011] EWHC 2047 (Ch); [2011] B.P.I.R. 1529; *Re Fowlds (A Bankrupt)* [2020] B.P.I.R. 1111. These were bankruptcy cases that dealt with s342, the bankruptcy equivalent of s.241.

[308] *Re Fowlds (A Bankrupt)* [2020] B.P.I.R. 1111.

[309] Orders are not limited to situations where the property was originally owned by the company.

[310] *Re Paramount Airways Ltd* [1993] Ch. 223.

"discretion is wide enough to enable the court, if justice so requires, to make no order against the other party to the transaction".[311]

However, s.423(2) provides that a court is empowered to make a restoration order similar to s.238(3) where it is satisfied that a transaction defrauding creditors has been entered into. Section 423(2) states that:

"Where a person has entered into such a transaction, the court *may*, if satisfied under the next sub-section, make such order as it thinks fit …" (my emphasis).

If this form was adopted here, why was not the same form adopted in s.238(3) **11-047** if the same meaning was to be conveyed? In *Re Barton Manufacturing Co Ltd*,[312] Harman J appeared to take the view that an order has to be made by a court as he emphasised the word "shall" in s.238(3). But subsequent cases have involved courts declining to make orders even where the elements of s.238 have been established by the applicant. One example is *Re MDA Investment Management Ltd*[313] where Park J said that if he were to order the position to be restored to what it was before the relevant transaction, the company in liquidation would have been in a worse position. More recent cases have indicated that a court has a discretion to make no remedial order even if a transaction falls foul of the provision, where justice requires.[314] But, such action is likely to be something that is very much out of the ordinary,[315] and it would only be in exceptional circumstances where a court would be justified in withholding relief to which the office-holder otherwise would seem to be entitled.[316] Would delay in the bringing of proceedings by a liquidator be grounds for refraining from making an order? Mann J in *Stonham v Ramrattan*[317] said that it is impossible to say that delay by the office-holder can never be a factor in the exercise of discretion, as it was dangerous to limit the discretion of the court, but, he did say that delay by itself cannot be a relevant reason for not exercising the discretion to grant relief which would otherwise seem to be appropriate.[318]

The respondent to the action has the burden of convincing the court that it should

---

[311] *Re Paramount Airways Ltd* [1993] Ch. 223 at 239. His Lordship took this view in the process of determining that if there is a foreign element involved a court must be convinced, in relation to the relief sought, that it was just and proper to make an order against the defendant (at 239–240). His Lordship's view accords with the view expressed earlier by L. Sealy and D. Milman, *Annotated Guide to the 1986 Insolvency Legislation*, 3rd edn (Bicester: CCH Editions Ltd, 1991), p.273. The learned authors have repeated the same view more recently: see *Annotated Guide to the 1986 Insolvency Legislation*, 20th edn (Bicester: CCH Editions Ltd, 2017), p.265. For a recent application of the approach in *Re Paramount Airways Ltd*, see *Re Fowlds (A Bankrupt)* [2020] B.P.I.R. 1111.

[312] *Re Barton Manufacturing Co Ltd* [1998] B.C.C. 827; [1999] 1 B.C.L.C 740 at 830.

[313] *Re MDA Investment Management Ltd* [2003] EWHC 2277; [2005] B.C.C. 783 at [123].

[314] *Re Paramount Airways Ltd (No. 2)* [1992] B.C.C. 416 at 229; *Singla v Brown* [2007] EWHC 405 (Ch); [2007] B.P.I.R. 424 at [52]; *Claridge's Trustee in Bankruptcy v Claridge* [2011] B.P.I.R. 1529 at [41]; *Re Fowlds (A Bankrupt)* [2020] B.P.I.R. 1111.

[315] *Singla v Brown* [2007] B.P.I.R. 424 at [59]; *Hill v Haines* [2007] EWCA Civ 1284; [2007] B.P.I.R. 1280 at [5].

[316] *Stonham v Ramrattan* [2010] EWHC 1033 (Ch); [2007] B.P.I.R. 424 at [40] (appeal to the Court of Appeal was dismissed ([2011] EWCA Civ 119); *Claridge's Trustee in Bankruptcy v Claridge* [2011] B.P.I.R. 1529; *Re Fowlds (A Bankrupt)* [2020] B.P.I.R. 1111. In the latter two cases, the court decided not to give a remedy when hearing a claim under s.339 and s.340 respectively (the bankruptcy equivalents of ss.238 and 239).

[317] *Stonham v Ramrattan* [2010] EWHC 1033 (Ch). This was a case decided under s.339.

[318] *Stonham v Ramrattan* [2010] EWHC 1033 (Ch) at [34].

not make an order in favour of the applicant.[319] There has been at times some uncertainty as to whether change of position on the part of the respondent can provide the basis for the court to refrain from ordering restoration of any benefits he or she received. However, two bankruptcy cases which dealt with the personal insolvency equivalents of ss.238 and 239, namely *Claridge's Trustee in Bankruptcy v Claridge*[320] and *Re Fowlds (A Bankrupt)*,[321] suggest it can be taken into account in determining whether to grant the order sought by the claimant.[322] In the former case, Sales J, in holding that exceptional circumstances existed for him to exercise the discretion in s.342 (equivalent to s 241(1)) not to make an order, got to that point partly by relying upon the fact that the transferee had changed her position in good faith. In the latter case, dealing with a preference claim under s.340 (equivalent to s.239), ICC Judge Jones relied on the decision in *Claridge* and he said that:

> "The existence of the unfettered discretion means Parliament intends there to be cases, albeit out of the norm, when the Court may decide that justice trumps the statutory policy of equal distribution and, in which case, the policy will not be applied. There can be no reason for not considering applying the broad analogy identified by Mr Justice Sales [in the s.423 case of *4 Eng v Harper* [2009] EWHC 2633 (Ch); [2010] B.P.I.R. 1] in an appropriate case when deciding whether to exercise that discretion. It is not contrary to the statutory scheme and policy of equal distribution amongst creditors. It is the application of an inherent qualification."[323]

In *Fowlds* the judge gave five factors that led to his decision to decline to give relief to the applicant notwithstanding the fact that the applicant had established the conditions for a preference. These were that the respondent: received the preference on a commercial basis as though at arm's length even though she was connected to the bankrupt who made the payment; acted in good faith both at the time of receipt and whilst transferring or spending the preference; no longer had the preference or its proceeds available; changed her position so that it would be inequitable to require restitution; faced wholly disproportionate consequences should an order for restitution be made with the result that such an order would be unjust.[324] The judge felt that these took the case out of the normal situation where an order would be granted.[325]

**11-048**    **(b)    Specific remedial orders**    As indicated above, the provisions of s.241 are merely to be regarded as examples of the orders or types of orders which a court might see fit to make to remedy the entering into of a transaction which can be

---

[319] *Re Fowlds (A Bankrupt)* [2020] B.P.I.R. 1111 at [13].

[320] *Claridge's Trustee in Bankruptcy v Claridge* [2011] B.P.I.R. 1529.

[321] *Re Fowlds (A Bankrupt)* [2020] B.P.I.R. 1111.

[322] On appeal from the decision of Judge Jones in *Fowlds*, Trower J (*Bucknall v Wilson* [2021] EWHC 2149 (Ch) at [94]) said that change of position was not the strong factor which Judge Jones considered it to be in *Fowlds*. To characterise it in that way would be to give insufficient weight to the underlying policy of ensuring a pari passu distribution. The judgment was delivered just before going to press and so it could not be analysed in this chapter.

[323] *Re Fowlds (A Bankrupt)* [2020] B.P.I.R. 1111 at [22].

[324] *Re Fowlds (A Bankrupt)* [2020] B.P.I.R. 1111 at [104].

[325] *Re Fowlds (A Bankrupt)* [2020] B.P.I.R. 1111 at [104]. The judgment was appealed (*Bucknall v Wilson* [2021] EWHC 2149 (Ch)) and the appeal judge provided some comments on the issue of change of position. The appeal was not allowed. See the comment at fn.528 below.

adjusted.[326] It is important to realise that s.241 applies not only to s.238, it also applies to transactions which are classified as preferences under s.239.

While theoretically any of the kinds of orders set out in s.241(1) might be made by a court where it finds that a transaction at an undervalue was entered into, the fact is that some provisions in s.241 will be more suited to transactions at an undervalue and others more suited to preferences. With transactions at an undervalue, where the company has either purchased an asset at an inflated price or sold one of its assets for a low amount, orders in line with s.241(1)(a) are most likely to be regularly made. Section 241(1)(a) involves an order whereby the court requires the vesting of any property transferred in connection with the transaction at an undervalue in the company.

Section 241(1)(b) provides that property is to be vested in the company where the property represents in anyone's hands the application of either the proceeds of property, or money, transferred by the company as part of the impugned transaction. This allows for tracing. It could be particularly helpful where the company made a payment or transferred property to a person who is, at the time of winding up, insolvent. If the money or property had been passed to some other person the liquidator might consider proceeding against that other person providing he or she is solvent. Another instance of the use of s.241(1)(b) is where[327] X Ltd transferred land to Y to discharge the debt of £50,000 owed to Y. At the time, the property was worth £70,000. Y sells the land to Z, a purchaser in good faith and without notice, for £80,000 and uses the proceeds to purchase shares. X Ltd goes into liquidation. It is unlikely that the liquidator could take action against Z who was acting in good faith. However, on the application of the liquidator, the court could order Y to transfer the shares to X Ltd. This would fairly represent the application of the proceeds of the property that was transferred by the company.

Section 241(1)(c) indicates that a court could order the release or discharge of any security[328] given by the company.[329] So, for instance, if the company granted a mortgage to a creditor over some property which it owns in exchange for some property, a release or discharge would return the company to the position it enjoyed prior to the transaction, if the transaction was held to be within s.238. **11-049**

Section 241(1)(d) provides that an order may

> "[r]equire any person to pay, in respect of benefits received by him from the company, such sums to the office-holder [this includes a liquidator] as the court may direct".

This type of order is more likely to be made in preference cases, as the common order will be that the creditor who was paid by the company (preferentially) in relation to a debt owed by the company is to pay that sum to the liquidator. But an order in accordance with s.241(1)(d) could be made in a transaction at an undervalue case where property has been transferred at an undervalue and rather than ordering a re-transfer of the property the court could order the transferee to repay the company the difference between what he or she paid and a fair price together with an inter-

---

[326] See Goode, *Principles of Corporate Insolvency Law* (2011), pp.560–566 for some examples of where an order in terms of s.241(1) might be appropriate.

[327] This is based on an example provided by Professor R. Goode in *Principles of Corporate Insolvency Law* (2011), p.566.

[328] This is defined in s.248(b)(i) to include "any mortgage charge lien or other security".

[329] This was ordered in the preference case of *Mills v Edict Ltd* [1999] B.P.I.R. 391 at 394.

est component. In *Re Barton Manufacturing Co Ltd*,[330] Harman J ordered that interest be paid on the amount that was given by the company by way of gift (and which constituted a transaction at an undervalue) and it was to be calculated from the date of the company's liquidation.[331]

According to s.241(1)(e), the court could make an order whereby it imposes, as it thinks fit, new or revived obligations on a guarantor who was released or discharged from obligations as a result of the transaction that has been attacked. This kind of order could conceivably be made in conjunction with a s.241(1)(d) type order and would seek to do justice in a broad way.

**11-050**    A court may make an order in the terms of s.241(1)(f) which provides that the court may require the provision of security for the discharge of any obligation imposed by the court's order, for the obligation to be charged on any property and for the security to have the same priority as a security released or discharged by the transaction at an undervalue.

The final order set out in s.241(1)(g) is that a court may provide the extent to which a person whose property is vested (by court order) in the company or on whom obligations are imposed (by court order), is able to prove in the winding up of the company in relation to debts or liabilities which resulted from, or were released, by the transaction that has been successfully challenged. This is primarily directed at preferences. It is fair that a creditor who received a preference and had to disgorge same should only be able to prove in the winding up like other creditors. But it would be unfair on the respondent where there was a transaction at an undervalue if he or she were required to do the same. For instance, if X paid £10,000 to Y Ltd for property which was worth £20,000, and Y Ltd enters liquidation and its liquidator challenges the transaction, it would not be fair if X was ordered to return the property to Y Ltd, but then forced to prove for his £10,000 in the winding up. That would unfairly enrich the estate of Y Ltd and give unjust benefits to the creditors.

**11-051**    **(c)   Problems of restoration**    While the legislative statement that the aim of court orders is to ensure that the status quo prior to the preference is to be restored is most laudable, there are variables that may be relevant in any given case which precipitate problems for courts in achieving the legislative objective. Courts may well find that they will be faced with problems, particularly where any property which has been transferred by, or to, the company under a transaction at an undervalue has increased or decreased in value. These are issues with which a court may well have to grapple. A discussion of the issues are not within the scope of this book.[332]

## 7.   *Third party protection*

**11-052**    A court order following a decision that a transaction at an undervalue was entered into may affect a third party. In such a case one must have regard for s.241(2) which might provide protection for a third party. This provision, which can be relied upon

---

[330] *Re Barton Manufacturing Co Ltd* [1998] B.C.C. 827; [1999] 1 B.C.L.C. 740.
[331] The company was in members' voluntary liquidation prior to being wound up compulsorily. The case reports do not disclose whether the date of the liquidation was to be the date when the company entered voluntary or compulsory winding up.
[332] For a discussion, see Keay, "The Recovery of Voidable Preferences: Aspects of Recovery" [2000] Cfi L.R. 1.

by a person who was not a party to the impugned transaction but who acquired, from someone other than the company, a benefit from the transaction, indicates that a court order must not prejudice any interest in property which was acquired from a person other than the company in good faith and for value, or prejudice any interest deriving from such an interest. Also the order shall not require a third party who received a benefit from the impugned transaction in good faith and for value to pay a sum to the liquidator, except where the person was a party to the transaction.

Section 241(2A) must be considered in relation to the issue of the good faith of the third party. The provision introduces an important rebuttable presumption. It states that where a person who acquired an interest in property from someone other than the company or has received a benefit from a transaction at an undervalue at the time of the acquisition of the interest, had notice of the relevant surrounding circumstances and of the relevant proceedings, or was connected with, or an associate of, the company or the person with whom the company had entered the impugned transaction, then there is a presumption that the third party acquired the benefit otherwise than in good faith. Section 241(3) then explains what is meant by "relevant surrounding circumstances" and ss.241(3B) and 241(3C) explain the meaning of "relevant proceedings". According to s.241(3), the former expression means the fact that the company entered into the impugned transaction. The meaning of "relevant proceedings" depends on how the company went into liquidation. If the company entered liquidation following the discharge of an administration order, then a person has notice of relevant proceedings if he or she has notice of: the presentation of the petition on which the administration had been made; the making of the administration order; or that the company had entered liquidation.[333] Where a liquidation occurred in circumstances other than following on from the discharge of an administration order, then a person has notice of relevant proceedings if he or she has notice, where the liquidation is precipitated by a winding-up order, by the fact that a petition for winding up had been presented or of the fact that the company had gone into liquidation. In voluntary liquidation, notice of relevant proceedings would be constituted by notice of the fact that the company had entered liquidation.

## 8.   *Limitation of actions*

Actions under s.238 are generally to be regarded, prima facie, as actions on a specialty, and are covered by s.8 of the Limitation Act 1980, and as a consequence there is a 12-year time period in which office-holders can commence proceedings, provided that the substance of the application is to set aside a transaction, and not to recover a sum that is recoverable.[334] Where there is some doubt as to the aim of the claim the court will ascertain what is the substantial nature of the relief that is sought.[335] If a claim for a sum is ancillary to a primary head of relief that involves the setting aside of a transaction, then the time limit is 12 years.[336]

**11-053**

---

[333] 1986 Act s.241(3B).

[334] *Segal v Pasram* [2008] EWHC 3448 (Ch); [2007] B.P.I.R. 881; *Priory Garage (Walthamstow) Ltd* [2001] B.P.I.R. 144 at 149 and 160; *Re Yates* [2005] B.P.I.R. 476. Also, see *Hill v Spread Trustee Co Ltd* [2006] EWCA Civ 542; [2007] 1 W.L.R. 2404; [2006] B.P.I.R. 789.

[335] *Re Priory Garage (Walthamstow) Ltd* [2001] B.P.I.R. 144.

[336] *Re Priory Garage (Walthamstow) Ltd* [2001] B.P.I.R. 144 at 160.

### 9.  *Market contracts are exempted*

**11-054**     Section 238 is specifically disapplied in relation to market contracts if a
recognised investment exchange or clearing-house is a party to those contracts, and
does not affect a disposition of property in pursuance of a market contract.[337] Similar
exemptions applicable to financial and security settlements and associated security
arrangements are provided for in the Financial Markets and Insolvency (Settle-
ment Finality) Regulations 1999.[338]

## F.   Preferences[339]

### 1.  *Introduction*

**11-055**     It is understandable that the creditors of a company that is in financial difficul-
ties should spare no effort in striving to ensure that their debts are paid in full.
However, to allow them complete freedom in coming to terms with a company
which is facing possible liquidation would inevitably result in a diminution of the
fund of assets available for division among other creditors and thus undermine the
fundamental rule that the property of the company is to be applied in satisfaction
of its liabilities equally. It has been generally asserted that the consequence of the
policy of pari passu distribution is that transactions which affect the disposition of
assets or other property before the commencement of winding up and have the ef-
fect of reducing the dividend to be paid to the unsecured creditors, should be
reviewed and adjusted as they affect the principle of equal distribution, or—to put
it more accurately—affect the statutory order of distribution.[340]
     The payment by a company, which subsequently goes into liquidation, of some
of its creditors could mean that those payments constitute preferences. The
traditional view has been that if preferences could not be attacked then it would af-
fect pari passu distribution. It is better to say, as noted above, that preferences should
be impugned as they will prejudice the statutory scheme of distribution because the
destination of the funds held by a liquidator are rarely, if at all, ever going to be
dictated solely by pari passu. The statutory scheme might involve consideration of
pari passu, if there are funds available after discharging what is owed to priority
creditors, a matter discussed in detail in Ch.13.

### 2.  *Background[341]*

**11-056**     The law against the giving of preferences can certainly be traced back as far as
the days of Lord Mansfield in the 18th century. Until this time there was little
development of a law of preferences. Some advance was made by the opinion given

---

[337] Companies Act 1989 ss.155, 165(1)(b), (3).

[338] Financial Markets and Insolvency (Settlement Finality) Regulations 1999 (SI 1999/2979). See
reg.17. The Regulations implemented the Settlement Finality Directive (Directive 98/26 on settle-
ment finality in payment and securities settlement systems [1998] OJ L166/45).

[339] For further details, see Parry, *Transaction Avoidance in Insolvencies*, 3rd edn (2018); Walters,
"Preferences" in Armour and Bennett (eds), *Vulnerable Transactions in Corporate Insolvency* (2003),
Ch.4; Keay, "Preferences in Liquidation Law: A Time for a Change" (1998) 2 Cfi L.R. 198.

[340] *Skandinaviska Enskilda Banken AB v Conway* [2019] B.P.I.R. 1562 at [101].

[341] For a more detailed discussion, see Keay, "The Recovery of Voidable Preferences: Aspects of
Recovery" [2000] Cfi L.R. 1.

by Lord Coke in the *Case of the Bankrupts*,[342] but generally legal historians are perplexed at the lack of potency of preference law before the time of Lord Mansfield.[343] During Lord Mansfield's time on the bench there was a common law development of the avoidance of preferences[344] in order to give effect to the general spirit of the bankruptcy legislation.[345] An examination of the cases reveals that the law of preferences developed as a branch of the law of fraudulent transfers.[346] Any allegation that a preference had been given was effectively dependent on proving fraudulent intent on the part of the debtor.[347]

It was during Lord Mansfield's time that the law on preferences became firmly established. However, it was not until the Bankruptcy Act of 1869[348] that the law was codified.[349] Strangely, the first legislation to include a statutory formulation of the principles of preferences was not a bankruptcy statute but one dealing with companies, namely the Joint Stock Companies Act 1856.[350]

The preferences that could be challenged before the advent of the Act came to be known as "fraudulent preferences". This description was derived from the provisions contained in the Bankruptcy Act 1869 and succeeding provisions,[351] which provided, inter alia, that transfers, payments and other transactions were deemed to be fraudulent if entered into by a debtor (later adjudged bankrupt) who was insolvent and who entered into the transaction with a view to giving a creditor a preference over other creditors.

To describe preferences as fraudulent was misleading[352] because the avoidance **11-057** of preferences did not depend on fraud. In *Re Patrick and Lyon Ltd*,[353] Maugham J said that what is called a fraudulent preference might not involve moral blame at

---

[342] *Case of the Bankrupts* (1592) 2 Co. Rep. 25; 76 E.R. 441.

[343] Weisberg, "Commercial Morality, the Merchant Character, and the History of the Voidable Preference" (1986) 39 *Stanford Law Review* 3, fn.144. A critical factor in Lord Mansfield's development of the preference was, undoubtedly, his Scottish heritage. See below at fn.327.

[344] Weisberg, "Commercial Morality, the Merchant Character, and the History of the Voidable Preference" (1986) 39 *Stanford Law Review* 3, 44–51.

[345] *Alderson v Temple* (1768) 4 Burr. 2235 at 2239–2240; 98 E.R. 165 at 167–168. The first case in which Lord Mansfield outlined the principles behind preference law was in *Worseley v De Mattos* (1758) 1 Burr. 467; 96 E.R. 1160.

[346] Kronman, "The Treatment of Security Interests in After-Acquired Property Under the Proposed Bankruptcy Act" (1975) 124 *University of Pennsylvania Law Review* 110, 111. Professor Farrar in "The Bankruptcy of the Law of Fraudulent Preference" ([1983] J.B.L. 390, 391) regards the body of preference law that grew up as a gloss on the law of fraudulent conveyances.

[347] See *Alderson v Temple* (1768) 4 Burr. 2235; 98 E.R. 165 where Lord Mansfield laid down a clear set of principles.

[348] Bankruptcy Act 1869 s.92 (32 & 33 Vict. c.71). Interestingly, Scotland had legislation on the subject as early as 1690 (Bankruptcy Act (Sc) 1690). For discussion of the Scottish developments see J. M'Laren, *Bell's Commentaries on the Laws of Scotland*, 7th edn (Edinburgh: Law Society of Scotland and Butterworths, 1990), Vol.II. A detailed history of preference law is found in Glenn, "The Diversities of the Preferential Transfer: A Study in Bankruptcy History" (1930) 15 *Cornell Law Quarterly* 521; Weisberg, "Commercial Morality, the Merchant Character, and the History of the Voidable Preference" (1986) 39 *Stanford Law Review* 3; Countryman, "The Concept of a Voidable Preference" (1985) 38 *Vanderbilt Law Review* 713.

[349] Although reference was made to fraudulent preferences in s.82 of the Bankruptcy Act 1825 (Geo. IV c.16).

[350] 19 & 20 Vict. c.47 s.76.

[351] Such as s.44 of the Bankruptcy Act 1914.

[352] Cork Report, para.1244; Fletcher, "Voidable Transactions in Bankruptcy Law: British Law Perspectives" in Ziegel (ed.), *Current Developments in International and Comparative Corporate Insolvency Law* (1994), p.305.

[353] *Re Patrick and Lyon Ltd* [1933] Ch. 786 at 790.

all. The term stemmed from the time when the law of preferences was developed by the courts, and principally by Lord Mansfield, who recognised that a debtor was entitled to prefer a creditor in normal circumstances, but if this was done in contemplation of bankruptcy it was fraud unless it was in response to threats from the creditor, in which case the preference was not given voluntarily and could not constitute fraud.[354] His Lordship was concerned to prevent partiality to one or more creditors and any partiality shown to one or more creditors constituted a fraud on the creditors who were not given the same advantage.

The Bankruptcy Act 1869 changed the common law in that the giving of a wrongful preference was referred to as actual fraud at common law, whereas in the legislation the provision providing for the avoidance of preferences referred to "deemed" fraud. A second change was that the legislation introduced a time period prior to bankruptcy in which the preference must have been granted if it was to be avoided.[355]

When bankruptcy law was consolidated in the Bankruptcy Act of 1914, s.44 dealt with the avoidance of preferences and it was applied to liquidations by companies legislation.[356] Section 44 provided that a payment, inter alia, by an insolvent debtor and in favour of a creditor with a view to giving the creditor a preference over the other creditors was deemed fraudulent and void provided it occurred within the six months preceding the presentation of a petition which led to the winding up of the debtor or the passing of a resolution that the company wind up. The law was, as a number of commentators[357] indicated, unsatisfactory in several ways.

**11-058**    One of the major problems was that the cases provided that a liquidator could not merely establish that the debtor paid the preference with a view to giving a preference, he or she had the onerous task of proving that the debtor's dominant intention in making the payment was to prefer the creditor.[358] Allied to this approach was the fact that if the debtor's payment was made as a consequence of pressure from the creditor who received payment, the liquidator was unable to succeed as the pressure negated any intention to prefer the creditor.[359] Thus it was in the best interests of the creditor to apply pressure to debtors so that any payments received would not be deemed to be voidable preferences.

Other matters besides pressure could act as negating factors. For example, if a creditor was able to establish that the transaction to do in the ordinary course of business then it could not be avoided because to do so would impede the ordinary everyday transactions of commerce.[360] Further, s.44(2) provided that the rights of a person were not affected by s.44 if he or she could make good title in good faith and for valuable consideration through or under a creditor of the insolvent debtor.

---

[354] For example, see *Alderson v Temple* (1768) 4 Burr. 2235 at 2239; 98 E.R. 165 at 168; *Harman v Fishar* (1774) Lofft. 472 at 489; 98 E.R. 753 at 762; *Thompson v Freeman* (1786) 1 T.R. 155 at 157; 99 E.R. 1026 at 1028.

[355] See s.92. The time period was three months.

[356] The relevant provision prior to the enactment of the Act was s.320 of the Companies Act 1948.

[357] For example, see Fletcher, "Voidable Transactions in Bankruptcy Law: British Law Perspectives" in Ziegel (ed.), *Current Developments in International and Comparative Corporate Insolvency Law* (1994), p.299. Professor J. Farrar saw the law as "obscurely drafted, confusing in its interpretation and ineffective in practice" ("The Bankruptcy of the Law of Fraudulent Preference" [1983] J.B.L. 390).

[358] *Re Bird* (1883) 23 Ch. D. 695; *Peat v Gresham Trust Ltd* [1934] A.C. 252; *Re Lyons* [1934] 152 L.T. 201; *Re Kushler* [1943] Ch. 248; *Re Cutts* [1956] 2 All E.R. 537; *Re FLE Holdings Ltd* [1967] 1 W.L.R. 1409.

[359] See *Thompson v Freeman* (1786) 1 T.R. 155; 99 E.R. 1026; *Re Cooper* (1882) 19 Ch. D. 580; *Re Wilcoxon* (1883) 23 Ch. D. 69; *Re FLE Holdings Ltd* [1967] 1 W.L.R. 1409 at 1420.

[360] *Re Ex p. Blackburn Cheeseborough* (1871) L.R. 12 Eq. 358 at 363.

The need to establish intention, a subjective approach, is to be contrasted with the objective approach that is adopted in many common law jurisdictions such as the US, Australia and New Zealand, and this approach is also adopted in Scotland.

The Cork Report considered the problems with s.44 and while it recommended the retention of the requirement of an intention to prefer and that genuine pressure should continue to provide a defence in accordance with the traditional English approach, it felt that the state of the law made the task facing the trustee or liquidator too difficult (with many transactions which ought to be challenged being safe from attack) and recommended the reversal of the onus of proof in circumstances where the parties were not at arm's length.[361] The Report went on to say that if a transfer is made to someone who is not at arm's length then the transfer should be presumed to be one that was made with a view to giving a preference to the creditor.[362]

Primarily, because of criticisms of s.44 of the Bankruptcy Act 1914 and the recommendations of the Cork Report in relation to preferences and their avoidance, the Act introduced a different preference provision—found in s.239.

### 3.   Nature of a preference

The avoidance of preferences is designed, ostensibly, to prevent a creditor jumping to the front of the queue of the creditors, who should be paid according to the statutory scheme. Also it has been asserted that the avoidance of preferences is to ensure that "an undignified scramble by creditors over available assets" is avoided.[363] This undignified scramble, which can affect an orderly and collective winding up, usually occurs because creditors fear the imminent liquidation of their debtor and they wish to improve their position and beat other creditors to getting paid, realising that not everyone will receive payment.

**11-059**

It is trite law that the essence of a preference is that a creditor has received more from a company before it goes into liquidation than would have otherwise been received in a liquidation. This concept is encapsulated in s.239(4). The true test of a preference is—does the transaction confer a priority or advantage on a creditor in relation to past indebtedness of the company and is the advantage given at the expense of other creditors who are owed debts at the time of transaction, thereby preventing a distribution of the company's property amongst the unsecured creditors according to the scheme set out in statute?

Professor Weisberg put it well when he said that a preference is:

"A transfer of money or of some interest in property by a debtor to a creditor to settle an antecedent debt; it occurs when the debtor faces imminent bankruptcy [or liquidation]; and it benefits that creditor to the prejudice of other creditors by granting the favoured creditor a greater share of the diminished assets of the debtor than that creditor would enjoy under the formal system of bankruptcy [or liquidation] distribution."[364]

The classic preferences occur where shortly before entering insolvent liquidation a company pays one of a number of its creditors the full amount owed to that creditor. If the company was insolvent at the time of the making of the payment,

**11-060**

---

[361] Cork Report, paras 1256–1257.
[362] Cork Report, para.1258.
[363] O'Donovan, "Corporate Insolvency: Policies, Perspectives and Reform" (1990) 3 C.B.L.J. 1, 11–12.
[364] R. Weisberg, "Commercial Morality, the Merchant Character, and the History of the Voidable Preference" (1986) 39 *Stanford Law Review* 3.

then the creditor will have got more than other creditors, because no general unsecured creditor who has not got a priority right will get paid in full.

The Cork Report gave the following as examples of preferences: paying the whole or part of a debt (the most common), providing security or further security for an existing debt, and returning goods that have been delivered but not paid for.[365]

When assessing whether a transaction is a preference, the court is to have regard for the transaction as a whole, in much the same way that the House of Lords in *Phillips v Brewin Dolphin Bell Lawrie Ltd*[366] approached s.238.[367]

**11-061**   There are indications, albeit rather vague ones, that payments by a company out of funds that are not available to unsecured creditors in a winding up, can be regarded as preferences that are voidable. This comes out of the Australian High Court in *G & M Aldridge Pty Ltd v Walsh*[368] where the Court stated that it would not accept that an earlier case in the Federal Court, *Wily v St George Partnership Banking Ltd*,[369] was authority for a general proposition that payments out of assets not available to unsecured creditors can never be preferential. In *G & M Aldridge Pty Ltd v Walsh* the Court held that payments to unsecured creditors out of funds to which a secured creditor had in fact been entitled could constitute preferences. It would seem that this conclusion was reached on the basis that the payments could be regarded as giving an advantage or priority to those paid as against the other unsecured creditors who have to compete with the other creditors for remaining assets.[370]

## 4.   *Conditions for avoidance*

**11-062**   In order for a liquidator successfully to attack a transaction as a preference, the liquidator has to prove that[371]:

- the company is in liquidation[372];
- the transaction was entered into at the relevant time (within the six months before the onset of insolvency[373] or, if the defendant is a person connected with the company, within the two years prior to the onset of insolvency)[374];
- the other party to the transaction (the recipient of the preference) is one of the company's creditors or a surety or guarantor for any of the company's debts[375];
- the company does something which has the effect of putting the recipient

---

[365]   Cork Report, para.1208.
[366]   *Phillips v Brewin Dolphin Bell Lawrie Ltd* [2001] UKHL 2; [2001] 1 W.L.R. 143; [2001] B.C.C. 864.
[367]   *Damon v Widney Plc* [2002] B.P.I.R. 465 at 469–470.
[368]   *G & M Aldridge Pty Ltd v Walsh* [2002] B.P.I.R. 482; [2001] HCA 27; (2001) 203 C.L.R. 662.
[369]   *G & M Aldridge Pty Ltd v Walsh* [1999] FCA 33; (1999) 84 F.C.R. 423 at 435.
[370]   See *Richardson v Commercial Banking Co of Sydney Ltd* (1952) 85 C.L.R. 110; [1952] HCA 8 at 136–137.
[371]   Morritt J, in *Re Ledingham-Smith* ([1993] B.C.L.C. 635 at 639), discussed the issues which confront a court in a preference case.
[372]   As with transactions at an undervalue, the company may also be in administration under Sch.B1 to the Act. See *Re Exchange Travel (Holdings) Ltd*; sub nom. *Katz v McNally* [1996] B.C.C. 933 (upheld on appeal: [1999] B.C.C. 291) for a preference action initiated by administrators.
[373]   This term is defined in s.240(3) in relation to straight liquidations, the date of the commencement of winding up. According to s.129, this date is, in relation to compulsory liquidations, the date of the presentation of the petition to wind up.
[374]   1986 Act s.239(2).
[375]   1986 Act s.239(4)(a).

of the preference into a position which, in the event of the company enter-ing insolvent liquidation, will be better than the position he or she would have been in had the thing not been done[376];
- the company was influenced in deciding to enter into the impugned transac-tion by a desire to enable the recipient to have a preference[377]; and
- at the time of, or as a result of, the giving of the preference the company was unable to pay its debts within the meaning of s.123.[378]

To implement one of the key recommendations of the Cork Report, in relation to adjustment provisions, s.239(6) provides a rebuttable presumption, namely if the preference was given to a person connected with the company then it is presumed that the company was influenced by a desire to give a preference. As seen earlier,[379] s.249 defines the persons who are regarded as being connected with a company. The presumption contained in s.239(6) was introduced to assist liquidators to recover preferences from persons who were associated with the company.

It is notable that the present law, consistently with the previous law, still maintains an emphasis on motivation. This reflects the decision of the Cork Com-mittee to eschew any notion of introducing an objective theory of preferences which is, as mentioned earlier, contained in the law in Australia, the US, Scotland and New Zealand.[380] For a successful action, either the liquidator must prove that the company was influenced by a desire to give a preference or, if a connected person is involved, the connected person must fail to establish that the company was not influenced by such a desire. The company's motive is of critical importance in the determination of whether a transaction can be successfully challenged. In jurisdic-tions where the objective theory prevails the only task has been for the liquidator to prove that a transaction covered by the legislation occurred within a certain time frame before liquidation when the debtor was insolvent and the transaction favoured a creditor with the effect that the creditor received an advantage over other creditors. The following comment from Starke J of the Australian High Court in *S Richards and Co Ltd v Lloyd*[381] encapsulates the effect of the objective approach:

"… it says nothing about the view or intention of the debtor nor about any choice or selec-tion by him. It [the Act] simply declares that a conveyance, transfer or assignment, made within a reasonable time before bankruptcy, having the effect of giving the creditor a preference, shall be void. It looks to the effect of the transaction and not to the intent, or state of mind, of the debtor."[382]

The obvious advantage with the objective approach is that it obviates the need **11-063** for any inquiry into the motives of people[383]; such inquiries can be complicated, and ascertaining motives is always a difficult exercise.

---

[376] 1986 Act s.239(4)(b).
[377] 1986 Act s.239(5).
[378] 1986 Act s.240(2).
[379] See above at paras 11-023–11-024. For a case where the presumption was rebutted by a connected person in relation to a payment, see *Re MDA Investment Management Ltd* [2003] EWHC 2277; [2005] B.C.C. 783; [2004] 1 B.C.L.C. 217 at [148].
[380] A minority of the Cork Committee favoured implementing an objective approach. New Zealand only changed to an objective approach in its Companies Act 1993 s.266. Until then a subjective ap-proach was employed. See *Countrywide Banking Corp Ltd v Dean* [1998] B.C.C. 105 PC, for consideration of the New Zealand provision. The subjective approach still applies in Singapore.
[381] *S Richards and Co Ltd v Lloyd* (1933) 49 C.L.R. 49.
[382] *S Richards and Co Ltd v Lloyd* (1933) 49 C.L.R. 49 at 62.
[383] This was acknowledged by the Cork Committee (para.1253). See Keay, "Preferences in Liquida-

Assets Available for Division and Distribution

It will be noted that just as with transactions at an undervalue, the liquidator is obliged to establish the insolvency of the company at the time of the transaction that is impugned. But unlike with transactions at an undervalue, this is not a concern. While it is submitted that there is a good arguable case for the imposition of a strict avoidance rule with respect to preferences, whereby all payments to creditors within a specified short period (say 90 days) before winding up are avoided automatically,[384] if such a scheme is not to be introduced then the imposition of an insolvency requirement can be defended in the sense that unless a company is insolvent the receipt of payment of a debt by a creditor is not, prima facie, going to hurt other creditors.

At first blush, s.239 seems to provide a liquidator with a better chance of attacking a transaction as a preference than its predecessor. However, in practice this does not appear to be the case. Absent the situations where the respondent is a connected person who is labouring under the burden of a presumption that the company had a desire to give a preference to the respondent, liquidators will often have difficulty in adducing any or sufficient evidence to impugn the transaction.

### 5. The need for a debtor-creditor relationship or suretyship

**11-064**    Clearly any transaction, for it to be classified as a preference, must either be in favour of a creditor of, or a surety for, the company.[385] There must be an antecedent debt in existence when the alleged preference is effected, and the preference must be referable to that debt.

Is a payment made by a third party to the creditor (on behalf of the debtor) able to be regarded as a preference within s.239? For instance, Y Ltd owes money to Z and is owed money by X, and Y Ltd procures X to pay Z directly the amount owed to Z by Y Ltd. Y Ltd then goes into liquidation. In such a case, prima facie, there has been no disposition by Y; technically Y is not a party to the transaction that may have a preference-like effect. Is there a preference, assuming that Y Ltd was insolvent at the time and all the other conditions were present? There is no doubt that such an arrangement could be held to be a preference as s.239(4) provides that the recipient of a benefit is a creditor of the company (in our case Z is a creditor of Y Ltd) and the company "does anything or suffers anything to be done" which has the effect of putting the creditor in a better position than he or she would have been in an insolvent liquidation. In our example, Y Ltd suffered something to be done to enable Z to be placed in a better position than he would have been had the arrangement not been put into effect. So that if the facts of two Australian cases, *Re Stevens Ex p. Official Receiver and McPhee*,[386] and *Re Emanuel (No.14) Pty Ltd*[387] were before an English court, a preference would have been held to have occurred (assuming that there were the necessary conditions set out above). In *Re Stevens Ex p. Official Receiver and McPhee*; S owed money to M and at the instigation of M, S entered into a contract with O to sell his business. S received nothing for the business. M financed the purchase, with O giving him a promissory note in

---

tion Law: A Time for a Change" (1998) 2 Cfi L.R. 198 for an argument that the objective test ought to be invoked in England and Wales.

[384] This was argued for in Keay, "Liquidators' Avoidance of Preferences: Issues of Concern and a Proposal for Radical Reform" (1996) 18 *Adelaide Law Review* 159.

[385] 1986 Act s.239(4)(a).

[386] *Re Stevens Ex p. Official Receiver and McPhee* (1929) 1 A.B.C. 90.

[387] *Re Emanuel (No.14) Pty Ltd* (1997) 15 A.C.L.C. 341.

consideration therefor. S subsequently became bankrupt and his trustee attacked the transaction with O. Moule J held that the giving of the promissory note with the concurrence of S was a preference and that the trustee was entitled to have the control of the promissory note. Importantly, Moule J said that while the bankrupt did not deliver the purchase price to M he acquiesced in M obtaining it.[388]

In *Re Emanuel (No.14) Pty Ltd*, A contracted with B that in settlement of all claims between them B would make payments both for A and at A's direction to C. C was A's creditor and the payment to C would act as a partial discharge of the debt owed to C by A. The liquidator of A sought to recover the payments on the basis that they were preferences. The Full Court of the Federal Court held that they were.

If the transactions in these two Australian cases were not preferences then it would be possible for traders to enter into all sorts of arrangements, such as agreeing to pay one another's creditors, in order to avoid the preference law. As Moule J pointed out most adroitly in *Re Stevens*:

**11-065**

"To allow such a scheme as this to prevail whereby the bankrupt parts with his whole estate for the benefit of one creditor alone would open the door to a multitude of frauds. If such a transaction can escape, then the efficiency of the administration of bankruptcy must fail."[389]

A supplier who supplies goods on the basis of cash-on-delivery usually could not be regarded as being in receipt of a preference[390] because the supplier was not at any time a creditor in receipt of a benefit relating to an unsecured debt, i.e. no creditor-debtor relationship came into existence.

What could be an important issue in the context of the above discussion, is whether a contingent creditor is within the meaning of "creditor" in s.239? There is no English authority that specifically holds that a contingent creditor is encompassed by s.239. There is case law on earlier versions of s.239[391] which included no express reference to guarantors and sureties; in other words, the provisions simply stated that for a preference to be established the beneficiary of the alleged preference had to be a creditor. In *Re Paine*,[392] Vaughan Williams J observed that the relevant statute did not define the term "creditor" in the relevant provision.[393] In his judgment, it meant a person who would be entitled to prove and to share in a distribution of an insolvent's estate, and a contingent creditor is entitled to do so. Subsequently, this approach was approved in *Re Blackpool Motor Car Co Ltd*[394] where it was held that a surety was a contingent creditor and was, therefore, a creditor for the purposes of the preference provisions. In more recent times, in the Australian case of *Re Timbatec Pty Ltd*,[395] it was held that a contingent creditor is a "creditor" for the purposes of the then Australian statutory provision that was equivalent to s.239.

It is to be noted that, as r.14.2 makes clear, contingent creditors are able to prove in a winding up, and it would seem to be odd if a contingent creditor could prove

---

[388] *Re Stevens Ex p. Official Receiver and McPhee* (1929) 1 A.B.C. 90 at 93.

[389] *Re Stevens Ex p. Official Receiver and McPhee* (1929) 1 A.B.C. 90 at 93.

[390] *Re Discovery Books Pty Ltd* (1972) 20 F.L.R. 470 at 478; *Ferrier & Knight v Civil Aviation Authority* (1994) 48 F.C.R. 163 at 169.

[391] For example, Bankruptcy Act 1883 s.48.

[392] *Re Paine* [1887] 1 Q.B. 122.

[393] *Re Paine* [1887] 1 Q.B. 122 at 124.

[394] *Re Blackpool Motor Car Co Ltd* [1901] 1 Ch. 77.

[395] *Re Timbatec Pty Ltd* (1974) 24 F.L.R. 30,

in a winding up but not be subject to the adjustment provision on preferences when all other creditors potentially are. If transactions entered into by contingent creditors with an insolvent were not subject to adjustment but transactions entered into by other creditors were, this might seem to strike at the heart of the idea of equal and equitable treatment of creditors in an insolvency. Furthermore, the inclusion of guarantors and sureties within s.239 might also suggest contingent creditors are encompassed by the provision. However, it should be noted that one commentator does not appear to accept the view that contingent creditors are within the terms of s.239(4)(a). It is said:

> "[A]lthough the term 'creditor' includes, for other purposes, future, prospective and contingent creditors as well as creditors to whom the debts are currently payable, the preference provisions are necessarily confined to existing creditors, for it is only they who by definition will have received a payment or transfer without giving new value."[396]

### 6. *The need to establish improvement in the position of the creditor or guarantor*

**11-066**    Section 239(4)(b) provides that liquidators must prove, inter alia, that creditors or guarantors were placed in a better position than they would have been if preferences had not been given, and the company entered insolvent liquidation. The test for deciding whether a preference has been given is to ask whether, if the transaction were permitted to stand, it would have the effect of disturbing the statutory order of priorities as regards payment in winding up.[397] It may be thought strange that there is no mention of the creditor enjoying an advantage over other creditors. While there is no explicit requirement that for a preference the creditor must have an advantage over the rest of the creditors, the fact is that if the creditor is in a better position the upshot is that he or she does have an advantage over other creditors. What s.239(4)(b) is providing for, in effect, is that a transaction which results in a creditor receiving from a company more than the creditor would receive from the company in respect of the debt owed if the transaction were set aside and the creditor were to prove for the debt in a winding up of the company, it is a preference. A comparison must be drawn, i.e. between what the creditor received as a result of the transaction and what would have been received if the transaction was set aside and the creditor proved in a winding up of the company. This causes one to ask: is the creditor's benefit, received under the impugned transaction, to be weighed against what would be received in the actual winding up of the company or what would have been received had there been a winding up at the time of the transaction, i.e. a hypothetical liquidation? Keith Bennetts summarises the reason for the latter when he states:

> "[T]o determine preferential effect by reference to creditors in the actual winding up competing for assets as a result of the challenged transaction confuses the policy justification for preference recoveries with preferential effect. For, although it is appropriate to recognise that preference recoveries are ultimately justified by reference to the need to prevent individual creditors from improving their position when winding up is imminent, leaving those creditors who remain in the winding up to compete for limited assets, such policy recognition has nothing to do with the determination of preferential effect … establishing preferential effect is best perceived in terms of satisfying the operation

---

[396] *Van Zwieten, Goode on Principles of Corporate Insolvency Law*, 5th edn (2019), pp.669–670.
[397] *Burns v Stapleton* (1959) 102 C.L.R. 97 at 104.

of the preference avoidance provisions … which … are concerned with the circumstances of the transaction under review and its consequences at the time when the transaction is entered into."[398]

The decision of Morritt J in the bankruptcy case of *Re Ledingham-Smith*[399] seems to suggest the latter position, namely a hypothetical liquidation was envisaged, was correct, and, more recently, Lewison J (as he then was) in *Re Hawkes Hill Publishing Co Ltd (in li)*; sub nom. *Ward v Perks*;[400] clearly indicated that the latter position was correct.

If there is a benefit to a creditor then the fact that something has been done in pursuance of the order of a court to provide a benefit, does not, without more, prevent the doing or suffering of that thing from constituting the giving of a preference.[401] An instance of a preference[402] is the acquiescence by a company in a creditor obtaining a judgment in default, notwithstanding the presence of a good defence available to the company in respect of the claim, and the failure to oppose an application to register a charge out of time.[403]

As to whether there is a preference where the creditor's position is improved when a third party pays what the company owes to the creditor, there does not appear to be any English authority directly on point. As mentioned earlier,[404] there is substantial Australian authority which provides that if the company is owed a debt by a third party, who agrees to pay one of the company's creditors in settlement of what is owed to the company the payment by the third party is a preference.[405] However, there are differing views as to whether a company which authorises a payment by a third party to one of its creditors is granting a preference in the situation where the company does not actually owe a debt to the third party. In *Burness v Supaproducts Pty Ltd*[406] the Federal Court of Australia took the view that this could be a preference. However, Supreme Courts in different Australian state courts in *Re Evolvebuilt Pty Ltd*[407] and *Re Eliana Construction and Developing Group Pty Ltd (No.2)*,[408] adopted the opinion that merely establishing the fact that the company requested, or acquiesced to, the third party's repayment of the creditor of the company was insufficient to establish that the payment was made by the company, and, therefore, it could not be impugned as a preference where the only effect of the payment was the incurring of a debt by the company to the third party and no reduction in the assets of the company. Subsequently, the Victorian Court of Appeal in *Cant (as liquidator of Eliana) v Mad Brothers Earthmoving Pty Ltd*[409] followed the same approach. In this case the liquidator of E company applied for an order avoiding a payment given by the company prior to its liquidation as a

---

[398] Bennetts, "Establishing Preferential Effect Under Avoidance Powers, Corporations Law" (1994) 12 Aust. Bar Rev. 170, 177–178.

[399] *Re Ledingham–Smith* [1993] B.C.L.C. 635.

[400] *Re Hawkes Hill Publishing Co Ltd (in liq)*; sub nom. *Ward v Perks* [2007] B.C.C. 937; [2007] B.P.I.R. 1305 at 31.

[401] 1986 Act s.239(7).

[402] Keay, "Adjustment of Prior Transactions (Corporate)" in *Tolleys Insolvency Service* (LexisNexis), para.A2014.

[403] See *Sir William Henry Peat v Gresham Trust Ltd* [1934] A.C. 252 HL.

[404] See above at para.11-064.

[405] *Re Emanuel (No.14) Pty Ltd* (1997) 15 A.C.L.C. 341.

[406] *Burness v Supaproducts Pty Ltd* [2009] FCA 893; (2009) A.L.R. 259.

[407] *Re Evolvebuilt Pty Ltd* [2017] NSWSC 90.

[408] *Re Eliana Construction and Developing Group Pty Ltd (No.2)* [2019] VSC 546.

[409] *Cant (as liquidator of Eliana) v Mad Brothers Earthmoving Pty Ltd* [2020] VSCA 198.

preference. E had incurred a debt to the respondent, M company, for earthworks conducted by M at various construction sites. A dispute arose between E and M over the debt with M applying to have E wound up on the basis of non-compliance with a statutory demand. The debt was settled when E agreed, on 15 September 2020, to pay M. On 16 September 2016, R company, which was associated with E by their common sole director, made the payment due under the settlement employing money borrowed from a third-party financier. The court said that a payment by a third party which does not have the effect of diminishing the assets of the company available to creditors is not a payment received "from the company" and is therefore not a preference. The court further said that if the company in liquidation directs a third party to make the payment, or authorises or ratifies it, that does not necessarily make the payment one that is "from the company" and therefore a preference. Such a position might not be taken in England. In *Re Hood (A Debtor)*[410] Green J had to deal with an appeal that involved consideration of whether a payment by a third party to the petitioning creditor that purported to discharge the petition debt (and lead to the dismissal of the petition) and where the debtor has agreed to repay or reimburse that third party. The judge held that it was a void disposition or payment pursuant to s.284 of the Act, the bankruptcy equivalent of s.127. The judge also said that there would probably be a good case for a preference claim against the petitioner under s.340 of the Act (equivalent to s.239).

### 7.  *The position of secured creditors and the giving of security by a debtor*

**11-067**    Security given by a debtor in exchange for a contemporaneous or subsequent advance of funds does not constitute a preference in the hands of the creditor; the reduction in assets caused by the creation of the security is matched by the infusion of new funds into the company, and the secured creditor is not a creditor in respect of past indebtedness.[411] It is well settled that a payment in discharge of a valid security cannot constitute a preference.[412] But where an unpaid unsecured creditor is satisfied by a payment or by the provision of security for the debt, there is a disturbing of the statutory order of priorities as regards payment in winding up.[413] However, this is not the case where there is a payment to an already fully secured creditor since this does not improve the position of the secured creditor and it does not affect the position vis-à-vis the other creditors in winding up.[414] Nor does a change in the form of security held by the creditor constitute a preference. Hence, there is no preference where a registered mortgage replaces a vendor's lien for unpaid purchase money, even though the mortgage gives the vendor an easier method of realising his or her security.[415]

If some form of security, such as a charge or a mortgage, is created in respect of

---

[410]  *Re Hood (A Debtor)* [2020] EWHC 3232 (Ch); [2021] B.P.I.R. 274.
[411]  See *Robertson v Grigg* (1932) 47 C.L.R. 257. The same position has been taken in the US; see *Keenan Pipe & Supply Co v Shields* (1956) 241 F. 2d 486; *Ricotta v Burns Coal & Building Supply Co* (1959) 264 F. 2d 749 cited in Seligson "Preferences under the Bankruptcy Act" (1961) 15 *Vanderbilt Law Review* 115, 120.
[412]  *National Australia Bank Ltd v KDS Construction Services Pty Ltd* (1987) 163 C.L.R. 668 at 679 HC (Aus).
[413]  *Burns v Stapleton* (1959) 102 C.L.R. 97 at 104.
[414]  See *Re Moffatt* (1940) 11 A.B.C. 146.
[415]  *Sharyn Development Co Pty Ltd (in liq) v Official Receiver in Bankruptcy as Trustee of the Estate of Bridgland* (1980) 5 A.C.L.R. 1.

both past indebtedness and new advances, the security could only be impugned as a preference and set aside to the extent that it related to the existing indebtedness.[416] The intention of the law in providing preference provisions is not to prevent a debtor company from entering into further transactions with a person or entity where that person or entity is granted security for new advances merely because that person or entity happens to be a creditor already.[417] If the security given to a person in consideration of the advance of new funds was not safe from being set aside as a preference, companies in financial difficulties could not attract funds because potential lenders would be apprehensive of companies going into liquidation, and the taking of security rendered otiose by the subsequent challenge of a liquidator.

### 8.   *Running accounts*

It is not unusual in business to find dealings between parties handled on what are **11-068** known as running or current accounts. A running account is generally understood to occur where there is a relationship between a debtor and creditor which involves an expectation that there will be ongoing dealings rather than a series of instantaneously completed transactions, that is, there is a series of transactions which are continuous and not terminated by a specific dealing.[418] A good illustration of a running account is where a debtor deposits money in an overdrawn bank account on the understanding that the bank will make further advances to the debtor. While the relationship between the parties continues there will be various payments by the debtor to reduce its account with the creditor/supplier, and at other points the creditor/supplier will supply goods to the company, adding to the company's indebtedness. Prima facie, when an insolvent company pays a cheque into its overdrawn account, thus reducing its indebtedness to its banker, the payment, provided that it is within the relevant time zone immediately preceding the commencement of winding up, could be regarded as a preference if the necessary conditions set by s.239 are fulfilled, even though the day following the payment of the cheque the bank honours a cheque drawn on the account to pay some third party. If the bank would be required to disgorge the payment made into the account by the company, but not given credit for honouring the later cheque (effectively a fresh advance of funds), then the creditors of the company might be seen as being unfairly enriched.

In Australia, the courts have exempted payments made pursuant to a clear and bona fide running account from being attacked as preferences. The running account principle has become well established over the years.[419] As explained by the

---

[416]  See *Burns v Stapleton* (1959) 102 C.L.R. 97 HC (Aus). Also, see *Re Mistral Finance Ltd* [2001] B.C.C. 27.

[417]  The subsection is in accordance with the situation which has existed for many years in the US. See s.547(c)(3) of the Bankruptcy Reform Act 1978; *In the Matter of Cable Link Corp 132 F. Supp. 277* (1955).

[418]  *Air Services Australia v Ferrier* (1996) 21 A.C.S.R. 1 at 17. For a broader discussion, see Baxt, "The Ballad of the Running Account—Voidable Preferences in the Ordinary Course of Business" (1969) 7 M.U.L.R. 178; Keay, *McPherson, The Law of Company Liquidation*, 4th edn (Sydney: LBC Information Services, 1999) at 454; Lawrence, "Keeping a Running Account on the Preference Laws" (1996) 4 *Insolvency Law Journal* 171.

[419]  See the detailed discussion by Baxt in "The Ballad of the Running Account—Voidable Preferences in the Ordinary Course of Business" (1969) 7 M.U.L.R. 178; Lawrence, "Keeping a Running Ac-

ASSETS AVAILABLE FOR DIVISION AND DISTRIBUTION

Australian High Court in *Air Services Australia v Ferrier*,[420] a running account[421] can be seen as "an active account running from day to day, as opposed to an account where further debits are not contemplated".[422] The Australian courts will look for an understanding between the debtor and the creditor that the latter agreed to continue to supply goods or services on a credit basis provided that the debtor complied with its credit arrangements.[423] This understanding may be express, but is more often than not merely implied. It is not necessary that there is an express understanding for the continuation of a relationship; a mutual assumption will suffice.[424] At common law in Australia, if a creditor can establish the fact that the transaction sought to be impugned was not an isolated transaction but part of a series of transactions which involved the creditor dealing with the debtor pursuant to a running account, then any payments will not be regarded as preferential.[425]

Where a running account exists it is not possible to pause at any payment in the account and treat it as having produced an immediate effect to be considered independently of what followed.[426] A running account will come to an end when the debtor and creditor assume that the relationship will no longer proceed on a running account basis.[427]

**11-069**  The common law has now been codified as far as liquidations are concerned, and is now found in the Australian Corporations Act 2001.[428]

*Goode on Principles of Corporate Insolvency Law* commends the law as it has developed in Australia.[429] It is certainly possible to argue that such a principle assists in keeping companies afloat as credit providers are willing to continue lines of credit without undue fear of debtors entering liquidation and then having to disgorge all payments made to them in the six months prior to the commencement of the liquidation.[430] Professor Adrian Walters has adroitly pointed out,[431] it is submitted respectfully, that the need for exempting running account payments from

---

count on the Preference Laws" (1996) 4 *Insolvency Law Journal* 171; Keay, *Avoidance Provisions in Insolvency Law* (Sydney: Law Book Co, 1997), pp.134–139.

[420] *Air Services Australia v Ferrier* (1996) 21 A.C.S.R. 1.

[421] The term is discussed briefly in the majority judgment in *Air Services Australia v Ferrier* (1996) 21 A.C.S.R. 1 at 17.

[422] *Air Services Australia v Ferrier* (1996) 21 A.C.S.R. 1 at 17.

[423] *Air Services Australia v Ferrier* (1996) 21 A.C.S.R. 1 at 16.

[424] *M & R Jones Shopfitting v National Bank of Australasia Ltd* (1983) 68 F.L.R. 282 at 289; (1983) 1 A.C.L.C. 946 at 952; *Petagna Nominees Pty Ltd v Ledger* (1989) 1 A.C.S.R. 547 at 564.

[425] For example, see *Richardson v Commercial Banking Co of Sydney Ltd* (1952) 85 C.L.R. 110; *Rees v Bank of New South Wales* (1964) 111 C.L.R. 210; *Queensland Bacon Pty Ltd v Rees* (1966) 115 C.L.R. 266; *Re Weiss* [1970] A.L.R. 654; *Petagna Nominees Pty Ltd v Ledger* (1989) 1 A.C.S.R. 547; *Spedley Securities Ltd (in liq) v Western United (in liq)* (1992) 27 N.S.W.L.R. 111; (1992) 7 A.C.S.R. 271; (1992) 10 A.C.L.C. 357; *CSR Ltd v Starkey* (1994) 13 A.C.S.R. 321; *Air Services Australia v Ferrier* (1996) 21 A.C.S.R. 1.

[426] *Richardson v Commercial Banking Co of Sydney Ltd* (1952) 85 C.L.R. 110 at 133; *Queensland Bacon Pty Ltd v Rees* (1966) 115 C.L.R. 266 at 286; *Petagna Nominees Pty Ltd v Ledger* (1989) 1 A.C.S.R. 547 at 565. A classic example of a running account occurred in *M & R Jones Shopfitting Co Pty Ltd v National Bank of Australasia Ltd* (1983) 68 F.L.R. 282; (1983) 1 A.C.L.C. 946.

[427] Purcell, "Banks and the Recovery of Voidable Preferences" (1990) 2 Bond L.R. 107 at 110.

[428] See Australian Corporations Act 2001 s.588FA(3).

[429] Van Zwieten, *Goode on Principles of Corporate Insolvency Law* (2019), p.673.

[430] For further discussion of the running account principle, see Barlow, "Voidable Preferences and the Running Account—The High Court Reconsiders" (1998) 26 *Australian Business Law Review* 1; Bolitho, "Continuing Business Relationships—Eight Questions in Search of an Answer" (1998) 16 *Company & Securities Law Journal* 584.

[431] "Preferences" in Armour and Bennett (eds), *Vulnerable Transactions in Corporate Insolvency* (2003), p.158.

the effect of the preference provision is less in England and Wales because payments to a supplier or a bank are not likely to be able to attacked successfully because the court is likely to infer that the making of the payment was not influenced by a desire to provide a preference. In Australia there is no need to prove a desire to provide a preference.

### 9. *The need to establish desire to produce preferential effect*

Apart from establishing the insolvency of a company, which can, in some cases, **11-070** be arduous, the conditions which a liquidator has to prove, and which have been considered so far, can be done, on the whole, without a great deal of difficulty. It is only in complicated transactions where difficulties arise. However, one condition can often be extremely difficult for a liquidator to prove. This is that the company was influenced in deciding to give the preference by a desire to give the other party to the transaction a preference.[432] This is, where a preference has been given other than to a connected person, usually the critical aspect of a claim and the point that the defence will latch onto fairly swiftly. It has been made clear that in establishing the desire of the company it is not necessary to prove that the controllers of the company knew that their company was insolvent,[433] or that the controllers knew that the company would enter insolvent liquidation.[434]

Under the pre-1986 law (s.44 of the Bankruptcy Act 1914), the liquidator was required to establish that the company's dominant intention in effecting the transfer that was alleged to be a preference was to give the transferee a preference over other creditors. As mentioned earlier, the Cork Report expressed concern over the elements of the previous preference provision and felt, inter alia, that the onus on liquidators was too great. However, the Report did not recommend an objective approach to preferences. A subjective approach, albeit framed in a different way to the pre-1986 law, was maintained in the Act. Notwithstanding this, the Cork Committee did want to assist liquidators even more than just rewording the subjective requirement in the preference provision, and so the Report recommended that if a transfer is made to someone who is not at arm's length then the transfer should be presumed to be one which was made with a view to giving a preference to the creditor.[435] Consequently, s.239 provides:

"A company which has given a preference to a person connected with the company (otherwise than by reason only of being its employee) at the time the preference was given is presumed, unless the contrary is shown, to have been influenced in deciding to give it by such a desire as is mentioned in subsection (5)."[436]

The presumption contained in this subsection was invoked in *Mills v Edict Ltd*.[437] In that case a Liberian company (S Inc) entered liquidation and its liquidator sought to attack, under s.239, security given to another company, E Ltd. S had borrowed money from E, its only shareholder. When it was insolvent S created a charge in

---

[432] 1986 Act s.239(5).
[433] *Katz v McNally* [1999] B.C.C. 291 CA at 296.
[434] *Wills v Corfe Joinery Ltd* [1997] B.C.C. 511 at 514. Although the judgments in both *Re Living Images Ltd* [1996] B.C.C. 112 at 127; and *Re Agriplant Services Ltd* [1997] B.C.C. 842 at 851 suggest that knowledge of impending liquidation may assist in establishing desire.
[435] Cork Report, para.1258.
[436] 1986 Act s.239(6).
[437] *Mills v Edict Ltd* [1999] B.P.I.R. 391.

favour of E. Stanley Burnton QC (sitting as a deputy judge of the High Court) held that the creation of the charge constituted a preference within s.239. The deputy judge found that the presumption was made out on the basis that E was connected to S. It was held that E was an associate of S under the definition in s.435(10), for E was the sole shareholder of S, and the directors of E always acted on the instructions of a man, M, who effectively controlled the companies.[438]

The seminal case on the topic of preferences under the Act is the decision of Millett J (as he then was) in *Re MC Bacon Ltd*.[439] This case is critical to an appreciation of the present law of preferences and the practical problems which face liquidators. No discussion of preference law could be complete without considering the case.

**11-071**    **(a)    The decision in Re MC Bacon Ltd**    In *Re MC Bacon Ltd*, a classic situation for a preference claim emerged.[440] A bank had provided an unsecured overdraft facility to a company, B. B's fortunes plummeted during late 1986 and early 1987 and B was operating by using its overdraft facility to the full. The Bank became aware of B's misfortunes and demanded security. In May 1987, a report by officers of the Bank stated that B was insolvent but it was reasonable to conclude that it could trade out of its problems. Shortly thereafter, a debenture was executed by B giving the Bank a fixed and floating charge over B's assets. Subsequently, on 4 September 1987 B appointed an administrative receiver. On 7 September 1987 a liquidator was appointed by a meeting of creditors. In due course the liquidator applied to have the debenture given to the Bank set aside on the basis that it was either a preference under s.239 or a transaction at an undervalue under s.238. Only the former argument is examined here.

In words reminiscent of those used by Lindley LJ in *Re Wilcoxon Ex p. Griffith*,[441] when argument was presented to him relating to old law, Millett J refused to consider any case law based on s.44 of the Bankruptcy Act 1914 because, in his Lordship's opinion, the section had been recast entirely and "[e]very single word of significance … has been jettisoned".[442] His Lordship stated that the test in s.239 of being influenced by a desire to produce the effect of putting a person into a position which is better than the position he or she would have been had the transaction not been entered into, was completely different from the "dominant intention to prefer" test in s.44 of the Bankruptcy Act 1914. Now courts are not to consider whether there was, on the part of the insolvent, a dominant intention to prefer the creditor, but rather whether the decision of the insolvent was influenced by a desire to produce a preferential effect. In explaining the new test, his Lordship stated that while a man is to be taken as intending the necessary consequences of his actions, he is not to be taken as desiring all of the consequences. Some consequences will be advantageous to the man, others disadvantageous, while he may be indifferent to some of them.[443]

While recognising the fact that many of the preference claims coming before the

---

[438]    *Mills v Edict Ltd* [1999] B.P.I.R. 391 at 394.

[439]    *Re MC Bacon Ltd* [1990] B.C.L.C. 324.

[440]    For a more expansive discussion of the case, see Keay, "Preferences in Liquidation Law: A Time for a Change" (1998) 2 Cfi L.R. 198.

[441]    *Re Wilcoxon Ex p. Griffith* (1883) 23 Ch. D. 69 at 73.

[442]    *Re MC Bacon Ltd* [1990] B.C.L.C. 324 at 335. A similar approach was advocated earlier by Nicholls LJ in *Re A Debtor (No.1 of 1987)* [1989] 1 W.L.R. 271.

[443]    *Re MC Bacon Ltd* [1990] B.C.L.C. 324 at 335–336.

courts will be decided in the same way as they would have been decided under the previous law, Millett J focused on "desire" in s.239(5) and indicated that the word was subjective, while intention was objective. Accordingly, desire does not mean intention and cannot be inferred only from the fact that an advantage has been bestowed on the creditor by the debtor.[444] His Lordship opined that "desire" involved positively wishing something to occur.[445] According to his Lordship, it is not necessary to adduce direct evidence of the requisite desire as it might, just as intention was in cases dealing with claims under s.44 of the Bankruptcy Act, be inferred from the circumstances of the case,[446] but importantly the desire must have influenced the decision of the company to enter into the transaction which is impugned by the liquidator[447]; there must be a nexus between the desire and the making of the transaction. It is unnecessary to establish that the requisite desire was the only or decisive factor that caused the company to confer the preference on the creditor; it might only be one of the factors.[448] Furthermore, his Lordship made it clear that desire does not have to be the sole or dominant motivation for the giving of an alleged preference, providing it is influential; that is, a desire does not suffice for the purposes of s.239 unless it actually influences the decision to give the benefit.[449] Also, his Lordship said that it would be putting the test too high if it was necessary for the liquidator to prove that if the requisite desire had not been present then the company would not have entered into the transaction impugned.[450] More recently, in *Abdulali v Finnegan*,[451] it was said that "the fact that something is the inevitable consequence of an act does not mean a person has necessarily been influenced by a desire to bring it about, or that it has even occurred to them at all."[452] Birss J said that:

"if more than one factor was influential in the debtor's mind, it is sufficient if one of the factors which did influence them was to put one of the unsecured creditors in a better position. Furthermore if that factor is present, it does not have to be the decisive factor which caused the debtor to do what they did nor does the trustee have to prove that it is the factor which "tipped the scales" in favour of making the preference."[453]

While the test that is used with this condition is a subjective one, a court is entitled to decline to accept the evidence of a debtor company's officers in which they say that the company was not influenced in deciding to enter into the impugned transaction by a desire to put the creditor in an advantageous position given the evidence that is presented.[454] In *Re Transworld Trading Ltd*,[455] the judge took the view that events that occur subsequent to the impugned transaction could, in some cases, be considered in a court's attempt to ascertain the debtor's desire and whether

**11-072**

---

[444] *Re MC Bacon Ltd* [1990] B.C.L.C. 324 at 336.

[445] *Re MC Bacon Ltd* [1990] B.C.L.C. 324 at 335.

[446] This was affirmed in *Rooney v Das* [1999] B.P.I.R. 404 at 406. But note the fact that, in *Re Beacon Leisure* [1991] B.C.C. 213, the court refused to infer a desire in circumstances which were highly suggestive of a desire to improve the position of the preferred creditor.

[447] *Re MC Bacon Ltd* [1990] B.C.L.C. 324 at 335–336.

[448] *Re MC Bacon Ltd* [1990] B.C.L.C. 324 at 336.

[449] *Re MC Bacon Ltd* [1990] B.C.L.C. 324 at 336.

[450] *Re MC Bacon Ltd* [1990] B.C.L.C. 324 at 336.

[451] *Abdulali v Finnegan* [2018] EWHC 1806 (Ch), [2018] B.P.I.R. 1547.

[452] *Abdulali v Finnegan* [2018] B.P.I.R. 1547 at [31].

[453] *Abdulali v Finnegan* [2018] B.P.I.R. 1547 at [17].

[454] *Re Agriplant Services Ltd* [1997] B.C.C. 842.

[455] *Re Transworld Trading Ltd* [1999] B.P.I.R. 628.

it was influenced by a desire to benefit the creditor. He said:

> "Courts often have to infer the relevant desires of companies from slender evidence. I have seen and have listened very carefully to Mr Kirby. He leaves me in not the slightest vestige of doubt that he, and therefore TWT of which he was a director, desired, nay, very much wanted to better TFS's position in the event of the likely eventual winding up of TWT. That desire significantly influenced the decision of TWT to grant this debenture. Far from disproving the relevant desire, the evidence would have left me in no doubt whatsoever, even if the burden of proof had rested on the liquidator … Events subsequent to the grant of a preference will sometimes throw light upon what was the desire of the company when it granted the preference, and upon whether that desire influenced the company in making the grant, but in my view it is ordinarily the evidence of events leading up to the grant which is the most relevant. Subsequent events will usually be on the periphery in terms of proof. Inferences can sometimes be drawn from them as to the relevant earlier intention but great care is needed."[456]

**11-073**   The point at which to assess whether the necessary desire existed is when the decision to enter the transaction was made and not when the transaction was effected.[457] According to David Richards J (as he then was) in *Re Stealth Construction Ltd*,[458] the question of when the decision to enter the transaction is made is a matter to be decided on the facts of each case. It is clear from this decision, and others, that it is the state of mind of the directors that is critical and not the creditor who is paid or any other person. Courts are entitled to draw inferences concerning desire from facts in appropriate cases. If it is reasonable to infer the requisite desire, but there are alternative possibilities as to why a benefit was bestowed on the creditor, the courts are likely to require direct evidence that the alternative possibility was a factor that caused the debtor to do what was done.[459]

In *Re MC Bacon Ltd*, Millett J made it clear that, as with the situation under s.44 of the Bankruptcy Act, a preference does not necessarily result where financial assistance is provided to a struggling company and then the finance provider is paid by the company, as long as the company is motivated by commercial considerations in making the payment and is not desirous of improving the creditor's position.[460]

In the case before him, Millett J was of the opinion that the debtor company held the genuine belief that it could survive and that it had no choice but to grant the debenture demanded by the Bank. His Lordship went on to find that there was no reason why the directors would want to improve the Bank's position in the event of an insolvent liquidation and that there was no motive other than a desire to avoid the calling in of the overdraft and to continue the carrying on of business.[461]

**11-074**   **(b)   The problems with establishing desire**   Notwithstanding the exposition in

---

[456] *Re Transworld Trading Ltd* [1999] B.P.I.R. 628 at 634.

[457] *Re MC Bacon Ltd* [1990] B.C.L.C. 324 at 336; *Re Stealth Construction Ltd* [2011] EWHC 1305 (Ch); [2011] B.P.I.R. 1173; [2012] 1 B.C.L.C. 297. The Singaporean Court of Appeal has said that the relevant time to determine whether a debtor had the requisite desire to prefer is the time when the creditor received the preference: *Coperatieve Centrale Raiffeisen-Boerenleenbank BA (trading as Rabobank International, Singapore Branch) v Jurong Technologies Industrial Corp Ltd (under judicial management)* [2011] SGCA 48 at 34.

[458] *Re Stealth Construction Ltd* [2011] EWHC 1305 (Ch); [2011] B.P.I.R. 1173; [2012] 1 B.C.L.C. 297 at [62].

[459] *Doyle v Saville and Hardwick* [2002] B.P.I.R. 947 at [62].

[460] *Re MC Bacon Ltd* [1990] B.C.L.C. 324 at 336.

[461] *Re MC Bacon Ltd* [1990] B.C.L.C. 324 at 337.

*Re MC Bacon Ltd*, it is not plain what "desire" actually entails. The use of subjective terms in legislation, such as desire, precipitates problems of definition and leads to discussions involving etymology, rather than a straightforward application of the law.

The liquidator is not required to prove that the debtor had a desire to enter the transaction that is alleged to be a preference, rather the liquidator must prove that the debtor positively wished to improve the position of the creditor.[462] Also, the liquidator must establish that the desire did in fact influence the decision to enter into the relevant transaction.[463] Importantly, while the requirement to prove "intention" under the law pre-dating the Act was judged on an objective basis, under the Act the liquidator has to establish the debtor's subjective motivation.[464] Such a demand is always exacting and there are several reasons why it is unrealistic and unreasonable to require such proof. First, it is difficult to ascertain what a person's desire is and persons are always likely to "play down" their intentions (or desires) where it might affect their rights or position. The words of Bowen LJ in *Bird Ex p. Hill*[465] are most apposite:

"But if we are to consider whether amongst all of the shadows which pass across a man's mind, some view as well as the dominant view influenced him to do the act, we shall be embarking on a dark and unknown voyage across an exceedingly misty sea."[466]

The inclusion of a provision like s.239 requires the courts to engage in the difficult task of attempting, ex post facto, to determine what must have been the motive of the insolvent at the time of the entering into of the transaction which is challenged. Even the Cork Committee that, by a majority, recommended the retention of some element of motive in the preference provision recognised that ascertaining motive is "a difficult and unsatisfactory inquiry".[467]

It is even more problematical when one is seeking to ascertain the desire of a **11-075** corporate entity. As a company is unable to have desires, whose desire will have to be established? According to HH Judge Holyer QC (sitting as a judge of the High Court) in *Re Transworld Trading Ltd*,[468] it is "necessary to explore the mind of the company which gave the preference".[469] The question of how one determines the state of mind of a company has been a difficult issue for courts to resolve.[470] This issue was discussed earlier in relation to the defence applying to transactions at an undervalue.[471] Probably though, the basic question which will be asked is: what was the objective of the board in entering into the transaction?[472] In some cases courts may consider the mind of an appropriate person who was involved in initiating the making of the preference, and this is particularly appropriate where the company is the classic "one man company."

---

[462] *Re MC Bacon Ltd* [1990] B.C.L.C. 324 at 335, 336.

[463] *Re MC Bacon Ltd* [1990] B.C.L.C. 324 at 336.

[464] *Re MC Bacon Ltd* [1990] B.C.L.C. 324 at 335; *Re Beacon Leisure Ltd* [1991] B.C.C. 213 at 216; *Re Fairway Magazines Ltd* [1992] B.C.C. 924 at 929.

[465] *Bird Ex p. Hill* (1883) 23 Ch. D. 695.

[466] *Bird Ex p. Hill* (1883) 23 Ch. D. 695 at 704.

[467] Cork Report, para.1253.

[468] *Re Transworld Trading Ltd* [1999] B.P.I.R. 628.

[469] *Re Transworld Trading Ltd* [1999] B.P.I.R. 628 at 629.

[470] According to Young J of the New South Wales Supreme Court ascertaining the knowledge or intention of a company is "a very tricky business": *Ishac v David Securities Pty Ltd (No. 6)* (1992) 10 A.C.L.C. 652 at 653.

[471] See above at paras 11-041–11-042.

[472] Verrill, "Attacking Antecedent Transactions" (1993) 7 J.I.B.L. 485 at 489.

ASSETS AVAILABLE FOR DIVISION AND DISTRIBUTION

Establishing the subjective motive of the debtor is exacting for a liquidator and unrealistic because while the courts have said that a debtor's state of mind may be inferred from the circumstances,[473] they have not been all that ready to make this inference.[474] Absent admissions by the directors of the debtor company or direct evidence from the minute book or a person who participated in the discussions that led to the decision, the only way that the liquidator can prove the requisite desire is by demonstrating that it is unlikely that the directors reached the decision they did without taking the desire to prefer into account.[475] While Millett J in *Re MC Bacon Ltd*[476] said that the test for whether a preference was in fact given is not—did the desire to improve the position of the creditor tip the scales as far as the debtor deciding to enter the transaction?[477]—it might be argued that in practice this has been the test adopted.[478]

But for the need to establish desire, and if an objective approach to preferences was adopted, the court in *Rooney v Das*[479] would have found that preferences had been given, because the facts disclose a classical preference type case. In that case D conducted business at two restaurants. He was indebted to a number of creditors. He subsequently sold one of his restaurants for £17,000 and used this money to repay four of his creditors on the day that he received the proceeds of sale. Then, just over a month after making these repayments, he presented his own petition for bankruptcy. The trustee sought to set aside the payments to the creditors on the basis that they were preferences under the bankruptcy equivalent of s.239.[480] The application was dismissed (as was the subsequent appeal by the trustee) on the basis that the evidence did not demonstrate that the bankrupt was influenced by a desire to prefer the creditors.

**11-076**   Another reason why establishing the subjective motive of the debtor is difficult is that in practice most transfers in favour of creditors are made, except where the creditors are associates of company officers, without any desire to improve the position of the creditors (applying Millett J's interpretation of the provision), but are made to ensure that the debtor can continue to do business or get creditors "off their back". Furthermore, it is common for companies in financial straits to pay their creditors haphazardly. The reason why one creditor receives payment and another does not is often a matter of pure luck. In such cases a liquidator could not, usually, attack haphazard payments as the payments were probably not accompanied by a desire to improve the creditor's position in a liquidation.

As a consequence, and taking into account the fact that liquidators need to have sufficient funds or indemnities to allow them to take legal proceedings, if s.239 remains as it is then there is little scope for liquidators to challenge transfers in many insolvencies.

The need to prove motive is an anachronism, for the focus on motive occurred

---

[473] *Re Kushler* [1943] Ch. 248 at 253; *Re Cutts* [1956] 2 All E.R. 537; *Skandinaviska Enskilda Banken AB v Conway* [2019] B.P.I.R. 1562.

[474] This is borne out by *Re Beacon Leisure Ltd* [1991] B.C.C. 213; *Re Fairway Magazines Ltd* [1992] B.C.C. 924. In the former case, Robert Wright QC (sitting as a deputy High Court judge) said that he was willing to accept the denials of the directors of the debtor company that they had a desire to improve the lot of the creditor (at 216).

[475] Otter, "Influential Desire—Dominant Intention?" (1990) 3(6) Insolv. Int. 42.

[476] *Re MC Bacon Ltd* [1990] B.C.L.C. 324 at 336.

[477] The argument put by the defendant bank in *Re MC Bacon Ltd* [1990] B.C.L.C. 324.

[478] See Otter, "Influential Desire—Dominant Intention?" (1990) 3(6) Insolv. Int. 42.

[479] *Rooney v Das* [1999] B.P.I.R. 404.

[480] 1986 Act s.340.

when the institution of credit was the subject of deep mistrust in England and bankruptcy was considered a crime and bankrupts villains.[481] While bankruptcy became, over the years, decriminalised, English law has never accepted the fact that the motive of the debtor was not a relevant element in the voidability of preferences.[482] An objective approach would overcome the need for considering the motives of insolvents and take much of the uncertainty out of the law.[483] It would also be likely to ensure that there was greater fairness in the distribution of the company's funds.

**(c)   Cases subsequent to Re MC Bacon Ltd**   Little purpose would be served in   **11-077** discussing in detail all of the preference cases, though relatively few in number (at least reported), have been decided subsequent to the decision in *Re MC Bacon Ltd*; many of these cases have not taken the law much further than that set out in *Re MC Bacon Ltd*, and in most of the cases the judges were preoccupied with the individual facts which were before them. In these cases the views of Millett J have been referred to widely, and generally approved.[484] In all of the cases dealing with preferences given by companies, the recipient of the preference, except for the recipients of preferences in the occasional case, such as *Re Living Images Ltd*[485] and *Gemma Ltd v Davies*,[486] has been a person who is able to be classified as a connected person.[487] This is, it is submitted, an indication of the difficulty that a liquidator has in establishing that the company had the requisite desire. Of course, in cases where the recipient was a connected person there is a presumption that the company had the requisite desire of wanting to see the creditor's lot improved. Even in such situations, connected persons have had some success in rebutting the presumption.[488] Although in *Re Exchange Travel Holdings Ltd* (on appeal),[489] it was held that connected persons could not rebut the presumption merely by establishing that they did not know that the company was insolvent at the time of the preference being made,

---

[481] Weisberg, "Commercial Morality, the Merchant Character, and the History of the Voidable Preference" (1986) 39 *Stanford Law Review* 3, 11–16.

[482] Conaglen, "Voidable Preferences Under the Companies Act 1993" [1996] *New Zealand Law Review* 197, 203.

[483] See Keay, "Preferences in Liquidation Law: A Time for a Change" (1998) 2 Cfi L.R. 198 for a criticism of the present position and an argument for the use of an objective test.

[484] For example, see *Re DKG Contractors Ltd* [1990] B.C.C. 903 at 909–910; *Re Lewis's of Leicester Ltd* [1995] B.C.C. 514 at 523; *Re Living Images Ltd* [1996] B.C.C. 112 at 117; *Wills v Corfe Joinery Ltd (in liq)* [1997] B.C.C. 511 at 512; *Re Agriplant Services Ltd* [1997] B.C.C. 842 at 848–849; *Rooney v Das* [1999] B.P.I.R. 404 at 405 (a bankruptcy case).

[485] *Re Living Images Ltd* [1996] B.C.C. 112. However, it must be pointed out that in this case the application was against the directors of the company in liquidation for their disqualification on the basis of unfitness and one of the grounds used to prove this was the giving of a preference.

[486] *Gemma Ltd v Davies* [2008] EWHC 546 (Ch).

[487] For example, see *Re DKG Contractors Ltd* [1990] B.C.C. 903; *Weisgard v Pilkington* [1995] B.C.C. 1108; *Re Exchange Travel (Holdings) Ltd* [1996] B.C.C. 933; *Wills v Corfe Joinery Ltd (in liq)* [1997] B.C.C. 511; *Mills v Edict Ltd* [1999] B.P.I.R. 391 (bankruptcy case); *Re Transworld Trading Ltd* [1999] B.P.I.R. 628; *Conquest v Fox* [2003] All E.R. (D) 360; *Re Conegrade Ltd* [2003] B.P.I.R. 358; *Re Stealth Construction Ltd* [2011] EWHC 1305 (Ch); [2011] B.P.I.R. 1173; [2012] 1 B.C.L.C. 297. In *Mills v Edict Ltd*, the court found that the presumption in s.239(6) applied although it would seem that the court would have made an order in any event as there was a desire to improve the position of a creditor.

[488] See *Re Beacon Leisure Ltd* [1991] B.C.C. 213; *Re Fairway Magazines Ltd* [1992] B.C.C. 924; *Green v Tai* [2015] B.P.I.R. 24.

[489] *Re Exchange Travel Holdings Ltd*; sub nom. *Katz v McNally* [1996] B.C.C. 933. *Katz v McNally* [1999] B.C.C. 291.

and, therefore, could not have had the requisite desire.[490] Also, defendants have failed to rebut the presumption where they believed that there was reason to be optimistic concerning the prospects of the company.[491]

Of some comfort to liquidators, although overall it does not amount to much, may be the fact that a liquidator does not have to prove that the sole or dominant desire of the company was to effect an improvement in the position of the creditor who benefited from the preference;[492] it is probably sufficient if the liquidator establishes that there was some desire to provide an improvement.[493] Further comfort may have been given to liquidators by what was said in two recent decisions. While it has not been judicially settled that if a director of a company omits to do something, such as preventing a regular payment arrangement to a creditor, that it can constitute desire on the part of the company in giving a preference, Marcus Smith J in *Re Paul Flatman Ltd*[494] said that an argument to that effect might well have some force.[495] Furthermore, in *Re Fowlds (A Bankrupt)*[496] ICC Judge Jones said that the fact that a debtor company had a desire to fulfil its legal obligations to creditors when making transfers does not mean that the company cannot be said to also desire to prefer all or any of the creditors.[497]

The decision in *Re Living Images Ltd*,[498] on the basis that it is case in which a court has found there to be a preference in favour of a person other than a connected person, is worth examination. The case did not involve an application for the adjustment of a transaction on the basis that it was a preference. Rather, it involved an application against the three directors of the company in liquidation, L Ltd, for their disqualification on the basis of unfitness and one of the grounds used to prove this was the giving of a preference to B. It was proved that L Ltd had made a payment to B to pay off a loan that had been made to the company. The payment was authorised by one of the directors, W. It was said by the directors that the payment was made to B in order to "keep on the right side" of B as he was a rich man and he might be willing to fund a future project which L Ltd might undertake. Laddie J found that B and W were friends, with W sponsoring B's membership of W's golf club.[499] The wives of the men were close friends. W's son, one of the directors of L Ltd, admitted under cross-examination that W would be highly embarrassed if one of his friends was not paid back.[500] Laddie J noted that B was treated differently from other creditors (a point that seems not to have made any impression on judges in other cases) and that he did not believe that repayment was designed to enable the company to obtain a future loan from B. His Lordship went on to say:

"The most likely explanation of the repayment to [B] was that [W] knew that there was a great risk that the company was on the point of going into liquidation and, if it did so,

---

[490] *Katz v McNally* [1999] B.C.C. 291 at 295.
[491] *Conquest v Fox* [2003] All E.R. (D) 360.
[492] *Abdulali v Finnegan* [2018] B.P.I.R. 1547 at [17].
[493] *Re Fairway Magazines Ltd* [1992] B.C.C. 924.
[494] *Re Paul Flatman Ltd* [2019] EWHC 3338 (Ch); [2020] B.P.I.R. 522.
[495] *Re Paul Flatman Ltd* [2020] B.P.I.R. 522 at [36].
[496] *Re Fowlds (A Bankrupt)* [2020] B.P.I.R. 1111.
[497] *Re Fowlds (A Bankrupt)* [2020] B.P.I.R. 1111 at [65].
[498] *Re Living Images Ltd* [1996] B.C.C. 112.
[499] *Re Living Images Ltd* [1996] B.C.C. 112 at 127.
[500] *Re Living Images Ltd* [1996] B.C.C. 112 at 127.

[B] would not be paid. To avoid that, and to put [B] in a better position than other creditors, his loan was repaid … ."[501]

*Re Agriplant Services Ltd*[502] seems to be a rather strange case as the recipient of **11-078** the preference appears to have been a connected person, yet the court concluded that the company had the necessary desire to give a preference. That case involved a claim that the repayment of a loan to CAF by the company in liquidation, A Ltd, was a preference. The payment had been made shortly before A Ltd had entered voluntary winding up. The loan had been guaranteed by S, one of the two directors of A Ltd. S said in evidence that the payment was made so as to retain the equipment that CAF could repossess if the loan was not paid, and thereby enable A Ltd to continue trading.[503] S also said that he made the payment because of pressure exerted by CAF. This evidence was rejected by Jonathan Parker J (as he then was), who found that in getting the company to pay off CAF, S had his own liability under the guarantee directly in mind. The judge said that S was:

"influenced by a desire to reduce the company's indebtedness to CAF with the consequence that his own position on an insolvent liquidation of the company would be improved".[504]

It is perhaps surprising that a number of payments to creditors whose debt is guaranteed by one or more of the debtor company's directors have not been held to be preferences over the year in accordance with the line taken by Jonathan Parker J.

In *Gemma Ltd v Davies*,[505] it was found by the court that the alleged preferential payments made by the company to trade creditors of the company now in liquidation were instigated by one of the directors who had hoped to continue a trading relationship with the creditors in the future. The court held that these payments were preferences and the company had the requisite desire.

It is submitted that in these three judgments, the learned judges (and particularly Jonathan Parker J) while adhering to the views espoused in *Re MC Bacon* were willing to make important inferences as to the motives of the directors who were behind the preferences given. If more courts were willing to follow the approach adopted by these learned judges then there might be more opportunities for liquidators to attack preferences successfully. The problem that faces many liquidators is that courts have shown themselves ready to be swayed by testimony to the effect that a payment was made under commercial pressure, which is the subject of the next part of the chapter.

## *10.    Commercial pressure*

It is plain from the cases that have been decided under s.239 that if the decision **11-079** of the insolvent company to enter the impugned transaction was influenced solely by proper commercial considerations, the liquidator cannot succeed.[506] While the expression "proper commercial considerations" has not been defined exhaustively,

---

[501] *Re Living Images Ltd* [1996] B.C.C. 112 at 128.
[502] *Re Agriplant Services Ltd* [1997] B.C.C. 842.
[503] *Re Agriplant Services Ltd* [1997] B.C.C. 842 at 851.
[504] *Re Agriplant Services Ltd* [1997] B.C.C. 842 at 127.
[505] *Gemma Ltd v Davies* [2008] EWHC 546 (Ch).
[506] *Re MC Bacon Ltd* [1990] B.C.L.C. 324, 336; *Re DKG Contractors Ltd* [1990] B.C.C. 903, 910; *Re*

the cases do indicate that certain actions fall within this phrase. For example, in *Re MC Bacon Ltd*[507] it was found that the directors gave the debenture which the liquidator tried to attack in order to ensure that their company might pull through a difficult period. Similarly, in *Re Fairway Magazines Ltd*,[508] the desire of the directors was, in giving a debenture, to keep the company going through a cash injection. In these cases, as well as in the bankruptcy case of *Re Ledingham-Smith*,[509] the transactions were entered into because of pressure being exerted by creditors. Pressure can be exerted in a number of ways, such as threatening to institute legal proceedings or winding-up action, threatening to refuse to continue to supply critical goods or services,[510] or threatening to cut off financial support. Pressure has, for many years, been the main reason why a debtor pays a creditor. Hence one can say that the previous law which required, for there to be a preference, a voluntary act, has been duplicated in practice in that pressure will provide a good defence to a liquidator's claim.

It has been a principle of English law since the days of Lord Mansfield that preferential transactions entered into because of pressure will not be set aside. In *Thompson v Freeman*,[511] Lord Mansfield said:

"A bankrupt when in contemplation of his bankruptcy cannot by his voluntary act favour any one creditor, but if under fear of legal process he gives a preference, it is evidence that he does not do it voluntarily."[512]

The reason why pressure prevents a transfer from being a voidable preference is that a preference predicates an act of free will[513] and pressure negatives free will. It has been held that as long as pressure is genuine[514] and not fraudulent[515] then no transfer can be regarded as a preference. It could be said that if there is pressure then the debtor company, in granting a preference, could not have been influenced by a desire to benefit the creditor. Therefore, it is advantageous for creditors to exert pressure on any of their debtors whose financial state appears to be parlous. It would not be very difficult for most finance providers or traders to ensure that they indulged in genuine pressure. All that a trader would need to do would be for it or its solicitors to write a letter either threatening no further supplies or the commencement of winding-up proceedings before the time when payment is actually forthcoming—this could even be orchestrated with the co-operation of the debtor so that it looked as if the payment was a direct result of the pressure. Evidence is likely to be couched in such a way as to provide an indication that commercial pressure was the reason for payment. In *Rooney v Das*, where the bankrupt, who had paid four creditors out of many who were owed money just before entering bankruptcy, swore (inter alia) in an affidavit that:

---

*Fairway Magazines Ltd* [1992] B.C.C. 924, 930; *Wills v Corfe Joinery Ltd (in liq)* [1997] B.C.C. 511 at 512.

[507] *Re MC Bacon Ltd* [1990] B.C.L.C. 324 at 337.
[508] *Re Fairway Magazines Ltd* [1992] B.C.C. 924 at 930.
[509] *Re Ledingham-Smith* [1993] B.C.L.C. 635.
[510] For example, see *Leyland DAF v Automotive Products* [1993] B.C.C. 389.
[511] *Thompson v Freeman* (1786) 99 E.R. 1026.
[512] *Thompson v Freeman* (1786) 99 E.R. 1026 at 1028.
[513] *Walker Ex p. Topham* (1885) L.R. 8 Ch. App. 614; *Butcher v Stead* (1875) L.R. 7 H.L. 839 at 846.
[514] *Graham v Candy* (1862) 3 F. & F. 206; 176 E.R. 93; *Re Greaves* (1881) 45 L.T. 80; *Re Cooper* (1882) 19 Ch. D. 580; *Re Allen* (1971) 115 S.J. 244.
[515] *Re Wrigley* (1875) L.R. 20 Eq. 763.

"The first, second and third respondents all either in writing or verbally threatened legal proceedings against me which obviously caused me great concern.

The motivation for paying the first, second and third respondents was driven by a desire to avoid legal proceedings and stop the respondents hassling me. This was my only reason for making the payment.

In no way was I wanting to put the respondents in a better position than my other creditors."[516]

The trustee argued that these statements did not ring true as one of the bankrupt's other creditors had obtained a judgment, yet had not been paid. The trustee did not, however, succeed in the application as the proof he presented was held not to show the existence of a desire on the part of the bankrupt to prefer the creditors.

**11-080**

The approach invoked by Jonathan Parker J in *Re Agriplant Services Ltd*[517] is of interest in this context. This case was discussed earlier. What is of importance here is the fact that the learned judge was not willing to accept the evidence of S, a director of the company in liquidation who benefited from the alleged preference; he had guaranteed the loan that was being repaid by the company. The learned judge rejected the evidence of S to the effect that the motivation for the payment was so as to retain the equipment, which the recipient of the payment could repossess if the debt was not paid, and thereby enable S's company to continue trading. Jonathan Parker J, it is respectfully submitted, adopted a realistic and broad view of the evidence and held that the payment was motivated by S's desire to reduce his liability on the impending liquidation.

The Cork Committee considered the issue of pressure and a majority of it decided in favour of retaining pressure as a defence to a preference action.[518] Yet this invites creditors to implement a "first in first served" approach and to exert as much pressure so that they are able to grab what they can before liquidation eventuates, and if any payment is challenged they can point to such pressure to justify the payment. Also, it favours those creditors who are strong or more knowledgeable (in that they are aware that pressure will mean that any subsequent transfer is immune from attack), usually the wealthier creditors such as banks, at the expense of the small, less well-informed and less powerful creditors who can ill afford to get little or nothing out of a winding up. To permit individual creditors to secure advantages by coercing the insolvent is totally antithetical to the purposes behind the enactment of laws preventing preferences, namely to ensure that there is a collective process involving a pari passu distribution of the company's assets, subject to statutory priorities.

When an insolvent company enters into transactions, which could be classified as preferences, in favour of creditors not connected with it, it is usual that the company does so because of commercial considerations. Commonly, payments are made to creditors so that either they will not pursue threatened winding-up proceedings or they will continue to supply goods or service. Hence, if these kinds of transactions cannot be attacked there are likely to be few or any transactions for a liquidator to consider challenging. Contrast the situation if an objective approach

**11-081**

---

[516] *Rooney v Das* [1999] B.P.I.R. 404 at 407.
[517] *Re Agriplant Services Ltd* [1997] B.C.C. 842.
[518] Cork Report, para.1256.

ASSETS AVAILABLE FOR DIVISION AND DISTRIBUTION

to preference law is adopted, namely a transaction would be avoided no matter what had led to its instigation.[519]

It is unlikely that a court will accept blindly any assertions by the officers of the debtor company that they were under commercial pressure to grant the transfer. In *Chee Yoh Chuang v Progen Holdings Ltd*,[520] the Singaporean Court of Appeal indicated that it would engage in a full analysis of all the circumstances surrounding the granting of an alleged preference in order to ascertain the intentions of the company and it would not accept without consideration assertions by company officers that commercial pressure led to the giving of the alleged preference in an attempt to explain the transaction.

## 11.   Orders[521]

11-082   **(a)   Generally**   Section 239(3) provides, in the same way as s.238(3) does in relation to transactions at an undervalue, that the object of any court order is to restore the position to what it would have been if there had been no preference given. As with transactions at an undervalue, s.241(1) applies to provide examples of the kinds of orders which a court might make to facilitate the restoration of the position that existed prior to the preference. It is not necessary to repeat much of the discussion which is to be found above under the heading of transactions at an undervalue at paras 11-045–11-51, except to make some comments which can be applied to preferences.

11-083   **(b)   Specific orders**   If a liquidator has proved a case for the giving of a preference within s.239 then the court is probably first going to make a declaration to that effect. Then it will consider what other orders are appropriate. Section 241(1)(c) indicates that a court could order the release or discharge of any security[522] given by the company. This was ordered in *Mills v Edict Ltd*.[523] In that case a Liberian company (S Inc) entered liquidation and its liquidator sought to attack, under s.239, security given to another company, E Ltd. S had borrowed money from E, its only shareholder. When it was insolvent S created a charge in favour of E. Stanley Burnton QC (sitting as a deputy judge of the High Court) found that the creation of the charge constituted a preference within s.239 and made an order setting aside the charge.

So, given s.241(1)(c), if a company granted a mortgage to a creditor over some property which it owns, in lieu of payment for the debt owed, then, if the granting of security is held to be a preference, a release or discharge would return the company to the position it enjoyed prior to the preference. If a court was hearing the case of *Burns v Stapleton*[524] today, it is probable that it would make an order of the kind set out in s.241(1)(c). In that case a creditor who was owed an unsecured debt of £232 by a debtor agreed to lend the debtor who was insolvent a sum of £500 and sell him some cows on credit for £1,900. As part of the transaction the debtor

[519] Under such an approach, some commercial considerations could constitute a defence to a liquidator's claim.

[520] *Chee Yoh Chuang v Progen Holdings Ltd* [2010] SGCA 31.

[521] For a more detailed discussion, see Keay, "The Recovery of Voidable Preferences: Aspects of Recovery" [2000] Cfi L.R. 1.

[522] This is defined in s.248(b)(i) to include "any mortgage charge lien or other security".

[523] *Mills v Edict Ltd* [1999] B.P.I.R. 391 at 394.

[524] *Burns v Stapleton* (1959) 102 C.L.R. 97.

agreed to pay interest on the sum loaned and the purchase price for the cows, and further he agreed to grant security for the repayment of the principal advanced, purchase price and interest by granting mortgages over real estate owned by the debtor with his wife. The loan was advanced and the cows delivered, and the debtor and his wife executed mortgages to secure the sum of £2,732 that covered the amount of the loan, the price of the cows, interest in the sum of £100 and the outstanding debt of £232. A court might order discharge of the mortgage as far as it applies to the outstanding debt.

While theoretically any of the kinds of orders set out in s.241(1) might be made by a court where it finds that a preference has been given, the fact is that most preferences consist of payments of money and hence an order similar to that found in s.241(1)(d) is likely to be the most commonly made order. This paragraph provides that any person might be required to pay, in respect of any benefits received from the company, to the liquidator such sums as the court directs.

According to s.241(1)(e), the court could make an order whereby it imposes, as **11-084** it thinks fit, new or revived obligations on a guarantor who was released or discharged from obligations as a result of the giving of a preference. This kind of order would probably be made in conjunction with a s.241(1)(d) type order and would seek to do justice in a broad way. An order under s.241(1)(e) could provide for the restoration of the obligations of a guarantor, and it potentially does not just benefit the company. Assuming that the creditor to whom the guarantor owed obligations was ordered to repay any payment to the liquidator, he or she would not have to rely on proving for a dividend in the winding up; reliance could be again placed on the guarantee. The type of case where the provision could be invoked is where X (probably a director) guarantees to Y that he will cover the liability of Z Ltd to Y. Later, and not long before winding up, X orchestrates payments by Z Ltd to Y to ensure that his liability under the guarantee is extinguished.

A court may make an order in the terms of s.241(1)(f) which provides that the court may require the provision of security for the discharge of any obligation imposed by the court's order, for the obligation to be charged on any property and for the security to have the same priority as a security released or discharged by the transaction at an undervalue. A court might make such an order if it has ordered a repayment of the preference to the company but the repayment is effected over time and the court thinks it appropriate for the repayment to be secured.[525]

The final order set out in s.241(g) is that a court may provide the extent to which a person whose property is vested (by court order) in the company or on whom obligations are imposed (by court order), is able to prove in the winding up of the company in relation to debts or liabilities which resulted from, or were released by, the giving of the preference. Traditionally, creditors who have to repay a preference have not been penalised by not being allowed to prove in the winding up for their original debt. Section 241(1)(g) seems to suggest that the court could limit the amount that could be proved in the winding up by a creditor. Yet this cannot be so, as the aim of court orders must be to restore the position to what it was before the giving of the preference. The legislative aim for court orders must mean that the company gets back what it paid to the creditor and the creditor returns to being a creditor for the amount of the debt owed by the company. If the court was to order that a creditor who had been owed a debt of £20,000 and who was paid a preference payment of £20,000, was only entitled to prove in the winding up for £10,000, the rest of the creditors would be unjustly enriched.

---

525 I. Snaith, *The Law of Corporate Insolvency* (1990), p.667.

ASSETS AVAILABLE FOR DIVISION AND DISTRIBUTION

**11-085**    Just as there might be problems for a court in achieving a complete restoration of the pre-transaction position where a transaction at an undervalue has occurred, so courts may experience problems with respect to the situation where a preference has been given.[526]

Importantly, in a recent decision, ICC Judge Jones in *Re Fowlds (A Bankrupt)*[527] (a bankruptcy case dealing with s.340 of the Act, the bankruptcy equivalent of s.239) was of the view that the fact that a recipient of a preference had changed his or her position since receiving the preference could be taken into account by a judge in the course of exercising the discretion contained in s.241(1).[528] Judge Jones took the view that considering change of position was not contrary to the application of the statutory rule providing for pari passu distribution; it was merely a qualification of the rule. The judge opined that in the appropriate exceptional case that a court may determine to make no order in favour of the liquidator (trustee in bankruptcy in *Fowlds*) even if the liquidator had established the conditions for a preference under s.239.[529]

One issue, which has attracted little or no significant comment, now warrants specific coverage in relation to preferences.

**11-086**    **(c)  Interest**[530]    Invariably a liquidator will claim, as part of the proceedings initiated to recover a preference, interest on any sum awarded by the court, whether the amount reflects a payment made by the company to the creditor or the value of property transferred to the creditor by the company. The liquidator will seek an award of interest on the basis that the creditor had the benefit of the money or property for a period of time and the liquidator has been denied that property for the benefit of the general body of creditors.[531] A claim for interest may seem to be mundane and insignificant, but in claims for large sums, a substantial sum can be involved, and an interest claim may be of some benefit to the general body of unsecured creditors. If a creditor is held to have been in receipt of a preference and is ordered to pay interest, while the creditor will be entitled to claim the debt owed to him or her, the creditor will not be able to lodge a proof of claim for the interest component which has to be paid. It should be added that a claim for interest is not peculiar to claims for recovery of preferences. It may be appropriate for a liquidator to claim interest in relation to proceedings involving a transaction at an

---

[526] See above at para.11-051; and Keay, "The Recovery of Voidable Preferences: Aspects of Recovery" [2000] Cfi L.R. 1 for a discussion of some of the problems which may face courts in achieving restoration where preferences have been given.

[527] *Re Fowlds (A Bankrupt)* [2020] B.P.I.R. 1111.

[528] But change of position cannot be invoked as a defence: *Skandinaviska Enskilda Banken AB v Conway* [2019] B.P.I.R. 1562 at [111]; *Bucknall v Wilson* [2021] EWHC 2149 (Ch) at [94]. In the latter case, which was an appeal from Judge Jones' decision in *Fowlds*, Trower J accepted that in exceptional circumstances change of position will weigh in the balance when the court is determining how to exercise its discretion as to the order it thinks fits for restoring the position to what it would have been if the transaction had not been entered into or the preference had not been given. His Lordship did add that change of position was not the strong factor which Judge Jones considered it to be in *Fowlds* (at [94]). Trower J's judgment was delivered very shortly before going to press and thus it could not be analysed fully in this chapter.

[529] For further discussion of the case, see above at para.11-047. Also, see comments in the previous footnote (fn.528).

[530] This portion of the chapter draws on Keay, "The Recovery of Voidable Preferences: Aspects of Recovery" [2000] Cfi L. R. 1.

[531] See *London, Chatham and Dover Ry Co v South Eastern Ry Co* [1893] A.C. 429 at 437; *Putnin v Energy Trucking Pty Ltd* [1990] 5 W.A.R. 16 at 29; (1990) 8 A.C.L.C. 485 at 496.

undervalue, but the fact of the matter is that such claims are more often associated with claims relating to preference actions so it is felt more appropriate to consider it at this juncture.

Although the preference provision and its attendant sections do not specifically address the issue of interest, the courts are endowed with a broad power in making orders. Courts are permitted to order a person to pay to the liquidator an amount that represents benefits that the person received as a result of the transaction.[532] This would, it is submitted, include the right to order that any interest earned on moneys received by a creditor (the respondent) is to be paid to the company. While this seems reasonable, it does not address the situation where no interest has been earned by the creditor, or if there has been interest earned it is less than is normally claimed under the relevant legislation on debts ordered to be paid by court judgment.

There is little doubt that a court can, either pursuant to the Act, or (more likely) pursuant to the Senior Courts Act 1981, award interest in preference claims. Section 35A of the Senior Courts Act provides, inter alia, that in proceedings for the recovery of a debt, there may be included in any sum for which judgment is given simple interest from the date on which the cause of action arose and the date of judgment. It has been held by the Court of Appeal in *Re FP & CH Matthews Ltd*[533] in relation to s.3 of the Law Reform (Miscellaneous Provisions) Act 1934, the precursor of s.35A, that a right to recover a preference was a debt. Hence, it would seem that a preference claim would now be covered by s.35A.

In addition, according to the opinion of Clarke JA in the Australian case of *Star v O'Brien*,[534] there is also power at common law to award interest where necessary to effect just and proper restitution.[535] His Honour said that he would be willing to award interest under the common law where the award of interest under the relevant provision, the Supreme Court Act 1970 (N.S.W.), was not sufficient to accord just restitution.[536]   **11-087**

If a claim for interest is made whether pursuant to the Senior Courts Act 1981, under the Act or at common law, a court has a discretion whether or not to accede to the claim.[537] The fact that interest may be claimed and may be awarded is not the main issue. The main issue which needs to be considered is the date from which interest is calculated. The end of the period will usually be the date of judgment. If interest is awarded pursuant to s.35A of the Senior Courts Act then it will be from the date on which the cause of action arose. When does the right to claim a preference arise? There are four possible answers:

- the date of the preference;
- the date of the commencement of winding up;
- the date of the winding-up order in compulsory liquidations; or
- the date of the first demand made by the liquidator for repayment by the allegedly preferred creditor (or the date of the commencement of proceedings).

As the fact that the use of different starting dates could mean liquidators getting

---

[532] See 1986 Act s.241(1)(d).
[533] *Re FP & CH Matthews Ltd* [1982] 1 All E.R. 338.
[534] *Star v O'Brien* (1997) 15 A.C.L.C. 144.
[535] *Star v O'Brien* (1997) 15 A.C.L.C. 144 at 149.
[536] *Star v O'Brien* (1997) 15 A.C.L.C. 144.
[537] See Scott and Whitaker, *Civil Procedure* ("The White Book") (London: Sweet & Maxwell, 2011), Vol.1, para.7.0.20.

a lot more for distribution to creditors it is worth setting out the arguments for the respective starting dates.

**11-088**    The first of the above options was the one effectively employed by Jonathan Parker J in *Re Agriplant Services Ltd*.[538] His Lordship actually ordered that interest was to run from the date on which the cheque which was given by the company to the creditor was cleared.[539] This date was selected as it was from this date that the creditor had the use of the company's money. The problem with adopting this date is three-fold. First, at the time of the preference the company was not in liquidation and for all the creditor knew at the time the company might not be wound up. Secondly, when the transaction occurred there was no one who could institute proceedings for the recovery of the preference and this is necessary before a cause of action is said to arise.[540] It was not until the appointment of the liquidator that there was anyone who could institute proceedings. Thirdly, neither at the date of the giving of the preference, nor at the time when any cheque given was cleared, was anything wrong with the transaction[541]—the creditor was simply being paid for a debt owed and there was no winding up in process. While the law allows for a retrospective invalidation of transactions, the law has always regarded transactions like preferences as voidable and not void ab initio, with the result that until the liquidator elected to avoid the transaction it was valid.[542] In *Stevenson v Newnham*,[543] the Court said that it could not find any authority for the proposition that there is a relation back from the date of the liquidator's election to the date of the preference.[544] The preference provision can be usefully contrasted with s.127 of the Act which was discussed in detail in Ch.7[545] and which provides, inter alia, that any disposition of the company's property after the commencement of winding up is void. Section 127 has been interpreted to mean that once a liquidation is ordered a transaction covered by the section is invalid from its inception.[546] Two acknowledgements must be noted. First, the present provision dealing with preferences is different from the provisions that were considered in the cases that have developed most of the law on the subject. Secondly, in *Re MC Bacon Ltd*[547] Millett J (as we have already noted) said that he protested at having cited to him cases decided under the old law.[548] Nevertheless, there is nothing to suggest, either in the Act or in the cases, that the law relating to the very essence of a preference is irrelevant. Consequently, until action is taken by a liquidator to challenge a

---

[538] *Re Agriplant Services Ltd* [1997] B.C.C. 842.

[539] The reported case does not disclose this fact but I was informed by Mr Steven Fennell now of counsel, but then of the solicitors for the liquidator in the case (Dibb Lupton Alsop (as it was then) of Sheffield) that this was what his Lordship subsequently ordered. I am indebted to Mr Fennell for his and his firm's assistance.

[540] *Meyappa Chetty v Supramanian Chetty* [1916] 1 A.C. 603 at 610; *Spedley Securities Ltd (in liq) v Western United Ltd (in liq)* (1992) 7 A.C.S.R. 721 at 722.

[541] See N. Rubenstein, "Preferences in Bankruptcy" (1995) 112 *Banking Law Journal* 422, 467.

[542] *Stevenson v Newnham* (1853) C.B. 286; 138 E.R. 1208; *Marks v Feldman* (1870) L.R. 5 Q.B. 275; *In Re Brall* [1893] 2 Q.B. 381 (voluntary settlement); *In Re Hart Ex p. Green* [1912] 3 K.B. 6 (voluntary settlement); *Star v O'Brien* (1997) 15 A.C.L.C. 144.

[543] *Stevenson v Newnham* (1853) 138 E.R. 1208.

[544] *Stevenson v Newnham* (1853) 138 E.R. 1208 at 1216. This was accepted in *Marks v Feldman* (1870) L.R. 5 Q.B. 275 at 279.

[545] See above at paras 7–009–7–044.

[546] *National Acceptance Corp Pty Ltd v Benson* (1988) 12 N.S.W.L.R. 213 at 220; (1988) 6 A.C.L.C. 685 at 691.

[547] *Re MC Bacon Ltd* [1990] B.C.L.C. 324.

[548] *Re MC Bacon Ltd* [1990] B.C.L.C. 324 at 335.

preferential transaction, it is valid. It is submitted that that point, which was not addressed by the Act, is too well settled to be overturned now.

The second option is the one that appears to be accepted generally as the correct date in England. The date was applied by the Court of Appeal in *Re FP & CH Matthews Ltd*.[549] Lawton LJ in handing down the leading judgment said that a claim could be made for interest pursuant to s.3(1) of the Law Reform (Miscellaneous Provisions) Act 1934 which provides, inter alia, that interest could be ordered in relation to any proceedings for the recovery of a debt and the time period to be used was the period from the point when the cause of action arose until the date of judgment.[550] His Lordship said that a claim for the recovery of a preference was a debt within the meaning of s.3(1) and that the date arose when the company entered voluntary liquidation, namely on the passing of the members' resolution to wind up.[551] While the decision has been used frequently to support the proposition that the date from which interest is to be calculated is the date of the commencement of the winding up, there is one important point which must be noted about the decision in *Re FP & CH Matthews Ltd*. The Court did not actually state that interest was payable from the commencement of winding up. Lawson LJ said that the date to be used was the date of the members' resolution to wind up.[552] The case involved a voluntary winding up and in voluntary winding up the members' resolution to wind up is both the date marking the entry of a company to liquidation and the date known as the commencement of winding up,[553] whereas in compulsory liquidation the date when a company enters liquidation and the commencement of winding up are two different dates. The former is the date of the winding-up order and the latter is the date on which the petition for winding up was presented.[554] Lawton LJ did not actually state that the date from which interest was to be calculated was the commencement of winding up. In his judgment his Lordship said that he decided on the date of the members' decision to wind up as that was the date from which the company had not got use of the money which had been given to the creditor. It is submitted that his Lordship said this because it was not until there was a winding up that the preference could be impugned. Therefore, it is questionable whether one can rely upon *Re FP & CH Matthews Ltd* to assert that the commencement of winding up should be the relevant date because in a compulsory winding up one cannot say that the commencement of winding up marks the date from which a preference can be challenged. It is not until a winding-up order is made, and a liquidator assumes control of the company,[555] that a preference can be impugned. Also, *Re FP & CH Matthews Ltd* could equally stand for the proposition that the relevant date is the date of the winding up, which in compulsory winding up is the date of the winding-up order.

Support for the use of the commencement of winding up may be secured from the Court of Appeal decision in *Re Carter and Kenderdine's Contract*.[556] In that case the court was dealing with a claim made in relation to s.47 of the Bankruptcy Act 1914 that allowed for the avoidance of certain pre-bankruptcy transactions. In an

---

[549]   *Re FP & CH Matthews Ltd* [1982] 1 All E.R. 338 at 344.
[550]   *Re FP & CH Matthews Ltd* [1982] 1 All E.R. 338 at 344.
[551]   *Re FP & CH Matthews Ltd* [1982] 1 All E.R. 338 at 344.
[552]   *Re FP & CH Matthews Ltd* [1982] 1 All E.R. 338 at 344.
[553]   1986 Act s.129(1).
[554]   1986 Act s.129(2).
[555]   Usually, it will be the official receiver initially.
[556]   *Re Carter and Kenderdine's Contract* [1897] 1 Ch. 776.

obiter comment A.L. Smith LJ said that a transaction is only void from the date of the act of bankruptcy to which the title of the trustee in bankruptcy relates back.[557] The date of the act of bankruptcy that formed the basis of the bankruptcy petition was, under the Bankruptcy Act, the commencement of bankruptcy and by analogy one could say that the date of the commencement of winding up is also the date from which a transaction is said to be void.

**11-089**    In Australia there has been a line of cases that have held that the commencement of winding up is the correct date. The reason given for holding this view is the same as that given by Lawton LJ, namely the creditor has had use of the money and the company deprived of the money ever since the commencement of winding up.[558]

In *Maurice Drycleaners Pty Ltd (in liq) v National Australia Bank Ltd*,[559] Hodgson J of the New South Wales Supreme Court accepted the fact that the date from which to calculate interest was the commencement of winding up even though he acknowledged that there was no obligation on the defendant to repay a preference until the liquidator made a demand.[560] In *Hamilton v Commonwealth Bank of Australia*,[561] his Honour affirmed his view although he conceded that the appropriate date might, in some cases, be the date of the winding-up order.[562] Neither this case, nor any other case, articulates clear reasons why the starting point for the calculation of interest should be the date of the winding-up order. Hodgson J in *Hamilton* seemed to indicate that the date might be appropriate because it was the date on which a cause of action arose and the limitation period would run from that date.[563]

In one of the only two Australian appellate cases to consider the issue, *Star v O'Brien*,[564] Cole JA (with whom Beazley JA agreed) said that to take the date of the commencement of winding up presumes that demand for recovery would successfully be made, yet unless and until demand is made any transfer remains valid and effective because it is only void at the election of the liquidator.[565] His Honour continued:

"I can see no basis in principle why a payment, otherwise effective, which becomes recoverable only upon an election by a liquidator on the giving of demand for its repayment as a preference, should be regarded as not properly paid prior to that time. The debtor company, subsequently in liquidation, owed the money and paid it. Unless and until the payment is struck down as a void preference there is no basis upon which the paying company can deny its obligation to have made the payment it has made. That means, in my opinion, that prior to that date of demand for repayment, which demand may or may not be made, the paying debtor company cannot say that the monies it paid to a creditor were in truth due to it. As it is now well established that the object of interest is to

[557] *Re Carter and Kenderdine's Contract* [1897] 1 Ch. 776 at 782.
[558] For example, see *Re Mike Electric (Aust) Pty Ltd (in liq)* (1983) 71 F.L.R. 117; *Re Toowong Trading Pty Ltd (in liq)* [1989] 1 Qd. R. 207; *Maurice Drycleaners Pty Ltd (in liq) v National Australia Bank Ltd* (1990) 8 A.C.L.C. 798; *Re Buckley's Earthmoving Pty Ltd* (1993) 10 A.C.S.R. 129.
[559] *Maurice Drycleaners Pty Ltd (in liq) v National Australia Bank Ltd* (1990) 8 A.C.L.C. 798.
[560] *Maurice Drycleaners Pty Ltd (in liq) v National Australia Bank Ltd* (1990) 8 A.C.L.C. 798 at 800.
[561] *Hamilton v Commonwealth Bank of Australia* (1992) 9 A.C.S.R. 90.
[562] *Hamilton v Commonwealth Bank of Australia* (1992) 9 A.C.S.R. 90 at 126. This was the date accepted in *Putnin v Energy Trucking Pty Ltd* [1990] 5 W.A.R. 16.
[563] *Hamilton v Commonwealth Bank of Australia* (1992) 9 A.C.S.R. 90 at 125.
[564] *Star v O'Brien* (1997) 15 A.C.L.C. 144.
[565] *Star v O'Brien* (1997) 15 A.C.L.C. 144 at 151.

compensate a plaintiff for having been kept out of money due to it, it follows that interest cannot be claimed prior to that date."[566] (Footnote in the original omitted.)

The third option for compulsory windings up is the date of the winding up. This **11-090** does not appear to have been commonly accepted by courts,[567] but it must be the earliest date from which interest can be calculated in compulsory liquidations as there is no accrual of a cause of action until the appointment of a liquidator,[568] which occurs effectively on the making of a winding-up order when, normally, the official receiver assumes the duties of liquidator. As indicated above, it is possible to construe the decision in *Re FP & CH Matthews Ltd* as standing for the proposition that interest is to run from the actual beginning of a winding up, i.e. either the date of the members' resolution to wind up or the making of a winding-up order. The problem with this is that the liquidator does not elect to impugn the transaction from this date. The creditor who received a preference may not even be aware that the company has entered winding up.

The fourth option is the date of the first demand made by the liquidator for the return of the money paid to the creditor by the company. A variation of this option could be the date of the commencement of proceedings, particularly if, in the unusual situation, the liquidator does not make a demand prior to initiating proceedings.[569] The majority of cases in the US have seen the courts consistently holding that interest should run from the date of the commencement of the action, where no earlier demand was made.[570]

The date of the first demand by the liquidator has been accepted as the appropriate date by two Australian appellate courts in *Ferrier v Civil Aviation Authority*[571] and *Star v O'Brien*.[572] In the latter case, Cole JA said:

"[U]nless and until claim is made by the liquidator of the debtor company claiming repayment of the sum paid the payment constitutes an effective payment of that debt [the debt owed by the company to the creditor], it cannot be said that the creditor receiving that sum is, as between the debtor and the creditor, unjustly enriched. The creditor has only received what was due to it. Accordingly, even though in consequence of the payment being regarded as a statutory preference, the recipient creditor is obliged to repay the sum received to the liquidator, the recipient creditor should not be obliged to pay interest on monies which it was, prior to demand, entitled to hold."[573]

Professor Countryman has argued convincingly, it is respectfully submitted, that **11-091** it would be unfair to charge a creditor interest before a liquidator's demand as the

---

[566] *Star v O'Brien* (1997) 15 A.C.L.C. 144 at 151.

[567] This is with the exception of the Australian decisions of *Re Lyons Ex p. Allpass* (1989) 87 A.L.R. 69 at 72; *Ledger v Petagna Nominees Pty Ltd* [1989] 1 W.A.R. 300; *Putnin v Energy Trucking Pty Ltd* [1990] 5 W.A.R. 16 at 29.

[568] *Meyappa Chetty v Supramanian Chetty* [1916] A.C. 603 at 610; *Spedley Securities Ltd (in liq) v Western United Ltd (in liq)* (1992) 7 A.C.S.R. 721 at 722.

[569] This was adopted as the date in *Katoa Pty Ltd v Premier Auto Spares Pty Ltd* (1984) 2 A.C.L.C. 352 at 356, only because the court had no evidence of the date of any demand by the liquidator.

[570] *Ommon v Talcott* 175 F. 261 at 269 (1909); *In Re Roco Corp, 37 B.R. 770* at 774 (1984); and *In Re Art Shirt Inc, 93 B.R. 333* at 341–342. See Countryman, "The Trustee's Recovery in Preference Actions" (1986) *Bankruptcy Developments Journal* 449, 501–502.

[571] *Ferrier v Civil Aviation Authority* (1994) 127 A.L.R. 472.

[572] *Star v O'Brien* (1997) 15 A.C.L.C. 144.

[573] *Star v O'Brien* (1997) 15 A.C.L.C. 144 at 152.

creditor cannot be sure that he or she will be pursued until that time.[574] It could be added that until a demand is made many preferred creditors are not actually aware that they are liable to disgorge benefits to the liquidator.

It would seem that the courts are able to choose any of the options which have been set out here, save for the date of the preferential transaction, but which date is the more appropriate for interest to begin running? Despite the decision in *Re FP & CH Matthews Ltd*, it is submitted, with respect, that the preferable time is the date of demand. First, it seems illogical to say that the avoidance of a transaction can be deemed to operate from the commencement of winding up because until a liquidator is appointed no cause of action exists.[575] Secondly, liquidators will have an incentive to examine the affairs of the insolvent promptly to establish whether there are any transactions which are able to be attacked as preferences, and to make a demand.[576] This would help to overcome inordinate delays in initiating proceedings as liquidators would be encouraged to make a demand and commence proceedings within a reasonable period of time.

Thirdly, because a party cannot be sure that an action exists or, if it does, whether the liquidator will pursue it, until there is some demand for recovery, it may seem unfair to charge interest from an earlier time.[577] Fourthly, if any date prior to the making of the first demand is taken a preferred creditor might be prejudiced. Take the case where a liquidator makes a demand for the return of a preference and the creditor accepts the strength of the liquidator's case. The liquidator may well demand interest on the amount of the preference. If the creditor has to pay interest it seems unfair for the creditor to have to pay from a date earlier than the time of the demand for he or she may not know that he or she has been the beneficiary of a preference, and surely the creditor should be given some opportunity of considering his or her position before being liable to pay interest.

If the last option is preferable, should the date be when the demand is sent or when it is received? While we may be referring to a matter of days, a few days in claims for large amounts can be crucial. It seems reasonable that the time should be from the date of reception of the demand.[578]

## *12.    Third party protections*

**11-092**        Section 241(2) makes it clear that court orders may affect the property of, or impose any obligation on, any person, not just the company and the creditor who received the benefit of the preference. So, if the creditor received a cheque for the sum of £10,000 from the company which later entered liquidation and the creditor gave the cheque to another person, perhaps an associate, if the creditor is insolvent

---

[574] Countryman, "The Trustee's Recovery in Preference Actions" (1986) *Bankruptcy Developments Journal* 449, 501.

[575] *Meyappa Chetty v Supramanian Chetty* [1916] A.C. 603 at 610; *Spedley Securities Ltd (in liq) v Western United Ltd (in liq)* (1992) 7 A.C.S.R. 721 at 722.

[576] Lovell, "Interest on Preference Payments" (1993) 11 *Company & Securities Law Journal* 26, 30.

[577] Countryman, "The Trustee's Recovery in Preference Actions" (1986) *Bankruptcy Developments Journal* 501.

[578] Lovell, "Interest on Preference Payments" (1993) 11 *Company & Securities Law Journal* 26, 29 (fn.23) suggested that there may be merit in allowing some time for a defendant to respond to a demand before interest begins to accrue. This approach finds some support in the judgment of Smith J in *Larade Pty Ltd (in liq) v Foodland Stores Pty Ltd* unreported 6 June 1991 Supreme Court of Victoria. In *Katoa Pty Ltd v Premier Auto Spares Pty Ltd* ((1984) 2 A.C.L.C. 352 at 335), Olney J said that he would favour allowing interest to run from a reasonable time after the date of demand.

when the liquidator of the company obtains a declaration that the giving of the cheque represented a preferential transfer, then the court might be minded to make an order that the person to whom the cheque was given is to pay the sum covered by the cheque to the liquidator, as the liquidator would not get full benefit from an order against the insolvent creditor. However, s.241(2) provides, as it does where there has been a transaction at an undervalue, a protection for a third party who acquired a benefit from the creditor (after he or she had received a preference), where the third party acquired the benefit in good faith and for value and that person was not a party to the preference. This is in line with the common law that has traditionally limited the effect of the avoidance of transactions in relation to preferences to immediate parties and their privies.[579] But a third party, if he or she at the time of receiving a benefit from a creditor had notice of the circumstances which amounted to a preference and the presentation of a petition against the company or that the company has entered winding up, on the one hand, or he or she was a connected person,[580] or an associate,[581] of the company or the creditor on the other hand, it will be presumed that the benefit was received otherwise than in good faith.[582] A third party who relies on the ground of good faith has the onus of establishing good faith.[583] There are indications from *Re Sonatacus Ltd*[584] that establishing good faith may not be easy. *Re Sonatacus Ltd* represents a case where the court used s.241(2) to order the repayment of a preference. The presumption that the benefit was received otherwise than in good faith is rebuttable but it is not easy to rebut presumptions in this area of insolvency law.

### 13.   Limitation of actions

Actions under this section are generally to be regarded as actions on a specialty, covered by s.8 of the Limitation Act 1980, and as a consequence there is a 12-year time period in which office-holders can commence proceedings, but this is provided that the substance of the application is to set aside a transaction, and not to recover a sum that is recoverable.[585] If a claim for a sum is ancillary to a primary head of relief that involves the setting aside of transactions, then the time limit is 12 years.[586] Thus any repayment of a sum paid by way of a preferential transfer could be regarded as ancillary to an order that the transfer is to be set aside under s.239. **11-093**

### 14.   Market contracts are exempted

Section 239 is specifically disapplied in relation to market contracts if a recognised investment exchange or clearing-house is a party to those contracts, and does not affect a disposition of property in pursuance of a market contract.[587] Similar exemptions applicable to financial and security settlements and associated security **11-094**

---

[579] See *Stevenson v Newnham* (1853) C.B. 286 at 302; 138 E.R. 1208 at 1215.
[580] Defined in 1986 Act s.249.
[581] Defined in 1986 Act s.435.
[582] See 1986 Act s.241(2)–(3), (3C).
[583] See *Re Sonatacus Ltd* [2007] EWCA Civ 31; [2007] 1 B.C.L.C. 627; [2007] B.C.C. 186 at [24].
[584] *Re Sonatacus Ltd* [2007] EWCA Civ 31; [2007] 1 B.C.L.C. 627; [2007] B.C.C. 186 at [29].
[585] *Re Priory Garage (Walthamstow) Ltd* [2001] B.P.I.R. 144 at 149, 160.
[586] *Re Priory Garage (Walthamstow) Ltd* [2001] B.P.I.R. 144 at 149, 160.
[587] Companies Act 1989 ss.155, 165(1)(b), (3).

arrangements are provided for in the Financial Markets and Insolvency (Settlement Finality) Regulations 1999.[588]

### *15.   Conclusion*

**11-095**     The fact of the matter is that despite changes to the law of preferences in 1986 there does not seem to have been a significant departure from the law as it was applied previously.[589] It may have been thought, now that the concept of preference is not preceded by the tag of "fraudulent", that courts may be more willing to infer the requisite motive in the circumstances of any cases coming before them. However, because of the paucity of preference matters either being initiated or getting to a hearing, we are unable to ascertain whether this is in fact the case. One decision that may shine some light on this, *Rooney v Das*,[590] indicates that courts are not likely to go far in making inferences. This case was discussed earlier.[591]

It is likely that liquidators have been discouraged by the views expressed in *Re MC Bacon Ltd*, especially where, as in that case, the creditor is not a connected person. It all means that the role of s.239 is very limited, and one might be able to say that save where connected persons benefit from a preference the law against preferences is not used frequently. Because of this limited role many preferences can swim through the net with the consequent result that the body of unsecured creditors lose out and the pari passu principle (and the statutory regime) is eroded. Of significant concern to our liquidation system which focuses on the collective process is the fact that it is likely that the strong and powerful creditors will be able to place enough pressure on insolvent companies so that they get paid at the expense of the weak and unsuspecting creditors. It is submitted that England and Wales should follow the law as it is found in those countries that adopt an objective approach to preferences.[592]

### G.   Extortionate credit transactions[593]

### *1.   Introduction*

**11-096**     Section 244(2) of the Act provides that a court may make an order in relation to an extortionate credit transaction entered into within the three years before the company went into liquidation (or became subject to administration). It is to be noted that the end point for the period in which the transaction must have occurred for it to be able to be challenged is different from the period applying to

---

[588] Financial Markets and Insolvency (Settlement Finality) Regulations 1999 (SI 1999/2979). See reg.17. The Regulations implemented the Settlement Finality Directive 98/26.

[589] Milman and Parry, "Challenging Transactional Integrity on Insolvency: An Evaluation of the New Law" (1997) 48 N.I.L.Q. 24, 28.

[590] *Rooney v Das* [1999] B.P.I.R. 404.

[591] See above at para.11-075.

[592] See Keay, "Preferences in Liquidation Law: A Time for a Change" (1998) 2 Cfi L.R. 198, which argues for an objective approach to be implemented in England and Wales. Highly respected commentators such as Professors Goode (*Principles of Corporate Insolvency Law* (1997), p.387), Milman and Parry ("Challenging Transactional Integrity on Insolvency: An Evaluation of the New Law" (1997) 48 N.I.L.Q. 24, 29) and Prentice ("Some Observations on the Law Relating to Preferences", in R. Cranston (ed.), *Making Commercial Law* (Oxford: Oxford University Press, 1997), pp.449 and 459) seem to support an effects approach.

[593] It would seem that the provision covering extortionate credit transactions applies equally to Scotland as well as England and Wales.

THE ADJUSTMENT PROVISIONS

transactions at an undervalue and preferences. The end point is the time when the company went into liquidation and this is defined in s.247 as occurring when a winding-up resolution is passed or a winding-up order is made by the court at a time when the company has not gone into liquidation by passing such a resolution.

In effect the provision will allow for the re-opening of the relevant transaction. Section 244 was clearly modelled on ss.137–140 of the Consumer Credit Act 1974, and it is likely the courts will have reference to the cases which have been decided under those provisions.

The aim of s.244 is, it appears, to ensure that the rights of unsecured creditors are not prejudiced by reason of the company having entered into a loan arrangement for which the consideration is excessive. The aim is not to attack loans which turn out to be bad bargains, but to allow for the impugning of those loans which are grossly unfair, i.e. loans which no reasonable company in normal circumstances would enter into save where there was some underlying rationale such as where there is a sham agreement designed to confer an undue benefit on the lender.

It is noteworthy that as yet the section has not been the subject of any reported decision, suggesting that it has not been invoked frequently, or at all, by liquidators.

## 2. Scope

The provision is able to operate where the company in liquidation is, or has been, a party to a transaction involving the extension of credit.[594] The powers conferred by s.244 are exercisable in relation to any transaction concurrently with any powers exercisable under s.238 (transaction at an undervalue). **11-097**

The type of transaction to which the provision applies is an extortionate credit transaction. "Credit" is not defined. However, in the Consumer Credit Act the word is defined broadly to include "a cash loan, and any other form of financial accommodation", and there is nothing to indicate that the courts will refrain from adopting such a wide construction in an insolvency context. "Loan" is not defined in the Act. Consequently, one is driven back to the common law. At common law a loan is:

"[A] contract whereby one person lends or agrees to lend a sum of money to another, in consideration of a promise express or implied to repay that sum on demand, or at a fixed determinable future time, or conditionally upon an event which is bound to happen with or without interest."[595]

It is likely that in most cases little will turn on the question of whether the transaction which is involved is a loan. Another expression referred to in the Consumer Credit Act is "financial accommodation" and this is likely to include:

"… not only the common forms of instalment credit transactions with which companies may acquire goods such as hire-purchase, instalment sale, and conditional sale, but any agreement under which the time for payment of the purchase price is extended after delivery."[596]

It is likely that these transactions would fall within the expression "credit transaction" in s.244. **11-098**

---

[594] 1986 Act s.244(1).
[595] A.G. Guest, *Chitty on Contracts*, 26th edn (London: Sweet & Maxwell, 1989), Vol.2, para.3574.
[596] Bailey, Groves, Smith, *Corporate Insolvency Law and Practice* (1992), p.373. Also, see I. Snaith, *The Law of Corporate Insolvency* (1990), p.669.

Assets Available for Division and Distribution

The final thing to say on this subject is, in dealing with the issue under the Consumer Credit Act, the Court of Appeal in *Paragon Finance Plc v Nash*[597] said that the nature of the test for what is an extortionate transaction is stringent, and this was adopted in relation to a consideration of s.244 in the case of *White v Davenham Trust Ltd (2010)*.[598]

### 3. *Extortionate*

**11-099**     This term is the critical part of the provision. While there is not an exhaustive definition of the term, the provision gives an indication of what it means. Section 244(3) states that it means (having regard to the risk accepted by the one providing credit) either that the transaction prescribed grossly exorbitant payments (whether unconditionally or in certain contingencies) in respect of the provision of credit, or the transaction grossly contravened ordinary principles of fair dealing.[599] "Extortionate" does not mean unwise.[600]

There appears to be some difference of opinion as to whether the definition implies that transactions must not merely be unfair but also oppressive, reflecting an imbalance in bargaining power of which the other party took improper advantage. Professor Goode[601] and *Wills v Wood*[602] both suggest that the transaction requires the elements of unfairness and oppression, while in *Davies v Direct Loans Ltd*,[603] Mr Edward Nugee QC (sitting as a deputy High Court judge) expressly disagreed. It is likely that courts will have reference to the terms of s.138 of the Consumer Credit Act that provide that in determining whether a bargain is extortionate, regard must be had to a number of specified matters.

Of note is the fact that the liquidator is given somewhat of a helping hand from the legislature in that s.244(3), as it closes, states that a transaction to which an application under s.244 relates is presumed, unless the contrary is proved, to be extortionate.

### 4. *Orders*

**11-100**     If a liquidator can establish that a transaction was an extortionate credit transaction then the court may make an order to free the company from the burdens associated with the transaction and the order may contain any one or more of the following as the court thinks fit, namely[604]:

(1)  provision setting aside the whole or part of any obligation created by the transaction;

(2)  provision otherwise varying the terms of the transaction or varying the terms on which any security for the purposes of the transaction is held;

(3)  provision requiring any person who is or was a party to the transaction to

---

[597] *Paragon Finance Plc v Nash* [2001] EWCA Civ 1466; [2002] 1 W.L.R. 685.

[598] *White v Davenham Trust Ltd (2010)* [2010] EWHC 2784 (Ch).

[599] See *Batooneh v Asombang* [2004] B.P.I.R. 1 a case involving an allegation that a loan was extortionate under the Consumer Credit Act 1974.

[600] *Broadwick Financial Services Ltd v Spencer* [2002] EWCA Civ 35 at [79].

[601] R.M. Goode, *Principles of Corporate Insolvency Law*, 3rd edn (London: Sweet & Maxwell, 2005), p.481.

[602] *Wills v Wood* (1984) C.C.L.R. 7; (1984) 128 S.J. 222.

[603] *Davies v Direct Loans Ltd* [1986] 1 W.L.R. 823 at 831.

[604] 1986 Act s.244(4).

> pay to the liquidator (or administrator) any sums paid to that person, by
> virtue of the transaction, by the company;
>
> (4)  provision requiring any person to surrender to the liquidator (or administra-
> tor) any property held by him as security for the purposes of the transac-
> tion; and/or
>
> (5)  provision directing accounts to be taken between the persons.

These provisions are somewhat similar to the powers given to courts under
s.139(2) of the Consumer Credit Act.

## H.   Avoidance of floating charges[605]

In examining the affairs of a company in liquidation the liquidator will care-  **11-101**
fully scrutinise charges existing over company property. While company property
which has been validly charged with payment of particular debts does not, of
course, form part of the general assets available to satisfy the claims of unsecured
creditors in winding up, floating charges may, in certain circumstances, be at-
tacked and avoided. Whether a specific asset comes within the scope of a charge
created by the company must necessarily depend upon the nature and terms of the
security in question, but in the widest form, which is attained in the case of a float-
ing charge, it embraces all the present and future assets of the company.[606] Quite
often this may mean that, after satisfying the charge, nothing will remain for divi-
sion amongst the unsecured creditors, but there are at least two grounds on which
the liquidator may have a charge declared invalid in winding up. One is that the
statutory provisions[607] relating to registration of charges were not complied with at
the time the charge was created; but although the effect of this is to render the
charge invalid as against the liquidator or any creditor in winding up, the rules
requiring registration are really concerned with events occurring before liquida-
tion and so fall outside the scope of this work. Consideration must, however, be
given to the possibility of avoiding a floating charge under s.245. Obviously, if a
charge can be successfully challenged the chargeholder cannot claim priority as a
secured creditor, and, hence, there will be a greater amount available for distribu-
tion amongst the general body of unsecured creditors.

One problem that a liquidator might encounter is determining whether or not a
charge was in fact fixed or floating, as the distinction is not always clear, witness

---

[605]  For further discussion, see R. Parry, *Transaction Avoidance in Insolvencies* (2018); Bennetts, "Late
Floating Charges" in Armour and Bennett (eds), *Vulnerable Transactions in Corporate Insolvency*
(2003), Ch.5.

[606]  But even a floating charge does not extend to assets recovered in consequence of avoiding a prefer-
ence under s.239 since the liquidator's right to have a preference set aside is statutory in origin and
exists for the benefit of the general body of creditors: *Re Yagerphone Ltd* [1935] Ch. 392; *Re MC
Bacon Ltd* [1991] Ch. 127; *Campbell v Michael Mount PPB* (1996) 14 A.C.L.C. 218; *Hamilton v
National Australia Bank* (1996) 14 A.C.L.C. 1202. Compare D. P. Sellar, "Floating Charges and
Fraudulent Preferences", 1983 S.L.T. 253.

[607]  Companies Act 1985 s.395. Particulars of certain charges, chief of which is the floating charge (see
s.396(1)), together with the document which creates the charge, must be lodged with the registrar
of companies for registration within 21 days of the creation of the charge. The court may extend the
time for registration. See s.404 of the Companies Act and McCormack, "Extension of Time for
Registration of Company Charges" [1986] J.B.L. 282.

the significant amount of litigation on the matter, especially when it comes to fixed charges on book debts.[608]

The immediate predecessor of s.245 was s.617 of the Companies Act 1985.[609] A provision in similar terms to the present s.245 was first introduced in 1908[610] to deal with the specific cases of a company which, on the verge of liquidation, purports to secure some of its past debts by creating a floating charge[611] over all its assets in favour of one or only a few of its creditors.[612] If this were permitted it would mean that all the assets would be withdrawn from the control of the liquidator in winding up and applied for the sole purpose of satisfying the claims of the chargeholders at the expense of other creditors of the company. In order to prevent this, s.245 avoids any floating charge on the undertaking or property of the company which is being wound up in insolvency[613] which was created within a certain period prior to the commencement of winding up, subject to certain exceptions contained in s.245(2).[614]

The section really seeks to prevent companies on their last legs from creating floating charges in favour of certain creditors in order to secure past debts.[615] For example, X, an unsecured creditor of Y Ltd agrees to continue to provide credit to Y Ltd if the company agrees to give security for the continued credit, and the advance by X is used to satisfy or reduce the existing unsecured debt. This involves both X's debt being converted from unsecured to secured, effectively giving X a preference, and it leaves the company in no better position financially. Hence, the test with a floating charge created in the time period referred to in the section is

"whether the transaction is to be regarded as one intended bona fide for the benefit of the company, or whether it is intended merely to provide certain moneys for the benefit of certain creditors of the company to the prejudice of other creditors of the company".[616]

**11-102**    Recently, the Court of Appeal articulated the objective of s.245 as a provision designed to prevent a secured creditor from gaining an unfair advantage as against unsecured creditors by obtaining:

"priority for any part of the company's indebtedness to it which in substance preceded the date of the charge, or which post-dated the charge but exceeded the further value actually provided by the creditor to the company before the charge crystallised."[617]

It will be evident from the above that the purpose and effect of the section is similar to that of the preference provision. However, since the period of retrospectivity is, as we shall see shortly, greater for the avoidance of floating

---

[608] See *Re Spectrum Plus Ltd*; sub nom. *National Westminster Bank Plc v Spectrum Plus Ltd* [2005] UKHL 41; [2005] 4 All E.R. 209.

[609] This provision followed s.322 of the Companies Act 1948.

[610] Companies (Consolidation) Act 1908 s.212: at this time the relevant period was only three months.

[611] It seems that because of the definition of "floating charge" in s.251 a charge which was a floating charge at the time of its creation falls within the section even if it crystallised into a fixed charge prior to the commencement of the winding up.

[612] *Re Orleans Motor Co* [1911] 2 Ch. 41 at 45 per Parker J; *Revere Trust Ltd v Wellington Handkerchief Works Ltd* [1931] N.I. 55 at 61 per Andrews LJ.

[613] The provision also applies to companies which are in administration.

[614] This area is explicitly made applicable to Scotland as well as England and Wales, by s.245(1).

[615] See, in relation to an earlier section, *Re Orleans Motor Co* [1911] 2 Ch. 41 at 45.

[616] *Re Destone Fabrics Ltd* [1941] Ch. 319 at 324.

[617] *Re Peak Hotels and Resorts Ltd (in liq)* [2019] EWCA Civ 345; [2019] B.C.C. 796 at [33] per Henderson LJ.

charges except where a preference is given to a connected person, a liquidator is likely to rely more on s.245 than s.239. This is especially true when one considers the problems in establishing that there was a desire on the part of the company to grant a preference to the creditor.

### 1.    Time zone

Before discussing the type of floating charge that can be avoided it is appropriate to explain the time zone in which a charge must be created if it is to be subject to avoidance.    **11-103**

Section 245(2) provides that a charge is only invalid if created within the relevant time ("the relevant time" is defined in s.245(3)). There are two time zones in which a charge may be created for it to be subject to invalidation. First, any floating charge created within the 12 months preceding the onset of insolvency may be invalid.[618] "Onset of insolvency", as discussed earlier in this chapter, means, where the company is in liquidation, the commencement of winding up.[619] "Commencement of winding up" in voluntary winding up is the time of the passing of the resolution for voluntary winding up.[620] In compulsory liquidation, winding up the commencement of winding up is the time of the presentation of the petition.[621] Also, if a voluntary liquidation was commenced prior to the presentation of a petition on which a winding-up order is subsequently made then the commencement of winding up is deemed to be the date of the resolution to wind up.[622] If a petition is presented and then there is a substitution order made leading to an amended petition, the date of the commencement of the winding up is deemed to be the date of the presentation of the petition by the first petitioner.[623]

Secondly, charges created in favour of a connected person may be invalidated where they were created within the period of two years prior to the onset of winding up.[624] This prevents a person who is a connected person, such as a director, from taking a charge and enjoying security when the company may be on the verge of insolvency (but still technically solvent).[625] But for this provision a director might be able, with the assistance of his or her fellow directors, to take security and ensure that the company stays afloat for 12 months, but it would be far more difficult to keep a company going for two years.

It must be noted that where a charge is created in the 12 months prior to the onset    **11-104** of winding up and in favour of a person who is not a connected person, the charge is not created within the relevant time unless, according to s.245(4), the company is either unable to pay its debts within the meaning of s.123 or became unable to pay its debts within s.123 as a result of the entering into of the transaction under which the charge is created.

---

[618] 1986 Act s.245(3)(b).
[619] 1986 Act s.245(5)(b).
[620] 1986 Act s.86.
[621] 1986 Act s.129(2).
[622] 1986 Act s.129(1).
[623] *Re Western Welsh International System Buildings Ltd* (1985) 1 B.C.C. 99,296.
[624] 1986 Act s.245(3)(a).
[625] The preference provision could not be relied on because there would be no insolvency at the time when the transaction was entered into.

ASSETS AVAILABLE FOR DIVISION AND DISTRIBUTION

### 2. *Floating charges that are void*

**11-105**    The type of charge regulated by s.245 is therefore a floating charge created in the relevant time zone prior to the commencement of winding up of a company that is being wound up in insolvency.[626] Such charges are void subject to the defence in s.245(4) (discussed shortly) and certain exceptions (under s.245(2)) dealt with later.

Overall s.245 is broader than its predecessors. First, it applies to companies in administration as well as in liquidation. Secondly, as we have already seen, where the chargeholder is a connected person the time zone is two years as opposed to 12 months. Under previous legislation the time zone was 12 months for all chargeholders. This change is very much in accord with the Cork Committee's concern that extended time periods should apply where persons connected with the company are involved. However, in one respect s.245 is more restrictive than previous provisions. Because of the exceptions contained in s.245(2), certain charges will now clearly escape avoidance as the exceptions are wider than what was previously prescribed. Under s.617 of the Companies Act 1985 a charge was not invalid only to the extent of any cash paid to the company at the time of or subsequent to the creation of, and in consideration for, the charge. Now under s.245 a charge is exempt from invalidity if it secures many different forms of new value, besides cash, provided to the company by the chargeholder. In other words, s.245 includes much broader types of transactions that can be regarded as good as extending cash to the company. If a chargeholder provided cash to a company at the time of the creation of the charge or soon thereafter, he or she would always be able to save the charge, but now the provision of other forms of consideration will suffice to save the charge.

Section 245 does not state whether a charge created as a floating charge within the requisite time zone is covered by the section if it is either converted into a fixed charge at the option of the creditor (assuming the creditor is permitted to do so under the terms of the agreement) before the commencement of liquidation or it crystallises before that time, e.g. because of the appointment of a receiver. However, the definition of "floating charge" in s.251 provides that "floating charge" includes a charge that was created as a floating charge, so s.245 would apply where a floating charge covered by the section is converted into a fixed charge. Rather than organising a conversion of the charge to a fixed status, a creditor would be better off realising the security and paying off the debt owed to him or her, because provided that this is done prior to the commencement of winding up the liquidator is not able to recover the amount.[627] This seems rather anomalous in that where the creditor converts the security to a fixed charge at least the company has continued use of the money lent (or other credit) whereas in the latter situation the realisation of the security might precipitate the company's demise.

### 3. *Exceptions*

**11-106**    Importantly floating charges that are covered by s.245 may not, however, be totally invalid. They are not invalid to the extent that they secure:

- the value of so much of the consideration for the creation of the charge as

---

[626] 1986 Act s.245(2).

[627] *Re Mace Builders (Glasgow) Ltd v Lunn* [1986] Ch. 459; [1985] B.C.L.C. 154.

consists of money paid, or goods or services supplied, to the company at the same time as, or after, the creation of the charge[628];

- the value of so much of that consideration as consists of discharge or reduction, at the same time as, or after, the creation of the charge, of any debt of the company[629]; and

- the amount of such interest (if any) as is payable on the amount falling within either of the above in pursuance of any agreement under which the money was so paid, the goods or services were so supplied or the debt was so discharged or reduced.[630]

These exceptions are applicable whether the chargeholder is a connected person or not.

The first, and the most important, exception obviously purports to make an exception where funds are lent in order to revitalise a failing company. Persons who lend in such circumstances should be entitled to their security. If this were not the case, then it would be difficult for ailing companies to obtain new financing when seeking a restructuring.

Whether there has, in fact, been money advanced by the chargeholder within s.245(2)(a) will be a question which will depend upon the circumstances of the particular case. In considering the circumstances, the courts will probably examine substance and not form.[631] This makes it difficult to generalise about the matter, but it is certainly true to say:

"[W]here an existing creditor of the company takes a debenture from the company to secure the amount of his debt on terms that he shall not immediately press for payment of his debt, or where he takes a debenture[632] for the amount of his debt on terms that the debt itself is to be extinguished, obviously no cash passes from the debenture-holder to the company"[633] (footnote not in the original).

Such cases present little difficulty because of the absence of any payment in money to the company, but there have been others in which what appeared to be an actual payment of money to the company was really no more than a transparent subterfuge designed to secure a creditor in respect of an existing debt. One example is where a loan to the company in cash is immediately repaid to the lender[634]; another is provided by *Re Orleans Motor Co*[635] where directors who had guaranteed the company's bank overdraft took a floating charge over its assets in return for a payment to the company of £1,500 which was to be applied in reducing its overdraft. Parker J had little hesitation in deciding that this was not in substance a payment of money to the company: it was, as Romer LJ has stated in a later case,[636] no more than a device by which the directors obtained security for themselves as

**11-107**

---

[628] 1986 Act s.245(2)(a).

[629] 1986 Act s.245(2)(b).

[630] 1986 Act s.245(2)(c).

[631] *Re Matthew Ellis Ltd* [1933] Ch. 458.

[632] That is, a debenture secured by a floating charge.

[633] *Re Matthew Ellis Ltd* [1933] Ch. 458 at 477 per Romer LJ. It is different, however, where an unpaid vendor accepts a debenture securing the balance of the purchase money plus interest in return for relinquishing rights and remedies under a contract for the sale of goods: *Re Mataura Motors Ltd* [1981] 1 N.Z.L.R. 289 CA. This charge would be protected by the exception to s.245.

[634] *Revere Trust Ltd v Wellington Handkerchief Works Ltd* [1931] N.I. 55.

[635] *Re Orleans Motor Co* [1911] 2 Ch. 41.

[636] *Re Matthew Ellis Ltd* [1933] Ch. 458 at 478.

contingent creditors of the company, the company itself simply acting as a "conduit pipe" through which they reduced their own potential indebtedness to the bank. Some of the remarks of Parker J in *Re Orleans Motor Co*[637] suggested, however, that a payment to the company could never be regarded as payment of money unless it were absolute and unconditional[638] in the sense that it was received free of all obligation to apply it in discharging particular debts. The existence of a rigid rule to this effect was categorically rejected by the Court of Appeal in *Re Matthew Ellis Ltd*,[639] but it does not follow that no account may be taken of the fact that a condition of this kind has been imposed by the payer; indeed, it seems to have been regarded as virtually decisive in the later case of *Re Destone Fabrics Ltd*,[640] where the payment in question was coupled with a direction that it be used to discharge debts owing to the payer and his accomplices. In the opinion of Simonds J:

> "[T]he ultimate test in such cases may well be whether the transaction is to be regarded as one intended bona fide for the benefit of the company, or whether it is intended merely to provide certain moneys for the benefit of certain creditors of the company to the prejudice of other creditors of the company."[641]

Only the former type of transaction is safe from attack. In the latter case, the charge is totally invalid.

**11-108**    Section 245(2)(a) covers not only cash but also goods and services supplied. The precursor of s.245, as mentioned earlier, only referred to "cash" and there were doubts concerning the meaning of "cash". Decisions dealing with the previous provision stated that cash did not necessarily have to be advanced for the exception in s.245(2)(a) to be available[642]; it was sufficient if there was "a transaction [involving] the equivalent of cash among businessmen".[643] Importantly, the transaction had to be the equivalent to a cash payment; the fact that the company received some benefit will not, necessarily, cause a court to regard the transaction as equivalent of a cash payment. The inclusion of goods and services[644] in s.245 makes it clear that cash in literal terms is not the only commodity that is covered by the exception.[645] Bank honouring cheques of a company drawn on an overdraft account in favour of the company's creditors were regarded as equivalent to cash under previous legislation,[646] and one would assume that under s.245 a court will see them as equivalent to cash as the intention of Parliament in drafting s.245(2)(a) must surely have been to make clear that anything which adds value to the company

---

[637] *Re Orleans Motor Co* [1911] 2 Ch. 41 at 45.

[638] See *Re Hayman, Christy and Lilly Ltd* [1917] 1 Ch. 283.

[639] *Re Matthew Ellis Ltd* [1933] Ch. 458. See also *M Hoffman Nominees Pty Ltd v Cosmas Fish Processors (International) Pty Ltd (in liq) (in receivership)* (1982) 1 A.C.L.C. 528.

[640] *Re Destone Fabrics Ltd* [1941] Ch. 319; affirmed by the Court of Appeal [1941] Ch. 325; see also *Re Port Supermarket Ltd* [1978] 1 N.Z.L.R. 330.

[641] *Re Destone Fabrics Ltd* [1941] Ch. 319 at 324. See also *Re Ambassadors (Bournemouth) Ltd* (1961) 105 Sol. Jo. 969.

[642] *Re Matthew Ellis Ltd* [1933] Ch. 458.

[643] *Re Matthew Ellis Ltd* [1933] Ch. 458 at 469.

[644] Interestingly, while the Cork Report recommended the inclusion of goods, it did not recommend the inclusion of services: para.1564.

[645] In Australia a provision in similar terms to s.617 of the Companies Act 1985 was interpreted to include a sale of goods on credit: *Re Peruss Pty Ltd* (1980) 5 A.C.L.R. 176; (1981) C.L.C. 40–700.

[646] *Re Thomas Mortimer Ltd* unreported 17 February 1925 per Romer J noted at [1965] 1 Ch. 186; *Re Peruss Pty Ltd* (1980) 5 A.C.L.R. 176 at 179.

can fall within the exception. As Professors Sealy and Milman have noted,[647] it is hard to see why other forms of consideration, such as the transfer of land or shares, were not also included.

The exception in s.245(2)(a) requires the money to be paid, or the goods or services supplied, to the company. In *Re Orleans Motor Co Ltd*,[648] as the moneys which were paid to secure charges were paid to the company's bank and were never paid to the company and never became part of the assets of the company, Parker J held that the charges were not valid.[649] Later, in *Re Fairway Magazines Ltd*[650] where money was paid into the company's overdrawn bank account, it was held that a charge was invalid in similar circumstances because the money never became available to the company to be used as it liked. It seems that given the wording of s.245(2)(a) the same result as handed down in these cases would follow today. This seems, certainly as far as the decision in the former case is concerned, to be unfair. It is submitted that money paid, or goods or services supplied, at the company's direction should be covered by the provision.

A charge is saved from invalidity if any money was paid, or goods or services supplied, at the same time as, or after, the creation of the charge. This is obviously designed to prevent a creditor from having the benefit of a charge in relation to previous advances to the company. The meaning of "at the same time as" has never been interpreted to require strict contemporaneity as far as the creation of the charge and the payment of the money.[651] If the advance follows the creation of the charge there is no problem. A problem may arise if the advance was made before the creation. It is always a question of fact and degree whether an advance is regarded as being made at the time of the charge's creation.[652] In the past a delay in execution of the charge, after the payment of the money by the intended chargeholder, has not been of concern if the delay could be explained.[653] Prolonged delay in executing the charge may call for explanation,[654] but, while the matter is said to be one of fact in each case,[655] it is difficult to resist the conclusion that

"as a general rule a payment made on account of the consideration for the charge and in anticipation of its execution, and in reliance upon a promise to execute it, although made some days before its execution, is made at the time of its creation within the meaning of the section".[656]

However, the more recent opinion in *Re Shoe Lace Ltd*[657] suggests that a more strict approach may be applied now. In that case there were four payments made in April, May, June and on 16 July to the company. These payments were

**11-109**

---

[647] L. Sealy and D. Milman, *Annotated Guide to the Insolvency Legislation*, 5th edn (1999), p.295.

[648] *Re Orleans Motor Co Ltd* [1911] 2 Ch. 41.

[649] *Re Orleans Motor Co Ltd* [1911] 2 Ch. 41 at 45.

[650] *Re Fairway Magazines Ltd* [1992] B.C.C. 924.

[651] For instance, see *Columbian Fireproofing Co Ltd* [1910] 2 Ch. 120 CA; *Re Nathan Hope & Son Ltd unreported 5 June 1924*; *Re F & E Stanton Ltd* [1929] 1 Ch. 180.

[652] *Re Shoe Lace Ltd* [1993] B.C.C. 609; [1994] 1 B.C.L.C. 111.

[653] *Re F A Stanton Ltd (No.2)* [1929] 1 Ch. 180; *M Hoffman Nominees Pty Ltd v Cosmas Fish Processors (International) Pty Ltd (in liq) (in receivership)* (1982) 1 A.C.L.C. 528 at 535.

[654] *Re F A Stanton Ltd (No.2)* [1929] 1 Ch. 180, where a delay of 54 days between the first payment of cash and creation of the charge was satisfactorily explained.

[655] *Re Columbian Fireproofing Co* [1910] 2 Ch. 120 at 123. In this case, there was a delay of 11 days between the advance made and the creation of the charge.

[656] *Re Olderfleet Shipping Co* [1922] I.R. 26 per Powell J.

[657] Sub nom. *Power v Sharp Investments Ltd* [1993] B.C.C. 609; [1994] 1 B.C.L.C. 111 CA.

subsequent to a resolution of the directors of the company, in March, to grant a debenture. However, it was not executed until 24 July. At first instance, Hoffman J (as he then was)[658] declined to follow the earlier cases on the basis that s.245 was worded differently from s.322 of the Companies Act 1948 and held the charge to be invalid. In the Court of Appeal, which affirmed the decision of Hoffmann J, Sir Christopher Slade said that

> "no moneys paid before the execution of the debenture will qualify for exemption … unless the interval between payment and execution is so short that it can be regarded as minimal and payment and execution can be regarded as contemporaneous".[659]

Another important matter that is to be borne in mind is that s.245(2)(a) provides that an exception is given in relation to "the value of so much of the consideration for the creation of the charge". So, if the chargeholder is to obtain the comfort of this exception, in relation to any advance subsequent to creation of the charge, it must be established that it was in consideration of the charge. In order to ensure that payments are made in reliance upon the charge, it is not necessary for the chargeholder to satisfy the strict requirements of the doctrine of consideration as it applies in the law of contract[660]; the words, "in consideration of" have been said to mean "by reason of" or "because of the existence of a charge"[661] and it follows that a prior charge can be sustained on the basis of subsequent payments to the company even though, in the strict sense, these payments have been made on account of a consideration which is wholly past. The effect of this ruling can best be illustrated by reference to the hitherto unreported case of *Re Thomas Mortimer Ltd*,[662] which was approved by the Court of Appeal in *Re Yeovil Glove Co*.[663] The facts were that the company, which at the relevant time was indebted to its bank on current account to an amount of £58,000, gave the bank a floating charge to secure its indebtedness to an amount of £50,000. Between this date and the commencement of winding up, the company paid some £41,000 into the account and the bank paid out £51,000 in cash to the company or on cheques drawn by the company in favour of third parties. By applying the rule in *Clayton's Case*,[664] Romer LJ arrived at the conclusion that the sum of £41,000 paid in by the company must be deemed to have been appropriated by the bank in discharge of the debt of £58,000 existing at the time the charge was given, and since this left the bank's subsequent advances unpaid, the charge was valid to its full extent. This, as was recognised by Harman LJ in *Re Yeovil Glove Co*,[665] would seem largely to nullify the effect of the section, but, had the charge not been given, the bank would certainly never have made its subsequent advances, and this, it has been said,[666] is the relevant question in cases of this kind. To overcome this problem the Cork Committee[667] recommended that all payments into the overdrawn account be treated as discharging debit items incurred after the creation of the floating charge before they discharge the

---

[658] *Re Shoe Lace Ltd* [1993] B.C.C. 367.
[659] Sub nom. *Power v Sharp Investments Ltd* [1993] B.C.C. 609 at 620.
[660] *Re Yeovil Glove Co Ltd* [1965] Ch. 148 at 178, 185.
[661] *Re Yeovil Glove Co Ltd* [1965] Ch. 148 at 178 and 185.
[662] *Re Thomas Mortimer Ltd* (1925): see [1965] Ch. 186n.
[663] *Re Yeovil Glove Co Ltd* [1965] Ch. 148; affirming [1963] Ch. 528.
[664] *Devaynes v Noble; Clayton's Case* (1816) 1 Mer. 572; 35 E.R. 781.
[665] *Re Yeovil Glove Co Ltd* [1965] Ch. 148 at 173.
[666] *Re Yeovil Glove Co* [1963] Ch. 528 at 536 per Plowman J.
[667] Cork Report, para.1562.

debts incurred prior to the creation of the charge. This recommendation was not implemented by Parliament.[668]

Section 245(6) is linked to s.245(2)(a), in that it states that the value of any goods or services supplied to the company by way of consideration for the charge is the amount in money which at the time of supply could reasonably have been expected to be obtained for supplying the goods or services in the ordinary course of business. So, a charge is invalid to the extent that it secures an amount in excess of what is a reasonable value for the goods or services. The rationale for this is to ensure that security is not obtained in relation to prior debts owing to the chargeholder by inflating the value of the consideration for the charge.

It has been said that the test of valuation of services supplied was, according to Henderson LJ (with whom the other judges agreed) in *Re Peak Hotels and Resorts Ltd (in liq)*,[669] objective. In this case the Court of Appeal said that the commercial fairness underlying any agreement between the company and the service-provider was immaterial in dealing with s.245(6) and the valuation of the services which the provision required.[670] In considering s.245(6) there has to be regard for services supplied in the ordinary course of the supplier's business, and for that purpose. The court said that in assessing the value of services, it is both legitimate and helpful to examine the supplier's standard terms for guidance, although in doing so it would be in no sense conclusive, because the test is an objective one.[671] Henderson LJ (with whom the other judges concurred) said that part of the function of the phrase "in the ordinary course of business" was: "to insulate the valuation of the services actually provided from any increase in the supplier's normal charging rates or any special terms of business attributable to the risk of non-payment by the recipient of the services."[672]

According to s.245(2)(a) any funds have to be paid to the company that creates the charge. So, where a company grants a charge in order to secure the obligations of an associated company in a group, such as its parent, the charge would be valid to the extent that the cash paid by the party advancing funds to the associated company would be paid on to the company granting the charge. If funds were paid directly to the company that created the company, but in order to pay on the funds to an associated company or other person, the funds would not constitute cash paid to the company for the purposes of s.245 (and the charge is invalid) as the court would, as mentioned earlier, consider the substance rather than the form of the transaction.[673]

Section 245(2)(b) provides a second exception in that the charge is saved to the extent of the value of so much of that consideration as consists of discharge or reduction, at the same time as, or after, the creation of the charge, of any debt of the company. A payment by the chargeholder of money into an overdrawn bank account of the company, as occurred in *Re Fairway Magazines Ltd*[674] would be covered by this exception.

---

[668] Professor Goode is of the view that this was the right result. The learned commentator is scathing of the recommendation of the Cork Committee: *Principles of Corporate Insolvency Law* (2011), p.606.

[669] *Re Peak Hotels and Resorts Ltd (in liq)* [2019] B.C.C. 796 at [38].

[670] *Re Peak Hotels and Resorts Ltd (in liq)* [2019] B.C.C. 796 at [36], [40],

[671] *Re Peak Hotels and Resorts Ltd (in liq)* [2019] B.C.C. 796 at [41].

[672] *Re Peak Hotels and Resorts Ltd (in liq)* [2019] B.C.C. 796 at [45].

[673] See *Re Destone Fabrics Ltd* [1941] Ch. 319.

[674] *Re Fairway Magazines Ltd* [1992] B.C.C. 924.

Assets Available for Division and Distribution

### 4. The effect of avoidance

**11-110**    If a charge is avoided then the property over which the charge was created is freed and available for distribution amongst the unsecured creditors. The only effect for the creditor is that a security interest is lost. The creditor must then prove as an unsecured creditor in the winding up.

### 5. Unenforceable liens

**11-111**    Section 246(2) provides that a lien or other right to retain possession of books, papers or other records of the company is unenforceable to the extent that it would deny possession to the liquidator.[675] The section does not apply to a lien on documents which give "a title to property and are held as such".[676] This, therefore, allows a bank or other lender that has a fixed charge over assets of the company to retain the indicia of title, such as the title deeds to real property. In *Re SEIL Trade Finance Ltd*,[677] solicitors applied to discharge an order awarded in favour of liquidators requiring the solicitors to deliver to the liquidators all property, books, papers or other records to which the company was entitled, in relation to various security documents (share certificates, charges on land and debentures) which the solicitors claimed gave a title to property of the company. The solicitors had obtained the security documents in the course of acting for the company in the recovery of debts owed to the company. The solicitors sought a lien on the security documents pursuant to s.246(3). The main argument centred around whether the security documents were held by the solicitors "as such" within the meaning of s.246(3). The liquidators argued that the provision only applied to documents that were held so as to confer on the holder of the documents a proprietary interest in the property to which the documents related. The counter-argument of the solicitors was that the words "as such" meant that the documents were held as documents that give the solicitors title to company property by way of lien. The court said that the wording of s.246 as a whole was inconsistent with any requirement that for the document to be held "as such" it had to be held so as to confer a proprietary title on the holder of the document. Rather, the words, "as such" referred to the circumstances, manner or capacity in which the documents gave rise to the lien, in order to distinguish that situation from those where the documents were held by someone who would sometimes be entitled to assert a lien, but in the situation when a lien did not arise. In this case the court said that the circumstances and capacity in which the solicitors held the documents, which gave title to property, were such that a lien arose.

Section 246(2) prevents a person, often a professional such as a solicitor or accountant from holding on to documents in order to, in a sense, secure payment of outstanding fees. Liens over goods are not affected by the provision.

---

[675] The provision also applies to administrators and provisional liquidators: s.246(1).
[676] 1986 Act s.246(3). It would not encompass a motor vehicle registration certificate: *Joblin v Watkins & Rosaveare (Motors) Ltd* [1949] 1 All E.R. 47.
[677] *Re SEIL Trade Finance Ltd*; sub nom. *Brereton v Nicholls* [1992] B.C.C. 538; [1993] B.C.L.C. 593.

## III.    TRANSACTIONS DEFRAUDING CREDITORS[678]

### A.    Background

Any consideration of the assets which liquidators might have available to them **11-112** would be incomplete without a discussion of pre-liquidation transactions which can be classified as defrauding creditors. This is notwithstanding that the provision that deals with such transactions is not contained in the same part of the Act as other provisions that permit a liquidator to attack pre-liquidation transactions. Section 423–425, the provisions which provide for the avoidance of transactions designed to defraud creditors, are found in their own part of the Act, namely Pt XVI.[679] This could be because it is difficult to know where to locate the provisions. The provisions are, in effect, successors to s.172 of the Law of Property Act 1925, and not to any provisions in the Bankruptcy Act 1914. But the original forebear of ss.423–425 is the Statute of Elizabeth of 1570, the first statute which proscribed fraudulent conveyances by debtors to prevent debtors putting their assets beyond the reach of their creditors.[680] This statute remained in effect until the enactment of the Law of Property Act. The common law had also previously recognised a similar action, analogous to the *actio pauliana* available to creditors under Roman law and employed in many European civil jurisdictions.[681] Sections 423–425, as s.172 of the Law of Property Act before them, may be employed against any debtor and not just a debtor who is subject to some formal insolvency regime. Also these provisions, like s.172,[682] apply to individuals and companies and all of this probably explains why the provisions are placed in their own discrete Part of the Act. Section 424 sets out who may initiate proceedings under s.423 for the avoidance of a transaction. Importantly for our purposes a liquidator of a company being wound up qualifies. It is also worth noting that the creditors of an insolvent company[683] and persons who are litigants in proceedings against the company[684] may bring proceedings on the basis that they are victims of a transaction entered into by the insolvent company. Victims of a transaction[685] may, even where the company is in liquidation, take action under s.423, provided that they have obtained the leave of the court.[686] One of the most striking aspects of the case law that has developed in relation to s.423 is that many actions have been brought by creditors.[687]

Sections 423–425 have revamped s.172 and in doing so have, in accordance with

---

[678] For further discussion, see Miller, "Transactions Prejudicing Creditors" [1998] Conv. 362; Parry et al, *Transaction Avoidance in Insolvencies*, 3rd edn (Oxford: OUP, 2018); Armour, "Transactions Defrauding Creditors" in Armour and Bennett (eds), *Vulnerable Transactions in Corporate Insolvency* (2003); Stubbs, "Section 423 of the Insolvency Act in Practice" (2008) 21 Insolv. Int. 17.

[679] It is to be noted that the Insolvency Rules do not apply to s.423 actions: *TSB Bank Plc v Katz* [1997] B.P.I.R. 147. This is on the basis that actions under s.423 are not regarded as insolvency proceedings: *J Syke Bank Ltd v Spieldnaes* [1999] 2 B.C.L.C. 101 at 124A; *Re Baillies Ltd* [2012] EWHC 285 (Ch); [2012] B.P.I.R. 665; [2012] B.C.C. 554.

[680] The Statute rendered transactions "clearly and utterly void, frustrated and of no effect".

[681] See *Cadogan v Kennett* (1776) 2 Cowp. 432 at 434.

[682] *Re Shilena Hosiery Co Ltd* [1980] Ch. 219.

[683] For example, see *Re Ayala Holdings Ltd* [1993] B.C.L.C. 256.

[684] *Pinewood Joinery v Starelem Properties Ltd* [1994] 2 B.C.L.C. 412 at 418.

[685] They must be victims at the time of the application. They do not have to be victims at the time of the transaction.

[686] 1986 Act s.424(1)(a).

[687] For example, see *Arbuthnot Leasing International Ltd v Havelet Leasing Ltd* [1990] B.C.C. 636; *Re Ayala Holdings Ltd* [1993] B.C.L.C. 256; *Aiglon v Gau Shan* [1993] 1 Lloyd's Rep. 164; *National*

[783]

the recommendations of the Cork Committee,[688] widened the ambit of the earlier provision. As mentioned earlier in this chapter, "transaction" is defined in broad terms in s.436 as something that "includes a gift, agreement or arrangement" and much of the discussion of "transaction" earlier in relation to s.238 is relevant.

The main focus of the provisions is on preventing debtors from disposing of assets so as to frustrate their creditors. The overriding objective of the section is to recover assets for the victims so as to protect their interests.[689] As indicated above, the provisions apply to individual debtors and even to debtors not under any form of insolvency administration; however, the following discussion considers how the provisions may benefit a liquidator of a company that is in liquidation.

## B.    The provisions

**11-113**    Section 423(1) states that it applies to transactions entered into at an undervalue. The subsection then proceeds to define what such a transaction is. A debtor enters into a transaction at an undervalue if:

- he or she makes a gift or the transaction does not provide the debtor with any consideration;
- the transaction is entered into in consideration of marriage; and/or
- the transaction is entered into for a consideration the value of which, in money or money's worth, is significantly less than the value, in money or money's worth, of the consideration provided by the debtor.

This definition is essentially the same as the definition of undervalue in s.238(4), and as with that latter section the last of the above situations will be the most difficult to make out. This situation involves, as we saw when considering s.238, comparing in terms of money or money's worth the consideration given by the debtor and that received by him or her.[690] Thus, it has been said[691] in relation to s.423 that the court will have to compare the value of property as against what consideration was given for it, and then consider "in percentage terms, how much less the consideration is than the value".

Liquidators may take proceedings against a person on the basis of ss.238 and 423 in the alternative.[692] The experience is that there is a considerable overlap between

---

*Bank of Kuwait Ltd v Menzies* [1994] B.C.C. 119; *Pinewood Joinery v Starelm Properties Ltd* [1994] 2 B.C.L.C. 412; *Agricultural Mortgage Corp Pty Ltd v Woodward* [1994] B.C.C. 688; *Barclays Bank Pty Ltd v Eustice* [1995] 1 W.L.R. 1238; [1995] B.C.C. 978 (the report deals with an appeal relating to discovery); *Royscot Spa Leasing Ltd v Lovett* [1995] B.C.C. 502; *Midland Bank Plc v Wyatt* [1995] 1 F.L.R. 697; *Dora v Simper* [1999] B.C.C. 836; *Jyske Bank (Gibraltar) Ltd v Spjeldnaes (No.2)* [1999] 2 B.C.L.C. 101; [1999] B.P.I.R. 525; *National Westminster Bank Plc v Jones* [2000] B.P.I.R. 1092; *Times*, 22 June 2000 per Neuberger J, all of which involved proceedings initiated by creditors of the relevant debtors. In *Menzies v National Bank of Kuwait*, a creditor took action because the liquidator did not have sufficient funds. The creditor sought to recover, for the benefit of the company, property which would, ultimately, benefit himself. In *Re Ayala Holdings Ltd*, Chadwick J commented on the fact that no proceedings had been brought by the liquidator.

[688] Cork Report, para.1238.

[689] *BTI 2014 LLC v Sequana SA* [2017] EWHC 211 (Ch) at [25].

[690] *Agricultural Mortgage Corp Pty Ltd v Woodward* [1994] B.C.C. 688 at 693.

[691] *National Westminster Bank Plc v Jones* [2000] B.P.I.R. 1092 at 1115.

[692] Although note that it has been contended by some commentators that as s.423 actions are not covered by the Insolvency Rules, it is not appropriate to commence a claim under s.423 in the same application as a claim under s.238: Collings and Morgan, "Litigation strategies aimed at swelling avail-

TRANSACTIONS DEFRAUDING CREDITORS

ss.423 and 238.[693] However, it would seem, if the reported cases are anything to go by, that in fact actions have been more regularly initiated under s.423 rather than s.238, although in recent years the difference in case numbers has not been as great. The fact that there has been a greater number of s.423 cases may appear to be odd, especially when, as we will see shortly, there is a subjective element which has to be proved on the part of the debtor in a s.423 action, but it may be explained partly by the fact that most applications have been made by creditors rather than insolvency office-holders, and, of course, only liquidators and administrators may avail themselves of s.238, and partly by the fact that an applicant under s.423, un- like an applicant under s.238, is not required to prove that the debtor was, at the time of the transaction or as a result of the transaction, insolvent.

The advantage of ss.423–425 is that, unlike ss.238, 239 and 245, there are no time limits specified as to when the transaction which is sought to be challenged, must have occurred. Another advantage, as mentioned above, is that a claimant does not have to establish that the company was insolvent or became insolvent as a result of entering into the impugned transaction to succeed.[694] However, notwithstand- ing these apparent advantages, the provisions have not been overly used. The reason may be that the critical element which must be proved by the liquidator, according to s.423(3), before the court will make an order, is that the person entering into the impugned transaction (this will be the debtor ordinarily) had the purpose of either putting assets beyond the reach of a person who is making, or who may make at some time, a claim against the debtor or otherwise prejudicing the interests of such a person (a creditor or potential creditor) in relation to the claim.[695] It is not suf- ficient merely to prove that the transaction involved a gift or a clear undervalue, and allege that that fact alone demonstrates the necessary purpose.[696] The requirement of purpose is consistent with the history of avoidance provisions in England, namely that there is some subjective factor involved. The element of purpose warrants some careful consideration.

The heading to s.423 is "Transactions defrauding creditors" and is incorrect as it suggests, wrongly, that there must be some dishonesty perpetrated by the defend- ant for a claim to succeed, but that is not the case.[697] Simply the conditions laid down by the section have to be established and this does not include dishonesty necessarily.

---

able assets" in Butterworths' *Practical Insolvency* (1999), Vol.VII, p.4. However, if this is the case it seems to be most unfair and against the whole thrust of procedural changes in recent times, which appear to be designed at streamlining procedures and making them less unwieldy.

[693] This is illustrated in *Agricultural Mortgage Corp Pty Ltd v Woodward* [1994] B.C.C. 688, where the judge relied upon the comments of Millett J in *Re MC Bacon Ltd* [1990] B.C.L.C. 324 at 340, in relation to the meaning of undervalue in s.238. The Court of Appeal in *National Bank of Kuwait v Menzies* [1994] B.C.C. 119 at 128–129 said that the analysis of s.238(4)(c) by Millett J applied mutatis mutandis to s.423(1)(c).

[694] *BTI 2014 LLC v Sequana SA* [2016] EWHC 1686 (Ch) at [494].

[695] Evans-Lombe J specifically held in *Jyske Bank (Gibraltar) Ltd v Spjeldnaes (No.2)* [1999] 2 B.C.L.C. 101; [1999] B.P.I.R. 525, that all that an applicant has to do is to prove that the purpose of the debtor was to put the assets beyond the reach of the applicant. It was not necessary to prove that the purpose was specifically designed to defeat the applicant's claim against the debtor.

[696] *Royscot Spa Leasing Ltd v Lovett* [1995] B.C.C. 502 at 507 per Sir Christopher Slade.

[697] *Watchorn v Jupiter Industries Ltd* [2014] EWHC 3003 (Ch) at [3].

ASSETS AVAILABLE FOR DIVISION AND DISTRIBUTION

### 1.  *Purpose*[698]

11-114    Proving that something was done with a particular purpose in mind is never easy. Even understanding the meaning of "purpose" is not easy. In *Brady v Brady*,[699] Lord Oliver (with whom the other Lords agreed) said, in considering the word in the context of s.151 of the Companies Act 1985 (prohibiting the granting of financial assistance by a company in the purchase of shares), that it can have several shades of meaning.[700] His Lordship went on to say that "purpose" is a word of wide content, but the mischief against which the section (in which it is contained) is aimed must be borne in mind.[701] According to his Lordship, "purpose" must be distinguished from "reason".[702] "Purpose" has been defined as "the action or fact of intending or meaning to do something; intention, determination" and "the object for which anything is done or made, or for which it exists, the result or effect intended or sought; aim".[703]

The problem with the use of "purpose" in s.423 was exacerbated by the fact that the courts required anyone taking proceedings under that section to demonstrate that the debtor's purpose either to put assets beyond the reach of claimants, or to prejudice claimants, was the debtor's dominant purpose,[704] although it was unnecessary to establish that this was the predominant purpose.[705] In *Chohan v Saggar*,[706] it was indicated that it did not matter if the debtor had purposes besides what is seen as the "dominant purpose", if that dominant purpose was such as to fall within s.423(3); the statutory purpose did not have to be the sole purpose. It is surprising that the approach gained authoritative support notwithstanding some concern being expressed about it. As Professors Sealy and Milman noted adroitly, the approach did not line up well with the courts' approach to s.238.[707] In *Pinewood Joinery v Starelm Properties Ltd*,[708] HH Judge Moseley QC (sitting as a High Court judge) doubted, albeit in an ex tempore judgment, whether the applicant had to prove a dominant purpose on the part of the debtor. He felt that it was strange that if a debtor had two purposes which are of equal importance in his or her mind that the debtor could not have the requisite purpose as he or she did not have a dominant purpose at all.[709] In *Royscot Spa Leasing Ltd v Lovett*,[710] the Court of Appeal gave its imprimatur to the approach adopted in *Chohan v Saggar* and accepted that the purpose of the debtor must be investigated, but the Court stated that a judge had to

---

[698] For more detailed discussion, see Keay, "Transactions Defrauding Creditors: The Problem of Purpose Under Section 423 of the Insolvency Act" [2003] *The Conveyancer and Property Lawyer* 272.

[699] *Brady v Brady* [1989] A.C. 755.

[700] *Brady v Brady* [1989] A.C. 755 at 778.

[701] *Brady v Brady* [1989] A.C. 755 at 779.

[702] *Brady v Brady* [1989] A.C. 755 at 779.

[703] The *Oxford English Dictionary*, prepared by J.A. Simpson and E.S.C. Weiner, 2nd edn (Oxford: Clarendon Press, 1989), Vol.12, p.878.

[704] *Chohan v Saggar* [1992] B.C.C. 306; affirmed on appeal ([1994] 1 B.C.L.C. 706; [1994] B.C.C. 134).

[705] *Royscot Spa Leasing Ltd v Lovett* [1995] B.C.C. 502.

[706] *Chohan v Saggar* [1992] B.C.C. 306.

[707] Sealy and Milman, *Annotated Guide to the Insolvency Legislation* (1999), p.466.

[708] *Pinewood Joinery v Starelm Properties Ltd* [1994] 2 B.C.L.C. 412.

[709] *Pinewood Joinery v Starelm Properties Ltd* [1994] 2 B.C.L.C. 412 at 419.

[710] *Royscot Spa Leasing Ltd v Lovett* [1995] B.C.C. 502.

be satisfied that it was the debtor's substantial purpose to injure claimants.[711] Sir
Christopher Slade said that this test was less strict than the dominant purpose test.[712]
How much this differed from the dominant purpose is hard to say. But, in *Barclays
Bank Pty Ltd v Eustice*,[713] a differently constituted Court of Appeal accepted that
the dominant purpose approach was fair and accurate.[714] In any event both the
dominant and substantial purpose tests, it is submitted, placed an unreasonable
burden on a liquidator.

The Court of Appeal addressed the issue in detail in *IRC v Hashmi*.[715] The ap-
pellant was the respondent to a s.423 application. As the case is a critical one in the
area, and because it represents facts that are often found with s.423 cases, the facts
warrant some consideration.[716] The appellant's father, G, had conducted a restaurant
business at certain premises for some years. In early 1989, G had the chance to
purchase the freehold in the premises for £18,000. On the same day as the purchase
was completed G executed a declaration of trust in which he transferred to his son,
the appellant, G's beneficial interest in the premises on the basis of his natural love
and affection for his son. In 1993 it came to the notice of the Inland Revenue Com-
missioners that G, either alone or with his eldest son, K, had purchased properties
in the UK and Spain with business profits that he had not declared for the purposes
of income tax. After an investigation the IRC and G came to an agreement that the
latter was to pay the former unpaid tax liabilities, interest and penalties. The amount
of the undeclared profits was £885,000 for the period between 1983 and 1994.
When G died in 1997, the IRC were still owed money. The declaration of trust came
to the notice of the IRC after G's death, and the IRC applied to the court to set it
aside pursuant to s.423 so that the IRC could recoup the benefit of the premises. The
only issue in the case was whether the appellant had, in executing the declaration
of trust, the necessary purpose mentioned in s.423(3). At first instance,[717] Hart J
found that G was a loving parent and wanted to secure the future of his children.
So, one of the purposes of the transaction was to benefit his son, the appellant. But
his Lordship found that G had a second purpose, namely to put assets beyond the
reach of his creditors.[718] Hart J could not see why s.423 was unable to apply where
there were two equal purposes, but, he said, if it was necessary for there to be a
dominant purpose before a s.423 application succeeded, there was material that
permitted him to find that there was a dominant purpose in this case.[719] It was this
finding on which the appeal was based. The submission of counsel for the appel-
lant was, inter alia, that the court was not entitled to draw the inference that the
statutory purpose was G's dominant purpose given the evidence adduced.[720] The es-
sential issue on the appeal was, according to Arden LJ (as she then was), who gave

---

[711] This approach was invoked by Jonathan Parker J (as he then was) in *Re Brabon*; sub nom. *Treharne v Brabon* [2001] 1 B.C.L.C. 11; [2000] B.P.I.R. 537.
[712] *Royscot Spa Leasing Ltd v Lovett* [1995] B.C.C. 502 at 507.
[713] *Barclays Bank Pty Ltd v Eustice* [1995] B.C.C. 978.
[714] *Barclays Bank Pty Ltd v Eustice* [1995] B.C.C. 978 at 990.
[715] *IRC v Hashmi* [2002] EWCA Civ 981; [2002] B.P.I.R. 974; [2002] 2 B.C.L.C. 489.
[716] The facts are taken, for the most part, from Keay, "Transactions Defrauding Creditors: The Problem of Purpose Under Section 423 of the Insolvency Act" [2003] *The Conveyancer and Property Lawyer* 272.
[717] *IRC v Hashmi* [2002] B.P.I.R. 271.
[718] *IRC v Hashmi* [2002] B.P.I.R. 271 at 276.
[719] *IRC v Hashmi* [2002] B.P.I.R. 271 at 279.
[720] *IRC v Hashmi* [2002] 2 B.C.L.C. 489 at 502.

the leading judgment, whether the purpose that fell within s.423(3) must be the dominant purpose of the debtor.[721]

**11-115**    The Court held that the dominant purpose test should be rejected, and the appeal was dismissed. Instead of proving a dominant purpose, Arden LJ said that what an applicant must establish is that the debtor had the purpose required in s.423, i.e. he or she intended positively that the assets would be put out of the reach of creditors.[722] Her Ladyship expressed agreement with the view of Hart J, at first instance, that often there will be the situation where the debtor will have the motive to defeat the creditors and the motive to secure the family for the future, co-existing in such a way that even the debtor may well not be able to say which was uppermost in his mind.[723] Arden LJ, after considering the authorities, opined that for something to constitute a purpose, under s.423, it must be a real substantial purpose (and not a dominant purpose) and not something that was a consequence of what the debtor did.[724] So, if the evidence indicated that a debtor entered into a transaction for a purpose other than to prejudice his or her creditors, but the consequence of the entering into the transaction was to prejudice creditors, the applicant would not succeed.

In *Chohan v Saggar*,[725] E. Evans-Lombe QC (sitting as a deputy High Court judge) (as he then was) said that purpose was to be equated with "intention",[726] but result was not to be equated with purpose. Therefore, just because the effect of a transaction was to put assets beyond the reach of creditors, that in itself would not impugn it unless the debtor had the requisite purpose.[727] This approach was clearly approved of by the Court of Appeal in *Hashmi*.

It is not clear how much the approach taken by the Court of Appeal in *Hashmi* differs from the dominant purpose approach. Where the *Hashmi* approach may assist an applicant is in the frequent case where a person had two equally important purposes in effecting the transaction impugned, as a court might well say, certainly on the view of Arden LJ, that he or she had two substantial purposes, and if one falls within s.423 then the application should succeed. Finally, it is important that any applicant takes note of Simon Brown LJ's caveat that if a judge

"were to find in any given case that the transaction is one which the debtor might well have entered into in any event, he should not then too readily infer that the debtor also had the substantial purpose of escaping his liabilities".[728]

**11-116**    Notwithstanding the decision in *Hashmi*, problems might still exist. First, what actually constitutes a substantial purpose might be difficult to ascertain. It seems to be difficult to specify when a purpose actually becomes substantial. This is exemplified by the comment of Simon Brown LJ in *Hashmi*, where, after his Lordship indicated his agreement with the substantial test, he said that there was dif-

---

[721]  *IRC v Hashmi* [2002] 2 B.C.L.C. 489 at 504.
[722]  *IRC v Hashmi* [2002] 2 B.C.L.C. 489 at 504.
[723]  *IRC v Hashmi* [2002] 2 B.C.L.C. 489 at 504.
[724]  *IRC v Hashmi* [2002] 2 B.C.L.C. 489 at 505. This approach has been subsequently applied. For example, see *Gil v Baygreen Properties Ltd* [2004] EWHC 1732 (Ch); [2005] B.P.I.R. 95; *Random House Ltd v Allason* [2008] EWHC 2854 (Ch).
[725]  *Chohan v Saggar* [1992] B.C.C. 306.
[726]  *Chohan v Saggar* [1992] B.C.C. 306 at 321.
[727]  *Chohan v Saggar* [1992] B.C.C. 306 at 321.
[728]  *IRC v Hashmi* [2002] 2 B.C.L.C. 409 at 509.

ficulty in ascertaining what is the correct approach to be taken in applying the test.[729] The judge felt that the substantial purpose test could not be refined any better than, in each case, asking the question: "can the court be satisfied that a substantial purpose of the debtor's transaction was … to escape his liabilities?"[730] Secondly, there is no explanation in any case that has concluded that the purpose only had to be substantial rather than dominant, why the purpose has to be substantial, rather than declining to require any specification of the purpose. It is submitted that there seems to be no need to qualify "purpose" in the section.[731]

"Why is it necessary for the applicant to have to prove the purpose of the debtor was the dominant or a substantial purpose? It is submitted that there is not, save for the case law, any indication that there is a need for any gloss to be placed on the statutory purpose. There simply appears to be no mandate for reading the statutory purpose in s.423(3) as requiring proof of dominant or substantial purpose. Either interpretation needlessly complicates the provision. Why is it necessary to add to the statute? If Parliament wanted s.423 claims only to succeed where there was a dominant or substantial purpose then it could have made that patent."[732]

Subsequent to *Hashmi*, the Court of Appeal in *JSC BTA Bank v Ablyazov*[733] agreed with this submission and cast doubt on the formulation in *Hashmi* concerning the need for there to be a substantial purpose. Leggatt LJ (with whom Coulson and Gloster LJJ agreed) said that the description of the requisite purpose as a "substantial" purpose was not necessary to the decision in *Hashmi*, and he felt that it risked causing confusion. His Lordship went on to say that:

"The word 'substantial' is not used in section 423 and I can see no necessity or warrant for reading this (or any other) adjective into the wording of the section … It is sufficient simply to ask whether the transaction was entered into by the debtor for the prohibited purpose. If it was, then the transaction falls within section 423(3), even if it was also entered into for one or more other purposes. The test is no more complicated than that."[734]

The upshot of the decisions in *Hashmi* and *JSC BTA Bank v Ablyazov* is that it is not necessary that the intention to be ascertained or inferred for the purposes of s.423(3) is the only purpose of the transaction. Following these decisions, it is clear that an order can be made under s.423 where there are purposes for entering into the transaction of equal potency, each of which are substantial purposes, so long as one such purpose is the statutory purpose.

To succeed in an action, it will not be sufficient for the applicant to establish that the transaction had the consequence of putting assets of the debtor beyond the reach of creditors. That is so, even if the consequence was foreseeable or was actually foreseen by the debtor at the time of entering into the transaction. It does not prove purpose within s.423. If there is evidence that the debtor believed that the transaction would result in putting assets beyond the reach of creditors that may support an inference that the transaction was entered into for the purpose of doing so, but

---

[729] *IRC v Hashmi* [2002] 2 B.C.L.C. 489 at 508.
[730] *IRC v Hashmi* [2002] 2 B.C.L.C. 489 at 509.
[731] "Transactions Defrauding Creditors: The Problem of Purpose Under Section 423 of the Insolvency Act" [2003] *The Conveyancer and Property Lawyer* 272.
[732] [2003] *The Conveyancer and Property Lawyer* 272, 283.
[733] *JSC BTA Bank v Ablyazov* [2018] EWCA Civ 1176; [2019] B.C.C. 96.
[734] *JSC BTA Bank v Ablyazov* [2019] B.C.C. 96 at [14].

it is not possible to say that believing the transaction would put assets beyond the reach of creditors means that the debtor had the necessary purpose.[735]

As alluded to in the above discussion, if the respondent does not admit having the required purpose it will be necessary for the applicant to ask the court to infer purpose from the evidence that has been presented to it. Can a court do so? Courts have made inferences with respect to precursors of s.423. However, it has not always been clear whether the courts will do with the claims under the present legislation. In *Chohan v Saggar*,[736] Edward Evans-Lombe QC (sitting as a deputy High Court judge) said that he saw no reason[737] for giving a different meaning to s.423 nor taking a different approach than the Court of Appeal in *Lloyds Bank Ltd v Marcan*,[738] a case decided under s.172 of the Law of Property Act.[739] It must be acknowledged that these provisions say nothing about inference, but nor did earlier provisions. This can produce difficult situations for a liquidator because the result may be a significant element in proving purpose,[740] as it was under earlier provisions.

Some assistance in arguing for the drawing of inferences may be obtained from the law that developed in relation to s.239's precursor, s.44 of the Bankruptcy Act 1914. This section provided that if a person who was insolvent made a payment in favour of a creditor with a view to giving that creditor a preference over other creditors, the payment could be set aside. It became established in case law that a trustee had to prove that the debtor's dominant intention in making the payment was to prefer the relevant creditor.[741] The courts came to the view that they could, in certain circumstances, infer an intention to prefer.[742] It would seem from what the Court of Appeal said in dicta in *Williams v Taylor*[743] that the required intention to defraud (under s.423) might be based on objective factors that are in evidence. The court said that the existence of objective factors shifted the evidential burden on to the respondent to the claim. Certainly, in any event, as Professor Ian Fletcher argued in relation to s.423, it would be open to a court to presume that persons intend the necessary consequences of their actions.[744]

In any event, the decision of the Court of Appeal in *JSC BTA Bank v Ablyazov*[745] seemed to suggest that a court is able, in certain circumstances, to make inferences. It only seems right that inferences of purposes can be made by courts, in the appropriate circumstances, or else in the majority of cases a claimant would not be able to succeed under s.423. If the debtor denies that he or she had the purpose required by the section then the applicant would, necessarily, have to persuade the court to infer the purpose. Nevertheless, the Court of Appeal in *JSC BTA Bank v Ablyazov* said that an inference that the debtor had the improper purpose could not

---

[735] *JSC BTA Bank v Ablyazov* [2019] B.C.C. 96 at [15].

[736] *Chohan v Saggar* [1992] B.C.C. 306.

[737] *Chohan v Saggar* [1992] B.C.C. 306 at 323.

[738] *Lloyds Bank Ltd v Marcan* [1973] 1 W.L.R. 1387; [1973] 3 All E.R. 754.

[739] *Chohan v Saggar* [1992] B.C.C. 306 at 323.

[740] Miller, "Transactions Prejudicing Creditors" [1998] Conv. 362 at 372. This appears to have been the case in *Barclays Bank Plc v Eustice* [1995] 1 W.L.R. 1238; [1995] B.C.C. 978 at 1248. But compare *Aiglon v Gau Shan Co Ltd* [1993] 1 Lloyd's Rep. 164; [1993] B.C.L.C. 321 at 168.

[741] For example, see *Peat v Gresham Trust Ltd* [1934] A.C. 252 at 262; *Re Kushler* [1943] Ch. 248; [1943] 2 All E.R. 22 at 253; *Re Cutts* [1956] 1 W.L.R. 728; [1956] 2 All E.R. 537 at 541.

[742] *Re Kushler* [1943] Ch. 248 at 253; *Re Cutts (A Bankrupt)* [1956] 1 W.L.R. 728; [1956] 2 All E.R. 537 at 541.

[743] *Williams v Taylor* [2012] EWCA Civ 1443; [2013] B.P.I.R. 133 at [30].

[744] I.F. Fletcher, *The Law of Insolvency*, 2nd edn (London: Sweet & Maxwell, 1996), p.217.

[745] *JSC BTA Bank v Ablyazov* [2019] B.C.C. 96 at [15], [25].

be drawn from the fact that he or she lied unless the inference is justified by what actually occurred and which the debtor tried to conceal.[746] Much earlier, the court in *Royscot Spa Leasing Ltd v Lovett* indicated that one cannot infer purpose from the fact that the debtor made a transfer for no consideration,[747] and the court went on to say that it was not possible to equate result with purpose.[748]

Besides the apparent liberalising of the law on purpose that comes out of the Court of Appeal decisions in *Hashmi* and *JSC BTA Bank v Ablyazov* there are other positive elements in the developing jurisprudence as far as prospective applicants are concerned. First, there is no need to demonstrate a s.423(3) purpose in relation to creditors as a class; it is sufficient to demonstrate an intent to defeat a single creditor.[749] This is also the case even if the transaction does not diminish the debtor's assets, and creditors as a whole are not disadvantaged.[750] Secondly, a person can be said to have the necessary purpose even if he or she is mistaken as to whether the entering into of the transaction challenged can have the effect of being detrimental to the interests of a victim.[751] Thirdly, if a person knows that the entering into of a transaction alone will not cause prejudice, but some other event must also have to occur for that to happen, that will not save the transaction from a successful attack, provided that the person had the necessary purpose; this is because it is the entering into of the transaction that is critical for a s.423 action to succeed.[752]

It has been held that if a debtor did not have a dishonest motive or he or she took legal advice to the effect that what was being done was acceptable, that is not sufficient to defeat a s.423 action provided that the court is satisfied that the necessary purpose existed at the time of the transaction.[753] In *Arbuthnot Leasing International Ltd v Havelet Leasing Ltd*,[754] Scott J (as he then was) said that the

**11-117**

> "fact that lawyers may have advised that the transaction is proper or can be carried into effect does not of itself mean that the purpose of the transaction was not the subsection (3) purpose".[755]

Also, the motive or knowledge of the person who enters into the transaction impugned with the debtor is of no relevance.[756] A court will consider what the asset position of the debtor was at the time of the transaction together with the other circumstances extant at the time, and this will be relied on if it conflicts with the evidence of the debtor.[757]

It does not matter, as far as finding a transaction is to be avoided, that where the debtor had the necessary purpose in entering into a transaction the transaction did not achieve the purpose that the debtor had. That is, the effect of the transaction does not have the desired effect. The transaction can still be impugned successfully. As

---

[746] *JSC BTA Bank v Ablyazov* [2019] B.C.C. 96 at [36].

[747] *Royscot Spa Leasing Ltd v Lovett* [1995] B.C.C. 502; [1994] N.P.C. 146.

[748] *Royscot Spa Leasing Ltd v Lovett* [1995] B.C.C. 502 at 508.

[749] 1986 Act s.423(3)(b). See *National Westminster Bank Plc v Jones* [2000] B.P.I.R. 1092; [2001] 1 B.C.L.C. 98 at 1112 and 1113.

[750] *National Westminster Bank Plc v Jones* [2000] B.P.I.R. 1092 at 1112–1113.

[751] *Hill v Spread Trustee Co Ltd* [2006] EWCA Civ 542; [2007] 1 W.L.R. 2404 at [102].

[752] *Hill v Spread Trustee Co Ltd* [2007] 1 W.L.R. 2404.

[753] *Arbuthnot Leasing International Ltd v Havelet Leasing Ltd* [1990] B.C.C. 636 at 644; *Midland Bank Plc v Wyatt* [1995] 1 F.L.R. 696 at 698; *Re Brabon* [2000] B.P.I.R. 537 at 570.

[754] *Arbuthnot Leasing International Ltd v Havelet Leasing Ltd* [1990] B.C.C. 636 at 644.

[755] *Arbuthnot Leasing International Ltd v Havelet Leasing Ltd* [1990] B.C.C. 636 at 644.

[756] *Moon v Franklin* [1996] B.P.I.R. 196.

[757] *Moon v Franklin* [1996] B.P.I.R. 196.

the Court of Appeal in *Hill v Spread Trustee Co Ltd* observed[758]:

> "If the transaction is entered into with the requisite purpose, the fact that some other event needs to occur does not mean that the transaction cannot itself be within section 423(3)."

As far as applications made against the counterparty to a transaction with a company that is now in liquidation, it is sufficient for a liquidator to demonstrate that a majority of the directors acted with the necessary purpose.[759]

The Court of Appeal in *JSC BTA Bank v Ablyazov*[760] said that there is no rule of law that if the debtor knew at the time of entering into the transaction that is being challenged that the debtor was facing claims, the court must find that the transaction was entered into for the prohibited purpose unless the debtor adduces evidence to show otherwise; there is no presumption, like the one in s.238(5), found in s.423.[761]

## 2.    Victim

**11-118**    "Victim" is a term that is defined in s.423(5) and means a person who is or is capable of being prejudiced by the transaction at an undervalue as defined in s.423(1) and who falls within either s.423(3)(a) or (b). The definition of the term by its indirect reference to the persons that are within the scope of s.423(3) is broad and extends to existing and future creditors. "Victim" will cover unsecured creditors,[762] members of a debtor company qua creditors,[763] a mortgagee[764] or a claimant or prospective claimant in litigation. In *Sands v Clitheroe*,[765] it was indicated that a person could be regarded as a victim provided that it could be proved that he or she had been prejudiced by the transaction; victim is not limited to those who became creditors as a consequence of the activity that the debtor had in mind when entering into the transaction that is to be challenged.[766] The Court of Appeal in *Hill v Spread Trustee Co Ltd*[767] emphasised that the term "victim" is to be construed broadly and it has said that a victim might be someone who was not in the compass of the debtor's purpose when entering into the impugned transaction; in fact the person entering into the transaction may not have been aware of the victim's existence.[768]

In *Clydesdale Financial Services Ltd v Smailes*,[769] the court said that the term "victim" is one that is not limited to creditors of the debtor. The critical factor for a claim to be successful is that the applicant can demonstrate that he or she was capable of being prejudiced by the transaction. The approach of adopting a wide view of the section was manifested in *Fortress Value Recovery Fund I LLC v Blue*

---

[758] *Hill v Spread Trustee Co Ltd* [2006] EWCA Civ 542; [2007] 1 W.L.R. 2404; [2006] B.P.I.R. 789; [2007] 1 All E.R. 1106; [2007] 1 B.C.L.C. 450 at [102].
[759] *BTI 2014 LLC v Sequana SA* [2016] EWHC 1686 (Ch) at [494].
[760] *JSC BTA Bank v Ablyazov* [2019] B.C.C. 96.
[761] *JSC BTA Bank v Ablyazov* [2019] B.C.C. 96 at [28].
[762] *Re Ayala Holdings Ltd* [1993] B.C.L.C. 256.
[763] *Soden v British and Commonwealth Holdings Plc* [1997] B.C.C. 952.
[764] *Agricultural Mortgage Corp Plc v Woodward* [1994] B.C.C. 688.
[765] *Sands v Clitheroe* [2006] B.P.I.R. 1000.
[766] *Sands v Clitheroe* [2006] B.P.I.R. 1000 at [18]–[20].
[767] *Hill v Spread Trustee Co Ltd* [2006] EWCA Civ 542; [2007] 1 W.L.R. 2404; [2006] B.P.I.R. 789.
[768] *Hill v Spread Trustee Co Ltd* [2006] EWCA Civ 542; [2006] B.P.I.R. 789 at [101].
[769] *Clydesdale Financial Services Ltd v Smailes* [2009] EWHC 3190 (Ch).

*Skye Special Opportunities Fund LP*[770] when Flaux J said that the scope of persons falling within s.423(3), namely those who are making or may at some time make a claim, is to be given a broad interpretation and is not necessarily limited to "victims" under s.423(5).

A liquidator can, in an insolvent liquidation, demonstrate that the creditors of the company are victims if the impugned transaction led to, or worsened, the company's insolvency. Obviously the liquidator should be able to do this as he or she will have access to the company's documents and knowledge of its affairs.

### 3.   *Establishing the claim*

While the requirements of proving a s.423 action are still demanding, prima facie, **11-119** they are easier to fulfil than the conditions provided for under s.172 of the Law of Property Act 1925, for under the latter legislation the plaintiff had to establish an intent to defraud on the part of the debtor. Although this did not mean proving deceit in the criminal sense of the word,[771] it meant to hinder, delay or deprive creditors,[772] and not even a disposition made for the express purpose of defeating other creditors by giving a preference to one of them would necessarily give rise to a fraudulent intent.[773] Furthermore, if valuable consideration has been given by the recipient of an allegedly fraudulent disposition, the applicant had to prove a fraudulent intention on the part of both of the parties to the transaction.[774] The burden of proving fraud, while not easy, was lessened somewhat by the fact that fraud could be presumed from the circumstances of the transaction,[775] and fraud could be inferred.[776]

So, as in the area of preferences, any reference to fraud has now gone. Also, it is not necessary for an applicant to establish bad faith on the part of the respondent in the sense of recklessness or sharp practice before a claim can be successful and a remedy under s.425 can be awarded.[777]

Consequently, liquidators may want to argue that because no intent to defraud has to be proved now, it is proper that the courts have been prepared to infer the requisite purpose in certain circumstances. Engaging in risky or a hazardous activity might be a factor which might well justify the court making an inference that the debtor's intention was to put assets beyond the reach of creditors.[778]

While the existence of debts or claims at the time of the transaction may be of **11-120** assistance in establishing the fact that the debtor had the requisite purpose, that fact alone will not suffice, but may be an important factor in the case.[779]

Given the nature of the transactions which are usually sought to be impugned under s.423, it is surprising that Parliament did not provide that where a con-

---

[770] *Fortress Value Recovery Fund I LLC v Blue Skye Special Opportunities Fund LP* [2013] EWHC 14 (Comm) at [110].
[771] *Lloyd's Bank Ltd v Marcan* [1973] 1 W.L.R. 1387 at 1392; *Official Trustee v Marchiori* (1983) 69 F.L.R. 290 at 298.
[772] *Lloyd's Bank Ltd v Marcan* [1973] 1 W.L.R. 1387 at 1392; *Official Trustee v Marchiori* (1983) 69 F.L.R. 290 at 298.
[773] *Grellman v PT Garuda Indonesia Ltd* (1991) 29 F.C.R. 26 at 34–35; (1991) 101 A.L.R. 135 at 143.
[774] *Re Johnson* (1881) 20 Ch. D. 389; *Re Barnes* [1962] Qd. R. 231; (1961) 19 A.B.C. 126.
[775] *Godfrey v Poole* (1883) 13 App. Cas. 497 PC at 503.
[776] For example, see *Freeman v Pope* (1870) 5 Ch. App. 538.
[777] *BTI 2014 LLC v Sequana SA* [2016] EWHC 1686 (Ch) at [523].
[778] *Midland Bank v Wyatt* [1997] 1 B.C.L.C. 242; *Sands v Clitheroe* [2006] B.P.I.R. 1000.
[779] Miller, "Transactions Prejudicing Creditors" [1998] Conv. 362, 373.

ASSETS AVAILABLE FOR DIVISION AND DISTRIBUTION

nected person is involved in the transaction there should be a presumption of the purpose required by s.423(3). One would think that this would be of inestimable value to a liquidator trying to make out a case.

**11-121**  It may be of assistance to an applicant that in considering any claim under s.423 a court will not look at the impugned transaction in isolation; it is necessary that a court looks at a transaction as a whole.[780]

While there is no time zone in which an impugned transaction must have been entered into, the courts will not entertain speculative claims, particularly where the allegations reach back many years. For instance, in *Law Society v Southall*,[781] Peter Gibson LJ identified the allegation of an attempt to defeat creditors over 30 years previously as "mere speculation" and that it was "wishful thinking on the [applicant's] part that the pre-trial procedures, or cross-examination, would yield valuable support for its case".[782]

A critical aspect of the provision is that there must be an entering into of a transaction. "Transaction" is broad.[783] According to *Defra v Feakins*,[784] the word includes participating in an arrangement. The Court said that arrangement was to be given its natural meaning, and included an agreement or understanding, whether formal or informal, oral or in writing. It is not necessary for the claimant to establish that when the transaction impugned was effected the debtor was engaging, or about to engage, in risky or hazardous business.[785]

**11-122**  If one victim of a transaction brings proceedings under s.423 and succeeds, then the court may make an order which is in effect a form of class relief, providing a benefit to all creditors.[786] This is further indicated by s.424(2) which provides that an application made by a victim of a transaction is treated as an application on the part of every victim of the transaction.

It has been held that s.423(3) does not require that the transaction sought to be impugned was entered into in order to prejudice the particular person now bringing the claim. It is enough that the transferor/debtor acted with the purpose of defrauding any person who had made or might make a claim against him or her.[787]

A company with no creditors when the transaction was entered into (and, therefore, solvent) may be the subject of a claim under s.423 in the future on the basis that it may be construed as having entered into the transaction for the purpose of defeating future claims.

**11-123**  Like s.238, a claim is not going to succeed unless it can be established that the transaction is entered into for a consideration the value of which, in money or money's worth, is significantly less than the value, in money or money's worth, of the consideration provided by the debtor. So, again, value is a critical issue. In

---

[780] *Agricultural Mortgage Corp Pty Ltd v Woodward* [1994] B.C.C. 688. See the discussion of this case above at para.11-037.

[781] *Law Society v Southall* [2001] B.P.I.R. 336. The Court of Appeal reversed the decision of Hart J below at first instance.

[782] *Law Society v Southall* [2001] B.P.I.R. 336 at 52.

[783] *Griffin v Awoderu* [2008] EWHC 349 (Ch); [2008] B.P.I.R. 877 at 25. Reference might be had to the discussion under "Transactions at an undervalue" earlier in the chapter.

[784] *Defra v Feakins* [2004] EWHC 2735 (Ch); [2005] B.P.I.R. 292; and upheld on appeal ([2005] EWCA Civ 1513; [2007] B.C.C. 54).

[785] *Midland Bank v Wyatt* [1997] 1 B.C.L.C. 242; *Sands v Clitheroe* [2006] B.P.I.R. 1000.

[786] See *Moon v Franklin* [1996] B.P.I.R. 196; *Dora v Simper* [1999] B.C.C. 836; *Hill v Spread Trustee Co Ltd* [2006] EWCA Civ 542; [2007] 1 W.L.R. 2404; [2006] B.C.C. 646 at [104].

[787] *4 Eng Ltd v Harper* [2009] EWHC 2633 (Ch); [2010] B.P.I.R. 1; [2010] 1 B.C.L.C. 176 at [22]; *Fortress Value Recovery Fund I LLC v Blue Skye Special Opportunites Fund LP* [2013] EWHC 14 (Comm) at [111].

considering a transaction, the court is to look at the value received from the point of view of the debtor.[788] This is, as we saw when considering transactions at an undervalue earlier in the chapter, the same in relation to cases brought pursuant to s.238.

Neuberger J (as he then was) in *National Westminster Bank Plc v Jones*[789] said that when determining whether consideration received by the respondents to a s.423 claim was significantly less than the consideration passed to the debtor(s), the court has to form the view as to the price which the property representing the consideration given by the respondents and that given by the debtor(s) would fetch in the open market, thus providing a "correct valuation".[790] The court will have to compare the value of property as against what consideration was given for it, and then consider "in percentage terms, how much less the consideration is than the value".[791]

The final thing to note is that where the debtor has been adjudged bankrupt or entered a formal corporate insolvency regime, which includes entering liquidation, a person who wishes to make a claim under s.423 is required to seek the leave of the court (once proceedings have been instituted). But if proceedings were instituted before the debtor entered liquidation, the claimant does not need to obtain the leave of the court that is ordinarily required by s.424(1).[792] In any event, if leave is required in such a situation it can be granted retrospectively by the court.[793] In the situation where a claimant does require leave and the liquidator has declined to bring proceedings under s.423 then the claimant must demonstrate that he or she has a realistic prospect of establishing: the transaction is covered by s.423; the claimant was a victim of the transaction within s.423; there is a good reason why he or she should bring proceedings when the liquidator had not.[794]

### C. Procedure

A claim under s.423 was held not to be within the term "insolvency proceedings" as found in r.13.7 of the Insolvency Rules 1986.[795] The latest Rules do not define insolvency proceeding. A claim may be commenced in any Division of the High Court. The Insolvency Rules 1986 did not apply to a s.423 claim other than where the claim was brought in existing proceedings in the Companies Court,[796] and it is probable that this will be the case under the Insolvency Rules 2016. Hence, where there is a claim under s.423 in a compulsory liquidation one would think that the latest Rules will apply to it and the claim will be able to be brought in existing proceedings. Where a claim is issued in the wrong form as an originating or ordinary application under the previous Insolvency Rules 1986, where there are no existing proceedings in the Companies Court (or the Bankruptcy Court), the court has power to cure the defect and to treat the application as a claim form.[797]

**11-124**

The Court of Appeal held in *Orexim Trading Ltd v Mahvir Port and Terminal*

---

[788] *Delaney v Chen* [2010] EWCA Civ 1455; [2011] B.P.I.R. 39 at [15].

[789] *National Westminster Bank Plc v Jones* [2000] B.P.I.R. 1092.

[790] *National Westminster Bank Plc v Jones* [2000] B.P.I.R. 1092 at 1115.

[791] *National Westminster Bank Plc v Jones* [2000] B.P.I.R. 1092 at 1115.

[792] *Godfrey v Torpy* [2007] EWHC 919 (Ch); [2007] B.P.I.R. 1538; *Times*, 16 May 2007 at [39].

[793] *Godfrey v Torpy* [2007] EWHC 919 (Ch); [2007] B.P.I.R. 1538 at [43].

[794] *Re Simon Carves Ltd* [2013] EWHC 685 (Ch) at [27].

[795] *Jsyke Bank Ltd v Spieldnaes* [1999] 2 B.C.L.C. 101 at 124.

[796] *TSB Bank v Katz* [1997] B.P.I.R. 147 at 149–150.

[797] *Banca Carige v Banco Nacional* [2001] 2 B.C.L.C. 407 at [16].

*Private Ltd*[798] that the court has power under the jurisdictional "gateway" in para.3.1(20) of Practice Direction 6B: Service out of the Jurisdiction[799] to permit service of a claim under s.423 outside England and Wales. The court said that the effect of s.423 was to confer on the courts power to make orders against persons and property outside of England and Wales although this was subject to the fact that there had to be a sufficient connection between the claim and England and Wales.[800] The claimant has the burden of establishing the fact that there was a sufficient connection and this would only be achieved if the claimant persuades the court not merely that England and Wales is the appropriate forum but that this is clearly so.[801]

As discussed earlier in the chapter, notwithstanding there is no reference in s.238 of it having extraterritorial scope, the court in *Re Paramount Airways Ltd (No.2)*[802] held that the provision could have effect outside of the country. It is generally recognised that the comments in the judgment apply equally to s.423. If so, a court, in a case involving a foreign element, has to be satisfied, before making an order under s.423, that the respondent was sufficiently connected with England for it to be just and proper to make the order.[803] The court set out the kinds of connections which would suffice for a claim to be brought (and they are set out at para.11-026 above) and an order made. In *Jyske Bank (Gibraltar) Ltd v Spjeldnaes(No.2)*,[804] Evans-Lombe J held, in relation to a claim under s.423 of the Act, that *Re Paramount Airways* did not establish that the court could never grant an order under s.423 in the absence of the type of connections with England and Wales which the court set out. In *Avonwick Holdings Ltd v Azitio Holdings Ltd*[805] Cockerill J adopted a similar view, saying that the court must consider the factors mentioned specifically in *Re Paramount Airways* but that others could be taken into account in undertaking a balancing exercise.[806] Her Ladyship came to the conclusions that there were connections other than those mentioned in *Re Paramount Airways* that enabled her to decide the issue. In *Suppipat v Narongdej*[807] Butcher J accepted this approach and refused a strike out application made on the basis that a s.423 claim which was made against foreign defendants who had no connection with England and Wales.

## D.    Defence

**11-125**    Besides contending that liquidators have failed to establish all of the conditions that are needed for a successful claim under s.423, respondents might seek to argue that they should not be held liable as they have changed their position as a result of entering into the impugned transaction. In *4Eng Ltd v Harper*,[808] Sales J (as he then was) said that where a person receives property in good faith and he or she has

---

[798] *Orexim Trading Ltd v Mahvir Port and Terminal Private Ltd* [2018] EWCA Civ 1660; [2018] B.P.I.R. 1432 at [47].

[799] Practice Direction 6B: Service out of the Jurisdiction.

[800] *Orexim Trading Ltd v Mahvir Port and Terminal Private Ltd* [2018] B.P.I.R. 1432 at [55].

[801] [2018] B.P.I.R. 1432 at [63] and applying *Spiliada Maritime Corp v Cansulex Ltd* [1987] A.C. 460; [1986] 3 W.L.R. 972 at 480.

[802] *Re Paramount Airways Ltd (No.2)* [1992] B.C.C. 416. This case involved an administration, but nothing turns on that fact.

[803] *Re Paramount Airways Ltd (No.2)* [1992] B.C.C. 416 at 425.

[804] *Jyske Bank (Gibraltar) Ltd v Spjeldnaes (No.2)* [2000] B.C.C. 16.

[805] *Avonwick Holdings Ltd v Azitio Holdings Ltd* [2018] EWHC 2458 (Comm).

[806] *Avonwick Holdings Ltd v Azitio Holdings Ltd* [2018] EWHC 2458 (Comm) at [53].

[807] *Suppipat v Narongdej* [2020] Costs L.R. 1649.

[808] *4Eng Ltd v Harper* [2009] EWHC 2633 (Ch); [2010] B.P.I.R. 1; [2010] 1 B.C.L.C. 176.

changed his or her position as a result, then it would not be appropriate to require the transferee to return the property.[809] As mentioned earlier in this chapter, this is a controversial decision and has been criticised by a number of commentators.[810] It is arguable whether it is possible to plead change of position as a defence in relation to a s.423 claim given that in *Skandinaviska Enskilda Banken AB v Conway*,[811] the Privy Council said, in the context of a preference claim, that change of position cannot apply where the relevant avoidance provision includes a relief element, and s.425 does provide such an element.

While there are significant doubts as to whether a respondent could plead change of position as a defence, there is support for the possibility of change of position being taken into account by a court when considering what relief, if any, should be ordered in favour of a successful applicant. The law on this point is discussed later under "Orders".

### E.    Limitation period

The general view concerning claims pre-dating the Act and alleging a fraudulent conveyance were not subject to a limitation period on the basis that such conveyances were rendered void. Notwithstanding the apparent presumption in earlier cases that no statutory limitation period applied to actions under s.423,[812] the Court of Appeal in *Hill v Spread Trustee Co Ltd*[813] has now ruled that there is.[814] The period is 12 years if s.9 of the Limitation Act 1980 applies, which covers actions upon a specialty,[815] and six years if s.8 of applies, which covers a claim for monetary relief.[816] It was accepted in *Hill v Spread Trustee Co Ltd* that there could be separate limitation periods for different applicants.[817] **11-126**

The Court of Appeal allowed the extension of the limitation period in *Giles v Rhind*.[818] Arden LJ (with whom the other judges agreed) held that a claim under s.423 is able to be encompassed within the expression, "breach of duty", in s.32(2) of the Limitation Act 1980, as this expression has a wide meaning. Section 32(2) provides that the deliberate commission of a breach of duty in circumstances in which it is unlikely to be discovered for some time amounts to a deliberate concealment of the facts and the deliberate concealing of facts permits, according to s.32(1) of the Limitation Act 1980, a court to extend time.[819] The time runs from the time the applicant ascertains the fact that the improper action occurred. Arden LJ noted that a transaction that falls within s.423 is the kind of transaction of which there was

---

[809] *4Eng Ltd v Harper* [2009] EWHC 2633 (Ch); [2010] B.P.I.R. 1; [2010] 1 B.C.L.C. 176 at [14].
[810] For example, see Morgan, "4 Eng Ltd v Harper—an unjustified change?" (2010) 3 (1) *Corporate Rescue and Insolvency* 5; Goode, *Principles of Corporate Insolvency Law*, 4th edn (2011), pp.633–634.
[811] *Skandinaviska Enskilda Banken AB v Conway* [2019] B.P.I.R. 1562.
[812] For example, *Law Society v Southall* [2001] EWCA Civ 2001; [2001] B.P.I.R. 336.
[813] *Hill v Spread Trustee Co Ltd* [2006] EWCA Civ 542; [2007] 1 W.L.R. 2404; [2007] 1 All E.R. 1106; [2006] B.C.C. 646; [2006] B.P.I.R. 789; [2007] 1 B.C.L.C. 450.
[814] *Hill v Spread Trustee Co Ltd* [2006] EWCA Civ 542; [2007] 1 W.L.R. 2404 at [117]–[118], [143].
[815] To the extent that actions do not seek the recovery of a sum recoverable by virtue of an enactment within s.9 of the Limitation Act 1980, they are actions for a specialty: *Hill v Spread Trustee Co Ltd* [2006] EWCA Civ 542; [2007] 1 W.L.R. 2404; [2006] B.P.I.R. 789 at [116].
[816] *Hill v Spread Trustee Co Ltd* [2006] EWCA Civ 542; [2007] 1 W.L.R. 2404 at [116].
[817] *Hill v Spread Trustee Co Ltd* [2006] EWCA Civ 542; [2007] 1 W.L.R. 2404 at [149].
[818] *Giles v Rhind* [2008] EWCA Civ 118; [2008] B.P.I.R. 342.
[819] *Giles v Rhind* [2008] EWCA Civ 118; [2008] B.P.I.R. 342 at [38] and [39].

likely to be concealment and "thus there would be a heightened policy reason for the application of s.32(2) to claims under that section".[820]

## F.   Orders

**11-127**      Section 423(2) is in similar terms to ss.238(3) and 239(3) (which apply to transactions at an undervalue and preferences respectively), although s.423(2) provides clearly that the court has a discretion whether or not to make an order while ss.238 and 239 rely on case law to explain that a judge has a discretion whether or not to make an order. It has been held that a court's discretion under s.423(2) to make no order is not limited to the existence of exceptional circumstances where justice requires.[821] Like ss.238(3) and 239(3), s.423(2) states that the object of any court order is to restore the position to what it would have been if there had been no transaction entered into. In considering this injunction to restore, the words "as far as possible" must be added.[822] In addition, and in this manner it is different from ss.238(3) and 239(3), s.423(2)(b) provides that any order must protect the interests of the persons who are victims of the transaction.[823] Third party interests can be affected by an order under s.425(2) but the provision also provides that an order shall not prejudice any interest in property which was acquired from a person other than the debtor and was acquired in good faith, for value and without notice of the relevant circumstances, or prejudice any interest deriving from such an interest, and the order shall not require a person who received a benefit from the transaction in good faith, for value and without notice of the relevant circumstances to pay any sum unless he was a party to the transaction.

In considering what order to make the Court of Appeal in *Chohan v Saggar*[824] said that the court must consider what loss has been sustained and then, as far as practicable, restore the loss.[825] Hence, it is submitted that the court's remedial power is restitutionary and not compensatory in nature.[826]

Judges are granted wide discretion when it comes to ordering relief.[827] This is indicated by the use of the words, at the commencement of s.425, "without prejudice to the generality of Section 423". The court is entitled, in determining the granting of relief, to take into account all the circumstances of the different parties involved in fashioning a just and appropriate remedy,[828] and there are some circumstances in which the court can decide that it is not appropriate for there to be any remedy imposed, but this would only be in an exceptional case.[829] As with

---

[820] *Giles v Rhind* [2008] EWCA Civ 118; [2008] B.P.I.R. 342 at [54].

[821] *Moffat v Moffat* [2020] NICh 17 at [51]. The decision was concerned with the equivalent rule in Northern Ireland.

[822] *Chohan v Saggar* [1992] B.C.C. 306; affirmed on appeal by the Court of Appeal ([1994] 1 B.C.L.C. 706; [1994] B.C.C. 134).

[823] See the comments of Neuberger J in *National Westminster Bank Plc v Jones* [2000] B.P.I.R. 1092 at 1113.

[824] *Chohan v Saggar* [1994] 1 B.C.L.C. 706.

[825] *Chohan v Saggar* [1994] 1 B.C.L.C. 706 at 714.

[826] *Johnson v Arden* [2018] EWHC 1624 (Ch); [2019] 2 B.C.L.C. 215 at [92].

[827] *National Westminster Bank Plc v Jones* [2000] B.P.I.R. 1092 at 1112–1113; *Griffin v Awoderu* [2008] EWHC 349 (Ch); [2008] B.P.I.R. 877 at [40]; *BTI 2014 LLC v Sequana SA* [2017] EWHC 211 (Ch) at [39].

[828] *BTI 2014 LLC v Sequana SA* [2017] EWHC 211 (Ch) at [24].

[829] *Chohan v Saggar* [1992] B.C.C. 750; *National Westminster Bank Plc v Jones* [2000] B.P.I.R. 1092 at 1112–1113; *BTI 2014 LLC v Sequana SA* [2019] B.C.C. 631 at [24].

transactions at an undervalue and preferences,[830] s.425(1) applies to provide examples of the kinds of orders which a court might make to facilitate the restoration of the position that existed prior to the transaction. Rather than discussing the paragraphs contained in s.425(1), reference can be made to earlier discussions of the paragraphs in s.241(1).[831] The only appreciable difference is the fact that in s.425(1) there is no counterpart of s.241(1)(g) which allows the court to control proofs in a winding up or bankruptcy. As one would expect what relief is ordered is heavily dependent on the facts, and no hard and fast rules can be prescribed.[832] Clearly the provision allows for flexibility in tailoring orders to permit justice to be done. Thus the court's discretion in ordering relief is not limited. According to Rose J in *BTI 2014 LLC v Sequana SA*,[833] the remedy under the section can go further

"than the value of any obligations of the transferor to the victims at the time when the court comes to consider the imposition of the remedy. Such a principle would risk creating an unfairness to the victims where, as here, a substantial period of time has elapsed between the date of the impugned transaction and the date when the remedy is devised and where the relationship between the various parties has changed in ways which have, at the least, been influenced by the fact that the impugned transaction took place".

As mentioned above, even where an applicant proves his or her case, there might **11-128** be some circumstances in which the court can decide that it is not appropriate for there to be any remedy imposed, but this would only be in an exceptional case.[834] It would only be in exceptional circumstances as the purpose of the provision is to recover assets for victims and generally override the interests of the transferee. Thus far, the range of considerations which may lead a court to refrain from granting relief where the claimant has proved his or her case has not been authoritatively determined.[835]

In *4Eng Ltd v Harper*[836] Sales J said that the nature and the extent of relief in an order should take into account the mental state of either the transferee of the property that is the subject of the impugned transaction or any other person against whom an order is sought, as well as their involvement in the scheme of the debtor to put assets out of the reach of creditors.[837] In this case Sales J also said, as mentioned earlier, that where a person receives property in good faith and he or she has changed his or her position as a result, then it would not be appropriate to require the transferee to return the property.[838] At first instance in *BTI 2014 LLC v Sequana SA*,[839] a case dealing with s.423, Rose J (as she was then) referred to *4Eng Ltd v Harper* with implicit approval and she regarded a change of position as relevant to the question of the appropriate relief, if any, to be granted. In a later hearing involving the same litigation[840] Rose J said that a court is entitled to take into account all the circumstances of the different parties involved in the process of

[830] See 1986 Act s.241(1).
[831] See above at paras 11-045–11-050.
[832] *4Eng Ltd v Harper* [2009] EWHC 2633 (Ch); [2010] B.P.I.R. 1; [2010] 1 B.C.L.C. 176 at [16].
[833] *BTI 2014 LLC v Sequana SA* [2017] EWHC 211 (Ch) at [39].
[834] *Chohan v Saggar* [1994] BCLC 706; *BTI 2014 LLC v Sequana SA* [2019] B.C.C. 631 at [24].
[835] *Payroller Ltd (in liq) v Little Panda Consultants Ltd* [2018] EWHC 3161 (QB), [2019] B.P.I.R. 205 at [30].
[836] *4Eng Ltd v Harper* [2009] EWHC 2633 (Ch); [2010] B.P.I.R. 1.
[837] *4Eng Ltd v Harper* [2010] B.P.I.R. 1 at [11] and [13].
[838] [2010] B.P.I.R. 1 at [14].
[839] *BTI 2014 LLC v Sequana SA* [2016] EWHC 1686 (Ch) at [522]–[525] per Rose J.
[840] *BTI 2014 LLC v Sequana SA* [2017] EWHC 211 (Ch).

fashioning a just and appropriate remedy.[841] The approach of Rose J to change of position as a factor that could affect the order made is consistent with the approach of other judges in cases involving other provisions that may be used to attack pre-liquidation transactions. In *Re Claridge*[842] Sales J, in holding that exceptional circumstances existed for him to exercise the discretion in s.342 (the bankruptcy equivalent of s.241(1)) which permitted a court discretion in the kind of order made where an applicant had been successful under s.339 (the bankruptcy equivalent of s.238), got to that point partly by relying upon the fact that the transferee/respondent had changed her position in good faith. In *Re Fowlds (A Bankrupt)*,[843] a bankruptcy case dealing with a preference claim under s 340 (the bankruptcy equivalent of s.239), ICC Judge Jones relied on the decision in *Re Claridge*. Judge Jones said that:

> "The existence of the unfettered discretion means Parliament intends there to be cases, albeit out of the norm, when the Court may decide that justice trumps the statutory policy of equal distribution and, in which case, the policy will not be applied. There can be no reason for not considering applying the broad analogy identified by Mr Justice Sales [in the s 423 case of *4 Eng v Harper* [2009] EWHC 2633 (Ch); [2010] BPIR 1] in an appropriate case when deciding whether to exercise that discretion. It is not contrary to the statutory scheme and policy of equal distribution amongst creditors. It is the application of an inherent qualification."[844]

In the case before him ICC Judge Jones decided not to order the recipient of a preference to pay back the money paid to her by the bankrupt prior to his bankruptcy. This decision was based on a number of factors, one of which was the respondent's change of position. The judge emphasised the fact that a decision not to award relief to a successful applicant was exceptional.

While an order may affect the property of, or impose an obligation on, any person, whether or not that person was a party to the transaction impugned, an order is not to prejudice any interest in property which was acquired from a person other than the debtor and was acquired in good faith, for value and without notice of the relevant circumstances, or prejudice any interest deriving from such an interest. Also an order is not to require a person who received a benefit from the transaction in good faith, for value, and without notice of the relevant circumstances to pay any sum unless he or she was a party to the transaction.[845] This is designed to protect third parties who are bona fide purchasers. The order made in *Arbuthnot Leasing International Ltd v Havelet Leasing Ltd (No.2)*[846] is an instance of the court taking this requirement into account. In that case the debtor carried on business leasing aircraft and coaches, and the applicant financed the business in that it owned the vehicles that it leased to the debtor. The debtor sub-leased the vehicles to others. The debtor failed to pay what was owed to the applicant who obtained a judgment, and this was followed by the appointment of receivers. The receivers discovered that before the judgment the debtor had transferred its business to another company (F Ltd). The benefit of all of the debtor's agreements with credit providers were transferred to F Ltd save for the agreements with the applicant. The

---

[841] *BTI 2014 LLC v Sequana SA* [2017] EWHC 211 (Ch) at [24].
[842] *Re Claridge*; sub nom. *Claridge's Trustee in Bankruptcy v Claridge* (2011) B.P.I.R. 1529.
[843] *Re Fowlds (A Bankrupt)* [2020] B.P.I.R. 1111 at [20]–[21].
[844] *Re Fowlds (A Bankrupt)* [2020] B.P.I.R. 1111 at [21].
[845] 1986 Act s.425(2).
[846] *Arbuthnot Leasing International Ltd v Havelet Leasing Ltd (No.2)* [1990] B.C.C. 636.

debtor remained liable to the credit providers but sub-lessees of vehicles paid F Ltd what had been required to be paid to the debtor quarterly. The applicant sought a reversal of the transfer of the debtor's business to F Ltd. Ultimately, Scott J held in favour of the applicant. The order the judge made was to reverse the transfers but in doing so indicated that it was to be without prejudice to the claims of creditors of F Ltd who had become creditors since the transfer of the business from the debtor to F Ltd.[847]

Orders under s.425 may cover the same ground as freezing orders,[848] and these latter kind of order may be granted to assist an applicant bringing a s.423 application.[849] In some cases an application for such an order before judgment may be appropriate.[850]

It was indicated in *Chohan v Saggar*[851] by the Court of Appeal that while an order under s.423 should aim to restore the position as it was before the transaction was entered into, bona fide purchasers might be deleteriously affected if total restoration took place, so the court has to balance the interests of the creditor(s) and any third party, and it may be appropriate to protect a third party in such a way that total restoration is not possible. On the same issue Neuberger J, when delivering judgment in *National Westminster Bank Plc v Jones*,[852] said that if a court is satisfied that a transaction is within s.423(1) and (3), it **11-129**

"has a very wide discretion as to the appropriate courses to take ... In my judgment, in an appropriate case, even where the two requirements of s.423 are satisfied, the court does not have to restore the position to what it was before the transaction was entered into, or otherwise protect the victims. No doubt, in the majority of cases that may be the appropriate course, but in some circumstances another, less radical, solution may be appropriate, and, indeed, in an unusual case the court might decide that nothing should be done".[853]

"The relevant circumstances" for the purposes of s.425, and referred to above, are defined as the circumstances by virtue of which an order pursuant to s.423 may be made in respect of the transaction.[854]

## G. Market contracts are exempted

Section 423 is specifically disapplied in relation to market contracts if a recognised investment exchange or clearing-house is a party to those contracts, and does not affect a disposition of property in pursuance of a market contract.[855] Similar exemptions applicable to financial and security settlements and associated security arrangements are provided for in the Financial Markets and Insolvency (Settlement Finality) Regulations 1999.[856] **11-130**

---

[847] A similar approach was taken, with quite different facts, in *Chohan v Saggar* [1992] B.C.C. 306.

[848] *The Mercantile Group (Europe) A.G. v Aiyela* [1993] F.S.R. 745 at 757 per Hobhouse J.

[849] *Aiglon v Gau Shan* [1993] 1 Lloyd's Rep. 164.

[850] Collings and Morgan, "Litigation Strategies aimed at swelling available assets" in *Practical Insolvency* (1999), Vol.VII, p.5. This occurred in *Arbuthnot Leasing International Ltd v Havelet Leasing Ltd* [1990] B.C.C. 636.

[851] *Chohan v Saggar* [1994] B.C.C. 134.

[852] *National Westminster Bank Plc v Jones* [2000] B.P.I.R. 1092.

[853] *National Westminster Bank Plc v Jones* [2000] B.P.I.R. 1092 at 1112–1113.

[854] 1986 Act s.425(3).

[855] Companies Act 1989 ss.155, 165(1)(b), (3).

[856] Financial Markets and Insolvency (Settlement Finality) Regulations 1999 (SI 1999/2979). See

Assets Available for Division and Distribution

## IV.   Proceedings Against Directors

**11-131**    When liquidation occurs, the liquidator will examine the conduct of the directors of the company and consider if they might be liable for certain activities during the life of the company. If liquidators are successful in their proceedings they will receive money that will swell the assets to be distributed to the creditors.

It will be recalled that the definition of "director" in s.251[857] includes any person occupying the position of director, by whatever name called. This will, therefore, cover a person who has been validly appointed pursuant to the legal requirements (a de jure director), but also encompasses a person or a company who may be regarded as, what is usually called a "de facto director"[858] or a "shadow director".[859] The former is a person who acts as a director although he or she has not been validly appointed. The latter is someone in accordance with whose directions or instructions the directors of the company are accustomed to act.[860] One commentator has distinguished a de facto director from a shadow director in the following succinct manner:

"[T]he former [de facto] acts himself as if he were a director whereas the latter [shadow director] acts through the de jure or de facto directors."[861]

Directors may be either executive or non-executive. The former is a person who sits on the board of directors and is employed full-time in some capacity in the management of the company, such as a managing director (or chief executive officer as that person tends to be known as now). Frequently, such directors have entered into formal contracts and will be remunerated not only by salary but by the receipt of other benefits, depending on how the company progresses. Non-executive directors are not employed by the company; they are outsiders. They are usually well regarded in the community or have particular business experience and only attend board meetings and provide comments on company affairs and act as monitors of the executives. Such directors are seen to be there to vet what is proposed by the executive directors and are paid directors' fees for their efforts. Often the chairman of the board is a non-executive director.

---

reg.17. The Regulations implemented the Settlement Finality Directive 98/26 of the European Parliament and of the Council.

[857] The same definition is in s.250 of the Companies Act 2006.

[858] See, for example, *Re Kaytech International Plc* [1999] B.C.C. 390. Also, see Griffin, "The Characteristics and Identification of a De Facto Director" [2000] Cfi L.R. 126.

[859] "Shadow director" is defined in s.251 of the Companies Act 2006. See *Re Hydrodam (Corby) Ltd* [1994] B.C.C. 161; *Secretary of State for Trade and Industry v Deverell* [2000] 2 B.C.L.C. 133; [2000] B.C.C. 1057. In the former case, Millett J contrasted a de facto director with a shadow director. Also, see Drennan, "Shadow Directorship—defining the 'Eminence Grise'" (1993) 8 I.L. & P. 176; Bartlett, "'Shadow Director'—a spectre that haunts the high street banker" (1994) 9 I.L. & P. 52. For an Australian perspective, see the discussion in Markovic, "The Law of Shadow Directorships" (1996) 6 Aust. J. Corp. L. 323; and Markovic, "Corporate Recovery Accountants: Beware of the Long Arm of Section 60(1)(b) Corporations Law" (1997) 5 *Insolvency Law Journal* 112.

[860] See, for example, *Secretary of State for Trade and Industry v Deverell* [2000] 2 B.C.L.C. 133; [2000] B.C.C. 1057.

[861] *Goode on Principles of Corporate Insolvency Law* (2019), p.741.

## A.   Wrongful trading[862]

It is a little difficult to know where to place the discussion of this area. In some **11-132** ways it fits in with discussions surrounding the misconduct of officers of the company (Ch.16), but in other ways it is better included in this chapter as the action for wrongful trading can be seen as an asset available to the liquidator and the fruit from an action has generally been seen as something which can swell the assets of the company in the same manner as preference and other adjustment type actions. Also it is not in the same category as actions and matters discussed in Ch.16. On balance it is thought that it is better to deal with it in this chapter.

### *1.   Background*

In the first quarter of this century there was dissatisfaction at the ease with which **11-133** the protection of limited liability could be abused by those who managed companies, and in 1926 the Greene Committee on Company Law Reform[863] had its attention directed particularly to the case, said to be encountered principally in private companies

> "where the person in control of the company holds a floating charge and, while knowing that the company is on the verge of liquidation, 'fills up' his security by means of goods obtained on credit and then appoints a receiver".[864]

The Committee's recommendation, which with one small addition was originally embodied in s.75 of the 1928 Act, was that a new section should be inserted providing that where, in the course of winding up a company, it appeared that any business of the company had been carried on with intent to defraud creditors of the company the court should have power, on application by the liquidator or any creditor or contributory, to declare that the directors responsible should be subjected to unlimited personal liability in respect of the debts or other liabilities of the company; and, further, that the court should be empowered to charge such liability upon any debt or obligation due from the company to the director, or upon any charge on any of the company's assets held by or vested in him or her or in any person on the director's behalf. Directors held liable were regarded as being engaged in fraudulent trading.

The Cork Committee was of the opinion that the fraudulent trading provision

---

[862] For further discussion, see Oditah, "Wrongful Trading" [1990] L.M.C.L.Q. 205; Keay, "Wrongful Trading and the Liability of Company Directors: A Theoretical Perspective" (2005) 25 *Legal Studies* 431; A. Walters, "Enforcing Wrongful Trading—Substantive Problems and Practical Incentives" in B.A.K. Rider (ed), *The Corporate Dimension* (Bristol: Jordans Publishing, 1998), pp.146 onwards; S. Griffin, *Personal Liability and Disqualification of Company Directors* (Oxford: Hart Publishing, 1999), pp.57–98; Goode, *Principles of Corporate Insolvency Law* (2005); Hicks, "Advising on Wrongful Trading: Pt 1" (1993) 14 Co. Law 16; Hicks, "Advising on Wrongful Trading: Pt 2" (1993) 14 Co. Law 55; Keay, "Wrongful Trading and the Point of Liability" (2006) 19 Insolv. Int. 132; A. Keay, *Company Directors' Responsibilities to Creditors* (Abingdon: Routledge-Cavendish, 2007), pp.71–150; Didcote, "Controlling the abuse of limited liability: the effectiveness of the wrongful trading provision" (2008) I.C.C.L.R. 373; Werdnik, "Wrongful Trading provision—is it efficient?" (2012) 25 Insolv. Int. 81; A Keay "Wrongful trading: Problems and Proposals" (2014) 65 *Northern Ireland Legal Quarterly* 63; R Williams, "What Can We Expect to Gain from Reforming the Wrongful Trading Remedy?" (2015) 78 M.L.R. 55 and other articles referred to in the following pages.

[863] *Report of the Company Law Amendment Committee* (HMSO, 1926), Cmnd.2697.

[864] *Report of the Company Law Amendment Committee* (HMSO, 1926), Cmnd.2697, para.61.

which was by the time that the Committee was considering insolvency law set out in s.332 of the 1948 Act, possessed significant inadequacies in dealing with ir-responsible trading,[865] such as the fact that the criminal burden of proof applied to civil actions and, also, applicants were required to establish actual dishonesty and real moral blame on the part of the defendant.[866] Consequently, the Cork Commit-tee recommended that the provision be amended and that only criminal liability should apply in relation to fraudulent trading, and a new provision should be introduced to allow for civil actions for unreasonable trading where only the civil burden of proof would apply. While the government stubbornly resisted the inclu-sion of a section in the terms envisaged by the Cork Report, it finally partly took up these proposals and enacted s.214 of the Act, which introduced civil action for what has been called "wrongful trading". This is to be contrasted with fraudulent trading.[867] Fraudulent trading remains as the basis for both civil and criminal ac-tion, and is discussed in Ch.16 because it is patently a matter of misconduct.[868]

**11-134**    Provisions like s.214 are, in effect, exceptions to the fundamental principle of corporate law that if a company is liable for debts it, and it alone, is liable for them. This rule is based, of course, on the inveterate principle emanating from *Salomon v Salomon & Co Ltd*[869] that a company is a legal entity which is separate from its members and controllers and consequently it and not its directors is liable, inter alia, for its contracts and debts generally. Section 214 was introduced to stop directors from continuing to trade while their companies are on a slide into insolvency. Coupled with this is the notion that the purpose of s.214 is to

> "recoup the loss to the company so as to benefit the creditors as a whole. The court has no jurisdiction to direct payment to creditors or to direct that moneys paid to the company should be applied in payment of one class of creditors in preference to another".[870]

Furthermore, it was: "an attempt to stop directors from externalising the cost of their companies' debts and placing all of the risks of further trading on the creditors".[871]

The section was designed not to penalise directors for taking a company into a state of insolvency, but to address the situation where directors can see that their company is in difficulty, perhaps insolvent, and they do nothing to protect credi-tors' interests. Wrongful trading is not therefore intended to deal with mismanage-ment per se.

**11-135**    Section 214(8) provides that the section is without prejudice to s.213 (the fraudulent trading provision), so there is nothing to prevent a liquidator, in the ap-propriate case, from mounting proceedings which claim relief in the alternative, namely, under either s.214 or s.213.

A claim may be initiated against foreign directors of a company being wound up in England or Wales, but the court must take into account what obligations a direc-

---

[865]  Cork Report, paras 1776–1780.
[866]  *Re Patrick and Lyon Ltd* [1933] Ch. 786.
[867]  See Goode, *Principles of Corporate Insolvency Law* (2011), pp.665–666 for a list of the differ-ences between wrongful and fraudulent trading.
[868]  See below at paras 16-029–16-047.
[869]  *Salomon v Salomon & Co Ltd* [1897] A.C. 22.
[870]  *Re Purpoint Ltd* [1991] B.C.L.C. 491 at 499 per Vinelott J.
[871]  Keay, *Company Directors' Responsibilities to Creditors* (2007), p.77.

tor had to minimise losses to the company's creditors under the relevant foreign law.[872]

At one time proceedings for wrongful trading could only be commenced by liquidators, namely under s.214, but now administrators are also entitled, by s.246ZB, to bring proceedings for wrongful trading. Section 246ZB is in the same terms as s.214 and will undoubtedly be interpreted and applied in the same way.

## 2.   Section 214

**(a)   Introduction**   Initially it must be pointed out that the provision that provides for wrongful trading neither includes the words "wrongful trading" within it nor sets out the kind of conduct which will constitute wrongful trading.[873] This suggests that the section is very wide and can catch all sorts of activity or inactivity which involved directors in misconduct in the affairs of their companies. However, the conduct which will mean that directors fall foul of the section is restricted by s.214(2). The subsection provides, inter alia, that a director will only be liable if he or she knew or ought to have concluded that there was no reasonable prospect of the company avoiding going into insolvent liquidation, and it has been made clear that liability is not imposed on the directors necessarily where they knew or ought to have known that the company was insolvent, and it has been emphasised that the fact that a company is insolvent and the directors know that, does not mean, of itself, that they will be liable.[874] Liability only attaches where the directors knew or ought to have concluded that the company could not avoid entering insolvent liquidation.[875] But the fact that the company is hopelessly insolvent and the directors are aware of that fact might be an important factor.[876]

Stephen Griffin has said that the type of conduct caught by s.214 includes the paying of over generous dividends, selling company assets at an undervalue and the payment of excessive remuneration to directors.[877] The case of *Re Bangla Television Ltd (in liq)*[878] confirms the fact that a transfer of assets at an undervalue could lead to a successful claim against a director.

As the word "trading" is not expressly mentioned in s.214, there is no reason why activity short of actual trading is not able to be the subject of an action, such as selling assets with a view to winding up the company or failing to collect debts owed. The section is only available to liquidators, and no other insolvency administrators[879] or creditors (the latter probably in order to avoid a multiplicity of actions), in relation to actions against the past and present directors (including shadow directors[880]) of the company that is now in liquidation. The company must have entered insolvent liquidation.[881] According to s.214(6), insolvent liquidation means that the company, at the time of winding up, was in a position where its debts and li-

**11-136**

---

[872] *Re Howard Holdings Inc* [1998] B.C.C. 549.

[873] See the criticism of the fact that the section does not set out what activity is proscribed in Doyle, "Anomalies in the Wrongful Trading Provisions" (1992) 13 Co. Law. 96.

[874] *Re Hawkes Hill Publishing Co Ltd (in liq)* [2007] B.C.C. 937; [2007] B.P.I.R. 1305.

[875] *Re Hawkes Hill Publishing Co Ltd (in liq)* [2007] B.C.C. 937; [2007] B.P.I.R. 1305 at [28].

[876] *Re Bangla Television Ltd (in liq)* [2009] EWHC 1632 (Ch); [2010] B.C.C. 143.

[877] *Personal Liability and Disqualification of Company Directors* (1999), p.64.

[878] *Re Bangla Television Ltd (in liq)* [2009] EWHC 1632 (Ch); [2010] B.C.C. 143.

[879] This is not in accord with the recommendations of the Cork Report which recommended administrators and administrative receivers also being given the right to take proceedings: para.1792.

[880] 1986 Act s.214(7).

[881] 1986 Act s.214(2)(a).

ASSETS AVAILABLE FOR DIVISION AND DISTRIBUTION

abilities, together with the expenses of winding up, exceeded its assets.[882] In bringing proceedings a liquidator should specify a date from which he or she maintained the director should have realised that insolvent liquidation was inevitable.[883]

**11-137**    It is likely that in some situations liquidators may choose to couple a claim under s.214 with other claims, such as a claim against directors for a breach of duty.[884] As a claim under s.214 is regarded as a claim for the "recovery of a sum recoverable under any enactment the limitation period is six years,[885] and runs from the date when the company entered insolvent liquidation, being the date when the cause of action accrued.[886]

A claim pursuant to s.214 may be continued against a director's estate in the event of his or her death as there was reason to suppose that Parliament had intended that such a claim should not be defeated by death.[887]

If a person is found to have been involved in wrongful trading and is liable to make a contribution to the assets of the company then the court may, on application or of its own volition, and pursuant to s.10 of the Company Directors' Disqualification Act 1986, make a disqualification order thereby disqualifying the person from acting as a director or taking part in the management of a company.[888]

An important point to note here is that the Corporate Insolvency and Governance Act 2020, which partly was enacted in reaction to the COVID-19 pandemic which commenced in early 2020, was said to suspend liability for wrongful trading for a period, namely from 1 March 2020 until 30 September 2020. The statute did not actually suspend liability but it provided that a court, in determining what contribution a directors should make for wrongful trading, is to assume that a director is not responsible for the worsening of a company's financial position or that of the company's creditors during this period.[889] This "suspension" did not apply if the company concerned was excluded from being eligible by any of the paragraphs of Sch.ZA1 to the Insolvency Act 1986 listed in para.(4). Examples of such companies are banks and insurers. In November 2020, the Government decided to introduce a further suspension of liability for the period from 26 November 2020 until 30 April 2021. This was provided for by reg.2 of the Corporate Insolvency and Governance Act 2020 (Coronavirus) (Suspension of Liability for Wrongful Trading and Extension of the Relevant Period) Regulations 2020.[890] Like earlier provisions reg.2 provided that suspension did not apply if the company concerned was excluded from being eligible by any of the paragraphs of Sch.ZA1 to the Insolvency

---

[882]  Section 214(6A) provides that insolvent liquidation can also mean that a company entered administration at a time the company's debts and liabilities, together with the expenses of administration, exceeded its assets.

[883]  Griffin deals with evidential problems facing a liquidator in: *Personal Liability and Disqualification of Company Directors* (1999), pp.92–94.

[884]  For example, see *Re Brian D. Pierson (Contractors) Ltd* [1999] B.C.C. 26.

[885]  Limitation Act 1980 s.9(1).

[886]  *Re Farmizer (Products) Ltd* [1997] 1 B.C.L.C. 589; [1997] B.C.C. 655.

[887]  *Re Sherborne Associates Ltd* [1995] B.C.C. 40 at 46.

[888]  The maximum period of disqualification is 15 years: s.10(3). See *Re Brian D. Pierson (Contractors) Ltd* [1999] B.C.C. 26 for a case where the respondents were found to have been guilty of wrongful trading and were disqualified from acting as directors as a result. Also, see below at para.11-142.

[889]  See the Corporate Insolvency and Governance Act 2020 s.12.

[890]  Corporate Insolvency and Governance Act 2020 (Coronavirus) (Suspension of Liability for Wrongful Trading and Extension of the Relevant Period) Regulations 2020 (SI 2020/1349).

Act 1986.[891] There might be some concern that there is a period of about two months (30 September to 26 November 2020) where the suspension does not apply and it is possible that a company experienced distress during the period up to 30 September 2020, but it is only at some point between 30 September and 25 November that the directors can be said to be guilty of wrongful trading, namely it in this period that the directors knew or other to have known that the company could not avoid insolvent liquidation. On 21 March 2021, the Government in reg.2 of the Corporate Insolvency and Governance Act 2020 (Coronavirus) (Extension of the Relevant Period) Regulations 2021[892] further extended the suspension of liability for wrongful trading to 30 June 2021. Unlike the early regulations which amended the Corporate Insolvency and Governance Act 2020 in relation to director liability under s.214, there was no inclusion of a provision that said that suspension did not apply if the company concerned was excluded from being eligible by any of the paragraphs of Sch.ZA1 to the Insolvency Act 1986.

**(b)   The primary conditions for liability[893]**   Besides the fact that the company    **11-138**
must have been in insolvent liquidation the two primary conditions for liability of a person are that:

- at some time prior to the commencement of winding up the person knew or ought to have concluded that there was no reasonable prospect of the company avoiding going into insolvent liquidation; and
- he or she was at that time a director of the company.

Unlike fraudulent trading which may apply to a broad range of persons, s.214 only applies to directors.[894] "Director" is defined in s.214(7) to include a shadow director. Persons who give advice in a professional capacity or business relationship are not included within the definition of "shadow director", even though the directors may act on his or her directions or instructions.[895] Notwithstanding this exclusion of professionals, investigating accountants put into a company by influential creditors, and accountants involved in an informal corporate rescue must be especially careful that they are not seen as running the company and, therefore, being regarded as shadow directors. Such persons must be seen as advising the board and permitting it to make a decision after assessing their advice. It has been held that liability may extend to de facto directors as well as de jure and shadow directors.[896]

Section 214 has ditched the concept of dishonesty that has proved so troublesome in relation to claims for fraudulent trading. In s.214(4), there is provision for

---

[891] See reg.2(4).
[892] Corporate Insolvency and Governance Act 2020 (Coronavirus) (Extension of the Relevant Period) Regulations 2021(SI 2021/375).
[893] See Keay, *Company Directors' Responsibilities to Creditors* (2007), Ch.8.
[894] Claims against foreign directors of a foreign company that is being wound up in England or Wales can be commenced (*Re Howard Holdings Inc* [1998] B.C.C. 549 at 552; *Stocznia Gdanska SA v Latreefers Inc (No.2)* [2001] 2 B.C.L.C. 116 CA at 142) but, in assessing the claims, courts must have regard for the relevant foreign law under which the directors were acting and what obligations a director had to minimise losses to the company's creditors under that law, and it might well be that if the foreign law did not impose obligations akin to s.214, the English court will decide that it is not appropriate to make an order under s.214 (*Re Howard Holdings Inc* at 554).
[895] 1986 Act s.251.
[896] *Re Hydrodam (Corby) Ltd* [1994] B.C.C. 161.

both objective and subjective tests.[897] The provision sets out the approach that a court must take in assessing a claim. The subsection provides that the facts that a director ought to know or ascertain, the conclusions which ought to be reached and the steps which the director ought to take are those that a reasonably diligent person would take or have taken. So, the provision lays down an objective test. But there is a subjective ingredient to add in. The reasonably diligent person who is used here is one who has the general knowledge, skill and experience that may reasonably be expected of a person who carries out the same functions as are carried out by the respondent director, and, in addition, that person has the general knowledge, skill and experience that the respondent director has. The subjective element introduces the general knowledge, skill and experience of the director, namely something that is specific to the respondent director. But this does not serve to reduce the standard of knowing or ascertaining; rather it heightens it if the director is experienced. So, if a director is not very experienced or has qualities that do not match that of the reasonable person, he or she is not able to take advantage of that and be protected from liability; ignorance or inexperience is not an excuse. A director is not able to argue, as might be done in relation to a small family company, that he or she left all management functions to others without question; there are minimum responsibilities that must be met.[898] If a person is designated as the "sales director" or "finance director" then special skills must be expected of that person.[899] All of this means that a director will be judged by two tests and the director has to attain the higher of the standard set by the tests. So, if a director were to meet the standard of a reasonable person carrying out his or her functions in relation to the company, but a court took the view that the director did not act in such a way as one would expect of someone with his or her knowledge, skill and experience, because the director is highly experienced or has laudable skills, the director could be held liable under s.214. As indicated above, the director must fulfil both tests. In *Re DKG Contractors Ltd*,[900] the director said that he did not know about companies and had no idea what was involved in being a director; he was judged against a reasonable person. But this did not save him. Obviously the concern of the legislature would be that neither inexperienced nor incompetent directors are to be protected because of the mere fact that they are inexperienced or incompetent, and those who are experienced are not able to say that while they did not live up to their standards, they did what a reasonable person would have done in their position.

**11-139**    In determining whether a director knew or ought to have concluded that there was no reasonable prospect of avoiding insolvent liquidation, courts are not restricted to a consideration of the material available to the director during the period of the alleged wrongful trading; reference may be had to material that was able to be accessed by a person exercising reasonable diligence and an appropriate level of general knowledge.[901]

Obviously when hearing a wrongful trading case the courts are hearing it retrospectively and they must realise that and the fact that the director respondent did not have the benefit of hindsight. However, there is always the danger of the

---

[897] Companies Act 2006 s.174, dealing with the duty of care owed by directors is based on this provision.
[898] *Re Brian D. Pierson (Contractors) Ltd* [1999] B.C.C. 26 at 55.
[899] *Re Brian D. Pierson (Contractors) Ltd* [1999] B.C.C. 26 at 55.
[900] *Re DKG Contractors Ltd* [1990] B.C.C. 903.
[901] *Re Produce Marketing Consortium Ltd* (1989) 5 B.C.C. 569 at 595.

court taking the view, because of hindsight, that it can be assumed that what in fact occurred was always bound to happen and was apparent.[902] The result is that the decisions of the director must be taken in the context of the material available to him or her and the situation that existed at the relevant time.

Clearly courts are to have regard for the kind of company managed by the director, as well as the type of business in which it was involved.[903] Consequently, the courts will expect less general knowledge, skill and experience of a director of a company which has modest systems and which is involved in a modest amount of business, than a person whose company has well-developed systems and practices and is conducting a large scale business.[904] According to Professors Sealy and Milman, s.214(4) should "give scope for the courts to make some allowances in the case of non-executive and part-time directors".[905] But courts will assume that certain minimum standards are assumed to be attained in whatever the company or its business.[906] For example, directors are to cause accounting records to be maintained.[907]

A director is not able to argue that he or she left all management functions to oth-  **11-140** ers without question; there are minimum responsibilities that must be met.[908] It should be noted that if a director is involved in what the Cork Committee called, "wilful blindness",[909] that is resolutely shutting one's eyes to the obvious or refraining from asking obvious questions in case he or she discovers the truth, the director will be regarded as having the requisite knowledge. In *Re Continental Assurance Assurance Co of London*,[910] Park J said that the typical case in which directors have been held to be liable, the directors have

"closed their eyes to the reality of the company's position, and carried on trading long after it should have been obvious to them that the company was insolvent and that there was no way out for it. In those cases the directors had been irresponsible, and had not made any genuine attempt to grapple with the company's real position".[911]

Section 214(5) assists in the interpretation of s.214(4). It provides that the reference in the latter subsection to the functions carried out in relation to the company by the director includes any function that the director does not carry out but were entrusted to him or her. This, therefore, makes a director responsible for omitting to do that which he or she should have done, and is in contrast with the common law on care and skill which tended to absolve directors when they did not do something, such as attending board meetings.

The objective test laid down in s.214(4) was new as far as directors and their duties was concerned. Prior to this provision directors were not subjected to an objective test as far as their care and skill, although Hoffmann LJ did, in *Re D'Jan of*

---

[902] *Re Sherborne Associates Ltd* [1995] B.C.C. 40 at 54; *Re Brian D. Pierson (Contractors) Ltd* [1999] B.C.C. 26 at 50.
[903] *Re Sherborne Associates Ltd* [1995] B.C.C. 40 at 54; *Re Brian D. Pierson (Contractors) Ltd* [1999] B.C.C. 26 at 50; *Re Produce Marketing Consortium Ltd* (1989) 5 B.C.C. 569 at 594.
[904] *Re Produce Marketing Consortium Ltd* (1989) 5 B.C.C. 569 at 594–595.
[905] *Annotated Guide to Insolvency Legislation*, 13th edn, p.209.
[906] *Re Produce Marketing Consortium Ltd* (1989) 5 B.C.C. 569 at 595.
[907] *Re Produce Marketing Consortium Ltd* (1989) 5 B.C.C. 569 at 595.
[908] See *Re Brian D. Pierson (Contractors) Ltd* [1999] B.C.C. 26 at 55.
[909] Cork Report, para.1788.
[910] *Re Continental Assurance Assurance Co of London* [2001] B.P.I.R. 733.
[911] *Re Continental Assurance Assurance Co of London* [2001] B.P.I.R. 733 at 769.

*London Ltd*,[912] say that s.214 encapsulated the common law duty of care owed by a director.

**11-141**    *Palmer's Corporate Insolvency Law* neatly summarises the position when it states[913]:

> "The court is thus required to arrive at a conclusion as to the appropriate conduct and acumen of an hypothetical person assuming him to have possessed in combination the levels of general knowledge, skill and experience which the director in question subjectively did possess and which objectively he ought to have possessed in view of the position held."

In determining whether there was no reasonable prospect of a company avoiding insolvent liquidation, courts will take into account a broad range of factors which may be presented to them through evidence. This may include pressure from creditors who are owed debts, the withdrawal of support from banks, the loss of contracts, the fact that other contracts cannot be obtained, the failure to pay Crown debts,[914] and the loss of a major supplier.[915]

Even conscientious and competent directors can be placed in difficult positions when they become aware that their companies' finances are not too healthy. They must not be cavalier, but they must also not be overly cautious, because the latter could see them do something that would not benefit creditors. For example, the immediate cessation of business could be the worst thing for all concerned. The fact that continued trading might be expected to be profitable for the company does not mean that the directors ought not to have concluded that the company could avoid insolvent liquidation.[916]

**11-142**    The liquidator will need to decide on a point of time from which it is alleged the director knew or ought to have concluded that there was no reasonable prospect of the company avoiding going into insolvent liquidation.[917] Liquidators will have to weigh up a number of factors in determining from which time wrongful trading commenced.[918] Cases have said that a liquidator is not entitled, where the case put is not made out in relation to the dates pleaded in the claim, to argue for wrongful trading in respect of other dates.[919] Nevertheless, in *Re Brian D Pierson (Contractors) Ltd*,[920] Hazel Williamson QC (sitting as a deputy High Court judge), appeared to take the view that she would not rule against a liquidator being able to point to events that establish liability around about the date that has been pleaded. The court is able, it seems, to impose its own starting point for wrongful trading.[921] In *Official Receiver v Doshi*,[922] Hart J held that the respondent was engaging in wrongful trading from November 1992, and the fact that the liquidator had al-

---

[912] *Re D'Jan of London Ltd* [1993] B.C.C. 646.

[913] P. Davies et al (eds), *Palmer's Corporate Insolvency* (London: Sweet & Maxwell, 1986), Vol.1, p.1256.

[914] S. Griffin, *Personal Liability and Disqualification of Company Directors* (1999), p.66.

[915] For example, see *Re DKG Contractors Ltd* [1990] B.C.C. 903.

[916] *Re Ralls Builders Ltd* [2016] EWHC 243 (Ch); [2016] B.C.C. 293 at [186].

[917] For a detailed consideration of the issue, see Keay, "Wrongful Trading and the Point of Liability" (2006) 19 Insol. Int. 132.

[918] In this regard, see Hicks, "Advising on Wrongful Trading: Pt 1" (1993) 14 Co. Law 16, 17.

[919] *Re Sherborne Associates Ltd* [1995] B.C.C. 40 at 42; *Re Hawkes Hill Publishing Co Ltd (in liq)* [2007] B.C.C. 937; [2007] B.P.I.R. 1305 at 37.

[920] *Re Brian D Pierson (Contractors) Ltd* [1999] B.C.C. 26 at 49–50; [2001] B.C.L.C. 275 at 302–303.

[921] *Re Purpoint Ltd* [1991] B.C.C. 121 at 128. See Keay, "Wrongful Trading and the Point of Liability" (2006) 19 Insol. Int. 132.

[922] *Official Receiver v Doshi* [2001] 2 B.C.L.C. 235 at 281.

leged that the trading had commenced on February 1992 did not seem to matter.[923] Also, none of the courts in *Roberts v Frohlich*,[924] *Re Kudos Business Solutions Ltd*[925] or *Re Ralls Builders Ltd*[926] expressed any concern with the liquidators nominating dates in the alternative. Furthermore, it seems that dates can be estimates. For instance, in *Roberts v Frohlich* the case pleaded was that the wrongful trading occurred "around 1 July 2004 (or alternatively on or around 1 September 2004)".[927] In this case the judge found that wrongful trading had occurred by 14 September and allowed the liquidator's claim. In *Brooks v Armstrong*,[928] it was said that liquidators did not always have to specify an actual date, although to do so was useful, and a case would not fail simply because a specific date was not mentioned.[929]

The fact that a company was insolvent at some point and then carried on trading did not necessarily mean that a director with knowledge of that fact would be liable for wrongful trading if the company failed to survive. It is not unusual for companies to have a balance-sheet deficit from time to time but despite this have a real prospect of trading out of that position or otherwise recovering from the deficiency and thereby avoiding insolvent liquidation. In a similar manner, companies often experienced cash-flow difficulties and failed to pay their creditors on time, but were able to overcome that problem in some way.[930]

The burden of making out a case is, as one would expect, on the liquidator.[931] If the liquidator is able to establish that there was no reasonable prospect of avoiding insolvent liquidation, then the burden of proof is transferred to the director, who must make out a defence pursuant to s.214(3), a matter discussed shortly.

### 3.    Defences[932]

The solitary defence is found in s.214(3). This provides that a director is not liable for wrongful trading where the court is satisfied that after becoming aware that the company was bound for insolvent liquidation, the director took     **11-143**

"every step with a view to minimising the potential loss to the company's creditors as (assuming him to have known that there was no reasonable prospect that the company would avoid going into insolvent liquidation) ought to have taken".

Initially we should note that Snowden J in *Re Ralls Builders Ltd*[933] took the view that given the express wording of s.214(3), it is intended that the provision is to be a high hurdle for directors to surmount, and accordingly the provision should be construed strictly. With this in mind, what constitutes "every step"? The provision does not enumerate any actions that may constitute the step which a director ought to take. Obviously the placing of the company in some form of insolvency

[923] For a more detailed consideration of the issue of point of liability, see Keay, "Wrongful Trading and the Point of Liability" (2006) 19 Insolv. Int. 132.
[924] *Roberts v Frohlich* [2011] EWHC 257 (Ch); [2011] 2 B.C.L.C. 635 at [6].
[925] *Re Kudos Business Solutions Ltd* [2011] EWHC 1436 (Ch) at [3], [131].
[926] *Re Ralls Builders Ltd* [2016] EWHC 243 (Ch); [2016] EWHC 293.
[927] *Roberts v Frohlich* [2011] EWHC 257 (Ch); [2011] 2 B.C.L.C. 635 at [6].
[928] *Brooks v Armstrong* [2015] EWHC 2289 (Ch); [2015] B.C.C. 661.
[929] While the decision was partly reversed on appeal ([2016] EWHC 2893 (Ch)), this view was not criticised.
[930] *Re Ralls Builders Ltd* [2016] B.C.C. 293 at [168].
[931] *Re Sherborne Associates Ltd* [1995] B.C.C. 40.
[932] See A. Keay, *Company Directors' Responsibilities to Creditors* (2007), Ch.9.
[933] *Re Ralls Builders Ltd* [2016] B.C.C. 293 at [245].

administration, such as under administration would probably exculpate a director, in most cases, certainly as further losses are concerned, and where the financial state of a company is questionable and its future unknown the safe option is to place the company in administration. Liquidation might be another option, but the danger with this is that the company may not be "finished" and so this action might be premature. In *Re Ralls Builders Ltd*,[934] Snowden J said, as noted above, that s.214(3) should be interpreted strictly:

> "[A]nd to require a director who wishes to take advantage of the defence offered by that subsection to demonstrate not only that continued trading was intended to reduce the net deficiency of the company, but also that it was designed appropriately so as to minimise the risk of loss to individual creditors."[935]

Directors should not be permitted to set up the defence when they paid off some existing creditors in full by paying them from credit received from new creditors and at the expense of the latter.[936] There needs to be some attempt at protecting new creditors.

The requirement in the section was intended to cover specific steps taken by directors with a view to preserving or realising assets or claims for the benefit of creditors and did not apply to the act of wrongful trading itself, even if that action was undertaken with the intention of attempting to make a profit.[937]

**11-144**   What steps could directors take to safeguard themselves? Taking advice (and recording the fact that meetings took place) from appropriate professionals, and acting on it, is probably a good starting point. The courts have said that they will take into account the fact that the directors have taken professional advice.[938] But following the advice of a professional adviser is not guaranteed to absolve a director, but it should go some way to doing so.[939] Certainly a director who decided not to heed the advice of such a person is likely to be regarded as not taking every step to minimise the potential loss to the company's creditors. One or more of the following may be prudent:

- calling a creditors' meeting in order to advise them of the state of the company;
- liquidating the company;
- appointing an administrator;
- ensuring that adequate inquiries are made of managers; and/or
- convening regular board meetings to review the position of the company.

Resignation might be considered by individual directors, but it is not guaranteed to extricate a director from liability because if he or she resigns then it is not possible for the director to influence decision-making and to take action to minimise losses for creditors.[940] Resignation should be seen, in most cases, as the last straw.

---

934 *Re Ralls Builders Ltd* [2016] B.C.C. 293 at [245].
935 *Re Ralls Builders Ltd* [2016] B.C.C. 293 at [245].
936 *Re Ralls Builders Ltd* [2016] B.C.C. 293 at [246].
937 *Re Brian D Pierson (Contractors) Ltd* [1999] B.C.C. 26; [2001] B.C.L.C. 275.
938 *Re Hawkes Hill Publishing Co Ltd* [2007] B.C.C. 937; [2007] B.P.I.R. 1305 at [45]; *Re Ralls Builders Ltd* [2016] [2016] B.C.C. 293 at [176], [206].
939 See Oditah, "Wrongful Trading" [1990] L.M.C.L.Q. 205, 208 where the learned commentator argues that if a director acts on the informed advice of an auditor a strong case should be able to be mounted against the director being held liable.
940 Hicks, "Advising on Wrongful Trading: Pt 2" (1993) 14 Co. Law 55 at 58.

PROCEEDINGS AGAINST DIRECTORS

It may be the only action that a director can take if he or she has made proposals to the board for the arrest of a company's demise, and the board has refused to implement them or any other efficacious alternatives.[941] While the Act permits the directors to petition for the winding up of their company,[942] a single director may not do so.[943] Also, if a director disagrees with the board he or she would not be wise to publicise his or her concerns as this could escalate the company's demise.[944] The director should ensure that he or she keeps a detailed record of all that he or she has done to minimise the losses of creditors.

It would seem that while tightening the corporate belt[945] might well be appropriate, directors do not necessarily have to stop taking salaries. Snowden J said in *Re Ralls Builders Ltd*[946] that he did not think that the directors "should be deprived of that defence merely because they also continued to draw reasonable salaries to which they were entitled for work actually done during the period. Provided that they were genuine salaries and not excessive in amount …".[947]

The termination of business, while it may seem to be the most sensible and proper thing to do, can in fact be the worst thing, especially in the short term, as it may be detrimental for all concerned, particularly the creditors. Trading on the basis of cash purchases may well not be regarded as sufficient as overheads will still mount up.[948]

Professor Sir Roy Goode set out 12 points for a director to survive in a company where financial problems are apparent.[949] These include:    **11-145**

- ensuring that the company's accounts are properly kept up to date;
- requiring that there are frequent board meetings;
- ensuring the board receives details of the company's trading and financial position on a regular basis;
- obtaining outside professional assistance on taking remedial action;
- ensuring that major creditors are kept informed and obtaining their support; and
- directors ensuring that any time they dissent from what they believe are imprudent actions, this dissent should be recorded in the minutes of board meetings.

In *Brooks v Armstrong*,[950] Registrar Jones (as he then was) set out the following as guidance as to the factors that probably should be considered by directors and kept under review both generally and when considering specific financial decisions assuming the business remains sustainable:

"Ensuring accounting records are kept up to date with a budget and cash-flow forecast; preparing a business review and a plan dealing with future trading including steps that can be taken (for example cost cutting) to minimise loss; keeping creditors informed and reaching agreements to deal with debt and supply where possible; regularly monitoring

---

[941] Griffin has submitted that resignation, in the majority of cases, will probably be viewed as an indication of the fact that the director has failed to take every step: *Personal Liability and Disqualification of Company Directors* (1999), p.76.

[942] 1986 Act s.124(1).

[943] *Re Instrumentation Electrical Services Ltd* (1988) 4 B.C.C. 301.

[944] See Hicks, "Advising on Wrongful Trading: Pt 2" (1993) 14 Co. Law. 55, 58.

[945] *Re Idessa (UK) Ltd* [2011] EWHC 804 (Ch); [2011] B.P.I.R. 957; [2012] B.C.C. 315.

[946] *Re Ralls Builders Ltd* [2016] B.C.C. 293.

[947] *Re Ralls Builders Ltd* [2016] B.C.C. 293 at [248].

[948] Oditah, "Wrongful Trading" [1990] L.M.C.L.Q. 205, 214.

[949] Goode, *Principles of Corporate Insolvency Law*, 4th edn (2011), pp.674–676.

[950] *Brooks v Armstrong* [2015] EWHC 2289 (Ch); [2015] B.C.C. 661.

ASSETS AVAILABLE FOR DIVISION AND DISTRIBUTION

the trading and financial position together with the business plan both informally and at board meetings; asking if loss is being minimised; ensuring adequate capitalisation; obtaining professional advice (legal and financial); and considering alternative insolvency remedies."[951]

In *Re Continental Assurance Co of London Plc*,[952] Park J was impressed with the fact that the directors "reduced the scale of trading to minimal and cautious levels", and eventually ceased trading when they were advised that their company was insolvent.[953] While in *Re Idessa (UK) Ltd*,[954] the directors failed in their defence as they had clearly not exercised sufficient caution and prudence. They had not tightened the corporate belt or encouraged cost savings or done anything differently in their management of the affairs of the company notwithstanding the company's state.[955] The defence in s.214(3) has to be construed strictly, and thus if the directors of a company decided to continue trading when they ought to have concluded that the company was bound for insolvent liquidation in order to make out the defence in s.241(3) they would be required to show that the continuation of trading was intended to reduce the net deficiency of the company and, in addition, it was designed to minimise the risk of loss to individual creditors.[956] If this was not the case, according to Snowden J in *Re Ralls Builders Ltd*,[957] "a director could make out the defence under s.214(3) by claiming that he or she traded on with a view to reducing the overall deficiency for creditors as a general body, irrespective of how he or she achieved that result as between creditors".[958] It was indicated in *Brooks v Armstrong*[959] that losses suffered by individual creditors would not lead to liability for the respondent directors if there was not an increase in net deficiency. Nevertheless, in *Re Ralls Builders Ltd*, Snowden J held that whether or not the directors succeeded in reducing the net deficiency of the company as regards the general body of unsecured creditors, they ought not be entitled to an outright defence under s.214(3) because of the manner in which they chose to continue trading, namely existing unsecured creditors at the expense of new creditors who ended up not being paid.[960]

In determining whether the defence is made out or not, the court is required by s.214(4) to consider if the director took the steps which a reasonably diligent person who has the general knowledge, skill and experience that may reasonably be expected of a person who carries out the same functions as are carried out by the respondent director, and, the general knowledge, skill and experience that the respondent director has. This is the same factor that applies in deciding whether or not a director has met the condition for liability. Again, a director is not able to rely on his or her inexperience. Nor is the experienced director who has above-average experience able to argue that he or she did what the reasonable person would have done. In this case, where the standard expected of a reasonable person would be less

---

[951] *Brooks v Armstrong* [2015] EWHC 2289 (Ch); [2015] B.C.C. 661 at [259].
[952] *Re Continental Assurance Co of London Plc* [2001] B.P.I.R. 733.
[953] *Re Continental Assurance Co of London Plc* [2001] B.P.I.R. 733 at 769.
[954] *Re Idessa (UK) Ltd* [2011] EWHC 804 (Ch); [2011] B.P.I.R. 957; [2012] B.C.C. 315.
[955] *Re Idessa (UK) Ltd* [2011] EWHC 804 (Ch); [2011] B.P.I.R. 957; [2012] B.C.C. 315 at [120].
[956] *Re Ralls Builders Ltd* [2016] B.C.C. 293 at [245]. For criticism of the notion that as long as the net deficiency does not increase a director is not guilty of wrongful trading, see Moss, "No compensation for wrongful trading—where did it all go wrong?" (2017) 30 Insolv. Int. 49.
[957] *Re Ralls Builders Ltd* [2016] B.C.C. 293.
[958] *Re Ralls Builders Ltd* [2016] B.C.C. 293 at [245].
[959] *Brooks v Armstrong* [2015] B.C.C. 661.
[960] *Re Ralls Builders Ltd* [2016] B.C.C. 293 at [246].

than for a person with the director's experience and skill then the higher standard will be used to judge the director.

The liquidator does not have the burden of establishing that the directors failed to take every step.[961] Rather, the burden of establishing the elements of a defence falls on directors, and they must establish their case on the balance of probabilities, but, as mentioned before, courts will not assess the directors' actions with hindsight,[962] and so a determination whether a director took every step should not be considered in light of later developments that could not have been reasonably foreseen by directors.

The use of the words "every step" in s.214(3) might be said to be too strong, for if one wanted to be strict, the defence is, except in rare cases, almost impossible to establish. Notwithstanding that concern, there does not seem to be a plethora of wrongful trading actions. This may be the result of a number of factors, such as a lack of funding, but it also may be because liquidators are exercising restraint in circumstances where the directors have not acted unreasonably, even though technically they may not have taken every step that ought to have been taken. Also, as Professor Goode has said, in relation to the words, "every step", this may mean no more than, given the reference in s.214 to the reasonably diligent person, requiring the taking of "every reasonable step".[963] The courts have acknowledged the fact that in many situations the directors have a difficult decision as to whether they trade on or close down the company and go into liquidation, the courts will take note of the fact that the directors can be in a real and unenviable dilemma.[964]

What if a director was ill for a significant period of time or for some good reason did not take part in the management of the company, such as being overseas on company business? In the Australian case of *Androvin v Figliomeni*,[965] dealing with the Australian equivalent of s.214 (s.588G of the Corporations Act 2001), a director was held not to be liable for debts incurred while he was overseas. The director had indicated to the other directors, before his departure, that he would not be in a position to act as a director or accept any responsibilities during his absence. As a result there had been a fundamental change in the working operations of the company.

Essentially, whether a director has taken every step depends on courts considering what has been done in light of the criteria contained in s.214(4). If directors can demonstrate that they took every step with a view to minimising the potential loss to the company's creditors, they avoid liability even if the steps do not actually succeed in minimising the potential loss to the creditors.[966]

Another defence open to a director may be to argue that there was a reasonable prospect of the company avoiding insolvent liquidation and, therefore, s.214(2) is not made out.

Essentially s.214(3) is exhaustive of the defences available to a director. A direc-

**11-146**

**11-147**

---

[961] *Brooks v Armstrong* [2015] EWHC 2289 (Ch); [2015] B.C.C. 661 at [7].
[962] *Re Sherborne Associates Ltd* [1995] B.C.C. 40 at 54; *Re Brian D Pierson (Contractors) Ltd* [1999] B.C.C. 26 at 50; [2001] B.C.L.C. 275 at 303; *Re Ralls Builders Ltd* [2016] B.C.C. 293 at [173], [216].
[963] *Principles of Corporate Insolvency Law* (2005), p.536.
[964] *Re Continental Assurance Co of London Plc* [2001] B.P.I.R. 733; *Brooks v Armstrong* [2015] EWHC 2289 (Ch); [2015] B.C.C. 661. In the latter case the registrar indicated that directors will often be faced with decisions for which there is no obvious right or wrong answer (at [180]).
[965] *Androvin v Figliomeni* (1996) 14 A.C.L.C. 1461.
[966] *Re Ralls Builders Ltd* [2016] B.C.C. 293 at [244].

tor is not able to avail himself or herself of general defences.[967] In particular it has been held that a director cannot be excused for wrongful trading under s.1157 of the Companies Act 2006 on the basis that he or she had acted honestly and reasonably, as the defence is incompatible with the objective nature of the test found in s.214.[968] But this is questionable because s.214 in fact involves both subjective and objective elements, as does s.1157. On that basis perhaps ss.214 and 1157 are not as incompatible as has been suggested. It is notable that, in *Re D'Jan of London Ltd*,[969] Hoffmann LJ (as he then was) was prepared to relieve a director from liability for breach of the director's duty of care and skill, and the test for a breach of this duty was, according to his Lordship, the same as that found in s.214. It is also interesting that the judge in *Re DKG Contractors Ltd*[970] did not exclude possible relief from liability for a director liable under s.214.

### 4.   Relief[971]

**11-148**    Like fraudulent trading, under s.213, the court has the power to order a director to contribute an amount to the assets of the company in liquidation.[972] The courts have an unfettered discretion in the exercise of this power. The jurisdiction under s.214 is compensatory and not penal,[973] and the amount of compensation that can be ordered is totally at the discretion of the court.[974] However, in relation to s.213, the Court of Appeal, when dealing with the same wording as in s.214(1), has said that the contribution to the assets to be shared amongst the creditors should reflect the loss which has been caused to the creditors by the carrying on of the business in the way that gives rise to the exercise of the power,[975] and this appears to limit the discretion of judges, certainly when it comes to ascertaining loss.

Any liability to contribute is based on the loss to the company overall and the amount by which the position of the creditors had worsened.[976]

In his judgment in *Brooks v Armstrong*,[977] Registrar Jones set out the principles which are to be applied when deciding on relief. These are:

"(a)    The discretion under *s.214* is unfettered (subject to acting judicially and to achieving the purpose of the power) and the purpose is compensatory not penal …

(b)    Compensation is designed to recoup the loss to the company caused by wrongful trading. The resulting award will benefit the creditors as a whole. There is no jurisdiction to direct payment to a specific class of creditors or creditor. Those whose debts are incurred after the date of wrongful trading have no stronger claim. All creditors at the date of liquidation will suffer from the company's loss to the extent that the assets of the company have been depleted and/or creditors increased by the decisions and actions of the directors …

---

[967] Oditah, "Wrongful Trading" [1990] L.M.C.L.Q. 205, 214.

[968] *Re Produce Marketing Consortium Ltd* [1989] 1 W.L.R. 745; (1989) 5 B.C.C. 399; *Re Brian D. Pierson (Contractors) Ltd* [1999] B.C.C. 26. See the comments of Nelson J in *Bairstow v Queens Moat Houses Plc* [2000] B.C.C. 1025.

[969] *Re D'Jan of London Ltd* [1994] 1 B.C.L.C. 561.

[970] *Re DKG Contractors Ltd* [1990] B.C.C. 903.

[971] See Keay, *Company Directors' Responsibilities to Creditors* (2007), pp.101–108.

[972] 1986 Act s.214(1).

[973] *Re Produce Marketing Consortium Ltd* (1989) 5 B.C.C. 569 at 597. Although a finding against a director may mean that an order of disqualification from acting as a director may be imposed by the courts: Company Directors' Disqualification Act 1986 s.10.

[974] *Re Produce Marketing Consortium Ltd* (1989) 5 B.C.C. 569 at 597.

[975] *Morphites v Bernasconi* [2003] EWCA Civ 289; [2003] B.C.C. 540 at 55.

[976] *Re Ralls Builders Ltd* [2016] B.C.C. 293 at [268].

[977] *Brooks v Armstrong* [2015] EWHC 2289 (Ch); [2015] B.C.C. 661.

(c)   In order to establish a maximum liability (i.e. subject then to the exercise of discretion), the loss will normally be represented by the amount the assets have depleted and/or the creditors have increased. The increase in the net deficiency from the hypothetical insolvent liquidation on the date of wrongful trading to the date of the usual compulsory order or resolution to wind up will normally reflect the loss to the company as a result of the liquidation having been delayed …

(d)   Whilst current authority does not recognise it to be necessary to establish a causal link between wrongful trading and any particular loss,[978] it not being an express requirement of *s.214*, there must be more than a 'but for' nexus. The court's discretionary jurisdiction enables allowance to be given when the loss is not caused by the actions of the director responsible for wrongful trading. Compensation should be linked to the liabilities that result from the wrongful trading attributed to the director(s) …

(e)   In *Re Continental Assurance Co of London Plc* (above) Park J identified the following examples as potentially two ends of the spectrum of causation. At one end, the obvious case of continuing a loss-making business resulting in compensation to recover the trading losses the directors ought to have known would result from that continued trading. At the other end the exclusion of losses attributable to worsening weather conditions which could not be attributed to decisions taken by the directors."[979]

It has been asserted, on the basis that the courts have a broad discretion, that the courts may take into account, when considering the conduct that constitutes wrongful trading,[980] the fact that a director was culpable; with the result that courts may treat directors who have been reckless more harshly than those who have acted honestly and perhaps naively.[981] But this does not accord with the fact that the Court of Appeal in *Morphites v Bernasconi*[982] rejected any notion of providing for a penal award. Yet this might not be inconsistent with the fact that it has been said that a judge can order various respondents to a liquidator's claim to pay different amounts, depending on their position, knowledge and experience.[983]

The compensation ordered by the court does not have to be based on the loss suffered by creditors.[984] What a director can be ordered to pay is the amount by which it can be discerned that the assets of the company have been depleted by the wrongful trading of the director[985] and hence the amount by which the position of the creditors as a whole has worsened. The period commences from the date on which the director should have realised that the company had no reasonable prospect of avoiding insolvent liquidation.

While dishonesty is not needed to be demonstrated by the liquidator in making out a case, it has been stated that a judge is able to take into account the directors lack of dishonesty in coming to a decision on what directors who are found to have engaged in wrongful trading are to pay.[986] Given the fact that dishonesty has nothing to do with the establishing of wrongful trading it is arguable whether the fact that directors have not acted dishonestly is a matter that should be taken into ac-

---

[978] This was a point Snowden J specifically made in *Re Ralls Builders Ltd* [2016] B.C.C. 293 at [242].
[979] *Brooks v Armstrong* [2015] B.C.C. 661 at [287].
[980] S. Griffin, *Personal Liability and Disqualification of Company Directors* (1999), p.83.
[981] *Re Produce Marketing Consortium Ltd* (1989) 5 B.C.C. 569 at 598.
[982] *Morphites v Bernasconi* [2003] EWCA Civ 289; [2003] B.C.C. 540 at 55.
[983] *Re Continental Assurance Co of London Plc* [2001] B.P.I.R. 733 at 847.
[984] *Re Produce Marketing Consortium Ltd* (1989) 5 B.C.C. 569 at 598.
[985] *Re Produce Marketing Consortium Ltd* (1989) 5 B.C.C. 569 at 598; *Re Purpoint Ltd* [1991] B.C.L.C. 491; *Re Ralls Builders Ltd* [2016] B.C.C. 293 at [252].
[986] *Brooks v Armstrong* [2016] EWHC 2893 (Ch) at [140].

ASSETS AVAILABLE FOR DIVISION AND DISTRIBUTION

count in determining the amount of liability. Directors are either liable or not liable for wrongful trading and the issue of honesty should not come into the picture.

**11-149**   It has been stated that it does not necessarily follow that directors should be required to make a contribution to the company's assets if they ought to have concluded that there was no reasonable prospect of the company avoiding insolvent liquidation.[987] Even though the liquidator proves his or her case the court may decide not to award anything.[988]

If liability is established the court must, where two or more directors have been sued, determine how much each ought to contribute individually.[989] The court may in its discretion order that the directors be "jointly and severally liable for the whole or part of whatever sum the court thinks fit to require to be contributed to the company's assets."[990]

No orders may be made in favour of particular creditors as the aim of s.214 is to assist the liquidator to recoup the loss to the company so as to benefit all of the creditors of the company.[991] Not all losses suffered by a company after the directors wrongly decide to continue trading can necessarily be claimed by a liquidator,[992] and liability will be restricted to those consequences which are attributable to the wrongful action(s) of the directors.[993] In any action it will be incumbent on a liquidator to establish that there was a net deficiency in company assets when comparing the company's position as at the time when wrongful trading is alleged to have commenced (and trading should have stopped) and the position when trading actually ceased.[994] As mentioned earlier, according to *Re Bangla Television Ltd (in liq)*,[995] a transfer of assets at an undervalue could constitute the basis for a contribution by the directors. In this case the directors had effected a transfer at an undervalue and the judge held that the value of the property transferred represented an increase in the net deficiency of the company's assets.

Where a court makes a declaration against the respondent to a s.214 application, it is, at its discretion, empowered to make further directions to give effect to its declaration.[996] In particular it may provide for the liability of the respondent (under the declaration) to be a charge on any debt or obligation due from the company to the respondent, or on any mortgagee or charge or any interest in a mortgage or charge on assets of the company held by or vested in the respondent, or any person on behalf of the respondent, or any person claiming as assignee from or through the respondent.[997] Also the court may, from time to time, make such further or other order as may be necessary for enforcing any charge imposed under s.215.[998]

Although not deciding the issue, it was assumed in some of the earlier case law,

---

[987] *Re Ralls Builders Ltd* [2016] B.C.C. 293 at [219].

[988] *Nicholson v Fielding* [2017] All ER (D) 156 (Oct) at [110]; *Re Ralls Builders Ltd* [2016] B.C.C. 293.

[989] *Re Continental Assurance Co of London Plc*; sub nom *Singer v Beckett* [2001] B.P.I.R. 733; [2007] 2 B.C.L.C. 287 at [385].

[990] *Re Continental Assurance Co of London Plc* [2001] B.P.I.R. 733 at 846 ([385]).

[991] *Re Purpoint Ltd* [1991] B.C.L.C. 491 at 499.

[992] *Re Continental Assurance Co of London Plc* [2001] B.P.I.R. 733 at 844; *The Liquidator of Marini Ltd v Dickenson* [2003] EWHC 334 (Ch) at 68.

[993] *Re Continental Assurance Co of London Plc* [2001] B.P.I.R. 733 at 845.

[994] *Re Continental Assurance Co of London Plc* [2001] B.P.I.R. 733 at 844; *The Liquidator of Marini Ltd v Dickensen* [2003] EWHC 334 (Ch) at 68.

[995] *Re Bangla Television Ltd (in liq)* [2009] EWHC 1632 (Ch); [2010] B.C.C. 143.

[996] 1986 Act s.215(2).

[997] 1986 Act s.215(2)(a).

[998] 1986 Act s.215(2)(b).

PROCEEDINGS AGAINST DIRECTORS

such as *Re Simmon Box (Diamonds) Ltd*,[999] that it may not be necessary to prove a causal link between the wrongful trading established, and any particular loss, but *Re Continental Assurance Co of London Plc*,[1000] and later *Brooks v Armstrong*[1001] and Re Ralls Builders Ltd[1002] held that it is necessary to establish some connection between the wrongfulness of the directors' conduct with the company's losses which the liquidator seeks to recover. Snowden J in *Re Ralls Builders Ltd*[1003] said something similar, and his Lordship added that the directors should not be responsible for losses that the company would have incurred in any event as a result of the company entering a formal insolvency procedure.

If a director is liable he or she is not able to claim contribution from non-directors as they are not liable for the same damage caused by directors.[1004]

The criticism of the present system of compensation has been that the persons **11-150** who have been the real victims of the wrongful trading, namely those who became creditors subsequent to the time when wrongful trading commenced, do not receive all of the compensation, for some of it will go to persons who had become creditors prior to the advent of wrongful trading.[1005] The purpose of s.214 is not, it has been held, "to provide differential redress for individual creditors, depending upon an assessment of the extent of their loss caused by the period of wrongful trading."[1006] Where the losses of some creditors are greater than others, because the latter were paid some or all of what was owed, the liquidators could look to taking proceedings under the preference provision, s.239 and not under s.214.[1007]

### 5. *Recoveries*[1008]

The discretion given to courts under s.214 is to be exercised in order to benefit **11-151** unsecured creditors[1009]; the section says that a director can be ordered to make a contribution to the *company's* assets (my emphasis). As a liquidator is taking proceedings under s.214 on behalf of the creditors and contributories of the company, any money recovered will be paid to them and not to creditors who hold charges.[1010] It has been argued that it is inconsistent to say that the award under s.214 does not belong to the company (and, therefore, the chargeholders would be able to claim priority) when the courts, notably those in *Re Purpoint Ltd*[1011] and *Re*

---

[999] *Re Simmon Box (Diamonds) Ltd* [2000] B.C.C. 275; [2001] 1 B.C.L.C. 176 CA.

[1000] *Re Continental Assurance Co of London Plc* [2001] BPIR 733 at 844.

[1001] *Brooks v Armstrong* [2015] EWHC 2289 (Ch), [2015] B.C.C. 661 at [287].

[1002] *Re Ralls Builders Ltd* [2016] B.C.C. 293 at [242].

[1003] *Re Ralls Builders Ltd* [2016] B.C.C. 293 at [242].

[1004] *Re International Championship Management Ltd* [2006] EWHC 768 (Ch). In this case, it was sought to obtain contribution from an insolvency practitioner.

[1005] Hicks, "Advising on Wrongful Trading: Pt 1" (1993) 14 Co. Law 16, 17.

[1006] *Re Ralls Builders Ltd* [2016] B.C.C. 293 at [236].

[1007] *Re Ralls Builders Ltd* [2016] B.C.C. 293 at [251].

[1008] For an interesting and thoughtful consideration of the issue, see Parry, "The destination of proceeds of insolvency litigation" (2002) 23 Co Law 49. Also, see Armour and Walters, "The Proceeds of Office-holder Actions under the Insolvency Act: Charged Assets or Free Estate?" [2006] L.M.C.L.Q. 27.

[1009] *Re Produce Marketing Consortium Ltd* (1989) 5 B.C.C. 569 at 598.

[1010] *Re Oasis Merchandising Ltd* [1997] 1 All E.R. 1009. Compare the earlier decision of Knox J in *Re Produce Marketing Consortium Ltd* (1989) 5 B.C.C. 569.

[1011] *Re Purpoint Ltd* [1991] B.C.L.C. 491.

*Continental Assurance*,[1012] recognise that wrongful trading causes loss to the company, and it is the company that is the victim of the wrongful trading.[1013] Section 214(1) refers to liable directors having to contribute to the assets of the company. Yet, of course, s.214(3) refers to minimising the loss to creditors. Probably the comment of Snowden J in *Re Ralls Builders Ltd*,[1014] and mentioned earlier, is apposite. His Lordship brought both net deficiency and loss to creditors together when he said the defence in s.214 required a director:

> "who wishes to take advantage of the defence offered by that subsection [s.214(3)] to demonstrate not only that continued trading was intended to reduce the net deficiency of the company, but also that it was designed appropriately so as to minimise the risk of loss to individual creditors."[1015]

The contribution ordered to be paid by errant directors under s.214 must be distributed according to the statutory scheme among the general body of unsecured creditors and that points to the fact that the provision's purpose is not to benefit creditors differentially depending on the nature of their loss caused by the wrongful trading.[1016]

### 6. An assessment[1017]

**11-152**    It is not intended to deal with s.214 in any great depth because of constraints of space in a general text like this, but it may be worthwhile providing a basic evaluation of the provision, adverting to some of the perceived strengths and weaknesses of the action. There has been a significant amount written by commentators concerning the effectiveness of s.214. Shortly after the advent of the provision, a number of academics regarded wrongful trading as a significant weapon in the arsenal of liquidators. Academics and practitioners alike saw s.214 as having a bright future in providing much needed protection for creditors.[1018] In the early days of the provision Professor D.D. Prentice said that it was "unquestionably one of the most important developments in company law this century".[1019] Dr Fidelis Oditah QC said that s.214 was a "welcome additional weapon in the fight against abuse of the privilege of limited liability by directors of trading companies".[1020] Since these statements were made other commentators have been more circumspect and less optimistic about its potential and impact. It is probably fair to say that s.214 has not lived up to its early promise. It has been stated that

> "despite the provision's potential to significantly displace the director's protective shield of limited liability, section 214 has, in reality, failed to fulfil its objective of achieving an

---

[1012] *Re Continental Assurance* [2001] B.P.I.R. 733.
[1013] See Ho, "On Deepening Insolvency and Wrongful Trading" (2005) 20 *Journal of International Banking Law and Regulation* 426.
[1014] *Re Ralls Builders Ltd* [2016] B.C.C. 293.
[1015] *Re Ralls Builders Ltd* [2016] B.C.C. 293 at [245].
[1016] *Re Ralls Builders Ltd* [2016] B.C.C. 293 at [236].
[1017] For a more detailed assessment, see Keay, *Company Directors' Responsibilities to Creditors* (2007), Ch.10. For more recent evaluations, see Keay, "Wrongful trading: problems and proposals" (2014) 65 *Northern Ireland Legal Quarterly* 63; Williams, "What Can We Expect to Gain from Reforming the Wrongful Trading Remedy?" (2015) 78 M.L.R. 55.
[1018] Schulte, "Enforcing wrongful trading as a standard of conduct for directors and a remedy for creditors: the special case of corporate insolvency" (1999) 20 Co. Law. 80.
[1019] "Creditors' Interests and Director's Duties" (1990) 10 O.J.L.S. 265, 277.
[1020] "Wrongful Trading" [1990] L.M.C.L.Q. 205 at 222.

PROCEEDINGS AGAINST DIRECTORS

efficient means by which the wrongful trading activities of directors can be successfully penalised".[1021]

There have only been a relatively small number of reported cases to date,[1022] and while there have undoubtedly been unreported decisions and claims that have been either settled after the initiation of proceedings, but prior to hearing or even before proceedings have been commenced,[1023] it would seem that s.214 has not been as regularly invoked as the Cork Committee would have hoped.[1024] As Griffin has pointed out in 1999, there had been an average of 18,000 insolvent liquidation per year since 1986 and one would expect there to have been more actions brought.[1025] There have been fewer insolvent liquidations in more recent years, but still we have relatively few cases. Hicks found in conducting empirical research amongst directors that actions for wrongful trading are rarely brought against directors who are disqualified under s.6 of the Company Directors' Disqualification Act 1986.[1026] Schulte has remarked that the provision has not achieved its public or private law role because of substantive and procedural problems.[1027] He concludes that s.214

"is of no interest to a liquidator, no benefit to creditors, and for wrongdoers it is the impotent progeny of a fine legal theory".[1028]

This damning assessment seems to be consistent with the recent trend of criticising s.214. And it is submitted, respectfully, that it is not unreasonable.

What is interesting is that up until now the cases have involved exclusively small closely-held companies. There is not a single instance of the directors of a larger company being held liable. According to one commentator this is because "companies large enough to have professional non-executive directors are highly unlikely to engage in wrongful trading".[1029]

**11-153**

---

[1021] Griffin, *Personal Liability and Disqualification of Company Directors* (1999), p.96.

[1022] Some cases, such as *Re Farmizer (Products) Ltd* [1995] B.C.C. 926; [1995] 2 B.C.L.C. 462 (appeal from this decision was dismissed in [1997] 1 B.C.L.C. 589; [1997] B.C.C. 655), which touch upon the action, have really dealt with procedural issues relating to a s.214 claim, while others have focused on other matters relating to a s.214 claim: *Burgoine v London Borough of Waltham Forest* [1997] B.C.C. 347; [1997] 2 B.C.L.C. 612. Also, *Re Oasis Merchandising Services Ltd* [1995] B.C.C. 911 dealt indirectly with s.214, but the focus was on champerty and funding arrangements.

[1023] See Hicks, "Wrongful Trading—Has it been a failure?" (1993) 8 I.L. & P. 134.

[1024] See the comments of Godfrey and Nield in this regard: "The wrongful trading provisions—all bark and no bite" (1995) 11 I.L. & P. 139 at 140. However, note that Doyle said that data up to 1993 suggested that proceedings for wrongful trading were regularly issued: "Ten Years of wrongful Trading" (1996) 18 I.L & P. 10.

[1025] *Personal Liability and Disqualification of Company Directors*, p.97. Professor Rizwaan Mokal argues (*Corporate Insolvency—Theory and Application* (2005), p.298), correctly, it is respectfully submitted, that the efficacy of s.214 cannot be determined by consideration of the number of proceedings or the number of successful claims. He opines that the provision could have been successful in bringing home to directors that they must consider the interests of creditors if their company is failing and that a more accurate way of testing the section's effectiveness would be to compare the dividends paid to creditors before and after the introduction of the provision.

[1026] A. Hicks, *Disqualification of Directors: No Hiding Place for the Unfit* (London: Chartered Association of Certified Accountants, Research Report No.59, 1998), p.125.

[1027] Schulte, "Enforcing wrongful trading as a standard of conduct for directors and a remedy for creditors: the special case of corporate insolvency" (1999) 20 Co. Law. 80, 81.

[1028] Schulte, "Enforcing wrongful trading as a standard of conduct for directors and a remedy for creditors: the special case of corporate insolvency" (1999) 20 Co. Law 80, 88.

[1029] Mokal, *Corporate Insolvency Law—Theory and Application* (2005), p.283, fn.97.

It has been submitted[1030] that the judges in reported cases have tended to be lenient so as to favour directors. In a nutshell, the point is that there are indications in several cases, such as *Re Continental Assurance Co of London Plc*,[1031] *Re Sherborne Associates Ltd*[1032] and in *Re Hawkes Hill Publishing Co Ltd (in liq)*[1033] that the courts are focusing overly on the need for blameworthy actions of directors before attaching liability to directors. Section 214 is not about blameworthiness. It is about whether directors were aware or should have been aware of their company's inevitable slide into insolvent liquidation and what they have done about it.

It has been submitted that one possible way of ensuring that s.214 is more effective is to permit others besides the liquidator to initiate proceedings.[1034] The legislature has taken up this and now permit administrators to bring proceedings,[1035] just as it does with fraudulent trading.[1036] However it has not gone further. It has been submitted that it would be a meritorious step to allow the Secretary of State to bring an action,[1037] and there may be merit in permitting creditors being able to initiate proceedings in limited circumstances. The involvement of a government agency in such proceedings is not radical. In both Ireland and Australia, a government agency is entitled to initiate equivalent proceedings against directors. In Ireland action may be taken by the Director of Corporate Enforcement,[1038] and in Australia action is able to be initiated by the Australian Securities and Investment Commission.[1039] This book is not the place to provide an argument for implementing this initiative, but it is submitted that it bears consideration.[1040]

While under the Australian equivalent of s.214, s.588G of the Corporations Act 2001, only liquidators are entitled to take proceedings as a general rule, creditors may proceed in two situations, namely if the consent of the liquidator is secured,[1041] or a creditor gives notice to the liquidator after six months from the commencement of the winding up that it is intended to begin proceedings against a director and asking the liquidator to give to the creditor, within three months, either a consent or a statement of reasons why the liquidator is of the opinion that proceedings should not be initiated under s.588M.[1042] If no consent is given within the three months the creditor may proceed against the director.[1043] If a reason for not proceeding is given by the liquidator, it must be produced to the court in the action in which proceedings have been or are initiated.[1044] This approach is also worth some consideration.

**11-154**    Perhaps s.214 would have been more successful if it had been based on

---

[1030] Keay, *Company Directors' Responsibilities to Creditors* (2007), 146–147.

[1031] *Re Continental Assurance Co of London Plc* [2001] B.P.I.R. 733.

[1032] *Re Sherborne Associates Ltd* [1995] B.C.C. 40.

[1033] *Re Hawkes Hill Publishing Co Ltd (in liq)* [2007] B.C.C. 937; [2007] B.P.I.R. 1305.

[1034] Keay, *Company Directors' Responsibilities to Creditors* (2007), p.125.

[1035] 1986 Act s.246ZB.

[1036] 1986 Act s.246ZA.

[1037] See Keay, "Wrongful trading: problems and proposals" (2014) 65 *Northern Ireland Legal Quarterly* 63.

[1038] Company Law Enforcement Act 2001.

[1039] Australian Securities and Investments Commission Act 2001.

[1040] See Keay, "Wrongful trading: problems and proposals" (2014) 65 *Northern Ireland Legal Quarterly* 63.

[1041] Corporations Act 2001 s.588R.

[1042] Corporations Act 2001 s.588S.

[1043] Corporations Act 2001 s.588T(2). For a case under s.588G where proceedings were initiated by a creditor, see *Metropolitan Fire Systems Pty Ltd v Miller & Ewins* (1997) 23 A.C.S.R. 699.

[1044] Corporations Act 2001 s.588T(3).

insolvency, namely directors would be liable if they traded when the company was insolvent. This is the approach taken in Australia, which has amended its counterpart of s.214 on several occasions. It seems that it may have now got it right. The present section, s.588G of the Corporations Act 2001, while still producing some debates over interpretation and application, is now being invoked quite often and with some success.

Section 588G states that directors will contravene the section if all of the following criteria apply:

- they are directors when the company incurs a debt[1045];
- the company was insolvent at the time when the debt was incurred or became insolvent as a result of the incurring of the debt[1046];
- at the time when the debt was incurred there were reasonable grounds for suspecting that the company was insolvent or would become insolvent as a result of the debt incurred[1047];
- the person is aware at the time of the incurring of the debt that there are grounds for suspecting the insolvency of the company or a reasonable person in a like position in a company in the company's circumstances would be aware of the company's insolvency[1048]; and
- the debt was incurred after 23 June 1993 (the date from which the latest provision began to apply).[1049]

Section 588G is the first provision in the line of insolvent trading provisions which actually requires directors to prevent their companies trading while insolvent.[1050]

The Cork Committee had in fact recommended something akin to s.588G, for it **11-155** defined the action of "wrongful trading" as

> "at any time when the company is insolvent or unable to pay its debts as they fall due it incurs further debts or other liabilities to other persons without a reasonable prospect of meeting them in full".[1051]

This approach was rejected by government with the end result that a person may be held liable for wrongful trading without incurring further debts.

The above suggestions would not, however, overcome another problem with s.214, and that is the issue of funding. It seems that actions are not likely to be readily instigated by liquidators because of problems with funding. This book has already highlighted the difficulties that liquidators may experience in trying to make claims.[1052] A liquidator will be concerned to find some way of financing an action, because the liquidator will be personally liable for any costs incurred in pursuing a claim if the company does not have sufficient funds. A liquidator is now in a better situation than he or she once was. Any costs incurred in prosecuting an action would attract a high priority in payment out of the company's assets (under either r.6.42(4)(a) or r.7.108(4)(a)). But, of course, the company might not have adequate

---

[1045] Corporations Act 2001 s.588G(1)(a).
[1046] Corporations Act 2001 s.588G(1)(b).
[1047] Corporations Act 2001 s.588G(1)(c).
[1048] Corporations Act 2001 s.588G(2).
[1049] Corporations Act 2001 s.588G(1)(d).
[1050] See Corporations Act 2001 s.588G(2).
[1051] Cork Report, para.1806.
[1052] See above at paras 9-072–9-075.

assets to cover the costs, and there is still the danger that a liquidator could be liable personally for an adverse costs order made against him or her and in favour of the respondent if the respondent succeeds.[1053]

**11-156**     Another matter that is a source of discouragement to liquidators is the decision in *Re Ralls Builders Ltd*,[1054] where the judge found the directors had engaged in wrongful trading but held that they should not be responsible for losses that the company would have incurred in any event as a result of the company entering a formal insolvency procedure[1055] as the company's net assets were not further reduced between the date of the wrongful trading and the date when the company went into administration. In this case the directors had obtained fresh credit from new creditors after the date on which they were subject to s.214 and used this money to pay off existing creditors. However, as the net deficiency in company assets had not increased there could be no liability.[1056]

## B.   Misfeasance proceedings

**11-157**     Some improper activities of directors might lead to a liquidator considering taking proceedings against the directors, under s.212, for misfeasance. This provision does not create any dedicated claim for a liquidator. It merely provides a procedural avenue that can be adopted. This topic, while relevant to claims for breach of duty by directors, an issue that is discussed shortly, is best left until Ch.16 as that deals with the misconduct of officers.

## C.   Fraudulent trading

**11-158**     A liquidator may take action against directors for a breach of s.213, i.e. conduct which amounts to fraudulent trading. As with misfeasance, this is best discussed in Ch.16.

## D.   Prohibited distributions[1057]

**11-159**     In order to recover distributions of money or assets made by the company before winding up, a liquidator may seek to rely on ss.830 and 831 of the Companies Act 2006 which provide that certain company distributions are prohibited. The former provision prohibits the distribution of company funds, otherwise than out of profits, unless they come within s.830(2). Any distribution must be justified by the company's accounts.[1058] This prohibition is designed to stop capital being returned to the shareholders at the expense of the creditors, thereby protecting the creditors.

Different kinds of transactions and arrangements might be entered into in order to make distributions to shareholders. In examining these arrangements the courts are concerned with substance and not form, so it does not matter how the parties

---

[1053] See below at para.13-038 where the book discusses the issue of whether a liquidator can claim from the company's assets the indemnity costs of the other party, if that party is successful.

[1054] *Re Ralls Builders Ltd* [2016] B.C.C. 293.

[1055] *Re Ralls Builders Ltd* [2016] B.C.C. 293 at [242].

[1056] *Re Ralls Builders Ltd* [2016] B.C.C. 293 at [268]. Snowden J acknowledged that the actions of the directors might cause the liquidators to claim preferences against paid creditors under s.239 (at [251]).

[1057] This topic is only discussed briefly.

[1058] Companies Act 2006 s.836.

PROCEEDINGS AGAINST DIRECTORS

label a transaction, it is how it is to be characterised.[1059] The courts are to consider what is the true purpose and substance of a transaction.[1060] The Supreme Court in *Progress Property Co Ltd v Moorgarth Group Ltd*[1061] has, however, made it clear that if a purely objective rule was applied to the effect that an unlawful return of capital occurred whenever the company entered into an arrangement with a shareholder that led to a transfer that was provided for by undistributable profits without any concern for the purpose of the arrangement, that would be oppressive and unworkable. It would cast doubt on any arrangement that was entered into in good faith when considered with hindsight and where the company had made a loss.[1062]

Besides distributions that purport to be dividends other distributions can be susceptible to challenge. For example, in *Ridge Securities Ltd v IRC*,[1063] intra-group loans involving the company borrower paying excessive amounts of interest were impugned. Some of these distributions might be more easily attacked as transactions at an undervalue, preferences or transactions defrauding creditors. For instance, it has been held that a payment of a dividend by a company might constitute a transaction for the purposes of s.423 provided that it was made when the debtor had the purpose mentioned in s.423(3).[1064]

Any unlawful distribution may be recouped under s.847 in that the benefit can be ordered to be repaid to the company.[1065] If directors do pay out dividends other than from profits then they are liable to the company.[1066] Section 847(2) provides that shareholders can be required to return dividends if unlawfully paid to them and if they knew or had reasonable grounds for believing they were made in contravention of the Act. According to the Court of Appeal in *It's a Wrap (UK) Ltd v Gula*,[1067] shareholders are liable to do so even if they did not know about the legal rules, as long as they knew or could not in the circumstances have been unaware of the facts that indicated that the distribution was unlawful, such as they knew that the company had made losses.

While the Companies Act does not provide that the directors are liable for unlaw-    **11-160** ful distributions, the common law does, and probably most actions are taken against the directors. Many directors, especially in small-medium sized companies, will also be the members in receipt of the benefit.[1068] The directors could be liable for that part of the distribution that is unlawful.[1069] This is on the basis that the directors are regarded as the trustees of the company's property and the payment would

---

[1059] *Progress Property Co Ltd v Moorgarth Group Ltd* [2010] UKSC 55; [2011] 2 B.C.L.C. 332 at [16].
[1060] *Progress Property Co Ltd v Moorgarth Group Ltd* [2010] UKSC 55; [2011] 2 B.C.L.C. 332 at [16].
[1061] *Progress Property Co Ltd v Moorgarth Group Ltd* [2010] UKSC 55; [2011] 2 B.C.L.C. 332.
[1062] *Progress Property Co Ltd v Moorgarth Group Ltd* [2010] UKSC 55; [2011] 2 B.C.L.C. 332 at [29].
[1063] *Ridge Securities Ltd v IRC* [1964] 1 W.L.R. 479.
[1064] *BTI 2014 LLC v Sequana SA* [2016] EWHC 1686 (Ch) at [502] and affirmed by the Court of Appeal, [2019] EWCA Civ 112; [2019] B.C.C. 631.
[1065] For a recent example, see *Snelling House Ltd v Alford* [2012] EWHC 440 (Ch). The actions impugned in this case occurred before the coming into force of s.847 and so s.22 of the Companies Act 1985 applied.
[1066] *Bairstow v Queens Moat Houses Plc* [2000] 1 B.C.L.C. 549 (Nelson J); [2002] B.C.C. 91; [2001] 2 B.C.L.C. 531 CA.
[1067] *It's a Wrap (UK) Ltd v Gula* [2006] EWCA Civ 544; [2006] B.C.C. 626.
[1068] For example, see *Global Corporate Ltd v Hale* [2018] EWCA Civ 2618, [2019] BCC 431.
[1069] *Liquidator of Marini Ltd v Dickenson* [2003] EWHC 334 (Ch); [2004] B.C.C. 172

constitute an unlawful distribution of the company's assets.[1070] If a director is held liable then the order will be that the director must repay the funds paid out by way of dividends.[1071] It is usually pleaded that directors who grant unlawful distributions are in breach of duty or breach of trust and action is instituted pursuant to s.212 of the Act (the so called "misfeasance provision").

As far as directors' liability to repay the value of any improper distribution that they have made Rimer LJ, in giving the leading judgment in the Court of Appeal in *Holland v HMRC*[1072] (*Re Paycheck Services 3 Ltd*), took the view (constituting obiter), and this view was approved by a majority of the members of the Supreme Court when an appeal was before them[1073] from the Court of Appeal, that liability was strict and there was no need to establish proof of dishonesty or negligence. The director might be able to claim relief under s.1157 of the Companies Act 2006.

If a director is liable then on the basis of *Bairstow v Queens Moat Houses Plc*,[1074] namely sums have been paid out other than from profits, his or her liability is not restricted to the loss that the company has experienced because of the payment that is impugned.[1075]

### E.  Duties of directors to their company[1076]

**11-161**    Directors owe important and somewhat onerous general duties to their companies. This is because directors are fiduciaries in relation to the company and the company is in a relatively vulnerable position as its affairs are often within the almost total control of the directors.

Duties have been imposed on directors for many years by equity and the common law in order to protect shareholders and, on occasions, creditors of the company. Now the general duties have been codified and are found in Ch.2 of Pt 10 of the Companies Act 2006.[1077] While some of the duties are different from the pre-codified duties, the majority follow closely the earlier duties. Section 170(3) acknowledges the fact that the duties in Ch.2 are based on certain common law rules and equitable principles, but indicates that the codified duties have application in lieu of the said rules and principles. Nevertheless, in s.170(4) the legislation provides that the codified duties should be interpreted and applied in the same way as the common law rules and equitable principles, and regard is to be had to the corresponding rules and principles in the process of interpreting and applying the general duties. So, it is likely that much of the case law that has built up over some 150 years will be applicable to, or at least used as a basis for, interpretation and application.

---

[1070] *Belmont Finance Corp Ltd v Williams Furniture Ltd* [1980] 1 All E.R. 393, 405; *Bairstow v Queen's Moat Houses Plc* [2001] EWCA Civ 712; [2002] B.C.C. 91 at [44], [50], [51].

[1071] *Re Paycheck Services 3 Ltd*; sub nom. *Revenue and Customs Commissioners v Holland* [2010] UKSC 51; [2010] 1 W.L.R. 2793 at [48]–[49].

[1072] *Holland v HMRC* [2009] EWCA Civ 625; [2010] B.C.C. 104; [2009] 2 B.C.L.C. 309 at [83]–[84].

[1073] *Revenue and Customs Commissioners v Holland* [2010] UKSC 51; [2010] 1 W.L.R. 2793; [2011] S.T.C. 269.

[1074] *Bairstow v Queens Moat Houses Plc* [2002] B.C.C. 91; [2001] 2 B.C.L.C. 531 at [52] CA.

[1075] See Davies and Worthington, *Gower and Davies' Principles of Modern Company Law* (2012), p.313.

[1076] This does not purport to be an exhaustive discussion of this area, which is a huge one. For further discussion see Keay, *Directors' Duties*, 4th edn (London: LexisNexis, 2020), as well as general corporate law texts such as B. Hannigan, *Company Law*, 5th edn (Oxford: Oxford University Press, 2018), Chs 8–13; Davies and Worthington, *Gower and Davies' Principles of Modern Company Law*, 10th edn (2016), Ch.16.

[1077] For a discussion of the rationale for, and the background to, codification, see Keay, *Directors' Duties*, 4th edn (2020), pp.63–69.

PROCEEDINGS AGAINST DIRECTORS

A liquidator may investigate whether directors breached their duties to the company during its life because if they did breach their duties, the liquidator, acting on behalf of the company, could proceed against them if the company could have maintained a claim but for liquidation ensuing. The majority of cases that are brought against directors are initiated by liquidators. A liquidator may be able to recover assets lost by the company as a consequence of a breach, obtain an account of profits received by a director, or obtain compensation for the loss suffered by the company, as a result of the gain made by the director or because of his or her breach.[1078]

A liquidator will usually be focused on taking action against a de jure director, that is one appointed formally and legally to the position of director, and recognised by the law as a director. However, on occasions liquidators might consider proceedings against persons who are allegedly de facto or shadow directors. It is not intended to enter into a discussion of the positions of these two types of directors.[1079] Suffice it to say a de facto director is a person who assumes the functions and status of a director, while never being appointed according to law.[1080] This might be as a result of some defect in the appointment of a person as a de jure director, but more often than not it covers someone who is not appointed, but is involved in directorial roles. If a person had assumed responsibility to act as a director then the court would have to determine in what capacity the person was acting.[1081] A shadow director is defined in s.251 of the Companies Act 2006 (and also in s.251 of the Insolvency Act 1986) as "a person in accordance with whose directions or instructions the directors of the company are accustomed to act". Then s.251(2) of the former statute and s.251 of the latter state that persons are not deemed to be shadow directors just because the directors act on their advice, in situations where the advice is given in a person's professional capacity.

Any recovery of property, account of profits or award of damages would swell **11-162** the pool of assets available to be distributed among the creditors. However, it must be noted that any damages or profits recovered form part of the general assets of the company and are thus available to a creditor who has a secured interest over future property.[1082]

The standard by which executive and non-executive directors are judged are the same.[1083]

This part of the chapter is only intended to provide a brief introduction to directors' duties because the law is voluminous and there are extensive treatments to be found in most company law texts, as well as some specialist works.[1084] Below the content of the duties are merely set out and a few remarks made concerning their application.

---

[1078] For a substantial discussion of the remedies available, see Keay, *Directors' Duties*, 4th edn (2020), Ch.15.

[1079] For a discussion, see Keay, *Directors' Duties*, 4th edn (2020), pp.13–25.

[1080] *Re Hydrodan (Corby) Ltd* [1994] B.C.C. 161; [1994] 2 B.C.L.C. 180 at 183; *Re Kaytech International* [1999] 2 B.C.L.C. 351; *Re Mea Corp Ltd* [2006] EWHC 1846 (Ch) at [83]; [2007] B.C.C. 288 at 305.

[1081] *Smithton Ltd (formerly Hobart Capital Markets Ltd) v Naggar* [2014] EWCA Civ 939; [2015] 1 W.L.R. 189; [2014] B.C.C. 482 at [36].

[1082] *Re Anglo-Austrian Printing and Publishing Union* [1895] 2 Ch. 891.

[1083] *Dorchester Finance Co Ltd v Stebbing* [1988] B.C.L.C. 498. Note the situation in Australia. See *A.W.A. Ltd v Daniels* (1992) 10 A.C.L.C. 933 and on appeal (*Daniels v Anderson*) (1995) 16 A.C.S.R. 607).

[1084] For example, Keay, *Directors' Duties*, 4th edn (2020).

[827]

ASSETS AVAILABLE FOR DIVISION AND DISTRIBUTION

**11-163**    At the outset it should be noted that the effect of the provisions in the Companies
Act 2006 is cumulative so more than one duty may apply to a particular state of
affairs.[1085] Where this occurs, a director must comply with each applicable duty.
Directors cannot claim immunity if they were fulfilling one duty, but fail to comply
with another.[1086] Also, it needs to be noted that the duties were put in force at dif-
ferent times. In each of the following parts I will mention when the particular sec-
tion(s) was put in force. Of course, if a director did something before the relevant
duties under the Companies Act came into force, he or she will be judged accord-
ing to the previous equitable principles and common law rules. All sections save
for ss.175–177 came into force on 1 October 2007.[1087] Sections 175–177 came into
force from 1 October 2008.[1088]

In considering whether a director is in breach or not the court in *Mama Milla
Ltd*[1089] said that

"the starting point for a liquidator should be one of neutrality, neither trusting nor distrust-
ing directors and third parties, but forming a judgment based on information available,
information coming to hand, information gathered upon making careful and diligent
enquiries, and, where appropriate, information obtained by probing further or using statu-
tory powers".

The following discusses all sections dealing with the general duties and it does
not purport to address the law as it existed before codification for that would make
the discussion far too voluminous and would be complex. But much of the law that
applied prior to codification will be relevant to a consideration of the provisions of
the Act.

### *1.   Duty to act for proper purposes*[1090]

**11-164**    Section 171 of the Companies Act 2006 sets out two duties that are encompassed
by the broad title to the heading above. This is based on the section's heading in
the Act. The first duty is that directors must act in accordance with the company's
constitution. Secondly, they must only exercise their powers for the purposes for
which they were conferred. The first duty has not received much attention, while
the second duty has. The latter states that it matters not if directors believe in good
faith that their action is in the best interests of the company if the courts assess that
the directors' substantial purpose in taking the action was improper.[1091] The stages
of the inquiry of the courts is summarised in *Extrasure Travel Insurances Ltd v
Scattergood*[1092]:

"92.1.   identify the power whose exercise is in question;

---

[1085] Companies Act 2006 s.179.

[1086] Explanatory notes to the Companies Act 2006, p.313.

[1087] Companies Act 2006 (Commencement Order No.3, Consequential Amendments, Transitional Provi-
sions and Savings) Order 2007 (SI 2007/2194).

[1088] Companies Act 2006 (Commencement Order No.3, Consequential Amendments, Transitional Provi-
sions and Savings) Order 2007 (SI 2007/3495).

[1089] *Re Top Brands Ltd v Sharma*; sub nom. *Mama Milla Ltd* [2014] EWHC 2753 (Ch); [2015] 1
B.C.L.C. 546; [2015] B.P.I.R. 621 at [35]; and affirmed on appeal at [2014] EWCA Civ 761.

[1090] See Keay, *Directors' Duties*, 4th edn (2020), Ch.5.

[1091] For some of the leading cases, see *Piercy v S Mills & Co Ltd* [1920] 1 Ch. 77; *Teck Corp Ltd v Mil-
lar* (1973) 33 D.L.R. (3d) 288; *Hogg v Cramphorn* [1967] Ch. 254; *Howard Smith Ltd v Ampol Ltd*
[1974] A.C. 821 (PC); *Extrasure Travel Insurances Ltd v Scattergood* [2003] 1 B.C.L.C. 598.

[1092] *Extrasure Travel Insurances Ltd v Scattergood* [2003] 1 B.C.L.C. 598 at [92].

PROCEEDINGS AGAINST DIRECTORS

92.2.    identify the proper purpose for which that power was delegated to the direc-
tors;
92.3.    identify the substantial purpose for which the power was in fact exercised; and
92.4.    decide whether that purpose was proper."

The leading case on this duty is now the decision of the Supreme Court in *Eclairs
Group Ltd v JKX Oil and Gas Plc*,[1093] although it is fair to say that there was not
unanimity as far as laying down the approach that courts should take in relation to
deciding whether a director is liable or not. For instance, Lords Sumption and
Hodge appeared to favour a causative approach in determining whether a director
was liable or not. That is, to find a director liable it must be established that it was
his or her improper purpose that led to the exercising of powers. Lords Mance and
Neuberger had sympathy with the view but felt that they needed to hear more argu-
ment on the point before endorsing it.

### 2.    *Duty to promote the success of the company*[1094]

Section 172(1) is the duty that is more different from its precursor than any other
of the codified duties, and it is probably the most controversial duty. Also, it is the
one which has posed the most questions concerning interpretation. It clearly has
links to the duty to act bona fide in the best interests of the company, a pre-
codification duty. The provisions states:

"A director of a company must act in a way that he considers, in good faith, would be most
likely to promote the success of the company for the benefit of its members as a whole,
and in doing so have regard (amongst other matters) to … ."

The provision then goes on to list several factors which directors should take into
account, such as the interests of employees, relations with suppliers and the effect
of the company's operations on the environment.

The judges have seen s.172(1) as a natural successor to the duty to act in the best
interests of the company and generally applied the existing law.[1095]

The provision includes several unknown elements, such as the meaning of "the
success of the company". The provision appears to give almost unfettered discre-
tion to directors in their decision-making. Provided that the directors act in good
faith and can point to the fact that they have considered the factors set out in the
subsection (subss.(a)–(f), e.g. employee interests etc), it would seem that their deci-
sions are unassailable. Nevertheless, the courts might, as they did with the former

**11-165**

---

[1093] *Eclairs Group Ltd v JKX Oil and Gas Plc* [2015] UKSC 71; [2016] 1 B.C.L.C. 1; [2016] B.C.C.
79.

[1094] For more discussion of the duty, see, for example, Keay, "Enlightened shareholder value, the reform
of the duties of company directors and the corporate objective" [2006] L.M.C.L.Q. 335; Kiarie, "At
Crossroads: Shareholder Value, Stakeholder Value and Enlightened Shareholder Value: Which Road
Should the United Kingdom Take?" (2006) 17 I.C.C.L.R. 329; Keay, "Section 172(1): An Interpreta-
tion and Assessment" (2007) 28 Co. Law. 106; A. Keay, *Directors' Duties*, 4th edn (2020), Ch.6;
Lowry, "The Duty of Loyalty of Company Directors: Bridging the Accountability Gap Through Ef-
ficient Disclosure" (2009) 68 C.L.J. 607; Keay, "Office-holders and the Duty to Promote the Suc-
cess of the Company" (2010) 23 Insolv. Int. 133; A. Keay, *The Enlightened Shareholder Value*
Principle and Corporate Governance (Abingdon: Routledge-Cavendish, 2012), Ch 4.

[1095] For example, see *Re West Coast Capital (LIOS) Ltd* [2008] CSOH 72; *Madoff Securities
International Ltd (in liq) v Raven* [2013] EWHC 3147 (Comm) at [260]; *Re HLC Environmental
Projects Ltd* [2013] EWHC 2876 (Ch).

duty of acting bona fide in the best interests of the company,[1096] take the view that any evidence given by a director as to his or her directorial belief that the decision reached will promote the success of the company should be disbelieved,[1097] or take the view that the director did not turn his or her mind to what was being done would promote the success of the company.

### 3.    Duty to exercise independent judgment[1098]

**11-166**    It is provided in s.173 that directors must exercise independent judgment, and then goes on to allow for exceptions to that rule when it says that the duty is not breached if directors act in accordance with an agreement entered into by the company that restricts the future exercise of discretion by the directors or in a way authorised by the company's constitution. The duty is clearly based on the duty at common law that directors are not to fetter their discretion.

### 4.    Duties of care, skill and diligence[1099]

**11-167**    Unlike the other duties contained in Ch.2 of Pt 10, these duties, provided for in s.174, are not fiduciary duties. For many years directors have been required to exercise reasonable care, skill and diligence in carrying out their responsibilities. Historically, duties of care and skill have not been as strictly enforced as the fiduciary duties. But, in the past 20 years the courts have been more strict in the enforcement of care and skill responsibilities.

The classic case in this area is *Re City Equitable Fire Insurance Co Ltd*,[1100] which set out the basic principles covering care and skill largely in subjective terms, and was regularly followed by subsequent cases. The case provided, inter alia, that directors need not manifest, while undertaking their duties, a greater degree of skill than may be expected of the non-professional reasonable person. The court said that directors were not bound to give continuous attention to the affairs of their companies and this has been said to have caused the poor attendance of some directors at board meetings. Also, the court stated that if it is prudent, from a business point of view (and taking into account the constitution), that some duty be left to some other official, then a director, in the absence of grounds for suspicion, is justified in trusting that official to perform such a duty honestly.

As indicated above, the interpretation of the law has tightened up and in recent years courts have demanded greater vigilance on the part of directors.[1101] The older cases that devised the law did so with the post of non-executive director in mind. It was generally accepted that non-executive directors had no serious role to play within the company.[1102] The principles that were formulated are totally inappropriate for executive directors and, of course, the commercial world has changed significantly over time and the role of non-executive directors more demanding than it once was.

---

[1096] See *Charterbridge Corp Ltd v Lloyds Bank Ltd* [1979] Ch. 62.

[1097] For example, *Breitenfeld UK Ltd v Harrison* [2015] EWHC 399 (Ch) at [69].

[1098] See, Keay, "The duty of directors to exercise independent judgment" (2008) 29 Co Law 290; Keay, *Directors' Duties*, 4th edn (2020), Ch.7.

[1099] For a detailed discussion, see Keay, *Directors' Duties*, 4th edn (2020), Ch.8.

[1100] *Re City Equitable Fire Insurance Co Ltd* [1925] Ch. 407.

[1101] See *Re Majestic Recording Studies Ltd* (1988) 4 B.C.C. 519. See Walters, "Directors' duties: the impact of the Company Directors' Disqualification Act 1986" (2000) 21 Co. Law. 110.

[1102] P. Davies, *Gower's Principles of Modern Company Law*, 6th edn (London: Sweet & Maxwell, 1997), p.641.

PROCEEDINGS AGAINST DIRECTORS

The cases that had the most profound effect on the area are probably *Norman v*   **11-168**
*Theodore Goddard*[1103] and *Re D'Jan of London Ltd*,[1104] where the courts held that
the wrongful trading provision, s.214 of the Act, embodies the standard required of
a director at common law, in terms of care, skill and diligence. As considered earlier
in this chapter, s.214 provides that a director is liable if he or she "knew or ought
to have concluded that there was no reasonable prospect that the company would
avoid going into insolvent liquidation" unless the court is satisfied that the direc-
tor "took every step with a view to minimising the potential loss to the company's
creditors" as ought to have been taken. Section 174 requires directors to act as a
reasonably diligent person having the knowledge, skill and experience that may be
reasonably expected of a person performing the same functions, as well as having
the knowledge, skill and experience which the director has. After stating that direc-
tors have to exercise reasonable care, skill and diligence in carrying out their func-
tions, s.174(2) explains what this means. The subsection, in explaining this,
combines both objective and subjective standards. The subsection provides:

"This means the care, skill and diligence that would be exercised by a reasonably diligent
person with—

(a)   the general knowledge, skill and experience that may reasonably be expected of
      a person carrying out the functions carried out by the director in relation to the
      company, and

(b)   the general knowledge, skill and experience that the director has."

Jonathan Parker J (as he then was) in *Re Barings Plc (No.5)*,[1105] a disqualifica-
tion case, discussed the duties of directors in general. The learned judge sum-
marised the duties of directors as far as care and skill are concerned, from the
authorities, as:

"(i)    Directors have, both collectively and individually, a continuing duty to acquire
        and maintain a sufficient knowledge and understanding of the company's
        business to enable them to discharge their duties.

(ii)    Whilst directors are entitled (subject to the articles of association of the
        company) to delegate particular functions to those below them in the manage-
        ment chain, and to trust their competence and integrity to a reasonable extent,
        the exercise of the power of delegation does not absolve a director from the
        duty to supervise the discharge of the delegated functions.

(iii)   No rule of universal application can be formulated as to the duty referred to
        in (ii) above. The extent of the duty, and the question whether it has been
        discharged, must depend on the facts of each particular case, including the
        director's role in the management of the company."[1106]

These principles appear to be applied under the codified law.

---

[1103] *Norman v Theodore Goddard* [1992] B.C.C. 14.
[1104] *Re D'Jan of London Ltd* [1993] B.C.C. 646; [1994] 1 B.C.L.C. 561.
[1105] *Re Barings Plc (No.5)* [1999] 1 B.C.L.C. 433.
[1106] *Re Barings Plc (No.5)* [1999] 1 B.C.L.C. 433 at 489.

[831]

Assets Available for Division and Distribution

### 5. Duty to avoid conflicts of interest[1107]

**11-169**    In the same fashion as rules regulating trustees, company law has always been concerned to ensure that directors do not place themselves in conflict situations, for example, where their own personal interests and their duty to their company conflict in some way. The idea behind this is to ensure that the fiduciary is not swayed by concerns for his or personal interests in any given situation.[1108] Section 175(1), succeeding what was referred to as the no-conflict rule at common law,[1109] provides that a director of a company must avoid a situation in which he has, or can have, a direct or indirect interest that conflicts, or possibly may conflict, with the interests of the company. According to the next subsection, this rule applies in particular to the exploitation of any property, information or opportunity. This latter provision introduces into the legislation an element of what was known at common law as the no-profit rule, that is, directors are not to profit from their positions unless they are expressly permitted to do so and they are not to exploit something which really belongs to their company. The classic breach of this rule is where a director discovers a commercial opportunity whilst acting as a director of a company and rather than advising the board or exploiting it for the company, he or she exploits it for his or her own benefit, either whilst a director or after resigning from the company's board.[1110]

### 6. Duty not to accept benefits from third parties[1111]

**11-170**    Section 176 deals with another aspect of what was the no-profit rule at common law. It provides in subs.(1) that a director of a company must not accept a benefit from a third party conferred by reason of (1) his being a director; or (2) his doing (or not doing) anything as director. This is designed to proscribe directors taking secret commission or bribes.

### 7. Duty to declare interest in proposed transaction or arrangement[1112]

**11-171**    Company legislation has for some time provided that directors have to disclose certain interests. Section 177(1) provides that if a director of a company is in any way, directly or indirectly, interested in a proposed transaction or arrangement with the company, he must declare the nature and extent of that interest to the other directors. The provision is only concerned with proposed transactions and not existing ones. But a director is not exempt from disclosing an interest in existing transactions or arrangements, for s.182 requires disclosure of such interests.

---

[1107] For a detailed discussion, see Keay, *Directors' Duties*, 4th edn (2020), Chs 9–10; Teele-Langford, *Company Directors' Duties and Conflicts of Interest* (Oxford: OUP, 2019).

[1108] *Wilkinson v West Coast Capital* [2005] EWHC 3009 (Ch); [2005] B.C.C. 717 at 251.

[1109] For example, see *Aberdeen Rly Co v Blaikie Bros* (1854) 1 Macq HL 461.

[1110] For example, see *Regal (Hastings) Ltd v Gulliver* [1967] 2 A.C. 134n; [1942] 1 All E.R. 378 (HL); *IDC Ltd v Cooley* [1972] 1 W.L.R. 443.

[1111] For a detailed discussion, see Keay, *Directors' Duties*, 4th edn (2020), Ch.11.

[1112] For a detailed discussion, see Keay, *Directors' Duties*, 4th edn (2020), Ch.12.

PROCEEDINGS AGAINST DIRECTORS

### 8. *Other statutory developments*

Besides Ch.2 of Pt 10, Parliament has included in the Companies Act 2006 some provisions that relate to other actions and responsibilities of directors and are included in Chs 3 and 4 of Pt 10 of the Companies Act. It is not within the scope of this book to deal with them. Of course, in a sense provisions like s.214 of the Act, and discussed earlier in this chapter, also affect the duties owed by directors. Also, see the discussion in Ch.16 of other provisions that impact on the activities of directors. **11-172**

### 9. *Disadvantages with actions for breach*

Unlike in a wrongful trading claim,[1113] a court is able, where the claim is for breach of duty, to grant relief to the respondent director under s.1157 of the Companies Act 2006 (formerly, s.727 of the Companies Act 1985).[1114] This provision permits a court, wholly or in part, to relieve officers from liability in relation to proceedings for negligence, default, breach of duty, or breach of trust.[1115] Jurisdiction under s.1157 can be exercised only if the court is satisfied that the person who sought relief had acted honestly, and reasonably, and that, having regard to all the circumstances of the case, he or she ought fairly to be excused.[1116] **11-173**

It is probably fair to say that as the law develops in relation to the duties of directors, and their required competence increases, that it may become more and more difficult to argue for the employment of s.1157.[1117]

On some occasions the respondent to a misfeasance proceeding has been relieved, under s.1157, either wholly or in part, only if the obligation to make good the full amount for which prima facie he or she was liable,[1118] and only if the interests of creditors were unlikely to be affected and the members themselves had acquiesced in the wrongful act. Given this, it is not likely that s.1157 can be invoked in many cases.[1119]

With an action for breach of duty the liquidator will issue proceedings in the name of the company. It is possible that the defendant will apply for an order for security of costs pursuant to pursuant to r.25.12 of the Civil Procedure Rules.[1120] If the company is insolvent, as it will be in most situations, that may lead a court to making the order requested. But it cannot be said that there is a presumption that security will be ordered against a company in liquidation. It is submitted that while **11-174**

---

[1113] *Re D'Jan of London Ltd* [1993] B.C.C. 646.

[1114] See Keay, *Directors' Duties*, 4th edn (2020), Ch.17.

[1115] The request for relief does not have to be specifically pleaded: *Re Kirby's Coaches Ltd* [1991] B.C.C. 130.

[1116] *Re J. Franklin & Sons Ltd* [1937] 4 All E.R. 43.

[1117] Oditah, "Misfeasance proceedings against company directors" [1992] L.M.C.L.Q. 207 at 213, 219. See the comments of Nelson J in *Bairstow v Queens Moat Houses Plc* [2000] B.C.C. 1025.

[1118] See *Re Sunlight Incandescent Gas Lamp Co* (1900) 16 T.L.R. 535; *Re Home & Colonial Insurance Co* [1930] 1 Ch. 102. For a case where the section was not applied, see *Re Westlowe Storage and Distribution Ltd* [2000] 2 B.C.L.C. 590.

[1119] In any case, it is for the party in default to show that he or she is entitled to relief: *Re International Vending Machines Ltd* (1961) 80 W.N. (N.S.W.) 465 at 474–475.

[1120] For an admirable treatment of security for costs in relation to company law, see Milman, "Security for Costs: Principles and Pragmatism in Corporate Litigation" in B.A.K. Rider (ed.), *The Realm of Company Law* (London: Kluwer Law International, 1998), p.167.

the fact that a company is in insolvent liquidation must constitute a significant factor in favour of ordering security, it is not conclusive.[1121]

Of course, even if a liquidator obtains an order from the court based on a breach of duty, the problem facing the liquidator is that the order has to be enforced and at the end of the day the director(s) may be impecunious, rendering the proceedings possibly tantamount to useless. However, this point must be put into perspective, for it applies equally to any claim against a director personally.

Probably the biggest drawback with pursuing a claim for breach of duty is the fact that the fruits of a successful claim will, unlike with property and money recovered under actions for wrongful trading[1122] and preferences[1123] that are not available to satisfy a chargeholder, be available to any secured creditor who has a floating charge over all present and future company property.

### F.  Duties of directors to take into account the rights of creditors[1124]

**11-175**    As the traditional view of directors' duties is that they are owed to the company—so that directors are under an obligation to exercise their powers in the interests of the company (and affirmed by s.170 of the Companies Act 2006)—it might be more proper to include this discussion under the broad heading of "Duties of directors to their companies". But as this has become quite a distinct area, and one that might be particularly fruitful for a liquidator,[1125] it is preferable to place it under a main heading. Also, it warrants being considered separately as thus far it is liquidators who have taken action to enforce this duty, an action which can be a useful weapon in their arsenals.[1126] It is trite law that directors owe duties to their

---

[1121] See the discussion above at paras 9-014–9-015.

[1122] *Re Oasis Merchandising Services Ltd* [1995] B.C.C. 911.

[1123] *Re Yagerphone Ltd* [1935] 1 Ch. 392; *Re MC Bacon Ltd (No.2)* [1990] B.C.L.C. 607; [1990] B.C.C. 430; *Katz v McNally*; sub nom. *Re Exchange Travel (Holdings) Ltd* [1997] B.C.C. 784; [1998] B.P.I.R. 30.

[1124] For a detailed discussion of the topic, see Dawson, for example, "Acting in the Best Interests of the Company—For Whom are Directors 'Trustees'?" (1984) 11 N.Z.U.L.R. 68; Sealy, "Director's Wider Responsibilities—Problems Conceptual Practical and Procedural" (1987) 13 Mon. U.L.R. 164; Farrar, "The Responsibility of Directors and Shareholders for a Company's Debts" (1989) 4 Canta. L.R. 12; Riley, "Directors' duties and the interests of creditors" (1989) 10 Co. Law. 87; Prentice, "Creditor's Interests and Director's Duties" (1990) 10 O.J.L.S. 265 at 275; Finch, "Directors' Duties: Insolvency and the Unsecured Creditor" in A. Clarke (ed.), *Current Issues in Insolvency Law* (London: Stevens, 1991), p.87; Grantham, "The Judicial Extension of Directors' Duties to Creditors" [1991] J.B.L. 1; Sappideen, "Fiduciary Obligations to Corporate Creditors" [1991] J.B.L. 365; Worthington, "Directors' Duties, Creditors' Rights and Shareholder Intervention" (1991) 18 M.U.L.R. 121; Wishart, "Models and Theories of Directors' Duties to Creditors" (1991) 14 N.Z.U.L.R. 323; Ziegel, "Creditors as Corporate Stakeholders: The Quiet Revolution—An Anglo-Canadian Perspective" (1993) 43 *University of Toronto Law Journal* 511; Keay, "The Director's Duty to Take into Account the Interests of Company Creditors: When is it Triggered?" (2001) 25 *Melbourne University Law Review* 315; Keay, "The Duty of Directors to Take Account of Creditors' Interests: Has it Any Role to Play?" [2002] J.B.L. 379; Keay, "Another Way of Skinning the Cat: Enforcing Directors' Duties to Creditors" (2004) 17 Insolv. Int. 1; Keay, *Company Directors' Responsibilities to Creditors* (2007), Ch.11–17; Keay, *Directors' Duties* (2020), Ch.13; Keay, "Directors' Duties and Creditors' Interests" (2014) 130 L.Q.R. 443; Keay, *Directors' Duties*,' 4th edn (2020), Ch.13.

[1125] See Keay, "Another Way of Skinning the Cat: Enforcing Directors' Duties to Creditors" (2004) 17 Insolv. Int. 1.

[1126] See Keay, "The Duty of Directors to Take Account of Creditors' Interests: Has it Any Role to Play?" [2002] J.B.L. 379; Keay, *Company Directors' Responsibilities to Creditors* (2007), Ch.12.

Proceedings Against Directors

companies as a whole but not to any individual members or other persons, such as creditors[1127]; in fact directors would be acting beyond the scope of their powers if they acted for the ultimate benefit of creditors.[1128] However, there is clear authority at common law that in certain cases directors have a duty to consider creditors' interests.[1129] This common law development has been recognised by Parliament, for s.172(3) of the Companies Act 2006 accepts that the duty to promote the success of the company for the benefit of the members in s.172(1) is subject to rules that require directors, in certain circumstances, to consider the interests of the company's creditors.

There have been a significant number of cases decided in the past 30 years. It is not possible to discuss all of the cases and the following discussion only seeks to provide a consideration of the major issues and the leading points made by the courts.[1130]

According to the predominance of judicial and academic opinion, the duty is mediated through the company,[1131] that is directors have a duty to their companies to consider creditors' interests, rather than having a duty that directors owe directly to the creditors.[1132] Having said that, it would be remiss not to mention the fact that there have been some who have taken the view that directors should owe a duty to creditors directly.[1133] It has been pointed out that the judge who is regarded as being responsible for bringing the duty to light, Mason J in *Walker v Wimborne*,[1134] did not exclude a direct duty to creditors, and one can perhaps read the judgments of Lord Templeman in *Winkworth v Edward Baron Development Ltd*[1135] and the Full Court of the Supreme Court of Western Australia in *Jeffree v NCSC*[1136] as providing some support for an independent duty being owed to creditors.[1137] However, recent judicial comments are set against such a duty. First, a clear majority of the Australian High Court in a joint judgment in *Spies v R*[1138] said in obiter that "it is

---

[1127] If authority is necessary, see *Percival v Wright* [1902] 2 Ch. 421; *Mutinational Gas and Petrochemical Co v Mutinational Gas and Petrochemical Services Ltd* [1983] Ch. 258; *Grove v Flavel* (1986) 11 A.C.L.R. 161 at 166. Also see the comments of the Jenkins Committee (1962), Cmnd.1749, para.89.

[1128] Although it appears that they could have regard to creditors' interests, pursuant to s.172(1) of the Companies Act 2006.

[1129] For a theoretical case for the duty, see Keay, "Directors' Duties to Creditors: Contractarian Concerns Relating to Efficiency and Over-Protection of Creditors" (2003) 66 M.L.R. 665; Keay, *Company Directors' Responsibilities to Creditors* (2007), Ch.19.

[1130] For more detailed discussion, see the source referred to above at fn.1124.

[1131] Prentice, "Creditor's Interests and Director's Duties" (1990) 10 O.J.L.S. 265, 275.

[1132] This has the support of the predominance of academic commentators. For example, see Prentice, "Creditor's Interests and Director's Duties" (1990) 10 O.J.L.S. 265, 275; Worthington, "Directors' Duties, creditors' Rights and Shareholder Intervention" (1991) 18 M.U.L.R. 121 at 151; Sealy, "Personal Liability of Directors and Officers for Debts of Insolvent Corporations: A Jurisdictional Perspective (England)" in Ziegel, *Current Developments in International and Comparative Corporate Insolvency Law* (1994), p.486. See the trenchant comments of Richardson J in *Nicholson v Permakraft (NZ) Ltd* (1985) 3 A.C.L.C. 453 at 463 against an independent duty.

[1133] Hinnant, "Fiduciary Duties of Directors: How Far Do They Go?" (1988) 23 *Wake Forest Law Review* 163; Sappideen, "Fiduciary Obligations to Corporate Creditors" [1991] J.B.L. 365. See the discussion in Keay, *Company Directors' Responsibilities to Creditors* (2007), Ch.15.

[1134] *Walker v Wimborne* (1975-76) 137 C.L.R. 1; (1976) 3 A.C.L.R. 529.

[1135] *Winkworth v Edward Baron Development Ltd* [1986] 1 W.L.R. 1512; [1987] 1 All E.R. 114.

[1136] *Jeffree v NCSC* (1989) 7 A.C.L.C. 556; (1989) 15 A.C.L.R. 217.

[1137] Also, see the comments of Young J in *Hooker Investments Pty Ltd v Email Ltd* (1986) 10 A.C.L.R. 443 at 445.

[1138] *Spies v R* [2000] 74 A.L.J.R. 1263.

ASSETS AVAILABLE FOR DIVISION AND DISTRIBUTION

extremely doubtful whether Mason J intended to suggest that directors owe an independent duty directly to creditors".[1139] Secondly, in *Yukong Lines Ltd of Korea v Rendsburg Investments Corp*[1140] Toulson J clearly rejected the notion of a direct duty being owed to creditors.[1141] Thirdly, the Supreme Court of Canada in *Peoples' Department Stores v Wise*[1142] took the same view. Given the strong criticism by the academic commentaries[1143] of the view that creditors are owed an independent duty, it means that it is very unlikely that the English courts will follow the view of Lord Templeman. It is submitted that it is better to see the duty as one owed to the company and involving taking into account the position of the company's creditors. The reason for this is that a duty cannot be owed to creditors as they have no right to interfere in the affairs of a company in the absence of a winding up.[1144] If a duty was owed it could encourage creditors to place pressure on directors who might manipulate payments by their companies to ensure that they are not personally liable, leaving the general body of creditors disadvantaged. Furthermore, if a duty were owed to creditors it could lead to a deluge of actions against directors and in such circumstances the stronger creditors would be favoured to succeed in receiving payment from the directors at the expense of weaker ones as directors may be rendered impecunious by the claims which are satisfied first; this does not provide a fair and reasonable distribution of the property which is available. In such circumstances the only hope for unsatisfied creditors would be that the directors are bankrupted subsequently, and in such a period which would allow a bankruptcy trustee to attack payments to creditors as preferences.

**11-176**    Notwithstanding the denial of a direct duty being owed to creditors, a substantial body of case law has developed[1145] which states that while directors only owe duties to their companies, in certain circumstances they must, in discharging their duties to the company, take into account the interests of its creditors, i.e. in discharging their duties to their companies directors must consider the interests of their

---

[1139] *Spies v R* [2000] 74 A.L.J.R. 1263 at [93]; and quoting Heydon, "Directors' Duties and the Company's Interests" in P.D. Finn (ed.), *Equity and Commercial Relationships* (Sydney: Law Book Co, 1987), p.126.

[1140] *Yukong Lines Ltd of Korea v Rendsburg Investments Corp* [1998] B.C.C. 870.

[1141] *Yukong Lines Ltd of Korea v Rendsburg Investments Corp* [1998] B.C.C. 870 at 884.

[1142] *Peoples' Department Stores v Wise* [2004] S.C.C. 68; (2004) 244 D.L.R. (4th) 564. For a discussion of the case, see Keay, "Do Recent Canadian Developments Require a Re-Think in the United Kingdom on the Issue of Directors' Duties to Consider Creditor Interests?" (2005) 18 Insolv. Int. 65. Also, see the later Supreme Court of Canada decision in *BCE Inc v 1976 Debentureholders* 2008 SCC 69; [2008] 3 S.C.R. 560.

[1143] For example, see Prentice, "Creditor's Interests and Director's Duties" (1990) 10 O.J.L.S. 265 at 275; Worthington, "Directors' Duties, Creditors' Rights and Shareholder Intervention" (1991) 18 M.U.L.R. 121 at 151; Sealy, "Personal Liability of Directors and Officers for Debts of Insolvent Corporations: A Jurisdictional Perspective (England)" in Ziegel, *Current Developments in International and Comparative Corporate Insolvency Law* (1994), p.486.

[1144] *Kinsela v Russell Kinsela Pty Ltd* (1986) 4 N.S.W.L.R. 722; (1986) 4 A.C.L.C. 215; *Yukong Lines Ltd of Korea v Rendsburg Investments Corp* [1998] B.C.C. 870 at 884. The same view is expressed in academic comment: Sealy, "Directors' 'Wider' Responsibilities—Problems Conceptual, Practical and Procedural" (1987) 13 Mon. U.L.R. 164; Prentice, "Creditors' Interests and Directors' Duties" (1990) 10 O.J.L.S. 265 at 275; H.A.J. Ford, R.P. Austin and I.M. Ramsay, *Ford's Principles of Corporation Law*, 8th edn (Sydney: Butterworths, 1997), p.305. Compare the comments by Lord Templeman in *Winkworth v Edward Baron Development Co Ltd* [1987] 1 All E.R. 114 at 117.

[1145] Commencing with the Australian case of *Walker v Wimborne* (1975-76) 137 C.L.R. 1 at 7; (1976) 3 A.C.L.R. 529 at 532 per Mason J HC (Aus).

PROCEEDINGS AGAINST DIRECTORS

companies' creditors.[1146] The fact that directors owe a duty to take into account creditors' interests was first established in Anglo-Commonwealth law in a formal way by the comments of Mason J of the Australian High Court in delivering the leading judgment in *Walker v Wimborne*[1147] where His Honour said:

> "In this respect it should be emphasised that the directors of a company in discharging their duty to the company must take into account of the interests of its shareholders and its creditors. Any failure by the directors to take into account the interests of creditors will have adverse consequences for the company as well as for them."[1148]

While his Honour's statement may have been of a rather casual nature, the impact of the dictum has been far-reaching and it has been either acknowledged or even eagerly taken up by many other courts in the Commonwealth, including those in the UK, and also in Ireland,[1149] with the result that at certain points in the life of a company, its directors may be forced to give consideration to the interests of the creditors. By the 1980s the idea of directors owing some duty to take into account the interests of creditors had been regarded as providing a real protection for creditors of companies,[1150] with the Court of Appeal in *Liquidator of West Mercia Safetywear v Dodd*[1151] clearly accepting the duty. In the far more recent Court of Appeal decision, *BTI 2014 LLC v Sequana SA*[1152] the court again accepted the existence of the duty and applied it, bolstered now, of course, by s.172(3).[1153]                                                                    **11-177**

There are two major and difficult issues that one must confront in determining when this duty will lead to liability. The first is when does the duty arise? The second is: what are directors to do when subject to the duty?

### 1.    When does the duty arise?

The case law had indicated that the duty is only owed in certain circumstances. What are they? The fact of the matter is that the case law has not been clear notwithstanding the longevity of this duty. The exception to the traditional view that directors do not have to pay attention to creditors is ill-defined; there has been a distinct lack of judicial unanimity as to the actual circumstances which will cause directors to have to consider creditors' interests. There have been various formulae pronounced for the triggering of the duty by the courts over the past 40 years. The lack of precision in delineating the point at which directors are to have regard for creditor interests, and potentially become liable, is highly unsatisfactory, and this issue has been, arguably, the major one affecting the duty. Directors in undertaking their decision-making need to be guided by consistent and clear principles so that they know the ground rules and at what point in time, if at all, they are subject                **11-178**

---

[1146] *Lyford v Commonwealth Bank of Australia* (1995) 130 A.L.R. 267 at 283.

[1147] *Walker v Wimborne* (1976) 137 C.L.R. 1; (1976) 3 A.C.L.R. 529.

[1148] *Walker v Wimborne* (1976) 137 C.L.R. 1 at 6-7; (1976) 3 A.C.L.R. 529 at 532.

[1149] See *Re Frederick Inns Ltd* [1991] ILRM 582 HC (Irl); and affirmed at [1994] I.L.R.M. 387 Sup Ct (Irl); *Jones v Gunn* [1997] 3 IR 1; [1997] 2 I.L.R.M. 245.

[1150] Finch, "Directors' Duties: Insolvency and the Unsecured Creditor" in Clarke (ed.), *Current Issues in Insolvency Law* (1991), p.91.

[1151] *Liquidator of West Mercia Safetywear v Dodd* (1988) 4 B.C.C. 30.

[1152] *BTI 2014 LLC v Sequana SA* [2019] B.C.C. 631.

[1153] At the time of writing, the decision of the Court of Appeal in *BTI 2014 LLC v Sequana SA* [2019] EWCA Civ 112; [2019] B.C.C. 631 was the subject of an appeal to the Supreme Court. At the time of going to press the arguments had been heard but no judgment delivered.

to this duty. As a matter of legal certainty and fairness lines have to be drawn[1154] so that directors can be confident that when they act they are taking into account the appropriate interests and that their action is safe from attack. If directors are unable to ascertain, with a fair degree of certainty, what they can do and when they are potentially liable then, from an academic viewpoint, the law is unjust, and, from a practical perspective, directors are going to nearly always take the safest option in order to prevent any possible law suits. In doing this, directors are likely to act defensively and make decisions on the basis of not what is best for the company, but moreover, that which will avoid liability.[1155]

It is worthwhile mentioning the circumstances the courts have identified as triggering the duty in the past.[1156]

**11-179**   **(a)   Insolvency**   It is almost non-contentious to say that the directors owe a duty to have regard for the interests of creditors when the company is insolvent. While Mason J in *Walker v Wimborne* did not limit the duty to cases of insolvency or even of financial distress, the vast majority of cases in the 1980s introduced insolvency as a requirement for the duty to operate.[1157]

In one of the leading cases in the area, *Kinsela v Russell Kinsela Pty Ltd*,[1158] a case cited with approval in a number of jurisdictions, the New South Wales Court of Appeal was faced with a claim against directors who, on behalf of their company, entered into a lease of the company's premises in favour of themselves for a three-year period with a three-year option at a rental which was well below the current market rental. At the time the company was in a financially precarious state. Shortly after the lease was given the company entered liquidation pursuant to a winding-up order. Subsequently the liquidator sought a declaration that the lease was voidable. Street CJ, in giving the leading judgment, found against the directors of the company because of the fact that the company was clearly insolvent when the lease was executed. His Honour left open the door for extending the scope of the duty to encompass other states of financial distress short of insolvency, preferring not to comment on the degree of financial instability that had to exist before a duty was imposed on directors as he was not required given the facts of the case.[1159]

Certainly it is possible to say that when insolvency exists the notions of corporate ownership and creditors' rights converge.[1160] The creditors are often seen as the real owners of the company[1161]; the ownership rights of the shareholders having been

---

[1154] Wishart, "Models and Theories of Directors' Duties to Creditors" (1991) 14 N.Z.U.L.R. 323 at 329.
[1155] Rao, Sokolow & White, "Fiduciary Duty a la Lyonnais: An Economic Perspective on Corporate Governance in a Financially-Distressed Firm" (1996) 22 *The Journal of Corporation Law* 53, 65.
[1156] See Keay, "The Director's Duty to Take into Account the Interests of Company Creditors: When is it Triggered?" (2001) 25 *Melbourne University Law Review* 315; Keay, "Directors' Duties and Creditors' Interests" (2014) 130 L.Q.R.443.
[1157] For example, see the comments of Clarke and Cripps JJA of the New South Wales Supreme Court in *Equiticorp Finance Ltd (in liq) v BNZ* (1993) 11 A.C.L.C. 952 at 1016.
[1158] *Kinsela v Russell Kinsela Pty Ltd* (1986) 10 A.C.L.R. 395.
[1159] *Kinsela v Russell Kinsela Pty Ltd* (1986) 10 A.C.L.R. 395 at 404.
[1160] Schwarcz, "Rethinking a Corporation's Obligations to Creditors" (1996) 17 *Cardozo Law Review* 647, 666. The author sees the creditors' rights being transformed into equity-type rights with the advent of insolvency (at 668).
[1161] *Brady v Brady* (1987) 3 B.C.C. 535 CA at 552; *Kinsela v Russell Kinsela Pty Ltd* (1986) 4 A.C.L.C. 215 at 221; (1986) 10 A.C.L.R. 395 at 401; R.M. Goode. *Principles of Corporate Insolvency Law*, 2nd edn (London, Sweet & Maxwell, 1997), p.455; McDonnell, "Geyer v Ingersoll Publications Co:

PROCEEDINGS AGAINST DIRECTORS

expunged as there is nothing over which they have a claim.[1162] Hence, if a company is insolvent, directors act improperly if they employ funds that are payable to creditors in order to continue the activities of the company.[1163]

English case law firmly provides that when a company is insolvent, the interests of the creditors should be at the forefront of the directors' minds.[1164] The most authoritative decisions are those of the Court of Appeal in *Liquidator of West Mercia Safetywear Ltd v Dodd*,[1165] where the court said that where a company is insolvent the interests of the creditors overrode those of the shareholders, and the more recent decision of the court in *BTI 2014 LLC v Sequana SA*.[1166] The difficulty with this trigger is determining whether a company is insolvent. As we saw in Ch.3 determining insolvency is often difficult.

**11-180**

Some cases have, however, given indications that a duty to take into account creditors' interests arises before the company enters an insolvent state. This has been recognised by the Court of Appeal in *BTI 2014 LLC v Sequana S.A.*[1167] The next sections of the chapter address this matter briefly. It is in respect of the trigger pre-insolvency that has caused the most uncertainty.

**(b)  Near or in the vicinity of insolvency**  A majority of the Australian High Court in *Spies v R*[1168] approved of the comments of Gummow J in *New World Alliance Pty Ltd*[1169] when his Honour said that if a company is nearing insolvency directors have a duty to creditors.[1170] In New Zealand in *Nicholson v Permakraft (NZ) Ltd*,[1171] Cooke J included near insolvency, along with insolvency or doubtful insolvency, as the trigger for the imposition on directors of a duty to creditors. Leslie Kosmin QC (sitting as a deputy judge of the High Court) in *Gwyer v London Wharf (Limehouse) Ltd*[1172] said that the duty arose where the company was on the verge of insolvency and that is probably close or near to insolvency.

**11-181**

While insolvency may suffer from imprecision, prescribing the triggering of the duty when the company is near to insolvency suffers even more from that problem,[1173] for it is impossible in many situations to say from what point a company is nearing insolvency, except where one is viewing this ex post facto.

---

Insolvency Shifts Directors' Burden From Shareholders to Creditors" (1994) 19 *Delaware Journal of Corporate Law* 177, 185.

[1162] Ferran, "Creditors' interests and 'core' company law" (1999) 20 Co. Law 314, 316.

[1163] M. Ross, "Directors' Liability on Corporate Restructuring" in C. Ricketts (ed.), *Essays on Corporate Restructuring and Insolvency* (Wellington: Brooker's, 1996), p.176, p.177.

[1164] For example, see *Re Pantone 485 Ltd* ([2002] 1 B.C.L.C. 266; *Gwyer v London Wharf (Limehouse) Ltd* [2002] EWHC 2748; [2003] 2 B.C.L.C. 153; *Re MDA Investment Management Ltd* [2003] EWHC 2277 (Ch); [2004] B.P.I.R. 75 at 102; *Re Cityspan Ltd* [2007] EWHC 751 (Ch); [2007] 2 B.C.L.C. 522; [2008] B.C.C. 60; *Williams v Farrow* [2008] EWHC 3663 (Ch); *Roberts v Frohlich* [2011] EWHC 257 (Ch); *GHLM Trading Ltd v Maroo* [2012] EWHC 61 (Ch).

[1165] *Liquidator of West Mercia Safetywear Ltd v Dodd* (1988) 4 B.C.C. 30; [1988] B.C.L.C. 250 at 33.

[1166] *BTI 2014 LLC v Sequana SA* [2019] B.C.C. 631.

[1167] *BTI 2014 LLC v Sequana SA* [2019] B.C.C. 631 at [213], [216].

[1168] *Spies v R* [2000] 74 A.L.J.R. 1263.

[1169] *New World Alliance Pty Ltd* (1994) 122 A.L.R. 531 at 550.

[1170] *Spies v R.* [2000] HCA 43 at [94].

[1171] *Nicholson v Permakraft (NZ) Ltd* (1985) 3 A.C.L.C. 453 at 459.

[1172] *Gwyer v London Wharf (Limehouse) Ltd* [2002] EWHC 2748 at 74; [2003] 2 B.C.L.C. 153 at 178.

[1173] See the comments of Richardson J in *Nicholson v Permakraft (NZ) Ltd* (1985) 3 A.C.L.C. 453 at 463.

ASSETS AVAILABLE FOR DIVISION AND DISTRIBUTION

**11-182**  **(c)  Doubtful solvency**    While some commentators have been concerned that making insolvency the trigger for the duty to creditors because, inter alia, the company may move in and out of technical insolvency and the directors may not be aware of the company's insolvent state, prescribing doubtful insolvency as the trigger allows for more leeway for liquidators in proving cases and means that directors do not have to ascertain whether their companies are in fact insolvent. Cases have held that directors may be under a duty when doubtful insolvency exists.[1174]

The argument that may be levelled at this as the trigger-point is that it is also imprecise. Unlike insolvency that is now defined in the insolvency legislation of most common law countries, there is no definition of doubtful solvency. Who must doubt the solvency of the company? However, directors could probably ascertain when the solvency of their company is doubtful more easily than say when insolvency has occurred. Insolvency occurs only at one point, while doubtful solvency is broader.

**11-183**  **(d)  Risk of insolvency**    Moving further away from the point of insolvency, some cases support either expressly or implicitly the fact that directors have a duty to creditors once there is a risk of insolvency.[1175] For instance, Cooke J in *Nicholson v Permakraft (NZ) Ltd*[1176] said that directors owed a duty where a "contemplated payment or other course of action would jeopardise solvency".[1177] In *Liquidator of West Mercia Safetywear Ltd v Dodd*,[1178] Dillon LJ referred to his earlier judgment in *Multinational Gas and Petrochemical Co v Multinational Gas and Petrochemical Services Co*,[1179] a case in which the Court of Appeal rejected the argument that the directors owed a duty to take into account creditors' interests after the directors made a bad decision and this led to the company becoming insolvent.[1180] His Lordship said that the reason for his decision in that case was the fact that the company was amply solvent and the decision of the directors was made in good faith.[1181] His Lordship implies in *Dodd* that if the company in *Multinational Gas* had not been amply solvent and there was a risk of insolvency as a result of the directors' decision then he would have held there to have been a duty.

In the case of *Re HLC Environmental Projects Ltd*,[1182] it was made clear that before the duty is triggered there must be a real rather than a remote risk of insolvency. John Randall QC (sitting as a deputy High Court judge) in *Re HLC*

---

[1174] *Nicholson v Permakraft (NZ) Ltd* (1985) 3 A.C.L.C. 453 at 459, 463–464; *Brady v Brady*(1988) 3 B.C.C. 535 at 632 CA; *Geyer v Ingersoll Publications Co* 621 A. 2d 784; *Gwyer v London Wharf (Limehouse) Ltd* [2002] EWHC 2748 at [74]; [2003] 2 B.C.L.C. 153 at 178. Also, see the comments of Templeman LJ in *Re Horsley & Weight Ltd* [1982] Ch. 442 at 455.

[1175] For example, see *Wright v Frisina* (1983) 1 A.C.L.C. 716; *Grove v Flavel* (1985) 3 A.C.L.C. 453; *Kinsela v Russell Kinsela Pty Ltd* (1986) 4 A.C.L.C. 215 at 223; (1986) 10 A.C.L.R. 395 at 404 (agreeing with Cooke J in Nicholson); *Winkworth v Edward Baron Development Ltd* [1986] 1 W.L.R. 1512; [1987] 1 All E.R. 114; *Hilton International Ltd (in liq) v Hilton* [1989] N.Z.L.R. 442.

[1176] *Nicholson v Permakraft (NZ) Ltd* (1985) 3 A.C.L.C. 453.

[1177] *Nicholson v Permakraft (NZ) Ltd* (1985) 3 A.C.L.C. 453 at 459. Similar language is used by Giles JA in *Linton Telnet Pty Ltd* (1999) 17 A.C.L.C. 619 at 631; (1999) 30 A.C.S.R. 465 at 478.

[1178] *Liquidator of West Mercia Safetywear Ltd v Dodd* (1988) 4 B.C.C. 30.

[1179] *Multinational Gas and Petrochemical Co v Multinational Gas and Petrochemical Services Co* [1983] Ch. 258.

[1180] *Liquidator of West Mercia Safetywear Ltd v Dodd* (1988) 4 B.C.C. 30 at 33.

[1181] *Liquidator of West Mercia Safetywear Ltd v Dodd* (1988) 4 B.C.C. 30 at 33.

[1182] *Re HLC Environmental Projects Ltd* [2013] EWHC 2876 (Ch) at [94]–[95].

PROCEEDINGS AGAINST DIRECTORS

*Environmental Projects Ltd*,[1183] said that in ascertaining what triggers the duty

> "[t]he underlying principle is that directors are not free to take action which puts at real (as opposed to remote) risk the creditors' prospects of being paid, without first having considered their interests rather than those of the company and its shareholders".

In *BTI 2014 LLC v Sequana SA*,[1184] Rose J (as she then was) considered the issue of whether a director could be held liable because there had been a risk of insolvency and she adopted what might be seen as a more strict approach as far as holding directors liable where there is a risk of insolvency. Her Ladyship rejected the fact that whenever a company is "at risk" of becoming insolvent at some indefinite point in the future, then the duty arises unless that risk can be described as "remote".[1185] She went on to say that the essence of the real risk test was that "the directors ought in their conduct of the company's business to be anticipating the insolvency of the company because when that occurs, the creditors have a greater claim to the assets of the company than the shareholders".[1186] In a later decision, *Dickinson v NAL Realisations (Staffordshire) Ltd*,[1187] HH Judge Cooke QC (sitting as High Court judge) proceeded along similar lines when he said that directors were not required to give precedence to creditors' interests simply because when their company entered into a transaction at a time when the company was solvent even if there was a recognised risk of adverse events that might result in significant liability that could lead to insolvency. In the appeal in *BTI 2014 LLC v Sequana SA*,[1188] this approach was criticised by the Court of Appeal. In giving the leading judgment of the court, David Richards LJ seemed to reject the idea of risk of insolvency being a trigger. In the case before him his Lordship explicitly rejected the argument that the duty was triggered where there was a real as opposed to a remote risk of insolvency.[1189] He felt that this, if allowed, would provide for a much lower threshold for the application of the duty.[1190]

**(e)   Financial instability**   Other cases have not sought to identify with any preci-   **11-184**
sion how close to insolvency the company must be before the duty arises. They have been content to say that the company was in a dangerous financial position[1191] or financially unstable.[1192] These phrases can mean a number of things and can be regarded as indefinite, but it is fair to say that for the most part from a financial economist's viewpoint they mean that the company is facing insolvency,[1193] and this appears to have been the meaning given in the cases. Therefore, the trigger point is probably close to, if not the same as, where there is "doubtful solvency" or a "risk of insolvency".

---

[1183] *Re HLC Environmental Projects Ltd* [2013] EWHC 2876 (Ch) at [94]–[95].

[1184] *BTI 2014 LLC v Sequana SA* [2016] EWHC 1686.

[1185] *BTI 2014 LLC v Sequana SA* [2016] EWHC 1686.

[1186] *BTI 2014 LLC v Sequana SA* [2016] EWHC 1686 at [478].

[1187] *Dickinson v NAL Realisations (Staffordshire) Ltd* [2017] EWHC 28 (Ch) at [118].

[1188] *BTI 2014 LLC v Sequana SA* [2019] B.C.C. 631.

[1189] *BTI 2014 LLC v Sequana SA* [2019] B.C.C. 631 at [214], [215].

[1190] *BTI 2014 LLC v Sequana SA* [2019] B.C.C. 631 at [214].

[1191] *Facia Footwear Ltd (in administration) v Hinchliffe* [1998] 1 B.C.L.C. 218.

[1192] *Linton Telnet Pty Ltd* (1999) 17 A.C.L.C. 619 at 625; (1999) 30 A.C.S.R. 465 at 471.

[1193] Rao, Sokolow and White, "Fiduciary Duty a la Lyonnais: An Economic Perspective on Corporate Governance in a Financially-Distressed Firm" (1996) 22 *The Journal of Corporation Law* 53, 62.

[841]

**11-185** **(f)    Summary and assessment**    Perhaps the first thing to note is that the preponderance of authority favours the view that a duty to take into account the interests of creditors does not arise where a company is clearly solvent.[1194] But as already noted, there is a significant amount of judicial opinion that supports the view that the duty is triggered before a company actually becomes technically insolvent. After saying that, it is plain, as indicated at the outset of this discussion, that, while there is significant agreement amongst judges both as to the need for a duty to creditors and the fact that the duty should not arise until the company is suffering some degree of financial difficulty, there is no unanimity on the question of when the duty is triggered.

If the duty is imposed at one extreme of the financial spectrum, namely insolvency, there is the significant danger that creditors will not benefit, for the reasons discussed shortly. If the duty was to apply at the other extreme, namely when the company is clearly solvent,[1195] then it would have the effect of unreasonably interfering with the decision-making of directors, hamper the business of the company and would be likely to lead to directors being over-cautious.

So in deciding on a point when liability should arise, there must be a balance. On the one hand the courts must not place unreasonable limitations and burdens on directors, and must permit companies to be managed commercially.[1196] Yet, on the other hand, the courts must ensure that they do not allow directors absolute freedom so that the position of the creditors is ignored. Limited liability is a privilege and it must not be forgotten that it can work to the disadvantage of creditors. As Cooke J stated in *Nicholson v Permakraft (NZ) Ltd*[1197]:

> "It [limited liability] is a privilege healthy as tending to the expansion of opportunities and commerce, but it is open to abuse. Irresponsible structural engineering—involving the creating, dissolving and transforming of incorporated companies to the prejudice of creditors—is a mischief to which the courts should be alive."[1198]

**11-186**    Hence, courts have the somewhat difficult task of reconciling the interests of the creditors on the one hand and those of the shareholders/directors on the other.

While it might be argued that in jurisdictions other than England and Wales there remains significant uncertainty as to what the trigger, short of insolvency, is, in England and Wales it might be said that the Court of Appeal in *BTI 2014 LLC v Sequana SA*,[1199] has provided some greater certainty. David Richards LJ, after agreeing that it was difficult to set a trigger for the duty, said that:

---

[1194] For example, see *Mutlinational Gas and Petrochemical Co v Mutlinational Gas and Petrochemical Services Ltd* [1983] Ch. 258; *Nicholson v Permakraft (NZ) Ltd* (1985) 3 A.C.L.C. 453; *Brady v Brady* (1988) 3 B.C.C. 535; *Kinsela v Russell Kinsela Pty Ltd* (1986) 4 A.C.L.C. 215; (1986) 10 A.C.L.R. 395; *Liquidator of West Mercia Safetywear v Dodd* (1988) 4 B.C.C. 30; *Equiticorp Finance Ltd (in liq) v BNZ* (1993) 11 A.C.L.C. 952; *BTI 2014 LLC v Sequana SA* [2019] B.C.C. 631.

[1195] The controversial dictum of Lord Templeman in *Winkworth v Edward Baron Development Ltd* [1986] 1 W.L.R. 1512 at 1517; [1987] 1 All E.R. 114 at 118 seems to provide that directors of companies which are solvent are under the duty. But, save for the decision in *Jeffree v NCSC* (1989) 7 A.C.L.C. 556; (1989) 15 A.C.L.R. 217, no court seems to have followed that view.

[1196] See the comments of Lockhart J in *Australian Innovation Ltd v Paul Andrew Petrovsky* (1996) 14 A.C.L.C. 1357 at 1361.

[1197] *Nicholson v Permakraft (NZ) Ltd* (1985) 3 A.C.L.C. 453.

[1198] *Nicholson v Permakraft (NZ) Ltd* (1985) 3 A.C.L.C. 453 at 459.

[1199] *BTI 2014 LLC v Sequana SA* [2019] B.C.C. 631.

PROCEEDINGS AGAINST DIRECTORS

"First, it [the trigger] may be when the company is actually insolvent, either on a cash-flow or balance sheet basis. The decision in West Mercia authoritatively establishes that at least at this point the duty is engaged. Second, it may arise when the company is on the verge of insolvency or nearing or approaching insolvency. Phrases such as these have been used in a number of the cases. Third, it may arise when the company is or is likely to become insolvent. This is, I think, what judges mean when they refer to a company as being of dubious solvency. Fourth, it might be the trigger advanced by BTI, where there is a real, as opposed to a remote, risk of insolvency. Other phrases, such as the company being in a parlous financial state or in financial difficulties, could fall within either the second or third categories, assuming that they convey something less than outright insolvency. Although they may be apt descriptions of a company's situation in particular cases, they are in my view too vague to serve as a useful test for the important step of engaging the creditors' interests duty."[1200]

Thus, his Lordship did not approve of any of the existing formulae in earlier judgments. In his Lordship's view the duty arises when the directors know or should know that the company is or is likely to become insolvent.[1201] According to the judge, in this context "likely" means probable, not some lower test.[1202]

**11-187**  What might be of some concern to some is that the formula set out in *BTI 2014 LLC v Sequana SA*[1203] seems to place the point at which the duty is triggered higher than many, if not all, of the formulations put forward in earlier cases. This might conceivably make it more difficult for liquidators to establish cases against directors.

Finally, when the *Sequana* approach, articulated in the Court of Appeal, is applied in England and Wales, as it must be, the facts, and the courts' interpretation of them, is going to be critical. It should be noted that the decision has been appealed to the Supreme Court. The hearing of the appeal has occurred, but no judgment handed down.

## 2. Rationale for the duty

**11-188**  When a company clearly has a significant amount of assets and the debts owed to creditors are relatively minimal, then the interests of creditors should not, arguably, count for a lot.[1204] But if the company is insolvent, in the vicinity of solvency or embarking on a venture which it cannot sustain without relying totally on creditor funds, "the interests of the company are in reality the interests of existing creditors alone".[1205] At this time, because the company is effectively trading with the creditors' money, the creditors become the major stakeholders in the company and are, in effect, the real owners of the company[1206]; undoubtedly where insolvency ex-

---

[1200] *BTI 2014 LLC v Sequana SA* [2019] B.C.C. 631 at [213].

[1201] *BTI 2014 LLC v Sequana SA* [2019] B.C.C. 631 at [220].

[1202] *BTI 2014 LLC v Sequana SA* [2019] B.C.C. 631 at [220]. As mentioned in an earlier footnote, the judgment of the Court of Appeal was appealed and we are awaiting a judgment of the Supreme Court.

[1203] *BTI 2014 LLC v Sequana SA* [2019] B.C.C. 631.

[1204] *Brady v Brady* (1988) 3 B.C.C. 535 at 552.

[1205] *Brady v Brady* (1988) 3 B.C.C. 535 at 552. See *Equiticorp Finance Ltd (in liq) v Bank of New Zealand* (1993) 11 A.C.S.R. 642 at 725.

[1206] *Kinsela v Russell Kinsela Pty Ltd* (1986) 4 A.C.L.C. 215 at 221; (1986) 10 A.C.L.R. 395 at 401; Goode, *Principles of Corporate Insolvency Law* (1997), p.455; McDonnell, "Geyer v Ingersoll Publications Co: Insolvency Shifts Directors' Burden From Shareholders to Creditors" (1994) 19 *Delaware Journal of Corporate Law* 177, 185.

ists the ownership rights of the shareholders have been expunged as there is nothing over which they have a claim.[1207] The creditors are protected only by contractual rights, but when companies are financially stressed perhaps it is only fair to provide creditors with some form of fiduciary protection,[1208] although any protection of this nature would be indirect as all duties are owed to the company and not to the directors. Unless this occurs then the directors have every reason, at this time, to engage in risky ventures that could bring in substantial benefits, but could, if they fail, imperil the company.

The shareholders have little or nothing to lose by such a gamble as they have already lost the money which they invested in the company and they cannot be pursued by creditors because of the concepts of separate legal entity and limited liability.[1209] A venture, however risky, could conceivably turn the company around and provide the shareholders with some return, but such action, if it failed, would see the creditors suffer an even greater loss as they would be the ones to lose out if the company collapses.[1210] The fact is that creditors will receive the same sum irrespective of how well the company performs, therefore, they have the most to lose from risky actions being taken by directors.[1211] So, while the doctrine of limited liability shifts the risk of failure from the shareholders to the creditors,[1212] the duty to take account of creditors' interests seeks to mitigate the shift. Breach of the duty is usually claimed when the company is in liquidation and the duty is a way of compensating unsecured creditors for whom liquidation is frequently perceived as an empty formality.[1213] While most jurisprudence sees debtors as the weaker party in the lending situation, the fact of the matter is that when a company is in financial distress the creditors can well be occupying that position.[1214]

While traditionally the existence of the duty has been seen to prevent directors engaging in risky activities designed to resurrect company fortunes, save for the occasional case such as *Roberts v Frohlich*,[1215] the UK case law demonstrates that there are two situations where directors have been found liable and that is where either the directors have sought to self-deal or benefit associates, on the one hand,[1216]

---

[1207] Ferran, "Creditors' interests and 'core' company law" (1999) 20 Co. Law 314, 316.

[1208] Van der Weide, "Against Fiduciary Duties to Corporate Stakeholders" (1996) 21 *Delaware Journal of Corporate Law* 27, 43.

[1209] While creditors always have to accept the risk that the post-contractual actions of a company will increase the expected risk of default (Van der Weide, "Against Fiduciary Duties to Corporate Stakeholders" (1996) 21 *Delaware Journal of Corporate Law* 27, 43–44), it is unfair that creditors are not able to be compensated when directors engage in action which clearly was not part of the *ex ante* bargain at the time of the entering into of the credit contract, and may in some ways be regarded as improper activity. The fact of the matter is that creditors cannot be expected to foresee every action which directors take.

[1210] *Kinsela v Russell Kinsela Pty Ltd* (1986) 4 A.C.L.C. 215 at 223; (1986) 10 A.C.L.R. 395 at 404.

[1211] McDonnell, "Geyer v Ingersoll Publications Co: Insolvency Shifts Directors' Burden From Shareholders to Creditors" (1994) 19 *Delaware Journal of Corporate Law* 177, 190.

[1212] R.A. Posner, *Economic Analysis of Law*, 4th edn (Boston: Little Brown, 1992), p.394.

[1213] Finch, "Directors' Duties: Insolvency and the Unsecured Creditor" in Clarke (ed.), *Current Issues in Insolvency Law* (1991), p.91.

[1214] See the comments of Schwarcz in "Rethinking a Corporation's Obligations to Creditors" (1996) 17 *Cardozo Law Review* 647, 658.

[1215] *Roberts v Frohlich* [2011] EWHC (Ch) 257; [2012] B.C.C. 407 at [112].

[1216] For example, see *Liquidator of West Mercia Safetywear Ltd v Dodd* [1988] 4 B.C.C. 30; *GHLM Trading Ltd v Maroo* [2012] EWHC 61 (Ch); *Re HLC Environmental Projects Ltd (in liq)* [2013] EWHC 2876 (Ch); [2014] B.C.C. 337; *Ball v Hughes* [2017] EWHC 3228 (Ch); [2018] B.C.C. 196; *Joint Liquidators of CS Properties (Sales) Ltd* [2018] CSOH 24; 2018 G.W.D. 12-161.

[844]

or, on the other, they have either turned a blind eye to their company's financial problems or failed to appreciate the predicament in which their company finds itself.[1217]

In any event the rationale behind the provision appears to be one of creditor protection in the vicinity of, or in actual, insolvency.

### 3. *Directorial behaviour*

If the duty is triggered in line with the discussion above, the issue that this **11-189** precipitates is: how are directors to act in response?[1218] Clearly this is an important matter. It is not possible here to set out a full consideration of the relevant matters, but the following seeks to encapsulate the main conclusions that we can draw from the case law.

Where a company is clearly insolvent then the overwhelming number of English decisions[1219] provide that when the duty arises the creditors' interests are paramount and so directors must put the interests of creditors before any other concern or interest. Where a company is not insolvent, but in some condition short of insolvency, again the majority of English authorities hold that directors must see the creditors' interests are paramount.[1220] However, there are some English decisions,[1221] as well as some Australian decisions,[1222] that hold that the interests of creditors and those of the shareholders must both be considered where a company is not insolvent but nearing it.[1223] In the Court of Appeal in *BTI 2014 LLC v Sequana SA*,[1224] it was not necessary for the making of the decision for the Court to consider the issue, but David Richards LJ did provide us with some comments. These are, necessarily, obiter and consequently not binding, although, obviously, High Court judges will take the comments into serious consideration when making decisions on this subject. While not clearly saying that the creditors' interests were to be regarded as paramount, David Richards LJ did seem to accept, in one part of his

---

[1217] For example, see *Re Idessa (UK) Ltd (in liq)* [2011] EWHC 804 (Ch); [2012] B.C.C. 315. Also, *Roberts v Frohlich* [2012] B.C.C. 407 may partly fit within this classification.

[1218] For a detailed discussion of this issue, see Keay, "Directors' Duties and Creditors' Interests" (2014) 130 L.Q.R. 443.

[1219] For example, *Re Pantone 485 Ltd* [2002] 1 B.C.L.C. 266; *Gwyer v London Wharf (Limehouse) Ltd* [2002] EWHC 2748 (Ch); [2003] 2 B.C.L.C. 153; *Roberts v Frohlich* [2011] EWHC 257 (Ch); [2012] B.C.C. 407; [2011] 2 B.C.L.C. 625; *Re Idessa (UK) Ltd; sub nom. Burke v Morrison* [2011] EWHC 804 (Ch); [2012] B.C.C. 315; *City of London Group Plc v Lothbury Financial Services Ltd* [2012] EWHC 3148 (Ch); *Re HLC Environmental Projects Ltd* [2013] EWHC 2876 (Ch); *Re Pro4Sport Ltd; Hedger v Adams* [2015] EWHC 2540 (Ch); [2016] 1 B.C.L.C. 257. Some Australian decisions take the view that creditors' interests are to be considered, but are not necessarily to be seen as paramount. For example, see *Bell Group Ltd (in liq) v Westpac Banking Corp (No 9)* [2012] WASCA 157.

[1220] *Gwyer v London Wharf (Limehouse) Ltd* [2002] EWHC 2748 (Ch); [2003] 2 B.C.L.C. 153; *Roberts v Frohlich* [2011] EWHC 257 (Ch); [2012] B.C.C. 407; [2011] 2 B.C.L.C. 625; *GHLM Trading Ltd v Maroo* [2012] EWHC 61; [2012] 2 BCLC 369; *Re HLC Environmental Projects Ltd* [2013] EWHC 2876 (Ch).

[1221] *Re MDA Investment Management Ltd* [2004] 1 B.C.L.C. 217 at 245; [2004] B.P.I.R. 75; *Ultraframe (UK) Ltd v Fielding* [2005] EWHC 1638 (Ch); *Re Kudos Business Solutions Ltd* [2011] EWHC 1436 (Ch); [2012] 2 B.C.L.C. 65.

[1222] For example, *Bell Group Ltd (in liq) v Westpac Banking Corp (No.9)* [2012] WASCA 157.

[1223] The whole issue is discussed in Keay, "Directors' Duties and Creditors' Interests" (2014) 130 L.Q.R. 443.

[1224] *BTI 2014 LLC v Sequana SA* [2019] B.C.C. 631.

judgment, that that was a consequence of the drafting of s 172.[1225] Later, he was a little more circumspect and said that the matter was not straightforward and a decisive view should wait until there is a case where, on the facts, it needed to be decided.[1226] However, he then said that: "where the directors know or ought to know that the company is presently and actually insolvent, it is hard to see that creditors' interests could be anything but paramount."[1227]

### 4.    Concluding remarks

**11-190**    Some commentators have questioned whether a right to hold directors liable for not taking into account creditors' rights is necessary.[1228] But clearly there are situations where the existence of a duty imposed on directors has merit as far as creditors are concerned and it is helpful to a liquidator.[1229] There will be situations where a liquidator will not be able successfully to pursue a claim for a preference,[1230] a transaction at an undervalue, a transaction defrauding creditors, or even for wrongful or fraudulent trading because, inter alia, of the matters raised earlier in this chapter and in Ch.16 (with respect to fraudulent trading), and proceedings for breach of duty are worthy of consideration.[1231]

The fact of the matter is that if one excludes the breach of duty action, then there have been (and will continue to be) cases such as *Ring v Sutton*,[1232] *Kinsela v Russell Kinsela Pty Ltd*,[1233] *Liquidator of West Mercia Safetywear v Dodd*[1234] and *Facia Footwear Ltd (in administration) v Hinchliffe*,[1235] where liquidators would not have succeeded and creditors would have been prejudiced.

As mentioned earlier, and discussed in detail in Ch.16, s.212 of the Act provides a liquidator[1236] with the right to initiate what are usually known as "misfeasance proceedings" against certain persons, including officers of the company. Over the years, proceedings have frequently been brought by liquidators against directors pursuant to s.212 and its precursors. But, s.212 does not take one too far as the section does not create any new rights in the same way that ss.214 and 239 do. For a misfeasance action to succeed under s.212, it must be founded on some action in relation to which the company could have initiated proceedings prior to winding

---

[1225] *BTI 2014 LLC v Sequana SA* [2019] B.C.C. 631 at [198], [199].

[1226] *BTI 2014 LLC v Sequana SA* [2019] B.C.C. 631 at [222].

[1227] *BTI 2014 LLC v Sequana SA* [2019] B.C.C. 631 at [222].

[1228] For example, Sealy, "Directors' Duties—An Unnecessary Gloss" [1988] C.L.J. 175; Hayne, "Directors' Duties and a Company's Creditors" (2014) 38 *Melbourne University Law Review* 795; Watts, "Why as a matter of English-law principle directors do not owe a duty of loyalty to creditors upon insolvency" [2021] J.B.L. 103.

[1229] A view which Professor Prentice takes: "Creditor's Interests and Director's Duties" (1990) 10 O.J.L.S. 264 at 273–274, as does a senior Australian solicitor, Richard Fisher: "Preferences and Other Antecedent Transactions: Do Directors Owe a Duty to Creditors?" (1995) 8 C.B.L.J. 203.

[1230] As to which, see Keay, "Financially distressed companies, preferential payments and the director's duty to take account of creditors' interests" (2020) 136 L.Q.R. 52.

[1231] For a detailed discussion, see Keay, "The Duty of Directors to Take Into Account Creditors' Interests: Has It Any Role to Play?" [2002] J.B.L. 379.

[1232] *Ring v Sutton* (1980) 5 A.C.L.R. 546.

[1233] *Kinsela v Russell Kinsela Pty Ltd* (1986) 4 A.C.L.C. 215; (1986) 10 A.C.L.R. 395.

[1234] *Liquidator of West Mercia Safetywear Ltd v Dodd* (1988) 4 B.C.C. 30.

[1235] *Facia Footwear Ltd (in administration) v Hinchliffe* [1998] 1 B.C.L.C. 218.

[1236] As well as other possible applicants, namely, the official receiver, a creditor and a contributory.

up, namely a breach of any fiduciary or other duty in relation to the company[1237]; so under s.212 an applicant must "establish actionable wrongdoing by the respondent independently of section 212".[1238] In accordance with its legislative precursors, s.212 is essentially procedural as it provides an alternative summary procedure which is designed to facilitate recovery of assets improperly dealt with, and to enable the liquidator to obtain compensation for misconduct which had caused loss to the company.[1239] As misfeasance covers the whole spectrum of directors' duties,[1240] a liquidator could rely on a breach of duty under s.172(3) to take into account the interests of creditors, and s.212 could be used as the means by which the claim could be initiated and prosecuted, as was the case in *Liquidator of West Mercia Safetywear Ltd v Dodd*[1241] and many more recent cases.[1242]

There is nothing prohibiting a liquidator from coupling a claim against a director for breach of the duty to take into account the interests of creditors with any of the kinds of proceedings mentioned earlier in this chapter or in Ch.16. There is no need for the liquidator to have to decide whether he or she is going to rely on this duty alone. Coupling a claim for breach of duty with one or more other claims could well be the most prudent course of action to adopt. **11-191**

## V.  THIRD PARTY LIABILITY[1243]

This section deals briefly with the fact that a director may have received assistance from a third party in committing a breach of duty, or a third party might have been in knowing receipt of the benefits of a breach of duty by a director. If it is possible to establish knowing assistance or knowing receipt in relation to a breach of duty, a liquidator may be able to claim relief. It would appear that actions against third parties are being increasingly employed.[1244] **11-192**

The reason why it might be worthwhile considering taking proceedings against third parties instead of directors, who are the ones primarily liable, is that they might have taken flight and cannot be found, be impecunious or simply cannot pay all that is owed, as they might have dissipated any property or profits made from the breach. Considering a third party is particularly useful where the third party is a person or an institution of substance.

The third party that is often the subject of proceedings, is another company that the director has established in order either to run a business in competition with the company to which the director owes duties, or in order to exploit a business opportunity to which that company is entitled.

A third party has been said to be potentially liable if he or she was acting **11-193**

---

[1237] For a recent instance of a misfeasance action, see *Re Simmons Box (Diamonds) Ltd* [2000] B.C.C. 275, which involved directors failing to act carefully.

[1238] Oditah, "Misfeasance proceedings against company directors" [1992] L.M.C.L.Q. 207, 208.

[1239] *Re Kingston Cotton Mill Co (No.2)* [1896] 2 Ch. 279 at 283, 288; *Re London & Colonial Finance Co* (1897) 13 T.L.R. 576; *Re B. Johnson & Co (Builders) Ltd* [1955] Ch. 634.

[1240] *Re D'Jan of London Ltd* [1993] B.C.C. 646; *Re Westlowe Storage and Distribution Ltd* [2000] 2 B.C.L.C. 590.

[1241] *Liquidator of West Mercia Safetywear Ltd v Dodd* (1988) 4 B.C.C. 30.

[1242] For instance, *Re Idessa Ltd* [2011] EWHC 804 (Ch); [2012] B.C.C. 315; *Re Kudos Business Solutions Ltd* [2011] EWHC 1436 (Ch); [2012] 2 B.C.L.C. 65.

[1243] See Stafford and Ritchie, *Fiduciary Duties*, 2nd edn (Bristol: Jordans, 2015), pp.333–370; Keay, *Directors' Duties*, 4th edn (2020), pp.550–564.

[1244] S. Thomas, "'Goodbye' Knowing Receipt. 'Hello' Unconscious Receipt" (2001) 2 O.J.L.S. 239, 239–240.

dishonestly[1245] in knowingly assisting a breach of duty, even if the third party received no benefit from the breach. Third parties can also be liable even if they did not realise that what was done by the director was a breach of duty provided that they knew or suspected that their involvement in the activity was dishonest.[1246] If a third party is liable then it exposes him or her to the full range of remedies in equity that can be obtained against a trustee or a director. The foundation for liability is located in the classic case of *Barnes v Addy*.[1247]

If a liquidator alleges dishonesty (and it must be specifically pleaded) the burden of proof is firmly on him or her, and the ordinary civil burden applies.[1248]

There are three matters which a claimant needs to establish knowing assistance, according to Rix LJ in *Abou-Ramah v Abacha*[1249] (and the other judges appeared to have agreed) in order to succeed: (1) the defendant, the assister, had the required knowledge; (2) given the knowledge that the assister has he or she acts in such a way that is contrary to normally acceptable standards of honest conduct; and (3) the assister is held to be dishonest.[1250]

What has been problematic is determining what test is to apply in assessing whether dishonesty exists—is it a subjective or an objective test? The assistance that is available is from the case law that has been delivered in relation to claims that respondents have been guilty of assisting a breach of trust, with breach of trust being regarded as analogous to breach of duty (both involve improper actions by fiduciaries). In one such case, *Twinsectra v Yardley*,[1251] Lord Hutton (with whom the majority agreed) said that there were three tests that could be applied in determining whether someone acted dishonestly or not. The first two tests were the standard subjective and objective tests. But his Lordship applied the third test, which he called "the combined test". This is

"a standard which combines an objective test and a subjective test, and which requires that before there can be a finding of dishonesty it must be established that the defendant's conduct was dishonest by the ordinary standards of reasonable and honest people and that he himself realised that by those standards his conduct was dishonest".[1252]

Lord Nicholls had said something similar in *Royal Brunei Airlines Bhd v Tan*.[1253]

In its advice the Privy Council in *Barlow Clowes International Ltd (In Liquidation) v Eurotrust International Ltd*[1254] (given by Lord Hoffmann) said, in interpreting *Twinsectra v Yardley*, that the respondent, to be liable, had to have knowledge of the elements of the transaction which rendered his or her participation contrary to ordinary standards of honest behaviour, and the respondent's knowledge of the transaction that was impugned had to be such as to render his or her participation

---

[1245] *Royal Brunei Airlines Bhd v Tan* [1995] 2 A.C. 378 PC.
[1246] *Agip (Africa) Ltd v Jackson* [1990] Ch. 265 at 295; *Madoff Securities International Ltd (in liq) v Raven* [2013] EWHC 3147 (Comm).
[1247] *Barnes v Addy* (1873-74) L.R. 9 Ch. App. 244.
[1248] *In Re H* [1996] A.C. 563 at 586; *Statek Corp v Alford* [2008] EWHC 32 (Ch) at 101.
[1249] *Abou-Ramah v Abacha* [2006] EWCA Civ 1492; [2007] Bus. L. R. 220.
[1250] *Abou-Ramah v Abacha* [2007] Bus. L. R. 220 at [16].
[1251] *Twinsectra v Yardley* [2002] UKHL 12; [2002] 2 A.C. 164.
[1252] *Twinsectra v Yardley* [2002] 2 A.C. 164 at 171.
[1253] *Royal Brunei Airlines Bhd v Tan* [1995] 2 A.C. 378 at 389.
[1254] *Barlow Clowes International Ltd (in liq) v Eurotrust International Ltd* [2005] UKPC 37; [2006] 1 W.L.R. 1476.

contrary to normally acceptable standards of honest conduct.[1255] There was no need for the respondent to have had reflections about what those normally acceptable standards were.[1256] In other words, respondents would be liable if they contravened ordinary standards even if they did not turn their minds to what the standards were.[1257]

The liquidator does not have to show the contribution which the third party made **11-194** to the breach, as long as it can be established that he or she dishonestly provided some assistance to the perpetration of the breach.[1258]

The other ground of possible liability for a third party is where he or she is in knowing receipt of the benefits of a breach of duty. This like knowing assistance is also based on *Barnes v Addy*.[1259] The essential requirements of knowing receipt were identified by Hoffmann LJ in *El Ajou v Dollar Land Holdings Plc*[1260]:

> "For this purpose the plaintiff must show, first, a disposal of his assets in breach of fiduciary duty; secondly, the beneficial receipt by the defendant of assets which are traceable as representing the assets of the plaintiff; and thirdly, knowledge on the part of the defendant that the assets he received are traceable to a breach of fiduciary duty."[1261]

The test for liability was laid down by the Court of Appeal in *Bank of Credit and Commerce International (Overseas) Ltd v Akindele*.[1262] The Court relied on the test of unconscionability.[1263] On this basis a person is liable if his or her state of knowledge would make it unconscionable for him or her to retain the benefit of the receipt.[1264]

## VI.    Procedural Issues

### A.    Parties to proceedings

Liquidation does not have the effect of depriving the company of its corporate **11-195** state or corporate powers, including its power of taking proceedings for the recovery and protection of its property. Hence, whenever the object of proceedings is to recover a debt, or to recover or protect property the title to which is in the company, the liquidator ought to sue in the name of the company and not in his or her own

---

[1255] The Supreme Court in *Ivey v Genting Casinos (UK) Ltd* [2017] UKSC 67; [2018] 3 W.L.R. 1212, in dealing with a different area of law, adopted the two-pronged consideration of dishonesty and included subjective and objective elements. The court accepted that the test of dishonesty as set out by Lord Nicholls in *Royal Brunei Airlines Sdn Bhd v Tan* and by Lord Hoffmann in *Barlow Clowes International Ltd v Eurotrust International Ltd* was correct.

[1256] *Barlow Clowes International Ltd (in liq)) v Eurotrust International Ltd* [2005] UKPC 37; [2006] 1 W.L.R. 1476 at [15].

[1257] *Barlow Clowes International Ltd (in liq)) v Eurotrust International Ltd* [2005] UKPC 37; [2006] 1 W.L.R. 1476 at [16].

[1258] Baughen, "Accessory liability at common law and in equity—'The redundancy of knowing assistance' revisited" [2007] L.M.C.L.Q. 545, 553.

[1259] *Barnes v Addy* (1873-74) L.R. 9 Ch. App. 244.

[1260] *El Ajou v Dollar Land Holdings Plc* [1994] 2 All E.R. 685.

[1261] *El Ajou v Dollar Land Holdings Plc* [1994] 2 All E.R. 685 at 700.

[1262] *Bank of Credit and Commerce International (Overseas) Ltd v Akindele* [2001] Ch 437.

[1263] *Bank of Credit and Commerce International (Overseas) Ltd v Akindele* [2001] Ch 437 at 455.

[1264] *Houghton v Fayers* [2000] Lloyd's Rep. Bank. 145; [2000] 1 B.C.L.C. 511; *Times*, 9 February 2000 CA; *Bank of Credit and Commerce International (Overseas) Ltd v Akindele* [2001] Ch. 437 CA.

ASSETS AVAILABLE FOR DIVISION AND DISTRIBUTION

name.[1265] So that if a liquidator decides to take action against a director of the company on the basis that there was a breach of directors' duties, the liquidator must bring the proceedings, for the loss suffered by the company, in the name of the company. The position is different where the right that is sought to be asserted is not enforceable by the company itself but only by the liquidator acting on behalf of the creditors or contributories in winding up,[1266] for example, where the liquidator is given power to bring proceedings for wrongful trading.[1267]

Under the adjustment provisions in the Act it is clear that orders can only be made on the application of the liquidator.[1268] Many of the orders that a court may make involve the company in liquidation. For instance, under s.241(1)(b) a court may require any property transferred as part of a transaction to be vested in the company.[1269] This raises the question as to whether the company should be joined as a co-applicant in the proceedings. If a court decides that it is appropriate to direct a person to transfer property to the company, then it appears that the company should be a part of the proceedings because the rights of the company will be affected and no interest in the property is conferred on the liquidator.[1270] Consequently, it is submitted that the prudent course to be adopted by any liquidator applying for an order(s), certainly under ss.238 and 239, is to include the company as a co-applicant.

If a liquidator is unwilling to institute proceedings, all that a creditor can do is to make a complaint to the court. First, an application may be made in respect to the liquidator's conduct under s.212. A court may make an order, if the liquidator is guilty of misfeasance or any breach of fiduciary duty or other duty in connection with the carrying out of the liquidator's functions.[1271] While little has been said in England about the provision, in the context of the examination of the conduct of liquidators, the courts in Australia have found it necessary to discuss its equivalent on more than a few occasions. It has been held, in relation to the Australian equivalent of s.212(3),[1272] that courts will not permit a liquidator to be subject to an examination of his or her conduct unless it is satisfied that there is a prima facie case requiring an examination.[1273] Australian courts are wary about allowing people to set in train an examination.[1274] It has been stated that if a creditor wishes to chal-

---

[1265] *Kent v La Communaute des Soeurs* [1903] A.C. 220 at 226; *Bolton v Darling Downs Building Society* [1935] St.R.Qd 237; *Re W.A. Holiday Resorts Ltd* [1961] W.A.R. 152. This rule also applies where bankruptcy proceedings are taken by the company against a person: *Re Winterbottom* (1886) 18 Q.B.D. 446; *Crowden v Wiltshire* (1935) 52 C.L.R. 286; *Re A Debtor* [1952] Ch. 192.

[1266] *Kent v La Communaute des Soeurs* [1903] A.C. 220.

[1267] See 1986 Act s.214.

[1268] See, for example, 1986 Act ss.238(2), 239(2).

[1269] Interestingly any money which is ordered to be paid under s.241(1)(d) is to be paid to the office-holder.

[1270] However, an order relating to the repayment of money (as per s.241(1)(d)) will mean that the money is to be paid to the liquidator.

[1271] See 1986 Act s.212(2)–(3).

[1272] This used to be s.536 of the Corporations Act 2001, but it has now been replaced by s.90-10 of Sch.2 to the Act. Both s.536 was and s.90-10 are worded differently from s.212 and it applies only to liquidators, but its thrust is much the same. Interestingly, in Australia a person who wishes to complain about the conduct of a liquidator may make a complaint either to the courts or to the Australian Securities and Investment Commission, Australia's corporate regulator.

[1273] *Re Siromath Pty Ltd (No.3)* (1991) 9 A.C.L.C. 1587 at 1590; *Burns Philp Investments Pty Ltd v Dickens* (1993) 11 A.C.L.C. 272; *Re Biposo Pty Ltd*; sub nom. *Condon v Rodgers* (1995) 120 F.L.R. 399 at 403.

[1274] *Burns Philp Investments Pty Ltd v Dickens* (1993) 11 A.C.L.C. 272 at 273.

lenge the decision of a liquidator, apparently arrived at in good faith, then it is not appropriate to seek to employ the equivalent of s.212; rather it is more appropriate to appeal against the decision under the equivalent of s.168(5),[1275] which allows a court to review the actions and decisions of a liquidator.[1276] This is because the former is concerned with aspects of the conduct of liquidators that are likely to attract sanctions for disciplinary reasons.[1277]

The second, and probably the more realistic alternative is for the creditor to apply to the court under s.168(5) against the liquidator's decision (not to proceed), and ask the court to reverse the decision. To make such an application, one must be a person aggrieved by an act, omission or decision. First, a creditor would have to convince a court that a liquidator is entitled to proceed on his or her behalf and, if successful, the benefits would flow to the creditor. Secondly, it would be incumbent on the creditor to argue successfully that he or she fulfilled the requirement of being an "aggrieved person". It would seem that the creditor would need to demonstrate that he or she is someone who has suffered some legal grievance, someone against whom a decision has been made which has wrongly deprived the creditor of something.[1278] Even if a creditor could be said to be "an aggrieved person", it is unlikely that an appeal would, save in exceptional circumstances, be successful.

**11-196**

Realistically, there will be few occasions when a liquidator refrains from initiating proceedings to attack a transaction where legal advice has been given that there is a fair chance of success provided funding can be obtained. If the liquidator refrains because of a concern about costs one would expect interested creditors to agree to indemnify the liquidator, establish a fighting fund or locate a funder.[1279]

It has been clearly stated in the past that the holder of a charge over the company's property is not permitted to initiate proceedings to have pre-liquidation transactions set aside.[1280] The present adjustment provisions take the same approach as they indicate that an application must be commenced by the liquidator or other office-holder.

## B.  Cost of proceedings

One of the main concerns of a liquidator in initiating proceedings is whether there are sufficient funds to pay his or her costs and whether there will be any personal liability to pay the costs of the other party if the recovery action is unsuccessful.

**11-197**

---

[1275] *Belvista Pty Ltd v Murphy* (1993) 11 A.C.S.R. 628 at 630.

[1276] See above at paras 9-114–9-116 for a discussion of reviews of actions of liquidators.

[1277] *Northbourne Developments Pty Ltd v Reiby* (1990) 8 A.C.L.C. 39 at 43.

[1278] *Ex p. Sidebotham* (1880) 14 Ch. D. 458 at 465; *Northbourne Developments Pty Ltd v Reiby* (1990) 8 A.C.L.C. 39 at 42–43.

[1279] Committee J of the International Bar Association (Discussion Paper, "*Statement of Common Principles of Invalid Pre-Bankruptcy Transactions*" (21 September 1992), para.3), the Committee which deals with issues relating to insolvency and creditors' rights, proposed that if a liquidator chooses not to challenge a transaction, a creditor or group of creditors (with the permission of the court) should be permitted to institute proceedings in the name of the liquidator. This seems to be a reasonable suggestion and should be supported.

[1280] For example, see *Ex p. Cooper*; sub nom. *In Re Zucco* (1875) 10 Ch. App. 510 at 511 and 512; *Re Yagerphone Ltd* [1935] 1 Ch. 392 at 395; *NA Kratzmann Pty Ltd (in liq) v Tucker (No.2)* (1968) 123 C.L.R. 295; *Re An Application by J.G.A. Tucker and Reid Murray Developments (Qld) Pty Ltd* [1969] Qd. R. 193 at 203; *Starkey v Deputy Commissioner of Taxation* (1993) 11 A.C.L.C. 558 at 566.

A liquidator is generally entitled to be indemnified from the unsecured assets of the insolvent company. However, it is all very well having a right to indemnity, but it is of little use if there are no funds available to satisfy it. The indemnity allows, according to Australian authorities, the liquidator to have an equitable lien over the unsecured assets of the insolvent company.[1281]

As discussed later in Ch.13,[1282] it is unclear whether a liquidator can claim the payment of an adverse costs order against the liquidator from company assets under either r.6.42(2)(a) or r.7.108(2)(a). Reference should be had in this regard to Ch.9 where the issue was discussed in the context of the liquidator's power to bring proceedings.

**11-198**   Because, both out of concern that costs might be awarded against them, and there may be insufficient funds in the company's coffers to pay for the prosecution of an action, liquidators will usually need to explore ways of obtaining some funding support. This topic has been discussed in relation to the duty to collect assets.[1283]

This uncertainty makes it imperative that a liquidator either gets creditor backing or enters a funding arrangement whereby an insurer agrees, in exchange for a portion of the fruits of the action, to underwrite the costs of the action. As mentioned in Ch.9 and earlier in this chapter, another option for the liquidator is to obtain after the event insurance (ATE). This is much easier to secure than third party funding and it will cover the legal costs of the other side (in case of losing the proceedings and the court making the usual order), disbursements and a portion of the liquidator's own legal costs.[1284]

## C.   Security for costs

**11-199**   A further concern for a liquidator, albeit of marginal importance, is that a defendant in an action brought under the adjustment provisions may apply for an order for security for costs. It must be noted that courts will rarely make such an order against a liquidator, but might well do so where proceedings are brought in the name of the company. This topic was discussed earlier in the book in the context of the power of liquidators to bring legal proceedings.[1285]

## VII.   Recovery of Assets

**11-200**   A liquidator has three means by which property can be recovered or rights enforced. The liquidator has all the powers of an ordinary litigant of instituting proceedings in the usual way, and, in addition, may take advantage of two special forms of procedure that are not generally available. First, property which is in the possession of the officers, agents, or members of the company may be recovered by means of a summary order for delivery under s.234; and the liquidator may take proceedings for breach of duty against promoters, liquidators, and officers of the company in order to enforce its claims to profits, damages, or compensation. The

---

[1281] *Nationwide News Pty Ltd v Samalot Enterprises Pty Ltd* (1986) 5 N.S.W.L.R. 227; (1986) 10 A.C.L.R. 748; *Shirlaw v Taylor* (1991) 9 A.C.L.C. 1235.
[1282] See below at para.13-038.
[1283] See above at paras 9-072–9-075.
[1284] Crinson and Morphet, "Funding for actions brought by insolvency officeholders" (2011) 24 Insolv. Int. 108, 111.
[1285] See above at paras 9-017–9-019.

second procedure is misfeasance proceedings, which has been mentioned in this chapter but is discussed in detail in Ch.16.[1286]

## A.  Legal proceedings

The liquidator's power to institute legal proceedings to recover company property forms part of the wider power conferred by ss.165(3) (voluntary liquidations) and 167(1) (compulsory liquidations)[1287] together with paras 3A and 4 of Sch.4. Some account of these provisions has already been given. One of the biggest barriers to initiating legal proceedings is the fact that the liquidator has to fund them.[1288]   **11-201**

A liquidator might be able to file an application for summary judgment under r.24.2 of the Civil Procedure Rules 1998,[1289] however, it has been recognised that it is a severe matter to order summary judgment and deny a respondent a day in court.[1290] Before making such an order the court must consider whether the defence indicates that there are real prospects of the claim being successfully defended.[1291]

## B.  Entitlement to recoveries[1292]

Where a liquidator recovers money or property pursuant to litigation: who is entitled to them? Many, if not most, companies in liquidation will have given security interests to lenders or credit providers. In cases where sums are recovered pursuant to adjustment proceedings the holder of a floating charge over the present and future assets of the company, who may not be fully secured under the security held, may want to claim the recovered amount or part thereof. Where money has been recovered under s.239 proceedings on the basis that the company gave a preference, it has been clearly held to be for the benefit of the unsecured creditors.[1293] In fact, some cases have stated that the liquidator holds it in trust for the unsecured creditors of the company.[1294] In *Re MC Bacon Ltd*,[1295] Millett J said that the court's powers to make orders in relation to cases where a preference has   **11-202**

---

[1286] See below at paras 16-005–16-028.

[1287] Before bringing proceedings the sanction of the court of liquidation committee is required: s.167(1)(a).

[1288] The problems with funding are disclosed in the results of an empirical study conducted by Professors Milman and Parry. See *A Study of the Operation of Transactional Avoidance Mechanisms in Corporate Insolvency Practice* (Wallingford: GTI Specialist Publishers, 1997). For a briefer discussion of their findings, see "Transaction Avoidance Provisions in Corporate Insolvency: An Empirical Study" (1998) 14(5) I.L.&P. 280.

[1289] See CPR r.24.4 for the procedure.

[1290] *Purnell v Chorlton* [2000] B.C.C. 876.

[1291] *Purnell v Chorlton* [2000] B.C.C. 876. In this case, HH Judge Weeks QC (sitting as a High Court judge) gave summary judgment to a liquidator. Also, generally, see *ED&F Man. Liquid Products Ltd v Patel* [2003] EWCA Civ 472.

[1292] For an interesting and thoughtful consideration of the issue, see Parry, "The destination of proceeds of insolvency litigation" (2002) 23 Co Law 49; Armour and Walters, "The Proceeds of Officeholder Actions under the Insolvency Act: Charged Assets of Free Estate?" [2006] L.M.C.L.Q. 27.

[1293] *Ex p. Cooper*; sub nom. *In Re Zucco* (1875) 10 Ch. App. 510 at 511–512; *Wilmott v London Celluloid Co* (1886) 34 Ch. D. 147 at 150; *Sanguinetti v Stuckey's Banking Co* [1894] 1 Ch. 176 at 180; *Re Yagerphone Ltd* [1935] 1 Ch. 392 at 396; *Re Quality Camera Co Pty Ltd* (1965) 83 W.N. (pt.1) (N.S.W.) 226 at 229; *NA Kratzmann Pty Ltd (in liq) v Tucker (No.2)* (1968) 123 C.L.R. 295 at 300; *Re MC Bacon Ltd (No.2)* [1991] Ch. 127 at 137; *Campbell v Michael Mount PPB* (1995) 13 A.C.L.C. 50 at 509; and on appeal ((1996) 14 A.C.L.C. 218).

[1294] *Re Yagerphone Ltd* [1935] 1 Ch. 392 at 396; *Re Quality Camera Co Pty Ltd* (1965) 83 W.N. (pt.1) (N.S.W.) 226 at 229. However, that appears to be a flawed view: *Re MC Bacon Ltd (No.2)* [1991]

Nonexistent

Assets Available for Division and Distribution

been found to have been given are not intended to enable a chargeholder to benefit from proceedings initiated by a liquidator.[1296] His Lordship said that such sums enure for the benefit of the unsecured creditors and not for the benefit of the company or a holder of a floating charge.[1297] His Lordship said that the principle in *Re Yagerphone Ltd*[1298] was still good law despite the changes brought about by the enactment of the Act.[1299] The Court of Appeal in *Katz v McNally*[1300] affirmed the correctness of this position. Any concern about the correctness of the case law was addressed in 2015 when s.119 of the Small Business, Enterprise and Employment Act 2015 introduced s.176ZB of the Act.[1301] This provision makes it clear in subs.(2) that the proceeds of a claim under ss.214, 238, 239 and 244 are not to be treated as part of the company's net property, namely the amount of its property which would be available for satisfaction of claims of holders of debentures secured by, or holders of, any floating charge created by the company.

The same position existed at common law even if, as occurs in some cases, a preference action leads to a court order that the creditor is to return property in specie to the company. This might appear to be somewhat unusual as one might think that a revesting of property in the company might mean that a secured creditor is entitled to claim against it in priority to the unsecured creditors. Indeed, that has been the case in Australia,[1302] where a distinction is drawn between money recoveries and recoveries in specie, and this still appears to be the situation. However, in England it does not matter whether a preference action produces a payment of money or a recovery of property, the unsecured creditors are entitled to it. This is well explained as follows:

> "The true justification for treating recoveries in respect of preferences as held for the general body of creditors is that the legislation is remedial in character, embodying a policy decision to benefit the general body of creditors and not any individual creditor, and the claim is accordingly vested by statute in the liquidator, not in the company."[1303]

Notwithstanding that, s.176ZB only refers to "proceeds" and thus, it might be argued that it would not cover orders relating to specific property. On the other hand, if the liquidator sold the property subject to the order so that he or she had funds to distribute, the funds might be seen as "proceeds". The upshot is that things are not clear and so a liquidator might still have to depend on the common law in relation to orders relating to specific property when distributing the property or the funds resulting from the realisation of the property to the creditors.

The position at common law that applied in relation to preferences was also said

Ch. 127 at 137 per Millett J; *Starkey v Deputy Commissioner of Taxation* (1993) 11 A.C.L.C. 558 per McPherson J; Goode, *Principles of Corporate Insolvency Law* (1997), p.440.

[1295] *Re MC Bacon Ltd* [1991] Ch. 127.

[1296] *Re MC Bacon Ltd* [1991] Ch. 127 at 137.

[1297] *Re MC Bacon Ltd* [1991] Ch. 127 at 137.

[1298] *Re Yagerphone Ltd* [1935] 1 Ch. 392.

[1299] *Re MC Bacon Ltd* [1991] Ch. 127 at 137.

[1300] *Katz v McNally*; sub nom. *Re Exchange Travel (Holdings) Ltd* [1997] B.C.C. 784 at 791, 799; [1998] B.P.I.R. 30 at 38, 48.

[1301] Section 176ZB came into force on 1 October 2015 according to reg.2(j) of the Small Business, Enterprise and Employment Act 2015 (Commencement No.2 and Transitional Provisions) Regulations 2015 (SI 2015/1689).

[1302] *NA Kratzmann Pty Ltd (in liq) v Tucker (No.2)* (1968) 123 C.L.R. 295 at 300; *Bank of New Zealand v Essington Developments Pty Ltd* (1991) 5 A.S.C.R. 86 at 89–90.

[1303] Van Zwieten, *Goode on Principles of Corporate Insolvency Law*, 5th edn (2019) at 724.

to apply where there are recoveries pursuant to proceedings under s.238 in relation to a transaction at an undervalue, under s.244 in relation to an extortionate credit bargain and under s.214 for wrongful trading.[1304] Section 176ZB makes is plain that, as with orders made pursuant to a successful claim under s.239, the proceeds of a claim under these other provisions would also go to the general body of unsecured creditors.

There is an exception to the rule that the total proceeds from a claim go to the unsecured creditors and that is where the liquidator has paid preferential creditors out of the proceeds of the assets of the company that were the subject of a floating charge. Preferential creditors are entitled to be paid before the chargeholder out of charged assets but only where the non-charged assets are not sufficient to pay the preferential creditors. In the scenario just posed there is Australian authority[1305] to the effect that the liquidator is required to pay any awards obtained from a liquidator's claims, such as under the equivalents of those provided for in ss.238, 239, 244, 213 or 214 to the chargeholder if it was not satisfied under the charge. This is on the basis that the secured creditor would be subrogated to the rights of the preferential creditors so as to be paid out of the funds obtained in the litigation. Given that the legislative provisions are the same in the UK as they are in Australia concerning the payment of preferential creditors ahead of holders of floating charges and that the former should be paid out of uncharged assets first, the reasoning of the Australian courts is likely to be followed.

Unlike actions under ss.238, 239 and 244, which are, as indicated earlier in this chapter, to seek adjustment of pre-liquidation transactions, an action under s.245 is to avoid a transaction, namely the giving of a charge. The upshot of an avoidance order is that property that was disposed of never ceased being the company's property and is subject to security interests. Hence, any property freed from a floating charge, under s.245 proceedings, may be claimed by existing secured creditors. The position is the same in three other cases. First, where property is recovered pursuant to s.127 (avoidance of post-petition dispositions) as the property never ceased to be the company's.[1306] Secondly, where compensation is ordered to be paid by directors for breach of duty to their company. Thirdly, where compensation is ordered to be paid to the company by a party pursuant to any cause of action which the company had in relation to that party, such as a breach of a contract or the commission of a tort against the company. **11-203**

### C.  Summary delivery orders

Where a company is being wound up, liquidators may avail themselves of the powers conferred by s.234(2).[1307] This provision creates a summary procedure for obtaining payment, delivery, or transfer of property,[1308] books, papers or records **11-204**

---

[1304] The proceeds from a fraudulent trading claim under s.213 are also covered by s.176ZB.

[1305] *Cook v Italiano Family Fruit Co Pty Ltd* [2010] FCA 1355; (2010) 190 FCR 474; (2010) 80 ACSR 680; *Re Damilock Pty Ltd* [2012] FCA 1445.

[1306] See *Mond v Hammond Suddards* [1996] 2 B.C.L.C. 470. Compare the position in Australia, see *Campbell v Michael Mount PPB* (1995) 13 A.C.L.C. 506 (on appeal at (1996) 14 A.C.L.C. 218).

[1307] For a broader discussion, see, Keay, "The Office-Holder's Delivery Up Power and the Recovery of Debts" [2011] 4 *Corporate Rescue and Insolvency* 3.

[1308] This does not embrace the improper seizure of choses in action, as it only covers tangible property. *Welsh Development Agency Ltd v Export Finance Co* [1992] B.C.C. 270.

from any person.[1309] Section 234(2) replaced s.551 of the Companies Act 1985, which was drafted more restrictively. The latter provision provided that the liquidator could get payment, delivery, conveyance, surrender or transfer of money, property, or books or papers from any contributory, trustee, receiver, banker, agent or officer of the company. In providing that the liquidator is able to get property from "any person" the legislature was both making the delivery order process wider, and making the task of liquidators easier in that they do not have to assert that the holder of the property falls into one of the named classes.

Although s.234(2) refers to the court requiring a person to deliver etc, r.7.78 makes it clear that the power of the court may be invoked by a liquidator. The relevant rule only applies to a compulsory winding up. In a voluntary winding up, application must be made to the court to exercise these powers. Of course, a person might not accede to a liquidator's demands, so the liquidator will have to apply to the court. The application must be commenced in the liquidator's own name, and not that of the company.[1310] The purpose of this form of procedure is simply to facilitate the administrative side of winding up. Originally it was the courts' view that it conferred no jurisdiction to adjudicate on issues of fact[1311] and was available only where the company was prima facie entitled to the money or property in question. Consequently, if the party against whom the demand was made or order was sought raised a dispute as to the company's rights, the liquidator was not entitled to invoke the summary procedure but had to institute legal proceedings in the ordinary way.[1312] However, the attitude of the courts has changed. In *Re London Iron & Steel Co Ltd*,[1313] Warner J took the view because of the fact that s.234(2) states:

> "where any person has in his possession or control any property books, papers or records[1314] to which *the company appears to be entitled*" (my emphasis, footnote not in original)

and the earlier equivalent of Pt 12 of the Rules are very comprehensive, that this allows courts to entertain any dispute.[1315] But the courts are not entitled to do so where the issue of ownership of property is subject to the jurisdiction of the courts of a foreign country.[1316]

Section 234(3) and (4) provide some protection for a liquidator. The liquidator is not liable for any loss or damage resulting from a seizure or disposal (save where loss has been caused by the liquidator's negligence) of property which is not company property where he or she, at the time of the seizure or disposal, believes, and has reasonable grounds for that belief, that he or she is entitled to seize or

---

[1309] See, e.g. *Re Oakwell Collieries Co* [1879] W.N. 65 (director ordered to deliver property sold to the company).

[1310] *Re Cosslett (Contractors) Ltd* [2001] B.C.C. 740.

[1311] *Re Ilkley Hotel Co* [1893] 1 Q.B. 248, where it was held that there was no power to declare that a particular transaction constituted a preference.

[1312] *Re Palace Restaurants Ltd* [1914] 1 Ch. 492.

[1313] *Re London Iron & Steel Co Ltd* [1990] B.C.C. 159.

[1314] Books, papers and records has been held by the Supreme Court of Appeal of South Africa in *Le Roux v Viana 2008* (2) S.A. 173 to include any information relating to the company in liquidation where it is located on a computer's hard drive and where the computer is owned by a third party.

[1315] See *Euro Commercial Leasing Ltd v Cartwright & Lewis* [1995] B.C.C. 830; *Re Cosslett (Contractors) Ltd* [2001] B.C.C. 740 HL.

[1316] *Re Leyland DAF Ltd* [1994] B.C.C. 166 CA.

dispose of the property. Also, in such circumstances the liquidator has a lien on the property seized, or the proceeds of any sale, for such expenses as were incurred in the seizure or disposal.

# **Exhibit 65**

338

it is impossible to say that Cussons was bound to succeed in removing No. 251537 and this point therefore fails. Their Lordships will therefore humbly advise Her Majesty that the appeal should be dismissed. Cussons must pay Unilever's costs before their Lordships' Board.

     *Solicitors: Bird & Bird; Eversheds.*

S. S.

——————

[PRIVY COUNCIL]

COUNTRYWIDE BANKING CORPORATION LTD.    .    APPELLANT

AND

BRIAN NORMAN DEAN    .    .    .    .    .    .    RESPONDENT

[APPEAL FROM THE COURT OF APPEAL OF NEW ZEALAND]

1997 Oct. 20;       Lord Browne-Wilkinson, Lord Slynn of Hadley,
Nov. 24           Lord Hoffmann, Lord Hutton and Gault J.

*New Zealand—Insolvency—Transaction having preferential effect—Company paying arrears due under lease to lessor—Whether transaction "in the ordinary course of business"—Whether voidable—Companies Act 1955 (No. 63 of 1955, as amended), ss. 266(2)(3), 268(1)(2)*

     The lease by the applicant of retail space to a company provided for assignment by the company with the applicant's consent, and as a condition precedent to the giving of consent the applicant was entitled to require payment by the company of all rent and other moneys due and payable under the lease. The company fell into arrears. It agreed to sell its business including the lease and, on the basis that the sums due under the lease would be paid out of the proceeds of sale, at the company's request the applicant agreed not to issue proceedings against the company to recover the outstanding amount. The company made that payment to the applicant, although the company was unable to pay its due debts at that time, thereby enabling the applicant to receive more towards the satisfaction of its debt than it would have been likely to receive in the company's liquidation. Soon afterwards the company was put into liquidation. The liquidator, considering the payment to be voidable under section 266(2) of the Companies Act 1955,[1] filed a notice under section 268(1) that he wished to have the transaction set aside and the amount

---

[1] Companies Act 1955, as amended, s. 266: see post, pp. 342D–343B.
S. 268(1)(2): see post, p. 343C–D.

A.C.          Countrywide Banking Corpn. Ltd. v. Dean (P.C.)

A    repaid. The applicant applied to the High Court of New Zealand
under section 268(2) for an order that the transaction should not
be set aside on the ground that it had taken place in the ordinary
course of business. Unchallenged evidence in support of the
application showed that the virtually invariable practice of
landlords was to require all outstanding amounts under a lease to
be paid as a condition of consent to assignment of the lease, and
that where a tenant of commercial premises was unable to meet
B    payments under a lease as they fell due and the tenant's business
was about to be sold it was usual for the landlord to receive all
such payments from the proceeds of sale. The judge dismissed the
application, holding that the payment had not been made in the
ordinary course of business since it had been, to the applicant's
knowledge, dependent on the cessation of the company's business.
The Court of Appeal of New Zealand dismissed the applicant's
appeal, holding that the payment was of long accrued arrears and
C    was the largest sum paid by the company to the applicant at any
one time, and so it had not been made in the ordinary course of
business.
        On the applicant's appeal to the Judicial Committee:—
        *Held*, dismissing the appeal, that it was not necessary to adopt
a particular formulation or comprehensive statement of the criteria
for determining whether a transaction had taken place in the
D    ordinary course of business for the purposes of section 266 of the
Act of 1955; that the transaction had to be examined in its factual
setting, excluding the company's intent or purpose save as required
by section 266(4), and the determination made objectively by
reference to the standard of what constituted the ordinary course
of business having regard to business practices in the commercial
world in general and in relation to the ordinary operational activities
of businesses as going concerns; that the past practices of the
E    particular company and its dealings with the particular creditor
were also relevant considerations; that the actual circumstances
had to be assessed and, although the payment of sums owed
under a lease in order to secure a lessor's consent to an assignment
of the lessee's interest might be within the ordinary course of
business in certain circumstances, since on the evidence the
payment included long-standing arrears and had been made when
F    to the knowledge of the applicant it was part of the transaction
whereby the company was disposing of its business the courts
below had been entitled to conclude that it had not been made in
the ordinary course of business; and that, accordingly, the
applicant had failed to rebut the presumption in section 266(3)(*b*)
and the transaction was therefore voidable under section 266(2)
and would be set aside (post, pp. 349A–B, D–H, 350A–C).
        *Rust v. Cooper* (1777) 2 Cowp. 629 and *Tomkins v. Saffery*
G    (1877) 3 App.Cas. 213, H.L.(E.) distinguished.
        Decision of the Court of Appeal of New Zealand affirmed.

    The following cases are referred to in the judgment of their Lordships:

*Burns v. McFarlane* (1940) 64 C.L.R. 108
*Downs Distributing Co. Pty. Ltd. v. Associated Blue Star Stores Pty. Ltd.*
H        (1948) 76 C.L.R. 463
*Julius Harper Ltd. v. F. W. Hagedorn & Sons Ltd.* [1991] 1 N.Z.L.R. 530
*Modern Terrazzo Ltd., In re* (unreported), 10 October 1997; High Court of
        New Zealand (Auckland Registry), No. M654 of 1995
*Reynold Bros. (Motors) Pty. Ltd. v. Esanda Ltd.* (1983) 8 A.C.L.R. 422

*Rust v. Cooper* (1777) 2 Cowp. 629                                          A
*Taylor v. White* (1964) 110 C.L.R. 129
*Tomkins v. Saffery* (1877) 3 App.Cas. 213, H.L.(E.)

The following additional cases were cited in argument:

*Alderson v. Temple* (1768) 4 Burr. 2235
*Builders Hardware Co. Ltd. v. Steel* (unreported), 15 March 1995; High Court
    of New Zealand (Christchurch Registry), No. M386 of 1994          B
*Ceres Orchard Partnership v. Fiatagri Australia Pty. Ltd.* [1995] 1 N.Z.L.R. 112
*Chilton Saint James School v. Gray* (unreported), 19 March 1996; High Court
    of New Zealand (Wellington Registry), C.P. No. 304 of 1995
*Katoa Pty. Ltd. v. Dartnall* (1983) 2 A.C.L.C. 42
*Robertson v. Grigg* (1932) 47 C.L.R. 257
*Taylor v. Australia and New Zealand Banking Group Ltd.* (1988) 6 A.C.L.C.
    808                                                                C

APPEAL (No. 41 of 1997) with leave of the Court of Appeal of New
Zealand by the applicant, Countrywide Banking Corporation Ltd.,
from the judgment of the Court of Appeal of New Zealand (Thomas,
Keith and Neazor JJ.) given on 12 December 1996 dismissing the
applicant's appeal from the judgment of Cartwright J. delivered on
5 December 1995 in the High Court of New Zealand whereby she had     D
dismissed its application for an order that the transaction by which the
applicant had received $30,914·90 on 5 May 1995 from C. B. Sizzlers Ltd.
not be set aside in accordance with the notice filed by the company's
liquidator, Brian Norman Dean, the High Court having put the company
into liquidation on 1 June 1995.

The facts are stated in the judgment of their Lordships.            E

*David Smith* (of the New Zealand Bar) for the applicant. The payment
was made by the company in the ordinary course of business within
section 266(2) of the Companies Act 1955, as amended, notwithstanding
that the company was unable to pay its debts at that time. The test to
apply to the transaction is objective. Intention or purpose is irrelevant.
The court should adopt an approach which is in accord with commercial    F
reality. The question was whether the transaction was one which a person
might undertake without having bankruptcy in view. The answer clearly
was in the affirmative. [Reference was made to *Alderson v. Temple* (1768) 4
Burr. 2235; *Rust v. Cooper* (1777) 2 Cowp. 629; *Tomkins v. Saffery* (1877)
3 App.Cas. 213; *Robertson v. Grigg* (1932) 47 C.L.R. 257; *Downs
Distributing Co. Pty. Ltd. v. Associated Blue Star Stores Pty. Ltd.* (1948) 76    G
C.L.R. 463; *Reynolds Bros. (Motors) Pty. Ltd. v. Esanda Ltd.* (1983)
8 A.C.L.R. 422; *Taylor v. White* (1964) 110 C.L.R. 129; *Taylor v. Australia
and New Zealand Banking Group Ltd.* (1988) 6 A.C.L.C. 808; *Katoa Pty.
Ltd. v. Dartnall* (1983) 2 A.C.L.C. 42; *Julius Harper Ltd. v. F. W. Hagedorn
& Sons Ltd.* [1991] 1 N.Z.L.R. 530; *Ceres Orchard Partnership v. Fiatagri
Australia Pty. Ltd.* [1995] 1 N.Z.L.R. 112; *Builders Hardware Co. Ltd. v.
Steel* (unreported), 15 March 1995; High Court of New Zealand            H
(Christchurch Registry), No. M386 of 1994; *Chilton Saint James School v.
Gray* (unreported), 19 March 1996; High Court of New Zealand
(Wellington Registry), C.P. No. 304 of 1995 and *In re Modern Terrazzo*

341

A.C.            **Countrywide Banking Corpn. Ltd. v. Dean (P.C.)**

A    *Ltd.* (unreported), 10 October 1997; High Court of New Zealand (Auckland Registry), No. M654 of 1995.]

   *Jonathan Williams* (of the New Zealand Bar) for the liquidator. Section 266 of the Companies Act 1955, as amended, is directed to the effect of the transaction and not the debtor's intention. If a company makes a preference payment when it is unable to pay its debts the liquidator may avoid the transaction and recover the money, unless (section
B    266(2)) the recipient is able to prove that the payment was made in the ordinary course of business: see *In re Modern Terrazzo Ltd.,* 10 October 1997.

   The payment to the applicant did not accord with general commercial practice. "Ordinary course of business" means the ordinary business practice of the commercial world in general, and not a response to
C    abnormal financial difficulties. Whether a payment is made in the ordinary course of business is a question of fact. As there have been concurrent findings of fact, unless it is established that an incorrect test was applied then the finding of fact should not be disturbed in accordance with established practice.

                                                          *Cur. adv. vult.*
D

   24 November.  The judgment of their Lordships was delivered by
GAULT J.
   This appeal raises the issue of the correct construction of the voidable preference provisions of the New Zealand Companies Acts 1955 and 1993.
   At the time of the enactment of the new Act of 1993, the earlier Act
E    of 1955, which continued to apply, was amended so that the same new provisions governing company liquidations were introduced in both Acts. In this case their Lordships are concerned with section 266 of the Act of 1955 as amended which is in identical terms to those in section 292 of the Act of 1993.
   The material facts can be stated briefly. The applicant, Countrywide Banking Corporation Ltd., was the lessor under a lease dated 4 May 1993
F    by which C. B. Sizzlers Ltd. ("the company") occupied retail space in the foodcourt complex in the Queen Street Countrywide Bank Centre at Auckland. In addition to the base rent, the lessee was required to pay as additional rent a percentage of the gross receipts of its business, a percentage of the foodcourt operating expenses and a promotion levy also based upon gross receipts.
G    The lease provided for payment of interest by the lessee on amounts in arrear and unpaid and for the lessor's costs of recovery. There was also provision for assignment of the lease by the lessee subject to the consent of the lessor. Before giving consent the lessor was entitled to require payment of all moneys due and payable under the lease.
   The lessee company fell into arrears and in October 1994, by variation, the rent was reduced with retrospective effect from 1 September 1993. The
H    rate of additional rent also was reduced. Still arrears increased and in March 1995 the amount outstanding was N.Z.$18,766·86. The applicant then instructed solicitors to recover that amount. Shortly after that instruction was issued the applicant was made aware that the business of

342

the company was subject to a sale and purchase agreement. The sale    A
included the lease the assignment of which required the consent of the
applicant. At the request of the company's solicitors the applicant agreed
not to issue proceedings on the basis that all moneys due to it under the
lease would be paid out of the proceeds of sale. On 5 May 1995 the
applicant received from the solicitors acting for the company a payment of
$30,914·90 which is the subject of this appeal. That sum represented the
total of the amounts payable under the lease and unpaid to that date.    B

In the meantime, unknown to the applicant, another creditor had
served on the company on 28 March 1995 a statutory demand for payment
of other indebtedness and had applied on 4 May for an order that the
company be wound up. Such an order was made in the High Court at
Auckland on 1 June 1995. Under the 1993 law the liquidation commenced
on the appointment of the liquidator.    C

There were filed with the liquidator proof of debts totalling $63,715·43
in addition to which the National Bank was owed $15,375 under a
debenture. The balance of the proceeds of the sale of the business (there
were no other assets) were such that other creditors were likely to receive
nothing whereas the applicant had been paid in full.

The relevant sections of the Companies Act 1955, as amended, are:    D

"**266.** *Transactions having preferential effect.* (1) In this section
'transaction,' in relation to a company, means—(*a*) A conveyance or
transfer of property by the company: (*b*) The giving of a security or
charge over the property of the company: (*c*) The incurring of an
obligation by the company: (*d*) The acceptance by the company of
execution under a judicial proceeding: (*e*) The payment of money by
the company, including the payment of money under a judgment or    E
order of a court. (2) A transaction by a company is voidable on the
application of the liquidator if the transaction—(*a*) Was made (i) At
a time when the company was unable to pay its due debts; and
(ii) Within the specified period; and (*b*) Enabled another person to
receive more towards satisfaction of a debt than the person would
otherwise have received or be likely to have received in the
liquidation—unless the transaction took place in the ordinary course    F
of business. (3) Unless the contrary is proved, for the purposes of
subsection (2) of this section, a transaction that took place within the
restricted period is presumed to have been made—(*a*) At a time when
the company was unable to pay its debts; and (*b*) Otherwise than in
the ordinary course of business. (4) For the purposes of this section,
in determining whether a transaction took place in the ordinary    G
course of business, no account is to be taken of any intent or purpose
on the part of a company—(*a*) To enable another person to receive
*more towards satisfaction of a debt than the person would otherwise
receive* or be likely to receive in the liquidation; or (*b*) To reduce or
cancel the liability, whether in whole or in part, of another person in
respect of a debt incurred by the company; or (*c*) To contribute    H
towards the satisfaction of the liability, whether in whole or in part,
of another person in respect of a debt incurred by the company—unless
that person knew that that was the intent or purpose of the company.
(5) For the purposes of subsection (2)(*a*)(ii) of this section, 'specified

A.C.         Countrywide Banking Corpn. Ltd. v. Dean (P.C.)

A    period' means—(a) The period of two years before the commencement
of the liquidation; and (b) In the case of a company that was put into
liquidation by the court, the period of two years before the making of
the application to the court together with the period commencing on
the date of the making of that application and ending on the date on
which the order was made. (6) For the purposes of subsection (3) of
this section, 'restricted period' means—(a) The period of six months
B    before the commencement of the liquidation; and (b) In the case of a
company that was put into liquidation by the court, the period of six
months before the making of the application to the court together
with the period commencing on the date of the making of that
application and ending on the date on which the order of the court
was made. . . .

C        "268. *Procedure for setting aside voidable transactions and charges.*
(1) A liquidator who wishes to have a transaction that is voidable
under section 266 of this Act or a charge that is voidable under
section 267 of this Act set aside must—(a) File in the court a notice
to that effect specifying the transaction or charge to be set aside and,
in the case of a transaction, the property or value which the liquidator
wishes to recover, and also the effect of subsections (2), (3), and (4)
D    of this section; and (b) Serve a copy of the notice on the other party
to the transaction or the grantee of the charge and on every other
person from whom the liquidator wishes to recover. (2) A person—
(a) Who would be affected by the setting aside of the transaction or
charge specified in the notice; and (b) Who considers that the
transaction or charge is not voidable—may apply to the court for an
order that the transaction or charge not to be set aside. (3) Unless a
E    person on whom the notice was served has applied to the court under
subsection (2) of this section, the transaction or charge is set aside
28 days after the date of service of the notice. (4) If one or more
persons have applied to the court under subsection (2) of this section,
the transaction or charge is set aside on the day on which the last
application is finally determined, unless the court orders otherwise.

F        "269. *Other orders.* If a transaction or charge is set aside under
section 268 of this Act, the court may make one or more of the
following orders—(a) An order requiring a person to pay to the
liquidator, in respect of benefits received by that person as a result of
the transaction or charge, such sums as fairly represent those
benefits: . . .

G        "270 . . . (3) Recovery by the liquidator of property or its equivalent
value, whether under section 269 of this Act or any other section of
this Act, or under any other enactment, or in equity or otherwise,
may be denied wholly or in part if—(a) The person from whom
recovery is sought received the property in good faith and has altered
his or her position in the reasonably held belief that the transfer to
that person was validly made and would not be set aside; and (b) In
H    the opinion of the court, it is inequitable to order recovery or recovery
in full."

The liquidator gave notice under section 268 of his wish to set aside
the payment by the company to the applicant and called for repayment of

544

the amount of $30,914·90. The applicant applied on 8 September 1995 to    A
the High Court under section 268(2) for an order that the transaction not
be set aside on the ground that it took place in the ordinary course of
business.

It is common ground that at the time the payment was made the
company was unable to pay its due debts, that the payment was made
within the specified and restricted periods and that it enabled the applicant
to receive more towards the satisfaction of its debt than it would be likely    B
to receive in the liquidation. The sole question therefore was whether the
applicant had overcome the presumption in section 266(3) and established
that the transaction took place in the ordinary course of business so as to
fall within the exception provided in section 266(2).

In support of its application the applicant filed an affidavit from an
experienced conveyancing solicitor. His unchallenged evidence was that it    C
is virtually invariable practice for a landlord to require all outstanding rent
and other payments under a lease to be paid as a condition of the
landlord's consent to the assignment of a lease. He said also that if a
tenant of commercial premises has been unable to meet payments under a
lease as they fall due and the sale of that tenant's business is about to
occur it is entirely usual for a landlord to receive all lease payments due
under the lease from the sale of that business.    D

The case for the applicant was that a payment for which the company
was liable under the terms of its lease made in circumstances which were
entirely usual represented a transaction that took place in the ordinary
course of business within the meaning of that expression in section 266(2).

In the High Court, in her judgment delivered on 5 December 1995,
Cartwright J. referred to authorities to which further reference will be    E
made. She rightly noted the focus of section 266 as on the company which
is about to be, or has been, placed in liquidation and its transactions. She
accepted that the transactions are to be viewed against the circumstances
of the company at the time. She found that the payment to the applicant
was made when there was no possibility of the company's business
continuing, that the applicant was aware of that and of the company's
serious financial difficulties when it consented to the assignment of the    F
lease. In that context she held that the payment which was dependent
upon the cessation of business could not be in the ordinary course of
business.

The applicant appealed to the Court of Appeal. The judgment of that
court delivered by Keith J. on 12 December 1996, after brief reference to
the principal authorities relied upon at first instance, noted that the parties    G
were not understood as disagreeing on the law. The court said that the
wording of the phrase "in the ordinary course of business" and its
standard interpretation make it plain that the test is an objective and
general one such that emphasis is not to be placed on the business of the
particular parties to the transaction, whether jointly or singly. The court
went on to consider the particular transaction in question. It was held that
while payments of debts as they become due, including payments under a    H
lease, would be part of the ordinary course of business, as might adherence
to invariable practice of meeting outstanding indebtedness as a condition
of securing a lessor's consent to assignment of a lease, the payment in this

A.C.                    **Countrywide Banking Corpn. Ltd. v. Dean (P.C.)**

A    case was of a quite different order. This was a payment of long accrued
arrears and, being the largest sum paid by the company to the applicant
at any one time, it could not be accepted as having been made in the
ordinary course of business. The appeal was dismissed.

Before their Lordships' Board Mr. Smith for the applicant emphasised
the importance of the case to lessors and the need, if the appeal should be
dismissed, for lessors to change what on the evidence is an invariable
B    practice of recovering arrears upon assignment by the lessee. He said
lessors will have to move on defaulting tenants before any substantial
arrears accrue with consequent disruption to the lease market.

Mr. Smith submitted that certain factual findings of Cartwright J. were
unsupported by evidence. Their Lordships consider however that of those
material to her decision the findings that the applicant knew of the
C    cessation of the business of the company and of its financial difficulties
were reasonable inferences from the evidence of the request to withhold
proceedings pending completion of the sale of the business.

Mr. Smith did not take issue with the Court of Appeal's description of
the test of what is in the ordinary course of business as an objective and
general one. He submitted however that in its reasoning the court did not
apply that test but focused on the particular dealings between the lessor
D    and the lessee in concluding that the transaction was not in the ordinary
course of business between them.

He contended for a test of whether the transaction was one which a
man might undertake without having any bankruptcy in view. On that test,
he argued, the payment of moneys due under a lease, in accordance with
invariable practice where the lease is assigned, must be accepted as in the
E    ordinary course of business. This, he said, would reflect commercial reality.

Mr. Williams for the liquidator supported the judgment. He submitted
that whether the payment was made in the ordinary course of business is
basically a question of fact and that there were concurrent findings in
favour of the liquidator in the lower courts.

On the law Mr. Williams was able to rely upon a judgment of Fisher J.
delivered only a few days before the hearing before their Lordships in
F    *In re Modern Terrazzo Ltd.* (unreported), 10 October 1997; High Court of
New Zealand (Auckland Registry) No. M654 of 1995. In that judgment
Fisher J. considered in some detail the interpretation of the phrase "in the
ordinary course of business" in section 266 (and section 292 of the Act of
1993). In a careful analysis, drawing upon a perceptive article by M. D. J.
Conaglen, "Voidable Preferences under the Companies Act 1993,
G    A Change in Focus" [1996] N.Z. Law Review 197, Fisher J. reviewed the
authorities and brought them into clearer perspective. Their Lordships
have been considerably assisted by his judgment, as indeed was
Mr. Williams.

The repeal of section 309 and the substitution of section 266 in 1993
effected a substantial change in the approach to voidable preferences in
New Zealand. Section 309, which was based upon the English law,
H    provided that payments made within two years before winding up
commenced, if made by a company unable to pay its debts as they fell
due, was voidable as against the liquidator if made "with a view to" giving
one creditor a preference over other creditors. The inquiry was as to

whether it was the dominant intention to prefer on the part of the debtor
when the payment was made. A creditor so preferred was able to retain
the payment by showing that it was received in good faith, that in reliance
on the validity of the payment the creditor had altered his or her position
and that retention would not be inequitable: section 311A(7).

A

The change effected in 1993 by the new section 266 was to abandon as
the sole ground for avoidability the intention of the debtor to prefer. The
inquiry under section 266(2) is as to whether in the prescribed
circumstances the effect of the transaction was to prefer—to enable a
creditor to receive more than would be likely in the liquidation. That
intention did not cease to be relevant in all circumstances is apparent from
subsection (4) which reintroduces it as a factor for consideration of the
ordinary course of business exception where the person preferred knew of
any intent or purpose of the debtor to prefer. The alteration of position
relief for creditors has been maintained in section 270.

B

C

What then is a transaction in the ordinary course of business which
has the effect of preferring a creditor, the identification of which may be
influenced by knowledge of the other person that there was an intention
or purpose on the part of the company to prefer? Good faith on the part
of the creditor of itself cannot bring a transaction within the exception
because that is an element of the change of position relief the creditor
might seek where the exception does not apply.

D

In the course of argument references were made to a number of other
contexts in which consideration has been given to the ordinary course of
business. Under the former fraudulent preference provisions of bankruptcy
(or insolvency) and company winding up laws the courts evolved a test for
negating an intention to prefer where the preference was made in the
ordinary course of business. It could be satisfied where the payment was
one a person might make without having any bankruptcy in view. That
was the approach contended for by the applicant relying on English
authorities tracing back to *Rust v. Cooper* (1777) 2 Cowp. 629 and *Tomkins
v. Saffery* (1877) 3 App.Cas. 213. Those are the authorities that also
recognised that the necessary intention to prefer could be negated by
showing that the debtor paid under pressure from the creditor or in a
desperate attempt to remain in business. They represent the approach
jettisoned in New Zealand by the repeal of section 309. This is clear from
the report of the Law Commission which recommended the comprehensive
revision of the company law enacted in 1993 (New Zealand Law
Commission, Company Law Reform and Restatement (1989) N.Z.L.C.
Report 9, p. 153, para. 649):

E

F

G

"The focus at present, when a creditor receives payment in preference
to others, is on the intention of the debtor company. This means that
in circumstances were a creditor is preferred through no voluntary
action by the debtor, for example, where a creditor is able to coerce
the debtor, the transaction cannot be attacked. This leads to the
unsatisfactory situation where creditors may be treated differently
according to the quirks of their circumstances. The purpose of a
voidable transaction regime is to avoid this, yet the present law permits
it. Our proposals, which are drawn from both the Australian Law
Reform Commission's Report and the submission of the New Zealand

H

A  Society of Accountants, set out a test which is more straightforward
to apply."

The view expressed at the end of this paragraph has not attracted
unanimous agreement as appears from the poignant addendum to
Fisher J.'s judgment in *In re Modern Terrazzo Ltd.*, 10 October 1997:

B
"It was in 1993 that the Australians abandoned the phrase 'in the
ordinary course of business' as the key exception to their company
voidable preference regime (formerly section 565 of the Corporations
Law (Commonwealth) and its predecessors; see now sections 588FA
to 588FG of The Corporations Law). As one commentator put it
(Keay, (1994) 19 M.U.L.R. 545, 572): 'This abolition has occurred,
principally, because of the judicial uncertainty in interpreting what
was meant by the phrase. It is undeniable that there has not only been

C
uncertainty, but also confusion.' New Zealand chose that moment to
introduce into its own companies legislation the very phrase which
Australia had just discarded. One of us must have got it wrong.
Although in these situations right-thinking New Zealanders would
normally assume it to be Australia, Barker J. conceded in *In re NZ
Spraybooth Ltd.* [1996] 7 N.Z.C.L.C. 261,075, 261,079, that in this

D
instance 'It is perhaps unfortunate that this phrase was included in
the new companies legislation.' He may be right."

The Australian experience revolved around a statutory provision having
some similarity to section 266 but which cannot be said to have been
adopted by the New Zealand legislature. The leading decision of the High
Court of Australia in *Taylor v. White* (1964) 110 C.L.R. 129 dealt with the

E  statutory exception in favour of a "payee in good faith and for valuable
consideration and in the ordinary course of business." The relevant section
expressly negated the good faith component of the exception under
circumstances leading to an inference of actual or constructive knowledge
by the creditor of the debtor's inability to pay its debts and the preferential
effect of the payment. In their Lordships' view that represents a
considerably different approach to that required by the New Zealand

F  section. The Australian cases therefore do not have direct application to
the New Zealand provision though they may provide some guidance as to
the meaning to be given to the phrase "in the ordinary course of business."

Another context in which the expression is to be found is in identifying
the circumstances in which a company may dispose of assets the subject of
a floating charge. *Reynolds Bros. (Motors) Pty. Ltd. v. Esanda Ltd.* (1983)

G  8 A.C.L.R. 422 and *Julius Harper Ltd. v. F. W. Hagedorn & Sons Ltd.*
[1991] 1 N.Z.L.R. 530 are cases in that field. As was recognised by the
Court of Appeal in the second of those cases, at p. 543, the focus of
consideration in these situations is the course of business of the particular
company. Dicta in this context are to be considered in that light.

In each of the judgments of the High Court and Court of Appeal in
the present case reliance was placed on passages from two judgments

H  in Australian cases. The first is to be found in the judgment of Rich J. in
*Downs Distributing Co. Pty. Ltd. v. Associated Blue Star Stores Pty. Ltd.*
(1948) 76 C.L.R. 463, 476–477. That was a decision of the High Court of
Australia on the question of whether a transaction which had the effect of

348

converting an unpaid supplier into a secured creditor within the statutory     A
period prior to liquidation was void or whether the creditor was protected
by the exception in favour of a payee in good faith and for valuable
consideration and in the ordinary course of business. Citing the earlier
decision of *Burns v. McFarlane* (1940) 64 C.L.R. 108, 125, Rich J. said:

> "This last expression it was said 'does not require an investigation
> of the course pursued in any particular trade or vocation and it does     B
> not refer to what is normal or usual in the business of the debtor or
> that of the creditor.' It is an additional requirement and is cumulative
> upon good faith and valuable consideration. It is, therefore, not so
> much a question of fairness and absence of symptoms of bankruptcy
> as of the everyday usual or normal character of the transaction. The
> provision does not require that the transaction shall be in the course
> of any particular trade, vocation or business. It speaks of the course     C
> of business in general. But it does suppose that according to the
> ordinary and common flow of transactions in affairs of business there
> is a course, an ordinary course. It means that the transaction must
> fall into place as part of the undistinguished common flow of business
> done, that it should form part of the ordinary course of business as
> carried on, calling for no remark and arising out of no special or     D
> particular situation."

Williams J. in the same case said, at p. 480:

> "It seems to me, therefore, that the expression refers to a transaction
> into which it would be usual for a creditor and debtor to enter as a
> matter of business in the circumstances of the particular case
> uninfluenced by any belief on the part of the creditor that the debtor     E
> might be insolvent."

The New Zealand Court of Appeal in *Julius Harper Ltd. v. F. W.
Hagedorn & Sons Ltd.* [1991] 1 N.Z.L.R. 530, 543, said that the last part
of the passage from the judgment of Rich J. expresses the usual meaning
of the words "ordinary course of business" though it was there applied in
a different context.     F

In his judgment in *Reynolds Bros. (Motors) Pty. Ltd. v. Esanda Ltd.*, 8
A.C.L.R. 422, Mahoney J.A., in considering whether a floating charge
continued to attach to certain tractors disposed of by a company, addressed
the question of whether it was done by the company in the ordinary
course of business. He said, at p. 428:

> "That transaction was, as Mr. Grieve submitted, an extraordinary
> one. But, within this principle, 'ordinary' is not to be confined to what     G
> is in fact ordinarily done in the course of the particular business of
> the company. Transactions will be within this principle even though
> they be, in relation to the company, exceptional or unprecedented."

Fisher J. in *In re Modern Terrazzo Ltd.*, 10 October 1997, expressed the
view that this dictum is inconsistent with that of Rich J. in the *Downs
Distributing Co.* case, 76 C.L.R. 463, 476–477 and, because of its quite     H
different context, is unhelpful. He preferred the view of Rich J. expressed
in the analogous context as more appropriate to reflect the purpose of the
voidable preference provisions.

A.C.            Countrywide Banking Corpn. Ltd. v. Dean (P.C.)

A      There are difficulties in drawing upon formulations in different words of statutory tests and treating them as applicable in all circumstances. Such difficulties are increased where those formulations originate in different legal or factual contexts. This is particularly so where the test is essentially one of fact in any event. For these reasons, as presently informed by the argument in this case, their Lordships do not adopt any particular formulation. Nor is it necessary for this case to make any comprehensive statement, suitable for all cases, of the criteria for determining when a transaction is to be held to have taken place in the ordinary course of business for the purpose of section 266 and the corresponding section in the Act of 1993.

B      Their Lordships do not accept, as submitted for the applicant, that the test is general in the sense that it would be satisfied so long as it can be said that the transaction is one which might reasonably take place in some business setting. To abstract the particular business setting and inquire (in effect) merely whether it is possible to envisage a setting in which the transaction would be an ordinary one is not what the statute requires. In that situation the intent and purpose of the company would never have relevance yet section 266(4) specifies circumstances in which they are to be taken into account.

C      Plainly the transaction must be examined in the actual setting in which it took place. That defines the circumstances in which it is to be determined whether it was in the ordinary course of business. The determination then is to be made objectively by reference to the standard of what amounts to the ordinary course of business. As was said by Fisher J. in the *Modern Terrazzo Ltd.* case, 10 October 1997, the transaction must be such that it would be viewed by an objective observer as having taken place in the ordinary course of business. While there is to be reference to business practices in the commercial world in general, the focus must still be the ordinary operational activities of businesses as going concerns, not responses to abnormal financial difficulties. Their Lordships respectfully agree with the judge's conclusion by reference to the policy of the section:

D

E

F      "Whether a payment should be regarded as commercially routine at a day to day trading and operating level will turn at least in part upon a comparison with the practices of the commercial community in general. But equally, the way in which the particular company has acted in the past, and its dealings with the particular creditor, would seem pertinent. That the payment was simply a repetition of past patterns of behaviour would make it more difficult to argue that it represented special assistance to an insider or the result of special enforcement measures or a situation in which the subject creditor ought to have investigated before extending credit. So at a policy level there is something to be said for the view that relevant considerations should extend to the prior practices of the particular company."

G

H      The section therefore requires examination of the actual transaction in its factual setting (excluding the intent or purpose of the company save as required by subsection (4)). Because the examination is undertaken objectively by reference to the standard of the ordinary course of business, there may be circumstances where a transaction, exceptional to a particular

350

trader, will nonetheless be in the ordinary course of business as for    A
example its first transaction of a particular type. It may be that transactions
undertaken in the past will, because of changed circumstances, no longer
be considered as in the ordinary course of business. The payment of some
accrued indebtedness may be within the ordinary course of business as
may the payment of moneys owing under a lease to secure a lessor's
consent to an assignment of the lessee's interest. The particular
circumstances will require assessment in each case.    B

In the present case, on the finding of Cartwright J. at first instance, the
payment was made when, to the knowledge of the lessor, it was part of
the transaction by which the company was disposing of its business. Their
Lordships consider it was entirely open to the judge to find that in the
circumstances the payment was not in the ordinary course of business.
Equally, the view was open to the Court of Appeal that the payment,    C
made up as it was including long-standing arrears, when made was not in
the ordinary course of business.

Mr. Smith's argument that to apply the section so narrowly as to
exclude from the ordinary course of business payments of the kind here in
issue will disrupt the ordinary conduct of the affairs of lessors is not
accepted. Lessors, although contractually entitled to payments provided
for in the lease, are not secured creditors. There is no warrant for more    D
favourable treatment for them than other creditors. On the contrary, the
policy of the voidable preference law is to secure the equal participation of
creditors in such of the company's property as is available in the
liquidation.

For the reasons given their Lordships will humbly advise Her Majesty
that the appeal should be dismissed. The applicant must pay the liquidator's    E
costs before their Lordships' Board.

*Solicitors: Alan Taylor & Co.; Cruickshanks.*

S. S.

F

G

H

# **Exhibit 66**

Three Arrows * FTX
Previous messages
8 June 2021

WP

11:26
Wilson P
could u pls withdraw to SEN for us?


11:26
Deleted Account
yep, but pls save a new withdrawal address with your SEN detail
11:26
I can process this signet one via SEN tho
11:30
25m sent via SEN

WP

11:30
Wilson P
In reply to this message
saved, but think need to be whitelisted
11:30
will send email
11:31
email sent thx
11:31
wire rcvd

WP

18:13
Wilson P
sorry guys, one more signet withdrawal of 10m USD, no rush
9 June 2021

WP

18:21
Wilson P
hi guys, signet withdrawn 5m USD, pls process when u can, no rush
18:34
thx Terence
10 June 2021

WP

08:05
Wilson P
hi guys, signet withdrawn 20m USD, pls process when u can, no rush


08:05
Deleted Account
noted
08:15
USD out

WP

08:25
Wilson P
Thx
Hieu Tran removed Hieu Tran
15 June 2021

WP

08:44
Wilson P
hi guys, signet withdrawn 5m USD, pls process when u can, no rush

Tackett_3AC_000000158

S

08:51
Stephen
sure

E

14:11
Eric
Hi guys, we just reset our password today - would you be able to lift the 24 hr withdrawal freeze for us?

LN

22:12
Lena Ngoy
In order to do so, I believe you must email into support from your main account holder email and follow the steps they provide!
17 June 2021

WP

10:45
Wilson P
hi guys, signet withdrawn 20m USD, pls process when u can, no rush

WP

11:32
Wilson P
Ty!
18 June 2021

WP

16:28
Wilson P
hi guys, signet withdrawn 10m USD, pls process when u can, no rush

T

16:35
Terence
USD out

WP

16:37
Wilson P
thx terence
20 June 2021

WP

08:45
Wilson P
hi guys, signet withdrawn 25m USD, pls process when u can, no rush

12:18
Deleted Account
sent
21 June 2021

WP

08:14
Wilson P
hi guys, signet withdrawn 40m USD, pls process when u can, no rush

08:41
Deleted Account
gonna be a while for signet. We can process immediately for SEN.

WP

08:48
Wilson P

Tackett_3AC_000000159

got you @ftx_tkh how long would u think signet would take?

08:53
Deleted Account
would be during US business hour

WP

08:54
Wilson P
gotcha, would a smaller amount be easier to expedite?

08:55
Deleted Account
sure, you can put in a few tickets then we can try to process earlier.

WP

12:07
Wilson P
@ftx_tkh amended to 20m usd

E

14:51
Eric
Hi team, sent an address whitelisting request via email - please help when you have a chance, thanks!

WP

16:08
Wilson P
hey guys, just checking to see if any luck on the signet
16:08
and eric's address whitelisting

B

16:09
Burg (Wont Dm you)
In reply to this message
On it

WP

16:09
Wilson P
signet would need to wait till NY AM you think?

S

16:09
Stephen
In reply to this message
yep most likely
16:10
we can do SEN though now

B

16:10
Burg (Wont Dm you)
In reply to this message
Done

WP

16:13
Wilson P
In reply to this message
understood thx, will check then

WP

16:39
Wilson P

Tackett_3AC_000000160

@phteven18 actually, would u be able to process 20m to SEN?

S

16:45
Stephen
In reply to this message
yep we can do that

S

17:05
Stephen
20mm usd should be sent to you shortly via SEN

WP

20:05
Wilson P
thx @phteven18 just wanted to check if u'd have an ETA for the signet
20:17
@ftx_tkh @handiyang
Handi YANG invited Deleted Account


20:35
Deleted Account
we still need a few more hours to process the withdrawal

WP

20:36
Wilson P
understood thx

HY

20:55
Handi YANG
out of 40m requested, we sent 20m on silvergate, is it okay?
20:55
we could also do the second half on silvergate immediately
20:55
signet is gonna take some time

WP

21:02
Wilson P
@handiyang ok np, could u pls do the 2nd half to SEN as well?

HY

21:04
Handi YANG
sure we are on it
21:08
out
23 June 2021

WP

08:03
Wilson P
hi guys, signet withdrawn 10m USD, pls process when u can
08:12
thx
24 June 2021

WP

13:24
Wilson P
hi guys, pls help to whitelist DOGE address when u can
13:24
sent email to compliance and support

CONFIDENTIAL

B

14:38
Burg (Wont Dm you)
believe this was done

WP

14:39
Wilson P
yep thx burg

B

14:43
Burg (Wont Dm you)
Sweet!
26 June 2021

WP

12:55
Wilson P
hi guys, signet withdrawn 20m USD, pls process when u can, no rush

S

15:39
Stephen
out soon
29 June 2021

WP

21:51
Wilson P
hi guys, signet deposited 10m USD to exchange side, could u pls process when u can

LN

21:52
Lena Ngoy
moment
21:56
not seeing a ticket

WP

21:57
Wilson P
done just now, sorry

LN

21:57
Lena Ngoy
no worries!
21:57
done

WP

22:03
Wilson P
ty
30 June 2021

WP

09:59
Wilson P
hi guys, SENt $5m usd to OTC side, could you pls process when you can


10:01
Deleted Account
moment

WP

Tackett  3AC  000000162

10:20
Wilson P
thx @ftx_tkh any luck?


10:23
Deleted Account
should be with you now
2 July 2021

WP

12:43
Wilson P
hi guys, signet withdrawn 15m USD, pls process when u can, no rush
8 July 2021

WP

20:10
Wilson P
hi guys, signet withdrawn 15m USD, pls process when u can, no rush
20:14
ty
9 July 2021

WP

22:41
Wilson P
hi guys, signet withdrawn 10m USD, pls process when u can, no rushv
22:43
ty
12 July 2021

WP

17:13
Wilson P
hi guys, signet withdrawn 25m USD, pls process when u can, no rush

WP

17:34
Wilson P
thx!
13 July 2021

WP

20:22
Wilson P
hi guys, signet withdrawn 25m USD, pls process when u can, no rush

WP

20:46
Wilson P
ty
14 July 2021

WP

20:40
Wilson P
hi guys, signet withdrawn 25m USD, pls process when u can, no rush

T

20:45
Terence
out

WP

20:46
Wilson P

Tackett_3AC_000000163

ty
15 July 2021

WP

15:40
Wilson P
hi guys, signet withdrawn 25m USD, pls process when u can, no rush

T

18:29
Terence
out now, sorry took slightly longer

WP

22:06
Wilson P
thx @terence_ch1 would u have room for us to do another $25m?

T

22:06
Terence
can do via SEN not from Signet at the moment

WP

22:14
Wilson P
gotcha, no worries
16 July 2021

WP

18:49
Wilson P
hi guys, signet withdrawn 25m USD, pls process when u can, no rush

WP

19:56
Wilson P
@terence_ch1
20:07
In reply to this message
Ok can wait thx 🙏
19 July 2021

WP

20:17
Wilson P
hi guys, signet withdrawn 25m USD, pls process when u can, no rush

T

20:18
Terence
out

WP

20:24
Wilson P
tyty
24 July 2021

WP

21:04
Wilson P
hi guys, signet deposited 75m USD into exchange account, could you pls credit when u can

LN

21:05
Lena Ngoy

Tackett_3AC_000000164

Moment!
21:10
done btw

WP

21:12
Wilson P
thx Lena

WP

21:56
Wilson P
@lenangoy could we trouble u to credit another 100m USD
21:57
signet sent

LN

22:15
Lena Ngoy
moment
22:17
done
26 July 2021

E

14:27
Eric
Hi guys, sent another 20m Signet, can you please credit when you can? thanks!
14:31
can you please deposit to exchange? sorry haven't done this for a while, don't see where I can specify signet deposit to exchange

B

14:32
Burg (Wont Dm you)
you guys need to raise a ticket on the gui
Eric invited Ningxin

E

14:32
Eric
just raised, not sure if correct since specified to silvergate by default
14:35
new one submitted, pls cancel last
14:40
thanks!
28 July 2021

WP

20:49
Wilson P
hi guys, signet withdrawn 25m USD from exchange account, could you pls process when u can, no rush
20:52
In reply to this message
Ok let's do SEN
20:56
apparently our SEN is not whitelisted
20:57
Screenshot 2021-07-28 at 9.57.05 PM.png
733.7 KB
20:59
@terence_ch1 just send email to whitelist? or?
21:02
ok email sent
21:03
done thx
21:09
ty
29 July 2021

Tackett_3AC_000000165

WP

20:56
Wilson P
hi guys, signet withdrawn 34m USD from exchange account, could you pls process when u can, no rush
21:04
thx thx
6 August 2021

Z

09:38
Zane
Hey guys, I wanted to make sure you're aware of the change we recently (Aug. 2nd) pushed on the exchange which changes the way fees are charged on spot trades. Before fees on all trades were taken from the target currency, now fees are taken from the target currency on maker orders and quote currency on taker orders.

To be clear, this is for spot markets only, derivatives remain the same.

WP

14:35
Wilson P
hi guys, signet deposited 50m USD into exchange account, could you pls credit when u can
14:37
ty
7 August 2021

WP

23:10
Wilson P
hi guys, signet deposited 30m USD into exchange account, could you pls credit when u can
23:11
ty
8 August 2021

WP

21:31
Wilson P
hi guys, could u pls help to whitelist our COMP address
21:31
sent email
9 August 2021

WP

08:27
Wilson P
hi team, any luck whitelisting COMP pls?
08:34



WP

09:17
Wilson P
Thx man
10 August 2021
Wilson P invited k

k

CONFIDENTIAL

08:23
k
Morning. Would like to explore expanding our credit line. Can you pls help review? Thank you! @tristanftx

T
08:24
Tristan
Hi @kyled1 pinging @burglol or @ztackett for that :)

B
10:06
Burg (Wont Dm you)
Heya @kyled1

k
16:57
k
In reply to this message
Howdy

WP
20:53
Wilson P
hi guys, signet deposited 50m USD into exchange account, could you pls credit when u can
20:55
ty
12 August 2021

WP
09:24
Wilson P
hi guys, signet deposited 10m USD into exchange account, could you pls credit when u can

S
09:26
Stephen
sure

E
14:51
Eric
Hi guys, how does the serum unlock process work on your staking function?

RS
14:51
Ryan Salame
need to unstake and it will begin unlocking, staked remains locked I believe

E
14:52
Eric
right, so need to unstake all and then any previously unlocked tokens will split off immediately?

RS
14:53
Ryan Salame
would assume so, but let me confirm
14:57
ah no thats wrong, apologies. so your staked locked srm should be converting into staked unlocked srm
14:57
and then if you want to trade it you'll need to unstake the srm and wait for that to unstake before selling

E
15:00
Eric
ah great - can you advise timeframe on when this happens? believe unlock was slated to happen Aug 11 and not seeing this move on our staking page
15:02

or maybe it already started but just so small it's not clear to me

15:06
Deleted Account
It started already. LOCKED_SRM balances will unlock into SRM every day at 00:00 UTC.

E

15:15
Eric
great, will keep an eye out, thx!
16 August 2021

WP

16:33
Wilson P
hi guys, signet withdrawn a measly 2m USD from exchange account, could u pls process when u can
16:37
ty!
20 August 2021

w

01:54
wantonwallet
My page got desynced for some reason
01:55
can someone tell me what my position is kyle8@threearrows,com, subaccount ALGOTOWN
01:55
cant seem to get resynced

L

01:55
Lynn
@Reyftx

R

01:56
Rey
what do you mean by "resynced"?

w

01:57
wantonwallet
not sure just frozen on a particular screenshot that it reloads to everytime i refresh
01:57
just need to know if my position is what i think it is

R

01:57
Rey
ok
01:58
You are SHORT BNBPERP 775
SHORT CREAMPERP 1197.24
LONG 100 ETH
SHORT 12640 UNI

w

01:58
wantonwallet
and USD Balance?

R

01:58
Rey
3750.40 USD
01:58
or you mean overall USD worth of the subaccount?

Tackett_3AC_000000168

01:59
2,383,754.74

w

01:59
wantonwallet
ok thanks
01:59
no issue then

R

02:00
Rey
👆

21 August 2021

N

07:23
Ningxin
hi team, just deposited $20mio via signet, could u pls help credit?

L

07:25
Lynn
sure

N

07:30
Ningxin
Pls lmk once in, ty

L

07:32
Lynn
done

N

07:32
Ningxin
see it, ty!

N

11:04
Ningxin
hi have requested 20mio BUSD withdrawal quite a while ago, could u pls help check?
11:08
actually no need now, cancelled, will try in smaller clip

N

15:16
Ningxin
hi @lynpnguy3n could u pls help credit another $8.958mio to exchange account? we just sent via signet

15:16
Deleted Account
moment
15:18
done

N

15:18
Ningxin
ty @ar_charlie
23 August 2021

N

CONFIDENTIAL

11:58
Ningxin
hi team, got $635k deposit from SEN, could u pls help credit?

N

16:11
Ningxin
hi any updates on the above pls?

S

16:12
Stephen
hey do you want this credited to the ftx exch side?

N

16:12
Ningxin
yes pls

S

16:13
Stephen
have you created a deposit ticket yet?

N

16:13
Ningxin
yes

S

16:13
Stephen
I haven't managed to locate it
16:13
wanna create another one? then can get this credited

N

16:14
Ningxin
image_2021-08-23_17-14-12.png
12.5 KB
16:14
does this help?
16:15
or still need another one?

S

16:16
Stephen
thanks should be credited now

N

16:17
Ningxin
thanks a lot
16:17
actually got another withdrawal to signet if you can help
16:17
$522k

16:18
Deleted Account
on it
16:19
withdrawal sent

N

16:20
Ningxin
tyvm

N

17:42
Ningxin
hi team, sorry to bother again, another signet withdrawal if you could help
24 August 2021

N

09:39
Ningxin
hi team, $25mio deposit from signet to exchange, could u pls help credit?

09:40
Deleted Account
sec
09:41
with you

N

09:41
Ningxin
awesome ty!

N

12:15
Ningxin
hi team, we sent an email to your support to whitelist a new address last night, but no reply yet, could you pls help check? thank you!

N

13:56
Ningxin
see it, tx a lot!
31 August 2021

N

12:37
Ningxin
hi team, could u pls help credit a deposit of $1,192,618.32 into exchange side? just sent via signet
1 September 2021

N

22:30
Ningxin
hi team, could you pls help withdraw $330k to signet, just requested on exchange side?
22:37
@terence_ch1

LN

22:39
Lena Ngoy
will let you know when its out

N

23:04
Ningxin
sure pls
2 September 2021

N

19:26
Ningxin
hi team, could u pls help with signet withdrawal of 1.5mio from exchange? ty

Tackett_3AC_000000171

19:46
Deleted Account
on it
19:48
sent

N

19:57
Ningxin
ty
7 September 2021

k

18:14
k
@burglol thank you for the help with the loan facility. When do you expect it to be ready pls?
wantonwallet removed Wilson P
wantonwallet removed Eric

B

19:00
Burg (Wont Dm you)
Thanks for the reminder let me chase that up
19:00
@ztackett

Z

19:07
Zane
devs said it'd be ready within a week.

k

19:07
k
Perfect, thank you. What amt pls?

Z

19:07
Zane
haven't been a part of those conversations, so wouldn't know. @burglol

B

19:20
Burg (Wont Dm you)
Ohh was just for the contract
8 September 2021

N

09:48
Ningxin
hi team, just to confirm where can i check the interests we pay for the borrowed coin? we borrowed RUNE and sold it, hence we have negative RUNE balance,
how often is the interest charged and where can i check it?

Z

09:59
Zane
it's charged at the hour, every hour
09:59
you can see your payments on the margin borrows page
10:00
https://ftx.com/spot-margin/borrows

N

10:03
Ningxin
see it ty!
Ningxin invited Fung

Tackett_3AC_000000172

Z

10:16
Zane
np

N

10:26
Ningxin
btw, just sent an email to whitelist another 2 addresses, could up pls help?

Z

11:37
Zane
@Reyftx mind taking a look on this.

N

15:14
Ningxin
hi pls let us know if any updates, ty
15:18
yes
9 September 2021

N

08:09
Ningxin
In reply to this message
thank you
08:09
hi team, could u pls help credit $13.6mio from signet to exchange side?

08:11
Deleted Account
yup
08:11
credited
10 September 2021

F

14:25
Fung
Hi team, just sent an email to whitelist an address, could u pls help?

F

16:46
Fung
Yes, agree
17:00
Thx
13 September 2021

N

15:31
Ningxin
hi team, we are getting order rejections sometimes today saying "account does not have enuf margin for order", do you know why is that, and how we could solve this?

15:35
Deleted Account
on the exchange? do you have enough free collateral?

N

15:36
Ningxin
on the exchange, what is the definition of free collateral here?

A(

15:38
Ash (I won't message you first)
hey, which subaccount are you seeing this on?

N

15:39
Ningxin
its the main account

A(

15:40
Ash (I won't message you first)
which market are you seeing this error on? you would see it if you dont have enough collateral to place the order

N

15:41
Ningxin
saw it on a couple markets, like DOT perp, SUSHI perp
15:41
now looks fine
15:42
btw we do have a lot of coins as collateral in our account, but we are having USD deficit, is that related?

A(

15:42
Ash (I won't message you first)
In reply to this message
got it, yup you can see your current free collateral on the trade page right below the order form on the right

N

15:43
Ningxin
ah gotcha
15:44
how can we increase free collateral? is there a formula or anything?

A(

15:54
Ash (I won't message you first)
In reply to this message
by adding more collateral, closing open positions, orders, etc. Can find details in https://fuelp.ftx.com/hc/en-us/articles/360024780511-Complete-Futures-Specs

N

15:54
Ningxin
Ty

A(

15:58
Ash (I won't message you first)
np!
14 September 2021

N

08:24
Ningxin
hi team, just requested $600k withdrawal to SEN, could u pls help

LN

08:26
Lena Ngoy
gotcha
15 September 2021

N

12:08

Tackett_3AC_000000174

Ningxin
hi team, just deposited $10mio via SEN to exchange side, could u pls help credit?

12:15
Deleted Account
moment
12:19
credited

N

12:20
Ningxin
ty
20 September 2021

N

15:15
Ningxin
hi team, just deposited $10mio via SEN to exchange side, could u pls help credit?

15:16
Deleted Account
on it
15:18
credited

N

15:18
Ningxin
ty

N

19:37
Ningxin
hi team, another $8mio deposited via SEN, could u pls help?
19:41
ty
21 September 2021

N

11:03
Ningxin
hi team, could u pls help credit another $50mio? just sent over via SEN

11:05
Deleted Account
credited

N

11:08
Ningxin
ty @BeatriceChui , one last $22mio deposit from SEN too, if you could help?

11:08
Deleted Account
sure, a sec
11:08
with you

N

11:09
Ningxin
awesome, tx a lot!

11:09
Deleted Account
np
23 September 2021

k

12:51
k
@burglol , sorry to keep chasing. Any update on the loan pls?

B

13:10
Burg (Wont Dm you)
will get the contract out today

k

13:12
k
perfect thank you!
24 September 2021

N

10:10
Ningxin
hi team, stupid question, where can i find the expiry price for futures?

N

13:01
Ningxin
nvm found it
27 September 2021

N

16:23
Ningxin
hi team, could u pls help with $41+mio deposit via SEN into exchange?

16:25
Deleted Account
credited

N

16:25
Ningxin
perfect ty
28 September 2021

N

10:09
Ningxin
hi team, could u pls help process $5mio withdrawal to signet?

Z

15:55
Zane
@terence_ch1 @lenangov @BeatriceChui

N

15:57
Ningxin
yes saw it, ty
29 September 2021

N

09:50
Ningxin

Tackett_3AC_000000176

hi team, could u pls help credit $8.68mio to exchange from signet? ty

09:58
Deleted Account
credited

N

10:00
Ningxin
ty
30 September 2021

N

09:06
Ningxin
hi team, could u pls help with another $4.25mio credit from signet?

N

09:42
Ningxin
@BeatriceChui @terence_ch1

09:48
Deleted Account
on it
09:49
credited

N

09:50
Ningxin
tyvm

N

16:49
Ningxin
hi team, could u pls help with $6.5mio withdrawal to signet? sry for the trouble

17:00
Deleted Account
moment
17:02
sent

N

17:02
Ningxin
thanks a lot!
4 October 2021

N

13:15
Ningxin
hi team, could u pls help with $9.2mio withdrawal to signet? ty
5 October 2021

N

14:54
Ningxin
hi team, could u pls help with $7mio withdrawal to signet?
Terence invited Anton

A

15:01
Anton

Tackett_3AC_000000177

sec
15:03
done

F

15:07
Fung
Thx
6 October 2021

N

17:30
Ningxin
hi team, another $8.3mio withdrawal to signet pls if you could help?

A

17:30
Anton
sure
17:33
usd on the way

N

17:33
Ningxin
Thx a lot!

A

17:33
Anton
👆

7 October 2021

N

14:43
Ningxin
hi team, withdrawing another $9mio to signet, could u pls help?

A

14:43
Anton
yep
14:47
shld be done

F

14:47
Fung
Thx
8 October 2021

N

14:55
Ningxin
hi team, could u pls help withdraw $8.7mio to signet? initiated on exchange side

A

15:01
Anton
sure
15:03
shld be done alr

N

15:03
Ningxin
see it, tyvm
11 October 2021

Tackett_3AC_000000178

N

16:25
Ningxin
hi team, withdrawing $9033000 to signet if you could help pls?

F

16:45
Fung
Received thx
12 October 2021

k

16:30
k
@burglol , when do you expect the credit line to be ready pls? Would like to have our team ready
13 October 2021

N

17:22
Ningxin
hi, looking to withdraw $18mio to signet, could u pls help? ty!

S

17:51
Stephen
usd should be with you

F

17:55
Fung
Thx received
14 October 2021

N

15:29
Ningxin
hi team, another $9.15mio withdrawal to signet pls
15:29
could u pls help?

A

15:29
Anton
sure
15:32
on the way

N

15:35
Ningxin
cool thats nice
15:35
will check it out
15:42
submitted the request
15:52
noted
15:58
so how shud i deposit now?
15:58
image_2021-10-14_16-58-50.png
13.2 KB
initiate deposit from here?
15:59
In reply to this message
and then send fund from signet to this address?

N

16:34
Ningxin
image_2021-10-14_17-33-57.png
19.5 KB
just tested $1, but didnt work?
16:34
image_2021-10-14_17-34-13.png
15.2 KB
16:44
ok nws
16:44
will try again later
18 October 2021

N

17:16
Ningxin
hi team, trying to withdraw $6.6mio to signet via the instant signet transfer, but looks like it is not processed yet
17:17
could u pls help?

17:22
Deleted Account
with you now
19 October 2021

k

12:49
k
In reply to this message
What is the best way to finish up the credit line pls?

B

12:51
Burg (Wont Dm you)
@ztackett

B

12:51
Burg (Wont Dm you)

K

Kyle 04.10.2021 13:20:12
TACL - FTX BIG LOC- 240221.docx
52.3 KB

B

12:51
Burg (Wont Dm you)
confirming this is the doc

k

13:17
k
Looks good from our side. Shall I PDF and sign?
20 October 2021

N

10:50
Ningxin
hi team, got a $50mio deposit from SEN, could u pls help credit?

10:56
Deleted Account
credited
21 October 2021

Tackett_3AC_000000180

N

09:01
Ningxin
hi team, another $17.8mio deposit from SEN if you could help?

S

09:03
Stephen
credited

N

09:03
Ningxin
ty
22 October 2021

B

14:02
Burg (Wont Dm you)
TACL - FTX BIG LOC- 22.10.docx
55.0 KB
14:02
Okay please confirm the details
14:03
My understanding is we are good to go here - @kyled1

k

14:34
k
In reply to this message
Looks good, ready to sign. Will be by Docusign?

B

14:41
Burg (Wont Dm you)
Happy for you to DocuSign this to us
14:41
Or just paper sign this version

k

14:44
k
TACL - FTX BIG LOC- 22.10.pdf
326.2 KB
14:44
Signed, thank you!

B

14:45
Burg (Wont Dm you)
Second page as well please

k

14:47
k
TACL - FTX BIG LOC- 22-Oct-2021.pdf
440.7 KB
25 October 2021

N

16:53
Ningxin
hi team, could u pls help with $500k withdrawal to signet? have used up the $10mio auto withdrawal limit


16:55
Deleted Account

Tackett_3AC_000000181

moment
16:55
should be with you

N

16:56
Ningxin
thank you! @BeatriceChui

RS

20:18
Ryan Salame
someone with https://yield.app looking for an intro, you guys want me to connect anyone with them?

k

20:18
k
In reply to this message
Thank you Ryan, would be great to intro
26 October 2021

Z

10:21
Zane
Hello @kyled1, did you see the email regarding the update to how we will be charging interest on lines of credit?

In case you missed it:
https://docs.google.com/document/d/1r5zmYD6B-HuFQQS4y9Cew_8ZoTVcnq0ByQEU5CMZNDI/edit
Also this does mean that we'll need to settle up on the outstanding interest owed on the existing LOC

@burglol will help with getting the number for outstanding interest owed for you and then you can settle with any stable (husd/usdc/usdp/busd/tusd) to this address:
0xC0Ec4af53114B3128f95C5ef0c1AaCA9db77d753

k

10:24
k
In reply to this message
Haven't seen yet. Just requested access to that doc.

Z

10:24
Zane
try again please, just made it anyone with the link can view

k

10:25
k
works
10:33
In reply to this message
These terms work. When will the LOC be effective pls?

B

10:33
Burg (Wont Dm you)
I got the counter sign from Sam Last night
10:33
Will send that over shortly
10:33
Just a case of a dev printing it

k

10:33
k
Excellent
3 November 2021

N

Tackett_3AC_000000182

20:46
Ningxin
hi team, could you pls help process $2,451,224.45 deposit via SEN?

N

21:35
Ningxin
@BeatriceChui
21:35
@terence_ch1 @phteven18


21:36
Deleted Account
a moment
21:36
credited

N

21:37
Ningxin
thank you!
4 November 2021

N

09:27
Ningxin
hi team, another $4.168mio deposit from SEN if you could help pls?
09:36
ty!
8 November 2021

N

17:31
Ningxin
hi team, could u pls help credit $11.487mio from SEN? thank you

A

17:33
Anton
sec
17:34
credited

N

17:37
Ningxin
ty
9 November 2021

N

13:05
Ningxin
hi team, another $8.624 deposit from SEN, could u pls help credit?

N

18:48
Ningxin
image_2021-11-09_19-48-53.png
22.5 KB
hi team, trying to withdraw 10mio USDT but been stuck for some time, could u pls advise ETA?

A

18:50
Anton
having some issues with erc20 w/ds

N

18:51
Ningxin
Oh
18:51
Pls let me know once fixed

A

18:51
Anton
should be back relatively soon
18:51
will do

N

18:51
Ningxin
Ok gotcha

A

19:39
Anton
these should be out now

N

20:04
Ningxin
the transaction hash cannot be found onchain tho

A

20:04
Anton
our devs are currently looking into this issue
20:04
transactions will be re--broadcasted shortly

N

20:31
Ningxin
ok pls keep us posted

A

20:37
Anton
should be ok now- pls confirm

N

20:39
Ningxin
still dont see them
20:39
https://etherscan.io/tx/0xf65216099e442a885e713a45432cb5924a715b294e5b6ebcc7d580f47d3efb0a
20:39
https://etherscan.io/tx/0x45df3ca0986b4d1375904fdeebda1742600d5bea1ed73b92a06fe6124ed74227

A

20:48
Anton
checking again

N

21:18
Ningxin
https://etherscan.io/tx/0x0776267e253e492f900dda5cf544f382d4920b67e58f5eb8deb9d429899f1c0e
21:18
and one more in addition to the above 2
21:25
actually are you able to cancel them?

CONFIDENTIAL

A

21:31
Anton
unfort we won't be able to as it's already sent out. it looks like its a broadcasting issue. Apologies for the delay here

N

21:39
Ningxin
do you have an ETA on this?

A

21:49
Anton
Don't want to overpromise with an eta, but our devs are looking at it as we speak
12 November 2021

N

11:01
Ningxin
hi team, could u pls help credit $23.17mio from SEN?
11:05
perfect ty
Lynn removed Lynn
15 November 2021
Zane invited willy (I won't message you first)
Zane invited Allison
Zane invited Leven Liu
Zane invited Cheryl.C
Zane invited Cheese

N

20:52
Ningxin
hi team, could u pls help process $1.7mio to SEN?


20:53
Deleted Account
on it
20:58
USD sent

N

21:02
Ningxin
ty!
18 November 2021

N

10:34
Ningxin
hi team, could u pls help deposit $50mio from SEN pls?

F

10:40
Fung
Thx
Burg (Wont Dm you) removed Burg (Wont Dm you)

N

18:58
Ningxin
hi team, another $50mio deposit via SEN, could u pls help?
Anthony Yoon removed Anthony Yoon

N

19:00

Tackett_3AC_000000185

Ningxin
awesome, tx a lot
22 November 2021

N

18:31
Ningxin
hi team, dumb q, as we pay interest on our negative balances, do we get paid on our positive balances in ftx?

A

18:37
Allison
In reply to this message
Yes, negative balances for margin borrow, you will have to pay interest hourly for each coin https://ftx.com/spot-margin/borrows

if you are lending out coins, you can receive interest from borrowers
https://ftx.com/spot-margin/lending

Z

22:25
Zane
In reply to this message
just to be totally clear, no you do not.
22:25
Negative balance means you're borrowing the negative amount.
22:26
Positive balances don't necessarily mean you're getting interest as they may not be loaned out (they may be used as collateral, or for open orders, or just idle)
22:27
if you want to earn interest on positive balances, you can of course lend them out.
23 November 2021

N

07:11
Ningxin
thank you for clarification!

Z

07:55
Zane
my pleasure
25 November 2021
Allison invited Emma
3 December 2021

C

15:36
Cheryl.C
FTX and FTX US will be down for around 10 minutes of scheduled maintenance starting at 22:30 UTC this Saturday December 4 (5:30 PM Saturday Bahamas time, 4:30 PM Saturday Chicago time, 6:30 AM Sunday Hong Kong time). All orders will be cancelled. Markets will be in post-only mode for one minute afterwards. Deposits and withdrawals will be disabled for five minutes before and after.

https://twitter.com/sbf_ftx/status/1466681908025344001?s=21
5 December 2021

C

06:03
Cheryl.C

C

Cheryl.C 05.12.2021 06:00:22
Please note system upgrade completed
6 December 2021

N

11:07
Ningxin
hi team, could u pls help with $100mio withdrawal to SEN?
11:10

Tackett_3AC_000000186

awesome, ty!
7 December 2021

N

17:50
Ningxin
hi team, could u pls help withdraw $96mio to SEN?

A

17:58
Anton
sec
18:05
done

N

18:06
Ningxin
ty!
16 December 2021
Leven Liu invited Nick
21 December 2021

N

08:16
Ningxin
hi team, we have some GBTC shares in our brokerage account, could u pls share how we could transfer it over to our FTX account?

Z

14:46
Zane
umm, let me double on this. think there's two options, one of which is to sell it, and buy it back at cm-equity (which i get is not ideal) and they'll give you an spl token
for them which you can have credited on ftx
14:46
and there's another option...
14:46
but i can't remember the details
14:46
one sec
22 December 2021

Z

01:01
Zane
do you have an IB account by chance? can transfer the gbtc to Cm-equity through that and then have them credited to ftx.
23 December 2021

N

16:09
Ningxin
In reply to this message
ok noted, ty

N

17:25
Ningxin
hi team, separate question, we sent an email to compliance asking to disable the feature of withdrawal only to whitelisted addresses, could you pls help check?

Z

17:30
Zane
sure, can you forward to mm@ftx.com and we'll take a look.

N

17:49
Ningxin
fwded

Tackett_3AC_000000187

N

20:25
Ningxin
hi team, got a $50mio deposit via SEN, could u pls help?
20:29
@anton_cS @terence_ch1 @BeatriceChui
20:34
@ztackett
20:35
actually got 2 more $50mio deposit
20:35
1 sec
20:36
initiated and sent
20:38
see $100mio completed as of now, initiating 1 more
20:40
hmm sry i tried too many times, and only allow me to try a gain in 15min
20:54
hi @terence_ch1 sry delay, the last $50mio initiated
20:55
and fund has been sent alr

T

20:55
Terence
all good
20:55
with you now

N

20:55
Ningxin
tyvm, happy holidays!
24 December 2021

N

10:13
Ningxin
In reply to this message
hi team, any update on this pls?

A

10:53
Allison
In reply to this message
Hi Ningxin, checking on this, will get back to you asap.

A

12:43
Allison
In reply to this message
Please check the email reply, need a picture of you holding your ID and a handwritten note that says "FTX Whitelisting Removal" and has the current date written on it.

N

12:57
Ningxin
Noted will do
Ryan Salame removed Agnes zh
27 December 2021

N

21:18
Ningxin
hi team, got another $50mio deposit via SEN, could u pls help?

A

Tackett_3AC_000000188

21:18
Anton
yep
21:19
did you raise a ticket?

N

21:19
Ningxin
yes
21:19

A

21:19
Anton
moment here
21:24
all done

N

21:24
Ningxin
tyvm!

A

21:24
Anton
np!
28 December 2021

N

15:21
Ningxin
hi team, got 2 usd withdrawals stuck, could u pls help?
15:22

A

15:39
Anton
will take a look

N

15:46
Ningxin
these are to our signet

15:49
Deleted Account
20mm USD is with you now

N

15:56
Ningxin
ty
29 December 2021

N

15:48
Ningxin

Tackett_3AC_000000189

hi team, could u pls help with another $20mio withdrawal to signet?

15:58
Deleted Account
moment
16:11
USD sent

N

16:12
Ningxin
ty!
30 December 2021

N

15:00
Ningxin
hi team, $20mio withdrawal to signet requested, could u pls help?
Zane invited Deleted Account
Zane invited Deleted Account
Zane invited E Lee

Z

15:01
Zane
@BeatriceChui @ellizllee

15:04
Deleted Account
apologies for the delay. We are working on it now

N

15:04
Ningxin
nws

15:08
Deleted Account
USD is with you

N

15:09
Ningxin
ty!

Z

16:10
Zane
also added a few more from the settlements team to help with this
1 January 2022

N

14:32
Ningxin
hi team, who would be a good contact regarding ftx listing?

A

14:36
Anton
Hey, feel free to shoot your question(s) here but I think @ztackett can help with specifics

N

16:13
Ningxin
thank you!

CONFIDENTIAL

16:13
happy new year!

A

16:15
Anton
Happy New Year!
Leven Liu invited Z

Z

22:31
Z
In reply to this message
Hey @Ningxin_TAC I'm from the listing and great to connect
3 January 2022

N

17:27
Ningxin
hi team, could u pls help with $15.5mio signet withdrawal?

A

17:27
Anton
sure
17:33
all done
4 January 2022

N

21:39
Ningxin
hi team, we have trouble placing buy order of USD spot pairs via API, our account is in USD deficit atm, but we still have free collateral of $19mio, previously we were able to buy BTCUSD for example (which borrows USD automatically), could u pls advise?
21:39



Z

21:42
Zane
you need to turn on the margin toggle
21:42
as this trade would result in a margin borrow

N

21:43
Ningxin
yeah i can toggle this when trading via UI
21:43
but how about via API?

Z

21:43
Zane
api shouldn't need it, should do it automatically

Tackett_3AC_000000191

21:43
if you're seeing issues, please share the api response and we can look into it

N

21:46
Ningxin
ok sec
5 January 2022

N

09:32
Ningxin

hi team, could u pls advise on the collateral weight of GBTC & ETHE?
09:32

09:36
is it as below?
For positive balances, collateral = size * price * min(weight, 1.1 / (1 + imf factor * sqrt(size)))
09:38
In reply to this message
Photo
774×77
this is the error msg we got

LL

09:41
Leven Liu
hi, all the free collateral you're having now is LoC, it can be used as collateral for spot margin trading, but not for spot trading itself, that's why you're getting the error

N

09:41
Ningxin
ok i see

Z

09:43
Zane
In reply to this message
Yes it is
09:44
IMF comes into play when factoring in large sizes of relatively illiquid coins

N

09:44
Ningxin
ok got it now
09:46
In reply to this message
how can i see if the free collateral is LoC or not?
09:49
is there an easy way to see it?

Z

10:02
Zane
In reply to this message
You're trying to buy ethe @Ningxin_TAC or sell ethe?

N

10:02
Ningxin
was trying to buy

Z

10:03
Zane
In reply to this message
Can you screenshot this entire page for me? Can dm if you'd like
10:03
Sorry, on mobile now so can't check our admin panel

N

10:09
Ningxin
separate question, could u pls help process 2.62mio usd to SEN?

Z

10:12
Zane
@BeatriceChui @ellizllee @Chade7
Zane invited Deleted Account

Z

10:12
Zane
@terence_ch1 @RoshanDaswani

10:14
Deleted Account
Moment
10:21
Usd sent

10:22
Deleted Account
kyle@threearrowscap.com
Deleted pinned this message

Z

10:28
Zane
and are you only seeing this on ETHE @Ningxin_TAC, or any other pairs?

N

10:28
Ningxin
all the pairs

LL

10:42
Leven Liu
In reply to this message
seems this isnt the case, we're still digging and will get back to you later

Z

10:42
Zane
Ok, let me dig into this.
Ailant ~ removed Ailant ~
8 January 2022

N

06:42
Ningxin
hi team, $25.643mio deposit via signet looks stuck, could u pls help?

Tackett_3AC_000000193

06:44
Deleted Account
moment

N

09:03
Ningxin
Hi still not credited, could u pls check again?

09:12
Deleted Account
shd be good now
12 January 2022

N

07:33
Ningxin
hi team, could u pls check a $20mio deposit via signet? its not processed automatically

C

07:34
Cheryl.C
will keep an eye on it

N

07:35
Ningxin
it is sent from our side alr, could u pls help credit it?

C

07:36
Cheryl.C
will let you know once it done
07:36
pinged settlement team

N

07:36
Ningxin
ty

C

07:37
Cheryl.C
np

08:19
Deleted Account
On it
08:23
Credited

C

08:24
Cheryl.C
thanks Beatrice~

N

08:34
Ningxin
thank you
15 January 2022

N

09:56
Ningxin
hi team, got another $24.126mio deposit via signet stuck, i thought it shud be processed automatically?

S

10:00
Stephen
i believe its not automatic if the deposit value is over 20mm usd
10:00
should be credited in a moment

N

10:00
Ningxin
i see
20 January 2022
Zane changed group title to «Three Arrows * FTX»
Zane invited FTX VIP Bot

Z

03:03
Zane
/clear

F

06:17
FTX VIP Bot
As you probably know, for the past couple months we've been working on increasing the matching engine throughput and stability improvements. I'm happy to share that we recently completed the latest batch of upgrades are seeing some promising results.

- The upgrades greatly reduce fill reporting and position/balance updating latency. They should also decrease tail case latency and reduce the frequency of 503 rejections during busy periods.
- We rewrote some auxiliary systems which further decreased database load, thereby increasing capacity during busy times by up to 10%
- Lastly, we rolled out some changes that will reduce order placement latency by around 10ms.

We are also making some adjustments to our rate limits. Please see this document for more information. As always, please feel free to share any feedback you may have.
21 January 2022

F

00:58
FTX VIP Bot
After considering the feedback we've received from our VIPs and MMs, we're adjusting the per-market large size thresholds to be more responsive to actual volume on FTX.

The new thresholds are now published on https://ftx.com/api/markets under largeOrderSizeThreshold. These are, approximately, min(5k, max(500, 0.005% of daily volume for that underlying)) . "Underlying" here means either the underlying of the future, or base currency of the spot market

A more human-readable breakdown:
1000
ALT, BADGER, ENJ, ETC, FIL, ICP, KNC, OMG, SRM, VET, XLM, XTZ, ZEC

1500
BCH, FLOW, MANA, SCRT, SPELL, STX, SXP, TRX

2000
AAVE, ALGO, AXS, GALA, SUSHI, THETA, YFI

2500
CREAM, CRV, DYDX, EOS, ONE

3500
LRC, SAND

5000
ADA, ATOM, AVAX, BNB, BTC, DOGE, DOT, ETH, FTM, FTT, LINK, LOOKS, LTC, LUNA, MATIC, NEAR, SOL, USDT, XRP

500
Everything else

Tackett_3AC_000000195

We may update these occasionally to reflect changes in volumes -- say once per week or so, but we're curious what you'd be comfortable with.

We're happy to roll this out on Wednesday instead of Friday.

Let us know what you think!
23 January 2022

N

09:25
Ningxin
hi team, i see STETH withdrawal is disabled atm, may i know when its available?

Z

09:43
Zane
Let me ask for you
25 January 2022

N

09:48
Ningxin
hi team, could u pls help with $15mio withdrawal to signet?


09:58
Deleted Account
Moment
10:06
Usd sent
Deleted invited Katy F and Cody
26 January 2022

N

07:12
Ningxin
hi team, got a SEN deposit of $8,967,690, could u pls help credit? ty

Z

07:12
Zane
hello
07:13
have you linked your SEN account on the website? like ftx.com/wallet -> deposit usd-> link SEN account
07:13
this will allow for automated deposits/withdrawals

N

07:13
Ningxin
nice will set up now
07:17
done
07:17
so this deposit will reflect soon?


07:17
Deleted Account
credited!

N

07:17
Ningxin
cool ty!
Deleted invited Deleted Account
Deleted invited Deleted Account
Handi YANG removed Handi YANG

N

15:01
Ningxin
hi team, could u pls help with $11.6mio signet withdrawal?

KF

15:02
Katy F
MOMENT
15:06
USD11.6M was sent out. Thz

N

15:06
Ningxin
ty
27 January 2022

F

00:33
FTX VIP Bot
Please be aware that the aforementioned rate limit changes will be going live in 30 minutes at 1pm ET. Details of this change can be read here:
https://help.ftx.com/hc/en-us/articles/360052595091-Ratelimits-on-FTX

Please note the change to rate limits on small orders, plus the increased limits on large orders. If you have any questions, please let us know.

N

12:43
Ningxin
hi team, we got $400k sen deposit this morning, but its not processed automatically
12:43
could u pls help check?

C

12:44
Cody
moment


12:54
Deleted Account
400k sen deposit credited manually.

N

12:54
Ningxin
ty
12:54
just checking how we could do this automatically?

F

12:55
FTX VIP Bot
We just published our 2021 End of Year Review, it was quite the interesting year for crypto and FTX in particular, so there was a lot to cover as you'll see. In the post we provide some insight into what we were able to accomplish in the past year; some metrics to highlight our growth; features and improvements we rolled out on the product side; a broad overview of the immense work we did in our first year of actively marketing FTX, from commercials to winning the naming rights for FTX Arena and much more. We also share some of what we'll be focusing on moving forward

Would love to hear your feedback on what we can do to improve in 2022!

https://blog.ftx.com/blog/end-of-year-2021/


12:58
Deleted Account
Since the SEN Link will connect to our new SEN account on FTX Digital Market Limited. The SEN connection need to apply at Silvergate again. You will receive the SEN connection form from Silvergate soon. The process may take a few days. Will inform you when all set.

Tackett_3AC_000000197

N

12:58
Ningxin
gotcha
12:58
ty


12:58
Deleted Account
welcome
1 February 2022

F

04:59
FTX VIP Bot
We just rolled out an update to FTT staking that allows for stacking the maker rebates received from the MM program and FTT staking. To-date, maker rebates from staking FTT only benefitted those that weren't already getting rebates from being in the MM tiers. With this rollout, you'll receive the MM rebate, in addition to whatever rebate you would have from staking FTT, up to the maximum rebate allowed of -1bps.

Example:
MM1 (-0.25bps rebate), with 1,000 FTT staked (-0.1bps) would now receive -0.35bps rebate on maker trades.

If you have any questions about FTT staking or FTT in general, don't hesitate to let us know. And we're always looking for more ways to drive value to FTT holders/stakers, if you have any ideas please share!
2 February 2022

N

12:34
Ningxin
hi team, could u pls help with 4.415mio SEN withdrawal pls

LL

13:07
Leven Liu
@BeatriceChui @ellizllee @RoshanDaswani


13:14
Deleted Account
on it
13:27
USD sent
7 February 2022

N

17:34
Ningxin
hi team, could u pls help with $2,000,200 signet withdrawal pls?


17:34
Deleted Account
on it
17:38
USD sent

N

17:44
Ningxin
ty!
8 February 2022
willy (I won't message you first) removed willy (I won't message you first)

N

15:10
Ningxin
hi team, could u pls help with $23mio signet withdrawal?

Tackett_3AC_000000198

KF

15:13
Katy F
moment
15:14
Sent

N

15:14
Ningxin
ty
9 February 2022

F

14:28
Fung
Hi team, could u help with $27M Signet withdrawal pls

KF

14:28
Katy F
moment
14:31
Sent
10 February 2022

N

15:08
Ningxin
hi team, requesting a $57mio signet withdrawal, could u pls help?

KF

15:08
Katy F
moment
15:11
Sent

N

15:15
Ningxin
ty!
11 February 2022

N

15:00
Ningxin
hi team, another $40mio signet withdrawal requested, could u pls help?


15:04
Deleted Account
on it
14 February 2022

N

14:27
Ningxin
hi afternoon, could u pls help with another $50mio withdrawal to signet?

KF

14:27
Katy F
moment
14:29
Sent
15 February 2022

Tackett_3AC_000000199

N

14:30
Ningxin
hi team, $32.4mio signet withdrawal requested

KF

14:32
Katy F
moment
14:34
Sent

N

14:34
Ningxin
great ty!
16 February 2022

N

14:45
Ningxin
hi team, could u pls help with $46.9mio signet withdrawal?

KF

14:45
Katy F
moment

KF

15:01
Katy F
Sent

N

15:18
Ningxin
ty
17 February 2022

N

14:58
Ningxin
hi team, $16.1mio signet withdrawal for today if you could help? ty!

KF

14:59
Katy F
moment
15:01
Sent
18 February 2022

N

07:03
Ningxin
hi team, could u pls help with 2 SEN deposits, $99,999,999 & $99,999,998?

C

07:03
Cody
moment
07:09
could you please also register 99999998 one?

N

07:09
Ningxin

ah right
07:09
sec
07:09
done

C

07:26
Cody
both credited

N

07:36
Ningxin
tx a lot!


12:03
Deleted Account

Hi Three Arrows Team, the SEN link is all set now. You can deposit to our new SEN account FTX Digital Market Ltd *2564 and register you deposit through "Deposit via SEN". The deposits can auto-credit.
12:04
https://help.ftx.com/hc/en-us/articles/360042472631-Depositing-Withdrawing-USD

N

12:31
Ningxin
Nice ty!
12:31
Is there a limit?


12:36
Deleted Account
USD 10mm/ day for withdrawals on automation. If more, we can go through manual flow.
12:38
USD 10mm per transaction for deposit on automation. system requires review on large deposit. you can ping us here

N

12:43
Ningxin
got it

N

15:24
Ningxin
hi team, could u pls help with $36mio signet withdrawal for today?


15:25
Deleted Account
sure, moment pls
15:27
USD sent

Tackett_3AC_000000201

N

15:33
Ningxin
showing "processing", and usd not arrived yet, i guess will be anytime?

15:42
Deleted Account
@Ningxin_TAC Sorry that it sent to the SEN account *8250.
15:43
do you want to send to signet account? if yes, can you return the amount to our sen account and we will resend it

N

15:46
Ningxin
I see, ok will send back
15:49
SEN't
15:49
pls send to our signet account ty

15:50
Deleted Account
moment
15:55
sent, apologies for the inconvenience caused.

N

15:56
Ningxin
confirmed, ty

N

20:46
Ningxin
hi team, could u pls help with $75mio SEN withdrawal? sry for the trouble

20:58
Deleted Account
moment
21:00
sent

N

21:04
Ningxin
tyvm!

21:04
Deleted Account
welcome
21 February 2022

N

07:31
Ningxin
hi team, could u pls help with $33mio SEN withdrawal?

LN

07:33
Lena Ngoy
moment here
07:35
did you use the "Withdraw via SEN" option?

Tackett_3AC_000000202

N

07:35
Ningxin
i didnt

LN

07:36
Lena Ngoy
ah, can you requeue using that function?

N

07:36
Ningxin
used the saved template

LN

07:47
Lena Ngoy
please use the SEN function!

N

07:48
Ningxin
it doesnt let me enter 33mio tho
07:48
will reject with "no more than 10mm per user per day"

LN

07:48
Lena Ngoy
ah, gotcha

N

08:05
Ningxin
pls lmk once done, ty

C

08:10
Cody
moment
08:11
sent
24 February 2022

N

12:00
Ningxin
hi team, could u pls help with $17.757mio SEN withdrawal?

KF

12:02
Katy F
moment
12:03
sent

N

12:09
Ningxin
ty
1 March 2022

F

12:15
FTX VIP Bot
Hello 👋

Tackett_3AC_000000203

We wanted to share some updates from the past couple weeks. Please see the google doc for more information on the below topics:

Telegram Announcement Channel
Update to ordering on small order placement for API rate limits
USDC support on AVAX
LUNA and ATOM listing
API Errors Documentation
API key labeling
FIX Fee reporting
API Rate limit page
Cap on BTC/ETH/USD spot margin interest rates
Coachella / Ultra Tickets

https://docs.google.com/document/d/11wDzLBUWQ3wWNufPWyn14q6o5F8yz5FEGK2Abg3Y8j8/edit
2 March 2022
Allison invited Hang
Allison invited Michael S
5 March 2022

N

09:33
Ningxin
hi team, could u pls help with $49mio SEN withdrawal?

KF

09:38
Katy F
moment
09:39
USD sent

N

09:40
Ningxin
ty
8 March 2022

F

08:02
FTX VIP Bot
Hello 👋

We would like to thank you for your continued support of FTX and helping us grow to where we are today. As FTX is ultimately a platform built to service our clients' needs, we wanted to send around a questionnaire to collect some feedback from our VIPs and see what we're doing right, where we need to improve, and help ensure that our priorities are aligned with what our most important clients want to see us working on.

If you could please take a minute to fill out this questionnaire when you have a chance it would be much appreciated. The responses we collect here will have a direct impact on our priorities moving forward, so it benefits both of us to hear from you!

For clients with multiple teams, or anyone with multiple people interested in sharing feedback, you're not limited to one response per firm so please feel free to have multiple people on your team submit a response.

If you have any questions or if there's any feedback you'd rather not share in the form, feel free to ping us here in the chat or dm your account manager.

Link to questionnaire: https://forms.gle/z9jddeGS2RtxvSBB8
9 March 2022

F

07:15
FTX VIP Bot
We're only 2 days into the week, so a bit early for our weekly update, but there's some major updates that i'm sure you'll be happy to hear:

- **Increased rate limits:** Rate limits were increased by 20% across the board.
- **Decreased MM3 Requirement:** The requirement for MM3 was reduced from 2.5% of overall exchange volume in maker flow to 1.5%, that is now live.
- **Increase of CLP order limit:** CLP now allows for 40 orders to be risk checked at once, up from 20 previously. If you're not on CLP and would like to be, please let us know!
- **Native UST support on Terra**
- **Ongoing Announcements Doc:** We'll continue to update this document with updates on a weekly basis. Moving forward, you'll be able to come back to this

Tackett_3AC_000000204

doc at any point and see the latest updates.
- Please don't forget to fill out the questionaire!

Full announcement: https://docs.google.com/document/d/11wDzLBUWQ3wWNufPWyn14q6o5F8yz5FEGK2Abg3Y8j8/edit
11 March 2022

N

08:32
Ningxin
hi team, could u pls help with a $15mio credit via signet? it was not processed automatically

C

08:35
Cody
on it
08:42
did you register it with amount 15011000?

N

08:43
Ningxin



no i cancelled that one

C

08:45
Cody
did you raise a SEN one for 15mio?

N

08:45
Ningxin
oh i thought i did Signet
08:45
so shall i cancel that, and raise another signet one?

C

08:46
Cody
i saw the funds in signet a/c.

N

08:46
Ningxin
yeah the fund is sent via signet
08:49
In reply to this message
so to confirm, i can do this?

C

08:51
Cody
seems there's issues in creating deposit slip as i only see a 15mio one for SEN.

N

08:51
Ningxin
ok

C

08:55
Cody
it has been credited

N

CONFIDENTIAL

08:55
Ningxin
ty!
17 March 2022

F

14:03
Fung
hi team, could u pls help with $5,001,000 SEN withdrawal?

KF

14:06
Katy F
Photo
1206×133
Hi, may I confirm that is it a SEN withdrawal? Thanks.

F

14:07
Fung
*sry Signet withdrawal

KF

14:07
Katy F
OK. Moment
14:10
Sent

F

14:10
Fung
Thx

N

21:25
Ningxin
hi team, could u pls help with another $5mio signet withdrawal pls?


21:29
Deleted Account
on it
21:32
sent

N

21:41
Ningxin
hi @BeatriceChui , sry for trouble, could u pls help with another $4mio signet withdrawal? will combine them together for future


21:43
Deleted Account
moment
21:46
done

N

21:47
Ningxin
thank you very much!

F

22:23
Fung
hi team, could u pls help with another $6M signet withdrawal pls? Should be last one for tonight thx!

22:23
Deleted Account
one moment
22:30
Your $6m is withdrawal is now completed

F

22:31
Fung
thanks again!


22:31
Deleted Account
you're welcome
22 March 2022

F

06:24
FTX VIP Bot
Hello 👋
Time for our weekly updates.

Week of March 21st:
**- LUNA and ATOM now accepted as collateral and enabled for spot margin**
**- Client order id added to WS fills channel**
**- Listed Apecoin (APE) Convex (CVX), Anchor (ANC), and STEPN (GMT)**
**- Historic tick-level orderbook snapshots now available upon request**
**- New dated futures have been listed:** Going forward, new quarterly futures will be listed on the third to the last Friday each quarter (one week before expiry of the existing quarterly).
**- Tomorrowland tickets:** We recently announced our partnership with Tomorrowland. If you're interested in attending this summer in Belgium please let us know!

Full announcement can be found here: https://docs.google.com/document/d/11wDzLBUWQ3wWNufPWyn14q6o5F8yz5FEGK2Abg3Y8j8/edit

N

21:49
Ningxin
hi team, got 3 deposits pending for some time, could you pls help?
$9mio deposit via signet
$9.994mio deposit via sen
$3.0209mio deposit via sen
21:50
those shud be credited automatically, but been pending for some time


21:52
Deleted Account
all credited

N

21:53
Ningxin
the $9mio via signet still shows "initiated"
21:57
@BeatriceChui


21:57
Deleted Account
done

N

21:57
Ningxin
tyvm
28 March 2022

N

Tackett_3AC_000000207

20:57
Ningxin
hi team, got 2 SEN deposits stuck, $9.999mio & $9.998mio, could u pls help?

Z

21:00
Zane
hey guys, just checked your account and noticed you're way above the collateralization requirement for the LOC. I remember when burg was discussing with you that we offered a lower interest rate for higher collateralization and you took the higher interest rate for lower collateralization.
21:00
Since you're keeping a fair bit more collateral, wanted to revisit this and see if you'd be up to repaper the agreement with higher collateralization ratio and lower interest rate


21:13
Deleted Account
In reply to this message
both credited
29 March 2022

N

05:29
Ningxin
In reply to this message
Hi, may I have the details of the higher collat and interest numbers? Happy to take a look

Z

05:30
Zane
i believe we offered you 200% collateral at 5%
05:30
and you're at 125% and 8%

N

08:43
Ningxin
just checking how flexible for us to go back to 125% in the future if we change to 200% collat now?

Z

08:52
Zane
Easy.
08:52
Just tell us you want to go back and I'll update the interest and agreement
08:53
I mean you don't have to change. Just noticed you have way more capital in your account than needed as collateral so thought I'd see if you want the lower interest rate of a higher collateralized loc

N

08:54
Ningxin
nice! yeah sure we like to change to 200% collat with 5% interest for now

Z

08:55
Zane
@allisonnx can you update the docs please

A

09:30
Allison
In reply to this message
will do later today

N

21:11
Ningxin
hi team, looks like another $9.997mio SEN deposit got stuck, could u pls help?

                                                                                    Tackett_3AC_000000208

21:13
Deleted Account
one moment

EL

21:18
E Lee
Credited
30 March 2022

N

08:53
Ningxin
hi team, could u pls help with these 3 SEN deposits? thank you
08:53



C

08:57
Cody
on it
09:00
credited

N

09:00
Ningxin
ty

A

13:12
Allison
In reply to this message
Hi @Ningxin_TAC please check the update LOC contract, 200% collateral with 5% interest, sign back to us and we will make the interest rate adjustment
13:12
Three Arrows FTX Line of Credit Agreement 20220330.docx.pdf
110.0 KB

N

15:56
Ningxin
In reply to this message
looks good, do you have docusign or any equivalent to send to Kyle for signing?

A

19:05
Allison
In reply to this message
Sure, kyle@threearrowscap.com this is Kyle's email right, will send soon

F

19:09
Fung
In reply to this message
Yes, thanks
31 March 2022

Z

01:42
Zane
sent

N

08:42

Ningxin
signed

Z

10:18
Zane
interest rate has been updated to 5%

N

10:18
Ningxin
tyvm

Z

10:21
Zane
Three Arrows FTX Line of Credit Agreement 20220330.docx (1).pdf
252.4 KB
10:21
completed doc for reference
2 April 2022

F

10:01
FTX VIP Bot
Hello Again 👋

Time for our weekly round up:

**Tradingview Integration:** You can now trade on FTX from your TradingView.com account.

**Cryptobahamas**: Our conference in the Bahamas is less than a month away. For more information and to register, please go to cryptobahamas.com

**F1 Miami:** F1 is having its inaugural race in Miami and we're planning quite the weekend around it. If you're interested in joining us for this weekend of festivities, please fill out this form.

**BTC Miami:** DM Zane if you're interested in grabbing a beer while in Miami (we're not hosting any events this time around, so a beer will have to suffice).

**Full announcement here:**
https://docs.google.com/document/d/11wDzLBUWQ3wWNufPWyn14q6o5F8yz5FEGK2Abg3Y8j8/edit
7 April 2022

N

15:20
Ningxin
hi team, could u pls help with $20mio signet withdrawal?

KF

15:22
Katy F
moment
15:24
USD sent
8 April 2022

N

14:46
Ningxin
hi team, could u pls help with another $19mio signet withdrawal?

C

14:47
Cody
on it
14:53
usd sent

N

15:02
Ningxin
ty
11 April 2022

N

14:47
Ningxin
hi team, another $19mio signet withdrawal pls?

KF

14:49
Katy F
moment
14:52
USD Sent
12 April 2022

N

14:56
Ningxin
hi, could u pls help with $16mio signet withdrawal?

KF

14:57
Katy F
moment
14:59
Sent
13 April 2022

N

08:36
Ningxin
hi team, could u pls help with $12mio SEN withdrawal?

KF

08:38
Katy F
moment

KF

08:55
Katy F
Sent

N

08:57
Ningxin
tx a lot

N

16:01
Ningxin
hi, requesting another $20mio signet withdrawal

KF

16:02
Katy F
moment
16:04
Sent
18 April 2022

N

14:09
Ningxin
hi team, could u pls help with $21mio signet withdrawal?

Tackett_3AC_000000211

KF

14:10
Katy F
MOMENT
14:14
USD Sent

N

21:04
Ningxin
hi team, may i trouble you to help with another $90mio SEN withdrawal pls?

EL

21:07
E Lee
Moment

N

21:09
Ningxin
actually requested another $100mio to SEN, as i have you here, shud be the last one today

N

21:34
Ningxin
pls let us know once done, ty
Leven Liu invited Richard Chang

EL

22:07
E Lee
Both processed and now pending approval
Apologies for the delay
22:20
Both approved and sent out
25 April 2022

N

14:40
Ningxin
hi team, could u pls help with $50mio deposit via SEN?
14:40
and another clip of $49mio pls

C

14:42
Cody
moment
14:44
credited

N

14:44
Ningxin
nice ty
3 May 2022

N

15:01
Ningxin
hi team, could u pls help with $20mio withdrawal to signet pls?

KF

15:03
Katy F
moment
15:05

Tackett_3AC_000000212

Sent

N

15:05
Ningxin
ty!
5 May 2022

N

12:44
Ningxin
hi team, got a $10mio signet withdrawal stuck somehow

KF

13:02
Katy F
on it
13:08
Sent
6 May 2022

N

07:56
Ningxin
hi team, could u help with $29mio SEN withdrawal pls?

C

08:11
Cody
sent

N

08:12
Ningxin
thank you
9 May 2022

N

14:25
Ningxin
hi team, could u pls help with $30mio signet withdrawal?

KF

14:27
Katy F
moment
14:32
Sent

N

14:33
Ningxin
ty!
10 May 2022

N

07:50
Ningxin
hi team, could u pls help with $61mio sen withdrawal?

C

07:54
Cody
on it
07:58
sent

N

07:59
Ningxin
tx a lot
11 May 2022

RS

16:29
Ryan Salame
Hey guys, could we get a name / address / phone number / email for a 3rd year FTX anniversary gift we'll be sending out within the next two months!
12 May 2022

F

01:12
FTX VIP Bot
Due to market conditions, the collateral requirements for LUNA and UST have been increased by 2x. This only affects initial collateral requirements, not maintenance (only affects your ability to open positions, not get liquidated).

For UST and LUNA futures positions, their initial margin requirement is:

```
max(IMF of your account, IMF factor * sqrt(position open size in tokens) * 2
```

For UST and LUNA spot borrows (negative balances), their initial margin requirement is:

```
max(1.1/W - 1, spot margin IMF factor * sqrt(borrow size in tokens), IMF of your account) * 2
```

Furthermore, we have reduced the collateral contribution for LUNA and UST, they now have the following haircut:
LUNA: 0.76154 with spot margin turned on, 0.6925925 with spot margin off
UST: 0.6925925 with spot margin turned on, 0.628571 with spot margin off

If you have any questions, don't hesitate to reach out and let us know.

N

13:10
Ningxin
hi team, got a few withdrawals stuck
13:10
BTC & USDT

Z

13:16
Zane
screenshot pls

N

13:16
Ningxin



Z

14:22
Zane
out

N

14:23
Ningxin
ty
14:23



but got new ones for your help pls

LL

14:25
Leven Liu
raised

CONFIDENTIAL

F

14:44
FTX VIP Bot
Due to the recent price action, we will be modifying the price increment for both LUNA-PERP and LUNA/USD to 0.00005. You can see that reflected here in a moment (spot has been updated, futures should be here shortly): https://ftx.com/api/markets

Please let us know if you have any feedback or questions.

N

15:05
Ningxin
In reply to this message
any ETA pls?

Z

15:05
Zane
>will prioritize to process once we see them thanks
15:05
that's what we have
15:11
they're on their way

N

15:11
Ningxin
see them, ty!

N

17:12
Ningxin



pls also help with these, ty!

LL

17:14
Leven Liu
Sure

LL

17:52
Leven Liu
Should be out

F

17:52
Fung
ty

N

20:37
Ningxin



would need your help with one more withdrawal pls

LL

20:55
Leven Liu
Pinged

LL

21:17
Leven Liu

Tackett_3AC_000000215

Processing
21:20
Done

F

22:30
FTX VIP Bot
Due to the recent price action, we will be modifying the price increment for both LUNA-PERP and LUNA/USD to 0.000005. You can see that reflected here in a moment https://ftx.com/api/markets

Please let us know if you have any feedback or questions.

F

23:57
FTX VIP Bot
Please note: we're no longer going to credit UST and LUNA erc20 deposits now.
13 May 2022

F

00:26
FTX VIP Bot
Price bands have been made more lenient for LUNA and UST. Take the 10% and 5% and make them 50% and 20%. Same applies to some tokenized stock futures: AMC, GME, BB, NOK, WSB.
https://help.ftx.com/hc/en-us/articles/360027946651-Order-Limits-and-Price-Bands

F

00:49
FTX VIP Bot
We are adding the following markets to our NEAR index: ftx NEAR/USD, ftx NEAR/USDT, and the following to our LUNA index: ftx LUNA/USD, ftx LUNA/USDT.
These changes will hit at the turn of the hour (May 12 18:00:00 UTC), so won't effect current funding rates.
00:54
We are adding the following markets to our LUNA index: **FTX LUNA/USD, FTX LUNA/USDT,** and the following markets to our NEAR index: **FTX NEAR/USD, FTX NEAR/USDT.**

**The LUNA index will now be as follows:**
* Binance BTC
* Binance USDT
* Huobi USDT
* FTX USD
* FTX USDT

**NEAR index:**
* Binance USDT
* Huobi USDT
* FTX USD
* FTX USDT

These changes will hit at the turn of the hour **(May 12 18:00:00 UTC)**, as to not affect current funding rates. Apologies for the duplicate messages, just trying to add more info.

F

02:19
FTX VIP Bot
LUNA and UST deposits are now live on Terra and ERC20, we're working on re-enabling withdrawals and hope to have them up and running soon. Please be aware that delays on crediting/processing are to be expected and changes to the state of the network may introduce additional delays to processing times and re-enabling withdrawals. If anything changes we'll be sure to notify you

F

03:25
FTX VIP Bot
Update: UST and LUNA withdrawals have been re-enabled on both Terra and ERC20.

F

06:30
FTX VIP Bot
Due to the recent price action, LUNA imf factor and spot margin imf factor are decreased to 0.0001.
LUNA positions still require 2x collateral for opening (but not liquidation).
Additionally, we will be modifying the price increment for both LUNA-PERP and LUNA/USD to 0.00000025

Tackett_3AC_000000216

F
09:38
FTX VIP Bot
UPDATE: Due to the recent price action, we will be modifying the price increment for both LUNA-PERP and LUNA/USD to 0.00000001. It will take effect in next few minutes.
Deleted removed Deleted Account

N
20:21
Ningxin
Photo
1280×100
20:21
hi team, could u pls help with these 2 wtidhrawals?
20:21
Photo
1280×183
and this signet deposit too


20:21
Deleted Account
hey @Ningxin_TAC we are working on this
20:22
In reply to this message
could you please have a look? @adelancy242 @BeatriceChui @Chade7


20:24
Deleted Account
checking on this
20:29
this has been credited

N
20:29
Ningxin
ty

N
21:34
Ningxin
hi any ETA on BTC pls?


21:35
Deleted Account
we are trying to expedite it as there is a backlog currently
21:36
200 BTC should be out!

N
21:36
Ningxin
ok great, ty

F
22:41
FTX VIP Bot
https://twitter.com/FTX_Official/status/1525138742482116609
15 May 2022

F
01:42
FTX VIP Bot
LUNA's collateral weight (for purposes of opening further positions) is reduced to 15% with spot margin turned on, 20% with spot margin off. LUNA spot margin borrows demand ~20x the collateral they previously did. There are no changes to how LUNA collateral or positions are treated for liquidation purposes

Tackett_3AC_000000217

This means for LUNA futures positions, their initial margin requirement is:
max(IMF of your account, IMF factor * sqrt(position open size in tokens) * 20
20 May 2022

N

14:03
Ningxin
hi team, could u pls help with $28mio SEN withdrawal?

C

14:04
Cody
on it
14:08
sent
24 May 2022

F

06:26
FTX VIP Bot
At 02:00 UTC (22:00 EDT, 10:00 HKT, so in roughly two and a half hours) FTX will be disabling ERC-20 UST deposits. **Please do not send ERC-20 UST after this time as it will not be credited to your account.** UST deposits/withdrawals on Terra remain unaffected.

We will continue to update you with any upcoming changes related to the ongoing Terra/Luna and UST proposals.
26 May 2022

F

02:12
FTX VIP Bot
Proposal 1623: Rebirth Terra Network has passed. FTX will support LUNA and UST migration, and new LUNA airdrop. Please see details in the announcement:
https://help.ftx.com/hc/en-us/articles/6534496348564
27 May 2022

F

09:16
FTX VIP Bot
New LUNA airdrop and ticker change

FTX will make the following ticker change at 04:00 UTC:
* Old LUNA (Terra Classic) ticker = LUNC
* Old TerraUST (Terra Classic) ticker = USTC
* New LUNA (Terra 2.0) ticker = LUNA2
28 May 2022

F

22:36
FTX VIP Bot
LUNC and USTC deposits and withdrawals are open.
30 May 2022

F

23:21
FTX VIP Bot
FTX has completed the new LUNA (LUNA2) airdrop distribution

* New LUNA (LUNA2) to all eligible LUNC and/or USTC users has been distributed

* LUNA2 deposit and withdrawal are now open

It is your responsibility to understand the implications of the new LUNA (LUNA2) airdrop. FTX is not liable for any losses.

Details: https://help.ftx.com/hc/en-us/articles/6628852953108
31 May 2022

F

09:43
FTX VIP Bot
Introducing New Fee and Ratelimit Tiers to the FTX VIP & Market Maker Program

Tackett_3AC_000000218

Starting June 1, 2022 at 00:00 UTC, FTX will introduce new tiers to its VIP and Market Maker (MM) program.

Previously, our VIP and MM program only had 3 tiers, which made it challenging for users to become VIP/MMs and jump from one tier to the next one.

Today, we're excited to announce that we will be adding four new additional tiers to our VIP/MM programs, for a total of 7 tiers (MM1 - MM7, VIP1 - VIP7).

By introducing new tiers, we will be making it easier for users to start participating in our VIP/MM programs in order to unlock lower fees and higher ratelimits. Additionally, we're also reducing the incremental volume/market share requirements between tiers, which will empower users to reach higher tiers and continuously grow on the platform.

More details please refer to https://help.ftx.com/hc/en-us/articles/6632016038548-Introducing-New-Fee-and-Ratelimit-Tiers-to-the-FTX-VIP-Market-Maker-Program
6 June 2022

F

22:22
FTX VIP Bot
FTX will delist RUNE spot markets, and consider its relisting in the future after finishing RUNE mainnet integrations.

Details please refer to the link below:

https://help.ftx.com/hc/en-us/articles/6753040861204
14 June 2022

N

06:05
Ningxin
In reply to this message
hi team, could we change the credit line to 125% collat and 8% interest?
06:10
just checking why we cant withdraw funds, but we got $28mio available collateral?

Z

06:10
Zane
In reply to this message
Don't think it'd be loc
06:10
As the limit isn't applied by the system
06:11
In reply to this message
Due to the size of the loc, no.
06:11
Since you have such a large loc we need it to be overcollateralized

N

06:12
Ningxin
overcollat by how much?

Z

06:12
Zane
200%
06:12
Your loc is an order of magnitude larger than others on the platform

N

06:12
Ningxin
In reply to this message
can we change it to this?

Z

06:18
Zane
In reply to this message
no we cannot

Tackett_3AC_000000219

06:18
unless you want to reduce the size

N

06:19
Ningxin
yes sure we can reduce size
06:19
actually can we remove the loc?

Z

06:19
Zane
yes

Z

06:42
Zane
i cannot
06:42
it would likely liquidate you
06:43
it would indeed
06:43
you need to top up a lot of capital btw
06:43
you're massively under the collateral requirements for the LOC
06:43
and to even pull the LOC you need to add a lot of collateral to prevent being liquidated

N

06:43
Ningxin
we are reducing postiions now

Z

06:43
Zane
I could pull a portion of the loc for now if you'd like

N

06:43
Ningxin
yes pls
06:43
what size do you suggest now?

Z

06:44
Zane
i can see you have 59,632,392.62 available for initial margin
06:45
i don't know how close you'd like to cut it to that
06:45
Also, but pulling the loc you're going to go more negative USD, which might increase the collateral requirements
06:45
cause you're massively negative USD, so IMF is likely coming into play here
06:45
i'd suggest starting with like 5-10mm, and we can see how that affects things, then can go from there

N

06:46
Ningxin
sure, lets try 10mio
06:49
pls lmk when done

Z

Tackett_3AC_000000220

06:54
Zane
so i'm getting an error that says "Account does not have enough balances", i can override that, but it might liquidate you.
06:54
due to the size of your account, i'd like to be abundantly cautious

N

06:55
Ningxin
In reply to this message
ok, could u pls try 5mio and go ahead then?

Z

07:00
Zane
So just fyi, you're account value collateral is $113,438,132.47, and you have a loc of $120,000,000
07:01
which means you're underwater on the LOC in general.
07:02
The reason you can't withdraw is because you're account right now is technically underwater

N

07:02
Ningxin
[image box]

i see our account collateral is $199mio?

Z

07:05
Zane
that's the collateral contributed by spot assets, that's not the collateral value though (you're negative 85mm usd)
07:11
can someone from your team give me a call
07:11
we need to discuss this situation.
07:16
Just to highlight the issue here, per the agreement we signed you need to keep 200% collateral for the LOC, any shortfall of that which isn't topped up within 24hrs is charged 10%/day. Not only are you not within your collateral requirements, you're -$3,145,735.41 underwater as of right now.
07:16
We aren't going to charge you 10%/day obviously
07:16
But we should hop on a call to discuss this.

Z

07:36
Zane
anything here guys?

Z

09:32
Zane
I need a response here guys. You're now 20mm in the hole

T

09:38
Tristan
In reply to this message
@kyled1

Z

09:49
Zane
I would really recommend responding here @Ningxin_TAC. Lack of response gives us more cause for concern than anything.

Z

21:56

Zane

hello @Ningxin_TAC @kyled1, we have to turn off withdrawals on your account until we can get a response from you. You're currently basically flat, but you need to increase your USD balance by a sizable amount. If we pulled the LOC you'd be negative 83mm or so, which would likely cause you to be liquidated, and we don't want to do that. But the bare minimum you can do is just respond to us and provide an update which you aren't doing, which is a cause for concern.

21:59

Please respond and let us know what you'd like to do. Also, as mentioned above, per the agreement you signed any shortfall on the collateral requirements for the LOC that aren't topped up are subject to 10%/day in interest. That means any shortfall on $240,000,000 of your own collateral ($360mm account value)—which you're very far from currently—is subject to 10%/day in interest. Like i said above, we'd prefer not to charge you that amount, but we need to know how you plan on dealing with this situation and radio silence is not confidence inspiring.

Z

22:53
Zane
3AC,

Your account is in an undesirable state. We've tried to reach you several times: consider this something like a final warning.

As per the Line of Credit agreement you signed, we have the right to request information from you to assess your continued eligibility for the LOC at any time, and have the right to remove the it at any time.

Currently your account has about $13m in value outside of your $120m line of credit. Note that, per section 5 of our Line of Credit agreement, you are obligated to maintain 200% of the line of credit ($240m) in your account at all times, and that FTX has the right to charge 10%/day on any shortcomings there. You are currently $227m short on this obligation, and so FTX has the right to charge you $22.7m/day. Further, we noticed that last night around 4AM ET, you did not respond to our inquiries and withdrew even more from your account, thereby actively becoming even more delinquent on your obligation and acting against the spirit of our agreement.

We will remove your $120m line of credit in whichever comes sooner: 6pm ET, your account reaching $3m of value. If the state of your account does not change substantially, this will result in you being levered long crypto on FTX: negative USD, positive crypto. And depending on the state of that leverage, your account may be liquidated.

These are busy times. We know that you are likely overwhelmed with short-term responsibilities. Separate from this discussion, if you wanted to discuss financial relief options for your firm as a whole, we would be open to a conversation there. If you did want to pursue this route, we'd want a conversation with your CEO to assess the situation very shortly.

15 June 2022

Z

04:15
Zane
Would really prefer if we could resolve this via a discussion, but we're not left with a lot of choices if we can't hear back from you

04:15
we'll be pulling the loc in 45min

19 June 2022

F

02:32
FTX VIP Bot
At 14:00 UTC on Sunday, June 19th we will be putting the following perp markets into close-only mode in preparation for delisting on June 21st at 14:00 UTC:

BAO, CONV, CUSDT, HUM, KIN, MCB, MER, MTA, ORBS, ROOK, SRN, and TULIP

Orders that'd open or increase positions in these markets will see the error message "Future is in close-only mode. Can only place closing orders."

Please note that **users in the MM tiers will be exempt** from this rule to better protect the health and liquidity of these markets until they are delisted.

Further spot borrows in these tokens will also be disabled for all users, including those in the MM tiers.

If you have any questions, don't hesitate to reach out.

21 June 2022

F

13:52
FTX VIP Bot
Dear clients,
We're impacted by the Cloudflare issue, to place orders and receive market data please use the link below instead for now:
https://awsapi.ftx.com/api/
Please note: markets are in post-only mode on FTX.com and FTx.us.

F

14:21

FTX VIP Bot
Cloudflare issues appear to be resolved, markets will be taken out of post-only mode in 10 minutes at 07:30 UTC
14:36
Cloudflare seems to still be experiencing intermittent issues, we will be putting markets back in post-only until further notice.
14:50
Things appear to be returning to a better state, we will be taking markets out of post-only at 7:55 UTC, in 5 minutes
22 June 2022

F

03:25
FTX VIP Bot
There is a planned hard fork for Binance Smart Chain (BEP20) that will take place at a block height of 18,907,621, or approximately 08:00 (UTC) on 6/22.
Deposits and withdrawals via BEP20 network will be suspended from 07:00 (UTC). We expect to re-enable them shortly thereafter, but will be monitoring the state of the network and update our users accordingly.

F

14:46
FTX VIP Bot
BEP20 withdrawals and deposits are paused for the upcoming hard fork
Please see https://help.ftx.com/hc/en-us/articles/7218752678676 for more details
23 June 2022

LL

16:26
Leven Liu
FTX VIP Bot, [23 Jun 2022 at 5:13:16 PM]:
VIP Update 06/20
Week of 06/20: Apologies for the lack of updates the past while, it's definitely been a busy period with a lot of volatility in the markets. We hope everyone is faring alright in the downturn, as always please let us know if there's anything we can do to be of help. As it has been a while, there'...

FTX VIP Bot, [23 Jun 2022 at 5:13:16 PM]:
VIP Update 06.22:

**Platform Improvements (Features & UI/UX):**
- SEN and SIGNET Deposits now autocredit
- FTX OTC updates: Streaming pricing (RFS), TWAPs, OTC-FTX.com instant crypto transfers
- USDT now supported on AVAX
- USDC now supported on MATIC & TRON

**API & Backend changes:**
- IMF Weight: We added an additional factor to collateral requirements called IMF weight. IMF weight acts as a multiplier on initial margin requirements.
- Changed methodology for calculating fill price on off-market liquidations
- Improved reliability on trigger orders effectively triggering
- Added spotMarginImfFactor to GET /wallet/coins endpoint

**Hospitality (free tickets to cool stuff):**
- **Ultra Europe:** taking place **July 8-10th in Split, Croatia.** We would like to extend an invite to our VIPs to come join us for the festivities, tickets are on us!
Please let us know ASAP if you're interested so we can manage our inventory of tickets and include as many VIPs as possible.
- **MLB All-Star Game & Home Run Derby:** July 18th-19th in Los Angeles
- **Home Run Derby X:** July 9th in London

There are more updates and a lot more detail on the above changes in the full announcement which can be found here:
https://docs.google.com/document/d/11wDzLBUWQ3wWNufPWyn14q6o5F8yzSFEGK2Abg3Y8j8/edit#
28 June 2022

F

10:27
FTX VIP Bot
**Announcement Regarding Upcoming ETH Upgrade:**

The upgrade will take place at the Ethereum block height of 15,050,000, which is expected to occur at roughly 10:45 (UTC) on June 29th, the exact time may vary.
For more information on the network upgrade, please refer to the Ethereum Gray Glacier Upgrade Announcement.

FTX will support the upgrade and trading of ETH and ERC-20 tokens on FTX will not be affected. In preparation, please note the following:
• Deposits and withdrawals of ETH and ERC-20 tokens will be disabled starting from June 29th at 09:43 (UTC) i.e. 1 hour prior to the estimated upgrade.
• FTX will monitor the state of the network following the upgrade and reopen deopists and withdrawals for ETH and ERC-20 tokens once the upgrade is complete.
5 July 2022

F

CONFIDENTIAL

06:39
FTX VIP Bot
**VIP update 07/04:**

**Small order size thresholds decreased: Threshold was taken down ~33%** in light of decrease in prices. We may make further adjustments after a deeper review, but we wanted to push an update in the meantime

**Changes to LOCs: Please read full announcement using the link below.** In short, USD from an LOC is now expendable on spot margin; any shortfall between your LOC and USD balance will be charged prevailing spot margin USD borrow rates; LOCs now require spot margin to be enabled in any sub with an LOC.

**Introducing organizations for Custom Logins:** Users can now send an invite to others allowing them to set up their own password and 2FA for their custom login.

**NFT Permissioning for API keys:** You can now disable an API keys ability to be used for trading NFTs.

**MM reports:** We are aware of the issue with MM reports showing up blank and hope to have it resolved by EOD tomorrow.

**Full announcement:** https://docs.google.com/document/d/1wDzLBUWQ3wWNutPWyn14q6o5F8yz5FEGK2Abg3Y8j8/edit?usp=sharing
(please let us know if you aren't able to view the full announcement, we had some reports of people not having access but everyone should, and after testing on our end don't see any issues, but please let us know otherwise if you're having issues)
14 July 2022

F

02:19
FTX VIP Bot
**WebSocket Update:** We're going to release something in a few hours that should decrease unexpected websocket disconnections. We think that it'll take up average session lengths and reduce tail-case websocket message delay. We'll be rolling this out at 10pm ET, so expect some disconnections then. As usual, these will be rolling starts and we will maintain availability throughout, but you will need to reconnect.

**The Paradigm integration with FTX went live on July 13, 2022,** enabling one-click futures spreads trading. Paradigm and FTX users can now trade the spread between spot, perps and dated futures on BTC, ETH, SOL and AVAX with a single click and reduced fees. More information here: https://help.ftx.com/hc/en-us/articles/7744740732308

**LoC Updates Live as of July 11, 2022.** The changes to the LOCs went live on both FTX and FTX US. You can now use your line of credit for spot trading. See last week's update in full announcement below.

**MLB Playoffs are coming up in October.** To indicate interest, please fill out this form to provide more information on preferred dates, cities and teams.

**Full Announcement:** https://docs.google.com/document/d/1Z8vObEfCah0iUjh2MCeI_ePpNxmNDyna2GOS-ZhiDm0/edit

F

02:40
FTX VIP Bot
Please use this link for the full announcement: https://docs.google.com/document/d/1pz_vs4rzJHi4geLm6nLp9n09_vCAH0YnoeraBo5hBGs/edit?usp=sharing
19 July 2022

F

01:17
FTX VIP Bot
**Announcement on IMF Factor Update.**

We have updated the IMF factor for a number of assets/markets, please check ftx.com/api/markets (this should always be treated as the source of truth for IMF factors and any other contract specs) or the documents below for a more readable format:

**Helpdesk:**

https://help.ftx.com/hc/en-us/articles/360027668832-Contracts-Specs

**Full announcement with the list of updated contracts:**

https://docs.google.com/document/d/1zqJNoZnDUEQVo-GBS-UeqbBNS0RbRFk5rlRGUgCv3Ag/edit

Best regards,
FTX VIP Team
22 July 2022

F

CONFIDENTIAL

Tackett_3AC_000000224

05:59
FTX VIP Bot
The platform is currently experiencing intermittent issues causing the API to throw up errors. We have spoken with the devs who are currently working on a resolution and we hope to have more information to share here soon. We'll be sure to share any updates as we have them.
06:12
We think that the problems are now fully resolved and expect no more issues. We continue monitoring actively and we apologize for the inconvenience.

F

06:32
FTX VIP Bot
Between approximately 19:30 to 23:00 UTC, various FTX endpoints were intermittently giving 500s. The underlying issue related to a caching system that experienced degradation with a version upgrade. Cache shards went down one-by-one (hence the intermittent failures). We've addressed the root cause and do not expect this to come up again.
Leven Liu invited SR
23 July 2022

F

20:02
FTX VIP Bot
**FTX Update Week of July 18 - 22 :**

**Results of 7/13 WebSocket update:** Last week's change improved WebSocket stability and decreased unexpected disconnections. Since the change, we've observed decreases in forced disconnections of 80-90%, and message delay is down 50-60%.

**Sorting Open Orders Table:** You can now sort the open orders tab by "side", "size", and "price" on FTX and FTX US

**IMF Factor Update:** Earlier this week we updated IMF factors for a number or markets. See full announcement here:
https://docs.google.com/document/d/1zqJNoZnDUEQVo-GBS-UeqbBNS0RbRFk5rlRGUgCv3Ag/edit. Note: this was previously notified by bot msg, and reiterated here for reference in the weekly summary.

**Full Announcement:** https://docs.google.com/document/d/1pz_vs4rzJHi4geLm6nLp9n09_vCAH0YnoeraBo5hBGs/edit
3 August 2022

F

03:56
FTX VIP Bot
**FTX Update Week of July 25-29th:**

Apologies for the delay in getting this one out, but hopefully the number of new features/improvements will more than make up for it. We'll likely have a number of further updates on the below by EOW, so stay tuned!

**FTX Status Page:** Status pages have been launched for FTX.com and FTX.us, which can be found at status.ftx.com and status.ftx.us respectively. These are a work in progress, so please bear with us as we improve the relevant processes and build out additional components/metrics.

**SEN/Signet Withdrawals:** We've increased the default 24hr limit to $50M (up from $10M).

**TWAP Price Bounds/Limits:** You can now set upper and lower bounds for TWAP orders by using the "pause above/below price" field. If specified, an individual order that is part of the TWAP will not be submitted if market price is above the upper bound specified.

**TWAP Limit orders**: users can now choose between limit and market orders for TWAPs.

**Deep Dive Meetings with FTX:** Availability permitting, FTX would like to invite VIP/MM clients to schedule a meeting to do a deep dive on the FTX tech stack. Please reach out if interested.

**HUSD is no longer part of the USD Stablecoin basket and is no longer supported as collateral.**

**Full Announcement** (please read for more information, there's a lot more shared in the full announcement than in the TG announcement. And reminder we update the same link every week, so can use it as a sort of changelog):
https://docs.google.com/document/d/11wDzLBUWQ3wWNufPWyn14q6o5F8yz5FEGK2Abg3Y8j8/edit?usp=sharing
19 August 2022

F

04:19
FTX VIP Bot
**FTX Update August 1-17th:**

**MMF Weight:** We've introduced a new term to the margin model: MMF weight. The MMF weight is similar to the IMF weight that we introduced in June, however it is used to calculate the maintenance margin fraction for existing positions vs. new positions.

CONFIDENTIAL

Starting on Monday, August 22nd, 2:00pm EST, we will be updating the IMF weights and start slowly increasing the MMF weights of the following underlyings: TRYB, LEO, HNT, POLIS, ATLAS, THETA, SCRT, COMP. See official announcement for more details (https://help.ftx.com/hc/en-us/articles/8662420538772).

**FTX US Update – Fees:** FTX US is introducing a new VIP/MM program and fee schedule! The new VIP/MM program will have a total of 7 tiers (MM1-MM7 and VIP1-VIP7). See the official announcement page for more info and ratelimits (https://help.ftx.us/hc/en-us/articles/8193663258263).

As a reminder, FTX US accepts customers from across the globe, and has the same API as FTX.com. If you are interested in onboarding, let us know and the US VIP team will reach out to set up a call.

**What happens after the ETH merge?** FTX has published an update on what will happen after the merge in the event of a fork. See the official announcement for more details. https://help.ftx.com/hc/en-us/articles/8567017550356

**IP Whitelisting:** We now support IP whitelisting for all account access (API, GUI, app, custom logins, etc). The settings are only accessible by the VIP/MM tiers and are found at ftx.com/profile under the "Account Whitelisted IPs" section.

**LOC Utilization per Subaccount:** We now support LoC utilization per subaccount. If enabled, we charge each of the user's subaccounts interest separately based on their individual LOC usage.

**New MM Report Columns:** We added new columns to the VIP/MM Daily Reports that display the difference in volume between the accounts above and below you in trailing 30-day maker and total volume.

**FTX Status Page:** Removed Public Option for Subscriptions. Please reach out if you'd like to subscribe.

**MLB Playoffs October 2022:** As a reminder, we are planning for the MLB Playoffs in October. If you have not yet, please fill out the MLB Playoff form (https://airtable.com/shrkU5AMQ7WWiesdT).

**Full Announcement (please read for more information, there's more detailed information and this bot message is a summary):** https://docs.google.com/document/d/1pz_vs4rzJHi4geLm6nLp9n09_vCAH0YnoeraBo5hBGs/edit
1 September 2022

F

05:29
FTX VIP Bot
**FTX Update August 18-31st:**

**Upcoming VIP Events:** Please let us know if you're in town and available for the following events.
*SALT - New York, Sept 12-15, 2022* - reach out if you'll be in town and would like to meet up.
*Circle Converge - San Francisco, Sept 28, 2022* - Reg link: https://lu.ma/nrtni817
*LCS Finals - Chicago, Sept 10-11, 2022* - request form: https://airtable.com/shrd6bvdxaI9GvxMT
*Tomorrowland Winter - French Alps, March 18-25, 2023* - request form: https://airtable.com/shrfAysynSYDdrNxy
*MLB Playoffs - US, October 2022* - request form: https://airtable.com/shrkU5AMQ7WWiesdT

**Bulk cancel orders by id or by client order id** - see API documentation for more info - https://docs.ftx.com/#bulk-cancel-orders

**Latency fix** - We've implemented several fixes that should improve latency and site speed, particularly for trading/ordering pages. We've also improved latency on the get_positions API call.

**Address Whitelisting** - We've published new documentation on the whitelisting process and settings. Please see our help desk for more information: https://help.ftx.com/hc/en-us/articles/8847474347156-Whitelisting-Withdrawal-Addresses

**Full Announcement (please read for more information, there's more detailed information and this bot message is a summary):** https://docs.google.com/document/d/1pz_vs4rzJHi4geLm6nLp9n09_vCAH0YnoeraBo5hBGs/edit
3 September 2022

F

01:23
FTX VIP Bot
FTX has published a new annoucement regarding the ETH merge, please see this article for more information: https://help.ftx.com/hc/en-us/articles/9025415733396
5 September 2022

F

13:10
FTX VIP Bot
To prepare for the upcoming ETH Merge, FTX will suspend deposits and withdrawals for ETH on the Arbitrum One, Solana, and Binance Smart Chain blockchains.

See this post for more details and the exact timeline: https://help.ftx.com/hc/en-us/articles/9086294034580
15 September 2022

Tackett_3AC_000000226

F

12:26
FTX VIP Bot
ETH Merge Update:

1. ETH withdrawals will be disabled at 2am EST.
2. Snapshot of ETH balances for ETHW airdrop will be taken at at 2:15am EST.

More details here:
https://help.ftx.com/hc/en-us/articles/9025415733396

F

14:08
FTX VIP Bot
ETH Merge Update #2:
1. ETH deposits and withdrawals are now re-enabled.
https://help.ftx.com/hc/en-us/articles/9346071275924

2. Snapshot of ETH balances for ETHW airdrop was taken at around 2:15am EST. ETHW credits/debits should start getting reflected on your account over the next hour or so.

F

16:08
FTX VIP Bot
ETH Merge Update #3:

ETHW/USD spot market is now live https://ftx.com/trade/ETHW/USD
Zane removed FTX VIP Bot
wantonwallet removed wantonwallet
16 September 2022

RS

00:54
Ryan Salame
GIF



Tackett_3AC_000000227

# Exhibit 67

*West Thames Regional Health Authority*[556] an employer under a building contract stopped payment on a cheque that had been forwarded to the contractor so as to obtain a set-off in the contractor's liquidation, the liquidation having commenced after the cheque was sent to the contractor. The Court of Appeal allowed the set-off.

### (4) Breach of contract in not establishing a trust

**8.113**    A contract may stipulate that a sum of money equal in amount to the indebtedness of one of the parties to the other is to be set aside in a separate fund and held on trust. If a trust is established, the trustee would be denied a set-off in the beneficiary's bankruptcy against the obligation to account for the trust fund.[557] It may be, however, that, in breach of contract, the person failed to establish the trust, in which case the question may arise whether a set off should be allowed in respect of the resulting liability. In some cases the maxim that equity deems as done that which ought to be done may apply, so that equity would deem a notional trust to have been created against which there may not be a set-off.[558] In other cases, however, the bankruptcy of the party having recourse to the maxim may make it difficult for him or her to obtain an order for specific performance, and the application of the maxim depends upon the availability of such an order.[559] One possible objection to a set-off is that the person claiming the benefit of the set-off is in breach of contract, in not setting aside a separate fund to which the trust may attach. The contrary argument is that this is no worse than a creditor neglecting to pay, or indeed choosing not to pay, a separate debt owing by him or her to the debtor on the due date,[560] and if a set-off may arise in the one case then similarly it should be available in the other. A second possible objection is that, by stipulating for a trust, the parties impliedly had agreed to exclude a set-off, but under the current state of the law that argument would not be tenable[561] given that the House of Lords has held that the parties to mutual dealings cannot contract out of the operation of the insolvency set-off provision.[562] If neither of these objections would be valid individually, they should not be valid cumulatively, and so, unless equity would deem a notional trust fund to have been set up, it is suggested that a set-off would be available in this situation.[563]

[556] (1984) 26 BLR 51.
[557] See paras 10.02–10.06 below.
[558] *Re Arthur Sanders Ltd* (1981) 17 BLR 125. Compare *Re ILG Travel Ltd* [1995] 2 BCLC 128, 162, in which ILG acquiesced in the agent's failure to pay the money into a separate account, and also *GPT Realisations Ltd v Panatown Ltd* (1992) 61 BLR 88 (application for mandatory interlocutory injunction to set up a separate trust account refused).
[559] *Re Anstis* (1886) 31 Ch D 596, 605–6; *Re Plumptre* [1910] 1 Ch 609, 619. Similarly, the insolvency of the party against whom it is sought to apply the maxim may prevent its application. See *Mac-Jordan Construction Ltd v Brookmount Erostin Ltd* [1992] BCLC 350. Compare *Re Arthur Sanders Ltd* (1981) 17 BLR 125. The Greater London Council had failed to pay retention money relating to work performed by a contractor (now in liquidation) and various subcontractors into a separate trust account, despite a contractual obligation to do so. Nourse J said that, in the case of a solvent employer such as the GLC, equity would deem as done that which ought to have been done and would find a notional trust. While the availability of an order for specific performance was not considered, it appears that the remaining work under the contract in fact had been completed by another contractor.
[560] See para 8.112 above.
[561] See *Re ILG Travel Ltd* [1995] 2 BCLC 128, 160–1.
[562] *National Westminster Bank Ltd v Halesowen Presswork & Assemblies Ltd* [1972] AC 785. See para 6.131 above.
[563] See *Mac-Jordan Construction Ltd v Brookmount Erostin Ltd* [1992] BCLC 350, 359.

# 9

# COMMENSURABLE DEMANDS

| | | |
|---|---|---|
| A. The Requirement of Commensurability | 9.01 | (3) The adequacy of damages 9.10 |
| (1) The principle | 9.01 | C. Set-off where Contracts Involve |
| (2) *Rolls Razor v Cox* criticized | 9.03 | Non-Money Obligations 9.12 |
| B. Repudiation, and Specific Performance | 9.05 | D. Foreign Money, and Foreign |
| (1) Insolvency as a repudiation | 9.06 | Exchange Contracts 9.17 |
| (2) Specific performance | 9.07 | |

## A.  The Requirement of Commensurability

### (1)  The principle

For the insolvency set-off section to apply the demands must be commensurable, in other words the claim on each side of the account must be a money demand.[1] Set-off under the Statutes of Set-off and equitable set-off are subject to the same requirement.[2] A claim is not monetary in nature is not susceptible to a set-off even if its value is measurable with precision in money terms.[3] Thus, a set-off has been denied in the context of a claim for the return of specific property in circumstances where the court nevertheless accepted that the property in question had a particular value.[4] Further, a right to appropriate property under    **9.01**

[1] *Eberle's Hotels and Restaurant Co, Ltd v E Jonas & Brothers* (1887) 18 QBD 459; *Palmer v Day & Sons* [1895] 2 QB 618, 622; *Re Taylor, ex parte Norvell* [1910] 1 KB 562, 567; *Hiley v The Peoples' Prudential Assurance Co, Ltd* (1938) 60 CLR 468, 481, 490, 497; *Gye v McIntyre* (1991) 171 CLR 609, 623; *Lloyds Bank NZA Ltd v National Safety Council of Australia Victorian Division* [1993] 2 VR 506, 510; *Re Parker* (1997) 80 FCR 1, 10. See also *Rose v Hart* (1818) 8 Taunt 499, 129 ER 477; *Re Pen'Allt Silver Lead Mining Co. Fothergill's Case* (1873) LR 8 Ch App 270, 275 (shares); *Ex parte Roy, re Sillence* (1877) 7 Ch D 70; *Re Winter, ex parte Bolland* (1878) 8 Ch D 225; *Peacock v Anderson* (1878) 4 NZ Jur (NS) SC 67; *Lord (Trustee of ) v Great Eastern Railway Co* [1908] 2 KB 54 (reversed on other grounds [1909] AC 109); *Ellis & Co's Trustee v Dixon-Johnson* [1925] AC 489; *Re Leeholme Stud Pty Ltd (In Liq)* [1965] NSWR 1649; *Smith v Bridgend County BC* [2002] 1 AC 336 at [36]. In *Bateman v Williams* [2009] EWHC 1760 (Ch), [2009] BPIR 973, it was held that set-off was not available against a claim for an interest in a property, and a trust for sale of the property did not impose a liability susceptible to a set-off but only an obligation on both owners to sell and distribute the proceeds of sale on the terms of the trust.
[2] For the Statutes of Set-off, see *Tony Lee Motors Ltd v M S MacDonald & Son (1974) Ltd* [1981] 2 NZLR 281, 288; *Grant v NZMC Ltd* [1989] 1 NZLR 8, 13. See also *Air New Zealand Ltd v Wellington International Airport Ltd* [2008] 3 NZLR 87. For equitable set-off, see para 3.02 above. In the case of equitable set-off, this principle has also been applied in the case of an order under the Torts (Interference with Goods) Act 1977, s 3(2)(b) for the delivery of goods but giving the defendant the alternative of paying damages by reference to the value of the goods. See *Blue Sky One Ltd v Mahan Air* [2010] EWHC 631 (Comm) at [118] (and see [3] for the order made). Contrast *Baylin Technologies Inc v Gelerman* 2021 ONCA 45 at [59]–[73] (Ontario Court of Appeal) in relation to contractual set-off.
[3] Compare Balcombe LJ in the Court of Appeal in *Stein v Blake* [1994] Ch 16, 22 ('applies to all cross-claims provided that they are mutual and are measurable in money terms').
[4] See *Eberle's Hotels and Restaurant Co, Ltd v E Jonas & Brothers* (1887) 18 QBD 459; *Ellis & Co's Trustee v Dixon-Johnson* [1925] AC 489 (shares readily available on the stock exchange).

one's control (such as a security deposit) or to be discharged from liability is not equated with a money demand for the purpose of a set-off.[5]

9.02   In the case of insolvency set-off there are two reasons for the principle. The first, which has been emphasized in the cases, is the perceived difficulty in producing a balance on the account when one of the demands is not a money claim. As Lord Russell of Killowen CJ once remarked: 'There could not be an "account" as between goods and money, and no balance could be struck.'[6] The second is that the requirement of money demands is inherent in the stipulation in the bankruptcy set-off section that 'the sums due from one party shall be set off against the sums due from the other'.[7] In so far as the Statutes of Set-off are concerned, the requirement of money demands follows from the very basis of the Statutes, that there must be mutual debts.

## (2) Rolls Razor v Cox criticized

9.03   A set-off in respect of a claim to recover property was permitted in *Rolls Razor Ltd v Cox*.[8] A salesman employed by a company had been entrusted with goods for the purpose of sale. The company subsequently went into liquidation. When the liquidator brought an action for the return of the goods, the Court of Appeal held that the salesman could retain them as a set-off against the company's debt to him for commissions. For the purpose of the set-off, the goods were valued at the price at which the salesman had been authorized to sell them. It has been suggested that the right enforced in *Rolls Razor* may be explicable as some sort of lien rather than a set-off,[9] but the question of a lien was specifically argued before and rejected by the Court of Appeal. It is clear from the judgments that the right in question was regarded as a set-off. The *Rolls Razor* case should be regarded as wrongly decided.[10] In *Smith v Bridgend County BC*[11] Lord Hoffmann said that, in the absence of a lien or other security, a defendant could not retain an asset belonging to a plaintiff by way of set-off against

---

[5] *Re Bank of Credit and Commerce International SA (No 8)* [1998] AC 214, 229.
[6] *Palmer v Day & Sons* [1895] 2 QB 618, 622. See also *Eberle's Hotels v Jonas* (1887) 18 QBD 457, 465, 467, 468, 469; *In re Pen 'Allt Silver Lead Mining Co. Fothergill's Case* (1873) LR 8 Ch App 270 at 275 ('Shares cannot be set off against a money demand').
[7] Insolvency Act 1986, s 323(2). For companies, see the similar language in the Insolvency (England and Wales) Rules 2016, r 14.24(2) (administration) and r 14.25(2) (winding up). The Australian legislation refers to the 'sum due', which imports the same analysis. See the Bankruptcy Act 1966 (Cth), s 86(1)(b) and the Corporations Act 2001 (Cth), s 553C(1)(b).
[8] [1967] 1 QB 552.
[9] Wood, *English and International Set-off* (1989), 564.
[10] *Rolls Razor v Cox* nevertheless was referred to without adverse comment in *Bateman v Williams* [2009] EWHC 1760 (Ch), [2009] BPIR 973 at [16]. It was also accepted as correct by the Court of Appeal (Ackner and Slade LJJ) in *Gromal (UK) Ltd v WT Shipping Ltd* (unreported, 13 July 1984), the court regarding it as an exception to the general rule that goods which are the property of a bankrupt and which are in the possession of a creditor cannot be set off by setting their value against a debt owed to the creditor by the bankrupt. The goods in question in that case were sold by agreement between the parties after the liquidation, on the basis that the proceeds received were to take the place of the goods and the parties were to retain the same rights in respect of the proceeds to which they would have been entitled in respect of the goods. Before the liquidation, one of the parties had asserted a contractual lien over the goods with a power of sale. It was argued that this justified the availability of a set-off as at the date of the liquidation based upon the 'exception' in *Rolls Razor v Cox*. However, it was held that there was no presently exercisable right to sell as at the date of the liquidation, and hence that case did not apply.
[11] [2002] 1 AC 336 at [36].

---

a money claim. The comment was made in the context of equitable set-off, but the judgment suggests that it was thought to apply also to insolvency set-off.[12]

In the *Rolls Razor* case, Lord Denning MR relied on a comment by Gibbs CJ in 1818 in   **9.04** *Rose v Hart*,[13] to the effect that credit may be given for the purpose of the set-off section where there is a delivery of property with a direction to turn it into money. However, the Chief Justice went on to speak in terms of setting off the 'debt' resulting from the direction to turn the property into money, and while it is true that on another occasion he said that credit is created when goods are deposited for the purpose of sale and not just when the goods are sold,[14] the set-off in *Rose v Hart* nonetheless related to the 'debt' arising from the receipt of the money as a result of carrying out the directions. *Rose v Hart* is considered in greater detail later.[15] The point is there made that Gibbs CJ was concerned to limit the perception that the earlier decision of Lord Hardwicke in *Ex parte Deeze*[16] stood as authority for the proposition that there could be a set-off against goods. Lord Hardwicke himself later remarked in *Ex parte Ockenden*[17] that in *Ex parte Deeze* there had been evidence of a custom of the trade by which packers could retain goods, not only as security for the price of their work upon the goods, but also for the separate debts of the owner. In subsequent cases, however, *Ex parte Deeze* had been referred to as an authority on set-off,[18] and Gibbs CJ in *Rose v Hart* was attempting to rationalize the decisions in those cases with the stipulation in the set-off section in the bankruptcy legislation of 1732[19] that 'one debt may be set against another'. In the cases in question the direction to turn the property into money had been carried out, so that in each case there was in fact a debt in existence when the account was to be taken. On the other hand, the debts were not in existence at the relevant date for determining rights of set-off, a problem that Gibbs CJ overcame in *Rose v Hart* by ascribing a wider meaning to mutual credits than to mutual debts. Therefore, a debt which arose after the relevant date could be brought into an account, provided that it was based upon a credit given before that date. Nevertheless, he still required a 'debt' at the taking of the account, so that 'one debt may be set against another' in accordance with the 1732 Act. A proper statement of the principle is that, when goods are deposited for sale, credit is given for any proceeds of sale that *in fact* are received. This is reflected in the marginal note to Moore's report of *Rose v Hart*,[20] that '[i]n order to constitute a mutual credit, within 5 Geo 2, c 30, s 28, it must be confined to *pecuniary* demands on such credits only as in their nature will terminate in a debt'.

---

[12] See [2002] 1 AC 336 at [35]. See also *Tony Lee Motors Ltd v M S MacDonald & Son (1974) Ltd* [1981] 2 NZLR 281 in the context of the Statutes of Set-off.
[13] (1818) 8 Taunt 499, 506, 129 ER 477, 480.
[14] *Graham v Russell* (1816) 3 Price 227, 231, 146 ER 244, 246.
[15] See paras 10.13–10.35 below.
[16] (1748) 1 Atk 228, 26 ER 146.
[17] (1754) 1 Atk 235, 237, 26 ER 151, 152.
[18] See eg *French v Fenn* (1783) 3 Doug 257, 99 ER 642; *Smith v Hodson* (1791) 4 TR 211, 100 ER 979. Compare *Olive v Smith* (1813) 5 Taunt 56, 128 ER 607.
[19] (1732) 5 Geo II, c 30, s 28.
[20] (1818) 2 Moore CP 547 (emphasis added).

## B. Repudiation, and Specific Performance

9.05   Consider that A has entered into a contract for the purchase of goods from B, B being a creditor of A on another transaction, but prior to delivery the purchaser (A) goes into liquidation.

### (1) Insolvency as a repudiation

9.06   Insolvency of itself does not generally terminate outstanding contracts to which the insolvent is a party.[21] Nor does it necessarily constitute a repudiation of the contracts so as to entitle the other contracting party to elect to treat the contract as terminated.[22] A repudiation may occur if insolvency is coupled with other circumstances. For example, insolvency may have the effect of putting it beyond the insolvent's power to perform his or her obligations under a contract.[23] Thus, an order that an insurance company be wound up because of insolvency has been said to constitute a repudiation by the company of its contracts of insurance, on the basis that the deficiency in the company's funds makes it impossible to pay claims in full.[24] Similarly, if a bank has discounted bills of exchange for a customer prior to the customer's insolvency, the customer has already obtained the benefit of the contract and only has an obligation to reimburse the bank, which the customer could not do in view of his or her insolvency.[25] Repudiation may also occur if the conduct of the insolvent, or of the insolvent's trustee in bankruptcy or liquidator, shows that the contract has been abandoned.[26] In that regard the courts have indicated that, if one contracting party notifies the other that he or she is insolvent, that may be treated as a notice of repudiation if the first person does not also inform the other that he or she still intends to complete the contract.[27] Generally though, in the absence of any such circumstances, the courts have

---

[21] See eg *Re Sneezum* (1876) 3 Ch D 463, 473; *Shipton Anderson & Co* (1927), *Ltd v Micks, Lambert & Co* [1936] 2 All ER 1032, 1037; *Official Receiver v Henn* (1981) 40 ALR 569, 572; *Re Palmdale Insurance Ltd* [1982] VR 921, 929.

[22] The ensuing discussion should be distinguished from the situation in which a contract in its terms is such that it is to remain in operation only so long as one of the parties continues in business, so that cessation of business consequent upon insolvency terminates the contract without giving rise to a liability for damages for breach of contract. See eg *Rhodes v Forwood* (1876) 1 App Cas 256 and *Re Arawa Dairy Co Ltd* [1938] NZLR 411, though compare *Reigate v Union Manufacturing Co (Ramsbottom) Ltd* [1918] 1 KB 592.

[23] See eg the comments of Cotton LJ in *Re Asphaltic Wood Pavement Co. Lee & Chapman's Case* (1885) 30 Ch D 216, 223–4 in relation to the obligation of the company in liquidation to maintain the street for a period of fifteen years. See also *Ogdens, Ltd v Nelson* [1905] AC 109, in which the company had sold its business prior to going into voluntary liquidation.

[24] *Re National Benefit Assurance Co Ltd* [1924] 2 Ch 339, 343; *Re The Federal Building Assurance Co Ltd* (1934) 34 SR (NSW) 499, 506; *Hiley v The Peoples Prudential Assurance Co Ltd* (1938) 60 CLR 468, 493; *Re Palmdale Insurance Ltd* [1982] VR 921, 929. See also *Re Northern Counties of England Fire Insurance Co (Macfarlane's Claim)* (1880) 17 Ch D 337, 341, but compare the comments of Lord Cairns in the *Albert Arbitration* (reported as a footnote to *Re English Assurance Co (Holdich's Case)* (1872) LR 14 Eq 72). Query whether English courts would now reach the same conclusion in relation to insurance companies carrying on long term business, in view of the liquidator's statutory obligation to carry on the insurer's business so far as it consists of those contracts with a view to its being transferred as a going concern to a person who may lawfully carry out those contracts. See the Financial Services and Markets Act 2000, s 376, and MacGillivray on Insurance Law (15th edn, 2022), 190 [7-070]–[7-071].

[25] *Baker v Lloyd's Bank, Ltd* [1920] 2 KB 322, 326.

[26] As in *Morgan v Bain* (1874) LR 10 CP 15. See also *Lawrence v Knowles* (1839) 5 Bing (NC) 399, 132 ER 1152; *Re Tru-Grain Co Ltd* [1921] VLR 653.

[27] *Morgan v Bain* (1874) LR 10 CP 15, 25–6. Compare *Mess v Duffus and Co* (1901) 6 Com Cas 165, in which the notice was held not to constitute notice of intention not to perform the contract.

---

shown a marked reluctance to conclude that insolvency of itself constitutes a repudiation of contracts that could return a profit for the insolvent's estate.[28] An example is the case of a contract for the sale of goods. The mere fact that the purchaser becomes insolvent before delivery of the goods is not considered to be a sufficient reason to entitle the vendor to treat the contract as rescinded.[29] In view of the vendor's precarious position, the vendor is entitled to insist that the whole of the price be tendered before delivery, even if the sale was otherwise expressed to be on credit terms.[30] But the purchaser's insolvency itself, without some additional circumstance, is not regarded as a repudiation of the contract. This is based upon a sound policy consideration, that the insolvent's beneficial contracts should be preserved for the benefit of the creditors.[31] If the contract can be performed at a profit, it would make good sense for the purchaser's trustee in bankruptcy or liquidator to use the funds of the estate to pay the price and complete the contract.

### (2) Specific performance

If, in the case of a contract for the sale of goods, the purchaser's trustee in bankruptcy or liquidator wishes to proceed with the contract and tenders the price, the vendor could not accept payment and refuse to deliver the goods as a set-off against a separate debt owing by the purchaser, since the contractual obligation to deliver is not a money obligation. The vendor nevertheless may adopt a different approach. The vendor may decide that it would be better to repudiate the contract, on the premise that he or she may thereby incur a monetary damages liability to the purchaser which could be set off against the purchaser's separate debt, and retain the goods for sale elsewhere. It should not be an objection to a set-off that the damages liability would be incurred to the purchaser after the commencement of the bankruptcy, since the liability would have arisen out of a prior dealing between the parties.[32] Nor should it be an objection that the set-off would be based upon the vendor's own conduct in deliberately breaching the contract for the express purpose of obtaining a set-off.[33] The vendor's prospect of success may ultimately depend upon whether the purchaser's trustee in bankruptcy or liquidator is able to obtain an order for specific performance of the contract. If specific performance is available, the vendor could be compelled to perform the obligation under the contract to deliver the goods and, since this obligation is not a money obligation, it could not be the subject of a set-off.

9.07

---

[28] In addition to the cases cited in the next footnote, see *Brooke v Hewitt* (1796) 3 Ves Jun 253, 30 ER 997; *Re Tru-Grain Co Ltd* [1921] VLR 653, 656; *Lindley on Companies* (6th edn, 1902) vol 2, 1014. See also *Jennings Trustee v King* [1952] 1 Ch 899; *Shipton, Anderson & Co* (1927) *Ltd v Micks, Lambert & Co* [1936] 2 All ER 1032, 1037.

[29] *Tolhurst v Associated Portland Cement Manufacturers (1900) Ltd* [1902] 2 KB 660 (esp at 671, referring to *Ex parte Chalmers, re Edwards* (1873) LR 8 Ch App 289 and *Morgan v Bain* (1874) LR 10 CP 15). Similarly, the insolvency of a vendor is not a sufficient reason to entitle the purchaser to put an end to the contract. See *Mess v Duffus and Co* (1901) 6 Com Cas 165.

[30] *Ex parte Chalmers, re Edwards* (1873) LR 8 Ch App 289. See also *Gunn v Bolckow, Vaughan & Co* (1875) LR 10 Ch App 491, 501; *Re Phoenix Bessemer Steel Co* (1876) 4 Ch D 108, 112, 114; *Re Sneezum* (1876) 3 Ch D 463, 473–4; *Grice v Richardson* (1877) 3 App Cas 319; *Chitty on Contracts* (35th edn, 2023) vol 1, 1934–5 [24-037]. This principle has been codified in the sale of goods legislation. See the Sale of Goods Act 1979, s 41(1)(c).

[31] *Ex parte Chalmers, re Edwards* (1873) LR 8 Ch App 289, 294.

[32] See para 8.51 above.

[33] See para 8.112 above.

**9.08** If the article the subject of the sale is unique, the court, subject to other discretionary considerations, ordinarily would decree specific performance. On the other hand, if the contract concerns goods readily available in the market at an ascertainable market price, the courts incline against specific relief. It has been suggested that in such a case specific performance is not available under any circumstances.[34] However, that view would seem contrary to principle, and it is doubtful.[35] Specific performance is denied, not on an absolute jurisdictional basis, but rather because damages are usually an adequate remedy,[36] this being the original foundation of the decree of specific performance.[37] As a corollary, if in a particular case damages at law would not be an adequate remedy,[38] the court in principle should have a discretion to grant specific relief.[39] There is, nevertheless, a difficulty in relation to contracts for the sale of unascertained goods. The Sale of Goods Act 1979, s 52 expressly provides for specific performance of a contract to sell specific or ascertained goods,[40] and Atkin LJ in *Re Wait*[41] said of the corresponding provision in earlier legislation[42] that it set out the full extent of equitable remedies in the context of contracts for the sale of goods, so that specific performance is not available where the goods are unascertained. Comments by Lord Brandon of Oakbrook in delivering the judgment of the House of Lords in *Leigh and Sillavan Ltd v Aliakmon Shipping Co Ltd*[43] suggest that he would have agreed with Atkin LJ.[44] On the other hand, Atkin LJ's view has been criticized by commentators.[45]

**9.09** Amendments to the Sale of Goods Act 1979[46] have ameliorated to some extent the position in relation to unascertained goods. The definition of 'specific goods' in s 61 has been amended so as to include within the meaning of that term an undivided share, specified as a fraction or percentage, of goods identified and agreed on at the time a contract of sale was made. This has the effect that, where a specified fraction or percentage of an identified and agreed bulk is sold, the agreement may be specifically enforced pursuant to s 52.[47] The amendment does not apply when the agreement relates to a sale of a specified quantity to be taken from an identified bulk, as opposed to a fraction or a percentage, although as a result of another amendment to the Act[48] the buyer in such a case, once he or she pays the price,

[34] *Price v Strange* [1978] Ch 337, 369 (Buckley LJ).
[35] It is questioned in Jones and Goodhart, *Specific Performance* (2nd edn, 1996), 278. See also the more cautious approach of Goff LJ in *Price v Strange* [1978] Ch 337, 359.
[36] *Adderley v Dixon* (1824) 1 Sim & St 607, 610, 57 ER 239, 240; *Falcke v Gray* (1859) 4 Drewry 651, 657–8, 62 ER 250, 252; *Re Clarke* (1887) 36 Ch D 348, 352; *Thomas Borthwick & Sons (Australasia) Ltd v South Otago Freezing Co Ltd* [1978] 1 NZLR 538, 548 (PC) ('A contract for the sale of goods obtainable on the market will not normally be specifically enforced' (emphasis added)); Spry, *Equitable Remedies* (9th edn, 2014), 57 n 18, 67–9.
[37] *Harnet v Yeilding* (1805) 2 Sch & Lef 549, 553 (Lord Redesdale).
[38] See paras 9.10–9.11 below.
[39] See in that regard *Sky Petroleum Ltd v VIP Petroleum Ltd* [1974] 1 WLR 576 (esp at 578–9).
[40] But see s 52(5) in relation to a contract to which Ch 2 of Pt 1 of the Consumer Rights Act 2015 applies.
[41] [1927] 1 Ch 606, 630.
[42] Sale of Goods Act 1893, s 52.
[43] [1986] 1 AC 785, 812.
[44] See also *Re Goldcorp Exchange Ltd* [1995] 1 AC 74, 90–1 in relation to the question of equitable title, and *Astrazeneca UK Ltd v Albemarle International Corp* [2011] EWHC 1574 (Comm) at [303]. In New South Wales, compare *Electrical Enterprises Retail Pty Ltd v Rodgers* (1989) 15 NSWLR 473, 492–3, although the legislation in issue differed from that in England. *Re Wait* has been followed in Victoria. See *King v Greig* [1931] VLR 413, 438–9.
[45] Treitel, 'Specific performance in the sale of goods' [1966] JBL 211, 222–4; Jones and Goodhart, *Specific Performance* (2nd edn, 1996), 147–50. See also Spry, *Equitable Remedies* (9th edn, 2014), 56–7; Pollock, 'Re Wait' (1927) 43 LQR 293. Pettit, *Equity and the Law of Trusts* (12th edn, 2012), 654 n 41 suggests that the claim to specific performance in *Re Wait* was based solely on the predecessor of s 52 of the Sale of Goods Act 1979.
[46] See the Sale of Goods (Amendment) Act 1995.
[47] See *Benjamin's Sale of Goods* (12th edn, 2024), 1301 [17-096].
[48] See s 20A, introduced by the Sale of Goods (Amendment) Act 1995.

may become the owner of an undivided share in the bulk.[49] If, however, there is no identified bulk, the reforms have no application.

### (3) The adequacy of damages

In determining whether damages are an adequate remedy, it is not simply a matter of considering whether the amount of the loss can be adequately quantified and expressed in a judgment. This is apparent from the decision of the House of Lords in *Beswick v Beswick*.[50] The defendant had breached a contract with the plaintiff to make periodic payments to a third party. A judgment for nominal damages arguably would have constituted an accurate reflection of the plaintiff's own loss, but it would not have been adequate to meet the justice of the case. Accordingly, specific performance was granted. The question is whether a judgment for damages would put the claimant in a situation as beneficial to him or her as if the agreement were specifically enforced,[51] or, in other words, whether damages would provide a 'complete remedy'.[52] Thus, the courts have indicated that it is appropriate to consider whether the defendant for any reason is unlikely to satisfy a judgment for damages.[53] In that regard, if the reason that the defendant is unlikely to satisfy the judgment is insolvency, and the defendant has other creditors, the court may refuse to grant relief on the basis that specific performance would have the effect of preferring the claimant over the general body of creditors, if in fact there is no other reason apart from inadequacy of damages for granting relief.[54] But in the absence of that countervailing circumstance, the actual amount that the claimant is likely to receive in his or her hands as a result of a judgment for damages, in comparison to what the position would be if specific performance were granted, is a relevant factor. **9.10**

In the situation posited,[55] an award of damages would not constitute an adequate remedy to the insolvent purchaser's estate, even where the goods are readily available in the market at an ascertainable price. If the vendor were to perform his or her obligation and deliver the goods, the purchaser's estate would have the full benefit of the contract, and at the same time would only have to pay a dividend on the separate debt owing to the vendor. If, however, the purchaser is remitted to a claim for damages against the vendor after the vendor's repudiation, the vendor's liability for damages ordinarily should be capable of set-off against the debt, given that it is not an objection to a set-off that the vendor may have deliberately breached a contract in order to obtain a set-off.[56] The allowance of a set-off where none otherwise would be available may have a considerable effect on the funds available **9.11**

[49] *Benjamin's Sale of Goods* (12th edn, 2024), 1301 [17-096] n 763.
[50] [1968] AC 58.
[51] *Harnet v Yeilding* (1805) 2 Sch & Lef 549, 556; Spry, *Equitable Remedies* (9th edn, 2014), 61–2.
[52] *Adderley v Dixon* (1824) 1 Sim & St 607, 610, 57 ER 239, 240 (Sir John Leach).
[53] *Hodgson v Duce* (1856) 2 Jur NS 1014; *Evans Marshall & Co Ltd v Bertola SA* [1973] 1 WLR 349, 380–1; *The Oakworth* [1975] 1 Lloyd's Rep 581, 583. See also Horack, 'Insolvency and specific performance' (1918) 31 *Harvard Law Review* 702; Spry, *Equitable Remedies* (9th edn, 2014), 70–1.
[54] *Re Wait* [1927] 1 Ch 606. See also *Hewett v Court* (1983) 149 CLR 639, 658; *Gilgandra Marketing Co-Operative Ltd v Australian Commodity & Merchandise Pty Ltd* [2011] NSWSC 16 at [112]; Spry, *Equitable Remedies* (9th edn, 2014), 57 n 20, 71.
[55] See para 9.07 above.
[56] See para 8.112 above.

for distribution to the purchaser's creditors, and on that basis an award of damages would not put the purchaser and his or her creditors in a situation as beneficial as if the contract in question were specifically performed. As a matter of principle there is much to be said for the view that specific performance should be available in this situation, subject to other relevant discretionary considerations.

## C.   Set-off where Contracts Involve Non-Money Obligations

9.12   Consider that two companies, A and B, have entered into various contracts for the transfer or delivery of non-money assets to each other, such as commodities or securities, for a money consideration. For example, pursuant to a contract, entered into on, say, 1 January, A may have agreed to transfer non-money assets to B on 1 June, and under a second contract entered into on 30 January, B may have agreed to transfer other non-money assets to A on 1 June, in each case in consideration of payment to be made on the delivery date. However, on 1 April one of the parties, A, goes into liquidation.

9.13   Upon his or her appointment, A's liquidator has the ability to 'cherry pick' between contracts entered into by A, that is to say, to disclaim any contract which, because of movements in the market values, has become unprofitable to A[57] and keep on foot A's profitable contracts. If a contract is disclaimed, a person who sustains consequential loss or damage is deemed by the Insolvency Act[58] to be a creditor of the company to the extent of the loss, and accordingly may prove for the loss in the liquidation. If A's liquidator were to disclaim one contract with B as unprofitable but elect to perform another profitable contract, B may wish to set off its obligation arising under the continuing contract against its damages claim against the company in liquidation arising as a result of the disclaimer.

9.14   The set-off consequences would differ depending on which of the parties has the non-money obligation under the continuing contract. The situation posited is that a contract has been disclaimed by the A's liquidator because it is considered to be unprofitable. As a result, B has a damages claim against A which is provable in A's liquidation. However, the liquidator has not disclaimed a second contract, because this contract is considered to be profitable for A. In view of A's insolvency, B would not be obliged to perform its obligation under the second contract until A has first performed its own obligation.[59] If the liquidator accordingly performs A's obligation under the continuing contract, B may then assert that it can set off its resulting obligation to perform its side of the contract against the damages claim that it has against A arising from the disclaimer of the first contract.

9.15   Consider that A (in liquidation) has the non-money obligation under the continuing contract, while B's obligation is to make a money payment. It is suggested that B in this circumstance ordinarily should be entitled to a set-off in A's liquidation, since it has a money obligation that arose out of a contract entered into before the liquidation.[60] Alternatively, B

[57]   Pursuant to the Insolvency Act 1986, s 178. In the case of bankruptcy, see s 315. In Australia, see the Corporations Act 2001 (Cth), ss 568–568F, and for bankruptcy the Bankruptcy Act 1966 (Cth), s 133.
[58]   Insolvency Act 1986, s 178(6), and for bankruptcy s 315(5).
[59]   See Ex parte Chalmers, re Edwards (1873) LR 8 Ch App 289, and para 9.06 above.
[60]   The decision of Watkin Williams J in Ince Hall Rolling Mills Co Ltd v The Douglas Forge Co (1882) 8 QBD 179 is authority to the contrary. In that case, the liquidator of a supplier delivered goods to a purchaser pursuant to a

may have the non-money obligation. In such a case, the requirement of commensurability prima facie would mean that that obligation could not be employed in a set-off in A's liquidation. There would not be a 'sum due' for the purpose of the insolvency set-off section. The fact that the subject of the obligation (commodities or securities) has a readily ascertainable value on its own would not affect that conclusion.[61] B may seek to avoid that result by refusing to deliver and asserting a consequent liability in damages which, being a money claim, could be the subject of a set-off. This would then raise the issue of the availability to A's liquidator of an order for specific performance against B.[62] An argument that the court in its discretion should decline to order specific performance may be based upon two points. The first is the question of the adequacy of damages as a remedy, which was considered above.[63] The second is that the liquidator is refusing to perform A's own obligations under the disclaimed contracts. This may raise the question of mutuality, in the sense that, as a matter of discretion, the court ordinarily would not compel a defendant to perform his or her obligations specifically if it cannot at the same time ensure that any unperformed obligations of the claimant will be specifically performed, unless perhaps damages would be an adequate remedy for any default by the claimant.[64] A response to that would be that the stated proposition has in contemplation unperformed obligations under the contract sought to be specifically enforced, whereas in the situation considered disclaimed contracts are separate.[65]

In order to avoid any such perceived difficulties in a liquidation, B may seek to protect itself   9.16 against the consequences of 'cherry picking' by a future liquidator of A, should A go into liquidation before the performance dates of the contracts between them, by means of a close-out netting agreement with A. The question of the efficacy of close-out netting is considered later.[66]

## D.   Foreign Money, and Foreign Exchange Contracts

Much discussion of the requirement of commensurability has taken place in the context of   9.17 foreign exchange contracts. This is partly a consequence of the conflicting views that have been expressed as to the nature of foreign money.

The traditional view, as expressed by Dr Mann,[67] is that foreign money may function either   9.18 as money or as a commodity, depending on the circumstances. He said that foreign money should be regarded as money where it serves monetary functions, for example in the case

contract to sell a quantity of unascertained goods entered into before the liquidation. It was held that the purchaser was not entitled to a set-off in respect of its resulting liability for the price. However, the better view is that the Ince Hall case was wrongly decided. See paras 13.37–13.57 below.

[61]   See para 9.01 above.
[62]   See paras 9.07–9.11 above.
[63]   See paras 9.10–9.11 above.
[64]   Price v Strange [1978] Ch 337, 367–8 (Buckley LJ).
[65]   But contrast the 2002 ISDA Master Agreement for close-out netting, which provides that all Transactions subject of the Agreement form a single agreement. See para 16.47 below.
[66]   See paras 16.31–16.50 below. In Australia, see paras 16.65–16.80 below in relation to the Payment Systems and Netting Act 1998 (Cth).
[67]   Mann, The Legal Aspect of Money (5th edn, 1992), 191 et seq. Following the views expressed in Camdex International Ltd v Bank of Zambia [1997] 6 Bank LR 43, [1997] CLC 714, [1997] EWCA Civ 798 (see para 9.20 below), a different approach was adopted in later editions. See now Mann and Proctor on the Law of Money (8th

of a foreign currency debt.[68] However, in the particular situation in which foreign money is dealt in and quoted on the foreign exchange market, he considered that it is the object of commercial intercourse and therefore is a commodity.[69] In other words, it is similar to a contract to deliver so many tons of wheat. Nussbaum[70] and Rabel[71] expressed similar views. Nussbaum justified the conclusion by reference to the distinction between acting as a measure and being measured, between *mensura* and *mensuratum*. Money in a general sense is a standard or measure of the value of goods and services.[72] As a corollary, it is correct to say that the value of goods and services is measured by reference to money. Indeed, money has been described as the common denominator of value.[73] But while money is a measure, it is an abstract unit of measurement (in England, the pound sterling) which cannot be precisely defined.[74] Money as such is not measured by anything else. Money is *mensura*, not *mensuratum*.[75] Yet, when foreign money is sold or exchanged it is being measured. It is measured by its fluctuating exchange value against the fixed unit of account in which domestic money is denominated, the rate of exchange of a foreign currency being the price of that currency in terms of a country's own currency.[76] According to Nussbaum,[77] when foreign money is measured in that manner it has the character of a commodity.

**9.19**  The distinction drawn by Nussbaum between acting as a measure and being measured is not without difficulty.[78] Nevertheless, the view that foreign money when sold or exchanged

edn, 2022), 44–50 [1.90]–[1.97]. However, for the purpose of the discussion below of the traditional view advocated by Dr Mann, references to the fifth edition have been retained.

[68] See particularly the comments of Lord Radcliffe in *Re United Railways of Havana and Regla Warehouses Ltd* [1961] AC 1007, 1059–60.
[69] See Mann, *The Legal Aspect of Money* (5th edn, 1992), 191.
[70] See Nussbaum, *Money in the Law National and International* (1950), 340–4 for a discussion of foreign money in the context of a foreign currency debt, and at 24 (and see also at 319) in relation to foreign money functioning as a commodity when it is purchased or exchanged on the foreign exchange market.
[71] Rabel, *The Conflict of Laws* (2nd edn, 1964) vol 3, 26.
[72] Nussbaum, *Money in the Law National and International* (1950), 14, referred to in Mann, *The Legal Aspect of Money* (5th edn, 1992), 49.
[73] Nussbaum, *Money in the Law National and International* (1950),11.
[74] Mann, *The Legal Aspect of Money* (5th edn, 1992), 49, 86. As Nussbaum (*Money in the Law National and International* (1950), 14) put it in relation to the United States dollar, 'the dollar concept existing at any given time is as little susceptible of definition as, say, the concept of "blue"'.
[75] Nussbaum, *Money in the Law National and International* (1950) 28, and see also the discussion in Mann, *The Legal Aspect of Money* (5th edn, 1992), 43–9. Under the Bretton Woods Agreement, the 'par value' of the currency of each member was expressed in terms of gold, in the sense that the par value determined the price for the purchase and sale of gold. See Mann, *op cit*, 33–6. It is therefore correct to say that the par value constituted a measure. See Mann, *op cit*, 46. That system effectively had ceased to apply by 1973. See *Lively Ltd v City of Munich* [1976] 1 WLR 1004, 1010–3.
[76] See Mann, *The Legal Aspect of Money* (5th edn, 1992), 61.
[77] Nussbaum said (*Money in the Law National and International* (1950), 24) that, 'in special situations pieces of money are dealt with as commodities. This happens mainly in the matter of foreign exchanges. Ever since there has been a theory of money, it has been recognized that money may have a "second use", – namely, to be purchased or exchanged. In the language of Thomas Aquinas, money, if sold or exchanged, is "-measured, not a measure;" – "*mensuratum*," not "*mensura*". Its intrinsic or exchange value as distinct from the extrinsic or nominal (face) value is controlling in the situation. The latter value is a matter of the law; the former is the result of economic conditions. While the intrinsic value is subject to fluctuations, the extrinsic one is invariable.'
[78] Domestic money is not always used as payment for (and therefore as a measure of the value of) goods or services. For example, it may be transferred by way of gift. Further, parties to a contract may have agreed that what is admittedly a foreign currency debt (so that foreign money is functioning as money) nevertheless should be converted into (and in that sense measured against) domestic money at a specified exchange rate for certain purposes, for example because payment is to be made in domestic money, or in order to ascertain whether security 'top up' is required.

functions as a commodity has had support in the cases.[79] It is consistent with references to foreign exchange contracts in a number of cases in terms of a sale and purchase,[80] although, if the obligation on both sides of the contract was a foreign money obligation, the contract would have been more appropriately described as one of exchange, similar to a barter. In *Drexel Burnham Lambert International NV v El Nasr*[81] Staughton J described Swiss francs as the subject of forward contracts of sale and purchase as a commodity, and in New South Wales Lee J referred to the opinions of Mann and Nussbaum with evident approval when he held that a foreign exchange contract that made provision for physical delivery was a commodity agreement for the purposes of the Futures Industries Code formerly applicable in that jurisdiction.[82] While 'commodity' admittedly had a particular definition in the Code,[83] his Honour said that, 'it is a natural use of the word to apply it to foreign currency in circumstances in which it is dealt with in commercial transactions of the kind under consideration.'[84] On another occasion, Lord Radcliffe in the House of Lords[85] recognized that there is a distinction between, on the one hand, a contract to pay foreign money abroad in satisfaction of a debt and, on the other, 'a contract to deliver foreign currency in this country or abroad or a true exchange contract', which he defined as a contract to exchange the currency of one country for the currency of another. He specifically rejected the view that foreign currency debts payable abroad give rise to an obligation to deliver a commodity as opposed to an obligation to pay money. On the other hand, he seems to have regarded foreign exchange contracts as contracts for the delivery of a commodity. The distinction subsequently was recognized in New South Wales.[86]

However, that view as to the nature of foreign money is no longer current in England. In **9.20** *Camdex International Ltd v Bank of Zambia*[87] the Court of Appeal rejected the view that the foreign money obligation under a foreign exchange contract is not a money obligation, Simon Brown LJ commenting:[88]

> When indeed one asks for what purpose it is sought to categorise foreign exchange transactions variously as commodity or as money transactions one is lost for an answer. What in

[79] The following authorities are in addition to cases which have dealt with money in a bag, or specific coins. See eg *Taylor v Plumer* (1815) 3 M & S 562, 105 ER 721; *Moss v Hancock* [1899] 2 QB 111.
[80] *Re British American Continental Bank Ltd (Goldsdorf and Penso's Claim)* [1922] 2 Ch 575, 586 (Warrington LJ: 'The subjects of these contracts for sale and purchase were sums of foreign currency'); *Bank of India v Patel* [1982] 1 Lloyd's Rep 506, 508, 509, and on appeal [1983] 2 Lloyd's Rep 298, 299, 302; *Isaac Naylor & Sons Ltd v New Zealand Co-operative Wool Marketing Association Ltd* [1981] 1 NZLR 361, 366.
[81] [1986] 1 Lloyd's Rep 356.
[82] *Shoreline Currencies (Aust) Pty Ltd v Corporate Affairs Commission (NSW)* (1986) 10 ACLR 847. See also *Carragreen Currency Corporation Pty Ltd v Corporate Affairs Commission (NSW)* (1986) 11 ACLR 298; *Corporate Affairs Commission (NSW) v Lombard Nash International Pty Ltd* (1986) 11 ACLR 566, 569 ('there is a bet made on the relative price of a commodity, such as currency, gold or platinum').
[83] 'Commodity' was defined in s 4 of the Futures Industries Code as 'a thing that is capable of delivery pursuant to an agreement for its delivery; or … an instrument creating or evidencing a thing in action'.
[84] (1986) 10 ACLR 847, 855.
[85] *Re United Railways of Havana and Regla Warehouses Ltd* [1961] AC 1007, 1059–60.
[86] *Daewoo Australia Pty Ltd v Suncorp-Metway Ltd* (2000) 48 NSWLR 692 at [33]. See also *Conley v Commissioner of Taxation* (1998) 81 FCR 24, 28 (Davies J) (referred to in *Sturdy Components Pty Ltd v Burositzmobelfabrik Friedrich W Dauphin GmbH* [1999] NSWSC 595 at [22]–[25]), where Dr Mann's view (see para 9.18 above) was referred to with evident approval. The distinction between acting as a measure and being measured (see para 9.18 above) was implicitly recognized by Dixon CJ in *Caltex Ltd v Federal Commissioner of Taxation* (1960) 106 CLR 205, 220: 'In many respects the money of another country must be treated in point of law like goods. It is not currency of this country and it is not a measure of value in this country.'
[87] [1997] 6 Bank LR 43, [1997] CLC 714, [1997] EWCA Civ 798 (17 Jan 1997).
[88] [1997] 6 Bank LR 43, 51–2, [1997] CLC 714, 725.

other words is the point of the distinction ... Of course if one is concerned with rare coins or the manufacture of bank notes or something of that kind, money may indeed be a commodity rather than a medium of exchange. But where, as is the usual case, the obligation in question is simply the payment of a stipulated sum in a stipulated currency, then, whether that obligation arises from a loan, a sale, or any other contract or set of circumstances, it is an obligation properly described as one of debt.

Similarly, Phillips LJ said:[89]

> In my judgment, where a contract expressly provides for the payment of a sum in a foreign currency, the obligation is a money obligation and breach of it gives rise primarily to a claim in debt, whether the obligation is by way of repayment of money loaned, payment for goods or services or payment for other currencies.
>
> So far as the last type of contract is concerned, I recognise that an exchange transaction is *sui generis*, but its true nature is the incurring of mutual money obligations, not the barter of commodities.

**9.21**   It has been suggested that the view adopted in the *Camdex* case may give rise to difficulties in some situations.[90] Nevertheless, the reasoning in the case is likely to be followed.[91] Because the foreign money obligation in a foreign exchange contract is a money obligation, it should be available for a set-off in the liquidation of either party where a contract has not been disclaimed, and in that context the analysis set out above in relation to contracts dealing with non-money obligations[92] should not apply.

---

[89] [1997] 6 Bank LR 43, 57, [1997] CLC 714, 733.
[90] Brindle and Cox (eds), *Law of Bank Payments* (5th edn, 2018), 35–9 [2-009]–[2-014].
[91] In Australia, compare *Daewoo Australia Pty Ltd v Suncorp-Metway Ltd* (2000) 48 NSWLR 692 at [33], where Austin J affirmed the view (without reference to the *Camdex* case) that the foreign money obligation under a foreign exchange contract is not a money obligation. However, the discussion in the *Camdex* case was referred to with approval in *Georges v Seaborn International* [2012] FCA 75, (2012) 288 ALR 240 at [98]–[100], without reference to *Daewoo*.
[92] See paras 9.12–9.16 above.

---

# 10

# TRUST FUNDS

| | | | | |
|---|---|---|---|---|
| A. | Introduction | 10.01 | (2) Set-off against a trust fund | 10.38 |
| B. | Insolvency Set-off | 10.02 | (3) Deceased's insolvent estate | 10.39 |
| | (1) The general principle | 10.02 | (4) Proceeds received before the debtor's insolvency | 10.41 |
| | (2) Express stipulation for a trust | 10.04 | | |
| | (3) Dissipation of the trust fund | 10.05 | (5) Proceeds received after the debtor's insolvency | 10.44 |
| | (4) An apparent exception: *Rose v Hart* | 10.06 | (6) Criticism of the cases | 10.46 |
| C. | Statutes of Set-off | 10.07 | G. Special-Purpose Payments | 10.47 |
| D. | Equitable Set-off | 10.11 | (1) Failure of the purpose | 10.47 |
| E. | Authority to Turn Property into Money: *Rose v Hart* | 10.13 | (2) Residue remaining after the purpose is carried out | 10.48 |
| | (1) The general principle | 10.13 | (3) Collection of the proceeds of a negotiable instrument | 10.49 |
| | (2) The circumstances in which the set-off applies | 10.22 | (4) The justification for denying a set-off | 10.50 |
| F. | Surplus Proceeds after Realizing a Security | 10.36 | (5) Bank accounts, and other debt relationships | 10.54 |
| | (1) Mortgagee's right of retainer, and tacking | 10.37 | (6) The principle rephrased | 10.57 |

## A.  Introduction

The subject of discussion in this chapter is the question whether, and if so under what circumstances, the obligation of a person who holds a fund impressed with a trust to account for the trust fund may be the subject of a set-off against a debt owing to that person in his or her personal capacity. It should be distinguished from the situation in which a beneficiary of a trust is obliged to contribute to the trust fund. That situation is not one of set-off, but rather the application of a principle known as the rule in *Cherry v Boultbee*,[1] which is considered later.[2]   **10.01**

## B.  Insolvency Set-off

### (1)  The general principle

If T holds a sum on trust for B, and B becomes bankrupt, T must account for the trust fund to B's trustee in bankruptcy without a set-off in respect of an independent debt owing by   **10.02**

---

[1] (1839) 4 My & Cr 442, 41 ER 171.
[2] See Ch 14 below.

# Exhibit 68

| | |
|---|---|
| **From:** | Daniel Friedberg[dan@ftx.com] |
| **Sent:** | Fri 6/17/2022 12:25:27 AM (UTC) |
| **To:** | Ryne Miller[ryne@ftx.us] |
| **Subject:** | Fwd: Regarding your line of credit on FTX |

fyi

---------- Forwarded message ---------
From: **Zane Tackett** <zane@ftx.com>
Date: Thu, Jun 16, 2022 at 7:06 PM
Subject: Fwd: Regarding your line of credit on FTX
To: Nishad Singh <nishad@ftx.com>, Daniel Friedberg <dan@ftx.com>, Sam Bankman-Fried <sam@ftx.com>, Can Sun <can@ftx.com>

Cheers,
Zane Tackett

---------- Forwarded message ----------
From: Zane Tackett <zane@ftx.com>
Date: Tuesday, June 14 2022 at 11:53 AM EDT
Subject: Regarding your line of credit on FTX
To: kyle@threearrowscap.com

3AC,

Your account is in an undesirable state. We've tried to reach you several times: consider this something like a final warning.

As per the Line of Credit agreement you signed, we have the right to request information from you to assess your continued eligibility for the LOC at any time, and have the right to remove the it at any time.

Currently your account has about $13m in value outside of your $120m line of credit. Note that, per section 5 of our Line of Credit agreement, you are obligated to maintain 200% of the line of credit ($240m) in your account at all times, and that FTX has the right to charge 10%/day on any shortcomings there. You are currently $227m short on this obligation, and so FTX has the right to charge you $22.7m/day. Further, we noticed that last night around 4AM ET, you did not respond to our inquiries and withdrew even more from your account, thereby actively becoming even more delinquent on your obligation and acting against the spirit of our agreement.

We will remove your $120m line of credit in whichever comes sooner: 6pm ET, your account reaching $3m of value. If the state of your account does not change substantially, this will result

in you being levered long crypto on FTX: negative USD, positive crypto. And depending on the state of that leverage, your account may be liquidated.

These are busy times. We know that you are likely overwhelmed with short-term responsibilities. Separate from this discussion, if you wanted to discuss financial relief options for your firm as a whole, we would be open to a conversation there. If you did want to pursue this route, we'd want a conversation with your CEO to assess the situation very shortly.

Cheers,
Zane Tackett

# Exhibit 69

This is a PDF of the original 36th Ed. main work

# PART V—TRUSTS

CHAPTER 21

## DEFINITION AND CLASSIFICATION OF TRUSTS

CONTENTS

1. THE CORE CASE OF THE TRUST ........................ 21-001
   1. Definition .................................... 21-001
   2. Parties to Trust Relationship .................... 21-007
   3. Variants on Core Case ......................... 21-012
   4. Functional Approach to Ownership of Trust Property ... 21-016
2. CLASSIFICATIONS ................................. 21-017
   1. Express, Resulting and Constructive Trusts .......... 21-018
   2. Kind of Legal Event Creating the Trust ............. 21-023
   3. Bare and Special Trusts ........................ 21-027
   4. Private and Public Trusts ....................... 21-030
   5. Executed and Executory Trusts ................... 21-031
   6. Completely and Incompletely Constituted Trusts ...... 21-032
3. TRUSTS COMPARED WITH OTHER RELATIONSHIPS ............ 21-033
   1. Bailment .................................... 21-034
   2. Fiduciary Relationships ........................ 21-035
   3. Agency ..................................... 21-036
   4. Contract .................................... 21-037
   5. Power ...................................... 21-040
   6. Administration ............................... 21-047
   7. The Crown .................................. 21-056

1. THE CORE CASE OF THE TRUST

### 1. Definition

**(a) General features.** The general feature of an English trust is that a person **21-001** in whom property is vested (called the "trustee") is compelled in equity to hold the property for the benefit of another person (called the "beneficiary"), or for some legally enforceable purposes other than his own. In the case of an express trust arising from a settlor's intentions, the conscience of the trustee is bound to give effect to the entitlements of the beneficiary or to carry out the purposes for which the property was vested in him. In the case of many trusts arising by operation of law, the trust is imposed upon the trustee to prevent him from benefiting unconscionably from his ownership of the property.[1]

_____

[1] *Westdeutsche v Islington LBC* [1996] A.C. 669 at 705, 709; *Guardian Ocean v Banco do Brasil*

DEFINITION AND CLASSIFICATION OF TRUSTS

In explaining the nature of a trust it is simplest to begin with the core example of a private express settlement of property. Some of the important variants on that example may then be introduced.

**21-002**    **(b)    Equitable rights enforceable against trustee and trust property.**    The effect of a trust is to divide the incidents of ownership of the property between the trustee and the beneficiary. The legal ownership vests in the trustee. As legal owner, the trustee enjoys the usual powers of enjoyment and disposition that are incidents of property of that kind. The trustee may, for example, transfer or charge the property as effectively in law as if he had been the entire owner of it. The trustee has the general liberty of a legal owner to deal with the property as he wishes, subject to the restraints of statute and the general law. He generally has the same freedom as any other legal owner to deal with his property as he wishes without having to account for his reasons or purposes in dealing with it.

But when a person holds property as trustee he is treated in equity as taking it subject to the beneficiary's equitable rights, as defined by the general law and stipulated in the trust instrument. The existence of this feature is generally sufficient for the relationship to be defined as a trust.[2] Since historically those entitlements would only have been recognised in equity, the division in the incidents of ownership is explained as a split in the legal and equitable title to the property.

**21-003**    **(c)    Content of equitable title.**    The beneficiary's equitable title consists in the totality of his equitable rights against the trustee and third parties in respect of the trust property. Since some of the beneficiary's rights are binding on third parties, his title to the trust property is analysed as a proprietary interest.

Against the trustee, the beneficiary's most important right is to hold the trustee accountable for his management of the trust fund and to require the trustee to administer it according to the terms of the trust.[3] The beneficiary can compel the trustee to distribute the economic benefits derived from the trust assets according to the terms of the trust. The beneficiary also has a limited right to control the reasons or purposes that inform the trustee's discretions in dealing with the property.[4]

Against third parties, however, the beneficiary cannot enforce the full range of duties that the original trustee owed to him. Those duties are only binding on the person who assumes the office of express trustee to the beneficiary. His right against a third party consists in a power to make him reinstate the trust property to the trustee if the trustee has transferred it without proper authority under the trust.[5]

---

[1994] 2 Lloyd's L.R. 152. It has been said that since the existence of the trust depends on the trustee's conscience being affected, a person cannot be a trustee of property if and so long as he is ignorant of the facts alleged to affect his conscience: *Westdeutsche v Islington LBC* at 705, 709. This may be questioned in the case of resulting trusts, which depend for their creation on presumptions about the settlor's intentions, not the trustee's: See P.J. Millett (1998) 114 L.Q.R. 399 at 412.

[2]    *Westdeutsche v Islington LBC* [1996] A.C. 669 at 707; *Don King Productions v Warren* [2000] Ch. 291 at 317, per Lightman J; affirmed by the CA; cf. *Hardoon v Belilios* [1901] A.C. 118 at 123, per Lord Lindley. See also *R. v Chester Legal Aid Office, Ex p. Floods* [1998] 1 W.L.R. 1496 at 1500, per Millett LJ describing this as raising a "semantic question"; and P.J. Millett (1998) 114 L.Q.R. 399 at 403–404.

[3]    *Target Holdings Ltd v Redferns (a firm)* [1996] A.C. 421 at 434; *AIB Group (UK) Plc v Mark Redler & Co Solicitors* [2014] UKSC 58 at [64].

[4]    See para.10-017 above.

[5]    See para.30-050 below.

**(d)  Source of beneficiary's equitable rights.**  The beneficiary's equitable rights  **21-004**
are defined in the trust instrument and the general law.[6] They determine the trustee's
equitable powers and duties over the trust property. These powers and duties may,
however, best be analysed as equitable limitations on the trustee's legal ownership
of the property.[7] The reason is that if the trustee entered into a transaction that
exceeded his equitable powers, then the transaction would be void in equity and
possibly a breach of trust. The beneficiary might then have an equitable action to
recover the property or a claim against the trustee to make good any losses result-
ing from his breach.[8] But the invalidity of the transaction in equity would not af-
fect its validity at law. The trustee would have the legal power to enter into the
transaction owing simply to his status as the legal owner of the trust property.

   The main source of the trustee's powers and duties is the trust instrument. It
defines the terms of the "trust bargain" between the settlor and the trustee, and the
nature of the beneficiary's interest in the trust fund.[9] The general law is relevant
where the trust instrument is silent or where it provides mandatory rules that over-
ride the provisions of the trust instrument.

**(e)  Irreducible core.**  An express trustee owes an "irreducible core" of duties  **21-005**
under the general law.[10] The settlor cannot modify or exclude these duties if the
institution he seeks to create is to be recognised as a trust. These include a duty to
know and perform the trust terms; to act honestly in the beneficiaries' best interests;
to exercise some independent discretion in carrying out his powers; and to be practi-
cally accountable to the beneficiaries for the management of the trust assets. The
settlor cannot include terms in the trust instrument that conflict with the irreduc-
ible core of trustee duties. If he does, then the term is either void (because it is
incompatible with the settlor's general intention to create a trust) or it indicates an
intention to enter into a transaction that the court will not give effect to as a trust.
The purported trust may be void on the ground that it is illusory or because the
document appearing to create it is a sham.[11]

**(f)  Trust property.**  An essential feature of a trust is that there should be  **21-006**
property vested in the trustee. This feature is often sufficient to distinguish the of-
fice of trustee from that of agent.[12] There are some situations, however, where a
person who has neither received nor is in possession of property may be called a
"constructive trustee". An example is where a third person incurs liability to the
principal in a fiduciary relationship by assisting the fiduciary to breach his duties.[13]
The description of such a person as a trustee is strictly inaccurate. He may not have
received any relevant property which belonged to the beneficiary. The description
of the defendant as a trustee is merely a formula to describe his equitable liability

---

[6]  The most important statutory sources of trustees' powers are the Trustee Act 1925 and Trustee Act
2000.
[7]  See R.C. Nolan (2006) 122 L.Q.R. 232; and (2006) 1 J. of Eq. 18.
[8]  See Ch.30.
[9]  See J. Langbein (1995) 105 Yale L.J. 625.
[10]  *Armitage v Nurse* [1998] Ch. 241; *Citibank NA v QVT Financial LP* [2007] EWCA Civ 11; [2007]
1 C.L.C. 113; and A Hofri-Winogradoff (2023) 139 L.Q.R. 311.
[11]  See Ch.22.
[12]  See para.21-036 below.
[13]  See para.30-077.

DEFINITION AND CLASSIFICATION OF TRUSTS

to account for the losses caused by his wrongful conduct.[14] Accordingly, such a person will not be described as a trustee in this book.[15]

The beneficiary has an equitable proprietary interest in the trust property. The effect is to segregate the property that the trustee holds for the trust from other property that he holds beneficially for himself. The trust property operates as a separate patrimony which is not liable to the debts incurred by the trustee in his personal capacity.[16] The trustee's personal creditors have no claim to the trust property if the trustee becomes insolvent. The beneficiaries may trace and recover trust property that has been paid to a third party in excess of the trustee's equitable powers. The effect is to reconstitute the original fund of trust property.[17]

Although every beneficiary of a private trust may be said to have an equitable interest in the trust property, the content of that interest in may, in some instances, be highly attenuated. For example, the potential beneficiary of a discretionary trust has no vested interest any ascertainable part of the trust fund before the trustee makes an appointment to him.[18] His only right is to be considered by the trustee for a discretionary appointment from the fund. The beneficiary's interest is proprietary only in the limited sense that it would entitle the beneficiary to restrain the trustee from making an unauthorised application of property from the fund. The beneficiary would also have a sufficient title to require any third party who wrongfully received the property to reinstate it to the trustee.

The trustee does not always have the legal interest in the property. His interest may be equitable only, as where a beneficiary under a settlement creates a trust of his interest while the legal ownership is still in the hands of the trustees of the settlement, or where for some other reason the legal estate is outstanding. The effect is to create a sub-trust.[19] As a matter of law the intermediate beneficiary remains a party to the former settlement and a trustee to the ultimate beneficiary. But where the sub-trust is a bare trust the trustees of the original settlement may find it more convenient to deal directly with the beneficiary of the sub-trust.[20]

## 2. Parties to Trust Relationship

**21-007**    The key parties to the express trust relationship are the trustee, the beneficiary, and the settlor or testator. Sometimes a trust may also have a protector.

**21-008**    **(a)  Trustee.**  The trustee is the person who generally owns the trust property.[21] He manages and deals with the trust assets for the beneficiary according to his limited equitable powers. The trustee's interest in the trust assets is described as a

---

[14]  *Paragon Finance Plc v Thakerer & Co* [1999] 1 All E.R. 400 at 408–409; *Dubai Aluminium Co Ltd v Salaam* [2003] 2 A.C. 366; [2002] UKHL 48 at [38]–[42].

[15]  See further para.26-004 below.

[16]  G.L. Gretton (2000) 49 I.C.L.Q. 599 at 608–617; K.G.C. Reid (2000) 8 European Review of Private Law 427.

[17]  See para.30-050.

[18]  See para.22-005.

[19]  See, e.g. *Gilbert v Overton* (1864) 2 H. & M. 110. For "sub-trusts", see P. Matthews, *Scott on Trusts*, 4th edn (Aspen Publishers, 2006) para.10.7; [2005] P.C.B. 335.

[20]  *Nelson v Greening & Sykes (Builders) Ltd* [2007] EWCA Civ 1358; [2008] 1 E.G.L.R. 59.

[21]  The exception is where the trustees enter into a custodianship or custodian trusteeship arrangement. The trust property or any documents of title may be deposited with a custodian or vested in a custodian trustee. The management of the trust property or exercise of any trustee powers remains in the managing trustees: Trustee Act 2000 s.17; Public Trustee Act 1906 s.4.

"bare title" since he is generally barred by the equitable limits on his ownership of the trust assets from deriving any economic benefit from them.

**(b)    Beneficiary.**    The beneficiary is the legal person for whose benefit the trustee administers the trust assets.[22] He has equitable rights to make the trustee account to him for the economic benefits derived from the trust assets, whether individually or collectively with the other beneficiaries. He is the beneficial owner of those assets only to the extent of his entitlements defined in the trust instrument or under the general law. The residue of beneficial ownership is in the trustee to the extent that it is not defined to be in the beneficiary. This follows from the trustee's legal ownership of the trust property.    **21-009**

**(c)    Settlor or testator.**    The settlor or the testator is the person who creates the trust. He defines the terms of the trustee's powers and duties and constitute the trust by vesting the trust assets in the trustee. The word "settlor" is used for a person who creates a trust in an inter vivos transaction. It is not used of a person who creates a trust by will. The usual term "testator" or "testatrix" is used for such a person.    **21-010**

**(d)    Protector.**    Some trusts also have a protector.[23] This person, who is neither a trustee nor generally a beneficiary of the trust, has limited powers defined in the trust instrument to oversee the trustee's administration of the fund. These may include the power to give essential consents to the effective exercise of the trustee's powers, to appoint or remove trustees, or to approve the trustee's remuneration. The distinct office of protector is now formally recognised in some offshore jurisdictions.[24] But even in English law, functions like those of a protector have long been exercised by people who have been authorised to take a part in administering a trust.    **21-011**

### 3.    Variants on Core Case

Not all trust relationships involve trustee powers and duties arising from an express transaction and actionable by a beneficiary.[25] Outside the core case of the private express trust, either of these features may be absent.    **21-012**

**(a)    Trust arising by operation of law.**    Not all trusts arise through the express intention of a settlor or testator to create a trust. Some trusts arise by operation of law once certain facts have happened. These are constructive trusts and resulting trusts. The distinction between express trusts and those arising by operation of law can be a fine one. For example, a constructive trust often arises to give effect to an informal agreement between the trustee and the beneficiary.[26]    **21-013**

---

[22]    The beneficiary must be a human being. A trust for an animal is a purpose trust since the animal lacks the standing to enforce the trust.

[23]    D. Harnett and W. Norris [1995] P.C.B. 109; A. Duckworth [1996] P.C.B. 169, 245, 328.

[24]    For example Trustee Act 1998 (Bahamas) ss.3, 81; Trustee Ordinance 1961 (British Virgin Islands) s.86.

[25]    P.J. Millett (1998) 114 L.Q.R. 399 at 403–406. cf. *Westdeutsche v Islington LBC* [1996] A.C. 669 at 705–707.

[26]    See Ch.24.

**21-014**    **(b)    No equitable powers.**    A trustee may sometimes hold property for a beneficiary without having any equitable powers of management over it and without owing any fiduciary duties to the beneficiary in respect of it. An example is a constructive trust imposed on a person to strip him of the benefits of his fraud against the claimant.[27] This relationship, though called a trust, is a really device to give effect to the claimant's entitlement to a proprietary remedy to recover the proceeds of the fraud.

**21-015**    **(c)    Trust for purpose without beneficiary.**    Some trusts do not have a beneficiary. A trustee may hold property to give effect to some purpose defined by the trust instrument or by the general law. In general, the only kind of valid purpose trust recognised in English law is the charitable trust.[28] In the absence of beneficiaries, the Attorney General or the Charity Commissioners have standing to enforce the trustee's equitable duties. Although there are no beneficiaries with equitable interests in the trust property, the property is nonetheless ring-fenced from the claims of the trustee's personal creditors.

## 4.    Functional Approach to Ownership of Trust Property

**21-016**    If, for example, T holds income from property on trust for B, it may be difficult to say who is the "real owner" of the income. Either B is to be regarded as the real owner of the income as it accrues (subject to T's right to deduct expenses),[29] or T is to be regarded as the real owner with B merely having a right to compel T to account to him for the balance due.[30]

But to ask who is the "real owner" may oversimplify the relationship: the question presupposes a universally applicable conception of ownership and a single conception of trust. It is better to approach the question in functional terms. The incidents of ownership are split between the trustee and the beneficiary according to the terms of the particular trust. The nature and extent of their entitlements cannot be determined in the abstract without referring to the terms of the trust instrument.[31]

The relevant conception of ownership may also depend on the purpose of the question. In determining, for example, whether an express trustee is the real owner of property, it may be more productive to ask whether, and to whom, he is accountable for his management of the property, and whether he owes a fundamental duty not to act dishonestly.[32] If he does, it can be said, at least negatively, that the trustee is not the "real" owner of the property. The beneficial incidents of the property may be divided among many different trust claimants or held in suspense.[33] The terms of tax legislation, rather than any abstract conception of ownership, may determine

---

[27]   See para.26-011.

[28]   See Ch.23. For the approach offshore, see para.22-034.

[29]   *Baker v Archer-Shee* [1927] A.C. 844 (B the real owner for income tax purposes); *Corbett v Commissioners of Inland Revenue* [1938] 1 K.B. 567 at 577; *Nelson v Adamson* [1941] 2 K.B. 12.

[30]   *Schalit v Joseph Nadler Ltd* [1933] 2 K.B. 79 (B not entitled to distrain for rent due under lease of trust property granted by T).

[31]   *CPT Custodian Pty Ltd v Commissioner of State Revenue* [2005] HCA 53; (2005) 79 A.L.J.R. 1724.

[32]   D.J. Hayton, Ch.3 in A.J. Oakley (ed), *Trends in Contemporary Trust Law* (1996); *Armitage v Nurse* [1998] Ch. 241.

[33]   Purpose trusts illustrate the possibility that a trustee may hold property without any other person having beneficial rights to it (see para.21-015 above). To suspend the beneficial ownership may be the

whether a beneficiary is to be treated as having a sufficient interest in the trust to be liable to tax.[34] Similarly, the terms of company or insolvency legislation may require a court to inquire whether a trustee or beneficiary is entitled to exercise the voting rights or voting power attaching to shares held on trust. To ask who is the "real owner" of the shares without considering the purpose and context of the question would be simplistic.[35]

## 2. CLASSIFICATIONS

Trusts may be classified in various ways. None of these classifications is absolute or mutually exclusive. Any one trust may be open to more than one classification, depending on the aspect of the relationship that is in issue. So, for example, it will be seen that a trust may be categorised as "constructive" in that it arises by operation of law, irrespective of the intentions of the owner of the property, and at the same time as "bare" in that it imposes no active duties of management on the trustee. An express trust, which arises through the intention of the settlor to create it, may either be public or private in its purposes. This section describes the more important forms of classification. **21-017**

## 1. Express, Resulting and Constructive Trusts

A classification of trusts in these terms refers to the degree to which the trust arises through the expression of a settlor's actual intention to create it, or by operation of law and irrespective of the settlor's intentions. The distinction is often a fine one, and depends on a close analysis of the relevant transaction.[36] **21-018**

**(a) Express trust.**[37] An express trust is created by the actual intention of the person in whom the property is vested, as where A declares himself a trustee of Whiteacre for B, or conveys it to C on trust for B. The intention may be apparent from the express use of the words "trust" in the relevant instrument or gathered by inference from A's words or conduct. **21-019**

**(b) Resulting trust.**[38] A resulting trust arises by operation of law, though in response to a legal presumption about the intentions of the person who transfers the property which becomes subject to the trust. If A transfers property to B when it is unclear whether A intends B to have the beneficial interest in it, then B may hold the property on resulting trust for A. The trust arises by operation of law to give effect to a presumption that A did not intend B to take the property beneficially. **21-020**

---

very reason why the settlor vested the property in the trustee: D.J. Hayton (2001) 117 L.Q.R. 96; and P. Matthews, Ch.1 in A.J. Oakley (ed), *Trends in Contemporary Trust Law* (1996).

[34] *Gartside v IRC* [1968] A.C. 553 at 617–618, per Lord Wilberforce; *CPT Custodian Pty Ltd v Commissioner of State Revenue* [2005] HCA 53; (2005) 79 A.L.J.R. 1724. See generally D.M.W. Waters (1967) 45 Can. Bar Rev. 219.

[35] For example *Re Kilnoore Ltd (in liquidation)* [2005] EWHC 1410 (Ch); [2005] 3 All E.R. 730.

[36] See, e.g. *Cook v Fountain* (1676) 3 Swans. 585; *Soar v Ashwell* [1893] 2 Q.B. 390; *Re Llanover SE* [1926] Ch. 626; G.P. Costigan (1914) 27 Harv.L.R. 437.

[37] See Chs 22, 23.

[38] See Ch.25.

DEFINITION AND CLASSIFICATION OF TRUSTS

**21-021** **(c)  Constructive trust.**    A constructive trust is imposed by operation of law, rather than through the express or presumed intention of the owner of the property to create a trust or to retain any beneficial interest for himself. The trust may even arise contrary to the actual intentions of the owner, as where a person in a fiduciary position makes an unauthorised profit for himself, which equity then requires him to hold on constructive trust for his principal.[39] In other cases, the distinction between constructive and express trusts is less clear. So a constructive trust may be imposed on property to give effect a person's intention to make a gift to another or to act as an express trustee, but where the formalities necessary to give effect to the gift or the express trust have not been fully complied with.[40]

**21-022** **(d)  Significance and practical limits of distinction.**    The distinction between trusts which are express on the one hand, and resulting and constructive on the other, may be important in two main ways.

First, the formal requirement that a trust of an interest in land must be evidenced by signed writing only applies to express trusts. Since resulting and constructive trusts arise by operation of law, they may be enforced in the absence of writing.[41]

Secondly, the duties of an express trustee are typically more extensive than those of a resulting or constructive trustee. The office of express trustee is intentionally undertaken by the trustee. He should therefore enjoy the range of administrative powers and duties defined by the general law that are incidents of his office.[42] He should also be bound by fiduciary duties in exercising those primary powers.[43]

The duties of a resulting or constructive trustee are minimal. He is often no more than a bare trustee so that his only duty is to convey the property as the beneficiary directs. However, this is not necessarily the case. Statute defines the powers and duties of trustees of land, whether express, resulting or constructive, bare or active.[44] A constructive trustee who has intentionally assumed his office, such as a secret trustee, but whose undertaking is not directly enforceable for want of formality, may have the same range of powers and duties as an express trustee.[45]

## 2.  Kind of Legal Event Creating the Trust

**21-023**    A trust may be classified according to the distinction between rights arising through an actual intention, wrongful conduct and other events. In this way, it corresponds in part to the organisation of private law obligations into those arising by consent, wrongs, unjust enrichment and other events.[46]

**21-024** **(a)  Intention and wrongs.**    This distinction between trusts arising through intent and through wrongs does not correspond perfectly to the distinction between express trusts on the one hand, and resulting and constructive trusts on the other.

---

[39] For fiduciaries, see Ch.7, and for trusts arising from wrongs, see Ch.26.
[40] See para.24-005.
[41] LPA 1925 s.53(1)(b), (2).
[42] Trustee Act 2000.
[43] P.J. Millett (1998) 114 L.Q.R. 399 at 405.
[44] Trusts of Land and Appointment of Trustees Act 1996 s.1(2).
[45] See para.24-023. See *Paragon Finance Plc v DB Thakerar & Co* [1999] 1 All E.R. 400 at 409, per Millett LJ.
[46] See A.S. Burrows (ed), *English Private Law*, 2nd edn (OUP, 2007), vol.1 pp.xxxvii–xliii. P. Birks, *The Classification of Obligations* (Clarendon Press, 1997), Ch.1.

CLASSIFICATIONS

It has been seen that express trusts and resulting trusts arise through the expression of the settlor's intention or through default rules about a person's intention when he transfers property to another. Moreover, some kinds of constructive trust give effect to informal expressions of a person's intention to make a gift of property or to create an express trust which would otherwise be void or unenforceable.[47]

Trusts that arise through a person's wrongful conduct tend to be classified as constructive. A constructive trust commonly arises where it would be unconscionable for the owner of property to assert his own beneficial ownership in the property and deny the beneficial interest of another.[48] The effect of the trust is to make the defendant give restitution of property that he had acquired by an equitable wrong, as where a trustee makes a profit in breach of fiduciary duty to his beneficiary,[49] or where a person acquires property by committing a fraud against the claimant.[50]

**(b)    Unjust enrichment and resulting trusts.**    It has been argued that resulting trusts arise to reverse unjust enrichment: in the situations where a recipient of money is liable in a personal action at common law for unjust enrichment, such as mistake or failure of consideration, the payer does not intend to pass his beneficial interest in the money to the recipient. It has been argued therefore that a resulting trust should arise in those situations.[51] The decided cases have not accepted this view, and it is not relied upon to explain the classification of trusts in this book. In many instances, a person may intend to pass the beneficial interest in money even though the payment is made by a mistake or for a failed consideration.[52] The recipient of the money could therefore rebut any presumption that a resulting trust arose for the payer.    **21-025**

**(c)    Significance and practical limits of distinction.[53]**    The distinction between legal events is not absolute. A classification based on different types of legal event is only useful if it is treated as a general description of many particular instances of trusts. Since the reasons for recognising the existence of a trust are pragmatic rather than conceptual, any one trust may show features of more than one category of legal event. So a secret trust of property may give effect to the testator's informal intention to make a devise or bequest on death. But it also serves the policy of preventing the secret trustee from fraudulently relying on the informality of the testator's gift to take a personal benefit which the testator did not intend him to have.[54]    **21-026**

## 3.    Bare and Special Trusts

**(a)    Bare trust.**    A bare (or simple)[55] trust is one where property is vested in one person on trust for another, but where the trustee owes no active duties arising from    **21-027**

---

[47] See paras 24-005, 24-041.
[48] *Paragon Finance Plc v Thakerer & Co* [1999] 1 All E.R. 400 at 408–409, per Millett LJ.
[49] See para.7-057.
[50] See para.26-011.
[51] See R. Chambers, *Resulting Trusts* (1997); P.J. Millett (1998) 114 L.Q.R. 399 at 408–411.
[52] *Westdeutsche Landesbank Girozentrale v Islington LBC* [1996] A.C. 669 at 708–709, per Lord Browne-Wilkinson. See para.25-002 below.
[53] P. Jaffey, *Private Law and Property Claims* (2007) Ch.1.
[54] See para.24-030.
[55] See generally P. Matthews [2005] P.C.B. 266, 335; and *Re Cunningham and Frayling* [1891] 2 Ch.

his status as trustee. His sole duty is to convey the trust property as the beneficiary directs him. An example is where property is transferred to T "on trust for B absolutely". In such a case, T's sole duty is to allow B to enjoy the property and to obey any direction he may give as to how the property should be disposed of.

21-028 **(b)  Special trust.**  A special trust, on the other hand, is one where the trust itself imposes duties of active management on the trustees, e.g. a trust for sale, or a trust for a life tenant and remainderman. The great majority of express trusts are thus "special". Such trusts may be either fixed or discretionary. In a fixed trust the settlor defines in the instrument the entitlements of the beneficiaries. In a discretionary trust, the settlor defines a range of potential objects of the trust but allows the trustee a discretion to select which of them should receive property from the trust.

21-029 **(c)  Significance and practical limits of distinction.**  Although the defining feature of a bare trust is that the trustee owes no active duties as trustee, he may nonetheless owe active contractual duties to him. This would happen, for example, where a solicitor employed under a contract of retainer holds money for his client on a bare trust.[56] Despite their apparent similarities, the features of a bare trust are strictly distinguishable from the rights of a beneficiary under the rule in *Saunders v Vautier*.[57] The beneficiaries of an active trust may give binding directions to their trustee about the disposition of the trust assets provided that they are all sui juris and collectively entitled to the entire beneficial interest.

Many constructive trusts arising in response to a person's wrongful conduct are bare trusts. The effect of imposing a bare trust on the wrongdoer is that the claimant may compel the trustee to restore the proceeds of his wrong to him.[58] A custodian trustee[59] is not a bare trustee, as he is not a mere name or "dummy" for the managing trustees or for the beneficiaries.[60]

## 4.  Private and Public Trusts

21-030 Trusts may also be divided according to the extent of the benefit they confer. The distinction is between private and public trusts. A trust is private if it is for the benefit of an individual or class with standing to enforce the trustee's duties. It is immaterial that the trust also confers an incidental benefit on the public at large. The only public trusts that are valid in English law are those which are charitable, according to the legal definition of charity.[61] It must also promote the public welfare, even if incidentally it confers a benefit on an individual or class. A charitable trust is enforced by the Attorney General or the Charity Commission.

---

567 at 572; *Tomlinson v Glyns Executor and Trustee Co* [1970] Ch. 112 at 125, 126; *Herdegen v Federal Commissioner of Taxation* (1988) 84 A.L.R. 271.
[56] *Target Holdings Ltd v Redferns* [1996] A.C. 421. For the significance of this distinction in insolvency, see P. Matthews [2005] P.C.B. 266 at 269.
[57] *Saunders v Vautier* (1841) 4 Beav. 115; affirmed Cr. & Ph. 240. See para.29-030 below.
[58] See Ch.26.
[59] Trustee Act 2000 s.17.
[60] *IRC v Silverts Ltd* [1951] Ch. 521.
[61] f*Morice v Bishop of Durham* (1804) 9 Ves. Jun. 399; Charities Act 2006 ss.2(1)(b); 3. See Ch.23.

### 5. Executed and Executory Trusts[62]

This distinction refers to the degree of precision with which the trust instrument **21-031** defines the beneficiaries' interests in the trust property. So an instrument which declares the full extent of the beneficiaries' entitlements under the trust is said to be executed. An instrument which defines a trust in a general way but which contemplates some further instrument to specify their interests in detail is said to be executory.

### 6. Completely and Incompletely Constituted Trusts[63]

This distinction, though sometimes drawn, is not actually about different **21-032** categories of trust. It refers to whether all the relevant formal steps have been completed which are necessary to vest the trust property in the intended trustee of an express trust. Where the property has not been properly vested, the trust is said to be incompletely constituted. Such an arrangement may not give rise to any trust at all, or at least not the trust that the parties intended to create in the transaction. The intended trustee may have no title to the property, and it is only in special circumstances that the intended beneficiary would be entitled to an order compelling the settlor to complete the vesting of the property in the intended trustee.[64]

### 3. Trusts Compared With Other Relationships

In a number of ways trusts resemble certain other legal relations, notably bail- **21-033** ments, agency, fiduciary relationships generally, contracts and powers.[65] The execution of a trust also has a marked affinity with the administration of the estate of a deceased person. This section considers the similarities and differences between trusts and these other legal relationships.

### 1. Bailment[66]

To some degree, a bailment (e.g. a deposit of a chattel) is similar to a trust,[67] since **21-034** the bailee holds the chattel subject to duties towards the bailor. But the differences are more marked. The duties of the bailee are recognised at common law, whereas the duties of a trustee and the rights of the beneficiary to the trust property are only enforceable in equity. Only personal chattels can be bailed, whereas any property may be held in trust. Further, the trustee of an asset has the general ownership of it at law, subject to the beneficiary's equitable entitlements. A bailee, however, merely has a possessory interest in the chattel and the general ownership of it remains in the bailor. An unauthorised sale by a trustee will accordingly confer a good title upon a bona fide purchaser who acquires the legal interest without notice of the trust, whereas such a sale by a bailee usually confers no title to the legal ownership of the property as against the bailor.

---

[62]   See below para.22-026.

[63]   See below para.22-041.

[64]   See below paras 22-047, 24-006–24-007.

[65]   See, e.g. *Re Nanwa Gold Mines Ltd* [1955] 1 W.L.R. 1080 (whether debt, bailment, or trust).

[66]   See F.W. Maitland, *Equity* (1909) Lecture IV.

[67]   They were even defined by the Court of Appeal in terms of trust in *Rosenthal v Alderton & Sons Ltd* [1946] 1 All E.R. 583 at 584 (omitted from [1946] K.B. 374).

## 2. Fiduciary Relationships[68]

**21-035**    The relationship of express trustee and beneficiary is one of a number of relationships generally described as fiduciary. A fiduciary relationship arises where one person has undertaken to act for another in a particular matter in circumstances giving rise to a relationship of trust and confidence. Some of the common categories of fiduciary relationship are agent and principal, solicitor and client, and director and company. The distinguishing feature of such a relationship is the fiduciary's duty of loyalty to this principal. He must act in good faith, not profit from his position, and not place himself in a position where his duty and his interest may conflict.

But not all fiduciary relationships can properly be described as trusts. A fiduciary is a trustee only if he has vested in him a fund of property or a power of disposal over it.[69] Not all trusts involve fiduciary duties. A fiduciary duty must arise from the voluntary conduct of the person bound by it.[70] Accordingly, a person who becomes a trustee by operation of law and has not voluntarily undertaken the office may not owe any fiduciary duties in respect of the trust property. An example is the trust imposed on a person to strip him of the benefits of his fraudulent conduct.[71] The trust merely gives effect to the equitable right of the claimant to hold the defendant personally liable to account for his profit, or to recover the property specifically. While these remedies are commonly enforced against a person who owes fiduciary duties, they are not necessarily an indicator of his status as a fiduciary.[72] It is also open to the settlor of an express trust to modify or exclude the operation of the trustee's fiduciary duties under the general law.[73]

## 3. Agency

**21-036**    An agent and a trustee resemble each other in that each is typically subject to fiduciary obligations towards his principal or beneficiaries, but there are many differences. Trusts are the exclusive creature of equity, whereas the basic incidents of agency arise at common law. In most trusts, there is no contractual relationship between the trustees and the beneficiaries. But apart from agents of necessity, agency normally arises by contract between principal and agent, and generally does not give rise to a trust.[74] Usually a trustee has property vested in him. His legal powers to deal with it and make contracts affecting it arise from his status as owner. Since a trustee contracts in his own right, he cannot make his beneficiaries directly liable on any transaction that he concludes with a third party. An agent, however, does not own the property that his principal authorises him to dispose of. His power to do so generally depends on the terms of the authority from his principal. An agent can make his principal directly liable on the contract that he concludes.[75]

---

[68]  See Ch.7.
[69]  See *Paragon Finance v DB Thakerar & Co* [1999] 1 All E.R. 400 at 416.
[70]  See generally P.J. Millett (1998) 114 L.Q.R. 214.
[71]  *Paragon Finance v DB Thakerar & Co* [1999] 1 All E.R. 400 at 414–415.
[72]  cf. R. Flannigan [2019] Conv. 207.
[73]  See above para.7-016.
[74]  See *Kingscroft Insurance v HS Weavers* [1993] 1 Lloyd's Rep. 187.
[75]  See generally H. Tjio (2005) 19 T.L.I. 75; and *Ingram v IRC* [2000] A.C. 293 at 305.

## 4. Contract

**(a)  The distinction.**  It is sometimes difficult to determine whether a debt **21-037**
obligation arises out of a trust or a contract. The difference may be important. If a
fund is vested in T, who is insolvent, B will be paid if T was a trustee for him, but
B can only claim in T's bankruptcy if T was merely B's debtor.[76] Contract and trust
are distinct legal concepts. Contract was developed by the common law courts and
involves the enforcement of purely personal obligations between the parties. Trust
was developed in the courts of equity and involves the enforcement of personal
obligations owed by the trustee and third parties in relation to a specific fund of
assets. The beneficiaries' rights to the trust assets are proprietary in effect.[77]

**(b)  Bare trust behind contract.**  The same transaction may involve both **21-038**
contract and trust. One example is a Quistclose trust.[78] Here a lender advances
money on the understanding that it must only be applied for certain purposes or to
pay certain persons. As a matter of contract at common law, the borrower is a debtor
to the lender. In equity, the borrower is a trustee to the lender, who retains a
beneficial interest in the money.[79] Another example is a bare trust of money exist-
ing concurrently with a contract of agency or retainer. So a solicitor who receives
funds from his client to be applied in a conveyancing transaction holds the funds
on bare trust for the client. The trust attaching to the funds is discharged once the
solicitor applies them according to the client's contractual instructions. If the solici-
tor should misapply the funds, then the terms of the contract may determine whether
he is concurrently liable in equity for the breach of trust.[80]

**(c)  Trust of benefit of contract.**  The trust concept has frequently been imported **21-039**
into contractual transactions to get round the general rule that only a party to a
contract may sue upon it. The Contracts (Rights of Third Parties) Act 1999 now
provides that a contract may confer the right to enforce a term of the contract on a
person who is not a party to it,[81] and these trust exceptions to the privity rule have
become less important than they once were.

A person entitled to the benefit of a contract may subsequently set up a trust of
that benefit for third parties either by declaring himself a trustee of it or by assign-
ing it to trustees for them.[82] A person may also contract as trustee for a third party
so that in equity the third party is entitled to the benefit of the contract ab initio. If
the contract is not performed, the trustee can take proceedings in his own name[83]
to enforce it for the benefit of the third party and, if the trustee refuses to do so, the

---

[76]  See *Re Kayford* [1975] 1 W.L.R. 279; *Re Farepak Food and Gifts Ltd (In Administration)* [2006]
EWHC 3272 (Ch); [2008] B.C.C. 22.

[77]  See above para.2-003.

[78]  See below para.25-033.

[79]  *Barclays Bank Ltd v Quistclose Investments Ltd* [1970] A.C. 567; *Twinsectra Ltd v Yardley* [2002]
2 A.C. 164; [2002] UKHL 12.

[80]  *Target Holdings Ltd v Redferns (a firm)* [1996] 1 A.C. 421.

[81]  Contracts (Rights of Third Parties) Act 1999 s.1.

[82]  See the surveys by A. L. Corbin (1930) 46 L.Q.R. 12; and J. G. Starke (1948) 21 Austr.L.J. 382 at
422, 455; F. E. Dowrick (1956) 19 M.L.R. 374 at 386.

[83]  As, e.g. in *Gregory and Parker v Williams* (1817) 3 Mer. 582; *Lloyd's v Harper* (1880) 16 Ch. D.
290. In *Les Affreteurs Reunis Societe Anonyme v Leopold Walford (London) Ltd* [1919] A.C. 801
the trustee was not a party but the defendants agreed to treat the case as if they were.

third party can sue, joining the trustee as a defendant.[84] The declaration of trust often has effects similar to an outright assignment of the benefit of the contract, particularly where the contract is for payment of a simple debt.

The main difficulty in these cases is to discover what test the courts will apply in deciding whether the party intended to contract as trustee or to hold the benefit of his contract as a trustee. The inquiry plainly involves the construction of the contract and the special circumstances in which it is entered into. Beyond this generalisation, it is hard to draw clear principles from the authorities.[85] A prohibition on direct assignment of a contract does necessarily prevent a declaration of trust over the benefit of it. A trust of the proceeds of a contract claim would not necessarily entitle the beneficiary to interfere in the operation of the underlying contract. There is therefore no special reason to suppose that it would be inappropriate to find a declaration of trust.[86]

A trust of the benefit of a contract may also be imposed by statute, as where a person effects an insurance policy that is expressed to be for the benefit of his spouse or children.[87]

## 5. Power

**21-040**    A trust must be distinguished from a power. A power is an authority vested in a person (called a "donee") to deal with or dispose of property that is not his own.[88] It can take a number of forms. A power of attorney is simply a special type of agency which allows another to act on behalf of the principal in dealing with property. Administrative powers are powers to manage particular items of property. Finally, and most significantly for the distinction with trusts, are powers of a dispositive nature. These are powers of appointment that authorise the creation or grant of beneficial interests in property.

**21-041**    **(a) Legal or equitable.**    Trusts are necessarily equitable, whereas powers may be legal. Thus a power of attorney may authorise the conveyance of a legal estate, and a mortgagee of freehold land has a statutory power to convey the legal fee simple when he exercises his power of sale.[89] After 1925, however, all powers of appointment have necessarily been equitable.[90]

---

[84]   *Vandepitte v Preferred Accident Insurance Corp of New York* [1933] A.C. 70 at 79. See, e.g. *Harmer v Armstrong* [1934] Ch. 65.

[85]   Contrast *Lloyd's* (1880) 16 Ch.D. 290; *Harmer's* [1934] Ch. 63; *Walford's* [1919] A.C. 801; *Gregory and Parker's* (1817) 3 Mer. 582 cases above; *Fletcher v Fletcher* (1844) 4 Hare 67; *Gordon, Re Lloyds Bank v Lloyd* [1940] Ch. 851; *Royal Exchange Assurance v Hope* [1928] Ch. 179; *Re Webb* [1941] Ch. 225; *Re Foster's Policy* [1966] 1 W.L.R. 222 where the court found a trust with *Vandepitte*'s case [1933] A.C. 70; *Re Engelbach's Estate* [1924] 2 Ch. 348; *Re Sinclair's Life Policy* [1938] Ch. 799; *Re Foster (No.1)* [1938] 3 All E.R. 357; *Green v Russell* [1959] 2 Q.B. 226; *Re Cook's ST* [1965] Ch. 902 (appeal compromised: *The Times,* 7 November 1964); *Beswick v Beswick* [1966] Ch. 538 (in the House of Lords the point was abandoned: [1968] A.C. 58 at 95); *Swain v The Law Society* [1983] 1 A.C. 598; and *Southern Water Authority v Carey* [1985] 2 All E.R. 1077 where the court found none. See generally A.L. Corbin (1930) 46 L.Q.R. 12.

[86]   *Re Turcan* (1888) 40 Ch. D. 5; *Don King Productions Inc v Warren* [2000] Ch. 291; *Barbados Trust v Bank of Zambia* [2007] 1 Lloyd's Rep. 495 (noted P.G. Turner [2008] C.L.J. 23).

[87]   Married Women's Property Act 1882 s.11. See also Civil Partnership Act 2004 s.253.

[88]   See *Freme v Clement* (1881) 18 Ch. D. 499 at 504.

[89]   See para.39-034.

[90]   LPA 1925 s.1(7).

TRUSTS COMPARED WITH OTHER RELATIONSHIPS

**(b)  Imperative or discretionary.**  The substantial distinction is that a trust for **21-042**
the disposition of property is imperative, while a mere power of appointment is
discretionary. Even with a discretionary trust (sometimes called a "trust power") the
trustee holding the power of distribution has an obligation to make distributions
from the fund though the trustee may select which of the potential objects is to
receive them. Thus if A holds £10,000 upon trust to divide in his discretion among
a certain class of persons, A has no option in the matter, but is bound to carry out
the trust. If A fails to do so, the court will see that the property is duly divided ac-
cording to its understanding of the settlor's intention. If the class of beneficiaries
is small, such as immediate members of the settlor's family, the court may order
equal distribution of the fund.[91] In the case of a large class of beneficiaries, each
with varying needs and claims on the settlor, the court may prepare a scheme of
distribution.[92]

If, on the other hand, A is given a mere power to appoint the £10,000 among the
members of the class, he cannot be compelled to exercise the power. If A fails to
do so, whether from accident or design, the members generally have, in the absence
of some improper purpose, no claim to make A pay them the money. It will pass to
the persons entitled in default of appointment.[93]

**(c)  Marginal cases.**  The distinction between trusts and powers of appoint- **21-043**
ment can become blurred, particularly where the donee of a power owes fiduciary
duties to the objects. First, an instrument which initially appears to confer a mere
power of appointment over a fund may, on its proper construction, create a trust for
distribution of the fund. Secondly, the duties governing the way a discretionary
trustee and a fiduciary donee of a power of appointment are very similar. Thirdly,
the interests of a beneficiary of a discretionary trust or fiduciary power of appoint-
ment are enforceable against third parties in the same way. In effect, therefore, the
difference between a trust and a power of appointment is often more a distinction
of degree than of type.

*(1)  Construction.*  In construing a gift as creating either a trust for distribution **21-044**
of a fund or a power of appointment, the first thing to consider is whether there is
a gift over in default of appointment. If there is, the power is a mere power[94]; if there
is not, it will probably be a discretionary trust.[95] But the absence of a gift over is
not conclusive.[96] The main question is whether the donor has shown an intention
that, in any event, the property shall go to the objects of the power. The presence
of a power to accumulate undistributed income from a fund is not inconsistent with

---

[91] *Re Arnold, Wainwright v Howlett* [1947] Ch. 131 (grandchildren taking per capita equally with
children). The relevant maxim is "Equality is equity".
[92] *McPhail v Doulton* [1971] A.C. 424 at 451, 457.
[93] *Brown v Higgs* (1803) 8 Ves. 561 at 570; *McPhail v Doulton* [1971] A.C. 424 at 456, 457. Exception-
ally, the court has assumed the execution of a fiduciary power of appointment over a pension fund
surplus where the donee was faced with an irreconcilable conflict of interest: *Mettoy Pension Trustees
Ltd v Evan* [1990] 1 W.L.R. 1587. Statute has now removed this situation: Pensions Act 1995 s.25(2).
[94] See, e.g. *Re Mills* [1930] 1 Ch. 654; and see *Re Gestetner Settlement* [1953] Ch. 672; see (1953) 69
L.Q.R. 309.
[95] *Re Llewellyn's Settlement* [1921] 2 Ch. 281; *Re Weekes' Settlement* [1897] 1 Ch. 289; *Re Combe*
[1925] Ch. 210; *Re Perowne* [1951] Ch. 785.
[96] *Re Weekes' Settlement* [1897] 1 Ch. 289; *Re Combe* [1925] Ch. 210; *Re Perowne* [1951] Ch. 785.

DEFINITION AND CLASSIFICATION OF TRUSTS

the construction of the gift as a trust of the income.[97] Also, a gift that appears to be a primary power may actually be a primary trust subject to a secondary power to alter the interests under the trust. In *Burrough v Philcox*,[98] a testator gave property to his two children for their lives, and empowered the survivor of them to dispose of the property by will

> "amongst my nephews and nieces or their children, either all to one of them, or to as many of them as my surviving child shall think proper."

It was held that a primary trust was created in favour of the testator's nephews and nieces, subject to a power of selection and distribution in his surviving child. As the surviving child had failed to exercise the power, the property was divided equally between the objects.

**21-045**   *(2)   Duties.*   The donee of a fiduciary power of appointment owes similar duties in exercising it to a discretionary trustee. These include a duty to survey the class of potential objects; to group them into different categories; and then to prioritise those categories according to their needs.[99] The survey made by a donee of a mere power need not be as rigorous as that made by a discretionary trustee who has a duty to distribute the fund.

**21-046**   *(3)   Interest.*   The interest of the beneficiary of a discretionary trust or equitable power would be enforceable against a third party who received property that the trustee or donee did not have authority to transfer to him. Either kind of interest would give the beneficiary standing to follow or trace the property.[100] The priority of the power affecting the property would be preserved if the person holding the property became insolvent.[101] But the beneficiary's only right would be to have the asset or its proceeds reinstated to the trustee or donee.[102] The beneficiary could not compel the third party to transfer the asset directly to himself since this would give him a greater equitable right against the third party than he had against the trustee or donee.

### 6.   Administration[103]

**21-047**   **(a)   Resemblances.**   Trusts were the invention of the Chancellor, whereas the administration of the assets of a deceased person was regulated originally by the ecclesiastical courts. From early times, however, the Court of Chancery exercised a supplementary jurisdiction over the personal representatives, and their position has become more and more assimilated to that of trustees. Thus they must exercise the same degree of care as trustees in carrying out their duties. In general the provisions of the Trustee Act 1925 extend to them.[104]

---

[97] *McPhail v Doulton* [1971] A.C. 424 at 448.
[98] *Burrough v Philcox* (1840) 5 My. & Cr. 72; and see *Salusbury v Denton* (1857) 3 K. & J. 529.
[99] *Re Manisty's Settlement* [1974] Ch. 17 at 25; *Re Hay's Settlement Trusts* [1982] 1 W.L.R. 202 at 209–210. See para.10-013.
[100] See para.30-054.
[101] *Mettoy Pension Trustees Ltd v Evan* [1990] 1 W.L.R. 1587.
[102] *Gartside v IRC* [1968] A.C. 553 at 617–618; *Target Holdings Ltd v Redferns* [1996] A.C. 421.
[103] See generally below section VI.
[104] Trustee Act 1925 s.68(17); see also AEA 1925 ss.33, 39.

TRUSTS COMPARED WITH OTHER RELATIONSHIPS

**(b)   Distinctions.**   There are, nevertheless, a number of distinctions between  **21-048**
trusts and the administration of estates. Six may be mentioned here.

*(1)   Objectives.*   In broad terms, the main function of personal representatives as  **21-049**
such is to wind up the estate of the deceased, paying all debts and distributing the
assets to those entitled to them or to trustees on their behalf. Trustees, on the other
hand, are normally intended to hold the trust property and administer it in accord-
ance with the trusts which bind them. In a phrase, the function of personal
representatives is to wind up, and the function of trustees, at least in cases of special
trusts, is to hold.

*(2)   Property.*   Until they assent, personal representatives usually have the whole  **21-050**
ownership of the property of the deceased vested in them; the beneficiaries have no
beneficial interest in any particular asset but merely the right to compel the due
administration of the estate. Under a fixed trust, the beneficiaries may have an
equitable interest in a specific trust assets and possibly even the right to compel the
trustee to transfer it to them.[105] But the distinction is less clear where the beneficiar-
ies have interests under a discretionary trust.

*(3)   Limitation.*   An action by a beneficiary to recover trust property or in respect  **21-051**
of any breach of trust is, in general, barred after six years,[106] whereas the period in
respect of claims to the personal estate of a deceased person is 12 years.[107] Neither
limit applies in the case of fraud or property retained by the trustee or personal
representative or converted to his own use.[108]

*(4)   Joint and several authority.*   One of several personal representatives may  **21-052**
dispose of pure personalty,[109] whereas trustees must act jointly.

*(5)   Receipt of sole trustee or representative.*   Unlike a trustee, a sole personal  **21-053**
representative acting as such may give a valid receipt for capital money arising on
a trust of land, even though he is not a trust corporation.[110]

*(6)   New trustees.*   The Trustee Act 1925 gives wide powers of appointing new  **21-054**
trustees.[111] These powers do not apply to personal representatives unless and until
they are holding as trustees.[112] Personal representatives as such can be appointed
only by will or by the court.

**(c)   Dual status.**   Despite these distinctions the dividing line between trustees and  **21-055**
personal representatives tends to become blurred, so that a person may at the same
time be both a trustee and a personal representative.[113] A will may set up certain

[105] See *Corbett v IRC* [1938] 1 K.B. 567 at 577; and see above para.29-029.
[106] Limitation Act 1980 s.21(3).
[107] Limitation Act 1980 s.22(a).
[108] See generally below para.30-035.
[109] See below para.31-019.
[110] See LPA 1925 s.27(2); compare above para.4-014.
[111] See below para.27-012.
[112] See *Re Ponder* [1921] 2 Ch. 59; *Re Pitt* (1928) 44 T.L.R. 371; *Re Yerburgh* [1928] W.N. 208; *Re Cockburn's WT* [1957] Ch. 438.
[113] See *Re Timmis* [1902] 1 Ch. 176 at 182; and see generally B. S. Ker (1955) 19 Conv. (NS) 199.

DEFINITION AND CLASSIFICATION OF TRUSTS

trusts and appoint the same persons to be both executors and trustees. Once appointed, a personal representative remains a personal representative for the rest of his life[114] unless the grant is limited or is revoked, or unless he is removed from office by the court. Further, on an intestacy the personal representatives are constituted express trustees.[115]

It follows that no general test can be laid down; the distinction can be drawn only in relation to the particular assets in question. If the personal representatives have no duties to perform beyond the collection of assets, payment of creditors and distribution of the estate, they will remain personal representatives[116] (even if they have stated that they are trustees[117]) until assenting,[118] or, if the legatees are infants, until availing themselves of the power to appoint trustees of the gifts to the infants.[119] This will be so even where the payment of the legacy is postponed.[120] However, where they are directed to hold the estate or some part of it upon certain trusts (e.g. for persons in succession[121] or upon trust for sale and division[122]) they will become trustees when the administration is complete,[123] though in the case of land not, it has been held, until they sign a written assent in their own favour.[124] The moment of transition from administration to trusteeship depends on the circumstances,[125] although when the personal representatives bring in their residuary accounts,[126] or exercise a power of appropriation,[127] there is a presumption that the trusteeship has begun. The mere existence of an outstanding mortgage does not prevent the residue from being ascertained.[128]

## 7. The Crown

21-056   (a)   **Trustee.** There is nothing to prevent the Crown acting as trustee.[129] But a trust does not arise in every case where money or property is held by the Crown and used for the benefit of others. The Crown may simply be administering the property in exercise of governmental functions.[130] These public duties are

---

[114] *Attenborough v Solomon* [1913] A.C. 76 at 83; *Re Timmis* [1902] 1 Ch. 176 at 183.
[115] AEA 1925 ss.33(1), 46(1); and see *Toates v Toates* [1926] 2 K.B. 30.
[116] *Re Richardson, Pole v Pattenden* [1920] 1 Ch. 423; *Harvell v Foster* [1954] 2 Q.B. 36; disapproving dicta *Re Ponder* [1921] 2 Ch. 59.
[117] *Re Mackay, Mackay v Gould* [1906] 1 Ch. 25; *Re Rowe* (1889) 58 L.J.Ch. 703.
[118] *Attenborough v Solomon* [1913] A.C. 76 at 83; and see *Re Aldhous* [1955] 1 W.L.R. 459.
[119] *Harvell v Foster* [1954] 2 Q.B. 36; *Re Davis, Evans v Moore* [1891] 3 Ch. 119: *Re Mackay, Mackay v Gould* [1906] 1 Ch. 25.
[120] *Re Barker* [1892] 2 Ch. 491.
[121] *Re Bowden, Andrew v Cooper* (1890) 45 Ch. D. 444; *Re Swain* [1891] 3 Ch. 233; *Re Timmis* [1902] 1 Ch. 176; *Re Oliver, Theobald v Oliver* [1927] 2 Ch. 323.
[122] *Re Claremont* [1923] 2 K.B. 718.
[123] See *Re Cockburn's WT* [1957] Ch. 438 at 440; and see *Lilley v Public Trustee of the Dominion of New Zealand* [1981] A.C. 839.
[124] *Re King's WT* [1964] Ch. 542. Sed quaere: see RRA Walker (1964) 80 L.Q.R. 328; J.F. Garner (1964) 28 Conv.(NS) 298.
[125] *Attenborough v Solomon* [1913] A.C. 76 at 82, 83.
[126] *Re Claremont* [1923] 2 K.B. 718.
[127] *Phillipo v Munnings* (1837) 2 My. & Cr. 309.
[128] *IRC v Smith* [1930] 1 K.B. 713.
[129] *Civilian War Claimants Association Ltd v The King* [1932] A.C. 14 at 27; *Nissan v Attorney General* [1970] A.C. 179 at 223.
[130] *Tito v Waddell (No.2)* [1977] Ch. 106.

sometimes called "trusts in the higher sense" but do not give rise to an equitable relationship enforceable in the courts.[131]

**(b) Beneficiary.** The Crown can be a beneficiary under a trust but it has been **21-057** held that where a minister or other public servant acting in his public capacity takes property on behalf of the Crown, there is no trust and the Crown and the minister are considered as one.[132]

---

[131] *Tito v Waddell (No.2)* [1977] Ch. 106 at 216, per Megarry VC.
[132] *Town Investments Ltd v Department of the Environment* [1978] A.C. 359; see (1977) 93 L.Q.R. 321.

CHAPTER 30

## BREACH OF TRUST

CONTENTS

| | | |
|---|---|---|
| 1. | NATURE OF BREACH OF TRUST | 30-001 |
| | 1. Breach and Absence of Equitable Authority | 30-001 |
| | 2. Personal and Proprietary Remedies | 30-002 |
| | 3. Third Parties Involved in the Breach of Trust | 30-003 |
| 2. | ESTABLISHING A BREACH OF TRUST | 30-004 |
| | 1. Liability of Trustee for his Own Defaults | 30-004 |
| 3. | PERSONAL REMEDIES AGAINST THE TRUSTEE IN BREACH | 30-010 |
| | 1. Anticipated Breach | 30-010 |
| | 2. Personal Remedies after Breach | 30-011 |
| | 3. Impoundment of Trustee's Beneficial Interest | 30-023 |
| 4. | DEFENCES AND ADJUSTMENTS TO TRUSTEE'S LIABILITY | 30-024 |
| | 1. Exemption Clauses and Express Modification of Duty | 30-024 |
| | 2. Prior Consent or Acquiescence by Beneficiary | 30-028 |
| | 3. Subsequent Release or Confirmation by Beneficiary | 30-031 |
| | 4. Relief by Court | 30-032 |
| | 5. Lapse of Time and Limitation | 30-035 |
| | 6. Bankruptcy | 30-044 |
| | 7. Contribution and Indemnity | 30-045 |
| 5. | PROPRIETARY REMEDIES AGAINST PROCEEDS OF BREACH OF TRUST | 30-050 |
| | 1. General | 30-050 |
| | 2. Title to Follow or Trace in Equity | 30-054 |
| | 3. Identification and Mixed Funds | 30-056 |
| | 4. Loss of Proprietary Claim; Defences to Proprietary Remedies | 30-064 |
| 6. | PERSONAL LIABILITY OF THIRD PARTIES INVOLVED IN BREACH OF TRUST | 30-067 |
| | 1. Receipt of or Dealing with Trust Property | 30-068 |
| | 2. Knowing Receipt | 30-071 |
| | 3. Inconsistent Dealing | 30-075 |
| | 4. Dishonest Assistance | 30-077 |
| | 5. Limitation | 30-083 |

[901]

This is a PDF of the original 36th Ed. main work

BREACH OF TRUST

1.    NATURE OF BREACH OF TRUST

## 1.    Breach and Absence of Equitable Authority

**30-001**    A trustee is guilty of a breach of trust if he fails to do what his duty requires, or if he does what he is not entitled to do. Breaches of trust are almost infinitely various. They range from the fraudulent conversion of trust funds to purely technical failures of duty which harm nobody, and transactions (such as investments in unauthorised securities) which may even result in a substantial profit for the trust. Their common feature is that the trustee wrongfully exceeds the equitable authority conferred upon him by the trust instrument or by the general law, in circumstances which may lead to a liability to make good any losses which may result.

## 2.    Personal and Proprietary Remedies

**30-002**    A trustee may be liable to personal or proprietary remedies for his breach of trust. Personal remedies are traditionally enforced by requiring the trustee to account for his stewardship of the trust fund.[1] On taking the account, it may be found that the trustee is liable to pay a sum of money that will restore the trust to the position it would have been in if the breach had not occurred.[2] The trustee may also be liable to a proprietary remedy. The beneficiary of the trust has an equitable interest in the assets held in the trust fund so if the trustee misapplies them, the beneficiary may recover the original trust assets or their traceable proceeds from the trustee.[3] He may also enforce a proprietary remedy if the trustee has transferred the assets to a third party and his equitable interest in them has not been extinguished.

## 3.    Third Parties Involved in the Breach of Trust

**30-003**    The trust claimant may also have an action against third parties who have become involved in the primary breach of trust committed by the trustee.[4] They may have received money or other assets that were misapplied by the trustee, or they may have wrongly implicated themselves in the trustee's breach by lending him assistance. The trust claimant is likely to sue a third party when the trustee is insolvent and is unable to satisfy the full amount of a personal claim against him. The trust claimant may not recover his loss twice over. Any money that he recovers on the claims against the third parties must be deducted from the amount of his claim against the trustee for the losses resulting from his breach.

---

[1]    See Ch.20 above.
[2]    See para.30-013 below.
[3]    See para.30-050 below.
[4]    See para.30-067 below.

2.   Establishing a Breach of Trust

## 1.   Liability of Trustee for his Own Defaults

The liability of a trustee is essentially for his own acts and defaults and not for those of others. This is true both in relation to his co-trustees and agents to whom he delegates his functions as trustee.[5]  **30-004**

**(a)   Liability personal and not vicarious.**   A trustee is not liable for breaches committed by fellow trustees unless the trustee is at fault. If A and B are trustees, and A makes away with trust funds, B is not liable for A's acts merely because they are co-trustees; one trustee is not vicariously liable for another. But B may be liable for his own default, e.g. in improperly allowing A to receive the funds or have sole control over them; and similarly if a trustee improperly allows trust property to remain in the control of an agent.[6]  **30-005**

The old case of *Townley v Sherborne*[7] illustrates the rule. A trustee who had joined with his co-trustees in signing receipts was liable, though he had received nothing, because the liability of the non-receiving trustee arose, not from his mere signing of the receipts, but from his subsequently leaving in the hands of his co-trustees the money that had been received. This was said to be an "evil-dealing" or, as we would now say, a breach of trust.

**(b)   Independent liability for act of co-trustee.**   Though the trustee is not vicariously liable for the default of his co-trustee, he may nonetheless incur liability for losses caused directly by the breach of his co-trustee. This is particularly relevant where one trustee is active in the administration of the trust and the other passive. So, for example, where one trustee applied trust money in an unauthorised investment, the co-trustee who took no part in the investment decision was nonetheless held accountable for the losses which resulted. She, in her own right, owed a duty to ensure that trust fund was property invested.[8]  **30-006**

A trustee may also be said to be liable for losses resulting from a breach by his co-trustee which he might reasonably have anticipated. It is a question of how far the trustee is expected to be vigilant over the co-trustee. In one case it was held that a trustee was not liable for losses resulting from the fraudulent misappropriation of some proceeds of sale of trust property by her co-trustee, a solicitor. She knew him to be a dilatory and incompetent muddler but did not know he was dishonest.[9] On the other hand, a trustee may be liable if he conceals a breach which his fellow trustees have committed,[10] or if he stands by, knowing that his fellow trustees are committing[11] or even meditating[12] a breach of trust, or if he leaves trust matters in their hands without inquiry.[13] In so doing he is neglecting his duty to watch over

---

5   Trustee Act 2000 s.23(1).
6   TA 2000 s.23(1).
7   *Townley v Sherborne* (1634) Bridg. J. 35 at 37, 38; and see *Brice v Stokes* (1805) 11 Ves. 319.
8   *Bahin v Hughes* (1886) 31 Ch. D. 390.
9   *Re Munton* [1927] 1 Ch. 262.
10   *Boardman v Mosman* (1779) 1 Bro. C.C. 68.
11   *Booth v Booth* (1838) 1 Beav. 125.
12   *Wilkins v Hogg* (1861) 5 L.T. 467 at 470.
13   *Lord Shipbrook v Lord Hinchinbrook* (1810) 16 Ves. 477; *Wynne v Tempest* (1897) 13 T.L.R. 360; contrast *Shepherd v Harris* [1905] 2 Ch. 310.

his fellow trustees.[14] In all such cases the burden would be on the beneficiary to prove that the loss resulting from the default of the co-trustee could be said to be caused by the independent breach of duty of the trustee whom he sues.[15]

**30-007**  **(c)  Breaches by former trustees.**  A new trustee is not liable for breaches of trust committed by his predecessors; unless he has reason to believe otherwise, he is entitled to assume that he has performed his duties and got in all the trust property.[16] If, however, he discovers that breaches of trust have been committed, he must obtain satisfaction for them from the old trustees, just in the same way as an original trustee must get in any part of the trust estate which is outstanding.[17] The only excuse for not doing so is that it would be useless to take proceedings against the old trustees.[18]

**30-008**  **(d)  Breaches by subsequent trustees.**  A trustee who has retired is prima facie not liable for breaches of trust committed by his successors. But he may be liable if he retired in order to enable the breach to be committed; for in so doing he may not only make the new trustees his agents for the purpose, but also be guilty of a breach of his own duty to protect the trust property.[19] However, he is not liable merely because by retiring he facilitated the commission of some breach, or because he knew that some breach was likely: it must be shown that he retired in contemplation of the particular breach committed.[20] Even an analogous breach is not enough.[21]

**30-009**  **(e)  Executors.**  In general, an executor is answerable for his own acts only, and not for the acts of his co-executors. Each executor has a full and absolute control over the pure personalty of the testator and is competent to give a valid discharge for it by his own separate act, independently of the others. If, therefore, an executor joins with his co-executor in signing a receipt, this is stronger evidence of his having actually received the money than in the case of trustees; and even if he can show that he did not in fact receive it, he will be liable if he allowed the money unnecessarily to get into the hands of his co-executor, or remain there.[22]

3.  Personal Remedies Against the Trustee in Breach

## 1.  Anticipated Breach

**30-010**  If a beneficiary has reason to suppose that the trustee is about to do an act not authorised by the trust, he need not wait until a breach has been committed, but may obtain an injunction to restrain the trustee.[23] The courts have thus restrained the elec-

---

[14]  *Styles v Guy* (1849) 1 Mac. & G. 422 at 433 (executors).

[15]  *Re Brier* (1884) 26 Ch. D. 238.

[16]  *Re Strahan* (1856) 8 De G.M. & G. 291.

[17]  See *Forest of Dean Coal Mining Co* (1878) 10 Ch. D. 450 at 451, 452.

[18]  *Hobday v Peters* (1860) 28 Beav. 603.

[19]  *Head v Gould* [1898] 2 Ch. 250 at 268. This rule probably applies to directors of companies: *Curtis's Furnishing Stores Ltd v Freedman* [1966] 1 W.L.R. 1219 at 1224.

[20]  *Webster v Le Hunt* (1861) 4 L.T. 723; *Head v Gould* [1898] 2 Ch. 250.

[21]  *Clark v Hoskins* (1868) 19 L.T. 331.

[22]  *Clough v Bond* (1838) 3 My. & Cr. 490 at 496; *Joy v Campbell* (1804) 1 Sch. & Lef. 328 at 341; affirmed 2 Sch. & Lef. 740; *Re Gasquoine* [1894] 1 Ch. 470.

[23]  *Balls v Strutt* (1841) 1 Hare 146; and see above Ch.18.

PERSONAL REMEDIES AGAINST THE TRUSTEE IN BREACH

tion by the trustees of a church of an unqualified person as minister[24]; an improvident sale of trust property[25]; and the grant of an unauthorised mortgage.[26] Injunctions have also been granted to secure the due conduct of the trust business, e.g. to prevent a minority of trustees of a charity from disturbing the management of the trust by the majority.[27]

## 2. Personal Remedies after Breach

**(a) General.**

30-011

"The basic right of a beneficiary is to have the trust duly administered in accordance with the provisions of the trust instrument … and the general law."[28]

If the trustee commits a breach which causes loss to the trust, then the beneficiary may require the trustee to restore the trust fund to the position it would have been in if the breach had not occurred. This point was once summed up by saying that the "obligation of a defaulting trustee is essentially that of effecting restitution to the trust estate".[29] But to describe the trustee's liability in this way may cause confusion. It may imply that the trustee's liability depends on principles of unjust enrichment rather than restoration of the trust estate and compensation for loss. It also obscures important differences in the kind of breach committed by the trustee. In some cases, the trustee's breach may be that he has misapplied assets from the trust fund in breach of his duties of custodial stewardship. In others, the trustee may be in breach of his duties of management stewardship. The nature of the loss resulting from each kind of breach is different. To avoid any confusion with unjust enrichment, the general expression "restoration" will be used in this chapter to refer to loss-based remedies that arise out of a breach of trust.[30]

The proper approach to restoring the trust depends on the following points:

(i)     the nature of the trustee's breach, either as a breach of a duty of custodianship or a breach of a duty of management;
(ii)    whether the trustee can specifically restore any misapplied assets to the trust or whether he should pay a sum of money to restore the trust to an equivalent financial position;
(iii)   where a sum of money is awarded, whether it should be paid into the trust fund or directly to the beneficiary; and
(iv)    the date for assessing the trustee's liability.

**(b) Breach of custodianship duty or breach of management duty.** Two main    30-012 kinds of breach of trust need to be distinguished when considering the trustee's li-ability make restoration to the trust fund: a misapplication of trust assets in breach

---

[24] *Milligan v Mitchell* (1833) 1 My. & K. 446.
[25] *Dance v Goldingham* (1873) 8 Ch. App. 902; *Wheelwright v Walker (No.2)* (1883) 31 W.R. 912.
[26] *Rigall v Foster* (1853) 18 Jur. 39.
[27] *Perry v Shipway* (1859) 4 De G. & J. 353. For the power of a majority to act, see above para.23-063.
[28] *Target Holdings Ltd v Redferns* [1996] A.C. 421 at 434; *AIB Group (UK) Plc v Mark Redler & Co Solicitors* [2014] UKSC 58; [2015] A.C. 1503 at [64].
[29] *Re Dawson (Deceased)* [1966] 2 N.S.W.R. 211 at 214, per Street J; *Bartlett v Barclays Bank Trust Co Ltd* [1980] Ch. 515 at 543 per Brightman J.
[30] This is the general expression used in leading case *Target Holdings Ltd v Redferns* [1996] A.C. 421.

of his duty to preserve the custody of the trust assets, and a breach of his duty to manage the assets.[31]

A trustee misapplies trust assets if he disposes of them in breach of his general duty to preserve them according to the terms of the trust. A misapplication may occur where the trustee invests trust money in an unauthorised security[32]; where he pays trust money to an unauthorised agent[33]; or where a trustee releases trust money in breach of the authority conferred upon him by his beneficiary.[34] The loss to the trust consists in a direct transfer of an asset out of the fund.

A trustee commits a different kind of breach when he fails to manage the trust fund according to his equitable duties.[35] He may, for example, cause loss to the trust by failing to exercise reasonable care and skill in selecting an investment, or in selecting an agent to whom he pays trust money.[36] Here the loss suffered by the trust is not caused by a wrongful disposal of assets from the fund. In the two examples given, the trustee's actions were authorised but they were performed negligently, in breach of his equitable duty of care.[37] The loss consists in a fall in the value of the trust fund compared with its value if due care had been exercised.

The difference between these two kinds of breach and loss can be seen in the traditional accounting procedures for determining a trustee's liability for breach.[38] When the trustee misapplies property from the trust fund, the beneficiary is entitled to "falsify" the entry in the account that records the unauthorised disposition. The effect is to make the trustee liable to restore the property or its value that was wrongfully transferred out of the trust fund.

But where the trustee causes loss by breaching a managerial duty, there is no unauthorised disposition of property that the beneficiary can falsify. The beneficiary instead seeks an account on the basis of "wilful default". The trustee is required to restore the financial position of the trust fund to what it would have been if the trustee had not been guilty of wilful default.[39] The effect is that the trustee must pay fresh money into the account. The trustee's liability is essentially to compensate the trust for consequential losses that follow from the trustee's breach.

---

[31] For the distinction, see *Youyang Pty Ltd v Minter Ellison Morris Fletcher* [2003] HCA 15; (2003) 212 C.L.R. 484 at 499–500; and *AIB Group (UK) Plc v Mark Redler & Co Solicitors* [2014] UKSC 58; [2015] A.C. 1503 at [51]–[60]. The distinction is sharply drawn in S.B. Elliott and C. Mitchell (2004) 67 M.L.R. 16 at 24–31; and S.B. Elliott and J. Edelman (2004) 18 Tru. L.I. 116 at 116–122 between monetary awards amounting to "substitutive compensation" for misapplication of trust funds and "reparative compensation" for losses resulting from wrongful administration of the trust.

[32] *Knott v Cottee* (1852) 16 Beav. 77.

[33] *Re Dawson (Deceased)* [1996] 2 N.S.W.R. 211; *Clough v Bond* (1838) 3 My. & Cr. 490.

[34] *Target Holdings Ltd v Redferns* [1996] A.C. 421; *Youyang Pty Ltd v Minter Ellison Morris Fletcher* [2003] HCA 15; (2003) 212 C.L.R. 484. It is a matter of construction to determine which terms of a solicitor's contractual retainer limit his authority to disburse monies which he holds on trust: *Lloyds Bank TSB Plc v Markandan & Uddin* [2012] EWCA Civ 65; [2012] 2 All E.R. 884; *Nationwide Building Society v Davisons Solicitors* [2012] EWCA Civ 1626; [2013] P.N.L.R. 12; *AIB Group (UK) Plc v Mark Redler & Co Solicitors* [2014] UKSC 58; [2015] A.C. 1503.

[35] See Ch.29 above.

[36] TA 2000 s.1, Sch.1.

[37] *Re Chapman* [1896] 2 Ch. 763; TA 2000 s.24.

[38] See Ch.20 above; and generally P. Millett (1998) 114 L.Q.R. 214 at 225–227; R. Chambers, Ch.1 in Birks and Pretto (eds) *Breach of Trust* (Hart Publishing, 2002).

[39] *AIB Group (UK) Plc v Mark Redler & Co Solicitors* [2014] UKSC 58; [2015] A.C. 1503 at [54].

PERSONAL REMEDIES AGAINST THE TRUSTEE IN BREACH

**(c) Specific or monetary restoration.**

*(1) Misapplication.* Where the breach consists in a misapplication of trust assets, the first question is whether the trustee should specifically restore the assets to the trust or restore their value by making a money payment. If the trustee still has the original assets, he may make restoration in specie by transferring them back to the trust fund.[40] If the original assets are no longer available, then the beneficiary may elect to assert a proprietary remedy over any traceable proceeds in the hands of the trustee or a third party.[41] To the extent that this is possible, it will be treated as the specific restoration of the trust assets.

    If the trust assets or their proceeds cannot be restored in specie, then the trustee must pay a sum of money sufficient to restore the trust fund to the position it would have been in if the trust assets had not been misapplied. The money payment is a substitute for restoration in specie.[42]

    In assessing the amount of money payable by the trustee, the court does not make any allowance for the remoteness or foreseeability of losses resulting from the original misapplication.[43] The money claim is a liquidated debt even though the court may need to assess its precise amount.[44] Where, for example, the trust suffers a loss because the trustee has invested trust money in an unauthorised security, the trustee must reinstate the full amount of the money even if the loss on the investment was unforeseeable.[45] The approach is different from the assessment of damages for breach of a contractual or tortious duty at common law.[46] The trustee's breach relates to his distinctive equitable duty to preserve the trust fund and to apply it solely in accordance with his limited equitable powers. Causation is only relevant to determining the equivalent position to which the trust fund should be restored. The award of money must restore the fund to the position it would have been in if the trustee had not made the unauthorised disposition of trust assets.[47] This requires the court to consider events between the dates of breach and judgment.[48]

**30-013**

*(2) Breach of management duty.* Where the trustee has breached a management duty, then it may be unnecessary or impossible for the trustee to restore any specific assets to the trust fund. The assets may still be held in the trust fund, although at a diminished value. The trustee can only be liable to pay monetary compensation for the losses caused by his breach of duty.[49] The analogy with the breach of a contractual or tortious duty arising at common law is strong.[50] The trustee is liable to restore the trust fund to the financial position it would have been in but for his breach of duty. But common law rules of forseeability and remoteness to not apply to limit the claimant's loss in the way that they would for the

**30-014**

---

[40] *Target Holdings Ltd v Redferns* [1996] A.C. 421 at 434C–D.

[41] See para.30-050 below.

[42] *Target Holdings Ltd v Redferns* [1996] A.C. 421 at 434D–G; *AIB Group (UK) Plc v Mark Redler & Co Solicitors* [2014] UKSC 58; [2015] A.C. 1503 at [90], [107].

[43] *Re Dawson (Deceased)* [1996] 2 N.S.W.R. 211; *Re Duckwari Plc (No.2)* [1999] Ch. 268 at 272.

[44] *Creggy v Barnett* [2016] EWCA Civ 1004; [2017] Ch. 273 at [35], [44]–[45], [47]–[55].

[45] *Re Duckwari Plc (No.2)* [1999] Ch. 268 at 272.

[46] See *The Heron II* [1969] 1 A.C. 350; *The Wagonmound (No.1)* [1961] A.C. 388.

[47] *Target Holdings Ltd v Redferns* [1996] A.C. 421 at 434; *AIB Group (UK) Plc v Mark Redler & Co Solicitors* [2014] UKSC 58; [2015] A.C. 1503 at [93].

[48] See para.30-016 below.

[49] *Bartlett v Barclays Bank Trust Co Ltd* [1990] 1 Ch. 515 at 545.

[50] See *Bristol and West Building Society v Mothew* [1998] Ch. 1 at 17; P. Millett (1998) 114 L.Q.R. 214 at 226.

BREACH OF TRUST

breach of a common law duty.[51] This marks an important difference between equitable compensation and common law damages.

**30-015** **(d) Restoration of trust fund or payment to beneficiary.** Where the terms of the trust require continuing duties of custodianship over the fund, then the trustee must restore the trust assets or pay compensation into the trust fund itself.[52] An example is a traditional family trust where the beneficiaries have successive interests, or are the objects of a discretionary power. Under such a trust, no individual beneficiary has an absolute interest in the trust fund that would entitle him to direct the trustee to pay the fund to him.[53] His only right is to have the trust properly administered according to its terms. When a breach occurs, the beneficiary cannot require the trustee to transfer the trust assets or pay compensation to him directly. To do so would give him a greater right after the breach of the trust than he would have had when the trust was being properly administered.

Where the beneficiary is the object of a bare trust, however, then the court may order the trustee to pay equitable compensation directly to the beneficiary.[54] Under the bare trust the beneficiary would have been absolutely entitled to the trust fund and could have required it to be paid over to him. Payment of equitable compensation directly to the beneficiary gives him no greater right than he would have had under the original trust. The court might only require the trustee to reconstitute the original bare trust if the underlying transaction for which the trust was established still had to be carried out according to its terms.[55]

**30-016** **(e) Date for assessing liability.** The court assesses the trustee's liability for loss at the date of judgment rather than the date of breach. It does not "stop the clock" and assess the amount of the loss to the trust at some intermediate stage.[56] The selection of this date follows from the trustee's duty to account for his stewardship of the trust assets: the account must be taken down to the date on which it is rendered.[57]

So where the trustee is in breach of his duty of care and skill in administering the trust, the court takes into account matters after the date of breach to determine the full extent of the loss for which the trustee must pay compensation.[58] Where assets are misapplied from a continuing trust, then the monetary remedy paid by the trustee is a substitute for the specific restoration of the trust assets. The trustee must therefore pay their value at the judgment date.[59] The judgment date is also used to assess the remedy where the trustee misapplies assets held on a bare trust and is li-

---

[51] For criticism see S.B. Elliott (2002) 65 M.L.R. 588; S.B. Elliott and C. Mitchell (2004) 67 M.L.R. 16; S.B. Elliott and J. Edelman (2004) 18 Tru. L.I. 116.

[52] *Partridge v Equity Trustees Executors and Agency Co Ltd* (1947) 75 C.L.R. 149 at 167; *Target Holdings Ltd v Redferns* [1996] A.C. 421 at 434; *AIB Group (UK) Ltd v Mark Redler & Co Solicitors* [2014] UKSC 58; [2015] A.C. 1503 at [100].

[53] See para.22-005 above.

[54] *Target Holdings Ltd v Redferns* [1996] A.C. 421 at 434G–D; *AIB Group (UK) Ltd v Mark Redler & Co Solicitors* [2014] UKSC 58; [2015] A.C. 1503 at [106].

[55] *Contrast Target Holdings Ltd v Redferns* [1996] A.C. 421 with *Youyang Pty Ltd v Minter Ellison Morris Fletcher* [2003] HCA 15; (2003) 212 C.L.R. 484.

[56] *Target Holdings Ltd v Redferns* [1996] A.C. 421 at 437, 440.

[57] P. Millett (1998) 114 L.Q.R. 214 at 225.

[58] *Bartlett v Barclays Bank Trust Co Ltd* [1980] Ch. 515; *Nestle v National Westminster Bank Plc* [1993] 1 W.L.R. 1260.

[59] *Re Dawson (Deceased)* [1966] 2 N.S.W.R. 211; *Phillipson v Gatty* (1846) 6 Hare 26; affirmed (1850) Hare 516.

PERSONAL REMEDIES AGAINST THE TRUSTEE IN BREACH

able to pay equitable compensation directly to the beneficiary.[60] The court acts with the benefit of hindsight. It considers what the beneficiary's position would have been if the trustee had properly performed his duty. It may therefore determine whether the transaction would have proceeded in any event even if the disbursement of money by the trustee had been properly authorised. Thus, a beneficiary may not be entitled to full restoration of the entire sum paid if the transaction would have gone ahead despite the trustee's breach and the same loss would have happened in any event.[61] But if the transaction would not have happened at all, the beneficiary may have a right to restoration of the entire sum paid.[62]

**(f)    Quantification of loss: examples.**

*(1)    Misapplication.*    Many of the cases involve unauthorised investments or    **30-017** disbursement of trust monies in conveyancing transactions. The starting point in cases of unauthorised investment is that the trustee is liable to reinstate the money applied in making the investment. He is entitled to a credit for the money raised on realising it so he remains liable for difference between this and the purchase price,[63] even if the fall in value was unforeseeable.[64] If the trustee sells an authorised security to make an unauthorised investment, then the whole transaction is regarded as one, and he is liable to restore the original security at its value on judgment date. If the authorised security has increased in value, then the trustee is liable for difference.[65] If he wrongfully retains an unauthorised investment, he is liable for the difference between the price for which it is sold and the price that would have been obtained on a sale at the correct time.[66] The trustee bears the risk of any currency fluctuations between the dates of breach and judgment.[67] In the cases where a solicitor makes an unauthorised disbursement of trust monies in a conveyancing transaction, the starting point is that the beneficiary is entitled to full restoration of the money paid if the transaction is never in fact completed.[68] So where a fraudulent third party caused the solicitor to disburse the money in breach of his authority, the court would not inquire whether the fraudster might have caused a similar loss in

---

[60]    *Target Holdings Ltd v Redferns* [1996] A.C. 421; *Youyang Pty Ltd v Minter Ellison Morris Fletcher* [2003] HCA 15; (2003) 212 C.L.R. 484.

[61]    *Target Holdings Ltd v Redferns* [1996] A.C. 421; *AIB Group (UK) Plc v Mark Redler & Co Solicitors* [2014] UKSC 58; [2015] A.C. 1503 at [73], [90], [134]–[135].

[62]    *Lloyds Bank TSB Plc v Markandan & Uddin* [2012] EWCA Civ 65; [2012] 2 All E.R. 884; *Nationwide Building Society v Davisons Solicitors* [2012] EWCA Civ 1626; [2013] P.N.L.R. 12; *Ikbal v Sterling Law* [2013] EWHC 3291 (Ch); [2014] P.N.L.R. 9. The trustee may however have a defence under the Trustee Act 1925 s.61.

[63]    *Knott v Cottee* (1852) 16 Beav. 77.

[64]    *Re Duckwari Plc* [1999] Ch. 253 at 272; (1837) 3 My. & Cr. 490.

[65]    *Phillipson v Gatty* (1848) 7 Hare 516; affirmed (1850) 2 H. & Tw. 459; applied in *Re Massingberd's Settlement* (1890) 63 L.T. 296. If the investment was in fact resold by those to whom it was improperly sold, the resale price is the measure of the trustee's liability, because this would in fact have been the cost of replacement: *Re Bell's Indenture* [1980] 1 W.L.R. 1217.

[66]    *Fry v Fry* (1859) 27 Beav. 144. And see *Robinson v Robinson* (1851) 1 De G.M. & G. 247.

[67]    *Re Dawson (Deceased)* [1966] 2 N.S.W.R. 211.

[68]    *Youyang Pty Ltd v Minter Ellison Morris Fletcher* [2003] HCA 15; (2003) 212 C.L.R. 484; *Lloyds Bank TSB Plc v Markandan & Uddin* [2012] EWCA Civ 65; [2012] 2 All E.R. 884; *Nationwide Building Society v Davisons Solicitors* [2012] EWCA Civ 1626; [2013] P.N.L.R. 12; *Ikbal v Sterling Law* [2013] EWHC 3291 (Ch); [2014] P.N.L.R. 9.

a different way.[69] But where the unauthorised transaction would have proceeded despite the solicitor's technical lack of authority, the court will compare the actual position with that which the beneficiary would have been in had there been no breach.[70]

**30-018**    *(2)  Breach of management duty.*    Where the trustee breaches a management duty, then the quantification of his liability may be more difficult since it does not involve the outright misapplication of money. The court must assess the current value of the trust fund against the value it would have had if the breach had not occurred. The trustee may be liable for capital and income losses that can be proved to follow from his breach.[71] Exceptionally, where the breach relates to more than one transaction and stems from the same policy, the court may allow the trustee to set off a loss made in one transaction against a profit made in another.[72] But where the trust claimant cannot prove what the trustees would have done if they had not committed the breach, then they may fail to prove any loss resulting from the trustee's breach. So where trustees failed in their duty to diversify the trust investments, the trust claimants could not prove any loss resulting from the breach unless they could point to actual investment returns that would have been made if the fund had been properly diversified.[73]

The trustee, unlike a contract breaker and tortfeasor, is not entitled to any allowance for the tax which the beneficiaries would have incurred if they had received the full amount of capital and income to which they were entitled. The trustee's liability is calculated as if they were restoring the trust fund rather than paying damages directly to the beneficiary. The tax liability of individual beneficiaries arises not at the point where the trust estate is restored but where capital or income is distributed from it.[74]

**30-019**    *(3)  Set off.*    Where assets are misapplied, a profit made in one unauthorised transaction cannot be set off against a loss incurred in another unauthorised transaction.[75] If the trustee's net liability were reduced in this way, they would effectively be allowed to keep part of the unauthorised profit for himself. Yet profits and losses that stem from same transaction[76] or from the same wrongful policy in administering the trust can be set off against each other to reduce the trustee's net liability.[77]

---

[69] *Lloyds Bank TSB Plc v Markandan & Uddin* [2012] EWCA Civ 65; [2012] 2 All E.R. 884; *Ikbal v Sterling Law* [2013] EWHC 3291 (Ch); [2014] P.N.L.R. 9.

[70] *AIB Group (UK) Plc v Mark Redler & Co Solicitors* [2014] UKSC 58; [2014] 3 W.L.R. 1367 at [105], [107], [134].

[71] *Bartlett v Barclays Bank Trust Co Ltd* [1980] Ch. 515.

[72] *Bartlett v Barclays Bank Trust Co Ltd* [1980] Ch. 515.

[73] *Nestle v National Westminster Bank (No.2)* [1993] 1 W.L.R. 1260.

[74] *Re Bell's Indenture* [1980] 1 W.L.R. 1217; *Bartlett v Barclays Bank Trust Co Ltd* [1980] Ch. 515; distinguishing *British Transport Commission v Gourley* [1956] A.C. 185.

[75] *Dimes v Scott* (1827) 4 Russ. 195; *Wiles v Gresham* (1854) 2 Drew. 258; affirmed 5 De G.M. & G. 770.

[76] *Fletcher v Green* (1864) 33 Beav. 426.

[77] *Bartlett v Barclays Bank Trust Co Ltd* [1980] Ch. 515.

PERSONAL REMEDIES AGAINST THE TRUSTEE IN BREACH

**(g) Interest and liability for lost income.**[78]    The trustee may be liable to pay **30-020** interest to compensate the trust for losses resulting from his breach.[79] Where the trustee applies the trust money for his own use, he may also have to account for his unauthorised profit made with the trust money. In principle, the rules for awarding interest should compensate the beneficiary fully for his lost investment returns or make the trustee disgorge his full profit.[80] Where trust money has been misapplied, the court should aim, as far as the evidence reliably allows, to award interest which reflects the cost to the trust beneficiaries of being kept out of their money.[81] The exercise of calculating the actual loss to the trust or gain to the trustee may be difficult: it may involve speculative inquiries into the possible income returns on the original capital sum, or the degree to which the trustee's profit was attributable to his use of the trust money. Where however the court has precise and reputable information about the expected returns on the trust investment, then interest should be awarded as a proxy for them.[82]

The traditional approach has been to award interest at defined rates. Historically, the standard trustee rate was set at 4 per cent.[83] A higher rate of 5 per cent was only awarded in special cases. Interest was not generally compounded.[84] Since the 1970s, this regime was replaced with two fluctuating rates pegged to recognised scales. For private trusts, standard awards of interest are now set at the rate allowed from time the time on money deposited in court on the special account.[85] The new higher rate is 1 per cent above bank base rate.[86] It is awarded where the party is a commercial organisation, or where the special circumstances of a private trust warrant it.[87]

The special cases where the higher rate may be awarded in a private trust claim are:

(i)    Where the trustee is guilty of fraud or serious misconduct. The higher rate would also be compounded[88] with yearly[89] or even half-yearly rests.[90]

(ii)   Where the trustee has traded with the trust money for his own use. Here he is presumed to have earned more than the standard rate. Interest at the higher commercial rate is available where the beneficiary cannot prove and

---

[78] See generally S.B. Elliott [2001] Conv. 313.
[79] e.g. *Stafford v Fiddon* (1857) 23 Beav. 386; *Re Jones* (1883) 49 L.T. 91; *Re Waterman's WT* [1952] 2 All E.R. 1054 (trustee liable for interest representing lost income owing to undue delay in investing trust funds).
[80] S.B. Elliott [2001] Conv. 313 at 319–321.
[81] The principles are summarised in *Challinor v Juliet Bellis & Co* [2013] EWHC 620 (Ch); reversed on other grounds in [2015] EWCA Civ 59; [2016] W.T.L.R. 431; and *Watson v Kea Investments* [2019] EWCA Civ 1759, [2019] 4 W.L.R. 145.
[82] *Watson v Kea Investments* [2019] EWCA Civ 1759, [2019] 4 W.L.R. 145 at paras [65], [71]-[74].
[83] *Re Davy* [1908] 1 Ch. 61.
[84] *Burdick v Garrick* (1870) L.R. 5 Ch.App. 233 at 241–242; *Wallsteiner v Moir* [1975] Q.B. 373.
[85] *Bartlett v Barclays Bank Trust Co Ltd* [1980] Ch. 515. See Court Funds Rules 1987 r.26 for the special account. The rate of interest is prescribed from time to time by a direction made by the Lord Chancellor with the concurrence of the Treasury: above rr.27. This approximates to the return on National Investment Instruments and assumes that the private trust funds would have been invested in secure investments offering a relatively low rate of return. The special account was formerly known as the "short-term investment" account.
[86] *Wallsteiner v Moir* [1975] Q.B. 373.
[87] *Re Duckwari Plc (No.2)* [1999] Ch. 268.
[88] See *Westdeutsche Bank v Islington LBC* [1996] A.C. 669.
[89] See *Re Barclay* [1899] 1 Ch. 674.
[90] *Re Emmet's Estate* (1881) 17 Ch. D. 142. Half-yearly rests are rarely directed: *Burdick v Garrick* (1870) 5 Ch. App. 233.

recover the profits actually made by the trustee with the trust money.[91] Normally compound interest is awarded[92] unless the trading has been for the benefit or partly for the benefit of the beneficiary.[93] Likewise, simple interest would be awarded if the money, while employed in a business or profession, was not used in the normal course of trading.[94]

Alternatively, the court may order an inquiry into the actual loss by the beneficiary owing to the trustee's breach, or the actual rate of return in fact made by the trustee with the trust money (this may include the total return of any investment, including any capital gain)[95]:

- (i)   thus where the trust claimant can establish what proportion of the trustee's profits was made by trading with the trust money, he must account for that profit rather than pay interest on trust money[96];
- (ii)  where a trustee who applied trust money for his own benefit invested it at a rate above the standard trustee rate, he must account for the interest he actually received.[97]

In periods when there is a wide difference between commercial borrowing rates and investment rates, the court may vary from the usual higher rate of one per cent above bank base rate. It may take into account the purpose for which the claimant placed the money on trust with the defendant, and the standard rates of borrowing or investment return that a hypothetical person in the position of the claimant might have expected to pay or receive.[98]

**30-021**   **(h)  Costs.**   A trustee against whom an action for breach of trust succeeds will be ordered to pay costs on the standard basis. Cost on the higher indemnity basis will only be awarded in exceptional circumstances.[99] Interests on costs runs from the date of judgment even though it is not until taxation that the trustee knows what he has to pay.[100]

**30-022**   **(i)  Imprisonment.**   In addition to ordinary methods of execution, a trustee may be imprisoned for not more than a year if he fails to pay any sum in his possession

---

[91]  *Vyse v Foster* (1872) 8 Ch.App. 309 at 329 (affirmed L.R. 7 H.L. 318); *Re Davis, Davis v Davis* [1902] 2 Ch. 314; *Gordon v Gonda* [1955] 1 W.L.R. 885. The beneficiary may not claim the profits of a trader to whom the money has been improperly lent, even though the borrower knew that the money belonged to the trust: *Stroud v Gwyer* (1860) 28 Beav. 130.

[92]  *Jones v Foxall* (1852) 15 Beav. 388; *Williams v Powell* (1852) 15 Beav. 461; *Wallersteiner v Moir (No.2)* [1975] Q.B. 373; and see *Westdeutsche Bank v Islington LBC* [1996] A.C. 669.

[93]  *O'Sullivan v Management Agency and Music Ltd* [1985] Q.B. 428.

[94]  *Burdick v Garrick* (1870) 5 Ch. App. 233.

[95]  *Watson v Kea Investments* [2019] EWCA Civ 1759, [2019] 4 W.L.R. 145.

[96]  *Docker v Somes* (1834) 2 My. & K. 655.

[97]  *Re Emmet's Estate* (1881) 17 Ch. D. 142.

[98]  *Challinor v Juliet Bellis & Co* [2013] EWHC 620 (Ch); reversed on other grounds in [2015] EWCA Civ 59; [2016] W.T.L.R. 43.

[99]  *Bartlett v Barclays Bank Trust Co Ltd* [1980] Ch. 515; *Bowen-Jones v Bowen-Jones* [1986] 3 All E.R. 163.

[100]  *Hunt v RM Douglas (Roofing) Ltd* [1990] A.C. 398; overruling *K v K* [1977] Fam. 39; applied in *Bartlett v Barclays Bank Trust Co Ltd* [1980] Ch. 515.

or under his control as ordered by a court of equity.[101] This rule applies to others in a fiduciary capacity, e.g. executors[102] and auctioneers.[103]

### 3.    Impoundment of Trustee's Beneficial Interest

If a trustee who has been guilty of a breach of trust has a beneficial interest under the trust instrument, he will not be allowed to receive any part of the trust fund in which he is equitably interested until he has made good the breach of trust.[104] The principle is that to the extent that he is in default[105] he is regarded as having already received his share.[106] The rule applies not only to beneficial interests given to him directly by the trust instrument, but also to interests acquired derivatively, e.g. by purchase from another beneficiary or as his next-of-kin.[107] The beneficial interest which he claims under the instrument imposing the trust is treated as being subject to an implied condition of the proper performance of his duty as trustee.[108] His assignee is accordingly in no better position than he would be, even where the default was committed by the trustee after assigning his beneficial interest.[109] But there can be no impounding if the assignor does not become a trustee until after the assignment[110]; and if the trustee holds two distinct funds on distinct trusts, and has a beneficial interest in the first but not in the second, the court has no power to impound his beneficial interest in the first to make good his default in the second.[111]

**30-023**

### 4.    DEFENCES AND ADJUSTMENTS TO TRUSTEE'S LIABILITY

### 1.    Exemption Clauses and Express Modification of Duty[112]

The trust instrument is the primary source of the trustee's powers and duties. A settlor is generally free to alter any duties or limitations on powers that a trustee would owe under the general law. A trust instrument commonly contains clauses that negative or modify the duties to which the trustee would otherwise be subject,[113] or which exempt him from liability for a breach of duty.[114] It may prove therefore that the trustee has not committed any actionable breach or, at least, not one for which he can be held liable.

**30-024**

**(a)    Construction.**    The duty or liability of a trustee under the general law can

**30-025**

---

[101] Debtors Act 1869 s.4; *Re Lord Berwick* (1900) 81 L.T. 797.

[102] *Re Bourne* [1906] 1 Ch. 697.

[103] *Crowther v Elgood* (1887) 34 Ch. D. 691.

[104] *Re Dacre* [1916] 1 Ch. 344. Contrast impounding orders under TA 1925 s.62.

[105] For adjustments to be made in respect of costs, see *Selangor United Rubber Estates Ltd v Cradock (No.4)* [1969] 1 W.L.R. 1773.

[106] *Re Dacre* [1916] 1 Ch. 344. The principle is also applied as between shareholder directors and companies in liquidation: see *Selangor United Rubber Estates Ltd v Cradock (No.4)* [1969] 1 W.L.R. 1773; discussing *Re VGM Holdings Ltd* [1942] Ch. 235.

[107] *Jacubs v Rylance* (1874) L.R. 17 Eq. 341; *Doering v Doering* (1889) 42 Ch. D. 203; *Re Dacre* [1916] 1 Ch. 344.

[108] *Morris v Livie* (1842) 1 Y. & C.C.C. 380; *Re Pain* [1919] 1 Ch. 38 at 47.

[109] *Doering v Doering* (1889) 42 Ch. D. 203.

[110] *Irby v Irby (No.3)* (1858) 25 Beav. 632; *Re Pain* [1919] 1 Ch. 38 at 47.

[111] *Re Towndrow* [1911] 1 Ch. 662.

[112] See generally Law Commission, *Trustee Exemption Clauses* (C.P. No. 171); and *Trustee Exemption Clauses* (Law Com. No.301).

[113] *Wilkins v Hogg* (1861) 5 L.T. 467; *Bartlett v Barclays Bank Trust Co Ltd* [1980] Ch. 515.

[114] *Bartlett v Barclays Bank Trust Co Ltd* [1980] Ch. 515 at 536, 537; and Law Com. No.301 paras 5.46–5.102.

BREACH OF TRUST

only be excluded by clear and unambiguous words. The court construes the exemption clause restrictively. Anything not clearly within it is treated as falling outside it.[115] The clause is construed *contra proferentem* only in a limited sense. The party relying on the clause bears the burden of showing that its words refer to the conduct that has been called into question. The court has no inherent reason to construe the clause in favour of the trust beneficiary since the beneficiary is not generally a party to the trust instrument.[116]

**30-026** **(b) Limits on permitted exclusion.** Even a clearly worded clause may not be applied according to its terms if it exceeds the permitted range of exclusion. A trustee owes an irreducible core of duties that cannot be excluded if the transaction between himself and the settlor is to be recognised as a trust. So a settlor cannot exclude liability for loss or damage resulting from the trustee's actual fraud.[117] In this context, fraud is understood to mean dishonesty, in the sense of conduct falling below the objective standard of an ordinary honest trustee.[118] A person who is at liberty to deal with property that belongs to him at law in dishonest disregard of his alleged beneficiaries' interests and without being held accountable to him is in substance a beneficial owner rather than a trustee.

The settlor is generally free to exclude any lesser degree of fault, such as negligence, and the trustee may rely on the clause as it stands.[119] The current understanding of English law is that the settlor may also exclude liability even for the trustee's gross negligence.[120] Some doubts have been expressed, however, as to whether the earlier authorities in fact provided clear support for this view: in principle, a settlor might not be free to modify or exclude certain other core duties of a trustee, such as the duty to obey the terms of the trust; to keep the trust property separate from his own property; and exercise his discretion in good faith and for a proper purpose.[121] Statute may also prohibit the exclusion of certain general law duties.[122]

A clause that is too broad in its purported range of exemption may nonetheless

---

[115] For example *Knox v MacKinnon* (1888) 13 App. Cas. 753 (HL Sc); *Lutea Trustees Ltd v Orbis Trustees Guernsey Ltd* 1998 S.L.T. 471; *Barnsley v Noble* [2016] EWCA Civ 799; [2016] W.T.L.R. 1027.

[116] *Bogg v Raper* unreported 8 April 1998 Court of Appeal. It may however take a somewhat stricter approach to construction against a professional trustee: *Midland Bank Trustee (Jersey) Ltd v Federated Pension Services Ltd* [1996] P.L.R. 179 at [133] Jersey CA.

[117] *Armitage v Nurse* [1998] Ch. 241.

[118] *Walker v Stones* [2000] 4 All E.R. 412; following *Royal Brunei Airlines Sdn Bhd v Tan* [1995] A.C. 378. See para.30-079 below. An intentional breach of trust that was justifiably committed in the interests of the beneficiaries would not necessarily be dishonest in this sense. "The main duty of a trustee is to commit *judicious* breaches of trust": *Perrins v Bellamy* [1889] 1 Ch. 797, 798 in arg. A trustee who believes her acts are morally justified, or that her actions have not fallen below acceptable standards, may nonetheless be held to have acted dishonestly if an ordinary, honest trustee would not have acted as she did: *Wong v Burt* [2004] NZCA 174; [2005] W.T.L.R. 29; *Barnes v Tomlinson* [2006] EWHC 3115; [2007] W.T.L.R. 377. For the pleading a dishonest breach of trust where the trustee relies on an exoneration clause, see *Sofer v Swiss Independent Trustees SA* [2020] EWCA Civ 699.

[119] *Armitage v Nurse* [1998] Ch. 241.

[120] *Spread Trustee Co Ltd v Hutcheson* [2011] UKPC 13; [2012] 2 A.C. 194.

[121] D. Hayton, in A.J. Oakley (ed.), *Contemporary Trends in Trust Law* (OUP, 1996), Ch.3.

[122] For example Pensions Act 1995 s.33(1) (duty of care and skill by trustees or fund managers in performance of investment functions); Financial Services and Markets Act 2000 s.253 (duty of care and skill of trustees of a unit trust scheme). The Unfair Contract Terms Act 1977 does not apply to trusts: *Baker v JE Clark & Co (Transport) Ltd* [2006] EWCA Civ 464; [2006] Pens. L.R. 131.

DEFENCES AND ADJUSTMENTS TO TRUSTEE'S LIABILITY

be valid. But it is read down in its effect to the permitted range of exclusion.[123] In extreme cases, an excessively broad exemption clause may indicate that a purported trust is a sham if there is other evidence, outside the terms of the instrument, that also supports this inference.[124]

**(c) Rule of practice.** The Law Commission's review of trustee exemption clauses concluded that the use of trustee exemption clauses was best regulated by rules of professional practice. It recommended that any paid trustee who caused a settlor to include a clause in a trust instrument that had the effect of excluding or limiting liability for negligence had to take reasonable steps to ensure that the settlor was aware of the meaning and effect of the clause.[125] If the trustee did not do so, then the clause would remain fully enforceable but the trustee would be liable to be censured by the professional or regulatory organisation that they belonged to. The aim of the rule was to ensure that the settlor gave a properly informed consent to the inclusion of the clause. The Society of Trusts and Estate Practitioners has now adopted this practice.[126]   **30-027**

## 2.  Prior Consent or Acquiescence by Beneficiary

Two consequences may follow from a beneficiary's acquiescence in a breach of trust or prior consent to it.   **30-028**

**(a) Beneficiary's action barred.** A beneficiary who has consented to the trustee's breach or acquiesced in it may not proceed against the trustee.[127] The rule applies whether or not the beneficiary derived any benefit from the breach.[128] The reason is that a beneficiary cannot be heard to complain of acts which he has himself knowingly authorised.[129] The beneficiary must have had full knowledge of the facts, and possibly also their legal consequences if his concurrence is to bar his claim.[130]   **30-029**

The bar on the beneficiary's claim only applies if he has full capacity to concur in the breach. Unless the beneficiary is himself guilty of fraud,[131] his consent is only effective if he has attained the age of majority[132] or is not subject to his parents' undue influence and they are profiting from the breach.[133]

The beneficiary's consent or acquiescence only bars his own claim against the trustee. The trustee remains liable to the other beneficiaries who have not consented.[134] Thus if trustees made an unauthorised investment, and all the beneficiaries being sui juris elected to adopt it as part of the trust fund, then the

---

[123] *Midland Bank Trustee (Jersey) Ltd v Federated Pension Services Ltd* [1996] Pens. L.R. 179 at [146]–[147].

[124] See para.22-067 above.

[125] Law Com. No.301, Pt 6.

[126] See STEP, *Guidance Notes: Practice Rule to Trustee Exemption Clauses*.

[127] *Fletcher v Collis* [1905] 2 Ch. 24; *Life Association of Scotland v Siddal* (1861) 3 De G.F. & J. 58. See generally *Re Pauling's ST (No.1)* [1964] Ch. 303; *Knight v Frost* [1999] 1 B.C.L.C. 364.

[128] *Fletcher v Collis* [1905] 2 Ch. 24.

[129] *Brice v Stokes* (1805) 11 Ves. 319; *Re Deane* (1888) 42 Ch. D. 9.

[130] *Cockerell v Cholmeley* (1830) 1 Russ. & M. 418; *Re Howlett* [1949] Ch. 767 at 775; contrast *Stafford v Stafford* (1857) 1 De G. & J. 193 at 202; *Holder v Holder* [1968] Ch. 353; approving *Re Pauling's ST (No.1)* [1962] 1 W.L.R. 86 at 108 (affirmed: [1964] Ch. 303).

[131] *Overton v Bannister* (1844) 3 Hare 503.

[132] *Wilkinson v Parry* (1828) 4 Russ. 272 at 276.

[133] *Re Pauling's ST (No.1)* [1964] Ch. 303; for undue influence, see above para.8-008.

[134] *Brice v Stokes* (1805) 11 Ves. 319; *Ghost v Waller* (1846) 9 Beav. 497.

trustee would be absolved from liability.[135] They must, however, positively adopt it: it is not sufficient merely that a beneficiary has become absolutely entitled to a share in the trust fund.[136]

**30-030**  **(b)  Trustee's indemnity from consenting beneficiary.**  If the trustee remains liable to another beneficiary who did not consent to the breach, then they may have some recourse against the consenting beneficiary. Equity has always had jurisdiction to order the trustee to be indemnified out of the interest of the beneficiary who instigated[137] the breach of trust to the extent that the beneficiary benefited by the breach.[138] This jurisdiction was considerably enlarged by statute.[139] It is provided that where a trustee commits a breach of trust at the instigation or request of a beneficiary (whether oral or written),[140] or with his consent in writing:

> "the court may, if it thinks fit, make such order as to the court seems just, for impounding all or any part of the interest of the beneficiary in the trust estate by way of indemnity to the trustee or persons claiming though him."

The court has a full discretion under this section. It will not grant an impounding order unless the beneficiary clearly knew the facts which constituted the breach of trust, although it need not be shown that they knew that these facts amounted to a breach of trust.[141] If the order is made, it takes priority over the right of an assignee of the beneficiary's interest under an assignment made after the breach of trust was committed.[142] Moreover, neither the equitable nor the statutory right depends upon possession of the trust fund, so that the order can be made in favour of a former trustee.[143]

### 3.  Subsequent Release or Confirmation by Beneficiary

**30-031**  On the same principle, a beneficiary may, by subsequent confirmation or release, prevent himself from taking proceedings against his trustee for breach of trust. The beneficiary must be of full capacity and know all the relevant facts.[144]

It is not clearly settled whether a trustee or executor is entitled to demand a release when he completes his duties. It seems that an executor is entitled to a release on handing over the residue to the residuary legatee. In general, a trustee remains liable for breaches of trust even after he has retired from his trusteeship. He cannot require a deed of release from the incoming trustee[145] or the beneficiaries.

---

[135] *Re Jenkins and HE Randall & Co.'s Contract* [1903] 2 Ch. 362; *Wright v Morgan* [1926] A.C. 788 at 799. And see above para.29-030.

[136] *Consider Bartlett v Barclays Bank Trust Co Ltd* [1980] Ch. 515 at 543.

[137] See *Sawyer v Sawyer* (1885) 28 Ch. D. 595 at 598. In so far as this case appears to apply the rule more favourably towards a married woman beneficiary (even where she was not restrained from anticipation), it would probably not now be followed.

[138] *Raby v Ridehalgh* (1855) 7 De G.M. & G. 104; and see *Re Balfour's Settlement* [1938] Ch. 928.

[139] Trustee Act 1925 s.62. Contrast the automatic impounding of the interest of a trustee-beneficiary; above para.30-023.

[140] *Griffith v Hughes* [1892] 3 Ch. 105; *Re Somerset* [1894] 1 Ch. 231 at 266.

[141] *Re Somerset* [1894] 1 Ch. 231 at 270, 274.

[142] *Bolton v Curre* [1895] 1 Ch. 544.

[143] *Re Pauling's ST (No.2)* [1963] Ch. 576.

[144] *Burrows v Walls* (1855) 5 De G.M. & G. 233; *Walker v Symonds* (1818) 3 Swans. 1.

[145] *Tiger v Barclays Bank Ltd* [1951] 2 K.B. 556 (affirmed on other grounds, [1952] 1 All E.R. 85).

DEFENCES AND ADJUSTMENTS TO TRUSTEE'S LIABILITY

Often, however, he will be given a release if he asks for it.[146] Moreover, the trustee is entitled to have his accounts examined and settled, and beneficiaries who are sui juris ought not to keep the risk of proceedings for breach hanging indefinitely over him. A claim by the beneficiary may be barred by lapse of time.[147]

## 4. Relief by Court

**(a)   The jurisdiction.**   By the Trustee Act 1925 s.61,[148] the court may relieve a trustee either wholly or partly from personal liability for a breach of trust if he "acted honestly and reasonably, and ought fairly[149] to be excused for the breach of trust and for omitting to obtain the directions of the court in the matter in which he committed such breach". The power to grant relief extends to executors as well as trustees.[150]    **30-032**

**(b)   Grant of relief.**   There are two stages to the applying the test. The burden lies on the trustee to establish that he acted honestly and reasonably, and that the discretion to grant relief should be exercised in his favour.[151] The conduct relied upon by the defendant must have had some relevant connection to the beneficiary's loss, at least in the sense that it raised the risk of the loss happening. But it need not be the "but for" cause of the loss in a strict sense, since in many transactions where the defence is raised, the loss might have occurred in any event owing to the involvement of a fraudulent third party.[152] Conduct outside this range of relevance may not be taken into account.[153] The defendant need only have acted reasonably, which is does not imply that he must have complied with best practice in every respect.[154] The defendant may rely on the defence even though he has failed to seek the directions of the court, particularly where the sum involved was small.[155]    **30-033**

---

[146]  *King v Mullins* (1852) 1 Drew. 308; *Re Cater's Trusts (No.2)* (1858) 25 Beav. 366; but see *Re Wright's Trusts* (1857) 3 K. & J. 419 at 421, 422.

[147]  See para.30-035 below.

[148]  Replacing Judicial Trustees Act 1896 s.3. For the events leading to the enactment of the Judicial Trustees Act 1896 s.3, see D. R. Paling (1973) 37 Conv.(N.S.) 48 at 53, n.22. Companies Act 2006 s.1157 confers a similar power to relieve a director, officer, or auditor. But the tests for relief are not interchangeable. Unlike TA 1925 s.61, Companies Act s.1157 contemplates that the defendant may still be found to have acted reasonably even if he has breached his duty of care: *Santander UK v RA Legal Solicitors* [2014] EWCA Civ 183; [2014] P.N.L.R. 20 at [31]. For examples, see *Re Allsop* [1914] 1 Ch. 1; *Holland v German Property Administrator* [1937] 2 All E.R. 807; *Re Wightwick's WT* [1950] Ch. 260 (transfer of trust property to wrong person). For recent applications of s.61, see P.S. Davies [2015] Conv. 379; and J. Lowry and R. Edmunds (2017) 133 L.Q.R. 223.

[149]  See *Marsden v Regan* [1954] 1 W.L.R. 423 at 434, 435; *Bartlett v Barclays Bank Trust Co Ltd* [1980] Ch. 515 at 537, 538.

[150]  Trustee Act 1925 s.68(17); and see *Re Kay* [1897] 2 Ch. 518.

[151]  *Santander UK v RA Legal Solicitors* [2014] EWCA Civ 183; [2014] P.N.L.R. 20.

[152]  e.g. *Purrunsing v A'Court & Co (a firm)* [2016] EWHC Ch 789; [2016] 4 W.L.R. 81.

[153]  *Davisons (Solicitors) v Nationwide Building Society* [2012] EWCA Civ 1626; [2013] P.N.L.R. 20; *Santander UK v RA Legal Solicitors* [2014] EWCA Civ 183; [2014] P.N.L.R. 20 at [24].

[154]  *Davisons (Solicitors) v Nationwide Building Society* [2012] EWCA Civ 1626.

[155]  *Re Grindey*; contrast *Re Gee* at 297; *Partridge v Equity Trustees Executors and Agency Co Ltd* (1947) 75 C.L.R. 149 at 165.

BREACH OF TRUST

**30-034**  **(c)  Paid or professional trustees.**

> "A paid trustee is expected to exercise a higher standard of diligence and knowledge than an unpaid trustee."[156]

Thus the court may expect a higher standard of care of a paid or professional trustee before allowing him the benefit of the defence. Since the effect of granting the defence is to leave the loss with the beneficiary, the court may be reluctant allow it to a trustee who carried liability insurance.[157]

## 5.  Lapse of Time and Limitation

**30-035**  **(a)  General.**  There were originally no limitation statutes applying to equitable claims arising out of a breach of trust. Instead, equity relied on the defence of laches to bar old suits.[158] A claimant who had been guilty of an inexcusable delay might be barred from bringing his suit if it would cause substantial prejudice to the defendant. Laches may still bar a claim arising out of breach of trust where statute does not provide a relevant limitation period.[159]

The present law is laid down by the Limitation Act 1980.[160] The general rule is now that an action by a beneficiary to recover trust property or in respect of any breach of trust may not be brought after six years from the date that the right of action accrued.[161] There are some exceptions to this general rule, where the trustee's liability is indefinite. It is therefore necessary to consider:

    (i)    who is a "trustee" for the purposes of the Limitation Act 1980; and

    (ii)   the exceptions where the six-year limitation period does not apply.

**30-036**  **(b)  Meaning of "trustee".**  For the purposes of the Limitation Act 1980 and these exceptions, a "trustee" is a person who has lawfully assumed fiduciary obligations in relation to trust property, with or without any formal appointment to his office.[162] The term obviously includes an express trustee. It also extends to people who are in a sense "constructive trustees" because they have assumed trustee-like duties to their principals. These include a personal representative,[163] a director of a company (since for some purposes a director is treated as a trustee of the company's funds under his control)[164]; and a mortgagee with respect to any balance of the

---

[156] *Re Waterman's WT, Lloyds Bank Ltd v Sutton* [1952] 2 All E.R. 1054 at 1055 per Harman J.

[157] See *National Trustees Co of Australasia Ltd v General Finance Co of Australasia Ltd* [1905] A.C. 373; *Re Windsor Steam Coal Co (1901) Ltd* [1929] 1 Ch. 151; *Bartlett v Barclays Bank Trust Co Ltd* [1980] Ch. 515; *P & P Property Ltd v Owen, White and Catlin LLP* [2018] EWCA Civ 1082 at [110]; [2018] 3 W.L.R. 1244.

[158] *Williams v Central Bank of Nigeria* [2014] UKSC 10; [2014] 2 W.L.R. 355 at [12], [44].

[159] Limitation Act 1980 s.36(2).

[160] LA 1980 s.21, replacing LA 1939 s.19, which replaced TA 1888 s.8, on which see *How v Earl Winterton* [1896] 2 Ch. 626 at 639.

[161] LA 1980 s.21(3); as to settled land and land held on trust, see s.18.

[162] *Williams v Central Bank of Nigeria* [2014] UKSC 10; [2014] 2 W.L.R. 355, at [9]. It is immaterial whether the trustee in this sense has any beneficial interest in the property: LA 1980 s.38(1), TA 1925 s.68(17).

[163] LA 1980 s.38 and TA 1925 s.68(17).

[164] *JJ Harrison (Properties) Ltd v Harrison* [2002] 1 B.C.L.C. 162; *Burden Holdings (UK) Ltd v Fielding* [2018] UKSC 14; [2018] A.C. 857. As to the circumstances in which a claim against a director for an account is within LA 1980 s.21, see *DEG-Deutsche Investitions v Koshy* [2002] 1 B.C.L.C. 478.

proceeds of sale of the mortgaged property.[165] The expression also applies to one who, although not expressly appointed as a trustee, takes upon himself the office of trusteeship.[166] The main instance is a trustee de son tort since he assumes trustee duties to a beneficiary even if he is not expressly appointed as a trustee.[167] But it does include not a trustee in bankruptcy,[168] nor, apparently, the liquidator of a company in a voluntary liquidation.[169]

Significantly, the term does not apply to a person who is called a "constructive trustee" merely because he is liable to account to the claimant for some breach of equitable duty.[170] The common instances are where the defendant's liability is merely ancillary to that of the primary trustee, such as for knowing receipt of misapplied trust property or dishonest assistance in a breach of trust.[171] To call a person a constructive trustee in those cases is only a formula indicating that he is liable to an equitable claim.[172] The liability of such a person remains subject to the general six-year limitation period.[173]

**(c)   Exceptions to six-year rule.**   Where these exceptions apply, the trustee is exposed to an indefinite liability.[174] Delay will not bar the action unless the defendant can rely on laches. The exceptions are as follows:   **30-037**

*(2)   Fraud or fraudulent breach of trust.*   The Limitation Act 1980 provides that no period of limitation applies in respect of any fraud or fraudulent breach of trust to which the trustee was a party or privy.[175] "Fraud" means dishonesty.[176]   **30-038**

*(3)   Recovery of trust property from trustee.*   The Limitation Act 1980 also provides that no period of limitation applies to a suit to recover from the trustee trust property or its proceeds in the possession of the trustee,[177] or previously received by the trustee and converted to his use.[178] The trust property may be capital or income.[179] The trustee's liability is indefinite since he is treated as having possession of the property on the beneficiary's behalf both before and after he commits   **30-039**

---

[165] *Thorne v Heard* [1895] A.C. 495; and Law of Property Act 1925 s.105.

[166] See para.26-005 above.

[167] *Mara v Brown* [1896] 1 Ch. 196; *Williams v Central Bank of Nigeria* [2014] UKSC 10; [2014] 2 W.L.R. 355.

[168] *Re Cornish* [1896] 1 Q.B. 99.

[169] *Re Windsor Steam Coal Co (1901) Ltd* [1928] Ch. 609; affirmed on a different ground [1929] 1 Ch. 151.

[170] *Paragon Finance v DB Thakerar & Co* [1999] 1 All E.R. 400; *UCB Home Loans v Carr* [2000] Lloyd's Rep. PN 754 at 767–769; *JJ Harrison (Properties) Ltd v Harrison* [2002] 1 B.C.L.C. 162; *Williams v Central Bank of Nigeria* [2014] UKSC 10; [2014] 2 W.L.R. 355.

[171] *Williams v Central Bank of Nigeria* [2014] UKSC 10; [2014] 2 W.L.R. 355. See para.30-087 below.

[172] *Selangor United Rubber Estates Ltd v Cradock* [1968] 1 W.L.R. 1555 at 1582, per Ungoed-Thomas J; *Dubai Aluminium Co Ltd v Salaam* [2002] UKHL 48; [2003] 2 A.C. 366 at [141]–[143], per Lord Millett who criticises the description of the defendant as "accountable as a constructive trustee", it being more accurate simply to describe the defendant "as accountable in equity".

[173] See para.30-085 below.

[174] LA 1980 s.21(1). See, e.g. *Mills v Drewitt* (1855) 20 Beav. 632 (33 years); *Re Ashwell's Will* (1859) Johns. 112 (37 years). Compare *McDonnel v White* (1865) 11 H.L.C. 570.

[175] LA 1980 s.21(1)(a). See *Thorne v Heard* [1895] A.C. 495. The fraud must be related to the breach of trust rather than coincidental to it: *UCB Home Loans v Carr* [2000] Lloyd's Rep. P.N. 754 at 757.

[176] *Armitage v Nurse* [1998] Ch. 241 at 260. For dishonesty, see para.30-078 below.

[177] See *Thorne v Heard* [1895] A.C. 495; *Re Page* [1893] 1 Ch. 304.

[178] LA 1980 s.21(1)(b).

[179] *Re Howlett* [1949] Ch. 767; and see A.K.R. Kiralfy (1949) 13 Conv.(N.S.) 276.

BREACH OF TRUST

the breach of trust.[180] The effect is to leave the trustee open indefinitely to a proprietary claim for restitution of the original trust property or its traceable proceeds. But the trustee does not "convert" the property to his use when it is properly paid to him in his capacity as a beneficiary.[181] Nor is it "converted" because it is properly lent on mortgage to enable the mortgagor to repay a debt owed to a firm in which a trustee is a partner.[182] In such cases, time runs in the usual way.

**30-040** *(1) Charitable trusts.* No period of limitation applies to an action by the Attorney General[183] to enforce charitable trusts; such an action does not involve allegations of breach of trust nor is there any beneficiary in whom the cause of action is vested, as the Limitation Act requires.[184]

**30-041** **(d) Accrual of cause of action.** In general, time begins to run under the Limitation Act from when the breach of trust was committed, whether the beneficiary knew of it or not.[185]

The Limitation Act provides for certain refinements to this general rule. Where the beneficiary is under disability (i.e. while a minor or of unsound mind)[186] time runs only once his disability ceases.[187] Time is also postponed if the action is based on the trustee's fraud,[188] or the defendant has fraudulently concealed the right of action.[189] A trustee who is unaware that he is acting in breach of trust does not conceal the right of action by fraud.[190]

Where the beneficiary has a future interest, time begins to run only when his interest falls into possession.[191] The reason is that the beneficiary cannot be expected to risk litigation about damage to a future interest which he may never live to enjoy.[192] The possibility of a beneficiary having property appointed to him under a simple discretionary trust does not postpone the running of time until he in fact receives the property.[193]

**30-042** **(e) Effect of limitation.** A beneficiary whose action is barred cannot benefit from proceedings brought by one whose action is not barred.[194] The point is relevant to beneficiaries with successive interests in the trust. The example is of a trustee who commits a non-fraudulent breach of trust by advancing too much on a mortgage. After the tenant for life's right of action has been barred, the remainder-

---

[180] *Paragon Finance v DB Thakerer & Co Ltd* [1999] 1 All E.R. 400; *Halton International Holdings SARL v Guernoy Ltd* [2006] EWCA Civ 801.

[181] *Re Timmis* [1902] 1 Ch. 176. *Contrast Re Landi* [1939] Ch. 828; and see *Re Milking Pail Farm Trusts* [1940] Ch. 996; criticised (1941) 57 L.Q.R. 26.

[182] *Re Gurney* [1893] 1 Ch. 590.

[183] For this function of the Attorney General, see above para.23-065.

[184] *Attorney General v Cocke* [1988] Ch. 414; and LA 1980 s.21(1), (3).

[185] *Re Somerset* [1894] 1 Ch. 231.

[186] LA 1980 s.38(2).

[187] LA 1980 s.28.

[188] This should mean actual rather than constructive fraud: W. Swadling, Ch.11 in P. Birks and A. Pretto, *Breach of Trust* (Hart Publishing, 2002).

[189] LA 1980 s.32.

[190] *Bartlett v Barclays Bank Trust Co Ltd* [1980] Ch. 515.

[191] LA 1980 s.21(3). Sums do not fall into possession merely because, under a power of advancement, they are advanced out of a future interest: *Re Pauling's ST (No.1)* [1964] Ch. 303 at 353; affirming [1962] 1 W.L.R. 86 at 115; *Armitage v Nurse* [1998] Ch. 241 at 261.

[192] *Cattley v Pollard* [2006] EWHC 3130 (Ch); [2007] 2 All E.R. 1086.

[193] *Johns v Johns* [2004] NZCA 42; [2005] W.T.L.R. 529.

[194] LA 1980 s.21(4).

DEFENCES AND ADJUSTMENTS TO TRUSTEE'S LIABILITY

man may nonetheless sue the trustee to replace the lost capital. The interest on the money until the death of the tenant for life belongs to the trustee himself.[195]

**(f)  Trustee also beneficiary.**  Where a trustee who is also a beneficiary receives or retains trust property as his share in a distribution, his liability in an action to recover trust property after the period of limitation is limited to the excess over his proper share.[196] Thus if the property is divided between three including the trustee, and a further beneficiary claims, so that the property is divisible in quarters, the trustee is liable only for the difference between one-third and one-quarter, and not for a whole quarter. This relief is only available if the trustee acted honestly and reasonably in making the distribution.[197]   **30-043**

### 6.  Bankruptcy

A trustee will be freed from further liability for a breach of trust by becoming bankrupt and obtaining his discharge, unless the breach was fraudulent and he was a party to the fraud.[198] "Fraud" in this context connotes actual fraud or dishonesty. A finding of undue influence or "wilful default" is not enough.[199]   **30-044**

### 7.  Contribution and Indemnity

**(a)  Joint and several liability.**  The starting point is that a trustee is only liable for the losses resulting from his own breach of trust.[200] But where two or more trustees are liable, each of them may be sued for the whole amount of the loss resulting from their breach. If they are all sued, the judgment may be executed against any one of them singly. When the judgment against two co-trustees is partly satisfied by one of them and the other goes bankrupt, the judgment creditor may prove in the bankruptcy for the whole original judgment debt and not merely for the balance of it which remains unsatisfied.[201]   **30-045**

**(b)  Contribution.**  The general rule in equity was that, as between themselves, the trustees liable to make good a breach of trust had to bear the liability equally: if one paid more than his share he could claim contribution from the others.[202]   **30-046**

In exceptional cases,[203] the rule of equal contribution was replaced by a right of one trustee to obtain an indemnity from the others, but there was no intermediate position between these extremes. These rules have now been superseded by

---

[195] See *Re Somerset* [1894] 1 Ch. 231; *Re Fountaine* [1909] 2 Ch. 382; *Bartlett v Barclays Bank Trust Co Ltd* [1980] Ch. 515 at 537.
[196] LA 1980 s.21(2), a new provision introduced by the Limitation Amendment Act 1980.
[197] LA 1980.
[198] Insolvency Act 1986 s.281, replacing Insolvency Act 1985 s.128, which itself replaced Bankruptcy Act 1914 s.28.
[199] *Mander v Evans* [2001] 1 W.L.R. 2378; *Woodland-Ferrari v UCL Group Retirement Benefits Scheme* [2002] 3 All E.R. 670.
[200] See para.30-004 above.
[201] *Edwards v Hood-Barrs* [1905] 1 Ch. 20.
[202] *Lingard v Bromley* (1812) 1 V. & B. 114; *Bahin v Hughes* (1886) 31 Ch. D. 390; *Jackson v Dickinson* [1903] 1 Ch. 947.
[203] See para.30-047.

statute.[204] The court may now award in favour of one trustee against another a contribution that is just and equitable having regard to the extent of the contributing trustee's responsibility for the loss.[205] This enables the loss to be apportioned between the trustees according to their different degrees of fault and responsibility.

A contribution may also be sought from third parties who are liable for receiving the proceeds of the breach. They also may claim contribution from other defendants who are liable for the same damage. For the purposes of contribution proceedings under the statutory rule, the restitutionary claim against the recipient is treated as one to recover compensation for damage sustained through the trustee's breach.[206]

**30-047**  **(c)  Indemnity.**  In proceedings in which contribution is claimed, the court has power to exempt any person from liability to make contribution, or to direct that the contribution to be recovered from any person shall amount to a complete indemnity.[207] The statutory power to order one co-trustee to indemnify another is likely to be exercised in the same instances where under the former law a right of indemnity replaced the rule of equal contribution. These were:

(i)  Where one trustee received and misappropriated the trust money, or was otherwise alone morally guilty.[208]

(ii)  Where one of the trustees acted as solicitor to the trust, and the breach of trust was committed on his advice,[209] and not independently of it[210]

(iii)  Where one of the trustees was a beneficiary, to the extent of his beneficial interest rather than the extent of the benefit he received from the breach. The breach of trust was made good as far as possible out of the beneficial interest before applying the normal rule that the loss is borne equally between them.[211]

**30-048**  **(d)  Limitation.**  Special rules govern contribution and indemnity claims both in the date on which the right to claim contribution accrues and to the period of limitation.[212] If a beneficiary obtains judgment against a trustee for breach of trust, the trustee's right to claim contribution accrues on the date of the judgment[213]: while, if the trustee compromises the beneficiary's claim (whether or not he admits liability), his right of action for contribution accrues on the date on which he and the beneficiary reach agreement as to the amount to be paid by him.[214] The right of action for contribution becomes statute-barred two years after it has accrued.[215]

---

[204]  Civil Liability (Contribution) Act 1978 ss.1(1), 6(1), 7(3); *Friends Provident v Hillier Parker* [1997] Q.B. 85 at 107.

[205]  Civil Liability (Contribution) Act 1978 ss.1(10), 2(1).

[206]  *Charter Plc v City Index Ltd* [2007] EWCA Civ 1382; [2008] Ch. 313, applying Civil Liability (Contribution) Act 1978 s.6(1); noted G. Virgo [2008] C.L.J. 254.

[207]  Civil Liability (Contribution) Act 1978 s.2(2).

[208]  *Bahin v Hughes* (1886) 31 Ch. D. 390 at 395.

[209]  *Lockhart v Reilly* (1856) 25 L.J.Ch. 697; *Re Partington* (1887) 57 L.T. 654; *Re Turner, Barker v Ivimey* [1897] 1 Ch. 536; *Re Linsley* [1904] 2 Ch. 785.

[210]  *Head v Gould* [1898] 2 Ch. 250.

[211]  *Chillingworth v Chambers* [1896] 1 Ch. 685. Consider also the court's powers of impounding: above para.30-023.

[212]  Contrast the position with regard to contribution claims between sureties: below para.45-023.

[213]  Limitation Act 1980 s.10(3).

[214]  LA 1980 s.10(4).

[215]  LA 1980 s.10(1).

PROPRIETARY REMEDIES AGAINST PROCEEDS OF BREACH OF TRUST

**(e)  Adjustment of payments due to beneficiaries.**[216]  A trustee who overpays **30-049** one beneficiary can adjust accounts by retaining the overpayments out of other interests of the beneficiary, e.g. future income.[217] Thus payments out of capital for legacy duty which should have been made out of income,[218] or the amount of tax on payments made gross but which should have suffered deduction of tax,[219] have been recouped in this way.[220] Where, however, the trustee being also a beneficiary underpays himself while overpaying the other beneficiaries, equity will not allow him to adjust accounts in his own favour if this would cause inconvenience and hardship to the beneficiaries.[221]

5.  PROPRIETARY REMEDIES AGAINST PROCEEDS OF BREACH OF TRUST

## 1.  General[222]

The beneficiary may also enforce proprietary claims to the proceeds of the misap- **30-050** plied trust property which he identifies by the rules of following and tracing. Against the defaulting trustee, a proprietary claim may be enforced by an equitable lien or beneficial interest under a constructive trust.[223] A third party to whom the beneficiary follows the misapplied property may be liable on a personal claim for receiving the property.[224] A third party into whose hands the proceeds of the misapplied property are followed or traced will hold it subject to an equitable lien or constructive trust, depending on whether that person took the property with notice of the breach of trust.[225] The value of any property recovered on a proprietary claim against the trustee or from a third party must be taken into account in determining the amount of the trustee's personal liability to account for losses which the trust has incurred.

**(a)  Following and tracing.**  The rules of following and tracing are artificial rules **30-051** of evidence which allow a claimant to identify misapplied property or its proceeds.[226] Following is the process of identifying the same property as it is transferred from one person to another. Tracing is the process of identifying a new asset as the substitute for an original asset which was misappropriated from the claimant. Where one asset is exchanged for another, the claimant may elect to treat the substituted asset as representing the value contained in the original asset. He is said to trace the value represented in the original asset into the substitute.

In the strict sense, the processes of following and tracing are not claims or remedies. They merely lay the evidential foundation necessary to prove some claim against the defendant which the claimant then forces by a remedy.[227] The remedy may be personal or proprietary. So, for example, the claimant may follow money

---

[216] C. Harpum, Ch.1 in P. Birks (ed.) *The Frontiers of Liability*, Vol.1. (OUP, 1994) at 21–22.

[217] *Livesey v Livesey* (1827) 3 Russ. 287; and see *Re Robinson* [1911] 1 Ch. 502 at 508.

[218] *Re Ainsworth* [1915] 2 Ch. 96.

[219] *Re Musgrave* [1916] 2 Ch. 417.

[220] See also *Re Reading* [1916] W.N. 262.

[221] *Re Horne* [1905] 1 Ch. 76; as explained in *Re Ainsworth* [1915] 2 Ch. 96.

[222] See L. Smith, *The Law of Tracing* (Oxford, Clarendon Press, 1997).

[223] *Foskett v McKeown* [2001] 1 A.C. 102.

[224] See para.30-071 below.

[225] See para.30-055 below.

[226] *Boscawan v Bajwa* [1996] 1 W.L.R. 328 at 334; *Foskett v McKeown* [2001] 1 A.C. 102 at 127–128, per Lord Millett.

[227] *Foskett v McKeown* [2001] 1 A.C. 102 at 128, per Lord Millett.

BREACH OF TRUST

which the trustee paid in breach of trust to a third party. The claimant's motive may be to establish the personal liability of the third party in a claim for knowing receipt.[228] In such a case, the process of following merely proves the identity of the money received by the third party with that misapplied from the trust. It is common, however, that a claimant relies on the rules of following and tracing to prove his entitlement to a proprietary remedy against the defendant, and tracing and following are considered in this section for this reason. For example, the claimant may trace misapplied property from the trust into the trustee's personal bank account with a view to asserting an equitable lien over the account. This will ensure the priority of his claim in the insolvency of the trustee.

30-052   **(b)   Law and equity.**   For historical reasons, different rules of following and tracing have evolved at common law and in equity. The distinction has been much criticised.[229] The main difference is that the common law rules of identification do not allow money to be followed through a mixed fund, whereas the equitable rules do. The rules cannot be applied interchangeably so a claimant cannot necessarily rely on the equitable rules of identification to follow money through a mixture when his attempts to follow the money at law have failed.[230] However, the distinction between the two sets of rules has diminished in its importance. The rules which determine whether the claimant has a sufficient equitable title to trace in equity have been expanded. In many situations where the claimant might once have needed to trace his property at law, he is now treated as having a sufficient equitable title to rely on the more sophisticated rules of identification in equity because the very circumstances of the misapplication generate in him a distinct equitable title to the money.[231]

The common law and equitable rules of identification will be discussed separately.

30-053   **(c)   Following and tracing at common law.**[232]   A claimant with a legal interest in the original asset is generally required to rely on the common law rules of following and tracing, and then to enforce any claim they may have by a common law remedy. The common law treated money as identifiable so long as it had not become mixed with other money. Accordingly, if the defendant paid the claimant's money into a bank account which already contained money belonging to the defendant, the claimant could not trace his money into any withdrawal from the account.[233] This would prevent the claimant from following his money at law through a clearing payment system.[234]

But if the defendant withdrew money from the claimant's account then the claimant could trace into the withdrawal. There would be no mixture involved in the substitution of the money proceeds for the original chose in action representing the

---

[228] See para.30-071 below.
[229] *Trustee of the Property of FC Jones & Sons v Jones* [1997] Ch. 159 at 169, per Millett LJ; *Foskett v McKeown* [2001] 1 A.C. 102 at 128, per Lord Millett.
[230] See para.30-054 below.
[231] See further para.30-054 below.
[232] See generally R.M. Goode (1976) 92 L.Q.R. 360; S. Khurshid & P. Matthews (1979) 95 L.Q.R. 78; D. Fox [1999] Restitution L. Rev. 55.
[233] *Lipkin Gorman (a firm) v Karpnale Ltd* [1991] 2 A.C. 548 at 572, per Lord Goff; *Trustee of the Property of FC Jones & Sons v Jones* [1997] Ch. 159 at 169, per Millett LJ.
[234] *Agip (Africa) Ltd v Jackson* [1991] Ch. 547; *El Ajou v Dollar Land Holdings Plc* [1993] 3 All E.R. 717 at 733; reversed on other grounds [1994] 2 All E.R. 685.

credit balance in the bank account.[235] Having proved his title to the money in this way, the claimant might have an action in money had and received against a third person to whom the defendant paid the money, provided that the money remained unmixed until the point of receipt.[236] This has been explained as a restitutionary action for the enforcement of the claimant's proprietary title to the money.[237] If the fund of money remained identifiable, he would be entitled to a declaration of his legal title to it. He could thus recover it specifically even in the insolvency of the person who had it in his control.[238] But if the claimant's money were mixed with that of another person and applied in the purchase of another asset, he could have no claim to the substituted asset. In contrast to the common law claims arising from the mixture of granular or fluid fungibles, the common law appears not to recognise a co-ownership interest in a mixture of money.[239]

## 2. Title to Follow or Trace in Equity

**(a)  Fiduciary relationship or distinct equitable title.**    To rely on the equitable    **30-054** rules of identification the claimant must have some distinct equitable title to the original asset.[240] It need not be a beneficial interest: it would be enough, for example, that he had an equitable charge over the original asset.[241] On the orthodox view, therefore, it is not enough that the claimant has a legal and beneficial title to the original asset. In this situation, the claimant has no distinct equitable title to the asset[242] and must instead rely on the common law rules of identification to found his claim.

The requirement that the claimant have a distinct equitable title is commonly satisfied by the original asset having been held subject to a fiduciary relationship before it was misapplied. In other cases, where the claimant was not the principal in such a relationship, the circumstances in which claimant was separated from the original asset may generate a distinct equitable title sufficient to allow him to follow or trace it. So, for example, a person who is induced to pay money by a fraudulent misrepresentation has a sufficient equitable title even before he elects to rescind the payment transaction to follow or trace the money.[243] It has been said that a thief holds the stolen property on trust for his victim and the victim thereby has a sufficient title to rely on the equitable rules of identification.[244] On one view, the payment of money under a simple mistake generates a sufficient equitable title in the claimant to allow him to trace it. This, however, has been doubted at least in

---

[235] *Lipkin Gorman v Karpnale Ltd* [1991] 2 A.C. 548.

[236] *Lipkin Gorman v Karpnale Ltd* [1991] 2 A.C. 548.

[237] *Armstrong DLW GmbH v Winnington Networks Ltd* [2012] EWHC 10 (Ch); [2013] Ch. 156.

[238] *Trustee of the Property of FC Jones and Sons v Jones* [1997] Ch. 159.

[239] *Spence v Union Maritime Insurance Co* (1868) L.R. 3 C.P. 427; *Indian Oil Corp v Greenstone Shipping SA* [1988] 1 Q.B. 345.

[240] *Re Diplock* [1948] Ch. 465 at 520 per curiam.

[241] *Dick v Harper* [2006] B.P.I.R. 20.

[242] *Vandervell v IRC* [1967] 2 A.C. 291 at 311, per Lord Upjohn; 317 per Lord Donovan; *Westdeutsche Landesbank Girozentrale v Islington LBC* [1996] A.C. 669 at 706, per Lord Browne-Wilkinson.

[243] *El Ajou v DLH Plc* [1993] 3 All E.R. 717 at 734, per Millett J; *Twinsectra Ltd v Yardley* [1999] Lloyd's Rep. Bank. 438; reversed on other grounds [2002] 2 A.C. 164; [2002] UKHL 12. Similarly, an equity founding a claim in proprietary estoppel may confer a sufficient title to trace: *Re Sangha* [2021] EWHC 1599 (Ch). See further para.2-007 above.

[244] *Westdeutsche Landesbank Girozentrale v Islington LBC* [1996] A.C. 669 at 715–716, per Lord Browne-Wilkinson; applied in *Armstrong DLW GmbH v Winnington Networks Ltd* [2012] EWHC 10 (Ch); [2013] Ch. 156 at [274]–[275].

cases where the conscience of the recipient is unaffected by knowledge of the mistake.[245]

The requirement that the claimant have a distinct equitable title to follow or trace property has been criticised. It confuses the requirements of the process of identifying the claimant's original asset or its proceeds, with the appropriate conditions for the assertion of a proprietary remedy against the property so identified, thereby conferring priority on the claimant over the defendants' unsecured creditors.[246]

**30-055** **(b) Identification and assertion of proprietary claim.** Where the trustee has misapplied the claimant's original asset and transferred it to a third person, the claimant has a choice to make. He may either follow the original asset and enforce his equitable title to it, or trace into the substituted asset in the hands of the trustee and enforce a proprietary remedy against it.[247] In cases where the original asset can no longer be identified as still existing, or where the claimant's equitable title to it has been extinguished (as where the third party took the legal interest in it as a bona fide purchaser for value without notice),[248] the claimant's only option will be to trace into the substituted asset in the hands of the defendant.

Against an asset in the hands of the trustee, the claimant has an election between two proprietary remedies. He may enforce an equitable lien against it for the value of the original asset which was applied to acquire it. The lien is for this fixed amount, and does not change in value even if the substituted asset rises or falls in value. Alternatively, he may claim the entire beneficial ownership of the substituted asset under a constructive trust. The value of this proprietary security will vary as the value of the substituted asset fluctuates. The claimant has an unrestricted election between whichever of the remedies is more advantageous to him.[249]

### 3. Identification and Mixed Funds

**30-056** **(a) General.** It often happens that the proceeds of the claimant's original asset are mixed in a bank account. Money is then withdrawn from the account which is used to acquire a substituted asset. Before the claimant can assert any claim to the substituted asset, he must establish whether the money used to acquire it was specifically attributable to him or to the other contributor to the bank account. Formalised rules of identification are used resolve the evidential uncertainty. They differ depending on whether the other contributor to the mixture is—like the claimant—innocent of any fault, or whether he is a wrongdoer. In this context, a wrongdoer means the defaulting trustee or a person who has received the money with notice of the breach of trust. Money belonging to two innocent contributors may be mixed where a trustee mixes the funds of two separate trusts,[250] or gives trust money to a volunteer who mixes it with his own.[251]

**30-057** **(b) Other contributor at fault.** Punitive presumptions of identification apply

---

[245] *Chase Manhattan NA Ltd v Israel British Bank (London) Ltd* [1981] Ch. 105; cf. *Westdeutsche Landesbank Girozentrale v Islington LBC* [1996] A.C. 669 at 714–715.

[246] See, e.g. *Bristol & West BS v Mothew* [1998] Ch. 1 at 23, per Millett LJ; *Foskett v McKeown* [2001] 1 A.C. 102 at 128, per Lord Millett.

[247] *Re Hallett's Estate* (1879) 13 Ch. D. 696 at 709–711, per Sir George Jessel MR; *Foskett v McKeown* [2001] 1 A.C. 102 at 129–133, per Lord Millett.

[248] See para.4-017 above.

[249] *Foskett v McKeown* [2001] 1 A.C. 102.

[250] *Hancock v Smith* (1889) 41 Ch. D. 456; *Re Stenning* [1895] 2 Ch. 433.

[251] *Re Diplock* [1948] Ch. 465 at 552–554.

PROPRIETARY REMEDIES AGAINST PROCEEDS OF BREACH OF TRUST

where the other contributor to the bank account is a wrongdoer. They aim to preserve the value contributed by the claimant to the mixed fund in the bank account at the expense of the value contributed by the wrongdoer. A reversed burden of proof operates. The mixed money in the bank account is presumed to belong to the innocent trust claimant to the extent that the wrongdoer cannot prove that it is attributable to his own contributions to the account.[252]

> "If a trustee mixes trust assets with his own, the onus is on the trustee to distinguish the separate assets, and to the extent that he fails to do so, they belong to the trust."[253]

The wrongdoing trustee cannot defeat the trust claimant's proprietary claim by so fundamentally mixing the trust money with his own that he creates an evidential "black hole". The onus is on the trustee to show the very part of the mixed fund which is his own property.[254] It follows that when money is withdrawn from the account and dissipated, then it is presumed to have been drawn from the wrongdoer's share of the mixed fund.[255] The presumption is made with the benefit of hindsight. Depending on the outcome of events, it may turn out that the trust claimant's share of the mixture remained unspent in the account or that it was withdrawn and used to acquire another asset which still survives. So in one case where the money which the trustee withdrew from the account was dissipated, it was presumed that the residue was attributable to the claimant. She was entitled to an equitable lien over the account for the money thus identified. In other case, where the money which the trustee withdrew from the account was successfully invested in stock and the residue in the account was dissipated, it was presumed that the claimant's money could be traced into the stock.[256] There is no rule that money first withdrawn from the account must be treated as the trustee's,[257] unless it turns out that that money was dissipated.

Where, however, the trustee deposits money into the account after he has been proved by the rules above to have drawn against the claimant's money, there is no presumption that he intends the deposit to replace the claimant's money.[258] The claimant is therefore limited to asserting a claim against the account for the lowest balance that his money has fallen to between the date of the deposit of his money and the subsequent deposit of the trustee's own money. This result is consistent with the general presumptions operating in cases of mixture. Since the subsequent deposit of the trustee's money does not originate in the mixed fund, the trustee can easily displace the evidential presumption that it is attributable to the claimant.[259] The claimant might only be able to trace into the later deposit if the defendant controlled the funds in the account as part of a coordinated scheme for laundering funds and obscuring their movement through the account.[260]

**(c)   Other contributor innocent.**   Where neither of the two contributors to the      **30-058**

---

[252] *El Ajou v DLH Plc* [1993] 3 All E.R. 717 at 735–736, per Millett J.

[253] *Re Tilley's WT* [1967] 1 Ch. 1179 at 1183 per Ungoed-Thomas J.

[254] *Sinclair Investments (UK) Ltd v Versailles Trade Finance Group* [2011] EWCA Civ 347; [2012] Ch. 453 at [138].

[255] *Re Hallett's Estate* (1879) 13 Ch. D. 696 at 726–729 per Jessel MR.

[256] *Re Oatway* [1903] 2 Ch. 356.

[257] *Re Tilley* [1967] Ch. 1179 at 1185, per Ungoed-Thomas J.

[258] *Roscoe v Winder* [1915] 1 Ch. 62; *Bishopsgate Investment v Homan* [1995] 1 All E.R. 347.

[259] For example *El Ajou v DLH Plc* [1993] 3 All E.R. 717 at 735–736, per Millett J.

[260] *Federal Republic of Brazil v Durant International Ltd* [2015] UKPC 35; [2016] A.C. 297. See further para.30-061 below.

Breach of Trust

mixed fund in the bank account is a wrongdoer towards the other, there is no reason to favour the interests of one over the other. Different presumptions of identification apply between them.

**30-059**    *(1) Rule in Clayton's Case.*    The traditional approach has been to apply the rule in *Clayton's Case* to allocate the mixture in the bank account between them. Specific credits in the account are matched against specific debits. It is presumed that the money first withdrawn from the account is drawn against the contribution of the party whose money was first deposited. Once that contribution has been exhausted, later withdrawals are treated as made against the contribution of the party whose money was next deposited. In attributing withdrawals to one party or the other, the court does not take into account—as it would with a wrongdoer—whether the money withdrawn is dissipated or preserved.

The results of applying *Clayton's Case* may be arbitrary. Its effect may be to prejudice or favour the contributor whose money was first paid into the account depending on whether the money withdrawn happened to be dissipated or preserved in some other asset. The rule can also be expensive to apply where the money in a mixture derived from many different contributors, and where there have been many deposits and withdrawals in the account all of which need to be specifically matched with each other.[261] Moreover, the analytical justification for applying *Clayton's Case* in tracing cases has been questioned. The rule developed to determine the state of the running account between the bank and its customer. But it has been extended to apportion the value in the account between parties who have equitable claims to the benefit of the customer's chose in action against the bank.[262]

**30-060**    *(2) Different rules for allocation.*    Recent cases have recognised reasons to displace the rule in *Clayton's Case*. Although it remains the default rule, it may be displaced with relative ease in favour of a solution that produces a fairer result.[263] It would not apply where it was contrary to the actual presumed intentions of the contributors,[264] or was unjust or impractical in its operation.[265] The court may instead treat the mixed fund as subject to a "rolling charge" in favour of each innocent contributor.[266] Debits from the account are borne proportionately by each contributor according to the amount of their money in the account immediately before each withdrawal.[267] But this approach may become unnecessarily complex or expensive to apply where the mixed fund derives from the deposits of many different contributors made over a long period.[268] The simpler solution is to treat all withdrawals from the account as borne rateably by all the contributors but to make

---

[261] For example *Barlow Clowes International Ltd (In Liquidation) v Vaughan* [1992] 4 All E.R. 22.

[262] *D.A. McConville* (1963) 79 L.Q.R. 388; *Re French Caledonia Travel* (2004) 22 A.C.L.C. 498.

[263] *Charity Commission for England and Wales v Framjee* [2014] EWHC 2507 (Ch); (2014) 17 I.T.E.L.R. 271 at [49].

[264] *Barlow Clowes International Ltd (In Liquidation) v Vaughan* [1992] 4 All E.R. 22; *Russell-Cooke Trust Co v Prentis* [2002] EWHC 2227 (Ch); [2003] All E.R. 478.

[265] *Commerzbank AG v IMB Morgan Plc* [2004] EWHC 2771 (Ch); [2005] 2 All E.R. (Comm) 564.

[266] See *Ontario Securities Commission and Greymac Credit Corp* (1985) 55 O.R. (2d) 673; discussed in *Barlow Clowes International Ltd (In Liquidation) v Vaughan* [1992] 4 All E.R. 22 at 27, 44.

[267] This applies combines a version of the "lowest intermediate balance" rule in *Roscoe v Winder* [1915] 1 Ch. 62 with the "rolling charge" form of analysis: *Caron v Jahani* [2020] NSWCA 117. See para.30-057 above.

[268] The authorities and reasons are gathered in *Caron v Jahani* [2020] NSWCA 117 at [106]-[122].

PROPRIETARY REMEDIES AGAINST PROCEEDS OF BREACH OF TRUST

no adjustment for sequence of deposits and withdrawals from the account.[269] The effect may be to allow a contributor to trace into a withdrawal from the account even though the withdrawal was made before his money had been deposited in the account.

**(d)   Payment systems and backward tracing.**   Special difficulties arise where the trustee misapplies the claimant's money and passes it through a series of bank accounts, or where the trustee manipulates the timing of debits and credits in a network of accounts under his control. It may not be straightforward to identify the funds debited from the claimant's account with funds credited in the defendant's account. When the funds pass through a series of bank account, the claimant may succeed even without exact proof of each transactional link between himself and the defendant. There reason is that where defendant is a wrongdoer, he cannot defeat the possibility of tracing against him by creating an evidential "black hole" designed to frustrate the claimant's action against him.[270] This is consistent with the punitive evidential presumption against a party who is at fault.[271] It is not even strictly necessary for each relevant credit to come after each relevant debit. To a limited extent, the claimant may be allowed to trace "backward" into earlier credits. Thus a credit to the defendant's account may be treated as linked to the debit to the claimant's account when the rules of a payment system post the credit before the defendant's bank is reimbursed with funds attributable to the claimant.[272] A traceable link might also be proved where the trustee has manipulated the timing of debits and credits in the accounts to effect a single transaction or as part of a coordinated scheme to launder the claimant's money.[273] Similarly, the claimant may be allowed to trace into a certain asset acquired on credit before his money was misapplied if the defendant acquired the asset in anticipation paying for it with the misapplied trust money.[274] Without some deliberate coordination of this kind, however, there is no general rule allowing the claimant to trace backward into an asset acquired before the trustee misapplied the claimant's money.[275]

**(e)   Tracing beyond mixture in bank account.**   Where money drawn from the account by the trust is entirely attributable to the claimant, then the claimant may assert a lien or right of beneficial ownership over the asset bought with it. The choice of remedy will make no difference to him unless the asset increases in value.[276] But where it is proved that the withdrawal was partly attributable to the claimant and partly to the trustee, it would be inequitable to award to claimant the

**30-061**

**30-062**

---

[269] *Barlow Clowes International Ltd (In Liquidation) v Vaughan* [1992] 4 All E.R. 22.

[270] *Sinclair Investments (UK) Ltd v Versailles Trade Finance Ltd* [2011] EWCA Civ 347; [2012] Ch. 453 at [135]–[139].

[271] See para.30-057 above.

[272] *Agip (Africa) Ltd v Jackson* [1990] Ch. 265; *Relfo Ltd (In Liquidation) v Varsani* [2014] EWCA Civ 360; [2015] 1 B.C.L.C. 14; *Serious Fraud Office v Hotel Portfolio II UK Ltd (in liq)* [2021] EWHC 1273 (Comm) at [22]–[48].

[273] *El-Ajou v Dollar Land Holdings Plc* [1993] 3 All E.R. 717 at 733; reversed on other grounds [1994] 2 All E.R. 685; *Federal Republic of Brazil v Durant International Ltd* [2015] UKPC 35; [2016] A.C. 297 at [34], [38]; *Relfo Ltd (In Liquidation) v Varsani* [2014] EWCA Civ 360; [2015] 1 B.C.L.C. 14.

[274] *Serious Fraud Office v Hotel Portfolio II UK Ltd (in liq)* [2021] EWHC 1273 (Comm).

[275] *Relfo Ltd (In Liquidation) v Varsani* [2014] EWCA Civ 360; [2015] 1 B.C.L.C. 14; *Federal Republic of Brazil v Durant International Ltd* [2015] UKPC 35; [2015] 3 W.L.R. 599 at [40]–[41]; *Serious Fraud Office v Hotel Portfolio II UK Ltd (in liq)* [2021] EWHC 1273 (Comm) at [22]-[48].

[276] See para.30-055 above.

entire beneficial ownership of the mixed substituted asset. This would, in effect, operate as a forfeiture of the trustee's interest.[277] Accordingly, the claimant is entitled to enforce his interest in the mixed asset either by a lien for the amount of his money which can be proved to have been applied purchasing it, or a proportionate beneficial interest. The election is wholly unrestricted.[278] The claimant may assert whichever remedy is more favourable to him. Should the asset fall in value, the claimant is better to assert a lien since the risk of depreciation is then borne by the trustee. Should it rise in value, he is better to assert a proportionate interest so that he may capture a share of that increase for his own benefit.

Where the substituted asset is bought with money attributable to two innocent contributors, then the claims enforceable against the asset are different. Since the equities between the two contributors are equal, there is no reason to favour one contributor over the other. They each share the beneficial ownership of the asset in proportion to their contributions. Both then bear equally the risk of depreciation in the asset or the benefits of any increase in value.[279]

**30-063**   **(f)   Subrogation to secured charge.**   If the claimant's money is paid to discharge a debt, the creditor will typically take free of his interest since he will generally be bona fide purchaser for value of the legal interest in the money. The claimant may nonetheless be entitled to enforce a proprietary remedy if the debt was secured by a charge over property. He may elect to be subrogated to the creditor's charge over the debtor's property to the extent that his money was applied towards repaying it.[280] It is unnecessary for the claimant to show that he intended to keep the charge alive for his own benefit,[281] since the remedy of subrogation depends on a principle of preventing unjust enrichment at the claimant's expense.[282] Indeed, it may not even be necessary for the claimant to prove by the formal rules of tracing that money in which he had a proprietary interest was used to repay the charge. It is enough that there is a sufficiently clear transfer of value between the claimant and the creditor whose change was repaid to establish that the defendant was enriched at his expense. Since the claimant's rights are in the charge, the value of their interest does not fall or rise as the value of the underlying asset fluctuates. The substitute acquired when the claimant's money is applied towards the secured debt is a discharge of the charge rather than an equity share in the underlying asset. The original purchase of the asset and the discharge of the charge are often analytically distinct transactions.[283]

---

[277] See *Indian Oil Corp v Greenstone Shipping SA* [1988] 1 Q.B. 345.

[278] *Foskett v McKeown* [2001] 1 A.C. 102; which in this respect did not follow dicta *Re Hallett's Estate* (1879) 13 Ch. D. 696 at 709, per Sir George Jessel MR.

[279] *Re Diplock* [1948] Ch. 465 at 539 per curiam; *Lord Provost of Edinburgh v The Lord Advocate* (1879) 4 App. Cas. 823 (HL (Sc)).

[280] *Boscawen v Bajwa* [1996] 1 W.L.R. 328; explaining *Re Diplock* [1948] Ch. 465 at 549–550; *Banque Financière de la Cité v Parc (Battersea) Ltd* [1999] A.C. 221; *Cheltenham & Gloucester Plc v Appleyard* [2004] EWCA 291; [2004] 13 E.G. 127 (CS).

[281] *Boscawen v Bajwa* [1996] 1 W.L.R. at 338–339; explaining *Butler v Rice* [1910] 2 Ch. 277; and *Ghana Commercial Bank v Chandiram* [1960] A.C. 732.

[282] *Banque Financière de la Cité v Parc (Battersea) Ltd* [1999] A.C. 221 at 234; *Lehman Commercial Conduit v Gatedale Ltd* [2012] EWHC 848 (Ch).

[283] *Calverley v Green* [1984] HCA 81; (1984) 155 C.L.R. 242 at [7] per Mason and Brennan JJ.

PROPRIETARY REMEDIES AGAINST PROCEEDS OF BREACH OF TRUST

## 4. Loss of Proprietary Claim; Defences to Proprietary Remedies

**(a)  Failure of identification and dissipation of proceeds.**  If it is established **30-064**
by the rules of following and tracing that the specific proceeds of the claimants'
property have been dissipated, then there will be no foundation for a proprietary
remedy against the assets of the trustee. In the absence of such specific identifica-
tion, the claimant may not assert a general lien over the trustee's assets to reflect
the extent to which they might have been swollen by the contribution of the
claimant's money.[284] Accordingly the effect of the trustee's paying the claimant's
money into an overdrawn bank account is generally to render the money
untraceable.[285] The claimant may however assert a lien over the account to the
extent that his money reduces an authorised overdraft since the authorised overdraft
is a chose in action equivalent to a credit balance in the account.

**(b)  Extinction of the claimant's proprietary interest.**  Regardless of whether **30-065**
the claimant's property remains specifically identifiable, the claimant will be barred
from recovering it if his proprietary interest has been extinguished. Accordingly the
claimant may not recover money or personal property which is received by a bona
fide purchaser for value of the legal interest. In relation to registered land, the
claimant's interest would be extinguished if the land were the subject of a registered
disposition for value and the claimant had not protected the priority of his interest.[286]

**(c)  Change of position and inequitability.**  Change of position has been **30-066**
recognised as a defence to restitutionary claims founded upon unjust enrichment.[287]
Its place in claims arising from a breach of trust and depending on following or trac-
ing remains uncertain.

The rationale of the defence is that the liability of a person should be reduced or
extinguished if his position has been so changed by the receipt of the claimant's
money that it would be inequitable for him to make restitution of all or part of the
money received.[288] The defence is not available to a wrongdoer. This includes a
person who changes his position knowing the facts of the claimant's cause of ac-
tion against him. Accordingly, the defence is unlikely to be available to a claim for
knowing receipt. The pre-condition to liability in that action is the defendant's
knowledge of the facts making his receipt of the money unconscionable.[289]

The authorities are divided on whether change of position should be available as
defence to a claim to a proprietary remedy founded on tracing or following. In
general, the enforcement of a proprietary right against a third party does not depend
on questions of inequitability to the third party, and the enforcement of a property
right against a substituted asset is said not to depend on questions of unjust
enrichment.[290] In an earlier case, however, it was held that an innocent volunteer
who used the claimant's money to improve buildings on his land or to repay a loan

---

[284] *Re Goldcorp Exchange Ltd (In Receivership)* [1995] 1 A.C. 74 at 110; *Bishopsgate Investment v Ho-
man* [1995] 1 All E.R. 347; not following dicta in *Space Investments Ltd v Canadian Imperial Bank
of Commerce Trust Co (Bahamas) Ltd* [1986] 1 W.L.R. 1072 at 1074.

[285] *Bishopsgate Investment v Homan* [1995] 1 All E.R. 347; see Smith (1994) 8 T.L.I. 102.

[286] See paras 4-017, 4-006 above.

[287] *Lipkin Gorman (a firm) v Karpnale Ltd* [1991] 2 A.C. 548.

[288] *Lipkin Gorman (a firm) v Karpnale Ltd* [1991] 2 A.C. 548; *Scottish Equitable Plc v Derby* [2001]
EWCA Civ 369; *Jones v Commerzbank AG* [2003] EWCA Civ 1663.

[289] *Bank of Credit and Commerce International (Overseas) Ltd v Akindele* [2001] Ch. 437 at 456.

[290] *Foskett v McKeown* [2001] 1 A.C. 102 at 129, 132.

secured by a charge should not be liable to a proprietary remedy enforceable against the land since enforcement of the remedy would be "inequitable".[291] These instances may nowadays be analysed as instances of the change of position defence.[292]

6. Personal Liability of Third Parties Involved in Breach of Trust

**30-067**     The claimant in a breach of trust may have claims against third parties involved in the breach. The third party may have received or dealt with the misapplied trust property or he may have wrongfully assisted the trustee in committing it. A common feature of all these forms of liability is that the claimant enforces a personal remedy against the defendant. Even in cases where the defendant is made liable because he has received the misapplied trust property, he is not required to restore the specific fund he received. His liability is only to restore an equivalent amount of money. A second feature is that the defendant in such cases is commonly described as a "constructive trustee". This formula merely indicates that the defendant is held liable to account for the relevant gain to himself or the loss to the trust as if he were a trustee to the claimant. In imposing the liability on the defendant, it is not supposed that he owes the full range of primary and fiduciary duties commonly owed by an express trustee, or even that he has ever held property which belonged in equity to the claimant.[293] A third common feature is that these forms of liability depend on proving that the defendant was at fault. The degree of fault required may vary with each kind of liability, and from transaction to transaction.

Each of these claims brought against third parties has the effect of reducing the amount of the beneficiary's loss resulting from the primary breach of trust. Any sum which the beneficiary recovers would therefore be counted towards reducing the amount of the trustee's primary liability for losses resulting from the breach.

## 1.   Receipt of or Dealing with Trust Property

**30-068**     Before considering liability for knowing receipt and inconsistent dealing, it is necessary to say something about the distinction between beneficial and ministerial receipt of property, and about the kinds of property for which the claims may lie.

**30-069**   **(a)   Nature of receipt.**   A person may receive or deal with misapplied trust property in different capacities. He may receive it for his own benefit, in which case his liability is for "knowing receipt" of the property. His liability is to restore the benefit received or, failing that, its monetary value. If he deals with it ministerially, as an agent for another person, then his liability is based on the wrong of dealing with the property "inconsistently" with the beneficiary's equitable interest in it.

---

[291] *Re Diplock* [1948] Ch. 465 at 544–550.

[292] *Boscawen v Bajwa* [1995] 4 All E.R. 769 at 783; cf. *Foskett v McKeown* [2001] 1 A.C. 102 at 129.

[293] See para.26-005 above. For criticism of the expression and the risks of applying too closely the analogy with express trusteeship, see *Paragon Finance v DB Thakerar & Co* [1999] 1 All E.R. 400 at 408–409; *Dubai Aluminium Co Ltd v Salaam* [2002] UKHL 48; [2003] 2 A.C. 366 at [141]–[143]; Lord Nicholls, Ch.15 in W.R. Cornish (eds), *Restitution: Past, Present and Future* (Hart Publishing, 1998) pp.243–244; C. Mitchell, Ch.6 in P. Birks and A. Pretto (eds), *Breach of Trust* (Hart Publishing, 2002) pp.146–150.

PERSONAL LIABILITY OF THIRD PARTIES INVOLVED IN BREACH OF TRUST

Each kind of liability has a different standard of fault, which reflects the difference in their rationale.[294]

The distinction between beneficial and ministerial receipt is important when a bank receives a deposit of trust money for crediting to its customer's account.[295] The relevant meaning of benefit in this context is easily misunderstood. The question does not depend on the beneficial ownership of the funds that gave rise to the credit in the customer's account but on the existence of agency duties owed by the bank to the customer in respect of the credit in the account. In proprietary terms, a bank nearly always becomes the legal and beneficial owner of the funds received through the payment clearing system. It is a debtor to the customer for the amount of the deposit. The customer's debt is analytically separate from the funds received by the bank.[296] When the bank makes a payment out of the account on the customer's behalf, it acts as the customer's agent. Its dealings with the credit balance in the account are therefore undertaken in a purely ministerial capacity.[297] It is the customer who is treated as having received the money beneficially unless, for separate reasons, the customer happens to hold it ministerially for another.[298] Sometimes, however, the bank may receive the trust money for its own benefit. This would happen if it applied the deposit in the account towards clearing the customer's overdraft, or as payment for special banking services it provided to the customer.[299] Here the bank might be liable for knowing receipt rather than inconsistent dealing.

**(b)   Property received.**   The defendant must have received or dealt with property     **30-070**
in which the trust claimant has an equitable interest. Any kind of asset that is recognised as property could found the claim. Most commonly, it is the original trust money or its traceable proceeds. But it could also be trust chattels,[300] securities,[301] and possibly even the benefit of a contractual obligation owed by the trustee to the defendant, provided that it was secured on other trust property.[302] But the right to enforce a purely personal contractual obligation against the trustee would not be treated as the receipt of property.[303] Nor generally would the receipt of confidential information, even if it was of some financial benefit to the recipient.[304]

---

[294] This passage was cited with approval in *Uzinterimpex JSC v Standard Bank Plc* [2008] EWCA Civ 819.

[295] M. Bryan (1998) 26 Australian Business Law Review 93; D. Fox, *Property Rights in Money* (2008) paras 9.53–9.62.

[296] *Foley v Hill* (1848) H.L.C. 28; *Lipkin Gorman v Karpnale (a firm)* [1991] 2 A.C. 548 at 573–574.

[297] *Jeremy D. Stone Consultants Ltd v National Westminster Bank Plc* [2013] EWHC 208 (Ch) at [242]–[244]; *Byers v Saudi National Bank* [2023] UKSC 51; [2024] 2 W.L.R. 237 at [67].

[298] For example *Law Society v Habitable Concepts Ltd* [2010] EWHC 1449 (Ch).

[299] For example *Westpac Banking Corp v Savin* [1985] 2 N.Z.L.R. 41; *Gray v Johnston* (1868) L.R. 3 H.L. 1; *Stephens Travel Service International Pty Ltd v Qantas Airway Ltd* (1988) 13 N.S.W.L.R. 331; *Agip (Africa) Ltd v Jackson* [1990] Ch. 265 at 292, per Millett J; *Lankshear v ANZ Banking Group (New Zealand) Ltd* [1993] 1 N.Z.L.R. 481; *Citadel General Assurance Co v Lloyds Bank Canada* (1997) 152 D.L.R. (4th) 411 (all involving clearing of overdraft); and *Polly Peck International Plc v Nadir (No.2)* [1992] 4 All E.R. 769 at 777, per Scott LJ; *Nimmo v Westpac Banking Corp* [1993] 3 N.Z.L.R. 218; *Uzinterimpex JSC v Standard Bank Plc* [2008] EWCA Civ 819 (all involving receipt of fees or provision of special banking services).

[300] *Re Montague's ST* [1987] Ch. 264.

[301] *Byers v Saudi National Bank* [2023] UKSC 51; [2024] 2 W.L.R. 237.

[302] *Gold v Primary Developments Ltd* (1997) 152 D.L.R. (4th) 385 at [54], [88].

[303] *Gold v Primary Developments Ltd* (1997) 152 D.L.R. (4th) 385 at [54], [88].

[304] *Farah Constructions v Say-Dee Pty Ltd* (2007) 81 A.L.J.R. 1107 at [120]–[121].

Breach of Trust

## 2. Knowing Receipt

30-071   **(a)   Beneficial receipt.**   Where the defendant receives the property beneficially he may be liable to give restitution of its value in an action for knowing receipt. The basis of the defendant's liability is that he received property in which the claimant had an equitable proprietary interest. From the moment the defendant became unconscionably aware of this fact, he came under a personal obligation to restore the property to the claimant or to act as a custodian of it in the meantime.[305] Although the defendant is required to be at fault, this is not sufficient to make him liable if by that point the claimant's interest in the property has been extinguished or overridden. It follows that the claim does not arise if the defendant received it as a bona fide purchaser for value,[306] after a trustee transferred it in an overreaching transaction,[307] or if it was received in a foreign jurisdiction that did not recognise the separate existence of an equitable interest.[308] The claimant may need to prove by the formal rules of following or tracing that the money received by the defendant was specifically attributable to him.[309] It would not be enough to prove in a more general way that the sum received by the defendant was the same as the sum misapplied from the trust.

Since the defendant's liability is restitutionary, it is fixed at the value of the property when he first received it. He remains liable even if the defendant dissipated the original property, or if it can no longer be specifically identified in the defendant's remaining assets. This is an important practical distinction between it and the proprietary claim founded on following or tracing.

30-072   **(b)   Fault.**   The defendant must be at fault when he receives the trust property. This justifies his continuing liability to restore its value to the claimant even after the property has been dissipated or passed on to another person.[310] Fault means that the defendant must know enough of the facts surrounding the misapplication of trust property to make it unconscionable for him to retain the benefit of his receipt.[311] The degree of knowledge which might make the defendant's conduct unconscionable varies with the context. This allows the court to set a standard that is appropriate to exigencies of the transaction in question.[312] An example of the application of this test arose when a bank received money from a fraudulently operated company in discharge of secured loans owed to it. The company then became insolvent. The test was whether a responsible large bank with the benefit of experienced insolvency practitioners as its receivers should have realised that a proprietary claim prob-

---

[305] *Byers v Saudi National Bank* [2023] UKSC 51; [2024] 2 W.L.R. 237, developing the views of C. Harpum, (1986) 102 L.Q.R. 115, 267–269 and C. Mitchell and S .Watterson in C. Mitchell (ed), *Constructive and Resulting Trusts* (London: Bloomsbury Publishing, 2010), Ch.4.

[306] See paras 4-017–4-041 above.

[307] See paras 4-013–4-016 above.

[308] *Byers v Saudi National Bank* [2023] UKSC 51; [2024] 2 W.L.R. 237 esp. at [70], querying *El Ajou v Dollar Land Holdings Plc (No.1)* [1993] 3 All E.R. 717; [1993] B.C.C. 698.

[309] See para.30-051 above.

[310] An innocent volunteer who received misapplied trust property would be liable to restore its traceable proceeds in a proprietary claim. But would not be liable to a personal claim in knowing receipt: *Re Diplock* [1948] Ch. 465.

[311] *Bank of Credit and Commerce International (Overseas) Ltd v Akindele* [2001] Ch. 437.

[312] See generally D. Fox, *Property Rights in Money* (2008) paras 8.55–8.72. In modern-day banking transactions, the court may need consider the soundness of the defendant's automated processes for the detecting fraudulent payments as well as the conduct and state of mind of its employees: cf *Tecnimont Arabia Ltd v National Westminster Bank plc* [2022] EWHC 1171 (Comm).

PERSONAL LIABILITY OF THIRD PARTIES INVOLVED IN BREACH OF TRUST

ably existed or should have made inquiries that would have revealed the probable existence of a claim.[313]

The degree of awareness which might fix the defendant with liability varies on a sliding scale between two extremes. At one end, the defendant may actually know the possibility that the money is paid to him in breach of trust or without proper authority. This would clearly be unconscionable. A defendant's wilful decision to overlook a possible breach of trust or to his deliberate failure to make reasonable inquiries as to that possibility would be treated in the same way. At the other end of the scale, a mere negligent failure to appreciate that transfer to him was possibly improper would not be unconscionable.[314] But the defendant's failure to appreciate a probable breach which would have been obvious to a reasonable person in his situation may be enough to make his receipt unconscionable, at least in situations where there is an established practice of making inquiries into title. But where there is no such practice and where transactions need to be concluded promptly, the defendant may need to be subjectively aware that he is receiving tainted property before his receipt could be stigmatised as unconscionable.[315] His knowledge of the facts may shade into dishonesty, as that term is now defined.[316] But in gratuitous transactions, where the defendant has no reasonable justification to rely unquestioningly on the trustee's authority to transfer the property to him, it may be reasonable to impose a duty of inquiry on him. The recipient's knowledge of facts that would put a reasonable person on inquiry might amount to unconscionable knowledge.[317]

### (c)  Strict liability.

*(1)  Argument from analogy.*  It has been argued that equity should recognise an  **30-073** alternative ground of liability where the defendant receives misapplied trust property for his own benefit. It would not depend on proving that the recipient was at fault, but on the principle of reversing unjust enrichment.[318] The defendant's liability would be strict but subject to a defence of change of position. The burden would be on the defendant to prove that he did not know of the wrongful or unauthorised origin of the trust property when he changed his position. On this view, the claim for knowing receipt would subsist alongside the claim in unjust enrichment, or possibly be replaced by or subsumed within it.

---

[313] *Sinclair Investments (UK) Ltd v Versailles Trade Finance Group* [2011] EWCA Civ 347; [2012] Ch. 453 at [109] (proof of notice so as defeat a bona fide purchase defence).

[314] *Armstrong DLW GmbH v Winnington Networks Ltd* [2012] EWHC 10 (Ch); [2013] Ch. 156 at [131]–[132]; adapting the gradations of fault in *Baden v Société Générale pour Favoriser le Développement du Commerce et de l'Industrie en France SA Note* [1993] 1 W.L.R. 509 at 575–576. The test for unconscionabilty is similar to the standard of notice used in commercial transactions. It is less exacting than the standards of constructive notice used in dealings with unregistered land where there are formalised procedures which purchasers are expected to adhere to in conveyancing transactions: *MacMillan Inc v Bishopgate Investment Trust Plc* [1995] 1 W.L.R. 978 at 1000.

[315] *Eagle Trust Plc v SBC Securities Ltd* [1992] 4 All E.R. 488 at 509, per Vinelott J; *Cowan de Groot Properties v Eagle Star Trust Plc* [1992] 4 All E.R. 700 at 759–761 per Knox J; *Polly Peck International Plc v Nadir (No.2)* [1992] 4 All E.R. 769.

[316] *Royal Brunei Airlines Sdn Bhd v Tan* [1995] 2 A.C. 378. See para.30-077 below.

[317] *MacMillan Inc v Bishopgate Investment Trust Plc* [1995] 1 W.L.R. 978 at 1000.

[318] See C. Harpum, Ch.1 in P. Birks (ed.), *The Frontiers of Liability, Vol.1.* (OUP, 1994) pp.24–25; Lord Nicholls, Ch.15 in W.R. Cornish (eds), *Restitution: Past, Present and Future* (1998); P. Birks, Ch.7 in P. Birks and A. Pretto (eds), *Breach of Trust* (2002). For judicial endorsement, see *Criterion Properties Plc v Stratford UK Properties LLC* [2004] UKHL 28; [2004] 1 W.L.R. 1846 at [4].

The argument has drawn on an analogy with two other kinds of strict liability claim against a recipient of misapplied money. These are: the claim of an unpaid creditor of a deceased estate to sue an overpaid legatee of a will[319]; and the common law restitutionary claim against a person to receive misapplied money to which the claimant has a subsisting legal title.[320]

**30-074**    *(2) Rejection of argument.*    The argument for the strict liability claim in restitution has not been accepted in the authorities. The cases hold that the defendant's fault is an essential condition to any liability to restore misapplied trust property.[321] As to principle, the analogy with unjust enrichment does not give proper weight to the defendant's distinctive liability to account to or pay compensation to the claimant as if he were a trustee of the property. The defendant's duty is to restore the trust property to the claimant, as far as that is still possible, and he owes basic custodial duties to claimant until he does so.[322] Moreover, the two analogies drawn to support the argument are not quite in point. First, the strict liability claim against an overpaid legatee is the product of a peculiar procedural history. Historically, the legatee of a will was made strictly liable to an unpaid creditor of the estate as the price for no longer having to give security to the executor when he received his legacy for any unpaid debts due from the estate. It is not a sound basis for holding that equitable liability for misapplied money should generally be strict.[323] The analogy with title-based liability at common law overlooks the different incidents of legal and equitable titles to property. Equitable titles are more vulnerable to extinction than legal titles. Interference with an equitable title might only be actionable if the defendant's conscience was affected by knowledge or notice that he had received property that derived from a breach of trust.[324]

### 3. Inconsistent Dealing

**30-075**    **(a)    Ministerial receipt.**    When the defendant receives or deals with money that still belongs to the trust then he may be liable to restore its value to the trust claimant. His liability is explained by wrongful participation in the trustee's breach of duty. The defendant's liability is ancillary rather than restorative in nature since the defendant does not receive and deal with the money as a beneficial owner of it.[325] The defendant is traditionally described as a constructive trustee to the trust claimant. As with the other related kinds of liability for participation in a breach of

---

[319]    *Re Diplock* [1948] Ch. 465; affirmed. sub nom. *Ministry of Health v Simpson* [1951] A.C. 251. See para.34-021 below.

[320]    For example *Lipkin Gorman (a firm) v Karpnale* [1991] 1 A.C. 548.

[321]    *Farah Constructions v Say-Dee Pty Ltd* (2007) 81 A.L.J.R. 1107 at [120]–[121] (HCA) (noted M. Conaglen and R. Nolan [2007] C.L.J. 19; [2007] C.L.J. 515; J. Edelman (2006) 122 L.Q.R. 174; P. Ridge and J. Dietrich (2008) 124 L.Q.R. 26). In *Citadel General Assurance Co v Lloyds Bank Canada* (1997) 152 D.L.R. (4th) 411 at [51]–[52] (noted L. Smith (1998) 114 L.Q.R. 394) the Supreme Court of Canada accepted the unjust enrichment explanation but affirmed that the recipient must be at fault. The recipient's enrichment would not be unjust unless he knew or had notice that the property derived from a breach of trust.

[322]    *Byers v Saudi National Bank* [2023] UKSC 51; [2024] 2 W.L.R. 237 at [10], [29] and [30].

[323]    See C. Harpum, (1994) above at 21–24, and L. Smith (2000) 116 L.Q.R. 412 at 437–444, following S. J. Whittaker (1983) 4 J.L.H. 3.

[324]    See L. Smith (2000) above.

[325]    *Uzinterimpex JSC v Standard Bank Plc* [2008] EWCA Civ 819 at [39]; C. Harpum, Ch.1 in P. Birks (ed.), *The Frontiers of Liability, Vol.1.* (OUP, 1994) at 16.

trust, this is merely a formula that expresses the defendant's accountability for the losses that the claimant suffers from the defendant's dealing with the money.[326]

The common situations where a person is liable for inconsistent dealing are where he deals with trust property as an agent, bailee or debtor for the trustee.[327] In principle, a bank might be liable for making payments of trust money from its customer's account since it acts as an agent for the customer in carrying out his payment instructions.[328] This situation must be distinguished from that where the bank applies a deposit of trust money for its own benefit, as where it uses it to clear the customer's overdraft.[329] Here the bank's liability should be for knowing receipt since it has received the funds beneficially.

**(b)  Fault.**   A higher degree of fault is required to justify the liability of a person    **30-076** who merely handles money in a ministerial capacity than would be sufficient to justify liability for knowing receipt in the same circumstances. Where the defendant acts as an agent, his primary duty is to comply with his principal's instructions.[330] He should be entitled to follow them unless he realises that he would be acting in breach of a third person's equitable rights.[331] A merely negligent failure to realise this should not be enough to implicate him.[332] In principle, constructive notice of the breach should not be enough either. This may be tantamount to requiring the defendant's dealing with the money to be dishonest. This is the standard of fault now required where a person is held liable for assisting in a breach of fiduciary duty. Many instances of ministerial receipt could also be characterised as dishonest assistance in the breach of trust, and the reason for requiring a higher standard of fault in each kind of liability is the same.[333]

## 4.  Dishonest Assistance[334]

**(a)  Accessory liability.**   Dishonest assistance in a breach of trust is a kind of    **30-077** ancillary liability. It depends on the defendant's wrongful participation in a primary breach committed by the trustee. It is unnecessary for the primary breach to be

---

[326] Since the defendant receives the money in a ministerial capacity, he generally does not make any personal gain that could be establish a gain-based liability to account. In principle, however, the defendant might be liable to account for any secondary profits that accrue to him from handling the money. Compare the position for dishonest assistance at para.30-081 below.

[327] *Agip (Africa) Ltd v Jackson* [1990] Ch. 265 at 291–293. e.g. *Lee v Sankey* (1873) L.R. 15 Eq. 204 (solicitor retained by trustees misapplies proceeds of sale of trust property); *Ashman v Price and Williams* (1881) 17 Ch. D. 437 (solicitor to trust makes disbursements of trust income on behalf of trustees).

[328] As was argued unsuccessfully in *Uzinterimpex JSC v Standard Bank Plc* [2008] EWCA Civ 819.

[329] For example *Gray v Johnston* (1868) L.R. 3 H.L. 1; *Barclays Bank Ltd v Quistclose Investments Ltd* [1970] A.C. 567; *Westpac Banking Corp v Savin* [1985] 2 N.Z.L.R. 41.

[330] *Lee v Sankey* (1872) L.R. 15 Eq. 204 at 211; C. Harpum (1986) 102 L.Q.R. 114 at 131.

[331] *Lee v Sankey* (1872) L.R. 15 Eq. 204.

[332] *Ashman v Price and Williams* (1881) 17 Ch. D. 437.

[333] See para.30-079 below.

[334] See generally C. Mitchell, Ch.6 in P. Birks and A. Pretto (eds), *Breach of Trust* (2002); S.B. Elliott and C. Mitchell (2004) 67 M.L.R. 16; P. Ridge (2008) 124 L.Q.R. 445.

This is a PDF of the original 36th Ed. main work

BREACH OF TRUST

dishonest or fraudulent.[335] Unlike knowing receipt, the defendant's liability is not restorative since it need not depend on the defendant receiving the trust property.[336]

The modern formulation of dishonest assistance covers conduct that would once have been analysed as the separate wrong of knowingly inducing or procuring a breach of trust.[337] It too was a kind of accessory liability, the gist of which was that the defendant wrongfully implicated himself in the trustee's primary breach. The distinction between the ways of characterising the accessory's conduct was once significant: for dishonest assistance, the rule used to be that the primary breach of trust needed to be dishonest and fraudulent. It seemed that this was not necessary where the defendant induced or procured the breach. Now that a defendant can be liable for dishonestly assisting a breach of trust that is merely negligent or even innocent, it has been possible to bring these two kinds of liability into line with each other.

**30-078**    **(b)    The primary breach of duty.**    The defendant must have lent assistance to the commission of a primary breach of trust, or in some other breach of duty by a person in a fiduciary relationship with the claimant. Beyond trusts, the principle has been applied to partners in a fiduciary joint venture,[338] or to the director of a company.[339] The duty breached by the primary wrongdoer need not be one that is distinctively fiduciary in type.[340] What matters is the fiduciary status of the primary wrongdoer rather than the fiduciary character of his breach. So the unauthorised mixing of money by a trustee or the misapplication of it in breach of the terms of an undertaking could both found a claim for dishonest assistance.[341]

**30-079**    **(c)    Dishonesty.**    The defendant's assistance in the breach of trust must have been given dishonestly.[342] This is an objective standard which implies a more serious degree of fault than ordinary negligence.[343] One reason for setting the standard of fault above negligence is to differentiate the defendant's duties to the trust claimant from those that they may often owe to the trustee himself. It often happens that the people who lend assistance to what proves to be a breach of duty by a trustee have been hired as agents or advisers to the trust. Their primary duty, which arises in contract, is to the trustee. If they are to be liable directly to the trust beneficiary

---

[335] *Royal Brunei Airlines Sdn Bhd v Tan* [1995] 2 A.C. 378; not following *Barnes v Addy* (1874) 9 Ch. App. 244 at 252–252. Compare the approach in *Australia: Farah Constructions v Say-Dee Pty Ltd* (2007) 81 A.L.J.R. 1107.

[336] The defendant's dealing with the trust property as an agent for the trustee may sometimes amount to dishonest assistance for the trustee's breach, as where he facilitates the breach by hiding or laundering the proceeds of it.

[337] See *Royal Brunei Airlines Sdn Bhd v Tan* [1995] 2 A.C. 378 at 383. For inducement of a breach of trust, see *Alleyne v Darcy* (1854) 4 Ir. Ch. Rep. 199; and *Eaves v Hickson* (1861) 30 Beav. 136; and generally C. Harpum (1986) 102 L.Q.R. 115 at 141–144. In *Royal Brunei Airlines Sdn Bhd v Tan* [1995] 2 A.C. 378 at 385 the Privy Council treated *Eaves v Hickson* as an example dishonest assistance.

[338] *Abou-Rahmah v Abacha* [2005] EWHC 2662 (QB); [2006] Lloyd's Rep. 484 at [38].

[339] *Baden v Société Generale* [1993] 1 W.L.R. 509 at 573; but see *Brown v Bennett* [1999] B.C.C. 525; *Goose v Wilson Sandford & Co* [2001] Lloyd's Rep. PN 189; and *Gencor ACP Ltd v Dalby* [2002] 2 B.C.L.C. 734 at 757 where the point was left open.

[340] See Ch.7 above.

[341] *Royal Brunei Airlines Sdn Bhd v Tan* [1995] 2 A.C. 378; *Twinsectra Ltd v Yardley* [2002] 2 A.C. 164; [2002] UKHL 165.

[342] *Royal Brunei Airlines Sdn Bhd v Tan* [1995] 2 A.C. 378, as explained in *Group Seven Ltd v Nasir* [2019] EWCA 614, [2020] Ch 129.

[343] *Clydesdale Bank v Workman* [2016] EWCA Civ 73; [2016] P.N.L.R. 18.

PERSONAL LIABILITY OF THIRD PARTIES INVOLVED IN BREACH OF TRUST

in equity, then their misconduct should be more serious than the simple negligence that might make them liable for breach of contract to the trustee.[344]

When the test of dishonesty is applied, the defendant is not free to be judged according to his own standards. He is judged according the standards of an ordinary honest person, who would have the same knowledge of the circumstances as he does, and sharing some of his personal characteristics, such as his age and experience.[345] His conduct need not be dishonest by the standards of all people, since not all people may appreciate the kinds of specialised wrongdoing involved in certain kinds of commercial transaction.[346] In the past the authorities were uncertain whether the trustee also needed to realise that his conduct would be regarded as dishonest by the standard of an ordinary honest person. The better view, which is now accepted, is that the defendant need not also take a view on the propriety of his own conduct.[347] A finding that the defendant was dishonest only involves an assessment of his participation in the impugned transaction, judged in the light of his motives and his knowledge of the facts. Reckless participation in the impugned transaction is not the same as dishonesty unless the defendant's motive for acting was itself dishonest.[348]

The finding of dishonesty depends on how precisely he knew the facts which amounted to the breach of trust, and the extent to which his assistance in the transaction involved a commercially unacceptable risk of knowingly implicating himself in the trustee's breach. For this purpose, knowledge and a deliberate choice by the defendant not to confirm his suspicions are treated alike.[349] A negligent or incompetent failure to realise that the transaction was unlawful is not enough.[350]

The defendant need not appreciate the precise legal significance of the transaction as amounting to a breach of trust. It is enough that he realises that the person whom he assists is misappropriating money over which he does not have a right of free disposal.[351] But he must have some suspicions about the particular transactions to which he gives his assistance. A general suspicion, for example, that the transaction is of a kind consistent with possible money laundering is not direct enough to support a finding of dishonesty.[352] But a deliberate removal of assets from an insolvent company to defeat the claims of a certain creditor would be commercially dishonest behaviour.[353]

**(d) Amount of liability.** If the defendant is proved liable, then he may be  **30-080**

---

[344] *Royal Brunei Airlines Sdn Bhd v Tan* [1995] 2 A.C. 378 at 391.

[345] *Royal Brunei Airlines Sdn Bhd v Tan* [1995] 2 A.C. 378.

[346] *Starglade Properties Ltd v Nash* [2010] EWCA Civ 314.

[347] Compare the former view in *Twinsectra Ltd v Yardley* [2002] UKHL 165; [2002] 2 A.C. 164 at [32]–[35]; with *Barlow Clowes v Eurotrust International Ltd* [2005] UKPC 37; [2006] 1 All E.R. 333 at [15]–[16]. It is now beyond doubt that the later decision in *Barlow Clowes* case represents the correct view of English law: *Abou-Rahmah v Abacha* [2006] EWCA Civ 149; [2007] W.T.L.R. 12; *Starglade Properties Ltd v Nash* [2010] EWCA Civ 314; *Group Seven Ltd v Nasir* [2019] EWCA 614, [2020] Ch 129, following *Ivey v Genting Casinos (UK) Ltd (trading as Crockfords Club)* [2017] UKSC 67, [2018] A.C. 391 (restating the corresponding rule in criminal law).

[348] *Clydesdale Bank v Workman* [2016] EWCA Civ 73; [2016] P.N.L.R. 18 at [51].

[349] *Attorney General of Zambia v Meer Care & Desai (a firm)* [2008] EWCA Civ 1007 at [21]; *Group Seven Ltd v Nasir* [2019] EWCA 614, [2020] Ch 129, at paras [59]-[60].

[350] *Royal Brunei Airlines Sdn Bhd v Tan* [1995] 2 A.C. 378 at 391–392.

[351] *Barlow Clowes v Eurotrust International Ltd* [2005] UKPC 37; [2006] 1 All E.R. 333 at [28], per Lord Hoffmann; *Group Seven Ltd v Nasir* [2019] EWCA 614, [2020] Ch 129, at para [101]-[104].

[352] *Abou-Rahmah v Abacha* [2006] EWCA Civ 1492 at [72], per Arden LJ, [98] per Pill LJ.

[353] *Starglade Properties Ltd v Nash* [2010] EWCA Civ 314.

BREACH OF TRUST

required to compensate the trust for losses following from his assistance,[354] or to account for profits which accrue to him as a result of his assistance.[355] These two kinds of liability follow from the premise that the defendant is held liable to account as if he were truly a trustee to the claimant.[356]

**30-081**   *(1) Losses.*   As to losses, once it is proved that the defendant provided relevant assistance to the breach of duty, he is jointly and severally liable for the losses resulting from the trustee's breach.[357] Since the defendant's fault is serious, he cannot put the claimant to proof of the specific causal connection between the assistance given and the loss that ensued; nor is it open to the defendant to exculpate himself by arguing that the losses resulted directly from the voluntary act of the trustee.[358] But his assistance must have had some causative impact in facilitating the trustee's breach of duty if he is to be held accountable for them.[359] The measure of the defendant's liability is not reduced to reflect the claimant's contributory negligence.[360]

**30-082**   *(2) Profits.*   The defendant is only liable to account for a profit which he himself has made through his own assistance in the trustee's breach. Unlike where the claimant sues for losses, the defendant is not jointly and severally liable for the profit made by the trustee.[361] The defendant's liability for his own profits is purely personal. He should not be required to hold the profit on a constructive trust, enforceable by a proprietary remedy, unless perhaps it accrued to him through use of the claimant's own property.[362] The claimant must prove a sufficiently direct causal connection between the defendant's assistance and the alleged profit accruing to him. The profit for which the defendant is held accountable must not be disproportionate to his conduct.[363] This may require the defendant's assistance to the real or effective cause of the profit. Proof of a simple "but for" causal connection may not suffice, nor that the defendant's assistance merely provided the opportunity for his profit to be made for other reasons. But where the defendant is a

---

[354] *Royal Brunei Airlines Sdn Bhd v Tan* [1995] 2 A.C. 378.
[355] *Ultraframe (UK) Ltd v Fielding* [2005] EWHC 1638 (Ch); [2007] W.T.L.R. 835; *Novoship (UK) Ltd v Mikhaylyuk* [2014] EWCA Civ 908; [2015] Q.B. 499.
[356] *Novoship (UK) Ltd v Mikhaylyuk* [2014] EWCA Civ 908; [2015] Q.B. 499 at [75], relying on this passage.
[357] *Hotel Portfolio II UK Ltd (In Liquidation) v Ruhan* [2023] EWCA Civ 1120; [2023] Bus. L.R. 160. For the extent of the losses and the possible relevance of the kind of primary breach of trust, see S.B. Elliott and C. Mitchell, (2004) 67 M.L.R. 16, 38–39.
[358] *Grupo Torras SA v Al Sabah* [1999] C.L.C. 1, 469 (reversed in part on appeal without comment on this point: [2001] C.L.C. 221). cf. *Edgington v Fitzmaurice* (1885) L.R. 29 Ch. D. 459; *Banque Bruxelles Lambert SA v Eagle Star Insurance Co Ltd* [1997] A.C. 191 (causation of loss resulting from fraudulent misrepresentation). See further S.B. Elliott and C. Mitchell (2004) 67 M.L.R. 16 at 17–20.
[359] *Brown v Bennet* [1999] B.C.C. 525.
[360] *Corp del Cobre de Chile v Sogemin Ltd* [1997] 1 W.L.R. 1396; *Standard Chartered Bank v Pakistan National Insurance Corp (Nos 2 and 4)* [2002] UKHL 43; [2003] 1 A.C. 959.
[361] *Ultraframe (UK) Ltd v Fielding* [2005] EWHC 1638 (Ch); [2007] W.T.L.R. 835; *Hotel Portfolio II UK Ltd (in liquidation) v Ruhan* [2023] EWCA Civ 1120; [2023] Bus. L.R. 160.
[362] *Sinclair Investment Holdings SA v Versailles Trade Finance Ltd* [2007] EWHC 915 (Ch); [2007] 2 All E.R. (Comm) 993. See further P. Ridge, (2008) 124 L.Q.R. 445 at 460–467.
[363] *Novoship (UK) Ltd v Mikhaylyuk* [2014] EWCA Civ 908; [2015] Q.B. 419 at [107]–[120], relying on this passage.

corporate vehicle controlled by the defaulting trustee, then it may be liable for its full profit just as if the trustee himself had made the profit personally.[364]

## 5. Limitation

The rules governing the limitation of actions against third parties involved in a breach of trust have special complexities of their own that warrant a separate treatment. The general limitation rules governing breach of trust have already been explained.[365] **30-083**

**(a) General.** As a general rule, s.21(3) of the Limitation Act 1980 bars any action arising out of a breach of trust six years after the cause of action against the defendant accrued. This rule applies to trustees and to third parties who, without being trustees themselves, are liable in equity because they have become involved in a breach of trust committed by another person who is in fact a trustee. **30-084**

This general rule is subject to two statutory exceptions where no limitation period applies. They are:

(i) an action against a person in respect of any fraud or fraudulent breach of trust to which the trustee was party or privy[366];
(ii) an action to recover from the trustee trust property or its proceeds in the possession of the trustee,[367] or previously received by the trustee and converted to his use.[368]

In these exceptional cases, the defendant's liability is indefinite, subject to the defence of laches.

In applying these two exceptions to third parties who become involved in a breach of trust, a distinction is drawn between two categories of person. The first includes people who are true trustees in the sense that they have lawfully assumed fiduciary duties in relation to trust property, whether or not they have been formally appointed to the trust. The two exceptions to the general six-year limitation rule apply to such persons. The second category refers to persons who have never assumed or intended to assume the status of trustees, whether formally or informally, but who have become liable to equitable remedies through their unlawful participation in the misapplication of trust assets by another person. These persons are ancillary to a breach of trust committed by another. The two exceptions do not apply to such persons. They are therefore subject to the general rule and their liability is barred six years after the cause of action accrued against them.[369] **30-085**

**(b) True trustees.** The two exceptions that allow indefinite liability should only apply to persons who have been expressly appointed as trustees, or who are de facto trustees in the sense that they intended to act as such, if only as a matter of objec- **30-086**

---

[364] *Akita Holdings Ltd v Attorney General of the Turks and Caicos Islands* [2017] UKPC 7; [2017] A.C. 590.
[365] See para.30-035 above.
[366] LA 1980 s.21(1)(a). See *Thorne v Heard* [1895] A.C. 495.
[367] See *Thorne v Heard* [1895] A.C. 495; *Re Page* [1893] 1 Ch. 304.
[368] LA 1980 s.21(1)(b).
[369] *Williams v Central Bank of Nigeria* [2014] UKSC 10; [2014] 2 W.L.R. 355 at [9]; following *Selangor United Rubber Estates Ltd v Cradock (No.3)* [1968] 1 W.L.R. 1555; *Paragon Finance v DB Thakerar & Co* [1999] 1 All E.R. 400 at 408–409; *Dubai Aluminium Co Ltd v Salaam* [2002] UKHL 48; [2003] 2 A.C. 366 at [141]–[143].

BREACH OF TRUST

tive construction of their acts.[370] So express trustees, personal representatives, trustees de son tort,[371] and persons who become constructive trustees owing to the informality of an express transaction may be indefinitely liable in the two situations specified above.[372] A common feature of all these situations is that the defendant already held office as a trustee before the events that gave rise to the claimant's action.[373] Trustees de son tort and trustees of informally created trusts are "constructive trustees" for these purposes, only in the sense that they were not expressly appointed.

**30-087**  **(c) Knowing receipt, inconsistent dealing and dishonest assistance.**  Conversely, where the defendant has become liable in equity only by reason of the events that founded the claimant's action against him, then the usual six-year limitation period applies.[374] In these circumstances, the description of the defendant as a "constructive trustee" is merely a formula for his equitable accountability to the trust claimant rather than anything indicating that he assumed the duties of trusteeship.[375] Consequently, a claim in knowing receipt would generally be barred six years after the defendant received the misapplied trust property.[376]

But if the person receiving the trust property was already a trustee to the claimant or if he owed fiduciary duties to the claimant in his own right, then his liability would be indefinite even if he no longer held the traceable proceeds of the breach of trust. This a situation to which exception (ii) above applies. The defendant would be a "trustee" to the claimant for the purposes of the Limitation Act 1980, and the trust property would have been received by him and converted to his own use.[377]

**30-088**  For the same reasons as apply to claims for knowing receipt, the liability of a person who is a constructive trustee for inconsistent dealing or dishonest assistance in a breach of trust is barred six years after the relevant act of dealing or assistance.[378] It makes no difference whether the primary breach of trust was fraudulent or not, since the defendant in the dealing or assistance action is not the "trustee" referred to in exception (i) above. That "trustee" is the true trustee who committed the primary breach.

---

[370] *Williams v Central Bank of Nigeria* [2014] UKSC 10; [2014] 2 W.L.R. 355 at [9].

[371] *Mara v Brown* [1896] 1 Ch. 196; *Williams v Central Bank of Nigeria* [2014] UKSC 10; [2014] 2 W.L.R. 355 at [9].

[372] These would include secret trustees and constructive trustees under the rules in *Pallant v Morgan* [1953] Ch. 43; and *Stack v Dowden* [2007] UKHL 17; [2007] 2 A.C. 432: *Paragon Finance v DB Thakerar & Co* [1999] 1 All E.R. 400 at 408–409.

[373] *Taylor v Davies* [1920] A.C. 636 at 653. See too *Clarkson v Davies* [1923] A.C. 100 at 110–111; *Paragon Finance v DB Thakerar & Co Ltd* [1999] 1 All E.R. 400; *Halton International Holdings SARL v Guernoy Ltd* [2006] EWCA Civ 801.

[374] *Paragon Finance v DB Thakerar & Co* [1999] 1 All E.R. 400; *UCB Home Loans v Carr* [2000] Lloyd's Rep. P.N. 754 at 767–769; *JJ Harrison (Properties) Ltd v Harrison* [2001] EWCA Civ 1467; [2002] B.C.L.C. 162; *Williams v Central Bank of Nigeria* [2014] UKSC 10; [2014] 2 W.L.R. 355 at [9].

[375] *Selangor United Rubber Estates Ltd v Cradock* [1968] 1 W.L.R. 1555 at 1582, per Ungoed-Thomas J; *Dubai Aluminium Co Ltd v Salaam* [2002] UKHL 48; [2003] 2 A.C. 366 at [141]–[143], per Lord Millett who criticises the description of the defendant as "accountable as a constructive trustee", it being more accurate simply to describe the defendant "as accountable in equity".

[376] *Taylor v Davies* [1920] A.C. 636; *Williams v Central Bank of Nigeria* [2014] UKSC 10; [2014] 2 W.L.R. 355.

[377] *JJ Harrison (Properties) Ltd v Harrison* [2001] EWCA Civ 1467; [2002] B.C.L.C. 162 at [27]–[29].

[378] *Cattley v Pollard* [2006] EWHC 3130 (Ch); [2007] 2 All E.R. 1086 (dishonest assistance); *Williams v Central Bank of Nigeria* [2014] UKSC 10; [2014] 2 W.L.R. 355; not following *Statek Corp v Alford* [2008] EWHC 32 (Ch); [2008] B.C.C. 266.

PERSONAL LIABILITY OF THIRD PARTIES INVOLVED IN BREACH OF TRUST

**(e)  Cause of action against defendant based on fraud.**  The running of time **30-089** in the cause of action against the third party may be postponed if the "the action is based upon the fraud of the defendant". The limitation period does not begin to run until the claimant has discovered the fraud or could with reasonable diligence have discovered it.[379]

The term "fraudulent" has been interpreted as meaning "dishonest" in the analogous context of a fraudulent breach of trust committed by an express trustee.[380] In some cases of knowing receipt, inconsistent dealing or dishonest assistance the claimant may be able to invoke this exception to postpone the commencement of the six years.[381] It has been argued that the running of time in a dishonest assistance action might routinely be postponed until the claimant had discovered the defendant's dishonesty.[382] The defendant's dishonesty is an integral part of the claimant's cause of action against him and not merely incidental to it.[383]

---

[379] LA 1980 s.32(1)(b).

[380] *Armitage v Nurse* [1998] Ch. 241 at 260 interpreting LA 1980 s.21(1)(a).

[381] *Williams v Central Bank of Nigeria* [2014] UKSC 10; [2014] 2 W.L.R. 355 at [119].

[382] See C. Mitchell [2008] Conv. 236–237.

[383] *Beaman v ARTS Ltd* [1949] 1 K.B. 550.