## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

|  |  |
|---|---|
| In re: | Case No. 22-11068 (KBO) |
| FTX TRADING LTD., *et al.*,[1] | Chapter 11 |
| Debtors. | (Jointly Administered) |
|  | **Hearing Date: March 26, 2026 at 9:30 a.m. (ET)** |
|  | **Obj. Deadline: February 13, 2026 at 4:00 p.m. (ET) (By Agreement)** |

### ELD CAPITAL LLC'S OBJECTION TO THE FTX RECOVERY TRUST'S OBJECTION TO PROOFS OF CLAIM FILED BY ELD CAPITAL LLC

ELD Capital LLC ("ELD Capital" or "Claimant"), a customer-claimant in these Chapter 11 Cases of FTX Trading, Ltd. and affiliated debtors and debtors-in-possession (collectively the "Debtors"), by and through its undersigned counsel, respectfully submits this objection to the FTX Recovery Trust's ("Trust") objection to ELD Capital's proofs of claim 91933 and 96369 (the "Objection"). In support of its objection, ELD Capital concurrently submits the *Declaration of Dominic J. Cubitt in Support of Objection of ELD Capital LLC to FTX Recovery Trust's Objection to Proofs of Claim Filed by ELD Capital LLC* ("Cubitt Decl."), the *Declaration of Alec J. Berin in Support of ELD Capital LLC'S Objection to the FTX Recovery Trust's Objection to Proofs of Claim Filed by ELD Capital LLC* ("Berin Decl."), and respectfully states as follows:

---

[1] The last four digits of FTX Trading Ltd.'s and Alameda Research LLC's tax identification numbers are 3288 and 4063, respectively. Due to the large number of debtor entities in these Chapter 11 Cases, a complete list of the Debtors and the last four digits of their federal tax identification numbers is not provided herein. A complete list of such information may be obtained on the website of the Debtors' claims and noticing agent at https://cases.ra.kroll.com/FTX.

**PRELIMINARY STATEMENT**

1. ELD Capital's claims are far simpler than the Trust attempts to make them. The component that is disputed by the Trust does not involve a sophisticated institutional trader who knowingly made risky bets based on full information. Rather, it involves a husband and wife who justifiably relied on the Debtors' representations regarding a means to rescue their assets from FTX's platform during a moment of intense vulnerability. Unfortunately, the Debtors' representations were false and what was sold to ELD Capital as a bridge over troubled waters was doomed from the start. Despite the Trust's characterization of ELD Capital's purchases of TRON Tokens as "heedless[]" or a "gambit," these purchases are exactly what the Debtors solicited when announcing the credit facility at issue. Unbeknownst to ELD Capital, however, the only parties who could benefit from its purchases of TRON Tokens were the Debtors and their insiders. Now, the Trust seeks to blame the victim. This should not be countenanced.

2. As discussed fully herein, the Objection is untimely and, in any event, ELD Capital can establish all the elements of its fraud claim. ELD Capital's claims should be recognized in full.

**BACKGROUND**

    **I.    Background Regarding ELD Capital**

3. ELD Capital is a customer-claimant in these Chapter 11 cases. Cubitt Decl. ¶ 2. ELD Capital is a limited liability corporation registered in St. Vincent and the Grenadines that is wholly owned by Dominic J. Cubitt and Leona Sammon. *Id.* ¶ 3. Mr. Cubitt and Ms. Sammon have one minor child who is their dependent. *Id.*

4. ELD Capital exists solely to manage their family's personal assets. *Id.* The name ELD Capital refers to the initials of Mr. Cubitt, Ms. Sammon, and their son (*i.e.*, Ethan, Leona,

and Dominic).  *Id.*  ELD Capital has never raised or taken outside investment.  *Id.* ¶ 4.  ELD Capital has no partners, employees, or clients.  *Id.* ¶ 5.  ELD Capital operates from Mr. Cubitt and Ms. Sammon's family home and does not use any of the technology or tools that are typical of institutional and/or proprietary traders.  *Id.* ¶ 7.

5.      ELD Capital was formed by Mr. Cubitt and Ms. Sammon on November 20, 2020, because of regulatory uncertainty in the European Union concerning cryptocurrency at the time of ELD Capital's formation.  *Id.* ¶ 4.  Specifically, when ELD Capital was formed, there was a credible threat that the European Union or certain member States would ban retail trading of cryptocurrency futures and derivatives.  *Id.*  Mr. Cubitt and Ms. Sammon formed ELD Capital to ensure regulatory compliance and continuity of access to the markets and our assets during a period of legislative flux in Europe.  *Id.*

6.      The assets of ELD Capital represent the personal life savings and retirement funds of Mr. Cubitt and Ms. Sammon.  *Id.* ¶ 6.  ELD Capital is not an institutional investor.  *Id.* ¶ 8.

## II.     ELD Capital's Attempted Participation in the TRON Facility

7.      In the days preceding the announcement of the TRON facility, Mr. Cubitt and Ms. Sammon became aware of reports regarding concerns with the viability of FTX; however, no reporting of which they were aware indicated a date by which FTX was expected to collapse or file for bankruptcy.  Cubitt Decl. ¶ 9.

8.      Although ELD Capital placed five withdrawal orders between November 8 and 9, 2022, the assets that ELD Capital attempted to withdraw do not represent the entire value of ELD Capital's assets on the FTX platform as of the withdrawal attempts.  *Id.* ¶ 10.  Indeed, three of the five attempted withdrawal attempts applied to a total of less than $11,500 (*i.e.*, the attempted withdrawals of USDC, SOL, and AVAX).  *Id.*  The other two attempted withdrawals related to the

same assets (*i.e.*, 200 ETH). *Id.* These attempted withdrawals are not the signs of panic that the Trust paints them to be.

