# EXHIBIT 3

UNITED STATES BANKRUPTCY COURT
DISTRICT OF DELAWARE

IN RE:                              .  Chapter 11
                                    .  Case No. 22-11068 (JTD)
FTX TRADING LTD.,                   .
*et al.*,                           .  (Jointly Administered)
                                    .
          Debtors.                  .
. . . . . . . . . . . . . . . .     .
                                    .
ALAMEDA RESEARCH LLC, FTX           .  Adversary Proceeding
TRADING LTD., WEST REALM            .  No. 23-50419 (JTD)
SHIRES, INC., AND WEST              .
REALM SHIRES SERVICES, INC.         .
(D/B/A FTX.US),                     .
                                    .
          Plaintiffs,               .
                                    .
     v.                             .
                                    .
DANIEL FRIEDBERG,                   .
                                    .
          Defendant.                .
. . . . . . . . . . . . . . . .     .
                                    .
FTX TRADING LTD., ALAMEDA           .  Adversary Proceeding
RESEARCH LTD., WEST REALM           .  No. 24-50066 (JTD)
SHIRES, INC., WEST REALM            .
SHIRES SERVICES, INC., and          .
and NORTH DIMENSION, INC.,          .
                                    .
          Plaintiffs,               .
                                    .
     -against-                      .
                                    .
CENTER FOR APPLIED                  .
RATIONALITY, LIGHTCONE              .
INFRASTRUCTURE, INC.,               .  Courtroom No. 5
LIGHTCONE ROSE GARDEN, LLC          .  824 Market Street
And FTX FOUNDATION,                 .  Wilmington, Delaware 19801
                                    .
          Defendant.                .  Thursday, September 12, 2024
. . . . . . . . . . . . . . . .        1:00 p.m.


                              (Cont'd)

FTX TRADING LTD., *et al.,*          .  Adversary Proceeding
                                     .  No. 24-50072 (JTD)
          Plaintiffs,                .
                                     .
     -against-                       .
                                     .
ALEXANDER CHERNYAVSKY,               .
BRANDON ORR, CHUKWUDOZIE             .
EZEOKOLI, EDWIN GARRISON,            .
GREGG PODALSKY, JULIE                .
PAPADAKIS, KYLE RUPPRECHT,           .
LEANDRO CABO, MICHAEL                .
LIVIERATOS, MICHAEL NORRIS,          .
RYAN HENDERSON, SHENGYUN             .
HUANG, SUNIL KAVURI, VIJETH          .
SHETTY, VITOR VOZZA, and             .
WARREN WINTER,                       .
                                     .
          Defendants.                .
. . . . . . . . . . . . . . .        .
                                     .
ALAMEDA RESEARCH LTD., WEST          .  Adversary Proceeding
REALM SHIRES, INC., and              .  No. 23-50379 (JTD)
WEST REALM SHIRES SERVICES,          .
INC.,                                .
                                     .
          Plaintiffs,                .
                                     .
     -against-                       .
                                     .
ROCKET INTERNET CAPITAL              .
PARTNERS II SCS, ROCKET              .
INTERNET CAPITAL PARTNERS            .
(EURO) II SCS, GFC GLOBAL            .
FOUNDERS CAPITAL GMBH, GFC           .
GLOBAL FOUNDERS CAPITAL              .
GMBH & CO. BETEILIGUNGS KG           .
NR. 1, WILLIAM HOCKEY                .
LIVING TRUST, and 9YARDS             .
CAPITAL INVESTMENTS II LP,           .
                                     .
          Defendants.                .
. . . . . . . . . . . . . . .        .

                              (Cont'd)

ALAMEDA RESEARCH LTD.,          .   Adversary Proceeding
WEST REALM SHIRES, INC.,        .   No. 23-50380 (JTD)
and WEST REALM SHIRES           .
SERVICES, INC.,                 .
                                .
          Plaintiffs,           .
                                .
    - against -                 .
                                .
MICHAEL GILES, et al.,          .
                                .
          Defendants.           .
. . . . . . . . . . . . . . . . .
                                .
ALAMEDA RESEARCH LTD. and       .   Adversary Proceeding
FTX TRADING LTD.,               .   No. 23-50444 (JTD)
                                .
          Plaintiffs,           .
                                .
    - against -                 .
                                .
PLATFORM LIFE SCIENCES          .
INC., LUMEN BIOSCIENCE,         .
INC., GREENLIGHT                .
BIOSCIENCES HOLDINGS, PBC,      .
RIBOSCIENCE LLC, GENETIC        .
NETWORKS LLC, 4J                .
THERAPEUTICS INC., LATONA       .
BIOSCIENCES GROUP, FTX          .
FOUNDATION, SAMUEL BANKMAN-     .
FRIED, ROSS RHEINGANS-YOO,      .
and NICHOLAS BECKSTEAD,         .
                                .
          Defendants.           .
. . . . . . . . . . . . . . . . .

                    TRANSCRIPT OF HEARING
          BEFORE THE HONORABLE JOHN T. DORSEY
             UNITED STATES BANKRUPTCY JUDGE

                         (Cont'd)

4

APPEARANCES:

For the Debtors and
Debtors-in-Possession:   Adam G. Landis, Esquire
                         LANDIS RATH & COBB, LLP
                         919 Market Street
                         Suite 1800
                         Wilmington, Delaware 19801

                         -and-

                         Brian D. Glueckstein, Esquire
                         Justin J. DeCamp, Esquire
                         SULLIVAN & CROMWELL, LLP
                         125 Broad Street
                         New York, New York 10004

For the Litigation
Oversight Committee of
Celsius Network, LLC,
*et al.*, and the
Litigation Administrator
of Celsius Network,
LLC, *et al.*:            Richard Levy, Jr., Esquire
                         Andrew Richmond, Esquire
                         PRYOR CASHMAN, LLP
                         7 Times Square
                         New York, New York 10036

For the Media
Intervenors:             Adam A. Marshall, Esquire
                         THE REPORTERS COMMITTEE FOR FREEDOM
                           OF THE PRESS
                         1156 15th Street NW
                         Washington, DC 20005

(APPEARANCES CONTINUED)

Audio Operator:          Jermaine Cooper, ECRO

Transcription Company:   Reliable
                         The Nemours Building
                         1007 N. Orange Street, Suite 110
                         Wilmington, Delaware 19801
                         Telephone: (302)654-8080
                         Email:  gmatthews@reliable-co.com

Proceedings recorded by electronic sound recording,
transcript produced by transcription service.

APPEARANCES (CONTINUED):

For the Joint Official
Liquidators of FTX
Digital Markets Ltd.:      John Christopher Shore, Esquire
                           WHITE & CASE, LLP
                           1221 Avenue of the Americas
                           New York, New York 10020


For the U.S. Trustee:      Benjamin A. Hackman, Esquire
                           OFFICE OF THE UNITED STATES TRUSTEE
                           J. Caleb Boggs Federal Building
                           844 King Street
                           Suite 2207, Lockbox 35
                           Wilmington, Delaware 19801

For Seth Melamed:          David Adler, Esquire
                           MCCARTER & ENGLISH, LLP
                           Worldwide Plaza
                           825 Eighth Avenue
                           31st Floor
                           New York, New York 10019

For Michael Giles,
*et al.*:                  Lucian B. Murley, Esquire
                           SAUL EWING, LLP
                           1201 North Market Street
                           Suite 2300
                           Wilmington, Delaware 19899

                           -and-

                           Erica Richards, Esquire
                           COOLEY, LLP
                           55 Hudson Yards
                           New York, New York 10001

For the Official
Committee of
Unsecured Creditors:       Siena Cerra, Esquire
                           MORRIS JAMES, LLP
                           500 Delaware Avenue
                           Suite 1500
                           Wilmington, Delaware 19801

APPEARANCES (CONTINUED):

For the Official
Committee of
Unsecured Creditors:        Isaac Sasson, Esquire
                            PAUL HASTINGS, LLP
                            200 Park Avenue
                            New York, New York 10166


For Defendants:             Gregory F. Laufer, Esquire
                            PAUL, WEISS, RIFKIND, WHARTON
                              & GARRISON, LLP
                            1285 Avenue of the Americas
                            New York, New York 10019

INDEX

MOTIONS:                                                          PAGE

Agenda
Item 37:   The Celsius Litigation Administrator's Motion
           for Relief from the Automatic Stay
           [D.I. 16815, filed on June 5, 2024]

           Court's Ruling:

Agenda
Item 38:   The Celsius Litigation Administrator's Motion      61
           for Entry of an Order for Authority to File
           Under Seal the Transfer Schedules Containing
           Confidential Information
           [D.I. 17182, filed on June 10, 2024]

           Court's Ruling:                                     71

Agenda
Item 39:   Debtors' Objection to Proofs of Claim Filed by     11
           Celsius Network LLC and Its Affiliated Debtors
           [D.I. 19795, filed on July 8, 2024]

           Court's Ruling:                                     58

Agenda
Item 40:   Debtors' Objection to Proofs of Claim Filed by     72
           Seth Melamed
           [D.I. 20051, filed on July 10, 2024]

           Court's Ruling:                                     85

Agenda
Item 42:   Motion of Morris James LLP to Withdraw as          10
           Counsel to Genetic Networks LLC [Alameda
           Research Ltd., et al. v. Platform Life
           Sciences Inc., et al., Adv. No. 23-50444 (JTD)
           – Adv. D.I. 121, filed on August 21, 2024]

           Court's Ruling:                                     11

8

INDEX

MOTIONS:                                                      PAGE

Agenda
Item 44:   Defendants' Motion to Stay Adversary              86
           Proceedings Nos. 23-50379 (JTD) and 23-50380
           (JTD) [Adv. D.I. 130 & 254, filed on August
           23, 2024]

           Court's Ruling:


EXHIBITS

DECLARATIONS:                                                PAGE

1) Declaration of Kumanan Ramanathan                         66


Transcriptionists' Certificate                               121

(Proceedings commenced at 1:00 p.m.)

THE CLERK:  All rise.

THE COURT:  Good afternoon, everyone.  Thank you. Please be seated.

Mr. Landis?

MR. LANDIS:  Good afternoon, Your Honor, and may it please the Court, Adam Landis, from Landis, Rath & Cobb, on behalf of FTX Trading, Limited and its affiliated debtors.

Your Honor, we have a 44-item agenda today.

THE COURT:  Yes.

MR. LANDIS:  But, fortunately, only six matters should be going forward.

Items 1 through 12 have been adjourned.  Item 13 was withdrawn.  Items 14 through 36, 41 and 43 have been resolved.

That brings us to matters 37, 38, and 39, which are related, relating to the Celsius Litigation Administrator's claims and Motion for Relief from the Automatic Stay.

We've had discussions with counsel to the Celsius Litigation Administrator and have agreed that Item number 39, the claim objection, debtors' claim objection, ought to go forward first, as it presents a gating item in connection with these matters, and depending on the ruling, we may not need to go forward with numbers 37 and 38.

So, with that, I would cede the podium to Mr. Glueckstein from Sullivan & Cromwell, and I'll be --

THE COURT:  Before we do that --

MR. LANDIS:  Oh.

THE COURT:  --  I want to deal with the motion of Morris James to withdraw as counsel first so they don't have to sit here for the whole hearing.

MR. LANDIS:  That's -- Your Honor, that's a wonderful idea, so I will -- I know they're here in Court so I will cede the podium to them.

THE COURT:  Okay.  Thank you.

MS. CERRA:  Good afternoon, Your Honor.

Siena Cerra, from Morris James.  We're here to address Item number 42 on the agenda, Morris James' Motion to Withdraw as Counsel, that was filed --

THE COURT:  Yeah, the only reason I put this on the agenda is -- I always put motions to withdraw on the agenda because -- especially if -- well, all of them I put on the agenda, even if there's no objection filed just because I want to make sure that if the client is available -- and I don't know -- your client was Genetic Networks, LLC.

Is anyone from Genetic Networks, LLC in the courtroom or on the Zoom call?

(No verbal response)

THE COURT:  Didn't hear anything.  Okay.

Because they are a corporation, they cannot appear with counsel.  So -- and I don't know -- you know, so I'm going to grant the motion, but I want you to make sure you tell your client they have to get counsel or if -- they're going to face a default judgment.

MS. CERRA:  Understood.

THE COURT:  Okay?

MS. CERRA:  Thank you, Your Honor.

THE COURT:  Thank you.

MR. GLUECKSTEIN:  Good morning, Your Honor.

THE COURT:  Good morning -- afternoon.

MR. GLUECKSTEIN:  Afternoon now.  So I apologize.

THE COURT:  Yeah.  We usually are in the morning, but this time we're afternoon.

MR. GLUECKSTEIN:  Apologies.  I'm used to the morning.  It is the afternoon.  Thank you, Your Honor.  Good afternoon.

Brian Glueckstein, Sullivan & Cromwell, for the debtors.

As Mr. Landis previewed, our position with respect to the Celsius matters is that there's a gating threshold issue that's presented both in our objection and as touched on in the stay motion but is addressed fully in the objection to the proofs of claim that we filed, and that issue is whether the Celsius Administrator's new found preference

claims can be asserted against the debtors at all.

If we are right that they cannot be asserted, then the motion seeking relief from the automatic stay would become moot.  As a result, as previewed, we've agreed to address this issue first.

Your Honor, the debtors filed their pending objection to the duplicative claims that Celsius had filed against each of the debtors.  In those claims, Celsius asserted the same threadbare claims for disparagement and defamation, seeking $2 billion in damages.

As we detailed in our objection, those claims were based on unsubstantiated, unidentified alleged statements made by FTX personnel pre-petition when Celsius was in the midst of its own fraudulent contact.

The Celsius Administrator, apparently recognizing that these claims were frivolous, subsequently abandoned them entirely in their responsive pleadings to our objection.

That $2 billion alleged liability of the debtors is now fixed at zero.  Those claims and the proofs of claims in which they are asserted, in our view, should therefore be expunged.

Celsius, however, is nonetheless attempting to rely on those same claims to support its argument that those proofs of claim somehow provide a basis to permit the Administrator to file brand new claims to provide -- that

they styled as amendments, asserting approximately $445 million in preference claims, plus interest through a combination of initial transferee and subsequent transferee claims that seek to impose these brand new liabilities upon the debtors at the expense of all other creditors.

Celsius argues that a single generic reference in their proofs -- original proofs of claim, their investigating potential Chapter 5 preference claims, permits all of this to occur, and they asserted these claims more than a year after the Court's non-customer claims bar date that was established by order of this Court.

There can be no serious dispute that the Celsius preference claims are time-barred standing alone, having been filed more than a year after the bar date.

Celsius didn't even bother to obtain Court's permission to amend its claims.  They simply submitted to our Claims Agent the so-called amended claims and now argues that they should be deemed timely.

They are not, and we submit are barred by the non-customer claims bar date order of this Court.  We submit there is no basis for this Court to permit these claims as valid amendments in any event.

The Third Circuit is clear in a claim, it must allege facts in the proof of claim sufficient to support a legal liability.

And as Judge Ambro affirmed in an appeal of one of this Court's <u>Mallinckrodt</u> decision, a claim can only amend a prior claim in three circumstances, where it 1) corrects a defect in the form of the original, if it describes the original claim with greater particularity, or it pleads a new theory of liability on facts that are set forth in the original claim.

The amended claims that Celsius seeks that bring forward here do none of these things.

The question fundamentally in the case law is whether the initial claim provided the debtors notice of the later claim.

Critically here, the original proofs of claim do not allege a single fact that could form the basis of the preference claims.

