# EXHIBIT 4

UNITED STATES BANKRUPTCY COURT
DISTRICT OF DELAWARE

|  |  |  |
|---|---|---|
| IN RE: | . | Chapter 11 |
|  | . |  |
|  | . | Case No. 22-11068 (KBO) |
| FTX TRADING LTD, et al, | . |  |
|  | . | 824 Market Street |
|  | . | Wilmington, Delaware 19801 |
| Debtors. | . |  |
| . . . . . . . . . . . . . . . . | . | Tuesday, May 14, 2025 |
| FTX RECOVERY TRUST, | . |  |
|  | . | Adv. Proc. No. 24-50184(KBO) |
| vs. | . |  |
|  | . |  |
| GATE TECHNOLOGY INCORPORATED, | . |  |
| GATE GLOBAL CORP., GATE | . |  |
| INFORMATION PTE. LTD., and | . |  |
| SUN YUNZHI. | . |  |
| . . . . . . . . . . . . . . . . | . |  |
| FTX RECOVERY TRUST, | . |  |
|  | . | Adv. Proc. No. 24-50188(KBO) |
| vs. | . |  |
|  | . |  |
| FORIS DAX MT LTD., FORIS DAX | . |  |
| ASIA PTE. LTD., FORIS DAX, | . |  |
| INC., and IRON BLOCK CAPITAL. | . |  |
| . . . . . . . . . . . . . . . . | | |

(Continued)

TRANSCRIPT OF SCHEDULING CONFERENCES
BEFORE THE HONORABLE KAREN B. OWENS
CHIEF UNITED STATES BANKRUPTCY JUDGE

| | |
|---|---|
| Audio Operator: | Electronically Recorded |
|  | by Shaheed Austin, Jr., ECRO |
|  |  |
| Transcription Company: | Reliable |
|  | 1007 N. Orange Street |
|  | Wilmington, Delaware 19801 |
|  | (302)654-8080 |
|  | Email:  gmatthews@reliable-co.com |

Proceedings recorded by electronic sound recording,
transcript produced by transcription service.

```
FTX RECOVERY TRUST,                  .
                                     .  Adv. Proc. No. 24-50192(KBO)
        vs.                          .
                                     .
COMMON SENSE LEADERSHIP FUND, .
INC. a/k/a COMMONSENSE               .
LEADERSHIP FUND.                     .
. . . . . . . . . . . . . . . . . .
FTX RECOVERY TRUST,                  .
                                     .  Adv. Proc. No. 24-50197(KBO)
          vs.                        .
                                     .
FARMINGTON STATE CORPORATION  .
(f/k/a FARMINGTON STATE BANK, .
d/b/a GENIOME BANK, d/b/a     .
MOONSTONE BANK), FBH          .
CORPORATION, and JEAN         .
CHALOPIN.                     .
. . . . . . . . . . . . . . . . . .
FTX RECOVERY TRUST,                  .
                                     .  Adv. Proc. No. 24-50201(KBO)
          vs.                        .
                                     .
PROSPERITY ALLIANCE, INC.     .
. . . . . . . . . . . . . . . . . .
```

APPEARANCES:

For the FTX Recovery
Trust/Plaintiff:                Matthew R. Pierce
                                LANDIS, RATH & COBB, LLP
                                919 Market Street, Suite 1800
                                Wilmington, Delaware 19801

                                Brian D. Glueckstein, Esq.
                                Christopher J. Dunne, Esq.
                                SULLIVAN & CROMWELL, LLP
                                125 Broad Street
                                New York, New York 10004

For Seth Melamed:               Kate Roggio Buck, Esq.
                                MCCARTER & ENGLISH, LLP
                                Renaissance Centre
                                405 North King St., 8th Floor
                                Wilmington, Delaware 19801

                                David Adler, Esq.
                                MCCARTER & ENGLISH, LLP
                                250 West 55th Street, 13th Floor
                                New York, New York 10019

(Proceedings commence at 9:31 a.m.)

(Call to order of the Court)

THE COURT:  Good morning, everyone.  Nice to see you in person.

COUNSEL:  Good morning.  Good morning, Your Honor.

THE COURT:  Mister -- hello.

MR. PIERCE:  Good morning, Your Honor.

