# EXHIBIT 5

UNITED STATES BANKRUPTCY COURT
DISTRICT OF DELAWARE


IN RE:                                    .  Chapter 11
                                          .  Case No. 22-11068 (KBO)
FTX TRADING LTD., *et al.,*               .
                                          .  (Jointly Administered)
                                          .
          Debtors.                        .
                                          .
. . . . . . . . . . . . . . . . .         .
                                          .
FTX RECOVERY TRUST,                       .  Adversary Proceeding
                                          .  No. 24-50184 (KBO)
          Plaintiff,                      .
                                          .
     -against-                            .
                                          .
GATE TECHNOLOGY INCORPORATED,             .
GATE GLOBAL, CORP., GATE                  .
INFORMATION PTE. LTD., and                .
SUN YUNZHI,                               .
                                          .
          Defendants.                     .
                                          .
. . . . . . . . . . . . . . . . .         .
                                          .
FTX RECOVERY TRUST,                       .  Adversary Proceeding
                                          .  No. 24-50188 (KBO)
          Plaintiff,                      .
                                          .
     -against-                            .
                                          .
FORIS DAX MT LTD., FORIS DAX              .
ASIA PTE. LTD., FORIS DAX,                .  Courtroom No. 3
INC., and IRON BLOCK CAPITAL,             .  824 Market Street
                                          .  Wilmington, Delaware 19801
          Defendants.                     .
                                          .  Wednesday, June 25, 2025
. . . . . . . . . . . . . . . . .         .  9:34 a.m.

                    TRANSCRIPT OF HEARING
           BEFORE THE HONORABLE KAREN B. OWENS
           CHIEF UNITED STATES BANKRUPTCY JUDGE


                       - Cont'd -

FTX RECOVERY TRUST,          .  Adversary Proceeding
                            .  No. 24-50189 (KBO)
          Plaintiff,         .
                            .
      -against-              .
                            .
AMERICAN ACTION              .
NETWORK, INC.,               .
                            .
          Defendant.         .
                            .
. . . . . . . . . . . . . . .
                            .
FTX RECOVERY TRUST,          .  Adversary Proceeding
                            .  No. 24-50190 (KBO)
          Plaintiff,         .
                            .
      -against-              .
                            .
AMERICAN PROSPERITY ALLAINCE, .
                            .
          Defendant.         .
                            .
. . . . . . . . . . . . . . .
                            .
FTX RECOVERY TRUST,          .  Adversary Proceeding
                            .  No. 24-50191 (KBO)
          Plaintiff,         .
                            .
      -against-              .
                            .
AMERICAN VALUES              .
COALITION, INC.,             .
                            .
          Defendant.         .
                            .
. . . . . . . . . . . . . . .

- Cont'd -

FTX RECOVERY TRUST,                .  Adversary Proceeding
                                   .  No. 24-50192 (KBO)
          Plaintiff,               .
                                   .
     -against-                     .
                                   .
COMMON SENSE LEADERSHIP            .
FUND, INC. a/k/a COMMONSENSE       .
LEADERSHIP FUND,                   .
                                   .
          Defendant.               .
                                   .
. . . . . . . . . . . . . . . . .  .
                                   .
FTX RECOVERY TRUST,                .  Adversary Proceeding
                                   .  No. 24-50193 (KBO)
          Plaintiff,               .
                                   .
     -against-                     .
                                   .
CONGRESSIONAL LEADERSHIP           .
FUND,                              .
                                   .
          Defendant.               .
                                   .
. . . . . . . . . . . . . . . . .  .
                                   .
FTX RECOVERY TRUST,                .  Adversary Proceeding
                                   .  No. 24-50197 (KBO)
          Plaintiff,               .
                                   .
     -against-                     .
                                   .
FARMINGTON STATE CORPORATION       .
(f/k/a FARMINGTON STATE BANK,      .
d/b/a GENIOME BANK, d/b/a          .
MOONSTONE BANK), FBH               .
CORPORATION, and JEAN              .
CHALOPIN,                          .
                                   .
          Defendants.              .
                                   .
. . . . . . . . . . . . . . . . .  .

                              - Cont'd -

4

FTX RECOVERY TRUST,                  .  Adversary Proceeding
                                     .  No. 24-50199 (KBO)
          Plaintiff,                 .
                                     .
    -against-                        .
                                     .
NEW YORK SOLIDARITY NETWORK,         .
                                     .
          Defendant.                 .
                                     .
. . . . . . . . . . . . . . . . .    .
                                     .
FTX RECOVERY TRUST,                  .  Adversary Proceeding
                                     .  No. 24-50200 (KBO)
          Plaintiff,                 .
                                     .
    -against-                        .
                                     .
ONE NATION, INC.,                    .
                                     .
          Defendant.                 .
                                     .
. . . . . . . . . . . . . . . . .    .
                                     .
FTX RECOVERY TRUST,                  .  Adversary Proceeding
                                     .  No. 24-50201 (KBO)
          Plaintiff,                 .
                                     .
    -against-                        .
                                     .
PROSPERITY ALLIANCE, INC.,           .
                                     .
          Defendant.                 .
                                     .
. . . . . . . . . . . . . . . . .    .
                                     .
FTX RECOVERY TRUST,                  .  Adversary Proceeding
                                     .  No. 24-50202 (KBO)
          Plaintiff,                 .
                                     .
    -against-                        .
                                     .
SENATE LEADERSHIP FUND,              .
                                     .
          Defendant.                 .
                                     .
. . . . . . . . . . . . . . . . .    .

                              - Cont'd -

FTX RECOVERY TRUST,                    .   Adversary Proceeding
                                       .   No. 24-50203 (KBO)
          Plaintiff,                   .
                                       .
     -against-                         .
                                       .
VOTO LATINO, INC.,                     .
                                       .
          Defendant.                   .
                                       .
. . . . . . . . . . . . . . . . .      .
                                       .
FTX RECOVERY TRUST,                    .   Adversary Proceeding
                                       .   No. 24-50204 (KBO)
          Plaintiff,                   .
                                       .
     -against-                         .
                                       .
WORKING AMERICA,                       .
                                       .
          Defendant.                   .
                                       .
. . . . . . . . . . . . . . . . .      .
                                       .
FTX RECOVERY TRUST,                    .   Adversary Proceeding
                                       .   No. 24-50211 (KBO)
          Plaintiff,                   .
                                       .
     -against-                         .
                                       .
SECUREBIO, INC. dba                    .
SECUREBIO,                             .
                                       .
          Defendant.                   .
                                       .
. . . . . . . . . . . . . . . . .      .

                         - Cont'd -

FTX RECOVERY TRUST,                     .  Adversary Proceeding
                                        .  No. 24-50212 (KBO)
                                        .
          Plaintiff,                    .
                                        .
      -against-                         .
                                        .
THE GOODLY INSTITUTE dba                .
GOODLY LABS,                            .
                                        .
          Defendant.                    .
                                        .
. . . . . . . . . . . . . . . . .       .
FTX RECOVERY TRUST,                     .  Adversary Proceeding
                                        .  No. 24-50213 (KBO)
                                        .
          Plaintiff,                    .
                                        .
      -against-                         .
                                        .
SPARTZ PHILANTHROPIES, dba              .
RETHINK CHARITY and                     .
NONLINEAR,                              .
                                        .
          Defendant.                    .
                                        .
. . . . . . . . . . . . . . . . .       .
FTX RECOVERY TRUST,                     .  Adversary Proceeding
                                        .  No. 24-50214 (KBO)
                                        .
          Plaintiff,                    .
                                        .
      -against-                         .
                                        .
MANIFOLD MARKETS, INC.,                 .
                                        .
          Defendant.                    .
                                        .
. . . . . . . . . . . . . . . . .       .

                              - Cont'd -

FTX RECOVERY TRUST,                    .  Adversary Proceeding
                                       .  No. 24-50220 (KBO)
                                       .
              Plaintiff,               .
                                       .
        -against-                      .
                                       .
DENG JUN, SHEN LING, TU JING,          .
DENG DINGYUAN, DENG LAN, DENG          .
JIAN, TU FAN, PAN YANG LIAN,           .
HU JINGMING, HU SIFENG, YANG           .
YUHUA, QIN YONG QIANG, HUANG           .
YAO, DAI FUYANG, FU LING,              .
CHEN CHAO, SHEN LIUGEN, LIN            .
GUODONG, YANG YIBO, XU MIN,            .
XU HONG, WAN JIAN, WU QIAO,            .
WU TIANMING, LI PING, JIA              .
SHUYUN, and JOHN DOES 1-20,            .
                                       .
              Defendants.              .
                                       .
. . . . . . . . . . . . . . . . . .
FTX RECOVERY TRUST,                    .  Adversary Proceeding
                                       .  No. 25-50635 (KBO)
                                       .
              Plaintiff,               .
                                       .
        -against-                      .
                                       .
KUROSEMI, INC.,                        .
                                       .
              Defendant.               .
                                       .
. . . . . . . . . . . . . . . . . .
FTX RECOVERY TRUST,                    .  Adversary Proceeding
                                       .  No. 25-50636 (KBO)
                                       .
              Plaintiff,               .
                                       .
        -against-                      .
                                       .
NFT STARS LIMITED,                     .
                                       .
              Defendant.               .
                                       .
. . . . . . . . . . . . . . . . . .

                              - Cont'd -

APPEARANCES:

For the FTX
Recovery Trust:               Matthew R. Pierce, Esquire
                              LANDIS RATH & COBB, LLP
                              919 Market Street
                              Suite 1800
                              Wilmington, Delaware 19801

                              -and-

                              Brian D. Glueckstein, Esquire
                              Christopher J. Dunne, Esquire
                              SULLIVAN & CROMWELL, LLP
                              125 Broad Street
                              New York, New York 10004


For Claimant
No. 911658:                   R. Stephen McNeill, Esquire
                              POTTER ANDERSON & CORROON, LLP
                              1313 North Market Street
                              6th Floor
                              Wilmington, Delaware 19801


For Seth Melamed:             David Adler, Esquire
                              MCCARTER & ENGLISH, LLP
                              Worldwide Plaza
                              825 Eighth Avenue
                              31st Floor
                              New York, New York 10019




(APPEARANCES CONTINUED)

Audio Operator:               Shaheed Austin, Jr., ECRO

Transcription Company:        Reliable
                              The Nemours Building
                              1007 N. Orange Street, Suite 110
                              Wilmington, Delaware 19801
                              Telephone: (302)654-8080
                              Email: gmatthews@reliable-co.com

Proceedings recorded by electronic sound recording,
transcript produced by transcription service.

