# EXHIBIT 6

UNITED STATES BANKRUPTCY COURT
DISTRICT OF DELAWARE


IN RE:                                    . Chapter 11
                                          . Case No. 22-11068 (KBO)
FTX TRADING LTD., *et al.*,               .
                                          . (Jointly Administered)
                                          .
         Debtors.                         .
                                          .
. . . . . . . . . . . . . . . . .         .
                                          .
FTX RECOVERY TRUST,                       . Adversary Proceeding
                                          . No. 24-50184 (KBO)
         Plaintiff,                       .
                                          .
    -against-                             .
                                          .
GATE TECHNOLOGY INCORPORATED,             .
GATE GLOBAL, CORP., GATE                  .
INFORMATION PTE. LTD., and                .
SUN YUNZHI,                               .
                                          .
         Defendants.                      .
                                          .
. . . . . . . . . . . . . . . . .         .
                                          .
FTX RECOVERY TRUST,                       . Adversary Proceeding
                                          . No. 24-50188 (KBO)
         Plaintiff,                       .
                                          .
    -against-                             .
                                          .
FORIS DAX MT LTD., FORIS DAX              .
ASIA PTE. LTD., FORIS DAX,                . Courtroom No. 3
INC., and IRON BLOCK CAPITAL,             . 824 Market Street
                                          . Wilmington, Delaware 19801
         Defendants.                      .
                                          . Tuesday, July 22, 2025
. . . . . . . . . . . . . . . . .         . 9:00 a.m.

                        TRANSCRIPT OF HEARING
              BEFORE THE HONORABLE KAREN B. OWENS
              CHIEF UNITED STATES BANKRUPTCY JUDGE


                           - Cont'd -

FTX RECOVERY TRUST,                .   Adversary Proceeding
                                   .   No. 24-50189 (KBO)
          Plaintiff,               .
                                   .
     -against-                     .
                                   .
AMERICAN ACTION                    .
NETWORK, INC.,                     .
                                   .
          Defendant.               .
                                   .
. . . . . . . . . . . . . . . . .  .
                                   .
FTX RECOVERY TRUST,                .   Adversary Proceeding
                                   .   No. 24-50190 (KBO)
          Plaintiff,               .
                                   .
     -against-                     .
                                   .
AMERICAN PROSPERITY ALLAINCE,      .
                                   .
          Defendant.               .
                                   .
. . . . . . . . . . . . . . . . .  .
                                   .
FTX RECOVERY TRUST,                .   Adversary Proceeding
                                   .   No. 24-50191 (KBO)
          Plaintiff,               .
                                   .
     -against-                     .
                                   .
AMERICAN VALUES                    .
COALITION, INC.,                   .
                                   .
          Defendant.               .
                                   .
. . . . . . . . . . . . . . . . .  .

                              - Cont'd -

FTX RECOVERY TRUST,　　　　　　.　Adversary Proceeding
　　　　　　　　　　　　　　　.　No. 24-50193 (KBO)
　　　　　Plaintiff,　　　　　.
　　　　　　　　　　　　　　　.
　　　-against-　　　　　　　.
　　　　　　　　　　　　　　　.
CONGRESSIONAL LEADERSHIP　　.
FUND,　　　　　　　　　　　　.
　　　　　　　　　　　　　　　.
　　　　　Defendant.　　　　　.
　　　　　　　　　　　　　　　.
. . . . . . . . . . . . . .　.
　　　　　　　　　　　　　　　.
FTX RECOVERY TRUST,　　　　　.　Adversary Proceeding
　　　　　　　　　　　　　　　.　No. 24-50197 (KBO)
　　　　　Plaintiff,　　　　　.
　　　　　　　　　　　　　　　.
　　　-against-　　　　　　　.
　　　　　　　　　　　　　　　.
FARMINGTON STATE CORPORATION　.
(f/k/a FARMINGTON STATE BANK,　.
d/b/a GENIOME BANK, d/b/a　　.
MOONSTONE BANK), FBH　　　　.
CORPORATION, and JEAN　　　　.
CHALOPIN,　　　　　　　　　　.
　　　　　　　　　　　　　　　.
　　　　　Defendants.　　　　.
　　　　　　　　　　　　　　　.
. . . . . . . . . . . . . .　.

- Cont'd -

FTX RECOVERY TRUST,                    .   Adversary Proceeding
                                       .   No. 24-50199 (KBO)
          Plaintiff,                   .
                                       .
     -against-                         .
                                       .
NEW YORK SOLIDARITY NETWORK,           .
                                       .
          Defendant.                   .
                                       .
. . . . . . . . . . . . . . . . .      .
                                       .
FTX RECOVERY TRUST,                    .   Adversary Proceeding
                                       .   No. 24-50200 (KBO)
          Plaintiff,                   .
                                       .
     -against-                         .
                                       .
ONE NATION, INC.,                      .
                                       .
          Defendant.                   .
                                       .
. . . . . . . . . . . . . . . . .      .
                                       .
FTX RECOVERY TRUST,                    .   Adversary Proceeding
                                       .   No. 24-50201 (KBO)
          Plaintiff,                   .
                                       .
     -against-                         .
                                       .
PROSPERITY ALLIANCE, INC.,             .
                                       .
          Defendant.                   .
                                       .
. . . . . . . . . . . . . . . . .      .
                                       .
FTX RECOVERY TRUST,                    .   Adversary Proceeding
                                       .   No. 24-50202 (KBO)
          Plaintiff,                   .
                                       .
     -against-                         .
                                       .
SENATE LEADERSHIP FUND,                .
                                       .
          Defendant.                   .
                                       .
. . . . . . . . . . . . . . . . .      .

                              - Cont'd -

FTX RECOVERY TRUST,                          .   Adversary Proceeding
                                             .   No. 24-50203 (KBO)
            Plaintiff,                       .
                                             .
       -against-                             .
                                             .
VOTO LATINO, INC.,                           .
                                             .
            Defendant.                       .
                                             .
. . . . . . . . . . . . . . . .              .
                                             .
FTX RECOVERY TRUST,                          .   Adversary Proceeding
                                             .   No. 24-50204 (KBO)
            Plaintiff,                       .
                                             .
       -against-                             .
                                             .
WORKING AMERICA,                             .
                                             .
            Defendant.                       .
                                             .
. . . . . . . . . . . . . . . .              .
                                             .
FTX RECOVERY TRUST,                          .   Adversary Proceeding
                                             .   No. 24-50211 (KBO)
            Plaintiff,                       .
                                             .
       -against-                             .
                                             .
SECUREBIO, INC. dba                          .
SECUREBIO,                                   .
                                             .
            Defendant.                       .
                                             .
. . . . . . . . . . . . . . . .              .

                              - Cont'd -

FTX RECOVERY TRUST,               .   Adversary Proceeding
                                  .   No. 24-50212 (KBO)
          Plaintiff,              .

     -against-                    .

THE GOODLY INSTITUTE dba          .
GOODLY LABS,                      .
                                  .
          Defendant.              .
                                  .
. . . . . . . . . . . . . . . . .
FTX RECOVERY TRUST,               .   Adversary Proceeding
                                  .   No. 24-50213 (KBO)
                                  .
          Plaintiff,              .
                                  .
     -against-                    .
                                  .
SPARTZ PHILANTHROPIES, dba        .
RETHINK CHARITY and               .
NONLINEAR,                        .
                                  .
          Defendant.              .
                                  .
. . . . . . . . . . . . . . . . .
FTX RECOVERY TRUST,               .   Adversary Proceeding
                                  .   No. 24-50214 (KBO)
                                  .
          Plaintiff,              .
                                  .
     -against-                    .
                                  .
MANIFOLD MARKETS, INC.,           .
                                  .
          Defendant.              .
                                  .
. . . . . . . . . . . . . . . . .

                              - Cont'd -

FTX RECOVERY TRUST,                  .  Adversary Proceeding
                                     .  No. 24-50222 (KBO)
                                     .
              Plaintiff,             .
                                     .
       -against-                     .
                                     .
BINANCE HOLDINGS LIMITED,            .
BINANCE CAPITAL MANAGEMENT           .
CO. LTD., BINANCE HOLDINGS           .
(IE) LIMITED, BINANCE                .
(SERVICES) HOLDINGS LIMITED,         .
CHANGPENG ZHAO, DINGHUA              .
XIAO, SAMUEL WENJUN LIM, and         .
DOES 1-1000,                         .
                                     .
              Defendants.            .
                                     .
. . . . . . . . . . . . . . . .      .
FTX RECOVERY TRUST,                  .  Adversary Proceeding
                                     .  No. 25-50635 (KBO)
                                     .
              Plaintiff,             .
                                     .
       -against-                     .
                                     .
KUROSEMI, INC.,                      .
                                     .
              Defendant.             .
                                     .
. . . . . . . . . . . . . . . .      .

APPEARANCES:

For the FTX
Recovery Trust:          Adam Landis, Esquire
                         LANDIS RATH & COBB LLP
                         919 Market Street
                         Suite 1800
                         Wilmington, Delaware 19801


                         - Cont'd -

For the FTX
Recovery Trust:          Brian D. Glueckstein, Esquire
                         Christopher J. Dunne, Esquire
                         SULLIVAN & CROMWELL, LLP
                         125 Broad Street
                         New York, New York 10004

For Weiwe Ji,
et al.:                  William Sullivan, Esquire
                         SULLIVAN HAZELTINE ALLINSON LLC
                         919 North Market Street
                         Suite 420
                         Wilmington, Delaware 19801

For the Foreign
Representatives of
FTX Digital:             Colin West, Esquire
                         WHITE & CASE LLP
                         1221 Avenue of the Americas
                         New York, New York 10020

For Seth Melamed:        David Adler, Esquire
                         MCCARTER & ENGLISH, LLP
                         Worldwide Plaza
                         825 Eighth Avenue
                         31st Floor
                         New York, New York 10019

(APPEARANCES CONTINUED)

Audio Operator:          Kim Ross, ECRO

Transcription Company:   Reliable
                         The Nemours Building
                         1007 N. Orange Street, Suite 110
                         Wilmington, Delaware 19801
                         Telephone: (302)654-8080
                         Email:  gmatthews@reliable-co.com

Proceedings recorded by electronic sound recording,
transcript produced by transcription service.

APPEARANCES (CONTINUED):

For ELD Capital:          Peter Hughes, Esquire
                          DILWORTH PAXSON LLP
                          1650 Market Street
                          Suite 1200
                          Philadelphia, Pennsylvania 19103

                          Alec Berin, Esquire
                          MILLER SHAH LLP
                          1845 Walnut Street
                          Suite 806
                          Philadelphia, Pennsylvania 19103

For Binance Holdings      Gregory Strong, Esquire
Ltd:                      CAHILL GORDON & REINDEL LLP
                          221 West 10th Street
                          3rd Floor
                          Wilmington, Delaware 19801

                          Michele Angell, Esquire
                          WESTERMAN BALL EDERER MILLER
                            ZUCKER & SHARFSTEIN, LLP
                          1201 RXR Plaza
                          Uniondale, NY 11556

Pro Se Litigants:         Sen Wang
                          Kaihao Ni
                          Xiaodong Wang
                          Ming Zhu
                          Manqiu Cai
                          Vladimir Jelisavcic
                          Shirong Wang
                          Yongqiang Xu
                          Ihor Menshykvo
                          Qin Yi
                          Yuan Wang
                          Hejia Zhao

10

INDEX

MOTIONS:                                                              PAGE

Agenda
Item 34: Notice of Proposed Reduction of Disputed            13
         Claims Reserve Amount
         [D.I. 31085; Filed on June 27, 2025]

         Court's Ruling:                                     18

Agenda
Item 35: Motion of the FTX Recovery Trust for Entry          19
         of an Order in Support of the Confirmed
         Plan Authorizing the FTX Recovery Trust to
         Implement the Restricted Jurisdiction
         Procedures in Potentially Restricted
         Foreign Jurisdictions
         [D.I. 31148; Filed on July 2, 2025]

         Court's Ruling:                                     83

Agenda
Item 36: Motion of ELD Capital LLC for Entry of Order        95
         Establishing Claims Determination Schedule
         for its Claims
         [D.I. 31298; Filed on July 8, 2025]

         Court's Ruling:                                     107

Agenda
Item 38: Notice of Scheduling Conference Scheduled           109
         for July 22, 2025 at 9:30 a.m. (ET) –
         [FTX Recovery Trust, et al. v. Binance
         Holdings Limited et al., Adv. No. 24-50222
         – Adv. D.I. 83, filed on June 26, 2025]

         Court's Ruling:                                     116

INDEX

MOTIONS:                                                        PAGE

Agenda
Item 37: Motion of the FTX Recovery Trust for Leave      117
         to File Omnibus Reply to the Objections to
         FTX Recovery Trust's Motion to Implement
         the Restricted Jurisdictions Procedures in
         Potentially Restricted Foreign
         Jurisdictions
         [D.I. 31559, filed on July 20, 2025]

         Court's Ruling:                                 117

Agenda
Item 32: Debtors' Amended Objection to Proofs of         117
         Claim Filed by Seth Melamed and Motion for
         Subordination Pursuant to 11 U.S.C. §§
         510(B) and 510(C)(1) [D.I. 28643, filed on
         December 9, 2024]

Agenda
Item 33: Opposition to Debtors Amended Objection to
         Proofs of Claim and Motion for Subordination
         Pursuant to 11 U.S.C. §§ 510(B) and 510(C)(1)
         and Cross-Motion to Compel Arbitration
         [D.I. 30077; Filed on April 7, 2025]

         Court's Ruling:                                 117


DECLARATIONS:                                            PAGE

1 - Declaration of Steven Coverick                       14


EXHIBITS:                                                PAGE

FTX Exhibit 1 - Emails                                   99


Transcriptionists' Certificate                           133

(Proceedings commenced at 9:35 a.m.)

THE CLERK:  All rise.

THE COURT:  Good morning, everyone.  Nice to see you.  Please be seated.

Good morning, Mr. Landis, how are you?

MR. LANDIS:  Good morning, Your Honor, and may it please the Court.

THE COURT:  Good to see you.

MR. LANDIS:  Good to see you, as well.

Adam Landis from Landis, Rath & Cobb on behalf of the FTX Recovery Trust.

Your Honor, we filed a number of agendas, including this morning an amended agenda at Docket Number 31757.  And I hope Your Honor has had an opportunity to review the amended agenda.  You'll see that we had 38 listed items, but the news isn't all bad.  Of those items, only six of them are going forward this morning.

Numbers 1 through 5 are adjourned contested matters.  Items 6 through 23 are adjourned adversary proceedings.

THE COURT:  Okay.

MR. LANDIS:  Items 24 through 31 have been resolved.  So what we have going forward, items 32 through 38, 32 and 33 consist of the Court's rulings on matters relating to the Melamed claims.  34 is the Trust's motion to

reduce disputed claims reserve.  35 and 37 are related; it's the motion with respect to restricted -- procedures in potentially restricted jurisdictions.  37 is our motion for leave to file an omnibus reply.  Item Number 36 are ELD matters.  And 38 is a status conference, scheduling conference in the Binance matter.

We would propose to proceed in the order of the agenda starting with 32 and 33 if it pleases the Court.

THE COURT:  I would actually like to take those, the Melamed matters last.  There's, I believe, hundreds of -- well, we were supposed to have hundreds of participants related to other matters, and I thought we could get through those first so they could sign off if that's acceptable.

MR. LANDIS:  That's absolutely fine with us, Your Honor.  So in that case, we propose starting with Item Number 34, and I'll cede the podium to Mr. Glueckstein.

THE COURT:  Okay.  That would be great.  Thank you.

MR. LANDIS:  Thank you.

MR. GLUECKSTEIN:  Good morning, Your Honor.

THE COURT:  Good morning.

MR. GLUECKSTEIN:  Nice to see you.

Brian Glueckstein, Sullivan & Cromwell, on behalf of the FTX Recovery Trust.

Agenda Item 34 this morning is the FTX Recovery

Trust proposed reduction of the disputed claims reserve.

Your Honor, as we set forth in the notice that was filed and detailed in the declaration of Steven P. Coverick, the FTX Recovery Trust seeks to reduce the original reserve amount, which was set in December of 2024 prior to the plan effective date by $1.93 billion to a total reserve of $4.599 billion.

In support of the reduction, the FTX Recovery Trust submitted the declaration of Mr. Coverick, filed at Docket Number 31086, which I respectfully request be moved into evidence at this time in support of the reduction request.  Mr. Coverick is in the courtroom if the Court would have any questions for him.

THE COURT:  All right.  Thank you very much.

Does anyone object to the admission of the declaration into evidence?

(No verbal response.)

THE COURT:  All right.  I'm hearing no objection. It's admitted.

(Declaration of Steven Coverick received in evidence)

MR. GLUECKSTEIN:  Thank you, Your Honor.

The order that was entered by Judge Dorsey expressly contemplated reductions of the disputed claims reserve over time, as the Trust successfully reconciles and resolves claims.  By the end of the process, the reserve will

go to zero with all claims administered and all Trust assets distributed.

