**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| In re: | Chapter 11 |
| FTX TRADING LTD., *et al.*,[1] | Case No. 22-11068 (KBO) |
| Debtors. | (Jointly Administered) |
| | **Ref. Nos. 34251, 34252 & 34703** |
| | **Hearing Date:  April 16, 2026 at 1:00 p.m. ET** |

**FTX RECOVERY TRUST'S REPLY IN SUPPORT OF ITS OBJECTION TO THE
PROOFS OF CLAIM FILED BY ELD CAPITAL LLC**

The FTX Recovery Trust[2] hereby submits this reply (the "Reply") in further support of the *FTX Recovery Trust's Objection to Proofs of Claim Filed by ELD Capital LLC* [D.I. 34251] (the "Objection"), and in response to *ELD Capital LLC's Objection to the FTX Recovery Trust's Objection to Proofs of Claim Filed by ELD Capital LLC* [D.I. 34703] (the "Response").[3]  In support of the Reply, the FTX Recovery Trust submits contemporaneously herewith the Supplemental Declaration of Kumanan Ramanathan (the "Supplemental Ramanathan Declaration") and Declaration of Kimberly A. Brown (the "Brown Declaration").

---

[1]    The last four digits of FTX Trading Ltd.'s and Alameda Research LLC's tax identification numbers are 3288 and 4063 respectively. Due to the large number of debtor entities in these chapter 11 cases, a complete list of the Debtors and the last four digits of their federal tax identification numbers is not provided herein. A complete list of such information may be obtained on the website of the Debtors' claims and noticing agent at https://cases.ra.kroll.com/FTX.

[2]    The FTX Recovery Trust (a/k/a the Consolidated Wind Down Trust) was established on January 3, 2025, the effective date of the Debtors' confirmed Second Amended Joint Chapter 11 Plan of Reorganization of FTX Trading Ltd. and Its Debtor Affiliates [D.I. 26404-1] (the "Plan"). Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to them in the Plan.

[3]    Capitalized terms used but not defined herein have the meaning ascribed to them in the Objection.

## PRELIMINARY STATEMENT

1.　　In November 2022, when withdrawals were halted on the FTX.com Exchange, ELD Capital's owners found themselves in a regrettable position because they had chosen to invest most of their assets in cryptocurrency through an account on the FTX.com Exchange, which they improperly treated like a checking account, but could no longer liquidate assets on demand to generate cash.  (Brown Decl. Ex. 5, the Transcript of the Deposition of Dominic Cubitt on April 8, 2026 (the "Cubitt Transcript") at 90:14-91:7; 121:23-122:16.) Dominic Cubitt, the co-owner of ELD Capital who conducted its trading activities, was aware of "substantial and well-publicized concerns about the Debtors' ability to operate as a going concern and satisfy the withdrawal demands of customers" so he resorted to increasingly desperate and reckless efforts to find ways to withdraw assets from the FTX.com Exchange to generate liquidity.  (Am. Claim ¶ 7.)  These efforts were ultimately unsuccessful.

2.　　ELD Capital now attempts to pass the cost of those decisions onto the Debtors' legitimate creditors under the guise of a fraud claim.  But ELD Capital has failed to allege or prove any of the elements of fraud, and cannot do so because the record shows that its own heedless conduct in the face of obvious risks—not any misrepresentation or omission by the Debtors—was the cause of ELD Capital's losses.  ELD Capital is entitled to the Petition Date value of its Customer Entitlement Claim on account of the tokens credited to its account and nothing more.

3.　　When FTX began to collapse, Mr. Cubitt saw public reports regarding the liquidity crisis facing the Debtors, as well as the withdrawal freeze put in place by the Debtors, and immediately attempted to withdraw over half of ELD Capital's holdings on the FTX.com Exchange.  (Cubitt Tr. 106:7-14; 120:12-121:5.)  When that failed, Mr. Cubitt purchased a small amount of a cryptocurrency ELD Capital had not previously held, AVAX, and attempted to

withdraw it "as a probe to see" whether withdrawals of other tokens were possible. (*Id*. at 127:4-128:5.) Unsurprisingly, this withdrawal was also unsuccessful.

4.     On November 10, 2022, Mr. Cubitt saw the Tron Facility Announcement, a limited scope announcement made by the FTX Group, and decided to use available cash in ELD Capital's FTX.com Exchange account to purchase a small amount of TRX, which he immediately attempted to withdraw around the time the Tron Credit Facility was scheduled to open. (Cubitt Decl. ¶ 16.) After he initiated this withdrawal attempt, Mr. Cubitt received an automated email from the Debtors confirming his withdrawal attempt and explaining that (typically) withdrawals processed within a few hours. (Brown Decl. Ex. 2.) Although other customers were able to successfully withdraw Tron Tokens using the Tron Credit Facility, Mr. Cubitt's withdrawal transaction did not immediately clear. (Supp. Ramanathan Decl. ¶ 7; Cubitt Decl. ¶ 16.) While the withdrawal request remained outstanding, Mr. Cubitt chose to cancel it in the early morning hours of November 11, 2022. (Cubitt Decl. ¶ 16; Cubitt Tr. 182:7-15.)

