**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| In re: | Chapter 11 |
| | Case No. 22-11068 (KBO) |
| | (Jointly Administered) |
| FTX TRADING, LTD., *et al.*,[1] | |
| | **Related to D.I. 35243, 35364** |
| | **Hearing Date: May 14, 2026** |
| | **Objection Deadline: April 20, 2026** |
| Debtors. | |

**OBJECTION OF SETH MELAMED TO FTX RECOVERY TRUST'S MOTION TO ENFORCE PRIOR ORDERS THAT PRECLUDE SETH MELAMED FROM ASSERTING NEW CLAIMS IN ARBITRATION [D.I. 35243]**

Seth Melamed ("**Melamed**"), by and through his undersigned counsel, hereby submits this objection (the "**Objection**") to the FTX Recovery Trust's Motion to Enforce Prior Orders That Preclude Seth Melamed from Asserting New Claims in Arbitration [D.I. 35243] (the "**Motion**"), and respectfully states as follows:

**PRELIMINARY STATEMENT**

1. On July 31, 2025, after extensive briefing and the Court's July 22, 2025 bench ruling, the Court entered the Arbitration Order[2] [D.I. 32058] granting Melamed's Cross-Motion with respect to the SPA Claim and compelling arbitration. Thereafter, Melamed filed a Notice of Arbitration ("**NOA**") which asserts claims for fraud (NOA ¶ 38(a)-(b)), fraudulent inducement (NOA ¶ 38(c)) and indemnity for misrepresentations and breaches of warranty (NOA ¶ 38(d))

---

[1] The last four digits of FTX Trading Ltd.'s and Alameda Research LLC's tax identification numbers are 3288 and 4063, respectively.  A complete list of the Debtors and the last four digits of their federal tax identification numbers is not provided herein. A complete list of such information may be obtained on the website of the Debtors' claims and noticing agent at https://cases.ra.kroll.com/FTX

[2] Capitalized terms not defined herein shall have the meanings ascribed to such terms in the Motion.

(collectively, the "**NOA Claims**").  The Trust has responded, *inter alia*, that the tribunal lacks jurisdiction over these claims and indicated at a recent case management conference before the SIAC tribunal that it would file the Motion.

2.      The Motion does not raise issues concerning the "jurisdiction" of the tribunal. Rather, the Motion seeks to enjoin Melamed from prosecuting the NOA Claims on the basis that the NOA Claims are "new" claims that assert new theories of recovery that were not previously asserted in the SPA Claim.

3.      Bluntly stated, the Motion is without merit and appears to be a disguised attempt to relitigate issues under the pretense of seeking to enforce prior orders of this Court including the bar date order, the confirmation order and the Arbitration Order. These orders provide no basis to enjoin the NOA Claims.[3]

4.      The Trust's starting argument is that the NOA Claims are new claims that were not preserved by the SPA Claim.  As a result, the Trust argues that the Court can enjoin Melamed from pursuing the NOA Claims under the bar date order.  This argument is without merit.  The NOA Claims are **the same** claims asserted in the SPA Claim and include "claims against the Debtor [for] breach of contract, breach of warranty, retained consideration, indemnification, and fraud and in connection with the Debtor's purchase of the Claimant's Shares in Liquid Group Inc."  Annex to SPA Claim ¶3.  The NOA asserts claims for fraud, fraudulent inducement and indemnity for misrepresentations and breaches of warranty.  There are no "new" theories of recovery.

---

[3] Separately, the Trust's Motion seeking an injunction is procedurally deficient.  Glueckstein Decl. Ex. 9, November 24, 2025 Hr'g Tr. 42:15-18 ("I get a lot of these where it's motions to enforce orders, but generally, my view is pretty strict on those, which is: You need to file a complaint.")

5.      The Trust repeatedly references that the NOA Claims are new claims because of the measure of damages.  But as specifically noted in ¶ 24 of the NOA, that amount is an estimate and is calculated in accordance with the measure that both parties' foreign law experts stated would be applicable under Article 709 of the Japanese Civil Code, namely, "the difference between the consideration Mr. Melamed received for the Liquid Transaction and the value of his interests that he conveyed to FTX pursuant to the SPA."  Moreover, the NOA provides a 60% credit on account of any claim relating to the FTX Shares.  NOA ¶ 28.  The result is not a "new claim"; it is the arithmetic consequence of the position that the parties both agreed was the measure of damages.

6.      The Trust also repeatedly asserts that because the NOA seeks a finding that certain claims are "legally distinct" or "distinct acts", the NOA Claims are new claims.  As the Court will recall, there is an unresolved issue concerning Melamed's ability to recover on his indemnity claim related to the Crypto Currency (the "**Retained Consideration**").  Pursuant to paragraph 3 of the Amended Claims Objection Order ("**ACO Order**"), the Court "reserved judgment regarding the allowance, classification, and subordination of any indemnification claim arising from the Crypto Consideration." (the "**Retained Consideration Indemnity**").  Separately, paragraph 2 of the ACO Order determined that "any indemnity claim related to the FTX Shares" is subordinated pursuant to Section 510(b) of the Bankruptcy Code. (the "**FTX Share Indemnity**").  Assuming Melamed is successful before SIAC, this Court will need to determine whether any indemnity award relates to the FTX Share Indemnity or the Retained Consideration Indemnity.[4]

---

[4] Because the NOA Claims do not introduce new parties, new transactions, new operative facts or new causes of actions in relation to the claims stated in the SPA Claim, the NOA Claims are not a new claim and no amendment to the SPA Claim is necessary or required at this time.

