**Exhibit A**

ARBITRATION UNDER THE ARBITRATION RULES OF THE
SINGAPORE INTERNATIONAL ARBITRATION CENTRE

------------------------------------------------------------

|  |  |  |
|---|---|---|
| SETH MELAMED, | : | |
| Claimant, | : | SIAC Case No.:  ARB602/25/VKH |
| v. | : | |
| THE FTX RECOVERY TRUST, | : | |
| Respondent. | : | |

------------------------------------------------------------

**RESPONDENT FTX RECOVERY TRUST'S
<u>RESPONSE TO NOTICE OF ARBITRATION</u>**

## TABLE OF CONTENTS

*Page*

**INTRODUCTION** ................................................................................................................1

**COUNTER-STATEMENT OF FACTS** .............................................................................6

    A.    The Parties ...........................................................................................................6

    B.    FTX's 2022 Rescue of Liquid.............................................................................7

    C.    Melamed's Claims in Bankruptcy Court ............................................................9

**CLAIMANT'S CLAIMS IN ARBITRATION**...................................................................11

I.    THE TRIBUNAL LACKS JURISDICTION OVER THESE CLAIMS ...........................12

II.    IN ANY EVENT, CLAIMANT'S CLAIMS ARE MERITLESS .....................................14

    A.    Melamed's Claims Do Not Assert Any Legally Cognizable Harm Distinct from the Harm He Purports To Exclude ..................................................14

    B.    Melamed's Claims Do Not Allege The Required Causal Connection Between The Alleged Fraud and The Claimed Damages .....................................15

        i.    *Melamed's Theory That He Was Defrauded into Accepting the Crypto Consideration Is Meritless*................................................16

        ii.    *Melamed's Theory That He Was Defrauded into Accepting the Cash Consideration Is Meritless*..................................................18

    C.    Melamed Does Not State a Legally Cognizable Claim for Breach of Contract or Indemnification .........................................................................19

**CLAIMED DAMAGES** ....................................................................................................20

**PROCEDURAL MATTERS** .............................................................................................20

**RESERVATION OF RIGHTS** .........................................................................................21

**RELIEF SOUGHT** ...........................................................................................................21

Pursuant to Rule 7 of the Arbitration Rules of the Singapore International Arbitration Centre (the "Rules"), Respondent FTX Recovery Trust (the "Respondent" or "Trust") submits this response (the "Response") to the notice of arbitration (the "Notice") submitted by Seth Melamed ("Claimant" or "Melamed").

## INTRODUCTION

1.      This matter arises out of the U.S. bankruptcy proceeding initiated after the collapse of a global cryptocurrency enterprise known as the FTX Group.  In November 2022, many of the companies that comprised the FTX Group, including FTX Trading Ltd. ("FTX"), the predecessor of Respondent, filed for bankruptcy in the United States Bankruptcy Court for the District of Delaware (the "Bankruptcy Court").[1]

2.      The instant dispute represents the latest in a series of efforts by Claimant Melamed to exploit the FTX bankruptcy in order to gain a windfall from FTX's pre-bankruptcy acquisition of a Japanese digital asset exchange firm called Liquid Group, Inc. ("Liquid"), all at the expense of FTX Group's other creditors.  FTX's purchase of Liquid was memorialized in a November 19, 2021 share purchase agreement (the "SPA," Ex. C-1), which is governed by Japanese law.  Melamed, a U.S. citizen, had a 22% equity stake in Liquid.  As part of the transaction, FTX agreed to pay him *31 times* the price he had paid for his stake in Liquid, and Melamed personally structured the forms of consideration he would receive for his shares—20% in cash (the "Cash Consideration"), 20% in cryptocurrencies to be paid at a later date (the "Crypto Consideration"), and 60% in FTX equity (the "FTX Consideration Shares").  In accordance with the SPA, FTX paid Melamed the Cash Consideration and FTX Consideration Shares when the

---

[1]      The Bankruptcy Court case is identified as *In re FTX Trading Ltd.*, No. 22-11068 (Bankr. D. Del. 2022), and is available at https://restructuring.ra.kroll.com/ftx.

transaction closed in April 2022.  Melamed also secured himself a highly paid executive position as Chief Operating Officer of the post-acquisition entity, FTX Japan.

3.    As is standard in U.S. bankruptcy proceedings, after FTX's collapse and bankruptcy filing, any creditors of FTX were required to file "proof of claim" forms with the U.S. Bankruptcy Court if they wished to preserve a claim to payment from the FTX estate.  Between June 29, 2023 and November 7, 2024, Melamed filed a series of claims against the estate in the Bankruptcy Court, including a claim for damages arising from FTX's acquisition of Liquid (the "SPA Claim," Ex. R-1) and claims relating to Melamed's subsequent employment with and termination from FTX Japan.  As relevant here, the SPA Claim sought two categories of relief: *first*, payment of the unpaid Crypto Consideration, which had not yet become due under the SPA at the time that FTX filed for bankruptcy, and *second*, damages based on alleged misrepresentations by FTX concerning its own financial condition and integrity, which Melamed contended induced him to sell a portion of his Liquid shares in exchange for the FTX Consideration Shares (which later became worthless).  Melamed's SPA Claim, as presented in the Bankruptcy Court, did not concern the Cash Consideration which had been satisfied.

