**Exhibit B**

IN THE MATTER OF AN ARBITRATION UNDER THE ARBITRATION RULES OF THE SINGAPORE INTERNATIONAL ARBITRATION CENTRE

**SETH MELAMED**

(CLAIMANT)

-VERSUS-

**THE FTX RECOVERY TRUST**

(RESPONDENT)

APPLICATION FOR EARLY DISMISSAL

3 April 2026

MORI HAMADA

Marunouchi Park Building, 2-6-1 Marunouchi
Chiyoda-ku, Tokyo 100-8222, Japan

1

TABLE OF CONTENTS

I.    INTRODUCTION ........................................................................... 3

II.   BACKGROUND ............................................................................ 4

   A.   Legal standard ...........................................................................4

   B.   The object of this application ....................................................4

   C.   Whether the application should be permitted to proceed ...........6

III.  IT IS MANIFEST THAT THERE IS A VALID AND EFFECTIVE ARBITRATION AGREEMENT
THAT ENCOMPASSES THIS DISPUTE ..................................................... 7

   A.   There is an arbitration agreement that encompasses this dispute ...............8

   B.   The arbitration agreement has not been waived, abandoned, or supplanted8

IV.   CONTENTIONS THAT THE CLAIMANT HAS ASSERTED CLAIMS IMPROPERLY FROM THE
PERSPECTIVE OF US BANKRUPTCY LAW CANNOT GROUND OBJECTIONS TO JURISDICTION
............................................................................... 10

   A.   The distinction between jurisdiction and admissibility ..............10

   B.   Contentions as to exceeding the scope of the Proof of Claim......................12

   C.   Contentions as to acting "inconsistently" with the right to arbitrate specific
claims ...........................................................................................13

   D.   Disclaimer and context...............................................................14

V.    REQUEST FOR RELIEF ................................................................. 15

## I. INTRODUCTION

1.   Rule 47 of the SIAC Rules empowers the Tribunal to order early dismissal of claims or defenses that are "manifestly without legal merit".

2.   The Respondent's challenge to the Tribunal's jurisdiction lacks legal merit, and that deficiency is manifest. The Claimant therefore respectfully requests that the Tribunal dismiss that challenge now.

3.   Even assuming all facts alleged by the Respondent to be true, the Respondent has not alleged grounds that could support a challenge to the Tribunal's jurisdiction.

   ①   The SPA contains a valid arbitration agreement, the scope of which plainly covers these claims. At all times the Claimant explicitly preserved his rights under the SPA's arbitration agreement, and the bankruptcy court has ordered the enforcement of the SPA's arbitration agreement as written.

   ②   The Respondent's contentions that some of the Claimant's claims might be misaligned with the Claimant's submissions to the bankruptcy court are—at most—objections to the admissibility of those claims. They do not bear in any way on this Tribunal's underlying jurisdiction.

4.   That the Respondent's challenge to jurisdiction manifestly lacks legal merit is, on its own, sufficient reason under Rule 47 to dismiss it now. There is no compelling reason for manifestly unmeritorious jurisdictional objections to be allowed to linger for

any amount of time.

## II. BACKGROUND

### A. LEGAL STANDARD

5.    The legal standard for this application is set out in Rule 47.1(a) of the SIAC Rules, which permits a party to apply for early dismissal of "a claim or a defence" where it is "manifestly without legal merit". The Tribunal's decision can take the form of a ruling, order, or award, with reasons in summary form.

6.    Manifest lack of legal merit is usually understood to mean that the lack of merit is "'plain', 'clear', 'obvious', 'evident' and easily understood or recognized by the mind". It is not a matter of the gravity of the problem, but of the ease of perceiving it.[1]

7.    The Claimant's position is therefore that the Tribunal should assume, solely for the purpose of this application, the correctness of the Respondent's own pleaded premises (in particular, the Respondent's premise that there might be a misalignment between the claims that the Claimant has submitted in this arbitration and those submitted in the bankruptcy). Even on that assumption, the plea that the Tribunal lacks jurisdiction cannot succeed, because the Respondent's contentions do not bear on the Tribunal's jurisdiction.

### B. THE OBJECT OF THIS APPLICATION

8.    This application concerns one specific request for relief.

9.    In paragraph 47(a) of the Response, the Respondent has requested that the Tribunal issue an award "[d]eclaring that the Tribunal lacks jurisdiction to adjudicate any of the claims

---

[1]    Attachment 1, Lingard, Choong, Mangan: Guide to the SIAC Rules, 11.31.

4

described in the Notice".

10.  That request for relief remains live. In its letter of 27 March 2026, the Respondent confirmed that, although it is not seeking an "immediate intervention" on its objections, the objections are not withdrawn.

11.  The grounds advanced by the Respondent as support for its request for a declaration of no jurisdiction can be found in paragraphs 28 to 32 of the Response to the Notice of Arbitration. Those paragraphs comprise a section that is entitled "[t]he Tribunal lacks jurisdiction over these claims".

12.  The specific contentions that the Respondent makes in that section are as follows:

①  In paragraph 28 of the Response, the Respondent asserts that some or all of the Claimant's claims might not have been asserted in the bankruptcy, and that any claims not asserted in the bankruptcy proceeding are "forever barred" and "undoubtedly waived".

②  In paragraph 29 of the Response, the Respondent asserts that the Claimant has argued his case using a case theory that is "legally distinct" from what was contemplated in the bankruptcy court's order to compel arbitration.

③  In paragraph 31 of the Response, the Respondent asserts that "[u]nder Singapore law, which governs the arbitration agreement, Melamed has abandoned any right to arbitrate the claims he now asserts because he acted inconsistently with such right".

④  Paragraph 31 of the Response further asserts that, to the extent that the Claimant has asserted claims that were not covered by the court's order compelling arbitration, the

5

Claimant has engaged in an "abuse of process", and should on that basis be estopped from pursuing some or all of his claims.

13. All of these contentions concern whether the Claimant has raised claims or arguments in this arbitration in respect of which the bankruptcy court might ultimately decide not to allow the estate to pay. That point has nothing to do with the parties' consent to arbitrate disputes relating to the SPA, and therefore does not bear on this Tribunal's jurisdiction.

14. Finally, although the Respondent's recent letter referred both to "jurisdiction" and "admissibility" in respect of its objections, there can be no question that the Respondent has <u>not</u> sought a declaration that any claim might be inadmissible. If the Respondent comes to wish also to challenge the admissibility of any of the Claimant's claims, it will need to state that request for relief and articulate a justification corresponding to the relevant legal principles. The Claimant's rights to respond are reserved.

### C. WHETHER THE APPLICATION SHOULD BE PERMITTED TO PROCEED

15. Finally, there is one threshold procedural issue: that Rule 47.3 of the SIAC Rules calls for the Tribunal first to determine whether the application is allowed to proceed.

16. The purpose of this provision is to give the Tribunal the power "to prevent applications for early dismissal from proceeding if they are obviously unfounded or merely aim at delaying or complicating the proceedings".[2]

17. For the avoidance of doubt:

① The application would not delay the proceedings, as the Claimant requests that the Tribunal determine this application

---

[2]    Attachment 1, Lingard, Choong, Mangan: Guide to the SIAC Rules, 11.43.

in parallel, with no interruption to the merits proceedings.

②  The application would not complicate the proceedings. The Claimant merely seeks early determination of an issue that would be litigated in any event, and the Claimant has raised the application as early as possible. For the avoidance of doubt, the Claimant first urged the Respondent to withdraw its request for a declaration of no jurisdiction voluntarily, but the Respondent has chosen not to do so.

③  Even if the Respondent ultimately submits similar arguments in a way that does not purport to challenge the Tribunal's jurisdiction, that would not mean that this application complicated the proceedings (much less that it had "aimed" to do so). Rather, if the effect would be that the Respondent's objection would be articulated within a more appropriate legal framework, that would still yield a net reduction of the arbitration's complexity by enabling the Respondent's objections to be addressed with clarity as to whether they bear on jurisdiction, admissibility, or some other issue.

## III.  IT IS MANIFEST THAT THERE IS A VALID AND EFFECTIVE ARBITRATION AGREEMENT THAT ENCOMPASSES THIS DISPUTE

18.  This section establishes two threshold points for the avoidance of doubt:

①  The Respondent does not dispute that the Claimant's claims fall within the scope of the SPA's arbitration agreement.

②  The Respondent has not submitted any grounds to contradict the fact that the arbitration agreement remains in effect as

written.

### A. THERE IS AN ARBITRATION AGREEMENT THAT ENCOMPASSES THIS DISPUTE

19.    It is undisputed that Clause 19 of the SPA is an arbitration agreement. It is also undisputed that Clause 19 of the SPA is governed by Singapore law, which implements the UNCITRAL Model Law.

20.    In terms of its scope, Clause 19 is broad. It applies to "any dispute, controversy or claim arising in any way out of or in connection with" the SPA. It explicitly includes contractual, pre-contractual, and non-contractual rights, obligations, and liabilities, and issues concerning existence, validity, breach, or termination.

21.    The Respondent has not asserted that Clause 19 is invalid, void, inoperative, or incapable of performance. Nor has the Respondent asserted that the claims described in the Notice fall outside the textual scope of Clause 19.

22.    In short, the Respondent has raised no issue with the submission of this dispute to arbitration other than issues relating to the bankruptcy proceedings.

### B. THE ARBITRATION AGREEMENT HAS NOT BEEN WAIVED, ABANDONED, OR SUPPLANTED

23.    Nor has anything that has occurred in the bankruptcy proceedings affected the validity, effectiveness, or scope of the arbitration agreement itself.

24.    Under Singapore law, a party does not lose the right to rely on an arbitration agreement by commencing and maintaining court proceedings in the face of that agreement (even proceedings that are wholly incompatible with the arbitration agreement) unless it

8

has done so "in the absence of explanation or qualification".[3]

25.   It would be impossible for the Respondent to satisfy that standard. The Claimant's Proof of Claim in the bankruptcy proceeding clearly and explicitly reserved the right to seek resolution of his claims in arbitration.

26.   Specifically:

①   The Proof of Claim states at paragraph 32 that "Claimant reserves the right to seek resolution of his claims in Singapore-based arbitral proceedings".[4]

②   In addition, the Proof of Claim states at paragraph 33 that "[n]othing contained in Claimant's Proof of Claim nor any subsequent appearance, pleading, claim or suit is intended to be a waiver or release of: […] (d) the right of Claimant to have any unliquidated portions of the Claims determined by applicable state, federal, or foreign courts or tribunals; […] (f) the right to arbitration of any dispute".[5]

③   The Claimant then acted consistently with his intention to rely on the arbitration agreement. It is undisputed that he sought to compel arbitration of his claims pursuant to the SPA's arbitration agreement.

27.   It is obvious that the Claimant's conduct on this is the opposite of waiver or abandonment of the arbitration agreement, but recent Singapore authority in any event confirms the point. In Singapore, participation in an insolvency process by filing a proof of debt does not, without more, render the arbitration agreement ineffective or preclude the creditor from pursuing arbitration outside the

---

[3]   Attachment 2, Marty Ltd v Hualon Corp (Malaysia) Sdn Bhd [2018] SGCA 63.
[4]   Exhibit R-1.
[5]   Exhibit R-1.

insolvency process.[6]

28.    Further, and for the avoidance of doubt, the Bankruptcy Court's order compelling arbitration does not purport to impose a new arbitration agreement or to alter the terms of the SPA's arbitration agreement. As the Bankruptcy Judge explained during the 22 July 2025 oral hearing, the question before her was "whether the arbitration agreement in the SPA should be enforced".[7]

## IV. CONTENTIONS THAT THE CLAIMANT HAS ASSERTED CLAIMS IMPROPERLY FROM THE PERSPECTIVE OF US BANKRUPTCY LAW CANNOT GROUND OBJECTIONS TO JURISDICTION

29.    What the Respondent <u>has</u> argued manifestly does not constitute a *prima facie* challenge to the Tribunal's jurisdiction.

30.    All of the Respondent's contentions in the "jurisdiction" section of the Response to the Notice of Arbitration relate not to the Tribunal's power, but to the possible effect of the bankruptcy proceedings or the Claimant's conduct on the Claimant's claims. These contentions manifestly do not describe a potential defect in the Tribunal's jurisdiction or otherwise support an objection to the Tribunal's jurisdiction.

### A.  THE DISTINCTION BETWEEN JURISDICTION AND ADMISSIBILITY

31.    As a starting point, Singapore law implements a strict conceptual distinction between jurisdiction and other objections, such as admissibility.

32.    A jurisdictional objection challenges the Tribunal's authority to decide the dispute. An admissibility objection is a contention that the claim should not be heard, should not be heard yet, or should

---

[6]    Attachment 3, Sapura Fabrication Sdn Bhd v GAS [2025] SGCA 13, para 100.
[7]    Exhibit R-2, page 121.

not be heard in the form in which it is advanced.

33. The key to the distinction is the target of the objection. If the objection is directed at the Tribunal, it is jurisdictional. If it is directed at the claim, it is an objection to admissibility. As the Singapore High Court has put it:

> The "tribunal versus claim" test asks whether the objection is targeted at the tribunal (in the sense that the claim should not be arbitrated due to a defect in or omission to consent to arbitration), or at the claim (in that the claim itself is defective and should not be raised at all).[8]

34. The consequences of this distinction are practical and significant. Under Singapore law, an arbitral tribunal's determination on jurisdiction is fully reviewable by a court, while an arbitral tribunal's determination on other issues (such as an admissibility objection) is not reviewable.[9]

35. To be clear, by contrasting jurisdiction and admissibility, the Claimant is not suggesting that the Respondent's arguments support objections to the admissibility of any claim. The Claimant's view is that the Respondent's arguments are, at most, arguments that the Respondent may wish to present to the bankruptcy court after the arbitration, at the stage of claim allowance.

36. But, again, that is an aside: the Respondent has not requested any form of relief relating to admissibility. The only question presented in this application is whether the Respondent's challenge to the jurisdiction of the Tribunal is manifestly without

---

[8]     Attachment 4, BBA v BAZ [2020] SGCA 53, para 77.
[9]     See Attachment 4, BBA v BAZ [2020] SGCA 53, para 83.

legal merit.

## B. CONTENTIONS AS TO EXCEEDING THE SCOPE OF THE PROOF OF CLAIM

37.    In challenging the Tribunal's jurisdiction, the Respondent begins with two related arguments:

①    The Respondent first contends that it might be a rule of United States Bankruptcy Law that claims not included within a valid proof of claim become "forever barred" after the claims deadline. On that basis, the Respondent contends that it should be held that the Claimant has "undoubtedly waived" any claims that are found not to have been within the scope of the Proof of Claim.

②    The Respondent further contends, in a similar vein, that the Claimant's current theory of fraud is "legally distinct" from the theory preserved in his Proof of Claim or as to which he sought to compel arbitration, and that the Bankruptcy Court's order to compel arbitration therefore did not encompass that "legally distinct" claim.

38.    Whether or not they have any merit, these arguments manifestly do not support a challenge to the Tribunal's jurisdiction. Neither point concerns the validity or scope of the SPA's arbitration agreement or the parties' consent to arbitration. Both instead concern the status of the Claimant's claims—specifically, whether there might have been a waiver of the claims or there might exist some external reason not to proceed to the adjudication of his claims at this point in time. Under Singapore law, that is, at most, an objection to claim admissibility.

39.    There can be no serious question that whether a claim may be time-barred, waived, or precluded has nothing to do with whether it falls within the scope of a valid, broadly-scoped arbitration

agreement that contains no relevant exceptions. Even if the Claimant's claims were to be found to fall outside the scope of the Proof of Claim, it would not mean that the Tribunal lacked jurisdiction under Clause 19. It would not even be material to the question of the Tribunal's jurisdiction.

## C. CONTENTIONS AS TO ACTING "INCONSISTENTLY" WITH THE RIGHT TO ARBITRATE SPECIFIC CLAIMS

40. The Respondent also contends—again, in the section of its Response to the Notice of Arbitration arguing that the Tribunal lacks jurisdiction—that the Claimant's claims should be rejected on "estoppel grounds and as an abuse of process".

41. Although presented distinctly, these contentions concern the same underlying point as the one discussed above: that what the Claimant is arguing in this arbitration might not be fully aligned with what the Claimant wrote in his Proof of Claim. These, too, are claim-level objections, concerning only whether the Bankruptcy Court is seeking to restrain the Claimant from submitting these claims in arbitration.

42. Specifically, the Respondent has contended that the Claimant should not now be allowed to bring these claims in this arbitration on the basis that he might have "acted inconsistently" with his right to arbitrate these claims by:

① "filing five proofs of claim with the Bankruptcy Court, thereby consenting to its jurisdiction, but failing to include the 'legally distinct' theories of harm or damages upon which he now seeks to recover" and/or

② "seeking, and ultimately obtaining, leave from the Bankruptcy Court to arbitrate the SPA Claim but failing to include in that claim the new theories of recovery he asserts in the Notice, despite the fact that they arise out of the same SPA

13

transaction".

43. In other words, the Respondent's contention is that, at least with respect to some claims or "theories of recovery", the Claimant might have waived those claims or that the Bankruptcy Court might have intended to prevent the Claimant from submitting those claims (or theories of recovery) in arbitration.

44. These contentions therefore fail to support an objection to jurisdiction for the same conceptual reason as the contentions addressed in the previous section. These are not challenges to the validity or scope of the parties' consent to arbitration in the SPA's arbitration agreement, which is the basis of this Tribunal's jurisdiction. Characterizing this issue as a matter of estoppel or "abuse of process" does not grant it a jurisdictional dimension.

### D. DISCLAIMER AND CONTEXT

45. Finally, and for the avoidance of doubt, the Claimant does not accept that there is any underlying merit to the Respondent's contentions as to time-bar, waiver, or preclusion. The Claimant's position is that all of the claims asserted in the Notice of Arbitration were included in the Proof of Claim, and that there is no misalignment. In particular, it certainly is not the case that the Claimant's position is that his claims in this arbitration are "legally distinct" from those asserted in the bankruptcy, as the Respondent has suggested—that is a severe misreading of what the Claimant has submitted.[10]

46. On that point, and purely by way of context, the Claimant notes that the Proof of Claim is worded broadly and clearly states the

---

[10] What the Claimant has submitted is that the fraudulent behavior that the Claimant identified in the Proof of Claim and in the Notice of Arbitration led to multiple harms that are, under Japanese law, "legally distinct". The loss that the Claimant suffered as a result of fraud in respect of the Share Consideration is "legally distinct" from the loss that the Claimant suffered in respect of the Retained Consideration. Nowhere did the Claimant suggest that his claims in the Notice of Arbitration should be considered "legally distinct" from those covered in the Proof of Claim.

Claimant's view that FTX is liable to him in damages "under theories of Japanese law"[11] because FTX defrauded him, including "fraud on Claimant in the inducement to sign the SPA and in the execution, performance and breach of the SPA".[12] The Claimant preliminarily quantified his losses as "not less than" a particular figure, and explicitly distinguished between damages in respect of "the purchase price" and damages in respect of "the Retained Consideration".[13] Damages in respect of FTX's indemnification obligation were also distinguished.

47.     Should the Respondent later resurrect any contention that the Claimant's claims in this arbitration were not covered by the Proof of Claim, whether in the context of a request for a declaration of inadmissibility or in any other context, the Claimant stands ready to explain in full why contentions of that nature are wrong.

## V.  REQUEST FOR RELIEF

48.     For the reasons set out above, the Claimant respectfully requests that the tribunal issue a Partial Award:

   (a) DISMISSING the Respondent's request for a declaration that the Tribunal lacks jurisdiction.

Respectfully submitted

*Mori Hamada & Matsumoto*

Mori Hamada & Matsumoto

Counsel for the Claimant

---

[11]     Exhibit R-1, paragraph 13.
[12]     Exhibit R-1, paragraph 4.
[13]     Exhibit R-1, paragraph 4.

**Exhibit C**

UNITED STATES BANKRUPTCY COURT
DISTRICT OF DELAWARE


IN RE:                              .  Chapter 11
                                    .  Case No. 22-11068 (JTD)
FTX TRADING LTD., *et al.,*         .
                                    .  (Jointly Administered)
                                    .
                                    .  Courtroom No. 5
                                    .  824 North Market Street
            Debtors.               .  Wilmington, Delaware 19801
                                    .
                                    .  Monday, October 7, 2024
. . . . . . . . . . . . . . . . .  10:00 a.m.

                    TRANSCRIPT OF HEARING
           BEFORE THE HONORABLE JOHN T. DORSEY
                UNITED STATES BANKRUPTCY JUDGE

APPEARANCES:

For the Debtors:          Adam Landis, Esquire
                          LANDIS RATH & COBB LLP
                          919 Market Street
                          Suite 1800
                          Wilmington, Delaware 19801

                          Brian Glueckstein, Esquire
                          Andrew Dietderich, Esquire
                          Alexa Kranzley, Esquire
                          SULLIVAN & CROMWELL LLP
                          125 Broad Street
                          New York, New York 10004


(APPEARANCES CONTINUED)

Audio Operator:           Jermaine Cooper, ECRO

Transcription Company:    Reliable
                          The Nemours Building
                          1007 N. Orange Street, Suite 110
                          Wilmington, Delaware 19801
                          Telephone: (302)654-8080
                          Email: gmatthews@reliable-co.com

Proceedings recorded by electronic sound recording,
transcript produced by transcription service.

APPEARANCES (CONTINUED):

For Sunil Kavuri,
Ahmed Abd El-Razek,
Pat Rabbitte:                    David Adler, Esquire
                                 MCCARTER & ENGLISH LLP
                                 Worldwide Plaza
                                 825 Eighth Avenue
                                 31st Floor
                                 New York, New York 10019

For the Committee of
Unsecured Creditors:             Kenneth Pasquale, Esquire
                                 PAUL HASTINGS LLP
                                 200 Park Avenue
                                 New York, New York 10166

For the SEC:                     William Uptegrove, Esquire
                                 U.S SECURITIES AND EXCHANGE
                                    COMMISSION
                                 950 East Paces Ferry Road, NE
                                 Suite 900
                                 Atlanta, Georgia 30326

For the U.S. Trustee:            Benjamin Hackman, Esquire
                                 OFFICE OF THE UNITED STATES TRUSTEE
                                 844 King Street, Suite 2207
                                 Lockbox 35
                                 Wilmington, Delaware 19801

For LayerZero Group:             William Dalsen, Esquire
                                 Jordan Sazant, Esquire
                                 PROSKAUER ROSE LLP
                                 1 International Plaza
                                 Boston, Massachusetts 02110

For the Ad Hoc
Committee of Non-Us
Customers of FTX.com:            Erin Broderick, Esquire
                                 EVERSHEDS SUTHERLAND
                                 227 West Monroe Street
                                 Suite 6000
                                 Chicago, Illinois 60606

APPEARANCES (CONTINUED):

For the Celsius
Litigation
Administrator:            Richard Levy, Esquire
                          PRYOR CASHMAN LLP
                          7 Times Square
                          40th Floor
                          New York, New York 10036

For the Bahamian
Liquidators:              Christopher Shore, Esquire
                          WHITE & CASE LLP
                          1221 Avenue of the Americas
                          New York, New York 10020

For the Class
Action Plaintiffs:        Andrew Entwistle, Esquire
                          ENTWISTLE & CAPPUCCI LLP
                          230 Park Avenue
                          3rd Floor
                          New York, New York 10169

For Steadview Capital
Mauritius Limited:        Douglas Mintz, Esquire
                          SCHULTE ROTH & ZABEL LLP
                          555 13th Street, NW
                          Suite 6W
                          Washington, DC 20004

Pro Se Litigants:         Kihyuk Nam
                          Lidia Favario
                          Arush Sehgal

INDEX

MOTIONS:                                                              PAGE

Agenda
Item 3: Second Amended Joint Chapter 11 Plan of              15
        Reorganization of FTX Trading Ltd. and
        its Debtor Affiliates [D.I. 26029;
        Filed on 9/30/24]

Agenda
Item 4: The Celsius Litigation administrator's
        Motion for Relief from the Automatic
        Stay [D.I. 16815; Filed on 6/5/24]


EXAMINATIONS:                                                         PAGE

        JAMES DALOIA
        Cross-examination by Mr. Adler                      17

        STEVEN COVERICK
        Cross-examination by Mr. Adler                      23
        Cross-examination by Mr. Dalsen                     33

        EDGAR MOSLEY II
        Cross-examination by Mr. Adler                      41


DECLARATIONS:                                                        PAGE

1)  James Daloia                                            16

2)  Steven Coverick                                         22

3)  Edgar Mosley, II                                        41

4)  Lord Neuberger                                          46

(Proceedings commence at 10:00 a.m.)

(Call to order of the Court)

THE COURT:  Good morning, everyone.  Thank you.  Please be seated.

Mr. Landis.

MR. LANDIS:  Good morning, Your Honor.  May I please the Court, Adam Landis from Landis Rath & Cobb on behalf of FTX Trading Ltd., and its related debtors and debtors-in-possession.

Your Honor, this morning, shortly before 9, we filed our second amended agenda, in connection with this hearing, reflecting -- including a revised confirmation order and reflecting the resolution of one additional objection of the foreign representatives of Three Arrows Capital.  We would propose to proceed in order of the agenda this morning.  Items Nos. 1 and 2 have been resolved.  That leaves us with Item No. 3 to go forward, that is confirmation of the debtors' second amended plan.  We would propose to have Mr. Dietderich address the Court first and then Mr. Glueckstein handle the confirmation matters.

THE COURT:  Okay.  Thank you.

MR. LANDIS:  Thank you, Your Honor.

MR. DIETDERICH:  Thank you, Mr. Landis.  For the record Andy Dietderich, Sullivan & Cromwell, for the debtors.

As Mr. Landis said, Your Honor, Mr. Glueckstein

will address our affirmative case for confirmation and the remaining objections.  I would like to say, if it pleases the Court, a few words on background.

THE COURT:  I am not they can hear you in the back.  You might have to --

MR. DIETDERICH:  Is this better, Your Honor?

THE COURT:  Lift up the microphone so they're closer to you.

MR. DIETDERICH:  How about this, testing one, two, three.

THE COURT:  Can you hear in the back?  Okay, you're good.

MR. DIETDERICH:  I will try my best to project.

THE COURT:  Okay.

MR. DIETDERICH:  Turning back the clock, Your Honor, FTX filed on November 11th, 2022.  At the time it was correctly seen as one of the most complex bankruptcy cases ever attempted. It had the scope of a diversified financial institution like Lehman, but with digital assets, no effective regulatory system, the absence of accurate books and records, competing foreign jurisdictions seeking to displace this Court, and a team of founders that faced not just investigation, but active criminal prosecution.

Less than 23 months later, we are here contemplating what effectively is a fully consensual one day

confirmation hearing.  There are some remaining objections to resolve, but what is striking is the lack of any plan critical objection by any major stakeholder.  What marks the resolution of this extraordinary case is not the level of customer recovery merely, it is the level of consensus.

How did we get here? The answer is experienced leadership.  At the start, Mr. Ray and the board made three key decisions.  Everything else is a consequence of those decisions.  The first was that former management would have no role in these cases.  This meant not only excluding compromised and potentially compromised employees, it meant creating a new corporate organizational structure, a new system of corporate governance, the migration of digital assets to new custodians, new financial and tax reporting systems, and new cash management and financial controls.

The result of this effort was credibility.  That effort took time.  We were not able to say as much as we wanted to say at the beginning of this case but after we had done the work and were able to speak what we did say was credible and there could be no restructuring without the effort we spent early building the ability to produce credible information.

The second decision we would cooperate with government authorities.  At the first meeting of the company the board determine that cooperating with the many government

investigations and compiling and providing information to those investigations from a centralized repository was in the economic best interest of FTX and its creditors.  We did not do this just because it was the right thing to do.  We did it because it was beneficial to creditors and there is no decision we have made since that has created more distributable value.

It is our posture of cooperation for the government that has avoided criminal indictments of the debtor.  That posture has allowed us to coordinate asset recovery with governmental actors, it has positioned us to conform the bankruptcy code definition of creditor with the criminal law definition of victim and to stand here today proposing a plan where unlike Madoff or other cases substantially all value will be distributed to creditors in a single centralized distribution process.

That posture has also avoided the assessment of fines and penalties that would have reduced creditor recoveries.  In fact, it has resulted in the voluntary subordination of governmental claims, not just a bankruptcy petition time value but to an unprecedented 9 percent post-petition interest rate.  It even has resulted in the subordination of federal income taxes for the prepetition and the post-petition period. None of this would have been possible without the initial decision to fully cooperate with

the government.

The third decision was that we would not make business decisions alone. We would do so with consensus with the statutory committee and the other major stakeholders. This was critical because of the difficulty of the business judgments we faced. Our assets were incredibly diverse and often novel and hard to value. Virtually all of them were highly volatile.

What if we sold something and then it went up? What if we held something and then it went down? Mr. Ray and the board's answer was not to make those decisions themselves alone. The most important example of this was the process created for the liquidation of digital assets where the UCC and later the ad hoc committee of customers made decisions side by side with management. Often this meant we could not move as fast as we might wish. Where we did not have consensus, rather then run to Court and seek an order from Your Honor we tried harder to reach agreement, but when decisions were made they reflected everyone's views.

The number of important motions entered by this Court without objection or hearing is testament to the power of this approach. Collaboration, Your Honor, is also the key to understanding the plan. Confirmation in this case is not the creation of a building. It is the laying of a capstone. The last piece that balancing everything and locks the other

pieces into place.

I should draw the Court's attention, before we get to the plan in chief, to a few of those other pieces that have been absolutely critical. We have been thinking about this day for almost two years. The first piece was the settlement with the Bahamas. The Bahamas began this case as a jurisdictional war. Had that war been allowed to continue the loss of value to creditors would have been excessive. The Bahama settlement solved this problem with a novel solution worked out with our friends at FTX Digital Markets.

