**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE**

|  |  |
|---|---|
| In re: | Chapter 11<br>Case No. 22-11068 (KBO)<br>(Jointly Administered) |
| FTX TRADING, LTD., *et al.*,[1] | **Related to D.I. 35243**<br>**Hearing Date: May 14, 2026** |
| Debtors. | |

**DECLARATION OF DANIEL ALLEN IN SUPPORT OF SETH
MELAMED'S OBJECTION TO THE FTX RECOVERY TRUST'S
<u>MOTION TO ENFORCE PRIOR ORDERS [D.I. 35243]</u>**

I, Daniel Allen, hereby declare that the following is true and correct to the best of my knowledge, information and belief:

1.      I am a Partner at Mori Hamada & Matsumoto ("**<u>MH</u>**"), an international law firm with its principal Japanese office at Marunouchi Park Building, 2-6-1 Marunouchi, Chiyoda-ku, Tokyo 100-8222, Japan. I am admitted to practice law in New York, and I am a registered foreign lawyer in Japan. I make this declaration based on my personal knowledge.

2.      I serve as lead counsel for Seth Melamed ("**<u>Mr. Melamed</u>**") in Singapore International Arbitration Centre ("**<u>SIAC</u>**") arbitration ARB602/25/VKH (the "**<u>SIAC Arbitration</u>**"), in which Mr. Melamed is the Claimant and the FTX Recovery Trust (the "**<u>Trust</u>**") is the Respondent.

---

[1] The last four digits of FTX Trading Ltd.'s and Alameda Research LLC's tax identification numbers are 3288 and 4063, respectively.  A complete list of the Debtors and the last four digits of their federal tax identification numbers is not provided herein. A complete list of such information may be obtained on the website of the Debtors' claims and noticing agent at https://cases.ra.kroll.com/FTX

3.      I submit this declaration to update the Court with respect to the status of the SIAC Arbitration.  I understand the Court has scheduled a hearing on the Trust's Motion to Enforce for May 14, 2026.[2]

4.      Under Rule 6 of the 7th Edition of the SIAC Rules (the "**SIAC Rules**"), which govern the SIAC Arbitration, an arbitration is commenced through the filing of a Notice of Arbitration.[3] The Notice of Arbitration's limited purpose is to identify the parties, "describe" the "nature and circumstances" of the dispute, address certain threshold procedural issues (such as identification of the instrument providing consent to arbitration), and trigger the formation of the arbitral tribunal.

5.      Under Rule 33.2 of the SIAC Rules, the default procedure is that the operative pleading on the merits is the Statement of Claim.[4] That is the first and only written submission in the arbitration to set out a full statement of facts, legal grounds supporting the claim, and the damages and other relief sought. However, under Rule 33.1 of the SIAC Rules, the specific procedures for written submissions can be varied by an order of the arbitral tribunal.

6.      On April 4, 2026, the Tribunal issued Procedural Order No. 1 in the SIAC Arbitration (the "**First Procedural Order**").  A copy of the First Procedural Order is attached hereto as **Exhibit A**.  Paragraphs 14 to 23 of the First Procedural Order set out specific rules governing the written submissions to be made in the SIAC Arbitration. Paragraphs 15 and 16 of the First Procedural Order provide that there will be two rounds of written submissions. Paragraph 15 of the First Procedural Order provides that the first round of written submissions is when each side is to set out "the facts and legal arguments on which it intends to rely as its case

---

[2] *See* D.I. 35243.
[3] The SIAC Rules are available on the SIAC website and can be reviewed at this link https://siac.org.sg/siac-rules-2025.
[4] *Id.*

2

in chief on the merits". This submission would correspond to the "Statement of Claim" to which Rule 33.2 of the SIAC Rules refers and will therefore be the first and only written submission by Mr. Melamed in the arbitration to set out a full statement of facts, legal grounds supporting the claim, and the damages and other relief sought. For the avoidance of doubt, neither the SIAC Rules nor the First Procedural Order contemplates that the Notice of Arbitration should be taken to have been a full explanation of the legal or factual basis of any claims.

7.      The First Procedural Order did not determine any deadlines for the parties' written submissions.

8.      On April 20, 2026, the same day that Mr. Melamed submitted his Opposition to the Motion to Enforce, the Tribunal issued Procedural Order No. 2 in the SIAC Arbitration (the "**Second Procedural Order**").  A copy of the Second Procedural Order is attached hereto as **Exhibit B**.

9.      The Second Procedural Order sets the deadline for Mr. Melamed's Statement of Claim at three weeks following this Court's ruling on the Trust's Motion to Enforce. The practical effect of the Second Procedural Order is that, in principle, the submission schedule in the SIAC Arbitration will not progress until after this Court's ruling. The Second Procedural Order thus effectively sequences the SIAC Arbitration's substantive proceeding to follow this Court's ruling, only after which will the Statement of Claim be filed and the merits of the claim (such as the specific factual and legal arguments relied upon by Mr. Melamed) developed within the SIAC procedural framework.

10.      In summary: (i) the Notice of Arbitration filed November 12, 2025 is a commencement filing, not the operative SIAC merits pleading; (ii) the operative merits pleading — the Statement of Claim — has not yet been filed; (iii) by Procedural Order No. 2, that filing is sequenced to follow this Court's ruling on the Motion to Enforce; and (iv) the legal and factual

3

arguments on which Mr. Melamed intends to rely as his case in chief on the merits will be set out, for the first time, in that Statement of Claim.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on this _8th_ day of ___MAY___, 2026 at Tokyo, Japan.

Daniel Allen
Partner
Mori Hamada & Matsumoto
Marunouchi Park Building, 2-6-1 Marunouchi
Chiyoda-ku, Tokyo 100-8222, Japan

4

**Exhibit A**

**SINGAPORE INTERNATIONAL ARBITRATION CENTRE (SIAC)**

**CASE NO. ARB602/25/VKH**

**BETWEEN:**

**SETH MELAMED**

Claimant

**v.**

**THE FTX RECOVERY TRUST**

Respondent

---

**PROCEDURAL ORDER NO. 1**

---

**<u>Tribunal</u>**

Chiann Bao
Daniel Schimmel
Pierre Bienvenu (Presiding Arbitrator)

Singapore, 4 April 2026

**Table of Contents**

I.      Introduction ............................................................................................... 1

II.     Notifications and Communications ........................................................... 2

III.    Written Submissions ................................................................................. 3

IV.     Documentary Evidence ............................................................................. 5

V.      Document Production ................................................................................ 6

VI.     Fact Witnesses .......................................................................................... 8

VII.    Expert Witnesses ..................................................................................... 10

VIII.   Pre-Hearing Conference .......................................................................... 11

IX.     Hearing .................................................................................................... 11

X.      Post-Hearing Briefs and Cost Submissions ............................................ 14

XI.     Time Limits ............................................................................................. 14

XII.    Conduct of the Proceedings .................................................................... 14

Annex I - Redfern Schedule ............................................................................... 16

1. After hearing the Parties, the Tribunal hereby issues Procedural Order No. 1 to govern these proceedings.

## I.   Introduction

2. On 1 April 2026, a first case management conference (**CMC**) was held in this case. The agenda for the CMC was as follows:

> 1.   *Introductory remarks*
> 2.   *Open items on draft PO1 and procedural calendar*
>      a.   *The Claimant's proposal to bifurcate the Respondent's preliminary objections*
>      b.   *The Respondent's anticipated application to the United States Bankruptcy Court for the District of Delaware*
>      c.   *Other point of divergence (PO1, para. 52)*
> 3.   *Points to be clarified in PO1 (paras. 18, 35-37, and 83)*
> 4.   *The Tribunal's proposed additions to PO1*
> 5.   *Next steps*
> 6.   *Others*

3. On 27 March 2026, when the Parties first submitted a draft of this Order for the Tribunal's consideration, the Claimant was proposing that the arbitration be bifurcated. Under the Claimant's initial proposal, the Tribunal would have determined the Respondent's "preliminary objections" (corresponding to the requests for relief set out at subparagraphs 47 (a) and (c) of the Response to the Notice of Arbitration (**Response**)) by a partial final award at the end of a first phase of the arbitration. In a subsequent (second) phase of the arbitration, the Tribunal would have considered and determined the merits of the Claimant's claims. That proposal was not agreed by the Respondent.

