**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| In re: | Chapter 11 |
| FTX TRADING LTD., *et al.*,[1] | Case No. 22-11068 (KBO) |
| Debtors. | (Jointly Administered) |
| FTX RECOVERY TRUST, | |
| Plaintiff, | |
| - against - | Adv. Pro. No. 26-_____ (KBO) |
| CRYPTO LOTUS FUND B INTERNATIONAL, LTD., | |
| Defendant. | |

**COMPLAINT AND CLAIM OBJECTION TO PROOF OF CLAIM FILED BY CRYPTO LOTUS FUND B INTERNATIONAL, LTD.**

Plaintiff FTX Recovery Trust[2] (the "Trust" or "Plaintiff"), by and through its undersigned counsel, hereby brings this complaint against Defendant Crypto Lotus Fund B International, Ltd. ("Crypto Lotus") and objects to Proof of Claim No. 82109 (McGuire Decl., Ex. A (the "Claim")), alleging as follows:

---

[1] The last four digits of FTX Trading Ltd.'s and Alameda Research LLC's tax identification number are 3288 and 4063, respectively. Due to the large number of debtor entities in these Chapter 11 Proceedings, a complete list of the Debtors and the last four digits of their federal tax identification numbers is not provided herein. A complete list of such information may be obtained on the website of the Debtors' claims and noticing agent at https://cases.ra.kroll.com/FTX.

[2] The FTX Recovery Trust (a/k/a the Consolidated Wind Down Trust) was established through the Debtors' confirmed *Second Amended Joint Chapter 11 Plan of Reorganization of FTX Trading Ltd. and Its Debtor Affiliates* (the "Plan") [D.I. 26404-1], which became effective on January 3, 2025 [D.I. 29127]. All capitalized terms not otherwise defined herein shall have the meanings ascribed to them in the Plan.

**NATURE OF THE ACTION**

1.     This is an action for declaratory judgment, breach of contract, and related claims. It arises out of the failed trading strategy of California-based cryptocurrency hedge fund Crypto Lotus, Crypto Lotus's refusal to acknowledge the validity of an $84 million line of credit that FTX Trading Ltd. ("FTX") extended to Crypto Lotus as an accommodation to prevent the liquidation of Crypto Lotus's trading positions, which is outstanding and owed to FTX, and Crypto Lotus's attempt to exploit the bankruptcy claims process to recoup upwards of an additional $200 million in investment losses for which it has no one to blame but itself.

2.     On September 29, 2023, Crypto Lotus filed its Claim.  Crypto Lotus asserts that it is entitled to one of the following:

    a.   The value of its FTX.com account holdings as of April 30, 2021 (the "April 30, 2021 Balance"), which Crypto Lotus asserts was $200,836,076.42; or

    b.   In the alternative, $7,595,035.13, which Crypto Lotus asserts was the value of its FTX.com account holdings as of the Petition Date.

Crypto Lotus is entitled to neither.

3.     In support of its claim for the April 30, 2021 Balance, Crypto Lotus offers no explanation for why it could possibly be entitled to the alleged value of its FTX.com account on a random date *18 months before* the Petition Date.  In any event, like all other customer claims, Crypto Lotus's Claim is a claim in respect of "Digital Assets," and pursuant to the confirmed Plan, the value of its Claim must be determined according to the Estimation Order as of the Petition Date.  [D.I. 26404-1].

4.     Crypto Lotus is thus correct in asserting that it is entitled to the value of its FTX.com account as of the Petition Date.  But Crypto Lotus miscalculates, and perhaps intentionally misstates, that amount.  Crypto Lotus did not have $7,595,035.13 in its account on

November 11, 2022. In fact, Crypto Lotus did not have a positive balance as of that date at all; instead, it had a massive negative account balance of approximately *$77 million*.

5. As of the Petition Date, Crypto Lotus was the beneficiary of a roughly $84 million line of credit ("LOC") provided by FTX. Pre-petition, the LOC would have been reflected as part of Crypto Lotus's USD account balance. The funds that Crypto Lotus borrowed under the LOC served as additional collateral for margin trading.

6. Having accepted the benefits of the LOC for nearly 19 months prior to the Petition Date, Crypto Lotus now asserts that the LOC is invalid, and that its Petition Date balance is therefore positive $7.6 million. Although Crypto Lotus does not explain how it calculated this value, it appears to treat the $84 million that it borrowed from FTX under the LOC as USD that it owned. But there is no basis, regardless of the validity of the LOC, for Crypto Lotus to treat this $84 million in money that it borrowed from FTX as its own.

7. *First*, the LOC is valid and enforceable. Crypto Lotus, concerned about a potential liquidation of its risky trading positions, asked FTX for help, and in response FTX extended an LOC, and then increased the amount of the LOC again and again. Crypto Lotus never objected to the LOC and accepted the benefit of it for nearly 19 months prior to the Petition Date. The parties' conduct implies a contract, in fact and in law, that is enforceable notwithstanding the lack of a written LOC agreement. Crypto Lotus therefore has an affirmative obligation to repay the outstanding balance of the LOC—approximately $77 million. Crypto Lotus's refusal to acknowledge this obligation (and explicit disclaimer of it in its Claim) and to repay these funds is a breach of the LOC.

