**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| In re: | Chapter 11 |
| FTX TRADING LTD., *et al.* | Case No. 22-11068 (KBO) |
| Debtors.[1] | (Jointly Administered) |
| | **Re: Docket No. 35722** |

**ARGENT LIQUIDATION TRUST'S LIMITED OBJECTION TO THIRD NOTICE OF PROPOSED REDUCTION OF DISPUTED CLAIMS RESERVE AMOUNT**

The Argent Liquidation Trust (the "Trust"), as successor to the estates of debtors Silvergate Capital Corporation, Silvergate Liquidation Corporation (f/k/a Silvergate Bank), and Spring Valley Lots, LLC (the debtors, collectively, "Silvergate"), hereby files this limited objection (this "Limited Objection") to the *Third Notice of Proposed Reduction of Disputed Claims Reserve Amount* (Dkt. No. 35722 (the "Reduction Notice")) filed by the FTX Recovery Trust.[2]  In support of this Limited Objection, the Trust respectfully states as follows:

**PRELIMINARY STATEMENT**

1.     The FTX Recovery Trust seeks to reduce the Disputed Claims Reserve for the third time—a further $600 million reduction, to $1.78 billion—even though some of the largest and best-supported claims against the FTX Group estate remain unobjected to and outstanding.  The Trust does not dispute that the FTX Recovery Trust has authority to manage its reserves, but that authority is not unlimited: the Disputed Claims Reserve must remain at a level necessary to satisfy

---

[1] The last four digits of FTX Trading Ltd.'s and Alameda Research LLC's tax identification number are 3288 and 4063 respectively. Due to the large number of debtor entities in these Chapter 11 Cases, a complete list of the Debtors and the last four digits of their federal tax identification numbers is not provided herein. A complete list of such information may be obtained on the website of the Debtors' claims and noticing agent at https://cases.ra.kroll.com/FTX.

[2] Capitalized terms used but not defined herein have the meaning given to them in the Reduction Notice or the *Declaration of Steven P. Coverick in Support of Third Notice of Proposed Reduction of Disputed Claims Reserve Amount* (Dkt. No. 35723 (the "Fifth Coverick Declaration")), as applicable.

Disputed Claims that ultimately become Allowed.  (*See* Second Amended Joint Chapter 11 Plan of Reorganization of FTX Trading Ltd. and its Debtor Affiliates § 8.5, Dkt. No. 26404-1 (the "FTX Plan"); *see also* Dkt. No. 28689.)

2.      The Trust's claims against the FTX Group, evidenced by proofs of claim filed by Silvergate in these chapter 11 cases (the proofs of claim and their supporting addenda, the "Silvergate Claims"), carry potential damages ranging from hundreds of millions to potentially billions of dollars—and that does not account for the treble damages available under the Trust's civil RICO claims.  Meanwhile, the FTX Recovery Trust touts a $900 million "cushion" in the proposed reserve.  (Fifth Coverick Decl. ¶ 11.)  But if the projected Allowed Claims already consume nearly all of the proposed $1.78 billion reserve, and the Silvergate Claims have not been meaningfully accounted for, then the only apparent protection for the Silvergate Claims is that $900 million cushion.  The Silvergate Claims could more than exhaust it before RICO trebling and before any other remaining Disputed Claim is considered.  Such an unsupported reduction in the Disputed Claims Reserve is not an abstract concern; it is a mathematical one.

3.      The Silvergate Claims against the FTX Group are both large and well-supported. The Silvergate Claims include fraud, breach of contract, contractual indemnification, violation of civil RICO (18 U.S.C. § 1962(c)), and conspiracy to violate civil RICO (18 U.S.C. § 1962(d)). The damages associated with these claims include approximately $751 million or more in forced fire-sale securities losses, billions in lost equity value, and more than one hundred million dollars in regulatory settlements and other investigative, advisor, settlement, bankruptcy, and unreimbursed indemnification costs—before accounting for treble damages available under civil RICO.

4.    And the damages flowing from the Silvergate Claims are well-founded, arising from identifiable and well-documented misconduct.  The FTX Group systematically lied to Silvergate to obtain banking services it was not entitled to receive, submitted fraudulent account applications, fabricated corporate documents for a shell company with no business operations or employees, and had its CEO personally sign false due diligence questionnaires—all to conceal that the FTX Group was secretly directing billions of dollars in customer deposits through Silvergate's banking system.  The FTX Group used Silvergate's accounts as a critical infrastructure for its fraud, and when the FTX Group's fraud was exposed, the resulting collapse of confidence in the FTX Group and its financial-service providers immediately triggered a run on Silvergate's bank and a liquidity crisis.  The chain of events was devastating.  The FTX Group's collapse drove deposit flight; deposit flight forced Silvergate to raise liquidity in an unfavorable market, and the desperate need to raise liquidity required borrowings, repayments of those advances, and forced securities sales at heavy losses.  Indeed, when the FTX Group's scheme unraveled, it destroyed Silvergate—evaporating billions in equity value, forcing the sale of $5.2 billion or more of securities at distressed prices, subjecting Silvergate to a cascading waterfall of lawsuits and regulatory investigations for years, and ultimately compelling Silvergate to wind down and liquidate.

