**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| In re | **Chapter 11** |
| FTX TRADING, LTD., *et al.*,[1] | **Case No. 22-11068 (KBO)** |
| Debtors. | **(Jointly Administered)** |
| | **Hearing Date: July 23, 2026 at 9:30 a.m. (ET)**<br>**Objection Deadline: July 16, 2026 at 4:00 p.m. (ET)**<br>**Related to D.I. 35243, 35411, 35768, 32057 & 32058** |

**MOTION OF SETH MELAMED FOR RECONSIDERATION OF THE
JUNE 2, 2026 ORDER [D.I. 35768] PURSUANT TO 11 U.S.C. § 502(j) AND
FEDERAL RULES OF BANKRUPTCY PROCEDURE 3008, 9023, AND 9024**

Seth Melamed ("**Melamed**") respectfully submits this motion (the "**Motion**") for reconsideration of the Order Granting FTX Recovery Trust's Motion to Enforce Prior Orders that Preclude Seth Melamed from Asserting New Claims in Arbitration, entered June 2, 2026 [D.I. 35768] (the "**June 2nd Order**"), pursuant to 11 U.S.C. § 502(j) and Federal Rules of Bankruptcy Procedure 3008, 9023, and 9024.  In support of the Motion, Melamed states as follows.

**PRELIMINARY STATEMENT**

1.      Paragraph two of the June 2nd Order provides:

Pursuant to the Court's prior findings of fact and conclusions of law set forth in the Confirmation Order, including those set forth in paragraphs 38-41, 49-50, 93, 119, and 143-144, Seth Melamed is enjoined from pursuing the claims described in his November 12, 2025 Notice of Arbitration (SIAC Case No. ARB602/25/VKH) because they are premised on claims that have been compromised, settled, resolved, and enjoined under sections 5.2 and 10.8 of the Second Amended Joint Chapter 11 Plan of Reorganization of FTX Trading Ltd. and Its Debtor Affiliates.

---

[1] The last four digits of FTX Trading Ltd.'s and Alameda Research LLC's tax identification numbers are 3288 and 4063, respectively. Due to the large number of debtor entities in these Chapter 11 Cases, a complete list of the Debtors and the last four digits of their federal tax identification numbers is not provided herein. A complete list of such information may be obtained on the website of the Debtors' claims and noticing agent at https://cases.ra.kroll.com/FTX.

1

2.      The June 2nd Order enjoins Melamed from prosecuting his arbitration claims on the basis that those claims "have been compromised, settled, resolved, and enjoined under sections 5.2 and 10.8" of the Plan.  Pursuant to Rule 9023 (which applies Rule 59 of the Federal Rules of Civil Procedure), the Court should vacate the June 2nd Order to correct clear errors of law or fact and to prevent manifest injustice. *Max's Seafood Café v. Quinteros*, 176 F.3d 669, 677 (3d Cir. 1999).

3.      First, the June 2nd Order cannot be reconciled with this Court's own prior ruling. On July 31, 2025, following its July 22, 2025 bench ruling, the Court entered the ACO Order[2] which did not disallow Claim No. 3385 (the "**SPA Claim**")—it subordinated a portion of the claim under Section 510(b), valued another part, and reserved judgment on a third. Each of those dispositions treats the SPA Claim as an existing, allowable claim.  A claim cannot have been settled and released under Section 5.2 and, at the same time, subordinated, valued, and reserved as a live claim more than six months later.  If the June 2nd Order's release rationale were correct, there would have been nothing for the Court to subordinate, value, or reserve—and the ACO Order would be a nullity. That irreconcilable conflict is cause for reconsideration under Section 502(j) and a clear error of law under Rule 59(e).

4.      Second, § 5.2 of the Plan does not release Melamed's claims.  Consistent with Section 1123(b)(3)(A) of the Code, a plan may provide for the "*settlement or adjustment of any claim or interest belonging to the debtor or to the estate*".    Thus, §5.2 of the Plan is a settlement of *estate* causes of action and intercreditor controversies— as was represented to the court by the Debtors.  It is not a stealth release of a creditor's direct claims.[3]  Melamed's claims under the SPA

---

[2] For the sake of brevity, capitalized terms not defined herein shall have the meanings ascribed to such terms in the *Opposition of Seth Melamed to the Motion to Enforce* D.I. 35411.
[3] In addition, §10.9 expressly preserves causes of action "arising under any contract".

