**THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| In re: | Chapter 11 |
| FTX TRADING LTD., *et al.*,[1] | Case No. 22-11068 (KBO) |
| Debtors. | (Jointly Administered) |
| | **Ref. Nos. 28689, 35722 & 35808** |

**FTX RECOVERY TRUST'S RESPONSE TO ARGENT LIQUIDATION TRUST'S**
**LIMITED OBJECTION TO THIRD NOTICE OF PROPOSED REDUCTION**
**OF DISPUTED CLAIMS RESERVE AMOUNT**

The FTX Recovery Trust[2] hereby submits this response to *Argent Liquidation Trust's Limited Objection to Third Notice of Proposed Reduction of Disputed Claims Reserve Amount* [D.I. 35808] (the "Objection" filed by "Argent").[3]  In response to the Objection and in further support of the *Third Notice of Proposed Reduction of Disputed Claims Reserve Amount* [D.I. 35722] (the "Third Notice"), the FTX Recovery Trust respectfully states as follows:

**PRELIMINARY STATEMENT**

1.      On June 30, 2023, Silvergate Capital Corporation ("Silvergate Capital") and Silvergate Bank (together with Silvergate Capital, "Silvergate") filed a series of vague and duplicative proofs of claim (the "Silvergate Claims") against FTX Trading Ltd. and other former

---

[1]   The last four digits of FTX Trading Ltd.'s and Alameda Research LLC's tax identification number are 3288 and 4063 respectively.  Due to the large number of debtor entities in these Chapter 11 Cases, a complete list of the Debtors and the last four digits of their federal tax identification numbers is not provided herein. A complete list of such information may be obtained on the website of the Debtors' claims and noticing agent at https://cases.ra.kroll.com/FTX.

[2]   The FTX Recovery Trust (a/k/a the Consolidated Wind Down Trust) was established on January 3, 2025, the effective date of the Debtors' *Second Amended Joint Chapter 11 Plan of Reorganization of FTX Trading Ltd. and Its Debtor Affiliates* [D.I. 26404-1] (the "Plan") which was confirmed by this Court [D.I. 26404] (the "Confirmation Order") on October 8, 2024.

[3]   Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to them in the Third Notice or Plan, as applicable.

Debtors.  (*See, e.g.*, Obj. Ex. A.)  Silvergate then stood by for years as this Court approved the Plan in October 2024, authorized the establishment of the Disputed Claims Reserve in December 2024, and authorized two reductions of the Reserve Amount in July 2025 and January 2026.  But now—almost three years later—Argent, as successor in interest to Silvergate, has come forward to challenge the third proposed reduction of the Reserve Amount in an attempt to interfere with the orderly claims administration by the FTX Recovery Trust for the benefit of legitimate creditors.

2.    Argent asserts that it holds "some of the largest and best-supported claims against the FTX Group" and that its claims are worth "well over a billion dollars."  (Obj. ¶¶ 1-2, 33.)  According to Argent, the Third Notice is defective because it does not provide "transparency into how the FTX Recovery Trust has accounted for the Silvergate Claims" and this is a "critical omission."  (*Id*. ¶ 30.)  This bluster is nonsense.  There is no need for any special "transparency" into the FTX Recovery Trust's accounting for the Silvergate Claims in relation to the $1.78 billion Third Revised Reserve Amount.  Nonetheless, because the Silvergate Claims are facially deficient unliquidated claims, they have not been, and do not need to be, accorded any specific value, and no further adjustment to the Third Revised Reserve Amount is either necessary or appropriate at this time.

3.    Argent insists that the "evidentiary record" supporting its claims is "overwhelming" because Samuel Bankman-Fried was "sentenced to 25 years' imprisonment" as a result of "the FTX Group's sprawling fraudulent scheme" and multiple FTX Group insiders "pleaded guilty to numerous fraud counts."  (Obj. ¶ 5.)  However, as this Court has repeatedly enforced, all claims premised on "the actual or purported fraud, unjust enrichment, misappropriation, conversion and misconduct of" FTX and its insiders were conclusively settled and released under the Global Settlement provision of the Plan and permanently enjoined under

the Plan's injunction provision. (Plan §§ 5.2, 10.8; Confirmation Order ¶¶ 49, 50, 144.) There is no clearer example of claims barred by the Plan's Global Settlement than those set forth in the Silvergate Claims and detailed in the Objection.

4.     Moreover, even if the Global Settlement was somehow not dispositive, the FTX Recovery Trust has numerous strong defenses to the merits of the speculative Silvergate Claims that it will detail and present at the appropriate time. Argent's newfound claims are rooted in a made-for-litigation factual narrative about Silvergate's downfall that is very different than the one that Silvergate represented to the Court when it filed petitions for Chapter 11 relief.[4] Argent's narrative is also at odds with the one that emerges from the many legal and regulatory actions against Silvergate as a result of its efforts to defraud its own investors and conceal its failure to establish the required basic controls. Accordingly, if the FTX Recovery Trust is required to litigate Argent's claims, it would show, among other things, that (i) Silvergate and its insiders aided and abetted, and in fact knowingly participated in, the fraud committed by Mr. Bankman-Fried and other FTX insiders, and (ii) that the damages Argent is claiming were not proximately caused by the FTX insiders because they were the result of Silvergate's own illegal conduct and poor business decisions. To be clear, there is no scenario where Argent will be able to pass off liability for Silvergate's misconduct onto the shoulders of the FTX Recovery Trust's legitimate creditors.

5.     As to the matter before the Court, the evidence establishes that the Third Revised Reserve Amount, including approximately $900 million over and above the FTX Recovery Trust's projections with respect to liability for Disputed Claims, is conservative and reasonable under the circumstances. (*See Declaration of Steven P. Coverick in Support of Third*

---

[4]     *See* Declaration of Elaine Hetrick in Support of the Debtors' Chapter 11 Petitions and Certain Motions ¶ 8, *In re Silvergate Capital Corp., et al.*, No. 24-12158-KBO [D.I. 9] (Bankr. D. Del. Sep. 18, 2024) (the "Hetrick Declaration" in the "Silvergate Bankruptcy").

