P1

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE                    Pro Se Filer

Chapter 11
Case No. 22-1168 (KBO)

In re:

FTX TRADING LTD., et al.,

RESPONSE OF ALEX MASHINSKY, PRO SE, IN OPPOSITION TO THE FTX RECOVERY TRUST'S FIRST AMENDED OBJECTION TO PROOFS OF CLAIM FILED BY ALEX MASHINSKY

Alex Mashinsky ("Mashinsky"), appearing pro se, respectfully submits this Response in opposition to the FTX Recovery Trust's First Amended Objection to Proofs of Claim Filed by Alex Mashinsky [D.I. 34704] (the "Amended Objection"). In support of this Response, Mashinsky respectfully states as follows:

PRELIMINARY STATEMENT

1.    At the threshold, two points should be acknowledged. First, the Trust concedes that the three Proofs of Claim filed by Mashinsky on June 25, 2023 against Alameda Research Ltd., Alameda Research LLC, and FTX Trading Ltd. (Claim Nos. 2314, 3233, and 3195, the "June Individual POCs") were timely filed before the Non-Customer Claims Bar Date. (Amended Objection Paragraph 9.) Each of those claims asserts $2.15 billion in damages arising from "Fraud, Conspiracy to commit fraud, market manipulation, bribery, securities fraud, money laundering." those timely-filed claims are not, and cannot be, extinguished on timeliness grounds. The Trust's motion principally turns on whether the November 6, 2023 amendments (the November Individual POCs") validly amplify those timely claims under the well-settled three-prong test of In re FLYi, Inc. 2008 WL 17055, at *3 Bankr. D. Del. Jan 16, 2008). They do.

2.    Second, Mashinsky has accepted responsibility for the conduct underlying his criminal conviction and is presently serving his sentence at FCI Otisville Camp. There is no need to relitigate that conviction in this proceeding. The conduct to which he pled guilty to during his allocution was for misstatements concerning clarity from regulators and his statements about the sale of his CEL tokens. The claims at issue in this proceeding concern entirely separate tortious conduct by FTX Trading Ltd., Alameda Research Ltd., and Alameda Research LLC ("FTX/Alameda") directed at Celsius Network LLC ("Celsius") who was a direct competitor, and at Mashinsky personally, in his capacity as Celsius's controlling shareholder and largest holder of CEL tokens. Those two streams of conduct are factually and legally distinct, and the doctrine of in pari delicto does not collapse them into one.

3. The Trust's objection rests on four grounds, none of which warrants dismissal. First, the November Individual POCs are valid amendments under FLYi because they describe the timely-filed June Individual POCs with greater particularity pleading no new theories, no new defendants, and no increased damages. Second, the Mashinsky Proofs of Claim satisfy the prima facie validity standard of In re Allegheny International, Inc., 954 F.2d 167 (3d Cir. 1992), because they identify cognizable theories of liability (tortious interference, market manipulation, civil conspiracy) supported by specific factual allegations, several of which have been corroborated by Damian Williams, the United States Attorney for the Southern District of New York in a publicly filed letter to the SDNY court. Third, the Global Settlement contained in Sections 5.2 and 10.8 of the confirmed Plan, was designed to resolve generalized customer claims arising from the misuse of customer deposits and the misconduct of former FTX insiders toward FTX customers. It did not seek a resolution with regard to third-party competitor claims arising from targeted tortious conduct by FTX/Alameda against an outside enterprise. Fourth, the doctrine of in pari dilicto is inapplicable because Mashinsky's misconduct toward Celsius customers is not of a magnitude comparable to, and more importantly is not factually connected with, FTX/Alameda's tortious conduct toward Celsius and Mashinsky as a shareholder. Furthermore, his actions are not the reason that Celsius froze assets or eventually filed for bankruptcy. The freezing of assets and the filing for bankruptcy, was the result of the improper conduct of FTX/Alameda.

4. Mashinsky's claims are corroborated by sources that are not in dispute. In a letter filed on February 6, 2024 to the Honorable Lewis A. Kaplan; Re: United States v. Samuel Bankman-Fried (No. 1:22-cr-00673 (S.D.N.Y.) [ECF No. 397] (Attached as Exhibit

P2

A) Damian Williams, the United States Attorney for the Southern District of New York represented to the federal court that:

"Celsius status as a victim of the fraud on Alameda Research's lenders may create a conflict. At Bankman-Fried's trial, the Government presented evidence that Alameda Research was borrowing money from Celsius, that Celsius asked for loans to be returned, and that Alameda Research ultimately repaid certain Celsius loans with customer money. At sentencing the Government will argue that Alameda Research's lenders, including Celsius, were victims of the fraud and that lenders are entitled to restitution."

The same letter further represented that:

"prior to Celsius's bankruptcy, Bankman-Fried had discussions with Celsius executives about the financial condition of Celsius and the prospect of FTX purchasing Celsius and Bankman-Fried replacing Mashinsky as CEO."

The United States' own representation made in a sworn submission to a federal district court in connection with the criminal prosecution of FTX's founder, Bankman-Fried, establishes that Celsius, and by extension Mashinsky, its CEO, Chairman, and its controlling shareholder, was a victim of fraud by FTX-affiliated entities. FTX's founder Bankman-Fried, Caroline Ellison ("Ellison"), Chief Executive Officer of Alameda Research, Gary Wang, and others engaged in covert efforts to manipulate CEL and other assests of Celsius in an effort to induce an artificially manufactured bank run on Celsius, and to displace Mashinsky as Celsius's chief executive and to destabilize Celsius in the process. These facts are not speculative. They are matters of public record in a related federal criminal proceeding, and this Court is respectfully requested to take judicial notice of them under Federal Rule of Evidence 201.

5.    What the Trust labels "generic," "vague," and "speculative" is in fact a set of allegations corroborated by the United States (U.S. Attorney for the SDNY Damian Williams) in federal court, supported by documentary evidence available in the SDNY criminal record. This includes but is not limited to a June 15, 2022 email from Ellison, of Alameda Research, from her Alameda email account, to four Celsius employees seeking to borrow 30 milion CEL tokens after Celsius paused withdrawals and CEL's price tanked 80%. Celsius's own internal documents that will be produced in discovery will further demonstrate and corroborate the fraud inflicted by FTX. Mashinsky's claims should be permitted to proceed to discovery. This motion is pled with sufficient particularity to satisfy the Third Circuit's Allegheny International standard.

6.    Mashinsky files this Response without counsel because his prior counsel, Ruskin Moscou Faltischek P.C., withdrew from this matter following Sheryl P. Giugliano's elevation to the bench. He files it from FCI Otisville Camp, where his access to legal research, public-record materials, and the docket is necessarily and highly constrained. He respectfully requests that this Court construe his pro se submission liberally, as is required by long-settled authority Erickson v. Pardus, 551 U.S. 89, 94 (2007); Haines v. Kramer 404 U.S. 519, 520 (1972).



## PROCEDURAL AND FACTUAL BACKGROUND

### A.   The Mashinsky Proofs of Claim

7.   On June 25, 2023, Mashinsky timely filed the June Individual POCs against the three principal Debtors (Claim Nos. 2314, 3195, and 3233), each identifying the basis of claim as "Fraud, Conspiracy to commit fraud, market manipulation, bribery securities fraud, money laundering," asserting damages of $2.15 billion. Each was supported by an attachment titled "FTX CEL naked short positions 2022 May 3. July. pdf"(sourced directly from FTX's own platform) containing data reflecting the magnitude of CEL short positions and borrow rates on the FTX platform during the period leading up to the Celsius bankruptcy filing.

8.   On November 6, 2023, Mashinsky filed Claim Nos. 88338, 88339, and 88341 (the November individual POCs), each expressly identifying itself as an amendment to the corresponding June Individual POC. The amendments name the same claimant, the same defendants, and the same dollar amount. They substitute, in place of the data attachment to the original claim, a rider drafted by then counsel that articulates the theories of liability and the factual bases for the claims with greater specificity. The amendments add no new theories not encompassed by the original claim's assertion of "Fraud, market manipulation, securities fraud," and they add no new claimant or defendant.

