**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| In re: | Chapter 11 |
| FTX TRADING LTD., *et al*. | Case No. 22-11068 (KBO) |
| Debtors.[1] | (Jointly Administered) |
| | **Re: Docket No. 35768** |

**ARGENT'S JOINDER AND STATEMENT IN SUPPORT OF MOTION OF**
**SETH MELAMED FOR RECONSIDERATION OF THE JUNE 2, 2026 ORDER**

The Argent Liquidation Trust ("Argent"), as successor to the estates of debtors Silvergate

Capital Corporation, Silvergate Liquidation Corporation (f/k/a Silvergate Bank), and Spring

Valley Lots, LLC (these debtors, collectively, "Silvergate"), hereby joins the *Motion of Seth*

*Melamed for Reconsideration of the June 2, 2026 Order [D.I. 35768] Pursuant to 11 U.S.C.*

*§ 502(j) and Federal Rules of Bankruptcy Procedure 3008, 9023, and 9024* (the "Motion for

Reconsideration") and files this statement in support (the "Statement in Support") of the Motion

for Reconsideration. In support of the foregoing, Argent respectfully submits as follows:

**PRELIMINARY STATEMENT**

1.      Section 5.2 of the Plan plainly provides that, "[i]n consideration of the

classification, treatment, Distributions, releases and other benefits provided by the Debtors to their

stakeholders under the Plan," the provisions of the Plan constitute a "good-faith compromise,

settlement and resolution" of "all Claims, Interests and Causes of Action against, by or among the

---

[1]     The last four digits of FTX Trading Ltd.'s and Alameda Research LLC's tax identification numbers are 3288 and 4063, respectively. Due to the large number of debtor entities in these Chapter 11 Cases, a complete list of the Debtors and the last four digits of their federal tax identification numbers is not provided herein. A complete list of such information may be obtained on the website of the Debtors' claims and noticing agent at https://cases.ra.kroll.com/FTX.

Debtors, including without limitation" certain specified categories of claims.[2]  Plan § 5.2.  Three things are immediately apparent from this text.  First, the text describes a bargain: claims are resolved *in exchange for* Plan treatment and Distributions.   Second, this bargain encompasses "*all*" claims "*without limitation*"—not just fraud claims or any other category of claims.  Third, the provision says the Plan is a "compromise, settlement and resolution."  It does not say "release."  It does not say "extinguishment."  It does not say "disallowance."  The drafters of this Plan knew those words well; they used, for example, "expunged" and "disallowed" in Section 8.3, "forever barred" in Section 6.2, and "irrevocably and forever released" in Section 10.4.  They chose to use none of these terms in Section 5.2, and that choice was purposeful.

2.      Yet, the FTX Trust would have this Court read Section 5.2 in a way that is inconsistent with the words on the page so as to purportedly "settle" claims for no consideration. In recent litigation filings, the FTX Trust has argued that Section 5.2 bars claims premised on fraud and misconduct of former FTX insiders—focusing on the specified categories in subsections (a) and (k) of Section 5.2.  But Section 5.2 does not limit itself to those categories.  It describes "all Claims, Interests and Causes of Action . . . *including without limitation*" the illustrative examples. Plan § 5.2 (emphasis added).  The FTX Trust's reading thus cannot be cabined to fraud claims alone; taken to its logical conclusion, the FTX Trust's interpretation requires that Section 5.2 operates to extinguish, automatically on the Effective Date, *every* filed proof of claim in these cases without notice, without individualized adjudication, without the consent of the affected creditors, and without delivering any of the "consideration" the provision's own opening clause identifies as the core of the "settlement."  Whether the FTX Trust's reading is limited (outside the text) to fraud claims or extends to all claims, the result is the same: it is completely irreconcilable

---

[2]      Capitalized terms used but not defined in this Preliminary Statement shall have the meanings ascribed to them herein.  *See infra* n.3.

with the Plan's text, its structure, and the Debtors' own representations to the Court at the time the Plan was presented for confirmation.

3.      Consider what such an interpretation would require this Court to accept.  If Section 5.2 extinguished all claims on the Effective Date, then the Disputed Claims Reserve—expressly maintained "on account of Disputed Claims that may be subsequently Allowed after the Effective Date," Plan § 8.5—has no reason to exist.  Article 8's comprehensive process for objecting to, litigating, settling, and paying individual claims is meaningless.  Article 4's promise of 100% payment to holders of Allowed General Unsecured Claims is a promise that can never be fulfilled, because there are no claims left to allow.  Section 5.17's preservation of all the estates' Causes of Action for the benefit of the FTX Trust preserves nothing, because the same "Causes of Action . . . by . . . the Debtors," Plan § 5.2, were already extinguished.  And the Plan's carefully constructed, consent-based release framework in Section 10.4—with its defined "Releasing Parties," its opt-out mechanism, and its express carve-outs for pre-petition causes of action—was an elaborate exercise in futility, as Section 5.2 had already accomplished, without consent, a far broader extinguishment.  None of these provisions makes sense under the FTX Trust's reading.  All of them make sense under Argent's.

4.      If the FTX Trust truly believed its reading, its conduct since the Effective Date is inexplicable.  Indeed, why did the FTX Trust spend months prosecuting individual claims objections—including against fraud-premised claims—through the ordinary Article 8 process? Why did the FTX Trust litigate the Amended Melamed Objection for nearly 21 months without once invoking Section 5.2?  Why did the FTX Trust not simply file a single omnibus motion to expunge every proof of claim in these cases on the day the Plan became effective?  The answer to all these questions is obvious: the FTX Trust knows its reading does not reflect how Section 5.2

truly operates.  The extinguishment theory is not a faithful reading of the Plan.  It is a *post-hoc* litigation position, manufactured months after confirmation, that has expanded with each successive dispute—from silence, to customer fraud claims, to non-customer fraud claims, to breach of contract claims, and now to all the claims of a non-customer bank.  The Debtors never disclosed this interpretation to creditors, nor did they present it to the Court at confirmation.  To the contrary, the Debtors told the Court that Section 5.2 was standard boilerplate—with language "almost identical" to the language found in "several plans approved by this Court"—and that they were "not attempting to circumvent any requirement imposed by the Bankruptcy Code or the Bankruptcy Rules." *See* Debtors' Confirmation Reply ¶¶ 79, 81.  Those representations were made to obtain confirmation, and they should be honored now.

5.      The FTX Trust also cannot escape the breadth of the language it invokes.  Section 5.2 settles "***all*** Claims, Interests and Causes of Action ***against, by or among*** the Debtors . . . ***without limitation***." Plan § 5.2 (emphases added).  And the Plan's defined term "Cause of Action" is broadly defined to include "any action, claim, cause of action, controversy, demand . . . of any kind or character whatsoever, known, unknown, contingent or non-contingent, matured or unmatured, suspected or unsuspected, liquidated or unliquidated, disputed or undisputed, . . . whether arising before, on, or after the Petition Date, ***in contract or in tort***, ***in law or in equity, or pursuant to any other theory of law***, including without limitation: (a) any right of setoff, counterclaim or recoupment and any claim on contracts or for breaches of duties imposed by law or in equity; (b) the right to object to Claims or interests[.]" Plan § 2.1.27 (emphasis added).  If Section 5.2 extinguishes all Causes of Action *against* the Debtors, it must equally extinguish all Causes of Action *by* the Debtors, including, for example, the FTX Trust's own fraud-based claims against Silvergate, for which the FTX Trust is, even now, working with Argent to coordinate a

4

litigation schedule to prosecute, as well as every claim objection filed to date.  The FTX Trust cannot eliminate every claim against it yet retain every claim it holds.  Nor can it play favorites: it cannot tell this Court that one creditor's claim is barred because it sounds in fraud while another's survives because it sounds in contract or something else.  Section 5.2 draws no such lines; it says "all" and "without limitation," and the defined term "Cause of Action" expressly includes claims arising under any theory of law, including contract claims.  That thus leaves before the Court two conflicting readings of the contested language in Section 5.2.  Either those words *extinguish* everything, or they *channel* everything into the Plan's claims allowance process and distribution framework.  Every indicator—the Plan's text and structure, the universal understanding of comparable language in other Chapter 11 plans, the established rules of contract interpretation, the relevant extrinsic evidence, the distinction between plan treatment and claim allowance under the Bankruptcy Code, and constitutional due process considerations—points toward the latter.

6.      That is Argent's position: Section 5.2 does what standard global settlement language has always done—it channels all claims into the Plan's claims allowance and distribution framework, in consideration for Plan treatment.  That is the only reading that gives the Plan's words their plain meaning, renders the Plan's promises not illusory, keeps many Plan provisions from becoming surplusage, comports with fundamental principles of bankruptcy law, and explains the FTX Trust's own post-confirmation conduct.

7.      Assuming, *arguendo*, that there is any ambiguity about the import of Section 5.2, it is reasonable to consult the Disclosure Statement which underlies the consent of creditors and other stakeholders to the Plan.  At no point does the Disclosure Statement disclose that Section 5.2 was intended to, would, or, indeed, *could* have the breathtakingly preemptive effect the FTX Trust now contends it to have.  No creditor or other stakeholder considering its vote on the Plan and

whether to support its confirmation reasonably could have understood Section 5.2 to supersede the Plan's other provisions in the absence of specific, clear, and illuminating disclosure.

8. Accordingly, Argent joins the Motion for Reconsideration for the purpose of seeking correction of the interpretation of Section 5.2 reflected in the June 2, 2026 Order. Argent need not, and does not, take any position on Melamed's specific claims or ask the Court to reverse the June 2, 2026 Order as applied to Melamed's specific claims. The Court can reach the same ultimate result it reached as to Melamed—on the grounds that he may not circumvent the claims-allowance process by asserting new claims in arbitration or re-litigating claims already resolved—while correcting the underlying legal basis. That correction matters. If the extinguishment rationale stands uncorrected, the FTX Trust will continue to deploy it—as it is already doing against Argent—to bar creditors whose claims were timely filed and remain unadjudicated from pursuing the very process and distributions the Plan promises them.

## FACTUAL BACKGROUND

### I. Relevant Provisions of the FTX Disclosure Statement and Plan.

#### A. The Customer Priority Settlement.

9. Shortly after filing these Chapter 11 Cases, the Debtors sought to negotiate a settlement of claims held by former customers of the FTX Exchanges. According to the Debtors, such customers could have asserted, or had already asserted, claims for the imposition of an express or constructive trust, unjust enrichment, and bailment, among others, generally based on the theory that the cryptocurrency held by the Debtors was not property of the estates but of the customers who had deposited such currency. *See Disclosure Statement for Debtors' Joint Chapter 11 Plan of Reorganization of FTX Trading Ltd. and Its Affiliated Debtors and Debtors-In-Possession* at 91 [Dkt. No. 19143] (the "Disclosure Statement"). With the goal of resolving these claims consensually, the Debtors engaged certain creditor groups—specifically, the Official

6

Committee of Unsecured Creditors (the "Official Committee"); the Ad Hoc Committee of Non-US Customers (the "Ad Hoc Committee"); and certain claimants (the "Class Action Claimants") who had commenced a class action adversary proceeding against the Debtors on behalf of U.S. customers of the FTX Exchanges. *Id.*

10.     Ultimately, the parties successfully reached a settlement (the "Customer Priority Settlement") that resolved the customer creditors' claims in exchange for "provid[ing] special treatment for customers versus other creditors." *Id.* at 7. The key terms of the Customer Priority Settlement were summarized in the Disclosure Statement as follows:

- The Debtors pooled their assets and liabilities. *Id.* at 25.

- The Debtors' pooled assets are then divided into three sources of recovery: (1) the Dotcom Customer Priority Pool, consisting of the assets held in the FTX.com Exchange; (2) the U.S. Customer Priority Pool, consisting of the assets held in the FTX.US Exchange; and (3) the General Pool, which contains all other assets. *Id.* at 89.

- Customers of the FTX.com Exchange and the FTX.US Exchange will recover from the Dotcom Customer Priority Pool and U.S. Customer Priority Pool, respectively, before recovering from the General Pool; furthermore, such customers also receive a partial priority claim against the General Pool to cover any shortfalls not covered by the recovery sources. *See id.*

- In exchange for this negotiated priority scheme, customers agreed to settle their claims, particularly their claims relating to the customers' alleged property interest in and entitlements to digital assets and fiat currency deposited with FTX. *See id.* at 91 (noting that, as part of the Customer Priority Settlement, the Debtors established "priority claims and shortfall amounts for the benefit of customers" in order to "consensually resolve" the Ad Hoc Committee's and Class Action Claimants' claims).

11.     In other words, as consideration for the settlement of their claims, the customers obtained a higher priority in distributions—such customers not only would recover from sources of recovery created specifically for them but also would recover from the general pool before other general unsecured creditors.

**B.        Section 5.2: Global Settlement of Claims and Interests.**

12.        Article 5 of the Debtors' confirmed bankruptcy plan—*the Second Amended Joint Chapter 11 Plan of Reorganization of FTX Trading Ltd. and Its Debtor Affiliates* [Dkt. No. 26404-1] (the "Plan")—sets forth the mechanics for the "Implementation of the Plan."

13.        On July 31, 2023, the Debtors filed a preliminary draft of their proposed bankruptcy plan [Dkt. No. 2100] (the "Draft Plan").  The Draft Plan included in Section 5.2 a description of a global settlement (the "Global Settlement").  That section states, in relevant part:

> in consideration for the classification, treatment, Distributions, releases and other benefits provided under the Plan, on the Effective Date, the provisions of the Plan shall constitute a good-faith compromise, settlement and resolution (the "Global Settlement") of **various** Claims, Interests, Causes of Action, controversies and disputes **arising from or related to, among other things**: (a) the purported fraud, unjust enrichment, misappropriation, conversion and misconduct of former Insiders; (b) the contractual, structural and legal subordination rights that a Holder of a Claim or Interest may have with respect to any Allowed Claim, Interest or any Distribution to be made on account of such Allowed Claim or Interest; (c) the purported commingling and misuse of customer deposits and corporate funds; (d) the tracing of assets of individual Debtors to particular sources of funding; (e) the allocation of corporate and administrative expenses across each of the Debtors; (f) the effects and consequences of the Debtors' Terms of Service and whether the assets held by the FTX.com Exchange and the FTX.US Exchange are property of the Debtors' Estates; (g) the purported absence of adequate corporate governance, cash management, accounting and cybersecurity controls by the Debtors and their Affiliates prior to the commencement of the Chapter 11 Cases; and (h) the costs and risks to the Debtors' Estates and creditor recoveries otherwise associated with prolonged litigation of each of the foregoing.

