**IN THE UNITED STATES BANKRUPTCY COURT**

**FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| In re:<br><br>FTX TRADING LTD., *et al.*, [1]<br><br>Debtors. | Chapter 11<br><br>Case No. 22-11068 (KBO)<br><br>(Jointly Administered)<br><br>Ref. Nos. **D.I. 35980, 36004** |

**REPLY OF SETH MELAMED IN FURTHER SUPPORT OF MOTION FOR ENTRY OF AN ORDER DETERMINING THAT THE FILING AND PROSECUTION OF THE PROPOSED REQUEST TO AMEND DESCRIPTION OF ARBITRATION IS NOT ENJOINED BY THE JUNE 2ND ORDER OR THE CONFIRMATION ORDER**

Seth Melamed ("**Melamed**" or "**Movant**"), by and through his undersigned counsel, respectfully submits this reply in further support of his Motion for Entry of an Order Determining that the Filing and Prosecution of the Proposed Request to Amend Description of Arbitration is Not Enjoined by the June 2nd Order or the Confirmation Order [D.I. 35980] (the "**Motion**") and in response to the objection of the FTX Recovery Trust (the "**Trust**") [D.I. 36004] (the "**Objection**" or "**Obj.**"), and states as follows:

**Reply**

**I.    The Amended Notice does not Seek Advisory Relief**

1.      In the Objection, the Trust asserts that the Motion fails because it "seeks advisory relief" based on "a procedural posture that is not yet certain" (Obj. ¶¶ 3, 7).  That argument is incorrect -- Melamed does not ask the Court to opine on "a hypothetical state of facts." *Chafin v. Chafin*, 568 U.S. 165, 172 (2013).  Rather, Melamed asks whether a specific, fully drafted pleading

---

[1] The last four digits of FTX Trading Ltd.'s and Alameda Research LLC's tax identification numbers are 3288 and 4063, respectively.  A complete list of the Debtors and the last four digits of their federal tax identification numbers is not provided herein. A complete list of such information may be obtained on the website of the Debtors' claims and noticing agent at https://cases.ra.kroll.com/FTX

— the Amended Notice[2], attached to the Motion in its entirety — may be filed *now*, consistent with an injunction that is operative *now*.

2.       The relief sought is not advisory in any context.   What exists today is a live, concrete dispute over the boundaries of an operative injunction, presented before any step is taken to the only court that can authoritatively resolve it.   Nor is any parallel proceeding racing ahead while the Court answers: the SIAC Registrar officially suspended the arbitration on June 18, 2026, pursuant to Rule 27.4 of the SIAC Rules, completely freezing the proceeding. *See Declaration of Daniel Allen in Support of Seth Melamed's Replies to his Motion for Reconsideration and Motion to Clarify* ("**Allen Decl.**") at ¶ 11.

3.       The Trust's own authority establishes that this Motion is the proper procedure. In *Regal Knitwear Co. v. NLRB*, 324 U.S. 9, 15 (1945) the Supreme Court noted that when parties "enter upon transactions which raise doubts as to the applicability of the injunction, they may petition the court granting it for a modification or construction of the order," and that courts "would not be apt to withhold a clarification in the light of a concrete situation that left parties . . . in the dark as to their duty toward the court." *Id*.   As noted, the point of this procedure is "to avoid unwitting contempts, as well as to punish deliberate ones" *Id.*  Nothing in *Regal Knitwear* requires that the order from which relief is sought be ambiguous as the Trust argues (Obj. ¶ 7.)

4.       The Supreme Court has made clear that seeking the issuing court's construction *before* acting is not merely permissible but the favored course.  In *McComb v. Jacksonville Paper Co.*, 336 U.S. 187, 192 (1949), the Supreme Court sustained contempt sanctions against parties who resolved doubts about a decree's application in their own favor and acted on their own interpretation, emphasizing that they "could have petitioned the District Court for a modification,

---

[2] Capitalized terms not defined herein shall have the meanings ascribed to such terms in the Motion.

clarification or construction of the order" instead. *Id.* The Trust's own contempt authorities involve parties who charted their own course around an injunction rather than asking the issuing court first. *See Paramedics Electromedicina Comercial, Ltda. v. GE Med. Sys. Info. Techs., Inc.*, 369 F.3d 645 (2d Cir. 2004); *In re Johns-Manville Corp.*, 666 B.R. 476 (Bankr. S.D.N.Y. 2025).

