**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| In re:<br><br>FTX TRADING LTD., *et al.*,[1]<br><br>Debtors. | Chapter 11<br><br>Case No. 22-11068 (KBO)<br><br>(Jointly Administered)<br><br>**Ref. Nos. D.I. 35827, 36002**<br><br>**Hearing Date: July 23, 2026 at 9:30 a.m. (ET)** |

**REPLY OF SETH MELAMED IN FURTHER SUPPORT OF MOTION
FOR RECONSIDERATION OF THE JUNE 2, 2026 ORDER [D.I. 35768]
PURSUANT TO 11 U.S.C. § 502(j) AND FEDERAL
RULES OF BANKRUPTCY PROCEDURE 3008, 9023, AND 9024**

Seth Melamed ("**Melamed**" or "**Movant**"), by and through his undersigned counsel, respectfully submits this reply in further support of his Motion for Reconsideration [D.I. 35827] (the "**Motion**") and in response to the objection of the FTX Recovery Trust (the "**Trust**") [D.I. 36002] (the "**Objection**" or "**Obj.**"), and states as follows:

**PRELIMINARY STATEMENT**

1.      The Trust has rewritten history at every stage of this litigation.  Its latest turn is the most revealing.  In opposing reconsideration, the Trust continues to insist that § 5.2 of the Plan "applies to 'all Claims, Interests and Causes of Action against, by or among the Debtors' arising from the FTX fraud."  (Obj. ¶ 11.)  Notably absent from the Objection is any explanation of why Point Two of the Amended Claims Objection, which is entitled "Melamed's Claim For the Crypto Consideration Must Comply With This Court's Estimation Order and the Debtors' Plan of

---

[1] The last four digits of FTX Trading Ltd.'s and Alameda Research LLC's tax identification numbers are 3288 and 4063, respectively.  A complete list of the Debtors and the last four digits of their federal tax identification numbers is not provided herein. A complete list of such information may be obtained on the website of the Debtors' claims and noticing agent at https://cases.ra.kroll.com/FTX

ME1\62044759.v1

Reorganization," discusses at length § 4.4 of the Plan and the measure of fraud damages under Japanese law but nowhere even mentions § 5.2 of the Plan.  The reason is obvious.  Section 5.2 of the Plan is not a global release of fraud claims.  Instead it is a *post hoc* creation.[2]

2.	While the Trust accuses Melamed of gamesmanship, bad faith and "tactical shifts," it is the Trust that has engaged in precisely that conduct[3] as the Argent Joinder reflects.  In making the argument as to Melamed, it concedes, as it must, that the "release" under § 5.2 is mutual.  The consequences of this argument could jeopardize significant assets of the estate — and, as shown below, the Trust's own conduct is wholly inconsistent with its assertion.

3.	By way of example, on October 31, 2024, after entry of the Confirmation Order, the Debtors filed a proof of claim in the Silvergate bankruptcy, which asserted:

> FTX Group files this Proof of Claim for any and all claims, rights, and causes of action that it has or may have against the Debtors. Based on the foregoing conduct, and the conduct described in the Ray Declaration, the First Interim Report, and the Second Interim Report, each of which is incorporated here by reference, the FTX Group asserts that it has legal claims against the [Silvergate] Debtors, including, but not limited to, claims for aiding and abetting breach of fiduciary duty, aiding and abetting conversion, and unjust enrichment.

4.	Moreover, on November 10, 2024, after entry of the Confirmation Order, the Debtors commenced an action (the "**Binance Action**") against Binance and Changpeng Zhao seeking damages "of at least $1.76 billion."[4]  Among other claims, the Binance Action asserts claims for fraud, unjust enrichment and intentional misrepresentation — claims that, under the Trust's interpretation, would have been released pursuant to the Global Settlement.

---

[2] On July 13, 2026, the Argent Liquidation Trust ("**Argent**") filed *Argent's Joinder and Statement in Support of Motion of Seth Melamed for Reconsideration of the June 2, 2026 Order* [D.I. 35985] (the "**Argent Joinder**") which is incorporated herein by reference.  Paragraphs 28 through 37 lay out the evolution of the Section 5.2 argument.

[3] This pattern is reflected by the change from the Claims Objection to the Amended Claims Objection (asserting a belated section 510(c) claim).  Thereafter, the Trust sought the Court's ruling on certain "threshold issues" and characterized that request as a "proposal for how to stage this litigation in a way that we believe is **most efficient** for the Court and the parties …." May 14, 2025 Hr'g Tr. 5:21–23.

[4] *FTX Recovery Trust v. Binance Holdings, Limited*, et al., Adv Pro. No. 24-50222 (KBO).

2

5. Because the interpretation of § 5.2 is wholly inconsistent with the Trust's conduct post-confirmation, the Court should grant the Motion to correct a clear error of law and to prevent manifest injustice.

6. Alternatively, and to avoid any unintended conflict with this Court's prior rulings, the Court should amend the June 2nd Order to clarify that it does not extend to the Crypto Indemnity claims expressly reserved for future definition in this Court's July 31, 2025 Order. [D.I. 32057 ¶ 3; D.I. 32058.]

