**EXHIBIT B**

Trustee objected to Section 5.2 on the ground that it impermissibly "purports to treat the Plan itself as if it were a Rule 9019 'settlement.'" *Id.* ¶ 71. The U.S. Trustee argued that section 1123(b) of the Bankruptcy Code "does not authorize a debtor to unilaterally seek to modify claims in a Chapter 11 plan" and that "[t]he resolution of claims against the Debtors is governed by sections 1129 and 1141." *Id*. ¶¶ 63–71.

26. In response, the Debtors did not defend Section 5.2 as a self-executing bar to all filed proofs of claim. Instead, the Debtors asserted that Section 5.2 was not novel or unprecedented and used standard, boilerplate language, noting that "several plans approved by this Court contain ***almost identical*** language to Section 5.2 of the Plan." *See Debtors' Omnibus Reply to Objections to Confirmation of the Second Amended Joint Plan of Reorganization* ¶ 79 [Dkt. No. 26039] (the "Debtors' Confirmation Reply") (emphasis added) (citing *In re Mallinckrodt PLC*, Case No. 20-12522 (JTD) (Bankr. D. Del. Feb. 18, 2022) [Dkt. No. 6510]; *In re SiO2 Med. Prods., Inc.*, Case No. 23-10366 (JTD) (Bankr. D. Del. July 17, 2023) [Dkt. No. 466]; *In re Glob. Eagle Ent.*, Case No. 20-11835 (JTD) (Bankr. D. Del. Jan. 29, 2021) [Dkt. No. 753]).

26. The Debtors also squarely disavowed all suggestions that Section 5.2 would allow them to circumvent the claims resolution process. The Debtors conceded that section 1123(b)(5) of the Bankruptcy Code does not authorize a debtor "to unilaterally seek to modify claims in a Chapter 11 plan." *Id*. ¶ 81. And the Debtors affirmed that they were "not attempting to circumvent any requirement imposed by the Bankruptcy Code or the Bankruptcy Rules," adding that the Debtors "satisfy both section 1123(b) of the Bankruptcy Code and Bankruptcy Rule 9019." *Id.*

14

27.     Ultimately, on October 8, 2024, the Court confirmed the Plan, overruling objections thereto. *See Findings of Fact, Conclusions of Law and Order Confirming the Second Amended Joint Plan of Reorganization of FTX Trading Ltd. and Its Debtor Affiliates* [Dkt. No. 26404] (the "Confirmation Order").   In that order, consistent with the Debtors' narrow characterization of Section 5.2 in support of confirmation, the Court described the Global Settlement as a compromise made "in consideration for" Plan treatment, including expressly contemplating that Holders of an "Allowed Claim" would have "Distributions made" to them pursuant to Article 7.  *See id.* ¶ 93.  The Confirmation Order did not describe Section 5.2 as releasing or expunging any and all claims against the Debtors, including Disputed Claims.  *See id.*

### III.     Months After Confirmation, the FTX Trust First Invokes Section 5.2 to Bar Certain Customer Claims.

28.     Neither the Debtors nor the FTX Recovery Trust (the "FTX Trust") treated Section 5.2 as a claim-extinguishment device until several months after the Plan was confirmed. For months before and after confirmation, the Debtors objected to numerous proofs of claim through the ordinary Article 8 claims adjudication process, including by filing dozens of omnibus objections.  The Debtors did not once contend in those objections that any of those proofs of claim were subject to a mass settlement or extinguishment under Section 5.2, even when such claims involved allegations of fraud.  *See, e.g.*, *FTX Recovery Trust's One Hundred Fifty-Sixth (Substantive) Omnibus Objection to Certain Overstated and/or Unliquidated Proofs of Claim (Customer Claims)* [Dkt. No. 29729] (the "156th Omnibus Objection") (objecting to certain proofs of claim without invoking Section 5.2); 156th Omnibus Objection, Ex. ~~B~~**A, Schedule 1** at ~~7~~**9** [Dkt. No. ~~29729-3~~**29729-2**] (noting that, in support of his claims, one of the

15

unilateral, consideration-less forfeiture.  The claims allowance process *is* the delivery mechanism for the consideration that Section 5.2 contemplates.  Without it, the "classification, treatment, Distributions, releases and other benefits" identified in the opening clause cannot be provided.

