**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| In re:<br><br>FTX TRADING LTD., *et al.*,<br><br>Debtors. | Chapter 11<br><br>Case No. 22-11068-KBO<br><br>(Jointly Administered)<br><br>Related to Docket Nos. 34704 and 35863 |

**SUPERSEDING OPPOSITION OF CREDITORS ALEXANDER MASHINSKY, KOALA1 LLC, AND AM VENTURES HOLDINGS INC. TO FTX TRUST'S <u>FIRST AMENDED OBJECTION</u>**

Creditors Alexander Mashinsky ("Mashinsky"), Koala1 LLC, and AM Ventures Holdings Inc. hereby submit this superseding opposition (the "Superseding Opposition"), pursuant to Section 502 of Title 11 of the United States Code, 11 U.S.C. §§ 101 *et seq.* (the "Bankruptcy Code"), Rule 3001 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), and Rule 7007-2 of the Local Rules of the United States Bankruptcy Court for the District of Delaware (the "Local Rules"), to the First Amended Objection filed by The FTX Recovery Trust (a/k/a the Consolidated Wind Down Trust) (hereafter the "Trust")and in support hereof, state as follows:

**<u>Preliminary Statement</u>**

1. This dispute arises from one of the most consequential frauds in the history of the digital-asset industry, but the Trust has the victim and the wrongdoer reversed.

2. Mashinsky was the founder and Chief Executive Officer ("CEO") of Celsius Network LLC ("Celsius"), a cryptocurrency company that (i) issued a token known as "CEL," and (ii) was a competitor and financial partner of Debtors FTX Trading Ltd. ("FTX"), Alameda

Research Ltd., and Alameda Research LLC (the two Alameda entities are referred to collectively as "Alameda").

3. The evidence demonstrates that Mashinsky was the target of a secret scheme coordinated by FTX and Alameda, with the assistance of certain Celsius executives and investors, to oust him as CEO and to engineer a merger or takeover of Celsius that would benefit those executives personally.

4. Pursuant to that scheme, at the very moment Mashinsky sought to reduce Celsius's exposure to FTX and Alameda, other Celsius executives and investors were moving in the opposite direction. Specifically, in early 2022, Mashinsky recognized that certain loans Celsius had made to FTX were unacceptably risky because they were collateralized by (i) FTT, a token FTX itself created and completely controlled, and (ii) SRM, the highly speculative native utility and governance token of Serum, an entity in which Alameda was one of the largest investors. However, without Mashinsky's knowledge, other Celsius executives (i) secretly negotiated with FTX, (ii) funneled sensitive proprietary information to FTX without CEO and board authorization, and (iii) thereby enabled FTX to use confidential information to front-run[1] Celsius's positions in stETH, WBTC, Tripool (3CRV), and other assets, and take large, manipulative naked short positions[2] in the tokens, including the CEL token. It was that scheme, and *not* any of Mashinsky's alleged

---

[1] "Front-run" refers to the practice of trading ahead of a known, pending order in order to profit from the price movement that order is expected to cause. The term originated in traditional markets, where it describes a broker or intermediary who exploits advance knowledge of a customer's large order by transacting for its own account first. *See* FINRA Rule 5270; 17 C.F.R. § 155.3. In digital-asset markets the same conduct occurs in two forms: on centralized exchanges, where the operator or an affiliated trading desk exploits non-public order-flow or position information to which it has privileged access; and on decentralized exchanges, where the pendency of transactions is publicly visible in the "mempool," permitting validators and automated traders to reorder, insert, or suppress transactions for their own gain. *See* Oleh Malanii, *Front-Running In Blockchain: Real-Life Examples & Prevention*, Hacken (June 30, 2025), https://hacken.io/discover/front-running/.

[2] I.e., short positions exceeding the CEL tokens available on the market to cover them.

actions, that precipitated the very collapse the Trust now seeks to foist on Mashinsky. None of the Trust's sundry and assorted arguments can be reconciled with those facts.

5. *First*, and most critically, the Trust does *not* dispute that the June Individual POCs[3] were timely filed. Those POCs are therefore entitled to *prima facie* validity. Under controlling Third Circuit precedent, a proof of claim that presents facts sufficient to support legal liability shifts the burden to the objector to produce evidence negating those facts. The June Individual POCs easily clear that bar: they (i) identify the claimant, the specific Debtors at issue, and the amount of the claim, (ii) enumerate six theories of liability, and (iii) attach data, downloaded from FTX's own trading platform, documenting FTX's anomalous CEL trading and evidencing its improper naked short positions. The November Individual POCs[4] (referred to collectively with the June Individual POCs as the "Mashinsky Claims") amplify the *same* claims with greater particularity. They refine, rather than replace, Mashinsky's earlier allegations, of which the Trust had ample notice. The Trust has produced no evidence negating any of them, as the *Allegheny* burden-shifting standard requires, and its documentation-based objection is not a permissible ground for disallowance under Section 502(b).

6. *Second*, the September and December Corporate POCs should be allowed because they did not surprise the Trust, expand the dispute, or impair the administration of the claims process. The September Corporate POCs,[5] filed by Koala1 LLC and AM Ventures Holdings Inc. on September 29, 2023, asserted the *same* core FTX/Alameda misconduct in the timely June Individual POCs and attached the *same* CEL short-position materials. The December Corporate

[3] The June Individual POCs refer to claims 2314, 3195, and 3233.

[4] The November Individual POCs refer to claims 88338, 88339, and 88341.

[5] The September Corporate POCs refer to claims 85255, 85256, 85257, and 85258.

POCs[6] then clarified the bases for the September Corporate POCs, without adding new Debtors, new claimants, or a new factual predicate. The Trust had the claims on file before its July 2024 objection, and any later delay resulted from consensual stays, not sandbagging by the corporate claimants. On these facts, the Trust had timely notice of the substance, nature, amount, and factual basis of the liability, suffered no cognizable prejudice, and cannot identify any bad faith. Disallowing the Corporate POCs would therefore elevate form over substance and impose the very forfeiture that equitable claim-allowance principles are designed to prevent.

7. *Third,* the Global Settlement does not bar the Mashinsky Claims. That settlement was negotiated to resolve disputes with FTX *customers* concerning the treatment, commingling, and allocation of FTX customer deposits and the misconduct of former FTX insiders. The Mashinsky Claims are *not* customer claims. They assert distinct, individualized theories of third-party tort liability *by a competitor/market participant* arising from, among other things, the Debtors' misappropriation of Celsius's confidential information, forced liquidation of Celsius's positions, and targeted manipulation of the CEL token. Because no other creditor could assert these claims on the same facts, allowing them would neither reopen the settlement nor disturb the Court's prior rulings addressing customer-wide issues.

8. *Fourth*, the doctrine of unclean hands does not bar the Mashinsky Claims because the misconduct to which Mashinsky pleaded guilty *has nothing to do* with the basis for his claims. That plea concerns: (i) a December 2021 statement regarding regulatory approval and (ii) a September 2019 nondisclosure of his own relatively small CEL sales, conduct directed at Celsius customers and investors. That conduct predates, and bears no causal relationship to, the June 2022

---

[6] The December Corporate POCs refer to claims 89689, 89697, 89698, and 89699.

conduct by FTX and Alameda on which his claims are built. This is fatal to the Trust's argument, because unclean hands requires *a direct nexus* between a claimant's wrongdoing and the claim asserted. Nor does the doctrine shield a debtor from liability for its own independent tortious conduct. Applying it here would reward the Debtors for their misconduct simply because their victim separately admitted to unrelated wrongdoing.

9. For these reasons, and as set forth more fully below, the Court should overrule the Trust's First Amended Objection in its entirety and allow the Individual and Corporate Mashinsky Claims.

## Statement of Facts

### I. Facts Relevant to the Procedural Background

10. On November 11 and November 14, 2022, FTX Trading Ltd. and 101 affiliated debtors (collectively, the "Debtors") filed a voluntary petitions for relief under Chapter 11 of the United States Bankruptcy Code (the "Chapter 11 Cases") in the United States Bankruptcy Court for the District of Delaware (the "Court").

11. Thereafter, on May 3, 2023, the Debtors filed the Motion of Debtors for Entry of an Order (I)(A) Establishing Deadlines for Filing Non-Customer and Government Proofs of Claim and Proofs of Interest and (B) Approving the Form and Manner of Notice Thereof and (II) Granting Related Relief [D.I. 1416]. On May 19, 2023, the Court entered an order (i) granting Debtors' motion, (ii) setting a non-customer claims bar date of June 30, 2023 (the "Non-Customer Claims Bar Date"), and (iii) establishing certain claims procedures [D.I. 1519].

12. Before the expiration of the Non-Customer Claims Bar Date, Mashinsky filed three proofs of claim in his own name on June 25, 2023, against each of Alameda Research Ltd., Alameda Research LLC, and FTX Trading Ltd. in the amount of $2.15 billion, (collectively the "June Individual POCs.") In the June Individual POCs, Mashinsky identified the basis for his

claims as "Fraud, Conspiracy to commit fraud, market manipulation, bribery, securities fraud, [and] money laundering," and attached a spreadsheet specifically detailing FTX's naked short trades of CEL, which was the basis for the claims asserted. Notably, Mashinsky obtained the trade data provided with the June Individual POCs from FTX itself while it was still in operation.

13. Several months later, on September 29, 2023, Mashinsky filed four additional proofs of claim. Two were filed in the name of Koala1 LLC, one against Alameda Research LLC and one against FTX Trading Ltd., and two were filed in the name of AM Ventures Holdings Inc., again one against Alameda Research LLC and one against FTX Trading Ltd. (collectively the "September Corporate POCs"). The September Corporate POCs filed against Alameda Research LLC state the basis of the claim as "Fraud, market manipulation, conspiracy, contract interferance [sic]." Similarly, the September Corporate POC filed by Koala1 LLC against FTX Trading Ltd. states the basis of the claim as "Fraud, market manipulation, contract interferance [sic]," while the September Corporate POC filed by AM Ventures Holdings Inc. against FTX Trading Ltd. states the basis for the claim as "Fraud, market manipulation, naked shorting, torcherus [sic] interferance [sic], conspiracy to comit [sic] crimes."

14. Mashinsky then amended his individual claims. On November 6, 2023, he filed three additional proofs of claim in his own name amending the June Individual POCs filed against FTX Trading Ltd. and Alameda Research LLC, (collectively the "November Individual POCs"). In the Rider Attachment to the November Individual POCs, Mashinsky stated specifically that "Prior to the Celsius Petition Date, on or about June 5, 2022, certain former officers of the Celsius Debtors provided the FTX Debtors with sensitive financial information concerning the Celsius Debtors, without the knowledge, consent, or authorization of the Celsius Debtors' Board of

Directors or former Chief Executive Officer (Claimant)."[7] The November Individual POCs further explain that "[a]s a result of that unauthorized sharing of sensitive financial information, the FTX Debtors were able to force the liquidation of Celsius's positions" in "stETH" (an Ethereum crypto-token) and "WBTC" (a Bitcoin crypto-token)[8] "at well below market prices" in order to "attack CEL Token to create fear and mass withdrawals," which culminated in an unstoppable crypto bank run.

