**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| In re: | Chapter 11 |
| FTX TRADING LTD., *et al.*,[1] | Case No. 22-11068 (KBO) |
| Debtors. | (Jointly Administered) |
| | **Hearing Date: October 20, 2026 at 9:30 a.m. ET**<br>**Response Deadline: October 2, 2026 at 4:00 p.m. ET** |

**FTX RECOVERY TRUST'S TWO HUNDRED THIRD (SUBSTANTIVE) OMNIBUS OBJECTION TO CERTAIN PROOFS OF CLAIM WITH REJECTED KYC (CUSTOMER CLAIMS)**

**THIS OBJECTION SEEKS TO DISALLOW AND EXPUNGE CERTAIN CLAIMS. CLAIMANTS RECEIVING THIS OBJECTION SHOULD CAREFULLY REVIEW THIS OBJECTION AND LOCATE THEIR CLAIMS ON SCHEDULE 1, SCHEDULE 2, SCHEDULE 3 AND SCHEDULE 4 OF EXHIBIT A ATTACHED TO THIS OBJECTION AND, IF APPLICABLE, FILE A RESPONSE BY THE RESPONSE DEADLINE FOLLOWING THE INSTRUCTIONS SET FORTH HEREIN.**

The FTX Recovery Trust (the "Trust")[2] hereby submits this two hundred third omnibus claims objection (the "Objection")[3] for entry of an order, substantially in the form attached hereto as Exhibit A (the "Order"), pursuant to sections 105 and 502 of title 11 of the United States Code, 11 U.S.C. §§ 101 *et seq*. (the "Bankruptcy Code"), and rules 3001 and 3007 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), disallowing and expunging in its entirety each Objection Claim (as defined below) set forth in Schedules 1, 2, 3,

---

1 The last four digits of FTX Trading Ltd.'s and Alameda Research LLC's tax identification numbers are 3288 and 4063 respectively. Due to the large number of debtor entities in these Chapter 11 Cases, a complete list of the Debtors and the last four digits of their federal tax identification numbers is not provided herein. A complete list of such information may be obtained on the website of the Debtors' claims and noticing agent at https://cases.ra.kroll.com/FTX.

2 The Trust (a/k/a the Consolidated Wind Down Trust) was established through the Debtors' confirmed *Second Amended Joint Chapter 11 Plan of Reorganization of FTX Trading Ltd. and Its Debtor Affiliates* [D.I. 26404-1] (the "Plan"), which became effective on January 3, 2025 [D.I. 29127].

3 Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to them in the Plan.

and 4 (the "Schedules") attached to the Order. In support of the Objection, the Trust submits the *Declaration of Michael S. Leto in Support of the FTX Recovery Trust's Two Hundred Third (Substantive) Omnibus Objection to Certain Proofs of Claim with Rejected KYC (Customer Claims)* (the "Leto Declaration"), attached hereto as Exhibit B. In further support of this Objection, the Trust respectfully states as follows:

**PRELIMINARY STATEMENT**

1. Soon after the Petition Date, it became clear to the Debtors that a material number of customers of the FTX.com exchange ("Exchange") were not who they claimed to be, were involved in criminal activity, and/or were subject to sanctions or residing in sanctioned regions. As it is now well documented, the Exchange lacked basic anti-money laundering ("AML"), counter-terrorist financing ("CTF"), and know-your-customer ("KYC") procedures, leaving it vulnerable to misuse and exploitation by malefactors. These deficiencies presented a significant challenge for the postpetition Debtors—and now the Trust—who took on the critical task of verifying the identity of each claimant seeking a distribution from the estate. Valid creditor recoveries would be diminished, potentially substantially, if the Trust were to blindly pay Customer Entitlement Claims without verifying the identity of each customer as of the Petition Date (each, an "Original Holder"). Such an unregulated process could result in the Trust paying the wrong claimant, facilitating money laundering or other illicit activities, and incurring liability by violating sanctions regimes in the United States and abroad.

2. To address this challenge, the Debtors sought and received approval from the Court to: *first*, collect KYC information ("KYC Information") from Original Holders in connection with every Customer Entitlement Claim; *second*, disallow and expunge Customer Entitlement Claims where Original Holder KYC Information was not provided; and *third*, review Original Holder KYC Information to determine if, ultimately, the Trust would object to a claim

based on the KYC Information provided. The Plan made explicit—and put all creditors on notice—that, based on the findings from the Trust's review of KYC Information, the Trust could object to Customer Entitlement Claims on the basis of KYC Information provided.

3. The Debtors' efforts to collect and review KYC Information—which have been continued and expanded by the Trust—have been overwhelmingly successful. To date, the Trust has accepted KYC Information for approximately 99% of claims for which all required KYC Information was submitted. (Leto Decl. ¶ 19.) In the vast majority of these cases, the Trust has accepted the KYC Information provided without the need for further dialogue with the purported Original Holder. Even when follow-up questions were required, the Trust was typically able to work productively with Original Holders to resolve its concerns and accept their KYC Information.

4. This Objection relates to a subset of the claims (the "Objection Claims," filed by the "Claimants")[4] for which KYC Information was rejected during the Trust's KYC collection and review process. These Objection Claims are listed in the Schedules and fall into four generalized fact patterns:

- The Trust identified a mismatch between the prepetition KYC Information and the postpetition KYC Information and, when the Trust contacted the Claimant to resolve the mismatch, the Claimant has consistently failed to respond;
- The Trust lacked prepetition KYC Information for an Original Holder so, to test whether a Claimant actually owned the customer account for which it filed an Objection Claim, the Claimant was asked certain security questions based on the customer account, but the Claimant answered the security questions incorrectly;
- The Trust flagged the postpetition KYC submission as needing source of funds documentation and, when the Trust requested such documentation from the Claimant, the

[4] Claimants are the current Holder of the Claim, which can be either the Original Holder or a subsequent Transferee of the Claim.

Claimant has consistently refused to provide it; and

- The Claimant formally withdrew its KYC application and no longer wished to continue the KYC process mandated by the Court.

5. For each of these Objection Claims, the Trust requested basic information from the Claimants to support their KYC applications and the Claimants failed to provide that basic information. The Trust was left with no choice but to reject the Claimants' KYC Information.

6. The Trust cannot delay objecting to these Objection Claims any longer. Nearly four years after the Petition Date, the persistence of these Objection Claims only further delays distributions to legitimate creditors who ***are*** who they claim to be and ***are*** able to provide sufficient documentation establishing their claim ownership. *See Boyle* v. *PMA Med. Specialists, LLC*, 754 F. App'x 93, 95 (3d Cir. 2019) ("One of the principal purposes of bankruptcy law is to secure within a limited period the prompt and effectual administration and settlement of the debtor's estate." (cleaned up)). Further, if these Objection Claims were allowed, they would pose material risks to the Trust, including paying the wrong claimants and/or exposing the Trust to strict liability under relevant sanctions laws.

7. The Objection Claims are patently unenforceable and should be disallowed and expunged under section 502(b)(1) of the Bankruptcy Code. *First*, several categories of the Objection Claims are not *prima facie* valid because the Claimants have failed to prove their ownership of the relevant customer accounts on which their Objection Claims are based. Many of the Claimants submitted KYC Information with material discrepancies from that of the Original Holders that initially opened the relevant customer accounts on the Exchange, then never offered any explanation for such discrepancies. Other Claimants failed to correctly answer basic questions about the customer accounts over which they asserted ownership. For each Objection Claim, the Claimant's deficient KYC Information means that they cannot establish a *prima facie* entitlement

to distributions from the Trust on account of such Objection Claim.

8. *Second*, several categories of Objection Claims are not *prima facie* valid because the Claimants have continuously failed to respond to basic questions or follow-up requests regarding their KYC Information. This failure to respond provides an independent basis to disallow and expunge the Objection Claims, particularly because the lack of adequate KYC Information poses material legal and regulatory risks to the Trust.

