**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| In re: | Chapter 11 |
| FTX TRADING LTD., *et al.*,[1] | Case No. 22-11068 (KBO) |
| Debtors. | (Jointly Administered) |

**DECLARATION OF MICHAEL S. LETO IN SUPPORT OF THE FTX RECOVERY TRUST'S TWO HUNDRED THIRD (SUBSTANTIVE) OMNIBUS OBJECTION TO CERTAIN PROOFS OF CLAIM WITH REJECTED KYC (CUSTOMER CLAIMS)**

I, Michael S. Leto, pursuant to 28 U.S.C. § 1746, hereby declare under penalty of perjury that the following is true and correct to the best of my knowledge, information, and belief:

1. I am a Managing Director and Co-Head of Crypto at Alvarez & Marsal North America, LLC ("A&M"), a restructuring advisory services firm specializing in interim management, crisis management, turnaround consulting, operational due diligence, creditor advisory services, and financial and operational restructuring.

2. I have over fifteen years of distressed company advisory experience. Through roles both in senior management and as a restructuring advisor, I have substantial experience helping financially distressed companies stabilize their financial condition, analyze their operations, and develop business plans to accomplish the necessary restructuring of their operations and finances. I have advised clients in numerous major bankruptcy cases, including Lehman Brothers Holdings Inc., where I spent three years as the Chief Financial Officer; Genesis Global Holding and subsidiaries, a lending and borrowing, spot trading, derivatives, and custody

---

[1] The last four digits of FTX Trading Ltd.'s and Alameda Research LLC's tax identification number are 3288 and 4063 respectively. Due to the large number of debtor entities in these Chapter 11 Cases, a complete list of the Debtors and the last four digits of their federal tax identification numbers is not provided herein. A complete list of such information may be obtained on the website of the Debtors' claims and noticing agent at https://cases.ra.kroll.com/FTX.

service for digital assets and fiat currency; and Terraform Labs PTE, a Singapore-based blockchain firm focused on decentralized financial infrastructure and applications in the digital asset space. I have also served as the interim Chief Financial Officer of other private companies. I received my bachelor's degree in accounting and business administration from Hofstra University and a Master of Business Administration from Fordham University in management systems and international business.

3. I have been involved in the Chapter 11 Cases since October 2024 and have been leading the A&M Know-Your-Customer team, as well as playing an instrumental role in distributions to creditors of the Debtors.

4. I submit this declaration (the "Declaration") in support of the *FTX Recovery Trust's Two Hundred Third (Substantive) Omnibus Objection to Certain Proofs of Claim with Rejected KYC (Customer Claims)* (including all exhibits and schedules thereto, the "Objection").[2]

5. I am not being compensated separately for this testimony other than through payments received by A&M as a financial advisor retained by the Trust. A&M was retained by the Debtors from November 11, 2022 through January 3, 2025, and A&M has been retained by the Trust since January 3, 2025.

6. Except as otherwise indicated herein, all the facts set forth in this Declaration are based upon my personal knowledge, my review of relevant documents, information provided to me by A&M professionals working under my supervision, or my opinion based upon my experience and knowledge related to the Debtors' and Trust's operations, businesses, and financial condition. If called upon to testify, I could and would testify to the facts set forth herein on that basis. I am authorized to submit this Declaration on behalf of the Trust.

[2] Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to them in the Objection.

## I. FTX's Compliance Failures

7. As set forth in the *First Interim Report of John J. Ray III to the Independent Directors on Control Failures at the FTX Exchanges* [D.I. 1242-1] ("First Ray Report"), prepetition FTX was tightly controlled by a small group of insiders—principally Samuel Bankman-Fried, Nishad Singh, and Gary Wang—who exercised near-total authority without meaningful oversight or independent controls. These insiders commandeered nearly every significant operational and financial decision for the exchange. Necessary organizational characteristics such as formal policies and reliable reporting systems were either nonexistent, hastily assembled, or ignored in practice. Rather than operating as a mature financial institution entrusted with billions of dollars in customer assets, FTX functioned as a disorganized, unaccountable group of entities, steered almost exclusively by a handful of inexperienced individuals. I have reviewed the First Ray Report and am not aware of any information that would cause me to alter or amend any of the facts, assertions, or conclusions set forth therein.

