**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| In re: | Chapter 11 |
| FTX TRADING LTD., *et al.* | Case No. 22-11068 (KBO) |
| Debtors.[1] | (Jointly Administered) |

**ARGENT LIQUIDATION TRUST'S**
**MORE DEFINITE STATEMENT OF PROOFS OF CLAIM**

Pursuant to this Court's *Order Approving Stipulation* [Dkt. 36189], the Argent Liquidation Trust (the "Trust"), as successor to the estates of debtors Silvergate Capital Corporation ("SCC") and Silvergate Liquidation Corporation (f/k/a "Silvergate Bank," and together with SCC and Spring Valley Lots, LLC, "Silvergate"), hereby submits this more definite statement (the "More Definite Statement") of Silvergate's proofs of claim (the proofs of claim, together with their addenda, the "Silvergate Claims")[2] filed on June 30, 2023, against FTX Trading Ltd. and each of its affiliated debtors and debtors in possession (collectively, the "FTX Group").[3] The Trust submits this More Definite Statement in connection with and as provided for in the agreed-upon litigation schedule and framework for resolving the competing Silvergate Claims and proofs of claim filed by the FTX Group against Silvergate. This More Definite Statement sets forth in more

[1] The last four digits of FTX Trading Ltd.'s and Alameda Research LLC's tax identification number are 3288 and 4063 respectively. Due to the large number of debtor entities in these chapter 11 cases, a complete list of the Debtors and the last four digits of their federal tax identification numbers is not provided herein. A complete list of such information may be obtained on the website of the Debtors' claims and noticing agent at https://cases.ra.kroll.com/FTX.

[2] On March 31, 2026—the effective date of Silvergate's plan in its chapter 11 cases—the Trust was established, and the Silvergate Claims automatically transferred to the Trust. For the avoidance of doubt, the Trust filed notices of transfer in the FTX Group's chapter 11 cases for each of the Silvergate Claims.

[3] The Trust asserts these claims against each member of the FTX Group because, as explained in both the Silvergate Claims and the Trust's notices of transfer, the operations of the FTX Group are opaque to a third party, and it is infeasible to determine which specific entities in the FTX Group caused harm to Silvergate. This More Definite Statement also uses the term "FTX Group" to refer to the relevant particular FTX Group debtor entity, as otherwise alleged herein and/or to be revealed through discovery.

detail the factual allegations, legal theories, and estimated damages underlying the Silvergate Claims, and it in no way limits the Silvergate Claims. In support thereof, the Trust respectfully sets forth the following:

**PRELIMINARY STATEMENT**

1. Silvergate is a victim of the FTX Group's extensive pattern of fraud, deceit, and illegal conduct. The FTX Group—whose founder is serving 25 years in federal prison for fraud—systematically lied to Silvergate to obtain banking services it was not entitled to receive and used those services, unbeknownst to Silvergate, in perpetrating one of the largest financial frauds in American history. The misconduct of the FTX Group destroyed Silvergate, and the Trust now seeks to hold the FTX Group accountable for the promises it broke, the wrongdoing it engaged in, and the devastation it caused.

2. For decades, SCC, through its subsidiary, Silvergate Bank, was a leading provider of innovative financial infrastructure solutions to the digital asset industry. Founded in 1986, Silvergate built its reputation as a trustworthy, regulated institution, and one that welcomed digital asset customers while maintaining the compliance safeguards required of a federally regulated bank. Silvergate Bank designed and implemented internal controls to reduce the risk of financial misconduct, which contributed to its reputation as a trustworthy financial institution. But the FTX Group was determined to, and did indeed, circumvent those safeguards.

3. The FTX Group's fraud against Silvergate, and its breaches of contractual promises owed to Silvergate, were deliberate and sustained. The FTX Group sought to open bank accounts with Silvergate. But, to avoid the enhanced due diligence and licensing requirements that Silvergate imposed on *custodial* accounts—accounts that allow an exchange to hold and manage funds on behalf of its users—members of the FTX Group submitted fraudulent account

applications for *non-custodial* accounts. To further accomplish the fraud, the FTX Group also fabricated corporate documents for a shell company with no business operations or employees, and its founder and CEO, Samuel Bankman-Fried, personally signed and certified false due diligence questionnaires. All of this was done to conceal that the FTX Group was secretly directing billions of dollars in customer deposits through Silvergate's banking system, in direct violation of both the representations made by the FTX Group to Silvergate during onboarding and the contractual terms by which Silvergate had agreed to provide services.

4. Much of this has already been proven. The Department of Justice specifically identified Silvergate as a victim of the FTX Group's fraud, noting that "the evidence at trial, including witness testimony and documentary evidence, proved that the defendant . . . made false statements to [Silvergate] to induce it to open a bank account that he used in furtherance of his other fraudulent schemes."[4] Bankman-Fried was convicted on all counts presented to a jury related to the FTX Group's sprawling fraudulent scheme and was sentenced to 25 years' imprisonment. Three additional FTX Group employees—Caroline Ellison, Gary Wang, and Nishad Singh—pleaded guilty to fraud counts.

5. The FTX Group's web of misconduct caused catastrophic harm to Silvergate. When the fraud was unraveled in November 2022, the FTX Group collapsed and caused a devastating run on the bank at Silvergate. Silvergate's deposits declined by $6.9 billion (a 52.4% drop) in the fourth quarter of 2022 alone. To meet withdrawal demands, Silvergate was forced to liquidate approximately $5.2 billion of debt securities into a cratered market, crystallizing approximately $751.4 million in losses. And to satisfy its resulting obligations to the Federal

---

[4] Letter by United States at 2, Dkt. No. 388, *United States v. Bankman-Fried*, No. 1:22-cr-00673-LAK (S.D.N.Y. Dec. 29, 2023) ("DOJ Letter").

Home Loan Bank of San Francisco and to accommodate sustained lower deposit levels, Silvergate was forced to sell additional investment securities at a significant loss. Within four months, Silvergate was forced to announce its wind-down and voluntary liquidation, destroying the going-concern value of a bank built over nearly four decades.

6. The wreckage caused by the FTX Group's misconduct did not stop there for Silvergate. Silvergate was subjected to years of regulatory investigations and litigation, and not because Silvergate participated in or knew of the FTX Group's fraud, but because the FTX Group had secretly used Silvergate's accounts as the plumbing for its criminal enterprise. In addressing the fallout from the FTX Group's fraud and misconduct, Silvergate incurred approximately: $63 million in regulatory penalties; over $21 million in litigation settlements; over $120 million in investigative, defense, advisory, and bankruptcy professional fees and expenses; and tens of millions more in indemnification-related costs on behalf of Silvergate's former officers and directors. In total, the Trust suffered approximately one billion dollars in damages, with hundreds of millions—if not billions—more in lost enterprise value expected to be identified in further discovery, and before any statutory trebling under RICO.

7. The FTX Group defrauded Silvergate, breached its contracts with Silvergate, and breached its contractual duty to indemnify Silvergate for any and all losses in any way caused by any acts, omissions, or breaches by the FTX Group entities, employees, or their agents. Further, the FTX Group entities violated and conspired to violate the civil provisions of the RICO statute, 18 U.S.C. § 1962(c)-(d), through a sustained pattern of bank, wire, and mail fraud directed at Silvergate and others. Overall, the FTX Group lied to get in the door; used Silvergate accounts to perpetuate its fraud while continuing to lie to Silvergate and its own customers; contractually promised to indemnify Silvergate for exactly the kind of harm it then inflicted; and when the

scheme collapsed, it took Silvergate down with it. The Trust now seeks the full measure of damages to which it is entitled.

## FACTUAL ALLEGATIONS

### I. Silvergate Background

8. SCC was a Maryland corporation founded in 1986 and headquartered in La Jolla, California. Its subsidiary, California-chartered Silvergate Bank, was for years a leading provider of innovative financial infrastructure solutions to the digital asset industry. Silvergate Bank was able to secure some of the largest cryptocurrency-related businesses as customers due to its reputation as a trustworthy, regulated institution with extensive experience serving digital asset customers. Among its many digital asset customers, Silvergate provided banking services to the FTX Group.

9. Silvergate offered different types of accounts to its customers, which, by year-end 2020, included operating, trading, market-making, SEN,[5] automated clearing house ("ACH"), and custodial accounts. The majority of Silvergate's account offerings were non-custodial accounts, which could contain only the accountholder's own capital and were prohibited from holding or using any funds belonging to any third parties, including with respect to Silvergate's cryptocurrency exchange customers, the accountholder's own users or customers. There were multiple types of non-custodial accounts: operating accounts were for business operating expenses; trading accounts were for an entity using its own capital to purchase and redeem virtual currencies; market-making accounts were for an entity providing two-sided liquidity, using its own capital to buy or sell virtual currency to institutional counterparties or exchanges; and SEN accounts were

[5] Central to Silvergate's business was the Silvergate Exchange Network ("SEN"), which was a proprietary platform that enabled digital currency exchanges and institutional investors to transfer U.S. dollars between their Silvergate accounts with near-instantaneous settlement through a closed-loop, book-entry system, even outside normal banking hours. In 2021 alone, $787.4 billion in transfers had occurred on the SEN.

accounts limited to internal transfers between approved Silvergate accounts, with all other transaction types blocked. Silvergate also offered ACH accounts, which were used for the settlement of ACH transactions from payment processors. If Silvergate's customers, for example, cryptocurrency exchanges such as Coinbase and Binance, wanted to hold capital on behalf of the exchange's end-user customers, the exchange had to open a "custodial" account. Each account type came with its own levels of onboarding and periodic due diligence. Non-custodial accounts required less due diligence. Custodial accounts were subject to enhanced due diligence and a heightened onboarding process, including certain licensing and documentation requirements. In general, such custodial accounts required enhanced scrutiny because the exchange was holding and managing pooled funds belonging to third parties, which heightened the potential for misuse of customer assets and increased Silvergate's exposure.

10. As a U.S. bank, Silvergate Bank was subject to the Bank Secrecy Act ("BSA") and related U.S. banking statutes and regulations, including those targeting anti-money laundering ("AML"), which required Silvergate to design and implement a program of internal controls to reduce the risk that the bank would be utilized to facilitate money laundering, financing of terrorist activities, financial fraud, and other forms of misconduct (the "BSA/AML Compliance Program"). Silvergate maintained and operated a BSA/AML Compliance Program, which underwent substantial change and growth during the 2019–2022 period as a result of Silvergate's expansion in connection with the growth in the digital asset industry. Silvergate's BSA/AML Compliance Program was regularly examined and assessed by the Board of Governors of the Federal Reserve System (the "Federal Reserve Board") and the California Department of Financial Protection and Innovation (the "DFPI") (or its predecessor agency). The content of such assessments is subject

to regulatory privileges and will be pleaded with further specificity as appropriate once necessary regulatory approvals are secured.[6]

11. Silvergate's BSA/AML Compliance Program comprised, among other components, (1) procedures for onboarding new clients, which included protocols to satisfy "know your customer" or "KYC" regulations; (2) ongoing monitoring of customers and account activity, including automated transaction monitoring and periodic "enhanced due diligence" ("EDD") reviews; and (3) suspicious activity monitoring, including the filing of suspicious activity reports ("SARs"). As part of its regular onboarding process, Silvergate collected due diligence information on all potential customers to satisfy KYC requirements and develop an understanding of the nature and purpose of any requested account, and customers were categorized into certain "risk" levels based on their industry type, products and services offered, and/or type of account requested. Customers identified as "higher risk" received additional due diligence review, which frequently included: (i) screening for potential reputational risk to Silvergate; (ii) additional screening related to source of funds; (iii) additional screening related to information regarding beneficial ownership of 10% or more; (iv) a risk-based due diligence questionnaire; and (v) review and analysis of additional documentation related to the potential customer's BSA/AML controls.

12. Following onboarding, each customer account was assigned a risk rating that determined the frequency of ongoing periodic reviews, with the highest-risk accounts receiving EDD reviews every three months and other risk categories reviewed either ad-hoc or every six months, nine months, annually, or on an 18-, 24-, 36-, or 48-month basis. Those EDD reviews included reviewing transactions in all accounts for a particular customer (e.g., custodial accounts, operating accounts, trading accounts, market making accounts, and SEN accounts) for anomalous

---

[6] *See, e.g.*, 12 C.F.R. § 261.2(b).

activity or activity that otherwise differed from what was expected based on the onboarding due diligence or prior EDD reviews, and the EDD reviews generally contained an analysis of previous suspicious activity alerts and/or SARs involving the customer. Automated transaction monitoring was conducted through the "Prime" system prior to April 2021, and thereafter through the "Verafin" system.

