**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| In re: | Chapter 11 |
| FTX TRADING LTD., *et al.*,[1] | Case No. 22-11068 (KBO) |
| Debtors. | (Jointly Administered) |
| | **Ref. Nos.: 35985, 36059** |
| | **Hearing Date: October 20, 2026 at 9:30 a.m. ET** |

**FTX RECOVERY TRUST'S RESPONSE TO ARGENT LIQUIDATION TRUST'S CORRECTED JOINDER AND STATEMENT IN SUPPORT OF MOTION OF SETH MELAMED FOR RECONSIDERATION OF THE JUNE 2, 2026 ORDER**

The FTX Recovery Trust (the "Trust")[2] hereby submits this response (the "Response") to *Argent Liquidation Trust's Corrected Joinder and Statement in Support of Motion of Seth Melamed for Reconsideration of the June 2, 2026 Order* [D.I. 36059] (the "Joinder") by the Argent Liquidation Trust ("Argent") and pursuant to the *Stipulation Governing Litigation of Claims and Objections of the FTX Recovery Trust and the Argent Liquidation Trust* [D.I. 36186]. In support of this Response, the Trust respectfully states as follows:

## PRELIMINARY STATEMENT

1. The FTX Debtors' Plan was the culmination of a brick-by-brick process to build consensus, resolve novel and complex issues through a series of settlements, and ensure the fair allocation of value among creditors around the world in the face of unprecedented challenges

[1] The last four digits of FTX Trading Ltd.'s and Alameda Research LLC's tax identification numbers are 3288 and 4063 respectively. Due to the large number of debtor entities in these Chapter 11 Cases, a complete list of the Debtors and the last four digits of their federal tax identification numbers is not provided herein. A complete list of such information may be obtained on the website of the Debtors' claims and noticing agent at https://cases.ra.kroll.com/FTX.

[2] The Trust (a/k/a the Consolidated Wind Down Trust) was established through the Debtors' confirmed *Second Amended Joint Chapter 11 Plan of Reorganization of FTX Trading Ltd. and Its Debtor Affiliates* [D.I. 26404-1] (the "Plan"), which became effective on January 3, 2025 [D.I. 29127]. Capitalized terms not otherwise defined herein shall have the meaning assigned to them in the Plan.

at the time of the Debtors' collapse. In overruling the pending objections and confirming the Plan, Judge Dorsey observed that this was "a model case for how to deal with a complex, very complex Chapter 11 bankruptcy proceeding." (Oct. 7, 2024 Hr'g Tr. 183:1-7.) Those negotiated settlements were incorporated into and implemented through the Plan, including its centerpiece, the Global Settlement. Any effort by Argent or anyone else to degrade the importance and reach of that settlement flies in the face of the record and the carefully crafted Plan that was litigated and confirmed by this Court almost two years ago.

2. The Global Settlement ensured that the Debtors' Chapter 11 Cases would not be mired in years of litigation with creditors attempting to procure for themselves outsized recoveries at the expense of other victims of the fraud committed by Samuel Bankman-Fried and the other FTX Insiders. Among other things, the Debtors and the Official Committee of Unsecured Creditors were concerned with individual creditors trying to increase their recoveries as of the Petition Date by (i) asserting legal or equitable ownership of the Debtors' assets, or (ii) asserting additional theories of liability based on facts or circumstances that could have been alleged by some or all of the creditors, *i.e.*, generalized fraud and similar claims based on the FTX Insiders' prepetition conduct.

3. The solution to ensure fair treatment of all creditors was the Global Settlement, which provides that the treatment provided for in the Plan for each class of Claim constitutes the entire recovery for that creditor's loss, and that any other claim or theory of liability relating to those facts or circumstances is released and enjoined. All creditors received substantial value in return for this uniform treatment, including the Customer Settlement, voluntary subordination of material governmental claims so that value could be distributed to victims, consolidation of the Debtors' Estates, and payment of postpetition interest at the Consensus Rate.

The implementation of this grand bargain is embodied in section 5.2, which incorporates the Global Settlement into the Plan, gives effect to a complex web of settlements, and works alongside the other Plan provisions to provide substantial recoveries to Holders of Allowed Claims.

4. Section 5.2 lays out the compromise across three paragraphs: the first paragraph channels all Claims against the Debtors into the framework of the Plan and expressly prohibits pursuit of other theories of liability; the second paragraph lays out consideration provided in return for being bound by the Plan; and the third paragraph provides for approval of the Global Settlement and recognizes its independent significance.

5. The Debtors, the Trust, and the Court have all consistently and correctly applied the Global Settlement where applicable during the claims administration process in these Chapter 11 Cases. There is no dispute that section 5.2 functions as part of the implementation of the Plan—that is the title of the section after all—but the suggestion that the provision is merely an administrative channeling provision is wrong. Section 5.2 is substantive and works with the rest of the Plan to ensure that each claimant receives fair and equal treatment on account of an Allowed Claim, and precludes any supplemental recovery on a generalized fraud or other theory of recovery that otherwise could be asserted as a result of the FTX Group's prepetition conduct under applicable law.

6. For example, if a Claim is for more than $50,000 on account of Digital Assets or fiat currency held in an account on the FTX.com exchange, then the Claim will be classified as a Dotcom Customer Entitlement Claim in Class 5A. (*See* Plan §§ 2.1.47, 2.1.67, 2.1.68, 4.3.6.) If such a Claim becomes Allowed, then it will be treated as follows under the Plan: *First*, all Causes of Action asserted in the Claim will be treated as compromised, settled, and resolved. (*Id.* § 5.2.) *Second*, the Claim will receive "the value as of the Petition Date" of the

Cash or Digital Assets held in the relevant customer account. (*Id.* § 2.1.47.) *Third*, that Petition Date value of such Digital Assets will be set by the Digital Assets Estimation Order. (*Id.* § 4.4.) *Fourth*, the Claim will be paid "in Cash in an amount equal to (i) 100% of such Allowed Dotcom Customer Entitlement Claim, *plus* (ii) interest at the Consensus Rate . . . *plus* (iii) any proceeds from the Supplemental Remission Fund . . . ." (*Id.* § 4.3.6.) *Fifth*, the Claim will receive priority on such payments consistent with the Plan waterfall, *i.e.*, largely ahead of General Unsecured Claims, Digital Asset Loan Claims, and various government claims. (*Id.* §§ 4.2.1, 4.2.3.) *Sixth*, no other Causes of Action or theories of liability relating to that Claim can be pursued or added onto the Claim. (*Id.* § 5.2.) Other types of Claims are similarly subject to the Global Settlement and the Plan's classification and treatment framework.

7. This framework unlocked enormous value for all creditors, both Customers and non-Customers alike. Moreover, this framework was clear and evident to parties-in-interest at the time of Plan confirmation. For example, one creditor recognized that the Global Settlement would eliminate its Causes of Action against the Debtors for fraud in connection with price dislocations in the final days of the FTX.com exchange [D.I. 23140]. That creditor objected to the Plan and ultimately was the only creditor to receive a voluntary carve-out of the Global Settlement to permit that specific fraud claim to be litigated [D.I. 26039]. Both Seth Melamed and the Silvergate Debtors were represented and received notice of the Plan confirmation proceedings but did not object to the Global Settlement at the time, and it is too late to do so now.

8. Despite arguing that the Plan must be read "'as a whole'" and each provision construed "to further the Plan's 'overall scheme'" (Joinder ¶ 58 (quoting *In re G-I Holdings, Inc.*, 755 F.3d 195, 202 (3d Cir. 2014))), Argent myopically focuses on only the first paragraph of section 5.2 to the exclusion of its second paragraph—spending only two sentences discussing the

second paragraph of section 5.2 across 56 pages of argument (Joinder ¶¶ 16, 89)—and the broader relationship between classification and treatment of Claims under the Plan. This approach is inconsistent with the text of the Plan and Delaware law, *see Eugene A. Delle Donne & Son, L.P.* v. *Applied Card Sys., Inc.*, 821 A.2d 885, 887 (Del. 2003) ("in construing a contract, [it] must be considered as a whole"), and leads Argent to its absurd assertions (i) that the Trust's reading of the Global Settlement can only mean that "Section 5.2 extinguished all claims on the Effective Date" (Joinder ¶ 3) and (ii) that the Global Settlement has no meaning outside of channeling Claims (*id.* ¶ 5). These conclusions are wrong.

9. *First*, the Trust has already paid out over $11 billion on Allowed Claims to date. Thus, the idea that the Global Settlement somehow extinguishes all Claims is facially ridiculous and Argent's strawman arguments can be set aside. (*See, e.g.*, Joinder ¶ 2 ("taken to its logical conclusion, the Trust's interpretation requires that Section 5.2 operates to extinguish, automatically on the Effective Date, every filed proof of claim in these cases").)

10. *Second*, the Global Settlement's scope is plainly broader than suggested by Argent. The Global Settlement created a framework through which all Claims are classified and treated in accordance with the specific negotiated provisions of the Plan. That classification and treatment form part of the consideration provided under the Global Settlement, which provided significant value to all claimants, both Customers and non-Customers alike. This is supported both by the plain language of the Plan and the negotiation history and circumstances surrounding it.

11. Furthermore, the Plan does not—and could not—extinguish the Trust's claims against third parties. Section 5.2 resolves Intercompany Claims "by or among" the various

Debtors and nothing more. That is confirmed both by the language and context of the Plan, and the history of its creation. Argent does not seriously argue otherwise.

12. The Court correctly held in its June 2 Order that the claims asserted in Melamed's November 12, 2025 Notice of Arbitration are barred and enjoined by sections 5.2 and 10.8 of the Plan. As Melamed himself argues, every claim asserted in his Notice of Arbitration seeks to recover on account of the cryptocurrency portion of his SPA Claim, styled as "Crypto Indemnity." Any and all Claims or theories of recovery are limited under section 5.2 of the Plan to the value of the Digital Assets calculated in accordance with section 4.4. Any supplemental recovery under any other theory—based on the generalized fraud allegations relied upon by Melamed and otherwise—is precluded by the Global Settlement.

13. The focus of the Plan, including section 5.2, was on Claims for losses tethered in some way to accounts on the FTX exchanges or Digital Assets. There are, however, a small set of Class 6A General Unsecured Claims that are not so tethered and seek recoveries for other types of alleged losses based on generalized allegations of prepetition misconduct by Samuel Bankman-Fried and the other FTX Insiders. These Claims are outliers. They involve claimants seeking to benefit from the terms of the Plan at the expense of creditors, without limitation. The nature of these Claims means they arguably are not precluded by section 5.2 despite the framework provided for in the Global Settlement and detailed in the Plan. Following the Trust's more detailed review of Argent's allegations, the Silvergate Claims are one of the few examples of such Claims.

14. It would be manifestly inequitable for these types of claims to siphon off any value—never mind the alleged hundreds of millions or billions of dollars—based on the very types of generalized fraud claims and theories of recovery that actual victims are precluded from asserting in order to receive supplemental recoveries. As a result, the Trust maintains that it is

appropriate for the Court to decline to consider the Silvergate Claims on this basis. However, the Trust has numerous defenses to the Silvergate Claims, including both threshold legal arguments and other merits defenses, as well as equitable defenses including equitable subordination. As a result, the Trust has concluded that it will not request that the Court apply the Global Settlement or section 5.2 to the Silvergate Claims as a threshold legal matter, and thus the question of whether the language of the Plan bars the assertion of the Silvergate Claims at all is moot.

## BACKGROUND

### I. The Debtors' Early Acknowledgment of Misconduct at FTX

15. On November 11 and 14, 2022, the Debtors filed with this Court petitions for relief under the Bankruptcy Code. Six days after the Petition Date, the Debtors filed the *Declaration of John J. Ray III in Support of Chapter 11 Petitions and First Day Pleadings* [D.I. 24]. That declaration made clear that misconduct had occurred at FTX and that the postpetition Debtors would seek to investigate this misconduct in a "transparent and deliberate manner." (*Id.* ¶¶ 5-6 ("Never in my career have I seen such a complete failure of corporate controls and such a complete absence of trustworthy financial information as occurred here.").)

16. After months of investigation, on April 9 and June 26, 2023, respectively, the Debtors filed the *First Interim Report of John J. Ray III to the Independent Directors on Control Failures at the FTX Exchanges* [D.I. 1242] (the "First Ray Report") and *Second Interim Report of John J. Ray III to the Independent Directors: the Commingling and Misuse of Customer Deposits at FTX.com* [D.I. 1704] (the "Second Ray Report"). These First and Second Ray Reports detailed the extensive misconduct that had occurred at FTX.

17. The First Ray Report provided an overview of the lack of appropriate management and governance structures at FTX, detailing how FTX was "tightly controlled by a small group of individuals" who "stifled dissent, commingled and misused corporate and customer

funds, lied to third parties about their business, joked internally about their tendency to lose track of millions of dollars in assets, and thereby caused the FTX Group to collapse as swiftly as it had grown." (First Ray Report at 3.)

