**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| In re:<br><br>FTX TRADING LTD., *et al.*,[1]<br><br>Debtors. | Chapter 11<br><br>Case No. 22-11068 (KBO)<br><br>(Jointly Administered)<br><br>**Hearing Date: November 19, 2026 at 1:00 p.m. (ET)**<br>**Obj. Deadline: October 19, 2026 at 4:00 p.m. (ET)** |

**FTX RECOVERY TRUST'S TWO HUNDRED FOURTH (SUBSTANTIVE) OMNIBUS OBJECTION TO PROOFS OF CLAIM FILED BY SKYBRIDGE CAPITAL II, LLC, SKYBRIDGE GP HOLDINGS, LLC, AND SALT VENTURE GROUP, LLC (NON-CUSTOMER CLAIMS)**

**THIS OBJECTION SEEKS TO DISALLOW AND EXPUNGE CERTAIN CLAIMS. CLAIMANTS RECEIVING THIS OBJECTION SHOULD CAREFULLY REVIEW THIS OBJECTION AND LOCATE THEIR NAMES AND CLAIMS ON SCHEDULE 1 OF EXHIBIT A ATTACHED TO THIS OBJECTION AND, IF APPLICABLE, FILE A RESPONSE BY THE RESPONSE DEADLINE FOLLOWING THE INSTRUCTIONS SET FORTH HEREIN.**

The FTX Recovery Trust[2] (the "Trust") hereby submits this amended claims objection[3] (the "Objection"), pursuant to section 502 of title 11 of the United States Code, 11 U.S.C. §§ 101 *et seq*. (the "Bankruptcy Code") and rules 3001 and 3007 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), to the proofs of claim (the "Proofs of Claim")

---

1 The last four digits of FTX Trading Ltd.'s and Alameda Research LLC's tax identification numbers are 3288 and 4063 respectively. Due to the large number of debtor entities in these Chapter 11 Cases, a complete list of the Debtors and the last four digits of their federal tax identification numbers is not provided herein. A complete list of such information may be obtained on the website of the Debtors' claims and noticing agent at https://cases.ra.kroll.com/FTX.

2 The FTX Recovery Trust (a/k/a the Consolidated Wind Down Trust) (the "Trust") was established on January 3, 2025, the effective date of the Debtors' (as defined below) confirmed *Second Amended Joint Chapter 11 Plan of Reorganization of FTX Trading Ltd. and Its Debtor Affiliates*. [D.I. 26404-1.]

3 The Trust previously objected to the Proofs of Claim in Counts Ten, Twelve, and Thirteen of the Original Complaint (as defined herein) (the "Original Objection"). This Objection supersedes and amends the Original Objection.

filed by SkyBridge Capital II, LLC ("SkyBridge II"), SkyBridge GP Holdings, LLC ("SkyBridge GP"), and SALT Venture Group, LLC ("SALT") (together, "SkyBridge") against 79 Debtors.[4] The Trust seeks to disallow and expunge the Proofs of Claim in their entirety. In support of the Objection, the Trust respectfully states as follows:

## Background

1. On November 11 and November 14, 2022 (as applicable, the "Petition Date"), FTX Trading Ltd. ("FTX") and its affiliated Debtors[5] filed with the United States Bankruptcy Court for the District of Delaware (the "Court") voluntary petitions for relief under Chapter 11 of the Bankruptcy Code (the "Chapter 11 Cases").

2. On October 7, 2024, the Court confirmed the *Second Amended Joint Chapter 11 Plan of Reorganization of FTX Trading Ltd. and Its Debtor Affiliates* [D.I. 26404-1] (the "Plan"), and on October 8, 2024, entered the *Findings of Fact, Conclusions of Law and Order Confirming the Second Amended Joint Chapter 11 Plan of Reorganization of FTX Trading Ltd. and Its Debtor Affiliates* [D.I. 26404].

3. On January 3, 2025, the Plan became effective, the Trust was established, and all assets of the Debtors, including all claims and causes of action, were transferred to and vested in the Trust. *See Notice of Effective Date of the Second Amended Joint Chapter 11 Plan of Reorganization of FTX Trading Ltd. and Its Debtor Affiliates* [D.I. 29127].

---

[4] **Schedule 1** affixed to the proposed order attached hereto as **Exhibit A** provides a list of the Proofs of Claim.

[5] The "FTX Group" comprises FTX and its affiliated debtors and debtors-in-possession (the "Debtors") and all non-Debtor affiliated entities. The FTX Group refers to four silos: (i) a group composed of Debtors WRS, WRSS, and their Debtor and non-Debtor subsidiaries; (ii) a group composed of Debtor Alameda Research LLC, Debtor Alameda Research Ltd., and their Debtor subsidiaries; (iii) a group composed of Debtor Clifton Bay Investments LLC, Debtor Clifton Bay Investments Ltd., Debtor Island Bay Ventures Inc., and Debtor FTX Ventures Ltd.; and (iv) a group composed of Debtor FTX Trading Ltd. and its Debtor and non-Debtor subsidiaries.

4. Prior to filing this Objection, FTX and affiliated Debtors filed the *Complaint for Avoidance and Recovery of Transfers and Obligations Pursuant to 11 U.S.C. §§ 105, 544, 548, and 550 and Del. Code Ann. Tit. 6, §§ 1304 and 1305, for Unjust Enrichment, for Breach of Contract, for Breach of Fiduciary Duties, for Aiding and Abetting Breach of Fiduciary Duties, and for Disallowance of Claims Pursuant to 11 U.S.C. § 502* [D.I. 27829] (the "Original Complaint") against SkyBridge, Digital Macro Fund LP f/k/a SkyBridge Coin Fund LP, and two individual defendants, Anthony Scaramucci and Brett Messing, seeking to avoid and recover millions of dollars in obligations and transfers arising from a series of pre-petition transactions between the FTX Group and SkyBridge.

5. Contemporaneous to this Objection, the Trust has filed a motion to amend the Original Complaint, attaching a *Proposed Amended Complaint for Avoidance and Recovery of Transfers and Obligations Pursuant to 11 U.S.C. §§ 105, 544, 548, and 550 and Del. Code Ann. Tit. 6, §§ 1304 and 1305, and for Disallowance of Claims Pursuant to § 502* (the "Amended Complaint").[6]

**Background Specific to the Relief Requested**

6. The Trust incorporates by reference the facts alleged in the Amended Complaint and sets forth below only certain key facts relevant to the Proofs of Claim.

