**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| In re: | Chapter 11 |
| FTX TRADING LTD., *et al.*,[1] | Case No. 22-11068 (KBO) |
| Debtors. | (Jointly Administered) |
| | **Hearing Date: December 17, 2026 at 1:00 p.m. (ET)**<br>**Objection Deadline: November 9, 2026 at 4:00 p.m. (ET)** |

**FTX RECOVERY TRUST'S DISPOSITIVE MOTION TO DISALLOW AND PRELIMINARY OBJECTION TO THE ARGENT LIQUIDATION TRUST'S CLAIMS**

The FTX Recovery Trust[2] hereby submits this dispositive motion and preliminary claims objection (the "Claim Disallowance Motion"), pursuant to section 502 of title 11 of the United States Code, 11 U.S.C. §§ 101 *et seq*. (the "Bankruptcy Code"), rules 3001 and 3007 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), and the *Order Approving Stipulation* [D.I. 36189] entered by the Court on August 28, 2026, as modified by the *Order Approving Stipulation* [D.I. 36461] (the stipulations so approved, the "Stipulation"), to disallow with prejudice the 100 substantially identical proofs of claim filed by Silvergate Capital Corporation, Silvergate Liquidation Corporation (f/k/a Silvergate Bank), and Spring Valley Lots, LLC (the "Silvergate Claims," and the debtors, collectively, "Silvergate") against former-debtor entities within the FTX Group (collectively, the "FTX Group"), as supported by the Argent Liquidation Trust's ("Argent") More Definite Statement of Proofs of Claim [D.I. 36200]

---

[1] The last four digits of FTX Trading Ltd.'s and Alameda Research LLC's tax identification numbers are 3288 and 4063, respectively. Due to the large number of debtor entities in these chapter 11 cases (the "Chapter 11 Cases"), a complete list of the Debtors and the last four digits of their federal tax identification numbers is not provided herein. A complete list of such information may be obtained on the website of the Debtors' claims and noticing agent at https://cases.ra.kroll.com/FTX.

[2] The FTX Recovery Trust (a/k/a the Consolidated Wind Down Trust) was established through the Debtors' confirmed Sec*ond Amended Joint Chapter 11 Plan of Reorganization of FTX Trading Ltd. and Its Debtor Affiliates* [D.I. 26404], which became effective on January 3, 2025 [D.I. 29127].

("Argent's More Definite Statement" or "Argent MDS").[3] In support thereof, the FTX Recovery Trust respectfully states as follows:

## PRELIMINARY STATEMENT

1. Argent's claims are a transparent attempt to exploit the fallout of the fraud committed by the FTX Group's insiders against its customers to cover self-inflicted losses arising from Silvergate's own failed, high-risk business model and rampant regulatory violations. Having watched from the sidelines as the victims of the FTX Group's misconduct waited to be substantially recompensed for the harm caused by Samuel Bankman-Fried and his co-conspirators, Argent now asks those same customers and creditors to reimburse Silvergate for "billions" in alleged corporate losses and other expenses incurred during its collapse and eventual bankruptcy, based entirely on the faulty theory that the FTX Group can be held legally liable for any and all losses associated with Silvergate's downfall, no matter how remote and notwithstanding the admissions by Silvergate and its officers of its many failed banking procedures and regulatory violations.

2. But Argent's claims fail on their face because Argent does not—and cannot—articulate any facts demonstrating that the FTX Group proximately caused any of its alleged injuries. Instead, Argent vacillates between two fatally flawed theories of causation. At times, Argent blames its purported injuries on misrepresentations made by Alameda and North Dimension in connection with their opening and use of non-custodial bank accounts. At other times, recognizing, as it must, that Silvergate's collapse was not caused by mere account-opening misrepresentations, Argent attempts to substitute the broader scheme to misappropriate FTX

[3] If the Court does not disallow the Silvergate Claims in full with prejudice on the grounds set forth herein, the FTX Recovery Trust reserves the right to assert additional objections supported by evidence at the appropriate stage of this claims litigation.

customer deposits (the "FTX Insider Fraud") for the missing causal link. But Argent's concession that it was actually the "revelation of the FTX Group's elaborate fraud" that triggered a "domino effect" causing Silvergate's "irrevocable harm" is in fact fatal to its claims. (Argent MDS ¶ 60.) As a matter of law, Argent cannot recover damages caused by the revelation of the FTX Group's fraudulent scheme, rather than by the scheme itself. Moreover, far from being harmed by that scheme, Silvergate *benefitted* from it—the FTX Group's fraud gave Silvergate access to over a billion dollars in low-cost deposits held in the FTX Group's non-compliant accounts that Silvergate used to drive record revenue.

3. Even if the revelation of the FTX Insider Fraud could support Argent's claims (and it cannot), there were multiple, intervening events between that revelation and Silvergate's liquidation and bankruptcy. Silvergate itself acknowledged those intervening causes when it submitted a first-day declaration to this Court in its own bankruptcy proceedings. In that sworn submission, Silvergate blamed regulatory pressure, macroeconomic conditions, rising interest rates, the insolvency of Three Arrows, Voyager, and Celsius, and the broader crypto-industry contraction for its collapse—not the FTX Insider Fraud. In fact, Silvergate explicitly represented that the collapse of the FTX Group only caused already-existing economic pressure to *continue* to build on Silvergate, but that despite the FTX Group's bankruptcy it possessed more than sufficient assets to cover its liabilities to depositors. These sworn admissions are fatal to any demonstration of proximate cause, which is an essential element of the Silvergate Claims.

4. According to Silvergate, it was forced to liquidate and file for bankruptcy not by the steep decline in its deposits, but by increased supervisory pressure. In other words, the "jig was up" and Silvergate's flawed regulatory procedures were exposed. The theory Argent now advances seeking to hold the FTX Group singularly liable for Silvergate's collapse is, therefore,

nothing more than a made-for-litigation reconstruction by a successor trust designed to monetize a claim that its predecessor's own sworn filings foreclose. Nonetheless, Argent tries to pass the cost of every poor business decision, misconduct, and regulatory failure onto the FTX Recovery Trust creditors: everything from securities sale losses and lost going concern value to fines and penalties and defense costs, some of which are expressly barred from being reimbursed. Argent has not and cannot articulate a discernible basis for relief under any of its theories of liability because Silvergate suffered no cognizable injury from the FTX Group's conduct.

5. Argent also attempts to shoehorn all of its damages claims into boilerplate indemnification language contained in the account opening documents, which fails pursuant to the plain language of those contracts. The FTX Group did not agree to indemnify Silvergate's direct losses or its own negligence or misconduct.

6. Finally, while the Silvergate Claims fail as a matter of law, they are also all barred by the doctrine of *in pari delicto*, including because of its misconduct resulting in Silvergate incurring $63 million in fines from its regulators—amounts included in the Silvergate Claims. Accordingly, the Silvergate Claims should be disallowed in full with prejudice.

## BACKGROUND

### A. Silvergate's Banking Business and Concentrated Bet on Digital Assets

7. Prior to its collapse in March 2023, Silvergate Bank was one of a few U.S. banks at the time that actively sought digital-asset customers in the high-risk cryptocurrency market. (*See In re Silvergate Capital Corp., et al.*, Case No. 24-12158 (KBO) (Bankr. D. Del. Sep. 18, 2024) (Dkt. No. 9) (*Declaration of Elaine Hetrick in Support of the Debtors' Chapter 11 Petitions and Certain Motions*) ¶¶ 8, 18 (the "Hetrick Declaration" in the "Silvergate Bankruptcy"); *see also* Argent MDS ¶ 8.) One of its core product offerings was the Silvergate Exchange Network ("SEN"). (Argent MDS ¶ 9 n.5.) The SEN was an internal payments platform that allowed crypto

exchanges and institutional investors to move U.S. dollars between Silvergate accounts in near real time. (*Id.*) The SEN was a massive success for Silvergate Bank, with $787.4 billion transferred on the SEN in 2021 alone. (*Id.*)

8. Until its collapse, Silvergate's digital assets strategy appeared highly successful to investors and the public. "Silvergate Bank was able to secure some of the largest cryptocurrency-related businesses as customers." (Hetrick Decl. ¶ 8.) Accordingly, Silvergate Bank's deposit book reportedly grew from $1.8 billion at the end of 2019 to approximately $14.3 billion at the end of 2021. (*Id.*) Driven by this success, Silvergate Bank continued to add to its bet on the digital assets industry and, as of June 30, 2022, substantially all of Silvergate Bank's noninterest-bearing deposits (which were approximately 99.5% of total deposits) were digital-asset-industry deposits. (*Id.*) Accordingly, Silvergate Bank had intentionally and knowingly concentrated its balance sheet in the digital asset industry and built a business model that depended upon public confidence in the market for digital assets and Silvergate Bank's ability to manage the heightened regulatory risks related to digital assets.

### B. Silvergate's Banking Relationship with the FTX Group

9. One of the cryptocurrency-related businesses that Silvergate Bank secured as a customer was the FTX Group. Silvergate opened non-custodial bank accounts for Alameda Research LLC and Alameda Research Ltd. (together "Alameda") in March 2018 and 2019, respectively. (Argent MDS ¶ 14.) In April 2021, Silvergate also opened non-custodial and SEN accounts for North Dimension Inc. ("North Dimension"). (*Id.* ¶¶ 22-23.) Ultimately, Silvergate opened numerous non-custodial and custodial accounts for a variety of FTX Group entities, including West Realm Shires Services Inc. (d/b/a "FTX.US"), Quoine Pte Ltd., and FTX Digital Markets Ltd. (*Id.* ¶ 13.) Each FTX Group accountholder entered into Cash Management and Treasury Services Agreements ("CMTS Agreements") and Deposit Account Agreement and

Regulatory Disclosures ("DAARDs") governing those accounts. (*Id.* ¶ 28.) Importantly, the FTX Group was just one of the crypto-related businesses which Silvergate Bank serviced.

10. Silvergate's relationship with the FTX Group proved wildly profitable for Silvergate, with its net income rising from $7.6 million in 2017 to $75.5 million in 2021.[4] And, as the FTX Recovery Trust has alleged, FTX-related deposits grew more than 200-fold to approximately $1.4 billion (approximately 10% of Silvergate Bank's total deposits) by mid-2022, likely generating an estimated 7% of Silvergate's quarterly interest income by the third quarter of 2022 (equal to an estimated $27 million in pro forma annualized interest income). (*See In re Spring Valley Lots, LLC*, Case No. 24-12157 (KBO) (Bankr. D. Del.) (Dkt. No. 67) (the "FTX MDS") ¶ 71.)

## C. Silvergate's Own Compliance Failures and Regulatory Warnings

11. Despite catering to high risk digital asset companies (or perhaps because it was doing so), Silvergate failed to establish an adequate Bank Secrecy Act ("BSA") and anti-money laundering ("AML") compliance program as required by law. A final exam report issued on April 20, 2022 by the Federal Reserve Bank of San Francisco ("FRBSF") and California Department of Financial Protection and Innovation ("DFPI") identified "material internal control weaknesses over BSA/AML compliance."[5] A September 2022 targeted examination, also by FRBSF and DFPI, found that Silvergate's transaction monitoring system was "not configured commensurately to the Bank's risk profile" and that Silvergate's BSA compliance program "continued to inadequately dispose of suspicious activity alerts." (*Id.* ¶ 85.)

---

[4] *See* Silvergate Cap. Corp., Registration Statement (Form S-1), at 68 (Nov. 16, 2018); Silvergate Cap. Corp., Annual Report (Form 10-K) at 38, 53 (Feb. 28, 2022).

[5] *SEC* v. *Silvergate Cap. Corp.*, No. 1:24-cv-04987 (S.D.N.Y. July 1, 2024) ("SEC Action"), Dkt. No. 1 ("SEC Complaint") ¶ 82.

12. Silvergate was allegedly aware of these "weaknesses" but ignored them. Indeed, the SEC alleged that Silvergate's automated transaction-monitoring system failed to cover internal SEN transfers from at least April 2021 through September 2022, leaving more than $1 trillion in SEN transactions unmonitored and nearly $9 billion in suspicious FTX-related transfers undetected. (*Id.* ¶¶ 3, 50.) But when Silvergate's leadership was made fully aware of the egregious gaps in Silvergate's transaction monitoring, the issue was brushed aside and, ultimately, ignored. (*Id.* ¶ 70 (Chief Risk Officer Kathleen Fraher allegedly told the bank's BSA Officer that the bank would "take our lumps" rather than remediate).)

**D. Silvergate Experiences a Bank Run Amidst Digital Asset Industry Collapse and Rising Interest Rates**

13. Although Silvergate reaped substantial profits on noninterest-bearing deposits when interest rates were low and the digital-asset industry was booming, Silvergate's business model predictably faltered when the digital asset industry experienced a downturn amid rising interest rates. By mid-2022, the digital asset industry began to come "under stress," with the collapse of Three Arrows Capital, Voyager Digital Holdings, and Celsius Network. (*See* Hetrick Decl. ¶ 9.) These events "had a contagion effect on the digital asset industry as a whole, including on the exchanges that represented a substantial portion of Silvergate Bank's depositor base." (*Id.*)

14. Amidst these events, on November 11 and 14, 2022, FTX Trading Ltd. and certain of its affiliates filed voluntary petitions for relief under Chapter 11 of the Bankruptcy Code in this Court (the "<u>FTX Bankruptcy</u>"). According to Silvergate, the FTX Group's collapse caused "[p]ressure" to "***continue***[]" to build on Silvergate Bank, because that collapse brought "***further*** troubles within the digital asset industry [to come to] the forefront and ***continued*** to chill the crypto markets and generate increased regulatory scrutiny and restrictions on banks with a digital asset customer base." (*See* Hetrick Decl. ¶ 10 (emphasis added).) But the collapse of FTX did not bring

down Silvergate. According to Silvergate, after the FTX Group collapsed "Silvergate Bank possessed ***more than sufficient assets to cover its liabilities to depositors*** and had no lending or other business relationship with FTX beyond holding deposits and providing bank account services." (*Id.*)

15. Instead, it was the "perception of risk and fear of contagion, likely as a result of the string of cryptocurrency-related insolvency proceedings," that led to a crisis of confidence across the digital asset industry, which "along with similar problems faced by banks across the country" because of rising interest rates, "caused a 'run on the bank.'" (*Id.*) As more customers withdrew their holdings, Silvergate Bank's noninterest-bearing deposits fell to about $3.852 billion by December 31, 2022. (*Id.*) This "contraction in deposits was exacerbated by the general rise in interest rates in the economy at large" which made Silvergate's noninterest-bearing accounts "significantly less appealing for depositors in this higher interest rate environment." (*Id.* ¶ 12.) To meet withdrawals by its own customers reacting to the wider crisis of confidence in the digital asset industry, Silvergate sold $5.2 billion of debt securities in late 2022. (Argent MDS ¶ 60.) But the combination of the "general rise in interest rates" and the decrease in value of "even supposed safe haven investments held by Silvergate Bank such as treasury bonds, agency securities, and municipal bonds" contributed to a fiscal 2022 net loss of $948.7 million "largely driven by sales of long-dated securities impaired by rising interest rates." (Hetrick Decl. ¶ 12.) Indeed, the pressure that rising interest rates put on bank deposits sent shockwaves through the banking industry. Silicon Valley Bank, Signature Bank, and First Republic Bank[6]—all of which were less

---

[6] *FDIC Creates a Deposit Insurance National Bank of Santa Clara to Protect Insured Depositors of Silicon Valley Bank, Santa Clara, California*, FDIC (Mar. 10, 2023), https://www.fdic.gov/news/press-releases/2023/pr23016.html; *FDIC Establishes Signature Bridge Bank, N.A., as Successor to Signature Bank, New York, NY*, FDIC (Mar. 12, 2023), https://www.fdic.gov/news/press-releases/2023/pr23018.html; *JPMorgan Chase Bank, National Association, Columbus, Ohio Assumes All the Deposits of First Republic Bank, San Francisco, California*, FDIC (May 1, 2023), https://www.fdic.gov/news/press-releases/2023/pr23034.html.

exposed to the digital assets industry and FTX than Silvergate Bank—failed between March 10 and May 1, 2023.

### E. Silvergate Chooses to Liquidate Due to Regulatory Pressure on Its Flawed Business Model

16. Faced with its dwindling depositor base, Silvergate began to reduce the size of its operations in late 2022. (Hetrick Decl. ¶ 13.) In its own sworn submissions to this Court, Silvergate asserted that by early 2023 it "still held assets valued in excess of deposits and met its regulatory capital requirements." (*Id.*) But, after the Federal Reserve, the Federal Deposit Insurance Corporation, and the Office of the Comptroller of the Currency issued a joint statement advising banks of the risks of a deposit base highly concentrated with crypto-asset related depositors, Silvergate began restructuring its business to "eliminat[e] products such as Silvergate Bank's digital asset custody and certain cash management services that were no longer economical with a reduced depositor base." (*Id.* ¶¶ 14-15.) As a result of these changes, Silvergate itself stated that by early 2023 it had "stabilized" and had "the capability to continue to serve its customers that had kept their deposits with Silvergate Bank." (*Id.* ¶ 17.)

