**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| In re: | Chapter 11 |
| FTX TRADING LTD., *et al.* | Case No. 22-11068 (KBO) |
| Debtors.[1] | (Jointly Administered) |

# ARGENT LIQUIDATION TRUST'S OPPOSITION TO FTX RECOVERY TRUST'S DISPOSITIVE MOTION TO DISALLOW AND PRELIMINARY OBJECTION TO THE ARGENT LIQUIDATION TRUST'S CLAIMS

[1] The last four digits of FTX Trading Ltd.'s and Alameda Research LLC's tax identification number are 3288 and 4063 respectively. Due to the large number of debtor entities in these Chapter 11 Cases, a complete list of the Debtors and the last four digits of their federal tax identification numbers is not provided herein. A complete list of such information may be obtained on the website of the Debtors' claims and noticing agent at https://cases.ra.kroll.com/FTX.

# TABLE OF CONTENTS

Page

PRELIMINARY STATEMENT ........ 1

RELEVANT FACTUAL BACKGROUND ........ 8

I. THE FTX GROUP OBTAINED AND MAINTAINED ITS BANKING RELATIONSHIP THROUGH DELIBERATE FRAUD ........ 8

II. SILVERGATE WEATHERED EVERY "INTERVENING EVENT" THE MOTION IDENTIFIES, UNTIL THE FTX GROUP'S SCHEME COLLAPSED ........ 10

III. THE REGULATORY PRESSURE THE FTX TRUST INVOKES WAS A DIRECT CONSEQUENCE OF THE FTX GROUP'S FRAUD AND COLLAPSE ........ 13

IV. THE EVIDENCE ON WHICH THE FTX TRUST RELIES DOES NOT BREAK THE CAUSAL CHAIN FROM THE FTX GROUP'S MISCONDUCT TO SILVERGATE'S HARMS ........ 18

LEGAL STANDARD ........ 22

RESPONSE ........ 23

I. THE ARGENT TRUST PLAUSIBLY ALLEGED THAT THE FTX GROUP'S CONDUCT CAUSED SILVERGATE'S LOSSES ........ 23

A. The Argent Trust Alleged Sufficient Facts to Establish Causation ........ 24

B. The FTX Trust Has Not Adequately Rebutted Causation ........ 28

1. The Account Noncompliance and the FTX Group's Fraud Were One Scheme, Not Two ........ 29

2. The FTX Trust's Revelation-Versus-Fraud Distinction Does Not Disprove Causation ........ 30

3. Any "Benefit" To Silvergate Does Not Disprove Causation ........ 31

4. "Macroeconomic Factors" Do Not Disprove Causation ........ 33

5. The FTX Trust Fails To Disprove That The Regulatory Actions And Third-Party Lawsuits Were Caused By The FTX Group's Fraud ........ 36

6. The FTX Trust's Claims Regarding Silvergate's Business Model Do Not Disprove Causation ........ 39

7. The FTX Trust Has Not Disproven Silvergate's Liquidation Was Caused By The FTX Group's Fraud ........ 40

C. The Argent Trust Has Proven Causation By A Preponderance Of The Evidence ........ 41

II. THE FTX TRUST'S CLAIM-SPECIFIC ARGUMENTS FAIL ........................ 42

A. The Argent Trust's Losses Are Within The Scope Of The Indemnification Provision ........................ 42

1. The Indemnification Provision Encompasses Silvergate's Losses ........................ 43

2. The Indemnification Provision's "Minimal" Causal Nexus Is Easily Met ........................ 44

3. Silvergate's Regulatory Settlements Are Recoverable Under The Indemnification Provision. ........................ 47

4. The Indemnification Provision Reaches Direct Losses ........................ 48

5. The Argent Trust Does Not Seek Indemnity For Silvergate's Own Negligence. ........................ 50

B. The Argent Trust's Breach Of Contract Claims Sufficiently Allege Recoverable Damages. ........................ 51

1. The Argent Trust Sufficiently Alleges General Damages, As Silvergate Lost The Very Performance The FTX Group Promised. ........................ 52

2. The Argent Trust Sufficiently Alleges Special Damages, As The Breaches Were A Substantial Factor In Foreseeable Losses. ........................ 53

C. The Argent Trust's Fraud And Misrepresentation Claims Adequately Allege Causation ........................ 56

D. The Argent Trust's RICO Claims Are Adequately Pleaded ........................ 57

III. THE FTX TRUST'S REMAINING ARGUMENTS ARE EQUALLY MERITLESS ........................ 59

A. The Argent Trust Is Not Judicially Estopped From Asserting Its Claims ........................ 59

B. The Silvergate Claims Are Not Barred By *In Pari Delicto* Or Unclean Hands ........................ 60

C. The FTX Trust's Preliminary Objections Should Be Disregarded ........................ 62

CONCLUSION ........................ 64

# TABLE OF AUTHORITIES

**Case** **Page(s)**

*3500 Sepulveda, LLC v. RREEF Am. REIT II Corp.*,
No. 2:17-cv-8537, 2023 WL 3866570 (C.D. Cal. June 6, 2023)....................33

*Acceptance Ins. Co. v. Syufy Enters.*,
81 Cal. Rptr. 2d 557 (Cal. Ct. App. 1999)....................2, 6, 44

*Adalman v. Baker, Watts & Co.*,
599 F. Supp. 752 (D. Md. 1984)....................48

*In re Adler, Coleman Clearing Corp.*,
263 B.R. 406 (S.D.N.Y. 2001)....................30

*AGK Sierra de Montserrat, L.P. v. Comerica Bank*,
109 F.4th 1132 (9th Cir. 2024)....................49

*Alexander v. Cuomo*,
No. 24-cv-2179, 2026 WL 124580 (E.D.N.Y. Jan. 16, 2026)....................40

*Alki Partners, LP v. DB Fund Servs., LLC*,
209 Cal. Rptr. 3d 151 (Cal. Ct. App. 2016)....................49

*All. Mortg. Co. v. Rothwell*,
900 P.2d 601 (Cal. 1995)....................56, 57

*In re Allegheny Int'l, Inc.*,
954 F.2d 167 (3d Cir. 1992)....................7, 22

*Altman v. HO Sports Co.*,
821 F. Supp. 2d 1178 (E.D. Cal. 2011)....................24

*Am. First Fin., LLC v. Garcia*,
No. 1:23-cv-117, 2025 WL 418686 (E.D. Cal. Feb. 6, 2025)....................49

*Anschutz Corp. v. Merrill Lynch & Co. Inc.*,
785 F. Supp. 2d 799 (N.D. Cal. 2011)....................35

*Anza v. Ideal Steel Supply Corp.*,
547 U.S. 451 (2006)....................59

*In re Argus Indus., Inc. v. Liodas*,
443 F.2d 1255 (9th Cir. 1971)....................27

*Ash v. N. Am. Title Co.*,
168 Cal. Rptr. 3d 499 (Cal. Ct. App. 2014)....................27, 51, 54, 55

*In re Ashcraft*,
680 B.R. 523 (D. Del. 2026)....22

*In re Avandia Mktg., Sales Pracs. & Prod. Liab. Litig.*,
804 F.3d 633 (3d Cir. 2015)....24

*Bank of N.Y. v. Fremont Gen. Corp.*,
523 F.3d 902 (9th Cir. 2008)....6, 34

*Bay Cities Paving & Grading, Inc. v. Lawyers' Mut. Ins. Co.*,
855 P.2d 1263 (Cal. 1993)....43

*BCCI Holdings (Lux.), Societe Anonyme v. Pharaon*,
43 F. Supp. 2d 359 (S.D.N.Y. 1999)....59

*Beebe v. Wonderful Pistachios & Almonds LLC*,
309 Cal. Rptr. 3d 461 (Cal. Ct. App. 2023)....56, 57

*Bell Atl. Corp. v. Twombly*,
550 U.S. 544 (2007)....24

*Bettencourt v. Hennessy Indus., Inc.*,
141 Cal. Rptr. 3d 167 (Cal. Ct. App. 2012)....52

*BetterHelp Inc. v. Columbia Cas. Co.*,
No. 25-cv-2571, 2025 WL 3022875 (N.D. Cal. Oct. 29, 2025)....35

*Bhatia v. Silvergate Bank*,
No. 3:23-cv-01406-RBM-BLM (S.D. Cal. May 19, 2023), Dkt. No. 14....19, 36

*Blue Chip Stamps v. Manor Drug Stores*,
421 U.S. 723 (1975)....47

*Bowers v. NCAA*,
563 F. Supp. 2d 508 (D.N.J. 2008)....61

*Brandon & Tibbs v. George Kevorkian Accountancy Corp.*,
277 Cal. Rptr. 40 (Cal. Ct. App. 1990)....51, 55

*Burger v. Kuimelis*,
325 F. Supp. 2d 1026 (N.D. Cal. 2004)....27, 37

*C.I. Eng'rs & Constructors, Inc. v. Johnson & Turner Painting Co.*,
189 Cal. Rptr. 824 (Cal. Ct. App. 1983)....43

*Cal. Med. Ass'n v. Aetna Health of Cal. Inc.*,
532 P.3d 250 (Cal. 2023)....4, 5, 34, 38

*Cambridge Fund, Inc. v. Abella*,
501 F. Supp. 598 (S.D.N.Y. 1980) ....................28, 47

*Carroll Shelby Licensing, Inc. v. Halicki*,
138 F.4th 1178 (9th Cir. 2025) ....................48

*Celador Int'l Ltd. v. Walt Disney Co.*,
347 F. Supp. 2d 846 (C.D. Cal. 2004) ....................56

*Cell Therapeutics, Inc. v. Lash Grp., Inc.*,
586 F.3d 1204 (9th Cir. 2009) ....................26

*In re Cendant Corp. Sec. Litig.*,
139 F. Supp. 2d 585 (D.N.J. 2001) ....................27

*CFTC v. Richards*,
No. 96 C 334, 1996 WL 199729 (N.D. Ill. Apr. 23, 1996) ....................48

*Charles D. Warner & Sons, Inc. v. Seilon, Inc.*,
112 Cal. Rptr. 425 (Cal. Ct. App. 1974) ....................44

*City of Bell v. Superior Ct.*,
163 Cal. Rptr. 3d 90 (Cal. Ct. App. 2013) ....................49

*Cont'l Heller Corp. v. Amtech Mech. Servs., Inc.*,
61 Cal. Rptr. 2d 668 (Cal. Ct. App. 1997) ....................44, 46

*Crawford v. Weather Shield Mfg., Inc.*,
187 P.3d 424 (Cal. 2008) ....................46

*Crossroads Invs., L.P. v. FNMA*,
222 Cal. Rptr. 3d 1 (Cal. Ct. App. 2017) ....................54

*DCD Partners, LLC v. Transamerica Life Ins. Co.*,
No. 2:15-cv-3238, 2018 WL 3770030 (C.D. Cal. Aug. 1, 2018) ....................52

*DeBaun v. First W. Bank & Tr. Co.*,
120 Cal. Rptr. 354 (Cal. Ct. App. 1975) ....................25

*In re Doctors Health, Inc.*,
335 B.R. 95 (Bankr. D. Md. 2005) ....................25, 54

*Doe v. Bank of America, N.A.*,
819 F. Supp. 3d 314 (S.D.N.Y. 2026) ....................51

*Ely v. Cabot Oil & Gas Corp.*,
No. 3:09-CV-2284, 2016 WL 454817 (M.D. Pa. Feb. 5, 2016) ....................36

*Engalla v. Permanente Med. Grp., Inc.*,
938 P.2d 903 (Cal. 1997) ....................56

*Engine Specialties, Inc. v. Bombardier Ltd.*,
605 F.2d 1 (1st Cir. 1979), *abrogated in unrelated part by Associated Gen. Contractors of Cal., Inc. v. Cal. State Council of Carpenters*, 459 U.S. 519 (1983) ....................39

*Ernest W. Hahn, Inc. v. Sunshield Insulation Co.*,
137 Cal. Rptr. 732 (Cal. Ct. App. 1977) ....................24

*In re ESML Holdings*,
135 F.4th 80 (3d. Cir. 2025) ....................59, 60

*In re F-Squared Inv. Mgmt.*,
546 B.R. 538 (Bankr. D. Del. 2016) ....................23, 37

*FDIC v. Deglau*,
207 F.3d 153 (3d Cir. 2000) ....................37

*FHFA v. Nomura Holding Am., Inc.*,
873 F.3d 85 (2d Cir. 2017) ....................4, 30, 31, 33

*In re Fin. Partners Class Action Litig.*,
597 F. Supp. 686 (N.D. Ill. 1984) ....................26

*Fireman's Fund Insurance Co. v. Discover Property & Casualty Insurance Co.*,
No. C 08-3079, 2009 WL 2591394 (N.D. Cal. Aug. 21, 2009) ....................45

*First Am. State Bank v. Cont'l Ins. Co.*,
897 F.2d 319 (8th Cir. 1990) ....................37

*FiTeq Inc. v. Venture Corp.*,
169 F. Supp. 3d 948 (N.D. Cal. 2016) ....................25

*Four Star Elec., Inc. v. F & H Constr.*,
10 Cal. Rptr. 2d 1 (Cal. Ct. App. 1992) ....................43

*Frangipani v. Boecker*,
75 Cal. Rptr. 2d 407 (Cal. Ct. App. 1998) ....................25

*FTX Recovery Tr. v. Binance Holdings Ltd. (In re FTX Trading Ltd.)*,
--- B.R. ----, No. 22-11068, 2026 WL 2149961 (Bankr. D. Del. July 24, 2026) ....................7, 61, 62

*Garrett v. Perry*,
346 P.2d 758 (Cal. 1959) ....................31

*Gateway Bank, F.S.B. v. Metaxas*,
279 Cal. Rptr. 3d 779 (Cal. Ct. App. 2021) ............ 4, 32, 57

*Glendale Fed. Sav. & Loan Assn. v. Marina View Heights Dev. Co.*,
135 Cal. Rptr. 802 (Cal. Ct. App. 1977) ............ 27

*Goehring v. Chapman Univ.*,
17 Cal. Rptr. 3d 39 (Cal. Ct. App. 2004) ............ 57

*Graham v. Scissor-Tail, Inc.*,
623 P.2d 165 (Cal. 1981) ............ 46

*Gray v. Don Miller & Assocs., Inc.*,
674 P.2d 253 (Cal. 1984) ............ 38

*Green v. Healthcare Servs., Inc.*,
283 Cal. Rptr. 3d 482 (Cal. Ct. App. 2021) ............ 35

*Guz v. Bechtel Nat'l Inc.*,
8 P.3d 1089 (Cal. 2000) ............ 56

*Hartong v. Partake, Inc.*,
72 Cal. Rptr. 722 (Cal. Ct. App. 1968) ............ 31

*Hemi Grp., LLC v. City of N.Y.*,
559 U.S. 1 (2010) ............ 57, 58

*Heppler v. J.M. Peters Co.*,
87 Cal. Rptr. 2d 497 (Cal. Ct. App. 1999) ............ 43

*HH Assocs., U.S., Inc. v. Evans*,
No. Civ. 22-62, 2024 WL 1178135 (D. Haw. Feb. 14, 2024) ............ 25

*Holland v. United States*,
83 Fed. Cl. 507 (Fed. Cl. 2008) ............ 25, 54

*Holliday v. Miles, Inc.*,
72 Cal. Rptr. 96 (Cal. Ct. App. 1968) ............ 24

*Hot Rods, LLC v. Northrop Grumman Sys. Corp.*,
196 Cal. Rptr. 3d 53 (Cal. Ct. App. 2015) ............ 48

*Hubbard v. BankAtlantic Bancorp, Inc.*,
688 F.3d 713 (11th Cir. 2012) ............ 35, 59

*IFMK Realty II, LLC v. Atl. Prop. Dev., LLC*,
No. 20-6989, 2024 WL 1857374 (D.N.J. Apr. 29, 2024) ............ 27

*Inter Med. Supplies Ltd. v. EBI Med Sys., Inc.*,
975 F. Supp. 681 (D.N.J. 1997) ....................61

*Jenni Rivera Enters., LLC v. Latin World Ent. Holdings, Inc.*,
249 Cal. Rptr. 3d 122 (Cal. Ct. App. 2019) ....................8, 52

*Jimenez v. Pac. W. Constr. Co.*,
229 Cal. Rptr. 575 (Cal. Ct. App. 1986) ....................51

*Kars 4 Kids Inc. v. Am. Can!*,
98 F.4th 436 (3d Cir. 2024) ....................61

*Knit With v. Knitting Fever, Inc.*,
No. 08-4221, 2012 WL 2938992 (E.D. Pa. July 19, 2012) ....................59

*Knopick v. UBS Fin. Servs., Inc.*,
121 F. Supp. 3d 444 (E.D. Pa. 2015) ....................59

*Knutson v. Foster*,
236 Cal. Rptr. 3d 473 (Cal. Ct. App. 2018) ....................56

*Kransco v. Am. Empire Surplus Lines Ins. Co.*,
2 P.3d 1 (Cal. 2000) ....................54

*Krystal Cadillac-Oldsmobile GMC Truck, Inc. v. Gen. Motors Corp.*,
337 F.3d 314 (3d Cir. 2003) ....................60

*Lemat Corp. v. Am. Basketball Ass'n.*,
124 Cal. Rptr. 388 (Cal. Ct. App. 1975) ....................63

*Lewis Jorge Constr. Mgmt., Inc. v. Pomona Unified Sch. Dist.*,
102 P.3d 257 (Cal. 2004) ....................51, 52, 53, 54, 55

*Lipsky v. Commonwealth United Corp.*,
551 F.2d 887 (2d Cir. 1976) ....................5, 36

*LL B Sheet 1, LLC v. Loskutoff*,
362 F. Supp. 3d 804 (N.D. Cal. 2019) ....................5, 33, 54, 55

*Longmont United Hosp. v. Saint Barnabas Corp.*,
No. 06-2802, 2007 WL 1850881 (D.N.J. June 26, 2007) ....................59

*Lovejoy v. AT&T Corp.*,
111 Cal. Rptr. 2d 711 (Cal. Ct. App. 2001) ....................30

*Mailand v. Burckle*,
572 P.2d 1142 (Cal. 1978) ....................61

*Malcolm v. Marathon Oil Co.*,
642 F.2d 845 (5th Cir. 1981) ....................................................................................40

*Malley-Duff & Assocs., Inc. v. Crown Life Ins. Co.*,
734 F.2d 133 (3d Cir. 1984)...................................................................................25, 40

*In re Mallinckrodt PLC*,
No. 20-12522-JTD, 2022 WL 3545583 (D. Del. Aug. 18, 2022)..........................................28

*Marin Storage & Trucking, Inc. v. Benco Contracting & Eng'g, Inc.*,
107 Cal. Rptr. 2d 645 (Cal. Ct. App. 2001) ..................................................................46

*In re Mariner Post-Acute Network, Inc.*,
312 B.R. 520 (Bankr. D. Del. 2004) ..........................................................................38

*Markley v. Beagle*,
429 P.2d 129 (Cal. 1967) ........................................................................................50

*Martinez v. City of Clovis*,
307 Cal. Rptr. 3d 64 (Cal. Ct. App. 2023) ...................................................................24

*McAdam v. Dean Witter Reynolds, Inc.*,
896 F.2d 750 (3d Cir. 1990)...................................................................................7, 61

*McCrary Constr. Co. v. Metal Deck Specialists, Inc.*,
35 Cal. Rptr. 3d 624 (Cal. Ct. App. 2005) ...................................................................51

*Md. Cas. Co. v. Bailey & Sons, Inc.*,
41 Cal. Rptr. 2d 519 (Cal. Ct. App. 1995) ...................................................................49

*Med. Marijuana, Inc. v. Horn*,
604 U.S. 593 (2025).......................................................................3, 5, 25, 40, 58

*Mendoza v. Zirkle Fruit Co.*,
301 F.3d 1163 (9th Cir. 2002) ..................................................................................24

*MF Glob. Holdings Ltd. v. PricewaterhouseCoopers LLP*,
199 F. Supp. 3d 818 (S.D.N.Y. 2016).........................................................................39

*Mid-Cal. Nat'l Bank v. Fed. Rsrv. Bank of S.F.*,
590 F.2d 761 (9th Cir. 1979) ....................................................................................51

*In re Moody's Corp. Sec. Litig.*,
No. 07-cv-8375, 2013 WL 4516788 (S.D.N.Y. Aug. 23, 2013)...........................................35

*Moore v. Centrelake Med. Grp., Inc.*,
299 Cal. Rptr. 3d 544 (Cal. Ct. App. 2022).....................................................52, 53, 55

*Morgan, Olmstead, Kennedy & Gardner, Inc. v. Schipa*,
585 F. Supp. 245 (S.D.N.Y. 1984) ....................40

*N.J. Tpk. Auth. v. PPG Indus., Inc.*,
16 F. Supp. 2d 460 (D.N.J. 1998) ....................61

*In re Nortel Networks, Inc.*,
469 B.R. 478 (Bankr. D. Del. 2012) ....................23

*In re Nu Ride Inc.*,
No. 23-50414 (MFW), 2024 WL 4376130 (Bankr. D. Del. Oct. 1, 2024) ....................63

*Nw. Human Servs., Inc. v. Panaccio*,
No. 03-157, 2004 WL 2166293 (E.D. Pa. Sept. 24, 2004) ....................59

*In re O'Brien*,
440 B.R. 654 (Bankr. E.D. Pa. 2010) ....................28

*OCM Principal Opportunities Fund, L.P. v. CIBC World Mkts. Corp.*,
68 Cal. Rptr. 3d 828 (Cal. Ct. App. 2007) ....................56

*Oki Semiconductor Co. v. Wells Fargo Bank, Nat'l Ass'n*,
298 F.3d 768 (9th Cir. 2002) ....................33

*Pac. Gas & Elec. Co. v. G.W. Thomas Drayage & Rigging Co.*,
442 P.2d 641 (Cal. 1968) ....................49

*In re Pack Liquidating, LLC*,
No. 22-10797, 2025 WL 2587577 (Bankr. D. Del. Sep. 5, 2025) ....................63

*Peregrine Funding, Inc. v. Sheppard Mullin Richter & Hampton LLP*,
35 Cal. Rptr. 3d 31 (Cal. Ct. App. 2005) ....................62

*PPG Indus. Inc. v. Transamerica, Ins. Co.*,
975 P.2d 652 (Cal. 1999) ....................32, 57

*Prentice v. N. Am. Title Guar. Corp.*,
381 P.2d 645 (Cal. 1963) ....................38

*In re Quantum Foods, LLC*,
554 B.R. 729 (Bankr. D. Del. 2016) ....................63

*Queen Villas Homeowners Ass'n v. TCB Prop. Mgmt.*,
56 Cal. Rptr. 3d 528 (Cal. Ct. App. 2007) ....................49

*Raychem Corp. v. Fed. Ins. Co.*,
853 F. Supp. 1170 (N.D. Cal. 1994) ....................47, 48

*In re Residential Cap., LLC*,
531 B.R. 1 (Bankr. S.D.N.Y. 2015) ........................................................................28

*Rideau v. L.A. Transit Lines*,
268 P.2d 772 (Cal. Ct. App. 1954) ........................................................................39

