# **Exhibit G**

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---------------------------------------------------------------x

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | |
| *-v.-* | : | S7 22 Cr. 673 (LAK) |
| RYAN SALAME, | : | |
| Defendant. | : | |

---------------------------------------------------------------x

**<u>THE GOVERNMENT'S SENTENCING MEMORANDUM</u>**

DAMIAN WILLIAMS
United States Attorney
Southern District of New York

Danielle Kudla
Samuel Raymond
Thane Rehn
Nicolas Roos
Danielle R. Sassoon
Assistant United States Attorneys
Southern District of New York
*- Of Counsel -*

**TABLE OF CONTENTS**

PRELIMINARY STATEMENT ..... 1
FACTUAL BACKGROUND ..... 2
PROCEDURAL HISTORY ..... 11
APPLICATION OF THE SENTENCING GUIDELINES ..... 11
A SENTENCE OF FIVE TO SEVEN YEARS' IMPRISONMENT IS APPROPRIATE ..... 13
I. The Nature, Circumstances, and Seriousness of the Offenses ..... 14
II. The Court Should Consider General Deterrence in Imposing Sentence ..... 17
III. A Substantial Sentence is Required to Afford Specific Deterrence ..... 18
IV. Comparator Cases Suggest the Defendant Should Receive a Sentence of Five to Seven Years' Incarceration ..... 20
V. The Defendant's Other Arguments for Leniency Are Not Merited ..... 24
FORFEITURE AND RESTITUTION ..... 28
CONCLUSION ..... 28

The Government respectfully submits this memorandum in advance of the sentencing of Ryan Salame, presently scheduled for May 28, 2024, and in response to the defendant's sentencing memorandum dated May 14, 2024 ("Def. Mem.").

## PRELIMINARY STATEMENT

From 2019 until November 2022, Ryan Salame was a high-ranking executive, first at Alameda Research ("Alameda") and then at FTX.com ("FTX"), during which time he assisted Samuel Bankman-Fried in perpetrating aspects of the interrelated frauds that Bankman-Fried carried out at both companies. Salame, who Bankman-Fried prized for loyalty and served many different roles for Bankman-Fried's empire, committed two serious crimes to foster the growth of FTX and burnish Bankman-Fried's image: he helped lead efforts to allow customers to send and receive fiat currency to fund their FTX accounts through U.S.-based bank accounts without complying with federal registration requirements; and he acted as a straw donor to help pump more than $100 million dollars in illegal contributions through the U.S. political system to help support Bankman-Fried and FTX's legislative priorities. The campaign finance offense is one of the largest-ever in American history, and the unlicensed money transmitting business exchanged more than $1 billion without proper supervision. Those are serious crimes, and a substantial sentence is required to ensure that Salame receives just punishment. General deterrence is also particularly important in this closely watched case. Would-be violators of the campaign finance laws must understand that these are not minor offenses. And players in the crypto industry, who are serial offenders of the money transmission laws, must understand that they disregard the registration requirements at their peril. Only a meaningful period of incarceration could adequately deter the defendant and others, and promote respect for the law. For these reasons, the relevant sentencing factors require an aggregate sentence within the range of five to seven years' imprisonment.

## FACTUAL BACKGROUND

Salame began working at Alameda in 2019, and moved over to become CEO of FTX Digital Markets, FTX.com's Bahamian affiliate, in 2021. Salame was a loyal and trusted high-level associate of Bankman-Fried. As Caroline Ellison testified at trial, Bankman-Fried "really valued Ryan for his loyalty." (Tr. 690) (Ellison testimony).[1] Because of his loyalty to Bankman-Fried, and his leadership roles as the head of the Settlements Team at Alameda and then CEO of FTX Digital Markets, the defendant was involved in critical and varied roles and decisions at the companies throughout his tenure. For instance, he was relied upon to integrate FTX into the Bahamas (Def. Mem. at 9), and he spoke to Caroline Ellison about ways to retrieve funds from cryptocurrency exchanges in China that had frozen Alameda accounts (Tr. 830) (testimony from Ellison).[2]

While he was not directly involved in perpetrating the $8 billion fraud on FTX's customers, he nonetheless willingly assisted Bankman-Fried in committing other serious crimes to further FTX's and Bankman-Fried's interests. As he admitted in connection with his guilty plea on September 7, 2023, he conspired to defraud the United States and to willfully violate the Federal Election Campaign Act, and conspired to operate an unlicensed money transmitting business. As part of his guilty plea, the defendant also agreed to be held responsible in connection with sentencing for conspiring to make false statements to banks as part of the unlicensed money transmitting business; willfully making an excessive political contribution to a candidate for

[1] Salame himself cites excerpts of testimony during Bankman-Fried's trial, and a Court may consider a co-defendant's trial record when sentencing a defendant who pled guilty. *See United States v. Romano*, 825 F.2d 725, 729 (2d Cir. 1987); *United States v. Babilonia*, 687 F. App'x 63 (2d Cir. 2017).

[2] The Government does not have evidence that Salame was involved in criminal conduct related to this incident.

federal office in 2022; and fraudulently misappropriating property of the FTX bankruptcy estate and then subsequently spending those proceeds from November 2022 through January 2023.

This criminal conduct was motivated by, among other things, greed. While Bankman-Fried and other FTX employees purported to follow the philosophy of effective altruism, Salame had more traditional motivations: he sought money and influence. He earned millions of dollars at Alameda and FTX, (Presentence Investigation Report ("PSR") ¶ 88), and the value of his holdings on FTX at some point were worth hundreds of millions of dollars, at least on paper. He spent that money purchasing homes, cars (PSR ¶ 92), restaurants in Lenox, Massachusetts (Def. Mem. at 11), and other luxury items.

**A. Unlicensed Money Transmission and False Statements to Banks**

When FTX was first established in 2019, its founder Sam Bankman-Fried wanted to appeal to many different types of cryptocurrency customers: not only customers who already had purchased cryptocurrency from another exchange or wanted to withdraw cryptocurrency from FTX, but also customers seeking to buy cryptocurrencies using fiat currency or vice versa. In order to do that, FTX needed to obtain bank accounts to receive and send customer fiat currency. (PSR ¶ 23). However, in 2019 and 2020, U.S. banks were generally reluctant to open accounts for cryptocurrency companies, particularly exchanges, because it is illegal for a cryptocurrency company operating in the United States to receive and send fiat currency without obtaining the appropriate license from the Department of Treasury and complying with federal anti-money laundering requirements. *See, e.g.*, *United States v. Murgio*, 209 F. Supp. 3d 698, 705-07 (S.D.N.Y. 2016), *conviction aff'd*, 32 F.3d 40, 49 (2d Cir. 2019); (PSR ¶ 23–24).

