# **Exhibit K**

RSM

RSM US LLP

# Bank Secrecy Act/Anti-Money Laundering Report

**Silvergate Bank**

May 24, 2019

# EXECUTIVE SUMMARY

## Background

Silvergate Bank is a state chartered, headquartered in La Jolla, California with assets of nearly $2 billion as of 12/31/2018 with two-business banking centers that offer deposit and lending products. Silvergate Bank is a leading bank for innovative businesses in FinTech and Cryptocurrency, including offering services to foreign FinTech entities. Within the last year, there has been significant growth in the customer base, tripling to over 500 FinTech customers.

RSM US LLP (RSM) was engaged to perform Bank Secrecy Act (or BSA) and anti-money laundering (AML) review services for Silvergate Bank. The purpose of the review was to evaluate Silvergate Bank's level of compliance with respect to the agreed-upon scope using a testing process designed to identify regulatory exceptions and weaknesses in the BSA Program.

## Objective and Scope

Our procedures were performed in accordance with the Bank Secrecy Act/Anti-Money Laundering (BSA/AML) scope and approach set forth in our engagement letter dated November 13, 2018 as updated during pre-audit scoping collaboration. Our review procedures covered the independent testing requirements outlined in the Federal Financial Institutions Examination Council BSA manual. Furthermore, we took a risk-based approach to our audit work program that considered the Bank's size, complexity, scope of activities, risk profile, quality of control functions, geographic diversity, and use of technology.

The scope of our procedures is included in Appendix A.

The scope period included January 1, 2018 – February 28, 2019.

Fieldwork was performed March 11, 2019 – April 17, 2019. A preliminary exit meeting held with management on April 17, 2019. Additional documentation was provided and final discussions concluded on May 15, 2019.

## Overall Summary/Highlights

We found that the Bank's BSA Program adequately addresses all pillars of the BSA (designation of BSA officer, system of internal controls, ongoing training, independent audit/review and ongoing customer due diligence).

Board-appointed BSA Officer Osman Gabeire and Bank personnel are responsible for day-to-day BSA/AML compliance. As outlined in the BSA Organization Chart dated March 11, 2019, there are 19 employees in the department. The diverse experience of the leadership in the department can be found in Appendix A Compliance Area, Scope and Testing Procedures.

We found that internal controls put in place to provide for ongoing compliance with BSA requirements are sufficient for the size and complexity of the Bank.

Additionally, we reviewed the audit tracking log for the two audits performed in the prior year (2018). Audit One conducted an independent review of the overall BSA program and BDO conducted an independent review of the FinTech BSA program. There were no observations reported and we noted that the recommendations provided were remediated and reported to the Audit Committee. Management also advised us that if there were any matters requiring follow up as a result of the 2018 or 2019 Federal Reserve Bank Examinations they were incorporated into the scope.

However, we have identified some areas where improved processes and procedures are needed to strengthen the Bank's BSA Program. There is one systemic quantity of risk rating, which is based on the definition found in Appendix B of this report and is the result of the number of observations from the testing, which are technical in nature and not an indication of a systemic breakdown in the internal control.

**We would like to thank all Silvergate Bank team members who assisted us throughout this review.**
**Please contact Chris Dick at 617.241.2767 or Colleen Dorian-Tharp at 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 if you have any questions regarding this report.**


© 2019 RSM US LLP. All Rights Reserved.

RSM

# EXECUTIVE SUMMARY (CONTINUED)

| Overall Rating (See Appendix B for Definitions) | | | | |
|---|---|---|---|---|
| | Report Rating | Number of Relative Risk Observations | | |
| | | High | Moderate | Low |
| Current BSA/AML Review | Satisfactory | | 1 | 1 |

## Ratings and Conclusions

Following is a summary of high and moderate observations noted in the areas reviewed. Definitions of the rating scales are included in Appendix B.

| Ratings by Observation | | |
|---|---|---|
| **Observations** | **Relative Risk** | **Quantity Risk** |
| BSA/AML Risk Assessment | Moderate | Nonsystemic |
| Customer Due Diligence/Enhanced Due Diligence | Moderate | Systemic |


