# Exhibit L

Grant Thornton

Silvergate

# Bank Secrecy Act / Anti-Money Laundering and Office of Foreign Assets Control

## Internal Audit Report

Audit Period: March 1, 2019 to February 29, 2020
Report Date: August 28, 2020

## Table of Contents

I. Executive Summary .......... 3
II. General Background .......... 4
III. Audit Period, Objective and Scope .......... 4
IV. Sampling Methodology .......... 5
V. Summary of Audit Procedures .......... 5
VI. Summary of Audit Findings .......... 8
Appendix A – Overall Audit Rating Definitions .......... 10
Appendix B – Definition of Finding Types and Priority .......... 11
Appendix C – The Key Pillars of a BSA / AML Program .......... 12
Appendix D – Detailed Findings and Recommendations .......... 13
Appendix E – Prior Audit Issues .......... 23

*This report is solely for the internal use of Silvergate Bank's Management, employees and the Audit Committee of Silvergate Bank. Our internal audit procedures were not intended to and did not constitute a full external audit in accordance with Generally Accepted Auditing Standards. Therefore, we are not able to express, nor do we express, any opinion on the overall internal control structure relating to the BSA/AML & OFAC processes. In addition, our internal audit related only to the areas described in this report and did not extend to any other functions of Silvergate Bank taken as a whole.*

# I. Executive Summary

As part of the Silvergate Bank (hereinafter "the Bank" or "Bank" or "SGB") 2020 internal audit plan, Grant Thornton performed an internal audit of Silvergate Bank's Bank Secrecy Act ("BSA") / Anti-Money Laundering ("AML") and Office of Foreign Assets Control ("OFAC") program covering the period from March 1, 2019 to February 29, 2020. The internal audit was performed in accordance with the professional standards established by the Institute of Internal Auditors ("IIA") and standards established by the American Institute of Certified Public Accountants ("AICPA") Statements of Standards for Consulting Services. Additionally, this internal audit was designed to include general regulatory requirements for BSA/AML & OFAC, prescribed by the Federal Financial Institutions Examination Council ("FFIEC").

## Internal Audit Results and Rating

Based on the results of our procedures, Silvergate Bank's BSA/AML and OFAC internal control framework was rated "***Satisfactory***" and no high-risk findings were noted. Overall, the Bank's control environment was found to be reflective of a maturing BSA/AML and OFAC Compliance Program. Grant Thornton noted a commitment by management to continue to enhance the BSA/AML and OFAC Compliance Program during the audit. The overall audit rating takes into consideration recent transitional changes in key BSA compliance functions as well as sizable growth in the Bank's customer-base, particularly with respect to clients engaged in the Financial Technology (i.e., "FinTech") space during the audit period. While a sound compliance program has been implemented covering key BSA/AML and OFAC related risks facing the Bank, some further procedural enhancements may be necessary to ensure program sustainability due to recent expansion in client-base and changes to processes and staffing within the BSA Compliance Department (hereafter 'BSA Compliance').

As part of this audit, Grant Thornton also performed a validation of Silvergate Bank's corrective actions taken in response to an issue identified in the 2019 Full Scope Joint Federal Reserve Bank of California ("FRB") Examination related to the Bank's customer risk rating ("CRR") process and methodology. The results of the validation are detailed in a separate memo.

The audit covered the period from March 1, 2019 through February 29, 2020. During fieldwork, BSA Compliance indicated that certain policies and/or procedures had been updated subsequent to the end of the audit period. The results included three moderate risk and seven low risk findings that related to the following themes:

- The frequency of procedural documentation updates not keeping pace with the rate of operational changes which occurred during the audit scope period.
    - The audit identified several instances in which the procedure documentation had not been updated to reflect current processes in place during the audit period. However, it was noted that the Bank had made several policy and procedure updates immediately following the end of the audit period in March 2020.
- Quality Assurance ("QA") function (i.e. Compliance Monitoring) not yet fully implemented during the audit period as primarily evidenced by gaps in secondary reviews of hybrid processes (i.e. involving both automated systems and manual processes) performed by analysts.
    - Discrepancies were identified around the completeness and accuracy of hybrid processes performed by analysts. The volume of hybrid processes performed by BSA Compliance increases the potential for human error. Once fully implemented, the QA function should serve as a suitable compensating control to identify gaps in secondary reviews of manual processes. Based on discussions with BSA Compliance, the QA function is expected to be fully implemented by Q3 of 2020.

More detailed information surrounding the audit findings identified can be found in Appendix D - Findings and Recommendations of this report.

Considerable professional judgment is required in determining this overall audit rating. Accordingly, others could evaluate the results differently and draw different conclusions. The overall rating is based on criteria as defined in Appendix E.

## II. General Background

Silvergate Bank is a Federal Reserve member bank headquartered in La Jolla, California. The Bank offers a full range of personal and business financial products and services, including financial infrastructure solutions and services for the growing digital currency industry. As a result, the Bank has implemented a comprehensive and effective BSA/AML and OFAC Compliance program based on an assessment of the Bank's BSA/AML and OFAC-related risks and the associated internal controls implemented to mitigate such risks The Bank has seen continued growth in the commercial cryptocurrency (i.e. 'FinTech') industry, representing 31% of Silvergate's entire client base of 2,553[1]. The Bank did not have any foreign correspondent banking clients during the audit period ending February 29, 2020. The annual BSA Risk Assessment completed by BSA Compliance highlights the risk exposures arising from the Bank's current products, services, customers, and geographic locations. The BSA/AML and OFAC Compliance Program also provides for thorough independent testing of compliance with BSA/AML and OFAC requirements, training of all appropriate staff, internal controls to allow for compliance with BSA/AML and OFAC requirements, administration of the Customer Identification Program ("CIP"), and the overseeing all day-to-day operations by the BSA Compliance Officer.

The BSA Compliance Officer is designated by the Board and, as such, is responsible for the overall administration of BSA, OFAC, and related compliance programs, and for providing training for those individuals involved with BSA and OFAC compliance processes. One officer can assume both BSA and OFAC Sanctions Compliance roles. This includes assuming full responsibility for conducting BSA and OFAC risk assessments, as well as coordinating and monitoring day-to-day compliance with all relevant and applicable BSA and OFAC regulations. Day-to-day BSA and OFAC compliance activities include: currency transaction reporting; suspicious activity reporting; develop and implement operating procedures for First Line of Defense business units; understand the nature and purpose of customer relationships for developing customer risk profiles; conduct ongoing monitoring to identify and report suspicious transactions; maintain and update customer information; and train bank employees on BSA requirements and expectations.

In the period following the prior independent audit of the BSA/AML Program dated May 2019, other than growth experienced, the Bank has not undergone any notable changes to its product or service offerings significantly affecting BSA Compliance. The Bank is planning to transition their current Transaction Monitoring System from Prime to Verafin, as Prime does not accommodate the type of Customer Risk Scoring and reporting that Silvergate desires. The most recent model validation, performed by a separate service provider, on the current transaction monitoring system Prime did not identify any critical deficiencies.

