# Exhibit M

# Bank Secrecy Act/Anti-Money Laundering Report

**Silvergate Bank**

December 22, 2021

# EXECUTIVE SUMMARY

## Background

Silvergate Bank is a state-chartered bank, headquartered in La Jolla, California, with assets of nearly $12.8 billion as of September 30, 2021. Silvergate Bank is a leading bank for innovative businesses in FinTech and cryptocurrency, including offering services to foreign FinTech entities. The bank has experienced significant growth in recent years.

RSM US LLP (RSM) was engaged to perform Bank Secrecy Act (BSA) and anti-money laundering (AML) review services for Silvergate Bank. The purpose of the review was to evaluate Silvergate Bank's level of compliance with respect to the agreed-upon scope using a testing process designed to identify regulatory exceptions and weaknesses in the BSA/AML and OFAC program.

## Objective and Scope

Our procedures were performed in accordance with the BSA/AML scope and approach set forth in our engagement letter dated March 17, 2021, as updated during preaudit scoping collaboration. Our review procedures covered the independent testing requirements outlined in the Federal Financial Institutions Examination Council BSA/AML Examination Manual. Furthermore, we took a risk-based approach to our audit work program that considered the bank's size, complexity, scope of activities, risk profile, quality of control functions, geographic diversity and use of technology.

The scope of our procedures is included in Appendix A. The scope period included March 1, 2020–June 30, 2021.

Fieldwork was performed August 6, 2021, through November 1, 2021.
A preliminary exit meeting was held with management on November 1, 2021.

## Overall Summary/Highlights

Overall, management has implemented a program for BSA compliance. The written documentation on file addresses the regulatory requirements. We noted, as of the date of our audit, that management was still in the process of updating policies and procedures to address the April 2021 change in the transaction monitoring system from Prime to Verafin.

During 2021, the bank's BSA program underwent multiple changes. Michelle Sabins was appointed the BSA officer on June 11, 2021. In addition, the current deputy BSA officer was hired on May 3, 2021.

We found that internal controls implemented to provide for ongoing compliance with BSA requirements are sufficient for the size and complexity of the bank. However, we have identified some areas where improved processes and procedures are needed to strengthen the bank's BSA program as documented in this report.

We reviewed the findings identified in the 2020 independent audit conducted by Grant Thornton. During our testing, we determined whether issues identified had been remediated based on the outcome of the results of our audit. There were no regulatory examination findings requiring follow-up.

**We would like to thank all Silvergate Bank team members who assisted us throughout this review.**

**Please contact Othel Rife at othel.rife@rsmus.com or Daniel Shumovich at dan.shumovich@rsmus.com if you have any questions regarding this report.**


© 2021 RSM US LLP. All Rights Reserved.

## Executive Summary (Continued)

| Overall Rating (Appendix B—Rating Definitions) | | | | |
|---|---|---|---|---|
| | Report Rating | Number of Relative Risk Observations | | |
| | | High | Moderate | Low |
| Current BSA/AML Review | Satisfactory | 0 | 5 | 2 |

### Ratings and Conclusions

Following is a summary of High and Moderate observations noted in the areas reviewed. Definitions of the rating scales are included in Appendix B.

| Ratings by Observation | | |
|---|---|---|
| **Observations** | **Relative Risk** | **Quantity Risk** |
| Enhanced Due Diligence (EDD) Periodic Reviews for FinTech Clients | Moderate | Nonsystemic |
| Suspicious Activity Reporting | Moderate | Isolated |
| Financial Crimes Enforcement Network (FinCEN) 314(a) Information Sharing With Law Enforcement | Moderate | Isolated |
| EDD Periodic Reviews for Core Clients | Moderate | Nonsystemic |
| Foreign Correspondent Accounts Beneficial Ownership | Moderate | Isolated |
| Decisions not to File Suspicious Activity Reports (SARs) | Low | Nonsystemic |
| New High Risk FinTech Client Due Diligence | Low | Isolated |


© 2021 RSM US LLP. All Rights Reserved.

