# Exhibit N

# ANTI-MONEY LAUNDERING (AML) MODEL VALIDATION SERVICES

**Silvergate Bank**

January 7, 2022

THE POWER OF BEING UNDERSTOOD
AUDIT | TAX | CONSULTING

RSM

January 7, 2021

**TO:** Ms. Judy Wang
Silvergate Bank
4250 Executive Square, Suite 300
La Jolla, California 92037

RSM US LLP ("RSM", "us", or "we") has assisted Silvergate Bank ("Silvergate", "Bank", "you", or "your") by providing model validation services for the Bank's Verafin transaction monitoring system. Our services were performed during October, November, and December 2021 in accordance with the terms of our Engagement Letter dated February 16, 2021. The enclosed report outlines our observations and recommendations, where appropriate, resulting from our validation.

This report contains the following:

- **Executive Overview**—an overall summary of observations for the board and/or Audit Committee
- **Services and Scope of Work**—describes the steps used to perform the independent model validation
- **Observations and Recommendations**—detailed listing of specific observations noted during the testing with associated risks and recommendations for enhancement
- **Exhibit**—**Assumptions and Limiting Conditions**—a discussion of items outside the scope of this review

The result of the validation is based on materials provided by Bank staff at RSM's request, as well as statements and representations made by Bank personnel. The Executive Summary section is designed to give a brief overview of our results while the remainder of the report is written in a technical nature, so that staff can effectively implement corrective action measures and revise policies and procedures as needed.

This report is intended solely for the information and use of management and the board of directors. It is not intended to be and should not be used by anyone other than these specified parties. The Bank's regulators may be provided with a copy of this report in connection with fulfilling their respective responsibilities.

We appreciate the cooperation extended to us during this project and the opportunity to be of service to the Bank. If you have any questions concerning this report, please contact Chris Dick at 617.241.2767 or Jared Long at 312.634.5583.

Sincerely,

© 2022 RSM US LLP. All Rights Reserved.

# TABLE OF CONTENTS

**SECTION** **PAGE**


**I. EXECUTIVE SUMMARY ..... 3**

**II. SERVICES AND SCOPE OF WORK ..... 6**

**III. VALIDATION RESULTS – TEST STEPS ..... 8**

A. PHASE I—MODEL GOVERNANCE ..... 8

B. PHASE II—DATA INTEGRITY ..... 8

C. PHASE III—CUSTOMER RISK SCORING ..... 15

D. PHASE IV—ACTIVITY MONITORING AND ALERTS ..... 18

E. PHASE V—MODEL OUTPUT EFFICIENCY ..... 20

**IV. EXHIBIT—ASSUMPTIONS AND LIMITING CONDITIONS ..... 26**


© 2022 RSM US LLP. All Rights Reserved.

# I. EXECUTIVE SUMMARY

Silvergate Bank engaged RSM to complete model validation advisory services of the Bank's Verafin transaction monitoring system. RSM's model validation methodology is designed to determine if the anti-money laundering (AML) model is performing as expected and is functioning in accordance with the design objectives and intended business uses of the system. The validation assessed the major components of the institution's AML monitoring system, including inputs, processing, and reporting. Additionally, the framework of our program incorporated the evaluation of the core elements of the model—conceptual soundness, ongoing monitoring processes and outcome analysis. The validation provides an assessment of the reliability of the AML monitoring model, based on its underlying assumptions, theory, and methods. The validation was executed in the following phases:

- Phase I—Model and System Governance (Not in Scope)
- Phase II—Data Integrity
- Phase III—Customer Risk Scoring
- Phase IV— Suspicious Activity Monitoring
- Phase V—Model Output Efficiency

**Summary of Observations and Recommendations**

Based on the testing performed, RSM concluded that the Verafin system and models therein have been implemented and appear to be functioning as intended. We determined that the Bank is using Verafin and its features adequately. The system is detecting potential unusual and suspicious activity in higher-risk areas based on the Bank's Bank Secrecy Act (BSA)/AML risk profile. However, RSM noted areas of improvement that should be considered to enhance the overall AML monitoring program and system.

Below is a summary of the enhancement opportunities noted during the validation. A detailed analysis of all validation results is noted in the report in Section III, Validation Results. These observations were discussed with senior management during the exit meeting held on December 17, 2021.

| Observation Title | Risk Rating | Enhancement Opportunities | Recommendation |
|---|---|---|---|
| Verafin Country Code Parsing | Moderate | Based on testing of a selection of wire transactions being fed into Verafin, we noted several discrepancies in the Originator, or the Beneficiary country details that were incorrectly specified in the AML monitoring system. Per discussion with management, these errors are caused by the failure of Verafin's address standardization logic to parse the country code out of the address field. If the country code is unable to be parsed in Verafin, the sending bank country will be used by default. As such, Verafin is ingesting incorrect country codes into the system in some instances.<br>Through discussion with management, this was a known issue prior to fieldwork being performed and the Bank has an open support ticket with Verafin. | RSM recommends the Bank continue to work with Verafin on this issue and perform additional testing to determine the impacts of the country code parsing error as it pertains to transaction monitoring. |

© 2022 RSM US LLP. All Rights Reserved. 

| Observation Title | Risk Rating | Enhancement Opportunities | Recommendation |
|---|---|---|---|
| Enrichment File Suppression Logic Updates | Moderate | Based on testing of transactions between the core system and Verafin, RSM noted certain transactions in Verafin that were not in the core system. These transactions were grouped into three areas that are noted below:<br>• 40 wires with transaction code 9258-DD and Type "Service Charges" were noted in Verafin that did not have corresponding core transactions. Per discussion with management, these appear to be mapped to Euro wire debit transaction codes that are incorrectly classified as Service Charges, which are actually MT103 messages, not the monetary transaction. Verafin is ingesting both a monetary transaction and the corresponding message, which should have been excluded from Verafin.<br>• 90 return wires were found in Verafin that did not have corresponding core transactions. Per discussion with management, retuned wires are not posted to the Core because they are not posted to a customer account. They are returned before they are posted and should have been excluded from Verafin.<br>• 528 transactions appear to have the same value of $48 and a missing value in transaction code and description. Per discussion with management, the transactions showing as $48 are SWIFT 900 and SWIFT 910 messages between the bank's foreign currency liquidity providers and customers who have performed foreign exchange transactions. These are not monetary transactions, and the $48 is a default programmatic value assigned to these fields. These transactions should not be evaluated as customer or core transactions in this review and have been excluded from the FGPP extract going to Verafin as of November 12, 2021. | RSM recommends the Bank update the suppression logic used for the enrichment file that is ingested by Verafin. The suppression logic should be updated to exclude non-monetary transactions related to Euro wire debits, return wires, and SWIFT 900, and SWIFT 910, and MT103 messages. Model documentation related to these exclusions should also be updated accordingly. |
| Lack of Customer Risk Qualification Activities | Moderate | It was noted through discussions with the Bank that, in establishing the customer risk models in Verafin, each customer was individually mapped to an analytical group and risk model based on their base risk category. Prior to full go-live implementation of the Customer Risk Rating model within Verafin, no analysis was conducted on customers to ensure that the system generated risk aligns with the Bank's expectations of customer risk. A holistic view of the risk distribution for the customer base | Recommendation RSM recommends that Silvergate conduct a sample-based review of customers within each defined risk agent to confirm the system generated risk is in line with the Bank's expectation of risk, and desired configuration. |

© 2022 RSM US LLP. All Rights Reserved. 

