IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 11 |
| FTX TRADING LTD., et al.,[1] | Case No. 22-11068 (KBO) |
| Debtors. | (Jointly Administered) |
| | **Obj. Deadline: November 25, 2026 at 4:00 PM**<br>**Hearing Date: December 17, 2026 at 1:00 PM** |

**MOTION OF CHRISTOPHER AMES FOR AN ORDER DEEMING HIS PRE-DISTRIBUTION REQUIREMENTS TIMELY SATISFIED AND DIRECTING DISTRIBUTION OF THE MAY DISTRIBUTION AMOUNT**

Christopher Ames ("Movant"), by and through his undersigned counsel, hereby moves this Court (the "Motion") for entry of an order (a) deeming his submission of Pre-Distribution Requirements under Section 7.14 of the confirmed *Second Amended Joint Chapter 11 Plan of Reorganization of FTX Trading Ltd. and its Debtor Affiliates* [D.I. 26404-1] (the "Plan") timely satisfied, or alternatively, accepting such submission as excusably late, and (b) directing the FTX Recovery Trust (the "Trust") and Distribution Agent to treat Movant's $3,297,466.50 distribution scheduled for May 30, 2025 (the "May Distribution Amount") as payable and to release such amount, together with the post-petition interest ("PPI") attributable to it, to Movant no later than the next distribution cycle.[2] In support of this Motion, Movant has filed the *Declaration of Christopher Ames in Support of the Motion of Christopher Ames for an Order Deeming his Pre-Distribution Requirements Timely Satisfied and Directing Distribution of the May Distribution*

[1] The last four digits of FTX Trading Ltd.'s and Alameda Research LLC's tax identification number are 3288 and 4063 respectively. Due to the large number of debtor entities in these Chapter 11 Cases, a complete list of the Debtors and the last four digits of their federal tax identification numbers is not provided herein. A complete list of such information may be obtained on the website of the Debtors' claims and noticing agent at https://cases.ra.kroll.com/FTX.

[2] Capitalized terms not defined herein shall have the same meanings as ascribed to them in the Plan.

*Amount* (the "Ames Declaration") attached hereto as **Exhibit A** and respectfully represents as follows:

## PRELIMINARY STATEMENT[3]

1. Imagine working for decades to build up your wealth, only to have a brief delay in submitting an administrative form decimate your hard-earned personal savings intended for retirement. That is what happened to Movant. He invested funds intended for retirement with FTX, timely filed a proof of claim, and initiated Know Your Customer ("KYC") verification that same day. He ultimately satisfied all Pre-Distribution Requirements, and the Debtors recognized an Allowed Claim in the amount of $4,548,642.32. The Trust nevertheless refuses to pay more than $4.3 million in principal and PPI on that Allowed Claim because Movant completed two administrative steps less than three weeks after the applicable deadline.

2. That brief delay was not the product of neglect or indifference. In August 2023, Kroll suffered a data breach that exposed claimant information to bad actors. Movant was thereafter inundated with FTX-related phishing attempts and fraudulent communications. Legitimate notices concerning the Pre-Distribution Requirements arrived among those messages, from inconsistent domains, and appeared similar to the fraudulent communications he had been receiving. Wary of clicking on e-mail links, Movant instead relied on the FTX Customer Portal (the "Portal"), and the notices went unseen.

3. When Movant learned in August 2025 that distributions had begun, he promptly reviewed the Debtors' Frequently-Asked-Questions website (the "FAQ") and Portal and completed the remaining requirements—less than three weeks after the deadline. He has since received subsequent distributions, confirming that all technical and administrative requirements

[3] Capitalized terms used but not defined in this Preliminary Statement shall have the same meanings as ascribed to them in the Motion.

have been satisfied. The Trust does not dispute that Movant holds an Allowed Claim or that the May Distribution Amount would otherwise be payable. It nevertheless contends that the May Distribution Amount, comprising the majority of Movant's Allowed Claim, was forfeited under the Plan because of that brief delay.

