**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| In re:<br><br>FTX TRADING LTD., *et al.*,[1]<br><br>Debtors. | Chapter 11<br><br>Case No. 22-11068 (KBO)<br><br>(Jointly Administered) |

**FTX RECOVERY TRUST'S REPLY IN SUPPORT OF ITS DISPOSITIVE MOTION TO DISALLOW AND PRELIMINARY OBJECTION TO THE ARGENT LIQUIDATION TRUST'S CLAIMS**

The FTX Recovery Trust[2] (the "Trust") hereby submits this reply (the "Reply") in further support of the *FTX Recovery Trust's Dispositive Motion to Disallow and Preliminary Objection to the Argent Liquidation Trust's Claims* [D.I. 36654] (the "Motion" or "FTX Mot."),[3] and in response to *Argent Liquidation Trust's Opposition to FTX Recovery Trust's Dispositive Motion to Disallow and Preliminary Objection to the Argent Liquidation Trust's Claims* [D.I. 36935] (the "Opposition" or "Argent Opp."). In support thereof, the Trust respectfully states as follows:

---

[1] The last four digits of FTX Trading Ltd.'s and Alameda Research LLC's tax identification numbers are 3288 and 4063, respectively. Due to the large number of debtor entities in these chapter 11 cases (the "Chapter 11 Cases"), a complete list of the Debtors and the last four digits of their federal tax identification numbers is not provided herein. A complete list of such information may be obtained on the website of the Debtors' claims and noticing agent at https://cases.ra.kroll.com/FTX.

[2] The FTX Recovery Trust (a/k/a the Consolidated Wind Down Trust) was established through the Debtors' confirmed Sec*ond Amended Joint Chapter 11 Plan of Reorganization of FTX Trading Ltd. and Its Debtor Affiliates* [D.I. 26404], which became effective on January 3, 2025 [D.I. 29127].

[3] Capitalized terms not otherwise defined herein shall have the meaning assigned to them in the Motion or, if not defined therein, the Opposition.

## PRELIMINARY STATEMENT

1. Argent should not be permitted to enrich the Silvergate preferred shareholders at the expense of the actual victims of the FTX Group's misconduct. Argent's Opposition confirms the fundamental missing piece of the Silvergate Claims. According to Argent, its claims arise from the FTX Group's alleged misstatements and breaches relating to the opening and use of accounts at Silvergate (the Account Noncompliance) and then, years later, a "domino effect" caused its purported losses. But the first "domino" that Argent actually identifies is not the Account Noncompliance or any other dealings between the FTX Group and Silvergate—it is the November 2022 revelation that the FTX Group insiders had misappropriated FTX assets comprising customer entitlements. Silvergate was not a victim of that fraud; it was never an FTX Group customer and never deposited assets on the FTX cryptocurrency exchanges. And while Argent insists in conclusory fashion that "the harms Silvergate suffered flowed directly from the FTX Group's fraudulent misstatements to Silvergate about how the FTX Group would use and did use its accounts" (Argent Opp. ¶ 50), it never actually explains how.

2. Nor does Argent's misguided attempt to collapse the parties' banking relationship and the FTX Insider Fraud into one integrated scheme bridge that gap. Even if the two were integrated, every claimed loss begins with the revelation of the FTX Insider Fraud aimed at FTX customers—years after the accounts were opened—and each later "domino" turns on how the market, depositors, and regulators reacted to it. (*See* Argent MDS ¶¶ 5–6, 60–63.) And a loss caused by the public's reaction to the exposure of a fraud directed at others is not a loss caused by the fraud itself. Moreover, each step runs through independent forces Argent never accounts for—an industry-wide crisis of confidence, rising interest rates, Silvergate's compliance record, and the regulators' independent decisions—as Silvergate's sworn account of its collapse confirms. (*See* Hetrick Decl. ¶¶ 9–19.) Under any of its theories, then, Argent pleads nothing connecting the

Account Noncompliance to the losses it seeks—not the securities losses, not the lost enterprise value, not the regulatory penalties, and not the costs of liquidation. Manufacturing that connection *post hoc* would require ignoring basic logic and reality. Without it, the Silvergate Claims fail under every causal standard that governs them, including the standard for indemnification.

3. For that reason, and all the reasons set forth in the Motion, the Court should disallow the Silvergate Claims in their entirety at this stage.

## APPLICABLE LEGAL STANDARD

4. In the Opposition, Argent asserts—without justification—that its More Definite Statement serves as *prima facie* evidence of the validity of its claims, that the Trust has not brought "evidence" to rebut its *prima facie* case, and therefore by default the Silvergate Claims should proceed to trial. (Argent Opp. ¶¶ 9, 40.) But the only question before the Court is the legal sufficiency of Argent's allegations. A claim that fails to articulate a discernible basis for relief is not *prima facie* valid and may be disallowed at the outset. *In re Trib. Co.*, 2013 WL 1909617, at *3 (Bankr. D. Del. May 2, 2013). Argent fails to state a legally sufficient claim for the relief it seeks, and the Court should disallow the Silvergate Claims without engaging in the evidentiary disputes Argent raises.[4]

## ARGUMENT

### I. Argent's Allegations Cannot Demonstrate Legally Sufficient Causation for Any of Its Claims or Any of the Claimed Losses.

5. In order to survive this stage of litigation, Argent must have adequately alleged for each cause of action it asserts legally sufficient causation of the applicable damages by the misconduct Argent alleges. But Argent has failed to do so and in fact its own allegations

---

[4] Argent repeatedly asserts that the Trust has conceded breach, misrepresentation, and the other elements of its claims. (Argent Opp. ¶¶ 2, 72, 85, 98.) It has not. For purposes of the Motion and this Reply only, the Trust assumes the truth of Argent's non-conclusory factual allegations to test their legal sufficiency, and it reserves all rights to contest them.

demonstrate that there is no legally cognizable connection between the FTX Group's banking dealings with Silvergate and Argent's claimed losses under any of its theories of liability.[5] That should be the end of the inquiry and the Silvergate Claims disallowed.[6]

6. Argent simply has not alleged and cannot articulate how the FTX Group's banking relationship with Silvergate caused any of the claimed damages; it is a practical impossibility when the losses have no logical connection to those business dealings on their face. Moreover, Argent's attempt to recast the FTX-Silvergate banking relationship and the FTX Insider Fraud as "One Scheme, Not Two" (which for the reasons described herein should be rejected) does not change that reality: Argent's express allegations that those losses followed the revelation of the FTX Insider Fraud, not the Account Noncompliance, are dispositive on their face and, in addition, each purported "domino" in its causal chain runs through independent forces and decisions its allegations conveniently ignore. Those are simply not cognizable theories of causation for any of its legal theories and thus its claims should be disallowed at this stage without further litigation.

---

5 That is not a factual dispute that requires discovery. Argent's own authority recognizes that causation may be decided as a matter of law where "the undisputed facts permit only one reasonable conclusion," *Jenni Rivera Enters., LLC* v. *Latin World Ent. Holdings, Inc.*, 36 Cal. App. 5th 766, 792–93 (2019) (cited at Argent Opp. ¶ 9), and the only facts here are the ones Argent pleaded and Silvergate swore to. Nor does Argent's assurance that the FTX Group's role in the regulatory timeline "will emerge in discovery" (Argent Opp. ¶ 29; *see id*. ¶¶ 42–43) cure the deficiency, *see In re Avandia Mktg., Sales Pracs. & Prod. Liab. Litig.*, 804 F.3d 633, 646 (3d Cir. 2015) (allegations must still "raise a reasonable expectation that discovery will reveal evidence of proximate causation" (internal quotation marks omitted)) (cited at Argent Opp. ¶ 43). In *Avandia*, the alleged misrepresentations were designed to induce the very payments the plaintiffs sought to recover. 804 F.3d at 645–46. Here, the Account Noncompliance allegedly obtained banking services, while the losses Argent seeks arose from later events that Argent never connects to it.

6 Argent argues that its indemnification claim is based on both the alleged account misrepresentations and the FTX Insider Fraud. (Argent Opp. ¶ 73.) For the reasons explained below, Argent fails to adequately allege that the FTX Insider Fraud resulted in a loss covered by the Indemnification Provision. (*See infra* ¶ 41 & n.38.)

### A. Argent Has Not Connected, and Cannot Connect, the FTX Group's Alleged Misconduct Relating to the FTX/Silvergate Banking Dealings and the Claimed Losses.

7. The Silvergate Claims fail as a threshold matter because they do not plausibly allege a theory by which dealings between the FTX Group and Silvergate caused any of the losses Argent seeks under any of its causes of action.[7] Argent expressly states that its losses flow "directly from the FTX Group's fraudulent misstatements to Silvergate about how the FTX Group would use and did use its accounts" (Argent Opp. ¶ 50), but it never explains how those misstatements could have caused Silvergate's claimed losses.

8. Argent simply says it is so, offering no plausible way that those misstatements—made in the context of the FTX Group's banking relationship with Silvergate—caused the billions of dollars of losses Argent claims, which followed not from the banking services that Silvergate provided to the FTX Group but from the market's and regulators' reaction to the revelation of the FTX Insider Fraud. As the Motion explains, the only direct impact of that banking relationship on Silvergate was a material benefit in the form of interest income.[8] Argent responds that any benefit Silvergate received from the FTX Group's accounts "does not disprove causation" and at most supports an offset. (Argent Opp. ¶¶ 52–53 (capitalization altered).) That misreads the Trust's argument. The Trust does not invoke Silvergate's benefit to reduce Argent's damages; the fact that Silvergate benefited from its banking relationship with the FTX Group by receiving over a billion dollars of deposits (FTX Mot. ¶ 10), and suffered no losses in connection with that banking relationship goes directly to whether Silvergate suffered any loss from the alleged misconduct by

---

[7] As explained in the Motion, the alleged misconduct (the Account Noncompliance) also forms the basis of Argent's breach of contract claims. (*See* FTX Mot. ¶ 70.)

[8] The Motion does not rely solely on Silvergate's overall net-income growth, as Argent suggests. (Argent Opp. ¶ 53.) It separately estimated the income attributable to FTX-related deposits: "$27 million in pro forma annualized interest income." (FTX Mot. ¶ 10.)

the FTX Group in opening and using those bank accounts. That is an element of Argent's claims—whether the conduct Argent sues on injured Silvergate at all—not a question of damages.[9] More specifically, Argent's causation theories for its core claims fail as follows:

9. **Contract claims.** Argent's losses do not qualify as general damages. They are entirely contingent on other factors and do not necessarily flow from the alleged breaches. *See Lewis Jorge Constr. Mgmt., Inc.* v. *Pomona Unified Sch. Dist.*, 34 Cal. 4th 960, 968–77 (2004). Argent answers that Silvergate lost "the very performance the FTX Group promised." (Argent Opp. ¶ 87 (capitalization altered).) But that performance was the provision of accurate account information, notice of changes, and compliant ACH entries, and Argent seeks no value resulting from those alleged breaches. What Argent seeks instead—securities-sale losses, lost going-concern value, and regulatory and litigation costs—is "the value of some consequence that performance *may* produce." *Lewis Jorge*, 34 Cal. 4th at 971 (emphasis added).[10] That leaves only special damages, and Argent does not plausibly allege that any breach was a substantial factor in

---

[9] Argent's principal authority is not to the contrary. (*See* Argent Opp. ¶ 53 (citing *Gateway Bank, F.S.B.* v. *Metaxas*, 65 Cal. App. 5th 71 (2021)).) In *Gateway*, causation was never in doubt: the bank's former CEO had concealed the true nature of a transaction from the board, pleaded guilty to conspiracy to commit bank fraud, and was found liable after trial for fraud and intentional breach of fiduciary duty. 65 Cal. App. 5th at 85–87. The issue on appeal was whether her damages should be reduced by a "special benefit," a doctrine that applies only "[w]hen the defendant's tortious conduct has caused harm to the plaintiff." *Id.* at 89 (quoting Restatement (Second) of Torts § 920). The special-benefit doctrine thus presupposes the causal link that Argent has failed to allege; it cannot supply one. Argent's offset arguments fail for the same reason. (*See* Argent Opp. ¶ 53 & n.67.) Because no harm flows from the Account Noncompliance, the Court need not reach offset, which in any event is "an equitable process, to be applied in the discretion of the fact finder" once damages are assessed. *Gateway*, 65 Cal. App. 5th at 87-88. The Trust reserves all rights to seek it.