9.      ELD Capital first became aware of the TRON exchange offer on November 10, 2022. *Id.* ¶ 11. Specifically, Mr. Cubitt and Ms. Sammon logged onto FTX's online platform and saw a prominent banner at the top of the landing page that promoted the TRON facility. *Id.* They clicked on the link embedded in the banner, which directed them to the full language of the announcement. *Id.* The language of the announcement on FTX's online platform was the same as the language of the announcement made on the FTX Group's and Justin Sun's Twitter accounts (collectively, "<u>Announcement</u>"):

> We are pleased to announce that we have reached an agreement with Tron to establish a special facility to allow holders of TRX, BTT, JST, SUN, and HT to swap assets from FTX 1:1 to external wallets. This functionality will be enabled at 18:30 UTC, November 10, 2022. The exact capacity of the Tron Token facility will be determined weekly and future injections will occur at 14:00 UTC. The amount to be deposited will depend on a number of factors such as withdrawal demand and funding capacity to be provided by Tron. By providing a set schedule of the amount of tokens to be introduced into the market and the corresponding time, our goal is to provide more clarity to the market allowing users to make better informed decisions. As part of this agreement, we will be disabling Tron deposits for all users during this period. The only deposits will be the pre-announced deposits conducted weekly by the Tron Team. Initially, $13,000,000 of assets will be deployed to facilitate such swaps. Information on future capital injections will be shared on a weekly basis. We sincerely appreciate your patience and support of FTX during this period! And we hope to have more information to share in the near future. We are also very grateful to the Tron team for stepping up to assist us in these hard times and provide support for the wider crypto industry. Please note, these markets (TRX, BTT, JST, SUN, and HT) may experience high levels of volatility. Please ensure you understand the details of this arrangement and any associated risks before taking any actions. If you have any questions, don't hesitate to reach out through support channels or our official telegram channel: [link embedded].

10.      ELD Capital's understanding at the time (and continuing understanding) is that the TRON facility would enable 1:1 swap transactions, whereby a holder of TRX, BTT, JST, SUN, and HT (collectively, "<u>TRON Tokens</u>") would be able to ***swap*** assets from the FTX platform to

4

external wallets.  *Id.* ¶ 12.  The Announcement characterized the facility as permitting a unique transaction type in the character of a "swap."  *Id.*  The Announcement did not provide specific instructions regarding how to effectuate the swap transaction contemplated under the facility.  *Id.*

11.    According to the Announcement, TRON agreed to deploy $13,000,000 of assets "to facilitate such swaps."  *Id.* ¶ 13.  In other words, the Announcement stated that TRON would provide TRON Tokens equivalent to $13,000,000 to FTX for FTX to sell to account holders such as ELD Capital.  *Id.*  As such, FTX benefitted from the significant premiums at which TRON Tokens were trading following the announcement and earned fees on transactions in TRON Tokens following the Announcement.  *Id.*

12.    The Announcement's statement that deposits would be conducted by TRON "weekly" suggested to Mr. Cubitt and Ms. Sammon that the facility would be ongoing and not limited to the initial $13,000,000 of assets deployed by TRON.  *Id.* ¶ 14.

13.    Mr. Cubitt and Ms. Sammon relied on the representations that the former Debtors made in the Announcement, which was prominently displayed on the landing page of FTX's online platform and repeated on multiple related X (f/k/a Twitter) channels.  *Id.* ¶ 15.

### III.    ELD Capital's November 10 and 11, 2022 Trades and Attempts to Swap or Remove Its TRON Tokens from FTX's Platform

14.    Shortly after the Tron facility opened on November 10, 2022, ELD Capital purchased 33,691 TRX with USD already in its account.  Cubitt Decl. ¶ 16.  Following this trade, ELD Capital initiated a withdrawal transaction with respect to this 33,691 TRX.  *Id.*  When ELD Capital initiated this transaction to withdraw its TRON Tokens from FTX's platform, there was no indication that the facility was closed or unavailable.  *Id.*  This attempted withdrawal was cancelled on November 11, 2022.  *Id.*  When this transaction was cancelled, no reason was provided for the

cancellation of the transaction; again, there was no indication that the facility was closed or unavailable. *Id.*

15.      Since the Announcement characterized the transaction as a "swap" rather than a "withdrawal," ELD Capital and its owners had no reason to believe this transaction was cancelled because the facility would not be able to support the swap transactions advertised in the Announcement—for lack of sufficient capacity or otherwise. *Id.* ¶ 17.  The cancellation of this transaction, therefore, did not come as a surprise or raise a "red flag." *Id.*

16.      Subsequently, ELD Capital made a series of additional purchases of Tron Tokens with the balance of its assets held on the FTX platform, acquiring a total of 1,774,949 TRX.  *Id.* ¶ 18.  Following these additional trades, ELD Capital initiated another withdrawal transaction with respect to all of its TRX holdings.  *Id.*  When ELD Capital initiated this transaction to withdraw its TRON Tokens from FTX's platform, there was no indication that the facility was closed or unavailable.  *Id.*  This attempted transaction was cancelled shortly after it was initiated.  *Id.*  When this transaction was cancelled, no reason was provided for the cancellation of the transaction; as with the cancellation of ELD Capital's first withdrawal attempt, there was no indication that the facility was closed or unavailable.  *Id.*

17.      Still, because the Announcement characterized the transaction as a "swap" rather than a "withdrawal," ELD Capital and its owners had no reason to believe this transaction was cancelled because the facility would not be able to support the swap transactions advertised in the Announcement.  *Id.* ¶ 19.  These withdrawal attempts were simply one of several attempts ELD Capital made to avail itself of the TRON facility because the Announcement did not contain specific instructions about how the swap would be carried out.  *Id.*

18.    HTX (formerly known as Huobi) is a cryptocurrency exchange that was founded and owned by Justin Sun and affiliated with TRON.  *Id.* ¶ 20.  ELD Capital became aware that Huobi, as the cryptocurrency exchange arm of TRON's organization, was one of the external platforms onto which Tron Tokens could be moved as part of the facility.  *Id.*

19.    On November 11, 2022, ELD Capital opened a Huobi account as part of its efforts to facilitate the swap transaction offered in the Announcement.  *Id.* ¶ 21.  On November 11, 2022, ELD Capital received a webform from Huobi to provide information regarding its Tron Token holdings to assist Huobi in facilitating the swap with FTX.  *Id.*  Among other things, the form stated:

> The FTX liquidity crunch has caused great concerns over asset security. After careful consideration, Huobi and TRON DAO have decided to permanently support users to redeem their Tron tokens (TRX, BTT, JST, SUN, HT) deposited on the FTX platform at a 1:1 ratio.
>
> Tron tokens holders on FTX can fill out the following form with the required information, and we will coordinate with FTX regarding the withdrawals of Tron tokens, including TRX, BTT, JST, SUN, and HT.