The only facts asserted there in the original proofs of claim, such as they are, relate to the purported disparaging statements and the claims that have since been abandoned.

This is a classic example of an impermissible post-bar date new claim that fundamentally changes a timely filed claim.  It's a completely different claim.

Celsius, in its briefing, telling -- it does not point to a single fact in the alleged -- that it alleged in the original proofs of claim that could be relevant to its

preference claims because there are none.

Instead, Celsius repeatedly points to the broad reservation of rights language.  That is the type of language that courts in this Circuit, as we detail in our papers, regularly determine cannot be relied upon to assert new claims.

As the court -- Bankruptcy Court in Calpine held, amendments based on this type of generic language would render bar dates meaningless.

Celsius seems to retreat then to an argument that the one sentence reservation in its original proof of claim, which has nothing to do with the claim that was actually asserted in those proofs of claim, was a protective filing and thus sufficient, but that argument is a red herring, claimed that amendments are rooted in Rule 15 of the Federal Rules of Civil Procedure.

A protective filing of preference claims still must provide the debtors facts sufficient to establish a theory of liability under Section 547 or Section 550 of the Bankruptcy Code, and the original proofs of claim that were filed by Celsius prior to the bar date do nothing of the sort.

Your Honor, the new Celsius claims also fail to satisfy the second requirement for an amended claim, that it would be equitable to permit it.

The debtors would have to start from scratch, investigating hundreds of alleged transfers and determining whether they passed through the FTX exchanges at any time.

I also want to put to rest the repeated statements by the Celsius Administrator that their customer preference claims somehow would not impose new liabilities on the debtors.

Celsius is seeking to litigate preference claims in order to establish liability directly against the debtors as recipients of subsequent transferees of avoidable transfers that, if established, would be collectible whether or not the debtors ever had a corresponding or still have a corresponding liability to the customer.

As we sit here today, the debtors are liable for valid customer claims asserted by any of the Celsius transferees because no preference judgments have been obtained against those initial transferees in the Celsius preference cases.

But, of course, the Celius Administrator is free to pursue those initial transferee actions and we understand that they are starting the process of going after those initial -- alleged initial transferees.

Celsius' suggestion that, despite what their claims are actually asserting and what actually is asserted in the complaint that they seek to file, their stay motion,

that they are really only seeking to redirect distributions from customers to Celsius, is not even a valid request at this juncture.

If and when they actually obtain judgments against initial transferees, Celsius would be free to come to this Court and attempt to argue that distributions to that judgment party should be paid over to Celsius.

We submit there's no prejudice to Celsius by not being able to pursue the debtors on these facts.  It's simply that they view litigating against us in one -- you know, one forum more convenient than chasing the individual initial transferees.

THE COURT:  Let me ask you a question about that what you just said.

How is that going to work if they're going to come back and say well, you -- we got a judgment against this initial transferee so you should not distribute to that initial transferee, you should distribute to us instead.  How does that work?  How do I do that, especially if distributions to FTX's customers are due before they get their judgment?

MR. GLUECKSTEIN:  Well, I agree, Your Honor.  And just to be clear, I said they could attempt to come do it. We think there are legal hurdles to them actually prevailing. But they have the ability to sue, and we understand they have

or will sue the initial transferees and are seeking to recover from them directly.

They're seeking to now sue the debtors on the subsequent transferee theory, which if they had reserved those claims, they could try to do. But our view is they haven't.

The point I'm making simply is there are other remedies available to Celsius. This isn't a situation where if their claim is disallowed, the Administrator is unable to pursue these amounts in any shape or form.

I think, certainly, if we were to pay out distributions to our customers on account of liabilities prior to them obtaining a judgment against the initial transferee, then we would argue, I think, that -- you know, that that money, in one form or another, has been paid out.

But the problem here is if you look at it from that perspective, what they're trying to do here is -- and we address this in our papers, it sounds to us like some form of kind of pre-judgment attachment.

What they want to do is ensure that we can't make -- somehow can't make distributions to customers -- seems to be what they're implying because they want to litigate subsequent transferee claims.

And the issue here, Your Honor, simply is they haven't preserved the right to do it and if you look at the

equities of this situation, we submit that it would be fundamentally unfair to make an exception to the bar date under these circumstances.

In addition, Your Honor, Celsius is indisputably seeking to impose a new $67 million liability against the debtors on account of a transfer directly against one of the debtors in these Chapter 11 cases.

The debtor coin -- you know, nowhere has Celsius offered any evidence to the Court justifying its delay in filing the preference claims either before the bar date or at any time for more than a year thereafter.

And as we detail in our papers, Celsius' own schedules filed in its Chapter 11 case back in October of 2022, eight months before the bar date in this case, identified very specifically -- we could look it up and find it, the coin transfers at issue.

So all of the information necessary to assert the claims by this Court's non-customer bar date was known and available. They could've filed that claim. They didn't file that claim. They chose instead to file the claims that they filed, which were these very large $2 billion face value that sat on the record of this case for over a year, only to abandon them when we started this process in order to assert these alternative claims that are new and completely different claims.

And, Your Honor, I'll just point out, we addressed this more comprehensively in our papers. It's not the first time Celsius has failed to comply with a bar date in a cryptocurrency bankruptcy.

They similarly try to do the same thing on a much smaller claim by filing a late claim against Voyager to assert preference claims without any justification and that effort was rejected by Judge Wise.

FTX's creditors, Your Honor, should not have to risk that their recoveries are potentially diluted by Celsius' untimely preference claims and we submit that the purported amendments should not be permitted.

As a result, the original claims, which should now have been abandoned in substance, should be disallowed in their entirety with no leave provided to amend those claims to assert these new found priority claims.

THE COURT: Okay.

MR. GLUECKSTEIN: Thank you, Your Honor.

THE COURT: Thank you.

MR. RICHMOND: Good afternoon, Your Honor.

Andrew Richmond, from Pryor Cashman, on behalf of the Post-Confirmation Litigation Administrator for Celsius Network, LLC and its affiliated debtors.

One line, Your Honor. One line. The entire claim objection revolves around one line, namely the description

and the basis of the claim, which only needs to be one line.

Whether or not the proofs of claim are valid rests on a single very simple question, whether they put the debtors on notice of Celsius' intention to bring a preference action. The answer to that question is a resounding yes.

Before going into the sum and substance of the claim objection, the requirements of a proof of claim and how Celsius more than adequately complied with those requirements in the original proofs of claim, let alone the amended proofs of claim, it's important to pause and understand what was not included in the objection.

One, the objection did not address the merits or the substance of the preference claim. Two, the objection did not include any factual support to undermine the proofs of claim. Three, the objections do not dispute the timeliness of the original proofs of claim. And, four, the moving papers make no reference to the amended proofs of claim, even though they were unfiled before the debtors filed their objection.

Now, what is in fact required in a proof of claim? Bankruptcy Rule 3001 states a proof of claim shall conform substantially to their appropriate official form, which as we know is Official Form 410. The bar date order for the non-customer proofs of claim entered on May 19, 2023, which we found at Docket Number 1519, is Exhibit FTX-3 on the exhibit

and witness list, echoes Rule 3001(a) and provides for each proof of claim to "conform substantially to the proof of claim form or Official Form 410."

Question 8 of the modified 410 form attached to the bar date order asks for the basis of the claim and provides examples, such as goods sold, money loaned, leased services performed, et cetera.

The debtors' proof of claim form, which was approved by this Court, includes one line to describe the basis of the claim and includes various examples, many of which are one or two words.

Rule 3001(c) and (d), which outline the additional information that's required for proofs of claim makes no reference to the need to provide additional supporting information to claims based on preference claims or the need to provide any detail laid to specific preferential transfers.

In fact, as noted in our papers, the Third Circuit in Lampey (phonetic) held that a proof of claim was sufficient when it simply stated debtors were engaged in fraud and breach of fiduciary duties.

The Circuit Court in Ellis and District Court in Mallinckrodt found that even protective claims where the creditor does not even know the amount or the validity of the claim are sufficient.

Now, the debtors want this Court to forget all of that, wants to change the standard for an adequate proof of claim and recharacterize and rewrite what Celsius actually stated in its proofs of claim.

Specifically, the debtors allege that the reference to the preference claim was simple boilerplate reservation of rights and Celsius made "no mention of the transfers underlying the purported preference claims or any other facts that can form the basis for the preference claims, despite having the facts to do so." This is found in paragraph 23 of the debtors' objections and as mentioned before.

However, the debtors fail to explain or demonstrate how Celsius' description of the claim is simply a boilerplate reservation of rights.

Similarly, they fail to provide any case law which requires a claimant to include the specific underlying transfers which form the basis of the preference claim. Remember, question 8 of the debtors' modified 410 form is one line long. It isn't the time or place to include a detailed explanation of the claim or a cause of action by cause of action breakdown.

Now, what exactly was included in Celsius' original proofs of claim? I have here our original proof of claim filed against FTX Trading, Limited, Claim Number 3938,

which is Exhibit CL-3 of the joint witness and exhibit list.

As mentioned in our papers, each of the proofs of claim against all the various debtors are identical.  In response to question number 8, what is the basis of the claim, we state, see attached explanation of causes of action.

In the accompanying attachment, which is attached to each and every proof of claim, on the bottom of the first page, the paragraph states, Celsius' cause of action against FTX may include, but are not limited to -- then it goes into a description -- a discussion of the libel and slander actions.

And then the next -- excuse me.  The next sentence, which is in the same paragraph, says -- and I -- and I'll quote, "Celsius is also investigating causes of action against the FTX debtors under Chapter 5 of the Bankruptcy Code, including preference and fraudulent transfer actions."  End of discussion.

Does this provide the debtors with notice of Celsius' intention to pursue preference actions?  Absolutely, yes.

Now, how can this line be construed as a simpler -- simple boilerplate reservation of rights?  The term boilerplate means a standardized text.  There's nothing standard about discussing Celsius' investigation into Chapter

5 causes of action.

The line is also not a reservation of rights. In fact, the next two paragraphs start with the words, Celsius expressly reserves the right to assert additional claims and Celsius expressly reserves all rights to seek stay relief.

The line at issue is found in the paragraph which starts, Celsius' causes of action against FTX may include, but are not limited to.

Your Honor, words matter and context matters. And from the words that were stated and the context of where they were stated, it is clear that they are not a reservation of rights. It's clear that it's not boilerplate. It is clear that we complied with Bankruptcy Rule 3001, the bar date order, and Third Circuit case law.

Now, the debtors point to our bankruptcy schedules to demonstrate that we were on notice of the coin transfers, we should have asserted them in our original proofs of claim. However, we did. We did exactly what was needed. We stated that we have preference actions.

The term preference actions means that there was a preferential transfer on behalf of an antecedent debt in the 90 days leading up to the Celsius bankruptcy filing that was transferred from Celsius to FTX.

We don't need to say anything more. The argument that we are a "habitual late filers", as allegedly

demonstrated in Voyager, is (a) not true and irrelevant. In Voyager, Celsius never filed a proof of claim before the bar date. Here, we did.

Now, there was a discussion about the amended proofs of claim and about whether or not they were an abandonment or an amendment and I want to clear the record on that.

For starters, as mentioned, the moving papers make no reference to the original -- the amended proofs of claim and, in fact, the first time that the debtors make reference to the amended proofs of claim in their "initial claim objection" was filed three days ago.

Rule 3007 requires a claim objection to be filed 30 days before a hearing. The debtors knew before they even filed their initial objection about our amended proofs of claim, and even if you want to argue that they didn't and it took them a week or two to get up to speed, they could've easily withdrew the original objection, or at least amended it to include in the original proofs of claim, but they didn't.

Instead, they sat on their hands for two months, from July 7th to September 9th, and 30 days from when we filed our response to the claim objection to raise these issues.

But besides that, turning to the -- what I'll call

merits of the amended -- the objection to the amended proofs of claim, the debtors allege that we withdrew our original proofs of claim and that the amended claims are late-filed claims, but again that's not true.

I want to turn to our amended proof of claim, which is Claim Number 95759, which was filed against FTX Trading, Limited on July 7, 2024, which is Exhibit CL-4 on our joint witness list, and question number 4 --

THE COURT:  Do you have a copy of that one?  It's not opening up on my -- for some reason, it says the destination path is too long.  It won't open it for me.

MR. RICHMOND:  May I approach, Your Honor?

THE COURT:  Yes.  Thank you.

MR. RICHMOND:  Question 4, does this claim amend one already filed?  We stated yes.  They made reference to the Claim Number 3938, which is the same original proof of claim that I made reference to earlier.  It's clearly an amendment.

In the accompanying attachment, which again was included in each of our amended proofs of claim, under Section I, Basis of the Claim, question 4, we note that our original proof of claim includes two causes -- two types of causes of action.

The first is the slander and libel, which we are no longer pursuing, and the other one is the avoidance

claims. The next two paragraphs expand and further elaborate on what was stated in the original proofs of claim and reduced the total claim amount from no less than $2 billion to no less than around $445 million.

There is nothing in the amended proofs of claim which give any impression that they are new claims and they are not simply to expand and elaborate on what was included in the original proofs of claim.

Now, Your Honor, the debtors argue that it's inequitable to allow the amended proofs of claim to go forward.

I want Your Honor to pause for a second, understand what the debtors are actually stating. The debtors, who have a fiduciary duty to all creditors, find it inequitable to allow an amended proof of claim which reduces the claim out by 78 percent from $2 billion to no less than half a billion dollars.

While the debtors claim in their papers that we are seeking a new claim totaling $445 million, and as I previously noted that's plainly false, we are simply refining our original proofs of claim, elaborating on the Chapter 5 causes of preference action, and reducing the claim for the benefit of all creditors.

If the debtors want to pay us the $2 billion on behalf of our original proof of claim, be my guest. We're

certainly not going to say no to that.

Ultimately, as Celsius timely and properly filed its original proofs of claim and, in fact, the amended proofs of claim, the Celsius Litigation Administrator respectfully asks the Court to deny the objection in its entirety.

Unless the Court has any questions, I have nothing further, Your Honor.

THE COURT:  Why didn't you file a motion to amend the proof of claim?

MR. RICHMOND:  Your Honor, it's our understanding that the practice in this Court is that it's typically not done to request.  But, ultimately, what's unique about this amended claim is that we are reducing what was allowed -- what we initially sought.  We are not actually expanding on anything further.

THE COURT:  Well, but it's a different claim.  I mean it's --

MR. RICHMOND:  It's not, Your Honor.  The original --

THE COURT:  Well, the original claim was for -- the 2 billion was for the libel and slander, right?

MR. RICHMOND:  No, Your Honor.  The $2 billion included both the libel and slander and the preference actions.

THE COURT:  Where --

MR. RICHMOND:  That was the total amount.

THE COURT:  Where does it say that in the proof of claim?

MR. RICHMOND:  Well, the proof of claim just sought $2 billion in total and included the two parts to it, the causes of action, the libel and the preference actions.

THE COURT:  But --

MR. RICHMOND:  And, in total, it was around $2 billion.

THE COURT:  But it didn't say you were bringing or that you had a claim for Article -- Subsection V causes of action.  You said you were investigating whether you did or didn't have them.

MR. RICHMOND:  Correct.  But --

THE COURT:  So why is that sufficient to allege a cause of action?

MR. RICHMOND:  Because, Your Honor, the ultimate question, as I mentioned earlier, is providing the debtors with notice of a claim.  They had notice.  They had notice of a libel claim and they had notice of a preference claim.

The fact that we said that we're investigating, we would not be investigating a claim if we felt we didn't, in fact, have one, or at least a colorable claim.