THE COURT:  I was expecting to see Mr. Glueckstein at the podium.

(Laughter)

THE COURT:  No offense.  I just almost said --

MR. PIERCE:  None taken --

THE COURT:  -- "Mr. Glueckstein."

MR. PIERCE:  -- Your Honor.  Good morning, Your Honor.  Matthew Pierce with Landis, Rath & Cobb on behalf of the FTX Recovery Trust.

Your Honor, there are two related matters on this morning's agenda, which appear at Agenda Items 9 and 10, which are going forward as a scheduling conference.

Now is the time that I will turn it over to Mr. Glueckstein --

THE COURT:  Sounds good.

MR. PIERCE:  -- to address those matters.

THE COURT:  Thank you very much, Mr. Pierce.

MR. GLUECKSTEIN:  I will actually turn it over to

my partner Mr. Dunne today.

THE COURT:  Okay.  Sounds good.

MR. DUNNE:  Good morning, Your Honor.

THE COURT:  Good morning.

MR. DUNNE:  Christopher Dunne from Sullivan & Cromwell for the FTX Recovery Trust.

We are here today, Your Honor, to discuss scheduling matters on the trust's amended objection to claims filed by Seth Melamed, as well as Mr. Melamed's motion to compel arbitration.  And there are a few moving parts here, Your Honor, so if I may just summarize where this stands at a high level.

Mr. Melamed has five operative claims seeking approximately $36 million.  His claims arise from FTX's acquisition, in April of 2022, of a company called Liquid Group, of which Mr. Melamed was a shareholder, as well as some subsequent employment operation -- arrangements.  The vast majority, as much as 99 percent, of the value of Mr. Melamed's claims comes from two buckets of consideration that he was promised in the Liquid Group purchase agreement, and those two buckets are:

One, 1 million shares of FTX common stock, which Mr. Melamed received;

And two, specified amounts of particular cryptocurrency tokens, which were to be delivered to him in

April of 2023 and 2024, but which were not delivered, of course, because FTX went bankrupt in November of 2022.

The trust has raised various objections. And most notably, the trust seeks to subordinate the portion of Mr. Melamed's claims relating to the stock pursuant to Section 510(b), and to apply the FTX plan of reorganization to the portion of his claim that relates to the crypto consideration, which, as Your Honor knows, the plan calls for tokens to be valued at petition date prices, as set forth in the Court's digital assets estimation order.

Mr. Melamed has, of course, also moved to compel arbitration. The liquid group share purchase agreement has a Singapore law arbitration clause that, if enforceable, would call for arbitration in Singapore, and the trust opposes arbitration.

Now, Your Honor, both the trust and Mr. Melamed agree that there are certain threshold issues that should be decided before litigating on the merits. The parties disagree, however, on what those threshold issues are.

We believe that 510(b) -- I'm sorry. Excuse me.

We have a proposal for how to stage this litigation in a way that we believe is most efficient for the Court and the parties, including Mr. Melamed himself.

We believe that 510(b) subordination and application of the plan to the cryptocurrency tokens are

threshold issues that this Court can and should decide now. We would propose that the Court stage proceedings on this claim objection by hearing argument on those two issues, as well as Mr. Melamed's motion to compel arbitration before we get into the merits.

Your Honor, Mr. Melamed is going to argue that the Court should address only arbitration in the first instance and leave 510(b) subordination and plan application for issues for a later hearing, which he believes should take place only after the parties conduct arbitration in Singapore. We would submit that that does not make sense for the parties or for this Court. There is dispute that 510(b) subordination and application of the plan are matters for this Court to decide, it cannot be decided by an arbitral panel.

Even if Mr. Melamed's claim were to be liquidated in arbitration, he would still have to come back before Your Honor to collect on it, at which time the Court would have to address whether -- subordinating a portion of his claim and how the relevant portions of the plan apply to it.  So, even if Mr. Melamed were correct that his claim must be arbitrated -- and of course, we do not think he is -- it is beneficial to both parties to know how much is at stake in that arbitration before they incur the time and expense to conduct it.

The parties have been trying to resolve this matter for some time.  And as I mentioned, the two threshold issues control approximately 99 percent of the value in dispute here.  If the Court rules on them, Your Honor, I highly doubt that any further litigation will be required and, frankly, Your Honor, will probably not hear from us again on this matter.