APPEARANCES (CONTINUED):

For Ross
Rheingans-Yoo:                    Michael J. Joyce, Esquire
                                  THE LAW OFFICES OF JOYCE, LLC
                                  1225 King Street
                                  Suite 800
                                  Wilmington, Delaware 19801

                                  -and-

                                  Scott D. Simon, Esquire
                                  GOETZ PLATZER, LLP
                                  One Penn Plaza
                                  Suite 3100
                                  New York, New York 10119

INDEX

MOTIONS:                                                              PAGE

Agenda
Item 41:   Debtors' Objection to Proof of Claim filed by      20
           Ross Rheingans-Yoo
           [D.I. 3409, filed on October 30, 2023]

           Court's Ruling:                                     45

Agenda
Item 42:   Motion to Extend Time to Complete KYC              --
           Requirements
           [D.I. 30432, filed on May 16, 2025]

           Court's Ruling:                                    --

Agenda
Item 43:   Motion to Appear Remotely Via Video Conference
           [D.I. 30433, filed om May 16, 2025]

           Court's Ruling:                                    --

Agenda
Item 44:   Debtors' Amended Objection to Proofs of Claim      48
           Filed by Seth Melamed and Motion for
           Subordination Pursuant to 11 U.S.C. §§ 510(B)
           and 510(C)(1)
           [D.I. 28643, filed on December 9, 2024]

           Court's Ruling:                                    86

Agenda
Item 45:   Opposition to Debtors Amended Objection to         48
           Proofs of Claim and Motion for Subordination
           Pursuant to 11 U.S.C. §§ 510(B) and 510(C)(1)
           and Cross-Motion to Compel Arbitration
           [D.I. 30077, April 7, 2025]

           Court's Ruling:                                    86

EXHIBITS

DECLARATIONS:                                                    PAGE

1 - Declaration of Taro Tanaka, Docket 28646, 30367          50

2 - Declaration of Balakrishnan A. Kumar, Docket 30365       50

3 - Declaration of Ryo Kawabata, Docket 30078               67

4 - Declaration of Takane Hori, Docket 30079, 30080         67


Transcriptionists' Certificate                               87

(Proceedings commenced at 9:34 a.m.)

THE CLERK:  All rise.

THE COURT:  Good morning, everyone.  Nice to see you.  Please be seated.

Good morning.

MR. PIERCE:  Good morning, Your Honor.

Matthew Pierce with Landis Rath & Cobb, on behalf of the FTX Recovery Trust.

Your Honor, consistent with the Court's direction at the May hearing, we've split the agenda into a morning session, with respect to the omnibus matters and then an afternoon session with respect to the Melamed claim objection matters, which appear at Agenda Items 44 and 45.

Your Honor, the majority of the matters set for the morning session are resolved.  We appreciate the Court for entering the orders that were submitted under CNO and COC.

THE COURT:  Happy to do so.

MR. PIERCE:  From the FTX Recovery Trust's position, there's only one matter set -- remaining to go forward this morning, which is Agenda Item 41, which is the Ross Rheingans-Yoo claim objection.  Your Honor, we're aware that there may be a scheduling matter that may need to be addressed with respect to the claim objection response filed by Mr. McNeill's client and we're happy to proceed with the

agenda however the Court would like.

THE COURT:  Why don't we take Mr. McNeill's issue first and then we'll go into the more substantive matter.

MR. MCNEILL:  Good morning, Your Honor.

Steve McNeill from Potter Anderson & Corroon, here on behalf of my client who has been identified with a unique code of 911658.  I understand customer identifications are sealed in this matter, Your Honor.

And thank you for the time in court this morning, Your Honor.  I apologize for the early-morning email.

Essentially, Your Honor, my client was the subject of the one-hundred-and-sixtieth-omnibus objection that was filed back, I believe, in February.  We had originally reached out regarding potential settlement resolution, got an adjournment.  The adjournment was in perpetuity.  Things weren't progressing fast enough for my client, so he wanted us to move forward.

We reached out to counsel on May 23rd via email and said, you know, we'd like to move this forward and, if not, we want to go forward at today's hearing unless you give us some documents.  They did give us some documents.  We ultimately decided the documents weren't helpful; didn't really support their position.  There's been no settlement offers proposed either way, Your Honor.

So, we filed our objection last Wednesday.  We

noted on our objection that we, that -- with a hearing date for today.  And then, when the agenda was filed, we noticed that we were not listed on the agenda at all.  We reached out to counsel and, you know, asked why; apparently, there was some misunderstanding regarding the production of documents and that, you know, whether that moved our request to go forward today or not.

Nevertheless, Your Honor, we're here.  We want to go forward.  My client is interested in resolving this and moving on with his life and I believe that it is a contested matter.  Since we filed the objection, we filed it a week before, as is customary for objections in this district.  We gave -- we filed it a week ago with today's hearing in mind, Your Honor, and it's just not on the agenda.

But our request would be that we go forward today on this matter.

THE COURT:  My understanding is that your claim objection alleges fraudulent inducement, is that correct, or your claim alleges fraudulent inducement?

MR. MCNEILL:  It's -- it was filed *pro se* by my client Your Honor.

There is a fraudulent component; essentially, it involves what was supposed to be a charitable donation.

THE COURT:  Uh-huh.

MR. MCNEILL:  My client made the charitable

donation to FTX philanthropy or whatever it's called now. Made that do nation.  We do not believe that it ever left and went out to any charity.

And so, Your Honor, in our view, that is -- you know, all the funds at FTX are commingled and our view is it never left the commingled accounts.  And even if it did, FTX has been suing charities left and right to claw back money that was paid to the charities.  But that is our position, Your Honor, is that, basically, we were fraudulently induced into making a gift that never left the FTX estate.

THE COURT:  Okay.  I ask because that type of claim seems highly evidentiary in nature.

Are you prepared to go forward today with your evidence?

MR. MCNEILL:  I don't believe so, Your Honor. There's an abundance of evidence attached to the proof of claim, but I appreciate that Your Honor probably hasn't seen that either --

THE COURT:  Okay.

MR. MCNEILL:  -- because it probably wasn't in the claims objection binder.

THE COURT:  Okay.

MR. MCNEILL:  But, Your Honor, that is, you know, that would be our evidence, would be what was attached -- what was included and attached to the proof of claim, as well

as the couple of exhibits to our response.

THE COURT:  Okay.  That's helpful.  Thank you.

MR. MCNEILL:  Thank you.

MR. GLUECKSTEIN:  Good morning, Your Honor.

THE COURT:  Good morning.

MR. GLUECKSTEIN:  Good to see you.

Brian Glueckstein, Sullivan & Cromwell, for the FTX Recovery Trust.

So, we have a very different perspective on this, Your Honor, and I think Your Honor is hitting on some of the salient points.  We did agree -- this was one of numerous claims, of course, that was in the hundred-and-sixtieth omnibus objection.  We did engage with counsel when they reached out; we gave them an extension.  We did, consistent with counsel's remarks, they wanted documents, they wanted information.  We provided that information, provided that information on June 5th.  We offered to discuss it on the phone.  We received no substantive engagement.

They did file a further, a response to the objection last week.  They filed it under seal.  It raises numerous factual issues, many of which we dispute.  If it is the case, and apparently it is, because the first at least I heard about this was last evening, that they intended to go forward today or wanted to go forward today; if that is the case and they're no longer interested in discussing this

claim with us, that's fine.  That's their right.

But, then, what we would like to do is address a litigation schedule on this claim.  We believe that it might be discovery that's necessary, based on the filing that they filed last week.  We have some fundamental disagreements.  Counsel just referenced things like tracing and where money went; that's, by nature, of course, evidentiary.  And we think we should prepare for a hearing if that is, in fact, necessary on this claim.

But, certainly, there's nothing before the Court today.  The Court doesn't have the information it needs to rule on this and the suggestion that this could just be granted, based on a proof of claim that was filed is, obviously, something we disagree with.

THE COURT:  Okay.  All right.

Well, listen, I agree that this matter is premature.  I think I would at least need a reply from the Trust --

MR. GLUECKSTEIN:  Right.

THE COURT:  -- but, also, beyond that, there potentially is factual discovery that will be necessary.  I agree that the parties need to meet and confer and discuss on a schedule moving forward.

It sounds, Mr. McNeill, that you would like to move forward sooner rather than later, your client would.

And so that's fine, I think we have omnibus -- we have dates scheduled in this case that you could put the matter on and then drive the parties to litigation on this.

So, why don't you meet and confer on a schedule and a hearing date and we'll move forward with that.  You can use an omni if we think that you can get it done --

MR. MCNEILL:  Okay.  Thank you -- yeah, thank you, Your Honor.

THE COURT:  -- in the omnibus time.

MR. MCNEILL:  I think we're trying to schedule a call, I think, tomorrow, but it was, you know, kind of -- it was kind of too little too late at that point --

THE COURT:  Yeah.

MR. MCNEILL:  -- and so, I did want to raise it for Your Honor because I think, you know, we had a fundamental disagreement about even the tracing thing, given the facts and circumstances of this case, Your Honor.  But I understand your ruling and we will meet and confer and get this back on the calendar.

THE COURT:  That would be great.

MR. MCNEILL:  Thank you, Your Honor.

THE COURT:  That would be helpful.

And the docket is becoming unmanageable, it seems, so it's important that you all keep abreast of your matters and do what you did to keep pushing forward to get them

scheduled, because things can just get lost.  So it's incumbent upon everyone to be focused and advocate their scheduling, I think, in a case of this nature, so thank you.

MR. MCNEILL:  Thank you, Your Honor.

I'm not sure there's much else going forward, but I am not interested in it.

May I and my colleague be excused?

THE COURT:  That would be fine.

And just one more thing.  I'm fine with you all want to agree on an informal schedule, but to the extent that there'll be further deadlines that we could, perhaps, from the Court's standpoint, keep track of, like, in a reply deadline and when you want to schedule it for a hearing, if you could just keep us abreast of it, I would appreciate it because we'll monitor and be able to prepare for the hearing, as opposed to, you know, receive a reply two days before the hearing.  It just makes it difficult for us to be -- to prepare.

MR. MCNEILL:  Absolutely, Your Honor.

THE COURT:  If you want to do a more formal order, just submit it under certification of counsel and I'll enter that order.  It's up to you.

MR. MCNEILL:  Okay.  Thank you, Your Honor.

THE COURT:  Okay.  Thank you.

You may be excused.

MR. GLUECKSTEIN:  Thank you, Your Honor.

And point understood, and we are, as the Trust, endeavoring to do that.  We understand there are a number of matters, there are a number of claims objections that are pending.  We are, certainly, only trying to bring forward the ones that we believe are ripe and ready for the Court's attention --

THE COURT:  Okay.

MR. GLUECKSTEIN:  -- that we're unable to resolve.  And we, of course, will give the Court sufficient notice on that.

THE COURT:  Okay.  Thank you.

MR. GLUECKSTEIN:  With respect to the matter going forward this morning, and we have successfully, as Mr. Pierce referenced, been able to resolve many of the matters that were originally scheduled for this morning's session, consensually.  Well, there was a late adjournment on one that we're talking to the movant.

So, as far as this morning goes, the only matter going forward is Agenda Item 41, which is there's objection to the remaining portion of the proof of claim filed by Ross Rheingans-Yoo.  Your Honor, there was a lot of paper associated with this claim, but there's very little of it that's still relevant at this point.

THE COURT:  I'm motioning for the counsel to the

claimant to move forward and set yourself up at counsel's table, if you see fit.

(Pause)

MR. GLUECKSTEIN:  And specifically, Your Honor, with respect to the landscape of this claim, in April of 2024, the Debtors were able to settle all aspects of this claim except for what is referred to in the briefing as the "FDU claim," which relates to a portion of a claimed bonus where the claimant asserts FTX will make, upon election, a $650,000 donation to an effective, alterous cause of the movant's choosing if he wants, is the language that was used.

We resolved everything else.  We left that claim expressly open because there was a disagreement with that claim that could not be reached.  And so, where we -- what we tried to do was streamline this issue for the Court.  And the parties are in agreement that the question before the Court today is really one that's legal in nature and application of what are undisputed facts at this point; in fact, we have filed a stipulation of undisputed facts, filed at Docket 29218, so that there are no material facts in dispute and we agreed no evidentiary hearing would be necessary.