Much progress has been made in that regard, but we have a long way to go before this estate will be fully administered.  However, the Trust does intend to make distributions to holders of allowed claims as often as practical, and periodic adjustments to disputed claims reserve when appropriate are critical to that effort.  To date, the FTX Recovery Trust has reconciled more than $8.3 billion of claims, and as of the notice date, the reconciliation and expungement efforts have led to a net reduction of approximately $1.79 billion of disputed claims.

As with the determination of the original reserve amount, the FTX Recovery Trust used a rigorous process to determine the revised reserve amount based on multiple inputs, as set forth in Mr. Coverick's declaration, that in the Trust's business judgment concluded reducing the reserve amount by $1.93 billion to $4.559 billion is reasonable and appropriate.  The revised reserve amount is based on intentionally conservative assumptions and still includes approximately $1.9 billion of disputed claims over and above the amounts the Trust projects will ultimately become allowed claims.

The Trust is also maintaining approximately $350 million beyond that of contingency over and above the amount

to further protect those claims that are unliquidated or included in the reserve at less than the full asserted claim amount.  All disputed claims will continue to have recourse to the entire disputed claims reserve amount consistent with the terms of the confirmed plan.

Having disclosed and explained these facts, including how conservative the Trust is being with the revised reserve amount, the Trust did not receive any objections to the size of the reserve amount or to the business judgment to make a reduction at this time despite there being tens of thousands of disputed claims, including some very large claims still to be reconciled.

The Trust did, however, receive a total of five pro se objections to the notice, one of which has been resolved, leaving four, which necessitates this hearing, which was set in accordance with Paragraph 6 of the Court's original order.  Those objections each advance some form of argument that the reserve should not be adjusted until after there has been satisfactory resolution of each objector's individual claim.

There is no basis to require the resolution, of course, of any individual claim prior to reducing the size of the reserve.  That, of course, is the purpose of the reserve, to ensure that claims can be paid if and when they were allowed in the future.

Of the remaining four objections as detailed in our reply papers, two do not have standing to object because their claims have been fully resolved, and two of the remaining objections are creditors whose relatively small claims are fully reserved for in the reserve before even considering the $2.3 billion in additional reserve buffer that exists in the current calculation as revised.

None of these creditors had advanced any basis to delay progress in this case and facilitate the Trust making further distributions to holders of allowed claims, which will benefit all stakeholders.  Any remaining objections, we submit, should be overruled and an order be entered approving the revised reserve amount at $4.599 billion.

I'm happy to answer any questions the Court has.

THE COURT:  I do not have any questions at this time.

All right.  I'm happy to hear from the parties that oppose the reduction.  Is there anyone in the courtroom that wishes to be heard?

(No verbal response)

THE COURT:  Okay.  There are many parties joining us by Zoom.  I'll ask if the parties that objected to the notice of proposed reduction of disputed claims reserve wish to be heard.

(No verbal response)

THE COURT:  Okay.  I'm not hearing from those parties, and they're not appearing on my screen and speaking.

I did read the objections, however, and will consider them in making my ruling.  I reviewed the proposed notice of reduction and the declaration that was admitted into evidence.  I think it's reasonable and appropriate relief that the Trust seeks today.

It's important to note that it does not adjudicate the claims that are at issue, that are disputed.  That comes at a later date.  And the evidence that has been advanced supports the Trust's assertions that funds will be available for claims if and once allowed after the claims administration has been completed.  I think it's, again, reasonable and appropriate relief, and I will allow it.

Is there an order -- there will be an order that will be submitted that represents the reduction, or is this sufficient?

MR. GLUECKSTEIN:  I think the original order does contemplate a further order of the Court, so we will submit one consistent with that for Your Honor to enter.

THE COURT:  Okay, that would be wonderful.  I'll look for it under certification of counsel.

MR. GLUECKSTEIN:  Thank you.

THE COURT:  Okay.

MR. GLUECKSTEIN:  Thank you, Your Honor.

That does take us then to the next item on the agenda, which is Agenda Item 35.  That is the motion of the FTX Recovery Trust for an order authorizing what we have defined as the restricted jurisdiction procedures.

Your Honor, if I could start to put a bit of context on what we're proposing to do.  The FTX Recovery Trust seeks to establish today only procedures, purely process, to aid the implementation of a confirmed and effective plan which will permit this Court to consider any future requests to protect the Trust and its officers and directors from potential liability for making distributions to residents of foreign jurisdictions in violation of foreign law.  It should not be controversial that the Trust can only be expected to make distributions to creditors pursuant to the plan if it is legally permissible to do so.

There can be no serious argument that the plan, as confirmed, expects the Trust to act unlawfully.  But, Your Honor, we view this as a distributional issue.  Similar to whether creditors satisfy Know Your Customer requirements, provide necessary tax information, onboard with the distribution service provider as required by our plan, the Trust needs certainty that any distribution being made to residents of foreign jurisdictions is in fact permitted.

This concern is heightened here in this case, where FTX's infamous pre-petition business activities

violated cryptocurrency laws and regulations in various countries around the world.  And some creditors reside in jurisdictions that continue today to have relevant laws and regulations that could trigger fines or penalties for the Trust.

Like many things we have faced in these Chapter 11 cases, this is somewhat of a novel issue, given the pre-petition facts that we face.  The Trust is working to navigate the unclear and ever-changing landscape in jurisdictions around the world.  But we submit it is prudent to be in a position to promptly seek Court intervention as necessary to protect the interests of all stakeholders.

The Trust could simply object to claims on the basis that it would be illegal to satisfy.  And absent these procedures, we would probably be in a position where we needed to do so.  But we ultimately concluded that it was fairer to creditors and more efficient to address the actual distributional problem in a more surgical way than seeking any sort of claim disallowance.

The proposed procedures would establish a transparent process where any affected creditors have an opportunity to be heard in the future, prior to the designation of any jurisdiction as a restricted foreign jurisdiction.  In addition, Your Honor, by addressing the issue on a distribution-by-distribution basis, the claim

holder retains the possibility that changed circumstances, like a change in residence, will permit future distributions and also retains that creditor's ability, if it so chooses, to monetize their claim.

The relief sought today is purely procedural and is not seeking at this time to designate anywhere in the world as a foreign, as a restricted foreign jurisdiction. We're not seeking to forfeit any distributions or otherwise impact creditors' substantive rights today.

The FTX Recovery Trust developed and is requesting approval of the restricted jurisdiction procedures for the express purpose of ensuring that any and all affected creditors receive notice and an opportunity to be heard before this Court in the future, prior to the designation of any jurisdiction as a restricted jurisdiction.

The full procedures we seek approval of are set forth in the motion, but to summarize, we are proposing to retain and consult with a qualified attorney in any jurisdiction where our investigation to date has raised concerns for the Trust.  That attorney will opine, issue an opinion on whether making distributions pursuant to the plan to residents of that jurisdiction are permitted under applicable local law.

If the opinion concludes without qualification that the distributions can be made, the Trust will proceed.

If the attorney instead delivers what we define as an unacceptable opinion, which is basically any sort of a qualified opinion, where upon further investigation and consultation, the Trust cannot otherwise resolve its concerns, the procedures that we're requesting today simply establish a process through which the Trust can, on notice to all affected creditors in that jurisdiction, put the foreign law issues before the Court and request the jurisdiction be designated as a restricted foreign jurisdiction.

This Court, of course, deals with foreign law issues all the time, and there is a process that is well established on how to address them.  Affected creditors in the jurisdiction are then welcome to object in writing to the designation as reflected in the notice, which will be resolved by the Court on an evidentiary record if the Trust cannot resolve those objections directly with the creditors. It is only at the point where a jurisdiction would eventually be designated and continues to be a restricted foreign jurisdiction on any distribution record date as defined in the plan.

So when we set a record date for a forthcoming distribution, if that jurisdiction is restricted pursuant to order of this Court at that time, where a holder of claims has been determined by the Trust through the pre-distributional requirements set forth in 7.14 of the plan to

be a resident of that jurisdiction, then the distribution and associated interest at that point would be forfeited and revert to the Trust for distribution to all creditors. Again, only with respect to that distribution.

Your Honor, the dozens of mostly pro se objections that we received in response to the motion, mostly from residents of China, argue that their country of residence should not be designated as a restricted foreign jurisdiction.  It's a substantive objection.  Again, no such designations have been made and, thus, the objections we submit are at best premature.

The objections and conclusory statements though that are proffered without evidence underscore the uncertainty of the legal landscape in these jurisdictions and why we believe the procedures are in fact necessary.  The objections in many cases misconstrue the motion's limited scope.  There is nothing before the Court today as to whether China or any other jurisdiction should ultimately be designated as a restricted foreign jurisdiction.  Thus, no issue of foreign law is ripe and before the Court today.

Now, Your Honor, I just want to touch on a few of the arguments that were advanced in the objections, all of which were addressed in the reply brief we filed over the weekend.  But first, Your Honor, none of the various plan confirmation provisions cited in the objections are relevant

or applicable.

The plan was confirmed and is now effective. Thus, the restricted jurisdiction procedures cannot somehow violate the equal treatment or unfair discrimination principles at least as set out in Section 1123 and 1129 of the Bankruptcy Code.  Any analogy to those or other confirmation-related provisions, we believe, are misplaced. The Trust is proposing the procedures as part of the general authority under Section 1142(b) and Paragraph 135 of the confirmation order entered with respect to this plan to facilitate lawful distributions in furtherance of the plan.

The procedures do not apply selectively to any particular claim or class of claims.  There is no allowance or treatment issue implicated but, rather, the procedures deal with a purely distributional issue similar to the pre-distributional requirements that are set forth in 7.14 of the plan that was approved by this Court.  There, the plan already provides that if those requirements are not met, including Know Your Customer information, tax certification, the distributions on account of those claims by the holder of those claims will be forfeited.

Second, Your Honor, the suggestion that somehow by proposing these procedures, the Trust is breaching fiduciary duties is unfounded.  To the contrary, the Trust is raising the issue and seeking to put procedures in place to provide

due process if and when we request any jurisdiction be designated as a restricted foreign jurisdiction.  The prospects of knowingly violating local laws in making distributions that could result in fines or other liabilities being imposed on the Trust or its officers would ultimately harm all stakeholders.

Third, the proposed procedures provide adequate notice and time for affected creditors to respond to any restricted jurisdiction notice that we might file in the future.  Every one of the objecting creditors has already consented to jurisdiction for purposes of having their claim adjudicated in this Court by having filed claims and/or not opting into the FTX Digital Markets process in the Bahamas that was an option if creditors did not want to come to the United States to have their claims administered.

Fourth, Your Honor, and just for clarity's sake, we discussed this at length in our reply, but I want to address it since it was raised.  The procedural order we seek today is not and could not be a plan modification.  Rather, the proposed procedures seek to establish a process through which the Trust can obtain any necessary guidance as to whether distributions into certain jurisdictions can and should proceed.  The procedures do not contradict or seek to change any unambiguous terms of the plan but, rather, to further the general principles set forth in Section 7 of the

plan, ensuring that all distributions are lawfully made. Thus, Section 1127(b) we submit is not implicated.

And finally, Your Honor, I want to note just for the record that there was an assertion in an objection filed by Mr. Ji that his objections that were filed should somehow be viewed as representative of other creditors. Any such assertion should be rejected. There was no evidence of those creditors and, as a threshold matter, either Mr. Ji or his counsel should have submitted any sort of filed verified statement in accordance with Bankruptcy Rule 2019. To the extent that they are purporting to act for a group, should not be heard without filing such a submission.

I will reserve in response to any objections that are raised or further discussed this morning. But before I cede the podium, I'm happy to answer any questions the Court might have.

THE COURT: Sure. I guess two questions. One is, there was some discussion in the objections and in your papers discussing the residency issue. Can you walk me through that process? How does the Trust determine residency and what would be the mechanisms for creditors to challenge the Trust residency determination, if and when it becomes a relevant point?

MR. GLUECKSTEIN: The issue of residency, what we're seeking to do is not recreate the wheel. What we're

seeking to do is build off of what already is contained in the plan.

THE COURT:  Okay.

MR. GLUECKSTEIN:  And in Section 7.14 of the plan, there are requirements that before a creditor is eligible for a distribution, they have to complete Know Your Customer information, submit, go through our KYC process, which has been discussed previously, was approved from a process perspective in connection with our original bar date order that was entered with respect to customer claims.  Complete that process, part of that process, the creditor has to establish residency.  So one of the things that, one of the data points we get through the KYC process is the residency of the creditor.

THE COURT:  So the creditor asserts what their position of residency is and then you can contest it?

MR. GLUECKSTEIN:  The creditor submits documentation.

THE COURT:  Okay.

MR. GLUECKSTEIN:  And based on that documentation, our KYC process makes an evaluation of that submitted evidence, whether it be passports, other information that they submit as part of that process to determine where they are residing.

THE COURT:  Okay.

MR. GLUECKSTEIN:  There is, secondarily as part of that, there's a tax certification requirement as part of that process.  Tax residency is submitted.  And so -- and the third for relevant customers is to register with a distribution services provider who actually are facilitating the distributions in most cases, not all, to creditors.

And in those situations, similar type information is submitted with respect to KYC --

OPERATOR:  You are unmuted.

You are muted.

MR. GLUECKSTEIN:  Similar information is submitted through that process that would establish residency.

We have had situations and situations arise where creditors have submitted information and have inquired or have talked about changing residency or have asked questions about the residency process, and we've tried to address those as we go.

But we intend to make the determination based on residency based on the data points that we have, which are the data points that are going to be submitted as required pursuant to Section 7.14 of the plan.  That's information that the creditors already have to submit to the Trust and, based on that information, we can make that evaluation.

THE COURT:  So if I were to adopt the procedures that you have put before the Court and a jurisdiction is

designated because you've received an unacceptable opinion and you file the appropriate notices, at that point in time, affected creditors could come in and challenge your residency determination in connection with the notice?

MR. GLUECKSTEIN:  We can make that clear, Your Honor, if the Court wanted us to, that if there is a dispute about residency, right?  So we're past the question of does that jurisdiction --

THE COURT:  Right.

MR. GLUECKSTEIN:  -- is that jurisdiction, unfortunately in a situation where we can't directly make a distribution into that jurisdiction.  But individual creditors says, well, I am not a resident of that jurisdiction as submitted and they want to bring that challenge to the Court, we can provide for that.

THE COURT:  Okay.  So there's no other mechanism already at hand within the plan or otherwise that would allow for that?

MR. GLUECKSTEIN:  Probably not because --

THE COURT:  Okay.

MR. GLUECKSTEIN:  -- we're not seeking through this process to disallow claims.  There would be through a claim of disallowance process if for whatever reason that was a relevant question for disallowance.  So we could certainly add to the procedures a process by which if a creditor

disagrees with our jurisdiction determination, they would have an express right to come back to the Court.

THE COURT:  Okay.  I mean, I can envision a, as you mentioned, changed circumstances.  Perhaps there would be a changed-circumstance argument.  Residency might be one of them where the creditor has moved, for example.

MR. GLUECKSTEIN:  Sure.

THE COURT:  Establish residency somewhere else in the process.  We hope that this will be done quickly, but time will tell.  And so that would be something we'd have to address is how we could dispute or bring those changed circumstances to the Court.

My second question goes to this concept that was raised and I think addressed in your papers, but I didn't see it anywhere accounted for in the procedures, which is this idea of alternative delivery methods.  I make no judgment on whether those alternative delivery methods are acceptable.  But there was some discussion about creditors posing alternative distribution methods, and I believe the Trust said they would consider them.  Really, I'm trying to understand how that would work and where that is contemplated in the procedures.

MR. GLUECKSTEIN:  Yeah, I think there was a reference in the motion that at least one of the objectors highlighted that I think was probably not elegant wording.  I

don't think it's alternative as in we could come up with a completely separate bespoke solution. I don't know that that's practical.

I think what we are talking about, and Your Honor touched on it, if there were changed circumstances whereby somebody changed their residence where there's information that the Trust is not aware of that should be brought to our attention that could facilitate the distribution, at the end of the day, if these claims are otherwise allowable, putting aside any other substantive objections, if these claims are otherwise allowable and we're only dealing with the distributional problem that --

THE COURT: Sure.

MR. GLUECKSTEIN: -- this motion is seeking to address, our preference, of course, is to make those distributions.

THE COURT: Right.

MR. GLUECKSTEIN: So if there is a circumstance where we don't have all the facts or what was submitted through the KYC process is stale and somebody says, I've changed my residence and can document that and provide us evidence of that, we're happy to consider that.

And that is why, Your Honor, as I said in my opening remarks, this is why we want and think it is in the creditors' best interest to view this as a distributional

issue because we'll have the opportunity to revisit this question with respect to future distribution.  So we need to have clarity at the time of a distribution to know who's getting paid, what's happening with that money.