5.     Mr. Cubitt, with knowledge of his multiple failed attempts to withdraw assets off of the FTX.com Exchange, thereafter doubled down on his efforts to avail himself of the Tron Credit Facility. On November 11, 2022, Mr. Cubitt liquidated ELD Capital's cryptocurrency assets to purchase large amounts of Tron Tokens at what he knew to be wildly inflated prices. (Cubitt Decl. ¶ 18; Cubitt Tr. 135:25-136:7; 137:4-138:6; 181:7-15.) Mr. Cubitt then attempted to withdraw all of ELD Capital's Tron Tokens. (Cubitt Decl. ¶ 18.) When that withdrawal transaction did not immediately clear, Mr. Cubitt also canceled the withdrawal transaction based on some purported belief that he could still "swap" assets off the FTX.com Exchange by opening an account on a third-party exchange, Huobi, and completing a form put forward by Huobi and the TRON DAO. (*Id*.; Cubitt Tr. 186:18-187:1.) None of this is

discussed in the Tron Facility Announcement or has anything to do with it.  As a result, ELD Capital was left with a quantity of Tron Tokens that, as of the Petition Date, was worth less than the cash and cryptocurrency ELD Capital used to purchase Tron Tokens.

6.     ELD Capital undoubtedly made a regrettable decision to convert its assets into Tron Tokens, but ELD Capital has come nowhere close to showing that this decision was induced by any misstatement or omission by the FTX Group.  Rather, while ignoring obvious risks, Mr. Cubitt purchased Tron Tokens at what he knew to be inflated prices in hopes of utilizing the Tron Credit Facility despite—by his own admission—not understanding how any "swap" transaction involving the Tron Credit Facility was supposed to work.  (Cubitt Tr. 156:5-19, 179:17-23.)  This ill-advised action was voluntarily undertaken by ELD Capital and does not reflect justifiable reliance on any supposedly fraudulent statement by the FTX Group.

7.     Thus, ELD Capital's fraud claim should be expunged for all the reasons set forth in the FTX Recovery Trust's Objection because ELD Capital cannot carry its heavy burden to prove each and every element of a fraud claim—in fact it can prove none.  ELD Capital's Response fails to identify any misrepresentation or omission in the Debtors' announcement of the Tron Credit Facility because there was none in the Tron Facility Announcement's inactionable forward-looking statements made amid well-publicized news reports of the Debtors' dire financial condition.  Moreover, as discovery has confirmed, ELD Capital has not and cannot prove justifiable reliance.  Although Mr. Cubitt was sophisticated enough to know better, he ignored multiple obvious warning signs—including news reports of the Debtors' imminent bankruptcy and his own failed withdrawal attempts—and allocated all of ELD Capital's assets into Tron Tokens despite not understanding how the Tron Credit Facility was supposed to work.  (Cubitt Tr. 21:11-29:3; 35:6-39:3; 63:11-74:12; 102:19-106:14; 184:9-

190:13.)  Thus, Mr. Cubitt's actions as manager of ELD Capital were reckless.  Further, ELD Capital fails to show that any supposed misstatement or omission in the Tron Facility Announcement was made with scienter.  There is simply no evidence that the Debtors knew some "truth" that "ELD Capital and other customers would not be able to avail themselves of the facility."  (Response ¶ 66.)

8. Lastly, ELD Capital's tacked-on procedural argument that the Objection should be overruled as untimely is meritless.  The FTX Recovery Trust was not required to file its Objection prior to the Claims Objection Deadline.  Having done so prior to the original Claims Objection Deadline, ELD Capital was not prejudiced in any way.  In any event, the Court extended the Claims Objection Deadline as to all Claims.

## **LEGAL STANDARD**

9. For a claim to be entitled to *prima facie* validity, a claimant must first "allege[] facts sufficient to support a legal liability." *In re Allegheny Int'l Inc.*, 954 F.2d 167, 173 (3d Cir. 1992).  A claimant's failure to allege such facts deprives the claim of *prima facie* validity.  *In re Jorczak*, 314 B.R. 474, 481-82 (Bankr. D. Conn. 2004).  Where, as here, the objector has produced evidence to rebut the claimant's prima facie case, the claimant bears the burden of proving each element of its purported claim (including damages) through admissible evidence by a preponderance of evidence.  *In re Allegheny*, 954 F.2d at 173-74.  A claim must be disallowed (or, where applicable, reduced) when the claimant fails to present admissible evidence proving the elements of the claim.  *See In re Mariner Post-Acute Network, Inc.*, 2005 WL 1662226, at *1-2 (D. Del. July 8, 2005) (affirming reduction in the amount of the claim due in part to the inadmissibility of the claimant's evidence).  ELD Capital has not and cannot do so.

**ARGUMENT**

10.     Under Delaware law, a plaintiff alleging common law fraud (or fraudulent inducement) must prove: "(1) a false representation, usually one of fact, made by the defendant; (2) the defendant's knowledge or belief that the representation was false, or was made with reckless indifference to the truth; (3) an intent to induce the plaintiff to act or to refrain from acting; (4) the plaintiff's action or inaction taken in justifiable reliance upon the representation; and (5) damage to the plaintiff as a result of such reliance." *Great Hill Equity Partners IV, LP* v. *SIG Growth Equity Fund I, LLLP*, 2018 WL 6311829, at \*31-32 (Del. Ch. Dec. 3, 2018).  ELD Capital has not put forward any evidence to support even one of the elements of its fraud claim and certainly cannot prove (as it must) each element by a preponderance of the evidence.  *In re IBP, Inc. S'holders Litig.*, 789 A.2d 14, 54 (Del. Ch. 2001).  Its fraud claim, therefore, must be disallowed.