7.      The Trust asserts that the NOA Claims have "been conclusively settled and released under the Global Settlement provision of the Plan" (§5.2) and, as a result, the Trust seeks to enjoin Melamed from pursuing the NOA Claims under Plan, §10.8.  Motion at ¶ 14.  It is noteworthy that this argument appears now and was never asserted by the Debtors/Trust in the lengthy briefing in connection with the Amended Claims Objection.  In any event, the Trust ignores that the Debtors previously described the scope as being limited to customers:

> Section 5.2 of the Plan provides that the Plan shall constitute a good faith compromise, settlement and resolution (the "Global Settlement") of all Claims, Interests and Causes of Action against the Debtors, including, among other things, issues relating to tracing of assets of individual Debtors and the effects and consequences of the Dotcom TOS and US TOS and whether Exchange Assets are property of the Debtors.

*Debtors' Memorandum of Law in Support of Confirmation of the Second Amended Joint Chapter 11 Plan of Reorganization of FTX Trading Ltd. and its Debtor Affiliates* ¶ 52.  [D.I. 26035].

8.      The Trust's assertion that the NOA Claims raise "generalized allegations concerning FTX's financial condition, business practices, and handling of assets" (Motion at ¶ 14) ignores the volume and extent of the misrepresentations/ breaches of warranty identified in the NOA which were made directly to Melamed in connection with a lengthy due diligence process.  These include false documentation sent by FTX and oral misrepresentations of FTX senior management as to its business practices, financial condition, segregation of customer assets, fabricated insurance and undisclosed shortfalls (NOA ¶16-17).

9.      The Trust argues that if the NOA Claims were compromised under section 5.2, the Court can enjoin Melamed from pursuing the NOA Claims under Section 10.8 of the Plan.  Section 10.8 is limited in scope. It applies only to claims that were settled or released under Article 10 of the Plan and then only to the extent "provided for or authorized by sections 524 or

1141 thereof." Melamed opted out of the Voluntary Release and did not settle or release any claims under Article 10 of the Plan.

10. The efficacy of Section 10.8 is questionable given that the Plan is a liquidating plan and the Debtors did not receive a discharge under section 1141(d)(3) of the Bankruptcy Code. As a result, the injunction provision under section 524 does not apply.

11. Finally, the Trust argues that because the NOA Claims were not included in the SPA Claim (which, as noted above, is incorrect), they are outside the scope of the Arbitration Order. As a result, the Trust requests that the Court examine whether the NOA Claims exceed the scope of the referral to arbitration. The Court should not engage in this exercise. Pursuant to the ACO Order, claims on account of the FTX Shares were not disallowed – they were subordinated under section 510(b). Given that this Court will ultimately need to determine the allowability of any arbitral award, the Trust's request appears to be a clumsy attempt at reconsideration.

12. In sum, none of the orders that the Trust seeks to enforce has any impact on the continued prosecution of the NOA Claims. Accordingly, the Motion should be denied.

**RELEVANT BACKGROUND**

### A. The Non-Customer Bar Date

13. On May 3, 2023, the Debtors filed the *Motion of Debtors for Entry of an Order (I)(A) Establishing Deadlines for Filing Non-Customer and Government Proofs of Claim and Proofs of Interest and (B) Approving the Form and Manner of Notice Thereof and (II) Granting Related Relief* [D.I. No. 1416] (the "**Bar Date Motion**"). On May 19, 2023, the Bankruptcy

Court entered an order approving the Bar Date Motion (the "**Bar Date Order**"), which set the

FTX Bar Date as June 30, 2023, at 4:00 p.m. ET ("**Bar Date**").

14.     According to the Bar Date Order, each proof of one or more non-customer claims

must, among other things, "conform substantially to the Proof of Claim Form (or Official Form

410)[,]" Bar Date Order ¶ 7.  On the form prepared by the Debtors (the "**POC Form**"), item no.

8 includes a 1-line box to explain the basis of the underlying claim.

### B.     SPA Claim – Claim #3385

15.     Melamed filed Claim No. 3385 ("**Claim 3385**" or the "**SPA Claim**") prior to the

Bar Date.  *See* Declaration of Brian Glueckstein ("**Glueckstein Decl**.") Ex. A.

16.     The SPA Claim asserts, *inter alia*, claims for breach of contract, indemnification

and fraud:

> 3. Claimant asserts non-subordinated general, unsecured claims against the Debtor which arise from breach of contract, breach of warranty, retained consideration, indemnification, and fraud and in connection with the Debtor's purchase of the Claimant's Shares in Liquid Group Inc. . . .pursuant to and as defined in that certain Agreement for the Sale and Purchase of Shares, Stock Options and Warrants in Liquid Group Inc., (Major Shareholders), dated November 19, 2021 (the "SPA") . . .
>
> "4. Claimant was damaged as a proximate result of the following breaches and torts by FTX Trading Ltd., by its affiliated debtors in the Bankruptcy Proceeding, by said Sam Bankman-Fried, and by various other principals, officers and employees of FTX Trading Ltd. and/or of its affiliated debtors in the Bankruptcy Proceeding: (a) breach of contract, including the SPA; (b) multiple breaches of warranties and representations contained in the SPA and elsewhere; (c) failure to pay retained consideration as defined and promised in the SPA; (d) failure to indemnify Claimant for damages from breaches of contract and breaches of warranties and representations as provided in the SPA; and (e) fraud in the inducement of Claimant to sign the SPA and in the execution, performance and breach of the SPA."