4.    The Trust objected to Melamed's claims in the Bankruptcy Court; Melamed sought to compel arbitration; and the parties have been litigating in the Bankruptcy Court for a year and a half.  On July 22, 2025, after full briefing, the Bankruptcy Court ruled on three threshold issues:[2]  (i) the Court ruled that the portion of Melamed's SPA Claim based on the Crypto Consideration must be valued in accordance with the Bankruptcy Court's prior order which is binding on all creditors (and to which Melamed never objected) providing a uniform methodology

---

[2]    The Bankruptcy Court issued an oral ruling (*see* July 22, 2025 Hearing Tr., Ex. R-2), which was memorialized in two court orders (Exs. R-3, R-4).

for valuing digital asset claims against FTX (the "Estimation Order," Ex. R-5), and thus, Melamed cannot recover more than $1,558,871.90 for that portion of his claim; (ii) the Court ruled that the "remainder of the SPA [C]laim[]," which seeks damages for the FTX Consideration Shares based on allegations of fraud, must be treated as subordinate to (*i.e.*, given a lower priority than) other claims against FTX pursuant to FTX's Bankruptcy Court-approved plan of reorganization and applicable bankruptcy law; and (iii) the Court granted Melamed's motion to compel arbitration with respect to the limited remaining issues underlying the SPA Claim.  (Ex. R-2 at 118:16-22, 125:11-15, 126:23-25, 129:4-6.)  Those remaining issues are:  (a) whether Melamed is entitled to the unpaid Crypto Consideration under the terms of the SPA; and (b) what value, if any, Melamed is entitled to on his now-subordinated fraud claim in respect of the FTX Consideration Shares. That is the proper scope of any arbitration over Melamed's SPA Claim, and the Bankruptcy Court will ultimately determine the valuation and treatment of any arbitration award in accordance with its rulings on the threshold issues and whether Melamed is entitled to recover any value from the Trust.  Under U.S. bankruptcy law, the Trust may not make any payment to Melamed for the SPA Claim (or any other claim) that has not been authorized by the Bankruptcy Court in accordance with FTX's confirmed plan of reorganization (*see* Ex. R-7).

5.      Melamed's Notice, however, does not seek to resolve either of the two remaining issues underlying the SPA Claim.  With respect to the first issue, the Notice does not make any argument that Melamed is entitled to receive the Crypto Consideration in accordance with the terms of the SPA.  With respect to the second issue, the Notice asserts a new theory of fraud that is entirely different from the fraud alleged in the SPA Claim and that the Bankruptcy Court referred to arbitration.  While the SPA Claim alleges that FTX induced Melamed to accept the FTX Consideration Shares as consideration for his shares in Liquid by misrepresenting FTX's

financial condition and integrity, the Notice expressly disclaims any damages relating to the FTX Consideration Shares.  (Notice ¶ 28.)  Instead, the Notice asserts that FTX somehow induced Melamed to enter into a "harmful transaction structure and purchase price," resulting in Melamed selling 20% of his Liquid shares in exchange for the Crypto Consideration and 20% of his Liquid shares in exchange for the Cash Consideration.  (Notice ¶¶ 15, 16.)  The Notice asserts that this purported harm is "legally distinct" from the harm Melamed allegedly suffered with respect to 60% consideration in FTX Consideration Shares, and resulted from "distinct acts."  (Notice ¶ 38(c).)  Melamed does so, by his own admission, in an effort to end-run the Bankruptcy Court's ruling that any arbitration award on his fraud claim as originally presented to the Bankruptcy Court (premised on the FTX Consideration Shares) will be subordinated to the claims of other FTX creditors.  (Notice ¶ 29.)  The Tribunal should reject Claimant's shell game.

6.    *First*, Melamed cannot pursue his new theory of fraud in this arbitration because he did not expressly preserve it through the Bankruptcy Court claim process that Melamed freely pursued.  Indeed, the Bankruptcy Court limited the arbitrable matters to those asserted in the SPA Claim, which Melamed now describes as "legally distinct" from the claims he is pursuing here.  (Notice ¶ 38(c).)

7.    *Second*, even if he could bring his claim, Melamed's Notice seeks to recover for alleged harms that are not legally cognizable under Japanese law.  Melamed premises his claim on the assertion that he somehow suffered "legally distinct harms" with respect to each of the three tranches of Liquid shares that he sold to FTX in exchange for the Cash Consideration, Crypto Consideration, and FTX Consideration Shares, and that he can seek damages in respect of the cash and crypto while excluding the FTX Consideration Shares.  But the claims that Melamed asserts, and the relief that he seeks, are not permissible under Japanese law, which does not treat different

-4-

categories of assets culminating in a single transaction as creating multiple independent claims, protected interests, or legally cognizable harms.