That solution was the economic and procedural consolidation of the Chapter 11 cases with the proceedings in the Bahamas under a structure that did so by contract rather than requiring extensive and expensive coordination proceedings and lots of Court time. That settlement has already been approved by Your Honor and the Court in the Bahamas, but its effectiveness is conditional on the confirmation of the plan today.

A second critical stone was the global settlement with customers. That settlement resolved after many months of discussion. The dispute between FTX and all of its organized customer constituencies concerning whether digital asset entitlements should be treated as claims or property interests. The settlement recognizes what became the consensus view that customers do not have a legal interest in

property but that something happened here that as an equitable matter suggests customers should have some priority over general unsecured creditors.

The way the plan addresses this, consistent with the general approach of substantive consolidation of the debtors is to identify exchange shortfalls and create a special priority intercompany claim that benefits all of the customers of each exchange to the extent of that shortfall. That settlement also, Your Honor, is to be finalized by confirmation today. Other important pieces were a settlement with the IRS, with the CFTC, with state AG's, with the liquidators in Australia, with Emergent, and with the MDL Plaintiffs. All of those settlements have an effectiveness condition that is waiting for confirmation of the plan.

Now, Your Honor, I would like to address one settlement that hasn't happened yet. We still do not have an understanding with the Department of Justice concerning the over a billion dollars in forfeiture proceeds they are holding in connection with the criminal prosecution of the founders. We are in discussions with the Department of Justice.

What we have done in the meantime is to reach consensus with the other parties besides FTX that have competing claims against this money. We resolved our difficulties -- our differences, really, with Emergent, which

had a competing claim.  We resolved our differences with the MDL Plaintiffs who had their own competing claim.  And we have an understanding with the critical mass of the preferred shareholders who also have a competing claim to this money as well.

This raises the question I should address at the outset because its one of the potentially confusing parts of the plan and I want to get it right at the start of how we see preferred shareholders in this case.  It makes sense to clarify this.  The plan, Your Honor, is an absolute priority plan.  It pays creditors and other stakeholders in accordance with bankruptcy priorities.  And we do not anticipate there will be any value available to preferred shareholders from FTX in the plan.  We are forecasting that their distribution is zero.  It may not be if we have extra money, but the current forecast is the distribution is zero.

However, Your Honor, we are not the Department of Justice.  The DOJ has the forfeiture proceeds and the DOJ, as a matter of criminal law, is not bound by the absolute priority rule or bankruptcy priority scheme.  Under criminal law they see preferred shareholders as victims too.  So, as we contemplate an arrangement with the DOJ for release of forfeiture proceeds to us, we must either litigate or negotiate in the criminal proceeding how much of that recovery is received by the FTX estate and how much the DOJ

decides to allocate the preferred shareholders.

The plan does not incorporate this settlement. There is no preferred shareholder settlement in the plan; however, as part of our discussion so far with the DOJ there is a possibility that the DOJ will ask FTX to, effectively, be its distribution agent or its paying agent for money to be distributed by the DOJ to the preferred shareholders. Again, we have a centralized distributional architecture and we built that to be used by the government as well as by the estate.

We included this possibility in the plan for disclosure purposes but there is of yet no deal. I should underscore that our understanding with the preferred shareholders to approach the DOJ jointly and advocate for this is only that, an understanding. With them it is not yet an understanding with the DOJ.

Now the last thing I would like to address before we go to the plan, Your Honor, is the process to building the plan itself. In July 2023 the debtors filed publicly a first draft of this plan expressly for the purpose of soliciting comments from stakeholders. Mr. Ray, the board and the team recognized that this case was to big and to important, effected too many people for us to only solicit feedback from the creditor professionals who happen to be around the table already. This was a great decision.

We have received very meaningful feedback from numerous creditors and governmental authorities that we could incorporate into the plan and disclosure statement before we launched. Almost a year later, this Court approved the disclosure statement. We included in the disclosure statement an unusual amount of background on the major decisions reflected in the plan; in particular substantial consolidation of the debtors and the comprehensive work done by the debtors, the creditors committee, the ad hoc committee of customers to explore strategic alternatives to the plan.

We launched customers and other creditors voted. The voting, Your Honor, was overwhelming. The plan was approved by 98 percent of voting creditors by amount and 96 percent of voting creditors by head count. The turnout was extremely robust. This is not a case that had a silent majority. The majority has clearly spoken. Over two-thirds of all solicited claims around the world, Your Honor, returned their ballots.

On behalf of Mr. Ray, the board and all of the debtor professionals, this case represents some of the most meaningful work of our careers. We thank the Court for its guidance over this period and absent general questions I'd like to hand the podium to Mr. Glueckstein and he will present our case for confirmation.

THE COURT:  Thank you, Mr. Dietderich.  No

questions at this time.

MR. GLUECKSTEIN:  Good morning, Your Honor.

THE COURT:  Good morning.

MR. GLUECKSTEIN:  For the record Brian Glueckstein, Sullivan & Cromwell, for the debtors.

As Mr. Dietderich has begun discussing, we are here today seeking confirmation of the debtors plan of reorganization.  We filed this morning, at Docket No. 26313, the most up to date form of the confirmation order that incorporates a number of changes to resolve a number of objections.

The consensus in support for the plan reflected in the voting results is further illustrated by the lack of objections that were filed, many of which, we are pleased to report, the debtors have since been able to resolve.  The list of objections and status is contained in the chart attached as Exhibit 1 to our reply brief.  Your Honor, since the filing we have continued to work hard to resolve objections to the greatest extent possible and have since resolved the objection of ELD Capital, Three Arrows Capital, RQ Capital, and we have resolved all but one remaining issue in the objection of the Office of the United States Trustee. We will address those objections as we proceed today.

If it pleases the Court, we intend to first address the evidentiary record for today's hearing before

moving to argument and addressing the remaining objections thereafter which are mostly legal in nature.

The debtors have submitted declarations from four witnesses comprising -- consisting of those witnesses direct testimony and the debtors affirmative case in support of confirmation.  I will now address each.

Your Honor, the first witness of the debtors in support of confirmation is James Daloia, senior director at Kroll Restructuring.  Mr. Daloia submitted a declaration at Docket No. 26045, which addresses solicitation and the voting results.  At this time, Your Honor, the debtors respectfully move to admit Mr. Daloia's declaration into evidence in support of plan confirmation.  Mr. Daloia is in the courtroom and available for cross-examination.

THE COURT:  Is there any objection?

(No verbal response)

THE COURT:  Its admitted without objection.

(Daloia declaration received into evidence)

THE COURT:  Does anyone wish to cross the witness?  We have one taker.

MR. GLUECKSTEIN:  Mr. Daloia, can you come forward.

THE COURT:  Mr. Daloia, if you could take the stand please.  Remain standing for the oath.

JAMES DALOIA, DEBTOR WITNESS, SWORN

MR. DALOIA:  James Daloia, D-A-L-O-I-A.

THE COURT:  Thank you.

CROSS-EXAMINATION

BY MR. ADLER:

Q     Good morning, Mr. Daloia.

A     Good morning.

Q     My name is David Adler and I represent the Kavuri Plaintiffs and separately Seth Melamed, all of whom are creditors of the estate.

I wanted to ask you questions, since you put the solicitation affidavit together, you mention in the affidavit that there were a number of packages that were never delivered or that you learned after the fact were not delivered.  Can you elaborate on the that?

A     There is not much to elaborate on.  It just seems like it is a post office error.

Q     How did you determine what happened?

A     Using our contacts we realized that, you know, making calls, doing our research, finding out that these packages were just not delivered.  And taking the word of the creditors that they never received a package.

Q     So, you don't know whether everyone received a package, do you? I mean there is no way to trace it, is there?

A     There would be no way to tell if everyone actually received their package.  We trust the post office.

Q      Now under the disclosure statement and solicitation order the ballots were supposed to be mailed -- emailed, excuse me, to the email of record of the creditors, is that correct?

A      Yes, if one was available.

Q      Did you, in fact, send it to all creditors by email?

A      If they had a valid email that was available, yes.

Q      What efforts did you undertake to make sure that ballots were delivered if you got something back saying that the email was undeliverable?

A      We would go through the records again to see if there was another email address and if not, we would send it to any physical address that we had on record.

Q      Okay.  Have you filed a list, under seal, with this Court, identifying all the creditors who received the ballots by email?

A      That I am not -- I don't believe so.

Q      Okay.  Is there -- do you know if you have a list?

A      We have records of those that would have had a bounce back.

Q      To your knowledge there is no affidavit of service on file?

A      No, not that I know of.

Q      Are you aware of the issue with my client, Melamed, and what happened to him?

A       You would have to remind me specifically because there were a number of issues that we --

Q       He did not receive a ballot by email.

A       Okay.

Q       And the ballot package was mailed to him on Wednesday, August 14th and it was mailed to his prior counsel.  Got there on August 16t and the ballot was returned.  Does that refresh your recollection?

A       There was a number of instances.  So, if you are telling me that is the case I will believe it.

Q       Okay.  I just want to go back to the point that you are aware of 50 to 75 of these instances, I think you said in your declaration.

A       Yes, roughly.

Q       Okay.  And are you aware that if a creditor was a voting creditor and didn't return a ballot, he or she was deemed to have released certain third parties?

A       If that is what the release provisions say, yes.

Q       Does that comport with your understanding?

A       I believe so, but I --

Q       I understand.  What would happen if a creditor came forward and tried to bring a claim at this point who hadn't voted?

A       A claim? I'm sorry.

Q       A claim -- let me be mor precise.  What would happen if

a creditor came forward and asserted a claim against a release party under the plan who had not voted?

UNIDENTIFIED SPEAKER:  Objection, Your Honor.  It calls for a legal conclusion.

THE COURT:  Sustained.

BY MR. ADLER:

Q     Let me ask you this question: In your experience -- how long have you been in the restructuring field?

A     About 15 years.

Q     Have you submitted solicitation declarations before?

A     Yes.

Q     In your experience have you ever had a case where you were seeking to -- or the debtors were seeking to obtain a third-party release embodied in a plan where an affidavit of service had not been filed identifying the creditors who had received the ballots?

A     Can you restate that? I'm sorry, I --

Q     This plan calls for -- asks for a third-party release, correct?

A     Correct.

Q     In your experience, in those types of cases, have you ever had a situation where such a release was requested when the parties who are granting the release are not identified on an affidavit of service as having received the ballot?

A     Not that I am aware of.  They would normally all be on

the affidavit of service.

Q    Let me back up.  In your experience have you ever put together a solicitation declaration without an affidavit of service being on file indicating who the creditors were and how they were served?

A    No.  The affidavit of service would always cover those parties that were served, whether it be a ballot, a notice, you know, any non-voting notice whether deemed to accept or reject and the vote declaration would always reference that affidavit of service.

Q    Right.  And in this case that affidavit of service is not on file, is that correct?

A    The affidavit of service is on file.

Q    With all the names of the customers and how they were served?

A    Depending on the redaction rules within the case it might say name on file, but otherwise it would have all the names of the parties that were served and what they were served with.

Q    So, the unredacted version on file, the one under seal, would have all the email addresses, is that correct?

A    If they were on there, yes.

MR. ADLER:  No further questions, Your Honor.

THE COURT:  Redirect -- well, I should ask: Does anyone else wish to cross?

(No verbal response)

THE COURT:  Okay. Mr. Glueckstein.

MR. GLUECKSTIEN:  No questions, Your Honor.

THE COURT:  Okay.  Thank you.

Thank you, Mr. Daloia.  You may step down.

THE WITNESS:  Thank you.

(Witness excused)

MR. GLUECKSTEIN:  Your Honor, the second witness of the debtor in support of confirmation is Steven P. Coverick, managing director at Alvarez & Marsal North America, LLC.  Mr. Coverick submitted a declaration at Docket No. 26041 which addresses facts relevant to the plan's compliance with the bankruptcy code and approval of customer priority and customer preference settlements, among other things.  The debtors respectfully move to admit Mr. Coverick's declaration into evidence in support of confirmation. Mr. Coverick is in the courtroom and available for cross-examination.

THE COURT:  Is there any objection?

(No verbal response)

THE COURT:  Its admitted without objection.

(Coverick declaration received into evidence)

THE COURT:  Anyone wish to cross Mr. Coverick? Mr. Adler.

Please take the stand and remain standing for the

oath, sir.

THE COURT REPORTER:  Please raise your right hand. Please state your first name and spell your last name for the Court record, please.

MR. COVERICK:  Steven Coverick, C-O-V-E-R-I-C-K.

STEVEN COVERICK, DEBTOR WITNESS, SWORN

THE COURT:  Mr. Adler, whenever you are ready.

CROSS-EXAMINATION

BY MR. ADLER:

Q     Good morning, Mr. Coverick.  My name is David Adler, I represent the Kavuri Plaintiffs and Seth Melamed in this proceeding.

I wanted to ask you a couple questions about your declaration, particularly -- well, let's start off with the solicitation process.  Were you involved in the solicitation process at all?

A     I was involved in the solicitation process in a limited capacity.

Q     But not on the day-to-day stuff that was just --

A     I was not involved in the individual solicitation to creditors.

Q     My next question for you is in your declaration you say the plan exculpation provisions are appropriate and should be approved.  I wanted to ask you about the FTX recovery trust exculpation agreement.  Do you believe that exculpation

should be approved?

A    I don't have the agreement in front of me, but I am generally familiar with it.  Yes, I do believe it should be approved.

Q    Are you aware that the exculpation covers the plan administrator?

A    Yes.

Q    Does the plan administrator exist at the present moment?

A    I believe the plan administrator is a role that would be created upon effectiveness of the plan, but I also understand, as defined in the plan supplement that it is the same individual that is currently serving as CEO of the debtors.

Q    Right.  But will be a new title with new powers.

A    That is my understanding. Yes, sir.

Q    Were you involved at all in discussions over the scope of that exculpation?

A    Not in detail, but I am generally familiar and was involved in the general negotiations surrounding the releases and exculpations in the plan.

Q    So, its Paragraph 8 of the, just so the record is clear, plan administrator agreement.  Its in the second amended plan supplement, Docket No. 26226-2 filed on October 3rd.  Paragraph 8 is the exculpation provision and the

exculpation has a change to it that was made from the last amended -- last plan supplement where the carve outs to the exculpation originally were fraud, gross negligence or willful misconduct.  That has now been changed in the latest version to simply willful misconduct.  Are you aware of that?

A    I generally recall the change, but I am not a lawyer, so I am not familiar with the specific reasons why the change may have been made.

Q    Okay.  You believe that this exculpation is appropriate based on your experience?

A    Yes, sir.

Q    How about the wind down entities.  What are they under Paragraph 8 of the exculpation?

A    I'm sorry, I don't have it in front of me.

Q    Generally speaking, do you know what the winddown entities are under the plan?

A    Yes, sir, I do.

Q    Generally speaking, what are the winddown entities?

A    The winddown entities generally consist of the remaining debtor entities that will provide assets into the FTX recovery trust upon effectiveness of the plan.

Q    Right.  Are they being consolidated?

A    Substantially consolidated under the plan, that is correct.

Q    Right.  Do the winddown entities presently exist as

that term is defined under the plan?

A    The entities that comprise the general definition of winddown entities, those do currently exist.

Q    I also wanted to ask you some questions about crypto in kind.  Were you involved in efforts by the debtors to make distributions to creditors in kind?

A    I have been involved in the general discussions and negotiations with the major stakeholders in this case surrounding the mechanisms under which the debtors may be able to make plan distributions.

Q    Can you tell us what efforts were made to attempt to distribute in kind?

A    So, in general, the plan does not provide for in kind distributions. That was a topic that was discussed at length with major stakeholders in the case including the official committee of unsecured creditors, the ad hoc committee, as well as other stakeholders.  There were a number of factors involved in the decision to make cash distributions pursuant to the plan. I would be happy to elaborate on some of those decisions if that is helpful.

One, the debtors do not have the cryptocurrency that would be required to make in kind distributions and, in fact, never had the cryptocurrency and the proportions in which customers believed they had in their accounts.  The cryptocurrency that the debtors did have has largely been

liquidated pursuant to the asset monetization order that was entered, I believe, approximately a year ago in consultation with the official committee of unsecured creditors and the ad hoc committee.

So, the most important factor is the debtors simply don't have the crypto to distribute in kind.  That would mean the debtors would have to purchase that cryptocurrency on the open market in order to make in kind distributions.  There is a number of complicating factors that were considered with regard to what that purchase would require, what the logistics of such a complex distribution would be and in consulting with the unsecured creditors committee and the ad hoc committee, we determined, collaboratively, that it would not be feasible and would, in fact, result in potentially inequitable creditor recoveries for members of the same class.

Further, we determined it would be exorbitantly expensive to undertake such a large purchase. It would require the purchase of billions of dollars of cryptocurrency on the open market, there would be new professionals that would have to be retained or additional administrative costs that would be incurred to safeguard those assets while waiting to make those distributions.

There would be, what we generally refer to as, slippage where the debtors would effectively have to set a record date

and calculate the exact amount of cryptocurrencies that would have to be purchased for a given distribution.  Once that quantity was set at a record date the debtors would then have to go purchase billions of dollars of cryptocurrencies in those quantities which would, in consultation with our investment fiduciary, Galaxy, we have been informed would result in a runup in the market.

So, in other words, we would have to overpay for those same quantities which would come at a detriment to other creditors in the case.  So, those were the major factors in addition to the fact that, in my understanding, there is nothing in the bankruptcy code that requires a debtor to make in kind distributions.

Q    Were you aware of the fact that customers who received cash when they had crypto may have a taxable event?

A    I am not a tax professional, but I have --

Q    Neither am I.

A    -- discussed the topic with the debtors tax professionals. I understand that to be a very complicated topic and one that is predicated on the individual circumstances of each customer, which jurisdiction they sit in, the underlying nature of their entitlement. Its very complicated and I am aware that there is not a conclusive opinion amongst the tax professionals in this case that in kind distributions would or would not eliminate tax exposure

of a customer.

Q    Fair enough for non-tax advice.

You mentioned that this consideration of distributing crypto in kind was done internally.  Were efforts made to reach out to third parties to act as an agent for the customer for crypto distributions?

A    There have been many efforts and those efforts are still ongoing to identify distribution agents that would be required to make distributions under the plan.  There were discussions with those distribution agents as to what their capabilities may be with regard to cryptocurrencies.  As I understand, in the plan -- I actually forget if it's the plan or the disclosure statement, but the debtors mention that they're exploring the possibility of making some distributions in stablecoin.  So, that is a topic that has been discussed with some of those potential distribution agents.  So, yes, there were many discussions.

Q    Were you involved in any of the other crypto bankruptcies that have been filed since 2022?

A    No, sir.  Not personally.

Q    Okay.  I will represent to you that in BlockFi it had simply cash and it managed to retain in Coinbase as its agent to convert the cash distribution to crypto for customers who wanted to receive in kind.  Was any attempt made to do that in this case?

A    I am aware of the general distribution scheme in BlockFi. I did not serve as financial advisor to BlockFi, so I can't speak to the factors that led to them making that decision. I understand the cases to be very different cases, the nature of the customer base to be very different, the scope of the customer base, general size of the creditor population.  So, again, I would just cite the factors that I am aware of as to why the FTX debtors made the decision not to do in kind distributions, but I can't speak to how BlockFi came to that conclusion.

Q    Okay.  Were efforts made to -- or were discussions had with Coinbase or PayPal?

A    As I mentioned, we had discussions with a number of parties.  You know, due to the ongoing nature of those discussions I think there's competitive concerns with disclosing any individual names of distribution agents that we have spoken to.

Q    Last topic is the fees to be paid to the various entities created on the effective date.  So, we have the plan administrator, we have the board for the FTX recovery trust, we have the advisory committee, we have the Delaware litigation trustee, and nowhere in the plan supplement is compensation disclosed for those entities.  Can you tell me why?

A    Well, I don't entirely agree with that.  In the plan

supplement we included a winddown budget.  That winddown budget was prepared by the debtors, approved by the debtors current board of directors and includes a level of detail as to what is included in the winddown budget.  One of those items lists governance which includes all of the plan administrator, the recovery trust board, creditor advisory committee, etc., and that estimate and total is included in the winddown budget.

Q     Is it broken down on a line-by-line basis?

A     No, sir, it is not.

Q     Okay. How did you go about making those estimates without knowing the compensation to be paid?

A     Well, I don't think we can know with certainty what compensation would be paid to the plan administrator specifically because that will be set by the winddown board and that board does not exist today.  So, we could not discuss it with that board; however, we did use an analysis of run rates of the existing compensation.  We reviewed it with both the individual that is slated to be serving as the plan administrator and eventually the current board of the debtors who all felt that the estimate that was included in the winddown budget was reasonable.

Q     Can you give me a range of what that estimate was for various entities?  Let's take the board of directors for the FTX recovery trust. Do you recall what the --

32

A    The total of all the governance costs in the windown budget is, I believe, I don't have it in front of me, but if I recall its $34 million in total for the three-year projected winddown period.  I don't have memorized the individual line items behind that, but that is something that my team did put together when preparing the winddown budget.

Q    So, the estimate from you was $34 million in total for the winddown governance?

A    Yes, sir.

Q    Last question, what is the joint board?

A    The joint board, I would have to look at the definition. I'm sorry, sometimes we speak in general terms.

Q    I ask because I thought I might have misread it the first time, but its referenced in the compensation provision, I believe, of the FTX recovery trust that the board -- the FTX recovery trust board will receive the same compensation as the joint board.

A    Okay.

Q    I have not seen the joint board defined anywhere in the plan supplement documents.

A    Understood. I don't have it in front of me, but I can -- I believe I understand what it means. I believe its referring to the debtors existing board of directors, but I can't be certain.  I would need to see the definitions in front of me.

Q     What is the current compensation of the debtors board of directors?

A     I believe each member of the board of directors has a compensation of $50,000 a month.

Q     Are there any other fees that will be payable at any point to the board other than the stipend?

A     No, sir, not that I'm aware of.

Q     So, there aren't incentive fees upon emergence from bankruptcy or anything of that nature?

A     No, sir, not that I'm aware of.

          MR. ADLER:  That's all I have, Your Honor.

          THE COURT:  Thank you.

          Does anyone else want to cross?

          MR. DALSEN:  May I proceed, Your Honor?

          THE COURT:  Yes.

          MR. DALSEN:  Thank you, Your Honor.

                    CROSS-EXAMINATION

BY MR. DALSEN:

Q     Good morning, Mr. Coverick.

A     Good morning.

Q     We met before.  My name is William Dalsen from Proskauer Rose. I represent the LayerZero Group.

     Now we met previously when you were deposed in this proceeding, is that right?

A     Yes, sir.

Q      And at that deposition you testified on behalf of FTX Trading Ltd. and its affiliated debtors and debtors-in-possession, correct?

A      Yes, sir.

Q      And if I refer to FTX Trading Ltd. and its affiliated debtors and debtors-in-possession as simple FTX is that okay with you?

A      Yes, sir.

Q      Thank you.

At that deposition you were prepared to testify on behalf of FTX as to the customer preference settlement, correct?

A      That's correct.

Q      Out of curiosity, before you took the stand, somebody handed you something in a manila envelope. Is that before you?

A      It is.

Q      What is it?

A      It's my declaration.

Q      Got it.  Thank you.

Mr. Coverick, you are familiar with the second amended joint Chapter 11 plan of reorganization of FTX Trading Ltd. and its affiliated debtors that is the subject of this hearing today, correct?

A      Correct.

Q       Do you have a copy of the plan with you?

A       I do no

MR. DALSEN:  Your Honor, may I approach the witness?

THE COURT:  Yes.

BY MR. DALSEN:

Q       Mr. Coverick, I have handed you what was Exhibit 2 from your deposition.  Can you tell us what this is?

A       It is the second amended joint Chapter 11 plan of reorganization of FTX Trading Ltd. and its debtor affiliates.

Q       And if I just call that the plan, would that be okay with you?

A       Yes, sir.

Q       Okay.  And now you are familiar with the plan because you reviewed it and because you were involved in the negotiations and formation of the plan, right?

A       That is correct.

Q       You are also familiar with the customer preference settlements in the plan, correct?

A       That is correct.

Q       And you are familiar with the customer preference settlement because you reviewed it and you were involved in this negotiation, correct?

A       Correct.

Q       If you could turn to page 50 of this exhibit, I just

handed to you, the plan, and specifically I want to ask you about Section 5.5.  Just let me know when you are there.

A      I'm there.

Q      Section 5.5 of the plan is a description of the customer preference settlement, correct?

A      Correct.

Q      If you turn to page 51, please, which is also still Section 5.5, let me know when you are there.

A      I'm there.

Q      Do you see the first full paragraph beginning the debtors shall not designate?

A      I do.

Q      And this paragraph contains what you would call the objective set of criteria under which all preference claims should be reviewed, correct?

A      That is correct.

Q      The debtors did not use any criteria other then those listed in this Paragraph of Section 5.5 to identify which customer preference actions to exclude, correct?

A      That is correct.

Q      I want to ask you about the application of these criteria now in Section 5.5.  Sir, debtors counsel reviewed each customer preference claim to determine whether it met one of those criteria in Section 5.5, is that right?

A      That's correct.

Q     Specifically, debtors counsel reviewed the base of potential preference claims against the list of criteria and for any claims that met one of the criteria they were included in the plan supplement, is that right?

A     On the list of excluded customer preference actions, yes.

Q     You had no direct involvement with the process of reviewing claims against the set of criteria included in the plan, correct?

A     No, that is a process that was conducted by debtors counsel.

Q     You did not discuss with debtors counsel the specific consideration of individual claims on the list of excluded customer preference actions, correct?

A     That is correct.

Q     The FTX board of directors did not review each individual claim that was set to be designated as an excluded customer preference action, correct?

A     To the best of my knowledge that is correct.

Q     In fact, the FTX board did not review any particular customer preference action that was designated as an excluded customer preference action in the plan supplement, correct?

A     On an individual basis I believe that is correct.

Q     You were not involved with the attorneys at debtors counsel who conducted the review of these claims, right?

38

A     No.  As I stated, that was a process conducted by debtors counsel.

Q     And you personally did not decide whether any customer preference action should be excluded under these criteria on the second paragraph of Section 5.5, correct?

A     Correct.

Q     The debtors designated LayerZero Labs as an excluded customer preference action because the debtors do have a filed complaint against the LayerZero Group, correct?

A     Correct.

Q     And its your understanding that LayerZero Labs, therefore, meets the criteria listed in Section 5.5(b) of the plan to be an excluded customer preference action, correct?

A     Correct.

Q     Other than referring to the adversary complaint filed against the LayerZero Group, there is nothing more you can tell the Court about why LayerZero Labs was excluded under Section 5.5 because you were not involved with the attorneys at debtors counsel who conducted the review of claims, correct?

A     Again, to be clear, I pointed to the adversary complaint as containing the relevant information for why LayerZero Labs and the LayerZero Group in general met the criteria.  There is a lot of information in that complaint. I am not a lawyer, so I can't speak to the legalities or merits

of the items included in the complaint, but I pointed to the complaint as the supporting document, as well as the many underlying documents behind that complaint as the reason for why I believe LayerZero Labs and LayerZero Group met the criteria for being on the list.

Q     You did not draft that complaint, correct?

A     I did not.

Q     You do not refer to that complaint in your declaration, correct?

A     I do not.

Q     You did not review the documents underlying the adversary complaint to draft that complaint, correct?

A     Not to draft the complaint, no.

Q     You did not know all of the documents that debtors counsel used to draft the complaint, correct?

A     I don't have them memorized, but I am aware of their general existence.

Q     Mr. Ari Litan is also on the excluded customer preference list because the debtors have a cause of action against him, correct?

A     Correct.

Q     Skip & Goose, another of my clients, is also on the excluded customer preference list because the debtors have filed a cause of action that includes Skip & Goose, correct?

A     Correct.

Q     And there are no other facts or information you can share with us as to why the debtors determined that Skip & Goose would be excluded from the customer preference settlement, correct?

A     Again, I point to all of the facts and statements in the adversary complaint that include Mr. Litan and Skip & Goose's defendants.

MR. DALSEN:  I will pass the witness, Your Honor.

THE COURT:  Thank you.

Does anyone else want to cross?

(No verbal response)

THE COURT:  Mr. Glueckstein, go ahead.

MR. GLUECKSTEIN:  No questions, Your Honor.

THE COURT:  Thank you.  You may step down, sir.

(Witness excused)

THE COURT:  Mr. Dalsen, did you sign in on the sign-in sheet? I don't see your name listed.

MR. DALSEN:  (Indiscernible).

MR. GLUECKSTEIN:  Thank you, Your Honor. Continuing with the debtors case in support of confirmation, our third witness, Your Honor, is Edgar W. Mosley II, managing director at Alvarez & Marsal North America, LLC. Mr. Mosley submitted a declaration at Docket No. 26044 which addresses facts relevant to the debtors operations of the FTX exchanges, the debtors positions as to the estate, and

substantive consolidation, among other things.

Your Honor, the debtors respectfully move to admit Mr. Mosley's declaration and attached exhibits which are Exhibits 2 through 6 on our exhibit list that we submitted in advance of the hearing into evidence in support of confirmation.  Mr. Mosley is in the courtroom and available for cross-examination.

THE COURT:  Anyone object to the introduction of the declaration and the exhibits?

(No verbal response)

THE COURT:  They are admitted without objection.

(Mosley declaration received into evidence)

THE COURT:  Anyone wish to cross?

Mr. Mosley, come forward.

THE COURT REPORTER:  Please raise your right hand. Please state your full name and spell your last name for the Court record, please.

MR. MOSLEY:  Edgar Mosley, II, M-O-S-L-E-Y.