4. During the CMC, the Claimant informed the Tribunal that it intended to submit an application for early dismissal under Rule 47 of the SIAC Rules (**Rules**), targeting one of the Respondent's preliminary objections, namely, the "jurisdictional objection" set out in subparagraph 47 (a) of the Response. The Claimant also advised that it was requesting the bifurcation of liability issues and proposing that any issue of quantum arising from its claims be considered in a subsequent stage of the arbitration, after all liability issues have been determined by a partial final award.

5. Not having been apprised in advance of the CMC of the Claimant's intention to submit an early dismissal application, the Respondent reserved its position on this question, all the while reiterating its intention to apply to the US Bankruptcy Court for the District of Delaware (**Bankruptcy Court**) to invite it to determine whether, in light of the Bankruptcy Court's previous orders, the claims asserted in the Claimant's Notice of Arbitration could be pursued in this arbitration. The Respondent added that it saw no justification for the bifurcation of liability proposed by the Claimant and submitted that if the Bankruptcy Court were to allow the Claimant's claims to move forward, the Tribunal should decide all liability and quantum issues in one single phase.

6. At the end of the CMC, the Tribunal informed the Parties that, in light of these recent developments, it considered it appropriate to defer determination of the Parties' differences concerning the procedural calendar until such time as the Parties had exchanged and submitted to the Tribunal their respective applications: in the case of the Claimant, its early dismissal application under Rule 47; in the case of the Respondent, its application for directions to the Bankruptcy Court. In the event, these applications were submitted to the Tribunal on 3 April 2026.

7. In order to avoid any delay in the issuance of Procedural Order No. 1, the Tribunal has decided that all questions relating to the procedural calendar would be determined by the Tribunal in a separate procedural order, to be issued once the Tribunal has had an opportunity to consider not only the Parties' respective applications, but also their views on the potential impact of these applications on the procedural calendar of this arbitration. For the time being, all issues pertaining to the procedural calendar are reserved.

## II.   Notifications and Communications

8. Each Party shall address all communications, submissions, and documents directly to the Tribunal, with a copy to the other Party, the Tribunal Secretary, and the SIAC Secretariat, as set out below.

9. All notifications and communications in this arbitration shall be in English. They shall be valid provided that they are made:

   (i)   If to the Tribunal, at the addresses set forth below or notified later in this arbitration:

   pbienvenu@imk.ca
   chiann.bao@arb-boutique.com
   dschimmel@foleyhoag.com

   (ii)   If to the Parties, to their respective counsel and representative(s) at the addresses set forth below or notified later in this arbitration:

   **Claimant:**

   daniel.allen@morihamada.com
   lexi.takamatsu@morihamada.com
   zoe.lim@morihamada.com
   yoshino.saito@morihamada.com
   seri.takahashi@morihamada.com

   **Respondent:**

   gluecksteinb@sullcrom.com
   dunnec@sullcrom.com

2

finna@sullcrom.com
izquierdop@sullcrom.com
goldmanj@sullcrom.com
frankm@sullcrom.com
devriess@sullcrom.com

(iii)   If to the Tribunal Secretary, at the address set forth below or notified later in this arbitration:

gmarchisio@imk.ca

(iv)   If to the SIAC Secretariat, at the addresses set forth below or notified later in this arbitration:

rohanayusof@siac.org.sg
andresfrancisco@siac.org.sg
vakhtangigiorgadze@siac.org.sg
SIACSecretariatTeam6@siac.org.sg

10.   Except for written submissions (which are governed by Section III below), all notifications and communications by the Parties and by the Tribunal, including all awards, shall be made by email only.

11.   All notifications, submissions and communications shall be timely if the email to which they are attached, or which contains a link to a secure file transfer, is sent by midnight (Singapore time) of the day of the expiration of the relevant time limit.

12.   The Parties shall not engage in any oral or written communications with the Tribunal ex parte in connection with the subject matter of the arbitration. All communications to the Tribunal shall be copied to the other Party, the Tribunal Secretary, and the SIAC Secretariat.

13.   The Parties are instructed not to copy the Tribunal in their correspondence with one another. They shall only address the Tribunal to comply with the procedural calendar, address administrative matters, or seek the Tribunal's intervention in resolving a matter that has not been agreed upon by the Parties.

## III.   Written Submissions

14.   The Parties shall present their written submissions in accordance with the procedural calendar to be set forth in a forthcoming Order of the Tribunal.

15.   In the first exchange of submissions, each Party shall set forth all the facts and legal arguments on which it intends to rely as its case in chief on the merits. Allegations of fact and legal arguments shall be presented in a detailed, specified, and comprehensive

manner, and shall respond to all allegations of fact and legal arguments made by the other Party. Together with such submissions, each Party shall produce all the evidence upon which it intends to rely, including documentary evidence, legal authorities, written witness statements, and expert reports, if any.

16. The Parties' responsive submissions shall be limited to responding to allegations of fact and legal arguments made by the other Party in the prior exchange of submissions, unless new facts have arisen, or previously existing facts have surfaced, after the first exchange of submissions which justify new allegations of fact or legal arguments. Together with the aforementioned submissions, the Parties may file additional documents, witness statements, and expert reports only insofar as the relevance of such additional evidence has arisen as a result of the adverse Party's immediately preceding submission (including the documents, witness statements, and expert reports produced therewith).

17. Following each factual allegation, the Parties shall, whenever possible and appropriate, identify the evidence in support of that allegation. Following each legal argument, the Parties shall, whenever possible and appropriate, identify the legal authority in support of that argument.

18. The written submissions shall be in English, dated, paginated, and divided into consecutively numbered paragraphs.

19. Each Party shall present its relief sought to the Tribunal in a separate section at the end of its written submissions.

20. Written submissions (including factual exhibits, legal authorities, witness statements and expert reports) shall be provided in electronic form to each member of the Tribunal, the other Party, the Tribunal Secretary, and the SIAC Secretariat, at the email addresses specified herein and in accordance with the following paragraphs. Within the next 5 (five) business days, a paper copy in A5 format of the Parties' written submissions, including witness statements and expert reports, but not factual exhibits and legal authorities, shall be couriered to those members of the Tribunal who have requested it at the first case management conference.

21. By the relevant filing date, the Parties shall file their submissions (including any witness statements, any expert reports, and a list of exhibits). Within three business days thereafter, the Parties shall share through a password-protected file-sharing platform all factual exhibits, legal authorities, and any supporting documents appended to witness statements and expert reports.

22. In case of simultaneous submissions, the Parties shall email their submissions solely to the Tribunal, copying the Tribunal Secretary and the SIAC Secretariat. The Tribunal Secretary shall distribute all submissions made by one Party to the opposing Party as soon as possible after it has received both Parties' respective submissions, copying the Tribunal and the SIAC Secretariat.