8. *Second*, even if the LOC were not valid, that would not impact Crypto Lotus's negative Petition Date account balance, which was caused by decreases in the market value of

Crypto Lotus's positions on the exchange and its own risky trading strategies—not by credit that FTX extended to Crypto Lotus to help it avoid liquidation. The value of Crypto Lotus's positions began to decline precipitously starting in around April and May 2021. Around the same time, FTX.com revised its margin trading rules, such that account holders of certain positions who wished to use the margin trading program would have to increase the amount of collateral they held. The combination of these two developments led to Crypto Lotus's account becoming extremely undercollateralized and subject to automatic liquidation. To prevent a liquidation, Crypto Lotus reached a "special deal" with Samuel Bankman-Fried, the former CEO of FTX: Crypto Lotus would get whatever credit it needed from FTX to prevent an automatic liquidation. By the Petition Date, this amount had risen to $84 million. Although the LOC functioned to prevent liquidation of Crypto Lotus's undercollateralized positions, it did not contribute to the negative value of the Crypto Lotus account, which, as of the petition date, was negative $77 million, even with the benefit of the LOC. Thus, even if the LOC were not valid, the amount of Crypto Lotus's claim here would be zero.

## JURISDICTION AND VENUE

9.     This Adversary Proceeding is commenced pursuant to Rule 7001 of the Federal Rules of Bankruptcy Procedure and includes an action for a declaratory judgment pursuant to 28 U.S.C. § 2201. This Adversary Proceeding seeks, among other things, to recover money or property belonging to the Debtors' Chapter 11 estates. Fed. R. Bankr. P. 7001(1). The statutory predicate for the relief requested herein is Section 502 of Title 11 of the United States Code, 11 U.S.C. § 101 *et seq.* (the "Bankruptcy Code"), and Section 2201 of Title 28 of the United States Code, 28 U.S.C. § 2201 (the "Declaratory Judgment Act").

10.     This Adversary Proceeding relates to the Plaintiff's Chapter 11 Cases filed with this Court on the Petition Date. The Court has subject matter jurisdiction over this Adversary

Proceeding pursuant to 28 U.S.C. §§ 157(a) and 1334(a) and the *Amended Standing Order of Reference* from the United States District Court for the District of Delaware, dated February 29, 2012.

11.     This Court has personal jurisdiction over the Defendant under Federal Rule of Bankruptcy Procedure 7004(f), as Defendant has filed a proof of claim against Plaintiff in this Court.

12.     Venue of this Adversary Proceeding in this District is proper pursuant to 28 U.S.C. § 1409, and venue in this District is consistent with the interests of justice, judicial economy, and fairness.  This Adversary Proceeding is a core proceeding pursuant to 28 U.S.C. § 157(b), and the Court may thus enter a final order or judgment consistent with Article III of the U.S. Constitution.

13.     Pursuant to Rule 7008-1 of the Local Rules of the United States Bankruptcy Court for the District of Delaware, Plaintiff consents to the entry of final orders and judgments by the Court on these claims to the extent that it is later determined that the Court, absent consent of the parties, cannot enter final orders or judgments consistent with Article III of the United States Constitution.

## THE PARTIES

14.     Plaintiff FTX Recovery Trust is a Delaware statutory trust created and implemented pursuant to the Plan, and the sole owner by assignment of all rights and assets of FTX under the Plan as confirmed by the Court.  On November 11 and November 14, 2022 (as applicable, the "Petition Date"), FTX and its affiliated debtors and debtors-in-possession (collectively, the "Debtors" and each a "Debtor") filed with the United States Bankruptcy Court for the District of Delaware (the "Court") voluntary petitions for relief under Chapter 11 of the Bankruptcy Code.

15.     On October 8, 2024, the Court entered an order confirming the *Second Amended Joint Chapter 11 Plan of Reorganization of FTX Trading Ltd. and Its Debtor Affiliates* [D. I.

26404] (the "Plan"), which became effective on January 3, 2025 [D.I. 29127] (the "Effective Date"). Upon the Effective Date, all assets of the Debtors, including all claims and causes of action, were transferred to and vested in the FTX Recovery Trust, a Delaware statutory trust operated for the benefit of creditors arising out of the collapse of FTX. Accordingly, the FTX Recovery Trust has the authority to file this Complaint to commence, and thereafter to prosecute, this Adversary Proceeding.

16. Defendant Crypto Lotus is a private fund organized under the laws of Delaware.

### OTHER RELEVANT PERSONS

17. Jonas Norr is Crypto Lotus's managing partner.

18. Samuel Bankman-Fried is the founder and former CEO of FTX.

### FACTUAL ALLEGATIONS

**I.    Crypto Lotus Opens a Trading Account and Agrees to the FTX Terms of Service.**

19. In October 2018, Crypto Lotus began trading over-the-counter ("OTC") with Alameda. Over the next two years, Crypto Lotus routed millions of dollars' worth of OTC trades through Alameda, and its managing partner, Jonas Norr, became a close business associate of Samuel Bankman-Fried.

20. In December 2020, Crypto Lotus opened a customer account on FTX.com. When it opened its account, Crypto Lotus agreed to terms of service dated November 25, 2020 (McGuire Decl., Ex. B (the "Terms of Service")), which remained in effect during the period relevant to the Claim. Under the Terms of Service, Crypto Lotus agreed to "maintain a sufficient amount of Digital Assets at all times to meet FTX's margin requirements, *as such requirements may be modified from time to time*" and that "FTX Trading may seize and liquidate any or all [] positions and assets to reduce [] leverage" if the value of collateral in its account "falls below the maintenance margin requirement." Terms of Service § 6 (emphasis added).