5.    The evidentiary record is overwhelming, even before discovery.  The FTX Group's founder and CEO, Samuel Bankman-Fried was convicted on all counts presented to a jury related to the FTX Group's sprawling fraudulent scheme and was sentenced to 25 years' imprisonment. Three additional FTX Group employees—Caroline Ellison, Gary Wang, and Nishad Singh— pleaded guilty to numerous fraud counts.  A superseding indictment specifically charged Bankman-Fried with conspiracy to commit bank fraud against Silvergate, and the Department of

Justice expressly found that "the evidence at trial, including witness testimony and documentary evidence, proved that the defendant . . . made false statements to [Silvergate] to induce it to open a bank account that he used in furtherance of his other fraudulent schemes." (*See* Letter by United States, Dkt. No. 388, *United States v. Bankman-Fried*, No. 1:22-cr-00673-LAK (S.D.N.Y. Dec. 29, 2023).)  Few civil claims come to a reserve analysis with a stronger record.

6.        Yet, to date, the Trust's compelling and sizeable claims have gone unaddressed. Although counsel for the Trust and the FTX Recovery Trust have recently begun discussions of a procedure and timeline to efficiently address the Silvergate Claims, no schedule has been set.  Nor has the FTX Recovery Trust provided any transparency into the proposed reserve reduction or any claims-specific analysis showing that the proposed reserve, if reduced, could satisfy the Silvergate Claims.  The Trust understands from counsel that the magnitude of the Silvergate Claims was not appreciated in the reserve amount.  That was surprising given the Trust's candor regarding Silvergate's damages and the information provided nearly three years ago in the Silvergate Claims, which disclosed that Silvergate had recognized over $751 million in securities-sale losses during the fourth quarter of 2022 alone because of the FTX Group's fraud.  (*See* Ex. A[3] ¶ 17.)  Even after being informed of the potential magnitude of the Silvergate Claims, counsel for the FTX Recovery Trust and Plan Administrator would not agree to defer the proposed reduction until a later time or until additional work had been done to establish a litigation schedule and procedure for fully resolving the Silvergate Claims.  The timing matters.  The Trust was formed on March 31, 2026— about two months ago—and, since then, has already begun to work in good faith with the FTX Recovery Trust to establish an efficient procedure and schedule for resolving the Silvergate Claims

---

[3] A representative Silvergate Claim is attached hereto as **Exhibit A**.  Pincites to Exhibit A refer to the pages in the addendum.

against the FTX Group.  But the FTX Recovery Trust is seeking to release reserve value before that process is in place, forcing the Trust to file this Limited Objection now to prevent interim prejudice to the Silvergate Claims that are substantially likely to be Allowed and required to be paid under the FTX Plan.

7.    Against this backdrop, the relief requested is limited.  The Trust only asks the Court to ensure the Disputed Claims Reserve remains large enough to honor the FTX Plan's promise: that holders of Disputed Claims will receive the distributions to which they are entitled if and when their claims are Allowed.  The Trust respectfully requests that the Court direct the FTX Recovery Trust to provide transparency regarding the amount that the FTX Recovery Trust has ascribed to the Silvergate Claims in the reserve calculation and accordingly deny, modify, or delay the proposed reduction to the extent necessary to preserve sufficient value to pay the Silvergate Claims pending their resolution.

## BACKGROUND

**I.    The FTX Group's Systematic Fraud Against Silvergate.**

8.    Silvergate Capital Corporation was a Maryland corporation founded in 1986 and headquartered in La Jolla, California.  Its subsidiary, California-chartered Silvergate Bank, was for years a leading provider of innovative financial infrastructure solutions to the digital asset industry.  (*See* Ex. A at 2.)  Silvergate was able to secure some of the largest cryptocurrency-related businesses as customers due to its reputation as a trustworthy, regulated institution that welcomed digital asset customers.  Among its many digital asset customers, Silvergate provided banking services to the FTX Group.  (*Id.*)

9.    Silvergate offered different types of accounts, each with their own levels of onboarding and periodic due diligence.  For example, customers could open trading or market-making accounts to use their own capital to buy or sell virtual currency, which had more limited

due diligence.   On the other end of the spectrum, if Silvergate's customers—primarily large cryptocurrency exchanges such as Coinbase and Binance—wanted to use Silvergate's accounts to hold capital on behalf of the exchange's end-user customers, the exchange had to open a custodial account, which was subjected to enhanced due diligence and a heightened onboarding process, including certain licensing requirements and documentation requirements.

10.   In or around March 2018, the FTX Group opened non-custodial accounts for Alameda Research LLC at Silvergate.  In or around March 2019, the FTX Group opened additional non-custodial accounts for Alameda Research Ltd. (together with Alameda Research LLC, "Alameda") at Silvergate.  (*Id.* at 3–4.)  The FTX Group did not seek to open a custodial account for Alameda and, as such, Alameda was never subjected to the heightened due diligence (onboarding and ongoing) specifically required for such an account.  In the course of the parties' dealings, the FTX Group never disclosed to Silvergate—and sought to prevent Silvergate from learning—that Alameda accounts were being used to receive customer deposits and fund customer withdrawals for the FTX.com exchange, in direct contravention of the stated purposes of those accounts.  (*Id.*)  Indeed, although these accounts were explicitly ***not*** opened for the purpose of receiving and transmitting customer funds (*see id.* at 3), that is exactly how the FTX Group used the accounts.