2

are contractual – they arise from breaches of representation/warranty and indemnity obligations; they are direct and personal as to Melamed pursuant to a contract (the SPA).

5.      Third, Melamed opted out of the §10.4 Release and was not a Releasing Party (as that term is defined under the Plan).[4]   Given that the Debtors were not entitled to a discharge, Plan, §5.2 could not accomplish that which §1141(d)(3) prohibited.[5]

6.      Fourth, the Plan Injunction (§10.8), in turn, enjoins only claims "released, settled or exculpated under the Plan," and only "to the extent . . . authorized . . . by sections 524 or 1141." Melamed opted out of the Plan's voluntary release.

7.      The arguments raised by the Trust are recently manufactured and are without merit. The release issue was never raised by the Trust when it sought certain threshold rulings last year in connection with the Amended Claims Objection.  Nor was the purported release in §5.2 discussed in the Disclosure Statement that was circulated to creditors.

8.      Moreover, representations of the Debtors that were made to the Court contemporaneously in connection with the confirmation of the Second Amended Plan reflected that the Debtors were not seeking to use §5.2 to short circuit the claim disallowance process. Indeed, in their reply brief in support of confirmation, the Debtors represented to the Court that §5.2 was not disallowing claim under the guise of a global settlement:

> In *Dynamic Brokers*, a debtor sought to modify the amount of a claim in a proposed plan instead of objecting to the amount of the claim in accordance with Bankruptcy Rule 3007. 293 B.R. at 496-497. The court sustained the objections of the claimant, noting that the debtor needed to file a formal claims objection in respect of such claim because section 1123(b)(5) of the Bankruptcy Code does not authorize a debtor to unilaterally seek to modify claims in a Chapter 11 plan. *See id*. **This has nothing to do with the U.S. Trustee's objection. The Debtors are not attempting to circumvent any requirement imposed by the Bankruptcy Code or the Bankruptcy Rules. As detailed in the**

---

[4] *See* Plan § 2.1.172.

[5] The Second Amended Plan removed the proposed discharge. *See Notice of Filing of Blackline of Second Amended Plan* dated September 30, 2024 [D.I. 26030-1] at p. 76 (removing Section 10.2 in the Second Amended Plan ("Discharge of Claims and Termination of Interests")).

*Confirmation Brief (Argument § II), the Debtors satisfy both section 1123(b) of the Bankruptcy Code and Bankruptcy Rule 9019.* Accordingly, the U.S. Trustee's objection should be overruled.

Debtors' Omnibus Reply in Support of Confirmation ¶¶ 80–81 [D.I. 26039] (emphasis supplied).[6]

9. The issue before this Court on this Motion is interpretation of the Plan. The June 2nd Order overlooked the controlling Plan text, representations of the Debtors to the Court at confirmation and the ACO Order and reached a conclusion that is incorrect. The Motion should be granted and the Court should vacate the June 2nd Order.

## JURISDICTION AND VENUE

10. This Court has jurisdiction pursuant to 28 U.S.C. §§ 157 and 1334 and the Amended Standing Order of Reference from the United States District Court for the District of Delaware, dated February 29, 2012. This is a core proceeding under 28 U.S.C. § 157(b).

11. Venue is proper under 28 U.S.C. §§ 1408 and 1409.

12. The statutory and rule predicates for the relief requested are 11 U.S.C. § 502(j) and Federal Rules of Bankruptcy Procedure 3008, 9023, and 9024.

## STATEMENT OF FACTS AND PROCEDURAL HISTORY

A. **The Chapter 11 Cases and the Non-Customer Bar Date**

13. The Debtors commenced these jointly administered Chapter 11 cases on November 11, 2022 (and November 14, 2022 for certain Debtors). On May 19, 2023, the Court entered the Non-Customer Bar Date Order [D.I. 1519], setting a non-customer bar date of June 30, 2023.