*Notice of Proposed Reduction of Disputed Claims Reserve Amount* [D.I. 35723] ¶ 13 (the "Coverick Declaration").)  To the extent the Silvergate Claims become Allowed Claims, the $900 million cushion within the Third Revised Reserve Amount is more than sufficient to address them. The Court should overrule the Objection and enter an order approving the Third Revised Reserve Amount.

### RELEVANT BACKGROUND

I.     **The FTX Bankruptcy Proceedings**

A.     **The Disputed Claims Reserve**

6.     The FTX Recovery Trust has made, and continues to make, significant progress reconciling and resolving Disputed Claims.  (Coverick Decl. ¶¶ 6, 7, 9.)  In accordance with the Plan and Confirmation Order, on November 20, 2024, the Debtors filed a motion to establish the Disputed Claims Reserve and to estimate claims in the aggregate for the purposes of establishing the Reserve Amount [D.I. 28102].  On December 11, 2024, this Court granted the request and entered an order setting the Reserve Amount at $6.533 billion [D.I. 28689] (the "Reserve Order").  On June 27, 2025, the FTX Recovery Trust filed the first notice to reduce the Reserve Amount [D.I. 31085].  The Court overruled five objections to the first notice and, on July 23, 2025, the Court reduced the Reserve Amount by $1.93 billion, from $6.533 billion to $4.599 billion [D.I. 31822].  On January 2, 2026, the FTX Recovery Trust filed the second notice to reduce the Reserve Amount [D.I. 34248].  This notice was then amended by the FTX Recovery Trust [D.I. 34406] and, on January 29, 2026, the Court reduced the Reserve Amount by approximately $2.22 billion, from $4.599 billion to $2.38 billion [D.I. 34610].  No objections were filed ahead of the Court's January 29, 2026 reduction of the Reserve Amount.

**B.    The Silvergate Claims**

7.    On June 30, 2023, Silvergate filed 100 substantially identical proofs of claim.  (Obj. ¶ 25.)  Based on a common set of factual allegations, the Silvergate Claims assert "unliquidated" claims for (i) fraud, (ii) breach of contract, (iii) contractual indemnification, and (iv) a violation of the Racketeer Influenced and Corrupt Organizations Act ("RICO Act") and a civil conspiracy to violate the RICO Act.  (*See* Silvergate Claims ¶¶ 24-47.)

8.    The Silvergate Claims assert that "like many other customers, investors and financial services providers, [Silvergate and certain of its affiliates] are victims of the FTX Group's extensive pattern of fraud, deceit and violations of applicable law."  (Silvergate Claims ¶ 1.)  To support its narrative that Silvergate is entitled to damages flowing from the FTX insiders' fraud, the Silvergate Claims identify multiple allegedly fraudulent statements made by FTX insiders, including Mr. Bankman-Fried and Dan Friedberg (*see, e.g.*, *id.* ¶¶ 3-5, 10, 25, 39), and cite to the criminal prosecutions and pleas of Mr. Bankman-Fried and other FTX insiders (*see, e.g.*, *id.* ¶¶ 14-16, 22).

9.    Based on these same allegations of fraud, the Silvergate Claims assert that Debtor entities "breached several of the obligations contained in [their] contract agreements with Claimants."  (Silvergate Claims ¶¶ 27-29.)  The Silvergate Claims also assert that the Debtors are obligated to indemnify Silvergate Bank under "Cash Management and Treasury Services Agreements" so "[a]ny damages suffered by Claimants as a result of the FTX Group's improper use of its accounts with Silvergate Bank . . . and any attorneys' fees and costs resulting from related litigations, are covered by the terms of these indemnification provisions."  (*Id.* ¶¶ 30-35.)

**C.    Argent's Objection to the Third Notice**

10.    On May 26, 2026, the FTX Recovery Trust filed the Third Notice seeking to reduce the Reserve Amount by $600 million to $1.78 billion (the "Third Revised Reserve

Amount"). (Third Notice at 3.) Although Silvergate never objected to the establishment of the Disputed Claims Reserve or the two previous reductions in the Reserve Amount, Argent objected to the Third Notice, recklessly asserting for the first time that it is the holder of "some of the largest and best-supported claims against the FTX Group" and that its claims are worth "well over a billion dollars." (Obj. ¶¶ 1-2, 33.) The Objection claims Mr. Bankman-Fried's conviction on all counts for "the FTX Group's sprawling fraudulent scheme" creates an "overwhelming" evidentiary record showing that the Silvergate Claims are meritorious. (*Id.* ¶ 5; *see also id.* ¶¶ 19-21.) Accordingly, the Objection wrongly asserts that the Third Notice is defective because it does not provide "transparency into how the FTX Recovery Trust has accounted for the Silvergate Claims" and effectively asserts that any further reduction of the Disputed Claims Reserve must await resolution of the supposedly valuable Silvergate Claims. (*Id.* ¶¶ 30, 35-36.)

11. To bolster this bold attempt to grind the administration of these cases to a halt, the Objection asserts that Argent is entitled to recover on three categories of damages. *First*, Argent claims that the FTX Recovery Trust is liable for "$751 million or more in forced fire-sale securities losses" because the collapse of the Debtors: (i) "triggered" a $6.9 billion decline in Silvergate's deposits; (ii) which then "forced" Silvergate to sell $5.2 billion of debt securities and borrow from the Federal Home Loan Bank of San Francisco; and (iii) that then resulted in Silvergate losing $751.4 million due to the market decline in those securities. (Obj. ¶¶ 3, 22-23.) *Second*, Argent claims that the FTX Recovery Trust is liable for "billions in lost equity value" in Silvergate Capital without any details on how Argent suffered as a result of the alleged stock drop. (*Id.* ¶¶ 3, 27.) *Third*, Argent claims that the FTX Recovery Trust is liable for "more than one hundred million dollars in regulatory settlements and other investigative, advisor, settlement, bankruptcy, and unreimbursed indemnification costs." (*Id.* ¶ 3.) Argent identifies Silvergate's

settlements with the Federal Reserve Board ("FRB") and the California Department of Financial Protection and Innovation ("DFPI"), as well as its resolution of the *Bhatia* action, as falling within the Debtors' contractual indemnification obligations because of the Debtors' fraud in "conceal[ing] the true nature and purpose of the transactions flowing through its accounts at Silvergate." (*Id.* ¶ 27.)  And Argent also identifies its "tens of millions of dollars" in fees, expenses, legal, and professional costs in defending Silvergate in the "fallout from the FTX Group's fraud" and in managing "its own bankruptcy . . . that was the direct result of the FTX Group's fraud." (*Id.*)