9. The September Corporate POCs (Claim Nos. 85255, 85256, 85257, an 85258) and December Corporate POCs (Claim Nos. 89689, 89697, 89698, and 89699) were filed on behalf of Koala1 LLC and AM Ventures Holdings Inc., entities affiliated with Mashinsky, which hold CEL tokens and other interests damaged by the same FTX/Alameda conduct described in the individual claims. AM Ventures Holdings Inc. is wholly owned by Mashinsky and his wife.

### B.   The SDNY's Recognition of Celsius as a Victim of FTX/Alameda Fraud

10.   On February 6, 2024, the United States Attorney for the Southern District of New York filed a letter with the Honorable Lewis A Kaplan; Re: United States v. Samuel Bankman-Fried (No. 1:22-cr-00673) (S.D.N.Y.) [ECF No. 397], representing that "In summations, the Government argued to the jury that the defendant [Bankman-Fried] had conspired to defraud Alameda Research's lenders [including Celsius], while the defendant [Bankman-Fried] at various times during the trial [at which he was convicted] disputed the fraud." This letter goes on to say "At sentencing the Government will argue that Alameda Research's lenders, Including Celsius, were victims of the fraud and that lenders are entitled to restitution." The same letter to the court disclosed that Bankman-Fried, prior to Celsius's bankruptcy, conducted covert discussions with Celsius executives concerning a potential FTX acquisition of Celsius and the replacement of Mashinsky as CEO. These highly improper discussions undertaken without the knowledge or consent of Mashinsky, Celsius's controlling shareholder and Chief Executive Officer. These were discussions that Bankman-Fried initiated with other officers of Celsius was likely done with the intent to create instability at Celsius, as nothing could be agreed to without the consent of Mashinsky who owned a controlling interest in Celsius, and was unaware of their taking place at the time.

11.   These representations by the United States are not characterizations made by Mashinsky. They are sworn submissions made by six federal prosecutors responsible for prosecuting the FTX matter: Damian Williams, U.S. Attorney for the SDNY, and by, Nicolas Roos, Danielle R. Sassoon, Samuel Raymond, Thane Rehm, Danielle Kudla, five Assistant United States Attorneys for the S.D.N.Y.. They were made to the federal judge who presided over the trial of Bankman-Fried. They corroborate the existence of misconduct by FTX/Alameda toward Celsius which is fundamentally different from the conduct for which Mashinsky was convicted. Since the conviction Mashinsky has filed a motion to Vacate under U.S.C. 28 Section 2255.

### C.   Documentary Evidence of FTX/Alameda Market Manipulation

12.   On June 15, 2022, days after Celsius froze customer withdrawals, Ellison then the Chief Executive Officer of Alameda Research sent an email, from her email account at Alameda Research to four Celsius executives, including Jason Perman, Celsius's Controller. Alameda, in an unsolicited proposal, sought to borrow 30 million CEL tokens. This proposal's goal was to enable Ellison, Bankman-Fried and FTX to further manipulate CEL tokens to prevent any viable recovery for Celsius. The email being cited is among the materials this Court is asked to take judicial notice of pursuant to FRE 201. The size of this borrow request, was four times the amount then available on the entire (publicly-available CEL float) FTX platform.

13.   The annual contemporaneous borrow rates for CEL tokens on the FTX platform on June 15, 2022, the date of Ellison's

email, ranged from 1,000% to 2,600%. This was originally reported in the data attachment to the June Individual POCs titled 'FTX CEL naked short positions 2022 May3-July. pdf'. Discovery will confirm the accuracy of this information which was downloaded directly from FTX's own operating platform. Borrow rates of that magnitude are economically rational only when the supply of borrowable units is grossly insufficient relative to outstanding short interest, a condition consistent with the establishment of naked short positions in violation of applicable securities law requirements (Reg SHO) that short sellers locate borrowable units prior to executing short sales. Ellison had no choice but to send Celsius that email on June 15, 2022, seeking to borrow 30 million CEL tokens after the naked short was already created, and she had failed to locate any CEL tokens to borrow, despite the high rates of interest FTX offered to pay to potential lenders of CEL tokens on their own platform. Celsius refused to lend Alameda any assets and immediately upon FTX's aborting their baseless freeze of Celsius's assets on the platform, Celsius removed all of their assets from FTX.

D.   The Procedural Posture of This Objection

14.   The Original Objection was filed on July 10, 2024 [D.I. 20044]. Litigation was thereafter consensually stayed at the parties' request pending the resolution of Mashinsky's criminal proceedings. The Trust elected to amend that Objection after Mashinsky was sentenced and after his prior counsel, Ruskin Moscou Faltischek PC. moved to withdraw. Mashinsky now responds, pro se and from prison, and respectfully requests that this Court consider his submission with the latitude appropriate to those circumstances.

JURISDICTION

15. This Court has jurisdiction over this Response pursuant to 28 U.S.C. Section 157 and 1334 and the Amended Standing Order of reference from the United States District Court for the District of Delaware dated February 29, 2012. Mashinsky consents to entry of a final order by this Court on this matter to the extent such consent is required by Article III.

ARGUMENT

I. THE NOVEMBER INDIVIDUAL POCS ARE VALID AMENDMENTS TO THE TIMELY-FILED JUNE INDIVIUAL POCS.

16.   The Trust concedes that the June Individual POCs were timely filed. (Amended Objection Paragraph 9.) The question is whether the November individual POCs constitute valid amendments to those timely-filed claims. They do. Under In re FLYi, Inc., a post-bar-date amendment is valid if it: (i) corrects a defect of form in the original complaint; (ii) describes the original claim with greater particularity; or (iii) pleads a new theory of recovery on the facts set forth in the original claim. 2008 WL 17055, at *3 (Bankr. D. Del. Jan 16, 2008) (quoting McLean Indus, Inc., 121 B.R. 704, 708 (Bankr, S.D.N.Y. 1990). The November Individual POCs squarely satisfy the second prong greater particularity, and do not run afoul of Allegheny International or Peregrine.

A.   The November Individual POCs Describe the Same Claims With Greater Particularity.

17.   The June Individual POCs identified the basis of claim as "Fraud, Conspiracy to commit fraud, market manipulation, bribery, securities fraud, money laundering" and were supported by data from FTX's own platform reflecting CEL naked-short positions on the FTX platform. Those words are theories, not labels. They placed the Debtors on notice that Mashinsky was asserting tort and statutory claims arising from market manipulation of CEL and from fraud causing the loss of his equity stake in Celsius and his CEL holdings.

18.   The November Individual POCs assert the same dollar amount ($2.15 billion or "not less than" the same), against the same defendants (FTX Trading Ltd. and Alameda Research LLC), by the same claimant (Mashinsky personally), on the same theories (fraud, market manipulation, securities fraud). The rider attached to the November POCs identifies with greater particularity the mechanisms for which those theories operate: (i) the Debtors' solicitation and receipt of "unauthorized" information from former officers of Celsius that allowed the Debtors to force the liquidation of Celsius's positions at depressed prices (by virtue of Bankman-Fried ignoring the terms of an NDA he had just signed and front running the sale of positions held by Celsius); and (ii) the Debtors' false and fraudulent creation of, and sale of, non-existing CEL tokens on the FTX platform.

19.   Both of those mechanisms are species of the market manipulation and fraud theories pled in the original claim. They are not new theories. The "false and fraudulent creation and sale of CEL Token" is the precise mechanism captured by the original claim's reference to "market manipulation" and by the data attachment titled "FTX CEL naked short positions." Forcing the liquidation of Celsius customers holding CEL tokens on the FTX platform, at depressed prices is the precise harm captured by the original claim's reference to "fraud" and "market manipulation." The amendments specify the conduct and the causal chain. That is the textbook function of an amendment under prong (ii) of FLYi.