Draft Plan § 5.2 (emphasis added).

14.        Five months later, on December 16, 2023, the Debtors filed the first *Joint Chapter 11 Plan of Reorganization of FTX Trading Ltd. and its Debtor Affiliates* [Dkt. No. 4861] (the "First Filed Plan").[3]  Through the First Filed Plan, the Debtors revised the language of Section 5.2 to expand its scope:  whereas the Draft Plan stated that the Global Settlement was a "compromise,

---

[3]    Capitalized terms not defined herein shall have the meaning assigned to them in the Plan.

settlement and resolution of various Claims . . . *arising from or related to*" the specified bases of liability, the First Filed Plan stated that the Global Settlement was a compromise, settlement and resolution of "all Claims, Interests and Causes of Action against, by or among the Debtors . . . *without limitation*" as shown below (in relevant part):

> In consideration of the classification, treatment, Distributions, releases and other benefits provided by the Debtors to their stakeholders under the Plan, on the Effective Date, the provisions of the Plan shall constitute a good-faith compromise, settlement and resolution (the "Global Settlement") of **all** Claims, Interests and Causes of Action **against, by or among the Debtors, including without limitation**: (a) the actual or purported fraud, unjust enrichment, misappropriation, conversion and misconduct of former Insiders; (b) any basis for the contractual, structural and legal subordination rights of any Claim or Interest or any Distribution to be made on account of any Claim or Interest; (c) the purported commingling and misuse of customer deposits and corporate funds; (d) the tracing of assets of individual Debtors to particular sources of funding; (e) transactions among the Debtors prior to and on the Effective Date; (f) the allocation of corporate and administrative expenses across each of the Debtors; (g) the effects and consequences of the Debtors' Terms of Service and whether the assets held by the FTX.com Exchange and the FTX.US Exchange are property of the Debtors' Estates; (h) the Debtors' disregard for corporate separateness before the Petition Date; (i) any causes of action by a Debtor against other Debtors or the Insiders of other Debtors; (j) the purported absence of adequate corporate governance, cash management, accounting and cybersecurity controls by the Debtors and their Affiliates prior to the commencement of the Chapter 11 Cases; and (k) **all Causes of Action relating to any of the foregoing**.

First Filed Plan § 5.2 (emphases added).

15.    From that point forward, this language in Section 5.2 remained unchanged. Accordingly, Section 5.2 of the final, confirmed Plan, filed on October 8, 2024, contains the exact language quoted above from Section 5.2 of the First Filed Plan. *See* Plan § 5.2. Specifically, Section 5.2 of the Plan provides that "*all* Claims, Interests and Causes of Action against, by or among the Debtors . . . *without limitation*" are settled and resolved "[i]n consideration of the classification, treatment, Distributions, releases and other benefits provided by the Debtors to their stakeholders under the Plan, on the Effective Date." *Id.* (emphases added). Section 5.2 also explicitly references eleven kinds of claims subject to the Global Settlement (categories (a) through

9

(k)), but that list is, by the plain words of the section, exemplary and non-exhaustive. *See id.* (noting that the Global Settlement applies to "all Claims, Interests, and Causes of Action . . . including without limitation" the described categories of claims). Section 5.2 further provides that the Plan operates as "a motion to approve the Global Settlement pursuant to Bankruptcy Rule 9019, and the entry of the Confirmation Order shall constitute the Bankruptcy Court's approval of the Global Settlement under section 1123 of the Bankruptcy Code[.]" *Id.*

16.     The second paragraph of Section 5.2 goes on to state the waterfall recovery scheme described in the Disclosure Statement as part of the Customer Priority Settlement, a priority settlement that was never separately approved by the Court but appears to have been incorporated into the broader Global Settlement set forth in Section 5.2. *See Declaration of Steven P. Coverick in Support of Confirmation of the Second Amended Joint Chapter 11 Plan of Reorganization of FTX Trading Ltd. and Its Debtor Affiliates* ¶ 22 [Dkt. No. 26041] ("[T]he terms of the Customer Priority Settlement . . . are incorporated into the Plan through the Global Settlement in Section 5.2 of the Plan").

17.     The consideration provided in the Global Settlement—Plan treatment and Distributions—is, in turn, set forth in Article 4 of the Plan. As is relevant to Argent, Section 4.3.9 provides that Holders of Allowed General Unsecured Claims shall recover:

> Except to the extent that a Holder of an Allowed General Unsecured Claim agrees to less favorable treatment . . . payment in Cash in an amount equal to (i) ***100% of such Allowed General Unsecured Claim***, ***plus*** (ii) ***interest*** at the lower of the Consensus Rate, the applicable Contract Rate or such other rate determined by the Court (or as otherwise agreed by the relevant parties) on such Allowed General Unsecured Claim from the Petition Date through the applicable Distribution Date[.]

Plan § 4.3.9 (emphases added).

18.     To ensure that the Debtors and their successors maintain sufficient funds on hand to satisfy claims to the full extent provided by Article 4 of the Plan, Section 8.5 of the Plan provides

for the establishment of the Disputed Claims Reserve, a reserve of funds designed to cover future Distributions on account of claims that are currently Disputed but later become Allowed.[4]  Plan § 8.5.

**C.      Section 10.4: Voluntary Release by Holders of Claims and Interests.**

19.      The Plan also contains a separate release provision, set forth in Section 10.4 and captioned, "Voluntary Release by Holders of Claims and Interests."  Plan § 10.4.  That section provides that "[f]or good and valuable consideration, including . . . the implementation of the Plan, and the distribution of proceeds," Releasing Parties "shall be deemed to conclusively, absolutely, unconditionally, irrevocably and forever release, waive and discharge the Released Parties" of specified claims.  *Id.*  "Released Parties" is a defined term that does not include the Debtors' estates themselves.  *Id*. § 2.1.171.

20.      Section 10.4, however, also exempts certain claims from release.  Specifically, it states that it does not "cause the release of . . . Causes of Action to the extent arising out of conduct that occurred prior to the Petition Date[.]"  *Id.* § 10.4.

**D.      Section 10.5: the FTX DM Global Settlement.**

21.      In late 2023, the Debtors entered into the FTX DM Global Settlement Agreement, which resolved their disputes with FTX Digital Markets Ltd. ("FTX DM") and the Joint Official Liquidators of FTX DM (the "Bahamas JOLs"), including FTX DM's approximately $7.7 billion fraudulent transfer claim and $1.1 billion indemnification claim against the Debtors.  *See*

---

[4]    Under the Plan, "Allowed" claims are claims that (i) have been allowed by the Plan, the Confirmation Order, or a final order of the Bankruptcy Court, (ii) have been allowed or stipulated in writing by the Debtors or by the plan administrator, (iii) are listed in the Debtors' Schedules as not disputed, contingent, or unliquidated (and are not subject to a pending or greater-amount Proof of Claim, objection, estimation request, or similar challenge), or (iv) are evidenced by a valid and timely filed Proof of Claim as to which no objection, estimation request, or other challenge has been filed.  Plan § 2.1.8.  Claims that are not Allowed are "Disputed" claims.  Plan § 2.1.57; *see also id.* §§ 8.1, 8.6.

Disclosure Statement at 77.  That bilateral settlement included explicit mutual releases under which the Debtors and FTX DM agreed to:

> fully, unconditionally and irrevocably release, relieve, waive, relinquish, remise, acquit and forever discharge each other . . . from . . . any and all present and future Claims, cross-claims, counterclaims, third-party claims, demands, liabilities, obligations, debts, liens, damages, losses, costs, expenses, controversies, actions, rights, suits, assessments, penalties, charges, indemnities, guaranties, promises, commitments, or causes of action of whatsoever nature, whether based in contract, tort or otherwise . . . that such Party may have or may have against any other Party since the beginning of time."

*Order Authorizing and Approving the Debtors' and FTX DM's Entry Into, and Performance of Their Obligations Under, (I) The Global Settlement Agreement and (II) The Loan Agreement*, Ex. A § 9.01 [Dkt. No. 6365-1] (Ex. A, the "Approved FTX DM Settlement Agreement").  The settlement was separately approved under Bankruptcy Rule 9019 by both this Court and the Supreme Court of The Bahamas.  *See* Disclosure Statement at 77–78.

22.    The release provision for the FTX DM Global Settlement was then expressly incorporated into Section 10.5 of the Plan, which provides that "[t]he releases in the FTX DM Global Settlement Agreement are hereby expressly incorporated and repeated herein."  Plan §§ 5.3, 10.5.  Section 5.2, by contrast, does not contain its own separate release language, nor is it identified by Section 10.4 as one of the Plan's release mechanisms.  *See id.* § 5.2.

### E.    Section 10.8: Injunction.

23.    Finally, the Plan also contains an injunction provision, set forth in Section 10.8, which affirms that parties that released claims under Article 10 of the Plan are permanently enjoined from pursuing those released claims.  That section states, in relevant part:

> Except as otherwise expressly provided in the Plan or Confirmation Order with respect to Preserved Potential Claims, **the satisfaction and release pursuant to this Article 10 shall also act as a permanent injunction against any Person who has held, holds or may hold Claims, Interests or Causes of Action** from (a) commencing or continuing any action to collect, enforce, offset, recoup or recover with respect to any Claim, liability, obligation, debt, right, Interest or Cause

12

of Action released, settled or exculpated under the Plan or the Confirmation Order to the fullest extent authorized or provided by the Bankruptcy Code, including to the extent provided for or authorized by sections 524 or 1141 thereof, (b) enforcing, attaching, collecting, or recovering by any manner or means any judgment, award, decree, or order on account of or in connection with or with respect to any such Claim or Interest; (c) creating, perfecting or enforcing any encumbrance of any kind on account of or in connection with or with respect to any such Claims or Interests; and (d) asserting any right of setoff that was not validly asserted before Confirmation, or subrogation of any kind on account of or in connection with or with respect to any such Claim or Interest, against any Plan Asset, the Wind Down Entities, any Holder of a Claim or Interest or any initial or subsequent transferee.

*See id*. § 10.8 (emphasis added).

## II.    The Debtors Defend Section 5.2 as a Standard Provision that Does Not Circumvent the Claims Resolution Process.

24.    On August 23, 2024, the Office of the United States Trustee for the District of Delaware (the "U.S. Trustee") filed an objection to the proposed Plan. *Objection of the United States Trustee to Confirmation of First Amended Joint Chapter 11 Plan of Reorganization of FTX Trading, Ltd. and Its Debtor Affiliates* [Dkt. No. 23610]. Among other grounds, the U.S. Trustee objected to Section 5.2 on the ground that it impermissibly "purports to treat the Plan itself as if it were a Rule 9019 'settlement.'" *Id*. ¶ 71. The U.S. Trustee argued that section 1123(b) of the Bankruptcy Code "does not authorize a debtor to unilaterally seek to modify claims in a Chapter 11 plan" and that "[t]he resolution of claims against the Debtors is governed by sections 1129 and 1141." *Id*. ¶¶ 63–71.

25.    In response, the Debtors did not defend Section 5.2 as a self-executing bar to all filed proofs of claim. Instead, the Debtors asserted that Section 5.2 was not novel or unprecedented and used standard, boilerplate language, noting that "several plans approved by this Court contain ***almost identical*** language to Section 5.2 of the Plan." *See Debtors' Omnibus Reply to Objections to Confirmation of the Second Amended Joint Plan of Reorganization* ¶ 79 [Dkt. No. 26039] (the "Debtors' Confirmation Reply") (emphasis added) (citing *In re Mallinckrodt PLC*, Case No. 20-

13

12522 (JTD) (Bankr. D. Del. Feb. 18, 2022) [Dkt. No. 6510]; *In re SiO2 Med. Prods., Inc.*, Case No. 23-10366 (JTD) (Bankr. D. Del. July 17, 2023) [Dkt. No. 466]; *In re Glob. Eagle Ent.*, Case No. 20-11835 (JTD) (Bankr. D. Del. Jan. 29, 2021) [Dkt. No. 753]).

26.     The Debtors also squarely disavowed all suggestions that Section 5.2 would allow them to circumvent the claims resolution process.  The Debtors conceded that section 1123(b)(5) of the Bankruptcy Code does not authorize a debtor "to unilaterally seek to modify claims in a Chapter 11 plan." *Id*. ¶ 81.  And the Debtors affirmed that they were "not attempting to circumvent any requirement imposed by the Bankruptcy Code or the Bankruptcy Rules," adding that the Debtors "satisfy both section 1123(b) of the Bankruptcy Code and Bankruptcy Rule 9019." *Id.*

27.     Ultimately, on October 8, 2024, the Court confirmed the Plan, overruling objections thereto.  *See Findings of Fact, Conclusions of Law and Order Confirming the Second Amended Joint Plan of Reorganization of FTX Trading Ltd. and Its Debtor Affiliates* [Dkt. No. 26404] (the "Confirmation Order").   In that order, consistent with the Debtors' narrow characterization of Section 5.2 in support of confirmation, the Court described the Global Settlement as a compromise made "in consideration for" Plan treatment, including expressly contemplating that Holders of an "Allowed Claim" would have "Distributions made" to them pursuant to Article 7.  *See id.* ¶ 93. The Confirmation Order did not describe Section 5.2 as releasing or expunging any and all claims against the Debtors, including Disputed Claims.  *See id.*

**III.     Months After Confirmation, the FTX Trust First Invokes Section 5.2 to Bar Certain Customer Claims.**

28.     Neither the Debtors nor the FTX Recovery Trust (the "FTX Trust") treated Section 5.2 as a claim-extinguishment device until several months after the Plan was confirmed.  For months before and after confirmation, the Debtors objected to numerous proofs of claim through the ordinary Article 8 claims adjudication process, including by filing dozens of omnibus

14

objections.  The Debtors did not once contend in those objections that any of those proofs of claim were subject to a mass settlement or extinguishment under Section 5.2, even when such claims involved allegations of fraud.  *See*, *e.g.*, *FTX Recovery Trust's One Hundred Fifty-Sixth (Substantive) Omnibus Objection to Certain Overstated and/or Unliquidated Proofs of Claim (Customer Claims)* [Dkt. No. 29729] (the "156th Omnibus Objection") (objecting to certain proofs of claim without invoking Section 5.2); 156th Omnibus Objection, Ex. B at 7 [Dkt. No. 29729-3] (noting that, in support of his claims, one of the customer creditors at issue had alleged that the funds he had deposited in the FTX Exchanges had been "fraudulently liquidated by FTX's fraudulently [*sic*] practices on the Site").