5.      Melamed has done precisely the opposite: before filing anything, he brought the proposed pleading to the Court that entered the injunction and asked for a determination. It would stand *McComb* on its head — and convert the June 2nd Order into the trap *Regal Knitwear* identifies — to hold that a party who acts first proceeds at peril of contempt, while a party who respectfully asks first presents no justiciable question.

6.      The Trust's reservation of contempt remedies is itself what makes the controversy concrete. A party confronted with the choice between abandoning arguably permissible conduct and "expos[ing] himself to liability" is not required to "bet the farm" before obtaining an adjudication of his rights; that dilemma is precisely the controversy Article III recognizes. *MedImmune, Inc. v. Genentech, Inc.*, 549 U.S. 118, 128–34 (2007); *see Steffel v. Thompson*, 415 U.S. 452, 459 (1974) (a party need not "first expose himself to actual arrest or prosecution" before seeking a determination of his rights). The Trust cannot hold contempt in reserve with one hand (Obj. ¶ 3 n.3) and, with the other, dismiss as "advisory" the very motion by which Melamed seeks to conform his conduct to the Court's order.

7.      The balance of the Trust's Objection refutes its first section. Having pronounced the relief as hypothetical (Obj. ¶ 7), the Trust devotes the next sixteen paragraphs to answering it — arguing at length, and on the merits, that the Amended Notice nonetheless violates the June 2nd Order" (Obj. §§ II–IV, ¶¶ 8–23). A dispute the Trust is actively litigating is not a dispute that does not exist.

8.      The Objection's reliance on *In re Cubic Energy, Inc.*, 587 B.R. 849 (Bankr. D. Del. 2018) is misplaced. There, the movants asked the Court to construe plan releases against a trustee who *had asserted no claim against them*: there was no pending or threatened proceeding between the movants and their actual counterparty, the underlying facts were undeveloped, and any ruling would have had to be relitigated in the Texas and Louisiana courts where the real dispute, if it ever arose, would proceed. Here, every element is reversed. The adverse party is before the Court, disputing the merits; the conduct at issue is a specific, completed pleading, not a contingency; the operative order is this Court's own injunction, which the Trust invokes and threatens to enforce; and this Court — on the Trust's own submission — is the only tribunal that can authoritatively construe it.   The June 2nd Order's retention-of-jurisdiction provision (June 2nd Order ¶ 4) contemplates exactly this application.

9.      Nor is the Motion "premature" because reconsideration and appeal remain pending. (Obj. ¶ 7.)   The Motion does not ask "what [Melamed] may do next assuming his motion for reconsideration and appeal fail" (*id.*); it takes the June 2nd Order exactly as the Trust insists Melamed must take it — as fully operative today — and asks whether distinct, narrower proposed conduct falls outside it.

10.      In short, the Motion does not seek an advisory opinion.

## II.      The Amended Notice does not Violate the June 2nd Order

11.      The Trust's arguments in point two can be reduced to a single proposition: because everything that went wrong at FTX ultimately traces to the insiders' fraud, no claim Melamed could ever plead can escape the June 2nd Order. (Obj. ¶¶ 8–11.) That is not what the June 2nd Order says, it is not how injunctions are construed, and it is not how contract law works. The June 2nd Order enjoins Melamed from pursuing "the claims described in his November 12, 2025 Notice of Arbitration" because those claims were "premised on" matters compromised, settled, and resolved

under §5.2 of the Plan. (June 2nd Order ¶ 2.) The Amended Notice withdraws those claims and pleads claims with a different legal predicate: breaches of specific contractual representations and warranties that FTX made to Melamed in the SPA — claims on which liability attaches, if at all, without proof of fraud, scienter, reliance, or any FTX-wide misconduct whatsoever. Claims that can be proven without establishing the compromised misconduct are not "premised on" the compromised misconduct.