## I. 11 U.S.C. § 502(j) and Rules 3008, 9023 and 9024 All Authorize Reconsideration

7. The Trust's argument that § 502(j) and Rules 3008, 9023 and 9024 do not authorize reconsideration is entirely without merit. The Trust asserts that Rules 9023 and 9024 do not apply because the Order is interlocutory (Obj. ¶ 16)[5] and § 502(j) and Rule 3008 do not apply because the June 2 Order "neither allowed nor disallowed any claim" (Obj. ¶ 15). Assuming the Trust were correct, then the Court could still reconsider the June 2 Order under Fed. R. Civ. P. 54(b) (made applicable by Rules 7054 and 9014(c)). *See Stanziale v. S. Steel & Supply, L.L.C. (In re Conex Holdings, LLC)*, 524 B.R. 55, 58 & n.4 (Bankr. D. Del. 2015) (bankruptcy court entertained reconsideration when Rule 9023 did not apply). *See also Calyon N.Y. Branch v. Am. Home Mortg. Corp.*, 383 B.R. 585, 589 (Bankr. D. Del. 2008) (courts "routinely" treat motions to reconsider interlocutory orders under Rule 59(e) standards); *In re Energy Future Holdings Corp.*, 575 B.R. 616, 627–28 (Bankr. D. Del. 2017) (granting reconsideration of a concededly interlocutory order filed roughly a year after entry), *aff'd*, 904 F.3d 298 (3d Cir. 2018); *In re Tribune Co.*, 464 B.R.

---

[5]The Trust's accusation that Melamed "improperly" noticed an appeal without leave (Obj. ¶ 6 & n.5, ¶ 32) is wrong twice over. If the Order is final, no leave was needed. And even on the Trust's interlocutory premise, leave is the District Court's issue, not this Court's: Rule 8004(d) lets the district court treat a notice of appeal as a motion for leave, and that is exactly what this District does. *See In re Marvel Entm't Grp., Inc.*, 209 B.R. 832, 837 (D. Del. 1997) ("[a]lthough appellants have not filed a motion for leave to appeal, the court will construe their timely notice of appeal as such a motion."); *In re Bertoli*, 812 F.2d 136, 139 (3d Cir. 1987).

ME1\62044759.v1

208, 213 & n.6 (Bankr. D. Del. 2011) (deciding Rule 9023 motions aimed at an order denying plan confirmation while a notice of appeal was pending).  A motion aimed at an interlocutory order simply invokes "the . . . court's general discretionary authority to review and revise interlocutory rulings prior to entry of final judgment."  *Pellicano v. Blue Cross Blue Shield Ass'n*, 540 F. App'x 95, 97 n.4 (3d Cir. 2013).

8.      *Tribune* is instructive.  The bankruptcy court there denied confirmation in a lengthy decision and certain indenture trustees filed a notice of appeal and sought reconsideration under Rule 59.  The order denying confirmation was not final, yet the court entertained the Rule 59 motion, decided it on the merits, and gave it tolling effect under Rule 8002(b), noting that "the appeal is not effective until entry of an order disposing of the motions under Fed. R. Bankr. P. 9023."  *Tribune*, 464 B.R. at 213 & n.6.  Melamed's posture here — a reconsideration motion plus a dormant notice of appeal — is the same posture as in *Tribune*.

9.      If instead the June 2 Order is what the Trust elsewhere says it is — "dispositive" (Obj. ¶ 4) — then it is final, and Rules 9023 and 9024 apply by their terms.  The Order grants the Motion to Enforce in full, permanently enjoins Melamed from pursuing the claims in his Notice of Arbitration because they "have been compromised, settled, resolved, and enjoined" under the Plan, and is "immediately effective and enforceable."  (June 2 Order ¶¶ 1–3.)  It is unlimited in duration, conditioned on nothing, and preserves the enjoined claims for no forum at any time.  That is a permanent injunction, and it conclusively resolved the only dispute the Trust's own motion presented.  Bankruptcy orders "qualify as 'final' when they definitively dispose of discrete disputes within the overarching bankruptcy case."  *Ritzen Grp., Inc. v. Jackson Masonry, LLC*, 589 U.S. 35, 37 (2020).  Finality also means Melamed's appeal lies as of right under 28 U.S.C. § 158(a)(1) and, independently, under 28 U.S.C. § 1292(a)(1) as an appeal from an order granting

4

ME1\62044759.v1

an injunction.  *See In re Prof'l Ins. Mgmt.*, 285 F.3d 268, 278–80 (3d Cir. 2002) (bankruptcy finality is "pragmatic"; § 1292(a)(1) alternatively supports review of injunctive orders).

10.     The Trust's only escape from finality is to say that the June 2 Order "adjudicates fewer than all disputes between Melamed and the Trust." (Obj. ¶ 7.)  But *Ritzen* teaches that the unit of analysis is the discrete dispute, not the parties' entire relationship: the stay-relief order in *Ritzen* was final even though the underlying claims remained to be litigated.  *Ritzen*, 589 U.S. at 37–40.  The Motion to Enforce presented one controversy — whether Melamed may pursue the claims described in his Notice of Arbitration — and the June 2 Order answered it conclusively, granting that relief.  An order permanently enjoining claims follows *a fortiori* from an order denying stay relief.  *Flintkote* and *Isaac* (Obj. ¶ 16) are inapposite because they involved orders deciding pieces of a still-live claims dispute.