61.     The breadth of Section 5.2's language is an important textual feature, and it is fatal to the FTX Trust's reading.  Section 5.2 does not settle a narrow category of claims.  Section 5.2 was explicitly updated to provide that "*all* Claims, Interests and Causes of Action against, by or among the Debtors, . . . *without limitation*," are resolved in exchange for Plan treatment.  *Id.* § 5.2 (emphases added).  Every word of that phrase matters.  "All" means all—not some, not most, and not only fraud-related claims.  Section 5.2 lists some specific categories of disputes (for example, subordination and priority disputes, asset-ownership and tracing disputes, and inter-Debtor issues), but it unmistakably "includ[es] *without limitation*" those kinds of Causes of Action.  *Id.* (emphasis added).  Caselaw makes clear that "including without limitation" must be interpreted broadly and non-exclusively.  *See, e.g.*, *Weyerhaeuser Co. v. Domtar Corp.*, 61 F. Supp. 3d 445, 450 (D. Del. 2014) ("Under Delaware law, contract language such as 'including without limitation' and 'including but not limited to' is interpreted broadly. . . . [T]he Third Circuit has interpreted such language to mean that the following list is 'not exhaustive.'" (first quoting *CorVel Enter. Comp, Inc. v. Schaffer*, Civ. No. 4896, 2010 WL 2091212 at *2 (Del. Ch. May 19, 2010); then quoting *Cooper Distrib. Co. v. Amana Refrigeration, Inc.*, 63 F.3d 262, 280 (3d Cir. 1995))); *accord* 11 U.S.C. § 102(3) ("'includes' and 'including' are not limiting").  So does the Plan itself **and other plans**.  *See**, e.g.,*** Plan § 2.2(~~k~~**a) (including rules of construction providing that "any reference herein to the word 'including' or word of similar import shall be read to mean 'including without limitation'"); *Second Amended Joint Chapter 11 Plan Proposed by Residential Capital, LLC,***

*et al. and the Official Committee of Unsecured Creditors* at Art. I.B, Dkt. No. 6065-1, In re *Residential Capital, LLC, et al.,* No. 12-12020 (MG) (Bankr. S.D.N.Y. Dec. 11, 2013) (including rules of construction providing that "the words 'includes' and 'including' are not limiting and mean that the things specifically identified are set forth for purposes of illustration, clarity, or specificity and do not in any respect qualify, characterize, or limit the generality of the class within which such things are included").[10]  Because the categories in Section 5.2 are merely illustrative, the FTX Trust's attempt to isolate subpart (a)—claims for fraud and misconduct of former FTX Group higher-ups—and treat it as the only operative mechanism of claim extinguishment cannot be reconciled with the illustrative nature of this list.  These categories are merely examples of the types of controversies channeled into the Plan process in consideration for Plan treatment, classification, and Distributions.

62.     Moreover, the Plan's defined term "Cause of Action" underscores the breadth of Section 5.2's reach.  "Cause of Action" is defined extremely broadly, incorporating "any action, claim, cause of action, controversy . . . of any kind or character whatsoever" including unliquidated and unknown causes of action arising "in contract or in tort, in law or in equity, or pursuant to any other theory of law, including without limitation"[11] an illustrative list of claims and disputes, including contract claims and objections to filed proofs of claim.  *See* Plan § 2.1.27.  This is a catchall definition, plainly intended to include everything the drafters could

---

[10]   Further, plans confirmed in this District regularly incorporate this language, including one of the cases the Debtors cited at confirmation to assert that Section 5.2 is mere boilerplate language.  *See, e.g.*, *Second Amended Joint Plan of Liquidation for Global Eagle Entertainment Inc. and its Affiliate Debtors Under Chapter 11 of the Bankruptcy Code* at 50, Dkt. No. 753-1, *In re Glob. Eagle Ent.*, No. 20-11835 (JTD) (Bankr. D. Del. Jan. 29, 2021) ("the provisions of this Plan shall collectively constitute an integrated and global good faith compromise or settlement of all Claims, Interests and controversies . . . ***including, without limitation*** [specific claims, interests, or controversies related to varying causes of action]" (emphasis added)).