15. Thereafter, on December 13, 2023, Mashinsky filed four additional proofs of claim, two in the name of Koala1 LLC and two in the name of AM Ventures Holdings Inc., amending the four September Corporate POCs (collectively, the "December Corporate POCs," together with the September Corporate POCs, the "Corporate POCs").

16. On July 10, 2024, the Debtors filed Debtors' Objection to Proofs of Claim Filed by Alex Mashinsky and Krissy Meehan [D.I. 20044], requesting, *inter alia*, that the Court disallow and expunge the Mashinsky Individual and Corporate Proofs of Claim in their entirety.

17. While that claims dispute was pending, the parties agreed to defer litigation concerning the claims until after Mashinsky's criminal trial for certain Celsius-related misconduct in the District Court for the Southern District of New York.[9] On September 25, 2024, the Court entered an Order Approving the Stipulation Staying Claims Litigation and Related Discovery with Respect to Proofs of Claim Filed by Alexander Mashinsky, Kristine Meehan, Koala1 LLC, Koala2

[7] *In re Celsius Network LLC*, Case No. 22-10964-(MG) (Bankr. S.D.N.Y.). Celsius Debtors is defined as Celsius Network LLC, Case No. 22-10964-(MG); Celsius KeyFi LLC, Case No. 22-10967-(MG); Celsius Lending LLC, Case No. 22-10970-(MG); Celsius Mining LLC, Case No. 22-10968-(MG); Celsius Network Inc., Case No. 22-10965-(MG); Celsius Network Limited, Case No. 22-10966-(MG); Celsius Networks Lending LLC, Case No. 22-10969-(MG); and Celsius US Holding LLC, Case No. 22-10971-(MG).

[8] stETH and WBTC are wrapped tokens. Bitcoin coins and Ethereum coins only transact on their own individual network. By locking a coin on one network and creating a proxy token on the other, it allows users to effectively utilize bitcoin coins on the Ethereum network and vice versa.

[9] *United States v. Mashinsky*, No. 23-cr-347-(JGK) (S.D.N.Y.).

LLC, and AM Ventures Holdings, Inc. [D.I. 25684], whereby Mashinsky and the Trust agreed to defer litigation related to his claims pending the conclusion of Mashinsky's criminal case.

18. On December 3, 2024, Mashinsky pled guilty to Counts Two and Five of the Department of Justice's ("the Government") indictment, as described further below. Following his guilty plea, on May 8, 2025, Mashinsky was sentenced to 144 months' imprisonment, to be followed by three years of supervised release. The sentencing court also ordered Mashinsky to forfeit approximately $48.4 million in cash, along with additional property. Mashinsky began serving his sentence in September 2025.

19. On October 19, 2025, after Mashinsky began serving his sentence, he effectively discharged his former counsel in this bankruptcy case, Ruskin Moscou Faltischek, P.C., and directed them to substitute himself as *pro se* in all matters in which that firm represented him, including this matter.

20. On February 13, 2026, the Trust filed its First Amended Objection to Proofs of Claim Filed by Alex Mashinsky [D.I. 34704] to provide additional facts and arguments in support of the Trust's request to disallow the Mashinsky Claims and the Corporate Claims, including the amendments thereto, in their entirety. In response, on June 22, 2026, Mashinsky, appearing *pro se*, filed his response in opposition to FTX Trust's First Amended Objection [D.I. 35863].

21. Shortly thereafter, new counsel appeared for Mashinsky in this matter. Specifically, on July 27, 2026, Kirby McInerney LLP notified the Trust that it had been retained by Alex Mashinsky in this matter. The Parties then discussed in good faith a modified schedule with respect to the pending dispute of the Mashinsky and Corporate Claims and agreed that Mashinsky's deadline to file a restated and superseded response to the First Amended Objection on behalf of

himself and his Corporate Entities would be August 31, 2026. Consistent with that agreement, on July 29, 2026, the Court filed its Order Approving Stipulation [D.I. 36060].

22. Accordingly, Mashinsky, by undersigned counsel, hereby submits this restated and superseded response to the FTX Trust's First Amended Claims Objection.

**II. Facts Relevant to Mashinsky's Guilty Plea**

23. As noted above, on December 3, 2024, Mashinsky pled guilty to Counts Two and Five of the indictment the Government had filed against him. Count Two charged Mashinsky with commodities fraud. In entering his guilty plea to that Count, Mashinsky admitted that, in December 2021, in connection with the Celsius Earn Program – "part of which included electronic sales of the commodity Bitcoin in exchange for the CEL tokens that were used to pay customer rewards" – he gave an interview in which he suggested that Celsius had received approval from regulators regarding the Earn Program, even though he knew that statement was not true. Mashinsky Plea Transcript, *United States v. Mashinsky*, No. 23-cr-00347-(JGK) (S.D.N.Y. Dec. 3, 2024), ECF No. 112 at 25:4-13.

24. Count Five of the indictment charged Mashinsky with price manipulation of the CEL token. In pleading guilty to that Count, Mashinsky admitted that, in September 2019, he intentionally failed to disclose that he was selling his CEL token holdings, while publicly representing that he was not selling. Mashinsky further stated that he understood at the time that customers would likely find false comfort in that misrepresentation and that it would be material to their decision to purchase or sell the CEL token as an investment contract. Mashinsky Plea Transcript at 25:14-21.

25. Those admissions, which were the factual basis for his guilty plea to Counts Two and Five, concern conduct distinct from the broader allegations set forth in the indictment,

including allegations concerning other conduct, time periods, and alleged causes of Celsius's financial condition or the decline in CEL's value. The remaining allegations in the indictment were never proved by the Government.

26. Notably, Mashinsky's plea allocution did *not* include any admissions (i) that his conduct caused Celsius to freeze withdrawals in June 2022, or that any third parties later traded, created, sold, or otherwise affected CEL in a manner relevant to the losses presented in the Mashinsky Individual and Corporate Proofs of Claim, or (ii) concerning FTX's May and June 2022 CEL trading activity.

## III. Facts Relevant to FTX's Attack on Mashinsky[10]

27. FTX and Alameda targeted Mashinsky for removal. Working through certain Celsius executives whose cooperation they secured, they pursued a secret scheme to (i) remove him as CEO, and (ii) engineer a merger or takeover that would benefit those Celsius executives personally. Specifically, when Mashinsky attempted to reduce Celsius's FTT collateralized loan exposure to FTX and Alameda, recognizing the substantial financial and market risks those entities posed, other Celsius executives secretly negotiated with FTX and provided sensitive proprietary information without board approval. Ultimately, the scheme enabled FTX and Alameda, in direct violation of a non-disclosure agreement, to (i) manipulate the market related to Celsius's positions, (ii) share confidential company information with the press, (iii) front-run Celsius's positions in stETH and WBTC, (iv) take manipulative naked short positions in CEL tokens, and (v) thereby precipitate the very collapse they later blamed on Mashinsky. FTX and Alameda's campaign

[10] The facts set forth herein are asserted affirmatively because Mashinsky expects to prove each of them. Mashinsky respectfully submits that the claims are *prima facie* valid on their face, that the Trust has not carried its burden of production, and that no further proof is required at this juncture. Should the Court conclude otherwise, Mashinsky stands ready to establish the facts asserted herein by a preponderance of the evidence.

against Celsius was not ordinary competition. Beginning in or about May 2022, FTX and Alameda attacked the three pillars on which Celsius's viability rested, its reputation among depositors, the market price of its CEL token, and the carrying value of its balance sheet, and did so simultaneously, so that each line of attack reinforced the others.

28. To best understand how FTX and Alameda manipulated the market, it is important to understand the methods they used. Shorting an asset means selling it now with an obligation to buy it back later. In a normal "covered" short, the seller first borrows the actual tokens from someone who owns them, sells those borrowed tokens, and later buys tokens back on the market to return them. By contrast, a "naked" short skips the borrowing step: the seller sells tokens on an exchange that they never possessed or borrowed, in effect creating sell pressure on the market without a matching real supply of tokens behind it. For example, in the attachment to the June Individual POCs, on June 13, 2022 (3:00 UTC), FTX held a naked short size of approximately 20.5 million CEL tokens, while only having a little over 5 million actually available to trade with on its exchange. *See* Exhibit A. The distinction between a covered short and naked short is crucial here, because the top chart below shows a short position in CEL growing far larger, far faster, than the bottom chart's borrowing-cost[11] would allow *if it were fully covered by real borrowed tokens,* which is the basis for Mashinsky's "naked short" assertion.

[11] The borrowing cost is the interest a short seller pays to the owner of the tokens it has borrowed, quoted as an annualized rate and accrued at short intervals. The rate is set by utilization: it rises as the available lendable supply is drawn down, and it spikes when supply is nearly exhausted.




*Dashed lines mark four key dates: the FTX/Celsius NDA (6.4.2022), Celsius's withdrawal pause (6.12.2022), Caroline Ellison's email seeking to borrow 30M CEL (6.15.2022), and Celsius's Chapter 11 filing (7.13.2022).*

29. On FTX, CEL short positions of this kind are typically taken through a "perpetual futures" contract, a derivative that tracks CEL's price with no expiration date. Because this type of contract has no expiration date to force it back to the real (*i.e.*, the "spot") price, exchanges use a periodic "funding rate" payment between longs and shorts to keep the two in line. When more traders want to be short rather than long, the shorts have to pay the longs, and the rate rises until it becomes expensive enough to discourage more shorting or attract offsetting buyers. Normally, perpetual futures only refer to actual crypto tokens or coins deposited on a decentralized finance ("DeFi") or centralized finance ("CeFi")[12] exchange. FTX was able to create fake crypto and fake

[12] Decentralized finance allows individuals to trade, lend, borrow, and stake crypto assets without an intermediary third party, such as a bank. By contrast, centralized finance concerns the traditional financial system, whereby intermediaries such as banks facilitate transactions. *See What is DeFi?*, Fidelity (Oct. 12, 2023), https://www.fidelity.com/learning-center/trading-investing/what-is-defi.

perpetuals, and then mix them in the market, which had real coins and tokens, with corresponding perpetual futures.

30. A stable market typically sees funding rates in the low double digits, annualized.[13] However, the rates for trades in CEL set forth in the attachment to the June Individual POCs *spiked as high as between 2,600–3,643%* annualized. In context, this means a short-seller paying that rate would give up more than the entire value of their position in a matter of weeks just to hold it open. Rates that extreme are a signal that demand to short (or to hold an existing short) vastly exceeded the supply of CEL actually available to borrow, exactly the condition Mashinsky's claims characterize as consistent with an uncovered, *i.e.*, "naked," short, since a fully covered short backed by ordinary borrowed tokens would not need to pay rates anywhere close to those levels to stay open. The economics of these positions confirm they were not trading positions at all. A rational short seeks profit from the price decline; Alameda sought the decline itself. The borrowing cost Alameda sustained establishes that CEL was not merely difficult to borrow for hours or days but it was persistently unavailable, a condition no profit-motivated participant would carry. The only rational explanation is that this trading was designed solely to create the decline of the CEL token price, as doing that would accomplish the destruction of a competitor and cause the migration of Celsius's depositors to FTX and BlockFi, which Sam Bankman-Fried ("SBF") was in the process of acquiring. The cost of this manipulative trade was unsustainable even for a trader with unrestricted access to the FTX balance sheet, which is why Alameda approached Celsius, the very company the position was designed to destroy, for accommodation.