9. *Third*, the Objection Claims are unenforceable under the operative contract between the Claimants and FTX—the Terms of Service of the Exchange. As this Court has held, the assets sought by the Claimants are property of the Trust. Any entitlement to such assets asserted by the Claimants is ultimately based on their contractual relationship with the Exchange as governed by its Terms of Service. That contract expressly conditioned any customer's right to payment on compliance with AML, CTF, and KYC requirements, and granted FTX broad authority to suspend accounts and freeze assets where those requirements are not satisfied. The Claimants' failure to provide accurate, verifiable KYC Information renders the Objection Claims unenforceable.

10. For these reasons, the Objection Claims should be disallowed and expunged in their entirety.[5]

[5] For the avoidance of doubt, this Objection does not affect the rights of claimants or Original Holders whose KYC Information was also rejected but whose claims are not listed in the Schedules to this Objection, nor the rights of the claimants or Original Holders whose KYC Information remains under review. The Trust expressly reserves its rights with respect to all such claims and all other claims.

## BACKGROUND

### I. Anti-Money Laundering and Counter-Terrorist Financing Regulatory Framework

11. The Office of Foreign Assets Control of the U.S. Department of the Treasury ("OFAC") administers and enforces economic sanctions against targeted foreign countries and regimes, terrorists, international narcotics traffickers, and those engaged in threats to U.S. national security. OFAC publishes lists of Specially Designated Nationals ("SDNs"), individuals and companies owned or controlled by, or acting for or on behalf of, sanctioned countries as well as individuals, groups, and entities, such as terrorists and narcotics traffickers designated under various sanctions programs.[6] Assets subject to OFAC sanctions are "blocked," and U.S. persons—like the Debtors and now the Trust—are generally prohibited from dealing with them. U.S. sanctions laws apply to both U.S. and non-U.S. persons when there is a U.S. connection to their conduct. OFAC is explicit that sanctions apply to "anyone engaging in virtual currency activities in the United States, or that involve U.S. individuals or entities."[7] Enforcement of OFAC sanctions is based on a strict liability standard, with substantial penalties for violations.

12. The Money Laundering Control Act of 1986 (the "AML Act") prohibits certain financial transactions connected to unlawful activity. Among other provisions, money laundering laws make it a crime to knowingly conduct a financial transaction that involves the proceeds of "specified unlawful activity" with one of four specific intents or to knowingly engage

---

[6] *See Specially Designated Nationals and Blocked Persons List*, U.S. Dep't of the Treasury, Office of Foreign Assets Control (Aug. 24, 2026), https://www.treasury.gov/ofac/downloads/sdnlist.pdf; *Specially Designated Nationals (SDNs) and the SDN List: Frequently Asked Questions*, U.S. Dep't of the Treasury, Office of Foreign Assets Control (last updated June 29, 2026), https://ofac.treasury.gov/faqs/topic/1631.

[7] *See Sanctions Compliance Guidance for the Virtual Currency Industry*, U.S. Dep't of the Treasury, Office of Foreign Assets Control, at 6 (Oct. 2021), https://ofac.treasury.gov/media/913571/download?inline.

in a monetary transaction in property derived from specified unlawful activity with a value greater than $10,000.[8]

13. An effective KYC program is essential to ensuring compliance with and mitigating the risks inherent in failing to comply with this regulatory framework. Through an effective KYC program, entities obtain information about customers during onboarding and throughout the lifecycle of the customer relationship, and use such information to conduct due diligence sufficient to mitigate potential regulatory violations and sanctions-related risk. A robust KYC program is indispensable to preventing an entity's inadvertent facilitation of money laundering and the financing of terrorist activities. In addition, the primary means of preventing OFAC violations is the identification and screening of customers, relationships, and transactions that pose a sanctions risk.[9] For example, OFAC's sanctions compliance guidance specifically notes that through the implementation of a KYC program, an entity should collect information from customers and use such information "in the sanctions screening process to prevent violations."[10]

## II. The FTX Terms of Service

14. Prepetition, all prospective customers who signed up for an account on the Exchange agreed to be bound by the Terms of Service of the Exchange,[11] the contract that governs

---

[8] 18 U.S.C. §§ 1956(a)(1), 1957(a); *see also* 31 C.F.R. § 1022.210(a). Under the U.S. AML laws, a "financial institution" includes money service businesses and "currency exchange[s] or . . . business[es] engaged in the exchange of . . . value that substitutes for currency or funds." 31 U.S.C. § 5312(a)(2).

[9] *See Sanctions Compliance Guidance for the Virtual Currency Industry*, U.S. Dep't of the Treasury, Office of Foreign Assets Control (Oct. 2021), https://ofac.treasury.gov/media/913571/download?inline.

[10] *Id.* at 14.

[11] The version of the Dotcom TOS discussed herein became effective on May 13, 2022. This version of the Dotcom TOS also applied to all customers who logged onto and used the Exchange on or after that date. (Dotcom TOS § 22.2 ("If you do not agree with any amendments to the Terms, your sole and exclusive remedy is to terminate your use of the Services and close your Account.").)

the relationship between these customers and FTX.[12] (*See* Leto Decl., Ex. 1 ("Dotcom TOS") at 1 ("By registering for a[n Exchange] account or using the Services . . . you acknowledge and agree that you will be bound by and comply with the Terms.").)

15. While it became clear after commencement of these Chapter 11 Cases that the prepetition Debtors failed to effectively implement basic KYC procedures (*see infra* Section III), the Dotcom TOS laid out detailed KYC requirements with which customers were contractually obligated to comply, as described below. If a customer failed to comply with these KYC requirements, the Dotcom TOS granted FTX expansive rights including, among other things, the right to freeze (temporarily or permanently) assets and terminate customers' accounts.

**A. KYC Requirements**

16. Section 5 of the Dotcom TOS set out specific KYC requirements, requiring all customers to "provide complete, accurate, up-to-date and not misleading information for all required elements on the registration page, including your full legal name." (Dotcom TOS § 5.1.) Customers also agreed, "on an ongoing basis," to provide "any additional information" requested by FTX "for the purposes of identity verification and the detection of money laundering, terrorist financing, fraud, or any other financial crime." (*Id.*) Such additional information could include, without limitation, "a copy of your government-issued photo ID or evidence of residency such as a lease or utility bill" (*id.*) and "information about yourself, your business, your source of wealth or your transactions" (*id.* § 5.2). Customers represented that any KYC Information they provided was "complete, accurate, up-to-date, and not misleading in any respect" and, if any of their KYC Information changed, they agreed "it [was their] obligation to update such information as soon as

[12] The preamble to the Dotcom TOS made clear that a customer should "not proceed with registering for an Account, or using the Services, if you do not understand and accept the Terms in their entirety." (Dotcom TOS at 1.)

possible." (*Id.* § 5.3; *see also id.* § 13.1.2 ("In connection with your use of the Services, you agree that you will not: . . . provide false, inaccurate, incomplete, out-of-date or misleading information").)

**B. AML and CTF Requirements**

17. The Dotcom TOS made clear to customers that it was FTX's "policy to take the necessary steps that we believe appropriate to prohibit fraudulent transactions, report suspicious activities, and actively engage in the prevention of money laundering and terrorist financing, any related acts that facilitate money laundering, terrorist financing or any other financial crimes." (Dotcom TOS § 3.2.) And a customer's "access to and use of [its] Account and the Services . . . is subject to [its] continued compliance with all Applicable Laws, including the rules and directions of any applicable Regulatory Authority and, without limitation, all applicable tax, anti-money laundering . . . and counter-terrorist financing . . . laws and regulations." (*Id.* § 3.1.2.)