8. These systemic control failures extended to FTX's compliance and risk management processes, including its anti-money laundering ("AML"), counter-terrorist financing ("CTF"), and Know-Your-Customer ("KYC") functions. The prepetition management of the Debtors consistently failed to collect adequate KYC information ("KYC Information") from customers, perform basic due diligence, and obtain reliable information concerning the source of funds deposited onto the FTX platform. These failures were compounded by the broader absence of effective financial reporting and risk management controls.

9. Because the prepetition Debtors routinely operated without the safeguards necessary to ensure that basic KYC Information was collected, they exposed the postpetition Debtors and Trust to a heightened risk of fraud, sanctions violations, and facilitating criminal misconduct. Following extensive postpetition efforts to reconstruct the Debtors' books and

records, the Debtors and the Trust were able to collect prepetition KYC Information for a subset of customers. The KYC Information that the Debtors and the Trust were able to recover is generally limited to (i) photos of customers' government-issued IDs; (ii) photos of customers holding their IDs; and (iii) the customers' legal names, countries of residence, and email addresses.

10. Attached hereto as Exhibit 1 is a true and correct copy of a document titled "FTX Terms of Service," dated May 13, 2022 (the "Dotcom TOS"), which was the user agreement that specified the terms of service for FTX.com Exchange customers as of the Petition Date.

## II. The Collection and Review of KYC Information

11. To mitigate the risk of regulatory and sanctions-related violations in the payment of Customer Entitlement Claims, the Debtors initially requested, and were granted in the Customer Bar Date Order,[3] authorization from the Court to establish procedures through which Original Holder KYC Information could be collected and, if Original Holders failed to submit KYC Information, the associated Customer Entitlement Claims could be objected to and disallowed and expunged. Notice of the Customer Bar Date Order and Customer Bar Date was provided through multiple channels, including by email, postcard, publications in *The New York Times* and *CoinDesk*, notices issued by the Debtors' Claims Agent, and posts by the Debtors on X (f/k/a Twitter) reminding customers to submit their KYC Information by the bar date.

12. The Debtors then created the Customer Claims Portal to facilitate the collection of the requested KYC Information. To determine the KYC Information that would be requested from each Original Holder, the Debtors reviewed the customer due diligence requirements and recommendations promulgated by the United States, Cyprus, Japan, Singapore,

[3] *Order (I)(A) Establishing Deadlines for Filing Customer Proofs of Claim, (B) Approving Procedures for Submitting Proofs of Claim and (C) Approving the Form and Manner of Notice Thereof and (II) Granting Related Relief* [D.I. 1793].

Turkey, and the Financial Action Task Force,[4] and requested sufficient KYC Information to comply with each set of requirements and recommendations. Using the KYC Information submitted by Original Holders, the Debtors have since executed a framework that applies varying review procedures depending on whether the Original Holder was an individual or institution. The Debtors also retained KYC vendors Sum and Substance Ltd. ("Sumsub"), BitGo, Inc. ("BitGo"), and Integreon, Inc. ("Integreon") to assist with the review of KYC Information and manual outreach to claimants, as applicable.

**A. Individual Original Holders**

13. The Debtors required individual Original Holders to provide KYC Information including, among other things, their full name (including any aliases), date of birth, proof of address, identification and identification-related documents, nationality, email address, occupation, and, for U.S. citizens, Social Security number. The Debtors' KYC vendors also requested that Original Holders provide documentation supporting the value of their customer accounts from one of six categories: bank statements; salary or income slips; tax statements; investment/securities account statements; loan agreements; or other documents such as proofs of sale, inheritance, etc. In addition, the Debtors required individual Original Holders to undergo a facial liveness check (typically through a range of head movements through an electronic device camera) to ensure a match between the person now claiming to be the Original Holder and the postpetition identification document provided.