## II. The FTX Group's Systematic Fraud Against Silvergate

13. Over the course of its banking relationship with the FTX Group, Silvergate opened accounts for several FTX Group entities, including: Alameda Research LLC, Alameda Research Ltd. (together with Alameda Research LLC, "Alameda"), North Dimension Inc. ("North Dimension"), West Realm Shires Services Inc. (d/b/a "FTX.US"), Quoine Pte Ltd., and FTX Digital Markets Ltd. Based on the information currently available to the Trust, and subject to further investigation and discovery, as detailed below, the Trust's allegations of misconduct primarily center on the Alameda and North Dimension accounts, which the FTX Group used to circumvent Silvergate's compliance safeguards and to receive, hold, and transmit FTX.com customer deposits in violation of the stated purposes of those non-custodial accounts.

### A. The FTX Group Opens Non-Custodial Accounts for Alameda

14. In or around March 2018, the FTX Group opened non-custodial accounts for Alameda Research LLC with Silvergate. In or around March 2019, the FTX Group opened additional non-custodial accounts for Alameda Research Ltd. with Silvergate. The FTX Group represented to Silvergate, in an Alameda account application listing Bankman-Fried as the principal officer, that Alameda was "[b]uying and selling digital currency with [its] own capital,"

was a "[p]roprietary trading firm," and was "No[t]" a money services business ("MSB").[7] That application also represented that Alameda's accounts would be for "[b]uying and selling crypto with personal funds," "paying company expenses," and "[t]ransfers to Silvergate counterparties." At around the same time, in a questionnaire signed by Alameda Research LLC COO Andrew Croghan, the FTX Group made similar representations about its description of Alameda's business, and it again stated that it was "not required to hold [a] license[]" for being a "registered money services business." Alameda did not state that it would use the accounts to hold any funds of third parties, and certainly not the customers of an affiliated cryptocurrency exchange with no Silvergate account that had never undergone Silvergate's due diligence process.

15. The FTX Group ***never*** opened—or even sought to open—custodial accounts for Alameda, and therefore, Alameda was not subject to the heightened due diligence (both onboarding and ongoing) that was mandatory for custodial accounts. During the parties' dealings, the FTX Group never disclosed to Silvergate—and actively sought to prevent Silvergate from learning, including through subsequent misleading statements—that the Alameda accounts were being used to receive customer deposits and fund customer withdrawals for the FTX.com exchange, in direct contravention of the stated purposes of those accounts. Indeed, although these accounts were explicitly ***not*** opened for the purpose of receiving and transmitting their customers' funds, that is exactly how the FTX Group used the accounts.

16. The FTX Group's efforts to conceal its fraudulent, custodial use of Alameda's non-custodial accounts included making additional subsequent misrepresentations and misleading statements to Silvergate, including after the FTX Group had engaged in that fraudulent misuse of

[7] A money services business includes any person or entity doing business in the capacity of, among other things, (i) a currency dealer or exchanger, or (ii) a money transmitter. 31 C.F.R. § 1010.100(ff).

the Alameda accounts. For example, in late 2020 when the FTX Group submitted its custodial account application for West Realm Shires Services Inc. (which listed Bankman-Fried as CEO and Daniel Friedberg as Chief Compliance Officer), it perpetuated the false representation that Alameda is "a trading firm that trades crypto for its own account." By this time, however, the FTX Group had already fraudulently used the Alameda accounts to hold customer funds. In addition, when opening a "Euro" account for Alameda in February 2021, Bankman-Fried signed and submitted a questionnaire that again described Alameda as "[b]uying and selling digital currency with own capital" and as a "[p]roprietary trading firm"—the same misrepresentations at account opening—with no mention of the fraudulent, custodial misuse of the Alameda accounts, as further described below.

B. The FTX Group Abandons Effort for FTX Trading Ltd. Custodial Account

17. In or around October 2019, shortly after FTX Trading Ltd. (the parent holding company of the FTX.com cryptocurrency trading platform) was founded, the FTX Group approached Silvergate to explore opening a custodial account for FTX Trading Ltd. Ryan Salame, an employee of the FTX Group, emailed Silvergate and stated that the purpose of the proposed account was "to allow direct USD deposits/withdrawals" for its (i.e., FTX.com) customers. In the same email, Salame represented that "[w]e run a standard and strict KYC/AML program as well as utilize Chainalysis for further review and security."

18. Consistent with Silvergate's standard procedures for custodial accounts, Silvergate made clear that FTX Trading Ltd. (or FTX.com) would need to be licensed and registered as an MSB in the United States and, accordingly, that it would be subject to enhanced onboarding and periodic due diligence measures to open a custodial account. Silvergate then described the onboarding process for a custodial account, including the lengthy list of documents and

information that would be required, and advised the FTX Group that the process would take considerable time.

19. Faced with Silvergate's rigorous onboarding requirements, including in particular with respect to custodial accounts, the FTX Group abandoned its effort with respect to an account for FTX Trading Ltd. Thus, the FTX Group ***never*** opened any custodial account for FTX Trading Ltd. Indeed, FTX Trading Ltd. never sought to open, and therefore never did open, *any* Silvergate account whatsoever.

C. The FTX Group Fraudulently Uses Alameda Non-Custodial Accounts to House Customer Funds to Further the FTX Group's Fraud

20. Having abandoned its efforts to open a custodial Silvergate account to hold the capital of FTX.com customers, the FTX Group—between at least November 2019 and August 2020—directed FTX.com customers, on instructions printed on Alameda letterhead, to wire their deposits to Alameda's non-custodial accounts at Silvergate. Silvergate was not informed of, and did not consent to, those instructions or the FTX Group's use of Alameda's non-custodial accounts to receive FTX.com customer deposits. Even after that period with formal written instructions to FTX.com customers, the FTX Group continued directing, welcoming, and accepting customer deposits into the Alameda non-custodial accounts, again, without ever disclosing to Silvergate that it was soliciting and channeling customer funds into accounts that it had opened for non-custodial purposes only.

21. Such conduct directly contradicted the representations the FTX Group made in the Alameda account applications, which described the Alameda accounts not as custodial accounts but as accounts to be funded solely with Alameda's own capital. Those misrepresentations were

also material in enabling the FTX Group to evade heightened EDD measures throughout the pendency of the Silvergate accounts.[8]

D. The FTX Group Opens Non-Custodial Accounts for North Dimension and Fraudulently Uses the Account to Hold Customer Funds to Further the FTX Group's Fraud

22. In or around August 2020, Delaney Ornelas, an FTX Group employee, requested to open non-custodial trading and SEN accounts for a new entity, North Dimension. The North Dimension application (with Bankman-Fried listed as CEO), submitted by Ornelas, represented that (1) North Dimension was an OTC cryptocurrency trading business, and (2) the accounts would be for the company to profit from trading for its own account, with wires to be coming in from OTC trading customers, and wires/SEN transfers out destined for cryptocurrency exchanges for trading. Because these representations described a company using its own capital to trade with arm's-length counterparties—rather than receiving, holding, or transmitting funds belonging to its own customers—such an account would appropriately be qualified as non-custodial under Silvergate's onboarding procedures.

23. Consistent with its standard onboarding procedures, Silvergate conducted extensive due diligence on the North Dimension application over a period of approximately eight months. The process included, among other things, review of the application materials, corporate documentation, and compliance representations that the FTX Group provided. Relying on the

[8] These were not the only misrepresentations of this character the FTX Group made regarding Alameda accounts.

For example, in May 2020, a representative of a bank where Alameda maintained an account that received customer deposits wrote to Alameda that he "noticed references to 'FTX,' a related company that offers crypto derivatives exchange services and is also owned by Samuel Bankman-Fried." Second Interim Report of John J. Ray III to the Independent Directors: The Commingling and Misuse of Customer Deposits at FTX.com at 10-11, Dkt. No. 1704-1 ("Second Ray Report"). Given this observation, the representative asked whether the account would "be[] used to settle trades for their derivatives exchange platform (FTX Trading)?" *Id.* at 11. Rather than tell the truth to the bank—i.e., that it not only intended to, but had in fact been using the Alameda account for FTX.com customer transactions for nearly a year—the FTX Group lied. Specifically, at the direction of a senior FTX Group executive, an Alameda employee falsely responded that "customers occasionally confuse FTX and Alameda" but that "all incoming/outgoing wires are to settle trades with Alameda Research." *Id.*

information and representations provided by the FTX Group—all of which, as described below, were deliberately false and fabricated by the FTX Group—Silvergate approved the application and opened the North Dimension non-custodial account in April 2021.

24. Unbeknownst to Silvergate, however, North Dimension had no business operations and no employees. As was later revealed, North Dimension was a shell company formed solely for the purpose of executing and maintaining the FTX Group's fraudulent scheme. Contrary to the representations in North Dimension's application, the North Dimension account was ultimately used by the FTX Group to facilitate and house deposits from FTX.com exchange customers. To conceal North Dimension's true nature and its intended role in the FTX Group's fraud, the FTX Group repeatedly and knowingly lied to Silvergate. Upon the Trust's information and belief, these lies included:[9]

- ***First***, the general counsel of Alameda and chief compliance officer of FTX.US, Friedberg, "instructed an FTX Group employee to copy and paste into the application for North Dimension's bank accounts the information that Alameda had previously submitted on its own applications to open its bank accounts" at Silvergate.[10] The FTX Group "employee did so, and as a result, the application submitted to [Silvergate] falsely represented that North Dimension 'operates a cryptocurrency trading business.' "[11] This was a lie; North Dimension did not operate any business at all.[12]

- ***Second***, in December 2020, in response to a due diligence questionnaire that Silvergate required as part of the application process for trading businesses, the FTX Group falsely described North Dimension as follows—with Bankman-Fried personally signing and

---

[9] More examples of the FTX Group's deception are likely to be revealed through discovery.

[10] *Id.* at 18.

[11] *Id.*

[12] Friedberg's lies in furtherance of the FTX Group's fraud were not limited to the North Dimension application. Among other things, Friedberg "conceived of, drafted and backdated—by nearly two years—a sham intercompany agreement" to conceal the FTX Group's misuse of customer funds, and presented it to an external auditor, resulting in false and misleading financial statements. *Id.* at 21–23.

Allegedly, too, before Friedberg joined Alameda and FTX.US, he, through a letter on outside counsel's official firm letterhead, made a false representation to institutional investors and lenders seeking to extend credit or capital to FTX.com or Alameda, upon which commercial decision-makers acted in reliance. Friedberg represented that the firm knew the principal of Alameda and—the falsity—considered him to be of high reputation in the industry.

certifying that the responses were "correct and complete to the best of his knowledge and belief":[13]

- that North Dimension was *not* an MSB, which was a lie because the FTX Group intended to (and did) use the North Dimension account as an MSB to receive and transmit FTX.com customer funds;

- that North Dimension was "a proprietary and OTC trading firm with 2,000 counterparties and average monthly trading volume of $10 million,"[14] which was a lie because North Dimension had no counterparties, no trading activity, and no employees; and

- that the purpose of the North Dimension account was to profit from trading for its own account, and that expected funds would be wires in from OTC customers and wires/SEN transfers out to exchanges for trading, which was a lie because the true purpose of the North Dimension account was to use it as a custodial account for customer funds and perpetuate the FTX Group's fraudulent scheme.

- ***Third***, when Silvergate requested a copy of North Dimension's corporate register, as required to open the accounts, Friedberg directed FTX Group employees to knowingly fabricate a false and misleading corporate register and provide it to Silvergate—a document manufactured to give the shell company the appearance of legitimate governance.

- ***Fourth***, although North Dimension was a shell company with no officers, no counsel, and no compliance function, the FTX Group represented the general counsel of Alameda, Friedberg, "in a false and misleading fashion as North Dimension's General Counsel and Chief Compliance Officer," including through the application signed by Bankman-Fried.[15]

25. The FTX Group's lies about North Dimension were deliberate and material. The FTX Group made these false statements "to give North Dimension, a purely shell company, a false air of legitimacy."[16] And critically, the FTX Group made these lies to allow the North Dimension application to bypass the enhanced onboarding due diligence (which would have included, for example, an independent audit of North Dimension's own BSA and AML policies, procedures,

---

[13] *Id.* at 18.