18. The Second Ray Report focused on the mismanagement of customer deposits at FTX. The Second Ray Report described how "approximately $8.7 billion in customer-deposited assets was misappropriated from the FTX.com exchange." (Second Ray Report at 2.) The report explained how, even though FTX had "touted a commitment to protecting customer deposits from misuse or misallocation, and publicly championed legislative and regulatory efforts to protect crypto industry customers," in reality "the FTX Group's representations in this regard were false." (*Id.* at 3-4.) With respect to FTX's cash management, "FTX Trading Ltd. had difficulty establishing banking relationships" because U.S. banks were "generally . . . unwilling to provide services to crypto businesses." (*Id.* at 7.) As a result, FTX "funneled customer deposits and withdrawals in fiat currency through bank accounts of Alameda Research Ltd. . . . and other affiliates, and made misrepresentations to banks about the purpose for which it was using the accounts." (*Id*. at 8.)

## II. The Non-Customer and Customer Bar Dates

19. Given the anticipated high number of claims against the Debtors and their Estates, in consultation with the Official Committee of Unsecured Creditors (the "Committee"), the Debtors decided to bifurcate the bar date process between Claims by Customers ("Customer Claims") and non-Customers ("Non-Customer Claims").

20. On May 19, 2023, the Court entered the *Order (I)(A) Establishing Deadlines for Filing Non-Customer and Government Proofs of Claim and Proofs of Interest and (B) Approving the Form and Manner of Notice Thereof and (II) Granting Related Relief* [D.I. 1519] (the "Non-Customer Bar Date Order"). The Non-Customer Bar Date Order

established, among other things, the deadline of June 30, 2023 for all persons and entities to file Non-Customer Claims against the Debtors. (*Id.* ¶ 3.)

21. Paragraph 13 of the Non-Customer Bar Date Order provided:

> Pursuant to Bankruptcy Rule 3003(c)(2), absent further order of this Court, all holders of Non-Customer Claims . . . that fail to comply with [the Non-Customer Bar Date] Order by timely filing a proof of claim . . . in the appropriate form, if required, shall be forever barred, estopped and enjoined from: (a) asserting the applicable Non-Customer Claim against . . . the Debtors or their estates or property in these Chapter 11 Cases or (b) voting on, or receiving any distribution under, any plan filed in these Chapter 11 Cases, except to the extent that (i) such Claim is identified in the Schedules as an undisputed, non-contingent and liquidated claim (including with respect to the amount, nature or classification of such Claim) or . . .

22. Accordingly, any claimant (i) with a Non-Customer Claim that was not identified in the Debtors' Schedules as undisputed, non-contingent and liquidated or (ii) who disagreed with the amount, nature or classification of its Claim in the Debtors' Schedules, and who did not timely file a Non-Customer Claim by June 30, 2023, was barred from asserting such Claim against the Debtors, their Estates or property in the Chapter 11 Cases and was barred from receiving any Distributions on account of such Claim under the Plan.

23. On June 28, 2023, the Court entered the *Order (I)(A) Establishing Deadlines for Filing Customer Proofs of Claim, (B) Approving Procedures for Submitting Proofs of Claim and (C) Approving the Form and Manner of Notice Thereof and (II) Granting Related Relief* [D.I. 1793] (the "Customer Bar Date Order"). The Customer Bar Date Order established, among other things, the deadline of September 29, 2023 for all persons and entities to file Customer Claims against the Debtors. (*Id.* ¶ 3.)

24. Section 7 of the Customer proof of claim form asked claimants to "[l]ist the quantity of each type of cryptocurrency . . . or fiat currency . . . held in your account(s) as of November 11, 2022" and "[l]ist any Non-Fungible Tokens . . . held in your account(s) along with

the unique identification code." (*See* Customer Bar Date Order, Ex. 1 § 7.) Section 8 of the Customer proof of claim form also allowed claimants to include "Customer Claims related to any Other Trading Activity on the FTX Exchanges" where Other Trading Activity "would not include quantities of crypto, fiat or NFTs listed in Box 7 above." (*Id.* § 8.)

25. Similar to the Non-Customer Bar Date Order, paragraph 14 of the Customer Bar Date Order provided:

> Pursuant to Bankruptcy Rule 3003(c)(2), absent further order of this Court, all holders of Customer Claims that fail to comply with [the Customer Bar Date] Order by timely filing a proof of claim in the appropriate form, if required, on or before the applicable Customer Bar Date, shall be forever barred, estopped and enjoined from (a) asserting the applicable Customer Claim against the Debtors or their estates or property in these Chapter 11 Cases or (b) voting on, or receiving any distribution under, any Chapter 11 plan in these Chapter 11 Cases, except to the extent that such claim is identified in the Schedules as an undisputed, noncontingent and liquidated claim (including with respect to the quantity or nature of such claim).

26. Accordingly, any claimant (i) with a Customer Claim that was not identified in the Debtors' Schedules as undisputed, non-contingent and liquidated or (ii) who disagreed with the quantity or nature of its Customer Claim in the Debtors' Schedules and who did not timely file a Customer Claim by September 29, 2023, was barred from asserting such Claim against the Debtors, their Estates or property in the Chapter 11 Cases and was barred from receiving any distributions on account of such Claim under the Plan.

## III. The Development of the Plan

### A. The December 2022 Customer Property Actions Against the Debtors

27. On December 27, 2022, certain customers commenced an adversary proceeding against the Debtors in *Onusz, et al.* v. *West Realm Shires Inc., et al.*, Adv. Pro. No. 22-50513 (JTD) (Bankr. D. Del.), alleging that customers of the FTX.com and FTX.US exchanges

had, as of the Petition Date, a property interest in certain fiat currency and Digital Assets that the Debtors asserted to be property of their Estates. On December 28, 2022, members of an ad hoc committee of creditors (the "Ad Hoc Committee") also commenced an adversary proceeding against the Debtors in *Ad Hoc Committee of Non-US Customers of FTX.com* v. *FTX Trading, Ltd., et al.*, Adv. Pro. No. 22-50514 (JTD) (Bankr. D. Del.) (together with *Onusz*, the "Customer Property Actions"), alleging that customers of FTX.com had, as of the Petition Date, a property interest in certain fiat currency and Digital Assets that the Debtors asserted to be property of their Estates.

28. The Customer Property Actions and similar claims likely to follow posed an existential threat to the Debtors' efforts to provide recoveries to creditors in the Chapter 11 Cases in a timely manner. If the Customer Property Actions were successful, then the Debtors would not have ownership of some portion of the Digital Assets that made up their Estates and, as a result, could not monetize, and distribute the proceeds of, those Digital Assets. (*See Declaration of Steven P. Coverick in Support of Confirmation of the Second Amended Joint Chapter 11 Plan of Reorganization of FTX Trading Ltd. and Its Debtor Affiliates* [D.I. 26041] ("Coverick Declaration") ¶¶ 23-25.) Furthermore, the litigation of the Customer Property Actions would have taken significant resources and time, and would have materially impacted the plan formation and confirmation process.

29. The Debtors, the Committee, and the plaintiffs in the Customer Property Actions recognized that to avoid costly and value-destructive litigation, a consensual resolution of the issues raised in the Customer Property Actions was in the interests of all parties-in-interest.

**B. The Initial July 2023 Plan**

30. To facilitate these and other discussions, on July 31, 2023, the Debtors filed a draft chapter 11 plan of reorganization (the "Initial Plan") and term sheet (the "Initial Plan Term

Sheet") that described "certain material terms" of the draft plan [D.I. 2100]. The Debtors did so "before the expiration of customer bar dates, the completion of pending investigations, the resolution of important negotiations with Consulting Parties . . . and the preparation of a disclosure statement – in order to facilitate creditor feedback and the consensual resolution of certain issues." (Initial Plan Term Sheet at 1.)

31. The Initial Plan Term Sheet was explicit that "[t]he draft Plan provides an initial construct for a global settlement and good-faith compromise of an exceptionally large and complicated collection of claims, causes of actions and disputes involving the Debtors, including both claims against the Debtors and intercompany claims by various Debtors against other Debtors." (Initial Plan Term Sheet at 1-2.) This "initial construct" of the Global Settlement explained that the agreement would ultimately resolve issues fundamental to all claimants in the Chapter 11 Cases like, among other things, "the valuation of claims in U.S. dollars as of the Petition Date based on a valuation methodology that will be separately prepared by the Debtors and approved by the Bankruptcy Court;" "the cancellation of intercompany claims;" "the substantive consolidation of the estates of substantially all of the Debtors;" and "the subordination of certain claims to the pecuniary losses of customers and creditors." (*Id.*)

32. The "initial construct" of the Global Settlement also set out that it would resolve Customer-specific issues, like "disputes regarding the ownership of the assets held on the FTX.com and FTX US exchanges based on the applicable terms of service and trust doctrines" and "the recognition of special 'shortfall' claims by the FTX.com and FTX US exchanges for the benefit of their customers against the pool of general assets, to compensate the exchanges for the unauthorized borrowing and/or misappropriation of assets held on the exchanges." (Initial Plan Term Sheet at 1-2.)

### C. The October 2023 Customer Settlement

33. After the filing of the Initial Plan and Initial Plan Term Sheet, the Debtors continued to engage with, among others, the plaintiffs in the Customer Property Actions regarding the consensual resolution of the Customer Property Actions in connection with an amended chapter 11 plan. As a result of these good faith, arm's-length negotiations, on October 16, 2023, the Debtors filed the *Notice of Proposed Settlement of Customer Property Disputes* [D.I. 3291], which attached a Settlement and Plan Support Agreement (the "Customer Settlement") with the Ad Hoc Committee, plaintiffs in the *Onusz* action, and the Committee.

34. The Customer Settlement attached a plan term sheet setting out the key provisions of the Plan. (Customer Settlement, Ex. A (the "Customer Settlement Term Sheet").) The Customer Settlement Term Sheet built on the Initial Plan Term Sheet and referred to any plan pursuant to the Customer Settlement Term Sheet as a complex global settlement that involved, among other things, "the valuation of claims in USD as of the petition time based on a valuation methodology that will be separately prepared by the Debtors and approved by the Bankruptcy Court;" "the cancellation of intercompany claims . . . and the substantive consolidation of the estates of substantially all of the Debtors;" and "the subordination of certain claims to the pecuniary losses of customers and creditors." (Customer Settlement Term Sheet at 2-3.)

35. Customer Claims also received priority treatment under the Customer Settlement Term Sheet, including: the "resolution of disputes regarding the ownership of the digital assets held on the FTX.com and FTX U.S. exchanges based on the applicable terms of service and trust doctrines;" "the identification of three primary recovery pools, corresponding to segregated assets attributable to FTX.com customers, segregated assets attributable to FTX U.S. customers, and other assets that the Debtors contend are not clearly attributable to the FTX.com or FTX U.S. exchanges;" and "the recognition of special 'shortfall' claims by the FTX.com and

FTX U.S. exchanges for the benefit of their customers against the pool of general assets, to compensate the exchanges for the unauthorized borrowing and/or misappropriation of assets held on the exchanges." (Customer Settlement Term Sheet at 2-3.)

36. Finally, the Customer Settlement settled on the Effective Date, in full and final settlement and satisfaction of the Customer Property Actions, "all claims and causes of action against the Debtors that are asserted or could have been asserted in the complaints filed in each of the Customer Property Actions on the terms set forth in the Amended Plan . . . ." (Customer Settlement § 5.1.) The Customer Settlement was incorporated into all later drafts of the Plan and the Customer Settlement itself was approved by the Court as part of the Global Settlement at the Plan confirmation hearing. (*Findings of Fact, Conclusions of Law and Order Confirming the Second Amended Joint Chapter 11 Plan of Reorganization of FTX Trading Ltd. and Its Debtor Affiliates* [D.I. 26404] ("Confirmation Order") ¶ 93.)

**D. The December 2023 Draft Plan**

37. In accordance with the milestones set forth in the Customer Settlement, on December 16, 2023, the Debtors filed the *Joint Chapter 11 Plan of Reorganization of FTX Trading Ltd. and Its Debtor Affiliates* [D.I. 4861] (the "December 2023 Draft Plan"). The December 2023 Draft Plan incorporated the Customer Settlement into a framework that would remain largely unchanged through Plan confirmation.

38. Section 5.2 of the December 2023 Draft Plan updated the Initial Plan as follows:

> ~~As discussed in detail in the Disclosure Statement and as otherwise provided under the Plan, and pursuant to sections 363 and 1123 of the Bankruptcy Code and Bankruptcy Rule 9019, and in consideration for the~~In consideration of the classification, treatment, Distributions, releases and other benefits provided by the Debtors to their stakeholders under the Plan, on the Effective Date, the provisions of the Plan shall constitute a good-faith compromise,

settlement and resolution (the “Global Settlement”) of ~~various~~all Claims, Interests~~,~~ and Causes of Action~~, controversies and disputes arising from or related to, among other things: (a) the~~ against, by or among the Debtors, including without limitation: (a) the actual or purported fraud, unjust enrichment, misappropriation, conversion and misconduct of former Insiders; (b) any basis for the contractual, structural and legal subordination rights ~~that a Holder~~ of ~~a~~any Claim or ~~Interest may have with respect to any Allowed Claim,~~ Interest or any Distribution to be made on account of ~~such Allowed~~any Claim or Interest; (c) the purported commingling and misuse of customer deposits and corporate funds; (d) the tracing of assets of individual Debtors to particular sources of funding; (e) ~~the~~transactions among the Debtors prior to and on the Effective Date; (f) the allocation of corporate and administrative expenses across each of the Debtors; (~~f~~g) the effects and consequences of the Debtors’ Terms of Service and whether the assets held by the FTX.com Exchange and the FTX.US Exchange are property of the Debtors’ Estates; (~~g~~h) the Debtors’ disregard for corporate separateness before the Petition Date; (i) any causes of action by a Debtor against other Debtors or the Insiders of other Debtors; (j) the purported absence of adequate corporate governance, cash management, accounting and cybersecurity controls by the Debtors and their Affiliates prior to the commencement of the Chapter 11 Cases; and (~~h) the costs and risks to the Debtors’ Estates and creditor recoveries otherwise associated with prolonged litigation of each~~k) all Causes of Action relating to any of the foregoing.