7. Claimant SALT purports to operate a platform connecting investors with asset managers and entrepreneurs. Claimants SkyBridge II and SkyBridge GP are, respectively, an investment management firm and associated holding company. Anthony Scaramucci operates these entities, serving as Chairman of SALT and Managing Partner of SkyBridge II and

[6] Capitalized terms not defined herein shall have the same meaning attributed to them in the Amended Complaint.

SkyBridge GP, with assistance from Brett Messing, who serves as the President and Co-Chief Investment Officer of SkyBridge II and SkyBridge GP.

8. In 2021, as SkyBridge refocused its investment strategy on cryptocurrency, Scaramucci began cultivating a relationship with Samuel Bankman-Fried, the now-convicted founder of FTX, hoping that an association with FTX would give SkyBridge a competitive advantage in the cryptocurrency space.

**A. The SALT Sponsorship**

9. SALT is a conference and media platform founded by SkyBridge. It organizes multiday conferences marketed as bringing together asset managers, institutional investors, government officials, business leaders, and others in the finance, technology, and public-policy sectors for panel discussions, networking, and introductions between investment managers and potential sources of capital.

10. In 2021, SALT held its flagship domestic conference in New York, which featured panel discussions, keynote presentations, and networking events addressing investment management, financial markets, technology, cryptocurrency, and public policy. At Scaramucci's invitation, Bankman-Fried attended the conference in September 2021 and appeared on a panel titled "How Crypto Changes Everything: The Future of Finance and Culture." Following their meeting at the conference, Scaramucci offered to provide Bankman-Fried access to his network of high-profile contacts in government and finance in exchange for the FTX Group's sponsorship of a series of SALT programs (the "SALT Sponsorship") [Adv. D.I. 31-1].[7]

[7] William D. Cohan, *S.B.F. and The Mooch's Arabian Nights*, PUCK (Apr. 19, 2023), https://puck.news/sbf-and-the-moochs-arabian-nights/; TALES FROM THE CRYPTO, *Into the Future with Sam Bankman-Fried and FTX* (AudioUp Media, Oct. 17, 2023).

11. On January 3, 2022, FTX and SALT entered into the SALT Sponsorship. Under the agreement, FTX would serve as the "Presenting Sponsor" of four SALT programs during each of 2022, 2023, and 2024: (i) the SALT New York conference; (ii) the SALT Abu Dhabi conference; (iii) the SALT Asia conference; and (iv) weekly *SALT Talks: Crypto* podcast episodes.

12. The SALT Sponsorship agreement provided for sponsorship fees of "up to $12 million," consisting of $4 million per year paid in quarterly installments of $1 million. (SALT Sponsorship at 1.) Each of the four sponsored programs was assigned a value of $1 million. If any program did not occur during its intended calendar year, FTX could deduct $1 million for that program from the payments due beginning the following year. For example, if three of the four programs occurred in 2022, FTX would owe only $3 million in 2023. If any deduction remained after the agreement expired, SALT was required to refund that amount within three months after the agreement's termination. (SALT Sponsorship at 6, ¶ 2.)

13. FTX's presenting-sponsor placement was exclusive for SALT New York. (SALT Sponsorship at 1.) For international conferences, FTX had veto power over certain co-presenting sponsors, including "over any co-presenting sponsor that is a competitor to FTX (as determined by FTX in its reasonable discretion)" and any sponsor "that is not a state, state-owned or affiliated entity." (SALT Sponsorship at 6, ¶ 3.) If a co-presenting sponsor was ultimately secured, FTX would receive a 15% reduction in the $1 million fee allotted to that conference. (SALT Sponsorship at 6, ¶ 3.) FTX was also to receive "advisory services" under the agreement, including "introductions" to "leading hedge funds, family offices and high net worth investors." (SALT Sponsorship at 3.)

14. On January 12 and April 14 of 2022, FTX made transfers to SALT totaling $2 million pursuant to the SALT Sponsorship. No further payments were made towards the SALT Sponsorship prior to the Petition Date.

15. The available record indicates that at least some of the required events and deliverables did not occur. Although SALT New York occurred from September 12 through 14, 2022, other conferences during the term were either cancelled or differed from those specified in the SALT Sponsorship agreement. Publicly available records also indicate that SALT failed to publish *SALT Talks: Crypto* episodes weekly during the term of the agreement, as the agreement required.

**B. The SkyBridge Acquisition**

16. Following the decline in cryptocurrency markets during the summer of 2022, Scaramucci needed additional funding for SkyBridge. At a lunch in August 2022, Scaramucci proposed that Bankman-Fried arrange for the FTX Group to provide SkyBridge with a bailout.

17. After conducting only bare-bones due diligence, Alameda Research Ventures entered into a Subscription Agreement with SkyBridge II and SkyBridge GP on September 7, 2022, pursuant to which Alameda Research Ventures transferred $45 million (the "Purchase Price") in exchange for 30% membership interests in both SkyBridge II and SkyBridge GP (the "SkyBridge Acquisition"). That same day, SkyBridge II executed the Fifth Amended and Restated Limited Liability Company Agreement (the "SkyBridge II LLCA"), and SkyBridge GP executed its Third Amended and Restated Limited Liability Company Agreement (the "SkyBridge GP LLCA").[8]

[8] While the Subscription Agreement, SkyBridge II LLCA, and SkyBridge GP LLCA were originally signed on behalf of Alameda Research Ventures, the newly incorporated Island Bay was later substituted into the agreements with no objection from SkyBridge.

18. Section 3.11 of the SkyBridge II LLCA ("Section 3.11") provided that $40 million of the Purchase Price would be used by SkyBridge to purchase Bitcoin, Solana, FTT, and Serum (the "Purchased Cryptocurrency"). The specific amounts of each cryptocurrency comprising the Purchased Cryptocurrency were to be "selected jointly" by Scaramucci and Island Bay Ventures ("Island Bay"), an entity owned by Paper Bird Inc., which was wholly owned by Bankman-Fried. The Purchased Cryptocurrency was to be held in an account segregated from SkyBridge II's other assets, and pursuant to the SkyBridge II LLCA, SkyBridge II was not permitted to "sell, transfer, assign, pledge, mortgage, hypothecate or otherwise dispose of" the Purchased Cryptocurrency without Island Bay's consent. The remaining $5 million of the Purchase Price was to be used for "general working capital purposes."