17. Nevertheless, on March 8, 2023, Silvergate Bank voluntarily liquidated, citing most prominently regulatory pressure that "prevent[ed] Silvergate Bank from continuing its digital asset focused business model." (*Id.* ¶¶ 14–19.) Such pressure was industry wide, resulting in the closure and sale of Signature Bank which, according to Silvergate, "made clear that" regulators "would not tolerate banks with significant concentrations of digital asset customers." (*Id.* ¶ 19.) Silvergate considered pivoting away from crypto-asset businesses but concluded the "cost of operating the business while pivoting to a new business model would outweigh the potential benefits of doing so." (*Id.* ¶ 18.)

**F. The Silvergate Chapter 11 Proceedings**

18. On September 17, 2024, Silvergate Capital filed voluntary petitions for relief under chapter 11 in the United States Bankruptcy Court for the District of Delaware. (Silvergate Bankruptcy, Dkt. No. 1.) The Silvergate Bankruptcy was described as a pre-packaged bankruptcy and, in connection with its initial chapter 11 petition, Silvergate filed a proposed chapter 11 plan (*id*. Dkt. No. 10) that was supported by approximately 63% of the aggregate liquidation preference of Silvergate's preferred stockholders (Hetrick Decl. ¶ 27).

19. On October 31, 2024, the FTX Group filed proofs of claim against multiple bankrupt Silvergate entities (the "FTX Claims"). (*See, e.g.*, *Declaration of Benjamin S. Beller in Support of FTX Recovery Trust's Dispositive Motion to Disallow and Preliminary Objection to the Argent Liquidation Trust's Claims*, Ex. A (Claim No. 137).) In the FTX Claims, the FTX Group alleged that Silvergate failed to implement appropriate corporate controls, was aware of the schemes to defraud FTX customers by insiders at the FTX Group, and helped the insiders at the FTX Group conceal their wrongful conduct. (*See id.* ¶¶ 8-9.) The FTX Group asserted claims against Silvergate, including, but not limited to, for aiding and abetting breach of fiduciary duty, aiding and abetting conversion, and unjust enrichment. (*See id.* ¶ 10.)

20. On December 24, 2024, one purportedly independent director of Silvergate—Ivona Smith—issued the *Report of the Internal Investigation Committee of the Board of Directors of Silvergate, Inc.* (the "SIC Report"). (Silvergate Bankruptcy, Dkt. No. 689-1.) The SIC Report incredulously concluded that Silvergate lacked credible claims against its directors for breach of duties relating to Silvergate's BSA/AML compliance program, alleged insider trading, and misleading public statements concerning Silvergate's compliance program. (SIC Report at 2-3.) Relying on this Report, Argent represented to the Court that "Silvergate had no actual knowledge

of—nor was willfully blind to—the FTX Group's fraud before it was publicly revealed." (Argent MDS ¶ 56.)

21. Although omitted from Argent's More Definite Statement, on April 4, 2025, an independent examiner appointed in the Silvergate Bankruptcy—Stephanie Wickouski—issued the *Report of Stephanie Wickouski, as Examiner* (the "Wickouski Report"). (Silvergate Bankruptcy, Dkt. No. 634-1.) The Wickouski Report broadly found that the conclusions of the SIC Report were "not reasonable." (*Id.* at 4-5.) *First*, it found that the counsel that had prepared the SIC Report was subject to a structural conflict. (*Id.* at 19-21.) *Second*, it concluded that the SIC's assessment of potential claims against insiders suffered from "factual deficiencies" and an "incomplete analysis." (*Id.* at 22, 30-35.) *Third*, it found that the SIC lacked access to witness interview transcripts and notes, interviewed only four witnesses, and failed to interview Silvergate's former General Counsel. (*Id.* at 13-14.) As a result, the Wickouski Report concluded that the SIC's analysis did not provide a reliable basis for evaluating potential claims belonging to the estate. (*Id.* at 38.)

22. Following the Wickouski Report, Silvergate entered into a settlement with its common stockholders to modify its initially proposed plan of reorganization. (Silvergate Bankruptcy, Dkt. No. 811 at 39.) That amended plan of reorganization was ultimately confirmed on November 13, 2025. (Silvergate Bankruptcy, Dkt. Nos. 1077-1 (as modified by Dkt. No. 1222, the "Silvergate Plan").)

23. The Silvergate Plan provided for the establishment of a liquidation trust on the Silvergate Plan's effective date. (Silvergate Plan, Article VI.) On March 31, 2026 (the Silvergate Plan's effective date), with only certain enumerated exceptions, all Silvergate assets transferred automatically to Argent. (Silvergate Plan, Article I(A)(123), Article VI(c).)

### G. Silvergate's Legal and Regulatory Exposure Resulting from Its Violations of the Law

24. Silvergate Bank's decision to voluntarily liquidate and enter bankruptcy did not cut off legal and regulatory actions against Silvergate that were a direct result of Silvergate's failures to establish basic systems and controls with respect to, among other things, BSA and AML compliance. On May 23, 2023, the Board of Governors of the Federal Reserve System (the "FRB") and DFPI issued a joint cease and desist order to aid in implementing Silvergate Bank's voluntary liquidation plan.[7] The order noted that examinations of Silvergate "identified numerous deficiencies, including with respect to both safety and soundness and compliance with banking laws and regulations." (*Id.* at 2.)

25. ***Bank Regulatory Actions***. On June 4, 2024, the FRB fined Silvergate Bank $43 million for "deficiencies in Silvergate [Bank]'s monitoring of internal transactions through the SEN."[8] On June 26, 2024, the DFPI imposed its own fine of $20 million against Silvergate Bank for the same identified deficiencies in monitoring internal transactions.[9]

26. ***SEC Action***. On July 1, 2024, the U.S. Securities and Exchange Commission filed a complaint against (i) Silvergate Capital, (ii) former CEO Alan J. Lane, (iii) former COO Kathleen Fraher, and (iv) former CFO Antonio Martino. (SEC Complaint at 1.) The complaint alleged that "Defendants made false or misleading statements and material omissions to, and

---

[7] *Order to Cease and Desist Issued Upon Consent Pursuant to the Federal Deposit Insurance Act, as Amended, and the California Financial Code*, Nos. 23-003-B-HC & 23-003-B-SM (Board of Governors and DFPI, May 23, 2023), https://www.federalreserve.gov/newsevents/pressreleases/files/enf20230601a1.pdf (the "Cease-and-Desist Order").

[8] *Order of Assessment of Civil Money Penalty Issued Upon Consent Pursuant to the Federal Deposit Insurance Act, as Amended*, Nos. 24-013-CMP-HC & 24-013-CMP-SM, at 2 (Board of Governors, June 4, 2024), https://www.federalreserve.gov/newsevents/pressreleases/files/enf20240701a1.pdf (the "FRB Order").

[9] *Consent Order*, Banking License No. 1824 (DFPI, June 26, 2024), https://dfpi.ca.gov/wp-content/uploads/sites/337/2024/06/Consent-Order-Silvergate-Bank.pdf (the "DFPI Order").

engaged in other conduct that misled, the public and . . . investors regarding the effectiveness of Silvergate Bank's . . . [BSA/AML] compliance program and its financial soundness." (*Id.*) The complaint described how Silvergate Capital, Lane, and Fraher falsely stated in SEC filings and other public statements that Silvergate Bank had an effective BSA/AML compliance program "tailored to the heightened risks" posed by its crypto-related customers, despite knowledge that Silvergate Bank's BSA/AML compliance program was woefully inadequate as, among other things, it had (i) "failed to . . . monitor for suspicious activity ***approximately $1 trillion*** in banking transactions that occurred on the SEN" and (ii) "failed to detect nearly ***$9 billion*** in suspicious transfers by FTX."[10] (*See id*. ¶¶ 2-3 (emphases added).)

27. On July 8, 2024, without admitting or denying the allegations, Silvergate resolved the SEC Action by agreeing to a final judgment imposing (i) a permanent injunction and (ii) a $50 million civil penalty (offset against the previous $63 million in fines) for which it "***shall not*** seek or accept, directly or indirectly, reimbursement or indemnification ***from any source***."[11] On the same day, Lane and Fraher, without admitting or denying the allegations, both agreed to final judgments (i) enjoining them from violating the Securities Exchange Act, (ii) imposing five-year officer-and-director bars, and (iii) levying civil penalties of $1 million and $250,000, respectively.[12] (*See* SEC Action, Dkt. Nos. 19, 21.)

---

[10] The SEC Complaint ultimately asserted claims against Silvergate Capital for violations of Section 17(a)(2) and (3) of the Securities Act, Sections 13(a), 13(b)(2)(A), and 13(b)(2)(B) of the Exchange Act, along with violations of Rules 12b-20, 13a-1, 13a-11, and 13a-13. Claims against Lane were asserted for violations of Section 17(a)(2) and (3) of the Securities Act, claims against Fraher were asserted for violations of Section 17(a)(3) of the Securities Act, and claims against Martino were asserted for violations of Section 17(a) of the Securities Act, Section 10(b) and 13(b)(5) of the Exchange Act—along with Rules 10b-5 and 13b2-1—and aiding and abetting several of Silvergate Capital's alleged violations.

[11] SEC Action, Dkt. No. 20 at 11 (emphasis added) (hereinafter, the "SEC Order").

[12] Unlike the other defendants, Martino has not agreed to settle the SEC's claims. Martino's motion to dismiss was denied on September 30, 2025, and the parties are currently in discovery. (*See* SEC Action, Dkt. No. 58.)

28. ***Securities Fraud Class Action***. On September 3, 2025, Silvergate Capital entered into a $37.5 million settlement to resolve a securities fraud class action brought on behalf of its common stockholders.[13] The relevant amended complaint alleged that Silvergate Capital misled investors by touting its risk-management, compliance, customer-vetting, due diligence, and monitoring practices, when in reality Silvergate Bank failed to vet or monitor customers. (*See* Securities Class Action, Dkt. No. 43 (*Amended Consolidated Class Action Complaint for Violations of Federal Securities Laws*) ¶¶ 3-7, 50-87.) The amended complaint further alleged that a series of disclosures beginning in November 2022 revealed Silvergate Bank's compliance failures, causing Silvergate Capital's stock to fall from more than $225 per share to approximately $1.47. (*See id.* ¶¶ 128-48.)

29. As required by the Private Securities Litigation Reform Act ("PSLRA"), the judgment approving the settlement of the securities class action includes a bar order that provides as follows:

> any and all claims, future claims, and claims . . . by [Silvergate[14]] against any individual or entity, for (a) contribution or indemnity, however denominated, whether as a claim, cross-claim, counterclaim, third-party claim, or otherwise, on whatsoever theory, based upon, arising out of, or related to Released Plaintiffs' Claims, or (b) any other claim of any type, whether arising under state, federal, common or foreign law, for which the injury claimed is that person's or entity's actual or threatened liability to Plaintiffs and/or members of the Settlement Class, whether asserted in the Action or any other proceeding, in this Court, in any federal or state court, or in any other court, arbitration proceeding, administrative agency, or other forum in the United States or elsewhere, are permanently barred, enjoined, restrained, extinguished, and discharged to the

[13] *In re Silvergate Cap. Corp. Sec. Litig.*, Case No. 3:22-cv-01936 (JES/MSB) (S.D. Cal.) (Sep. 3, 2025) (Dkt. No. 150) (*Judgment Approving Class Action Settlement*) (the "Securities Class Action Judgment" entered in the "Securities Class Action").

[14] Silvergate is covered by the Bar Order. (Securities Class Action, Dkt. No. 139-1 (*Stipulation and Agreement of Settlement*) (the "Securities Settlement") at 1, 6.)

fullest extent permitted by law.

(Securities Class Action Judgment at 7-8 (the "Bar Order").) The judgment also provides that the Bar Order "shall be interpreted and applied as the broadest permitted under the PSLRA, common law, and the District Court's inherent authority, as applicable." (*Id*. at 8.)

30. This settlement was funded in part by a $5.32 million "Preferred Equity Holder Contribution" that was transferred to the Securities Class Action settlement escrow account on the effective date of Silvergate's chapter 11 plan "from the cash distribution made by the Debtors to the preferred equity holders." (Securities Settlement ¶ 10; *see also* Silvergate Bankruptcy, Dkt. No. 732 (*Preliminary Order (I) Approving Global Settlement, Including the Debtors' Entry Into and Performance Under Indemnification Settlement and Securities Litigation Settlement, Pursuant to Bankruptcy Rule 9019, and (II) Granting Related Relief*) ¶ 4 & Ex. 2 ¶ 4(b).) That $5.32 million contribution is one of the Settlement Payments that Argent seeks to recover here. (*See* Argent MDS ¶ 66.)

31. ***FTX Depositor Class Action***. On February 10, 2026, after its motion to dismiss was denied,[15] Silvergate entered into a $10 million settlement to resolve a putative class action brought on behalf of customers of the FTX.com exchange.[16] The relevant complaint alleged that Silvergate provided banking services to FTX and Alameda "despite numerous unmistakable indicators of suspicious activity" because losing FTX's business "would have been devastating for Silvergate," and also "substantially helped FTX, Alameda, and [Sam Bankman-Fried] perpetrate [their] fraud." (Bhatia Action, Dkt. No. 14 (*Consolidated Class Action Complaint*) ¶¶ 162-90.)

---

[15] *Bhatia* v. *Silvergate Bank*, 725 F. Supp. 3d 1079 (S.D. Cal. 2024).

[16] *Bhatia* v. *Silvergate Bank*, Case No. 3:23-cv-01406 (RBM/BLM) (S.D. Cal.) (the "Bhatia Action") (Dkt. No. 92 (*Order (1) Granting Plaintiffs' Motion for Final Approval of Settlement [Doc. 87]; and (2) Granting Plaintiffs' Motion for Attorney's Fees, Expenses, and Service Awards [Doc. 88]*) (Feb. 10, 2026)).

### H. Silvergate's Claims Against the FTX Estate

32. On June 30, 2023, Silvergate filed the Silvergate Claims against the FTX Group. (S*ee, e.g.*, *FTX Non-Customer Proof of Claim Form*, [D.I. 35808-1].) Based on a common set of factual allegations centered on the FTX Group's alleged misstatements relating to account-opening and account-use agreements, the Silvergate Claims assert claims for (i) fraud, (ii) breach of contract, (iii) contractual indemnification, and (iv) claims for a violation of the Racketeer Influenced and Corrupt Organizations Act ("RICO Act") and a civil conspiracy to violate the RICO Act. (*Id*. ¶¶ 24-47.) The Silvergate Claims assert that claimed damages in relation to each of these asserted legal claims are "significant and unliquidated" (*id*. ¶¶ 26, 29, 35, 42, 47), and recite a laundry list of generalities to allege damages in an "unfixed and unliquidated amount arising from the fraudulent conduct perpetrated against Silvergate Bank by the FTX Group" (*id*. ¶ 50).

33. On December 12, 2024, the Ad Hoc Group of Silvergate preferred stockholders explained to this Court in the Silvergate proceedings that Silvergate had determined that its assets, "including . . . potential claims against third parties," "would not yield sufficient value to provide recoveries beyond the [$200 million] Liquidation Preference." (Silvergate Bankruptcy, Dkt. No. 367 (*Objection of the Ad Hoc Group to Stilwell Activist Investments, L.P.'s Motion to (A) Terminate Exclusivity and (B) to Adjourn the Disclosure Statement Hearing*) ¶¶ 2, 19.) It added that, as of the petition date, **Silvergate's estate was worth "far below $200 million."** (*Id*. ¶ 32 (emphasis added).) Silvergate's confirmed plan then vested its claims in Argent, made the preferred stockholders Argent's first-priority beneficiaries, and gave the Ad Hoc Group the right to select Argent's trustee (in consultation with two common stockholders) and two of its three board members. (*See* Silvergate Plan, arts. I.A.86–87, VI.E–F; *see also* Silvergate Bankruptcy, Dkt. No. 1221-1 §§ 2.1, 9.1.)

34. Silvergate did not do anything in the FTX Bankruptcy for nearly three additional years, and Argent surfaced only after the FTX Recovery Trust filed the *Third Notice of Proposed Reduction of Disputed Claims Reserve Amount* [D.I. 35722] (the "Third Notice") on May 26, 2026, seeking to reduce the Reserve Amount by an additional $600 million to $1.78 billion. In its objection, Argent asserted that its claims against the FTX Group had a worth "well over a billion dollars." (*See Argent Liquidation Trust's Limited Objection to Third Notice of Proposed Reduction of Disputed Claims Reserve Amount* [D.I. 35808] (the "DCR Objection") ¶¶ 1–2, 33.)[17] The Court overruled the DCR Objection at the hearing on June 18, 2026, finding on an unrefuted evidentiary record that the general reserve—reduced to $1.78 billion, with roughly $900 million of cushion over projected allowed claim amounts—was more than adequate to protect the Silvergate Claims pending their ultimate adjudication. (Hr'g Tr. 40:21-42:24 (June 18, 2026).)