*Robinson Helicopter Co. v. Dana Corp.*,
102 P.3d 268 (Cal. 2004) ........................................................................53

*Rossmoor Sanitation, Inc. v. Pylon, Inc.*,
532 P.2d 97 (Cal. 1975) ........................................................................24, 43, 50

*S. Cal. Gas Co. v. Syntellect, Inc.*,
534 F. App'x 637 (9th Cir. 2013) ........................................................................33, 44

*S. Cal. Gas Co. v. Ventura Pipe Line Constr. Co.*,
309 P.2d 849 (Cal. Ct. App. 1957) ........................................................................43

*Salas v. Sierra Chem. Co.*,
327 P.3d 797 (Cal. 2014) ........................................................................62

*Schertzer v. Bank of Am., N.A.*,
109 F.4th 1200 (9th Cir. 2024) ........................................................................48

*Serv. by Medallion, Inc. v. Clorox Co.*,
52 Cal. Rptr. 2d 650 (Cal. Ct. App. 1996) ........................................................................30

*Slattery v. United States*,
583 F.3d 800 (Fed. Cir. 2009), *vacated*, 369 F. App'x 142 (Fed. Cir. 2010),
*reinstated in relevant part on reh'g en banc*, 635 F.3d 1298 (Fed. Cir. 2011) .......................25

*Smith v. Workers' Comp. Appeals Bd.*,
176 Cal. Rptr. 843 (Cal. Ct. App. 1981) ........................................................................33

*Spray-Rite Serv. Corp. v. Monsanto Co.*,
684 F.2d 1226 (7th Cir. 1982) ........................................................................40

*St. Luke's Health Network, Inc. v. Lancaster Gen. Hosp.*,
967 F.3d 295 (3d Cir. 2020) ........................................................................58

*State Farm Fire & Cas. Co. v. Eddy*,
267 Cal. Rptr. 379 (Cal. Ct. App. 1990) ........................................................................63

*Staub v. Proctor Hosp.*,
562 U.S. 411 (2011) ........................................................................4, 33

*In re SubMicron Sys. Corp.*,
432 F.3d 448 (3d Cir. 2006) ........................................................................64

*Sutter v. Gen. Petroleum Corp.*,
170 P.2d 898 (Cal. 1946) ....................3, 31

*Tabor v. Miller*,
389 F.2d 645 (3d Cir. 1968)....................39

*Torres v. S.G.E. Mgmt., L.L.C.*,
838 F.3d 629 (5th Cir. 2016) (en banc) ....................31

*Transwestern Pipeline Co. v. Monsanto Co.*,
53 Cal. Rptr. 2d 887 (Cal. Ct. App. 1996)....................28

*In re Tribune Co.*,
No. 08-13141, 2013 WL 1909617 (Bankr. D. Del. May 2, 2013)....................28

*Trollinger v. Tyson Foods, Inc.*,
370 F.3d 602 (6th Cir. 2004) ....................24

*UBS Sec. LLC v. Highland Cap. Mgmt., L.P.*,
70 A.D.3d 526 (N.Y. App. Div. 2010) ....................35

*United Roasters, Inc. v. Colgate-Palmolive Co.*,
649 F.2d 985 (4th Cir. 1981) ....................25

*United States v. DeRosier*,
501 F.3d 888 (8th Cir. 2007) ....................37

*United States v. Holmes*,
673 F. Supp. 3d 1049 (N.D. Cal. 2023)....................35

*United States v. Myers*,
170 F.4th 1180 (9th Cir. 2026) ....................43

*United States v. Ohle*,
678 F. Supp. 2d 215 (S.D.N.Y. 2010)....................37

*United States v. Spencer*,
700 F.3d 317 (8th Cir. 2012) ....................35

*US Ecology, Inc. v. State*,
28 Cal. Rptr. 3d 894 (Cal. Ct. App. 2005)....................3, 51, 54

*Vale v. Union Bank*,
151 Cal. Rptr. 784 (Cal. Ct. App. 1979)....................33

*In re Vivendi, S.A. Sec. Litig.*,
838 F.3d 223 (2d Cir. 2016)....................31

*In re Volkswagen "Clean Diesel" Marketing, Sales Practices, & Products Liability Litigation*,
467 F. Supp. 3d 849 (N.D. Cal. 2020) ....................32, 57

*In re Volkswagen "Clean Diesel" Mktg., Sales Pracs., & Prods. Liab. Litig.*,
349 F. Supp. 3d 881 (N.D. Cal. 2018) ....................58

*In re Volkswagen "Clean Diesel" Mktg., Sales Pracs., & Prods. Liab. Litig.*,
No. 2672, 2019 WL 4581340 (N.D. Cal. Sept. 20, 2019) ....................59

*Vu v. Cal. Com. Club, Inc.*,
68 Cal. Rptr. 2d 31 (Cal. Ct. App. 1997) ....................54

*White v. Kolinsky*,
No. 10-2252, 2011 WL 1899307 (D.N.J. May 18, 2011) ....................35

*Williams v. Pennsylvania*,
289 F. App'x 483 (3d Cir. 2008) ....................5, 37

*Wilshire-Doheny Assocs., Ltd. v. Shapiro*,
100 Cal. Rptr. 2d 478 (Cal. Ct. App. 2000) ....................49

*In re Windmill Run Assocs., Ltd.*,
566 B.R. 396 (Bankr. S.D. Tex. 2017) ....................27

*Zalkind v. Ceradyne, Inc.*,
124 Cal. Rptr. 3d 105 (Cal. Ct. App. 2011) ....................46, 48

*Indiana ex rel. Zoeller v. Pastrick*,
696 F. Supp. 2d 970 (N.D. Ind. 2010) ....................28

*In re Zohar III, Corp.*,
650 B.R. 622 (Bankr. D. Del. 2023) ....................63

**Statutes**

11 U.S.C. § 502(a) ....................22

18 U.S.C. § 1964(c) ....................58

Cal. Civ. Code § 1636 ....................43, 48

Cal. Civ. Code § 1638 ....................43, 48

Cal. Civ. Code § 1641 ....................48

Cal. Civ. Code § 1644 ....................43, 48

Cal. Civ. Code § 3333 ....................31, 56

Civ. Code § 2778(3)....................................................................................................46

Civ. Code § 3300 ........................................................................................................51

Civ. Code § 3358 ........................................................................................................51

Civ. Code § 1717 ........................................................................................................49

Civ. Code § 2773 ....................................................................................................7, 63

Code Civ. Proc. § 1858 ...............................................................................................48

**Other Authorities**

12 C.F.R. § 261.2(b) ....................................................................................................42

Fed. R. Bankr. P. 3001(f)........................................................................................22, 23

Fed. R. Civ. P. 8 ..........................................................................................................23

Fed. R. Civ. P. 9 ..........................................................................................................23

The Argent Liquidation Trust (the "Argent Trust"), as successor to the estates of debtors Silvergate Capital Corporation and Silvergate Liquidation Corporation (f/k/a "Silvergate Bank") (collectively, "Silvergate"),[1] by and through its undersigned counsel, hereby submits this opposition (the "Opposition") to the *FTX Recovery Trust's Dispositive Motion to Disallow and Preliminary Objection to the Argent Liquidation Trust's Claims*, FTX Dkt. No. 36654 (Oct. 8, 2026) (the "Motion"), filed by the FTX Recovery Trust (the "FTX Trust"). The Argent Trust respectfully requests the Court issue an order substantially in the form of the proposed order attached hereto as **Exhibit A**. In support of its Opposition, the Argent Trust respectfully states as follows:

## PRELIMINARY STATEMENT

1. The FTX Trust does not genuinely dispute what the FTX Group[2] did to Silvergate. The FTX Group lied to Silvergate to open "non-custodial" accounts for Alameda and North Dimension, used those fraudulently obtained accounts to route FTX.com customer funds through Silvergate without the licensing and enhanced diligence Silvergate required for such "custodial" account-types, and then kept lying and falsely certifying that nothing had changed to keep the accounts open and conceal the fraud running through them. The DOJ, the FTX Group's CEO, John Ray, and the FTX Group's own special counsel, among others, all agree that Silvergate was the victim of those lies, which "impair[ed] Silvergate's ability to detect any wrongdoing." MDS

[1] The Argent Trust is also a successor to the estate of debtor Spring Valley Lots, LLC. Spring Valley Lots, LLC, however, did not file claims against the FTX Group.

[2] Capitalized terms not otherwise defined herein shall have the meaning ascribed to them *in Argent Liquidation Trust's More Definite Statement of Proofs of Claim*, FTX Dkt. No. 36200 (Sep. 1, 2026) (the "MDS").

The Argent Trust uses "FTX Dkt." to refer to the docket of *In re FTX Trading Ltd., et al.*, No. 22-11068-KBO (Bankr. D. Del.), "Silvergate Dkt." to refer to the docket of *In re Silvergate Capital Corp., et al.*, No. 24-12158-KBO (Bankr. D. Del.), and "SVL Dkt." to refer to the docket in *In re Spring Valley Lots, LLC*, No. 24-12157-KBO (Bankr. D. Del.). References to "Rules" and "Bankruptcy Rules" refer to the Federal Rules of Civil Procedure and the Federal Rules of Bankruptcy Procedure, respectively.

¶¶ 4, 36–39, 56–59. When the FTX Group's "house of cards,"[3] collapsed in November 2022, it took Silvergate with it: a run on deposits, forced securities sales into a falling market, regulatory investigations into Silvergate's "relationship with FTX/Alameda,"[4] a wave of lawsuits, and, within four months, the wind-down of a regional bank that had endured nearly four decades.

2. The Motion concedes nearly every element of the Argent Trust's claims for contractual indemnification, breach of contract, fraud,[5] and RICO.[6] The FTX Trust does not seriously contest that the FTX Group's conduct falls within the Indemnification Provision, that the FTX Group breached its account agreements, that it made the repeated misrepresentations the Argent Trust alleges, or that it committed the predicate acts underlying the RICO claims. The Motion rests almost entirely on a single argument: that something other than the FTX Group caused Silvergate's losses.

3. The Argent Trust has adequately pleaded that the FTX Group's conduct caused Silvergate's harms under every applicable standard, none of which is demanding. For the contractual indemnification claim, which reaches all losses "resulting from or arising out of" the FTX Group's acts, omissions, and breaches, the language requires "only a minimal causal connection or incidental relationship." *Acceptance Ins. Co. v. Syufy Enters.*, 81 Cal. Rptr. 2d 557, 561 (Cal. Ct. App. 1999). For contract and fraud claims, the relevant inquiry is whether the FTX Group's conduct was a substantial factor, meaning "more than a slight, trivial, negligible, or

---

[3] *Statement of More Definite Claims of the FTX Recovery Trust in Supp. of the FTX Group's Proofs of Claim Against Silvergate* ¶ 26, SVL Dkt. No. 67 (Sep. 1, 2026) (the "FTX Trust MDS").

[4] C&D Order ¶ 12.

[5] This includes fraud, fraudulent inducement, fraudulent misrepresentation, and negligent misrepresentation (the "Fraud Claims"). MDS ¶¶ 74-82. For the avoidance of doubt, the Argent Trust agrees that its state-law claims against the FTX Group are governed by California law based on the facts set out in the MDS.

[6] The RICO claims comprise a civil violation of 18 U.S.C. § 1962(c) and a civil conspiracy to violate Section 1962(c) under 18 U.S.C. § 1962(d). *Id.* ¶¶ 97–113.

theoretical factor." *US Ecology, Inc. v. State*, 28 Cal. Rptr. 3d 894, 909 (Cal. Ct. App. 2005) (citation modified). RICO causation requires "some direct relation between the injury asserted and the injurious conduct alleged," *Med. Marijuana, Inc. v. Horn*, 604 U.S. 593, 612 (2025) (citation modified), a test met where, as here, a plaintiff was a direct target of the defendant's lies. None of these standards require that the FTX Group be the ***sole*** cause of Silvergate's losses.

4. The Argent Trust's MDS clears each bar with room to spare. It identifies each false application and certification, explains how those lies shielded the accounts from Silvergate's diligence and monitoring, and traces how the FTX Group's misconduct and subsequent collapse produced every category of loss: more than $751.4 million in forced securities-sale losses; the loss of Silvergate's going-concern value; approximately $63 million in Federal Reserve Board and DFPI penalties; more than $21 million in settlements; defense, advisory, and bankruptcy costs; and the current director-and-officer indemnification costs that now total $7.78 million as of November 6, 2026. MDS ¶¶ 14–32, 60–72, 114–23. Those allegations do not describe merely a "slight" or "theoretical" contribution. *US Ecology*, 28 Cal. Rptr. 3d at 909. They describe the FTX Group's fraud as the trigger that set each of Silvergate's losses in motion.

5. Unable to deny the misconduct, the FTX Trust offers multiple variations on its single causation theme. None survives scrutiny or rebuts the *prima facie* validity the Silvergate Claims enjoy:

- ***First***, to sever causation, the FTX Trust splits the FTX Group's conduct in two—purportedly harmless "Account Noncompliance" and an "FTX Insider Fraud" supposedly aimed elsewhere—and then faults the Argent Trust for failing to connect the two. Mot. ¶¶ 2, 36–38. That is a distinction without a difference; they are the same scheme.
- ***Second***, the FTX Trust argues Silvergate's losses flowed from the *revelation* of the FTX Group's fraud, not from the fraud itself. Mot. ¶¶ 48, 67. That distinction is meritless. The FTX Group's concealment kept Silvergate from protecting itself, and the law has long recognized that injury from a concealed fraud occurs "[w]hen the fraud finally came to light." *Sutter v. Gen. Petroleum Corp.*, 170 P.2d 898, 902 (Cal. 1946). Accepting the FTX Trust's argument would reward the most successful concealment, which cannot be the law.

- ***Third***, the FTX Trust argues the FTX Group's fraud cannot have caused any loss to Silvergate because Silvergate purportedly "benefited" from the relationship. The FTX Trust points to Silvergate's net income growth between 2017 and 2021, Mot. ¶¶ 10, 47, 66, but fails to acknowledge that growth was Silvergate's consolidated income across its entire customer base during an industry-wide boom, and the FTX Trust makes no attempt to trace any of it to the Alameda and North Dimension accounts. Those accounts held FTX.com customer money only because the FTX Group lied to open them. Those deposits were the instrument of injury, not a "benefit" that entitles the FTX Trust to an offset. *See Gateway Bank*, *F.S.B. v. Metaxas*, 279 Cal. Rptr. 3d 779, 791 (Cal. Ct. App. 2021) (finding an offset unavailable where the benefit is "clearly outweighed" by the harm the fraud caused). Nor does the FTX Trust explain how income Silvergate earned before the FTX Group's scheme collapsed in 2022 bears on whether that collapse caused injuries Silvergate suffered only afterward.

- ***Fourth***, the FTX Trust points to Silvergate's prior Chief Administrative Officer's reference to rising interest rates and the 2022 failures of Terra/Luna, Three Arrows, Celsius, and Voyager as proof that those events caused Silvergate's losses instead. Mot. ¶¶ 13–15, 51. But Silvergate weathered every one of those events and still held approximately $11.9 billion in digital-asset deposits as of September 30, 2022. Its deposits ran, and its stock collapsed, only *after* the FTX Group's fraud inevitably came to light. Silvergate never blamed those events for its downfall, but in any event, that other proximate causes may exist is not dispositive. "It is common for injuries to have multiple proximate causes," *Staub v. Proctor Hosp.*, 562 U.S. 411, 420 (2011), and a defendant "may not hide behind a market downturn that is in part [its] own making," *FHFA v. Nomura Holding Am., Inc.*, 873 F.3d 85, 156 (2d Cir. 2017).

- ***Fifth***, the FTX Trust argues that regulators' enforcement decisions broke the causal chain. Mot. ¶¶ 16–17, 52, 55–56. But the regulatory crackdown was a response to the FTX Group's fraud. Before November 2022, the agencies' crypto guidance raised no specific safety-and-soundness concerns. Within days of the FTX Group's inevitable collapse, however, the Federal Reserve's Vice Chair for Supervision testified about "recent events in crypto,"[7] within weeks, three Senators demanded that Silvergate explain its "involvement in the transfer of FTX customer funds to Alameda,"[8] and in January 2023 the agencies warned—for the first time—of safety-and-soundness concerns with crypto-concentrated banks, citing "fraud and scams" and the facts underlying the FTX Group's fraud.[9] The FRB and DFPI's own cease-and-desist order states that Silvergate's deposit declines were "triggered in part by the collapse of" the FTX Group and describes the investigation as one "into Silvergate's relationship with FTX/Alameda and SEN transactions."[10] A third party's response breaks the causal chain only if a defendant proves it was "neither foreseeable" nor "caused injury of a type which was foreseeable," *Cal. Med.*

[7] Christopher Rugaber, *Fed's Top Financial Regulator Urges 'Guardrails' for Crypto*, The Independent (Nov. 14, 2022), *available at* https://perma.cc/ZE7L-FCPU.

[8] Kim. Decl. Ex. C at 4.

[9] First Joint Statement at 1–2.

[10] C&D Order at 2; *id.* ¶ 12.

*Ass'n v. Aetna Health of Cal. Inc.*, 532 P.3d 250, 265 (Cal. 2023) (citation modified), and nothing was more foreseeable than regulators scrutinizing a federally regulated bank whose accounts a fraudster used to conceal a multibillion-dollar fraud.

- ***Sixth***, the FTX Trust asserts that the Federal Reserve Board, DFPI, and SEC "have all determined" that Silvergate's BSA/AML Compliance Program was deficient, and that this deficiency caused Silvergate's penalties, settlements, and defense costs. Mot. ¶ 117. But no regulator or court has ever adjudicated that to be so. Every consent order, judgment, and settlement the FTX Trust cites was entered without admission or adjudication of any fact, and none found that Silvergate knowingly or willfully violated the BSA or knew of the FTX Group's fraud. Such orders have no evidentiary value on the underlying allegations, *e.g.*, *Lipsky v. Commonwealth United Corp.*, 551 F.2d 887, 892–94 (2d Cir. 1976), and third-party complaints "are merely allegations and not evidence," *Williams v. Pennsylvania*, 289 F. App'x 483, 484 (3d Cir. 2008). Independent third parties routinely concluded in this time period that Silvergate's BSA/AML Compliance Program was satisfactory. MDS ¶¶ 54–55.[11] And comparative fault is no defense to contract claims. *LL B Sheet 1, LLC v. Loskutoff*, 362 F. Supp. 3d 804, 827–30 (N.D. Cal. 2019).

- ***Finally***, the FTX Trust calls Silvergate's wind-down a "voluntary" business decision. Mot. ¶ 52. But a plaintiff whose injuries "force him to shut his doors . . . can recover for the loss of his business." *Med. Marijuana, Inc. v. Horn*, 604 U.S. at 601. And a "voluntary" "response" that "derived foreseeably from [the defendant's] conduct" does not break the causal chain. *Cal. Med. Ass'n.*, 532 P.3d at 265. Silvergate announced its wind-down less than four months after the FTX Group's fraud was exposed, once the run had drained most of its deposits and forced it to sell securities at a loss to repay emergency borrowings. As the DOJ found, Silvergate collapsed "in significant part because th[e FTX Group's] misrepresentations exposed the bank to risks it might not have otherwise taken on." Kim Decl. Ex. A at 59; *see* MDS ¶¶ 35–38.

6. These failures are fatal under each claim's own standards, and the Argent Trust's indemnification claim exemplifies the point well. Section 18 of the CMTS Agreements (the "<u>Indemnification Provision</u>") requires each FTX Group customer to "defend, indemnify and hold the Bank harmless against ***any loss***, ***liability or expense*** (including attorneys' fees and expenses) resulting from or arising out of: (a) ***any acts or omissions*** by you or your employees or agents; . . .

[11] *See also* Investigation Committee Report at 71–72, Silvergate Dkt. No. 689-1 (May 5, 2025) (noting RSM's December 2021 conclusion that Silvergate's BSA controls were sufficient for Silvergate's size and complexity); *id*. at 72–73 (discussing RSM's January 2022 conclusion that Verafin was functioning as intended and detecting potentially unusual and suspicious activity in higher-risk areas); *id*. at 104–05 ("in December 2021 and January 2022, the Board received overall positive audits from RSM with regard to the BSA/AML Compliance Program, including specifically on the implementation and effectiveness of the Verafin system."); *id*. at 108–09 (concluding the record revealed no reason to suspect officers were complicit in, had actual knowledge of, or intentionally turned a blind eye to FTX/Alameda compliance issues).

and (c) ***any breach*** by you . . . of any representation, warranty, covenant or agreement." Kim Decl. Ex. D ¶ 18 (emphasis added). The FTX Group's lies and concealment are "acts or omissions" and "breach[es]" by definition, and the FTX Trust does not seriously contend otherwise. Mot. ¶¶ 86–88. Instead, it offers only its causation arguments, never acknowledging the proper governing standard for this claim, much less applying it. Losses from a bank run, regulatory investigations, and litigation that followed directly from the FTX Group's concealed misuse of Silvergate's accounts are, at the very least, "broadly link[ed]" to that misuse, which easily clears the "minimal causal connection" bar. *Acceptance*, 81 Cal. Rptr. 2d at 561.

7. The FTX Trust's arguments stand on the same ill footing for the remaining claims. On the contract claims, the FTX Trust does not dispute breach and challenges only damages. But Silvergate lost exactly what it bargained for—truthful information on which to decide whether, and on what terms, to accept the FTX Group as a customer—and its losses were in any event a foreseeable result of using a federally regulated bank to conceal a multibillion-dollar fraud. On the fraud claims, the FTX Trust ignores California's substantial-factor test and instead relies entirely on asserted alternative causes. But "the notion of independent intervening cause has no place in the law of intentional torts." *Bank of N.Y. v. Fremont Gen. Corp.*, 523 F.3d 902, 910 (9th Cir. 2008) (citation modified). And on the RICO claims, the FTX Trust never addresses RICO's directness considerations, each of which confirms that Silvergate, the direct target of the FTX Group's lies, is the proper plaintiff.

8. The FTX Trust's remaining arguments fare no better. *First*, its estoppel argument cherry-picks statements from a declaration by Silvergate's Chief Administrative Officer. Read in full, the declaration identifies the "rapid collapse of FTX" as the event that "continued to chill the crypto markets and generate increased regulatory scrutiny," and places the "inflection point" of

Silvergate's business in early 2023, "[i]n the midst of the FTX collapse." Hetrick Decl.[12] ¶¶ 10, 14. *Second*, the FTX Trust's reliance on *FTX v. Binance*[13] to argue *in pari delicto* turns that decision on its head. *Binance* barred the FTX Group's estate from shifting the consequences of its own fraud onto a third party. It did not bar the fraud's victim from recovering against the fraudster. *See also McAdam v. Dean Witter Reynolds, Inc.*, 896 F.2d 750, 757–58 (3d Cir. 1990) (doctrine requires "at least substantially equal responsibility for the underlying illegality."). If *Binance* applies here at all to dismiss claims, it applies to the FTX Trust's claims against Silvergate, not the other way around. *Finally*, the FTX Trust's preliminary objection is equally thin: setoff seeks no present relief and at most reduces a net distribution rather than compelling disallowance; California Civil Code § 2773 does not apply because the Argent Trust seeks indemnity for Silvergate's losses caused by the FTX Group's acts, not for any wrongdoing of Silvergate's own; and equitable subordination—a drastic and unusual remedy—cannot be imposed on a non-insider victim that engaged in no inequitable conduct and whose recovery injures no creditor when the FTX Trust's customers have been paid in full.