Salame joined Alameda in 2019. (PSR ¶ 52). He ultimately rose to be head of the "Settlements Team." In order to satisfy Bankman-Fried's desire to allow transactions in fiat, at

FTX's inception, instead of opening an account at a bank in FTX's name, which would have required obtaining such a money transmission license and complying with related rules, FTX simply used preexisting bank accounts in the name of Alameda Research. (PSR ¶ 25). The Settlements Team, which Salame oversaw, was responsible for managing the fiat-to-crypto process for FTX customers: employees assigned to the Settlements Team were tasked with manually tracking customer fiat deposits and withdrawals sent to or from the applicable Alameda bank accounts and crediting or debiting that customer's FTX account with the appropriate amount of funds via an internal ledger system. (PSR ¶ 52). When deposited, customers could use these funds on FTX's suite of products, and FTX charged fees and generated revenues from many of these activities. (PSR ¶ 31). But Alameda employees never informed the applicable banks that the accounts were now being used not only for Alameda's purposes, but also for customer deposits and withdrawals on FTX. Indeed, in May 2020, an employee at Signature Bank, where Alameda had a bank account, asked about a transfer received from an FTX customer. With Salame's knowledge, an Alameda employee responded falsely that the transfer was actually related to Alameda. (PSR ¶ 28).

Over time, however, banks began to reject many of the wires sent to the Alameda accounts. In October 2019, Salame, Bankman-Fried, and others tried to formally open a bank account at Silvergate Bank to transmit fiat currency to and from FTX customers. But the bank did not agree to open such an account, stating that it required information that FTX.com was licensed and registered, including registration with the Department of Treasury, and that even with such registration, Silvergate would first conduct an enhanced due diligence process before opening an account used to process customer deposits and withdrawals. FTX.com was not at that time, and never was, properly licensed and registered in the United States. (PSR ¶ 26).

Case 1:22-cr-00673-LAK Document 436 Filed 11/05/24 Page 7 of 30

Instead of complying with the bank's instruction, in or about August 2020, Bankman-Fried directed the incorporation of a new U.S.-based entity, North Dimension. (PSR ¶ 29). Bankman-Fried and others chose the name "North Dimension," in part to conceal from the banks where North Dimension opened accounts that there was a relationship between North Dimension, Alameda, and FTX. (PSR ¶ 29).[3] In the fall of 2020, Alameda employees falsely claimed to Silvergate Bank that North Dimension sought to open an account to facilitate North Dimension's trading; these false statements were designed to evade the bank's prior instructions that it would only open an account for onboarding and off-boarding FTX customer fiat if the exchange was properly licensed in the United States and passed the bank's enhanced diligence. (PSR ¶ 30). The account application submitted to the bank on behalf of North Dimension included false statements about the purpose of the North Dimension account, and the due diligence questionnaire which Bankman-Fried signed also included false statements about North Dimension. (PSR ¶ 30).[4] At no point did North Dimension have actual operations; it was only used to open the bank account and exchange FTX customer fiat. North Dimension also did not obtain a money transmitting license from the Department of Treasury.

In April 2021, Silvergate Bank approved the opening of the North Dimension account, without a money transmitting license, enhanced due diligence or review by the bank's executive

[3] Salame objects that he had no role in choosing the name North Dimension. (Def. Mem. at 16). The Government's evidence indicates that around or before the period in which North Dimension was incorporated, Salame told others about the new entity including its name, indicating that he was involved in that decision.

[4] Salame objects that he did not direct the specific false statements relayed to Silvergate Bank. (Def. Mem. at 16). The Government's evidence indicates that Salame was a participant in communications where the specific false statements were discussed as they were being prepared to be submitted to Silvergate Bank. Regardless of whether he directed specific false statements, in his sentencing submission, Salame does not dispute the core fact that he did learn of the false statements to the Bank and did nothing to correct them. (Def. Mem. at 16).

committee. (PSR ¶ 30). Once the North Dimension bank account was opened, FTX.com directed customer dollar deposits to that account. (GX-568) (wire instruction on FTX website instructing customers to send fiat to the North Dimension account). Thereafter, the Settlements Team would make the internal notations to credit or debit funds to customers on their FTX account. When customers withdrew fiat from their FTX accounts, FTX employees sent those withdrawals by wire transfer from the North Dimension bank account; by no later than the summer of 2021, the platform charged a fee for such withdrawals. (PSR ¶ 31).

As the head of Settlements in 2021, Salame oversaw this credit and debit process through the North Dimension account. In the period from when North Dimension was opened until when Salame left Alameda in the fall of 2021, the North Dimension account at Silvergate Bank was the primary means by which customers of FTX.com onboarded fiat currency, and customers deposited or withdrew more than $1.5 billion in the account.[5] (PSR ¶ 32). Over the entire period in which North Dimension was the primary means for fiat conversion, it processed more than $5 billion. (PSR ¶ 32 n.1).

Many customers took advantage of this fiat "on-ramp" and "off-ramp," which was an important competitive advantage that FTX enjoyed over other crypto exchanges. Some cryptocurrency derivative platforms only accepted or allowed withdrawals of cryptocurrency, but by using the North Dimension account FTX allowed its customers to buy or sell cryptocurrency directly, which meant that it was easier for customers with no prior experience with cryptocurrency

[5] Salame mentions at times that the "government has proffered that deposits to Alameda and North Dimension accounted for only $10 million." (Def. Mem. at 7 n.5). This appears to be a product of miscommunication with defense counsel. In fact, during the period when Salame was running Settlements and the North Dimension account was active, from April 2021 until August 2021, the North Dimension account received more than $600 million in customer deposits and sent more than $900 million for customer withdrawals. This is the basis of the offense amount in the Guidelines Range to which Salame agreed in the plea agreement.

to use FTX than to use competing exchanges that did not have unlicensed fiat currency-depositing mechanisms.