© 2019 RSM US LLP. All Rights Reserved.
RSM

## DETAILED OBSERVATIONS

| | | |
|---|---|---|
| **Reference #1** | **BSA/AML Risk Assessment** | **Recommendation** |
| | We noted that the combination of the Key Risk Indicators identified using TraceRisk software and the quarterly dashboard report included both qualitative and quantitative data. We also noted that a few certain types of customers / entities; products and services as outlined in the FFIEC exam that the bank does not offer or service were not included in the risk assessment. We provided a comprehensive list to the BSA Officer during our review. | We recommend management include all types of businesses/entities, products and services outlined in the exam manual even though the bank does not offer those types of products and services. At the time of our review, the BSA Officer was in process of developing a more robust risk assessment that will include these. |
| | **Relative Risk Rating: Low** | **Quantity Risk Rating: Nonsystemic** |
| **Reference #2** | **Customer Due Diligence/Enhanced Due Diligence** | **Recommendation** |
| | Throughout the Core and Fintech CIP/CDD/EDD reviews, we noted instances where there was a lack of follow-up for missing or additional information requested for a customer resulting from an account review or investigation.<br><br>We reviewed the documentation for 18 reviews of FinTech customers and noted the 17 of the 18 reviews for Fintech customers during 2018 were missing information, such as:<br><br>• Clarification of previous SAR filings, number of accounts reviewed in transactional activity charts, discussion of countries involved in foreign wire activity,<br>• Details regarding how the actual account activity was calculated for comparison to anticipated activity, and<br>• Entities incorporated in foreign countries lacked describing if the customer was in good standing and complying with all | As per discussion with the BSA Officer and Deputy BSA Officer, a project is underway to implement a tracking process that will monitor all requests for further information to ensure the appropriate information received in a timely manner.<br><br>The quantity of risk is systemic due to the number of observations identified in the testing, which are technical in nature and are not an indication of a systemic breakdown in the internal controls.<br><br>We recommend management continue to address the review process and content. As a result of the changes made to the BSA Department in December 2018, it appears that these issues are being addressed as revisions to review forms and checklists have been made and include a section for signature and date |


© 2019 RSM US LLP. All Rights Reserved.
RSM

| | | |
|---|---|---|
| | regulations posed by their incorporated country within the periodic review.<br>We also noted that during the review period timeframe, there was a lack of explanation for deviation from the standard review period based on the customer's risk rating.<br>As noted in the background, during the scope of our review, the Fintech branch tripled in size and there were several changes with the BSA Officer. As a result, EDD reviews were not completed in a timely manner. There were 11 instances where reviews were not completed within two months from of the end of the review period, seven instances where completed reviews were missing the analysts and BSA Manager's signature and date of execution, and three instances where the date was not included with the BSA Manager's signature. There was one additional review where a narrative was not included and the review was not completed. We determined during discussions with the BSA Manager that the employee working on this review was terminated and this was an isolated incident. | |
| | **Relative Risk Rating: Moderate** | **Quantity Risk Rating: Systemic** |


© 2019 RSM US LLP. All Rights Reserved.
RSM

## OPERATIONAL AND PROCESS IMPROVEMENT OPPORTUNITIES

| | | |
|---|---|---|
| **Reference #1** | **Suspicious Activity Reporting** | **Recommendation** |
| | Our review of nine SARs for **FinTech** customers filed between May 2018 and November 2018 disclosed that critical and non-critical fields were not properly completed, and the narrative did not include all information provided in other sections of the report.<br>A comprehensive list was provided to management during the exit meeting.<br>Two SARs filed between December 2018 – February 2019 indicated these observations noted from the previous filed SARs did not continue.<br>Two SARs filed indicated there was an isolated incident where the SARs were filed separately, instead of being combined. | We recommend management file one SAR in instances where the same subject is conducting the same activity during the same period between multiple SGB customers to accurately describe the overall pattern and impact of the subject's activity. |
| **Reference #2** | **Customer Due Diligence and Enhanced Due Diligence** | **Recommendation** |
| | We noted in our review of the Cash Management's annual reviews for ACH and RDC customers that there were several annual reviews that did not include the type of business or specify the type of limit for the customer, i.e.; daily, per item or aggregate.<br>In order for the BSA Department to have the most information available information to conduct investigations and periodic reviews, there is an interdependency with other departments conducting annual reviews of customers enrolled in higher risk products and services, such as ACH Origination and Remote Deposit Capture. The BSA Department relies upon these completed reviews from the Cash Management Department as a supplement when performing their periodic account reviews, and the information submitted to the BSA Department needs to consistently be complete. | We recommend management discuss the importance of consistently receiving complete information from Cash Management and request that they review to make sure that all information prompted for is provided when approving the annual reviews. |