## III. Audit Period, Objective and Scope

**Period:** The time period covered by this audit was from March 1, 2019 through February 29, 2020.

**Objective:** The objective of this internal audit was to evaluate whether Silvergate Bank's BSA/AML & OFAC internal controls are adequately designed and operating effectively. Our internal audit procedures evaluated Silvergate Bank's control environment against industry standards and best practices. The audit scope was determined in agreement with the Silvergate Bank Audit Committee and included the following BSA/AML & OFAC Program areas listed below.

**Scope:** The audit scope included the following BSA/AML & OFAC Program areas listed below:

- BSA/AML and OFAC Program Governance and Oversight

---

[1] Client total numbers as of August 31, 2019 per the December 4, 2019 BSA/AML and OFAC Risk Assessment.

- BSA/AML and OFAC Risk Assessment
- BSA/AML and OFAC Training Program
- KYC Program for Core and FinTech customer segments
- Transaction Monitoring Program and Suspicious Activity Reporting
- Monetary Instruments and Currency Transaction Reporting ("CTR") and Exemptions
- Office of Foreign Assets Control ("OFAC") Program
- Regulatory Reporting and Information Sharing
- Funds Transfer and Record Retention
- Quality Assurance ("QA") / Compliance Surveillance Program
- Products and Services

Refer to Section V: Summary of Audit Procedures for more detail on the testing approaches taken for each of the above mentioned BSA/AML and OFAC Program areas.

## IV. Sampling Methodology

The table below details the sampling methodology for Operating Effectiveness Testing. For this internal audit, sample selections were comprised of both random and judgmental selections.

| Frequency | Type of Control | Population | Sample Size |
|---|---|---|---|
| Annual Control | Manual | 1 | 1 |
| Quarterly Control | Manual | 4 | 2 |
| Monthly Control | Manual | 12 | 4 |
| Weekly Control | Manual | 52 | 10 |
| Daily Control | Manual | 260 (Business Days) | 20 |
| More than Daily | Manual | > 260 | 30 |
| Event | Manual | See Note 1 | See Note 1 |
| Any | System | Varies | 1 |
| **Note 1:** In the event that a control frequency is not regular, but is driven by an external factor (e.g., account opening), an appropriate sample size will be arrived at by counting the number of events in the Audit Period and comparing that to the sample size suggested above for events of a similar frequency - e.g. an event that occurs 140 times / year could be sampled at or above the minimum sample size suggested for a weekly or daily control. | | | |

## V. Summary of Audit Procedures

| BSA/AML and OFAC Program Governance and Oversight |
|---|
| • Reviewed the Bank's written program and verified that the Bank developed a BSA/AML and OFAC compliance program that is written, approved, and up to date with current processes.<br>• Confirmed whether the BSA/AML and OFAC written compliance program includes a system of internal controls, independent testing, designates a BSA compliance officer, compliance training, and Customer Due Diligence.<br>• Evaluated whether the Bank established a process for providing sufficient information on the BSA/AML and OFAC compliance program to the Board of Directors or an appropriate committee for proper oversight.<br>• Reviewed the BSA/AML/OFAC Policy and verified that the Bank has a process for appointing a qualified BSA/AML/OFAC Officer.<br>• Verified the BSA Compliance Officer was appointed by the Board or designee, has defined roles and responsibilities, and authority to execute day-to-day BSA Compliance function. |
| BSA/AML and OFAC Risk Assessment |
| • Evaluated that the BSA/AML and OFAC Risk Assessment is commensurate with the Bank's risk profile. |

- Confirmed whether the Risk Assessment utilized both quantitative and qualitative factors for determining the Bank's risk profile.
- Confirmed that the Risk Assessment was in line with the Risk Assessment Methodology.
- Reviewed the BSA/AML and OFAC Risk Assessment and verified that the Bank included products, services, customer accounts, entities and geographic locations when determining the inherent and residual risk ratings.

**BSA/AML and OFAC Training Program**

- Confirmed that the Bank has a documented BSA/AML and OFAC training program with requirements for all employees, including Senior Management and the Board of Directors, and that the training program was approved.
- Reviewed a sample of training materials and verified that the information is in line with regulatory requirements and that the Bank has tailored training for specific departments.
- Reviewed a sample of new and existing employees and verified that the employees completed the training within the specified time period, and any conditions of non-compliance was escalated and remediated.
- Verified the Board of Directors received BSA/AML and OFAC training on an annual basis.

**KYC Program (CIP, CDD, EDD and CRR) for Core and FinTech**

- Verified the Bank has established a written Customer Identification Program (CIP) and customer due diligence (CDD) program which includes risk-based procedures, and a defined process for performing enhanced due diligence (EDD).
- Reviewed a sample of new FinTech and Core customer accounts and determined whether the onboarding was in compliance with the Bank's policies and procedures and regulatory requirements.
- Reviewed a sample of core and FinTech customer accounts that have gone through a periodic review and determined that the review was performed in accordance with policies and procedures.
- Reviewed a sample of FinTech and Core customers warranting EDD and validated that the EDD process was performed in accordance with policies and procedures.
- Reviewed a sample of customers warranting EDD Counterparty Program Testing and verified that the review was performed in accordance with policies and procedures.
- Confirmed the Customer Risk Rating ("CRR") methodology has defined specific factors the Bank considers when determining a customer's overall risk profile.
- Verified the Customer Risk Rating Methodology utilizes quantitative and qualitative data, appropriately assigns high-risk ratings, includes a process to override customer risk ratings, and is periodically reviewed.
- Reviewed a sample of new and existing core and FinTech customer accounts to verify that they were risk rated appropriately in accordance with the Customer Risk Rating Methodology.

**Transaction Monitoring ("TM") Program and Suspicious Activity Reporting**

- Verified the Bank's manual and automated transaction monitoring process is designed effectively ton detect unusual activity to comply with regulatory requirements, and the Bank has clear escalation, reporting, and investigation procedures in the event of the identification of potential suspicious activity.
- Reviewed the TM Procedures and associated desktop manuals and verified that the procedures are in compliance with regulatory requirements and provides a clear description and sufficient level of detail for managing TM cases.
- Reviewed a sample of alerts and cases to determine that the alert and case disposition were in compliance with the Bank's policies and procedures as well as regulatory requirements.
- Verified that the Bank has implemented policies and procedures for identifying, researching, and reporting suspicious activity.
- Determined if the Bank's SAR Policies and Procedures are in line with regulatory requirements.
- Reviewed a sample of SARs and validated that the SARs were completed and documented in accordance with the Bank's Policies and Procedures, as well as applicable regulatory requirements.