## DETAILED OBSERVATIONS

| | | | |
|---|---|---|---|
| **Ref. 1** | **EDD Periodic Reviews for FinTech Clients** | **Recommendation** | **Management's Response** |
| | We selected a sample of 30 high risk FinTech clients, 15 foreign money services business (MSB) clients and 15 domestic MSB clients (a total of 60 clients) to verify that EDD reviews were conducted and adequate documentation was retained. We identified the following:<br>• Three instances were noted in which EDD reviews for high-risk clients were not completed.<br>• For two foreign MSB clients, no review was completed.<br>• One instance was noted in which the EDD review was completed after the due date.<br>Per discussion with management, there was a reassessment of the due dates for certain clients, but the process for making the determination to postpone periodic reviews and the justifications for postponing the reviews was not adequately documented. | Management should review the high-risk client population to identify any past-due periodic EDD reviews. | The bank has transitioned to utilizing the new CRR module within Verafin and is now tracking all EDD reviews based on the customer's risk rating. All high-risk clients have either a current periodic review or have a review now scheduled to be complete by the end of Q1 2022, based on the new Verafin risk ratings.<br>**Responsible Party:** Michelle Sabins<br>**Target Date:** 3/31/2022 |
| | **Relative Risk Rating: Moderate** | **Quantity Risk Rating: Nonsystemic** | |
| **Ref. 2** | **Suspicious Activity Reporting** | **Recommendation** | **Management's Response** |
| | We selected a sample of 40 SAR filings to determine if the information reported was complete, accurate and adequately supported. In addition, we verified that the forms were filed in a timely manner. During our testing, we identified the following:<br>• One instance was noted in which the report was filed more than 60 days after escalation to the Financial Intelligence Unit (FIU). Management had previously self-identified this late SAR filing and presented RSM with a memo to detail reason for late filing, and the bank's action plan for remediation during the review. | Management should ensure that reports are filed timely and where information is available it is included in the SAR filing. | The late filing was due to a date mapping issue that resulted from the transition of cases from Prime to Verafin. In May 2021, FCRM Management identified late SAR filings as a result of the Prime to Verafin transition. The bank performed a lookback to identify any other impacted SAR's and updated its procedures to ensure this would not happen in the future. Additionally, |


© 2021 RSM US LLP. All Rights Reserved.

| | | | |
|---|---|---|---|
| | • Two instances were noted in which known IP addresses were not included in Part II Field #43 of the SAR form. | | SAR accuracy and completeness is an area being thoroughly reviewed and tested by the bank's QC function on a monthly basis.<br>**Responsible Party:** Spencer Garlick<br>**Target Date:** Completed 10/27/21 |
| | **Relative Risk Rating: Moderate** | **Quantity Risk Rating: Isolated** | |
| **Ref. 3** | **FinCEN 314(a) Information Sharing with Law Enforcement** | **Recommendation** | **Management's Response** |
| | We reviewed the screening of all 314(a) information requests for the period of January 2021 through June 2021. We identified three instances in which the bank did not perform a timely search of the listing, as it was missed in the transition of BSA department management.<br>Per management, these were special requests, which were not appropriately forwarded by the point-of-contact to the BSA department for screening. All missed requests were between January 2021 and February 2021. | Management should perform retro-active searches of the missed requests. | The bank has performed the missed searches. Additionally, the bank now has several redundant authorized parties able to access the SISS site and perform 314(a) screening, and does so within the Verafin tool in an automated fashion.<br>**Responsible Party:** Paul Gallegos<br>**Target Date:** Completed 4/1/21 |
| | **Relative Risk Rating: Moderate** | **Quantity Risk Rating: Isolated** | |
| **Ref. 4** | **EDD Periodic Reviews for Core Clients** | **Recommendation** | **Management's Response** |
| | We selected a sample of five high-risk core clients to verify that EDD reviews were conducted and adequate documentation was on file. We identified two instances in which reviews were either not conducted or were conducted late. This appears to be related to the reassessment of the due dates for certain clients as outlined in Reference #1. | Management should review the high-risk client population to identify any past-due periodic EDD reviews. Additionally, management should document all decisions to change high-risk account periodic review due dates. | Please see management response to item Ref.1 above. In addition, new procedures have been implemented related to Customer Risk Rating and Enhanced Due Diligence reviews as of December 2021, which outline how due dates are assessed, etc.<br>**Responsible Party:** Michelle Sabins<br>**Target Date:** 3/31/22 |
| | **Relative Risk Rating: Moderate** | **Quantity Risk Rating: Nonsystemic** | |


© 2021 RSM US LLP. All Rights Reserved.