| Observation Title | Risk Rating | Enhancement Opportunities | Recommendation |
|---|---|---|---|
| | | was performed by the Bank. However, a review of customer risk was not performed at the individual customer level to determine the degree of change from their previous risk rating to the new risk model ratings, which now take into account transactional activity volumes as risk factors. Without such investigation, the Bank is at risk of making BSA/AML decisions on customers whose risk scores may not be commensurate with the desired output. | |
| Lack of Transaction Monitoring Agent Threshold Rationale | Low | Silvergate Bank is utilizing the default Verafin thresholds for alert generation on all BSA/AML Agents. While testing was conducted to establish which agents should be enabled/disabled, the Bank has not conducted an evaluation of the threshold appropriateness for each BSA/AML Agent. The Bank is utilizing the Verafin BTL functionality in order to conduct a future ongoing analysis of alert thresholds. Without proper rationale and testing of alerting thresholds, the Bank is at risk of potentially missing suspicious activity on transactional activity below the current threshold for BSA/AML Agents, and increasing the quantity of false-positive alerts generated on transactional activity above the current threshold for BSA/AML Agents. | RSM recommends that Silvergate conduct a calibration analysis on the BSA/AML Agents to determine the appropriate alerting threshold for each agent. RSM notes that, through discussions with the Bank, this process is a future consideration of the Bank. |
| Loan Transaction Activity System Limitation | Low | Upon tracing transactions for loan activity from the source system to Verafin, it was noted that some transactions were not present in source system. The Bank is aware of a system limitation within the Horizon transaction journal that creates a second (duplicate) transaction for loans when they are paid off, in addition to the monetary transaction that actually occurred. This duplicated transaction is being ingested because Verafin is mapped to the Horizon transaction journal. The impact of the duplicated transactions may result in over-monitoring and increased false positives for certain loan payments. | RSM recommends the Bank document this system limitation within the model governance program that is being implemented in 2022. |
| Transaction Code Mapping Discrepancies | Low | Through testing transaction code mapping documentation relative to the transaction codes being used within the system, it was noted that six (6) transaction codes were not included in the documentation provided by the Bank. While these codes appeared to be mapped correctly within the system, the Bank's documentation does not detail for the codes and how they are mapped. | RSM recommends the Bank to document the transaction codes, as applicable, within the existing mapping documentation. |
| Lack of Formalized Data Ingestion Verification Process | Low | At present, the Bank does not maintain a formalized process to remediate data ingestion errors that occur between the core system and Verafin. Verafin will send an email to designated individuals in the event that data ingestion errors are detected from | Within the model governance program being developed and implemented by the Bank, it is recommended that the Bank include a formalized process to remediate any ingestion errors in |

© 2022 RSM US LLP. All Rights Reserved. 

| Observation Title | Risk Rating | Enhancement Opportunities | Recommendation |
|---|---|---|---|
| | | the core system to Verafin. Controls should be put in place to ensure that any errors are remediated on a timely basis. | the event that Verafin indicates such errors have occurred. |
| Customer Risk Score Coverage | Process Improvement | RSM identified that all risk agents except the High Risk Persons contain a relationship age factor. Without the relationship age risk factor, which assigns risk factor points to other customers up to five (5) years after onboarding, the Bank's risk model for High Risk Persons may not properly identify new customer risk as commensurate with expectations. | RSM recommends that Silvergate add the relationship age risk factor to the High Risk Persons risk agent in order to provide an elevated risk of new customers within this group. |

## II. SERVICES AND SCOPE OF WORK

The validation was performed in four phases and covered the following elements:

**Validation Scope**

**Phase I—Model Governance**

Model Governance activities were removed from the scope of this engagement, per Silvergate's request. The Bank is currently developing a model governance program that will be implemented in its entirety in Q1 2022. As such, RSM did not perform testing or review documentation related to model governance of the AML model.

**Phase II—Data Integrity**

To assess the quality, completeness and accuracy of the transactional and customer data used for inputs to the AML model:

- Determined whether the transaction code mapping between the source system(s) and the software include all codes relevant to AML monitoring and are mapped appropriately
- Determined whether the bank has documented the rationale supporting the inclusion or exclusion of transaction codes in the mapping process
- Determined if transaction and customer data is being transferred from all critical applications (Core, Wire, etc.) to the AML Monitoring system completely and accurately so that it can provide for the timely identification of potentially unusual or suspicious activities.
    - Compared AML system and source system data at the transaction code or account level for a selection of five recent dates, and identify reasoning for any differences, after excluding known/designed exclusions
    - Tested the accuracy and descriptiveness of the data at the transaction level with a judgmental selection of transactions from various transaction types
    - Tested the accuracy and descriptiveness of the data at the customer level with a judgmental selection of customers from various risk classes and types.

**Phase III—Customer Risk Scoring**

To assess the AML system's customer risk scoring mechanics and methodologies using the institution's BSA risk assessment as a foundation:

© 2022 RSM US LLP. All Rights Reserved. 

- Determined whether the risk scoring model adequately provides coverage of the Institution's geographies, products, services, customer types and transactions

- Determined whether the Institution has documented the rationale supporting the customer risk scoring methodology, and evaluate the appropriateness of the risk scoring factors and measurement calculation

- Evaluate the customer risk scoring and rating process provided by the AML system, including completeness and accuracy of automated scoring. Procedures will be limited to current system documentation and non-proprietary calculation components.

**Phase IV—Activity Monitoring and Alerts**

To assess the adequacy and effectiveness of the AML system's activity monitoring coverage and typologies using the institution's BSA risk assessment as a foundation:

- Determined if the company's inventory of active alerts provides monitoring coverage of the institution's clients, products, services, and transactions

- Determined whether the Bank has documented the rationale supporting the alert configuration settings, and evaluate the appropriateness of the settings

- Test a selection of the generated alerts and verify that they have been generated consistent with specifications, identifying triggering activity to evaluate the appropriateness of the alert generation.

**Phase V—Model Output Efficiency**

To determine if efficiencies can be gained by revising current AML system settings:

- Analyzed system outcome reporting metrics, such as but not limited to, alert-to-case, case-to-SAR, and false positive ratios, to assess the efficiency and effectiveness of the current rule inventory.

- Determine if new settings for higher-volume alerts and extremely low-volume alerts should be assessed by the institution.

- Determine if the institution's customer and account risk-rating model is operating efficiently, including how the customers are elevated and categorized as higher risk.

© 2022 RSM US LLP. All Rights Reserved.

# III. VALIDATION RESULTS – TEST STEPS

## A. PHASE I—MODEL GOVERNANCE

N/a – not in scope. See **Section II. Services and Scope of Work** for details.

## B. PHASE II—DATA INTEGRITY

The primary goal of the Data Integrity section of the validation was to assess the quality, completeness and accuracy of the transactional and customer data used for inputs to the AML model.

**Data Transformation and Validation:** *Evaluated the technical documentation pertaining to the AML model, including documentation describing all relevant source applications and data feeds, as well as the extract, transform and load (ETL) processes and data validation processes.*

Through discussion with management, and based on industry experience with the Verafin transaction monitoring and customer risk rating system, it was noted that the Vendor does not provide the information for data flow upon implementation of the system. As such, the Bank does not have access to the technical model documentation that identifies required data sources for each feed to the model and the associated data elements included in each feed. No concerns were noted as the Verafin vendor maintains and owns these processes independently.

Lastly, the Bank receives emails from Verafin upon failure of data feeds that are ingested into the transaction monitoring or customer risk rating system. It was noted by management that these emails are reviewed by Bank personnel to determine the root cause of the issue; however, management noted that the Bank does not have a formal process in place to review the emails and remediate any applicable issues at this time. The Bank is in the process of implementing a comprehensive model governance program that will include formalized processes related to import failures within Verafin. Please refer to the associated observation related to import processing errors for details.

***Observation: Lack of Formalized Data Ingestion Verification Process***

At present, the Bank does not maintain a formalized process to remediate data ingestion errors that occur between the core system and Verafin. Verafin will send an email to designated individuals in the event that data ingestion errors are detected from the core system to Verafin. Controls should be put in place to ensure that any errors are remediated on a timely basis..

***Recommendation:***

Within the model governance program being developed and implemented by the Bank, it is recommended that the Bank include a formalized process to remediate any ingestion errors in the event that Verafin indicates such errors have occurred.

**Data Mapping:** *Assessed the transaction code mapping information and determined whether the mapping between the source system(s) and the model is complete and accurate, and that excluded transaction codes have adequate documented rationale for exclusion.*

The objective of transaction code mapping testing was to determine whether the data and transaction code mapping between the source system(s) and the model agree and include all intended data and transactions.

© 2022 RSM US LLP. All Rights Reserved. 

To determine whether all codes relevant to the Verafin monitoring function are appropriately received by the system, we obtained the transaction code mapping document (TRANSACTION_DESCRIPTIONS_ALL-1604343452638.xlsx), transaction data from Verafin for September 2021, and transaction data from the Core for September 2021. We then identified transaction codes noted in the transaction activity for September 2021 and compared them to the transaction codes in the transaction code mapping document (Tran Code Analysis tab). We flagged any instances where a transaction code was found in the transaction data but was not found in the transaction code mapping.