4. Enforcing a forfeiture under these circumstances would be disproportionate. Movant acted in good faith, the delay was minimal, and no party would be prejudiced by the requested relief. The Claim is already allowed, there is an adequate reserve for payment, and granting the Motion would not disrupt the administration of these Chapter 11 Cases. Denying relief, by contrast, would deprive Movant of more than $4.3 million in principal and PPI on an Allowed Claim based solely on a delay of less than three weeks in completing administrative requirements.

5. Bankruptcy Rule 9006(b)(1) permits the Court to accept a late act where the failure to act resulted from excusable neglect. Under *Pioneer*, the relevant considerations—including the length of the delay, the reason for the delay, good faith, and prejudice—favor relief here. *Pioneer Inv. Servs. Co. v. Brunswick Assocs. Ltd. P'ship*, 507 U.S. 380, 396 (1993). Those considerations weigh especially strongly where, as here, the delay was brief, Movant acted in good faith, and no party would be prejudiced.

6. The Court should therefore deem Movant's Pre-Distribution Requirements timely satisfied or, alternatively, accept them as excusably late and direct the Trust to release the May Distribution Amount, and its PPI no later than the next distribution cycle.

## BACKGROUND

### A. The Chapter 11 Cases

7. On November 11 and November 14, 2022 (as applicable, the "Petition Date"), FTX Trading Ltd. and its affiliated debtors and debtors-in-possession (collectively, the "Debtors") filed with the Court voluntary petitions for relief under the Bankruptcy Code (the "Chapter 11 Cases").

8. On October 8, 2024, the Court confirmed the Plan and entered the *Findings of Fact, Conclusions of Law and Order Confirming the Second Amended Joint Chapter 11 Plan of Reorganization of FTX Trading Ltd. and Its Debtor Affiliates* [D.I. 26404].

9. On January 3, 2025, the Effective Date occurred, which, among other things, established the Trust and transferred, assigned, and vested all of the Debtors' assets in the Trust. *See Notice of Effective Date of the Second Amended Joint Chapter 11 Plan of Reorganization of FTX Trading Ltd. and Its Debtor Affiliates* [D.I. 29127].

### B. The Movant's Claim

10. Movant is an individual who deposited his personal savings intended for retirement with FTX. He had never been involved in a bankruptcy or insolvency proceeding before FTX collapsed. *See* Ames Declaration ¶¶ 1–2

11. On September 28, 2023, Movant timely submitted a proof of claim through Portal, assigned claim no. 76406 (the "Claim"). *See id.* ¶ 3.

12. That same day, Movant initiated the KYC verification process. At that time, the Portal had six steps, with Steps 7 and 8 added later and locked while KYC remained pending. KYC was finally approved in October 2024, after which the Claim was deemed an Allowed Class 5A Claim in the amount of $4,548,642.32. *See id.* ¶¶ 3–4.

13. Section 7.4.1 of the Plan establishes the mechanics surrounding Distribution Record Dates, providing that Distribution Record Dates shall be no less than 45 and no more than 75 days prior to the corresponding Distribution Date. *See* Plan § 7.4.1.

14. In August 2025, after learning that payments had begun, Movant visited the FAQ, the public support page for claimants. The FAQ listed August 15, 2025 as the record date for the September 30, 2025 distribution. *See* Ames Declaration ¶¶ 10–12. It did not mention an earlier record date or a deadline for the May distribution. *See id.*

15. The FAQ also stated: "In addition, if the holder of an Allowed Claim does not successfully onboard with a distribution service provider (step 8 of the FTX claims portal) ***within six months*** from the September 30th distribution date, such holder may forfeit their right to receive distributions on their Allowed Claims." *id.* ¶ 13 (emphasis added). Believing he had six months to comply, Movant nevertheless completed Steps 7 and 8 before August 15, 2025. *See id.* ¶¶ 13–14.

16. Additionally, under Section 7.14 of the Plan, holders of Allowed Claims are required, upon request, to complete certain pre-distribution requirements (the "<u>Pre-Distribution Requirements</u>"), including the submission of a completed and valid tax form ("<u>Step 7</u>"). *See* Plan § 7.14.