[10] *Robinson Helicopter Co.* v. *Dana* Corp., 34 Cal. 4th 979 (2004), on which Argent relies (Argent Opp. ¶ 88 n.98), confirms the point. There, the false certifications concealed nonconforming parts, and the manufacturer recovered the cost of that nonconforming performance itself. *Robinson Helicopter Co.*, 34 Cal. 4th at 985–88. Argent seeks nothing comparable. Nor does the Trust's argument depend on comparative fault or a superseding-cause defense to the contract claims. (*See* Argent Opp. ¶ 91 (citing *LL B Sheet 1, LLC* v. *Loskutoff*, 362 F. Supp. 3d 804 (N.D. Cal. 2019) and *Ash* v. *N. Am. Title Co.,* 223 Cal. App. 4th 1258 (2014)).) Silvergate's own conduct and the intervening market and regulatory events matter because Argent must plead that the breaches were a substantial factor in, and foreseeably resulted in, its losses. *See US Ecology*, 129 Cal. App. 4th at 909; *Lewis Jorge*, 34 Cal. 4th at 968–69. Indeed, *Ash* itself recognizes that "bankruptcies normally are not within the contemplation of the parties." 223 Cal. App. 4th at 1272.

producing Silvergate's particular losses. At most, it identifies the breaches as a factual antecedent to those losses. That is not enough. *See US Ecology, Inc.* v. *State*, 129 Cal. App. 4th 887, 909–10 (2005); *PPG Indus., Inc.* v. *Transamerica Ins. Co*., 20 Cal. 4th 310, 315 (1999). Argent's assertion that truthful disclosures "could have" allowed Silvergate to intervene in the FTX Insider Fraud is speculative at best. (Argent Opp. ¶¶ 88, 90.) And Argent pleads no facts showing that, at contracting, the FTX Group knew or should have known that the alleged breaches would produce securities-sale losses, regulatory and litigation expenses, or the destruction of Silvergate's business. *See X Corp.* v. *Ctr. for Countering Digital Hate, Inc.*, 724 F. Supp. 3d 948, 969–71 (N.D. Cal. 2024). Where the defendant would have had to foresee multiple contingent events when it entered the contract, special damages do not attach. *See Glob. Hawk Ins. Co. (RRG)* v. *Wesco Ins. Co*., 424 F. Supp. 3d 848, 857–59 (C.D. Cal. 2019). Argent's contract claims therefore fail to plead recoverable damages.[11]

10. **Fraud claims.** Argent's fraud claims likewise lack facts connecting the alleged account misrepresentations to the particular losses sought. Argent alleges that Silvergate would have restricted or closed the accounts had it known the truth. (Argent MDS ¶¶ 80, 115; Argent Opp. ¶¶ 87–90.) But that does not explain how the misrepresentations substantially caused Silvergate's securities losses, loss of enterprise value, or liquidation expenses. California fraud law requires that causal connection, even if its standard differs from RICO's directness requirement. *See Patrick* v. *Alacer Corp.*, 167 Cal. App. 4th 995, 1016–17 (2008). Indeed,

---

[11] Argent's implied-covenant claim fares no better. Argent says the FTX Group's "deliberate misuse of its accounts" was a bad-faith frustration of the agreements "distinct from the express-breach theory." (Argent Opp. ¶ 93 n.102.) But that misuse is the same conduct Argent pleads as the express breaches, and Argent seeks the same damages for it. (*See* Argent MDS ¶¶ 86-87.) Where an implied-covenant claim "rel[ies] on the same alleged acts," and "seek[s] the same damages," as the contract claim, it is "superfluous." *Careau & Co.* v. *Sec. Pac. Bus. Credit, Inc.*, 222 Cal. App. 3d 1371, 1395 (1990); *see Guz* v. *Bechtel Nat'l Inc*., 24 Cal. 4th 317, 352 (2000) (implied covenant claim superfluous). And whether or not it is duplicative, the implied-covenant claim fails for the same reason as the contract claim: Argent does not plead recoverable damages caused by the conduct alleged.

contrary to Argent's assertion (*see* Argent Opp. ¶¶ 94–97), the court in *In re Volkswagen "Clean Diesel" Mktg., Sales Pracs., & Prods. Liab. Litig.* rejected the fraud claims under California law independently of RICO, and Argent cannot avoid that analysis simply by asserting that the two standards differ. 467 F. Supp. 3d 849, 858–59 (N.D. Cal. 2020) ("*Volkswagen II*") (rejecting the plaintiffs' "simple causality" argument and, even assuming California's proximate cause standard is not identical to RICO's, finding the fraud allegations insufficient). Argent's fraud claims rest solely on the FTX Group's alleged "fraudulent misstatements," but nothing connects those misstatements to Silvergate's collapse. As a result, those claims fail the substantial factor test under any formulation. (*See* FTX Mot. ¶¶ 65–68.)

11. **RICO claims.** As pleaded, Argent's RICO claims fail to connect the alleged predicate conduct directly to Silvergate's injuries, as required. Argent pleads two sets of predicates: deception directed at Silvergate to obtain and retain banking services, and wire and mail fraud directed at FTX customers. (Argent MDS ¶¶ 104–07.) The first explains how the FTX Group obtained and kept the accounts; the second explains how customer funds were diverted. Neither bears a direct relation to Silvergate's claimed injuries, which arose only after the customer fraud was exposed. Argent responds by invoking RICO's three "directness" factors: "whether (1) 'better situated plaintiffs would have an incentive to sue'; (2) there is a 'concern of a double recovery by a better-situated plaintiff' for a similar injury; and (3) determining damages would 'be unduly burdensome' on the court." (Argent Opp. ¶¶ 99–101 (quoting *Hemi Grp., LLC* v. *City of New York*, 559 U.S. 1, 11–12 (2010) (first two quotations); and *St. Luke's Health Network, Inc.* v. *Lancaster Gen. Hosp.*, 967 F.3d 295, 302–03 (3d Cir. 2020) (last two quotations)).) Those policy considerations do not replace RICO's proximate causation requirement. *See St. Luke's*, 967 F.3d at 301–03; *Anza* v. *Ideal Steel Supply Corp.*, 547 U.S. 451, 458 (2006). And here, they only

confirm that Argent has not pleaded proximate cause. *First*, there are better-situated plaintiffs: the direct victims of the FTX Insider Fraud, the FTX Group's customers, who have sought recovery through these bankruptcy proceedings. *See Nw. Hum. Servs., Inc.* v. *Panaccio*, 2004 WL 2166293, at *7 (E.D. Pa. Sep. 24, 2004) (plaintiff was "not the appropriate plaintiff to vindicate the goals of RICO" where the "direct victim" of the fraud was the Government, which had entered into a plea agreement with the plaintiff); *Anza*, 547 U.S. at 460 ("There is no need to broaden the universe of actionable harms to permit RICO suits by parties who have been injured only indirectly."). Argent's assertion that "no other person or entity suffered similar injuries" simply ignores them. (Argent Opp. ¶ 100.) *Second*, determining Argent's damages would require the Court to isolate the portion of loss, if any, attributable to the FTX Insider Fraud or the Account Noncompliance. That is exactly the speculative inquiry proximate cause is designed to prevent. *See Anza*, 547 U.S. at 459–60. Merely totaling the claimed expenditures does not identify what portion, if any, the alleged predicate acts directly caused. (*Contra* Argent Opp. ¶ 100 (citing Argent MDS ¶¶ 116–23).)[12]

12. In an unpersuasive attempt to elide that fatal facial deficiency in its claims, Argent's Opposition artificially constructs three separate paths to draw a causal nexus between the Account Noncompliance and its alleged losses: (i) that the false information the FTX Group gave Silvergate and the FTX Insider Fraud were "One Scheme, Not Two"; (ii) that the FTX Group's alleged concealment "kept Silvergate from protecting itself"; and (iii) that the FTX Group's

---

[12] Argent's request to defer the causation inquiry until after discovery fares no better. (Argent Opp. ¶ 100 & n.105.) In *In re Volkswagen "Clean Diesel" Mktg., Sales Pracs., & Prods. Liab. Litig.*, 349 F. Supp. 3d 881, 907–08 (N.D. Cal. 2018) ("*Volkswagen I*"), on which Argent relies, the court had already found that plaintiffs "plausibly established a direct connection between their injuries and the fraud": they overpaid for vehicles falsely marketed as environmentally friendly. The court deferred potential multiple-recovery questions against that backdrop. *Id.* That decision does not excuse Argent's failure to plead a direct connection between the alleged predicate acts and Silvergate's claimed losses.

misrepresentations and breaches to Silvergate caused regulators to scrutinize and penalize Silvergate. (Argent Opp. ¶¶ 5, 23, 48–49.) None can legally tie a single claimed loss to the Account Noncompliance itself.

13. *First*, Argent seeks to collapse the Account Noncompliance and the FTX Insider Fraud into "One Scheme, Not Two." (Argent Opp. ¶¶ 48–49 & n.63; *see* Argent MDS ¶¶ 3–7, 100.) In its telling, the Account Noncompliance was a "mechanism" of the FTX Insider Fraud because it obtained the banking infrastructure through which the FTX Group "channeled and concealed FTX.com customer funds." (Argent Opp. ¶ 48.) But as Argent's own authority holds, a plaintiff "cannot escape the proximate cause requirement merely by alleging that the fraudulent scheme embraced all those indirectly harmed by the alleged conduct"; otherwise, proximate cause "would become a mere pleading rule." *Hemi Grp.*, 559 U.S. at 13 (plurality opinion) (cited at Argent Opp. ¶¶ 96, 99). It is likewise irrelevant that Silvergate was a target of the misstatements: neither being the target of a deception nor a defendant's specific intent to harm the plaintiff makes a downstream injury direct. *See Steamfitters Local Union No. 420 Welfare Fund* v. *Philip Morris, Inc.*, 171 F.3d 912, 927–28, 932–33 (3d Cir. 1999); *Allegheny Gen. Hosp.* v. *Philip Morris, Inc.*, 228 F.3d 429, 441, 443–44 (3d Cir. 2000). Argent's own RICO allegations distinguish the two sets of predicates. One consists of misrepresentations allegedly "designed to fraudulently procure banking services from Silvergate." (Argent MDS ¶¶ 105–106.) The other is "directed at others, including FTX.com customers." (*Id.* ¶ 107.) Calling those acts one scheme supplies no facts connecting the alleged misstatements or account misuse to Silvergate's losses.[13]

---

13 Courts require a connection between the particular misrepresentation and the particular loss. *See Patrick*, 167 Cal. App. 4th at 1016–17 (no direct fraud claim where the directors could have taken the same injurious actions without the plaintiff's fraudulently induced vote). Nor do the third-party statements describing Silvergate as a victim of the FTX Group's lies merge the two. (Argent Opp. ¶ 49.) At most, they show that Silvergate was deceived; they do not show how the Account Noncompliance caused the bank run and

14. *Second*, Argent's theory that if the FTX Group had provided Silvergate with truthful information, Silvergate could have avoided its losses is entirely speculative and unsupported and, in any event, does not create a legally cognizable causation nexus between its claimed losses and the Account Noncompliance because it presumes that Silvergate's claimed losses arose from the Account Noncompliance. But they did not and Argent has not adequately pleaded that they did in a legally cognizable way. (Argent MDS ¶¶ 80, 115; Argent Opp. ¶¶ 87–90.) Taking Argent's counterfactual on its own terms, truthful disclosures would have changed only how Silvergate handled the Alameda and North Dimension accounts: whether it declined, restricted, monitored, or closed them. They would not have kept Silvergate's other digital-asset customers from withdrawing their deposits in an industry-wide crisis, or spared Silvergate the losses it realized selling securities to meet those withdrawals. *See Beckwith* v. *Dahl*, 205 Cal. App. 4th 1039, 1064–65 (2012) (explaining no causation present where plaintiff would have suffered the same damage absent fraud); *Bank of America Corp.* v. *Superior Court*, 198 Cal. App. 4th 862, 873 (2011) (no "nexus" between concealment of lender's fraudulent scheme and plaintiff-borrower's losses where homeowners who never dealt with the lender suffered the same losses). Argent itself alleges that the crisis reached well beyond Silvergate: by early 2023, "the FTX Group's fraud had already inflicted widespread damage on the digital asset industry." (Argent MDS ¶ 61.) Recasting the FTX Group's misrepresentations as concealment does not change the analysis.[14] Whether the FTX Group misled Silvergate when it opened the accounts or through

---

resulting securities losses. *See Aramony* v. *United Way of Am.*, 969 F. Supp. 226, 232–33 (S.D.N.Y. 1997) (charity injured by executive's embezzlement could not recover losses resulting from public mistrust rather than from the theft).

[14] California law treats affirmative misrepresentation and concealment as equivalent forms of fraud, *see Rattagan* v. *Uber Techs., Inc.*, 17 Cal. 5th 1, 39–40 (2024), and Argent's MDS pleads them together, alleging misrepresentations made "both affirmatively" and "by concealment and nondisclosure." (Argent MDS ¶ 76.)

later certifications and continued nondisclosure (*see* Argent MDS ¶¶ 24–31), none of that conduct caused Silvergate's losses—nor could it.[15]

15. *Third*, Argent's theory that the FTX Group's banking dealings with Silvergate caused regulators to investigate and penalize Silvergate (Argent Opp. ¶¶ 23, 25–30) fails on the face of Argent's own pleading. Argent's MDS asserts that the FTX Group's "fraudulent concealment of the true nature and purpose of the transactions flowing through its accounts at Silvergate" "proximately caused the intense regulatory scrutiny that fell upon Silvergate." (Argent MDS ¶ 63.) Its factual allegations, however, never connect the FTX Group's alleged misstatements and breaches to the regulatory scrutiny. Indeed, Argent itself insists that the regulators learned about the FTX Insider Fraud, which "set off years of regulatory investigations into Silvergate" that "centered on Silvergate's BSA/AML Compliance Program"—not that the regulators learned that the FTX Group lied on account applications. (*Id.*) And whatever drew the regulators' attention, the FTX Group certainly did not cause the critical deficiencies regulators found in Silvergate's BSA/AML compliance program. (*See infra* § I.B.3.)[16]

---

15 Argent's reliance on *Lovejoy* v. *AT&T Corp.*, 92 Cal. App. 4th 85 (2001), illustrates the missing link. (*See* Argent Opp. ¶ 49 n.63.) There, AT&T's concealed takeover of the plaintiff's toll-free service led directly to the disconnection of the number on which his business depended. *Id.* at 90, 95–98. Argent offers no comparable explanation of how the account information withheld from Silvergate caused its bank run, forced securities sales, or liquidation.