*Id.*

20.    Considering the joint nature of the Announcement between the former Debtors and TRON—and, by extension, Huobi—there was no reason to suspect that the facility contemplated by the Announcement would be ineffective.  *Id.* ¶ 22.

21.    Although ELD Capital and its owners were aware that TRON Tokens were trading at a premium on FTX's platform, they understood the premium to reflect interest in the TRON facility rather than risk that the facility itself would fail.  *Id.* ¶ 23.

## IV.    ELD Capital's Claims

22.    On February 25, 2024, Mr. Cubitt filed customer claim 91933 on behalf of ELD Capital without the assistance of an attorney.  Cubitt Decl. ¶ 24.

23.     On July 2, 2024, ELD Capital's present counsel filed claim 96369, which is reflected in the Amended Proof of Claim for customer claim 91933. *Id.* ¶ 25. This Amended Proof of Claim corrected the holder of these claims to accurately reflect ELD Capital as the claims holder and to elaborate on the basis for ELD Capital's clams against the former Debtors, not the Trust. *Id.*

24.     As set forth more fully in the Amended Proof of Claim, ELD Capital's claim consists of two components, totaling $569,262.34: (a) $98,943.38, representing the fraudulently induced diminished value of assets in Claimant's account as of the Petition Date, plus (b) $470,318.96 in damages directly arising from the fraud of the former Debtors with respect to the transactions described therein. *Id.* ¶ 26.

## V.     ELD Capital's Objection to the Second Amended Joint Chapter 11 Plan of Reorganization of FTX Trading Ltd. and its Affiliated Debtors

25.     When the former Debtors sought confirmation of the Second Amended Joint Chapter 11 Plan of Reorganization of FTX Trading Ltd. and its Affiliated Debtors ("Reorganization Plan"), ELD was concerned that the release and settlement provisions of the Reorganization Plan would extinguish ELD Capital's fraud claim. Cubitt Decl. ¶ 27. Accordingly, on August 16, 2024, ELD Capital objected to the Reorganization Plan. [D.I. 23140].

26.     To resolve ELD Capital's objection to the Reorganization Plan, the former Debtors reached an agreement with ELD Capital that its claims are not extinguished by the Reorganization Plan and will be resolved through the claims allowance process [D.I. 26039]. This agreement was memorialized in the Confirmation Order. [D.I. 26404]. In addition, the former Debtors agreed and promised in writing as part of the resolution of ELD's objection to the Reorganization Plan to "make general efforts to reconcile ELD's claims promptly."

## VI.     ELD Capital's Losses

8

27.    The former Debtors' fraudulent conduct at issue in ELD Capital's claim has inflicted significant hardship on Mr. Cubitt and Ms. Sammon's family.  Cubitt Decl. ¶ 29.  Their life savings have been unavailable to them since the former Debtors filed the Petition commencing these Chapter 11 proceedings.  *Id.*  In addition, the amount of their savings remains both uncertain and unavailable based on the former Debtors' fraudulent conduct.  *Id.*

28.    Among other things, ELD Capital lost the value of the liquidity (*i.e.*, immediate access to its assets) that ELD Capital bargained for when engaging in transactions in anticipation of participating in the TRON facility.  *Id.* ¶ 30.  In other words, ELD Capital paid the cost of having immediate access to its assets but did not receive the benefit of the bargain it struck because of the former Debtors' fraudulent conduct.  *Id.*

29.    Since objecting to ELC Capital's claim, the Trust has scheduled a distribution for holders of allowed claims and interest.  *Id.* ¶ 31.  The anticipated record date is February 14, 2026, and the distribution is expected to commence on March 31, 2026.  *Id.*  This distribution was announced in a press release by the Trust.  *Id.*  Like the Trust's prior distributions, ELD Capital will be unable to participate in the scheduled March 31, 2026 distribution. *Id.*

## VII.    ELD Capital's Amended Proof of Claim

30.    The Amended Proof of Claim [D.I. 31298-2] alleges all the elements of fraud sufficient to establish a *prima facie* case.

31.    The Amended Proof of Claim alleges: (1) the Debtors misrepresented that ELD Capital and other customers would be able to avail themselves of the facility to move their assets off the FTX platform to an external wallet if they converted their assets to Tron Tokens; (2) that the Debtors concealed their imminent bankruptcy filing at the time they made the exchange offer; and (3) at the time of the Debtors' misrepresentations and concealment, the Debtors were aware

that ELD Capital would not be able to avail itself of the facility to move its assets to an external wallet and that they would imminently be making their bankruptcy filing.  The Amended Proof of Claim Alleges that Debtors' misrepresentations and concealment were intended to induce ELD Capital's and other customers' exchange transactions of cryptocurrencies and fiat currency into TRON Tokens.  [D.I. 31298-2 ¶ 9].

32.      The Amended Proof of Claim alleges that ELD Capital justifiably relied on the Debtors' misrepresentations and concealment in determining to make the exchange transactions given the means and manner in which the exchange offer was made (*i.e.*, on FTX's online platform and official social media channels, with a specific indication of TRON-sponsored tokens included in the offer, and FTX's representations that TRON would be participating in the facility and that future capital injections to support the credit facility would be "shared on a weekly basis").  [D.I. 31298-2 ¶ 9].

33.      In addition, the Amended Proof of Claim alleges that, as a direct result of the ELD Capital's exchange transactions made in reliance on the Debtors' misrepresentations and concealment, ELD Capital was damaged at least to the extent of the reduction in value of the assets its account as of the Petition Date.  [D.I. 31298-2 ¶¶ 9-11].