As previously mentioned and as noted in our papers, even a protective filing where the cause of action is

not even known yet, is sufficient.  We did more than that.

THE COURT:  Give me an example of that, a cause -- where there's -- the cause of action isn't known and you're filing a protective filing.  What does that mean?

MR. RICHMOND:  Your Honor, I know that -- and I don't have it in front of me.  I know that the Court, in Mallinckrodt, provided that it was a protective cause of -- protective proof of claim was sufficient.  I don't know the exact details there but the Court definitely held that such a cause of action is -- such of proof of claim is sufficient.

THE COURT:  All right.  Do you want to take a second and see if you can find it?

MR. RICHMOND:  I don't know, Your Honor.  But I would say that just the mere fact of stating those words are sufficient enough for the original proofs of claim.

THE COURT:  Well, is there a difference between saying in a proof of claim claimant believes it has Subsection V causes of action against a debtor, different from saying we're investigating whether we have Subsection V claims?

MR. RICHMOND:  I don't think so, Your Honor, because, ultimately, we wouldn't say such a statement if we didn't have at least a colorable reason to believe that we had such a cause of action.

We were conducting -- we were doing due diligence

at the time.  There was billions of dollars of transfers that were done and there was funds moving in and out of Celsius at the time.

We obviously had to file a proof of claim under the compulsion of the bar date order and at that point, that was what we knew and that's what we provided and, frankly, the debtors knew that we were potentially pursuing a proof of -- a preference action.

THE COURT:  Okay.  All right.  Thank you.

MR. RICHMOND:  Thank you, Your Honor.

MR. GLUECKSTEIN:  Thank you, Your Honor.

Again, Brian Glueckstein, for the debtors.

Your Honor, Celsius acknowledges they filed the proof of claim.  They acknowledge -- I didn't hear any dispute that the information to assert the coin claim was in their schedules.

They're doubling down saying that this language, this one sentence that we are focused on here, that they are investigating causes of action, is sufficient to allege claims with respect to an excess of 500 different -- transfers with respect to 500 different customers -- transferees of -- potentially of our -- in our case to come back and assert these claims at whatever time in whatever way they wanted to.

Now, they're suggesting that somehow we had notice

of their amended claim and didn't object to it.  It's preposterous.  They filed, apparently, these amended claims, hours before we file -- and when we say filed in this case, it's not on the docket.  They didn't send them to us.  They apparently submitted them for portal, then went to our Claims Agent, and there's -- those claims have not made their way to us.

I think they probably suspected we would be filing the claims against their frivolous $2 billion claim when we did on the deadlines with respect to voting record date of our plan.

And so they filed the amended claims.  They didn't make a motion.  They didn't put us on notice of these claims they submitted.  We filed our claims.  They have not taken any issue.  They have not tried to defend the merits of the objection that we filed with respect to the disparagement claims.

A lot of semantics about whether this is a new claim or an amended claim.  When I talk about it as a new claim, our position is it's a new claim as a matter of law.  It's not what they called it.  I understand what they did.

They want it to be an amended claim because they know it needs to relate back to this original proof of claim and this singular sentence that Celsius is investigating causes of action, that that somehow put us on notice that we

were going to be sued.

Either they first sought, through their stay relief motion -- they want to file a lawsuit.  Then they come in and they file these amended claims.  Either way, at some later date and time, a year after the bar date, that these debtors should defend $445 million of preference claims.

There is nothing about what they submitted in their timely proof of claim that suggests that.  While their original claim is deficient as to the defamation claim as we -- on its face, as we set out in the objection, they at least attempted to articulate that claim in some way.

There's nothing about this, as Your Honor points out -- they didn't even say we have claims.  They just say we're investigating.  This is boilerplate language.  It cannot be -- somebody can file a proof of claim that says we're investigating all sorts of things and they just list a laundry list of everything claim that they can think of and they can come back years later and say, you know, we're just elaborating on our claim and now here's this detailed schedule of what we want to pursue.

There's discussion both in their papers and by counsel today about what was decided and what was said in the Mallinckrodt case and Your Honor knows that better than anybody here.

But the decision that then went up on appeal on

this question where protective claims are discussed, in that decision, 2022 Westlaw 3545583, Judge Ambro, who decided that appeal, sitting by designation, after discussing the standards that we've been discussing this afternoon concluded, "Here, the proofs of claim do not sufficiently allege facts under the theory of antitrust liability" and then goes on to say to allege any conduct by any of the non-defendant debtors and it appears that proofs of claim were filed out of an abundance of caution.

The decision to disallow those claims was affirmed.

What we have -- there's a standard. There has to be some real notice based on facts that we are going to be defending preference claims, some articulation of the transfers at issue, the debtors at issue, that we're talking about customer claims, we're talking about loan claims. What -- there's nothing. There is literally nothing. There is a single sentence that says they're investigating causes of action and, based on that, they want to come back and say this all relates back and we filed these amended claims and now we should engage on this burdensome litigation.

And so we submit, Your Honor, that the claims that they now want to assert that could have been asserted prior to the bar date are time-barred and the claim that they did assert, the disparagement claim that is stated in that

original proof of claim and that was the basis of the $2 billion in our records, they have now abandoned and should be expunged.

There has been no response on the substance of the pleading deficiencies of that claim to the claim -- to the -- in the objection that we filed today.

Thank you, Your Honor.

THE COURT:  All right.  Thank you.

All right.  I know the parties saw this, and it is a gating issue, but I'm not prepared to rule from the bench on a half-a-billion dollar claim objection without taking some time to think about it and perhaps write an opinion about it because it certainly will go up on appeal and I want to make sure if it does, either way, the appellate court has an opportunity to understand what my thinking on all of this was.

So I'm going to take this under advisement.  It doesn't help the parties today.  We're going to have to go forward with the remaining portions of what's on the agenda for Celsius, but that is what it is at this point.

MR. GLUECKENSTIN:  Thank you, Your Honor.

I think the next issue then on -- with respect to the Celsius matters is Celsius' Motion to Lift the Automatic Stay.

THE COURT:  Okay.  Let me ask first -- I think I

saw it, but is there a tolling agreement in place because the statute of limitations already ran, right?

MR. LEVY:  Yes, there is.

THE COURT:  All right.

MR. LEVY:  Your Honor, Richard Levy, of Pryor Cashman, for the Celsius Litigation Administrator.

The original 546(a) bar date was mid-July.  The parties agreed, and Your Honor entered an order in both the Chapter 11 and the Chapter 15 case, to approve a tolling agreement which extends the time to file for 546(a) purposes. I believe it's seven days after Your Honor enters an order if relief is granted from the stay.

THE COURT:  Okay.

MR. LEVY:  All right?

THE COURT:  Thank you.

MR. LEVY:  Your Honor, Richard Levy, of Pryor Cashman, for the Celsius Litigation Administrator.

I'm going to refer to the -- use the word Celsius to refer to my client.  My client is effectively running the Celsius estate when we talk about what the rights of Celsius are and what Celsius intends to do.

Your Honor, I'm also going to try not to -- so as not to burden the Court today, there are commonalities between both motions, the motion on the Celsius 11 and the motion on the Celsius -- excuse me, on the FTX 11 and on the

FTX 15.  Both --

THE COURT:  Yeah, let's do that one first, the 15, because --

MR. LEVY:  Pardon me?

THE COURT:  Let's do the 15 first because there was a motion to adjourn that portion of the hearing, right?

MR. LEVY:  Your Honor, I didn't hear Your Honor.

THE COURT:  I said let's do the Chapter 15 issue first because there was a motion to adjourn that particular --

MR. LEVY:  Your Honor --

THE COURT:  -- part of the motion.

MR. LEVY:  -- we think that that should be heard today.  We think that the matters both should be heard today and, frankly, the issue that I was hoping to deal with in order not to burden the record was to deal with the common issues on the elements of relief, the cause that's been shown, and the reason why there is none of the parade of horribles that comes in either case.

In the Celsius -- in the Chapter 15 case, we're really talking about -- I mean our view is, first, that that -- the whole purpose here is a delay tactic.  It's designed to prevent us from prosecuting our case.  It's designed to prevent us from being in a position to assert before Your Honor needs for relief, which are part of the substance of

the motion.

If this matter is delayed a long time, and the Chapter 15 case -- actually, the Bahamian portion of the liquidation proceeds and there's nothing left.  We are left holding the bag.  That's exactly the scenario that they want us to be in.

THE COURT:  Well, the problem I have or the issue I have is you've now filed something in the Bahamas, which the joint liquidators say now subjects you to jurisdiction of the Bahamian courts, and I have to consider whether I'm interfering with something that the Bahamian court has the right to pursue as an initial matter, rather than me, because they are the center of main interest for that case, not me.

MR. LEVY:  Your Honor, I understand.  I'm happy to address that point.

THE COURT:  Okay.  Go ahead.

MR. LEVY:  So, Your Honor, the first point I want to make is that the FTX party, the FTX foreign representatives, came to this -- came to the United States, exercised their right to invoke the jurisdiction of the United States courts to seek Chapter 15 relief.

They started in New York.  They ended up here.  Your Honor granted them a motion which gave them Section 1520 relief, which makes the stay under Section 362 applicable, applicable to the debtor and as -- property of the debtor

located in the United States.

Section 362 -- I'm going to start with the language of Section 362, which now applies, and why Your Honor should be dealing with it from that standpoint first.

Section 362 tells us what's stayed and how a party gets relief from the stay and which court it goes to to get relief from the stay. And the old maxim, read the statute, read the statute. The statute tells us that Your Honor is the person who should be making the decision with respect to the United States issues that we are asserting.

And remember, Your Honor, that we are going to be seeking relief, if we get that far, to the distributions that are being made both to the Celsius clients and to the former Celsius clients through FTX and the former Celsius clients through FTXDM.

Your Honor, the reason why --

THE COURT: Ask Mr. Glueckstein about that. You're going to have to explain that one to me too as to how it's possible that you're going to come in here and say, Judge, you should not allow distributions under this plan to these 500 claimants who are entitled to a distribution under the plan because they are subjected to litigation unrelated to this case in another jurisdiction.

What authority do I have to do that?

MR. LEVY: Your Honor, we are asserting that --

and this is the basis of an objection to the plan that you're going to hear about in not long from now, is that this is, in effect, an interpleader situation.

There is a common fund. The money that is coming out of FTX to a group of FTX clients whose accounts were funded, in whole or in part, with money as to which Celsius has an ownership interest, that's the basis, Your Honor.

THE COURT: Well, isn't that giving them -- isn't that giving you a prejudgment attachment of these claimants' funds --

MR. LEVY: No, Your Honor. We are not asking for any --

THE COURT: No. Let me finish my question.

MR. LEVY: I'm sorry, Your Honor.

THE COURT: Go ahead.

MR. LEVY: We are not asking for a prejudgment attachment. We are not asking for garnishment. We are suggesting to the Court, as we did in our plan objection, which I'll read, that all that has to happen here is that the funds be held back and the parties allowed to litigate who is entitled to that money.

If we don't do that, the money disappears because the debtor makes its distributions. We are left -- again, to use the phrase I used earlier, we have to hold the bag.

Now, if that means, Your Honor, that we have to

pursue our claim directly against FTX, the FTX debtors, I guess we have to do it at that point and the risk is they're going to end up paying again, even if they've already paid back the customers because we are entitled, under 550, to one single recovery from whatever source we can get, initial or subsequent.

THE COURT:  Well, that doesn't answer my question as to what authority are you relying on for me to tell these claimants you're not entitled to your distribution because you've been sued somewhere else.

MR. LEVY:  Your Honor, we are asserting that the plan is defective because it needs to deal with the disputed claims.  There are going to be, in effect, two sets of disputed claims, the debtors' objections to our claim and our objection to the Celsius claims in the New York -- to the Celsius creditors in New York.

THE COURT:  So why am I dealing with this issue now if this is a -- I mean that's a big issue for me.  And I haven't looked at the -- your plan objection, so I don't know --

MR. LEVY:  Of course.

THE COURT:  So, you know, how do I make a decision today on whether to lift the stay on something I'm not even sure what this is all about?

MR. LEVY:  Well, Your Honor, what it's about is

starting an action, asserting a right, making sure that the rights are preserved.

Your Honor, we don't have any problem granting the stay relief.  We'll start the action.  We'll stop right there and deal with all of the other issues in the plan context and, if need be, after.  We may ask you for the relief that we're talking about, some kind of a provisional relief if it were an interpleader type of -- I'm going to use the word restraint.

We're not asserting -- we actually could assert that we had an ownership interest because the accounts were funded with our property.  Those Celsius creditors who now come to FTX as FTX creditors are really not entitled to receive distributions based on their preferential movement of our property.

THE COURT:  But I don't have that before me.  You're just saying it.  But I don't have any papers that say that.  You didn't file anything to say --

MR. LEVY:  The draft --

THE COURT:  -- you're not entitled to it.

MR. LEVY:  The draft --

THE COURT:  Wait.  You got to wait until I finish talking before you try to talk.

You haven't filed anything that establishes this.  And this all gives me pause as -- that this is all related to

the FTX bankruptcy.  That's a major issue.  How do I do this and allow you to say I'm going to freeze these funds until you get your judgments somewhere else against people who aren't before me.

MR. LEVY:  Well, Your Honor, I'll give you one example, I suppose.

We'll file our complaint.  We'll prosecute our plan objection.  We'll ask Your Honor to make appropriate -- to deal with appropriate modifications to the plan.

And if we don't -- if we get that far, or the alternative, Judge, we will have a claim -- if Your Honor sustains the claim that we have filed, the debtors are going to object.  They're going to have to reserve.  They're going to have to reserve funds and either they're going to pay once or they're going to pay twice.

So Your Honor is going to be able to hear all of that.  The question will be one of timing.

THE COURT:  Well, my point is this seems like it's all related to this case, not Celsius.

MR. LEVY:  Sorry, Your Honor?

THE COURT:  This seems like this is all related to the FTX case, not to Celsius.

MR. LEVY:  I disagree.

THE COURT:  And those are issues that I need to decide, not the court in New York.

MR. LEVY:  Your Honor, I respectfully disagree because the question of whose money is it travels through from Celsius to FTX.

If Celsius' property was diverted to its customers and then moved to FTX, the debtors got our property.

THE COURT:  But, again, you haven't --

MR. LEVY:  We're entitled --

THE COURT:  You haven't raised that issue before me that it's your property.  I don't have that in front of me.

Is that a part of your plan objection?

MR. LEVY:  Yes.

THE COURT:  All right.  Well, I don't -- I haven't gotten to that yet.

MR. LEVY:  I understand that, Your Honor.

THE COURT:  So I'm still -- this still all seems to be related to FTX, not Celsius, and you have a tolling agreement in place that says seven days after I rule.  Why do you need to file anything at this point?  Just wait until --

MR. LEVY:  Excuse me, Your Honor?  I missed the last comment.

THE COURT:  I said I have -- you have a tolling agreement in place so why do I need to decide this now?  Why not wait until we get through plan confirmation?  You can raise your issues you have about plan confirmation and then I

can decide whether or not I'm going to lift the stay to allow you to pursue this in New York or bring it here.

MR. LEVY:  Your Honor, I obviously have to defer to your sense of case management.

We think that we need relief because we don't want to be left holding a bag.  We don't -- and by the same token, Your Honor, we're trying to deal with responding to the debtors' concern that we're looking for additive recoveries, which we're not, but if we can't glom on to the distributions -- and I'm using that word in a colloquial vernacular, then we're going to have to come back and litigate our claim and get recoveries from the debtor and we're going --

THE COURT:  Well, that's my point.  Why don't we wait until we know if there's a plan confirmation process whether or not you're right about the fact that you have this intervenor-type situation where you have the right to prevent claimants from being paid until your claims are liquidated?