So, to sum up, what we would propose, Your Honor, is that the Court hold a hearing on Section 510(b) subordination, the application of the plan to the crypto piece, and arbitrability.  That could be done in the near term, without discovery.  The only witnesses that would need to be involved are foreign law experts on the question of arbitrability.  And if Mr. Adler were to agree, we would propose to have those experts submit their declarations on the papers and, with this Court's permission, appear remotely, so they don't have to fly in from Asia.  Further proceedings could await the Court's ruling on those threshold issues, though, again, as I said, if the Court were to rule them, I doubt further proceedings would be necessary.

Your Honor, if the Court has any questions, I'm happy to answer them.

THE COURT:  I do not.  Thank you.

MR. DUNNE:  Thank you, Your Honor.

THE COURT:  Ms. Buck, nice to see you.

MS. BUCK: Nice to see you, Your Honor. Good morning, Your Honor. Kate Buck from McCarter & English on behalf of Seth Melamed. I have with me here today David Adler from our New York office to address the Court.

THE COURT: Great. Thank you.

MR. ADLER: Good morning, Judge Owens.

THE COURT: Good morning.

MR. ADLER: David Adler from McCarter & English on behalf of Seth Melamed.

I just want to step back a little bit and explain Mr. Melamed's relationship with FTX. Mr. Melamed was the COO of FTX Japan, which was the entity that was fully regulated in Japan, and which gave back to customers 100 percent of their crypto, starting in February of 2023.

When Mr. Melamed sold his interest in the prior company, which was called Liquid, to FTX in March of 2023, there was an associated management agreement with it. So Mr. Melamed stayed on to work at FTX from pre-petition until July of 2024, when FTX Japan was sold to BitFlyer, at which point he was terminated.

Now Mr. Dunne said that 99 percent of the claims would be addressed by these two issue -- by the threshold issues of the plan and 510(b). There are all sorts of claims regarding -- as the Court might have seen in the declarations, regarding the unpaid director's fees that are

post-petition.  Mr. Melamed was reappointed as a representative director of FTX Japan in May, I think, May or March of 2024, so a year ago, and I think that that term was for 24 months.

In any event, the point is, is that Mr. Melamed has claims for both pre-petition, he has a claim under the contract, he has claims for unpaid director's fees, I think he has a claim for an unpaid bonus.  And post-petition, he has the director's fees and he also has the -- he never got paid under the KEIP.  So the KEIP was -- he was supposed to get paid upon the sale or 60 days after the sale of BitFlyer, and that payment hasn't come in.

THE COURT:  What's the totality of the asserted admin claim?

MR. ADLER:  The admin on the director's fees, it's a million, I believe, a little bit over a million, a million-five maybe.  On the KEIP claims, I think it's hundred and ten -- it's in the low hundreds, hundred and ten, hundred and twenty.

THE COURT:  Okay.

MR. ADLER:  And so, Your Honor, Mr. Dunne and I and Mr. Glueckstein went back and forth.  And we believe that the appropriate way is to consider the arbitration issue first, and that's one of the reasons why we filed the cross-motion, because we think that putting 510(b) and the plan issues in

the front are just going to create issues down the road.

So, for example, under the contract claim or under the SPA, which was a contract, he has a claim for breach of contract, breach of warranties, and he also has a claim for fraud. Okay? The 510(b) issue, to the extent it applies, may address some issues with respect to what he received, in terms of consideration on the FTX shares, but it -- he also has an indemnity claim under that agreement, which I don't think is -- the trust is asserting is subject to subordination.

So, from our view -- and we don't know how things will turn out in Singapore, right? So, I mean, applying 510(b) at this instance or saying, you know, you're limited to this and this and this doesn't really make sense from our perspective because we think it's -- it could be providing rulings that are somewhat advisory.

From our -- and we don't dispute that, upon receiving whatever the arbitration panel gives in Singapore, we have to come back here and have this Court determine at that time, you know, what the -- whether 510(b) applies and to what extent, and the same issue with respect to the plan, so --

THE COURT: And the KEIP, I would assume, and the admin claim.

MR. ADLER: And the admin claim, yeah.

THE COURT:  At least, at least, right?