I will briefly address why the claim, from the Trust's perspective, can never be allowed.  We did address these points comprehensively in our reply brief filed at Docket 30712.  But just for a bit of context, Your Honor,

stepping back, what Mr. Rheingans-Yoo is asking this Court to do is to compel the FTX Recovery Trust to make a $650,000 payment to a still-undisclosed, effective, alterous charity of his choosing from funds that, of course, have been recovered for the benefit of FTX creditors to be distributed to victims of the fraud and the matters that have been before this Court for, unbelievably, will soon be three years.

Mr. Rheingans-Yoo is seeking this money to be paid out of the trust, despite the fact that the offer to make such a donation that if it had been accepted prepetition -- and there's no dispute that there was never any designation made by the claimant prepetition; there was never a request made to FTX prepetition that's in the stipulated facts -- but if a request had been made and a payment had gone out in the period of time that we're talking about prepetition, the Debtors would have sought to claw this money back as a fraudulent transfer, alongside the approximately $95 million and counting of improper, prepetition FTX donations that were made to hundreds of entities that have already been brought back into the estate.

The record of FTX making specious, fraudulent, improper payments to purported charities and political groups is well-documented in the record of these Chapter 11 cases and elsewhere.  There's no basis, legally, equitably or otherwise to permit Mr. Rheingans-Yoo to force the Recovery

Trust to make the $650,000 payment to an undisclosed recipient now, when if FTX had done so prepetition, we submit it would not have been permitted to stand.

The request for payment that the claimant has dressed up as a claim, we submit, must be denied for three independent reasons and just to touch on them briefly, first, the movant has -- the claimant has no standing to recover on the FDU claims because he's neither a creditor with an actual entitlement to be paid, nor an authorized agent of such creditor.  His proof of claim asserts that he is the creditor.  He checked the box; he's the creditor who's seeking to recover from the estate.

He has since recognized in the papers and in the stipulated facts, that he doesn't have right to payment on the claim under which the terms of the bonus memo, if enforceable, merely provided that Mr. Rheingans-Yoo would be able to direct a payment, if requested, to an effective, alterous cause.

THE COURT:  Let me interrupt you.

If he had made the designation prepetition, as you assert was necessary, then what would have been the -- what would you have like to seen -- what would you have liked to see with respect to a claim?

MR. GLUECKSTEIN:  I think the only -- at that point, if a designation had been made -- if the hypothetical

is the designation was made but the payment was not made --

THE COURT:  Correct.

MR. GLUECKSTEIN:  -- if he had just identified the creditor --

THE COURT:  Uh-huh.

MR. GLUECKSTEIN:  -- potentially, that organization could have attempted to file a claim.  We would object to it, because we don't believe that would be a valid claim.

THE COURT:  Why is that, again, I'm sorry?  It's not abundantly clear to me why you don't think it would be a valid claim, because under -- isn't the theory that it is part of his bonus compensation?

MR. GLUECKSTEIN:  His theory is that it's part of his bonus compensation, right.

THE COURT:  Okay.

MR. GLUECKSTEIN:  The question is whether or not the bonus compensation offer was, in fact, accepted.

So, if it was, in fact -- if the hypothetical is it was, in fact, accepted and he designated somebody to receive this payment, but we did not make the payment, we would still have, at that point, that entity could, theoretically, I guess, have come in and made a claim and we would have had to evaluate the propriety of that claim and the circumstances in which that grant was made to that

entity.

THE COURT:  Uh-huh.

MR. GLUECKSTEIN:  That's a different fact pattern that we have now.

Those two gating issues, right, from our perspective, never happened.  There was never an acceptance of the offer to actually inform FTX that they want -- that the claimant wanted such a payment to be made and no designation was ever made of an entity.

So what we have now, post-petition, is Mr. Rheingans-Yoo coming in and arguing that that offer was somehow fixed and we should now make the payment to him, that maybe could be directed.  We, of course, have no recourse as to where that money would go at that point and, of course, the plan isn't set up that way.  And that's why the case law is clear that the actual claimant has to be the party who is submitting the claim unless they are doing it on behalf of another party and we know who that party is.

What we would have this in situation, if this claim were to become allowed, we would make a $650,000 payment to the claimant who, even under the bonus compensation structure, if accepted as true, prepetition, was never entitled to possess that money or to keep that money, certainly.  He was entitled to direct FTX to make a payment to somebody else.  That never happened and would still never

happen, right.  As we sit here today, we have no idea where that money would go if this claim was ultimately allowed.

THE COURT:  And why wouldn't I be able to just direct the claims agent to make the distribution to the charitable entity of his choosing?

MR. GLUECKSTEIN:  If the claim were to ultimately become allowed and Your Honor put parameters around it, it would be under -- you could order and put parameters around what you needed to put it around --

THE COURT:  Uh-huh.

MR. GLUECKSTEIN:  -- but under our claims structure under the plan --

THE COURT:  Uh-huh.

MR. GLUECKSTEIN:  -- right, from the Trust's perspective, if we have an allowed claim, we pay the claimant.

The holder of the claim at that point would be Mr. Rheingans-Yoo, as the claimant, who has submitted the claim.  We have nobody else on the scene.  We have nobody else identified as to where that money would go.

THE COURT:  Okay.  I understand.  Thank you.

MR. GLUECKSTEIN:  The only other point I would just address, and I'll let him speak -- his counsel speak and reserve on rebuttal -- but the -- what we see in the further response that the claimant filed here is a lot of reference

and discussion about the negotiation history leading up to the bonus memo that documented what we're now here talking about, this potential $650,000 payment.  And we submit while that documentation is annexed to the stipulated facts because those documents exist, right, our position is that none of those documents are relevant and that parol evidence is not admissible for the question at hand because what we have is an employment agreement that postdates those documents.

That agreement includes an integration clause.  It's clear.  The language is clear.  The case law is clear that on that type of language and, in fact, almost verbatim language, the cases we cite in our reply papers, the Court is not to look at parol evidence that predates that.  If Mr. Rheingans-Yoo liked some of the formulations of how his compensation bonus was going to be structured from the earlier correspondence between himself and Mr. Bankman-Fried, he needed to document that in the signed agreement.

The signed agreement is what controls here.  That does not provide for any of this with respect to this potential payment.  What, then, would govern it was his bonus memo that postdates in connection with his employment agreement and that has this language, whereby he needs to have accepted and designated in order to trigger this.

And from our perspective, Your Honor, it is important that the employment agreement itself talks about

the fact that a bonus could be offered and granted at the sole discretion of the Debtor entity.  And terms can be put on that.  Conditions can be put on that.  And the conditions that were put on this particular piece of the grant, unlike his other compensation which resolved for the settlement that we reached last year, was that this had to be accepted. There had to be direction provided to the Debtor, or to FTX at the time --

THE COURT:  Uh-huh.

MR. GLUECKSTEIN:  -- and that never happened.  And it's undisputed that it has never happened, even up until today.

What's being asked for is the Court to grant this claim, to make the $650,000 payment, and as we would have to pay out under our plan, absent the Court imposing some sort of conditions, we would pay it to the claimant and that would be the end to the Trust's role in this.  And we don't believe that under the circumstances, funds should be coming out of the trust that are otherwise distributable to victims here for this sort of a claim.

THE COURT:  When do you assert was the deadline by which the claimant had to accept the alleged offer?

MR. GLUECKSTEIN:  The claimant -- well, the reality of the situation is that shortly after the events in question here, we filed for bankruptcy, right, so --

THE COURT:  Which would have been my next question:  When was the petition date in relation to this?

MR. GLUECKSTEIN:  So while there wasn't a firm expiration deadline that's set out in the documents, we certainly believe FTX would view this as requiring acceptance within a reasonable period of time.  But it's mooted by the fact that, from our perspective, that the bankruptcy intervened here.

And so there was no -- there was a period of time pre-bankruptcy, but no designation was made.  But then the bankruptcy happens, the proof of claim is filed.  There was never any attempt to designate anybody pre or post-petition, and so --

THE COURT:  When was the bar date established in this case?

MR. GLUECKSTEIN:  I'm sorry, Your Honor?

THE COURT:  When was the bar date?

MR. GLUECKSTEIN:  The bar date on this type of a claim was June -- the non-customer claim bar date was June of 2023.

THE COURT:  Okay.  Thank you.

MR. GLUECKSTEIN:  So that's -- you know, the claim was filed and preserved in connection with the bar date, but the bar date was set eight months after the petition date.

THE COURT:  Understood.

Okay.  That's helpful.  Thank you.

MR. GLUECKSTEIN:  Absent any other questions, Your Honor, I would just reserve time for rebuttal.

THE COURT:  I don't think I have any at this time.  Thank you.

MR. GLUECKSTEIN:  Thank you, Your Honor.

MR. JOYCE:  Good morning, Your Honor.

THE COURT:  Good morning.

MR. JOYCE:  Nice to be here, Your Honor.

THE COURT:  Nice to see you.

MR. JOYCE:  Michael Joyce for claimant, Ross Rheingans-Yoo.

Your Honor, Mr. Rheingans-Yoo is in court today, along with my co-counsel Scott Simon of the Goetz Fitzpatrick firm.  Mr. Simon is admitted *pro hac* and I would cede the podium to Mr. Simon if it pleases the Court?

THE COURT:  That would be fine.  Thank you.

MR. JOYCE:  One matter, Your Honor, before I do.

I want to make sure you had a copy of the stip and the related exhibits; if not, Your Honor, we can hand up a binder.

THE COURT:  Oh, I don't have them in front of me and I'm happy to refer to them during argument.

MR. JOYCE:  May I approach, Your Honor?

THE COURT:  Absolutely.

(Pause)

THE COURT:  Thank you.

Do you happen to have an extra copy for my law clerk?

MR. JOYCE:  I have possibly one to share.  You can have this one.  We have our own copy.

MR. SIMON:  We gave a copy to counsel, so...

THE COURT:  Oh, okay.  If you happen to have an extra one.  Thank you.

MR. SIMON:  Thank you.  I appreciate it.

Good morning, Your Honor --

THE COURT:  Good morning.

MR. SIMON:  -- Scott Simon, Goetz Platzer, LLP, representing Ross Rheingans-Yoo, who is here in the courthouse with us today.

The Debtors are objecting to a strawman version of Ross' claim.  They say Ross lacks standing, but they cite products liability cases where the claimant had no relationship with the Debtor.  They cite a case where the claimant sold his claim to a third party before he filed it.  They cite cases where the claimant filed the proof of claim representing an undisclosed class action, right.

None of the cases the Debtor cites addressed the issues that we have before the Court today, which is Ross was employed by the Debtor.  The Debtor awarded him a bonus --

that's undisputed -- the Debtor did not pay the bonus.  Ross has standing to assert a wage claim here and this isn't argued; this is stipulated fact.

The Debtor issued a bonus memo to Ross two months before the petition date, in August or September of 2022. The Debtor did not dispute Ross' standing to assert the cash portion of his claim; that was resolved.  So it doesn't make sense for the Debtor to say that Ross lacks standing to assert a claim based on the FDU portion, which was awarded in the same bonus memo.

The Court understands that it's not our position that Ross should be paid this FDU claim.  He is asserting the claim because he has a right, a property right, a wage right to direct payment to a charity that he designates.

Next, the Debtors say that Ross forfeited the FDU bonus by not accepting it in the two months between the bonus memo and the petition date.  Again, the Debtor argues against the strawman.