But if there are, in fact -- I don't know how common this would be, but in the hypothetical, if there was changed circumstances where in the context of a future distribution, that claim becomes eligible either because of the changed circumstances of the creditor or because the creditor decides to monetize that claim or otherwise transfer that claim to somebody in jurisdiction where we can -- for consideration where we can make that distribution, we want to have the opportunity for the creditor to receive some value.

What we didn't want to do was be put in a position where we thought we could not make the distribution legally and we were in the world of talking about disallowance. That's in nobody's interest.  And so this way, while people could argue and obviously have taken issue with the process that we've put forward here, we think it's a reasonable one.

And the key to it is that it's going to be overseen by the Court.  And before anybody's rights are affected with respect to any individual distribution, there's going to be a further proceeding before Your Honor.  And of course, between now and then, we're going to work both with legal counsel in those jurisdictions as we've been doing to

try to figure out whether there's a way to make the distribution. And if we come forward and a creditor comes forward with an opposing view in opposition, we're going to consider that and we're going to try to reconcile where there's a disagreement.

So by the time it gets to Your Honor, we're going to be before Your Honor on an evidentiary basis, saying we're just in a spot where the creditor can't violate foreign law. And Your Honor will make a ruling of whether that we're right about that. And at that point, distributions up to that time will be forfeit, but the possibility is open going forward. And so we think that this is an appropriate balance.

We understand that it's not ideal. But as I said at the outset, and as we detail in our papers, there's a lot of things about the FTX case that are not ideal, that we have faced and we have done our best along the way to try to come up with solutions that address the facts and circumstances and allow maximum distributions to creditors. That's what we're trying to do here.

THE COURT: Okay, thank you.

Okay. Well, as I mentioned, there's many people on the line that most likely may wish to be heard, but let me turn to the courtroom first. Is there anyone appearing today in the courtroom that wishes to be heard in connection with this motion? Mr. Sullivan.

MR. SULLIVAN:  Good morning, Your Honor.

Bill Sullivan from Sullivan Hazeltine Allinson on behalf of Weiwei Ji and his related family members and his entity.

Your Honor, I also have co-counsel on the line, Michele Angell from the Westerman Ball firm, but I'll address the issues before the Court.

Your Honor, we filed an objection on behalf of Mr. Ji, and one of the premises of the objection is that we think that it's based somewhat on a mischaracterization. What is going on under the plan is debt satisfaction, not cryptocurrency trading.  So we're not clear why this is being characterized as potentially violating law.  That doesn't help the board, apparently, who is concerned about it, and so we understand that.  But we do believe that these procedures are a plan modification, primarily because of the forfeiture of distribution provision that's in there.

Counsel characterizes this as purely procedural. But the order is very clear, Your Honor, with respect to the procedures, that upon a determination by Your Honor that any of the 49 jurisdictions are a restricted jurisdiction, then any distributions and associated interest shall be immediately forfeited by creditors residing in that jurisdiction.  That's not purely procedural, that's dispositive.

And Your Honor, Your Honor may be aware that the Trust made its second round of distributions at the end of May.  And for foreign creditors, I believe they received 72 percent of their claim value if they had an allowed claim. Mr. Ji has a claim that is marked as disputed.  He did not receive a distribution.

But the impact of the disallowance or the forfeiture provision is significant because if Your Honor determines, for example, that China is a restricted jurisdiction, then that 72 percent distribution is automatically forfeited upon the making of that determination.  That's a harsh result, and it's not necessary to put in place procedures to address the concerns of the Trust.

Your Honor, one more point about the forfeiture. Forfeiture provisions are already impacting creditors because if they are concerned -- and as you can see by the number of objections, there are many concerned creditors -- then they also have to consider about whether they should be selling their claim immediately or later, or what the market is, or where the market will go.  And that's a lot of uncertainty created for creditors who have substantial claims, which may be fully allowable.  And Your Honor, that should not be an impact of procedures that have ostensibly a legitimate purpose of making sure that distributions don't violate the

law.

Your Honor, with respect to the -- we agree with Counsel's characterization that this is a novel circumstance. And their papers lay out the different bankruptcy rules, like 105, and the provisions of the plan that allow them to do what's necessary to implement the plan. All of those are general procedures. None of them are specific to a circumstance where distributions may be illegal.

And to the extent they're aware of any other cases that have dealt with this issue, they don't raise that. So we're really, as far as the motion's concerned, on new ground and in new territory.

THE COURT: Mr. Sullivan, let me just ask you a quick question on your forfeiture point. How would you envision -- how would you solve for the problem that you raise if ultimately it would be illegal to make the distribution?

MR. SULLIVAN: So the way that I would interpret, if there's a determination that a distribution would be illegal, then basically the Trust can then tell the creditor we can't deliver this to you.

THE COURT: Right.

MR. SULLIVAN: That doesn't preclude the fact that the Trust could then -- or that the creditor could then find a way to pick it up. Maybe that's a time where they have to

consider whether they have to move or sell their claim or take whatever steps are appropriate.  It's like an unclaimed distribution.

And if a debtor wants to get rid of -- or wants to forfeit unclaimed distributions, they have to file a motion, get approval, and there's procedures then.  But it should not be automatic.  That's a circumstance where they can say, okay, we've got a decision.  Creditors in China, we can't deliver to you.

THE COURT:  Okay.

MR. SULLIVAN:  Work from there.  There's no reason -- this is 100 percent plan plus interest.  And so there's no reason they can't hold the distributions and while creditors work at an appropriate resolution.  The problem is, at this point, we're completely in the dark because we haven't even seen any opinions or the Trust hasn't reached any conclusions yet and yet we're trying to fashion procedures that could lead to an immediate forfeiture.

THE COURT:  So is your issue on the forfeiture really timing?  In other words, it should be something that is left to the end of the case?

MR. SULLICAN:  Yes.

THE COURT:  Because if this plays out as the Trust suggests it will, we would be left with a situation at the end of the case where the Trust cannot make distributions to

creditors, a set of creditors.

MR. SULLIVAN:  I totally understand that, Your Honor.

THE COURT:  Okay.  So your issue is really that there should be a multi-step process here.

MR. SULLIVAN:  Absolutely.  And the issue of changed circumstances highlights that.  You know, let me step back and say another thing.

I won't go through the four or five points except to the extent that they're relevant ff  that we have issues that we have with the procedures except if they're relevant here.  But, Your Honor, there are 49 countries listed.  They include Iran, North Korea, other places.  Clearly, you're going to have a different issue there than you might with China in terms of number of creditors, in terms of access to courts, in terms of how many objections you'll receive.

There's a large number of Muslim-based countries in the Middle East.  Maybe they all have the same issue.  But I don't think this is a one-size-fits-all situation.  And in particular, there's an issue about whether you should decide this versus whether you should certify a question or whether creditors should be able to get an opinion from a Chinese court.

For example, let's suppose that these procedures play out the way the debtor has drafted them and they have an

expert that comes in and testifies about Chinese law and says it's illegal.  And creditors bring in an expert or experts who say no, it doesn't violate the law, and you rule that it does -- I'm sorry, and you rule that it doesn't violate the law, that they can make the distribution.  And they say, we're still not comfortable.  All right?

Your order in a Chinese court might not mean so much, but maybe the parties would agree that getting a Chinese court to make that ruling would help everybody resolve the issue.  There's not a need to decide that now.  I think one of the things that are point number three in our procedures is that there isn't transparency about where this is and what the opinions are and what the fears are.

And what the procedures call for is the debtors to file any sort of opinion that gives rise to their concerns and then let creditors object in 45 days.  And that's, I think, Section, let me just see.

I'm looking at the Procedures Section C (ii) says 45 days.  And then in (iii), it talks about if creditors object, then the Trust is going to hold the distributions until such objection is resolved or a further order of the Court.  What it doesn't provide for is the kinds of things that are going to need to happen, which is a scheduling order, discovery, expert retention, depositions.  All of those things have to be figured out later.

We submit that the issue of who decides it should also be figured out later.  It may be that you need to decide for Iran, but not for China.

THE COURT:  Why would that be?

MR. SULLIVAN:  Well, I don't know that --

THE COURT:  That's not intuitive to me.

MR. SULLIVAN:  I don't know that a court in Iran would hear anything related to this if cryptocurrency trading is illegal.

THE COURT:  I think, isn't the issue what you already hit on, which is if I make a determination that the jurisdiction is an acceptable jurisdiction and can make -- and there would not be liability?  The issue is really whether that jurisdiction would respect the authority of this Court and recognize the Court's order and abide by it.  Right?  That's really -- I can't think of another issue, but I'm sure there are other issues.  But to me, that would be the biggest issue.

MR. SULLIVAN:  Yeah, that's --

THE COURT:  Right.

MR. SULLIVAN:  I mean, that's certainly the concern.  That could be their concern and it's certainly our concern.

THE COURT:  Right.  I mean, we could be left with a situation where the Trust needs to be further bonded and

insured or indemnified from the Trust here to make the distribution.

MR. SULLIVAN:  Yeah, we certainly haven't had the time to play out all of the possible resolutions here.  But we certainly believe that an immediate forfeiture of distributions, if you don't object in the 45 days, or if there's a determination about restricted jurisdictions that it's immediately forfeited, is not appropriate.

And Your Honor, I guess with respect, one other issue is sort of the participation issue.  I'm not sure what the Court plans to do if you have hundreds of objections and how you manage a proceeding like that.  It could require the Court to maybe appoint an ombudsman or counsel or find a way to handle it, but certainly that's something that probably needs to be considered.  Because if there are procedures in place that don't allow individual creditors to protect their rights, they really are prejudicial.

So in general, the principle is, obviously, we're not saying they can't, they shouldn't seek authority to make these distributions.  But in terms of the procedures as they currently exist, Your Honor, we certainly have those concerns.

And if Your Honor has any questions, otherwise I'm done.  I don't know if Ms. Angell has anything she wants to add, if Your Honor wants to hear from her or not.

THE COURT:  She, I think, is shaking her head, so I will give her a moment.

MR. SULLIVAN:  Okay.

THE COURT:  All right.

MS. ANGELL:  Yes, Your Honor.  Thank you for allowing me to appear remotely today.  I was not able to attend in person in Delaware.

Michele Angell from Westerman Ball on behalf of Mr. Ji.  If Your Honor will indulge me, I just want to add a couple of points that I don't think were highlighted from our objection.

Another issue with these procedures, and to be clear, we're clear that we are objecting to being designated a potentially restricted foreign jurisdiction.  We understand that this is not the time for being designated a restricted foreign jurisdiction.  So all our objections go to being designated as potentially restricted.

And one thing I think we didn't really discuss is that creditors resident in certain countries shouldn't be burdened to come to an American bankruptcy court to justify why they shouldn't forfeit otherwise valid distributions based solely on their country of residence or their perceived residence.  They don't speak English and don't -- well, in many cases, don't speak English, I've communicated with Mr. Ji through a translator -- and don't understand American

bankruptcy procedure.

Many of them literally would just lack the means to do anything about an unacceptable opinion, even if they or other Chinese counsel could reasonably disagree with that unacceptable opinion, so they can forfeit distributions based on that that are otherwise valid.  And we think that's just not fair.

THE COURT:  Isn't the issue that they're not otherwise valid?  I mean, the issue is, is that the distribution may be illegal under non-bankruptcy law.

MS. ANGELL:  Right, we --

THE COURT:  Am I misunderstanding the issue that has been presented?  I mean, your argument is assuming that the creditors may receive the distribution, but I think what is happening here or the way that has been presented to me is that, while the distribution may be appropriate under bankruptcy law because of the plan, it is not permitted in their area of residency.

MS. ANGELL:  Right.  And our point is that if the Trust gets an opinion saying that, many creditors will not be able to do anything about that, even if other Chinese lawyers could disagree, even if a Chinese court could disagree as proposed.  It's very hard to come to American bankruptcy court when you're a foreign creditor and the procedures as proposed would require people to do that.

So putting that cost and burden on creditors from overseas, we do think is another issue with the procedures. And that practically speaking, what will happen is that valid distributions could be forfeited simply because creditors couldn't do anything about it.  Even if Chinese counsel, or a Chinese court even, could disagree with the capitalized unacceptable opinion.  So that's another issue we had.

And I also just want to say, we obviously know that 1123 and 1129 are confirmation objections, but the point is we didn't know about these procedures when we could have objected to confirmation.  So that's the issue.  And we don't think that it's fair for them to turn around and say, well, too late for that, but ha ha, it's not a plan modification either to put you through this entirely different framework to get distributions.  So that's just another point.  Of course, we are aware of that.

And just to be clear, we, Westerman Ball, represent Mr. Ji, his wife, his brother, and his wholly-owned Hong Kong entity.  So these are the four creditors that we represent.  We do not represent any other Chinese creditors that Mr. Ji may or may not be communicating with.  And those four holders are the four holders of the four proofs of claim we listed by number in our objection.

So I think that's just all I wanted to add.  If Your Honor has any questions for me, I'm happy to answer

those.

THE COURT:  I do not.  Thank you very much.

MS. ANGELL:  Thank you.

THE COURT:  All right, is there anyone else in the courtroom that wishes to be heard before I turn to the parties appearing on Zoom?

(No verbal response)

THE COURT:  Okay.  There are a number of parties that are appearing on Zoom.  Several of you have your hand raised, so I will look to you first.  I'll look to, is it Mr. Weiwei Ji, who just had counsel speak for you? Do you need to supplement your counsel's presentation?

MR. JI:  Yes, yes.

THE COURT:  Okay, I will allow you to briefly do so.  However, I'll note you have counsel who just spoke for you.  So I would request that you only fill in what is necessary to augment your counsel's presentation today.

MR. JI:  Okay, okay.  One thing I want to emphasize, what we distribute, that's U.S. dollar and not cryptocurrency.  That's very important.  Because one of my friend, he's from Taiwan, and today I asked him a question. He is also a FTX creditor, and I asked -- his question is, what do you get through the token?  And he tell me, he get U.S. dollar through the token.  That means today the topic we shall discuss, distribute U.S. dollar to creditor is legal or

illegal.  I think that's very, very important.  That's not cryptocurrency.

The FTX entity, before bankruptcy, they running trading platform, and they provide cryptocurrency service.  But now that's different.  After crypto bankruptcy, after the FTX bankruptcy, and the entity distribute USD to the creditor.  I think that's very important to discuss.  Very different topic.

THE COURT:  Okay.

MR. JI:  Distribute U.S. dollar to creditors is legal, not illegal.  Already have a lot of case, and distribute U.S. dollar to Chinese creditors.  And all of those Chinese creditors already get that payment.  So those entity didn't face any legal issue.  So I want to ask, why during FTX process, they cannot provide this message to all the creditors?

THE COURT:  I'm sorry, I don't answer questions to the extent that you're posing them to me.  So if you're waiting for a response, you will not be getting one from me.  I apologize.  I just want to make sure I hear your complete argument.

MR. JI:  Okay.  So can I try to ask several questions to the FTX counsel?

THE COURT:  You have counsel, so it's best if they communicate through counsel, sir.

MR. JI:  Okay, thank you.

THE COURT:  Okay.  That will help answer your questions more expeditiously, if your counsel pose the questions to the Trust counsel, not in the court proceeding.

Okay.  All right. Unless there's anything further from Mr. Ji, I see someone, Yongqiang Xu, and I apologize if I'm mispronouncing your name, but your hand is raised, and I will look to you next.

MR. XU:  (No verbal response).

THE COURT:  Okay.  Hearing nothing, Mr. or Sen Yang [sic], your hand is raised.  I'll turn to you next. Mr. Yang [sic]?

MR. S. WANG:  Your Honor.

THE COURT:  Yes.

MR. S. WANG:  Thank you for allowing me to speak. Can you hear me?  Yeah.

THE COURT:  Yes, I can.  Thank you.

MR. S. WANG:  My name is Sen, yes.  My name is Sen Wang, and I respectfully appear today as a creditor of FTX, on behalf of both myself and my mother, Ms. Yongqiang Xu. Together, we hold two verified FTX claims submitted in full compliance with the bankruptcy process.  So, we file a formal objection to the proposed restricted jurisdiction procedures, because we believe the motion, if approved, would arbitrarily and unfairly deprive the Chinese creditors' lack of rightful

distribution, despite no legal or regulatory basis for such exclusion.

And secondly, our claim, our U.S. dollar denominated, so we seek a settlement through the standard U.S. dollar transfer procedure that do not involve crypto distribution or violate any Chinese law.  In fact, several U.S. bankruptcy cases, including the Celsius and the (Indiscernible), that suspectfully reversed the bond to the Chinese creditors using the similar channel without any issue.

So, basically, we are not asking for special treatment.  We are asking for equal treatment to be excluded solely because our jurisdictional assumptions, especially when no actual legal risk has been demonstrated.  It's just unjust.  So, we trust this Court's commitment to the fairness, and we respectfully urge you to reject the motion that label China as a potential restricted jurisdiction.

Thank you, Your Honor.

THE COURT:  Thank you very much.