## I.     ELD Capital Fails to Show that Debtors Made Any False or Misleading Statement or Actionable Omission.

11.     ELD Capital bases its fraud claim on arguments that "(a) the Debtors misrepresented that ELD Capital and other customers would be able to avail themselves of the TRON facility to move assets off the FTX platform to an external wallet if they converted assets to TRON Tokens, and (b) the Debtors omitted to disclose that bankruptcy was so imminent . . . at the time of the Announcement that the facility would not be available to ELD Capital and other customers."  (Response ¶ 49.)  But ELD Capital does not and cannot explain how any of the forward-looking statements in the Tron Facility Announcement were guarantees that the facility would be available to ELD Capital, or how they were in any way false when made.  Further, ELD Capital fails to explain how the Debtors concealed anything about their well-publicized liquidity problems.  Indeed, news sources that ELD Capital monitored warned of the very risk of

imminent bankruptcy that ELD Capital says was concealed.  (Brown Decl. Ex. 4; Cubitt Tr. 102:19-106:14.)  Thus, ELD Capital fails to identify any actionable misstatement or omission.

12.     As an initial matter, ELD Capital fails to explain how the Tron Facility Announcement promised that the facility would be available to ELD Capital.  (Objection ¶ 38.) The Tron Facility Announcement itself plainly never made such a guarantee.  Rather, it made clear that the initial capacity of the facility was limited to $13 million and that its ongoing capacity would be "determined weekly" and would "depend on a number of factors" outside of the Debtors' control "such as withdrawal demand and funding capacity to be provided by Tron." [D.I. 34252 (*Declaration of Kumanan Ramanathan in Support of the FTX Recovery Trust's Objection to Proofs of Claim Filed by ELD Capital LLC* ("Ramanathan Decl.") Ex. C (Tron Facility Announcement)).].   These statements about the limitations of the facility were made clearly and obviously such that they were immediately the subject of negative commentary that only amplified the warnings they provided.[4]  (Ramanathan Decl. Ex. D (Crypto Briefing article discussing the fact that the Tron Facility Announcement made "no guarantees that users will be able to withdraw their funds."); *see also* Brown Decl. Ex. 3 (Twitter/X user comments on the Tron Facility Announcement pointing out that the facility only covered "a small % of what's stuck" and that the $13,000,000 asset injection "sounds more like a marketing stunt than anything.").)  Thus, ELD Capital cannot show that the Debtors made any misstatement about the availability of the facility.

---

[4]     ELD Capital also misses the significance of the public criticism of the Announcement.  (*See* Response ¶ 52.) Instead of addressing the Objection's point that there was public wariness of the capabilities of the Tron Credit Facility, ELD Capital falls down an irrelevant rabbit hole, arguing that the speculations written in the referenced article somehow confirm that the Debtors committed fraud.  (*Id*.)  The article's only relevance is that it confirms that the Announcement was understood not to be a guarantee or promise.

13.     Nevertheless, ELD Capital argues that it "need not show that the Announcement promised that the facility would have 'unlimited capacity' to sufficiently allege that it was not actually made available to customers consistent with the Announcement." (Response ¶ 51.)  But ELD Capital has never even alleged anything other than the fact that ELD Capital itself was not able to use the facility.  (Amended Claim ¶ 9.)  The fact that a particular customer was unable to access the facility is wholly consistent with the Tron Facility Announcement, which made clear that the facility's capacity to service customer withdrawals was severely constrained and subject to change.  (Ramanathan Decl. Ex. C.)  Moreover, as Mr. Cubitt admitted, ELD Capital's two withdrawal transactions entered in an effort to use the facility were *cancelled by Mr. Cubitt himself* despite receiving a confirmation email noting that his attempted withdrawal could take several hours to clear.  (Cubitt Decl. ¶¶ 16, 18; *see also* Brown Decl. Ex. 2.)  Thus, Mr. Cubitt's intervening cancellations should end the inquiry because at that point there were no longer any withdrawals to be completed.

14.     Further, ELD Capital's efforts to distract from the actual terms of the Tron Facility Announcement cannot change the fact that the it contains nothing but inactionable, forward-looking statements.  Although ELD Capital admits that "Delaware courts generally 'disfavor allegations of fraud [based on] unfulfilled promises of future performance,'" (Objection ¶ 50), it argues that such a promise of future performance can be converted to an actionable misrepresentation if the alleged facts "collectively allow the inference that, at the time the promise was made, the Debtors had no intention of performing" (Response ¶ 51).  ELD Capital has, however, come forward with no such admissible evidence.  Moreover, even if the Tron Facility Announcement could be construed as a promise that the facility would be available to all customers in the future (and it was not), mere nonperformance of such a promise is not

sufficient, as a matter of law, to show that any false statement was made. *CPC Mikawaya Holdings, LLC* v. *MyMo Intermediate, Inc.*, 2022 WL 2348080, at *18 (Del. Ch. June 29, 2022) ("But again, a party's failure to keep a promise does not prove the promise was false when made. Without particularized facts to support that inference, Plaintiff cannot state a fraud claim.") (cleaned up).