Annex to SPA Claim ¶¶3-4.

17.     Paragraph 24 of the Annex to the SPA Claims states that:

> [u]nbeknownst to Claimant, Debtor allowed Alameda to maintain an essentially unlimited line of credit from Debtor, thereby creating a financial picture of Debtor that

was materially false and misleading. This material misrepresentation of Debtor's financial health induced claimant to enter into the SPA, causing claimant to sell his shares in LGI for 1/50 of their true value and take in exchange shares in Debtor worth $35,613,112.19 less than his LGI shares were worth."

*Id.* ¶ 24.

18.     Paragraph 13 of the Annex identified all three damage theories the Trust now asserts are new.

Claimant seeks damages of $35,613,112.19 from Debtor for Debtor's (a) breach of warranty in the SPA (b) impermissible retention of the Retained Consideration; and (c) its indemnification obligations. *The Claimant states its claims under theories of Japanese law and Delaware law, to the extent applicable."*

*Id.* ¶ 13 (emphasis supplied).

19.     Paragraph 14 of the Annex sets forth the component parts of the damages claim with the same specificity the Trust now demands.

Accordingly, Claimant is entitled to obtain damages from Debtor in an amount of not less than $35,613,112.19, for (a) the purchase price received under the Agreement, less payment of the cash consideration; (b) the Retained Consideration, in the event it is not returned; and (c) damages, including, but not limited to, reimbursement of expenses and fees including any currently unliquidated future expenses or losses and attorney fees as allowed by law.

*Id.* ¶ 14.

20.     Paragraph 33 to the Annex preserved an omnibus reservation of all remaining rights of action, including specifically at subpart (g) "the right of Claimant to initiate any other rights, claims, actions, defenses, setoffs, or recoupments to which Claimant is or may be entitled under the Agreement, any other agreement, documents, or instruments, in law or equity, all of which rights, claims, actions, defenses, setoffs, and recoupments are expressly reserved."

*Id.* ¶ 33(g).

**C.      The Plan**

21.      In connection with the voting on the *Second Amended Joint Chapter 11 Plan of Reorganization of FTX Trading Ltd. and its Debtor Affiliates* (the "**Plan**") [D.I. 26029]*,* Melamed opted out of the voluntary release under Section 10.3.  *See* Declaration of Seth Melamed In Support Of Supplemental Opposition To First Amended Joint Chapter 11 Plan Of FTX Trading Ltd. D.I. 24582;  Glueckstein Decl. Ex. 3, Sept. 12, 2024 Hr'g Tr. 74:12–15 ("[w]e have made clear Mr. Melamed will be able to, to the extent he hasn't already, opt out of the releases and the ballots associated with these claims.").  *See* Adler Declaration Ex. C, Oct. 7, 2024 Conf. Hr'g Tr. 114:25–115:2 ("Mr. Adler's clients submitted their ballots, they I believe opted out of the releases. So he doesn't even have standing to be advocating on this point . . .").

**D.      The Amended Claims Objection**

22.      On December 9, 2024, the Debtors filed their Amended Objection to Proofs of Claim Filed by Seth Melamed and Motion for Subordination pursuant to 11 U.S.C.  §510(B) and §510(C)(1)(the "**Amended Claims Objection**" or "**ACO**"). D.I. 28643.

23.      Neither the Debtors nor the Trust attached the SPA Claim to the ACO.  Rather, the Debtors summarized and labelled the claim into three components which were defined as the "FTX Consideration Shares"; the "Cash Consideration" and the "Crypto Consideration."  ACO ¶ 15(a)–(c); *see also* Annex to SPA Claim ¶ 9 (identifying these components as part of the contract claim). The Trust then argued its objection based upon those categorizations.  ACO ¶ 17.

24.      In the ACO, the Debtors sought to subordinate the SPA Claim based on Bankruptcy Code sections 510(b) and 510(c)(1).  In connection with the Amended Claims Objection, the parties briefed the complex issues associated with the SPA Claim, including that i) the SPA was governed by Japanese law; ii) Japan is governed by civil law; and iii) the measure

of damages on account of a fraud claim.  In particular, both parties briefed the Japanese Civil

Code's tort provision — Article 709.  The Debtors submitted a declaration from the foreign law

expert, Taro Tanaka, who testified on the measure of damages under Article 709 as follows:

> As a general rule, damages for tort claims such as fraud are determined pursuant to Article 709 as well as 416 of the Japanese Civil Code. The purpose of such damages is to restore the situation that would have existed had the wrongdoing not occurred.8 Mr. Melamed claims that he was induced to sign the SPA based on misrepresentations FTX made to him. (Claim No. 3385 ¶ 24.) Mr. Melamed claims that had the allegedly fraudulent misrepresentations not been made, he would not have signed the SPA. **Under Japanese law, Mr. Melamed's damages for his fraud claim, if any, would be calculated by determining the difference between the consideration Mr. Melamed received as part of the transaction and the true value of the Liquid shares and stock options that he sold to FTX pursuant to the SPA.**

See D.I. 28646 at ¶ 20 (emphasis supplied).

25.      On April 7, 2025, Melamed filed his *Opposition to Debtors' Amended Objection to Proofs Of Claim and Motion for Subordination pursuant to 11 U.S.C. 510(B) and 510(C)(1) and Cross-Motion to Compel Arbitration* (the "**Cross-Motion**").  D.I. 30077.  In connection with the Cross-Motion, Melamed submitted his foreign law expert who agreed with Tanaka on the measure of damages under 709.  See *Declaration of Takane Hori* [D.I. 30079] at ¶ 21 ("Melamed's damages for his fraud claims, if he successfully prevailed, would be calculated (i) if under Article 709, by determining the difference between the consideration Mr. Melamed received for the Liquid Transaction and the value of his interests that he conveyed to FTX pursuant to the SPA").