8.      *Third*, Melamed's claim makes no sense in any event.  Establishing fraud under Japanese law would require proof that (a) FTX's allegedly deceptive acts were specifically directed at inducing Melamed to agree to the purportedly unfavorable transaction structure and purchase price; and (b) those acts caused him to suffer harm.  The only deceptive act Melamed has ever alleged is that FTX misrepresented its financial condition and integrity, and the only possible consideration on which that allegation would have had any bearing is the FTX Consideration Shares because their value turned on FTX's financial condition.  But in his Notice, Melamed has *expressly disclaimed* any claim related to the FTX Consideration Shares in an apparent attempt to circumvent the Bankruptcy Court's subordination ruling, and identifies no alleged misrepresentation that supposedly induced him to adopt the SPA transaction structure or accept a lower price than he asserts his Liquid shares were worth, or otherwise had a causal connection to any harm asserted.  Nor could Melamed make such an allegation because he, not FTX, chose the form of consideration he would receive based on his own preferences rather than any representation made by FTX.

9.      *Fourth*, Melamed's attempt to characterize his claim as one for breach of warranty or indemnification similarly fails.  (*See* Notice ¶¶ 21, 25.)  Melamed does not identify any alleged breach or misrepresentation that relates to the "distinct harm" he now alleges, and the SPA's indemnification provision is limited to losses arising from breaches of FTX's representations and warranties and thus fails for the same reason.

10.    For these reasons, and those that Respondent will present at later stages of this arbitration if it were to move forward, the Tribunal should issue an award dismissing all of Claimant's claims.

## COUNTER-STATEMENT OF FACTS

### A.    The Parties

11.    Claimant Seth Melamed is a U.S. citizen and the former Chief Operating Officer and representative director of FTX Japan, and before that, the Chief Operating Officer and major shareholder of FTX Japan's predecessor, Liquid.  Prior to FTX's acquisition, Liquid was a cryptocurrency holding company based in Japan, of which Melamed owned approximately 22%. Liquid operated a cryptocurrency exchange with its subsidiaries.

12.    Before filing for bankruptcy, the FTX Group operated a digital asset exchange, which provided cryptocurrency trading services to customers, and a cryptocurrency trading firm, which made and managed private investments, among other ventures within the digital assets industry.  As part of its rapid, global expansion, FTX's founder, Samuel Bankman-Fried, caused FTX to acquire a number of cryptocurrency companies around the world—often grossly overpaying for those target companies.  As the Bankruptcy Court has recognized, Bankman-Fried often acquired cryptocurrency companies for consideration that far exceeded their value, leading to huge windfalls for target company executives and major shareholders.  The instant dispute involves one such acquisition and windfall.

13.    On January 3, 2025, following the Bankruptcy Court's confirmation of the bankruptcy plan of reorganization, all assets of the FTX Group, including all claims and causes of action, were transferred to and vested in Respondent, a Delaware statutory trust established to recover, monetize, and distribute assets for the benefit of FTX Group stakeholders.

14.     The Trust is represented in this arbitration by:

Brian D. Glueckstein
Christopher J. Dunne
Andrew J. Finn
Pedro José Izquierdo
Sullivan & Cromwell LLP
125 Broad Street, New York, NY 10004
Tel:  (212) 558-4000
Facsimile:  (212) 558-3588
E-mail:     gluecksteinb@sullcrom.com
               dunnec@sullcrom.com
               finna@sullcrom.com
               izquierdop@sullcrom.com

## B.     FTX's 2022 Rescue of Liquid

15.     Before its acquisition by FTX, Liquid was struggling.  Under Melamed's leadership (along with others), the Liquid exchange had experienced multiple security breaches, including an incident on August 19, 2021 in which hackers siphoned nearly $95 million in customer funds.  That breach resulted from Liquid's failure to implement adequate controls to secure the exchange's cryptocurrency wallets.  The stolen assets were more than three times Liquid's assets, and after the hack, shareholder equity was negative.

16.     After the hack left Liquid desperate for cash, Bankman-Fried agreed to have FTX bail out Liquid with a USD $120 million loan in August 2021, which allowed Liquid to continue to operate.  By this point, Melamed had already acquired all of his Liquid shares, and thus personally benefitted from FTX's bailout.  Around the same time, FTX also reached a deal with Liquid's shareholders to acquire the cash-strapped Liquid for an additional *USD $200 million*. The Notice begins its articulation of facts there, omitting any mention of Liquid's dire financial situation or the fact that before the acquisition FTX had saved Liquid from insolvency.

17.     To consummate FTX's purchase of Liquid, FTX, Melamed, and other Liquid shareholders executed the SPA on November 19, 2021.  As set forth in Schedule 2 of the

SPA, Melamed sold his 12,203 shares of Liquid common stock and 510 Liquid stock options to FTX for a "Total Consideration" of over USD $44.5 million.  Melamed thus sold his shares for USD $3,510.41 per share.  In contrast, he had paid only $100 for many of those shares just a few months earlier, before Liquid was rendered insolvent on his watch.

18.    FTX was to pay the purchase price to Melamed in three forms of consideration:

- **60% in FTX Consideration Shares**, comprised of 1,019,070 shares of FTX common stock, then valued at USD $26,709,834.14.  (SPA Sch. 2.)  There is no dispute that Melamed received the FTX Consideration Shares at closing in accordance with the terms in the SPA.