EDGAR MOSLEY, II, DEBTOR WITNESS, SWORN

THE COURT:  Mr. Adler, whenever you are ready.

CROSS-EXAMINATION

BY MR. ADLER:

Q    Good morning, Mr. Mosley.  My name is David Adler, I represent the Kavuri Plaintiffs and Mr. Seth Melamed.

I just had a few questions for you today which was were

you involved in the operational aspects of FTX post-petition?

A     I was.

Q     Were you involved at all in the discussions about trying to make a crypto in kind distribution to creditors?

A     Yes, I was.

Q     Can you tell me or tell the Court what those discussions consisted of?

A     Consistent with Mr. Coverick's testimony, I was involved in many of the same meetings and discussions with the unsecured creditors, the ad hoc committee as well as management and the board.

Q     Are you aware, was there any attempt to reach out to an exchange?

A     To reach out to an exchange?

Q     To convert the cash distribution to a creditor and to a crypto distribution?

A     As Mr. Coverick stated, we are, as the debtors, still considering all of our options and the plan does leave open the potential of distributing via stablecoins.  So, yes, its ongoing and we are talking to multiple parties about being a distribution agent.

Q     Approximately how many?

A     I don't remember what the original list is.  I think we are down to four or five parties at this point.

Q     Is it a competitive process?

43

A     Yes, it is.

Q     Are you seeking to retain that exchange as an agent for the distribution?

A     We are seeking to retain distribution agents to make distributions on behalf of the estate.  Does that answer your question?

Q     Well, are they prepared to make distributions in stablecoin?

A     We are looking at all options and some of those parties will be able to make distributions in stablecoins.

Q     Is there a term sheet with any of those parties?

A     I am not certain as to whether or not there is a term sheet right now.  I don't recall if there is a term sheet right now.

Q     Is there a memorandum of understanding or something more preliminary to a term sheet?

A     There are discussions at this point.

Q     But nothing in writing is what you are saying, correct?

A     I am saying that I don't recall whether or not we have one.

Q     Were you involved in the discussions with respect to the scope of the exculpation provision in the plan administrator agreement?

A     Broadly.  I am clearly not as close to it as counsel, management or Mr. Coverick, but broadly, yes.

44

MR. GLUECKSTEIN:  Your Honor, (indiscernible). We would object at this point.  Mr. Mosley -- this is outside the scope of Mr. Mosley's direct testimony which has been put into evidence by his declaration.

THE COURT:  Mr. Adler, you outside the scope.

MR. ADLER:  My response is that he stated that he was involved in the day-to-day operations of FTX and I am trying to determine, you know, how that relates to the plan process and specifically the plan supplement.

MR. GLUECKSTEIN:  Your Honor, Mr. Adler did not notice Mr. Mosley as a hostile witness for this hearing. He is appearing as a witness on cross-examination on his direct which was submitted by his declaration.  Frankly, the prior testimony was outside the scope as well, we let it go, but now we are moving from more topics that are outside the scope of his declaration.

THE COURT:  I will give you a little leeway, Mr. Alder, but let's keep it tight.

BY MR. ADLER:

Q    Are you on the board of directors of the debtors right now?

A    I am not.

Q    Okay.  Will you be on the board of directors of the FTX Recovery Trust?

A    Not to my knowledge.

MR. ADLER:  No further questions.

THE COURT:  Thank you.

Redirect?

MR. GLUECKSTEIN:  No redirect.

THE COURT:  Okay.  Thank you.

You may step down, sir.  Thank you.

(Witness excused)

MR. GLUECKSTEIN:  Okay.  Your Honor Your Honor, continuing with the Debtors' case, our fourth and final witness this morning is the Right Honorable Lord Neuberger of Abbotsbury, who is a former judge on the English Court of Appeal and what became the U.K. Supreme Court.  He was later appointed Master of the Rolls on that court as a senior Court of Appeal judge in the United Kingdom.

Lord Neuberger is also a leading expert on U.K. law issues.  We're lucky to have him here with us in the courtroom today.

Lord Neuberger submitted a declaration at Docket 26042, pursuant -- in accordance with Rule 44.1 of the Federal Rules of Civil Procedure to aid the Court with issues as to the meaning and effect of the FTX.com in terms of service, which are at the heart of the customer property arguments being settled to the customer property settlement contained in the plan.

Your Honor, at this time, the Debtors respectfully

move to admit Lord Neuberger's declaration into evidence in support of confirmation.  Lord Neuberger is also available for cross-examination.

THE COURT:  Okay.  Is there any objection?

(No verbal response)

THE COURT:  The declaration is admitted, without objection.

(Neuberger Declaration received in evidence)

THE COURT:  Anyone wish to cross?

(No verbal response)

THE COURT:  No cross, thank you.

MR. GLUECKSTEIN:  Your Honor -- thank you, Your Honor.  At this point, neither the Debtors, or as far as I'm aware, the Court, have been provided notice of any witnesses or evidence by any other party, so that seems it should close the evidentiary record for the confirmation hearing.

THE COURT:  Did you have any other, because I know you admitted Exhibits 1 through 6 and there were 17 exhibits on your exhibit list.

MR. GLUECKSTEIN:  The remainder of the exhibits, Your Honor, were filings in the case.  We would just ask the Court to take judicial notice of those exhibits.

THE COURT:  Okay.  Thank you.  All right.

MR. GLUECKSTEIN:  Thank you, Your Honor.

Then proceeding, with respect to our confirmation

case, and Mr. Dietderich covered a number of points and I won't repeat them, the plan satisfies, Your Honor, and the Debtors submit, all of the requirements of the Bankruptcy Code and is overwhelmingly supported by each class that was entitled to vote. As noticed, the plan provides for recoveries on allowed claims that are projected to be paid in full, plus interest, to all customers and non-governmental creditors.

This result was inconceivable when the FTX Group collapsed into bankruptcy less than two years ago. Mr. Daloia's declaration details that every voting class accepted the plan at 95 percent or more.

Mr. Coverick's declaration, now in evidence, explains why the plan satisfies the requirements of the Bankruptcy Code necessary for confirmation and also addresses the Debtors' process and rationale for entering into the customer priority settlement, that is an essential pillar of the global settlement of claims in the plan.

The customer priority settlement provides a negotiated resolution of arguments made that customers have some form of property rights in the Debtors' assets that, otherwise, would have required protracted litigation to resolve on a final basis. As detailed in our confirmation memorandum of law, and supported by the declarations now in evidence of Mr. Mosley and Lord Neuberger, the Debtors

48

maintain that well-settled case law establishes that all of the Exchange assets are presumptively part of the Debtors' estates because they were commingled together and that the customers could never satisfy their burden to both, one, prove that they have any property rights, pursuant to any trust or availment of relationship and, two, trace any assets that they claim to own, any of the assets that are currently part of the Debtors' estates.

The unrefuted evidence in the record from Lord Neuberger and Mr. Mosley conclusively establish the Debtors' positions and should put an end to the narrative still being peddle by a few individual customers that they could have property interests in the Debtors' assets.  Those few still advancing such arguments have claims arising from purchased or traded digital assets on the FTX.com Exchange and, therefore, as Mr. Mosley explains in his admitted declaration, never had anything, other than a book entry reflecting what was owed to them and, thus, no assets in any deposit addresses at any time.

Nonetheless, as Mr. Mosley details in his testimony, after the good faith, arm's-length negotiations, the Debtors, the Official Committee, both the Ad Hoc Committee and the Class Action Claimants who had asserted customer property claims, all agreed to the customer priority settlement in recognition of the arguments advanced by

49

customers and the fact that litigation of all such issues to final judgment would be complex, burdensome, uncertain, and could have delayed the conclusion of these cases and distributions to creditors.  The plan and this result is now also supported by the putative class representatives in the multidistrict litigation pending in Florida.  The customer priority settlement is reasonable and satisfies the standard for approval, pursuant to Bankruptcy Rule 9019.

Your Honor, the settlements previously approved by this Court, Mr. Dietderich walked there many of them, including with the CFTC, the IRS, and other governmental entities, facilitated the creation of the Supplemental Remission Fund that's in the plan, which has the potential to further increase customer and other eligible creditor recoveries, and the formation of the Wind-down Trust through the substantive consolidation of the Debtors, completes a plan that the Debtors and virtually all of their stakeholders have all agreed is the best possible option for resolving these Chapter 11 cases and maximizing recoveries for creditors and it should be confirmed.

There are, however, Your Honor, a few holdout objections.  As I noted at the outset, the Debtors have worked to resolve, through changes to the plan and the confirmation order, as many objections as possible and was largely successful.  We addressed, substantively, the

remaining objections filed in the Debtors' reply filed at Docket 26039.  Those objections that remain raise mostly discrete, parochial issues by which the objector seeks to hold everyone else hostage for their own personal benefit and do not actually implicate the terms of the plan, and we submit none have merit.

Unless the Court wishes to proceed differently, I will generally address the remaining objections one at a time by objector, but before I do, Your Honor, does the Court wish to hear from any of the plan supporters at this point before we get into the objections or later in the hearing?

THE COURT:  If anyone wants to make a statement now, that would be fine.  And I think just to we move things along, as we're going through the objections, I know there are some overlapping objections, so I want to make sure parties who have an overlapping objection, with regard to whatever objection you are raising first or second or third, they have the opportunity to respond --

MR. GLUECKSTEIN:  Yes, Your Honor.

THE COURT:  -- to make their arguments.

Do any other plan supporter wish to make an opening statement?

MR. PASQUALE:  Good morning, Your Honor.

Ken Pasquale from Paul Hastings for the Official Committee of Unsecured Creditors.

Your Honor, the Committee is very pleased to support confirmation of the plan today and looks forward to distributions being promptly made to customers and all creditors of the Debtors upon confirmation.  We join in all the substantive arguments set forth by the Debtors and join in the request that the remaining objections be overruled.

When these cases began nearly two years ago, the landscape for creditor recoveries was extremely uncertain. The extent of the fraud by the Debtors' prepetition management team was not yet known and cryptocurrency values were extremely depressed.  The Committee, during those first few months, was focused on leveraging market opportunities and expediting these bankruptcy cases to a conclusion.

It was with those goals in mind that in the summer of 2023, the Committee filed a motion asking this Court to order plan mediation.  The Court never had to rule on that motion because the Debtors, the Committee, the Ad Hoc Group, and the other stakeholders soon thereafter began good faith plan discussions, which were quite difficult at times, but because of the professionalism of many in this courtroom, those meetings resulted in a number of the agreements upon which the plan today is founded, including, as you just heard, the customer priority settlement.

There were plenty of bumps and disagreements between the parties along the way, but we were able to

resolve those disputes, as Mr. Dietderich said, without bringing them to the Court's attention and I think we're all very proud to be able to say that today and to be able to have done that.

It is a testament, again, to the parties in this room that the plan not only held together, but resulted in important components that maximized recoveries to creditors, including providing post-petition interest to creditors at the 9 percent consensus rate, the Supplemental Remission Fund, those going to most creditors, and the establishment of the Creditor Advisory Committee to assist in post-effective date management of the estates.

Certainly, we benefited from a bull crypto market over the last year, but it is because of the hard work of the Debtors, the Committee, and the other stakeholders that we were able to take advantage of those markets to maximize the monetization of the Debtors' digital assets and to put these cases in a position to not only conclude, but to conclude while returning a par-plus recovery to unsecured creditors.

The Committee and all of its professionals extend our sincere thanks to the Court, to the Court's staff for its attention to these cases over these nearly two years and we look forward to the day, soon to come, upon confirmation we hope today, that creditors will begin to receive their plan distributions.

Thank you, Your Honor.

THE COURT:  Thank you, Mr. Pasquale.

Anyone else?

MR. SHORE:  Good morning, Your Honor.

Chris Shore from White & Case, on behalf of the Joint Official Liquidators of FTX DM as foreign representatives of, in the FTX DM proceedings and FTX DM as a creditor of the U.S. Debtors.

We also rise in support of this Chapter 11 plan, which in our view, is a truly remarkable achievement by Mr. Ray and his team of professionals, along with the various directors on the joint board.

I'll also turn back in time.  We were one of the few parties that appeared at that first day hearing when Mr. Bromley laid out his state of the estate PowerPoint.  And I'll be maybe more graphic than Mr. Dietderich, it was a very, very dark presentation for creditors.

Despite Mr. Bromley's brave face, it was entirely unclear what assets the Debtors had and whether they were even safe with ongoing hacks occurring during that first day hearing in real time.  The best the Debtors could come up with on an org chart, which is typically one of the first slides in any first day presentation was a vague spaghetti of silos, grouping diverse businesses into one synthetic Debtor with a joint board.

There was no, virtually no management; most had been kicked out, had already lawyered-up, and ultimately would be convicted of their crimes and everybody in the courtroom was worried about the possibility that the Debtors, themselves, would be indicted. But have no fear, Mr. Bromley deadpanned, it would all be sorted out once the corporate records consisting of files of Slack messages, thumbs-up emojis, furniture receipts, and Amazon QuickBooks printouts were knitted together in the Debtors' schedule, and from our perspective, there was a brewing first day dispute that machinery referenced about what, if anything, was going to proceed in this court versus the Bahamian Court. And if I remember Mr. Bromley's remarks correctly, out of all the uncertainty and chaos in the first days, the one thing the Debtors were sure of was that DM had no assets, had no operations, and that the Bahamian proceedings were illegitimate.

We've come a very, very long way. We are here today with a plan with overwhelming support that pays allowed dollarized claims in full with interest. And for the JOLs, an approved settlement distribution scheme that recognizes the jurisdictional importance of both insolvency regimes and allows for rapid, coordinated distributions to the customers of the FTX Enterprise, whether they elected to have their claims liquidated in the Bahamas or, here, in this court.

And for that reason, the JOLs, two of whom were able to make it here today, wholeheartedly support entry of the confirmation order and whatever ruling Your Honor may render today, we extend all of our thanks to the Court and its staff for all of its attention and good care to our respected legal views, and most importantly, for creating an environment in which global consensus could take root.  So, thank you, Your Honor.

THE COURT:  Thank you, Mr. Shore.

Good morning.

MS. BRODERICK:  Good morning, Your Honor.

May I please the Court?  Erin Broderick of Eversheds Sutherland on behalf of the Ad Hoc Committee of Non-U.S. Customers of FTX.com.

The Ad Hoc Committee represents holders of approximately $6 billion in claims, spanning 34 countries, with claim amounts as small as a couple hundred dollars to hundreds of millions of dollars.  The Ad Hoc Committee was established in December of 2022 with an initial focus on advancing customer property rights.

Those issues have been addressed at length by the Debtors and other parties throughout these cases, but to summarize briefly, the applicable legal standards, as well as the factual realities of FTX prepetition operations, including the misappropriation of customer assets, presents a

very difficult case and empiric victory at the end of the day for customers on a "property of the estate" determination.

That said, however, the customers plain reading of the terms of service and the reliance on assurances that their assets will be safe and returned to them, has not been dismissed or overlooked by anyone in this courtroom. Indeed, that was the foundation of the Ad Hoc Committee's negotiation with the Debtors, the Official Committee, and other parties in the case and ultimately resulted in the plan before the Court that has several creative mechanisms to enhance customer recoveries within the confines of the Bankruptcy Code and in balance with the interest and rights of other stakeholders.

We're very proud of the role that the Ad Hoc Committee played in developing the plan. We spearheaded the customer preference settlement construct, which was critical in providing certainty to allow customers to sell their claims at the highest amount in the last year since the settlement was announced.

We fiercely advocated for the 9 percent post-petition interest rate implemented in the plan and the Ad Hoc Committee's arguments and appeal to the equitable prioritization of customer claims was central to the subordination of governmental claims and creation of the CFT Supplemental Remission Fund. These plan components represent

not only sound legal reasoning, but consensus that was built on collaboration in ensuring that customers receive the best treatment possible within the constraints of these cases.

Our presence has not been front and center in these cases, but that is not reflective of disengagement; rather, it's a testament to the extremely constructive and cooperative relationship that we've had with the Debtors, the Official Committee, the JOLs, and other parties in the case.

In short, the Debtors' second amended plan represents culmination of almost two years of extremely hard work, skilled balancing of competing interests, and unwavering dedication to provide the best treatment possible for creditors.  The Ad Hoc Committee enthusiastically supports confirmation of the plan and respectfully requests that Your Honor enter the confirmation order.  Thank you.

THE COURT:  Thank you, Ms. Broderick.

MR. ENTWISTLE:  Good morning, Your Honor.

THE COURT:  Good morning.

MR. ENTWISTLE:  May I please the Court?  Andrew Entwistle, Entwistle & Cappucci, for the Class Action Plaintiffs.

As Your Honor's aware, we filed the adversary proceeding at the outset of this bankruptcy back in December of 2022 on behalf of customers.  And, at that time, as you've heard today, or been reminded today, although, I don't know

that anyone can forget, the customers stood in a position that was, indeed, dark.  The likelihood of recovery by them of anything on day one here was pretty bleak and we've worked tirelessly with the Debtors throughout this proceeding to try and resolve a number of issues that have led to the recoveries that you've heard of here today and, obviously, both sets of customers both, the FTX.com and the FTX U.S. customers, have supported this plan, you know, in extremely high numbers.  Over almost 90 percent of the U.S. customers, by vote; 97 percent by dollars.  And 97 percent, I think, by vote for the FTX dot -- or 95 percent for the FTX.com customers and 97 percent, by dollars, have supported the plan.

There's a good reason for that.  The customers are recovering 100 cents on the dollar, plus the other amounts that are in the plan.  But that doesn't come about in a vacuum.  As you've heard from Ms. Broderick and others, the Committee, we worked together in many ways; at odds, in other ways.  There were -- we did extensive due diligence with the Debtors on behalf of the customers.  There were four days of hard-fought negotiations in 2022, as Your Honor is aware, that led to the plan agreement that resolved the property issues.

We fought hard on behalf, particularly on behalf of the U.S. creditors, who had slightly different property

claims because of the law in California that affected those claims, as opposed to that for the FTX.com claims. Through those negotiations, the result of which is the plan supplemental agreement that takes the property settlement into account.

None of that could have been accomplished without the cooperation of the Committee, Mr. Ray, the Debtors, and the Ad Hoc Committee as we worked through that process, which was highly contentious at times, as you might imagine, in order to get an equitable resolution for all customers, the U.S. customers and the dot com customers.

And while I am aware that there are a couple of customers out there that are still insisting on a property-driven resolution by objection, that just wasn't possible here. As Your Honor's aware, the law, even the best of the cases that one might argue from the U.S. point of view, is far from settled and would there have been, in our view, a very difficult argument to have advanced before the Court successfully, although, credible.

The law, as we've heard, with regard to the dot com customers is even less-settled and more difficult. But more importantly, as you've heard today, the Debtors didn't have in-kind property to distribute to customers and we would always have been fighting or always fighting for a solution that would have helped through that process, recognizing that

bankruptcy law that applies to the claims here.  But an in-kind property solution just wasn't feasible or practical as we went through the in-depth due diligence and worked with the Debtors' professionals to evaluate that situation.

That's what led, ultimately, to the final resolution that's before the Court on the property issues and, as a result, the customer adversary Plaintiffs wholeheartedly support the plan and we'd ask that Your Honor approve it and the property settlement that's baked into it, in order to, as the Committee noted, advance the process here so that we can start to get these distributions back out to customers.

We thank Your Honor and your staff for all of your time.  We've been before you on lots of different issues over time, as you know, in trying to resolve some of the other issues that are part of the adversary case; in particular, the claims against some of the prior management of the company.  At least one piece of that, we've successfully resolved with the Debtors against Ms. Ellison; that'll come before your Court, before Your Honor in due course.  Much of the rest continues.  We're also working with them, as you know, on the negotiations with the DOJ, which hopefully, will come to a great fruition for the estate, as well.

But thank you, Your Honor, and your staff, again, for all your time and hard work in this case and, again, we

wholeheartedly support the plan.  Thank you.

THE COURT:  Thank you.

MR. MINTZ:  Good morning, Your Honor.

THE COURT:  Good morning.

MR. MINTZ:  Doug Mintz of Schulte Roth & Zabel, on behalf of a group of preferred equity holders.  Our group filed an updated 2019 last night at Docket 23154.

Our clients are among the preferred equity holders and preferred equity holders, like many of the folks in this courtroom, are victims of all that came before the bankruptcy.  We are among several constituents that spent time negotiating with the Debtors regarding treatment of the preferred equity holders, particularly, as it pertains to the Department of Justice's Remission Fund and Victims Fund.

The parties worked hard and fruitfully over the last few months to reach the resolution that Mr. Dietderich described earlier and filed a plan supplement agreement documenting that on the docket at 25932.  Each of our constituents have signed onto that plan support agreement and we support that settlement, which treats preferred as they should be treated, as victims here, and look forward to working with the Debtors to reach a resolution with the Department of Justice on the treatment of the Remission Fund going forward.

We thank the Court for its time.  We thank Mr. Ray

and Mr. Dietderich for their hard work on this case and look forward to further resolution.  Thank you.

THE COURT:  Okay.  Thank you, Mr. Mintz.

Anyone else in support?

Okay.  Mr. Dietderich?

MR. GLUECKSTEIN:  Thank you, again, Your Honor.

Brian Glueckstein for the Debtors.  So I --

THE COURT:  I'm sorry, I called you Mr. Dietderich.  Sorry.

MR. GLUECKSTEIN:  No problem.

We will proceed -- I will proceed at this point to address the remaining objections, Your Honor, and we'll just kind of move through them.  I will group my remarks where there is overlap to ensure that any objector who wants to weigh in on the issue has an opportunity to.

Your Honor, the first, just starting in order, the first objection to which, then there, are some joinders, all on a *pro se* basis, filed by Mr. Nam and those supporting his objection are really objecting to the valuation of the FTT utility token.  That is styled as a classification objection, Your Honor.

These objectors want to receive value for claims on account of FTT tokens.  They wrongly argue that the Court's final order entered in February 2024, after the presentation of evidence and setting the value of claims

based on FTT at zero, should not be binding or somehow should be revisited.

This is not permitted at this juncture, Your Honor, and there is no basis, we submit, to do so. The evidence presented at that time on the estimation hearing by the Debtors' experts, explain that FTT has no fundamental value because it has no utility outside of an operating FTX.com Exchange. There is no and there will be no restarted FTX.com Exchange. We now know that conclusively.

Based on the evidence presented at that time, the Court held that FTT was valued appropriately at zero. No evidence to the contrary was presented at that evidentiary hearing and while it would not be permissible, none is offered now. The Court's estimation order is binding and cannot be collaterally attacked.

The evidence presented at the estimation hearing, including that FTT had unique equity-like features, such as token burn, voting, and governance rights, and the fact that FTT derived its value from FTX's future cash flows, supported the classification of FTT as an equity class in the plan. No objector can point to any evidence, then or now, as to why classification is wrong. Of course, given the claims have been conclusively value to be worth zero, the classification on the facts as they now exist with no restarted Exchange makes it somewhat of an academic exercise.

64

We submit, Your Honor, that the plan appropriately treats and classifies FTT and these objections should be overruled.

THE COURT:  Okay.  Thank you.

Mr. Nam, I see you raised your hand on Zoom.

MR. NAM:  Your Honor?

THE COURT:  Yes, go ahead.

MR. NAM:  This is Kihyuk Nam and my translator (indiscernible).  I would like just to speak, Your Honor.

Thank you for giving me the opportunity to speak. My name is Kihyuk Nam and I have filed an objection against the Debtors that unfairly treats FTT holders.  I'm proceeding with this objection on behalf of myself and my family.  And my family members are not familiar with English and legal procedures.  I have legally acquired their lot of claims and represent them legally.

So, today, I stand here before you as a direct victim affected by the Debtors' decisions.  I reviewed the estimation valuation with my family members and I even sent a letter to Your Honor requesting reconsideration of the FTT valuation.

Well before the reorganization plan was released when we received the estimation motion, the Debtor cannot clearly stated, We at FTX will restart operations, so we hoped that the value of FTT might recover in one way or

another.  Additionally, we noted that paragraph 7 of the estimation order reserved rights regarding the classification of FTT, so we waited until the situation became clear.

Subsequently, the plan to restart FTX was abandoned and in the reorganization plan, FTT was valued at zero dollars and classified in the lowest class, 17, making the unfair treatment of FTT holders (indiscernible), therefore, I proceeded to file objection to the current plan, Your Honor.

In the Debtors' response to my objection, they referred to paragraph 6 of the estimation order, stating that classification of a claim is distinct from its value, stating that and argued that I misread the reorganization order; however, paragraph 7 of the estimation order begins with, "Notwithstanding anything to the contrary in the motion or this order," indicating that paragraph 7 takes precedence, therefore, the scope of the reserved classification (indiscernible) in paragraph 7, cannot be remedy by paragraph 6.

Moreover, when interpreting the classification of paragraph 7, FTT was valued at zero dollars because it was classified as equity.  Since the classification of FTT had a decisive impact on its value, classification and its value cannot be conceded separately.

According to the Exhibit 5 of the estimation

motion in Document 5203, the price of FTT at the time of bankruptcy was $2.69 and the asset liquidation discount rate was only (indiscernible) point 13 percent.  Even after applying this discount rate, the value exceeded $2.00, but a 100 percent FTT discount was applied, reducing its value to zero dollars.

Moreover, according to 11 U.S.C. 502(j) of the U.S. Bankruptcy Code, a claim that has been allowed or disallowed may be reconsidered for just cause.  This provides the legal basis for reexamining the classification and valuation of FTT, considering the change of circumstances and the importance of fair treatment.

Your Honor, the Debtor processed with FTT at zero dollars.  I think that FTT lost its fundamental value due to FTX's bankruptcy; however, cryptocurrencies, in general, they have no intrinsic value and are priced based on market sentiment.  The Dogecoin and other (indiscernible) coins avoid being valued at zero because they have intrinsic value, applying a different standard only to FTT is not fair, in fact, FTT is still actively traded, as you know, on various ETRADE markets today and is trading as similar or something, sometimes higher prices than at the time of bankruptcy.

Your Honor, (indiscernible) the Debtors claims that FTT is a (indiscernible), but FTT is a utility token, not an (indiscernible).  The features which the Debtor

mentions are similar to securities, are general characteristics of utility tokens and are unrelated to ownership of (indiscernible).

Moreover, regardless of whether FTT is inactive, it was trading as a discount asset on the FTX Exchange, so general investors did not receive it as an equity. Based on this perception, it's unfair that we receive no compensation simply because we chose FTT. Even though we purchased Debtor assets in the same manner as other investors just before the bankruptcy.

Your Honor, last thing, circumstances have significantly changed after the estimation order. FTX's assets have substantially recovered and most victims are expected to receive over 140 percent compensation based on the petition date. I understand that the Debtor has even decided to indemnify shareholders.

In this situation, is it truly fair to maintain the general value only assigned to FTT? Your Honor, I respectfully request your wise judgment so victims like us may receive fair treatment.

Your Honor, thank you for giving me the time to speak.

THE COURT: Thank you.

Mr. Dietderich -- Mr. Glueckstein -- I keep on calling you Mr. Dietderich.

68

(Laughter)

MR. GLUECKSTEIN:  We're obviously next to each other and so sometimes we do get confused.  It's no problem, Your Honor.

Just a few things in response to Mr. Nam.  Just so that the record is clear on how the estimation order that Your Honor entered and in relation these provisions relate, paragraph 6 of the estimation order that's now a final order, long ago, provides that the only circumstance in which the valuation of the FTT token would be reconsidered would be if the plan that was submitted to Your Honor for consideration was modified, such that there was an operating exchange utilizing FTT as a utility token following confirmation.

So we had discussions with certain objectors at the time and the question was, well, we were still in discussions about what might happen, what hypothetically could happen with respect to a restart exchange or a post-effective date exchange.  In that circumstance, if we were to modify our plan, because an exchange was going to be restarted, then the question of value, based on the characteristics of FTT might be different and there was a reservation of rights to reopen that question.

In such circumstance, there's a separate provision in paragraph 7 that talks about the classification and to reserve rights of creditors to object to classification.  As

I said in my opening remarks, if the value of the token is not greater than zero, it doesn't have practical, real-world effect in any event, but we do believe that for the reasons why the estimation order was entered, based on the evidentiary record at the time, that there's a basis for the classification, with a good basis for classification as it sets forth in the plan.

There were references to Section 502(j). To be to be clear, there's no claims that have been disallowed here. All that happened and through the estimation order is valuation of the claims; that's what that estimation hearing was about.

And I, respectfully, don't believe there's any change in circumstances here, certainly, no motion has been made to reopen that order, but there's certainly no change in circumstances here in the perspective of the Debtors, as it pertains to the FTT token.

And just finally, just so that there's no confusion in the record, as Mr. Dietderich did address at the outset of the hearing this morning, the Debtor has not made any decision and the Debtor is not forecasting any distributions to shareholders on account of their interests in these bankruptcy cases. The issue with respect to the DOJ is separate and deals with assets that are outside the estate.

So for all those reasons, Your Honor, we would submit that the Court's order, with respect to the valuation of FTT is long ago, final, and that the classification, as to the nature of those claims in our plan is appropriate.

THE COURT: Okay. Thank you.

All right. On this objection, I am going to overrule the objection. I did hold an estimation hearing in which I determined the value of FTT tokens at zero, based on the evidence that was submitted to me.

There was no contrary evidence submitted at that time and I have no evidence today that the value of FTT tokens would be anything other than zero. So, and FTT tokens were inextricably intertwined with the Debtors; it was a token traded by the Debtors and since the Debtor is not re-establishing an exchange, there simply is no basis upon which the FTT tokens could increase in value or create some value now or in the future. So for those reasons, I will overrule the objection.

MR. GLUECKSTEIN: Thank you, Your Honor.