23. Written submissions, factual exhibits, legal authorities, witness statements, expert reports, and any other document forming the Parties' submissions shall be provided, to the extent practically possible, in searchable PDF format. Where a document is not capable of being submitted in PDF format, it shall be submitted in native format.

## IV.   Documentary Evidence

24. The Tribunal may determine, in its own discretion, the admissibility, relevance, weight, and materiality of the evidence offered.

25. The documentary evidence (factual exhibits and legal authorities) shall be submitted in the following form:

   (i)    Factual exhibits and legal authorities shall be independently and consecutively numbered throughout the proceedings and submitted in separate electronic folders (one folder for factual exhibits and another for legal authorities). Translations into English shall receive the same number as the original document, including an indication that the document is a translation.

   (ii)   Multiple documents shall not be submitted using the same identifying number or be placed in subfolders of a specific factual exhibit or legal authority, unless they were attached in their original format.

   (iii)  The Parties shall avoid duplication. All references to factual exhibits and legal authorities that have already been submitted shall be made to the existing exhibit and authority numbers, even if they have been submitted by the other Party, unless there are material differences.

   (iv)   The identification number of each factual exhibit submitted by the Claimant shall be C-1, C-2, C-3, etc., and those submitted by the Respondent shall be R-1, R-2, R-3, etc.

   (v)    The identification number of each legal authority submitted by the Claimant shall be CLA-1, CLA-2, CLA-3, etc., and those submitted by the Respondent shall be RLA-1, RLA-2, RLA-3, etc.

   (vi)   Lists of consolidated factual exhibits and legal authorities shall be presented with each submission. They shall set forth (a) the identification number of each factual exhibit or legal authority; (b) its date; and (c) a brief description of its content.

26. Documentary evidence shall be submitted together with the written submissions in accordance with Section III above. No further documentary evidence may be submitted by a Party after its last written pre-hearing submission (including at the hearing), except as agreed upon by the Parties or with leave of the Tribunal in exceptional circumstances. A Party seeking to submit evidence out of time shall request leave to do so in advance,

5

without submitting the new evidence. The Tribunal shall rule on the request after hearing the other Party. If admitted, the other Party shall be afforded sufficient opportunity to provide comments concerning the new evidence, including the right to submit rebuttal evidence.

27. The Parties may submit documentary evidence in the form of copies. All evidence submitted to the Tribunal shall be deemed to be authentic and complete unless a Party disputes its authenticity or completeness, in which case the Tribunal will determine whether authentication is necessary.

28. Exhibits or legal authorities in a language other than English shall be accompanied by a translation into English. Any citation or quote of that evidence contained in the written submissions shall also be in English. In case of lengthy documents, the Parties may submit an English translation of the relevant passages relied upon, together with a translation of any other passages that must be translated for the content of the document not to be distorted by a partial translation. The Parties shall provide any translations of exhibits or legal authorities no more than three business days after the filing date.

29. Any translation shall be deemed accurate unless a Party challenges its accuracy. In that case, the Party submitting the document and the Party challenging the translation shall work in good faith to arrive at an agreed upon wording. If they are unable to do so, the Tribunal will resolve the matter.

**V.    Document Production**

30. The Parties may submit Requests for Production of Documents ("Requests") in accordance with the procedural calendar.

31. For the purposes of the Requests, "Document" means a writing, communication, picture, drawing, program, or data of any kind, whether recorded or maintained on paper or by electronic, audio, visual, or any other means.

32. Requests shall be made in MS Word format in the form of a Redfern Schedule as attached in Annex I hereto.

33. Requests shall be exchanged between the Parties and shall not be copied to the Tribunal.

34. Each Request shall contain (i) either a description of the requested Document sufficient to identify it, or a description in sufficient detail (including subject matter) of a narrow and specific requested category of Documents that are reasonably believed to exist; and (ii) a statement as to how the Document(s) requested are relevant and material to the outcome of the case, including a reference to specific factual allegations made in the submissions filed by the Parties to date.

6

35. Each Party shall request only those Documents which are not in its possession, custody, or control, and which it reasonably believes to be in the possession, custody, or control of the other Party.

36. In formulating their Requests, the Parties shall not use a generic formulation, such as "all documents" or "all records," nor will they use such formulation and then define it to "include" specific categories of Documents. The Parties also shall avoid seeking multiple categories of Documents in the same Request.

37. By the date specified in the procedural calendar, the Party to whom Requests are addressed shall produce to the other Party copies of all the Document(s) requested in its possession, custody, or control as to which no objection is made.

38. The Parties shall confer regarding any Requests in respect of which an objection is made. For example, if a Party to whom a Request is addressed objects to the Request on the basis of overbreadth or excessive burden (including, inter alia, the likely cost of compliance with the Request), it should indicate whether there is a narrower or less burdensome formulation with which it would be willing to comply. In reply, the requesting Party should likewise indicate whether there is a narrower or less burdensome formulation that it would be willing to accept. The Parties shall work together in good faith to find potential alternate formulations that avoid overbreadth and excessive burden, in line with the *IBA Rules on the Taking of Evidence in International Arbitration (2020)* (**IBA Rules**), while still allowing production of documents that are relevant and material to the outcome of the case.

39. If the Parties are nevertheless unable to resolve any disputed Request in this manner, the Party to whom the Request is addressed shall state its objections to some or all of the Documents requested, together with any proposed alternative formulation of the Request, within the time specified in the procedural calendar.

40. The reasons for any objections shall be those set forth in Article 9.2 of the IBA Rules and any arising from the failure to comply with the requirements for Requests set forth in this Order.

41. The requesting Party shall then, within the time specified in the procedural calendar, respond to any such objections or proposals, and submit the filled Redfern Schedule to the Tribunal for its decision on any remaining disputed Requests.

42. The Parties shall make every effort to use only one page for each Request (including any objections, alternative formulations or responses thereto). Submissions on the merits are to be reserved for the pleadings scheduled in the procedural calendar and the Parties are to refrain from arguing the merits in their respective Redfern Schedules.

43. The Tribunal will, in its discretion, rule upon the production of the Documents or categories of Documents having regard to requirements set forth in this Order, the written

submissions of the Parties, the legitimate interests of the Parties, any applicable privileges, the burden of proof if appropriate, and the surrounding circumstances. In making its rulings, the Tribunal may take guidance from, but is not bound by, the IBA Rules.

44.     Documents withheld from production on the basis of a claim of legal privilege (e.g., professional secrecy, attorney-client privilege or attorney work product) shall be listed in a privilege log describing, in regard to each document, the type of document, the general subject matter thereof, the date on which it was created, the author(s) of the document, all persons who were intended to be recipients of the document, and the legal privilege being claimed, referencing the law under which the privilege claimed is asserted. It shall be permissible for a Party to list in its privilege log, categories of documents over which the same claim of legal privilege is made (e.g., communications between a Party and its legal counsel), provided that the category is homogenous and that the other information requested under this paragraph is provided in relation to the category.

45.     The Parties shall produce all documents ordered to be produced by the Tribunal within the time specified in the procedural calendar or ordered by the Tribunal.

46.     Documents produced in response to a Request or an order of the Tribunal shall be communicated directly to the requesting Party without copying the Tribunal. Documents so communicated shall not be considered to be on the record in the arbitration unless and until a Party subsequently files them as exhibits.

47.     All Documents in a language other than English and responsive to a request or order shall be produced in their original form, and no translation or explanation in English shall be required. However, a Party seeking to rely upon a Document produced pursuant to this section shall be required to submit the Document with an English translation, in accordance with paragraph 25 above.

## VI.    Fact Witnesses

48.     Any individual, including a Party's officer, employee, or other representative may present evidence as a fact witness. For each witness, a written and signed witness statement shall be submitted to the Tribunal.