21.     The Terms of Service to which Crypto Lotus agreed also provided that accounts that engaged in leveraged trading, such as spot margin or futures trading, "may be required to have or make additional collateral available as margin" if the "markets for a Futures Contract or the underlying Digital Asset decrease [in] value" and that "position[s] may be liquidated at a loss, and [the account holder] will be liable for the deficit, if any" if "[the] Account is under the minimum margin requirements set by the Exchange." *Id.* § 12.

22.     At all times after opening its account, Crypto Lotus had access to FTX's margin requirements via the user interface for its customer account.  Among other things, Crypto Lotus could see the minimum account value it needed to maintain to collateralize its leveraged positions (the "Maintenance Margin Requirement") and FTX's current valuation of its assets serving as collateral (the "Margin Trading Account Value").

**II.     Crypto Lotus Puts on Highly Leveraged Positions and Gets a Line of Credit from FTX.**

23.     On March 15, 2021, Crypto Lotus made its first deposit into its FTX account of approximately $33 million of MOB coin, a cryptocurrency launched just three months earlier that had experienced extreme price volatility on minimal trading volume.  Within hours of its first deposit, Crypto Lotus enabled the spot margin trading feature on its account, giving it the ability to participate in FTX's spot margin lending program (the "Margin Program").  Under the Margin Program, Crypto Lotus could purchase assets with leverage by borrowing from other participating FTX customers or open positions in futures contracts on the exchange and cover any losses in excess of their existing USD balance by borrowing from other participating FTX customers.

24.     For example, without taking into consideration any applicable margin requirements, if Crypto Lotus held a positive $10,000 USD balance (and no other assets) but wanted to execute a trade for 1 Bitcoin that required payment of $25,000, it could automatically

borrow $15,000 via the Margin Program when the trade was executed, resulting in new account balances of 1 Bitcoin and negative $15,000 USD. In this example, Crypto Lotus would end up with the same total account balance: $10,000 (1 Bitcoin worth $25,000 less $15,000 in borrowed funds). But Crypto Lotus would also owe $15,000.

25. The Margin Program operated pursuant to standardized, platform-wide rules and was broadly available to eligible customers, with borrowing strictly conditioned on the value of assets maintained in the customer's account as collateral. The purpose of the Margin Program was to allow customers more flexibility to trade digital assets and open futures contracts, if they wished to do so. But in return, the customer would need to meet the Maintenance Margin Requirement in their customer account as collateral. The Margin Trading Account Value of the collateral was based on a formula which assigned different weights to different types of assets, so more risky assets, such as the MOB coin, were assigned lower values. If a customer's account level dipped below the Maintenance Margin Requirement, the Terms of Service allowed FTX to liquidate or close the customer's account.

26. Crypto Lotus quickly made extensive use of the Margin Program. As of March 28, 2021, just two weeks after its first deposit, Crypto Lotus had borrowed over $19 million, against an account balance of approximately $83 million, consisting almost entirely of MOB. In light of its extensive borrowing and the risky illiquidity of MOB, Crypto Lotus was highly exposed to slight decreases in the market price of MOB, which could lead to its Margin Trading Account Value falling below its Maintenance Margin Requirement, resulting in FTX automatically liquidating the firm's cryptocurrency holdings into cash and closing open futures positions until the account was in compliance with the Maintenance Margin Requirement.

27.    On March 29, 2021, Crypto Lotus expressed concerns to FTX about the possibility that it would face automatic liquidation.  (Claim ¶ 12 n.3.)  In response, Bankman-Fried extended an initial $1 million LOC to Crypto Lotus, which was logged internally as a transfer from "SBF" to a "known counterparty."  (*See* McGuire Decl., Ex. C.)  The LOC functioned to inflate Crypto Lotus's Margin Trading Account Value balance by $1 million USD, which effectively increased the amount of available collateral in the account, thereby providing a cushion through borrowing and saving Crypto Lotus from the threat of automatic liquidation.  Unlike the Margin Program, which was a standardized, broadly available feature collateralized by customer assets and subject to uniform margin requirements, lines of credit on FTX were bespoke arrangements, extended only in limited circumstances, that functioned as unsecured or lightly secured extensions of credit rather than collateralized borrowing.

28.    The bail-out worked, briefly.  Throughout the first half of April 2021, the value of Crypto Lotus's account rose.  But within a few weeks, its account value dropped precipitously, and once again, the low account value put Crypto Lotus at risk of liquidation.

### III.    FTX Amends Its Margin Trading Requirements.

29.    In early May 2021, FTX amended its methodology for calculating Margin Trading Account Value pursuant to its authority under the Terms of Service to make modifications to margin requirements.  (Terms of Service § 6.)  Under the new methodology, FTX decreased the amount at which large holdings of volatile or illiquid tokens like MOB—a relatively new cryptocurrency that Crypto Lotus held large amounts of—would be valued as collateral.

30.    FTX's decision to adjust the margin methodology had nothing to do with Crypto Lotus.  Rather, it was motivated by losses that FTX and Alameda had suffered over the prior month due to a fraud orchestrated by another customer who used an illiquid token, BTMX, to collateralize extremely large positions on FTX, including a massive short position in MOB.  When the price of

MOB spiked, and the customer had no actual collateral to cover the short, Alameda stepped in to close out the position. This required Alameda to purchase significant amounts of MOB in the open market and through OTC desks at extremely inflated prices, resulting in hundreds of millions of dollars in losses. To prevent this from happening again, FTX modified its margin methodology to put a greater emphasis on liquidity when valuing tokens as collateral.