11.   In October 2019, shortly after FTX Trading Ltd. (the parent holding company of the FTX.com cryptocurrency trading platform) was founded, the FTX Group approached Silvergate to explore opening an account for FTX Trading Ltd. to facilitate direct USD deposits and withdrawals for its (i.e., FTX.com) customers.  Silvergate made clear to the FTX Group that FTX Trading Ltd. (or, FTX.com) would need to be licensed and registered as a money services

business ("MSB")[4] and, accordingly, would be subject to enhanced due diligence measures and additional onboarding requirements under Silvergate's onboarding procedures. (*See, e.g.*, *id.* at 3 n.1.) As was the case for the Alameda accounts, the FTX Group ***never*** applied for or received any form of custodial (or *any*) account for FTX Trading Ltd, and FTX Trading Ltd. never identified itself as an MSB.

12.     Thwarted in its efforts to lawfully open a custodial account to hold the capital of FTX.com customers, the FTX Group, between at least November 2019 and August 2020, simply directed FTX.com customers to wire their deposits to Alameda's non-custodial accounts at Silvergate, without Silvergate's knowledge or consent and in direct contradiction of the representations made in the account applications.   These are undisputed facts to which FTX Trading Ltd. and Alameda founder and CEO Samuel Bankman-Fried admitted under oath at trial. (*See, e.g.*, Ex. C[5] at 2170, 2362–64 (Bankman-Fried testifying the FTX Group "gave wire bank account information for an Alameda bank account to customers where they could wire funds in and be credited on FTX to trade"); *see also Second Interim Report of John J. Ray III to the Independent Directors: The Commingling and Misuse of Customer Deposits at FTX.com* at 10, Dkt. No. 1704-1 ("Ray Report on Misuse of Customer Deposits at FTX.com") ("[W]ire instructions provided to FTX.com customers for the purpose of making fiat currency deposits were printed on Alameda letterhead, and instructed FTX.com customers to send funds to one of more than a dozen different Alameda bank accounts.").)

---

[4] A money services business includes any person or entity doing business in the capacity of, among other things, a currency dealer or exchanger. (Ex. A at 3 n.1.)

[5] Cited excerpts of the trial transcript are compiled and attached hereto as **Exhibit C**.  Pincites are to the internal transcript numbering, not any CM/ECF pagination.

13.    The FTX Group's deception continued.  In August 2020, the FTX Group contacted Silvergate to open non-custodial accounts for a new entity: North Dimension Inc. ("North Dimension").  Unbeknownst to Silvergate, North Dimension had no business operations and no employees; it was a shell company.  (Ray Report on Misuse of Customer Deposits at FTX.com at 19.)  To keep Silvergate from learning these facts and others about how it intended to use the North Dimension account to perpetuate the FTX Group's fraud, the FTX Group *repeatedly* and knowingly lied to Silvergate in connection with opening this new North Dimension account.  As just a few examples:

- *First*, the general counsel of Alameda and chief compliance officer of FTX.US "instructed an FTX Group employee to copy and paste into the application for North Dimension's bank accounts the information that Alameda had previously submitted on its own applications to open its bank accounts" at Silvergate.  (*Id.* at 18; *see also* Dkt. No. 15545 at 74.)  The FTX Group "employee did so, and as a result, the application submitted to [Silvergate] falsely represented that North Dimension 'operates a cryptocurrency trading business.'"  (Ray Report on Misuse of Customer Deposits at FTX.com at 18.)  This was a lie: North Dimension did not operate any business at all.[6]

- *Second*, in December 2020, in response to a due diligence questionnaire that Silvergate required as part of the application process for trading businesses, the FTX Group falsely described North Dimension as follows—with Bankman-Fried personally signing and certifying that the responses were "correct and complete to the best of his knowledge and belief" (*id.*):

  o  that North Dimension was *not* an MSB (Ex. A at 2–3, 5; Ex. C at 2236–38), which was a lie because the FTX Group intended to (and did) use the North Dimension account to receive and pay funds to FTX.com customers, thus using North Dimension as an MSB; and

---

[6] This legal officer's lies in furtherance of the FTX Group's fraud were not limited to the North Dimension application.  Among other things, this legal officer "conceived of, drafted and backdated—by nearly two years—a sham intercompany agreement" to conceal the FTX Group's misuse of customer funds, and presented it to an external auditor, resulting in false and misleading financial statements.  (Ray Report on Misuse of Customer Deposits at FTX.com at 21–23.)

Allegedly, too, before this legal officer joined Alameda and FTX.US, he, through a letter on outside counsel's official firm letterhead, falsely represented to institutional investors and lenders seeking to extend credit or capital to FTX.com or Alameda that the firm knew the principal of Alameda and considered him to be of high reputation in the industry, upon which commercial decision-makers acted in reliance.

- o that North Dimension was "a proprietary and OTC trading firm with 2,000 counterparties and average monthly trading volume of $10 million" (Ray Report on Misuse of Customer Deposits at FTX.com at 18), which was a lie because North Dimension had no counterparties, no trading activity, and no employees.

- *Third*, when Silvergate asked for a copy of North Dimension's corporate register, as required to open the accounts, FTX Group employees knowingly directed the creation of a false and misleading corporate register for North Dimension and provided it to Silvergate—a fabricated document, manufactured to lend a shell company a false appearance of legitimate governance. (Ex. A at 3.)