---

[6] The Debtor's brief in support of confirmation also contains no argument about a release under §5.2. *See Debtors' Memorandum Of Law In Support Of Confirmation Of The Second Amended Joint Chapter 11 Plan Of Reorganization Of FTX Trading Ltd. And Its Debtor Affiliates* [D.I. 26035].

B. **The Share Purchase Agreement/Claim 3385**

14.      The claims at issue arise from FTX's prepetition acquisition of Melamed's shares in Liquid Group Inc. pursuant to the Agreement for the Sale and Purchase of Shares, Stock Options and Warrants in Liquid Group Inc. (Major Shareholders), dated November 19, 2021 (the "**SPA**"). Under the SPA, Melamed was to receive consideration in the form of FTX common stock (the "**FTX Consideration Shares**"), cash (the "**Cash Consideration**"), and cryptocurrency (the "**Crypto Consideration**"), the last of which FTX withheld as security against indemnification obligations under the SPA. [ACO ¶¶ 15–16.]

15.      Before the bar date, Melamed filed the SPA Claim (Claim No. 3385), asserting claims against FTX "aris[ing] from breach of contract, breach of warranty, retained consideration, indemnification, and fraud . . . in connection with the Debtor's purchase of the Claimant's Shares in Liquid Group Inc.," pleaded "under theories of Japanese law and Delaware law, to the extent applicable." [SPA Claim Annex ¶¶ 3–4, 13.]

C. **Disclosure Statement/Plan/Confirmation Order/Opt-Out**

9.      On June 27, 2024, the Debtors filed the solicitation version of the Disclosure Statement. *See Disclosure Statement for Debtors' Joint Chapter 11 Plan of Reorganization of FTX Trading Ltd. and Its Affiliated Debtors and Debtors-in-Possession (Solicitation Version)* [D.I. 19143].

10.      The proposed plan was thereafter amended and the second amended joint plan was filed on September 30, 2024.    [D.I.26029].      On October 8, 2024, the Court entered the Confirmation Order.    [D.I. 26404].

11. As the Plan is a liquidating plan, the Debtors were not entitled to receive a discharge and the proposed discharge in the earlier versions of the plan (section 10.2) were removed. *See* 11 U.S.C. § 1141(d)(3).

12. The United States Trustee, inter alia, objected to Section 5.2 of the Plan and stated that:

> Section 1123(b)(3) only allows a debtor to settle claims it has against others; it does not allow a debtor to settle claims that creditors and interest holders may have against it, which is what Plan § 5.2 seeks to do. *See Varela v. Dynamic Brokers, Inc. (In re Dynamic Brokers, Inc.)*, 293 B.R. 489, 496 (B.A.P. 9th Cir. 2003) ("The only reference in [section 1123(b)] to adjustments of claims is the authorization for a plan to provide for 'the settlement or adjustment of any claim or interest belonging to the debtor or to the estate.' . . . It is significant that there is no parallel authorization regarding claims against the estate.") (emphasis in original) (quoting section 1123(b)(3)(A)) (internal citation omitted). . . . The resolution of claims against the Debtors is governed by sections 1129 and 1141. . . Here, Plan § 5.2 purports to treat the Plan itself as if it were a Rule 9019 "settlement." Further, it appears § 5.2 is not limited to settling claims belonging to the Debtors or the estates. Thus, § 5.2 exceeds the scope of what can be settled under section 1123(b)(3)(A). Unless § 5.2 is narrowed so that (i) it pertains only to claims the Debtors are settling against others and (ii) it provides the Plan itself is not a settlement, the Plan does not comply with section 1123(b)(3)(A) and does not satisfy section 1129(a)(1).

*See Objection of the United States Trustee to Confirmation of First Amended Joint Chapter 11 Plan of Reorganization of FTX Trading, Ltd. And Its Debtor Affiliates* [D.I. 23610] at ¶¶ 63-71.