## II.     The Collapse of Silvergate Bank

### A.     Silvergate Bank's Risky Bet on the Digital Asset Industry

12.     Prior to its collapse in March 2023, Silvergate Bank was one of the few U.S.-based banks that sought out high-risk digital asset companies as clients.[5]  In fact, one of Silvergate Bank's core product offerings was the Silvergate Exchange Network (the "SEN"), an internal payments platform that allowed Silvergate's digital asset customers to move U.S. dollars to and from one another in near real time.  (*Id.*)

13.     Until its collapse, "Silvergate Bank was able to secure some of the largest cryptocurrency-related businesses as customers."  (Hetrick Decl. ¶ 8.)  As of June 30, 2022, Silvergate Bank's non-interest bearing deposits—substantially all of which were deposits from customers in the cryptocurrency industry—comprised approximately 99.5% of total deposits. (*See id.* ¶ 8.)  One of the cryptocurrency-related businesses that Silvergate Bank was able to secure as a customer was FTX in 2019.  (*See* Obj. ¶ 9.)

---

[5]     *See* Order of Assessment of Civil Money Penalty Issued Upon Consent Pursuant to the Federal Deposit Insurance Act, as Amended at 2, *In the Matter of Silvergate Capital Corp. & Silvergate Bank*, Nos. 24-013-CMP-HC, 24-013-CMP-SM (FRB, June 4, 2024), https://www.federalreserve.gov/newsevents/pressreleases/files/enf20240701a1.pdf ("FRB Order").

14.     Despite seeking out a high-risk customer base, Silvergate Bank failed to establish a Bank Secrecy Act ("BSA") and anti-money laundering ("AML") compliance program as required by law.  A final exam report issued on April 20, 2022 by the Federal Reserve Bank of San Francisco ("FRBSF") and DFPI identified "material internal control weaknesses over BSA/AML compliance."[6]  A September 2022 targeted examination, also by FRBSF and DFPI, found that Silvergate Bank's transaction monitoring system was "not configured commensurately to the Bank's risk profile" and that Silvergate Bank's BSA compliance program "continued to inadequately dispose of suspicious activity alerts."  (*Id.*)

**B.     Silvergate Bank's Efforts to Survive a Bank Run Caused by a Downturn in the Digital Asset Industry and Rising Interest Rates**

15.     Although Silvergate profited on non-interest bearing deposits when interest rates were low and the digital asset industry was booming, Silvergate's flawed business model faltered when the digital asset industry experienced a downturn amid rising interest rates.  In mid-2022, the digital asset industry began to come "under stress," with the collapse of Three Arrows Capital, Voyager Digital Holdings, and Celsius Network.   (Hetrick Decl. ¶ 9.)  These events "had a contagion effect on the digital asset industry as a whole, including on the exchanges that represented a substantial portion of Silvergate Bank's depositor base."  (*Id.*)  The result was a "crisis of confidence across the digital asset industry," which, "along with similar problems faced by banks across the country" because of rising interest rates, "caused a 'run on the bank.'"  (*Id.* ¶ 10.)

16.     Amidst these events, on November 11 and 13, 2022, FTX Trading Ltd. and certain of its affiliates filed voluntary petitions for relief under Chapter 11 of the Bankruptcy Code

---

[6]     Complaint, *SEC* v. *Silvergate Capital Corp.*, No. 1:24-cv-04987 [D.I. 1] (S.D.N.Y. July 1, 2024), https://www.sec.gov/files/litigation/complaints/2024/comp26044.pdf (filed in the "SEC Action").

in this Court.  According to Silvergate, FTX's collapse caused "[p]ressure" to "*continue*[]" to build on Silvergate Bank, because the collapse of FTX brought "*further* troubles within the digital asset industry . . . to the forefront and *continued* to chill the crypto markets and generate increased regulatory scrutiny and restrictions on banks with a digital asset customer base."  (*See* Hetrick Decl. ¶ 10 (emphasis added).)  But the collapse of FTX did not bring down Silvergate.  According to Silvergate, on November 11, 2022 "Silvergate Bank possessed *more than sufficient assets to cover its liabilities to depositors* and had no lending or other business relationship with FTX beyond holding deposits and providing bank account services." (*Id.* (emphasis added).)

17.     Nevertheless, Silvergate Bank's non-interest bearing deposits reportedly continued to decline.  (*See* Hetrick Decl. ¶ 10.)   Silvergate's "contraction in deposits was exacerbated by the general rise in interest rates in the economy at large," such that "non-interest bearing accounts [at Silvergate] were significantly less appealing for depositors."  (*Id*. ¶ 12.) Silvergate explains how it took steps to stave off the bank run.  To pay withdrawing depositors, Silvergate Bank chose to sell $5.2 billion of debt securities that it maintained as "safe haven investments" in late 2022.  (*Id.; see also* Obj. ¶¶ 23, 27.)  But the "general rise in interest rates drove down the value" of those securities.  (Hetrick Decl. ¶ 12.)  Accordingly, Silvergate booked a 2022 fiscal year net loss of $948.7 million that was "*largely driven* by sales of long-dated securities impaired by rising interest rates." (*Id*. (emphasis added).)