20. The McLean test whether the initial claim provided the debtor with "reasonable notice" of the later claim is satisfied. 121 B.R. at 708. The Debtors had reasonable notice in June 2023 that Mashinsky was asserting claims for market manipulation and fraud causing the destruction of value in his Celsius equity, his CEL holdings and his reputation. The November amendments do not surprise the Debtors with anything they did not already know was being claimed. They merely describe with greater particularity the mechanisms of harm.

B. The Trust's Reliance on Peregrine is Misplaced.

21. The Trust relies on In re Peregrine Financial Group, Inc., 215 WL 2237201 (Bankr. N.D. III May 13, 2015), for the proposition that where a creditor "alleged no facts whatsoever in their timely claims, it is is impossible for them to amend." That proposition does not control here. The June Individual POCs were not silent as they identified six specific theories of liability and attached documentary evidence regarding the CEL naked-short positions that are the central factual predicate of the claims. The Trust's characterization of the June POCs as alleging "no facts whatsoever" conflicts with the proof-of-claim forms themselves, which identify the conduct, the theories, and (through the attached data) the documentary basis.

22. Moreover, Mashinsky's June Individual POCs are materially more particularized than the bare-bones placeholder claims at issue in Peregrine and the cases following it. In each of the cases the Trust cites for the "guise of amendment" doctrine International Horizons, Unioil, and Mallinckrodt, the proposed amendment introduced a categorically different claim (e.g., a tort claim added to a contract claim, or a personal injury claim added to an insurance claim) on a different transactional theory. Here, the amendment specifies the same transactions, the same actors, the same harm, and the same theories that the original claim asserted.

C. If Leave to Amend Is Required, It Should Be Granted Under the Enron Factors.

23. If the Court determines that the November Individual POCs should be evaluated as a request to file post-bar-date amendments under Bankruptcy Rule 7015, leave should be granted. The Enron factors (i) undue prejudice to the debtor (ii) windfall to other creditors, and (iii) good faith and jurisdiction for delay favor permitting the amendments. In re Enron Corp., 419 F.3d 115, 133 (2nd Cir. 2005).

24. There is no undue prejudice to the Trust. The dollar amount of the claim was on file in June 2023. The defendants were on file in June 2023. The theories of liability were on file in June 2023. The November rider added particularity, not surprise. The Trust's "floodgate" argument is unavailing because Mashinsky is uniquely situated: he is unaware of any other timely claimant asserting specific tortious conduct by FTX/Alameda toward Celsius that was independently corroborated by the United States Attorney for the Southern District of New York in a sworn submission to a federal district court. There is no "floodgate" of similarly-situate claimants because there is no other Celsius founder whose company's collapse was the subject of public representations by the United States.

25. There is no windfall to other creditors from allowing the amendments because the underlying claim is on file from the timely June filing and would survive in any event.

26. Mashinsky's good faith is demonstrated by the timely filing of the June Individual POCs. The delay in filing the rider was attributable to counsel's ongoing development of the factual case and to the parallel federal criminal proceeding that limited Mashinsky's ability to gather and present the relevant factual record in a single filing.

D. The Corporate POCs are Likewise Valid Amendments Reflecting Mashinsky-Controlled Entities.

27. The September and December Corporate POCs (Claim Nos. 85255, 85256, 85257, 89689, 89697, 89698, and 89699) were filed on behalf of Koala1 LLC and AM Ventures Holdings Inc. (AM Ventures was wholly owned and controlled by Mashinsky and his wife). They held CEL tokens and were damaged by the same FTX/Alameda conduct. To the extent these claims are subject to the bar date, leave should be granted under Pioneer Investment Services Co. v. Brunswick Associates Ltd. Partnership 507 U.S. 380 (1993), because: (i) there is no undue prejudice (the substantive claim is on file from June): (ii) the delay is short (three to six months) and the underlying claim was on the docket throughout; (iii) the reason for the delay was the practical difficulty of coordinating filings across the multiple Mashinsky-controlled entities under the circumstances; and (iv) Mashinsky acted in good faith, as demonstrated by his timely filing of the individual claims.

28.    In the alternative, if this Court determines that the Corporate POCs are barred while the November individual POCs survive, the substantive case against FTX/Alameda is preserved through the individual claims, which seek the same $2.15 billion in aggregate damages.

II.    THE MASHINSKY PROOFS OF CLAIM ARE FACIALLY VALID AND ENTITLED TO PRIMA FACIE STATUS.

29.    Under in re Allegheny International, Inc. a proof of claim is entitled to prima facie validity if the claimant has "alleg[ed] facts sufficient to support a legal liability to the claimant." 954 F.2d 167, 173 (3rd Cir. 1992). The Mashinsky Proofs of Claim properly read together with the November rider and the publicly noticeable federal court record concerning the underlying FTX fraud, satisfy that standard for at least three independent theories of liability: tortious interference with prospective business relations and contractual relations; the market manipulation of CEL and other assets held by Celsius; and civil conspiracy.

A.    Tortious Interference With Prospective Business Relations and Contractual Relations.

30.    Under Delaware law, a claim for tortious interference with prospective business relations requires (i) the reasonable probability of a business opportunity, (ii) intentional interference by the defendant, (iii) proximate causation, and (iv) damages. DeBonaventura v. Nationwide Mut. Ins. Co. 428 A.2d 1151, 1153 (Del. 1981). Each element is supported by specific factual allegations

30(a).    Reasonable probability of business opportunity. In the spring of 2022, Celsius maintained custodial and Earn-program relationships with hundreds of thousands of customers and managed tens of billions of dollars in customer deposits. Celsius was, at the time of the relevant FTX/Alameda conduct, an ongoing enterprise with a documented book of business and ongoing customer relationships.

30(b).    Intentional interference. The interference is documented in multiple forms. First, the United States Attorney for the SDNY has represented to a federal district court that Bankman-Fried, prior to Celsius's bankruptcy, engaged in covert discussions with Celsius executives about replacing Mashinsky as CEO and FTX's acquisition of Celsius. [ECF No. 397, 1:22-cr -00673.] These executives lacked the voting control to replace Mashinsky or the authority or voting rights to sell the company. Further, as would have been required, there was no Board approval, or CEO approval for any Celsius employee to engage in any discussions regarding a transaction with Celsius. However this approach by Bankman-Fried had the effect of destabilizing Celsius management, averting their attention from doing their daily jobs, and causing them to potentially seek other employment. He violated the terms of the NDA and used the information learned in the data room to front run Celsius and create for them significant market losses. Second, FTX/Alameda appears to have illegaly created through the use of a back door "God Mode" fake CEL tokens which were sold creating outsized short positions in CEL on the FTX platform during a period when contemporaneous borrow rates indicated insufficient locatable supply consistent with naked shorting in violation of established securities law requirements. Third, the June 15, 2022 Ellison email seeking 30 million CEL tokens from Celsius reflects an apparent attempt by Alameda to either locate tokens for delivery to satisfy existing naked short sales, or to initiate new short sales in an attempt to drive the price of CEL tokens much lower and further destabilize the Celsius business. From the June Individual POC titled 'FTX CEL naked short positions 2022 May3-July. pdf' the existing short CEL positions on the FTX platform exceeded the available float, an act that is irreconcilable with arm's-length market participation and consistent with deliberate market manipulation. To accomplish the shorting of CEL without arranging for a borrow in advance required the use of a 'back door' or "God mode" that was available only to Alameda and not available to any other FTX customer.

Despite FTX having signed an NDA with Celsius, illegally arranged for by Citibank in connection with these improper and unsanctioned merger discussions, Bankman-Fried immediately ignored the terms of this NDA in other ways. After having received a detail list of Celsius's positions, he aggressively shorted their holdings including that of StETH which had a market value of $1 billion. The illegal selling of just this one position, while under an NDA prohibiting such an action, caused a depeg in the price of StETH and a $200 million mark to market loss for Celsius forcing its bankruptcy. Further, despite the NDA prohibiting any public discussion of what he learned about Celsius, FTX used Bankman-Fried and paid spokesmen (with the payments then undisclosed) to publicly disparage Celsius as if they were stating their own, unbiased opinions when in fact the statements were self serving but not described as such. Examples of people making such improper statements include Anthony Scaramucci a noted cryptocurrency fund manager, and former head of communications for the first Trump Administration, and Kevin O'Leary of 'Shark Tank' fame.