29.     The FTX Trust first improperly invoked Section 5.2 on February 25, 2025— roughly five months after confirmation—in its *One Hundred Sixtieth (Substantive) Omnibus Objection to Certain Overstated Proofs of Claim* [Dkt. No. 29733] (the "160th Omnibus Objection").  There, the FTX Trust objected to certain fraud-based claims brought by customers, including, in particular, certain claims raised by alleged customer creditor Angelo Breen.  In support of its objection, the FTX Trust characterized the Global Settlement as a customer-facing agreement, asserting that "[a]s part of the Global Settlement, customers compromised claims" and, therefore, customers were not entitled to any "incremental distributions" for generalized claims "on the basis of fraud, misrepresentation, misappropriation, breach of fiduciary duty and other similar assertions in connection with the customer accounts and deposited digital assets."  160th Omnibus Objection ¶¶ 13–15.  In other words, the Debtors made the unremarkable assertion that customers who lost their deposits are not entitled to double recovery of (i) Plan treatment and (ii) damages for a claim of fraud in the loss of the customer deposit.

15

30. On June 18, 2025, Angelo Breen filed a response to the 160th Omnibus Objection, contesting the FTX Trust's objection to his claims. *See Response of Claimant to One Hundred Sixtieth (Substantive) Omnibus Objection to Certain Overstated Proofs of Claim* [Dkt. No. 30911]. Breen was an FTX customer who, between April 10 and April 13, 2021, had donated $690,420.00 through his FTX.com account to the FTX Foundation. *See FTX Recovery Trust's Reply to Response of Claimant Angelo Breen to the One Hundred Sixtieth (Substantive) Omnibus Objection to Claims* ¶ 7 [Dkt. No. 32306]. On August 16, 2024, Breen untimely filed a proof of claim, alleging that his donated funds "were likely commingled with other customer deposits and misappropriated." *Id*. ¶¶ 16, 35.

31. On August 12, 2025, the Court held a hearing on the FTX Trust's objection to Breen's proof of claim. After hearing arguments from both parties, the Court ruled from the bench. The Court expressly declined to reach the FTX Trust's untimeliness argument, holding instead that, even assuming the late-filed claim was allowed, Breen did not have a valid claim because he had directed and consented to the transfer of the relevant funds to a charity, and those funds were, in fact, donated as instructed. Aug. 12, 2025 Hr'g Tr. 38:12–39:2 [Dkt. No. 32344]. The Court also stated that even "[i]f there was a valid claim under some sort of fraud, mismanagement, commingling claim, it has been compromised through the global settlement under the plan for the good of all creditors and customers of FTX." *Id*. at 39:15–21 (emphasis added). The Court's second statement was couched within a hypothetical and not necessary for the Court's disposition of that objection. Indeed, the Court's written order sustaining the FTX Trust's objection to Breen's claims did not reference Section 5.2. *See Order Sustaining FTX Recovery Trust's One Hundred*

*Sixtieth (Substantive) Omnibus Objection to Claim Number 96754 and Granting Related Relief* [Dkt. No. 32398].[5]

## IV.   After More than One Year of Litigation, the FTX Trust Belatedly Invokes Section 5.2 to Preclude Seth Melamed from Pursuing Certain Claims in Arbitration.

32.   Seth Melamed, a former executive of FTX Japan, timely filed a number of claims against Debtors, most notably among them Proof of Claim No. 3385 (the "SPA Claim") seeking $35.6 million arising from FTX's April 2022 acquisition of Liquid Group Inc. from Melamed pursuant to a Share Purchase Agreement (the "SPA"). *FTX Recovery Trust's Motion to Enforce Prior Orders that Preclude Seth Melamed From Asserting New Claims in Arbitration* ¶¶ 1–3 [Dkt. No. 35243] (the "Melamed Motion to Enforce"). The SPA Claim expressly asserted "claims for breach of contract, breach of warranty, retained consideration, indemnification, and fraud," including "fraud in the inducement of Claimant to sign the SPA and in the execution, performance and breach of the SPA." *Objection of Seth Melamed to FTX Recovery Trust's Motion to Enforce* ¶¶ 15–16 [Dkt. No. 35411] (the "Melamed Objection to Motion to Enforce"). Melamed cross-moved to compel arbitration of his claims, relying on the arbitration provision in the SPA. *Opposition to Debtors' Amended Objection to Proofs of Claim and Motion for Subordination*

---

[5]   More recently, in 2026—more than a year after confirmation—the FTX Trust cited Section 5.2 in two pending disputes.

*First*, in early 2026, the FTX Trust invoked Section 5.2 to support its objection to the customer claim of Three Arrows Capital Limited ("Three Arrows"). Specifically, on January 5, 2026, the FTX Trust filed its *Reply in Further Support of the Objection of the FTX Recovery Trust to the Amended Proof of Claim Filed by the Joint Liquidators of Three Arrows Capital Ltd.* [Dkt. No. 34259] (the "Three Arrows Reply"). In that reply, the FTX Trust framed the Global Settlement of Section 5.2 as a bargain between the Debtors and their former customers, asserting that "[i]n exchange for **enhanced priority treatment** and other consideration, *customers* released all potential claims relating to the general mismanagement of the FTX Exchanges and the misappropriation of certain assets deposited by customers on the FTX Exchanges." Three Arrows Reply ¶ 220 (emphases added). That dispute remains pending.

*Second*, in February 2026, the FTX Trust invoked Section 5.2 (together with Section 10.8) against the non-customer proofs of claim filed by Alex Mashinsky. *See First Amended Objection to Proofs of Claim Filed by Alex Mashinsky* ¶¶ 24, 41–42 [Dkt. No. 34704]; *Resp. of Alex Mashinsky, Pro Se, in Opposition to the FTX Recovery Trust's First Amended Objection* ¶¶ 2–3, 40–42 [Dkt. No. 35863]. The Mashinsky dispute remains pending.

17

*Pursuant to 11 U.S.C. §§ 510(b) and 510(c)(1) and Cross-Motion to Compel Arbitration* [Dkt. No. 30077].

33.    On July 10, 2024, the Debtors objected to Melamed's claims. *Debtors' Objection to Proofs of Claim Filed by Seth Melamed* [Dkt. No. 20051].  On December 9, 2024, following further briefing, the Debtors amended their objection to Melamed's claim. *Debtors' Amended Objection to Proofs of Claim Filed by Seth Melamed and Motion for Subordination Pursuant to 11 U.S.C. §§ 510(b) and 510(c)(1)* [Dkt. No. 28643] (the "Amended Melamed Objection").  In the Amended Melamed Objection, the Debtors sought (i) subordination of the equity portion of Melamed's claims under section 510(b); (ii) reduction of the cryptocurrency portion of Melamed's claims to values fixed by a court estimation order; (iii) disallowance and expungement (or, alternatively reduction) of Melamed's remaining claims for service fees, a bonus, and administrative expenses; and (iv) equitable subordination of all of Melamed's claims under section 510(c).  Amended Melamed Objection ¶¶ 1, 27.  The Amended Melamed Objection did not contend that any portion of the SPA Claim was outright barred under Section 5.2; indeed, the Debtors did not invoke Section 5.2 at all, even though Melamed's claims were expressly grounded in allegations of fraud.  *See generally* Amended Melamed Objection.

34.    On July 22, 2025, following briefing and oral argument, the Court issued a bench ruling on the Amended Melamed Objection and Melamed's cross-motion to compel arbitration. July 22, 2025 Hr'g Tr. 118:16–129:11 [Dkt. No. 31934].  The Court (i) held that the portion of the SPA Claim relating to unpaid crypto consideration should be valued pursuant to the confirmed Plan and the estimation order which provided USD conversions for crypto, *id.* at 125:16–126:22; (ii) subordinated the portion of the SPA Claim relating to the FTX Consideration Shares under section 510(b), *id.* at 128:2–129:6; (iii) reserved judgment on any indemnification claim arising

from the Crypto Consideration until such claim was "clearly defined," *id.* at 129:7–11; and (iv) granted Melamed's cross-motion to compel arbitration with respect to the SPA Claim only, *id.* at 125:11–13.

35.    These rulings were memorialized in two orders entered July 31, 2025—the *Order Sustaining in Part Debtors' Amended Objection to Proofs of Claim Filed by Seth Melamed* [Dkt. No. 32057] and the *Order Granting in Part and Denying in Part Cross-Motion of Seth Melamed Seeking To Compel Arbitration of the Claims* [Dkt. No. 32058]—neither of which mentioned Section 5.2 or ordered that the SPA Claim (including its fraudulent inducement component) had been released.   Those orders merely directed that claim to arbitration.

36.    On November 12, 2025, Melamed filed a notice of arbitration with the Singapore International Arbitration Centre (SIAC Case No. ARB602/25/VKH).  *See Declaration of Brian D. Glueckstein in Support of FTX Recovery Trust's Motion to Enforce Prior Orders that Preclude Seth Melamed from Asserting New Claims in Arbitration* ¶ 3 [Dkt. No. 35244].

37.    On April 2, 2026, the FTX Trust filed a motion to enforce the Court's prior orders against Melamed and thereby preclude Melamed from asserting new claims in the arbitration. Melamed Motion to Enforce ¶¶ 1–3.  The FTX Trust argued, among other things, that the claims Melamed raised in arbitration were "new claims" not preserved by the SPA Claim or any of Melamed's other filed proofs of claim and thus time barred.  *See id.* ¶ 12.  The FTX Trust further argued that such claims exceeded the scope of the arbitration order, which had referred "Claim No. 3385 only" to arbitration.  *Id.* ¶ 46.  And, after nearly 21 months of litigating with Melamed and for the first time in the context of its dispute with Melamed, the FTX Trust argued that Melamed's arbitration claims "have been conclusively settled and released under the Global Settlement provision of the Plan."  *Id.* ¶ 14 (quoting Plan § 5.2).  The FTX Trust explained that

Melamed's "new claims are based on generalized allegations concerning FTX's financial condition, business practices and handling of assets, and therefore fall squarely within that release and injunction." *Id.*

38.    On April 20, 2026, Melamed filed the Melamed Objection to Motion to Enforce. Melamed noted that the FTX Trust's Section 5.2 release theory "was never asserted by the Debtors/Trust in the lengthy briefing in connection with the Amended Claims Objection," and that the Debtors themselves had "previously described the scope" of Section 5.2 "as being limited to customers." Melamed Objection to Motion to Enforce ¶ 7.

39.    The Court held a hearing on the Melamed Motion to Enforce on May 14, 2026. At that hearing, counsel for the FTX Trust characterized Section 5.2 as barring claims arising from the fraud perpetrated by former FTX Group higher-ups. Specifically, counsel stated that the "impetus" of Section 5.2 was to prevent litigating claims premised on "generalized harm where creditors at large could assert that [Samuel] Bankman-Fried and his associates defrauded people." *See* Ex. A[6] at 59:24–60:02. Counsel also noted that Section 5.2 covers "any cause of action related to" such fraud claims. *See id.* at 60:13–15. Counsel did not argue that Section 5.2 bars all proofs of claim, without limitation, filed against the Debtors.

40.    On June 2, 2026, the Court entered an order granting the Melamed Motion to Enforce. *See Order Granting FTX Recovery Trust's Motion to Enforce Prior Orders that Preclude Seth Melamed From Asserting New Claims in Arbitration* [Dkt. No. 35768] (the "June 2, 2026 Order"). The June 2, 2026 Order enjoined Melamed from pursuing his arbitration claims on the ground that they "are premised on claims that have been compromised, settled, resolved, and enjoined under sections 5.2 and 10.8" of the Plan. June 2, 2026 Order ¶ 2.

---

[6]    Cited excerpts of the May 14, 2026 hearing transcript are attached hereto as **Exhibit A**.

41.     On June 16, 2026, Melamed timely moved for reconsideration of the June 2, 2026

Order.  *See* Motion for Reconsideration.  That same day, Melamed also appealed the June 2, 2026

Order.  *Notice of Appeal* [Dkt. No. 35825]; Motion for Reconsideration ¶ 21.  That appeal,

however, is effectively stayed while the Motion for Reconsideration remains pending.  *See* Fed.

R. Bankr. P. 8002(b)(2).  The deadline to object to the Motion for Reconsideration is July 16, 2026,

and the hearing is currently set for July 23, 2026.

**V.      Silvergate's Proofs of Claim Against the Debtors Are Transferred to Argent for Prosecution.**

42.     On June 30, 2023, Silvergate filed 100 proofs of claim against the Debtors (the

"Silvergate Claims")[7], asserting causes of action for fraud, breach of contract, contractual

indemnification, and civil violations of the RICO Act (18 U.S.C. §§ 1962(c), (d)).  *See Argent*

*Liquidation Trust's Limited Objection to Third Reduction Notice of Proposed Reduction of*

*Disputed Claims Reserve Amount* ¶ 25 [Dkt. No. 35808] (the "Argent Limited Objection"); *FTX*

*Recovery Trust's Response to Argent Liquidation Trust's Limited Objection* ¶ 7 [Dkt. No. 35828]

(the "FTX Response").  The Silvergate Claims and causes of action against the Debtors, which

Silvergate had timely filed over three years ago in these Chapter 11 Cases, were expressly

preserved pursuant to Silvergate's bankruptcy plan and transferred to Argent, as successor to

Silvergate's estates, on March 31, 2026, the date when Silvergate's plan went into effect and

Argent was officially formed.  *See* Argent Limited Objection ¶ 26.

43.     At a high level, the Silvergate Claims are non-customer claims that arose from,

among other things, (i) certain misrepresentations the Debtors made to Silvergate in order to induce

---

[7]     The Silvergate Claims are General Unsecured Claims, as they do not fall into any of the enumerated claim categories and instead assert unsecured pre-petition causes of action for fraud, breach of contract, contractual indemnification, and civil RICO arising from Silvergate's discrete banking relationship with the Debtors.  *See* Plan § 2.1.113; Argent Limited Objection ¶ 25.