12.    The June 2nd Order enjoined an identified set of claims — those "described in" the November 12, 2025 Notice of Arbitration — on an identified ground. It did not enjoin a subject matter, a set of facts, or every claim arising from the parties' relationship.

13.    The Trust's argument that "[a] narrowed subset of an enjoined whole remains enjoined (Obj. ¶ 8) trades on an equivocation. The Amended Notice amends the description of the existing arbitration, deleting the enjoined claims rather than commencing a new proceeding and limits the claims to purely contract claims.  A claim for breach of representations and warranties is a contract claim, and it differs from a fraud claim in its very elements: it requires no scienter, no intent to deceive, no justifiable reliance, and no misconduct — only a bargained-for representation that proved untrue, and resulting loss. *See e.g., Interim Healthcare, Inc. v. Spherion Corp.*, 884 A.2d 513, 548 (Del. Super. 2005); *Cobalt Operating, LLC v. James Crystal Enters., LLC*, 2007 WL 2142926, at *28 (Del. Ch. July 20, 2007) (representations "serve an important risk allocation function"; reliance is not an element), *aff'd*, 945 A.2d 594 (Del. 2008).

14.    *Arwood v. AW Site Services, LLC*, 275 A.3d 258 (Del. Ch. 2022) is instructive.  In that case, the Court of Chancery *rejected* the buyer's fraud and fraudulent-inducement claims — no scienter, no justifiable reliance — and simultaneously *sustained* its claim for breach of the same agreement's representations, awarding full contractual damages. The court held that "[t]he

reasonableness, or not, of [the buyer's] reliance upon the sellers' representations is not a relevant consideration in assessing the *bona fides* of [its] indemnification claim." *Id.* at 283-84.  If a warranty claim and a fraud claim were the same claim in different clothes, *Arwood* could not exist: the warranty claim could not succeed where the fraud claim failed. The two claims can share a factual landscape and yet have entirely different legal lives — which is the whole point of bargaining for representations in the first place.

15.     The Trust's argument that counsel conceded that the alleged breaches of warranty occurred "[b]ecause of their fraud" (Obj. ¶¶ 4, 10.) relies on a fragment from the transcript.  The words the Trust quotes were the Court's, in colloquy — "THE COURT: Because of their fraud." (May 14, 2026 Hr'g Tr., Ex. 5 at 44:19.) Counsel's answer, in the same exchange, was that the claim is "based on . . . breaches of warranty made by the debtor" (*id.* 44:16-18), that "the misrepresentations themselves" are what "gives the trigger to the indemnity claim" (id. 44:20-22), and that there is "a separate cause of action for fraud, a separate cause of action for indemnity" (*id.* 44:24-45:3).

16.      The argument confuses the *cause* of a representation's falsity with the *legal predicate* of the claim. A warranty that financial statements are accurate is breached if they are inaccurate — whether the inaccuracy was the product of fraud, recklessness, negligence, or innocent error. The claimant need not plead or prove which; falsity plus loss is the claim. *See Arwood*, 275 A.3d at 283–84. That the historical explanation for FTX's false financials happens to be fraud does not transform a warranty claim into a fraud claim, any more than a warranty claim against an honestly mistaken seller would be transformed into a negligence claim.

17.     Indeed, the Trust's contrary test — any claim is enjoined if the facts underlying it trace causally to the FTX fraud — is the truly circular one, and it has no limiting principle. FTX's

collapse was fraud all the way down; on the Trust's logic, §5.2 silently extinguished every representation, warranty, covenant, and indemnity in every contract FTX ever signed, because every breach of every FTX promise ultimately "depends on" the fraud. Nothing in the Plan, the Confirmation Order, or the June 2nd Order announces — let alone accomplishes — the wholesale abrogation of the contractual protections of every counterparty who ever transacted with an FTX entity.[3]

18.     The Trust's comparison of allegations (Obj. ¶ 11) proves only what no one disputes: the SPA's representations concern FTX's financial condition, risk management, liabilities, and affiliate dealings — because that is what FTX promised Melamed in the SPA — and any claim on those representations will therefore describe the respects in which they were false. Factual overlap of that kind is inevitable and legally irrelevant. The question the Trust itself poses is whether the reformulated claim "*depends on*" the compromised FTX-wide misconduct. (Obj. ¶ 9 (emphasis added).) It does not. To prevail in the arbitration, Melamed need not prove that anyone defrauded anyone: he must prove that identified contractual representations made to him were false when made and that he suffered loss on the crypto leg of the exchange as a result.  The evidence may traverse the same terrain as the fraud but an element and an evidentiary backdrop are different things. The June 2nd Order speaks in terms of what claims are "premised on," and a claim is premised on its elements.