11.     Section 502(j) and Rule 3008 also authorize reconsideration.  The July 31, 2025 Order directed that Claim 3385 be determined through arbitration as the parties agreed.  The June 2 Order held that all claims asserted in the Notice of Arbitration in Singapore were settled and released, and enjoined their prosecution.  A ruling that claims can never become allowed claims is a disallowance in everything but caption; form does not control.  And in the claims context the standard comes from the statute: reconsideration "for cause," with the claim then "allowed or disallowed according to the equities of the case."  11 U.S.C. § 502(j).  The court's discretion is "virtually plenary," *In re Colley*, 814 F.2d 1008, 1010 (5th Cir. 1987), and Rule 3008 imposes no deadline and no heightened threshold.  Rule 9023 itself carves these motions out of Rule 59's regime — "*[e]xcept as provided in this rule and Rule 3008*, Rule 59 F.R.Civ.P. applies in cases under the Code" — and the "cause" standard "is not identical to the more stringent" requirements of Rule 60(b).  *In re Cassell*, 206 B.R. 853, 856 (W.D. Va. 1997).  The Trust's cases — *In re*

*Genesis Health Ventures, Inc.*, 362 B.R. 657, 661 (D. Del. 2007), and *In re Nortel Networks Inc.*, 2017 WL 3141906 (Bankr. D. Del. July 24, 2017) (Obj. ¶ 18) — borrow the Rule 59/60 grounds only where the claimant already litigated his claim to a conclusion, the one situation where repose makes sense.  Melamed has never litigated his claims anywhere.  He is not asking for a second bite; he has yet to get his first.  And even where courts borrow the Rule 59/60 grounds to give content to "cause," that answers only the first step: the statute's second step — allowance or disallowance "according to the equities of the case" — is an equitable command that no judicial gloss can delete.  The equities are addressed in Part II.E below.

12.    Meanwhile, the Motion itself was filed on June 16, 2026 — the fourteenth day — so it is timely under Rule 9023, and it tolls the appeal clock for all parties under Rule 8002(b)(1). The notice of appeal simply lies dormant and "becomes effective when the order disposing of the last such remaining motion is entered."  Fed. R. Bankr. P. 8002(b)(2); *see Tribune*, 464 B.R. at 213 n.6.  If the Order is instead interlocutory, a notice of appeal from a non-final order does not divest this Court of jurisdiction in any event.  *Venen v. Sweet*, 758 F.2d 117, 121 (3d Cir. 1985). While the Trust accuses Melamed of "gamesmanship," had he not filed a notice of appeal, it would have no doubt argued that the June 2 Order was final.

## II. <u>The Record Satisfies Any Reconsideration Standard</u>

13.    Whichever standard applies, reconsideration lies "to correct a clear error of law or fact or to prevent manifest injustice," *Max's Seafood Café ex rel. Lou-Ann, Inc. v. Quinteros*, 176 F.3d 669, 677 (3d Cir. 1999), and reargument is proper where the Court "has made an error not of reasoning but of apprehension."  *Brambles USA, Inc. v. Blocker*, 735 F. Supp. 1239, 1241 (D. Del. 1990).  Manifest injustice means a record "so patently unfair and tainted that the error is manifestly clear to all who view it."  *Energy Future*, 575 B.R. at 628.  The Trust's quotations from *Titus* and

*Grigg* (Obj. ¶ 19) describe motions that merely "take[] issue with the Court's findings" on a record the movant fully litigated. That is not this Motion. This Motion rests on the prevailing party's own conduct and on a solicitation record that was never placed before the Court. It clears the bar under each of the Objection's five headings, taken in turn.

14. Section 5.2 provides:

> In consideration of the classification, treatment, Distributions, releases and other benefits provided by the Debtors to their stakeholders under the Plan, on the Effective Date, the provisions of the Plan shall constitute a good-faith compromise, settlement and resolution (the "Global Settlement") of *all Claims, Interests and Causes of Action against, by or among the Debtors, including without limitation*: (a) the actual or purported fraud, unjust enrichment, misappropriation, conversion and misconduct of former Insiders; (b) any basis for the contractual, structural and legal subordination rights of any Claim or Interest or any Distribution to be made on account of any Claim or Interest; (c) the purported commingling and misuse of customer deposits and corporate funds; (d) the tracing of assets of individual Debtors to particular sources of funding; (e) transactions among the Debtors prior to and on the Effective Date; (f) the allocation of corporate and administrative expenses across each of the Debtors; (g) the effects and consequences of the Debtors' Terms of Service and whether the assets held by the FTX.com Exchange and the FTX.US Exchange are property of the Debtors' Estates; (h) the Debtors' disregard for corporate separateness before the Petition Date; (i) any causes of action by a Debtor against other Debtors; (j) the purported absence of adequate corporate governance, cash management, accounting and cybersecurity controls by the Debtors and their Affiliates prior to the commencement of the Chapter 11 Cases; and (k) all Causes of Action relating to any of the foregoing.

Plan § 5.2 (emphasis added).