[11]   Here is yet another illustrative, non-exhaustive list which should not be interpreted as cabined to just the specified categories.

relevant here, the Debtors' fraud-based claims against Silvergate.  Plan § 5.17; Confirmation Order ¶ 122.  But if the FTX Trust's interpretation is accepted that Section 5.2 extinguished "all Claims, Interests and Causes of Action against, by or among the Debtors . . . without limitation" on the Effective Date, then Section 5.17 has nothing left to preserve.  Section 5.2 says "by or among," not just "against."  The FTX Trust's own claims, including its purported claims against Silvergate, are "Claims" or "Causes of Action" "by" the Debtors.   The FTX Trust cannot have it both ways.

75.    ***Section 10.4***.  The Plan's "Voluntary Release by Holders of Claims and Interests" provides that creditors who do not affirmatively opt out "shall be deemed to [have] conclusively, absolutely, unconditionally, irrevocably and forever release[d]" certain claims against the defined Released Parties in exchange for the implementation of the Plan and distribution of proceeds.  Plan § 10.4.  Section 10.4 is the Plan's mechanism for creditor-side releases, and it operates only upon either affirmative consent or deemed consent through a failure to opt out.  *See* ~~Disclosure Statement at 157-58~~*id*.  Importantly, the "Released Parties" is a defined term that does not include the Debtors' estates themselves.  Plan § 2.1.171.  Moreover, Section 10.4 expressly carves out from even this consent-based release "Causes of Action to the extent arising out of conduct that occurred prior to the Petition Date."[17]  *Id.* § 10.4.  The Silvergate Claims arise from pre-petition conduct and thus fall squarely within this carve-out, and so the Debtors

---

[17]    Notably, Section 10.4 also carves out from release "any Preserved Potential Claims that are otherwise transferred to, and may be prosecuted by, the Wind Down Entity pursuant to the terms of the Plan."  Plan § 10.4.  "Preserved Potential Claims" are defined as the "Causes of Action set out in the Plan Supplement," Plan § 2.1.156, which, in turn, defines "Cause of Action" as "hav[ing] the meaning assigned to [it] in the Plan," Liquidating Trust Agreement at § 1.1(l), Dkt. No. 26226-3, which, in turn, defines "Cause of Action" to encompass "any claim against Persons or Entities that are not released under the Plan, including the Preserved Potential Claims," Plan § 2.1.27.  Through these circular definitions, the "Preserved Potential Claims" carved out from Section 10.4's release encompass the same universe of Causes of Action defined under the Plan—that is, effectively *everything*.

40

"critical stone" that "resolved after many months of discussion" the "dispute between FTX and all of its organized customer constituencies concerning whether digital asset entitlements should be treated as claims or property interests" and whether "customers should have some priority over general unsecured creditors." Oct. 7, 2024 Hr'g Tr. 10:13–11:3. The Disclosure Statement describes the "central and highly controversial issue" of customer property interests, the parties involved, the priority structure, and the rationale for resolving the litigation. *See* Disclosure Statement at 25, 88–91; *see also* Oct. 7, 2024 Hr'g Tr. 133:3–135:5. The relevant outcome of the Customer Priority Settlement, addressing the waterfall of recoveries, is set forth in the second half of Section 5.2, but that settlement itself is not discussed elsewhere in the Plan.

90.    Similarly, the FTX DM Global Settlement, which resolved FTX DM's approximately $7.7 billion fraudulent transfer claim and $1.1 billion indemnification claim, was a bilateral agreement that Debtors' counsel described as having been "worked out" over many months of mediation and that was "already been approved by Your Honor and the Court in the Bahamas." Oct. 7, 2024 Hr'g Tr. 10:~~4  12~~**4–17**. The FTX DM Global Settlement included explicit mutual releases backed by specific consideration and was separately approved under Bankruptcy Rule 9019. *See* Disclosure Statement at 76–78; Approved FTX DM Settlement Agreement § 9.01. The release provisions of the FTX DM Global Settlement were then expressly incorporated into Section 10.5 of the Plan by specific reference. Plan §§ 5.3, 10.5.

91.    Section 5.2, by contrast, has none of these characteristics or descriptions: no separate motion, no separate approval, no bilateral negotiation, no identified parties, and no incorporation into the Plan's release provisions. Its operative language regarding the Plan provisions constituting "a settlement, compromise, and resolution of all" claims has remained unchanged since the First Filed Plan in December 2023—not because it was the product of

49