[13] Victor Haghani & James White, *Perpetual Futures: Mechanics, History and Purpose*, Elm Wealth (Aug. 4, 2026), https://elmwealth.com/perpetual-futures/. ("Over the past six years, the funding rate on Binance – the largest exchange trading crypto perpetuals – has averaged about 14% per annum, against a U.S. T-bill rate that has averaged around 3%, a gap of 11%.").

**A. The Early Relationship and Mashinsky's Decision to Derisk**

31. The relationship between Celsius and FTX/Alameda began in 2019, when Mashinsky signed a Digital Asset Lending Agreement with SBF. For a time, the agreement governed a substantial lending relationship between Celsius, FTX, and Alameda. But, by early 2022, Mashinsky had concluded that the relationship with his largest customer had become too risky.

32. Mashinsky initiated a trip to the Bahamas because no Celsius executive had met with FTX or Alameda, even as massive lending to both entities grew. On or around January 5, 2022, Mashinsky met with SBF, other FTX executives, and Alameda personnel in the Bahamas at FTX's main office. The object of Mashinsky's meeting was to gauge whether Celsius should continue the lending relationship. Mashinsky concluded that, based on the FTX business model, the relationship was too risky. Thus, shortly afterward, Mashinsky instructed Celsius's Risk and Lending teams to close $2.5 billion worth of loans with Alameda because those overcollateralized loans were only backed by FTT and SRM[14] collateral, two brands of cryptocurrency tokens, which Mashinsky viewed as unsuitable for "low risk loans." Indeed, as Mashinsky's risk forecast had predicted, both FTT and SRM tokens dropped by over 95% in value in late 2022. While Mashinsky's decision to call the Alameda loans proved prescient, it marked a turning point in his relationship with FTX and Alameda: it made him a target of SBF, Alameda, and FTX.

**B. Celsius Executives' Secret Merger Discussions**

33. What Mashinsky did not know at the time was that Celsius executives had already initiated merger talks with FTX/Alameda. Thus, at the same time Mashinsky was trying to reduce

[14] Both FTT and SRM were controlled by SBF since FTX and Alameda owned a controlling position of tokens in both companies.

Celsius's lending exposure to FTX and Alameda, many Celsius executives (and other stakeholders) were moving in the opposite direction, attempting to curry favor with a possible future employer.

34. On March 18, 2022, fearing the closure of new loans to FTX and the loss of favor with SBF, Celsius executives frantically issued new USDC loans backed by FTT totaling $247 million[15] at 7.5%, even though Mashinsky had explicitly instructed Celsius to derisk and avoid exposure to FTX/Alameda. The 7.5% rate was lower than what Celsius was paying its own users on USDC at the time. Thus, as Mashinsky was ordering the closure of over $1 billion FTT/SRM backed loans to FTX/Alameda, a portion of the loan recalls he initiated after the Bahamas meeting, other Celsius executives were, without his knowledge, negotiating to sell or merge Celsius with FTX and replace him as CEO.

**C. Mashinsky's Clear Warnings About Risk**

35. Mashinsky made his concerns regarding the risk of Celsius's existing lending activity with FTX clear to the rest of Celsius's leadership the next day. On March 19, 2022, he sent a strong email to the executive committee stating that FTX/Alameda was Celsius's riskiest customer and asking that Celsius not accept FTT/SRM as collateral. That same day, Mashinsky also wrote to the risk team: "Alameda represents the largest and most risk to Celsius." Mashinsky further warned that "Alameda is a very aggressive market maker on FTX and other platforms and routinely moves markets to force liquidations that they front run."

**D. Internal Conflict and the Push to Remove Mashinsky**

36. By April 2022, the internal conflict had deepened. Between April 10 and 12, 2022,

[15] USDC (USD Coin) is a digital stablecoin pegged 1:1 to the U.S. dollar. Issued by Circle, it is backed 100% by cash and short-term U.S. Treasury securities.

Mashinsky believed that Celsius executives were intentionally withholding information from regulators and key investors in hopes of getting him removed as CEO.

37. Then, in May 2022, the broader crypto market deteriorated sharply during the Terra Luna collapse.[16] FTX lost substantial funds because most of its holdings were in UST, Luna, SOL, and FTT, which dropped by approximately 40% in May.

**E. The Merger Push and Information Sharing with FTX**

38. The effort to remove Mashinsky then merged with the push toward FTX. On May 3, 2022, at the end of a Board of Directors meeting, the hostile takeover effort by Celsius executives, which had begun shortly after the closing of the December 3, 2021 funding round, quickly progressed when they decided to pursue a merger with FTX, without board approval and behind Mashinsky's back. By then, the Celsius executives understood that they had mismanaged customers' crypto assets and believed Celsius needed a strong financial partner to survive the negative investor sentiment that was descending on the crypto industry as a whole in the wake of the Terra Luna collapse.

39. In that environment, without Mashinsky's knowledge, Celsius employees issued loans and provided secret proprietary information about Celsius to FTX that easily enabled it to front-run Celsius's positions and to de-peg prices[17] of many assets Celsius relied on in the market

[16] The Terra Luna collapse refers to the May 2022 failure of the Terra blockchain, created by Terraform Labs, including its algorithmic stablecoin TerraUSD ("UST") and associated cryptocurrency, LUNA. UST was designed to maintain a one-to-one peg to the U.S. dollar through an algorithmic mechanism involving LUNA. Large sell-offs and withdrawals in the market caused UST to de-peg, eventually causing the Terra blockchain to collapse, resulting in hundreds of billions of losses in the wider crypto markets. *See Terra Network Collapse*, Bitstamp Learn (Aug. 18, 2023), https://www.bitstamp.net/learn/crypto-101/terra-network-collapse/.

[17] A de-peg occurs when a stablecoin loses its intended fixed value (typically $1) and trades at a different price from the native coin. When a stablecoin de-pegs, it loses the confidence of the market that it is actually connected to the underlying native coin. CoinMarketCap, *Depeg*, https://coinmarketcap.com/academy/glossary/depeg (last visited Aug. 28, 2026).

for illiquid assets, including stETH and Tripool, where Celsius held large, concentrated positions. This de-pegging created extreme pressure on Celsius' s finances. In addition, CEL token trading was concentrated on the FTX exchange, where over 70% of the daily volume occurred, making CEL vulnerable to manipulation there.

**F. The Growth of the CEL Short Position**

40. As shown in the attachment to the June Individual POCs, the initial market activity in CEL appeared relatively contained. Between May 3 and 10, 2022, short positions in CEL remained small and fairly stable, ranging from approximately 108,000 to 290,000 CEL tokens, with the funding rate mostly near 0.88% to 6% annualized, which was within the appropriate range. But after the outreach by certain Celsius executives to FTX progressed, the short position began to grow.

41. On May 12, 2022, a data room was set up for FTX, with access granted to certain parties. Between May 11 and 17, 2022, the short size in CEL roughly doubled to the 500,000 to 900,000 range, crossing 500,000 for the first time on May 11, 2022 at 20:00 UTC. The funding rate also spiked briefly to 346% on May 11 and 350% on May 18 and 27, 2022.

42. On May 16, 2022, without Mashinsky's permission, Celsius executives, working through Citibank, which arranged meetings, attempted to secure FTX/SBF as a lender or merger-and-acquisition partner. In doing so, they provided SBF with Celsius's full asset, positions, and customer list. Subsequently, between May 18 and June 6, 2022, the CEL short position continued to rise, growing from approximately 700,000 tokens to just over 1,000,000 CEL by May 28 to 29, 2022, then climbing further to approximately 1.1 to 1.4 million through the first days of June. Funding rates were mostly still in the single digits to low double digits, with occasional spikes.

### G. The June 2022 Trap and Accelerated Information Flow

43. FTX had no intent of merging with Celsius, as it was already closing the purchase of BlockFi, Celsius's largest direct competitor, but it proceeded with the charade to obtain additional sensitive Celsius information. To that end, under the guise of a merger or acquisition, the parties signed an NDA on June 4, 2022. Immediately after the NDA was signed, Alameda increased its CEL short positions on the FTX platform and began front-running Celsius's stETH, WBTC, and Tripool (3CRV) positions to de-peg them, while spreading rumors via paid proxies and social media to push institutional customers toward BlockFi. SBF later said in interviews that he "passed" on Celsius because of a $2 billion "hole,"[18] without acknowledging FTX's own role in creating it.

44. The same day the NDA was signed, Celsius executives met with SBF, without Mashinsky, to discuss merging Celsius with FTX and installing SBF as CEO. The flow of sensitive information then accelerated. On or about June 5, 2022, Celsius provided FTX with additional sensitive financial information concerning Celsius, without the knowledge, consent, or authorization of the Celsius Board of Directors or Mashinsky. SBF knew Mashinsky was the controlling shareholder in Celsius and that no transaction could take place even if the other Celsius executives signed an agreement with FTX. Mashinsky's control was therefore the one obstacle standing between FTX and the acquisition of its principal competitor. The scheme could not succeed while he held that position, and its objective from the outset was to remove him from it.

### H. The Explosion of the Short Position, Withdrawal Pause, and an Alameda Executive's Use of "God Mode" to Create 20 Million Fake CEL Tokens

45. The market data then reflected a sharp escalation. Between June 7 and 10, 2022,

[18] Yogita Khatri, *FTX Walked Away From a Deal with Celsius After Seeing State of Its Finances: Sources*, The Block, (June 30, 2022), https://www.theblock.co/news/deals/2022-06-30-ftx-walked-away-from-celsius-deal-155069.

the CEL short size moved from approximately 1.1 million tokens on June 7, past 1.4 million on June 8 to 9, and then jumped sharply on June 10, closing that day at 3.17 million, *roughly triple where it had started that morning*. The funding rate on June 10 spiked as high as 350%. That same day, in the continued push to remove him as CEO, Mashinsky received a letter from WestCap, a company that invested $700 million into Celsius just months earlier, asking him to resign.

46. On June 11, 2022, after the NDA was fully executed, FTX gained full access to the data room. The short position exploded almost immediately. Between June 11 and 12, 2022, it more than doubled again, rising from approximately 3.2 million tokens at the start of June 11 to a staggering 8.5 million by the end of that day. The funding rate similarly exploded, reaching 3,643% annualized on June 11, remaining in the 2,600% to 3,600% range into June 12.

47. On June 12, 2022, a Celsius executive prepared a 20-page full disclosure document for FTX detailing the current regulatory status with the SEC, state regulators, the UK's Financial Conduct Authority, and other topics. That same day, after Celsius executives had given SBF access to the data room and exposed all the assets Celsius would have to sell, SBF froze all Celsius assets on FTX while front-running Celsius's positions. The consequences were immediate. With its assets frozen, Celsius could not meet withdrawal requests, and customers reported that failure publicly; CEL fell sharply, and the reports and the price decline together drove a further wave of withdrawals over the hours and days that followed.

48. In sum, Celsius management had incurred substantial losses caused by FTX's actions against Celsius over the prior six months, and especially in the days after the signing of the NDA, without telling Mashinsky; they then sought a bailout deal with FTX. When Mashinsky learned of the losses at a June 12, 2022 emergency board meeting, he pushed to pause withdrawals to protect the remaining customers and creditors rather than proceed with an FTX deal. Later that

day, Celsius announced that it was pausing all withdrawals, swaps, and transfers, citing "extreme market conditions." On June 13, 2022, a rough draft offer was made by FTX via Citibank, but Mashinsky concluded that FTX was not a good partner and, for the second time, declined to proceed with the FTX/Alameda merger.