18. By agreeing to the Dotcom TOS, customers represented that they were, and would continue to be, in compliance with all "Applicable Laws" as long as they maintained their customer accounts on the Exchange.[13] (*See* Dotcom TOS § 3.1.1 ("You agree and understand that by opening an Account and using the Services in any capacity, you shall act in compliance with all Applicable Laws."), § 13.1.1 ("In connection with your use of the Services, you agree that you will not: violate or assist in violating any Applicable Laws").) Customers also agreed they would not "engage in any illegal activity, including without limitation illegal gambling, money

[13] Applicable Laws are defined in the Dotcom TOS to be "all laws, including rules of common law, principles of equity, statutes, regulations, directives, proclamations, ordinances, by-laws, rules, regulatory principles and requirements, mandatory codes of conduct, writs, orders, injunctions, judgments and any awards of other industrial instruments, which are applicable to the provision, receipt or use of the Services or any products or other deliverables provided, used or received in connection with the Services." (Dotcom TOS, Schedule 1 § 1.1.)

laundering, fraud, blackmail, extortion, ransoming data, the financing of terrorism, other violent activities or any prohibited market practices" (*id.* § 13.1.4); not "engage in any behavior which is unlawful, violates the Terms, or is otherwise deemed unacceptable by FTX Trading in its sole discretion" (*id.* § 13.1.14); and not "assist, facilitate or encourage any third party in undertaking any activity otherwise prohibited by the Terms" (*id.* § 13.1.15).

19. Further, customers were warned that "[i]n order to be eligible to open an Account or use the Services," they must have not "violated; been fined, debarred, sanctioned, the subject of economic sanctions-related restrictions, or otherwise penalised under; received any oral or written notice from any government concerning actual or possible violation by you under; or received any other report that you are the subject or target of sanctions, restrictions, penalties, or enforcement action or investigation under, any Applicable Law (including but not limited to AML, CTF, anti-corruption, or economic sanctions laws)." (Dotcom TOS § 4.1.3.) And they must also not be a "Restricted Person" (*id.* § 4.1.5)—defined to be "a member of any sanctions list or equivalent maintained by the United States government, the United Kingdom government, the European Union, the Singapore government, or The Bahamas government" (*id.* § 3.3.1(B)). Customers were also not eligible to create or use an account if they would "be using the Services for any illegal activity." (*Id.* § 4.1.6.)

### C. FTX Remedies for a Customer's Failure to Comply with KYC and AML Requirements

20. The Dotcom TOS granted FTX expansive rights to prevent or respond to violations of the AML and CTF laws and FTX's KYC process. If a customer submitted any KYC Information which was not, or FTX suspected was not, "complete, accurate, [or] up-to-date" or which was "misleading in any respect," or the customer "fail[ed] to provide updates to any information that you have provided to us to ensure that it is complete, accurate, up-to-date, and not

misleading in any respect on a timely basis," then Section 5 of the Dotcom TOS granted FTX the power to "suspend [the customer's] ability to use the Services or close [the customer's] Account at [its] discretion." (Dotcom TOS § 5.5.) Further, Section 5 of the Dotcom TOS warned customers that their "access to the Services and the limits that apply to [their] use of the Services may be altered as a result of information collected about [them] on an ongoing basis." (*Id.* § 5.4.)

21. Section 3.1 of the Dotcom TOS also granted FTX the ability to "suspen[d]" and "clos[e]" a customer's account if the customer failed to comply with any Applicable Laws, including the AML and CTF laws (Dotcom TOS § 3.1), and Section 3.3.2 granted FTX the power, at its "sole discretion," to "restrict access to and use of the Services" should an account risk FTX's non-compliance with any applicable sanctions (*id.* § 3.3.2). Section 4.2 further granted FTX the "discretion" to "suspend" or "close" a customer's account if the customer failed to meet the eligibility requirements detailed elsewhere in Section 4 of the Dotcom TOS. (*Id.* § 4.2.)

22. Section 2.6 of the Dotcom TOS allowed FTX "in its sole discretion" to "'blacklist' certain addresses and freeze associated Assets (temporarily or permanently) that [FTX] determines . . . are associated with illegal activity or activity that otherwise violates the Terms." (Dotcom TOS § 2.6.1.) And, if FTX determined it was "necessary to report such suspected illegal activity," a customer could "forfeit any rights associated with your Assets, including the ability to redeem or exchange your Digital Assets." (*Id.* § 2.6.2.)

23. Section 12 of the Dotcom TOS reiterated FTX's broad rights "in its sole and absolute discretion and at any time, without liability to you or any third party" to "suspend" or "terminate" a customer's account (Dotcom TOS § 12.1) if: (i) FTX could not "positively identify" a customer (*id.* § 12.3.1); (ii) the customer violated the Applicable Laws or Terms (*id.* § 12.3.2);

or (iii) FTX "believe[d] that a transaction is suspicious or may involve fraud, money laundering, terrorist financing or other misconduct" (*id.* § 12.3.3).

24. Ultimately, if a customer account was "suspended or closed by [FTX] in accordance with the Terms" ***or*** allowing a withdrawal "would be prohibited by Applicable Laws" ***or*** FTX determined a customer's assets "were obtained fraudulently" ***or*** a customer had "not completed the required identity verification procedure," then the Dotcom TOS were explicit that FTX had the "right" to "refuse to permit withdrawals from [the customer's] Account." (Dotcom TOS § 12.8.)

## III. Compliance Failures

25. On November 11 and November 14, 2022, the Debtors filed with the Court voluntary petitions for relief under the Bankruptcy Code. It immediately became clear to the Debtors' new management and advisors that the prepetition Debtors operated without basic management, governance, and organizational structures. (*See First Interim Report of John J. Ray III to the Independent Directors on Control Failures at the FTX Exchanges* [D.I. 1242-1], at 7.) The prepetition Debtors were tightly controlled by a small group of insiders—principally Samuel Bankman-Fried, Nishad Singh, and Gary Wang—who exercised near-total authority without meaningful oversight or independent controls. (*Id.* at 7-8.) These insiders commandeered nearly every significant operational and financial decision for the Exchange. (*Id.*) Necessary organizational characteristics such as formal policies and reliable reporting systems were either nonexistent, hastily assembled, or ignored in practice. (*Id.* at 7-8, 11.) Rather than operating as a mature financial institution entrusted with billions of dollars in customer assets, the prepetition Debtors functioned as a disorganized, unaccountable group of entities, steered almost exclusively by a handful of inexperienced individuals. (*Id.* at 7-8.)

26. These systemic control failures extended to the Debtors' compliance and risk management processes, including their AML, CTF, and KYC obligations. (Leto Decl. ¶ 8.) Prepetition management consistently failed to collect adequate KYC Information for all customers, perform basic due diligence on customers, and collect reliable information concerning the source of funds deposited onto the FTX platform. (*Id.*) These failures were compounded by the broader absence of financial reporting and risk management controls. (*Id.*) In short, the prepetition Debtors routinely operated without the safeguards necessary to ensure basic AML and CTF compliance, which exposed the platform to a heightened risk of fraud, sanctions violations, and criminal misuse of customer accounts and funds. Following extensive postpetition efforts to reconstruct the Debtors' books and records, the Debtors and their advisors were able to collect prepetition KYC Information for certain customers. (*Id.* ¶ 9.) The KYC Information that the Debtors and the Trust were able to recover is generally limited to (i) photos of customers' government-issued IDs; (ii) photos of customers holding their IDs; and (iii) the customers' legal names, countries of residence, and email addresses. (*Id.*)