14. After an individual Original Holder submitted all requested KYC Information, the KYC vendor Sumsub performed an automated validation and screening process.

[4] The Financial Action Task Force is an international policy-making body that sets global standards for combatting money laundering, terrorist financing, and other financial crimes. "Financial Action Task Force," *U.S. Department of the Treasury*, https://home.treasury.gov/policy-issues/terrorism-and-illicit-finance/financial-action-task-force.

The automated screening process would flag an individual Original Holder for a manual review process if (i) the Original Holder was assessed to be a high-risk customer due to their nationality, residency, or occupation, (ii) Sumsub could not verify the individual Original Holder's documentation, (iii) the individual Original Holder's KYC Information did not match the Debtors' prepetition records or prepetition records were not available, and/or (iv) the Original Holder received a screening hit, including because the Original Holder was a sanctioned party, a politically exposed person (a "PEP"), or the subject of adverse media attention.

15. For each category of flagged applications, a manual reviewer from the KYC vendor Integreon analyzed the submitted KYC Information and, where applicable, contacted the Original Holder to request additional documentation or an explanation for discrepancies between their submitted KYC Information and the Debtors' records.

**B. Institutional Original Holders**

16. The Debtors required institutional Original Holders to provide KYC Information including, among other things, their company name, registration information, tax identification number, principal business address and phone number, business email address, information on the nature of the business and principal business activity, entity size, annual revenue and profit, authorized signer, identities of ultimate beneficial owners ("UBOs"), identities of directors and/or members of management, and, for any UBOs, directors, or members of management, similar identification information and records as are collected for individual Original Holders.

17. All institutional Original Holder KYC Information was manually reviewed by the KYC vendor BitGo. Institutional Original Holders and their UBOs, directors, and executives first underwent AML screening to determine whether any were sanctioned parties, PEPs, or the subjects of adverse media attention. BitGo then manually reviewed every institutional

Original Holder's KYC Information to confirm that all documents and information could be successfully verified. Similar to individual Original Holders, if a manual reviewer determined an institutional Original Holder was a high-risk entity due to its place of incorporation/business activity or industry, its application would go through an enhanced due diligence ("EDD") process. This process typically included, but was not limited to, requesting and reviewing additional documents pertaining to the Original Holder's source of wealth and funds, such as bank statements, audited financial statements, tax filings, and approvals of account openings or transactions.

### C. Conclusion of Review and Determination That a Claim Is Subject to Objection

18. For individual customers, A&M closely monitors Sumsub's KYC review process and escalates applications that raise money laundering or sanctions concerns, involve potential investigation targets, or exceed a balance of $1 million. For institutional customers, A&M does not directly oversee BitGo's KYC review process, but participates in weekly discussions to identify KYC issues and potential escalations. Certain claims are identified for escalation and provided to the Trust's counsel, Sullivan & Cromwell LLP, for further review with support from A&M. Once a final determination is made that a claim is subject to KYC rejection, the Customer Claims Portal is updated to reflect a "Failed" KYC application status, which the claimant can view upon logging into the portal.

## III. Status of the Trust's Ongoing KYC Review

19. In total, the Debtors and the Trust were faced with the resolution of approximately 642,000 Customer Entitlement Claims that were not *de minimis*. Of these claims, approximately 192,000 passed the KYC review, representing approximately 99% of claims that submitted all required KYC Information. Approximately 440,000 Customer Entitlement Claims

were disallowed under the 130th Omnibus Objection, and approximately 6,846 additional claims were disallowed under the 200th Omnibus Objection.