[14] *Id.*

[15] *Id.* at 18–19.

[16] *Id.* at 19.

and processes) or the registration and licensing required as an MSB—measures that would have been applied had the FTX Group disclosed to Silvergate the true purpose of the North Dimension account (*i.e.*, receiving and processing FTX.com customer deposits).

26. Once the North Dimension accounts were opened, the FTX Group directed FTX.com customer deposits to the North Dimension account, where an automated, back-end process on FTX.com's internal books credited customers on the FTX.com exchange, and then the FTX Group transferred those custodial funds to Alameda's non-custodial accounts at Silvergate to be used for illicit purposes. Indeed, Caroline Ellison, the former CEO of Alameda, testified that Bankman-Fried set up the systems that allowed Alameda to take the money and directed FTX Group employees to take customer money to repay the FTX Group's loans, confirming that the FTX Group intentionally misappropriated billions in FTX.com customer funds through, *inter alia*, the use of the FTX Group's Silvergate accounts.

* * *

27. The FTX Group's lies and fabrications, facilitated through repeated acts by several individuals at numerous FTX Group entities, were not isolated acts; they formed a sustained pattern of deception to prevent Silvergate from learning the true nature of the FTX Group's use of its accounts and from deploying the safeguards Silvergate had specifically designed to curtail the risks of such uses. At every stage—from the concealment of FTX.com customer deposits flowing through Alameda's accounts (which had been approved for proprietary trading purposes only), to the fabrication of an entirely new entity with a false identity (North Dimension), to the creation of forged documents to support that false identity—the FTX Group deliberately circumvented Silvergate's compliance safeguards.

E. The FTX Group Executed Binding Contracts with Silvergate, Agreeing, Among Other Things, to Broadly Indemnify Silvergate for All Losses

28. To open accounts with Silvergate, the respective FTX Group entities, including, but not limited to, Alameda Research LLC, Alameda Research Ltd., FTX Digital Markets Ltd., North Dimension Inc., Quoine Pte Ltd., and West Realm Shires Services Inc., entered into Cash Management and Treasury Services Agreements ("CMTS Agreements") and Deposit Account Agreement and Regulatory Disclosures ("DAARDs") among other account opening materials and agreements, with Silvergate Bank.

29. The CMTS Agreements all contain indemnification provisions in favor of Silvergate that cover losses it incurs as a result of actions by the applicable FTX Group customer or its employees or agents. Specifically, the CMTS Agreements each provide:

> **Indemnity by You.** You [the applicable FTX Group customer] agree to defend, indemnify and hold the Bank harmless against any loss, liability or expense (including attorneys' fees and expenses) resulting from or arising out of: (a) any acts or omissions by you or your employees or agents; (b) any claims against the Bank from a third party resulting directly or indirectly under this CMTS Agreement where the Bank has acted in accordance with your instructions and/or within the terms of this CMTS Agreement; and (c) any breach by you or your employees or agents of any representation, warranty, covenant or agreement made pursuant to or in this CMTS Agreement. Nothing contained in this CMTS Agreement will be deemed to relieve you of any liability, duty, or obligation which may be imposed upon you by any Applicable Laws or Regulations.

The FTX Group submitted false and misleading account applications, furnished fabricated corporate documents, certified inaccurate information as true, used accounts for purposes neither disclosed to nor authorized by Silvergate, and failed to disclose changes in account usage. At a minimum, this conduct constitutes acts or omissions by the FTX Group and its employees and agents and breaches of representations.

30. The CMTS Agreements also contain certain warranty provisions, under which each applicable FTX Group entity represented and warranted, among other things, that each "Entry

complies with all local, state and federal regulations, including but not limited to the Electronic Fund Transfer Act, Regulation E, if applicable or the Uniform Commercial Code Article 4A, if applicable, and any applicable regulations issued by the Office of Foreign Assets Control[.]" The FTX Group's conduct breached such representations. For example, North Dimension was operating as an unregistered MSB—receiving and transmitting FTX.com customer deposits—in violation of federal law, having falsely represented to Silvergate that it was not operating and would not operate as an MSB. Every ACH Entry originated by and through North Dimension while it operated its Silvergate accounts was therefore in violation of federal regulations.

31. Separately, the DAARDs all provide that, in opening an account on behalf of an entity, the FTX Group must provide appropriate documentation and certify that the information contained therein is true and accurate to the best of its knowledge. Specifically, the DAARDs provide:

> **Information You Provide Us**
>
> When you open an account with Silvergate Bank, you provide us with information about yourself and confirm that it is correct. We keep this information in our records. We may rely on that information until you notify us of a change, and we have had a reasonable amount of time to act on the new information.

Breaching this requirement, the FTX Group knowingly submitted false information to Silvergate, both around the time of the account opening and on an ongoing basis, failing to ever notify Silvergate when the use of its accounts changed from the purposes represented in the applications.

32. The DAARDs further incorporate the account-opening applications into the DAARDs themselves:

> **Introduction**
>
> . . .
>
> When you open an account at Silvergate Bank, you agree to the terms and conditions described in this Deposit Account Agreement and Regulatory

> Disclosure, the signature card, the Schedule of Fees and Charges, the Deposit Interest Rate Schedule, and the application (collectively, "Agreement").

As described herein, the FTX Group knowingly breached the account applications by, among other things, providing false information, including falsely describing North Dimension as a proprietary trading firm, falsely representing that North Dimension would not operate as an MSB, and falsely representing that Alameda's accounts would be used for proprietary trading and not to house third-party (customer) funds.

## III. The FTX Group's Fraud is Revealed, and the FTX Group Collapses

33. In early November 2022, an internet news organization leaked what appeared to be Alameda's balance sheet, revealing publicly that much of its $14.6 billion in assets consisted of the FTX Group's own proprietary token, FTT, which was illiquid and difficult to value, triggering a crisis of confidence.

34. On or about November 7, 2022, Bankman-Fried posted a series of false and misleading tweets, publicly stating that FTX.com "has enough to cover all client holdings" and "do[es]n't invest client assets."[17] In truth, FTX.com had only $4 billion to cover $12 billion in customer holdings on the FTX.com exchange and had otherwise loaned customer assets to Alameda for illicit purposes such as high-risk investments.

35. Between November 6 and 8, 2022, FTX.com customers withdrew approximately $6 billion from the exchange. On November 11, 2022, Bankman-Fried resigned from FTX Trading Ltd. and FTX.US. That same day, the FTX Group entities, approximately one hundred affiliated entities, filed voluntary petitions for relief under chapter 11 of the Bankruptcy Code in the United States Bankruptcy Court for the District of Delaware.

---

[17] Superseding Indictment ¶ 49, Dkt. No. 80, *United States v. Bankman-Fried*, No. 1:22-cr-00673-LAK (S.D.N.Y. Feb. 23, 2023) ("Superseding Indictment").

36. On December 13, 2022, the Department of Justice (the "DOJ") unsealed an eight-count indictment against Bankman-Fried, charging him with two counts of wire fraud, two counts of wire fraud conspiracy, conspiracy to commit commodities fraud, conspiracy to commit securities fraud, conspiracy to commit money laundering, and conspiracy to defraud the United States and violate the campaign finance laws.

37. In February 2023, a federal grand jury returned the Superseding Indictment,[18] charging Bankman-Fried with, among other new crimes, conspiracy to commit bank fraud against Silvergate, identified as "Bank-1" in the Superseding Indictment.[19]

38. The grand jury found and charged the following specific facts (among others) regarding the FTX Group's fraud against Silvergate:

- When the FTX Group asked Silvergate to open a custodial account for FTX Trading Ltd. (or FTX.com), "[Silvergate] made clear" "that it would not open an account for customer deposits and withdrawals absent evidence that FTX[.com] was licensed and registered, including federal registration as a money services business, and that, in any event, [Silvergate] would need to conduct an enhanced due diligence process before opening any account used to process customer deposits and withdrawals."[20]

- Bankman-Fried directed the incorporation of North Dimension "[i]n part to obscure the relationship between FTX[.com] and Alameda, and in order to overcome [Silvergate]'s refusal to open a bank account for FTX[.com] without extensive due diligence and licensing."[21]

- "BANKMAN-FRIED and others chose the name 'North Dimension' in part to conceal that there was a relationship between North Dimension and Alameda from FTX[.com] customers and from banks approving transactions with the North Dimension bank account."[22]

---

18 This More Definite Statement incorporates by reference the allegations in the Superseding Indictment, to the extent not inconsistent with the allegations herein.

19 *Id.* ¶¶ 15, 80–82.

20 *Id.* ¶ 15.

21 *Id.* ¶ 17.

22 *Id.*

- "Aware of the fact that [Silvergate] would not open an exchange account or account for receiving customer deposits for an entity without the appropriate registration and enhanced due diligence," Bankman-Fried "and other Alameda employees told [Silvergate] a false story" about North Dimension and its purpose.[23]
    - FTX Group employees "completed an account application that falsely stated that the purpose of the North Dimension bank account was for 'trading' and 'market making.' "[24]
    - Silvergate was "given a completed North Dimension due diligence questionnaire" signed by Bankman-Fried "that falsely stated that North Dimension 'trades on multiple cryptocurrency exchanges worldwide for its own account,' " "that North Dimension 'also participates in direct peer-to-peer, OTC purchases and sales with certain third parties for its own account,' " and "that North Dimension was not a money services business."[25]
- "[Silvergate] approved the opening of the North Dimension account, without enhanced due diligence or review by [Silvergate's] executive committee, as would have been required had the true purposes of North Dimension's account been disclosed to [Silvergate]."[26]

39. In November 2023, after a five-week trial and approximately three hours of deliberation, a jury convicted Bankman-Fried on all counts presented for verdict.[27] Bankman-Fried was sentenced to 25 years' imprisonment.

---

[23] *Id.* ¶ 18.

[24] *Id.*

[25] *Id.*

[26] *Id.* ¶ 19.

[27] Although the Superseding Indictment charged Bankman-Fried with conspiracy to commit bank fraud against Silvergate, that count was severed from the remaining counts and not presented to the jury at trial because of delays in resolving procedural questions regarding the extradition treaty with The Bahamas.

Regardless of the severing of the bank fraud count against Silvergate, the DOJ's evidence at trial more than established the fraud on Silvergate. Indeed, after achieving its conviction of Bankman-Fried on the charges presented at the November 2023 trial, the DOJ chose not to pursue a second trial on the severed counts because "much of the evidence that would [have been] offered in a second trial was already offered in the first trial and [could] be considered by the Court at" Bankman-Fried's sentencing. DOJ Letter at 1. In particular, the DOJ explained, "The evidence at trial, including witness testimony and documentary evidence, proved that the defendant . . . made false statements to [Silvergate] to induce it to open a bank account that he used in furtherance of his other fraudulent schemes." *Id.* at 2.

40. In addition to Bankman-Fried, other high-ranking members of the FTX Group were convicted of fraud arising from their respective roles in the FTX Group's scheme.

41. On December 21, 2022, Caroline Ellison, the former CEO of Alameda, pleaded guilty to seven criminal counts: two counts of wire fraud, two counts of conspiracy to commit wire fraud, and one count each of conspiracy to commit commodities fraud, conspiracy to commit securities fraud, and conspiracy to commit money laundering. These charges included allegations of criminal behavior in connection with the improper lending of FTX.com customer funds to Alameda to help support Alameda as it faced liquidity crunches around the time the cryptocurrency market crashed in Spring 2022.

42. Also on December 21, 2022, Gary Wang, the co-founder and former Chief Technology Officer of FTX.com, pleaded guilty to four criminal counts: wire fraud, conspiracy to commit wire fraud, conspiracy to commit commodities fraud, and conspiracy to commit securities fraud. These charges included allegations that Wang crafted the software code that enabled Alameda to divert FTX.com customer funds for its own trades.

43. On February 28, 2023, Nishad Singh, an early employee of FTX.com and leader of the FTX Group's cybersecurity team, pleaded guilty to six criminal counts: wire fraud, conspiracy to commit wire fraud, conspiracy to commit commodities fraud, conspiracy to commit securities fraud, conspiracy to commit money laundering, and conspiracy to make unlawful political contributions and defraud the Federal Election Commission. These charges included allegations that Singh was responsible for creating software code that enabled Alameda to misappropriate FTX.com customer assets and that Singh personally misappropriated millions of dollars of assets, including FTX.com customer assets.