~~Pursuant to, and as part~~In connection with the implementation of~~,~~ the Global Settlement pursuant to the Plan: (~~i~~a) the value of Claims in respect of Digital Assets shall be calculated pursuant to Section 4.4; (~~ii~~b) the Dotcom Intercompany Shortfall Claim and the U.S. Intercompany Shortfall Claim shall be recognized for the benefit of Holders of Allowed Dotcom Customer Entitlement Claims and Allowed U.S. Customer Entitlement Claims; (~~iii~~c) the Alameda U.S. Customer Claim shall be recognized as part of the General Pool; (d) Claims shall be classified and treated as set forth in Article 4, which entitles Holders of Allowed Dotcom Customer Entitlement Claims and Allowed U.S. Customer Entitlement Claims to recover against the (~~x~~i) Dotcom Customer ~~Pool~~Priority Assets and the U.S. Customer ~~Pool~~Priority Assets, respectively, and (~~y~~ii) General Pool, in accordance with the waterfall ~~priority~~priorities set forth in Section 4.2; (~~iv~~e) the Consolidated Debtors shall be substantively consolidated as set forth in Section ~~5.3~~5.5; (~~v~~f) Cancelled Intercompany Claims shall be ~~canceled~~cancelled; (~~vi~~g) ~~the~~Separate Subsidiary Intercompany Claims, Subordinated Claims, Equitably Subordinated Claims, FTT Interests, Preferred Equity Interests and Section 510(b) Claims shall be subordinated to Claims of other

> Holders~~; (vii) FTT Claims and~~, in accordance with the waterfall priorities set forth in Section 4.2; (h) Holders of Other Equity Interests shall ~~be canceled~~recover against the General Pool in accordance with the waterfall priorities set forth in Section 4.2; ~~and~~ (~~viii~~h) Distributions to customers and creditors shall be made in Cash (other than in Available NFTs) as set forth in Articles 4 and 7 and (i) all assets scheduled by the Debtors shall constitute property of the Debtors' Estates.
>
> The Plan shall be deemed a motion to approve the Global Settlement pursuant to Bankruptcy Rule 9019, and the entry of the Confirmation Order shall constitute the Bankruptcy Court's approval of the Global Settlement under section 1123 of the Bankruptcy Code and Bankruptcy Rule 9019, as well as findings by the Bankruptcy Court that the Global Settlement is fair, equitable, reasonable and in the best interests of the Debtors, their Estates and Holders of Claims and Interests.
>
> ~~Any settlement agreement entered into among any of the Debtors and Holders of Claims or Interests that is contained in the Plan Supplement is incorporated into the Plan and shall become effective in accordance with its terms.~~

39. The December 2023 Draft Plan thus added multiple terms to both its first and second paragraphs making clear that Intercompany Claims "against, by or among the Debtors" would be resolved by the Plan and, in turn, any Causes of Action against the Debtors based on such facts could not be sustained. And the December 2023 Draft Plan also added a new clause in the second paragraph of section 5.2 providing that "all assets scheduled by the Debtors shall constitute property of the Debtors' Estates." After the introduction of the revised version of section 5.2 in the December 2023 Draft Plan, the first paragraph of section 5.2 would remain substantially identical through confirmation of the Plan.[3]

40. The definition of a Customer Entitlement Claim in the December 2023 Draft Plan was updated from the Initial Plan:

[3] The confirmed Plan removed the reference to "Insiders of other Debtors" from clause (i) of the first paragraph.

> "Customer Entitlement Claim" means any Claim of any kind or nature whatsoever (whether arising in law or equity, contract or tort, under the Bankruptcy Code, federal or state law, rule or regulation, common law or otherwise) held by any Person or Entity against any of the Debtors~~, in each case arising out of or related to any~~ that compensates the Holder of such Claim for the value as of the Petition Date of Cash~~,~~ or Digital Assets ~~or other assets~~ held by such ~~person~~Person or ~~entity~~Entity in an account on any FTX Exchange ~~as of the Petition Date~~.

41. This change fundamentally changed the treatment of Customer Entitlement Claims under the Plan. Holders of Customer Entitlement Claims could only recover the ***value as of the Petition Date of Cash or Digital Assets in their Customer accounts.*** The definition of Customer Entitlement Claims would also remain unchanged through confirmation of the Plan.

**E. The February 2024 Digital Assets Estimation Order**

42. Two months after the Customer Settlement was filed, the Debtors filed the *Motion of Debtors to Estimate Claims Based on Digital Assets* [D.I. 5202] (the "Digital Assets Estimation Motion"). Consistent with the valuation methodology contemplated by the Customer Settlement, the Digital Assets Estimation Motion sought to establish a uniform method for valuing Claims in respect of Digital Assets through a proposed Digital Assets Conversion Table. (*Compare* Customer Settlement Term Sheet at 7 *with* Digital Assets Estimation Motion ¶ 3.) On February 7, 2024, the Court entered the Digital Assets Estimation Order, granting the Digital Assets Estimation Motion [D.I. 7090].

43. The Plan subsequently incorporated the methodology approved in the Digital Assets Estimation Order directly into its distributional framework. Section 4.4 of the Plan provides that "the value of a Claim in respect of a Digital Asset shall be calculated by converting the value of such Digital Asset into Cash as of the Petition Date utilizing the conversion rates set forth in the Digital Assets Conversion Table." Section 5.2 of the Plan, in turn, incorporates those valuations into the Global Settlement and the Plan's waterfall by providing in its second paragraph

that Claims in respect of Digital Assets are valued pursuant to section 4.4 and then classified and treated under article 4, including in accordance with the waterfall priorities set forth in section 4.2.

**F. The May 2024 Draft Plan**

44. On May 7, 2024, the Debtors filed a further revised plan [D.I. 14300] (the "May 2024 Draft Plan").

45. The May 2024 Draft Plan incorporated language into sections 4 and 5.2 that, "interest shall be paid at the applicable rate to Holders of certain Claims in accordance with Section 7.1 and the treatment set forth in Section 4.3." (May 2024 Draft Plan § 5.2; *see also id.* §§ 4.2-4.3.) This additional consideration applied to, among others, Customer Entitlement Claims, Digital Asset Loan Claims, and General Unsecured Claims. (*Id.* §§ 4.3.6-4.3.10.) In anticipation of forthcoming settlements with government creditors discussed below, sections 4 and 5.2 also incorporated several distinct classifications of Claims, including: Senior Subordinated IRS Claims, Senior Subordinated Governmental Claims and Junior Subordinated IRS Claims. (*Id.* §§ 4.3.18-4.3.20, 5.2.)

46. After the May 2024 Draft Plan, the second paragraph of section 5.2 would remain substantially identical through confirmation of the Plan.[4]

**G. The 2024 Government Settlements**

47. Throughout 2024, the Debtors continued to resolve outstanding disputes with major stakeholders in advance of Plan confirmation and, in particular, with government creditors who filed significant claims against the Debtors' Estates. In each case, the settlements with government creditors were structured to provide additional value to non-governmental creditor victims. By the time of the confirmation hearing, the Debtors had subordinated billions

[4] The confirmed Plan added "FTT Claims" to clause (f) and "Allowed Separate Subsidiary Claims" to clause (l) of the second paragraph.

of dollars in claims through settlements with government creditors and obtained agreement that any recovery on such subordinated claims would, for the most part, be distributed to non-governmental creditors.

48. For example, on June 3, 2024, the Debtors filed the *Debtors' Motion for Entry of an Order (A) Authorizing the Debtors' Entry Into, and Performance Under, the Settlement with the United States Department of the Treasury – Internal Revenue Service, (B) Approving the Settlement and (C) Granting Related Relief* [D.I. 16558] (the "IRS Settlement Motion"). At the time, the Internal Revenue Service (the "IRS") had asserted proofs of claim against the Debtors that initially totaled more than $44 billion and had subsequently been amended to approximately $24 billion. (IRS Settlement Motion ¶ 2.)

49. The IRS settlement was a key component of the Global Settlement and is contained in section 5.2 of the Plan. (Plan § 5.2 (Junior and Senior Subordinated IRS Claims "shall be subordinated to Claims of other Holders, in accordance with the waterfall priorities set forth in Section 4.2").) The IRS settlement unlocked substantial value for both Customer Entitlement Claims and General Unsecured Claims because the IRS agreed that the Junior and Senior Subordinated IRS Claims would be subordinated to such classes under the Plan waterfall. (*See* IRS Settlement Motion, Ex. A, Ex. 1 at 2-3.) As explained in the IRS Settlement Motion, should the IRS's claims have been allowed without a settlement, they "would have been classified as priority claims and consumed nearly the entire estate if allowed in full." (IRS Settlement Motion ¶ 23.)

50. Just as the Plan classified claims based on Customer accounts as Customer Entitlement Claims pursuant to the Customer Settlement, the Plan classified the IRS's claims as Priority Tax Claims (Plan § 2.1.158), Senior Subordinated IRS Claims (*id.* § 2.1.183), and Junior

Subordinated IRS Claims (*id.* § 2.1.128) pursuant to the IRS settlement. Further, similar to how the Plan treated Customer Entitlement Claims as set out in the Customer Settlement, the Plan treated Priority Tax Claims, Senior Subordinated IRS Claims, and Junior Subordinated IRS Claims as set out in the IRS settlement: (i) Priority Tax Claims would be allowed for $200 million (*id.* § 2.1.158), (ii) Senior Subordinated IRS Claims would be allowed for "the Debtors' income tax and employment tax obligations for the period beginning November 1, 2022" (*id.* § 2.1.183), and (iii) Junior Subordinated IRS Claims would be allowed for $685 million (*id.* § 2.1.128). Finally, similar to how the Plan waterfall prioritized Customer Entitlement Claims based on the Customer Settlement, the Plan waterfall subordinated the Junior and Senior Subordinated IRS Claims based on the IRS settlement. (*Id.* §§ 4.3.18, 4.3.20.)

51. On June 20, 2024, the Court approved the IRS settlement [D.I. 18036]. Because of the integration of the IRS settlement into the Global Settlement, the IRS settlement only became effective "upon confirmation of Debtors' proposed chapter 11 reorganization plan." (IRS Settlement Motion ¶ 3.)

52. On August 5, 2024 and October 8, 2024, the Court entered similar orders approving resolutions with the CFTC[5] and certain states.[6] Both settlements followed similar structures to the Customer Settlement and IRS settlement, resolving their respective claims in

---

5 After "lengthy negotiations," the Debtors and the CFTC agreed to forego "significant litigation risk" by settling the CFTC's proofs of claim amounting to $52.2 billion in connection with civil enforcement actions the CFTC filed against the Debtors [D.I. 20344 ¶¶ 2-3, 6]. Among other things, the settlement granted the CFTC an allowed claim of $4.0 billion, and the CFTC agreed to subordinate its claim [D.I. 22283 ¶¶ 4, 6].

6 Various state agencies and the Debtors agreed to settle the agencies' claims, which totaled approximately $1.8 billion, to avoid "time consuming, burdensome, and costly litigation" [D.I. 25287 ¶¶ 5, 21; 26403]. Under the settlement, the agencies' claims were fully satisfied, as long as certain claimants are paid their Allowed Claim plus interest, thereby maximizing distributable value to non-governmental creditors [D.I. 26403-1 at 3-4; D.I. 25287 ¶ 21].

return for classification and treatment under the Plan (Plan § 2.1.182), and agreeing to subordination in accordance with the Plan's waterfall (*id.* § 4.2.3).

**IV. Plan Confirmation**

53. On June 24, 2024, as the Plan moved toward solicitation, the Committee filed the *Notice of Filing of Official Committee Letter* [D.I. 18656], attaching a letter to creditors regarding the Plan (the "Committee Letter"). The Committee explained that "[t]he Plan provides for settlements of several key legal issues, including Customers' alleged property interests in and entitlements to Digital Assets and fiat currency in the Debtors' possession." (Committee Letter at 3.) The Committee Letter explicitly advised creditors that the Plan resolved several of the principal disputes in the Chapter 11 Cases through negotiated settlements.

54. The other materials provided in connection with solicitation likewise advised creditors that confirmation of the Plan would affect their rights. The Debtors' *Notice of Hearing to Consider Confirmation of Debtors' Joint Chapter 11 Plan of Reorganization* [D.I. 19150] advised that, if confirmed, the Plan would bind claimants regardless of whether they received or retained any property under the Plan, filed a Proof of Claim, failed to vote on the Plan or voted to reject the Plan. (*Id.* at 4.) The *Notice of Deadline to Vote On, Deadline to Object to Confirmation Of, and Hearing to Consider Confirmation of Debtors' Joint Chapter 11 Plan of Reorganization* [D.I. 19068-9] similarly advised that the Plan proposed "a permanent injunction against any person who has held . . . Claims, Interests or Causes of Action from commencing or continuing any action with respect to any Claim, Interest or Cause of Action released, settled or exculpated under the Plan" and cautioned that creditors' "legal rights may be affected if the Plan is approved." (*Id.* at 2.)