19. On September 8, 2022, the day after the Subscription Agreement was executed, Alameda Research Ventures wired $45 million to SkyBridge. Immediately after receiving the Purchase Price, SkyBridge II purchased approximately 515 BTC, 398,868 SOL, 482,253 FTT, and 15,243,902 SRM—amounting to $10 million worth of each—pursuant to its obligations under Section 3.11.

20. The investment did not make economic sense for the FTX Group. Island Bay had no need to acquire cryptocurrency indirectly through its minority investment in an asset manager when the FTX Group operated cryptocurrency exchange and trading businesses and could readily have purchased the Purchased Cryptocurrency directly with no middleman and no restrictions on transferability.

## C. SkyBridge's Breach of the SkyBridge II LLCA

21. Following the Petition Date, SkyBridge's outside counsel contacted Debtors' counsel to seek Island Bay's consent for SkyBridge II to "monetize certain of the Purchased Cryptocurrency," as required by the SkyBridge II LLCA before SkyBridge II could dispose of

those assets. Although SkyBridge II never received that consent, it nevertheless liquidated its FTT and SRM holdings for total proceeds of approximately $3 million, in breach of Section 3.11 of the SkyBridge II LLCA. In January 2025, SkyBridge's outside counsel represented to the Trust that SkyBridge II continued to hold the Bitcoin and Solana purchased in connection with the SkyBridge Acquisition (the "Appreciated Tokens"). The Appreciated Tokens are currently worth approximately $80 million.

**D. Debtors' Rejection of the SALT Sponsorship**

22. On January 26, 2023, the Court entered an *Order Authorizing the Debtors to Reject Certain Executory Contracts Effective as of the Rejection Date* [D.I. 585] (the "Rejection Order"), pursuant to which the Debtors rejected certain executory contracts of the FTX Group, including the SALT Sponsorship [D.I. 585-1].

**E. The SALT Claim**

23. On June 29, 2023, SALT filed Claim No. 5126 against FTX (the "SALT Claim"). SALT asserts an unliquidated claim for damages arising from the Debtors' rejection of the SALT Sponsorship pursuant to the Rejection Order. SALT contends that it is entitled to "not less than $8 million," which purportedly reflects FTX's unpaid quarterly "Programming Fees," and "other fees, expenses and costs that FTX was required to fund to or for the benefit of SALT" under the SALT Sponsorship. (SALT Claim ¶ 4.)

**F. The Acquisition Claims**

24. On June 29, 2023, the same day that the SALT Claim was filed, SkyBridge II and SkyBridge GP each filed 100 substantively identical and duplicative proofs of claim against 100 different Debtors seeking the same losses. Of those 200 claims, 158 remain pending (*see*

**Schedule 1**) (the "Acquisition Claims").[9] Each Acquisition Claim seeks "not less than $45,000,000" for alleged realized and unrealized losses, reputational harm, regulatory expenses, and other damages that SkyBridge II and SkyBridge GP claim to have suffered "as a direct result of Mr. Bankman-Fried's and the Debtors' fraud and conspiracy that resulted in [the SkyBridge Acquisition]." (Acquisition Claims ¶ 13.) The $45 million figure appears to correspond to the Purchase Price that SkyBridge II and SkyBridge GP *received in full* from Alameda Research Ventures in connection with the SkyBridge Acquisition.

25. The Acquisition Claims assert causes of action for fraudulent misrepresentation and concealment (Acquisition Claims ¶¶ 14-16), fraudulent inducement (Acquisition Claims ¶ 17), negligent misrepresentation (Acquisition Claims ¶ 18), breach of contract (Acquisition Claims ¶ 19), unjust enrichment (Acquisition Claims ¶¶ 20-21), breach of the implied covenant of good faith and fair dealing (Acquisition Claims ¶¶ 22-23), and civil conspiracy (Acquisition Claims ¶ 24). These causes of action rest on allegations that the FTX Group and its "Representatives" falsely portrayed the FTX Group entities as financially sound and required SkyBridge to purchase FTT and SRM in connection with the SkyBridge Acquisition, despite allegedly knowing that those tokens were effectively worthless. (Acquisition Claims ¶¶ 9, 11-12.)

## Jurisdiction

26. The Court has jurisdiction over this Objection pursuant to 28 U.S.C. §§ 157 and 1334 and the *Amended Standing Order of Reference from the United States District Court for the District of Delaware* dated as of February 29, 2012. This matter is a core

[9] The other 42 claims have since been expunged because the Debtors against which those claims were filed were dismissed from the Chapter 11 Cases. Many of the pending claims likewise were filed against Debtors with no connection to the underlying events described in the Proofs of Claim.

proceeding within the meaning of 28 U.S.C. § 157(b)(2). Venue is proper in this district pursuant to 28 U.S.C. §§ 1408 and 1409. The statutory bases for the relief sought are section 502 of the Bankruptcy Code, and rules 3001 and 3007 of the Bankruptcy Rules. Pursuant to rule 9013-1(f) of the Local Rules of Bankruptcy Practice and Procedure of the United States Bankruptcy Court for the District of Delaware, the Trust confirms its consent to entry of a final order by the Court in connection with this Objection if it is later determined that the Court, absent consent of the parties, cannot enter final orders or judgments consistent with Article III of the United States Constitution.

**Relief Requested**

27. By this Objection, the Trust seeks entry of the proposed order (the "Proposed Order"), substantially in the form attached hereto as **Exhibit A**, disallowing the Proofs of Claim listed on **Schedule 1** annexed thereto.

**Amended Objection**

28. Section 502(a) of the Bankruptcy Code provides, in pertinent part, that "[a] claim or interest, proof of which is filed under section 501 of this title, is deemed allowed, unless a party in interest . . . objects." 11 U.S.C. § 502(a). Once an objection to a claim is filed, the Court, after notice and hearing, shall determine the allowed amount of the claim. 11 U.S.C. § 502(b). Section 502(b)(1) further provides that a claim may not be allowed to the extent that it "is unenforceable against the debtor and property of the debtor, under any agreement or applicable law." 11 U.S.C. § 502(b).