**I. The FTX Recovery Trust's More Definite Statement of Claim**

35. On September 1, 2026, the FTX Recovery Trust filed the FTX MDS in accordance with the Stipulation. The FTX MDS alleges that Silvergate Bank had actual knowledge—not merely constructive notice or unheeded "red flags"—of the FTX Group's misuse of its Silvergate Bank accounts. (FTX MDS ¶¶ 3–5, 27, 79, 88, 96, 103, 111.) With that knowledge, Silvergate preserved and affirmatively expanded the FTX Group's access to the banking infrastructure through which it operated—maintaining its accounts, increasing wire capacity, honoring ad hoc processing requests, and continuing to execute the very transactions through which the alleged breaches were carried out—rather than restrict or terminate a relationship that Silvergate regarded

[17] Neither Silvergate nor Argent objected to the Reserve's establishment or to prior reductions of the Reserve Amount. (*See Order Reducing the Amount of the Disputed Claims Reserve* [D.I. 31822] (reducing the Reserve Amount by $1.93 billion, from $6.533 billion to $4.599 billion); *Order Reducing the Amount of the Disputed Claims Reserve* [D.I. 34610] (reducing the Reserve Amount by approximately $2.22 billion, from $4.599 billion to $2.38 billion).)

as commercially valuable. (*Id.* ¶¶ 7, 34, 80.) Silvergate's actions caused significant damages by directly aiding in the depletion and dissipation of FTX Group assets, including more than $830 million in specifically traceable transfers from the two principal Alameda and North Dimension accounts held at Silvergate Bank, rendering it liable to the FTX Group for those injuries under multiple causes of action, including aiding and abetting breach of fiduciary duty. (*Id.* ¶¶ 124-125, Ex. A.)

**J. Argent's More Definite Statement of Claim and Losses Claimed**

36. Argent also filed its More Definite Statement on September 1, 2026. The core allegation of Argent's More Definite Statement is that the FTX Group "systematically lied to Silvergate to obtain banking services it was not entitled to receive[.]" (Argent MDS ¶ 1.) In support, Argent's More Definite Statement identifies a wide array of allegedly fraudulent statements made by the FTX Group to Silvergate Bank—as well as a number of breaches of the contracts governing the FTX Group's accounts (the CMTS Agreements and DAARDs)—including that FTX Group entities breached the warranty that each ACH entry "complie[d] with all local, state, and federal regulations" by operating North Dimension as "an unregistered MSB"; submitted "fraudulent account applications for non-custodial accounts," "fabricated corporate documents," and submitted "false due diligence questionnaires" in order to induce Silvergate Bank to open and maintain accounts for Alameda and North Dimension, and failed to advise Silvergate that the actual use of the accounts had materially departed from their stated purposes (together, the "<u>Account Noncompliance</u>"). (*See id.* ¶¶ 3, 14-16, 22-26, 30, 76, 86.)

37. Based on these allegations, Argent pleads causes of action for fraud, fraudulent inducement, fraudulent misrepresentation, negligent misrepresentation, and breach of contract, all identifying as the fraudulent statements (or breaches) at issue the FTX Group Account Noncompliance—not the FTX Insider Fraud. (*Id.* ¶¶ 28, 74-89.) Argent's More Definite

Statement further recasts these same instances of Account Noncompliance as predicate acts of mail, wire, and bank fraud undergirding civil RICO and RICO-conspiracy claims for treble damages under 18 U.S.C. § 1962(c)–(d). (*Id.* ¶¶ 97-113.) Argent also asserts that the FTX Group is obligated to indemnify Silvergate under the CMTS Agreements' indemnification provision (Section 18) for a range of "acts or omissions" and breaches of warranty that are allegedly covered by Section 18. (*Id.* ¶¶ 29, 90-96.) Argent alleges that the same FTX Group Account Noncompliance on which it bases its fraud, RICO, and breach of contract claims caused indemnifiable damages that "fall squarely within the scope of the CMTS Agreements' indemnification provisions." (*Id.* ¶ 94.)

38. Crucially, Argent does not identify any losses arising directly out of the alleged misstatements and breaches of contract on which it bases its claims. Nor does Argent articulate a causal connection between the Account Noncompliance and the FTX Insider Fraud. Instead, Argent relies on several attenuated and unactionable damages theories to assert damages in excess of $1 billion constituting every dollar of loss it incurred purportedly caused by the revelation of the FTX Group's fraud. Argent is seeking to impose six wide-ranging categories of losses on the FTX Recovery Trust.

- "**<u>Securities Sale Losses</u>**." Approximately "$751.4 million in losses" on the sale of approximately $5.2 billion of debt securities into a "cratered market," and other "incremental losses" from sales of additional securities in January and February 2023 that "are subject to further quantification." (*Id.* ¶¶ 5, 60–62, 116.)

- "**<u>Lost Going-Concern Value</u>**." The loss of Silvergate's purported "going-concern value," which Argent estimates in "the hundreds of millions, if not billions." (*Id.* ¶ 117.)

- "**<u>BSA/AML Compliance Penalties</u>**." Approximately $63 million in "regulatory penalties" that Silvergate paid to the FRB and the DFPI. (*Id.* ¶ 64.)

- "**<u>Settlement Payments</u>**." Approximately $21 million in "settlement payments" made in connection with (i) a lawsuit alleging that Silvergate itself "aided and abetted" the

FTX Group's fraud, (ii) a securities class-action suit arising from Silvergate's own disclosures about its banking relationship with the FTX Group, (iii) stockholder objections to the Silvergate Plan, (iv) proofs of claim filed by a third party alleging breaches of certain contracts between it and Silvergate, and (v) proofs of claim filed by KPMG for reimbursement of fees and costs incurred "in responding to third-party subpoenas issued by the SEC and DFPI in connection with KPMG's work for Silvergate." (*Id.* ¶¶ 66, 119.)

- "**Fees and Costs**." Over $120 million in "investigative, defense, and advisory costs," including approximately $75 million for defense of FTX-related third-party litigation and responses to regulatory investigations (the "Defense Costs"), approximately $33 million in fees and expenses of Silvergate's own chapter 11 professionals (the "Bankruptcy Costs"), and approximately $12 million to fund and operate Argent itself (the "Trust Costs" and together with the Defense Costs and Bankruptcy Costs, "Fees and Costs"). (*Id.* at ¶¶ 68, 120.)

- "**Indemnification Costs**." "Tens of millions" more in "indemnification-specific costs" that Silvergate agreed to bear for its own former directors and officers as part of its plan of reorganization, including an $8.77 million "Go-Forward Chapter 11 Budget," up to $40.25 million in indemnification reserves, and approximately $2 million in premiums for a "DOJ Insurance Policy." (*Id.* ¶¶ 69–72, 121.)

## JURISDICTION

39. The Court has jurisdiction over this Claim Disallowance Motion pursuant to 28 U.S.C. §§ 157 and 1334 and the *Amended Standing Order of Reference from the United States District Court for the District of Delaware*, dated as of February 29, 2012. This matter is a core proceeding within the meaning of 28 U.S.C. § 157(b)(2). Venue is proper in this district pursuant to 28 U.S.C. §§ 1408 and 1409. The statutory bases for the relief sought are section 502 of the Bankruptcy Code, and rules 3001 and 3007 of the Bankruptcy Rules. Pursuant to rule 9013-1(f) of the Local Rules of the United States Bankruptcy Court for the District of Delaware (the "Local Rules"), the FTX Recovery Trust confirms its consent to entry of a final order by the Court in connection with this Claim Disallowance Motion if it is later determined that the Court, absent consent of the parties, cannot enter final orders or judgments consistent with Article III of the United States Constitution.

**LEGAL STANDARD**

40. Section 502(a) of the Bankruptcy Code provides, in pertinent part, that "[a] claim or interest, proof of which is filed under section 501 of this title, is deemed allowed, unless a party in interest . . . objects." 11 U.S.C. § 502(a). The burden of proof for a claim asserted in a bankruptcy case under section 502(a) of the Bankruptcy Code is a shifting burden that rests on different parties at different times. *In re Allegheny Int'l Inc.*, 954 F.2d 167, 173 (3d Cir. 1992). First, the claimant must allege facts sufficient to support its claim. *Id.* But only a claim that "alleges facts sufficient to support a legal liability to the claimant satisfies the claimant's initial obligation" and is entitled to *prima facie* validity. *Id.* If the allegations in the filed claim meet this standard, the burden shifts to the objector to produce sufficient evidence to rebut the facts alleged in support of the proof of claim. *Id*. If the objector advances sufficient evidence to challenge the validity of the proof of claim, the burden shifts back to the claimant to prove the claim's validity by a preponderance of the evidence. *Id*. at 174.

41. "Federal pleading standards apply when assessing the validity of a proof of claim," such that "a claimant must allege enough facts to state a claim for relief that is plausible on its face." *In re Residential Cap., LLC*, 531 B.R. 1, 12 (Bankr. S.D.N.Y.), *on recons. in part*, 537 B.R. 161 (Bankr. S.D.N.Y. 2015) (cleaned up). Claims grounded in fraud are held to an even stricter standard that "requires the claimant to state with particularity the circumstances constituting fraud or mistake." *Id*. (citation omitted). Therefore, as a threshold matter, a claimant's failure to allege facts and to provide adequate support for a claim deprives the claim of *prima facie* validity. *See In re Trib. Co.*, 2013 WL 1909617, at *3 (Bankr. D. Del. May 2, 2013) (claimant "failed to meet her initial burden of asserting a *prima facie* valid claim" because "she ha[d] not articulated a discernable basis for a claim against the Debtors"); *see also In re Mallinckrodt Plc*, 2022 WL 3545583, at *4 (D. Del. Aug. 18, 2022) (proofs of claim were not entitled to *prima facie* validity

where they "failed to allege any conduct by any of the non-defendant Debtors" to support antitrust, RICO, and unjust enrichment claims as to those Debtors).

42. Where a proof of claim is not *prima facie* valid, the burden of proof remains with the claimant. *In re Frascella Enters., Inc*., 360 B.R. 435, 458 n.49 (Bankr. E.D. Pa. 2007) ("[W]here requisite documentation is not attached to the proof of claim, it may be deprived of its *prima facie* validity and the burden will therefore remain with the claimant.") (citation omitted). But a claimant cannot meet its burden of proof with a proof of claim that failed to clear the low hurdle of *prima facie* validity. Courts thus routinely disallow in summary fashion claims that do not allege enough facts to "articulat[e] a discernable basis for a claim against the Debtor[]." *In re Trib. Co.*, 2013 WL 1909617, at *3; *see also Residential Cap*., 531 B.R. at 19, 21-24 (disallowing claims lacking factual allegations to support causes of action against certain debtors); *In re O'Brien*, 440 B.R. 654, 657, 667-68 (Bankr. E.D. Pa. 2010) (finding that lack of *prima facie* evidence and failure of claimant to provide additional evidence warranted disallowance of claim).

43. Because Argent fails to allege (among other things) any facts establishing that the FTX Group proximately caused any of its alleged injuries—especially considering the stricter standard for claims based in fraud, *see Residential Cap*., 531 B.R. at 12—the Silvergate Claims do not articulate a discernible basis for a claim and must be disallowed and expunged as a matter of law.[18]

[18] Although Argent's MDS does not address choice of law, California law applies to Argent's state-law claims. Argent's breach of contract and indemnification claims arise under agreements that select California law as the governing law. Delaware courts routinely enforce such selections. *Coface Collections N. Am. Inc*. v. *Newton*, 430 F. App'x 162, 166-67 (3d Cir. 2011). Under Restatement (Second) of Conflict of Laws ("Restatement") § 187, the contractual selection will only be ignored if the chosen state lacks a substantial relationship to the parties, or its law offends a fundamental policy of a state with a materially greater interest. *Id*. Neither exception applies here. Argent's fraud claim is also governed by California law because California has the "most significant relationship" to the fraud allegations under Restatement § 148. Silvergate was headquartered in California and, based on the present allegations, plausibly received, acted on, and relied upon the challenged representations there when opening and maintaining the FTX Group's accounts. (Argent MDS ¶ 8; *see Maniscalco* v. *Brother Int'l*

## ARGUMENT

### I. Argent's RICO Claims Fail as a Matter of Law

44. In order to manufacture the largest possible headline damages amount for its claims, Argent asserts RICO Claims under § 1962(c) and the specter of RICO's treble damages provision. (Argent MDS ¶¶ 97-108.) Argent argues that the FTX Group's Account Noncompliance and the FTX Insider Fraud each constitute the requisite pattern of wire, mail, and bank fraud to state a RICO claim. (*Id.* ¶¶ 105-107.) As a result of these alleged RICO violations, Argent asserts that it is entitled to a laundry list of damages including everything from $63 million in regulatory penalties levied for Silvergate Bank's BSA/AML compliance failures, to the "ultimate destruction of Silvergate's going-concern value." (*Id.* ¶ 108.)

45. To prevail on a private RICO claim, the plaintiff must demonstrate "some direct relation between the injury asserted and the injurious conduct alleged." *Med. Marijuana, Inc.* v. *Horn*, 604 U.S. 593, 612 (2025) (citing *Holmes* v. *Sec. Inv. Prot. Corp.*, 503 U.S. 258, 268 (1992)). "[F]oreseeability," without more, "does not cut it." *Id.* (quoting *Hemi Grp., LLC* v. *City of N.Y.*, 559 U.S. 1, 12 (2010)). Thus, "whenever the plaintiff's theory of causation requires moving 'well beyond the first step,' it 'cannot meet RICO's direct relationship requirement.'" *Id.* (quoting *Hemi Grp.*, 559 U.S. at 10).

46. Argent fails to plausibly allege the necessary causation between the alleged RICO predicates and any "catastrophic harm" actually caused by the FTX Group. Specifically, Argent makes no effort to tie any cognizable injury to the Account Noncompliance, which at most induced Silvergate to open accounts that benefitted Silvergate. And Argent's attempt to blame the

---

*(USA) Corp.*, 709 F.3d 202, 208-09 (3d Cir. 2013) (applying the law of the state where the plaintiff was domiciled and where plaintiff received and relied upon misrepresentations).)

"revelation of the FTX Group's elaborate fraud" for its alleged harms (*id*. ¶ 60) fails as a matter of law because harms caused by the revelation of a fraudulent scheme, rather than the scheme itself, cannot support a RICO claim. Additionally, Argent's own admission that its alleged injuries were multiple "domino[s]" removed from the collapse of the FTX Group (*id*. ¶ 60) is independently fatal to its claim.

47. Argent first alleges that the FTX Group's "false representations" in connection with the Account Noncompliance constituted "multiple, separate indictable acts of mail, wire, and bank fraud" that triggered:

> a bank run that forced Silvergate to liquidate billions of dollars in securities at a loss; hundreds of millions of dollars in regulatory penalties, litigation settlements, investigative, defense, advisory, and bankruptcy fees and expenses, indemnification expenses, and related costs; the exposure of Silvergate to litigation by FTX.com customers and others; and the ultimate destruction of Silvergate's going-concern value, requiring the wind down and voluntary liquidation of a business that had operated since 1986.

(Argent MDS ¶¶ 105-106, 108.) But Argent fails to allege a single fact connecting the FTX Group's Account Noncompliance to any of those alleged injuries. Instead, Argent concedes that the end result of the FTX Group's Account Noncompliance was Silvergate's agreement to open and maintain accounts for the FTX Group. (*Id*. ¶ 106 (alleging that the FTX Group's misrepresentations procured banking services from Silvergate).) As a result, the FTX Group's customer funds provided approximately 10% of Silvergate's overall deposits by the second quarter of 2022 (FTX MDS ¶ 71), and Silvergate's net income rose from $7.6 million in 2017 to $75.5 million in 2021.[19] By the third quarter of 2022, the FTX Group's deposits likely generated 7% of Silvergate's total interest income, representing an estimated $27 million in pro forma annualized

---

[19] *See* Silvergate Cap. Corp., Registration Statement (Form S-1), at 56 (Nov. 16, 2018); Silvergate Cap. Corp., Current Report (Form 8-K), Ex. 99.1 at 1 (Jan. 18, 2022).

interest income. (FTX MDS ¶ 71.) Thus, the only direct impact of the FTX Group's Account Noncompliance was that Silvergate's balance sheet, income statement, and stock price **improved**. Accordingly, Argent's RICO claim fails as a matter of law for lack of proximate cause. *See Knit With* v. *Knitting Fever, Inc.*, 2012 WL 2938992, at *10-11 (E.D. Pa. July 19, 2012) (plaintiff failed to establish a concrete injury because it profited off the sales of "allegedly mislabeled yarn"), *aff'd*, 625 F. App'x 27 (3d Cir. 2015); *Nw. Hum. Servs., Inc.* v. *Panaccio*, 2004 WL 2166293, at *4, *7 (E.D. Pa. Sep. 24, 2004) (plaintiff lacked proximate cause in part because "the actual, immediate and direct result of [defendant's] Medicare/Medicaid fraud was the collection of excessive reimbursements," which benefitted the plaintiff).