9. The allocation of burden is decisive here. A properly filed proof of claim, like the Argent Trust's, is *prima facie* evidence of its validity and amount. The objector must produce evidence "equal in force to the *prima facie* case" before the burden shifts back to the claimant. *In re Allegheny Int'l, Inc.*, 954 F.2d 167, 173–74 (3d Cir. 1992). Through its Motion, the FTX Trust offers no evidence disproving causation, only other third-party litigants' unproven complaints, consent orders entered without any admission, and selective quotations from Silvergate's

---

[12] *Decl. of Elaine Hetrick in Support of the Debtors' Chapter 11 Petitions and Certain Motions* ¶¶ 10, 14, Silvergate Dkt. No. 9 (Sep. 18, 2024) ("Hetrick Decl.").

[13] *FTX Recovery Tr. v. Binance Holdings Ltd. (In re FTX Trading Ltd.)*, --- B.R. ----, No. 22-11068, 2026 WL 2149961 (Bankr. D. Del. July 24, 2026) ("*FTX v. Binance*").

bankruptcy filings. The burden never shifts back to the Argent Trust. But even if it did, the Argent Trust proves causation by a preponderance of the evidence, and supporting evidence will only abound during discovery. At this preliminary stage, that is enough—indeed, causation is fundamentally a question of fact, decided as a matter of law only "where the undisputed facts permit only one reasonable conclusion." *Jenni Rivera Enters., LLC v. Latin World Ent. Holdings, Inc.*, 249 Cal. Rptr. 3d 122, 145 (Cal. Ct. App. 2019) (citation omitted). Whether other forces also contributed to Silvergate's harms is a question for an evidentiary hearing on a full record, not a basis to disallow claims at the threshold.

10. The Silvergate Claims are well pleaded and *prima facie* valid; the FTX Trust has offered nothing to rebut them, and each of its arguments fails as a matter of law. The Court should deny the Motion in its entirety.

## RELEVANT FACTUAL BACKGROUND

11. The Argent Trust incorporates by reference the facts set forth in the MDS and avoids repeating them here. Because the Motion mischaracterizes certain facts and relies on unsupported factual assertions, however, the Argent Trust addresses below the facts necessary to give the Court an accurate and complete account of the circumstances underlying the Silvergate Claims and the issues raised by the Motion.

### I. THE FTX GROUP OBTAINED AND MAINTAINED ITS BANKING RELATIONSHIP THROUGH DELIBERATE FRAUD.

12. Silvergate's focus on the digital asset industry was not a "concentrated bet" or reckless gamble on the "high-risk cryptocurrency market" as the Motion suggests. Mot. ¶ 7. Silvergate built its reputation over nearly four decades as a trustworthy institution that welcomed digital asset customers while maintaining the compliance safeguards required of a federally

regulated bank. That reputation is precisely why Silvergate attracted some of the largest digital asset businesses.

13. Silvergate's account structure was designed specifically to manage the "risks" of the crypto-asset market—safeguards the FTX Group circumvented through misrepresentation and fraud. Silvergate offered custodial and non-custodial accounts, each with diligence calibrated to its risk. MDS ¶¶ 9, 11–12. Non-custodial accounts could hold only the accountholder's own capital, while custodial accounts—which held pooled funds for an exchange's users—required enhanced onboarding diligence, licensing (including money services business registration), and more frequent enhanced due diligence reviews. These controls operated within Silvergate's broader BSA/AML Compliance Program, which included know-your-customer onboarding procedures and risk ratings, automated transaction monitoring, suspicious activity reporting, and, for custodial accounts, independent assessments of the customer's own BSA/AML controls. *Id.*

14. The Motion describes Silvergate as having "secured" the FTX Group as a customer. Mot. ¶ 9. But the record shows otherwise: the FTX Group obtained the accounts at issue by bypassing those compliance measures, through deliberate fraud and misrepresentation, and maintained and expanded them through years of concealment. Both the Department of Justice ("DOJ") and the FTX Group's CEO—John Ray—recognized Silvergate as a victim of the FTX Group's false statements. The DOJ found that the FTX Group "made affirmative misrepresentations to Silvergate Bank to induce it to open a bank account that was an essential component of the fraudulent scheme." Gov't Sent'g Mem. at 58, Dkt No. 410, *United States v. Bankman-Fried*, No. (S6) 1:22-cr-673 (S.D.N.Y. Mar. 15, 2024), attached as **Exhibit A** to the Kim Declaration; *see* MDS ¶ 4 (citing DOJ Letter at 2, attached as **Exhibit B** to the Kim Declaration). John Ray similarly found that "the FTX Group lied to [Silvergate] to induce it to open new

accounts in the name of North Dimension, which the FTX Group falsely claimed was a crypto trading firm." Second Ray Report at 18.

15. As the grand jury charged, Bankman-Fried directed North Dimension's formation precisely "to overcome [Silvergate]'s refusal to open a bank account for FTX[.com] without extensive due diligence and licensing," and Silvergate approved the account "without enhanced due diligence . . . as would have been required had the true purposes of North Dimension's account been disclosed." *Id.* ¶ 38.

## II. SILVERGATE WEATHERED EVERY "INTERVENING EVENT" THE MOTION IDENTIFIES, UNTIL THE FTX GROUP'S SCHEME COLLAPSED.

16. The FTX Trust leans heavily on the Hetrick Declaration's references to the mid-2022 failures of Three Arrows Capital, Voyager, and Celsius, and on rising interest rates as independent causes of Silvergate's demise. Mot. ¶¶ 13–15, 51. As addressed below, the FTX Trust's self-serving quotation of isolated passages strips them of their context and presents neither a complete nor an accurate account of the then-existing market events. Read in full, those very events confirm that Silvergate withstood each of them, and that it was the FTX Group's fraud and sudden collapse that proximately caused Silvergate's losses.

17. The chronology is telling. The Federal Reserve began raising rates in March 2022. Hetrick Decl. ¶ 12. Terra/Luna collapsed in the spring of 2022; Three Arrows, Celsius, and Voyager entered bankruptcy proceedings in mid-2022. *Id.* ¶ 9. Yet as of September 30, 2022—after all of those events—Silvergate still held approximately $12.005 billion in noninterest-bearing deposits and approximately $11.9 billion in deposits from digital asset customers, with only

approximately $700 million in FHLB-SF borrowings outstanding.[14] Silvergate's deposit high for the fourth quarter of 2022 was still $11.9 billion.[15]

18. The FTX Group's fraud came to light in early November 2022, and the FTX Group filed for bankruptcy on November 11, 2022. Shortly thereafter, Silvergate was forced to sell approximately $5.2 billion of its securities at a loss and to take on additional FHLB-SF advances to meet the resulting withdrawals. MDS ¶ 60. By March 1, 2023, Silvergate disclosed that it had been required to sell additional securities in January and February 2023 "primarily to repay in full the Company's outstanding advances from the Federal Home Loan Bank of San Francisco"—advances it had drawn to meet the 2022 fourth-quarter withdrawals—and that the resulting losses "could result in the Company and the Bank being less than well-capitalized" and bore on its "ability to continue as a going concern."[16] One week later, Silvergate announced the wind-down.

19. The FTX Trust contends that because Silvergate possessed more than sufficient assets to cover its liabilities after the FTX Group's collapse, that collapse could not have proximately caused Silvergate's losses. The record shows the opposite: Silvergate maintained a healthy balance sheet through each of the 2022 market events preceding the FTX Group's collapse, and its business began to suffer seriously only once the FTX Group's misconduct was exposed.

20. Moreover, the FTX Trust's assertion that Silvergate restructured its business and stabilized by early 2023 ignores context. To stabilize, Silvergate was forced to sell securities, increase its FHLB-SF borrowings, and then sell additional securities to repay those borrowings.

---

[14] Silvergate Capital Corp., Quarterly Report (Form 10-Q) at 2, 22, 56 (Nov. 7, 2022), *available at* https://perma.cc/5QZG-NVU3.

[15] Silvergate Capital Corp., *Silvergate Announces Select Preliminary Fourth Quarter 2022 Financial Metrics and Provides Business Update* (Exhibit 99.1), Current Report (Form 8-K) (Jan. 5, 2023), *available at* https://perma.cc/F38D-GQCQ.

[16] Silvergate Capital Corp., Notification of Late Filing (Form 12b-25) (Mar. 1, 2023), *available at* https://perma.cc/Y7Z5-Z7CJ ("Mar. 1, 2023 NT 10-K").

*E.g.*, MDS ¶ 60. Any "stability" was thus the product of emergency measures that left Silvergate with a shrunken, debt-laden balance sheet—not evidence that Silvergate had survived the FTX Group's collapse, but a measure of the damage that collapse had already inflicted.

21. The FTX Trust's claim that the FTX Group's collapse merely caused Silvergate's harm to "continue" therefore falls flat. Silvergate's CEO—in the very earnings call the Motion cites for the proposition that Silvergate blamed "macroeconomic factors"—explained that the 2022 deleveraging "obviously culminated with the collapse of FTX," and that the ensuing "crisis of confidence" caused institutional customers to pull money from trading platforms "throughout most of the fourth quarter."[17] Silvergate survived every earlier 2022 event; it did not survive the FTX Group's fraudulent scheme.

22. Nor do the 2023 failures of Silicon Valley Bank, Signature Bank, and First Republic Bank explain what happened to Silvergate. The FTX Trust cites them as proof that "the pressure that rising interest rates put on bank deposits sent shockwaves through the banking industry." Mot. ¶ 15. But, as stated, rates had been rising since March 2022, and six months later Silvergate still held approximately $12.005 billion in noninterest-bearing deposits. Silvergate's run began only when the FTX Group's fraud was exposed, months before any of those banks failed. And by the FTX Trust's own account, those banks were "less exposed to the digital assets industry and FTX than Silvergate Bank." *Id.* Whatever caused those bank failures, and whether or not those failures were due to the FTX Group, it has no bearing on what happened to Silvergate, which failed due to the FTX Group's misconduct inflicted upon it and the resulting harm that followed.

[17] Silvergate Capital Corp., Tr. of January 5, 2023 conference call (Exhibit 99.1), Current Report (Form 8-K) (Jan. 10, 2023), *available at* https://perma.cc/CH44-FKNR.

## III. THE REGULATORY PRESSURE THE FTX TRUST INVOKES WAS A DIRECT CONSEQUENCE OF THE FTX GROUP'S FRAUD AND COLLAPSE.

23. The FTX Trust contends that Silvergate "voluntarily liquidated, citing most prominently regulatory pressure," and that the regulators were therefore an intervening actor between the FTX Group's fraud and Silvergate's harms. *See* Mot. ¶¶ 16–17, 52. The chronology, the regulators' public statements, and their own orders show otherwise. The FTX Group's misconduct did not merely injure its own customers. It brought down one of the world's largest exchanges, sent shockwaves through the digital-asset sector, and shook public and regulatory confidence in the institutions that served that sector. And Silvergate was not simply one more bank caught in that turmoil: the FTX Group had secretly run its fraud through Silvergate's accounts. The ensuing regulatory pressure and investigations were the government's response to the FTX Group's fraudulent misuse of Silvergate's accounts and its implications on the broader crypto banking industry, not an independent force.

24. The regulators' posture before November 2022 confirms the point. Through most of 2022—while Silvergate held billions in digital-asset deposits and weathered the Terra/Luna, Three Arrows, Celsius, and Voyager failures—the federal banking agencies' guidance on crypto-related banking was procedural. The November 2021 joint statement of the Federal Reserve, the Federal Deposit Insurance Corporation (the "FDIC"), and the Office of the Comptroller of the Currency (the "OCC"), and the Federal Reserve's August 2022 supervisory letter, asked banks to notify their supervisors before engaging in crypto-asset activities and identified risks for banks to manage; neither suggested that a bank whose deposit franchise was concentrated in crypto-asset

customers was unsafe or unsound.[18] The Hetrick Declaration does not cite any pre-collapse regulatory statement as a cause of Silvergate's liquidation. The only regulatory statements it identifies are the two joint statements issued in January and February 2023, after the FTX Group's fraud was exposed.[19] And there was ***no*** public enforcement action concerning Silvergate's BSA/AML Compliance Program before May 2023.

25. When the FTX Group's misconduct came to light in November 2022, the regulators' reaction was immediate and expressly tied to the FTX Group. Commentators reported that the FTX Group's "stunning fall from grace" was "prompting policymakers across Washington to consider how regulation of the broader cryptocurrency world could affect . . . the safety and soundness of banks."[20] On November 15, 2022, days after the FTX Group's bankruptcy filing, the Federal Reserve's Vice Chair for Supervision told the Senate Banking Committee that "recent events in crypto" showed the need for "strong guardrails"—testimony that the public viewed as coming "in the wake of the swift collapse last week of FTX."[21] The widely held view that regulators would "be emboldened to shine a light on everything that touched FTX" proved true.[22]

---

18 *See* Fed. Rsrv. Bd., FDIC & OCC, *Joint Statement on Crypto-Asset Policy Sprint Initiative and Next Steps* (Nov. 23, 2021), *available at* https://perma.cc/D46G-LTE2; Federal Rsrv. Bd., *Engagement in Crypto-Asset-Related Activities by Federal Reserve-Supervised Banking Organizations* (Aug. 16, 2022), *available at* https://perma.cc/72RY-GDEQ.

19 Hetrick Decl. ¶¶ 14, 16.

20 Claire Williams, *With Banking Regulators on the Sidelines, Congress Eyes Crypto Legislation After FTX Implosion*, Am. Banker (Nov. 10, 2022), *available at* https://perma.cc/7PFP-5SFU; *see also* Kevin Roose, *Is This Crypto's Lehman Moment?*, N.Y. Times (Nov. 9, 2022), *available at* https://perma.cc/UR63-UFQR (explaining "how to make sense of the industry-shaking collapse of FTX").

21 Rugaber, *supra* n.7 (reporting that the Vice Chair urged legislation "in the wake of the swift collapse last week of FTX, a leading crypto exchange"); *see* Claire Williams, *Fed's Michael Barr Says FTX Turmoil Shows Crypto Risk to Financial System*, Am. Banker (Nov. 15, 2022), *available at* https://perma.cc/VB28-CYXQ.

22 Carlos Fernandez & Christopher Patalinghug, *FTX Fallout: More Regulatory Action and . . . Turf War?*, Turnarounds & Workouts, Vol. 36, No. 11 (Nov. 2022) at 13, *available at* https://perma.cc/CPG9-TNDF (predicting regulators would use "FTX's dramatic demise as justification for expanding federal protection of crypto investors").

26. The scrutiny that followed was aimed at the FTX Group's fraud, collapse, and its banking connections, not at a newly discovered risk in crypto generally. In December 2022, the OCC urged banks to limit their engagement with crypto firms, with "the downfall of . . . FTX [Group] still reverberating," and Senators Warren and Smith asked each banking agency to catalog the banks' crypto exposure because the "FTX[ Group]'s collapse shows that crypto may be more integrated into the banking system than regulators are aware."[23] Silvergate was singled out by name: on December 5, 2022, three Senators wrote to Silvergate's CEO about the bank's "involvement in the transfer of FTX customer funds to Alameda."[24]

27. The FTX Trust urges that Silvergate wound down after the agencies issued a joint statement on the risks of crypto-concentrated deposit bases, and thus that the FTX Group did not cause the wind down. *See* Mot. ¶¶ 16–17. But that statement was issued on January 3, 2023, less than two months after the FTX Group's fraud was exposed and the FTX Group filed for bankruptcy. In it, the Federal Reserve, FDIC, and OCC publicly advised *for the first time* of "significant safety and soundness concerns with business models that are concentrated in crypto-asset-related activities or have concentrated exposures to the crypto-asset sector."[25] The agencies grounded that shift in "[t]he events of the past year" and the "recent failures of several large crypto-asset companies," and catalogued risks that describe the FTX Group's scheme: "fraud and scams," uncertainty about "custody practices," and "inaccurate or misleading representations and

---

[23] Jordan Finneseth, *U.S. Banking Regulator Urges Cautious Approach to Cryptocurrencies*, Kitco (Dec. 9, 2022), *available at* https://perma.cc/F9QQ-NB4D; Benjamin Robertson, *Senators Question U.S. Banking Regulators on Crypto Exposure*, The Block (Dec. 10, 2022), *available at* https://perma.cc/W28N-ET6S (noting the Senators also sought information on how "Sam Bankman-Fried's Alameda Research" acquired Moonstone Bank).

[24] Letter from Sens. Elizabeth Warren, Roger Marshall & John Kennedy to Alan J. Lane, CEO, Silvergate Capital Corp. (Dec. 5, 2022), at 2–3, attached as **Exhibit C** to the Kim Declaration.

[25] First Joint Statement, *available at* https://perma.cc/XLN6-BH9M.

disclosures by crypto-asset companies."[26] The First Joint Statement was silent as to any bank's BSA/AML Compliance Program. In short, the agencies were responding to the same fraud and misrepresentations of which Silvergate was a victim. Contemporaneous coverage reported the First Joint Statement as coming "less than two months after the astonishing collapse of the FTX exchange," and as a warning issued "[a]fter the FTX collapse."[27] A second joint statement followed on February 23, 2023; it was reported as having "followed the collapse of the crypto exchange FTX" and addressed the very deposit run Silvergate had just experienced.[28]

28. These two post-exposure statements are the only regulatory statements the Hetrick Declaration identifies in describing the circumstances that preceded the wind-down.[29] The public drew the same causal line at the time: Silvergate's customers "rushed to pull their deposits out of Silvergate following the FTX collapse," and "[a] subsequent regulatory crackdown, in turn, spooked banks serving crypto companies."[30] Later reporting confirmed the sequence: "FTX had imploded a month earlier, and scrutiny of crypto-friendly banks had intensified."[31] The "industry

---

[26] First Joint Statement at 1–2.

[27] Gabrielle Saulsbery, *Fed, OCC, FDIC Issue Joint Warning on Crypto Risks for Banks*, Banking Dive (Jan. 4, 2023), *available at* https://perma.cc/R6H7-6SJK (noting the FTX Group "lost more than $8 billion of customers' money"); *see also* Mike Winters, *'Contagion Risk': After the FTX Collapse, Top U.S. Regulators Warn Banks About Crypto*, CNBC (Jan. 6, 2023), *available at* https://perma.cc/4X63-RR6J ("Without mentioning recent implosion of the crypto exchange FTX by name, regulators said that . . . crypto-asset companies are a 'contagion risk' for banks.").

[28] Federal Reserve Board, FDIC & OCC, *Joint Statement on Liquidity Risks to Banking Organizations Resulting from Crypto-Asset Market Vulnerabilities* (Feb. 23, 2023), *available at* https://perma.cc/TSG4-DBJH; Kyle Campbell, *Bank Regulators Warn About Liquidity Risks in Crypto-Related Deposits*, Am. Banker (Feb. 23, 2023), *available at* https://perma.cc/H28P-GGC8 (reporting that Silvergate "saw a drawdown of $8.1 billion of its $11.9 billion of deposits" and that "[t]he run followed the collapse of the crypto exchange FTX").

[29] Hetrick Decl. ¶¶ 14, 16–17.

[30] Rachel Louise Ensign, *Crypto Bank Silvergate to Shut Down, Repay Deposits; California Lender to Unwind After Run Fueled by FTX Collapse*, Wall St. J. (Mar. 8, 2023), *available at* https://perma.cc/W7YB-ERUT.

[31] Aleks Gilbert, *Crypto Debanking Was Probably Real: Fed Chair Jerome Powell*, DL News (Feb. 14, 2025), *available at* https://perma.cc/DK8M-7NBZ.

wide" pressure the Motion describes, Mot. ¶ 17, was ***not*** independent of the FTX Group; it was the response to it.

29. Silvergate itself immediately became a focus of that regulatory response. After the FTX Group's fraud became public, regulators and Congress opened formal and informal inquiries into Silvergate focused on the FTX Group's use of its banking services. Regulators became a near-constant presence at Silvergate. The Federal Reserve Board ("FRB") and DFPI described their own investigation as one "into Silvergate's relationship with FTX/Alameda and SEN transactions." *See* C&D Order ¶ 12. The details of this timeline—and the central role of the FTX Group's fraud and collapse throughout—will emerge in discovery after the relevant regulatory approvals are secured.

30. Additionally, the FTX Trust quotes one recital of the joint cease and desist order issued by the FRB and DFPI on May 23, 2023—that examinations "identified numerous deficiencies[.]" Mot. ¶¶ 24, 111. However, the very next recital states the regulators' view of the cause of Silvergate's funding crisis:[32]

> [B]eginning in the fourth quarter of 2022, the Bank experienced significant declines in deposits by its crypto-asset-related customers, triggered in part by the collapse of the crypto-asset exchange FTX Trading Ltd. and its affiliated proprietary trading firm Alameda Research LLC (collectively, 'FTX/Alameda'), which has resulted in funding and liquidity stress on the Bank and a decline in activities that were key sources of revenue[.]

The C&D Order also expressly required Silvergate to cooperate with the regulators' "ongoing investigation into Silvergate's relationship with FTX/Alameda and SEN transactions."[33] The regulators thus identified, in a public order, (i) the FTX/Alameda collapse as a trigger of the deposit

[32] C&D Order at 2.

[33] *Id.* ¶ 12.

flight, liquidity stress, and revenue loss, and (ii) Silvergate's "relationship with FTX/Alameda" as the subject of the investigation that culminated in the $63 million in penalties.[34]

## IV. THE EVIDENCE ON WHICH THE FTX TRUST RELIES DOES NOT BREAK THE CAUSAL CHAIN FROM THE FTX GROUP'S MISCONDUCT TO SILVERGATE'S HARMS.

31. The FTX Trust relies on additional bodies of evidence to contend that something other than the FTX Group's actions caused Silvergate's harms: the Hetrick Declaration, the class-action pleadings, the regulatory consent orders and SEC Complaint, and the Wickouski Report (defined herein). Read in full, each confirms that the FTX Group's misdeeds caused the harm for which the Argent Trust seeks recovery.

32. ***The Hetrick Declaration***. The Motion contends that, in the Hetrick Declaration, Silvergate "blamed regulatory pressure, macroeconomic conditions, rising interest rates, the insolvency of Three Arrows, Voyager, and Celsius, and the broader crypto-industry contraction for its collapse—not the FTX Insider Fraud."[35] The Hetrick Declaration is not so narrow. Indeed, it also identifies the "rapid collapse of FTX Trading Ltd. ('FTX') and Alameda Research LLC" as the event that "continued to chill the crypto markets and generate increased regulatory scrutiny and restrictions on banks with a digital asset customer base."[36] And it places an "inflection point" in early 2023, when, "[i]n the midst of the FTX collapse," the agencies released the First Joint Statement, and "publicly advised for the first time" of their safety-and-soundness concerns.[37] The regulatory scrutiny the Hetrick Declaration describes is a link in the chain the FTX Group's fraud began, not a break in it. *See supra* ¶¶ 23–30.