**B. Unlawful Political Contributions through Alameda**

In the fall of 2021, Salame transferred from Alameda to become the CEO of FTX's Bahamian affiliate, FTX Digital Markets. Beginning around this time through the 2022 mid-term elections, Salame, Bankman-Fried, and Nishad Singh made a total of more than $100 million dollars in campaign contributions to politicians in both parties. These contributions were made to improve Bankman-Fried and Salame's personal standing in political corridors, increase FTX's profile, and curry favor with candidates that could help pass legislation favorable to FTX, including legislation concerning regulatory oversight over FTX and its industry, as well as legislation related to other causes favored by Bankman-Fried and his co-conspirators. These contributions were made through unlawful means. The contributions were paid for with Alameda corporate funds (at least some of which had been stolen from FTX's customers). The true source of the funds used to make the contributions was concealed by having Salame and Singh serve as conduit contributors or straw donors. Specifically, money was transferred from Alameda to Singh's or Salame's bank accounts to pay for donations to political campaigns. The use of the straw donors allowed Bankman-Fried to evade contribution limits for dozens of individual donations to candidates to whom Bankman-Fried had already donated.

Bankman-Fried was the mastermind of the scheme. While he was interested in supporting candidates of both major political parties and across the political spectrum, he did not want to be known as a left-leaning partisan, or to have his name publicly attached to Republican candidates. (PSR ¶ 18). In order to obscure Bankman-Fried's association with certain contributions, those contributions were made in the names of Salame and Singh, instead of Bankman-Fried or

Alameda. (PSR ¶ 18). Salame explained the scheme plainly to a confidant: "Sam wants to donate to both democtratic [sic] and republican candidates in the US but cause the worlds frankly lost its mind if you dontate [sic] to a democrat no republicans will speak to you and if you donate to a republican then no democrats will speak to you." (PSR ¶ 18); (GX-505). Salame would be the face of the Republican donations, with Bankman-Fried "rout[ing] money through me," with the intention of "heavily putting money to weed out anti crypto dems for pro crypto dems and anti crypto repubs for pro crypto repubs." While Bankman-Fried was particularly featured in the media, he was not the only conspirator to gain power and influence. Salame also enjoyed the fruits of the donations scheme. As he acknowledges, his huge donations granted him access to meetings with powerful political figures, including United States Senate and United States House of Representatives leaders. (Def. Mem. at 11).

Between in or about the fall of 2021 and the November 2022 election, Salame, Bankman-Fried, and Singh collectively made tens of millions of dollars in contributions, including in "hard money" contributions, to federal candidates from both major political parties. (PSR ¶ 19). The money used to make these political donations or to compensate for donations made by credit card originated from Alameda or FTX bank accounts. (PSR ¶ 19). Notwithstanding his awareness of the campaign finance laws, in order to conceal the true source of the funds, Salame agreed with others that the contributions would be transferred from Alameda's bank accounts to bank accounts in his, Singh, or Bankman-Fried's name, and then from those individuals' bank accounts to the relevant campaigns. (PSR ¶ 19).

To further conceal the scheme, the outgoing wire transfers from Alameda to the bank accounts were recorded as Alameda "loans" or "expenses." (PSR ¶ 20). Unlike other loans that were made to FTX executives, most (but not all) of these outgoing wire payments were not

documented in agreements or on term sheets, and there were no set interest rates, no interest payments, no collateral, and no evidence of repayment. (PSR ¶ 20).

In total, Salame and his co-conspirators made over 300 political contributions, totaling tens of millions of dollars, that were unlawful because they were made in the name of a straw donor or paid for with corporate funds. (PSR ¶ 21). This also allowed the donors to evade contribution limits on individual donations to candidates to whom they had already donated. (PSR ¶ 21). As a result of this fraudulent conduct, Salame and his co-conspirators also caused false information to be reported by campaigns and PACs to the Federal Election Commission, which had the result of impairing and impeding the FEC's reporting and enforcement functions.

**C. Other Unlawful Political Contributions**

Salame engaged in other unlawful political donations. In June 2022, Salame donated the maximum allowed amount to support the Congressional campaign of a close associate. (PSR ¶ 33). Even though he had already made the maximum individual contribution, and was barred by law from making additional contributions to the candidate, Salame continued to wire hundreds of thousands of dollars to the associate, which the associate immediately wired into the associate's Congressional campaign account. (PSR ¶ 34). This included over $200,000 sent after the associate lost in the primary, to assist in retiring outstanding debts the associate owed. (PSR ¶ 35). These payments far exceeded the applicable contribution limit, and were thus illegal. (PSR ¶ 36). To conceal what he was doing, the payments were made to the associate's personal account (not their campaign account), and were not reported to the FEC.

**D. Transfers from FTX in November 2022**

While Salame did not have contemporaneous knowledge of Bankman-Fried's theft of billions of dollars of customer funds, he, like many others at FTX, began to learn the truth soon

after Alameda's balance sheet was leaked to and then published by CoinDesk on November 2, 2022. (PSR ¶ 37). When FTX began experiencing huge customer outflows around November 6, 2022, Salame was involved in the efforts to try to staunch the bleeding and raise necessary funds. On November 6 and 7, he recognized there was a meaningful chance FTX would go bankrupt, and even told an associate on November 7 that FTX needed more than one billion dollars to meet ongoing and accelerating customer withdrawals. (PSR ¶ 37).

Despite this knowledge, Salame acted in his own interest that day. At about 8:30 P.M. on November 7, 2022, Salame withdrew more than $5 million in cryptocurrency from an account he controlled on FTX.com to a crypto wallet. (PSR ¶ 38). He tried to withdraw tens of millions more that evening, but the withdrawals failed.[6] Over the next few days, Salame was a party to additional conversations about FTX's doomed position, some of which raised the implication that Bankman-Fried had committed a massive fraud. (PSR ¶ 38). On the morning of November 9, 2022, Salame learned that FTX's US affiliate FTX.US was also affected and had a deficit of $45 million in funds; one senior FTX.US executive recommended shutting down all trading calling the deficit a "tier 1 fire at any financial institution." (PSR ¶ 39). Salame nonetheless withdrew nearly $600,000 in cryptocurrency from his account at FTX.US on November 11, 2022, hours before the bankruptcy. (PSR ¶ 40).