© 2019 RSM US LLP. All Rights Reserved.
RSM

## APPENDIX A—COMPLIANCE AREA, SCOPE AND TESTING PROCEDURES

### BSA/AML Compliance

#### Transactional testing – Core and FinTech

- Core - Customer Identification Program (CIP/CDD)—new accounts (39)
- FinTech – Customer Identification Program (CIP/CDD) – new accounts (29)
- Core – CDD/Enhanced due diligence—high-risk accounts (7 on list), entities not high risk (2 NGO, 5 NRA, 4 PSP, 4 NBFI)
- Core – CDD/EDD – high risk products (8 ACH, 18 RDC)
- Core -Suspicious Activity Reports (SARs) (12)
- FinTech – Suspicious Activity Reports (SARs) (11)
- FinTech - Suspicious activity not resulting in SAR filing (5)
- Training (5 new employees and 11 Existing)
- 314a Requests (January – November 2018 with 9 instances of name match and 4 instances of False/Positive cleared)
- Core 314(b) Requests (none during scope period of review)
- Currency Transaction Reports (CTRs) (15)
- Exemptions (2)
- Fintech – CDD/Enhanced due diligence – high risk accounts (18)
- Monetary instruments (none sold during scope period of review 1/1/18 – 2/28/19)
- Funds transfers (26 incoming and 26 outgoing)
- Core - Suspicious Activity not resulting in a SAR filing (3)
- OFAC Searches (68 New accounts and 52 Funds Transfers)
- OFAC Name Deviation Searches (8 names with 7 variations)
- OFAC Search (Digital Wallet Addresses) (2)
- FinTech 314(b) Requests (7)


© 2019 RSM US LLP. All Rights Reserved.

| Compliance Area | Comments |
|---|---|
| **BSA/AML and OFAC Compliance Program, Governance and Training** | |
| • Reviewed program content to ensure that all applicable internal control processes were addressed relating to BSA/AML, OFAC and USA PATRIOT Act<br>• Verified annual board of directors' approval of the program<br>• Ensured that the results of risk assessments for BSA/AML, OFAC and CIP properly connected to the written compliance program | The Board approved the BSA/AML Policy in November 2018 that includes the four pillars. The BSA Department also published a document "Silvergate Bank BSA Manual". The BSA Program is comprehensive and includes policies and procedures for compliance with AML, CIP, CDD/EDD, OFAC, Information Sharing, Training, Record Retention and internal controls to mitigate risks identified in the BSA Risk Assessment.<br>There were changes made to the structure of the BSA Department in the 4th quarter of 2018 that consisted of hiring a new BSA Officer. In addition, there are 19 employees in the BSA Department, consisting of the BSA Manager, with over 18 years of experience and BSA Supervisor with over 25 years of experience. There are 8 analysts, 2 investigators, an OFAC Supervisor, One OFAC/Wire Analyst, 1 BSA Administrator and 1 BSA Systems Engineer. Below is a summary of the relevant experience of the leadership team.<br>The SVP, Director of BSA is a Certified Anti Money Laundering Specialist (CAMS), with over 20 years of experience in the public and private sector. He worked as a Commissioned Bank Examiner/Risk Specialist with the Federal Reserve Bank of Minneapolis and San Francisco and with Office of the Comptroller of the Currency. He also served as a consulting Director of Bank Supervision for Central Bank of Somalia<br>The VP, Deputy BSA Officer has over 20 years of experience in bank operations, lending and compliance. She has held positions of Corporate Risk Manager, Compliance Manager and Credit Administrator and graduate of American Bankers Association Graduate School of Compliance Management.<br>The AVP, BSA Manager has over 18 years of experience in banking, with positions working with card fraud investigations and BSA/AML day-to-day operations and investigations. She was a Deputy BSA Officer with an emphasis for managing and maintaining AML and Enhanced Due Diligence programs for specialty customers such as BitCoin (CryptoCurrency), Casa De Cambios (foreign exchange houses – Mexican Pesos) Money Service Businesses, Cash Intensive Businesses and Payday Lenders. |


© 2019 RSM US LLP. All Rights Reserved.
RSM

| Compliance Area | Comments |
|---|---|
| | The BSA Supervisor has 30 years in banking, with positions of operations supervisor, operations officer, Regulatory Compliance Officer and Bank Secrecy Act Officer.<br><br>The BSA Lead Investigator has over 30 years of background in investigating white-collar crimes working at the Federal Bureau of Investigation and working as a Senior Anti-Money Laundering Investigator for a bank.<br><br>The OFAC Supervisor has over 24 years of general banking experience which has periodically included OFAC responsibilities. She has held her current position of OFAC Supervisor for 4 years.<br><br>No observations noted. |
| **BSA/AML and OFAC Risk Assessments** | |
| • Reviewed the risk assessments for content to ensure that all products, services, geographies and customers were included in the risk assessment<br><br>• Verified that the risk assessment information was complete and accurate, and quantifies risk with supporting documentation maintained | The bank is currently using software program “TraceRisk” to assess the risk for the overall BSA/AML/OFAC Program. We reviewed the risk assessment date for the 4th quarter 2018. The Risk Assessment identified 70 key risk indicators (KRI) with an overall residual risk rating of “Moderate/High”.<br><br>Additionally, the BSA Officer provides a quarterly dashboard report to the board of directors that includes quantitative data that supports the Key Risk Indictors outlined in the Risk Assessment.<br><br>A separate risk assessment completed specific to the FinTech/MSB operations with an overall residual risk of Moderate/High.<br><br>During our review of the risk assessments for fourth quarter 2018, quarterly dashboard reports for 2018, and discussions with the BSA Officer, it was determined that the dashboard reports supplement the TraceRisk report.<br><br>We also noted that the BSA Officer is in the process of developing one report that will combine the core bank and FinTech branch, as well as the qualitative and quantitative data.<br><br>See Detailed Observations Reference #1 for recommendations. |