| |
|---|
| • Reviewed a sample of No-SARs and verified that the rationale for not filing a SAR was properly supported and approved by Management. |
| **Monetary Instruments and Currency Transaction Reporting ("CTR") and Exemptions** |
| • Evaluated if the Bank implemented procedures for collecting and maintaining information regarding purchases of monetary instruments.<br>• Reviewed the Banks policies and procedures to monitor and aggregate purchases of monetary instruments for alignment with regulatory requirements.<br>• Reviewed a sample of monetary instruments sold or purchased in amounts between $3,000 and $10,000 and verified that the transactions were recorded in accordance with regulatory requirements and internal policies and procedures.<br>• Evaluated if the Bank implemented policies, procedures, and processes to adequately address CTR requirements and exemptions.<br>• Reviewed the Bank's policies, procedures and processes for CTR Phase I exemptions and CTR Phase II exemptions and verified that the procedures specify the documentation and due diligence requirements.<br>• Reviewed a sample of CTRs and verified that the CTRs were completed in accordance with regulatory requirements and internal policies and procedures. |
| **Regulatory Reporting and Information Sharing** |
| • Reviewed the Banks policies and procedures for conducting 314(a) searches and sharing information voluntarily through the 314(b) Program for alignment with regulatory requirements.<br>• Reviewed a sample of 314(a) and 314(b) requests to determine requests were in compliance with the Banks policies and procedures and regulatory requirements.<br>• Reviewed the Bank's policies and procedures and verified that the Bank implemented a process for receiving and responding to special measures from FinCEN, obtaining, recording, and reporting the information as required<br>• Reviewed a sample of NSL and Subpoenas to verify requests were handled in accordance with policies, procedures and regulatory requirements.<br>• Verified that the Bank has a process to track and compile any prohibitions and restrictions resulting from Special Measures. |
| **OFAC and Sanctions Compliance** |
| • Verified the Bank has established procedures for screening transactions, new accounts, employees, vendors, and consultants for potential matches against OFAC databases.<br>• Reviewed a sample of employees, onboarded customers, and existing customer accounts that have gone through periodic review to verify that OFAC screening was performed in accordance with policies and procedures and regulatory requirements.<br>• Reviewed a sample of OFAC alerts for proper disposition and escalation, if applicable, in accordance with regulatory requirements and internal policies and procedures.<br>• Reviewed a sample of OFAC List Updates, validated that adequate screening was performed against additions, removals, and changes to the SDN list were performed.<br>• Evaluated that the Bank performed an on-going analysis of the Filtering system, and tracks and remediates any issues identified.<br>• Reviewed a sample of prohibited transactions that were blocked and rejected and verified that the Bank took appropriate actions to meet regulatory requirements and internal policies and procedures. |
| **Funds Transfer and Record Retention** |
| • Reviewed the Bank's policies, procedures and processes related to funds transfers for compliance with FinCEN's travel rule requirements.<br>• Reviewed a sample of incoming and outgoing wires and verified that data for travel rule requirements were maintained.<br>• Reviewed the Bank's BSA/AML and OFAC policies and procedures and validated that they include recordkeeping requirements around maintaining key BSA/AML/OFAC related records for at least 5 years, and that they are stored in such a manner as to be accessible within a reasonable amount of time. |

| |
|---|
| • Reviewed a sample of CTRs, Monetary Instruments, SARs, OFAC Records, and closed accounts and verified that the records were appropriately maintained in accordance with regulatory requirements. |
| Quality Assurance ("QA")/ BSA Compliance Surveillance Program |
| • Reviewed the Bank's QA policies and procedures and verified that the process is risk-based and that the frequency, documentation requirements are clearly defined. |
| Products and Services |
| • Reviewed the policies, procedures, and processes to monitor, identity, and report unusual and suspicious activities for loan activity for adequacy.<br>• Reviewed the Bank's policies, procedures and processes related to Electronic Banking and Remote Deposit Capture and verified that the controls are adequate to mitigate BSA/AML risks.<br>• Verified the Bank has adequate policies, procedures, and processes for performing due diligence on Brokered Deposit Accounts. |

## VI. Summary of Audit Findings

**Medium Risk Findings:**

**Missing Documentation, timeliness of Enhanced Due Diligence (EDD) reviews, and discrepancies in EDD Annual Review Procedures.** Four (4) out of 15 EDD customer files were noted as not in compliance with the Bank's procedures and one (1) EDD customer file did not indicate a review due date. In addition, for six (6) out of 15 FinTech EDD samples, the EDD Annual Review was not completed by the Review Due Date, however the EDD procedures did not include a process for deadline extensions. This finding is a repeat finding from the 2019 BSA/AML audit report. The prior report noted similar issues around missing documentation and reviews not completed within the review timeframe. (Refer to **Appendix D – 4.2** for a detailed description of the finding)

**Missing Documentation and Timeliness of Case Investigations.** For 14 out of 30 supporting documentation evidencing required public domain research was not included with the sampled cases. Additionally, three (3) sampled cases were not completed and submitted for review within the thirty (30) days of escalation, as required. (Refer to **Appendix D – 5.1** for a detailed description of the finding)

**Inconsistent application of Information Sharing Procedures.** Two (2) positive 314(a) matches were not escalated to FIU for investigation as required per the Bank's' Information Sharing Procedures. Additionally, the Bank's Information Sharing Procedures do not include a process for immediately obtaining prior 314(a) requests from FinCEN, and performing a retroactive search of the records, in the event the Bank fails to perform or complete searches on one or more information request(s) received during the previous 12 months. (Refer to **Appendix D – 8.1** for a detailed description of the finding)

**Low Risk Findings:**

**Missing documentation, timeliness of periodic reviews, and incomplete periodic review procedures.** Seven (7) out of 30 customer KYC files did not contain all documentation as required by the Bank's BSA Periodic Review Procedures. Additionally, no documented timeline requirements were identified surrounding periodic reviews and approvals. (Refer to **Appendix D – 4.1** for a detailed description of the finding)

**Customer Risk Rating Methodology Procedure Documentation gaps** The Bank's Customer Risk Rating Methodology Procedures do not specify account types that are excluded from the customer risk rating process. (Refer to **Appendix D – 4.3** for a detailed description of the finding)

**Timeliness of Quality Control Reviews for FinTech Customer Onboarding.** For eight (8) out of 30 FinTech customer CIP files, the Quality Control Checklists were not completed and approved within 30

calendar days as required by the Bank's procedures. (Refer to **Appendix D – 4.4** for a detailed description of the finding)

**Missing Documentation and Timeliness of Core Customer Onboarding Process Completion.** For eight (8) out of 20 Core customer CIP files, all required documentation was not retained in the files (e.g., LLC Documentation Checklists, review/approval of business documents within set timeframe, ID for authorized signors/principals). (Refer to **Appendix D – 4.5** for a detailed description of the finding)

**Transaction Monitoring & Suspicious Activity Reporting Policies and Procedure Documentation Gaps.** While, the transaction monitoring and suspicious activity reporting policies and procedures were deemed to be designed and operating effectively based on process walk-throughs and sample testing, six processes were not formally documented in the Bank's Written Program (e.g., continuing SAR filings, requirement to notify law enforcement earlier than 120 days if warranted). (Refer to **Appendix D – 5.2** for a detailed description of the finding)

**Missing Documentation and Timeliness of Transaction Monitoring Alert Reviews.** For Two (2) out of 30 TM alerts, the documentation used to disposition the alert was not retained. In addition, three (3) out of 30 TM alerts, were not reviewed within thirty (30) days of generation as required by the Bank's procedures. (Refer to **Appendix D – 5.3** for a detailed description of the finding)