| | | | |
|---|---|---|---|
| **Ref. 5** | **Foreign Correspondent Accounts (FCA)** | **Recommendation** | **Management's Response** |
| | We reviewed the due diligence information on file for two out of five FCA customers. For one customer, we identified that the bank did not obtain information for persons with 10% or more beneficial ownership in the financial institution.<br>While the procedures do detail the process for obtaining beneficial ownership information, they do not explicitly state the requirement that all beneficial owners with 10% or more ownership in the entity be identified. | Management should review all FCA accounts to verify that information is obtained for anyone with beneficial ownership of more than 10%.<br>Management should update the FCA due diligence process documentation to include the required identification of any persons with 10% or more beneficial ownership as part of the due diligence process. | The bank is updating its Beneficial Ownership form to reflect the 10% requirement for Foreign Correspondent clients, and obtaining an updated form for the client sampled during this audit.<br>**Responsible Party:** Claudia Pinilla<br>**Target Date:** 1/30/22 |
| | **Relative Risk Rating: Moderate** | **Quantity Risk Rating: Isolated** | |
| **Ref. 6** | **Decisions Not to File SARs** | **Recommendation** | **Management's Response** |
| | We selected a sample of 30 cases in which management determined not to file a SAR to verify that conclusions were adequately documented and supported. We identified seven instances in which there was no management approval of the nonfiling determination.<br>Per discussion with management at the time of our review, the procedures had not yet been updated to reflect that the practice of performing secondary reviews of closed cases had been terminated due to a newly implemented quality control program. | Management should update policies and procedures to reflect current practices. | The bank no longer requires management approval on every No-SAR decision, as these are tested for decision-making quality during our QC process after the fact. This was a process put in place prior to the start of the audit but the bank had not had the chance to finish procedural updates. The procedures have since been updated as of 10/25/21.<br>**Responsible Party:** Spencer Garlick<br>**Target Date:** Completed 10/25/21 |
| | **Relative Risk Rating: Low** | **Quantity Risk Rating: Nonsystemic** | |


© 2021 RSM US LLP. All Rights Reserved.
RSM

| Ref. 7 | New High Risk FinTech Client Due Diligence | Recommendation | Management's Response |
|---|---|---|---|
| | We selected a sample of 30 new high-risk FinTech clients to review due diligence at account opening as well as any periodic reviews that were conducted. We identified one instance in which the periodic review documentation erroneously stated that there were no alerts generated for the client during the review period, though there were two alerts generated during the review period. It was identified that one of the alerts was to be evaluated as part of the periodic review but was not included. | Management should remind personnel of the importance of including all pertinent information as part of the periodic review analyses. | Management will cover this item as a reminder at an upcoming staff meeting.<br>**Responsible Party:** Claudia Pinilla<br>**Target Date:**1/30/22 |
| | **Relative Risk Rating: Low** | **Quantity Risk Rating: Isolated** | |


© 2021 RSM US LLP. All Rights Reserved.
RSM

## OPERATIONAL AND PROCESS IMPROVEMENT OPPORTUNITIES

| **Ref. A** | **Alert Clearing Documentation** | **Recommendation** |
|---|---|---|
| | We selected a sample of 25 transaction monitoring alerts cleared within the Verafin monitoring system to determine if alert clearing conclusions were adequately supported and documented. We identified the following:<br>• Four instances were noted in which the disposition explanations did not contain adequate information about the reason for the alert or the final result of the investigation.<br>• Four instances were noted in which the disposition notes did not adequately identify the alert that triggered the review, or the reasoning behind the determination that the activity was not unusual or suspicious. | Management should provide additional training for employees to adequately document and support conclusions when alerts are cleared. |


© 2021 RSM US LLP. All Rights Reserved.

## STATUS OF PRIOR OBSERVATIONS

The following is a status report on the high- and medium-risk observations noted in the August 29, 2020 BSA/AML independent review and the bank's most recent examination report completed February 18, 2021, which did not have any findings related to the bank's BSA/AML and OFAC program. The reported status notes the progress made toward plan completion as reported to us by management. Through interviews with management and staff, testing and our current observations, the progress is reported as Complete, In-Process or Open. Any in-process or open items from the prior review or examination are cross-referenced below to observations noted during this review, if applicable.

| BSA AML Independent Review | | | | | |
|---|---|---|---|---|---|
| **Prior Observations** | **Relative Risk Rating** | **Complete** | **In-Process** | **Open** | **Reference** |
| EDD<br>i. As part of EDD for Fintech Customer testing, four (4) out of 15 EDD customer files were noted as not in compliance with the bank's procedures "BSA-109 Enhanced Due Diligence: Annual Review Procedure" (e.g., missing customer's BSA/AML Policies and Procedures, training materials, BSA/AML Risk Assessment, BSA/AML Audit and Customer Fair-Treatment Related Policies and Procedures)<br>ii. For six (6) out of 15 FinTech EDD samples, the EDD Annual Review was not completed by the Review Due Date. However, the BSA-109 Enhanced Due Diligence: Annual Review Procedure does not indicate whether extensions may be granted.<br>iii. One (1) out of 15 FinTech EDD samples did not indicate a review due date. Therefore, Grant Thornton was unable to verify whether review was performed timely. | Medium | | X | | See Reference #1 |