To identify inconsistent mappings or inappropriate code exclusions and inclusions, we compared transaction code descriptions between the Core and Verafin in the Tran Code Analysis tab and flagged any potential inconsistencies. We also examined transaction code descriptions in the transaction code mapping document (Tran Code Mapping tab) to identify any non-customer driven activity such as fees, service charges, general ledger activity, etc.

We noted six (6) instances where transaction codes were identified in the transaction data but were not found in the transaction code mapping document:

- 97-DD
- 2025-DD
- 4011-DD
- 4028-DD
- 4029-DD
- 4154-DD

We noted one (1) instance where transaction code description between the Core and the transaction code mapping document did not match. The transaction code 76-DD appears to be associated with Cashier's checks as per the Core transaction data, but is shown as Service Charge in the transaction code mapping document. In addition, we noted that all non-customer driven activity is mapped to Verafin. These include adjustments, service charges, and internal activity type transactions.

Upon further inquiry with the Bank, we noted that there is no issue because 76-DD transaction code is associated with Cashier's check fee and, thus, is consistent with the Service Charge description in the transaction code mapping document. No further concern.

***Observation: Transaction Code Mapping Discrepancies***

Through testing transaction code mapping documentation relative to the transaction codes being used within the system, it was noted that six (6) transaction codes were not included in the documentation provided by the Bank. While these codes appeared to be mapped correctly within the system, the Bank’s documentation does not detail for the codes and how they are mapped.

***Recommendation:***

RSM recommends the Bank to document these transaction codes, as applicable, within the existing mapping documentation.

**Action Plan:**
**Individual Responsible:**
**Due Date:**

**Transaction Data Completeness:** *Assessed the completeness of transaction data in the AML system for a judgmental selection of source data by comparing core and AML system data at the*

© 2022 RSM US LLP. All Rights Reserved.

*transaction code or account level for a selection of recent dates, identifying material differences and detailing the reasoning for those differences, where possible, after excluding known/designed* exclusions.

The objective of this testing was to determine if transactions from all critical applications are being transferred to the AML Monitoring system completely so that it can provide for the timely identification of potentially unusual or suspicious activities.

Using the listing of all transactions for the month of September 2021 from the core and from Verafin, we performed the following procedures for DD/SAV, LN, and COD account transactions:

- Aggregated the data at the transaction code level and compared transaction totals, removing transactions associated with the transaction codes that reconciled with less than $100 variance from further analysis.
- Aggregated the remaining transaction data at the account level and compared transaction totals, removing transactions associated with the accounts that reconciled with less than $100 variance from further analysis.
- Aggregated the remaining data by account, transaction code, and effective date and compared transaction totals, removing transactions associated with the line items that reconciled with less than $100 variance from further analysis.
- Created a unique identifier for the remaining transactions and matched them at the individual transaction level based on the following attributes: account number, transaction code, effective date, and transaction amount.
- Joined the unmatched transactions from the step above again, now dropping transaction code and only joining on account number, effective date, and transaction amount.

Upon performing the analytical procedures listed above, we were able to identify all transactions from the core data extract in the Verafin data extract with no exceptions for all DD/SAV, LN, and COD account transactions. We also noted that there were additional transactions remaining in Verafin:

DD/SAV: We noted 1,405 unmatched transactions in Verafin. After further inspection we noted the following patterns:

- 509 had transaction codes ACH-22, ACH 27, ACH-32, ACH-37, ACH-42, and ACH-47. Per discussion with Edward Choi and Michelle Sabins, these are underlying transactions from NACHA batch processed for the Bank's customer. These transactions are not mapped to BSA/AML transaction monitoring scenarios and are only used for Fraud analytics on ACH batches and counterparties. No concerns were noted for the transactions with the aforementioned codes from batch processing. The Verafin data contains each individual ACH transaction as well as a batch. All individual ACH transactions show up under transaction codes 7190 and 2190, which reconciled with no variance. No concerns noted.
- 40 wires with transaction code 9258-DD and Type "Service Charges." Per discussion with Michelle Sabins, these appear to be Euro wire debits and are incorrectly classified as Service Charges. It appears that the Verafin data contains both a monetary transaction and a message, which should have been excluded from Verafin. The issue is caused by an error in the suppression logic in the enrichment file. Observation noted.
- 90 wires that were returned. Per discussion with Michelle Sabins, retuned wires are not posted to the Core because they are not posted to a customer account. They are returned before they are posted and should have been excluded from Verafin. The issue is caused by an error in the suppression logic in the enrichment file. Observation noted.
- 528 transactions appear to have the same value of $48 and a missing value in transaction code and description. Per discussion with Michelle Sabins, the transactions showing as $48 are SWIFT 900 and SWIFT 910 messages between the bank's foreign currency liquidity providers and customers who have performed foreign exchange

© 2022 RSM US LLP. All Rights Reserved. 

transactions regarding the rate. They are not monetary transactions, and the $48 is a default programmatic value assigned to these fields. These transactions should not be evaluated as customer or core transactions in this review and have been excluded from the FGPP extract going to Verafin as of November 12, 2021. The issue is caused by an error in the suppression logic in the enrichment file. Observation noted.

LN: We noted 8 unmatched transactions in Verafin that were not present in the core data provided. Upon further inquiry with the Bank, we noted that these transactions were not present in the core data because these were not monetary transactions. It appears that the Horizon transaction journal creates a second (duplicate) transaction for loans when they are paid off. This duplicated transaction is being ingested because Verafin is mapped to the Horizon transaction journal. The Bank is aware of a system limitation. Observation noted.

***Observation: Loan Transaction Activity System Limitation***

Upon tracing transactions for loan activity from the source system to Verafin, it was noted that some of transactions were not present in source system. The Bank is aware of a system limitation within the Horizon transaction journal that creates a second (duplicate) transaction for loans when they are paid off, in addition to the monetary transaction that actually occurred. This duplicated transaction is being ingested because Verafin is mapped to the Horizon transaction journal. The impact of the duplicated transactions may result in over-monitoring and increased false positives for certain loan payments.

***Recommendation:***

RSM recommends the Bank document this system limitation within the model governance program that is being implemented in 2022.

**Action Plan:**
**Individual Responsible:**
**Due Date:**

***Observation: Enrichment File Suppression Logic Updates***

Based on testing of transactions between the core system and Verafin, RSM noted certain transactions in Verafin that were not in the core system. These transactions were grouped into three areas that are noted below:

- 40 wires with transaction code 9258-DD and Type "Service Charges" were noted in Verafin that did not have corresponding core transactions. Per discussion with management, these appear to be mapped to Euro wire debit transaction codes that are incorrectly classified as Service Charges, which are actually MT103 messages, not the monetary transaction. Verafin is ingesting both a monetary transaction and the corresponding message, which should have been excluded from Verafin.
- 90 return wires were found in Verafin that did not have corresponding core transactions. Per discussion with management, retuned wires are not posted to the Core because they are not posted to a customer account. They are returned before they are posted and should have been excluded from Verafin.
- 528 transactions appear to have the same value of $48 and a missing value in transaction code and description. Per discussion with management, the transactions showing as $48 are SWIFT 900 and SWIFT 910 messages between the bank's foreign currency liquidity providers and customers who have performed foreign exchange transactions. These are not monetary transactions, and the $48 is a default programmatic value assigned to these fields. These transactions should not

© 2022 RSM US LLP. All Rights Reserved. 

be evaluated as customer or core transactions in this review and have been excluded from the FGPP extract going to Verafin as of November 12, 2021.

***Recommendation:***

RSM recommends the Bank update the suppression logic used for the enrichment file that is ingested by Verafin. The suppression logic should be updated to exclude non-monetary transactions related to Euro wire debits, return wires, and SWIFT 900, and SWIFT 910, and MT103 messages. Model documentation related to these exclusions should also be updated accordingly.

**Action Plan:**
**Individual Responsible:**
**Due Date:**

**Transaction Data Accuracy:** *Assessed the accuracy and descriptiveness of individual transaction data and inputs relied upon by the model using a risk-based judgmental selection of transactions from material transaction codes.*

The objective was to test the accuracy and descriptiveness of the data at the transaction level with a judgmental selection of transactions from various transaction types. Testing was performed to determine if transaction data was being transferred from all source systems to the AML monitoring system accurately, so that it can provide for the timely identification of potentially unusual or suspicious activities. These steps focus on the accuracy of the transaction data and compliment part one, which provided coverage of the completeness of the data.