17. Section 7.14 of the Plan also provides that if a Holder fails to satisfy an initial request for Pre-Distribution Requirements within 30 days, a second request shall be sent, and if the Holder fails to comply within 60 days of the second request, such holder "shall be deemed to have forfeited its right to receive Distributions." *Id.*

18. The requests related to the Pre-Distribution Requirements were transmitted to Movant by e-mail. However, following the August 2023 Kroll data breach, Movant was inundated with FTX-themed emails, many of which were phishing scams or other fraudulent communications

designed to exploit victims like him. Many used Kroll's or FTX's name and asked Movant to act on his distribution. *See* Ames Declaration ¶ 5.

19. Two legitimate Pre-Distribution Requirement notices arrived among those fraudulent emails and did not stand out from them. Because of the phishing, Movant avoided acting on e-mail links and instead relied on the Portal; he did not see the notices at the time and later located both notices, still unopened, in his inbox. *See id.* ¶ 6.

20. The two notices came from different e-mail addresses:

ftxnoticing@ra.kroll.com (first notice, April 22, 2025)

ftxnoticing@noticing.ra.kroll.com (second notice, May 29, 2025)

The senders' inconsistent domains meant that Movant could not rely on the sender to discern legitimate emails from phishing scams. Further compounding this issue, neither of these addresses matched any of three different e-mail addresses Kroll had used to communicate concerning the FTX bankruptcy cases. *See id.* ¶ 7.

21. mailto:support@ftx.comMovant later located additional emails sent by FTX Support between October 2024 and April 2025, which he also did not see at the time. Those communications characterized themselves as reminders, rather than requests under Section 7.14 of the Plan, and were sent by FTX Support rather than from the e-mail addresses used to send the two notices. *See id.* ¶¶ 7–8.

22. Based on the May 29, 2025 notice, the 60-day compliance deadline fell on approximately July 28, 2025 (the "Deadline"). *See id.* ¶ 9.

23. In August 2025, a friend who knew Movant was expecting a distribution mentioned that payments had begun and encouraged him to check the status of the bankruptcy case. Movant immediately visited the FAQ and then logged onto the Portal, where he completed the tax-form

step and onboarded with a distribution service provider (Steps 7 and 8, respectively) before August 15, 2025. Although he had never seen or been aware of the Pre-Distribution Requirement notices for the May distribution, he completed Steps 7 and 8 less than three weeks after the Deadline. *See id.* ¶¶ 10–15.

24. On September 30, 2025, Movant received $258,478.50 through his selected distribution service provider, Kraken. He did not receive the May Distribution Amount of $3,297,466.50, scheduled for May 30, 2025 and representing approximately 72.5% of his Claim principal. *See id.* ¶ 16.

25. Because all the Portal steps were then complete, Movant could not understand why the May Distribution Amount had been withheld. At that time, the Portal displayed no notice of forfeiture, warning, cure deadline, or countdown. *See id.* ¶ 17.

26. After the September 30, 2025 distribution was made, the Portal initially displayed only the May distribution panel. Later that fall, a September section appeared, but the Portal then displayed contradictory September sections, including a catch-up for the May Distribution Amount alongside a forfeiture line. Those displays left Movant confused about whether the May Distribution Amount would still be paid. *See id.* ¶¶ 19–20.

27. Over the next six months, Movant diligently contacted Kroll and FTX Support about the missing May Distribution Amount. Their responses were inconsistent and confusing: at various times, they told him to wait for distribution updates, suggested the delay might be due to routine "data reconciliation," or directed him to check the Portal. These conflicting communications left Movant without a clear answer as to whether the May Distribution Amount had been forfeited, remained pending, or would eventually be paid. *See id.* ¶ 18.

28. On December 2, 2025, FTX Support first cited Section 7.14 of the Plan in response to Movant's inquiry; this was the first time anyone had directly told Movant that the May Distribution Amount had been forfeited. In January 2026, FTX Support twice wrote that the May distribution had not yet been forfeited, and in February stated that it might be delayed. *See id.* ¶ 21.