16 Argent's attempt in the Opposition to shore up its theory with references to documents that were not identified in its proofs of claim or its MDS—news reports, commentary, congressional testimony, and senators' letters—to argue that the regulatory response was "not an independent force" fails. (Argent Opp. ¶¶ 23, 25–28 & nn.20–24, 27–28, 30–31.) "[I]t is axiomatic that the complaint may not be amended by the briefs in opposition to a motion to dismiss." *Pennsylvania ex rel. Zimmerman* v. *PepsiCo, Inc.*, 836 F.2d 173, 181 (3d Cir. 1988) (citation omitted); *Frederico* v. *Home Depot*, 507 F.3d 188, 201–02 (3d Cir. 2007) (refusing to consider "after-the-fact allegations" made in plaintiff's briefs). In any event, those materials say nothing about how the Account Noncompliance caused the penalties Argent seeks. On Argent's own theory, the regulatory consequences ran through the independent decisions of the regulators themselves, which, under RICO, is precisely the kind of indirect causal chain that fails the directness requirement. *See Devon Drive Lionville, LP* v. *Parke Bancorp, Inc.*, 791 F. App'x 301, 307 (3d Cir. 2019) (regulators that relied on the bank's misrepresentations were intervening actors that broke the RICO causal chain). California law likewise recognizes that independent decisions by other actors can break the chain of causation in other contexts. *Cf. Manta Mgmt. Corp.* v. *City of San Bernardino*, 43 Cal. 4th 400, 412 (2008) (court's "intervening exercise of

**B. Argent's Integrated Scheme Theory Does Not Cure Its Missing Causation.**

16. In any event, treating the Account Noncompliance and the FTX Insider Fraud as a single integrated scheme does not supply the missing causal link. Even accepting that theory, Argent's claimed losses flowed from the **revelation** of the FTX Insider Fraud, not from the fraud itself, which is fatal to those claims as a matter of law. Additionally, each step in Argent's series of dominoes depends on independent forces and decisions for which its allegations do not account.

***1. The Market's Reaction to the Fraud's Exposure Does Not Establish Causation.***

17. Every loss Argent claims began with the revelation of the FTX Insider Fraud, not with the Account Noncompliance on which its claims rest. Those losses did not arise until at the earliest November 2022, when the fraud was revealed—more than a year after the last account was opened and four years after the first. (*See* Argent MDS ¶¶ 5, 14–26, 60.) That revelation is where the "domino effect" on which Argent's causation theory rests begins: "the ***revelation*** of the FTX Group's fraud triggered a catastrophic bank run" (*id.* ¶ 60 (emphasis added)), which "forc[ed] Silvergate to sell billions of dollars in securities" and ultimately "le[ft] Silvergate with no viable choice but to voluntarily liquidate" (*id.* ¶¶ 5–6, 60–61; *see also* Silvergate Claims ¶¶ 7, 25, 49). But whether under RICO's directness requirement or California tort law, a loss caused by the public's reaction to the exposure of a fraud directed at others is not a loss caused by the fraud itself.

18. Argent dismisses the distinction between losses caused by a fraud and those caused by its revelation as "legally meaningless" and asserts that the Trust "cites *no* case supporting its categorical argument" that there can be no causation where injuries are caused "by the exposure

---

independent judgment breaks the chain of causation"); *Brewer* v. *Teano*, 40 Cal. App. 4th 1024, 1037 (1995) (prosecutors' and magistrate's charging decisions "operated independently" of the defendant's conduct). Here, by their own terms, the regulators' orders penalized Silvergate for deficiencies in its own monitoring of transactions through the SEN, not for anything created by (or attributable to) the FTX Group. (*See infra* ¶ 32.)

of [the] fraudulent scheme, rather than the scheme itself." (Argent Opp. ¶¶ 50–51 (quoting FTX Mot. ¶ 48).) Argent is wrong, and its assertion is demonstrably false and disingenuous. Both the Trust's and Argent's cited authorities make clear that only losses caused by the fraud itself are recoverable. (*See infra* ¶¶ 19–21.) Where, as here, the claimed losses flow from the market's reaction to the exposure of a fraud, courts hold that the plaintiff has not connected its losses to the conduct its claims arise from. (*See* FTX Mot. ¶¶ 48, 67.)

19. In *In re American Express Co. Shareholder Litigation*, the Second Circuit rejected RICO claims for the company's reputational harm, lost profits, and legal expenses because "any losses to American Express were caused only because the scheme itself was exposed and thus failed." 39 F.3d 395, 398, 400 (2d Cir. 1994). And in *In re Volkswagen "Clean Diesel" Marketing, Sales Practices, & Products Liability Litigation*, the court drew the same line under both RICO and California fraud law as to dealership salespeople whose commissions fell after Volkswagen's emissions fraud was exposed. The court first dismissed their RICO claims because their losses arose only "[w]hen the veil was lifted on Volkswagen's defeat device scheme" and consumers "became less inclined to buy" Volkswagen cars, leaving the salespeople's injuries "well beyond the first step in the causal chain." 2019 WL 4581340, at *9–10 (N.D. Cal. Sep. 20, 2019). It later dismissed their fraud claims on the same ground: because "the drop in sales occurred only after the fraud was revealed," the claimed harm "was caused by the revelation of the scheme, not the scheme itself." *Volkswagen II*, 467 F. Supp. 3d at 858. Other courts draw the line in the same place, denying recovery for injuries that "arose as a result of the scandal, not the scheme itself." *Meng* v. *Schwartz*, 116 F. Supp. 2d 92, 97 (D.D.C. 2000); *see also In re Crazy Eddie Sec. Litig.*, 714 F. Supp. 1285, 1290–91 (E.D.N.Y. 1989) (rejecting a company's RICO claim for stock-price

and liability losses following exposure of insiders' fraud directed at shareholders and the investing public).

20. Argent tries to distinguish *Volkswagen* by casting the salespeople as "bystanders" and Silvergate as "in the same position as the deceived consumers." (Argent Opp. ¶ 52; *see id.* ¶ 101 n.106.) But the court there rejected the premise that targeting mattered: the salespeople's problem was not that they were outside the "target of the scheme," but that they "failed to allege a sufficiently direct injury from the misconduct they complain of." *Volkswagen II*, 467 F. Supp. 3d at 857. The consumers, by contrast, were injured at purchase, when they paid a premium for emissions performance they never received, because "[i]t was the fraud itself that harmed" them. *Volkswagen I*, 349 F. Supp. 3d at 907 (cited at Argent Opp. ¶ 100 n.105). Silvergate's position is analogous to the salespeople's, not the consumers': it "unwittingly benefited from the fraud" while the misconduct continued, *Volkswagen II*, 467 F. Supp. 3d at 858, and every loss Argent claims began only after the FTX Insider Fraud was exposed. (*See* FTX Mot. ¶¶ 47–48; *supra* ¶ 17.) Nor does it matter that Silvergate does not seek "speculative future profits" (Argent Opp. ¶ 52): the salespeople's claims failed for want of a direct injury, not because of the kind of damages they sought. *See Volkswagen II*, 467 F. Supp. 3d at 857.

21. The cases Argent cites to establish causation are inapposite. (*See* Argent Opp. ¶¶ 5, 49 n.63, 51.) In each, the fraud itself caused the loss: the plaintiff bought something that the alleged misrepresentation made appear more valuable, and its loss flowed from that deception. *See Sutter* v. *Gen. Petroleum Corp.*, 170 P.2d 898, 899–900, 902 (Cal. 1946) (investors induced by misrepresentations about the soundness of an offshore drilling island lost their investment when the island collapsed); *Torres* v. *S.G.E. Mgmt., L.L.C.*, 838 F.3d 629, 639–41 (5th Cir. 2016) (en banc) (participants' losses were built into the pyramid scheme's payment structure; the fraud itself

caused those losses because, by design, plaintiffs would "never recoup their payments"). However that deception came to light, the loss was the fraud's work, not the revelation's.[17] Where the plaintiff's losses are instead new harm caused by the exposure of the fraud, the plaintiff cannot establish the requisite causation between the fraud and its losses. *Volkswagen II*, 467 F. Supp. 3d at 858. Here, the FTX Insider Fraud was a theft of FTX.com assets comprising customer entitlements. That fraud did not induce Silvergate to pay for or invest in anything, and it took nothing from Silvergate. Silvergate's claimed losses are instead the product of how depositors, markets, and regulators reacted to the revelation that the FTX Group's insiders had stolen FTX.com assets that should have been available for customers, and are therefore not recoverable. *Id*. at 859 ("[B]ecause it was the revelation of the fraudulent scheme, rather than the fraud itself, that caused Plaintiffs' alleged harm, their detriment was not proximately caused by . . . [the] misrepresentations.").

22. Argent's assertion that exposure of the fraud was "inevitabl[e]" changes nothing. (Argent Opp. ¶¶ 50, 56.) That a fraud was bound to be discovered may make the public's reaction foreseeable, but foreseeability is not the test. *Med. Marijuana, Inc.* v. *Horn*, 604 U.S. 593, 612 (2025) ("The key word is 'direct'; foreseeability does not cut it."). California law is no different:

---

[17] Argent's securities law authorities follow the same rule. The plaintiffs there acquired securities whose value the misrepresentations overstated, and when the truth emerged, the securities lost the value the misrepresentations had added and that lost value was recoverable. *See In re Vivendi, S.A. Sec. Litig*., 838 F.3d 223, 254–55 (2d Cir. 2016) (artificial inflation that "dissipated from Vivendi's stock price must have entered into the price in the first place"); *FHFA* v. *Nomura Holding Am., Inc*., 873 F.3d 85, 153–55 (2d Cir. 2017) (explaining that mortgage-backed certificates lost value once it emerged that the underlying loans did not meet the underwriting standards the offering documents represented because the certificates' value then reflected the greater credit risk the misstatements had concealed) (citing *NECA-IBEW Health & Welfare Fund* v. *Goldman Sachs & Co*., 693 F.3d 145, 166 (2d Cir. 2012)). Importantly, in those cases, the revelation of the truth did not inflict a new injury, but instead converted the overstated value the misrepresentation had created into a realized loss. The loss was the dissipation of the misrepresentation's own effect on what the plaintiff held. Here, by contrast, the revelation of the FTX Insider Fraud did not reverse any inflation in anything that Silvergate held. It set off depositor, market, and regulatory reactions that caused new purported harms, which is the kind of loss *Volkswagen II* holds is too indirect to recover. 467 F. Supp. 3d at 858.

foreseeability alone does not establish proximate cause, and the plaintiff must connect the claimed loss to the misrepresentation. *See, e.g., Volkswagen II*, 467 F. Supp. 3d at 858–59.

#### *2. Argent's Domino Theory Relies on Inferences Unsupported by Argent's Allegations and Contrary to Silvergate's Own Previous Sworn Statements to the Court and Fails as a Legal Matter.*

23. Even if Argent could somehow rely on the revelation of the FTX Insider Fraud to support its claims, the dominoes Argent lines up between the revelation of that fraud and Silvergate's losses do not form an unbroken causal chain. As the Motion explains, each step depends on independent forces and decisions that Argent's theory ignores. (FTX Mot. ¶¶ 49–63.) The Opposition does not close those gaps. Argent's own allegations, read with Silvergate's sworn account of its collapse, show that the chain runs through the market's reaction to the revelation of the FTX Insider Fraud, macroeconomic forces, Silvergate's own compliance record and business choices, and the regulators' independent decisions—not through the alleged misconduct.