**VIII.   The Objection is Untimely**

34.      On November 3, 2025, the Trust filed a motion ("Motion") seeking to extend the claims objection deadline through and including January 4, 2027, and without prejudice to seeking further extensions.  [D.I. 33444].

35.      On November 10, 2025, counsel for ELD Capital contacted counsel for the Trust by email to inform the Trust that ELD Capital would object to the Motion unless the Trust provided a concrete timeline for the Trust to file any objection to ELD Capital's claims.  Berin Decl. ¶ 3.

On November 12, 2025, counsel for ELD Capital followed up by email seeking clarity regarding the Trust's position so that ELD Capital could timely file an objection to the Motion, if necessary. *Id.* ¶ 4.

36.     On November 12, 2025, counsel for the Trust wrote, "[t]he FTX Recovery Trust **will object** to ELD Capital's claims **by end of this month**. Based on your email below, we assume this will address your client's timing concerns and obviate any perceived need for motion practice regarding the claims objection deadline or its application to ELD Capital's claim." *Id.* ¶ 5 (emphasis added).

37.     The Trust did not file an objection by the end of November 2025, despite the Trust's specific representations, through counsel, on November 12, 2025, that it would object to ELD Capital's claims "by the end of this month" in exchange for ELD Capital's agreement not to object to the Motion. *Id.* ¶ 6.

38.     On December 8, 2025, counsel for ELD Capital wrote to the Trust's counsel indicating that their review of the docket reflected that the Trust had not objected to ELD Capital's claim. *Id.* ¶ 7. Since ELD Capital informed the Trust that it was considering an objection to the Motion and other actions to protect its rights and relied on the Trust's agreement to object to ELD Capital's claims by the end of November 2025, ELD Capital asked for the Trust's confirmation that it would allow ELD Capital's claims. *Id.*

39.     On December 10, 2025, the Trust's counsel indicated that ELD Capital's claims remain disputed and the Trust "will be objecting to them in the coming days." *Id.* ¶ 8. Further, the Trust's counsel incorrectly asserted that "ELD has not been prejudiced in any way and any argument that ELD's claims should be automatically allowed is frivolous." *Id.*

40.     More than three weeks later, on January 2, 2026, the Trust objected to ELD Capital's claims.  [D.I. 34251].

41.     Not only is the Trust's objection untimely considering its agreement to object to ELD Capital's claims (if at all) by the end of November 2025, but the Trust's untimely objection also has caused ELD Capital to miss another of the Trust's scheduled distributions to holders of allowed claims and interests.  *Id.* ¶ 11.

42.     This is not the first commitment by the Trust (and former Debtors) to ELD Capital that it has subsequently disregarded.  *Id.* ¶ 12.  When the former Debtors sought confirmation of the Second Amended Joint Chapter 11 Plan of Reorganization of FTX Trading Ltd. and its Affiliated Debtors ("Reorganization Plan"), ELD Capital was concerned that the release and settlement provisions of the Reorganization Plan would extinguish ELD Capital's fraud claim. Accordingly, on August 16, 2024, ELD Capital objected to the Reorganization Plan.  [D.I. 23140].

43.     To resolve ELD Capital's objection to the Reorganization Plan, the former Debtors reached an agreement with ELD Capital that its claims are not extinguished by the Reorganization Plan and would be resolved through the claims allowance process [D.I. 26039].  This agreement was memorialized in the Confirmation Order.  [D.I. 26404].  In addition, the former Debtors agreed and promised in writing as part of the resolution of ELD's objection to the Reorganization Plan to "make general efforts to reconcile ELD's claims promptly."

44.     Rather than make any efforts to "reconcile ELD's claims promptly," the Trust ignored numerous requests by ELD Capital for clarity regarding the Trust's timeline for any objection it wished to make to ELD Capital's claims.  This forced ELD Capital to file a motion seeking the entry of a schedule for the Trust to file any objection to its claims.  [D.I. 31298].

**LEGAL STANDARDS**

## I.      Standard of Review for Proofs of Claim

45.      "A proof of claim which has been duly filed under section 501 of the Bankruptcy Code and the Bankruptcy Rules is deemed allowed unless a party in interest objects." *In re Eastern Fire Protection, Inc.*, 44 B.R. 140, 142 (Bankr. E.D. Pa. 1984) (citing 11 U.S.C. § 502(a)).  "The filing of the proof of claim constitutes prima facie evidence of the validity and amount of the claim. Bankruptcy Rule 3001(f)." *Id.*  "Upon the filing of [] objections, the trustee is then called upon to produce evidence and show facts tending to defeat the claim. Such evidence must be of a probative force equal to that of the allegations of the creditor's proof of claim. While the burden of ultimate persuasion is always on the claimant, and while probative force is given to the allegations in that creditor's proof of claim, the trustee nonetheless carries the burden of going forward to meet, overcome, or at least equalize, what operates in favor of the creditor by the force of section 502(a) and the Rule." *Id.* (citing 3 *Collier on Bankruptcy*, ¶ 502.01, pp. 502–16—502–18 (15th ed. 1984)).

## II.     Substantive Fraud Standard

46.      To establish common law fraud, a plaintiff must show that: (1) the defendant made a false representation; (2) the defendant knew or believed the representation was false, or made it with reckless indifference to the truth; (3) the defendant's false representation was intended to induce the plaintiff to act or refrain from acting; (4) the plaintiff's action or inaction was taken in justifiable reliance upon the representation; and (5) the plaintiff was damaged by such reliance. *See Stephenson v. Capano Dev., Inc.*, 462 A.2d 1069, 1074 (Del. 1983). Fraud may occur through misrepresentation or by concealment.  *See id.*[2]

---

[2]Delaware law also recognizes a claim for equitable fraud, proof of which requires a plaintiff to "satisfy all the elements of common-law fraud with the exception that plaintiff need not

**ARGUMENT**

**I.      The Objection Should be Denied as Untimely**

47.     The Court should overrule the Objection because it was untimely filed more than

one month after a deadline to which the ***Trust itself agreed*** in exchange for ELD Capital's own

agreement not to object to the Trust's motion seeking an extension of the objection deadline in the

Reorganization Plan.  *See supra* Background § VIII; Berin Decl. Ex. A.  The Trust's willful delay

has prejudiced ELD Capital because it has caused ELD Capital to miss out on several distributions,

including the upcoming distribution scheduled for March 31, 2026.  *See supra* Background § VIII.