MR. LEVY:  I understand the Court's concern.  I can't say anything further than what I've presented thus far.

THE COURT:  All right.  Let me -- I want to hear from the Joint Liquidators.

MR. LEVY:  Your Honor, before that, may I address -- may I respond to points -- couple of points on the 15 that I think are relevant to the whole question of whether we have to go back to the other court first, or whether we're

properly here before Your Honor?

THE COURT:  Well, let me hear -- well, it's their motion -- or their motion to adjourn.  So let me hear from them and then you can respond to their argument.

MR. LEVY:  Thank you, Judge.

MR. SHORE:  Good afternoon, Your Honor.

Chris Shore, from White & Case, on behalf of the Joint Official Liquidators.

You got it right.  We want to adjourn this.  We asked multiple times.  We couldn't get them to agree, so we all trotted down here for this hearing, and thank you for hearing us, Your Honor, and thank you for allowing our witnesses at least to appear through Zoom and not have to come here.

I want to clarify a couple of things because we're kind of aligning, to some extent, the two estates because they started jointly.

The claims that are a subject of the lift stay motion that I'm seeking to adjourn are claims related to transfer -- alleged transfers from Celsius to FTXDM for customer accounts held under the FTXDM terms of service, and they lay out $327 million of claims.

They did file a proof of debt in the Bahamas for that amount and, unlike saying I'm doing an investigation, they did say we are asserting these claims, we have these

claims, and we have a process for dealing with those claims.

I do want to point out it is not a customer claim. A lot of what they're saying is the -- this gets tied up in the U.S. because of the customer claim election that is part of the approved global settlement agreement.

I want to be clear they do not fit the definition of customer claim. It is not a customer claim. It is a general, unliquidated portion -- and partially liquidated claim asserted in the Bahamas to be paid out of the Bahamian liquidation.

That is a submission to jurisdiction to have the court deal with all of those issues. They have submitted to that court. They did not file a proof of claim in this Court with respect to those particular transfers we're talking about because those aren't claims against the U.S. debtors. The only place those claims are pending is in the Bahamas.

Be clear about the scope of the stay and why we're asking for the relief.

Your Honor has a 362 stay in place for properties within the territorial jurisdiction of the United States. The Bahamian court, as set forth in Ms. Rolle-Kap's (phonetic) initial declaration, is worldwide. So there are two stays applying to assets within the United States, a stay in the Bahamas -- sorry, a stay in the U.S. and a worldwide stay in place.

So both courts need to sign off on that stay and we believe, as a question of comity, the Court should be deferring to that court to address it because if the Court says I'm not lifting the stay and answers the question both am I lifting the stay worldwide, including in the U.S., and if we do it here, the only question we're answering is should the stay be lifted in the United States.

As Mr. Greaves points out, there's nothing really here in the United States but, nonetheless, we believe that the court to whom the Celsius Administrator has submitted to jurisdiction to resolve the substantive underlying issue should be the first and, ultimately, the adjournment request, which would be let's wait and see what the Bahamian court does before Your Honor addresses it, is a question of comity and comity, in my lay terms, it's always do unto the other court as you would have done to yourself.

If we flip this, imagine that, instead, they had decided that they wanted to prosecute the claims against the U.S. debtors in the Bahamas and went to the Bahamian court and said I would like you to lift the stay in the Bahamas to allow me to sue the U.S. debtors in the Bahamas and execute against Bahamian assets.

Your Honor would haul them in here and say you're not allowed to do that. You have to come to me. You have claims. This is an attempt to recover a claim against a U.S.

debtor.  You got to come get the stay lifted here first.

So all we're asking -- it's not a delay tactic. Every opposition to stay relief is a request for more time. That's the point of a stay.  We're just saying they can start -- they started the process there.  Ms. Rolle-Kap, in her supplemental declaration, lays out the process by which that's going to get done.

And if the Bahamian court lifts the stay -- I can't imagine there would be a different result in the U.S., but if the Bahamian court doesn't lift the stay, even if Your Honor were inclined to lift the stay with respect to the U.S. assets, they still wouldn't be able to proceed because the stay of the Bahamian court covers those assets as well.

THE COURT:  Okay.  Are the -- all of the assets of the Bahamian debtor located in the Bahamas?

MR. SHORE:  No.

THE COURT:  Okay.

MR. SHORE:  The Bahamian debtors have, and as Mr. Greaves leaves out, he -- they do have contingent assets in the U.S.  It's just nothing that's liquidated at this point. But, as I said, it is all still covered by the Bahamian stay.

There are -- the largest assets are in the Bahamas in the forms of funds and crypto held and the properties that we've talked about before.

THE COURT:  What's in the U.S.?

MR. SHORE:  There are -- there -- of the -- the biggest assets in the U.S. are the Silvergate and Moonstone accounts, but those have been seized by the Federal Government as part of the claims -- the criminal claims.  So we don't have access to those funds.

THE COURT:  Okay.  Thank you.

MR. SHORE:  But, nonetheless, the stay is in place to protect our interest in it.

THE COURT:  Okay.

MR. SHORE:  It's just a police powers exception for the -- you know --

THE COURT:  Got you.  Thank you.

MR. SHORE:  Thank you, Your Honor.

THE COURT:  All right.  Okay.

Mr. Levy?

MR. LEVY:  Thank you, Your Honor.

We find ourselves in a sort of a darned if you do and darned if you don't situation.

When we started this, we filed our motion for relief from the stay.  The foreign representative comes to us and says no, you got to go to the Bahamas, so we did.

We filed a motion there.  We filed a proof of claim.  That's not enough now, apparently.  We can't stay here because, under Section 362, we are properly before Your Honor, and I'll talk about some Bahamian law in one second.

52

It's not just the assets of the debtor.  It's the debtor and property of the debtor in the United States under Section 362 as made subject to protection by 15 -- Chapter 15, Section 1520.

The debtor --

THE COURT:  Which you're asking me to lift the stay --

MR. LEVY:  Yes, Your Honor.

THE COURT:  -- to allow you to pursue causes of action against the Bahamian entities --

MR. LEVY:  Yes, Your Honor.

THE COURT:  -- and when you -- if and when you get a judgment, you're going to go to the Bahamas to collect on it?

MR. LEVY:  We may.

THE COURT:  So doesn't that kind of show that the Bahamas have the initial interest in this, not me?

MR. LEVY:  No, Your Honor, I don't think so.

Two things.  Number one, the fact that -- the Bahamian stay is not of extraterritorial application.  It only applies to the Bahamas, and there's case law that says that, a case called - - matter of Leadenhall Bank & Trust Company, 2009 Supreme Court of the Bahamas, which says our stay is not extraterritorial.

Somebody who is litigating in a foreign

jurisdiction against assets that are Bahamian or were made into Bahamian can litigate there and can litigate to judgment.

THE COURT: Well, here's the problem I -- I know the Joint Liquidators filed a -- was it a sur reply or reply that raised these Bahamian law issues.

Now, you haven't had the opportunity to respond to that, and I'm not going to be in a position to rule on anything until I give you an opportunity to address the Bahamian law issues so I can have an opportunity to review that information and decide which way I'm supposed to go on this.

So I mean we can stand here and we can talk -- you can tell me what's in these opinions, but, you know, then Mr. Shore is going to want to have an opportunity to respond to that and I need to see it. I need to see it.

So at this point, I just don't see how I can go forward on deciding, as to the Bahamian entities, whether or not I'm going to lift the stay.

I think I need to adjourn until I have full briefing on these foreign law issues.

MR. LEVY: All right. Thank you, Your Honor.

THE COURT: Okay?

So I'm going to grant the motion for adjournment. So the parties should meet and confer. Well, we'll talk

about it more, about what the scheduling is going to be on all of this.

Do you want to go to the next issue?

MR. LEVY:  Yes, Your Honor.

On the Chapter 11 case, Your Honor, I'm going to start by talking about what these motions address and what they don't address.

We're not asking for permission to sue.  What we're asking Your Honor is for leave to sue in another court, and that's a signal, Your Honor, that if we can't sue in another court, we'll do it here.

But we think we have a basis, a sufficient basis, for relief from the stay to go to the New York court.

THE COURT:  Let me -- I want to go back to what we talked about earlier with the -- your plan objection and how that's going to impact all of this.

I think that's going to have a major impact on my view as to whether or not I will lift the stay to allow you to sue in New York or to sue here.

So my inclination at this point is to say I'm not going to lift the stay at this point.  I want to see your arguments at confirmation so that I can then make a decision about, okay, how is this all going to play out at the end of the day.

Can you effectively prevent claimants from getting

a distribution under the plan until your claims are liquidated either here or somewhere else?  That's going to have a major impact on how I view this whole thing.

I don't see any prejudice to anybody at this point because you got the tolling agreement in place.  You got to wait a little longer to pursue it but you got a tolling agreement in place so the statute of limitations is not an issue.

Eventually, you're going to sue either here or in New York, assuming I don't dismiss your claim on the claim objection.  So why don't we wait and see how all this plays out before I make the decisions about lifting the stay?

MR. LEVY:  Your Honor, may I have a moment to confer with counsel?

THE COURT:  Sure.

If you want to go out in the hallway for a little bit, that's fine so you don't have people overhearing what you're saying.

MR. LEVY:  Can we have five or ten minutes, Your Honor?

THE COURT:  Yeah, that's fine.

We'll take a five --  we'll take a ten-minute recess.

MR. LEVY:  Thank you, Your Honor.

THE COURT:  Let me know when you're ready.

(Recess taken at 2:03 p.m.)

(Proceedings resumed at 2:18 p.m.)

MR. LEVY:  Till the confirmation hearing.  On October 7th, we would have the stay motion adjourned to the same date.

And are we in agreement on that, Mr. Glueckstein, on us having the stay motion the same day as the confirmation hearing?

MR. GLUECKSTEIN:  That's fine, Your Honor.  If I may, just -- can I briefly just be heard on our perspective on this --

THE COURT:  Yeah, that's fair.

MR. GLUECKSTEIN:  -- because I'm a little concerned that we have --

THE COURT:  Mr. Levy had the opportunity, so I'll give you the same opportunity.

MR. GLUECKSTEIN:  I don't want to argue the motion, but I'd like to just, so that the record is not completely one-sided here.

We're fine adjourning the motion at Your Honor's suggestion and we'll take guidance from the Court on that.  To be clear, we don't think there's any scenario where this motion could be granted, regardless, and I think that the plan issues, we will address, of course, their plan objection in connection with plan confirmation, but -- and I want to be

clear that the debtors' position is, and Your Honor asked this question, there is absolutely no basis by which the Celsius administrator can come into this court without a judgment or without prejudgment attachment and dictate that we can't make distributions on allowed claims. They have no judgment in their cases. They have -- they've -- they have not sought any sort of prejudgment remedy. They stated today that they're not seeking that. They've referenced this idea of interpleader that is not applicable.

We do not agree with them that there is a dispute as between them and the alleged Defendants in this litigation. And, of course, we go all the way back to where we started this afternoon, we don't think any of these claims can be asserted against these debtors as all.

So all of these issues, I do agree, though, Your Honor, are interrelated. Obviously, the claims issue is dispositive. The plan objection will be addressed and we will seek to have that overruled at the confirmation hearing. So we're fine to take guidance from Your Honor.

I do think, irrespective, if they did have a claim, if Your Honor disagreed with us and their amended claims were able to be pursued, there is no question that they have submitted to the jurisdiction of this Court. They have now filed these claims. They are now participating in the plan process. And as was discussed in connection with

what would happen here and the ultimate remedy, they're seeking, effectively, distributions out of this estate to them, instead of our customers, and we think there's all kinds of problems with that.  And we will address this in the plan objection.  These are not customer claims; they are subsequent transferee claims that they want to assert.

THE COURT:  Okay.  Well, why don't we do that. We'll adjourn this until the confirmation hearing.  You need to work with Mr. Shore, though, on the Chapter 15 case if we're going to have it on the same day to, get some additional briefing to me on the foreign law issue.

MR. LEVY:  Your Honor, may I address that?

THE COURT:  Yes.

MR. LEVY:  So on the Chapter 15, as Your Honor observed, we only received the affidavit of law barely 48 hours ago and Your Honor has invited us to take an opportunity to respond to that so that Your Honor has a full legal regard before you to decide whether or not we have a basis for Your Honor to rule to lift the stay.

THE COURT:  Right.

MR. LEVY:  So, Your Honor, we appreciate the opportunity to proceed in the manner that you suggest.  We

agree that this matter ought to be adjourned until the confirmation date on October 7th.  We will supply supplemental authority, in effect, our own surreply.

I assume, Your Honor, that -- Your Honor, to the extent I need to, may I make this a motion to submit our own surreply in the context of --

THE COURT:  Yes, that's granted.

MR. LEVY:  Thank you, Your Honor.

As I understand, Your Honor, we are not adjourning -- Mr. Shore's motion asked for adjournment of this matter until the Chapter -- until the Bahamian liquidation proceeding is done.  We oppose that.

I construe Your Honor's invitation to carry the stay motion until the confirmation hearing, with us having an opportunity to supplement the record.

THE COURT:  That's correct.

MR. LEVY:  Your Honor, we agree that that's an appropriate way to proceed.

THE COURT:  Okay.

MR. SHORE:  Just two points of clarification on that, Your Honor, just so everybody is on the same page.  The surreply, I take it, will be limited to issues that were raised for the first time in our surreply, and not an opportunity to raise issues.

It was an incorrect statement to say they only got

the declarations of law last night or yesterday or whenever. They've had two declarations on file, in connection with our objection.  So I take it that the surreply is limited to the new material and not a re-hash?

THE COURT:  That's correct.

MR. LEVY:  That is correct, Your Honor; we agree.

THE COURT:  Okay.

MR. SHORE:  And then to the other thing, I take it that the adjournment is not an invitation for the Celsius administrator to just stop moving in the Bahamas.  They came to the Court and they said, We're doing the right thing in the Bahamas, but as we noticed -- noted, they haven't served us with the papers.

And the way this works is as soon as they serve us with the papers, we can go to the Bahamian Court, set up a schedule for lifting the stay there and whatnot.  They can't come in and say, We're proceeding in good faith and then hip pocket this whole process while they play out in this court.

So I take it that Your Honor is not directing them not to go forward in the Bahamas?

THE COURT:  No, not in any way, shape or form.

MR. SHORE:  Okay.  Thank you, Your Honor.

MR. LEVY:  And, Your Honor, I don't claim to know anything about Bahamian law, so I don't know exactly what happens with or without the summons being served.

We'll deal with the matters raised in the surreply, which is, I think, the scope of what we're going to talk about in several weeks.

THE COURT:  Okay.  Sounds good.  Thank you.

MR. LEVY:  Thank you, Your Honor.

THE COURT:  All right.  Next item?

MR. LANDIS:  Your Honor, for the record, Adam Landis from Landis Rath & Cobb on behalf of the debtors.  I was just going to make sure that he didn't omit, inadvertently, the Celsius litigation administrator's motion for authority to file under seal, the transfer schedules. That's at Item 38.

THE COURT:  Yes, we do need to address that, I guess.  Do we have -- has the U.S. Trustee objected to that one for the Media Intervenors.

Yeah, okay.  Let me hear from the objectors first.

MR. HACKMAN:  Good afternoon, Your Honor.

May I please the Court?  Ben Hackman for the U.S. Trustee.  Our office filed an objection to the seal motion at Docket Item 24215 in the Chapter 11 case and then at Docket Item 174 in FTX Digital Markets, Chapter 15 case.