MR. ADLER:  Yes.

THE COURT:  Okay.

MR. ADLER:  Yes.

And so, I mean, from our perspective -- and I appreciate Mr. Dunne's offer of having the foreign law experts testify by video.  As I read Rule 44.1 of the Federal Rule of Civil Procedure, issues of foreign law are a matter of law for this Court, the Court can do its own research.  That's what 44.1 says.  And you know, we can show up -- the date that was circulated, I think, was June 25th for the hearing.

And I think that, if we get into the issues of 510(b) and the plan, there may also be some factual issues floating around within those two buckets, whereas the arbitration issue is just a straight question of applying, you know, let's call it the "Mintze test," under the Third Circuit, you know, and whether there is a demonstration by the trust that, for whatever reasons, the Court can exercise discretion, despite the breadth of the agreement, the arbitration agreement provision.

So that's where we are right now.  We're both in agreement that arbitration is a threshold issue.  I -- Seth Melamed disagrees that we have to deal with 510(b) and the plan issue right now.  And we think that the arbitration

panel should determine his claim, and then we can come back here to determine the allowability of that claim, and they can raise the 510(b) issues and, you know, all the other issues, at that point.

And we'll also have to deal with all the other issues at that point regarding his admin claim. I'm sure there are disputed facts embedded in that, as well as the other pre-petition claims.

So, Your Honor, do you have any questions for me?

THE COURT: I do. What are the fact issues that you believe are relevant to the 510(b) and plan issues?

MR. ADLER: I think there's a question of whether -- and I don't know how to put this in the right context. But there are other situations that exist that were -- so the 510(b) objection was filed on July 10th last year, and there were a whole slew of other 510(b) objections that were filed on that day. One of them was against a company called "Artz," which the debtors withdrew. And that claim -- much, much larger than Mr. Melamed's claim -- was allowed. And so it's the exact same fact pattern, where they're buying FTX trading shares. And from my perspective, there's a factual issue embedded in that as to why the debtors believed, at that time, that 510(b) didn't apply.

There are also, I think, issues with respect to how -- what the -- what scope 510(b) would cover. Would it cover

just a stated amount in the contract claim?  Would it -- if he's asserting a fraud claim, does it -- does 510(b) disallow the portion that was allocated to the FTX shares, per the agreement?  So that's why I think that, with an arbitration award, we have a number.  And at that point, it becomes much easier to apply the law against that number, rather than doing it in a vacuum.

THE COURT:  Okay.  I appreciate that.  Thank you.

MR. ADLER:  Okay.  Thank you, Your Honor.

THE COURT:  Okay.

MR. DUNNE:  Just a few points, Your Honor?

THE COURT:  Sure.

MR. DUNNE:  Your Honor, I don't know the details of this Artz claim, but we would submit that it's irrelevant. It was not allowed, as Mr. Adler suggests it was.

I want to come back to 510(b) here.  First --

THE COURT:  Well, let me just close the loop on that.  What happened with it?

MR. DUNNE:  Mr. Glueckstein?

MR. GLUECKSTEIN:  May I speak to that, Your Honor?

THE COURT:  Sure.

MR. GLUECKSTEIN:  The objection was withdrawn, Your Honor.

THE COURT:  Okay.

MR. GLUECKSTEIN:  I mean, and I -- I'm trying to

recall now.

THE COURT:  This is an objection to subordinate?

MR. GLUECKSTEIN:  There was an objection that was filed to a claim arising out of preferred shares that we objected to on 510(b) grounds.  There was, eventually, a resolution by the trust; so, therefore, it's post-emergence.  That claim was not allowed as anything other than a 510(b) claim.  So there was a portion of that claim that was allowed as a 510(b) claim in a liquidated amount.

THE COURT:  Okay.

MR. GLUECKSTEIN:  Okay?  But there is the suggestion by Mr. Adler that somehow we withdrew the objection or that 510(b) didn't apply.  That's not correct.  In fact, it was stipulated to that that was a 510(b) claim.

THE COURT:  So the claims agent's website would reflect the stipulated agreement that has been reached by the parties?

MR. GLUECKSTEIN:  It --

THE COURT:  How is that documented?

MR. GLUECKSTEIN:  It's documented, Your Honor, in a private stipulation because it was done post-emergence --

THE COURT:  Sure.