They cite a case where the Debtor claims he should have been awarded a bonus based upon the Debtor's past course of performance of awarding bonuses to people in that position and the Court disallowed the claim because the Debtor had the discretion to award a bonus or not.

Here, of course, the parties stipulated that the Debtor actually awarded the FDU bonus to Ross.  This

distinction is material, Your Honor.  The Debtor did not engage with the numerous cases we cited for the principle that a bonus is earned when it's awarded, not when it's paid, even if the bonus is contingent upon future events.  Nor did the Debtor engage with the cases we cited anticipating the argument on reply that Ross waived the bonus by not accepting it before the petition date.

It's black-letter law that waiver requires a voluntary and intentional relinquishment of rights.  In the stipulated facts, the parties agree that the bonus memo contained no mechanism for Ross to accept the bonus, nor a deadline for him to do so.

In one of the cases the Debtor cited on reply, Barker v The Bancorp, the Court recited a longstanding policy against the forfeiture of earned wages.  That's what we have here.  Ross, indisputably, earned a bonus.  It was awarded to him.  The Debtor is wrongfully arguing that Ross forfeited.

Now, the Debtors would have the Court exclude Exhibit G in the binder we just provided; that's called "final Ross terms."  The final Ross terms is the final version of a negotiated document between Ross and the Debtors that was executed before the employment agreement was signed.

The Debtor seeks to preclude Ross terms because the Ross terms affirmatively states that Ross would receive the bonus.  The Debtor's obligation to pay the bonus is not

contingent upon Ross accepting it.  There's no "if you want" in the bonus memo.

The Debtor also seeks to preclude Ross terms because it discusses Ross holding or rolling over the FDU bonus, demonstrating that the parties never expected Ross to immediately designate a charity.

Now, the Debtor holds up the employment agreement's integration clause as a complete bar to the admissibility of Ross terms as parol evidence, but that's not the law.  Even the cases cited by the Debtor provide that an integration clause prevents evidence from being admitted only for the purpose of contradicting a writing when the subject is specifically dealt with in the written agreement.

Here, Ross does not seek to shirk his part in or avoid the consequences of the plain language of the employment agreement.  The employment agreement provides the Debtor explicitly with two pieces of discretion:  how much -- whether to award a bonus at all and if the bonus is awarded, how much to award.  This is undisputed.

The Debtor ignores that the employment agreement fails to discuss the structure of the bonus as the bonus structure was discussed in Ross terms.  So Ross terms doesn't contradict the employment agreement; it acknowledges that the Debtor has discretion to award a bonus.  It's right there in Ross terms.  But it says if a bonus is awarded, then it will

be awarded, half in cash and half in FDUs that Ross can direct to donate to charity.

So --

THE COURT:  Doesn't the bonus memo memorialize that anyway; I mean, doesn't the bonus memo that came after the employment agreement --

MR. SIMON:  It does --

THE COURT:  -- provide the bonus and the FDU award?

MR. SIMON:  Your Honor, you're absolutely right, but what it --

THE COURT:  Okay.  So why do I need to look at the Ross terms anyway?

MR. SIMON:  Because -- for two reasons:  one, the bonus memo doesn't say -- it's inconsistent with the employment agreement, right.  The bonus memo says, "if you want."

THE COURT:  Okay.

MR. SIMON:  The employment agreement doesn't say, "if you want."

So while we're on the topic of this integration clause, the Debtor seeks to apply it to Ross, but not to, themselves.  If the Debtor is correct that the employment agreement is fully integrated, right, they claimed a minute ago, terms can be put on the award of the bonus; that's

Counsel's own language.

Terms can't be put.  That's what an integration clause means, right?  So if the employment agreement is fully integrated, it says the Debtor has discretion whether to award a bonus and how much to award a bonus.  It doesn't say the Debtor can condition the bonus on Ross' specific acceptance of it; it's awarded.  It's deemed accepted.

The employment agreement does not allow the Debtor to condition a bonus.  It's also worth mentioning that the employment agreement, while being unambiguous, was followed by the bonus memo, which is ambiguous.  The Debtor admits that the bonus memo doesn't tell Ross by when he needed to designate a charity, nor the mechanism for him to do so.

So there's a fundamental principle that ambiguous documents are construed against their drafting.  The Debtor cited a case about the longstanding policy against forfeiting wages.  So the Debtor can't be heard to argue that Ross voluntarily and intentionally forfeited this FDU bonus by not accepting it in the two months between when it was awarded and when the Debtor filed a Chapter 11 petition.  This may certainly be an issue of first impression for the Court. It's certainly unusual for an executive to negotiate for half of his bonus to be paid as a donation to the charity of his choice, but Ross is a charitable person.  He was hired to direct the charity and he wanted his compensation to be paid,

in part, to charity.  This is what the Debtor and Ross agreed, as evidenced by Ross terms.

THE COURT:  Well, putting aside the Ross terms, if this is a contract dispute, one could argue that the missing deadline is a missing term.  So what's my authority to fill in, under contract law, the missing term?

MR. SIMON:  The missing term can be filled in by extrinsic evidence because if there's a missing term, then the employment agreement is only partially integrated.  And I cited many cases for that provision, that principle in my papers.

If a partially integrated document is presented to the Court, then the parties' prior negotiations are fair game, especially here, where that parol evidence does not contradict the agreement.  The Ross terms is the exact evidence the Court is looking for that says:  Here's how the bonus will be structured.  There is no timeline for Ross to accept.  It could be held.  It could be rolled over.  And there's no "if you want" provision.

But even if the Court declines to consider Ross terms, there's no doubt that the FDU bonus was part of Ross' compensation.  He earned that compensation when the Debtor awarded it to him and the Debtor's attempt to blatantly add an "if you want" term that's not in the employment agreement should be rejected.

THE COURT:  Well, couldn't the proof of claim be the answer to the "if you want"?

MR. SIMON:  It certainly could.

I mean, the Debtor is claiming that it wasn't accepted within a reasonable time, but given a mere two months and the fact that Ross was an employee, I don't think that argument holds water.  So, yes, Your Honor, I believe that the claimant here should not be found to have intentionally and voluntarily forfeited wages that he earned.

THE COURT:  Let me ask you this:  Why haven't you designated the charity?

MR. SIMON:  Because --

THE COURT:  Why don't we know who this alleged charity would be?  I have concerns about that.

MR. SIMON:  Because as soon as we filed the claim --

THE COURT:  Uh-huh.

MR. SIMON:  -- well, let's back up for a second.

The Debtor filed an adversary proceeding against Ross and several other entities.  Ross was the director of an FTX affiliate called "Latona BioScience."  Latona was one of the charitable arms of FTX and Latona made grants, donations, investments in health and science companies.

The Debtor clawed back, as part of this adversary proceeding settlement, those donations because they were made

directly from the Debtor to those entities.  Ross as a Defendant was alleged wrongfully to have, you know, conspired with Sam Bankman-Fried about the underlying fraud.  These claims were all resolved and settled, but because in that adversary proceeding the Debtor immediately indicated that Ross was not entitled to any portion of his claim, we didn't feel that it was necessary or proper at the time to throw up a flag and say, Oh, by the way, here's the charity, right.

It's just, procedurally, we were baffling over whether the charitable donation, that FDU claim, was allowable.  And now, once the Court determines that it's allowable, we can certainly work with the Court and Counsel to -- with, you know, the claims payment process and the claims administrator to pay that out.  Ross does not seek to be paid that money, but Ross has the property right to direct the Debtor to pay that money.

Thank you, Your Honor.

THE COURT:  Okay.  Thank you.  I understand.

MR. GLUECKSTEIN:  Thank you, Your Honor.

Brian Glueckstein for the Recovery Trust.

The backdrop here is important, all right.  This all arises out of what was a substantial piece of fraudulent transfer litigation.  What the claimant was doing, we had significant concerns, we had serious allegations about what Latona, itself, what all these charitable donations that were

coming out of this entity were doing.  We did claw those amounts back.  There were settlements.

So the merits of our allegations were never adjudicated by the Court, because we managed to settle those claims consensually, okay.  But at the end of the day, what it's being asked to do now is to take a future -- an additional portion of -- I'll come back to where I started.

If this money had been paid out in the period we're talking about, if on September 2nd, the claimant had designated the charity and FTX had made the payment, this $650,000 would have been subject to the same clawback as all the other payments that were subject to that litigation and otherwise.

THE COURT:  Well, you would have asserted that.

MR. GLUECKSTEIN:  We would have asserted that.

THE COURT:  Right.  That's not fact or law.

MR. GLUECKSTEIN:  It's not fact.

THE COURT:  The fact is that you would have tried to claw back.

MR. GLUECKSTEIN:  And I --

THE COURT:  But that's not the facts we have before us.

MR. GLUECKSTEIN:  Well, I think it would raise an interesting question if it was paid out now, whether we still retain those claims because I think --

THE COURT:  Absolutely.

MR. GLUECKSTEIN:  -- we would seek to claw those back if it were to be paid out now because it's all arising out of the same circumstances.  But I guess --

THE COURT:  I guess all rights reserved, if I were to allow the claim.

MR. GLUECKSTEIN:  So that's -- I mean, that, potentially, is an issue for down the road if we were to get there.

THE COURT:  Okay.

MR. GLUECKSTEIN:  But at the end of the day, the issue here, with respect to this payment, the employment agreement itself talks about, has a section about bonuses: You may be eligible for a bonus.

The bonus memo, right, the bonus memo itself talks about and has this language:  If you want us to make the payment, we'll make the payment.  That is an offer.  That piece of it is different; it's worded very differently than the rest of his compensation, which awards him specific compensation.

And so it is our argument that that piece of that offer had to be accepted and it wasn't.  And I understand Your Honor's hypothetical to counsel:  Could the proof of claim by the acceptance?  That's a question for the Court. We don't think so; we think this needed to happen earlier in

time.

THE COURT:  Well, I guess I'm beginning to ask you the same question that I asked claimant's counsel, which is under your argument, distilling it to a legal theory, okay, which is what I'm required to do, there's a missing term, because everyone agrees there's no deadline.  So I have to fill in that term or maybe the missing term is so essential it negates the entire contract, but that's not what I'm hearing.

So, how do I fill the missing term in?  What do I look to?  What's your position?

MR. GLUECKSTEIN:  Our position -- I certainly don't -- we certainly don't agree.  Well, there's two points.  So, the Ross terms, as they're referred, we do not believe those are not admissible.

THE COURT:  Okay.

MR. GLUECKSTEIN:  I don't believe, even if Your Honor were to look at those terms, that that answers the question Your Honor is positing now.

THE COURT:  Correct.

MR. GLUECKSTEIN:  Because it doesn't -- in those terms, it's more direct language about awarding, but it doesn't talk about acceptance, how this would be paid; nonetheless, we think the answer here to this question is, this never happened in the two months prior to the petition.

The petition happened.

Our position is regardless of whether there was a deadline, whether there was a firm deadline that had to be executed on by Mister -- by the claimant here, if, regardless of whether that existed or what that term would be, there has to be a prepetition claim as of the petition date.  Now, our argument is that claim never vested, because he never accepted it.

So, whether he could have accepted it a day later or a month later or two months later --

THE COURT:  Uh-huh.

MR. GLUECKSTEIN:  -- had there been no bankruptcy, he never accepted the offer as of the petition date.  There was no claim.  There was an offer with no acceptance to this piece of his bonus offer.  He doesn't have a prepetition claim that vested as of the petition date.

THE COURT:  It wouldn't be contingent?