Okay.  There is a creditor, and I will not mispronounce your name.  It's K-A-I-H-A-O, last name N-I. I'm happy to hear from you next.

MR. NI:  Yes, can you hear me?

THE COURT:  Yes, I can.

MR. NI:  Okay.  So, mine is kind of short.

So, I guess I want to bring one topic. So, there are a lot of other major crypto exchange bankruptcy, like, I don't know how to pronounce it, but there's Celsius, BlockFi, and Voyager, and they have already distributed funds globally, including China. Especially, I know I asked a few friends who suffered this process, and they said that's via US dollar, including PayPal or banks.

So, my point is, you know, there are a lot of cases that have certainly done that. And so, that's why I think that that's unfair in FTX case, and they cannot do this process.

THE COURT: Okay, thank you very much. I understand.

MR. NI: Okay, thanks.

THE COURT: Thank you. Okay, I will go to the next person, and I'll just spell your first name so I don't mispronounce. It's X-I-A-O-D-O-N-G, Wang, W-A-N-G. Happy to hear from you next.

MR. X. WANG: Hello. Hello, can you hear me?

THE COURT: Yes, I can.

MR. X. WANG: Thank you.

Your Honor, my name is Xiaodong Wang, and I'm a creditor of FTX. I'm just an ordinary individual. The assets I hold on FTX come from hard work, My Honor, my own labor. The money is extremely important to me and my family.

We creditors have completed every step of the claims progress from step one through step eight, and we have voted to -- we have agreed the bankruptcy team's plan.

But now, at the final payment stage, we have suddenly told that we are in a so-called restricted jurisdiction. Yet, throughout the entire process, the debtors never provide any definition of the restricted. There have been no clear standard. They claim there may be legal risk if they pay us but, in fact, delaying and refusing to pay us is really -- is real legal risk.

Why aren't we informed about these restrictions early during the step one to step eight? Why only now, and at the final distribution stage? Is our stage being questioned? There are many struggling families, people like me, who simply want to recover what is rightfully ours. Thank you.

THE COURT: Thank you, Mr. Wang.

All right, I'll hear from Ming Zhu. Last name is Z-H-U.

MR. ZHU: Thank you, Your Honor.

My name is Ming Zhu. I'm a creditor speaking on my own behalf.

First, I want to emphasize my objection is to inclusion of China as a potentially restricted foreign jurisdiction. The Trust claims it wants to avoid legal risk,

but it has not cited a single example where a bankruptcy estate was fined or penalized for making distributions to foreign creditors.  What they call risk is purely hypothetical and cannot justify treating one group of creditors differently from others.

While the Trust says it does not wish to opine on matters of foreign law without receiving formal opinions in the reply, its actions have already done so.  By dividing creditors' jurisdictions into (indiscernible) and potentially restricted, and by assuming that transferors who are permitted a jurisdiction eliminate legal risk without providing critical legal support, they are clearly making judgments about foreign law.

When asked about the criteria of labeling a jurisdiction as potentially restricted, the Trust responded in the reply that this is irrelevant because the motion does not actually designate any jurisdiction as a restricted foreign jurisdiction at this time.  This conflates two distinct terms, potentially restricted and restricted, and avoids addressing the core concern.

Fourth, the procedures leave no room for practical solutions.  There are no proposed alternatives for distributing to affected creditors.  No escrow arrangements, no trustee intermediaries.  It's either receive payment as planned or risk for future.  That is not, as the Trust

claims, an effort to reach as many creditors as possible. It's a threat.

Despite the seriousness of the potential consequences, the Trust has not directly notified the affected creditors. Many people who suffered in the collapse are now struggling to make a living and are not constantly monitored for this. I believe many impacted creditors still don't even know this is happening. Lack of objection does not mean consent.

Taken together, this flaws legal ambiguity, lack of transparency, lack of notice, and the lack of alternatives show that the procedures are not fair, not neutral, and not ready for approval. Thank you, Your Honor.

THE COURT: Thank you very much.

Okay. I'll hear next from the creditor that's appearing, M-A-N-Q-I-U, last name C-A-I.

MS. CAI: Hi. Hello, Your Honor. My name is Manqiu Cai. I'm a creditor in this case. Today, I ask the Court to look past the surface of this motion. The Trust claims it's merely a procedural request but, in reality, this is a calculated legal strategy to lock in laws that heavily fuel the Trust before any real dispute even begins.

The danger lies in shifting the burden of proof from a well-founded trust to scattered, under-resourced individual creditors like us. If the motion is approved, the

Trust will choose a foreign attorney.  If that opponent's opinion goes against us, it becomes our burden to prove it wrong.  Each of us will have to hire U.S. counsel to challenge an expert selected and paid by the Trust.  This creates a serious financial and procedural barrier for everyday creditors.

It's divide and conquer.  Today, the Trust asks to approve neutral laws.  Tomorrow, those laws will be used to defeat us.  I urge the Court not to approve a framework that pretends to be neutral, but is designed to exhaust our resources before the real issues are even heard.  Thank you.

THE COURT:  Thank you very much.

I will hear next from Vladimir Jelisavcic -- I'm just going to spell it because I don't want to be disrespectful in the pronunciation of your last name, J-E-L-I-S-A-V-C-I-C.  Happy to hear from you next.

MR. JELISAVCIC:  Thank you very much.  Good morning, Your Honor.  Vladimir Jelisavcic of Cherokee Debt Acquisition.

Just one issue that we had is the wording of the order would be construed to read that if a buyer of claims purchases a claim from a creditor who is a resident of a potentially restricted jurisdiction, that any distributions could be forfeited, including distributions that have been made otherwise to holders of allowed claims previously, such

54

as the May 30th second distribution. So we think this is a serious ambiguity that makes it very difficult for investors to purchase claims from holders of potentially restricted jurisdictions that otherwise might want to sell.

THE COURT:  Okay.

MR. JELISAVCIC:  And we would respectfully request that that ambiguity be clarified.

THE COURT:  Could you point me to the -- if you have the proposed procedures in front of you, could you point me to the particular provision?

MR. JELISAVCIC:  It's going to be difficult for me to do so very rapidly.  What's the best way for me to follow up?

THE COURT:  That's okay.  I think I have it in front of me.  I think I found that particular provision.

MR. JELISAVCIC:  It's that (v), I believe.  I don't have the full cite in front of me, Your Honor, but it's the (v).

THE COURT:  Okay.  Thank you.

Okay.  There's a Shirong Wong, S-H-I-R --

MR. JELISAVCIC:  I got my question in.

THE COURT:  Oh.  Okay, moving on.  There is a Shirong Wang, S-H-I-R-O-N-G W-A-N-G.  I'm happy to hear from you next.

MS. WANG:  Hello.  Good morning, Your Honor.  My

name is Shirong Wong.  I'm a creditor in the FTX case, originally from China, but now legally residenting in Toronto, Canada.

I submitted my claim early and complete all KYC and tax requirements.  My account is verified upon to Kraken for US dollar distributions.  I only deposit USD on FTX to our interest.  Now for crypto trading, there's no Chinese nor that prohibition from receiving USD wire transfer from a foreigner bank.  Other cases like (indiscernible) and Celsius repay Chinese creditors without restriction.  Why should FTX be different?

There's a lot of Chinese creditors like me have the Chinese passport, but living -- illegally living in a foreign country like Canada or America.  Why we can't get paid?  Please protect the fairness of this process.  I respectfully request the Court to reject the motion and allow (indiscernible)'s international creditors to receive their right for distributions.  Thank you for your time.

THE COURT:  Thank you very much.

Okay.  I'll ask again.  There's a creditor who's appearing with the name Y-O-N-G-Q-I-A-N-G X-U.  I'll hear from you next.

MR. XU:  Good morning, Your Honor.

THE COURT:  Good morning.

MR. XU:  My name is Xu Yongqiang, and I am a

creditor.

I'm here today to respectfully object to the Trust motion because it attempts to fundamentally and unfairly change the deal that we creditors voted for. When we voted to approve the reorganization plan, we were promised a recovery. We were never told that our claims could be permanently abated simply because where we live. This devastating possibility was not in the disclosure statement. It was not in the plan. This new rule was created long after our votes were cast, and it seeks to strip us the rights we were promised.

Your Honor, no one is asking the Trust to break any laws. A fair solution exists that honors the original deal. Place our funds in a secure escrow account. This will protect the Trust from any legal risk while also protecting our fundamental rights to our property.

I respectfully ask you to deny this motion. Please do not allow the Trust to rewrite the plan at our expense and enforce a rule we never agreed to, which results in such an unjust punishment. Thank you for your time.

THE COURT: Thank you very much.

Okay, there's a few others with their hand raised.

A party is appearing with the last name, M-E-N-S-H-Y-K-O-V. I'll hear from you next.

MR. MENSHYKOV: Yes, thank you.

I'm an FTX creditor from Ukraine.  Do you hear me, by the way?

THE COURT:  Yes, I can hear you.

MR. MENSHYKOV:  Yes.  So I'm an FTX creditor from Ukraine, and Ukraine is one of the countries listed on the potentially restricted list.

So I have three major concerns.  One of these concerns is that 45 days is really not enough, and this has already resulted in fire sale claims.  On the second resale market, the claims had already lost a third of their value versus prior to this idea of forfeiting those claims.

Forty-five days is not enough because it takes 21 days, for example, from even filing the transfer of the claim for the claim to happen, right?  And if you could file it wrong somehow, you would have your claim forfeited just accidentally.  So 45 days is not enough.  A year would be maybe enough.  Half a year maybe would be enough.  Forty-five days is like, why bother?  Why does it have to be so fast?  We've waited for years already.  Why does it have to be 45 days until forfeiture?

The second notion is, it's not like we want necessarily to give this money away to other creditors.  Maybe we want to nominate some charity and donate the money that is owed to us to some charity, right, instead of this money being redistributed.  It's not like we own five percent

claim on our five-percent claim.  We own 100 percent of our five-percent claim -- I mean, the general funds, right?  So we should be able to maybe nominate a charity that we want our money to be transferred to, right?

And the next is not much of an objection, but a clarification of how things are actually.  Lawyers in the US are extremely expensive.  They're like 30 times, say, more expensive than lawyers in Ukraine.  For example, it takes $5,000 to $10,000 to even transfer a claim.  If you want to hire a law firm, they will transfer a claim.  I had to research 30 firms to even find a single law firm that would do the claim transfer.

And that's the amount that -- most creditors don't even have that much of a claim.  They can't even hire somebody to transfer their claim to another jurisdiction.  But they can resell through people who regularly resell claims.  And for them, because it's semi-automatized, it's much cheaper for them to resell their claims, right?  But with a 45-day fire sale, there's just not going to be any reasonable liquidity to buy out all of the hundreds of millions of dollars of these claims.

So, you know, reselling is like a way for us who are in the jurisdictions where FTX might decide that they can't distribute to us, although our claims are completely valid.  But they decided that we can't, for some reasons, we

can't -- I'm sorry, but we can't distribute money to you.
But it doesn't have to be so fast and with very little
liquidity that we can't at least get some portion of our
money back, you know.  Thanks.

THE COURT:  Okay.

MR. MENSHYKOV:  That will be all.

THE COURT:  Thank you very much.

Okay, two other parties have their hand raised.
One is Weiwei --

MR. MENSHYKOV:  Can I say one other thing?

THE COURT:  Sure.  Happy to hear from you.

MR. MENSHYKOV:  Can I say one other thing?

THE COURT:  Yes.

MR. MENSHYKOV:  Like, FTX could streamline this
process of transferring claims to make it like semi-automatic
and bring the price down to maybe a hundred dollars or
several hundred dollars, like semi-automatize this claim
filing and all of that -- claim transfer filing and all of
that for maybe hundreds of thousands of claimants in these
regions to be able to actually transfer their claims out to
maybe their friends or their family in other states, in other
jurisdictions, and that way to save their money, you know.
Thanks.

THE COURT:  You're welcome.  I'll note that the
claims transfer procedures are established by local

bankruptcy and federal law.  I'll just note that to the extent that the Trust was going to respond to that argument. That's really something that's out of the Trust's control. Okay.

MR. MENSHYKOV:  Yeah.  I'm just saying helping in that, helping in that procedure.  Like, they already have our KYC.  Maybe we want to like forward it to some other entity that -- you know, like just streamlining the process, making it cheaper.

I'm not saying that they can like forego the legal process, just make the legal process easier because, you know, for people who don't like, for example, have credit cards in U.S. banks, we can't even like register in the PACER system.  So we can't really represent ourselves, and representing ourselves through lawyers is like prohibitively expensive.  It's more than most of the claimants can afford. Thanks.

THE COURT:  Okay.  That's very helpful.  Thank you very much.

Okay. There are other parties raising their hand. I'll also note that, to the extent you filed an objection but you don't feel comfortable speaking, please rest assured we've read all the objections that we've received and that have been docketed, and that I'll take them under consideration as I rule on these issues.

But with that being said, there are several parties with their hands still raised. One party has the last name Q-I-N Y-I. I'll hear from you.

MR. YI:  Good morning, Your Honor.  I'm one of the creditors from China.  Can you hear me?

THE COURT:  Yes, I can.

MR. YI:  Okay.  So I have only issue about that is like the Trust itself has acknowledged that claims from China's creditor account for the vast majority of those affected by this motion.  When such a large group from a single country is impacted, the Court must pay particular attention to procedural fairness and the fundamental property right of the creditor.

The convenience of the Trust or the concern about legal risk cannot justify sacrifice the legitimate right of the thousands of ordinary people.  So this issue is like that. It is important to emphasize that whether Chinese law imposes restriction or cross-border distribution is one legal issue.  Whether the Court should deny distribution to Chinese creditor based on that is a completely separate question, Your Honor.

So even if there is some legal uncertainty on the Chinese law, that alone should not be grounds for the U.S. Court, I think.  So the Court should base its decision on the

fact and the principle of equal treatment rather than simply accept the Trust subject assignment.  So that's my opinion. Thank you, Your Honor.

THE COURT:  Thank you very much.

Okay. There's a Yuan Wang, W-A-N-G.  I'll hear from you next.

MR. Y. WANG:  Thank you, Your Honor.  Can you hear me?

THE COURT:  I can hear you, yes.

MR. Y. WANG:  Good morning.  Thank you very much for giving me the chance to speak out my voice.  My name is Yuan Wang.  I'm a creditor in this case, and I'm Chinese, living and working in Europe.

I'm here to object to the Trust's motion and respectfully request that Your Honor to reject this motion. If the motion were passed, I'm worried that it would damage or erode the foundation of modern civilization.  The most fundamental cornerstone of modern civilization is private property rights.

Regardless of whether they are Americans or non-Americans, legal experts or legal illiterates, people of high moral character or despicable persons, they all have equal rights to defend, declare, and control their legal property before the law.  Thank you very much, Your Honor, for your time.

THE COURT:  Thank you very much.

Okay. We're nearing the end. There's a party appearing with the last name D-E-L-O-N-G.  Happy to hear from you next.

(No verbal response)

THE COURT:  Okay. D-E-L-O-N-G.

Is anyone appearing on behalf of this party?

(No verbal response)

THE COURT:  Okay.  I'll lower that hand.

All right.  Mr. Ji, I already heard from you, but to the extent you want to briefly supplement what you've provided earlier, I'll hear from you.

MR. JI:  Can you please give me one more opportunity?  I have already organized my watch, and I think I have some very important points needed to emphasize.

THE COURT:  I'll hear from you briefly, and then I'll hear --

MR. JI:  Okay.

THE COURT:  -- hear from the Trust in response.

MR. JI:  Okay.  I think let's start with the foundation.  Is there a real risk that justifies the motion? FTX bankruptcy is now in a distribution state.  That means we are dealing with a matter of the U.S. dollar space, creditor-debtor relationship.  This has nothing to do with the business operation of FTX before it is collapsed.

It is not about crypto trading or crypto payment anymore.  So I must ask, what is the actual legal risk that this motion is trying to prevent?  Other major crypto bankruptcy, like Voyager and Associates and BlockFi, have already distributed funds globally, including to creditors in China, without tackling any legal or regulatory issues.  So those cases show that global distribution, including to so-called restricted countries, is feasible and lawful.  That's why I believe the legal risk the debtor cites here is speculative at best.

They have not provided a single case precedent, legal opinion, or enforcement action to support their claim.  What's more, in trying to justify the risk, they have misquoted and misunderstand Chinese regulations.  The cite rule in their motion is not a law, but a guideline.  It has nothing to do with a bankruptcy distribution.  It is about prohibiting the banks from supporting ICO, not blocking the debt repayment.  In short, the legal risk is imaginary.  It has no legal foundation.  And I believe it is being used as a pretext to implement discriminatory procedures.

And another thing I need to emphasize is, does this motion really reduce the legal risk or does it create more?  The debtors argue that this motion is meant to protect the estate from the legal complication and lower the case for everyone.  But in fact, it may do the opposite by aiding the

unnecessary restrictions.  And uncertainly, this motion could trigger new (indiscernible), increase the distrust, and create the complex legal issues across multiple countries.