15.     In the end, ELD Capital is attempting to allege fraud by hindsight in arguing that forward-looking statements about the Tron Credit Facility must have been false when made because ELD Capital later did not successfully use the facility.  That is, as a matter of law, an impermissible way to prove fraud. *See Fin Cap Inc.* v. *PayNerd LLC*, 2023 WL 5543736, at *3 (Del. Super. Ct. Aug. 16, 2023) ("Merely alleging 'fraud by hindsight' is not sufficient to survive a motion to dismiss.")  But it also makes no sense here.  The Tron Credit Facility was funded and did operate until depleted.  (Supp. Ramanathan Decl. ¶ 7.)  Thus, ELD Capital cannot show that the Debtors never intended for the facility to be open and operate.

16.     ELD Capital's omission theory of fraud is also fatally flawed.  ELD Capital contends that the Tron Facility Announcement "omitted to disclose that the facility would not be available to ELD Capital and other customers based on the financial position of the Debtors, and steps already taken toward bankruptcy, at the time of the Announcement." (Response ¶ 54.)  As an initial matter, ELD Capital has repeatedly admitted that it was aware of the Debtors' dire liquidity situation and Mr. Cubitt admitted at his deposition that he monitored news sources that reported on the threat that the Debtors could imminently file for bankruptcy. (Amended Claim ¶ 7 (admitting knowledge of "the substantial and well publicized concerns about the Debtors' ability to operate as a going concern"); Response ¶ 55 ("acknowledg[ing] that there was substantial public reporting about concerns with the Debtors' financial position");

Cubitt Tr. 102:19-106:14.)  Thus, it is absurd to suggest that the Debtors omitted to disclose the risk that they could imminently file for bankruptcy when it was public knowledge.  A party cannot, as a matter of law, omit disclosure of an obvious fact that is widely known.  (*See* Objection ¶ 41 (citing *Diabat* v. *Credit Suisse Grp. AG*, 2024 WL 4252502, at \*35 (S.D.N.Y. Sept. 19, 2024)); *see also Airborne Health, Inc*. v. *Squid Soap, LP*, 2010 WL 2836391, at \*8 (Del. Ch. Jul. 20, 2010) (finding that counterclaim-defendant did not engage in fraud by concealment because the allegedly concealed information about a pending class action lawsuit was "a matter of public record").)

17.    Accordingly, to attempt to salvage its claim, ELD Capital suggests that the Debtors omitted information by failing to disclose that at the time of the Tron Facility Announcement, (i) "assets were frozen by foreign securities regulators," and (ii) Samuel Bankman-Fried had already transferred authority to John J. Ray III.  (Response ¶¶ 54-55.)  But these assertions rest on misstatements regarding the factual record.  (*See* Section III, *infra*.) Accordingly, the Debtors made no actionable omission.

**II.    ELD Capital Still Fails to Adequately Allege Justifiable Reliance.**

18.    As explained in the Objection, ELD Capital's reliance on any supposed misstatement or omission in the Tron Facility Announcement was unjustifiable in light of the obvious risk that the facility might be unavailable because of its limited capacity, ELD Capital's knowledge of well-publicized concerns regarding the FTX Group's ability to continue operating, and ELD Capital's own failed withdrawal attempts.  (Objection ¶¶ 44-46, 48.)  The Objection further explained that any alleged reliance was independently barred by the express non-reliance clause in the Dotcom TOS. (Objection ¶ 47.)  In response, ELD Capital argues that it justifiably relied on the Tron Facility Announcement given its "circumstances," incorrectly reframes the governing justifiable reliance standard to attempt to excuse its own recklessness, and tries to

sidestep the explicit disclaimers in the Dotcom TOS by recharacterizing how it relied upon the Tron Facility Announcement. (Response ¶¶ 57-62.) Each of these responses fails.

19. As an initial matter, ELD Capital claims that the FTX Recovery Trust "ignores the actual grounds for justifiable reliance" in the Amended Claim, which is that the Tron Facility Announcement was "made on FTX's online platform and official social media channels." (Response ¶ 58.) Not so. As stated in the Objection, the mere fact that a statement appears on official company platforms does not render reliance justifiable. *See In re AgFeed USA,* LLC, 558 B.R. 116, 132 (Bankr. D. Del. 2016) (rejecting an allegation that "because these were statements of a publicly held company, shareholders justifiably relied on such statements" as "conclusory").