26.      Melamed also argued in the Cross-Motion that a ruling on Section 510(b) might be premature:

> The Debtors assert that a portion of Melamed's claim is subject to subordination under Section 510(b) and, as a result, the Court should retain jurisdiction. This argument puts the cart before the horse. The first step is to determine the amount of Melamed's claim under Japanese law through arbitration. As set forth in the Hori Response Decl., a claim of fraud can be pled under Article 709 and Article 96 of the Japanese Civil Code. A

9

plaintiff can make both claims simultaneously. Hori Response Decl., ¶ 20. If Melamed prevailed in his fraud claims damages would be calculated: (i) if under Article 709, by determining the difference between the consideration Mr. Melamed received for the Liquid Transaction and the value of his interests that he conveyed to FTX pursuant to the SPA . . .[u]ntil the amount of these damages is determined in arbitration (in accordance with Japanese law), there is no liquidated claim and consideration of §510(b), even if applicable, is premature.

Cross-Motion ¶ 75.

### E.   Status Conference and June 25th Hearing

27.   On May 14, 2025, the Court held a status conference.  Glueckstein Decl. Ex. 4. At that hearing, counsel for Melamed acknowledged that this Court would be the gatekeeper for the allowance of the SPA Claim:  "we don't dispute that, upon receiving whatever the arbitration panel gives in Singapore, we have to come back here and have this Court determine at that time, you know, what the — whether 510(b) applies and to what extent, and the same issue with respect to the plan . . . ."  Glueckstein Decl. Ex. 4, May 14, 2025 Hr'g Tr. 10:17–22.

28.   On June 25, 2025, the Court heard argument on the Amended Claims Objection. Glueckstein Decl. Ex. 5.

### F.   Ruling on Amended Claim Objection

29.   On July 22, 2025, the Court issued its ruling.  *Id.* at Ex. 6.

30.   First, the Court granted the Cross-Motion and referred the SPA Claims to arbitration.  Second, with respect to the ACO, the Court ruled that:

- The claim for the Retained Consideration would be valued pursuant to section 4.4 of the Plan.  Glueckstein Decl. Ex. 6, July 22, 2025 Hr'g Tr. 125:16–126:2.

- The claim on account of the FTX Consideration Shares, including any indemnity claim, would be subordinated pursuant to Section 510(b) of the Bankruptcy Code. (*Id.* 128:2–129:6).

- The Court reserved judgment as to any indemnity claim on account of unpaid crypto consideration "until such claim is clearly defined" (*Id.* 129:7–129:11).

10

31.     These rulings were memorialized in two orders entered on July 31, 2025.  In the ACO Order, the Court ruled as follows:

> The Claims Objection is SUSTAINED to the extent that it seeks to subordinate pursuant to 11 U.S.C. § 510(b) any portion of Claim 3385 relating to the shares of FTX Trading Ltd. ("FTX Shares") provided to Melamed as consideration for FTX's purchase of Liquid Group, Inc., including any indemnity claim related to the FTX Shares. To the extent any claim is ultimately allowed relating to the FTX Shares, it shall be allowed only as a Class 14 Section 510(b) Other Equity Claim, as defined in the [Plan]
>
> The Claims Objection is SUSTAINED insofar as it relates to the Crypto Consideration. The portion of Claim 3385 relating to the Crypto Consideration is a "Claim in Respect of [] Digital Asset[s]," as that term is broadly defined in section 4.4 of the Plan. The Crypto Consideration claim shall be valued using their petition-date values in accordance with the Court's Order Granting Motion of Debtors to Estimate Claims Based on Digital Assets [D.I. 7090] (the "Estimation Order"). *The Court reserves judgment regarding the allowance, classification, and subordination of any indemnification claim arising from the Crypto Consideration.*

ACO Order ¶¶ 2–3 (emphasis supplied). In the Arbitration Order, the Court ruled "[t]he Cross-Motion is GRANTED with respect to Claim No. 3385 only and DENIED with respect to Claims 3244, 3353 and 4578 and the administrative claim."

### G.     Subsequent Events

32.     On November 12, 2025, Melamed filed the NOA with the Singapore International Arbitration Centre, commencing ARB602/25/VKH.  Glueckstein Decl. Ex. 2.

33.     The NOA asserts claims for fraud (NOA ¶ 38(a)-(b)), fraudulent inducement (NOA ¶ 38(c)) and indemnity for misrepresentations and breaches of warranty (NOA ¶ 38(d)).

34.     The NOA asserts damages arising from the Retained Consideration and Cash Consideration portions of the SPA transaction.  The NOA expressly does not seek damages attributable to the FTX Consideration Shares. NOA ¶¶ 28–30.

35.     The NOA also asserts an indemnity on account of the Retained Consideration. Specifically, the NOA asserts that:

> 17(a) if FTX had not made material misrepresentations and omissions to the Claimant concerning (i) its segregation, custody, and reconciliation of customer assets; (ii) the true status of customer asset backing and risk management (including fabricated 'insurance fund' metrics and undisclosed shortfalls); and (iii) the secret preferential treatment and effectively unlimited credit extended to Alameda Research—funded by FTX customer deposits—the Claimant would not have agreed to allow FTX to hold 20% of the purchase price because he would have understood that this portion of the purchase price was at risk

> 25. In addition, FTX's misrepresentations has caused the Claimant to incur significant legal and other expenses in the bankruptcy proceeding and to pursue this arbitration. The Claimant is entitled to full indemnity of those amounts under the SPA.