- **20% in Cash Consideration**, comprised of USD $8,903,278.05.  (SPA Sch. 2.)  There is also no dispute that Melamed received the Cash Consideration at closing in accordance with the terms in the SPA.

- **20% in Crypto Consideration**, comprised of specified amounts of cryptocurrencies, then valued at USD $8,903,278.05.  (SPA Sch. 2.)  Melamed was to receive half of the Crypto Consideration one year after the transaction closed (April 4, 2023) and the remaining half two years after the transaction closed (April 4, 2024).  (SPA § 4.2.)  Melamed did not receive the Crypto Consideration because FTX filed for bankruptcy in November 2022, before any portion of the Crypto Consideration became due under the SPA.

19.    Melamed's Notice correctly summarizes the breakdown of the consideration owed under the SPA, but incorrectly asserts that FTX procured Melamed's consent to that structure.  (Notice ¶¶ 14, 16.)  In reality, the structure and form of Melamed's consideration were determined by Melamed himself, not FTX.  FTX gave Melamed the flexibility to decide how the purchase price would be allocated, and Melamed selected the structure and form of consideration—including the precise allocation of cash, cryptocurrencies, and FTX shares.  Melamed's self structuring of the transaction undercuts any notion of inducement relative to the transaction consideration.

20.     FTX's acquisition of Liquid closed on April 4, 2022, at which point Melamed not only received more than USD $8.9 million in Cash Consideration and FTX Consideration Shares then worth nearly USD $27 million, but also secured positions as Chief Operating Officer of FTX Japan and director of certain affiliated entities.  The Notice fails to mention those positions or the substantial salary that Melamed received in them, in addition to tens of thousands of U.S. dollars in monthly allowances for housing, childcare, and other personal benefits.  As Melamed has recognized in the U.S. bankruptcy proceedings, however, his employment was a condition of closing on the FTX acquisition, and thus constitutes additional consideration that he received.

21.     Melamed continued his employment with FTX Japan for a period after the FTX Group filed for bankruptcy in November 2022, but was ultimately terminated from all of his positions with the FTX Group for acting in a conflicted and self-interested manner in breach of his employment agreement.

### C.     Melamed's Claims in Bankruptcy Court

22.     Melamed filed five claims against the FTX estate in the Bankruptcy Court, thereby consenting to the Bankruptcy Court's jurisdiction.  The SPA Claim is the only one of Melamed's five claims that the Bankruptcy Court referred to arbitration.

23.     As relevant here, Melamed filed the SPA Claim with the Bankruptcy Court on June 29, 2023, seeking USD $35.6 million in purported damages primarily based on two claims: (i) a breach of contract claim seeking payment of the unpaid Crypto Consideration, which had not yet become due at the time FTX filed for bankruptcy (and which the Notice does not seek); and (ii) a claim for allegedly fraudulent misrepresentations that FTX made to Melamed concerning its own financial condition, which purportedly resulted in Melamed agreeing to accept the FTX Consideration Shares as a form of consideration under the SPA (and which the Notice has

expressly carved out from this arbitration).  The SPA Claim also asserted an entitlement to indemnification under the SPA, which, together with the alleged damages under the two primary claims, comprised Melamed's USD $35.6 million in claimed damages.  (SPA Claim ¶ 13.)

24.    FTX objected to Melamed's five operative claims, including the SPA Claim, in Bankruptcy Court.  During these proceedings, Melamed moved to compel arbitration of all of his claims.  After the parties collectively filed six briefs over the course of a year, supported by twelve fact and expert witness declarations comprising more than one thousand pages of submissions overall, the Bankruptcy Court issued a ruling on July 22, 2025 concerning three threshold issues:

(a)    *First*, the Court addressed "whether the portion of the SPA claim based on the [C]rypto [C]onsideration should be valued pursuant to the [E]stimation [O]rder," which provides a uniform method for valuing digital asset claims against FTX.  (Ex. R-2 at 118:18-20.)  The Court concluded that "the answer is yes, it should be."  (Ex. R-2 at 125:19-20.)  Accordingly, "any arbitration award Mr. Melamed obtains related to the unpaid Crypto Consideration" will be capped at USD $1,558,871.90.  (Ex. R-2 at 126:23–25.)  The Notice makes no mention of this portion of the Bankruptcy Court's ruling.

(b)    *Second*, the Court addressed "whether the remainder of the SPA [C]laim[] should be subordinated under Section 510(b)" of the U.S. Bankruptcy Code, which subordinates claims made by equity holders of a bankrupt company, including claims sounding in breach of contract and fraud.  (Ex. R-2 at 118:21-22.)  The Court "agree[d] with the Trust" and held that "the non-crypto portion of Mr. Melamed's claim must be subordinated, which includes any related indemnification claim."  (Ex. R-2 at 127:6-9, 129:4-6.)  The Court reserved judgment "to the extent that Mr. Melamed asserts an indemnification claim on account of the SPA Claim

-10-

arising from the unpaid Crypto Consideration," deferring that question "until such claim is clearly defined." (Ex. R-2 at 129:7-11.)