The next objection that I will address is the objection that was filed by the Celsius plan administrator. The Celsius --

THE COURT: Before we do Celsius, we've been going for an hour and a half, why don't we --

MR. GLUECKSTEIN: Sure.

THE COURT:  -- take a 10-minute recess.

MR. GLUECKSTEIN:  Absolutely.

THE COURT:  And we'll come back, let's come back at a quarter of.

MR. GLUECKSTEIN:  Thank you, Your Honor.

THE COURT:  Thank you.

(Recess taken at 11:36 a.m.)

(Proceedings resumed at 11:45 a.m.)

THE CLERK:  All rise.  In.

THE COURT:  Thank you, everyone.

Mr. Glueckstein?

MR. GLUECKSTEIN:  Thank you, Your Honor.

It's still morning, so good morning.  Brian Glueckstein for the Debtors.

Your Honor, moving to our next objection that remains outstanding, that is the objection of the Celsius plan administrator.  That objection, Your Honor, relates to the Debtors' pending claim objection that is *sub judice* with the Court, addressing Celsius', as we submit, time-barred attempt to assert subsequent transferee claims under Section 550 of the Bankruptcy Code, related to 497 different Celsius customers, who are alleged to have transferred assets to the accounts of the FTX Exchanges.

Of course, if the Debtors' claim objection is ultimately sustained, all of these other issues become moot.

But with respect to the objection today, Your Honor, the first objection that the plan administrator interposes is a classification objection under Section 1122.  And on its merits, the plan objection, we submit, fails.

Celsius argues that the Debtors must modify the definition of customer entitlement claims to include its subsequent transferee claims asserted under Section 550 of the Bankruptcy Code, which Celsius, itself, acknowledges or asserted against the Debtors.

Celsius is not a customer.  It has no rights of its own to participate in the customer priority settlement that we discussed at length this morning, or receive the benefits that were negotiated and are provided to the Debtors' customers holding claims to compensate holders for value of assets held in account on the FTX Exchanges.

The subsequent transferee liability that Celsius seeks to establish would result from a judgment against the Debtors and for which the Debtors would be responsible, ultimately, for satisfying.  While that would present some issues for the Debtors in terms of allowance of any related customer entitlement claims, that liability would simply be a general unsecured claim, owing from the Debtors to Celsius, and is properly classified as such; in fact, as we sit here today, there remains significant uncertainty, whether any or all of the subsequent transferee claims actually correspond

to customer liabilities of the Debtors, as of the petition date in the same or lesser amounts or in any amount at all.

Celsius is not challenging how the plan generally distinguishes between customer entitlement claims and general unsecured claims, with customer entitlement claims separately classified to provide the benefits of the customer priority settlement detailed in the plan.

As we discussed in our papers, in our reply papers, Celsius itself adopted a similar distinction in its own bankruptcy plan, distinguishing between claims held by customers in Celsius accounts from all other unsecured claims, which would include subsequent transferee claims.

The Debtors' classification of claims satisfies Section 1122(a) of the Bankruptcy Code on the facts of these cases. If Celsius is permitted to pursue its claims, it would be pursuing those claims against the Debtor and those are properly classified as general unsecured claims.

Celsius next argues that the Debtors must somehow commit now, that it will not make any distributions to its own creditors until both, Celsius' subsequent transferee claims against the Debtors and the initial transferee claims Celsius says it has asserted in New York are resolved. There is no basis whatsoever to require such a result; never mind, legislated in our plan.

What Celsius is trying to do without saying it, is

obtain prejudgment garnishment as to the distributions that would be owed to FTX Exchange customers with allowed claims on the basis of Celsius purporting to have claims against those customers.

Settled law provides that prejudgment garnishment is generally not available against a Debtor because it unduly burdens and complicates the administration of the estate.

And here, Your Honor, Celsius has not even made a proper request for such relief for the Court to consider. Their fallback position seems to be that the Debtors must establish some specific reserve for their time-barred subsequent transferee claims now at the plan confirmation stage and we submit that is not correct. No change to the definition of disputed claims, as they suggest, is required.

To the extent the Court permits Celsius to assert their subsequent transferee claims and/or their preference claim against the coined Debtor, the Debtors will need to consider those claims in considering and establishing their disputed claims reserve, as contemplated by the plan. But there's no requirement for some special reserve for Celsius and certainly no reserve is needed prior to the effectiveness of the plan or the Court's ruling on the pending claims objection.

On the disputed claims reserve issue, Your Honor, which was also the focus of the Three Arrows Capital

objection, which we have now resolved, we believe the Debtors have satisfied Section 1123(a)(4) by providing for a disputed claims reserve in Section 8.5 of the plan and that nothing more is required in the plan itself.

But as we explained in our papers, Your Honor, the reality is, the establishment and size of the disputed claims reserve contemplated by the plan in this case will be the subject of a separate motion that the Debtors intend to file with this Court and everyone's rights, including Celsius, Three Arrows, and anyone else, are fully reserved with respect to that motion and it's ultimately the size of the disputed claims reserve that will be proposed.

We have added language, Your Honor, in new paragraph 168 of the confirmation order in the version of the order filed this morning, making this point clear and it was that language that resolved the 3AC objection on this basis. Certainly, that language, to the extent Celsius is continuing to push the reserve issue at this time, should cover, more than cover that issue as well.

But nonetheless, Your Honor, we, for all of those reasons and those set forth in our papers, we submit that the Celsius objection should be overruled.  Thank you.

MR. LEVY:  Good morning, Your Honor.  Richard Levy of Pryor Cashman, on behalf of the Celsius litigation administrator.

As when I was before you last time, Your Honor, I'm going to refer to Celsius and the Celsius litigation administrator as "Celsius"; I think it'll be easier for the record.

Your Honor, I want to make clear at the outset that we are not arguing that the plan should fail; we are arguing that there is a defect in the plan that should be addressed.  And to resolve that defect, we've suggested several means in our responsive papers.  I'll get into that in a little bit.

I'm going to suggest that there's yet another basis that you'll see from the argument, Your Honor, that can resolve this issue.  Not only are we misclassified and should be otherwise classified, we could be separately classified. Let's talk about this as we go through the argument.

I want to approach this from a dual perspective, Your Honor.  The customer entitlement claims are in Classes 5(a) and 5(b).  The general unsecured claims in which the Debtors propose to classify us are in Class 6.  If our claims are more in the nature of customer claims, directly or indirectly, they should be in Class 5; perhaps, in their own subclass of Class 5.  But given their nature, they surely don't belong in Class 6.

Your Honor, we although that Section 1122 requires that the plan provide for classification and equal treatment

of the members of each of those classes.  That requires that substantially different claims can't be placed in the same class and must be placed in a class with other claims of similar nature or, perhaps, in a separate class.

The essential issue is not the person who holds the claim, but it's the legal character of the claim as it relates to the assets of the Debtor, and that's the Grace case in Third Circuit 2012 -- '13 -- and in other cases.

The customer entitlement claims are based on persons; persons who had an account with FTX.  That's the only element that results in their classification in Class 5.  It says nothing, Class 5 said nothing -- says nothing about any other means in which a claimant could have a connection to or a claim against FTX based on a relationship to the account, and that's what we are urging in our complaint, proposed complaint, which underlies our proof of claim, that we, in fact, have a relationship to that account.

It was Celsius property that was preferentially transferred to holders of claims now in FTX to fund or to increase the funding of their account at FTX.

THE COURT:  Well, let me ask you about that.

What's the basis for your argument that the funds that were transferred from customers who withdrew their funds from the Earn accounts prior to the petition date at Celsius, what's the basis for Celsius to having any property interest

in those funds?

MR. LEVY: In the Earn accounts, Your Honor, Judge Glenn has concluded that that was property of the Celsius estate.

THE COURT: No, what he concluded was that funds that were in the accounts as of the petition date were property of the Debtors' estate. He said nothing about funds that had been withdrawn prepetition.

MR. LEVY: Well, Your Honor, that's something we may have to deal with going forward.

THE COURT: You're definitely going to have to deal with it going forward.

MR. LEVY: It seems to me if it's in the account at the petition date, it's the same principal, previously.

THE COURT: Well, what's the basis for that?

MR. LEVY: Because --

THE COURT: Give me a basis. Give me something to hang my hat on that says that you can assert a property right over funds that were withdrawn from the Celsius Earn accounts by the customers.

MR. LEVY: Your Honor, I would argue that those were Celsius funds even before the petition date for the same reasons that Judge Glenn concluded that they were Celsius property. The nature of the --

THE COURT: But not once they're withdrawn. Once

the customer withdraws the funds --

MR. LEVY:  Pardon me, Your Honor?

THE COURT:  Once the customer withdraws the funds from the account, they revert back to the customer's property.

How could, prepetition, how could Celsius have said to a customer who withdrew their funds:  That money is ours.  We still have a property interest in those funds.

Explain that to me.

MR. LEVY:  I'm going to say, Judge, that based on Judge Glenn's reasoning, it's the same reasoning that would apply to prior transfers out from Celsius.  The account funds were never the property of the customer; they were property of Celsius under the account documents and contract.

THE COURT:  They had bare legal title.

MR. LEVY:  Pardon me?

THE COURT:  They had bare legal title; the customer still had an interest in those funds and they had the right to withdraw them under their terms of service.

MR. LEVY:  It's still Celsius' property, as the Earn ruling says.

THE COURT:  So if someone who withdrew their funds from the Celsius account two years ago, two years before they filed for bankruptcy, Celsius could go to that customer and say, Hey, by the way, that's our property and we want it

back?

MR. LEVY:  I suppose that's a possibility.

THE COURT:  I don't think so.  I don't think so.

(Laughter)

THE COURT:  Go ahead.

MR. LEVY:  So, Your Honor, our theory, as we've just discussed, is that there's a property interest in the settlement, in the Celsius case -- in the Celsius estate that tracks through to the customers at FTX.  They funded their account using property in which Celsius had a property interest.  They're going to receive a distribution.

Celsius has a claim that is based on the fact that that account at FTX was funded with property in which Celsius asserts a property interest and if upheld under Section 551, that attribute remains at Celsius.  And we would have an entitlement to be treated, in effect, as a customer.

We have a claim.  We have an indirect link.  I'll agree, it's indirect at the moment, but indirect and direct doesn't necessarily answer the question.

Also from the Grace case, Your Honor, in the 2013 decision by the Third Circuit, the question in that case was whether indirect asbestos claimants who had claims for indemnity and contribution were properly classified in the same class as direct asbestos claims.

THE COURT:  What did you, when you filed your

proofs of claim, which proof-of-claim form did you use?

MR. LEVY:  Pardon me, Your Honor?

THE COURT:  Which proof-of-claim form did you use when you filed your claims against the Debtors?

MR. LEVY:  We used the custom.  We used the class, the general unsecured claim, because that's all we could.

We were not a person who held an account.  There's no question about that.  But we're claiming that we have an interest relating to that account.

And the point that's made in the Third Circuit case in Grace is that indirect and direct claims relating to asbestos liabilities were properly classified in the same class and that there was no basis for carve the indirect out.  The key language in that case, Your Honor, I'll find it in a moment.

(Pause)

THE COURT:  Well, while you're doing that --

MR. LEVY:  Pardon me?

THE COURT:  While you're doing that, I'd like to know the answer to the question of, what evidence have you introduced to me today?

MR. LEVY:  What happens?

THE COURT:  What evidence have you introduced in this hearing today that would lead me to conclude that Celsius has an interest as a customer in the FTX accounts?

MR. LEVY:  Your Honor, we have a filed proof of claim, which includes the basis of our argument, and we've explained that as a matter of what we rest our position on. I don't think there's any dispute about that.

Your Honor, the Third Circuit says, "Both direct and indirect claims under the asbestos plan exhibit a similar effect on Grace's bankruptcy, they seek recovery for actions related to Grace's asbestos liability."

By analogy, we seek recovery based on FTX's liability relating to the existence of a customer account.

The Third Circuit goes on and says, although Montana and the Crown (ph) must first -- those were the indirect claimants -- must first be held liable for failure to warn before they can bring such a claim, that makes no difference to Grace, the debtor, as its liability for such a claim depends solely on asbestos-related activities.

Same argument, by analogy, here.  FTX's liability depends upon an account; not a person holding an account, an account.  And our money, as we assert in our complaint, finds its way into FTX to fund or increase the funding of an account for which we will now be able to claim, should we win in the avoidance proceeding, that that creates liability for a subsequent transfer.

Your Honor, the point that is concluded in the Grace case is that a reasonable classification of

indemnification and contribution, together with direct asbestos personal injury claims, those were all properly classified, and that's what we're asserting should happen here, Your Honor. Classification cannot be used to place claims of substantially different character in the same class. I'm arguing, Your Honor, that our claims are not substantially different because they arise from the account relationship, the account existence, and not from the person who holds the account.

(Pause)

MR. LEVY: Forgive me, Your Honor, I'm trying to skip down so I don't have to repeat myself.

Your Honor, to honor the purpose and meaning of classification, it seems to me that the approaches that we've suggested to the debtor are proper. One, include us in Class 5, but, two, we shouldn't be in Class 6. Our claims are significantly different from any other creditor in Class 6, to my knowledge. Now, I have not looked at the thousands of claims, but I doubt that anybody else is asserting a claim based on liability through an account. For that reason, Judge, we don't belong in Class 6. We belong perhaps in our own class under Class 5.

So, Your Honor, I think I've explained the basic theory here that the attributes of the claim are what should govern classification and the attributes of the claim here

require that we be classified along with the customers so that we are properly treated under the plan.

Let me turn to Mr. Glueckstein's comments and a couple of other points that come up along the way. As we pointed out at the hearing on September 12th, Judge, one of the big issues that arises from what we are talking about here is the risk of potential dual exposure to the FTX estate. They may make distributions to customers and they have a year to object to those customers under their Earn plan. So maybe they're going to do something that will delay things and in fact that would be one procedural mechanism that would work. We've got a claim, the customers have a claim, put it all in front of one proceeding instead of having the risk of dual exposure to the estate, which I can't imagine any judge or any debtor would want to face.

Mr. Glueckstein says that we're trying to seek prejudgment garnishment. I think Your Honor recognizes what garnishment is as opposed to what we're asking, which is in effect a holdback or a reserve. We are not seeking the imposition of a property interest against the debtors' property or against the potential distributions to be made. So we are not seeking garnishment at all or attachment.

You know, Your Honor, the cases that the debtor relies on for this Chapter 7 case is they're not Chapter 13 cases. They've said in their opposition to us, Your Honor,

in their response that we are a creditor of a creditor and we don't have any standing to be heard.  I dispute that, Your Honor.  We have a claim under Section 101.5 of the Bankruptcy Code.  We have a right to payment, direct or indirect, that makes us a creditor.  We're not dependent on the rights of the -- we are not -- we have a claim, it will require certain facts and circumstances to progress to further proceedings, but we have a claim.  We are not a creditor of a creditor; we are ultimately a creditor of FTX.

I think, Your Honor, that that's all I need to say, unless Your Honor has further questions.

THE COURT:  No questions.  Thank you.

MR. LEVY:  Thank you, Your Honor.

MR. GLUECKSTEIN:  Thank you, Your Honor, just a few points in response.  Maybe I'll take them in reverse order.

On this last point, as Your Honor knows, the debtors don't believe they have a claim against the debtors, they believe -- we believe those claims are time-barred, and we reiterated that point in our papers.  Obviously, if Your Honor were to agree and sustain the claims objection that is pending and rule that their claims cannot be brought against the debtors in subsequent transferee claims, the only claim they have vis-a-vis the debtor would be against the initial transferee.

This issue of they're just trying to have us reserve so that we don't pay out on the claim twice, we will -- if their claims are allowed to proceed, we will have to address that issue, Your Honor. Obviously, the debtors have no intention of making payments out at times when we have issues that need to be resolved, but the suggestion that Celsius can come in and say, well, you can't make any distributions to creditors if the debtors determine those are allowed claims, there's no basis for Celsius to say we can't pay those claims.

And so, okay, the reserve issue, I understand the reserve issue, we'll have to deal with a reserve if their claims are allowed to proceed in one way or another, it doesn't mean we believe we need to reserve on those claims separately or in their entirety, but we'll deal with that issue when we come to it. But what they're asking is not about a reserve, what they're asking, and we just heard it again, is that somehow the debtor should be forced to hold distributions until they reserve whatever litigation claims they have in their court in New York. There's no basis, none has been cited to Your Honor to force the debtors to do that at this stage.

Now, with respect to this argument that we've now heard -- this is the most we've heard elaborated on it -- that somehow -- the argument now is that Celsius has an

actual property interest in the funds that were deposit -- allegedly deposited by their customers, who withdrew those funds from the Celsius exchange from their account.  The allegation is they deposited the money into an FTX account, and now what they're arguing is that they had some property interest in those funds at the time they were deposited.  And, as Your Honor correctly points out, there's no basis for that whatsoever.  There's been no evidence put on about that, there's been nothing cited to that would lead to that result.

And why are they doing this?  They're doing this because they want to be classified as a customer claim.  In the event that their claims are allowed to proceed against the debtor under Section 550 of the Bankruptcy Code, they want the benefits of the customer priority settlement.  They are not a customer.  Whatever funds were deposited, to the extent funds were deposited into the FTX exchange accounts by the Celsius customers, those funds, like all other customer deposits, were comingled with the debtors' assets and with other customer assets and there are no property rights.  That has now been conclusively determined by the evidence before Your Honor today from Mr. Mosley and from Lord Neuberger.

So what they're trying to do is say, okay, but wait a minute, we have this idea that we have a property right that we're going to collect on through the customer who deposited that money in the FTX exchange, there's no basis

for that whatsoever. What it really sounded like they were saying this morning is they have some kind of turnover action or they want their funds back, and that's not what they've done.

They have brought -- what they are seeking to file, what they filed in their late proof of claim and what they have sought to file in their draft complaint against the debtors is a subsequent transferee liability claim against the debtors pursuant to Section 550 of the Bankruptcy Code, and there is no question, we deal with this in our papers, that if that liability is established, that is a liability that the debtors will have to deal with, that is a general unsecured claim. What they are not in any way, shape, or form -- and we just heard it, Celsius admits they're not a customer, they were not a customer of the exchange -- they want to rely on this language that there was a relationship to the account and that somehow their subsequent transferee claim must be classified with the creditors -- with the customers.

We submit, Your Honor, that the facts of this case and the facts of this plan are clear: The reason why the customers are separately classified from the general unsecured creditors is a result of the nature of the claims that they have and the benefits that are being provided to the customers as a result of the negotiated customer priority

settlement. There is nothing about any of that that touches on Celsius' subsequent transferee claims against the debtors. And to the extent that they want to establish liability in the Southern District of New York against the initial transferees -- and we talked about this at the hearing last month -- and they think they can come here and have some theory to have the debtors -- somehow collect against the debtors on that judgment, they can try to do that; we don't think that will work, but they could try to do that. But what they cannot do is elevate their claim and elevate their standing into the shoes of the customer. They're not the customer.

And so the classification for purposes of a plan today, we submit, Your Honor, is correct. Any issues with respect to a disputed claims reserve have now been made clear that we're going to be addressing those in terms of the amount of that reserve in the aggregate with Your Honor separately, and there is no basis whatsoever to force the debtors to have Celsius, the Celsius administrator legislate how the debtors are going to address their claims reconciliation process.

Thank you, Your Honor.

THE COURT: Thank you.

All right, I am going to overrule this objection as well.

First of all, let me say I had hoped that I would be in a position to have issued a ruling on the question of whether or not Celsius' proof of claim was timely filed, but I will do so as soon as possible in the future.  But as for purposes of today, to reclassify them under 1122 because they assert that they have a property interest in the accounts of certain FTX customers, I simply have no evidence to support that.  The proof of claim that was filed is not sufficient, it only gives me the bare facts that customers of Celsius, prior to the filing of the Celsius bankruptcy, withdrew funds from their Earn accounts and deposited them into the FTX accounts.  That's the only allegation that's in there, and it's only an allegation, it's not any evidence.

So I have no basis to conclude that Celsius has any interest whatsoever in any FTX customer account and, for that reason, their classification under 1122 is correct.  They are a noncustomer general unsecured creditor of the estate for purposes of the plan.

Debtors -- or the argument that the debtors must not release funds to these FTX customers in connection with distributions under the plan, the objection fails for the same reason.  I have no basis to conclude at this point that Celsius has any property interest whatsoever in those customers' accounts.  The only thing Judge Glenn said in his opinion in Celsius was that funds that were in the accounts

as of the petition date became property of the debtors' estate. He did not address the question of what happened prior -- funds that were withdrawn prior to the petition date of the Celsius case and, therefore, it has no impact on my ability to say FTX customers should not get paid when the distributions are made.

So, for those reasons, I will overrule the objection, and we'll deal with the question about whether the Celsius proof of claim is valid in the near future.

MR. GLUECKSTEIN: Thank you very much, Your Honor.

So continuing forward with the remaining objections, I plan to next address the remaining piece of the objection filed by the Office of the United States Trustee. The one issue that remains unresolved -- and I would like to note, and we appreciate the engagement and we worked very constructively with the Office of the United States Trustee to resolve all but one issue in their objection based on the revised -- the revisions to the plan and the revised confirmation order. The one issue that we have not resolved that remains open is their challenge to the consensual third party releases contained in Section 10.4 of the plan and the corresponding injunction in Section 10.8. This releases issue was also raised in the Kavuri parties' objection as well.

Your Honor, the argument being made is that the

opt-out release structure approved by this Court to obtain consensual releases from the holders of claims is not permissible. Importantly, Your Honor, nobody is challenging the scope of the releases being inappropriate, nobody is challenging who is being released as inappropriate. In fact, the third party releases in this case are extraordinarily narrow.

First, the releases do not release any causes of action arising out of conduct that occurred prepetition, or claims otherwise preserved for the wind-down trust, and are limited to address plan formation and the business of these Chapter 11 cases. The releases also have carveouts for fraud, gross negligence, and willful misconduct.

Second, the releases do not include a release for any insider or employees of the debtors before Mr. Ray and his team took over, an overlap with those covered by exculpation in many respects. There are, however, certain parties benefitting from the releases who were integral to the plan formation process, namely the ad hoc committee and the joint liquidators of FTX Digital Markets. Thus, the opt-out releases in this case are narrowly tailored to the unique facts and circumstances presented.

The debtors also provided, after discussions in connection with the disclosure statement, with the United States Trustee at that time in connection with approval of

the solicitation procedures, that releases are deemed -- releases for classes who are deemed to reject the plan required opt-in releases, and so opt-in releases were solicited for those classes as part of our process.

The voluntary release here is an important, albeit limited, part of the plan. The releases here, we submit, are thus quite distinguishable from the general releases provided in many plans. Nonetheless, the objection asserts that the releases are not consensual because they contain an opt-out structure. We submit this is wrong both before and after the U.S. Supreme Court's decision in Purdue.

The U.S. Trustee's Office has for a long time advocated against opt-out releases. This is not an issue arising from the Purdue decision. But as the U.S. Trustee acknowledges, prior to Purdue, Your Honor, along with many other courts in this district have consistently held that voluntary opt-out releases are consensual or can be consensual on the right facts and are thus permissible. This Court is well aware of the reasoning on which those cases are based that consent to the release can be inferred by failing to opt out of the releases through a ballot election.

Notice is a very important component to those decisions where creditors have an opportunity to opt out or otherwise express their views on the proposed release. On the facts here, it is hard to imagine more notice having been

provided to creditors. This case is one of highest profile cases in history, it is regularly reported on in publications around the world. The debtors sent ballots with opt-out materials to almost one million creditors in the voting classes. Those were accompanied by clear and thorough materials explaining the releases and the opt-out process that were approved by this Court. In addition, the debtors published notice of the releases and the need to opt out of it if a creditor in the voting class did not want to grant the releases in national and international publications, including the New York Times and CoinDesk.com.

The debtors submit this robust notice is akin to the type of noticing provided in class action cases pursuant to Rule 23 of the Federal Rules of Civil Procedure, which indisputably use and are permitted to use opt-out noticing.

The argument that somehow the Purdue decision up-ended the ability for this Court to approve on appropriate facts opt-out releases is baseless. The Supreme Court's decision in Purdue itself expressly cautioned that nothing in the decision, "should be construed to call into question consensual third party releases," and later stated, "or express a view as to what qualifies as a consensual release."

Thus, if this Court were to believe that the debtors' opt-out releases are consensual on the facts of this case, then nothing in Purdue dictates a different result.

Courts in this circuit and elsewhere have recognized this fact and have since the Purdue decision confirmed plans containing opt-out structures for third party releases, including in the Invitae case, BowFlex, and Robertshaw, all of which are discussed in detail in our reply papers. In the Robertshaw case, Judge Lopez in the Southern District of Texas noted that Purdue did not change the law on consensual opt-out releases.

Your Honor, the U.S. Trustee and the Kavuri parties each cite to the In re Chassix Holdings decision from 2015 for the proposition that opt-out releases are not permitted, but that decision, which of course is not binding on Your Honor, has been thoroughly considered by this Court in the past when confirming plans containing opt-out releases, and that case notes that the circumstances could justify different outcomes on particular facts and circumstances. And we do submit that the facts of this case support the very limited releases that are contained in this plan.

Finally, Your Honor, we do discuss in our reply brief and note we are of course aware that Judge Goldblatt recently issued a decision in the In re Smallhold case expressing a view that creditors need to take affirmative steps to indicate consent following Purdue. That decision, which of course is not directly binding on the Court, we do

believe is inconsistent with <u>Purdue</u> and, critically, distinguishable on its facts.

Here, as noted, notice was widely sent via both direct and publication notice, featuring the releases in the highest profile pending Chapter 11 case.  And the releases, as discussed, are very limited.

I also note that Judge Goldblatt in his opinion did not expressly rule on opt-outs for those who did receive ballots but did not return them, and also noted that, if the protections of Rule 23 class actions were provided, the results might be different.

We submit, Your Honor, all things considered, given the limited scope of the releases here, the facts and circumstances of this case, the noticing that was provided to creditors, that the releases in the debtors' plan here are reasonable, consensual, and should be approved.

THE COURT:  Thank you.

MR. GLUECKSTEIN:  Thank you.

MR. HACKMAN:  Good afternoon, Your Honor.

THE COURT:  Good afternoon.

MR. HACKMAN:  May it please the Court, Ben Hackman for the U.S. Trustee.

Our office filed a confirmation objection at Docket Item 23610 and our objection raised --

THE COURT:  You might need to speak up a little

for the folks in the back.

MR. HACKMAN:  I'm sorry, Your Honor.  Our office filed a confirmation objection at Docket Item 23610 and our objection raised ten issues with confirmation.  We have resolved nine of those issues, and we thank debtors' counsel for working with us.  Our only open issue is, does the plan contain nonconsensual third party releases, and we respectfully submit the answer is yes.

Our position is that third party releases that are based on inaction such as a failure to opt-out are nonconsensual, and third party releases that are nonconsensual are foreclosed after the Supreme Court's ruling in Purdue.

The second amended plan filed at Docket Item 26029 defines releasing parties to include creditors who are unimpaired, creditors who are eligible to vote, but do not return a ballot, and people who vote to accept or reject, but do not opt out.  And that's in Article 2.1.172.  Our position is that contract principles govern whether a release is nonconsensual and that, under contract law, silence does not equal consent except in limited circumstances not applicable here.

As the Restatement Second of Contracts states in Section 69, comment (c), the mere fact that an offeror states that silence will constitute acceptance does not deprive the

offeree of his privilege to remain silent without accepting. Here, people who are unimpaired, in unimpaired classes, are not being asked to vote, their silence or inaction should not equal consent to a third party release.

As the Bankruptcy Court for the Southern District of New York wrote in the Chassix decision, it is difficult to understand how a creditor can be unimpaired if it is releasing its claims against third parties. We submit that the only way for creditors in unimpaired classes to consent to the FTX plan's third party release is by opting into them. The same thing goes for people who are eligible to vote, but do not return a ballot.

The debtors' customer base in this case, as I understand it, is spread out all over the world. The presentation the debtors made at the first day hearing, which is filed at Docket Item 115, indicates that customers were located in more than 24 countries, including 22 percent in the Cayman Islands, 11 percent in the Virgin Islands, eight percent in China, eight percent Great Britain, six percent Singapore, five percent Bermuda, four percent Korea, four percent the United Arab Emirates, and so on. We're not sure how many of the customer base, how many people in the customer bases read and write English, or how many of them are familiar with the U.S. legal system generally or the U.S. bankruptcy system in particular. I believe Mr. Daloia during

his testimony today indicated that he would not have a way to tell if anyone, any particular person received a solicitation package.  We submit that consent should not be inferred based on a creditor or customer's inaction.

We recognize that this plan's third party releases are limited, they do not extend to conduct that occurred prepetition, as I read the document, they do not apply to gross negligence, willful misconduct, fraud, or criminal acts.  It seems to us that the third party releases largely overlap with the plan's exculpation.  Having said that, we agree with Judge Goldblatt's observation in the Smallhold decision, which Mr. Glueckstein referenced, that nonconsensual third party -- the nonconsensual third party release is now per se unlawful.  And if a third party release is nonconsensual, then no matter how narrow it is, it should not be approved.

The debtors' reply in support of confirmation in paragraphs 73 to 74 discusses the Smallhold decision.  We are not suggesting that that decision is binding on Your Honor. If Your Honor is inclined to consider the Smallhold analysis, we agree -- we disagree with the debtors' argument that Smallhold is inapplicable here.  The debtors argue that FTX is distinguishable because creditors are being paid in full and Smallhold did not address a situation where creditors were being paid in full, but Smallhold did address releases

by unimpaired classes whose creditors are being paid in full.