49.     In accordance with Section III above, each Party shall submit its witness statements together with its written submissions. If a Party submits two or more witness statements by the same witness, the subsequent witness statement shall be identified as "Second", "Third", etc. The witness statements shall be numbered independently from other documents and properly identified using the prefixes "CWS-" and "RWS-" (for the Claimant's and the Respondent's witness statements, respectively).

50.     It shall not be improper for a Party, its directors, officers, employees, other representatives or counsel to interview a (potential) witness or contact that witness prior to the submission of his or her witness statement and his or her appearance at the hearing, including for the

purpose of establishing facts relevant to the arbitration. Furthermore, it shall not be improper for a Party or its counsel to assist the witness in the preparation of his or her witness statement or appearance at the hearing. A Party must seek to ensure that a witness statement reflects the witness's own account of relevant facts or his or her own true opinion.

51.    Each written witness statement shall:

(i)    Be in consecutively numbered paragraphs and paginated.

(ii)    Contain a photograph and the name, address, and date of birth of the witness, a description of his or her relationship to any of the Parties, counsel, or members of the Tribunal (past and present, if any), and a description of his or her position and qualifications.

(iii)    Contain a full and detailed description of the facts, and the source of the witness's information about those facts, sufficient to serve as that witness's evidence in chief in the matter in dispute.

(iv)    Be submitted in the language in which it has been prepared by the witness. If prepared in a language other than English, it must be accompanied by a complete translation into English and include a statement of the language in which the witness anticipates testifying at the hearing.

(v)    Identify with specificity any document relied upon. Any such document shall be introduced into the record as a fact exhibit in compliance with the rules applicable to fact exhibits.

(vi)    Contain an affirmation of the truth of the statement.

(vii)    Be signed by the witness and state the date and place of signature.

52.    Each witness statement shall stand as the witness's evidence in chief. In principle, witness statements should only seek to present factual testimony concerning relevant and material matters of fact that are in dispute.

53.    No further witness statements may be presented by a Party after the filing of its respective last written submission before the hearing, unless agreed by the Parties or previously authorized by the Tribunal upon a duly made request showing exceptional circumstances and after hearing the other Party. If admitted, the other Party shall be afforded sufficient opportunity to present rebuttal documentary and witness evidence.

54.    Witnesses shall appear in person. However, if exceptional circumstances exist, upon a reasoned request of the Party proffering the witness to be filed no later than 15 days before

the date on which the witness is due to appear, the Tribunal may allow a witness to appear and be examined by videoconference and will issue appropriate directions.

55. The Tribunal may consider the written statement of a witness who provides a valid reason for failing to appear when summoned to a hearing, or of a witness who was not called for cross-examination, having regard to all the surrounding circumstances, including the fact that the witness was not subject to cross-examination. Save in exceptional circumstances, the Tribunal shall not consider the witness statement of a witness who fails to appear and does not provide a valid reason. For these purposes, it shall be understood that a witness whom the Tribunal has allowed to testify by videoconference has appeared at the hearing.

56. Each Party shall be responsible for the appearance at the hearing of those of its witnesses whom the other Party has called for cross-examination or whom the Tribunal has ordered to appear for questioning. The costs of a witness's appearance shall be borne by the Party that relies on his or her testimony, without prejudice to the decision of the Tribunal as to which Party shall ultimately bear the costs of the arbitration.

## VII. Expert Witnesses

57. The rules set forth in Section VI above shall apply by analogy to the evidence of Party- and Tribunal-appointed experts, subject to the rules in this Section VII.

58. Each Party may retain and produce evidence of one or more experts who shall be independent of the Parties, their counsel, and the Tribunal.

59. The Tribunal may, on its own initiative or at the request of a Party, appoint one or more experts. The Tribunal shall consult with the Parties on the selection, terms of reference, and conclusions of any such expert. The Tribunal may, on its own initiative or at the request of any Party, take oral evidence of such expert(s).

60. Any expert retained by either the Parties or the Tribunal shall provide their evidence in a signed expert report. Each expert report shall comply with the requirements set forth above at paragraph 47 for written witness statements, and in addition shall:

(i) Be numbered independently from other documents using the prefixes "CER-" and "RER-" (for the Claimants' and the Respondent's expert reports, respectively).

(ii) Identify the expert's area of expertise and qualifications, and include the expert's opinion, a description of the instructions received and the method, and the evidence and information consulted to form the opinion.

(iii) Contain a declaration of his or her independence of the Parties, their legal representatives, the members of the Tribunal and the Tribunal Secretary.

(iv) Contain an affirmation of his or her sincere belief that the opinions expressed in the expert report are correct.

61. In the event that a Party submits an expert report signed by more than one expert, the report shall indicate who has authored each section or, alternatively, that all signatories are responsible for the report as a whole.

62. The Parties may call the expert witnesses whose reports they have submitted in support of their own allegations to testify at the hearing.

63. A Party shall not appoint an expert when a relationship exists between the expert and a member of the Tribunal that would create a conflict of interest, unless neither Party objects after disclosure. The Tribunal may, in case of breach of the preceding sentence, take measures appropriate to safeguard the integrity of the proceedings, including the exclusion of the expert from participating in all or part of the arbitral proceedings.

## VIII. Pre-Hearing Conference

64. A pre-hearing conference by telephone or video conference may be convened at the date set forth in the procedural calendar to address any outstanding issues with respect to the organization of the hearing, including procedural, administrative, and logistical matters.

65. Shortly after the pre-hearing conference, the Tribunal shall issue a procedural order setting forth the procedures for the hearing.

## IX. Hearing

66. Hearings before the Tribunal other than procedural or organizational meetings shall be subject to the rules set out in this Section IX.

67. The hearing shall take place in-person at a place agreed by the Parties or fixed by the Tribunal in a pre-hearing order on the dates set forth in the procedural calendar. If an in-person hearing becomes impractical or comes to impose unacceptable risks, after consulting with the Parties, the Tribunal may determine that the hearing take place remotely.

68. The Parties shall jointly make the necessary arrangements for the reservation of the hearing rooms, breakout rooms for the Parties and the Tribunal and other logistics. They shall also retain interpreters, if any, and court reporters. The Parties shall advise the Tribunal of the status of their logistical arrangements at a date to be determined closer to the hearing.

69. The hearing shall be conducted in English. Any oral evidence by a fact witness or expert at the hearing in a language other than English shall be simultaneously interpreted into English by one or more interpreters. Any witness testifying in a language other than

11

English may be examined in the language in which the witness is testifying, with simultaneous or consecutive interpretation, as appropriate.

70. The expenses of hearing rooms, court reporters and other expenses jointly incurred in connection with the hearing will initially be shared equally between the Parties, without prejudice to the Tribunal's decision on the costs of the arbitration.

71. Subject to other arrangements during the pre-hearing conference, the hearing will start each day at 09:00 and finish at approximately 18:00, with a one-hour lunch break, one 15-minute morning break, and one 15-minute afternoon break. To the extent possible, the examination of each witness shall be completed on the same day it commences.

72. At the start of the hearing, the Parties will each give an opening statement in the form of an oral presentation.

73. In principle, each Party will have an equal time allocation to examine witnesses and experts at the hearing, subject to adjustments if circumstances so require, for instance as a result of a severe imbalance in the number of cross-examinations which each Party must conduct.