31.   Crypto Lotus concedes in its Claim Addendum that, on April 30 and May 3, 2021, FTX notified Crypto Lotus of its planned modification to the margin requirements and requested that it post additional collateral. (Claim ¶¶ 7-8.)

32.   FTX's automatic liquidation engine kicked in early in the morning on May 19, 2021. At this point, Crypto Lotus had borrowed approximately $79 million via the Margin Program. Crypto Lotus had also failed to post additional collateral to its account despite acknowledging that it had received two notices from FTX to do so. (Claim ¶¶ 7–8.) As a result, Crypto Lotus's account holdings could no longer adequately collateralize its margin balance in accordance with FTX's Maintenance Margin Requirement, triggering FTX's automatic liquidating engine.

33.   Throughout the day of May 19, 2021, FTX liquidated some of Crypto Lotus's positions, while Crypto Lotus voluntarily sold certain assets, closed certain positions, and deposited additional assets to save its account from further liquidation.

## IV.   FTX Prevents Further Liquidations of Crypto Lotus Positions by Increasing the LOC and Eventually Disabling Liquidations Altogether.

34.   By May 21, 2021, Crypto Lotus's account had fallen below applicable maintenance margin thresholds such that, without an increase to the LOC, the account would have been fully liquidated and reduced to a zero balance (or negative balance)—with Crypto Lotus remaining liable for any resulting shortfall.

35. On May 22, 2021, FTX increased the amount of Crypto Lotus's LOC by an additional $40 million, memorializing the increase in an internal document alongside the note "MOB—SBF." (*See* McGuire Decl., Ex. C.) This increased the Marginal Trading Account Value of Crypto Lotus's account by $40 million, creating a significant cushion against further liquidations. In September 2021, an FTX employee described Crypto Lotus's LOC in an internal document as a "special deal with [S]am after they blew up their account in [M]ay. [S]am said to leave it." (*See* McGuire Decl., Ex. D.)

36. But even with the benefit of a more than $40 million LOC, Crypto Lotus's account continued to experience significant volatility.

37. On October 28, 2021, Crypto Lotus's managing partner, Jonas Norr, emailed Ramnik Arora, a senior executive at FTX, forwarding an email he had received from support@ftx.com. Norr wrote, "This is the email I was concerned about. Seems to say a liquidation is imminent and I'm not sure how we could avoid it. Let me know if there's anything we can do!" (McGuire Decl., Ex. E.) Arora responded that the account would likely not be liquidated, but that the interest charged on the LOC would be reflected as negative USD in the Crypto Lotus account. *Id.* Norr responded, "Ah, got it." *Id.* Another FTX employee, Cheryl Chan, then explained the details of the automatic interest charge associated with the LOC and how Norr could check the amount of interest charged. *Id.* Norr replied, "Thanks so much for the explanation Cheryl, super helpful! Think I grasped the structure now." *Id.*

38. On January 20, 2022, Crypto Lotus received an email notification from support@ftx.com stating that its account was "close to liquidation." (McGuire Decl., Ex. F.) On January 21, 2022, Norr forwarded this notification to Bankman-Fried and Arora and asked, "Anything we can do to prevent this?" *Id.* That same day, FTX increased Crypto Lotus's LOC

by an additional $10 million, further increasing its Margin Trading Account Value and staving off liquidation yet again.

39.    On September 6, 2022, FTX increased Crypto Lotus's LOC by an additional $33.35 million, further raising the account's Margin Trading Account Value.

40.    The Trust has identified no communications prior to the Petition Date from Crypto Lotus reflecting any opposition to, or concerns over, the previously agreed upon LOC.  To the contrary, the communications and course of dealing between Crypto Lotus and FTX make clear that Crypto Lotus fully understood and accepted that FTX was providing it credit via an LOC, and, indeed, Crypto Lotus was glad to receive the benefit of the LOC, which prevented its account from being liquidated.

## V.    Crypto Lotus's FTX Account Value Remains Negative as of the Petition Date.

41.    After the automatic liquidation that occurred on May 19, 2021, Crypto Lotus was never subjected to another liquidation.  However, decreases in the price of Crypto Lotus's cryptocurrency holdings, consisting primarily of MOB, continued to lower the account's value.

42.    As of the Petition Date, the Crypto Lotus account had a final account balance of approximately negative $77 million.  Separately, FTX had by that time extended $84 million of credit to Crypto Lotus via the LOC.

## CAUSES OF ACTION

### COUNT ONE
### DECLARATORY JUDGMENT—IMPLIED-IN-FACT CONTRACT

43.    The FTX Recovery Trust repeats and realleges the allegations in paragraphs 1 through 42 as if fully set forth here.

12

44.     A current, ripe, and justiciable dispute and controversy exists between the parties and is fully susceptible to judicial resolution.  This Court's entry of a declaratory judgment will terminate the uncertainty giving rise to Defendant's Claim.

45.     On four different occasions—once each on March 29, 2021; May 22, 2021; January 21, 2022; and September 6, 2022—FTX extended credit to Crypto Lotus via an LOC.  The total principal amount extended via this LOC to Crypto Lotus is $84,353,175.

46.     Through the parties' communications and course of conduct, it is clear that Defendant acknowledged, understood, agreed to, and reaped the benefits of the LOC.