- *Fourth*, the FTX Group identified the general counsel of Alameda to Silvergate "in a false and misleading fashion as North Dimension's General Counsel and Chief Compliance Officer." (*See* Ray Report on Misuse of Customer Deposits at FTX.com at 18–19.) This was a lie; North Dimension was a shell company with no officers, no counsel, and no compliance function.[7]

14. These lies about North Dimension were deliberate. For one, they were made "to give North Dimension, a purely shell company, a false air of legitimacy." (*Id.* at 19.) But, critically, they allowed the North Dimension application to bypass the enhanced onboarding due diligence (which would have included, for example, an independent audit of North Dimension's own Bank Secrecy Act and Anti-Money Laundering Act policies, procedures, and processes) or the registration and licensing required of an MSB—measures that would have been applied had the FTX Group disclosed to Silvergate the North Dimension account's true purposes: receiving and processing customer deposits for the FTX.com exchange. (*See, e.g.*, Ex. A at 3 & n.1.)

15. Relying on the FTX Group's fraudulent representations, Silvergate approved the application and opened the North Dimension non-custodial accounts. (*Id.* at 4–5.) In reality—and as the FTX Group had intended all along—the FTX Group directed FTX.com customer deposits to the North Dimension account, where an automated process credited customers on the FTX.com exchange, and the FTX Group then transferred the custodial funds to Alameda's non-custodial

---

[7] More examples of the FTX Group's deception are likely to be revealed through discovery.

Silvergate accounts. (*See* Ex. C at 155–58, 654–56, 2758–59; Ray Report on Misuse of Customer Deposits at FTX.com at 18–19.)

16.     The FTX Group's lies and fabrications—facilitated through repeated acts by numerous individuals at numerous entities—were not isolated acts; they formed a sustained pattern of deception to prevent Silvergate from learning the true nature of the FTX Group's use of its accounts and from deploying the safeguards Silvergate had specifically designed to curtail the risk of such uses. At every stage—from the concealment of FTX.com customer deposits flowing through Alameda's accounts (which had been approved for proprietary trading purposes only), to the fabrication of an entirely new entity with a false identity, to the creation of forged documents to support that false identity—the FTX Group deliberately circumvented Silvergate's compliance safeguards.

## II.     FTX Group's Collapse and Resulting Harm to Silvergate.

17.     In November 2022, the FTX Group's fraudulent scheme was exposed and immediately collapsed. A leaked Alameda balance sheet revealed that much of its $14.6 billion in assets consisted of the FTX Group's own token, triggering a crisis of confidence. (Ex. C at 891–93, 896–97.) Bankman-Fried responded with further lies, tweeting publicly that FTX.com "has enough to cover all client holdings" and "do[es]n't invest client assets." (*Id*. at 2543, 2785, 2789.) This was not true: FTX.com had only $4 billion to cover $12 billion in customer holdings on the FTX.com exchange and had otherwise loaned customer assets to Alameda for illicit purposes, like risky investments. (*Id*. at 919.) The same pattern of deliberate deception that defined the FTX Group's relationship with Silvergate—saying whatever was necessary to conceal the truth—played out on a public stage.

18.     Between November 6 and 8, 2022, FTX.com customers withdrew approximately $6 billion from the exchange.  (*Id*. at 2543–44; Dkt. No. 15545, at 93–94.)  And on November 11, 2022, the FTX Group filed voluntary petitions for relief under Chapter 11 of the Bankruptcy Code.  (Ex. A at 5.)

19.     In December 2022, a federal grand jury indicted Bankman-Fried on numerous counts of fraud.  (*Id.* at 6.)  That same month, Caroline Ellison, the (then-former) CEO of Alameda, and Gary Wang, co-founder and (then-former) CTO of FTX.com, each pleaded guilty to numerous fraud counts arising from their respective roles in the FTX Group's fraudulent scheme.  (*Id.*)  In February 2023, Nishad Singh, an early employee of FTX.com and leader of the FTX Group's cybersecurity team, pleaded guilty to numerous fraud counts based on his role in the FTX Group's fraud.  (*Id.* at 7.)

20.     In February 2023, a federal grand jury returned a superseding indictment, charging Bankman-Fried with, among other new crimes, conspiracy to commit bank fraud against Silvergate, identified as "Bank-1" in the superseding indictment.  (*Id.*; Superseding Indictment ¶¶ 80–82, Dkt. No. 80, *United States v. Bankman-Fried*, No. 1:22-cr-00673-LAK (S.D.N.Y. Feb. 23, 2023) ("Superseding Indictment").)  The grand jury found and charged the following specific facts (among others) regarding the FTX Group's fraud:

- When the FTX Group asked Silvergate to open a custodial account for FTX Trading Ltd., "[Silvergate] made clear" "that it would not open an account for customer deposits and withdrawals absent evidence that FTX [Trading Ltd.] was licensed and registered, including federal registration as a money services business, and that, in any event, [Silvergate] would need to conduct an enhanced due diligence process before opening any account used to process customer deposits and withdrawals."  (Superseding Indictment ¶ 15.)

- Bankman-Fried directed the incorporation of North Dimension "[i]n part to obscure the relationship between FTX[.com] and Alameda, and in order to overcome [Silvergate's] refusal to open a bank account for FTX[.com] without extensive due diligence and licensing."  (*Id.* ¶ 17.)