13. In response to this objection, the Debtors responded:

> The single case cited by the U.S. Trustee, *Varela v. Dynamic Brokers, Inc. (In re Dynamic Brokers, Inc.)*, 293 B.R. 489, 496 (B.A.P. 9th Cir. 2003) is completely irrelevant. (UST Obj. ¶ 66.) In *Dynamic Brokers*, a debtor sought to modify the amount of a claim in a proposed plan instead of objecting to the amount of the claim in accordance with Bankruptcy Rule 3007. 293 B.R. at 496-497. The court sustained the objections of the claimant, noting that the debtor needed to file a formal claims objection in respect of such claim because section 1123(b)(5) of the Bankruptcy Code does not authorize a debtor to unilaterally seek to modify claims in a Chapter 11 plan. *See id*. This has nothing to do with the U.S. Trustee's objection. ***The Debtors are not attempting to circumvent any requirement imposed by the Bankruptcy Code or the Bankruptcy Rules. As detailed in the Confirmation Brief (Argument § II), the Debtors satisfy both section 1123(b) of the Bankruptcy Code and Bankruptcy Rule 9019.*** Accordingly, the U.S. Trustee's objection should be overruled.

[Debtors' Omnibus Reply ¶¶ 80–81, D.I. 26039.]  The Plan was thereafter confirmed on the basis

of these representations. Paragraph 41 of the Confirmation Order notes that:

> The entry of this Confirmation Order constitutes the Court's approval of the Global
> Settlement, including the Customer Priority Settlement, **under section 1123** of the
> Bankruptcy Code and Bankruptcy Rule 9019, as well as findings by the Court that the
> Global Settlement is fair, equitable, reasonable and in the best interests of the Debtors,
> their Estates and Holders of Claims and Interests and fall above the lowest point in the
> range of reasonableness.

Confirmation Order ¶ 41 (emphasis supplied).[7]

14.     Section 10.8 provides that the Article 10 releases "shall also act as a permanent

injunction" against the prosecution of any claim "released, settled or exculpated under the Plan or

the Confirmation Order to the fullest extent authorized . . . including to the extent provided for or

authorized by sections 524 or 1141 thereof." [Plan § 10.8.] Section 10.9 provides that "none of the

releases or exculpations set forth herein shall operate to waive or release any obligation or Causes

of Action of any Person or Entity . . . arising under any contract, instrument, agreement, release or

document." [Plan § 10.9.]

15.     Melamed opted out of the Plan's voluntary release under Section 10.4. [Melamed

Decl., D.I. 24582.] The Debtors acknowledged that Melamed had opted out and was not a

Releasing Party on the record. [Sept. 12, 2024 Hr'g Tr. 74:12–15; Oct. 7, 2024 Conf. Hr'g Tr.

114:25–115:2.]

D. **The Amended Claims Objection and the Referral to Arbitration**

16.     On December 9, 2024, the Debtors filed the Amended Claims Objection, brought

"pursuant to sections 502 and 510(b)" of the Bankruptcy Code. [ACO at 1; D.I. 28643.] The

Debtors sought to "subordinate the portion of Claim 3385 that arises from the purchase or sale of

---

[7] The Confirmation Order's approval of the Global Settlement under section 1123 confirms that the claims being compromised under Section 5.2 were those that, consistent with section 1123(b)(3)(A), belonged to the "debtor or to the estate."

FTX shares as an equity claim pursuant to section 510(b)"; to "reduce the portion of Claim 3385 that arises from . . . cryptocurrency . . . to the value of the cryptocurrency as determined by the Estimation Order"; and, in the alternative, to "equitably subordinate all of Melamed's Claims pursuant to section 510(c)." [ACO at 1–2; ¶ 27.] The Amended Claims Objection did not invoke Section 5.2 and did not contend that the SPA Claim had been settled, released, or enjoined. The Debtors briefed the measure of damages for the fraud claim under Japanese law [ACO ¶¶ 40–41], and expressly reserved—rather than asserting any release of—the indemnification claim, stating that they "do not have an objection to such claim at this point in time" and "reserve all rights to object to any indemnification claim in the future." [ACO ¶ 17 n.6.]