C.     **Silvergate Liquidates Because of Regulatory Pressure on Its Flawed Business Model**

18.     By early 2023, "Silvergate Bank had [reportedly] stabilized, was able to meet regulatory capital requirements, and had the capability to continue to serve its customers that had kept their deposits with Silvergate Bank."  (Hetrick Decl. ¶ 17.)  Despite this recovery, Silvergate states that it chose to cease operations and liquidate Silvergate Bank on March 8, 2023

because a stark shift in the regulatory environment for banks "prevent[ed] Silvergate Bank from continuing its digital asset focused business model." (*Id*. ¶¶ 14-19.)

19.    In Silvergate's telling, "increased supervisory pressure on Silvergate Bank and other banks focused on servicing crypto-asset businesses" made it so that Silvergate Bank "would have needed to remake its business model away from its focus on crypto-asset businesses." (Hetrick Decl. ¶ 17.)  While Silvergate considered making exactly such a shift, it concluded that the "cost of operating the business while pivoting to a new business model would outweigh the potential benefits of doing so." (*Id.* ¶ 18.)

### D.    Silvergate's and Its Insiders' Violations of the Law

20.    Silvergate Bank's decision to voluntarily liquidate did not stop legal and regulatory actions against Silvergate that were a direct result of Silvergate's own failures to operate in compliance with the law and establish basic systems and controls with respect to, among other things, BSA and AML compliance.   Thus, Silvergate faced multiple legal and regulatory exposures:

- ***FRB Fine***.  On June 4, 2024, the FRB fined Silvergate Bank $43 million for "deficiencies in Silvergate [Bank]'s monitoring of internal transactions through the SEN."[7]  This penalty was explicitly for a violation of law.  (*Id.* at 3-4.)

- ***DFPI Fine***.  On June 26, 2024, the DFPI imposed its own fine of $20 million against Silvergate Bank for the same identified deficiencies in monitoring internal transactions.[8]

- ***SEC Settlement***.  On July 8, 2024, Silvergate Capital settled an action brought by the SEC by agreeing to a final judgment imposing (i) a permanent injunction and (ii) a $50 million civil penalty (offset

---

[7]    FRB Order at 2.

[8]    Consent Order at 4, *Comm'r of Fin. Prot. and Innovation* v. *Silvergate Cap. Corp. and Silvergate Bank*, Banking License No. 1824 (DFPI, June 26, 2024), https://dfpi.ca.gov/wp-content/uploads/sites/337/2024/06/Consent-Order-Silvergate-Bank.pdf.

against the previous $63 million in fines) for which Silvergate Capital agreed it "***shall not*** seek or accept, directly or indirectly, reimbursement or indemnification ***from any source***."[9]  The SEC's action was premised on false statements by Silvergate Capital regarding the effectiveness of its BSA/AML program given it had (i) "failed to . . . monitor for suspicious activity approximately $1 trillion in banking transactions that occurred on the SEN" and (ii) "failed to detect nearly $9 billion in suspicious transfers by FTX."[10]

- ***FTX Depositor Class Action***.  On February 10, 2026, Silvergate settled a putative class action brought on behalf of customers of the FTX.com Exchange for $10 million.[11]  The relevant complaint had survived a motion to dismiss[12] and alleged that Silvergate provided banking services to FTX and Alameda "despite numerous unmistakable indicators of suspicious activity" because losing FTX's business "would have been devastating for Silvergate," and also that Silvergate "substantially helped FTX, Alameda, and [Mr. Bankman-Fried] perpetrate [their] fraud."[13]

## III.   The Silvergate Bankruptcy Proceedings

21.    On September 17, 2024, Silvergate Capital filed voluntary petitions for relief under chapter 11 in the United States Bankruptcy Court for the District of Delaware. (Silvergate Bankruptcy [D.I. 1].)  The Silvergate Bankruptcy was filed with pre-arranged support for a plan of reorganization memorialized in a restructuring support agreement, including support

---

[9]    *Final Judgment as to Defendant Silvergate Cap. Corp.* at 4, SEC Action [D.I. 20] (emphasis added) ("SEC Order").  On the same day, Silvergate's former CEO Alan Lane and COO Kathleen Fraher each agreed to final judgments (i) enjoining them from violating the Securities Exchange Act, (ii) imposing five-year officer-and-director bars, and (iii) levying civil penalties of $1 million and $250,000, respectively.  (*Final Judgment as to Defendant Alan J. Lane*, SEC Action [D.I. 19]; *Final Judgment as to Defendant Kathleen Fraher*, SEC Action [D.I. 21].)

[10]    Complaint ¶¶ 2-3, SEC Action [D.I. 1].

[11]    Order at 11, *Bhatia* v. *Silvergate Bank*, No. 3:23-cv-01406 [D.I. 92] (S.D. Cal. Feb. 10, 2026) (entered in the "Bhatia Action").

[12]    *Bhatia* v. *Silvergate Bank*, 725 F. Supp. 3d 1079 (S.D. Cal. 2024).

[13]    Amended Complaint ¶¶ 162-90, Bhatia Action [D.I. 14].

from approximately 63% of the aggregate liquidation preference of Silvergate's preferred stockholders.  (Hetrick Decl. ¶ 27.)

22.     On October 31, 2024, the Debtors filed proofs of claim (the "FTX Claims") against multiple Silvergate debtors arising out of Silvergate's misconduct and violations of federal banking laws.  (*See, e.g.*, Ex. A.)  In the FTX Claims, the Debtors alleged that Silvergate failed to implement appropriate corporate controls, was aware of the schemes to defraud FTX customers by insiders at the Debtors, and helped the insiders at Debtors conceal their wrongful conduct.  (*See id.* ¶¶ 8-9.)  The Debtors also alleged that they had legal claims against Silvergate, including, but not limited to, aiding and abetting breach of fiduciary duty, aiding and abetting conversion, and unjust enrichment.  (*See id.* ¶ 10.)  Remarkably and in sharp contrast to Argent's current Objection, Silvergate obtained confirmation from this Court of a plan of liquidation expressly including provisions approving zero reserve for the FTX Claims.[14]

## ARGUMENT

### I.     Nothing Requires the Creation of a Specific Reserve for the Silvergate Claims.

23.     Silvergate never objected to the establishment of an aggregate Disputed Claims Reserve or the two prior reductions of the Reserve Amount.  Nevertheless, Argent now challenges the Third Revised Reserve Amount of $1.78 billion, including $900 million in excess of projected Allowed Claims, on the basis of the newfound assertion that "the Silvergate Claims should be valued well over a billion dollars."  (Obj. ¶ 33.)  Argent—with no evidence whatsoever—posits that based on this fanciful valuation the Third Revised Reserve Amount must be inadequate.  Not so.