Scaramucci appearing on CNBC (on or about June 14, 2022) said "...Unfortunately, there are no new mistakes. As so we saw this in 1998 with the Long term Capital Management crisis, we saw it in 2008. Uh, and listen, there's a lot of people that were over levered in the system. They were overzealous, uh, there was double collateralization going on. It was almost as if like Bernie Madoff got married to Long Term Capital Management and they created Celsius." Neither Scaramucci nor CNBC

disclosed that he was a paid spokesman for FTX who had an agenda to destroy their competitor, Celsius. As one would expect, speaking six months later at the World Economic Forum, Scaramucci's opinion on Bankman-Fried was radically different.

30(c).    Proximate causation. Celsius froze customer withdrawals on June 12, 2022, just 3 days before the Ellison email, and filed for Chapter 11 on July 13, 2022. The contemporaneous deterioration of CEL's market price and the run on Celsius customer deposits were the direct consequence of the manipulative conduct alleged. While the Trust will likely argue that other factors contributed to the run, proximate causation is a fact question not suitable for resolution on a claim objection.

30(d).    There were 3 causes of manipulated harm to Celsius: (i) FTX spreading rumors and shorting CEL and frontrunning other assets held by Celsius before the pause; (ii) spreading rumors and shorting CEL and frontrunning Celsius positions during the pause causing positions to depeg from their fair market value; and (iii) FTX fictitiously approaching Citibank and Celsius executives (not including Mashinsky), before the pause, about an M&A transaction when they had already entered into a transaction with Blockfi. FTX by virtue of having signed an NDA with Celsius knew their positions and was inviolation fo the NDA's terms, able to manipulate the market price of their assets, forceing them to depeg in an effort to destroy their balance sheet. FTX's sole motivation was the destruction of Celsius and ensuring that no other suitors would consider a transaction with Celsius, thus forcing a Chapter XI bankruptcy filing.

P8

30(e).    Damages. Mashinsky held majority equity in Celsius and substantial personal holding of CEL tokens. The destruction of both interests is the basis of the claimed damages. [Note: a more detailed damages framework appears in Section V below.]

31.    These factual allegations are not generic and they are not speculative. The interference alleged is documented in publicly noticeable federal court records (the SDNY February 6, 2024 letter to the Honorable Lewis A. Kaplan), in materials produced in the Bankman-Fried prosecution (the Ellison email and contemporaneous Alameda short position data), and in the FTX CEL short position data attached to the June individual POCs themselves. Together, they articulate a coherent theory of tortious interference that satisfies Allegheny International's "facts sufficient to support a legal liability" standard.

B. Market Manipulation.

32.    Market manipulation of CEL token is actionable under multiple legal theories, including (i) Section 9(a) of the Securities Exchange Act of 1934, 15 U.S.C. Section 78i(a), to the extent CEL was treated as a security for purposes of the alleged conduct; (ii) Section 10(b) and Rule 10b-5; and (iii) state common law fraud and unfair competition theories. The factual allegations supporting market manipulation include:

32(a).    The establishment by FTX/Alameda (or by FTX customers facilitated by FTX/Alameda) of short positions in CEL on the FTX platform in quantities exceeding the publicly available CEL float on that platform, at times when borrow rates were prohibitively high, as great as 3,600% per year, indicia of illegal naked shorting, a violation of Reg SHO.

32(b).    The Ellison email of June 15, 2022 seeking 30 million CEL tokens from Celsius. Ellison, in her email offered that Alameda would post initial collateral of approximately 100 million USDC. It defies economic logic for Alameda to send $100 million of USDC to Celsius, just days after Celsius had frozen customer withdrawals. The perception at the time was that Celsius never would have been in a position to return any of the USDC to FTX if the price of CEL tokens declined. A party looking to borrow a security, does so with the expectation that it will decline in price. Discovery will shed further light on Ellison and Alameda's motivation to send this email, and in their attempt to secure 30m CEL tokens.

32(c).    Discovery will provide details of any other manipulations of CEL tokens that Williams, U.S. Attorney for the SDNY, who had access to documents currently unknown to Mashinsky, may have been alluding to, with regard to FTX/Alameda's improper market manipulation strategy as it relates to Celsius. Contemporaneous data reflected in the attachment to the June Individual POCs showing borrow rates for CEL during the May-July 2022 period that are economically rational only in the presence of grossly insufficient locatable supply relative to outstanding short interest. These borrowing rates far exceeded even the rates charged at the height of the Game Stop meme mania by those looking to establish short positions in that equity.

32(d).    The 2019 BMA v. FTX Complaint was a harbinger of what was to come. In that case, it was alleged that for the two prior years FTX had acted as a continuous racketeering enterprise. The defendants, FTX Trading Ltd., Alameda Research LLC, Alameda Research Ltd. BVI, Samuel Bankman-Fried, Gary Wang, Caroline Ellison and others, were the very same people and entities that were later charged criminally by the SDNY. That lawsuit brought in the early days of FTX, already accused FTX and Alameda of acting as an undisclosed single enterprise. The conflict of interest that was alleged turned out to be exactly what the CFTC later described as Alameda's "unfair advantages": faster execution, exemption from auto-liquidation, and unlimited borrowing, and the manipulation of markets.

33.    The Trust's argument that any "downward price manipulation" theory is undermined by an objection in the Celsius bankruptcy proceeding (see Amended Objection Paragraph 37, citing the Davis Objection) is irrelevant. The Davis Objection was a pro se filing by a CEL holder addressing a different question regarding the valuation of CEL for purposes of the Celsius plan. Davis argued that CEL was worth more than the price ascribed by the bankruptcy court. It is not a substantive ruling. The Trust cites no court ruling rejecting the naked short (Reg SHO violation) or market manipulation theories on the merits, and indeed the Memorandum Opinion of the Celsius court approving the CEL token settlement did not adjudicate the question of FTX/Alameda's liability for market manipulation of CEL. It addressed only the valuation of CEL within the Celsius estate.

C.    Civil Conspiracy.

34.    Under Delaware law, civil conspiracy requires (i) a combination of two or more persons, (ii) for the purpose of accomplishing an unlawful act or a lawful act by unlawful means, (iii) an overt act in furtherance of the conspiracy, and (iv)

P9

actual damages. Allied Capital Corp. GC-Sun Holdings, L.P., 910 A.2d 1020, 1036 (Del. Ch. 2006) The factual allegations support civil conspiracy:

34(a). Combination. FTX Trading Ltd. and Alameda Research (and the individuals controlling them, including Bankman-Fried and Ellison) constitute multiple persons capable of forming a conspiracy. Participants in this included Citibank and senior Celsius executives, who allowed themselves to be manipulated by Bankman-Fried. The SDNY trial record establishes substantial communication and coordination between FTX and Alameda concerning trading positions, including in CEL. FTX would by necessity been aware of all positions, long or short, held on a daily basis by Alameda.

34(b). Unlawful act/unlawful means. Naked short selling in violation of applicable securities law requirements, tortious interference with Celsius's business, and covert communications with Celsius employees to displace Celsius's controlling shareholder constitute unlawful acts and unlawful means.

34(c). Overt acts. The June 15, 2022 Ellison email, the establishment of outsized CEL short positions, and the Bankman-Fried discussions with Celsius executives all constitute overt acts in furtherance of the alleged conspiracy.

34(d). Damages. The destruction of Mashinsky's Celsius equity and CEL holdings, as described in Section V.

D. The Trust's "Vagueness" Argument Fails

35. The Trust argues that the Mashinsky's Claims fail to identify (i) what actions were taken, (ii) by whom, (iii) the consequence of those actions, and (iv) the harm caused (Amended Objection Paragraph 37,) Each of these elements is, in fact identified above and in the November rider:

35(a). What actions: naked short selling of CEL on the FTX platform; the receipt of unauthorized information from former Celsius officers; covert efforts to displace Mashinsky as CEO; coordinated disparagement of Celsius designed to induce a run on customer deposits.