Silvergate to provide the banking services to the Debtors, (ii) the Debtors' subsequent misuse of such services, (iii) the Debtors' breaches of the contractual representations, warranties, and covenants set forth in the parties' banking agreements, and (iv) the Debtors' failure to satisfy their contractual indemnification obligations to Silvergate under those agreements; the specific factual bases for the Silvergate Claims are further described in the Argent Limited Objection. *See* Argent Limited Objection ¶¶ 8–27.  As the Silvergate Claims are not customer claims, if and when such claims are allowed, Argent, as a general unsecured creditor, will recover from the general pool and will not receive the priority treatment provided to customers of the FTX Exchanges under Section 5.2.  *See* Plan § 4.3.9.

44.     Shortly after its formation, Argent contacted the FTX Trust to consensually develop a schedule and procedures for Argent's prosecution of the Silvergate Claims as well as the FTX Trust's prosecution of its claims against Argent, as Silvergate's successor.  The parties agreed to prosecute their respective claims in a coordinated and consolidated manner and are in the process of finalizing a proposed schedule.

45.     To be clear, Argent does not seek to bring new, previously unasserted claims or claims based on the Debtors' post-petition conduct.  Instead, Argent seeks to prosecute the timely proofs of claims that Silvergate filed in these Chapter 11 Cases over three years ago and seeks to have its damages liquidated through the very claims allowance and distribution process that the Plan establishes.

**VI.     Argent Objects to the FTX Trust's Proposed Reduction to the Disputed Claim Reserve, and the FTX Trust Responds, Arguing that Argent's Claims Are Barred by Section 5.2.**

46.     On May 26, 2026, the FTX Trust filed the *Third Reduction Notice of Proposed Reduction of Disputed Claims Reserve Amount* [Dkt. No. 35722] (the "Third Reduction Notice"), seeking to reduce the reserve of money held by the FTX Trust to pay Disputed Claims (the

22

"Disputed Claims Reserve") by $600 million, from $2.38 billion to $1.78 billion. *See* Third Reduction Notice.

47.     On June 11, 2026, Argent filed the Argent Limited Objection, objecting, to a limited extent, to the Third Reduction Notice. *See* Argent Limited Objection. Argent argued that further reducing the reserve, while the Silvergate Claims remained unadjudicated and unaddressed by the FTX Trust, may prejudice Argent's (and other unsecured creditors') eventual recovery on those claims. *Id*. ¶¶ 1, 6. Argent noted that the Silvergate Claims assert damages "well over a billion dollars," including approximately $751 million in securities losses, tens of millions of dollars in regulatory settlements and investigative, defense, indemnification, and bankruptcy-related costs, and billions in lost equity value, all before accounting for treble damages under civil RICO. *Id.* ¶¶ 2–3, 27, 33. The merits of the Silvergate Claims and the amount to which Argent is entitled remain unresolved.

48.     On June 16, 2026, the FTX Trust filed the FTX Response, defending the Third Reduction Notice. As its second argument, the FTX Trust asserted that "all claims premised on 'the actual or purported fraud, unjust enrichment, misappropriation, conversion and misconduct of' FTX" and the FTX Group's former executives were conclusively settled and released under the Global Settlement provision of the Plan and permanently enjoined under the Plan's injunction provision, and that "[t]here is no clearer example of claims barred by the Plan's Global Settlement than those set forth in the Silvergate Claims and detailed in the Objection." FTX Response ¶ 3 (internal citations omitted). This was the first time—roughly three years after Silvergate filed the Silvergate Claims and 20 months after the Court confirmed the Plan—that the FTX Trust asserted Section 5.2 barred the Silvergate Claims.

49.     The FTX Trust further argued that Section 5.2 bars not only fraud-based claims but also "breach of contract and indemnity claims" premised on the former FTX Group higher-ups' fraud, contending that the Silvergate Claims, notwithstanding the fact that they arise from a discrete banking relationship in which Silvergate served as the bank for some of the FTX Group entities rather than from any customer relationship, "can never become Allowed Claims as a matter of law" and warrant no dedicated reserve. FTX Response ¶¶ 30, 33.

50.     The Court held a hearing on the Third Reduction Notice on June 18, 2026. At that hearing, the Court remarked that it believed Section 5.2 may bar "all fraud claims or any other type of claim," noting that it had previously "held twice in this case that it did." Ex. B[8] at 19:18–23. In the same discussion, the Court stated its belief that Section 5.2 "[is] limited by subject matter qualifiers" and does "not" apply to "any and all causes of action." *Id.* at 18:15–19.

51.     In response, counsel for Argent noted that the Section 5.2's subject matter qualifiers are merely "illustrative," pointing to the provision's operative "including without limitation" language. *Id.* at 18:20–19:14. Argent's counsel further argued that, if the Plan's drafters had intended to "carve out fraud claims" or to "call out fraud claimants and release their claims, expunge them, effectively, for no value," they could (and should) have done so clearly and unambiguously by, for example, "creat[ing] a class for fraud claimants that received an allocation of zero." *Id.* at 19:4–14. The drafters, however, "chose not to do that." *Id.* at 19:06–07.

52.     Ultimately, the Court granted the requested reduction of the Disputed Claims Reserve but did so on adequacy-of-reserve grounds. *See Order Reducing the Amount of the Disputed Claims Reserve* [Dkt. No. 35851]. The Court did not issue any rulings pertaining to

---

[8]     Cited excerpts of the June 18, 2026 hearing transcript are attached hereto as **Exhibit B**.

Section 5.2.  The Court also indicated, considering Argent's arguments, that the Court "might start to feel uncomfortable" "with further reductions."  Ex. B at 40:23–25.

53.    In light of the Court's comments at the June 18, 2026 hearing regarding Section 5.2 and the reference to the Global Settlement in the June 2, 2026 Order, Argent files this Statement in Support for the purpose of seeking reconsideration of the interpretation of Section 5.2 reflected by the June 2, 2026 Order.

## ARGUMENT

54.    Argent submits this Statement in Support and respectfully urges this Court to reconsider the June 2, 2026 Order to prevent manifest injustice and correct a clear error of law. *See Howard Hess Dental Labs. Inc. v. Dentsply Int'l, Inc.*, 602 F.3d 237, 251 (3d Cir. 2010) (reconsideration warranted "to correct a clear error of law or fact or to prevent manifest injustice"). The Court should reconsider the June 2, 2026 Order to the extent it interpreted Section 5.2 of the Plan as extinguishing and releasing claims without any consideration and without any claims resolution process.  Critically, the Court can clarify or correct the interpretation reflected in the June 2, 2026 Order while ultimately affirming the result it reached in that Order.  *See, e.g.*, *W.P. v. Comm'r of Soc. Sec.*, No. CV 21-2940 (RBK), 2022 WL 2341561, at *2 (D.N.J. June 29, 2022) ("The grant of a motion for reconsideration does not prevent a court from reaching an outcome identical to its prior decision." (citing *Pena-Ruiz v. Solorzano*, 281 F. App'x 110, 111 n.1 (3d Cir. 2008))); *Vaughn v. Consumer Home Mortg. Co.*, 470 F. Supp. 2d 248, 251 (E.D.N.Y. 2007) (granting reconsideration but reaching same result "on grounds other than those initially stated"); *see also Trudeau v. Bockstein*, No. 05-CV-1019, 2008 WL 541158, at *4 (N.D.N.Y. Feb. 25, 2008) ("If the Circuit may affirm a district court judgment 'on other grounds,' the court sees no reason why it cannot affirm its own earlier judgment on other grounds as well." (citation omitted)).

25

55. The June 2, 2026 Order held that Melamed "is enjoined from pursuing the claims . . . because they are premised on claims that have been compromised, settled, resolved, and enjoined under sections 5.2 and 10.8" of the Plan. June 2, 2026 Order ¶ 2. To the extent that holding is construed to mean that Section 5.2 operates to extinguish filed proofs of claim, that construction exceeds the Plan's plain text and works a manifest injustice on creditors who have not received the consideration Section 5.2 contemplates. Section 5.2 does not say claims are "released," "extinguished," or "disallowed." It says they are "compromise[d], settle[d] and resol[ved]" through the provisions of the Plan and conditioned upon the delivery of "classification, treatment, Distributions, releases and other benefits" under the Plan. Plan § 5.2. Argent has not received that consideration. Extinguishing claims before they enter the claims allowance process can hardly be called a "compromise" or a "settlement."

56. The interpretive difficulty is further illustrated by this Court's statement at the June 18, 2026 hearing that Section 5.2 "is limited by subject matter qualifiers" and "is not any and all causes of action." Ex. B at 18:15–19. Respectfully, Section 5.2's text is *not* limited. Just the opposite. Section 5.2 applies to "*all* Claims, Interests and Causes of Action against, by or among the Debtors, *including without limitation*" the specified categories. Plan § 5.2 (emphases added). If the provision means what it says (and it must), then it cannot be limited to only certain subject-matter categories or selectively deployed against some claims but not others. That tension underscores why reconsideration is warranted to correct a clear error of law.[9] The only reading that harmonizes the provision's breadth with the Plan's structure is that Section 5.2 channels all

---

[9] "[T]he 'proper construction' of a contract is a question of law." *Get Kaisered, Inc. v. AKT Franchise, LLC*, No. 21-1033, 2021 WL 3503811, at \*1 (3d Cir. Aug. 10, 2021) (quoting *Exelon Generation Acquisitions, LLC v. Deere & Co.*, 176 A.3d 1262, 1266–67 (Del. 2017)).

claims into the Plan's distribution framework.  On the FTX Trust's reading, Section 5.2 must act to extinguish literally *every* cause of action, even the FTX Trust's own.

57.    Accordingly, reconsideration on the issue of Section 5.2's meaning is appropriate for three reasons.  *First*, the plain terms of Section 5.2, read in the context of the Plan's overall structure and in accordance with rules of contract construction, provide that the Plan channels claims through the claims allowance and distribution process established in Articles 4 and 8.  This is the same meaning that comparable "global settlement" language carries in dozens of other confirmed Chapter 11 plans, including plans confirmed in this District and by this Court.  *Second*, even looking beyond the four corners of the Plan, every piece of extrinsic evidence, including the drafting history, the Debtors' confirmation-related representations, and the FTX Trust's own post-confirmation conduct, refutes any claim-extinguishment interpretation.  *Third*, the FTX Trust's contrary interpretation conflates plan treatment with claim allowance—two distinct concepts that the Bankruptcy Code and the courts applying it hold separate—and cannot be reconciled with the Plan's own claims administration machinery.  *Fourth*, the law does not permit the FTX Trust to settle, release, or expunge filed proofs of claim without actually saying so—clearly and specifically.  Due process requires clear notice and consent before a creditor's property right is taken, and Section 5.2 provides neither.  For these reasons, Argent respectfully requests that the Court reconsider its prior interpretation of Section 5.2 to confirm that the Global Settlement channels filed proofs of claim into the Plan's claims allowance and distribution framework, rather than extinguishing claims wholesale.

**I.     The Plain Language of Section 5.2 Unambiguously Channels Claims Through the Claims Allowance Process to Plan Treatment and Distributions.**

58.    The starting point for interpreting any confirmed plan is its text.  A confirmed plan is construed "apply[ing] contract principles."  *In re Shenango Grp. Inc.*, 501 F.3d 338, 344 (3d

Cir. 2007). The Plan is governed by Delaware law and its contract construction principles, *see* Plan § 2.3, which requires a court to ascertain the parties' intent from the text, reading the Plan "as a whole" and construing provisions to further the Plan's "overall scheme." *In re G-I Holdings, Inc.*, 755 F.3d 195, 202 (3d Cir. 2014) (quoting *E.I. du Pont de Nemours & Co., Inc. v. Shell Oil Co.*, 498 A.2d 1108, 1113 (Del. 1985)); *see In re Filene's Basement, LLC*, 621 B.R. 94, 99 (Bankr. D. Del. 2020).

59. Here, the plain text of Section 5.2 is dispositive, and it forecloses the FTX Trust's interpretation. Section 5.2 provides:

> In consideration of the classification, treatment, Distributions, releases and other benefits provided by the Debtors to their stakeholders under the Plan, on the Effective Date, the provisions of the Plan shall constitute a good-faith compromise, settlement and resolution (the "Global Settlement") of all Claims, Interests and Causes of Action against, by or among the Debtors . . . .

Plan § 5.2. That language reflects a bargain: a resolution of claims in exchange for Plan treatment and Distributions. The Plan's own text identifies the consideration flowing to creditors: "classification, treatment, Distributions, releases and other benefits provided . . . under the Plan." *Id.* Creditors thus participate in the Global Settlement by agreeing to receipt of Plan treatment and Plan Distributions, which are delivered over time as claims are classified, allowed, and paid through the Plan's distribution framework.

60. Distributions with respect to Disputed Claims are held in the Disputed Claims Reserve pending resolution, *id.* § 8.5, and claims that are Allowed upon resolution receive Distributions, *id.* § 8.7. The Plan promises Holders of Allowed General Unsecured Claims—the class in which Argent's claims are classified—payment of 100% of the allowed amount, plus interest. *Id.* § 4.3.9. This is the "consideration" that Section 5.2 identifies: the right to participate in the claims-allowance and distribution process and to recover Plan treatment and Distributions— not, as the FTX Trust contends, the extinguishment of all claims. Under the FTX Trust's reading,

28

the claims of creditors, like Argent, are extinguished before they ever enter the process—without classification, without adjudication, without any opportunity to be heard, and without any possibility of Distribution.    That is no "compromise" or "settlement"; that is unilateral, consideration-less forfeiture.  The claims allowance process *is* the delivery mechanism for the consideration that Section 5.2 contemplates.    Without it, the "classification, treatment, Distributions, releases and other benefits" identified in the opening clause cannot be provided.