19.     The Trust's final argument — that the Amended Notice improperly leaves it to the arbitral tribunal to police the boundary of the Global Settlement (Obj. ¶ 12) — is answered by the Motion's very existence. Melamed has not asked the tribunal to decide whether his reformulated

---

[3] §10.9 provides that "none of the releases or exculpations set forth herein shall operate to waive or release any obligation or Causes of Action of any Person or Entity: (a) arising under any contract, instrument, agreement, release or document delivered pursuant to the Plan or documents . . ."

claims fall within Section 5.2 or the June 2nd Order; he has asked *this Court* to decide exactly that, before filing anything. It is the Trust that insists this Court should refuse to answer while simultaneously insisting no other tribunal may. (Obj. ¶¶ 7, 12; *see* Section [I], *supra*.)

20.     In the end, the Trust's arguments do not construe the June 2nd Order; they enlarge it.  The June 2nd Order enjoined the claims described in the original Notice of Arbitration on the ground that they were premised on matters compromised under Section 5.2. The Amended Notice deletes those claims and pleads contract claims that stand or fall on the truth of FTX's bargained-for representations — claims of a type the law has always treated as independent of fraud, asserted by a counterparty whose contractual protections no order of this Court has adjudicated out of existence. The June 2 Order drew a line; Melamed has honored it; and the Trust's objection is a request to move it.

## III.     The Amended Notice does not Violate the Plan and Estimation Order

21.     The Trust's third argument — that the Amended Notice "asks the arbitral tribunal to do exactly what this Court has conclusively held cannot be done: value Melamed's alleged Crypto Consideration losses" other than under the Plan and Estimation Order (Obj. ¶ 5) — rests on a category error.  This Court's Threshold Rulings divided the universe of Melamed's claims into three categories: 1) claims asserting an entitlement to cryptocurrency, which are valued under the Plan and Estimation Order; 2) claims arising from or measured by the FTX Consideration Shares, which are subordinated; and 3) the contractual "Crypto Indemnity" claim, on which the Court reserved judgment.   The Amended Notice asserts only the third. It is a contract claim for breach of representations and warranties quantified by the discrete 20% block of Liquid shares Melamed exchanged for the Crypto Consideration, and by design excluding any recovery relating to the FTX Shares. (Amended Notice ¶ 25.)

22. The Amended Notice seeks neither the delivery of any digital asset, nor the value of any digital asset held by the Debtors, nor any benefit from post-petition token appreciation, nor any recovery on account of the FTX Consideration Shares.

23. The Trust's arguments incorrectly attempt to force this claim in the Amended Notice into the first category.

24. The Amended Notice alleges that FTX made specific contractual representations and warranties concerning its financial condition — sound risk management, accurate financials, the absence of hidden liabilities and undisclosed affiliate dealings — and that those representations were false when made. (Amended Notice ¶ 18.) A claim for breach of representations and warranties is a pure creature of contract: the representations "serve an important risk allocation function," and the recipient of that contractual protection is "entitled to rely upon the accuracy of the representation[s] regardless of what [its] due diligence may have or should have revealed." *Interim Healthcare, Inc. v. Spherion Corp.*, 884 A.2d 513, 548 (Del. Super. 2005); *accord Cobalt Operating, LLC v. James Crystal Enters., LLC*, 2007 WL 2142926, at *28 (Del. Ch. July 20, 2007), *aff'd*, 945 A.2d 594 (Del. 2008); *Arwood v. AW Site Servs., LLC*, 275 A.3d 258, 283–84 (Del. Ch. 2022) (warranty liability is contractual and attaches upon breach without regard to scienter, reliance, or any underlying misconduct). The right to payment thus arises *because of* the falsity of bargained-for contractual promises — not because of any entitlement to, deposit of, or dealings in a digital asset, and not because of any interest in a security of the Debtors.