**A. The June 2 Order Conflicts with the Threshold Rulings**

15. The Trust's answer to the conflict argument is to shrink both rulings until neither one decided anything: the Threshold Rulings only fixed how the SPA Claim would be treated *if* liquidated, and the June 2 Order "did not hold that any portion of the SPA Claim was settled or released." (Obj. ¶¶ 9, 21–22.) That cannot be squared with the Trust's own description of the Order as "dispositive" (Obj. ¶ 4), or with what the Order actually does. Melamed told the Court

7

at argument that his arbitration claims sit in the Crypto Indemnity component of the SPA Claim — the one piece the Court expressly reserved until any such claim "is clearly defined." (May 14, 2026 Hr'g Tr. 33:11–16; July 22, 2025 Hr'g Tr. 129:7–11.) The Threshold Rulings preserved that question and sent the SPA Claim to arbitration to be liquidated. The June 2 Order enjoins that arbitration on the ground that the claims were settled at confirmation. The same claims cannot be reserved for future definition and extinguished two years earlier. Either the enjoined claims sit inside the SPA Claim — in which case the June 2 Order settled and released what the Threshold Rulings preserved and referred, a direct conflict — or they sit outside it, in which case the Order rests on the preservation ground the Court expressly declined to reach. (June 2 Order ¶ 2 n.2.) Either way, the Order cannot stand as written.

16. The Trust says the conflict is manufactured by Melamed's "recharacterization" of his claims (Obj. ¶¶ 10, 23), and that the argument comes too late (Obj. ¶ 25). Neither charge lands. Melamed's position has not moved: his arbitration claims arise from the unpaid Crypto Consideration and sound in the SPA's indemnity provisions. It is the Trust that keeps changing what the June 2nd Order is — dispositive or interlocutory, a ruling on nothing or a settlement of everything — depending on the argument of the moment. And no one could have briefed a conflict with the June 2nd Order before it existed. Until the Court held the claims "compromised, settled, [and] resolved," there was no holding to reconcile with the Threshold Rulings. That is precisely the kind of error "of apprehension" reconsideration reaches. *Brambles*, 735 F. Supp. at 1241.

17. The Trust's remaining points fare no better. It quotes Melamed's earlier observation that the Threshold Rulings would be "advisory" absent liquidation of the claim (Obj. ¶ 22) — but that is Melamed's point. The Threshold Rulings were built to govern the treatment of the SPA Claim once liquidated in arbitration, which is why enjoining the arbitration guts them.

ME1\62044759.v1

And the Trust's observation that the Court "was well aware" of its own Threshold Rulings when it entered the June 2 Order (Obj. ¶ 24) misses the problem entirely. Of course it was. What nobody briefed — because the Trust's motion never confronted it — was what declaring the arbitration claims "settled" would do to rulings that presuppose a live claim headed to liquidation. The conflict was never put in front of the Court, which is exactly what makes it "a decision outside of the adversarial issues presented." *Brambles*, 735 F. Supp. at 1241.

**B. The Trust's Conduct Demonstrates the Interpretation of § 5.2 is Clear Error**

18.     The Trust waves Melamed's § 5.2 arguments away as "repackag[ing]." (Obj. ¶¶ 11, 26.) Initially, it should be highlighted that in the *Motion to Enforce Prior Orders That Preclude Seth Melamed from Asserting New Claims in Arbitration* [D.I. 35243] (the "**Motion to Enforce**"), the Trust devoted a total of two pages (seven paragraphs) to the argument that § 5.2 effectuated a global release. Notable, the Trust did not even assert that *all* fraud claims were released under §5.2. Rather it suggested that general claims for fraud were released: "the generalized allegations … concerning FTX's finances, governance, and handling of customer or corporate assets put Melamed in the same position" as other creditors asserting similar misconduct. Motion to Enforce at ¶ 41. In making this argument, the Trust ignored the arguments that were made by the Debtors in response to the Objection of the United States Trustee.

### Preconfirmation

19.     Prior to confirmation, the Debtors never suggested in any document that section 5.2 was intended to effectuate a global release of claims. The Disclosure Statement contains no description of 5.2 other than a verbatim copy paste of the text, the ballots contain no bolded language and the briefs submitted in connection with confirmation described this provision as

9

standard, unremarkable language.  Section 5.2 cannot now be retroactively transformed into a release.

20.     The permanent extinguishment of a creditor's filed claims deserved more than that — and it deserved the record set out below.

**Postconfirmation**

21.     By its plain terms, Section 5.2 applies to "all Claims, Interests and Causes of Action *against, by or among* the Debtors."  If the provision automatically settled every claim premised on the FTX fraud, as the Trust represented to the Court (May 14, 2026 Hr'g Tr. 59:24–60:15), then it settled the Debtors' own fraud-premised causes of action too.

22.     The Trust's conduct has been completely inconsistent with this statement.  On October 31, 2024 — three weeks after confirmation — the Debtors filed proofs of claim (the "**Silvergate Claims**") against each of the debtors in *In re Spring Valley Lots, LLC (f/k/a Silvergate Capital Corp.)*, No. 24-12158 (KBO) (Bankr. D. Del.) asserting aiding-and-abetting and unjust enrichment claims expressly premised on "the FTX Insiders . . . perpetrating a sprawling fraudulent scheme."  (Silvergate Claim, Addendum ¶¶ 7–10.)[6]  The Silvergate Claims were signed under penalty of perjury and to date have not been withdrawn.  If the Trust really believed that § 5.2 effectuated an extinguishment of fraud claims, it would not have signed — or kept alive — proofs of claim it believed the Plan had extinguished.[7]

23.     Silvergate is not unique.  One month after confirmation, the Debtors sued Binance and Changpeng Zhao in this Court to avoid certain transfers and to assert claims for fraud, unjust

---

[6] A copy of the Silvergate Claim is attached hereto as **Exhibit "A"** to the Declaration of David Adler ("**Adler Decl**.") filed herewith.