49. The unusual nature of the extreme short positions taken in CEL and the corresponding funding rate was fueled by FTX's creation/shorting of *fake* CEL tokens. Specifically, on June 12, 2022, shortly before the largest spike in the short, Caroline Ellison, who was Chief Executive Officer of Alameda Research, created 20 million fake/unreal CEL tokens on the FTX platform using her "God Mode" – *i.e.*, the exemption that let Alameda trade on margin with no collateral requirements, no auto-liquidation, and effectively unlimited access to FTX customer funds – and then shorted those tokens, driving the price of CEL from $2.50 down to $0.10, before the price later stabilized around $0.50. Since the short was transacted in unreal tokens, Ellison needed 30 million CEL to cover her naked short positions.

**I. The Peak Short Position**

50. The CEL short position reached its highest level immediately after Ellison's actions. Between June 13 and 14, 2022, the single highest reading was approximately 20.48 million CEL on June 13, 03:00 UTC, a remarkable 11.7 million-token jump in one hour from the prior reading of 8.8 million. Elevated readings in the 16 to 20 million range persisted through most of June 13 and into June 14, still remaining at 18.7 million as of June 14 at 00:00, before declining through the day down to 8.5 to 9.6 million by the evening of June 14. The high peak coincided with full data-room access being granted to FTX leadership, including SBF, only a few hours earlier.

51. To cover her naked position fueled by fake CEL tokens, on June 15, 2022, just three days after Celsius froze withdrawals, Ellison emailed four Celsius executives from her Alameda account and proposed to lend $100 million against 30 million CEL tokens as collateral. Her goal was to source tokens to fill the artificial gap she created between tokens FTX had, and the fake "God Mode" created tokens she had shorted. Her request was denied. The request was four times the entire CEL float on FTX, at a time when same-day FTX borrow rates for CEL were running 1,000% to 2,600% annualized. This email alone, given the lending rate she had entered into, demonstrates her desperation in finding CEL tokens to cover her manipulative naked short of the CEL tokens.

52. Between June 16 and 21, 2022, the position stepped down steadily from approximately 7.8 million tokens on June 16 to a local low of approximately 2.6 million on June 21, although funding rates remained volatile and elevated, repeatedly spiking to 1,400% to 2,600% throughout this period. On July 13, 2022, Celsius filed for bankruptcy.

**J. The CEL Token Manipulation Was a Deliberate Attack**

53. The data in the attachment to the June Individual POCs (*see* **Exhibit A)** reveals a clear pattern of manipulation that tracks precisely with the flow of confidential information from Celsius executives to FTX:

a. **May 3-10, 2022**: CEL short position small and stable (108,000 to 290,000 tokens;

b. **May 11-12, 2022**: Data room set up for FTX; short position doubles (500,000 to 900,000 tokens); funding rate spikes to 346%;

c. **May 16, 2022**: Celsius executives provide SBF with full asset and customer list;

d. **June 4, 2022**: NDA signed with FTX; Celsius executives meet with SBF to discuss merger;

e. **June 10, 2022**: Short position triples in one day (1.1 million to 3.17 million); funding rate hits 350%;

f. **June 11, 2022**: FTX granted full data-room access; short position more than doubles in one day (3.2 million to 8.5 million); funding rate explodes to 3,643%;

g. **June 12, 2022**: Ellison creates 20 million fake CEL tokens using her "God Mode," driving price from $2.50 to $0.10.

h. **June 13, 2022**: Short positions peak at 20.5 million, an 11.7 million jump in one hour, coinciding with full FTX leadership access to data room;

54. This pattern is inconsistent with ordinary market activity and can only be explained by coordinated manipulation using inside information.

**K. The Government's Recognition of Celsius as a Potential Victim in the SBF Prosecution**

55. As the Court is well aware, SBF was prosecuted by the Department of Justice, *via* the United States Attorney's Office for the Southern District of New York, for orchestrating a scheme to defraud customers of FTX by misappropriating billions of dollars of those customers' funds. In connection with that scheme, he also provided "false and misleading information" to lenders about the financial condition of Alameda Research, while separately misleading FTX investors about the exchange's own finances. *See generally United States v. Samuel Bankman-Fried*, 22-cr-673-(LAK) (S.D.N.Y.). During that prosecution, the Government recognized the significance of Celsius's relationship with SBF, FTX, and Alameda. Specifically, in a February 6, 2024 letter, the Government requested a *Curcio* hearing, which deals with potential conflicts of

interest that could arise when the same lawyers represent multiple criminal defendants in the same or related matters (here, certain lawyers sought to represent both SBF and Mashinsky in their separate prosecutions). That letter, which is annexed hereto as **Exhibit B**, states in relevant part:

> First, Celsius's status as a victim of the fraud on Alameda Research's lenders may create a conflict in the simultaneous representation of SBF and Mashinsky. The government explained that, at SBF's trial, it had presented evidence that Alameda Research borrowed money from Celsius, that Celsius asked for loans to be returned, and that Alameda Research ultimately repaid certain Celsius loans with customer money. The government further stated that it had argued to the jury that SBF had conspired to defraud Alameda Research's lenders, while SBF disputed the fraud at various points during the trial. The government also stated that at sentencing, it would argue that Alameda Research's lenders, including Celsius, were victims of fraud, and that lenders were entitled to restitution.

56. That letter further addressed Mashinsky's contention that FTX and Alameda caused significant financial damage to Celsius at least in part by actions taken by Alameda Research, possibly at SBF's direction, to short CEL, the native cryptocurrency token issued by Celsius. The government noted that Mashinsky had alleged that Alameda Research used its unique and secret ability to borrow unlimited funds on FTX to borrow CEL on FTX, flood the market, and push down CEL's price. The government stated that if true, while those allegations could possibly aid Mashinsky's defense, in SBF's case the manipulation of CEL could constitute additional relevant conduct for the Court to consider at SBF's sentencing.

**L. The Economic Impact on Mashinsky**

57. As discussed below, FTX's and Alameda's conduct caused Mashinsky economic harm in three respects. It destroyed the value of CEL tokens he held. It stripped him of control of the company he founded and of the position from which he exercised that control. And it eliminated the value of the controlling equity stake that control had made possible.

58. Specifically, in December 2021, after approximately *six months* of due diligence with Deloitte and White & Case LLP as advisors, Celsius had closed an upsized $700 million

investment with WestCap and CDPQ (Caisse de dépôt et placement du Québec), originally negotiated at $400 million, for approximately 20% of Celsius equity post-money, implying a company valuation of approximately $3.5 billion. These investors had unique and long-standing access to the Celsius balance sheet and other financial statements and still made this investment. Based on that post-investment valuation, Mashinsky, as founder and majority shareholder, held approximately 64% of Celsius equity, valued at approximately $2.24 billion. That stake carried with it the exclusive right to approve or reject any sale, merger, or change of control of Celsius, and the scheme described above was designed to override that right. Mashinsky lost not only the value of the stake but the control position itself, together with the office of Chief Executive Officer and the compensation and unvested equity attached to it.

59. At the time of FTX/Alameda conduct, Mashinsky also held approximately 52,000,000 CEL tokens, of which approximately 48,500,000 were held through entities he wholly owns and controls, Koala1 LLC (no fewer than 7,500,000) and AM Ventures Holdings Inc. (no fewer than 41,000,000), and the remainder directly in his own name. At a pre-attack market price of approximately $2.50 per CEL, that holding was worth approximately $130 million. Following the conduct described above, CEL traded as low as $0.10 and stabilized at approximately $0.50, reducing the value of those tokens by approximately $104 million.

60. Another indicator of the value Celsius held prior to FTX's actions is Ionic Digital, the Bitcoin mining and high-density computing company created out of Celsius's bankruptcy in January 2024 to hold its mining assets, owned by Celsius creditors. Ionic debuted on Nasdaq in July 2026 at a valuation of roughly $2.8 billion,[19] years after the estate had already been depleted

[19] Francisco Rodrigues, *Ionic Digital Jumps 26% in Nasdaq Debut, Giving Celsius Network Claimholders an Exit Route*, CoinDesk (July 29, 2026), https://www.coindesk.com/business/2026/07/29/ionic-digital-jumps-26-in-nasdaq-debut-giving-celsius-network-claimholders-an-exit-route.

through bankruptcy. That a mere fragment of Celsius's business could command such a valuation on the open market suggests the company as a whole was worth far more than what remained for creditors. If FTX's naked short-selling of CEL and misuse of NDA-protected information helped drive Celsius into bankruptcy, Ionic's market valuation is evidence that Celsius's underlying asset base was sound, and therefore that the collapse was caused by an external attack rather than internal insolvency.

## Jurisdiction and Venue

61. The Court has jurisdiction over this Superseding Opposition pursuant to 28 U.S.C. §§ 157 and 1334 and the Amended Standing Order of Reference from the United States District Court for the District of Delaware, dated February 29, 2012. This matter is a core proceeding within the meaning of 28 U.S.C. § 157(b)(2). Venue is proper in this district pursuant to 28 U.S.C. §§ 1408 and 1409. The statutory bases for the relief sought are section 502 of the Bankruptcy Code, and Rule 3001 of the Bankruptcy Rules. Pursuant to Rule 9013-1(f) of the Local Rules, the Creditor confirms his consent to entry of a final order by the Court in connection with this Superseding Opposition if it is later determined that the Court, absent consent of the parties, cannot enter final orders or judgments consistent with Article III of the United States Constitution.

## Relief Requested

62. By this Superseding Opposition, Mashinsky requests that the Court overrule the Trust's First Amended Objection in its entirety.

## Argument

### IV. Mashinsky's POCs Should Be Afforded *Prima Facie* Validity

63. The Trust contends that Mashinsky's POCs are facially invalid because they fail to allege *any* facts sufficient to support legal liability. *See* First Amended Objection ¶¶ 34–38, pp.

17–20 (emphasis added). As detailed below in Sections, IV.A – C, *infra*, this contention lacks merit since it is easily disproven by the POCs themselves, which comply with Mashinsky's minimal burden at the claims stage. On the contrary, the Mashinsky POCs should be allowed because they are entitled to *prima facie* validity under established Third Circuit precedent.

64. To establish *prima facie* validity, a proof of claim must allege facts sufficient to support a legal liability to the claimant. *See In re Allegheny Int'l, Inc.*, 954 F.2d 167, 173 (3d Cir. 1992). Once the claim meets that threshold, the burden shifts to the objector to produce sufficient evidence to negate the facts alleged in support of the claim. *Id*. Only if the objector carries that burden does the burden shift back to the claimant to prove the claim's validity by a preponderance of the evidence. *Id*. at 174. The Trust has not met its burden.

**A. The June Proofs of Claim Plead Facts Sufficient to Support a Legal Liability**

65. The Trust concedes that the June Individual POCs were timely filed on June 25, 2023, five days before the June 30, 2023 Non-Customer Claims Bar Date. *See* First Amended Objection ¶ 24.

66. Despite that concession, the Trust argues that the June Individual POCs contain no factual allegations and must be disallowed and expunged as duplicative of Mashinsky's other claims. Neither argument survives scrutiny.