## IV. Customer Bar Date Motion and Order

27. In light of the risks posed by the prepetition Debtors' AML, CTF, and KYC compliance failures, the Debtors sought to implement KYC procedures in their motion to establish a bar date for filing customer proofs of claim. (*Motion of Debtors for Entry of an Order (I)(A) Establishing Deadlines for Filing Customer Proofs of Claim, (B) Approving Procedures for Submitting Proofs of Claim and (C) Approving the Form and Manner of Notice Thereof and (II) Granting Related Relief* [D.I. 1635] (the "Customer Bar Date Motion").) Only through such procedures could the Debtors "mitigate the risk that the Customer Claims process could be used to facilitate money laundering, fund terrorism or result in violations of economic sanctions, limit regulatory risks and [ ] help ensure a legitimate claims trading market." (*Id.* ¶¶ 13-14.) As part of

the procedures for submitting proofs of claim, the Customer Bar Date Motion requested that all claimants submit KYC Information of the Original Holder for proofs of claim. (*Id.*)

28. As explained in the Customer Bar Date Motion, the proposed procedures for collecting and validating KYC Information were "needed" to implement the regulatory "controls" that were lacking, if not entirely absent, prepetition. (Customer Bar Date Motion ¶ 14.) Without the KYC procedures, the Debtors argued that they faced a material risk that Customer Entitlement Claims and related distributions could be used to fund terrorism and/or violate economic sanctions administered and enforced by OFAC. (*Id.* ¶¶ 41, 43.) The absence of such procedures also created a risk that the claims process could be exploited to launder criminal proceeds in violation of U.S. AML laws. (*Id.* ¶¶ 42-43.) The Debtors proposed that the KYC procedures—which, through their vendors, verified customer identities, screened customers against sanctions lists, and assessed whether funds transferred to the Debtors appeared to be the proceeds of crime—were the most effective means to mitigate these AML, CTF, and KYC risks and ensure compliance with applicable laws and regulations. (*Id.* ¶ 43.)

29. On June 28, 2023, the Court entered the *Order (I)(A) Establishing Deadlines for Filing Customer Proofs of Claim, (B) Approving Procedures for Submitting Proofs of Claim and (C) Approving the Form and Manner of Notice Thereof and (II) Granting Related Relief* [D.I. 1793] (the "Customer Bar Date Order"). The Customer Bar Date Order authorized, among other things, the Debtors to collect Original Holder KYC Information for every Customer Entitlement Claim. (*Id.* ¶ 16.)

30. Under the Customer Bar Date Order, Customer Entitlement Claims for which the Original Holders did not submit the requested KYC Information by the Customer Bar Date would be deemed "unverified" (such claims, "Unverified Claims"). (*Id.* ¶ 18.) The Customer

Bar Date Order then authorized the Debtors "in their sole discretion" to "object to the allowance of such Customer Entitlement Claims' proofs of claim and scheduled claims on an omnibus basis, on notice to all such holders, including, among other bases, of insufficient documentation, and request such holders submit the requested KYC Information." (*Id.*)

31. Notice of the Customer Bar Date Order was served on each known claimant via email and, if applicable, postcard, in accordance with this Court's order [D.I. 2431]. Notice of the Customer Bar Date was also published in *The New York Times* and *CoinDesk*. (*See* Customer Bar Date Order ¶ 19; [D.I. 2243].) Each of these notices contained information regarding the KYC submission process and how claimants might commence that process [D.I. 2243]. Additionally, although not required by the Customer Bar Date Order, Original Holders received multiple notices from the Debtors' Claims Agent. (*Declaration of Kumanan Ramanathan in Support of Debtors' One Hundred Thirtieth (Non-Substantive) Omnibus Objection to Unverified Customer Entitlement Claims* [D.I. 28227] (the "Ramanathan Declaration") ¶ 12.) The Debtors also published several posts on X (f/k/a Twitter) to remind customers to submit their KYC Information by the bar date. (Leto Decl. ¶ 11.)

**V. The Plan**

32. On October 7, 2024, the Court confirmed the Plan and, on October 8, 2024, entered the *Findings of Fact, Conclusions of Law and Order Confirming the Second Amended Joint Chapter 11 Plan of Reorganization of FTX Trading Ltd. and Its Debtor Affiliates* [D.I. 26404] (the "Confirmation Order"). The Plan defined an "Unverified Customer Entitlement Claim" to be "a Customer Entitlement Claim in respect of which (a) the Original Customer or Holder of such Customer Entitlement Claim has failed to submit KYC Information of the Original Customer by a date determined by the Debtors and approved by order of the Court or (b) an objection by the Debtors to the KYC Information of the Original Holder has been sustained by

order of the Court." (Plan § 2.1.197.) Pursuant to the Plan, Unverified Customer Entitlement Claims are not "allowed" claims ("Allowed Claims"), which are "any Claim or Interest [in which] the amount, priority and/or classification of such Claim or Interest has been . . . listed in the Schedules as not disputed, not contingent, not unliquidated with respect to amount, secured status or priority . . . [and] ***such Claim is not an Unverified Customer Entitlement Claim***." (Plan § 2.1.8 (emphasis added).)

33. The Plan contemplates that, where applicable, the Trust will "object[] . . . to the KYC Information[14] of the Original Holder" submitted by a claimant. (Plan § 2.1.197.) When such an objection is sustained, the proof of claim becomes an Unverified Customer Entitlement Claim and, necessarily, cannot be an Allowed Claim under the Plan. (Plan § 2.1.8(c)(iv) (defining an "Allowed Claim" to be one which is "not an Unverified Customer Entitlement Claim").)

## VI. The Collection of KYC Information and the Trust's Review of the KYC Information

34. With the authorization of the Court in the Customer Bar Date Order, the Debtors established—and the Trust continues to execute—a reliable KYC review process through which (i) holders of claims could submit Original Holder KYC Information through an online customer claims portal (the "Customer Claims Portal") and (ii) the Trust could, with the assistance of trusted vendors, review that KYC Information. (Leto Decl. ¶¶ 11-12.) To determine the KYC Information required from each Original Holder, the Debtors reviewed the customer due diligence requirements and recommendations promulgated by the United States, Cyprus, Japan, Singapore,

[14] "KYC Information" was defined by the Plan to be "the know-your-customer information requested by the Debtors." (Plan § 2.1.129.)

Turkey, and the Financial Action Task Force[15] and identified KYC Information sufficient to comply with each set of requirements and recommendations. (*Id.* ¶ 12.) The KYC Information collection and review framework adopted varying procedures depending on whether the Original Holder was an individual or an institution. (*Id.* ¶¶ 13-17.) The Debtors also retained KYC vendors Sum and Substance Ltd. ("Sumsub"), BitGo, Inc. ("BitGo"), and Integreon, Inc. ("Integreon") to assist with the review of KYC Information and manual outreach to claimants, as applicable. (*Id.* ¶ 12.)

**A. Individual Original Holders**

35. The Debtors required individual Original Holders to provide KYC Information including, among other things, their full name including any alias, date of birth, proof of address, identification and identification-related documents, nationality, email address, occupation, and, for U.S. citizens, Social Security number. (Leto Decl. ¶ 13.) In addition, the Debtors required individual Original Holders to undergo a facial liveness check (typically through a range of head movements through an electronic device camera) to ensure a match between the person claiming to be the Original Holder and the postpetition identification document provided. (*Id.*)

36. After an individual Original Holder submitted all requested KYC Information, Sumsub, one of the Debtors' KYC vendors, performed an automated validation and screening process. (Leto Decl. ¶ 14.) The automated screening process flagged an individual Original Holder for manual review if (i) the Original Holder was assessed to be a high-risk customer due to their nationality, residency, or occupation, (ii) Sumsub could not verify the

[15] The Financial Action Task Force is an international policy-making body that sets global standards for combating money laundering, terrorist financing, and other financial crimes. *See Financial Action Task Force*, U.S. Dep't of the Treasury, https://home.treasury.gov/policy-issues/terrorism-and-illicit-finance/financial-action-task-force (last visited Aug. 27, 2026).

individual Original Holder's documentation, (iii) the individual Original Holder's KYC Information did not match the Debtors' prepetition records (where available), and/or (iv) the Original Holder received an AML screening hit, including because the Original Holder was a sanctioned party, a politically exposed person (a "PEP"), or the subject of adverse media attention. (*Id.*)

37. For each category of flagged applications, a manual reviewer from the KYC vendor Integreon analyzed the submitted KYC Information and, where applicable, contacted the Original Holder to request additional documentation or an explanation for discrepancies between their submitted KYC Information and the Debtors' records. (Leto Decl. ¶ 15.)