## IV. The Objection Claims

20. The proofs of claim at issue in the Objection (the "Objection Claims," filed by the "Claimants") comprise 616 claims, representing roughly $4.5 million in scheduled claim value. These Objection Claims fall into four categories:

21. ***Prepetition Data Mismatch and Verification Failure***. Prepetition, the Debtors attempted to collect KYC Information (such as name, gender, and date of birth) from Original Holders, typically at the creation of their customer accounts. As part of the reconstruction of the books and records after the Petition Date, the postpetition Debtors and their advisors were able to recover and organize certain prepetition KYC Information.

22. 488 Objection Claims (the "Verification Failure Claims") were filed by Claimants (the "Verification Failure Claimants") who purported to be the Original Holders of certain customer accounts but submitted KYC Information that did not match the prepetition KYC Information contained in Amazon Web Services KYC tables for the Original Holders of those customer accounts. In most cases, there were discrepancies with respect to the relevant names. The Trust has no evidence that the customer accounts at issue or the Verification Failure Claims were transferred to the Verification Failure Claimants, nor did the Verification Failure Claimants affirmatively provide any such evidence. Due to this fundamental mismatch regarding the identity of the Original Holders and the Verification Failure Claimants, the KYC applications for these Verification Failure Claims were rejected. Despite the initial mismatch, to facilitate the resolution of these Objection Claims, the KYC vendors have repeatedly reached out to the Verification Failure Claimants to allow them to cure any discrepancies. The Verification Failure Claimants, however, have consistently failed to respond to these inquiries.

23. ***Deficient Prepetition Data and Security Questionnaire Failure***. As part of the books and records reconstruction and reconciliation process, the Debtors identified a subset of customer accounts that lacked or had incomplete prepetition KYC Information. The records show that these customers' accounts lacked the customers' names. To bridge this information gap, the Debtors created a security questionnaire that claimants associated with these customer accounts were required to complete and pass in addition to the standard KYC process. The security questionnaire included the following questions:

- When did you open your FTX account?
- Please provide the exact date or an estimated month and year.
- Did you sign up using a referral link or promotional code?
- Which phone number did you register when you signed up for an account?
- Did you set up a withdrawal password?
- Did you enable FTX Earn and/or Spot margin trading?
- Which one did you enable?

24. Only 458 claims were associated with such customer accounts, and the majority of claimants who received the security questionnaire completed and passed it.

25. However, 116 Objection Claims (the "Security Questionnaire Failure Claims") were filed by Claimants (the "Security Questionnaire Failure Claimants") who failed the security questionnaire. As a result of the Claimants' failure to correctly answer basic questions about their purported customer accounts, the KYC submissions were rejected for these Security Questionnaire Failure Claims, absent other ways to positively verify the account ownership.

26. ***Unwillingness to Provide Source of Funds ("SOF") Documentation***. For certain claims with a balance over $1,000 where the Original Holders were in a high-risk industry

and/or jurisdiction, the Trust requested that Original Holders submit documentation proving that they had a legitimate source for the funds in their customer accounts. In most instances, according to the Trust's instructions, customers provided paystubs, tax returns, and brokerage and account statements showing that SOF documentation was commensurate with their balance on FTX.

27. Ten Objection Claims (the "SOF Failure Claims") are associated with Claimants (the "SOF Failure Claimants") who have refused to provide SOF documentation or, where applicable, to respond to follow-up requests for SOF documentation. Because the SOF Failure Claimants refused to provide information regarding their source of funds, the KYC submissions were rejected for the SOF Failure Claims.

28. ***KYC Application Withdrawn***. Two Objection Claims (the "KYC Withdrawn Claims") were filed by Claimants (the "KYC Withdrawn Claimants") who informed the KYC vendors that they no longer wished to complete the KYC process and formally withdrew their KYC applications.

29. For the reasons described above, the Trust rejected the KYC applications associated with the Objection Claims. Shortly thereafter, the Customer Claims Portal was updated to describe the status of the KYC applications as "Failed."

30. Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge and belief.

Dated: September 1, 2026

*/s/ Michael S. Leto*
Michael S. Leto
Alvarez & Marsal North America, LLC
Managing Director