44. In addition, on September 7, 2023, Ryan Salame, head of OTC at Alameda before becoming co-CEO of FTX Digital Markets Ltd., pleaded guilty to two criminal counts: conspiracy to operate an unlicensed money transmitting business and conspiracy to make unlawful political contributions and defraud the Federal Election Commission. The unlicensed money transmitting business charge included allegations that Salame conspired with other FTX Group employees to unlawfully use FTX.com, Alameda, and North Dimension to transmit FTX.com customer funds without a license, and that the conspirators and others made false statements to Silvergate (identified as "Bank-1") to receive the account without the EDD that Silvergate would have required had the FTX Group not hidden the account's true purpose.

## IV. The FTX Group's Fraud Could Not Reasonably Be Detected by Silvergate

45. Silvergate did all it could to protect itself from bad actors like the FTX Group entities. But the FTX Group's lies and concealment prevented Silvergate from uncovering the FTX Group's fraud and misconduct, despite Silvergate's design and use of financial controls that third parties deemed satisfactory.

### A. Silvergate's Compliance Processes Did Not—and Could Not—Reveal the FTX Group's Misconduct

46. Silvergate maintained multiple compliance processes to detect and prevent the misuse of its banking services, and Silvergate took action whenever those processes identified concerns. Where suspicious activity was observed through one of the compliance processes, Silvergate took action. As just one example, Silvergate conducted investigations into any flagged transactions and held a "compliance to compliance" call with the FTX Group as necessary to discuss observations and action plans.[28]

[28] Silvergate also had obligations regarding SARs and the Financial Crimes Enforcement Network. The Trust is precluded by statute from providing additional detail in connection with any SARs. *See, e.g.*, 31 U.S.C. § 5318(g)(2).

47. The specific compliance processes Silvergate employed included (1) onboarding due diligence, through which Silvergate evaluated prospective customers before opening accounts, (2) periodic EDD reviews, through which Silvergate reassessed existing accounts on a risk-based schedule, (3) automated transaction monitoring, through which Silvergate's systems flagged potentially anomalous activity in real time, and (4) consideration of independent third-party assessments of its customers' own BSA/AML controls. As described herein, none of these processes revealed the FTX Group's misuse of Silvergate's banking services to further its fraudulent scheme because the FTX Group's sustained deception was designed to prevent each of them from doing so.

48. ***Onboarding***. As detailed above, Silvergate onboarded all applicable FTX Group entities as Silvergate customers pursuant to its standard policies and procedures, including the BSA/AML Compliance Program. As a matter of regular practice, Silvergate did not onboard any entities—FTX Group entities or otherwise—that did not comply with Silvergate's onboarding requirements. Such was the case with FTX Trading Ltd., which, as set forth above, was apprised of the rigorous onboarding requirements to open a custodial account and ultimately chose to abandon any effort to open a Silvergate account.

49. ***Periodic EDD Reviews***. After the applicable FTX Group entities' accounts were onboarded, each FTX Group entity account was assigned a risk score, based on the entity's information and representations provided at onboarding, that determined the cadence of EDD periodic reviews. Pursuant to Silvergate's policy, the non-custodial accounts—including the North Dimension trading account and the Alameda market-making and operating accounts—received EDD reviews approximately every six months. Custodial accounts, on the other hand, received

EDD reviews approximately every three months, reflecting the heightened risk associated with such accounts.

50. ***Automated Transaction Monitoring***. In addition to the periodic EDD reviews, Silvergate utilized automated systems to monitor transactions and detect any suspicious activity. These automated monitoring systems flagged, for example, instances in which the FTX Group's transaction volume exceeded expected levels. As with many other digital asset customers during this period, such spikes occurred from time to time. In September 2022, for example, SEN transfers involving FTX.US's accounts were analyzed and deemed reasonable because FTX.US's account application stated that its SEN account would be funded principally by its custodial account, and the observed flow of funds appeared to consist of routine fiat transfers from third parties buying and selling digital assets on the FTX.US platform.

51. As another example, Silvergate also took affirmative steps to address elevated fraud rates observed, including suspected social engineering fraud targeting mainly elderly customers at FTX.US. In September 2021 and again in June 2022, Silvergate identified increases in the number of fraud-related wire recalls involving FTX.US. Silvergate promptly met with FTX.US to address the issue, in response to which FTX.US took measures to reduce its fraud recall rates. For example, in July 2022, FTX.US committed to implementing additional measures at Silvergate's request. Overall, in the months preceding the FTX Group's collapse, observed fraud recall rates for Silvergate's cryptocurrency exchange customers demonstrated Silvergate's strong commitment to, and implementation of, its due diligence policies and procedures.

52. ***Consideration of Third-Party Assessments of Custodial Account Holders' Controls***. For custodial accounts, Silvergate's diligence process went beyond its own internal reviews of its counterparties, including the FTX Group entities. As part of its EDD process,

Silvergate also considered assessments of the relevant FTX Group entities' BSA/AML controls performed by independent third parties. For instance, Silvergate's EDD reviews for the FTX.US custodial account included review of a third-party audit performed by E3 Technology, Inc. in late 2021, which evaluated FTX.US's BSA/AML compliance program's adherence to applicable federal laws, including the BSA. That audit assessed FTX.US's program as adequate and meeting current regulatory requirements. In addition, the audit found the program to have been implemented in such a manner as to provide assurance of compliance with applicable federal and state laws and regulatory requirements related to BSA/AML activities. The audit included no reportable findings of non-compliance. These independent assessments further reinforced Silvergate's reasonable belief, based on the information available to it, that the FTX Group entities were operating their accounts at Silvergate in accordance with their stated purposes and applicable law.

53. In sum, at every stage—from initial onboarding through periodic EDD reviews and transaction monitoring—Silvergate conducted appropriate, risk-based diligence on the FTX Group entity accounts, calibrated to the account types and purposes as represented by the FTX Group. Nothing in the information available to Silvergate, whether from its own review, third-party assessments, or the FTX Group's own representations, revealed the FTX Group's fraud or improper conduct. And, as independent investigations would confirm years later, the FTX Group's sustained and deliberate deception was specifically designed to prevent Silvergate's compliance processes from detecting the true nature of the FTX Group's use of its accounts.

B. Silvergate's BSA Program was Evaluated by Third Parties and Deemed Satisfactory

54. Silvergate regularly commissioned third parties to assess Silvergate's compliance with BSA regulatory requirements, and those third parties routinely concluded Silvergate's

BSA/AML Compliance Program was satisfactory.[29] Each independent audit in 2018, 2019, 2020 and 2021 found Silvergate's BSA/AML Compliance Program to be appropriate for its risk profile, and any recommendations for enhancement were implemented by Silvergate. A 2022 third-party progress summary likewise identified that Silvergate undertook a comprehensive effort to strengthen its BSA/AML policies, procedures, and controls, ensuring that its BSA/AML Compliance Program meets or exceeds all applicable legal and regulatory requirements, supervisory expectations, and industry best practices.

55. Independent third-party review in January 2022 also validated that the automated transaction monitoring system in place at the time was appropriate and functioning as intended. The review determined that Silvergate was using the system and its features adequately and that the system was detecting potential unusual and suspicious activity in higher-risk areas based on Silvergate's BSA/AML risk profile.

C. Independent Third Parties Confirmed That Silvergate Was Unaware of the FTX Group's Fraud

56. Furthermore, independent investigations confirm that Silvergate had no actual knowledge of—nor was willfully blind to—the FTX Group's fraud before it was publicly revealed. *First*, in connection with Silvergate's bankruptcy cases, Silvergate formed an Internal Investigation Committee (the "Investigation Committee"), which included an independent director, to investigate potential claims or causes of action against Silvergate's then-current or former directors and officers. The Investigation Committee conducted a comprehensive review of documents from Silvergate, Silvergate's counsel, counsel for certain former Silvergate employees,

---

[29] Silvergate's regulators also assessed Silvergate's BSA/AML Compliance Program; any discussion of such assessments is forthcoming upon receipt of the necessary regulatory approvals. *See, e.g.*, 12 C.F.R. § 261.2(b).

and publicly available sources, and conducted interviews with then-former directors, officers, and employees of Silvergate.

57. Ultimately, the Investigation Committee found "no reason to suspect that the directors were complicit in or had actual knowledge of the FTX/Alameda fraud prior to public reports of a potential fraud" and made the same finding as to Silvergate's officers.[30] The investigation also confirmed that Silvergate was not willfully blind to the FTX Group's fraud. Silvergate's lack of actual knowledge was reasonable given the breadth of the fraud, which prevented Silvergate's compliance processes, rules, and procedures from detecting the fraud before it became public.

58. The Investigation Committee also found no "reason to suspect that the officers intentionally turned a blind eye toward compliance issues with regard to FTX/Alameda and their affiliates," and confirmed that "the FTX/Alameda entities were subject to the same compliance processes as other Silvergate clients, including periodic EDD reviews."[31] As explained above, those compliance processes were consistently deemed satisfactory by independent third parties, Silvergate reasonably believed the compliance processes to be satisfactory, and the periodic EDD reviews identified no red flags of unlawful behavior that Silvergate ignored.

59. *Second*, the findings of the Investigation Committee were independently corroborated by Quinn Emanuel Urquhart & Sullivan, LLP ("Quinn Emanuel"), special counsel to the FTX Group in these chapter 11 cases. Quinn Emanuel likewise investigated Silvergate and found that, although the FTX Group transferred funds "from 'for the benefit of' or 'FBO' accounts into operating accounts"—a practice that "could signal the misuse of customer funds"—"the FTX

[30] Report of the Internal Investigation Committee of the Board of Directors of Silvergate, Inc. at 97, 108–09, Dkt. No. 689-1, *In re Silvergate Capital Corp., et al.*, No. 24-12158-KBO (Bankr. D. Del. May 5, 2025).

[31] *Id.* at 109.

Group failed to properly designate all FBO accounts" at Silvergate, thereby "impair[ing] Silvergate's ability to detect any wrongdoing" by the FTX Group.[32]

## V. Silvergate Suffered Substantial Harm Due to the FTX Group's Misconduct

### A. The FTX Group's Misconduct Triggered a Run on Silvergate, Resulting in Its Collapse and Destruction of Its Going-Concern Value

60. The revelation of the FTX Group's elaborate fraud in November 2022 and its subsequent collapse triggered an unavoidable and direct domino effect that inflicted irrevocable harm on Silvergate. First, the revelation of the FTX Group's fraud triggered a catastrophic bank run on Silvergate. Indeed, in the fourth quarter of 2022 alone, in the wake of the FTX Group's public collapse, Silvergate's deposits declined by $6.9 billion (a 52.4% drop). The bank run triggered a severe liquidity crisis for Silvergate, forcing Silvergate to sell billions of dollars in securities to meet its obligations amid sustained lower deposit levels. In particular, Silvergate was forced to sell approximately $5.2 billion of unmatured debt securities into a market already cratered by the FTX Group's misconduct and collapse, resulting in a loss of approximately $751.4 million. Moreover, the FTX Group's misconduct caused Silvergate to draw on its revolver with the Federal Home Loan Bank of San Francisco ("FHLB-SF"). Silvergate's FHLB-SF borrowings increased from approximately $700 million as of September 30, 2022, to approximately $4.3 billion outstanding by year end, with those borrowings scheduled to mature in early 2023. Additionally, by the end of March 2023, FHLB-SF required Silvergate to pay down its borrowings to 25% of its total assets. Thus, to satisfy its FHLB-SF obligations and to accommodate its sustained lower deposit levels, Silvergate was forced to sell additional investment securities into a cratered market at a significant loss.

---

[32] Report of Robert J. Cleary, Examiner at 154, Dkt. No. 15545 (citing Quinn Emanuel, *Presentation Regarding FTX Professionals, Legal Insiders, and Venture Investments to Chapter 11 Examiner Robert J. Cleary, Esq*., Mar. 22, 2024).