55. On June 27, 2024, the Debtors filed the Court-approved solicitation version of the *Disclosure Statement for Debtors' Joint Chapter 11 Plan of Reorganization of FTX Trading*

*Ltd. and Its Affiliated Debtors and Debtors-In-Possession* [D.I. 19143] (the "Disclosure Statement"). The Disclosure Statement provided creditors with additional detail concerning the Global Settlement. It explained that the Plan contemplated a "proposed global settlement and good-faith compromise of a large and complicated collection of claims, causes of actions and disputes involving the Debtors, including both claims against the Debtors and intercompany claims by various Debtors against other Debtors." (Disclosure Statement at 80.) The Disclosure Statement also summarized whether the various Classes of Claims were impaired and the treatment provided to those Claims under the Plan, and reproduced the Global Settlement set forth in section 5.2. (*Id.* at 11-22, 114-15.)

56. On June 27, 2024, the Debtors filed an updated version of the Plan [D.I. 19139] and a notice that confirmation of the Plan would proceed on October 7, 2024 [D.I. 19150]. On August 2, 2024, the Debtors filed another revised version of the Plan [D.I. 22165].

57. On August 16, 2024, ELD Capital LLC ("ELD") filed an *Objection of ELD Capital LLC to Confirmation of Debtors' Joint Chapter 11 Plan of Reorganization and Reservation of Rights* [D.I. 23140]. ELD had asserted a Customer Entitlement Claim that sought damages of $470,319 above the Petition Date value of the Digital Assets reflected in its Customer account based on a fraud theory. (*Id.* at 2, 6.) ELD rightfully identified that "[i]f the Plan is confirmed . . . claimants in ELD's position will be stripped of the ability to recover the value of their accounts but for the Debtors' fraud." (*Id.* at 9.)

58. On August 23, 2024, the U.S. Trustee filed an *Objection of the United States Trustee to Confirmation of First Amended Joint Chapter 11 Plan of Reorganization of FTX Trading, Ltd. and Its Debtor Affiliates* [D.I. 23610]. The U.S. Trustee argued, in part, that section

5.2 was impermissibly broad because it applied to "claims that creditors and interest holders may have against" the Debtors. (*Id.* ¶ 66.)

59. On September 30, 2024, the Debtors filed the *Second Amended Joint Chapter 11 Plan of Reorganization of FTX Trading Ltd. and Its Debtor Affiliates* [D.I. 26029], the *Debtors' Omnibus Reply to Objections to Confirmation of the Second Amended Joint Plan of Reorganization of FTX Trading Ltd. and Its Debtor Affiliates* [D.I. 26039] (the "Plan Reply"), and the Coverick Declaration. Through the Coverick Declaration, the Debtors described how the Plan was "the culmination of good faith negotiations and arm's-length discussions" among the Debtors, the Committee, the Ad Hoc Committee, the CFTC, the IRS, the Bahamas JOLs, various offices within the United States Department of Justice, several states and other stakeholders. (Coverick Decl. ¶ 42.) And, in particular, the Debtors explained that section 5.2 of the Plan provided, "in consideration for the distributions and other benefits provided pursuant to the Plan," for a "good faith compromise of all Claims, Interests and controversies relating to the contractual, legal and subordination rights that a Holder of a Claim may have with respect to any Allowed Claim, or any distribution to be made on account of such Allowed Claim." (*Id.* ¶ 21.)

60. In the interest of resolving ELD's objection to confirmation of the Plan, the Debtors voluntarily agreed to carve ELD's fraud claims out of the Global Settlement and preserve them for subsequent resolution. (Plan Reply ¶ 76.) With respect to the U.S. Trustee's objection, the Debtors further argued that "[t]here is no reason why a plan may not be used as a vehicle for effectuating a global settlement of claims and interests, so long as it [] complies with all applicable bankruptcy rules." (*Id.* ¶ 80.)

61. At the October 7, 2024 hearing on confirmation of the Plan, the Debtors explained that "[c]ollaboration . . . is also the key to understanding the plan." (Oct. 7, 2024 Hr'g

Tr. 9:22-23.) The Debtors detailed how they reached settlements with various government agencies such that not only did the Debtors avoid fines, but the government also agreed to the "voluntary subordination of governmental claims, not just [to] a bankruptcy petition time value but to an unprecedented 9 percent post-petition interest rate." (*Id.* 8:17-9:1.) The Debtors explained how their settlement with customers recognized that "something happened here that as an equitable matter suggests customers should have some priority over general unsecured creditors." (*Id.* 10:24-11:3.) And the Debtors emphasized that each of the settlements that made up the Plan "have an effectiveness condition that is waiting for confirmation of the [P]lan." (*Id.* 11:13-14.)

62. The Court proceeded to overrule each of the pending objections to the Plan, including the U.S. Trustee's objection, and confirmed the Plan. (Oct. 7, 2024 Hr'g Tr. 182:6-8.) On October 8, 2024, the Court entered the Confirmation Order. The Confirmation Order expressly approved the Global Settlement and found that it "constitutes a good faith compromise of all Claims, Interests and controversies relating to the contractual, legal, and subordination rights that a Holder of an Allowed Claim or Interest may have against the Debtors, or any Distribution to be made on account of such Allowed Claim or Interest." (Confirmation Order ¶ 93.) The Confirmation Order went on to approve the Global Settlement under Bankruptcy Rule 9019 and further explained that "such compromise or settlement, is in the best interests of the Debtors and their Estates, is fair, equitable and reasonable and falls above the lowest point in the range of reasonableness." (*Id.*)

63. On January 3, 2025, the Effective Date of the Plan occurred, which, among other things, established the Trust and transferred, assigned, and vested all of the Debtors' assets in the Trust [D.I. 29127].

## V. The Post-Confirmation Application of the Global Settlement

### A. Initial Assertions of the Global Settlement by the Trust in 2025

64. The Trust first invoked the Global Settlement less than two months after the Effective Date. On February 25, 2025, the Trust filed the *FTX Recovery Trust's One Hundred Sixtieth (Substantive) Omnibus Objection to Certain Overstated Proofs of Claim (Customer Claims)* [D.I. 29733] (the "160th Objection"). This substantive objection identified Customer Entitlement Claims that asserted generalized theories of "fraud, misrepresentation, misappropriation, breach of fiduciary duty and other similar assertions in connection with the customer accounts and deposited digital assets." (*Id.* ¶ 13.) In other words, these Customer Entitlement Claims attempted to recover from the Trust more than the "value as of the Petition Date of Cash or Digital Assets held" by the Customers in their accounts on the FTX exchange. (Plan § 2.1.47.) In the 160th Objection, the Trust argued that while Customers were "entitled to the value of their Allowed Customer Entitlement Claims under the Plan (*i.e.* the value of Digital Assets calculated in accordance with Section 4.4 of the Plan)" they were not entitled to any "incremental distributions" and "all components of the Overstated Claims asserting generalized Claims and causes of action should be reduced to zero." (160th Objection ¶¶ 13, 15.)

65. One Customer, Angelo Breen, filed a response to the 160th Objection [D.I. 30911]. Breen sought $690,420 against FTX Trading for the U.S. dollars withdrawn from his Customer account and donated to FTX Foundation. (Aug. 12, 2025 Hr'g Tr. [D.I. 32344] 19:7-10.) In reply, the Trust explained that "Section 5.2 of the plan conclusively provides that in return for the claims treatment and benefits provided for under the plan, among other things, the plan is in resolution of all claims against the [D]ebtors for fraud, misappropriation and misconduct by the [I]nsiders." (*Id.* 11:1-5.) Therefore, the Trust argued, Breen's effort to "increase his customer

claim arising from his Petition Date balance of 56 cents to almost $700,000 on a fraud theory" was precluded by the Global Settlement. (*Id.* 11:10-13.)

66. The Court agreed with the Trust, noting that "[i]f there was a valid claim under some sort of fraud, mismanagement, commingling claim, it has been compromised through the global settlement for the good of all creditors and customers of FTX" (*id.* 39:15-21), but did not ultimately rely on the Global Settlement in overruling Breen's objection (*id.* 38:16-21). The Court entered an order sustaining the 160th Objection as to Breen's Claim No. 96754 on other grounds [D.I. 32398], after previously sustaining the 160th Objection as to the other Customer Entitlement Claims [D.I. 30392] and, thus, extinguished Causes of Action for damages in excess of the Petition Date value of the relevant Customers' accounts on the FTX exchanges.

67. Throughout 2025, the Trust also litigated an objection to a Claim asserted by the Joint Liquidators of Three Arrows Capital Ltd. ("3AC") based on trading in 3AC's Customer account on the FTX.com exchange ahead of 3AC's own collapse in June 2022. As part of this litigation, on December 29, 2025, the Trust filed its *Reply in Further Support of the Objection of the FTX Recovery Trust to the Amended Proof of Claim Filed by the Joint Liquidators of Three Arrows Capital Ltd.* [D.I. 34240] (the "3AC Reply").

68. By the time the Trust filed the 3AC Reply, 3AC had attacked a series of key elements of the Global Settlement, including by asserting Causes of Action for unjust enrichment and violation of the terms of service for the FTX.com exchange. (*See id.* ¶¶ 98, 245.) So, in the 3AC Reply, the Trust explained that this piecemeal and value-destructive litigation was precisely what the Global Settlement was designed to avoid. (*Id.* ¶ 219.) The Trust detailed that the Global Settlement "ensure[d] that no individual customer could augment its claim with theories of generalized harm that could be asserted by *all* customers arising as a result of prepetition FTX

management's conduct." (*Id.* (emphasis added).) In return for this compromise, the Trust pointed out, "the claims of customers were elevated and received certain priorities and other supplemental consideration." (*Id.*) The Trust resolved 3AC's claims without Court intervention.

**B. The Trust Asserts the Global Settlement Against Seth Melamed**

69. The Trust later invoked the Global Settlement in its litigation with Seth Melamed. Melamed had asserted a Claim (the "SPA Claim") seeking more than $35 million based on breach of contract and fraudulent inducement claims arising from FTX's April 2022 acquisition of Liquid Group Inc. ("Liquid"). In July 2025, the Court ruled on certain threshold issues concerning the valuation and treatment of the SPA Claim, including determining that the "crypto-related claim[s]" were "in respect of a digital asset," as defined in the Plan, and therefore "should be valued pursuant to the confirmed plan and estimation order." (July 22, 2025 Hr'g Tr. [D.I. 31934] 125:16-20, 126:15-127:5.) The Court granted Melamed's request to compel arbitration with respect to the remaining issues underlying the SPA Claim [D.I. 32058].

70. Melamed did not limit the ensuing arbitration to the SPA Claim that the Court had referred. On November 12, 2025, Melamed filed a Notice of Arbitration asserting claims that he characterized as involving harm "legally distinct" from the SPA Claim, premised on "distinct acts" and resulting in "distinct loss." (*FTX Recovery Trust's Motion to Enforce Prior Orders That Preclude Seth Melamed From Asserting New Claims in Arbitration* [D.I. 35243] (the "Motion to Enforce") ¶ 12.) Melamed has consistently argued that his claims in arbitration "sit in the Crypto Indemnity component of the SPA Claim." (*Reply of Seth Melamed in Further Support of Motion for Reconsideration of the June 2, 2026 Order [D.I. 35768] Pursuant to 11 U.S.C. § 502(i) and Federal Rules of Bankruptcy Procedure 3008, 9023, and 9024* [D.I. 36015] ("Reconsideration Reply") ¶¶ 15, 16.) These new claims relied on allegations that FTX had misrepresented, among other things, its "segregation, custody, and reconciliation of customer

assets," its "risk management," its "secret preferential treatment" of Alameda and the "legitimacy of its business practices." (Motion to Enforce ¶¶ 42-43.)

71. On April 2, 2026, the Trust filed the Motion to Enforce seeking to preclude Melamed from pursuing those new claims. Among other independent grounds to enforce the Plan injunction against Melamed's arbitration claims, the Trust argued that the claims had "been conclusively settled and released under the Global Settlement provision of the Plan" because they were based on "generalized allegations concerning FTX's financial condition, business practices, and handling of assets." (Motion to Enforce ¶ 14.) The Trust explained that those allegations concerned misconduct common to creditors generally and that permitting such claims to proceed would require repeated litigation of the same generalized FTX-wide issues that the Global Settlement was designed to resolve. (*Id.* ¶¶ 41-44.)

72. In the *FTX Recovery Trust's Reply in Further Support of Its Motion to Enforce Prior Orders that Preclude Seth Melamed from Asserting New Claims in Arbitration* [D.I. 35558] (the "Motion to Enforce Reply"), filed on May 11, 2026, the Trust addressed why it had not previously invoked the Global Settlement against the SPA Claim. The Trust explained that "the fact that the Trust has not previously raised the Global Settlement provision as a basis to disallow Melamed's SPA Claim . . . only highlights the novelty of his arbitration claims, which now plainly implicate that provision." (*Id.* ¶ 45.) At the May 14, 2026 hearing, the Trust drew the same distinction, explaining that the allegations previously presented to the Court concerned "the specific transaction and the sale of Liquid," whereas the new theories had "morphed from bilateral negotiations" into broader allegations concerning FTX's treatment of cryptocurrency and customer assets. (May 14, 2026 Hr'g Tr. [D.I. 35716] 22:8-11, 59:10-61:7.) The Trust further explained that these were "the very sort of global arguments . . . that were the impetus for Section 5.2," which

prevented generalized allegations of FTX fraud from being litigated "on a creditor-by-creditor basis." (*Id.* 59:22-60:10.)