29. "When considering a claim and objections to it, the burden of persuasion remains at all times with the claimant, but the burden of proof shifts between the claimant and the objector." *In re Trib. Media Co.*, 2017 WL 2622743, at *7 (D. Del. June 16, 2017), *aff'd*, 902 F.3d 384 (3d Cir. 2018). "The claimant must first allege facts sufficient to support his

claim." *Id.* A proof of claim that alleges facts sufficient to establish a legal liability is entitled to prima facie validity. *Id.* Conversely, a proof of claim that fails to allege sufficient facts is not entitled to that presumption. *See In re Jorczak*, 314 B.R. 474, 481 (Bankr. D. Conn. 2004). If the claim is deemed prima facie valid, "[t]he burden of going forward then shifts to the objector." *In re Allegheny Int'l, Inc.*, 954 F.2d 167, 173 (3d Cir. 1992). The objector may satisfy that burden by presenting evidence "capable of negating" the claim's prima facie validity and "plac[ing] the claimant's entitlement at issue," including evidence "which, if believed, would refute at least one of the allegations that is essential to the claim's legal sufficiency." *In re Trib. Media Co.*, 2017 WL 2622743, at *7; *In re Cath. Diocese of Wilmington, Inc.*, 513 B.R. 639, 643 (Bankr. D. Del. 2014). The burden then shifts back to the claimant to prove the claim's validity by a preponderance of the evidence. *In re Trib. Media Co.*, 2017 WL 2622743, at *7.

**I. All Claims Are Subject to Disallowance Under Section 502(d).**

30. As an initial matter, while the Trust's adversary proceeding against SkyBridge is pending, the Proofs of Claim are subject to disallowance under section 502(d) of the Bankruptcy Code and section 8.3.2 of the Plan. (*See* Plan § 8.3.2 ("any Claims held by any Person or Entity from which property is recoverable under sections 544 and 548 of the Bankruptcy Code . . . shall be deemed disallowed pursuant to section 502(d) of the Bankruptcy Code . . . until such time as such Cause of Action against that Person or Entity has been resolved").) As one bankruptcy court has explained, "a transferee who is obligated to return an avoidable transfer to the estate [should not] be permitted to further deplete the estate's resources by receiving payment of a claim of any kind without first being required to return the avoidable transfer." *In re MicroAge, Inc.*, 291 B.R. 503, 512 (B.A.P. 9th Cir. 2002).

## II. The Transactions Underlying the Claims Will Be Avoided Through the Adversary Proceeding.

31. The Trust has commenced an adversary proceeding against SALT, SkyBridge II, and SkyBridge GP seeking to avoid the obligations incurred and recover the transfers made in connection with both the SALT Sponsorship and the SkyBridge Acquisition. If the Trust prevails, the transfers and obligations underlying the SALT Claim and the Acquisition Claims will be avoided, eliminating the basis for the damages asserted in the Proofs of Claim. *See Mission Prod. Holdings, Inc.* v. *Tempnology, LLC*, 587 U.S. 370, 382 (2019) (explaining that, unlike rejection, avoidance allows trustees to "unwind" or "roll back a prior transfer" or obligation as if it never existed).

## III. The SALT Claim Should Be Disallowed.

32. Even if the obligations underlying the SALT Claim are not avoided, SALT cannot recover any damages resulting from FTX's rejection of the SALT Sponsorship. The rejection of an executory contract is deemed a breach of the agreement immediately prior to the Petition Date, 11 U.S.C. § 365(g), and "damages are to be determined on the last business day before the petition is filed," *In re Enron Corp.*, 354 B.R. 652, 659 (S.D.N.Y. 2006). New York law governs the nature and extent of the damages, if any, arising from that breach. Where a claimant "has not identified any damages flowing from breach of an enforceable agreement that are recoverable under New York law, [it] has not stated a cognizable contract claim." *Spithogianis* v. *Haj-Darwish*, 2008 WL 82188, at *5 (S.D.N.Y. Jan. 7, 2008).

33. Here, SALT has not established a nonspeculative measure of damages under the SALT Sponsorship. The Program Fees were not fixed; the amount ultimately payable depended on the occurrence of specified events and was otherwise subject to contractual reductions. Although FTX was scheduled to pay the annual $4 million "Program Fee" in quarterly $1

million installments, the agreement assigned $1 million to each of four program components: SALT New York, SALT Abu Dhabi, SALT Asia, and *SALT Talks: Crypto*. If a component did not occur during its intended calendar year, FTX could deduct the corresponding $1 million from the payments due beginning the following year. Thus, a program omitted in 2022 reduced the fees payable in 2023; if a deduction remained after the agreement expired, SALT was required to refund that amount. (SALT Sponsorship at 6, ¶ 2.) FTX's presenting sponsorship was exclusive for the New York conference, and FTX retained approval rights over certain proposed co-presenting sponsors for the international conferences. If a co-presenting sponsor was ultimately secured for any one of those international conferences, FTX was further entitled to a 15% reduction in the $1 million fee attributable to that event. (SALT Sponsorship at 6, ¶ 3.)

34. The SALT Claim does not allege which of the specified events occurred, whether SALT satisfied the applicable sponsorship conditions, or how SALT calculated its asserted damages. *See In re Allegheny Int'l, Inc.*, 954 F.2d at 173 ("Initially, the claimant must allege facts sufficient to support the claim."). The available record indicates that at least some of the required events and deliverables did not occur. Although SALT New York occurred in 2022, SALT Abu Dhabi was cancelled that year, and the conferences held by SALT for the remainder of the contract term were not qualifying SALT events. Rather than holding SALT Asia, the Asian conference held in 2022 was instead the first event jointly created by SALT and iConnections, an AI-powered platform that connects investors with capital opportunities, and the Asian and domestic conferences held during the remainder of the term likewise were "SALT iConnections" events. The Abu Dhabi conferences held in 2023 and 2024 were "Investopia" events and were produced or hosted through SALT's partnership with Investopia. Publicly available records also indicate that SALT failed to publish *SALT Talks: Crypto* episodes weekly

during the agreement's term. Accordingly, SALT's assertion that FTX owed a remaining balance of "not less than $8 million" is unsupported. SALT does not establish any recoverable damages and is not entitled to prima facie validity.