48. Additionally, Argent improperly attempts to tie its purported losses (no matter how tenuously related to its collapse) to the "revelation of the FTX Group's elaborate fraud in November 2022 … ." (Argent MDS ¶ 60.)[20] But that theory fails. As a matter of law, injuries caused by the exposure of a fraudulent scheme, rather than the scheme itself, are too indirect to sustain a RICO claim. *In re Volkswagen "Clean Diesel" Mktg., Sales Pracs., and Prods. Liab. Litig.*, 2019 WL 4581340, at *9 (N.D. Cal. Sep. 20, 2019) (dismissing RICO claims asserted by salespersons who allegedly lost income when consumers stopped buying cars from them after "the veil was lifted on Volkswagen's defeat device scheme"). Simply put, RICO cannot be used to recover for any of Argent's alleged injuries because they, at best, "arose as a result of the scandal, not the scheme itself." *Meng* v. *Schwartz*, 116 F. Supp. 2d 92, 97 (D.D.C. 2000); *see also In re Am. Exp. Co. S'holder Litig.*, 39 F.3d 395, 400 (2d Cir. 1994) (injuries lacked proximate cause

[20] *See also id*. ¶¶ 61-62 (revelation of the FTX Group's fraud caused Securities Sale Losses and Lost Going-Concern Value); ¶¶ 63-64 ("[t]he public revelation of the FTX Group's fraud" caused BSA/AML Compliance Penalties); ¶ 66 (FTX Group's wider "wrongdoing" caused Settlement Payments); ¶¶ 67-72 ("FTX Group's fraudulent and unlawful actions in connection with Silvergate's accounts" caused Defense Costs, Bankruptcy Costs, Trust Costs, and Indemnification Costs).

where they were "caused only because the scheme itself was exposed"); *Panaccio*, 2004 WL 2166293, at *7 (plaintiff's losses lacked proximate cause as they were "caused by exposure of the Medicare/Medicaid fraud and not by commission of the fraud itself").

49. What's more, even if the revelation of the FTX Insider Fraud constituted a RICO violation that could support Argent's RICO claims (and it cannot), Argent cannot establish that Silvergate's litany of alleged injuries was proximately caused by the revelation of that fraud. Argent concedes that the revelation of the FTX Insider Fraud only triggered a "domino effect" which then (after some indeterminate number of dominos) "inflicted irrevocable harm on Silvergate." (Argent MDS ¶ 60.) As described in greater detail below, the numerous dominos that lie between the revelation of the FTX Insider Fraud and Silvergate's alleged injuries—including market forces, regulator decisions, and Silvergate's own failed, high-risk business model—take Argent's "theory of causation . . . well beyond the first step" of "RICO's direct relationship requirement." *Med. Marijuana*, 604 U.S. at 612 (cleaned up). Thus, Argent's RICO claims must fail and be disallowed at this stage. *See Knopick* v. *UBS Fin. Servs., Inc.*, 121 F. Supp. 3d 444, 463-64 (E.D. Pa. 2015) (plaintiff lacked proximate cause where DOJ and SEC investigations, investment decisions, and changes in the market broke the causal chain between defendant's predicate act and plaintiff's injury).[21]

---

[21] Likewise, Argent's claim that the "Department of Justice specifically identified Silvergate as a victim of the FTX Group's fraud" (Argent MDS ¶ 4), cannot paper over these intervening causes to supply the requisite causal link between the FTX Insider Fraud and the alleged injuries. To be clear, the DOJ never asserted that Silvergate was a "victim" of the FTX Insider Fraud—even the portion of the DOJ's letter quoted by Argent makes clear that the only fraud related to Silvergate was the "false statements to [Silvergate] to induce it to open a bank account[.]" (Argent MDS ¶ 4 (quoting Letter by United States at 2, Dkt. No. 388, *United States* v. *Bankman-Fried*, No. 1:22-cr-00673-LAK (S.D.N.Y. Dec. 29, 2023)).) The use of those accounts "in furtherance of [] other fraudulent schemes" (*e.g.*, the FTX Insider Fraud) was not directed at Silvergate and certainly does not link those schemes to any harm purportedly suffered by Silvergate.

50. ***The Securities Sale Losses and Lost Going-Concern Value were not proximately caused by the alleged RICO violations.*** Argent alleges that "the revelation of the FTX Group's fraud triggered a catastrophic bank run," which "forc[ed] Silvergate to sell billions of dollars in securities" at an approximately $751.4 million loss and led to "[m]onths of financial insecurity" and "heightened regulatory scrutiny," which ultimately led to Silvergate's voluntary liquidation and bankruptcy. (Argent MDS ¶¶ 60-61.) As a matter of law, damages flowing from the *revelation* of a fraud are too attenuated to be recoverable under RICO. *Meng*, 116 F. Supp. 2d at 97 (dismissing RICO claim where alleged injuries resulted from the revelation of the fraudulent scheme, "sever[ing] the chain of legal causation."). Moreover, Silvergate's speculative loss of the "future earnings stream of Silvergate's goodwill and reputation" (Argent MDS ¶ 117), is not compensable under RICO. *See Knit With*, 2012 WL 2938992, at *10; *see also Parker* v. *Learn Skills Corp.*, 530 F. Supp. 2d 661, 678 (D. Del. 2008) ("Claimed losses to 'goodwill' and 'business reputation,' in addition to being highly speculative, are not the type of injuries compensable under RICO.").

51. Argent's causation theory also fails because, as its own allegations and prior representations to this Court demonstrate, there were multiple "intervening, non-racketeering" acts that "disrupt[] any potential causal relationship" between the FTX Group's conduct and Silvergate's collapse. *Singh* v. *Illusory Sys., Inc.*, 727 F. Supp. 3d 500, 508 (D. Del. 2024). For example, Silvergate's contemporaneous public filings and earnings disclosures blamed macroeconomic factors, such as rate hikes and "significant over-leverage in the [digital asset] industry leading to several high-profile bankruptcies"—not FTX-specific account-opening representations or the revelation of the FTX Insider Fraud—for the losses from its securities

sales.[22] Silvergate's representations to this Court in the sworn Hetrick Declaration likewise blamed myriad factors for its collapse, including: the "contagion effect" of the collapse of Three Arrows Capital, Voyager Digital Holdings, and Celsius Network LLC "on the digital asset industry as a whole"; the "general rise in interest rates"; and the decreased value of its "supposed safe haven investments." (*See* Hetrick Decl. ¶¶ 9, 12.) Ultimately, Silvergate concluded that its net loss of $948.7 million in fiscal year 2022 was "largely driven by sales of long-dated securities impaired by rising interest rates." (*Id.* ¶ 12.) These intervening acts break the causal chain between the Securities Sale Losses and the alleged RICO violations. *See, e.g., Anza* v. *Ideal Steel Supply Corp.,* 547 U.S. 451, 458 (2006) (no proximate cause if alleged injury depends on actions "entirely distinct from the alleged RICO violation"); *cf. Hubbard* v. *BankAtlantic Bancorp, Inc.*, 688 F.3d 713, 725-30 (11th Cir. 2012) (affirming judgment as a matter of law on securities-fraud claims where plaintiff failed to distinguish losses attributable to the alleged misrepresentations from losses caused by "market forces" that "would likely have caused significant losses for an investor in any bank with a significant credit portfolio in commercial real estate in Florida in 2007").

52. Moreover, the alleged factual predicates identified by Argent did not proximately cause Silvergate to wind down and liquidate (thereby destroying its "going-concern value" (*cf.* Argent MDS ¶ 5)).[23] As it already conceded to the Court, by early 2023, Silvergate "still held

---

[22] *See* Silvergate Cap. Corp., Current Report (Form 8-K) (Jan. 5, 2023), Ex. 99.1, https://www.sec.gov/Archives/edgar/data/1312109/000131210923000011/ex991silvergateannouncesse.htm (explaining that "significant over-leverage in the [digital asset] industry leading to several high-profile bankruptcies" sparked a "crisis of confidence" and deposit declines, and reporting that securities sales to "accommodate sustained lower deposit levels" resulted in a preliminary $718 million loss on securities and related derivatives); *see also* Silvergate Cap. Corp. Current Report (Form 8-K) (Jan. 10, 2023), Ex. 99.1, at 10, https://www.sec.gov/Archives/edgar/data/1312109/000131210923000014/ex991siconferencecalltrans.htm (explaining that borrowing costs had increased because "the Fed had been raising rates so rapidly during 2022," and that Silvergate responded to sustained lower deposits and rising rates by "selling the longest duration right now" to protect capital and preserve future earnings).

[23] Argent alleges the loss of Silvergate's "future earnings stream, goodwill, and reputation" and cites the decline in its share price to "illustrate the scale of value destruction." (Argent MDS ¶ 62 & n.34.) But that decline does

assets valued in excess of deposits" and could continue serving customers. (Hetrick Decl. ¶¶ 13, 17.) It was only *after* regulators "increased supervisory pressure" on banks "servicing crypto-asset businesses" that Silvergate decided to close its doors. (*Id*. ¶¶ 17-18; *see also id.* ¶ 19 (asserting that seizure of Signature Bank illustrated a "sudden regulatory shift" that "made clear that, at least as of the first quarter of 2023, the Federal Bank Regulatory Agencies would not tolerate banks with significant concentrations of digital asset customers, ultimately preventing Silvergate Bank from continuing its digital asset focused business model").) Thus, even if the revelation of the FTX Insider Fraud could otherwise give rise to a RICO claim for Silvergate's *voluntary* liquidation (which it does not), the intervening acts of the regulators prevent Argent from sufficiently alleging proximate cause. *Longmont United Hosp*. v. *Saint Barnabas Corp*., 2007 WL 1850881, at *4 (D.N.J. June 26, 2007) ("Where a government body is an intervening actor between an alleged RICO violation and the alleged harm, courts in this Circuit and others uniformly dismiss the claims for lack of proximate cause."), *aff'd*, 305 F. App'x 892 (3d Cir. 2009).

53. Argent cannot now disavow Silvergate's past statements to this Court that illustrate the myriad intervening acts that caused Silvergate to incur losses, including its decision to sell its securities at an approximately $751.4 million loss, and that it was these intervening causes and Silvergate's own decisions that led to its voluntary liquidation. Judicial estoppel may bar a party from taking "irreconcilably inconsistent" positions in "bad faith" where estoppel is tailored to address the resulting harm and no lesser sanction would adequately remedy that harm. *Krystal Cadillac-Oldsmobile GMC Truck, Inc*. v. *Gen. Motors Corp*., 337 F.3d 314, 319 (3d Cir. 2003)

---

not, by itself, establish the amount of any loss of going-concern value proximately caused by the alleged misconduct. Indeed, the approximately $4 billion decline in market capitalization cited by Argent spans all of 2022, including the period before the FTX Group's collapse. (*Id*. n.34.) Moreover, that loss would only be felt by Silvergate's shareholders—not Silvergate itself. *See Strougo* v. *Bassini*, 282 F.3d 162, 175 n.10 (2d Cir. 2002) ("A corporation . . . cannot have an equity interest in itself.").

(citation omitted). Silvergate clearly (and repeatedly) blamed a host of factors for its collapse, contrary to what it now asserts in the MDS. (*Compare* Hetrick Decl. ¶¶ 9, 12, 17-18 (identifying market failures, rising interest rates, and regulatory shifts as causes of Silvergate's collapse), *with* Argent MDS ¶ 60 (alleging an "unavoidable and direct domino effect" from the FTX Group's fraud and collapse and attributing Silvergate's securities losses to sales into a "market already cratered by the FTX Group's misconduct and collapse"), ¶ 61 (alleging that the FTX Group's fraud left Silvergate with "no viable choice but to voluntarily liquidate").)

54. At the time Silvergate petitioned for bankruptcy, it knew of its claims against the FTX Group; it had filed them more than a year before its own petition. It was also under a duty of candor when it explained to this Court why it collapsed and sought chapter 11 protection. Even so, it attributed its wind-down to other causes and described its FTX relationship in the narrowest terms. (Hetrick Decl. ¶ 10.) Argent has now taken the opposite position to allege that the FTX Group's collapse is the cause of its alleged losses, but has done so only after Silvergate's plan was confirmed and consummated in order to inflate the potential recovery from its facially deficient claims. That is enough to support an inference of bad faith. *See Krystal Cadillac-Oldsmobile GMC Truck, Inc.*, 337 F.3d at 321 ("[A] rebuttable inference of bad faith arises when averments in the pleadings demonstrate both knowledge of a claim and a motive to conceal that claim in the face of an affirmative duty to disclose."). Argent's contention that the FTX Group caused Silvergate's collapse is plainly a made-for-litigation theory intended to satisfy the proximate causation requirement of its asserted claims at odds with its predecessor's explanation of the exact same collapse sworn to this Court under penalties of perjury. That is an impermissible attempt "to gain an advantage by litigation on one theory, and then seek an inconsistent advantage by pursuing an incompatible theory." *Id*. at 319 (quoting *Ryan Operations G.P.* v. *Santiam–Midwest Lumber*

*Co*., 81 F.3d 355, 358 (3d Cir. 1996)). Argent should therefore be estopped from repudiating those representations to assert the causal chain that its RICO, fraud, breach of contract, and indemnity claims all require.

55. ***The BSA/AML Compliance Penalties were not proximately caused by the alleged RICO violations.*** Argent claims that "the public revelation of the FTX Group's fraud . . . set off years of regulatory investigations into Silvergate" that resulted in "approximately $63 million in regulatory penalties" imposed on Silvergate by the FRB and the DFPI. (Argent MDS ¶¶ 63-64.) Beyond the fact that losses caused by the revelation of the FTX Insider Fraud are not cognizable as a matter of law, those penalties were not proximately caused by any alleged RICO violations. They were instead the result of an intervening, independent cause: Silvergate's own systemic failure to maintain a compliant BSA/AML program.

56. Argent contends that "the FTX Group's fraudulent concealment of the true nature and purpose of the transactions flowing through its accounts at Silvergate—and not any known deficiency in the design or operation of Silvergate's monitoring systems—proximately caused the intense regulatory scrutiny that fell upon Silvergate in the wake of the collapse of the FTX Group's fraudulent scheme." (Argent MDS ¶ 63.) Argent's conclusory assertion of proximate causation is unavailing. Even if the FTX Group's misstatements on account opening documents resulted in regulatory scrutiny (and they did not), what the regulators identified were deficiencies in *Silvergate's* transaction monitoring. Neither the FRB Order nor the DFPI Order mentions FTX, Alameda, or North Dimension in describing those deficiencies; both orders imposed penalties for *Silvergate's* monitoring deficiencies. (FRB Order ¶ 1 (imposing penalties "for the unsafe or unsound practices described"); DFPI Order ¶ 2 (imposing penalties "for the practices described").) Courts routinely find that such regulatory investigations and ensuing enforcement actions

constitute intervening causes that break the causal chain linking alleged RICO violations to the claimed damages. *See Panaccio*, 2004 WL 2166293, at *7 (DOJ investigation and ensuing guilty plea agreement constituted intervening, independent causes of plaintiff's harm); *BCCI Holdings (Luxembourg), Societe Anonyme* v. *Pharaon*, 43 F. Supp. 2d 359, 366 (S.D.N.Y. 1999) (plaintiff lacked standing where its harm "resulted from the exposure, investigation, and prosecution of the scheme by regulatory authorities").

57. ***The Settlement Payments were not proximately caused by the alleged RICO violations***. Argent alleges that "Silvergate paid approximately $21 million to resolve" numerous "claims by third parties against Silvergate" that "were proximately caused by[] the FTX Group's misconduct against Silvergate." (Argent MDS ¶ 66.) However, Argent fails to articulate proximate causation for any of the five settlement payments it identifies: each was either the result of Silvergate's own conduct, or was caused by a series of intervening actions by third parties. None resulted from any cognizable harm caused by the Account Noncompliance or even the revelation of the FTX Insider Fraud. *See, e.g.*, *Hemi Grp.*, 559 U.S. at 9-11.

- *First*, Argent points to the *Bhatia* settlement in which Silvergate paid approximately $10 million to settle claims that Silvergate and Lane aided and abetted acts of fraud and breaches of fiduciary duties by the FTX Group and certain FTX insiders. (Argent MDS ¶ 66.) But the claims in *Bhatia* relied on Silvergate's knowledge and substantial assistance of the FTX Insider Fraud and purported deficiencies in Silvergate's due diligence—neither of which could plausibly have been caused by misstatements made by the FTX Group or certain insiders to Silvergate or even the FTX Insider Fraud itself. (Bhatia Action, Dkt. No. 14 ¶¶ 179-81, 185 (alleging that Silvergate provided banking services to FTX and Alameda "despite numerous unmistakable indicators of suspicious activity" because losing FTX's business "would have been devastating for Silvergate," and also "substantially helped FTX, Alameda, and [Sam Bankman-Fried] perpetrate [their] fraud").)