---

[34] MDS ¶¶ 60–65, 118.

[35] Mot. ¶ 3.

[36] Hetrick Decl. ¶ 10.

[37] Hetrick Decl. ¶ 14.

33. The Motion also relies on the Hetrick Declaration's discussion of Signature Bank as proof that regulatory pressure was "industry wide."[38] But the Hetrick Declaration invokes Signature Bank for the opposite point: the anti-crypto posture "at that time" following the exposure of the FTX Group's fraud.[39] Regulators sold Signature Bank's $38.4 billion of non-crypto deposits to Flagstar but excluded its digital-asset deposits, prompting a Signature Bank director to state that "regulators wanted to send a very strong anti-crypto message."[40] Signature Bank thus corroborates that the "industry wide" crypto-crackdown happening at that time was widely viewed as triggered by the FTX Group's fraud and collapse. *See supra* ¶ 28.

34. ***Class-Action Pleadings***. The FTX Trust contends that the securities and FTX-depositor class actions show that Silvergate's settlements and defense costs resulted from its "own" conduct. Mot. ¶¶ 28–31, 57, 59. While the plaintiffs accused Silvergate of wrongdoing, those accusations were never proven, adjudicated, or admitted. Each suit was settled or resolved without any finding against Silvergate. More fundamentally, every one of those suits was filed after, and because of, the FTX Group's misconduct and collapse, and each concerned the FTX Group's use of Silvergate's accounts. The *Zuleta*, *Gonzalez*, and *Bhatia* actions were brought by FTX.com customers alleging that Silvergate was complicit in the FTX Group's fraud.[41] The *Bhatia* Complaint's own theory was that "[t]he revelation that FTX had diverted customer money in Silvergate prompted a run on Silvergate deposits," and that "[a]s went FTX, so went Silvergate."[42]

---

[38] Mot. ¶¶ 17, 52 (citing Hetrick Decl. ¶ 19).

[39] Hetrick Decl. ¶ 19.

[40] *Id*.

[41] Compl., *Zuleta v. Silvergate Capital Corp*., No. 22-cv-1901 (S.D. Cal. Dec. 1, 2022), Dkt. No. 1; Compl., *Gonzalez v. Silvergate Bank*, No. 22-cv-1981 (S.D. Cal. Dec. 14, 2022), Dkt. No. 1; Consolidated Class Action Compl., *Bhatia v. Silvergate Bank*, No. 3:23-cv-01406-RBM-BLM (S.D. Cal. May 19, 2023), Dkt. No. 14 ("*Bhatia* Complaint").

[42] *Bhatia* Compl. ¶¶ 4, 159.

The securities action likewise tied each alleged stock drop to news about the FTX Group: it began with CoinDesk's November 2, 2022 report on Alameda's balance sheet and ended with the February 2, 2023 report that the DOJ was examining Silvergate's hosting of accounts connected to the FTX Group.[43] If anything, the allegations confirm that litigation was the foreseeable consequence of the FTX Group's concealment of customer-fund flows inside Silvergate's accounts. *See* MDS ¶¶ 66–68.

35. ***Consent Orders and SEC Complaint***. The FTX Trust contends that the regulatory penalties were imposed for Silvergate's "own" monitoring deficiencies, that neither consent order "mentions FTX, Alameda, or North Dimension," and that those orders are an intervening cause. Mot. ¶¶ 25, 55–56, 78, 111. But the penalties arose from an investigation the regulators described as targeting Silvergate's "relationship with FTX/Alameda and SEN transactions."[44] The SEN monitoring the orders address was the very channel through which the FTX Group fraudulently moved the FTX.com customer funds.[45] Silvergate entered the consent orders and the SEC judgment without admitting or denying the allegations, and no regulator found that Silvergate knowingly or willfully violated the BSA, violated any prior order, or knew of the FTX fraud. *See* MDS ¶¶ 64 n.37, 65. The SEC Complaint itself pleads that it was "FTX's failure" that "caused panic in the crypto asset industry—and a bank run and severe liquidity crisis for the Bank."[46]

36. The FTX Trust also contends that Silvergate's BSA/AML Compliance Program was deficient before the FTX Group's collapse, citing an April 2022 examination report and a

---

[43] Amended Consolidated Class Action Complaint for Violations of the Federal Securities Laws ¶¶ 247–49, 268–69, 277–78, *In re Silvergate Cap. Corp. Sec. Litig.*, No. 3:22-cv-01936-JES-MSB (S.D. Cal. May 11, 2023), Dkt. No. 43.

[44] C&D Order ¶ 12.

[45] Complaint, *SEC v. Silvergate Capital Corp.*, No. 1:24-cv-04987 (ALC) (S.D.N.Y. July 1, 2024), ECF No. 1 ("SEC Complaint") ¶ 33; *see also* MDS ¶¶ 63–64.

[46] SEC Compl. ¶¶ 5, 109–10.

September 2022 targeted examination as described in the SEC Complaint.[47] Those are unproven allegations in a complaint, and Silvergate's program was regularly reviewed by independent auditors and regulators.[48] What matters for causation—particularly at this stage—is that the investigation culminating in the penalties was, by the regulators' own description, directed at Silvergate's relationship with the FTX Group.[49]

37. ***Wickouski Report***. The FTX Trust presents the Wickouski Report as establishing Silvergate's culpability. Mot. ¶¶ 21, 116 (citing Report of Stephanie Wickouski, as Examiner, Silvergate Dkt. No. 634-1 (Apr. 4, 2025) ("Wickouski Report")). It does not. Ms. Wickouski assessed the process and reasonableness of the Investigation Committee's review of potential claims against insiders, not whether the FTX Group caused Silvergate's losses. The Investigation Committee responded to the Wickouski Report and reiterated that it "found no evidence that any fiduciary at Silvergate was involved in or knew about the fraud at FTX before that fraud became publicly known."[50] It also responded that the Wickouski Report "rests on two flawed premises": a supposed *per se* conflict and an inference of bad faith from the timing of the plan.[51] The Investigation Committee explained that Ms. Wickouski conducted only two interviews, both of the independent director, which "focused mostly on the issues of independence and conflict of interest" and did not "delve into the merits."[52] Even this Court questioned the Wickouski Report's worth, asking "what is the utility of the examiner's report in this case anyway," adding, "I don't

47 Mot. ¶ 11 (citing SEC Compl. ¶¶ 82, 85).

48 MDS ¶¶ 10, 54–55.

49 C&D Order ¶ 12.

50 *Internal Investigation Committee's Statement in Response to Report of Stephanie Wickouski, As Examiner*, Silvergate Dkt. No. 689 (May 5, 2025) at 33.

51 *Id*. at 1–2, 16–17, 38.

52 *Id*. at 16.

know if I could rely on that report at all" because "[t]here are so many things I could highlight with respect to an examiner's process in general that . . . we would need to discuss before that report could ever raise anything to usefulness for me at a hearing."[53] The Wickouski Report thus has no bearing on whether the FTX Group's fraud caused Silvergate's losses.[54]

## LEGAL STANDARD

38. A properly filed proof of claim "is prima facie evidence of the claim's validity and amount." Fed. R. Bankr. P. 3001(f); *see In re Ashcraft*, 680 B.R. 523, 533 (D. Del. 2026). The claim is deemed allowed unless a party in interest objects. 11 U.S.C. § 502(a). The burden of proof "rests on different parties at different times." *Allegheny Int'l*, 954 F.2d at 173. The Third Circuit explained the burden shifting as follows:

> Initially, the claimant must allege facts sufficient to support the claim. If the averments in his filed claim meet this standard of sufficiency, it is "*prima facie*" valid. In other words, a claim that alleges facts sufficient to support a legal liability to the claimant satisfies the initial obligation to go forward. The burden of going forward then shifts to the objector to produce evidence sufficient to negate the *prima facie* validity of the filed claim. It is often said that the objector must produce evidence equal in force to the *prima facie* case. In practice, the objector must produce evidence, which, if believed, would refute at least one of the allegations that is essential to the claim's legal sufficiency. If the objector produces sufficient evidence to negate one or more of the sworn facts in the proof of claim, the burden reverts to the claimant to prove the validity of the claim by a preponderance of the evidence.

*Id.* at 173–74 (citation modified).

---

53 *See* Hr'g Tr. 16:19–21; 18:5–12, Silvergate Dkt. No. 870 (July 15, 2025).

54 The FTX Trust also invokes a December 2024 statement by the ad hoc group of preferred stockholders that Silvergate's assets would not yield recoveries beyond the $200 million liquidation preference. Mot. ¶ 33. That statement is irrelevant. It was made by a stockholder group, not Silvergate, in a dispute over exclusivity; it was not a position the Court officially adopted, not an assessment of the merits of any claim against the FTX Group, and it predates Silvergate's plan and the Argent Trust's formation, which the plan established as Silvergate's successor and a fiduciary for all of its beneficiaries.

39. The parties agree federal pleading standards can apply when assessing the validity of a proof of claim, and the FTX Trust assesses this as a "low hurdle" to clear. Mot. ¶¶ 41–42; *see In re Nortel Networks, Inc.*, 469 B.R. 478, 496–97 (Bankr. D. Del. 2012) (applying Rule 12(b) standard to more definite statements of proofs of claim); *In re F-Squared Inv. Mgmt., LLC*, 546 B.R. 538, 544 & n.31 (Bankr. D. Del. 2016) (collecting cases suggesting "that the proof of claim pleading standard is a 'relatively low threshold' that is less burdensome than the federal civil pleading standard" (citations omitted)).

40. Here, the Silvergate Claims were filed in accordance with Bankruptcy Rule 3001 and are thus *prima facie* valid. The Argent Trust satisfied its initial burden, including satisfying Rules 8(a) and 9(b), as applicable, thus shifting the burden to the FTX Trust to produce evidence sufficient to negate the *prima facie* validity of the Silvergate Claims. As such, the FTX Trust must "produce actual evidence; mere allegations, unsupported by evidence, are insufficient to rebut the movant's prima facie case." *F-Squared*, 546 B.R. at 544.

## <u>RESPONSE</u>

### I. THE ARGENT TRUST PLAUSIBLY ALLEGED THAT THE FTX GROUP'S CONDUCT CAUSED SILVERGATE'S LOSSES.

41. The crux of the Motion is that the Argent Trust fails to sufficiently allege that the FTX Group caused Silvergate's losses. The FTX Trust's causation arguments fail for multiple reasons. *First*, the Argent Trust's MDS plausibly alleges that the FTX Group's misconduct caused Silvergate's injuries under the applicable standards for each claim. *Second*, the Motion is devoid of any evidence disproving the Argent Trust's causation allegations and fails to put forth any credible legal arguments that rebut the Silvergate Claims' *prima facie* validity. *Third*, even if the burden shifted back to the Argent Trust, it has proven causation by a preponderance of the evidence, and additional supporting evidence will follow.

42. In any event, the relief sought by the FTX Trust is premature. The parties contemplate discovery, and the Argent Trust expects that the evidence adduced in these proceedings will serve only to bolster its allegations regarding causation.[55] Disallowance of the Silvergate Claims at this stage is improper.

**A. The Argent Trust Alleged Sufficient Facts To Establish Causation.**

43. To sufficiently plead causation, the claimant need not plead more than a causation theory "plausible on its face," *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007), which merely requires "allegations that raise a reasonable expectation that discovery will reveal evidence of proximate causation," *In re Avandia Mktg., Sales Pracs. & Prod. Liab. Litig.*, 804 F.3d 633, 646 (3d Cir. 2015) (citation modified). The Argent Trust comfortably surpassed this initial burden.

44. The MDS exhaustively explained, across 55 pages, that the FTX Group engaged in a massive fraudulent scheme, and it directly targeted and defrauded Silvergate as an indispensable part of that scheme. The MDS cited the many substantial lies the FTX Group made to Silvergate about the Alameda and North Dimension accounts, and it explained how those lies induced Silvergate into opening those accounts and maintaining those accounts; those lies also shielded

---

55 *See, e.g.*, *Martinez v. City of Clovis*, 307 Cal. Rptr. 3d 64, 107 n.24 (Cal. Ct. App. 2023) ("Ordinarily, causation is a question of fact not decided on the allegations in a pleading."); *Altman v. HO Sports Co.*, 821 F. Supp. 2d 1178, 1193 (E.D. Cal. 2011) ("Causation is ordinarily a question of fact for the jury." (collecting California cases)); *Holliday v. Miles, Inc.*, 72 Cal. Rptr. 96, 99 (Cal. Ct. App. 1968) ("In general the question whether certain consequences of an act or omission are reasonably foreseeable is one for the trier of fact."); *Trollinger v. Tyson Foods, Inc.*, 370 F.3d 602, 618–20 (6th Cir. 2004) (reversing dismissal of RICO claim because defendants' arguments of "attenuated links in the chain of causation" involved "fact-driven questions" "counsel[ing] against resolving the dispute as a matter of law at this early stage in the case"); *Mendoza v. Zirkle Fruit Co.*, 301 F.3d 1163, 1171 (9th Cir. 2002) (same, holding plaintiffs "must be allowed to make their case through presentation of evidence, including experts who will testify about" market issues "and the effects of the illegal scheme"). And whether an indemnitee's negligence is classified as active or passive, *see infra* ¶¶ 83–84, is a question of fact that cannot be resolved against the Argent Trust on a claim objection. *Rossmoor Sanitation, Inc. v. Pylon, Inc.*, 532 P.2d 97, 101 (Cal. 1975); *Ernest W. Hahn, Inc. v. Sunshield Insulation Co.*, 137 Cal. Rptr. 732, 734 (Cal. Ct. App. 1977).

those accounts from Silvergate's due diligence procedures, which third parties routinely concluded were satisfactory. MDS ¶¶ 13–27, 46–55.

45. The MDS also painstakingly catalogued how the FTX Group's misconduct directly caused each category of damages, which the Argent Trust summarizes below. *Id.* ¶¶ 60–72.

- ***Securities-sale losses.*** The FTX Group's fraud triggered a catastrophic bank run, forcing Silvergate to liquidate approximately $5.2 billion in securities into a cratered market and crystallizing approximately $751.4 million in losses, plus further losses from early-2023 sales and maturing FHLB-SF advances. *Id.* ¶¶ 60–61, 116. The FTX Trust attributes these losses to the "revelation of" the fraud—not the fraud itself—and to "macroeconomic factors" that purportedly sever causation. Mot. ¶ 51. The MDS explained that these losses resulted directly from the scheme itself: the FTX Group's concealed misuse of Silvergate's accounts is what prevented Silvergate from protecting itself. *See supra* ¶¶ 12–15. The costs of Silvergate's reasonable efforts to limit the harm the FTX Group forced on it are recoverable under black-letter law. *See, e.g.*, *infra* ¶¶ 57, 67.

- ***Lost enterprise value.*** The collapse of Silvergate's deposit base, forced asset sales, and loss of confidence—all stemming from the fraud's exposure—compelled Silvergate's wind-down and liquidation. MDS ¶¶ 62, 117. The FTX Trust blames a "myriad" of other factors, including regulators' "intervening acts." Mot. ¶¶ 52, 77. But the Argent Trust alleged a direct link between the fraud and these harms, including that the fraud prompted the regulatory actions. *See supra* ¶¶ 16–30. Caselaw firmly recognizes these damages.[56] In particular, Silvergate's lost going-concern value is recoverable as contract damages; the FTX Trust's contrary authority, Mot. ¶ 77, speaks only to damages "to reputation," *Frangipani v. Boecker*, 75 Cal. Rptr. 2d 407, 410 (Cal. Ct. App. 1998), and does not bar recovery of lost enterprise value, which courts routinely award.[57] The FTX Trust's

[56] *See, e.g.*, *Malley-Duff & Assocs., Inc. v. Crown Life Ins. Co.*, 734 F.2d 133, 148 (3d Cir. 1984) (going concern); *HH Assocs., U.S., Inc. v. Evans*, Civ. No. 22-00062 JAO-KJM, 2024 WL 1178135, at *5 (D. Haw. Feb. 14, 2024) (collecting California-law cases recognizing enterprise valuation); *FiTeq Inc. v. Venture Corp.*, 169 F. Supp. 3d 948, 965–66 (N.D. Cal. 2016) (allowing fraud claim to proceed when based on valuation damages); *see also DeBaun v. First W. Bank & Tr. Co.*, 120 Cal. Rptr. 354, 361–62 (Cal. Ct. App. 1975) (affirming calculation of value of corporation as a going concern). To the extent the FTX Trust contends (Mot. ¶ 50) these damages are not available under RICO, that is wrong. The Supreme Court recently held that RICO's damages language is extremely broad, *see Med. Marijuana*, 604 U.S. at 600–01, and the Third Circuit in *Malley-Duff* already recognized the availability of these damages under the similarly worded antitrust laws, *see* 734 F.2d at 148.

[57] *See, e.g.*, *Doctors Health, Inc. v. NYLCare Health Plans of the Mid-Atl., Inc. (In re Doctors Health, Inc.)*, 335 B.R. 95, 120–21 (Bankr. D. Md. 2005) (awarding 60% of debtor's going-concern value); *Holland v. United States*, 83 Fed. Cl. 507, 524–30 (Fed. Cl. 2008) (awarding diminution in a federally regulated thrift's going-concern value caused by the breach); *Slattery v. United States*, 583 F.3d 800, 816–18 (Fed. Cir. 2009) (affirming $276 million "lost value" award measuring the franchise value of a bank destroyed by counterparty's breach, and rejecting contention that later, market-driven losses should offset the award where the breach was the but-for cause of the bank's demise), *vacated*, 369 F. App'x 142 (Fed. Cir. 2010), *reinstated in relevant part on reh'g en banc*, 635 F.3d 1298 (Fed. Cir. 2011); *United Roasters, Inc. v. Colgate-Palmolive Co.*, 649 F.2d 985, 992–93 (4th Cir. 1981) (affirming award valuing plaintiff's business as a going concern as of time before the breaching party abandoned the business by ceasing performance).

suggestion (Mot. ¶ 52 n.23) that any lost value was suffered only by Silvergate's shareholders—not Silvergate—and that the share-price decline it cites spans all of 2022 misapprehends the claim: the Argent Trust seeks the lost going-concern or franchise value of the enterprise itself, not the diminution in share price, and such enterprise-value losses are awarded to the entity whose business was destroyed.

- ***Regulatory penalties.*** The approximately $63 million in penalties followed directly from the regulatory scrutiny created by the FTX Group's concealed misuse of Silvergate's accounts and SEN. MDS ¶¶ 63–65, 118. For a federally regulated bank, penalties flowing from a customer's concealed unlawful money-services activity are an objectively foreseeable, probable, and direct result. The regulators themselves stated that their actions centered on BSA/AML issues arising from how crypto-asset customers like the FTX Group transacted on the SEN. *Id.* ¶¶ 63–64. The Argent Trust expects that future discovery contemplated by the parties and the resulting evidence adduced in these proceedings will bolster the Argent Trust's allegations regarding causation. The FTX Trust argues regulatory actions *always* sever causation and, alternatively, that these actions stemmed from the "revelation" of the fraud and Silvergate's "systemic failure" to meet its regulatory obligations, and thus, damages are not recoverable on this basis. Mot. ¶¶ 55–56. This categorical argument contradicts the facts and the law.[58] The FTX Trust's "revelation" argument fails for the reasons explained *infra* ¶¶ 50–51. Finally, no regulator or court has ever adjudicated that Silvergate knowingly or willfully violated the BSA, and Silvergate neither admitted nor denied the allegations in any consent order or settlement. MDS ¶¶ 64 n.37, 65. The FTX Trust therefore has ***no*** competent evidence that Silvergate failed to meet its regulatory obligations. *See infra* ¶¶ 60, 106.

- ***Settlement payments.*** The approximately $21 million in settlement payments resolved third-party claims that would not have existed but for the FTX Group's concealed misconduct. MDS ¶¶ 66, 119. The FTX Trust contends that these costs were "either the result of Silvergate's own conduct" or "caused by a series of intervening actions by third parties" such as Silvergate's regulators. *E.g.*, Mot. ¶ 57. The FTX Trust's only evidence

---

[58] *See, e.g.*, *Cell Therapeutics, Inc. v. Lash Grp., Inc.*, 586 F.3d 1204, 1209–12 (9th Cir. 2009) (holding regulated party may pursue breach of contract and indemnification claims for costs of investigation, defense, and settlement of government investigation triggered by counterparty's conduct); *Planned Parenthood Fed'n of Am., Inc. v. Ctr. for Med. Progress*, 214 F. Supp. 3d 808, 831 (N.D. Cal. 2016) (costs of "responding to multiple state and federal investigations and inquiries" triggered by a breach of confidentiality agreements were foreseeable consequential damages sufficient to survive a motion to dismiss); *In re Fin. Partners Class Action Litig.*, 597 F. Supp. 686, 688 (N.D. Ill. 1984) (denying motion to dismiss for indemnification for aiding and abetting regulatory violation).

of "Silvergate's own conduct" is the underlying plaintiffs' allegations, which are not evidence at all. *See infra* ¶ 61. All these are recoverable.[59]

- ***Defense, advisory, bankruptcy, and trust costs.*** These costs were incurred responding to investigations, regulatory proceedings, and litigation that the FTX Group's fraud set in motion and that Silvergate would never otherwise have faced. MDS ¶¶ 68, 120. The FTX Trust again attributes these costs to the "revelation" of the fraud, "Silvergate's own misconduct," intervening decisions by plaintiffs or regulators to bring actions, or a "multitude" of macroeconomic causes. *E.g.*, Mot. ¶¶ 58–61. Each argument fails: the revelation-versus-fraud distinction is irrelevant; the FTX Trust cannot prove any Silvergate "misconduct"; the fraud caused the plaintiffs' and regulators' actions; and macroeconomic factors cannot disprove causation. *See infra* ¶¶ 50–51, 54–64. Caselaw recognizes these damages as recoverable under analogous scenarios.[60]

- ***Director-and-officer indemnification costs.*** Silvergate's costs of indemnifying its former directors and officers, including reserves of up to $40.25 million (over $7.78 million paid as of November 6, 2026), flowed from the regulatory and litigation exposure the FTX Group's fraud directly caused. MDS ¶¶ 69–72, 121. The FTX Trust attributes these costs to the directors' and officers' "own misconduct." Mot. ¶ 63. But the FTX Trust again cites only what regulators "alleged," *id.*, which is not competent evidence, is rebutted by the findings of the Investigation Committee, and cannot disprove the Argent Trust's

---

59 The FTX Trust is incorrect to say the securities class actions "Bar Order" limits the Argent Trust's ability to recover for that settlement it was forced to pay because of the FTX Group's tortious conduct. *Contra* Mot. ¶ 57. Although the Bar Order bars "indemnity" claims or "any other claim" where "the injury claimed" is Silvergate's liability to the class, *id.* ¶¶ 29, 57, this does not bar claims like the Argent Trust's here: a claim "that [the FTX Group] has committed a tort to [Silvergate], and must pay damages for this, damages which happen to encompass the settlement payment," even if those damages "overlap[ ]" with what "maybe could have recovered through indemnity." *In re Cendant Corp. Sec. Litig.*, 139 F. Supp. 2d 585, 595 (D.N.J. 2001) (citation modified). Nor does it matter that approximately $5.32 million of the settlement was styled a "Preferred Equity Holder Contribution." *See* Mot. ¶ 30. That amount constitutes a damage borne by the Silvergate estates, for which the Argent Trust is entitled to recover as a result of the FTX Group's misconduct.