FTX and FTX.US declared bankruptcy on November 11, 2022. Despite the bankruptcy and the public revelation that Bankman-Fried had been stealing customer funds, Salame spent millions of dollars from the more than $5 million he had transferred from FTX to himself on November 7. Among other things, he spent the money on hiring a public relations firm and paying off personal

[6] As the Court knows from Mr. Bankman-Fried's trial, the huge number of customer withdrawal requests led to backlog and delay.

credit card expenses, including a $20,000 charge at Restoration Hardware that he incurred after the bankruptcy. (PSR ¶ 41).[7]

## PROCEDURAL HISTORY

On September 7, 2023, Salame self-surrendered, waived indictment, and consented to the filing of the S7 Information. That Information charges him in two counts. Count One charges him with conspiracy to make unlawful political contributions and defraud the Federal Election Commission, in violation of 18 U.S.C. § 371 and 52 U.S.C. §§ 30118, 30109, 30122. Count Two charges conspiracy to operate an unlicensed money transmitting business, in violation of 18 U.S.C. §§ 371 and 1960. Salame pleaded guilty to both counts pursuant to a plea agreement, and was ordered bailed. In the plea agreement, the defendant agreed to entry of a forfeiture money judgment of more than $1 billion, which obligation the Government has agreed will be satisfied if the defendant pays $6 million dollars and the Government successfully forfeits specific property turned over by the defendant. The defendant has also agreed to pay $5,593,177.91 to the debtors of the FTX estate in restitution. All payments are to be made by the date of sentencing.

## APPLICATION OF THE SENTENCING GUIDELINES

Consistent with the plea agreement, Probation has calculated an offense level of 40, as follows:

- Pursuant to U.S.S.G. §3D1.2(d), Counts One and Two are grouped because the offense level is determined largely on the basis of the total amount of harm or loss. (PSR ¶ 54).
- Pursuant to USSG § 3D1.3(b) and Application Note 3, the Guidelines applicable to the offenses charged in Counts One and Two are U.S.S.G. §§ 2X1.1 and 2C1.8 because

[7] Salame did not transfer the $600,000 he had moved from FTX.US on November 11, 2022.

those Guidelines, which are applicable to Count One, produce the highest offense level. (PSR ¶ 54).

- Pursuant to U.S.S.G. § 2X1.1(a), the base offense level is determined from the guideline for the substantive offense, plus any adjustments from such guideline for any intended offense conduct that can be established with reasonable certainty.
- Pursuant to U.S.S.G. § 2C1.8, the base offense level is 8. (PSR ¶ 55).
- Pursuant to U.S.S.G. § 2C1.8(a), because the value of the illegal transactions exceeded $6,500, the offense level is increased by the number of levels in the 2B1.1 table. Salame is responsible for more than $100,000,000 in illegal campaign contributions, and over $1 billion for the operation of the money transmitting business, meaning 30 levels are added under U.S.S.G. § 2B1.1(b)(1)(P). (PSR ¶ 56).
- Pursuant to U.S.S.G. § 2C1.8(b)(4), because Salame and his co-conspirators made at least 30 illegal transactions as part of the crime, two levels are added. (PSR ¶ 57).
- Pursuant to U.S.S.G. §3B1.1(b), because Salame managed and directed others in the unlicensed money transmitting, which involved five or more participants or was otherwise extensive, three levels are added. (PSR ¶ 59).
- Pursuant to U.S.S.G. §3E1.1, because the defendant accepted responsibility, three levels are removed. (PSR ¶ 60).

The defendant's criminal history score is zero, which puts him in Criminal History Category I. (PSR ¶ 68). Based upon these calculations, Salame's advisory Guidelines range is 292 to 365 months' imprisonment. (PSR ¶ 96). However, because the statutorily authorized maximum sentence is 10 years' imprisonment, the applicable Guidelines sentence is 10 years' (120 months') imprisonment. U.S.S.G. §§ 5G1.1(a), 5G1.2(d).

The Probation Office recommends a sentence of 120 months' imprisonment. (PSR at 38). Its recommendation focuses on the serious offense conduct, the large amounts of money involved, and the need for general deterrence. (PSR at 39–40).

**A SENTENCE OF FIVE TO SEVEN YEARS' IMPRISONMENT IS APPROPRIATE**

As the Court knows well, a criminal sentence must be crafted to reflect the seriousness of the offense, promote respect for the law, provide just punishment, deter future criminal conduct by the defendant and others, and avoid unwarranted disparities among similarly situated defendants. 18 U.S.C. § 3553(a). The "starting point" in making any sentencing determination remains the United States Sentencing Guidelines. *Gall v. United States*, 552 U.S. 38, 49 (2007). Here, the offense level is well beyond the applicable statutory maximum, which results in an advisory Guidelines sentence equal to the combined statutory maximum sentences for the defendant's crimes of conviction, ten years. *See* U.S.S.G. § 5G1.2(d).

In light of the defendant's serious crimes, which were designed to undermine the integrity of the U.S. campaign finance system and the U.S. financial system, a substantial term of incarceration, well above the 18 months' he requests, is required. The defendant's assertion that his crimes were intended only to help FTX and the cryptocurrency industry more generally are not mitigating and also belied by the evidence, which indicates that the defendant personally benefited in numerous ways from his criminal actions. Only a substantial incarceratory sentence could appropriately reflect the nature and seriousness of his conduct and afford adequate deterrence. In light of the sentencing factors discussed below, the Government respectfully requests that the Court impose an aggregate sentence within the range of five to seven years' incarceration, for both offenses.

## I. The Nature, Circumstances, and Seriousness of the Offenses

A substantial sentence is needed because the defendant played a critical role in two serious crimes while working at Alameda and FTX, and committed other relevant conduct during his employment there. His crimes and misconduct merit such a sentence because they undermined public trust in American elections, the financial system, and, contrary to his claims now, were often motivated by his own financial interests.