© 2019 RSM US LLP. All Rights Reserved.
RSM

| Compliance Area | Comments |
| --- | --- |
| **Customer Identification Program** | |
| • Tested a sample of new accounts for adequate CIP documentation and record retention<br>• Verified that discrepancies were resolved<br>• Verified that accounts were closed when verification did not occur within policy time frame requirements<br>• Verified that a customer notice was provided at account opening | We reviewed policies and procedures for adhering to the customer identification requirements of section 326 of the USA Patriot Act and 31 CFR 1020.220 (FINCEN) and FFIEC Exam manual, section customer identification.<br>**Core Bank** accounts opened using a Consumer or Business Account Information Profile Sheet, OFAC screening, business entity documents and beneficial ownership certification. The account will not open until all required information is received, reviewed and approved.<br>During our review, we tested 39 new accounts that were opened in the branch and/or online. We noted that address discrepancies were resolved and any instances of a false positive OFAC screening cleared.<br>**FinTech Branch**<br>Prior to an account opening for a FinTech customer at the FinTech branch, an initial screening by the FinTech Business Development Officer (FBDO) to understand the entities history and background, owners and management structure, years in business, the type of activity it engages in and anticipated activity, licensing status, and information about their investors and funding, as applicable. All customers must have a physical or virtual site visit conducted prior to account opening.<br>After the initial screening, the FinTech Service Manager will work with the customer and complete the required documentation as noted above for core.<br>During our testing of 29 new Fintech accounts, we noted one isolated instance where the customer's initial risk rating calculated incorrectly, due to a quality control oversight, resulting in the customer's scheduled reviews every 18 months instead of annually. Four months later, in October 2018, revisions made to the risk-rating matrix and the customer's risk rating updated accurately.<br>No observations noted. |


© 2019 RSM US LLP. All Rights Reserved.
RSM

<table>
<tr><th>Compliance Area</th><th>Comments</th></tr>
<tr><td>Customer Due Diligence and Enhanced Due Diligence</td><td></td></tr>
<tr><td>
• Determined the adequacy of the process used to risk rate customers<br>
• Tested a sample of new accounts for adequate customer due diligence, including beneficial ownership, documentation<br>
• Verified that enhanced due diligence was performed on high-risk customers, products and services:<br>
- Special Measures (311)Business entities (domestic shell companies and foreign international business corporations, private investment companies and offshore financial centers)<br>
- Privately owned ATMs<br>
- Nonresident alien, politically exposed persons and embassy customers<br>
- Money Services Businesses<br>
- ACH originators<br>
- Funds transfers<br>
- Cash-intensive businesses<br>
- Professional service providers<br>
- Nongovernmental organizations and charities<br>
- Remote deposit capture customers<br>
• Other products as applicable (including correspondent banks, U.S. dollar drafts, payable through accounts, pouch activities, electronic banking—bill pay, e-cash, Nondeposit Investment Products, concentration accounts, loans secured by cash, trade finance activities, insurance sales, and trust and asset management services)
</td><td>
Core<br>
We reviewed the Bank’s policies and procedures for products and services offered to customers, such as electronic banking, remote deposit capture and ACH origination.<br>
The Bank has implemented procedures to identify high-risk customers at account opening through a risk rating scorecard process. Bank personnel are required to obtain due diligence information for all new accounts. Once the account has opened, the BSA Department will review documentation, assign NAICS code and complete the risk-rating scorecard. Periodic reviews performed based on the results of the scorecard with a frequency of annually for high risk rated and every two years for moderate rating.<br>
We reviewed a sample of 33 new accounts to verify if adequate customer due diligence documentation maintained. We also reviewed the documentation and most recent review conducted for the seven (7) customers on the high-risk list.<br>
Fintech<br>
Once an account is on-boarded, the frequency of periodic reviews conducted is based on the risk rating score. In addition, all accounts are required to be reviewed at least annually and require the customer to complete a questionnaire.<br>
Fintech administrators and exchanges with a trading account or Silvergate Exchange Network (SEN) account undergo a Counterparty Program Testing (CPT) review conducted semi-annually to evaluate if the Fintech client is conducting adequate CIP/KYC and enhanced due diligence processes in accordance with the Fintech client's BSA/AML program on all counterparties with ACH and wire activity (including foreign wires). In addition, the CPT review involves a jurisdictional analysis of the Fintech client's transactional activity to identify whether the client is doing business in jurisdictions that the client is operational and/or licensed in.<br>
During our review of 18 FinTech periodic reviews, we noted the observations in 17 of the 18 periodic reviews conducted in 2018.
</td></tr>
</table>