**OFAC Procedures Documentation Gaps.** The process for filing a SAR in the event a true positive match is identified through OFAC screening is not documented in the OFAC procedures. Additionally, while the Accounting Department screens transactions prior to vendor payments, the Bank does not have a process for screening vendors against the OFAC SDN list prior to onboarding of a vendor. (Refer to **Appendix D – 7.1** for a detailed description of the finding)

**Inconsistent application of procedures to validate OFAC list updates.** Inconsistencies were identified surrounding the certification testing performed by BSA Compliance when validating the effectiveness of OFAC list updates. (Refer to **Appendix D – 7.2** for a detailed description of the finding)

**Special Measures Policy and Procedure Documentation Gaps.** Special measures are monitored through the Bank's automated transaction monitoring system (Prime). However, there are no documented procedures for complying with Special Measures, (Refer to **Appendix D – 8.2** for a detailed description of the finding)

**Self-identified Finding:**

The following represents a self-identified issue that was disclosed by BSA Compliance during the audit. Therefore, it is not included in the number of findings identified as a result of this internal audit.

**Duplicative transactions creating false positive alerts.** The original design of the PRIME transaction monitoring system rules included two data sources, namely FIS Horizon and eWire or Finastra. The same transactions feeding from eWire or Finastra and FIS Horizon into FIS Prime are being duplicated and combined resulting in some false positive transaction monitoring alerts. However, the inclusion of both data-sources was necessary. Given the intent to migrate from the PRIME platform (to Verafin) in 2020, the bank elected not to spend additional time and effort to complete the exercise to decommission the Horizon data source for wire transactions.

## Appendix A – Overall Audit Rating Definitions

Internal audit ratings are assigned based upon the following criteria/definitions, guidelines and the auditor's judgment as to the audit area's ability to assess and effectively control the principal business risk while operating in compliance with applicable policies, procedures, laws and regulations. Silvergate Bank engaged Grant Thornton as a co-sourced internal audit service provider. Silvergate Bank's internal audit overall audit and findings rating scales were utilized for this report.

**1. Effective**
Effective, risk based internal controls program including training, monitoring and management of policies and procedure and segregation of duties. Controls evaluated are adequate, appropriate, and effective to provide reasonable assurance that risks are being managed and objectives should be met. While exceptions may have been noted, there is no evidence of discriminatory patterns or practices and corrective action is addressed promptly. (Note: There should be nothing higher than low-risk exceptions noted and exceptions are not part of a larger pattern.)

**2. Satisfactory**
Exceptions have been noted; however, resulted from oversights of technical aspects of control areas or lack of written procedures. Modifications or implementation of new procedures, monitoring, and training may be recommended. Corrective action is addressed promptly. Generally, controls evaluated are adequate, appropriate, and effective to provide reasonable assurance that risks are being managed and objectives should be met. (Note: There should be nothing higher than medium-risk exceptions noted and exceptions part of a larger pattern can be promptly cured.)

**3. Satisfactory with Concerns**
The system of internal controls may meet the most fundamental compliance requirements, but the overall program has some weaknesses which have or are likely to result in regulatory violations. Control weaknesses were noted and are unlikely to provide reasonable assurance that risks are being managed and objectives should be met. Although some effort has been made to develop a compliance program, systemic failures occur, which have or may result in significant regulatory violations, losses, or penalties. Corrective action, training, monitoring and policies and procedures have not always been implemented fully or quickly. (Note: There should be nothing higher than moderate-risk exceptions noted and exceptions of a larger pattern can be promptly cured.)

**4. Improvement Needed**
The system of internal controls fails to facilitate regulatory compliance and have and will likely result in major regulatory violations, losses, or penalties. Controls evaluated are not adequate, appropriate, or effective to provide reasonable assurance that risks are being managed and objectives should be met. Corrective action is not addressed timely. Training, monitoring, policies and procedures have not been implemented or previous recommendations acted upon. The areas with exceptions should be of immediate concern to management and require prompt corrective action.

**5. Unsatisfactory**
The system of internal controls is critically deficient and in need of immediate remedial attention as the viability of the entity is threatened.

## Appendix B – Definition of Finding Types and Priority

**Below are Silvergate Bank's internal audit definition of risk and priority rating scale utilized for this report.**

| Rating | Risk | Priority |
|---|---|---|
| **High** | High risk level identifies significant vulnerabilities that should be addressed immediately. | Vulnerabilities should generally be remediated within 3 months or an Executive approved Project / Action plan should be formalized for implementation by an agreed upon date. |
| **Medium** | Medium risk level represents moderate vulnerabilities that should be addressed as soon as reasonably possible. | Vulnerabilities should be remediated within the normal course of operations as soon as reasonably possible - generally within 3-6 months. |
| **Low** | Low risk level represents a minor threat. Findings that are informational-only are also included at this level. | Vulnerabilities should be remediated within the normal course of operations as soon as reasonably possible - generally within 6-9 months so they are operational for at least three months prior to the next annual audit. |

## Appendix C – The Key Pillars of a BSA / AML Program

As per BSA Management, the in-scope BSA/AML activities are fulfilled with a general understanding of the key pillars outlined in the FFIEC manual and FinCEN's frequently asked questions:

| | |
|---|---|
| **Designation of a BSA Compliance Officer** | • The BSA Compliance Officer is appointed by the board of directors.<br>• The BSA Compliance Officer is charged with managing the institution's BSA/AML compliance and is ultimately responsible to the board of directors, with a direct line of communication to the board and senior management.<br>• The BSA Compliance Officer must be knowledgeable of all applicable AML regulations and have a strong working understanding of product and service offerings.<br>• The BSA Compliance Officer is responsible for managing communication with regulatory authorities for AML-related issues and reporting. |
| **Development of Internal Policies, Procedures and Controls** | • Provide sufficient controls and monitoring systems for timely detection and reporting of suspicious activity.<br>• Provide for adequate supervision of employees that handle currency transactions, complete reports, grant exemptions or monitor for suspicious activity.<br>• Incorporate BSA compliance into the job description and performance evaluation of personnel, as appropriate.<br>• Train employees to be aware of their responsibilities under the BSA regulations and internal policy guidelines. |
| **Ongoing, Relevant Training of Employees** | • The program must provide training for all personnel whose duties require knowledge of BSA.<br>• The training should be tailored to the person's specific responsibilities.<br>• Internal policies, procedures, processes and monitoring systems should be covered during training.<br>• Training programs and staff completion should be documented for examiner review. |
| **Independent Testing and Review** | • Independent testing provides verification that the BSA compliance program is operating as effectively as possible and is compliant with the law.<br>• Independent testing should be completed by internal audit, outside auditors, consultants or other qualified independent parties and be conducted every 12–18 months commensurate with the institution's risk profile.<br>• The audit program is sufficiently independent and reports to the board or a committee of the board. |
| **Ongoing Customer Due Diligence** | • Provide risk-based procedures for conducting ongoing customer due diligence.<br>• Risk-based procedures should include, but are not limited to the following:<br>- Understanding the purpose and nature of customer relationships to develop customer risk profiles<br>- Conducting ongoing monitoring to identify and report suspicious transactions |

## Appendix D – Detailed Findings and Recommendations

### 1. BSA/AML and OFAC Program Governance and Oversight

There were no findings noted during the testing for these audit areas.