© 2021 RSM US LLP. All Rights Reserved.

| BSA AML Independent Review | | | | | |
|---|---|---|---|---|---|
| **Prior Observations** | **Relative Risk Rating** | **Complete** | **In-Process** | **Open** | **Reference** |
| Missing Documentation and Timeliness of Case Investigations<br>While the bank's overall process for completing case investigations was deemed to be designed effectively, 14 out of 30 cases were noted during operating effectiveness testing as not in compliance with the bank's BSA 111 Financial Intelligence Unit Procedure.<br>Specifically Section 6.1 states the analysis will "conduct internet searches through Google, Bing, LinkedIn, etc. (with or without "dirt string") on involved parties/counterparties, and conduct other searches utilizing LexisNexis, Clear, World Check, CFPB, BBB and other databases (e.g. - IP Locator) on involved parties/counterparties." Based on these requirements 11 cases lacked one or more of the above documentation items as stipulated by the procedures.<br>For the remaining three (3) sampled cases, the case investigation was not completed and submitted for review within 30 days of escalation date as required by the BSA-111 Financial Intelligence Unit Procedure.<br>While BSA Compliance indicated that database searches are not required to be retained within the case file; this statement is not consistent with the BSA-111 FIU Procedure. | Medium | X | | | |


© 2021 RSM US LLP. All Rights Reserved.

| BSA AML Independent Review | | | | | |
|---|---|---|---|---|---|
| **Prior Observations** | **Relative Risk Rating** | **Complete** | **In-Process** | **Open** | **Reference** |
| Inconsistent application of Information Sharing Procedures<br>a. The bank's BSA-111 FIU Procedures require that all 314(a) positive matches are escalated to FIU for investigation to determine whether a SAR should be file. Out of 10 314(a) samples tested, there were two samples where a positive match was identified. However, these positive matches were not escalated to FIU for investigation. Additionally, there was no evidence provided by the bank that a SAR was filed regarding these two positive matches.<br>b. The bank's BSA-113 Information Sharing Procedures do not include a process for immediately obtaining prior 314(a) request from FinCEN, and performing a retroactive search of the records, in the event the bank fails to perform or completed searches on one or more information requests reviewed during the previous 12 months. | Medium | | X | | See Reference #3 |


© 2021 RSM US LLP. All Rights Reserved.

# APPENDIX A—TESTING PROCEDURES

| BSA/AML Compliance | |
|---|---|
| **Transactional testing** | |
| • Customer Identification Program (CIP)—new accounts (30 new core clients and 30 new FinTech clients)<br>• Customer due diligence (CDD)—new accounts (30 new core clients and 30 new FinTech clients)<br>• EDD—high-risk accounts (30 new FinTech high-risk clients, 29 existing high-risk FinTech clients, five core high-risk clients)<br>• SARs (40)<br>• Suspicious activity not resulting in SAR filing (30) | • Currency Transaction Reports (CTRs) (three, 100%)<br>• CTR exemptions (one, 100%)<br>• Monetary instruments (NA—There were no population to test in our scope period.)<br>• Funds transfers (30 incoming and 30 outgoing, including Silvergate Exchange Network [SEN] transactions)<br>• 314(a) information sharing (all requests from January 2021 through June 2021)<br>• 314(b) voluntary information sharing (nine)<br>• Training records (10 newly hired employees and 21 existing employees) |

| Compliance Area | Comments |
|---|---|
| **BSA/AML and OFAC Compliance Program, Governance and Training** | |
| • Reviewed program content to ensure that all applicable internal control processes relating to BSA/AML, OFAC and USA PATRIOT Act were addressed<br>• Verified annual board of directors' approval of the program<br>• Verified that the results of the BSA/AML, OFAC and CIP risk assessments properly connected to the written compliance program | The bank has adequate policies and procedures to address the requirements set forth by the BSA and its related regulations. We reviewed the BSA, AML and OFAC Sanctions Compliance Policy, as well as the supporting policies and procedures.<br>The BSA/AML and OFAC policy was approved by the board of directors on January 21, 2021, as noted in the corporate secretary certification dated July 15, 2021.<br>Overall, policies and procedures appeared adequate to address the risks presented by the bank's business practices. No observations were identified. |
| **BSA/AML and OFAC Risk Assessment** | |
| • Reviewed the risk assessment for content to ensure that all products, services, geographies and customers were included in the risk assessment<br>• Verified that the risk assessment information was complete and accurate, and quantified risk with supporting documentation maintained | The BSA/AML and OFAC risk assessment identifies inherent and residual risks and mitigating controls related to products, services, clients, entities and geographic locations. The risk assessment was reviewed by the director risk committee on June 9, 2021. No observations were identified. |