Using the listing of all transactions for the period of September 2021 from the Core, we aggregated the data at the transaction code level and found total of transaction amount. This analysis was then used to identify the Core transaction codes that made up the majority of activity during the period.

We selected 62 transaction codes that were used during the period of review for testing and noted that the sample selection included the codes that attributed to 99.6% of DD transaction total and 99.6% of Loan transaction total..

Then, for each sample, the following transaction details from the Core processing system were compared to transaction details in the AML monitoring system:

- Account details from the Core system agreed to the account details from the AML monitoring system.
- Transaction amount and date details from the Core system agreed to the transaction amount and date details from the AML monitoring system.
- Transaction Debit/Credit details from the Core system agreed to the transaction Debit/Credit details from the AML monitoring system.
- Transaction description (including transaction code) from the Core system agreed to the transaction description from the AML monitoring system.

The test was performed by obtaining the listing of all Customer transactions from the Core system for September 2021 and the listing of all transactions populated in the AML monitoring system for the same date range and comparing transaction details. Upon comparison, we noted one instance where transaction code details in the Core did not agree to the transaction code details in Verafin.

After further inspection and inquiry with the Bank, we noted that this closing debit was facilitated with the purchase of an official check. What is reflected in Verafin is the issuance of that official check and the payor details for that official check. The Horizon/Verafin interface pairs that

© 2022 RSM US LLP. All Rights Reserved. 

information because the transactions are paired. The transaction code of 71 is the sale of the monetary instrument. Thus, no exceptions were noted.

**Wire Samples –** The objective of this test was to test the accuracy and descriptiveness of the wire data at the transaction level with a judgmental selection of wire transactions.

Testing was performed to determine if transaction data was being transferred from all source systems to the AML monitoring system accurately, so that it can provide for the timely identification of potentially unusual or suspicious activities. These steps focus on the accuracy of the transaction data and compliment part one, which provided coverage of the completeness of the data.

Using the listing of all wires for September 2021 from the wire system, we randomly selected 40 wire transactions (20 Incoming - 10 Domestic & 10 International; 20 Outgoing - 10 Domestic & 10 International).

Then, for each sample, the following transaction details from the wire processing system were compared to transaction details in the AML monitoring system:

- Originator details from the wire system agreed to the Originator details from the AML monitoring system.
- Beneficiary details from the wire system agreed to the Beneficiary details from the AML monitoring system.
- Account details from the wire system agreed to the account details from the AML monitoring system.
- Amount details from the wire system agreed to the amount details from the AML monitoring system.

The test was performed by obtaining the listing of all wire transactions from the wire system for September 2021 and the listing of all transactions populated in the AML monitoring system for the same date range and comparing transaction details. Upon comparison, we noted several instances where the Originator or the Beneficiary country details were blank or incorrectly specified in the wire system data extract, but were correctly populated in Verafin. Per Michelle Sabins, Originator or Beneficiary country details may be missing from the Core because these are not mandatory fields. They are, however, available in the Address field. Verafin is able to populate this information correctly because it is using its own address parsing logic. No further concern.

We also noted 5 instances where Originator or Beneficiary country was not correctly specified in Verafin. Per Michelle Sabins, these discrepancies were caused by the failure of Verafin's standardization logic to correctly parse the address details. This is a known issue with an open ticket with Verafin. Please refer to the associated observation related to Verafin Country Code Parsing for further details.

***Observation: Verafin Country Code Parsing***

© 2022 RSM US LLP. All Rights Reserved.

Based on testing of a selection of wire transactions being fed into Verafin, we noted several discrepancies in the Originator or the Beneficiary country details that were incorrectly specified in the AML monitoring system. Per discussion with management, these errors are caused by the failure of Verafin's address standardization logic to parse the country code out of the address field. If the country code is unable to be parsed in Verafin, the sending bank country will be used by default. As such, Verafin is ingesting incorrect country codes into the system in some instances.

Through discussion with management, this was a known issue prior to fieldwork being performed and the Bank has an open support ticket with Verafin.

***Recommendation:***

RSM recommends the Bank continue to work with Verafin on this issue and perform additional testing to determine the impacts of the country code parsing error as it pertains to transaction monitoring.

**Action Plan:**
**Individual Responsible:**
**Due Date:**

**Cash Samples –** The objective was to test the accuracy and descriptiveness of the data at the transaction level with a judgmental selection of cash transactions. Testing was performed to determine if transaction data was being transferred from all source systems to the AML monitoring system accurately, so that it can provide for the timely identification of potentially unusual or suspicious activities. These steps focus on the accuracy of the transaction data and compliment part one, which provided coverage of the completeness of the data.

Using the Verafin data provided for the period of September 2021 from the core, we identified cash transactions with transaction amount exceeding $1,000. 23 transactions were identified. We then matched these transactions to the Core, and compared the following transaction details for each sample between the Core system and the AML monitoring system:

- Account details from the core system agreed to the account details from the AML monitoring system.
- Transaction amount details from the core system agreed to the transaction amount details from the AML monitoring system.
- Transaction date details from the core system agreed to the transaction date details from the AML monitoring system.

The test was performed by obtaining the listing of all transactions from the core system for September 2021 and the listing of all transactions populated in the AML monitoring system for the same date range and comparing transaction details. Upon comparison, we noted that there was one (1) instance where account number in Verafin was missing, but was populated in the Core. After further inspection and inquiry with the Bank, we noted that the account details were present in Verafin as we observed Michelle Sabins, title, access the system and open the transaction details. Thus, no exceptions noted.

**Customer and Account Data Integrity:** *Assessed the accuracy, integrity, and completeness of a risk-based judgmental selection of customer and account data to test that data from the source is being passed to the model as intended and in line with the model's design.*

RSM selected a random sample of 50 customer accounts, including 25 business and 25 individual accounts, in order to test the accuracy and descriptiveness of data at the customer and

© 2022 RSM US LLP. All Rights Reserved. 

account level between the core and Verafin model. For each of the selected customers, the following testing attributes were included:

- Customer Key;
- Customer Name;
- Customer Type;
- Account Number;
- Account Application;
- Address;
- City;
- State;
- Zip Code;
- International (Yes/No flag representing the customer's location referencing the United States);
- NAICS Code;
- Occupation; and
- Taxpayer ID

As a result of testing, RSM identified that 17 of the 25 sampled customers contained at least one (1) discrepancy, as detailed below:

- Seven (7) of 50 customer account records were noted to have a blank Account number in Verafin. It was noted that the "account numbers" in the core extract represent a card number for these customers, who are under the Card Management application; therefore, the value is not a true account number and is not expected to be within the account field in Verafin. No issues noted.
- One (1) of 50 customer account records was noted to have the Country in Verafin listed as "US", but the Country in the core system listed as Nassau, Bahamas. Through discussions with the Bank, it was noted that the customer's risk score was properly calculated based on the Bahamas address, and all subsequent "similar customers", identified through a patterned likeness of customer attributes in the core and Verafin, tested were also properly scored in the CRR model using the international country and not the United States. The root of the discrepancy was due to a priority ranking of addresses for clients with multiple addresses; where, all addresses were in Verafin, but only one (1) was marked as the primary address, and included in the extract pulled for reconciliation. As all customers are scored appropriately, and all addresses, where applicable, are found within the model, no issues were noted.

No concerns noted.

### C. PHASE III—CUSTOMER RISK SCORING

The primary objective of the Customer Risk Scoring section was to assess the AML system's customer risk scoring mechanics and methodologies using Bank's BSA risk assessment as a foundation.

**Risk Coverage:** *Determined if the design and functionality utilized in the customer risk scoring model is based on BSA/AML risk assessments and if the model reasonably mitigates the risks presented by Bank's products, services, geographies, and customers/counterparties*

RSM reviewed the Bank's most recent Risk Assessment to identify monitoring priorities and potential enhancements to the customer risk rating model and methodology; further, the adequacy of the coverage provided by the CRR model was assessed.

RSM created the coverage assessment in order to confirm the adequacy of coverage provided by the Bank's CRR and TM configurations within the Verafin AML model. In doing so, RSM performed the following test steps:

© 2022 RSM US LLP. All Rights Reserved. 