29. On or about March 24, 2026, the Portal was updated to show a scheduled distribution of $824,048.33, again without the May Distribution Amount. The Portal reflected a recovery of approximately 96.3%, while Movant's actual recovery, including the forthcoming March distribution, was only approximately 23.8%. *See id.* ¶ 22.

30. Because the March 31, 2026 distribution was again prepared without the catch-up May Distribution Amount, Movant retained Lowenstein Sandler LLP. After counsel contacted counsel for the Trust, the Trust took the position that the May Distribution Amount had been forfeited and would not be paid. On July 31, 2026, Movant received $388,569.38 through Kraken, consisting of $168,648.99 in principal and $219,920.39 in PPI, but the May Distribution Amount remains withheld, and no part of it has been distributed. *See id.* ¶¶ 23–24, 26.

## ARGUMENT

### I. The Pre-Distribution Requirements should be deemed timely, or, alternatively, accepted as excusably late.

31. Based upon the foregoing, the Pre-Distribution Requirements submitted by Movant should be accepted as timely, or accepted as excusably late. At the heart of the matter is whether a brief, good-faith delay of less than three weeks in completing ministerial distribution requirements should result in permanent forfeiture of more than $4.3 million in principal and PPI on an undisputed claim. As a court of equity, and after considering the relevant excusable neglect factors, the Court should find that such a punitive outcome is not warranted.

32. The circumstances here are readily analogous to those governing late-filed proofs of claim, where courts routinely evaluate whether a missed deadline should be excused under Rule 9006(b)(1) of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"). Bankruptcy Rule 9006(b)(1) provides that, where an act is required to be completed within a specified period, the Court may permit the act to be done after expiration of the deadline where the failure to timely act "was the result of excusable neglect."

33. The Supreme Court has held that the determination of whether neglect is "excusable" is "an equitable one, taking account of all relevant circumstances surrounding the party's omission." *Pioneer Inv. Servs. Co.*, 507 U.S. at 395. Those circumstances include, "the danger of prejudice to the debtor, the length of the delay and its potential impact on judicial proceedings, the reason for the delay, including whether it was within the reasonable control of the movant, and whether the movant acted in good faith." *Id.* (citation and footnote omitted).

34. This Court has consistently applied the *Pioneer* four-factor test. *See In re Energy Future Holdings Corp.*, 619 B.R. 99, 109–10 (Bankr. D. Del. 2020) (citations omitted); *In re Draw Another Circle, LLC*, 595 B.R. 174, 180 (Bankr. D. Del. 2018) (citation omitted); *In re Garden Ridge Corp.*, 348 B.R. 642, 645 (Bankr. D. Del. 2006) (citation omitted). Under Third Circuit and Delaware Bankruptcy Court precedent, "all factors must be considered and balanced; no one factor trumps the others." *In re Garden Ridge Corp.*, 348 B.R. at 645. Here, each one of those factors overwhelmingly favors Movant.

### A. Accepting the Pre-Distribution Requirements as timely will not prejudice the estates or disrupt administration of the Chapter 11 Cases.

35. The first *Pioneer* factor strongly favors Movant. The Third Circuit has made clear that prejudice in this context requires concrete, evidence-based harm, not merely hypothetical or imagined detriment. *Manus Corp. v. NRG Energy, Inc. (In re O'Brien Env't Energy, Inc.)*, 188

F.3d 116, 127 (3d Cir. 1999) ("[P]rejudice is not an imagined or hypothetical harm; a finding of prejudice should be a conclusion based on facts in evidence."). The Third Circuit, citing *In re R.H. Macy & Co.*, stated that *Pioneer* requires a more detailed analysis of prejudice which would account for more than whether the Plan set aside money to pay the claim at issue. Otherwise, "virtually all late filings would be condemned by this factor." *Manousoff v. Macy's Ne., Inc. (In re R.H. Macy & Co.)*, 166 B.R. 799, 802 (S.D.N.Y. 1994). As to prejudice, the Third Circuit has instructed courts to consider, among other things:

> [T]he size of the claim with respect to the rest of the estate; whether allowing the late claim would have an adverse impact on the judicial administration of the case; whether the plan was filed or confirmed with knowledge of the existence of the claim; the disruptive effect that the late filing would have on the plan or upon the economic model upon which the plan was based; and whether allowing the claim would open the floodgates to other similar claims. . . . *In re O'Brien Env't Energy, Inc.*, *188* F.3d at 126 (citation omitted).