24. Argent's "domino" theory links the revelation of the FTX Insider Fraud to the bank run, the bank run to the forced securities sales, the securities sales and ensuing regulatory scrutiny to the voluntary liquidation, the liquidation to the bankruptcy, and the bankruptcy to the so-called indemnification-specific costs. (Argent MDS ¶¶ 5–6, 60–72; Argent Opp. ¶¶ 16–30.) But Argent tells that story selectively, relying on the portions of Silvergate's sworn account that mention the FTX Group while downplaying or ignoring the portions that attribute each step to other causes. (*See* Argent Opp. ¶¶ 16, 32–33.) Read in full, Silvergate's own account only underscores the gap: it describes the bank run as part of an industry-wide crisis of confidence that preceded, and extended well beyond, the FTX Group's collapse, and it describes Silvergate surviving that run

and stabilizing before choosing to liquidate in response to supervisory pressure on Silvergate and other banks serving crypto-asset businesses. (*See* Hetrick Decl. ¶¶ 9–19.)[18]

25. Argent contends that because Silvergate survived the collapses of other cryptocurrency firms earlier in 2022, the fourth-quarter bank run must have been caused by the exposure of the FTX Insider Fraud, pointing to the SEC's allegation that "FTX's failure" caused "a bank run and severe liquidity crisis for the Bank" and to the statement of Silvergate's CEO that the 2022 deleveraging "obviously culminated with the collapse of FTX." (Argent Opp. ¶¶ 21–22, 35 (quoting SEC Compl. ¶ 5).) Those statements are irrelevant: the market's reaction to the FTX Group's collapse says nothing about whether the FTX Group's interactions with Silvergate (the basis of its claims) caused the bank run. In any event, Silvergate's own sworn account establishes other insurmountable gaps between the bank run and Silvergate's later losses. Silvergate was explicit that its "run on the bank" was "caused" by a "contagion" that Silvergate characterized as a "crisis of confidence across the digital asset industry, along with similar problems faced by banks across the country." (Hetrick Decl. ¶ 10; see Argent MDS ¶ 60.)

26. That contagion had been building since mid-2022, when the insolvencies of Three Arrows Capital, Voyager Digital Holdings, and Celsius Network had "a contagion effect on the digital asset industry as a whole, including on the exchanges that represented a substantial portion of Silvergate Bank's depositor base" (Hetrick Decl. ¶ 9) and rising interest rates made Silvergate's

---

[18] The Hetrick Declaration is properly before the Court. Argent's MDS draws on that declaration, at points nearly verbatim, to describe Silvergate's crypto-concentrated deposit base, the January 2023 joint statement, and Silvergate's wind-down. (*Compare* Argent MDS ¶ 61 & n.33, *with* Hetrick Decl. ¶¶ 14, 18, 20.) Having built its pleading on that declaration, Argent cannot ask the Court to disregard the parts that undercut its causation theory. *See In re Burlington Coat Factory Sec. Litig.*, 114 F.3d 1410, 1426 (3d Cir. 1997) (a claimant "cannot prevent a court from looking at the texts of the documents on which its claim is based by failing to attach or explicitly cite them"). The Hetrick Declaration also contains relevant sworn testimony offered to this Court by Argent's predecessor and the allegedly harmed party.

noninterest-bearing accounts "significantly less appealing for depositors" (*id.* ¶ 12).[19] By Silvergate's own account, its business model left it acutely exposed to that contagion, with noninterest-bearing deposits, substantially all from digital-asset customers, making up approximately 99.5% of its total deposits by June 30, 2022. (*Id.* ¶ 8.) That Silvergate weathered the earlier shocks shows only that the pressure was cumulative, not decisive. And even when the run came, Silvergate "was able to manage" it and "pay all its depositors as they withdrew funds." (Hetrick Decl. ¶ 10.) Indeed, Silvergate emphasized that, among the "most severe bank runs" of the last 40 years, it was the only bank that "did not fail." (*Id.*) By Silvergate's own account, then, the bank run did *not* cause its collapse.[20]

27. Argent also contends that, contrary to the arguments in the Motion, Silvergate was not a "mismanaged business" and that in any event a plaintiff's mismanagement does not disprove causation. (Argent Opp. ¶ 65.) But the Motion's argument was not so simplistic; the Motion did not argue Silvergate's mismanagement in the abstract to rebut the claim but that Silvergate's own deposit concentration (that resulted from that mismanagement) exposed it to the industry-wide run by cryptocurrency market participants (both FTX Group customers and otherwise). (*See* FTX Mot. ¶¶ 7–8, 13.) As a result, Argent fails to tie Silvergate's losses to the FTX Group's conduct rather than to Silvergate's own business decisions and the consequences of those decisions.

---

19 Argent contends that rising interest rates cannot explain the securities losses because rates "had been rising since March 2022," yet Silvergate still held approximately $12 billion in noninterest-bearing deposits six months later. (Argent Opp. ¶ 22.) That conflates what prompted the withdrawals with what made meeting them so costly. By Silvergate's own account, rising rates "drove down the value" of its long-term bonds, so that it "realized substantial losses when it sold these securities to pay withdrawing depositors." (Hetrick Decl. ¶ 12.)

20 Argent responds that stabilization came at a cost: Silvergate sold more securities in early 2023 to repay the FHLB advances it had drawn to meet withdrawals, and warned of capital and going-concern risk a week before announcing the wind-down. (Argent Opp. ¶¶ 18–20.) But this does not change the fact that Silvergate did not fail as a result of the purported bank run and explicitly stated that its decision to liquidate was driven by regulatory enforcement changes, not its efforts to stabilize.

Dismissal is appropriate where a plaintiff's own decisions prevent it from alleging causation. *See, e.g.*, *Chetty Holdings Inc.* v. *NorthMarq Capital, LLC*, 556 F. App'x 118, 122–23 & n.4 (3d Cir. 2014) (affirming grant of motion to dismiss where alleged damages were "the result of [plaintiff's] own decisions and of matters outside [defendants'] control"). And even accepting that the FTX Group exploited Silvergate's "digital-asset-friendly business model" to evade its diligence (Argent Opp. ¶ 66), Argent does not explain how that evasion caused Silvergate's deposit concentration or the industry-wide withdrawals that Argent says caused its losses.[21]

28. Additionally, Argent seeks the approximately $751.4 million Silvergate lost selling $5.2 billion of debt securities in the fourth quarter of 2022. (Argent MDS ¶¶ 5, 60, 116.) Argent's theory—that the alleged fraud precipitated withdrawals that forced Silvergate to sell impaired securities (Argent Opp. ¶¶ 22, 54–57)—fails at multiple points. As an initial matter, Argent does not allege a causal connection between the FTX Group's interactions with Silvergate and the withdrawals. And, further, Argent does not plead any connection between the FTX Group and the exogenous, market-based decline in the value of Silvergate's securities portfolio—a decline that Silvergate merely realized (but did not incur) at sale.[22]

[21] The cases cited by Argent are readily distinguishable. (*See* Argent Opp. ¶ 65 n.79.) In *Engine Specialties, Inc.* v. *Bombardier Ltd.*, the defendant was liable for antitrust and tortious interference damages resulting from its conspiracy to "eliminate [the plaintiff] as a competitor." 605 F.2d 1, 13–15 (1st Cir. 1979). In *MF Global Holdings Ltd.* v. *PricewaterhouseCoopers LLP*, professional malpractice claims were allowed to proceed to trial where the defendant-auditor's advice was intertwined with the investment strategy that allegedly destroyed the debtor's business, and the court still barred recovery of "damages attributable solely to [plaintiff's] business strategy." 199 F. Supp. 3d 818, 842–43 (S.D.N.Y. 2016) (citation omitted). *Morgan, Olmstead, Kennedy & Gardner, Inc.* v. *Schipa* addressed a victim's negligent failure to detect fraud as a contributory-negligence or mitigation defense. 585 F. Supp. 245, 248–49 (S.D.N.Y. 1984). Argent still must plead that the alleged fraud caused the damages it seeks, and cannot do so. (*See* Argent Opp. ¶ 66 n.80.)

[22] *Vale* v. *Union Bank*, 88 Cal. App. 3d 330, 337–38 (1979) does not help Argent. There, the trustee bank's wrongful resignation directly caused the liquidation of the trust assets. The bank could not escape the resulting loss merely because it did not control market prices. Here, Argent's theory runs through the FTX Group's collapse, depositor withdrawals, and Silvergate's liquidity and portfolio decisions. Argent also argues that the Trust bears the burden to show that macroeconomic factors severed the causal chain. (Argent Opp. ¶ 57.) Argent bears the burden to allege facts sufficient to support its claims. (*Supra* ¶ 4.) Courts may resolve an inadequately pleaded causal connection on a motion to dismiss. *See Chetty Holdings Inc.*, 556 F.

29. Silvergate also previously swore that it ***could have continued operating*** after the bank run that Argent now claims caused Silvergate to collapse. Indeed, *after* stabilizing and maintaining the "capability to continue to serve its customers," the *sole* reason Silvergate provided for its choice to liquidate was "supervisory pressure on Silvergate Bank and other banks focused on servicing crypto-asset businesses . . . ." (Hetrick Decl. ¶ 17 ("[I]ncreased supervisory pressure on Silvergate Bank and other banks . . . *forced* Silvergate Bank to a point where it would have needed to remake its business model away from its focus on crypto-asset businesses, seek to sell itself as a going concern in the shadow of the regulatory overhang or begin winding down its affairs with the goal of preserving as much value as possible for stakeholders.").) Argent tries to side-step this, arguing that the regulatory pressure behind Silvergate's wind-down was "a direct consequence of the FTX Group's fraud and collapse" (Argent Opp. at 13) and noting that the Hetrick Declaration places the regulatory "inflection point" "[i]n the midst of the FTX collapse" (*id.* ¶¶ 25–28, 32 (quoting Hetrick Decl. ¶ 14)).[23] But in its sworn statement to the court, Silvergate did not suggest that the regulators pressured Silvergate alone. Instead, Silvergate left no doubt that the regulatory pressure was targeted at "banks focused on servicing crypto-asset businesses," of which Silvergate was one. (Hetrick Decl. ¶ 17; *see also id.* ¶ 19 (using the "failed Signature Bank" to illustrate the "intense regulatory pressure faced by banks in the digital assets industry at that time").) Silvergate's connection to the FTX Group therefore had nothing to do with the

---

App'x at 122–23 (affirming dismissal for failure to plead substantial-factor causation). Superseding-cause principles presuppose an existing causal chain. *Id.* (rejecting argument that other contributing factors had to constitute superseding causes). Likewise—as set out in Argent's own case—the intentional-tort rule Argent invokes applies only "so long as there is a *factual* chain of causation." *Bank of N.Y.* v. *Fremont Gen. Corp.*, 523 F.3d 902, 910 (9th Cir. 2008). Argent has not plausibly alleged that chain. (*See* Argent Opp. ¶¶ 7, 57 & n.69.)

23 Argent mischaracterizes the Hetrick Declaration. The "inflection point" clearly refers to the "further regulatory scrutiny" evidenced by the Federal Reserve, FDIC, and OCC First Joint Statement, not the FTX Group's collapse. (Hetrick Decl. ¶ 14.)

industry-wide regulatory pressure that, according to Silvergate, "ultimately prevent[ed] Silvergate Bank from continuing its digital asset focused business model." (*Id.* ¶ 19.)

30. Thus, even if the collapse of the FTX Group alerted regulators to the potential safety concerns of the digital asset industry, the regulators chose to pressure *all* banks with high concentrations of digital asset deposits. That independent choice pushed Silvergate to liquidate. Argent cannot now claim that the losses that followed Silvergate's stabilization after the bank run—including its lost going-concern value and liquidation and bankruptcy costs—were caused by the revelation of the FTX Insider Fraud. Its claimed costs from earlier inquiries and lawsuits (Argent Opp. ¶¶ 26, 29–30, 34) fail for the separate reasons discussed below. (*See infra* ¶¶ 32–34.)

31. Argent cannot escape Silvergate's sworn account by recasting it. Pivoting from that recitation to claims seeking billions of dollars on the theory that the FTX Group was ultimately responsible for Silvergate's collapse is the kind of irreconcilable inconsistency judicial estoppel is designed to prevent. Silvergate's filed claims against the FTX Group make this worse, not better. (*Contra* Argent Opp. ¶ 104.) Silvergate knew of those claims when it swore to this Court that its losses had other causes, and it obtained confirmation of its wind-down plan on a record that included that sworn account. (*See* Confirmation Order, *In re Silvergate Cap. Corp.*, No. 24-12158 (KBO) (Bankr. D. Del. Nov. 13, 2025), [D.I. 1077] at 3 & ¶ D.) Having benefited from one account, Silvergate, through Argent, now offers the opposite to recover from the Trust's creditors. That knowing change in position is the bad faith that estoppel guards against, and no lesser remedy would suffice: Argent should be held to Silvergate's sworn account of what caused the very losses

it seeks.[24] *See Krystal Cadillac-Oldsmobile GMC Truck, Inc.* v. *Gen. Motors Corp.*, 337 F.3d 314, 319–21, 325 (3d Cir. 2003).[25]

***3. Argent's Allegations with Respect to Regulatory Penalties, Settlements, and Fees Demonstrate That Silvergate's Own Conduct Caused Those Losses.***

32. Argent faults the Trust for offering no "evidence" that Silvergate's own conduct caused the penalties, settlements, and fees it seeks. (Argent Opp. ¶¶ 60–61.) But it is Argent that must allege facts plausibly connecting those losses to the conduct it sues on, and promised discovery cannot substitute for those facts. (*See supra* ¶ 4; *see also* FTX Mot. ¶¶ 40–43; *contra* Argent Opp. ¶¶ 62, 68–69.) Whatever drew regulators' scrutiny, the orders and settlements on which Argent's claims rest state on their face what Silvergate paid to resolve: the FRB and DFPI penalties addressed "deficiencies in Silvergate [Bank]'s monitoring of internal transactions through the SEN," and the settlements resolved claims that Silvergate aided the FTX Insider Fraud, misled its investors, and breached its own contracts. (FTX Mot. ¶¶ 25, 98; *see also id.* ¶¶ 55, 57, 59.)[26]

---

[24] Judicial estoppel is an independent basis to disallow the Silvergate Claims, but the Court need not decide it to grant the Motion: the causation defects do not depend on it, and the Hetrick Declaration remains relevant context for them. To the extent the Court concludes that whether it adopted Silvergate's account, or whether Silvergate acted in good faith, cannot be determined on the existing record, the Trust reserves the defense for trial if any claim proceeds.