48.     Although Rule 3007 does not impose a deadline for trustees to object to a proof of

claim filed by a creditor, this default position should not apply since the Reorganization Plan

provides a specific deadline for the Trust to object to claims and the Trust ***agreed to an even more***

***immediate specific deadline*** as to ELD Capital's claims.  *See id.*  This is not the first time the Trust

has disregarded commitments it has made to ELD Capital.  *See id.*  It should not be permitted to

continue acting with impunity with respect to specific and clear agreements made in exchange for

a benefit provided to the Trust, at the expense of a victim of the Debtors' fraudulent and damaging

conduct.

**II.     Debtors Made False or Misleading Statements and Omissions Concerning the**
**TRON Facility**

49.     ELD alleges two fundamental predicates for its fraud claim, namely that (a) the

Debtors misrepresented that ELD Capital and other customers would be able to avail themselves

of the TRON facility to move assets off the FTX platform to an external wallet if they converted

---

demonstrate that the misstatement or omission was made knowingly or recklessly." *H-M*
*Wexford LLC v. Encorp, Inc.*, 832 A.2d 129, 144 (Del. Ch. 2003).

assets to TRON Tokens, and (b) the Debtors omitted to disclose that bankruptcy was so imminent (in fact, it was effectively underway) at the time of the Announcement that the facility would not be available to ELD Capital and other customers.  In response, the Trust contends that ELD Capital's allegations are conclusory and non-actionable because they conflict with the terms of the Announcement and facts in the public record by November 10, 2022.  Objection, at 17.  The Trust's position is incorrect, as it relies on illogically narrow reading of the Announcement and a disregard of its full context.

50.      As a preliminary matter, "[a] claim for fraud generally must concern something knowable, such as 'either a past or contemporaneous fact or a future event that falsely implies an existing fact.'"  *Trifecta Multimedia Holdings Inc. v. WCG Clinical Servs. LLC*, 318 A.3d 450, 465 (Del. Ch. 2024) (citation omitted).  "[O]ne is equally culpable of fraud who by omission fails to reveal that which it is his duty to disclose in order to prevent statements actually made from being misleading."  *Stephenson v. Capano Dev., Inc.*, 462 A.2d 1069, 1074 (Del. 1983).  And "[w]hile Delaware courts generally 'disfavor allegations of fraud when the underlying utterances take the form of unfulfilled promises of future performance,' a complaint that alleges facts with sufficient particularity may 'support a reasonable inference that Defendants made promises they had no intention of keeping when they made them.'"  *TrueBlue, Inc. v. Leeds Equity Partners IV, LP*, 2015 WL 5968726, at *6 (Del. Super. Ct. Sept. 25, 2015) (quoting *Winner Acceptance Corp. v. Return on Capital Corp.*, 2008 WL 5352063, at *9-*10 (Del. Ch. Dec. 23, 2008)); *see also Grunstein v. Silva*, 2009 WL 4698541, at *13 (Del. Ch. Dec. 8, 2009) ("Courts, however, will convert an unfulfilled promise of future performance into a fraud claim if particularized facts are alleged that collectively allow the inference that, at the time the promise was made, the speaker had no intention of performing.").

51.     Resorting to hyperbole, the Trust suggests that ELD Capital's allegations are insufficient because ELD Capital did not allege that the facility did not exist or that the Debtors did not receive TRON Tokens from Justin Sun and his platform.  Opposition, at 17.  Of course, neither fact is necessary to show that the Announcement misrepresented that it would be available to customers like ELD Capital.  Similarly, ELD Capital need not show that the Announcement promised that the facility would have "unlimited capacity" to sufficiently allege that it was not actually made available to customers consistent with the Announcement.  *Contra* Opposition, at 18.  The Announcement specifically referred to "weekly and future injections," indicating that the initial deployment of $13,000,000.00 would not be the extent of its capacity and the facility would operate on an ongoing basis to accommodate its demand.  *See supra* Background § II.  Contrary to the Trust's attempts to create straw men, ELD Capital clearly alleges facts that "collectively allow the inference that, at the time the promise was made, [the Debtors] had no intention of performing."  *Grunstein*, 2009 WL 4698541, at *13.

52.     The Trust points to a single article for its suggestion that the Announcement was "publicly criticized because there were 'no guarantees that users will be able to withdraw their funds.'"  Objection, at 18 (citing Ramanathan Decl. Ex. D).  The Trust mischaracterizes both the content and effect of the article.  For starters, the article characterized the TRON facility as a "rescue plan for some of [FTX's] users" and reviewed the Debtors' explanation of how customers could participate in the facility.  Ramanathan Decl. Ex. D.  The article discussed that the facility "sets up huge arbitrage opportunities for any market-makers with access to FTX's order books" and speculated that Alameda Research (then controlled by Samuel Bankman-Fried) is a known arbitrageur that is positioned to benefit from the facility.  *Id.*  The article concludes that "FTX may be attempting to partially plug the $9.4 billion hole in its balance sheet by forcing its captive users

to surrender about 80% of their portfolio to the arbitrageurs it has set up." *Id.* In other words, the lone article on which the Trust relies to suggest that the truth about the facility should have been known to ELD Capital suggests that the facility may have been a tool to defraud customers like ELD Capital. *See id.* In any event, this article cannot overcome the language of the Announcement and surrounding context.