The seal motions rely on Section 107(b)(1) of the Bankruptcy Code, which is -- which addresses the sealing of a trade secret or confidential research, development, or commercial information.  In other words, the seal motions are

not based on 107(c) of the Code, as we read them, which deals with protecting individuals from undo risk and identity theft or other unlawful injuries to the individual or the individual's property.

We respectfully submit that the Court should deny the seal motions because the motions seek to seal the names of Celsius customers, which have already been disclosed publicly.

The Bankruptcy Court for the Southern District of New York already considered and denied Celsius' request to seal the names of its customers in a published decision in September 2022.  We would submit that there's no basis to seal information in this court that has already been disclosed publicly elsewhere.

The public has a right to know what transfers were made from Celsius, which the Celsius litigation administrator now would seek to recover on.  If the Celsius liquidation [sic] administrator were successful in pursuing its claim or seeking stay relief, the FTX bankruptcy estates would have fewer available assets to pay creditor claims than it would currently and the amounts at issue here could be significant.

I believe the draft complaint that was attached to the Celsius litigation administrator's lift-stay motion alleges initial transferees withdrew over $516 million from the Celsius Exchange and moved over $377 million of that onto

the FTX Exchanges; both of those numbers net of new value.

So whatever plan distribution the Celsius litigation administrator would receive under the FTX plan should not be a secret; it should be reported in the post-confirmation quarterly reports for both debtors.

Two other points, Your Honor. First, is that the list of entities, Exhibit C to Mr. Ehrler's declaration, that the parties, that the Celsius litigation administrator is seeking to seal here is a very, very small sliver of the total customer base for FTX.

I believe FTX has asserted in its disclosure statement and elsewhere that as of the petition date, it had about two million customer accounts with positive balances. The number of entities listed in exhibit -- in the exhibit at issue in Mr. Ehrler's declaration is a very, very small fraction of that number.

The second thing, Your Honor, is, as we understand it, the Celsius litigation administrator would want to bring preference suits in the New York Bankruptcy Court. We think it would be anomalous for the New York Bankruptcy Court to deny Celsius' seal motion in 2022, then have the Celsius litigation administrator obtain sealing relief in the Delaware Court in 2024 and somehow use the sealing relief granted by the Delaware Court order to attempt to seal information back in the New York Court, which the New York

Court had already considered and denied.  That would seem like a revisiting of the New York Court's decision, which we don't think would be appropriate.

Beyond that, Your Honor, we rest on our papers and we'd respectfully submit that the seal motions before Your Honor should be denied.  Unless Your Honor has any questions, that's all I have.

THE COURT:  Okay.  Thank you.

MR. HACKMAN:  Thank you.

THE COURT:  Let me get the Media objectors first.

MR. MARSHALL:  Good afternoon, Your Honor.  Adam Marshall for Media Intervenors.

I wanted to note at the outset, Your Honor, that the Media Intervenors do, as you know, have a pending appeal in the district court, with respect to the sealing of the FTX customer creditor names.  That appeal is still pending and we're reserving all of our arguments with respect to that.

With respect to the sealing motion from Celsius, Media Intervenors have objected to sealing of the names of customers, whether they're customers of Celsius or of debtors or of both.

The Celsius administrator appears to believe that this Court's prior sealing order and its underlying rationale, with respect to the debtors' customers, applies to Celsius and its customer names, but it does not.  First,

Celsius has submitted no evidence whatsoever to support its argument that the names of its customers are confidential, commercial information.

Under Third Circuit precedent, the proponent of sealing any judicial record bears a heavy burden to show:

"That the material is the kind of information the courts will protect and that disclosure will work a clearly identified and serious injury to the party seeking closure."

Here, Celsius has proffered no evidence whatsoever in support of its claim, that the names of its customers qualify under Section 107(b)(1).  Has not demonstrated that such names were confidential, that the customer names are critical to its operations, or the disclosure would cause Celsius commercial injury.  So, in the absence of evidence alone, we would request that Celsius' motion be denied.

But second and more fundamentally, Celsius cannot make such a showing.  As my colleague from the United States Trustee's Office noted, these customer creditor names were ordered to be made public and were, in fact, made public in 2022.  Celsius cites no precedent or rationale authorizing the sealing of customer names that are already public.  That the horse has long left the barn and has probably left the state, at this point.

Given that prior disclosure, along with Celsius' wind-down, there's no reason why these names would qualify as

confidential, commercial information.  The re-disclosure of already-public information can't cause Celsius harm or provide an unfair advantage to its competitors.  It has none at this point.

So, Media Intervenors would respectfully request the Court deny Celsius' motion, insofar as it applies to the names, Your Honor.

THE COURT:  Okay.  Thank you.

MR. MARSHALL:  Any questions?

THE COURT:  No questions, thank you.

MR. GLUECKSTEIN:  Your Honor, Brian Glueckstein, Sullivan & Cromwell, for the debtors.

Your Honor, the debtors filed a response to the sealing motion at Docket 24458, which contained a declaration of Kumanan Ramanathan of Alvarez & Marsal.  Mr. Ramanathan is here today in the courtroom and we would ask that that declaration be admitted into evidence.

THE COURT:  Is there any objection?

(No verbal response)

THE COURT:  It's admitted, without objection.

(Ramanathan Declaration received in evidence)

MR. GLUECKSTEIN:  Your Honor, the reason the Celsius administrator submitted a list of customers to this Court, as we've been talking about all afternoon, is because it alleges those customers transferred assets onto the FTX

Exchanges and hold customer claims under our proposed plan of reorganization, thus, Celsius is arguing that the transfers at issue were made by customers of the FTX Exchanges.

Accordingly, our position is that in accordance with this Court's prior orders, including the order entered this morning, further extending the time for keeping FTX customers' names redacted, the Celsius administrator is not only overly authorized, but required to file Exhibit C, the names on the transfer schedules, under seal.

The focus of the Media objectors and the United States Trustee on the customers being customers of Celsius, we submit, is misplaced.  The fact that certain customers of Celsius are also customers of FTX has not been publicly disclosed and those FTX customer names are protected from public disclosure by order of this Court, both pursuant to Section 107(d)(1) of the Bankruptcy Code and with respect to the individual names on that list, the permanent sealing of those individual names under Section 107(c) that was entered by this Court many months ago.

As stated in Mr. Ramanathan's declaration, the debtors' ongoing investigation has already revealed that many of the names on the schedule match names with FTX customers and that the debtors believe more of those names will be confirmed to be customers.  We're starting with a list of names, which is not the best way to do this confirmation,

without account-identifying information, but we're working through the process.

As a result, Your Honor -- well, first, the suggestion that there's no evidence in the record to support sealing is clearly not true. Mr. Ramanathan's declaration has now been admitted into evidence, without objection. And so on the basis of the fact that we know a substantial portion of this list is already confirmed to be FTX customers, and we expect -- Celsius is alleging it -- certainly, that every one of the names on that list are FTX customers. That's why they're here before Your Honor seeking to bring the claims with respect to the transfers at issue that we've been talking about all afternoon. And we have every reason to believe that those customers will be confirmed to be -- those names will be confirmed to be customers, either all, or in substantial part.

And so, as a result, for all of the same reasons that the Court has kept the FTX customer list sealed to date, we submit it would be harmful to the debtors to reveal this list of names now, again, because these Celsius customers are alleged to be FTX customers and based on our ongoing investigation, we expect that to be confirmed.

THE COURT: Okay. Thank you.

MR. GLUECKSTEIN: Thank you, Your Honor.

THE COURT: Mr. Levy?

MR. LEVY:  Your Honor, Richard Levy for the Celsius litigation administrator.  I endorse everything that Mr. Glueckstein just said.

I want to supplement for Your Honor, in a very narrow sense.  Mr. Glueckstein is correct that we believe that all of the roughly 500, give or take, actions that we've commenced in New York are against former Celsius customers and we believe are FTX customers today.

THE COURT:  So you've already initiated the actions?

MR. LEVY:  We have started those actions, Your Honor.  Roughly 2500 actions were started within the last several weeks.  We believe we started with approximately 540 targets, former Celsius customers who would be the object of the avoidance claims that we ultimately want to get through to FTX.  That number is changing some, because there have been some preliminary settlements.

THE COURT:  Do the -- I'm sorry to cut you off -- but do the complaints filed in the New York identify the parties as FTX customers?

MR. LEVY:  That was exactly the point I was about to get to, Your Honor.

So those 2500 preference targets, their names are public.  There is not an iota of reference in any of the complaints of the 500 or so relevant customers to any

connection to FTX.

THE COURT:  Okay.

MR. LEVY:  So it's public.  In that case, I agree with Mr. Glueckstein that there's no reason for it to be public in this case.

THE COURT:  All right.  Thank you.

All right.  Well, go ahead.  You can speak.

MR. MARSHALL:  Your Honor, may I be heard?

THE COURT:  Yep.

MR. MARSHALL:  Very quickly, Your Honor.

Adam Marshall for Media Intervenors.  Just a couple of points.

This is the Celsius administrator's motion.  It's not the debtors' motion.  They didn't join the motion.  They filed something a couple of days ago, but it's the movant's burden to show that sealing is proper.

I also want to note that the relationship between the Celsius customers and FTX is not some secret thing.  If you look at the Ehrler declaration at paragraph 8, he says that they're -- he's using commercial, third-party sites to trace these purported relationships between Celsius and FTX. All the Celsius customer names are already public, so anyone who wanted to do that same kind of tracing could do the same thing.  So the relationship here is not secret and should not be sealed.

THE COURT:  All right.  Okay.

Well, it's an unusual situation, because they're not sealed in the Celsius case, but they are sealed here.  There's been -- when I first was looking at this, I thought, well, if they've already been disclosed in Celsius, why am I going to say they can be sealed here?

But they're not disclosed in the Celsius action as FTX customers and FTX has -- and I've entered the order sealing all the customer names, so I have to -- and I just extended that again this morning -- so I'm going to grant the motion to seal at this point and we'll go from there.

(Pause)

MR. LANDIS:  Your Honor, for the record, Adam Landis from Landis Rath & Cobb on behalf of the debtors.

Now, before we move on to Item 40, I understand that the Celsius litigation parties would like to be excused from the remainder of the proceedings.

THE COURT:  Yes, that's fine.  Thank you.

UNIDENTIFIED SPEAKER:  Thank you, Judge.

MR. SHORE:  One other thing that didn't come off on that.  There is, in the 15, also, a motion to stay or a motion to seal, with respect to the same customer information.

I assume that the same ruling will apply in that?

THE COURT:  Yes, I grant that motion, as well.

MR. SHORE:  Okay.  And then permission to be excused, as well?

THE COURT:  Yes, you may be excused.  Thank you.

MR. SHORE:  Thank you, Judge.

UNIDENTIFIED SPEAKER:  Take care, Chris.

THE COURT:  Well, that emptied half the room.

(Laughter)

MR. LANDIS:  There are trains to catch, Your Honor.

UNIDENTIFIED SPEAKER:  Thank you, Judge.

THE COURT:  Take care.

MR. LANDIS:  All right.  Your Honor, I think we are sufficiently on the move to continue the proceedings --

THE COURT:  All right.

MR. LANDIS:  -- if it pleases the Court?

THE COURT:  Go ahead.

MR. LANDIS:  Your Honor, with respect to Item 40, this is the debtors' objection to proofs of claim filed by Seth Melamed.  We had filed a motion to adjourn that on September 9th and we would plan to proceed, first, with the emergency motion to adjourn.

THE COURT:  Yes.

MR. LANDIS:  Mr. Glueckstein will address the Court.

MR. GLUECKSTEIN:  Thank you, Your Honor.  Again,

Brian Glueckstein for the debtors.

On this, Your Honor, we unfortunately needed, and did file earlier this week, the emergency motion to adjourn the hearing on our claims objection to Mr. Melamed's claims. We were forced to do so because he and his counsel ultimately refused to agree to what we see as a basic procedural step to permit the parties to establish a schedule for any necessary discovery and litigation, with respect to his contested claims objection.

As noted in the motion to adjourn, Mr. Melamed filed an objection to the debtors' claim objection, a response to the claim objection that included two lengthy declarations:  one from Mr. Melamed himself, which makes numerous factual assertions if there are issues related to the claims and attaches 28 exhibits.  That declaration raises issues that may be subject to further discovery and we expect that Mr. Melamed will be deposed.

The second declaration, submitted by a Japanese lawyer makes several assertions about Japanese law and foreign law issues that bar the claims and require a responsive Japanese law considerations on our side.

Once Mr. Melamed joined issue on the claims objection in filing his response to declarations, the debtors began considering the additional discovery and responses, as typical in such a situation, and as detailed in my partner

Mr. Dunne's declaration that was submitted with the adjournment motion.

We reached out to Mr. Melamed's counsel to obtain consent to adjourn the notice hearing date to today and to have discussions about the appropriate schedule for litigation on the merits of the claim.  There was a response that was filed about 10 minutes before this hearing, as I understand it, to the motion to adjourn, where I understand concerns were expressed that relate to plan confirmation.

Mr. Melamed has raised with the debtors over the last few days, concerns around his balloting and voting papers.  We have addressed those issues.  We have made clear Mr. Melamed will be able to, to the extent he hasn't already, opt out of the releases and the ballots associated with these claims.  There is certainly nothing about this claims objection that's different than any other claims objection, whereby it would have to be resolved substantively prior to plan confirmation, which is what's suggested in the response that was filed today.

And so what we have asked for is, you know, time to ensure that this claim is prepared, now that it's a joint issue on a contested matter, prepared to be litigated, and if necessary, with evidence before Your Honor in considering the issue.  Nonetheless, counsel for Mr. Melamed has insisted that we act like we're going forward today.  His witnesses

are not here.  I don't know what -- why we were forced to file this motion, but in any event, we would ask that the motion to adjourn be granted and that the parties be directed to discuss a schedule for litigating.

THE COURT:  Okay.  Thank you.

MR. GLUECKSTEIN:  Thank you.

MR. ADLER:  Good afternoon, Your Honor.  David Adler on behalf of Seth Melamed.

I wanted to sort of step back and correct the record a little bit, which was a plan objection was filed on July 10th of this year; coincidentally, the same day that the solicitation materials went out, and I might return to that issue in a few minutes.  But the response date was August 16th.  We put in a response.  The first legal point was there's a broad arbitration provision in the agreement that says, well, first of all, the agreement is governed by Japanese law and it says that in the event of any disputes arising under this agreement, it is to be arbitrated in Singapore and that's a straight, in my mind, legal issue that the Court can decide on.

But with my discussions with debtors' counsel -- and I was perfectly amenable to giving an extension of time -- I had no issues about giving an extension of time -- there was one issue, which was, I don't want the extension of time to go beyond the start of the confirmation hearing, because

Mr. Melamed has also objected to the confirmation hearing, and some of those arguments are related to how they've treated or how they propose to treat his claim.

So I said, when is the next omnibus date?  I was told it's October 22.  I said that's beyond -- 15 days after the start of confirmation and I asked specifically, could we have this matter heard on October 7th at the start of the confirmation?  I was told no.

And so, as a result, because Mr. Melamed suffers potential prejudice by not having any determination on his claim until after the confirmation hearing is over, I had to object.

THE COURT:  Can you explain to me how there's prejudice if -- I mean, claims get adjudicated after confirmation all the time.

MR. ADLER:  Well, he's seeking to be subordinated to that of an equity claim and he filed, as a Class 6A claim, and if he were subordinated to a class -- to a 510(b) claim, he would potentially raise issues concerning the treatment of other classes that are above the 510(b) class in terms of what the payout is and how the calculations were made.