MR. GLUECKSTEIN:  -- and didn't require court approval.  It should be -- it is certainly part of the official claims register.  There are questions around the

sealing of that and what portions are publicly available on the claim register.

THE COURT: Okay.

MR. GLUECKSTEIN: But the amount of that claim and it being allowed only as a 510(b) claim is reflected in the claims register of this case, yes.

THE COURT: Okay. So -- and refresh my recollection on the sealing. Was it just names of individuals or also entities?

MR. GLUECKSTEIN: It is names of entities and individuals on the basis -- so the names of individuals are sealed on a permanent basis.

THE COURT: Okay.

MR. GLUECKSTEIN: The names of -- names and entities have been continually sealed on an interim basis pending the trust's now ultimate resolution of what to do with their customer lists, of which the institutional names are part of that customer list.

THE COURT: So, if they're a customer and it's -- it would be the name and the -- the name of the individual, as well as the entity, that would be still sealed.

MR. GLUECKSTEIN: Correct.

THE COURT: Okay.

MR. GLUECKSTEIN: And now -- and as we're talking through it, Your Honor, we are talking about shareholders

here now, and so that should be -- right.  Because we're talking about this particular Artz claim was a --

THE COURT:  Sure.

MR. GLUECKSTEIN:  -- shareholder claim.

THE COURT:  Okay.

MR. GLUECKSTEIN:  So that should be available on the shareholders -- on the claim holder --

THE COURT:  Claims agent's website.

MR. GLUECKSTEIN:  -- claims agent's website.

THE COURT:  Okay.

MR. GLUECKSTEIN:  But that -- but I will represent to the Court that the only allowance of that claim was as a subordinated 510(b) claim.

THE COURT:  Okay.  All right.  Thank you for closing the loop on that.

MR. DUNNE:  Just a few things, Your Honor.

Fist, we are seeking to subordinate the request for indemnification as arising out of the equity claim.  And of course, as Your Honor knows, Section 510(b) applies, on its face, to any claims arising from equity, whether styled in terms of fraud or breach of contract or just a pure purchase of shares.

We are, obviously, raising other objections.  There's also a request for equitable subordination.  That stuff would all go to the merits, if and when -- if our

relief as requested, the threshold issues are decided and the case progresses on.  The other claims or the remainder of the case is a fraction of the value, ultimately, at issue.

THE COURT:  So just to clarify with equitable subordination, that would be -- you would be willing to hold off a determination of equitable subordination until after the claims were liquidated in arbitration.

MR. DUNNE:  Yes, Your Honor.

THE COURT:  Okay.

MR. DUNNE:  That's all I had, Your Honor.

THE COURT:  Okay.  All right.

MR. DUNNE:  Thank you.

THE COURT:  I have just one more question, and this could be to either of you.  Could you get me up to speed on -- there were some foreign law declarations that had been submitted, I believe.  The docket is enormous, we're trying to piece it all together.  And I know that Judge Dorsey requested something from the parties.  Could you sort of give me the procedural history on that and why they were requested?  And it sounds like there's still more to be filed.

MR. ADLER:  I --

THE COURT:  To the extent you can.  And if I'm misunderstanding things, please correct me.

MR. ADLER:  Thank you, Your Honor.  David Adler.

18

My recollection is, is we had a hearing on September 12th last year, and the issue was, I think -- and the other side can correct me if I'm wrong -- but I think the issue was whether arbitration agreements are enforceable under Japanese law.  And that's why we submitted the Ryo Kawabata declaration, which is very short.

And the rest of them we submitted two declarations by a woman named Hori Takane, one of them was in response to Mr. Tanaka's declaration on the amended objection, and the other one was to discuss post-petition director's fees and how those would be -- the damage claim, how the damage claim would be calculated under Japanese law.

THE COURT:  Okay.

MR. ADLER:  But that was not the subject of the September 12th hearing because the director's fees were payable, something around late August, early September.  And so, when we were before Judge Dorsey on September 12th, that issue had not yet ripened yet.  But the main one was on the arbitration issues under foreign law.

THE COURT:  So there is an open issue between the parties, not just on the application of Mintze, but on whether arbitration agreements are enforceable under Japanese law?