MR. GLUECKSTEIN:  Contingent on -- I don't think so -- contingent on him accepting, later, the offer?

THE COURT:  Well, there's no deadline.  I guess I'm sorry that I'm fixated on this deadline and, you know, you have to get me off the deadline, because I'm fixated on this deadline.  It's clear, under your theory, there's an offer, but there's no indication of when the claimant may have accepted or was required to accept, so to me, there's a

missing term.

Do we disagree?

MR. GLUECKSTEIN:  If there's -- there is -- there is no deadline.  We -- I agree --

THE COURT:  Okay.

MR. GLUECKSTEIN:  -- there is no deadline, as in the documentation --

THE COURT:  Right.

MR. GLUECKSTEIN:  -- as to when he would have had to accept.

THE COURT:  Okay.  So, does that make the claim contingent?

MR. GLUECKSTEIN:  I think it -- I don't think it makes the claim contingent.  I think what it does is that he -- that there was no -- there was no claim as of the petition date, because he did not accept it prior to that.

Whether he -- whether the deadline was November 1st, December 1st, six months later, the intervening event here was a bankruptcy.  There was no claim that he has at that time.

THE COURT:  Okay.

MR. GLUECKSTEIN:  If the argument is he could have accepted it at any point in the future and we have this indefinite, contingent claim, you know, it's -- we disagree with that.

THE COURT:  Okay.  No, that's helpful.

Okay.  I think I more -- I understand your position.  Okay.

MR. GLUECKSTEIN:  Thank you, Your Honor.

THE COURT:  Okay.  Thank you.

Okay.  Let me take a short break and I'm going to come back and rule, all right.

We'll stand adjourned.

MR. SIMON:  Thank you, Judge.

(Recess taken at 10:16 a.m.)

(Proceedings resumed at 10:42 a.m.)

THE CLERK:  All rise.

THE COURT:  Thank you for your patience.  Please be seated.

All right.  Thank you for the submissions in anticipation of today's hearing on this issue, as well as the arguments today.  And I do appreciate the parties meeting and conferring to streamline the hearing today and reach the stipulated facts that smoothed the way for today's argument.

Based on the submissions and the arguments of counsel today, I am prepared to overrule the Debtor's objection and allow the FDU claim as a general unsecured claim.  I'll note at the outset this is a highly unusual set of facts -- I've never seen it before -- it does put us in a bit of a procedural, a unique procedural posture, with

respect to the claim distribution, and I'll talk about that in a moment.  But to the actual issues at hand, I do find that the claimant has standing to assert this claim, given his personal interests in the FDU and the bonus.  And I do believe that the claim was part of his bonus, as indicated by the subsequent memorandum of Mr. Bankman-Fried, outlining the terms of the discretionary bonus approved by the company.

As I think I hinted at very clearly in the argument, the deadline to accept the FDU bonus was not delineated in the memo, but I find that it was preserved through the proof of claim that was submitted timely, pursuant to Judge Dorsey's bar date order and that this is reasonable, given that the bankruptcy intervened shortly after the bonus memorandum was issued.

Mr. Yoo has indicated that he is not seeking to receive payment of the claim; he would like it directed to the charity.  I think the way to go about handling this issue is for the parties to meet and confer on the designated charity and that there is an order that allows the claim, but directs the claims agent to make the payment to the charity that is designated by the claimant.

If there's dispute, with respect to the claimant -- the charity that is designated; that issue is not before me today and I would entertain the dispute, if there is one.  You'll have to let me know what that dispute is and

how we'll tee it up, okay.

Let me ask, when can you make the decision on the charity, because I think it needs to be done ASAP.

MR. SIMON:  Within the week, Your Honor.

THE COURT:  Okay.  All right.

So meet and confer with Mr. Glueckstein and his colleagues regarding a form of order that would memorialize the ruling and address the distribution issues.  There could be some unique issues from the Trust's perspective and the claims agent, so we'll work through those issues and I'll be here if you need me for subsequent disputes, okay.

Okay.  Thank you very much.

MR. SIMON:  Thank you.

THE COURT:  Is there anything else for this session?

(No verbal response)

THE COURT:  No?

Okay.  I will see you, then, at 1:30.  Thank you all very much.

COUNSEL:  Thank you, Your Honor.

THE COURT:  We'll stand adjourned.

(Recess taken at 10:45 a.m.)

(Proceedings resumed at 1:35 p.m.)

THE CLERK:  All rise.

THE COURT:  Good afternoon.  Nice to see everyone.

Please be seated.

MR. PIERCE:  Good afternoon, Your Honor --

THE COURT:  Mr. Pierce?

MR. PIERCE:  -- Matthew Pierce.

Good to see you again.

THE COURT:  Good to see you again.

MR. PIERCE:  Your Honor, I'm Matthew Pierce of Landis Rath & Cobb on behalf of the FTX Recovery Trust, for the record.

Your Honor, we're picking up on the agenda where we left off where we broke this morning, which is Agenda Item 44.  I will turn it over to Mr. Dunne, who will handle the balance of the agenda.

THE COURT:  Great.  Thank you so much.

MR. DUNNE:  Good afternoon, Your Honor.

THE COURT:  Good afternoon.

MR. DUNNE:  Christopher Dunne from Sullivan & Cromwell for the FTX Recovery Trust.

We are here to address certain threshold issues relating to the Trust's amended objection to the claims filed by Mr. Seth Melamed.  As a brief reminder, Mr. Melamed has filed five operative claims seeking approximately $36 million.  These claims arise from FTX's acquisition of a company called "Liquid Group," of which Mr. Melamed was a shareholder and an officer, as well as some subsequent

employment operations.

Mr. Melamed's principal claim, which is Number 3385, relates to the Liquid share-purchase agreement, sounds and fraud and breach of contract, and we refer to this in our papers and I'll refer to it today as the "SPA claim." The vast majority of the value that Mr. Melamed seeks to recover across all of his claims comes from two buckets of consideration that were set forth in the Liquid SPA and those buckets are one million shares of FTX common stock; we call that the "FTX consideration shares," and specified amounts of particular cryptocurrency tokens, which were to be delivered to Mr. Melamed in April 2023 and 2024, but we're not delivered, of course, because FTX went into bankruptcy.  We call that the "crypto consideration."  And as this Court is aware, of course, Mr. Melamed has moved to compel arbitration.  The Liquid share-purchase agreement has a Singapore law arbitration clause.  The Trust opposes arbitration.

At the May 14th hearing, Your Honor, the Court determined that we would address three threshold issues today:  first, whether the portion of Mr. Melamed's claim relating to the FTX consideration shares should be subordinated, pursuant to Section 510(b) of the Bankruptcy Code; second, whether the FTX plan of reorganization should be applied to Mr. Melamed's claim relating to the crypto

consideration. As this Court is aware, the plan provides that claims in respect of digital assets are valued using petition date prices, as set forth in the digital assets estimation order. And, third, the third threshold issue being, whether any of Mr. Melamed's claims should be liquidated in arbitration.

Before I begin, Your Honor, I would remind the Court that both, the Trust and Mr. Melamed, have submitted declarations of four law experts in connection with this matter and at the May 14th hearing, the parties agreed that these declarations should be admitted into evidence and to forego cross-examination of the secured parties. The Court subsequently also indicated that it did not have questions for the experts, so the Trust respectfully moves to admit into evidence the declarations of Mr. Taro Tanaka and Mr. Ashok Kumar; those are the trust experts on Japanese and Singapore law, respectively. Mr. Tanaka's and Mr. Kumar's declarations were filed with the Court electronically at Dockets 28646, 30365, and 30367.

THE COURT: Okay. Any objection?

MR. ADLER: None, Your Honor.

THE COURT: Okay. They're admitted into evidence. Thank you very much.

(Tanaka Declarations received in evidence)

(Kumar Declaration received in evidence)

MR. DUNNE:  Thank you, Your Honor.

With the Court's permission, I'll begin with Section 510(b), subordination; the first threshold issue.

THE COURT:  Okay.

MR. DUNNE:  Your Honor, Section 510(b) provides that claims for damages arising from the purchase or sale of a security of the Debtor shall be subordinated.

Mr. Melamed's claim relating to the FTX consideration shares plainly is such a claim.  It is a claim for damages and it arises from the purchase of FTX securities, because Mr. Melamed received FTX common stock in exchange for his Liquid shares.  There's no dispute about that.

If there were any doubt that Mr. Melamed's claim must be subordinated, the policy underlying Section 510(b) makes clear that it must be.  Many courts have recognized that in enacting 510(b), Congress made the decision to subordinate based on risk allocation.  And as the Third Circuit has observed, Section 510(b) was enacted to stop disappointed shareholders from, "bootstrapping their way to parity with general creditors."

Mr. Melamed contracted for and received FTX shares.  He is transparently trying to put his claim ahead of other shareholders by framing it as a claim for breach of contract and for fraud.  When Mr. Melamed sold his Liquid

Group shares to FTX, he could have negotiated for payment in cash entirely.  By agreeing to be paid in FTX shares, he has, as the Third Circuit put it, assumed the risk of business failure.

Now, in all of the papers he has filed in connection with this claim objection proceeding, Mr. Melamed has raised only two arguments against Section 510(b) subordination.  In the first, he has tried to really delay adjudicating it, arguing that this Court should not consider the matter until other issues, including arbitration, are first resolved; the Court correctly rejected this at the May 14th hearing.

Second, in response to his initial objection -- I'm sorry, in response to the initial claim objection that we filed last year, he argued that the SPA was an agreement for the sale of Liquid Group equity, not FTX equity, and that FTX shares were, at best, incidental to the transaction.  We would submit that this argument is baseless and, notably, Mr. Melamed did not raise it in response to the trust's amended objection.  The FTX consideration shares were hardly incidental to the SPA; in fact, they comprised approximately 60 percent of the compensation that Mr. Melamed received in the transaction, and the substantial majority, even more than 60 percent, of what he's currently seeking on all of his claims now.

And, Your Honor, the fact that Mr. Melamed acquired the FTX consideration shares as part of the Liquid M&A transaction does not change the fact that they are shares, the shares are equity of a debtor, and that his claim must be subordinated.  As in many similar M&A transactions, Mr. Melamed paid for the FTX consideration shares by tendering his Liquid shares to FTX.  The same is true of many claimants in many other cases whose claims were subordinated. For instance, in both In re Kaiser Group International and Peregrine Systems, these are cases cited at page 13 of the trust's amended objection and page 8 of the trust's reply, claimants received debtor equity as part of a share exchange in a merger, and they subsequently sued for fraud and breach of contract.  In both cases, this Court subordinated the claims, stating that they were squarely within the purview of 510(b).

When Mr. Melamed entered into the SPA, he accepted the FTX consideration shares and their associated risk as partial consideration for the shares of Liquid that he provided to FTX, and he must, therefore, assume the risk of FTX's business failure.

Relatedly, Your Honor, Mr. Melamed's SPA claim seeks indemnification of his legal fees that he's incurred in this action pursuant to an indemnification provision in the Liquid Group SPA.  To the extent that Mr. Melamed is entitled

to any indemnification payments, and we of course contend that he is not, those payments must also be subordinated pursuant to 510(b).  And that's because, Your Honor, in addition to claims for damages arising from the sale of the security of the debtor, Section 510(b) on its face calls for subordination of claims for reimbursement or contribution on account of such a claim.

This Court has consistently interpreted this language to include fees incurred in connection with litigation where the underlying claim is itself subordinated. So, put differently, if the Court concludes that Mr. Melamed's SPA claim should be subordinated, the legal fees incurred in litigating that claim must also be subordinated.