Just look at how many objections have been filed and how many creditors like myself are here today.  This should be a sign.  This motion doesn't bring clarity.  It brings confusion and conflict.

And the last one, and from the procedural standpoint, this motion changed the deal and violate the fairness.  Let me explain why.  During the pre-confirmation process, from the step one to step eight, there was no mention of any restricted concept.  No one worked on this idea.  Adding these restrictions after the vote is not a clarification.  It is a material change.

In the first round of the distribution, none of the creditor from those 49 countries, including myself, received anything.  We also got no explanation.  Now, if this motion is approved, it may permanently exclude some of us from receiving distribution at all.  That's a clear violation of the equal treatment under Section 1123.  And honestly, why we are even here today?  What standard was used to select those 49 countries?

Now I'm in Korea.  And this morning, my wife and my kids went out with my Korean friend.  And I tell them, I will stay home to prepare for this hearing.  One of my Korean

friend, also an FTX creditor, asked if I had finally received my money. I say, no. He asked why. I tell him, I don't know. That's the truth. We don't know why we are being singled out. The other 100-plus countries, including Korea, already received their distributions without issue. What makes us different? What is the transparent legal standard? If there is no clear rule, and if the creditors in a similar position are being treated differently, then this motion creates a real discrimination.

To summarize, the legal risks cited by the Trust is not real. It is speculative and unsupported. The motion would cause substantive change to the confirmation of the plan without creditor consent. It would lead to unfair and unequal treatment of the creditors, violating the core principles of the bankruptcy law. I respectfully ask the Court to deny this motion in full. Thank you for you give one more chance and allow me to speak. Thank you.

THE COURT: All right. Thank you very much.

All right. Two others raised their hand while Mr. Ji was talking, and I'll hear from them. The creditor with the last name Delong, I already called on you. Your hand is raised. This is your opportunity. If I don't hear from you, then I will not call on you again.

D-E-L-O-N-G.

MR. DELONG: Hello?

THE COURT: Can you hear me?

MR. DELONG: Yes, I can.

THE COURT: Okay. This is your opportunity to address the Court when you're ready.

MR. DELONG: Okay. I want to add one point, that the Trust cites in the one case is called Adelphia Communications Corp., 368, for the proposition that 1123(a) formally requires equal treatment for claims within the same class. However, in the Re W.R. Grace & Co., 729, clarifies that delayed distributions are permissible only if creditor rights are not distinguished.

But in our case, FTX Recovery Trust, there is a high risk that all the rights of the Chinese creditor might be permanent deprivation. So that means even though it seems like our money has been proposed, distributed, but in fact that maybe in the later, the rights of distribution will be extinguished in this case.

And also, there is no evidence shows that FTX Recovery Trust have found alternatives to distribute US dollars for the 49 countries in this case. That's two points I want to add. Thank you, Your Honor.

THE COURT: Thank you very much.

Okay. One more party. First name, H-E-J-I-A. Last name, Z-H-A-O. I'll hear from you next.

MS. ZHAO:  Yes, Your Honor.  I am a creditor from China.  There are two points I want to raise.

One thing is I legally disposed my USD into my FTX account. Its all my life's savings and money I raised from (indiscernible) but I can legally deposit my money into FTX but now its illegal to -- or FTX argues illegal to redistribute it to China.

FTX never mentioned about this restricted jurisdiction motion until this last moment.  And with such short notice its very hard for us to defend ourselves.  We are creditors, as many individuals, but it is very difficult for our voice to be heard.

As you can see, there is only Mr. Ji's attorney present.  Many of us can only represent ourselves and we don't even speak proper English but we still feel the urge to participate because of how much burden this has imposed on us.

That is all I want to add.

THE COURT:  Okay, thank you very much.

We have gone through all of the folks that have raised their hand that wishes to be heard.

Mr. Glueckstein, I will hear from you in reply.

MR. GLUECKSTEIN:  Thank you very much, Your Honor. Again, for the record, Brian Glueckstein for the FTX Recovery Trust.

So, there was a representation by Mr. Ji's counsel that they were only objecting to the procedures. Much of what was discussed, and then certainly by Mr. Ji and some of the other objectors, go to the substance.  That remains part of the issue here, I think, Your Honor.

So, I just want to level set so that everybody and everybody who is listening is clear.  What we are requesting today is procedural.  There is no question that if we come forward with an opinion and the Court, in a subsequent hearing, on notice and an opportunity to be heard, agrees with our -- enters an order authorizing a jurisdiction, restricted jurisdiction, on an evidentiary record -- alright, that is the difference. There is going to be an evidentiary record before the Court at that time. That will have some impact on these creditors with respect to prior distributions.

It is not, as I said earlier, a claims disallowance.  So, it is not going to impact go forward distributions necessarily if there is no change to the circumstances it will, right. If China is on the list, and China remains on the list because there's no change in regulatory regime, and people remain residents of China, they're not going to get further distributions. They still could try to monetize their claim. They still could, as we talked about earlier, have some individualized changed

circumstances but those are likely to be issues somewhat around the margins.

In fact, some of the objectors I heard this morning -- you know, we, obviously, don't have all those facts and these aren't ripe before the Court but based on representations that they made they wouldn't be effected by this motion because they represented that they're not resident in China yet they're objecting to China being on the list.

We are not suggesting that this is a simple process, right.  Anything about this entire bankruptcy process has complexity associated with it but all of these creditors are here.  They have submitted to the jurisdiction of this Court.  If we were to object to their claim, they would have to be here defending that objection.  What we have tried to do is put in place a process that doesn't require either the Court or the creditors to deal with every one of these potentially effected claims on an individualized claim basis.

We heard this morning, mostly if not exclusively, about China being designated as a potential jurisdiction. That is only one on the list of potential jurisdictions that we, as the Trust, have identified concerns with.  Again, nothing is being determined today.

Some of the objectors, mostly all of the objectors, have suggested that there isn't a legal restriction in making the distributions out of this case. Clearly, based on information that we have received, we don't necessarily agree but we continue to work through the issue and we have not, at this point, come forward.

We have the -- the first step we've taken here is to bring forward this motion to put the process in place so that we can have an efficient process should it be necessary to designate China or any other jurisdiction on that list as a potentially restricted jurisdiction.

We made clear in the motion that we hope that we can work through some of those jurisdictions and jurisdictions will come off of that list and we won't need to make the request of the Court. That we will be able to get comfortable that we can make the distributions and we will do so.

It is possible that list will change in other ways.  Jurisdiction is where some new laws are passed tomorrow that raise new issues.  This is an evolving landscape in the world of digital assets and we've been facing that for the almost three years that we have been in these Chapter 11 cases -- these Chapter 11 cases have been pending.

It was a suggestion that because we're distributing dollars that none of this matters, that nothing is implicated. I --

THE COURT:  I don't think we need to get into that today.

MR. GLUECKSTEIN:  We don't but all I wanted to note --

THE COURT:  I want to be careful about what doors we're opening here.  This is -- I agree with you this is a procedural motion in large part.

MR. GLUECKSTEIN:  I will reserve on that issue then, Your Honor.

THE COURT:  The issue of whether a distribution is made in dollars is an issue for another day of how it affects your potential liability or the unlawfulness or potential unlawfulness of distributions and I don't think its relevant for today.

MR. GLUECKSTEIN:  That is fine, Your Honor, and we agree.  It goes secondarily to this issue that was cited that certain other Chapter 11 cases that touch in cryptocurrency have made distributions to certain jurisdictions.  You know, we do address this in our papers but just to be clear, we don't know what analysis was done there but more importantly FTX is not those companies.

The FTX platform and what FTX was doing, and this went to my comments earlier about the nature of FTX's business, there were aspects of FTX's business that Celsius and these other cryptocurrency companies where you deposit crypto, maybe you earned interest and then crypto was withdrawn are very different then FTX.

FTX was facilitating trading in all kinds of markets; predication markets, tokenized stocks, futures trading, things that implicate other aspects of foreign law then simply just what we say, big picture, cryptocurrency. So, there are legal issues here to be addressed with respect to China and these other jurisdictions and that is why we're putting this process in place, you know, as we continue to work through what we're seeking to do.

This Court -- there was a suggestion that perhaps this Court should not rule on these issues and we should go somewhere else, or we should go to local jurisdictions, or we should do any number of other things. This Court has exclusive jurisdiction over the assets of this Trust. The assets are in a Delaware statutory trust that was established by the order of this Court that are being distributed pursuant to a plan that was confirmed by this Court.

The Court also has jurisdiction to address issues to implement, interpret, and, otherwise, enforce the plan and the confirmation order. We recognize, as Your Honor

observed, that regardless of the outcome here there could be jurisdictions where Your Honor might not have the final word at the end of the day.  We understand that.  That is always the case in a multinational situation where orders of this Court there's always a risk it might not be enforced in certain circumstances in a foreign jurisdiction.  We understand that risk but we believe that the only way to dela with this, as a matter of what is appropriate for the Trust to do, operating under US federal law, is to seek guidance from this Court to the extent we can't resolve the issue on the basis of local law advice that we're getting.

So, we do believe it is imperative that this Court exercise its retained jurisdiction and address this issue as it becomes appropriate.  Regardless, there is no question that the Court has the ability to approve procedures to help manage this process which is the relief that is before the Court today.

There were a couple of questions or issues, I should say, that were raised with respect to timing, that actually go to the procedures themselves.  Questions about both the 45-day notice and about the timing of forfeiting of distributions.  With respect to that, Your Honor, we submit that the time that we are providing is more than sufficient. The 45 days is actually longer then many events that have taken place in this case. Its longer then the period of time

that creditors had to file claims, longer then they had to vote on the plan.

This is -- when we come forward -- if and when we come forward with an opinion, we do believe it is important. We heard, somewhat inconsistently today, about some of the uncertainty that some of these issues can create. We think it is important that that uncertainty be resolved. If we get to the point where we need to come forward and say the Trust is of the opinion, based on the advice that it has obtained, that it cannot make a distribution into a particular jurisdiction.

We think it is important that there be a reasonable period of time for objectors to respond but that the issue be addressed by the Court in an expeditious manner so that any uncertainty around this can be resolved. So, we have proposed 45 days. We think -- we looked at that consistent with other timelines in this case and we think that is reasonable.

The issue with respect to the forfeiture, this is an issue that has existed in this case. This is a huge estate, as Your Honor knows, with a gigantic number of claims and a large number of assets. Making distributions is a significant task each time we go about doing it.

With respect -- we actually have provisions in the plan. Section 7.8 of the plan, right, deals with there was

an analogy made to unclaimed distributions or unclaimed property. We have that provision in the plan. There is no separate motion that needed to be made. We addressed that issue in the plan and that makes very clear that there is a said period of time by which assets will be forfeited.

Section 7.14 of the plan, which I referenced in my remarks earlier, that deals with the pre-dispositional requirements, has a process by which notice is given and if the pre-dispositional requirements are not completed within that timeline distributions are forfeit. That, of course, is a substantive event if we get to that point but it's been important in sizing those timelines similarly here that the estate, that the Trust have clarity around assets that are available for distribution.

We don't see it being the sort of thing that makes sense to hold until, you know, for example, the end of the case, which is at an indeterminate time at this point by which then those distributions would have to be reallocated at a later date.

So, Your Honor, while there isn't magic to the dates we've proposed, we proposed procedures in what we think is reasonable. Certainly, we think that conceptually having a structure like this is important to reach the ultimate goal which is to make distributions to the holders of allowed claims.

THE COURT:  I'm worried about the last provision, Subsection 5, that talks about what happens if a jurisdiction is designated and continues to be a restricted foreign jurisdiction on any distribution record date.  I think there's -- there could be potential issues with this.

So, if I were to designate, under your procedures, a jurisdiction that is a restricted jurisdiction and you approach a distribution record date, I think your -- the way you present it is at that point you couldn't make a distribution to those folks, okay, to those effected creditors.  But then you come up on another distribution record date, do you file something that says no changed circumstances here and then creditors get another bite at the apple and we're back here relitigating the same issues because they're arguing -- someone could argue that there's a change in circumstance with respect to the law and, of course, themselves because perhaps they have a residency change or they've sold their claim or devise another alternative method that they believe is reasonable.

So, then I hear those disputes.  And  then we go to another distribution record date. How is this -- really, it's a procedural issue. Is this really -- I think there needs to be some thought or maybe you have thought about it and its not clear in these procedures how this is really going to work because the way I'm seeing it is that we are

really going to be -- there is not certainty of when this will end. And these procedures are meant to, I agree with you, set forth a process and provide some clarity to parties. I can tell you this is not clear to me how this is going to work.

MR. GLUECKSTEIN:  So, apologies for that, Your Honor, but let me try to -- and I think this came up -- I think it came in a separate context from one of the creditors who spoke or counsel who spoke in the objections about this provision and how the applicable distribution date applies. We can certainly clarify this provision.

From the Trust's perspective, we have talked some today about the possibility of an individual changed circumstance or something which is why I believe, and the Trust believes, that keeping the possibility open and not just disallowing the claim make some sense but to be clear, we view that as likely to be (indiscernible) cases, right, individualized type circumstances.

What we are anticipating -- we are not anticipating that we are going to have this hearing in front of Your Honor every time we make a distribution.  We are thinking completely differently then that.  What we are expecting is that once, under our proposed procedures, once the jurisdiction is designated as a restricted foreign jurisdiction, so once the Court enters the order with respect

to that jurisdiction, as of the next applicable record date, right, those claims are not eligible for distribution.

So, to use an example, if we were to set a record date, just pick a date, tomorrow, if tomorrow was our record date then -- I'm sorry, if your Court entered an order tomorrow with respect to a particular jurisdiction and then we set a record date, you know, some period thereafter, on that record date with respect to those jurisdictions, those claims would not be eligible for that distribution or previous distribution.

We are not, at that time, forfeiting future distributions but we are not proposing here that the next time we make a distribution we're going to be going through this again.

THE COURT:  Well, what do you -- I'm not --

MR. GLUECKSTEIN:  We are envisioning that --

THE COURT:  -- what do you envision?

MR. GLUECKSTEIN:   -- unless we identify or a creditor steps forward and says I didn't get my distribution but there's a reason why I should be able to get it now that is a determination that unless somebody comes forward to ask, effectively, for a change of status of the restricted foreign jurisdiction, that order will apply to all subsequent distributions.  It's a finding based on the law at the time that the order is entered and unless the Trust or some other

party were to ask for relief from that or suggest that that order needs to be modified in some way or request that that order be modified in some way, and we could make that clear in the procedures, that somebody could make a motion to that effect of whether it be the Trust or another party, the Court's order would be in place with respect to that jurisdiction for the duration of the case.

THE COURT:  So then would be the -- when is the end to all of this.  When do parties know today is the day that your interest is forfeited with regards to the trust?

MR. GLUECKSTEIN:  The interest with respect to that individual jurisdiction -- distribution, I'm sorry. With respect to their individual distribution the next declared distribution is forfeit as of the next record date.

So, I think what is missing, when we say any distribution record date here, and we've gotten a few questions from this offline, and I think one of the clarifications, at least from our perspective that we would want to make is that it's the applicable distribution record date, meaning the next distribution. So, its distribution by distribution but once that record date occurs, if the Court has entered an order that that distribution is restricted, that distribution is forfeited for all time.  Its not coming back under our proposals.

THE COURT:  So, I -- and I apologize, I'm not trying to be argumentative but you mentioned changed circumstances the opportunity to --

MR. GLUECKSTEIN:  Yes.

THE COURT:  -- that does not allow for changed circumstances.  So, what am I missing?  When would be for changed circumstances?

MR. GLUECKSTEIN:  It would allow for changed circumstances with respect to future distributions, not past distributions. With respect to distributions that have already occurred, the distributions would have been forfeit.

So, we have made two distributions in this case already, right.  We expect to make a third, a fourth, a fifth, right. If somebody has -- if after the time that the jurisdiction -- the restricted jurisdiction order is entered somebody says I now have some changed circumstance they would be eligible for future distributions but not past distributions under these procedures proposed.

THE COURT:  Okay.

MR. GLUECKSTEIN:  The alternative to that, I think, as was suggested, is that we hold all distributions for some indeterminate or defined period of time that's much longer before its forfeited.  That is not what we proposed but that is certainly a possibility.

THE COURT:  Thank you.

MR. GLUECKSTEIN:  I think, Your Honor, with that, that is -- I will rest there unless the Court has further questions.

THE COURT:  I do not.

Mr. Sullivan, did you need to address me on anything?

MR. SULLIVAN:  Your Honor, only on that distribution sequence that we just talked about.

THE COURT:  Sure.

MR. SULLIVAN:  Bill Sullivan on behalf of Weiwe Ji.

Your Honor, as I understand it, if these procedures are implemented and there is a decision rendered in December -- I mean in November that a jurisdiction is a restricted jurisdiction and there's a further distribution in December then the 72 percent that has already been distributed through the second, plus whatever is in December would be -- it would be forfeited.  So, 72 percent plus whatever the next one is.