20. Recognizing that it cannot actually show justifiable reliance, ELD Capital resorts to attempting to avoid the burden of showing it. ELD Capital argues that "the Trust overstates the justifiable reliance standards" and that "[a]ssessing reliance requires a context-dependent inquiry that takes into account the plaintiff's knowledge and experience." (Response ¶ 57.) Although Mr. Cubitt's conduct would be sufficient to show a lack of justifiable reliance, if he were just the "[r]etail investor" he claims to be (Response ¶¶ 57-58), it is clear that Mr. Cubitt holds himself out as a sophisticated investor in the ordinary course of business. When ELD Capital opened its FTX Account, Mr. Cubitt submitted a CV that boasted of his "Analytical & Trading Skills" in "Macro Thesis Generation, discretionary swing trading, inverse perp hedging, cash and carry" trading and his research into "[b]lockchain analytics to automate macro bias." (Brown Decl. Ex. 1 at 8.) Indeed, by November 2022, Mr. Cubitt had spent years as a self-employed builder of trading systems and trader. (*Id.*; Cubitt Tr. 21:11-29:3; 35:6-39:3; 63:11-74:12.) Thus, any notion that ELD Capital was managed by a novice "[r]etail trader" is false and

cannot excuse ELD Capital's reckless conduct.  *See Getzler* v. *River Run Foods (DE), LLC*, 2024 WL 3273430, at *6 (Del. Super. Ct. July 1, 2024) ("An experienced businessman with personal knowledge of a company's troubled financial past, cannot establish fraudulent inducement where no due diligence was performed.").

21.     Indeed, even a "retail investor," would not be entitled to simply pass by the many obvious warning signs ELD Capital ignored.  Despite what ELD Capital asserts, this is not a situation where the FTX Recovery Trust is arguing ELD Capital merely could have discovered the fraud through better diligence, and that a "more cautious buyer" might not have relied upon the alleged misstatements.  (Response ¶ 59 (citing *Arwood* v. *AW Site Servs., LLC*, 2022 WL 705841, at *24 (Del. Ch. Mar. 9, 2022).)  Rather, ELD Capital engaged in reckless conduct because it "close[d] [its] eyes to a risk that is obvious." *Id*.

22.     ELD Capital was acutely aware of the "substantial and well-publicized concerns" regarding reports of the $8 billion hole in the Debtors' balance sheet threatening to plunge the Debtors into bankruptcy and the high price of Tron Tokens on the FTX.com Exchange—an obvious indicator that many other FTX customers were using the Tron Credit Facility and that its capacity could be quickly exhausted.  (Amended Claim ¶¶ 6-7; Response ¶ 7.)  In fact, Mr. Cubitt testified that he read articles reporting on the massive liquidity crisis that had put the Debtors on the brink of collapse.  (Cubitt Tr. 102:19-106:14.)  ELD Capital was also aware of its own failed effort to withdraw Tron Tokens after the Tron Credit Facility was scheduled to have opened and before ELD Capital doubled down by liquidating most of its holdings to purchase more Tron Tokens.  (Cubitt Tr. 178:23-184:15.)  Thus, this is not a situation where ELD Capital simply failed to uncover a concealed defect.  Rather, ELD Capital repeatedly ignored clear warning signs, either choosing to proceed despite perceiving these red flags or

failing to appreciate what was obvious from the public record and its own account activity. *See, e.g., Airborne Health*, 2010 WL 2836391, at *8 (finding that counterclaim-defendant did not engage in fraud by concealment because the allegedly concealed information about a pending class action lawsuit was "a matter of public record").

23.    ELD Capital's inability to show justifiable reliance is further established by its admission that it did not understand how the purported "swap" disclosed in the Tron Facility Announcement would function.  (Cubitt Decl. ¶¶ 12, 16-19.)   The Tron Facility Announcement told users to "[p]lease ensure you understand the details of this arrangement and any associated risks before taking any actions.  If you have any questions, don't hesitate to reach out through support channels or our official telegram channel."  (Objection ¶ 3.)  Although Mr. Cubitt testified that he was unsure how any "swap" contemplated by the Tron Facility Announcement should work because he had never previously undertaken any such transaction on the FTX.com Exchange, Mr. Cubitt never reached out to FTX Support to ask any clarifying questions about the Tron Credit Facility.  (Cubitt Decl. ¶¶ 10, 16-17; Cubitt Tr. 141:22-143:2, 163:6-23.)   Instead, Mr. Cubitt tested how the Tron Credit Facility might be operating by purchasing and then attempting to withdraw a small amount of TRX.  (Cubitt Tr. 179:17-23.) According to Mr. Cubitt, he tested this to "at least check[]" that a simple withdrawal would not work because he had heard "somewhere there was the instruction that if you wanted to take hold of this facility, you needed to fill out this form and you needed a Huobi account and that was the mechanism of action."  (Cubitt Tr. 155:2-156:19.)

24.    Critically, Mr. Cubitt could not recall where he heard this instruction about Huobi, a third-party exchange unrelated to the FTX Group, but acknowledged that it formed the basis for his understanding that the FTX.com Exchange would (somehow) "swap" his

-13-

Tron Tokens off the exchange to the Huobi exchange even though withdrawals were not working.  (Cubitt Tr. 175:8-21, 186:18-188:7.)  Thus, it is apparent that Mr. Cubitt's misguided decision to double down on the purchase of Tron Tokens after his initial withdrawal attempt failed had nothing to do with any statement made by the Debtors.  (Cubitt Tr. 185:3-17.) Further, to the extent Mr. Cubitt could be said to have acted on something the Debtors allegedly said, it is apparent that it was reckless for Mr. Cubitt to bet that he could guess how the Tron Credit Facility was operating despite obvious warning signs that he could not move Tron Tokens off the FTX.com Exchange, the Debtors' warning that the facility had a limited capacity, and Mr. Cubitt's knowledge of widespread reports that the Debtors could cease operating at any time. *See Surf's Up Legacy Partners, LLC* v. *Virgin Fest, LLC,* 2024 WL 1596021, at *20 (Del. Super. Ct. Apr. 12, 2024) (finding no justifiable reliance where counterclaimant "saw the warning signs" that certain financial projections were inflated "but nonetheless proceeded to go through with the transaction").