36.     On December 10, 2025, the Trust filed its Response to the Notice of Arbitration in ARB602/25/VKH (the "**Trust Response**").  *See* Declaration of David Adler (the "**Adler Declaration**"), Ex. "A".  Paragraph 4 of the Trust Response incorrectly summarizes the ACO Order and states that there are only two remaining issues (omitting the Retained Consideration Indemnity)[5] "(a) whether Melamed is entitled to the unpaid Crypto Consideration under the terms of the SPA; and (b) what value, if any, Melamed is entitled to on his now-subordinated fraud claim in respect of the FTX Consideration Shares."  Trust Response ¶ 4. In addition, the Trust Response asserts that the tribunal lacks jurisdiction.  *Id*. ¶¶ 28–31.

37.     A Case Management Conference ("**CMC**") was held before the SIAC tribunal on April 1, 2026.  The tribunal set a procedural calendar and authorized Melamed's counsel to file an application under SIAC Rule 47 for early dismissal of certain mislabeled jurisdictional objections (the "**Early Dismissal Application**").  The Trust filed the Motion on April 2, 2026 and Melamed filed the Early Dismissal Application on April 3, 2026.  Adler Decl. Ex. B.

---

[5] Similarly, the Trust refuses to acknowledge the existence of the Retained Consideration Indemnity in the Motion.

## LEGAL ARGUMENT

### I.  The SPA Claim Preserved the NOA Claims

38.     The Trust initially argues that the SPA Claim did not preserve the NOA Claims. Motion ¶¶ 20–32 & n.9. A proof of claim preserves a claim when it provides the debtor "fair notice" of the conduct, transaction, or occurrence that forms its basis. Official Form 410 calls for no transaction-by-transaction breakdown of damages; it asks the claimant to state the amount of the claim and the "basis for the claim," and to attach supporting documentation. *See* Official Form 410, Parts 2 & 4. There is no requirement — statutory, rule-based, or doctrinal — that the claimant itemize each damages theory or component prior to the bar date.

39.     The NOA does not assert new claims; it asserts the claims identified in the SPA Claim but values those claims in accordance with Japanese-law experts' damages.  The damages sought in the SIAC proceeding tracks the Article 709 damages referenced in the Cross-Motion: "the difference between the consideration Mr. Melamed received for the Liquid Transaction and the value of his interests that he conveyed to FTX pursuant to the SPA." D.I. 30077 ¶ 75. Because Mr. Melamed received the Trust's defined "FTX Consideration Shares" in-kind at closing (*see* ACO ¶ 16), that component is backed out of the Article 709 calculation as "consideration received." The result is not a "new claim"; it is the arithmetic consequence of the position that the parties both acknowledged was the measure of damages in the ACO briefing.

40.     The Motion's "new claims" theory depends on an American common-law assumption that each legal theory (fraud, breach of warranty, misrepresentation) is a discrete "claim."  Article 709 of the Japanese Civil Code is different and provides for a single unitary tort action: "A person who has intentionally or negligently infringed any right of others, or legally

protected interest of others, shall be liable to compensate any damages resulting in consequence."

41.    The Hori Declaration and the Tanaka Declaration agree on this basic point. The SPA Claim alleged fraud and misrepresentation arising from FTX's acquisition of Liquid; the NOA asserts the same unitary Article 709 claim. The Trust's attempt to slice Article 709 into "new" sub-claims reflects a misunderstanding of Japanese civil law.  That result is precisely what the parties agreed to in the SPA.

42.    Thus, Melamed is not carving out his fraud claim – he is only seeking a judgment which excludes that portion of damages related to the FTX Consideration Shares.  The Motion's repeated assertion that the NOA represents a sudden "200% jump" or the introduction of a "new" valuation theory (Mot. ¶¶ 12–13) is, respectfully, wrong on the face of the record.

43.    In sum: every claim the Trust identifies as "new" has already been asserted in the SPA Claim.

> (a) Trust's "20% Cash Consideration" Theory (Motion n.9) — identified in SPA Claim Annex ¶ 14(a) ("the purchase price received under the Agreement, less payment of the cash consideration").
> (b) Trust's "20% Retained Consideration" Theory — identified in SPA Claim Annex ¶¶ 13(b), 14(b), 19, 20.
> (c) Trust's "Indemnification" Theory — identified in SPA Claim Annex ¶ 13(c).
> (d) Trust's "Japanese Law Theories" Objection — identified in SPA Claim Annex ¶ 13 ("under theories of Japanese law") and n.2 (quoting SPA § 19.1).

44.    In support of its argument that the SPA Claim did not preserve the NOA Claims, the Trust relies on *In re FTX Trading Ltd*., No. 22-11068-JTD (Bankr. D. Del. December 18, 2024) [D.I. 28891] (the "**Celsius Decision**").  That reliance is misplaced.  In *Celsius*, Celsius had filed over 100 proofs of claim prior to the bar date that asserted various disparagement claims, including claims for "libel, slander, tortious interference with business relations, tortious interference with contract, tortious interference with business prospects, business disparagement,

restraint of trade, unfair competition, fraud, negligence, misrepresentation, defamation, and conspiracy" *Id.* at 1.  The proofs of claim also noted that "Celsius is also investigating causes of action against the FTX debtors under chapter 5 of the Bankruptcy Code, including preference and fraudulent transfer actions."  *Id.*  Thereafter, Celsius filed amended claims which dropped the disparagement claims and instead asserted avoidance claims of not less than $444,457,844 for alleged preferential transfers."  *Id.* at 2.