(c)     *Finally*, the Court granted Melamed's cross-motion to compel arbitration of the SPA Claim, but declined to compel arbitration of his other four claims or to stay those claims pending arbitration. (Ex. R-2 at 125:11-15.) The Notice incorrectly suggests that the Bankruptcy Court's arbitration ruling governs *any* claim Melamed might bring "with respect to the [SPA] transaction" (Notice ¶ 33), whereas the ruling only governs the claims that Melamed preserved in his timely-filed SPA Claim, namely, a claim for the unpaid Crypto Consideration and fraud claims for the FTX Consideration Shares predicated on alleged misrepresentations about FTX's financial condition.

25.     As a result of those Bankruptcy Court rulings, only two issues were to be addressed in arbitration: whether Melamed is entitled the unpaid Crypto Consideration, with any such recovery capped at USD $1,558,871.90 (Ex. R-2 at 126:23-25); and the liquidated amount, if any, of Melamed's subordinated fraud claims. (Ex. R-2 at 128:2-10). The Notice, however, does not seek to resolve either issue.

### CLAIMANT'S CLAIMS IN ARBITRATION

26.     Melamed submitted his Notice on or about November 12, 2025. In the Notice, he fundamentally recasts his SPA Claim in an effort to sidestep the Bankruptcy Court's rulings concerning how his claims must be valued and classified, including whether they are to be subordinated. The SPA Claim, as filed with the Bankruptcy Court, alleges only that FTX misrepresented its own financial condition and integrity, inducing Melamed to sell his Liquid shares in exchange for FTX Consideration Shares that later became worthless. Recognizing that any arbitral award on that theory "would be subordinated in the bankruptcy proceeding and receive

no recovery" (Notice ¶ 29), Melamed now advances a new fraud theory that excludes the FTX Consideration Shares from the requested relief.

27.     For the first time, Melamed asserts that FTX "procured" a "harmful transaction structure and purchase price" and assigns a valuation to Liquid that far exceeds the value he himself agreed to in the SPA and previously asserted in his SPA Claim in the Bankruptcy Court.  (Notice ¶¶ 16, 24, 38(d).)  The Notice specifically identifies two ways (both of them new) in which the SPA transaction structure allegedly harmed Melamed:  (i) the Crypto Consideration was purportedly "at risk" because the SPA provided that FTX was to retain this portion of consideration at closing, to be released one and two years after closing, and (ii) the nearly USD $9 million in Cash Consideration was somehow "a price far below the[] actual fair market value" of 20% of Melamed's Liquid shares.  (Notice ¶¶ 17(a), 38(b).)  These theories were not included in Melamed's proofs of claim filed with the Bankruptcy Court and thus never preserved for adjudication (either in arbitration or the Bankruptcy Court), are incoherent without the FTX Consideration Shares that formed the basis of Melamed's original fraud allegations, and are in any event contrary to the factual record.  Moreover, even if Melamed could pursue these new theories, any recovery he might seek to obtain through them will be restricted by the Bankruptcy Court's ruling that it will not enforce "any arbitration award Mr. Melamed obtains related to the unpaid Crypto Consideration" in excess of USD $1,558,871.90 and that it will subordinate "the remainder of the SPA [C]laim[]."  (Ex. R-2 at 126:23–25, 118:21–22.)

## I.     THE TRIBUNAL LACKS JURISDICTION OVER THESE CLAIMS.

28.     Melamed consented to the Bankruptcy Court's jurisdiction by filing his proofs of claim and engaging in extensive litigation in that forum.  That is undisputed.  (*See* Notice ¶ 34.)  As such, U.S. bankruptcy law applies in defining the scope of Melamed's preserved claims and whether he waived the claims asserted in the Notice.  Pursuant to U.S. bankruptcy law, all

creditors who wish to recover against a debtor must file a proof of claim with the bankruptcy court identifying the amount they assert that they are owed and their specific bases for recovery.  The proof of claim defines as a matter of law the scope of what has been preserved for adjudication.  The Bankruptcy Court set June 30, 2023 as the deadline to file proofs of claim in this case, after which all other non-customer claims against the estate are "forever barred."  (Ex. R-6 ¶ 13.) Melamed has undoubtedly waived the claims he asserts in the Notice; he not only failed to preserve them in a timely-filed proof of claim before that deadline, but he also never sought to raise them during the year and a half of litigation before the Bankruptcy Court.

29.     Because Melamed's new theory of fraud is, in his own words, "legally distinct" from those he preserved in his SPA Claim (Notice ¶ 38(c)), his SPA Claim did not operate to preserve the claims he now asserts.  For example:  (i) the fraud alleged in the SPA Claim is limited to the value of the FTX Consideration Shares (SPA Claim ¶¶ 24-28), whereas the fraud alleged in the Notice includes the Crypto Consideration and the Cash Consideration and specifically excludes the FTX Consideration Shares (Notice ¶ 28); (ii) the misrepresentations alleged in the SPA Claim are limited to statements concerning FTX's own financial condition and integrity, whereas Melamed now asserts (incorrectly) that FTX "procured" a "harmful transaction structure and purchase price" (Notice ¶ 16); and (iii) the SPA Claim seeks USD $35,613,112.19 in damages and concedes that Melamed's Liquid shares were collectively worth USD $44,516,390.24 (same as the "Total Consideration" in the SPA) (SPA Claim ¶ 24; SPA Sch. 2), whereas the Notice now asserts that "a conservative estimate" of Melamed's damages is USD $45 million, based on a purported fair market value of his Liquid shares that exceeds the valuation in the SPA and the SPA Claim *by over 200%* (Notice ¶ 24).