The debtors argue that Smallhold is inapplicable because they are people who were eligible to vote, but did not return a ballot, were not releasing parties, but I think it's clear what Judge Goldblatt was saying in that decision. He wrote, "Whatever one might think about the propriety of third party releases in the world before Purdue Pharma, this Court concludes that in light of that decision there is no longer a basis to argue with the conclusion in cases like Washington Mutual, Emerge Energy, Sun Edison, or Chassix. While the undersigned had previously been comfortable for the reasons described in Arsenal, concluding that creditors that failed to opt out may be deemed to consent to a plan's third party release, the Court no longer believes it is appropriate to do so."

That's page 26 of Judge Goldblatt's opinion.

I wanted to mention two other things about our objection, Your Honor. First, in paragraph 47, we had cited to the Restatement Second of Contracts, paragraph 69. The quoted text in the citation is accurate, but the citation itself is incomplete. It should say Restatement Second of Contracts, Section 69, comment (a).

The second point, Your Honor, is in paragraph 59 of our objection. We cited to Judge Goldblatt's bench ruling in TPC Group, Inc. to support the principle that voting to

accept does not necessarily manifest consent to a third party release.  I flag that because, as I read the Smallhold decision, I'm not sure if Judge Goldblatt would still adhere to that view.  I don't want to speak for the Court, but I flag it as potentially being a change in how the Court views that issue.

To conclude, Your Honor, we respectfully submit that contract principles govern whether a release is nonconsensual; that, under contracts law, failing to respond to an offer is generally not acceptance; and, similarly, failing to respond to a plan solicitation is not consent. People who took no action in response to the solicitation materials should not be deemed to consent to the third party releases.  We submit that consent by inference or silence should not be permitted.  We acknowledge that the releases are narrow in scope, they do not apply to conduct occurring prepetition, they have various exceptions similar to exculpation, but no matter how narrow they are in scope, if they are nonconsensual, they are not permitted after Purdue.

So, we would respectfully submit that the Court would be justified in requiring more than a failure to opt out to establish consent in this case.

Unless Your Honor has any questions, that's all I have.

THE COURT:  Well, let me ask you a question.  In

102

the context of a class action litigation, named plaintiffs in that class action agree to a settlement with the defendants, that settlement is a contract, isn't it?

MR. HACKMAN:  Your Honor, I'm not a class action lawyer --

THE COURT:  Well, any settlement between two parties is a contract, is it not?

MR. HACKMAN:  I would not dispute that, Your Honor.

THE COURT:  Okay.  So, in the context of a class action, class action plaintiffs, which may be only one or a few people, enter into a settlement agreement with the defendants on behalf of hundreds, thousands, tens of thousands of people who also have claims for the same thing against that defendant.  And a notice gets sent out to those class action plaintiffs that says this is the settlement we've entered into, you are one of the claim -- you have a claim or a potential claim against the debtor -- or against the defendant, if you want to opt out of this settlement and pursue your own cause of action against that defendant, you have the right to do so, but you've got to sign this form and send it back to us; if you don't, you're deemed to have consented and now you're part of the class, and you're going to get whatever distribution there is under the terms of the settlement.

How is that different from how it works in the plan context where we have a committee with fiduciary duties to all customers and other creditors in this case, with a small number of customers and creditors who are participants and sit on the creditors committee, who enter an agreement with the debtors on a plan of reorganization that includes something that says we're going to release claims against third parties, send out notice to those parties and say, if you don't want to participate in this, you have the right to opt out, but you've got to sign this form and send it back; if you don't, you're bound by the releases?  How is that any different from what happens in a class action?

MR. HACKMAN:  Your Honor, I would submit that in this case -- you know, Rule 23(b)(3) requires the Court to find that there are -- that questions of law or fact common to class members predominate over any questions affecting only individual members, and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy, I don't think it would be accurate to say that there are common questions of law or fact to class members, assuming for the sake of argument that the 23(b)(3) protections are a relevant factor.

So you have U.S. versus dot.com customer claims, our office appointed an official committee to represent all unsecured creditors, but there was a second ad hoc committee

of non-U.S. customers, presumably because different people were in different situations.  As I read Mr. Cleary's Phase 2 report, the examiner did not find evidence that the FTX U.S. customer assets were misappropriated in the same manner as the FTX.com customer assets, that's --

THE COURT:  But they were still misappropriated -- not in the same manner, but they were still misappropriated. Customer funds are gone.  There's no question that all the customers are in the same boat.

MR. HACKMAN:  I believe his investigation had also showed that there was little, if any, intentional comingling of customer fiat currency with corporate fiat currency.

The shortfall at the dot.com exchange was very different in size than the shortfall on the U.S. exchange.  I believe it was $8 billion on the dot.com exchange versus $141 million on the U.S. exchange.  Beyond that, there's a difference in treatment in this plan between larger customers and convenience class customers.  Some customers deposited cryptocurrency assets on the exchanges that are subject to English trust arguments that the debtors are advancing today, others deposited non-fungible tokens who are simply receiving those NFTs back, and then still others such as FTT token holders are getting nothing.

There's also the issue of different customers are in different situations in terms of their preference

exposure. And, as a simple bankruptcy matter, an official committee is not appointed to advocate for a particular creditor's interest, it's there to advocate for a class of creditors, the unsecured creditors as an overall body.

There are -- I believe there were two million customer accounts with net positive balances as of the petition date in this case spread out over more than 20 countries, and I think it's unlikely that there would be common questions of law or fact among all customers and creditors.

THE COURT: Okay. Thank you, Mr. Hackman.

MR. HACKMAN: Thank you, Your Honor.

THE COURT: Anyone else wish to speak on the third party releases?

Mr. Adler.

MR. ADLER: Good afternoon, Your Honor, David Adler on behalf of the Kavuri parties, and Mr. Malamed (ph).

I join completely -- we join completely in the comments made by the U.S. Trustee. I think that one of the concerns here, which is reflected in the declaration of Mr. Daloia, is in paragraph 8, which references that after the voting deadline approximately 84 creditors contacted Kroll, explaining that they received their solicitation package and ballot near or after the voting deadline. So I had a little bit of a colloquy with Mr. Daloia on that. The real concern

is what about all the people, the two million people who were sent notice, what proportion of them did not receive anything and did not bother to contact Kroll because they were unaware of it because they never received it.

The debtors reference notice by publication. I think that is insufficient, and I also think that -- in looking at the issue of whether mere silence can equal acceptance, in some circumstances -- when Judge Bernstein considered it in Sun Edison, he was just looking at New York law, I believe, but we have customers all over the world, I don't know what the laws of South Korea are on silence and whether it's acceptance or not. It's --

THE COURT: Well, the plan is governed by U.S. law, it's governed by U.S. Bankruptcy law.

MR. ADLER: Well, I suppose that's an argument, but if the customer never transacted in the United States, there could be some more related issues than just looking at Delaware law or U.S. law on whether silence is equivalent to an acceptance. Even within U.S. law, there's obviously a multitude of different case law on that issue.

So the problem, I think, is the fact that the customers are scattered across the world, some of them most likely never received any solicitation materials whatsoever and have not come forward, and they're being -- they're releasing claims against third parties as part of this plan.

The debtor is not getting a discharge, but these other parties are getting the equivalent of a discharge, a release. So I think that's another issue that the Court should be mindful of --

THE COURT: Well, I've always taken the position when considering third party releases that if a creditor or, in this case, a customer of a creditor comes forward later and says, hey, I never got notice, I didn't get the notice, I didn't see the publications, I had no idea this was going on, I'll listen to them and I'll consider that, and maybe give them an opt-out on the release and say you can go ahead and do whatever you want to do.

I can say, based on my experience and in discussions with some of the other judges about their experience, we've never seen someone come back later and say I didn't get notice, I didn't get an opportunity to opt out, I want that opportunity, but it's available. If someone can come forward and say I didn't get it, I'll listen to what they have to say and make a decision on a case-by-case basis.

MR. ADLER: I think that is appropriate, Your Honor.

And I just wanted to address the class action question that you posed to the U.S. Trustee. From my limited perspective, in those cases, generally, the creditor base is not known. So the only method you can do is notice by

publication --

THE COURT:  Sometimes they're known.

MR. ADLER:  Sometimes they're known, but a lot of times --

THE COURT:  I just got one not too long ago where someone sent me a notice and said, hey, you bought such-and-such, saying you're a member of this class.

MR. ADLER:  I get them from Toyota all the time and I don't even remember owning a Toyota.  But be that as it may, Your Honor, you know, I think it's a mechanism that exists in those cases where there's a lot of unknown creditors, certainly not the entire universe is known, and I think in those cases there's much more disclosure about the noticing process.

Here, what concerns us is the fact that there's an affidavit of solicitation that's on file, it doesn't list -- I mean, everything is sealed.  So, you know, it -- and I think, Your Honor, in the perfect world, the releases would be confined to those who turned in the ballots and checked off the box, but I understand Your Honor may have different views on it, but I think, given the multitude of creditors and countries in this proceeding that it's difficult, you know, to know who actually received the notice versus who didn't.  All we know of are the people who received notice, but received it late.

So do you have any questions for me?

THE COURT: No, that's it. Thank you.

MR. ADLER: Thank you.

THE COURT: Does anyone else wish to be heard?

MR. ENTWISTLE: Your Honor, I'll be very brief, Andrew Entwistle with Entwistle & Cappucci on behalf of the adversary class plaintiffs.

Just to respond to your questions regarding what happens in class actions, you have it exactly right. There's notice that goes out, it's very similar to the type of notice here, and in most of those cases, as you have acknowledged yourself has received, there are two kinds of notice. There's notice by publication, which we had here, there's also notice that goes out directly to identifiable class members, and also to transfer agents or other folks that manage funds for groups.

Now, in this case, obviously, we have notice that went out in a number of different contexts, not only for the plan, but also with regard to the customer notice, which was the customer priority settlement, which we discussed at length. There were a large number of publications and notices, releases, press releases by both the debtors; we published some ourselves on behalf of class members. The ad hoc committee and the UCC all put notices out with regard to the settlements just to advise customers about what was

happening. They also got notices, at least from us, to the extent we could publish information, with regard to the opt-out process, to the extent they wanted to opt out. But the notice that happened here is very much like what would have happened if we had had a 7023-type class before Your Honor with regard to these settlements. It's exactly what was contemplated, I think, in terms of the notice to the plan.

And of course notice is never perfect, right? And to the extent there were some questions earlier with regard to the notice process, there are always a couple of folks that -- you know, you can't say that everybody got it, all you can do is say who you sent it to, I think that's what happened here. I think the record is really well developed in terms of the solicitation that went out, particularly to the millions of customers that were on record, which were easily identifiable here, and to, obviously, subsequent holders of those funds and the like, as well as the other creditors.

So I really just wanted to stand up and respond to that part of Your Honor's question earlier today to the extent that it was helpful.

THE COURT: All right, thank you, appreciate it.

MR. ENTWISTLE: Thank you, Your Honor.

THE COURT: I thought somebody raised their hand briefly online, was there someone who wanted to be heard?

Was there -- Mr. Arush Sehgal.  Go ahead, Mr. Sehgal.

MR. SEHGAL:  Hi, I'm Arush Sehgal, one of the creditors.  I do also just agree with what was said by the gentleman earlier that I didn't have a chance to -- well, my voting packet arrived after the voting deadline had passed, and I did intend to opt out of releases and I didn't -- I didn't understand how to do it because I wasn't confident on what to vote or how to vote.  I just wanted to add that.  If given the opportunity to opt out, I would.

THE COURT:  Okay, anything else?  Thank you.

Mr. Glueckstein.

MR. GLUECKSTEIN:  Thank you, Your Honor, just a few points in rebuttal.

Just as a starting point, Your Honor, Mr. Hackman, you know, suggested this idea that there's some per se rule that was created by Purdue whereby it is just now the law of the land that opt-out releases cannot be approved, and we disagreed with that premise.  As I noted earlier and as we discussed at length in our papers, Purdue actually says the complete opposite.

And so, once you get past that idea that there isn't some per se unlawful rule, Your Honor has the ability to form your own view -- it doesn't have to be one-size-fits-all -- on the facts and circumstances of the case as to whether the opt-out mechanisms that were proposed are

appropriate here under the circumstances.  And in doing so we can't lose sight of the fact of what these third party releases are.

There was a whole bunch of discussion about types of claims and are customers similarly situated.  Your Honor, we're not releasing any prepetition claims or any claims for prepetition conduct.  So the question, honestly, of what happened on the FTX exchange versus the dot.com exchange, whether there was different misconduct by certain executives or insiders versus others, none of those claims are being released, they're outside the scope of the release.  The only thing that is within the scope of the release in this case, right, has to do with the business of the case and plan formation.  It's a limited scope of parties.  All of those parties are somewhere in this courtroom or on the Zoom.  Your Honor has jurisdiction over those claims.

What we're talking about here are claims that third parties would have to bring against parties who participated in the plan formation process and the proceedings before Your Honor.  If those claims were going to be asserted, Your Honor would have jurisdiction over those claims.  And so what these releases are doing is ensuring that those claims, to the extent somebody did not opt out, are being released and they're being -- there's estoppel around the case.  It does start to sound a lot like the

grounds for exculpation, but the parties who are the beneficiaries incrementally of these releases are not eligible for exculpation.  The U.S. Trustee's Office made that point clear and we worked through that with them, and they are not in the exculpation provision that's in the plan that we're asking Your Honor to approve.

So this is not a situation where it might be where we had a general release of all prepetition officers and directors, where some of the questions -- some of the responses to Your Honor's question about class action might become relevant.  I would submit, though, the real question on class action is the noticing, and Your Honor has that a hundred percent correct.  And as I said in my remarks earlier, the issue here is there could not hardly be a suggestion that more notice could be provided of these releases to more people.  The estate has spent a fortune noticing this plan, filing a publication notice, all within a rubric that was approved by Your Honor in connection with our solicitation procedures.

So what we have here are the same -- effectively the same post-petition claims that all the creditors would have that we're saying, if you didn't check the box and opt out of the release that you had an opportunity to do, you're going to be bound by those releases.  And I think certainly the Rule 23 class action noticing, I would submit, is

114

available more broadly because there certainly is no per se rule.

But for Your Honor to approve the releases in this case, you can look at it in the context of what is actually being released, who's being released, and for what. And for all of those claims, to the extent any creditor actually has a direct claim against any of these parties for the business of the case, Your Honor has jurisdiction over those claims, and we submit that the release and the opportunity to opt out is appropriate.

THE COURT: Let me ask you a quick question, Mr. Glueckstein. Did anybody opt out that submitted those?

MR. GLUECKSTEIN: Yes.

THE COURT: How many did the debtor receive? If you have a general number, you don't have to give me an exact number, if you know.

MR. GLUECKSTEIN: Let me see if I can get one -- I will get one. There are certainly opt-outs.

And while we're getting that number, Your Honor, I would just say on this point of the solicitation or errors in the solicitation, to the extent that postal service delivery caused the issues that are referenced in the declaration that was admitted into evidence today, as noted in there, we've corrected those issues, we've given people an opportunity.

Mr. Adler's clients submitted their ballots, they

I believe opted out of the releases.  So he doesn't even have standing to be advocating on this point generally, but from -- where irregularities were identified with respect to this issue, we've addressed those issues, and that's in the record and evidence before the Court.

THE COURT:  Were you aware of Sehgal's argument that he did not receive notice and wanted to opt out, but didn't have the opportunity?

MR. GLUECKSTEIN:  I personally am not aware of the circumstances of his situation, so that's something we could look into.

THE COURT:  Okay.

MR. GLUECKSTEIN:  So we think, ballpark, we have somewhere in the neighborhood of between three and 4,000 creditors who opted out of the releases, who returned an opt-out election.

THE COURT:  Okay.  Thank you.

All right.  The Supreme Court decision in Purdue Pharma determined that nonconsensual third parties releases are not permissible in the context of a bankruptcy plan of reorganization.  The Court specifically left open the question of what constitutes consent and declined to address that issue.  So the lower courts now are going to try to have to figure that out.

In my view, the Supreme Court was not saying that

third party consensual releases through an opt-out process are per se improper. I think opt-out releases remain a valid way for a debtor to be able to obtain releases through the plan process and do so on a consensual basis because the parties are given the opportunity to opt out; if they don't opt out or if they don't return a ballot at all, then they're presumed to have opted out. And I don't have any issues with that process per se. As Mr. Glueckstein pointed out, it is done on a case-by-case basis.

And, in this case, I'm satisfied that the opt-out process was appropriate. The releases are very narrowly tailored, they do not include opt-outs for conduct that occurred prepetition, it's limited in the scope of the number of people who are subject to the releases, and parties were given individual notice through the notification process, over a million, as Mr. Adler pointed out, received a ballot and an opportunity to opt out, and there was also an extensive publication notice. And both of those ways of giving notice to parties are acceptable in the context of class action litigation, and I don't see why it would be any different here under the facts and circumstances of this case. I think the creditors and the customers are in the same position as every other customer and claimant. They are getting -- they're going to get paid; some are going to get paid, according to the plan, they'll get paid in full, some

will not get paid in full, but they all were given the same opportunity to opt out.

So I'm satisfied at this point that those opt-out releases are appropriate and I will overrule the objection, and, again, based on the facts and circumstances of this case.

Now, Mr. Sehgal, I hope I'm pronouncing your name correctly, you should --

MR. SEHGAL:  Thank you, yes.

THE COURT:  -- you should reach out to debtors' counsel and see if you can work out something with them on whether you got notice, if you didn't get notice in a timely fashion in order for you to opt out, and whether they're willing to agree to allow you to opt out at this point.  If they are not, then you are going to be in a position where you will have to file an action against whomever it is you think you have a cause of action against -- and, again, this is only -- this doesn't deal with prepetition conduct, so it's only things that happened after the bankruptcy was filed -- you would have to file a cause of action against them, an adversary proceeding in the Bankruptcy Court, and raise -- or defend against an argument by the party that you sue that you opted out of those releases, and I'll deal with that at that time.  But at this point I'm not going to say that you're entitled to opt out at this time because I just don't know

the facts and circumstances of what you received and when you received it and how you received it, and whether you had a proper opportunity to opt out. Okay?

MR. SEHGAL: Yes, thank you.

THE COURT: Do the debtors have contact information for Mr. Sehgal?

MR. GLUECKSTEIN: Yes, we do, Your Honor.

THE COURT: Okay. So they'll be reaching out to you, Mr. Sehgal, to address the issue. Okay?

How much -- how many more objections do we have? Do we need to take a lunch break now and --

MR. GLUECKSTEIN: Yeah, happy to, Your Honor. Just so to preview, we have the remainder of Mr. Adler's objection for his clients, I was going to address that next, so we can either do that before or after the lunch break, and then we have three objections after that.

THE COURT: Okay. So let's go ahead and take our break now. How much time do you want to have for lunch?

MR. GLUECKSTEIN: I think we can be -- we can be quite short, Your Honor, whatever you think.

THE COURT: We can do -- come back at a quarter 'til 2:00?

MR. GLUECKSTEIN: Sure, that's more than sufficient.

THE COURT: Okay. We'll do a 45-minute recess for

lunch and we'll come back at quarter 'til 2:00.  Thank you.

MR. GLUECKSTEIN:  Thank you, Your Honor.

(Recess taken at 12:56 p.m.)

(Proceedings resume at 1:46 p.m.)

THE COURT:  Good afternoon, everyone.  Thank you.  Please be seated.  Mr. Glueckstein?

MR. GLUECKSTEIN:  Good afternoon.  Brian Glueckstein for the Debtors.  I think that brings us where we left off before the lunch break.  I'm going to address what I think are the remaining pieces of the objection filed by Mr. Adler's clients, the Kavuri group, and it was joined or filed by one of his other clients, Mr. Melamed.

The first issue, Your Honor, is this argument that the debtor's plan somehow must provide for in-kind distributions of digital assets.  There is no legal basis in the Bankruptcy Code or anywhere else to require the debtors to provide in their plan for in-kind distributions on account of claims based on digital assets.

As established by Mr. Mosley and throughout the record of these Chapter 11 cases, the Debtors could never have made in-kind distributions because there was a massive shortfall of digital assets held on the petition date compared to customer liabilities.

The Debtors have also spent the better part of the last two years monetizing and maximizing the value of their

assets in accordance with orders issued by this Court, including the coin monetization order.  The Debtors have taken great steps to avoid the volatile market fluctuations and other risks in speculating in digital assets during the pendency of these Chapter 11 cases.

Mr. Coverick testified this morning, including on cross examination, about the prohibitive factors to in-kind distributions that the Debtors, or anybody else for that matter, would face.

The Debtor's focus remains on getting distributions made to creditors as soon as practicable, which any creditor, of course, can then use to invest in digital assets as they so choose.

There's some suggestion to some tax ramifications, or somehow some tax ramifications of individual creditors as a basis to impose this requirement.  Of course, there's no evidence before the Court or tax opinion before the Court as to any individual creditor's tax liabilities as a result of receiving distributions from this estate.

And of course, those questions would vary, and the answers to those questions would vary by jurisdiction, with distributions being made to creditors around the world.

Your Honor, furthermore, there's no basis for the Kavuri parties to suggest that somehow a Chapter 7 trustee might do so in the context of this argument that we somehow

don't pass the best interest tests on this basis. Chapter 7 trustee, of course, would face the same hurdles, and many more because the conversion would negatively impact all creditors who would lose the benefits of the plan and related settlements.

The suggestion is also inconsistent with the mandate of a Chapter 7 trustee whose role is to liquidate and distribute assets, not take risky actions purchasing digital assets for the benefit of a few.

The second issue that was raised that has not been addressed has to do with the disclosures around the liquidating trust. Kavuri parties assert that the debtors do not satisfy the best interest test of Section 1129(a)(7) because of inadequate disclosure regarding the liquidating trust. The Kavuri parties, we submit, are wrong.

The debtors have disclosed a wind-down budget and was testified across examination this morning by Mr. Coverick, was addressed in his declaration, and submitted their liquidation analysis with the disclosure statement that was approved by this Court.

There's no credible argument that the compensation of the plan administrator and the wind-down trust board, which are projected and contained in the wind-down budget that is disclosed and has been available since the filing of a planned supplement, well in advance of voting deadline

would cost more than Chapter 7 liquidation at this point.

Beyond that, Your Honor, the debtor's disclosure satisfies the requirements of Section 1129(a)(5) because they include the identity and affiliations of the post-emergent board and of the plan administrator.

There is, we submit, and we brief this in our papers, there's no compensation disclosure requirement because the requirement of Section 1129 applies to directors and officers of the reorganized debtor, and here there are none. We are establishing a trust, but beyond that, to the extent 1129(a)(5)(b) does apply, the debtors have made sufficient disclosure of the identities and affiliations of the wind-down trust directors and officers and the nature of their compensation, which is what's required by statute.

The wind-down budget also estimates all costs of the wind-down trust, including its cost of governance, as Mr. Coverick explained this morning on cross examination.

Further details on the compensation of the plan administrator are not yet available and not yet knowable because the trust, of course, does not yet exist and the board that will ultimately make that determination is not yet seated.

I think with those points, we covered the releases issue. I'll reserve any comment if Mr. Adler raises other points that I can address.

THE COURT:  Okay, thank you.

Mr. Adler.

MR. ADLER:  Good afternoon, Your Honor.  David Adler from McCarter & English, on behalf of the Kavuri plaintiffs and Seth Melamed.

I'll address the crypto in-kind argument first. As I asked on cross examination today, every crypto case that I've seen has a distribution in-kind.  And I understand, and I'm not faulting the debtor on the fact that they monetize their assets, the crypto, at the beginning of the case. That's not the argument.

The argument is that when the money is going out, why can't it pass through an exchange at that point and be converted in-kind so that the customer receives back the same type of crypto that they originally had put in.  And it does, I believe, make a difference in some jurisdictions.

I'll say it, I'm not a tax lawyer, but from what I understand, if you had five Bitcoin on the platform and you get back two Bitcoin, that's a distribution in-kind that is not a taxable event.  You get back stablecoin or cash, that's a taxable event, as far as my limited knowledge goes.

So the point that I was trying to make today was to see what efforts the debtors have done to move that process along.  Now, it's been done in Celsius, it's been done in BlockFi, and it seems to me that it could be an

optional process where the customer makes an election as to whether they want to receive it through an exchange or not. A customer can actually pay for it.

But, you know, we're talking about here today, and it's a good thought, that the creditors are going to receive 140, 150 cents on the dollar. What I think a lot of the crypto customers look at is they had X Bitcoin on the platform.

Let's say they had ten Bitcoin on the platform. That ten Bitcoin today would be worth $650,000. Given the Bankruptcy Code and Your Honor's digital estimation ruling, that is capped at $16,000. So they have a claim for $160,000, and if they get 140 percent on that, let's say that's $200,000. Now, they're getting that in cash. If their basis is low, they're going to have a taxable event associated with that.

I just think it's the right thing to do to minimize pain to the customers, especially given the fact that when FTX filed, that was the low point in the crypto market, and it essentially has gone up since November 10, 2022.

And really what I wanted to see was where the process was. And it looked -- from what I heard, there wasn't much of a process. And I think really it is something that should be done in fairness to the people who had crypto;

that was their property.

They may not be able to get Your Honor to compel the return of it or the proceeds from it, but it was their property that was taken, and in exchange, they're getting back not their property, and maybe having a taxable event associated with it.  So that's my response on that point.

With respect to disclosure of compensation, I heard the number of $34 million as a wind-down budget.  I don't know.  I've been in cases where the compensation is set under the plan supplement for the board, for the plan administrator.

I don't know why it can't be set now, but if Your Honor is inclined not to have them disclose it, what the members are getting paid, what I would ask for is that in the operating reports that get filed post confirmation, that there just be breakdown of the individual line items for each of the different committees.

And I do want to say that there are, as I count them, four different entities that are getting paid post confirmation.  There's the advisory committee, there's the plan administrator, there's the FTX recovery trustee board of directors.  There's the Delaware litigation trustee.  So there are a lot of different entities that will be getting paid, and each of them will have their own set of professionals.

And I just think that, to me, the $34 million number sounded a little low, but I would like to see that those numbers be disclosed going forward, you know, after confirmation, because that was the first time I heard that number.

THE COURT:  Well, let's go back to the first issue.  How, I mean, any case where you have a debtor holding assets that are subject to fluctuation, you're going to -- people are going to say, well, I want my money back as a -- I want it back in cash as the date of the petition date, because the value of that property is now less than was before.

And others are going to say, well, I want the value of the property as it is today.  So I want the property back.  But what in the code, can you answer Mr. Glueckstein's question?  What in the code says I have to make the debtors do that?

MR. ADLER:  I think that it is consistent with good faith to try and give the customers back that which they originally put in.

THE COURT:  But how?  I mean, I don't have any -- you didn't put on any evidence to show me how that would work.  I mean, how would -- and I have testimony from Mr. Mosley that it would not be able to work because of the vast amount of -- over a million customers who submitted claims,

all different kinds of tokens.  Some have gone up, some have gone down.

You mentioned today the value of Bitcoin.  Ten Bitcoin would be $66,000 today.  A month and a half ago it would have been $77,000.  It's gone down.  If the debtors start buying up billions of dollars' worth of coin, the price is going to go up and then they can't buy as much, and people aren't going to get as much in distribution.  And I have no answer to that.

MR. ADLER:  I'm not asking for the debtors to buy it, okay?  I don't want the debtors to buy it.  I just want the debtors to be able to distribute on a customer's behalf to an exchange where that exchange can convert it into the crypto to be placed into the customer's account.

All I want is an exchange after the debtor's distributed.  Debtors are not going to buy crypto.  They distribute it to Coinbase.  Let's use Binance, distributed to Binance.  And what shows up in the customer's account is the in-kind of what they originally put on.

THE COURT:  Explain to me how.  I don't understand how that would work.  How would that possibly work?

MR. ADLER:  It worked in Celsius.  Coinbase was retained.  They distributed Bitcoin, they distributed E. Those people who got Stablecoins, they were allowed to convert, I believe, at the time it got to Coinbase.  I mean,

there's -- and I believe the same process is going on right now in BlockFi, where customers can sign up and basically let Coinbase be an agent, and the distribution passes through them such that what they receive is ultimately what they put in.

THE COURT: But every case is different, and I don't know how much coin, what types of coin were in the BlockFi and the other cases. Every case is different. I know in this case, there were over 1,300 different types of coin.

MR. ADLER: You are correct, Your Honor. I think that it's -- I'm going to say this. I think it is the equitable thing to do to try and minimize tax events to those people who have been injured.

THE COURT: All right. Okay. Thank you.

Mr. Glueckstein? Oh, nope. Nobody else?

MR. GLUECKSTEIN: Thank you, Your Honor. Just a couple of points. The unrefuted testimony, there's been -- the only evidence that's been presented to the Court in connection with this hearing on this issue was the testimony from Mr. Coverick and then also some testimony from Mr. Mosley on cross examination on what the debtors were doing and why they didn't do it with respect to this issue of allowing just all tokens to be the subject of in-kind distributions.

Mr. Adler's arguments, respectfully, are wrong with respect to what has happened in the other crypto cases, which are not relevant, as Your Honor notes, and certainly the suggestion that the reason why we should do this is to somehow minimize tax liability. What we just heard was now Mr. Adler saying, we're not looking for the debtors to actually acquire the crypto and make in-kind distributions. We can just facilitate in-kind distributions through a distribution agent.

I'm not a tax lawyer either, but there is no way in any country in the world that that is going to satisfy some sort of tax requirement that's going to give some tax benefit to the customer. The purchaser of the crypto at that point is going to be the third-party distribution agent.

But regardless, there's no requirement for any of this in the Bankruptcy Code. And to the extent that what these objectors are arguing is that somehow the basis for their argument in which this was raised doctrinally, was a best interest test objection. And the idea that somehow these debtors are not providing maximum value through this, there's no evidence of that whatsoever. None. No evidence in the record.