74. The Parties may use demonstrative exhibits (e.g., charts, diagrams, tabulations, etc.) at any hearing, provided that such demonstrative exhibits do not contain new evidence and fairly reflect the evidence on record. All demonstrative exhibits must clearly state the relevant source document(s) and, where applicable, the relevant portions of source documents on which such demonstrative exhibits are based. For the avoidance of doubt, PowerPoint slides and other visual aids that reproduce existing documentary exhibits (e.g., in a larger format and without amendment) are permitted as a form of demonstrative exhibits. The Parties must submit demonstrative exhibits to each other by 9 pm on the day before the proffering Party intends to use such demonstrative exhibit.

75. Each Party submitting more than one demonstrative exhibit shall number its demonstrative exhibits consecutively. Each demonstrative exhibit submitted by Claimants shall be labeled with "CD-" and each demonstrative exhibit submitted by Respondent shall be labeled with "RD-".

76. At the hearing, the examination of each witness and expert shall proceed as follows:

(i) The Party who has presented the witness may briefly examine the witness for purposes of confirming or correcting his or her witness statement, asking introductory questions, and addressing matters relevant to those addressed in his or her witness statement which have arisen after that witness's written statement was signed, if any (direct examination). As a rule, direct examination shall not exceed 10 minutes;

12

(ii) Experts may give a presentation in lieu of direct examination, summarizing their method and conclusions, which as a rule shall not exceed 45 minutes;

(iii) After direct examination or expert presentation, the opposing Party may then cross-examine the witness about relevant facts within the witness's knowledge but not necessarily limited to facts addressed in the witness statement;

(iv) The Party who has presented the witness may then re-examine the witness with respect to any matters or issues arising out of the cross-examination;

(v) The Tribunal may examine the witness at any time, preferably at the end of the examination;

(vi) The Tribunal may order two or more witnesses to be examined concurrently (witness conferencing).

77. Subject to a different agreement by the Parties or a different decision of the Tribunal at the pre-hearing conference, fact witnesses shall not be present in the hearing room during opening statements and other witnesses' examinations, or read the transcript of the opening statements or other witnesses' examinations, prior to their own examination. This limitation shall not apply to experts and to one fact witness, if any, whom a Party has designated as its representative.

78. The Tribunal shall, at all times, have complete control over the procedure for hearing a witness. In particular, but without limiting the foregoing, the Tribunal may in its discretion:

(i) Limit or refuse the right of a Party to examine a witness when it appears that a question has been addressed by other evidence or is irrelevant; or

(ii) Direct that a witness be recalled for further examination at any time.

79. The Tribunal may adopt the measures that it deems appropriate to ensure that, after having been heard, witnesses do not communicate with other witnesses whose testimony is yet to be heard. If a witness's examination is interrupted and must continue in the following session, the witness may not speak with or contact any of the Parties, their representatives or counsel regarding any aspect of the dispute until the examination is completed.

80. Unless otherwise determined in the pre-hearing conference, the order of the witnesses' examination shall be as follows: Claimant's fact witnesses, Respondent's fact witnesses, Claimant's experts, Respondent's experts.

81. The Parties shall jointly arrange for hearings to be recorded and transcribed verbatim by a qualified court reporter using LiveNote or similar software so that the transcript is available on a real-time basis. There shall also be a sound recording of all testimony in

both the language of the testimony and the interpretation. Issues of translation arising in the course of the hearing shall as a rule be raised immediately at the hearing. At the end of each day of hearings, the Parties shall be provided with the transcript of that day. At a date to be determined by the Tribunal in consultation with the Parties following the hearing, the Parties shall agree on corrections to the transcripts.

**X.    Post-Hearing Briefs and Cost Submissions**

82.    In consultation with the Parties, the Tribunal will determine at the end of the hearing whether there shall be post-hearing briefs. In the affirmative, the Tribunal will consult with the Parties on time and page limits as well as topics to be addressed. The Tribunal may in its discretion provide the Parties with a list of questions to be addressed in the post-hearing briefs. No additional evidence may be produced together with the post-hearing briefs, except with leave or on request of the Tribunal.

83.    The Parties shall present their cost submissions on the date specified by the Tribunal, which shall coincide with or follow the submission of any post-hearing briefs. In their cost submissions, the Parties may present argument as to the apportioning of costs. The cost submissions shall only list the costs incurred without the need to attach supporting documentation, unless otherwise ordered by the Tribunal upon the request of either Party.

**XI.    Time Limits**

84.    Except for hearing dates, extensions or modifications of time limits by no more than five business days may be agreed between the Parties. The Parties shall promptly notify the Tribunal of any such agreements, which the Presiding Arbitrator will approve unless he determines that the contemplated extension may threaten the agreed hearing dates. Other extensions or modifications of time limits are subject to the Tribunal's approval. Applications for extensions or modifications of time limits not agreed between the Parties must be made to the Tribunal in writing at least five business days before expiration of the time limit in question, explaining why the extension is required and for what period of time. The Party opposing an extension must submit its position in writing within the time determined by the Tribunal. To the extent a Party may have reason to make any application for an extension or modification less than five business days before expiration of the time limit, it must state as part of its request the reasons why the application was not made earlier, and the Tribunal shall have the discretion to take such further action as it considers appropriate under the circumstances. The Presiding Arbitrator shall only grant the extension of a time limit as an exception and provided that the request for an extension is made without undue delay (save in exceptional circumstances).

**XII.    Conduct of the Proceedings**

85.    The Presiding Arbitrator is authorized to send communications and sign procedural orders on behalf of the Tribunal, after consultation with the co-arbitrators. Article 32.7

14

of the Rules shall apply to any procedural decision made by the Presiding Arbitrator alone, in cases of urgency and after attempting to consult with the co-arbitrators.

86. In the conduct of this arbitration, the Parties and the Tribunal will be guided by the IBA Rules and the *IBA Guidelines on Party Representation in International Arbitration (2013)* adopted by a resolution of the IBA Council on 25 May 2013 (including any amendments thereto that are approved by the IBA Council during the pendency of this arbitration).

87. Pursuant to Section 19.2 of the SPA and Section 59 of the Rules, the Tribunal and Parties undertake to keep this arbitration confidential and shall not disclose to any person, other than those necessary to the proceedings, the existence of this arbitration, any information, testimony, or documents submitted during the arbitration or otherwise received from the Parties or a witness in connection with this arbitration, and any award, unless and to the extent such disclosure is required by law or is necessary for court proceedings to recognize, enforce, or challenge an award. For the avoidance of doubt, this section does not preclude either Party from disclosing information related to these proceedings as required in proceedings before the Bankruptcy Court in *In re FTX Trading Ltd.*, Case No. 22-11068 or otherwise in accordance with Rule 59 of the Rules.