47.     Accordingly, pursuant to the Declaratory Judgment Act, 28 U.S.C. § 2201, it would be just and appropriate for the Court to enter a judgment declaring that:

   a. The LOC extended by FTX to Defendant is an enforceable implied-in-fact contract.

   b. The parties agreed under this contract that FTX would extend credit to Defendant via the LOC in Defendant's FTX.com exchange account.

   c. The parties agreed under this contract that Defendant would pay interest on the LOC while the LOC was in effect.

   d. The parties agreed under this contract that the value of the credit extended to Defendant under the LOC was not the property of Defendant; rather, it functioned as a loan obligation Defendant owed to FTX.

## COUNT TWO
## DECLARATORY JUDGMENT—QUASI-CONTRACT

48.     The FTX Recovery Trust repeats and realleges the allegations in paragraphs 1 through 42 as if fully set forth here.

49.     A current, ripe, and justiciable dispute and controversy exists between the parties and is fully susceptible to judicial resolution.  This Court's entry of a declaratory judgment will terminate the uncertainty giving rise to Defendant's Claim.

13

50.     On four different occasions—once each on March 29, 2021; May 22, 2021; January 21, 2022; and September 6, 2022—FTX extended credit to Crypto Lotus via an LOC.  The total principal value of this LOC is $84,353,175.

51.     Defendant received the benefit of the LOC because the application of the LOC prevented Defendant's exchange account from being automatically liquidated.

52.     Defendant acknowledged and understood that the LOC was a loan obligation it owed to FTX.

53.     Defendant accepted and retained the benefit of the LOC, and, under the alleged circumstances, it would be inequitable for Defendant to retain the value of the LOC as if it were a gift.

54.     Accordingly, pursuant to the Declaratory Judgment Act, 28 U.S.C. § 2201, it would be just and appropriate for the Court to enter a judgment declaring that:

a.  The LOC extended by FTX to Defendant is an enforceable quasi-contract.

b.  FTX extended credit to Defendant via the LOC in Defendant's FTX.com exchange account.

c.  Defendant realized the benefit of the LOC, which prevented its exchange account from being automatically liquidated.

d.  It would be inequitable for Defendant to retain the value of the LOC.

## COUNT THREE
## BREACH OF CONTRACT

55.     The FTX Recovery Trust repeats and realleges the allegations in paragraphs 1 through 42 as if fully set forth here.

56.     FTX and Crypto Lotus entered into the LOC, which is enforceable as an implied-in-fact contract and quasi-contract.

57.    FTX performed its duties under the LOC by extending a line of credit on the FTX.com exchange, totaling $84,353,175, to Crypto Lotus, which was utilized by Crypto Lotus for 19 months prior to the bankruptcy to prevent liquidation of its account.

58.    Crypto Lotus has disclaimed its obligation to repay, and has not repaid, the amount borrowed from FTX, nor has it paid the interest owed under the LOC.  Rather, the Crypto Lotus account holds a Petition Date balance of negative $77 million, leaving FTX creditors to bear the burden of Crypto Lotus's risky trading decisions.

59.    Plaintiff has incurred damages from the failure to repay the funds owed by Crypto Lotus under the LOC in the amount of $84,353,175, plus interest.

## COUNT FOUR
## UNJUST ENRICHMENT

60.    The FTX Recovery Trust repeats and realleges the allegations in paragraphs 1 through 42 as if fully set forth here.

61.    In the alternative to Count Three, as alleged above, Defendant received the direct benefit of the credit extended by FTX under the LOC, which prevented its account from being liquidated and allowed Defendant the potential upside if the assets it held increased in value. Despite this benefit, Defendant has not returned the borrowed funds or paid the outstanding interest payments due under the LOC.  Accordingly, Defendant has been enriched, while Plaintiff and its creditors have been impoverished.

62.    Under the circumstances as alleged herein, allowing Defendant to retain the benefit of its use of the LOC for 19 months would unjustly enrich Defendant.  The unjust enrichment of Defendant, to the detriment of Plaintiff who extended the LOC and was ultimately impoverished by the decline in the value of the Crypto Lotus account, has caused Plaintiff damages.

15

63.     Should the Court find that Plaintiff has no remedy at law, Plaintiff seeks recovery in equity.

**COUNT FIVE**
**OBJECTION TO PROOF OF CLAIM 82109 PURSUANT TO 11 U.S.C. § 502(b)(1)**

64.     The FTX Recovery Trust repeats and realleges the allegations in paragraphs 1 through 42 as if fully set forth here.

65.     Section 502(a) of the Bankruptcy Code provides, in pertinent part, that "[a] claim or interest, proof of which is filed under section 501 of this title, is deemed allowed, unless a party in interest . . . objects." 11 U.S.C. § 502(a).  Once an objection to a claim is filed, the Court, after notice and hearing, shall determine the allowed amount of the claim.  *Id.* § 502(b). Section 502(b)(1) of the Bankruptcy Code provides, in relevant part, that a claim may not be allowed to the extent that it "is unenforceable against the debtor and property of the debtor, under any agreement or applicable law." *Id.* § 502(b)(1).

66.     While a properly filed proof of claim is *prima facie* evidence of the claim's allowed amount, when an objecting party presents evidence to rebut a claim's *prima facie* validity, the claimant bears the burden of proving the claim's validity by a preponderance of evidence.  *See In re Allegheny Int'l, Inc.,* 954 F.2d 167, 173-74 (3d Cir. 1992) ("Initially, the claimant must allege facts sufficient to support the claim.  If the averments in his filed claim meet this standard of sufficiency, it is '*prima facie*' valid.") (internal citation omitted).  The burden of persuasion with respect to the claim is always on the claimant, *see id*. at 174, and the failure to allege facts and to provide adequate support for a claim eliminates the claim's *prima facie* validity.  *See, e.g.*, *In re Jorczak*, 314 B.R. 474, 481-82 (Bankr. D. Conn. 2004) (discussing the evidentiary requirements and burden of proof with respect to the allowance of claims).