- "BANKMAN-FRIED and others chose the name 'North Dimension' in part to conceal that there was a relationship between North Dimension and Alameda from FTX[.com] customers and from banks approving transactions with the North Dimension bank account." (*Id.*)

- "Aware of the fact that [Silvergate] would not open an exchange account or account for receiving customer deposits for an entity without the appropriate registration and enhanced due diligence," Bankman-Fried "and other Alameda employees told [Silvergate] a false story" about North Dimension and its purpose. (*Id.* ¶ 18.)

  o FTX Group employees "completed an account application that falsely stated that the purpose of the North Dimension bank account was for 'trading' and 'market making.'" (*Id.*)

  o Silvergate was "given a completed North Dimension due diligence questionnaire" signed by Bankman-Fried "that falsely stated that North Dimension 'trades on multiple cryptocurrency exchanges worldwide for its own account,'" "that North Dimension 'also participates in direct peer-to-peer, OTC purchases and sales with certain third parties for its own account,'" and "that North Dimension was not a money services business." (*Id.*)

- "[Silvergate] approved the opening of the North Dimension account, without enhanced due diligence or review by [Silvergate's] executive committee, as would have been required had the true purposes of North Dimension's account been disclosed to [Silvergate]." (*Id.* ¶ 19.)

21.   In November 2023, after a five-week trial, a jury convicted Bankman-Fried on all counts presented for verdict,[8] after approximately three hours of deliberation. (*See* Nov. 2, 2023 Tr. at 3252, Dkt. No. 384, *United States v. Bankman-Fried*, No. 1:22-cr-00673-LAK (S.D.N.Y. Dec. 12, 2023); *see also* U.S. Dep't of Just., *Statement of U.S. Attorney Damian Williams on the Conviction of Samuel Bankman-Fried* (Nov. 2, 2023), https://www.justice.gov/usao-sdny/pr/statement-us-attorney-damian-williams-conviction-samuel-bankman-fried.)   He was

---

[8] Among other counts, the conspiracy to commit bank fraud count was severed from the remaining counts and not presented to the jury because of complications regarding the extradition treaty with The Bahamas. (*See* Letter by United States, Dkt. No. 388, *United States v. Bankman-Fried*, No. 1:22-cr-00673-LAK (S.D.N.Y. Dec. 29, 2023).) After achieving its conviction of Bankman-Fried on the charges presented at the November 2023 trial, the Department of Justice chose not to pursue a second trial on the severed counts because "much of the evidence that would [have been] offered in a second trial was already offered in the first trial and [could] be considered by the Court at" Bankman-Fried's sentencing. *Id.* at 1. In particular, the Department of Justice explained, "The evidence at trial, including witness testimony and documentary evidence, proved that the defendant . . . made false statements to [Silvergate] to induce it to open a bank account that he used in furtherance of his other fraudulent schemes." *Id.* at 2.

sentenced to 25 years' imprisonment.  (Judgment in a Criminal Case, Dkt. No. 424, *United States v. Bankman-Fried*, No. 1:22-cr-00673-LAK (S.D.N.Y. Mar. 29, 2024).)

22.     The FTX Group's collapse triggered a catastrophic bank run on Silvergate.  In the fourth quarter of 2022 alone, Silvergate's deposits declined by $6.9 billion (a 52.4% drop), with approximately $1 billion of that amount withdrawn by the FTX Group itself.  (*See Silvergate Capital Corporation Announces Fourth Quarter 2022 Results*, Silvergate (Jan. 17, 2023), available at https://www.sec.gov/Archives/edgar/data/1312109/000131210923000020/ex991si4q 22earningsrelease.htm ("Silvergate Q4 FY22 Results"); *see also* Mitchell Martin, *Silvergate Throws In The Towel, Crypto Bank Will Wind Up Business After Customers Flee*, Forbes (Mar. 8, 2023),    https://www.forbes.com/sites/digital-assets/2023/03/08/silvergate-throws-in-the-towel-crypto-bank-will-wind-up-business-after-customers-flee/.)   Within weeks of the FTX Group's fraud scheme coming to light, Silvergate's stock, which had traded as high as $219.75 per share in November 2021, plummeted to approximately $21.43 per share, evaporating billions in shareholder value.  (*See, e.g.*, Report of the Internal Investigation Committee of the Board of Directors of Silvergate, Inc. at 6–7, 60, Dkt. No. 689-1, *In re Silvergate Capital Corp., et al.*, No. 24-12158-KBO (Bankr. D. Del. May 5, 2025) ("Investigation Committee Report"); Caitlin Ostroff, *Silvergate Capital Stock Tumbles 43% After FTX Crypto Collapse Sparks Bank Run*, Wall Street J. (last updated Jan. 5, 2023), https://www.wsj.com/livecoverage/stock-market-news-today-01-05-2023/card/silvergate-bank-shares-tumble-premarket-snXfyKyVIyMEPC2SXXk9.)

23.     To maintain liquidity, Silvergate was forced to sell $5.2 billion of debt securities into a market that the FTX Group's collapse had cratered, crystallizing $751.4 million in losses at the worst possible moment.  (*See* Silvergate Capital Corp., Notification of Late Filing (Form 12b-25) (Mar. 1, 2023), available at https://www.sec.gov/Archives/edgar/data/1312109/00011046592

3027353/tm238251d1_nt10k.htm; Silvergate Q4 FY22 Results, *supra*.)  But the liquidity crisis ensued, and when advances Silvergate was forced to borrow from the Federal Home Loan Bank of San Francisco came due, Silvergate was forced to sell additional investment securities into the cratered market.  (*See* Silvergate Capital Corp., Notification of Late Filing (Form 12b-25) (May 11, 2023), available at sec.gov/Archives/edgar/data/1312109/000095015723000472/nt10-q.htm.)