17.	Following its July 22, 2025 bench ruling, the Court entered the ACO Order on July 31, 2025, which (i) subordinated the portion of Claim 3385 relating to the FTX Consideration Shares under Section 510(b), "including any indemnity claim related to the FTX Shares," allowable as a Class 14 Section 510(b) Other Equity Claim; (ii) directed that the Crypto Consideration claim be valued at petition-date values under the Estimation Order; and (iii) "reserve[d] judgment regarding the allowance, classification, and subordination of any indemnification claim arising from the Crypto Consideration." [ACO Order ¶¶ 2–3.] No portion of the SPA Claim was disallowed.

18.	The Court simultaneously granted Melamed's cross-motion to compel arbitration of the SPA Claim. [Arbitration Order, D.I. 32058.]

E. **The Notice of Arbitration**

19.	On November 12, 2025, Melamed commenced SIAC Case No. ARB602/25/VKH by filing the Notice of Arbitration ("**NOA**"). The NOA asserts claims for fraud, fraudulent inducement, and indemnity for misrepresentations and breaches of warranty. [NOA ¶ 38(a)–(d).]

It seeks damages arising from the Retained Consideration and Cash Consideration components of the SPA transaction and "expressly does not seek damages attributable to the FTX Consideration Shares." [NOA ¶¶ 28–30.] The claims rest on misrepresentations and breaches of warranty made directly to Melamed in the SPA due-diligence process. [NOA ¶¶ 16–17.]

F. **The Motion to Enforce/the June 2nd Order**

20.    On April 2, 2026, the Trust filed its Motion to Enforce Prior Orders That Preclude Seth Melamed From Asserting New Claims in Arbitration [D.I. 35243] (the "**Motion to Enforce**"), arguing, among other things, that the NOA claims had "been conclusively settled and released under the Global Settlement provision of the Plan" (§ 5.2) and could be enjoined under Section 10.8. [Motion to Enforce ¶ 14.] Melamed opposed on April 20, 2026 [D.I. 35411] (the "**Opposition**"), raising each of the arguments developed below. [See Opp. ¶¶ 60–70.]

21.    On June 2, 2026, the Court entered the June 2 Order, enjoining Melamed from pursuing the NOA claims "because they are premised on claims that have been compromised, settled, resolved, and enjoined under sections 5.2 and 10.8" of the Plan, "[p]ursuant to" the Confirmation Order findings "set forth in paragraphs 38-41, 49-50, 93, 119, and 143-144." [June 2 Order ¶ 2.] The Court found it "unnecessary . . . to determine whether the claims set forth in the Notice of Arbitration are impermissible claim amendments." [*Id*. ¶ 2 n.2.] Melamed timely brings this Motion within fourteen days of entry of the June 2 Order and, contemporaneously herewith, has filed a notice of appeal.

## ARGUMENT

I. **Reconsideration Is Authorized Under Section 502(j) of the Bankruptcy Code and Bankruptcy Rules 3008, 9023 and 9024.**

22. This Motion is brought under Section 502(j) and Bankruptcy Rules 3008, 9023 (Federal Rule of Civil Procedure 59(e)) (Bankruptcy Rule 9023) and Bankruptcy Rule 9024 (Federal Rule of Civil Procedure 60(b)).

23. Section 502(j) provides that "[a] claim that has been allowed or disallowed may be reconsidered for cause," and that "[a] reconsidered claim may be allowed or disallowed according to the equities of the case." 11 U.S.C. § 502(j). Reconsideration under Section 502(j) and Rule 3008 "is discretionary with the court," Fed. R. Bankr. P. 3008 advisory committee's note, and is governed by the flexible standards of "cause" and "the equities of the case" rather than the stricter standards applicable to a motion to alter or amend a judgment.

24. Section 502(j) is the appropriate vehicle because the June 2 Order, whatever its caption, functionally adjudicated the allowance status of the SPA Claim, holding that its underlying causes of action were settled and released and barring their liquidation. The injunction is not freestanding; by its terms it rests entirely on the determination that Melamed's claims were "compromised, settled, resolved, and enjoined under sections 5.2 and 10.8" of the Plan, and it therefore stands or falls with that antecedent ruling on the status of a claim the Court had already allowed, in subordinated form, under Section 510(b). Reconsidering whether that claim was in fact compromised and settled is reconsideration of the allowance status of a claim "that has been allowed or disallowed," squarely within Section 502(j).