---

[14]     *See* First Amended Joint Chapter 11 Plan (As Modified) of Silvergate Capital Corporation and Its Affiliated Debtors at Articles I(A)(91), V(O), VIII(I), Silvergate Bankruptcy [D.I. 1222].

24.     Section 8.5 of the Plan (i) requires that the FTX Recovery Trust establish and maintain a Disputed Claims Reserve and (ii) grants the FTX Recovery Trust broad discretion to "administer, adjust and maintain the Disputed Claims Reserve" such that it ensures sufficient funds are available for distributions to Disputed Claims that may one day become Allowed Claims. The Plan also provides the FTX Recovery Trust significant discretion in its estimation of Disputed Claims for purposes of setting a Reserve Amount.  (Plan § 8.5.)  Because it was based on an aggregate estimation of claims pursuant to section 502(c) of the Bankruptcy Code, the Disputed Claims Reserve was never intended to include amounts corresponding to the amount demanded by each and every claimant.  (*See* Reserve Order ¶ 3 ("Disputed Claims are estimated pursuant to sections 502(c) and 105(a) of the Bankruptcy Code in the aggregate Reserve Amount solely for purposes of determining the Disputed Claims Reserve").)  If the Disputed Claims Reserve had to account for every purported creditor's arbitrary demands, any claimant with an unliquidated claim could—like Argent—belatedly assert that its claims have some massive value in order to give them holdup value and disrupt orderly distributions to creditors with allowed claims.

25.     The Silvergate Claims are unliquidated claims, and neither Silvergate nor Argent have obtained an estimation ruling, liquidated judgment, or other determination establishing that the Silvergate Claims are worth anywhere near the amounts asserted in the Objection, or could come close to exceeding the FTX Recovery Trust's claims against Silvergate. Rather, the Objection asks the Court to hold up distributions to other creditors based upon nothing more than Argent's own assertion that the Silvergate Claims have a value "approaching $1 billion before accounting for the billions in lost equity value." (Obj. ¶ 31.)

26.     Unlike the Objection, which does not include any supporting evidence, the evidence offered in support of the Third Notice is more than sufficient to satisfy the requirements

of section 502(c) and support an aggregate estimate of claims for the purposes of establishing the Third Revised Reserve Amount.  A court estimating a claim can "use[] whatever method is best suited to the particular contingencies at issue."  *See CMB Export, LLC* v. *Tonopah Solar Energy, LLC (In re Tonopah Solar)*, 657 B.R. 393, 410 (D. Del. 2022) (quoting *Bittner* v. *Borne Chem. Co.*, 691 F.2d 134, 135 (3d Cir. 1982)).  Accordingly, "where there is sufficient evidence on which to base a reasonable estimate of the claim, the bankruptcy judge should determine [its] value."  *Bittner*, 691 F.2d at 135.

27.   As explained in the Coverick Declaration, the Third Revised Reserve Amount reflects the FTX Recovery Trust's determination that the current reserve exceeds the amount reasonably necessary to account for the remaining Disputed Claims that may ultimately become Allowed Claims.  (Coverick Decl. ¶ 13.)  The proposed reduction reflects the fact that claims "reconciliation and expungement efforts have led to a net reduction of approximately $600 million of Disputed Claims" since establishment of the Second Revised Reserve Amount.  (*Id.* ¶ 8.)  Even after the proposed reduction, the Disputed Claims Reserve will continue to contain a substantial cushion of $900 million over and above projected Allowed Claims.  (*Id.* ¶ 11.)  Thus, it continues to reflect an appropriate aggregate estimate of the value of Disputed Claims.  And, despite what Argent asserts (Obj. ¶¶ 35-36), there is simply no requirement to conduct individualized proceedings to estimate the value of the Silvergate Claims.  *See, e.g.*, *In re N. Am. Health Care, Inc.*, 544 B.R. 684, 689 (Bankr. C.D. Cal. 2016) ("Unliquidated claims can be estimated . . . in the aggregate"); *In re G-I Holdings, Inc.*, 323 B.R. 583, 622-23 (Bankr. D.N.J. 2005) (establishing an "aggregate" estimation procedure for asbestos claims).

28.   In the end, Argent does not question the integrity of this Court's prior estimations or question the reconciliation or expungement efforts underpinning the proposed

reduction of the Disputed Claims Reserve. Rather, it just asserts that the Silvergate Claims are suddenly so valuable that the Third Revised Reserve Amount must be insufficient. Silvergate has not—and cannot—sufficiently demonstrated that the Third Revised Reserve Amount is not reasonable, and accordingly, the Objection should be overruled.

## II.      The Third Revised Reserve Amount Will Be More than Sufficient to Cover Silvergate's Vaguely Asserted Meritless Claims.

29.     Even if the Reserve Amount is reduced as requested, the Disputed Claims Reserve will continue to include approximately $900 million in excess of projected Allowed Claims, providing substantial protection against any amount that may ultimately be allowed on account of the Silvergate Claims. (Coverick Decl. ¶ 11.)[15]

30.     But the Silvergate Claims can never become Allowed Claims as a matter of law because they are barred by the terms of the Global Settlement approved in the confirmed and effective Plan, Confirmation Order, and subsequent orders of the Court enforcing its terms. Although that alone should be dispositive to overrule Argent's objection, none of Argent's conclusory assertions about the value of its claims can withstand even cursory scrutiny. The FTX Recovery Trust has substantial defenses to each of Silvergate's asserted claims and alleged damages.