35(b). By whom: FTX Trading Ltd., Alameda Research, Samuel Bankman-Fried, and Caroline Ellison, the conduct of each of whom is documented in the SDNY criminal record.

35(c). Consequence: the deterioration of CEL's market price, the destabilization of Celsius's financial condition, the run on Celsius customer deposits that precipitated the Celsius bankruptcy, and by blatantly ignoring the NDA that he had just signed, Bankman-Fried used MNPI to front run and depress the prices for positions owned by Celsius. As a result of actions taken by Bankman-Fried, he effectively and deliberately blocked any other parties from investing in or from rescuing Celsius.

35(d). Harm: the destruction of value in Mashinsky's majority equity stake in Celsius and his personal CEL token holdings.

36. The Trust's argument also overlooks that Allegheny International sets a low bar at the prima facie stage. The standard is not factual exhaustiveness or full evidentiary development. It is "fact sufficient to support a legal liability." 954 F.2d at 173. Once prima facie validity is established, the burden shifts to the objector. That burden has not been carried here because the Trust's objection makes no attempt to introduce evidence rebutting the specific factual allegations such as the SDNY restitution letter, the Ellison email, or the contemporaneous CEL borrow rate data from FTX's on platform The Trust's motion is, in essence, a request that this Court reject the claims on the pleadings alone. That is not what Allegheny International contemplates for claims supported by a record of evidence of the nature found in this proceeding.

III. THE GLOBAL SETTLEMENT IN SECTIONS 5.2 AND 10.8 OF THE PLAN DOES NOT BAR THE MASHINSKY CLAIMS.

38. The Trust argues that the Global Settlement in Sections 5.2 and 10.8 of the confirmed Plan extinguished the Mashinsky Claims. (Amended Objection Paragraphs 39.- 43.) That argument depends on an overbroad reading of the Global Settlement that this court should reject.

A. The Global Settlement Was Designed to Resolve Customer Claims, Not Third Party Competitor Tort Claims.

39. Section 5.2 of the Plan resolves claims relating to: (i) "the actual or purported fraud, unjust enrichment, misappropriation, conversion and misconduct of former Insiders"; (ii) "the purported commingling and misuse of customer deposits and corporate funds"; (iii) "the tracing of assets of individual Debtors to particular sources of funding;" (iv) "the effects and consequences of the Debtors' Terms of Service"; (v) "the Debtors' disregard for corporate separateness before the Petition date"; and (vi) "the purported absence of adequate corporate governance, cash management, accounting and cybersecurity controls."

P 10

40.    Read in the context of the Plan and the Coverick Declaration on which the Trust relies, the Global Settlement was a customer facing settlement. It addressed how the FTX estate would treat the claims of its own customers and how value would be distributed among them. It resolved disputes about whether assets held on the FTX platform belonged to the estate or to customers (the Terms-of-Service question); how to trace funds' how to compromise generalized fraud claims that any customer might have asserted against the estate based on Bankman-Fried's insider misconduct. (Coverick Decl. Paragraphs 22. & 23.; Plan Section 5.2)

41.    Mashinsky's claims do no arise from "the purported commingling and misuse of customer deposits" as a customer of FTX. His claims arise from targeted tortious conduct by FTX/Alameda directed at a third party competitor (Celsius) in which Mashinsky held a controlling equity stake. That conduct is materially different from the conduct addressed by the Global Settlement.

42.    To illustrate the distinction: a customer who lost deposits because Bankman-Fried misused customer funds has, under the Global Settlement, given up the right to pursue a generalized fraud claim against the estate in exchange for the enhanced priority treatment afforded to customers. That release makes sense because the claim and the consideration both run between the customer and the estate. Mashinsky, by contrast, received no enhanced priority treatment in exchange for his supposed releasing competitor tort claims. He cannot have released, and he certainly never would have released, what he was never compensated for releasing.

B. This Court's Prior Rulings Do Not Compel a Contrary Result.

43. The Trust cites the August 12, 2025 and November 24, 2025 hearing transcripts as having rejected "similar' claims. (Amended Objection Paragraph 43.) Neither transcript involved claims of the kind asserted here, claims by a competitor's controlling shareholder, supported by representations of the United States Attorney that the competitor was a victim of FTX fraud. The Trust's ability to gesture toward those rulings does not establish that those rulings would compel the same result here, where the facts are materially distinguishable.

C.    Due Process Concerns Counsel Against an Overbroad Reading.

44.    Reading the Global Settlement to extinguish Mashinsky's claims raises due process concerns. Mashinsky was, at the time of the Plan's confirmation in October 2024, awaiting trial and then sentencing in an unrelated federal criminal case. His ability to participate in the Plan confirmation process and to be heard on the scope of the Global Settlement's release of his specific claims was substantially constrained. The Plan documentation did not specifically identify the Mashinsky Claims as among the released claims. Reading the Plan retroactively to extinguish a $2.15 billion claim asserted by a non-customer competitor without explicit notice to him in the Plan confirmation process would raise serious questions under Mullane v. Central Hanover Bank & Trust Co., 389 U.S. 306 (1950), and its progeny.

45.    Settled bankruptcy principles support a narrow reading of confirmation order releases where, as here, the claimant is not similarly situated to the customers whose claims were the bargained for subject of the release. See In re Continental Airlines, 203 F.3d 203, 217 (3d Cir. 2000) (third parity releases in confirmation orders are scrutinized closely).

IV.    THE DOCTRINE OF IN PARI DELICTO DOES NOT BAR THE MASHINSKY CLAIMS.

46.    The Trust's final argument is that the Mashinsky Claims are barred by the doctrine of in pari delicto. (Amended Objection Paragraphs 44. & 45.) That argument depends on equating two factually and legally distinct streams of conduct: (i) Mashinsky's misrepresentations regarding regulators and his statements about the sale of CEL tokens, for which he has accepted responsibility; and (ii) FTX/Alameda's tortious conduct toward Celsius as a competitor enterprise and toward Mashinsky in his capacity as its majority shareholder. Those two streams of conduct cannot be collapsed under in pari delicto.

A.    In Pari Delicto Requires Conduct of Substantially Equal Magnitude Connected to the Same Transaction.

47.    The in pari delicto doctrine "provides that a plaintiff may not assert a claim against a defendant if the plaintiff bears fault for the claim." Off. Comm of Unsecured Creditors v. R.F. Lafferty & Co., Inc., 267 F.3d 340, 354 (3d Cir 2001). The phrase "the claim" is dispositive: the plaintiff's fault must attach to the same conduct that gives rise to the claim against the defendant. The doctrine does not bar all claims by a plaintiff who has any prior misconduct; it bars claims arising from conduct in which the plaintiff was a co-participant of substantially equal magnitude.

48.    Mashinsky's allocution was for specific misrepresentations to Celsius customers regarding (i) misstatements concerning clarity from regulators and (ii) his statements about the sale of his CEL tokens. The victims of that conduct were Celsius customers and CEL holders.

49.    The claims at issue here are not misrepresentations to Celsius customers. The claims are for tortious interference, market manipulation and civil conspiracy by FTX/Alameda directed at Celsius as a competitor. The victims of that conduct the SDNY has now publicly represented as including Celsius itself, which the United States Attorney described as "a victim of the fraud on Alameda Research's lenders." Mashinsky's loss arises from his equity stake in Celsius, in that victimized enterprise, from his personal CEL holdings damaged by FTX/Alameda's market manipulation, and by the loss of his reputation.

50.    These two streams of conduct have different perpetrators, different victims, different mechanisms, and different temporal posture. Mashinsky's misrepresentations to Celsius customers did not cause the FTX/Alameda conspiracy to manipulate CEL. The FTX/Alameda conspiracy did not cause or play any role into Mashinsky's misrepresentations. The two are independent, and in pari delicto has application to independent streams of conduct.