61.    The breadth of Section 5.2's language is an important textual feature, and it is fatal to the FTX Trust's reading.  Section 5.2 does not settle a narrow category of claims.  Section 5.2 was explicitly updated to provide that "***all*** Claims, Interests and Causes of Action against, by or among the Debtors, . . . ***without limitation***," are resolved in exchange for Plan treatment.  *Id.* § 5.2 (emphases added).  Every word of that phrase matters.  "All" means all—not some, not most, and not only fraud-related claims.  Section 5.2 lists some specific categories of disputes (for example, subordination and priority disputes, asset-ownership and tracing disputes, and inter-Debtor issues), but it unmistakably "includ[es] ***without limitation***" those kinds of Causes of Action.  *Id.* (emphasis added).  Caselaw makes clear that "including without limitation" must be interpreted broadly and non-exclusively.  *See, e.g.*, *Weyerhaeuser Co. v. Domtar Corp.*, 61 F. Supp. 3d 445, 450 (D. Del. 2014) ("Under Delaware law, contract language such as 'including without limitation' and 'including but not limited to' is interpreted broadly. . . . [T]he Third Circuit has interpreted such language to mean that the following list is 'not exhaustive.'" (first quoting *CorVel Enter. Comp, Inc. v. Schaffer*, Civ. No. 4896, 2010 WL 2091212 at *2 (Del. Ch. May 19, 2010); then quoting *Cooper Distrib. Co. v. Amana Refrigeration, Inc.*, 63 F.3d 262, 280 (3d Cir. 1995))); *accord* 11 U.S.C. § 102(3) ("'includes' and 'including' are not limiting").  So does the Plan itself.  *See* Plan § 2.2(k) (including rules of construction providing that "the words 'includes' and 'including'

are not limiting and mean that the things specifically identified are set forth for purposes of illustration, clarity, or specificity and do not in any respect qualify, characterize, or limit the generality of the class within which such things are included").[10]  Because the categories in Section 5.2 are merely illustrative, the FTX Trust's attempt to isolate subpart (a)—claims for fraud and misconduct of former FTX Group higher-ups—and treat it as the only operative mechanism of claim extinguishment cannot be reconciled with the illustrative nature of this list.  These categories are merely examples of the types of controversies channeled into the Plan process in consideration for Plan treatment, classification, and Distributions.

62.    Moreover, the Plan's defined term "Cause of Action" underscores the breadth of Section 5.2's reach.  "Cause of Action" is defined extremely broadly, incorporating "any action, claim, cause of action, controversy . . . of any kind or character whatsoever" including unliquidated and unknown causes of action arising "in contract or in tort, in law or in equity, or pursuant to any other theory of law, including without limitation"[11] an illustrative list of claims and disputes, including contract claims and objections to filed proofs of claim.  *See* Plan § 2.1.27.  This is a catchall definition, plainly intended to include everything the drafters could conceive of into the Plan process.  The FTX Trust therefore cannot credibly argue that one Cause of Action is barred because it alleges fraud but another survives because it alleges something else.  The words just do not permit that distinction.  If Section 5.2 means what the FTX Trust says it means—that it

---

[10]    Further, plans confirmed in this District regularly incorporate this language, including one of the cases the Debtors cited at confirmation to assert that Section 5.2 is mere boilerplate language.  *See, e.g.*, *Second Amended Joint Plan of Liquidation for Global Eagle Entertainment Inc. and its Affiliate Debtors Under Chapter 11 of the Bankruptcy Code* at 50, Dkt. No. 753-1, *In re Glob. Eagle Ent.*, No. 20-11835 (JTD) (Bankr. D. Del. Jan. 29, 2021) ("the provisions of this Plan shall collectively constitute an integrated and global good faith compromise or settlement of all Claims, Interests and controversies . . . ***including, without limitation*** [specific claims, interests, or controversies related to varying causes of action]" (emphasis added)).

[11]    Here is yet another illustrative, non-exhaustive list which should not be interpreted as cabined to just the specified categories.

extinguishes claims—then it extinguishes *all* of them, without exception.  Every filed proof of claim in these cases would have been wiped out on the Effective Date.  That result is absurd on its face: the Plan would have extinguished claims it simultaneously promises to pay in full, and the FTX Trust has been administering a claims process for claims that no longer exist.

63.    And "against, by or among" means the provision runs in all directions:  if Section 5.2 extinguishes Causes of Action ***against*** the Debtors (as the FTX Trust argues), it must equally extinguish Causes of Action ***by*** the Debtors.  The FTX Trust thus cannot wield Section 5.2 as a sword to extinguish creditor claims while sheathing it as to its own claims.[12]  The only way to harmonize Section 5.2's breadth—all claims, without limitation, in every direction—is to read it as Argent urges: Section 5.2 directs all claims into the Plan's claims allowance and distribution process in consideration for Plan treatment.  The breadth of the language is not a mistake; it is a feature that confirms that *every* claim is directed into the Plan process, not that every claim (or a subset of claims) is destroyed.

64.    Furthermore, Section 10.8 of the Plan—the Plan's injunction provision—confirms this straightforward understanding of Section 5.2's text.  Section 10.8 provides that "the satisfaction and release pursuant to this Article 10 shall also act as a permanent injunction" barring any person from "commencing or continuing any action to collect, enforce, offset, recoup or recover with respect to any Claim, . . . Interest or Cause of Action released, settled or exculpated under the Plan or the Confirmation Order to the fullest extent authorized or provided by the Bankruptcy Code, including to the extent provided for or authorized by sections 524 or 1141 thereof."  Plan § 10.8 (emphasis deleted).  Section 10.8 thus does two things.  First, it anchors the

---

[12]    The FTX Trust is working with Argent to develop a litigation schedule and procedure to prosecute competing claims: Argent's claims against the Debtors, and the Debtors' claims against Silvergate.  The FTX Trust cannot have it both ways.  The FTX Trust is simultaneously prosecuting its own fraud-based claims and causes of action against Silvergate, claims that, under its own theory, must also have been extinguished on the Effective Date.

injunction to the releases granted elsewhere in the Plan, specifically, the Debtors' Release (§ 10.3), the Voluntary Release by Holders of Claims and Interests (§ 10.4), and the Exculpation (§ 10.7). Second, Section 10.8 limits the injunction's reach "to the fullest extent authorized or provided by" sections 524 and 1141 of the Bankruptcy Code. Because the FTX Plan is a liquidating plan and the Debtors received no discharge under section 1141(d)(3), the injunction operates only to enforce the releases actually granted under the Plan. In other words, it does not supply an independent basis for extinguishing claims that were never released.

65.    Read together, Sections 5.2 and 10.8 bar collateral collection and enforcement *outside* the Plan's distribution framework. Section 5.2 channels claims into the Plan's claims allowance and distribution process; Section 10.8 enjoins end-runs around that process. By their terms, neither provision disallows, expunges, or reduces to zero any subset or all filed proofs of claim. To the contrary, they presuppose that claims exist to be channeled. This is precisely how plan injunctions operate throughout Chapter 11 practice: they prevent circumvention of the plan's distribution scheme; they do not effectuate claim extinguishment. *See In re Combustion Eng'g, Inc.*, 391 F.3d 190, 234 (3d Cir. 2004) (channeling injunction directs claims to a particular trust for resolution rather than extinguishing them); *see also* 11 U.S.C. § 524(g) (codifying channeling injunction framework—claims are routed to a trust, not eliminated).

66.    Applying Section 5.2's plain text to Argent, Argent holds claims classified as General Unsecured Claims, which are slated to receive 100% of their allowed amount, plus interest. Plan § 4.3.9. Argent is entitled to this treatment—it is the very "consideration" Section 5.2 contemplates. Neither Argent nor its predecessor, Silvergate, has received that promised consideration. To be clear, neither Silvergate nor Argent has received any treatment or "Distributions" under the Plan as intended by Section 5.2. And they have received no "other

32

benefits." They have received ***nothing*** at all. If Section 5.2 extinguished Argent's (or any creditor's) claims, as the FTX Trust now asserts, then the "consideration" identified in Section 5.2 was never delivered. A compromise without consideration is no compromise at all. *See, e.g.*, Restatement (Second) of Contracts § 71 (1981) (consideration requires a bargained-for exchange); *In re Vantage Drilling Int'l*, 603 B.R. 538, 548 n.5 (D. Del. 2019) ("[A] person receiving a release generally must have provided something of value in return . . . ."). The FTX Trust cannot maintain that claims were extinguished when those claimholders received nothing in exchange.

67. Argent's plain-text reading of Section 5.2 finds further support in (A) the comparable language use in numerous other Chapter 11 confirmed plans, none of which has ever been construed as the FTX Trust now urges, and (B) five established rules of Delaware contract interpretation, each of which independently forecloses the FTX Trust's reading.

### A. Numerous Confirmed Plans with Comparable Language Confirm Section 5.2's Plain-Text Meaning, and None Adopted the FTX Trust's Interpretation.

68. In Chapter 11 practice, the understanding that a "global settlement" provision channels claims through the Plan distribution process is not novel; it is the universally understood meaning of standard global settlement language in confirmed Chapter 11 plans. The Debtors themselves recognized as much. In defending Section 5.2 at confirmation, the Debtors described the provision as boilerplate and told the Court that "several plans approved by this Court contain almost identical language to section 5.2 of the Plan." *See* Debtors' Confirmation Reply ¶ 79 (citing *Fourth Amended Joint Plan of Reorganization (With Technical Modifications) of Mallinckrodt PLC and its Debtor Affiliates Under Chapter 11 of the Bankruptcy Code* at 76, Dkt. No. 6660-1, *In re Mallinckrodt PLC*, No. 20-12522 (JTD) (Bankr. D. Del. Mar. 2, 2022) ("In consideration for the classification, distributions, releases, and other benefits provided under the Plan, on the Effective Date, the provisions of the Plan shall constitute a set of integrated, good-faith

compromises and settlements of all Claims, Interests, Causes of Action and controversies resolved pursuant to the Plan."); *Joint Chapter 11 Plan of Reorganization of SiO2 Medical Products, Inc., and Its Debtor Affiliates* at 45, Dkt. No. 478-1, *In re SiO2 Med. Prods., Inc.*, No. 23-10366 (Bankr. D. Del. July 19, 2023) ("[O]n the Effective Date, the provisions of the Plan shall constitute a good-faith compromise and settlement of all Claims, Interests, Causes of Action, and controversies released, settled, compromised, discharged, or otherwise resolved pursuant to the Plan."); *Second Amended Joint Plan of Liquidation for Global Eagle Entertainment Inc. and Its Affiliate Debtors Under Chapter 11 of the Bankruptcy Code* at 50, Dkt. No. 753-1, *In re Glob. Eagle Ent.*, No. 20-11835 (JTD) (Bankr. D. Del. Jan. 29, 2021) ("the provisions of this Plan shall collectively constitute an integrated and global good faith compromise or settlement of all Claims, Interests and controversies . . .")).[13]  The Debtors cited those plans to reassure the Court and creditors that Section 5.2 was standard, unremarkable language and not a novel mechanism for eliminating filed proofs of claim.

69.      The Debtors were right; this language is standard.  On top of the three plans the Debtors cited, numerous additional confirmed plans in this District contain materially identical provisions.[14]  This Court has itself previously confirmed Chapter 11 plans which also incorporated

---

[13]    The Debtors cited the pre-confirmation version of these three plans; Argent here cites the confirmation versions, which are identical in the relevant respects.

[14]    For plans not confirmed by this Court, see, for example, *Notice of Filing Further Amended (I) Joint Chapter 11 Plan of Liquidation of MVK FarmCo LLC & Its Debtor Affiliates* at 38, Dkt. 858-1, *In re MVK FarmCo LLC*, No. 23-11721 (Bankr. D. Del. Mar. 29, 2024) ("[I]n consideration for the classification, distributions, releases, and other benefits provided under the Plan, upon the Effective Date, the provisions of the Plan shall constitute a good-faith compromise and settlement of all Claims and Interests and controversies resolved pursuant to the Plan.  All distributions made to Holders of Allowed Claims and Allowed Interests, as applicable, in any Class, are intended to be and shall be final."); *Third Modified First Amended Joint Chapter 11 Plan of Lordstown Motors Corp. and Its Affiliated Debtors* at 61, Dkt. No. 1069-1, *In re Lordstown Motors Corp.*, No. 23-10831 (Bankr. D. Del. Mar. 6, 2024) ("[T]he Plan is and shall be deemed a good-faith compromise and settlement of all Claims, Interests, and controversies relating to the contractual, legal, and subordination rights that a Holder of a Claim or Interest may have with respect to any Allowed Claim or Interest, or any distribution to be made on account of such Allowed Claim or Interest.").  For plans confirmed by this Court, see some of the cases cited *infra* n.15.

a standard "global settlement" provision.[15]  These provisions are ubiquitous for the simple reason that they merely direct claims through the Plan claims allowance and distribution framework.  In none of the cases cited herein—and in none of the cases the Debtors themselves cited at confirmation—did any party argue that such a provision released, expunged, or otherwise served to disallow filed proofs of claim.  Indeed, the Debtors denied trying to unilaterally modify claims in their Chapter 11 plan.  *See* Debtors' Confirmation Reply ¶ 81.  And in all its briefing, the FTX Trust has not identified a single case to the contrary.  If its reading were correct, it would mean that every Chapter 11 plan containing this standard language—numerous plans, confirmed for