25. Claims for indemnification are "a separate substantive cause of action, independent of the underlying wrong." *McDermott v. City of New York*, 50 N.Y.2d 211, [218] (1980); *LaPoint v. AmerisourceBergen Corp.*, 970 A.2d 185 (Del. 2009) (indemnification claim is separate cause of action and independent of the underlying breach); *Scharf v. Edgcomb Corp.*, 864 A.2d 909 (Del.

2004) (indemnification claim accrues on its own schedule, when the underlying matter is "resolved with certainty").

26.     The distinction the Trust dismisses as wordplay is black-letter law: the indemnity claim and the subject matter it concerns are different claims, with different elements, different accrual rules, and different measures of recovery. Even assuming the Crypto Consideration consists entirely of digital assets, Melamed's indemnification claim is not a claim *to* the Crypto Consideration. It is an independent contract right whose measure is the loss he suffered on that part of the transaction.

27.     The Amended Notice deliberately cabins the damages measure inside both boundaries this Court's rulings have drawn.  On one side, the claim is not measured by cryptocurrency: Melamed does not ask the tribunal to count coins, price tokens as of any date, or award him the present value of digital assets he was promised.  On the other side, the claim is not measured by, and seeks no recovery relating to, the FTX Consideration Shares, whose associated recoveries this Court has held must be subordinated. (July 22, 2025 Tr., Ex. 2 at 128:2–129:6.) The quantification instead uses the one metric that implicates neither boundary: the value of the discrete 20% block of Liquid shares that Melamed exchanged for the Crypto Consideration — an asset that is not a digital asset and not a security of the Debtors received as consideration, but simply the property Melamed gave up on the crypto leg of the bargain.

28.     That is orthodox contract law: expectation damages are "the amount of money that would put the promisee in the same position as if the promisor had performed," *Duncan v. TheraTx, Inc.*, 775 A.2d 1019, 1022 (Del. 2001), and where a party surrenders property in reliance on warranties that prove false, the value of what it surrendered is a standard measure of its loss, *see Osram Sylvania Inc. v. Townsend Ventures, LLC*, 2013 WL 6199554, at *[8] (Del. Ch. Nov.

19, 2013) (warranty damages measured by the overpayment). The Liquid-share valuation is an evidentiary yardstick for quantifying a contract loss; it does not transform the claim into a claim about the consideration that flowed the other way. The measure of damages runs to what Melamed gave, not to what FTX kept: the claim has nothing to do with post-petition valuation, pricing, or delivery of any digital token. Valuing the surrendered Liquid shares takes nothing from the Estimation Order's domain; it is the ordinary expectation-damages arithmetic of an asset-exchange contract, measuring the value Melamed parted with in reliance on representations that proved false.

29.    Nor does the currency in which that consideration was denominated. Plan section 4.4 directs that Claims in respect of Digital Assets "shall be calculated by converting the value of such Digital Asset[s] into Cash as of the Petition Date" at the Estimation Order's conversion rates. (Plan § 4.4.) That machinery presupposes a claim whose subject *is* a digital asset — a claim asserted in coin quantities, for coins held by the Debtors, that can be run through a conversion table. That is exactly how this Court described the claims the estimation process addressed: "claims seeking to recover the value of the cryptocurrency assets . . . held by the Debtors," which "are asserted in quantities of digital assets." *In re FTX Trading Ltd.*, No. 22-11068, [D.I. 19069] (Bankr. D. Del. June 26, 2024), slip op. at 3.

30.    And "in respect of," like "on account of," demands a causal relationship between the claim and its subject — the phrase means "because of." *Cf. Bank of Am. Nat. Trust & Sav. Ass'n v. 203 N. LaSalle St. P'ship*, 526 U.S. 434, 450–51 (1999). Melamed's right to payment exists because FTX's contractual representations were false; the identical claim would exist had the same leg of the exchange been priced in dollars or yen, and no one would call it a claim "in respect of" dollars or yen.