[7] The Trust's own Silvergate claim is "unfixed" and "unliquidated" (Addendum ¶ 4), asserts damages based on claims "not identified in this Proof of Claim" (*id*. ¶ 12), and devotes six paragraphs to reservations of rights, including the right "to amend and/or supplement . . . for any purposes" (*id*. ¶¶ 14–19) — including indemnification claims.

ME1\62044759.v1

enrichment and intentional misrepresentation.  *FTX Trading Ltd. v. Binance Holdings Ltd.*, Adv. Pro. No. 24-50222 (KBO) (Bankr. D. Del.).  Those claims are Causes of Action "by" the Debtors premised on insider fraud — Sections 5.2(a), (c) and (k) to the letter.  And the Trust is still prosecuting them: on July 6, 2026 — five weeks *after* the June 2 Order — its counsel wrote to this Court defending those claims against dismissal and rejecting the notion that Bankman-Fried's fraud forfeits the estates' claims against third parties.  [Binance Action. D.I. 155.][8]

24.     The *Silvergate* record shows nobody else interpreted § 5.2 the Trust's way either. The Silvergate debtors' disclosure statement — filed September 5, 2025, eight months after the FTX Plan's Effective Date — treats both sets of cross-claims as live: Silvergate's own fraud, contract, indemnification and RICO claims against the FTX Debtors are described as unobjected-to and "prima facie valid," and the FTX claims sit behind a dedicated disputed-claims sub-reserve awaiting allowance.  (Silvergate Disclosure Statement at 32, 89 [D.I. 970].)  The Trust — a claimant entitled to notice — received that disclosure statement and plan and did not object to either premise.  A creditor with notice who fails to object is bound, *United Student Aid Funds, Inc. v. Espinosa*, 559 U.S. 260, 272–76 (2010); *accord Travelers Indem. Co. v. Bailey*, 557 U.S. 137, 152–55 (2009) (*see* Obj. ¶¶ 11, 28) — the Trust is bound to a confirmed plan premised on the survival of exactly the claims it says died at the FTX confirmation.  And the asymmetry runs in Melamed's favor: when Melamed did not single out § 5.2 at the FTX confirmation, the extinguishment reading did not exist anywhere; when the Trust stood silent in Silvergate in the fall

---

[8]The contrast with the Debtors' actual settlement practice is instructive.  When the Debtors meant to compromise claims involving a Binance entity, they did it the old-fashioned way: on May 29, 2024, the Court approved the Collateral Claim Settlement Agreement granting Binance (Switzerland) AG an allowed $50 million general unsecured claim, with express releases and reciprocal covenants, under Rule 9019.  [D.I. 16003 ¶¶ 3–6.]  Identified parties, defined consideration, express releases, and a 9019 order — exactly as with the FTX DM settlement incorporated into Section 10.5 of the Plan.  At no point did anyone treat Section 5.2 as having settled claims by or against anyone.

ME1\62044759.v1

of 2025, the Trust had been pressing that reading for months.  The Trust cannot demand absolute plan finality to bar Melamed's claims while ignoring its own binding silence:

25.     The chronology as recounted in the Argent Joinder tells the whole story. (Argent Joinder ¶¶ 28–29.)   For months after the Effective Date, the Trust objected to fraud-premised proofs of claim through dozens of ordinary omnibus objections which never sought disallowance under § 5.2.  The Trust first invoked the provision on February 25, 2025 — and even then only narrowly, to keep customers from double-recovering on their deposits.  It was first aimed at Melamed in the Motion to Enforce, nearly a year and a half after confirmation.  A construction that surfaces eighteen months after confirmation, as a litigation position, in direct contrast to the proponent's conduct, is not a construction.  It is an expedient.

26.     The confirmation record is just as lopsided.  Through fifteen months of drafting, the Debtors widened § 5.2's scope but never added a word saying any claim would be "released," "expunged" or "disallowed" — when the *Celsius* drafters wanted a plan to expunge filed claims, they wrote a separate provision saying exactly that; the FTX drafters wrote none. (Argent Joinder ¶¶ 13–15, 84–87.)  The Disclosure Statement's description of § 5.2 is a *verbatim* copy-paste of its text — no release, no affected creditors, no consent mechanism, no consideration.  (*Id.* ¶ 88; Disclosure Statement at 114–15.)  To win confirmation, the Debtors called the provision "standard, unremarkable language," citing materially identical provisions in other confirmed Delaware plans, none of which has ever been read to expunge a filed claim.  (Argent Joinder  ¶¶ 68–69.)