67. The June Individual POCs plead more than enough facts to survive the *prima facie* burden. Each was filed in Mashinsky's name, identified the target Debtors, identified six theories of misconduct by FTX, including "Fraud, Conspiracy to commit fraud, market manipulation, bribery, securities fraud, money laundering," asserted a claim in the amount of $2.15 billion, and attached documentary evidence. That attachment, titled "FTX CEL naked short positions 2022 May 3 - July .pdf," sets out specific CEL trades' date and time, short size, funding rate, and "FTX

Wallet Balance," with data highlighted where Mashinsky showed that FTX's activity was an extreme trading anomaly indicating fraudulent short trading in the CEL token.

68. The Trust cannot credibly claim it failed to understand that submission. Any person familiar with cryptocurrency and commodities trades would grasp the import of the trade information Mashinsky attached. The Trust, successor to the exchange that generated the data, cannot credibly claim it failed to understand either Mashinsky's allegations or the import of its own trading records. That data was more than sufficient to put the Trust on notice that Mashinsky was alleging that FTX's and Alameda's misconduct severely diminished his holdings in the CEL token.

69. The Trust responds that the attachment is indecipherable and patently fails to assert any claim entitled to *prima facie* validity. That is nothing more than the Trust's subjective opinion and a doubtful one given that the data came from FTX itself. More fundamentally, it misapprehends the controlling standard. In bankruptcy proceedings, "[t]he documents, then, that are required to give a proof of claim *prima facie* validity are those that identify the claimant and the amount of the claim, and provide information sufficient to identify the basis for the claim (such as the account number)." *In re Falwell,* 434 B.R. 779, 785 (Bankr. W.D. Va. 2009).

70. *Falwell* does *not* demand exhaustive detail or pristine legibility; it requires only that the claimant, the amount, and the claim basis be identifiable. The June Individual POCs supply all three, plus an attachment documenting FTX's and Alameda's manipulative CEL trading, the very heart of their misconduct. The Trust's effort to recast *Falwell's* functional threshold as a barrier to proofs that contain the requisite identifying information finds no support in the standard itself.

71. The Trust's disagreement with the sufficiency or persuasiveness of that support is a merits dispute, not a documentation defect warranting disallowance.

72. Even if the June Individual POCs were not entitled to *prima facie* validity, they would not be automatically disallowed. In that alternative scenario the objector has no burden to meet, and "the usual burdens of proof associated with claims litigation" should apply. *Campbell v. Verizon Wireless S-CA*, 336 B.R. 430, 436 (B.A.P. 9th Cir. 2005); *see In re Kincaid,* 388 B.R. 610, 614 (Bankr. E.D. Pa. 2008); *In re Mallinckrodt plc*, 2022 WL 3545583, at *4 (D. Del. Aug. 18, 2022); *see also Lampe v. Lampe,* 665 F.3d 506, 515 n.12 (3d Cir. 2011) (holding that the underlying claim was entitled to *prima facie* validity and overturning bankruptcy court ruling that it was not, while noting that allowance of the claim did not turn on that presumption). "Without this presumption of validity, the burden of proving the existence and amount of the claim falls to the claimant." *In re Kemmer*, 315 B.R. 706, 713 (Bankr. E.D. Tenn. 2004); *accord Kincaid*, 388 B.R. at 614; *In re Sacko*, 394 B.R. 90, 98 (Bankr. E.D. Pa. 2008); *see also In re Willis*, No. 07-10046, 2013 Bankr. LEXIS 5161, at *4 & nn. 10–11 (Bankr. D. Del. Nov. 7, 2013) (relying on the immediately cited cases). Nor does noncompliance with Rule 3001(f) automatically result in disallowance under 11 U.S.C. § 502(b); the Court retains discretion to evaluate whether the claim provides sufficient indicia of validity to warrant burden-shifting to the objector. *In re O'Brien,* 440 B.R. 654 (Bankr. E.D. Pa. 2010); *see In re New Century TRS Holdings, Inc.,* 495 B.R. 625 (Bankr. D. Del. 2013). The consequence, even on the Trust's own premise, is that Mashinsky is entitled to prove his claim—not to suffer immediate expungement with prejudice.

73. The Trust's duplication argument fares no better. A claim seeking duplicative recovery for the same debt is unenforceable only to the extent of the duplication. *In re Kahle*, 2025 Bankr. LEXIS 2493 at *4 (Bankr. E.D. Wis. Sept. 30, 2025). Mashinsky's June and November Individual POCs seek no double recovery. The June Individual POCs supply the factual basis for

his claims; the November POCs particularize that basis by identifying specific tortious misconduct by FTX. Supplementation is not duplication.

74. Accordingly, the June Individual POCs satisfy the requirements for *prima facie* validity and gave the Trust adequate notice of the basis, amount, and nature of Mashinsky's claims.

### B. The Trust Failed to Satisfy *Its* Burden of Disproving the June Individual Proofs of Claim

75. The burden therefore shifted to the Trust. Under *Allegheny*, once a proof of claim alleges facts sufficient to support legal liability, the objector must produce sufficient evidence to negate those facts. *Allegheny*, 954 F.2d at 173. Delaware bankruptcy courts routinely apply that burden-shifting rule in contested claim matters. *In re Seegrid Corp*., 560 B.R. 93, 97 (Bankr. D. Del. 2016); *In re Cath. Diocese of Wilmington, Inc.*, 513 B.R. 639, 643–44 (Bankr. D. Del. 2014).

76. The Trust cannot carry that burden by casually lobbing pejoratives, such as "unsupported," "speculative," "exorbitant," and "preposterous," *see* First Amended Objection ¶¶ 9, 14, and 37, for the simple reason that insults are not evidence. Rather, the Trust must identify the particular claim, the essential allegation being challenged, and the evidence or legal defense that defeats it. Conclusory objections do not satisfy the objector's burden under *Allegheny* and its progeny.

77. Nor may the Trust rest on the absence of documentation. A lack of supporting documentation is not, by itself, a sufficient statutory basis to disallow or invalidate a claim under § 502(b). *Khatibi v. FIA Card Servs., N.A.*, 2014 U.S. Dist. LEXIS 79873, at *15 (M.D. Ga. June 12, 2014). The grounds for disallowance enumerated in 11 U.S.C. § 502(b) are exclusive, and failure to attach documentation is not among them. *Id.* at *10. An objector must therefore identify a substantive defect, such as the statute of limitations, lack of legal liability, or that the debtor does not owe the money. The Trust has not done so. Its objection rests on alleged documentation

deficiencies alone, without advancing any legally sufficient statutory ground for disallowance under § 502(b). *Khatibi* supports overruling the objection.

78. The Trust has likewise produced no evidence negating the factual allegations in the Mashinsky Claims. The First Amended Objection does not refute allegations that FTX and Alameda: (i) obtained unauthorized information from former Celsius officers; (ii) forced liquidation of Celsius positions at below-market prices; (iii) attacked the CEL token to create fear and mass withdrawals; and (iv) engaged in false and fraudulent creation and sale of CEL token. Absent such evidence, the Trust has not met its burden under *Allegheny*, and Mashinsky's claims must be allowed to proceed.

**C. The November POCs are Valid Amendments to the June POCs**

79. The Trust next argues that the November Individual POCs are invalid amendments to the June Individual POCs and therefore time-barred. The argument fails at every step. The November POCs describe already-pleaded claims with greater particularity, which is a paradigmatic permissible amendment. They relate back under Delaware law; and in the alternative, they satisfy the excusable-neglect factors under *Pioneer*. *See Pioneer Inv. Servs. Co. v. Brunswick Assocs. Ltd. P'ship*, 507 U.S. 380, 395 (1993).

80. The Trust's reliance on *In re Peregrine* is misplaced. *Peregrine* held that where creditors have "alleged no facts whatsoever in their timely claims, it is impossible for them to amend." *In re Peregrine Fin. Grp., Inc.*, 2015 WL 2237201, at *8 (Bankr. N.D. Ill. May 13, 2015). That holding rested on facts nothing like these. The *Peregrine* plaintiffs used a "Forex Customer Claim Form" on which they (i) supplied only a single number for the account balance owed, (ii) disclaimed additional claims not reported on the form, and (iii) expressly disavowed having

any other claims beyond the one contract claim they raised. On those facts, the court rejected their later attempt to introduce *entirely new claims and legal theories* long after the bar date had passed.

81. Mashinsky's June POCs are the opposite. He did not file a bare-bones form, he presented six legal theories, among them, fraud, conspiracy, and market manipulation against FTX, attached specific trading data as documentary evidence of FTX's and Alameda's fraudulent trading activity in support of his claims, and quantified his claim. He disclaimed nothing. And unlike the *Peregrine* plaintiffs, he raised no new claims or legal theories in November; those POCs supply specificity and detail to the fraud, conspiracy, and market-manipulation allegations already asserted in June. *Peregrine* is simply inapplicable in this case.

**1. The November POCs Are Not New Claims**

82. The Trust characterizes the November Individual POCs as "clearly an attempt to assert new claims 'under the guise of amendment'" and therefore time-barred. *In re Int'l Horizons, Inc.*, 751 F.2d 1213, 1216 (11th Cir. 1985) (courts apply "careful scrutiny to assure that there was no attempt to file a new claim under the guise of amendment"); *Mallinckrodt*, 2022 WL 3545583, at *2 ("[O]nce the bar date passes, amendments to claims are closely reviewed to ensure they are not attempts to file a new claim."). Scrutiny is welcome. The November POCs withstand it.

83. A post-bar-date proof of claim is a valid amendment where it "(1) corrects a defect of form in the original claim; (2) describes the original claim with greater particularity; or (3) pleads a new theory of recovery on the facts set forth in the original claim." *In re FLYi, Inc.*, 2008 WL 170555, at *3 (Bankr. D. Del. Jan. 16, 2008) (quoting *In re McLean Indus., Inc.*, 121 B.R. 704, 708 (Bankr. S.D.N.Y. 1990)). The inquiry is not whether the later-filed claim contains additional detail, but whether "the initial claim provided the trustee or debtor-in-possession with reasonable notice of the later claim." *McLean*, 121 B.R. at 708. Courts also weigh equitable factors,

including undue prejudice to the debtor or other creditors, whether other creditors would "receive a windfall" from disallowance, and the claimant's good faith and justification for delay. *Midland Cogeneration Venture L.P. v. Enron Corp. (In re Enron Corp.),* 419 F.3d 115, 133 (2d Cir. 2005); *McLean*, 121 B.R. at 708. Prejudice is decisive: "[t]he critical consideration is whether the opposing party will be unduly prejudiced by the amendment." *In re Integrated Res., Inc.*, 157 B.R. 66, 70 (S.D.N.Y. 1993).

84. The Trust's position reduces to the proposition that any new additional detail creates a new claim. That is not the test. The November Individual POCs describe the June Individual POCs with greater particularity by identifying additional facts concerning the *same* misconduct, the *same* CEL token trading activity, and the *same* injury asserted in the timely filed claims. The theories of recovery they plead are encapsulated by, and entirely consistent with, facts and legal theories set forth in the June Individual POCs. They do not inject new facts or causes of action untethered to the original claims; they elaborate on them. The November Individual POCs therefore fall within the recognized scope of permissible post-bar-date amendments and are not time-barred.