**B. Institutional Original Holders**

38. The Debtors required institutional Original Holders to provide KYC Information including, among other things, their company name, registration information, tax identification number, principal business address and phone number, business email address, information on the nature of the business and principal business activity, entity size, annual revenue and profit, authorized signer, identities of ultimate beneficial owners ("UBOs"), identities of directors and/or members of management, and, for any UBOs, directors, or members of management, similar identification information and records as are collected for individual Original Holders. (Leto Decl. ¶ 16.)

39. All institutional Original Holder KYC Information was manually reviewed by the KYC vendor BitGo. (Leto Decl. ¶ 17.) Institutional Original Holders and their related persons first underwent AML screening to determine whether any were sanctioned parties, PEPs, or the subjects of adverse media attention. (*Id.*) BitGo then manually reviewed every institutional Original Holder's KYC Information to confirm that all documents and information could be successfully verified. (*Id.*) If a manual reviewer determined an institutional Original Holder was

a high-risk entity due to its place of incorporation, business activity, or industry, its application was subject to an enhanced due diligence ("EDD") process. (*Id.*) This process typically included, but was not limited to, requesting and reviewing additional documents pertaining to the Original Holder's source of wealth and funds, such as bank statements, audited financial statements, tax filings, and approvals of account openings or transactions. (*Id.*)

## VII. The Implementation of the Trust's KYC Review

40. Through this review, the Trust determined whether to "accept" a purported Original Holder's KYC Information and designate the relevant claim an Allowed Claim, or to "reject" a purported Original Holder's KYC Information and designate the relevant claim an Unverified Claim, subject to objection by the Trust. (Leto Decl. ¶ 18.)

41. In total, the Debtors and now the Trust have been faced with resolving approximately 642,000 Customer Entitlement Claims.[16] (Leto Decl. ¶ 19.) Of these Customer Entitlement Claims, approximately 440,000 have already been expunged by the Court pursuant to the *Order Sustaining Debtors' One Hundred Thirtieth (Non-Substantive) Omnibus Objection to Unverified Customer Entitlement Claims* [D.I. 29464] (the "130th Order").[17] Approximately 6,846 additional claims have been disallowed and expunged under the *Order Sustaining FTX Recovery Trust's Two Hundredth (Non-Substantive) Omnibus Objection to Unverified Customer*

[16] This number excludes the 1.2 million *de minimis* claims separately addressed in the Plan. (Ramanathan Decl. ¶ 6.)

[17] Pursuant to the 130th Order, the Unverified Claims of Original Holders who (i) did not commence the KYC submission process by March 1, 2025, or (ii) did not submit all requested KYC Information by June 1, 2025, would be disallowed and expunged in their entirety. (130th Order ¶¶ 2-3.) The Court also provided that the Debtors retained all rights in the event that KYC Information submitted by the established deadlines could not be validated or was otherwise rejected, *i.e.*, the KYC Information for the Original Holder was rejected. (*Id.* ¶ 8.)

*Entitlement Claims* [D.I. 35557] (the "200th Order").[18] The Trust has approved the KYC Information for approximately 192,000 Customer Entitlement Claims. (Leto Decl. ¶ 19.)

**FACTS SPECIFIC TO THE OBJECTION**

42. The Objection Claims comprise 616 claims, representing roughly $4.5 million in claim value. (Leto Decl. ¶ 20.) These Objection Claims fall into four categories.

43. ***Prepetition Data Mismatch and Verification Failure***. Prepetition, the Debtors attempted to collect KYC Information (such as name, gender, and date of birth) from Original Holders, typically at the creation of their customer accounts. (Leto Decl. ¶ 21.) As part of the reconstruction of the books and records after the Petition Date, the postpetition Debtors and their advisors were able to recover and organize certain prepetition KYC Information. (*Id.*)

44. 488 Objection Claims (the "Verification Failure Claims") were filed by Claimants (the "Verification Failure Claimants") who purported to be the Original Holders of certain customer accounts but submitted KYC Information that did not match the prepetition KYC Information for the Original Holders of those customer accounts. (Leto Decl. ¶ 22.) In most cases, there were discrepancies with respect to the names. (*Id.*) The Trust has no evidence that the customer accounts at issue or the Verification Failure Claims were transferred to the Verification Failure Claimants, nor did the Verification Failure Claimants affirmatively provide any such evidence. (*Id.*) Due to this fundamental mismatch regarding the identity of the Original Holders and the Verification Failure Claimants, the KYC applications for these Verification Failure Claims were rejected. (*Id.*) Despite the initial mismatch, to facilitate the resolution of these Objection Claims, the KYC vendors have repeatedly reached out to the Verification Failure Claimants to

[18] Pursuant to the 200th Order, the Unverified Claims of Original Holders who did not submit all requested KYC Information by June 30, 2026 would be disallowed and expunged in their entirety. (200th Order ¶ 2.) The Trust also retained all rights in the event that KYC Information submitted by the established deadline could not be validated or was otherwise rejected. (*Id.* ¶ 6.)

allow them to cure any discrepancies. (*Id.*) The Verification Failure Claimants, however, have consistently failed to respond to these inquiries or resolve the discrepancies. (*Id.*)

45. ***Deficient Prepetition Data and Security Questionnaire Failure***. As part of the books and records reconstruction and reconciliation process, the Debtors identified a subset of customer accounts that lacked or had incomplete prepetition KYC Information. (Leto Decl. ¶ 23.) The records show that these customers' accounts lacked the customers' names. (*Id.*) To bridge this information gap, the Debtors created a security questionnaire that claimants associated with these customer accounts were required to complete and pass in addition to the standard KYC process. (*Id.*) The security questionnaire included questions on the date and time the account was opened, the phone number or email address associated with the account, whether the account had a withdrawal password, and whether the account had enabled certain specific trading activities (such as enrollment in the FTX Earn program or its spot margin trading program). (*Id.*) Only 458 claims were associated with such customer accounts, and the majority of claimants who received the security questionnaire completed and passed it. (*Id.* ¶ 24.)

46. 116 Objection Claims (the "Security Questionnaire Failure Claims") were filed by Claimants (the "Security Questionnaire Failure Claimants") who failed the security questionnaire. (Leto Decl. ¶ 25.) As a result of the failure to correctly answer basic questions about their purported customer accounts, the KYC submissions were rejected for these Security Questionnaire Failure Claims, absent another way to positively verify account ownership. (*Id.*)

47. ***Unwillingness to Provide Source of Funds ("SOF") Documentation***. For certain claims with a balance over $1,000 where the Original Holders were in a high-risk industry and/or jurisdiction, the Trust requested that Original Holders submit documentation proving that they had a legitimate source for the funds in their customer accounts. (Leto Decl. ¶ 26.) In most

instances, customers provided paystubs, tax returns, and brokerage and account statements showing that the SOF documentation was commensurate with their balances on FTX. (*Id.*)

48. Ten Objection Claims (the "SOF Failure Claims") are associated with Claimants (the "SOF Failure Claimants") who have refused to provide SOF documentation in response to the KYC vendors' repeated outreach. (Leto Decl. ¶ 27.) Because the SOF Failure Claimants refused to provide information regarding their finances, the KYC submissions were rejected for the SOF Failure Claims. (*Id.*)

49. ***KYC Application Withdrawn***. Two Objection Claims (the "KYC Withdrawn Claims") were filed by Claimants (the "KYC Withdrawn Claimants") who informed the KYC vendors that they no longer wished to complete the KYC process and formally withdrew their KYC applications. (Leto Decl. ¶ 28.)