61. Months of financial insecurity resulting from the FTX Group's misdeeds prompted Silvergate, in early 2023, to explore ways to maximize its going-concern value with its financial advisors. But by then the FTX Group's fraud had already inflicted widespread damage on the digital asset industry, caused substantial financial harm to Silvergate, and subjected Silvergate's business to heightened regulatory scrutiny,[33] leaving Silvergate with no viable choice but to voluntarily liquidate. Accordingly, on March 8, 2023, Silvergate announced its intent to wind down and voluntarily liquidate. Promptly thereafter, Silvergate began working closely with regulators to wind down and liquidate in an efficient and legally compliant manner. On September 17, 2024, Silvergate filed its voluntary petitions for chapter 11 bankruptcy.

62. The FTX Group's wrongdoing thus destroyed the going-concern value of a franchise that Silvergate built since 1986, including its future earnings stream, goodwill, and reputation, resulting in the loss of hundreds of millions, if not billions, of dollars in lost enterprise value.[34]

B. Silvergate Incurred Regulatory Penalties Caused by the FTX Group's Fraudulent Use of Silvergate's Accounts

63. The public revelation of the FTX Group's fraud—and Silvergate's banking services being used by the FTX Group to perpetuate its fraud (unbeknownst to Silvergate)—set off years of regulatory investigations into Silvergate by the Federal Reserve Board, the DFPI, and the

---

[33] In the midst of the FTX Group's collapse, the Federal Reserve, the FDIC, and the Office of the Comptroller of the Currency (together, the "Federal Bank Regulatory Agencies") on January 3, 2023, released their Joint Statement on Crypto-Asset Risks to Banking Organizations (the "First Joint Statement"). In the First Joint Statement, the Federal Bank Regulatory Agencies publicly advised for the first time of their "significant safety and soundness concerns with business models that are concentrated in crypto-asset-related activities or have concentrated exposure to the crypto-asset sector." At the time of the First Joint Statement, Silvergate Bank's remaining deposit base was highly concentrated with crypto-asset related depositors, as it had been for several years.

[34] To illustrate the scale of value destruction, Silvergate's stock, which had reached a high of approximately $219 per share in November 2021, had fallen to $50.96 per share by November 7, 2022, and to $18.73 per share by December 14, 2022—a two-year low—in the weeks following the FTX collapse, with roughly $4 billion in market capitalization erased over the course of 2022.

Securities and Exchange Commission (the "SEC"). Those investigations centered on Silvergate's BSA/AML Compliance Program, including specifically in connection with the FTX Group and other crypto-asset related customers. The Federal Reserve Board and DFPI investigations focused on purported deficiencies in Silvergate's monitoring of internal transactions through the SEN, in the context of transfers of Silvergate customers, such as the FTX Group, "engaged in buying and selling crypto-assets,"[35] and the SEC investigation scrutinized whether Silvergate and its officers made false or misleading public statements regarding the effectiveness of that program, including as it pertained to the FTX Group. To be clear, any such purported deficiencies became the central focus of regulatory scrutiny because of the blockbuster revelation, in November 2022, that the FTX Group was using Silvergate's SEN network not for transactions between approved Silvergate customers, but rather for transactions involving customer funds from entities with no Silvergate account that had not been subject to any Silvergate due diligence. As such, the FTX Group's fraudulent concealment of the true nature and purpose of the transactions flowing through its accounts at Silvergate—and not any known deficiency in the design or operation of Silvergate's monitoring systems—proximately caused the intense regulatory scrutiny that fell upon Silvergate in the wake of the collapse of the FTX Group's fraudulent scheme.

64. The regulatory investigations culminated in Silvergate incurring approximately $63 million in regulatory penalties in or about June and July 2024: (i) a $43 million civil monetary penalty imposed by the Federal Reserve Board, and (ii) a $20 million civil monetary penalty

[35] Order of Assessment of Civil Money Penalty Issued Upon Consent Pursuant to the Federal Deposit Insurance Act, as Amended, at 2, *In re Matter of Silvergate Cap. Corp. & Silvergate Bank*, Nos. 24-013-CMP-HC, 24-013-CMP-SM (Fed. Rsrv. Bank June 4, 2024), https://www.federalreserve.gov/newsevents/pressreleases/files/enf20240701a1.pdf; Consent Order at 3, *Comm'r of Fin. Prot. and Innovation v. Silvergate Cap. Corp. & Silvergate Bank*, Banking License No. 1824 (Cal. Dep't of Fin. Prot. & Innovation June 26, 2024), https://dfpi.ca.gov/wp-content/uploads/sites/337/2024/06/Consent-Order-Silvergate-Bank.pdf.

imposed by the DFPI.[36, 37] Each consent order entered into with these agencies cited to alleged deficiencies regarding SEN transactions, in the context of Silvergate's crypto-asset-related customers, and these agencies jointly identified "the collapse of the crypto-asset exchange FTX Trading Ltd. and its affiliated proprietary trading firm Alameda Research LLC" as "result[ing] in [Silvergate's] funding and liquidity stress[.]"[38]

65. These penalties are a direct and proximate result of the FTX Group's misconduct. Silvergate did not knowingly engage in any independent or intervening act to cause these penalties. No regulatory agency found that Silvergate knowingly or willfully violated the BSA, that Silvergate violated any prior order or written agreement with its regulators, or that Silvergate had any knowledge of the FTX Group's fraud that was perpetrated through Silvergate's SEN. To the contrary, the DOJ charged Bankman-Fried with conspiracy to commit bank fraud and identified Silvergate as the victim of that fraud. Having deliberately induced a federally regulated bank to open and maintain accounts that the FTX Group then used—without disclosure and contrary to its representations—to receive and transmit FTX.com customer deposits and to operate an unlicensed MSB, the FTX Group cannot be heard to say that resulting regulatory scrutiny of, and penalties premised on, Silvergate's monitoring of those very transactions were unforeseeable. Those penalties were instead the direct, natural, and foreseeable consequence of the FTX Group's scheme, and they likewise constitute "loss, liability or expense" "resulting from or arising out of"

---

[36] The SEC investigation culminated in a lawsuit filed by the SEC in the U.S. District Court for the Southern District of New York, resulting in the SEC imposing a $50 million civil penalty on Silvergate. That penalty, however, was offset by the penalties Silvergate paid to the Federal Reserve Board and the DFPI. Accordingly, Silvergate does not seek damages from the FTX Group attributable to the SEC penalty.

[37] Silvergate agreed to pay such penalties without admitting to or denying any allegations made or implied by those regulators.

[38] Order to Cease and Desist Issued Upon Consent Pursuant to the Federal Deposit Insurance Act, as Amended, and the California Financial Code at 2, *In re Matter of Silvergate Cap. Corp. & Silvergate Bank*, Nos. 23-003-B-HC, 23-003-B-SM (Fed. Rsrv. Bank. & Cal. Dep't of Fin. Prot. & Innovation May 23, 2023), https://www.federalreserve.gov/newsevents/pressreleases/files/enf20230601a1.pdf.

"any acts or omissions by [the FTX Group] or [its] employees or agents" within the meaning of the indemnification provisions of the CMTS Agreements.

C. Silvergate Paid Substantial Amounts to Settle Litigation and Claims Arising from the FTX Group's Misconduct

66. The FTX Group's wrongdoing gave rise to numerous claims by third parties against Silvergate. Silvergate paid approximately $21 million in the aggregate to resolve these actions that would never have existed but for, and were proximately caused by, the FTX Group's misconduct against Silvergate:

- ***First***, Silvergate paid approximately $10 million to settle *Bhatia v. Silvergate Bank*, No. 3:23-cv-00667 (N.D. Cal.) (the "*Bhatia* Settlement"), in which a purported FTX.com account holder alleged, on behalf of himself and a putative class, that Silvergate and its former chief executive officer aided and abetted acts of fraud and breaches of fiduciary duty by the FTX Group and its insiders, and that Silvergate was unjustly enriched. The court denied Silvergate's motion to dismiss on March 20, 2024, and the parties executed a settlement agreement dated November 15, 2024.

- ***Second***, Silvergate paid approximately $5.32 million pursuant to a global settlement in its bankruptcy cases to resolve a securities class-action suit asserted by holders of Silvergate securities. Those claims directly arose from Silvergate's banking relationship with the FTX Group and from Silvergate's disclosures concerning that relationship, and would not have been asserted absent the FTX Group's wrongdoing.

- ***Third***, Silvergate paid approximately $3.1 million to resolve certain objections raised by holders of Silvergate's common stock to Silvergate's plan of reorganization. But for the FTX Group's misconduct, Silvergate would not have filed for bankruptcy and Silvergate's common stockholders' rights would not have been impaired, giving rise to their claims and objections in the bankruptcy cases.

- ***Fourth***, Silvergate paid approximately $1.3 million to settle proofs of claim filed by EJF Ventures GP LLC and EJF Ventures Fund LP (together, "EJF"), which asserted damages arising from breaches of certain contracts between Silvergate and EJF. The circumstances giving rise to EJF's claims and the settlement of those claims would not have occurred but for the FTX Group's misconduct.

- ***Fifth***, Silvergate paid approximately $1.3 million to settle proofs of claim filed by KPMG, LLC ("KPMG") for reimbursement of fees and costs KPMG incurred in responding to third-party subpoenas issued by the SEC and DFPI in connection with KPMG's work for Silvergate.

D. Silvergate Incurred Substantial Advisory, Professional, and Indemnification-Related Costs Resulting from the FTX Group's Misconduct

67. The FTX Group's wrongdoing caused Silvergate to incur well over one hundred million dollars in professional fees, bankruptcy expenses, and indemnification-related costs, none of which Silvergate would have borne absent the FTX Group's fraudulent and unlawful actions in connection with Silvergate's accounts, which caused a cascade of investigations, litigations, regulatory enforcement, and ultimately bankruptcy. These costs are described in turn below.

68. ***Advisory Costs***. Beginning from approximately November 2022 (the public disclosure of the FTX Group's fraudulent scheme) through the span of Silvergate's own bankruptcy cases, Silvergate incurred over $120 million dollars in investigative, defense, and advisory costs, none of which Silvergate would have incurred but for the FTX Group's malfeasance. This amount includes, but is not limited to:

- ***First***, approximately $75 million for:
  - fees and expenses Silvergate incurred defending itself against the FTX-related litigation brought by FTX.com customers and others in the immediate aftermath of the FTX Group's collapse, including the putative class actions captioned *Zuleta v. Silvergate Capital Corp.*, No. 22-cv-1901 (S.D. Cal.); *Gonzalez v. Silvergate Bank*, No. 22-cv-1981 (S.D. Cal.); and *Bhatia v. Silvergate Bank*, No. 3:23-cv-00667 (N.D. Cal.). Each of those actions alleged, in substance, that Silvergate aided and abetted or was otherwise complicit in the very fraud that the FTX Group perpetrated against Silvergate. The FTX Group knew or should have known that, by fraudulently inducing Silvergate to open and maintain accounts the FTX Group then used to receive and transmit FTX.com customer deposits, Silvergate would directly and foreseeably become a target of litigation by those customers when the scheme collapsed;
  - fees and expenses for counsel and other advisors engaged to investigate and respond to the FTX Group's conduct and its consequences, including advising Silvergate's board of directors concerning Silvergate's exposure arising from the FTX Group from 2022 through 2023, advising Silvergate in connection with its public statements regarding Silvergate Bank's BSA/AML compliance program in late 2022 and early 2023, and responding to the investigations, demands, and document requests of the Federal Reserve Board, the DFPI, the SEC, and the DOJ. Each of those investigations commenced only after the FTX Group's fraud was revealed, and each required Silvergate to produce hundreds of thousands of pages

of documents and otherwise cooperate extensively with the investigating agencies. Silvergate incurred fines in addressing the regulatory scrutiny arising from the FTX Group's fraudulent acts, including by way of settlement to reduce litigation costs, payable to the regulators;

- fees and expenses relating to Silvergate's retention of financial advisors and legal professionals to determine strategic alternatives as a direct result of the FTX Group's wrongdoing, including amounts paid pursuant to settlements of proofs of claim asserted by a financial advisor in Silvergate's bankruptcy cases for unpaid prepetition fees and expenses; and

- fees and expenses Silvergate incurred on behalf of certain former Silvergate directors and officers (the "Indemnified Individuals") in connection with the regulatory investigations and litigations arising from the FTX Group's scheme, including payment of self-insurance retention costs that Silvergate bore out-of-pocket to activate insurance coverage for the Indemnified Individuals. These are amounts that Silvergate directly paid and that were not reimbursed by insurance. But for the FTX Group's misconduct, these indemnification costs would not have arisen.[39]

- ***Second***, approximately $33 million in legal and professional costs related to its own bankruptcy, a bankruptcy that was the direct result of the FTX Group's wrongdoing. This amount includes the fees and expenses of the advisors of the Silvergate debtors and of the advisors of the Ad Hoc Group of Silvergate Preferred Stockholders.