73. On June 2, 2026, the Court granted the Motion to Enforce, holding "because [Melamed's arbitration claims] are premised on claims that have been compromised, settled, resolved, and enjoined under sections 5.2 and 10.8" of the Plan, Melamed is enjoined from pursuing such claims. (*Order Granting FTX Recovery Trust's Motion to Enforce Prior Orders that Preclude Seth Melamed From Asserting New Claims in Arbitration* [D.I. 35768] (the "June 2 Order") ¶ 2.)

### C. The Trust Raises the Global Settlement With Respect to Non-Digital Asset General Unsecured Claims

74. In 2026, the Trust has been faced with litigating two sets of claims—brought by Alex Mashinsky and the Argent Liquidation Trust—that do not fit into any of the bespoke classifications set out in the Plan. Both sets of claims attempt to blame the collapse of the claimants' businesses (and alleged billions of dollars in damages) on generalized fraud by the FTX Insiders while conveniently ignoring their own misconduct and other factual and legal infirmities. Such frivolous claims fall into the catchall classification of "General Unsecured Claims" in Class 6A of the Plan. Because General Unsecured Claims benefit from the Global Settlement without being subject to defined treatment under the Plan, it is the Trust's position that the Court should equitably apply the Global Settlement to General Unsecured Claims that are based on generalized misconduct by the Debtors and do not allege individualized harm.

75. Alex Mashinsky was the CEO and controlling shareholder of the cryptocurrency lender Celsius. (*FTX Recovery Trust's First Amended Objection to Proofs of Claim Filed by Alex Mashinsky* [D.I. 34704] ("Mashinsky Objection") ¶ 1.) After Mashinsky pled guilty to federal crimes, the Trust, on February 13, 2026, filed the Mashinsky Objection which

asserted the Global Settlement among other dispositive arguments against Mashinsky's facially deficient Claims. (*Id.* ¶¶ 39-43.) While the Trust explained how the Global Settlement was negotiated and applied primarily in the context of Customer Entitlement Claims, the Trust argued that the Global Settlement was applicable because it "was designed precisely to avoid mass costly and value-destructive litigation by ensuring that no individual customer could augment its claim with theories of generalized harm that could be asserted by all customers." (*Id.* ¶ 42.) On August 31, 2026, Mashinsky filed his response to the Mashinsky Objection [D.I. 36194], to which the Trust will file a reply on or before October 2, 2026 in accordance with the scheduling order entered by the Court [D.I. 36060].

76. Prior to its collapse in March 2023, Silvergate Bank was one of the few U.S.-based banks that sought out high-risk digital asset companies as clients. The prepetition Debtors were the most significant of those clients and, as detailed in the Trust's *Statement of More Definite Claim of the FTX Recovery Trust in Support of the FTX Group's Proofs of Claim Against Silvergate*[7], the prepetition Debtors relied on Silvergate Bank to aid in their fraud. Despite this, on June 30, 2023, Silvergate Bank (on behalf of itself and Silvergate Capital Corporation) filed 100 substantially identical unliquidated proofs of claim against the Debtors (the "Silvergate Claims"). (Joinder ¶ 42.) The Silvergate Claims point to the generalized fraud of the Debtors as the basis for their claims. (*Id.* ¶ 43.)

77. It was not until June 11, 2026—after Silvergate Bank and certain of its affiliates (the "Silvergate Debtors") commenced their chapter 11 proceedings and confirmed a plan of reorganization, and a liquidating trust acquired the Silvergate Claims—that Argent filed *Argent Liquidation Trust's Limited Objection to Third Notice of Proposed Reduction of Disputed Claims*

[7] *In re: Spring Valley Lots, LLC*, No. 24-12157 (Bankr. D. Del.), D.I. 67.

*Reserve Amount* [D.I. 35808] (the "Argent Objection") and asserted for the first time that the Silvergate Claims were worth "billions of dollars" based on "approximately $751 million or more in forced fire-sale securities losses, billions in lost equity value, and more than one hundred million dollars in regulatory settlements and other investigative, advisor, settlement, bankruptcy, and unreimbursed indemnification costs." (*Id.* ¶¶ 2-3.)

78. On June 16, 2026, the Trust filed *FTX Recovery Trust's Response to Argent Liquidation Trust's Limited Objection to Third Notice of Proposed Reduction of Disputed Claims Reserve Amount* [D.I. 35828]. In that response, the Trust outlined a non-exclusive list of independent defenses to the Silvergate Claims, including reference to the Global Settlement and section 5.2 of the Plan. (*Id.* ¶¶ 31-33.) The Trust argued that "Argent has conceded that the Silvergate Claims 'flow[] directly' from the fraud allegations and conduct covered by the Global Settlement" so the Global Settlement should apply to the Silvergate Claims. (*Id.* ¶ 33.)

**VI. The Argent Joinder**

79. On June 16, 2026, Melamed moved for reconsideration of the June 2 Order by filing the *Motion of Seth Melamed for Reconsideration of the June 2, 2026 Order [D.I. 35768] Pursuant to 11 U.S.C. § 502(j) and Federal Rules of Bankruptcy Procedure 3008, 9023, and 9024* [D.I. 35827] (the "Motion for Reconsideration"). On July 16, 2026, the Trust filed its *Objection of FTX Recovery Trust to Motion of Seth Melamed for Reconsideration of the June 2, 2026 Order [D.I. 35768] Pursuant to 11 U.S.C. § 502(j) and Federal Rules of Bankruptcy Procedure 3008, 9023, and 9024* [D.I. 36002] (the "Reconsideration Objection"), which is incorporated herein by reference.

80. On July 13, 2026, Argent filed a joinder and statement in support of Melamed's Motion for Reconsideration [D.I. 35985], which it subsequently amended on July 28 [D.I. 36059-1]. In the Joinder, Argent proposes an alternative reading to the Global Settlement

than that put forward by the Trust. Argent does not argue that Melamed's arbitration claims should be permitted to proceed. (Joinder ¶¶ 103-05.) Rather, Argent collaterally argues that its alternative reading of the Global Settlement precludes its application to the Silvergate Claims. (*See id.* ¶ 66.)

**ARGUMENT**

81. Argent joins the Motion for Reconsideration and urges this Court to revisit the June 2 Order to the extent it interpreted section 5.2 of the Plan as compromising, settling, resolving, and enjoining Melamed's claims in arbitration. (Joinder ¶¶ 53-57.) Argent's pathway to relief is a narrow one, and Argent comes nowhere close to showing that either a clear error of law or manifest injustice warrants reconsideration of the June 2 Order.

82. Courts apply the Rule 59(e) standard for altering or amending a judgment. *In re Conex Holdings, LLC*, 524 B.R. 55, 58 n.4 (Bankr. D. Del. 2015). "[C]ause" for reconsideration under Rule 59(e) requires a showing of at least one of the grounds set forth in Rule 59 or Rule 60(b). *In re Genesis Health Ventures, Inc.*, 362 B.R. 657, 661 (D. Del. 2007), *aff'd*, 248 F. App'x 475 (3d Cir. 2007). Under that standard, reconsideration is warranted only upon "(1) an intervening change in controlling law; (2) the availability of new evidence; or (3) the need to correct a clear error of law or prevent manifest injustice." *In re New Century TRS Holdings, Inc.*, 502 B.R. 416, 420-21 (Bankr. D. Del. 2013) (citation omitted); *see also Howard Hess Dental Labs. Inc.* v. *Dentsply Int'l, Inc.*, 602 F.3d 237, 251 (3d Cir. 2010) (same). Argent, like Melamed, relies solely on the third ground, urging reconsideration "to prevent manifest injustice and correct a clear error of law." (Joinder ¶ 54.)

83. That ground presents "a very high hurdle to leap over." *In re Titus*, 479 B.R. 362, 367 (Bankr. W.D. Pa. 2012). "[C]lear error of law or fact requires an error that is 'plain and indisputable, and that amounts to a complete disregard of the controlling law or the credible evidence in the record.'" *Id.* at 368 (citation omitted). "[M]anifest injustice" similarly requires an

error "that is direct, obvious, and observable." *Id.* at 367 (citation omitted). The authorities cited by Argent, *W.P.* v. *Comm'r of Soc. Sec.*, 2022 WL 2341561, at *2 (D.N.J. June 29, 2022), *Pena-Ruiz* v. *Solorzano*, 281 F. App'x 110, 111 n.1 (3d Cir. 2008), *Vaughn* v. *Consumer Home Mortg. Co.*, 470 F. Supp. 2d 248, 251 (E.D.N.Y. 2007), and *Trudeau* v. *Bockstein*, 2008 WL 541158, at *4 (N.D.N.Y. Feb. 25, 2008), address the relief a court may grant once reconsideration is warranted. They do not dispense with the threshold requirement that the movant establish a clear error of law or manifest injustice in the first place.

84. Argent cannot meet that standard. Argent argues that the Court's interpretation of section 5.2 is inconsistent with the Plan's text and structure and, if left undisturbed, would result in manifest injustice. (Joinder ¶¶ 54-57.) But, as explained herein, the June 2 Order reflects no clear error of law or manifest injustice. The Court's interpretation of section 5.2 is supported by the Plan's text, structure, drafting history, and confirmation record, and thus the Melamed arbitration claims were properly enjoined pursuant to section 10.8 of the Plan. Section 5.2 provides that Claims and Causes of Action settled through the Global Settlement cannot be pursued to obtain an additional recovery outside the Plan's classification and treatment framework. It does not, as Argent contends, extinguish every filed proof of claim or render articles 4 and 8 meaningless. Accordingly, the Motion for Reconsideration should be denied.

## I. The Global Settlement Is a Settlement of Claims and a Plan Implementation Provision.

85. The Global Settlement has been appropriately invoked in these Chapter 11 Cases. The Trust has sought to apply it where applicable under the framework established in the Plan. The Global Settlement is a comprehensive resolution of all Claims and Causes of Action against the Debtors in exchange for the Plan claim classification, treatment and structure. While the Global Settlement is a plan implementation tool, it has crucial substantive elements to ensure

the fair allocation of value among creditors. Language similar to that of the first paragraph of section 5.2 has been used elsewhere, but as used here it is not a mere administrative implementation provision as in other chapter 11 plans cited by Argent. (Joinder ¶¶ 68-69.) Here, section 5.2 provides explicit notice of specific categories of Claims and Causes of Action being settled and enumerates the benefits received in consideration for such settlement. Accordingly, the Trust submits that both its and the Court's interpretation and application of the Global Settlement have been appropriate and there is no basis to reconsider the June 2 Order.

86. "In construing a confirmed plan of reorganization, [courts] apply contract principles." *In re Shenango Grp. Inc.*, 501 F.3d 338, 344 (3d Cir. 2007). Similarly, under Delaware law applicable to the Plan pursuant to section 2.3 thereof, "[s]ettlement agreements are interpreted according to 'basic contract principles.'" *In re Diet Drugs (Phentermine/Fenfluramine/Dexfenfluramine) Prod. Liab. Litig.*, 706 F.3d 217, 223 (3d Cir. 2013) (citation omitted). "Where a plan (like a contract) is unambiguous, its terms must be enforced as written." *In re NorthEast Gas Generation, LLC*, 639 B.R. 914, 923 (Bankr. D. Del. 2022). Courts must "read the contract as a whole" and "endeavor 'to give each provision and term effect' and not render any terms 'meaningless or illusory.'" *Weinberg* v. *Waystar, Inc.*, 294 A.3d 1039, 1044 (Del. 2023).

### A. The Trust Applies the Court Approved Global Settlement as a Channeling Provision with Independent Effects.

87. The Trust has consistently referred to the Global Settlement where relevant. Under the Global Settlement, all "stakeholders" of the Debtors compromised, settled, and resolved all "Claims, Interests and Causes of Action" they may have possibly asserted against the Debtors in return for "classification, treatment, Distributions, releases and other benefits provided by the Debtors." But unlike a typical channeling provision, the Claims and Causes of Action resolved

include the theories of losses specifically enumerated in (a)-(k) of the first paragraph of section 5.2, along with any other Claim or theory of recovery against the Debtors. The first category of Claims on that list includes Claims based on "the actual or purported fraud, unjust enrichment, misappropriation, conversion and misconduct of former Insiders."

88. The classification and treatment of a given Claim under the Plan varies based on the factual relationship between the claimant and the Debtors. For the vast majority of claimants, the classification of their Claims determines what "Claims, Interests and Causes of Action" can be asserted against the Trust and what recoveries they may receive on account of such "Claims, Interests and Causes of Action." If a Claim is specifically classified, then it has been compromised, settled, and resolved in exchange for the Class-specific treatment set out in the Plan.