35. Even assuming that SALT could establish an entitlement to recover some amount under the SALT Sponsorship, any such recovery must be reduced—and, on this record, eliminated—by amounts that SALT obtained, or through reasonable efforts could have obtained, from replacement sponsors for the relevant conferences. In New York, damages for breach of a sponsorship agreement are calculated as "the contract price, reduced as though the contract was one for services, by such amount as was or could have been obtained in the exercise of reasonable efforts to minimize damages by the use of that space for other advertisements." *American Broadcasting-Paramount Theatres, Inc.* v. *American Mfrs. Mut. Ins. Co.*, 265 N.Y.S.2d 76, 88 (N.Y. Sup. Ct. 1965). Moreover, under New York law, a non-breaching party has "a legal obligation to mitigate [its] damages." *See Northland E., LLC* v. *J.R. Militello Realty, Inc.*, 81 N.Y.S.3d 694, 698 (N.Y. 4th Dep't 2018).

36. FTX's rejection of the SALT Sponsorship left SALT free to avoid the costs of providing FTX's sponsorship benefits and to sell the relevant sponsorship inventory to others. To the extent that the aforementioned iConnections and Investopia events were qualifying SALT conferences under the SALT Sponsorship agreement, the record reflects that SALT *did* mitigate its damages. Each of those conferences featured between one and 23 sponsors and partners, including Citi, UBS, Mubadala, and Goldman Sachs. SALT's recoverable damages, if any, therefore cannot equal the gross unpaid contract balance. Any recovery must begin with the fees that would have been payable after application of the agreement's $1 million program-specific deductions and 15% co-sponsorship reductions and must then be reduced by SALT's avoided

costs and replacement-sponsorship revenue. The SALT Claim provides none of the information necessary to perform that calculation, which is affirmatively required to demonstrate damages for breach of a sponsorship agreement under New York law. *See American Broadcasting-Paramount Theatres, Inc.*, 265 N.Y.S.2d at 88. SALT therefore has not demonstrated any nonspeculative recoverable loss, and the SALT Claim should be disallowed.

**IV. The Acquisition Claims Should Be Disallowed.**

37. The Acquisition Claims invert the economic reality of the SkyBridge Acquisition. SkyBridge alleges that it suffered at least $45 million in damages because the FTX Group paid it $45 million for minority interests in SkyBridge II and SkyBridge GP. It says that it was fraudulently induced to accept that payment because FTX misrepresented its financial condition, and that it was injured again because, under an LLCA SkyBridge signed, SkyBridge II used $40 million of the proceeds to acquire BTC, SOL, FTT, and SRM for itself. SkyBridge now isolates the decline in FTT and SRM, which it sold for approximately $3 million, and labels that decline a loss from the acquisition, while ignoring the fact that FTX handed it $45 million and disregarding the remainder of the transaction: the $5 million it retained for working capital and the Appreciated Tokens it continues to hold, now worth more than the entire Purchase Price. It dresses that supposed injury in claims for fraud, negligent misrepresentation, breach of contract and the implied covenant, unjust enrichment, and civil conspiracy. It also invokes unspecified reputational harm and professional fees associated with regulatory investigations and the FTX bankruptcy, but does not explain how either resulted from the alleged misconduct. Indeed, SkyBridge GP—which received only $1,000 and purchased none of the tokens—asserts the same claim for at least $45 million as SkyBridge II. In short, SkyBridge received a massive windfall in the transaction it now claims caused it to suffer a loss.

### A. Each of the Acquisition Claims Fails Because SkyBridge Did Not Suffer Any Damages From the SkyBridge Acquisition.

38. Under Delaware law, "[p]roving a contract claim or a tort claim requires proof of damages." *Abdullah* v. *Allstate Prop. & Cas. Ins. Co.*, 2022 WL 1123388, at *2 (Del. Super. Ct. Apr. 13, 2022).[10] Accordingly, SkyBridge's claims for fraud, negligent misrepresentation, breach of contract, breach of the implied covenant of good faith and fair dealing, and civil conspiracy each require proof that SkyBridge suffered damages from the SkyBridge Acquisition.[11] *See, e.g.*, *In re OSC 1 Liquidating Corp.*, 529 B.R. 825, 832 (Bankr. D. Del. 2015) (including "damage" as an element of common-law fraud); *Steinman* v. *Levine*, 2002 WL 31761252, at *14 (Del. Ch. Nov. 27, 2002), *aff'd*, 822 A.2d 397 (Del. 2003) (including "pecuniary loss" as an element of negligent misrepresentation); *In re Tropicana Ent., LLC*, 520 B.R. 455, 473 (Bankr. D. Del. 2014) (including "resulting damage" as an element of breach of contract); *Jiggy Puzzles, LLC* v. *Steelhead Acquisition EE, Inc.*, 2026 WL 465112, at *16 (Del. Super. Ct. Feb. 18, 2026) (including "resulting damages" as an element of breach of the implied covenant of good faith and fair dealing); *In re Am. Bus. Fin. Servs., Inc.*, 457 B.R. 314, 325 (Bankr. D. Del. 2011) (listing "actual damages" as an element of civil conspiracy). Each of those claims fails because SkyBridge cannot demonstrate any cognizable damages arising from the SkyBridge Acquisition.

39. The transaction itself did not cause SkyBridge any economic loss. SkyBridge indisputably received the entire $45 million Purchase Price paid by the FTX Group in connection with the SkyBridge Acquisition, and thus, received the full benefit of the bargain. To be sure,

---

[10] The Subscription Agreement and SkyBridge LLCAs are governed by Delaware law.

[11] SkyBridge's unjust enrichment claim similarly requires alleging an "impoverishment." *Pennsylvania Emp. Benefit Tr. Fund* v. *Zeneca, Inc.*, 710 F. Supp. 2d 458, 485 (D. Del. 2010). SkyBridge was not impoverished for the same reasons that it did not suffer any damages, and its unjust enrichment claim fails under the same logic.