- *Second*, Argent identifies a $5.32 million securities class action settlement that allegedly arose from Silvergate's own disclosures concerning its relationship with the FTX Group. (Argent MDS ¶ 66.) As a threshold matter, the Bar Order prevents Argent from recovering this Settlement Payment under any of its asserted causes of action. (*See* Securities Class Action, Dkt. No. 150 at 7-8 (barring claims for "indemnity . . .

based upon, arising out of, or related to" the claims asserted in the Securities Class Action, as well as "any other claim of any type" where "the injury claimed" is Silvergate's liability to the plaintiffs and/or settlement class).) By Argent's own description, the $5.32 million payment is exactly that: compensation paid to stockholders to resolve their claims against Silvergate. (Argent MDS ¶ 66.) Courts enforce such bar orders from securities litigation settlements "regardless of whether [the barred] claims are based on federal securities law or state tort or contract law." *In re PNC Fin. Servs. Grp., Inc.*, 440 F. Supp. 2d 421, 449-450 (W.D. Pa. 2006) (noting that "any cause of action for indemnification, however styled or pled, properly may and will be barred"). Moreover, Argent does not plead facts showing how the FTX Group's alleged "misconduct" proximately caused the securities settlement payment. (Argent MDS ¶ 66 (alleging that the securities claims "would not have been asserted absent the FTX Group's wrongdoing").) The Court need not credit such conclusory allegations. *See In re Mallinckrodt Plc*, 2022 WL 3545583, at *4 (proofs of claim were not entitled to *prima facie* validity where they "failed to allege any conduct by any of the non-defendant Debtors" to support legal entitlement to relief). But even accepting Argent's allegations, the settlement resolved stockholders' claims arising from Silvergate's *own* disclosures—merely stating that those disclosures concerned its "relationship" with the FTX Group (Argent MDS ¶ 66) is insufficient to allege proximate causation.

- *Third*, Argent alleges that Silvergate paid approximately $3.1 million to resolve objections to its plan of reorganization that only existed because Silvergate filed for bankruptcy which, Argent claims, only happened because of "the FTX Group's misconduct." (Argent MDS ¶ 66.) Argent is similarly cagey about the $1.3 million Silvergate paid to settle proofs of claim that asserted "breaches of certain contracts" between Silvergate and non-FTX Group third parties. (*Id.*) Again, Argent does not explain how the FTX Group's alleged misconduct caused those objections and claims—it alleges only that the circumstances giving rise to the third-party claims and settlements would not have occurred but for "the FTX Group's misconduct." (*Id.*) These conclusory allegations are wholly insufficient to plead that any alleged RICO violations by the FTX Group proximately caused those "claims and objections." (*Id.*); *see In re Mallinckrodt Plc*, 2022 WL 3545583, at *4. Additionally, as previously explained, Silvergate's voluntary decision to liquidate and file for bankruptcy was *not* proximately caused by any "misconduct" by the FTX Group. (*See supra* ¶¶ 51-52.)

- *Finally*, Argent claims that Silvergate paid KPMG, LLC ("KPMG") approximately $1.3 million to reimburse it for fees it incurred "in responding to third-party subpoenas issued by the SEC and DFPI in connection with KPMG's work for Silvergate." (Argent MDS ¶ 66.) As explained above, the regulatory investigations were not proximately caused by any alleged RICO violation committed by the FTX Group—they were instituted by the regulators to review Silvergate's BSA/AML compliance program. (*See supra* ¶¶ 55-56.) Therefore, the regulators were "an intervening actor between [the] alleged RICO violation and the alleged harm" and Silvergate's claim for costs incurred by KPMG in responding to subpoenas related to those investigations must be disallowed "for lack of proximate cause." *Longmont,* 2007 WL 1850881, at *4.

58. ***The Fees and Costs were not proximately caused by the alleged RICO violations.*** Argent lumps together a far-reaching array of "professional fees, bankruptcy expenses, and indemnification-related costs" that it claims were imposed on Silvergate due to "the FTX Group's fraudulent and unlawful actions in connection with Silvergate's accounts, which caused a cascade of investigations, litigations, regulatory enforcement, and ultimately bankruptcy." (Argent MDS ¶ 67.) Argent effectively concedes that the "cascade" of causes allegedly responsible for the Defense Costs, Bankruptcy Costs, and Trust Costs finds its roots in the *revelation* of the FTX Insider Fraud. (*Id*. ¶¶ 60, 63, 68.) As explained, this is exactly the type of attenuated damages theory that courts consistently find cannot establish proximate causation of a RICO violation. (*See supra* ¶ 48.)

59. What's more, the investigations, litigations, and enforcement actions against Silvergate that caused it to incur the Defense Costs were all brought as a result of Silvergate's own misconduct. (*See, e.g.,* Argent MDS ¶ 68 (conceding that the litigation expenses were to defend against actions alleging "that Silvergate aided and abetted or was otherwise complicit in the very fraud that the FTX Group perpetrated against Silvergate"); *id*. ¶¶ 63-64, 68 (noting costs from responding to "investigations, demands, and document requests of the Federal Reserve Board, the DFPI, the SEC, and the DOJ" which "centered on Silvergate's BSA/AML Compliance Program" and resulted in $63 million in penalties for deficiencies in that program).) As a matter of law, Argent cannot recover fees and expenses it incurred in defending against claims based on its own misconduct. *Cf. Santa Clara Valley Water Dist.* v. *Olin Corp*., 655 F. Supp. 2d 1048, 1063 (N.D. Cal. 2009) (holding that the plaintiff "cannot recover from [defendant], as damages under its negligence claim, the legal expenses which it incurred in third party litigation where the litigants

were suing the [plaintiff] for the [plaintiff's] own negligent acts"). Even if these costs were recoverable, Argent fails to allege adequately proximate causation.

60. *First*, Argent claims that Silvergate incurred approximately $75 million in "fees and expenses" relating to, among other things, Silvergate's defense of various litigations and response to investigations concerning its own actions as well as the actions of its former directors and officers. (Argent MDS ¶ 68.) But these "fees and expenses" were not proximately caused by the Account Noncompliance or the revelation of the FTX Insider Fraud; they were the result of the actions of third parties—plaintiffs filing suit against Silvergate and regulators investigating Silvergate—and are therefore not recoverable. *See Panaccio*, 2004 WL 2166293, at *4, *7 (civil penalty and attorneys' fees were the "direct result of the DOJ investigation and the ensuing guilty plea agreement" and were not proximately caused by defendant's fraud).

61. *Second*, Argent asserts that Silvergate incurred approximately $33 million "in legal and professional costs related to its own bankruptcy," and approximately $12 million in administrative and document preservation costs which also were allegedly caused by the "collapse, wind-down, and liquidation of Silvergate." (Argent MDS ¶¶ 68, 120.) As explained, however, Silvergate's own representations to this Court made clear that its voluntary liquidation and resulting bankruptcy were the result of a *multitude* of causes and were not proximately caused by either the FTX Group's Account Noncompliance or the revelation of the FTX Insider Fraud. (*See supra* ¶¶ 50-54.)

62. ***The Indemnification Costs were not proximately caused by the alleged RICO violations***. The "indemnification-specific costs" alleged by Argent are even more attenuated. Argent asserts that Silvergate incurred "tens of millions of dollars in indemnification-specific costs on behalf of its former directors and officers, who were—and continue to be—subjected to

regulatory investigations, enforcement actions, and litigation as a direct consequence of the FTX Group's fraudulent misuse of Silvergate's banking services." (Argent MDS ¶ 69.) As an initial matter, the vast majority of these reserves have not been paid out. (*Id*. ¶ 121 (reporting that, as of June 30, 2026, "over $3.6 million" had been paid from indemnification reserves of up to $40.25 million).) The remainder of these reserves are "contingent upon the impact of events in the future which have not yet occurred" and therefore cannot be claimed as RICO damages. *Yucaipa Am. All. Fund I, LP* v. *Ehrlich*, 716 F. App'x 73, 77 (3d Cir. 2017) (quoting *Maio* v. *Aetna, Inc*., 221 F.3d 472, 495 (3d Cir. 2000)).

63. Additionally, Argent's attempt to blame the FTX Group for its former officers and directors' own actions is completely misplaced. Those individuals face potential liability for their own misconduct—not the "FTX Group's fraudulent misuse of Silvergate's banking services." (*Cf.* Argent MDS ¶ 69.) The SEC alleged in the action against Silvergate that Lane and Fraher made or approved a series of false or misleading public statements about the effectiveness of Silvergate's BSA/AML compliance program (SEC Complaint ¶¶ 1-4, 95-103, 119-145, 155-161), and that Martino engaged in a separate fraudulent scheme to mislead investors and the FRBSF about the Bank's financial condition and Tier 1 leverage ratio (SEC Complaint ¶¶ 5, 257-296, 299-302). Indeed, Argent identifies no allegation in any of the "regulatory investigations, enforcement actions, and litigation" that attributes their misconduct to the FTX Group (or anyone else, for that matter). (Argent MDS ¶ 69.) This is fatal to Argent's attempt to recover Indemnification Costs. Moreover, such damages are "purely contingent on the harm suffered by [third parties]"—Silvergate's officers and directors—and, therefore, cannot be recovered under RICO. *See Holmes*, 503 U.S. at 271-73.

64. Because Argent has not alleged adequately how any of the injuries Silvergate purportedly suffered were directly caused by the FTX Group's alleged RICO violations, its RICO claims present no discernible basis for relief and should be disallowed.[24]

## II. Argent's Fraud and Misrepresentation Claims Fail to Allege Adequately Proximate Causation

65. Argent's fraud and misrepresentation claims under California law similarly fail to establish any possible proximate causation for the damages alleged as a matter of law, and thus fail. Argent's allegations simply repackage the same factual bases as claims for common-law fraud, fraudulent inducement, fraudulent misrepresentation, and negligent misrepresentation (the "Fraud Claims"). (*Compare* Argent MDS ¶¶ 75-82, *with id*. ¶¶ 105–08.) As with its RICO claims, to recover for fraud, Argent must show "detriment proximately caused" by the defendant's misconduct. Cal. Civ. Code § 3333.[25] For the same reasons that Argent's RICO claims failed (*see supra* ¶¶ 44-64), Argent's Fraud Claims must also fail for lack of proximate causation. *See In re Volkswagen "Clean Diesel" Mktg., Sales Pracs., and Prods. Liab. Litig.*, 467 F. Supp. 3d 849, 858 (N.D. Cal. 2020) (describing as "unavailing" plaintiff's argument that "RICO proximate cause and common law proximate cause are not identical concepts"). California's proximate cause standard not only requires "simple causality" but also considers "the degree of connection between the conduct and the injury." *PPG Indus., Inc*. v. *Transamerica Ins. Co.*, 20 Cal. 4th 310, 315-16

---

[24] Argent's claim under § 1962(d) based on the FTX Group's alleged conspiracy to violate § 1962(c) "necessarily must fail if the substantive claims are themselves deficient." *See Lightning Lube, Inc*. v. *Witco Corp*., 4 F.3d 1153, 1191 (3d Cir. 1993) (citation omitted). Because Argent has failed to allege an underlying RICO claim, its conspiracy claim necessarily fails as well.

[25] The same is true for negligent misrepresentation claims. *See Pac. Select Fund* v. *Bank of N.Y. Mellon*, 2010 WL 11468787, at *4 (C.D. Cal. Sep. 20, 2010) (granting motion to dismiss plaintiff's negligent misrepresentation claims for failure to allege proximate cause).

(1999). Here, the degree of connection between Argent's alleged injuries and the FTX Group's Account Noncompliance is nonexistent.

66. *First*, Argent cannot (and did not) plausibly allege a direct relation between the alleged "fraudulent misrepresentations" and its alleged harms because Silvergate actually benefitted from the FTX Group's Account Noncompliance, which provided Silvergate with over a billion dollars in deposits that it earned interest on for years. (*See supra* ¶¶ 10, 47.) This alone defeats proximate causation. *Volkswagen*, 467 F. Supp. 3d at 857-58 (explaining that the court had previously rejected Volkswagen dealerships' claim that loss of future TDI car sales can be attributed to Volkswagen's fraudulent representations about those cars where the dealerships "benefited (albeit unwittingly) from the scheme" and "sales ceased only when the fraud was revealed").

67. *Second*, despite basing its Fraud Claims entirely on the Account Noncompliance, Argent again attempts to muddy the waters by referring to the revelation of the FTX Insider Fraud. (*See* Argent MDS ¶ 81 (alleging that Silvergate was not harmed until "the FTX Group's fraudulent scheme was revealed")). As established, this theory of harm is too attenuated to adequately allege proximate cause (in addition to being contrary to Silvergate's own admissions about causation). *See Volkswagen*, 467 F. Supp. 3d at 859 (dismissing fraud claim caused by the "revelation of the fraudulent scheme, rather than the fraud itself"); *cf. Serv. by Medallion, Inc.* v. *Clorox Co.*, 44 Cal. App. 4th 1807, 1819 (1996) (holding that defendant's fraudulent "promise by entering into the contract" did not proximately cause plaintiff's damages, as plaintiff only incurred losses after the parties' contractual relationship terminated).

68. *Finally*, even if the revelation of the FTX Insider Fraud could serve as a basis for Argent's Fraud Claims (and it cannot), any connection between the disclosure of that fraud and

Silvergate's litany of alleged injuries is broken by the same series of intervening acts that are fatal to Argent's RICO claim. (*See supra* ¶¶ 49-63.) These intervening causes are similarly fatal to Argent's Fraud Claims and estoppel precludes Argent from trying to reverse course by manufacturing a contradictory theory of loss causation now. *See, e.g.*, *Goehring* v. *Chapman Univ.*, 121 Cal. App. 4th 353, 364-65 (2004) (former student's losses were not proximately caused by law school's fraudulent inducement to enroll the student, as the student's losses resulted from intervening academic dismissal); *Ash* v. *N. Am. Title Co.*, 223 Cal. App. 4th 1258, 1277-78 (2014) (finding failure to give jury instruction on intervening and superseding causes was error where there was sufficient evidence that bankruptcy occurring after defendant's allegedly tortious conduct broke the causal chain).

## III. Argent's Breach of Contract Claims Fail to Sufficiently Allege Recoverable Damages

69. Argent contends that, as a result of various breaches of contract, Silvergate suffered significant financial loss. (Argent MDS ¶¶ 86-89.) To state a claim for breach of contract, Argent must allege: (1) the existence of a contract; (2) Silvergate's performance or excuse for nonperformance of that contract; (3) the FTX Group's breach of that contract; and (4) resulting damages to Silvergate. *See X Corp.* v. *Ctr. for Countering Digital Hate, Inc.*, 724 F. Supp. 3d 948, 968 (N.D. Cal. 2024). But Argent has not and cannot tie the extensive damages it claims against the FTX Recovery Trust to the alleged breaches of a set of boilerplate bank account-opening and account-use agreements—the same agreements which Silvergate intentionally did not enforce through its failed compliance system.

70. Argent asserts that the FTX Group breached at least four express contractual obligations through the same conduct (the Account Noncompliance) that formed the basis for Argent's RICO and Fraud Claims.

- *First*, the CMTS Agreements required the FTX Group to represent and warrant that each ACH entry "complie[d] with all local, state, and federal regulations"; Argent alleges that the FTX Group breached that provision by using the Alameda and North Dimension accounts to receive and transmit FTX.com customer funds in violation of federal law. (Argent MDS ¶¶ 30, 86.)

- *Second*, the DAARDs required the FTX Group to certify that the documentation it submitted was true and accurate to the best of its knowledge; Argent alleges that the FTX Group breached that requirement by submitting fabricated North Dimension account materials, a fabricated due diligence questionnaire, and false descriptions of the Alameda accounts' purposes. (*Id*. ¶¶ 31, 86.)

- *Third*, the DAARDs required the FTX Group to notify Silvergate of changes to its account information, a requirement the FTX Group allegedly breached by failing to disclose that its non-custodial accounts were being used to receive and transmit customer deposits. (*Id*. ¶¶ 31, 86.)

- *Fourth*, the DAARDs incorporated the account-opening applications, which the FTX Group allegedly breached by misrepresenting North Dimension as a proprietary trading firm that would not operate as a money-services business, and Alameda's accounts as proprietary trading accounts that would be funded solely by Alameda's own capital. (*Id*. ¶¶ 32, 86.)

71. None of these alleged breaches ties to the damages asserted. "Contractual damages are of two types—general damages (sometimes called direct damages) and special damages (sometimes called consequential damages)." *Lewis Jorge Constr. Mgmt., Inc*. v. *Pomona Unified Sch. Dist*., 34 Cal. 4th 960, 968 (2004). General damages are those that "flow directly and necessarily from a breach of contract." *Id*. Special damages are "secondary or derivative losses arising from circumstances that are particular to the contract or to the parties." *Id*.

72. Argent does not identify any general damages arising from the FTX Group's Account Noncompliance. Indeed, Argent never makes a single factual allegation connecting its alleged damages to the purported breaches of the CMTS Agreements and DAARDs caused by the FTX Group's Account Noncompliance. All Argent does is claim superficially that its collapse, and the resulting customer withdrawals, regulatory scrutiny, and third-party litigation, were caused by the revelation of the FTX Insider Fraud. (Argent MDS ¶¶ 60-62.) This multistep causal chain

confirms that Argent's alleged injuries do "not flow directly and necessarily" from the FTX Group's alleged breaches. *X Corp.*, 724 F. Supp. 3d at 969 (general damages not available where the causes of plaintiff's alleged damages included multiple events separating defendant's alleged breach of plaintiff's terms of service from the alleged loss of advertising revenue). Moreover, general damages compensate the nonbreaching party for "the value of the performance itself, not [for] the value of some consequence that performance may produce." *Lewis Jorge*, 34 Cal. 4th at 971 (citation omitted). Here, none of Argent's alleged losses measure the value of the FTX Group's promised performance. That promised performance was only to make accurate statements in its account-opening representations, to notify Silvergate of any changes in those representations, and that its ACH entries would comply with applicable payment regulations. The FTX Group never promised to maintain all of its deposits at Silvergate or warranted that it would never collapse.