60 *See, e.g.*, *infra* ¶ 63 & n.76; *Glendale Fed. Sav. & Loan Assn. v. Marina View Heights Dev. Co.*, 135 Cal. Rptr. 802, 831 (Cal. Ct. App. 1977) (holding plaintiff entitled to recover attorney fees incurred in bankruptcy litigation as a result of the defendants' fraud); *In re Argus Indus., Inc. v. Liodas*, 443 F.2d 1255, 1260–61 (9th Cir. 1971) (allowing recovery of a bankrupt subcontractor's liquidation costs where breach was a "substantial contributing cause of such bankruptcy"); *Ash v. N. Am. Title Co.*, 168 Cal. Rptr. 3d 499, 510 (Cal. Ct. App. 2014) (recognizing situations "in which a bankruptcy is foreseeable if there is a breach of contract" such as a health maintenance organization that improperly terminates a contract with a provider and so "can expect dire financial consequences" for the provider); *In re Windmill Run Assocs., Ltd.*, 566 B.R. 396, 449–50 (Bankr. S.D. Tex. 2017) ("[T]o the extent of a breach of contract by Defendants, the Debtor's legal fees for filing and maintaining the instant bankruptcy case resulted naturally from the breach, and thus would be allowable as consequential damages."); *Burger v. Kuimelis*, 325 F. Supp. 2d 1026, 1036-37 (N.D. Cal. 2004) (holding, if given opportunity to replead, plaintiff could seek recovery of attorneys' fees caused by RICO violation); *IFMK Realty II, LLC v. Atl. Prop. Dev., LLC*, No. 20-6989, 2024 WL 1857374, at *3 (D.N.J. Apr. 29, 2024) (awarding attorneys' fees for litigation as a result of defendants' fraud).

allegations. *See, e.g.*, *infra* ¶¶ 60, 68, 106. These damages are recoverable.[61] Nor are these continuing costs impermissibly speculative merely because they keep accruing; California law awards a party's continuing obligation to reimburse another's "reasonably certain" future costs as damages, and "[t]he exact amount . . . need not be capable of precise measurement." *Transwestern Pipeline Co. v. Monsanto Co.*, 53 Cal. Rptr. 2d 887, 905 (Cal. Ct. App. 1996). Silvergate has paid more than $7.78 million against a reserve of up to $40.25 million, and the underlying proceedings remain pending, making continued accrual reasonably certain. Moreover, a substantial factor in the continuing accrual of these costs is the expense of prosecuting and defending these very claims against the FTX Trust. The FTX Trust therefore cannot rely on litigation it has chosen to pursue to argue that the resulting costs are unduly speculative.

46. The authorities the FTX Trust cites for the proposition that the MDS does "not allege enough facts," Mot. ¶¶ 41–43, prove the opposite. Each of the FTX Trust's cited decisions—*Tribune*, *Mallinckrodt*, *O'Brien*, and *Residential Capital*—disallowed a conclusory, unsupported claim largely or entirely untethered to any conduct by the debtor against whom it was asserted.[62] The MDS, by contrast, specifies detailed, documented, and quantified claims, which conclusively supports *prima facie* validity.

**B. The FTX Trust Has Not Adequately Rebutted Causation.**

47. None of the FTX Trust's legal or factual arguments rebuts the Silvergate Claims. Its attempt to separate Account Noncompliance from the fraud, its manufactured revelation-

---

[61] *See, e.g.*, *Cambridge Fund*, 501 F. Supp. at 601, 614–15 (indemnifying corporate officers from penalty resulting from a court-approved settlement); *Indiana ex rel. Zoeller v. Pastrick*, 696 F. Supp. 2d 970, 984 (N.D. Ind. 2010) (finding officer legal fees proximately caused under RICO where defendant's scheme proximately caused company to pay its officers' legal fees).

[62] *See, e.g.*, *In re Tribune Co.*, No. 08-13141, 2013 WL 1909617, at *3 (Bankr. D. Del. May 2, 2013) (disallowing *pro se* claimant's one-page, handwritten demand); *In re Mallinckrodt PLC*, No. 20-12522-JTD, 2022 WL 3545583, at *1, *3–4 (D. Del. Aug. 18, 2022) (affirming disallowance of claims "filed out of an abundance of caution," lacking "any allegations as to the other 62 Debtors against which proofs of claim were filed," and failing to provide "fair notice" and "allege any conduct by any of the non-defendant Debtors" as required by "a novel theory" under the antitrust laws); *In re O'Brien*, 440 B.R. 654, 659 n.6, 667–68 (Bankr. E.D. Pa. 2010) (disallowing debt-buyer's credit-card claim because it attached no writing tracing the assignment or documents upon which the underlying indebtedness was based); *In re Residential Cap., LLC*, 531 B.R. 1, 12, 24 (Bankr. S.D.N.Y. 2015) (disallowing only those causes of action the *pro se* claimant failed to plead). *In re Frascella Enterprises, Inc.* was merely a plan-confirmation and estimation dispute with the unremarkable observation that "where requisite documentation is not attached to the proof of claim, it may be deprived of its prima facie validity." 360 B.R. 435, 458 n.49 (Bankr. E.D. Pa. 2007).

versus-fraud distinction, its reliance on a purported "benefit" to Silvergate, and its asserted superseding causes each fail for the reasons below.

1. <u>The Account Noncompliance and the FTX Group's Fraud Were One Scheme, Not Two.</u>

48. The Motion's entire causation theory rests on an artificial dichotomy. The FTX Trust divides the FTX Group's conduct into a supposedly innocuous set of account-opening misrepresentations it labels "Account Noncompliance" and a separate "FTX Insider Fraud" it says was aimed only at FTX.com customers, and then insists the Argent Trust may not borrow the latter to supply causation for the former. Mot. ¶¶ 2, 36–38, 46–49. That division does not reflect what happened. The Account Noncompliance was not a discrete, self-contained injury; it was a mechanism of the FTX Group's fraud. The FTX Group lied to Silvergate to open and maintain the Alameda and North Dimension non-custodial accounts for one reason: to obtain the banking infrastructure through which it then channeled and concealed FTX.com customer funds. MDS ¶¶ 3, 14–27, 38. The very applications, fabricated corporate records, and false certifications that make up the "Account Noncompliance" are the same acts that let the fraud operate inside Silvergate. That link was made publicly explicit when Bankman-Fried was charged with directing North Dimension's creation "to overcome [Silvergate]'s refusal to open a bank account for FTX[.com] without extensive due diligence and licensing." MDS ¶ 38.

49. Because the two are one scheme, the FTX Trust cannot wall them off. The law treats a concealed fraud and the acts that carried it out as linked together in the same causal chain, and a wrongdoer may not escape liability by recharacterizing one part of a single scheme as a

separate, harmless act.[63] The DOJ, FTX's own CEO John Ray, and the FTX Group's special counsel all recognized Silvergate as a victim of the very lies the FTX Trust now seeks to quarantine as mere "Account Noncompliance." MDS ¶¶ 4, 36–39, 56–59. The FTX Trust's attempt to sever the account fraud from the scheme it existed to serve is therefore a meaningless distinction, and it cannot carry the Motion.

2. <u>The FTX Trust's Revelation-Versus-Fraud Distinction Does Not Disprove Causation.</u>

50. The FTX Trust argues the Argent Trust ties its losses only "to the revelation of" the FTX Group's fraud, and there can be no causation where injuries are caused "by the exposure of [the] fraudulent scheme, rather than the scheme itself." Mot. ¶ 48. This argument mischaracterizes the Argent Trust's claims; the Argent Trust is alleging harms directly from the FTX Group's fraud on and direct targeting of Silvergate. That the FTX Group's fraud (inevitably) was exposed does not change that the harms Silvergate suffered flowed directly from the FTX Group's fraudulent misstatements to Silvergate about how the FTX Group would use and did use its accounts.

51. Regardless, the FTX Trust's distinction between the fraud and its revelation is legally meaningless, and the FTX Trust cites *no* case supporting its categorical argument.[64] *See, e.g.*, *infra* ¶ 101 & n.106. Courts in various contexts have held that "to show loss causation, it is

---

[63] *See, e.g.*, *Nomura Holding*, 873 F.3d at 155–56 (rejecting loss-causation defense where the defendants' concealed misstatements and the later financial crisis "were linked together in the same causal chain," and holding that defendants "may not hide behind a market downturn that is in part their own making"); *In re Adler, Coleman Clearing Corp.*, 263 B.R. 406, 459–61 (S.D.N.Y. 2001) (refusing to let parties "disaggregate" their transactions from an "integrated scheme" because "[t]he facts are not to be atomized"); *Lovejoy v. AT&T Corp.*, 111 Cal. Rptr. 2d 711, 719, 724 (Cal. Ct. App. 2001) (treating an initial wrongful act that "set the stage" for later concealment as one continuous fraud, and holding that a wrongdoer cannot "fraudulently create a [relationship] and then . . . [use the] same relationship to shield itself from liability").

[64] What case law the FTX Trust does cite is inapposite, as here, Silvergate suffered damages it would not have suffered absent the FTX Group's fraud. *See Serv. by Medallion, Inc. v. Clorox Co.*, 52 Cal. Rptr. 2d 650, 656–57 (Cal. Ct. App. 1996) (concerning fraud which was the defendant's false promise to fully perform under a contract, and holding that the plaintiff sought to recover expenses "incurred in preparing to perform its contractual duty," but the defendant's fraud could not have caused those expenses because the plaintiff would have prepared to perform regardless of whether the defendant performed).

enough that the loss caused by the alleged fraud results from the relevant truth leaking out." *In re Vivendi, S.A. Sec. Litig.*, 838 F.3d 223, 261 (2d Cir. 2016) (citation modified); *see, e.g.*, *Torres v. S.G.E. Mgmt., L.L.C.*, 838 F.3d 629, 639–40 (5th Cir. 2016) (en banc) ("[O]ne who participates in a pyramid scheme can be harmed 'by reason of' the fraud . . . not because of any misrepresentations, but because the ultimate collapse of the scheme, and thus harm to participants, is a direct and foreseeable consequence of such structure."); *Sutter*, 170 P.2d at 902 (reversing dismissal of fraud claim where "the injury from that fraud occurred" "[w]hen the fraud finally came to light," and "[t]he whole series of events up to and including the injury was a part and parcel of the fraud practiced on plaintiff").[65] The point is intuitive: the harm from a concealed fraud is realized when the concealment ends. The fraud and its revelation thus cannot be separated for causation purposes; the FTX Group's misrepresentations, breaches, fraudulent use of Silvergate's accounts, and the revelation of the scheme are "linked together in the same causal chain." *Nomura Holding*, 873 F.3d at 155 (affirming denial of defendants' loss causation defense in Securities Act case).[66]

3. Any "Benefit" To Silvergate Does Not Disprove Causation.

52. The FTX Trust's sweeping argument that causation is lacking because the FTX Group's business briefly benefitted Silvergate is unavailing. *E.g.*, Mot. ¶ 47. The FTX Trust claims that any benefit to the victim of a fraud means there can be no proximate cause to harms flowing directly from the fraud. *Id.* But its cases in support are each inapposite, because those

---

[65] *See also, e.g.*, *Garrett v. Perry*, 346 P.2d 758, 763 (Cal. 1959) (granting consequential losses following foreclosure); *Hartong v. Partake, Inc.*, 72 Cal. Rptr. 722, 739–40 (Cal. Ct. App. 1968) (affirming "additional damages" under Cal. Civ. Code § 3333 for time and expenses incurred after plaintiffs discovered fraud).

[66] Moreover, the FTX Trust's contention (Mot. ¶ 96) that the public revelation of the FTX Group's fraud was not itself an "act or omission" by the FTX Group under the Indemnification Provision does not remove these losses from Section 18: the operative "acts or omissions" are the FTX Group's underlying concealment and misuse of Silvergate's accounts.

cases all involve plaintiffs who either made a net profit from an alleged wrongful scheme (and thus had no losses at all) or were not direct targets of the fraud. *See infra* ¶ 101 & n.106. For example, the plaintiffs in the FTX Trust's cited case, *In re Volkswagen "Clean Diesel" Marketing*, *Sales Practices, & Products Liability Litigation*, 467 F. Supp. 3d 849 (N.D. Cal. 2020) ("*Volkswagen II*"), were bystanders: Volkswagen salespeople who sought lost future commissions due to the market reaction to a fraud practiced by Volkswagen on *consumers* (through false advertising), and who had "unwittingly benefited from the fraud." *Id.* at 853, 858. Here, Silvergate is in the same position as the deceived consumers, as one of the targets of the FTX Group's fraud, and Silvergate does not seek the same speculative future profits as the *Volkswagen II* plaintiffs.

53. The FTX Trust's reliance on Silvergate's net income growth between 2017 and 2021 as the principal "benefit" from the relationship is flawed for several more reasons. Most fundamentally, the FTX Trust makes no effort to attribute any portion of that income growth to the fraudulently obtained accounts. Mot. ¶¶ 9–10. Moreover, any deposits held in those accounts existed only because the FTX Group diverted its customers' funds into them, rendering the accounts an instrumentality of the fraud rather than a benefit offsetting the harm. MDS ¶¶ 20–21, 26. Further, the FTX Trust offers no explanation as to how income generated before the collapse of the FTX Group's scheme bears any relevance to the losses realized in its aftermath. Regardless, an incidental benefit is not a causation issue; at most, it could permit an offset "to the extent . . . equitable." *Gateway Bank*, 279 Cal. Rptr. 3d at 792. No offset is equitable here. *See id.* at 792–94 (holding offset inequitable where benefit to bank "was clearly outweighed by the years of troubles [the fraudster's] actions caused the bank," including "years of unnecessary legal battles with federal regulators" and "reputational harm").[67] As in *Gateway*, any short-term benefit was

[67] *See, e.g.*, *PPG Indus. Inc. v. Transamerica, Ins. Co.*, 975 P.2d 652, 656–57 (Cal. 1999) ("[T]here is the policy of not allowing liability for intentional wrongdoing to be offset or reduced by the negligence of another."); *Loskutoff*,

one that Silvergate never wanted or asked for, as Silvergate never would have approved the accounts had it known the truth. *Id*. at 792.

4. <u>"Macroeconomic Factors" Do Not Disprove Causation.</u>

54. The FTX Trust has no support for its claim that "macroeconomic factors" categorically sever a causal chain. *E.g.*, Mot. ¶¶ 51, 97. The FTX Trust blames macroeconomic factors for many of Silvergate's losses. *Id.* But Silvergate need not show the FTX Group's conduct was the *only* cause of Silvergate's injuries.[68] Indeed, "it is common for injuries to have multiple proximate causes." *Staub*, 562 U.S. at 420.

55. In any event, the FTX Trust points to "the general decline of the digital-asset industry" as an intervening cause, Mot. ¶ 74, but that decline occurred, at least in part, due to the FTX Group's scheme. *See, e.g.*, *supra* ¶¶ 32–33. "Defendants may not hide behind a market downturn that is in part their own making simply because their conduct was a relatively small part of the problem." *Nomura Holding*, 873 F.3d at 156; *see also Vale v. Union Bank*, 151 Cal. Rptr. 784, 789 (Cal. Ct. App. 1979) (finding "fact that [defendant] had no control over the market value of the funds" "totally irrelevant to the issue of whether the forced sale was a proximate consequence of the [defendant's] breach").

---

362 F. Supp. 3d at 827–28 ("[T]here is an unbroken line of authority barring apportionment where defendant has committed an intentional tort." (citation modified)).

[68] *See, e.g.*, *Smith v. Workers' Comp. Appeals Bd.*, 176 Cal. Rptr. 843, 848 (Cal. Ct. App. 1981) ("Proximate cause and legal cause do not mean exclusive cause."); *Oki Semiconductor Co. v. Wells Fargo Bank, Nat'l Ass'n*, 298 F.3d 768, 773 (9th Cir. 2002) ("A plaintiff must show that the defendant's RICO violation was not only a but for cause of his injury, but that it was a proximate cause as well. A proximate cause is not the same thing as the sole cause." (internal citations omitted)); *S. Cal. Gas Co. v. Syntellect, Inc.*, 534 F. App'x 637, 638 (9th Cir. 2013) (explaining indemnification provisions with "phrases such as 'arising out of' or 'arising from' and 'resulting from'" impart liability if the indemnitor's covered conduct is simply "causally related *in some manner* to the injury for which indemnity is claimed," well below sole causation (emphasis added) (citation modified)); *3500 Sepulveda, LLC v. RREEF Am. REIT II Corp.*, No. 2:17-cv-8537, 2023 WL 3866570, at *2 (C.D. Cal. June 6, 2023) ("A defendant's breach of contract need not be the sole cause of the plaintiff's damages.").

56. Even if that were not so, the FTX Trust's argument still fails. *First*, had the FTX Group not secretly used Silvergate's accounts to carry out a fraud, Silvergate would not have faced the sudden run on deposits and acute liquidity crisis that followed the scheme's exposure, and Silvergate would have been able to assess its investment portfolio and engage in a thoughtful, long-term selection of which securities to sell and which to hold onto to handle its day-to-day liquidity needs. It could not do that because of the FTX Group. Nor do failures of other banks, *see* Mot. ¶ 15, during this time disprove causation for Silvergate's collapse. Moreover, the FTX Trust itself alleged "Silvergate could not exist without the FTX Group," FTX Trust MDS ¶ 30, acknowledging the direct connection the FTX Group forged with Silvergate sealing Silvergate's demise as an inevitable and foreseeable result of the FTX Group's fraud crashing down.

57. *Second*, and in any event, it is the FTX Trust's burden to prove that "macroeconomic factors" legally sever the causal chain. The FTX Trust needed to present evidence showing *both* that (i) the "macroeconomic factors" Silvergate was forced to contend with (because of the FTX Group's fraud) were entirely unforeseeable to the FTX Group, *and* (ii) Silvergate's actions like selling its securities when it did or filing for bankruptcy were abnormal or extraordinary responses to the FTX Group's fraud and its public exposure.[69] The FTX Trust has done neither, because these events and factors were foreseeable. As a matter of law, these factors are not superseding causes that sever the causal chain. *See* Restatement (Second) of Torts §§ 442A, 443 (A.L.I. 1965); *Cal. Med. Ass'n.*, 532 P.3d at 265 (finding no superseding cause because there was no "independent and unforeseeable conduct," even though plaintiff engaged in

[69] In any case, "the notion of independent intervening cause has no place in the law of intentional torts, so long as there is a *factual* chain of causation." *Fremont Gen.*, 523 F.3d at 910 (quoting *U.S. Fid. & Guar. Co. v. Am. Emp.'s Ins. Co.*, 205 Cal. Rptr. 460, 465 (Cal. Ct. App. 1984)). It is of "no importance" that the defendant's conduct "becomes effective in harm only through the intervention of new and independent forces for which the [defendant] is not responsible." *Id.* (quoting *Tate v. Canonica*, 5 Cal. Rptr. 28, 35 (Cal. Ct. App. 1960)).

"voluntary" conduct, because plaintiff's conduct was a "response . . . derived foreseeably from [the defendant's] conduct"). These same principles apply under federal law, including in the banking context.[70, 71]

58. The FTX Trust also attempts to sidestep the Indemnification Provision's reach on securities-sale losses and lost going-concern value, Mot. ¶ 97, by arguing the Indemnification Provision "contains no promise that the FTX Group would insure Silvergate against losses on its own securities portfolio." *Id.* That misstates the claim. The Argent Trust does not seek to shift market risk; it seeks the losses the FTX Group's conduct forced Silvergate to realize, which is all the Indemnification Provision's text requires. *See infra* ¶¶ 70–74; MDS ¶¶ 60–61. The FTX Trust's causation cases (only one of which cites California law) do not require a different result.[72]

---

[70] *See, e.g.*, *United States v. Spencer*, 700 F.3d 317, 323 (8th Cir. 2012) (holding fraudulent "acts directly and proximately caused the losses to the banks" under 18 U.S.C. § 3663A(a)(2), rejecting defendant's argument that "financial difficulties unrelated to his fraudulent scheme caused the losses of the banks," including "the downturn in the real estate market and a national recession," because it "was reasonably foreseeable . . . that [his] scheme . . . would unravel, and that market conditions could exacerbate the losses"); *United States v. Holmes*, 673 F. Supp. 3d 1049, 1055, 1058 (N.D. Cal. 2023) (collecting cases rejecting "causation objections" arguing "that financial crises, changes in company leadership, or borrowers' inability to repay loans had severed the causal link between their own fraudulent representations and the victims' investment losses or loan defaults" in restitution context, which requires "direct[ ] harm[ ]"); *Anschutz Corp. v. Merrill Lynch & Co. Inc.*, 785 F. Supp. 2d 799, 817 (N.D. Cal. 2011) (holding "collapse in the global credit crisis" did not cut off causal chain).

[71] In all events, this is an issue for later. The question of whether macroeconomic effects impact the Argent Trust's damages "is precisely the sort of question of fact" to be determined at the final hearing, after full discovery and evidence, not at the initial dispositive motion stage. *See White v. Kolinsky*, No. 10-2252, 2011 WL 1899307, at *8 (D.N.J. May 18, 2011); *Green v. Healthcare Servs., Inc.*, 283 Cal. Rptr. 3d 482, 489 (Cal. Ct. App. 2021) (holding that "superseding cause is an affirmative defense to be proven by the defendant" even as to a matter of negligent misrepresentation).

[72] *Hubbard v. BankAtlantic Bancorp, Inc.*, 688 F.3d 713 (11th Cir. 2012), is a federal securities case at a post-trial posture. *BetterHelp*'s "overarching theme" observation regarded a claim with a temporal mismatch absent here—the contract excluded harm arising out of pre-2015 conduct, but the claim rested on some post-2017 conduct. *BetterHelp Inc. v. Columbia Cas. Co.*, No. 25-cv-2571, 2025 WL 3022875, at *6–7 (N.D. Cal. Oct. 29, 2025). The remaining authorities do not even apply California law. *See In re Moody's Corp. Sec. Litig.*, No. 07-cv-8375, 2013 WL 4516788 (S.D.N.Y. Aug. 23, 2013) (federal securities laws); *UBS Sec. LLC v. Highland Cap. Mgmt., L.P.*, 70 A.D.3d 526 (N.Y. App. Div. 2010) (New York law).

5. The FTX Trust Fails To Disprove That The Regulatory Actions And Third-Party Lawsuits Were Caused By The FTX Group's Fraud.

59. The FTX Trust misstates the facts and the law regarding Silvergate's regulatory and third-party settlements and the associated fees Silvergate necessarily incurred. The FTX Trust claims regulatory complaints and settlements are proof that "Silvergate's own systemic failure to maintain a compliant BSA/AML program" was "an intervening, independent cause" of these injuries. Mot. ¶ 55. The FTX Trust also argues third-party lawsuits were "either the result of Silvergate's own conduct" or "a series of intervening actions by third parties." *Id.* ¶ 57. The FTX Trust also contends settlements, fees, and expenses Silvergate incurred in these cases are categorically unrecoverable. *E.g.*, *id.* ¶¶ 59–60. Each argument fails.