*First*, the defendant's offense threatened to dramatically undermine ordinary voters' faith in the integrity and fairness of American elections. The vast scope of this campaign finance offense is overwhelming. The defendant and his co-conspirators deployed over $100 million in illegal donations as part of their effort to influence the 2022 mid-term elections. No campaign finance crime of that scale has been attempted in this country's history. The defendant has not masked his motive: he and Bankman-Fried wanted to support candidates that they perceived as more favorable to the cryptocurrency industry. (Def. Mem. at 10) (Salame "formed GMI, a nonpartisan political action committee [] focused on supporting pro-crypto candidates from both major parties running for House and Senate seats. The PAC aimed to increase support for cryptocurrency without regard to political affiliation."). In 2021 and 2022, when the defendant committed this crime, there were serious political disputes in Washington, D.C., about how cryptocurrency and related products should be regulated – including whether certain cryptocurrencies were securities, whether the SEC or the CFTC was the best regulator of crypto, and whether crypto exchanges should be able to offer margined derivative products to retail customers.

Instead of trying to win those debates through reasoned means, Salame and Bankman-Fried took a massive, secretive shortcut, using corporate funds and straw donors to pour tens of millions of dollars to unlawfully support politicians they believed to be crypto-friendly. Using

straw donations in this manner undermines election transparency, and Salame's election crimes are particularly serious for their damaging consequences on the public perception of electoral politics. As Judge Oetken described at a sentencing for campaign finance offenses, described in more detail below, "[a]ny time there's a violation of these campaign prohibitions, the integrity of our electoral system is undermined and compromised. It adds to cynicism in the eyes of the public and to the perception that the system may be corrupt. Our democracy is fragile. It depends on people believing in it. And this type of criminal conduct threatens that belief and the legitimacy of our system." *United States v. Fruman*, 19 Cr. 725 (JPO), Dkt. No. 301 at 20; *see also United States v. Pan*, 12 Cr. 153 (RJS), Dkt. 204 at 31 ("the damage done" by illegal campaign contributions "in adding to what could fairly be characterized as public cynicism over this process is incalculable . . . it's a very serious crime for that reason because it makes people shrug and say the system is corrupt."). The public reaction to the revelation of the crimes committed by the defendant, Bankman-Fried, and Nishad Singh has borne out that concern, with dozens of news stories reflecting how the offense undermined the trust of ordinary voters in the political system.

*Second*, Salame's actions undercut appropriate regulation of the U.S. financial system. Federal law prohibits the operation of unlicensed money transmitting businesses. That prohibition exists to safeguard the financial system, both in the United States and around the world, from illicit use, and to combat money laundering. Money transmitting businesses must comply with federal law regarding the implementation of robust anti-money laundering checks to ensure that they do not foster criminal activity, and they must identify for law enforcement potential misconduct on their platforms by filing Suspicious Activity Reports ("SARs"). Through

the defendant's leadership of the Alameda Settlements Team, FTX evaded those requirements,[8] failed to file SARs when appropriate, and did so through deceit by making a series of false statements to open and maintain the North Dimension and Alameda bank accounts. This is no mere technical violation. It allowed FTX to grow quickly at the cost of imposing substantial risks to U.S. banks given FTX's lack of compliance with federal anti-money laundering rules.

*Third*, the defendant's crimes are serious because they were often motivated by his own personal financial interests. While the defendant asserts that he personally believed in the cryptocurrency policy and political candidates he supported (Def. Mem. at 21, 22), these aims also aligned perfectly with FTX's financial interests, and thus his own. Similarly, he argues that he believed operating the unlicensed money transmitting "would only *benefit* FTX's customers . . . by offering a simpler way to onboard and offboard their fiat currency to the FTX platform." (Def. Mem. at 22). But the benefits to FTX's customers also meant that FTX would continue to grow, and faster, with material rewards to Salame. As described above, he earned millions of dollars in income, flew on private jets around the world (Def. Mem. at A-2, letter from pilot of private jet company who flew Salame), acted as hometown hero and bought restaurants in Lenox, Massachusetts (Def. Mem. at 11), and his wealth allowed him to be feted as a potential kingmaker in Washington, D.C. Had Salame and Bankman-Fried's efforts to warp the regulatory environment fully succeeded, FTX would have had a pathway to even greater growth in the United States, further lining Salame's pockets (while also dramatically expanding the scope of Bankman-Fried's fraud).

---

[8] During the relevant time period, FTX did have some anti-money laundering controls, but did not comply with the panoply of obligations imposed by the Bank Secrecy Act.

Nor should the Court ignore the defendant's conduct in November 2022. While Salame did not know of Bankman-Fried's theft of customer funds or the related dire financial condition of FTX before November 2022, he withdrew a substantial amount of money upon learning of such circumstances. Salame argues that when he did learn of those facts in November 2022, he solely acted benevolently, informing Bahamian authorities and blowing the whistle. (Def. Mem. at 15). But his November 2022 transfers also indicate that he acted in his own financial interests, withdrawing and later spending millions of dollars that appropriately belonged to FTX's creditors.

## II. The Court Should Consider General Deterrence in Imposing Sentence

A substantial sentence is required to send an appropriate message to others. As an initial matter, white collar cases like this one "argue for punishing more heavily those offenses that either are lucrative or are difficult to detect and punish, since both attributes go to increase the expected benefits of a crime and hence the punishment required to deter it." *United States v. Heffernan*, 43 F.3d 1144, 1149 (7th Cir. 1994). It took FTX's massive and high-profile collapse to reveal the defendant's crimes. A substantial sentence is required to deter others from engaging in similarly insidious misconduct.

With respect to the money transmitting charge, FTX was not the first company to operate as an unlicensed money transmitting business exchanging traditional currency for crypto. As described further below, this Office, and the Department of Justice more broadly, have prosecuted numerous such cases, often resulting in meaningful periods of incarceration and substantial financial penalties for those companies' employees. This Court's sentence of the defendant will provide another warning sign to cryptocurrency companies operating in the U.S. that they must comply with federal registration laws.

Case 1:22-cr-10678-KBX Doc 36936-7 Filed 11/09/26 Page 20 of 30

The Court should impose a substantial sentence for the defendant's campaign offense as well. As described above, there has been intense public focus on crimes committed at FTX, including the unlawful donations conspiracy. The deterrent message of a substantial sentence will resonate to wealthy individuals and companies seeking to pervert the electoral system to their personal benefit, and hopefully indicate to American citizens how seriously government officials take such violations. *See United States v. Binday*, 12 Cr. 152 (CM), Dkt. 349, at 46 ("Only if white collar crime is punished commensurate with the damage it inflicts on society will citizens actually believe that the law metes out equal right to the poor and to the rich, which words are the cornerstone of the judicial oath.").