© 2019 RSM US LLP. All Rights Reserved.
RSM

| Compliance Area | Comments |
|---|---|
| | See Detailed Observations Reference #2.<br>As part of the CDD/EDD review, we also reviewed other types of customers/business entities and products and services defined as high risk in the FFIEC Exam Manual. We reviewed five (5) Non Resident Aliens “NRA”, four (4) Professional Service Providers “PSP, four (4) Non-Bank Financial Institutions “NBFI”, eight (8) ACH Originators and eighteen (18) customers using Remote Deposit Capture “RDC”.<br>See Operational and Process Improvement Opportunities Reference #2. |
| **Suspicious Activity Monitoring and Investigations** | |
| • Determined the process used to detect suspicious activity (automated and manual monitoring) and the handling of AML alerts<br>• Reviewed the monitoring reports for a period of time to determine if sufficient information was received to detect and monitor unusual and suspicious activity<br>• Selected a sample of suspects from the monitoring reports, such as the large currency transaction report, wire transfer report and monetary instrument purchases, and reviewed account activity and detail of unusual transactions | FinTech and Core BSA Investigations Procedures outlines types of suspicious activity and who is responsible to review. Investigations can be the result of alerts triggering in the bank's AML system "Prime", Suspicious Activity Incident Reports (SAIR) submitted by employees in other departments/branches, law enforcement inquiries, and periodic reviews.<br>Investigations are assigned in a centralized area resulting from triggers identified above. Completed investigations include a conclusion and are reviewed and approved by the BSA Officer or Deputy BSA Officer resulting in a SAR Filing or No SAR Filing.<br>The Bank engaged CAPCO in December 2018 to assist with creating and enhancing alert parameters specifically for FinTech customers. As a result, alerts and reports can be sorted for core and Fintech.<br>The Bank also engaged RSM to perform AML Validation in December 2018. The validation assessed the components of the AML monitoring system Prime that included inputs, processing and reporting. The review also evaluated the core elements of the model; conceptual soundness, ongoing monitoring processes and outcome analysis and ultimately provided an assessment of the AML model based on the assumptions, theory and methods used.<br>The Bank continues to enhance the surveillance (automated) account monitoring system. Some of the noted enhancements since prior audit include the following: |


© 2019 RSM US LLP. All Rights Reserved.
RSM

| Compliance Area | Comments |
|---|---|
| | • Created Fintech specific red flags by customer type;<br>• Hired a BSA Systems Analyst with FIS Prime expertise (formally with FIS) and BSA Systems Engineer;<br>• Transitioned from cases to alerts to further enhance case management and rules efficiency reporting (alert-to-case-to-SAR tracking);<br>• Segregated alerts by customer segments: Fintech and Non-Fintech customers (Core);<br>• Performed a GAP analysis of manual processes to determine a needs list for a transaction monitoring system;<br>• Engaged with FIS Prime for system enhancements: feed enhanced due diligence fields from Horizon (Core system) to Prime to further Fintech customer segregation in Prime to create targeted rules as well as expected account activity;<br>• Engaged with a third-party vendor (CAPCO) for rule-tailoring exercise. 1st engagement occurred in Dec. 2018 with a focus on digital currency exchanges; 2nd engagement focusing on risk modules and perform a complete rules effectiveness review of all existing rules which was completed on February 2019;<br>• Engaged third-party (RSM) to conduct model validation of PRIME (Dec. 2018) and another scheduled for September 2019 by also RSM;<br>• Created a Benchmarking Report produced weekly to track rule efficiency;<br>• Developed wire reporting tool (Sisense) to supplement transaction monitoring system and to enhance reporting and transaction visualization capabilities;<br>• Developed new procedures including a BSA alerts procedure and rules review and effectiveness;<br>• Fully implement new rules for digital currency exchanges targeted with the assistance of CAPCO |


© 2019 RSM US LLP. All Rights Reserved.