### 2. BSA/AML and OFAC Risk Assessment

There were no findings noted during the testing for these audit areas.

### 3. BSA/AML and OFAC Training Program

There were no findings noted during the testing for these audit areas.

### 4. KYC Program (CIP, CDD, EDD, and CRR) for Core and FinTech

| **4.1. Missing documentation, timeliness of periodic reviews, and incomplete periodic review procedures** | **Risk Rating: Low<br>Priority: Medium** |
|---|---|
| *Findings* | During the operating effectiveness testing of the Bank's periodic review process, the following observations were noted:<br><br>(i) Seven (7) out of 30 KYC files had insufficient documentation maintained as required by the BSA-117 BSA Periodic Review Procedure. Specifically, three (3) KYC files did not have documented evidence that the periodic review occurred within the required frequency based on customer risk rating, and four (4) KYC files were missing certain required documents, per the BSA Periodic Review Procedure, in the customer's KYC file provided (e.g., overall check activity charts, ACH activity count charts, domestic wire activity count charts).<br><br>(ii) BSA Compliance indicated that the periodic review scope could be extended with approval from the BSA Supervisor, BSA Manager or BSA Compliance Officer. However, the process to approve a periodic review extension is not documented in the BSA-117 BSA Periodic Review Procedure.<br><br>(iii) The BSA-117 BSA Periodic Review Procedure does not specify a timeline in which a periodic review must be reviewed and approved. Per inquiry with BSA Compliance, best practice is that reviews are approved within 30 days after they have been submitted for approval. However, for 10 out of 30 samples selected, the periodic review was approved more than 30 days after review completion. |
| *Root Cause* | Quality Assurance ("QA") function (i.e. Compliance Monitoring) not yet fully implemented during the audit period |
| *Risk Impact* | Inconsistent application of the periodic review process by employees may lead to improper maintenance of KYC files. |
| *Recommendation* | (i) The Bank should reinforce timeliness and procedures for obtaining required documentation as part of the periodic review process.<br><br>(ii). The Bank should update the BSA-117 BSA Periodic Review Procedure to include the process to approve a periodic review extension.<br><br>(iii). The Bank should update the BSA-117 BSA Periodic Review Procedure to include a timeline in which a periodic review must be reviewed and approved. |

| **4.1. Missing documentation, timeliness of periodic reviews, and incomplete periodic review procedures** | **Risk Rating: Low<br>Priority: Medium** |
|---|---|
| *Management's Response* | The BSA department will update our procedures (BSA-117) to reflect the noted recommendations. |

| **4.2. Missing Documentation, timeliness of Enhanced Due Diligence (EDD) reviews, and discrepancies in EDD Annual Review Procedures** | **Risk: Medium<br>Priority: High** |
|---|---|
| *Findings* | (i). As part of EDD for Fintech Customer testing, four (4) out of 15 EDD customer files were noted as not in compliance with the Bank's procedure "BSA-109 Enhanced Due Diligence: Annual Review Procedure"; (e.g., missing customer's BSA/AML Policies and Procedures, training materials, BSA/AML Risk Assessment, BSA/AML Audit and Customer Fair-Treatment Related Policies and Procedures).<br><br>(ii). For six (6) out of 15 FinTech EDD samples, the EDD Annual Review was not completed by the Review Due Date. However, the BSA-109 Enhanced Due Diligence: Annual Review Procedure does not indicate whether extensions may be granted.<br><br>(iii). One (1) out of 15 FinTech EDD samples did not indicate a review due date. Therefore, Grant Thornton was unable to verify whether review was performed timely.<br><br>This finding is a repeat finding from the 2019 BSA/AML audit report. The prior report noted similar issues around missing documentation and reviews not completed within the review timeframe. |
| *Root Cause* | Quality Assurance ("QA") function (i.e. Compliance Monitoring) not yet fully implemented during the audit period |
| *Risk Impact* | Inconsistent application of the EDD annual review process by employees, and untimely completion of EDD annual reviews may lead to failure to identify potentially suspicious activity and/or accurately capture current customer information. |
| *Recommendation* | (i) The Bank should reinforce the BSA-109 Enhanced Due Diligence: Annual Review Procedure, through training, to all analysts and supervisors during the enhanced due diligence annual review.<br><br>(ii). The Bank should reinforce to all analysts that the enhanced due diligence annual review must be completed by the review due date and develop a tracking and/or approval requirements as well as extension criteria for situations where a client does not have current BSA audit documentation available.<br><br>(iii). The Bank should reinforce to all analysts that a review due date must be listed on each BSAF-020, Annual Review Internal Questionnaire Summary completed. |
| *Management's Response* | The BSA department will update our procedures (BSA-109) to reflect the noted recommendations. |

| **4.3. Customer Risk Rating Methodology Procedure Documentation Gaps** | **Risk: Low<br>Priority: Medium** |
|---|---|
| *Findings* | While the Bank's new Customer Risk Rating Methodology is designed effectively overall, the following observations were noted in the Bank's Customer Risk Rating Process: |

| **4.3. Customer Risk Rating Methodology Procedure Documentation Gaps** | **Risk: Low<br>Priority: Medium** |
|---|---|
| | a. For four (4) out of 28 samples reviewed, there was no Customer Risk Rating Scorecard provided. Management explained that these four samples are warehouse-lending accounts and are not subject to customer risk rating. However, the BSA-115 Customer Risk Rating and Methodology Procedure does not specify account types that will be excluded from customer risk rating. |
| *Root Cause* | The frequency of procedural documentation updates not keeping pace with the rate of operational changes which occurred during the audit scope period. |
| *Risk Impact* | Failing to formally document customer risk rating processes may lead to inconsistent risk ratings applied to customers of the Bank. |
| *Recommendation* | The Bank should update the Customer Risk Rating and Methodology Procedure to ensure the following policies and processes are accurately documented and formalized:<br><br>a. The override process and required approvals for overriding a risk rating.<br><br>b. Warehouse-lending accounts are not subject to customer risk rating. |
| *Management's Response* | Management will update the Customer Risk Scoring and Methodology Procedures to reflect current practices. |

| **4.4. Timeliness of Quality Control Reviews for FinTech Customer Onboarding** | **Risk: Low<br>Priority: Low** |
|---|---|
| *Findings* | While the Bank's overall Customer Identification Program (CIP) is designed effectively, for eight (8) out of 30 FinTech customers tested as part of CIP, the Quality Control Checklist was not completed and approved within 30 calendar days of account activation as required by the Bank's COS-103 Onboarding and Service Quality Control Procedure. |
| *Root cause* | Quality Assurance ("QA") function (i.e. Compliance Monitoring) not yet implemented during the audit period |
| *Risk Impact* | Delays in quality control reviews may lead to delays in the identification of missing CIP information required to be obtained for each customer. |
| *Recommendation* | The Bank should reinforce the importance of obtaining timely and complete CIP documentation required to complete the Quality Control Checklist within 30 calendar days of account activation. |
| *Management's Response* | The BSA department will work with the onboarding team to address the noted recommendations. |