© 2021 RSM US LLP. All Rights Reserved.
RSM

| Compliance Area | Comments |
|---|---|
| **CIP** | |
| • Tested a sample of new accounts for adequate CIP documentation and record retention<br>• Verified that discrepancies were resolved<br>• Verified that accounts were closed when verification did not occur within policy time frame requirements<br>• Verified procedures for providing a customer notice at account opening | The bank has policies and procedures in place to address CIP requirement for both core and FinTech clients.<br>**Core Clients**<br>Management has implemented baseline identification standards, and requests additional information related to potentially higher-risk types of clients. Nearly all accounts are opened online, and the bank has implemented procedures for verification of identification to address this risk. We reviewed a sample of 30 new clients to verify that CIP procedures were followed and verification was documented. No observations were identified.<br>**FinTech Clients**<br>Before an account is opened, the account manager will conduct a screening interview with the prospective client to gather information such as entity history, types of activities conducted by the entity, proposed activity to be conducted through the entity's account(s) and additional relevant information necessary for management to make a determination to open an account. An application is provided to the entity and the onboarding team will review the documentation for completeness. We reviewed a sample of 30 new clients to verify that CIP procedures were followed and verification was documented. No observations were identified.<br>Per the BSA, AML and OFAC Sanctions Compliance Policy, no accounts will be opened if verification of the customer's identification cannot be performed. No observations were identified.<br>The procedures state that the customer notice is provided in the lobby, within the new account disclosures and on the bank's website. No observations were identified. |
| **CDD and EDD** | |
| • Determined the adequacy of the process used to risk rate customers<br>• Tested a sample of new accounts for adequate CDD, including beneficial ownership, documentation<br>• Verified that EDD was performed on high-risk customers, products and services:<br>- Special measures (311) business entities (domestic shell companies and foreign international business corporations, private investment companies and offshore financial centers)<br>- Privately owned ATMs<br>- Nonresident alien, politically exposed persons and embassy customers<br>- MSBs | The bank has implemented processes for risk rating all clients using the newly implemented Verafin system. Policies and procedures still refer to the prior risk rating methodology, which was a manual process. The risk rating definitions have not changed, but the bank is now utilizing analytical groups within the Verafin system for risk rating and monitoring purposes. The risk rating methodology through Verafin will be looked at as part of the system model validation completed by RSM later this year.<br>Due diligence conducted at account opening varies depending on the type of client: |


© 2021 RSM US LLP. All Rights Reserved.
RSM

| Compliance Area | Comments |
| --- | --- |
| - ACH originators<br>- Funds transfers<br>- Cash-intensive businesses<br>- Professional service providers (PSPs)<br>- Nongovernmental organizations and charities (NGOs)<br>- Remote deposit capture customers<br>- Foreign correspondent accounts<br>- Other products as applicable (including correspondent banks, U.S. dollar drafts, payable through accounts, pouch activities, electronic banking—bill pay, e-cash, nondeposit investment products, concentration accounts, loans secured by cash, trade finance activities, insurance sales, and trust and asset management services) | **Core Clients**<br>Per review of the processes for opening core client accounts, we noted that clients must complete a questionnaire on the bank's site, which will help management determine which due diligence worksheet to send to the client, and to determine if the client is on the prohibited business listing. A package requesting CIP and due diligence information is sent to the client. Approvals for account opening are then conducted. Within 30 days of account opening, the CDD information collected is reviewed and the analytical group assignment is made within Verafin. Higher-risk client types require additional due diligence. See Reference #4.<br>**FinTech Clients**<br>As outlined in the procedures for initial due diligence of FinTech clients when a potential new account is to be opened, a screening interview is conducted and an application is provided to each new applicant wishing to open an account. Prior to account opening an initial due diligence review is conducted for all applicants. Additional questionnaires and due diligence information are collected depending on the type of FinTech client that is requesting to open an account. Depending on the entity type, various approvals are required to open accounts.<br>We reviewed a sample of 30 new core clients and 30 new FinTech clients, as well as a sample of 30 new high-risk FinTech clients to verify that adequate CDD information was on file in accordance with the bank's policies and procedures. See References #1 and #7.<br>In addition, we reviewed documentation and monitoring for a sample of NGOs, PSPs, foreign correspondents and nonresident aliens. No observations were noted during our testing of these entities. |
| **Suspicious Activity Monitoring and Investigations** | |
| • Determined the process used to detect suspicious activity (automated and manual monitoring) and the handling of generated alerts | The bank implemented the Verafin system in April 2021 and migrated the suspicious activity alert and reporting function from the Prime monitoring system.<br>Verafin generates alerts on a daily basis. We reviewed a sample of 25 alerts generated from the system to verify notes related to clearing such alerts were sufficiently documented and adequately supported. See Reference A.<br>In July 2021, management identified that there were 476 alerts attached to cases that focused on unrelated counterparties for the same client. This resulted in 356 alerts that were not reviewed. At the time of this discovery management instituted a look back of these alerts for appropriate review and implemented procedures to mitigate the risk of this occurring in the future. |