- Review the most current BSA/AML Risk Assessment and identify the Bank's defined risks, inherent and residual, for each identified Risk Area.
- Determine if there is a dedicated component of the CRS methodology that covers each Risk priority identified.
- Identify the coverage provided by the AML monitoring system for each Risk priority identified.
- Identify any manual monitoring procedures conducted by the Bank the provides additional coverage over each Risk priority identified
- For each of the FFIEC BSA/AML Risks Associated with Money Laundering and Terrorist Financing, identify:
    - If the Risk Area is allowable by the Bank.
    - The coverage provided by the model for each allowed Risk Area.

As a result of testing on the CRR model, RSM identified that all risk agents except the High-Risk Persons contains a relationship age factor. Without the relationship age risk factor, which assigns risk factor points to other customers up to five (5) years after onboarding, the Bank's risk model for High Risk Persons may not properly identify new customer risk as commensurate with expectations.

***Process Improvement: Customer Risk Score Coverage***

RSM identified that all risk agents except the High Risk Persons contains a relationship age factor. Without the relationship age risk factor, which assigns risk factor points to other customers up to five (5) years after onboarding, the Bank's risk model for High Risk Persons may not properly identify new customer risk as commensurate with expectations.

***Recommendation:***

RSM recommends that Silvergate add the relationship age risk factor to the High Risk Persons risk agent in order to provide an elevated risk of new customers within this group

**Action Plan:**
**Individual Responsible:**
**Due Date:**

**Conceptual Soundness:** *Determined whether Bank has documented the rationale supporting the customer risk scoring methodology, and evaluate the appropriateness of the risk scoring factors and measurement calculation.*

RSM reviewed the Bank's Customer Risk Rating model configuration settings and rationale documents in order to evaluate the appropriateness of the risk scoring factors and subsequent calculations.

The Bank details the high-level scoring logic used by Verafin for Customer Risk Rating in the Verafin Risk Models Agents Methodology document. Additionally, this document details the methodology for which Silvergate has configured the model in Verafin, according to the following grouping of risk factors:

- Attributes
    - Relationship Age
    - International Activity Country
    - Headquarters Country
    - Ownership Country
- Modifiers
    - EDD Review Findings

© 2022 RSM US LLP. All Rights Reserved. 

- Transactional
  - ACH Volume
  - International Volume
  - Wire Volume

It should be noted that, while the Bank outlines the above risk factors, not all configured risk agents utilize this exact combination. The Bank assigns a weighting of a risk factor within each group as well as an overall weighting of the group itself to determine the conditional probability values for scoring. The Bank utilizes a Risk Agent risk multiplier for scoring values to further stratify the risk assigned to each group. This risk multiplier is based on the understanding that not all Risk Agent groups present the same potential risk to the Bank; where, for example, a Proprietary Trader represents the Highest risk to the Bank compared to a Network Security client, whose relative risk is lower. The final calculation for each row of the conditional probability table is detailed by the Bank on slide 15 of the attached "AML 45 Verafin Risk Models Agents Methodology.pptx" document.

RSM reviewed each risk factor included in each risk agent for any notes or rationale describing how the Bank derived the value.

While the Bank maintains adequate documentation surrounding the rationale and configuration of the Customer Risk Rating model, it was noted that no customer risk qualification activities were performed in order to confirm that the generated scores were commensurate with Bank expectations of customer risk. As the Verafin CRR model was newly implemented, such activities are vital to the effectiveness of scoring models. Please refer to the associated observation related to Customer Risk Qualification Activities for further details.

***Observation: Lack of Customer Risk Qualification Activities***

It was noted through discussions with the Bank that, in establishing the customer risk models in Verafin, each customer was individually mapped in to an analytical group and risk model based on their base risk category. Prior to full go-live implementation of the Customer Risk Rating model within Verafin, no analysis was conducted on customers to ensure that the system generated risk aligns with the Bank's expectations of customer risk. A holistic view of the risk distribution for the customer base was performed by the Bank. However, a review of customer risk was not performed at the individual customer level to determine the degree of change from their previous risk rating to the new risk model ratings, which now take in to account transactional activity volumes as risk factors. Without such investigation, the Bank is at risk of making BSA/AML decisions on customers whose risk scores may not be commensurate with the desired output.

***Recommendation:***

Recommendation RSM recommends that Silvergate conduct a sample-based review of customers within each defined risk agent to confirm the system generated risk is in line with the Bank's expectation of risk, and desired configuration.

**Action Plan:**
**Individual Responsible:**
**Due Date:**

**Risk Score Calculation Verification:** *Evaluated the customer risk scoring and rating process provided by the AML system, including completeness and accuracy of automated scoring. Procedures will be limited to current system documentation and non-proprietary calculation components.*

© 2022 RSM US LLP. All Rights Reserved. 

The objective of the customer risk rating testing performed was to determine whether the customer risk rating system is operating as designed relative to customer risk scoring. Using the Verafin risk rating logic, RSM replicated the customer risk scores for a selection of 38 customers across 19 active risk agents in order to determine whether the risk scores generated by RSM and the risk scores generated by Verafin were congruent. Per review of the risk scores for our selection across the 19 risk agents tested, no concerns were noted as all risk ratings between RSM's calculation and Verafin aligned appropriately. No concerns noted.

### D. PHASE IV—ACTIVITY MONITORING AND ALERTS

The main objective of Phase IV was to assess the adequacy and effectiveness of the AML system's activity monitoring coverage and typologies using Bank's BSA risk assessment as a foundation

**Risk Coverage:** *Determined if the design and functionality utilized in the transaction monitoring model is based on BSA/AML risk assessments and if the model reasonably mitigates the risks presented by Bank's products, services, geographies, and customers/counterparties.*

RSM reviewed the Bank's most recent Risk to identify monitoring priorities and potential enhancements to the transaction monitoring model and methodology. We also assessed the adequacy of the coverage provided by the TM model.

RSM created a coverage assessment in order to confirm the adequacy of coverage provided by the Bank's CRR and TM configurations within the Verafin AML model. In doing so, RSM performed the following test steps:

- Review the most current BSA/AML Risk Assessment and identify the Bank's defined risks, inherent and residual, for each identified Risk Area.
- Determine if there is a dedicated component of the CRS methodology that covers each Risk priority identified.
- Identify the coverage provided by the AML monitoring system for each Risk priority identified.
- Identify any manual monitoring procedures conducted by the Bank the provides additional coverage over each Risk priority identified
- For each of the FFIEC BSA/AML Risks Associated with Money Laundering and Terrorist Financing, identify:
  - If the Risk Area is allowable by the Bank.
  - The coverage provided by the model for each allowed Risk Area.

No issues noted.

**Conceptual Soundness (Alerts):** *Determined whether Bank has documented the rationale supporting the rule configuration settings, and evaluate the appropriateness of the settings.*

RSM reviewed the Bank's Transaction Monitoring model configuration settings and rationale documents in order to evaluate the appropriateness of the detection scenario thresholds and inclusions.

The Bank documents the list of Verafin BSA/AML agents along with the current threshold, whether it is enabled, details regarding referential lists and thresholds, as well as high-level notes regarding decisions made on the agents. RSM noted that the Bank was using the default Verafin thresholds for alert generation on all BSA/AML agents, and the Bank only conducted testing to determine if agents should be disabled; whereas no testing was performed in order to determine the threshold appropriateness for each agent. As the implementation of this model is recent, it is vital to the effectiveness of the model for the Bank to conduct testing on alert output to either

© 2022 RSM US LLP. All Rights Reserved. 

confirm or alter the alerting thresholds associated with each agent. Please refer to the associated observation related to the Lack of TM Agent Threshold Rationale observation for further details.

***Observation: Lack of Transaction Monitoring Agent Threshold Rationale***

Silvergate Bank is utilizing the default Verafin thresholds for alert generation on all BSA/AML Agents. While testing was conducted to establish which agents should be enabled/disabled, the Bank has not conducted an evaluation of the threshold appropriateness for each BSA/AML Agent. The Bank is utilizing the Verafin BTL functionality in order to conduct a future ongoing analysis of alert thresholds.