36. Here, it is clear the requested relief would cause no prejudice to the Debtors' estates, the Trust, or any other creditor. The Debtors have already allowed Movant's Claim and his entitlement to distributions under the Plan is undisputed. Movant has completed the Pre-Distribution Requirements and has received other distributions through Kraken while the May Distribution Amount has remained withheld. *See* Ames Declaration ¶¶ 4, 14, 16, 24, 26. This Motion therefore does not seek allowance of a disputed claim or recovery on account of a previously unknown liability. Rather, Movant seeks only payment of a previously withheld distribution to which he is already entitled under the Plan.

37. In *In re Garden Ridge Corp.*, this Court found no prejudice where the debtor had already scheduled a debt to the claimant and no amounts had been distributed, because payment would not require return of distributions already made. *In re Garden Ridge Corp.*, 348 B.R. at 646. The Third Circuit in *In re O'Brien Env't. Energy* held similarly, finding that there was no prejudice

because the debtor had already listed the claim in its schedules and had not contested its existence. *In re O'Brien Env't Energy, Inc.*, 188 F.3d at 128. As the court observed, "the only prejudice that would result" from allowing the late claim "would be the reorganized debtor's loss of a windfall." *Id*. Moreover, in *In re Sacred Heart Hosp. of Norristown*, the court held that the issue of prejudice to debtor as result of late filing of claim is a primary consideration and found excusable neglect where there was a lack of prejudice to debtor. *In re Sacred Heart Hosp. of Norristown*, 186 B.R. 891, 897 (Bankr. E.D. Pa. 1995).

38. The Trust appears to have ample reserves to pay the May Distribution Amount without disrupting distributions, and granting this Motion would not disrupt administration of the Chapter 11 Cases or reopen claims reconciliation. In fact, as of June 30, 2026, the Trust reported approximately $3.471 billion in cash and cash equivalents and had distributed approximately $10.312 billion to creditors, and a subsequent distribution of approximately $900 million was made in July 2026. *See FTX Recovery Trust Financial Report Q2 2026* [Docket No. 36154] at 5, 6, 18. In light of this information, the relief requested presents no prejudice to the Trust's distribution process or recoveries of other creditors, and this factor heavily favors Movant.

**B. The delay was de minimis and had no impact on proceedings.**

39. The operative forfeiture deadline under Section 7.14 of the Plan fell on approximately July 28, 2025, and Movant completed Steps 7 and 8 before August 15, 2025, less than three weeks later. *See* Ames Declaration ¶¶ 9, 14–15. The delay at issue was therefore less than three weeks—a minimal delay which strongly favors Movant. Movant completed the requirements in the context of a case pending since 2022 that will involve years of distributions, and he completed them before the August 15 record date for the September 30 distribution. The

relevant inquiry is thus whether a delay of less than three weeks after the Deadline justifies permanent forfeiture of over $4.3 million in principal and PPI.

40. The Supreme Court itself granted excusable neglect for a twenty-day delay in *Pioneer*. *See Pioneer*, 507 U.S. at 384. The Third Circuit found a two-month delay non-significant in *In re O'Brien Env't Energy*, 188 F.3d at 130. Here, Movant's delay was shorter than the delays in both seminal cases. *See* Ames Declaration ¶¶ 9, 14–15.