[25] Argent argues *Krystal* is inapposite because the debtor there left its claims out of its disclosure statement (Argent Opp. ¶ 104 & n.110), but the distinction makes no difference: the inference turns on knowledge, motive, and a duty to disclose, not on what kind of disclosure was made. 337 F.3d at 321. Nor does *ESML* help Argent. (Argent Opp. ¶¶ 102, 104.) There, the earlier position involved a stipulated protective order that expressly allowed later challenges to confidentiality designations, so a later motion to unseal was consistent with it. *In re ESML Holdings Inc.*, 135 F.4th 80, 92 (3d Cir. 2025). The Hetrick Declaration reserved nothing comparable; it attributed Silvergate's losses to other causes.

[26] Argent argues the consent orders and SEC Complaint are not "competent evidence" of BSA/AML violations. (Argent Opp. ¶ 60.) Regardless, those documents establish what regulatory issues Silvergate paid to resolve, and courts read a consent order for what it resolves even where the respondent admitted no wrongdoing. *Cf. Fox* v. U.*S. Dep't of Hous. & Urb. Dev.*, 680 F.2d 315, 318–19 (3d Cir. 1982). Argent's authorities concern the use of a consent order to establish the settling party's liability. *See Lipsky* v. *Commonwealth United Corp.*, 551 F.2d 887, 892–94 (2d Cir. 1976). The Cease-and-Desist Order's reference to Silvergate's "relationship with FTX/Alameda and SEN transactions" identifies the subject of an investigation. (*See*

33. Nor does foreseeability supply the missing link. (*Contra* Argent Opp. ¶ 64.) Under RICO, proximate cause turns on "the directness of the relationship between the conduct and the harm," not foreseeability. *St. Luke's*, 967 F.3d at 300 (quoting *Hemi Grp.*, 559 U.S. at 12); *see supra* ¶ 22. Contract law measures foreseeability at the time of contracting, yet Argent alleges no facts suggesting the FTX Group could then have anticipated investigations into Silvergate's compliance program. *See Lewis Jorge*, 34 Cal. 4th at 968–69; FTX Mot. ¶ 78. A customer's fraud may foreseeably draw scrutiny to its bank without causing the penalties, settlements, and fees that scrutiny produces—least of all where, by their own terms, the regulators' orders faulted the bank's own compliance program.

34. Argent's assertion that Silvergate would not have incurred the $21 million in settlements and related fees "but for the FTX Group's concealed misconduct" (Argent Opp. ¶ 45) also fails because it describes only but-for causation (*see* FTX Mot. ¶ 57).[27] So too for Silvergate's

Argent Opp. ¶ 29.) The penalties addressed "deficiencies in Silvergate [Bank]'s monitoring of internal transactions through the SEN." (FTX Mot. ¶ 25; *see* Argent Opp. ¶¶ 30, 35, 62.)

[27] Argent's cases allowing recovery of fees where a wrongdoer knows it is "exposing [the bank] to risk if [its] fraud is uncovered" require the expense to flow from the specific fraud at issue. (Argent Opp. ¶ 62 (cleaned up).) Several concern different questions entirely, such as criminal limitations periods, fidelity-bond coverage, and sentencing guidelines loss calculations. *See, e.g.*, *United States* v. *Ohle*, 678 F. Supp. 2d 215, 228-29 (S.D.N.Y. 2010). The others tied the fees to fraud that drew the plaintiff into the litigation. *See Burger* v. *Kuimelis*, 325 F. Supp. 2d 1026, 1036, 1044 (N.D. Cal. 2004) ("unwitting tool" whose expenses were "solely the result of" the scheme, and even then warning of "a significant problem demonstrating proximate causation"); *Gray* v. *Don Miller & Assocs., Inc.*, 674 P.2d 253, 257-59 (Cal. 1984) (requiring segregation of fees attributable to the action the misrepresentation caused). *Prentice* v. *North American Title Guaranty Corp.*, on which Argent relies (Argent Opp. ¶ 63), likewise requires a connection between the particular litigation and the tort: even under the tort-of-another doctrine, Argent must plead how the alleged tort caused the particular third-party proceedings or expenses it seeks to recover, 381 P.2d 645, 647 (Cal. 1963). And the doctrine does not reach fees a party incurs "solely in defense of alleged wrongdoing on its part." *Davis* v. *Air Tech. Indus., Inc.*, 22 Cal. 3d 1, 5–6 (1978); *see Santa Clara Valley Water Dist.* v. *Olin Corp.*, 655 F. Supp. 2d 1048, 1063 (N.D. Cal. 2009). Here, the customer actions alleged that Silvergate itself aided the FTX Insider Fraud. (Argent MDS ¶ 68.) Nor does the tort-of-another doctrine reach bankruptcy administration, indemnification of Silvergate's own personnel, or fees for pursuing these claims against the FTX Group itself. (*Contra id.*) Argent's reliance on *In re Cendant Corp. Securities Litigation*, to escape the Bar Order (Argent Opp. ¶ 45 n.59), fares no better, 139 F. Supp. 2d 585, 595 (D.N.J. 2001). On Argent's reading, *Cendant* preserves only a claim that the defendant "has committed a tort" against the settling party and owes damages "which happen to encompass the settlement payment." (*Id.*) That carve-out does Argent no good: its tort claims fail for want of causation, and what remains is a claim to shift the settlement payment

costs of responding to inquiries into its FTX relationship (Argent MDS ¶¶ 68, 120): by Argent's own allegations, those inquiries centered on Silvergate's own compliance program (*id.* ¶ 63), and a cost's alleged connection to the FTX Group does not show that the Account Noncompliance, rather than the revelation of the FTX Insider Fraud and Silvergate's own compliance record, made it necessary. The remaining professional fees and D&O indemnification costs (Argent Opp. ¶ 45; Argent MDS ¶¶ 67–72, 121) are costs of Silvergate's own business, wind-down, and bankruptcy, each requiring its own causal link to the conduct alleged. *See Mosier* v. *S. Cal. Physicians Ins. Exch.*, 63 Cal. App. 4th 1022, 1048–49 (1998); *Ash* v. *N. Am. Title Co.*, 223 Cal. App. 4th 1258, 1272 (2014) ("[B]ankruptcies normally are not within the contemplation of the parties[.]"). None of those are plausibly pled as recoverable from the Trust.

#### *4. Argent's Theory of Liability for Silvergate's Liquidation and Related Expenses Fails.*

35. Argent mischaracterizes the Motion as arguing that the FTX Group did not cause Silvergate's liquidation "because it was 'voluntary.'" (Argent Opp. ¶ 67 (citation omitted).) But as explained above, Silvergate decided to liquidate in response to an intensifying regulatory environment, not anything that the FTX Group had done. (*See supra* ¶¶ 29–30.) Argent's loss-of-business cases do not change that. (*See* Argent Opp. ¶ 67 & n.81.) They address what a plaintiff may recover if and when it shows that the defendant's conduct forced it out of business; they do not relieve the plaintiff of making that showing. And that causal link is the very point Argent alleges only in conclusory terms. *See Spray-Rite Serv. Corp.* v. *Monsanto Co.*, 684 F.2d 1226, 1242 (7th Cir. 1982) (full loss recoverable "[i]f the defendant's unlawful conduct causes the plaintiff to go out of business"); *Malley-Duff & Assocs., Inc.* v. *Crown Life Ins. Co.*, 734 F.2d 133,

itself, which is what the Bar Order forecloses. (FTX Mot. ¶¶ 29, 57.) And the $5.32 million "Preferred Equity Holder Contribution" came from distributions to Silvergate's preferred equity holders (*id.* ¶ 30), and Argent does not explain how it is a loss Silvergate bore at all.

147 n.7, 148 (3d Cir. 1984) (plaintiff still had to show on remand "that loss of its business was caused by the unlawful acts of defendants").[28]

36. The challenged categories of loss include the lost going-concern value (Argent MDS ¶ 117); the $3.1 million paid to resolve common stockholders' objections to Silvergate's reorganization plan and the $1.3 million paid to settle EJF's proofs of claim (*id.* ¶ 119); any portion of the claimed $75 million associated with "financial and restructuring advisors retained to assist Silvergate in determining strategic alternatives," the $33 million in bankruptcy fees and expenses, and the approximately $12.13 million to fund Argent and preserve Silvergate's records (*id.* ¶ 120); and the $8.77 million "Go-Forward Chapter 11 Budget" (*id.* ¶ 121).[29]

37. Argent's claim that the "DOJ found the FTX Group's fraud was a 'significant' cause of Silvergate's insolvency" is a red herring. (Argent Opp. ¶ 67 (citing *Declaration of Riah Kim in Support of Argent Liquidation Trust's Opposition to the FTX Recovery Trust's Dispositive Motion to Disallow and Preliminary Objection to the Argent Liquidation Trust's Claims*, [D.I. 36936] (the "Kim Decl."), Ex. A at 58–59).) The Government's sentencing submission merely advocated an enhancement on alternative grounds, and the sentencing court did not indicate that it

[28] Indeed, the very footnote Argent quotes rejected the plaintiff's loss-of-business theory as to the conduct at issue because "his proof does not show that the defendants' oppressive pricing practices forced him out of business." *Malcolm* v. *Marathon Oil Co.*, 642 F.2d 845, 862 n.28 (5th Cir. 1981). *Medical Marijuana*, on which Argent principally relies, held only that RICO's "business or property" requirement "operates with respect to the kinds of harm for which the plaintiff can recover, not the cause of the harm"; its example of a robbery victim whose injuries "force him to shut his doors" illustrates a recoverable kind of harm, not a causal holding. *Med. Marijuana*, 604 U.S. at 601. The Court reaffirmed that RICO still requires a direct relationship between the conduct and the injury—"foreseeability does not cut it." *Id.* at 612.

[29] Argent's going-concern-value cases follow the same pattern as its loss-of-business cases. (*See* Argent Opp. ¶ 45 nn.56–57.) Each awarded lost enterprise value only after the factfinder determined that the defendant's breach caused the claimed loss of value. *See, e.g.*, *In re Doctors Health, Inc.*, 335 B.R. 95, 120–21 (Bankr. D. Md. 2005) (breach "a substantial cause of the destruction of the debtor's business"); *Holland* v. *United States*, 83 Fed. Cl. 507, 524–30 (2008); *Slattery* v. *United States*, 583 F.3d 800, 816–18 (Fed. Cir. 2009), *vacated*, 369 F. App'x 142 (Fed. Cir. 2010), *reinstated in relevant part on reh'g en banc*, 635 F.3d 1298 (Fed. Cir. 2011). They address how to measure that loss once causation is established; none excuses Argent from pleading it. (*See supra* ¶ 4.)

applied the enhancement because of Bankman-Fried's interactions with Silvergate. (Kim Decl. Ex. A at 58–59; Sentencing Tr. 8:10–16, *United States* v. *Bankman-Fried*, No. 1:22-cr-673 (S.D.N.Y. Mar. 28, 2024), Dkt. No. 426.) A ruling that never identifies its ground cannot bind a nonparty or establish causation here,[30] and neither the submission nor the ruling determines whether Argent has adequately pleaded the distinct claims and categories of loss at issue.[31]

## II. The Indemnification Provision Does Not Reach Any of Silvergate's Losses as Pled.

### A. Argent Does Not Allege Any Indemnifiable Loss.

38. Argent's contention that the Trust "does not seriously dispute" that the FTX Group's conduct falls within the Indemnification Provision (Argent Opp. ¶ 72) ignores that—as explained in the Motion—indemnities cover losses, not conduct (*see* FTX Mot. ¶ 88; *see also Rossmoor Sanitation, Inc.* v. *Pylon, Inc.*, 13 Cal. 3d 622, 628 (1975) (indemnity is "the obligation resting on one party to make good a loss or damage another party has incurred")). The question is, therefore, whether Silvergate's losses are covered by the Indemnification Provision, and Argent never answers it. (*See* Argent Opp. ¶ 73.)[32] Instead, Argent faults the Trust for failing to "place

---

[30] *See Doe* v. *Hesketh*, 828 F.3d 159, 171–74 (3d Cir. 2016) (refusing to bind nonparty to sentencing-stage restitution determination because the government's and the nonparty's interests were not "squarely aligned").

[31] The FDIC testimony cited by the DOJ does not connect Silvergate's losses to the Account Noncompliance. Although it describes withdrawals following the FTX Group's collapse, it also identifies the traditional banking risks that made Silvergate vulnerable: "a lack of diversification, aggressive growth, maturity mismatches in a rising interest rate environment, and sensitivity to liquidity risk." (*Recent Bank Failures and the Federal Regulatory Response: Hearing Before the S. Comm. on Banking, Hous., & Urb. Affs.*, 118th Cong. 53 (2023) (statement of Martin Gruenberg, Chairman, FDIC), https://www.govinfo.gov/content/pkg/CHRG-118shrg54561/pdf/CHRG-118shrg54561.pdf; *see* Kim Decl. Ex. A at 59.)