53.     The Trust's argument that the Announcement was a non-actionable forward-looking statement is misplaced. Unlike the securities fraud cases on which the Trust relies, this Announcement was not simply a prediction about a company's future results, *see Great Lakes Chem. Corp. v. Pharmacia Corp.*, 788 A.2d 544, 554 (Del. Ch. 2001), or forthcoming regulatory approval. *See Neurvana Med., LLC v. Balt USA, LLC*, 2020 WL 949917, at *25 (Del. Ch. 27, 2020). Delaware courts recognize that actionable misstatements may occur in connection with a statement about a "future event that falsely implies an existing fact.'" *Trifecta Multimedia Holdings Inc.*, 318 A.3d at 465. This applies here, where the Debtors' statements about the future capacity and operation of the facility plainly implied "existing fact[s]" concerning its availability to customers like ELD Capital. *Id.*

54.     Similarly unavailing is the Trust's attempt to recast the omission alleged by ELD Capital as tantamount to reliance on a "guarantee that the FTX.com Exchange could stay out of bankruptcy." Opposition, at 19. ELD Capital's allegation is straightforward: the Debtors omitted to disclose that the facility would not be available to ELD Capital and other customers based on the financial position of the Debtors, and steps already taken toward bankruptcy, at the time of the Announcement.

55.     ELD Capital certainly acknowledges that there was substantial public reporting about concerns with the Debtors' financial position. However, the information that was omitted at

the time that the Debtors ***proactively made the Announcement*** would have apprised customers

like ELD Capital that the facility would not be available to them.  Indeed, the Omnibus Corporate

Authority by which Samuel Bankman-Fried appointed and transferred all applicable authority to

John J. Ray III is dated November 10, 2022.  [D.I. 1, at 12].[3]  This means that customers, induced

by the Announcement, were enabled to purchase TRON Tokens after all applicable corporate

authority was transferred to Mr. Ray and assets were frozen by foreign securities regulators—in

other words, when there was ***no possibility*** that customers could avail themselves of the TRON

facility.

### III.    ELD Capital Justifiably Relied on the TRON Facility Announcement

56.    The Trust asserts ELD Capital cannot establish that it justifiably relied on the

Announcement as guarantee that it would be able to withdraw TRON Tokens from FTX's platform.

Opposition, at 21-22.  Indeed, the Trust essentially argues that ELD Capital acted with "reckless

indifference" in placing reliance on the Announcement.  *Id.* (citing *Arwood v. AW Site Servs., LLC*,

2022 WL 705841, at *25 (Del. Ch. Mar. 9, 2022)).  According to the Trust, this is because, despite

the plain language of the Announcement and surrounding representations, it should have been

obvious to ELD Capital that the Debtors were in such dire financial straits that the FTX platform

likely would not be able to satisfy the demands of the TRON facility based on public reporting and

ELD Capital's unsuccessful attempts to withdraw assets from the FTX platform on November 11,

2022.  *See id.*

---

[3]The Trust assert that the Omnibus Corporate Authority was executed in the early morning of
November 11, 2022, before the Chapter 11 filings began at 7:30 a.m.  The Trust does not
acknowledge or explain the discrepancy between this representation and the date of November
10, 2022, indicated on the Omnibus Corporate Authority.

57.     As a preliminary matter, the Trust overstates the justifiable reliance standards.  To plead justifiable reliance "a plaintiff must allege facts making it reasonably conceivable that the plaintiff acted based on the material representation or omission."  *Trifecta Multimedia Holdings Inc.*, 318 A.3d at 465.  "Assessing reliance requires a context-dependent inquiry that takes into account the plaintiff's knowledge and experience."  *Id.*; *see also Vague v. Bank One Corp.*, 850 A.2d 303 (Table), at *1 (Del. 2004) ("The reasonableness of one's reliance on false information depends on all of the circumstances.").  "Whether reliance was justified is a contextual inquiry and 'is judged by reference to the plaintiff's knowledge and experience' and 'the relationship between the parties.'"  *Arwood*, 2022 WL 705841, at *23.  Justifiable reliance "has a personalized character" and it is "measured by reference to the plaintiff's capabilities and knowledge," such that "a plaintiff's sophistication may affect a court's judgments about what dangers were fairly considered obvious."  *Id.*

58.     The Trust does not contend that ELD Capital actually knew that the Debtors' representations in the Announcement were false and omitted necessary information.  Moreover, the Trust ignores the actual grounds for justifiable reliance pled in the Amended Proof of Claim.  Specifically, ELD Capital pleads that the circumstances of the Announcement demonstrate their justifiable reliance on the Debtor's representations, pointing to the fact that Announcement was made on FTX's online platform and official social media channels (where the Debtors typically made significant announcements and offers), the Announcement specified the TRON Tokens subject to the swap offer, the Announcement indicated that TRON would be participating in the facility and future capital injections to support the facility would be "shared on a weekly basis," among others.  [D.I. 31298-2 ¶ 9].  Retail investors like ELD Capital reasonably rely on information shared in this manner.  *See supra* Background § I.

59.     The Trust's primary response is that public reporting should have rendered obvious the Debtors' imminent bankruptcy and inability to service the facility.    However, it is "well-established that, generally, a [plaintiff's] failure to discover the fraud through due diligence does not excuse it." *Arwood*, 2022 WL 705841 at *24, n. 243 ("A party who has perpetrated a fraud through misrepresentations which induce action by another party cannot defeat a claim for damages by asserting that the defrauded party might have discovered the fraud by the exercise of proper care.").    Similarly, it is immaterial that another observer expressed concern about the effectiveness of the TRON facility. *See id.*, 2022 WL 705841 at *24 ("That a more cautious buyer might not have relied, might have smelled a rat, does not defeat liability." (citing 896 F.2d 1035, 1041–42 (7th Cir. 1990) (Posner, J.)).    The "clear public record" claimed by the Trust nowhere identified that ELD Capital and other customers would not be able to participate in the TRON facility.    Objection, at 24.    At bottom, the Trust's own conclusory assertions that ELD Capital should have known are insufficient to defeat a finding that ELD Capital justifiably relied. *Id.* (""Delaware law does not condone fraud, nor are buyers required to conduct perfect due diligence before their reliance can be said to be justified.").    Nor does the fact that ELD Capital engaged in additional purchases of TRON Tokens after an initial unsuccessful attempt to withdraw assets from FTX's platform suggest a "red flag" because no reason was provided for the cancellation of the transaction, there was no indication that the facility was closed or unavailable, and the transaction was characterized as a "swap" instead of a "withdrawal." *See supra* Background § III.