THE COURT:  That's a completely separate issue from his claim objection, though, from the claim and the objection to the claim.

MR. ADLER:  Well, I mean, if his claim is

subordinated, I mean, he doesn't know.  I mean, he would be put in the tenuous position of not knowing where his claim is and having to raise issues that may not even be relevant to what his claim is ultimately determined.

And so, from my perspective, I thought that the best way to have it would be to have a hearing on October 7th, which is what Celsius just got, at least with respect to this legal issue on whether this matter should be arbitrated in Singapore, because to me, that's a straight legal issue and the law of the Third Circuit is pretty clear on how those actions or how those issues are treated.

THE COURT:  How's that going to -- if it's arbitrated in Singapore, how is that going to affect whether or not his claim is subordinated under the plan?

MR. ADLER:  Well, I mean, there's Japanese law at issue here.  We don't know what -- whether -- we expect the matter to be arbitrated in Singapore, but I think that if it were arbitrated in Singapore, Mr. Melamed would not be pursuing his -- the claims that he is thinking about, you know, in terms of if he were subordinated; in other words, it would be off the table, because it's all going off to Singapore, whereas, if we're here, we're asking the Court to interpret Japanese law.  And that's why we submitted declarations of Japanese counsel.

We've, you know, pointed to the fact that

arbitration is -- is required under the agreement.  He has claims -- I mean, stepping back for a second, Mr. Melamed was a co-owner of a company called "Liquid," which was a crypto company in Japan.  And it was a custodial crypto company that got a license from Japan so they, you know, were legitimate.

And at some point, Mr. Melamed, in 2021, 2022 sold his stake in his company to FTX.  But that agreement is all-encompassing in terms of what happens if there are disputes.

THE COURT:  But -- so he's not going to get a resolution on whether or not his claim exists or not, even if -- he still has to come back here.  Even if I determine that he has to go to Singapore, he's still got to come back here to collect on the claim.

So how does -- where's the prejudice here?  I'm missing something.

MR. ADLER:  I think the prejudice is that if he is off in Singapore, his participation, at least with respect to the higher claims, is not front and center.

THE COURT:  Well, couldn't the -- the arbitration in Singapore could rule in a way that would result in his claim being subordinated, couldn't it?

MR. ADLER:  It could.  It definitely could.

THE COURT:  So, again, what's the difference here?  Why do I need to decide this now, as opposed to later?

MR. ADLER:  Well, I mean, I think that --

THE COURT:  He's got to proceed as if his claim might be subordinated and he's got to object to the plan if he wants to object on that ground.

MR. ADLER:  We've objected to the plan, but we reserved rights, with respect to objecting as to or what claims would be raised if he were subordinated.  I mean, we listed them, but we weren't taking discovery on them or -- I think it would make a cleaner confirmation presentation if we could focus on the legal issues that we raise in the objection and not have us deal with the issue of potential subordination.

And I think that Mr. Melamed would not be raising those subordination issues if his matter was off to Singapore at that point.

THE COURT:  Well, isn't that prejudicing himself?  If the Singapore Court rules in a way or the Singapore arbitration rules in a way that would mean that I would subordinate his claim under the plan, he's still got to object to the plan.

MR. ADLER:  Again, he objected to the plan, but he, you know, without knowing where he is in the scheme of the waterfall, it creates problems.  I think the view is that there are less problems if the matter is being adjudicated, per the agreement, in Singapore.

THE COURT:  I still don't see why.  You lost me on

that one.  I'm not seeing it.

MR. ADLER:  I think, Your Honor, I mean, what I would ask is that the -- and I should also note that there are other claims, as well:  claims for salary.  Mr. Melamed was at FTX, apparently, until the sale of FTX Japan was consummated.  He hasn't been paid monies that have been owed to him, director's fees.  He was a representative director of FTX Japan until, I think, July 31st.  He has other related claims, other than the claim under the SPA, which is the stock purchase agreement.

I think that we would ask that the Court, I mean, since it is a straight legal issue, make the determination on whether or not the claim should be arbitrated.

THE COURT:  It's a legal issue, but it's under Japanese law, right?

MR. ADLER:  Say it again.

THE COURT:  It's under Japanese law, I have to determine, right, whether it's -- whether the arbitration clause is enforceable?

MR. ADLER:  Well, the arbitration, the SPA is governed by Japanese law and it states that an arbitration, if there are any disputes -- any disputes under the agreements or related documents, that the matter is to be arbitrated in Singapore.

THE COURT:  Well, it still raises a factual

question about that and the question of Japanese law.  I mean, you submitted a declaration of a Japanese attorney, which, by the way, is not admissible, because it's not properly executed under 1746, 20 U.S.C. 1746.

MR. ADLER:  Right.  We do -- Your Honor, we did submit that under Rule 441, which basically gives the Court the ability to do its own research.

THE COURT:  And I understand that, but, you know, the declaration wouldn't be admissible.  So unless he's here to testify about it.

MR. ADLER:  Right.

THE COURT:  And I'm kind of in the same situation that it was with the Bahamian situation, where I want to hear what the law is on both sides.  I want to give the debtors an opportunity to say, No, their expert on Japanese law is incorrect.

MR. ADLER:  Right.  So, I mean, I think that from -- I mean, from our perspective, if the Court is inclined to grant the extension -- and, I mean, again, we were not opposed to the extension; we just wanted it heard on the first day of confirmation, at least the arbitration issue -- that that go forward on October 7th.  And then to the extent that there's discovery on other matters that is required, you know, we can discuss what the second, you know, phase of that hearing is.

THE COURT:  Okay.  Thank you.

MR. GLUECKSTEIN:  Thank you, Your Honor.  Brian Glueckstein for the debtors.

So, as Your Honor was getting to, these two issues are unrelated.  Counsel and Mr. Melamed under the debtors' position; we've set it out in our objection.

He understands our position that if we litigate -- when we litigate the claim objection, that his claim on the stock purchase agreement is an equity claim.  That will be treated how it's treated under the plan.  Whether this Court determines and liquidates his claim or that ultimately happens in the Singapore arbitration, as Your Honor observed, he has to come here to collect his distribution.

And so the claims process is not affected by confirmation of the plan and vice-versa.  Mr. Melamed has interposed a plan objection.  We will address that plan objection at the confirmation hearing.

But I don't understand what's being -- you know, this idea that we -- let's have argument on the arbitration issue at the confirmation hearing on this question of how to interpret a Japanese contract with potentially, you know, dueling experts.  I'm fairly confident Your Honor is not going to rule from the bench and we're going to proceed to the confirmation hearing in any event.

And so I -- and if you do rule from the bench and

you rule in our favor and his claim -- and we're here, we still have this issue of, is his claim equity or is it not? And if it is equity, he's going to be treated how he's treated under the plan.

So to the extent he has a plan objection, that has been filed. The date to file plan objections has long passed. We are in the process of responding to those objections. We will respond to Mr. Melamed's objection. We'll address it at the confirmation hearing, and then the plan, if it's confirmed, will provide for treatment both, under Class A, as general unsecured claim, and as 510(b), securities claim.

And then at some point in time, like many other claims in this case, there will be an adjudication of the merits of the claim, whether that be before Your Honor, as we think it should be, or in some arbitration, and then the claim, if it's allowed in any amount, in any particular form, will then be treated under the plan. That's how the claims reconciliation process is going to work for every claim.

So there's nothing special about Mr. Melamed's claim that requires action prior to the confirmation hearing. So, from our perspective, the question is, what do we need to do to get the record in front of Your Honor to litigate this claim? The same thing we're doing as we're working through the multitude of claims that we have objected to and will be

84

objecting to as time goes on, both before and after confirmation.  And I think it's pretty clear just from the colloquy today that there are some things, at a minimum, still need to happen, even if it was on the limited question of, does the arbitration clause control, given that it's a Japanese law agreement, before Your Honor can properly address those issues.

And that's all we've been trying to do, and there's nothing that about this that requires us to set a false deadline for just one claim, either at or before the confirmation hearing.

THE COURT:  All right.  Thank you.

MR. GLUECKSTEIN:  Thank you.

MR. ADLER:  Your Honor?

THE COURT:  Go ahead, Mr. Adler.

MR. ADLER:  I just did neglect to note what I said I would come back to, which was one of the concerns, which is -- and we actually filed something this morning -- was -- and the lawyers got back to me yesterday, is Mr. Melamed never received a ballot.  Apparently, on August 14th -- and this is in the declaration -- a ballot was mailed to his former law firm, which was received on August 16th, the day of the voting deadline.  And we submitted the declaration with the postmarks.  We also went crazy that day and got the ballot in at 2:39 p.m., as I recall.  But we have issues with the

balloting, I guess, is just what I wanted to note.

And, again, I think that, you know, I understand what Your Honor is saying, I think that from a sense of honoring the agreement and conserving judicial resources to some extent, it's better to be -- for this matter to be arbitrated or for the decision to be made sooner, rather than later.  And I know Your Honor is a little skeptical of that, but, you know, we can have competing Japanese law declarations here, but I think that, you know, the agreement is pretty wide in scope in terms of the fact that everything that Mr. Melamed has -- you know, all of his claims, which include salary, bonus, director's fees, all, you know, encompassed within that provision to arbitrate.

THE COURT:  Okay.  All right.

Well, as I've said, I simply don't see how it's necessary to decide the question of whether or not Mr. Melamed's claim should be arbitrated in Singapore or be handled here, in this court, prior to the confirmation hearing.  Even if we went forward at the confirmation hearing, I think Mr. Glueckstein's prediction is probably correct.  I'm not going to rule from the bench on that issue, nor are we burdening the confirmation hearing with other matters already.  And I learned my lesson no Mallinckrodt not to add too many things to a confirmation hearing before we get started.

So, I'm going to grant the motion to continue this matter until the 22nd of October.  And I'm going to give the debtors an opportunity to submit whatever additional Japanese law experts they want to provide and it's going to be an evidentiary hearing.  I mean, I'm going to want to hear from these -- this isn't like -- earlier in this case, we had the issue about whether English law was going to apply to some of the things and I said, Well, in English, it doesn't matter. I can read English.  I can understand English and I can read the law and I can know what it says.

I'm not going to know what the Japanese law says. I'm going to have to rely on the Japanese experts to tell me what it says.  So I need to have those experts here to testify about that.  So we'll continue the hearing until the 22nd and proceed that way.

MR. ADLER:  One last question, Your Honor.

Do you want us to agree on a discovery schedule?

THE COURT:  Yes, please.  Please do.

MR. ADLER:  Okay.  All right.

THE COURT:  Please meet and confer, come up with a discovery schedule, and submit something under COC.

MR. ADLER:  Thank you, Your Honor.

MR. LANDIS:  Thank you, Your Honor.  Once again, Adam Landis from Landis Rath & Cobb, on behalf of the debtors.  That brings us to Item 44 on the agenda.

THE COURT:  You can leave, Mr. Adler.

MR. LANDIS:  Safe travels, Mr. Adler.

That brings us to Item 44 on the agenda, which is the Defendants' motion to stay the adversary proceedings in the Embed adversaries.  Let me turn the podium over to the movants.

THE COURT:  Thank you.

MR. MURLEY:  Good afternoon, Your Honor.  Luke Murley of Saul Ewing.  We're Delaware counsel to Michael Giles, *et al.*, the list of parties that are attached to our motion.

I rise to introduce Erica Richards of Cooley, who will be handling the argument from our side, Your Honor.

THE COURT:  All right.  Thank you.

MS. RICHARDS:  Good afternoon, Your Honor.  Erica Richards of Cooley, appearing today on behalf of all the Defendants in both of the adversary proceedings, Giles and Rocket.

It's been a little while before we were -- excuse me -- it's been a little while since we were before Your Honor.  If you tell me, you don't need it and I should skip it, I will, but I was planning to reintroduce what the claims are about and cover a little bit of background so you can have some orientation before I get into the motion.

THE COURT:  Go ahead.  It has been awhile.  I was

hoping you guys would settle and I wouldn't have to deal with this, but ...

(Laughter)

MS. RICHARDS:  I have some things to say about that, Your Honor.

The Defendants in these cases, and there are currently 103 of them from my count, individuals and entities, they're all former investors, employees, and with respect to Michael Giles, a founder and principal of Embed Financial Technologies, a software firm that developed software.  And its business, together with its subsidiary, Embed Clearing, which was a licensed broker-dealer, clearing from the custodian, they allowed customers to use a software-enabled platform and execute conventional securities trading. Conventional only, no crypto.

The debtor WRS acquired Embed in a merger transaction that closed September 30th, 2022.  Six weeks later, FTX collapsed and these cases were commenced.  These two adversary proceedings were commenced approximately five months later on May 17th, 2023.

The complaints are seeking to avoid the transfers made to the Defendants in connection with the Embed acquisition.  The complaints assert constructive fraudulent transfer claims, actual fraudulent transfer claims, with respect to one payment I'll address in a minute, a preference

claim.

The Plaintiffs are three of the debtors:  WRS, which was the debtor that actually acquired Embed and is its parent company, owns Embed, and two other of the debtors. It's the FTX U.S. entity or WRSS and Alameda Research.

WRS is the debtor that actually made the payments to the debtors.  The Plaintiffs' complaint alleges that those amounts first transferred from Alameda to WRSS to WRS and then to our clients.  And in very round numbers, the amounts that are at issue are $243 million for payments made to investors for their equity interests, a $55 million retention award to Mr. Giles, that was made on the merger closing date, and the avoidance of contractual obligations for unpaid, post-closing retention awards they allege WRS is obligated to make to a number of other employee Defendants and those retention awards total $7.85 million.

So those are the parties and the claims, now, I'll just give you a quick timeline, status of the case, how we got here today, how things have unfolded.  As I said, there's 103 Defendants now.  A few have been dismissed and settled. They are located in a wide variety of geographic locations.

So the cases filed in mid-May.  It took a couple of months for everyone to get served, everyone to get retained, everything to get settled.  That was largely complete by July 18th and that's when the first case

management order was filed on the docket.  It set the timeline for discovery, as agreed by the parties, from fact discovery through summary judgment briefing.

And the deadline, the complete initial fact discovery under that CMO was April 5th of this year.  That CMO was modified and amended a number of times by agreement of the parties. The last version was entered by the Court on February 22nd of this year, and that had moved the final fact deadline, deadline to complete fact discovery, to June 28th, 2024.

The briefing schedule for the motions to dismiss never changed and, consistent with that schedule, the parties filed briefings.  So our motions to dismiss were filed on August 15th, 2023, all of the defendants either filed or joined a motion to dismiss.  The briefing was completed by October 20th, 2023.  The defendants requested oral argument in a filing on October 27th.  There were lots of schedules to coordinate, the Court's calendar, intervening holidays.  We did not get a hearing date set until mid-January and the date that was set was February 6th, and then it was adjourned two more times because of illnesses, conflicts.

So when we finally had oral argument before Your Honor it was approximately four months after the briefing. It was Leap Day, if that matters, and we present our arguments.  Your Honor took it under advisement, and you were aware that documents regarding mediation had been filed on

the docket.  And we confirmed that we had all agreed we're going to begin mediation shortly since we buttoned up a few final things.  You advised that it would not be a good use of judicial resources for you to be working on the ruling if we were going to settle, so you let us know you would not start working on the ruling unless and until the parties advised you that mediation had not resolved the issue.

We also asked for a stay of discovery during that period, the debtors didn't object.  So pencils down on discovery at the beginning -- sorry, at the end of February.