MR. ADLER:  I think -- I mean, I'll let them speak to it, but not from our side.

THE COURT:  Sure.  Okay.

(Laughter)

MR. DUNNE:  Well, that's a big caveat, Your Honor. I would say --

THE COURT:  And really, this is a broader question at what are the issues that are necessitated by the foreign law experts that you anticipate filing or submitting --

MR. DUNNE:  Yeah.

THE COURT:  -- declarations on.

MR. DUNNE:  Yes, Your Honor.

I think all of those declarations are now submitted.  There are several declarations, as the Court observes, before Your Honor.

THE COURT:  Uh-huh.

MR. DUNNE:  Those go to both the substance, the underlying substance, and to arbitrability.  And there was not a specific request from the Court at the September 12th hearing --

THE COURT:  Uh-huh.

MR. DUNNE:  -- for that, but, nonetheless, both sides have put in declarations on both of those subjects.  I believe, for our part, it is the latest declaration -- there's a Singapore expert declaration, a Japanese law expert declaration that were submitted in connection with our reply that address purely arbitration, I think.

THE COURT: Okay. So --

MR. DUNNE: And there is, to Your Honor's questions, obviously a dispute on whether the clause is enforceable and how it works and what it applies to.

THE COURT: Sure. Okay. Well, that's helpful. Okay.

MR. DUNNE: Thank you, Your Honor.

THE COURT: Okay. Well, thank you for presenting these issues to me. We did do our own work a little bit ahead of time to understand what the summary of the issues were before the parties, so I do have a basis of understanding what has developed and where we are.

And based on that understanding and the arguments, I am prepared to adopt the debtors' approach with respect to this dispute.

I think that a resolution on the 510(b) and the plan issue questions, while it could be seen as an advisory ruling, would help advance the disputes between the parties on the claims, not a guarantee that it will. But in my experience, I think it would, depending on the outcome of my decision. And so I think there's a benefit to doing it in the manner that the debtor suggests. Again, I understand that it could go into the advisory opinion realm, but it is appropriate to do so in certain instances, and I think it's appropriate here.

Also, of course, I agree that, if the parties -- the parties are in agreement that the motion to compel arbitration should also be heard at the same time, and I'm happy to do that, as well.

And I have no issue with the Japanese experts appearing by Zoom, so long as there is no live testimony. I understand maybe I'll have a question, I'm okay to ask them the question. But if you all are going to ask questions of these witnesses, then they need to be in person. This case was filed here, and I'm entitled to hear the testimony live.

So it sounds as if there's an agreement that there would not be live testimony. Has that been discussed? Mr. Adler is shaking his head yes and --

MR. DUNNE: We agree.

THE COURT: Okay. So the -- so yes, the witnesses could appear by Zoom, and I'm happy to accommodate that. I do not suspect I will have questions. But in moving the admissions of the declarations, they need to be present on Zoom and make an appearance.

Let me ask. Is the briefing complete on the three issues that will be presented?

MR. ADLER: From our side, I think that we would be entitled to file a reply --

THE COURT: Okay.

MR. ADLER: -- in support of the cross-motion.

THE COURT: Okay. So that's still open. When would that be due, or are you still discussing a deadline for that?

MR. ADLER: We haven't discussed it yet. We thought, depending on when the Court set the schedule --

THE COURT: Okay.

MR. ADLER: -- we could just backtrack and figure out the reply date.

THE COURT: Perfect.

Okay. So I apologize. What is the date that you all are seeking? Is it the 25th omnibus hearing

MR. DUNNE: We had discussed that, Your Honor, yes.

THE COURT: Okay. All right. I ask the same question every time, what else will be going forward at that time, because I do have a judges' meeting in the middle of -- you're scheduled for 9:30, and I have the entire day set aside, but I have a break in between that I need to take. It could be logical that we start this in the afternoon and you all do your omni in the morning. I'm willing to entertain that, if we think that that is an acceptable use of our time, and we can complete in the afternoon. Generally, I have to be out of the office at five o'clock, so I usually end my proceedings at 4:30. So, if we start at like 1:30, would that be enough time?

MR. ADLER: Your Honor, I just say this. Mr.

Melamed is in Bali, and I've gotten very used to the time zone.  So one o'clock here is 1 a.m. in Japan.  So that's the only issue that I raise, is the time difference, if we're starting in the afternoon.