And pages 9 and 10 of the trust's reply cites several cases making this proposition clear.  This of course also makes sense as a matter of policy for all the reasons that go along with subordination of equity-related claims in the first place and, as this Court has recognized, a contrary rule would encourage frivolous litigation and disincentivize settlement, all at the expense of FTX's other creditors.

I'll now address, Your Honor, the second threshold issue, the crypto consideration.  As a reminder, Your Honor, the Liquid SPA provided that Mr. Melamed was to receive specified amounts of particular crypto currency tokens, which

were to be delivered to him in April of 2023 and April of 2024, which were not delivered, again, because FTX went bankrupt.

Unsurprisingly, and as Your Honor is well aware, the Court and all stakeholders gave substantial attention to the question of how to deal with digital assets when forming the FTX plan of reorganization, and the plan provides that the value of a claim in respect of digital assets is calculated by converting the value of the digital assets in question into cash as of the petition date in accordance with conversion rates set forth in the separate estimation order.

Now, Your Honor, the estimation order, as my partner Mr. Glueckstein knows all too well, was the linchpin of the plan itself, it was the subject of multiple contested hearings, competing expert testimony, and consideration of over 150 objections from various stakeholders.  It was intended to and, by its plain terms, does encompass all claims of any type relating to digital assets, which, without exaggeration, number in the millions.  This includes everything from claims brought by FTX lenders for repayment of digital asset loan claims to claims brought by FTX customers for digital assets held in their customer accounts.

Mr. Melamed is not entitled, Your Honor, to special treatment, his claim for the crypto consideration clearly falls within the plan's definition of a claim in

respect of digital assets and it should be valued accordingly.  To get very granular about it, it is a claim, as that term is broadly defined in the plan and the Bankruptcy Code, and the plan of course incorporates the Bankruptcy Code's definition, because it's a right to payment regardless of whether or when it was reduced to a judgment, liquidated, unliquidated, and all the other myriad features set forth in the Bankruptcy Code.  And it is of course in respect of digital assets because Mr. Melamed was promised specified crypto tokens and he's seeking to recover value associated with those tokens.

Now, Mr. Melamed, notably, has not challenged the trust's characterization of his claims for the crypto consideration as a claim in respect of digital assets under the plan, he just wants a different valuation framework and valuation date.

Mr. Melamed argues that the crypto consideration should be valued at the time the SPA was breached.  I want to be very clear about one thing from the outset, whether FTX breached the SPA and when that breach occurred, assuming it did, does not matter, the plan provides for one treatment of claims in respect of digital assets, regardless of how that is characterized, and that treatment is valuation as of the petition date using the estimation order.

When FTX filed for Chapter 11, as a practical

matter, Mr. Melamed had the right to receive specified digital assets on April 4th, 2023 and April 4th, 2024.  It's clear from the face of the SPA, which even defines the crypto consideration as the retained consideration because it was supposed to be retained at closing and released later. Although Mr. Melamed highlights the fact that there was a side letter to the SPA that states that the crypto consideration was paid on the completion date, he acknowledges in paragraph 19 of his SPA claim that FTX was entitled to retain that consideration and to release it in April of 2023 and 2024.

So, in short, Your Honor, what Mr. Melamed had on the petition date was a contractual right to digital assets, this makes him exactly like millions of other creditors, and Judge Dorsey correctly rejected arguments for prepetition valuations of crypto assets in formulating the estimation order.  Mr. Melamed, again, is not entitled to special treatment, the plan applies to his claim just as it does to anyone else who has a claim in respect of digital assets.

And finally, Your Honor, the threshold issue of arbitration.  First, the Court must address the question of which of Mr. Melamed's claims are even covered by an arbitration clause; this is Mr. Melamed's burden to prove. Mr. Melamed has asserted five claims, he moves to compel arbitration of all five of them based on an arbitration

clause contained in the SPA, but that arbitration clause relates at most to the SPA claim.  Mr. Melamed concedes that the portion of his administrative claim relating to the KEIP is not arbitrable.  Mr. Melamed's claims for prepetition compensation for bonus payments and, he contends, the non-KEIP portion of his administrative claim are governed by a separate management agreement, not the SPA.

Mr. Melamed argues that the management agreement claims are arbitrable because the management agreement itself arises from the SPA.  The management agreement of course does not contain an arbitration clause, it contains a very different clause, which I'll discuss in a moment.

So, Mr. Melamed is wrong for several reasons. First, and importantly, Singapore law governs the SPA's arbitration clause.  Mr. Melamed has not offered the testimony of any Singapore law expert or any analysis under Singapore law whatsoever.  The trust's Singapore law expert, Mr. Kumar, has explained that an arbitration clause in one contract does not extend to disputes arising out of a second independent contract even where the second contract is specifically contemplated by the first.  This is especially the case here because the second contract, the management agreement, not only makes no mention of arbitration it specifically confers the Tokyo district court with exclusive jurisdiction over disputes arising from that agreement.

Second, Your Honor, Mr. Melamed has cited one Southern District of New York case in support of his argument, that case is Celsius Mining, but that case does not help him.  The arbitration provision in Celsius Mining, stated in bolded, capitalized letters that the arbitration clause covered any dispute of any nature between the parties relating in any way to this agreement.  In light of that, the Celsius Mining court concluded that there was no requirement that the dispute arise under or even be in connection with the agreement in order to be arbitrable, and it held that the provision extended to disputes arising out of not just the main agreement, but a related promissory note as well.  Here, to fall within the arbitration clause, disputes must arise out of or in connection with the SPA.  So the provision does not extend as far as the one in Celsius Mining.

Mr. Melamed has not responded to these points ever, not once.  Instead, what Mr. Melamed has chosen to do is to argue for the first time in his reply brief that he does not need to demonstrate that a valid arbitration agreement governs his claims because the question of arbitrability should be decided by the arbitrator and not by this Court.  Your Honor should disregard this argument, it was raised for the first time last week in what was Mr. Melamed's fourth submission on the subject of arbitrability.  This is, in our view, a transparent attempt

to take the question out of this Court's hands at the eleventh hour because Mr. Melamed apparently has decided that he does not want Your Honor to rule on it.

But to be clear, Your Honor, Mr. Melamed is wrong. Even as a matter of U.S. law, the SPA's incorporation of the rules of the Singapore International Arbitration Center does not end the Court's inquiry here.  The U.S. Supreme Court has made clear that the Court should decide the issue of arbitrability unless there's clear and unmistakable evidence that the parties intended to submit that question to the arbitrator.  The Richardson case from the Third Circuit on which Mr. Melamed relies itself states that even where an agreement incorporates in that case it was the AAA rules, a contract might still otherwise muddy the clarity of the parties' intent to delegate.  And, notably, none of the cases that Mr. Melamed cites involve multiple contracts with inconsistent dispute resolution provisions, which is exactly what's present here and which clearly affects the analysis. In situations like that, many cases have held that the Court should not reflexively delegate the question of arbitrability to the arbitrable panel.

But to the extent that the Court is inclined to hear more on this topic, notwithstanding the fact that Mr. Melamed did not raise it until now, the trust would request leave to file a surreply, if the Court is inclined to

read one.

Now, Your Honor, even with respect to Mr. Melamed's motion to compel arbitration on the SPA claim, that too should be denied because there Your Honor still has discretion not to compel arbitration.  The Supreme Court has held that Bankruptcy Courts may decline to compel arbitration where there's an inherent conflict between arbitration and the Bankruptcy Code's underlying purposes.  And this Court held in In re Yellow that the Third Circuit case law does not prohibit the Court -- I'm sorry, does not require the Court to enforce a prepetition arbitration clause in the context of a claim objection.  It's more nuanced than that.  The Yellow court distinguishes the Mintz case, on which Mr. Melamed relies, on the grounds that claims allowance disputes involve the Bankruptcy Court's *in rem* jurisdiction and, unlike the Truth in Lending Act claim that was at issue in Mintz, claims allowance disputes arise out of Section 502 of the Bankruptcy Code, which states that Bankruptcy Courts shall determine the amount of contested claims and whether to allow them.

THE COURT:  Should I give any significance to the fact that the Yellow court focused on perhaps the wrong -- well, let me ask this a different way.

In Mintz, the court focused on the cause of action that was alleged by the parties, as have many, many, many courts in conducting the analysis of whether we should defer

or not defer, or apply discretion or not apply discretion. Yellow looked a little broader and said -- it didn't necessarily look at the cause of action that was being alleged, but looked at the proceeding and now it was brought to the court.  So, the focus there was on the proceeding, the claims objection process.

MR. DUNNE:  So, I'm sorry, what was your question, Your Honor?

THE COURT:  Well, I'm trying to formulate --

MR. DUNNE:  Oh, okay.

THE COURT:  -- my question, which is, that seems to be a break in the application of the law, quite frankly.

So, is the focus really on the nature of the proceeding, or is the focus more rightly on the cause of action that's being alleged?

MR. DUNNE:  I think, under this Court's jurisprudence, we can't ignore the context in which the claim alleges.

THE COURT:  Well, you would agree with me that that was *dicta*?

MR. DUNNE:  That what was *dicta* precisely, Your Honor?

THE COURT:  Well, so in Yellow the issue turned on whether he should lift the stay, but the court then went on to conduct this analysis when it was not needed.  The issue

before the court turned on whether he had the discretion to lift the stay --

MR. DUNNE:  Right.

THE COURT:  -- and it could have ended then and there, but it went on to talk about whether --

MR. DUNNE:  In part because --

THE COURT:  -- the FAA should yield or -- sorry, whether the court should require mandatory arbitration if the issue was not really the lift stay.

MR. DUNNE:  Yeah, the lift stay issue was a little bit complicated there because the court did, I think, acknowledge that a motion to lift the stay had not formally been made, but nonetheless construed the claimant's request as one to lift the stay, and then to move to compel arbitration.  But I think the different is in -- or at least in part in that the claimant had come to the Bankruptcy Court seeking to assert a claim against the estate and this issue had arisen in that context, whereas in Mintz the plaintiff -- or the estate, the debtor was going out and bringing solely non-bankruptcy claims against, in that case, the defendant, essentially a federal claim under the Truth in Lending Act.

So I do think that context is significant, I will agree, of course, it's not dispositive.

THE COURT:  So, if this issue was arisen in an adversary proceeding as opposed to the claims objection,

should that change my mind?

MR. DUNNE:  If the issue had --

THE COURT:  Is that a different analysis under Mintz then?  Because Yellow even -- the court in Yellow even acknowledged that the issue that was raised in the adversary was really an objection to the secured claim of the lender, but nonetheless it was alleged in an adversary proceeding and that's a two-party dispute.  Is that the focus here?  Is that the correct framework by which I should analyze whether I have discretion to disregard an arbitration provision?

MR. DUNNE:  I think -- I do think it's important that we not forget the context that we're in, that we not set that aside completely, which I think the court in Yellow did acknowledge the point that you are making and noted that the posture could have arisen in a different way potentially, but it had not and, in light of the fact that it had not and the significance of the claims allowance process and the mandate that appears in Section 502, which charges this Court to value and determine whether to allow claims, that it had to undertake the analysis that it did.

So, I think I understand your question.  I don't think I -- your initial question, I don't think I would regard it as *dicta*.  I think in light of that context, the 502(b) context, the Court had to grapple with 502(b)'s language, and it did so, and it still had flexibility to

reach either outcome under that framework.