THE COURT:  Sure.

MR. SULLIVAN:  There is no minimum time for someone to say, okay, I need to adjust, I need to deal with this at all.  It could be -- you know, it's a function of when you enter the order and when they make the distribution. It could be a week, it could be months.  So, there is no

minimum here of saying, hey, you got a year, you got 180 days to figure it out and I mean I think we're going to be dealing with claims for a future period of time.

I know the claims bar date -- the right to object to claims is through January but those routinely get extended. So, I just raise that point as to the timing. You know, we don't believe it should say anything about forfeiture here. I think, you know, the issue is if a jurisdiction is determined to be restrictive is when the Court should take up, okay, now what are we going to do but I just wanted to comment on the time.

THE COURT: No, that's helpful. Thank you.

Thank you very much for all of the presentations today. Let me just note before I begin, Mr. Ji's hand is raised again. I am not going to hear from you, Mr. Ji. I've heard from you twice. I've heard from your counsel three times. That is more than sufficient and more then I would grant anyone else, quite frankly, but thank you for your participation in this case.

Let me say at the outset -- well, I will just say, I am prepared to overrule the objections in part and grant the relief with modifications. I will say I am sympathetic to all the parties that have appeared before me. I am sympathetic to the trust because this is an unusual circumstance and it is novel, and I do believe that the trust

is coming before me in good faith attempting to solve a problem that they anticipate in an organized and efficient manner.

I am sympathetic to all of the creditors or customers who are facing the procedures, facing a possibility that they could lose their distribution because of their residency and the nature of this case. And I don't take these decisions lightly and I, quite frankly, don't think anyone here is taking the decision lightly.

I appreciate also that you took the time to appear before me today while it is easy for the parties that are sitting before me in Court to come before me and address the Court after years of experience, I know it is very difficult for pro se entities to appear let alone with a language barrier. So, I have listened to you and I am taking your considerations to heart.

That being said, the Trust -- I agree, the Trust is attempting to establish procedures to aid the implementation of the plan and in particular the distribution process.  Based on the submissions, I think that at their heart its reasonable and necessary to establish these procedures given the uncertain legal landscape that's implicated by the proposed distributions in several numerous jurisdictions that could give rise to liability to the Trust. Also, I think that the proposed procedures balance that

concern with the need to provide due process to affected creditors in the future.  So, I agree with the Trust that that is the aim and the goal of these procedures.

Arguments regarding a creditors recovery -- excuse me, a creditors residency future opinions regarding whether a jurisdiction is restricted, alternative delivery method and other issues are not before me today and all rights are reserved on those issues. Really, its how do we tee those issues up before me is the question.

As I said, in general, the relief establishes a transparent process that's designed to provide due process to the effected creditors with Court oversight and that is why I think there is a need for them and I will approve them.  It is not unusual to impose distribution requirements on creditors that hold allowed claims in order to comply with applicable non-bankruptcy laws and the plan itself has several of those incorporated into the plan already.

Where my issues lie are the question or the ambiguity of how parties can dispute their residency determination that are made by the Trust based on the documents and data points that you have categorized that have been submitted and, of course, the changed circumstances given the length of time that may pass before this issue is presented to me.

The second issue I have is the issue that parties have raised regarding the process go forward once an unacceptable opinion is made.  I think that is what it is called, acceptable opinion.  I think that there needs to be a proposed scheduling order that puts forth the process and controls the process by which we would move forward, briefing schedule, experts, hearing times. I'm sure there's other things that I can't think of that able bodied practitioners could come up with.

I think also we need to give thought on whether we need to have a court certified interpreter present at those hearings to aid my consideration of the parties who are coming before me because there is a language barrier here and, I will admit, its difficult and who bears that cost, and who should bear that cost.

The last issue that has been an issue for me but is really crystalized today in the conversation is the forfeiture.  I understand why we need a definitive relief, really, an answer to the question of what happens if I designate the jurisdiction as a restricted jurisdiction.  The problem is that given the need for the -- and the acknowledgment that there could be changed circumstances and that this process could take longer then we all think, how do we really address it.

I don't want to keep rearguing that the forfeiture issue is going to happen and I feel as if that needs to be removed from this procedure and there needs to be given more thought on the timing of when you would ask for the forfeiture. I don't think its appropriate now. I don't have enough clarity of how this case is going to proceed, the length of time, how many distributions there will be, who is going to be designated in those distributions and how they would be effected by an unknown changed circumstance such as a change in the law, as Mr. Glueckstein acknowledged, perhaps a jurisdiction that was a restricted jurisdiction will come off that list. Is that fair to then allow the creditors in that restricted jurisdiction to receive a distribution while other creditors similarly situated did not receive the distribution based solely on the timing and their designation within the record date. I don't think it is.

So, I don't know what the answer to this is but I know you have given it considerable thought. So, there needs to be some more thinking as to that. When that is presented to me, I don't know the answer to that either and I wish I could give you guidance but things are just too unknown. Perhaps you give me that process when you give me the scheduling order and when you have more clarity of when you want me to make the decision on the restricted jurisdiction. That could be relevant to the forfeiture timing question.

These are, as you mentioned, a small subset of amount, five percent I think you said.  I don't know how many creditors are affected by that five percent.  Is it something that needs to be addressed in the near future.  Could it wait such that you go get your opinions and then the process gets teed up later but right now I think it is acceptable that you get authority to go and get opinions and file them on the docket, give parties the opportunity to object, I think 45 days is reasonable, and then with that in hand you propose a scheduling order of how I deal with those objections and, again, the language barrier whether we need to have an interpreter that the Trust could bear the cost depending on the jurisdiction and the particular language.  I think today's hearing demonstrated its probably necessary for several jurisdictions, maybe all of them.

Mr. Glueckstein, I know that this was a lot of rambling and I didn't give you exact clarity, which you will probably see that happening in a lot of hearings. I am doing my best but I am looking to you to really see if you could solve this problem that I have.  I think the residency portion should come out for today's purposes. I think you should build in the proposed scheduling order timeframe and you need to build in language regarding disputes over residency.  With that, I would consider the order under certification of counsel.  I don't think this order is the

order that I want to see your proposed forfeiture of language in.  I want that to be given more thought.

MR. GLUECKSTEIN:  Thank you, Your Honor. That is actually very helpful.  Can I just ask a couple of points of clarification --

THE CURT:  Yes, please.

MR. GLUECKSTEIN:  -- just to make sure we're responsive to Your Honor.  I hear what you are saying with respect to the forfeiture and the timing of the forfeiture question.  So, we can excise that for purposes of what we present for now.

I think what I heard you say about residency really relates to this issue. The Court is not -- correct me if I'm wrong, but I don't think the Court is taking issue with using residency as a barometer of what we're doing here because that does go to the heart of the issue. Its just a question of how we're going to -- what is going to come of that if and when an order is entered on this question of what happens with the distributions. I hear you saying that is premature.

THE COURT:  Well, really it's the issue of what if someone can test your designation of that creditor being a resident of the effected jurisdiction --

MR. GLUECKSTEIN:  That I understand Your Honor.

THE COURT:  -- because maybe they moved but also maybe they just disagree with your application of the law on residency.

MR. GLUECKSTEIN:  That I understand and I think that was your first point.

THE COURT:  Yes.

MR. GLUECKSTEIN:  And we discussed that a little bit in the colloquy earlier.  We can address that in the revised procedures to expressly provide for the ability for a creditor to make that -- to contest that determination.

THE COURT:  Yes.

MR. GLUECKSTEIN:  I think we can make that, that that will be available.

I understand on the other point with respect to the scheduling order.  Just so I'm clear, it sounds like the Court is contemplating that we would make clear in these procedures now that we would present a scheduling order as opposed to actually presenting some sort of form schedule now, is that right?

THE COURT:  That is correct that you would receive the objections and that you, at whatever appropriate time you see is fit, propose a schedule to deal with a particular jurisdiction. In that schedule you would propose whatever you think is necessary to organize the proceedings before me and

you would reach out to the Court to get a particular hearing date.  I think that provides two benefits:

I think it provides clarity because there could be a lot of parties, clearly, that would like to participate and they need clarity and you should have clarity. Its most effective to move forward.  Also, perhaps, you do not wish to tee that issue up before this Court because of a changing in landscape or you're talking to parties and you think that you could resolve the issues and, therefore, the timing by which this issue will be heard is in your control which could dovetail with your thinking on when you want to ask for forfeiture.

I am not saying that it should be used defensively, I just think there are so many moving parts here that you may want to give it some thought after you see the objections and maybe you will get an opinion that surprises you and you want to give it more thought and control.

MR. GLUECKSTEIN:  That makes sense, Your Honor, and I think that's fine.  So, we can make clear in the procedures now that we will propose such a schedule. I think, not to get too far in the weeds, we will put it under certification of counsel for the Court's review. I think what we can do is make clear that with respect to what we had to find is the restricted jurisdiction notice, that is the notice we provide to affected parties, with the potential

opinion that we will have a schedule associated with that filed at the same time.

THE COURT:  That would make good sense.

MR. GLUECKSTEIN:  I hear the Court saying that we will continue to -- we have given a lot of thought to the forfeiture issue, we will continue to think about it further in light of the Court's observations and comments.

THE COURT:  And let me put even a little finer point on that.  It's not uncommon for creditors that don't comply with the KYC process. I think I've entered orders that disallowed those claims or at least amounted to forfeiture or in other cases that are primarily in the United States where parties need to fill out tax forms and I think you have that. That's not uncommon. I am not saying that I oppose the relief, it's the timing because of changed circumstances.

So, it's the timing issue because we want to preserve everyone's rights and we want to have an organized process that really only happens once or twice, not every time you have a distribution date and then everyone re-argues everything.  Then we get to the end of the case and then I'm hearing the forfeiture issue and everyone argues the same things again.  I don't know how we solve for that problem but I'm trying to keep costs down and really that is to benefit everyone in this room and listening.

MR. GLUECKSTEIN:  Understood, Your Honor, and understand that timing aspect of it.  Your last point is of some concern to the Trust that we are at the very end of the case and now there's a discussion about are we forfeiting or what are we doing with these potential distributions.  So, there is probably somewhere in the middle and it might be that in certain jurisdictions it makes sense as part of this scheduling order, when we file the notice, to advise at that time what we're going to ask the Court to do on forfeiture and address it at that hearing.

Maybe in some circumstances it's not but I think -- we think it probably will but at least at that time understand Your Honor's point that you will be addressing the forfeiture point in connection with the substantive issue.

THE COURT:  I think that that is correct.

MR. GLUECKSTEIN:  So, we very much appreciate Your Honor's guidance on this and the ruling today.  We will revise the procedures accordingly and submit them under certification of counsel.

THE COURT:  Okay, thank you very much.

MR. GLUECKSTEIN:  Thank you.

THE COURT:  And if you need further attention to this matter, you will let my Chambers know and we can get on a Zoom status conference with respect to that.

MR. GLUECKSTEIN:  Thank you very much, Your Honor. Very much appreciate it.

THE COURT:  I would like to take a 10-minute break.

MR. GLUECKSTEIN:  I think that would make sense. I think the next item is the motion of ELD.  So, it will be their podium when we come back.

THE COURT:  Okay.  We will take a 10-minute break. Thank you very much.

(Recess taken at 11:43 a.m.)

(Proceedings resumed at 11:53 a.m.)

THE COURTROOM DEPUTY:  All rise.

THE COURT:  Please be seated.

Mr. Hughes.

MR. HUGHES:  Good morning, Your Honor.

THE COURT:  Good morning.

MR. HUGHES:  Peter Hughes, Dilworth Paxson LLP for ELD Capital LLC.  Your Honor, with me today is my co-counsel, Alec Berin of the Miller Shah firm.  He has been admitted *pro hac vice* and if its acceptable to the Court I would just yield the podium to Mr. Berin.

THE COURT:  That would be fine.  Thank you very much.

MR. HUGHES:  Thank you.

THE COURT:  Good morning.

MR. BERIN:  Good morning.  Nearly good afternoon, Your Honor.  Again, I'm Alec Berin, counsel for ELD Capital LLC.

Just before I begin, as a housekeeping matter, there are three exhibits that I plan to use during my time today. I have submitted them to the Court and opposing counsel.  I have copies if the Court would like.

THE COURT:  I think I have copies before me.

MR. BERIN:  Okay.

THE COURT:  All right.

MR. BERIN:  I just wanted to make sure.

THE COURT:  Thank you.

MR. BERIN:  Thank you again, Your Honor.  May it please the Court.

Before addressing the substance of ELD's motion, I'd just like to take a moment to explain what and, more accurately, who ELD is.  ELD is an LLC that serves as an investment vehicle for two individuals who are partners with a young child.  These two individuals invested their life savings using FTX's former trading platform, as described in the addendum to their amended proof of claim, which is contained in Exhibit 3.  ELD was induced by FTX and its principals the day before the petition date to enter into a series of exchange transactions that resulted in the value of ELD's account being severely reduced as of the petition date,

the day that account values were fixed for purposes of claims recognition.

Now, ELD has filed an amended proof of claim that outlines their claims, consisting of the value of crypto in fiat currencies in its account as of the petition date, and a fraud claim for damages equivalent to the difference between the ELD's account value as of the petition date and the account value just earlier, hours earlier before the exchange transactions were induced.

When the former debtors sought confirmation of the reorganization plan, ELD was concerned the second portion of its claim would be destroyed by operation of the general release in the plan, so it filed an objection to the plan. To resolve that objection, the former debtors agreed to two things:  first, a carveout of ELD's claim from the general release in the plan and, second, an agreement that the reorganized debtors would make efforts to reconcile ELD's claim promptly.  This agreement is reflected in the confirmation order and the correspondence that are Exhibits 1 and 2 annexed for the hearing today.  ELD's claim is the only customer claim that received this treatment.

In the nine months since making this agreement and more than six months since confirmation of the plan, the trust has unfortunately made no efforts to resolve ELD's claim promptly.  In fact, the trust's counsel has ignored

repeated attempts by ELD's counsel to garner any clarity concerning the resolution of its claim. Simply put, the trust has broken its promise and this motion is an appropriate procedure to seek enforcement of that promise.

The trust's response is twofold. First, it pretends the promise does not exist and that the agreement debtors made to resolve ELD's objection to the plan merely reflects the same obligation the trust owes to every customer claimant; this cannot be correct. As explained in our reply, courts around the country, and no less Bankruptcy Courts, decline to interpret a contract in a manner that would render its terms illusory. We cite a series of cases that firmly establish that. And, second, the trust resorts to hyperbole that granting the motion will somehow upend these proceedings or bend back time to enable ELD to object to the previous claims objection deadline approved in the plan.

Despite this rhetoric, the trust fails to acknowledge that the motion does not seek to re-litigate issues settled in the confirmation order, but rather seeks to enforce an agreement that was always intended to survive that order. For this reason and because ELD is the only customer claimant with a separate enforceable agreement, the trust alleged concern that granting the motion would invite other claimants to inundate the Court with similar motions is unfounded.

The trust has not even attempted to show beyond cursory statements regarding the scope and complexity of these proceedings, which ELD does not and need not dispute why it isn't feasible to address ELD's claim on a definite schedule. And while the trust has suggested that ELD's proposed schedule is too compressed, they have not made a counterproposal or suggested how long in fact it anticipates will be needed to litigate ELD's relatively straightforward claim.

Finally, the trust does not address the equities that support ELD's request, namely that ELD's life savings are both unavailable and uncertain while the months pass with no indication, much less action by the trust regarding ELD's claims. In the nearly three years since the petition date, ELD's members have been without access to their savings and their financial condition has deteriorated. They have a dire need for those savings and, at present, neither access nor certainty regarding those savings. This Court has the authority to enforce the former debtor's promise and otherwise equitable authority to enter the requested order.

So, for all these reasons and those discussed in ELD's motion papers, we respectfully request the Court grant its motion and, just as a final procedural matter, request that Exhibits 1 to 3 be moved into evidence.

THE COURT: Is there any objection to the

admission of these emails and the proof of claim?

MR. GLUECKSTEIN:  Your Honor, the emails are excerpts of a longer email chain.  We don't have an objection to them going in, but if they are going in, we have a copy of the entirety of the email chain and would ask that be admitted into evidence as well.

THE COURT:  Okay.  I would like to see the entirety of the email chain as opposed to just a partial, please.

MR. BERIN:  Of course.  I understand that might be the trust's exhibit and we would have no objection of course to that going in.

THE COURT:  Wonderful.  Thank you very much.

MR. BERIN:  Thank you.

MR. GLUECKSTEIN:  Your Honor, Brian Glueckstein again from Sullivan & Cromwell for the FTX recovery trust. To deal with that issue, may I hand up a copy of the -- what we have marked and disclosed previously to counsel as FTX Exhibit 1, which is the full email chain, the excerpts of which the Court has.

THE COURT:  Yes.  And, based on no objection, they're admitted into evidence.

(FTX Exhibit 1 received in evidence)

THE COURT:  Thank you.