25.     Lastly, ELD Capital cannot sidestep the non-reliance clause in the Dotcom TOS by arguing that the Tron Facility Announcement "is not investment advice" and thus would not fall under the Dotcom TOS's disclaimer.  (Response ¶ 61.)  Under the Dotcom TOS, ELD Capital agreed that it was "not relying on any communication (written or oral) by [FTX Trading] as investment advice or as a recommendation to use the Services and transact in Digital Assets." (Dotcom TOS § 2.1.1.)  ELD Capital spends much of the Response asserting that it relied on the Tron Facility Announcement—a written communication by the FTX Group—to engage in exchange transactions.  (Response ¶¶ 10-13, 58-62.)  In other words, it used the Tron Facility Announcement as investment advice.  Further, ELD Capital's effort to avoid the terms of the Dotcom TOS because they were not expressly incorporated into the Tron Facility Announcement

fails.  Delaware law does not require that contractual disclaimers be reattached to a subsequent communication to remain operative.  *See RAA Management, LLC* v. *Savage Sports Holdings, Inc.*, 45 A.3d 107, 117 (Del. 2012) (enforcing specific disclaimer language from a nondisclosure agreement to bar fraud claims based on alleged misrepresentations made during subsequent due diligence communications).  Having agreed not to rely on communications from FTX Trading as recommendations to transact, ELD Capital cannot now premise a fraud claim on precisely that theory.  *See Brent L. Mills, Inc.* v. *Katsamakis*, 2024 WL 196087, at *6 (Del. Super. Ct. Jan. 18, 2024) (dismissing fraud claim where the governing agreement contradicted the alleged misrepresentations).

### III.    ELD Capital Fails To Plead and Prove Scienter

26.    Scienter is a critical element of a fraud claim, and one that requires specific evidence to satisfy.  ELD Capital cannot offer a shred of evidence to carry its burden of providing scienter.  ELD Capital must establish (either through direct or circumstantial evidence, neither of which ELD Capital has put forward) that the FTX Group made a misrepresentation (which the record plainly establishes it did not) "either knowingly, intentionally, or with reckless indifference to the truth."  *Metro Commc'n Corp. BVI* v. *Advanced Mobilecomm Techs. Inc.,* 854 A.2d 121, 143 (Del. Ch. 2004).  Even evidence demonstrating negligence is insufficient to prove scienter.  *Id*. at 148.  ELD Capital has failed to offer a single fact through admissible evidence substantiating its baseless assertion that the FTX Group knew the Tron Credit Facility was fraudulently conceived and that the FTX Group had "no intention" to actually create and operate the facility.  (Response ¶ 66.)

27.    ELD Capital's Response first argues that the FTX Group acted with scienter by "'encourag[ing]' customers to purchase Tron Tokens" because the "facility would be unavailable to a customer unless they held TRON Tokens."  (Response ¶ 64.)  But even if ELD

Capital is correct—and there is no evidence of that fact—its Response does not demonstrate that it has met its burden of alleging "specific facts that lead to an inference of fraudulent intent"; it merely attacks allegations that it could have, but did not, make. *See Mooney* v. *Pioneer Nat. Res. Co.*, 2017 WL 4857133, at *7 (Del. Super. Ct. Oct. 24, 2017); *In re Allegheny Int'l Inc.*, 954 F.2d 167, 173 (3d Cir. 1992) (claimant has the "initial obligation" to allege "facts sufficient to support a legal liability to the claimant"). Nonetheless, its premise is incorrect—the Tron Facility Announcement only noted that holders of Tron Tokens could utilize the facility. Thus, any customer that already held Tron Tokens could access the facility without having to acquire more Tron Tokens. Customers like ELD Capital, which did not already hold Tron Tokens, were explicitly warned that the market for Tron Tokens "may experience high levels of volatility" and the FTX Group encouraged customers to "ensure [they] underst[ood] . . . any associated risks before taking any actions." (Ramanathan Decl. Ex. C.)

28.     Although the Amended Claim never made any allegations regarding the FTX Group's motivation to establish the Tron Credit Facility, ELD Capital's Response claims that the reasons for the FTX Group's purported intent to induce customers to acquire Tron Tokens are "obvious and straightforward": "FTX stood to gain as TRON Tokens sold at increasing premiums" and "FTX collected fees on transactions in TRON Tokens following the Announcement." (Response ¶ 65.) Even if true, these purported "obvious and straightforward" reasons have no effect on the adequacy of ELD Capital's claim, as they are not alleged in its Amended Claim. *Cf. In re Essar Steel Minnesota LLC*, 602 B.R. 600, 607 (Bankr. D. Del. 2019). And even if they were alleged, ELD Capital's inflammatory assertions would still fail because the Debtors made essentially nothing off of the transactions in Tron Tokens and, therefore, had no reason to induce customers to acquire Tron Tokens. The Debtors made, at

most, $185,000 from these transactions, which would amount to less than 7% of the fees collected by the FTX.com Exchange on an average day during this period of extreme distress. (Supp. Ramanathan Decl. ¶ 8.)