45.     The Court held that Celsius had not preserved its preference claim because a "single sentence in the Original POCs stating that Celsius was investigating possible avoidance actions was not sufficient to put the Debtors or the Court on notice of the existence or nature of the alleged Preference Claims."  *Id.*

46.     *Celsius* thus stands for the unremarkable proposition that if the proof of claim does not identify the claim and put the debtors on notice, it will not be preserved.  That is not the case with the SPA Claims.   The SPA Claims specifically asserted the factual background of the SPA transaction, the causes of action and the damages related to the transaction.  Accordingly, the claims asserted in the NOA were preserved.

47.     Not referenced by the Trust is another decision in this case, *In re FTX Trading Ltd.*, No. 22-11068-JTD (Bankr. D. Del. March 13, 2025) [D.I. 29924] ("**Three Arrows**") that is more on point.  In *Three Arrows*, the liquidators of Three Arrows Capital, Ltd. had filed claims asserting preference, conversion, and other avoidance actions under BVI, New York, Delaware and other applicable law arising out of what, at the time of filing, the Joint Liquidators understood to be an approximately $120 million liability. *Id.* at 1. After discovery, the liquidators concluded that the actual magnitude of the preference and avoidance exposure was approximately $1.53 billion — an increase of approximately twelve-fold — and moved to amend

the proof of claim to: (i) quantify damages at the higher amount; and (ii) add six new theories of recovery (including breach of contract, breach of trust, breach of fiduciary duty, unjust enrichment, turnover and proprietary restitution) on top of the original preference, conversion and avoidance theories. *Id.* at 6.

48.     The Court granted leave on the basis that the facts and circumstances that form the basis for the claims are essentially unchanged and all arose out of the same event. *Id*. at 9. Moreover, the evidence made clear that the original proof of claim had the effect of notifying the Debtors of the possibility of the later asserted claims, which is sufficient to establish that the claims relate back. *Id.*[6]

49.     That holding in *Three Arrows* controls here. If a twelve-fold damages increase and six new theories on preference and avoidance claims are consistent with the "facts of the original claim", then *a fortiori* Mr. Melamed's refinement of the fraud damages on account of the Cash Consideration and Retained Consideration components expressly identified in SPA Claim cannot be "new claims." The Trust cannot credibly ask this Court to draw a harder preservation line for Mr. Melamed than it drew in *Three Arrows*. Doing so would produce a stark inconsistency in the treatment of materially similarly-situated claimants.

50.     The Trust relies on *In re Nortel Networks*, 573 B.R. 522, 529 (Bankr. D. Del. 2017), for the proposition that a claimant may not assert a "new and different theory of damages" than what was included in the proof of claim. (Motion ¶ 25.)  *Nortel* has no application here because the claims and measure of damages have remained unchanged since the SPA Claim was filed.

---

[6] In making this ruling, the Court distinguished Celsius: "[u]nlike the claims asserted here, the original and amended proofs of claim filed by Celsius arose out of completely different facts, Celsius offered no explanation for its delay in filing the amended proof of claim long after the bar date, and Celsius had all facts related to its claims in its possession at all relevant times." *Id.* at 11.

51.     Similarly, *In re Exide Technologies* 601 B.R. 271 (Bankr. D. Del. 2019), aff'd, 613 B.R. 79 (D. Del. 2020) is inapplicable because the creditor asserted new violations and claims.  Here, the same theories of liability asserted in SPA Claim are set forth in the NOA Claims.

**II.     Amendment of the SPA Claims is not Warranted at this time**

52.     The NOA Claim and the SPA Claim share all of the following: the same parties (Melamed and the FTX entities, now the Trust); the same transaction (the Liquid SPA, dated November 19, 2021); the same factual allegations (FTX-induced fraud, misrepresentation and indemnity); and the same harm (Melamed's loss of value in the Liquid shares transferred to FTX).  The NOA is the articulation of the legal theory governing that transaction in the forum to which this Court referred it. It does not introduce new parties, new transactions, or new operative facts.

53.     Although Melamed does not believe that it is necessary, to the extent that the Court determines that an amendment to the SPA Claim is required, Melamed respectfully requests that this Objection be deemed a cross-motion to amend.

54.     Such an amendment should be granted. The Third Circuit has held that amendments to proofs of claim should be freely allowed, but "once the deadline to file claims has passed, 'an amendment to a claim filed post bar-date must be scrutinized to assure that it is not an attempt to file a new claim.'" *Plains Mktg., L.P. v. Bank of Am., N.A. (In re Semcrude, L.P.),* 443 B.R. 472, 477 (Bankr. D. Del. 2011) (quoting *Hatzel & Buehler, Inc. v. Station Plaza Assoc., L.P.,* 150 B.R. 560, 562 (Bankr. D. Del. 1993)). "Thus, a creditor may not use the claims amendment process to circumvent the claims bar date."

55.     The Third Circuit and courts in this District apply the rule liberally to proofs of claim, permitting amendments that "flesh out" the original claim arising from the same transaction rather than state a wholly new one. *See In re Trans World Airlines, Inc.*, 145 F.3d 124, 141 (3d Cir. 1998); *In re Ben Franklin Hotel Assocs.*, 186 F.3d 301, 309 (3d Cir. 1999); see *also In re Stone & Webster, Inc.,* 286 B.R. 532, 540–41 (Bankr. D. Del. 2002) (permitting amendment where original proof of claim gave the debtor notice of the nature and factual basis of the amended claim).  The Trust accepts this framework (Motion ¶ 13), conceding that the first requirement for post-confirmation amendment is that the proposed amendment "merely fleshes out the details of, a timely-filed claim."  It is the Trust's application of that standard, not the standard itself, that fails.