30. Moreover, Melamed also waived any right he may have had to arbitrate these claims because his motion to compel arbitration in the Bankruptcy Court was limited to his timely-filed proofs of claim, as was the Bankruptcy Court's subsequent arbitration order. Despite consenting to the Bankruptcy Court's jurisdiction, Melamed did not file a proof of claim for, or seek to compel arbitration over, the claims he now asserts. Nor did the Bankruptcy Court compel arbitration of such claims.

31. Under Singapore law, which governs the arbitration agreement, Melamed has abandoned any right to arbitrate the claims he now asserts because he acted inconsistently with such right by (i) filing five proofs of claim with the Bankruptcy Court, thereby consenting to its jurisdiction, but failing to include the "legally distinct" theories of harm or damages upon which he now seeks to recover, and (ii) seeking, and ultimately obtaining, leave from the Bankruptcy Court to arbitrate the SPA Claim but failing to include in that claim the new theories of recovery he asserts in the Notice, despite the fact that they arise out of the same SPA transaction. Melamed's attempt to use the arbitration agreement to sidestep the scope of arbitrable claims he himself presented to the Bankruptcy Court—and to evade the Bankruptcy Court's rulings on those claims—should thus be rejected, *inter alia*, on waiver and estoppel grounds and as an abuse of process on both the Bankruptcy Court and this Tribunal.

## II. IN ANY EVENT, CLAIMANT'S CLAIMS ARE MERITLESS.

### A. Melamed's Claims Do Not Assert Any Legally Cognizable Harm Distinct from the Harm He Purports To Exclude.

32. By carving out the FTX Consideration Shares and seeking to recover damages only attributable to the "legally distinct harms" he suffered in respect of the Crypto Consideration and Cash Consideration, Melamed dooms his claims. Under Japanese law, when a single alleged fraudulent inducement leads to the conclusion of a single contract—here,

Melamed's alleged inducement to enter into the SPA—the fact that the consideration is paid in different asset forms does not create multiple torts, multiple protected interests, or multiple legally cognizable harms.  Melamed cannot seek to recover damages on account of the Cash Consideration and Crypto Consideration on a theory that he suffered distinct injuries from these forms of consideration while excluding the FTX Consideration Shares.  Similarly, Melamed's request that the Tribunal "ensure that any award in the Claimant's favor explicitly confirms that any damages awarded *do not arise from the purchase of FTX shares*" (Notice ¶ 30 (emphasis added)) cannot possibly be met because the "purchase of FTX shares"—like Melamed's entitlement to Cash Consideration and Crypto Consideration—was part and parcel of a single transaction memorialized in the SPA, in which Melamed agreed to exchange his Liquid shares for FTX shares, cash, and crypto.  Put another way, Melamed's claims fail because they ask this Tribunal to fractionalize Melamed's interests in a way that is not possible under Japanese law.

B.   **Melamed's Claims Do Not Allege The Required Causal Connection Between The Alleged Fraud and The Claimed Damages.**

33.   Even if Melamed could segregate his claims with respect to the Cash Consideration and Crypto Consideration, his claims fail for a more fundamental reason:  his alleged fraud theory makes no sense without the FTX Consideration Shares, which he has strategically excluded from his Notice.  The only misrepresentations Melamed has ever alleged concern FTX's own value and, in turn, the value of the FTX Consideration Shares.  But those alleged misrepresentations are unrelated to the Crypto Consideration and the Cash Consideration.  Melamed now attempts to repackage his SPA Claim by asserting that he was somehow misled into accepting an unfair purchase price and "harmful transaction structure." (Notice ¶¶ 15-18, 38.) The Notice identifies two ways in which the transaction structure allegedly harmed Melamed (Notice ¶ 15), neither of which supports a viable claim of fraudulent inducement.

   i.  *Melamed's Theory That He Was Defrauded into Accepting the Crypto Consideration Is Meritless.*

34. The Notice first alleges that, if FTX had not misrepresented its handling of customer assets, Melamed "would not have agreed to allow FTX to hold [the Crypto Consideration] because he would have understood that this portion of the purchase price was at risk." (Notice ¶ 17(a).)  That theory fails.  Article 709 of the Japanese Civil Code requires Melamed to assert misrepresentations by FTX that were specifically directed at inducing him to structure the SPA transaction to hold his Crypto Consideration, and that such misrepresentations actually caused Melamed to agree to the transaction structure.