In fact, what we heard from Mr. Coverick, both in his declaration and on cross-examination, is that trying to do this, if the debtor were to embark on such a process,

would have a number of negative consequences for creditors. A significant majority of the customers in this case, hold fiat and stablecoin claims.

And so the idea that the estate, either through a distribution agent or itself, is going to speculate at this juncture in trying to deliver cryptocurrency, the business judgment of the Debtor has been that we're not going to do that.

And so we also heard from Mr. Mosley and Mr. Coverick that the Debtors are in discussions, continuing discussions, in a competitive process with the distribution agents to provide distribution services to the Debtors the terms of which are still to be determined. And that one of the things which is clear in the plan that the debtors are exploring is the possibility of an election for stablecoin distributions.

But none of these issues are plan issues. And just to be clear, the suggestion from Mr. Adler that he wants to suggest what is best for the creditors of this estate with no evidence from the podium, when he's representing a grand total of four creditors, there's no basis to make these proclamations. There is absolutely no requirement that the Debtors change the distribution architecture that he assigned it to in the Bankruptcy Code or otherwise that would require a change here.

So we submit on that issue. There is absolutely no reason, equitably, legally, or otherwise, to force the Debtor to do something different than the process they're currently on in exploring how they're going to make distributions to creditors.

On the disclosure issue, we covered this. The wind-down budget more than satisfies our obligations under the Bankruptcy Code. What is required in the plan and the plan supplement documents satisfy all of those requirements. That is the standard that needs to be passed for confirmation today. There's no continuing obligation of disclosure on the post-emergence Debtor.

Clearly, through the voting process and this approval process, the other creditors have either affirmatively supported this architecture, including the board's and the plan administrator. They'll be working post-emergence or otherwise, if not objected to it.

So we would ask, Your Honor, that the remaining portions of these creditor's objections be overruled.

THE COURT: Thank you. I am going to overrule these objections. There's nothing in the code that would require the Debtors to provide in-kind distribution to customers and creditors. And the evidence, the only evidence I have is that doing what Mr. Adler's clients are asking me to do would actually be harmful to the creditors, not

beneficial.

If I had other evidence, I could consider it, but I don't have any. So the only thing I can say is the Debtors have exercised their business judgment. This looks like the best way to handle distributions. The evidence I have supports that conclusion, and therefore, I will overrule the objections.

MR. GLUECKSTEIN: Thank you, Your Honor. I think we have three remaining. The next objection that I will address is the objection that was filed by the LayerZero group. There's two main components to this objection.

First, they dispute their exclusion from the customer preference settlement as somehow being in violation of Section 1123(a)(4) as unfair discrimination issue under the plan.

And two, there's a challenge in their papers, at least, to the ability to include language with respect to 502(d) in the plan.

With respect to the customer preference settlement, Your Honor, I want to address what the customer preference settlement is and what the evidence actually shows with respect to the customer preference.

As in every case, the debtors at some point need to make a decision as to how they are going to handle preference claims, which are going to be preserved, which are

going to be pursued, which are going to be settled, and on what terms.

As Mr. Coverick explained in his testimony, in his declaration, the Debtors had extensive discussions with their creditor constituencies, including the official committee and the ad hoc committee, about how to handle customer preference claims. No customer, including those in the LayerZero group, have some right to a settlement of preference claims.

The Debtors in their business judgment, on the other hand, do have the right to retain any or all of the preference claims and pursue them to maximize the value of these estates.

As Mr. Coverick made clear, as a result of discussions with creditors, given the projected recoveries for allowed customer claims, along with other factors, the debtors decided they would make settlement offers to most, but not all, of those customers with preference exposure.

And to protect the estate, the Debtors negotiated with the official committee, and the ad hoc committee, and other stakeholders certain general categories of customer preference defendants that the Debtors believe, again in their business judgment, are appropriate to retain and not to provide settlement offers at this time.

There's nothing unusual about that. And there's nothing about these determinations that permit the target of

those lawsuits, including the LayerZero group parties, to come before this Court and argue, as they're doing today, that the Debtors are required to provide them a settlement offer.

On the face of that argument, it makes no sense. So what did they do?  In order to manufacture standing, to do so, the LayerZero parties wrongly argue that offering the customer preference settlement to some but not all customers violates Section 1123(a)(4) of the Bankruptcy Code.  We submit that this argument is baseless.

As Mr. Coverick made clear in his declaration, the customer preference settlement is not plan or claim treatment provided on account of customer entitlement claims.  Your Honor, that is the operative testimony from the Debtor's perspective, and it's unrefuted, not the application of the factors, which we'll get to in a minute, to LayerZero.

The question here for the Court is, is this plan treatment or not?  And the facts and circumstances of what this settlement is, where it came from, and why it appears in the plan where it does are all in Mr. Coverick's testimony, and those portions of his testimony are unrefuted with any other evidence.

Your Honor, the customer preference settlement is completely separate.  It was negotiated separately.  It was discussed separately in the disclosure statement and in the

plan.  This settlement is no different than other settlements in this case and others that are being implemented through the plan process as permitted expressly by Section 1123(b)(3) of the Bankruptcy Code, but are separate settlements from the treatment of claims against the Debtors that are provided for in the plan.

The customer preference settlement consists of the Debtors making offers to certain creditors who then had the opportunity to consider the offer's terms and whether or not to accept them on an individual creditor basis.  To accept the Debtor's offer, the customer needed to elect into the settlement, agreed to the Debtor's proposed stipulated claim amount, which was of critical importance to the Debtor, and to vote in favor of the plan.

As Mr. Coverick details in his declaration, there was significant administrative savings for the Debtors by obtaining stipulated claims amounts and not needing to reconcile those claims later.  The Debtors did utilize the solicitation process to make these settlement offers.  That was clear back at the time the solicitation procedures were approved.

And we did that because we were already spending significant time and money sending materials to close to one million voting creditors, and it was the most efficient thing to do.  Otherwise, we'd have to separately solicit offers and

acceptance of the preference elements to many of those same creditors.

But of course, every potential preference claim is different, has potentially different defenses to it and constitutes a claim by the Debtors against the customer that is completely unrelated to the customer's claims against the Debtors, which are the claims that are being addressed through the classes in the plan.

The preference settlement offer is not on account of any claims against the Debtors and outside the scope of the plan's treatment of claims.  And once that's established, there can be no unfair discrimination and Section 1123(a)(4) is inapplicable.

What LayerZero is really saying is they don't believe the Debtors in their business judgment had a basis to exclude them from receiving an offer to settle preference claims.  But that argument holds no water outside of the context of 1123(a)(4).  There is simply no legal basis whatsoever for LayerZero to require the Debtors to make them a settlement offer.

The criteria set forth for excluded customer preference actions were established, again, as explained in Mr. Coverick's testimony, after extensive discussions with the creditor's committees to protect the Debtors and to ensure that offers were not made to settle certain types of

customer preference actions too early in the process.

The customer preference defendants are not the counterparties or the intended beneficiaries of those criteria that we've heard so much about.  As Mr. Coverick testified, the Debtors evaluated the potential preference claims against the criteria set forth in Section 5.5 of the plan and in exercising their business judgment, decided to place certain actions on the list of excluded customer preferences actions.

With respect to each of the LayerZero defendants, the basis for their inclusion on the excluded customer preference action list is self-evident by the public record and confirmed by Mr. Coverick.

The Debtor's criteria simply provide that the Debtors determined in their business judgment that there is a reasonable basis to conclude that, among other things, any debtor has a cause of action or defense against the recipient of the preference or any of its affiliates other than a preference claim.  That's the relevant portion of that provision that we've been discussing and that is at issue with LayerZero.

Each of the LayerZero parties are already named as defendants in an adversary proceeding in which the Debtors have alleged multiple causes of action based on allegations that LayerZero benefited from transactions with Alameda

Ventures using misappropriated FTX group funds, and then took advantage of the FTX group's desperate need for cash in the hours leading up to their collapse.

Those claims, all of them, are in their early stages of being litigated and discovery is ongoing in the adversary proceeding that is pending before Your Honor.

For purposes of making offers to settle preference claims, it is perfectly reasonable for the Debtors to retain all of their rights against those litigation defendants and resolve any and all claims there in that adversary proceeding.

LayerZero's attempt to use the Debtor's offer of customer preference settlements to other customers to force the Debtors and now request this Court to force the Debtors to release claims that are the subject of pending litigation and where other claims might still be asserted post discovery should be rejected.

What we're really doing here, Your Honor, just to put a fine point on it, is what they are asking this Court to do is to strike Counts 5 through 8 and 10 of the pending adversary proceeding complaint.  They want them stricken. They don't want to defend those causes of action, and their basis for doing that is that we have made offers of settlement of preferences to other customers in connection with plan solicitation.

The other issue that they've raised involves Section 502(d). LayerZero seems to take issue with Section 8.3.2 of the plan, which contains familiar language stating that claims shall be deemed temporarily disallowed pursuant to Section 502(d) of the Bankruptcy Code until a cause of action asserted by the Debtors is resolved.

The Debtors have pled claims pursuant to Section 502(d) of the adversary proceeding against the LayerZero parties. The plan provision does not permanently disallow or do anything to prejudge the claims in that adversary proceeding.

Rather, the plan provision recognizes the indisputable case law holding that Section 502(d) can be applied on an interim basis to allow the allowance of the claim where the creditor is subject to an avoidance action. That's exactly where LayerZero, all three of the LayerZero parties sit.

The language in Section 502 (d) of the code is mandatory. Courts are clear that because the focus is on the creditor and not the claim, any avoidable transfer may require disallowance of all of that creditor's claims until resolved. Courts regularly recognize, we cite cases in our papers and as was discussed by the Court in Enron and elsewhere, that where there's a pending avoidance action, defendant's claims continue to be disputed claims and

distributions are temporarily prevented.

This language that's in our plan has been approved by this Court and others in this district and numerous other cases, including in SIO 2 and Cred, amongst others.  It has the exact effect of the pending adversary proceeding on the allowance of the defendant's claim.

So we don't see any issue, either generally on this point, and certainly with respect to LayerZero parties, again, they are subject to litigation.  But what we're asking to do, Your Honor, is overrule the subjection.  Let's allow the adversary proceeding against the LayerZero parties to resolve all of these matters, which is what should happen in any event during due course through the litigation.

THE COURT:  Okay.  Thank you.

MR. GLUECKSTEIN:  Thank you.

MR. SAZANT:  Good afternoon, Your Honor.  Jordan Sazant of Proskauer Rose on behalf of the LayerZero group, which is comprised of LayerZero Labs Limited, Ari Litan, and Skip & Goose, LLC.

When these cases began nearly two years ago, the ashes of FTX were still smoldering, and the Debtor's advisors and new officers had to roll up their sleeves and locate billions of dollars of assets all over the world in cyberspace.  And these cases presented a few critical and difficult questions for the Debtors and for the Court and for

everyone else involved.

Who owned the assets held by FTX, the Debtors or their customer depositors?  And regardless of that answer, given the $9 billion shortfall on the FTX exchanges, how to fairly allocate and distribute the value among the Debtor's millions of customer depositors worldwide.

So the Debtors come before the Court with much fanfare and touting the plan as this overwhelmingly successful culmination of their efforts.

And the Debtors propose that the plan shall constitute a good-faith compromise, settlement and resolution of all claims, interests and causes of action against the Debtors, including, among other things, issues relating to the tracing of assets of individual debtors, the effects and consequences of the .com TOS and U.S. TOS, and whether exchange assets are property of the Debtor's estate.  That's at the confirmation brief of Paragraph 52.

And so through this global settlement, the plan provides for the substantive consolidation of the Debtor's estates, the prioritization of returning assets to customers, and liquidates and distributes the assets to customers in the form of cash.

All customers, regardless of their claim currency denomination are expected to recover approximately 130 percent of their petition date value of the property, and a

complete waiver of preference actions for customers who withdrew their assets prior to the petition date.

My clients, however, are one of the few exceptions to that rule, as they find themselves among the excluded minority to whom the waiver of customer preference actions does not apply. As a result, the plan cannot be confirmed for three independent reasons.

First, the plan violates Section 1123(a)(4) by providing unequal treatment through a waiver of preference claims only to those favored creditors who also agreed to stipulate to their claim amounts and to vote to support the plan and denying those recoveries to the excluded customer preference actions.

The Debtors argue that the customer preference waiver is not plan or claim treatment, but we will show why that's incorrect.

Second, even if the customer preference waiver doesn't constitute plan or claim treatment, the plan still cannot be confirmed because it's offered in bad faith as applied to at least two of the three members of the LayerZero group.

While the Debtors purport to apply exclusive and objective criteria to determine which customers should be excluded from the customer preference settlement, as we've already seen today, and as we'll discuss further, none of

143

those criteria are applicable to Mr. Litan or to Skip & Goose.

And then third, the plan violates applicable bankruptcy law by withholding distributions from liquidated claims and invalidly treating them as disputed solely on account of asserted preference actions that have not yet been litigated to conclusion.

So for these reasons, which we'll take in order, we believe the plan cannot be confirmed or, at the very least, can only be with an amended excluded customer preference actions exhibit that removes Mr. Litan and Skip & Goose.

So we'll start with the unequal treatment under 1123(a)(4). One of the fundamental underpinnings of the Bankruptcy Code is that similarly situated creditors must be treated equally. Specifically, Section 1123(a)(4) of the Bankruptcy Code requires that a plan provide the same treatment for each claim or interest of a particular class absent fee subject creditor's agreement otherwise.

As Your Honor noted at last week's hearing, one can simply look to the terms of the plan and the plan supplement and see clearly the discrepancies in treatment. All creditors in Class 5 receive 130 percent of the petition date value of their claim, and some receive the preference waiver while others do not.

So the only question then is whether the portion of recoveries associated with the waiver of preference actions constitutes treatment on account of such creditor's claims. The Debtors respond that it does not because it's described and contained in a separate section of the plan, and they argue that the settlement offer is not on account of creditor's claims against the Debtors, but rather a settlement of a Debtor's claim against the subject creditor.

But that's only part of the story when it comes to the customer preference settlement. They also argue that the only testimony before the Court is Mr. Coverick's declaration that this is not planned treatment. But that is not an evidentiary question. That is a legal question for the Court and a conclusion for you to make.

So sure, the settlement offer proposes to resolve the Debtor's potential preferences and preference actions against creditors by waiving such claims, but the waiver of claims isn't the settlement offer. Otherwise, the Debtors could simply have applied the objective criteria, waived those claims, and moved on.

But instead, the settlement has two requirements. You must agree to settle with the Debtors as to the calculation of your claim, settling the claim against the estate, and you must agree to vote that claim in favor of the plan. And worse yet, by tying the customer preference waiver

offer to a vote in favor of the plan, the Debtors ask this Court to permit the -- to bind the excluded minority to lesser treatment.

It's difficult to conceive of anything more fundamentally tied to a creditor's claim than a settlement that resolves its amount and its vote.  The Debtors focus solely on the settlement's resolution of the Debtor's causes of action while ignoring entirely the creditor's agreements under the settlement.

And while courts have approved plenty of plans which have provided the payment of fees or other consideration to certain creditors in the class in exchange for backstop commitments, to exit financing, or assisting in structuring transactions or other similar tangential reasons, that's not the case here at all.  None of these customers are providing any separate value.

Instead, this case is similar to the Adelphia bankruptcy cases where the Bankruptcy Court in the Southern District of New York originally confirmed a plan providing valuable releases and exculpations to creditors who voted in favor of that plan and withheld such benefits from creditors who opposed.

On appeal, the District Court for the Southern District of New York stated that there is no doubt here that in return for approving the plan, some claimants will receive

a more valuable settlement than others, i.e., additional benefits on top of their pro rata distributions.

While such an outcome may be permissible where the added benefit is given for truly collateral reasons, i.e., independent from their status as claimants, here, the benefit is given in exchange for the claimants' affirmative vote for the plan, an added benefit that is tied directly to the plan itself and given to some claimants in a class but not all.

Such an inducement may well have led some claimants to approve the plan when they otherwise may have rejected it, and as a result, creditors opposing the plan may have been prejudiced by a quid pro quo exchange of plan approval for valuable releases and exculpation.

Section 1123(a)(4) guarantees that each class member will be treated equally regardless of how it votes on a plan where the receipt of valuable benefits in a plan is conditioned on a vote to accept that plan, there is a very real possibility of dissuading or silencing opposition to the plan.

The Adelphia court granted a stay pending appeal of that plan on grounds that there was substantial likelihood that it would be overturned as a result.  However, that plan was ultimately consummated because the appealing creditors could not post the bond that was ordered.  And that's at 361 BR 337, and the quote is from Pages 363 to 64.

So here the benefit of the customer preference waiver is granted not only on account of a creditor's vote in favor of the plan, but also on account of stipulating to the amount of the claim that's calculated by the Debtors and sent out in the ballot. Those are not the same tangential reasons or added benefits. This is part of the resolution of customer claims and can't be offered prejudicially to the majority of creditors at the exclusion of the disfavored creditors.

Lastly, I just wanted one point from the Debtor's reply. The Debtor's reply on this point cites to the Energy Future Holdings case for the proposition that the customer preference waiver is outside the scope of the plan's treatment of claims, and to argue that the provisions of Section 1123(a)(4) do not apply to the Court's evaluation of the customer preference waiver.

But the EFH case is clearly distinguishable. The Debtors quote EFH to state that under its plain language, Section 1123(a)(4) applies only to a plan of reorganization and therefore not to pre-confirmation settlements. But this is not a pre-planned settlement. This offer's embedded within the plan, was solicited through the plan ballots, and requires a vote in favor of the plan.

It's not a 9019 settlement in the early stages of the case, and notably the proposed confirmation order, which

I've checked the one file this morning, contains the same language, it contains proposed findings by the Court that the terms of the customer preference settlement are independently fair, equitable, and reasonable and approves such terms pursuant to Section 1123 of the Bankruptcy Code.

So if the Court agrees with our argument that the customer preference waiver constitutes claim treatment under the strictures of the Bankruptcy Code because of its inextricable link to creditor's claim amounts and votes, then the inquiry can end there, and the plan cannot be confirmed due to the unequal treatment provided to creditors of the same class.

But even if the Court disagrees and holds that the customer preference waiver does not constitute claim treatment despite the other terms of the settlement, then the plan still cannot be confirmed until Ari Litan and Skip & Goose are removed from the excluded customer preference actions exhibit because, as applied to them, this plan is internally inconsistent and offered in bad faith.

The Debtors represent that the customer preference waiver is offered to all creditors who fall within the objective set of criteria that it agreed upon with the UCC and the ad hoc group.  And there are a specific set of five criteria in Section 5.5 of the plan that apply to potentially exclude a creditor from the benefits of the customer

preference settlement waiver.

And as we've just heard from the Debtor's witness, they cannot point to any evidence that any of the criteria have been met as to Mr. Litan and Skip & Goose. The only potential evidence cited by the Debtors and their declarant is the adversary complaint, which, as you noted earlier, with respect to the Celsius proof of claim, the adversary complaint itself contains no evidence and is only mere allegations.

And even if these allegations are credited, they're insufficient to satisfy the objective criteria that the Debtors state that they're appealing to. These criteria are, first, that the recipient was an insider of the Debtor. Mr. Litan and Skip & Goose were not insiders of the Debtors and there are no such allegations in the complaint.

The recipient was a current or former employee of the Debtor. Mr. Litan and Skip & Goose were not employees of the Debtors and there are no such allegations in the complaint.

The recipient may have had actual or constructive knowledge of the commingling and misuse of customer deposits. Mr. Litan and Skip & Goose had no knowledge of the Debtor's fraud before it became public, and the Debtors make no such allegations in the complaint.

The recipient either changed its KYC information

to receive preferential withdrawals or received assistance from Debtor employees, which neither of which Mr. Litan or Skip & Goose did, and no allegations are contained in the complaint alleging such.

And finally, any debtor has a cause of action other than a preference claim against the creditor or an affiliate.

And so again, the Debtors point only to the complaint that was filed against the LayerZero group in the adversary proceeding as justification for excluding each of the LayerZero group's members.  But the Debtors have also confirmed that there's no other basis for including the LayerZero group.  They are focused on the complaint.  And the witness has said all allegations underlying the complaint are what they are relying on.

And a review of the complaint shows only non-preference causes of action asserted against LayerZero Labs Limited.  And not that the complaint even contains any allegations of such, but just to confirm, neither Mr. Litan nor Skip & Goose are affiliates of LayerZero Labs, so they would not qualify under the cause of action against an affiliate category either.  Mr. Litan was merely an employee, is now a contracted consultant, and holds no voting rights in LayerZero Labs, and just to confirm, neither does Skip & Goose.

Either the objective criteria described in Section 5.5 of the plan have meaning and must be applied as written or they do not.  But the inclusion of Mr. Litan and Skip & Goose on the excluded customer preference actions exhibit is explicitly contrary to the terms of the plan and can only be explained as a bad-faith attempt by the Debtors to extract litigation leverage over LayerZero labs in the adversary proceeding.

And so, for this reason, even if the selective application of the customer preference waiver is permissible under the Bankruptcy Code, the plan cannot be confirmed without an amended plan supplement that removes Mr. Litan and Skip & Goose from the excluded customer preference actions list.

Notably, Paragraph 19 of the proposed confirmation order contains a proposed finding that the plan supplement, which includes the excluded customer preference actions list, complies with the terms of the plan, and that finding simply cannot be sustained by the Court under the current record because the excluded customer preference actions list and Section 5.5 and the objective criteria listed therein are internally inconsistent with one another.

And then, finally, to address our last argument on the disallowance of liquidated claims, the plan also provides for the withholding of distributions to creditors on account

of all claims that are held by a creditor against whom the debtors believe they have avoidance actions.

The disallowance and withholding of distributions on account of otherwise allowable claims pursuant to Section 502(d) is not permissible in this district prior to an actual judicial determination of liability on the defendant's part. And we've cited to cases in this district holding the same, including In Re Lids Corp at 260 BR 680.

The Debtor's reply argues that a delay in distributions on otherwise allowable claims pending adjudication of the adversary proceeding is permissible and provided for in the Bankruptcy Code. But it's telling that the Debtor's reply brief cites only to non-Third Circuit cases.

So while the Debtors may be correct on the law in other districts, precedent in this district is clear that preventing distribution on otherwise allowed claims as a result of mere allegations of avoidable transactions is improper and cannot be approved.

So for all these reasons, we believe that the plan cannot be approved as it provides for unequal treatment to Class 5 creditors as a result of the customer preference waiver. But even if you disagree with that, we believe that the plan cannot be approved as currently constructed with the plan supplement, including Mr. Litan and Skip & Goose as

excluded customer preference actions because that violates the terms of the plan in Section 5.5 itself.

Unless Your Honor has any questions?

THE COURT:  No questions.  Thank you, Mr. Sazant.

MR. SAZANT:  Thank you.

MR. GLUECKSTEIN:  Thank you, Your Honor.  Brian Glueckstein.  A few points in rebuttal.  Counsel suggests that the inclusion of these parties on the excluded preference list is, in their words, litigation leverage.  I can hardly think of more of a litigation leverage play than asking this Court to dismiss without adjudication Counts 5, 6, 7, 8, and 10 of a pending adversary proceeding complaint that is pending before Your Honor.

The issue with respect to -- the suggestion here is that we point to the complaint, the existence of the complaint, as a reason to exclude.  That is true.  Point to the allegations in the complaint.  That is also true.

There's a bunch of representations made from the podium by counsel about Mr. Litan, his relationship to LayerZero.  Lots of these facts are disputed.  None of them have been adjudicated.  They are all going to be adjudicated in the context of a complex adversary proceeding with a bunch of transactions amongst three different parties who were named as defendants by the Debtors in that action that include LayerZero Labs, Mr. Litan, and Skip & Goose.

THE COURT:  Mr. Litan says there's no claims against Mr. Litan and Skip & Goose other than preference claims in the complaint.

MR. GLUECKSTEIN:  There's no claims that have been asserted in that complaint, as of now, against those two defendants, other than the preference claim.  That is true.  That case is in the very early stages of discovery.  And the standard for the people that are on the excluded list is not what we -- the criteria that we've negotiated and have included in the plan, again, our position is for the benefit of the estate, in consultation with our creditors, so that we're not prematurely releasing claims, is that we have a reasonable basis to believe we have claims.

It doesn't mean that we have asserted them all.  It doesn't mean that every complaint has been filed.  It doesn't mean that every count of every complaint necessarily has been filed.  This is an evolving process.

All we're saying, when we take a step back, is the Debtors are not prepared at this time to make a settlement offer to these parties because we have a complex piece of litigation that is in discovery.  Our investigations against them, against other parties on that excluded preference list, remain ongoing.

And so the suggestion that we have to look at, and we can compare this standard, which again, we would submit

they're not the party to evaluate whether we've complied with the carve-out or the criteria set forth in this. They are a defendant in the litigation.

The question, which is why this all dials back to, is if we accept the proposition for a moment that this is not plan treatment, none of this is relevant because they're not entitled as a litigation defendant to get a settlement offer at any particular point in time from the Debtor. We included in the plan, as Section 1123(b) allows us to do, provision that incorporates a settlement that's being implemented through the plan.

Mr. Coverick not only stated in his declaration that his understanding, not as a legal matter, that, of course, is for Your Honor to decide, but his understanding as the business representative of the Debtors, where he described his presence at meetings where these issues were discussed, is that this is not a treatment on account of claims. That is the testimony. Sections 26, 27, Paragraphs 26, 27, 28, 29 of Mr. Coverick's declaration addressed these issues.

Counsel argues, well, there's no separate value being provided by the creditors for the settlement of the preference claims, and so therefore it must be plan treatment. That's not true. Paragraph 28 of Mr. Coverick's declaration, he addresses very clearly that the Debtors

benefit from not needing to reconcile the amount of each customer's claim for those accepting and opting into the customer preference settlement.

We could not force people to accept their stipulated claim. If they want to litigate their claim amount, they had the right to do that. They didn't need to take the settlement. But to the extent that creditors opted into the settlement and agreed to the Debtor's stipulated claim amount, that ends the process of reconciling the amounts of those claims for many creditors.

That's a significant benefit to the Debtors. That's the testimony from Mr. Coverick in Paragraph 28 of his declaration. That testimony is unrefuted.

What the record before Your Honor shows is that a settlement was offered to creditors that was solicited in connection with the plan process, but that election was separate from the plan process, that settlement is described separately in the plan and in the disclosure statement at the time the solicitation procedures were approved by this Court.

And as we set forth, we are asking, we are asking for approval of that settlement separately, both in connection -- pursuant to 1123(b) and Section 9019 of the Bankruptcy Code. And we briefed in our papers why we believe the settlement on its terms, vis a vis the Debtor and the customers, is an appropriate settlement of the customer

claims.

But the business judgment of the Debtor was to exclude certain -- in consultation with the creditors, to exclude certain creditors at this time from the settlement. And out of everybody who's on that list, out of everybody who's on that list of excluded customer preference actions, these parties we have actually sued. There is pending litigation before Your Honor, and we intend to pursue that litigation until it's resolved.

And again, what they are asking Your Honor to do today is say, on one hand, this is somehow plan treatment and they just get it. But of course, I don't think they really believe that because what they're saying is, well, even if it's not, you know, we're going to try to apply and argue that because, at this time, we have only asserted preference claims against two of those defendants that somehow Your Honor must summarily dismiss numerous causes of action pending adversary proceeding.

And we submit, Your Honor, that there's no basis to do that. There's no requirement to do that because what we have here is a settlement of preference actions. The benefit of those creditors who were offered that settlement, who accepted it that's being implemented through the plan. That's all it is. We could have waited to do this. We could have made settlement offers with respect to preference

actions after confirmation.  We did it here.

And as explained in Mr. Coverick's declaration, we did it here for efficiency, to ensure that we were maximizing the opportunity while we were going out to creditors to get the waiver -- to get the stipulated amounts agreed, and to not have to do another mailing to close to a million people once we had these terms agreed to.

Those who are excluded doesn't mean that the Debtor is never going to settle their preference claims.  All it meant is that the Debtors were not ready at this stage, at the process when solicitation went out over this summer of 2024, to make that settlement offer at this time.

And so we would ask that this objection be overruled, and that the plan, of course, be confirmed, and that any issues with respect to the LayerZero parties be addressed in the adversary proceeding in the context of that litigation.

THE COURT:  Can you address Mr. Sazant's argument about 502(d), that courts in this district have said you can't?

MR. GLUECKSTEIN:  I can, Your Honor.  So the language that we have in the plan has been, as I noted in my early remarks, has been included in numerous plans.  And what this idea, the context in which the cases that they're citing to are different.

The questions there was in the context of permanent disallowance, permanent disallowance for the avoidance claims.  That's what Judge Wallace was talking about in those cases, prior to the avoidance actions being fully resolved.

What we submit is the state of the law with respect to 502(d), including in this district, and why the language that appears in our plan has appeared in other plans, not only by Your Honor, approved by Your Honor, but other judges in this district, is that the plan language serves as a temporary disallowance until the cause of action is resolved.

Of course, if the creditor -- if the avoidance action is resolved favorably to the creditor, then we no longer have a basis to withhold the distribution, at least on that grounds.

But until that claim is resolved in the underlying litigation with respect to the adversary proceeding, it is perfectly appropriate.  It's consistent with the cases in this district, and that's why, again, this language appears in many plans for the Debtors not to pay out that distribution until litigation is resolved.

Beyond that here, again, this is a situation where, this is not a case where the creditor is standing here saying that the plan provision is problematic and is

affecting their rights. We've asserted a Section 502(d) claim in the adversary proceeding.

That claim is pending. It's there. They haven't moved to dismiss that claim. They haven't moved to dismiss that claim in the adversary proceedings, saying it can't be maintained. They didn't move to dismiss it all. They answered the complaint.