On behalf of the Tribunal,

Pierre Bienvenu, Ad. E.
Presiding Arbitrator

15

**Annex I**

**Redfern Schedule**

**Requesting Party: \***

| 1 | 2 | 3 | | 4 | 5 | 6 |
|---|---|---|---|---|---|---|
| No. | Documents or category of documents requested<br><br>(max. 200 words) | **Relevance and materiality according to the requesting Party** | | Objections to document production request<br><br>(max. 300 words) | Response to objections on document production request<br><br>(max. 250 words) | Decision of the Arbitral Tribunal |
| | | Reference to written submissions, exhibits, witness statements or expert reports<br><br>(max. 100 words) | Comments<br><br>(max. 300 words) | | | |
| | | | | | | |
| | | | | | | |

16

**Exhibit B**

**SINGAPORE INTERNATIONAL ARBITRATION CENTRE (SIAC)**

**CASE NO. ARB602/25/VKH**

**BETWEEN:**

### SETH MELAMED

Claimant

### v.

### THE FTX RECOVERY TRUST

Respondent

---

### PROCEDURAL ORDER NO. 2

---

### <u>Tribunal</u>

Chiann Bao
Daniel Schimmel
Pierre Bienvenu (Presiding Arbitrator)

### <u>Tribunal Secretary</u>

Giacomo Marchisio

20 April 2026

**Table of Contents**

I.    Overview ................................................................................................................ 1

II.   Background and Summary of the Parties' Positions ..................................................... 1

III.  Analysis ................................................................................................................. 3

      A.    Should the Claimant's Early Dismissal Application be Allowed to Proceed? ... 3

      B.    Should the Tribunal Bifurcate the Arbitration? .................................................. 5

      C.    Procedural Calendar Pending the Issuance of a Ruling on the Respondent's
            Motion to the Bankruptcy Court ........................................................................ 7

IV.   Order ..................................................................................................................... 9

## I. Overview

1. In this Procedural Order, the Tribunal issues directions relating to the **Procedural Calendar** applicable to this arbitration.[1]

## II. Background and Summary of the Parties' Positions

2. On 27 March 2026, the Parties submitted a draft PO1 for the Tribunal's consideration, while each Party submitted the proposed procedural calendar that it favoured for the conduct of this arbitration.

3. Under the Claimant's proposed procedural calendar, the Tribunal would have bifurcated the Respondent's "*preliminary objections*" (corresponding to the requests for relief set out in subparagraphs 47 (a) and (c) of the Respondent's Response) and determined them in a partial final award at the end of a first phase of the arbitration; in a subsequent, second phase of the arbitration, the Tribunal would have considered and determined the merits of the Claimant's claims.

4. Subparagraphs. 47 (a) and (c) of the Response read as follows:

   *47. For the foregoing reasons, the Trust respectfully requests that the Tribunal issue an award:*

   *(a) Declaring that the Tribunal lacks jurisdiction to adjudicate any of the claims described in the Notice;*

   *[…]*

   *(c) Declaring that Melamed may not recover more than USD $1,558,871.90 for his claim in respect of the Crypto Consideration[.]".*

5. The Respondent did not agree with the Claimant's proposed procedural calendar. Instead, the Respondent suggested that the Tribunal proceed to set a date for the filing of the Claimant's Statement of Claim, and, as regards all subsequent procedural steps of the calendar, invited the Tribunal to defer its decision, averring that the Respondent anticipated seeking immediate relief from the Bankruptcy Court to preclude the Claimant from pursuing the claims advanced in its Notice of Arbitration (**NoA**), on the basis that these claims are unauthorized under prior orders of the Bankruptcy Court.

6. On 1 April 2026, the first CMC was held in this case. At the outset of the CMC, the Claimant revisited its proposed procedural calendar, advising that it intended to submit an early dismissal application under Rule 47 of the Rules targeting the "*jurisdictional objection*" set out in subparagraph 47 (a) of the Response. The Claimant also advised that

---

[1] Capitalized terms not defined herein shall have, unless otherwise indicated, the meaning ascribed to them in the Tribunal's Procedural Order No. 1 **(PO1)**.

1

it was requesting the bifurcation of liability issues and proposing that any issue of quantum arising from its claims be considered in a subsequent stage of the arbitration, after all liability issues have been determined by a partial final award.

7. The Respondent took note of the Claimant's stated intention to file an early dismissal application, while reiterating its intention to apply to the Bankruptcy Court to invite it to determine whether, in light of the Bankruptcy Court's previous orders, the claims asserted in the Claimant's NoA could be pursued in this arbitration.

8. Regarding the Claimant's revised request for bifurcation, the Respondent stated that it saw no justification for the bifurcation of liability proposed by the Claimant. The Respondent took the position that if the Bankruptcy Court were to allow the Claimant's claims in this arbitration to move forward, then the Tribunal should decide all liability and quantum issues in one single phase.

9. At the end of the CMC, the Tribunal informed the Parties that, in light of these recent developments, it considered it appropriate to defer determination of the Parties' differences concerning the Procedural Calendar until such time as the Parties had exchanged and submitted to the Tribunal their respective applications, namely: in the case of the Claimant, its early dismissal application under Rule 47; and in the case of the Respondent, its Motion for directions to the Bankruptcy Court (**Motion**).

10. In the event, the Parties' preliminary applications were submitted to the Tribunal on 3 April 2026.

11. On 4 April 2026, the Tribunal issued its PO1. In order to avoid delaying the issuance of PO1, the Tribunal decided that all questions relating to the Procedural Calendar would be determined by the Tribunal in a separate Order, to be issued once the Tribunal had an opportunity to consider not only the Parties' respective applications, but also their comments on the potential impact of these applications on the Procedural Calendar of this arbitration.

12. On 7 April 2026, each Party commented on the other Party's application, including on the impact of such application on the Procedural Calendar.

13. In response to the Respondent's Motion, the Claimant argued that the Claimant's claims in this arbitration plainly fell within the scope of the Proof of Claim (Exhibit R-1) that the Claimant filed in the Bankruptcy, and that they should therefore be permitted to proceed, adding that the Respondent had failed to put forward any basis to have the Tribunal declare that it lacks jurisdiction over the Claimant's claims. As regards its request for bifurcation, the Claimant emphasized that because the decision of the Bankruptcy Court may influence the way in which losses should be quantified, efficiency militated in favour of determining liability issues before turning to issues of quantum.

14. The Respondent urged the Tribunal not to allow the Claimant's early dismissal application to proceed. According to the Respondent, there is no efficiency to be gained by ruling on the issue raised by that application. For even assuming that the Tribunal were to dismiss the Respondent's jurisdictional objection, the Tribunal would still need to determine the Respondent's argument that the Claimant's claims are inadmissible. Regarding the Claimant's bifurcation request, the Respondent noted that the fair market value of the Claimant's interest in Liquid was at the centre of the Claimant's case of fraudulent or negligent conduct on the part of the Respondent. It follows, so the argument goes, that, as a practical matter, the Parties would be required, during both proposed phases of the arbitration, to present facts and evidence relating to the value of the Claimant's interest, thus eliminating any potential efficiency gains from bifurcating liability.

## III. Analysis

15. The Tribunal understands that the Claimant no longer seeks bifurcation of the two preliminary objections that are set out in subparagraphs 47 (a) and (c) of the Respondent's Response. Instead, the Claimant proposes that the Tribunal rule upon only one of these objections, namely, the "*jurisdictional*" objection set out at subparagraph 47(a) of the Response, by way of a decision on the Claimant's early dismissal application. Furthermore, the Claimant maintains a request for bifurcation but is seeking to bifurcate the arbitration into a first phase dealing with liability, and a subsequent phase devoted to all issues of quantum.

16. The Respondent for its part requests that the Tribunal not allow the Claimant's early dismissal application to proceed, and that it deny the Claimant's bifurcation request.

17. The Tribunal considers first the Claimant's early dismissal application and then turns to the Claimant's reformulated request for bifurcation. The Tribunal thereafter addresses what should be the next steps in the procedural calendar in the circumstances of this case.