67.     For the following reasons and others that will be demonstrated following discovery and a hearing, the Court should disallow and expunge in its entirety claim number 82109.

**A. Under the Confirmed Plan and Estimation Order, Crypto Lotus Is Not Entitled to the April 30, 2021 Balance.**

68.     Under one theory, Crypto Lotus claims that it is entitled to the April 30, 2021 Balance[3] of an additional $200 million windfall, which is equivalent to the value of its account holdings as of that date.  This argument is frivolous.  Regardless of any assertions regarding FTX's amendment of its margin trading rules and the LOC (which are discussed further below), the Claim is a Customer Entitlement Claim.  The Plan defines "Customer Entitlement Claim" as "any Claim . . . held by any Person or Entity against any of the Debtors that compensates the Holder of such Claim for the *value as of the Petition Date of Cash or Digital Assets held by such Person or Entity in an account on any FTX Exchange*."  (Plan § 2.1.47 (emphasis added).)  The value of a "Claim in respect of [] Digital Asset[s]," is in turn determined by Petition Date pricing, as prescribed by the Plan and Digital Assets Estimation Order.  (Plan § 4.4; *see* Estimation Order [D.I. 7090]; *see also* 11 U.S.C. § 502(b) (directing bankruptcy court to determine the amount of claims "in lawful currency of the United States as of the date of the filing of the petition").)

69.     This Court has already decided the issue of how to value customer claims.  Parties in interest lodged over 150 objections to the Debtors' Estimation Motion, arguing that all manners

---

[3]     The Trust cannot discern any possible reason for the April 30, 2021 date other than it is one of the high points in the account's value.  Crypto Lotus asserts that FTX requested that it deposit additional collateral to its account, but provides no documentation of such a request.  Crypto Lotus also states without support that on April 30, 2021 FTX changed its margin rules and attaches two screenshots (Claim Exs. D, E) of the FTX webpage on margin rules as "proof."  Crypto Lotus says that Exhibit D shows the rules prior to April 30, 2021, and Exhibit E shows the rules "as of April 30, 2021."  (Claim ¶ 7.)  A cursory investigation of Exhibit E, however, shows that it reflects the margin trading rules as of May 7, 2021, *after* FTX provided Crypto Lotus with notice of its intent to change the margin rules on May 3, 2021.

of alternative methodologies and dates be used to calculate Customer Entitlement Claims.[4]  The Court overruled these objections, emphasizing that the Bankruptcy Code contained a clear directive to determine claim values as of the Petition Date.  (Jan. 31, 2024 Hearing Tr. 14:19-25.) This Court once again reinforced its decision on claim valuation when it confirmed the Plan.  (*See, e.g.*, Plan § 4.4.)  "[A] confirmation order is res judicata as to all issues decided or which could have been decided at the hearing on confirmation."  *Donaldson* v. *Berstein*, 104 F.3d 547, 554 (3d Cir. 1997) (internal citation omitted); *see also, e.g.*, *In re Varat Enters., Inc.*, 81 F.3d 1310, 1317 (3d Cir. 1996) ("Once a plan is confirmed, neither a debtor nor a creditor can assert rights that are inconsistent with its provisions.").

70.     Crypto Lotus did not object to the Plan or Estimation Order, and it does not (and cannot) challenge the validity of either.  Crypto Lotus makes no attempt to explain how it could be exempt from the Plan and Estimation Order (because it cannot), relying instead on cursory and conclusory allegations that the margin requirements and LOC were improper.  To accept Crypto Lotus's arguments would require the Court to disregard the confirmed and effective Plan and the Estimation Order, and permit favorable treatment to this one claimant at the expense of all legitimate creditors.   Any such result is impermissible and would plainly undermine the Bankruptcy Code's core aim of "achieving fundamental fairness and justice" for creditors.  *In re Am. Cap. Equip., LLC*, 688 F.3d 145, 157 (3d Cir. 2012).

71.     Even if the Court were to credit the incorrect premise that FTX was not entitled to apply its collateral requirements to Crypto Lotus's account, the Claim for the April 30, 2021

---

[4]     *See, e.g.*, *Objection to Motion of Debtors to Estimate Claims Based on Digital Assets*. *Filed by Hua Deng*. [D.I. 5765] (arguing that claimants were the victims of misrepresentations pre-petition, and therefore the date of the fraud should play a role in determining valuation); *see also Objection to Motion of Debtors to Estimate Claims Based on Digital Assets*. *Filed by Edward Lehman*. [D.I. 5785] (arguing that the Court should use the average price of a Digital Asset for one year before the Petition Date).

Balance must still be disallowed because the decrease in value of Crypto Lotus's account resulted from market price changes, not from margin rule changes, subsequent liquidations, or the LOC. Contrary to what Crypto Lotus implies in the Claim Addendum, analyses of the fund's account show definitively that its losses between April 30, 2021 and the Petition Date were caused by losses from futures trading and declines in MOB and Ethereum prices, not liquidations of the fund's positions. By the time of the liquidations on May 19, 2021, the account's collapse was largely complete. Under these circumstances, the Claim is nothing more than a demand that the FTX Recovery Trust bail out Crypto Lotus's poor investment decisions at the expense of legitimate creditors. That is an abuse of the claims process and should be rejected. *In re Watson*, 2010 WL 4496837, at *5 (Bankr. N.D. W. Va. Nov. 1, 2010) (noting debtor may seek sanctions for creditors' abuse of claims process by filing a false claim and collecting cases).