24.     Accordingly, on March 8, 2023—less than four months after the FTX Group's collapse—Silvergate announced its intent to wind down and voluntarily liquidate.  (Ex. A at 7.)

25.     On June 30, 2023, Silvergate filed the Silvergate Claims against the FTX Group, asserting causes of action for fraud, breach of contract, contractual indemnification, violation of civil RICO (18 U.S.C. § 1962(c)), and conspiracy to violate civil RICO (18 U.S.C. § 1962(d)).  A representative proof of claim is attached hereto as **Exhibit A**.  Silvergate filed substantively identical proofs of claim against approximately 100 FTX Group debtors because the operations of the FTX Group are opaque to outside parties, and it was infeasible to determine which specific entities in the FTX Group caused harm to Silvergate, compounded by the FTX Group's extensive commingling of funds across the FTX Group entities.  (Ex. A at 1.)

26.     On November 13, 2025, this Court confirmed Silvergate's plan.  (*See* Findings of Fact, Conclusions of Law, and Order Confirming First Amended Joint Chapter 11 Plan of Silvergate Capital Corporation and its Affiliated Debtors, Dkt. No. 1077, *In re Silvergate Capital Corp., et al.*, No. 24-12158-KBO (Bankr. D. Del. Nov. 13, 2025).)  Upon the plan's effective date of March 31, 2026, the Trust was formed, and the Silvergate Claims transferred automatically to the Trust.  (*Id*. ¶ 13; *see* Notice of Effective Date at 2, Dkt. No. 1231, *In re Silvergate Capital Corp., et al.*, No. 24-12158-KBO (Bankr. D. Del. Mar. 31, 2026).)  For the avoidance of doubt, the Trust filed notices of transfer for each of the Silvergate Claims on March 31, 2026.  A complete

table of all the Silvergate Claims, the docket number of the notice of transfer, and the status of each transfer is attached hereto as **Exhibit B**.[9]

27.    The damages underlying the Silvergate Claims are substantial.  Each category of loss flows directly from the FTX Group's deliberate fraud against Silvergate, a fraud that, as set forth above, has been established by, among other things, criminal convictions, guilty pleas, and sworn trial testimony.  The FTX Group's misconduct improperly put customer funds through Silvergate's banking system under false pretenses, and the exposure of that misconduct triggered the bank run, forced liquidity measures, securities losses, an avalanche of litigation and investigations, and the liquidation that followed.  The damages include, but are not limited to:

- *Securities Losses.*  When the FTX Group's fraud was exposed, it triggered a catastrophic bank run that forced Silvergate to sell roughly $5.2 billion in securities to meet liquidity demands—booking approximately $751 million or more in losses at exactly the worst time, when crypto markets were in free fall.  (*See supra* ¶ 23.)

- *Lost Equity Value.*  Silvergate Capital's common stock traded as high as $219.75 per share in November 2021.  (*See supra* ¶ 22.)  The FTX Group's fraud caused Silvergate's collapse and voluntary liquidation, evaporating billions of dollars in shareholder value.

- *Regulatory Settlements.*  Silvergate paid tens of millions of dollars in penalties to the Federal Reserve and California DFPI arising from deficiencies that existed only because the FTX Group concealed the true nature and purpose of the transactions flowing through its accounts at Silvergate.

- *Investigative, Defense, and Advisor Costs.*  Silvergate incurred tens of millions of dollars in fees and expenses defending itself against FTX-related litigation and engaging advisors to address the fallout from the FTX Group's fraud.

- *Bhatia Settlement.*  Silvergate paid millions of dollars to settle claims brought by plaintiffs alleging that Silvergate aided and abetted the FTX Group—litigation that would never have existed but for the FTX Group's fraud against Silvergate.

- *Bankruptcy and Indemnification Costs.*  Silvergate incurred tens of millions of dollars in legal and professional costs related to its own bankruptcy—a bankruptcy that was

---

[9] A small number of the transfers were deemed defective because the applicable FTX debtor entity's individual case had been closed prior to the transfer.  The Trust reserves all rights with respect to any claims affected by such closures and intends to seek relief to the extent necessary to preserve those claims.

the direct result of the FTX Group's fraud—and in unreimbursed indemnification expenses.

- *Treble Damages Under Civil RICO.* The RICO Act permits treble damages, which would multiply the Trust's recovery. 18 U.S.C. § 1964(c).

### III.    The Proposed Reserve Reduction.

28.    Although the FTX Recovery Trust has yet to address the Silvergate Claims in the approximately year-and-a-half since it was formed, the FTX Recovery Trust now proposes to reduce the Disputed Claims Reserve for a third time since that reserve was initially funded with $6.533 billion. (Dkt. No. 28689.) The Disputed Claims Reserve was first reduced by $1.93 billion to $4.599 billion on July 23, 2025 (Dkt. No. 31822), and then by $2.22 billion to $2.38 billion on January 29, 2026 (Dkt. No. 34610). The FTX Recovery Trust now seeks to reduce the Disputed Claims Reserve again, by $600 million, to $1.78 billion. (*See* Reduction Notice.) The cumulative reduction proposed to date exceeds $4.75 billion—a reduction of nearly 73% from the original reserve.