25. It is well established that the purpose of a motion for reconsideration is to "correct manifest errors of law or fact or to present newly discovered evidence." *Max's Seafood Cafe ex rei. Lou-Ann, Inc. v. Quinteros*, 176 F.3d 669, 677 (3d Cir. 1999)."A proper Rule 59(e) motion ...

must rely on one of three grounds: (1) an intervening change in controlling law; (2) the availability of new evidence; or (3) the need to correct a clear error of law or fact or to prevent manifest injustice. *Lazaridis v. Wehmer*, 591 F.3d 666, 669 (3d Cir. 2010) (citing *N River Ins. Co. v. CIGNA Reinsurance Co.*, 52 F.3d 1194, 1218 (3d Cir. 1995).

26.     To the extent the Court applies the Rule 59(e) standard, it is also satisfied: the June 2nd Order rests on a clear error of law, and its enforcement would work a manifest injustice. *Max's Seafood Café ex rel. Lou-Ann, Inc. v. Quinteros*, 176 F.3d 669, 677 (3d Cir. 1999); *see In re Nortel Networks Inc.*, 2017 WL 3141906, at *1 (Bankr. D. Del. July 24, 2017).

27.     Although Section 502(j) imposes no fixed deadline, Melamed has filed this Motion within fourteen days of the June 2nd Order.  He has done so deliberately. A timely motion of the type specified in Bankruptcy Rule 8002(b)(1)—including a motion under Bankruptcy Rule 9023—tolls the time to appeal the underlying order.[8]

## II. The June 2nd Order Conflicts with the Court's July 31, 2025 Orders

28.     In the June 2nd Order, the Court determined that the NOA claims were compromised, settled or released under §5.2.

29.     On July 31, 2025, the Court adjudicated the SPA Claim through the claims-allowance process—not by disallowance, but by subordinating part of it, valuing another part, and reserving judgment on a third.  Those rulings are in conflict with the June 2nd Order. Accordingly, these inconsistencies should result in reconsideration of the June 2nd Order.

---

[8] To avoid any question as to the timeliness of an appeal from the June 2 Order, Melamed has filed a notice of appeal. Where a notice of appeal is filed after entry of an order but before the court disposes of a timely motion of the type specified in Bankruptcy Rule 8002(b)(1)—including a motion under Bankruptcy Rule 9023—the notice of appeal becomes effective only when the order disposing of the last such motion is entered. Fed. R. Bankr. P. 8002(b)(2). The notice of appeal is, in effect, suspended until this Motion is adjudicated. Cf. Fed. R. App. P. 4(a)(4)(B)(i) (parallel rule for civil appeals); 6 James W. Moore et al., *Moore's Federal Practice* § 304.13 (3d ed. 2012).

**A.  The ACO sought to subordinate and value the SPA Claim under Section 510(b) and never asserted that Fraud Claims were released under Plan, Section 5.2**

30.     The ACO was a Section 502 claims-allowance proceeding. It invoked Section 502(a)–(b) and the burden-shifting framework of *In re Allegheny International, Inc.*, 954 F.2d 167, 173–74 (3d Cir. 1992), governing the validity and amount of a claim. [ACO ¶¶ 25–26.] The relief the Debtors sought—subordination under Section 510(b), reduction to Estimation-Order value, and alternative equitable subordination under Section 510(c) [ACO at 1–2, ¶ 27]—each presupposed the SPA Claim's continued existence.

31.     Section 5.2 appears nowhere in the ACO.  The Debtors/Trust did not argue that the SPA Claim had been settled, released, or enjoined under the Global Settlement, though the Plan had been confirmed and had become effective before the objection was litigated to ruling. To the contrary, the Debtors/Trust briefed the measure of damages for the fraud claim [ACO ¶¶ 40–41] and expressly reserved the right to object to the indemnification claim "in the future." [ACO ¶ 17 n.6.]  Had Section 5.2 been viewed in the manner that the Trust advocates, the Debtors would not have reserved rights to object if the claim had been released under Plan, Section 5.2.