### A.      The Silvergate Claims Are Barred by the Global Settlement.

31.     The Silvergate Claims assert that Silvergate "like many other customers, investors and financial services providers, are victims of the FTX Group's extensive pattern of fraud, deceit and violations of applicable law." (Silvergate Claims ¶ 1.) And the Silvergate Claims lay the blame for all of the alleged harms that befell Silvergate at the feet of "Mr. Bankman-Fried

---

[15]    The Reserve Order also expressly provides that the FTX Recovery Trust is authorized to adjust the Disputed Claims Reserve upward in the unlikely event that becomes necessary in the future. (Reserve Order ¶ 6.)

and an attorney for the FTX Group" who "affirmatively and fraudulently took steps to mislead Silvergate Bank on behalf of the FTX Group." (*Id.* ¶ 3.) In short, Argent seeks to recover from the FTX Recovery Trust because Mr. Bankman-Fried and his accomplices committed fraud. That is not permitted.

32. The Global Settlement released any claims premised on "the actual or purported fraud, unjust enrichment, misappropriation, conversion and misconduct of former" insiders at FTX. (Plan § 5.2.) Claims falling within the scope of the Global Settlement are deemed fully "settle[d]" under section 5.2 of the Plan. Section 10.8 of the Plan therefore "act[s] as a permanent injunction against any Person who has held, holds or may hold" such a settled claim or interest from "commencing or continuing any action to collect, enforce, offset, recoup or recover" on that claim. And this Court incorporated the Global Settlement into its Confirmation Order and held that "[t]he entry of this Confirmation Order constitutes the Court's approval of the Global Settlement . . . under section 1123 of the Bankruptcy Code and Bankruptcy Rule 9019, as well as findings by the Court that the Global Settlement is fair, equitable, reasonable and in the best interests of the Debtors, their Estates and Holders of Claims and Interests and fall above the lowest point in the range of reasonableness." (Confirmation Order ¶ 41.) The Confirmation Order also gave full effect to the injunction set forth in Section 10.8 of the Plan. (*Id.* ¶¶ 49, 143-44.)

33. Argent has conceded that the Silvergate Claims "flow[] directly" from the fraud allegations and conduct covered by the Global Settlement. (Obj. ¶ 27.) As a result, even if the Silvergate Claims were "valid . . . under some sort of fraud, mismanagement, commingling" theory, the Court has held that such claims have "been compromised through the global settlement under the plan for the good of all creditors and customers of FTX so that the litigation, with respect to these issues, wouldn't just consume the rest [of] the funds in the trust and destroy all potential

recoveries." (*See* Ex. B (Aug. 12, 2025 Hr'g Tr. 39:15-21).)  The Court has similarly applied the Global Settlement to breach of contract and indemnity claims similar to those asserted here. (*See* [D.I. 35768] (enjoining pursuit of contractual indemnification claims in arbitration "because they are premised on claims that have been compromised, settled, resolved, and enjoined under sections 5.2 and 10.8" of the Plan).)  Ultimately, the Global Settlement "is an important part of the Plan" to prevent exactly what Argent is doing:  using the uncontroverted "facts of the case" to litigate a self-interested claim that harms the many other creditors in these Chapter 11 Cases.  (*See* Ex. C (May 14, 2026 Hr'g Tr. 47:11-16).)  Given that the Silvergate Claims are plainly barred by the Plan and Confirmation Order, there is no basis to augment the Reserve Amount on account of these claims.

**B.      The FTX Recovery Trust Has Multiple Independent Defenses to the Silvergate Claims.**

34.      In the event that any portion of the Silvergate Claims is not barred by the Global Settlement, the FTX Recovery Trust has multiple independent defenses to the merits of the Silvergate Claims.  As a result, the $900 million contingency already reflected in the Third Revised Reserve Amount is more than sufficient to protect Argent at this stage.

35.      Without limiting the defenses that the FTX Recovery Trust may later raise in response to the Silvergate Claims when it objects to them, the following are examples of the defenses that the FTX Recovery Trust will assert in a substantive objection to the Silvergate Claims:

36.      ***RICO Defenses***.   Argent makes much of the threat of treble damages pursuant to RICO, but it presents no evidence and does nothing to explain how any of the injuries Silvergate allegedly suffered were directly caused by the FTX insiders' alleged fraud.  (Obj. ¶¶ 3, 22-27.)  Thus, Argent's RICO claims are facially deficient.  The "by reason of" language in the

RICO statute "demands 'some direct relation between the injury asserted and the injurious conduct alleged.'" *Med. Marijuana, Inc.* v. *Horn*, 604 U.S. 593, 612 (2025) (quoting *Holmes* v. *SIPC*, 503 U.S. 258, 268 (1992)). "The key word is 'direct'; foreseeability does not cut it." *Id.* (quoting *Hemi Grp., LLC* v. *City of New York*, 559 U.S. 1, 12 (2010)). "Whenever the plaintiff's theory of causation requires moving 'well beyond the first step,' it 'cannot meet RICO's direct relationship requirement.'" *Id.* (quoting *Hemi*, 559 U.S. at 10). Argent does not allege that Silvergate suffered any direct injuries as a result of the FTX insiders' alleged fraud—which Silvergate would have profited from by having access to large amounts of interest-free deposits. Rather, Silvergate alleges that it was harmed by the actions of third parties who reacted negatively "when the FTX Group's fraud was exposed." (Obj. ¶ 4.) Specifically, once FTX's fraud was revealed, a "collapse of confidence" allegedly caused depositors to withdraw funds from Silvergate and Silvergate became subject to a "cascading waterfall of lawsuits and regulatory investigations." (*Id.*)