B.    The Cases on Which the Trust Relies Involve Trustees Asserting Claims on Behalf of Tainted Debtors, Not Outside Claimants.

51.    The Third Circuit's decision in Lafferty involved a trustee asserting deepening insolvency claims on behalf of a tainted debtor. 267 F.3d at 343-344. The court held that the trustee stepped into the shoes of the debtor and was therefore subject to defenses that could have been asserted against the debtor itself. Similarly in re Liberty State Benefits of Delaware, Inc., 541 B.R. (Bankr. D. Del 2015), involved a bankruptcy trustee asserting claims on behalf of the estate.

52. Mashinsky is not a trustee asserting claims on behalf of Celsius. He is an outside claimant, the majority, approximately 64% shareholder of Celsius, and a personal CEL holder asserting claims against FTX Debtors. The "steps into the shoes" logic of Lafferty does not apply. To the contrary, the relevant question under in pari delicto is whether Mashinsky's personal misconduct toward Celsius customers was a participant in the same wrongdoing that he now seeks to recover for. It was not.

C.    A Tortfeasor May Not Invoke in Pari Delicto Based on the Plaintiff's Separate Misconduct toward Third Parties.

53.    Adopting the Trust's position would mean that a convicted defendant could never recover for tortious conduct committed against him by a third party. That is not the law. A bank robber who is the victim of an assault unrelated to his robbing the bank, may still recover for the assault. A person convicted of tax fraud who is the victim of a separate, unrelated securities fraud may still pursue the securities fraud. The relevant question is not whether the plaintiff has any misconduct in his record, but whether the plaintiff's misconduct is connected to the wrongdoing for which he seeks recovery. See Bateman Eichler, Hill Richards, Inc. v. Berner 472 U.S. 299, 310 (1985) (in pari delicto applies only where the plaintiff's fault is "of substantially equal magnitude" and "arises from the same transaction").

54.    FTX/Alameda's alleged tortious interference, market manipulation, and civil conspiracy did not arise from Mashinsky's misrepresentations to Celsius customers. The wrongdoing for which the Trust now seeks to invoke in pari delicto is independent. Application of the doctrine on these facts would be without precedent.

V.   DAMAGES FRAMEWORK

55.    Mashinsky's claims of "not less than $2,150,000,000" in damages comprise the following principal components, each of which is susceptible to evidence based proof at trial:

55(a).    In December of 2021, after 6 months of comprehensive and extensive due diligence both by their own internal staffs, and by White & Case, Deloitte, and Citibank, Celsius received an upsized investment of $700,000,000 (Exhibit B) from two highly respected and sophisticated independent investors, WestCap Group and Caisse de depot et placement du Quebec ("CDPQ"). The investment was originally negotiated to be $400 million. The investors then approached Celsius wanting to increase the size of their investment and Celsius agreed to the larger investment. They purchased approximately 20% of Celsius equity, post money. This gave Celsius a valuation of approximately $3,500,000,000. Mashinsky, Celsius's founder and majority shareholder owned approximately 64% of the equity of Celsius (includes the CEL tokens owned by Celsius) at the conclusion of the transaction.

55(b).    Mashinsky's ownership in Celsius had a valuation of approximately $2,240,000,000 (3,500,000,000 x .64) in December 2021. As sophisticated investors Westcap and QDPQ, having spent months analyzing Celsius, having conducted their own extensive due diligence, and having had professional paid assistance in this regard, and having had access to every Celsius related document since day 1, believed that the company was actually worth far more than the valuation assigned to it at the time of the transaction otherwise they never would have made this investment. Mashinsky's ownership of 64% of the 350 million CEL tokens held by Celsius was, by itself $875 million.

55(c).    Mashinsky personally owned approximately 77,000,000 CEL tokens at the time of FTX committed fraud, conspiracy to commit fraud, market manipulation, bribery, securities fraud, and money laundering, all in their successful attempt to destabilize Celsius and the CEL tokens. The market value for each CEL token was approximately $2.50 prior to this, giving them an approximate valuation of $187,500,000 to Mashinsky's stake of CEL tokens.

*PB*

55(d).    Just as the trust has accrued approximately 25% in interest to the value of the remaining allowed claims, that same percentage must be added to the amount of the Mashinsky claim. Mashinky's approximate loss of $2.4 billion would be increased by approximately $600,000,000 of interest, giving him a total claim as of this date of approximately $3 billion,

55(e).    Diminution in value of Mashinsky's majority equity stake in Celsius Network LLC. Prior to the FTX orchestrated market manipulation and run on deposits in June and July 2022. Celsius was a going concern with substantial enterprise value. The destruction of that value, in proportion to Mashinsky's controlling equity stake, constitutes the principal component of damages.

55(f).    Damage calculations do not include the value of CEL tokens owned by Celsius as their value would have been included in the value of Celsius at the time of the December investment by Westpac and QDPQ.

55(g).    Diminution in value of Mashinsky's personal CEL token holdings. Mashinsky personally held CEL tokens that were directly damaged by FTX/Alameda's market manipulation. The diminution in the market price of CEL during the relevant period applied to Mashinsky's holdings,constitutes a second component of his losses.

55(h).    Diminution in value of Mashinsky controlled entity CEL holdings (Koala1 LLC and AM Ventures Holdings Inc.), as asserted in the Corporate POCs.

55(i).    Consequential damages, including reputational harm and lost prospective business opportunities, to the extent recoverable under applicable law.

56.    Precise quantifications of these damages is appropriate for development through expert testimony and discovery, not at the proof of claim pleading stage. See In re Allegheny International, 954 F.2d at 173 (claim is prima facie valid if facts are sufficient to support liability).

FROM: 85794509
TO: Belfi, Eric; Bosco, Anthony; Parket, Brett
SUBJECT: part 6
DATE: 06/10/2026 06:29:20 PM

## VI.    IN THE ALTERNATIVE, LEAVE TO AMEND SHOULD BE GRANTED.

57.    If this Court determines that any of the Mashinsky Proofs of Claim fails for lack of particularity, Mashinsky respectfully requests leave to file a further amendment to cure any identified deficiency. Federal Rule of Bankruptcy Procedure 7015, incorporating Federal Rule of Civil Procedure 15(a), provides that leave to amend "shall be freely given when justice so requires." Particularly given Mashinsky's pro se status, his incarcerated status, the withdrawal of his prior counsel upon elevation to the bench, and the fact that the underlying claims rest on documentary evidence available in the related federal criminal record, this Court should not foreclose Mashinsky's claims without first permitting him a reasonable opportunity to particularize them with the assistance of new counsel.

## VII.    IN THE FURTHER ALTERNATIVE, BRIEF DEFERRAL SHOULD BE GRANTED TO PERMIT RETENTION OF SUCCESSOR COUNSEL.

58.    In the further alternative, if this Court is not prepared to deny the Amended Objection on the merits, Mashinsky respectfully requests a brief deferral of any ruling for ninety (90) to one hundred and twenty (120) days to permit retention of successor counsel. The grounds for this request are as follows:

59.    First, Mashinsky's prior counsel Ruskin Moscou Faltischek P.C. moved to withdraw from this matter on February 5, 2026 [D.I. 34651], shortly before the filing of the Amended Objection. Mashinsky was not the cause of that withdrawal as his lead counsel, Sheryl P. Giugliano, was elevated to the bench and was therefore prevented from continuing the representation.

60.    Second, Mashinsky is incarcerated at FCI Otisville Camp. His access to legal research, public record materials, the docket, and ongoing communication with prospective new counsel is necessarily constrained by his custodial status.

61.    Third, the Trust has, on its own representations, consented to multiple deferrals previously during the pendency of Mashinsky's criminal proceedings, during sentencing, and following the commencement of Mashinsky's incarceration. (Amended Objection Paragraph 15.) This request is appropriate given the disparity in litigation resources between the Trust (represented by Landis Rath & Cobb LLP and Sullivan & Cromwell LLP) and an incarcerated pro se claimant.