---

[15]   *See Third Amended Joint Chapter 11 Plan of Reorganization for WOM S.A. and Its Affiliated* Debtors at 75, Dkt. No. 1250-1, *In re WOM S.A. et al.*, No. 24-10628 (Bankr. D. Del. Mar. 7, 2025) ("Pursuant to section 1123 of the Bankruptcy Code and in consideration for the distributions and other benefits provided pursuant to the Plan, the Plan is and shall be deemed to be a good-faith compromise and settlement of all Claims, Interests, and controversies relating to the contractual, legal, and subordination rights that a Holder of a Claim or Interest may have with respect to any Allowed Claim or Interest, or any distribution to be made on account of such Allowed Claim."); *First Amended Joint Prepackaged Chapter 11 Plan of Reorganization of Clover Technologies Group, LLC and Its Debtor Affiliates* at 17, Dkt. No. 143-1, *In re Clover Techs. Grp., LLC*, No. 19-12680 (Bankr. D. Del. Jan. 22, 2020) ("[U]pon the Effective Date, the provisions of the Plan shall constitute a good-faith compromise and settlement of all Claims and Interests and controversies resolved pursuant to the Plan. The entry of the Confirmation Order shall constitute the Bankruptcy Court's approval of the compromise or settlement of all such Claims, Interests, and controversies, as well as a finding by the Bankruptcy Court that such compromise or settlement is in the best interests of the Debtors, their Estates, and Holders of Claims and Interests and is fair, equitable, and is within the range of reasonableness."); *Second Amended Joint Chapter 11 Plan of Reorganization of Hygea Holdings Corp. and Its Affiliated Debtors* at 19, Dkt. No. 576-1, *In re Hygea Holdings Corp.*, No. 20-10361 (Bankr. D. Del. June 15, 2020) ("To the extent provided for by the Bankruptcy Code and in consideration for the classification, distributions, and other benefits provided under the Plan, upon the Effective Date, the provisions of the Plan will constitute a good faith compromise and settlement of all Claims and Equity Interests and controversies resolved pursuant to the Plan."); *Debtors' Joint Prepackaged Chapter 11 Plan of Reorganization* at 49, Dkt. No. 556-1, *In re Quorum Health Corporation, et al.*, No. 20-10766 (Bankr. D. Del. June 30, 2020) ("[T]he provisions of the Plan shall constitute a good-faith compromise and settlement of all Claims, Interests, and controversies relating to the contractual, legal, and subordination rights that a Holder of a Claim or Interest may have with respect to any Allowed Claim or Interest, or any distribution to be made on account of such Allowed Claim or Interest."); *Modified Joint Chapter 11 Plan of Akorn, Inc. and Its Debtor Affiliates* at 20, Dkt. No. 673-1, *In re Akorn, Inc.*, No. 20-11177 (Bankr. D. Del. Sep. 4, 2020) ("[U]pon the Effective Date, the provisions of the Plan shall constitute a good-faith compromise and settlement of all Claims, Interests, Causes of Action, and controversies released, settled, compromised, or otherwise resolved pursuant to the Plan, including those resolved by the UCC Settlement. The Plan shall be deemed a motion, proposed by the Debtors, to approve the good-faith compromise and settlement of all such Claims, Interests, Causes of Action, and controversies, and the entry of the Confirmation Order shall constitute the Bankruptcy Court's approval of such compromise and settlement under section 1123 of the Bankruptcy Code, as well as a finding by the Bankruptcy Court that such settlement and compromise is fair, equitable, reasonable, and in the best interests of the Debtors and their Estates.").

35

years in this District and others—extinguished every filed proof of claim on the effective date. No one has ever understood these provisions to work that way, because they do not.

> **B.** **Section 5.2's Plain-Text Meaning is Reinforced by Established Rules of Contract Interpretation.**

70. The plain text of Section 5.2 is clear on its own, but its meaning is further reinforced by at least five of Delaware's established rules of contract construction, each of which independently forecloses the FTX Trust's reading. *First*, a contract must be read to "giv[e] meaning to each term and avoid[] an interpretation that would render any term mere surplusage." *Filene's Basement,* 621 B.R. at 99 (quoting *Sunline Commercial Carriers*, 206 A.3d at 846); *see G-I Holdings, Inc.*, 755 F.3d at 203–05. *Second*, "general terms of the contract must yield to more specific terms." *Filene's Basement,* 621 B.R. at 99 (quoting *Sunline Commercial Carriers*, 206 A.3d at 846); *see G-I Holdings, Inc.*, 755 F.3d at 205. *Third*, courts will "not [ ] add to or take from" the terms the drafters included to achieve an alternative reading. *Hallowell v. State Farm Mut. Auto. Ins. Co.*, 443 A.2d 925, 927 n.2 (Del. 1982) (quoting *Dover Glass-Works Co. v. Am. Fire Ins. Co.*, 29 A. 1039, 1041 (Del. 1894)). *Fourth*, where the drafter includes specific language in one provision but omits it from another, the omission is presumed intentional. *See, e.g.*, *Active Asset Recovery, Inc. v. Real Est. Asset Recovery Servs., Inc.*, No. CIV. A. 15478, 1999 WL 743479, at *11 (Del. Ch. Sep. 10, 1999) (finding that omission of a specific term in a contract "speaks volumes" about the parties' intent when construing included terms (citing 3 Corbin on Contracts § 552 (1960))); *Fortis Advisors LLC v. Shire US Holdings, Inc.*, No. 12147, 2017 WL 3420751, at *8 (Del. Ch. Aug. 9, 2017).[16] *Fifth*, any ambiguity is construed against the drafter. *Kaiser*

---

[16] *See also Torrent Pharma, Inc. v. Priority Healthcare Distrib., Inc.*, No. N18C-05-094 CEB, 2022 WL 3272421, at *9 (Del. Super. Ct. Aug. 11, 2022) ("Where one contract section omits a term present in another, the omission is presumed intentional."), *cited in Vaughn v. Allstate Prop. & Cas. Ins. Co.*, No. 109, 2025, 2025 WL 3563289, at *3 n.12 (Del. Dec. 12, 2025).

*Aluminum Corp. v. Matheson*, 681 A.2d 392, 398 (Del. 1996) (collecting authorities); *In re NVF Co.*, 309 B.R. 698, 704 (Bankr. D. Del. 2004) (citing *Hudson v. D & V. Mason Contractors, Inc.*, 252 A.2d 166, 168 (Del. Super. Ct. 1969)). Each of these rules is analyzed in greater depth below, and each confirms that Section 5.2 cannot bear the weight the FTX Trust has placed upon it post-confirmation.

       1.   <u>The FTX Trust's Reading Renders Entire Articles of the Plan Superfluous.</u>

71.    First, courts cannot read contracts to render provisions superfluous. *Filene's Basement*, 621 B.R. at 99; *G-I Holdings, Inc.*, 755 F.3d at 203–05. The FTX Trust's construction—that Section 5.2 extinguishes all claims as the "including without limitation" language requires—cannot be reconciled with numerous other provisions of the Plan.

72.    *Article 8*. The Plan establishes a comprehensive post-Effective Date process for resolving filed proofs of claim. The Plan Administrator retains authority to object to, litigate, settle, and adjust claims. Plan §§ 8.1–8.3. Distributions with respect to Disputed Claims are held in the Disputed Claims Reserve, which is expressly maintained "on account of Disputed Claims that may be subsequently Allowed after the Effective Date." *Id.* § 8.5. No distribution is made on account of a Disputed Claim unless and until it becomes an Allowed Claim. *Id.* § 8.6. And claims that are allowed upon resolution of the dispute receive Distributions. *Id.* § 8.7. Each of these provisions presupposes that the filed claims survive confirmation and proceed through the allowance process. If Section 5.2 had already extinguished "all Claims, Interests and Causes of Action against, by or among the Debtors, . . . without limitation," *id.* § 5.2, then there would be nothing to object to, no reason to hold reserves, and nothing to pay upon allowance. The FTX Trust's reading would make Article 8 nothing more than letters on a page.

73.    *Article 4*. The Disputed Claims Reserve applies to all Disputed Claims that may subsequently be Allowed through the Plan process after the Effective Date—without any carve-

out for fraud claims or any other specific category.  And the Plan guarantees Holders of Allowed General Unsecured Claims, like Argent's, payment in full: 100% of the allowed amount, plus interest.  Plan § 4.3.9.  Notably, neither Section 4.3.9 nor the definition of "General Unsecured Claim" contains any exception for fraud claims or any specific category of claims.  That promise of 100% payment in full, for any and all kinds of Allowed General Unsecured Claims, is the very "classification, treatment, Distributions, releases and other benefits" that Section 5.2 identifies as the consideration for the Global Settlement.  If claims are extinguished before they can be classified, allowed, and paid, then that promise of 100% payment in Section 4.3.9 (or any section of Article 4) is empty; it becomes a promise that can never be fulfilled.

74.　　***Section 5.17***.  The same defect affects the Plan's preservation of Causes of Action. Section 5.17's function is straightforward; it ensures that the FTX Trust retains the ability to pursue the estate's own Causes of Action after the Effective Date, including, as relevant here, the Debtors' fraud-based claims against Silvergate.  Plan § 5.17; Confirmation Order ¶ 122.  But if the FTX Trust's interpretation is accepted that Section 5.2 extinguished "all Claims, Interests and Causes of Action against, by or among the Debtors . . . without limitation" on the Effective Date, then Section 5.17 has nothing left to preserve.  Section 5.2 says "by or among," not just "against."  The FTX Trust's own claims, including its purported claims against Silvergate, are "Claims" or "Causes of Action" "by" the Debtors.   The FTX Trust cannot have it both ways.

75.　　***Section 10.4***.  The Plan's "Voluntary Release by Holders of Claims and Interests" provides that creditors who do not affirmatively opt out "shall be deemed to [have] conclusively, absolutely, unconditionally, irrevocably and forever release[d]" certain claims against the defined Released Parties in exchange for the implementation of the Plan and distribution of proceeds.  Plan § 10.4.  Section 10.4 is the Plan's mechanism for creditor-side releases, and it operates only upon

38

either affirmative consent or deemed consent through a failure to opt out. *See* Disclosure Statement at 157–58. Importantly, the "Released Parties" is a defined term that does not include the Debtors' estates themselves. Plan § 2.1.171. Moreover, Section 10.4 expressly carves out from even this consent-based release "Causes of Action to the extent arising out of conduct that occurred prior to the Petition Date."[17] *Id.* § 10.4. The Silvergate Claims arise from pre-petition conduct and thus fall squarely within this carve-out, and so the Debtors explicitly exempted such claims from even the Plan's own consent-based release mechanism. If Section 5.2 already effected a broader extinguishment of all claims on the Effective Date—without consent, without an opt-out mechanism, and without Section 10.4's express carve-outs—the entire apparatus of Section 10.4 would be superfluous.

76.    These are but a few examples, and they are devastating to the FTX Trust's position. The FTX Trust's reading would reduce the Disputed Claims Reserve, the claims-objection and allowance machinery, the distribution-after-allowance provisions, Article 4's promise of payment in full, Section 5.17's preservation of Causes of Action, and Section 10.4's opt-out release mechanism to mere surplusage. Each has work to do *only* if claims survive Section 5.2 and are channeled into the Plan's claims-allowance and distribution process. Indeed, Section 5.2, as part of Article 5, is meant to "Implement[]" the Plan—that is, to effectuate the Plan's other provisions, not nullify them. *See* Plan § 5. The sole interpretation that gives effect to every Plan term is that Section 5.2 compromises, settles, and resolves claims *in exchange for* Plan treatment, leaving filed

---

[17]    Notably, Section 10.4 also carves out from release "any Preserved Potential Claims that are otherwise transferred to, and may be prosecuted by, the Wind Down Entity pursuant to the terms of the Plan." Plan § 10.4. "Preserved Potential Claims" are defined as the "Causes of Action set out in the Plan Supplement," Plan § 2.1.156, which, in turn, defines "Cause of Action" as "hav[ing] the meaning assigned to [it] in the Plan," Liquidating Trust Agreement at § 1.1(l), Dkt. No. 26226-3, which, in turn, defines "Cause of Action" to encompass "any claim against Persons or Entities that are not released under the Plan, including the Preserved Potential Claims," Plan § 2.1.27. Through these circular definitions, the "Preserved Potential Claims" carved out from Section 10.4's release encompass the same universe of Causes of Action defined under the Plan—that is, effectively *everything*.

proofs of claim to be allowed or disallowed, and paid, through the process the Plan itself establishes. It is the construction the Court should adopt.

2. The Plan's Specific Provisions Govern Over Section 5.2's General Recital.

77. The rule that "specific" provisions "control[] over general" ones compels the same result. *See G-I Holdings, Inc.*, 755 F.3d at 205 (brackets omitted). Section 5.2 is a general recital: it declares that the provisions of the Plan constitute a "good-faith compromise, settlement and resolution" of "all Claims, Interests and Causes of Action" in exchange for Plan classification, treatment, Distributions, releases, and other benefits. Plan § 5.2. It prescribes no specific deadlines, procedures, or standards for the allowance or disallowance of any individual claim. The Plan's treatment of individually filed claims and its release mechanisms are instead more specifically addressed by other provisions, and those provisions govern. As described above, Article 8 prescribes the exclusive process for resolving individual claims—who may object, how disputes are resolved, when reserves are established, and under what circumstances a claim may be expunged or disallowed—and Section 10.4 establishes a separate, consent-based framework for creditor releases, operating through defined parties, an opt-out mechanism, and express carve-outs. Each of these provisions governs the same subject the FTX Trust reads into Section 5.2—the disposition of filed claims—but does so with the operative detail that Section 5.2 lacks.

78. Courts have consistently held that generic plan language cannot do the work of these specific provisions. In *In re Westinghouse Electric Co.*, the reorganized debtor argued—as the FTX Trust does here—that a plan's "global settlement of all disputes" provision barred a creditor's filed claims. The court declined to so read it, holding that expansive "global" settlement language "is not enough" to bar claims as a matter of law, and observing that "[i]f the intent was to release and bar any claims that were not being allowed . . . then the usual practice would have been to say exactly that." No. 17-10751 (MEW), 2019 WL 4555990, at *6–7 (Bankr. S.D.N.Y.

Sep. 19, 2019).  The court held that the "usual implication" of a plan's specific release provisions is that the claims not addressed by them "have not been released."  *Id.* at \*6.  The same analysis applies here: the Plan lists the claims and parties it releases in Article 10, and it identifies the limited circumstances in which claims are expunged or disallowed in Article 8.  Section 5.2 does none of this.

79.      Other caselaw confirms that only specific language will do.  In *Hernandez v. Larry Miller Roofing, Inc.*, the Fifth Circuit held that "generic language" in a confirmed plan purporting to release claims "was not sufficiently specific" to release a creditor's claim, because the released party "[was] not identified by name" and "nowhere [did] the Plan mention anything related to [the] claim."  628 F. App'x 281, 283, 287–88 (5th Cir. 2016).  A plan release is enforceable only where it specifically identifies the released parties and the released claims.  *Id.* at 285–88.  Section 5.2 does none of this: it does not identify Argent, it does not identify any specific filed proof of claim, and it does not even use the word "release."  In *In re Applewood Chair Co.*, the Fifth Circuit declined to give preclusive effect to a plan's general release—one providing that confirmation "shall discharge the Debtor, its officers, shareholders and directors from all claims that arose prior to Confirmation"—because the plan "contained no provision specifically releasing" the claim at issue.  203 F.3d 914, 916, 919–20 (5th Cir. 2000).  And the court in *In re Voyager Digital Holdings, Inc.* refused to approve a release of the debtors' claims that was "deliberately as broad and all-encompassing as possible, untethered to any actual review of many of the claims that would be subject to the release," holding that such a release "is not . . . tailored to claims that have actually been reviewed and assessed."  649 B.R. 111, 131–32 (Bankr. S.D.N.Y. 2023).  The common thread is that a plan's general language—no matter how broadly worded—cannot substitute for the

specific provisions that govern the disposition of filed proofs of claim.  The FTX Trust's reading of Section 5.2 suffers from precisely the defects these courts identified.