31.     On the Trust's contrary logic, every vendor invoice, employment claim, or settlement obligation payable in cryptocurrency anywhere in these cases would be transmuted into a customer-style "Digital Asset Claim" and dollarized off the conversion table — a result the Plan nowhere suggests and the Estimation Order was never asked to produce.

32.     The Trust's own Objection confirms that warranty and indemnity claims are analytically distinct from crypto claims — it tells the Court that the SPA Claim's breach-of-warranty claim "and any indemnity claim tied to it" were treated by the Threshold Rulings as part of the "non-crypto portion" of the SPA Claim. (Obj. ¶ 20.)  That is half right, and the half that is right defeats Section III: an indemnity claim for breach of representations is not a claim in respect of digital assets, on the Trust's own telling.

33.     Where the Trust goes wrong is in the other half: the "non-crypto portion" the Court subordinated was defined by its connection to the FTX Consideration Shares — the warranty claim that Melamed was induced to accept Consideration Shares worth less than represented, and indemnity claims tied to *that* loss. (July 22, 2025 Tr., Ex. 2 at 128:2–129:6.) The Amended Notice severs that connection entirely: it asserts no loss on the Consideration Shares and measures nothing by them. What remains is the claim the Threshold Rulings expressly left open — the Crypto Indemnity claim: a contract indemnity claim for the loss Melamed suffered on the portion of his Liquid shares exchanged for the Crypto Consideration. The Trust cannot collapse the Court's three categories into two, assigning every formulation of Melamed's claim either to petition-date dollarization (Section III) or to subordination-adjacent oblivion (Section IV), while pretending the category the Court itself reserved does not exist.

34.     The passage the Trust quotes resolved a different question where the Court rejected Melamed's argument that he was "entitled to monetary damages due to FTX's *failure to deliver*

*his cryptocurrency*." (July 22, 2025 Tr., Ex. 2 at 126:15–25 (emphasis added).) That was a claim to withheld crypto — a right to payment asserted *because of* a digital-asset entitlement — and the Court's fairness rationale confirms its subject: Melamed was to be treated "no better than any other similarly situated party whose claim in these cases relates to *crypto withheld from them* by the debtors." (*Id.* 127:1–5.) The Amended Notice asserts no entitlement to withheld crypto and no recovery measured by any token's quantity or price. Melamed is not similarly situated to a customer whose coins were frozen on the exchange; he is a counterparty who transferred operating-company equity in reliance on contractual warranties that were false. His claim does not ask the tribunal to re-value withheld crypto by a different methodology — it asks the tribunal to do what the Threshold Rulings never addressed: liquidate a reserved contract indemnity claim under the law governing the SPA.

35.     Finally, the Trust's "futility" argument (Obj. ¶ 17) assumes its own conclusion and misdescribes the division of labor the Motion respects. The arbitral tribunal would do only what tribunals liquidating contract claims always do: determine breach and quantify loss under the SPA's governing law. Allowance, valuation, subordination, and distribution — the bankruptcy treatment of whatever the tribunal liquidates — remain exclusively for this Court under the Plan, the Estimation Order, and §§502 and 510, as Melamed has consistently acknowledged and the Trust itself recognizes. (Obj. ¶ 13.)

36.     If, at the allowance stage, this Court were to determine that some component of the liquidated claim is in fact a Claim in respect of Digital Assets, §4.4 would supply the conversion at that point; if it were to determine that some component constitutes a recovery relating to the FTX Shares, the Threshold Rulings' subordination holding would govern at that point. Accordingly, there is nothing "futile" about liquidating the claim, and nothing that "defeats the

purpose" of the Threshold Rulings — unless the Estimation Order is read not as a valuation methodology but as a prohibition on liquidating any claim arising from any transaction that involved cryptocurrency. Neither the Plan nor the Estimation Order says any such thing.

## IV.    The Amended Notice Asserts Claims that are Clearly Stated in Claim 3385

37.    The Trust's preservation argument (Obj. ¶¶ 18-23) rewrites the proof of claim it purports to describe. The Trust reads Claim 3385 as if it consisted of ¶¶ 10-11 alone and dismisses the rest as a "passing reference to 'indemnification.'" (Obj. ¶¶ 20-21.)