27.     The Debtors' own words at confirmation were more emphatic still.  Responding to objections, they conceded that a debtor cannot "unilaterally seek to modify claims in a Chapter 11 plan" and affirmed they were "not attempting to circumvent any requirement imposed by the Bankruptcy Code or the Bankruptcy Rules."  (Confirmation Reply ¶ 81; Joinder ¶ 26.)  At the

12

October 7, 2024 hearing, counsel walked the Court through the Plan's actual negotiated settlements — the Customer Priority Settlement and the FTX DM Global Settlement, each with identified parties, described consideration and express releases — and said not one word suggesting § 5.2 would extinguish creditors' filed claims by its terms. (Oct. 7, 2024 Hr'g Tr. 10:4–11:3, 133:3–135:5; Argent Joinder ¶¶ 89–90.) The Confirmation Order tracks those representations: it describes the Global Settlement as a compromise made "in consideration for" Plan treatment and expressly contemplates that Holders of Allowed Claims will receive Distributions — nowhere does it describe § 5.2 as releasing or expunging anything. (Confirmation Order ¶ 93; Argent Joinder ¶ 27.)

28.    The solicitation record also speaks volumes. Rule 3016(c) requires a plan injunction against conduct not otherwise enjoined by the Code to be described "in specific and conspicuous language (bold, italic, or underlined text)" in the plan and disclosure statement, and Rule 2002(c)(3) requires the same in the confirmation notice. The Debtors knew how to comply: the ballots warned creditors in capital letters about the Article 10 third-party release and supplied an opt-out checkbox which Melamed checked. Section 5.2, by contrast, sits in ordinary type in the Plan's "Implementation" article, and the ballots never mention it or the Global Settlement at all. If § 5.2 were the universal release the Trust describes, then the Plan, the Disclosure Statement, the ballots and the notice all violated Rules 3016(c) and 2002(c)(3). The far more natural conclusion is the one every solicitation document reflects: § 5.2 is not a release at all. It is a piece of the inter-estate Global Settlement that channels claims through the Plan's distribution and claims-resolution machinery, leaving claims — the Debtors' and creditors' alike — to be resolved on their merits. That failure is not a technicality. A confirmed plan binds a creditor only to the terms disclosed to him — the premise of the Trust's own authorities (Obj. ¶ 28) — and a release

13

that Rule 3016(c) required to be stated in "specific and conspicuous language," yet appeared in no bold type, no ballot, and no notice, cannot be given preclusive effect against the creditor from whom conspicuous disclosure was withheld.

29.    The Trust cannot have it both ways.  Either § 5.2 categorically extinguished unadjudicated fraud-premised causes of action — in which case the Trust has spent twenty months prosecuting extinguished claims under penalty of perjury in a neighboring chapter 11 case and in an adversary proceeding on this Court's own docket — or § 5.2 is what its text, structure and history show it to be: a component of the inter-estate Global Settlement that channels claims through the Plan's distribution and claims-resolution machinery, leaving the merits for another day.  The Trust's conduct supplies the answer.  When its own recoveries are at stake, § 5.2 touches nothing.  When a creditor's filed claim is at stake, it becomes a self-executing extinguisher.  The Trust cannot read the word "by" out of § 5.2 to suit the needs of the moment.

30.    This is not just atmospherics.  A confirmed plan is interpreted like a contract, and a party's course of performance is strong evidence of what the contract means.  *See In re Shenango Grp., Inc.*, 501 F.3d 338, 344 (3d Cir. 2007); *Eagle Indus., Inc. v. DeVilbiss Health Care, Inc.*, 702 A.2d 1228, 1232–33 (Del. 1997).  The Trust's twenty months of prosecuting fraud-premised claims is its own practical construction of § 5.2.  Judicial estoppel supplies the rest: a party may not play fast and loose with the courts by prevailing on irreconcilably inconsistent positions.  *New Hampshire v. Maine*, 532 U.S. 742, 749–51 (2001); *Krystal Cadillac-Oldsmobile GMC Truck, Inc. v. Gen. Motors Corp.*, 337 F.3d 314, 319–25 (3d Cir. 2003).  The Trust has sworn to the Silvergate court that the FTX Group holds live, prosecutable fraud-premised causes of action.  It tells this Court that § 5.2 settled everything premised on that same fraud.  Both cannot be true.

14

31.     Moreover, the Trust failed to rebut how Melamed's claims could be extinguished under section 5.2 when § 10.9 of the Plan explicitly preserves those claims:

**10.9. Limitations on Exculpations and Releases**

Notwithstanding anything to the contrary herein, none of the releases or exculpations set forth herein shall operate to waive or release any obligation or Causes of Action of any Person or Entity: (a) arising under any contract, instrument, agreement, release or document delivered pursuant to the Plan or documents, agreements or instruments executed in connection therewith, including all post-Effective Date obligations, (b) arising under the FTX DM Global Settlement Agreement or (c) solely in the case of releases, expressly set forth in and preserved by the Plan, the Plan Supplement or related documents, including the Preserved Potential Claims.

32.     To the extent the Court determined that § 5.2 was a Global Settlement that released fraud claims, it should also have determined that, under § 10.9, Melamed did not release his claims arising under the SPA.