85. Delaware relation-back law points the same way. Delaware asks whether an amendment arises from the same conduct, transaction, or occurrence attempted to be set forth in the original pleading, emphasizing the conduct at issue rather than the label attached to the theory; changing or adding a legal theory is not controlling where the factual situation on which the claim depends remains the same and was brought to the opposing party's attention. *Oakes v. Gilday,* 351 A.2d 85, 89 (Del. Super. Ct. 1976). Here, the factual situation, FTX's and Alameda's tortious conduct targeting the CEL token and Mashinsky's resulting losses, remains unchanged. Only the level of detail and specificity has increased.

86. The November POCs identify specific factual bases for the fraud, conspiracy, and market manipulation theories pleaded in June. They state that: the FTX Debtors received "unauthorized" information from former officers of Celsius; used that information to "force the liquidation of Celsius's positions (specifically stETH and WBTC at well below market prices);" "attack[ed] CEL Token to create fear and mass withdrawals" from the Celsius platform; and engaged in "false and fraudulent creation and sale of CEL Token." Those allegations name the targeted assets (stETH, WBTC, CEL), the specific mechanisms of harm, and the specific sources of damages—the diminution in value of Mashinsky's Celsius equity interests and his CEL holdings.

87. The amount did not change. The November POCs describe, but do not alter, the $2.15 billion claim. "Claimant is owed in the aggregate not less than $2,150,000,000.00 on account of Claimant's loss of (i) CEL Token and its value, and (ii) equity in the Celsius Debtors; such losses arising out of the FTX (and Alameda) Debtors' fraud, conspiracy to commit fraud, market manipulation, bribery, securities fraud, and money laundering as set forth in this Amended Proof of Claim." The core theory is unchanged; only the supporting detail is new. That is what a proper amendment looks like.

**2. In the Alternative, the November POCs Satisfy the Excusable Neglect Standards under *Pioneer***

88. Even if the Court were to conclude that Mashinsky should have moved formally for an extension of time to amend his June Individual POCs, that procedural defect would not warrant complete disallowance of the November Individual POC amendments because they satisfy the *Pioneer* factors.

89. Under Rule 9006(b)(1) of the Bankruptcy Rules, a creditor may be excused from filing a claim after the applicable bar date where the failure to timely file was the result of

"excusable neglect." Courts weigh the following factors: (1) prejudice to the debtor, (2) the length of the delay and its potential effect on judicial proceedings, (3) the reason for the delay, including whether it was in the movant's control, and (4) the movant's good faith. *See Pioneer*, 507 U.S. at 395; *Mallinckrodt*, 2022 WL 3545583, at *3.

*a. The Trust has not demonstrated concrete prejudice in allowing the November POCs*

90. Prejudice to the debtor is a critical consideration. *See In re Enron Corp.*, 419 F.3d at 133. The Trust has demonstrated none.

91. The Trust asserts only that it faces a "significant risk of undue prejudice" because allowing the November Individual Claims would "open[] the floodgates" to similar late-filed claims. *See* First Amended Objection ¶¶ 27, 32. The sole support for that assertion is its *ipse dixit* that "the Mashinsky Claims appear to seek recompense for losses incurred in the cryptocurrency market, which are generic claims that any participant in the cryptocurrency market could assert." *See* First Amended Objection ¶ 27. That characterization is both factually wrong and legally insufficient to establish prejudice.

92. *First*, the Mashinsky Claims are not generic. They present highly specific and individualized conduct directed at Celsius as a competitor and market participant: receipt of unauthorized confidential information from former Celsius officers; use of that information to force liquidation of specific Celsius positions (stETH and WBTC) at below-market prices; coordinated attacks on the CEL token designed to create fear and induce mass withdrawals from the Celsius platform; and false and fraudulent creation and sale of CEL token. No ordinary market participant could plead those facts, unless the Trust means to contend that all cryptocurrency market participants also happened to be CEOs of a rival that FTX targeted for acquisition and that issued a token FTX and Alameda manipulated.

93. If the floodgate theory had substance, the Trust could have identified other creditors asserting claims comparable to Mashinsky's. It has identified none.

94. *Second*, even assuming some risk of similar claims by other creditors, the Trust has not shown that such claims would lack merit or that adjudicating them would constitute undue prejudice. The cases cited by the Trust, *In re Enron Corp.*, *In re Kmart Corp.*, and *In re Keene Corp*. involved circumstances where allowing late claims would have exposed the estate to *thousands* of duplicative claims asserting *identical legal theories* based on *the same underlying conduct*. *In re Enron Corp.*, 419 F.3d at 132–33; *In re Kmart Corp.*, 381 F.3d 709, 714 (7th Cir. 2004); *In re Keene Corp.*, 188 B.R. 903, 913 (Bankr. S.D.N.Y. 1995). The Mashinsky Claims assert unique theories of liability based on conduct that targeted Celsius specifically. There is no comparable risk of mass duplicative litigation, indeed, no risk of duplicative litigation at all.

95. *Third*, the Trust suffered no concrete prejudice from the timing of the late-filed claims. It had actual notice, well before the bar date, of claims arising from FTX's and Alameda's conduct targeting Celsius: the timely filed June Individual POCs presented fraud, conspiracy to commit fraud, and market manipulation relating to FTX's and Alameda's CEL trading activity; and attached documentary evidence of FTX's and Alameda's own CEL trading data. The November Individual POCs added detail, not surprise. And the Trust has identified no Plan provision harmed, no settlement negotiation undermined, and no other concrete harm resulting from the late filing.

96. What remains is speculation about future floodgate litigation that the uniqueness of Mashinsky's claim makes virtually certain to *not* occur. Speculation is not prejudice. *See In re New Century TRS Holdings, Inc.*, 465 B.R. 38, 51 (Bankr. D. Del. 2012) (the *Pioneer* prejudice factor "does not refer to an imagined or hypothetical harm; a finding of prejudice should be a

conclusion based on the facts in evidence."). The first *Pioneer* factor weighs decisively in favor of allowing the November Individual POCs.

*b. The length of delay was modest and had no effect on the proceedings.*

97. The second *Pioneer* factor also favors allowance. The delay was four months and it affected nothing. The Trust did not file its Original Objection until July 10, 2024, more than one year after the bar date and more than eight months after the November Individual POCs were filed. The Plan was not confirmed until October 8, 2024, more than fifteen months after the bar date. And on September 20, 2024, the parties agreed to stay litigation of the Original Objection pending resolution of Mashinsky's criminal proceedings. Against that backdrop, the Trust has not identified a single proceeding, deadline, or event affected by the November amendments.

98. The "hard line" approach discussed in *Energy Future* does not control on this record. 619 B.R. 99, 110 (Bankr. D. Del. 2020). This Court has made clear that all *Pioneer* factors "must be considered and balanced; no one factor trumps the others." *See In re Draw Another Circle, LLC*, 595 B.R. 174, 180 (Bankr. D. Del. 2018). Applying a rigid rule to the reason-for-delay factor would produce precisely the unbalanced analysis that *Pioneer* and *Draw Another Circle* reject.

*c. The delay was justified and Mashinsky acted in good faith.*

99. The third and fourth factors, reason for the delay and good faith, complete the analysis. Mashinsky has appeared *pro se* for a portion of this proceeding. He timely filed his June Individual POCs despite the substantial difficulties created by his ongoing criminal proceedings and, later, his incarceration, which severely limited his access to the tools and materials necessary to litigate this matter without the assistance of counsel. Those circumstances justify the delay in filing amendments that added specificity to claims already timely asserted. That timely June filing

also refutes any suggestion of bad faith: Mashinsky knew of the bar date and took affirmative steps to preserve his claims. The later filings were not made to circumvent the bar date or gain an unfair advantage; they were made to particularize what was already on file. Accordingly, all four *Pioneer* factors weigh in favor of allowing the November Individual POCs as valid amendments of the June Individual POCs.

## V. The Mashinsky Corporate POCs are Valid Claims

100. The Corporate POCs should be allowed for three independent but related reasons. First, excusable neglect supports allowance, because the Trust had timely notice of the substance of the corporate claims, suffered no cognizable prejudice, and identifies no bad faith. Second, the informal-proof-of-claim doctrine applies, because the timely filings disclosed the nature, amount, and factual basis of the claims asserted by the same claimants against the same Debtors. Third, the September and December Corporate POCs are proper amendments that relate back because, they added no new Debtors, no new claimants, and no new factual predicate, but merely formalized and clarified claims already disclosed in substance.

### A. The Court Should Allow the September and December Corporate POCs Under *Pioneer*

101. The Trust argues that the September and December Corporate POCs should be disallowed as time-barred and deficient. *See* First Amended Objection ¶¶ 25–27. To the contrary, they should be allowed under the *Pioneer* excusable neglect standard set out in Section IV.C above or, alternatively, the informal proof-of-claim doctrine. That determination is equitable and considers all relevant circumstances; all factors must be considered and balanced, and no single factor trumps the others. *Pioneer*, 507 U.S. at 395; *In re Draw Another Circle*, 595 B.R. at 180.

### B. The September Corporate POCs Should Be Allowed Under the *Pioneer* Factors

102. As discussed below, the September Corporate POCs, filed by Koala1 LLC and AM Ventures Holdings Inc. on September 29, 2023, satisfy the *Pioneer* factors, because they asserted the same core misconduct—fraud, market manipulation, conspiracy, and contract interference—and attached the same CEL short-position materials used in the timely June Individual POCs. The corporate claimants are Mashinsky-affiliated entities that held no less than 7.5 million CEL tokens (Koala1 LLC) and no less than 41 million CEL tokens (AM Ventures Holdings Inc.), and they were damaged by the same FTX/Alameda conduct described in the June Individual POCs.

#### 1. There is No Cognizable Prejudice to the Debtors

103. The Trust suffered no cognizable prejudice. The September Corporate POCs inject no new factual controversy; they identified related corporate holders asserting injury from the same FTX/Alameda misconduct already raised in the timely June Individual POCs. They were on file long before the Trust filed its Original Objection in July 2024, and that Objection addressed them. The Trust then agreed to stay litigation during Mashinsky's criminal proceedings and later agreed to continue the stay through sentencing. Whatever delay followed did not stem from the September filing date; the claims were known, objected to, and then held by agreement. *See Eagle Bus Mfg. v. Rogers*, 62 F.3d 730, 737 (5th Cir. 1995) (debtor not prejudiced by the late filed claims where its reorganization plan was negotiated and approved after it had notice of the claims).

#### 2. The Length and Impact of Delay Favor Allowance

104. The September Corporate POCs were filed roughly three months after the bar date; the December Corporate POCs, roughly six months after. Both preceded the Trust's July 2024 Original Objection and the later consensual stay, so neither was sprung on the Trust. "When considering the length of delay and potential impact on judicial proceedings, there is no specific

threshold at what point the lateness of a claim is 'substantial'" *See In re Roman Cath. Diocese of Syracuse*, 638 B.R. 33, 39 (Bankr. N.D.N.Y. 2022). This delay was not substantial and had no impact on case administration. The Trust itself agreed to stay the claims litigation, and the Corporate Claims came well before any plan confirmation or distribution.