50. For the reasons described above, the Trust rejected the KYC applications associated with the Objection Claims. (Leto Decl. ¶ 29.) Shortly thereafter, the Customer Claims Portal was updated to describe the status of the KYC applications as "Failed." (*Id.*)

## JURISDICTION

51. The Court has jurisdiction over this Objection pursuant to 28 U.S.C. §§ 157 and 1334 and the *Amended Standing Order of Reference from the United States District Court for the District of Delaware*, dated as of February 29, 2012. This matter is a core proceeding within the meaning of 28 U.S.C. § 157(b)(2). Venue is proper in this district pursuant to 28 U.S.C. §§ 1408 and 1409. The statutory bases for the relief sought are sections 105 and 502 of the Bankruptcy Code, and rules 3001 and 3007 of the Bankruptcy Rules. Pursuant to rule 9013-1(f) of the Local Rules of the United States Bankruptcy Court for the District of Delaware (the "Local Rules"), the Trust confirms its consent to entry of a final order by the Court in connection with

this Objection if it is later determined that the Court, absent consent of the parties, cannot enter final orders or judgments consistent with Article III of the United States Constitution.

**RELIEF REQUESTED**

52. By this Objection, the Trust seeks entry of the Order disallowing and expunging the Objection Claims in their entirety.

**ARGUMENT**

53. While a properly filed proof of claim is *prima facie* evidence of the claim's allowed amount, when an objecting party presents evidence to rebut a claim's *prima facie* validity, the claimant bears the burden of proving the claim's validity by a preponderance of the evidence. *See In re Allegheny Int'l, Inc.*, 954 F.2d 167, 173-74 (3d Cir. 1992) ("Initially, the claimant must allege facts sufficient to support the claim. If the averments in his filed claim meet this standard of sufficiency, it is '*prima facie*' valid."). The burden of persuasion with respect to the claim is always on the claimant, *id.* at 174, and the failure to allege facts and to provide adequate support for a claim eliminates the claim's *prima facie* validity, *see, e.g.*, *In re Jorczak*, 314 B.R. 474, 481-82 (Bankr. D. Conn. 2004) (discussing the evidentiary requirements and burden of proof with respect to the allowance of claims).

54. Section 502(a) of the Bankruptcy Code provides that "[a] claim or interest, proof of which is filed under section 501 of [the Bankruptcy Code], is deemed allowed, unless a party in interest . . . objects." 11 U.S.C. § 502(a). Once an objection to a claim is filed, the Court, after notice and a hearing, shall determine the allowed amount of the claim. 11 U.S.C. § 502(b). Section 502(b)(1) of the Bankruptcy Code provides that a claim may not be allowed to the extent that it "is unenforceable against the debtor and property of the debtor, under any agreement or applicable law." 11 U.S.C. § 502(b)(1). To determine whether claims are enforceable for bankruptcy purposes, section 502(b)(1) may rely on applicable non-bankruptcy law. *In re*

*Combustion Eng'g, Inc.*, 391 F.3d 190, 245 n.66 (3d Cir. 2004), *as amended* (Feb. 23, 2005). A claim against the bankruptcy estate, therefore, "will not be allowed in a bankruptcy proceeding if the same claim would not be enforceable against the debtor outside of bankruptcy." *Id.* (quoting *United States* v. *Sanford*, 979 F.2d 1511, 1513 (11th Cir. 1992)). Ultimately, the effect of section 502(b)(1) is "to provide a bankruptcy trustee with the same rights and defenses to claims as held by the debtor prior to bankruptcy." *In re Combustion Eng'g*, 391 F.3d at 245 n.66 (citations omitted).

**I. The Verification Failure Claims, the Security Questionnaire Failure Claims, and the KYC Withdrawn Claims Should Be Disallowed and Expunged Under Section 502(b)(1) Because the Claimants Cannot Verify Their Identities or Prove Ownership of the Underlying Customer Accounts.**

55. To have a valid Customer Entitlement Claim, a claimant (or the Original Holder if the claimant is a transferee) must establish that they (or the Original Holder) actually had a customer account on the Exchange. (Plan § 2.1.47 (defining "Customer Entitlement Claim" to be "any Claim . . . that compensates the Holder of such Claim for the value as of the Petition Date of Cash or Digital Assets held by such Person or Entity in ***an account on any FTX Exchange***" (emphasis added)).) Without a customer account on the Exchange, a claimant cannot be a "Customer" under the Plan. (Plan § 2.1.45 (defining a "Customer" to be "a Person or Entity that ***maintained an account on an FTX Exchange***" (emphasis added)).)

56. Courts have routinely recognized that the lack of sufficient documentation establishing a claimant's ownership of a claim is a valid basis for disallowance. *See In re O'Brien*, 440 B.R. 654, 662, 668 (Bankr. E.D. Pa. 2010) (it is not enough "that the debtor owes someone money; the issue is whether the debtor (and hence the bankruptcy estate) owes it to the party filing the proof of claim" (quoting *In re King*, 2009 WL 960766, at *5 (Bankr. E.D. Va. 2009))). This makes sense: an "objection based upon insufficient documentation proving that [a claimant] is the

holder of the claim is a defense that would be available to a debtor in a suit on the claim and is therefore a valid basis for disallowance of a claim under § 502(b)(1)." *In re Joslin*, 344 B.R. 146, 152 (Bankr. D. Kan. 2006); *see also Autovest, L.L.C.* v. *Weatherly*, 2019 WL 1308126, at *3 (Del. Com. Pl. Mar. 21, 2019) (holding for defendant because plaintiff failed to establish at trial that they own the at-issue debt); *Midland Funding, LLC* v. *Hanby*, 2015 WL 738060, at *5 (Del. Com. Pl. Feb. 23, 2015) (same).

57. ***Verification Failure Claims***. The Verification Failure Claimants submitted KYC Information inconsistent with the prepetition KYC Information associated with the customer accounts on which they base their Objection Claims. (Leto Decl. ¶ 22.) As a result, the Verification Failure Claimants do not, and cannot, establish ownership of their respective customer accounts and thus do not have a *prima facie* claim. *See In re O'Brien*, 440 B.R. at 662, 667-68 (discussing purported assignee's failure to establish ownership over the claim due to the lack of sufficient documentation of claim assignment). The Debtors and the Trust, through their KYC vendors, have repeatedly provided the Verification Failure Claimants ample opportunity to address these discrepancies, but the Verification Failure Claimants have failed to do so. (Leto Decl. ¶ 22.) For these reasons, the Verification Failure Claims should be disallowed and expunged under section 502(b)(1).

58. ***Security Questionnaire Failure Claims***. Like the Verification Failure Claims, the Security Questionnaire Failure Claims should be disallowed and expunged because the Claimants cannot establish ownership of the respective customer accounts on which they base their Objection Claims. Because the Trust could not locate sufficient prepetition data related to these customer accounts in the books and records, it needed additional information from these Security Questionnaire Failure Claimants to verify and corroborate the data it ***did*** have. (Leto

Decl. ¶ 23.) As a result, the security questionnaire that each of these Claimants received included basic questions to allow the Trust to accurately corroborate the Security Questionnaire Failure Claimants' customer account ownership. (*Id.*) By failing the security questionnaire, the Security Questionnaire Failure Claimants failed to meet this minimum requirement and thus do not have a *prima facie* valid claim. *See In re O'Brien*, 440 B.R. at 662, 667-68. The Security Questionnaire Failure Claims should therefore be disallowed and expunged under section 502(b)(1).