- ***Third***, approximately $10 million to fund the Trust for advisory and professional costs and expenses relating to the administration of the Trust and pursuit of retained causes of action, and approximately $2.13 million for costs and expenses relating to preserving Silvergate's documents and records for potential future litigations or investigations. None of these costs would be necessary but for the FTX Group's malfeasance and the resulting collapse, wind-down, and liquidation of Silvergate.

These estimates, and any other expenses incurred in connection with Silvergate's liquidation and bankruptcy cases, remain subject to reconciliation, supplementation, and further review.

69. ***Indemnification-Specific Costs***. In addition to the foregoing advisory fees and expenses, the FTX Group's unlawful acts also caused Silvergate to incur tens of millions of dollars in indemnification-specific costs on behalf of its former directors and officers, who were—and

[39] For the avoidance of doubt, these indemnification-related costs and expenses are distinct from the indemnification-specific costs asserted *infra* ¶¶ 69–72.

continue to be—subjected to regulatory investigations, enforcement actions, and litigation as a direct consequence of the FTX Group's fraudulent misuse of Silvergate's banking services.

70. *First*, as detailed in the Silvergate plan of reorganization and the indemnification settlement,[40] Silvergate paid $8.77 million as part of an agreed "Go-Forward Chapter 11 Budget" for incurred, reasonable, and documented fees and expenses of the Indemnified Individuals through the plan's effective date. Such fees and expenses were a direct consequence of the FTX Group's misconduct, including its covert misuse of Silvergate's banking services, which caused Silvergate's bankruptcy and the chapter 11 proceedings that followed.

71. *Second*, as detailed in Silvergate's plan of reorganization, and as part of the indemnification settlement, Silvergate was required to establish and fund indemnification reserves up to $40.25 million to satisfy the ongoing indemnification obligations owed to its former directors, officers, and other Indemnified Individuals. These reserves were necessitated by current or potential regulatory investigations, enforcement actions, and litigation that directly resulted from the FTX Group's fraudulent misuse of Silvergate's accounts.

- The first reserve is a $12.75 million "Go-Forward Indemnity Reserve" for the reasonable and documented indemnifiable fees and expenses for the Indemnified Individuals in proceedings that arise from the regulatory and litigation scrutiny triggered by the FTX Group's fraud. As of June 30, 2026, disbursements from this reserve total $593,803.74. This amount may continue to accrue and remains subject to ultimate reconciliation.

- The second reserve is a $22.5 million "Martino SEC Dedicated Reserve" for the reasonable and documented indemnifiable fees and expenses of Antonio Martino in connection with an enforcement action that was brought as a direct consequence of the FTX Group's fraud and the resulting regulatory scrutiny of Silvergate. As of June 30,

[40] *See Final Settlement Term Sheet Resolving Indemnified Individuals' Proofs of Claim for Indemnification*, appended to *Preliminary Order (I) Approving Global Settlement, Including the Debtors' Entry into and Performance under Indemnification Settlement and Securities Litigation Settlement, Pursuant to Bankruptcy Rule 9019, and (II) Granting Related Relief*, Dkt. No. 732, *In re Silvergate Capital Corp., et al.*, No. 24-12158-KBO (Bankr. D. Del. May 14, 2025), as Exhibit 1 thereto.

2026, over $3 million has been paid from this reserve. This amount may continue to accrue and remains subject to ultimate reconciliation.

- The third reserve is a $5 million "DOJ Indemnification Reserve" to cover indemnifiable claims relating to any potential DOJ-related claims against the Indemnified Individuals. Any such potential exposure is a direct consequence of the FTX Group's misuse of Silvergate's accounts. As of June 30, 2026, no payments have been made from this reserve, but such payments may accrue, and the reserve remains subject to ultimate reconciliation.

72. *Finally*, as part of the settlement resolving the claims of the Indemnified Individuals, Silvergate was required to purchase insurance for potential DOJ-related claims against the Indemnified Individuals (the "DOJ Insurance Policy"). Silvergate paid approximately $2 million in premiums for the policy. The Indemnified Individuals' exposure to potential DOJ claims is a consequence of the FTX Group's secret use of Silvergate's accounts for its criminal enterprise. The premiums were thus a reasonable and foreseeable expense of responding to conduct the FTX Group set in motion.

## CAUSES OF ACTION AGAINST THE FTX GROUP

73. Based on the foregoing conduct, the Trust asserts that it has legal claims against the FTX Group, as set forth below. The Trust reserves its rights to supplement these legal claims and allegations to the extent additional information becomes available.

### Fraud
### (Fraud, Fraudulent Inducement, Fraudulent Misrepresentation, Negligent Misrepresentation)

74. The Trust incorporates by reference all allegations above as though fully set forth herein.

75. The FTX Group committed fraud against Silvergate, fraudulently induced Silvergate to enter into agreements and provide banking services by making fraudulent misrepresentations regarding the nature and purpose of its accounts, and by making negligent misrepresentations without any reasonable ground for believing them to be true.

76. The FTX Group, through Bankman-Fried, Friedberg, Ellison, Salame, Ornelas, and other individuals of and associated with the FTX Group, fraudulently misrepresented the purpose of accounts opened by the FTX Group entities at Silvergate as non-custodial—thereby avoiding the enhanced onboarding due diligence, licensing requirements, and other heightened ongoing scrutiny that Silvergate applied to custodial accounts—and fraudulently misrepresented that those accounts would be used only for proprietary trading with the FTX Group's own capital. Notwithstanding those representations, the FTX Group used the Alameda and North Dimension non-custodial accounts to receive FTX.com customer deposits and fund customer withdrawals. The FTX Group also fraudulently misrepresented the purpose of the North Dimension accounts, maintaining falsely that North Dimension was not an MSB and was a proprietary and OTC trading firm, when in reality, North Dimension was a shell company used by the FTX Group to funnel customer deposits to Alameda's non-custodial accounts. These misrepresentations were made both affirmatively (through false statements in account applications, due diligence questionnaires, and other documents) and by concealment and nondisclosure (by failing to inform Silvergate of the true nature of the FTX Group's use of its accounts and by failing to disclose material changes in account usage).

77. The FTX Group knew its misrepresentations were false, and it lacked any reasonable grounds for believing its misrepresentations to be true. For example, the FTX Group knew that its representations in the North Dimension due diligence questionnaire that North Dimension would not operate as an MSB and its account was for proprietary trading were false, as the FTX Group knew that it would use the North Dimension account as a custodial account to hold and move customer funds. The FTX Group also knew its representations regarding the Alameda accounts (e.g., that the accounts were being opened and used for the purpose of trading

using only Alameda's own funds, and not for customer funds) were false, or recklessly disregarded their truth. The FTX Group's knowledge of that falsity was not limited to the point of account opening; the FTX Group continued to use the accounts for unauthorized purposes throughout the life of those accounts and fraudulently failed to inform Silvergate of the material diversion in the accounts' use. The FTX Group's fraudulent intent and ongoing effort to conceal the true nature of the accounts are further supported by documented instances in which the FTX Group made similar lies to other financial institutions, even when directly asked about this exact misuse of its accounts, as well as misrepresentations on subsequent account applications that reaffirmed the same false representations, including, for instance, that Alameda was merely "trading crypto for its own account."

78. The FTX Group made its misrepresentations with the intent of inducing Silvergate to act in reliance on them. Specifically, the FTX Group made fraudulent misrepresentations to Silvergate with the intent of defrauding and inducing Silvergate to open non-custodial accounts, including inducing Silvergate to enter into various agreements required to open accounts and receive Silvergate's services, which accounts the FTX Group then used to receive FTX.com customer deposits and to fund customer withdrawals while evading the heightened onboarding, licensing, and continuing due diligence those activities would otherwise have required. The FTX Group's fraud was not limited to the initial misrepresentations at account opening; the FTX Group continued to conceal the true use of its accounts throughout the account relationship and failed to disclose material changes in the use of those accounts, as it was obligated to do.

79. Silvergate actually and reasonably relied on these false statements in approving the Alameda and North Dimension accounts with the level of due diligence appropriate for those accounts' stated purposes.

80. The FTX Group's fraudulent misrepresentations were material in acquiring Silvergate's banking services. But for those misrepresentations, Silvergate would have required additional onboarding due diligence and requirements, and the accounts would not have been opened on the terms or in the manner the FTX Group sought.

81. Silvergate was injured as a direct and proximate result of the FTX Group's fraudulent misrepresentations. Until mere days before the FTX Group's fraudulent scheme was revealed, Silvergate was widely regarded by investors, customers, and media as one of the safest, most trustworthy, and most promising banks for serving the digital asset industry. The FTX Group's fraud caused Silvergate to suffer catastrophic damages, as set forth herein, including the triggering of a bank run that forced Silvergate to liquidate billions of dollars in securities at a loss; the precipitation of hundreds of millions of dollars in regulatory penalties, litigation settlements, investigative, defense, advisory, and bankruptcy fees and expenses, indemnification expenses, and related costs; the exposure of Silvergate to litigation by FTX.com customers and others; and the ultimate destruction of Silvergate's going-concern value, requiring the wind down and voluntary liquidation of a business that had operated since 1986.

82. The Trust asserts a claim for all damages as set forth herein resulting from the FTX Group's fraud. Silvergate suffered significant damages caused by this fraud, in an amount to be determined at trial.

**Breach of Contract**

83. The Trust incorporates by reference all allegations above as though fully set forth herein.

84. Silvergate executed numerous valid and binding contracts with members of the FTX Group, including, but not limited to, Alameda Research LLC, Alameda Research Ltd., FTX

Digital Markets Ltd., North Dimension Inc., Quoine Pte Ltd., and West Realm Shires Services Inc. These contracts include, but are not limited to, CMTS Agreements and DAARDs, as well as incorporated account opening materials.

85. At all times, Silvergate performed as required under its contracts with the FTX Group.

86. The FTX Group breached several obligations contained in its contracts with Silvergate, including, but not limited to:

- The CMTS Agreements required the FTX Group to represent and warrant that each "Entry complies with all local, state, and federal regulations." The FTX Group breached these representations by, among other things, using the Alameda and North Dimension accounts to receive and transmit the FTX.com customer deposits.

- The DAARDs required the FTX Group to provide appropriate documentation and to certify that the information contained therein was true and accurate to the best of its knowledge. The FTX Group breached this obligation by, among other things, submitting the fabricated North Dimension account, the false due diligence questionnaire signed by Bankman-Fried, the forged North Dimension corporate register, and the false Alameda account purposes.

- The DAARDs provide that Silvergate may "rely on that information until [the FTX Group entity] notif[ies] us of a change, and we have had a reasonable amount of time to act on the new information." The FTX Group breached this ongoing obligation by failing to ever notify Silvergate when the use of its accounts materially changed from the purposes represented in the applications, including by using the non-custodial accounts to receive and transmit FTX.com customer deposits.

- The DAARDs further incorporate the account-opening application into the agreements themselves. The FTX Group breached the incorporated applications by, among other things, providing false information, including falsely describing North Dimension as a proprietary trading and OTC firm, falsely representing that North Dimension would not operate as an MSB, and falsely representing that Alameda's accounts would be trading accounts to be funded solely with Alameda's own capital.

87. Each contract between Silvergate and the FTX Group carries an implied promise of good faith and fair dealing. The FTX Group acted unfairly, dishonestly, or with a dishonest purpose, and such actions prevented Silvergate from realizing the benefits of the agreements. The FTX Group's breaches caused Silvergate to suffer significant financial loss.

88. Silvergate suffered significant damages caused by these breaches, in an amount to be determined at trial.

89. The Trust asserts a claim for all damages as set forth herein resulting from the FTX Group's breaches of its obligations to Silvergate.

**Contractual Indemnification**

90. The Trust incorporates by reference all allegations above as though fully set forth herein.

91. Silvergate opened accounts with certain members of the FTX Group, including, but not limited to, Alameda Research LLC, Alameda Research Ltd., FTX Digital Markets Ltd., North Dimension Inc., Quoine Pte Ltd., and West Realm Shires Services Inc. Each time an entity of the FTX Group opened an account with Silvergate, such entity agreed to a CMTS Agreement governing the use of banking services relating to the applicable account, among other agreements. The CMTS Agreements represent valid and binding contracts entered into by the FTX Group entities and Silvergate.