89. The consideration for the specific classification is then set out in the second paragraph of section 5.2. The second paragraph describes what the Plan provides "[i]n connection with the implementation of the Global Settlement" and specifically identifies: (i) the valuation of "Claims in respect of Digital Assets" in accordance with the Digital Assets Estimation Order; (ii) the classification and treatment of Claims in accordance with article 4 of the Plan; (iii) the priority of Customer Entitlement Claims and subordination of certain government Claims; (iv) the substantive consolidation of the Consolidated Debtors; (v) the resolution of the customer property disputes such that all assets are treated as assets of the Debtors' Estates; and (vi) the payment of postpetition interest on certain Allowed Claims. Thus, the first and second paragraphs of section 5.2 work in tandem to effectuate and implement the Global Settlement into the Plan.

a. <u>The Application of the Global Settlement to Customer Claims.</u>

90. A claim based on a Customer account on one of the FTX exchanges that was properly filed (*i.e.*, the relevant Customer agreed with the Debtors' scheduled, non-contingent, liquidated and undisputed quantities of cryptocurrency and fiat or timely filed a Customer proof

of claim by the Customer Bar Date) is classified as a Customer Entitlement Claim, which is defined as:

> any Claim of any kind or nature whatsoever (whether arising in law or equity, contract or tort, under the Bankruptcy Code, federal or state law, rule or regulation, common law or otherwise) held by any Person or Entity against any of the Debtors that compensates the Holder of such Claim for the value as of the Petition Date of Cash or Digital Assets held by such Person or Entity in an account on any FTX Exchange. (Plan § 2.1.47.)

91. As a result, no matter how a Customer alleges that they were harmed by the Debtors or what Causes of Action they assert, if that harm or Cause of Action resulted in any way from their Customer account, then their Claim is classified as a Customer Entitlement Claim. This includes Claims for the value of any Cash or Digital Assets in a Customer account (*i.e.*, the Cash or Digital Assets scheduled or listed in section 7 of the Customer proof of claim form) and Claims for any other Cause of Action or harm (*i.e.*, any Claim identified in section 8 of the Customer proof of claim form), including claims based on fraud committed by the FTX Insiders, commingling of Debtor and Customer assets, purported property rights, and any lack of corporate separateness.

92. In return for the resolution of all Causes of Action or harms that could have possibly resulted from a Customer account, Holders of Customer Entitlement Claims receive streamlined and enhanced treatment under the Plan. Customer Entitlement Claims are "value[d] as of the Petition Date" in accordance with the Digital Assets Estimation Order for the "Cash or Digital Assets" held in the Customer account.[8] (Plan §§ 2.1.47, 4.4.) This treatment provides Customer claimants with certainty regarding—and removes any need to individually litigate—the value of their Customer Entitlement Claims. Further, under the Plan, Holders of Customer

---

[8] This treatment is explicitly incorporated into the second paragraph of the Global Settlement. (Plan § 5.2 ("the value of Claims in respect of Digital Assets shall be calculated pursuant to Section 4.4").)

Entitlement Claims receive "Cash in an amount equal to (i) 100% of such Allowed Dotcom Customer Entitlement Claim, *plus* (ii) interest at the [9%] Consensus Rate . . . *plus* (iii) any proceeds from the Supplemental Remission Fund . . . ." (*See, e.g.*, *id.* § 4.3.6.) In addition, Customer Entitlement Claims have priority in the Claims payment waterfall over General Unsecured Claims and, with the exception of the $200 million in Priority Tax Claims, all government claims. (*Id.* § 4.2.)

93. Thus, the Global Settlement ensures that each Customer is treated fairly and equally under the Plan, provides consistent treatment of Cash and Digital Assets in Customer accounts as of the Petition Date, and also provides that all general claims that could have been brought by any Customer in relation to the FTX exchanges cannot be separately pursued. This structure was critical to the Debtors being able to confirm the Plan at all and the Trust being able to make Distributions.

b. <u>The Application of the Global Settlement to Non-Customer Claims.</u>

94. The framework of the Global Settlement is also applicable to Non-Customer Claims. Holders of specifically classified Non-Customer Claims likewise receive specific treatment that provides valuation certainty, postpetition interest, and prioritization. In addition, non-Customer claimants receive the benefits of the Customer Settlement by ensuring that the property held by the Debtors is treated as property of the Debtors and, therefore, available for distribution. Absent this settlement—and if the Debtors litigated and lost the issue—Distributions could never have proceeded in the amount and at the pace realized in these Chapter 11 Cases. Holders of Non-Customer Claims, similar to Holders of Customer Claims, receive the benefit of the numerous settlements that the Debtors reached with various governmental agencies that

resulted in the subordination of significant claims that would otherwise be senior to, or *pari passu* with, these claims. (*See* Plan § 4.2.3.)

95. ***Class 6B Digital Asset Loan Claims.*** Class 6B Digital Asset Loan Claims are classified as "any Claim for loans of Digital Assets that is not a Secured Claim." (Plan § 2.1.53.) Similar to Customer Entitlement Claims, the scope of the Digital Asset Loan Claim includes *any* Claim or theory of recovery of any kind or nature for losses due to loans of Digital Assets. This includes any outstanding principal and interest amounts owed on the underlying loan as well as any other Cause of Action or theory of recovery relating to such loan, including, without limitation, the theories or bases of losses set forth in the first paragraph of section 5.2.

96. If Allowed, Digital Asset Loan Claims are valued for the outstanding principal of the Loan and are classified in Class 6B, which entitles them to (i) 100% of such Allowed Claim, (ii) postpetition interest on the Allowed Claim at the 9% Consensus Rate or applicable contract rate, and (iii) if applicable, proceeds from the Supplemental Remission Fund. (Plan § 4.3.10.) As with Customer Entitlement Claims, the Global Settlement provides streamlined, enhanced recoveries on account of Digital Asset Loan Claims in return for the resolution of all possible Claims and Causes of Action that could arise from such outstanding Digital Asset Loans under any theory of recovery.

97. ***General Unsecured Claims on Account of Digital Assets.*** General Unsecured Claims operate similarly. General Unsecured Claims are all claims other than those specifically classified and defined under the Plan. (Plan § 2.1.113.) While the scope of the types of claims that are General Unsecured Claims may be broader and more encompassing, the channeling features of section 5.2 nevertheless apply.

98. One important type of General Unsecured Claim is a Claim on account of Digital Assets—these are any Claims where the damages sought, or basis for damages, are in respect of Digital Assets. The scope of these types of Claims covers any Cause of Action or theory of recovery for harm relating to facts or circumstances. This includes Claims for any Digital Assets owed as well as any other Claim relating to the same underlying circumstances, including, without limitation, the theories of recovery or bases of losses set forth in the first paragraph of section 5.2 of the Plan.

99. If Allowed, General Unsecured Claims in respect of Digital Assets are valued in accordance with the Digital Assets Estimation Order for the Digital Assets and classified, depending on the value of the Claims, as either Class 6A General Unsecured Claims or Class 7C General Convenience Claims. (Plan § 4.4.) This treatment is explicitly incorporated into the second paragraph of the Global Settlement. (*Id.* § 5.2 ("the value of Claims in respect of Digital Assets shall be calculated pursuant to Section 4.4").) In either classification, the Holder of the Claim would be entitled to receive (i) 100% of such Allowed Claim and (ii) postpetition interest on the Allowed Claim at the 9% Consensus Rate or applicable contract rate. (*Id.* §§ 4.3.9, 4.3.13.) However, such Claim would not be entitled to recover anything beyond the Petition Date valuation of the at-issue Digital Assets set out in the Digital Assets Estimation Order, irrespective of the Cause of Action or theory of recovery. As with other classes, Holders of General Unsecured Claims in respect of Digital Assets are barred by section 5.2 from seeking to recover additional losses under any other theory of recovery.

100. ***Other General Unsecured Claims.*** The same framework applies to General Unsecured Claims untethered to Digital Assets that are asserted based on contracts with FTX. As a matter of equity, the same logic and framework should be applied to General Unsecured Claims

that are untethered to Digital Assets and seek damages based on allegations that the claimant's business suffered harm from the fraud perpetrated by Samuel Bankman-Fried and the other FTX Insiders. But because Class 6A General Unsecured Claims is by its nature a catch-all class of Claims irrespective of theory of recovery, the plain language of the Plan does not operate in the same manner. Nonetheless, General Unsecured Claims benefit from the Global Settlement because they have priority over subordinated government claims (*see* Plan § 4.2.3), are able to access the consolidated assets of the Debtors against which they have claims (*see id*. § 4.3.9), and receive "100%" of their Allowed amount with interest at the Consensus Rate (*see id*.). Further, the Plan's history supports the application of the Global Settlement's limitations to such outlier claims, either as a threshold matter or as a matter of equitable subordination.[9] It is thus fundamentally unfair for creditors to potentially have recoveries diluted by litigation of these claims.

### B. Argent's Strawman Interpretation of the Global Settlement Is Wrong.

101. Argent characterizes the Trust's position—that the Global Settlement is a grand bargain between stakeholders to enable streamlined Distributions to legitimate claimants—as "a *post-hoc* litigation position, manufactured months after confirmation." (Joinder ¶ 4.) Argent's position is that the Global Settlement is a "standard" administrative channeling provision that lacks effect beyond channeling Claims into the allowance and distributional framework of the Plan. (*Id.* ¶ 6.) And Argent absurdly concludes that, if the Global Settlement did more, it would operate "to extinguish, automatically on the Effective Date, every filed proof of claim in these cases without notice, without individualized adjudication, without the consent of the affected

[9] The Trust expressly reserves the right to seek equitable subordination of any and all Disputed Claims.

creditors, and without delivering any of the 'consideration' [section 5.2's] own opening clause identifies as the core of the 'settlement.'" (*Id.* ¶ 2.)

102. This, of course, did not happen. The Plan did not—and could not have—extinguished every filed proof of claim. In fact, since the Effective Date of the Plan, the Trust has administered and reconciled tens of thousands of claims, including filing numerous claims objections on myriad bases, and has already distributed over $11 billion to Holders of valid Allowed Claims.

103. Argent ignores the vast majority of section 5.2 and how it operates. *First,* section 5.2 compromises "Claims, Interests, and Causes of Action" in exchange for the classification and treatment set out in article 4 and as applied through the procedures set out in article 8. Section 5.2 thus works *with* articles 4 and 8, and does not render those provisions surplusage. The Trust has relied on articles 4 and 8 to allow and, where necessary, object to Claims. Similarly, section 5.17 separately preserves Causes of Action of the Estates, while section 10.4 governs third party (not Debtor) releases. Each provision retains independent effect. Any tension between section 5.2 and the provisions cited by Argent is entirely the result of Argent's strawman reading.

104. Argent's interpretation ignores the entire second paragraph of section 5.2 and also fails to consider the interaction between the Global Settlement and other key classifications in the Plan, including the definitions of Customer Entitlement Claims, Digital Asset Loan Claims, and General Unsecured Claims in respect of Digital Assets. Rather, Argent only posits Plan treatment in the narrow context of its own purported General Unsecured Claims. (Joinder ¶¶ 66, 73.) Only by ignoring key provisions of the Plan can Argent reach its stilted conclusion that the Global Settlement is merely an administrative channeling provision.

105. Moreover, Argent argues that because the list of specific Causes of Action waived under the Global Settlement is "without limitation," it is "merely illustrative" and the Trust's citation to "claims for fraud and misconduct of former FTX Group higher-ups" simply "cannot be reconciled with the illustrative nature of this list." (Joinder ¶ 61.) This reading of the Global Settlement is flawed and ignores the history that led to its creation. Complex issues regarding prepetition fraud and misconduct, property of the Debtors' Estates, customer entitlements and undocumented Intercompany Claims, among others, were all paramount at the outset of these Chapter 11 Cases. The Debtors recognized that virtually every claimant in these Chapter 11 Cases could have asserted Claims and Causes of Action related to these matters, and that litigation of such issues would have been prohibitive and value-destructive. Accordingly, the Debtors engaged with their key stakeholders and the resulting Global Settlement was the culmination of that extensive negotiation process. The Plan does, in fact, resolve these Claims and Causes of Action for specifically classified Claims. (*See* Coverick Decl. ¶ 28.)

106. *Second*, Argent mischaracterizes section 5.2 as a "general recital" that must yield to article 8 and section 10.4. (Joinder ¶¶ 77-80.) This is wrong for multiple reasons: (i) the third paragraph of section 5.2 (which Argent never addresses) makes clear that its terms have independent effect as a settlement approved by the Court, unlike article 8 and section 10.4 which exist entirely within the Plan; (ii) section 5.2 is highly specific—it lists multiple theories of losses for Claims and Causes of Action that are resolved, including subsection (k) that expressly provides that the settlement extends to "all Causes of Action relating to any of the foregoing"—that clause would be entirely unnecessary if the enumerated claims preceding it had no import—and (iii) the second paragraph of section 5.2 details the consideration provided to creditors in return for the Global Settlement's channeling and release—while article 8 and section 10.4 address entirely

different subjects—claims-administration procedures and voluntary third-party releases, respectively.[10]

107. *Third*, Argent's premise that section 5.2 could compromise Claims only by using the words "expunged," "disallowed," or "forever barred" is contradicted by the Plan's other provisions. (Joinder ¶¶ 81-82.) Section 8.2 expressly provides that Claims may be "compromised, settled, withdrawn or resolved by any mechanism approved by the Bankruptcy Court or under the Plan." Similarly, section 10.8 incorporates the Global Settlement and prohibits any "Person" from pursuing any "Claims, Interests, or Causes of Action" against the Debtors which were "***released, settled or exculpated*** under the Plan." These provisions demonstrate that the Debtors used the same language as used in section 5.2 to refer to the resolution and settlement of Claims in other sections of the Plan with effect.