Scaramucci himself has publicly stated that SkyBridge "didn't lose the money" in the SkyBridge Acquisition, because "Sam gave [him] the money."[12] Immediately upon receipt of those funds, SkyBridge used $40 million of the Purchase Price to acquire four cryptocurrencies—BTC, SOL, FTT, and SRM—pursuant to Section 3.11 of the SkyBridge II LLCA. SkyBridge has since represented that it continues to hold the Appreciated Tokens, which today are worth approximately $80 million—far exceeding the entire Purchase Price. Thus, SkyBridge currently retains assets from the SkyBridge Acquisition whose value surpasses the amount it allegedly "lost."[13] *See, e.g.*, *WaveDivision Holdings, LLC* v. *Millennium Digital Media Sys., L.L.C.*, 2010 WL 3706624, at *20 (Del. Ch. Sept. 17, 2010) (noting plaintiff was "only entitled to recover the net loss it has suffered" in breach of contract action).

**B. The Acquisition Claims Are Cancelled Under the Plan to the Extent They Seek Recovery in Respect of FTT.**

40. SkyBridge also cannot recover any purported losses arising from the decline in value of FTT because such claims are "cancelled or released" pursuant to Section 4.3.27(b) of the Plan. The Plan defines "FTT Claim or Interest" broadly to include "any . . . Claim or Interest, if any, of any kind or nature (whether arising in law or equity, contract or tort, under the Bankruptcy Code, federal or state law, rule or regulation, common-law or otherwise) in respect of an FTT." (Plan § 2.1.97.) The Plan likewise defines "Claim" broadly, in accordance with section 101(5) of the Bankruptcy Code, to include any "right to payment" or "equitable remedy," "whether or not such right is reduced to judgment, liquidated, unliquidated, fixed, contingent,

[12] *In Conversation with Anthony Scaramucci*, BLOOMBERG (Nov. 15, 2022), https://www.bloomberg.com/news/videos/2022-11-15/in-conversation-with-anthony-scaramucci.

[13] As an additional matter, SkyBridge cannot recover for its unilateral liquidation of the FTT and SRM holdings, which by its own admission breached Section 3.11 of the SkyBridge II LLCA. *See BioLife Sols., Inc.* v. *Endocare, Inc.*, 838 A.2d 268, 278 (Del. Ch. 2003) ("A party is excused from performance under a contract if the other party is in material breach thereof.").

matured, unmatured, disputed, undisputed, legal, equitable, secured, or unsecured." (Plan § 2.1.30.) SkyBridge's asserted right to recover losses in respect of FTT therefore falls squarely within the definition of an "FTT Claim or Interest" and is subject to the Plan's treatment of such claims: they "shall be cancelled," and their holders "shall not be entitled to, and shall not receive or retain, any Distributions[]." (Plan §§ 4.3.27(b), 5.2(f).) The Plan thus forecloses SkyBridge from recovering any amount arising from its acquisition and subsequent sale of FTT, regardless of whether it characterizes its asserted right to recovery as one "arising in law or equity, contract or tort." (Plan § 2.1.97.)

**C. The Acquisition Claims Fail to Identify Any Claimant-Specific Injury.**

41. SkyBridge also fails to identify any claimant-specific damages, instead asserting identical claims on behalf of SkyBridge II and SkyBridge GP. Only $1,000 of the Purchase Price was allocated to the membership interests in SkyBridge GP, and SkyBridge GP neither purchased nor held any of the Purchased Cryptocurrency. It therefore could not have incurred the purported realized or unrealized losses associated with FTT and SRM alleged in the Acquisition Claims. Nevertheless, SkyBridge GP asserts the same claim for "not less than $45 million" as SkyBridge II, without identifying any separate injury that it suffered. The Acquisition Claims' undifferentiated allegations concerning the "SkyBridge Parties" cannot provide a basis for recovery. *See Montway LLC* v. *Navi Transp. Servs. LLC*, 809 F. Supp. 3d 200, 220 (D. Del. 2025) ("I cannot assume that any loss incurred by [parent] impacted [subsidiary].").

**D. Even Assuming SkyBridge Suffered Damages From the Acquisition, the Acquisition Claims Fail to Establish Causation.**

42. Even assuming that either claimant suffered some injury, the Acquisition Claims do not explain how any alleged misrepresentation or contractual breach proximately caused that

injury. This deficiency is especially apparent with respect to SkyBridge's generalized allegations of "reputational harm" and "known and unknown liabilities," including professional fees associated with regulatory investigations and these Chapter 11 Cases. (Acquisition Claims ¶¶ 11-13.) SkyBridge does not connect its purported reputational harm to any asserted cause of action or identify any resulting lost client, investor, contract, business opportunity, or revenue. Indeed, before the Petition Date, SkyBridge affirmatively cultivated and benefitted from its association with the FTX Group and publicly touted its association with Bankman-Fried, whom Scaramucci dubbed the "preeminent leader in the crypto universe" and to whom "an attachment" would be "hugely beneficial to [SkyBridge's] business." (Amended Compl. ¶ 85.) SkyBridge's demand for professional fees fares no better. The Acquisition Claims do not explain how any such expenses resulted from an alleged misrepresentation or contractual breach, identify the amount or nature of the expenses, or specify which claimant incurred them. Nor do they identify any contractual, statutory, or other basis for shifting expenses associated with these Chapter 11 Cases to the Debtors' estates. SkyBridge's conclusory assertion that these purported injuries resulted from "the SkyBridge Parties' association with Island Bay and the Debtors" does not connect them to any actionable conduct and is insufficient to establish causation. (Acquisition Claims ¶ 12.)

### E. SkyBridge's Fraud and Breach of Contract Claims Fail Because SkyBridge Does Not Identify Any Actionable Misrepresentation or Contractual Breach.