73. Accordingly, Argent's claimed losses are recoverable only as special damages which must be both "foreseeable and proximately caused by the breach of a contract." *Id*. at 969. Argent fails to establish both proximate causation and foreseeability and, accordingly, cannot recover the special damages it seeks as a matter of law.

74. *First*, Argent cannot plausibly allege that the FTX Group's Account Noncompliance proximately caused its alleged harms. A plaintiff in a breach of contract action can establish proximate causation by showing that the "breach was a substantial factor in causing the damages." *US Ecology, Inc.* v. *State of California*, 129 Cal. App. 4th 887, 909 (2005). A substantial factor is generally "more than a slight, trivial, negligible, or theoretical factor in producing a particular result." *Id.* (citation omitted). The FTX Group's Account Noncompliance resulted in Silvergate opening accounts in which the FTX Group maintained significant deposits,

which in turn facilitated significant economic benefits to Silvergate. (*See supra* ¶¶ 10, 47.) The FTX Group's Account Noncompliance was, therefore, not even a "theoretical factor in producing" Argent's alleged injuries, much less the "substantial factor" required to allege adequately proximate causation. Indeed, Argent's theory of proximate causation depends on—and is negated by—a lengthy chain of events Silvergate itself has recited that have nothing to do with the Account Noncompliance that Argent now alleges breached the CMTS Agreements and DAARDs. (*See supra* Argument § I (Argent's alleged damages resulted from, among other things, the general decline of the digital-asset industry; rising interest rates; Silvergate's high-risk business model; increased regulatory pressure; and Silvergate's own decision to file for bankruptcy).) Argent's wholly speculative conclusory allegation that the FTX Group's Account Noncompliance was actually a "substantial factor" in causing its alleged harms is insufficient to establish proximate causation. *See Vu* v. *California Com. Club, Inc.*, 58 Cal. App. 4th 229, 233, 235-36 (1997) (explaining that the plaintiffs' "premise of causation was speculative as a matter of law").

75. Argent also cannot plausibly allege that its purported losses were a reasonably foreseeable result of the FTX Group's Account Noncompliance. Foreseeability may be established by showing that the circumstances giving rise to the plaintiff's loss "were actually communicated to or known by the breaching party (a subjective test) or were matters of which the breaching party should have been aware at the time of contracting (an objective test)." *Lewis Jorge*, 34 Cal. 4th at 969. "[C]onsequential damages beyond the expectations of the parties are not recoverable." *Ash*, 223 Cal. App. 4th at 1268 (quoting *Applied Equip. Corp*. v. *Litton Saudi Arabia Ltd*., 7 Cal. 4th 503, 515-16 (1994)). Where the contract at issue "does not spell out the foreseeable risks," the court will determine the foreseeability of the plaintiff's alleged injuries at the time the contract was formed "in the light of common sense." *Glob. Hawk Ins. Co. (RRG)* v. *Wesco Ins. Co.*, 424 F.

Supp. 3d 848, 855 (C.D. Cal. 2019) (quoting *Ash*, 223 Cal. App. 4th at 1273). *First*, as to the subjective test, Argent does not allege, as is required, that Silvergate advised the FTX Group—or that the FTX Group otherwise knew—that breaching boilerplate contractual provisions requiring accurate account information, lawful account use, and notice of changes in account use could culminate in "a catastrophic bank run on Silvergate." (Argent MDS ¶¶ 30-32, 60, 86.) *Second*, as to the objective test, Argent does not explain why a reasonable party entering these account-opening and account-use agreements reasonably should have foreseen such extraordinary consequences as the result of breach. Indeed, Argent's damages theories depend on the same lengthy string of unrelated contingent events to arrive at the losses it now attributes to the FTX Group's Account Noncompliance and/or the revelation of the FTX Insider Fraud. California law does not permit special damages that depend on such an unforeseeable sequence of events. *Glob. Hawk*, 424 F. Supp. 3d at 858 (finding that recovery would require defendant to have foreseen a chain of seven contingent events when it entered the contract). As a result, there is no need to go further.

76. ***Securities Sale Losses.*** As detailed herein, Silvergate's alleged Securities Sale Losses resulted, not from the Account Noncompliance, but from intervening market forces and Silvergate's independent strategic decisions. (*See supra* ¶¶ 50-54.) Argent cannot possibly show that the FTX Group's breaches of discrete account-opening and account-use provisions were a substantial factor leading to those losses. *Crossroads Invs., L.P.* v. *Fed. Nat'l Mortg. Ass'n*, 13 Cal. App. 5th 757, 792 (2017) ("[D]amages cannot be presumed to flow from liability. It is essential to establish a causal connection between the breach and the damages sought.") (quotations omitted). Nor were those losses reasonably foreseeable when the parties contracted: Argent's theory of foreseeability would require the FTX Group to have anticipated its own "public

collapse," the "catastrophic bank run on Silvergate," future market forces, and Silvergate's ultimate decision to sell billions of dollars of unmatured debt securities at a steep loss. (Argent MDS ¶¶ 5, 60.) Courts applying California law routinely dismiss claims for special damages that, like Argent's claim, are too attenuated to have been reasonably foreseeable at the time of contracting. *See X Corp.*, 724 F. Supp. 3d at 970-71, 981 (rejecting special damages where the alleged loss depended on an unforeseeable chain of events, including that the X platform would reinstate previously banned accounts, that defendants would publicly report on that issue, and that those reports would negatively impact X's advertiser revenue).

77. ***Lost Going-Concern Value.*** The Lost Going-Concern Value similarly resulted from a myriad of factors other than the FTX Group's Account Noncompliance. (*See supra* ¶ 52.) Additionally, Argent fails to plausibly allege that the FTX Group reasonably should have foreseen that breaches of discrete provisions within the CMTS Agreements and DAARDs would culminate years later in the collapse of the entire Silvergate enterprise. *Glob. Hawk*, 424 F. Supp. 3d at 857-58. Moreover, the losses of Silvergate's goodwill and reputation that it asserts are part of its "going-concern value" are not recoverable in a breach of contract action. *Frangipani* v. *Boecker*, 64 Cal. App. 4th 860, 865 (1998) ("[D]amages to reputation . . . are not recoverable in an action for breach of contract."); *see* also *X Corp*., 724 F. Supp. 3d at 971-72 (rejecting X Corp.'s claim for lost advertising revenue as a claim for reputational harm that "was not a foreseeable result of a claimed breach").

78. ***BSA/AML Compliance Penalties.*** The $43 million FRB penalty and $20 million DFPI penalty were imposed due to deficiencies in Silvergate's own BSA/AML program and the independent enforcement decisions of regulators—not the FTX Group's Account Noncompliance. (*See supra* ¶¶ 55-56.) Nor were those penalties reasonably foreseeable when the parties contracted:

Argent alleges no facts suggesting that the FTX Group knew or should have known that breaches of discrete account-information and account-use provisions would prompt multiple investigations into Silvergate for Silvergate's *own* compliance failures. In any event, "[t]he discretion inherent in governmental decisions whether to prosecute or investigate a potential violation of law generally breaks any existing causal chain" between the defendant's breach of contract and the plaintiff's costs in responding to government investigations. *Planned Parenthood Fed'n of Am., Inc.* v. *Ctr. for Med. Progress*, 402 F. Supp. 3d 615, 645 n.16 (N.D. Cal. 2019), *aff'd sub nom. Planned Parenthood Fed'n of Am., Inc.* v. *Newman*, 2022 WL 13613963 (9th Cir. Oct. 21, 2022).

79. ***Settlement Payments.*** As discussed above, Argent fails to allege the Settlement Payments were caused by anything other than Silvergate's own compliance deficiencies, independent disclosures, and breaches of contracts with third parties. (*See supra* ¶ 57; *see also id.* (explaining that Argent is barred from recovering $5.32 million securities class action settlement).) Instead, Argent only repeatedly asserts that Silvergate would not have suffered those costs "but for" the FTX Group's "wrongdoing" (*see* Argent MDS ¶¶ 66, 119), which is woefully insufficient to establish proximate causation. See *PPG Indus.*, 20 Cal. 4th at 315 ("[T]hat the defendant's conduct was a necessary antecedent of the injury does not resolve the question of whether the defendant should be liable."). Additionally, the Settlement Payments were not a reasonably foreseeable consequence of the FTX Group's Account Noncompliance at the time of contracting. No party could have foreseen that breaches of boilerplate account-opening warranties and representations would result in payments to settle the nonbreaching party's own compliance failures and independent misconduct. *X Corp.*, 724 F. Supp. 3d at 970-71.

80. ***Fees and Costs.*** Argent seeks reimbursement for approximately $75 million in various defense and advisory fees. (Argent MDS ¶ 68.) It cannot do so. Argent fails to connect

any of these costs to the FTX Group's conduct, much less the FTX Group's Account Noncompliance. (*See supra* ¶¶ 58-61.) To the extent Argent attributes these costs to the revelation of the FTX Insider Fraud, Argent must (but cannot) overcome the same deficiencies fatal to its other damages theories: even assuming that the FTX Insider Fraud was a catalyst or a "but for" cause of Argent's alleged damages, that is simply not enough to plausibly allege proximate causation. *See L. Barber Gems, Inc.* v. *Brink's Diamond & Jewelry N. Am.*, 43 F. App'x 164, 166 (9th Cir. 2002) ("At most, however, [the] breach amounts to a 'but for' cause for the loss, which is not determinative of proximate cause."); *see also PPG Indus.*, 20 Cal. 4th at 315.

81. Likewise, Argent cannot show that the FTX Group was informed of, knew about, or should have known about the risk of these costs at the time of contracting. Unlike cases where litigation or defense fees are "a natural and usual consequence" of a contractual breach, Argent's claimed costs are separated from the FTX Group's alleged breaches by numerous intervening events that were not contemplated by the parties at the time of contracting. *Cf. De La Hoya* v. *Slim's Gun Shop*, 80 Cal. App. 3d Supp. 6, 11 (App. Dep't Super. Ct. 1978) (permitting recovery of defense fees where the seller's breach of the warranty of title in the sale of a stolen firearm directly and foreseeably exposed the buyer to the risk of arrest and prosecution). Argent's conclusory assertion that the FTX Group "knew or should have known" that Silvergate would face litigation and scrutiny "when [FTX's] scheme collapsed" (Argent MDS ¶ 68) does nothing to establish that the wide range of alleged costs was within the contemplation of the parties at the time of contracting.

82. Argent also seeks $33 million in legal and professional costs incurred in Silvergate's bankruptcy cases. (Argent MDS ¶ 68.) Again, Argent cannot plausibly attribute these costs to the FTX Group's Account Noncompliance, particularly in light of Silvergate's own very

different representations regarding its reasons for winding down operations. (*See supra* ¶¶ 52-54, 61.) Moreover, "bankruptcies normally are not within the contemplation of the parties at the time of a contract." *Ash*, 223 Cal. App. 4th at 1272. This is because "financial ruin of an apparently sound company is not normally a foreseeable consequence" of a defendant's breach of contract. *Id.* (citing *Martin Marietta Corp.* v. *Fireman's Fund Ins. Co.*, 852 F.2d 566 (4th Cir. 1988)). Argent does not allege that Silvergate communicated any risk of insolvency to the FTX Group or that the FTX Group could reasonably have foreseen that breaching discrete account-opening and account-use provisions could cause Silvergate to go bankrupt. *See Ash*, 223 Cal. App. 4th at 1272 ("Unless financial ruin is a consequence arising naturally from a breach of contract, damages . . . for financial ruin are not recoverable unless a risk of insolvency was within the actual contemplation of the parties." (cleaned up)).

83. ***Indemnification Costs.*** Last and perhaps most attenuated is Argent's claim for "tens of millions of dollars" in costs associated with Silvergate's indemnification of its former directors and officers. (Argent MDS ¶¶ 69-72.) In line with the myriad damages previously alleged, Argent cannot show a causal relationship between the FTX Group's Account Noncompliance and these indemnification costs, which arose from investigations into Silvergate's officers for their own alleged misstatements regarding Silvergate's compliance program and financial condition. Moreover, it is simply not plausible that the FTX Group knew or should have known that its failure to comply with the CMTS Agreements and DAARDs would in any way give rise to Silvergate's officers deliberately misleading the public and incurring a slew of legal and regulatory costs to be indemnified by Silvergate.

84. Additionally, Argent impermissibly seeks $40.25 million as indemnification reserves, of which only $3.6 million has actually been paid. (Argent MDS ¶¶ 71, 121.) Argent

acknowledges only that future payments from these reserves "may accrue" and that the ultimate amount spent "remains subject to ultimate reconciliation." (*Id.* ¶ 71.) These speculative future expenses cannot serve as the basis for a current claim for damages. *Westside Ctr. Assocs.* v. *Safeway Stores 23, Inc.*, 42 Cal. App. 4th 507, 530-31 (1996) ("Damages which are remote, contingent, or merely possible cannot serve as a legal basis for recovery.") (citation omitted).[26]

**IV. Argent Fails to Establish That Its Alleged Losses Are Within the Scope of Any Indemnification Agreement Between the FTX Group and Silvergate**

85. Argent argues that all of Silvergate's supposed losses fall within boilerplate indemnification language in the CMTS Agreements, form adhesion contracts drafted by Silvergate that customers were deemed to accept merely by signing an account-opening signature card or using a Silvergate service. But Argent reads the indemnification provision far beyond its terms, seeking to transform it into an all-risk insurance policy requiring the FTX Group to pay for losses resulting from Silvergate's own misconduct, arising from its voluntary business decisions, and bearing no connection to any FTX Group account at Silvergate or use of a Silvergate service. The CMTS Agreements' indemnity clause covers specified losses arising from specified conduct; it does not make the FTX Group the guarantor of Silvergate's entire business.

86. Section 18 of the CMTS Agreements requires a customer "to defend, indemnify and hold the Bank harmless against any loss, liability or expense (including attorneys' fees and expenses)" only where the loss "result[s] from or aris[es] out of" one of three specified

---

[26] Argent's tacked-on claim alleging that the FTX Group breached the covenant of good faith and fair dealing fails. Argent does not plead any FTX Group acts that would breach the implied covenant besides a conclusory assertion that the FTX Group "acted unfairly, dishonestly, or with a dishonest purpose" (Argent MDS ¶ 87), leaving only the same flawed allegations that allegedly support Argent's breach of contract claim (*id.* ¶ 86). Argent's implied covenant claim is therefore duplicative and fails as a matter of law. *Careau & Co.* v. *Sec. Pac. Bus. Credit, Inc.*, 222 Cal. App. 3d 1371, 1392 (1990) (affirming demurrer without leave to amend of claim for breach of the implied covenant of good faith and fair dealing where claim was "simply duplicative of [plaintiffs'] two contract causes of action").

circumstances: (a) "any acts or omissions by [the customer] or [its] employees or agents"; (b) "any claims against the Bank from a third party resulting directly or indirectly under this CMTS Agreement where the Bank has acted in accordance with [the customer's] instructions and/or within the terms of this CMTS Agreement"; or (c) "any breach by [the customer] or [its] employees or agents of any representation, warranty, covenant or agreement made pursuant to or in this CMTS Agreement." (Argent MDS ¶ 29.)

87. Argent alleges that "acts or omissions" by the FTX Group and its employees, as well as purported breaches of representations and warranties in the CMTS Agreements and related agreements, fall within Section 18. (*Id*. ¶¶ 29-32.) These alleged acts, omissions, and breaches include submitting "false and misleading account applications," furnishing "fabricated corporate documents," certifying "inaccurate information as true," using accounts "for purposes neither disclosed to nor authorized by Silvergate," and failing "to disclose changes in account usage." (*Id.* ¶ 29.) Argent further alleges that North Dimension falsely represented that it did not and would not operate as a money-services business in violation of federal law. (*Id.* ¶ 30.) Based on these allegations, Argent concludes that the FTX Group's "conduct, acts, omissions, and contract breaches in connection with its accounts at Silvergate" fall "squarely within" Section 18. (*Id.* ¶ 94.)