60. The FTX Trust offers no competent evidence establishing that Silvergate's BSA/AML Compliance Program violated applicable law—a failure of proof that defeats its intervening-cause argument under *Allegheny*'s framework. As explained, the consent orders and the SEC Complaint do not constitute the final adjudication of any facts alleged of Silvergate therein vis-à-vis compliance with BSA/AML requirements and, as a matter of law, have no evidentiary value regarding such allegations in subsequent litigation against Silvergate. *E.g.*, *Lipsky*, 551 F.2d at 892–94; *Ely v. Cabot Oil & Gas Corp.*, No. 3:09-CV-2284, 2016 WL 454817, at *14 (M.D. Pa. Feb. 5, 2016). The FTX Trust is therefore wrong to assert that "the FRB, DFPI, and SEC have all determined" Silvergate's BSA/AML Compliance Program violated the law, or that the Argent Trust's MDS "contain[s] admissions" of regulatory noncompliance: whatever concerns those regulators identified, none of the resolutions adjudicated (and Silvergate never admitted) that the program failed to comply with applicable law. Mot. ¶¶ 113, 117.

61. Similarly, the *Bhatia* Complaint's allegations that Silvergate saw "indicators of suspicious activity" involving the FTX Group and "substantially helped" the FTX Group are not

evidence of intervening cause. Mot. ¶ 57. "Statements made in a complaint . . . are merely allegations and not evidence." *Williams*, 289 F. App'x at 484 (citing *FDIC v. Deglau*, 207 F.3d 153, 172 (3d Cir. 2000)). And reliance on "mere allegations . . . [is] insufficient to rebut the [claimant's] *prima facie* case." *F-Squared*, 546 B.R. at 544 (citation modified). Moreover, the allegations are implausible, as the Argent Trust explained in discussing the FTX Trust's MDS. *See* Argent Mot. ¶ 55 n.19.[73]

62. To the extent the FTX Trust suggests settlements and fees are *per se* too attenuated, *e.g.*, Mot. ¶ 60, it is wrong again. Caselaw recognizes that where wrongdoers use a bank "as a central player in" a wrongful scheme and "kn[ow] they [a]re exposing it to risk if their fraud [i]s uncovered," subsequent settlement costs or attorneys' fees (or the like) the bank suffers are "direct" injuries. *United States v. Ohle*, 678 F. Supp. 2d 215, 229 & n.13 (S.D.N.Y. 2010); *see id*. (holding harms "sufficiently direct" such that offense "affect[ed] a financial institution" under 18 U.S.C. § 3293(2) (citation modified)).[74] That the consent orders do not expressly "mention[ ] FTX," Mot. ¶ 56, does not disprove the Argent Trust's well-pleaded allegations, *see supra* ¶¶ 23–30, 35–36, but, in any event, the FRB and DFPI identified "the collapse of the crypto-asset exchange FTX Trading Ltd. and its affiliated proprietary trading firm Alameda Research LLC" as "result[ing] in [Silvergate's] funding and liquidity stress."[75] Further, the Argent Trust expects witnesses to testify

---

[73] *Argent Liquidation Trust's Objection to and Motion to Dismiss the FTX Claims*, SVL Dkt. No. 99 (Oct. 8, 2026) ("Argent Mot.")

[74] *See, e.g.*, *First Am. State Bank v. Cont'l Ins. Co.*, 897 F.2d 319, 325–26 (8th Cir. 1990) (holding bank suffered "a direct loss" under bond where bank "expended funds to effect settlement" to satisfy "potential third party liability" caused by employee's fraudulent scheme); *United States v. DeRosier*, 501 F.3d 888, 895 (8th Cir. 2007) (holding "costs incurred by the bank for investigating" employee fraudster were "not consequential because the investigation was in immediate response to [employee]'s fraudulent conduct," under U.S.S.G § 2B1.1); *see also Burger*, 325 F. Supp. 2d at 1037 (recognizing "innocent, unwitting tool" used by fraudsters in RICO scheme may recover legal expenses incurred during subsequent proceedings proximately caused by RICO scheme).

[75] C&D Order at 2.

that the FTX Group's fraud was the direct impetus for the regulatory scrutiny Silvergate faced. *E.g.*, *infra* ¶ 69.

63. The FTX Trust also ignores binding caselaw when it argues the Argent Trust cannot recover fees and expenses Silvergate incurred in defending against regulatory and third-party claims because those claims were "based on its own misconduct." Mot. ¶ 59. The California Supreme Court recognizes that "[a] person who through the tort of another has been required to act in the protection of his interests by . . . defending an action against a third person is entitled to recover compensation for the reasonably necessary loss of time, attorney's fees, and other expenditures thereby suffered or incurred." *Prentice v. N. Am. Title Guar. Corp.*, 381 P.2d 645, 647 (Cal. 1963).[76] The FTX Trust's argument also ignores that the parties bargained for such a result via the indemnity provision in the CMTS Agreements, which requires Silvergate's FTX Group customers to cover "*any* loss, liability or expense (*including attorneys' fees and expenses*) resulting from or arising out of . . . *any* acts or omissions by [the FTX Group] or [its] employees or agents" that Silvergate suffered. Kim Decl. Ex. D at 8 (emphases added).[77]

64. The FTX Trust has not shown that the regulatory actions and third-party lawsuits were "*neither* foreseeable by the defendant *nor* caused injury of a type which was foreseeable" from the FTX Group's fraud on Silvergate—both of which are required to "break[ ] the chain of proximate causation." *Cal. Med. Ass'n.*, 532 P.3d at 265 (emphases added) (citation modified); *see* Restatement (Second) of Torts §§ 442A, 443.

---

[76] *See, e.g.*, *Gray v. Don Miller & Assocs., Inc.*, 674 P.2d 253, 257–59 (Cal. 1984); Restatement (Second) of Torts § 914(2) (A.L.I. 1979); *see also In re Mariner Post-Acute Network, Inc.*, 312 B.R. 520, 523 (Bankr. D. Del. 2004) (collecting "California cases in which attorneys fees are included as part of the litigant's actual losses").

[77] A representative version of the CMTS Agreement is attached hereto as **Exhibit D** to the Kim Declaration.

6. The FTX Trust's Claims Regarding Silvergate's Business Model Do Not Disprove Causation.

65. The FTX Trust next tries to blame Silvergate for servicing the FTX Group to begin with, arguing Silvergate made a "concentrated bet" on digital assets and utilized a "high-risk business model" that caused its collapse. Mot. at 4 (formatting altered); *id.* ¶ 49. Any suggestion that Silvergate was a mismanaged business flies in the face of Silvergate's business record and longstanding reputation. *See, e.g.*, *supra* ¶ 12; MDS ¶ 8. But even accepting the FTX Trust's (false) characterizations, that does not disprove causation. It is fundamental that a tortfeasor takes his victim as he finds him.[78] Courts in a number of contexts have rejected arguments that a plaintiff company's alleged mismanagement disproves causation between the defendant's conduct and the plaintiff's damages.[79]

66. Moreover, the FTX Group used its knowledge of Silvergate's digital-asset-friendly business model and due diligence procedures to its advantage in targeting and defrauding Silvergate. Silvergate had enhanced onboarding and ongoing due diligence procedures for custodial accounts in place that the FTX Group knew of and circumvented through its repeated misrepresentations and concealment. *See supra* ¶¶ 12–15. The FTX Group's own special counsel found this "impair[ed] Silvergate's ability to detect any wrongdoing." *Report of Robert J. Cleary, Examiner* at 154, FTX Dkt. No. 15545 (May 23, 2024) (the "Cleary Report") (citing Quinn

---

[78] *See, e.g.*, *Rideau v. L.A. Transit Lines*, 268 P.2d 772, 775 (Cal. Ct. App. 1954); *Tabor v. Miller*, 389 F.2d 645, 647–48 (3d Cir. 1968).

[79] *See, e.g., Engine Specialties, Inc. v. Bombardier Ltd.*, 605 F.2d 1, 14 n.21 (1st Cir. 1979) (affirming jury verdict for plaintiff in antitrust case even though defendant argued plaintiff was "a mismanaged company" and that "accounted for its demise," because although "[t]here may have been more than one cause of [company's] failure," plaintiff "had only to prove that defendants' behavior was a material cause of it"), *abrogated in unrelated part by Associated Gen. Contractors of Cal., Inc. v. Cal. State Council of Carpenters*, 459 U.S. 519 (1983); *MF Glob. Holdings Ltd. v. PricewaterhouseCoopers LLP*, 199 F. Supp. 3d 818, 842 (S.D.N.Y. 2016) (denying summary judgment to malpractice defendant that argued plaintiff's "business decision" in taking particular investment strategy caused plaintiff's bankruptcy, because plaintiff provided evidence that defendant's acts were a "substantial factor" in the injury, and plaintiff did not "need [to] prove that the defendant's conduct was the sole cause of the injuries" (citation modified)).

Emanuel, *Presentation Regarding FTX Professionals, Legal Insiders, and Venture Investments to Chapter 11 Examiner Robert J. Cleary, Esq.*, Mar. 22, 2024). The FTX Trust cannot now blame Silvergate for having provided the FTX Group what the FTX Group lied to obtain.[80]

7. The FTX Trust Has Not Disproven Silvergate's Liquidation Was Caused By The FTX Group's Fraud.

67. The FTX Trust's suggestion that Silvergate's liquidation could not have been caused by the FTX Group's fraud because it was "*voluntary*," Mot. ¶ 52, fails for reasons already explained. The DOJ found the FTX Group's fraud was a "significant" cause of Silvergate's insolvency, supporting the MDS's ample factual allegations. Kim Decl. Ex. A at 58–59. A plaintiff can recover for loss of business if the defendant's conduct causes the plaintiff to close its business—even where the plaintiff's closing could be described as "voluntary" (which, in some sense, could be said about every business closing).[81] Further, for the same reasons stated *supra* ¶ 57, the FTX Trust has not shown Silvergate's bankruptcy was unforeseeable, which is independently fatal.

---

80 *See, e.g.*, *Morgan, Olmstead, Kennedy & Gardner, Inc. v. Schipa*, 585 F. Supp. 245, 249 (S.D.N.Y. 1984) ("[I]n all intentional frauds, one party has knowingly deceived the other party, and purposely exploited a weakness in the other's method of operation for his own gain. No social value would be served by allowing a defendant to assert the very weakness he has exploited as a ground for limiting the defrauded party's claim against him for damages. Instead, it would merely insulate one who has committed an intentional, antisocial act from accounting to the person he has injured for all of the consequences flowing from that act, and thus might have the undesired secondary effect of promoting fraudulent activity.").

81 *See, e.g.*, *Med. Marijuana*, 604 U.S. at 601 (holding, under RICO, that "if [a plaintiff's] injuries force him to shut his doors, he can recover for the loss of his business"); *Alexander v. Cuomo*, No. 24-cv-2179, 2026 WL 124580, at *4 (E.D.N.Y. Jan. 16, 2026) (same); *Spray-Rite Serv. Corp. v. Monsanto Co.*, 684 F.2d 1226, 1242 (7th Cir. 1982) ("If the defendant's unlawful conduct causes the plaintiff to go out of business, the plaintiff is entitled to recover the full amount of that loss."); *Malley-Duff*, 734 F.2d at 148 (holding "when the loss of business is alleged to be caused by the wrongful acts of another, damages [can be] measured by" "the going concern value"); *see also Malcolm v. Marathon Oil Co.*, 642 F.2d 845, 862 n.28 (5th Cir. 1981) (recognizing a plaintiff "may voluntarily close his business and still collect [damages] if he can show that the defendants' [ ] violations forced him out of business").

### C. The Argent Trust Has Proven Causation By A Preponderance Of The Evidence.

68. Even if the burden of proof shifted back to the Argent Trust, the Argent Trust has proven its allegations by a preponderance of the evidence. The following evidence substantiates the Silvergate Claims:

- The DOJ's charging documents and evidentiary conclusions in the Bankman-Fried and Salame criminal cases regarding the FTX Group's fraud on Silvergate and the harms that Silvergate suffered as a result.[82]

- The findings in the FTX Group's cases, including by its own CEO and special counsel, regarding the FTX Group's fraud on Silvergate and how it prevented Silvergate from uncovering the FTX Group's fraud.[83]

- The primary records of the lies themselves—including the FTX Group's false account opening applications and certifications.[84]

- The Investigation Committee's independent findings that Silvergate's directors and officers had no knowledge of the FTX Group's fraud, that Silvergate applied its same compliance processes to the FTX Group as it did its other clients, and that the FTX Group's fraud impacted Silvergate in many ways.[85]

- Third-party assessments from 2018 through 2022 finding Silvergate's BSA/AML Compliance Program was appropriate for its risk profile, that Silvergate was taking comprehensive efforts to strengthen its program, and validating Silvergate's

---

[82] Superseding Indictment ¶¶ 17–18, *United States v. Bankman-Fried*, No. (S3) 1:22-cr-673 (S.D.N.Y. Feb. 23, 2023), attached as **Exhibit E** to the Kim Declaration; Kim Decl. A at 24–27, 58–59; Kim Decl. Ex. B at 2; Superseding Information ¶¶ 9–10, Dkt. No. 262, *United States v. Salame*, No. (S7) 22-cr-673 (S.D.N.Y. Sep. 7, 2023), attached as **Exhibit F** to the Kim Declaration; Gov't Sent'g Mem., at 5 n. 4, Dkt. No. 436, *Salame*, No. (S7) 22-cr-673 (S.D.N.Y. May 21, 2024), attached as **Exhibit G** to the Kim Declaration; Judgment in a Criminal Case, Dkt. No. 455, *Salame*, No. (S7) 22-cr-673 (S.D.N.Y. May 29, 2024), attached as **Exhibit H** to the Kim Declaration.

[83] *See generally, e.g.*, Cleary Report at 154 (citation omitted).

[84] *See, e.g.*, Alameda Research LLC's Market Maker Due Diligence Questionnaire, attached as **Exhibit I** to the Kim Declaration; North Dimension, Inc.'s Initial Due Diligence Questionnaire for Traders, attached as **Exhibit J** to the Kim Declaration; *see also* MDS ¶¶ 14, 24 (corresponding allegations).

[85] Investigation Committee Report at 97, 108–09.

> automated transaction-monitoring system.[86] Silvergate's financial regulators also regularly assessed Silvergate's BSA/AML Compliance Program; any discussion of such assessments is forthcoming upon receipt of the necessary regulatory approvals.[87]

69. And there is more to come. The Argent Trust expects that additional evidence adduced during discovery, including fact and expert testimony, will further support that the FTX Group's fraud proximately caused Silvergate's injuries.

## II. THE FTX TRUST'S CLAIM-SPECIFIC ARGUMENTS FAIL.

### A. Silvergate's Losses Are Within The Scope Of The Indemnification Provision.

70. The FTX Group promised to cover *any* loss, arising out of *any* act or omission, *any* third-party claim, or *any* breach. The Indemnification Provision requires each FTX Group customer entity to:

> defend, indemnify and hold the Bank harmless against ***any loss, liability or expense*** **(including attorneys' fees and expenses) resulting from or arising out of**: (a) ***any acts or omissions by you or your employees or agents***; (b) ***any claims against the Bank from a third party*** resulting directly or indirectly under this CMTS Agreement where the Bank has acted in accordance with your instructions and/or within the terms of this CMTS Agreement; and (c) ***any breach by you or your employees or agents*** of any representation, warranty, covenant or agreement made pursuant to or in this CMTS Agreement.

Kim Decl. Ex. D at 8 (emphasis added); *see also* MDS ¶ 29.

---

[86] RSM US LLP, *Bank Secrecy Act/Anti-Money Laundering Report* (May 24, 2019) at 2 (finding that Silvergate's BSA program "adequately addresse[d] all pillars of the BSA" and its internal controls were "sufficient" for its "size and complexity"), attached as **Exhibit K** to the Kim Declaration; Grant Thornton, *Bank Secrecy Act / Anti-Money Laundering and Office of Foreign Assets Control Internal Audit Report* (Aug. 28, 2020) at 3 (rating Silvergate's BSA/AML and OFAC internal control framework as "satisfactory"), attached as **Exhibit L** to the Kim Declaration; RSM US LLP, *Bank Secrecy Act/Anti-Money Laundering Report* (Dec. 22, 2021) at 2 ("We found that internal controls implemented to provide for ongoing compliance with BSA requirements are sufficient for the size and complexity of the Bank"), attached as **Exhibit M** to the Kim Declaration; RSM US LLP, *Anti-Money Laundering (AML) Model Validation Services* (Jan. 7, 2022) at 3 (concluding that "the Verafin system and models therein have been implemented and appear to be functioning as intended"), attached as **Exhibit N** to the Kim Declaration.

[87] *See, e.g.*, 12 C.F.R. § 261.2(b).

71. Each of the FTX Trust's arguments tries to narrow the provision against its plain text and settled California law, and each should be rejected.

1. <u>The Indemnification Provision Encompasses Silvergate's Losses.</u>

72. The FTX Trust does not seriously dispute that the FTX Group's actions fall within the Indemnification Provision's language, nor could it. Mot. ¶ 88 (contending only that coverage "is not conclusively established").[88] Under California's codified plain-meaning rules, clear and explicit language controls and is read in its "ordinary and popular sense."[89] The Indemnification Provision is comprehensive, containing no language carving the Argent Trust's pleaded losses out of its reach. The repeated use of "any" (such as *any* loss, *any* acts or omissions, and *any* breach) signals the broadest possible scope. *E.g.*, *United States v. Myers*, 170 F.4th 1180, 1186–87 (9th Cir. 2026) ("expansive"); *C.I. Eng'rs & Constructors, Inc. v. Johnson & Turner Painting Co.*, 189 Cal. Rptr. 824, 827 (Cal. Ct. App. 1983) ("all encompassing").

73. Each category of covered conduct has been adequately pleaded:

- **Subsection (a), "any acts or omissions" by the FTX Group entity "or [its] employees or agents."** This covers Alameda's and North Dimension's false account applications, the fabricated North Dimension corporate register, the due diligence questionnaire Bankman-Fried signed and certified for North Dimension, and the concealed use of Alameda's and North Dimension's non-custodial accounts to move FTX.com customer funds. MDS ¶¶ 3, 21–27, 32. It also includes the FTX Group's fraud orchestrated by its own officers and employees, several of whom have been convicted, which ran—unbeknownst to Silvergate—through Silvergate accounts. *Id.* ¶¶ 4, 26–27, 39–44. This subsection is not limited to the "Account Noncompliance," Mot. ¶ 95; it reaches *all* acts and omissions of the FTX Group entities and their employees and agents.

[88] The cases the FTX Trust cites (Mot. ¶ 88) announce familiar legal principles and place no category of loss outside an indemnity clause. *See Four Star Elec., Inc. v. F & H Constr.*, 10 Cal. Rptr. 2d 1, 3 (Cal. Ct. App. 1992) (pleading rule); *S. Cal. Gas Co. v. Ventura Pipe Line Constr. Co.*, 309 P.2d 849, 851–53 (Cal. Ct. App. 1957) (denying recovery because indemnitee sought to recover liability it voluntarily assumed under separate, undisclosed third-party contract indemnitor never agreed to cover); *Rossmoor*, 532 P.2d at 104 (coverage turns on contract interpretation and party intent); *Heppler v. J.M. Peters Co.*, 87 Cal. Rptr. 2d 497, 509 (Cal. Ct. App. 1999) (strict-construction rule applies where indemnitee seeks indemnity for own fault).

[89] *E.g.,* Cal. Civ. Code §§ 1636, 1638, 1644; *Bay Cities Paving & Grading, Inc. v. Lawyers' Mut. Ins. Co.*, 855 P.2d 1263, 1270 (Cal. 1993).

- **Subsection (b), "any claims against [Silvergate] from a third party."** This covers litigation against Silvergate that grew out of the FTX Group's fraud and its consequences, including the putative FTX.com customer class actions, the securities class action, the KPMG and the EJF claims, and the FRB and DFPI proceedings. MDS ¶¶ 63–66, 68.

- **Subsection (c), "any breach" of "any representation, warranty, covenant or agreement."** This covers the account-related breaches, including the warranty that each ACH Entry "complies with all local, state and federal regulations," which North Dimension breached by operating as an unlicensed MSB; the DAARDs' truthfulness certification; the ongoing duty to give notice of changes; and the false representations in the incorporated account applications. MDS ¶¶ 30–32, 86.

74. Because the FTX Trust cannot contest coverage of the conduct, it makes four arguments to narrow the indemnity: (i) no causal nexus links the conduct to the losses, (ii) the Indemnification Provision reaches only third-party claims, (iii) the Indemnification Provision does not cover Silvergate's negligence, and (iv) regulatory penalties are barred. Mot. ¶ 89. Each argument fails.

2. The Indemnification Provision's "Minimal" Causal Nexus Is Easily Met.

75. The Indemnification Provision does not require proximate cause, fault, or a "substantial factor"; it only requires that Silvergate's loss be "resulting from or arising out of" the covered conduct. MDS ¶ 29. California law settles what that language means. "California courts have rendered consistently broad interpretations of 'phrases such as 'arising out of' or 'arising from' and 'resulting from.'" *S. Cal. Gas Co. v. Syntellect, Inc.*, 534 F. App'x 637, 638 (9th Cir. 2013) (citation modified).[90] So much so, it is "settled" that such language "does ***not*** import any particular standard of causation or theory of liability," but instead "***broadly links*** a factual situation with the event creating liability, and connotes ***only a minimal causal connection or incidental relationship***." *Acceptance*, 81 Cal. Rptr. 2d at 561 (emphases added). Silvergate's losses are, at

[90] *See, e.g.*, *Cont'l Heller Corp. v. Amtech Mech. Servs., Inc.*, 61 Cal. Rptr. 2d 668, 669–72 (Cal. Ct. App. 1997) (applying broad interpretation to "arising out of" language and holding indemnitee need not prove indemnitor was at fault or substantial cause of loss); *Charles D. Warner & Sons, Inc. v. Seilon, Inc.*, 112 Cal. Rptr. 425, 429–30 (Cal. Ct. App. 1974) (applying same to reach consequential business losses connected to covered conduct).

the very least, "broadly link[ed]" to the FTX Group's conduct. *See, e.g.*, *supra* ¶¶ 44–45. The FTX Trust does not acknowledge that only a "minimal causal connection" is necessary, let alone contest it.

76. The FTX Trust's own authorities undercut its causation argument. The FTX Trust concedes (as it must) that the Indemnification Provision's language is "broad[ ]," but says it "nonetheless requires more than 'but for' causation" and "cannot be extended indefinitely," lest the Court "extend[ ] causation impermissibly going back to the dawn of human events." Mot. ¶¶ 93, 97–98 (citation modified). The Argent Trust asks for nothing of the kind. The Argent Trust simply asks this Court to apply the plain text as written. And the Argent Trust has repeatedly explained the direct connection between the FTX Group's conduct and its losses, *see, e.g.*, *supra* ¶¶ 44–45; MDS ¶¶ 60–72, and this connection goes well beyond mere "but for" causation and far beyond the "minimal causal connection" the text requires. The cases the FTX Trust cites do not change this.[91]

77. The FTX Trust gestures at unconscionability. It notes that a noninsurance indemnitee "may possess superior bargaining power" and calls the CMTS Agreements "a standard-form adhesion contract." Mot. ¶ 94. But the FTX Trust does not actually argue the provision is unconscionable or that it defeated the FTX Group's reasonable expectations, the only grounds on which an adhesion contract is not otherwise "fully enforceable according to its terms."