The defendant asserts that the financial penalties, media scrutiny, and impact on his loved ones are more than sufficient to deter others from offending in similar fashion. (Def. Mem. at 31). But the numerous and often high-profile cases brought by the Department of Justice against cryptocurrency exchanges for violating the money transmitting laws, and against individuals who commit campaign finance offenses, belie that simple conclusion. And regardless, the Second Circuit has recognized that "the public humiliation suffered by one prosecuted and convicted of a crime is an ordinary consequence of his conduct, not a condition imposed by the criminal codes or the judicial process. These circumstances, though adverse, are not what § 3553(a)(2)(A) means by 'punishment.'" *United States v. Cutler*, 520 F.3d 136, 171 (2d Cir. 2008).

## III. A Substantial Sentence is Required to Afford Specific Deterrence

A substantial sentence is also needed to protect the public and afford adequate deterrence to the defendant.

While FTX no longer exists, it is still necessary to consider the risk of recidivism here. The defendant committed two serious crimes, and other forms of misconduct, while earning millions of dollars and being cheered as a political power broker and hometown hero. Whatever

the sentence the Court imposes, the defendant will still be a relatively young man when he is released. Life is long, the news cycle moves on, and the defendant could once again be faced with the opportunity to commit white collar crimes that he may view as having a low likelihood of detection. *United States v. Laguardia*, 19 Cr. 893 (LAK) (S.D.N.Y. Aug. 31, 2021), Dkt. No. 116 ("It's very easy sometimes, in a case like this, to say, well, look at all the trouble the defendant has gotten himself into, look at the harm that's been done to his family, look at the loss he suffered himself, there is no way he'll ever do something like this again, and maybe that's true in your case. I wish I were sure it were true. . . . in the case of someone who, at least when they got into it, thought everything was going to work out fine? Maybe the next time temptation comes along, you'll think it will work out fine, too, and the bad outcome the first time was a mistake."). Indeed, while the defendant does accept responsibility for his offenses in his sentencing letter, he also appears to shift some blame for his conduct to attorneys at FTX and Alameda, as described below, raising the concern that in the future were a lawyer to appear to authorize criminal conduct the defendant would simply go along with it.

Salame argues that specific deterrence is unnecessary because of his efforts at rehabilitation, the substantial financial penalties he has already paid and continues to face, the highly public nature of this case, and the numerous laws that restrict felons. (Def. Mem. at 29–31). But one conviction, even at a company as high-profile as FTX, does not ensure that a defendant will comply with the law going forward, and the defendant has shown himself enterprising and entrepreneurial such that he could again amass large sums of money even after paying the applicable financial penalties.

Case 22-11068-KBO Doc 36936-7 Filed 11/09/26 Page 22 of 31

## IV. Comparator Cases Suggest the Defendant Should Receive a Sentence of Five to Seven Years' Incarceration

While as described the 3553(a) factors all weigh in favor of a substantial period of incarceration, the Government does recognize that in this case, a sentence at the Sentencing Guidelines of 10 years' imprisonment would be too severe. Section 3553(a)(6) requires the Court to consider "the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct." While the Government believes that FTX was one of the largest unlicensed money transmitters, and that the campaign finance violation is among the largest by dollar value in U.S. history, defendants in relatively similarly cases have all received shorter periods of incarceration than the Sentencing Guidelines here would suggest. Based on the relevant comparator cases, as well as described herein the defendant's modest attempted cooperation, the Government respectfully submits that the Court should impose a sentence of five to seven years' imprisonment. Such a sentence would be below the applicable Guidelines range, but would reflect the seriousness of the offense here relative to other instances where defendants have engaged in unlicensed money transmission or committed campaign finance offenses.

In other unlicensed money transmission cases involving the exchange of fiat currency for digital assets, courts have generally imposed sentences of a few years' imprisonment, absent indication that the defendant knew his or her business was being used for large-scale money laundering or that he or she was committing other crimes like narcotics trafficking, money laundering, bank fraud, or wire fraud. *See, e.g., United States v. Marmilev*, 13 Cr. 368 (S.D.N.Y.) (DLC) (five year sentence for defendant who was Chief Technology Officer at digital currency service Liberty Reserve); *United States v. Chukharev*, 13 Cr. 368 (S.D.N.Y.) (DLC) (three year sentence for minor participant at Liberty Reserve); *United States v. Shrem*, 14 Cr. 243

(S.D.N.Y.) (JSR) (two year sentence for defendant who was the CEO and compliance officer of a Bitcoin exchange company); *United States v. Lord*, 15 Cr. 240 (W.D. La.) (46 months' sentence for operating an unlicensed money services business in cryptocurrency); *United States v. Murgio*, 15 Cr. 769 (S.D.N.Y.) (AJN) (66 months' total sentence for defendant convicted of operating an unlicensed money transmitting business and bank fraud, as well as other related offenses); *United States v. Tetley*, 17 Cr. 738 (C.D. Cal.) (sentence of a year and a day for a defendant who operated an unlicensed money services business and committed money laundering through cryptocurrency); *United States v. Fowler*, 19 Cr. 254 (S.D.N.Y.) (ALC) (75 months' sentence for defendant who operated an unlicensed money transmitting business for cryptocurrency, as well as committed bank fraud and wire fraud); *United States v. Rodriguez*, 23 Cr. 20474 (S.D. Fla.) (57 months' sentence for operating an unlicensed money services business in cryptocurrency).[9]

The *Chukharev* example is particularly instructive. There, the defendant received a three-year sentence for his minor role in the operation of the Liberty Reserve platform, which included false statements to foreign authorities, despite the fact that Government agreed that unlike some of his co-defendants, he was not "aware of the extensive criminal use of Liberty Reserve." 13 Cr. 368, Dkt. Nos. 136, 139 (S.D.N.Y.). Salame is more culpable than that defendant, given that he also made false statements to U.S. banks and received a leadership enhancement rather than a minor-role adjustment.