RSM

| Compliance Area | Comments |
|---|---|
| **Suspicious Activity Reports** | |
| • Reviewed a sample of SAR filings to ensure that forms were properly completed and narratives contained sufficient information<br>• Verified that initial SARs were filed timely, and a new SAR was reviewed every 90 days and refiled every 120 days, as applicable<br>• Verified that the SAR suspects were added to the high-risk list<br>• Reviewed files for investigations that did not result in a SAR filing | Within the scope of our review, the BSA Department filed 115 Suspicious Activity Reports (SARs), 90 for FinTech and 25 for Core. We tested 23 filed SARs: 12 for core customers and 11 for FinTech Customers.<br>In our review of SARs filed for **Core** customers, we noted two instances in January 2018 where the narrative did not include the date of detection. Based on our review of the additional ten for the period of February 2018 – February 2019, the date of detection was included and appears to be self-corrected.<br>We also noted 2 separate isolated instances where the specific occupation was not identified and the required key term for type of activity was missing from narrative.<br>Our review of nine SARs for **FinTech** customers filed between May 2018 and November 2018 disclosed that critical and non-critical fields were not properly completed and the narrative did not include all information provided in other sections of the report.<br>A comprehensive list was provided to management during the exit meeting.<br>Our review of two SARs filed between December 2018 – February 2019 indicated these observations noted from the previous filed SARs did not continue.<br>See Operational and Process Improvement Opportunities Reference #1<br>Investigations resulting in a No SAR decision were reviewed and approved by BSA Officer or Deputy BSA Officer. Many instances of No SAR decisions were prompted by investigations due for a 90-day follow up from the previous SAR filing, unusual activity identified during enrollment to online banking, law enforcement requests, referrals from an employee within a department/branch. We reviewed (4) four 90 day follow up investigations from the previous SAR filing for core and 20 No SAR decisions for FinTech customers. The documentation supported the disposition with a conclusion for the reason the investigation resulted in a No SAR Filing.<br>We noted no observations in our review of No SARs. |


© 2019 RSM US LLP. All Rights Reserved.

RSM

| Compliance Area | Comments |
|---|---|
| **Currency Transaction Reports and Exemptions** | |
| • Tested a sample of CTRs for accurate completion and timely filing<br>• Reviewed the process for aggregating multiple currency transactions<br>• Reviewed the cash aggregation reports for a period of time to detect potential structuring activity<br>• Reviewed reports of international transportation of currency or monetary instrument<br>• Reviewed the exemption list to ensure that none fell into one of the prohibited exemption categories<br>• Tested a sample of exemptions to ensure that the documentation supported proof of eligibility and annual review documentation | Cash transactions are aggregated by TIN number for amounts of $3,000 and greater. The BSA Department reviews the large currency transaction report generated from the core processing system and a report from the teller system on a daily basis to verify all applicable transactions for reporting are included. The bank uses E-Filing to file the Currency transaction reports.<br>During the scope period, there were 39 currency transaction reports filed. We tested 15 or 38% and noted that the reports were accurately completed and filed timely.<br>RSM performed a review of the bank's annual review of Phase II customers exempted from CTR reporting, which is two (2) or 100%. We noted that the supporting documentation provided proof of eligibility as well as a comparison to prior review activity.<br>No observations noted with Currency Transaction Reporting or Currency Transaction Exemption Processes. |
| **Information Sharing (Financial Crimes Enforcement Network [FinCEN] 314 Requests)** | |
| • Determined the process for receiving, searching and responding to 314(a) requests<br>• Verified that 314(a) requests were either destroyed or properly safeguarded<br>• Reviewed the documentation evidencing that 314(a) searches were completed timely<br>• Reviewed registration status for 314(b) information sharing | The BSA Manager receives and responds to 314a searches using FIS Prime. The AML system, Prime, was used to conduct the searches and completed within the prescribed timeframes.<br>For the scope period, there were nine (9) instances of positive name matches. Documentation to support verification of the matches reviewed with a cover sheet signed by the investigator. The positive name matches reported using the secure information sharing system.<br>In our review of the nine instances, we noted that one (1) cover sheet was missing signature of the investigator. This was an internal procedure and was isolated.<br>There were 6 employees registered as the point of contact for Information Sharing 314b. The bank has received 47 314(b) information requests for the FinTech branch during the scope of our review. |