| **4.5. Missing Documentation and Timeliness of Core Customer Onboarding Process Completion** | **Risk: Low<br>Priority: Medium** |
|---|---|
| *Findings* | As part of CIP Core Customer testing, eight (8) out of 20 new core-customer files were noted as not in compliance with the Bank's procedure "OPM-027 New Accounts Documentation Procedure", specifically: |

| **4.5. Missing Documentation and Timeliness of Core Customer Onboarding Process Completion** | **Risk: Low<br>Priority: Medium** |
|---|---|
| | a. One (1) new core-customer file was missing the Limited Liability Company Documentation Checklist, evidence the preparer is different from the reviewer, and that the business documents were reviewed and approved within 30 days of account opening.<br>b. One (1) new core-customer file was missing evidence the preparer is different from the reviewer, and that the business documents were reviewed and approved within 30 days of account opening.<br>c. Four (4) new core-customer files were missing evidence that the business documents were reviewed and approved within 30 days of account opening.<br>d. Two (2) new core-customer files did not retain an acceptable form of ID for authorized signors/principals. |
| *Root Cause* | Quality Assurance ("QA") function (i.e. Compliance Monitoring) not yet fully implemented during the audit period |
| *Risk Impact* | Inconsistent application of the core-customer onboarding process by employees may lead to failure to adequately verify the identity of customer(s). |
| *Recommendation* | The Bank should reinforce the following procedures, through training, to all analysts and supervisors during customer onboarding:<br><br>a. All business files must be reviewed and approved within 30 days of account opening.<br>b. An acceptable form of ID for Authorized Signors/Principals must be on file.<br>c. All business files must be reviewed and approved by an individual different than the file preparer.<br>d. If applicable, a Limited Liability Company Documentation Checklist must be completed and saved on file. |
| *Management's Response* | The BSA department will work with the onboarding team to address the noted recommendations. |

## 5. Transaction Monitoring Program and Suspicious Activity Reporting

| **5.1. Missing Documentation and Timeliness of Case Investigations** | **Risk: Medium<br>Priority: Medium** |
|---|---|
| *Findings* | While the Bank's overall process for completing case investigations was deemed to be designed effectively, 14 out of 30 cases were noted during operating effectiveness testing as not in compliance with the Bank's BSA-111 Financial Intelligence Unit Procedure.<br><br>Specifically, Section 6.1 (pg.9) of the BSA-111 Financial Intelligence Unit Procedure states the analyst will: "conduct internet searches through Google, Bing, LinkedIn, etc. (with and without "dirt string") on involved parties/counterparties; and conduct other searches utilizing LexisNexis, Clear, World Check, CFPB, BBB and other databases (e.g. –IP locater) on involved parties/counterparties." Based on these requirements, 11 cases lacked one or more of the above documentation items as stipulated by the procedures.<br><br>For the remaining three (3) sampled cases, the case investigation was not completed and submitted for review within 30 days of escalation date as required by the BSA-111 Financial Intelligence Unit Procedure.<br><br>While BSA Compliance indicated that database searches are not required to be retained within the case file; this statement is not consistent with the BSA-111 Financial Intelligence Unit Procedure. |
| *Root Cause* | Quality Assurance ("QA") function (i.e. Compliance Monitoring) not yet fully implemented during the audit period |
| *Risk Impact* | Inconsistent application of the case investigation process by employees may lead to failures to report suspicious activity. |
| *Recommendation* | The Bank should clearly state minimum due diligence requirements for each case investigation, including internet and database search requirements.<br><br>Additionally, the Bank should reinforce the FIU procedures, through training, to all analysts and supervisors during case investigations the importance of completing case reviews within 30 days of case escalation date; and that supporting documentation should be retained during the disposition of a case. |
| *Management's Response* | The noted procedural gaps in section 5.1 have been addressed in the FIU procedure (BSA-111); currently the procedure and its added updates are with our technical writing team. |

| **5.2 Transaction Monitoring & Suspicious Activity Reporting Policies and Procedure Documentation Gaps** | **Risk: Low<br>Priority: Medium** |
|---|---|
| *Findings* | The following transaction monitoring and suspicious activity reporting policies and procedures were deemed to be designed and operating effectively through process walk-throughs and sample testing. However, these policies and procedures were not formally documented in the Bank's Written Program:<br><br>a. tracking, monitoring and escalation of aged cases<br>b. review of SAR narratives by the FIU supervisor, BSA Manager and BSA Compliance Officer prior to submission<br>c. informing employees of Safe harbor provision for protection for civil liability for reports of suspicious transactions made to appropriate authorities |

| | |
|---|---|
| | d. reviewing customers and related parties that have been subject to multiple SAR filings<br>e. requirement to file a SAR within 120 calendar days after the date of the previously related SAR filing after 90-day review if activity is still deemed suspicious<br>f. requirement to notify law enforcement earlier than 120-day deadline if the account warrants immediate review by law enforcement |
| *Root Cause* | The frequency of procedural documentation updates not keeping pace with the rate of operational changes which occurred during the audit scope period |
| *Risk Impact* | Failing to formally document transaction monitoring and suspicious activity reporting policies and processes may lead to inconsistencies in the execution of key controls. |
| *Recommendation* | The Bank should update the transaction monitoring and suspicious activity reporting policies and procedures to ensure that the following policies and processes are accurately documented in the Bank's written program:<br><br>a. tracking, monitoring and escalation of aged cases<br>b. review of SAR narratives by the FIU supervisor, BSA Manager and BSA Compliance Officer prior to submission<br>c. informing employees of safe harbor provision for protection for civil liability for reports of suspicious transactions made to appropriate authorities<br>d. reviewing customers and related parties that have been subject to multiple SAR filings<br>e. requirement to file a SAR within 120 calendar days after the date of the previously related SAR filing after 90-day review if activity is still deemed suspicious<br>f. requirement to notify law enforcement earlier than 120-day deadline if the account warrants immediate review by law enforcement |
| *Management's Response* | The noted procedural gaps in section 5.2 (a-f) have been addressed in the FIU procedure (BSA-111); currently the procedure and its added updates are with our technical writing team. |

| **5.3 Missing Documentation and Timeliness of Transaction Monitoring Alert Reviews** | **Risk: Low**<br>**Priority: Medium** |
|---|---|
| *Findings* | While the Bank's overall process for transaction monitoring ("TM") alert reviews and dispositions was deemed to be designed effectively, the following findings were noted during operating effectiveness testing as not in compliance with the Bank's TM alert review procedures "BSA-101 BSA Surveillance Alert Procedure":<br><br>a. For two (2) out of 30 transaction monitoring alerts, supporting documentation used to disposition the alert was not retained as required by the procedures.<br><br>b. For three (3) out of 30 transaction monitoring alerts, the alerts were not reviewed within 30 days of alert generation as required by the procedures. The three (3) alerts were reviewed within 35, 44, and 48 days after the alert generation. |
| *Root Cause* | Quality Assurance ("QA") function (i.e. Compliance Monitoring) not yet fully implemented during the audit period |