© 2021 RSM US LLP. All Rights Reserved.

| Compliance Area | Comments |
|---|---|
| **SARs** | |
| • Reviewed a sample of SAR filings to verify that forms were properly completed and narratives contained sufficient information<br>• Verified that initial SARs were filed timely, and a new SAR was reviewed every 90 days and refiled every 120 days, as applicable<br>• Verified that SAR suspects were added to the high-risk list<br>• Reviewed files for investigations that did not result in a SAR filing | The SAR reporting function for the bank is centralized within the BSA department for all core and FinTech clients. The bank is currently filing all reports through the Verafin system.<br>All employees are directed to notify the BSA department of any potentially suspicious activity. In addition, the Verafin system generates alerts for potentially suspicious activity on an ongoing basis. If activity is determined to need additional review, a case is created in Verafin. Once an investigation is completed, a determination is made to either file a SAR or to close the case without filing a SAR.<br>In May 2021, management identified an issue with the timeliness of SAR reporting. The late SARs resulted from the bank's transition from the Prime system to the Verafin system. When continuing activity reviews were put into the Verafin system the due date for the reviews were set at 90 days from the date input, instead of the last review date. There were a total of 48 late SARs identified as of August 20, 2021. This issue was identified by management who engaged a third party to help identify the late filings. Remediation efforts were initiated prior to our audit.<br>We reviewed a sample of 40 SAR filings during the scope period. See Reference #2<br>In addition, we reviewed a sample of 30 cases that did not result in a SAR filing. See Reference #6. |
| **Currency Transaction Reports (CTRs) and Exemptions** | |
| • Tested a sample of CTRs for accurate completion and timely filing<br>• Reviewed the process for aggregating multiple currency transactions<br>• Reviewed the exemption list to ensure that none fell into one of the prohibited exemption categories<br>• Tested a sample of exemptions to ensure that the documentation supported proof of eligibility and annual review | The Verafin system will generate alerts when cash transactions of more than $10,000 are detected in a day. There were three CTR reports filed during the scope period, all of which were included in our review. No observations were identified.<br>The bank has one Phase II CTR exempt client. The bank has implemented processes to perform annual reviews of this client's exemption eligibility and account activity. No observations were noted during our testing of this client.<br>There are no Phase I exemptions. |
| **Information Sharing (FinCEN 314 Requests)** | |
| • Determined the process for receiving, searching and responding to 314(a) requests<br>• Verified that 314(a) requests were either destroyed or properly safeguarded<br>• Reviewed the documentation evidencing that 314(a) searches were completed timely<br>• Reviewed registration status for 314(b) information sharing | The BSA officer and deputy BSA officer are the designated points of contact for 314(a) requests received from FinCEN. The lists are downloaded from the FinCEN site and used for screening in the Verafin system.<br>We reviewed the handling of all requests issued by FinCEN from January 2021 through June 2021. See Reference #3. |