Without proper rationale and testing of alerting thresholds, the Bank is at risk of potentially missing suspicious activity on transactional activity below the current threshold for BSA/AML Agents and increasing the quantity of false-positive alerts generated on transactional activity above the current threshold for BSA/AML Agents.

***Recommendation:***

RSM recommends that Silvergate conduct a calibration analysis on the BSA/AML Agents in order to determine the appropriate alerting threshold for each agent. RSM notes that, through discussions with the Bank, this process is a future consideration of the Bank.

**Action Plan:**
**Individual Responsible:**
**Due Date:**

**Rule Logic Evaluation:** *Test a selection of generated alerts from Verafin and determine whether they have been generated consistent with known design specifications. Evaluate the reasonableness of the output score in relation to known alerting components and parameter settings.*

The objective of this section of the validation was to determine whether the model's logic and processing is operating as designed and generating output consistent with specifications and configured criteria. It is important to note that instead of rules, Verafin's solution applies fuzzy logic in its algorithms to perform the monitoring function via customer risk, global behavior parameters and analysis parameters. The solution also uses a broad set of data points in order to take a holistic view of customer transactions. However, RSM does not have access to the algorithms or to the voluminous data sets that are considered by the software's logic as this information is proprietary and not shared by Verafin. Due to the restriction of proprietary information and data in Verafin, RSM was unable to recalculate the risk scores associated with the system output for verification purposes. While RSM was unable to recalculate the entire alert risk score, the operation of the model's Analysis Parameters could be assessed to determine if the output is generated in accordance with known design methodology and within expected value ranges based on current parameter configurations.

To assess the reasonableness of the system output, we reviewed alerts from a variety of active BSA/AML Analysis parameters within the system. First, we obtained a listing of all alerts generated during the six (6) month period of May 1, 2021 through October 31, 2021. The sample selection included two alerts from the risk agents that generated output during the review. For each sample tested, the following alert elements were reviewed and analyzed:

- Scores associated with each Scenario associated with the Agent Type and Category fell within expected ranges based on known parameter settings. Procedures consisted of identifying the expected score for each Scenario based on known parameter settings and then comparing it to the system assigned score.

© 2022 RSM US LLP. All Rights Reserved. 

- System assigned alert risk level score agreed with expected alert risk score based on known parameter settings and system trends identified in vendor provided model documentation. Procedures consisted of identifying the expected overall alert risk score for each sample based on the Scenarios scores of associated Agent Categories and then comparing it to the system assigned alert risk score to determine if they agree.

For steps A and B, the expected values were stratified into the following groups based on known risk score methodology, system functionality, and system trends identified in vendor provided model documentation:

- Less than 1 (0)
- Greater than 0 and less than the alert threshold
- 1- 9 pts higher than the alert threshold
- 10 - Max pts higher than the alert threshold

The test was performed by logging into AML monitoring system observe the alert details to be used as basis for arriving at expected scoring values.

Upon completion of the system generated alert component testing, we noted the following:

- The scores associated with each Scenario employed by an Agent Type and Category included in testing fell within expected ranges based on known parameter settings for eight (8) of eight (8) samples. No observations noted.
- System assigned alert risk score agreed with expected alert risk score based on known parameter settings and system trends identified in vendor provided model documentation for eight (8) of (8) samples. No observations noted.

Based on the testing performed, it appears that the model's transaction monitoring logic and processing is operating as designed and generating output consistent with specifications and configured criteria. No observations noted.

### E. PHASE V—MODEL OUTPUT EFFICIENCY

**System Metrics and Alert Output Review:** *Analyze system outcome reporting metrics to assess the efficiency of the current rule inventory and review the current Alert settings and see if there are opportunities to decrease duplicative alerts/flags that would result in less false positives while still maintaining proper coverage. Use analysis of heavy volumes and low case rates and low volumes with high case rates. Also use benchmarking.*

The primary objective of Phase V was to determine if efficiencies can be gained by revising current BSA/AML analysis settings. The evaluation was conducted via an analysis of the system's output metrics to determine the efficiency of the current BSA/AML Analysis Parameters. The review incorporated the use of the BSA/AML dashboard provided by the system. The dashboard reflects a variety of output metrics that reflect a real-time analysis of money laundering activity, investigation statistics, and cases that were created to investigate money laundering alerts for a defined period of time. Our evaluation included the following 32 BSA/AML Analysis Parameters:

© 2022 RSM US LLP. All Rights Reserved.

- Funnel Account
- Terrorist Financing
- Cash In - Transfer Out - Business
- Cash In - Transfer Out - Person
- Cash In - Transfer Out - Sole Proprietor
- SBA Loan Fraud
- Stolen Stimulus Payments
- Excessive Federal Tax Returns
- Unemployment Benefit Fraud
- Excessive State Tax Returns
- Human Trafficking - Trafficker
- Human Trafficking - Front
- Human Trafficking - Victim
- Payments for Smuggling
- International Transfer Out - Business
- International Flow of Funds - Person
- International Transfer In - Business
- Early Loan Payoff
- Deposit Structuring - Low Volume
- Withdrawal Structuring - High Volume
- Deposit Structuring - High Volume
- Withdrawal Structuring - Low Volume
- Transfer In - Cash Out - Business
- Transfer In - Cash Out - Person
- Transfer In - Cash Out - Sole Proprietor
- Transfer In - Transfer Out - Person
- Transfer In - Transfer Out - Business
- Transfer In - Transfer Out - Sole Proprietor
- Transfer In - Transfer Out - Analytical Group
- Unusual Activity Referral - AML

For each analysis parameter, we evaluated system output metrics for the period of May 1, 2021 thru October 31, 2021 (six months), including alert false positive percentage, alert to case ratio, and the case to SAR ratio. Additionally, during the analysis, RSM evaluated the system's alert and case volume and categorized them as High or Low according to the following criteria:

| **Alert Volume** | |
|---|---|
| High | 5% or more of total Alerts during period |
| Low | Less than 5% of total Alerts during period |
| **Case Volume** | |
| High | Alert Escalation Ratio Greater than 5% |
| Low | Alert Escalation Ratio Less than 5% |

Once the alert and case volume were categorized for each analysis parameter, we identified the rules with the following combinations of alert and case volume categories. The different combinations of alert and case volume categories provide insight on the efficiency of the monitoring functionality and identifies the analysis parameters that should be targeted by the Bank for model output efficiency based on the risk associated with the corresponding alert and case volume metrics:

| Alert/Case Volume Category Combinations | Category Summary |
|---|---|
| High Volume Alerts; High Volume Case Escalation | Primary Target - Volume metrics indicate that the potential unusual or suspicious activity may be missed by the current rule parameter settings. |
| Low Volume Alerts; High Volume Case Escalation | |
| High Volume Alerts; Low Volume Case Escalation | Secondary Target - Volume metrics indicate that while potential unusual or suspicious activity appears to be alerted, the current rule parameter settings generate a high volume of false-positives. |
| Low Volume Alerts; Low Volume Case Escalation | |
| High Volume Alerts; No Case Escalation | |
| Low Volume Alerts; No Case Escalation | Tertiary Target - Volume metrics indicate that rule is inefficient and may not be configured |

© 2022 RSM US LLP. All Rights Reserved.

| Alert/Case Volume Category Combinations | Category Summary |
|---|---|
| | appropriately for the desired monitoring coverage. |

The analysis was used to assess the efficiency of the BSA/AML Analysis Parameters. Using the BSA/AML dashboard provided through the Verafin software, we identified 1,550 alerts that were generated at or just above current parameter settings (0 to 5 points above current threshold) for the Analysis Parameters. The alerts resulted in 41 cases and 9 SARs during the period of review. Upon completion of our review, we noted the following:

- 28 of the 32 BSA/AML Analysis Parameters did not generate any output during the period of review within our threshold evaluation range. All 28 parameters were categorized as Low alert volume and Low Case escalation (L-L). We noted that all 28 Analysis Parameters were secondary targets for model output efficiency based on the risk associated with the corresponding alert and case volume metrics. While there was no output during the review period for Agents, the analysis parameters and associated thresholds are designed to provide monitoring coverage over specific activity that warrant their inclusion in the inventory of BSA/AML Analysis parameters. No observation noted.