41. By contrast, courts in this circuit have denied excusable neglect where the delay was many months or years. *See Jones v. Chemetron Corp.*, 212 F.3d 199 (3d Cir. 2000) (four years after bar date, two years post-confirmation); see *also In re RS Legacy Corp.*, 577 B.R. 134 (Bankr. D. Del. 2017) (close to a year); *In re New Century TRS Holdings, Inc.*, 465 B.R. 38 (Bankr. D. Del. 2012) (approximately four years).

42. A delay of less than three weeks makes this factor supportive of Movant. The absence of any practical or administrative consequence strongly supports the finding of excusable neglect.

**C. The circumstances surrounding the delay were reasonable and not within Movant's control.**

43. The circumstances giving rise to Movant's delay were both understandable and, in substantial part, outside his reasonable control. Movant is an individual investor who had never been involved in a bankruptcy or insolvency proceeding before this case. Following the August 2023 Kroll data breach, he received an inundation of FTX-themed emails, many of which were phishing attempts or fraudulent communications designed to exploit victims like him. The two legitimate Pre-Distribution Requirement notices arrived among those e-mails, came from different sender domains, and were not discernible from fraudulent e-mail scams. *See* Ames Declaration ¶¶ 2, 5–7.

44. The Trust's own "Official Email Addresses" page compounded the difficulty. It instructed claimants to "always make sure to confirm that the actual email sender is one of these emails." Yet archived versions of that page from the period surrounding the second notice did not list the sender of that notice, ftxnoticing@noticing.ra.kroll.com. That address first appears in a version archived in August 2025—after the applicable Deadline. *See id.* ¶ 7 n.4. A claimant checking the Trust's list as instructed when the second notice arrived would not have found the sender's address. Against that backdrop, and given Movant's practice of using the Portal rather than clicking links in emails, distinguishing legitimate estate communications from fraudulent ones was particularly difficult.

45. The confusion was compounded by the publicly available FAQ, which stated that a holder may forfeit the right to receive distributions on an Allowed Claim if the holder fails to onboard with a distribution service provider "***within six months from the September 30th distribution date***." (emphasis added). *Id.* ¶ 13. Based upon that guidance, Movant reasonably believed he had six months to comply, but he nevertheless completed Steps 7 and 8 before August 15, 2025, less than three weeks after the Deadline. The FAQ did not mention an earlier record date or a deadline for the May distribution. *See id.* ¶¶ 11–15. Under these circumstances, Movant's misunderstanding was reasonable and does not resemble willful disregard or strategic delay.

46. Courts routinely recognize that confusion arising from complex noticing procedures, particularly where communications are voluminous or potentially misleading, weighs in favor of excusable neglect. In *In re O'Brien Env't Energy*, the Third Circuit reversed a denial of excusable neglect where critical information was "buried in the middle of a twelve page document" without sufficient alerting language. *In re O'Brien Env't Energy*, 188 F.3d at 129. The court held that the analysis must also consider whether the manner of notice contributed to the

confusion. *Id*. In fact, this Court has expressly acknowledged sympathy for this type of claimant, noting that the court is "sympathetic to the difficulties faced by claimants, who often must wade through complicated notices to ascertain whether action is necessary to preserve their rights." *In re RS Legacy Corp.*, 577 B.R. at 140.[4]

47. Here, where legitimate notices arrived among fraudulent e-mails, the Portal displayed conflicting information about whether the May Distribution Amount would be paid, and both Kroll and FTX Support offered conflicting accounts, it is easy to understand Movant's confusion. Despite this difficulty, Movant did not ignore his obligations or abandon the claims process. To the contrary, he completed Steps 7 and 8 before August 15, 2025, and continued searching for answers after the May Distribution Amount was withheld. Therefore, these facts clearly weigh in favor of excusable neglect.

**D. Movant acted in good faith.**

48. The good faith factor strongly favors Movant. Good faith is assessed by asking whether the delay was the product of a strategic or tactical decision, intentional evasion, or bad motive, rather than an honest mistake. *In re Energy Future Holdings Corp.*, 619 B.R. at 119 (finding bad faith where delay was a "strategic attempt to preserve appellate standing" or a deliberate tactical choice; distinguishing from honest mistakes). This Court has held that where the record is void of anything that suggests a movant did not act in good faith, and movant "admits it made a mistake, but it acted quickly to correct it," good faith is established. *In re Garden Ridge Corp.*, 348 B.R. at 647.