[32] The Trust does not concede that Argent adequately pled conduct that is covered by the Indemnification Provision, and reserves all rights. (*Contra* Argent Opp. ¶¶ 72-73; *see* FTX Mot. ¶ 88.) Subsection (a) reaches the customer's "acts or omissions" in using the Bank's services (*see* Kim Decl. Ex. D § 15 (describing acts or omissions under the CMTS Agreement)), not the FTX Insider Fraud at large; subsection (b) reaches only third-party claims where the Bank followed the customer's instructions or the agreement's terms (*see* FTX Mot. ¶ 102; *see also* Kim Decl. Ex. D § 18); and subsection (c) reaches losses resulting from a breach, not every loss suffered after a breach, and Argent identifies no loss that resulted from the falsity of any account-opening representation (*see* FTX Mot. ¶ 95; *see also* Kim Decl. Ex. D § 18).

[any] category of loss outside an indemnity clause." (Argent Opp. ¶ 72 & n.88.) But that gets the burden backwards: under what Argent concedes is a "pleading rule" (*id.*), the indemnitee must allege "the facts showing a loss within the meaning of the parties' indemnification agreement." *Four Star Elec., Inc.* v. *F & H Constr.*, 7 Cal. App. 4th 1375, 1380 (1992). And Argent cites no case placing securities-sale losses, regulatory penalties, lost enterprise value, or advisory costs inside a customer indemnity.[33]

39. Argent's textual arguments fare no better. (*See* Argent Opp. ¶ 72 & n.89.) Its own authority holds that "[e]qually important" to plain meaning "are the requirements of reasonableness and context," *Bay Cities Paving & Grading, Inc.* v. *Lawyers' Mut. Ins. Co.*, 5 Cal. 4th 854, 867 (1993), and Civil Code § 1648—which Argent conveniently ignores—provides that "[h]owever broad may be the terms of a contract, it extends only to those things concerning which it appears that the parties intended to contract."[34] Cal. Civ. Code § 1648; *see also S. Cal. Gas Co.*, 150 Cal. App. 2d at 258–60 (treating Section 1648 as the "touchstone" and refusing to hold the indemnitor responsible for "unknown and unexpected risks"). These are not mere "familiar legal principles" (Argent Opp. ¶ 72 n.88); they defeat Argent's reading of the Indemnification Provision.

40. Nor does the word "any" in the Indemnification Provision displace those principles. (*Id.* ¶ 72.) "Any" tells the reader how many, not what kind. *See Pac. Gas & Elec. Co.* v. *G.W. Thomas Drayage & Rigging Co.*, 69 Cal. 2d 33, 41 n.9 (1968) (where an indemnity reaches third-

---

[33] The Trust's cases, by contrast, do exactly what Argent says they do not: they hold particular categories of loss outside the indemnity. *See S. Cal. Gas Co.* v. *Ventura Pipe Line Constr. Co.*, 150 Cal. App. 2d 253, 258–59 (1957) (excluding liability the indemnitee separately assumed to a third party); *Heppler* v. *J.M. Peters Co.*, 73 Cal. App. 4th 1265, 1279–82 (1999) (excluding losses not caused by the indemnitor's fault, and defense of claims not "embraced by the indemnity").

[34] Argent elsewhere concedes as much. (*See* Argent Opp. ¶ 72 n.88 (acknowledging that under *Rossmoo*r, "coverage turns on contract interpretation and party intent," and that under *Heppl*er, a "strict-construction rule applies where [the] indemnitee seeks indemnity for [its] own fault" (describing *Rossmoor*, 13 Cal. 3d at 633, and *Heppler*, 73 Cal. App. 4th at 1278)).)

party claims, "the word 'all' simply refers to all such claims"); *accord AGK Sierra De Montserrat, L.P.* v. *Comerica Bank*, 109 F.4th 1132, 1141–42 (9th Cir. 2024) ("any and all loss"). Reading "any" to reach every Silvergate loss would make "resulting from or arising out of" the surplusage Argent condemns elsewhere (Kim Decl. Ex. D § 18; *see* Argent Opp. ¶ 81), and even Argent's own authority cautions that "any," "like all statutory language, must be read in context."[35] *United States* v. *Myers*, 170 F.4th 1180, 1187 (9th Cir. 2026). Additionally, any remaining ambiguity must be resolved against Silvergate, as both indemnitee and drafter. *Crawford* v. *Weather Shield Mfg., Inc.*, 44 Cal. 4th 541, 552 (2008); Cal. Civ. Code § 1654. Applying those rules to a bank's form agreement, the Ninth Circuit, in a case Argent cites, rejected a reading that "g[ave] a blank check to [the bank]." *Schertzer* v. *Bank of Am., N.A.*, 109 F.4th 1200, 1211–13 (9th Cir. 2024). Argent's reading would give Silvergate exactly that blank check, and no finding of unconscionability is needed to reject it. (*Contra* Argent Opp. ¶ 77.)[36]

41. In any event, even accepting Argent's broadest reading of the Indemnification Provision, its claim fails because there is no causation. The Indemnification Provision reaches only losses "resulting from or arising out of" covered conduct. (Kim Decl. Ex. D § 18.) Argent argues that only a "minimal causal connection" is needed (Argent Opp. ¶¶ 75–76), but it embraces

---

35 Nor does *C.I. Engineers* hold that "any and all" is limitless language, as Argent implies. (Argent Opp. ¶ 72.) The court read the phrase broadly because the same indemnity clause expressly carved out claims "arising through the sole negligence or sole willful misconduct" of the indemnitee, showing that the parties had considered and allocated that risk, unlike the circumstances here. *C.I. Eng'rs & Constructors, Inc.* v. *Johnson & Turner Painting Co.*, 140 Cal. App. 3d 1011, 1015–16 (1983).

36 *Graham* v. *Scissor-Tail, Inc.*, which Argent cites for the enforceability of adhesion contracts (Argent Opp. ¶ 77), also holds that a provision outside "the reasonable expectations of the weaker or 'adhering' party will not be enforced against him," and that construction against the drafter "applies with peculiar force" to adhesion contracts. 28 Cal. 3d 807, 819 n.16, 820 (1981); *see also Marin Storage & Trucking, Inc.* v. *Benco Contracting & Eng'g, Inc.*, 89 Cal. App. 4th 1042, 1055–57 (2001) (enforcing adhesive indemnity for risks within the customer's control); *Schertzer*, 109 F.4th at 1213 (reading bank's form agreement against the bank "with particular force"). And Argent's claim that the FTX Group held the bargaining power (Argent Opp. ¶ 77) ignores the pleading it cites, which alleges that "Silvergate . . . exercised substantial practical leverage over the relationship" (*Statement of More Definite Claim of the FTX Recovery Trust in Support of the FTX Group's Proofs of Claim Against Silvergate*, No. 24-12157-KBO (Bankr. D. Del.), [D.I. 67] ¶ 30).

*Fireman's Fund* as "confirm[ing]" the proper standard (*id.* ¶ 76 n.91), which is that "[m]ere 'but for' causation is not enough."[37] *Fireman's Fund Ins. Co.* v. *Discover Prop. & Cas. Ins. Co.*, 2009 WL 2591394, at *4 (N.D. Cal. Aug. 21, 2009). Yet Argent never identifies anything more than a "but for" connection between any FTX Group conduct and its claimed losses. In *Morlin*, the court dealt with a similar attempt to extend an indemnity clause to conduct that was merely a "but for" cause of the claimed losses, noting that "of course, in a remote sense the accident would not have occurred if the tenant had not hired Arax to clean the carpets in his dental suite, and in that sense, the accident could be said to arise from the tenant's use of the suite." *Morlin Asset Mgmt. LP* v. *Murachanian*, 2 Cal. App. 5th 184, 191 (2016) (cleaned up). But the court found that this "but for" theory of causation was insufficient. *Id.* at 193. The same is true here. In Argent's own words, "had the FTX Group not secretly used Silvergate's accounts to carry out a fraud, Silvergate would not have faced the sudden run on deposits and acute liquidity crisis that followed the scheme's exposure."[38] (Argent Opp. ¶ 56; *see also id.* ¶ 45 (defense costs arose from proceedings "that the FTX Group's fraud set in motion and that Silvergate would never otherwise have faced"); *id.* (settlement payments "resolved third-party claims that would not have existed *but for* the FTX Group's concealed misconduct" (emphasis added)).) That is the but-for theory *Morlin* rejected.

---

37 Argent argues that the facts *of Fireman's Fund* are "the opposite of this case" because "the FTX Group created the very risk that injured Silvergate." (Argent Opp. ¶ 76 n.91.) Not so. Just like in *Fireman's Fund*, the conditions that actually produced Silvergate's losses—a securities portfolio impaired by rising interest rates and a transaction-monitoring program with known gaps—were not caused by the conduct of the FTX Group (i.e., the indemnitor). *See* 2009 WL 2591394, at *4; (FTX Mot. ¶¶ 11–12, 15, 51, 56).

38 Argent argues that the operative "acts or omissions" under the Indemnification Provision are the FTX Group's concealment and misuse of Silvergate's accounts, not the revelation of the FTX Insider Fraud. (Argent Opp. ¶ 51 n.66.) But the Trust's point is causation, not coverage: even if that conduct is covered under the Indemnification Provision (*contra supra* ¶¶ 38–40), it is at most a "but for" cause of Argent's losses, which is plainly insufficient under *Fireman's Fund*. 2009 WL 2591394, at *4; *see also Morlin*, 2 Cal. App. 5th at 191–93. Moreover, Argent never ties those alleged "acts or omissions" to any of its losses because the FTX Insider Fraud itself never caused those losses. It was the exposure of the FTX Insider Fraud and the market's reaction to it—which itself was not an act or omission of the FTX Group—that Argent alleges "triggered a catastrophic bank run" and set off the "domino effect" to which it attributes every claimed loss. (Argent MDS ¶ 60.)

42. Even *Continental Heller*, which Argent relies upon, required a loss "connected to a specific act or omission" of the indemnitor. *Cont'l Heller Corp.* v. *Amtech Mech. Servs., Inc.*, 53 Cal. App. 4th 500, 505 n.1, 507 (1997). The court there offered an example: a refrigeration subcontractor would not owe indemnity for a contaminated hot dog "on the theory that but for the refrigeration system Oscar Meyer could not have made the hot dog." *Id.* at 507. Moreover, no customer signing a cash-management form would contemplate insuring a bank against its own securities losses, regulatory penalties, and bankruptcy. *See Morlin*, 2 Cal. App. 5th at 193 (no indemnification where connection "too remote to have been within the contemplation of the parties"). Argent's cited insurance cases are also inapposite. (Argent Opp. ¶ 75.) They resolve doubts in favor of coverage, *see Acceptance Ins. Co.* v. *Syufy Enters.*, 69 Cal. App. 4th 321, 327 (1999), a principle that does not apply to noninsurance indemnities, *City of Bell* v. *Superior Ct.*, 220 Cal. App. 4th 236, 249 (2013). Thus, Argent has not met its burden to adequately allege causation for any item of loss. *See BP W. Coast Prods., LLC* v. *Crossroad Petroleum, Inc.*, 2016 WL 3901020, at *14 (S.D. Cal. July 18, 2016). Loss by loss, the Indemnification Provision covers none of Argent's claimed damages.[39]

---

[39] With respect to Silvergate's penalties, settlements, and fees, Argent asserts the test is "connection to covered conduct, not fault." (Argent Opp. ¶ 78.) While Argent is wrong, the claimed losses fail even that test. The penalties punished Silvergate's own monitoring failures, and neither the FRB nor the DFPI order mentions FTX, Alameda, or North Dimension in describing them. (*See* FRB Order at 1–4; DFPI Order at 2–3.) The settlements, moreover, resolved claims that Silvergate aided the FTX Insider Fraud, misled its investors, and breached its own contracts. (*See* FTX Mot. ¶ 98; Argent MDS ¶ 66.) The approximately $75 million Argent attributes to defending those suits, responding to the investigations, and related advice falls with them, because Civil Code § 2778 reaches only the defense of claims "embraced by the indemnity." Cal. Civ. Code § 2778(4). And the balance of the over $120 million Argent seeks in "investigative, defense, and advisory costs"—approximately $33 million in Silvergate's own bankruptcy professional fees and approximately $12.13 million to fund and operate Argent—is outside the provision as well. (Argent MDS ¶¶ 68, 120.)

**B. Additional Limits Independently Bar Key Categories of Argent's Claimed Losses.**

43. Argent's failure to allege any indemnifiable loss requires disallowance of its indemnification claim in its entirety. But three additional limits independently foreclose indemnity for specific categories of Argent's claimed losses.