60.     The Trust's reference to ELD Capital's allegation that its decision to participate in the TRON facility was a "difficult decision" is a red herring.    Objection, at 23.    This was a "difficult decision" for ELD Capital because it was required to determine whether to pay a significant premium for TRON Tokens in exchange for liquidity and the ability to participate in the swap

transaction (a benefit ELD Capital never received).  Any supposed reliance by ELD Capital on its

"own knowledge or judgment" to reach its decision to purchase TRON Tokens is not disqualifying

because this is not a case where ELD Capital had knowledge or reason to know the truth of the

Debtors' misrepresentations and omission and chose to engage in the transactions anyway.  *See*

*Arwood*, 2022 WL 705841, at *23.

61.    Likewise, the Trust's attempt to seek exculpation based on its terms of service

("Dotcom TOS") is completely misplaced.  Objection, at 23.  As the Trust acknowledges, when

signing the Dotcom TOS, customers agree that they were "not relying on any communication . . .

***as investment advice*** or as a recommendation to use the Services and transact in Digital Assets."

*Id.* (citing Dotcom TOS § 2.1.1).  The other section to which the Trust points simply states "FTX

Trading strives to provide accurate and reliable information . . . but such information may not

always be correct . . . ."  *Id.* (citing Dotcom TOS § 19.1).  The Trust's attempted reliance on these

disclosures ignores that the Announcement is not investment advice, but rather an offer of a

particular service to customers that the Debtors could not fulfill.  In addition, unlike the anti-

reliance clause at issue in *Infomedia Grp., Inc.*, which was signed at the time of the asset purchase

at issue and, therefore, found to preclude a plaintiff's reliance on pre-contractual negotiations, the

Dotcom TOS were not part of the Announcement or process through which ELD Capital attempted

to participate in the TRON facility.  *See Infomedia Grp., Inc. v. Orange Health Sols., Inc.*, 2020

WL 4384087, at *4 (Del. Super. Ct. July 31, 2020).

62.    Ultimately, the Trust cannot show that ELD Capital "passed warning sign after

warning sign" while facts regarding the timing of FTX's bankruptcy and the ineffectiveness of the

TRON facility "stared them in the face."  *Arwood*, 2022 WL 705841 at *25.  Delaware courts have

recognized    certain    factors    as    tending    to    demonstrate    that    reliance    on    a    defendant's

misrepresentations or omissions was not justified.  These include a plaintiff having substantial access to information that would have revealed the truth, a plaintiff having actual knowledge that the defendant's representations in general are untrustworthy, actions by a plaintiff that demonstrate knowledge of the truth of the subject of the misrepresentations or omissions, and a plaintiff ignoring material facts that could have revealed the truth.  *Id.*, 2022 WL 705841 at *25-*26.  Taken together, "all of the circumstances" of ELD Capital's reliance on the Debtors' representations in the Announcement was justified.  *Vague*, 850 A.2d 303 (Table), at *1.

## IV.    ELD Capital Adequately Pled Scienter

63.    "Under Delaware law, scienter can be proven by establishing that the defendant acted with knowledge of the falsity of a statement or with reckless indifference to its truth."  *In re Wayport, Inc. Litig.*, 76 A.3d 296, 326 (Del. Ch. 2013) (citation omitted).  As one of the Trust's cases recognized, "[p]rotecting those who occupy [a] vulnerable posture is the essential purpose of the law of fraud—to act as a safeguard when there is reasonable, detrimental reliance on another's statement of fact by someone with less knowledge."  *Trenwick Am. Litig. Tr. v. Ernst & Young, L.L.P.*, 906 A.2d 168, 211 (Del. Ch. 2006).

64.    The Trust asserts that "ELD Capital does not point to a single statement in which the Debtors requested or encouraged customers to exchange their assets for Tron Tokens and participate in the Tron Credit Facility."  Opposition, at 26.  This is untrue.  The Amended Statement of Claim specifically identifies the Announcement, in which the Debtors proactively advertised the exchange facility that would be made available to holder of TRON Tokens.  [D.I. 31298-2 ¶ 5].  Since the facility would be unavailable to a customer unless they held TRON Tokens, it is clear that the Announcement was intended to "request" or, at a minimum, "encourage" customers to purchase TRON Tokens.

65.     Similarly, there are obvious and straightforward reasons "why the Debtors would want to induce these trades, or how Debtors could unfairly benefit from them." *Contra* Opposition, at 26.  Since TRON would provide TRON Tokens equivalent to $13,000,000 to FTX in connection with the facility for FTX to sell to account holders such as ELD Capital, FTX stood to gain as TRON Tokens sold at increasing premiums.  Cubitt Decl. ¶ 13.  Moreover, FTX collected fees on transactions in TRON Tokens following the Announcement.  *See id.*

66.     "[B]ecause any attempt to require specificity in pleading a condition of mind would be unworkable and undesirable," Rule 9(b) only requires that the claim "allege sufficient facts from which it can reasonably be inferred that this 'something' was knowable and that the defendants were in a position to know it." *Trifecta Multimedia Holdings*, 318 A.3d at 464.  "A claim for fraud generally must concern something knowable, such as 'either a past or contemporaneous fact or a future event that falsely implies an existing fact.'  A counterparty's failure to perform under a contract does not support an inference of fraud unless the pled facts support an inference that 'at the time the promise was made the speaker had no intention of performing.'" *Id.*  Here, it is apparent that the Debtors were aware of the liquidation proceedings already underway and the imminent United States bankruptcy filing at the time of making the Announcement.  Moreover, the Debtors either knew or acted with reckless indifference to the truth with respect to the fact that ELD Capital and other customers would not be able to avail themselves of the facility to remove TRON Tokens from the FTX platform.