Judge Chapman was approved as a mediator on March 8th, and mediation continued for the next five and a half months.  No settlements were reached with any of the 103 defendants, all of whom participated in mediation with counsel.  That was reflected in a final report filed by the mediator on August 21st.

We promptly reached out to the debtors to ask if they would consent to continue the stay that had already been in place during the mediation.  They obviously didn't agree and send us their proposed scheduling order, but they did agree to hear this motion on shortened notice so we get this issue resolved and move things forward.

So, unless you have questions about sort of where we are, I'll go ahead and turn to the next --

THE COURT:  Where does discovery stand?  I saw in

the papers that there had been some exchange of documents. Is document discovery completed already?

MS. RICHARDS:  No, no --

THE COURT:  What needs left --

MS. RICHARDS:  -- it's not, Your Honor.

THE COURT:  -- what's left -- what is left to be done?

MS. RICHARDS:  So I can give you some broad strokes.

THE COURT:  Just on documents, not on the rest of it.

MS. RICHARDS:  Yeah.  So there were still two months left of fact discovery when we went into mediation, when you paused it.  So, much had been done.  I know that we have documents, and we went pencils down and haven't reviewed them.

There are a number of documents that -- and I don't have quantity, I can get that for you -- a number of documents that were in the custody of Embed's counsel, and there were privilege issues because they were pre-merger and other counsel was involved.  I believe they're the debtors' documents, but we have to review them for privilege.  It's a little complicated, we haven't gotten to that yet.

There are three other defendant counsel, I don't know if they intend to serve any more discovery requests or

what is outstanding there.  Like I said, I know we have responsive discovery that came in that we have not even reviewed yet because we went pencils down and the discovery period was paused.

That's just the document discovery, and then, of course, there's expert discovery, depositions.  We anticipate given the number of parties here, the number of entities, that there could be, I mean, a dozen depositions, maybe more, plus some third parties who get deposed.  So there's a lot to be done still.

THE COURT:  Okay.

MS. RICHARDS:  Turning to our stay relief motion. So, all the defendants support the relief.  And of course our papers cite the three factors that Courts in Delaware consider when deciding whether to grant a stay motion.  The first is simplification of the issues; the second is what is the status of the litigation, particularly has discovery been completed and has a trial date been set -- neither of those things is true here -- and, number three, would a stay cause the non-movant or plaintiffs to suffer undue prejudice from any delay or allow the movants to gain a clear tactical advantage.  Our papers go through each of these factors and explain why all of them in these cases weigh in favor of a stay.

We cite cases explaining why that's the case.

Plaintiffs filed their objection, our reply responded to each of the points they raised. I don't want to repeat what's already in the papers and that you have.

So, with that, I would go a little off-book and hopefully address those factors in a way that may be of use to you. In particular, what I want to think about is we have these three factors, but on top of all that it's up to the Court's discretion how do you weight these factors against each other, how much do they matter against the broader context of the case. These are fact-specific issues that are not found in any other case, everything is specific.

So, rather than go through each specific issue separately, I want to explain how all those factors fit together and are even stronger when you consider them together weighing in favor of a stay, and how they fit into the larger context of these cases and how they compare to some other rulings I know Your Honor has made in other adversary proceedings where defendants sought a stay of discovery and Your Honor denied those requests.

So to start, to cover that point, how do the three factors in support of a stay fit together, because they really do in this case. I think the point in our motion that illustrates this in a really elegant way is actually one that the debtors, plaintiffs, didn't even respond to, and that is a stay here will facilitate a settlement of these cases.

It's still possible before we engage in further litigation.

Your Honor, unfortunately, will have to do something I'm sure you weren't wanting to do and going to have to issue a ruling, but this issue that the stay will facilitate a settlement, it doesn't fit into -- neatly, right, into any of the three factors, it really goes to overall judicial efficiency as sort of the umbrella consideration. And so it pulls in all those factors, they all say settlement, the ability to get to a settlement should be really important.

So the first point. Obviously, what happens in mediation stays in mediation. I'm not going to disclose anything parties said or what they did, but I will make explicit what I know Your Honor can easily infer, which is that no settlements among 103 defendants and the plaintiffs were reached over five and a half months of mediation because the parties have really different views. And you can guess what those views are, right? The plaintiffs think their claims are really strong and will survive the motions to dismiss, the defendants do not share that view. One or both sides are wrong about something. We're wrong, someone is wrong. The only way to sort that out is for you to issue your ruling.

Someone is going to have to move, right? Someone will have a "Come to Jesus" moment, maybe everybody. The gap

will close.  I don't know who will move, how close together we get.  Things will change after the ruling happens.  That doesn't mean we'll end up close enough to achieve a settlement, it doesn't even mean we'll resume settlement discussions, right?  But everyone will have to consider it; will have to think about it.  So that ruling presents an opportunity to still settle these cases before any more resources are expended, time is wasted, discovery is happening, we can stop it if the stay is put in place.

And why do I say that?  There are three reasons.  Number one, the parties are in violent agreement that a lot of resources have already been spent on the discovery, on the process.  But, as we just covered, there's still a lot to do, it's going to cost a lot.  That doesn't matter so much to the plaintiff, not only because, as we mention in our papers, they have more resources, they just do.  But, even more relevant, they're spending money to get what they think or hope will be more money, and they control if that stops, right?  They're the plaintiffs.  If they don't want to prosecute the claims anymore, they can move to dismiss it.  It's up to them and they think they're going to make money at the end of the day.

Contrast that with defendants.  They are never getting money back from the plaintiffs, they're defending claims.  At best, the claims will get dismissed and the

defendants will just be out legal costs, and they have no decision to walk away, it's in the plaintiffs' control.  All in, this means every dollar the defendants spend that they don't want to be spending on discovery is a dollar that could have been used to pay for a settlement.  So, if you stay discovery and they are not pushing their limited resources out the door to get nothing back, they can put that money towards a settlement.  That's one reason why a stay would really facilitate the possibility to still have a settlement.

The second point:  the plaintiffs here don't need the discovery to reassess settlement.  In fact, they have most of the documents that are going to be relevant because it's about the Embed acquisition and aside from those documents I mentioned that are at other counsel that need a privilege review, everything else is in the debtors' contract because WRS owns Embed.  So they have all the records, the files, the emails, the communications, they've been able to review those documents while we are in mediation and everything is stayed that we haven't seen.  They haven't been prejudiced by the stay yet and they won't be; they have what they need.  The thing that will help facilitate a settlement, again, is your ruling on the motion to dismiss.

The third point.  As I said, we think the plaintiffs, they actually have most of the stuff that will be relevant here and, despite that, the defendants and

plaintiffs respectively, the discovery has been relatively reciprocal.  And I say that because the debtors had a document production number in their objection.  We are excluding a data dump of 162,000 documents that were already on a DOJ database.  We attached the letter where they explained what that was to our reply.  It was a bunch of documents that they already had on a server, the just ran like a key term search, which, if you look at it, obviously pulled out 162,000 documents.  Most of those are not going to be relevant.  They expended virtually no effort to pull those out, right?  They ran a search, dumped it in a folder, gave us access to the platform.

So if we're comparing the effort people have put in, what they've expended, it's fair to exclude that because the debtors didn't really work hard, that wasn't an effort for them, and we didn't get anything because that was a huge data dump with documents that were generally not responsive. It would be more burdensome for the defendants to try to sort through all those documents and find something good than probably any benefit we would get.

So, putting aside those documents, the debtors have cumulatively produced 62,200 documents, round numbers, to us, we've produced collectively 64,000 documents to them. It's pretty equal.  And maybe they can talk about timing and when people put things in, there's more to do, sure, but so

far to date, when discovery is paused, the parties are on equal footing.  If that remains the case, the case is stayed, then, again, there's a better chance to facilitate a settlement because status quo will have remained the same; the parties know where they're at, we know the information we have.  Your ruling is what we need.  Everyone will know where we stand.  If the stay is lifted and defendants have, again, incurred these costs that are a bigger burden for them, for all these reasons, it shifts very quickly and where the ruling might have enabled them to reach something in the middle, it begins to skew.  And, again, it's disruptive and makes it a little less likely that we would be able to still settle before anything else goes forward.

Okay.  So that was just an illustration of how these three factors all weigh in, right?  Where we are in the discovery, what will be simplified?  These whole cases could be resolved and the stay is really what will protect that.

Prejudice to the parties.  To really talk about that point, I want to build some context and talk about the two adversary proceedings where Your Honor has already ruled on other motions to stay.  Those motions came up in the Lorem Ipsum adversary proceeding, that's 23-50437, and the Kives -- I don't know if I'm saying that right -- Kives adversary proceeding at 23-50411.

So in both of those cases -- reading the docket, I

wasn't -- no, I've read the pleadings, I wasn't involved, but from what I've gleaned from the parties' filings and Your Honor's ruling, in those cases, the defendants filed motions to stay, they had either filed -- or produced very few documents or none at all, and they were seeking to stay discovery.  On the other hand, the plaintiff had already produced lots of documents.  And they said the substantial resources, right, we've already expended in discovery to date weighs in favor -- or weighs against a stay because we would be prejudiced, plaintiffs' argument.  The part that is missing there is because it's one-sided.  You know, we've expended resources, we've given discovery to the other side, and the other side has just done nothing, right?  This is different for all the reasons I discussed.

So in those cases, to the extent that was an important factor, that unfairness, that prejudice, sort of looking like bad faith and a tactic and the plaintiffs would be harmed, that's not present here.

The second thing.  In both the Lorem and K5 adversary proceedings the plaintiffs made the point that the defendants could have filed their motions earlier and the fact that they didn't, were sort of filing it later, would allow the Court to infer that the motions were filed in bad faith.  That prejudice, tactical advantage point.  They made that argument here too, but, again, these are different.  In

Lorem, looking at, again, the plaintiffs' papers, the defendants' stay motion was accompanied by a new motion to dismiss based on information that they could have pulled together and objected to months before.  And both of those pleadings were filed just before the discovery deadline, and this is the defendant who had produced nothing.  So, not only had they produced nothing, they had filed this late stay motion coupled with what plaintiffs described as a frivolous motion to dismiss that had not yet been fully briefed.  They just filed the motion to dismiss, plaintiffs hadn't responded yet.  Sort of a Hail Mary, a bomb throw.

That's not the case here, right, as we've just discussed.  We filed when circumstances had changed, and it's clear that it will help and it's clear that all the factors support the stay.

I will also touch on the Kives point, the timing there again.  In that case, the case management order was different.  Fact discovery wasn't scheduled to start until after the motion to dismiss briefing happened.  So whatever was happening with timing there and whatever the arguments were, it's just different.  Whatever the basis for that ruling was shouldn't control here.

And that brings me to timing generally.  Both of those cases, those motions to stay were filed November (indiscernible) February, around the time when our discovery

was stayed because we went into mediation.  So we didn't have to think about whether we were going to file a motion. Candidly, we thought about it, and we were monitoring those other rulings.  And then we finally got oral argument started, went into mediation, it became a moot issue.

Since that time, our landscape has changed.  The uncertainty about where those cases were headed has substantially resolved.  We know confirmation is a little less than a month away.  There's no guarantees.  I know we're going to be very busy, it's going to be very busy.  There are no guarantees, a lot of things can move.

It's clear that whatever recoveries are going to come from the Embed plaintiffs -- excuse me, the Embed defendants, they're not going to really move the needle, they're not going to change timing for anything.  Plan confirmation, the ability to confirm a plan, doesn't depend on our litigation because it's happening whether the stay is granted or not.  They're not tied together.  Whether the stay is lifted or not, they've got their confirmation hearing happening; whether the stay is lifted or not, they'll be able to make whatever distributions they're going to make. There's no meaningful prejudice to the plaintiffs, to the estates, to the creditors if the stay is imposed, and everything to gain because we could still settle this, the clients will have potentially more money to fund a

settlement.  It is better for everyone to have things holistically in terms of efficiency, in terms of prejudice, in terms of the best use of the Court's time if the stay is granted.

So, unless Your Honor has any questions --

THE COURT:  No questions.  Thank you.

MR. DECAMP:  Good afternoon, Your Honor, Justin DeCamp for the debtor plaintiffs Alameda Research Ltd., West Realm Shires, Inc., and West Realm Shires Services, Inc.

I think it's interesting, Your Honor I think began in the right place here with the question of what remains to be done in discovery because it's not clear at all from the defendants' motion here what actually does remain to be done and what kind of burden that's going to impose on them.  And the answer is, as far as we were aware, in terms of document discovery, not that much is left to be done.  Many of the defendants told us they have little or few or no documents. They've produced what they had or so they said.  Ms. Richards is correct that the debtor, plaintiffs here have the Embed documents, we have produced them a long time ago to the defendants, they have those.  We also produced a lot of documents that have been produced to DOJ because they were responsive to the defendants' requests.

So, you know, from our perspective in terms of document discovery, we may have a few follow-up requests to

make, we have to identify maybe some deficiencies in what's been produced to us, some gaps to follow up on, but we think document discovery is largely finished.

THE COURT:  Well, Ms. Richards said they still have documents they need to review for privilege that they haven't produced to you yet.

MR. DECAMP:  That's correct, Your Honor, but that's -- I mean, frankly, that's their issue and those documents, you know, we notified them about those documents a long time ago.  It's a contractual provision in the sale agreement that they own the privilege over some documents that are actually in the possession of the debtors, we didn't look at those.  And we told them about that provision, they didn't get back to us for a long time.

We're ready and willing to make those documents available any time they want them to look at, to come up with an efficient way to look at them, but we don't think that's an excuse for a stay here.

I want to address this issue that the defendants rely very heavily on that somehow further delay and a stay of discovery, an extension of the stay of discovery that's been in place now for over six months is somehow going to facilitate a settlement.  The best, you know, chance we had for a settlement, an early settlement, was through mediation before a highly qualified former Federal Bankruptcy Judge,

Judge Chapman, which we did and it was not successful.  And it's really -- you know, if the long reprieve from discovery that the defendants had during the mediation didn't, you know, facilitate a settlement, I don't know how continuing that stay now is going to do so.  You know, that argument just really makes no sense.

In terms of the resources that have been spent and this idea that somehow there's some kind of financial disparity between the parties here that Counsel is in favor of a stay, you know, both parties invested resources in discovery.  That is a factor that courts consider on stay motions.  The amount of discovery that took place here, the fact discovery went on for six months, there was a scheduling order put in place.  The parties exchanged initial disclosures, they made numerous document requests on each other, they provided -- hundreds of thousands documents were exchanged in the course of that.  Interrogatories were served, we were about to respond to those when the stay was put into effect.

So a lot of fact discovery did take place and that weighs against a stay.  But in terms of financial disparity, that issue, you know, we saw that and we're puzzled by it because, obviously, we are estate fiduciaries, we have to maximize the value of the estate for the benefit of creditors, and that's what we're doing here.  The idea that

we have a $10 billion, you know, quote-unquote, "war chest," and the defendants here are crying poverty that they can't afford to litigate is just ridiculous.

The defendants here were the beneficiaries of cash payments of almost $300 million that went out of the debtors six weeks before the collapse of the FTX Group.  So, you know, one of the last major expenditures that went out of the estates, what became the estates just prior to the collapse. And the defendant Michael Giles and his corporate entity, whom Ms. Richards represents, personally received 157 million of that himself, and then the remaining defendants received the rest.