THE COURT:  Okay.

MR. DUNNE:  From our perspective, Your Honor, our experts can be available.

THE COURT:  I was going to -- I was going to ask is -- the only folks that actually need to be present are the Japanese experts, correct?

MR. DUNNE:  Correct, Your Honor.

THE COURT:  There will not be fact testimony; it's legal argument.

MR. DUNNE:  Right.  Mr. Melamed will not be testifying.

THE COURT:  All right.  Okay.  Sadly, we're going to run into this time change with everything we do in this case, and it's going to be difficult to really accommodate it.  And quite frankly, my willingness to accommodate it is really -- I have to balance it with my own personal schedule, and it really comes first.  I don't want to be lax about that, but that's the reality that we have.  We have to work within the confines of the Court's schedule.

So, Mr. Glueckstein, it really reserves you then here for the whole day, if we start at 9:30.

MR. GLUECKSTEIN:  I --

THE COURT:  We could move the start of the hearing day up, if it turns out that there's nothing else to talk about at the omnibus hearing.

MR. GLUECKSTEIN:  I think that's -- I think that's a very good idea to sequence it that way.

THE COURT:  Okay.

MR. GLUECKSTEIN:  I understand Mr. Melamed might want to observe the proceedings, but that's --

THE COURT:  Yes.

MR. GLUECKSTEIN:  -- not really --

THE COURT:  Of course.

MR. GLUECKSTEIN:  That's not --

THE COURT:  And I want --

MR. GLUECKSTEIN:  -- really --

THE COURT:  -- to accommodate him.

MR. ADLER:  No, Your Honor, I was talking about the experts.

THE COURT:  Okay.  Sure.

MR. GLUECKSTEIN:  But from the experts -- from our perspective, I think that's fine, Your Honor.  You know, the -- in terms of the omnibus calendar, you know, when we talked about this at the status conference we had a couple of weeks ago, obviously, we had more things on today's omnibus calendar, we worked to resolved those --

THE COURT: Right.

MR. GLUECKSTEIN: -- where we could. We, obviously, have thinned the calendar down. As it stands right now, there are other matters that are -- will be scheduled to go forward at the June omni hearing. Some of those might resolve.

But I think it is perfectly fine to sequence it as you suggest. We're happy to be here for the day and appreciate the Court being willing to take that much of the Court's time, should it be necessary.

THE COURT: Let me --

MR. GLUECKSTEIN: But as far as this matter, it should just be argument on the three threshold issues, and then subject to any questioning that Your Honor has for those witnesses, I see no reason why that couldn't be done in an afternoon session.

THE COURT: Okay. And let me ask one other followup question on scheduling. We have argument on, I think, three motions to stay in various adversaries. Is that scheduled for the 25th?

MR. GLUECKSTEIN: That's scheduled on June 9th.

THE COURT: Oh, okay.

MR. GLUECKSTEIN: You scheduled a special --

THE COURT: Okay.

MR. GLUECKSTEIN: -- hearing date for that --

THE COURT:  Okay.

MR. GLUECKSTEIN:  -- so that's separate.

THE COURT:  Okay.  Good.  All right.

I feel -- I will say I'm not comfortable and I really don't like making the experts have to appear at 1:30 in the morning, I really don't.  Maybe, in the future, we can accommodate a different schedule for matters that involve experts and people appearing.  But I see that the only way to really handle this is to schedule an afternoon session, so I send my apologies to the experts.

One thing I could do is that, if I don't have any questions for these witnesses, then I'm okay entering the declarations without their appearance.  And I will -- I could preview that with the parties once I'm fully prepared, and I could accommodate the experts.

Now, of course, if the experts want to still appear and they're willing to do that, but it just means that they could sleep the night through and won't necessarily have to make an appearance.  So I will give that thought and I will reach out to the parties to see if I can accommodate that for the witnesses.

So did you anticipate papering this in a stipulation or so order the record on this and you'll just agree to the reply deadline informally amongst yourselves?  Is that a good way to go forward?

MR. GLUECKSTEIN:  Yeah, that's fine, Your Honor.
Thank you.

THE COURT:  Okay.  All right.  Well, then let's proceed in that fashion.