THE COURT:  Okay.

MR. DUNNE:  And we would submit, Your Honor, that the Court should reach the same resolution that the Yellow court did here.  Sending Mr. Melamed's claim to arbitration would frankly result in the waste of both estate assets and Mr. Melamed's assets, as well as considerable delay.

As we have discussed, only one of Mr. Melamed's claims is arbitrable and substantially all of the value of that claim turns on the threshold issues of 510(b) subordination and application of the plan, which all parties agree must be decided by this Court.  And regardless of the outcome here, to add another layer, the matter must still come back before this Court on the issue of equitable subordination, which we all agree.  So, in short, both parties would benefit from this Court retaining jurisdiction.

Now, one last point, Your Honor, before I step down, Mr. Melamed argues in his reply brief that the Court should impose a procedural framework in which the Court compels arbitration and stays all other proceedings until this matter is finished.  That is clearly an attempt, in our view, to re-litigate what Your Honor ruled at the May 14th status conference, and what I think we're doing right now, and should be disregarded.  The Court may rule on all of the threshold issues now, it has the authority to do that, and a

66

decision on them will frankly, likely lead to a prompt resolution of this entire claim.

THE COURT:  Are subordinated claims receiving any distribution in this case?

MR. DUNNE:  I believe that they are not expected to receive any distribution.

THE COURT:  Okay.

MR. DUNNE:  I'll turn -- I'm looking at Mr. Glueckstein?

MR. GLUECKSTEIN:  Your Honor, at this point, like in any plan, it's unknown, but it is not estimated that -- it is not predicted at this point that subordinated claims will receive a distribution.  There are billions of dollars of subordinated Government claims that would have to be paid before you could ever get to that level.

THE COURT:  Okay.

MR. GLUECKSTEIN:  But we of course, the trust continues to -- you know, to look for assets, so we don't know.

THE COURT:  Okay, I appreciate that.  There were many, many, many classes of the plan and I don't have it fully committed to memory, so thank you.

MR. DUNNE:  Me either, Your Honor.  Unless there are further questions from the Court, that's all I have.

THE COURT:  I don't have anything further at this

time.   Thank you very much.

MR. DUNNE:   Thank you, Your Honor.

THE COURT:   Mr. Adler.

MR. ADLER:   Good afternoon, Your Honor, David Adler --

THE COURT:   Good afternoon.

MR. ADLER:   -- from McCarter & English on behalf of Seth Melamed.  With me today in court is Ms. Chelsea Botsch from our Wilmington office.

I wanted to begin just as Mr. Dunne began.  We would like to move into evidence the three declarations we submitted in connection with our opposition to the amended claims objection in April, and those are the declaration of Ryo Kawabata, and that is Document Number 30078, there is a declaration of Takane Hori, which is 30079, and then there's a second declaration of Ms. Hori, which is 30080.

THE COURT:   Okay.   Well, based on the representations, there's no objection, but I'll just ask for the record for you to confirm.

MR. DUNNE:   Correct, no objection, Your Honor.

THE COURT:   Okay, great.  They're admitted into evidence.  Thank you.

(Declaration of Ryo Kawabata received in evidence)

(Declarations of Takane Hori receive in evidence)

MR. ADLER:   Thank you, Your Honor.

So, I wanted to step back and go to the beginning because we were thrown -- or the Court was sort of presented with this in the middle of the dispute and I wanted to take it back to 2021, which is when Mr. Melamed, who was a 22-percent shareholder, agreed to sell his interests, and the rest of Liquid's shareholders agreed to sell their interests, to FTX.

Now, Liquid was a holding company that had two exchanges underneath it, one that operated in Japan and one that operated in Singapore.  The Japanese entity had a license, a crypto license, which made it extremely valuable.  So that license required that a company that operates an exchange would hold customer crypto in custody, and the customers of FTX Japan received, unlike any other creditor in this case, their distributions in kind 100 percent.

Now, Mr. Melamed and the rest of the shareholders entered into this agreement in November of 2021, and the completion date was -- the closing date took place on April 4th, 2022.  And under the agreement, which was referenced before, Mr. Melamed was entitled to several different forms of consideration; he was entitled to $8.9 million, which was crypto-currency, which was set aside for him, he was entitled to slightly more than a million shares of FTX common stock.  He also received indemnities from the debtor for any misrepresentation that was made on account of

the SPA.  And the SPA was very clear as a condition to closing that a management agreement had to be entered between Mr. Melamed and FTX and the FTX entities.

So that was a condition that was required as part of the closing and it took place on April 4th.  Mr. Melamed stayed on at FTX Japan, which is, you know, the old Liquid, the filing took place.  He stayed on as the COO of the company, getting -- interacting with the Japanese regulatory authorities, getting their approval to reopen the withdrawal window, and he stayed on actually until the FTX entity was sold to, I think it was bitFlyer, in July of last year.  So he started prepetition and continued all the way up to approximately 11 months ago.

Now, for purposes of the claim, I want to direct the Court's attention to the SPA and particular 7.2, which are representations and warranties made by FTX Trading.  And that representation -- those representations and warranties refer to Part B of Schedule 6, which is, if you look at -- I think it's the last item in Schedule 6, Number 8 says that all information contained in this agreement and all other information furnished by or on behalf of the purchaser to the sellers before and during the negotiations leading up to the agreement is true and correct in all material respects.

Well, I guess that did not turn out to be true, as we all know, and there's a separate representation that's

made that all statements in the disclosure documents are true and accurate.

Now, the disclosure documents are the documents that were actually provided to the Japanese regulatory authorities.  So, as I understand it, Liquid was sort of acting as a conduit of information to the JFSA in order to get their approval to let FTX buy the shares, but that's another representation that obviously turned out not to be accurate.

The section of the SPA that is very relevant to this proceeding is Section 9.3, which is the indemnity, and it essentially covers all losses, which is very, very broadly defined to mean all costs, losses, liabilities, damages, claims, demands, proceedings, expenses, penalties, and legal and other professional fees, occurring on account of breach of representations and warranties made by the purchaser.

So, in the proof of claim, which is Claim Number 3385, it states, claimant asserts a general unsecured non-subordinated claim against the debtor of not less than $35,613,112.19, which represents the purchase price of the Liquid shares less actual cash received, the retained consideration the debtors' obligation to indemnify claimant in connection with the purchase of LGI shares.  So that is one of the items that is specifically identified in Claim 3385.

With that as background, Your Honor, I think that, from my perspective, the first threshold issue among the threshold issues is our cross-motion to compel arbitration. And for that I want to refer to Section 19.1 of the SPA, which says Japanese law controls the agreement, and Section 19.2, which states that any dispute, controversy, or claim arising in any way out of or in connection with this agreement shall be submitted to binding arbitration administered by the Singapore International Arbitration Center in accordance with the SIAC rules in force when the notice of arbitration is submitted, which rules are deemed to be incorporated by reference into this clause.

So, turning to the case law -- and I'm thinking about Mintz and Hayes -- the first question is, is there a valid and enforceable arbitration agreement.  Well, the debtors haven't submitted any declarations that challenge the arbitration agreement.  They acknowledge that it's an enforceable agreement; they just say that it doesn't apply to everything in this case, just to the SPA.  So, at least on the threshold inquiry of whether there's a valid and enforceable arbitration agreement, the answer is yes.

And the next question becomes, if there's an arbitration agreement that's valid, does the scope of the arbitration get delegated to the arbitrator.  And Mr. Dunne made, you know, some statements that I raised it for the

first time in my reply, the Henry Schein Supreme Court case that basically says, you know, if there's a delegation, it needs to be enforced, that was in response to the trust's statement that we had the burden of proof on it.  I don't think that's the appropriate inquiry when there's a delegation provision.  So that -- the reason why we cited Henry Schein and the Celsius/Mohsin case was in response to their statement that we have the burden of proof.

And what those cases stand for is essentially that, when there's a delegation, the Court possesses no power to decide the arbitrability issue and what one looks at is the arbitration agreement itself.  And so if you're looking at the arbitration agreement under Section 19.2 of the SPA, I mean, I think it's pretty clear that the management agreement arises out of the SPA, it was a condition to the closing that that management agreement be executed.

So that, along with the incorporation of the SIAC rules -- and I think we referred to in our reply the SIAC rule, I think it's 28.1, that is the same as the AAA Rule 7(a) that says that the arbitrators possess the authority to determine the scope of their own arbitration. So the provisions that the courts are looking at in Henry Schein and in Mohsin are identical to the SIAC provision, and when those rules are incorporated, I think it means that essentially the Court has to defer in the first instance to

the arbitrator to decide what the scope of the arbitration is.

Now, even I can't say that the court in Singapore should be deciding what the Court -- what this Court determined in connection with the KEIP, okay?  There's a court order that says, you know, it's a key employee incentive plan and, if certain conditions take place, the claimant is entitled to an award.  Okay, I cannot see that that would be subject to arbitration.  Okay?  That's just the Court exercising its own authority to enforce its orders.

So I specifically referenced in the reply that we're not taking the position that that claim needs to be determined or whether the scope of the arbitration would include that claim.  I acknowledge that that claim stays here because it's already subject to a court order.

And on that line I just want to note that the Third Circuit case of Richardson says that when there's a clear and unmistakable delegation of arbitrability issues to the arbitrator, which the Circuit found was -- you know, happened when the parties included the rules in the arbitration clause, that the court essentially has to defer the scope of the arbitration to the arbitrator.

So, along that line, once we get past the scope, I think the Court has to ask itself whether there are reasons why the arbitration conflicts with Federal Bankruptcy law,

and we said in our reply that we don't think it does.  We are not saying that the arbitrator is going to be determining the Section 510(b) issue or the interpretation of the plan; it's just going to be the adjudication of the claim.  And that happens all the time, you know, despite the trust's position that the goal of bankruptcy is the centralization of all disputes and claims, I mean, courts frequently grant stay relief for claims to be liquidated in state court, courts permissibly and mandatorily abstain from adjudicating disputes.  You have the Rooker-Feldman doctrine, which basically -- you know, if there's a matter in state court, it has to go through the appellate process, not come to the Bankruptcy Court along the way.

So, there are many, many, many instances -- and, obviously, personal injury claims and wrongful death claims are not adjudicated in the Bankruptcy Court -- there are many, many, many instances where the Bankruptcy Court does not adjudicate the claim and it's left to the state court, despite the trust's desire that the Bankruptcy Court determine all claims.

So we don't think that there is a direct conflict because claims are adjudicated in other forums all the time, and we're not saying to the Court that the arbitrator is going to decide the Section 510(b) issue or the interpretation of the plan.  We're going to have to come back

here and the Court is going to have to determine those issues, but we do think that it is appropriate for the claim to be liquidated in the first instance in the arbitration because there are a lot of factual issues here, Judge, that I think need to get fleshed out before this Court can make a ruling.

And what I'm referring to is there's a disputed factual issue about whether there was a breach of contract prepetition, okay?  They say it doesn't matter, whether it's -- whether there's a breach of contract or not, the result is the same.  I'm not so sure about that, Your Honor, especially in light of the fact that Japanese law is applicable here, I don't know whether that is the case and, even if it were the case --

THE COURT:  What claim are you -- I'm sorry, just to clarify, what claim are you talking about?