(Pause)

MR. GLUECKSTEIN:  ELD's position has evolved a little bit from when they filed the motion, it seems, but based on their reply and argument this morning, the entirety of ELD's argument seems to now be that there was a binding promise made to them to litigate their filed fraud claim on a schedule other than that pursuant to the claims administration process set forth in the plan.  It is our position, Your Honor, there was no such promise.  There's no binding contract or other agreement that provides any basis whatsoever for the relief ELD seeks.  The only thing ELD attempts to point to is the selected portions of an email chain with debtors' co-counsel, which was exchanged pursuant to Rule FRE 408 in the context of resolving ELD's unrelated plan objection.

ELD negotiated language which appears in paragraph 167 of the confirmation order that addresses only the issue raised in the objection about ensuring that ELD's asserted fraud claims are not released under Section 10.4 of the plan. That paragraph contains language that was specifically agreed and is reflected in the email chain that we marked as Exhibit 1 added during that negotiation that such claims shall be adjudicated through the claims objection process.  It says it in paragraph 167 of the confirmation order the Court entered. That is the operative language.  There is no other binding contract, order, or other agreement that would alter that

language.

The settlement communications that ELD selectively cites from, while irrelevant, we submit actually supports the debtors' position.  First, ELD expressly tried to get the debtors to agree to a schedule to resolve their proof of claim and, on October 1st, 2024, counsel for the debtors expressly rejected that request, with counsel to the debtors stating, quote, the additional conditions -- which were outlined in the email below -- you've outlined are not acceptable to the debtors.  On October 4th, 2024, counsel to the debtors reiterated again that, quote, consistent with our prior discussions the debtors make no commitment on resolution of ELD's claims, which will be addressed in due course.  We then do on go on to say, however, the debtors will make general efforts to reconcile the claims promptly.

We of course are trying to reconcile all the claims in this case as promptly as possible; it's going to take time.  ELD extrapolates from that last sentence without the rest of the context or the operative language that's actually in the confirmation order that the debtor somehow had some binding contractual obligation by promising to treat ELD specially; that did not happen.  There's nothing binding the trust to any particular schedule.

The ELD claim is a fraud claim that requires investigation, the filing of an objection to trigger a

contested matter, and discovery prior to being set for a hearing.  This is not simply a customer claim where we're reconciling an account balance and we can relatively quickly move forward, it's a fraud claim.  That was the whole genesis of their objection to the plan is that they wanted the ability to preserve this claim and litigate it.  A fraud claim in the context of FTX is not a small undertaking.

ELD argues that the trust will somehow not be prejudiced and that this isn't going to open the floodgates if a litigation schedule is imposed on it, and we respectfully disagree, but it goes back to the position that we don't believe there's a special contractual obligation that we have to treat them specially.  And the concern that we have is that if the Court agrees to treat them specially, we could be in a situation where we know there are many, many creditors would like to have their objections resolved today -- or their claims reconciled and resolved today so that they have clarity around the process.

Prior to and since the plan effective date, the debtors and now the trust have been working through the very large task of reconciling more than 97,500 filed claims, in addition to all the multitude of scheduled claims that we had to deal with early on in the case.  The debtors have made enormous progress to date, but there is much work to be done.

As we have stated previously in court, in

pleadings and otherwise, and I say again today, we are endeavoring to reconcile all claims as promptly as possible, but given the volume and complexity of claims it's going to take time.  That should not surprise anybody given the magnitude of these Chapter 11 cases.  While every creditor would undoubtedly prefer to ignore the processes set forth in the plan and obtain immediate resolution, that's simply not possible, and that is exactly why the plan provides for a process and an extended timeline to ensure that the myriad of claims asserted against the debtors could be administered in an orderly manner.

ELD argues they have the special promise, but they don't, and therefore granting the relief, we submit, would in fact open the floodgates to innumerable copying motions from creditors who we know would likewise -- and we hear from would like to likewise jump to the front of the line and quickly render these cases impossible to administer.

ELD should not be permitted an end-around the claims reconciliation process.  That process, which is set forth in Sections 8.1, Section 2.1.32 of the plan, provides that any objections to claims shall be filed on or before the claims objection deadline, which is cued off of the effective date and subject to extension.  The plan became effective on January 3rd of this year, establishing that the trust has at least one year until January 3rd, 2026 to object to any

claim, and that deadline is of course subject to extension.

Under our plan, any claim that has not been allowed is considered a disputed claim, in accordance with Section 2.1.57 of the plan.  Of course, holders of disputed claims remain protected by the disputed claims reserve, as set forth in Section 8.5 of the plan, and as we discussed earlier today.

ELD's plan objection never objected to the claims objection deadline or any other aspect of the claims reconciliation process contained in the plan, which was approved through confirmation in this court more than nine months ago.  They wanted their claim resolution to be expedited, and we rejected expressly that request as a term of resolution, and no such language appears in the provision, the paragraph of the confirmation order that was negotiated and that was inserted specifically to deal with ELD.

Finally, Your Honor, if the Court is inclined to do anything other than deny the motion, and Counsel alluded to this, we do believe that ELD's proposed schedule of simply filing an objection and scheduling a hearing is completely impractical and not appropriate for a claim of this nature. As ELD has made clear, the theory of its claim sounds in fraud, litigation of this claim will require discovery from ELD, among other discovery and potentially expert witnesses. Therefore, once the trust interposes an objection, the

parties will need to confer on a schedule that takes into account the realities of the claim that has been asserted. But what we're here today is whether ELD has some basis different than any other creditor to force the the debtor to commence that process now with respect to its claim. And as we put in our papers, we're not aware of any motion being granted where a creditor is allowed to usurp the process that is set forth in the plan for claims reconciliation in a claim anywhere near this magnitude.

I'm happy to answer any questions the Court has; otherwise, I will leave it there.

THE COURT: I don't have any questions. Thank you.

MR. GLUECKSTEIN: Thank you.

MR. BERIN: Your Honor, could I just briefly reply?

THE COURT: Sure.

MR. BERIN: Thank you again, Your Honor, and we will work from the trust's Exhibit 1 just for purposes of my brief reply.

ELD's position is not that it has the same free-floating obligation owed to any customer claimant to act promptly. In the email string that Mr. Glueckstein read, it acknowledged that even though the recovery trust, or at that time the debtors, weren't willing to commit to a date certain

to object, they did make an agreement to resolve claims promptly.  And at the bottom of the first page of the exhibit, I note in my response confirming the settlement agreement, the second clause of the first sentence, and the debtors' agreement to make general efforts to reconcile the claims promptly.

We don't think that promptly means an indefinite period subject to extension, particularly when emails seeking any clarity regarding a timeline have gone un-responded to.

We certainly have no issue taking a reasonable amount of time to litigate the claim, if that's what the trust wishes to do once an objection is made.  We think the facts here are relatively straightforward, it might not require experts at all, but nonetheless we heard Mr. Glueckstein talk this morning about how 45 days might be a reasonable time period for a process involving experts in another context.  Regardless, we're very happy to confer with the debtors and work with them on a reasonable litigation schedule.  It's ELD's position that this is a relatively straightforward claim.

And I would just hearken again that it can't be that the trust agreed to do something it already had the obligation to do, that's an illusory promise, and I don't think a reasonable interpretation that we think the Court should take.

So, I thank the Court again for it's time and I'm happy to answer any questions.

THE COURT:  Okay, thank you.  I don't have any questions.

I thank the parties for the time and attention you spent to this matter.  I am going to deny the motion.

I think the emails reflect the debtors' or the trust's agreement to reconcile the claims, but also you have to look at it in the context of the order, the confirmation order that noted that the claim would be adjudicated in accordance with the administration process of the plan, which sets forth an objective standard by which to handle all claims.  I have no evidence in front of me that indicates that the trust is not making general efforts to reconcile the claim promptly.  Nine months time for a case of this magnitude, with the complexities posed here, does not evince on its face that the trust is not acting promptly in reconciling the claim.

I think the time really here to raise an objection would be if the trust moves to extend the claims objection deadline, and then I'm happy to hear from you on that; I'm not inviting it, I'm just saying that all rights are reserved and that would be the proper mechanism by which parties would assert objections to the request to extend the time.  It's not uncommon for parties to do that, but I think that there

is just simply no support here to justify forcing the litigation of this claim ahead of what the trust believes is appropriate given the language of the plan and the confirmation order.

So, for those reasons, I will so order the record and deny the motion.

Thank you very much for your time, and I appreciate your patience today.  Okay, thank you.

Okay, I understand that there may be a dispute on a scheduling order, and then we have Mr. Melamed's claims left, and thank you to the parties for being patient with respect to that issue.

MR. GLUECKSTEIN:  Yes, Your Honor, that occurs in the Binance adversary proceeding, and I will turn that over to my co-counsel from White & Case to handle that matter.

THE COURT:  Oh, okay.  Oh, and I understand that this is remote, so I'll look to the parties on Zoom.

Thank you for your patience in this matter.  I did receive proposed scheduling orders.  I will admit, I did not compare them, so you'll have to walk me through the differences in your presentation today.

I'll turn to White & Case first, and you can present what the issues are.

MR. STRONG:  Your Honor, good morning.  I'm here in person also, and I'll introduce myself when it's my turn.

THE COURT:  Okay, great.

MR. STRONG:  Thank you.

THE COURT:  Thank you.

MR. GLUECKSTEIN:  I don't think we can hear Mr. West.

THE COURT:  All right, if someone is talking, I can't hear you.

(Pause)

THE COURT:  Should we take a short break?

MR. WEST:  I apologize, Your Honor.  Can you hear me now?

THE COURT:  I can.

MR. WEST:  I'm sorry about that.  Good afternoon, Colin West of White & Case for the plaintiffs FTX Recovery Trust and FTX Digital Markets, LTD.  I am joined by my colleagues Ashley Chase and Brett Bakemeyer.

THE COURT:  Okay, welcome.  Happy to hear from you on this dispute.

MR. WEST:  Sure, I'll go forward, unless the Court wanted to hear appearances from the other parties before I proceed.  Okay.

THE COURT:  No, it's not necessary.

MR. WEST:  Very well.  We are here today, Your Honor, on a scheduling conference.  Subject to Your Honor's views, I would give the Court a very brief overview of the

case and status before turning to the scheduling issues before the Court, if that would be okay with the Court.

THE COURT:  That would be fine.  Thank you.

MR. WEST:  There are seven defendants here, Your Honor, four are Binance entities and three are individuals who were former executives of Binance.  Binance is also a cryptocurrency trading platform, among other things, it was a former shareholder of FTX, and its shareholdings in FTX are connected to the claims in the case, as I'll explain.

The three individuals include Binance's founder and majority shareholder Changpeng Zhao, who is also widely known as CZ.

There are nine counts in the complaint, but broadly speaking they can be broken down into two buckets. First, Counts 1 through 5 allege fraudulently transfers in connection with a 2021 share repurchase, in which we allege that certain debtors transferred consideration to or on behalf -- for the benefit of the defendants worth at least $1.7 billion, and that reasonable equivalent value was not received in exchange, and that was done at a time when the debtors were insolvent.

Second, Counts 6 through 9 relate to certain Tweets made by CZ -- made by or on behalf of CZ and Binance, those Tweets were made in November 2022, immediately before the petition date.  We allege those Tweets were false,

precipitated the bankruptcy, and damaged the FTX estates and their creditors.

Our complaint was filed on November 10th, 2024. Much of the period between then and now was spent seeking to serve the defendants. All seven defendants declined to accept service, but they have now all been served, so we're all here. Everyone is served and I don't think there's any disagreement now that service has been validly effectuated, but certainly we'll hear from the defendants if there is.

We've also agreed to schedules relating to answering or moving in response to the complaint with all seven defendants. Six of the seven defendants have filed motions to dismiss, and the seventh, Mr. Zhao, has a response deadline of August 4th, but based on conversations with counsel we also fully expect that Mr. Zhao will move to dismiss and, assuming that's the case, all motions to dismiss will be fully briefed by October 9th under the current schedule.

So that's the overview and status. I certainly didn't intend to do any advocacy with respect to the merits today. Unless Your Honor has any questions, I would proceed to address the scheduling issues that are before the Court today.

THE COURT: I do not. We can just get right to it.

MR. WEST:  All right.  The parties had their Rule 16(b) scheduling conference last week to discuss the scheduling issues.  We were not able to come to an agreement, at least not yet, so we filed competing schedules with the Court, but, Your Honor, we are not too far apart, and I think there's really only one significant dispute at the moment and I think everything else flows from that.

I think the main way in which the two competing schedules diverge is actually in connection with the timing of the initial Rule 26 discovery conference and the timing of the Rule 26 initial disclosures.  We have proposed the conference on August 11th and the initial disclosures on September 5th, the defendants propose the discovery conference be 30 days after the Court's ruling on the last motions to dismiss, and the initial disclosures would be 21 days later.  And I think what that portends, Your Honor, is a dispute over whether discovery should be stayed pending the motions to dismiss, and that's also based on conversations with the defendants, who we understand will seek to stay discovery.  That's a pretty typical dispute, not unexpected, but we think it's premature at this stage to decide now with no motion having been filed and certainly no briefing on the issue.

So, what we would propose is that the Rule 26 conference and the initial disclosures proceed at the

beginning of the case, as contemplated by the rules.  It doesn't have to be exactly the dates that we have proposed, but at the convenience of the parties, and the initial disclosures are essentially zero burden on the defendants. And then we could serve the merits discovery on the defendants, the initial discovery requests that we seek to -- that we would seek to serve, and then the defendants would presumably file whatever motion they want to file seeking to stay discovery.

And then we propose that when the motion to dismiss -- or the motions to dismiss are heard sometime after October 9th, when briefing has been completed and the Court has the various arguments on the motions before it and the plaintiffs' initial discovery requests, we could also use that hearing to determine whether merits discovery should proceed pending the Court's rulings on the motion to dismiss.

And I would just add, Your Honor, that all of that would be without prejudice to the plaintiffs' right to serve jurisdictional discovery.  All six of the defendants who have moved to dismiss have asserted a personal jurisdiction defense, and we also expect that Mr. Zhao will also assert that defense.  The defendants who have moved have argued that the complaint does not allege sufficient personal jurisdictional facts and that there is no personal jurisdiction.  Of course, under Rule 8, we weren't required

to plead personal jurisdiction defense, but the defendants have now -- sorry, personal jurisdiction facts, but the defendants have now raised that defense.  So we do plan to seek jurisdictional discovery once all the motions are in, and then we would argue in connection with our opposition to the motions to dismiss that we have pleaded sufficient jurisdictional facts, but that in the alternative we should be entitled to take the jurisdictional discovery that we will have then served by the time the motions are briefed.

So that's our proposal, Your Honor.  I don't think it -- I really think the only issue is whether we go forward with initial disclosures now, but we would seek to defer a resolution of the dispute on whether discovery -- merits discovery should be stayed pending the motions to dismiss.

THE COURT:  Okay.  Thank you, Mr. West, I appreciate that summary.

I'm happy to hear from defendants' counsel, to the extent you wish to be heard on this dispute.

MR. STRONG:  Thank you, Your Honor.  Good afternoon, I'm Greg Strong, Cahill Gordon & Reindel, on behalf of Binance Holdings Limited, Binance Holdings (IE) Limited, and Binance Services Holdings Limited, known as the BHL defendants colloquially and in our papers.

Your Honor, I think we agree with Mr. West as to the main issue in terms of the competing scheduling orders

that have been submitted to the Court.  The real issue is whether or not discovery will move forward pending the motions to dismiss that have been filed by my clients, as well as the clients of the other lawyers representing the other defendants here.  And so, Your Honor, we don't believe that it would be appropriate to engage in discovery given the personal jurisdiction arguments that are set forth in our motions to dismiss, and we would object to beginning discovery now, including taking personal jurisdiction discovery, because the motions raise significant issues around personal jurisdiction and raise due process issues that this Court has already recognized in other adversary proceedings would warrant a stay of discovery.

THE COURT:  Okay.  All right, thank you very much. I know you speak for three of the -- four of the defendants, except for --

MR. STRONG:  Three, Your Honor.

THE COURT:  Three, okay.

MR. STRONG:  Yeah.

THE COURT:  There's many other attorneys that are on the line and I'll ask if they wish to be heard as well.

(No verbal response)

THE COURT:  No, okay.  All right.

So do I have a motion to stay before me, or are we just truncating that and we're arguing it today?

MR. WEST:  Your Honor, there is no -- sorry.

THE COURT:  Go ahead, Mr. West.

MR. WEST:  I would just say there is no motion to stay discovery, and our position is that we shouldn't be truncating this, we should await a motion to stay discovery and resolve that issue with the full benefit of briefing on a motion to stay.

THE COURT:  All right.  I'll wait to receive the motion to stay and I'll make my decision, although I think I've made myself clear in other rulings, so I don't think it should come as a surprise to anyone where I'm going on this. And so to the extent it can be resolved between the parties and I avoid further briefing, I would very much appreciate that, and that's all I'm going to say on that.