29.    Still ignoring that it failed to allege a single fact demonstrating scienter, ELD Capital states it can demonstrate scienter because the "Debtors were aware of the liquidation proceedings already underway and the imminent United States bankruptcy filing at the time of making the Announcement" and, therefore, had "no intention of performing." (Response ¶¶ 66-67.)  But the FTX Debtors did open and operate the Tron Credit Facility, which completely undermines any inference of scienter.  (Supp. Ramanathan Decl. ¶ 7.)  Nonetheless, ELD Capital's conclusory allegation as to the Debtors' state of mind is insufficient, as a matter of law, to plead that the Debtors had no intention of performing.  *See Mooney*, 2017 WL 4857133, at *7.

30.    Even if its allegations were not wholly deficient, ELD Capital has its facts backwards:  liquidation proceedings were not already underway and the Omnibus Corporate Authority had not yet been signed when the Tron Facility Announcement was made.  As made clear in the Objection, the Tron Credit Facility was announced at 5:48 pm UTC on November 10, 2022 and reports that the Securities Commission of the Bahamas had frozen certain of the Debtors' assets were not published until approximately 11:00 pm UTC on November 10, 2022. (Objection ¶¶ 20, 22.)  ELD Capital points to no evidence showing that the Debtors were aware of liquidation proceedings sooner than when they were publicly reported or that any such proceedings had any bearing on the operation of the Tron Credit Facility.  And, the omnibus authority that appointed Mr. Ray as CEO was executed on the morning of November 11, 2022, not November 10, 2022.  (*See* Supp. Ramanathan Decl. Ex. A. (DocuSign confirmation email

and attachment produced in discovery establishing that Mr. Bankman-Fried signed the Omnibus Corporate Authority at 9:21:57 AM UTC).)

31.    Notwithstanding ELD Capital's mischaracterization of the factual record, its allegations are nothing more than an ill-fated attempt to convert the FTX Group's attempts to manage a crisis into a fraud claim.  (*See* Objection ¶ 50 (citing *Hutchinson* v. *Perez*, 2012 WL 5451258, at *7 (S.D.N.Y. Nov. 8, 2012)).)  ELD Capital's attempt to distinguish *Hutchinson* is unavailing.  (Response ¶ 67.)  There, the court specifically rejected the idea that scienter could be established through conclusory allegations that defendants "should have been aware" of negative information (like a "liquidity crisis" or impending bankruptcy) contrary to their public statements.  *Hutchinson*, 2012 WL 5451258, at *7.  The fact that, as ELD Capital points out, the Tron Facility Announcement was made less than a day before the Debtors ultimately decided to file for bankruptcy, is irrelevant.  The *Hutchinson* court's decision was not based on how close in time the allegedly false representations were in relation to the ultimate declaration of bankruptcy. Rather, the court found that scienter could not be plead on the basis that a debtor "consider[ed] bankruptcy as an option" while "pursu[ing] other alternatives to avoid it."  *Id*. at *5.  That is exactly what occurred here—the entire world was considering the possibility that the Debtors would declare bankruptcy, but that does not automatically convert any attempt to avoid bankruptcy into fraud.  Ultimately, ELD Capital fails to adequately allege scienter because it still has not pointed to a single fact through admissible evidence "suggesting that the Tron Facility Announcement was fraudulently conceived, from the get-go." (Objection ¶ 50.)

## IV.    ELD Capital Fails to Prove Damages

32.    In its Amended Claim, ELD Capital alleges that, because of the Debtors' purported fraud, it was unable to withdraw the value of assets from the FTX.com Exchange via the Tron Credit Facility, and thus should be entitled to $470,318.96 for the original value of its

assets, in addition to $98,943.38 for the value of its assets in its account as of the Petition Date. (Amended Claim ¶¶ 6, 9.)  But as the FTX Recovery Trust explained in the Objection, "even if [ELD Capital] had been able to send its newly acquired Tron Tokens to an external wallet, it still (by its own admission) would have suffered an 'enormous' loss because it purchased its Tron Tokens . . . at an approximately 450% premium."  (Objection ¶ 52.)  Now, ELD Capital attempts to rewrite its damages claims by arguing that its true damages were that it did not receive "the benefit of the bargain" when it purchased Tron Tokens because it did not receive "immediately access to its assets."  (Response ¶ 69.)  As an initial matter, ELD Capital's "lost liquidity" theory of damages is nowhere mentioned in its Amended Claim—nor is it clear exactly how such a loss in liquidity would be measured, or what portion of ELD Capital's claimed damages it should make up.