56.     In *In re Edison Bros. Stores, Inc.*, 2002 WL 999260 (Bankr. D. Del. May 15, 2002), the Court held that amendments are permissible "to cure defects in a claim already filed, to describe a claim with greater particularity, or to plead a new theory of recovery on the facts of the original claim." Id. at *3. "Courts have generally held that a post-bar date proof of claim seeking to increase the amount of a timely-filed claim is not the assertion of a new claim." *Id.* at *4. The Third Circuit's decision in *Ben Franklin* reiterates the same principle: increasing damages and adding new theories on facts already disclosed does not transform an amended claim into a new one. 186 F.3d at 309.

57.     "Courts typically apply a two-pronged inquiry when considering whether to allow post-bar-date amendments to proofs of claim." *Acthar Ins. v. Mallinckrodt plc (In re Mallinckrodt plc*), No. 20-12522-JTD, 2022 U.S. Dist. LEXIS 147924, at *6-7 (D. Del. Aug. 18, 2022). "First, they must determine whether there was a "timely assertion of a similar claim or demand evidencing an intention to hold the estate liable." *Id.* (quoting *In re Integrated Res., Inc.,*

157 B.R. 66, 70 (S.D.N.Y. 1993)). If the amendment elaborates, clarifies, quantifies, or adds theories of recovery on facts already disclosed in the timely-filed claim, the analysis is governed instead by Federal Rule of Civil Procedure 15(a)(2) — made applicable by Bankruptcy Rule 7015 — which provides that "[t]he Court should freely give leave when justice so requires." Fed. R. Civ. P. 15(a)(2); *see also In re Trans World Airlines, Inc.*, 145 F.3d 124, 141 (3d Cir. 1998) (holding that Bankruptcy Rule 7015 "commits the decision to grant or deny leave to amend to the trial court's sound discretion").

58. Assuming the first prong is satisfied, "the court must then determine whether it would be equitable to allow the amendment." *Id.* The *Semcrude* Court distilled this prong into a five-factor list: leave to amend should **only** be denied upon "a showing by the non-moving party of one of the following grounds for denial: (1) undue delay; (2) bad faith or dilatory motive; (3) repeated failure to cure deficiencies by amendments previously allowed; (4) undue prejudice to the opposing party by virtue of allowance of the amendment; or (5) futility of the amendment." *Plains Mktg., L.P. v. Bank of Am., N.A. (In re Semcrude, L.P.)*, 443 B.R. 472, 476 (Bankr. D. Del. 2011) (citing *Foman v. Davis*, 371 U.S. 178, 182 (1962)) (emphasis added). The burden is on the non-moving party (here, the Trust) to show one of those factors; absent such a showing, leave must be granted.

59. Because the SPA Claim preserved the relevant claims, the Court need not reach the *Semcrude* factors. But if it does, the burden lies with the Trust — *Semcrude*, 443 B.R. at 476 — and the Trust cannot carry that burden on any of the five factors.

### III. Neither §§5.2 nor 10.8 of the Plan impact the NOA Claims

60.     The Trust asserts that the NOA Claims have "been conclusively settled and released under the Global Settlement provision of the Plan" (§5.2) and, as a result, the Trust seeks to enjoin Melamed from pursuing the NOA Claims under Plan, §10.8.  Motion at ¶ 14.

61.     Initially, it bears note that in the extensive briefing to date, the Debtors/Trust have never raised § 5.2 as an independent disallowance theory with respect to the SPA Claims in the extensive briefing to date. (Motion ¶¶ 14, 39–45.)

62.     Section 5.2 of the Plan provides:

In consideration of the classification, treatment, Distributions, releases and other benefits provided by the Debtors to their stakeholders under the Plan, on the Effective Date, the provisions of the Plan shall constitute a good-faith compromise, settlement and resolution (the "Global Settlement") of all Claims, Interests and Causes of Action against, by or among the Debtors, including without limitation: (a) the actual or purported fraud, unjust enrichment, misappropriation, conversion and misconduct of former Insiders ….

Plan § 5.2.

63.     In connection with Plan confirmation, the Debtors stated:

Section 5.2 of the Plan provides that the Plan shall constitute a good faith compromise, settlement and resolution (the "Global Settlement") of all Claims, Interests and Causes of Action against the Debtors, including, among other things, issues relating to tracing of assets of individual Debtors and the effects and consequences of the Dotcom TOS and US TOS and whether Exchange Assets are property of the Debtors.

*Debtors' Memorandum of Law in Support of Confirmation of the Second Amended Joint Chapter 11 Plan of Reorganization of FTX Trading Ltd. and its Debtor Affiliates* ¶ 52.  [D.I. 26035].