35. With respect to the requirement that the alleged misrepresentations were aimed at inducing Melamed to adopt the particular transaction structure, Melamed's general statements about FTX's treatment of customer assets (Notice ¶ 17(a)) are not specific to Melamed or the SPA transaction structure.  Instead, these general allegations about FTX's fraud on its customers apply equally to all FTX customers who trusted FTX with their digital assets for safekeeping.[3]

36. The required causation is also not satisfied because any disadvantage resulting from the SPA transaction structure arose from Melamed's own decision-making, not from any allegedly fraudulent conduct by FTX.  Melamed himself decided how to structure the SPA—including to receive the Crypto Consideration instead of additional cash—based on

---

[3] Melamed's newly articulated fraud theory thus also runs afoul of the global settlement provision of FTX's bankruptcy plan, which releases any claims by all creditors based on "the actual or purported fraud, unjust enrichment, misappropriation, conversion and misconduct of" FTX.  (Ex. R-7 § 5.2.)  The global settlement provision of FTX's bankruptcy plan would similarly apply to bar Melamed's breach of contract and indemnification theories discussed *infra* at section II.C.  For this additional reason, the Bankruptcy Court will not enforce any award on the claims asserted in the Notice.

considerations that benefitted himself, not any misrepresentations or undue influence of FTX. Melamed's assertion that FTX "procured" his consent to the "transaction structure" is utterly false.

37. Moreover, the Notice incorrectly asserts that FTX's custody of the Crypto Consideration "led ultimately to the Claimant being deprived of that tranche of the purchase price." (Notice ¶ 15(a).)  But Melamed is not deprived of the Crypto Consideration.  Melamed is entitled to receive the value of the Crypto Consideration in accordance with the terms of the SPA and Bankruptcy Court's Estimation Order.  The Estimation Order provides that value is determined as of the date that FTX filed for bankruptcy as a matter of law.  Any decline in value of the Crypto Consideration between when the SPA was signed and when FTX filed for bankruptcy was due to the decline in market price of the underlying cryptocurrencies, not any misrepresentations by FTX. Had Melamed elected to be paid in cash, FTX would have obliged him.  He did not, presumably because he expected the Crypto Consideration to increase in value.  In electing to receive the Crypto Consideration, Melamed was fully aware of the risk that the cryptocurrencies might decline in value by the time the Crypto Consideration became due under the SPA.

38. The Notice also asserts that Melamed received false assurances that his assets would be held in segregated wallets and not commingled with FTX assets.  (Notice ¶ 18.) But these alleged but unsubstantiated assurances—which are not memorialized in any document— apparently occurred "[a]fter the SPA was signed" and thus could not have caused Melamed to agree to the SPA transaction structure.  (Notice ¶ 18.)  And regardless of whether the Crypto Consideration was held in segregated wallets or commingled, it would nonetheless be valued in the exact same way, in accordance with the Estimation Order.

ii.   *Melamed's Theory That He Was Defrauded into Accepting the Cash Consideration Is Meritless.*

39.   The Notice also asserts that "if FTX had not made misrepresentations to the Claimant as to the legitimacy of its business practices, and had not engaged in predatory business practices (including abuses of superior bargaining position) while the Claimant was under economic duress, the Claimant never would have agreed to sell 20% of his interests in Liquid to FTX for cash." (Notice ¶ 17(b).)  This claimed harm fails under Japanese law, including because the Notice does not:  (i) provide any explanation whatsoever as to how any alleged misstatement about FTX's business practices was specifically directed at inducing Melamed to accept USD $8,903,278.05 in cash at closing; (ii) articulate any causal link between such alleged misrepresentations and Melamed's decision to accept the Cash Consideration; or (iii) explain how receiving nearly USD $9 million in cash at closing could have possibly caused Melamed any harm.  A cash payment at closing is, by definition, the least speculative and most protective form of consideration a seller can receive.  Nor does the Notice identify any "predatory business practices" or "abuses of superior bargaining position" by FTX, or connect these vague assertions to the Cash Consideration that Melamed indisputably received at closing.  (Notice ¶ 17(b).)

40.   To the extent that Melamed argues that he was "grossly undercompensated for the value of that stake" (Notice ¶ 15(b)), the Notice again fails to identify any misrepresentation that could have induced such supposed underpayment.  The Notice alleges only that FTX misrepresented *its own* business practices, which were unrelated to the valuation of Liquid.  This new argument is also contrary to Melamed's sworn statements in the SPA Claim, which asserted that the "true value" of his Liquid shares was USD $44,516,390.24—the precise amount of the combined consideration stated in the SPA.  (SPA Claim ¶ 24; *see* SPA Sch. 2.)  Thus, on Melamed's own valuation, the cash payment—which represented 20% of the total consideration—

-18-

was fully consistent with the value of that 20% portion of his holdings.  Having effectively concluded that the cash component was fair, Melamed cannot now plausibly recast the Cash Consideration as the product of fraud.  Moreover, Melamed's belated assertion that the purchase price for Liquid was an underpayment reverses reality:  FTX *bailed out* Liquid, compensating its shareholders well in excess of its shares' value, and Melamed benefitted disproportionately from that bailout.