So, again, with respect to these parties, these plan issues are manufactured. These aren't issues that impact their rights in any way. There is a litigation that is pending. That litigation needs to be resolved on its merits in due course.

THE COURT: Okay. Thank you.

MR. GLUECKSTEIN: Thank you, Your Honor.

THE COURT: All right. I'm going to overrule the objection. I think the Debtors are correct that this is a separate settlement. It's not related to the plan itself. The fact that they solicited through the plan to obtain approval of the settlement from the creditors is not something that would make this settlement a part of the plan itself.

I think 1123(d)(3) allows for individual settlements, and these are individual settlements on behalf of the Debtors, who are the ones who are releasing their claims against creditors, not the creditor releasing claims

against the Debtors.  So there's no disparate treatment here amongst the members of this particular class.

Under the 502(d) issue, I agree, again, with Mr. Glueckstein that the cases that are cited by the defendants here or the movants here relate to a permanent disallowance of claims.  This is a temporary disallowance until resolution of the other claims against these particular creditors and therefore does not violate 502(d), which explicitly allows for temporary disallowance.  So for those reasons, I will overrule the objection.

MR. GLUECKSTEIN:  Thank you very much, Your Honor. I think that brings us to our last two objections, which I'm just going to group together for efficiency, but fully recognize they're separate objections.  There are two objections --

THE COURT:  Mr. Shore -- so finish real quick.

MR. GLUECKSTEIN:  The -- both of these are --

THE COURT:  Hold on one second, Mr. Glueckstein.

Mr. Sazant, did you --

MR. SAZANT:  I'm sorry, I didn't mean to interrupt.  But I just wanted to ask a question.  We had also raised the objection that Mr. Litan and Skip & Goose did not meet the requirements to be excluded from the -- and you didn't rule explicitly on that.

THE COURT:  Right.

MR. SAZANT:  So I just wanted to know --

THE COURT:  Okay.  And I will do so.  I think as Mr. Glueckstein explained, it wasn't the fact that the complaint itself had been filed, the settlement is that the Debtor can settle claims if they believe they don't have anything other than a preference action against particular defendants.

Mr. Glueckstein has indicated that they believe they do have other claims against these two defendants and, in fact, these are the only parties, as Mr. Glueckstein points that have actually been sued.  Others are also on the list who haven't been sued yet.

So that's just part of the settlement process.  So I'll overrule that objection, as well.

MR. SAZANT:  Thank you, Your Honor.

THE COURT:  Mr. Adler?  You're going to have come forward because I'm not sure we're getting this on the record.

MR. ADLER:  I just want it to be clear that, Your Honor, we haven't deal with the exculpation objection that I made, so we have to come back to that at some point.

MR. GLUECKSTEIN:  I don't know how we're coming back.  Your Honor, we addressed Mr. Adler's client's objection.  You heard argument from him on whatever points he had open.  You overruled his objection.  I don't know what --

163

THE COURT:  I think that was on the release -- third party releases.  But is there a separate objection on the exculpation clauses?

MR. GLUECKSTEIN:  There is, Your Honor. Well, then again, if Mr. Adler wants to address it, he should have addressed it with his objection.  If Your Honor is inclined to hear it, then we should hear it.

MR. ADLER:  I was getting up responding to Mr. Glueckstein, who had raised the board fees and the crypto (inaudible).

THE COURT:  I'll give you the opportunity, Mr. Adler.  Do you want to -- Mr. Glueckstein, do you want to deal with these last two first?  I'll go back to Mr. Adler. Do you want to just --

MR. GLUECKSTEIN:  Sure, that's fine.  That's fine, Your Honor.  The last two objections are objections that were filed pro se by individual creditors, both very late, including one that was filed just last week, days before the hearing.

So defer to Your Honor whether the Court is inclined to consider these very late objections in any event. But I will address them.  Individuals Samuel Gunawan and Linda Favario, who both filed objections arguing that they have rights in the Debtor's property akin to the customer property arguments, variations of them that we have been

164

addressing and we addressed this morning and that are the subject of the customer priority settlement.

These objections, Your Honor, merely selectively quote from the FTX.com terms of service to claim some ownership interest in the Debtor's assets.

As discussed earlier and in the record this morning, the unrefuted evidentiary record established by Mr. Mosley is that the Debtors immediately commingled any digital assets deposited on the FTX exchanges in the ordinary course, and the tracing of those assets to any customer would be impossible.

Neither of these objections present any evidence that they could trace any claimed assets to those held by the Debtors.  In addition, any customer who simply purchased, traded, or sold or traded digital assets on exchanges never had any tokens or coins in any account or in their possession of control.

At all times, as Mr. Mosley makes clear, the exchange assets were held in addresses and accounts owned and controlled by the Debtors, and were commingled with the Debtors and other assets.

Lord Neuberger, in his declaration, which was admitted into evidence this morning, provides a very detailed analysis of the relevant English law provisions and the law that's relevant to the terms of Service, considered the terms

of service in that context, and ultimately concludes that the FTX.com exchange customers are unsecured creditors. That testimony is unrefuted.

Of course, as we've been discussing over the course of the day today, the Debtors have, nonetheless, agreed to the customer priority settlement, which benefits customers with priorities of payments of assets being distributed as set forth in the plan. So the settlement of those claims and the benefits of that settlement are being seen by all creditors, all customers, on account of their claims as treated under the plan.

So to the extent that the Court is inclined to consider either objection, we submit the Court should overrule both of these objections on their merits.

THE COURT: Thank you. Are any of the -- yes, I see Ms. Favario is on the line.

MS. FAVARIO: Yes, Your Honor.

THE COURT: Can you turn on your camera please, Ms. Favario?

MS. FAVARIO: I'm doing it. Give me a second. Sorry. Okay, here I am.

THE COURT: Thank you.

MS. FAVARIO: Thank you so much, Your Honor, for giving me the chance to speak. My apologies, because English is not my native language, so my English is a little bit

exotic.  I will read my notes, so I will try to avoid to waste your time just trying to argue my points.  I will just read my notes for being quick.

THE COURT:  Can you first address the issue of why you filed your objection late?  It was past the deadline to file objections.

MS. FAVARIO:  Because I didn't know at all that I could file an objection by myself without a lawyer.  I don't have money for paying a lawyer.  And when I discovered was too late.  And I tried, simple as that.  I just tried.  And I hoped that Your Honor could read it and the public could read it.  I'm sorry, I'm very naive.  Bankruptcy is not my thing. I'm learning.  Actually, I'm learning a lot.

THE COURT:  Unfortunately, yeah.

MS. FAVARIO:  Yes.  So in any case, I'm extremely grateful for you give me the chance to speak.  So I'm FTX.com customers, and the money that I had on that platform was the money I received as a compensation for a car crash that left me disfigured.

When I was 19 years old, I had a 20 operation on my face.  Looks kind of okay now, but still full of scars. So this money was the only the money that I had left after the operation were the only thing, the only way to give me a whole day age with dignity.  Because I work as a life model. So I earn between 15 and 20 pounds per hour.  And this gives

me just a chance to survive with dignity, but not to pay attention. So these money were my future.

When I saw them disappear under my eyes on the 11, after the 11 November, I was first confused and disappointed and then quite suicidal. I'm also neurodivergent. So if things don't make sense, I just panic. And in that moment, nobody was giving me any sort of answer. No one was giving me any explanation.

Then at some point after about one year during the winter 2023, I found this community on X that gave me some answer. Mainly I found this community that breaks down quite complex English -- U.S. bankruptcy documents and make it understandable for people as me that they have a bad English.

So that I start to feel a little bit more relieved about thinking, well, actually, maybe something positive can happen. Then there has been the SBF trial and in the U.S. criminal court, the U.S. Criminal court actually cited the same FTX term of service. And the U.S. government successfully argued that customer assets were not the property of FTX, but instead the property of the customers.

But now the proposed plans seem to ignore the original and ambiguous of service, framing the assets as a part of the debt towards the estate. And I think to argue now, after 22 months, that these assets are Debtor assets, I don't know, seems inconsistent with the criminal court

168

findings and SBF conviction.

So the FTX.com term of service clearly and unequivocally establish ownership rights and they say title to your digital assets shall at all time remain with you and should not transfer to FTX Trading. None of these digital assets in your account are the property or of or should or may be loaned to FTX Trading. FTX Trading does not represent or trade digital assets in user accounts as belonging to FTX Trading.

So this language seems to me quite clear. I didn't need any explanation about these sort of things even before when I start panicking. So this language seems quite clear to me that the digital assets on the FTX.com belong to the customer, not to the Debtors, and the term of service grant to customer legal title to their assets.

So after 22 months, the Debtors have avoided these most critical issues in the case, and it has not been something that Your Honor has had the ability to rule on. And that is important for the rule of law, I believe. It is important for contract and property rights.

This court, I think for what is my understanding, has not had the chance to rule on these, the most critical issues in the case and as a result, hundreds of thousands of customers have been left feeling helpless.

And let's remember that, as you can hear from my

beautiful, exotic English, a lot of customers, the majority actually of them, they are not from U.S., and very often they don't even speak English, so they don't have money left to hire a lawyer to explain clearly what's going on in their language, in a language that they can understand.

And finally, it seems kind of incredible that the Debtors now claim that commingling of assets and poor record keeping can override the explicit term of service that establish ownership rights. Debtors may assert that the failure to segregate assets justify treating customer assets as a part of the estate, but this is a failure on their part, not ours.

Under this plan, my contractual rights and my ownership rights have been trampled. My property rights have been disregarded. If the plan will be approved without sorting out before the matter of term of service, and this term of service will be ignored, the FTX bankruptcy will set, I think, a dangerous practical precedent for property and contractual rights.

Property rights is a human right. Right to property is protected by the Fifth Amendment of the U.S. Constitution that says no person should be deprived of life, liberty, or property without due process of law, nor should private property be taken for public use without just compensation.

And last quote is from one of your founding fathers, Thomas Jefferson, that in a letter wrote, the true foundation of republican government is the equal right of every citizen in his person and property and in their management.  Thank you so much for listening to me.

THE COURT:  Thank you, Ms. Favario.  And your English is very good.  Thank you.

MS. FAVARIO:  Thank you.

THE COURT:  Anyone else wish to be heard?  Who's online?  Any other objectors?  Okay.

MR. KYUSONG:  Your Honor, if allowed, may I take the floor?

THE COURT:  Who's speaking, please?

MR. KYUSONG:  My name is Eun Kyusong (phonetic) from Advanced Legal PC who have assisted some Korean and Korean-American unsecured creditors in this case.

THE COURT:  Have you filed an objection to the plan of reorganization?

MR. KYUSONG:  No.  Actually, a 75-year-old Korean-American lady reached out to me last Friday.  So I have some concern to share with you.  Is that okay?

THE COURT:  Unfortunately, yes, it is.  Because we're way too late for new objections.

MR. KYUSONG:  I will be brief.

THE COURT:  No, it's not just about being brief.

It's about whether you have missed the deadline and waived your right to it object or waived the right of whoever this individual is to object.  Number one.

Number two, I don't know that you are an attorney. You say you're representing somebody, but you can't represent someone unless you are an attorney and you have to have local counsel.  So there's all kinds of issues with the fact that this was done late.

So unfortunately, I'm going to have to tell you that I cannot hear you with regard to any issues that you might want to raise.  Okay?

MR. KYUSONG:  I'm attorney in the registered New York.  In New York.  And I'm speaking about my client based on -- this is claim litigation.  So your jurisdiction is allowing attorney in other state to speak, right?

THE COURT:  Well, if it's a claim litigation, you can do that later.  Right now we're dealing with plan objections, and I don't have a plan objection from whomever it is you are saying you represent.  So at this point, I cannot hear you.  You'll have to wait until you get to the claims administration process.

MR. KYUSONG:  Okay.  All right.

THE COURT:  Thank you.

MR. KYUSONG:  Thank you, Your Honor.

THE COURT:  Let's see someone else raise their

hand.  Mr. Uptegrove?  Mr. Uptegrove, can you hear me?  I can't hear you.  You can hear me, but I can't hear you.

MR. UPTEGROVE:  Apologies, Your Honor.  William Uptegrove, on behalf of the United States Securities and Exchange Commission.  I just wanted to address our reservation of rights that we filed.  I can do that later, but I just -- you were asking for people on Zoom that had filed something, so I wanted to make sure that I raised my hand before --

THE COURT:  Only with regard to these objections, but -- and I can tell you, reservations of rights are -- all rights are always, always reserved.  I don't need -- I don't need parties to stand up and say I reserve my rights. Otherwise, I'm going to be here for the rest of the afternoon having people say we reserve our rights.

MR. UPTEGROVE:  Yeah.  Your Honor, we just wanted to make clear for the record that we were -- what we put in our reservation of rights that the SEC is not opining as to the legality under the federal security laws of any of the transactions outlined in the plan.  That's all we wanted to do.  So thank you, Your Honor.

THE COURT:  All right, thank you.  Anyone else? Okay, Mr. Glueckstein

MR. GLUECKSTEIN:  Thank you, Your Honor.  Just really briefly, in response to Ms. Favario, we understand the

concern she's expressing, and we just want to be clear that the Debtors here are distributing all of the assets of this estate. We're distributing every asset that we are able to find.

We are providing a waterfall plan that's going to continue to allow assets to flow if we are able to bring in more assets to augment this estate. As was outlined over the course of the day, starting with Mr. Dieterich's remarks this morning, we have a planned structure here that is as favorable as we think we can make it.

We've done a lot of hard work to get there in terms of trying to really maximize the recoveries to customers, including with the settlements we've negotiated that have allowed for the supplemental remission fund value to potentially flow to those creditors as well.

So we understand the concerns. We do believe that customers are being fairly compensated and then some, given what we're able to accomplish under the Bankruptcy Code.

With respect to the specific objections to the terms of service, customer property, those issues have been conclusively addressed over the course of the hearing today. The evidence in the record, including the conclusions on how to interpret those from Lord Neuberger, are unrefuted.

The evidence before, Your Honor, we submit, establishes not only that the 1919 settlement standard with

respect to the customer priority settlement is satisfied, but that there is no evidence in the record to refute the Debtors assertions with respect to the property propositions and the terms of service interpretation as before the Court.

So with respect to the actual objection that was filed, we do ask that that, as well as the objection from Mr. Gunawan, who it seems is not appearing, be (inaudible).

THE COURT:  Okay, thank you.  All right, I am going to overrule the objections.  Ms. Favario, the Debtors have put on evidence to show and made legal arguments to show that the funds, regardless of what is included in the terms of service, became property of the Debtor's estate once those funds became commingled with everybody else's funds.

And in order to show that you would have a particular interest in any particular piece of property, including any particular cryptocurrency that you might have on the exchange, it would require evidence of tracing to show that the funds that you included or the crypto that you deposited are directly traceable back to some particular point in the Debtor's assets.  And I don't have any evidence of that.

So at this point, I think it is a foregone conclusion at this point that the funds that were in the accounts, despite what might be included in the terms of service, are property of the Debtor's estate at this time.

All the crypto has been liquidated at this point.

If you have a claim and the Debtors are objecting to your claim, you will receive a payment. We've had referred testimony today and others have argued about how the payments are going to be up to 130 and 140 percent of the value of your claim based on what it was at the time of the filing of the bankruptcy.

So for those reasons, Ms. Favario, I'm going to overrule your object.

MR. GLUECKSTEIN: Thank you, Your Honor. Just so the record is clear, is the Court also overruling Mr. Gunawan's objection?

THE COURT: Yes, and Mr. Gunawan's objection as well.

MR. GLUECKSTEIN: Okay, thank you. That's from the Debtor's perspective, I thought we could address all the objections. I understand Mr. Adler thinks there's an outstanding issue. To the extent Your Honor is inclined to hear that, or anybody else who thinks there are outstanding objections, I think we're at that point of the day.

THE COURT: Okay. Let's go to Mr. Adler and hear his objection on the exculpation provision.

MR. ADLER: Good afternoon, Your Honor. David Adler from McCarter & English on behalf of the (inaudible) parties (inaudible). We objected on August 16th to the

exculpation provision under both the plan and the litigation for the plan administration agreement, for the FTX recovery trust.

I've taken a look at the changes that have been made to Section 10.7 of the plan, and they have put in the language that limits the exculpation to the petition date to the effective date. I think there might be a typo because at the end in (c), it just references the effective date but not occurring on or after the petition date.

I do think that it would be -- we said it in our objection that exculpation should be limited to the committee and the Debtor and no other parties. To the extent the Court wants to include other parties, we think it might be helpful to have a list somewhere as a plan supplement of exculpated parties so that everyone knows who's being exculpated. That was on the plan.

On the litigation on the plan administration agreement, paragraph 8. And this is from document 262262, filed on October 3. I'm on page 4 of 9. Paragraph 8 is exculpation. And I had asked during the examinations one of the witnesses about the plan administrator.

Paragraph 8 is giving the plan administrator, who does not yet exist, an exculpation. And when you read this provision of the agreement, this amounts to essentially an advance waiver, advance release.

So we're going to rely on Mallinckrodt, Your Honor, that basically, Your Honor ruled that entities that don't exist, you know, at the time the plan is confirmed, are not entitled to the benefit of exculpation.  And we think that paragraph 8, which is essentially advance release, should be stricken from the -- from the FTX recovery -- from the plan administration agreement.

THE COURT:  Okay, thank you.

MR. ADLER:  Thank you.

THE COURT:  Mr. Glueckstein?  Do you need a minute?

MR. GLUECKSTEIN:  Your Honor, instructing exculpation 10.7 of the plan, as Mr. Adler correctly notes, we have revised that language in consultation with the U.S. Trustee's Office with respect to the scope of that provision. They were comfortable with it.  We don't believe that a list of people needs to be included with that.  This language is standard language that's included, the Court has included frequently to pick up the title types of professionals and advisors, representatives that are exculpated.  The definition of exculpated parties is contained in the plan.

So from our perspective, the language as revised in response to the U.S. Trustee complies with all legal obligations and should be approved.

With respect to the form of the plan

administration agreement, that is, you know, that is disclosed, and the plan supplement is ultimately an agreement that is going to be entered into and executed by the Debtor's recovery trust in Allen Hill (phonetic).  And the terms of that are negotiating a contract from the perspective of not only the plan administrator, but of the Debtor's perspective of setting up the recovery trust, we think that the terms, including an exculpation provision in this agreement, is in the business judgment of the Debtor is appropriate, and so they intended to move forward with it.

We are, of course, asking for approval of the form of the agreement on behalf of the current Chapter 11 Debtor, but it is contemplated to be a three-way agreement that will govern only post-effectiveness activities.

THE COURT:  Can I see a copy of that section?  I don't have it in front of me?

MR. GLUECKSTEIN:  Yes, Your Honor.  May I approach, Your Honor?

THE COURT:  Yes, please.

MR. GLUECKSTEIN:  Section 8.

THE COURT:  Okay.  Thank you.  Anything else?

MR. GLUECKSTEIN:  No, Your Honor.  Well, the only thing I would just to -- so the record is complete, we of course, are asking for approval of the form of these agreements on behalf of the Debtor so that they could be

moved forward and executed on.

They're not -- we're obviously not prejudging anything that's going to happen or conduct of anybody or any actions taken by the plan administrator post-effectiveness. Of course, if somebody believes that there is something that gives rise to a claim, they would have the ability to bring that at the appropriate time.

THE COURT: Okay. All right. I'm satisfied from reading that language. I think it's appropriate at this point. It's only a proposed agreement that has not yet been executed and is subject to, I presume, negotiation once the plan administrator is identified. So I will overrule the objection.

Also, under the exculpation under the plan, I think is also appropriate based on the U.S. Trustee's revisions that they requested, I think those are appropriate, and therefore I will also overrule that objection.

Anything else, Mr. Glueckstein?

MR. GLUECKSTEIN: No, I don't. Unless there are -- I guess we just confirm that there are no other outstanding objections that the Court has not addressed.

THE COURT: Okay. Did we miss any of the objections from anybody? Going once, going twice. Okay. No one has spoken, so I guess we are done with objections.

MR. GLUECKSTEIN: Okay. I had a couple comments

with respect to the order, Your Honor, but I think I really want to address that now or after.

THE COURT:  Do we have -- I'm sorry, I couldn't hear you.

MR. GLUECKSTEIN:  I'm sorry.  Sorry, Your Honor, just two things with respect to the Debtor's proposed form of order.  I have one and I think Mr. Dietderich has one that's just been coming in as things are evolving here.

I just wanted to note for the record, we were asked to note for the record by the U.S. Department of Justice that there are provisions that we have included in the plan that were negotiated.  Sorry.  In the confirmation order that are negotiated provisions starting with Section 153, paragraph 153 of the order that were multi-agency negotiations amongst the DOJ and other the various governmental units that resolved any concerns any of those government entities had.

So that's why they're not here today.  They asked us to put that on the record, and I think Mr. Dietderich has one late point on the board.

MR. DIETDERICH:  Thank you, Mr. Gluckstein.  Your Honor, one last --

THE COURT:  Can I call you Mr. Glueckstein just to make it even.

MR. DIETDERICH:  Thank you, Mr. Dieterich.  Yes,

Your Honor, one last comment also from our -- from the federal government, back to my earlier remarks.  There's a few creditors that have raised a question about language recently added by the SEC.  It's Section 154, the proposed form of order.

That language says that beneficial interest in the consolidated wind-down trust will not be certificated and cannot be transferred, sold, pledged, or otherwise disposed of or offered for sale.  This language is intended, of course, to address the application of the U.S. securities laws and came from the Securities and Exchange Commission.

I just wanted to note for the record, in response to some of these creditor inquiries, it is not intended to prevent the ordinary operation of the claims trading market.  And of course the Debtor will honor claims trades and make distributions to the applicable holders of claims on the record dates as otherwise provided in the plan.

THE COURT:  Okay.

MR. DIETDERICH:  And that's it.

THE COURT:  Did the SEC want to have anything to say about that one?  Anyone here for the SEC or online?  Mr. Uptegrove?

MR. UPTEGROVE:  Yes, Your Honor.  William Uptegrove for the United States Securities and Exchange Commission.  Counsel is absolutely correct, though we concur

182

with what he restated on the record.

THE COURT: Okay, thank you.

MR. DIETDERICH: Thank you, Mr. Uptegrove.

THE COURT: All right, anything else?

MR. DIETDERICH: That concludes our presentation.

THE COURT: All right, well, I guess we've resolved all the objections, so I will approve the plan of reorganization.

I do want to take a look at the proposed form of order, revised form of order, because it came in early this -- or, you know, late this morning, actually just a little less than an hour before the hearing. So I want to take a look at it. I will take a look at that. Is that the final-final version or are we going to have other potential changes?

MR. DIETDERICH: It's final-final.

MR. GLUECKSTEIN: That's it, Your Honor. And that has limited changes that address primarily language we agreed to add on the disputed claims reserve, which I addressed this morning, formalizing the fact that we filed a motion on that. (Inaudible), but we'll obviously let Your Honor take a look at it.

THE COURT: All right, I'll take a look and as soon as I get through it, we'll get it entered for you.

MR. DIETDERICH: Thank you very much, Your Honor.

THE COURT:  Thank you.  Well, I just want to say congratulations, and I think this is a model case for how to deal with a complex, very complex Chapter 11 bankruptcy proceeding.  And I applaud everybody who was involved in the negotiation process and resolving of objections and getting this down to just a few plan objections at the time of the hearing.

I think you did -- you all did a lot of hard work and I greatly appreciate it.  So thank you all very much.

MR. DIETDERICH:  Thank you.

THE COURT:  Okay.  I guess that's it for the these Debtors today, right?  Do we have anything else?

MR. LANDIS:  Thank you, Your Honor.  For the record, Adam Landis from Landis, Rath & Cobb.  Seems a little anticlimactic, but we do have a number four item on our agenda, which is the Celsius litigation administrator's motion for relief from the automatic stay.  We've listed all the responses received, and also there's a similar motion in the Chapter 15 case that has been filed.

THE COURT:  All right, that one I'm going to continue to hold in abeyance until I rule on the issue of whether or not Celsius has an appropriate claim or not.  I think it would be premature at this point to have argument on lifting the stay until I know whether there's something lift the stay for.

MR. LANDIS:  We were at pains to list this on the agenda, Your Honor, but the Debtors certainly appreciate you are adjourning that until the underlying matter is resolved.

THE COURT:  Okay, thank you.

MR. LEVY:  Your Honor.  Richard Levy for the Celsius litigation administrator.  I was in the back of the room and unfortunately could not hear you clearly when you spoke to Mr. Landis.

THE COURT:  I was saying that because I still haven't ruled on the issue of whether or not the claim that you filed is appropriate or not.  I'm going to hold this in abeyance until I make that ruling, and then we'll have -- so I know whether I even need to have a hearing on whether to lift the stay.  And then we'll go from there so.

MR. LEVY:  So that, Your Honor, would relate only to the U.S. cases.  We still have the Chapter 15 case.

THE COURT:  We'll deal with that.  Are we dealing with that with your agenda, Mr. Shore?

MR. SHORE:  Yes, Your Honor.

THE COURT:  Okay, so we'll deal with that when we get to Mr. Shore's agenda.

MR. LEVY:  I didn't hear Mr. Shore.

THE COURT:  He said yes.  That's on the agenda for discussion in connection with that case as opposed to --

MR. LEVY:  So that's going to be carried to

185

another date as well?

THE COURT:  No, no, we're going to talk about it today once we get to it.

MR. LEVY:  Okay.  Sorry, Your Honor.  Thank you.

THE COURT:  No problem.

MR. LANDIS:  Your Honor, again, for the record, Adam Landis of Landis, Rath & Cobb, on behalf of the Debtors.  That does conclude the agenda for the FTX Trading case today.

THE COURT:  Okay, thank you, Mr. Landis.

All right, Mr. Shore.

MR. SHORE:  Well, Your Honor, we have only one thing on -- again, Chris Shore from White & Case for the Chapter 15 Debtor.

We have only one item on the agenda today, which is the lift stay motion, and I would just turn over, unless Your Honor wants to take a break, turn over the podium to the Celsius administrator, and they can make their argument, and I will respond.

THE COURT:  Okay.  Do we have any evidence on this issue or is it all legal argument?

MR. SHORE:  We had put in the evidence at the last hearing with respect to the other declarations.  The Celsius administrator, I believe, wants to move in one objection or, sorry, one sur sur reply declaration.  And I'd like to be heard on that when we address it.

THE COURT: Okay. So no new evidence from the joint administrators?

MR. SHORE: Correct.

THE COURT: Okay, thank you. All right. Mr. Levy?

MR. LEVY: Good afternoon, Your Honor. Richard Levy, Pryor Cashman for the Celsius litigation administrator. As a preliminary matter, Your Honor --

THE COURT: Now I'm having trouble hearing you, Mr. Levy, can you pull him a little closer? Try it there and see if that works.

MR. LEVY: Is that better?

THE COURT: That's better, yes. Thank you.

MR. LEVY: Thank you, Judge. Sorry, Your Honor. You have trouble hearing me, I have trouble hearing you, and I have a hearing problem, which makes it all -- I apologize, Your Honor.

THE COURT: We'll get through it.

MR. LEVY: Your Honor, as a preliminary matter, to complete the evidentiary record at the last hearing, Your Honor granted us an opportunity to file a sur reply affidavit declaration from -- excuse me -- from Bahamian counsel, which we did at Docket No. 190. The affidavit of the declaration of Tara Cooper Burnside, a member of the firm of Higgs & Johnson in the Bahamas. And I can proffer that, Your Honor,

if you need anything more than a simply --

THE COURT:  No, I've seen it.  So let me just ask you, Mr. Shore, are you objecting to (inaudible)?

MR. SHORE:  I do have an objection to a couple of paragraphs.  I can either address that now or let counsel go and just carry that objection.  I just ask you to strike, I think, five paragraphs.

THE COURT:  All right, let's leave -- you finish up, and then we'll go from there.

MR. LEVY:  Thank you, Your Honor.  Your Honor, when we were here a couple of weeks ago, we began the discussion of whether or not this application should be granted relief from the stay by Your Honor with respect to a proposed subsequent transferee litigation against the Celsius -- excuse me -- against the FTX U.S. -- the FTX DM.  I apologize, Your Honor.  I'm trying to find ones that are (inaudible).  I apologize.

THE COURT:  Take your time.

MR. LEVY:  Picking up from where we were, Your Honor, at that time.  Your Honor, I've left this out of my notes back at my seat.  May I go back?

THE COURT:  Certainly.

MR. LEVY:  Thank you, Judge.  Your Honor, can I ask for the Court's indulgence?  Could we have a five-minute break while I get everything in order?

THE COURT: Sure. Let's make it ten, and we'll come back at 3:30.

MR. LEVY: Very good.

THE COURT: Thank you.

(Off the record at 3:22 p.m.)

(On the record at 3:31 p.m.)

THE BAILIFF: All rise.

THE COURT: Thank you. Please be seated. I forgot something. All right.

MR. LEVY: Is this good? Judge, can you hear me here?

THE COURT: Yes. Thank you.

MR. LEVY: Judge, Richard Levy for Pryor Cashman in behalf of the Celsius litigation administrator. Thank you for the break, Judge. I appreciate that.

To finalize the admission of Ms. Cooper's -- Ms. Burnside's declaration, Judge, I believe she is on the line. Both parties, I understand, have waived or the other party has waived cross examination. But if the Court has any questions, she will be available.

THE COURT: Okay, so we resolved the issues that Mr. Shore wanted to strike some of the declaration?

MR. SHORE: No, but that does not require any cross examination to establish.

THE COURT: Okay, so I'll -- the declaration is

submitted without objection, then, subject to Mr. Shore's wanting to strike certain provisions.

MR. LEVY:  Judge, when we were here last time, you were asking the question why should you be deciding this matter?  The submission by Ms. Burnside makes clear why you should be deciding it.  And I will further amplify why you should be deciding it and why you should be deciding it now.