### A.    Should the Claimant's Early Dismissal Application be Allowed to Proceed?

18. Rule 47, entitled Early Dismissal of Claims and Defences, reads as follows:

> *47.1 A party may apply to the Tribunal for the early dismissal of a claim or defence where:*
>
> *(a)  a claim or defence is manifestly without legal merit; or*
> *(b)  a claim or defence is manifestly outside the jurisdiction of the Tribunal.*
>
> *47.2 An application for early dismissal under Rule 47.1 shall state the facts and legal basis supporting the application.*

*47.3 The Tribunal shall determine whether the application for early dismissal under Rule 47.1 is allowed to proceed.*

*47.4 If the application for early dismissal is allowed to proceed, the Tribunal shall, after giving the parties the opportunity to be heard, make a decision, ruling, order, or award on the application, with reasons which may be in summary form. The decision, ruling, order, or award shall be made within 45 days from the date of filing the application, unless the Registrar extends the time.*

19.   According to a commentary of the Rules, the aim of an early dismissal application "*is to save time and cost by bringing proceedings or claims that have an obvious outcome to an end as early as possible.*"[2]

20.   Rule 47.3 directs the Tribunal, upon receipt of an early dismissal application, to determine whether the application should be permitted to proceed, thus vesting the Tribunal with a gate keeping function in respect of early dismissal applications.

21.   In considering the threshold question arising pursuant to Rule 47.3, the Tribunal notes that the Claimant's early dismissal application targets only one specific request for relief in the Respondent's Response, namely subparagraph 47(a) of the Response, where, as seen, the Respondent has requested that the Tribunal issue an award "*[d]eclaring that the Tribunal lacks jurisdiction to adjudicate any of the claims described in the [NoA].*"[3] Accordingly, the request for relief sought in the application is that the Tribunal issue a final partial award dismissing the Respondent's request for a declaration that the Tribunal lacks jurisdiction.

22.   The Tribunal observes that the key substantive divergence between the Parties insofar as the relief sought in subparagraph 47(a) of the Respondent's Response is concerned centers on the question of whether the Claimant's claims as articulated in the NoA are advanced in this arbitration in breach of the Bankruptcy Court's previous orders. Whether the Respondent's objections to the Claimant's claims based on that ground go to jurisdiction or admissibility does not appear to the Tribunal to be of significant moment at this early stage of the arbitration. That is so because even if the Tribunal were to accept the Claimant's position that, while the Respondent's objection may affect the admissibility of the Claimant's claims, they do not call into question the Tribunal's jurisdiction under the broad language of the arbitration agreement, the admissibility objection would remain to be determined. For that reason alone, the Tribunal is of the opinion that the Claimant's early dismissal application would not allow for the final resolution of the substance of the Respondent's preliminary objections, and therefore would not likely advance the resolution of the dispute or save time and cost.

---

[2]   Attachment 1 to the Claimant's early dismissal application (John Choong, Mark Mangan & Nicholas Lingard, *A Guide to the SIAC Arbitration Rules*, Oxford University Press, 2018), at para. 11.03.

4

23. Accordingly, and without in any way prejudging the merits of the issue raised for determination in the Claimant's early dismissal application, the Tribunal has concluded that the early dismissal application should not be allowed to proceed as it is unlikely to attain the basic objective of such an application, namely, to save time and costs by bringing to an end as early as possible a claim or defense that has an obvious outcome.

24. Based on the foregoing, the Tribunal decides, under Rule 47.3, that the Claimant's early dismissal application, as presented, should not, at this juncture, be allowed to proceed.

## B.   Should the Tribunal Bifurcate the Arbitration?

25. The Tribunal turns to considering the Claimant's reformulated request for bifurcation, proposing that the arbitration involve two phases, the first dealing with liability, and the second, subsequent phase, to be devoted to all issues of quantum.

26. Under the Rules, the Tribunal "*shall have the power to conduct the arbitration in such manner as it considers appropriate*" (Rule 32.2), and to "*direct and schedule the order of proceedings*" (Rule 32.6).

27. Rules 46 explicitly contemplates the "*final and binding preliminary determination of any issue that arises for determination in the arbitration*", under certain conditions. Rule 46 reads in part as follows:

> *46.1 A party may apply to the Tribunal for a final and binding preliminary determination of any issue that arises for determination in the arbitration where:*
>
> *(a) the parties agree that the Tribunal may determine such an issue on a preliminary basis;*
> *(b) the applicant is able to demonstrate that the determination of the issue on a preliminary basis is likely to contribute to savings of time and costs and a more efficient and expeditious resolution of the dispute; or*
> *(c) the circumstances of the case otherwise warrant the determination of the issue on a preliminary basis.*
>
> *46.2 An application for preliminary determination under Rule 46.1 shall state the facts and legal basis supporting the application.*
>
> *46.3 The Tribunal shall, after giving the parties the opportunity to be heard, decide whether to proceed with the application for preliminary determination.*

28. In the absence of an agreement between the Parties that the Tribunal should finally decide an issue by way of preliminary determination (Rule 46.1(a)), the applicant seeking early determination of an issue must "*demonstrate that the determination of the issue on a*

---

3   Early Dismissal Application, paras. 8-9.

5

*preliminary basis is likely to contribute to savings of time and costs and a more efficient and expeditious resolution of the dispute*" (Rule 46.1(b)) or persuade the arbitral tribunal that the "*circumstances of the case otherwise warrant the determination of the issue on a preliminary basis*" (Rule 46.1(c)).

29.  The quoted language from Rule 46.1(b) is an articulation of some of the factors that arbitral tribunals typically consider when invited to bifurcate an issue for early determination, including issues of liability. One factor that tends to militate against bifurcation is when it appears that factual issues needing to be considered to determine liability will need to be revisited when the arbitral tribunal comes to determine issues of quantum.[4]

30.  As noted by a respected commentator, "*[b]ifurcation inevitably imposes delays, which are often significant, in the resolution of some issues and frequently results in increases in the overall time (and costs) of an arbitration. [...] These delays can only be justified on the basis that significant expense would be wasted in litigating particular issues, which might become moot or irrelevant following decisions on other issues.*"[5]

31.  Having carefully considered the Claimant's request, the Tribunal is not persuaded that the case has been made that bifurcating liability would result in any efficiency gain, or, to paraphrase Rule 46, that the Claimant has demonstrated "*that the determination of [liability] on a preliminary basis is likely to contribute to savings of time and costs and a more efficient and expeditious resolution of the dispute.*"

32.  To the contrary, the Tribunal finds that there is some force to the Respondent's argument that in view of the nature of the Claimant's claims, consideration of liability issues will require consideration of facts and evidence concerning the value of the Claimant's interest in Liquid and the alleged harm suffered by the Claimant from the alleged conduct of FTX that would have to be revisited at the quantum stage. Quoting from the Respondent's letter of 7 April 2026 (at p. 4):

> *[...] there is no good reason to otherwise bifurcate 'liability' and 'damages' issues in this case. [...] Here, Claimant claims he was fraudulently or negligently induced to sell certain interests in his company, Liquid, to FTX 'for a price far below their actual fair market value' and that he was 'harmed' as a result. Under Claimant's own articulation of his claims, the fair market value of Claimant's interests in Liquid, and whether anything FTX did harmed Claimant, must be determined to establish liability. That means, as a practical matter, if this arbitration proceeds and bifurcation were granted, the Parties will be required during both phases to present facts and evidence on the value of Claimant's interests in Liquid and any purported 'harm' to Claimant from the alleged conduct of FTX in acquiring those interests.*

---

[4]  **Exh. RLA-4**, Lucy Greenwood, "Does Bifurcation Really Promote Efficiency?" (2011) 28:2 Journal of Int'l Arbitration 105, at 110.

[5]  **Exh. RLA-02**, Gary Born, *International Commercial Arbitration* (Kluwer Law International, updated March 2024), at 15.08[Q].

> *These 'issues cannot be unraveled from each other but, instead, are so entwined that bifurcation will only result in facts being pleaded twice.'*

(Emphasis added)

33. Bifurcation being the exception,[6] and experience showing that bifurcation often results in lengthier and more costly proceedings, the Tribunal has concluded that the Claimant's request for bifurcation should be denied, and that should the Claimant's claims be allowed to proceed by the Bankruptcy Court, the Tribunal should decide all liability and quantum issues in one single phase.