**B. Because Crypto Lotus's Account Balance Was Negative as of the Petition Date, Its Claim Is Worth $0.**

72.     In determining what, if anything, Crypto Lotus is entitled to, what matters is the content and value of its account on the Petition Date, *not* 18 months earlier on April 30, 2021. And the value of Crypto Lotus's account as of the Petition Date must be valued using Petition Date prices. As explained below, on the Petition Date, Crypto Lotus had an approximately *negative $77 million* account balance. The appropriate value of Crypto Lotus's Claim is therefore $0.

73.     Crypto Lotus's account shows a history of volatile investments and losses that it now seeks to recoup. It should not be allowed to do so. Crypto Lotus's argument for a $7.6 million Claim can be summarized as follows: (1) FTX improperly changed its margin trading rules; (2) thereafter, FTX unilaterally imposed an LOC upon Crypto Lotus, and the LOC is therefore invalid; and (3) as a result, Crypto Lotus is entitled to a windfall equal to the value of the LOC in

USD. Crypto Lotus has failed to establish any portion of this argument, and its Claim must therefore be disallowed and expunged.

### 1. Crypto Lotus Fails To Establish That FTX Unlawfully Changed Its Margin Requirements.

74.     Crypto Lotus's theory of recovery is based on the contention that FTX "unilaterally and unlawfully" asserted new margin requirements, which led to liquidation of certain positions within Crypto Lotus's account, and the application of and increases in the LOC.[5] But Crypto Lotus has provided no support, legal or factual, for its assertion that the change to the margin rules was unlawful, or even improper, and therefore has not established a *prima facie* claim. *In re Tribune Co.*, 2013 WL 1909617, at *3 & n.10 (Bankr. D. Del., May 2, 2013) (disallowing and expunging claim when the claimant "has not articulated a discernable basis for a claim against the Debtors," and noting that "[e]ven were [the court] to decide that [claimant] had met her initial burden . . . the record reveals no basis upon which any relief can be granted").

75.     In fact, FTX was clearly entitled to adjust the methodology for calculating Margin Trading Account Value under the FTX Terms of Service, which govern the relationship between Crypto Lotus and the FTX Exchange. *See In re Bittrex, Inc.*, 2024 WL 2347311, at *18 (Bankr. D. Del. May 22, 2024), *aff'd*, 674 B.R. 271 (D. Del. 2025) (finding "[t]he Terms of Service entirely govern the parties' relationship"); *Kattula* v. *Coinbase Global, Inc.*, 2023 WL 4373385, at *2 (N.D. Ga. July 6, 2023) (finding that user "was bound by" two user agreements after opening two accounts on a cryptocurrency exchange platform). In fact, Crypto Lotus does not even contend, let alone try to explain why, the FTX Terms of Service are not applicable here.

---

[5]     According to its own Claim Addendum, the initial $1 million LOC was put in place March 29, 2021, prior to the change in margin requirements. Claim Addendum at ¶ 12 n.3.

76.    Further, courts have long found similar provisions involving liquidations to be enforceable. *See Conway* v. *Icahn & Co., Inc.*, 16 F.3d 504, 505, 508 (2d Cir. 1994) (finding "[i]t is well-settled that provisions of this nature are enforceable as between the parties to agreements that include such provisions" regarding a "Customer Agreement that permitted liquidation without notice to meet margin requirements").

### 2. Crypto Lotus Fails To Establish How or Why the LOC Was Improper or Any Basis for Excluding It from Crypto Lotus's Petition Date Balance.

77.    Crypto Lotus also fails to adequately explain why the LOC should be "invalid and void in its entirety." (Claim ¶ 14.)  It appears to rely solely on the fact that FTX and Crypto Lotus did not memorialize the LOC in writing.[6]  However, the parties' conduct and communications clearly evince an implied-in-fact contract or, alternatively, an implied-in-law contract (or a "quasi-contract").  Therefore, the LOC should be enforced, and its value should be accounted for in Crypto Lotus's Petition Date balance.

### i.    The LOC Agreement Is an Enforceable Implied-in-Fact Contract.

78.    An implied-in-fact contract is one "formed through the parties' conduct." *Webb* v. *Bank of Am. Corp.*, 2022 WL 4482711, at *3 (D. Del. Sept. 26, 2022).[7]  Rather than setting out the terms of the parties' relationship in writing, "[t]he parties' intent and mutual assent to an implied-in-fact contract is proven through conduct." *Id.*  The parties' conduct demonstrates, "in light of the surrounding circumstances, their tacit understanding." *Id.* (internal citations omitted); *see also Phillips* v. *Wilks, Lukoff & Bracegirdle, LLC*, 2014 WL 4930693, at *4 (Del. Oct. 1, 2014), *as*

---

[6]    The Trust reserves all rights to amend or supplement its objections to Crypto Lotus's Claim following discovery.

[7]    The Terms of Service are governed by the law of England.  However, the Trust is not aware of any English law that differs from Delaware law in this respect.  To the extent that Crypto Lotus contends that English law differs, it bears the burden of proving the substance of English law, *Germaninvestments AG* v. *Allomet Corp.*, 225 A.3d 316, 333 (Del. 2020), which it has made no attempt to do.

*corrected* (Oct. 7, 2014) (implied-in-fact contract existed where party "silently accepted" another's services "without raising any objection").