### LIMITED OBJECTION

### I.    The FTX Plan Does Not Permit a Reserve Reduction That Jeopardizes the Satisfaction of Allowed Claims.

29.    The Trust does not take the position that no reserve reduction is ever permissible. But the FTX Recovery Trust's discretion is bounded by the FTX Plan's requirements: the Plan Administrator must "reserve, as necessary, cash on hand in a manner consistent with Article 4 on account of the Disputed Claims Reserve in the amount that would otherwise be distributable to estimated Disputed Claims pursuant to the Plan." (FTX Plan § 8.5.) The reserve exists precisely so that holders of Disputed Claims that subsequently become Allowed Claims will receive the distributions to which they are entitled under the FTX Plan. (*See id*. §§ 8.5–8.7.) If the reserve is set too low, a claimant whose claim is later allowed may receive less than similarly-situated

claimants who were paid from a larger pool—a result that is inequitable, inconsistent with the FTX Plan's design, and inconsistent with the FTX Recovery Trust's own assurances that the proposed reserve reduction will not "jeopardize[e] the potential recoveries to claimants holding Disputed Claims in the event such claims subsequently become Allowed Claims." (Reduction Notice at 5; Fifth Coverick Decl. ¶ 11.)

30.     The FTX Recovery Trust asserts that the proposed Third Revised Reserve Amount of $1.78 billion includes approximately $900 million in excess of projected Allowed Claims. (Fifth Coverick Decl. ¶ 11.)  But the Reduction Notice and the Fifth Coverick Declaration provide no transparency into how the FTX Recovery Trust has accounted for the Silvergate Claims—or whether it has done so at all.  This is a critical omission.  The question is not whether $1.78 billion sounds large in the abstract; it is whether the projected Allowed Claims already embedded in that number leave the Silvergate Claims to recover only from the asserted $900 million excess—and whether that excess is remotely adequate for the Silvergate Claims plus other remaining Disputed Claims.  The Silvergate Claims are among the most formidable Disputed Claims in FTX Group's estate; they are backed by a grand jury Superseding Indictment and the federal criminal conviction of the FTX Group's founder, corroborated by guilty pleas from three additional high-level FTX Group employees, and assert causes of action for fraud, breach of contract, contractual indemnification, and civil RICO.  If the FTX Recovery Trust has projected the Silvergate Claims at an amount that undervalues them, then the proposed $900 million cushion is not a cushion at all.

31.     Simple arithmetic makes the point.  If the Silvergate Claims have not been meaningfully accounted for within the projected Allowed Claims, the only apparent protection for them is the $900 million excess.  The Silvergate Claims could more than exhaust that amount on

fraud and contract damages alone, before RICO trebling and before any other Disputed Claim is considered. Even without trebling, the Trust's damages include at least $751 million or more in forced securities losses and over a hundred million more in regulatory settlements, investigative and defense costs, settlement costs, bankruptcy costs, and indemnification costs—approaching $1 billion before accounting for the billions in lost equity value. The FTX Recovery Trust cannot treat the asserted $900 million excess as though the Silvergate Claims do not exist, and it certainly should not distribute that excess to holders of Allowed Claims while the Silvergate Claims—some of the largest in the FTX Group's estate—remain pending.

32. The FTX Recovery Trust has pointed to its "rigorous process" and "intentionally conservative assumptions" in determining the proposed reserve amount. (Reduction Notice at 4–5; Fifth Coverick Decl. ¶¶ 10–11.) But a process that, however rigorous, produces a reserve amount insufficient to satisfy one of the estate's largest Disputed Claims is, by definition, not conservative enough. Nor can the process be deemed conservative where—after being apprised of the Trust's damages position—the FTX Recovery Trust has yet to show the Trust how the reserve accounts for the Silvergate Claims and has not agreed to defer releasing reserve assets pending the resolution of the litigation process that the parties are currently working to schedule and finalize. The Trust respectfully submits that the Court should require the FTX Recovery Trust to demonstrate, with specificity, how the Silvergate Claims have been accounted for in the reserve calculation (if they have at all), and whether the proposed reserve is adequate to satisfy them if and when they are allowed.

33. The Trust submits that the Silvergate Claims should be valued well over a billion dollars, particularly as the claims are supported by an extensive factual record, even before discovery (*see supra* ¶¶ 8–27), which includes, among other things:

- The criminal conviction of Bankman-Fried on all fraud counts presented to a jury, following approximately three hours of deliberation after a five-week trial, and his 25-year prison sentence;

- Guilty pleas from three additional high-level FTX Group employees—Caroline Ellison, Gary Wang, and Nishad Singh—to numerous fraud counts from their respective roles in the FTX Group's fraudulent scheme;

- The grand jury Superseding Indictment specifically charging Bankman-Fried with conspiracy to commit bank fraud against Silvergate and the fact that trial evidence "proved that the defendant . . . made false statements to [Silvergate] to induce it to open a bank account that he used in furtherance of his other fraudulent schemes";

- Bankman-Fried's own trial testimony admitting that he signed the false due diligence questionnaire for North Dimension and that the FTX Group directed customers to wire custodial funds to Alameda's non-custodial bank accounts;

- Caroline Ellison's testimony that Bankman-Fried "set up the systems that allowed Alameda to take the money" and "directed us to take customer money to repay our loans," confirming that Alameda misappropriated approximately billions in FTX.com customer funds;

- The Ray Report on Misuse of Customer Deposits at FTX.com, documenting the FTX Group's systematic commingling and misuse of customer deposits;

- Detailed contractual indemnification provisions in the Cash Management and Treasury Services Agreements entered into between Silvergate and multiple FTX Group entities, which require the FTX Group signatories to indemnify Silvergate for losses "resulting from or arising out of" "any" of the FTX Group signatories' acts and omissions, or those of their "employees or agents" (*see* Ex. A at 10); and

- The Investigation Committee Report, confirming that no director or employee of Silvergate knew of the FTX Group's fraud (*see* Investigation Committee Report at 97, 108–09).