**B.  The Court's July 31, 2025 Order adjudicated the SPA Claim as existing subordinating, valuing, and reserving it**

32.     The Court's disposition treated the SPA Claim as an existing, allowable claim at every turn. Subordination under Section 510(b) operates only upon an allowed claim; it fixes priority in the waterfall and cannot apply to a claim that no longer exists. The Debtors said precisely this: "Whether Melamed styles his claim as one for fraud or breach of contract, and whether he seeks to liquidate it before this Court or in arbitration, subordination is inescapable." ACO ¶ 31.  Their position was that the claim survives albeit subordinated -- the opposite of released.  The Court likewise valued the Crypto Consideration claim because it remained a claim

12

to be paid, and reserved judgment on the Crypto-Consideration indemnity—a disposition impossible to square with a claim that has been released or compromised.

33.     These Orders are directly in conflict.  The June 2nd Order holds that the SPA Claim's causes of action were "settled, resolved, and . . . enjoined" under Section 5.2. The ACO Order, entered July 31, 2025, treated those same causes of action as existing. A claim cannot have been released under a plan and subordinated, valued, and reserved as a live claim more than six months later. Reconsideration is warranted to reconcile the two orders, and the only coherent reconciliation is the one the Court reached in the ACO Order: the SPA Claim was not released, but at most subordinated and channeled to the claims-allowance process.

34.     The Trust may argue that the orders address different components—that the ACO Order subordinated the FTX Consideration Shares claim while the June 2nd Order applies to the other claims asserted in the NOA.  That distinction fails. The June 2nd Order's rationale is categorical: Section 5.2(a) does not distinguish among the SPA components.  The release theory, taken to its logical end, would retroactively void the Section 510(b) subordination—because a released claim cannot be subordinated. Finally, because the conflict between the June 2nd Order and the ACO Order did not arise until entry of the June 2nd Order, it is necessarily a proper ground for reconsideration and could not have been presented earlier.

III. **The Claims Asserted in the NOA were not released under Section 5.2**

35.     Section 5.2 is a settlement of estate-level and intercreditor controversies. The Trust's present position—that Section 5.2 silently settled and released Melamed's direct, contractual claims, to which he never agreed—is in conflict with the Disclosure Statement and what the Debtors represented to the Court in connection with confirmation.

36.     That understanding accords with controlling law on the line between estate property and direct claims. A claim that is general to all creditors and could be asserted by a trustee is estate property; a claim arising from a particularized injury to an individual creditor is that creditor's own, is not estate property, and is beyond the reach of an estate-claim settlement. *In re Emoral, Inc.*, 740 F.3d 875, 879–82 (3d Cir. 2014); *Bd. of Trustees of Teamsters Local 863 Pension Fund v. Foodtown, Inc.*, 296 F.3d 164, 169 & n.10 (3d Cir. 2002); *St. Paul Fire & Marine Ins. Co. v. PepsiCo, Inc.*, 884 F.2d 688, 700–01 (3d Cir. 1989).   Melamed's claims arise from misrepresentations and breaches of warranty made *directly* to him in connection with the SPA[9]— a bilateral transaction to which he, not the creditor body generally, was the counterparty. [NOA ¶¶ 16–17.][10]   Indemnity claims could not have been asserted by a trustee, and do not fall directly under the fraud and misconduct of the insiders.

37.     Nor does paragraph 93 of the Confirmation Order support a broader reading. That paragraph approves the Global Settlement as a compromise of the "contractual, legal, and subordination rights that a Holder of an Allowed Claim or Interest may have against the Debtors, or any Distribution to be made on account of such Allowed Claim or Interest." By its terms, paragraph 93 addresses a Holder's priority and distribution rights on an Allowed Claim—where the Holder sits in the waterfall and what it recovers from the estate—not the existence of an affirmative cause of action a creditor holds against a Debtor. Melamed's breach-of-warranty and indemnity claims are not "subordination rights" or rights to a "Distribution . . . on account of [an] Allowed Claim"; they are independent claims that the estate breached the SPA, to be liquidated

---

[9] Section 10.9 also states that "none of the releases or exculpations set forth herein shall operate to waive or release any obligation or Causes of Action of any Person or Entity . . . **arising under any contract**, instrument, agreement, release or document . . .." (emphasis supplied).