37. Such attenuated alleged injuries related to the consequences of the discovery of a fraud—and not the fraud itself—are too indirect to sustain a RICO claim. *In re Volkswagen "Clean Diesel" Mktg., Sales Pracs., and Prods. Liab. Litig.*, 467 F. Supp. 3d 849, 856-57 (N.D. Cal. 2020) (dismissing RICO claims asserted by salespersons who allegedly lost income when consumers stopped buying cars from them after "the veil was lifted on Volkswagen's defeat device scheme"). Simply put, RICO cannot be used to recover for injuries that "arose as a result of the scandal, not the scheme itself." *Meng* v. *Schwartz*, 116 F. Supp. 2d 92, 97 (D.D.C. 2000). In this case, it is also readily apparent that the intervening acts of third parties (*e.g.*, depositors and bank regulators) break the causal chain between any damages Silvergate allegedly suffered and the fraud committed by FTX insiders. *See, e.g.*, *Hemi*, 559 U.S. at 11-12 (rejecting a RICO claim premised on "separate actions carried out by separate parties"); *Singh* v. *Illusory Sys.,*

*Inc.*, 727 F. Supp. 3d 500, 508 (D. Del. 2024) (dismissing RICO claims due to "intervening, non-racketeering" acts that "disrupt[] any potential causal relationship").

38.     ***Fraud Defenses***.  Argent's fraud claims fail on their merits for the same reason as its RICO claims:  none of the damages Argent alleges were proximately caused by the FTX insiders' fraud because Silvergate "benefitted from the fraud," which provided Silvergate Bank with deposits it could profitably deploy, and the harm Silvergate allegedly suffered "was caused by the revelation of the scheme, not the scheme itself."  *Volkswagen*, 467 F. Supp. 3d at 858 (dismissing fraud claims asserted under California law).

39.     ***Breach of Contract Defenses***.  Argent fails to identify any general damages or special damages that could be recoverable as a result of the FTX Group's alleged breach of contracts related to its accounts with Silvergate.  (Obj. ¶ 27.)   Under California law, general damages are those that "flow directly and necessarily from a breach of contract."  *Lewis Jorge Constr. Mgmt., Inc.* v. *Pomona Unified Sch. Dist.*, 34 Cal. 4th 960, 968 (2004).  Special damages are "secondary or derivative losses arising from circumstances that are particular to the contract or to the parties."  *Id.*  They are only recoverable under California law "if the special or particular circumstances from which they arise were *actually communicated to or known by the breaching party* (a subjective test) or were matters of which the breaching party *should have been aware* at the time of contracting (an objective test)."  *Id.* at 968-69 (emphasis added).  As to general damages, Argent never alleges Silvergate lost a cent because the FTX Group gave Silvergate access to more deposits.  Further, as to special damages, neither the Silvergate Claims nor the Objection allege that the risk of any of the attenuated downstream effects of the FTX insiders' alleged fraud were actually communicated to or known by anyone within FTX Group when relevant contracts were signed.  *See, e.g.*, *Glob. Hawk Ins. Co. (RRG)* v. *Wesco Ins. Co.*, 424 F.

Supp. 3d 848, 858 (C.D. Cal. 2019) (dismissing a claim for unforeseeable special damages). Additionally, Argent's allegations about how exposure of the FTX insiders' fraud resulted in a "chain of events" involving a "collapse of confidence" in Silvergate that supposedly caused a "run on Silvergate's bank and a liquidity crisis" (Obj. ¶ 4) demonstrate that Silvergate's claimed damages are, at bottom, "reputation damages" that are not recoverable through a breach of contract action. *See X Corp.* v. *Ctr. for Countering Digital Hate, Inc.*, 724 F. Supp. 3d 948, 971-72 (N.D. Cal. 2024) (rejecting a breach of contract claim seeking recovery for advertising revenue allegedly lost as a result of unfavorable reports about X's business practices).

40. ***Indemnification Defenses***. Argent broadly asserts that the FTX Recovery Trust must contractually indemnify it for every cost related to every legal and regulatory action brought against Silvergate caused by its own fatal lapse in legal and regulatory compliance. But these assertions have no legal foundation. Argent ignores the fact that multiple legal and regulatory actions arose out of Silvergate's own failure to establish basic systems and controls to comply with its statutory BSA and AML obligations—not any efforts by the FTX insiders to exploit Silvergate's lack of controls. Argent does not and cannot explain how losses arising from Silvergate's own conduct are indemnifiable based on an alleged indemnity covering things such as "acts or omissions by [a Debtor] or [a Debtor's] employees or agents." (Silvergate Claims ¶ 33.) Further, California law is clear that "[a]n agreement to indemnify a person against an act thereafter to be done, is void, if the act be known by such person at the time of doing it to be unlawful." Cal. Civ. Code § 2773. Accordingly, Silvergate cannot seek indemnification for any losses arising out of its obvious violations of applicable BSA and AML laws or its aiding and abetting of the FTX insiders' fraud. Here, Argent is seeking to recover Silvergate's losses from the FTX Recovery

Trust while ignoring the actual cause:  Silvergate and its officers and directors failing to comply with basic legal obligations.

41.   ***Setoff Defense***.  The FTX Recovery Trust has asserted unliquidated claims against Silvergate for "aiding and abetting breach of fiduciary duty, aiding and abetting conversion, and unjust enrichment."  (FTX Claims ¶ 10.)  These claims flow from the fact that Silvergate "through [its] familiarity with the FTX Group's business and banking activities" was not only aware that insiders at the Debtors were defrauding their enterprises, but also "substantially assisted" those insiders by "facilitating" and "helping . . . conceal" their scheme.  (*Id.* ¶ 9.)  Both parties have already acknowledged in their proofs of claim that their respective claims may be subject to setoff (*id.* at 2, Silvergate Claims at 17), but while the Silvergate Claims are already wilting at first scrutiny, analogous aiding and abetting claims brought by certain of the Debtors' customers against Silvergate already survived a motion to dismiss in the Southern District of California.  *See Bhatia*, 725 F. Supp. 3d at 1114-20 (holding that plaintiffs adequately alleged Silvergate aided and abetted the FTX insiders' fraud because they plead that Silvergate had actual knowledge of the fraud and substantially assisted it).  Success as to FTX Recovery Trust's claims against Silvergate would substantially reduce, if not entirely defeat the Silvergate Claims, even if they are ultimately allowed in some form.  Nonetheless, it is noteworthy that Silvergate obtained approval from this Court in its plan of liquidation to not reserve for the FTX Claims, while acknowledging setoff rights, but Argent now ironically insists that an increased reserve attributable to their claims is warranted.  Argent's request is baseless.