62.    Fourth, a brief deferral imposes no material prejudice on the Trust. The Mashinsky Claims have been on file since June 2023, and the Trust has, until now been content to defer their litigation for nearly three years.

## CONCLUSION

63.    For all of the foregoing reasons, Mashinsky respectfully requests that this Court (i) deny the Amended Objection in its entirety; (ii) permit the Mashinsky Proofs of claim to proceed to discovery; (iii) in the alternative, grant leave to amend any deficient claim under Bankruptcy Rule 7015; (iv) in the further alternative, defer ruling on the Amended Objection for ninety (90) to one hundred and twenty (120) days to permit retention of successor counsel; and (v) grant such other and further relief as this Court deems just and proper

Dated: _____June 14_____, 2026
Otisville, New York

Alex Mashinsky
68096-510
Otisville FCI Camp
Otisville, NY 10963

As an inmate I do not have access to a Phone Number, Facsimile, or E-mail





Exh. A.

**U.S. Department of Justice**

*United States Attorney*
*Southern District of New York*

*The Jacob K. Javits Federal Building*
*26 Federal Plaza*
*New York, New York 10278*

February 6, 2024

**BY ECF**

Honorable Lewis A. Kaplan
United States District Judge
Daniel Patrick Moynihan
United States Courthouse
500 Pearl Street
New York, NY 10007-1312

Re:     *United States v. Samuel Bankman-Fried*, S5 22 Cr. 673 (LAK)

Dear Judge Kaplan:

The Government writes to request that the Court conduct a hearing pursuant to *United States v. Curcio*, 680 F.2d 881 (2d Cir. 1982), concerning potential conflicts of interest that could arise from defense counsel's representation of a defendant in a separate criminal matter. In particular, Marc Mukasey and Torrey Young, who filed notices of appearance on behalf of the defendant on January 9, 2024, also represent Alex Mashinsky, a defendant in *United States v. Mashinsky*, 23 Cr. 347 (JGK). Because there is a possibility that a conflict of interest could arise in either case, the Government is seeking *Curcio* hearings in both matters so that the defendants may knowingly waive any conflict that could arise.

A.      Applicable Law

A defendant has a right under the Sixth Amendment to conflict-free legal representation. *United States v. Levy*, 25 F.3d 146, 152 (2d Cir. 1994). District courts have two separate obligations where there is a possible conflict of interest. First, when a court is aware of the possibility of an attorney's conflict of interest, it has a threshold obligation to "investigate the facts and details of the attorney's interests to determine whether the attorney in fact suffers from an actual conflict, a potential conflict, or no genuine conflict at all." *Id.* at 153; *see also United States v. Kliti*, 156 F.3d 150, 153 (2d Cir. 1998). As the Second Circuit has explained:

> The trial court has an obligation to inquire into the facts and circumstances of an attorney's interests either in response to a timely conflict of interest objection or when it knows or reasonably should know of the possibility of a conflict of interest. Failure to engage in such an inquiry, when it is required, results in an automatic reversal. An inquiry allows the trial judge to determine the precise nature of the conflict and how to proceed, *i.e.*, whether to disqualify counsel, obtain a waiver from the defendant pursuant to *Curcio*, or take no action.

*United States v. Stantini*, 85 F.3d 9, 13 (2d Cir. 1996) (citations and internal quotation marks omitted). Second, if the court determines that defense counsel has an actual or potential conflict of interest, the court has a "'disqualification/waiver' obligation" to determine whether the conflict is so severe as to obligate the Court to disqualify the attorney or a lesser conflict that can be waived in a *Curcio* hearing. *Kliti*, 156 F.3d at 153; *Levy*, 25 F.3d at 153.

An actual conflict exists "when the attorney's and the defendant's interests diverge with respect to a material factual or legal issue or to a course of action, or when the attorney's representation of the defendant is impaired by loyalty owed to a prior client." *United States v. Jones*, 381 F.3d 114, 119 (2d Cir. 2004) (citations and internal quotation marks omitted). To show divergent interests, "[s]peculation is not enough." *Triana v. United States*, 205 F.3d 36, 42 (2d Cir. 2000), nor is a "mere theoretical division of loyalties." *Mickens v. Taylor*, 535 U.S. 162, 171 (2002). A potential conflict of interest, by contrast, occurs when "the interests of the defendant may place the attorney under inconsistent duties at some time in the future." *United States v. Perez*, 325 F.3d 115, 125 (2d Cir. 2003) (quoting *Kliti*, 156 F.3d at 153 n.3) (internal quotation marks omitted).

Once the court has determined that an actual or potential conflict exists, it must determine whether the conflict is waivable. *Levy*, 25 F.3d at 153. Because the Sixth Amendment guarantees not only the right to an attorney of undivided loyalty but also, with certain exceptions, to an attorney of one's own choosing, where those rights conflict the determination of which right is to take precedence must generally be left to the defendant, who may make a knowing and intelligent waiver of his right to a conflict-free lawyer if he desires to continue the representation. *United States v. Cain*, 671 F.3d 271, 293 (2d Cir. 2012) (citing *Curcio*, 694 F.2d at 24-25). Nonetheless, because the Court has "an independent interest in ensuring that criminal trials are conducted within the ethical standards of the profession and that legal proceedings appear fair to all who observe them," *Wheat v. United States*, 486 U.S. 153, 160 (1988), "there exists a narrow class of so-called per se conflicts that are not susceptible to waiver." *Cain*, 671 F.3d at 293.

Conflicts "such as an attorney's representation of two or more defendants . . . are generally waivable." *Id.* at 127 (citation omitted). "Although such a conflict might require a defendant to abandon a particular defense or line of questioning, he can be advised as to what he must forgo; he 'can then seek the legal advice of independent counsel and make an informed judgment that balances the alteration in the trial strategy against the perceived effect of having to get a new and perhaps less effective defense counsel.'" *Id.* (quoting *Fulton*, 5 F.3d at 613). "In the multiple representation situation, the defendant 'can be advised by independent counsel of the dangers' of such matters as 'one defendant's cooperating with the government,' and make a knowing and intelligent decision that he wishes to continue to be represented by his attorney despite the attorney's representation of another accused." *Id.* (quoting *Fulton*, 5 F.3d at 613).

If a court determines that there exists a conflict that does not require disqualification, it "must conduct a *Curcio* hearing to determine whether the defendant will knowingly and intelligently waive his right to conflict-free representation." *Kliti*, 156 F.3d at 153; *see also Levy*, 25 F.3d at 153. The Second Circuit has set forth the requirements for such a *Curcio* hearing as follows:

At such a hearing, the trial court (1) advises the defendant of his right to representation by an attorney who has no conflict of interest, (2) instructs the defendant as to the dangers arising from particular conflicts, (3) permits the defendant to confer with his chosen counsel, (4) encourages the defendant to seek advice from independent counsel, (5) allows a reasonable time for the defendant to make a decision, and (6) determines, preferably by means of questions that are likely to be answered in narrative form, whether the defendant understands the risk of representation by his present counsel and freely chooses to run them.

*Perez*, 325 F.3d at 119.

## B.   Discussion

Mr. Mukasey's and Ms. Young's representation of defendants Bankman-Fried and Mashinsky in separate cases creates a potential conflict of interest; this potential conflict of interest, however, is waivable.

As background, Mashinsky was the cofounder and former CEO of Celsius Network LLC and its related entities (collectively, "Celsius"), a now-bankrupt cryptocurrency lending platform. As the trial evidence in this matter established, Celsius lent money to Alameda Research, and certain loans were repaid by Alameda Research to Celsius using customer funds. The relationship between Alameda Research and Celsius creates the potential for conflicts in several respects.