80.     The FTX Trust would read Section 5.2's general recital to accomplish what the Plan's specific provisions do not: the wholesale disallowance of claims outside of Article 8's claims-allowance process and the release of creditors' claims outside Article 10's defined, consent-based release framework.  Such a reading is not permissible.  Instead, Section 5.2 must be harmonized with, and read subordinate to, the specific provisions governing claim allowance and releases.  When it is, the answer is clear: Section 5.2 provides the general framework—claims are compromised and resolved through the Plan in exchange for consideration—while Articles 4, 8, and 10 supply the specific process by which that compromise is carried out.

### 3.   The Debtors Knew How to Extinguish Claims and Chose Different Language in Section 5.2.

81.     The FTX Trust's interpretation of Section 5.2 also runs headlong into the rule that courts may "not [ ] add to or take from" the terms the contract drafters included to achieve an alternative reading.  *See Hallowell*, 443 A.2d at 927 n.2 (quoting *Dover Glass-Works Co.*, 29 A. at 1041); *see also Coca-Cola Bottling Co. of Shreveport v. Coca-Cola Co.,* 769 F. Supp. 671, 706–07 (D. Del. 1991) (a court may not "rewrite the contract" or read an additional requirement into it under the guise of interpretation).  Section 5.2 contains no words of disallowance, no words of expungement, and no words of forfeiture.  The FTX Trust's reading would add to Section 5.2 a claim-extinguishing effect the Debtors did not write.  But a court's task is "to ascertain the legal import of the language employed" in the contract, not to supply the terms a party now wishes it contained.  *See Hallowell*, 443 A.2d at 927 n.2 (quoting *Dover Glass-Works Co.*, 29 A. at 1041).

82.     The omission of such language was not an oversight.  The Plan's drafters had no shortage of claim-extinguishing vocabulary at their disposal, and they deployed it with precision

42

elsewhere in the Plan whenever they intended those consequences. Section 8.3, captioned "Expungement and Disallowance of Claims," identifies the limited circumstances in which a claim may be disallowed or expunged. For example, a paid, satisfied, amended, duplicated, or superseded claim "may be adjusted or expunged on the Claims Register," Plan § 8.3.1, and claims subject to section 502(d) "shall be deemed disallowed," *id.* § 8.3.2. Section 6.2 provides that claims relating to the rejection of an executory contract or unexpired lease that are not filed by the bar date are "automatically disallowed, forever barred from assertion." *Id.* § 6.2. And, as described above, Section 10.4 provides that creditors who do not opt out "shall be deemed to [have] conclusively, absolutely, unconditionally, irrevocably and forever release[d]" certain claims for consideration. *Id.* § 10.4. The Debtors used none of these terms in Section 5.2. Instead, they chose "compromise, settlement and resolution"—words connoting a process, not a wholesale destruction. This Court should enforce the words the drafters wrote, not the words the FTX Trust now wishes it had written.

4. Section 5.2 Is Absent from the Plan's Release and Expungement Provisions.

83. Neither the Plan's enumerated release provisions (§§ 10.3, 10.4, 10.7) nor the Plan's enumerated grounds for expungement in Section 8.3 reference claims "settled" under Section 5.2. That absence "speaks volumes" and should be dispositive. *See Active Asset Recovery, Inc.*, 1999 WL 743479, at *11. The *expressio unius* rule teaches that because the Plan specifies mechanisms by which claims are released and the circumstances in which they are expunged, no additional, unstated mechanism of extinguishment may be read into those provisions. *See Fortis Advisors LLC*, 2017 WL 3420751, at *8 (finding *expressio unius* rule, i.e., "to express or include one thing implies the exclusion of the other," "particularly apt" in interpreting a contract).

84. *In re Celsius Network LLC* illustrates what genuine claim-extinguishment language looks like. The Celsius plan contained *both* a broad global settlement provision materially

identical to Section 5.2—providing that "the provisions of the Plan shall constitute a good-faith compromise and settlement of all Claims, Interests, Causes of Action, and controversies released, settled, compromised, discharged, or otherwise resolved pursuant to the Plan"—*and* a separate, narrower "Class Claim Settlement" provision. *See* Dkt. No. 3972-1 at Art. IV.B.1, IV.B.8, *In re Celsius Network LLC*, No. 22-10964 (Bankr. S.D.N.Y. Nov. 9, 2023); *In re Celsius Network LLC*, 659 B.R. 850, 855–56 (Bankr. S.D.N.Y. 2024).  It was the Class Claim Settlement, not the global settlement provision, that expressly extinguished claims: it provided that the proofs of claim of participants who did not opt out "shall be expunged from the Claims Register and shall be of no further force and effect." *Celsius Network*, 659 B.R. at 856.  The Celsius plan drafters—and all interested parties—thus understood that general global settlement language does not, by itself, expunge claims. *See* Dkt. No. 3972-1 at Art. IV.B.1, *In re Celsius Network LLC*, No. 22-10964 (global-settlement provision lacking statement that it wipes out filed proofs of claim).  That is precisely why they drafted a separate, specific provision to accomplish that result.

85.     To be clear, there is no provision anywhere in the Plan that uses the words "expunged" or "disallowed" in connection with Section 5.2.  There is no opt-out mechanism tied to Section 5.2.  And there is no defined consideration provided for any purported extinguishment effected by Section 5.2 on the Effective Date.  Had the drafters intended Section 5.2 to expunge filed proofs of claim—as the Celsius drafters intended with their Class Claim Settlement—they knew exactly how to draft such a provision.  They chose not to.  The contrast between the two plans confirms that Section 5.2, standing alone, does not and cannot accomplish any wholesale extinguishment the FTX Trust now urges.

**II.    Even if Section 5.2 Were Ambiguous (It Is Not), Extrinsic Evidence Refutes the FTX Trust's Current Reading of Section 5.2.**

86.    As demonstrated above, Section 5.2 is not ambiguous: its plain terms, the Plan's structure, and every applicable rule of contract construction compel a single reading.  But even if this Court were to conclude that Section 5.2 is genuinely susceptible to more than one reasonable interpretation, the result would be the same.  Every piece of extrinsic evidence—the drafting history, the disclosures concerning the Global Settlement, the Debtors' representations at Plan confirmation, the Confirmation Order itself, and the FTX Trust's own post-confirmation conduct—confirms that Section 5.2 was understood to be a channeling provision and was never intended to extinguish any filed proofs of claim, fraud-related or otherwise.  *See Eagle Indus., Inc. v. DeVilbiss Health Care, Inc.*, 702 A.2d 1228, 1233 n.11, 1234 (Del. 1997) (explaining that when "the meaning and application of contract terms are uncertain, a court" must "consider[] extrinsic evidence," and that "relevant extrinsic evidence is that which reveals the parties' intent *at the time they entered into the contract*") (emphasis in original).  And the well-settled rule is that any genuine ambiguity is construed against the drafter.  *Kaiser Aluminum*, 681 A.2d at 398.  The Debtors drafted the Plan, and the FTX Trust is their successor; both were represented by the same counsel, Sullivan & Cromwell LLP.[18]  The FTX Trust therefore cannot claim the benefit of an ambiguity of its predecessors' (and its own counsel's) creation, and any doubt as to whether Section 5.2 effects a wholesale disallowance of filed proofs of claim must be resolved against it.

87.    ***Debtors' Drafting History***.  The operative language of Section 5.2 first appeared in the Draft Plan, filed on July 31, 2023.  Between the Draft Plan and the First Filed Plan, filed on December 16, 2023, the Debtors revised Section 5.2 to expand the scope from "*various* Claims,

---

[18]    *Compare* Debtors' Confirmation Reply, *with FTX Recovery Trust's Response to Argent Liquidation Trust's Limited Objection* [Dkt. No. 35828].

Interests, Causes of Action, controversies and disputes *arising from or related to*" the specified categories to "*all* Claims, Interests and Causes of Action against, by or among the Debtors, including *without limitation*" the specified categories.  *Compare* Draft Plan § 5.2 (emphases added), *with* First Filed Plan § 5.2 (emphases added).  After December 16, 2023, the Debtors did not revise the language of Section 5.2 any further through the final Plan filed on October 8, 2024.  The drafting history thus shows that the Debtors deliberately broadened only the *scope* of the claims channeled into the Plan process—from "various" to "all" claims, and from "arising from or related to" to "including without limitation" certain categories.  What the Debtors did not do, at any point in the drafting process, was add language providing that claims would be extinguished, disallowed, expunged, or released.  The expansion went to breadth, not consequence.  So, while the Debtors cast a wider net, they did not change what the net does.

88.     ***Debtors' Disclosure Statement***.   The manner in which the Debtors disclosed Section 5.2 to creditors throughout the Plan drafting process confirms that nobody (Debtors or creditors) reasonably understood Section 5.2 as intended to operate as a comprehensive claim extinguishment mechanism.  At no point does the Disclosure Statement disclose that Section 5.2 was intended to, would, or, indeed, *could* have the breathtakingly preemptive effect the FTX Trust now contends it to have.  The Disclosure Statement's description of the Global Settlement is little more than a verbatim copy-paste of Section 5.2's Plan text, with no additional substantive disclosure—no identification of any specific creditor whose claims would be released, no discussion of any consent or opt-out mechanism, and no description that the consequence of Section 5.2 would be the destruction of claims before creditors could access consideration.  *See* Disclosure Statement at 114–15.

89.     That description (or lack thereof) stands in stark contrast to the Debtors' description of the Plan's *actual* negotiated settlements.  The Customer Priority Settlement, for example, was the product of extensive negotiations with the Official Committee, the Ad Hoc Committee, and the Class Action Claimants[19]—what the Debtors' own counsel described as a "critical stone" that "resolved after many months of discussion" the "dispute between FTX and all of its organized customer constituencies concerning whether digital asset entitlements should be treated as claims or property interests" and whether "customers should have some priority over general unsecured creditors."  Oct. 7, 2024 Hr'g Tr. 10:13–11:3.  The Disclosure Statement describes the "central and highly controversial issue" of customer property interests, the parties involved, the priority structure, and the rationale for resolving the litigation.  *See* Disclosure Statement at 25, 88–91; *see also* Oct. 7, 2024 Hr'g Tr. 133:3–135:5.  The relevant outcome of the Customer Priority Settlement, addressing the waterfall of recoveries, is set forth in the second half of Section 5.2, but that settlement itself is not discussed elsewhere in the Plan.

90.     Similarly, the FTX DM Global Settlement, which resolved FTX DM's approximately $7.7 billion fraudulent transfer claim and $1.1 billion indemnification claim, was a bilateral agreement that Debtors' counsel described as having been "worked out" over many months of mediation and that was "already been approved by Your Honor and the Court in the Bahamas."  Oct. 7, 2024 Hr'g Tr. 10:4–12.  The FTX DM Global Settlement included explicit mutual releases backed by specific consideration and was separately approved under Bankruptcy Rule 9019.  *See* Disclosure Statement at 76–78; Approved FTX DM Settlement Agreement § 9.01.  The release provisions of the FTX DM Global Settlement were then expressly incorporated into Section 10.5 of the Plan by specific reference.  Plan §§ 5.3, 10.5.

---

[19]   To be clear, Silvergate is not a Customer nor a Class Action Claimant.

91.     Section 5.2, by contrast, has none of these characteristics or descriptions: no separate motion, no separate approval, no bilateral negotiation, no identified parties, and no incorporation into the Plan's release provisions.  Its operative language regarding the Plan provisions constituting "a settlement, compromise, and resolution of all" claims has remained unchanged since the First Filed Plan in December 2023—not because it was the product of careful, settlement-specific drafting, but because it is standard boilerplate language that required no further negotiation.  If Section 5.2 were extinguishing billions of dollars of filed proofs of claim without consent and without consideration, it would be by far the most consequential settlement in these Chapter 11 Cases, while receiving less disclosure and attention throughout the drafting process than any of the Plan's actual settlements.

92.     ***Debtors' Representations at Confirmation***.  In support of Plan confirmation, the Debtors described the language used in Section 5.2 as standard and boilerplate, noting that nearly identical language had been used in several plans approved by this Court.  *See* Debtors' Confirmation Reply ¶ 79 (collecting plans).  As demonstrated above, that was true, and in none of those plans was such language ever construed to extinguish filed proofs of claim.  The Debtors further affirmed that they did not intend to use the Plan to unilaterally modify the claims against them nor to avoid the claims resolution process provided by the Bankruptcy Code.  *See id.* ¶ 81; *see also id.* ¶ 36 (in response to concerns raised by a customer creditor on the proposed Plan's impact on its claims, noting that such creditor's "due process rights are protected by the claims objection process").  Indeed, in the Confirmation Order, consistent with the Debtors' narrow characterization of Section 5.2, the Court described the Global Settlement as a compromise made "in consideration for" Plan treatment, including expressly contemplating that Holders of an "Allowed Claim" would have "Distributions made" to them pursuant to Article 7.  *See*

48

Confirmation Order ¶ 93. The Debtors' representations around confirmation—that Section 5.2 was boilerplate and that the Debtors were not circumventing the claims process—are contemporaneous and reliable evidence of the intent underlying Section 5.2, and they are flatly irreconcilable with any extinguishment theory the FTX Trust now advances.