38.    The Annex to Claim 3385 — filed June 29, 2023, and quoted here from the Trust's own exhibit (D.I. 35244-1, Ex. 1) — pleads the full contractual chain in terms: ¶ 4(b) asserts "multiple breaches of warranties and representations contained in the SPA"; ¶ 4(d) asserts FTX's "failure to indemnify Claimant for damages from breaches of contract and breaches of warranties and representations as provided in the SPA"; and ¶ 4(c) and ¶ 9 assert the "failure to pay retained consideration as defined and promised in the SPA" — the cryptocurrency component the Debtor retained "as security against certain indemnification obligations that might arise under the SPA." Warranty, to Clause 9.3 indemnity, to the unpaid crypto tranche: the chain was pleaded in 2023.

39.    The Amended Notice narrows that chain; it does not enlarge it. The side-by-side comparison attached hereto as *Exhibit A* sets the Annex's operative paragraphs against the Amended Notice's, *verbatim*: Annex ¶ 4(b) (warranty breaches) maps to Amended Notice ¶ 17, which itemizes the same breaches provision by provision; Annex ¶ 4(d) (indemnity) maps to Amended Notice ¶ 22, which quotes Clause 9.3 of the SPA — the indemnity the SPA attaches to exactly those breaches; and Annex ¶¶ 4(c) and 9 (the retained crypto consideration) map to Amended Notice ¶ 25, which pleads the loss on the same unpaid tranche. Annex ¶¶ 4(b) and 4(d) preserved the precise Clause 9.3 indemnity chain the Amended Notice now presents in narrowed

form. The Court need not take either party's characterization on faith: the side-by-side comparison makes the preservation of that contractual chain a clear, one-page exercise.

40. The Trust's own proof-text confirms the point. Its quotation of the Threshold Rulings stops at line 129:6 (Obj. ¶ 20 (citing "Ex. 2 at 128:2-129:6")) — one line short of the sentence that immediately follows: "To the extent that Mr. Melamed asserts an indemnification claim *on account of the SPA claim* arising from the unpaid crypto consideration, I will reserve judgment as to whether that claim is subordinated until such claim is clearly defined." (July 22, 2025 Tr., Ex. 2 at 129:7-11 (emphasis added).) The reservation describes an indemnification claim on account of the SPA Claim — the Court's own words locate the Crypto Indemnity inside Claim 3385. A claim this Court reserved on account of the SPA Claim cannot at the same time be a claim the SPA Claim never contained.

41. Rule 3001 requires notice, not code pleading: a proof of claim need only put the estate on "notice of the nature and basis" of the claim — the Trust's own standard. (Obj. ¶ 18.) Claim 3385 gave that notice in 2023: of SPA warranty breaches, of the SPA's indemnity, and of the unpaid crypto consideration. The Trust's authorities police claimants who pleaded one claim and later asserted a different one; none holds that a claimant who pleaded warranty, indemnity, and an unpaid tranche may not later present exactly that chain, shorn of everything else. The preservation objection fails on the face of the documents.

## CONCLUSION

For the foregoing reasons and those set forth in the Motion, the Court should grant the Motion, enter the Proposed Order determining that the filing and prosecution of the proposed Amended Notice is not enjoined by the June 2nd Order or the Confirmation Order, and grant such other and further relief as is just and proper.

Dated: July 20, 2026
      Wilmington, Delaware

Respectfully submitted,

**McCARTER & ENGLISH, LLP**

/s/ *Kate R. Buck*
Kate R. Buck (No. 5140)
Larry O'Brien (No. 7000)
405 North King Street, 8th Floor
Wilmington, Delaware 19801
Telephone: (302) 984-6300
Facsimile (302) 984-6399
kbuck@mccarter.com

-  and  –

David J. Adler (admitted *pro hac vice*)
250 W. 55th Street, 13th Floor
New York, New York 10019
Telephone: (212) 609-6847
Facsimile: (212) 609-6921
dadler@mccarter.com
*Counsel to Seth Melamed*