33.     Reconsideration is appropriate here.  Consider what the June 2 Order did: it disposed of Melamed's claims summarily — on a construction of § 5.2 advanced for the first time in a motion to enforce, without discovery, without an evidentiary record, and without reaching the Trust's alternative arguments — even though no tribunal anywhere has ever adjudicated their merits.  And the Court accepted counsel's description of § 5.2 as a self-executing settlement of all fraud-premised claims without being told that the Trust was prosecuting exactly such claims down the hall.  That is an error "not of reasoning but of apprehension." *Brambles*, 735 F. Supp. at 1241. In *Max's Seafood*, the Third Circuit held it an abuse of discretion not to correct a ruling premised on counsel's account that the documents refuted.  176 F.3d at 677–78.  The Silvergate and Binance filings are those documents.  And where the prevailing party's presentation kept the true picture from view, Rule 60(b)(3) — squarely in the case through Rule 9024, contrary to the Trust's footnote (Obj. ¶ 18 n.6) — independently authorizes relief from an order obtained through a

15

presentation that "prevented the moving party from fully and fairly presenting his case." *Stridiron v. Stridiron*, 698 F.2d 204, 207 (3d Cir. 1983).

**C. The § 10.8 Ruling Cannot Rest on a "Waiver"**

34.     Three times, the Objection asserts that counsel "withdrew," "expressly waived," or "expressly disclaimed" Melamed's Plan-injunction arguments, resting each time on one clipped fragment: "I, frankly, am not seeking to get a ruling on 10.8." Obj. ¶¶ 3, 12, 29 (quoting Tr. 50:11-51:2). The passage without the truncation reads differently.

> If there is no discharge and there is no injunction under 524, I don't know how there can be a plan injunction that references that it extends to the fullest extent authorized or provided by the Bankruptcy Code. . . . [W]ithout the discharge, you don't have 524.
> So, Your Honor, I mean, I think that it's an issue here. I, frankly, am not seeking to get a ruling on 10.8. I think Your Honor could deal with the 5.2 part and determine that Melamed's contractual claim for indemnity was not compromised or released by the ad hoc group of customers.

May 14, 2026 Hr'g Tr. 50:23–51:2 (Ex. 5).

35.     By its terms, § 10.8 does not apply.  It provides:

> Except as otherwise expressly provided in the Plan or Confirmation Order with respect to Preserved Potential Claims, **the satisfaction and release pursuant to this Article 10 shall also act as a permanent injunction** against any Person who has held, holds or may hold Claims, Interests or Causes of Action from (a) commencing or continuing any action to collect, enforce, offset, recoup or recover with respect to any Claim, liability, obligation, debt, right, Interest or Cause of Action released, settled or exculpated under the Plan or the Confirmation Order to the fullest extent authorized or provided by the Bankruptcy Code, including to the extent provided for or authorized by sections 524 or 1141 thereof, (b) enforcing, attaching, collecting, or recovering by any manner or means any judgment, award, decree, or order on account of or in connection with or with respect to any such Claim or Interest; (c) creating, perfecting or enforcing any encumbrance of any kind on account of or in connection with or with respect to any such Claims or Interests; and (d) asserting any right of setoff that was not validly asserted before Confirmation, or subrogation of any kind on account of or in connection with or with respect to any such Claim or Interest, against any Plan Asset, the Wind Down Entities, any Holder of a Claim or Interest or any initial or subsequent transferee. Notwithstanding anything to the contrary in the Plan, all Holders of Claims, Interests or Causes of Action are enjoined from interfering with the

16

ME1\62044759.v1

> Distributions contemplated by the Plan and from asserting any Claim or Cause of Action expressly preserved and vested exclusively in the Wind Down Entities as of the Effective Date.

Plan § 10.8 (emphasis added).

36.     Counsel stated that the § 10.8 defect "is an issue here," argued its substance, and offered the Court a narrower dispositive path under § 5.2. Offering a narrower ground of decision is ordinary advocacy, not waiver — and the characterization survives only by deleting the sentence before the quoted fragment and the sentence after it.

37.     On the merits, § 10.8 enforces what the Plan settles or releases; it is machinery, not an independent source of extinguishment.  If § 5.2 did not settle Melamed's claims — and it did not — § 10.8 adds nothing.  And the only release Melamed was ever asked to consent to was the Article 10 third-party release, the one he opted out of on the only ballot he was ever given.  Reading § 10.8 to impose a broader, involuntary release that was never disclosed in the ballot or the disclosure statement compounds the Rule 3016(c) problem discussed above; it does not cure it.

**D. The Trust's "Independent Reasons" are the Grounds the Court Declined to Reach**

38.     The Trust closes its merits argument by saying reconsideration "would still be unwarranted and serve no purpose" because the arbitration claims were unpreserved and exceed the Arbitration Order.  (Obj. ¶ 31.)  Those are the alternative grounds the Court found it "unnecessary" to decide.  (June 2 Order ¶ 2 n.2.)  An order cannot be insulated from reconsideration by arguments the Court never adopted.  If the ground the Court did adopt is wrong, the answer is to vacate the ruling and take up the alternatives on a full record — not to leave a permanent injunction standing on a rationale that cannot support it.