**3. The Reason for Delay and Good Faith Favor Allowance**

105. The third and fourth *Pioneer* factors, reason for delay and good faith, likewise support allowance of the September and December Corporate POCs. When the corporate claims were filed, Mashinsky was managing multiple lawsuits, including his criminal prosecution. A claimant in that position may reasonably be delayed in filing proofs of claim. *See Pioneer*, 507 U.S. at 394–95, (where "reading Rule 9006(b)(1) inflexibly to exclude every instance of an inadvertent or negligent omission would ignore the most natural meaning of the word 'neglect.'") Nor has the Trust accused Mashinsky of bad faith—and the record forecloses it. The corporate claimants filed before the Trust objected, disclosed the same factual basis as the timely June Individual POCs, concealed nothing, and cooperated in the consensual stays that governed the orderly resolution of this dispute.

**4. Alternatively, the September POCs Should Be Allowed as Informal Proofs of Claim**

106. Even if the September Corporate POCs are untimely formal filings, they should be allowed as informal proofs of claim that relate back to the timely June Individual POCs. The informal proof-of-claim doctrine permits a bankruptcy court to treat a late formal proof of claim as timely because it relates back to a document filed before the bar date. A document constitutes an informal proof of claim if: (1) it is in writing; (2) it contains a demand by the creditor on the estate; (3) it expresses an intent to hold the debtor liable for the debt; (4) it is filed with the bankruptcy court; and (5) given the facts of the case, it would be equitable to treat the document

as a proof of claim. *In re Maxus Energy Corp.*, 639 B.R. 51, 69 (Bankr. D. Del. 2022); *Hefta v. Official Comm. of Unsecured Creditors (In re Am. Classic Voyages Co.)*, 405 F.3d 127, 131 (3d Cir. 2005).

107. The timely June Individual POCs satisfy all five prongs of this test. They were in writing and filed with the Court before the June 30, 2023 Non-Customer Claims Bar Date, they gave notice that Mashinsky sought to hold FTX and Alameda liable for CEL-related fraud, market manipulation, conspiracy, bribery, securities fraud, and money laundering; and they asserted a claim of $2.15 billion supported by the same CEL short-position documentation that formed the basis of the September Corporate POCs. The September filings introduced no new factual universe—only corporate entities with their own separately asserted liabilities and specific CEL token holdings at issue.

108. Here, treating the September Corporate POCs as informal proofs of claim would be equitable. Before the bar date, the Debtors were on notice of the nature and amount of the claims, the identity of the wrongdoers, and the factual basis for liability. The September Corporate POCs merely formalized claims already disclosed in substance. Courts apply the informal proof-of-claim doctrine precisely to avoid forfeitures where the debtor had adequate notice and suffered no prejudice. *In re Rosenblum*, 545 B.R. 846, 859 (Bankr. E.D. Pa. 2016); *Rubino v. Spansion, Inc. (In re Spansion Inc.)*, 2013 U.S. Dist. LEXIS 151375, at *9 (D. Del. Oct. 22, 2013).

**5. Alternatively, the September Corporate POCs are Corrective Amendments to the June Individual POCs**

109. The September Corporate POCs also qualify as corrective amendments to the June Individual POCs, because Mashinsky's personal claim for loss rests on his control of the corporate entities.

110. The amendment standard is set out in Section IV.C above, a post-bar-date proof of claim is a valid amendment if it corrects a defect of form, describes the original claims with greater particularity, or pleads a new theory of recovery on the facts set forth in the original claim. The focus is whether the initial claim gave the trustee or debtor-in-possession reasonable notice of the later claim, and a critical consideration is undue prejudice. *In re Enron Corp.*, 419 F.3d at 133.

111. Here, the September Corporate POCs correct a defect of form by substituting the real parties in interest, Koala1 LLC and AM Ventures Holdings Inc. for Mashinsky individually. Those entities are Mashinsky affiliates that held CEL tokens and other interests damaged by the same FTX/Alameda conduct described in the June Individual POCs. The POCs, and the Trust itself identifies the September Corporate POCs as claims filed with the same attachment used for the earlier Individual POCs. They inject no new debt, no new debtor, no new transaction, or no new factual predicate; they correct the claimant identity so the claims may proceed in the name of the entity that held the affected property. That is the proper function of real-party-in-interest substitution, and the Trust can claim neither prejudice nor lack of notice.

112. Courts routinely allow such a substitution as a valid amendment. *See Gens v. Resolution Trust Corp.*, 112 F.3d 569, 575 (1st Cir. 1997) (where the court found that "a simple substitution of the real party in interest…for a related party mistakenly listed in the original POC…represents a proper ground for amendment."); *See Clamp-All Corp. v. Foresta (In re Clamp-All Corp.)*, 235 B.R. 137, 141 (B.A.P. 1st Cir. 1999) (finding that there was no evidence of prejudice to the debtor in allowance of an amended corporate proof of claim, particularly because the debtor knew of the nature of the corporate claims.); *See also In re Unioil*, 962 F.2d 988, 993 (10th Cir. 1992) ("In light of Unioil's failure to demonstrate actual prejudice resulting from the requested amendment, which, as already noted, asserted the same substantive interest as the

original proof of claim and merely substituted the Trust as the proper claimant, we cannot say the bankruptcy court abused its discretion in allowing the Trust's claim.").

### C. The December Corporate POCs are Valid Amendments

113. The December Corporate POCs are valid amendments to the September Corporate POCs. They assert no new claim; they clarify and particularize the same claims, by the same corporate claimants, against the same Debtors, arising from the same FTX/Alameda misconduct involving CEL.

#### 1. The December Corporate POCs Relate Back to the September Corporate POCs

114. The December Corporate POCs describe the September Corporate POCs with greater particularity. Koala1 LLC and AM Ventures Holdings Inc. filed the September POCs against Alameda Research LLC and FTX Trading Ltd., asserting fraud, market manipulation, and conspiracy, and attaching the same CEL short-position materials used in the June Individual POCs. The December POCs, filed by the same claimants against the same Debtors, expressly amended the September filings by listing their Confirmation IDs. They introduced no new Debtors, claimants, or course of misconduct, only a counsel-prepared rider addressing the same FTX/Alameda conduct already identified in shorthand.

115. Courts apply a two-step inquiry for late amendments. *Pavarini McGovern, LLC v. Waterscape Resort LLC (In re Waterscape Resort LLC)*, 520 B.R. 424, 434 (Bankr. S.D.N.Y. 2014). The amendment must first relate back to a timely filed claim by curing a formal defect, adding particularity, or pleading a new theory on the original facts; the court then assesses whether allowance would be equitable. *Id.* Belated amendments to timely claims are freely allowed absent prejudice. *Id.*

**2. There is No Unfair Prejudice to the Trust**

116. Allowing the December Corporate POCs would not unfairly surprise the Trust. The September Corporate POCs already identified the corporate claimants, the Debtors, the nature of the wrongdoing, and the CEL trading-focused documentary attachment. The December filing came from the same claimants against the same Debtors and added an explanatory rider the Trust was already familiar with from the November Individual POC amendments. The Debtors have been fully aware of the substantive interest and nature of these claims since the September filings.

117. Nor would allowance disrupt the administration of the Trust. Where an amendment merely elaborates on claims already disclosed and does not alter the debtor's evaluation of its liabilities, no undue prejudice results. *In re Enron Corp.*, 419 F.3d at 133; *In re SVB Fin. Grp.*, 664 B.R. 543, 568 (Bankr. S.D.N.Y. 2024). That standard, applied to the November Individual POCs in Section IV.C above, applies with equal force to the December Corporate POCs.

**3. Good Faith and Justified Delay**

118. There is no indication of bad faith on Mashinsky's part in filing the December Corporate POCs past the bar date. For the reasons already given, a claimant managing multiple proceedings, including a criminal prosecution then well underway, would be delayed in filing proofs of claim. That is precisely the situation "excusable neglect" is meant to cover. *In re Enron Creditors Recovery Corp.*, 370 B.R. 90, 101 (Bankr. S.D.N.Y. 2007).

119. For these reasons, the Court should allow the December Corporate POCs as valid amendments to the September Corporate POCs under the standard articulated in *Enron*, *McLean*, and *Integrated Resources* and applied in Section IV.C above. *In re Enron Corp.*, 419 F.3d at 133; *In re McLean Indus., Inc.*, 121 B.R. at 708; *In re Integrated Res., Inc.*, 157 B.R. at 70.

## VI. The Global Settlement Does Not Bar the Mashinsky Claims

120. The Trust next argues that the Global Settlement, referencing Sections 5.2 and 10.8 of the Plan, extinguishes Mashinsky's claims. *See* First Amended Objection ¶ 41. That argument misconstrues both the nature of the Mashinsky Claims and the scope of the Global Settlement. In summary, the Global Settlement resolved *customer* claims about the treatment of *customer* deposits; the Mashinsky Claims are third-party tort claims asserted by a competitor. And this Court's prior rulings, addressed below, rejected efforts to relitigate customer-wide issues—not claims of this kind.

121. The Coverick Plan Declaration specifies the scope of the Global Settlement: "Additionally, as part of the Global Settlement, I understand that the terms of the *Customer* Priority Settlement (as defined in the Disclosure Statement) are incorporated into the Plan through the Global Settlement in Section 5.2 of the Plan. Pursuant to the *Customer* Priority Settlement, all Claims, Interests and Causes of Action against, by or among the Debtors, including, among other things, issues relating to the tracing of assets of individual Debtors and the effects and consequences of the Dotcom TOS and US TOS and whether assets held by the FTX.com Exchange and the FTX.US Exchange are property of the Debtors, will be settled and resolved." (emphasis added). *See* Coverick Plan Declaration, [D.I. 26041], at ¶ 22. Its purpose was certainty and finality with respect to customer claims arising from the Debtors' prepetition conduct affecting FTX customer accounts and customer deposit treatment. Mashinsky does not assert that he was an FTX customer whose deposits were misappropriated by FTX insiders. He asserts distinct theories of liability based on FTX's and Alameda's misconduct directed at Celsius as a competitor and market participant, and the resulting harm to his CEL holdings and Celsius equity interests.

122. Further, Section 10.8 of the Global Settlement concerns the permanent injunction against any person who has held, holds, or may hold claims, interests, or causes of action from (a) commencing or continuing any action to collect, enforce, or recover with respect to any claim released under the Plan; (b) enforcing or collecting any judgment in connection with any such claim or interest; (c) creating any encumbrance in connection with any such claim or interest; and (d) asserting any right of setoff that was not validly asserted before confirmation. *See* Second Amended Joint Chapter 11 Plan of Reorganization, [D.I. 26029]. As established above, the Global Settlement, and particularly Section 5.2, only concerns the release of customer claims. Thus, the permanent injunction in Section 10.8 only applies to customer claims released against the Trust. Mashinsky is not a customer and is not alleging that he was harmed as a customer of FTX. His claims are not subject to the permanent injunction here.

123. The November Individual POCs confirm this distinction. They assert three categories of misconduct, none of which is covered by the Global Settlement.

124. *First*, the November Individual POCs contend that the FTX Debtors received and misused unauthorized confidential information from former Celsius officers without Mashinsky's knowledge or consent, and used it to target specific Celsius positions for forced liquidation. That is not a claim about fraud against FTX customers or the commingling of FTX customer deposits. It is a claim based on the misuse of confidential and proprietary information belonging to Celsius and the harm caused by that misuse.