59. ***KYC Withdrawn Claims***. Finally, by formally withdrawing from the KYC process, the KYC Withdrawn Claimants have refused to provide *prima facie* evidence that they own the customer accounts on which they base their KYC Withdrawn Claims.[19] Accordingly, the KYC Withdrawn Claims should be disallowed and expunged under section 502(b)(1).

## II. The Verification Failure Claims, the SOF Failure Claims, and the KYC Withdrawn Claims Should Be Disallowed and Expunged Under Section 502(b)(1) Because the Claimants Failed to Respond to the Trust's Requests for Information.

60. "[A] claimant *must* supply the underlying documents [establishing claim ownership] upon request." *In re Pursley*, 451 B.R. 213, 233 (Bankr. M.D. Ga. 2011) (emphasis in original). Indeed, a debtor can meet its burden of production and overcome a proof of claim's *prima facie* validity "by demonstrating that the claimant has not responded to *formal or informal* requests for documentation or other evidence supporting the amount, reasonableness or other factors relevant to the validity of the charges at issue." *In re Sacko*, 394 B.R. 90, 100-01 (Bankr. E.D. Pa. 2008) (emphasis in original). A creditor's lack of adequate response to the debtor's information request "itself may raise an evidentiary basis to object to the unsupported aspects of the claim[,] thereby coming within Section 502(b)'s grounds to disallow the claim." *Id.* at 101

[19] The KYC Withdrawn Claims do not differ materially from the Unverified Claims that have been disallowed and expunged under this Court's 130th Order and 200th Order. The only distinction is that these Claimants formally withdrew their KYC applications. Because of this noncompliance, their KYC applications were formally rejected.

(quoting *In re Campbell*, 336 B.R. 430, 436 (B.A.P. 9th Cir. 2005)); *see also In re FBI Wind Down, Inc.*, 2015 WL 1181890, at *1 (Bankr. D. Del. Mar. 3, 2015) (expunging and disallowing insufficient documentation claims); *In re Exide Techs.*, 2013 WL 12579684, at *1 (Bankr. D. Del. Mar. 7, 2013) (same).

61. ***Verification Failure Claims***. The Verification Failure Claims should be disallowed and expunged because the Verification Failure Claimants failed to respond to repeated outreach from the KYC vendors once a mismatch between the Verification Failure Claimants' prepetition and postpetition KYC Information was identified. This failure to provide "underlying documents" goes directly to the validity of the claims filed by the Verification Failure Claimants, and thus falls squarely within the scope of information that the courts in *In re Pursley* and *In re Sacko* found created "an evidentiary basis to object." *See* 451 B.R. at 231, 233; 394 B.R. at 101.

62. ***SOF Failure Claims***. The SOF Failure Claimants did not provide SOF information in response to reasonable requests from the KYC vendors for information.[20] This failure to provide the requested "underlying documents" is relevant to the "reasonableness" of the SOF Failure Claims, so again falls squarely within *In re Pursley* and *In re Sacko*. *See* 451 B.R. at 233; 394 B.R. at 101. The SOF Failure Claims should also be disallowed and expunged for the additional reason that the absence of adequate SOF documentation presents material legal risks. Without adequate evidence that these customers legally possess the funds that enabled their deposits and trading activities on the Exchange, the Trust cannot adequately assess whether the accounts associated with the SOF Failure Claims were used as a conduit for money laundering or

---

[20] The KYC vendors requested that Claimants provide documentation supporting the value of the SOF Failure Claimants' customer accounts from ***one*** of six categories: bank statements; salary or income slips; tax statements; investment/securities account statements; loan agreements; or other documents such as proofs of sale, inheritance, etc. Where documentation was obviously insufficient, the KYC vendors would ask for additional documentation. The SOF Failure Claimants did not respond to initial requests or, where applicable, refused to provide documentation on follow-up requests.

a pass-through entity for the proceeds of illegal activities. As a result, the Trust cannot make distributions to the SOF Failure Claimants without the material risk of violating the AML Act.

63. ***KYC Withdrawn Claims***. The KYC Withdrawn Claims present material risks similar to those posed by the Verification Failure Claims and SOF Failure Claims, including the risks of violating OFAC sanctions and the AML Act. The KYC process approved by this Court seeks information designed to help the Trust mitigate such risks, and the Trust cannot do so here without a complete KYC record for the KYC Withdrawn Claims. Affirmatively refusing to participate in the KYC process is an obvious red flag. These Objection Claims should likewise be disallowed and expunged under section 502(b)(1).

## III. The Objection Claims Should Be Disallowed and Expunged Under Section 502(b)(1) Due to the Claimants' Failure to Comply with the Dotcom TOS.

64. The Objection Claims should also independently be disallowed and expunged because they would ***never*** have been enforceable against FTX under the Dotcom TOS and applicable English law. *In re Combustion Eng'g*, 391 F.3d at 245 n.66 (noting that a claim "will not be allowed in a bankruptcy proceeding if the same claim would not be enforceable against the debtor outside of bankruptcy"); *see also* 4 Collier on Bankruptcy ¶ 502.03[2][b][ii] (16th ed. 2026) ("Generally applicable nonbankruptcy law determines the validity of claims.").

65. This Court has already found that "[t]he factual record establishe[d] that all Digital Assets and Cash held by the FTX Exchanges on or after the Petition Date . . . are property of the Debtors' Estates within the meaning of section 541 of the Bankruptcy Code." (Confirmation Order ¶ 20.) Thus, the Objection Claims—like all Customer Entitlement Claims—are not premised on any ownership right held by the Claimants in the assets associated with their customer accounts. Rather, these Objection Claims flow from the contractual relationship between the

Claimants and FTX, as found in the Dotcom TOS, and the right of FTX customers to the withdrawal of assets from the Exchange. (*See* Plan § 2.1.47; Dotcom TOS §§ 8.2.6(C), 8.3.7.)

66. But that withdrawal right is expressly ***qualified*** by FTX's "policies." (Dotcom TOS §§ 8.2.6(C), 8.3.7.) No fewer than seven independent sections expressly grant FTX the right to limit a customer's control of the assets associated with its account due to the customer failing to comply with FTX's AML, CTF, and KYC policies. Such sections include:

- **Section 2.6**: Permitting FTX "in its sole discretion" to "freeze" a customer's assets, cause a customer to "forfeit" any rights associated with the customer's assets, and "terminate" a customer's account if it is associated with "illegal activity."

- **Section 3.1**: Permitting FTX to "suspen[d]" and "clos[e]" a customer's account if there was a violation of the Applicable Laws, including the AML and CTF laws.

- **Section 3.3**: Permitting FTX at its "discretion" to "suspend" and "close" a customer's account if the customer is subject to sanctions.

- **Section 4**: Permitting FTX at its "discretion" to "suspend" and "close" a customer's account if the customer failed FTX's eligibility standards.

- **Section 5**: Permitting FTX at its "discretion" to "suspend" or "close" a customer's account if it failed to provide sufficient KYC Information.

- **Sections 12.1 and 12.3**: Permitting FTX "in its sole and absolute discretion and at any time, without liability to [the customer] or any third party," to "terminate" a customer's account if there is a KYC and AML violation.

- **Section 12.8**: Permitting FTX to "refuse to permit withdrawals" where a customer account was suspended or closed, the withdrawal would be prohibited by Applicable Laws, FTX determined that the customer's assets were obtained fraudulently, or the customer failed to provide sufficient KYC Information.