92. As detailed herein, the CMTS Agreements between Silvergate and the FTX Group, through its subsidiaries, contain substantially identical indemnification provisions. These provisions require the FTX Group to defend, indemnify, and hold Silvergate harmless against losses, liabilities, or expenses resulting from the FTX Group's acts or omissions, third-party claims, and/or breaches of any representation, warranty, covenant, or agreement by the FTX Group or its employees or agents.

93. At all times, Silvergate performed as required under the CMTS Agreements.

94. The FTX Group's conduct, acts, omissions, and contract breaches in connection with its accounts at Silvergate—including, but not limited to, the fraudulent misrepresentations

made at onboarding, the unauthorized use of non-custodial accounts to receive and transmit FTX.com customer deposits, and the operation of North Dimension as an unregistered MSB—fall squarely within the scope of the CMTS Agreements' indemnification provisions.

95. Silvergate suffered significant damages caused by the FTX Group's conduct, acts, omissions, and contract breaches in connection with its accounts at Silvergate, in an amount to be determined at trial.

96. The Trust asserts a claim for all damages, as set forth herein, indemnifiable under the CMTS Agreements, in an amount to be determined at trial.

**Civil Violation of the RICO Act, 18 U.S.C. § 1962(c)**

97. The Trust incorporates by reference all allegations above as though fully set forth herein.

98. Each of the FTX Group entities (including Alameda, FTX Trading Ltd., and North Dimension), Bankman-Fried, Friedberg, Ellison, Salame, Wang, Singh, and other individuals of and associated with the FTX Group is a "person" within the meaning of 18 U.S.C. § 1961(3), in that each is an individual or entity capable of holding a legal or beneficial interest in property, who conducted the affairs of an enterprise through a pattern of racketeering activity in violation of 18 U.S.C. § 1962(c).

99. Those persons, associated together, comprise an association-in-fact enterprise within the meaning of 18 U.S.C. § 1961(4). The enterprise was engaged in, and its activities affected, interstate and foreign commerce: it marketed, sold, and operated a global cryptocurrency exchange and trading platform for thousands of customers throughout the United States and other countries, and it processed billions of dollars in customer deposits and transfers by interstate and international wires.

100. The enterprise had a common purpose: to defraud Silvergate and others by fraudulently obtaining and using Silvergate's banking services to misappropriate billions of dollars and to divert those funds to the FTX Group entities' trading operations, investments, and purchases to the personal enrichment of themselves and their principals. Its members had ongoing relationships with one another and functioned as a continuing unit under an ascertainable command structure led by Bankman-Fried and Friedberg, among other principals, from at least November 2019 through November 2022, a period of sufficient longevity to permit them to pursue that common purpose.

101. The association-in-fact enterprise is distinct from each of its members. Each FTX Group entity and each individual that formed the enterprise—including Bankman-Fried, Friedberg, and Ellison—had an existence separate and distinct from the enterprise, and each was a participant in, and not an alter ego of, that enterprise.

102. SCC, through its subsidiary Silvergate Bank, was a "financial institution" within the meaning of 18 U.S.C. § 1344.

103. The FTX Group entities, including but not limited to North Dimension, were created and/or operated as a tool to effectuate a pattern of racketeering activity, through the enterprise.

104. Bankman-Fried, Friedberg, Ellison, Salame, Wang, Singh, the other individuals of and associated with the FTX Group, and the FTX Group entities—including Alameda, FTX Trading Ltd., and North Dimension—each conducted and participated, directly or indirectly, in the conduct of the enterprise's affairs and each had a part in directing those affairs, in the respective manners alleged herein, to fraudulently obtain, maintain, and use the accounts at Silvergate. They did so through a pattern of racketeering activity as defined in 18 U.S.C. § 1961(5), consisting of

acts indictable under 18 U.S.C. §§ 1341 (mail fraud), 1343 (wire fraud), and 1344 (bank fraud), each of which constitutes racketeering activity under 18 U.S.C. § 1961(1).

105. In furtherance of the scheme, and through the enterprise, Bankman-Fried, Friedberg, Ellison, Salame, Wang, Singh, other individuals of and associated with the FTX Group, and the FTX Group entities themselves committed multiple, separate indictable acts of mail, wire, and bank fraud in connection with both (1) the North Dimension accounts and (2) the Alameda accounts, as described below. Through the association-in-fact enterprise, Bankman-Fried, Friedberg, Ellison, Salame, Wang, Singh, other individuals of and associated with the FTX Group, and the FTX Group entities themselves engaged in a course of conduct that included making the following false representations, which they transmitted or caused to be transmitted, by interstate wire or by mail, to SCC and Silvergate Bank:

- Creating and submitting false information in an application for North Dimension to receive bank accounts from Silvergate, including that North Dimension "operates a cryptocurrency trading business."

- Falsely stating in its application to receive services from Silvergate that North Dimension was not an MSB, while knowing that their true intent was to use a North Dimension account with Silvergate to receive and pay funds to customers, thus acting as an MSB.

- Creating and submitting false information in Silvergate's required diligence forms for trading businesses that North Dimension was "a proprietary and OTC trading firm with 2,000 counterparties and average monthly trading volume of $10 million," when at the time the entity had no business operations or employees. Bankman-Fried signed and certified that this response was correct and complete to his knowledge and belief.

- Creating a false and misleading corporate register to provide to Silvergate in connection with North Dimension's application to open bank accounts and/or to receive other services.

- Knowingly misrepresenting the purpose of the Alameda accounts at onboarding and thereafter failing to disclose to Silvergate—and, indeed, making affirmative misrepresentations to Silvergate to hide—that the FTX Group was using those accounts to receive and transmit FTX.com customer deposits.

- Approaching Silvergate to explore opening a custodial account for FTX Trading Ltd., abandoning that effort when faced with Silvergate's rigorous custodial account requirements, and thereafter—unbeknownst to Silvergate—directing those same customer deposits into Alameda's and North Dimension's non-custodial accounts in circumvention of the safeguards the FTX Group sought to avoid, in violation of the representations the FTX Group had made.

106. These false representations were made directly to Silvergate and were a condition of receiving services, including banking services, and were part of a scheme or artifice to defraud Silvergate. Specifically, these false representations were designed to fraudulently procure banking services from Silvergate, knowing or believing that the scheme violated federal and state laws. Thereafter, the FTX Group concealed its use of the fraudulently obtained accounts to receive and transmit FTX.com customer deposits. These material misrepresentations enabled the FTX Group to avoid the heightened onboarding due diligence and EDD scrutiny that Silvergate applied to custodial accounts. The FTX Group's ongoing concealment allowed it to retain access to its accounts throughout the duration of the fraudulent scheme.

107. Through the association-in-fact enterprise, Bankman-Fried, Friedberg, Ellison, Salame, Wang, Singh, other individuals of and associated with the FTX Group, and the FTX Group entities themselves also used the accounts at Silvergate to engage in a course of conduct of indictable acts of wire and/or mail fraud directed at others, including FTX.com customers, over multiple years through multiple entities, including by directing customer funds into the Alameda and North Dimension accounts under false pretenses and then using those funds to pay Alameda's expenses.[41] These related and continuous acts constitute a pattern of racketeering activity under 18 U.S.C. §§ 1961(5) and 1962(c).

---

[41] *See, e.g.*, Superseding Indictment ¶¶ 58–62.

108. Silvergate suffered injury to its business and property by reason of the above-described predicate acts. Silvergate's injuries were directly and proximately caused by the enterprise's racketeering activity and include, among other catastrophic harms set forth herein, the triggering of a bank run that forced Silvergate to liquidate billions of dollars in securities at a loss; hundreds of millions of dollars in regulatory penalties, litigation settlements, investigative, defense, advisory, and bankruptcy fees and expenses, indemnification expenses, and related costs; the exposure of Silvergate to litigation by FTX.com customers and others; and the ultimate destruction of Silvergate's going-concern value, requiring the wind down and voluntary liquidation of a business that had operated since 1986. The Trust asserts a claim as set forth herein—jointly and severally against the FTX Group—for three times the damages Silvergate sustained, together with reasonable attorneys' fees and costs, pursuant to 18 U.S.C. § 1964(c), in an amount to be determined at trial.

**Civil Conspiracy to Violate the RICO Act, 18 U.S.C. § 1962(d)**

109. The Trust incorporates by reference all allegations above as though fully set forth herein.

110. 18 U.S.C. § 1962(d) provides that it "shall be unlawful for any person to conspire to violate any of the provisions of subsection (a), (b), or (c) of this section." The FTX Group entities, in coordination with certain of the FTX Group employees, directors, or officers, violated 18 U.S.C. § 1962(d) by conspiring and agreeing together and with each other to commit the aforementioned violations of 18 U.S.C. § 1962(c).[42] The object of this conspiracy was to conduct

[42] Further evidence of an agreement among the co-conspirators—i.e., evidence not already alleged herein, in the Superseding Indictment, and/or the Second Ray Report—is peculiarly within the knowledge and control of the FTX Group.

or participate in, directly or indirectly, the affairs of the above-described association-in-fact enterprise through a pattern of racketeering activity.

111. The FTX Group entities, in coordination with certain of the FTX Group employees, directors, or officers acting as its co-conspirators, engaged in numerous overt and predicate fraudulent racketeering acts in furtherance of the conspiracy, and/or aimed to complete further such predicate fraudulent racketeering acts, including the acts indictable under 18 U.S.C. §§ 1341 (mail fraud), 1343 (wire fraud), and 1344 (bank fraud) described above.

112. The nature of the above-described acts, material misrepresentations, and omissions in furtherance of the conspiracy confirm that the FTX Group entities, in coordination with certain of the FTX Group employees, directors, or officers, not only agreed to the objective of an 18 U.S.C. § 1962(d) RICO violation by conspiring to violate 18 U.S.C. § 1962(c), but were aware that their ongoing fraudulent acts had been, and were part of, an overall pattern of racketeering activity, or planned further racketeering activity. The purpose and effect of the conspiracy was to induce for the association-in-fact enterprise an increase in sales, profits, and/or other benefits that otherwise would not have been made in the absence of the illegal conduct.

113. Silvergate suffered injury to its business and property by reason of the above-described predicate acts in furtherance of violating 18 U.S.C. § 1962(d) by conspiring to violate 18 U.S.C. § 1962(c). Silvergate's injuries were directly and proximately caused by the association-in-fact enterprise's racketeering activity and include, among other harms set forth herein, the triggering of a bank run that forced Silvergate to liquidate billions of dollars in securities at a loss; hundreds of millions of dollars in regulatory penalties, litigation settlements, investigative, defense, advisory, and bankruptcy fees and expenses, indemnification expenses, and related costs; the exposure of Silvergate to litigation by FTX.com customers and others; and the ultimate

destruction of Silvergate's going-concern value, requiring the wind down and voluntary liquidation of a business that had operated since 1986. The Trust asserts a claim as set forth herein—jointly and severally against the FTX Group co-conspirators, regardless of whether the FTX Group co-conspirators were directly involved in a particular aspect of the fraudulent scheme—for three times the damages Silvergate, together with reasonable attorneys' fees and costs, pursuant to 18 U.S.C. § 1964(c), in an amount to be determined at trial.

## DAMAGES

114. The Trust incorporates by reference all preceding factual allegations as if fully set forth herein. As a direct and proximate result of, and a foreseeable and natural consequence of, the FTX Group's fraud, breaches, and racketeering conduct alleged herein, the Trust, as successor to Silvergate, has suffered approximately one billion dollars in damages, together with such additional damages as may be established through discovery and at trial, including quantification of the destruction of Silvergate's going-concern value, additional losses on the forced sale of securities, and other costs, expenses, losses, or damages incurred in connection with Silvergate's chapter 11 cases.