108. *Fourth*, Argent dismisses the second paragraph of Section 5.2 as merely reciting "the waterfall recovery scheme described in the Disclosure Statement as part of the Customer [] Settlement." (Joinder ¶ 16.) This is wrong. That second paragraph operates to detail benefits that valid creditors receive in exchange for the Claims and Causes of Action resolved as part of the Global Settlement. The Customer Settlement was only one of the settlements embodied in the Global Settlement and the Plan, the Global Settlement is significantly broader and

10 Further, the cases cited by Argent are inapposite. The global settlement provision in *In re Westinghouse Electric Co.* listed some, but not all, of a creditor's claims as "released." 2019 WL 4555990, at *5 (Bankr. S.D.N.Y. Sep. 19, 2019) (settlement provision providing for the treatment of claims, including "Toshiba GUC Claims" and "*Released* Toshiba Claims" (emphasis added)). Here, as Argent emphasizes, the Global Settlement applies to all Claims, Interests, and Causes of Action. The release provision in *In re Voyager Digital Holdings, Inc.* applied to a lengthy list of "Released Parties," but failed to identify the relevant "consideration" for the release. 649 B.R. 111, 131-32 (Bankr. S.D.N.Y. 2023); Third Amended Joint Plan [D.I. 1166-1] at Art. I.A.138, *In re Voyager Digital Holdings, Inc.*, Case No. 22-10943 (MEW) (Bankr. S.D.N.Y. Mar. 10, 2023). Nor did the Debtor make any attempt to consider "all of the types of claims that would be covered" by the release. 649 B.R. at 132. The court in *Hernandez* v. *Larry Miller Roofing, Inc.* analyzed whether a plan's release provision was sufficient to release a claim against a third party—a completely different context to that of the Global Settlement. 628 F. App'x 281, 284-88 (5th Cir. 2016).

incorporates and implements the settlements with the IRS, the CFTC, other state governmental agencies, and others. Each of these individual settlements was critical and made possible the results delivered to creditors through the Plan.

109. *Finally*, *contra proferentem* cannot rescue Argent's interpretation. (Joinder ¶ 70.) The Delaware Supreme Court has cautioned that the doctrine is not a "short-cut" for avoiding ordinary contract interpretation and applied it in *Kaiser Aluminum* "only as a last resort" because the instrument presented a "hopeless ambiguity." *Kaiser Aluminum Corp.* v. *Matheson*, 681 A.2d 392, 399 (Del. 1996). Argent maintains that section 5.2 is unambiguous. Even if section 5.2 were ambiguous, the extensive drafting history, confirmation record, disclosures, and post-confirmation course of conduct all available in the record of these Chapter 11 Cases provide the extrinsic evidence that was unavailable in *Kaiser*.

110. Accordingly, the Trust submits that Argent's interpretation is incorrect and inconsistent with the plain text of section 5.2 and the other provisions of the Plan.

## II. The Global Settlement Does Not Extinguish the Trust's Claims Against Third Parties.

111. The reference in the Global Settlement to "by or among the Debtors" plainly addresses resolution of the difficult Intercompany Claims issues facing the Debtors at the time. Any other interpretation would render the Global Settlement, and the Plan as a whole, nonsensical. Argent does not seriously suggest a different interpretation, but rather suggests that its extreme—and incorrect—characterization of the Trust's position would lead to such an absurd result. (Joinder ¶ 5.)

112. The Debtors did not release their Claims against third parties through the Global Settlement or the Plan. The Plan specifically preserves Causes of Action, and authorizes the Plan Administrator to pursue Causes of Action, on behalf of the FTX Recovery Trust. Section

5.17 provides that, unless expressly waived, released, or compromised, Causes of Action are preserved for later adjudication and may be pursued by the Plan Administrator. The Confirmation Order likewise preserves such Causes of Action and authorizes their prosecution. (Confirmation Order ¶ 51.) The Trust has of course diligently pursued its Causes of Action with great success for the benefit of legitimate creditors, and will continue to do so.

113. The Debtors would never have released their claims and Causes of Action for no consideration. If the Debtors had for some reason sought to do so, that would have required, at the very least, disclosure and express court approval (which was never requested). In fact, no such result was ever discussed in the confirmation hearing briefing or otherwise by the Debtors or any other party.

114. The Plan's drafting history supports the Trust's interpretation. In the December 2023 Draft Plan, which introduced the "by or among the Debtors" language to the Plan, the Plan was also amended to add the following items to the list of "Claims, Interests and Causes of Action" enumerated in (a)-(k): "(e) transactions among the Debtors prior to and on the Effective Date"; "(h) the Debtors' disregard for corporate separateness before the Petition Date"; and "(i) any Causes of Action by a Debtor against other Debtors or the Insiders of other Debtors." These changes, taken together, indicate that the "by or among the Debtors" language was added in contemplation of the fact that Intercompany Claims are compromised, settled and resolved by the Plan. Moreover, the Confirmation Order, in approving the Global Settlement references only claims against the Debtors. The Court expressly found that the "Global Settlement constitutes a good faith compromise of all Claims . . . against the Debtors." (Confirmation Order ¶ 93.)

115. Even if one were to credit Argent's strawman reading of section 5.2, applying the Global Settlement to the Trust would go too far. The Court is under no obligation to

give a general clause, like the Global Settlement, "the broadest possible construction it can bear." *Harrington* v. *Purdue Pharma L.P.*, 603 U.S. 204, 217 (2024); *see also Epic Systems Corp.* v. *Lewis*, 584 U.S. 497, 512 (2018). Rather, general language is read in context to reach matters "similar in nature" to the specific examples that accompany it. *Id.* at 217 (citing *Epic Systems*, 584 U.S. at 512). Section 5.2 must be read in this light. The matters identified in section 5.2 include claims against the Debtors and disputes arising from the relationships among the Debtors. Any suggestion that section 5.2 releases claims of the Debtors against third parties is unsupported and must be rejected.

## III. The Record of These Chapter 11 Cases Supports the Trust's Interpretation and Application of the Global Settlement.

116. If a contract provision is ambiguous, then the court "must consider admissible extrinsic evidence." *GMG Cap. Invs., LLC* v. *Athenian Venture Partners I, L.P.*, 36 A.3d 776, 783 (Del. 2012). Extrinsic evidence may include "prior agreements and communications of the parties as well as trade usage or course of dealing." *Eagle Indus., Inc.* v. *DeVilbiss Health Care, Inc.*, 702 A.2d 1228, 1233 (Del. 1997). Upon reviewing the extrinsic evidence, a court may conclude that "only one meaning is objectively reasonable" and interpret the provision according to that meaning. *Salamone* v. *Gorman*, 106 A.3d 354, 374 (Del. 2014) (citation omitted). A bankruptcy court will look, among other things, to the extrinsic evidence of the Debtors' intent while drafting the Plan, the Confirmation Order, and applicable law when interpreting an ambiguous Plan. *In re Forklift LP Corp.*, 363 B.R. 388, 394-95 (Bankr. D. Del. 2007).

### A. The Plan's History Is Consistent with the Trust's Interpretation of the Global Settlement.

117. Beyond the plain text of the Global Settlement, the circumstances surrounding the Plan's development, negotiation and approval confirm that section 5.2 is more

than a simple administrative channeling provision. Rather, section 5.2 is situated within "the culmination of a remarkable effort to build consensus, negotiate settlements of novel and complex issues, and recover and monetize assets such that customers and non-governmental creditors are projected to receive 100% of all distributable value and recoveries well in excess of par." (*Debtors' Memorandum of Law in Support of Confirmation of the Second Amended Joint Chapter 11 Plan of Reorganization of FTX Trading Ltd. and Its Debtor Affiliates* [D.I. 26035] ¶ 1.)

118. The starting point of the Plan is the extraordinary disorder and mismanagement that existed at the commencement of these Chapter 11 Cases. When the prepetition Debtors filed for bankruptcy, FTX lacked reliable books and records, meaningful financial reporting, and basic accounting controls across its more than one hundred entities. The postpetition Debtors were left with numerous challenges, including unmasking FTX's financial history, addressing the extent of the FTX Insiders' commingling of customer funds, the millions of customer claims, and the legal and regulatory consequences of the FTX Insiders' extensive fraud.

119. In addressing these challenges, the Debtors knew that resolving each potential individual claim arising from theories of recovery based on generalized fraud, misappropriation, commingling, and related misconduct by the prepetition Debtors would have been prohibitive and provided improper incentives for a creditor to seek to augment claim recovery at the expense of the collective. Accordingly, the Debtors engaged in intensive, arm's-length negotiations with major stakeholders, including the Committee, the Ad Hoc Committee, governmental authorities, and other institutional creditors. Those negotiations produced a series of landmark settlements resolving disputes that could have resulted in years of costly and time consuming litigation. The resulting settlements were expressly integrated into the Plan. For

example, approval of the IRS settlement[11] was a "Condition[] Precedent to the Effective Date" of the Plan. (Plan § 9.1.) And the Customer Settlement[12] was directly included in the Plan itself.

120. The Plan must be considered against this backdrop. After over a year of negotiations, the Debtors and key stakeholders replaced costly, duplicative litigation with a comprehensive, streamlined framework for valuing, classifying, and treating Claims. That framework provides claimants with significant benefits, including favorable treatment and enhanced recoveries from the subordination of government claim recoveries. In exchange, claimants relinquished the ability to pursue supplemental recoveries on alternative theories of liability for the same underlying losses, including based on Claims and Causes of Action arising from the same underlying fraud and misconduct that could be generally asserted by anyone. Section 5.2 incorporates this Global Settlement into the Plan.

### B. The Trust's Interpretation of the Global Settlement Is Consistent with the Confirmation Order.

121. The Confirmation Order reinforces this structure: the Court found that "[t]he Plan itself constitutes a compromise of all Claims, Interests and Causes of Action relating to the contractual, legal and subordination rights that any Holder may have with respect to any Allowed Claim or Allowed Interest or any Distribution to be made on account of such Allowed Claim or Allowed Interest." (Confirmation Order ¶ 38.) The Court then expressly determined that

---

11 The Debtors and the IRS agreed to forgo "costly and potentially protracted litigation," including on theories that "raise[d] novel issues of tax and bankruptcy law," in favor of settlement [D.I. 16558 ¶¶ 1, 3, 4]. Among other things, the settlement granted the IRS a priority position with respect to $200 million of its tax claims and subordinated the rest of its claims, closed all IRS audits for prepetition tax years, and prohibited the Debtors from carrying forward or carrying back purported losses from prepetition tax periods [D.I. 18036 ¶¶ 4-5].

12 The Customer Settlement, a centerpiece of the Global Settlement, was the result of "extensive negotiations" between the Debtors and the Official Committee, Ad Hoc Committee, and Class Action Claimants. (Disclosure Statement at 91.) Through these negotiations, the parties avoided "time consuming and costly" litigation and established a system by which the Debtors could classify and treat claims to the satisfaction of all parties involved. (*Id.*)

the "compromises and settlements embodied in the Plan were reached after good faith, arms'-length negotiations" and approved all three paragraphs of section 5.2. (*Id.* ¶¶ 38-41.) The Court ultimately held that "the Global Settlement, including but not limited to the Customer [] Settlement (as defined in the Disclosure Statement), is approved." (*Id.* ¶ 93.)

122. The Confirmation Order also makes clear that the Global Settlement cannot be limited to being an administrative channeling provision as suggested by Argent. In multiple instances, the Court describes how the Global Settlement "includes" the Customer Settlement, which includes additional settlements and terms far beyond the scope of what Argent argues the Global Settlement provides. (*See* Confirmation Order ¶ 41 (entry of the Confirmation Order "constitutes the Court's approval of the Global Settlement, including the Customer Settlement").)

**C. The Trust's Interpretation of the Global Settlement Is Consistent with Applicable Law.**

123. The Global Settlement, as approved and applied by this Court, is consistent with applicable law. As an initial matter, Argent cannot collaterally attack the Confirmation Order or the approval of the Global Settlement. *See Travelers Indem. Co*. v. *Bailey*, 557 U.S. 137, 153-54 (2009). Argent has been assigned Claims filed by the Silvergate Debtors, who had notice of the Plan confirmation hearing and were represented by sophisticated counsel. Any objection to the Plan or the Confirmation Order concerning the Global Settlement had to be asserted at that time and cannot be raised now.

124. Argent's misplaced legal concerns about the Trust's position on section 5.2 of the Plan lack merit. *First*, the Global Settlement does not conflate plan treatment with claim allowance. Claim "treatment" is referenced in section 1123(a)(3) of the Bankruptcy Code and involves determining "the recovery that creditors in each particular class will receive on account of their allowed claim." *In re AIO US, Inc.*, 677 B.R. 509, 542 (Bankr. D. Del. 2025). On the

other hand, Claim "allowance" relates to the "determination of the gross monetary amount of the obligation of the debtor to the creditor to be *recognized in bankruptcy,* without regard to that claim's . . . *treatment.*" *In re Pruitt*, 401 B.R. 546, 555 (Bankr. D. Conn. 2009).