43. SkyBridge asserts fraud claims based on allegations that Island Bay and Alameda TR Systems misrepresented their financial positions, concealed their "true tenuous financial states," and represented that FTX was "honest, law-abiding, and of good business and moral character" and would be a "good partner." (Acquisition Claims ¶¶ 14-17.) Its breach of contract claim likewise vaguely asserts that Island Bay provided incomplete or incorrect information

concerning its financial position and otherwise misrepresented the financial viability of the FTX Group. (Acquisition Claims ¶ 19.) Under Delaware law, fraud requires "a false representation of fact made by the defendant" that is "material," *Princeton Insurance Co.* v. *Vergano*, 883 A.2d 44, 54 (Del. Ch. 2005), and breach of contract requires a breach of a contractual provision resulting in damages, *In re Tropicana Entertainment, LLC*, 520 B.R. at 473. SkyBridge fails to allege either.

44. Both the fraud claims and the breach of contract claim rely on Section 3.1(j) of the Subscription Agreement, which represented only that information Island Bay had provided concerning Island Bay and its financial position was complete and correct in all material respects. But SkyBridge does not identify *any* information provided by Island Bay, let alone any incomplete or incorrect materials. In fact, the Acquisition Claims assert that "there were no financial statements for Island Bay." (Acquisition Claims ¶ 19.) That is because SkyBridge permitted newly formed Island Bay to replace Alameda Research Ventures as the investor shortly before closing, without objection, and did not insist on receiving financial statements for that entity or otherwise inquire about its financial condition. Having knowingly accepted the substitution without seeking that information, SkyBridge cannot now characterize its own failure to conduct more thorough diligence as a concealed fact or claim that their absence rendered Section 3.1(j) false.

45. SkyBridge's remaining assertions concerning the FTX Group's financial position and character are equally deficient because they do not identify what was said, who said it, when or where it was said, or on whose behalf the speaker acted. The purported assertion "that FTX was honest, law-abiding, and of good business and moral character" is far too vague and subjective to form the basis of a claim for fraud. *See Airborne Health, Inc.* v. *Squid Soap, LP*,

2010 WL 2836391, at *8 (Del. Ch. July 20, 2010) ("Under Delaware law, a company's optimistic statements praising its own 'skills, experience, and resources' are 'mere puffery and cannot form the basis for a fraud claim.'" (citation omitted)); *Trifecta Multimedia Holdings Inc.* v. *WCG Clinical Servs. LLC*, 318 A.3d 450, 464 (Del. Ch. 2024) (same, characterizing such statements as mere "deal-making courtship").

46. The Acquisition Claims also identify no affirmative step taken by the FTX Group to conceal a material fact and merely recite that SkyBridge's reliance was reasonable. *See Metro Communication Corp. BVI* v. *Advanced Mobilecomm Technologies Inc.*, 854 A.2d 121, 150 (Del. Ch. 2004). SkyBridge's fraud claims therefore fail.

**F. SkyBridge Cannot Establish the Special Relationship Required to Support Its Negligent-Misrepresentation Claim.**

47. SkyBridge asserts a claim for "negligent misrepresentation/equitable fraud" based on the Debtors' alleged misrepresentations concerning the FTX Group's financial condition and the value of FTT and SRM. (Acquisition Claims ¶ 18.) Under Delaware law, however, a negligent-misrepresentation claim requires either a special relationship giving rise to equitable jurisdiction or a need for relief available only in equity; "[a] generic pecuniary interest is not sufficient." *Blueacorn PPP, LLC* v. *Pay Nerd LLC*, 310 A.3d 590, 594 (Del. Ch. 2024). And where the claim arises from a contract, the claimant must identify a duty independent of the parties' contractual obligations. *Hatzel & Buehler, Inc.* v. *Orange & Rockland Util., Inc.*, 1992 WL 391154, at *10 (D. Del. Dec. 14, 1992). SkyBridge satisfies neither requirement. It seeks only money damages, not relief uniquely available in equity. And its purported "special relationship" consists entirely of the parties' "privity of contract" and the "significant membership interests" Island Bay acquired through the very Subscription Agreement at issue. (Acquisition Claims ¶ 18.) SkyBridge thus points to the contract as the source of a duty

supposedly independent of the contract—and to the transaction as the source of the relationship that supposedly induced the transaction. A relationship created by the challenged transaction cannot supply the preexisting duty necessary to support a claim of negligent misrepresentation.

### G. SkyBridge Does Not Establish the Elements of an Implied Covenant Claim.

48. SkyBridge fails to allege the required elements of an implied-covenant claim: "(1) a specific obligation implied in the contract; (2) a breach of that obligation; and (3) resulting damages." *Jiggy Puzzles*, 2026 WL 465112, at *16. SkyBridge alleges that the Debtors breached the implied covenant of good faith and fair dealing by requiring SkyBridge II to purchase FTT and SRM, which the Debtors allegedly knew would become "worthless," thereby depriving SkyBridge of the "benefit of [its] bargain." (Acquisition Claims ¶¶ 22-23.) But Section 3.11 of the SkyBridge II LLCA expressly provided that the amounts of each cryptocurrency were "selected jointly" by SkyBridge and Island Bay—it does not allege any facts supporting that FTX *required* that purchase. Nor does it identify any contractual gap or specific implied obligation concerning the value of FTT or SRM, much less a breach of such an obligation or resulting damages. To the extent SkyBridge asserts a loss based on the decline in value of those digital assets, nothing supports treating its claim differently from claims asserted by others in respect of FTT or SRM.

### H. SkyBridge's Unjust-Enrichment Claim Fails Because Express Agreements Govern and No Unjust Enrichment Occurred.

49. "The elements of unjust enrichment are: (1) an enrichment, (2) an impoverishment, (3) a relation between the enrichment and impoverishment, (4) the absence of justification, and (5) the absence of a remedy provided by law." *Pennsylvania Emp. Benefit Tr. Fund* v. *Zeneca, Inc.*, 710 F. Supp. 2d 458, 485 (D. Del. 2010). SkyBridge alleges that the Debtors were unjustly enriched by receiving membership interests in SkyBridge and profiting

from the purportedly "inflated" sale of FTT and SRM. (Acquisition Claims ¶ 20.) The claim fails for two independent reasons.