88. But even if the acts, omissions, and breaches that Argent alleges fell within Section 18 (which is not conclusively established), that is only the beginning of the indemnification analysis. To recover under an indemnification agreement, the indemnitee must allege "the facts showing a loss *within the meaning of the parties' indemnification agreement*." *Four Star Elec., Inc.* v. *F & H Constr.*, 7 Cal. App. 4th 1375, 1380 (1992) (emphasis added). Indeed, it is a "well settled" rule that an indemnitee "cannot recover beyond the terms of the indemnity contract." *S.*

*Cal. Gas Co.* v. *Ventura Pipe Line Constr. Co.*, 150 Cal. App. 2d 253, 257 (1957). Whether a loss falls within an indemnity provision "turns primarily on contractual interpretation," with the "intent of the parties" as expressed in the agreement controlling. *Rossmoor Sanitation, Inc.* v. *Pylon, Inc.*, 13 Cal. 3d 622, 633 (1975). And where an indemnitee seeks to be indemnified for its own negligence, indemnification provisions "are to be strictly construed against the indemnitee." *Heppler* v. *J.M. Peters Co.*, 73 Cal. App. 4th 1265, 1278 (1999).

89. Applying these principles, none of Silvergate's alleged losses fall within the scope of Section 18. As an initial matter, Argent cannot be indemnified for the regulatory penalties and fines it incurred because indemnification for those losses is independently barred. More fundamentally, Argent fails to establish the requisite causal nexus between Silvergate's alleged losses and the conduct covered by Section 18, defeating indemnification across every category of Argent's claimed damages. Even apart from that failure, Section 18 certainly does not cover Silvergate's direct losses or losses arising from its own negligence, independently barring multiple categories of alleged loss.

**A. Silvergate's Regulatory Penalties and Fines Are Barred from Indemnification**

90. In 2024, Silvergate consented to a final judgment imposing a $50 million civil penalty in an action brought by the SEC. (SEC Order at 4.) The incorporated consent order expressly provides that Silvergate "shall not seek or accept, directly or indirectly, reimbursement or indemnification from any source" for civil-penalty amounts paid under the Final Judgment. (*Id.* ¶ 9.) That prohibition requires Silvergate to bear the penalty's economic cost itself.

91. The consent order further provides that payments by Silvergate to satisfy penalties imposed by the FRB or DFPI offset the $50 million SEC penalty dollar for dollar. (*Id.* ¶ 2(d).) Those offset payments therefore satisfied the same penalty obligation that Silvergate expressly agreed not to shift to anyone else. Argent cannot evade that restriction by seeking indemnification

for payments to the FRB and DFPI rather than the SEC. Reimbursing Silvergate for amounts credited against the SEC penalty would restore the very funds that the consent order required Silvergate to bear and would accomplish indirectly what that order prohibits.

92. Moreover, indemnification would defeat the deterrent purpose of the BSA/AML enforcement regime. Where a statute is "regulatory rather than compensatory," the Ninth Circuit has held that "permitting indemnity would undermine the statutory purpose of assuring diligent performance of duty and deterring negligence." *Laventhol, Krekstein, Horwath & Horwath* v. *Horwitch*, 637 F.2d 672, 676 (9th Cir. 1980). The FRB and DFPI imposed these penalties to punish Silvergate's violations and deter similar failures by regulated banks. Permitting Argent to pass those penalties to a customer would effectively allow a regulated institution to "escape loss by shifting [its] entire responsibility to another party," *Heizer Corp.* v. *Ross*, 601 F.2d 330, 334 (7th Cir. 1979), and would undermine the very consequences the penalties were intended to impose.

## B. Argent Fails to Show a Causal Nexus Between Silvergate's Claimed Losses and Any Indemnified Conduct

93. Indemnification is available only if an "indemnitor's performance under the contract is causally related in some manner to the injury for which indemnity is claimed." *BP W. Coast Prods., LLC* v. *Crossroad Petroleum, Inc.*, 2016 WL 3901020, at *12 (S.D. Cal. July 18, 2016) (citation omitted). Section 18 explicitly imposes a causal requirement, covering only losses "resulting from or arising out of" specified acts, omissions, or breaches. (Argent MDS ¶ 29.) While courts read this language broadly, it nonetheless "requires more than 'but for' causation." *Fireman's Fund Ins. Co.* v. *Discover Prop. & Cas. Ins. Co.*, 2009 WL 2591394, at *3 (N.D. Cal. Aug. 21, 2009) (citation omitted).

94. Enforcing Section 18's causal limitation is particularly important here. In noninsurance indemnity agreements, California courts recognize that the indemnitee may possess superior bargaining power and use it "unfairly to shift to another a disproportionate share of the financial consequences of its own legal fault." *Crawford* v. *Weather Shield Mfg., Inc.*, 44 Cal. 4th 541, 552 (2008). Argent's attenuated causation theory presents precisely that risk. Silvergate drafted Section 18 in a standard-form adhesion contract, and Argent now seeks to extend it to make the FTX Group responsible for every loss that followed the FTX collapse, including losses caused by Silvergate's own conduct. Requiring Argent to connect each loss to the specific customer conduct identified in Section 18 prevents its boilerplate language from becoming an unlimited transfer of Silvergate's own business and regulatory risks.

95. The More Definite Statement bases Argent's indemnification claim on alleged acts, omissions, and breaches of various warranties committed by the FTX Group when it opened (and while it maintained) its Silvergate accounts (i.e., the Account Noncompliance). (Argent MDS ¶¶ 29-32, 90–96.) The Account Noncompliance allegedly induced Silvergate to open and maintain the accounts, but Argent does not allege that any claimed loss resulted from Silvergate's reliance on the falsity of any particular statement. Indeed, the immediate consequence of opening the accounts was actually substantial growth for Silvergate and thus none of Argent's alleged losses directly resulted from the Account Noncompliance. (*See supra* ¶¶ 10, 47.)

96. The Court should reach the same result even if the FTX Insider Fraud constituted the relevant "acts or omissions" covered by Section 18, as Argent suggests. (*See* Argent MDS ¶ 65.) In that scenario, Argent's own allegations are fatal to this theory: Argent alleges it was the *revelation* of the FTX Insider Fraud that led to Silvergate's "catastrophic" harms and eventual collapse. (*Id.* ¶ 60.) That public disclosure was not an "act or omission" by the FTX Group, and

therefore the harms resulting from that revelation are not indemnifiable under Section 18. And to simply say that the FTX Insider Fraud was in some way antecedent to Silvergate's losses "does not resolve the question of whether [the FTX Group] should be liable" because "the law must impose limitations on liability other than simple causality." *PPG Indus.,* 20 Cal. 4th at 315–16; *see also Fireman's Fund*, 2009 WL 2591394, at *4 ("Mere 'but for' causation is not enough.").

97. ***Securities Sale Losses and Lost Going-Concern Value.*** Silvergate's Securities Sale Losses and Lost Going-Concern Value resulted from industry contagion, rising interest rates, deposit flight, and regulatory pressure, not the Account Noncompliance, and Argent is estopped from arguing otherwise. (*See supra* ¶¶ 49-54.) And as discussed, the revelation of the FTX Insider Fraud is not an "act or omission" attributable to the FTX Group. Under California law, causation with respect to indemnification cannot be extended indefinitely. *See Fireman's Fund,* 2009 WL 2591394, at *4 (finding no causal nexus where, although a book signing brought the injured party to the vicinity of her accident, the injury was caused by unrelated construction activities); *see also UBS Sec. LLC* v. *Highland Cap. Mgmt., L.P.*, 70 A.D.3d 526, 526 (N.Y. App. Div. 2010) (dismissing an indemnification claim under New York law where the agreements contained no promise to assume the plaintiffs' investment losses or guarantee the performance of third-party funds to bear risk of investment losses). That Silvergate's losses followed FTX's collapse in time does not make them indemnifiable; sharing an "overarching theme" is insufficient to establish the requisite causal link. *See BetterHelp, Inc*. v. *Columbia Cas. Co*., 2025 WL 3022875, at *7 (N.D. Cal. Oct. 29, 2025) (analyzing "arising out of" language in the duty-to-defend context). And Argent fails to provide even a rough indication of losses attributable to any alleged misconduct rather than independent market forces. *See Hubbard*, 688 F.3d at 725-730; *see also In re Moody's Corp. Sec. Litig.*, 2013 WL 4516788, at *9-12 (S.D.N.Y. Aug. 23, 2013) (rejecting plaintiffs' loss

causation argument in part because plaintiffs could not distinguish defendant's fraud from market forces as the cause of their share price declines). Section 18 contains no promise that the FTX Group would insure Silvergate against losses on its own securities portfolio and Argent alleges nothing more than "but for" causation which cannot support the required nexus between any FTX Group conduct covered by Section 18 and its claimed losses. *Fireman's Fund*, 2009 WL 2591394, at *3.

98. ***BSA/AML Compliance Penalties and Settlement Payments.*** Similarly, Silvergate's BSA/AML Compliance Penalties (totaling $63 million) and Settlement Payments arose from its own compliance failures (including deficiencies in its monitoring of internal transactions) and obligations to third parties. (*See supra* ¶¶ 55-57.) Argent cannot recast those amounts as losses caused by customer conduct covered under Section 18 merely because the underlying claims allegedly would not have arisen but for the FTX Group's collapse. (Argent MDS ¶¶ 63-66.) That theory does not connect the losses to any covered conduct and instead extends causation impermissibly "go[ing] back to the dawn of human events." *PPG Indus.*, 20 Cal. 4th at 315 (citation omitted).

99. ***Fees and Costs.*** Argent's aggregated Defense Costs, Bankruptcy Costs, Trust Costs, and Indemnification Costs are also not covered by Section 18. These purported losses arose either from Silvergate's own failure to maintain a compliant BSA/AML program, from its decisions to liquidate and commence Chapter 11 proceedings amid rising interest rates, deposit flight, and regulatory pressure, or from the conduct of Silvergate's former officers and directors (and Silvergate's separate undertaking to fund their defenses and potential liabilities)—not any acts, omissions, or breaches by the FTX Group. (*See supra* ¶¶ 58-63.) Moreover, Argent identifies no account-related act or omission under Section 18(a), breach of the CMTS Agreements under

Section 18(c), or qualifying claim under Section 18(b) that caused those expenses. Calling the expenses "FTX-related" does not establish the causal nexus Section 18 requires. Section 18 does not make customers insurers against the costs of a market-driven business failure. *See PPG Indus., Inc.,* 20 Cal. 4th at 315–16 (recognizing "limitations on liability other than simple causality"); *Delshah Grp. LLC* v. *Javeri*, 2013 WL 2322488, at *26-27 (S.D.N.Y. May 28, 2013) (rejecting recovery for losses in part because the losses were not reasonably related to the alleged misconduct).

**C. Section 18 Does Not Cover Silvergate's Direct Losses**

100. Even if Argent could establish the requisite causal nexus between the alleged relevant conduct and its claimed losses (it cannot), Section 18 covers only third-party claims, not Silvergate's direct losses, including losses on its securities portfolio, lost going-concern value, bankruptcy expenses, and liquidation costs. Under California law, "indemnity agreements generally apply only to third party claims." *City of Bell* v. *Superior Ct.*, 220 Cal. App. 4th 236, 252 (2013). The use of terms such as "loss," "damage," and "expense" does not necessarily extend indemnity provisions beyond the third-party scope, because those terms commonly appear in third-party indemnity provisions. *Pac. Gas & Elec. Co.* v. *G.W. Thomas Drayage & Rigging Co.*, 69 Cal. 2d 33, 41 n.9 (1968). Nor may the words "indemnify" and "hold harmless" be read beyond their traditional third-party function, absent contractual language or commercial circumstances demonstrating a broader bargain. *Queen Villas Homeowners Ass'n* v. *TCB Prop. Mgmt.*, 149 Cal. App. 4th 1, 7 (2007).

101. Even "broad language" in an indemnity provision does not, by itself, overcome this limitation. *AGK Sierra De Montserrat, L.P.* v. *Comerica Bank*, 109 F.4th 1132, 1141 (9th Cir. 2024) ("Put differently, indemnity provisions that cover any, all, and every claim which arises out of the performance of the contract deal only with third party claims.") (cleaned up); *Am. First Fin.*

*LLC* v. *Garcia*, 2025 WL 418686, at *3 (E.D. Cal. Feb. 6, 2025) (language holding a party harmless from "any and all" expenses "of every nature and kind . . . arising out of or in any way occasioned," could not "be construed as clearly contemplating indemnification for a suit between the parties"). Rather, there must be "much more specific language" in the indemnification provision that "clearly evinces a desire" to include losses beyond the third-party context. *AGK Sierra De Montserrat,* 109 F.4th at 1141 (rejecting argument that attorney's fees incurred in direct action between contracting parties could be indemnifiable). Section 18 contains no such specific language. It does not refer to disputes between Silvergate and its customers, direct losses suffered by Silvergate, or expenses incurred to enforce the CMTS Agreements. Instead, it employs the traditional third-party formulation, requiring a customer "to defend, indemnify and hold the Bank harmless" against losses arising out of:

> a) any acts or omissions by you or your employees or agents;
>
> b) any claims against the Bank from a third party resulting directly or indirectly under this CMTS Agreement where the Bank has acted in accordance with your instructions and/or within the terms of this CMTS Agreement; and
>
> c) any breach by you or your employees or agents of any representation, warranty, covenant or agreement made pursuant to or in this CMTS Agreement.

(Argent MDS ¶ 29.)

102. Covering third-party claims "where the Bank has acted in accordance with [the customer's] instructions and/or within the terms of this CMTS Agreement," Section 18(b) is best read as a supplement to Sections 18(a) and (c): it captures third-party claims arising out of *Silvergate's* conduct, whereas 18(a) and (c) identify different *customer* conduct triggering third-party claims. *See Alki Partners, LP* v. *DB Fund Servs., LLC*, 4 Cal. App. 5th 574, 605 (2016) (interpreting "general words" in indemnity contract—where a separate clause dealt "exclusively

with a particular type of third party claims"—"to embrace 'only things similar in nature' to the specific words—that is, third party claims").

103. Argent nevertheless seeks to use Section 18 to recover Silvergate's own balance-sheet losses, including approximately $751.4 million in losses on its own securities portfolio (Argent MDS ¶¶ 5, 60, 116); lost "going-concern value" estimated by Argent in "the hundreds of millions, if not billions" (*id.* ¶¶ 61–62, 117); approximately $33 million in Silvergate's own bankruptcy professional fees (*id.* ¶¶ 68, 120); and the $8.77 million "Go-Forward Chapter 11 Budget," up to $40.25 million in indemnification reserves, and roughly $2 million in DOJ Insurance Policy premiums Silvergate elected to fund on behalf of its own former directors and officers. (*Id.* ¶¶ 69–72, 121.) None of these purported damages is a liability Silvergate incurred to a third party arising out of a covered claim. Instead, they are direct consequences of Silvergate's own investment, disclosure, bankruptcy, and liquidation decisions. Nothing in Section 18 clearly and explicitly makes the FTX Group responsible for those direct losses. Accordingly, Argent cannot convert a conventional third-party indemnity into a guaranty of Silvergate's enterprise value, and its direct-loss claims fail for that independent reason.

**D. Argent Cannot Assert Indemnification Claims for Silvergate's Negligence**

104. Under a "long-established" rule, a general indemnity clause that fails to address an indemnitee's negligence does not cover losses resulting from the indemnitee's own active negligence. *Md. Cas. Co.* v. *Bailey & Sons, Inc.*, 35 Cal. App. 4th 856, 866 (1995). An indemnity may only cover losses caused by the indemnitee's own negligence—or regardless of the indemnitor's fault—if the parties express that intent in "particularly clear and explicit" language, which must be "strictly" construed against the indemnitee. *Prince* v. *Pac. Gas & Elec. Co.*, 45 Cal. 4th 1151, 1158 (2009).

105. California courts historically determine whether an indemnity provision "expressly and unequivocally" states that the indemnitor must indemnify the indemnitee for its own negligence. *MacDonald & Kruse, Inc.* v. *San Jose Steel Co.*, 29 Cal. App. 3d 413, 419 (1972). In contrast, indemnity provisions that use broad, general language such as "howsoever . . . may be caused" or "regardless of responsibility" or "arising from" the connection of work, may cover the indemnitee's passive negligence, but ordinarily not its active negligence. *Id.* (citations omitted). Furthermore, provisions that cover liabilities caused by the indemnitor, "but which do[] not provide that the indemnitor is to indemnify the indemnitee for the indemnitee's liabilities that were caused by other than the indemnitor," do not cover even an indemnitee's passive negligence. *Id.* at 420.

106. No negligence protection is included in Section 18. That provision nowhere mentions Silvergate's negligence, much less states "expressly and unequivocally" that customers must indemnify Silvergate for losses caused by Silvergate's active negligence or misconduct. *Id*. at 419. Indeed, Argent fails to include a single factual allegation establishing that either party intended that Silvergate would be indemnified for knowingly aiding and abetting the FTX Insider Fraud or failing to maintain a compliant BSA/AML program. Since there is, therefore, "nothing otherwise to suggest that the intent of the parties was to provide indemnity under these circumstances," Silvergate cannot be indemnified for losses caused by its own negligence. *See McCrary Constr. Co*. v. *Metal Deck Specialists, Inc*., 133 Cal. App. 4th 1528, 1540-41 (2005). These limitations independently exclude substantial categories of Argent's claimed losses, including at least the BSA/AML Compliance Penalties, the Settlement Payments, and the Defense Costs.