---

[91] The FTX Trust (Mot. ¶¶ 93, 96–97) relies mainly on *Fireman's Fund Insurance Co. v. Discover Property & Casualty Insurance Co.*, No. C 08-3079, 2009 WL 2591394 (N.D. Cal. Aug. 21, 2009), which confirms the "minimal causal connection" standard and found none due to *extreme* remoteness—a pedestrian tripped over a fence "more than . . . two football fields" away from the leased premises which the tenant bookstore did not create. *Id.* at *3–5. That is the opposite of this case, where the FTX Group created the very risk that injured Silvergate. MDS ¶¶ 60–62.

*Graham v. Scissor-Tail, Inc.*, 623 P.2d 165, 172–73 (Cal. 1981).[92] The FTX Trust could not make that argument. The FTX Group entities were not unsophisticated, uneducated parties. Further, the FTX Trust suggests that it possessed the bargaining power, touting that "Silvergate could not exist without the FTX Group," FTX Trust MDS ¶ 30, and that the FTX Group repeatedly threatened to take its business elsewhere when Silvergate's terms did not suit it, *id.* ¶¶ 34, 62.

78. The FTX Trust's remaining objections to the penalties, settlements, and fees likewise rest on proximate-cause arguments the Indemnification Provision does not require. Mot. ¶¶ 98–99. The "penalties" and settlements resolved or arose from proceedings concerning the FTX Group's concealed transfers, MDS ¶¶ 63–66, and where parties do not expressly limit indemnity damages, the indemnity reaches "any and all" losses. *Zalkind v. Ceradyne, Inc.*, 124 Cal. Rptr. 3d 105, 114–18 (Cal. Ct. App. 2011). Blaming Silvergate's compliance does not change the result, because the test is connection to covered conduct, not fault. *See, e.g.*, *Cont'l Heller Corp.*, 61 Cal. Rptr. 2d at 669–72 (enforcing indemnity clause including "arising out of" language for settlement and defense costs even though the indemnitor was found not negligent and not a cause of explosion). The fees follow the same path; defense and investigative costs follow as a matter of law. Cal. Civ. Code § 2778(3); *see Crawford v. Weather Shield Mfg., Inc.*, 187 P.3d 424, 431–32 (Cal. 2008). The remaining wind-down costs and expenses flow from the plain text ("including attorneys' fees and expenses") and the same FTX Group-triggered harm. *See, e.g.*, *supra* ¶ 45.

---

[92] *See, e.g.*, *Marin Storage & Trucking, Inc. v. Benco Contracting & Eng'g, Inc.*, 107 Cal. Rptr. 2d 645, 653-57 (Cal. Ct. App. 2001) (enforcing adhesive indemnity against sophisticated party). For the avoidance of doubt, the Argent Trust does *not* concede the CMTS Agreements—or any agreements—were adhesion contracts.

3. Silvergate's Regulatory Settlements Are Recoverable Under the Indemnification Provision.

79. The FTX Trust argues the Argent Trust cannot recover the "$50 million civil penalty in an action brought by the SEC" under the consent order in that case. Mot. ¶ 90. The Argent Trust does not seek that. The SEC Order's bar reaches only "civil penalty amounts that Defendant pays pursuant to the Final Judgment" in that SEC action. SEC Order ¶ 9.[93] Instead, the Argent Trust seeks the around $63 million Silvergate paid to the FRB ($43 million) and the DFPI ($20 million) under ***separate*** orders containing no comparable bar. MDS at 31 n.35.[94] Those penalties were owed regardless of the SEC action. The SEC's decision to credit them did not turn them into SEC penalties.

80. Nor does the FTX Trust's appeal to public policy bar indemnification for the $63 million in FRB and DFPI settlements. Mot. ¶ 92. Silvergate consented to each of those orders without admitting the allegations. *See supra* ¶¶ 35–36. Because these orders did not formally find that Silvergate violated its BSA/AML obligations, indemnification could not undermine any purpose "to punish Silvergate's violations and deter similar failures." Mot. ¶ 92. Instead, courts routinely permit indemnification in these circumstances, where there was no adjudication of willfulness and only entry of a consent order. *See Cambridge Fund, Inc. v. Abella*, 501 F. Supp. 598, 601, 615 (S.D.N.Y. 1980) (indemnifying officers from penalty resulting from a court-approved settlement); *Raychem Corp. v. Fed. Ins. Co.*, 853 F. Supp. 1170, 1177 (N.D. Cal. 1994) (indemnifying officers from court-approved settlement penalty and related defense costs). Courts have declined to apply the cases cited by the FTX Trust where, as here, there was no finding of

---

[93] Final Judgment as to Defendant Silvergate Capital Corporation, *SEC v. Silvergate Cap. Corp.*, No. 1:24-cv-04987 (S.D.N.Y. July 8, 2024), Dkt. No. 20 ("SEC Order").

[94] In any event, as a nonparty, the FTX Trust cannot enforce the SEC Order: a consent decree "is not enforceable directly or in collateral proceedings by those who are not parties to it even though they were intended to be benefited by it." *Blue Chip Stamps v. Manor Drug Stores*, 421 U.S. 723, 750 (1975).

liability or a culpable state of mind. *See CFTC v. Richards*, No. 96 C 334, 1996 WL 199729, at *4 (N.D. Ill. Apr. 23, 1996) (declining to apply *Laventhol* and *Heizer* where there was no "adjudication of willfulness"); *Raychem*, 853 F. Supp. at 1177 (same where "defendants did not admit liability in settling the underlying suit"); *Adalman v. Baker, Watts & Co.*, 599 F. Supp. 752, 754 (D. Md. 1984) (same where "[t]here has been no determination of actual culpability by a trier of fact").

4. The Indemnification Provision Reaches Direct Losses.

81. The FTX Trust's contention, Mot. ¶¶ 101–03, that the Indemnification Provision reaches only third-party claims flies in the face of the provision's own structure. Section 18 is built from three independent triggers. Subsection (b)—and only subsection (b)—is tied to "claims against the Bank from a third party." Subsections (a) and (c), by contrast, are triggered by the FTX Group entity's own "acts or omissions" and "breach," with no third-party qualifier at all. Reading all three subsections as limited to third-party claims would collapse (a) and (c) into (b) and render the drafters' separate, third-party limitation in subsection (b) pure surplusage, an outcome California law forbids, because every clause of a contract must be given effect.[95] Moreover, California enforces indemnities covering the indemnitee's own direct losses where the contract's language and structure clearly show that parties intended it; no magic words are required. *See, e.g.*, *Hot Rods, LLC v. Northrop Grumman Sys. Corp.*, 196 Cal. Rptr. 3d 53, 61–65 (Cal. Ct. App. 2015) (indemnity reached both first- and third-party claims; "it is the intent of the provision, and the agreement as a whole, that governs"); *Zalkind*, 124 Cal. Rptr. 3d at 108–18 (enforcing a breach-triggered indemnity against direct claims); *Wilshire-Doheny Assocs., Ltd. v. Shapiro*, 100 Cal.

[95] *See* Cal. Civ. Code §§ 1636, 1638, 1641, 1644; Cal. Code Civ. Proc. § 1858; *Schertzer v. Bank of Am., N.A.*, 109 F.4th 1200, 1208–12 (9th Cir. 2024); *Carroll Shelby Licensing, Inc. v. Halicki*, 138 F.4th 1178, 1187–88 (9th Cir. 2025).

Rptr. 2d 478, 489–90 (Cal. Ct. App. 2000) (first-party indemnity enforced where nothing limited it to third-party suits).

82. The authorities the FTX Trust cites do not establish a categorical third-party-only rule, or a rule that overrides the Indemnification Provision's clear text. *City of Bell v. Superior Ct.*, 163 Cal. Rptr. 3d 90, 102 (Cal. Ct. App. 2013), refused to let a former city officer use a two-sentence employment indemnity as an "exculpatory clause or release" against the City's own suits for his embezzlement. The clause's settlement language there could "only be read to apply to claims or suits by third parties." *Id.* The FTX Trust's other anchor, *AGK Sierra de Montserrat, L.P. v. Comerica Bank*, 109 F.4th 1132, 1136, 1141 (9th Cir. 2024), addressed only attorney's fees for litigating the parties' own dispute, a question governed by California Civil Code § 1717. The FTX Trust's remaining authorities are weaker still.[96] Even under a third party-only reading, much of the Argent Trust's claim is covered because each of the following is a liability to, or a cost of defending against, a third party: the $63 million of Federal Reserve Board and DFPI payments, the more than $21 million in settlement payments, the defense and investigative costs within the approximately $75 million Silvergate spent defending the FTX.com customer suits and responding to the regulators and agencies, and the director-and-officer indemnification costs. MDS ¶¶ 66, 68–72. The remaining losses fall within subsections (a) and (c).

[96] *See Am. First Fin., LLC v. Garcia*, No. 1:23-cv-117, 2025 WL 418686, at *3 (E.D. Cal. Feb. 6, 2025) (unopposed Cal. Civ. Code § 1717 attorney fee order); *Alki Partners, LP v. DB Fund Servs., LLC*, 209 Cal. Rptr. 3d 151, 170–75 (Cal. Ct. App. 2016) (§ 1717 attorney fee case holding single general indemnity grant confined to third-party claims because only specifically enumerated item—criminal proceedings—was itself third-party claim); *Pac. Gas & Elec. Co. v. G.W. Thomas Drayage & Rigging Co.*, 442 P.2d 641, 646 n.9 (Cal. 1968) (finding contract terms "inconclusive," thus not foreclosing first-party coverage); *Queen Villas Homeowners Ass'n v. TCB Prop. Mgmt.*, 56 Cal. Rptr. 3d 528, 531–32 (Cal. Ct. App. 2007) (refusing to let indemnitee wield indemnity defensively to escape own liability); *Md. Cas. Co. v. Bailey & Sons, Inc.*, 41 Cal. Rptr. 2d 519, 526 (Cal. Ct. App. 1995) (merely holding general clause silent on negligence does not cover the indemnitee's own active negligence).

5. <u>The Argent Trust Does Not Seek Indemnity For Silvergate's Own Negligence.</u>

83. The FTX Trust last argues the Indemnification Provision cannot cover Silvergate's "own active negligence." Mot. ¶¶ 104–06. That common-law rule of strict construction—under which a general indemnity clause silent as to the indemnitee's own negligence is presumed not to reach the indemnitee's active negligence absent clear language—has no application here. The Argent Trust seeks indemnity for losses caused by the FTX Group's affirmative fraud, breaches, and misconduct, not by any negligence of Silvergate. The FTX Trust offers only the assertion that Silvergate "fail[ed] to maintain a compliant BSA/AML program," *id.* ¶ 106, but the FTX Trust has failed to provide any evidence that Silvergate indeed failed to do so. *See supra* ¶¶ 35–36, 60, 80. That alone defeats the argument.

84. Even accepting the FTX Trust's theory (the Argent Trust does not), it at most describes "passive" negligence, which the FTX Trust concedes is not barred. Mot. ¶ 105 (citing *MacDonald & Kruse, Inc. v. San Jose Steel Co.*, 105 Cal. Rptr. 725, 729 (Cal. Ct. App. 1972)). California law holds that an indemnitee's failure to discover a wrongful condition created or concealed by the indemnitor is, at most, passive negligence, which does not bar recovery under a general indemnity clause. *See, e.g.*, *Markley v. Beagle*, 429 P.2d 129, 136 (Cal. 1967) (building owners' negligent failure to inspect and discover dangerous condition created by contractors was "mere nonfeasance"); *Rossmoor Sanitation, Inc. v. Pylon, Inc.*, 532 P.2d 97, 101 (Cal. 1975) (holding "mere nonfeasance, such as the failure to discover a dangerous condition or to perform a duty imposed by law" will not preclude indemnity under a general clause). The FTX Trust's theory is a failure to perform BSA/AML duties, which is precisely a "duty imposed by law" and not a duty Silvergate undertook to the FTX Group. The theory also appears to be a failure to detect

fraud the FTX Group vigorously concealed. Neither is "active" negligence.[97] The FTX Trust's cases, Mot. ¶¶ 104–06, are thus distinguishable.

**B. The Argent Trust's Breach Of Contract Claims Sufficiently Allege Recoverable Damages.**

85. The FTX Trust does not dispute that the FTX Group breached the account agreements. MDS ¶¶ 29–32, 86. The FTX Trust challenges only damages. Mot. ¶¶ 69–71. California law entitles the Argent Trust to all detriment proximately caused by the breach, or which in the ordinary course of things would likely result from it. Cal. Civ. Code §§ 3300, 3358; *Brandon & Tibbs v. George Kevorkian Accountancy Corp.*, 277 Cal. Rptr. 40, 47, 56 (Cal. Ct. App. 1990). Those damages may be general damages, which flow "directly and necessarily" from the breach, or special damages, which are recoverable if the breaching party "should have been aware" of the relevant circumstances when it contracted. *Ash v. N. Am. Title Co.*, 168 Cal. Rptr. 3d 499, 508 (Cal. Ct. App. 2014) (quoting *Lewis Jorge Constr. Mgmt., Inc. v. Pomona Unified Sch. Dist.*, 102 P.3d 257, 261 (Cal. 2004)).

86. Causation in contract asks whether the breach was a substantial factor in causing the loss. *US Ecology*, 28 Cal. Rptr. 3d at 909. The bar is low. A substantial factor need only be "more than a slight, trivial, negligible, or theoretical factor." *Id.* (citation and internal quotation marks omitted). The breach need not be the sole or but-for cause; even "a very minor force" that causes harm qualifies, and thus "[u]ndue emphasis should not be placed on the term 'substantial.'"

[97] *Cf. Mid-Cal. Nat'l Bank v. Fed. Rsrv. Bank of S.F.*, 590 F.2d 761, 763 (9th Cir. 1979) (holding bank's failure to discover a check-kiting scheme was passive nonfeasance); *Doe v. Bank of America, N.A.*, 819 F. Supp. 3d 314, 330 (S.D.N.Y. 2026) (characterizing correspondent bank's monitoring and SAR failures as passive nonfeasance); *Jimenez v. Pac. W. Constr. Co.*, 229 Cal. Rptr. 575, 580–83 (Cal. Ct. App. 1986) (holding that even an indemnitee's mere knowledge of a dangerous condition created by the indemnitor, without affirmative participation, is passive nonfeasance rather than active negligence). But even an actively negligent indemnitee may recover where the indemnity covers the indemnitor's breach and the result "would never have happened except for such breach." *McCrary Constr. Co. v. Metal Deck Specialists, Inc.*, 35 Cal. Rptr. 3d 624, 632 (Cal. Ct. App. 2005) (citation modified).

*Bettencourt v. Hennessy Indus., Inc.*, 141 Cal. Rptr. 3d 167, 183 (Cal. Ct. App. 2012) (first quotation); *Jenni Rivera*, 249 Cal. Rptr. 3d at 144 (second quotation). Whether a breach was a substantial factor in causing a loss is ordinarily a question for the jury, so a dispute on that element cannot defeat an otherwise *prima facie* valid claim. *E.g.*, *DCD Partners, LLC v. Transamerica Life Ins. Co.*, No. 2:15-cv-3238, 2018 WL 3770030, at *11 (C.D. Cal. Aug. 1, 2018).

1. <u>The Argent Trust Sufficiently Alleges General Damages, As Silvergate Lost The Very Performance The FTX Group Promised.</u>

87. Silvergate's core contract injury is a general damage: the loss of the performance the FTX Group promised. General damages are "based on the value of the performance itself." *Lewis Jorge*, 102 P.3d at 263 (citation and internal quotation marks omitted); *see Moore v. Centrelake Med. Grp., Inc.*, 299 Cal. Rptr. 3d 544, 558 (Cal. Ct. App. 2022). The FTX Trust frames the promised performance narrowly, arguing the FTX Group promised only to make accurate statements and give notice and never promised to keep its deposits at Silvergate or warrant that Silvergate would not collapse. Mot. ¶¶ 72–73. This mischaracterizes the bargain. A bank does not provide deposit and payment services in a vacuum; it provides them to a vetted customer, for a disclosed purpose, under a compliance program calibrated to that disclosed risk. The FTX Group promised Silvergate its entries were lawful, its account information was true, and it would disclose material changes. Silvergate bargained for the ability to decide, on truthful information, whether to open each account, how to risk-rate and monitor it, and when to restrict or close it. The promises were concrete. MDS ¶¶ 29–32.

88. Had the FTX Group performed under its contracts, Silvergate would have known that the FTX Group wanted to route FTX.com customer funds through the accounts, and Silvergate could have responded accordingly: by imposing enhanced diligence and licensing requirements, conditioning or declining the relationship (as it had done before, *see id.* ¶¶ 17–19), monitoring the

accounts differently, or closing them before the suspicious FTX-related transfers moved through Silvergate. That lost ability to decide, on truthful information, whether and on what terms to accept the FTX Group entity as a customer is the value of the performance Silvergate bargained for. The difference between that promised performance and the non-compliant, concealed performance Silvergate received is recoverable as general damages. *See Lewis Jorge*, 102 P.3d at 263; *Moore*, 299 Cal. Rptr. 3d at 558.[98]

2. The Argent Trust Sufficiently Alleges Special Damages, As The Breaches Were A Substantial Factor In Foreseeable Losses.

89. The FTX Group hid its account misuse in violation of its contract, and that misuse was a substantial factor in Silvergate's losses. Those losses were also an objectively foreseeable result of using a federally regulated bank's accounts to run and conceal a multibillion-dollar fraud.

90. ***Substantial factor.*** The FTX Group's concealment of the accounts' true purpose, which it was legally obligated to disclose and continually apprise Silvergate of any change in account use, denied Silvergate any opportunity to intervene before the harm occurred and allowed the unlawful activity and fraud to continue. *See supra* ¶¶ 12–15, 45, 66. The substantial factor test is readily met: the FTX Group's concealed misuse was far more than a "slight, trivial, negligible, or theoretical factor" in the losses that followed, and courts applying the same test have

[98] Nor is it novel to recover contract damages for false contractual certifications. In *Robinson Helicopter Co. v. Dana Corp.*, 102 P.3d 268 (Cal. 2004), a supplier that issued false certificates of conformance after secretly changing its manufacturing process was held liable in contract for the cost of its nonconforming performance, because those costs flowed directly from the false certifications. *Id.* at 270–72. Had the supplier "simply been truthful," the manufacturer "could have refused to accept [the parts], thereby avoiding the damages it later suffered." *Id.* at 276 (affirming breach claim). So too here.

found a counterparty's breach to be a substantial factor even where other forces, including regulators, also contributed to the loss.[99]

91. The FTX Trust's arguments to the contrary fail. The FTX Trust, *e.g.*, Mot. ¶¶ 72–78, recycles its overarching arguments already debunked *supra* ¶¶ 47–67. Discussion of Silvergate's alleged wrongs, Mot. ¶ 78, is also legally irrelevant, as California law "exclude[s] affirmative defenses of comparative fault to breach of contract claims." *Loskutoff*, 362 F. Supp. 3d at 827–30 (collecting cases and granting summary judgment against comparative-fault defense to contract claim); *see Kransco v. Am. Empire Surplus Lines Ins. Co.*, 2 P.3d 1, 9–10 (Cal. 2000). The FTX Trust's intervening and superseding cause arguments, Mot. ¶¶ 3, 51, 68, are also irrelevant here: "[i]n contract cases, the defense does not absolve the defendant of liability." *Ash*, 168 Cal. Rptr. 3d at 511. Finally, the FTX Trust's estoppel arguments fail for the reasons stated *infra* ¶¶ 102–04.[100]

92. ***Foreseeability.*** Special damages are recoverable when the breaching party should have been aware at the time of contracting that the loss would be a probable result of breach, judged objectively in light of the contract's nature and purpose and the circumstances known to the parties. *Lewis Jorge*, 102 P.3d at 261–62. The breaching party need not have foreseen the specific consequence; it is enough that it had reason to foresee the loss as a probable result. *Ash*,

---

[99] *E.g.*, *Holland*, 83 Fed. Cl. at 522–24 (industry decline and a regulator-imposed supervisory agreement did not render the breach "an insubstantial causal factor" in a thrift's lost value); *Doctors Health*, 335 B.R. at 121 (breach "may not have been the sole reason" the debtor liquidated "but it was a substantial cause of the destruction of the debtor's business").

[100] Moreover, the FTX Trust's cited cases do not defeat the *prima facie* validity of the Argent Trust's claim, because each rejected causation on a developed evidentiary record, and only where the loss turned on random events, third parties' discretionary choices, or remedies within the plaintiff's control. *See, e.g.*, *US Ecology*, 28 Cal. Rptr. 3d at 911 (affirming finding breach not substantial factor where nonparty, the federal government, controlled outcome and would not have acted differently had defendant not breached); *Vu v. Cal. Com. Club, Inc.*, 68 Cal. Rptr. 2d 31, 33 (Cal. Ct. App. 1997) (affirming no substantial factor because losses depended on inherent randomness of card games and plaintiff admitted he could not identify cause); *Crossroads Invs., L.P. v. FNMA*, 222 Cal. Rptr. 3d 1, 32 (Cal. Ct. App. 2017) (finding plaintiff had self-executing statutory remedy fully within its own control and so "damaged itself" by failing to act).

168 Cal. Rptr. 3d at 507–08. A party is liable if, "because of [its] own education, training, and information," it "had reason to foresee the probable existence of such circumstances." *Brandon & Tibbs*, 277 Cal. Rptr. at 49. Foreseeability is a question of fact; a dispute thus cannot defeat an otherwise *prima facie* valid claim and is reserved for trial. *See Moore*, 299 Cal. Rptr. 3d at 560.

93. The standard is easily met here, because the FTX Group alone knew what it was hiding and why a regulated bank would care. The FTX Group touted itself as one of Silvergate's largest customers. FTX Trust MDS ¶¶ 8, 29. It then made false contractual representations, certified facts it knew were false, never told Silvergate the true use of the accounts, and thus exploited a federally regulated bank's payment channels to carry out and hide a multibillion-dollar fraud. Such an actor would objectively have foreseen that the bank could face customer litigation, regulatory investigations, enforcement penalties, and severe financial distress once the truth emerged. A party may rely on the other side's representations without independently verifying them, and the risk of their falsity rests on the party that made them. *Loskutoff*, 362 F. Supp. 3d at 827–28, 829–30. The FTX Group, which knowingly certified false facts, therefore has "reason to foresee" the harm that reliance will cause. *Brandon & Tibbs*, 277 Cal. Rptr. at 49. And because the agreements themselves addressed regulatory compliance and accurate account information, the resulting regulatory and litigation exposure is exactly the kind of loss their breaches would probably produce, even if the FTX Group could not predict the precise agency, proceeding, amount, or timing. *Ash*, 168 Cal. Rptr. 3d at 507–08.[101, 102]

---

101 The FTX Trust's cases are distinguishable. *Lewis Jorge* involved claimed lost profits on future unidentified contracts that flowed not from the breach but a third-party surety's independent, discretionary decision to reduce bonding capacity. 102 P.3d at 266–67. The contract in *X Corp. v. Center for Countering Digital Hate, Inc.*, barred data scraping, and the claimed harm occurred only after third parties reacted to reports based on the scraped data and caused reputationally mediated revenues. 724 F. Supp. 3d 948, 966–73 (N.D. Cal. 2024). Here, Silvergate's harms flow from the very performance the FTX Group falsified.