The defendant instead asserts that he should receive a *de minimis* sentence for the money transmitting charge, and in doing so relies most heavily on Judge Koeltl's recent sentences in the

[9] As described, many of these cases involved defendants convicted of unlicensed money transmitting along with other offenses, like narcotics trafficking, money laundering, bank fraud, or wire fraud, or who admitted that they knew their unlicensed money transmitting business was laundering criminal proceeds.

BitMEX case, in which each of the four defendants were sentenced to probation or house arrest. (Def. Mem. at 23–24) (citing *United States v. Hayes*, et al., 20 Cr. 500 (JGK)). But those defendants were not convicted of operating an unlicensed money transmitting business; they were convicted of willfully violating the Bank Secrecy Act ("BSA") by failing to implement an anti-money laundering program. Unlike operation of an unlicensed money transmitting business, the Sentencing Guideline for a BSA offense, and thus for those defendants, did not take into account the amount of funds transferred. *Compare* U.S.S.G. § 2S1.3(a)(1) (base offense level for violation of Bank Secrecy Act is 8) *with* U.S.S.G. § 2S1.3(a)(2) (base offense level for operation of unlicensed money transmitting business is based on the 2B1.1 table). Judge Koeltl specifically referenced that the sentence he imposed on the lead defendant was driven in part by that lower Guidelines range and "the government's choice of the appropriate offense for which it sought an indictment from the grand jury and is the consequence of the offense to which the defendant pleaded guilty." 20 Cr. 500, Dkt. No. 342 at 54.[10] It is perfectly reasonable for the Court to take into consideration the massive amount of money that flowed through the North Dimension account as part of Salame's unlicensed money transmitting offense.

As Salame himself recognizes, defendants who have engaged in campaign finance violations have faced meaningful periods of incarceration. Judge Oetken sentenced four defendants who violated the campaign finance laws to more than a year imprisonment each. *United States v. Fruman* (a year and a day), *Kukushkin* (a year and a day), *Correia* (a year and a

[10] Most of the other cases the defendant cites are also BSA cases, not unlicensed money transmitting cases. *United States v. Cohen*, 22 Cr. 265 (E.D. Pa.) (BSA violation); *United States v. Ofer*, 21 Cr. 174 (E.D.N.Y.) (BSA violation and minor role adjustment); *United States v. Fitch*, 16 Cr. 123 (S.D. Cal.) (BSA violation); *United States v. Panzera*, 11 Cr. 591 (E.D.N.Y.) (BSA violation).

day), *Parnas* (twenty months), 19 Cr. 725 (S.D.N.Y.) (JPO).[11] Other courts have also imposed incarceratory sentences for such crimes. *United States v. Pan*, 12 Cr. 153 (S.D.N.Y.) (RJS) (4 months' for straw donor scheme); *United States v. Benton*, 21 Cr. 569 (D.D.C.) (18 months' for illegal foreign contribution and straw donor scheme); *United States v. Stockman*, 17 Cr. 116 (S.D. Tex.) (120 months' incarceration for making excessive campaign contributions, wire fraud, money laundering, and filing false tax returns); *United States v. Harber*, 14 Cr. 373 (E.D. Va.) (24 months' incarceration for making coordinated expenditures and false statements to the FBI); *United States v. Rowland*, 14 Cr. 79 (D. Conn. 2015) (30 months' incarceration); *United States v. Bigica*, 12 Cr. 318 (D.N.J.) (60 months' incarceration for tax violation and conduit scheme involving $98,600 in illegal contributions); *United States v. Braddock, Jr.*, 12 Cr. 58 (D. Conn. 2013) (38 months' incarceration for nearly $28,000 conduit scheme).

The Court's sentence should also take "under advisement" the defendant's "efforts to cooperate, even if those efforts did not yield a Government motion for a downward departure pursuant to U.S.S.G. § 5K1.1." *United States v. Fernandez*, 443 F.3d 19, 33 (2d Cir. 2006), *abrogated on other grounds by Rita v. United States*, 551 U.S. 338 (2007). To be clear, the cooperation at issue here was relatively minor. Salame never entered into a formal cooperation process as would typically take place for a government witness who testifies at trial pursuant to a cooperation agreement. The defendant did not himself meet with the Government. Rather, Salame provided documents, such as text messages and emails, in response to Government document requests, and authorized his attorneys to make multiple factual proffers to the

---

[11] Once again, none of these cases are perfectly on point with the defendant: the amount of illegal funds contributed (in the range of one million dollars) was a small fraction of Salame, Bankman-Fried, and Singh's unlawful conspiracy. Parnas and Kukushkin both went to trial, and Parnas and Correia were both convicted for a separate wire fraud scheme.

Government. Shortly before trial against Bankman-Fried, the defendant through his attorneys provided some information as part of brief attorney proffers that focused on Bankman-Fried and certain FTX lawyers, which assisted the Government's trial preparation. (Def. Mem. at 28). As he notes, Salame's information was the source of some lines of cross-examination, including of Bankman-Fried related to Bankman-Fried's transfer of investor funds to Alameda. (Def. Mem. at 28 n.14).[12] None of the information resulted in any significant investigative leads, arrests, or charges. Some of these disclosures corroborated information the Government already knew or added additional detail to misconduct of which the Government was already generally aware.

The Government submits that a below-Guidelines, but still substantial, sentence of five to seven years' incarceration would appropriately balance the seriousness of the defendant's large-scale crimes, the need for general and specific deterrence, and the need to account for the defendant's efforts at cooperation and the sentences imposed on similarly-situated defendants.

## V. The Defendant's Other Arguments for Leniency Are Not Merited

The defendant's requested sentence of 18 months' is too lenient, and his proffered reasons for that sentence are inadequate.

Salame first asserts that the Sentencing Guidelines here are "artificially inflated" because they combine enhancements from two separate Guidelines provisions. (Def. Mem. at 17). But that is irrelevant because Salame did in fact commit two separate serious crimes. Moreover, this argument relies on incorrect calculations. Had Salame been convicted of *either* offense to which he pleaded guilty, his Sentencing Guidelines would have been well over the applicable statutory maximum of each crime, and over the five to seven years the Government is requesting here. *See*

[12] While the Government otherwise did not know about Bankman-Fried's *statements* to Salame, it had financial evidence about the actual transfers. (GX-1050) (Peter Easton exhibit indicating that FTX investor funds were co-mingled with Alameda funds and FTX customer deposits).