© 2019 RSM US LLP. All Rights Reserved.
RSM

| Compliance Area | Comments |
|---|---|
| | We tested seven (7) requests, noted that documented procedures were followed, responded to in timely manner, and were reviewed/approved by the BSA Manager prior to sending the response.<br>We noted no observations for the 314b Information Sharing Processes. |
| **Record-Keeping—Purchase/Sale of Monetary Instruments and Funds Transfer** | |
| • Tested a sample of cash purchases and verified that all record-keeping information was maintained<br>• Verified that policies were adhered to regarding the sale of monetary instruments to noncustomers<br>• Tested a sample of wires to ensure that record-keeping requirements were followed when acting as a beneficiary bank, originating bank and, if applicable, intermediary bank<br>• Verified that travel rule requirements were followed<br>• Determined the adequacy of BSA record retention requirements | The bank sells monetary instruments to customers only. A daily and monthly report generated from the core system includes monetary instrument purchases with cash totaling $3,000 or more. The BSA Department reviews the monthly report to verify the purchases and determine if required information for recordkeeping was collected.<br>During our review, we verified that there were no instances of monetary instrument purchases made with cash.<br>The bank uses FIS's product eWire and Pacific Coast Bankers Bank (PCBB) for foreign wire activity. The bank does not conduct wires for non-customers or allow Payable Upon Proper Identification (PUPID) wires. Wires were requested in person at a branch or via online banking for Cash Management customers "BEB".<br>In our discussion with the BSA Department's Deputy BSA Officer, the department reviews wire activity on a regular basis in addition to alert scenarios that are triggered in the AML System, Prime.<br>We reviewed policies and procedures for funds transfers and tested 26 incoming wires and 26 outgoing wires and noted no observations. |


© 2019 RSM US LLP. All Rights Reserved.
RSM

| Compliance Area | Comments |
| --- | --- |
| **Office of Foreign Assets Control** | |
| • Tested a sample of new accounts for documentation of OFAC verifications<br>• Tested a sample of noncustomer transactions to ensure that OFAC was verified<br>• Verified the appropriateness of the filtering criteria used by the institution to reasonably identify OFAC matches<br>• Reviewed evidence of periodic verifications against the existing customer base<br>• Reviewed the evidence of resolution for a sample of false hits<br>• Reviewed blocking procedures and reporting<br>• Reviewed the handling of international ACH transactions | OFAC screening was performed at the time a new account was opened, prior to loan consummation and when monetary instruments were purchased. Chex Systems, Watchdog or Horizon/Qualifile were used to screen names.<br>Additionally, the entire database is screened nightly in Horizon (and Prime) and any potential match creates an alert that is researched by the OFAC Supervisor. WatchDog is used for ad-hoc searches by other departments such as loan underwriting and branch account opening. Funds Transfer - Incoming/Outgoing are screened using eWire. The bank also has a process for screening all parties named on an incoming International ACH Transaction (IAT).<br>If screening returns a potential suspect match, steps are taken to verify that the name was not on the list and notes evidenced the clearing of the false positive, with initials reflecting the reason why it was not a match.<br>We reviewed policies and procedures, tested all names during the new account testing, and funds transfers testing. We also tested eight (8) names with deviations and two (2) digital addresses.<br>No observations noted. |
| **BSA/AML Training** | |
| • Determined if employees, new hires, the BSA officer and board members receive appropriate training in a timely manner<br>• Reviewed the training material content for adequacy<br>• Determined the process used to track BSA/AML training attendance and test accordingly | A web-based training program used for training all employees bank-wide based on their job duties. Additionally, the BSA Department conducts specific training for the department consisting of the Bank's internal policies and procedures and providing an overview of the different types of FinTech customer's and FinCEN's guidance to Persons Administering, Exchanging or Using Virtual Currency.<br>The Board of Directors receive training annually in March and we reviewed documents for training conducted in March 2018.<br>During our review, we noted that reports were provided to Senior Management and the Board of Directors regarding the completion of assigned training. We tested five (5) of nineteen (19) new employees hired during December 2018 – February 28, 2019 and eleven (11) existing employees. In addition, we reviewed training documentation provided by the BSA |


© 2019 RSM US LLP. All Rights Reserved.
RSM

| Compliance Area | Comments |
| --- | --- |
| | Department for the FinTech personnel. Training appeared adequate and we noted no observations. |
| **Prior Exam Findings** | |
| • Reviewed the most recent regulatory agency examination report and prior independent review in conjunction with management's plan to determine if corrective action was taken | We reviewed the audit tracking log for the two audits performed in the prior year (2018). Audit One conducted an independent review of the overall BSA program and BDO conducted an independent review of the FinTech BSA program. There were no observations reported and we noted that the recommendations provided were remediated and reported to the Audit Committee. Management also advised us that if there were any matters requiring follow up as a result of the 2018 or 2019 Federal Reserve Bank Examinations they were incorporated into the scope, |


© 2019 RSM US LLP. All Rights Reserved.
RSM

## APPENDIX B—RATING DEFINITIONS

**Relative Risk Rating Definitions**

| Rating | Definition |
|---|---|
| **Low** | Observation poses minimal risk and is oftentimes isolated or caused by human error. Low-risk observations can be addressed through the normal course of business or through minor control or process changes. |
| **Moderate** | Observation may be critical and should be addressed in a timely manner. However, the overall severity of the observation is not cause for immediate concern. |
| **High** | Observation is considered critical, even if the quantity of risk is isolated. High-risk observations are of a more noteworthy nature than observations rated moderate or low and should be addressed immediately. |

**Quantity Risk Rating Definitions**

| Rating | Definition |
|---|---|
| **Isolated** | This level of quantity risk indicates the frequency of the observation where there was only one instance of occurrence. |
| **Nonsystemic** | This level of quantity risk indicates the frequency of the observation where there was more than one instance of occurrence. |
| **Systemic** | This level of quantity risk indicates that the frequency of the observation consists of a large portion of the sample. |


© 2019 RSM US LLP. All Rights Reserved.