| **5.3 Missing Documentation and Timeliness of Transaction Monitoring Alert Reviews** | **Risk: Low<br>Priority: Medium** |
|---|---|
| *Risk Impact* | Inconsistent application of the alert dispositioning process by employees may lead to failures to identify and timely escalation and/or report potentially suspicious activity. |
| *Recommendation* | The Bank should implement a four-eyed check for level-one alerts prior closing the alert. Additionally, the Bank should include as part of the Quality Assurance Review that the QA reviewer assess the alert for timeliness.<br><br>The Bank should reinforce the following procedures, through training, to all analysts during alert reviews:<br><br>a. Supporting documentation used during the disposition of an alert must be retained.<br><br>b. All alert reviews must be completed and reviewed within 30 days of alert generation. |
| *Management's Response* | The procedural gaps stated in 5.3 (a-b) will be addressed in the Surveillance Alert procedure (BSA-101) and presented to the newly created BSA Committee Charter and then through the technical writing team. |

## 6. Monetary Instruments and Currency Transaction Reporting and Exemptions

- There were no findings noted during the testing for these audit areas

## 7. Office of Foreign Assets Control ("OFAC") Program

| **7.1. OFAC Procedures Documentation Gaps** | **Risk: Low<br>Priority: Medium** |
|---|---|
| *Findings* | Based on walkthroughs and results of sample testing, there were no operating effectiveness exceptions identified within the Bank's overall OFAC Program, however, the following documentation gaps were noted within the OFAC Policies and Procedures.<br><br>a. While the Bank does file SARs in instances of true hits on SDN individuals/entities, as confirmed through walkthroughs and sample testing, the process for filing a SAR in the event a true positive match is identified through OFAC screening is not documented.<br><br>Per inquiry with the BSA Compliance Officer, in the event a true positive match to an OFAC SDN designated individual or entity was identified, the Bank would forward the screening results and associated due diligence conducted to the FIU team to investigate further and determine whether a SAR is warranted.<br><br>b. The Bank's COM-012 OFAC Procedures state that each department is responsible for dispositioning OFAC alerts generated within their department; and escalating any alerts that cannot be cleared (i.e. possible true positive alert) to BSA Compliance. While BSA Compliance indicated that all vendors are screened by the Accounting Department prior to payment, the Bank does not have a process for screening vendors against the OFAC SDN list at onboarding of new vendors. |

| **7.1. OFAC Procedures Documentation Gaps** | **Risk: Low<br>Priority: Medium** |
|---|---|
| *Root Cause* | Frequency of policy and procedure updates not keeping pace with the rate of change in BSA Compliance processes |
| *Risk Impact* | Insufficient documentation of the control environment may lead to inconsistent execution of processes for OFAC and regulatory compliance. |
| *Recommendation* | The Bank should update the OFAC Program to include the following elements:<br><br>a. A process for filing a SAR in the event a true hit is identified during OFAC screening.<br><br>b. A process for screening vendors against the OFAC SDN prior to onboarding a new vendor.<br><br>The Bank should conduct training on updated policies and procedures to ensure awareness from BSA Compliance staff. |
| *Management's Response* | The procedural gaps stated in 7.1 (a-b) will be addressed in the OFAC procedure (BSA-112) and presented to the newly created BSA Committee Charter and then through the technical writing team. |

| **7.2. Inconsistent application of procedures to validate OFAC list updates** | **Risk: Low<br>Priority: Medium** |
|---|---|
| *Findings* | The Bank's process for confirming OFAC List Updates was deemed to be designed effectively with consideration of additional compensating controls implemented by the Bank's OFAC vendors. However, the following observations were noted as not in compliance with the Bank's procedures for OFAC list update testing as per COM-069, OFAC Certifications Testing:<br><br>a. The procedures indicate that a minimum of five (5) variations of the sampled SDN names must be tested. However, for all five (5) samples selected, only one (1) permutation of each of the sampled names was tested.<br><br>b. The procedures indicate that names will be tested against FIS Horizon, eWire, Watchdog, LexisNexis, Prime and CLEAR as part of the semi-annual certifications testing. However, for all five (5) samples selected, there was no evidence that the names were tested against LexisNexis and CLEAR.<br><br>c. The memo used to capture the results of the semi-annual certification testing performed in October 2019 does not indicate a "pass/fail" for each name spelling tested in each system as required by the COM-069 OFAC Certification Testing Procedure.<br><br>Furthermore, while BSA Compliance indicated that certification testing is performed on a semi-annual basis, the COM-069 procedures do not specify the frequency when certification testing is performed. |
| *Root Cause* | Quality Assurance ("QA") function (i.e. Compliance Monitoring) not yet implemented during the audit period |
| *Risk Impact* | Failure to implement adequate procedures and controls to ensure that customer accounts and transactions are screened against the most up-to-date OFAC lists for sanctioned countries, blocked entities/individuals, etc. could lead to an increased risk of non-compliance with OFAC requirements. |

| **7.2. Inconsistent application of procedures to validate OFAC list updates** | **Risk: Low**<br>**Priority: Medium** |
|---|---|
| *Recommendation* | In regard to certification testing process:<br>a. To complete the OFAC certifications testing as it is outlined in COM-069 OFAC Certifications Testing Procedures, the Bank should re-perform the OFAC certification procedures and ensure that at least a minimum of five (5) name variations is performed during testing.<br>b. As part of re-performing the OFAC certification testing, the Bank should screen the sample names and different variations against all required systems including FIS Horizon, eWire, Watchdog, LexisNexis, Prime, and CLEAR. Additionally, the Bank should update the procedures if certain systems are not required in practice as part of the OFAC Certification Testing.<br>c. The Bank should reinforce the procedure requirement of indicating "pass/fail" for each name in each system in the results memo.<br>Additionally, the Bank should formalize in the procedure the frequency of the certification testing process. |
| *Management's Response* | The BSA department will update our BSA-112 OFAC Procedures (COM-069 has been retired) to reflect the noted recommendations. |