© 2021 RSM US LLP. All Rights Reserved.
RSM

| Compliance Area | Comments |
|---|---|
| | The bank has procedures to appropriately respond to information requests under Section 314(b) voluntary information sharing. In addition, we verified the renewal of registration dated November 17, 2020. No observations were identified. |
| **Record-Keeping—Purchase/Sale of Monetary Instruments and Funds Transfer** | |
| • Tested a sample of cash purchases and verified that all record-keeping information was maintained<br>• Verified adherence to policies regarding the sale of monetary instruments to noncustomers<br>• Tested a sample of wires to verify that record-keeping requirements were followed when acting as a beneficiary bank, originating bank and, if applicable, intermediary bank<br>• Verified compliance with travel rule requirements<br>• Determined the adequacy of BSA record retention requirements | The bank has procedures to address monetary instrument record-keeping requirements. Per management, there were no cash sales in reportable amounts during our scope period. No observations were identified.<br>The bank has procedures to comply with travel rule and recordkeeping requirements for wire transfers. No observations were identified during our testing.<br>The bank appears to have adequate record retention procedures. |
| **Office of Foreign Assets Control** | |
| • Tested a sample of new accounts for documentation of OFAC verification<br>• Verified the appropriateness of the filtering criteria used by the institution to reasonably identify OFAC matches<br>• Reviewed evidence of periodic verifications against the existing customer base<br>• Reviewed the evidence of resolution for a sample of false hits<br>• Reviewed blocking procedures and reporting<br>• Reviewed the handling of international ACH transactions | The bank has processes for screening new clients prior to account opening, screening existing clients on a daily basis and performing screening of transactions such as wires and international ACH transactions. In addition, there are processes for clearing and documenting conclusions related to potential OFAC alerts.<br>We reviewed the conclusions of false positives during our testing for new clients and wire transactions. In addition, we submitted a sample of true match names for screening in the Bridger system as well as a sample of variations of those names. No observations were identified.<br>The bank reported one blocked transaction during our review period and we observed that the initial report and 2020 annual report were both filed timely and completely. No observations were identified.<br>In addition, we reviewed the documentation related to the OFAC licenses on file. No observations were identified. |


© 2021 RSM US LLP. All Rights Reserved.
RSM

| Compliance Area | Comments |
|---|---|
| **BSA/AML Training** | |
| • Determined if employees, new hires, the BSA officer and board members receive appropriate training in a timely manner<br>• Reviewed the training material content for adequacy<br>• Determined the process used to track BSA/AML training attendance and test accordingly | Per the bank's BSA policy all bank employees receive training that is relevant to their job function at least annually, or more frequently if procedures change. Newly hired employees are to receive training within the first 90 days of employment. No observations were identified.<br>Training materials provided to employees include coverage of the applicable requirements. No observations were identified.<br>Per discussion with management, it was identified that there was an escalation process for employees who do not complete the assigned training sessions. We selected a sample of 10 new employees and 21 existing employees to test training completion. No observations were identified. |
| **Special Measures and Foreign Correspondent Accounts** | |
| • Reviewed processes for screening against the Section 311 (Special Measures) lists<br>• Reviewed procedures of compliance with due diligence requirements for foreign correspondent banking relationships<br>• Reviewed due diligence documentation for a sample of foreign correspondent bank relationships | The bank has procedures to identify Section 311 special measures that apply to their clients and to screen against those lists.<br>The bank has policies and procedures to comply with requirements for foreign correspondent accounts. We reviewed documentation on file for a sample of two foreign correspondent relationships. We noted for one account opened in March 2021, the certification for foreign correspondent accounts (FCA) was not on file until September 2021. Per discussion with management, a review of all FCA accounts had been performed in September 2021, and we noted that the certification was obtained at that time. In addition, we noted it appeared that the bank had sufficient information on file to complete the certification at the time of approval prior to account opening. No observations were noted.<br>For the same customer, the bank had beneficial ownership information on file, but it did not indicate if there were any beneficial owners with 10% or more ownership interest in the FCA, but only indicated ownership of 25% or more. See Reference #5. |
| **Prior Exam Findings** | |
| • Reviewed the most recent regulatory agency examination report and prior independent review in conjunction with management's plan to determine if corrective action was taken | See Status of Prior Observations for prior audit and examination remediation of prior audit findings. |


© 2021 RSM US LLP. All Rights Reserved.

## APPENDIX B—RATING DEFINITIONS

**Relative Risk Rating Definitions**

| Rating | Definition |
|---|---|
| Low | Observation poses minimal risk and is oftentimes isolated or caused by human error. Low-risk observations can be addressed through the normal course of business or through minor control or process changes. |
| Moderate | Observation may be critical and should be addressed in a timely manner. However, the overall severity of the observation is not cause for immediate concern. |
| High | Observation is considered critical, even if the quantity of risk is isolated. High-risk observations are of a more noteworthy nature than observations rated moderate or low and should be addressed immediately. |

**Quantity Risk Rating Definitions**

| Rating | Definition |
|---|---|
| Isolated | This level of quantity risk indicates the frequency of the observation where there was only one instance of occurrence. |
| Nonsystemic | This level of quantity risk indicates the frequency of the observation where there was more than one instance of occurrence. |
| Systemic | This level of quantity risk indicates that the frequency of the observation consists of a large portion of the sample. |


© 2021 RSM US LLP. All Rights Reserved.