| Date Range – May 1, 2021 to October 31, 2021 (6 months) | | | | | | | |
|---|---|---|---|---|---|---|---|
| **Agent Name** | **Current Threshold** | **Score Range of Activity** | **Alert/Case Metrics** | **Output Totals** | | ***Ratio*** | ***%*** |
| **Funnel Account** | **80** | **80-85** | **L-L** | alerts | *0* | False Positive % | 0.0% |
| | | | | cases | *0* | Alert to Case Ratio | 0.0% |
| | | | | SARs | *0* | Case to SAR Ratio | 0.0% |
| **Terrorist Financing** | **80** | **65-70** | **L-L** | alerts | *0* | False Positive % | 0.0% |
| | | | | cases | *0* | Alert to Case Ratio | 0.0% |
| | | | | SARs | *0* | Case to SAR Ratio | 0.0% |
| **Cash In - Transfer Out - Business** | **80** | **80-85** | **L-L** | alerts | *0* | False Positive % | 0.0% |
| | | | | cases | *0* | Alert to Case Ratio | 0.0% |
| | | | | SARs | *0* | Case to SAR Ratio | 0.0% |
| **Cash In - Transfer Out - Person** | **80** | **80-85** | **L-L** | alerts | *0* | False Positive % | 0.0% |
| | | | | cases | *0* | Alert to Case Ratio | 0.0% |
| | | | | SARs | *0* | Case to SAR Ratio | 0.0% |
| **Cash In - Transfer Out – Sole Proprietor** | **80** | **80-85** | **L-L** | alerts | *0* | False Positive % | 0.0% |
| | | | | cases | *0* | Alert to Case Ratio | 0.0% |
| | | | | SARs | *0* | Case to SAR Ratio | 0.0% |
| **SBA Loan Fraud** | **80** | **75-85** | **L-L** | alerts | *0* | False Positive % | 0.0% |
| | | | | cases | *0* | Alert to Case Ratio | 0.0% |
| | | | | SARs | *0* | Case to SAR Ratio | 0.0% |
| **Unemployment Benefit Fraud** | **80** | **75-85** | **L-L** | alerts | *0* | False Positive % | 0.0% |
| | | | | cases | *0* | Alert to Case Ratio | 0.0% |
| | | | | SARs | *0* | Case to SAR Ratio | 0.0% |
| **Stolen Stimulus Payments** | **80** | **75-85** | **L-L** | alerts | *0* | False Positive % | 0.0% |
| | | | | cases | *0* | Alert to Case Ratio | 0.0% |
| | | | | SARs | *0* | Case to SAR Ratio | 0.0% |
| **Excessive Federal Tax Returns** | **80** | **75-85** | **L-L** | alerts | *0* | False Positive % | 0.0% |
| | | | | cases | *0* | Alert to Case Ratio | 0.0% |
| | | | | SARs | *0* | Case to SAR Ratio | 0.0% |
| **Excessive State Tax Returns** | **80** | **75-85** | **L-L** | alerts | *0* | False Positive % | 0.0% |
| | | | | cases | *0* | Alert to Case Ratio | 0.0% |
| | | | | SARs | *0* | Case to SAR Ratio | 0.0% |
| | **80** | **75-85** | **L-L** | alerts | *0* | False Positive % | 0.0% |

© 2022 RSM US LLP. All Rights Reserved. 

| Date Range – May 1, 2021 to October 31, 2021 (6 months) | | | | | | | |
|---|---|---|---|---|---|---|---|
| **Agent Name** | **Current Threshold** | **Score Range of Activity** | **Alert/Case Metrics** | **Output Totals** | | ***Ratio*** | **%** |
| **Human Trafficking - Trafficker** | | | | cases | *0* | Alert to Case Ratio | 0.0% |
| | | | | SARs | *0* | Case to SAR Ratio | 0.0% |
| **Human Trafficking - Front** | **80** | **75-85** | **L-L** | alerts | *0* | False Positive % | 0.0% |
| | | | | cases | *0* | Alert to Case Ratio | 0.0% |
| | | | | SARs | *0* | Case to SAR Ratio | 0.0% |
| **Human Trafficking - Victim** | **80** | **75-85** | **L-L** | alerts | *0* | False Positive % | 0.0% |
| | | | | cases | *0* | Alert to Case Ratio | 0.0% |
| | | | | SARs | *0* | Case to SAR Ratio | 0.0% |
| **Payments for Smuggling** | **80** | **75-85** | **L-L** | alerts | *0* | False Positive % | 0.0% |
| | | | | cases | *0* | Alert to Case Ratio | 0.0% |
| | | | | SARs | *0* | Case to SAR Ratio | 0.0% |
| **International Transfer In - Person** | **75** | **70-80** | **L-L** | alerts | *0* | False Positive % | 0.0% |
| | | | | cases | *0* | Alert to Case Ratio | 0.0% |
| | | | | SARs | *0* | Case to SAR Ratio | 0.0% |
| **Early Loan Payoff** | **80** | **75-85** | **L-L** | | *0* | False Positive % | 0.0% |
| | | | | | *0* | Alert to Case Ratio | 0.0% |
| | | | | | *0* | Case to SAR Ratio | 0.0% |
| **Deposit Structuring – Low Volume** | **80** | **75-85** | **L-L** | alerts | *0* | False Positive % | 0.0% |
| | | | | cases | *0* | Alert to Case Ratio | 0.0% |
| | | | | SARs | *0* | Case to SAR Ratio | 0.0% |
| **Withdrawal Structuring - High Volume** | **80** | **75-85** | **L-L** | alerts | *0* | False Positive % | 0.0% |
| | | | | cases | *0* | Alert to Case Ratio | 0.0% |
| | | | | SARs | *0* | Case to SAR Ratio | 0.0% |
| **Deposit Structuring – High Volume** | **80** | **75-85** | **L-L** | alerts | *0* | False Positive % | 0.0% |
| | | | | cases | *0* | Alert to Case Ratio | 0.0% |
| | | | | SARs | *0* | Case to SAR Ratio | 0.0% |
| **Withdrawal Structuring - Low Volume** | **80** | **75-85** | **L-L** | alerts | *0* | False Positive % | 0.0% |
| | | | | cases | *0* | Alert to Case Ratio | 0.0% |
| | | | | SARs | *0* | Case to SAR Ratio | 0.0% |
| **International Flow of Funds - Person** | **80** | **75-85** | **L-L** | alerts | *0* | False Positive % | 0.0% |
| | | | | cases | *0* | Alert to Case Ratio | 0.0% |
| | | | | SARs | *0* | Case to SAR Ratio | 0.0% |
| **International Transfer Out - Person** | **75** | **70-80** | **L-L** | alerts | *0* | False Positive % | 0.0% |
| | | | | cases | *0* | Alert to Case Ratio | 0.0% |
| | | | | SARs | *0* | Case to SAR Ratio | 0.0% |
| **Transfer In - Cash Out - Business** | **80** | **75-85** | **L-L** | alerts | *0* | False Positive % | 0.0% |
| | | | | cases | *0* | Alert to Case Ratio | 0.0% |
| | | | | SARs | *0* | Case to SAR Ratio | 0.0% |
| **Transfer In - Cash Out - Sole Proprietor** | **80** | **75-85** | **L-L** | alerts | *0* | False Positive % | 0.0% |
| | | | | cases | *0* | Alert to Case Ratio | 0.0% |
| | | | | SARs | *0* | Case to SAR Ratio | 0.0% |
| **Transfer In - Cash Out - Person** | **80** | **75-85** | **L-L** | alerts | *0* | False Positive % | 0.0% |
| | | | | cases | *0* | Alert to Case Ratio | 0.0% |
| | | | | SARs | *0* | Case to SAR Ratio | 0.0% |
| **Transfer In - Transfer Out - Person** | **80** | **75-85** | **L-L** | alerts | *0* | False Positive % | 0.0% |
| | | | | cases | *0* | Alert to Case Ratio | 0.0% |
| | | | | SARs | *0* | Case to SAR Ratio | 0.0% |
| | **80** | **75-85** | **L-L** | alerts | *0* | False Positive % | 0.0% |

© 2022 RSM US LLP. All Rights Reserved. 