[4]While the court in *In re RS Legacy Corporation* ultimately denied relief, the facts are distinguishable, because that claimant had separately and independently come to know of her claim and then offered no reason at all for the subsequent year of inaction. Here, Movant completed Steps 7 and 8 less than three weeks after the Deadline and has a specific, documented reason for missing the applicable deadline.

49. Here, Movant's good faith is demonstrated at every stage of the claims and distribution process. There is no evidence whatsoever of bad faith, gamesmanship, strategic delay, or prejudice to any stakeholder. Instead, for approximately six months Movant attempted to resolve this matter through Kroll and FTX Support. After the March 31, 2026 distribution was again prepared without the catch-up May Distribution Amount, he retained counsel; counsel then contacted counsel for the Trust before Movant resorted to judicial intervention. *See* Ames Declaration ¶¶ 18, 23. His conduct reflects diligence and good-faith efforts to comply—not indifference or obstruction.

**II. Allowing the forfeiture of the May Distribution Amount would cause extreme and undue prejudice to Movant.**

50. The forfeiture of the May Distribution Amount would inflict extraordinary and irreparable harm on Movant. Forfeiture is a harsh remedy and notice of forfeiture must be clear and unambiguous. *See Ford Motor Co. v. Earthbound LLC*, No. N23C-06-237 PRW CCLD, 2026 WL 2431329, at *7–8 (Del. Super. Ct. June 8, 2026); *Nucor Coatings Corp. v. Precoat Metals Corp.*, No. N22C-11-222 MAA CCLD, 2023 WL 6368316, at *11 (Del. Super. Ct. Aug. 31, 2023). That rationale is especially compelling here, where the Trust seeks to deprive Movant of approximately 72.5% of his otherwise Allowed Claim based on a brief delay occurring amid phishing scams, inconsistent communications, and a Portal that showed him no warning of forfeiture.

51. Movant seeks only the distribution to which he is otherwise entitled. Denying that distribution, approximately 72.5% of his Claim principal, based on a delay of less than three weeks in satisfying administrative requirements would impose a substantial forfeiture disproportionate to the delay and any resulting prejudice. Under these circumstances, rigid enforcement of Section

7.14 of the Plan would elevate form over substance, and the equitable considerations underlying Bankruptcy Rule 9006(b)(1) weigh strongly in favor of granting relief.

52. Accordingly, Movant respectfully submits that the Court should deem the Pre-Distribution Requirements timely satisfied or, alternatively, permit the late compliance based on excusable neglect and direct the release of the May Distribution Amount, together with the PPI attributable to it no later than the next distribution cycle.

WHEREFORE, Movant respectfully requests that this Court enter an order: (i) deeming Movant's Pre-Distribution Requirements timely satisfied or, alternatively, accepting Movant's late compliance on the basis of excusable neglect; (ii) directing the Trust and the Distribution Agent to treat the May Distribution Amount as payable and to release such amount, together with the PPI, no later than the next distribution cycle; and (iii) granting such other and further relief as the Court deems just and proper.

Dated: November 11, 2026
Wilmington, Delaware

Respectfully submitted,

**LOWENSTEIN SANDLER LLP**

By: */s/ Michael V. DiPietro*
Christopher A. Ward (No. 3877)
Michael V. DiPietro (No. 6781)
222 Delaware Avenue, Suite 1500
Wilmington, Delaware 19801
Telephone: (973) 597-2500
cward@lowenstein.com
mdipietro@lowenstein.com

-and-

Daniel Besikof
Lindsay Sklar
1251 Avenue of the Americas
New York, New York 10020
Telephone: (212) 262-6700
dbesikof@lowenstein.com
lsklar@lowenstein.com

*Counsel to Christopher Ames*