44. ***Argent Cannot Be Indemnified for Silvergate's Regulatory Penalties.*** In the Opposition, Argent rebuts an argument the Trust did not make: that Argent seeks indemnity for the $50 million SEC penalty itself. (Argent Opp. ¶ 79.) The Trust's argument is simpler. Silvergate agreed in the SEC Order not to "seek or accept, directly *or indirectly*, reimbursement or indemnification from any source" for its SEC penalty, and the SEC Order provided that Silvergate's payments to the FRB and DFPI to satisfy their penalties would offset the $50 million SEC penalty. (SEC Order at 4 & ¶¶ 2(d), 9 (emphasis added).) Argent concedes the point: the SEC penalty "was offset by the penalties Silvergate paid to the Federal Reserve Board and the DFPI." (Argent MDS ¶ 64 n.36.) The offset is thus the judgment's own mechanism for satisfying the SEC penalty, and indemnity for the $50 million of FRB and DFPI payments that satisfied it is exactly the indirect reimbursement Silvergate promised not to seek. The remaining $13 million of the $63 million fails for the independent reasons below. (*See infra* ¶¶ 45, 48–49.) It makes no difference that the FRB and DFPI orders contain "no comparable bar" (Argent Opp. ¶ 79) or that the Trust is a nonparty to the SEC Order (*id.* ¶ 79 n.94). The Trust does not seek to enforce the judgment, but invokes it as a limit on what Silvergate, and Argent as its successor, may recover.

45. Public policy independently bars shifting a bank's own regulatory penalty to its customer. Where the governing law's purpose "is regulatory rather than compensatory," "permitting indemnity would undermine the statutory purpose of assuring diligent performance of duty and deterring negligence." *Laventhol, Krekstein, Horwath & Horwath* v. *Horwitch*, 637 F.2d

672, 676 (9th Cir. 1980). Argent responds only that Silvergate consented to the regulatory penalties "without admitting the allegations." (Argent Opp. ¶ 80.) But a consent penalty is still a penalty: the FRB imposed its $43 million penalty "for the unsafe or unsound practices described" in its order, and the DFPI imposed its $20 million penalty after its investigation identified "deficiencies with respect to Silvergate's monitoring of internal transactions." (FRB Order at 2–3; DFPI Order at 3–4.) Deterrence comes from the bank bearing the cost, not from an admission, and because banks routinely settle without admitting liability, Argent's rule would let any bank shift any consent penalty to its customers—which is clearly impermissible. *Cf. SEC* v. *Conaway*, 697 F. Supp. 2d 733, 772 (E.D. Mich. 2010) ("[T]he remedial purpose of any such fine would be highly diluted if it were born by any third party.").[40]

46. ***Argent Cannot Be Indemnified for Silvergate's Direct Losses.*** Indemnification clauses "generally apply only to third party claims," and covering first-party, direct losses requires "clear and explicit language." *City of Bell*, 220 Cal. App. 4th at 252; *see AGK*, 109 F.4th at 1139–42. Argent responds that the presumption is not "categorical" (Argent Opp. ¶¶ 81–82), but effectively concedes that, under a third-party reading, its largest categories of loss, the securities-sale losses, lost going-concern value, bankruptcy fees, and insurance premiums, fall outside the Indemnification Provision. (*See id.* ¶ 82.)[41] To avoid that result, Argent tries to cabin the Trust's

---

[40] Argent's cases do not suggest otherwise. (Argent Opp. ¶ 80.) As Argent describes them, *Cambridge Fund* and *Raychem* concerned a company's indemnification of its own officers for court-approved settlements, not a regulated institution's attempt to shift its own regulatory penalty onto a customer. (*Id.*) And *Richards* and *Adalman* declined to apply *Laventhol* only because there had been no adjudication of willfulness or culpability. (*Id.*) The penalties here require neither: the regulators imposed them on Silvergate for its own unsafe or unsound practices and monitoring deficiencies, and *Laventhol*'s concern is that the party charged with the regulatory duty, not someone else, bear the cost of failing to perform it. 637 F.2d at 676.

[41] The items Argent says would survive a third-party reading—the FRB and DFPI payments, the settlements, the related defense and investigative costs, and the D&O indemnification costs (*id.*)—fail for three independent reasons: Argent pleads no causal connection between them and any covered conduct, the penalties cannot be shifted to a customer, and each is a consequence of Silvergate's own active negligence. (*See supra* ¶¶ 41–45; *infra* ¶¶ 48–49.)

cases to their facts. But *City of Bell* did not rest on its "two-sentence employment indemnity" (Argent Opp. ¶ 82); it applied the general third-party rule. 220 Cal. App. 4th at 252. And the three cases Argent dismisses as attorney's-fee cases under Civil Code § 1717 (Argent Opp. ¶ 82 & n.96 (citing *AGK*, 109 F.4th 1132; *Am. First Fin., LLC* v. *Garcia*, 2025 WL 418686 (E.D. Cal. Feb. 6, 2025); *Alki Partners*, *LP* v. *DB Fund Servs., LLC*, 4 Cal. App. 5th 574 (2016)))[42] each applied the third-party presumption when asked whether general indemnity language reached first-party losses.[43]

47. Argent contends "no magic words are required" for an indemnity to reach direct, first-party losses. (Argent Opp. ¶ 81.) True, but clear and explicit language is required, and Argent points to none. Each of its cited first-party-loss cases involved "much more specific language" than that in the Indemnification Provision. *AGK,* 109 F.4th at 1141; *see Hot Rods, LLC* v. *Northrop Grumman Sys. Corp.*, 242 Cal. App. 4th 1166, 1181 (2015) (defining "Claim" and "Person" broadly enough to include direct losses); *Zalkind* v. *Ceradyne, Inc*., 194 Cal. App. 4th 1010, 1027–28 (2011) (defining "Damages" to include losses "whether or not" arising from a third-party claim); *Wilshire-Doheny*, 83 Cal. App. 4th at 1395–96 (covering suits "by or in the right of the corporation"). The Indemnification Provision says nothing about disputes between Silvergate and

---

42 Ironically, Argent itself relies on an attorney's-fee indemnification case, *Wilshire-Doheny Assocs. Ltd.* v. *Shapiro*, 83 Cal. App. 4th 1380, 1394–97 (2000). (Argent Opp. ¶ 81.)

43 *AGK Sierra De Montserrat, L.P.* treated § 1717 as a reinforcing consideration, not the source of the third-party presumption. 109 F.4th at 1139–42. And Argent's own description of *Alki Partners* supports the Trust's argument: the court read a general indemnity grant there as limited to third-party claims because the only specific item listed alongside it was itself a third-party claim. 4 Cal. App. 5th at 604–05; (*see* Argent Opp. ¶ 82 n.96). So too here: the only place the Indemnification Provision identifies who may bring a claim, subsection (b), names "a third party." (Kim Decl. Ex. D § 18.) Argent's other attacks on the Trust's cases are likewise unavailing. Argent says *Pacific Gas & Electric Co.* found contract terms "inconclusive" and did not foreclose first-party coverage. (Argent Opp. ¶ 82 n.96.) That is the Trust's point: general words like "loss," "damage," and "expense" do not establish first-party coverage. 69 Cal. 2d at 41 n.9. And Argent says *Queen Villas Homeowners Ass'n* v. *TCB Property Management* merely refused to let an indemnitee use an indemnity defensively (Argent Opp. ¶ 82 n.96), but the court there reached that result by holding that a clause reaching "any and all claims . . . arising out of the performance of this agreement" was a "classic third party indemnity agreement." 149 Cal. App. 4th 1, 4, 8 (2007). The same result should follow here.

its customers or Silvergate's own losses. Unable to find clear language, Argent turns to structure, arguing that reading subsections (a) and (c) of the Indemnification Provision as third-party provisions "would collapse (a) and (c) into (b)." (Argent Opp. ¶ 81.) But subsection (b) covers a distinct set of third-party claims, those arising when the Bank "acted in accordance with [the customer's] instructions and/or within the terms of this CMTS Agreement." (*See* FTX Mot. ¶ 102.) Surplusage overcomes the third-party presumption only where specific language "would have been superfluous if it did not apply to first-party" claims. *AGK*, 109 F.4th at 1139, and in any event, "[i]f the surrounding provisions describe third party liability, the clause will be construed as a standard third party indemnification provision," *In re Zarate*, 567 B.R. 176, 187 (Bankr. N.D. Cal. 2017).[44] It is therefore Argent's reading that empties words of meaning: the Indemnification Provision obligates the customer to "defend" the Bank (Kim Decl. Ex. D § 18), yet there is nothing to defend in Silvergate's own securities losses, lost going-concern value, or advisory fees, and Section 8's separate fee clause would be unnecessary if the provision already covered disputes between the parties (*id.* § 8).[45] Silvergate drafted the CMTS Agreement, and to make its customers answer for its own losses, it had to "go out of [its] way and say 'we really, really mean it.'" *Queen Villas*, 149 Cal. App. 4th at 6. It said nothing of the kind, so the Indemnification Provision does not reach Silvergate's own losses.

---

[44] Argent's own surplusage authority supports the Trust. *Carroll Shelby Licensing, Inc.* v. *Halicki* read undefined terms "within the context [they are] used" and refused to "insert what has been omitted." 138 F.4th 1178, 1187–88 (9th Cir. 2025) (citation omitted). And the other interpretive rules Argent cites, which require courts to give effect to the parties' intent, read the contract as a whole, and refrain from inserting what has been omitted, only confirm the Trust's third-party reading. *See* Cal. Civ. Code §§ 1636, 1638, 1641; Cal. Code Civ. Proc. § 1858; *Schertzer*, 109 F.4th at 1208, 1210 (each cited at Argent Opp. ¶ 81 n.95).

[45] *See also Am. First Fin.*, 2025 WL 418686, at *2–3 (reading breach-triggered language like subsection (c), reaching losses "arising directly or indirectly out of any default by Seller under this Agreement," as a third-party indemnity); *Queen Villas*, 149 Cal. App. 4th at 9 (giving overlapping indemnity terms distinct meanings "even though both contemplate third-party liability situations" (emphasis omitted)).

48. ***Indemnification Does Not Cover Losses Resulting From Silvergate's Own Active Negligence.*** Argent concedes that "a general indemnity clause silent as to the indemnitee's own negligence is presumed not to reach the indemnitee's active negligence." (Argent Opp. ¶ 83.) The Indemnification Provision is silent on Silvergate's negligence (*see* FTX Mot. ¶ 106), and Argent never argues otherwise. So if Silvergate was actively negligent, its indemnity claims for the penalties, settlements, and defense costs—all consequences of its own conduct (*see id.* ¶¶ 98–99)—fail. Negligence is active where the indemnitee was "connected with negligent acts or omissions by knowledge or acquiescence." *Rossmoor,* 13 Cal. 3d at 629.

49. Argent argues that the Trust describes at most a "failure to discover a wrongful condition created or concealed by the indemnitor." (Argent Opp. ¶¶ 83–84.)[46] But because the indemnity is presumed not to reach active negligence (Argent Opp. ¶ 83), Argent was required to allege facts showing Silvergate's negligence was passive, and it pleads none. On the contrary, the SEC Complaint—a document integral to Argent's MDS—identified an April 20, 2022 FRBSF/DFPI examination report finding "material internal control weaknesses over BSA/AML compliance," and a September 2022 targeted examination finding that Silvergate's transaction

[46] Argent's own cited case undercuts its position. It cites *Jimenez* for the proposition that "mere knowledge of a dangerous condition . . . is passive nonfeasance" (Argent Opp. ¶ 84 n.97), but the court there held that actual knowledge supported a finding of active negligence and affirmed the denial of indemnity. *Jimenez* v. *Pac. W. Constr. Co.*, 185 Cal. App. 3d 102, 112–13, 117 (1986). Nor does it help Argent to call Silvergate's BSA/AML obligations a "duty imposed by law." (Argent Opp. ¶ 84 (quoting *Rossmoor*, 13 Cal. 3d at 629).) *Rossmoor* treats the mere failure to perform such a duty as passive, but in the same passage recognizes that an indemnitee who is connected with the negligent acts or omissions "by knowledge or acquiescence" is actively negligent. 13 Cal. 3d at 629. Silvergate was allegedly told of its compliance deficiencies before the FTX Group collapsed. Argent's other cases do not help, either. Argent quotes *McCrary Construction Co.* v. *Metal Deck Specialists, Inc.* for the proposition that an actively negligent indemnitee may recover where the loss "would never have happened except for" the indemnitor's breach (Argent Opp. ¶ 84 n.97), but that language comes from *Morton Thiokol, Inc.* v. *Metal Building Alteration Co*., 193 Cal. App. 3d 1025, 1030 (1987), which *McCrary* distinguished because the indemnitor there had assumed responsibility for "precisely the hazard" at issue. 133 Cal. App. 4th 1528, 1540–41 (2005). The FTX Group never assumed responsibility for Silvergate's transaction monitoring. The remaining cases are inapposite: *Mid-Cal National Bank* v. *Federal Reserve Bank of San Francisco* discussed "nonfeasance" in determining whether a bank owed a tort duty to another bank, 590 F.2d 761, 763 (9th Cir. 1979), and *Doe* v. *Bank of America, N.A*. concerned a bank's liability under the Trafficking Victims Protection Act, 819 F. Supp. 3d 314, 329–30 (S.D.N.Y. 2026).

monitoring system was "not configured commensurately to the Bank's risk profile" and Silvergate's BSA compliance program "continued to inadequately dispose of suspicious activity alerts." (SEC Compl. ¶¶ 81–82, 85.) And it alleges that, on multiple occasions in 2022, examiners "made it apparent to Lane and Fraher that the Bank's BSA compliance program was insufficient given its risk profile," and that both attended the October 7, 2022 board meeting at which the preliminary findings of the September examination were reviewed and the Board discussed possible enforcement action or sanctions. (*Id.* ¶¶ 76, 86.) On the face of the materials on which Argent's claims rest, then, Silvergate knew before the FTX Group's collapse of the very compliance failures that produced the penalties and costs (e.g., the Defense Costs and Indemnification Costs) it now seeks to shift to the Trust, and Argent pleads no facts to the contrary.[47]

**III. In Pari Delicto and Unclean Hands May Independently Bar the Silvergate Claims.**

50. Argent argues that *in pari delicto* does not apply to its claims because the doctrine requires the plaintiff to have joined the "same wrongdoing" with "substantially equal responsibility" and that Silvergate's regulatory noncompliance is "irrelevant." (Argent Opp. ¶ 105 & n.111 (citations omitted).)[48] *In pari delicto* bars recovery when "a participant in illegal, fraudulent, or inequitable conduct seeks to recover from another participant in that conduct."