67.     This case is unlike the Trust's cited authority, which concerned alleged misrepresentations about Kodak's financial condition in the one-year period leading to its bankruptcy. *See Hutchinson v. Perez*, 2012 WL 5451258, at *1, *7 (S.D.N.Y. Nov. 8, 2012).  Rather, the Announcement was made mere hours before the Omnibus Corporate Authority transferred

authority from FTX's then-executives to a new chief executive appointed to oversee its bankruptcy, and *after* the Securities Commission of the Bahamas froze the assets of certain Debtors and initiated liquidation proceedings in the Supreme Court of the Bahamas.  [D.I. 31298-2 ¶ 4].  In addition, the Announcement—promoting purchases of specific cryptocurrency assets as part of a "special facility"—is not akin to representations about a large corporate issuer's financial condition made over a prolonged period in the course of its regular financial reporting.  *See Hutchinson*, 2012 WL 5451258, at *1-*2.  Contrary to the Trust's suggestion, finding that the Debtors acted with the requisite scienter and fraudulently induced ELD Capital's purchases of TRON Tokens does not implicate "the public policy justifications for allowing a company operating near insolvency to make careful deliberations about its future." *Id.* at *8.  Rather, such a finding would simply reinforce the uncontroversial policy that a company operating near insolvency—or, in the Debtor's case, planning to imminently announce its bankruptcy—should not be permitted to knowingly (or recklessly) take advantage of vulnerable customers before the bell tolls.

## V.    ELD Capital was Damaged by Debtors' Misconduct

68.    The Trust asserts that ELD Capital's fraud claim fails because it seeks to "improperly inflate the amount of damages."  Objection, at 26.  Distilled to its essence, this argument posits that ELD Capital cannot claim damages above the value of its post-exchange account because it voluntarily accepted a "liquidity discount" when it traded its assets to purchase TRON Tokens at inflated prices.  *Id.*, at 26-27.

69.    In advancing this argument, the Trust either fundamentally mistakes (or knowingly mischaracterizes) the nature of the harm suffered by ELD Capital.  Indeed, ELD Capital *never received* the liquidity for which it paid a premium.  As already explained, ELD Capital paid the cost of having immediate access to its assets but did not receive the benefit of the bargain it struck

because of the Debtors' fraudulent conduct.  *Id.*  Thus, among other things, ELD Capital lost the value of the liquidity (*i.e.*, immediate access to its assets) that ELD Capital bargained for when engaging in transactions in anticipation of participating in the TRON facility.  The Debtors' fraudulent representation that ELD Capital and other parties would be able to engage in swaps to external wallets is not "merely a scapegoat," Opposition, at 27, but rather the essence of the deal that Debtors failed to (and never could) provide to ELD Capital.

70.     "The recipient of a fraudulent misrepresentation is entitled to recover as damages . . . pecuniary loss suffered otherwise as a consequence of the recipient's reliance upon the misrepresentation."  *In re Wayport*, 76 A.3d at 327 (quoting Restatement of Torts § 549).  The causation element of a common law fraud claim "has two dimensions."  *NACCO Indus., Inc. v. Applica Inc.*, 997 A.2d 1, 34 (Del. Ch. 2009).  "First, the false statement must be a factual cause of the harm in the sense that the harm would not have occurred but for the false statement. Second, the false statement must be a legal cause of the harm, meaning that the false statement must be a sufficiently significant cause of the harm to impose liability."  *Id.* (citing Restatement (Second) of Torts § 548A).  Both dimensions of causation are established here.  First, there can be no disputing that ELD Capital would not have purchased TRON Tokens but for the Announcement.  *See supra* Background §§ II-III.  Second, ELD Capital's inability to participate in the facility (and, therefore, obtain the liquidity it bargained for) after purchasing TRON Tokens despite the Debtors' representations to the contrary is not "attenuated" but rather a "sufficiently significant cause of the harm" ELC Capital suffered.  *NACCO Indus.*, 997 A.2d at 34.

71.     The Trust's reliance on *Dohmen v. Goodman*, 234 A.3f 1161, 1166 (Del. 2020), is misplaced.  The court in *Dohmen* simply found that the decline in the price of an investment was not caused by the misrepresentations at issue but other factors.  This is a far different circumstance,

as the Debtors' misrepresentations induced ELD Capital to engage in transactions for a benefit it ***could not obtain***.

72.    It is also relevant to note that recission is available as a remedy when a party engages in misrepresentation.  *See Norton v. Poplos*, 443 A.2d 1, 4 (Del. 1982); *see also Craft v. Bariglio*, 1984 WL 8207, at *8 (Del. Ch. Mar. 1, 1984) (explaining that recission is available as a remedy for both fraudulent and innocent misrepresentations).  Recission of the transactions that were fraudulently induced by the Debtors is warranted and would restore ELD Capital to its position before purchasing TRON Tokens.

73.    Finally, the Trust's accusation that ELD Capital made an "imprudently speculative bet," is at odds with the Debtors' plain representations about the Tron facility and the nature of ELD Capital's loss.   Objection, at 27.   The Debtor should not be permitted to issue the Announcement, full of positivity and encouragement for its customers who would take advantage of it, only for the Trust to call the same offer an "imprudently speculative bet."  The Trust's attempts to blame the victim should not be countenanced by the Court.


## CONCLUSION

For the foregoing reasons and all those appearing on the record, ELD Capital respectfully submits the Court should overrule the Trust's objection and allow ELD Capital's claims in the amount of $569,262.34, consisting of (a) ELD Capital's customer claim in the amount of $98,943.38, plus (b) ELD Capital's fraud claim in the amount of $470,318.96.

Dated: February 13, 2026

Respectfully submitted,

**DILWORTH PAXSON LLP**

By: */s/ Peter C. Hughes*
Peter C. Hughes, Esquire
800 N. King Street, Suite 202
Wilmington, DE 19801
Telephone: (215) 575-7282
Email: phughes@dilworthlaw.com

**MILLER SHAH LLP**

By: */s/ Alec J. Berin*
James E. Miller, Esquire
Alec J. Berin, Esquire
1845 Walnut Street
Philadelphia, PA 19103
Telephone: (866) 540-5505
Email: jemiller@millershah.com
       ajberin@millershah.com

*Counsel for ELD Capital LLC*