Apart from the fact that they received a substantial payout in absolute terms, the pre-acquisition investors in Embed who, if you read the briefing, come off as like these little, you know, poor entities that can't afford to litigate, they made a spectacular return when FTX bought Embed at a wildly inflated price.  On average, they more than tripled their short-term investment and, in the aggregate, they made a profit of over $87 million, that's on top of the principal, they got back their principal plus $87 million in profit.  And as we've made clear in various filings, Embed was a fledgling company with *de minimis* revenue, almost no customers other than FTX itself, and buggy, unfinished technology turned out to be essentially worthless.  And Mr.

Giles himself, again, who got 157 million out of the deal shortly before the collapse of the FTX Group, when the company was put up for auction, he said he would bid a million dollars for it.

So, you know, one of the things that the plaintiffs -- I'm sorry, the defendants focus on in their papers -- Ms. Richards didn't really touch on it, but I did want to mention it because it's in their papers -- is the idea that somehow a ruling by the Court on the security safe harbor in favor of the defendants would avoid the need for discovery on the value of Embed. And, you know, we thought that was pretty telling. We think they want to avoid that discovery at all costs. They don't want to deal with the fact that this company really was essentially worthless and that discovery is going to show that, expert discovery.

But in any case, even if the Court were to rule that the security safe harbor applies here -- and we don't think it does for all the reasons we argued at the motion to dismiss -- that would not obviate the need for discovery on the value of Embed, and in fact even the defendants here don't argue that it would obviate the need for the depositions that they say have to take place. The depositions of fact witnesses are going to take place regardless.

On the security safe harbor issue, you know,

clearly the defendants here, even if the constructive fraud claims were dismissed and, again, they shouldn't be, would -- they would certainly make an argument that they took in good faith for value, and they'll make a defense based on that and they'll try to get some credit for what they sold to FTX, and that's going to require expert discovery on valuation in any case on the actual fraud claim.  So that's not going away either.

So it's not clear what exactly is going to go away, why the defendants need this stay now when they conducted discovery for six months, the scheduling order was put in place over a year ago, fact discovery was more than halfway over, what is it about now other than the fact that the defendants have had a long vacation from discovery and they're now faced with the prospect of having to litigate again and engage in discovery, and they just don't want to do it and that's not a basis for a stay.

THE COURT:  Well, Mr. Glueckstein in part argued in the Celsius issue, Judge, don't lift the stay because it will distract us from confirmation which is October 7th, so why shouldn't I do the same thing here?

MR. DECAMP:  Well, Your Honor, I'm not working on confirmation.

(Laughter)

MR. DECAMP:  Certainly these folks over here are

not working on confirmation --

THE COURT:  I don't think Mr. Glueckstein is going to be working on the litigation matter up in New York either, but --

MR. DECAMP:  Yeah, yeah -- no, but we want to proceed with all of these avoidance actions expeditiously. We think, you know, the mandate from Congress to Bankruptcy Courts is to proceed with all matters affecting the estate expeditiously.  We don't see any reason a stay should be put in place here.  This is ordinary course litigation, it's an ordinary course avoidance action, we're the plaintiffs, they're the defendants; they have to litigate the case.  We don't see any basis for a stay here.  Nothing is going to change that's going to dramatically, you know, affect the discovery that's got to be done.

And, you know, again, Ms. Richards didn't focus so much on the factors here, but if you look at the narrowing-of-the-case factor, which is something that courts do consider, you know, that's not something where courts engage in some kind of predictive analysis of how the motion to dismiss is going to be decided.  There are certain outcomes where the defendants benefit, there's outcomes, obviously, where the case remains the same, plaintiffs benefit.  So that we think is, at best, neutral.  We don't think that the stay would simplify issues for trial for that reason.

And in terms of where the case is, I've mentioned we engaged in substantial fact discovery already, we think it's more than half over.  We're not sure, you know, why the defendants here would argue that there's lots of documents left to produce.  If they have them, they should produce them.  But we think really all this is about is giving a tactical advantage to the defendants or at least putting the plaintiffs at a tactical disadvantage.  I think it's clear from the papers that the defendants submitted and from Ms. Richards' argument that, you know, they want to just run out the clock as much as they possibly can.  They feel like, you know, we've submitted a plan that provides for a substantial payment to creditors, there's money that's being collected that will go to creditors, and maybe if things go on long enough, you know, we'll stop paying attention to them.  I can assure Your Honor and the defendants that is not going to happen.  We are going to vigorously prosecute this case for as long as we can, and so it's not going anywhere.

We've asked Your Honor in our opposition that the Court, as an alternative to a stay that you deny the stay, obviously, but that you order a schedule and you schedule in the case to take account of the time that was lost to mediation.  We proposed a schedule as an exhibit to our opposition brief, we're happy to confer with the defendants about that schedule.  I would suggest that's probably the

best solution here is to find mutually-acceptable dates that work for both sides that take account of the six months that we lost when mediation was pending, but not that a stay be issued.

THE COURT:  All right.

MR. DECAMP:  Thank you, Your Honor.

THE COURT:  Any response?

MS. RICHARDS:  Erica Richards, Cooley, Your Honor. I'll just respond to the points that Mr. DeCamp raised.

So to revisit what still has to be done, it's not just the document discovery, and we still had a period of time to do that.  So to say, aren't you almost done, we still had time, other parties still had time.  There is still work to be done.  Beyond that, there are the depositions, there are the expert reports.  That's a burden and --

THE COURT:  Other than the documents that you say you need to do a privilege review on, how many -- well, first, how many are there?  Do you know how many?

MS. RICHARDS:  I don't have that number.

THE COURT:  Do you have a guestimate of how many? Are we talking thousands, tens of thousands?

MS. RICHARDS:  Yeah, I would say tens of thousands.

THE COURT:  Okay.  And, other than those documents, do you have any other documents that the

defendants need to produce?

MS. RICHARDS:  We have documents that have been produced to us that we haven't reviewed yet and, because we went pencils down, the attorneys who are staffed on the matter, their availability has changed.  So we would need time to re-staff, get potentially new parties up to speed, and get that process started again.  So it's not push a button and we're ready to go.  We have to ramp back up, pull it together, bring some new parties up to speed.

As to burden, right, for having been stayed, that is still worth it for the other reasons I discussed.  And it's not about hoping plaintiffs will forget about us.  As I said, we are aware that plaintiffs are the ones in control; they'll decide if they want to drop it, I don't think they will.  And the fact that they don't care if the discovery is relevant based on the ruling you'll ultimately make, I think, says everything you need to know.  Just because you're doing something fast doesn't mean it's a good use of money, right?

THE COURT:  If I was to grant your motion to dismiss in total, is that a complete dismissal of the case or is anything still going?

MS. RICHARDS:  If you -- if you granted --

THE COURT:  If I were to grant your motion to dismiss, does that completely resolve the case or is there still issues outstanding?

MS. RICHARDS:  The motion to dismiss would dispose of the claims in their entirety, all of them against every party.  We have -- we've raised defenses to everything.

THE COURT:  Okay.  And that's mostly the 546(e) defense?

MS. RICHARDS:  I wouldn't say it's mostly the 546(e) defense.  So the reason we highlighted that in our papers is because it's one defense; it's not factual, it's a pretty clear legal issue.  There's precedent in other circuits, it's not ruled on in this circuit, but Your Honor wouldn't have to reinvent the wheel, and it disposes of a vast majority of the claims in --

THE COURT:  Oh, I've been doing 546(e) -- it seems like that's all I do anymore is 546(e).

MS. RICHARDS:  My colleagues said why don't -- why doesn't every deal just look like a securities transaction and then nobody ever gets sued.  That's not really how it works, right, but -- so it's an issue the Court is familiar with.

It could take care of a lot of claims against a lot of defendants.  And Mr. DeCamp said that doesn't matter, it doesn't matter if you can't bring constructive fraud claims, we're still going to get to take full discovery on all your value, we're still going to depose everyone.  Why? Because what he left out is we're not immediate transferees,

114

right?  This is another point in the motion to dismiss.  I don't want to get into the merits, but we have an argument that we're subsequent transferees.  If we paid one value and Mr. Giles worked one day, if the employees who had obligations stayed one day after the merger closing, that's enough value for a good faith transferee.  Why do you have to take valuation discovery in that case, why do you have to put up an expert?

THE COURT:  How am I going to decide those on a motion to dismiss?  I don't know how long they worked, if they worked at all after the transaction.

MS. RICHARDS:  The -- it's clear from the plaintiffs' complaint actually, Your Honor.

THE COURT:  Okay.

MS. RICHARDS:  Yeah.  They have --

THE COURT:  All right.

MS. RICHARDS:  -- they have the dates employees quit.  Mr. Giles earned his retention bonus by staying employed through closing, which he did.  The securities investors gave up their equity investments.  Everyone gave value under the plaintiffs' own allegations, but I don't want to do what Mr. DeCamp did because you don't have to talk about the merits, right?  This isn't about the merits.

I will say, Mr. DeCamp gave you his version, we obviously have a different version, a different view of the

facts.  Our client would like very much to tell his story, but we are hoping he doesn't have to.  We're hoping we get your ruling and then we can go settle.  And Mr. DeCamp said they've already had a stay for so long and we still didn't settle.  A stay doesn't help settlement.  With due respect, he's being a little disingenuous.  It's not the stay that will make the settlement possible, it's the ruling on the motion to dismiss that will cause the parties -- I mean, as I said, someone or lots of people are wrong.  If defendants have paid a bunch of money out the door in the meantime on discovery, especially for claims that are dismissed, they don't have much left to settle.  And it's not that we're pleading poverty, but, as I said, defendants are never getting money back and they don't have a bunch of other people to go sue to get this money.  Yes, they got money from the Embed transaction.  The amounts that Mr. DeCamp cited for you are gross taxes.  The money that they got in their hands years ago is not actually the money in the transactions.

And, again, if you want to get all those funds back, that becomes harder and harder if our clients have been paying for unnecessary discovery in the meantime.

Last point.  Mr. DeCamp called this an ordinary course, run-of-the-mill avoidance action.  We think it's anything but, Your Honor.  It sounds like it, which is why they filed it so quickly, but the reason we feel strongly

about our motion to dismiss is because there are so many issues.  Plaintiffs have problems.  They haven't even made clear what the transfer is they're trying to recover.  They can trace the funds, but they can't trace the funds, that everything was commingled, but it wasn't.  You're immediate transferee, but we're actually looking over at this debtor.  I mean, we think there are problems.  It's not just 546(e), there are problems; they have lots of problems with their claims.

So we don't think it's regular ordinary course.  We're not trying to run out the clock, we're trying to figure out whose view is wrong and see if we can make something happen once we get that ruling.  It's not that the stay will make us settle, it's that the stay will make sure we still have money to make that settlement happen.

THE COURT:  All right.  Thank you.

MR. LAUFER:  Your Honor, I am Greg Laufer from Paul, Weiss, I represent some of the other defendants.  If I just may be heard quickly?

THE COURT:  Sure.

MR. LAUFER:  Unless Mr. DeCamp wanted to speak again, I wasn't sure.

MR. DECAMP:  Well, maybe I might after Mr. Laufer since --

MR. LAUFER:  I didn't know if you wanted --

MR. DECAMP:  -- he didn't speak before, but --

MR. LAUFER:  -- after Ms. Richards.  I'm going to be very quick.

THE COURT:  I thought she represented -- she said she represented all the defendants.

MR. LAUFER:  She does -- well, no, she is speaking on behalf of all of the defendants.  I represent about 40 percent of the defendants or so, Ms. Richards and Cooley represent the other 60 percent.  We obviously sign onto and adopt all of the arguments that Ms. Richards just made, we joined the motion and we fully support it.

There was a lot of talk just now about factors and all sorts of characterizations about motives and the facts. Can I just boil this down to something very, very simple? We're here on a stay motion.  We're not talking about Bahamian law or Japanese arbitration law, it's really simple. There is a lot to do in this case.  I don't have an exact count for you, there are still, as Ms. Richards said, tens of thousands of documents to produce from dozens and dozens of individuals and venture capital firms and others who invested in this company.  A lot of people to coordinate from, lots to do.  And it's not just the documents, you then have depositions and expert discovery.  So we can't whitewash that or camouflage it; that is just a fact.

We have a very strong motion to dismiss.  They

obviously disagree, we had argument.  I stood here at this podium and argued it.  If we win that motion to dismiss, the case goes away and none of our clients have to open their files any more than they already have -- and they have, by the way, they've produced documents in response to the requests -- but if this case goes away either in whole or in part, the scope of discovery will be dramatically changed or eliminated all together, and we think that that motion is so meritorious that I think that there is a very, very strong chance that the case will go together completely.  And, in light of that, a stay is warranted.  I am not going to presume.  You obviously have a very, very busy docket, I don't know how long it will take you to rule on the motion, but the fact of the matter is this case has been pending for over a year.  The stay that they didn't object to on the other side has been in force now for some five and half or six months.  Another few months or even something beyond that is not going to kill anybody.  There is just no reason for our clients to spend time and money or, frankly, for the estate to want to expend resources on a litigation that may not be going anywhere.

So what we would ask is just keep the stay in place for some period of months, and if you even want to put a term on it, we can come back to you and see where things stand in terms of your consideration of the motion.  But I

just don't think it makes any sense from an efficiency standpoint, nor a judicial economy standpoint, for all of us to reengage in a very, very robust, comprehensive discovery exercise when the case might go by the wayside very soon.

Thank you.

THE COURT:  Thank you.

Mr. DeCamp, do you want to respond?

MR. DECAMP:  Just very briefly, Your Honor.  I'm not going to rehash all the points, but we don't think the factors weigh in favor of a stay here.

The one thing I did want to point out and just make very clear is the timing of this motion is highly unusual.  If you look at cases, usually a lot of the time defendants make this kind of motion when they file their motion to dismiss, here the motion to dismiss was filed I think almost a year ago, you know, fully briefed even a year ago.  So it's surprising to us that this motion was made now, we don't see any basis for it now.  We just had a lengthy stay of discovery, that did not facilitate a settlement, and we think the best way to deal with this case is to get it back on track and get discovery going again and we think that actually may facilitate a settlement.

So that's all, Your Honor.  Thank you.

THE COURT:  Thank you.

All right, here's what I'm going to do.  We've had

a stay in place for five and a half, six months already, I'm going to continue that stay for another 30 days only, and I will endeavor to issue my ruling within that 30-day period and I think that won't be a problem.

In the meantime, the parties should meet and confer and come up with a new scheduling, order, assuming that the discovery is going to go forward after that 30-day period ends.  So you can get ramped up, you can get your lawyers in place and be ready to go, and hit the ground running in 30 days if I don't dismiss the case.  Does that sense?

COUNSEL:  Yes, Your Honor.

THE COURT:  All right.  Anything else for today?

MR. LANDIS:  Your Honor, I don't think we have anything else.

THE COURT:  Okay, all right.  I guess we need a form of order on this one.  I guess the parties should meet and confer and come up with a --

MR. LANDIS:  We'll meet and confer and something will be submitted under certification, Your Honor.

THE COURT:  Okay, thank you.

All right, thank you all very much.  We are adjourned.

(Proceedings concluded at 3:57 p.m.)

CERTIFICATION

We certify that the foregoing is a correct transcript from the electronic sound recording of the proceedings in the above-entitled matter to the best of our knowledge and ability.

/s/ William J. Garling                    September 13, 2024

William J. Garling, CET-543

Certified Court Transcriptionist

For Reliable


/s/ Tracey J. Williams                    September 13, 2024

Tracey J. Williams, CET-914

Certified Court Transcriptionist

For Reliable


/s/ Mary Zajaczkowski                     September 13, 2024

Mary Zajaczkowski, CET-531

Certified Court Transcriptionist

For Reliable