If you could, please let me know the day -- excuse me -- the deadline that you agree on, on the reply, so we know and can look forward and read it and be prepared to come for the hearing.

Is there anything else we should discuss?  Have I --

MR. GLUECKSTEIN:  Not today, Your Honor.

THE COURT:  Okay.  Let me just -- one thing.  I'm very mindful that the notice of completion of briefing binders are flowing into my chambers, I think I received four yesterday.  You know, when I took the case, I didn't anticipate that I would get 11 matters under advisement probably within the first month.  But let me just stress I'll do the best I can.

And to the extent that I can order things without oral argument and I think it's appropriate, I'm going -- I'm prepared to do it and I do do it in cases that are really of this magnitude.  So we are working, and we'll reach out to schedule argument as we see appropriate on various things.  But also, don't be surprised if you start to see things coming and hitting the docket without oral argument, and

especially if the parties hadn't requested it.  Then, you know, we'll work through them as expeditiously as we can.

I guess I would say, if there's something that is extremely pressing that everyone needs to have it resolved, then you can contact chambers and it would help me organize the completion of briefing binders.  But that, in and of itself, could lead to disputes, as well, and I'm cognizant of that.  So I'm doing my best is what I'm going to say.

MR. GLUECKSTEIN:  No, and we very much appreciate that, Your Honor.  And I think a lot of what you've received has come from parties other than us.

THE COURT:  I think so.

MR. GLUECKSTEIN:  I think they've been defendants --

THE COURT:  Yeah.

MR. GLUECKSTEIN:  -- in adversary proceedings and the like who have motions to dismiss  filed.  Where we can, we are certainly trying to coordinate --

THE COURT:  Yes.

MR. GLUECKSTEIN:  -- scheduling matters, including with parties in those cases.  Certainly, anything from the trust's perspective, through Mr. Pierce and his firm, we will -- we'll reach out to chambers and try to give as much advance notice as possible.

But we noticed -- and we saw some of that hit the

docket, as well, where other parties have filed a notice of completion, and then presumably they're sending Your Honor --

THE COURT:  They are.

MR. GLUECKSTEIN:  -- materials.  I -- it -- I totally understand.  But from our perspective, we're going to give advance notice to the Court.

THE COURT:  And you don't even need to do that. I'm just -- it's more of a -- this was more of a statement to you, to apologize that, you know, I have 11 so far, some are more -- meatier than others, so it's going to take some time. And we had the discussion at the status conference, where you explained to me the interest issue.  You know, I can only do so much and I am working on it and I will do my best to act promptly and as efficiently as possible to get you the answers and move the cases along, given the discussion at the initial status conference of the urgency.  But ultimately, it is what it is.

MR. GLUECKSTEIN:  No, we understand that.

THE COURT:  All right?

MR. GLUECKSTEIN:  And certainly, anything that is truly exigent to the trust, we will alert chambers and file appropriate, you know, motions on an emergency basis, if that becomes necessary --

THE COURT:  Okay.

MR. GLUECKSTEIN:  -- on some things, so that Your

30

Honor is aware of things that are of -- that do have timing components to them.

THE COURT:  Right.

MR. GLUECKSTEIN:  But the things that you have in front of you right now are just litigation --

THE COURT:  Exactly.

MR. GLUECKSTEIN:  -- things that need to be done, so, obviously, Your Honor's time table is --

THE COURT:  Okay.

MR. GLUECKSTEIN:  -- fine with us.

THE COURT:  Sounds good.  All right.

And that stands for the defendants, as well, if they're listening and there's emergencies, I'll handle them as the parties request, so -- all right.

Well, thank you very much for today's hearing.  I think we have a good understanding of how to move forward, and I look forward to seeing the reply and seeing you all on the 25th.  Okay?  Take care.  We'll stand adjourned.

COUNSEL:  Thank you, Your Honor.  Thank you, Your Honor.

(Proceedings concluded at 10:03 a.m.)

*****

31

## CERTIFICATION

I certify that the foregoing is a correct transcript from the electronic sound recording of the proceedings in the above-entitled matter to the best of my knowledge and ability.

_____     May 15, 2025

Coleen Rand, AAERT Cert. No. 341

Certified Court Transcriptionist

For Reliable