MR. ADLER:  So with -- in the declarations of the foreign law experts we submit -- we submitted a declaration that said the retained consideration was required to be paid on April 4th, 2022, and the failure to pay it on April 4th, 2022 was a breach of contract, which allowed Mr. Melamed to go to arbitration and get a damages award as a result of their breach of contract.  And I think you can see that in Document Number 30079, paragraphs 16 and 17.  Our expert says, in my opinion, if a Japanese court or arbitral

panel applying Japanese law were to examine clause 2.1(d) of the side letter and the side letter schedule, it would conclude that there was a modification to clause 2.4(d) of the SPA.  Accordingly, it is my opinion that a Japanese court or arbitral panel applying Japanese law would conclude that by not paying the retained consideration to Melamed on the completion date, FTX was in breach of the SPA and side letter.

Then our expert goes on to say that, if FTX were determined to have breached the SPA and side letter, it is my opinion that a Japanese court or arbitral panel applying Japanese law would award money damages in an amount equal to the value of the retained consideration as of the date of the breach, along with interest of three percent per annum on the overdue sum, with interest accruing daily, and a statutory late penalty of three percent per annum on the foregoing, pursuant to Article 404-2 of the Japanese Civil Code.

So Mr. Tanaka, their expert, says that there was not a breach.  And if you look at the Hori declaration, 30079, she explains in detail why Mr. Takana is incorrect in his assessment that there was not a breach of contract.

All of this is to say, Your Honor, is that there are disputed factual issues, and I'll come to another one as we go forward, and that is the indemnity.

THE COURT:  On the retain consideration argument, even if I sent it to arbitration and even if the arbitrator determines, as your experts have determined, it still needs to come back to me for allowability and classification, correct?

MR. ADLER:  Correct.

THE COURT:  And I would have to apply the plan?

MR. ADLER:  Correct.

THE COURT:  Okay.

MR. ADLER:  We do not dispute that.

THE COURT:  So, there would be an argument at that point that I would have to take that claim and apply the estimation order to it, correct?

MR. ADLER:  Right.

THE COURT:  Okay.

MR. ADLER:  I mean, then argument and --

THE COURT:  So we would get there one way or the other?

MR. ADLER:  Correct.

THE COURT:  Okay.  So it's really a timing issue?

MR. ADLER:  Correct.

THE COURT:  Okay.

MR. ADLER:  Now, I was just about to talk about the indemnity claim.  Now, here, the record is pretty much barren because it was identified in the proof of claim, but,

for example, let's suppose that there, in the negotiation leading up to the SPA, there is a discussion over how the retain consideration is to be handled.  Let's suppose that it was going to be cash put aside and they convince Mr. Melamed, based on the representations and warranties that crypto would be held in custody, that -- to set it up that way.  That's separate and apart from the breach of contract issue; in other words, the formation, the modality of how the retain consideration was to be held, okay.

If misrepresentations were made, it is my opinion that those issues should be flushed out factually.  I would take the position that that does not relate to a digital asset, okay; that relates to the formation of a contract and the agreement to structure it in a certain way, not in respect of a digital asset, under Section 4.4 of the plan.

And I think that we would say, obviously, that Your Honor would have the final say, but we think that the record should be developed exactly what the scope of the indemnity is and what the amount is and that there are disputed factual issues as to, you know, along the way.  So that's why we think this is premature to be decided today because Your Honor just has a lot of legal argument in front of her; not that much facts.  And we think that the development of a factual record will assist the Court in ultimately determining whether or not, you know, the 510(b)

argument applies and whether the plan Section 4.4 applies, so --

THE COURT:  So there's a portion of your -- and forgive me that I don't know the answer, despite reading the pleadings -- but so that the indemnification claim, has that fully been flushed out, what the indemnification looks like?

MR. ADLER:  Well, I think from --

THE COURT:  What is the claim amount and how -- what's it relating to?

MR. ADLER:  Well, I think that there's -- I mean, if you take it, there's indemnity as a result of misrepresentations, right.  So you have misrepresentations as to the financial condition of FTX, right --

THE COURT:  Uh-huh.

MR. ADLER:  -- which, you know, relates to a lot of different things.  It relates to the agreement of Mr. Melamed to take part of the, or to set up the retain consideration in the way that it was set up.  Obviously, it relates to the stock itself, right.  Mr. Melamed was relying on the reps and warranties and the audited financial statements when he and the other shareholders made the decision to sell to FTX.

There are also, obviously, claims for legal fees and other professional fees.  Mr. Melamed has lawyers in Japan, Singapore, here, you know, which would need to be

quantified. And there would -- there are some other issues related to the indemnity, as well, but it would generally deal with the formation of the contract and, you know, the events subsequent to the bankruptcy until the implosion of FTX.

So, from our -- and I said it, but I think that the consideration of the 510(b) issue is premature because the liquidation should happen first, a factual record should be built out, and then this Court can consider that, prior to determining the allowability of the claim.

And it's the same thing with respect to the plan; the plan says the value of the claim in respect of a digital asset shall be calculated by converting the value of such digital asset into cash as of the petition date. Well, there are a lot of different things floating around here and, you know, one of the first issues is the breach of contract issue, which the experts disagree on. And, you know, if there's a claim for, an indemnity claim for misrepresenting the financial condition of FTX, does that relate or is that in respect of the digital asset?

I don't think so. I think that has to do with a misrepresentation that was made at the time of the formation. But I think that these are issues that the Court is going to have to grapple with as, you know, once a record is built out.

Now, I just wanted to respond a little bit to your question about Yellow.  When I look at Yellow, what I see is a hotly contested bankruptcy, where there's a claim by the PBGC, which will swamp everything.  And so the whole case is essentially on ice until that claim is quantified.

And, you know, we don't have that situation here.  FTX is out of bankruptcy.  The Trust is in charge of liquidating the assets and quantifying the liabilities.  So this case is very different than Yellow.

I'd also say that one of the points that Judge Goldblatt looked at was the fact that even if the claim went to arbitration, it still had to come back to an Article 3 Court.  So there was sort of a, you know, no harm, no foul, you know, issue floating around because it had to come back to an Article 3 Court in any event.  And that, coupled with the fact that it was a multiparty dispute -- if I remember correctly, it was one of the general unsecured creditors who had filed the objection.  So you had the Debtor, some creditors, the PBGC all fighting over this one issue.  And the Court was concerned over the fact that, you know, if it went to arbitration, the creditors, the general unsecured creditors might be iced out of that proceeding.  So, from our perspective of looking at it is sort of like an issue that everything is dependent upon:  the quantification of that liability.

And this is completely the opposite.  I mean, this is a large claim to my client, but it's a very small claim in the realm of FTX.

THE COURT:  So, regardless if I find whether I have discretion or not --

MR. ADLER:  Right.

THE COURT:  -- if I fall into Yellow's decision that I have discretion --

MR. ADLER:  Right.

THE COURT:  -- that I should not exercise the discretion?

MR. ADLER:  Right.

And we did make that point that the Singapore Court is better equipped.  You know, speaking for myself, dealing with the Japanese lawyers, I don't really understand civil law and, you know, there are -- it's completely a Civil Code country.  And we think that Singapore, the SIAC would be the better -- has more experience in terms of dealing with those matters and in terms of dealing with the liquidation of these types of claims.  It's apparently a very common procedure to resolve claims in this manner.

So, you know, for the reasons that we set forth in the reply, we would ask that our cross-motion to compel arbitration be granted and that the Court, essentially, either direct the arbitrator to determine the scope of the

arbitration or put the claims related to the management agreement on hold, pending that determination, so that when we do have to deal with these issues, it can be done in a coordinated fashion and not piecemeal.

And with that, Your Honor, do you have any questions?

THE COURT:  I do not at this time.

MR. ADLER:  Thank you.

THE COURT:  Okay.

MR. DUNNE:  Very briefly, Your Honor.

Mr. Adler said a lot there, Your Honor, on the background on the entities and what customers received and why that may have been.  And I would just remind the Court that none of that is before Your Honor today.  There were three threshold issues before Your Honor today.

Significantly, Mr. Adler conceded just now that the consideration that Mr. Melamed was to get in the SPA took the form of FTX stock and specified cryptocurrency.  That ends the inquiry on Section 510(b) subordination and plan application.

And as Your Honor pointed out in colloquy with Counsel, those are things that you can decide now.  Those are things that will ultimately have to come back to you know matter what is decided in an arbitration.

Mr. Adler also brought up a lot of things that his

experts say on the merits; obviously, both sides have parties -- I'm sorry -- both sides have experts who have views on the merits.  The reason that those experts aren't here today and why both sides aren't cross-examining them is that those things don't matter for purposes of this hearing. We are dealing with purely legal issues that are clearly before Your Honor and which all parties acknowledge must be decided by this Court.

The other thing I would mention, Your Honor, is Mr. Adler read a portion of the arbitration clause from the SPA to you.  He omitted Section 19.4, I think, which says that the arbitration agreement, in Clause 19, shall be governed by the laws of Singapore, on which he has offered neither evidence, nor argument.

And with respect to the various indemnification arguments that Mr. Adler raised, I would simply point out that the SPA indemnifies losses arising from breach of the agreement.  For purposes of the issues the Court is looking at today, it does not matter whether the agreement was breached or not, because Section 510(b) subordination applies, regardless of whether it is a fraud in the issuance of securities or sale of securities or some breach of contract or otherwise.

And, regardless, the crypto consideration piece was a claim in respect of digital assets.  They're specified

digital assets -- he doesn't dispute that -- and he ascribes value to them based on those digital assets.

THE COURT:  If there's an indemnification claim arising from the cryptocurrency dispute, are you seeking to subordinate that.

MR. DUNNE:  Yes, Your Honor.

We believe that we could seek to subordinate.  We could properly seek to subordinate any claim associated with the SPA on 510(b) grounds.  The case law on 510(b) subordination is extremely broad; it extends to all claims that even emanate from a contract or a claim relating to a sale of securities of the Debtor.

We have taken the position, however, in this claim proceeding that the best treatment of that claim is under the plan as a claim in respect of digital assets and we have not sought to subordinate the entire SPA claim, which would have been our right to do.

THE COURT:  But just the indemnification portion?

MR. DUNNE:  The indemnification portion, it is impossible to disentangle indemnification relating to the crypto consideration piece from all of the other arguments; it's one litigation that's essentially been brought.

THE COURT:  Uh-huh.

MR. DUNNE:  And, frankly, we believe that 510(b) subordination could apply to every aspect on this, even the

crypto consideration piece.

THE COURT:  Okay.  Thank you.

MR. DUNNE:  Thank you, Your Honor.

THE COURT:  Okay.  Well, I'm going to take this matter under advisement and I will attempt to rule promptly, either orally or by written opinion.

Thank you for reserving the afternoon for this. It turns out we didn't need to do that because you are all so efficient and I very much appreciate that, but that meant you all had to come down here in the afternoon and then stay, so -- but it is what it is.  I'm glad that we had the opportunity to tackle this today.

As I mentioned, I will take it under advisement and I will see some, perhaps all of you, back here on Friday. And with that, we'll stand adjourned.

Thank you all very much.

COUNSEL:  Thank you, Your Honor.

THE COURT:  Take care.

(Proceedings concluded at 2:31 p.m.)

CERTIFICATION

We certify that the foregoing is a correct transcript from the electronic sound recording of the proceedings in the above-entitled matter to the best of our knowledge and ability.

/s/ William J. Garling                    June 26, 2025

William J. Garling, CET-543

Certified Court Transcriptionist

For Reliable


/s/ Tracey J. Williams                    June 26, 2025

Tracey J. Williams, CET-914

Certified Court Transcriptionist

For Reliable