So, I will enter the plaintiffs' scheduling order that they have suggested, I will wait to receive something from you, and then I will resolve any issues that are extant at that point.  Okay?

MR. WEST:  Thank you, Your Honor.  We will sit down with the defendants' counsel and take into account your past rulings.

THE COURT:  Okay, that would be wonderful.  Thank you very much.

MR. STRONG:  Thank you, Your Honor.

THE COURT:  Okay, so I will wait to receive

something under certification of counsel when the parties are ready to present the form of scheduling order to me.  Okay?

MR. STRONG:  Thank you, Your Honor.

THE COURT:  Thank you very much, appreciate your time.

MR. WEST:  Thank you, Your Honor.

THE COURT:  Okay.  Looking at the agenda, there is a housekeeping item, which is the motion of the trust for leave to file an omnibus reply to support the restricted jurisdiction procedures.  You note on the agenda that you received an informal response.  I think the time has come and gone.  I've already heard argument on it and I've read the reply.

So, thank you for putting it on the agenda, but I see no need for my argument.  I'm going to grant the order and I will enter it promptly after the conclusion of today's hearing.

MR. LANDIS:  Thank you, Your Honor.

THE COURT:  Okay.  So am I right that leaves us with Mr. Melamed claims?

MR. LANDIS:  That is correct.

THE COURT:  Okay, all right.  Okay.

Well, I am prepared to rule, and thank you all very much for your time and patience on this matter.

Before the Court is the defendants' amended

objection to proofs of claim filed by Mr. Melamed and the motion for subordination pursuant to Sections 510(b) and 510(c)(1), and then Mr. Melamed's cross-motion to compel arbitration.  Mr. Melamed opposes the claims objection and the trust opposes the cross-motion for arbitration.

Again, I'd like to thank the parties for their time and attention to this matter.  The briefing and oral argument was very helpful in rendering my decision.  And I'd also like to thank the parties for their patience as this dispute has been pending for about a year, which is why I'm ruling orally because I think we need to -- you deserve an answer to this and writing would really just prolong the time that it would take to resolve this issue.

Pursuant to the schedule set forth at the hearing on May 14th, there are three preliminary issues for me to decide today:  One, whether all or some of the disputes in this matter should be submitted to arbitration before the Singapore International Arbitration Center; two, whether the portion of the SPA claim based on the crypto consideration should be valued pursuant to the estimation order; and, three, whether the remainder of the SPA claims should be subordinated under Section 510(b).

Mr. Melamed argues that the Court should not address the second and third questions because the Court would be issuing an advisory opinion, but addressing -- as I

already have ruled, addressing these two issues may streamline trial and increase the possibility of a settlement, and therefore I do find it's appropriate to rule on them.

Turning to the first question of whether the parties' claim disputes must be arbitrated.  During briefing, Mr. Melamed conceded that his claim based on the KEIP is not subject to arbitration.  Therefore, the arbitrability question before the Court focuses only on the claim disputes related to the SPA and management agreement.

Under the Third Circuit's decision in Century Indemnity and its subsequent cases such as Remicade, the first issue for the Court to decide when evaluating the question of arbitration is whether there's a valid agreement to arbitrate.

The Supreme Court in First Options of Chicago, and subsequent Third Circuit cases such as Nortel Networks, instructs courts to apply state law to determine whether there is a valid agreement to arbitrate.

There is an arbitration provision in the SPA, but there is not an arbitration provision in the management agreement.  Mr. Melamed argues, and the trust disputes, that the arbitration provision in the SPA extends to the management agreement.  Mr. Melamed characterizes this dispute as a scope question and argues that, under the law, I should

not decide the question, but rather should defer to the arbitrators on it.  I disagree, and in doing so find Mr. Melamed's characterization to be an incorrect one.

The disagreement before the Court is not one regarding the scope of the SPA's arbitration provision, but rather a threshold question of whether the parties agreed to arbitrate disputes arising under the management agreement, which is a question squarely within my authority to decide. Based on applicable Japanese law, I find that the parties did not agree to arbitrate disputes arising under the management agreement.

Except for the arbitration provision in the SPA, which is governed by Singaporean law, both the management agreement and the SPA are governed by Japanese law.  Both parties submitted declarations by experts pursuant to Federal Rule 44.1, which I have considered.

The trust's expert, Taro Tanaka, in paragraphs 12 through 15 of the declaration, found at Docket Item 30367, provides persuasive testimony that when two separate agreements contain different dispute resolution provisions, such as the arbitration provision of the SPA and the forum selection clause resolution -- excuse me, the forum selection clause of the management agreement, Japanese courts will respect the parties' contractual choices.  This testimony is unrebutted and, therefore, I conclude that the parties did

not agree to arbitrate management agreement disputes; rather, they agreed to resolve them in the Tokyo district court.

Because the parties did not agree to arbitrate disputes under the management agreement, I must only decide whether the arbitration agreement in the SPA should be enforced.

There is no dispute among the parties that Federal Arbitration Act applies to the SPA.  The FAA establishes a federal policy favoring arbitration.  Under Third Circuit precedent, including Mintz and Hayes, courts are instructed to honor valid arbitration agreements unless the party opposing arbitration can adequately show a congressional intent to create an exception to the FAA's mandate with respect to the parties' statutory claims at issue.  Under Mintz, if there is no intent to create an exception, the Court has no discretion to deny arbitration.

In Mintz, the Court determined that the plaintiff/debtor asserted no statutory claims created by the Bankruptcy Code in its adversary proceeding against a creditor, and therefore the court found no inherent conflict between the FAA and the Bankruptcy Code.  Accordingly, the Circuit held that the lower court had no authority to deny arbitration.

In Judge Goldblatt's recent Yellow decision, His Honor was faced with a claims dispute subject to arbitration

under the Multiemployer Pension Plan Amendments Act, and very thoughtfully and persuasively found a conflict between Section 502 of the Bankruptcy Code and the MPPAA.  Judge Goldblatt then applied discretion and determined that the arbitration provision should not be enforced.

I take no position on which analysis should apply to this proceeding because both paths lead me to the same result.  If Mintz applies and I examine the types of claims at issue before me, the SPA claim dispute must go to arbitration.  There are no statutory claims created by the Bankruptcy Code at play that create a conflict between the Code and the FAA.  Therefore, I have no discretion under Mintz and must defer to arbitration.

If I were to accept Judge Goldblatt's analysis in Yellow and consider the SPA claims dispute in the context in which it arises, the answer would be the same.  Under that framework, the FAA's arbitration mandate conflicts with Section 502's claim allowance process established by the Bankruptcy Code.  I then have the discretion to decide whether to send the claims dispute before me to arbitration and, given the facts and circumstances, I would exercise that discretion.

In Yellow, Judge Goldblatt treated the motion to compel arbitration as a motion for relief from the stay.  His Honor found unusual circumstances present that weighed in

favor of denying stay relief, including that the $7.8 billion pension plan withdrawal liability dispute was among the most important matters to be resolved in the case, and that it needed to be resolved promptly so that hundreds of millions of dollars of sale proceeds could be allocated.  Moreover, the dispute was not a two-party dispute because another party also objected to the claims at issue, and under the applicable MPPAA arbitration framework it was unclear whether the arbitration participants could include parties in interest beyond the debtors and the relevant multiemployer pension plans.

Judge Goldblatt also noted that unlike an arbitration conducted under the FAA, the MPPAA arbitration process before His Honor ultimately required a judicial process regardless of whether the matter proceeded to arbitration, and that there was a chance that a complete adjudication of the claims dispute could not occur within the arbitration, necessitating a parallel proceeding before the district court.

The matter before me is different.  A decision on the SPA claim will not impact the bankruptcy cases in a manner like Yellow, as they are post-confirmation and the allocation of value has already been determined.  While a decision on the validity and amount of Mr. Melamed's claim could affect the timing and amount of distributions to

similarly situated creditors under the plan, Section 8.5 of the plan accounted for this scenario by establishing a disputed claim reserve.  Moreover, unlike Yellow, the disputes under the SPA implicate Japanese law, necessitating the need for foreign experts, and while deciding the SPA claim using foreign experts is not an impossible task for this Court, the Singapore arbitrators are equally, if not better positioned to handle the dispute.

Finally, unlike Yellow, the adjudication of the SPA claim can be entirely disposed of in arbitration without any need of piecemeal litigation or significant subsequent proceedings before this Court; therefore, I will not exercise my discretion to keep the SPA claim here.

Because the SPA claim disputes should be arbitrated, I must decide whether to stay Mr. Melamed's remaining management agreement and KEIP claims.  This issue was raised briefly in Mr. Melamed's reply and, therefore, it is not an issue appropriately before me, but nonetheless, after considering the facts presented, it is not appropriate to issue a stay.

Mr. Melamed must demonstrate a clear interest in staying the remaining claim disputes, but he has not.  He asserts that a stay will avoid multiplication of proceedings; however, there is no meaningful overlap between the factual circumstances of the SPA claim and his other claims to

justify a stay, and Mr. Melamed has failed to articulate any prejudice to himself if his claims proceed in tandem.

Mr. Melamed argues that Section 3 of the FAA requires a stay of the non-arbitrable claims.  However, Section 3 requires a stay of a proceeding if an issue involved in that proceeding is referred to arbitration. Because the FAA does not govern disputes arising under the management agreement and this Court's KEIP order, Section 3 cannot mandate a stay of those claim disputes, which are separate proceedings from the SPA claim disputes.

In sum, the cross-motion to compel arbitration is granted as to the SPA claim, but denied as to Mr. Melamed's other claims.  Mr. Melamed's request to stay further adjudication of the management agreement and KEIP claims is denied.

The second question before me today is whether the portion of Mr. Melamed's SPA claim related to unpaid crypto consideration should be valued pursuant to the confirmed plan and estimation order.  I conclude that the answer is yes, it should be.

Section 4.4 of the plan provides that, unless otherwise expressly provided in the digital assets estimation order, the value of a claim in respect of a digital asset shall be calculated by converting the value of such digital asset into cash as of the petition date, utilizing the

conversion rate set forth in the digital assets conversion table.

The SPA provides Mr. Melamed three types of consideration for his liquid shares:  cash, shares in FTX, and cryptocurrency.  With respect to cryptocurrency consideration, Section 2.2 of the SPA provides that Mr. Melamed will receive a set dollar amount, approximately 18 million, satisfied by the payment of the types and amounts of digital assets deemed the crypto consideration, as set forth or set out in Schedule 2.

Schedule 2 of the SPA and side letter go on to specify the types and amounts of crypto consideration that Mr. Melamed was to receive, BTC 39.132, ETH 560.48, SOL 11,887.98, and FTT 47,532.

Mr. Melamed argues that his SPA claim falls outside the scope of the estimation order because he's entitled to monetary damages due to FTX's failure to deliver his cryptocurrency.  However, the plan is broadly worded to capture all claims, quote, "in respect of a digital asset," end quote.  Mr. Melamed's claim is in respect of a digital asset, which are the cryptocurrencies Mr. Melamed was entitled to and did not receive from FTX.

The estimation order and relevant plan provisions, therefore, must be used to value any arbitration award Mr. Melamed obtains related to the unpaid crypto consideration.

Not only is this the correct result based on the plain language of the plan, but also the fair result because it treats Mr. Melamed and his crypto-related claim no better than any other similarly situated party whose claim in these cases relates to crypto withheld from them by the debtors.

Lastly, I have been asked to decide whether the non-crypto consideration portion of Mr. Melamed's SPA claim should be subordinated under Section 510(b); I agree with the trust that it should be subordinated.

Section 510(b) of the Bankruptcy Code mandates subordination for purposes of distribution of a claim for damages arising from the purchase or sale of a security of the debtor or an affiliate of the debtor.  Section 510(b) should be broadly applied to prevent shareholders from using breach of contract or tort claims to recover their lost equity value at the same priority as general unsecured creditors.

In keeping with this broad application, the Third Circuit teaches in Telegroup that a claim must be subordinated if there is a nexus or casual connection between the claim and the security issuance.  Following the Telegroup decision, courts, including the Third Circuit in International Wireless, have used a but-for analysis to apply this test.  If a casual nexus is present, the claims should be subordinated, so long as subordination furthers the policy

goals of Section 510(b).

Here, the Liquid transaction that serves as the foundation of Mr. Melamed's SPA claim involved the purchase and sale of FTX stock through allocated consideration Mr. Melamed received from the sale of his stock and options in Liquid.  It is from this stock purchase and sale that Mr. Melamed claims for breach of warranty, misrepresentation, fraud, and indemnification arise.  In other words, but for Mr. Melamed's purchase of FTX stock, the claims would not exist.

Mr. Melamed claims that FTX's material misrepresentations as to its financial health caused him to suffer damages because his shares in FTX turned out to be worth less than what he was led to believe it to be.  He measures his damages because of this fraudulent and wrongful sale as the value difference between what he sold and what he failed to receive.  At bottom, this is an attempt to recover the losses he sustained as an FTX shareholder due to FTX's improper behavior.

When Mr. Melamed accepted the FTX shares as a form of consideration, he took on the risk-and-return expectations of shareholders.  His type of loss is shared amongst all FTX shareholders whose equity was devalued by the fraudulent conduct of the FTX insiders, and who could potentially receive nothing.  Accordingly, in keeping with the policy

considerations of Section 510(b), and pursuant to the Third Circuit's framework in Telegroup, and persuasive case law from courts within this circuit, including Kaiser, Peregrine, and U.S. Wireless, the non-crypto portion of Mr. Melamed's claim must be subordinated, which includes any related indemnification claim.

That covers, I believe, all the questions that were put before the Court. Again, I appreciate your patience. I would ask the parties confer on a form of order, and submit it under certification of counsel within a week's time memorializing this ruling.

I think that is everything --

MR. ADLER: Thank you, Your Honor.

THE COURT: Thank you very much.

Okay, I will look to receive that certification of counsel, and I will enter it promptly once the parties agree. That covers all the items on the agenda.

Mr. Glueckstein, let me ask you a question. I have two adversaries in which motions to compel arbitration are fully briefed, one is SkyBridge and one is Mirana. I

would ask that you meet and confer with defendants' counsel and schedule oral argument on the motions to compel arbitration.

MR. GLUECKSTEIN:  We will do that, Your Honor.

THE COURT:  It would be nice if you could do it on the same day --

MR. GLUECKSTEIN:  We will --

THE COURT:  -- just have an arbitration day.

MR. GLUECKSTEIN:  I'm happy to do that.

THE COURT:  But I defer to the parties' schedules and you have omnibus hearing dates, so I would suggest you put those on the already-scheduled omni dates.

MR. GLUECKSTEIN:  We will do that, and having the omni dates makes that easier.  So, we will attempt to do that certainly.  There's no reason why they can't be on the same day.

THE COURT:  Okay.  And then I believe my staff was going to reach out regarding one other adversary proceeding, which is the Ivanov adversary, because I have a fully-briefed motion to dismiss sitting before me, but on the docket it indicates you're engaging in personal jurisdiction discovery. I just need to know whether that is not -- is that no longer ripe for me?

And I ask that because I have to report different things and if things sit under my advisement too long, you

know, I could get a nasty-gram from the higher ups.  And I try to attend to matters promptly, but I don't see a need to have to address that at the moment.  And maybe you're not handling it --

THE COURT:  Understood --

MR. GLUECKSTEIN:  -- but I guess I would ask that you respond to chambers' emails promptly on that if -- you know, just let me know whether I should hold that in abeyance.

MR. GLUECKSTEIN:  Understood, Your Honor.  Let me check with my team on that.  I do think an email was sent while we've been here and we will --

THE COURT:  Oh, great.

MR. GLUECKSTEIN:  I'm sorry, from your chambers to us.  So I will confer with my team and we'll get back to chambers promptly today.

THE COURT:  Wonderful.  Thank you.  If I can set it aside, I will; if I can't, then I'll get on it.

MR. GLUECKSTEIN:  Understood.

THE COURT:  So, thank you all very much.

MR. GLUECKSTEIN:  Thank you, Your Honor.

THE COURT:  All right.  Is that everything?

MR. GLUECKSTEIN:  Yes, from our perspective.  Thank you very much --

THE COURT:  Great.

MR. GLUECKSTEIN:  -- for the Court's time today.

THE COURT:  We'll stand adjourned.  Have a great rest of your week.  Take care.

COUNSEL:  Thank you, Your Honor.

(Proceedings concluded at 12:45 p.m.)

CERTIFICATION

We certify that the foregoing is a correct transcript from the electronic sound recording of the proceedings in the above-entitled matter to the best of our knowledge and ability.

/s/ William J. Garling                    July 23, 2025

William J. Garling, CET-543

Certified Court Transcriptionist

For Reliable

/s/ Tracey J. Williams                    July 23, 2025

Tracey J. Williams, CET-914

Certified Court Transcriptionist

For Reliable

/s/ Dipti Patel                           July 23, 2025

Dipti Patel, CET-997

Certified Court Transcriptionist

For Reliable