33.    Regardless, there was no bargain between the FTX Debtors and ELD Capital, much less a bargain that promised that ELD Capital would be able to immediately have access to Tron Tokens.  Rather, the FTX Debtors set up a facility and warned customers of the risks involved in it.  There was no guarantee that every single customer that wanted to use it would be able to use it *immediately*.  ELD Capital's transactions with third parties by which it purchased Tron Tokens were completely separate.  ELD Capital could have attempted to sell those Tron tokens to other parties but chose not to pursue that option.  Those were ELD Capital's own "difficult decision[s]," which have nothing to do with some imagined bargain with the Debtors.  (Amended Claim ¶ 7.)

34.    Further, ELD Capital's interpretation of *Dohmen* v. *Goodman* does not support its position.  (Response ¶ 71 (citing 234 A.3d 1161, 1166 (Del. 2020)).)  ELD Capital argues that the circumstances here are different than those in *Dohmen* because in that case "the

decline in the price of an investment was not caused by the misrepresentations at issue but other facts," whereas, here, the Debtors' purported "misrepresentations induced ELD Capital to engage in transactions for a benefit it *could not obtain*." (*Id*. (emphasis in original).) According to ELD Capital, that benefit was "participat[ion] in the [Tron] facility" and immediate access to its assets. (*Id*. ¶¶ 69-70.) But, as already established, ELD Capital has presented no evidence proving that it was denied access to the Tron Credit Facility by any purported misrepresentations or other actions by the FTX Debtors. And, in fact, the available evidence shows the opposite— ELD Capital's "inability to participate in the facility (and, therefore, obtain the liquidity it bargained for)" was due to its own cancellation of its attempt to withdraw Tron Tokens. (*See* Section I, *supra*.) Thus, just like in *Dohmen*, the purported damages here (whether the diminution in the value of ELD Capital's cryptocurrency holdings, or its inability to immediately access its assets after attempting to use the Tron Credit Facility) were caused by other factors such as "trading decisions." 234 A.3d at 1166. ELD Capital's losses, therefore, were not caused by the FTX Debtors.

## V. The Objection Was Not Untimely

35. Desperate to sidestep their fundamental failure to state a *prima facie* fraud claim, ELD Capital makes much of the purported untimeliness of the Objection and requests (without basis) that the Court overrule the Objection as a sanction. (*See* Response ¶¶ 36-40, 47-48.) This argument is baseless.

36. As an initial matter, ELD Capital's request for sanctions in its Response is procedurally improper. (Fed. R. Bankr. P. 9011 ("A motion for sanctions must be made separately from any other motion or request . . . and be served under Rule 7004.").) Further, ELD Capital cites no authority to support its argument that the FTX Recovery Trust filing a timely objection prior to the *original* Claim Objection Deadline—which has since been extended

for a year—can be untimely because the FTX Recovery Trust had informed ELD Capital it intended to file the Objection a short time earlier. The so-called deadline upon which ELD Capital relies was never imposed by the Court and did not modify the time the FTX Recovery Trust had to timely object to claims.

37.     Moreover, ELD Capital has in no way been prejudiced by the so-called "delay" in filing the Objection. According to ELD Capital, it has been "prejudiced" by the FTX Recovery Trust's supposed delay because it "miss[ed] out on several distributions." (Response ¶ 47.) Not so. ELD Capital cannot be prejudiced by missing out on distributions because it is not entitled to any distributions. Disputed claims are not eligible for distribution under the Plan unless or until they become Allowed Claims. [*See* D.I. 26404-1, at § 8.6.] Until a claim's disputed status is resolved, the claim, including ELD Capital's claim, is protected by the Disputed Claims Reserve established and maintained pursuant to the Plan. [*See id.*, at § 8.5.] The timing for this Court resolving the Objection even if filed a month earlier is purely speculative in any event.

## CONCLUSION

38.     For the reasons stated above and in the Objection, the FTX Recovery Trust respectfully requests that the Court sustain the FTX Recovery Trust's Objection, disallow ELD Capital's fraud claim, and liquidate its claim at the Petition Date value of its customer account: $98,960.39.

Dated:  April 13, 2026
        Wilmington, Delaware

**LANDIS RATH & COBB LLP**

*/s/ Matthew R. Pierce*

Adam G. Landis (No. 3407)
Matthew B. McGuire (No. 4366)
Kimberly A. Brown (No. 5138)
Matthew R. Pierce (No. 5946)
919 Market Street, Suite 1800
Wilmington, Delaware 19801
Telephone:  (302) 467-4400
Facsimile:  (302) 467-4450
E-mail:   landis@lrclaw.com
          mcguire@lrclaw.com
          brown@lrclaw.com
          pierce@lrclaw.com

-and-

**SULLIVAN & CROMWELL LLP**

Andrew G. Dietderich (admitted *pro hac vice*)
James L. Bromley (admitted *pro hac vice*)
Brian D. Glueckstein (admitted *pro hac vice*)
Alexa J. Kranzley (admitted *pro hac vice*)
125 Broad Street
New York, NY 10004
Telephone:  (212) 558-4000
Facsimile:  (212) 558-3588
E-mail:   dietdericha@sullcrom.com
          bromleyj@sullcrom.com
          gluecksteinb@sullcrom.com
          kranzleya@sullcrom.com

*Counsel for the FTX Recovery Trust*