64.     In addition, the Debtors stated that Section 5.2 would not be used to circumvent the Bankruptcy Code.

The single case cited by the U.S. Trustee, *Varela v. Dynamic Brokers, Inc.* (In re Dynamic Brokers, Inc.), 293 B.R. 489, 496 (B.A.P. 9th Cir. 2003) is completely irrelevant. (UST Obj. ¶ 66.) In *Dynamic Brokers*, a debtor sought to modify the amount of a claim in a proposed plan instead of objecting to the amount of the claim in accordance with Bankruptcy Rule 3007. 293 B.R. at 496-497. The court

sustained the objections of the claimant, noting that the debtor needed to file a formal claims objection in respect of such claim because section 1123(b)(5) of the Bankruptcy Code does not authorize a debtor to unilaterally seek to modify claims in a Chapter 11 plan. *See id.* This has nothing to do with the U.S. Trustee's objection. **The Debtors are not attempting to circumvent any requirement imposed by the Bankruptcy Code or the Bankruptcy Rules. As detailed in the Confirmation Brief (Argument § II), the Debtors satisfy both section 1123(b) of the Bankruptcy Code and Bankruptcy Rule 9019.** Accordingly, the U.S. Trustee's objection should be overruled.

*Debtors' Omnibus Reply to Objections to Confirmation of the Second Amended Joint Plan of Reorganization of FTX Trading Ltd. and its Debtor Affiliates* ¶¶ 80–81. [D.I. 26039] (emphasis supplied); *see also* Confirmation Order ¶ 167 ("[P]roofs of claim numbers 91933 and 96369 (the '**ELD Claims**') filed by ELD Capital LLC shall not be deemed settled pursuant to section 5.2 of the Plan, and shall not be deemed released under section 10.4 of the Plan and such claims shall be adjudicated through the claims objection process. The parties' rights, defenses and objections with respect to the ELD Claims are fully reserved.")[7]

65.     Although the scope of section 5.2 is not clearly discussed, it appears that this section was a mechanism to settle estate causes of actions.  In that regard, the Motion argues the NOA Claims raise "generalized allegations concerning FTX's financial condition, business practices, and handling of assets" (Motion at ¶ 14).   That characterization simply ignores the volume and extent of the misrepresentations/ breaches of warranty identified in the NOA which were made directly to Melamed in connection with a lengthy due diligence process.  These include false documentation sent by FTX and oral misrepresentations of FTX senior

---

[7] In addition, Section 10.9 of the Plan  "Limitations on Exculpations and Releases," precludes the release of any Cause of Action arising under any contract and provides that: "[n]otwithstanding anything to the contrary herein, none of the releases or exculpations set forth herein shall operate to waive or release any obligation or Causes of Action of any Person or Entity: (a) arising under any contract, instrument, agreement, release or document delivered pursuant to the Plan or documents, agreements or instruments executed in connection therewith."

21

management as to its business practices, financial condition, segregation of customer assets, fabricated insurance and undisclosed shortfalls (NOA ¶16-17).

66.    Melamed's SPA Claims are direct and personal to him; they are not derivative of any estate cause of action. *See In re Emoral, Inc.*, 740 F.3d 875, 879–80 (3d Cir. 2014) (direct claims of individual creditors are not estate property and are not within the reach of estate-claim injunctions); *St. Paul Fire & Marine Ins. Co. v. PepsiCo, Inc.*, 884 F.2d 688, 700–01 (3d Cir. 1989) (same).

67.    The Trust argues that if the NOA Claims were compromised under section 5.2, the Court can enjoin Melamed from pursuing the NOA Claims under Section 10.8 of the Plan.

68.    Section 10.8 provides:

Except as otherwise expressly provided in the Plan or Confirmation Order with respect to Preserved Potential Claims, the satisfaction and release pursuant to this Article 10 shall also act as a permanent injunction against any Person who has held, holds or may hold Claims, Interests or Causes of Action from (a) commencing or continuing any action to collect, enforce, offset, recoup or recover with respect to any Claim, liability, obligation, debt, right, Interest or Cause of Action released, settled or exculpated under the Plan or the Confirmation Order to the fullest extent authorized or provided by the Bankruptcy Code, including to the extent provided for or authorized by sections 524 or 1141 thereof…. Notwithstanding anything to the contrary in the Plan, all Holders of Claims, Interests or Causes of Action are enjoined from interfering with the Distributions contemplated by the Plan and from asserting any Claim or Cause of Action expressly preserved and vested exclusively in the Wind Down Entities as of the Effective Date.

Plan § 10.8.

69.     Section 10.8 is limited in scope.  If a claim is not "released, settled or exculpated" under the Plan, § 10.8 has nothing to enforce. It applies only to claims that were settled or released under Article 10 of the Plan.

70.     Moreover, the efficacy of Section 10.8 is questionable given that the Plan is a liquidating plan and the Debtors did not receive a discharge under section 1141(d)(3) of the Bankruptcy Code.  As a result, the injunction provision under section 524 does not apply.

**CONCLUSION**

For the foregoing reasons, Melamed respectfully requests that the Court: (i) deny the Motion in its entirety; (ii) decline to enter any order that would narrow, limit, or interfere with the scope of the arbitration referral in the Arbitration Order [D.I. 32058]; and (iii) grant such other and further relief as the Court deems just and proper.

Dated: April 20, 2026
      Wilmington, Delaware

              **McCARTER & ENGLISH, LLP**

              /s/ Kate R. Buck
              Kate R. Buck (No. 5140)
              Renaissance Centre
              405 North King Street, 8th Floor
              Wilmington, DE 19801
              Telephone: (302) 984-6300
              Facsimile (302) 984-6399
              kbuck@mccarter.com
              -  and  -
              David J. Adler (admitted *pro hac vice*)
              250 W. 55th Street, 13th Floor
              New York, NY 10019
              Telephone: (212) 609-6847
              Facsimile: (212) 609-6921
              dadler@mccarter.com
              *Counsel to Seth Melamed*