### C.    Melamed Does Not State a Legally Cognizable Claim for Breach of Contract or Indemnification.

41.    The Notice also appears to assert an entitlement to recover a broad category of "losses" under the representation and warranty in the SPA that FTX would not provide false information to Claimant and the SPA's indemnification provision, which indemnifies losses resulting from such warranty.  (*See* Notice ¶¶ 21-25, 38(e).)  But Melamed does not identify any warranty in the SPA that relates to the "distinct harm" he now alleges—namely, being deprived of the supposed value of the 40% of his Liquid shares associated with the Cash Consideration and Crypto Consideration.  All of FTX's warranties in the SPA concern its own financial condition, authority, and corporate standing, not the transaction structure of the SPA or the value of Liquid.  And because the SPA's indemnification clause is expressly limited to losses resulting from any breach of these representations and warranties (SPA § 9.3), Melamed's indemnification argument fails for the same reason.

42.    Finally, Melamed cannot recover legal fees or other costs incurred in pursuing claims in amounts that exceed what he is entitled to receive.  The indemnification clause does not permit recovery of expenses incurred in repeatedly litigating issues already resolved by the Bankruptcy Court.  From the outset of this dispute, the Trust has indicated that it would agree to allow Melamed's claim for the Crypto Consideration in accordance with the values set forth in

the Court's Estimation Order.  Melamed's excessive litigiousness and continued efforts to seek far more than he is entitled to is not within the scope of indemnifiable losses contemplated in the SPA.[4]  Nor can Melamed fairly be said to have mitigated any such losses, as required under the SPA's indemnification provision, in light of the foregoing.  (SPA § 9.6.)

## CLAIMED DAMAGES

43.    Even if Melamed's claim with respect to the Crypto Consideration had merit, he may not relitigate the treatment or valuation of that claim, as the Bankruptcy Court, to which he freely brought his claim, has already ruled that "any arbitration award Mr. Melamed obtains related to the unpaid [C]rypto [C]onsideration" must be valued in accordance with the Estimation Order.  (Ex. R-2 at 126:24-25.)  Thus, to the extent Melamed seeks to recover damages in respect of the Crypto Consideration exceeding USD $1,558,871.90, such recovery is barred by *res judicata* as a matter of law.  Moreover, even if *res judicata* were not applicable, it is undisputed that any arbitral award will ultimately be subject to the Bankruptcy Court's allowance, classification, and valuation (Notice ¶ 34), and the Bankruptcy Court has made clear that it will not enforce any award in excess of that amount.

## PROCEDURAL MATTERS

44.    Respondent confirms that Clause 19 of the SPA provides for arbitration under the SIAC Rules, and that the arbitration agreement "shall be governed by the laws of

---

[4]    In fact, Melamed's U.S. counsel has been reprimanded by the Bankruptcy Court on numerous occasions for his attempts to relitigate settled matters.  (*See, e.g.*, Nov. 24, 2025 Hearing Tr., Ex. R-8 at 40:9–17 (The Court:  "I had hearings on this, a lot of time over the summer devoted to your client's issues . . . So, why am I here, the Monday before Thanksgiving, hearing from this again"); Ex. R-8 at 42:1–10 (The Court:  "I'm just not going to do this anymore," "we all agreed on how this was going to move forward and that hasn't been done"); Ex. R-2 at 118:23-119:4 (The Court:  "Melamed argues that the Court should not address the second and third [threshold] questions" but "I already have ruled" that "it's appropriate").)

Singapore," any arbitral tribunal shall consist of three arbitrators, and that "[t]he language of the arbitration proceedings shall be English." (SPA §§ 19.3-19.5.) Respondent confirms that the SPA provides for Singapore as the place of arbitration, (SPA § 19.4), but objects to the jurisdiction of any arbitral tribunal constituted under the SPA to adjudicate the claims currently asserted by Claimant.

45. Without prejudice to its jurisdictional objection, Respondent nominates Mr. Daniel Schimmel to serve as Co-Arbitrator, whose contact information is as follows:

> Foley Hoag LLP
> 1301 Avenue of the Americas,
> New York, NY 10019
> Tel:  (212) 812-0320
> Facsimile:  (212) 812-0399
> Email:  dschimmel@foleyhoag.com

## RESERVATION OF RIGHTS

46. Respondent reserves the right to amend this Response at later stages of this proceeding, and seek any further relief necessary in any appropriate venue.  By submitting this Response, Respondent does not consent to jurisdiction of any arbitral tribunal and does not waive, and expressly reserves, any and all objections to the jurisdiction of the Tribunal.

## RELIEF SOUGHT

47. For the foregoing reasons, the Trust respectfully requests that the Tribunal issue an award:

(a) Declaring that the Tribunal lacks jurisdiction to adjudicate any of the claims described in the Notice;

(b) Dismissing Melamed's claims in their entirety;

(c) Declaring that Melamed may not recover more than USD $1,558,871.90 for his claim in respect of the Crypto Consideration; and

-21-

      (d)    Granting such other relief as may be appropriate, including but not limited to ordering the reimbursement of all Respondent's costs, expenses, and attorneys' fees incurred in connection with this arbitration pursuant to Rule 58.1.

Dated: New York, New York
       December 10, 2025

            Respectfully submitted,

            Brian D. Glueckstein
            Christopher J. Dunne
            Andrew J. Finn
            Pedro José Izquierdo
            SULLIVAN & CROMWELL LLP
            125 Broad Street
            New York, NY 10004

            *Attorneys for Respondent*