To put a finer point on it, even with our having filed lift stay motions in both the United States and Bahamian courts, we are bound to do so because we're dealing with dueling Debtors in both of those jurisdictions.  Because there are Debtors on both sides of the aisle, lift stay relief is required from both of those courts.  We need relief from this court in order to sue in our United States claims because we seek to pursue a judgment under the United States Bankruptcy Law in a United States Bankruptcy Court.

Now, we filed a proof of claim in the Bahamas because we had to in order to participate in the Bahamas case if we wanted to receive a distribution in that case.

However, Your Honor, as was pointed out in the proof of debt filed as Joint Official Liquidator's Exhibit 4, we make very clear that instead of submitting to the jurisdiction of the Court for purposes of determination of our claim by the Joint Liquidators, we are asking for relief from the stay in order to proceed with a proceeding, a court

adjudication of the issues that we have raised in our draft complaint which arise under Sections 547 and 550 of the United States Bankruptcy.

While we may have submitted to the jurisdiction of the court in the Bahamas for various purposes, that does not mean that the United States lift stay proceeding cannot or should not go forward.  The fact that the -- excuse me -- it cannot go forward.  And in fact, as a practical matter, it should.  Let me explain why.

To the extent that we seek to proceed on our proof of debt through a proceeding and not through Joint Official Liquidators' adjudication, we need an indication from both courts that we can do so.

Your Honor would be asked in the first instance to grant relief from the automatic stay so that we can pursue the litigation.  We know we have to go back to the Bahamian court.  We have a lift stay proceeding already pending in that court.  It's not teed up anywhere near we are in this, but if Your Honor were to grant us relief, we think that that would have exceedingly probative value for the Bahamian court for this reason.

We are asking for relief under United States Bankruptcy Law.  That's something that's relatively alien in my understanding.  And I think Ms. Burnside could probably amplify this.  U.S. preference law, bankruptcy law, is not

something that comes before the Bahamian courts with any regularity. They deal with local law. But we're asking for a proceeding to happen here in the United States where the Bahamian state does not even apply.

But be that as it may, we need both courts to say, yes, go ahead and proceed. And we believe it would be more efficient for Your Honor to make the initial ruling which says, hopefully, yes, you can proceed with your United States preference claim.

I want to know for sure that the Bahamian court will go along with that. And that may take a while because the Bahamian system is somewhat slower than Your Honor's courtroom.

It would be very similar, Your Honor, in a situation I talked about last time I was here where a court facing a lift stay proceeding says, yes, I want to let another court handle the determination of the claim, the adjudication allowance, the liquidation of the claim. That's effectively what we are asking the Bahamian court to do.

But I don't think the Bahamian court will be as influenced on whether or not to grant that relief, unless Your Honor tells us, which we ask, that, yes, you can proceed on it here. And frankly, Your Honor, the United States courts are way more familiar with American bankruptcy.

It's hard to believe that a Bahamian court not

well versed in American bankruptcy law would take unto itself that determination.

On the flip side, as I said, it makes sense for a Bahamian law based controversy to be decided. It makes sense for a Bankruptcy Law-based controversy to be decided by the United States court that's fully versed in the body of law.

Now, Your Honor, in her declaration, Ms. Roll (phonetic), her sur reply declaration, Ms. Roll suggested that it was doubtful, and I use that word doubtful that a Bahamian court would recognize a claim based on Sections 547 and 550 because Bahamian preference law is different.

That's not the point. The point is a claim predicated on United States Bankruptcy Law which we request to be adjudicated in the United States and then taken back to the Bahamian court for consideration in connection with the allowance of our proof of debt, that's what matters. We're asking for the Bahamian court, hopefully with Your Honor's prior approval that we can proceed with an American bankruptcy litigation. The Bahamian court will say sure, go ahead and do that. Come back and see me in the Bahamas when you've got your case completed.

Your Honor, in effect, doesn't have to do anything more today other than say yes, you can proceed under the automatic stay. We know we have to deal with the Bahamian court before we can go farther with where we are.

To be clear, we recognize that at the end of the process, we have to bring any U.S. judgment back to the Bahamian court in order to participate in the proceeding at that time.  We are not trying to do an end run around the Bahamian court, and we are certainly not trying to do anything untoward in this court.  We are simply asking for what is our right, I believe, under the circumstances, relief from the automatic stay.

Now there are good and plenty reasons why Your Honor should do that, in addition to the fact that a Bahamian court is not a court of U.S. Bankruptcy Law.  What we have asked for is permission to proceed in front of Judge Glenn in New York for a couple of reasons.

He is well versed in the proceedings.  He has all of the experience in the Celsius case.  He has all of the Celsius proceedings centralized before him.  It would be efficient for that court to continue to hear all matters relating to that proceeding.  And once again, Judge, we still have to go back to the Bahamas if and when we prevail in that proceeding.

I think, Judge, that's about all I need to say at the moment unless Your Honor has questions.

THE COURT:  I just want to be clear what relief you're asking me for.  You want me to lift the stay?  Say yes, I'm going to lift the stay to allow you to proceed with

your adversary proceeding in New York.

MR. LEVY:  Yes, Your Honor.

THE COURT:  So why -- I mean, this is a Bahamian entity that's in a liquidation proceeding in the Bahamas with assets located in the Bahamas.  Number one, why does U.S. Bankruptcy Law even apply?  And number two, why should I -- why shouldn't I allow the Bahamian court to decide whether they want to hear it or whether they want Judge Glenn to hear it?

MR. LEVY:  This is not a usual ancillary proceeding.  This is a case now that involves a Chapter 11 plan under which distributions are going to be made to the DM customers with U.S. assets based on transactions that those parties engaged in.  Celsius was a U.S.-based entity.  The transfers came from U.S.-based entities.

As we pointed out, Your Honor, the judge in New York has made various determinations and is administering the stay and that's where we submit it should be determined.

I'm not asking Your Honor to do anything more today than say, yes, you can proceed.  Just make sure you do it right with the Bahamian court.  And I believe, Your Honor, that a Bahamian court may have some question about whether or nothing not to allow a proceeding under U.S. Bankruptcy Law to proceed separately than the proceeding there.  But a Bahamian judge doesn't deal with bankruptcy every day.

THE COURT:  Well, why can't I just say, okay, I'll lift the automatic stay but it's up to the court in the Bahamas to decide whether they're going to hear it or Judge Glenn is going to hear it?

MR. LEVY:  Not exactly what I anticipated to hear from Your Honor.  That certainly gets us over the first hurdle, which is to get relief from the automatic stay subject to our going to the Bahamian court to make a further determination.

I believe, Your Honor, that recognizing what I will call the primacy of U.S. Bankruptcy jurisdiction, it's better for a U.S. Bankruptcy Court to be hearing it, even if Your Honor grants us that relief.  I can't tell you that the behavior court is going to say, no, I'm not going to let you go back to New York.  At least let us have the relief that we've asked subject to going to the Bahamas and doing what we have to do next.

THE COURT:  And again, I don't know if you answered my question.  Maybe you did.  I just didn't catch it.

MR. LEVY:  I'm sorry Judge.  I didn't hear you.

THE COURT:  I have -- one of my questions that I asked, I'm not sure.  You may have answered it and I just didn't catch it.  But why does U.S. Bankruptcy Law apply to Celsius's claims against a Bahamian entity in the Bahamas?

MR. LEVY:  The transfers came from Celsius, a United States-based entity.

THE COURT:  Well, they came -- these, again, are the same type of situation where customers withdrew funds, pre-petition and then deposited them in the Bahamas?

MR. LEVY:  I can't say that for sure, Judge.  I don't know all those details.  I do know that the money came out of Celsius United States.  That took --

THE COURT:  Kind of an important issue.

MR. LEVY:  Pardon me?

THE COURT:  Kind of an important issue to know.

MR. LEVY:  It is, Judge.  And as far as I'm concerned, Judge, the 500 or so cases, the transfers emanate from the United States.  That's a basis for jurisdiction just as it's a basis for bankruptcy venue.  Where are the assets located.  Here, the transfers came from the United States.

THE COURT:  But the assets, from what I understand, and maybe you can correct me if I'm wrong and Mr. Shore will address it too, the assets, as far as I understand, are in the Bahamas.  That there's this joint agreement between the U.S. Debtors and the Bahamian Debtors that a claimant can say I want my claim decided in the U.S.

MR. LEVY:  Well, that's an interesting question, Your Honor, because I don't think any of us knows yet exactly how many entities who were claimants accepted U.S.

197

jurisdiction versus Bahamian court jurisdiction. That's something that may have to get sorted out.

But let me posit this to Your Honor. Your Honor grants us leave from the automatic stay and says, go ahead, go litigate in front of Judge Glenn. Judge Glenn hears the proceeding on the initial claims that have left -- that left Celsius and are now in the hands of the former Celsius customers who are FTX customers.

We get a judgment. We get a judgment saying you're right. You now have initial transfers that have been avoided. They were avoided in the United States -- based on United States law. We have to go back to the Celsius court. We have to ask for permission to enforce that judgment in the Bahamian proceeding, and we will continue to pursue our subsequent transfer remedies against anybody anywhere who is subject to jurisdiction.

THE COURT: All right. Okay. Let me hear from you.

MR. LEVY: Your Honor, I'll reserve in case you have further questions.

THE COURT: Thank you.

Mr. Shore?

MR. SHORE: Thank you Your Honor. Chris Shore from White & Case on behalf of the JOLs.

As I said, I have one evidentiary issue, and then

I want to address each of Your Honor's questions that you just asked. Let me deal with the evidentiary issue first.

We ended last hearing with the Court authorizing a sur reply, no question. And I stood up and I said I want to make clear this is a sur reply to address the issues that were raised for the first time in the sur reply of Ms. Roll-Capp. Nobody said anything otherwise.

Then we got the Burnside declaration, and we object to paragraphs 6 through 11 as improper sur sur reply and ask the Court to strike them. These paragraphs concern the jurisdictional scope of the Bahamian stay and how it applies to claimants in the Bahamian proceedings.

Let me set up the record on this first to explain why I think this issue should have been raised long before last week when they filed this sur reply. Celsius filed its motion on June 5th. It's Docket 155 in the 15. The JOLs filed their opposition on July 8, which included two declarations that the declaration of Ms. Roll-Capp, which is in evidence, was at 166.

At paragraphs 7 through 12 of that declaration, which was filed in July, Ms. Roll-Capp describes the effect of the Bahamas stay on Celsius and she concludes at paragraph 11, if the Celsius litigation administrator has claims against FTXDM, Bahamian law requires that he first seek to lift the Bahamas stay or seek leave from the Bahamas court.

That was a -- evidence that was submitted to the Court on July 8th.

On September 4tj, Celsius filed its reply at Docket 173 in the 15, and that response is silent as to the lift stay point.  They did not attempt to, at that time, rebut anything that was said in Ms. Roll-Capp's declaration with respect to the extent of the stay.  Five paragraphs.

Then on September 10th, we filed the supplemental Roll-Capp declaration at 181.  In one paragraph, paragraph 5, Ms. Roll-Capp declares, as I stated in my initial declaration, and she summarizes what she said, which was to emphasize the point of the following paragraphs, which is that, having read our opposition, Celsius decided to actually go seek lift stay not until September, as opposed to seeking stay from this court in July.

So now on September 4th -- or no, sorry, not at September 4th -- Ms. Burnside seeks to establish that the stay only applies in the Bahamas.  That was testimony that should have been provided in connection with the reply.  It is not appropriate to have it come in as sur sur reply at this point.

And I want to make clear why the record needs protecting here from just people lobbing in new stuff at the last second.  In the paragraphs at issue, Ms. Burnside quotes extensively to Vocaline (phonetic).  In that block quote,

that court made clear, this is not the case where the person sought to be restrained from proceedings abroad has made himself a party to the proceedings, such as, for example, filing a proof of claim.

But this case is that case. We're not dealing with what happens, what is the extent of a stay in a case in which the party has not submitted to the jurisdiction. We're dealing with a case in which the party has submitted jurisdiction.

So just as Mr. Levy came last time with --

MR. LEVY: Levy.

MR. SHORE: Levy. Sorry. Came with his own cases, we could go back and forth all day. I've got the cases here that deal with the instance in which a party has submitted to the jurisdiction of the Court, and they stand for the obvious proposition.

If you go into a court and you seek to have your claim adjudicated in that court, which is trying to provide radical distribution to all, you're not free to just go around the world and seek to have dozens, hundreds of other courts adjudicate your claim without seeking relief from the court to which you submitted your claim.

So the point, the whole point here is I think you should just strike 6 to 11. The record exists as it existed when the opposition to the motion was submitted months ago.

THE COURT: Okay, let me ask Mr. Levy if he wants to respond to that.

MR. LEVY: Sure, Your Honor. I note, Your Honor, that in as much as Mr. Shore wants to remove those paragraphs, he's arguing from them even before we've gotten to that point. Your Honor, this was an affidavit by Ms. Burnside to explain the full panoply of what she perceives to be the issue here. Whether Your Honor can rule, whether the Bahamian court should rule.

I dispute the question of whether or not this is something that needed to be -- needed to be handled previously. We got Ms. Burnside. Ms. -- sorry, Ms. Roll's supplemental affidavit two days before the hearing. The key issue was now in front of Your Honor at that hearing as I started to present cases and Your Honor said, I need to hear more. I need to understand what's going on. And we said we would not go beyond the confines of Ms. Roll's supplemental declaration. We have not done that, Judge.

We have limited ourselves to Ms. Roll's supplemental declaration, the points that were made, and these are important points, Your Honor, in considering which court has jurisdiction or should have jurisdiction to act first. We think the provision should remain before the Court.

THE COURT: Mr. Shore?

MR. SHORE:  I'm not disputing they're important points.  All I'm saying is if they had an important point to make, it should have been made in the normal sequence in responding to the objection which was filed months ago, not a week before the hearing.

THE COURT:  All right, I'm not going to strike them, but I'll take them for what they're worth.  I did read the declaration, so I'm familiar with what Ms. Burnside had to say.  So we'll just leave it at that for now.

MR. SHORE:  Okay.  I have two points to make on the objection to lift the stay in the Chapter 15 recognition order.  One is the question of sequencing.  Which court should decide the two pending lift stays, first?  And second, the lack of cause at this point to lift the stay in the 15.

Point one, we believe this court should let the Bahamas court decide first where the Celsius avoidance claim gets liquidated and then have this court follow on at a later date.  Either leave the stay in place or follow the direction of the Bahamian court.

And I want to start with the actual state of play because I think it's kind of getting lost, and it gets sometimes lost because these motions were -- or the companion lift stay against the U.S. Debtors was pending.

FTXDM has an ongoing liquidation in the Bahamas, which is the recognized foreign main proceeding with the JOLs

as recognized foreign representatives. The Celsius administrator contends that he has claims against FTXDM, not against the U.S. Debtors. That's the subject of the late claim, but against FTXDM based upon these alleged facts.

During the Celsius preference period customers of Celsius directed that Celsius move their crypto and cash in excess of $350 million to accounts at either the U.S. Debtors or FTXDM in the name of those customers that were listed in that sealed spreadsheet.

Wherefore, the Celsius administrator argues, FTXDM is liable to him for those transfers as a subsequent transferee. Okay. And now he's filed that claim in the Bahamian liquidation. That is, the liquidator has asserted a proof of claim for monies that he alleges were transferred to FTXDM accounts for customers removing their cash and crypto from the Celsius platform during the preference period.

But he's insisting that rather than having the Bahamian court liquidate that claim, he should be able to liquidate that claim in the New York Bankruptcy Court.

We oppose and believe that the claim must be liquidated in the Bahamas, and here's the current state of play. I think we all agree that two courts must act. This court must lift the Chapter 15 stay that's applicable to Bahamian court to lift its stay. Or, and I want to pause here, address a supplemental anti-suit injunction.

So when we filed our opposition to the stay, the Celsius administrator responded by filing a lift stay motion, months after they filed the lift stay motion in this court, essentially acknowledging that they needed to get relief of the Bahamian court, as Ms. Roll-Capp had pointed out.

They then filed the sur reply, the sur reply taking the position that regardless of what the JOLs were saying, they believed that the stay of the Bahamian court only applied within the territorial jurisdiction of the Bahamas, taking the position they were free to go anywhere in the world and seek to recover assets of FTXDM without relief from the Bahamian court.

So we have now filed a belt and suspenders anti-suit injunction action against them in the Bahamas to ensure that pending further order of the Court, they're not free to go around the world and seek to have their claims liquidated anywhere else, which would be a stay violation.  So that's the current state of play.

So now, we have a lift stay pending against the JOLs here in New York.  We have a lift stay pending in the Bahamas.  We have an anti-suit injunction application pending in the Bahamas, and we think that the Bahamian court should get the first shot at deciding, then have this court address, to answer your sequencing point.

We don't believe it would be appropriate for Your

Honor to rule on the Chapter 15 lift stay and then send it back to the Bahamian court to address the lifting of the Bahamian stay.

And this is fundamentally a question of comity between this court, not the New York Bankruptcy Court, but this court as the Chapter 15 court and the Bahamian court as to how to best protect their common debtor and their creditors.

I don't want to spend too much time on comity, other than to say it's -- I've always found it to be a do unto other courts as you would have done to yourself.  This is a question of a claim being asserted against the Bahamian Debtor in a different proceeding.  And I believe Your Honor would be rightfully upset if what happened here is the Celsius administrator had gone to the Bahamian court and asked the Bahamian court to rule on whether or not their claims against the U.S. Debtors were timely or valid or anything else.  This is fundamentally a core responsibility of the Bahamian court to allow or disallow claims against the Bahamian Debtor.

But I want to, you know, beyond that general concept of comity in which a Chapter 15 court routinely defers to an appropriate, sound decision of a court in the foreign main proceeding, there's a very specific reason why we're asking the Bahamian court to address this, and I'm

going to have to back up for just a second.

You heard earlier today in the confirmation hearing the discussion of a customer claim and how that was defined in the classification scheme of the Chapter 11 Debtor's plan. We also have a customer/noncustomer delineation in the global settlement agreement which Your Honor approved and which the Bahamian court has approved and which will go effective when the U.S. Debtor's Chapter 11 plan goes effective.

There is a definition of FTX customer entitlement claim that's at page 8 of the GSA which is attached to JOL-1. And it makes very clear that a customer claim are monies that were deposited on the exchange in the name of the creditors. Celsius is not alleging that the customers were -- or that they were a customer of the Debtors. Their argument is customers of the Debtors moved our money. So they do not fit the entitlement of customer claims which will receive depending on where you elect essentially the same treatment, whether you're in the Bahamas or the U.S.

THE COURT: How did they file it in the Bahamas? Is it similar here? We had customer claims and noncustomer claims. It had a different proof of claim form.

MR. SHORE: They filed a noncustomer claim. They're contending that they have a customer claim. But I don't -- when we're talking about cause and likelihood of

207

success, I, for the life of me, don't understand their argument.

THE COURT:  Is it the same issue that they claim they have an ownership interest in the customer's account?

MR. SHORE:  It's not in their lift stay motion.

THE COURT:  Okay.

MR. SHORE:  So I don't know.  The issue of a noncustomer claim is as follows.  Under the approved GSA, the Bahamian Debtors have $15 million to pay noncustomer claims, and in those noncustomer claims include all the trade of all the Bahamian operations of the Debtors that existed as of the petition date.  That amount was set as part of the process long before Celsius ever decided to come forward and say they've got a 350-plus million dollar claim.  But that is now final.

And so one of two things is going to happen.  If that claim is allowed in the amount they want, the trade will get wiped out in the Bahamas, just diluted down to nothing. Or there will be potentially residual money which will flow back to the United States estates through the mechanisms of the GSA.

If that's going to be the effect of the allowance of this claim, it would seem to me that the Bahamian court is the best court in the first instance to address who's going to be liquidating that claim and in what timeframe.

If what's going to happen here is the noncustomer entitlement pool is going to be held up while this claim is litigated in a New York Bankruptcy Court pursuant to the Federal Rules of Civil Procedure and the Federal Rules of Evidence, the Bahamian court should be the one deciding whether or not we can all sit around and wait for that to happen or whether this gets addressed in the Bahamian proceedings.

So to answer your question, why shouldn't I just lift the stay and send it back to the Bahamian court, it's because from a comity perspective, it's more appropriate, we believe, for Your Honor to say, you know what?  Why don't I hear from the Bahamian court on issues that are central to its estate, and then I'll decide whether or not it's an appropriate order, which I will recognize in the Chapter 15, or I'm going to go a different way and lift the stay, or I'm going to go a different way and not lift the stay, however you want to do it.

But it seems from a sequencing perspective in a 15, it's better to have the foreign main proceeding court address that originally.

To the extent, though, that we're going to get in to the merits of the lift stay motion in the 15, I've got four reasons why you should not lift the stay.

First, the Bahamian court's always going to have

to act here.  Lifting the stay doesn't take away the need for the Bahamian court to deal with the anti-suit injunction with the lift stay motion or, as counsel just pointed out, domesticating the judgment.

Lifting the stay though, point two, is going to create another forum in which we're going to have to do battle with them over a $15 million capped recovery.  We should be looking for ways to streamline the process, not to fall into the trap that all U.S. people want to do is litigate.  We don't.

We're trying to resolve a limited pool situation and exploding this into necessary proceedings in the Bahamas and allowing a preference litigation to go forward in New York doesn't seem an appropriate way to conserve resources here.

But more importantly, if you look at the Rexing (phonetic) factors, there are some key issues here that Your Honor would have to rule on, which in fairness should be done by the Court.  In order to lift the stay, you're going to have to find that the DM estate is not prejudiced.

But the question of prejudice to the DM estate, particularly laying out what I just did with respect to the treatment of noncustomer claims, I don't know that you're in a position to address that as well as the Bahamian court or that you have the record from which you can make that

210

conclusion.

And think about likelihood of success on the merits. Counsel stood up and said this is easy, it's just a preference action. Preference action to go forward in New York. New York court can deal with this, but we all know from our experience in this case that it's not that easy.

Think about one issue, the ownership of the assets. Under the DM terms of service. Is the DM estate an initial transferee? That is, that the money was transferred to them. Is it a subsequent transferee? What happens with respect to commingling?

Your Honor is appropriately making those decisions for the U.S. Debtors. But opining on, without a record in front of you that they have a likelihood of success that they'll be able to show that the Bahamian Debtor was a subsequent transferee, that is, the title to those assets went to the customers and that somehow we took it later, I don't know how you go about addressing those concepts.

Same with the issue of can they get an attachment? They have a likelihood that they're going to be able to get this customer money at a later date. How does Your Honor rule on this record with respect to the ability of the Bahamian court to garnish creditor distributions?

And then finally, I don't think there's any rush here. Why does this have to be decided now? Again, we have

the motions pending in the Bahamian court.  Counsel pointed out in her supplemental sur sur reply declaration that the Court's expected to act.

The only issue that counsel raised was, well, we're further along in this proceeding.  But the reason they're further along in this proceeding is because instead of filing their lift stay application on June 5th in the Bahamian court, just like they did here, we're just further behind in sequence.

So they can't -- they can't create the problem and say we should be proceeding here in New York because we didn't file our lift stay motion until two months after we were supposed to.

So I think at this point, again, primarily, I think this is a question of comity that Your Honor should just be deferring to the Court.  We can come back quickly to Your Honor after the Bahamian court decides whether or not to leave lift the stay to see where that claim is going to be liquidated and we can handle it quickly with Your Honor.

I'm not going to necessarily have a problem while reserving rights if the Bahamian court says I'm lifting the stay and allow it to go forward in New York, and I'm going to have a hard time arguing to Your Honor that you should stop it.

But by the same token, if the Bahamian court says

212

I'm not lifting the stay, even if Your Honor were inclined under U.S. law, if this was a Chapter 11 debtor to allow it to proceed in the New York court, I think really you should be deferring in that case to the Court, reserving your right to find that in recognizing that order there was some defect in due process or something like that that you wouldn't want to recognize that order.

So I think sequencing, let's go first. But if you're inclined to take it up, let's go first in the Bahamas. But if you're inclined to take it up, I'd ask that you deny it.

THE COURT: Okay. Thank you.

Mr. Levy?

MR. LEVY: One moment, Your Honor.

THE COURT: Yep.

MR. LEVY: Thank you, Your Honor. Let me be brief, Your Honor, but the first thing I do want to say is that the anti-suit injunction is news. We haven't been served with it. We know little, if anything, about it other than what Mr. Shore has explained today. Another 11th hour tactic to try to delay this proceeding.

In any event, I have told Your Honor that we know we have to go back to the Bahamas at some point for final allowance of our claim, which we hope the merits of will be litigated in the United States. We know that the stay in

Bermuda -- in the Bahamas is not extraterritorial.  The fact that they filed an anti-suit injunction this morning, I gather it was this morning, just proves the fact that the Bahamian stay doesn't extend beyond the shores of the Bahamas.

Now, this is a non-routine case.  Mr. Shore would have you believe that courts always defer in a Chapter 15 situation in comity rules.  This is not a routine case.  This is a case in which distributions are being made under different plans to customers of DM, the Bahamian Debtor, and money is already going out the door.

We now have a -- it's almost ready to go out the door.  We now have a confirmed plan through the gentleman sitting to my right.  The efforts of the Debtors.  That's going to start.

In the meantime, whatever rights we may have that we can demonstrate to a court with jurisdiction to hear our claim, we run the risk that the remedy is being frustrated merely by the passage of time.

I will note, Your Honor, one of the last things Mr. Shore said was who do we really have a right to recover against?  It's clear in our papers, Your Honor, that the progression is Celsius to initial transferees, the customers.  We win.  We have rights against them, but we also have rights to go down the chain.  How FTXDM held its assets, we'll get

214

to that point if we need to.  We have a right to look to any initial -- to all of the initial transferees and all of the subsequent transferees that we can find, recognizing under Section 550, we only get one single recovery per transferee, per initial transfer.  So we'll get to that point, Judge.

But those points belong with the Court having jurisdiction over the adjudication of a proceeding, which we believe should be the United States court.  Under comity rules, I don't think that that necessarily applies here, Judge, because we are asking the Bahamian court to let us come back here just as we are asking you to endorse our application.

And this is a dual court situation because we have two debtors.  We need, Your Honor's imprimatur.  We need the Bahamian imprimatur.  There's no harm for Your Honor to rule on this at this point and let us take that ruling back to the Bahamian court to say, look, we have a U.S. judge recognizing that the claims on which we plan to sue are U.S. claims under the Bankruptcy Code which the Bahamian courts do not administer.

Ms. Roll, when I was speaking earlier, said she doubted that a Bahamian court would recognize a U.S. preference claim.  She didn't have any citation to (inaudible).  It was her doubt.  It was not an absolute statement that it will never happen.

And I suggest, Your Honor, that because we don't intend to use the Joint Liquidators' adjudication process, if the Bahamian court will let us take on a proceeding, it's going to be handled by a court here. And that court's judgment, hopefully in our favor, we will take back for the adjudication process.

Your Honor, I think that's all I have. Unless you have questions.

THE COURT: Okay. No questions. Thank you.

MR. LEVY: Thank you, Judge.

THE COURT: All right. I'm not going to lift the stay at this point. I don't -- I just don't have enough information, I think, and I think a lot of this is going to be connected to what I do with the U.S. Debtors if I'm going to lift the stay for them. And I'm not going to make that decision until I decide whether Celsius actually even has a claim against the U.S. Debtors.

So there's a lot of steps here that need to be happening before I get to a decision about whether I'm going to lift the stay to allow something to go forward in New York that might have an impact on this case and my decisions about the U.S. Debtors as well as their Haitian Debtors.

So at this point I'm not going to rule. I'm going to hold this in abeyance until I rule on the question of, one, whether Celsius has a claim against the U.S. Debtors

and, two, whether I would lift the stay against the U.S. Debtors and allow the case to go forward in New York or whether to allow it to go forward here.

And I think once I make those decisions, then we can follow along with what happens with the Bahamian Debtors at the end of the day.

MR. LEVY:  Your Honor, one housekeeping matter that I should have addressed while I was at the podium, my local counsel reminds me that as the movant in this matter and subject to Your Honor's having taken, will take it under advisement, carry it without a decision because obviously the decision may affect us, given that we have a tolling agreement.

I should move the admission of all declarations and exhibits into the record so that it is complete before Your Honor.

THE COURT:  Which declarations are we talking about?

MR. LEVY:  The Roll declarations.  They're in the exhibit list, Your Honor.  But the exhibit lists, Your Honor, that were filed for this proceeding.

THE COURT:  Weren't they admitted in the first hearing?

MR. LEVY:  It's at Docket No. 192 is the full list of exhibits and declarations.

217

THE COURT:  I think all of them have been admitted at this point, they were either admitted the first hearing --

MR. LEVY:  Your Honor, Ms. Burnside's declaration. That was --

THE COURT:  That, I said, was submitted.

MR. LEVY:  Yes.

THE COURT:  So everything's in already.

MR. LEVY:  Thank you, Judge.

THE COURT:  Okay.  All right.  Anything else? Okay, well, thank you all very much.  As I said, I will try and get these rulings out as quickly as possible, because I know we need to start moving things forward and get these issues resolved.  So I thank you all for your patience, and we are adjourned.

MR. GLUECKSTEIN:  Thank you, Your Honor.

(End of Proceedings.)

218

CERTIFICATION

We certify that the foregoing is a correct transcript from the electronic sound recording of the proceedings in the above-entitled matter to the best of our knowledge and ability.


/s/ William J. Garling                    October 8, 2024

William J. Garling, CET-543

Certified Court Transcriptionist

For Reliable


/s/ Tracey J. Williams                    October 8, 2024

Tracey J. Williams, CET-914

Certified Court Transcriptionist

For Reliable