34. Accordingly, the Claimant's Statement of Claim and the subsequent substantive submissions of the Parties in relation to this case shall address all issues in dispute, including issues of liability and quantum.

### C.  Procedural Calendar Pending the Issuance of a Ruling on the Respondent's Motion to the Bankruptcy Court

35. The third issue to be determined concerns the extent to which subsequent steps in the conduct of this arbitration should be scheduled at this juncture considering the Respondent's pending Motion inviting the Bankruptcy Court to determine whether, in light of the Court's previous orders, the claims asserted in the Claimant's NoA can be pursued in this arbitration. In this respect, the more immediate question is whether the Claimant should be directed to prepare and file its Statement of Claim irrespective of the status of the Respondent's pending Motion.

36. The Respondent has made clear that it is not seeking a stay of the arbitration and, therefore, has submitted that it is appropriate to set a deadline for the submission of the Claimant's Statement of Claim.[7] The Claimant seemed not to disagree. In response to the Tribunal's email of 4 April 2026 inviting the Parties to comment on (among others) whether the Claimant should be directed to prepare and file its Statement of Claim while the Respondent's Motion was being considered by the Bankruptcy Court, the Claimant stated that "*it continues to make sense to press forward with consideration of liability issues in parallel to the Motion*" (emphasis added),[8] the only difference with the Respondent seeming to be whether the Tribunal should direct that the Parties "*press forward*" on liability issues only, or on both liability and quantum. That said, the Tribunal is mindful that the Claimant took this position not knowing whether the Tribunal would permit its early dismissal application to proceed, nor whether its reformulated request for bifurcation would be granted.

37. In considering the appropriate approach to be adopted regarding the Procedural Calendar, the Tribunal first notes that the Parties are agreed – and their respective submissions in this arbitration attest to it – that it is pursuant to orders of the Bankruptcy Court that the Claimant purports validly to advance its claims in this arbitration based on the SPA,

---

6   **Exh. RLA-4**, *op. cit.*, at 108 (*"[T]ribunals should be cautious about proceeding with a twin-track approach to a case without good cause."*).

7   See letter of 27 March 2026, at p. 2.

8   See email dated 7 April 2026.

despite FTX's filing for Chapter 11 bankruptcy protection in November 2022. In paragraphs 33 and 34 of the NoA, the Claimant avers:

> *33. For the avoidance of doubt, on 31 July 2025, the Bankruptcy Court ordered that the Claimant's claims with respect to the transaction are to be adjudicated through arbitration in accordance with the SPA's arbitration agreement.*
>
> *34. The Parties acknowledge, and the Claimant reserves, that certain issues (e.g., claim allowance and distribution under the Confirmed Plan) are reserved to the U.S. Bankruptcy Court for the District of Delaware. Consistent with the Court's 31 July 2025 orders, this arbitration is limited to: (i) liability and damages under Japanese law arising out of or in connection with the SPA and Side Letters; and (ii) the quantification of any such damages for submission to the Bankruptcy Court for allowance and distribution purposes.*

(Emphasis added)

38. However, and as reflected in the Respondent's Response,[9] the Parties disagree as to the scope of the claims in respect of which the Claimant's motion to compel arbitration was granted by the Bankruptcy Court's July 2025 orders. The purpose of the Respondent's Motion is to invite the Court to interpret its orders and, if the Respondent is to prevail under its Motion, to hold that the claims asserted by the Claimant in the arbitration are beyond the proper scope of the arbitration as defined in the Court's orders, or were unpreserved or waived. The concluding paragraph of the Respondent's Motion reads as follows:

> *For the foregoing reasons, the Trust respectfully requests that the Court grant the Motion, enforce the Confirmation Order, Non-Customer Bar Date Order, and Arbitration Order, and preclude Melamed from continuing to pursue in arbitration (or otherwise) the previously unasserted and unpreserved, and conclusively settled and released, claims described in Melamed's Notice of Arbitration, which in any event exceed the scope of the Arbitration Order.*

(Emphasis added)

39. In the opinion of the Tribunal, the Bankruptcy Court's ruling on the Respondent's Motion will provide useful guidance to the Parties and the Tribunal, regardless of its outcome. This ruling may also impact on the contents of the Claimant's Statement of Claim. Accordingly, as a matter of comity and procedural efficiency, the Tribunal believes that setting the Procedural Calendar of this arbitration without the benefit of the Bankruptcy Court's ruling on the Motion could lead to inefficiencies and disruption in the arbitration. Specifically, it cannot be excluded that if the Bankruptcy Court's ruling is issued after the date set for the filing of the Claimant's Statement of Claim, the Claimant may be required,

---

9    See Response, paras. 3-5 (among others).

in light of the ruling, to modify and amend its Statement of Claim. This would be wasteful and would not serve the prompt and efficient resolution of the dispute.

40. The Tribunal was informed that the hearing date set by the Respondent for its Motion was 16 April 2026. The questions of whether and precisely when the Court will agree to consider the Motion remain uncertain, but the Respondent has indicated that it intended to proceed with the Motion with alacrity.

41. In such circumstances, it appears to the Tribunal appropriate to direct that the Claimant work on the preparation of its Statement of Claim while the Respondent's Motion is being considered by the Bankruptcy Court, and, unless directed otherwise by the Tribunal after having provided the Parties with an opportunity to be heard, stand prepared to submit its Statement of Claim within 3 (three) weeks of the Bankruptcy Court's ruling on the Motion. Once the Bankruptcy Court has issued its ruling, the Tribunal will, having invited submissions by the Parties, set the subsequent steps of the Procedural Calendar.

42. In order to ensure that this procedural posture will not result in this arbitration being indefinitely held in abeyance, the Respondent is hereby directed, beginning on 27 April 2026 and until such time as the Bankruptcy Court has issued its ruling on the Motion, to make monthly reports to the Tribunal on the progress of the Motion, such reports to include the Respondent's best estimate of the likely date of the Court's ruling on the Motion. Should no ruling have been made by 15 September 2026, the Tribunal will consider convening a second CMC.

## IV.   Order

43. Having considered the Parties' respective applications, the Tribunal has determined and hereby decides:

   a. That, pursuant to Rule 47.3, the Claimant's application for early dismissal under Rule 47.1 shall not, at this juncture, be allowed to proceed in its current form;

   b. That the Claimant's Statement of Claim and the Parties' subsequent substantive submissions in relation to this case shall address all issues in dispute, including issues of liability and quantum;

   c. That the Claimant shall begin preparing its Statement of Claim, ensuring that, unless directed otherwise by the Tribunal after having provided the Parties with an opportunity to be heard, it is in a position to file said Statement of Claim within 3 (three) weeks of the issuance of the ruling of the Bankruptcy Court on the Respondent's Motion;

   d. That the dates of the other subsequent steps in the Procedural Calendar of this arbitration shall be set once the Bankruptcy Court has determined the Respondent's Motion; and

e.  That beginning on 27 April 2026 and until such time as the Bankruptcy Court has issued its ruling on the Motion, the Respondent shall provide monthly reports to the Tribunal on the progress of the Motion, such reports to include the Respondent's best estimate of the likely date of the Bankruptcy Court's ruling on the Motion. Should no ruling have been made by 15 September 2026, the Tribunal will consider convening a second CMC.

On behalf of the Tribunal,

Pierre Bienvenu, Ad. E.
Presiding Arbitrator

Place of the Arbitration: Singapore

10