79.    The parties' conduct reveals an implied-in-fact contract for FTX to extend and increase an LOC to Crypto Lotus to save its account from liquidation.  Crypto Lotus repeatedly asked FTX to prevent the liquidation of its account, and FTX came up with a "special deal": an ever-increasing LOC and special protections against liquidation.  Crypto Lotus paid interest on the LOC; Crypto Lotus asked FTX employees to explain the LOC and the interest charges; Crypto Lotus said it "grasped the structure" of the LOC.  (*See* McGuire Decl., Ex. E.)  These are not the actions of an entity that claimed it did not possess "any information about the LOC, including its terms, how it operated, or its effect on [its account]."  (Claim ¶ 10.)

80.    That Norr continued to have friendly ties with FTX, including working on a joint venture with Bankman-Fried and attending meetings with FTX employees in the Bahamas, after the imposition of the LOC also cuts against the notion that Crypto Lotus opposed the application of the LOC.  In fact, Crypto Lotus appears to have never raised a single concern about the LOC until it filed its Claim.

### ii.  The LOC Agreement Is an Enforceable Quasi-Contract.

81.    The parties' LOC agreement also formed a quasi-contract.  A quasi-contract is one that permits one party to recover from another where the latter has benefitted at the expense of the former, "in order to preclude unjust enrichment."  *Powell* v. *Powell*, 2006 WL 136500, at *2 (Del. Com. Pl. Jan. 18, 2006).  A quasi-contract requires "(1) a benefit conferred upon the defendant by the plaintiff; (2) appreciation or realization of the benefit by the defendant; (3) and acceptance and retention by the defendant of such benefit under such circumstances that it would be inequitable to retain it without paying the value thereof."  *Owens* v. *Connections Cmty. Support Programs, Inc.*, 840 F. Supp. 2d 791, 797 (D. Del. 2012).

82.    All elements of a quasi-contract are met here.  FTX conferred the benefit of the LOC upon Crypto Lotus, which saved Crypto Lotus from complete liquidation.  This benefit was actually realized by Crypto Lotus, because absent a brief period on May 19, 2021, its account was never liquidated again.  Crypto Lotus knowingly accepted and retained the benefit of the LOC, and willingly paid interest on it.

83.    It would therefore be inequitable to permit Crypto Lotus to retain the full value of the LOC.  The LOC was not a gift—something Crypto Lotus was well aware of, because gifts do not come with interest.  It should not be allowed to abscond with $84 million.

### iii. Regardless of the Validity of the LOC, Crypto Lotus Has a Negative Petition Date Balance.

84.    Even if the Court were to credit the incorrect premise that the LOC is invalid, Crypto Lotus still has a negative account balance of $77 million, resulting from market price decreases in MOB and ETH, as well as substantial declines in the value of Crypto Lotus's futures positions.

85.    Although not specified as such in the Claim, Crypto Lotus's assertion of an "invalid" LOC appears to be a claim that the LOC is void.  But it is long-standing law that if a "contract is void at law," "the only remedy is in equity."  *See Mahaffy* v. *Frank W. Diver, Inc.*, 1963 WL 64652, at *2 (Del. Ch. May 14, 1963); *see also Travers* v. *Reinhardt*, 205 U.S. 423, 444 (1907) ("When a void contract is acted upon, the remedy, when there is one, is not on the contract, but upon a quasi-contract, for a *quantum meruit*.").  Crypto Lotus advances no theory, legal, equitable, or otherwise, that would justify it keeping $84 million conferred under a void contract.

### PRAYER FOR RELIEF

WHEREFORE, the FTX Recovery Trust respectfully prays that this Court:

86. Enter an order under 28 U.S.C. § 2201 declaring that the LOC is a valid contract implied in law and fact;

87. Enter an order under 11 U.S.C. § 502(b) disallowing and expunging and/or reducing the Claim to $0 on the basis of no liability;

88. Award the FTX Recovery Trust the amount due under the LOC alleged herein, including principal and interest;

89. Award the FTX Recovery Trust its attorneys' fees, pre- and post-judgment interest, and costs of suit; and

90. Award the FTX Recovery Trust all other relief, at law or equity, to which it may be entitled.

Dated:  May 12, 2026
        Wilmington, Delaware

**LANDIS RATH & COBB LLP**

*/s/ Matthew B. McGuire*
Adam G. Landis (No. 3407)
Richard S. Cobb (No. 3157)
Matthew B. McGuire (No. 4366)
Howard W. Robertson (No. 6903)
919 Market Street, Suite 1800
Wilmington, Delaware 19801
Telephone: (302) 467-4400
Facsimile: (302) 467-4450
E-mail:  landis@lrclaw.com
         cobb@lrclaw.com
         mcguire@lrclaw.com
         robertson@lrclaw.com

-and-

**SULLIVAN & CROMWELL LLP**
Andrew G. Dietderich (admitted *pro hac vice*)
James L. Bromley (admitted *pro hac vice*)
Brian D. Glueckstein (admitted *pro hac vice*)
Justin J. DeCamp (admitted *pro hac vice*)
Jacob M. Croke (admitted *pro hac vice*)
125 Broad Street
New York, NY 10004
Telephone: (212) 558-4000
Facsimile: (212) 558-3588
E-mail:  dietdericha@sullcrom.com
         bromleyj@sullcrom.com
         gluecksteinb@sullcrom.com
         decampj@sullcrom.com
         crokej@sullcrom.com

*Counsel for the Plaintiff FTX Recovery Trust*