34.    It is difficult to imagine a stronger indicator of the likelihood of success of civil claims against a company than the criminal convictions of its owner and management based on the same conduct underlying those claims. *Cf. Reach Commc'ns Specialists, Inc. v. Williams*, 655 F. Supp. 3d 351, 362 (E.D. Pa. 2023) ("[C]ourts . . . bind a corporation to prior actions involving its controlling shareholder or owner . . . includ[ing] binding a corporation to the findings of a previous criminal proceeding against an owner or controlling shareholder." (collecting cases)).

The FTX Recovery Trust should not further deplete the pool of assets from which the Trust is entitled to recover while claims of this magnitude and strength remain unresolved.

## II.   The Timing of the Proposed Reduction is Prejudicial.

35.   The timing of this proposed reduction is particularly troubling because it pairs the FTX Recovery Trust's delay in addressing the Silvergate Claims with an immediate effort to release reserve value.  The Silvergate Claims have been on file since June 30, 2023, and the FTX Recovery Trust has been in place since January 3, 2025, yet the FTX Recovery Trust has taken no formal action to adjudicate or otherwise resolve the Silvergate Claims.  The Trust, by contrast, came into control of the Silvergate Claims only on March 31, 2026, and promptly began working in good faith to advance an efficient process for their resolution.  The FTX Recovery Trust's own deadline to object to the Silvergate Claims is not until January 4, 2027—more than seven months from the date of the Reduction Notice.  (*See* Dkt. No. 33890.)  And the FTX Recovery Trust has already extended that deadline once "without prejudice to seek further extensions."  (Dkt. No. 33444, at 1.)  Absent a final agreement to a coordinated litigation schedule and process, the Silvergate Claims may remain unresolved for months (if not longer), while the FTX Recovery Trust reduces the very reserve against which the Trust is entitled to recover.  This creates an obvious prejudice: the Trust could prevail on its substantial Silvergate Claims only to find that the reserve has been depleted.

36.   Counsel for the FTX Recovery Trust and the Plan Administrator agreed to work toward a coordinated schedule and procedure for resolving the Silvergate Claims.  That is constructive, and the Trust remains committed to that process.  But without a corresponding delay of the proposed reserve reduction, the Trust is forced to prosecute this Limited Objection to preserve value in the Disputed Claims Reserve necessary to ensure that the Silvergate Claims— once Allowed—can be paid in full as the FTX Plan requires.  A process to resolve the Silvergate

Claims cannot protect the Trust if, before that process runs its course, the reserve against which the Trust must recover has already been depleted.  The proposed reduction therefore should not proceed unless and until the FTX Recovery Trust demonstrates that the reserve accounts for the Silvergate Claims and will remain sufficient to satisfy them if and at the time they are ultimately Allowed.

## CONCLUSION

For the foregoing reasons, the Trust respectfully requests that the Court: (a) deny, modify, or delay the proposed reduction of the Disputed Claims Reserve to the extent necessary to ensure the Third Revised Reserve Amount adequately accounts for the Silvergate Claims and preserves sufficient value pending resolution of the Silvergate Claims; (b) direct the FTX Recovery Trust to provide transparency regarding how the Silvergate Claims have been accounted for in determining the proposed Third Revised Reserve Amount; and (c) grant such other and further relief as the Court deems just and proper.

*[Remainder of page intentionally left blank]*

Dated: June 11, 2026
      Wilmington, Delaware

Respectfully submitted,

*/s/ Gregory J. Flasser*

L. Katherine Good (No. 5101)
Gregory J. Flasser (No. 6154)
Sameen Rizvi (No. 6902)
Ethan H. Sulik (No. 7270)
**POTTER ANDERSON & CORROON LLP**
1313 N. Market Street, 6th Floor
Wilmington, Delaware 19801
Telephone: (302) 984-6000
Facsimile: (302) 658-1192
Email:   kgood@potteranderson.com
           gflasser@potteranderson.com
           srizvi@potteranderson.com
           esulik@potteranderson.com

-and-

Dennis F. Dunne, Esq. (*pro hac vice* forthcoming)
Lauren C. Doyle, Esq. (*pro hac vice* forthcoming)
**MILBANK LLP**
55 Hudson Yards
New York, New York 10001
Telephone: (212) 530-5770
Facsimile:  (212) 822-5770
Email:   ddunne@milbank.com
           ldoyle@milbank.com

-and-

Andrew M. Leblanc, Esq. (*pro hac vice* forthcoming)
**MILBANK LLP**
1101 New York Avenue, NW
Washington, D.C. 20005
Telephone: (202) 835-7574
Facsimile: (202) 263-7574
Email:   aleblanc@milbank.com

*Counsel to Argent Liquidation Trust*