[10] *See UST Objection* at [] ("because a "settlement" requires an agreement between the settling parties, Rule 9019 governs only parties that have entered into an express settlement agreement; it is not a blanket provision allowing general "settlements" to be unilaterally imposed upon broad swaths of claimants that have no formal agreement with any party to "settle" their claims.")

and then administered through the claims-allowance process. Paragraph 93 thus confirms, rather than undermines, that the Global Settlement compromised intercreditor allocation and priority— not Melamed's direct claims.

**IV. The Plan Injunction (§10.8) only applies to those releases granted under Article 10**

38.    The June 2nd Order also overlooked that the purported plan injunction (Section 10.8) authorizes an injunction only "to the extent . . . provided for or authorized by sections 524 or 1141." [Plan § 10.8.] The Plan is a liquidating plan, and the Debtors received no discharge under section 1141(d)(3).  Section 524 only applies upon a discharge which is lacking here.

39.    As a result, the plan injunction in Section 10.8 enjoins a claim only where it was "released, settled or exculpated under the Plan."  If a claim was not released, settled, or exculpated, Section 10.8 has nothing to enforce. Melamed released nothing: he opted out of being a "Releasing Party" and granted no releases under Section 10.4 of the Plan.   A claim belonging to Melamed could be relinquished only by Melamed, through his own consent. It could not be released by a settlement reached among the Debtors and other constituencies without his consent.  *Harrington v. Purdue Pharma L.P.,* 603 U.S. 204 (2024).

40.    Even assuming Section 5.2 had settled these claims, the consequence in a no-discharge case is not extinguishment but channeling: the creditor retains its claim and is bound to liquidate and recover on it through the Section 502 claims-allowance process and the Plan's distribution scheme. A permanent injunction barring a creditor from ever liquidating an unreleased, undischarged claim exceeds any enforcement mechanism the Plan or the Code supplies and works a manifest injustice. *See In re Energy Future Holdings Corp.*, 575 B.R. 616, 628 (Bankr. D. Del. 2017), aff'd, 904 F.3d 298 (3d Cir. 2018).

15

41. In the June 2nd Order, the Court erroneously interpreted ¶¶ 49-50 of the Confirmation Order as a basis to enjoin the prosecution of the NOA. In fact, paragraph 49 is narrowly drafted and states only that "[t]he injunction provisions set forth in Section 10.8 of the Plan are essential to the Plan and are (a) necessary to preserve and enforce the Debtors' Release, the Voluntary Release by Holders of Claims and Interests and the exculpation provisions set forth in Section 10.7 of the Plan . . ." [11] Had Section 5.2 in fact released claims of creditors, it would have been referenced as a basis to grant a broader plan injunction.

42. The silence speaks volumes. The Court should grant this Motion and, upon reconsideration, vacate the June 2nd Order.

---

[11] The claims allegedly compromised or released under Section 5.2 do not fall under either the Debtors' Release (Section 10.3), the Voluntary Release by the Holders (Section 10.4 which Melamed opted out of) or the exculpation provisions (Section 10.7).

16

## CONCLUSION

For the foregoing reasons, Melamed respectfully requests that the Court reconsider the June 2nd Order and vacate it insofar as it enjoins Melamed from prosecuting the claims described in his November 12, 2025 Notice of Arbitration, and grant such other and further relief as is just and proper.

Dated: June 16, 2026
      Wilmington, Delaware

Respectfully submitted,

**McCARTER & ENGLISH, LLP**

/s/ Kate R. Buck
Kate R. Buck (No. 5140)
Renaissance Centre
405 North King Street, 8th Floor
Wilmington, Delaware 19801
Telephone: (302) 984-6300
Facsimile (302) 984-6399
kbuck@mccarter.com

- and –

David J. Adler (admitted *pro hac vice*)
250 W. 55th Street, 13th Floor
New York, New York 10019
Telephone: (212) 609-6847
Facsimile: (212) 609-6921
dadler@mccarter.com

*Counsel to Seth Melamed*