42.   ***Any "Securities Losses" Are Not Recoverable***.   Argent asserts that Silvergate "recognized over $751 million in securities-sale losses during the fourth quarter of 2022 alone because of the FTX Group's fraud" (Obj. ¶ 6), but its attempt to shift onto the FTX Recovery

Trust the decline in the market value of Silvergate's securities portfolio is frivolous. Market fluctuations in the value of Silvergate's pre-existing securities portfolio due to macroeconomic factors—most notably an increase in interest rates—cannot be attributed to the Debtors. *See Lewis* v. *United States*, 2017 WL 2311874, at *6 (C.D. Cal. May 24, 2017) ("A tortfeasor is not liable for a plaintiff's pre-existing conditions or the natural progression of those conditions."). Moreover, Silvergate's intervening business decision to sell securities to address a decline in Silvergate Bank's deposit base (another intervening event) means that any losses Silvergate suffered in selling securities are simply not attributable to any fraud by Mr. Bankman-Fried and other FTX insiders.

43.    ***Any "Lost Equity Value" Is Not Recoverable***.    Argent asserts in its Objection—for the first time—that it is entitled to recover for declines in the value of Silvergate Capital's common stock and the "evaporating of billions of dollars in shareholder value." (Objection ¶ 27.) No such losses were alleged in the Silvergate Claims and Argent is not permitted to amend its claims now, so any such assertions are barred.[16] *See In re Nortel Networks Inc*., 573 B.R. 522, 529 (Bankr. D. Del. 2017) ("Creditors may not use the claims amendment process to circumvent the claims bar date"). In any event, Argent does not explain how Silvergate Capital— as opposed to its shareholders—was damaged by any decline in its share price, as would be required. *See Strougo* v. *Bassini*, 282 F.3d 162, 175 n.10 (2d Cir. 2002) ("A corporation . . . cannot have an equity interest in itself. As reflected on corporate balance sheets, equity is not an asset to the corporation, but indeed its opposite:  a claim on assets.").

44.    ***Any Bankruptcy Costs Are Not Recoverable***.    Argent now asserts—again improperly for the first time—that Silvergate's bankruptcy "was a direct result of the FTX Group's

---

[16]    Argent must receive the consent of the FTX Recovery Trust or an order from the Court to amend the Silvergate Claims [D.I. 1793].

fraud." (Obj. ¶ 27.) But this assertion is directly contradicted by the representations that Silvergate made to this Court when seeking Chapter 11 relief. (Hetrick Decl. ¶¶ 14-19.) In its first day declaration, Silvergate asserted that, by early 2023, it had weathered the financial storm that followed FTX Group's collapse but that it chose to liquidate its operations in March of 2023 because a shift in the regulatory environment for banks "prevent[ed] Silvergate Bank from continuing its digital asset focused business model." (*Id*.) Accordingly, it is readily apparent that the intervening actions of bank regulators and Silvergate's own independent business decisions in response to them break any causal chain between any costs related to Silvergate's voluntary bankruptcy and the alleged fraud committed by FTX insiders.

45. ***The Cost of Settlement with the SEC Is Not Recoverable***. In resolving the SEC enforcement action, Silvergate agreed that it would not "seek or accept, directly or indirectly, reimbursement or indemnification *from any source*" for the $50 million penalty it agreed to pay. (SEC Order at 4 (emphasis added).) Based on that promise, Silvergate obtained a judgment dismissing the SEC action against it. (*Id*.) Accordingly, Silvergate should not be permitted to violate the terms of that judgment and pursue indemnification claims that it agreed to forfeit.

46. The FTX Recovery Trust's defenses are numerous and comprehensive. While the FTX Recovery Trust will fully present these and any other defenses at the appropriate time, if needed, for purposes of the matter before the Court today, it is evident that the Silvergate Claims are not viable and lack any merit. Therefore, it is both reasonable and appropriate for the FTX Recovery Trust to ascribe them no value for purposes of the Reserve Amount. Nonetheless, as detailed in the Coverick Declaration, the Third Revised Reserve Amount contains approximately $900 million in conservative contingency over and above the FTX Recovery

Trust's projections of liability for Disputed Claims.  No adjustments to the Third Revised Reserve Amount are required.

## CONCLUSION

For the reasons stated above, the Court should overrule the Objection and enter an order approving the Third Revised Reserve Amount.

Dated: June 16, 2026
      Wilmington, Delaware

**LANDIS RATH & COBB LLP**

*/s/ Matthew R. Pierce*
Adam G. Landis (No. 3407)
Matthew B. McGuire (No. 4366)
Kimberly A. Brown (No. 5138)
Matthew R. Pierce (No. 5946)
919 Market Street, Suite 1800
Wilmington, Delaware 19801
Telephone: (302) 467-4400
Facsimile: (302) 467-4450
E-mail:  landis@lrclaw.com
       mcguire@lrclaw.com
       brown@lrclaw.com
       pierce@lrclaw.com

-and-

**SULLIVAN & CROMWELL LLP**
Andrew G. Dietderich (admitted *pro hac vice*)
James L. Bromley (admitted *pro hac vice*)
Brian D. Glueckstein (admitted *pro hac vice*)
Alexa J. Kranzley (admitted *pro hac vice*)
125 Broad Street
New York, New York 10004
Telephone: (212) 558-4000
Facsimile: (212) 558-3588
E-mail:  dietdericha@sullcrom.com
       bromleyj@sullcrom.com
       gluecksteinb@sullcrom.com
       kranzleya@sullcrom.com

*Counsel for the FTX Recovery Trust*