First, Celsius's status as a victim of the fraud on Alameda Research's lenders may create a conflict in the simultaneous representation of Bankman-Fried (the owner of Alameda Research) and Mashinsky (the former CEO of Celsius). At Bankman-Fried's trial, the Government presented evidence that Alameda Research was borrowing money from Celsius, that Celsius asked for loans to be returned, and that Alameda Research ultimately repaid certain Celsius loans with customer money. (Trial Tr. at 817-18, 1771.) In summations, the Government argued to the jury that the defendant had conspired to defraud Alameda Research's lenders, while the defendant at various times during the trial disputed the fraud. At sentencing, the Government will argue that Alameda Research's lenders, including Celsius, were victims of the fraud, and that lenders are entitled to restitution. This has the potential to create a conflict in the representation of Bankman-Fried and Mashinsky. Bankman-Fried may wish to argue at sentencing or in the event of an appeal that Celsius and similar lenders were not defrauded and are not entitled to restitution. Celsius, and potentially Mashinsky, may take a contrary position. Indeed, in a separate court proceeding, Mashinsky has argued that Celsius did not know that Alameda Research was a "risky counterparty." Def. Mem. of Law in Support of Motion to Dismiss Complaint, *People v. Alex Mashinsky*, Index No. 450040/2023 (N.Y. Cty May 2, 2023), https://shorturl.at/kyDJ9. In short, defense counsel's clients may be incentivized to take different, conflicting positions on Celsius's victim status, due diligence, and entitlement to restitution, creating a potential conflict of interest for the attorneys.

Second, it appears that Mashinsky has blamed Celsius's collapse, at least in part, on actions taken by Alameda Research, possibly at Bankman-Fried's direction, to short CEL, the native cryptocurrency token issued by Celsius. Some of the public reporting on this topic has suggested

that Mashinsky claimed that Alameda Research used its unique, secret ability to borrow unlimited funds to borrow CEL on FTX, flooding the market and pushing down the price of CEL. *See* The Block, *Celsius's Alex Mashinsky Responds to New York State Lawsuit Blaming Him for the Crypto Lender's Collapse* (May 3, 2023), https://www.theblock.co/post/229211/alex-mashinsky-celsius-nys-lawsuit-defense. This allegation creates the potential for a conflict of interest. If true, while Mashinsky's allegations could possibly aid in his own defense, in Bankman-Fried's case Bankman-Fried's alleged manipulation of CEL could be additional relevant conduct that the Court could consider at Bankman-Fried's sentencing. Thus, counsel could have an incentive in the *Mashinsky* case to develop evidence of Alameda Research shorting CEL and to air those facts in the litigation, while the same counsel may have an incentive to minimize or refute such allegations in the *Bankman-Fried* case.

Third, in this case, defense counsel has gained access to millions of records pursuant to a protective order, which will limit defense counsel's use and disclosure of that information. That too creates the potential for conflict. If defense counsel views something in the Bankman-Fried materials that they believe may be useful to Mashinsky, they will be limited in their ability to share that information with Mashinsky or use it in Mashinsky's defense. Thus, defense counsel's mere agreement to be subjected to a protective order creates the potential for a conflict of interest between their two clients.

Finally, we understand that, prior to Celsius's bankruptcy, Bankman-Fried had discussions with Celsius executives about the financial condition of Celsius and the prospect of FTX purchasing Celsius and Bankman-Fried replacing Mashinsky as CEO. Bankman-Fried's involvement at this stage of Celsius's history could cause him to have information that is relevant to the defense of Mashinsky, but that defense counsel is not authorized to share with Mashinsky.

That said, these potential conflicts are not so "severe" that "no rational defendant would knowingly and intelligently desire the conflicted lawyer's representation." *Levy*, 25 F.3d at 153. And such conflicts, to the extent they manifest, "are generally waivable" or can be dealt with through the appointment of additional counsel. *Id.* at 127. Here, Bankman-Fried already has conflict-free trial counsel that could advise him on issues relating to Celsius and Mashinsky. Nonetheless, to ensure the integrity of the proceeding and guard against the risk that the defendant may, in the future, complain about the conflict, the defendant must "knowingly and intelligently waive his right to conflict-free representation" to proceed with this representation. *Kliti*, 156 F.3d at 153.

Therefore, the Government respectfully requests that the Court schedule a *Curcio* hearing to review the potential conflicts of interest with Bankman-Fried, and to confirm that he knowingly waives any such conflict. The Government has conferred with Mr. Mukasey and Ms. Young, who have agreed to the scheduling of a *Curcio* hearing. For the convenience of the Court, the

Government is attaching a set of proposed questions to be put to the defendant as part of the *Curcio* inquiry.

Respectfully submitted,

DAMIAN WILLIAMS
United States Attorney

by: /s/ Nicolas Roos
    Nicolas Roos
    Danielle R. Sassoon
    Samuel Raymond
    Thane Rehn
    Danielle Kudla
    Assistant United States Attorneys
    (212) 637-2421

cc: Defense Counsel (by ECF)



**Proposed *Curcio* Examination**
***United States v. Bankman-Fried,*** S5 22 Cr. 673 (LAK)

## A. Introductory Questions To Establish Competence

Age

Education

Current medications

Alcohol, drugs, medications within past 24 hours

Is anything interfering with your ability to understand what is happening here today?

## B. Potential Conflict of Interest Posed by the Representation

1.  Are you satisfied with the services of Mr. Mukasey and Ms. Young thus far in the case?

2.  Have Mr. Mukasey and Ms. Young informed you that their firm represents Alex Mashinsky in connection with a prosecution in this district for conduct that may involve you as well?

3.  How long have you been aware of this issue? How much time have you spent discussing this issue with them? Have you discussed this issue with your trial counsel, Mr. Everdell and Mr. Cohen?

4.  Do you understand that the fact that Mukasey and Young simultaneously represent Mr. Mashinsky may mean that, in some cases, they may be required to put his interests before yours?

5.  Specifically, do you understand that Mr. Mukasey and Ms. Young may be required to forgo sentencing arguments that may be favorable to you because of their duty of loyalty to Mr. Mashinsky?

6.  Do you understand that there may be ways in which Mukasey and Young's representation of you will be impaired by their office's representation of Mr. Mashinsky that are not currently foreseeable?

7.  Do you understand that the potential conflict has existed since Mr. Mukasey and Ms. Young began representing you?

8.  Tell me in your own words what your understanding is of the potential conflicts of interest arising in this situation.

BlockWorks Article:

Exhibit B

Celsius Expands its Series B From $400M to Oversubscribed $750M
The company's new proceeds will in part go toward further bridging centralized finance and DeFi via its recently announced project CelsiusX, the company said.

Celsius Expands its Series B From $400M to Oversubscribed $750M
The company's new proceeds will in part go toward further bridging centralized finance and DeFi via its recently announced project CelsiusX, the company said.

"We paid over $1 billion to our community in yield, and I think the investors' excitement in almost doubling the round show that our mission of 'doing good then doing well' is working and they want to be apart of it," Mashinsky said. "We're happy to include more investors that will make Celsius stronger."

The company's new proceeds will go toward expanding its product offerings, growing into new markets and further bridging centralized finance and DeFi via its recently announced project CelsiusX, the company said in a statement.

Additionally, Celsius will use the funds to further improve the utility of its platform for its supportive community of users, and its commitment to sustainable Bitcoin mining, the company said.

Earlier this week, Celsius Network announced it would invest an additional $300 million into its bitcoin mining capabilities as the platform's assets under management continue to grow, Blockworks previously reported.

Celsius began building its mining business last year as a way to diversify its sources of yield, Mashinsky told Blockworks at the time. The business will continue to scale its mining operations based on the amount of assets managed, Mashinsky added. Celsius's AUM has grown to $28.6 billion.

Link: https://blockworks.com/news/celsius-expands-its-series-b-from-400m-to-oversubscribed-750m

No Oleardy did not.

"FTX said they walked away from the purchase due to a "$2 billion hole" in Celsius's balance sheet. The Celsius token dropped more than 20% on the news. Celsius was one of the many crypto lenders who lent to now insolvent Three Arrows Capital"

68096-51...
Alex Mashinsky
REG # 68096-510
PO BOX 1000
FCI Camp
Otisville, NY 10963
United States



Pro Se filer
(2nd Copy)

To Hon. Karen B. Owens
U.S. Bankruptcy Court
824 North Market St. 3 floor
Willmington D.E. 19801