93.        ***FTX Trust's Post-Confirmation Conduct***. To the extent relevant, the FTX Trust's own behavior after Plan confirmation reinforces what every other piece of evidence confirms. The FTX Trust's extinguishment theory was never raised at confirmation. It first surfaced in the 160th Omnibus Objection, filed roughly five months later, and even then, the theory was invoked narrowly, against a single customer's fraud claims. *See supra* ¶ 29. In the preceding months, claims objections were prosecuted, including against fraud-premised claims, through the ordinary Article 8 process without the FTX Trust once invoking Section 5.2. *See supra* ¶ 28. The Debtors' pre-confirmation representations about their Plan—that Section 5.2 was standard boilerplate and that the Debtors were not circumventing the claims allowance process—should control here. *See Eagle Indus*, 702 A.2d at 1233 n.11 ("[R]elevant extrinsic evidence is that which reveals the parties' intent *at the time they entered into the contract*.") (emphasis in original).

94.        In sum, whether this Court analyzes Section 5.2 on its face or looks beyond the four corners of the Plan, the answer is the same. Section 5.2 directs claims into the Plan's claims allowance and distribution process in consideration for Plan treatment. No creditor's filed proof of claim was quietly extinguished on the Effective Date. The FTX Trust's contrary reading finds no support in any Plan provision, rule of contract construction, pre-confirmation conduct, or other comparable Chapter 11 plan—because it was invented after the fact to serve a litigation objective.

### III.    The FTX Trust's Interpretation Conflates Plan Treatment with Claim Allowance.

95.        The FTX Trust's contrary interpretation of Section 5.2 rests on a conflation of two distinct concepts—plan "treatment" and claim "allowance." The Bankruptcy Code and the courts

49

applying it have long held these separate.  Plan treatment determines *how* an allowed claim is paid—its classification, priority, and the form, timing, and process of distribution.  Claim allowance determines *whether* a claim is valid and, if it is, in what amount it will be recognized.  These are separate and distinct processes that serve different functions within the bankruptcy system, and they are governed by different provisions of the Code and Rules.  *See, e.g.*, *In re AIO US, Inc.*, 677 B.R. 509, 542 (Bankr. D. Del. 2025); *In re Boy Scouts of Am.*, No. 11532, 2024 WL 459571, at *13 n.65 (Bankr. D. Del. Feb. 5, 2024) (citing *In re NorthEast Gas Generation, LLC*, 639 B.R. 914, 920 (Bankr. D. Del. 2022), as "recognizing that allowance of claim and treatment of claim are separate concepts"), *aff'd*, 772 F. Supp. 3d 496 (D. Del. 2025).  The FTX Trust's reading collapses that distinction, treating Section 5.2, a provision that governs how claims are channeled and administered through the Plan, as though it discreetly adjudicated the allowance of every filed proof of claim.  It could not and did not.

96.    *In re AIO US, Inc.*, 677 B.R. 509, confirms both the distinction between "treatment" and "allowance" and the distinction's significance.  The court explained that the "process of fixing the amount of the otherwise unliquidated claims" is understood as "allowance," while providing the ratable share of recoveries is "treatment."  *Id.* at 542.  This distinction, the court explained, "is an important one":

> If a class of creditors accepts a plan's proposed "treatment" of that class, the class's acceptance can bind an individual creditor in that class who opposes that treatment.  But every individual claimant is entitled to the protections provided by the statutory process of determining the allowed amount of that creditor's claim.

*Id.*  The court concluded that "[b]ecause claims allowance is not a matter on which the vote of a majority can bind a minority, the Court does not believe it correct to describe the mechanism of resolving unliquidated claims as part of a plan's 'treatment' of a class of creditors."  *Id.* at 543.

50

97.    Other courts have applied the same treatment-versus-allowance distinction and reached the same conclusion.  In *In re Yellow Corp.*, the court held that "[c]reditors are entitled to a judicial determination on the allowance or disallowance of their claims," and that a bankruptcy court "has a statutory duty to decide on the allowance or disallowance of the claim."  676 B.R. 516, 524, 528 & n.13 (Bankr. D. Del. 2025) (quoting 11 U.S.C. § 502(a)).  The court further held that a plan settlement may not be deployed to "effectively moot out a pending claim objection by a party in interest."  *Id.* at 524.  In *LVNV Funding, LLC v. Harling*, the Fourth Circuit explained that "[n]o provision of the Bankruptcy Code provides for the determination of the merits of an individual unsecured claim . . . as part of plan confirmation"; rather, "that function is reserved by statute for the claims allowance procedure, which stands separate and apart under the Bankruptcy Code from plan confirmation."  852 F.3d 367, 372 (4th Cir. 2017) (citing 11 U.S.C. §§ 501–502).  And in *In re Hale*, the court drew the same line: "[t]he plan confirmation process is separate and distinct from the claims adjudication process."  359 B.R. 310, 316 (Bankr. E.D. Wash. 2007).

98.    Applied here, Section 5.2 is a *treatment* provision.  It determines how claims are channeled and administered—through the Plan's distribution and recovery framework under Articles 4 and 8, rather than through litigation outside the Plan.  It does not determine whether individual claims are allowed, disallowed, or of any particular value.  Again, the Debtors denied trying to unilaterally modify claims in the Plan.  *See* Debtors' Confirmation Reply ¶ 81.  Those are questions of *allowance*, and the Bankruptcy Code reserves them to the claims allowance process under section 502, a process the Plan itself implements through Article 8.  The FTX Trust conflates these concepts, asking this Court to read a general channeling provision as having adjudicated allowance (more accurately, the disallowance) of proofs of claim in these cases without individualized determination and without any of the protections the Bankruptcy Code

51

affords to creditors in the claims-allowance process.  Had the Plan attempted to cast Section 5.2 as "a mechanism of resolving unliquidated claims as part of a plan's 'treatment' of a class of creditors," *AIO*, 677 B.R. at 543, that attempt would have proceeded on "a misapprehension of federal bankruptcy law," *id.* at 546, and would have rendered the Plan patently unconfirmable, because a bankruptcy plan cannot cut off an individual claimant from the statutory claims-allowance process.  *See id.* at 542 & n.183 (citing *In re Filex, Inc.*, 116 B.R. 37, 40 (Bankr. S.D.N.Y. 1990) (noting a plan was "patently unconfirmable under Chapter 11 of the Bankruptcy Code because it provide[d] that all objections or disputes as to claims w[ould] be resolved by an arbitrator in accordance with the rules of the American Arbitration Association rather than by th[e] court in accordance with 11 U.S.C. § 502"); *In re Butcher*, 459 B.R. 115, 130 (Bankr. D. Colo. 2011) (finding a plan unconfirmable where it sought to "cut off" the Bankruptcy Code's claims allowance process and noting that the court was "unaware of arguments in the Chapter 11 context that plan confirmation should cut off the orderly claim allowance process set out in the Bankruptcy Code and the Rules")).  Such a construction is not one that this Court should adopt.  Indeed, the confirming Court essentially already rejected it by confirming the Plan to begin with.

IV.    **The FTX Trust's Interpretation Raises Serious Due Process Concerns.**

99.    On top of failing as a matter of contract interpretation and conflating claims allowance and treatment, the FTX Trust's reading of Section 5.2 raises grave constitutional concerns that independently require its rejection.  A cause of action for damages is a property right. *In re Real Est. Title & Settlement Servs. Antitrust Litig.*, 869 F.2d 760, 768 (3d Cir. 1989) (citing *Mullane v. Cent. Hanover Bank & Tr. Co.*, 339 U.S. 306, 320 (1950)).  Due process requires that before such property right is taken, the holder must receive "notice reasonably calculated, under all the circumstances, to apprise interested parties of the pendency of the action and afford them an opportunity to present their objections." *Mullane*, 339 U.S. at 314.  Where a creditor is

52

not afforded due process, "a plan of reorganization and confirmation order that purport to discharge claims will not do so." *Wright v. Owens Corning*, 679 F.3d 101, 107 n.6 (3d Cir. 2012); *see id.* at 107 ("Inadequate notice . . . 'precludes discharge of a claim in bankruptcy.'" (quoting *Chemetron Corp. v. Jones*, 72 F.3d 341, 346 (3d Cir. 1995))).

100.    The FTX Trust's interpretation flunks this standard.    If the FTX Trust's interpretation were correct, and Section 5.2 extinguished every filed proof of claim on the Effective Date, then every creditor in these cases—including Argent—had its property right eliminated without proper notice that such a consequence would occur.  Nothing in the Disclosure Statement, solicitation materials, or Section 5.2 told creditors that Section 5.2 would operate to disallow or extinguish their filed proofs of claim.  And the absence of such disclosure was not an oversight; it reflects the reality that Section 5.2 was never intended to accomplish what the FTX Trust now claims.

101.    The contrast between Section 5.2 and the Plan's actual release provision proves the point.  Under the Bankruptcy Code and applicable rules, releases must be prominently disclosed in the plans and ballots so that creditors can make an informed decision about whether to opt in or out.  *See In re Lower Bucks Hosp.*, 571 F. App'x 139, 142–43 (3d Cir. 2014) (citing 11 U.S.C. § 1125(a)(1); and Fed. R. Bankr. P. 3016(c)).  The Debtors knew this; they applied bold typeface to *all* their release and exculpation sections, including Section 10.4.  *See* Plan §§ 10.2–7, 10.9.  Section 5.2 received no such treatment because it is not a release—not in form or in substance.

102.    At a minimum, these constitutional concerns show the implausibility of the FTX Trust's construction of Section 5.2.  Argent's reading—under which Section 5.2 channels filed claims into the Plan's Article 8 claims allowance and Article 4 distribution framework, rather than unnoticeably extinguishing them—alleviates these concerns.  It gives Section 5.2 full effect as a

channeling provision while preserving each claimant's statutory and constitutional right to have the allowance of its filed claim determined through the statutory process, on notice and with an opportunity to be heard. That is the construction the Court should adopt.

## V.      Reconsideration of Section 5.2 Is Possible Without Disturbing Prior Holdings.

103.      Argent recognizes that this Court has referenced Section 5.2 in two prior instances involving claim objections: the August 12, 2025 hearing in the Breen matter and the June 2, 2026 Order. The Court's prior references, however, do not foreclose reconsideration to correct the Court's interpretation of Section 5.2. Importantly, the Court can readily interpret Section 5.2 as a channeling provision—consistent with its plain text and the argument set forth herein—without disturbing the outcomes in either the Breen or Melamed disputes, because both are distinguishable on their facts. Thus, the Court can grant reconsideration narrowly, specifically regarding Section 5.2's interpretation, without reviving Breen's or Melamed's claims. *See, e.g.*, *W.P.*, 2022 WL 2341561, at *2 ("The grant of a motion for reconsideration does not prevent a court from reaching an outcome identical to its prior decision." (citing *Pena-Ruiz*, 281 F. App'x at 111 n.1)).

104.      In the Breen matter, the Court first addressed the application of Section 5.2 to claims in the August 12, 2025 hearing regarding the 160th Omnibus Objection. There, the Court sustained the Debtors' objection on the grounds that Breen's untimely claim was not valid because the Debtors had applied the deposited funds exactly as Breen had instructed—a ground dispositive of the claim irrespective of Section 5.2. Aug. 12, 2025 Hr'g Tr. 38:13–18. The Court's subsequent observation that "[i]f there was a valid claim under some sort of fraud, mismanagement, commingling claim, it has been compromised through the global settlement," *id.* at 39:15–17, was expressly conditioned on a hypothetical—"[i]f there was a valid claim"—and was unnecessary to the result. Indeed, the written order did not reference Section 5.2 at all. *See Order Sustaining FTX Recovery Trust's One Hundred Sixtieth (Substantive) Omnibus Objection to Claim Number 96754*

54

[Dkt. No. 32398].  Granting the relief Argent seeks to correct the interpretation of Section 5.2 would not disturb this outcome in any respect.

105.    In the Melamed matter, the Court has alternative grounds to reach the same result without improperly relying on the proposition that Section 5.2 extinguishes claims.  The June 2, 2026 Order held that "Melamed is enjoined from pursuing the claims [at issue] . . . because they are premised on claims that have been compromised, settled, resolved, and enjoined under sections 5.2 and 10.8 of the [Plan]."  June 2, 2026 Order ¶ 2.  But the Court can reach the same result of enjoining Melamed's claims by concluding that Melamed is barred from (i) circumventing the claims allowance process by asserting new claims in arbitration not encompassed in his original proofs of claim, and (ii) re-litigating claims that, in substance, are duplicative of the claims the Court has already resolved in its prior orders.  The result as to Melamed is the same; what changes is the legal basis.  That correction matters.  If the extinguishment rationale stands uncorrected, it will be deployed—as the FTX Trust is already doing—to bar countless creditors, like Argent, whose claims were timely filed and remain unadjudicated, who received no consideration, and who have not consented to any release, from pursuing their proofs of claim through the very process the Plan promises.

## CONCLUSION

106.    Argent reiterates that it takes no position on the June 2, 2026 Order as applied to Melamed on his particular facts.  However, for the foregoing reasons, Argent respectfully requests that the Court grant reconsideration to the extent of correcting and cabining the interpretation of Section 5.2 of the Plan, so that Section 5.2 is not read to disallow, release for no consideration, or expunge filed proofs of claim.  Argent further requests that the Court grant such other and further relief as is just and proper.

55

Dated: July 13, 2026
  Wilmington, Delaware

Respectfully submitted,

*/s/ Sameen Rizvi*

L. Katherine Good (No. 5101)
Gregory J. Flasser (No. 6154)
Sameen Rizvi (No. 6902)
Ethan H. Sulik (No. 7270)
**POTTER ANDERSON & CORROON LLP**
1313 N. Market Street, 6th Floor
Wilmington, Delaware 19801
Telephone: (302) 984-6000
Facsimile: (302) 658-1192
Email: kgood@potteranderson.com
   gflasser@potteranderson.com
   srizvi@potteranderson.com
   esulik@potteranderson.com

-and-

Dennis F. Dunne, Esq. (admitted *pro hac vice*)
Lauren C. Doyle, Esq. (admitted *pro hac vice*)
**MILBANK LLP**
55 Hudson Yards
New York, New York 10001
Telephone: (212) 530-5770
Facsimile:  (212) 822-5770
Email: ddunne@milbank.com
   ldoyle@milbank.com

-and-

Andrew M. Leblanc, Esq. (admitted *pro hac vice*)
**MILBANK LLP**
1101 New York Avenue, NW
Washington, D.C. 20005
Telephone: (202) 835-7574
Facsimile: (202) 263-7574
Email: aleblanc@milbank.com

*Counsel to the Argent Liquidation Trust*