39.     At a minimum, the Court need not choose between leaving the June 2nd Order untouched and vacating it outright. If the Court is not prepared to vacate the Order, Melamed

17

respectfully submits that the Order should be amended to conform to the Threshold Rulings: an amendment providing that nothing in the June 2nd Order enjoins the prosecution in arbitration of the claims within Claim No. 3385 referred to arbitration by the Arbitration Order [D.I. 32058], including the indemnification claim arising from the Crypto Consideration as to which the Court "reserves judgment regarding the allowance, classification, and subordination." [D.I. 32057 ¶ 3.] Such an amendment asks the Court to revisit nothing. It enforces the Court's July 31, 2025 Orders precisely as written; it leaves the Trust's alternative arguments — preservation and the scope of the referral — for adjudication on a full record, exactly where footnote 2 of the June 2 Order left them; and it returns the parties to the posture the Threshold Rulings established: liquidation of the SPA Claim in the referred arbitration, with allowance, classification, and subordination of the result reserved to this Court.

**E. The Equities Run Entirely in Melamed's Favor**

40.    The Trust's "equities" argument is name-calling: "gamesmanship," "bad faith," "dilatory tactics."  (Obj. ¶ 32.)  Section 502(j) points the Court to the equities *of the case* — the fairness of the claims treatment at issue — not to a tally of adjectives.[9]

---

[9] The Trust's insinuation that Mr. Melamed has "violated" the June 2 Order (Obj. ¶ 5, 32) is refuted by the sworn declaration of his lead SIAC counsel and by the Trust's own exhibits. First, the challenge to arbitrator Daniel Schimmel — which the Trust casts as post-Order obstruction — was filed on May 12, 2026 and fully briefed by May 29, 2026, three weeks before this Court entered the June 2nd Order. Allen Decl. ¶ 6 & n.2. A challenge that predates the Order cannot have been contrived to evade it. Second, the decision to defer the Trust's termination request pending resolution of that challenge was the Tribunal's, not Mr. Melamed's: the President of the Tribunal informed the parties on June 15, 2026 that the Tribunal did not intend to decide the termination request before the SIAC Court decided the challenge, and the June 18 suspension was ordered by the SIAC Registrar under Rule 27.4. Allen Decl. ¶¶ 10–11; Glueckstein Decl. Ex. 8 [D.I. 36003-8]. The suspension therefore "prevented" nothing the Tribunal was otherwise poised to do. Third, the assertion that Mr. Melamed asked the Tribunal to "stay the effect of the June 2 Order" (D.I. 36002 ¶ 5) misdescribes his counsel's June 4 email, which requested only that a pre-existing Statement-of-Claim deadline "continue to be held in abeyance (in the manner set out in Procedural Order No 2)" and expressly did not ask the Tribunal to stay or disregard this Court's Order. Allen Decl. ¶ 3; Glueckstein Decl. Ex. 6 [D.I. 36003-6]. Since entry of the Order, Mr. Melamed has filed no statement of claim, evidence, or other submission advancing the noticed claims. Allen Decl. ¶ 12.

41.    As set forth above, the conduct of the Trust has been inconsistent regarding Section 5.2 from not raising the issue in the Amended Claims Objection and in prosecuting estate claims that would appear to have been released.  Melamed's steps have been rule-sanctioned at every turn: a timely reconsideration motion, a protective notice of appeal that ripens by operation of Rule 8002(b)(2), and a request that the arbitral tribunal await this Court's rulings.  (*See supra* Part I.) The equities that matter are these: a creditor's timely filed claims were extinguished, without adjudication and for no consideration, on a construction of § 5.2 that did not exist — anywhere — until months after confirmation, that contradicts every statement made to this Court at or before confirmation, and that the Trust refutes in its own sworn filings.

42.    The Trust invokes the equities while waiting eighteen months to raise this issue, while prosecuting the mirror image of the claims it has enjoined; and while enforcing against a single non-customer creditor a reading of § 5.2 that it never disclosed, never solicited votes on, never presented at confirmation, and does not itself observe.  Melamed's timely filed claims were extinguished without adjudication and for no consideration. An order that permanently extinguishes a creditor's claims on a construction of the Plan that its own proponent disavows in sworn filings is neither. *See* "*In re Ira Haupt & Co.*, 361 F.2d 164, 168 (2d Cir. 1966) ("the conduct of bankruptcy proceedings not only should be right but must seem right.")(Friendly, J.).

## **CONCLUSION**

For the foregoing reasons, the Court should grant the Motion and vacate the June 2, 2026 Order. In the alternative, the Court should amend the June 2, 2026 Order to provide that it does not enjoin the prosecution in arbitration of the claims within Claim No. 3385 referred by the Arbitration Order [D.I. 32058], including the indemnification claim arising from the Crypto

19

Consideration reserved by the Court [D.I. 32057 ¶ 3], and grant such other and further relief as is just and proper.

Dated: July 20, 2026
         Wilmington, Delaware

Respectfully submitted,

**McCARTER & ENGLISH, LLP**

/s/ *Kate R. Buck*
Kate R. Buck (No. 5140)
Lawrence J. O'Brien (No. 7000)
Renaissance Centre
405 North King Street, 8th Floor
Wilmington, Delaware 19801
Telephone: (302) 984-6300
Facsimile (302) 984-6399
kbuck@mccarter.com
lobrien@mccarter.com

-and-

David J. Adler (admitted *pro hac vice*)
250 W. 55th Street, 13th Floor
New York, New York 10019
Telephone: (212) 609-6847
Facsimile: (212) 609-6921
dadler@mccarter.com

*Counsel to Seth Melamed*

20

ME1\62044759.v1