125. *Second*, they also assert that the FTX Debtors used the unauthorized information to force liquidation of Celsius's stETH and WBTC positions at highly manipulated prices well below a competitive market price. That is not a claim about the FTX Debtors' governance of customer assets or their treatment of FTX customer deposits. It is a claim for intentional interference with

Celsius's business operations and asset management, causing direct financial harm to Celsius and to Mashinsky.

126. *Third*, they claim that the FTX Debtors orchestrated coordinated attacks on the CEL token designed to create fear and induce mass withdrawals from the Celsius platform. That is not a claim about FTX's custody of customer deposits or the customer-wide issues resolved by the Global Settlement. It is a claim for market manipulation and tortious interference directed at Celsius's business and its CEL token.

127. Each category targets Celsius and Mashinsky specifically. None rest on generalized theories of fraud, commingling, or governance failure affecting FTX customers as a class, and none seeks to recover on the customer-wide claims resolved through the Global Settlement. The Plan's own text confirms as much.

### A. The Global Settlement Was Designed to Resolve Customer Claims, Not Third-Party Tort Claims

128. The Global Settlement was negotiated to provide enhanced recovery to FTX customers in exchange for release of customer-asserted theories of fraud and misconduct relating to the treatment of customer deposits. The Coverick Plan Declaration says so. *See* Coverick Plan Declaration, [D.I. 26041], at ¶ 22. The purpose of the Global Settlement was certainty and finality with respect to customer claims arising from the Debtors' prepetition conduct affecting FTX customer accounts and customer deposit treatment.

129. Nothing indicates that the Global Settlement was intended to release claims held by non-customer third parties arising from tortious conduct directed specifically at those parties. To the contrary, the categories of released claims enumerated in Section 5.2 of the Plan are all customer-specific: (i) commingling and misuse of customer deposits, (ii) the effects of the Terms of Service on customer assets, (iii) the tracing of customer assets, and (iv) governance failures

affecting customer funds. Those are disputes among and on behalf of the customer class about how customer assets were allocated, prioritized, commingled, and managed. They do not reach intentional torts directed at third-party entities outside the FTX customer relationship.

130. The Trust's own description confirms the point. It acknowledges that the Global Settlement addresses "claims against the Debtors related to the 'actual or purported fraud, unjust enrichment, misappropriation, conversion and misconduct of former Insiders,'" and "'the purported commingling and misuse of customer deposits and corporate funds.'" *See* First Amended Objection ¶ 39. "Former Insiders" means FTX insiders, Mr. Bankman-Fried and others, not separate tortious conduct by the Debtors themselves targeting third parties such as Mashinsky and Celsius. The claims related to "commingling and misuse of customer deposits" refer to FTX customer deposits, not to CEL token holdings. The Global Settlement does not relate to, or extinguish, Mashinsky's Claims.

**B. This Court's Prior Rulings Do Not Bar the Mashinsky Claims**

131. The Trust also argues that "this Court previously rejected similar attempts to relitigate customer-wide issues that were resolved by the Plan and Global Settlement." *See* First Amended Objection ¶ 43 (*citing* Aug. 12, 2025 Hr'g Tr. [D.I. 32344], at 39:15-21 ("If there was a valid claim under some sort of fraud, mismanagement, commingling claim, it has been compromised through the global settlement under the plan for the good of all creditors and customers of FTX[.]"); Nov. 24, 2025 Hr'g Tr. [D.I. 33909], at 30:9-13 ("The concerns here are generalized to all claimants and . . . would give rise to a reconsideration of the order for every creditor that is a subject of that order[.]")). Those rulings do not reach these claims.

132. Both rulings addressed individual customers seeking to relitigate issues that were resolved on a customer-wide basis through the Global Settlement. The Court's concern was

finality: preventing a flood of duplicative litigation from similarly situated creditors over the allocation, priority, and valuation of customer deposits.

133. The Mashinsky Claims are different in kind. They do not seek to relitigate customer-wide issues or to "reconsider the order for every creditor." They are unique to Mashinsky arising from tortious conduct directed specifically at him, as the controlling shareholder, and Celsius as a competitor and market participant, as detailed above. No other creditor could plead them on the same facts.

134. The rationale underlying the Court's prior rulings therefore does not apply here. Mashinsky's claims are not customer claims, and they do not arise from the same conduct, transactions, or legal theories addressed by the Global Settlement.

## VII. The Doctrine of Unclean Hands/*In Pari Delicto* Does Not Bar the Mashinsky Claims

135. The Trust's unclean hands/*in pari delicto* argument tries to do far too much with Mashinsky's guilty plea: convert it into a categorical bar to claims arising from separate misconduct.

136. The problem with the Trust's ambitious argument is that the unclean hands doctrine does not work that way. The doctrine does not bar every claim brought by a person who has committed wrongdoing; the misconduct must be tied to ***the particular claim before the Court***. The Third Circuit could hardly be clearer: "the primary principle guiding application of the unclean hands doctrine" is that the "inequitable conduct must be connected" to the matter before the court, and "the connection between the misconduct and the claim must be close." *In re New Valley Corp.*, 181 F.3d 517, 525 (3d Cir. 1999). *See also In re Stone & Webster Inc.*, 547 B.R. 588, 602 (Bankr. D. Del. 2016) (rejecting unclean hands where misconduct had "no direct connection" to the validity or amount of the claim). Unclean hands is a nexus doctrine, ***not*** a character test.

137. That nexus is missing here. Mashinsky pleaded guilty to defrauding Celsius customers through false statements in September 2019 about Celsius' s purchases of CEL and his own sales and December 2021 concerning Celsius' s regulatory approvals.[20] Mashinsky's sales were a de minimis amount of his overall holdings in CEL. The Government's indictment states that, "On or about August 22 through August 23, 2019, Mashinsky sold approximately 292,000 CEL, and from or about September 19 through or about September 23, he again sold another 382,000 CEL."[21] As part of his plea allocution Mashinsky agreed to the forfeiture allegation for Count Five. *See* Mashinsky Plea Transcript, at 29:3-4. At most, the 674,000 CEL Mashinsky sold was valued at $574,000. It represents a mere 0.86%, when compared to Mashinsky's ownership of 78 million CEL, at the time of his alleged sales. Mashinsky's sales therefore constituted a miniscule fraction of his holdings and could not have affected Celsius or the price of the CEL token. Mashinsky's admitted conduct occurred well before the acts described in Mashinsky's POCs. The Mashinsky claims concern far different conduct by different actors: FTX and Alameda's pretextual acquisition and misuse of confidential Celsius information, forced liquidation of Celsius positions, manipulation and naked shorting of CEL, and fraudulent creation and sale of CEL.

138. Indeed, the Trust itself characterizes the Mashinsky Claims as arising from the Debtors' receipt of "unauthorized" information, efforts to "force the liquidation of Celsius's positions," "attack [on] CEL Token," and "false and fraudulent creation and sale of CEL Token." First Amended Objection at ¶11. Those allegations describe a separate causal chain: Mashinsky asserts that, after FTX obtained confidential information concerning Celsius's positions, FTX and

---

[20] *See* Mashinsky Plea Transcript at 25:4–13; 26:9–27:6.

[21] *See* Indictment, *United States of America* v. *Alexander Mashinsky and Roni Cohen-Pavon*, No. 1:23-cr-00347 at ¶ 70(a) (S.D.N.Y. filed July 11, 2023) ("Mashinsky Indictment").

Alameda used that information to target Celsius assets and intensify pressure on CEL, thereby contributing independently to the losses for which the Mashinsky Claims seek recovery. Those Claims concern what ***FTX and Alameda did***—not the misconduct to which Mashinsky pleaded guilty.

139. The Trust nevertheless leaps from Mashinsky's guilty plea to the sweeping conclusion that he "bears direct responsibility for any harm suffered and for Celsius's own failure." First Amended Objection at ¶45. But the Trust does not support its contention with any evidence and instead relies exclusively on *ipse dixit.* While Mashinsky's plea establishes his responsibility for the specific misconduct he admitted, he did not concede, and the plea does not otherwise establish, that his conduct caused CEL's decline or the injuries for which the Mashinsky Claims seek recovery. That follows from the elements of the offenses themselves. Count Two charged commodities fraud arising from misrepresentations to Celsius customers regarding the Earn Program, in violation of 7 U.S.C. § 9(1) and 17 C.F.R. § 180.1(a); Count Five charged securities fraud arising from the scheme to manipulate the price of the CEL token, in violation of 15 U.S.C. § 78j(b) and 17 C.F.R. § 240.10b-5. Neither offense includes harm to the public as an element. Neither requires proof that any investor, customer, or holder of CEL suffered a loss, and neither requires proof that the defendant's conduct caused a decline in the price of any security or commodity. A conviction on either count establishes deception; it does not establish injury. Mashinsky's allocution therefore admits two discrete misstatements, made in September 2019 and December 2021, and nothing more. The remaining counts of the indictment, which are the only counts that arguably would have linked Mashinsky's conduct to the diminution in CEL's value or Celsius's collapse, were dismissed pursuant to the plea agreement and were never proved. The Trust cannot turn a guilty plea to one scheme into a forfeiture of claims arising from another.

140. *New Valley* makes the point especially clear. There, the creditor was accused of backdating documents and manufacturing evidence in the very bankruptcy proceeding in which it sought payment. *New Valley*, 181 F.3d at 524-25. Even that was insufficient for unclean hands because the misconduct did not bear closely enough on the claims being adjudicated. *Id.* at 526. Here, the Trust relies on separate misconduct by Mashinsky to disallow claims based on separate misconduct by FTX and Alameda. That is not a close nexus. It is a *non sequitur*.

141. Nor does equity support such a result. The Mashinsky Claims do not seek recovery for, or the fruits of, Mashinsky's admitted fraud. They seek recovery for injuries caused by independent misconduct of FTX and Alameda. Whatever consequences flow from Mashinsky's own wrongdoing, wholesale disallowance of claims arising from separate misconduct is not one of them. And even if the Trust could establish the required nexus, which it cannot, disallowance would not follow automatically. Application of unclean hands "rests within the sound discretion of the trial court," and neither the Third Circuit nor the Supreme Court has made application of the doctrine "mandatory." *New Valley*, 181 F.3d at 525.

142. The Trust's theory ultimately reduces to a remarkably convenient, and untenable, position: because Mashinsky committed fraud, his claims must be disallowed regardless of whether separate misconduct by FTX and Alameda caused the injuries for which he seeks recovery. That is not a permissible application of unclean hands.

## **Conclusion**

For the foregoing reasons, Mashinsky respectfully requests that this Court overrule the First Amended Objection in its entirety and allow the Individual and Corporate Mashinsky Claims.

Dated: August 31, 2026
Wilmington, Delaware

**ESBROOK P.C.**

*/s/ Maria Aprile Sawczuk*
Maria Aprile Sawczuk (DE Bar No. 3320)
800 N. King Street, Suite 301
Wilmington, DE 19801
Telephone: 302-408-7353
E-mail: maria.sawczuk@esbrook.com

-and-

**KIRBY McINERNEY LLP**
David Kovel
250 Park Avenue, Suite 820
New York, NY 10177
Telephone: (212) 371-6600
Facsimile: (212) 371-6600
E-mail: DKovel@kmllp.com

*Counsel for Alex Mashinsky, Koala1 LLC and AM Ventures Holdings Inc.*