67. Where a contract has been reduced to writing, under English law principles of contractual interpretation, "[t]he court's task is to ascertain the objective meaning of the language which the parties have chosen to express their agreement." *Wood* v. *Capita Insurance Services Ltd.* [2017] UKSC 24, [10]. To ascertain this objective meaning, an English court will determine what a reasonable person, with all the background knowledge that would reasonably have been available to the parties when they entered the contract, would have understood the language of the contract to mean. An English court will consider the contract as a whole, placing particular emphasis on the plain meaning of the contract if it is a standard form agreement—which the Dotcom TOS are.

68. The plain meaning of the Dotcom TOS is clear: FTX had no obligation to pay a customer anything if that customer failed to comply with the AML, CTF, and KYC obligations customers expressly agreed to under the agreement. (Dotcom TOS § 12.8.) This right was not only explicitly granted to FTX, but was also wholly consistent with other provisions in the Dotcom TOS: FTX repeatedly represented to customers that it took AML, CTF, and KYC obligations "seriously" (*see, e.g.*, *id.* § 3.2); customers repeatedly represented to FTX that "any and all" KYC Information they provided was "complete, accurate, up-to-date and not misleading" (*see, e.g.*, *id.* § 5.3), and they were in compliance with "all Applicable Laws" (*see, e.g.*, *id.* § 3.1.1).

69. Such contractual provisions are common in terms of service for banks and cryptocurrency exchanges, and courts in the United States have routinely enforced service providers' unqualified rights to suspend withdrawals where, as here, they are authorized to do so under the relevant terms of service. *See, e.g.*, *In re Bittrex, Inc.*, 2024 WL 2347311, at *18 (Bankr. D. Del. May 22, 2024), *aff'd*, 674 B.R. 271 (D. Del. 2025) (sustaining objection to an Iranian customer's tort claim premised on the prepetition debtor's refusal to permit the customer to

withdraw cryptocurrencies because the terms of service allowed the debtor to suspend services to customers at its sole discretion); *Banco San Juan Internacional, Inc.* v. *Fed. Rsrv. Bank of New York*, 700 F. Supp. 3d 86, 93, 100 (S.D.N.Y. 2023) (allowing the Federal Reserve Bank of New York to suspend a customer's account "at any time," because that customer failed to maintain adequate diligence records of its high-risk customers); *Zepeda* v. *PayPal, Inc.*, 777 F. Supp. 2d 1215, 1219-20 (N.D. Cal. 2011) (allowing PayPal, "in its sole discretion," to suspend a customer account even if the customer never engaged in "restricted activities"); *Griffin* v. *Bank of Am. Corp.*, 2010 WL 11598055, at *3-5, *9 (N.D. Ga. Sept. 17, 2010) (allowing Bank of America to freeze funds in customer accounts if it suspected the account was being used in connection with fraudulent activity).

70. The Objection Claims are not supported by complete, accurate, and up-to-date KYC Information and, as a result, the Trust is unable to positively identify the relevant claimants. Thus, the Claimants could not have asserted an enforceable right of withdrawal against prepetition FTX under the Dotcom TOS and applicable English law due to: (i) the express authorization in the Dotcom TOS for FTX to "suspend" and "close" the relevant customer accounts (Dotcom TOS §§ 5.4, 5.5) and the express limitation of FTX's withdrawal obligation (and liability) in connection with such a decision (*id.* §§ 12.1, 12.3, 12.8); and (ii) the material breach of the Dotcom TOS by the Claimants through their failure to comply with the AML, CTF, and KYC requirements set out in Sections 5.1, 5.2, 5.3, and 13.1.2 of the Dotcom TOS. Lacking any claim to the value associated with the Claimants' customer accounts, the Objection Claims are subject to disallowance and expungement under section 502(b)(1).

**<u>RESERVATION OF RIGHTS</u>**

71. This Objection is limited to the grounds stated herein. Accordingly, it is without prejudice to the rights of the Trust to object to any claim on any grounds whatsoever. The

Trust expressly reserves all further substantive or procedural objections. Nothing contained herein is intended or should be construed as: (i) an admission as to the validity of any claim against the Trust; (ii) a waiver of the Trust's rights to dispute any claim on any grounds; (iii) a promise or requirement to pay any claim; (iv) an implication or admission that any particular claim is of a type specified or defined in this Objection or any order granting the relief requested by this Objection; (v) an approval or assumption of any agreement, contract or lease under section 365 of the Bankruptcy Code; or (vi) a waiver of the Trust's rights under the Bankruptcy Code or any other applicable law.

## SEPARATE CONTESTED MATTERS

72. To the extent a response is filed regarding any Objection Claim listed in this Objection and the Trust is unable to resolve the response, the objection by the Trust to such Objection Claim shall constitute a separate contested matter as contemplated by Bankruptcy Rule 9014. Any order entered by the Court regarding an objection asserted in this Objection shall be deemed a separate order with respect to each Objection Claim subject thereto.

## LIMITED WAIVER OF LOCAL RULE 3007-1

73. The Trust acknowledges that Local Rule 3007-1(d)(iii) requires that the Schedules attached to the Order contain, at a minimum, the (i) name of the Claimant; (ii) Objection Claim number; (iii) Objection Claim amount; and (iv) reason for disallowance. However, pursuant to this Court's *Ninth Order Authorizing the Continued Redaction or Withholding of Certain Confidential Information of Customers* [D.I. 34287], the Trust has withheld the customer names from the Objection Claims and has instead listed the unique customer code associated with each Objection Claim on the Schedules.

74. In addition, the Trust has not listed the amounts (including the type and quantity of each digital asset) associated with each Objection Claim, because such amounts are not

relevant to the grounds underlying this Objection, and it would be unduly burdensome to do so. The Trust submits that not including the Objection Claim amounts promotes judicial efficiency and reduces the Trust's costs and administrative burden.

75. Subject to the foregoing, to the best of the Trust's knowledge and belief, this Objection and all related exhibits and schedules comply with Local Rule 3007-1. To the extent this Objection does not comply in all respects with the requirements of Local Rule 3007-1, the undersigned believes that such deviations are not material to the relief requested and respectfully requests that any such requirement be waived.

## NOTICE

76. Notice of this Objection has been provided to: (a) the U.S. Trustee; (b) the Securities and Exchange Commission; (c) the Internal Revenue Service; (d) the United States Department of Justice; (e) the United States Attorney for the District of Delaware; (f) each Original Holder of an Objection Claim and any subsequent transferee; and (g) to the extent not listed herein, those parties requesting notice pursuant to Bankruptcy Rule 2002. The Trust submits that, in light of the nature of the relief requested, no other or further notice need be provided.

## CONCLUSION

77. For the foregoing reasons, the Trust respectfully requests that the Court enter the Order disallowing and expunging the Objection Claims in their entirety.

Dated: September 1, 2026
Wilmington, Delaware

**LANDIS RATH & COBB LLP**

*/s/ Matthew R. Pierce*
Adam G. Landis (No. 3407)
Matthew B. McGuire (No. 4366)
Kimberly A. Brown (No. 5138)
Matthew R. Pierce (No. 5946)
919 Market Street, Suite 1800
Wilmington, Delaware 19801
Telephone: (302) 467-4400
Facsimile: (302) 467-4450
E-mail: landis@lrclaw.com
mcguire@lrclaw.com
brown@lrclaw.com
pierce@lrclaw.com

-and-

**SULLIVAN & CROMWELL LLP**
Andrew G. Dietderich (admitted *pro hac vice*)
James L. Bromley (admitted *pro hac vice*)
Brian D. Glueckstein (admitted *pro hac vice*)
Alexa J. Kranzley (admitted *pro hac vice*)
125 Broad Street
New York, NY 10004
Telephone: (212) 558-4000
Facsimile: (212) 558-3588
E-mail: dietdericha@sullcrom.com
bromleyj@sullcrom.com
gluecksteinb@sullcrom.com
kranzleya@sullcrom.com

*Counsel for the FTX Recovery Trust*