115. The FTX Group's concealment of the true purpose of the Alameda and North Dimension accounts was a proximate cause of Silvergate's injuries. But for that concealment, Silvergate would not have permitted the accounts to be used as they were, and the FTX Group's resulting fraudulent scheme would not have precipitated the destruction of Silvergate's going-concern value, Silvergate's deposit run, the forced sale of securities, the imposition of regulatory penalties, the FTX-related litigation and resulting settlements, Silvergate's own wind-down and dissolution, and the imposition of related fees and expenses. Each item is a direct, natural, foreseeable, and recoverable consequence of the FTX Group's misconduct. Accordingly, the Trust

seeks an award for the following categories of damages in the estimated amounts, subject to adjustment upon further discovery. Further, under 18 U.S.C. § 1964(c), the Trust is entitled to threefold the following damages it has sustained by reason of the violations alleged in the RICO causes of action, together with the cost of suit, including reasonable attorney fees.

116. ***Losses on Forced Securities Sales***. In the fourth quarter of 2022, Silvergate's deposits declined by $6.9 billion, or 52.4%. To meet the resulting withdrawal demands and maintain liquidity, Silvergate was forced to liquidate approximately $5.2 billion of debt securities, crystallizing approximately $751.4 million in losses. Silvergate sold additional securities in January and February 2023 and again when advances from the FHLB-SF came due; the incremental losses from those sales are subject to further quantification. These losses are recoverable under all causes of action against the FTX Group, subject to any applicable trebling and no duplication.

117. ***Loss of Going-Concern Value***. The FTX Group's wrongdoing irreversibly destroyed Silvergate's going-concern value. Within weeks of the FTX Group's fraud coming to light, Silvergate's going-concern value drastically deteriorated. Less than four months after the FTX Group's collapse, Silvergate was forced on March 8, 2023, to announce its wind-down and voluntary liquidation. That liquidation destroyed the going-concern value of a franchise built since 1986, including the future earnings stream of Silvergate's goodwill and reputation. The resulting lost going-concern value and other related damages are believed to be in the hundreds of millions, if not billions, and remain subject to further discovery. Such harm is recoverable under all causes of action against the FTX Group, subject to any applicable trebling and no duplication.

118. ***Regulatory Fines and Penalties***. Due to the FTX Group's misconduct and concealment of the true nature and purpose of transactions flowing through Silvergate's accounts,

Silvergate came under enhanced scrutiny by regulators. To avoid the expense of formal proceedings and protracted litigation to protect its interests, in or about June or July 2024, Silvergate entered into consent orders, pursuant to which it agreed to pay a $43 million civil monetary penalty to the Federal Reserve Board and a $20 million civil monetary penalty to the DFPI. These penalties are recoverable under all causes of action against the FTX Group, subject to any applicable trebling and no duplication.

119. ***Settlement Payments***. Silvergate paid approximately $10 million pursuant to the *Bhatia* Settlement; approximately $5.32 million pursuant to the global settlement to resolve a securities class-action suit asserted by holders of Silvergate securities; approximately $3.1 million to settle with Silvergate's common stockholders; approximately $1.3 million to settle with EJF; and approximately $1.3 million to settle with KPMG. Such settlement payments total no less than $21 million. These claims and the resulting settlements would not have arisen but for the FTX Group's wrongdoing. The amounts are recoverable under all causes of action against the FTX Group, subject to any applicable trebling and no duplication.

120. ***Advisory Costs***. Silvergate incurred over $120 million in investigative, defense, and advisory costs resulting from the FTX Group's fraud. This $120 million amount includes: (i) approximately $75 million in fees and expenses Silvergate incurred in connection with (a) defending itself against various FTX-related litigation brought on by FTX.com customers, (b) investigating and responding to the FTX Group's misconduct, including advising Silvergate's board of directors, advising Silvergate in connection with its public statements regarding its BSA/AML Compliance Program, and responding to the investigations, demands, and document requests of various regulatory agencies brought on due to the FTX Group's fraud, (c) financial and restructuring advisors retained to assist Silvergate in determining strategic alternatives as a direct

result of the FTX Group's misconduct, and (d) indemnifying certain Indemnified Individuals in connection with regulatory investigations and litigations arising from the FTX Group's wrongdoing; (ii) approximately $33 million in bankruptcy professional fees and expenses, an amount which includes expenses incurred for the advisors of the Silvergate debtors and professional fees incurred by the Ad Hoc Group of Silvergate Preferred Stockholders; and (iii) approximately $10 million to fund the Trust for advisory costs and professional costs relating to administering Silvergate's liquidation and pursuing retained causes of action, and $2.13 million to fund the Trust for costs associated with retaining and preserving Silvergate's records for future potential litigations and investigations, none of which would be necessary but for the FTX Group's malfeasance and the resulting collapse, wind-down, and liquidation of Silvergate. These estimates are each subject to reconciliation and further review. Each of these professional fees and expenses are reasonable, and a direct and proximate cause of the FTX Group's tortious and unlawful acts. These fees and expenses are recoverable under all causes of action against the FTX Group, subject to any applicable trebling and no duplication.

121. ***Indemnification-Related Costs***. The FTX Group's misconduct caused Silvergate to incur substantial indemnification-related costs on behalf of its former directors and officers, who were—and continue to be—subjected to regulatory investigations, enforcement actions, and litigation as a direct consequence of the FTX Group's fraudulent misuse of Silvergate's banking services. Certain indemnification-related amounts may be continuing to accrue and remain subject to ultimate reconciliation. First, Silvergate paid $8.77 million as part of an agreed "Go-Forward Chapter 11 Budget" for the incurred, reasonable, and documented fees and expenses of the Indemnified Individuals through the plan's effective date. Second, Silvergate established and funded indemnification reserves up to $40.25 million to satisfy ongoing indemnification

obligations owed to the Indemnified Individuals, from which over $3.6 million has been paid as of June 30, 2026. Third, Silvergate paid approximately $2 million in premiums for the DOJ Insurance Policy, which provides coverage for costs associated with any potential DOJ-related claims against the Indemnified Individuals. These amounts are recoverable under all causes of action against the FTX Group, subject to any applicable trebling and no duplication.

122. The damages figures stated above are estimates based on currently available information and are subject to continued review, supplementation, and reconciliation. The Trust expressly reserves the right to amend, modify, supplement, or further quantify the Silvergate Claims and this More Definite Statement, including to fix amounts that are currently contingent or unliquidated, to assert additional theories of recovery, and to seek punitive or exemplary damages.

123. The Trust seeks recovery of these damages, together with pre- and post-judgment interest at the maximum rate allowed by law, reasonable attorneys' fees and costs, and such other relief as the Court deems just and proper.

**SUPPORTING DOCUMENTATION**

124. The claims asserted herein are based on, without limitation, misrepresentations, omissions, or obligations contained in business account applications, organizational documents, due diligence questionnaires, correspondence regarding compliance, CMTS Agreements, DAARDs, and related account opening materials and agreements. In particular, and as discussed herein, the FTX Group submitted false and misleading business account applications, fabricated corporate documents, and false due diligence questionnaires to Silvergate, misrepresented the purposes for which accounts would be used, and used those accounts in violation of the terms on which they were opened. Additionally, the CMTS Agreements contain indemnification provisions covering losses suffered by Silvergate as a result of the FTX Group's acts, omissions, and breaches.

125. The supporting documentation for the claims asserted herein is voluminous, including the voluminous dockets for both the FTX Group's bankruptcy cases and the Silvergate bankruptcy cases. Much of the documentation contains confidential or private information of the Trust, Silvergate, or the FTX Group. For that reason, the Trust has not attached the supporting documentation to this More Definite Statement. Subject to entry of an appropriate protective order with respect to documents containing confidential or private information, supporting documentation may be obtained upon written request to counsel for the Trust.

**SETOFF AND RECOUPMENT**

126. The claims more definitely stated herein remain secured to the extent of any right of setoff and/or recoupment in favor of Silvergate against the applicable FTX Group debtor entity. The Trust expressly asserts a secured claim to that extent and preserves any and all rights of setoff and/or recoupment available to the Trust. No effort is made to take any action contrary to applicable law, but every reservation of rights is otherwise asserted herein with respect to setoff or recoupment rights.

**RESERVATION OF RIGHTS**

127. The Trust files this More Definite Statement with full reservation of rights, including the right to amend or supplement the Silvergate Claims and this More Definite Statement to assert or amend any theories, claims, and causes of action available for recovery against the FTX Group, their estates, successors, assigns, any affiliates, or any of their respective estates, successors, assigns, or any other person or entity who may be liable for all or part of the claims set forth herein.

128. The Trust does not waive or abandon any claims the Trust may have against any non-debtor person or entity and expressly reserves the right to pursue and recover from any party from which repayment of the claims asserted herein may be made.

129. The Trust does not waive, and expressly reserves, all rights and remedies at law or in equity that the Trust has or may have against the FTX Group, their estates, successors, assigns, any affiliates, or any of their respective estates, successors, assigns, or any other person or entity who may be liable for all or part of the claims set forth herein. The Trust's reservation of rights includes, without limitation: (i) any obligation owed to the Trust or Silvergate; and (ii) the Trust's right to trial by jury, or right to consent to trial by jury, in any hearing, proceeding, or other matter arising in or related to the FTX Group's chapter 11 cases or in any other court.

130. The filing of this More Definite Statement is not: (i) an election of remedies; (ii) a waiver or limitation of any procedural or substantive rights or any procedural or substantive defenses to any claim that may be asserted against the FTX Group; (iii) a waiver or release of any lien or security interest, as applicable; (iv) a waiver of any rights to any claims asserted herein by not ascribing a specific dollar amount thereto at this time; or (v) a waiver of any additional claims or other rights that the Trust may have against the FTX Group, their estates, successors, assigns, any affiliates, or any of their respective estates, successors, assigns, or any other person or entity who may be liable for all or part of the claims set forth herein.

131. This More Definite Statement is filed pursuant to a litigation schedule agreed with the FTX Group and pursuant to Federal Rule of Bankruptcy Procedure 3002. Notwithstanding anything to the contrary herein and for the avoidance of doubt, the filing of this More Definite Statement is not and should not be construed to be, *inter alia*: (i) a consent by the Trust to the jurisdiction of this Court with respect to the subject matter of the claims set forth herein and this

More Definite Statement, any objection or other proceeding commenced with respect thereto or any other proceeding commenced in the FTX Group's chapter 11 cases against or otherwise involving the Trust; (ii) a waiver of the Trust's right to have final orders in non-core matters, or core matters to which *Stern v. Marshall*, 564 U.S. 462 (2011), applies, entered only after *de novo* review by a United States District Court Judge; or (iii) a waiver of the Trust's right to (a) withdraw the reference, or otherwise challenge the jurisdiction of the Bankruptcy Court, with respect to the subject matter of these claims, any objection or any other proceeding commenced in the FTX Group's chapter 11 cases against or otherwise involving the Trust, or (b) assert that the reference has already been withdrawn with respect to the subject matter of these claims, any objection or other proceeding commenced with respect thereto or any other proceeding commenced in the FTX Group's chapter 11 cases against or otherwise involving the Trust.

[*Remainder of page intentionally left blank*]

Dated: September 1, 2026
Wilmington, Delaware

Respectfully submitted,

*/s/ L. Katherine Good*

L. Katherine Good (No. 5101)
Gregory J. Flasser (No. 6154)
Sameen Rizvi (No. 6902)
Ethan H. Sulik (No. 7270)
**POTTER ANDERSON & CORROON LLP**
1313 N. Market Street, 6th Floor
Wilmington, Delaware 19801
Telephone: (302) 984-6000
Facsimile: (302) 658-1192
Email: kgood@potteranderson.com
gflasser@potteranderson.com
srizvi@potteranderson.com
esulik@potteranderson.com

-and-

Dennis F. Dunne (admitted *pro hac vice*)
Daniel Perry (admitted *pro hac vice*)
Lauren C. Doyle (admitted *pro hac vice*)
**MILBANK LLP**
55 Hudson Yards
New York, New York 10001
Telephone: (212) 530-5770
Facsimile: (212) 822-5770
Email: ddunne@milbank.com
dperry@milbank.com
ldoyle@milbank.com

-and-

Andrew M. Leblanc (admitted *pro hac vice*)
Melanie Westover Yanez (admitted *pro hac vice*)
Hannah Blazek (admitted *pro hac vice*)
**MILBANK LLP**
1101 New York Avenue, NW
Washington, D.C. 20005
Telephone: (202) 835-7574
Facsimile: (202) 263-7574
Email: aleblanc@milbank.com
mwyanez@milbank.com
hblazek@milbank.com

*Counsel to the Argent Liquidation Trust*