125. Here, all Claims are classified as one of, among other classifications of Claims, Customer Entitlement Claims, Digital Asset Loan Claims, and General Unsecured Claims. Each class of claims is provided specific treatment under the Plan. Any individual Claim is then subject to allowance or disallowance. The Global Settlement does not independently disallow any Claims that attempt an end-run around the Plan's classification and treatment provisions, but rather releases and settles such Claims so that they are unenforceable and subject to disallowance under section 502(b)(1) of the Bankruptcy Code. This structure is not controversial and is consistent with chapter 11 plan structures. *See In re Roman Cath. Diocese of Rockville Ctr.*, 652 B.R. 226, 236-37 (Bankr. S.D.N.Y. 2023) (holding Claims subject to "releases" in Plan "should be disallowed").

126. *Second*, all claimants were on notice of the Global Settlement and its inclusion in the Plan. Due process "does not require that a debtor go out of its way to identify all items of particular interest to each creditor." *In re Congoleum Corp.*, 149 F.4th 318, 332 (3d Cir. 2025). Claimants only need actual notice of the contents of a plan. *See United Student Aid Funds, Inc.* v. *Espinosa*, 559 U.S. 260, 272 (2010). The concept of a global settlement was long contemplated as part of plan formulation, starting with the July 2023 Initial Plan. In each subsequent iteration of the plan and disclosure statement, the concepts and parameters of a global settlement were included and highlighted. In fact, the notice provided by the Debtors was clearly effective as ELD's Objection identified that the "global settlement . . . may be read to settle, release, or preclude ELD's fraud claim against the Debtors" [D.I. 23140 at 8]. The Silvergate

Debtors, like every other creditor, had ample opportunity to object to the Global Settlement or any other provision of the Plan.

## IV. The June 2 Order Correctly Applies the Global Settlement to Melamed's Arbitration Claims.

127. As detailed in the Trust's Reconsideration Objection, there is no basis to reconsider the June 2 Order, which correctly held that "Melamed is enjoined from pursuing the claims described in his November 12, 2025 Notice of Arbitration" because they are barred by sections 5.2 and 10.8 of the Plan. (June 2 Order ¶ 2.) Neither Melamed's Motion for Reconsideration nor the Joinder identifies any clear error of law or manifest injustice that would warrant disturbing that conclusion.

### A. The Court's Threshold Rulings Apply the Plan's Prescribed Treatment to Melamed's Crypto-Related Claims.

128. As relevant here, Melamed's SPA Claim arises from FTX's prepetition purchase of Melamed's shares in Liquid. In its July 2025 threshold rulings on the Trust's amended claims objection, the Court divided the SPA Claim into two categories of claims. The first comprised claims arising from FTX's obligation to deliver cryptocurrency (the "Crypto Consideration") to Melamed as consideration for a portion of his Liquid shares—what the Court referred to as the "crypto-related claim[s]." (July 22, 2025 Hr'g Tr. 125:16-20, 127:3.) The Court held that this portion of the SPA Claim "is in respect of a digital asset," as defined in the Plan, and therefore "should be valued pursuant to the confirmed plan and estimation order." (*Id.* 125:18-19, 126:15-127:5.) The second comprised "the remainder of the SPA claim[]"—*i.e.*, the "non-crypto portion of Mr. Melamed's claim." (*Id.* 118:20-22, 127:6-9, 129:4-6.) The Court held that those claims related to "the losses he sustained as an FTX shareholder" and therefore "must be subordinated," including "any related indemnification claim." (*Id.* 128:17-19, 129:4-6.) The Court reserved judgment only as to whether any indemnification claim arising from the first

category of crypto-related claims (what Melamed calls the "Crypto Indemnity") would likewise be subordinated, "to the extent that Mr. Melamed asserts" any such claim. (*Id.* 129:7-11.)

**B. The Claims Asserted in Melamed's Notice of Arbitration Are Barred by the Global Settlement.**

129. In an express effort to evade the Court's threshold rulings and circumvent the treatment prescribed by the Plan and Bankruptcy Code, Melamed subsequently asserted a slew of new claims in arbitration that he never articulated before this Court. Melamed insists that *all* of those arbitration claims "arise from the unpaid Crypto Consideration" and specifically, "sit in the Crypto Indemnity component of the SPA Claim." (Reconsideration Reply ¶¶ 15, 16; *see also* May 14, 2026 Hr'g Tr. 33:11-16, 35:11-12, 65:17-66:1.) Taking Melamed at his word, every claim asserted in his Notice of Arbitration therefore seeks recovery in respect of the Crypto Consideration, which this Court has already held "is in respect of a digital asset" and must be valued pursuant to section 4.4 of the Plan. (July 22, 2025 Hr'g Tr. 125:21-25, 126:20-22.)

130. That result follows directly from the second paragraph of section 5.2, which provides, "[i]n connection with the implementation of the Global Settlement," that "the value of Claims in respect of Digital Assets shall be calculated pursuant to Section 4.4." Section 4.4, in turn, dictates how such claims are valued: "by converting the value of such Digital Asset into Cash as of the Petition Date utilizing the conversion rates set forth in the Digital Assets Conversion Table" attached to the Digital Assets Estimation Order. Thus, whatever theory of liability Melamed invokes, his own characterization of the arbitration claims places them squarely within the Plan's prescribed treatment for claims "in respect of Digital Assets."[13]

---

[13] Indeed, in reaching its July 2025 threshold rulings, the Court specifically rejected Melamed's argument "that his SPA claim falls outside the scope of the estimation order" because he sought "monetary damages" rather than cryptocurrency, explaining that "the plan is broadly worded to capture *all* claims 'in respect of a digital asset.'" (July 22, 2025 Tr. 126:15-25 (emphasis added).) The Court emphasized that this was "[n]ot only" "the correct

131. While the second paragraph of section 5.2 dictates how Melamed's crypto-related claim must be valued, the first paragraph works in tandem to prevent him from using alternative Causes of Action or theories of recovery, including theories rooted in the broader FTX Group fraud, to obtain additional recovery arising from the same underlying loss. (*See* Motion to Enforce ¶¶ 42-44; Reconsideration Objection ¶ 27.) Melamed's Notice of Arbitration attempts to do precisely that. It seeks additional recovery in arbitration arising from the same Crypto Consideration that this Court held must be valued pursuant to the Plan and Estimation Order, based on new Causes of Action premised on generalized allegations concerning FTX's segregation and misuse of customer assets, risk management, treatment of Alameda, and broader business practices. (*See* Motion to Enforce ¶¶ 9-10; *see also* Motion to Enforce Reply ¶¶ 9, 29.) Section 5.2 forecloses Melamed's ability to do so.

132. The June 2 Order therefore correctly holds that Melamed's arbitration claims are compromised and resolved by the Global Settlement and, accordingly, enjoined under the Plan Injunction. Nothing in Melamed's Motion for Reconsideration establishes that this conclusion reflects a "plain and indisputable" error of law, or results in a manifest injustice, as required to overcome the "very high hurdle" for reconsideration. *Titus*, 479 B.R. at 367-68 (Bankr. W.D. Pa. 2012) (quoting *In re Oak Park Calabasas Condominium Ass'n*, 302 B.R. 682, 683 (Bankr. C.D. Cal. 2003)); *see also* Reconsideration Objection ¶ 19.[14]

result based on the plain language of the plan, but also the fair result because it treats Mr. Melamed and his crypto-related claim no better than any other similarly situated party." (*Id.* 127:1-5.)

14 As detailed in the Trust's briefing on the Motion to Enforce, Melamed's arbitration claims are independently barred and enjoined because they were not preserved by the SPA Claim. (*See* Motion to Enforce ¶¶ 20-38; Motion to Enforce Reply ¶¶ 14-42.) The Court did not need to reach those issues in its June 2 Order.

### C. The Claims Proposed in Melamed's Amended Notice Are Still Barred by the Global Settlement.

133. In the event that this Court declines to reconsider the June 2 Order, Melamed alternatively asks the Court to prematurely approve an amended notice of arbitration [D.I. 35981, Ex. A] (the "Amended Notice") that repackages his enjoined fraud-based claims as breach of contract, breach of warranty, and indemnification. Melamed contends that, by "narrow[ing]" his original Notice of Arbitration and deleting express references to fraud, he has "remove[d] the types of claims referenced in Section 5.2," such that his reformulated theories are now permitted. ([D.I. 35980] ¶¶ 3-4 & n.3; *see* Amended Notice ¶ 6.) As set forth in detail in the Trust's Reconsideration Objection, Melamed's motion fails because Melamed improperly seeks advisory relief (Reconsideration Objection ¶¶ 3, 7) and simply recasts a "narrow[ed]" subset of claims already enjoined by the June 2 Order (*id.* ¶¶ 4, 8-12).

134. Melamed's proposed repleading misunderstands how the Global Settlement operates with respect to his claims. Even if, *arguendo*, the Amended Notice asserted distinct claims for recovery that were not premised on the generalized fraud underlying the original Notice of Arbitration, the Global Settlement's reach is not so limited. As detailed herein, the first paragraph of section 5.2 compromises "*all* Claims, Interests and Causes of Action" asserted by a purported creditor whose claim is governed by specific Plan treatment, as set forth in the second paragraph of section 5.2 (emphasis added). Because the Amended Notice relates exclusively to the Crypto Consideration, each claim asserted therein remains a claim "in respect of Digital Assets" subject to the specific Plan treatment, as set forth in the second paragraph of section 5.2. (*See* Reconsideration Objection ¶¶ 13-17.) The first paragraph of section 5.2 bars *all* Causes of Action or theories of recovery that Melamed might assert to circumvent the Plan's express treatment of his crypto-related claim.

**V. The Global Settlement Should, as an Equitable Matter, Apply to the Silvergate Claims.**

135. The claims pursued by Argent (and Mashinsky) are extraordinary outliers. Together, they seek billions of dollars based on meritless theories of damage to their businesses that fall outside of the carefully-negotiated core classifications contained in the Plan. As a result, these claims are Class 6A General Unsecured Claims, a classification intended to capture claims not specifically addressed elsewhere in the Plan.

136. The Trust has already paid Distributions of hundreds of millions of dollars on account of valid General Unsecured Claims that are not premised on generalized fraud by the FTX Insiders. The claims being pursued by Argent, however, seek exorbitant recoveries at the expense of legitimate creditors based on meritless theories that, at their core, rely on the same prepetition misconduct of the Debtors that could be asserted by any Customer or other party who did business with the Debtors. These were the very kinds of arguments that the Global Settlement was designed to resolve. Nevertheless, Argent now seeks hundreds of millions of dollars or more and to disrupt the Plan's administration. (*See, e.g.*, Argent Objection ¶¶ 2-3 (demanding that the Disputed Claims Reserve not be reduced based on the outstanding Silvergate Claims).)

137. Permitting Silvergate Capital Corporation's preferred shareholders (through Argent) to receive the benefits of the Global Settlement and the Plan under these circumstances while providing nothing in return is entirely inequitable. That is not the bargain struck between the Debtors and their creditors or the Debtors and the IRS and other governmental agencies which are permitting their claims to be subordinated and Distributions paid to customers and other victims.

138. The Silvergate Debtors chose to not participate in the Plan process, and it was not until June 2026—over a year and a half after the Effective Date of the Plan—that Argent

surfaced and suggested it was seeking to recover in this manner on account of the unliquidated Silvergate Claims. In offering initial views on the Silvergate Claims in its response to Argent's objection to the Trust's notice of reduction of the Disputed Claims Reserve Amount [D.I. 35828], the Trust outlined a non-exclusive list of independent defenses to the Silvergate Claims, including the Global Settlement and section 5.2 of the Plan. The Trust believed then, and continues to believe, that settlement of Claims set forth in the Global Settlement should be applicable on an equitable basis. However, having now considered the issue further and reviewed the recently filed *Argent Liquidation Trust's More Definite Statement of Proofs of Claim* [D.I. 36200], the Trust is **not** going to request the Court apply the Global Settlement or section 5.2 to the Silvergate Claims as a threshold matter to bar any litigation of the Silvergate Claims.

139. The Trust has a multitude of legal, factual and equitable defenses that it will present in due course in the contested claims objection litigation pending before this Court. As a result, the question of whether the Global Settlement and section 5.2 of the Plan bar even the assertion of the Silvergate Claims is moot.

## CONCLUSION

140. For the foregoing supplemental reasons, the Trust respectfully requests that the Court deny the Motion for Reconsideration.

Dated: September 11, 2026
Wilmington, Delaware

**LANDIS RATH & COBB LLP**

*/s/ Matthew B. McGuire*
Adam G. Landis (No. 3407)
Matthew B. McGuire (No. 4366)
Kimberly A. Brown (No. 5138)
Matthew R. Pierce (No. 5946)
919 Market Street, Suite 1800
Wilmington, Delaware 19801
Telephone: (302) 467-4400
Facsimile: (302) 467-4450
E-mail: landis@lrclaw.com
mcguire@lrclaw.com
brown@lrclaw.com
pierce@lrclaw.com

-and-

**SULLIVAN & CROMWELL LLP**
Andrew G. Dietderich (admitted *pro hac vice*)
James L. Bromley (admitted *pro hac vice*)
Brian D. Glueckstein (admitted *pro hac vice*)
Alexa J. Kranzley (admitted *pro hac vice*)
125 Broad Street
New York, NY 10004
Telephone: (212) 558-4000
Facsimile: (212) 558-3588
E-mail: dietdericha@sullcrom.com
bromleyj@sullcrom.com
gluecksteinb@sullcrom.com
kranzleya@sullcrom.com

*Counsel for the FTX Recovery Trust*