50. *First*, express agreements govern each transaction underlying SkyBridge's unjust-enrichment claim. The Subscription Agreement governs Island Bay's acquisition of the membership interests, and the SkyBridge II LLCA governs SkyBridge II's use of the Purchase Price to acquire the Purchased Cryptocurrency. Delaware courts "routinely dismiss[] unjust enrichment claims" where an enforceable contract governs the same subject matter. *Veloric* v. *J.G. Wentworth, Inc.*, 2014 WL 4639217, at *19 (Del. Ch. Sept. 18, 2014). Accordingly, SkyBridge's unjust-enrichment claim fails under either possible outcome. If the Trust prevails in the avoidance action, the challenged transfers and obligations will be avoided and unwound, eliminating the basis for SkyBridge's claim. If the Trust does not prevail, the Subscription Agreement and SkyBridge II LLCA will remain enforceable and foreclose quasi-contractual recovery for transactions they comprehensively govern.

51. *Second*, the claim also independently fails because SkyBridge cannot establish any unjustified enrichment or corresponding impoverishment. Far from being impoverished, SkyBridge received the full $45 million Purchase Price and retains the Appreciated Tokens, now worth approximately $80 million. It also received approximately $3 million from selling FTT and SRM. Nor has SkyBridge established that the Debtors or the Trust were unjustly enriched by receiving the 30% membership interests in SkyBridge GP and SkyBridge II. Those interests were received in exchange for the $45 million Purchase Price. The Subscription Agreement expressly disclosed that the interests had no established market and that no such market was expected to develop "in the foreseeable future." The interests also conferred no voting rights, board seats, or right to withdraw capital, and neither the Debtors nor the Trust has received a

single distribution. Nor did SkyBridge provide access to anything the Debtors could not obtain themselves: the Debtors could have used the same funds to purchase and hold cryptocurrency directly, without the restrictions attendant to an indirect investment through SkyBridge. SkyBridge's theory thus inverts the transaction—SkyBridge received $45 million, while the Debtors received illiquid, nonvoting interests that have never yielded a dollar. That is not SkyBridge's impoverishment or the Debtors' unjust enrichment; it is the opposite.

### I. SkyBridge's Civil Conspiracy Claim Fails for Lack of an Underlying Wrong or a Conspiracy.

52. Under Delaware law, civil conspiracy requires "(1) [a] confederation or combination of two or more persons; (2) [a]n unlawful act committed in furtherance of the conspiracy; and (3) [a]ctual damages to the plaintiff caused by the conspiracy." *In re Am. Bus. Fin. Servs.*, 457 B.R. at 325. Civil conspiracy is not an independent cause of action and must rest on an underlying tort or statutory violation; breach of contract is insufficient. *Kuroda* v. *SPJS Holdings, L.L.C.*, 971 A.2d 872, 892 (Del. Ch. 2009); *Ramunno* v. *Cawley*, 705 A.2d 1029, 1039 (Del. 1998). SkyBridge cannot establish either requirement. Because its other tort claims fail for the reasons explained above, there is no underlying wrong to support a conspiracy claim. *See Kuroda*, 971 A.2d at 892. The Acquisition Claims also identify only the Debtors—which operated as one consolidated entity—and the FTX Insiders acting on their behalf. A corporation cannot conspire with itself or with its officers and agents, whose acts are attributable to the corporation. *In re Transamerica Airlines, Inc.*, 2006 WL 587846, at *6 (Del. Ch. Feb. 28, 2006); *see also Amaysing Techs. Corp.* v. *Cyberair Commc'ns, Inc.*, 2005 WL 578972, at *7 (Del. Ch. Mar. 3, 2005). The civil conspiracy claim therefore fails.

**Reservation of Rights**

53. This Objection is limited to the grounds stated herein. Accordingly, it is without prejudice to the rights of the Trust to object to any claim on any grounds whatsoever. The Trust expressly reserves all further substantive or procedural objections. Nothing contained herein is intended or should be construed as: (a) an admission as to the validity of any claim against the Trust; (b) a waiver of the Trust's rights to dispute any claim on any grounds; (c) a promise or requirement to pay any claim; (d) an implication or admission that any particular claim is of a type specified or defined in this Objection or any order granting the relief requested by this Objection; (e) an approval or assumption of any agreement, contract, or lease under section 365 of the Bankruptcy Code; or (f) a waiver of the Trust's rights under the Bankruptcy Code or any other applicable law.

**Compliance with Local Rule 3007-1**

54. To the best of the Trust's knowledge and belief, this Objection and the related exhibits comply with Local Rule 3007-1. To the extent this Objection does not comply in all respects with the requirements of Local Rule 3007-1, the undersigned believes such deviations are not material and respectfully requests that any such requirement be waived.

**Notice**

55. Notice of this Objection has been provided to: (a) the U.S. Trustee; (b) the Securities and Exchange Commission; (c) the Internal Revenue Service; (d) the United States Department of Justice; (e) the United States Attorney for the District of Delaware; (f) the claimants; and (g) to the extent not listed herein, those parties requesting notice pursuant to rule 2002 of the Bankruptcy Rules. The Trust submits that, in light of the nature of the relief requested, no other or further notice need be provided.

**Conclusion**

56. For the foregoing reasons, the Trust respectfully requests that the Court enter the Proposed Order, substantially in the form attached hereto as **Exhibit A**, disallowing SkyBridge's claims in their entirety.

Dated: September 18, 2026
Wilmington, Delaware

**LANDIS RATH & COBB LLP**

*/s/ Matthew B. McGuire*
Adam G. Landis (No. 3407)
Richard S. Cobb (No. 3157)
Matthew B. McGuire (No. 4366)
Howard W. Robertson IV (No. 6903)
919 Market Street, Suite 1800
Wilmington, Delaware 19801
Telephone: (302) 467-4400
Facsimile: (302) 467-4450
E-mail: landis@lrclaw.com
cobb@lrclaw.com
mcguire@lrclaw.com
robertson@lrclaw.com

-and-

**SULLIVAN & CROMWELL LLP**
Stephen Ehrenberg (admitted *pro hac vice*)
Brian D. Glueckstein (admitted *pro hac vice*)
Christopher J. Dunne (admitted *pro hac vice*)
Jacob M. Croke (admitted *pro hac vice*)
125 Broad Street
New York, New York 10004
Telephone: (212) 558-4000
Facsimile: (212) 558-3588
E-mail: ehrenbergs@sullcrom.com
gluecksteinb@sullcrom.com
dunnec@sullcrom.com
crokej@sullcrom.com

*Counsel for the FTX Recovery Trust*