## V. The Silvergate Claims Are Barred by the *In Pari Delicto* Doctrine

107. The Silvergate Claims are barred under the doctrine of *in pari delicto* because Silvergate's own misconduct—including misconduct for which regulators sanctioned Silvergate with $63 million in monetary penalties, which Argent now seeks reimbursement for from the Trust (Argent MDS ¶¶ 6, 63-65)—directly and substantially contributed to its self-inflicted losses.

108. "*In pari delicto* serves at least two important policy goals: deterring wrongful conduct by refusing wrongdoers any legal or equitable relief, and protecting the judicial system from having to use its resources to provide an accounting among wrongdoers." *In re FTX Trading Ltd.*, 2026 WL 2149961, at *18 (Bankr. D. Del. July 24, 2026) (quoting *Stewart* v. *Wilmington Tr. SP Servs., Inc.*, 112 A.3d 271, 302 (Del. Ch. 2015), *aff'd*, 126 A.3d 1115 (Del. 2015)). Under this doctrine, "a party is barred from recovering damages if his losses are substantially caused by activities the law forbade him to engage in." *Stewart*, 112 A.3d at 301-02; *see Uecker* v. *Zentil*, 244 Cal. App. 4th 789, 792 n.1 (2016) (under *in pari delicto*, "the law will aid neither [participant in illegal, fraudulent, or inequitable conduct], but rather, will leave them where it finds them"). Put simply, the doctrine "provides that a plaintiff may not assert a claim against a defendant if the plaintiff bears fault for the claim." *Off. Comm. of Unsecured Creditors* v. *R.F. Lafferty & Co.*, 267 F.3d 340, 354 (3d Cir. 2001); *In re Kwok*, 2025 WL 842454, at *2 (9th Cir. Mar. 18, 2025) ("Kwok, therefore, cannot seek redress based on his own alleged wrongful conduct."). Because "the main purpose of *in pari delicto* would be undermined by fact intensive proceedings comparing the culpability of the wrongdoers, the defense may be raised successfully on a motion to dismiss, unless the complaint is devoid of grounds for invoking the rule." *Stewart*, 112 A.3d at 302; *see also Produce All., LLC* v. *W. Cent. Produce, Inc.*, 2020 WL 8254865, at *7 (C.D. Cal. Oct. 22, 2020) (same), *aff'd*, 2022 WL 1285041 (9th Cir. Apr. 29, 2022).

109. Consistent with these long-established principles, this Court recently applied *in pari delicto* at the pleading stage, holding that the doctrine barred numerous state law claims brought by the FTX Recovery Trust against Binance and Changpeng Zhao. *In re FTX Trading Ltd.*, 2026 WL 2149961, at *22. The Court held, in part, that *in pari delicto* applied because the doctrine "is a broad one" that prevents courts from "refereeing between thieves." *Id*. at *20 (cleaned up).

110. This reasoning applies here. Argent's claims arise from Silvergate's collapse, which was substantially and directly caused by Silvergate's misconduct, including regulatory non-compliance. Most glaringly, as an example of Argent's unprincipled claims strategy, Argent seeks to recover from the FTX Group purported costs Silvergate incurred in connection with regulatory investigations of its own failure to comply with its BSA/AML obligations—including penalties imposed on Silvergate by regulators following those investigations. (Argent MDS ¶¶ 6, 63-65.) That is a paradigmatic claim subject to *in pari delicto*. Argent seeks to recover, among other things, a litany of regulatory penalties, litigation and settlement costs, and professional fees allegedly caused by the FTX Group's misconduct, even though Argent's own allegations acknowledge that those losses arose from investigations of (and enforcement actions against) Silvergate's own deficient BSA/AML program. (Argent MDS ¶¶ 6, 63-72.) The FTX Group's misconduct (whether the Account Noncompliance or the FTX Insider Fraud) did not cause Silvergate's monitoring deficiencies: regulators imposed $63 million in penalties for Silvergate's *own* compliance failures, including deficiencies in its monitoring of internal transactions. (*Id*. ¶¶ 6, 63-65.)

111. The Cease-and-Desist Order states that "the most recent examinations of Silvergate conducted by the Federal Reserve Bank of San Francisco . . . and the DFPI . . . identified numerous

deficiencies, including with respect to both safety and soundness and compliance with banking laws and regulations." (Cease-and-Desist Order at 2.) The DFPI Order likewise states: "An investigation by the Department identified deficiencies with respect to Silvergate's monitoring of internal transactions." (DFPI Order, Recital G.) And the FRB Order imposed a $43 million penalty "for the unsafe or unsound practices described," including "deficiencies in Silvergate's monitoring of internal transactions through the SEN." (FRB Order at 2-3.) These orders identify Silvergate's own compliance and monitoring failures—not anything the FTX Group represented in an account application—as the conduct underlying the penalties. It is therefore "clear from the face of the Complaint" that it was Silvergate's own misconduct "that was the primary cause of the lost value" that Argent attempts to collect through its claims. *In re FTX Trading Ltd.*, 2026 WL 2149961, at *18. Requiring the Court to decide whether and to what extent Silvergate's misconduct or the FTX Group's alleged misuse of Silvergate accounts produced Argent's claimed losses would make the Court the "referee[] between thieves" that *in pari delicto* exists to prevent. *Id.* at *20 (citation omitted).

112. Nor would the result differ if the Court analyzed Silvergate's misconduct under the unclean-hands doctrine, which California courts sometimes treat interchangeably with *in pari delicto*. *See In re Yellow Cab Coop., Inc.*, 602 B.R. 357, 358 (Bankr. N.D. Cal. 2019) (referring to "the doctrine of *in pari delicto* (also known as 'unclean hands')"); *Peregrine Funding, Inc.* v. *Sheppard Mullin Richter & Hampton LLP*, 133 Cal. App. 4th 658, 677 (2005) (noting unclean hands is "generally referred to in federal decisions as the *in pari delicto* doctrine"). Under the unclean hands doctrine, "[w]hether the particular misconduct [at issue] is a bar to the alleged claim for relief depends on (1) [the existence of] analogous case law, (2) the nature of the misconduct,

and (3) the relationship of the misconduct to the claimed injuries." *Padideh* v. *Moradi*, 89 Cal. App. 5th 418, 436 (2023) (citation omitted). All three prongs favor application of the defense here.

113. *First*, the analogous case of *Peregrine Funding*, 133 Cal. App. 4th at 679, demonstrates that the "unclean-hands defense is available [in this] general circumstance." *Padideh*, 89 Cal. App. 5th at 441. In *Peregrine Funding*, the court explained that the parties' "orchestration of the Ponzi scheme that defrauded investors is intimately related to the . . . claims before the court," and for the plaintiff, a bankruptcy trustee, to "complain of [the defendant's] role in enabling [the debtor] to commit the fraud is unfair." 133 Cal. App. 4th at 680-81 (applying the unclean hands doctrine and rejecting argument that bankruptcy trustee could "use his status as an innocent successor to insulate the debtor from the consequences of its wrongdoing"). The same equitable reasoning applies here. As an example, Argent, a litigation trust, complains that the FTX Group's misuse of certain Silvergate accounts exposed Silvergate's pre-existing compliance failures, prompting regulatory fines and myriad other attenuated costs. (Argent MDS ¶¶ 6, 60-72, 116-121.) Yet these fines and costs arose because of Silvergate's pervasive failures to monitor customer accounts in accordance with applicable law, regulations, and Silvergate's own policies—while incurring financial benefit throughout. Allowing Argent to shift those consequences onto the FTX Group's creditors presents "precisely th[e] sort of unfairness the unclean hands doctrine seeks to address." *Peregrine Funding*, 133 Cal. App. 4th at 681. Where, as here, Argent's own pleadings contain admissions that "establish the basis of an unclean hands defense"—that is, describing Silvergate's regulatory fines penalizing Silvergate's own conduct—"the defense may be applied without a further evidentiary hearing." *Id.*

114. *Second*, the nature of Silvergate's misconduct—in relation to both the FTX Group's accounts and Silvergate's system-wide BSA/AML compliance failures—supports the unclean

hands defense. Unclean hands does not require a separate crime or tort; rather, "conduct that violates conscience, or good faith, or other equitable standards of conduct is sufficient." *Padideh*, 89 Cal. App. 5th at 444 (citations omitted). As already established, Silvergate's business practices far surpassed that threshold. (*See supra* ¶¶ 110-11.)

115. *Third*, Silvergate's misconduct relates directly "to the transaction concerning which the complaint is made, i.e., to the subject matter involved." *Peregrine Funding*, 133 Cal. App. 4th at 681 (cleaned up). This misconduct need not be "part of the basis upon which liability is being asserted." *Id.* Here, Silvergate's compliance failures relate directly to the subject matter of its claims against the FTX Group—indeed, Argent expressly seeks to recover the regulatory penalties and associated costs and fees caused by its own misconduct and anchors all of its losses in the transactions that occurred between Silvergate and the FTX Group. (Argent MDS ¶¶ 6, 60-72.)

116. The investigation reports, legal memoranda, and technology audits relied on by Argent to argue that Silvergate's employees (and, by extension, Silvergate) were unaware of the FTX Group's fraud are unavailing. (Argent MDS ¶¶ 52-59.) Argent argues that the SIC Report found that there was "no reason to suspect" that Silvergate's directors and officers were complicit in "the FTX/Alameda fraud prior to public reports of a potential fraud." (Argent MDS ¶¶ 57-58.) But the SIC Report, a self-serving analysis of the potential liability of Silvergate's directors and officers, in no way undermines Silvergate's clear compliance failures, regardless of its conclusion with respect to the complicity of Silvergate's directors and officers in the FTX fraud. (Cease-and-Desist Order at 2.) Moreover, the Wickouski Report identified numerous, significant deficiencies in the SIC Report. (*See supra* ¶ 21.) For example, the Wickouski Report expressly found the SIC's conclusion that Lane lacked knowledge of the FTX intercompany transfers on the SEN—the very transfers Silvergate's monitoring system failed to flag—"not compelling" and identified

factual gaps in the report's broader analysis, including that the SIC Report's own cited documents show that Silvergate executives knew by January 2022 that SEN transactions were not being flagged for suspicious activity. (Wickouski Report at 25, 29-30.)

117. Argent points to a presentation authored by co-counsel to the FTX Group to argue that Silvergate's BSA/AML compliance was somehow reasonable despite the adverse regulatory action and that the FTX Group's failure to properly designate accounts "impair[ed] Silvergate's ability" to detect wrongdoing. (Argent MDS ¶ 59.) But this misdirection is irrelevant. The relevant question is whether Silvergate's own BSA/AML program complied with applicable laws, regulations, and other equitable standards of conduct, which the FRB, DFPI, and SEC have all determined it did not. Argent similarly invokes a third-party BSA/AML audit of FTX.US by E3 Technology, Inc. (the "E3 Audit") to argue Silvergate reasonably believed that all FTX Group entities "operat[ed] their accounts at Silvergate in accordance with their stated purposes and applicable law." (Argent MDS ¶¶ 52-53.) Argent's reliance on the E3 Audit is likewise misplaced. E3 audited FTX.US, not Alameda or North Dimension, the entities through which the alleged fraud occurred, in late 2021 long after many of the FTX Group accounts were opened. (*Id*. ¶ 52.) In any event, nothing about the E3 Audit could excuse Silvergate's own BSA/AML deficiencies for which Silvergate paid $63 million in fines. (FRB Order ¶ 1, DFPI Order ¶ 2.) There can be no serious question that Silvergate is at least partially responsible for damages it seeks. That is dispositive of the claims against the FTX Recovery Trust.[27]

[27] In the event that the Court determines that additional factual development is required to determine whether the *in pari delicto* or unclean hands doctrines bar the Silvergate Claims, the FTX Recovery Trust reserves its right to object to the Silvergate Claims on these grounds at the appropriate stage of this litigation. (*See* Stipulation at 4 (permitting preliminary objections to be filed with dispositive motions).)

118. For all the foregoing reasons, the Silvergate Claims have no discernible basis for relief and the FTX Recovery Trust therefore respectfully requests the Court enter the Order, substantially in the form attached hereto as Exhibit 1, disallowing and expunging the Silvergate Claims in their entirety.

## PRELIMINARY OBJECTIONS

1. To the extent the Court does not grant the Claim Disallowance Motion and enter the Order disallowing and expunging the Silvergate Claims in their entirety, the FTX Recovery Trust objects to the Silvergate Claims on the bases that Argent cannot prove the necessary elements of any of those Claims, including for the reasons set forth in this Motion. In addition, the FTX Recovery Trust preliminarily objects to the Silvergate Claims on the additional grounds set forth below. The FTX Recovery Trust reserves the right to assert additional objections in full at the appropriate stage of this claims litigation.

### I. Any Allowed Argent Claim Is Subject to Setoff Against Any Allowed FTX Claim Against Argent

2. Section 558 of the Bankruptcy Code preserves a debtor's pre-petition defenses, including state-law setoff claims. *See A.B.C. Learning Ctrs. Ltd.* v. *RCS Cap. Dev., LLC (In re RCS Cap. Dev., LLC)*, 2013 WL 3618550, at *8 (B.A.P. 9th Cir. July 16, 2013); *In re PSA, Inc.*, 277 B.R. 51, 54 (Bankr. D. Del. 2002) ("[A] right to setoff must be established under state law so that the debtor then may assert the setoff as a defense reserved by § 558."). The FTX Recovery Trust holds seven causes of action against Silvergate that provide substantial setoff rights against the Silvergate Claims asserted by Argent. (*See* FTX MDS ¶¶ 73-123.) Silvergate's actual knowledge of the FTX Group's wider fraud against its customers is now supported by specific factual allegations. (*See id.* ¶¶ 35, 47, 50, 53.) Substantial assistance is likewise well-pled. (*See*

*id*. ¶¶ 34, 44, 47, 97.) Indeed, analogous aiding-and-abetting claims against Silvergate survived a motion to dismiss in *Bhatia*, 725 F. Supp. 3d at 1114-1124 (S.D. Cal. 2024).

3. The FTX Recovery Trust's affirmative allegations will be further supported through discovery. Success on the claims asserted by the FTX Recovery Trust would substantially reduce, if not entirely defeat, the Silvergate Claims, even if they are ultimately allowed in some form. The FTX Recovery Trust therefore reserves its rights to setoff any recovery it obtains against any recovery that Argent obtains from the Silvergate Claims.

**II. Argent Cannot Seek Indemnification For Silvergate's Unlawful Acts**

4. Under California law, an indemnification clause cannot cover an indemnitee's unlawful acts if the indemnitee had actual knowledge that its acts were unlawful. Cal. Civ. Code § 2773; *see Lemat Corp*. v. *Am. Basketball Ass'n*, 51 Cal. App. 3d 267, 278-79 (1975) ("Civil Code section 2773, by its language, requires actual knowledge."). Discovery will demonstrate that Silvergate Bank had actual knowledge that its BSA/AML compliance program was deficient, and that it made false statements and misrepresentations to the public regarding the efficacy of this program.

**III. Argent's Claims Should Be Equitably Subordinated**

5. To the extent that the Court does not disallow all of the Silvergate Claims, the FTX Recovery Trust will seek, pursuant to § 510(c) of the Bankruptcy Code, to equitably subordinate any remaining claims based on Silvergate's conduct.

**<u>Reservation of Rights</u>**

6. This Claim Disallowance Motion is limited to the grounds stated herein. Accordingly, it is without prejudice to the rights of the FTX Recovery Trust to object to any claim on any grounds whatsoever. The FTX Recovery Trust expressly reserves all further substantive or procedural objections. Nothing contained herein is intended or should be construed as: (a) an

admission as to the validity of any claim against the FTX Recovery Trust; (b) a waiver of the FTX Recovery Trust's rights to dispute any claim on any grounds; (c) a promise or requirement to pay any claim; (d) an implication or admission that any particular claim is of a type specified or defined in this Claim Disallowance Motion or any order granting the relief requested by this Claim Disallowance Motion; (e) an approval or assumption of any agreement, contract, or lease under section 365 of the Bankruptcy Code; or (f) a waiver of the FTX Recovery Trust's rights under the Bankruptcy Code or any other applicable law.

Dated: October 8, 2026
Wilmington, Delaware

**LANDIS RATH & COBB LLP**

*/s/ Matthew B. McGuire*
Adam G. Landis (No. 3407)
Matthew B. McGuire (No. 4366)
Matthew R. Pierce (No. 5946)
919 Market Street, Suite 1800
Wilmington, Delaware 19801
Telephone: (302) 467-4400
Facsimile: (302) 467-4450
E-mail: landis@lrclaw.com
mcguire@lrclaw.com
pierce@lrclaw.com

-and-

**SULLIVAN & CROMWELL LLP**
Andrew G. Dietderich (admitted *pro hac vice*)
Brian D. Glueckstein (admitted *pro hac vice*)
Benjamin S. Beller (admitted *pro hac vice*)
Christopher J. Dunne (admitted *pro hac vice*)
125 Broad Street
New York, NY 10004
Telephone: (212) 558-4000
Facsimile: (212) 558-3588
E-mail: dietdericha@sullcrom.com
gluecksteinb@sullcrom.com
bellerb@sullcrom.com
dunnec@sullcrom.com

*Counsel for the FTX Recovery Trust*