102 The FTX Trust also argues the implied-covenant claim fails because it duplicates the breach of contract claim. Mot. ¶ 84 n.26. But courts do not "mechanically inquire whether the same facts are alleged and whether the same remedy is sought"; a claim is not duplicative where the defendant acted in bad faith to frustrate the contract's

### C. The Argent Trust's Fraud And Misrepresentation Claims Adequately Allege Causation.

94. The FTX Trust challenges only proximate cause on the Argent Trust's Fraud Claims. Mot. ¶¶ 65–68. Its argument fails. California's substantial factor test governs and is undisputedly met. *See supra* ¶¶ 44–45.

95. California law entitles a tort plaintiff to "all the detriment proximately caused . . . *whether it could have been anticipated or not*." Cal. Civ. Code § 3333 (emphasis added); *All. Mortg. Co. v. Rothwell*, 900 P.2d 601, 609–10, 616 (Cal. 1995) (measuring damages for intentional and negligent misrepresentation under Section 3333). "Causation for fraud is properly determined using the substantial factor test." *Knutson v. Foster*, 236 Cal. Rptr. 3d 473, 484 (Cal. Ct. App. 2018). That standard, which applies to "all tort claims" (and thus each of the Fraud Claims), is "a relatively broad one, requiring only that the contribution of the individual cause be more than negligible or theoretical," and even "a very minor force that does cause harm is a substantial factor." *Beebe v. Wonderful Pistachios & Almonds LLC*, 309 Cal. Rptr. 3d 461, 476 (Cal. Ct. App. 2023) (citation modified); *see also OCM Principal Opportunities Fund, L.P. v. CIBC World Mkts. Corp.*, 68 Cal. Rptr. 3d 828, 862–63 (Cal. Ct. App. 2007) (proximate cause in negligent misrepresentation case requires only a "connection with or relation" between plaintiff's losses and facts misrepresented, and fact that loss was "in part due to the depressed condition of the industry" does not prevent plaintiff "from recovering his entire loss"); *Engalla v. Permanente Med. Grp., Inc.*, 938 P.2d 903, 919 (Cal. 1997) (misrepresentation need not be "the sole or even the predominant or decisive factor" in plaintiff's conduct).

---

benefits. *Celador Int'l Ltd. v. Walt Disney Co.*, 347 F. Supp. 2d 846, 852–53 (C.D. Cal. 2004); *see Guz v. Bechtel Nat'l Inc.*, 8 P.3d 1089, 1110, 1112 n.18 (Cal. 2000). The FTX Group's deliberate misuse of its accounts constituted a bad-faith frustration of the agreements' benefits and is distinct from the express-breach theory; regardless, the duplication inquiry is not a basis to strip the claim of its *prima facie* validity. *See Guz*, 8 P.3d at 1110, 1112 n.18.

96. The FTX Trust never mentions the "substantial factor" standard; instead, it asserts the Fraud Claims fail "[f]or the same reasons" as the RICO claims. Mot. ¶ 65. But the Supreme Court has clearly held proximate cause "in the RICO context" does ***not*** take the exact same "shape[ ] proximate cause took at common law." *Hemi Grp., LLC v. City of N.Y.*, 559 U.S. 1, 12 (2010) (citation modified). The FTX Trust's own cases, Mot. ¶ 65, are not to the contrary (nor could they be). *Volkswagen II* rejected only the plaintiffs' "simple causality" description of California law and analyzed their fraud claims "assuming California's proximate cause standard is not identical to RICO's." 467 F. Supp. 3d at 858. And *Transamerica*, 975 P.2d at 655–56, simply describes California's causation standard, which is met here. More generally, all the FTX Trust's overarching proximate causation challenges fail for the reasons stated *supra* ¶¶ 47–67.

97. The Argent Trust easily satisfies the correct standard. As explained herein, the FTX Group's repeated, material misrepresentations directly to Silvergate undoubtedly played "more than negligible or theoretical" role in Silvergate's harms. *Beebe*, 309 Cal. Rptr. 3d at 476 (citation modified); *see supra* ¶¶ 44–45. California law allows a deceived financial institution to recover such losses, including regulator-driven payments and costs of responding to ensuing investigations.[103, 104]

**D. The Argent Trust's RICO Claims are Adequately Pleaded.**

98. The FTX Trust's only challenge to the Argent Trust's RICO claims is causation—it does not (and cannot) contest that the Argent Trust adequately pleaded every other element of

[103] *See, e.g.*, *All. Mortg.*, 900 P.2d at 615; *Gateway Bank*, 279 Cal. Rptr. 3d at 790–93.

[104] The FTX Trust's footnote (Mot. ¶ 65 n.25) on negligent misrepresentation adds nothing. That tort differs *only* in lacking scienter. *E.g.*, *Goehring v. Chapman Univ.*, 17 Cal. Rptr. 3d 39, 47 (Cal. Ct. App. 2004). Unlike this case where Silvergate's losses were connected to the FTX Group's misrepresentations, *Pacific Select Fund v. Bank of New York Mellon* dismissed fraud claims only because loss arose from "some subsequent event that has no connection with or relation to Defendant's misrepresentations." No. SACV 10-198, 2010 WL 11468787, at *4 (C.D. Cal. Sep. 20, 2010) (internal quotation marks omitted).

its civil RICO claims. As explained *supra* ¶¶ 45–67, the FTX Trust's causation arguments fail and the Argent Trust's RICO claims stand.

99. RICO's "by reason of" causation standard, 18 U.S.C. § 1964(c), requires a plaintiff show but-for and proximate cause. *Hemi*, 559 U.S. at 9. RICO proximate cause "demands some direct relation between the injury asserted and the injurious conduct alleged." *Med. Marijuana*, 604 U.S. at 612 (citation modified). Three considerations are "relevant to the RICO 'direct relationship' requirement": whether (1) "better situated plaintiffs would have an incentive to sue"; (2) there is a "concern of a double recovery by a better-situated plaintiff" for a similar injury; and (3) determining damages would "be unduly burdensome" on the court. *Hemi*, 559 U.S. at 11–12 (first two quotations); *St. Luke's Health Network, Inc. v. Lancaster Gen. Hosp.*, 967 F.3d 295, 302–03 (3d Cir. 2020) (last two quotations).

100. When viewed from the lens of RICO's "directness" factors, causation is further confirmed. *First*, the Argent Trust, as Silvergate's successor, is best situated to prosecute claims arising from the FTX Group's repeated misrepresentations to Silvergate and the unique harms Silvergate suffered as a direct result. *Second*, no other person or entity suffered similar injuries. *Finally*, calculating these injuries will not unduly burden the Court. The Argent Trust has already quantified its damages, MDS ¶¶ 116–23, and will present further supporting evidence during discovery. To the extent any uncertainty about these factors exists at this stage, this militates toward deferring resolution of RICO's "by reason of" requirement until after full discovery.[105]

101. Rather than addressing these factors, the FTX Trust relies on sweeping arguments and inapposite cases, all of which share a common defect: *none* involved a plaintiff that, like

[105] *See, e.g.*, *In re Volkswagen "Clean Diesel" Mktg., Sales Pracs., & Prods. Liab. Litig.*, 349 F. Supp. 3d 881, 908 (N.D. Cal. 2018) (holding RICO claims well-pled and denying motion to dismiss, and deferring resolution of "[w]hether Plaintiffs' claims pose a serious risk of multiple recoveries" to "later proceedings" after discovery).

Silvergate, was a *direct target* of the fraud that injured it. Its cases hold only that causation is lacking where the plaintiff "recouped the cost" it incurred during the fraud "at a profit," *Knit With v. Knitting Fever, Inc.*, No. 08-4221, 2012 WL 2938992, at *11 (E.D. Pa. July 19, 2012), or where the plaintiff was not a "direct target" or "direct victim" of the fraud, *e.g.*, *Nw. Human Servs., Inc. v. Panaccio*, No. 03-157, 2004 WL 2166293, at *4, *7 (E.D. Pa. Sept. 24, 2004).[106]

## III. THE FTX TRUST'S REMAINING ARGUMENTS ARE EQUALLY MERITLESS

### A. The Argent Trust Is Not Judicially Estopped From Asserting Its Claims.

102. Perhaps recognizing it cannot rebut causation, the FTX Trust cherry picks quotes from the Hetrick Declaration to argue judicial estoppel bars the Silvergate Claims in full. Mot. ¶ 54. Not so. Judicial estoppel requires demonstrating (1) the position to be estopped is "irreconcilably inconsistent" with the party's prior position, (2) "the party changed its position in bad faith," (3) the initial position was "accepted or adopted by a court" in a prior proceeding, and (4) the inconsistency is an "affront to the court's authority or integrity." *In re ESML Holdings*, 135 F.4th 80, 92 (3d. Cir. 2025) (citation modified). The FTX Trust comes nowhere close to making this showing.

103. *First*, the FTX Trust is wrong that the Hetrick Declaration takes "the opposite position." Mot. ¶ 54. As explained above, the Hetrick Declaration identifies that the "rapid

---

[106] *See In re Volkswagen "Clean Diesel" Mktg., Sales Pracs., & Prods. Liab. Litig.*, No. 2672, 2019 WL 4581340, at *9–10 (N.D. Cal. Sept. 20, 2019) (finding no proximate cause because plaintiffs salespeople were not direct victims of fraud and fraud could only impact commissions when fraud was revealed and sales fell); *Anza v. Ideal Steel Supply Corp.*, 547 U.S. 451, 458 (2006) (finding no proximate cause because "[t]he direct victim of th[e] conduct was the State of New York, not [the plaintiff]"); *Knopick v. UBS Fin. Servs., Inc.*, 121 F. Supp. 3d 444, 462, 464 (E.D. Pa. 2015) (finding no proximate cause where "[t]he direct victim of [the] tax fraud scheme" was "the United States government" and the plaintiff "was an indirect victim"); *Longmont United Hosp. v. Saint Barnabas Corp.*, No. 06-2802, 2007 WL 1850881, at *6 (D.N.J. June 26, 2007) (finding no causation because "the government [wa]s the party directly injured" by the defendant's conduct and the plaintiff's injuries were merely "derivative"); *BCCI Holdings (Lux.), Societe Anonyme v. Pharaon*, 43 F. Supp. 2d 359, 366 (S.D.N.Y. 1999) ("Banking regulators—not plaintiffs—were targeted and defrauded by the scheme detailed in the complaint."). *Hubbard*, 688 F.3d 713, is worst of all: not only did that not involve a fraudulent scheme targeted directly at the plaintiff, it was not a RICO case and was at a post-trial procedural posture.

collapse of FTX" dampened the crypto market, and that the 2023 regulatory warnings were a reaction to the FTX Group's fraud. *See supra* ¶¶ 32–33. The Hetrick Declaration did *not* take the position that the FTX Group's fraud was *not* the cause of Silvergate's harms, which is enough to reject the argument.

104. *Second*, even if there were any inconsistencies (there are not), judicial estoppel requires more. *ESML Holdings*, 135 F.4th at 92. The FTX Trust must show "culpability amounting to an *assault on the dignity or authority of the court*." *Id.* (emphasis added) (citation modified). It cannot. Its "bad faith" theory—that Silvergate concealed the Silvergate Claims before confirmation—is plainly false. Silvergate filed its proofs of claim in the FTX Group bankruptcy, timely scheduled those claims,[107] and disclosed them in its Disclosure Statement[108] filed on the first day of the Silvergate bankruptcy. And the Silvergate Plan[109] expressly contemplated the Argent Trust would assert the Silvergate Claims after the effective date.[110] That Silvergate viewed the FTX Group as the cause of its losses was never a secret. The FTX Trust falls far short of establishing its entitlement to "the harshest remedy" available. *Id.* (citation modified).

### B. The Silvergate Claims Are Not Barred By *In Pari Delicto* Or Unclean Hands.

105. The FTX Trust's invocation of *in pari delicto* and unclean hands is entirely without merit. To start, Silvergate's alleged misconduct—purported regulatory noncompliance—cannot

[107] Schedule of Retained Causes of Action at 4, Silvergate Dkt. No. 1017-8 (Oct. 13, 2025).

[108] Disclosure Statement at 11, Silvergate Dkt. No. 11 (Sep. 18, 2024).

[109] "Silvergate Plan" refers to the *First Amended Joint Chapter 11 Plan of Silvergate Capital Corporation and Its Affiliated Debtors*, Silvergate Dkt. No. 1077-1 (Nov. 13, 2025).

[110] Confirmation Order ¶¶ 13–21, Silvergate Dkt. No. 1077 (Nov. 13, 2025); Silvergate Plan at 58–67. This conclusively distinguishes the FTX Trust's only judicial estoppel case, *Krystal Cadillac-Oldsmobile GMC Truck, Inc. v. Gen. Motors Corp.*, 337 F.3d 314 (3d Cir. 2003), where the original disclosure statement omitted claims against General Motors as a potential asset, and the amended disclosure statement offered "little more than boilerplate" language about them. *Id.* at 320–21 (citation modified).

support *in pari delicto*. The defense is limited to where the plaintiff participated in the *same* wrongdoing for which it seeks redress.[111] The FTX Trust, however, does not contend Silvergate participated in the FTX Group's fraud. It points only to purported noncompliance, which is "irrelevant." *McAdam*, 896 F.2d at 758.

106. Even if regulatory noncompliance could support *in pari delicto*, the FTX Trust points only to no-admission settlements and consent orders and fails to present ***any*** evidence that Silvergate was noncompliant. *See supra* ¶ 60; *see also Bowers v. NCAA*, 563 F. Supp. 2d 508, 537 (D.N.J. 2008); *N.J. Tpk. Auth. v. PPG Indus., Inc.*, 16 F. Supp. 2d 460, 473 (D.N.J. 1998). Settlements with no finding of liability cannot establish Silvergate's "participation."[112]

107. The FTX Trust invokes this Court's observation in *FTX v. Binance* that these defenses may apply where the plaintiff's wrongdoing is "clear from the face of the Complaint." Mot. ¶ 111; *FTX v. Binance*, --- B.R. ----, No. 22-11068, 2026 WL 2149961, at *18–19 & nn.173–76 (Bankr. D. Del. July 24, 2026). The Argent Trust makes no such admission in its MDS. Rather, the Argent Trust alleges at length that the FTX Group's fraud proximately caused the regulatory scrutiny and Silvergate had no actual knowledge of the fraud. MDS ¶¶ 56, 63. Neither defense applies where the plaintiff is not a wrongdoer.[113] More generally, the FTX Trust's reliance on *Binance* is befuddling. The FTX Trust tries to stretch the decision far beyond what this Court intended as a sweeping rule that any plaintiff bearing any kind of fault is barred from recovery.

---

[111] *McAdam*, 896 F.2d at 757–58 (plaintiff must, "as a direct result of his own actions, bear[ ] at least substantially equal responsibility for the underlying illegality"); *accord Mailand v. Burckle*, 572 P.2d 1142, 1150 (Cal. 1978).

[112] The FTX Trust's attack, Mot. ¶ 117, that the Argent Trust's evidence does not "excuse Silvergate's own BSA/AML deficiencies" fails because it proceeds from this same faulty premise that the FTX Trust has established Silvergate violated BSA/AML rules. It has not. Moreover, the FTX Trust's allegations and the Wickouski Report's conclusions regarding the Committee Report, even if credited (though they should not be), say nothing about whether Silvergate participated in the FTX Group's fraud. The FTX Trust's allegations regarding the E3 Audit should be disregarded for the same reasons.

[113] *See, e.g.*, *Inter Med. Supplies Ltd. v. EBI Med Sys., Inc.*, 975 F. Supp. 681, 688 (D.N.J. 1997); *Kars 4 Kids Inc. v. Am. Can!*, 98 F.4th 436, 450 (3d Cir. 2024).

*Contra* Mot. ¶ 109. In doing so, the FTX Trust completely ignores that the decision barred the FTX Trust from recovering losses that the FTX Group's own pervasive fraud inflicted. If *Binance* applies here at all, it bars the FTX Trust's claims against Silvergate—not the other way around.

108. The FTX Trust's unclean hands argument fares no better. The FTX Trust's *only* claimed "analogous case" is *Peregrine Funding, Inc. v. Sheppard Mullin Richter & Hampton LLP*, 35 Cal. Rptr. 3d 31 (Cal. Ct. App. 2005), where the court barred a trustee whose debtor ran a Ponzi scheme from suing the law firm that enabled it. *Id.* at 48. That is *Binance*'s fact pattern, and is just as inapposite here. Silvergate did not orchestrate a scheme, the FTX Group did. Moreover, the FTX Trust's only support to its claim that Silvergate's business practices "violate[d] conscience, or good faith," is a cross-reference to the same regulatory orders addressing monitoring deficiencies that are not competent evidence of such deficiencies. Mot. ¶ 114; *see supra* ¶¶ 60, 106. The FTX Trust similarly cannot show the required "direct" relationship between the alleged misconduct and the claimed injuries. *See Salas v. Sierra Chem. Co.*, 327 P.3d 797, 812 (Cal. 2014). There are no allegations to support a claim that Silvergate's (alleged) failure to monitor transactions directly caused the FTX Group to repeatedly lie to Silvergate about the true nature of its accounts. Because Silvergate's alleged misconduct does not "pertain to the very subject matter involved," *id.* (citation modified), the unclean hands doctrine cannot apply.

**C. The FTX Trust's Preliminary Objections Should Be Disregarded.**

109. Each of the FTX Trust's preliminary objections, made in the alternative, are without merit. *First*, the FTX Trust seeks no present relief here. The Argent Trust does not dispute, and the Silvergate Plan contemplates, that any recovery the FTX Trust obtains on account of the FTX Claims would be set off against any recovery by the Argent Trust. *See* Silvergate Plan arts. I.A.91,

V.O, VIII.I. Regardless, setoff merely reduces a net distribution—it does not compel disallowance.[114]

110. *Second*, the FTX Trust is incorrect that the Argent Trust's indemnification claim is barred by Cal. Civ. Code § 2773. *See* Mot. at 66, ¶ 4. Section 2773 voids indemnity only where indemnitee acted with actual knowledge of its action's illegality—and, in any event, raises factual questions. *Lemat Corp. v. Am. Basketball Ass'n.*, 124 Cal. Rptr. 388, 396 (Cal. Ct. App. 1975); *State Farm Fire & Cas. Co. v. Eddy*, 267 Cal. Rptr. 379, 383–84 (Cal. Ct. App. 1990) (reversing grant of summary judgment to await full factual record). Here, the Argent Trust seeks indemnity for losses caused by the FTX Group's acts, not from Silvergate's own (allegedly) deficient compliance program. *See* MDS ¶¶ 7, 29, 91–96. Alleged false statements made by Silvergate to the public regarding its compliance program, even if discovery confirmed these allegations, are not the subject of the Silvergate Claims and cannot bar an indemnification claim under Section 2773. *See Lemat*, 124 Cal. Rptr. at 396.

111. *Finally*, there is no basis for equitable subordination. Equitable subordination is a "drastic" and "unusual" remedy applied only in limited circumstances. *In re Pack Liquidating, LLC*, No. 22-10797, 2025 WL 2587577, at *13 (Bankr. D. Del. Sep. 5, 2025). *First*, as Silvergate is a non-insider, the FTX Trust's allegations must show Silvergate's conduct was "more egregious"—amounting to fraud, overreaching, or spoliation—to justify subordination. *See In re Nu Ride Inc.*, No. 23-50414 (MFW), 2024 WL 4376130, at *22 (Bankr. D. Del. Oct. 1, 2024). The FTX Trust's allegations of regulatory noncompliance come nowhere close because there *was* no inequitable conduct by Silvergate; it was a victim of the FTX Group's fraud, not a participant. *See*

---

[114] *See, e.g.*, *In re Zohar III, Corp.*, 650 B.R. 622, 634–35 (Bankr. D. Del. 2023); *In re Quantum Foods, LLC*, 554 B.R. 729, 733–34 (Bankr. D. Del. 2016).

*supra* ¶¶ 12–15, 68. *Second*, the FTX Trust cannot establish injury to other creditors or any unfair advantage to Silvergate. *See In re SubMicron Sys. Corp.*, 432 F.3d 448, 462–63 (3d Cir. 2006). There is no injury to remedy, as the FTX Group's customer creditors have fully recovered on account of their claims, plus more. *See* Argent Mot. ¶ 59 & n.19 (collecting materials). The FTX Trust similarly cannot manufacture an unfair advantage by pointing to alleged "benefits" that were Silvergate's entitlements under valid agreements. *Lastly*, subordination would be inconsistent with the Bankruptcy Code. Silvergate engaged in no inequitable conduct, and creditors are being paid in full. Subordination would only serve to punish a defrauded depository and deny it the *pari passu* treatment to which it is entitled.

## CONCLUSION

112. For the foregoing reasons, the Argent Trust respectfully requests this Court enter an order denying the Motion in its entirety. A proposed order granting the relief requested is attached hereto as **Exhibit A**.

*[Remainder of the page is intentionally left blank.]*

Dated: November 9, 2026
Wilmington, Delaware

Respectfully submitted,

/s/ Ethan H. Sulik
L. Katherine Good (No. 5101)
Gregory J. Flasser (No. 6154)
Sameen Rizvi (No. 6902)
Ethan H. Sulik (No. 7270)
**POTTER ANDERSON & CORROON LLP**
1313 N. Market Street, 6th Floor
Wilmington, Delaware 19801
Telephone: (302) 984-6000
Facsimile: (302) 658-1192
Email: kgood@potteranderson.com
gflasser@potteranderson.com
srizvi@potteranderson.com
esulik@potteranderson.com

-and-

Dennis F. Dunne (admitted *pro hac vice*)
Daniel Perry (admitted *pro hac vice*)
Lauren C. Doyle (admitted *pro hac vice*)
**MILBANK LLP**
55 Hudson Yards
New York, New York 10001
Telephone: (212) 530-5770
Facsimile: (212) 822-5770
Email: ddunne@milbank.com
dperry@milbank.com
ldoyle@milbank.com

-and-

Andrew M. Leblanc (admitted *pro hac vice*)
Melanie Westover Yanez (admitted *pro hac vice*)
Hannah Blazek (admitted *pro hac vice*)
Riah Kim (admitted *pro hac vice*)
**MILBANK LLP**
1101 New York Avenue, NW
Washington, D.C. 20005
Telephone: (202) 835-7574
Facsimile: (202) 263-7574
Email: aleblanc@milbank.com
mwyanez@milbank.com
hblazek@milbank.com
rkim2@milbank.com

*Counsel to the Argent Liquidation Trust*