U.S.S.G. § 2S1.3(a)(2) (offense level for 1960 violation would be 36 based on more than $1 billion in funds transmitted, with a Guidelines range of 135–168 months' had he pleaded guilty without any other enhancements); § 2C1.8 (offense level for campaign finance violation would be 34 based on more than $100 million in illegal campaign contributions and more than 30 illegal transactions, with a Guidelines range of 108 to 135 months' had he pleaded guilty).

Salame's complaint that he played a merely "ministerial" role in Bankman-Fried and Singh's unlawful contributions rings hollow. (Def. Mem. at 22). If the Court were to consider only his own personal illegal donations, he would still face a Guidelines range exceeding the statutory maximum for that offense. (GX-1088) (defendant made more than 30 contributions worth more than $30 million); U.S.S.G. § 2C1.8 (offense level for campaign finance violation would be 32 based on more than $25 million in illegal contributions and more than 30 illegal transactions, with a Guidelines range of 87 to 108 months' had he pleaded guilty). And he played more than a ministerial role in his co-conspirators' donations, given that his conduct facilitated those donations by setting up wire transfers as part of an overarching scheme to further his and the conspirators' political agenda across multiple fronts.

Salame also generally attacks the 2B1.1 Guideline. (Def. Mem. at 19–20). Putting aside the merits of that attack, in this case, the Guidelines appropriately recognize the plain truth: the defendant conspired to operate a massive unlicensed money transmitting business, and conspired to commit one of the largest ever campaign finance offenses in American history. It is only logical that he should face a lengthier sentence than offenders whose crimes involved significantly smaller amounts of money, which cause fewer risks to the financial system and a smaller chance that the unlawful contributions would affect elections and thus distort legislation.

Salame repeatedly suggests that FTX attorneys were involved in some of the conduct that led to his convictions. (Def. Mem. at 7 n.4) (asserting that Salame believed in-house counsel were responsible for obtaining money transmitting licenses), (Def. Mem. at 8, 9, 16) (asserting that an attorney incorporated North Dimension and decided what information would be included in the bank account application), (Def. Mem. at 10) (asserting that Salame made political donations from funds transferred by Alameda at the attorney's suggestion and with a loan agreement drafted by another attorney). To the extent he suggests this is mitigating, however, that argument should be rejected. Whether Salame knew all of the intricacies of the federal registration requirements, he does not suggest that any attorney ever advised him or anyone else that it was legal to set up a shell company to deceive a bank into processing FTX customer deposits. On the contrary, he admits he knew that Alameda employees relayed false statements to banks, which could not be blessed by an attorney or anyone else. Similarly, Salame admitted at his plea that whether a lawyer had been involved in the funds transferred to him to make campaign contributions, he personally knew the applicable federal election laws, and that he could not make contributions with corporate funds or straw donations. (Plea Tr. at 22 ("At the time I knew it was prohibited by campaign finance laws to make contributions in my name with money that was not my own.")).

Finally, Salame relies on his history and characteristics to request a lower sentence. (Def. Mem. at 25–28). But these arguments do not support the significant downward variance sought by Salame in light of the specific facts of his crimes. Salame had a "very good childhood," with "loving and caring" and supportive parents. (PSR ¶ 73). The PSR and his sentencing letters are clear that he worked hard in college and thereafter, to get good well-paying jobs in financial services and then the cryptocurrency industry. While he may have been just 26 when he joined

Alameda, as this Court knows well, Sam Bankman-Fried was also in his twenties when he began committing his serious crimes, as were Nishad Singh, Gary Wang, and Caroline Ellison. Salame should have known enough from his college degrees in accounting and his job at Ernst & Young to know that what he was doing while working at Alameda and FTX was wrong.

The defendant also cites his current family role. (Def. Mem. at 26). It is undeniably sad that the defendant will miss important milestones for his children and stepchildren. But he made the decision to commit the crimes he was convicted of, and ultimately it was his decision alone to violate federal law and thus risk separating himself from his family. *See, e.g., United States v. Rioux*, 97 F.3d 648, 663 (2d Cir. 1996) (noting that personal factors should ordinarily only support a downward departure in "extraordinary cases" where multiple factors "combine to create a situation that differs significantly from the heartland cases covered by the guidelines"). Undeniably, a substantial period of incarceration will be difficult for Salame's family. But that is no different from most other criminal defendants.

Salame also cites his philanthropy and community service. (Def. Mem. at 26–27). As described in his sentencing letter, some of his commendable efforts pre-date his employment at Alameda and FTX. But such acts are not "ordinarily relevant in determining whether a departure is warranted." *See* U.S.S.G. § 5H1.11. That is even more true of his charitable endeavors after he joined Alameda and FTX, and became, at least on paper, extraordinarily wealthy. *See United States v. Vrdolyak*, 593 F.3d 676, 682 (7th Cir. 2010) ("Wealthy people commonly make gifts to charity. They are to be commended for doing so but should not be allowed to treat charity as a get-out-of-jail card.").

**FORFEITURE AND RESTITUTION**

The Government has confirmed that, as Salame notes, he has transferred assets to the FTX bankruptcy that satisfy his restitution obligation in full. (Def. Mem. at 29). Additionally, the Government and Salame are determining the best means for Salame to pay the total forfeiture settlement. The Government understands the parties will write the Court to amend the forfeiture order, including to allow Salame an additional few months to meet his obligations, but understands from Salame's counsel that he will be able to do so after this additional period.

**CONCLUSION**

In view of the defendant's serious crimes, the need to achieve specific and general deterrence, and also taking into account the need to avoid unwarranted sentencing disparities and his attempted cooperation, Ryan Salame is deserving of a substantial punishment. The Government respectfully requests that the Court impose a sentence of five to seven years' incarceration.

Dated: New York, New York
May 21, 2024

Respectfully submitted,

DAMIAN WILLIAMS
United States Attorney

By: /s Samuel Raymond
Nicolas Roos
Danielle Kudla
Samuel Raymond
Thane Rehn
Danielle R. Sassoon
Assistant United States Attorneys