## APPENDIX C—REPORT RATING DEFINITIONS

| Report Rating Definitions | |
|---|---|
| **Rating** | **Explanation** |
| **Satisfactory** | Adequate internal controls are in place and operating effectively. Few, if any, improvements in the internal control structure are required. Observation should be limited to only low-risk observations identified or moderate observations that are not pervasive in nature. |
| **Marginal** | Certain internal controls are either:<br>• Not in place or are not operating effectively, which in the aggregate, represent a significant lack of control in one or more of the areas within the scope of the review<br>• Several moderate control weaknesses in one process, or a combination of high and moderate weaknesses, which collectively are not pervasive |
| **Unsatisfactory** | Fundamental internal controls are not in place or operating effectively for substantial areas within the scope of the review. Systemic business risks exist, which have the potential to create situations that could significantly impact the control environment.<br>• Significant/several control weaknesses (breakdown) in the overall control environment in part of the business or the process being reviewed<br>• Significant noncompliance with laws and regulations<br>• High observations that are pervasive in nature |
| **Not Rated** | Opportunity to improve efficiency or profitability of operations, but does not indicate an internal control weakness or a material inefficiency |


© 2019 RSM US LLP. All Rights Reserved.

## APPENDIX D—THE KEY PILLARS OF A BSA / AML PROGRAM

Our in-scope BSA/AML activities are fulfilled with a general understanding of the key pillars outlined in the FFIEC manual and FinCEN's frequently asked questions:

| | |
|---|---|
| **Designation of a BSA Compliance Officer** | • The BSA officer is appointed by the board of directors.<br>• The BSA officer is charged with managing the institution's BSA/AML compliance and is ultimately responsible to the board of directors, with a direct line of communication to the board and senior management.<br>• The BSA officer must be knowledgeable of all applicable AML regulations and have a strong working understanding of product and service offerings.<br>• The BSA officer is responsible for managing communication with regulatory authorities for AML-related issues and reporting. |
| **Development of Internal Policies, Procedures and Controls** | • Provide sufficient controls and monitoring systems for timely detection and reporting of suspicious activity.<br>• Provide for adequate supervision of employees that handle currency transactions, complete reports, grant exemptions or monitor for suspicious activity.<br>• Incorporate BSA compliance into the job description and performance evaluation of personnel, as appropriate.<br>• Train employees to be aware of their responsibilities under the BSA regulations and internal policy guidelines. |
| **Ongoing, Relevant Training of Employees** | • The program must provide training for all personnel whose duties require knowledge of the BSA.<br>• The training should be tailored to the person's specific responsibilities.<br>• Internal policies, procedures, processes and monitoring systems should be covered during training.<br>• Training programs and staff completion should be documented for examiner review. |
| **Independent Testing and Review** | • Independent testing provides verification that the compliance program is operating as effectively as possible and is compliant with the law.<br>• Independent testing should be completed by internal audit, outside auditors, consultants or other qualified independent parties and be conducted every 12–18 months commensurate with the institution's risk profile.<br>• The audit program is sufficiently independent and reports to the board or a committee of the board. |
| **Ongoing Customer Due Diligence** | • Provide risk-based procedures for conducting ongoing customer due diligence.<br>• Risk-based procedures should include, but are not limited to, the following:<br>- Understanding the purpose and nature of customer relationships to develop customer risk profiles<br>- Conducting ongoing monitoring to identify and report suspicious transactions |


© 2019 RSM US LLP. All Rights Reserved.
RSM

RSM US LLP
515 South Flower St
17th Floor
Los Angeles, CA 90071
**T** +1 213 330 4800

www.rsmus.com

RSM US LLP is a limited liability partnership and the U.S. member firm of RSM International, a global network of independent audit, tax and consulting firms. The member firms of RSM International collaborate to provide services to global clients, but are separate and distinct legal entities that cannot obligate each other. Each member firm is responsible only for its own acts and omissions, and not those of any other party. Visit rsmus.com/aboutus for more information regarding RSM US LLP and RSM International.

RSM® and the RSM logo are registered trademarks of RSM International Association. The power of being understood® is a registered trademark of RSM US LLP.

© 2018 RSM US LLP. All Rights Reserved.

RSM