## 8. Regulatory Reporting and Information Sharing

| **8.1. Inconsistent application of Information Sharing Procedures** | **Risk: Medium<br>Priority: High** |
|---|---|
| *Findings* | The following observations were noted regarding the Bank's 314(a) policies and procedures:<br><br>a. The Bank's BSA-111 Financial Intelligence Unit Procedures require that all 314(a) positive matches are escalated to FIU for investigation to determine whether a SAR should be filed. Out of ten (10) 314(a) samples tested, there were two (2) samples where a positive match was identified. However, these positive matches were not escalated to FIU for investigation. Additionally, there was no evidence provided by the Bank that a SAR was filed regarding the two (2) positive matches.<br><br>b. The Bank's BSA-113 Information Sharing Procedures do not include a process for immediately obtaining prior 314(a) requests from FinCEN, and performing a retroactive search of the records, in the event the Bank fails to perform or complete searches on one or more information request received during the previous 12 months. |
| *Root Cause* | The frequency of procedural documentation updates not keeping pace with the rate of operational changes which occurred during the audit scope period |
| *Risk Impact* | A failure to implement adequate policies and procedures over Section 314(a) information requests could result a failure to identify potentially suspicious activity and/or improper handling of information requests which may trigger instances of non-compliance with regulatory requirements. |
| *Recommendation* | a. The Bank's FIU should retroactively investigate these two (2) true positive hits for 314(a) and make a determination whether or not to file a SAR.<br><br>b. The Bank should develop and document a process for performing a retroactive search of the records, in the event it fails to perform or complete searches on one or more information request received during the previous 12 months |
| *Management's Response* | The BSA department has made changes to the procedures to ensure all 314a possible matches are escalated to FIU. In addition, we will update the procedures to reflect the noted recommendations. |

| **8.2. Special Measures Policy and Procedure Documentation Gaps (Section 311)** | **Risk: Low<br>Priority: Medium** |
|---|---|
| *Findings* | While the tool "Continuity" is utilized by the Bank to identify any new changes surrounding Special Measures announcements, the procedures for complying with Special Measures in the event of an update are not documented. |
| *Root Cause* | The frequency of procedural documentation updates not keeping pace with the rate of operational changes which occurred during the audit scope period. |

| **8.2. Special Measures Policy and Procedure Documentation Gaps (Section 311)** | | **Risk: Low<br>Priority: Medium** |
|---|---|---|
| *Risk Impact* | Failure to establish processes to perform notification of Special Measures to Bank clients and accounts could lead to violations of the USA PATRIOT Act and increase the Bank's risk of non-compliance with BSA requirements. | |
| *Recommendation* | The Bank should document the procedures for complying with Special Measures including utilizing the Continuity tool to identify any new changes for Special measures and Prime for monitoring transactions. The procedures should also include verification that the list of Special Measures is up to date in Prime. | |
| *Management's Response* | The procedural gaps stated in 8.2 (Special Measures) have been addressed in the OFAC procedure (BSA-112) and will be presented to the newly created BSA Committee Charter and then through the technical writing team. | |

9. **Funds Transfer and Record Retention**

There were no findings noted during the testing for these audit areas.

10. **Quality Assurance / Compliance Surveillance Program**

There were no findings noted during the testing for these audit areas.

11. **Products and Services**

There were no findings noted during the testing for these audit areas.

12. **Management Self-Identified Issues**

| **12.1. Duplicative transactions creating false positive alerts** | | **Risk: N/A<br>Priority: N/A** |
|---|---|---|
| *Finding* | The same transactions feeding from eWire or Finastra and FIS Horizon into FIS Prime are being duplicated and combined resulting in some false positive alerts. | |
| *Finding Details* | The original design of the PRIME system rules included two data sources, namely Horizon and eWire. The two data-sources were similar in that they both included wire transfer data, but there were some distinct differences. For example, Department/Branch data was missing from the eWire file, and the inclusion Counterparty data was missing from the Horizon file. For this reason, the inclusion of both data-sources was necessary. | |
| *Remediation Status* | With the migration to the Finastra payments system in November of 2019, the bank now receives a single wire file from the Finastra system, which includes all data and could move to eliminate the Horizon data from the wire rules in PRIME. While this change is now possible, it would require additional rule configuration and testing to ensure the integrity of the proposed design. Given the intent to migrate from the PRIME platform (to Verafin) in 2020, the bank elected not to spend additional time and effort to complete the exercise to decommission the Horizon data source for wire transactions. | |

## Appendix E – Prior Audit Issues

The prior BSA/AML Audit service provider, RSM US LLP ("RSM"), issued a BSA/AML audit report on May 24, 2019. RSM identified two (2) findings around the Bank's KYC/CDD Program and the BSA/AML Risk Assessment. While Grant Thornton did not perform an issue validation on these two (2) items, the program areas were reviewed as part of Grant Thornton's audit scope. The following were noted:

| RSM Priority Rating | Audit-Identified Issue or Issue Description (RSM Bank Secrecy Act/Anti-Money Laundering Report dated May 24, 2019) | RSM Recommendation | Status |
|---|---|---|---|
| Moderate | Throughout the Core and Fintech CIP/CDD/EDD reviews, we noted instances where there was a lack of follow-up for missing or additional information requested for a customer resulting from an account review or investigation.<br><br>We reviewed the documentation for 18 reviews of FinTech customers and noted the 17 of the 18 reviews for Fintech customers during 2018 were missing information, such as:<br>• Clarification of previous SAR filings, number of accounts reviewed in transactional activity charts, discussion of countries involved in foreign wire activity,<br>• Details regarding how the actual account activity was calculated for comparison to anticipated activity, and<br>• Entities incorporated in foreign countries lacked describing if the customer was in good standing and complying with all regulations posed by their incorporated country within the periodic review.<br><br>We also noted that during the review period timeframe, there was a lack of explanation for deviation from the standard review period based on the customer's risk rating.<br><br>As noted in the background, during the scope of our review, the Fintech branch tripled in size and there were several changes with the BSA Officer. As a result, EDD reviews were not completed in a timely manner. There were 11 instances where reviews were not completed within two months from of the end of the review period, seven instances where completed reviews were missing the analysts and BSA Manager's signature and date of execution, and three instances where the date was not included with the BSA Manager's signature. There was one additional review where a narrative was not included and the review was not completed. We determined during discussions with the BSA Manager that the employee working on this review was terminated and this was an isolated incident. | As per discussion with the BSA Officer and Deputy BSA Officer, a project is underway to implement a tracking process that will monitor all requests for further information to ensure the appropriate information received in a timely manner.<br><br>The quantity of risk is systemic due to the number of observations identified in the testing, which are technical in nature and are not an indication of a systemic breakdown in the internal controls.<br><br>We recommend management continue to address the review process and content.<br><br>As a result of the changes made to the BSA Department in December 2018, it appears that these issues are being addressed as revisions to review forms and checklists have been made and include a section for signature and date | This issue remains open as a repeat finding in the current audit. Refer to detailed findings in Appendix D. |
| Low | We noted that the combination of the Key Risk Indicators identified using TraceRisk software and the quarterly dashboard report included both qualitative and quantitative data. We also noted that a few certain types of customers / entities; products and services as outlined in the FFIEC exam that the bank does not offer | We recommend management include all types of businesses/entities, products and services outlined in the exam manual even though the bank does not offer those types of products and services. At the time of our review, the BSA Officer was in process of | A separate issue validation was not required per SGB Internal Audit Procedures for low risk issues. SGB Internal Audit deemed |

| RSM Priority Rating | Audit-Identified Issue or Issue Description (RSM Bank Secrecy Act/Anti-Money Laundering Report dated May 24, 2019) | RSM Recommendation | Status |
|---|---|---|---|
| | or service were not included in the risk assessment. We provided a comprehensive list to the BSA Officer during our review. | developing a more robust risk assessment that will include these. | this issue to be closed and Grant Thornton concurred based upon the review of the BSA/AML and OFAC Risk Assessment during the current audit. |