## APPENDIX C—REPORT RATING DEFINITIONS

| Report Rating Definitions | |
|---|---|
| **Rating** | **Explanation** |
| **Satisfactory** | Adequate internal controls are in place and operating effectively. Few, if any, improvements in the internal control structure are required. Observation should be limited to only low-risk observations identified or moderate observations that are not pervasive in nature. |
| **Marginal** | Certain internal controls are either:<br>• Not in place or are not operating effectively, which in the aggregate, represent a significant lack of control in one or more of the areas within the scope of the review<br>• Several moderate control weaknesses in one process, or a combination of high and moderate weaknesses, which collectively are not pervasive |
| **Unsatisfactory** | Fundamental internal controls are not in place or operating effectively for substantial areas within the scope of the review. Systemic business risks exist, which have the potential to create situations that could significantly impact the control environment.<br>• Significant/several control weaknesses (breakdown) in the overall control environment in part of the business or the process being reviewed<br>• Significant noncompliance with laws and regulations<br>• High observations that are pervasive in nature |
| **Not Rated** | Opportunity to improve efficiency or profitability of operations, but does not indicate an internal control weakness or a material inefficiency |


© 2021 RSM US LLP. All Rights Reserved.

## APPENDIX D—THE FIVE PILLARS OF AN AML PROGRAM

**Our in-scope BSA/AML activities are fulfilled with a general understanding of the five key pillars outlined in the FFIEC manual and FinCEN's frequently asked questions:**

| | |
|---|---|
| **Designation of a BSA Compliance Officer** | • The BSA officer is appointed by the board of directors.<br>• The BSA officer is charged with managing the institution's BSA/AML compliance and is ultimately responsible to the board of directors, with a direct line of communication to the board and senior management.<br>• The BSA officer must be knowledgeable of all applicable AML regulations and have a strong working understanding of product and service offerings.<br>• The BSA officer is responsible for managing communication with regulatory authorities for AML-related issues and reporting. |
| **Development of Internal Policies, Procedures and Controls** | • Provide sufficient controls and monitoring systems for timely detection and reporting of suspicious activity.<br>• Provide for adequate supervision of employees that handle currency transactions, complete reports, grant exemptions or monitor for suspicious activity.<br>• Incorporate BSA compliance into the job description and performance evaluation of personnel, as appropriate.<br>• Train employees to be aware of their responsibilities under the BSA regulations and internal policy guidelines. |
| **Ongoing, Relevant Training of Employees** | • The program must provide training for all personnel whose duties require knowledge of the BSA.<br>• The training should be tailored to the person's specific responsibilities.<br>• Internal policies, procedures, processes and monitoring systems should be covered during training.<br>• Training programs and staff completion should be documented for examiner review. |
| **Independent Testing and Review** | • Independent testing provides verification that the compliance program is operating as effectively as possible and is compliant with the law.<br>• Independent testing should be completed by internal audit, outside auditors, consultants or other qualified independent parties and be conducted every 12–18 months commensurate with the institution's risk profile.<br>• The audit program is sufficiently independent and reports to the board or a committee of the board. |


© 2021 RSM US LLP. All Rights Reserved.

| Ongoing Customer Due Diligence | • Provide risk-based procedures for conducting ongoing customer due diligence.<br>• Risk-based procedures should include, but are not limited to the following:<br>- Understanding the purpose and nature of customer relationships to develop customer risk profiles<br>- Conducting ongoing monitoring to identify and report suspicious transactions |
|---|---|


© 2021 RSM US LLP. All Rights Reserved.

**RSM US LLP**

515 South Flower St
17th Floor
Los Angeles, CA 90071

**T** +1 213 330 4800
**F** +1 213 330 4880

www.rsmus.com

RSM US LLP is a limited liability partnership and the U.S. member firm of RSM International, a global network of independent audit, tax and consulting firms. The member firms of RSM International collaborate to provide services to global clients, but are separate and distinct legal entities that cannot obligate each other. Each member firm is responsible only for its own acts and omissions, and not those of any other party. Visit rsmus.com/who-we-are for more information regarding RSM US LLP and RSM International.

RSM® and the RSM logo are registered trademarks of RSM International Association. The power of being understood® is a registered trademark of RSM US LLP.

© 2021 RSM US LLP. All Rights Reserved.

RSM