| Date Range – May 1, 2021 to October 31, 2021 (6 months) | | | | | | | |
|---|---|---|---|---|---|---|---|
| **Agent Name** | **Current Threshold** | **Score Range of Activity** | **Alert/Case Metrics** | **Output Totals** | | ***Ratio*** | **%** |
| **Transfer In - Transfer Out - Sole Proprietor** | | | | cases | *0* | Alert to Case Ratio | 0.0% |
| | | | | SARs | *0* | Case to SAR Ratio | 0.0% |
| **Transfer In - Transfer Out - Analytical Group** | 80 | 75-85 | L-L | alerts | *0* | False Positive % | 0.0% |
| | | | | cases | *0* | Alert to Case Ratio | 0.0% |
| | | | | SARs | *0* | Case to SAR Ratio | 0.0% |

- Four (4) of the 32 BSA/AML Analysis Parameters generated alerts during the period of review with a combined 97.3% False Positive Average. Two (2) of those four (4) parameters did not generate a case during the period of review while two (2) parameters did. One (1) of the two (2) parameters that generated a case resulted in a SAR filing and one (1) did not.
  - For the two (2) Analysis Parameters that generated alerts with no escalated cases, all were categorized as Low alert volume and Low Case escalation (L-L) and designated as secondary targets for model output efficiency based on the risk associated with the corresponding alert and case volume metrics. While there were no cases during the review period, the analysis parameters and associated thresholds appear reasonable for the identification of unusual or suspicious behavior provide monitoring coverage over specific activity that warrant their inclusion in the inventory of BSA/AML Analysis parameters. No observations noted.

| Date Range – May 1, 2021 to October 31, 2021 (6 months) | | | | | | | |
|---|---|---|---|---|---|---|---|
| **Agent Name** | **Current Threshold** | **Score Range of Activity** | **Alert/Case Metrics** | **Output Totals** | | ***Ratio*** | **%** |
| **International Transfer Out - Business** | 75 | 70-80 | L-L | alerts | *51* | False Positive % | 100.0% |
| | | | | cases | *0* | Alert to Case Ratio | 0.0% |
| | | | | SARs | *0* | Case to SAR Ratio | 0.0% |
| **Transfer In – Transfer Out - Person** | 80 | 75-85 | L-L | alerts | *5* | False Positive % | 100.0% |
| | | | | cases | *0* | Alert to Case Ratio | 0.0% |
| | | | | SARs | *0* | Case to SAR Ratio | 0.0% |

  - The one (1) Analysis Parameter that had alerts escalated to cases, but resulted in a No SAR decision, was categorized as High alert volume and Low Case escalation (H-L). This Analysis Parameter was designated as a secondary target for model output efficiency based on the risk associated with the corresponding alert and case volume metrics. While this analysis parameter did not result in a SAR filing during the review period, the analysis parameter and its associated thresholds appear reasonable for the identification of unusual or suspicious behavior provide monitoring coverage over specific activity that warrant their inclusion in the inventory of BSA/AML Analysis parameters. No observations noted.

| Date Range – May 1, 2021 to October 31, 2021 (6 months) | | | | | | | |
|---|---|---|---|---|---|---|---|
| **Agent Name** | **Current Threshold** | **Score Range of Activity** | **Alert/Case Metrics** | **Output Totals** | | ***Ratio*** | **%** |
| **International Transfer In - Business** | 75 | 70-80 | L-L | alerts | *23* | False Positive % | 91.3% |
| | | | | cases | *2* | Alert to Case Ratio | 8.7% |
| | | | | SARs | *0* | Case to SAR Ratio | 0.0% |

  - The one (1) Analysis Parameters that had alerts that were escalated to cases and resulted in a SAR filing was categorized as High alert volume and Low Case escalation (H-L), and designated as a primary target for model output efficiency based on the risk associated with the corresponding alert and case volume metrics. The analysis parameter and its associated thresholds appear reasonable for the identification of unusual or suspicious behavior provide monitoring coverage over specific activity that

© 2022 RSM US LLP. All Rights Reserved.

warrant their inclusion in the inventory of BSA/AML Analysis parameters. No observations noted.

| Date Range – May 1, 2021 to October 31, 2021 (6 months) | | | | | | | |
|---|---|---|---|---|---|---|---|
| Agent Name | Current Threshold | Score Range of Activity | Alert/Case Metrics | Output Totals | | Ratio | % |
| Transfer In – Transfer Out - Business | 80 | 75-85 | H-L | alerts | 319 | False Positive % | 97.8% |
| | | | | cases | 7 | Alert to Case Ratio | 2.2% |
| | | | | SARs | 2 | Case to SAR Ratio | 28.6% |

Based on the results of our model configuration review, we determined that the BSA/AML Analysis Parameters and their associated threshold settings appear to be reasonable for the identification of unusual or suspicious behavior of the Bank's customers. Given the duration of these scenarios being active within the system (less than one year), RSM recommends the Bank continue to monitor the alert output for each of the active risk agents. No observations noted..

**Risk Coverage:** *Determined if the institutions customer and account risk-rating model is operating efficiently, including how the customers are elevated and categorized as higher risk.*

RSM reviewed the Bank's Customer Risk Rating model configuration settings and rationale documents in order to evaluate the appropriateness of the risk scoring factors and subsequent calculations.

Within the Verafin Risk Models Agents Methodology document, the Bank details the high-level scoring logic used by Verafin for Customer Risk Rating. Additionally, this document details the methodology for which Silvergate has configured the model in Verafin, according to the following grouping of risk factors:

- Attributes
  - Relationship Age
  - International Activity Country
  - Headquarters Country
  - Ownership Country
- Modifiers
  - EDD Review Findings
- Transactional
  - ACH Volume
  - International Volume
  - Wire Volume

It should be noted that, while the Bank outlines the above risk factors, not all configured risk agents utilize this exact combination. The Bank assigns a weighting of a risk factor within each group as well as an overall weighting of the group itself to determine the conditional probability values for scoring. Further, the Bank utilizes a Risk Agent risk multiplier for scoring values to further stratify the risk assigned to each group; this risk multiplier is based on the understanding that not all Risk Agent groups present the same potential risk to the Bank; where, for example, a Proprietary Trader represents the Highest risk to the Bank compared to a Network Security client, whose relative risk is lower.

RSM created the document attached as "Silvergate Verafin Risk Agent Transactional Range Assessment.xlsx" (Appending A: Verafin Risk Agent Transactional Range Assessments), which details recommendations for all transaction ranges that should be re-assessed, based on the historical transaction data for each corresponding risk agent and risk factor. See below for a summary of the results. We recommend the Bank perform further analysis to determine if revisions to thresholds are needed.

© 2022 RSM US LLP. All Rights Reserved. 

- 14 configurations were set too high relative to actual activity.
- 14 configurations were set too low relative to actual activity.
- Seven (7) configurations were inconclusive due to the low transaction activity and/or low number of customers in the risk agent.

While the Bank maintains adequate documentation surrounding the rationale and configuration of the Customer Risk Rating model, it was noted that customer risk qualification activities were limited upon implementation of Verafin, which prohibited the Bank from confirming that the generated scores were commensurate with Bank expectations of customer risk. As the Verafin CRR model was newly implemented, such activities are vital to the effectiveness of scoring models. For more information, refer to the Lack of Customer Risk Qualification Activities observation noted above in Section III.

## IV. EXHIBIT—ASSUMPTIONS AND LIMITING CONDITIONS

Our procedures were restricted to an examination of a limited sample of documents, a review of policies and written procedures as specified in our report and interviews with certain Institution personnel. Our procedures did not include tests to determine the accuracy of Institution personnel responses to our direct inquiries, except where so stated and then only to the extent described. Our procedures also did not include tests to determine the completeness or accuracy of the samples and lists that were submitted to us by Institution personnel. Our report outlines our observations and includes recommendations, where appropriate.

**Privacy Pledge**

We are committed to maintaining the confidentiality and privacy of our clients and the privacy of our clients' customers. Section 502(e) (4) of the Gramm-Leach-Bliley Act legislation allows your institution to disclose personally identifiable financial information about your customers to us. We are subject to the exception under Section 502 as a professional firm that assesses your institution's compliance with industry standards. Our policy is to maintain procedures to safeguard your customer's information and not to reuse that information for any other purpose.

© 2022 RSM US LLP. All Rights Reserved. 

## APPENDIX A: VERAFIN RISK AGENT TRANSACTIONAL RANGE ASSESSMENT

Silvergate Verafin
Risk Agent Transacti

© 2022 RSM US LLP. All Rights Reserved.