---

47 As already explained, Argent seeks to recover the $63 million in BSA/AML penalties that Silvergate paid to the FRB and DFPI, $50 million of which offset the $50 million SEC penalty imposed to resolve the allegations in the SEC Complaint. (*See supra* ¶ 44.) A claim to recover what Silvergate paid to resolve the SEC Complaint is necessarily based on that complaint, and Argent "cannot prevent a court from looking at the texts of the documents on which its claim is based by failing to attach or explicitly cite them." *Burlington Coat Factory*, 114 F.3d at 1426; *see also Doe* v. *Princeton Univ.*, 30 F.4th 335, 342–43 (3d Cir. 2022) (facts in documents integral to a complaint can be accepted "as true" unless they are "contested by the well-pleaded facts of a complaint"). Indeed, Argent itself relies on the SEC Complaint when it suits it. (Argent Opp. ¶ 35*; see supra* ¶ 25.)

48 "[S]ubstantially equal responsibility" is not a strict requirement. *In pari delicto* applies where the plaintiff participated "in some of the same sort of wrongdoing" as the defendant, and "may be raised against a plaintiff wrongdoer even if that plaintiff 'was led into a path of crime by one more culpable.'" *Stewart* v. *Wilmington Tr. SP Servs., Inc.*, 112 A.3d 271, 302 (Del. Ch. 2015), *aff'd*, 126 A.3d 1115 (Del. 2015).

*Uecker* v. *Zentil*, 244 Cal. App. 4th 789, 792 n.1 (2016) (citation omitted).[49] Argent concedes that its "allegations of misconduct primarily center on the Alameda and North Dimension accounts" (Argent MDS ¶ 13; *see id.* ¶¶ 22–26, 76, 94), and that "the harms Silvergate suffered flowed directly from the FTX Group's fraudulent misstatements to Silvergate about how the FTX Group would use and did use its accounts." (Argent Opp. ¶ 50.) And the FRB and DFPI orders on which Argent's claims rest imposed $63 million in penalties for deficiencies in Silvergate's monitoring of internal transactions, including through the SEN. (*See* FTX Mot. ¶¶ 110–11.) On the face of those materials, Silvergate's own conduct falls within the scope of the doctrine.

51. Argent also insists that the Trust's "accusations" of wrongdoing "were never proven, adjudicated, or admitted," and "[e]very consent order, judgment, and settlement the FTX Trust cites was entered without admission or adjudication." (Argent Opp. ¶¶ 5, 34–35, 45, 60, 106–07.) But Argent cannot rely on the orders' passing references to the FTX Group to establish the FTX Group's liability, and then retreat behind their no-admit-no-deny posture to avoid what those same orders say about Silvergate. (*See* FTX Mot. ¶ 111.) Nor does the record of Silvergate's misconduct rest on the FRB and DFPI orders alone. Silvergate itself described the settlements as resolving "regulatory concerns." (Hetrick Decl. ¶ 24.) And the Trust also identifies

---

49 Argent's authorities are inapposite. *McAdam* v. *Dean Witter Reynolds, Inc.* rejected the defense because the plaintiff was not an active and voluntary participant in the fraudulent scheme; his alleged separate misrepresentations were unrelated to the underlying illegality. 896 F.2d 750, 756–58 (3d Cir. 1990). Here, by contrast, Silvergate's monitoring failures are intertwined with Argent's claims, which seek $63 million in penalties for SEN monitoring deficiencies, plus settlements and fees arising from Silvergate's own diligence failures. (*See* FTX Mot. ¶¶ 57–59, 110–111.) *Mailand* v. *Burckle* involved a scheme that was the defendants' "invention," and the plaintiffs "neither participated in nor had any knowledge of the secret rebate arrangement." 20 Cal. 3d 367, 381–82 (1978). The conduct at issue here—Silvergate's own monitoring program—was Silvergate's invention, not the FTX Group's. And both cases Argent cites for the proposition that *in pari delicto* and unclean hands do not apply "where the plaintiff is not a wrongdoer" (Argent Opp. ¶ 107) were decided on full trial records, *see Inter Med. Supplies Ltd.* v. *EBI Med. Sys., Inc.*, 975 F. Supp. 681, 688 (D.N.J. 1997) (applying New Jersey's *in pari delicto* law); *Kars 4 Kids Inc.* v. *Am. Can!*, 98 F.4th 436, 450–51 (3d Cir. 2024) (finding no "clear and convincing evidence that either party engaged in the type of egregious, unconscionable misconduct demonstrating the fraudulent intent or bad faith necessary" for unclean hands).

contemporaneous examination findings predating the FTX Group's collapse: an April 20, 2022 FRBSF/DFPI examination report finding "material internal control weaknesses over BSA/AML compliance," and a September 2022 targeted examination finding that Silvergate's monitoring system was not configured to its risk profile and inadequately disposed of suspicious-activity alerts. (FTX Mot. ¶ 11 (citing SEC Compl. ¶¶ 82, 85).)[50]

52. Nor did the Trust try to extend this Court's decision in *Binance* into "a sweeping rule that any plaintiff bearing any kind of fault is barred from recovery." (Argent Opp. ¶ 107.) The Trust argued only that a plaintiff whose misconduct substantially caused the losses it sues to recover cannot ask the Court to apportion them. *In re FTX Trading Ltd.*, 2026 WL 2149961, at *19–20 (Bankr. D. Del. July 24, 2026) ("*Binance*"). Argent's claim that *Binance*, if it "applies here at all . . . bars the FTX Trust's claims against Silvergate—not the other way around" (Argent Opp. ¶ 107), misses the doctrine's purpose: to prevent courts from "refereeing between thieves." *Binance*, 2026 WL 2149961, at *20 (cleaned up). Argent invokes *in pari delicto* to bar every U.S.-law count of the FTX Claims, yet dismisses the Trust's invocation of the same doctrine as "without merit." (*Argent's Obj. to and Mot. to Dismiss the FTX Claims*, No. 24-12157 (Bankr. D. Del. Oct. 8, 2026) [D.I. 99] ¶¶ 46–52; Argent Opp. ¶ 105.) The Court will consider the parties' competing claims together, each alleging that the other participated in the same wrongdoing that underlies both sets of claims. (*See FTX Recovery Trust's Opp'n to Argent's Obj. to and Mot. to Dismiss the FTX Claims*, No. 24-12157 (Bankr. D. Del. Nov. 9, 2026) [D.I. 116] ¶¶ 79–80.) To the extent the

---

[50] Argent's reliance on Silvergate's third-party audits does not change the picture. (Argent Opp. ¶ 36; Argent MDS ¶¶ 54–55.) Those reviews covered 2018 through January 2022 (*see* Argent MDS ¶¶ 54–55); the regulators' April and September 2022 examinations came afterward and allegedly found the deficiencies anyway. (SEC Compl. ¶¶ 80–85.) Nor does Argent's response to the Wickouski Report help. (Argent Opp. ¶ 37.) The Trust does not cite that report to establish causation, but to show that the SIC Report on which Argent relies is unreliable—and the examiner found that Silvergate executives knew by January 2022 that SEN transactions were not being flagged for suspicious activity. (FTX Mot. ¶¶ 21, 116 (citing Wickouski Report at 25, 29–30).)

Court finds the parties *in pari delicto* as to that conduct, the doctrine must be applied consistently, subject to the requirements of each claim. (*See id.*) Courts will not "listen to [wrongdoers'] complaints against each other," because "there is no societal interest in providing an accounting between wrongdoers." *In re Am. Int'l Grp., Inc., Consol. Derivative Litig.*, 976 A.2d 872, 882–84 (Del. Ch. 2009). If the Court is inclined to disallow the FTX Claims on the basis of *in pari delicto*, it must reach the same result as to the Silvergate Claims.

53. The Court may reach the same result through the unclean hands doctrine. Argent's response that *Peregrine Funding, Inc.* v. *Sheppard Mullin Richter & Hampton LLP* is "inapposite" because "Silvergate did not orchestrate a scheme, the FTX Group did," misreads the analogy. (Argent Opp. ¶ 108 (citing 133 Cal. App. 4th 658, 680–81 (2005)).) The unclean hands defense rests on the Trust's contention that Silvergate's own misconduct bears a direct relationship to the transactions and losses at issue. (*See* FTX Mot. ¶¶ 59, 107–117.)[51] The required nexus is only that the misconduct "relates directly to the transaction concerning which the complaint is made," and need not be "part of the basis upon which liability is being asserted." *Peregrine Funding*, 133 Cal. App. 4th at 681 (cleaned up); FTX Mot. ¶ 115. Argent anchors all of its losses in the transactions between Silvergate and the FTX Group; that is all the relationship required by the unclean hands doctrine. (FTX Mot. ¶ 115.)[52]

---

[51] Argent takes issue with the Trust's reliance on the "regulatory orders addressing monitoring deficiencies" claiming that they are "not competent evidence of such deficiencies." (Argent Opp. ¶ 108.) As explained above, consideration of the orders' existence and operative terms is appropriate and not intended to establish the truth of disputed allegations within them at this stage. The Trust preserves its defenses to the extent factual development is necessary.

[52] If the Court determines that additional factual development is required, the Trust has reserved its right to object to the Silvergate Claims on *in pari delicto* and unclean hands grounds at the appropriate stage of this litigation (FTX Mot. ¶ 117 n.27), and it expects discovery to further develop Silvergate's participation in the conduct at issue.

## CONCLUSION

54. For the foregoing reasons, the Court should grant the Motion in its entirety.[53]

Dated: November 24, 2026
Wilmington, Delaware

**LANDIS RATH & COBB LLP**

*/s/ Matthew B. McGuire*
Adam G. Landis (No. 3407)
Matthew B. McGuire (No. 4366)
Matthew R. Pierce (No. 5946)
919 Market Street, Suite 1800
Wilmington, Delaware 19801
Telephone: (302) 467-4400
Facsimile: (302) 467-4450
E-mail: landis@lrclaw.com
mcguire@lrclaw.com
pierce@lrclaw.com

-and-

**SULLIVAN & CROMWELL LLP**
Andrew G. Dietderich (admitted *pro hac vice*)
Brian D. Glueckstein (admitted *pro hac vice*)
Benjamin S. Beller (admitted *pro hac vice*)
Christopher J. Dunne (admitted *pro hac vice*)
125 Broad Street
New York, NY 10004
Telephone: (212) 558-4000
Facsimile: (212) 558-3588
E-mail: dietdericha@sullcrom.com
gluecksteinb@sullcrom.com
bellerb@sullcrom.com
dunnec@sullcrom.com

*Counsel for the FTX Recovery Trust*

---

[53] Argent misconstrues the Trust's preliminary objections. (Argent Opp. ¶¶ 109-11.) The Stipulation contemplated filing "Dispositive Motions / Preliminary Objection to Claims." [D.I. 36189-1 ¶ 7.] The Trust included those objections to preserve them for adjudication if any Silvergate Claim survives this Motion, not to seek present relief on them. (FTX Mot. at 65–66.) Argent's responses confirm as much. Argent concedes that any recovery on the FTX Claims "would be set off against any recovery by the Argent Trust." (Argent Opp. ¶ 109.) And its arguments on California Civil Code § 2773 and equitable subordination turn on what Silvergate knew and how it conducted itself—matters that, by Argent's own account, raise factual questions and are properly addressed, if at all, at a later stage. (*Id.* ¶¶ 110–11.) Nor is Argent correct that section 2773 is beside the point because it seeks indemnity only for the FTX Group's acts. (*Contra id.* ¶ 110.) Argent seeks indemnity for penalties, settlements, and fees arising from Silvergate's own BSA/AML compliance and public statements (Argent MDS ¶¶ 63–68), which is precisely what the objection addresses. (*See* FTX Mot. at 66 ¶ 4.)